Stephen Manning (SBN 013373)
smanning@ilgrp.com
Nadia Dahab (SBN 125630)
nadia@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733

Karen C. Tumlin (*pro hac vice* forthcoming)
karen.tumlin@justiceactioncenter.org
Esther H. Sung (*pro hac vice* forthcoming)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
Telephone: +1 323 316-0944

*Attorneys for Plaintiffs*
*(additional counsel listed on signature page)*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; and LATINO NETWORK,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA,<br><br>Defendants. | Case No.:<br><br><br><br><br><br><br>CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

PARTIES ............................................................................................................................. 6

   PLAINTIFFS ................................................................................................................... 6

   DEFENDANTS ................................................................................................................ 9

FACTUAL ALLEGATIONS ........................................................................................... 10

   A.   The Proclamation .................................................................................... 10

   B.    Agency Implementation of the Proclamation .................................... 14

   C.   The Proclamation is Vague, Internally Contradictory, and
   Inconsistent with Existing Law in Ways State Department Action has Not Addressed .............. 18

      1.   The Proclamation Uses Unclear, Undefined Terms and Standards ................................ 18

      2.   Very Few, if Any of the Proclamation's "Approved Health Plans"
      Are Available to Visa Applicants .......................................................... 21

      3.   The Proclamation Is Internally Inconsistent with Its Stated Goals ................................ 27

THE PROCLAMATION IMPERMISSIBLY RESHAPES THE NATION'S
CONGRESSIONALLY-ENACTED HEALTH BENEFIT SYSTEM FOR IMMIGRANTS
BY PRESIDENTIAL FIAT ............................................................................................ 30

   A.   The Immigration and Nationality Act ("INA") ................................... 30

   B.    The Personal Responsibility Work Opportunity Reconciliation Act of 1996 ...................... 37

   C.   The Children's Health Insurance Plan ("CHIP") and CHIP Reauthorization Act ............. 38

   D.   The Affordable Care Act ........................................................................ 40

REGULATORY BACKGROUND .................................................................................. 43

THE PROCLAMATION, LIKE THE RECENT PUBLIC CHARGE RULE, ATTEMPTS
TO RADICALLY REWRITE CONGRESS' CHOICES ON WHICH IMMIGRANTS MAY
ENTER THE COUNTRY, BASED ON WEALTH CONSIDERATIONS ...................................... 44

THE PROCLAMATION AND ITS IMPLEMENTATION ARE UNLAWFUL ........................... 55

   A.   The Proclamation Does Not Pass Muster Under Section 212(f) or
   Rational Basis Review ............................................................................. 55

**B.   The Proclamation Does Not Pass Muster Under Equal Protection** ....................................... 65

**THE PROCLAMATION AND ITS IMPLEMENTATION HARM PLAINTIFFS** ....................... 75

**CLASS ALLEGATIONS** ............................................................................................................ 86

**CAUSES OF ACTION** ............................................................................................................... 90

**FIRST CLAIM FOR RELIEF**
**(Violation of the Administrative Procedure Act)**
**(On behalf of All Plaintiffs, including the Class)** ...................................................... 90

**SECOND CLAIM FOR RELIEF**
**(Equal Protection)**
**(On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)** ....................................... 93

**THIRD CLAIM FOR RELIEF**
**(Ultra Vires)**
**(On behalf of All Plaintiffs, including the Class)** ...................................................... 94

**FOURTH CLAIM FOR RELIEF**
**(Procedural Due Process)**
**(On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)** ....................................... 95

**PRAYER FOR RELIEF** ............................................................................................................. 96

## INTRODUCTION

1.      Late on Friday night, October 4, 2019, President Trump issued a presidential proclamation that, effective November 3, 2019, will block nearly two thirds of all prospective legal immigrants, mostly from predominantly nonwhite countries, from receiving visas and coming to the United States.

2.      The "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation") bars qualified immigrant visa applicants from receiving visas and entering the United States unless they can establish, "to the satisfaction of a consular officer," that they either "will be covered by approved health insurance" within 30 days after entry or are wealthy enough—and/or healthy enough—"to pay for reasonably foreseeable medical costs."

3.      The Proclamation seeks to unilaterally rewrite this country's immigration laws, imposing a new ground of inadmissibility that Congress has expressly rejected, and creating requirements that will be extremely difficult, or impossible, for most otherwise qualified immigrant visa applicants to satisfy. In doing so, the Proclamation contravenes well-established and duly enacted immigration and healthcare laws, exceeds the scope of the President's statutory authority, and violates Constitutional separation of powers and equal protection principles.

4.      In implementing the Proclamation, the U.S. Department of State has publicly announced on its website that, beginning November 3, 2019, all applicants for immigrant visas who are subject to the Proclamation "must demonstrate to the consular officer at the time of interview" that they will be covered by "approved" health insurance under the Proclamation within 30 days of entry or have the financial resources to pay for reasonably foreseeable medical costs"— and that "[i]nability to meet this requirement will result in the denial of the visa application."

CLASS ACTION COMPLAINT                                                                                       1

5.      In addition to imposing new requirements for immigrant visa applicants that are unmoored from the existing statutory and regulatory framework, the Proclamation and agency implementation actions provide staggeringly few options to satisfy this barrier. While the Proclamation lists a number of health insurance options that would-be immigrants ostensibly could obtain in order to satisfy the new requirement, it in fact provides few or even no options that are available to these individuals in reality. First, most of the "approved health insurance" plans that are listed as satisfying the Proclamation's requirement are not actually legally or practically available to the vast majority of prospective immigrants—like Medicare, which requires a recipient to have lived in the United States for five years, or any plan available under the Affordable Care Act, with or without financial assistance, because such plans are only available to individuals living in the United States. Second, under the Proclamation, any kind of coverage involving common federal- or state-provided health insurance benefits, such as premium tax credits under the Affordable Care Act ("ACA") for plans sold on the individual market or Medicaid coverage for any individual over age 18, does not allow prospective immigrants to surmount this new barrier to entry. By imposing these restrictions on "approved" types of health insurance, the Proclamation excludes benefits and assistance that Congress has specifically and explicitly made available by statute to certain immigrants in the United States. Third, a number of the "approved" health insurance options are not available in all states, or, in many cases, allow denials and exclusions based on pre-existing conditions, such that many would-be immigrants would not qualify for or have access to such plans. Fourth, the coverage provided under certain "approved" options is limited and does not provide for "minimum essential coverage" as defined under the ACA.

6.      The Proclamation is therefore poised to create a new class of otherwise qualified immigrants who are barred from entry on the sole ground of the health insurance requirement, as

well as a new class of underinsured individuals with non-comprehensive coverage in the United States. These effects frustrate both existing immigration laws and established healthcare laws, and create further concerns for public health and the healthcare system. Under its terms and agency implementation actions, the Proclamation would *ban* an immigrant who would receive financial assistance under the ACA to purchase comprehensive individual health insurance coverage, but would *allow* an immigrant who purchased an "approved," non-comprehensive visitor or short-term limited duration insurance plan, even though the former would be *better* insured and far less likely to incur uncompensated care costs than the latter. In effect, the Proclamation and its implementation incentivize, if not require, would-be immigrants to purchase non-comprehensive plans to satisfy the Proclamation's health insurance requirement because those plans are in many cases the most realistically accessible to immigrants. In doing so, the Proclamation and its implementation undermine not only Congress's intent, as expressed through the ACA, to provide a certain minimum level of coverage to all legal immigrants and citizens in the United States, but also the Proclamation's own stated goal of addressing the burdens of uncompensated care provided to uninsured individuals.

7. The Proclamation and its implementation are similar (yet even more egregious) in effect to the Administration's recently promulgated—and currently enjoined by several courts—"Public Charge" Rule, which attempts to redefine what it means for an immigrant to be a "public charge" and therefore inadmissible to the United States. Both the Proclamation requirements and the Public Charge Rule provisions are tools that the Trump Administration is seeking to use in order to exclude prospective immigrants who have satisfied all statutory requirements under the Immigration and Nationality Act ("INA") to enter the United States; both favor so-called "unsubsidized" ACA health insurance over subsidized; both consider the use of Medicaid to be a

negative or disqualifying factor for individuals age 18 and over; and both involve some analysis on the part of a consular officer as to whether an intending immigrant has sufficient financial resources to cover "reasonably foreseeable medical costs." The Public Charge rule, while still problematic and under challenge on various grounds (as reflected in the pending lawsuits challenging the rule and the preliminary injunction orders recently issued by several courts), was at least promulgated through a notice and comment rulemaking process, as required by the Administrative Procedure Act. The Proclamation did not go through any such a process and seeks to impose the same, or even a heightened, draconian effect on the immigration system through presidential fiat and corresponding agency action to carry out the new requirement.

8.    Indeed, the Proclamation is unprecedented in its scope and impact, the largest ever suspension on the entry of immigrants of its kind. It will affect mostly immigrants from Latin America, Africa, and Asia, by drastically reducing, if not eliminating, the numbers of immigrants who enter the United States with family-sponsored visas, humanitarian visas, or diversity visas. With no termination point or procedure by which a prospective immigrant may seek a waiver of the Proclamation's suspension on entry, the Proclamation will separate families—especially nonwhite families—indefinitely, in contravention of one of the bedrock principles of this country's immigration system.

9.    Such anticipated effects of the Proclamation are striking, but perhaps hardly surprising. Like the Public Charge Rule (and the failed RAISE Act of 2017), the Proclamation reflects the President's often expressed belief that, unlike immigrants who would enter via a "merit-based" system, immigrants who currently enter the country through family-based and diversity visas do not contribute to the United States but instead present a threat to the country's economy and security. "Why are we having all these people from shithole countries come here?"

CLASS ACTION COMPLAINT                                                                                    4

he reportedly asked during a 2018 Oval Office discussion of protections for immigrants from Haiti, El Salvador, and certain African countries. "Why do we need more Haitians?" he asked. During that same discussion, he suggested that the United States should instead bring more people from countries like Norway—which is regularly ranked as one of the wealthiest countries in the world.

10.     The Proclamation is but the latest effort of the Trump Administration to unilaterally rewrite Congressionally enacted laws governing who may come to this country as an immigrant. It is also the one of the most drastic. Based on the latest data, up to an estimated 375,000 immigrants are at risk each year of being banned due to a lack of "approved" health insurance coverage, or close to two-thirds of all qualified immigrant visa applicants, many of whom are people of color. This is repugnant not only to our values, but also our nation's laws and Constitution.

11.     Plaintiffs challenge the Proclamation and Defendants' implementation of its requirements under this Court's inherent authority to review executive actions that exceed statutory grants of authority, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(D), and the equal protection guarantee of the Due Process Clause of the Fifth Amendment. Plaintiffs respectfully request that the Court issue appropriate declaratory relief and preliminarily and permanently enjoin the Proclamation as a whole.

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution and federal statutes. The Court has additional remedial authority under 28 U.S.C. §§ 2201–02.

13.     Venue is proper under 28 U.S.C. § 1391 and Local Rule 3.2. Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States. Plaintiff John Doe #1 resides in the Portland Division of this District and Plaintiff Latino Network is a non-profit organization based in Portland. Moreover, on information and belief, the proposed class includes numerous members residing in this District who will be affected by the actions of Defendants. No real property is involved in this action.

## PARTIES

### PLAINTIFFS

14.     Plaintiff John Doe #1 is a United States citizen of Mexican origin who resides in Beaverton, Oregon, with his wife, a Mexican citizen, and his fourteen-year-old United States citizen son. John Doe #1, who is not able to work due to a disability, sponsored an immigrant visa for his wife so that she can have legal status to live and work in the United States. Her immigrant visa consular interview is scheduled for November 6, 2019. Under the Proclamation and Defendants' implementation of its requirements, John Doe #1 and his wife cannot afford or qualify for an "approved" health insurance option for her and fears that they lack sufficient financial resources to pay foreseeable medical costs out of pocket.

15.     Plaintiff Juan Ramon Morales is a United States citizen originally from Puerto Rico who now resides in Liberty, New York with his wife, Vianca Morales, a Mexican citizen; their daughter; and Ramon's step-daughter. Mr. Morales has sponsored his wife for an immigrant visa

CLASS ACTION COMPLAINT                                                                                    6

and she is waiting to schedule her consular interview, but he is not able to add his wife to his employer-sponsored health insurance or obtain another "approved" health insurance plan under the Proclamation due to cost.

16.      Jane Doe #2 is a United States citizen of Nicaraguan origin and a single mother of two children who resides in Rancho Cucamonga, California. She has an approved I-130 petition for her parents, who are living in Nicaragua and waiting to schedule their consular interview. She has been unable to find available and affordable health insurance for her parents that complies with the Proclamation, and it is unlikely that they will be able to show the ability to pay for reasonably foreseeable medical costs as required under the Proclamation and Defendants' implementation of its provisions.

17.      Plaintiff Jane Doe #3 is a U.S. citizen who currently resides in Los Angeles, California. She is unable to work due to a disability and has insurance through Medi-Cal, California's Medicaid program. Jane Doe #3 has an approved I-130 petition for her husband, a German citizen who currently resides in Berlin, Germany and is an architect who teaches architectural theory and design. Although he is gathering documents for consular processing, Jane Doe #3 does not believe that her husband will be able to prove at a consular interview that he would be covered by approved health insurance within 30 days of his entry into the United States because they do not believe that they have the financial resources to afford "approved" health insurance as defined in the Proclamation or to pay his foreseeable medical expenses out of pocket as required by the Proclamation and Defendants' implementation of it.

18.      Plaintiff Iris Angelina Castro is a United States citizen who lives in Springfield, Massachusetts with her son, who is a U.S. citizen. She recently became unemployed and currently has state health insurance. She has an approved I-130 visa petition for her husband, Hermogenes

CLASS ACTION COMPLAINT

Castro Molina, a Dominican citizen, so that they can reunite in the United States. He is currently in the process of filing all necessary documents so that they can schedule a consular interview, but they do not believe that he will be able to prove that he can obtain available and affordable "approved" health insurance within 30 days of entering the U.S. or pay for foreseeable medical costs as required under the Proclamation and Defendants' implementation of its provisions.

19.     Plaintiff Blake Doe is a U.S. citizen living in Corvallis, Oregon, with his wife. He has approved I-130 immigrant petitions for his parents, both Mexican citizens, with whom he had lived his entire life in Oregon until going to college at Oregon State University to study civil engineering. Blake Doe's parents are currently waiting to have their consular interview scheduled in Ciudad Juarez, Mexico. Blake Doe and his parents do not believe that they would be able to prove that his parents would be able to obtain available and affordable "approved" health insurance within 30 days of their entry into the U.S. or to pay foreseeable medical expenses out of pocket as required under the Proclamation and Defendants' implementation of its provisions.

20.     Plaintiff Brenda Villarruel is a U.S. citizen who currently resides in Chicago, Illinois, with her United States citizen son and United States citizen parents. Ms. Villarruel works part time as a licensed medical assistant. She does not have medical insurance and receives health care, when necessary, through a clinic that charges based on income. Ms. Villarruel has sponsored an immigrant visa for her husband, a Mexican citizen who currently resides in Mexico City, Mexico, and is awaiting consular processing. Ms. Villarruel and her husband do not have the resources to obtain available and affordable "approved" health insurance coverage for him or to pay his foreseeable medical expenses out of pocket as required under the Proclamation and Defendants' implementation of its provisions.

CLASS ACTION COMPLAINT

21.     Plaintiff Latino Network is a non-profit organization based in Portland, Oregon. Latino Network's organization mission is to educate and empower Multnomah County Latinos to achieve physical and mental health, safe housing, sustainable financial stability, and social support. Latino Network does so by offering a variety of programs and services, including early childhood services, community-based programs, school-based programs, arts and culture programs for youth, health and wellness programs, and civic leadership programs. The impending effective date of the Proclamation has forced Latino Network to divert resources from its core activities to address the Proclamation's fallout within the community the organization serves.

## DEFENDANTS

22.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation.

23.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. The Proclamation assigns DOS a variety of responsibilities regarding its implementation and enforcement.

24.     Defendant Kevin McAleenan is the Acting Secretary of Homeland Security and has responsibility for overseeing enforcement and implementation of the Proclamation by all Department of Homeland Security staff. He is sued in his official capacity.

25.     Defendant U.S. Department of Health and Human Services ("DHHS") is a cabinet-level department of the United States federal government. The Proclamation assigns DHHS a variety of responsibilities regarding its implementation and enforcement.

CLASS ACTION COMPLAINT

9

26.     Defendant Alex M. Azar II is the Secretary of Health and Human Services and has responsibility for overseeing enforcement and implementation of the Proclamation by all Department of Health and Human Services staff. He is sued in his official capacity.

27.     Defendant U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government. DOS is responsible for the issuance of immigrant visas abroad. The Proclamation assigns DOS a variety of responsibilities regarding its implementation and enforcement.

28.     Michael Pompeo is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Proclamation by all Department of State staff. He is charged by statute with the administration and enforcement of the Immigration and Naturalization laws, including those related to the powers, duties, and functions of consular officers not reserved to the officers themselves. 8 U.S.C. § 1104. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

A.     **The Proclamation**

29.     Late on Friday night, October 4, 2019, President Trump signed the "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation").  A copy of the Proclamation can be viewed at https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/ and is attached as Exhibit 1.

30.     Beginning at 12:01 a.m. eastern daylight time on November 3, 2019, the Proclamation will ban would-be immigrants from receiving visas and entering the United States unless they can demonstrate, "to the satisfaction of a consular officer," that they will be able to

CLASS ACTION COMPLAINT

obtain "approved" health insurance coverage within 30 days after arriving in the United States, or are wealthy enough to "pay for reasonably foreseeable medical costs."

31.     The Proclamation, by its own terms, was not issued for national security reasons. Ostensibly, the Proclamation is meant to "address[] the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care" given to "people who lack health insurance or the ability to pay for their healthcare." The Proclamation notes that hospitals and other health care providers "often administer care to the uninsured without any hope of receiving reimbursement from them." Such uncompensated costs "are passed on to the American people in the form of higher taxes, higher premiums, and higher fees for medical services." The Proclamation further states that uninsured individuals "strain Federal and State government budgets through their reliance on publicly funded programs, which ultimately are financed by taxpayers," and rely on emergency care for non-emergency conditions, "causing overcrowding and delays for those who truly need emergency services."

32.     Given these challenges, the Proclamation asserts that "the United States Government is making the problem worse by admitting thousands of aliens who have not demonstrated any ability to pay for their healthcare costs," and claims that "data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance." Accordingly, the Proclamation declares that "[c]ontinuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests." If a prospective immigrant will not "be covered by approved health insurance" "within 30 days of the alien's entry into the United States," or if the immigrant does not have "the financial resources to pay for reasonably foreseeable medical costs,"

CLASS ACTION COMPLAINT                                                                      11

the immigrant is deemed to be someone who will "financially burden the United States healthcare system" and whose entry into the United States is therefore "suspended."

33.     Simply put, under the Proclamation, a lack of "approved" insurance, or the inability to prove that an intending immigrant can pay for "reasonably foreseeable" medical care, absolutely bars the entry of that individual to the United States who meets *all qualifications* mandated by Congress in the Immigration and Nationality Act.

34.     The Proclamation sets out a narrow range of health insurance plans that qualify as "approved health insurance." No "subsidized" health plan offered in the individual market within a State under the ACA qualifies. Proclamation § 1(b)(ii). Nor does Medicaid qualify as "approved health insurance" for any individual over 18, Proclamation § 1(c), even though some states have chosen to make Medicaid available to certain adults over 18, including certain new and recently arrived immigrants. "Approved health insurance" under the Proclamation includes only:

- employer-sponsored plans (Proclamation § 1(b)(i));

- catastrophic plans (Proclamation § 1(b)(iv));

- certain health plans available to the U.S. military (Proclamation § 1(b)(vi));

- the health plans of family members (Proclamation § 1(b)(v));

- Medicare (Proclamation § 1(b)(viii));

- short-term, limited duration health policies effective for at least 364 days (Proclamation § 1(b)(iii)); and

- visitor health insurance plans that provide "adequate coverage for medical care," also for at least 364 days (Proclamation § 1(b)(vii)).

CLASS ACTION COMPLAINT                                                                12

As explained below, the Proclamation's "approved" health insurance plans are not practically or legally available to most or all prospective immigrants residing outside the country or within their first 30 days of arrival.

35.    A prospective immigrant may also obtain a "health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee," but the Proclamation provides no guidance as to how "adequate coverage" is defined. (Proclamation § 1(b)(ix)).

36.    Subject to limited exceptions, the Proclamation applies to nearly all individuals seeking to enter the United States with an immigrant visa. Indeed, based on insurance coverage alone, most adults who were granted green cards over the last three years would have been banned had the Proclamation been in effect.[1] The only exceptions from the Proclamation's suspension of entry cover very small populations, including:

- certain Special Immigrant Visa applicants specifically from Iraq and Afghanistan (Proclamation § 2(b)(ii));

- green card holders returning to the U.S. on a "Returning Resident" visa after remaining abroad for more than one year (Proclamation § 2(b)(v));

- biological and adopted children under 21, but only if those children are not accompanying a parent who is also immigrating to the United States and is subject to the Proclamation (Proclamation § 2(b)(iii), (vi)); and

- parents of U.S. citizen children over the age of 21 arriving with an IR-5 visa, but only if the parent or the U.S. citizen-child sponsor "demonstrates to the satisfaction of the consular

---

[1] Nicole Narea, *Trump just quietly cut legal immigration by up to 65%*, Vox, https://www.vox.com/2019/10/9/20903541/trump-proclamation-legal-immigration-health-insurance (last visited Oct. 27, 2019).

CLASS ACTION COMPLAINT                                                                 13

officer that the [parent's] healthcare will not impose a substantial burden on the United

States healthcare system" (Proclamation § 2(b)(iv)).

With respect to this last exception, the Proclamation provides no guidance as to how the parent or

U.S. citizen-child sponsor must demonstrate, nor how a consular officer should evaluate, whether

the parent's health care will impose a "substantial burden on the United States healthcare system."

37.    Notably, certain types of plans that qualify as "approved" coverage under the

Proclamation provide only very limited benefits and/or allow exclusions based on preexisting

conditions, such that they may be either unavailable to many individuals or may result in

"underinsurance"—which has itself been shown to impose a "substantial burden on the United

States healthcare system." Yet, the Proclamation would encourage underinsurance among newly

arrived immigrants.

38.    The Proclamation also contains exceptions for noncitizens "whose entry would

further important United States law enforcement objectives," or "whose entry would be in the

national interest," as "determined by the Secretary of State or his designee." Proclamation §

2(b)(vii), (viii). Again, however, the Proclamation provides no procedure for would-be immigrants

either to learn or to demonstrate how they would qualify for such exceptions.

**B.    Agency Implementation of the Proclamation**

39.    In implementing the Proclamation, the Department of State created a page on its

website that informs and instructs visa applicants and consular officers of their new obligations

under the Proclamation ("Posting"), available at https://travel.state.gov/content/travel/en/us-

visas/immigrate/Presidential-Proclamation-on-Health-Care.html (Exhibit 2).

40.    The Posting states definitively that "if you are applying for an immigrant visa" on

or after November 3, 2019 "you must demonstrate at the time of the interview" that you meet the

Proclamation's requirements. It also specifies that an "inability" to meet the Proclamation's requirements at the time of the interview "will result in the denial of the visa application." The Posting then lists the same exceptions that appear in the Proclamation and the same list of approved health insurances. Under the heading "Requirement at visa interview," the Posting specifies that "[d]uring the visa interview," applicants will need to demonstrate that they satisfy the requirements of the Proclamation. It informs that applicants that consular officers "will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation as needed." The Posting also includes a link to the Proclamation itself.

41.     By its terms, the Posting unequivocally makes clear not only that visa applicants have the obligation to satisfy the Proclamation's requirements or be denied a visa, but also that consular officers will enforce the Proclamation, which has significant legal and practical consequences for visa applicants and their families. It did so without satisfying any of the requirements for agency action under the Administrative Procedure Act ("APA") or demonstrating good cause for diverging from standard agency practice.

42.     Eleventh-hour action by the State Department purports to offer the opportunity for notice and comment for "information collection" related to the Proclamation, but this only highlights the agency's failure to act according to the requirements of the APA. Just yesterday, on October 29, 2019, the Department of State issued a "Notice of Information Collection" for "Emergency Review"[2] (the "Emergency Notice"), which was published in the *Federal Register*

---

[2] *60-Day Notice of Proposed Information Collection: Public Charge Questionnaire*, FED. REGISTER, https://www.federalregister.gov/documents/2019/10/24/2019-23219/60-day-notice-of-proposed-information-collection-public-charge-questionnaire (last visited on Oct. 27, 2019). https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-23639.pdf

today (October 30, 2019) and purports to announce a "methodology" established by the Secretary of State, as authorized by Section 3 of the Proclamation, "to establish standards and procedures for governing such determinations." 84 Fed. Reg. 58199 (Oct. 30, 2019); *see also* Advance Print Emergency Notice (issued Oct. 29, 2019), *available at* https://s3.amazonnews.com/public-inspection.federalregister.gov/2019-23639. The Emergency Notice states that "to implement [the Proclamation] when it goes into effect on November 3, 2019," consular officers "will verbally ask immigrant visa applicants covered by [the Proclamation] whether they will be covered by health insurance in the United States within 30 days of entry to the United States and, if so, for details relating to such insurance." If the applicant says yes, "consular officers will ask for applicants to identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary." The Emergency Notice further adds that visa applicants will not be suspended "if they do not have coverage, but possess financial resources to pay for reasonably foreseeable medical expenses." It defines "reasonably foreseeable medical expenses" as "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication."

43.     The Emergency Notice provides a comment period of less than 48 hours, an unusually short period of time, stating that "[a]ll public comments must be received by October 31, 2019." It notes that the Proclamation "was signed on October 4, 2019, and emergency review of this information collection is necessary for the Department to prepare consular officers to implement [the Proclamation] when it goes into effect on November 3, 2019."[3] The Emergency

---

[3] The late posting of the Emergency Notice and extremely short notice-and-comment period stand in stark contrast to a "60-Day Notice of Proposed Information Collection" in the Federal Register six days prior on October 24, 2019 (the "Notice"). That Notice proposed and solicited public comments on a new written form, DS-5540, that would ostensibly collect information

CLASS ACTION COMPLAINT                                                                                16

Notice was not, however, implemented in direct response to any particular event impacting foreign relations.

44.    Taken together, the Emergency Notice and the Posting make clear that, effective November 3, consular officers are empowered to determine whether prospective immigrants meet the Proclamation's requirements, resulting in a direct impact on the rights of immigrants and their families. These are definitive actions that reflect the consummation of the agency's decision-making process and that affect the substantive rights and obligations of regulated individuals.

45.    The Posting and the last-minute Emergency Notice confirm press reports that government officials were scrambling earlier this month to implement and enforce the Proclamation by its effective date. On information and best belief, these efforts necessarily include DOS officials as well as DHHS and DHS officials. For example, as indicated above, the DHHS Secretary "or his designee" has authority under the Proclamation to determine whether a "health plan . . . provides adequate coverage for medical care" (though provides no guidance as to how "adequate coverage" is defined for such purpose). Proclamation § 1(b)(ix). According to one media report published a week after the Proclamation was signed, government health officials "are wrestling with highly technical questions" as they attempt to implement the Proclamation, despite

---

intended to assist consular officers "in assessing whether an applicant is likely to become a public charge," but stated that a consular officer could ask a visa applicant to fill out certain questions on the same form to assess whether the applicant meets the Proclamation's requirements. *See 60-Day Notice of Proposed Information Collection: Public Charge Questionnaire*, FED. REGISTER,*See* https://www.federalregister.gov/documents/2019/10/24/2019-23219/60-day-notice-of-proposed-information-collection-public-charge-questionnaire (last visited on Oct. 27, 2019).https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-23219.pdf

CLASS ACTION COMPLAINT

"concerns" that its mandate "may be unworkable and even illegal."[4] Indeed, officials "are confused about numerous aspects of the proclamation, such as whether implementing the new health insurance requirements would fall to [the Center for Consumer Information and Insurance Oversight, within the Department of Health and Human Services] or the State Department."[5] None of these deliberations or concerns, which have a direct impact on the legal rights of visa applicants, have been presented to the public as part of any administrative process.

46.    It is no surprise that officials were at least initially confused about how to implement the Proclamation, given that the Proclamation is inconsistent with existing immigration and healthcare laws, contrary to core constitutional principles, and, moreover, is riddled with undefined terms and imprecise standards and appears to ignore many of the practical realities of both this country's immigration and health care systems.

**C.    The Proclamation is Vague, Internally Contradictory, and Inconsistent with Existing Law in Ways State Department Action has Not Addressed**

**1.    The Proclamation Uses Unclear, Undefined Terms and Standards**

47.    The Proclamation's list of "approved health insurance" plans includes several options that are unclear and undefined. "Catastrophic health insurance," for example, is one "approved" option, but the term can be used generically, to refer to certain high-deductible plans, or specifically, as defined by the ACA with certain coverage parameters and eligibility requirements. The Proclamation does not specify what it means when it allows "catastrophic health insurance" as "approved health insurance."

---

[4] Dan Diamond, *Health officials: Trump immigration order could be illegal*, POLITICO, https://www.politico.com/news/2019/10/11/trump-immigrants-health-insurance-illegal-044716 (last visited on Oct. 27, 2019).

[5] *Id.*

CLASS ACTION COMPLAINT

18

48.    Likewise, a variety of forms of financial assistance under the ACA are broadly available to individuals seeking health insurance on the ACA Exchanges—indeed, an Exchange enrollee may qualify for some level of assistance if she has a household income from 100 to 400 percent of the federal poverty level ("FPL"),[6] and lawfully present immigrants qualify for assistance even if their household income is below 100% FPL if they are not otherwise eligible for Medicaid. Such financial assistance can take the form of "premium tax credits" offered to eligible enrollees, as well as certain cost-sharing reductions tied to specific "silver" plans, for which eligibility is based on income. The ACA, however, does not define either of these forms of financial assistance as a "subsidy." The Proclamation is silent as to which forms of assistance would render a plan "subsidized," and therefore not "approved," health insurance.

49.    In addition, the Proclamation states that "an alien will financially burden the United States healthcare system . . . unless the alien possesses the financial resources to pay for reasonably foreseeable medical costs"—but provides no guidance on what might constitute a "reasonably foreseeable medical cost." Nor does the Proclamation indicate how a consular officer with no medical training should evaluate what medical costs may be "reasonably foreseeable" for a specific prospective immigrant, or how the consular offer should assess whether that individual has sufficient "financial resources" to cover such costs. The State Department's Emergency Notice, published today in the *Federal Register*, defines "reasonably foreseeable medical expenses" as "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication" but, again, does not clarify how consular officers are to make that assessment.

---

[6] In 2019, the income level necessary for a family of four to qualify for financial assistance ranged from $25,100 at 100% FPL to $100,400 at 400% FPL.

50.    Likewise, the Proclamation states that a visitor health insurance plan may qualify as an "approved" health plan if it provides "adequate coverage for medical care"—but provides no standards or definitions that would enable either a would-be immigrant or a non-medically trained consular officer to assess what coverage qualifies as "adequate." Similarly, the Secretary of Health and Human Services may approve "any other health plan that provides adequate coverage for medical care," but the Proclamation is devoid of guidance as to how the Secretary should determine that a plan's coverage is "adequate," to say nothing of guidance that would enable prospective immigrants to evaluate whether a potential plan not already enumerated in the Proclamation provides sufficiently "adequate" coverage to qualify as "approved."

51.    The Proclamation does provide exceptions to the entry suspension for immigrants "whose entry would be in the national interest," as determined by the Secretary of State, or "whose entry would further important United States law enforcement objectives," as determined by the Secretary of State based on a recommendation of the Attorney General. But the Proclamation does not explain what such terms as "national interest" or "important United States law enforcement objectives" mean. There is no indication, in either the text of the Proclamation or the Department of State website, of how a prospective immigrant may seek such a determination from the Secretary of State or demonstrate her qualifications for such a determination.

52.    When making an exception for immigrants whose entry would further "law enforcement objectives," moreover, the Proclamation makes no mention of a special visa, the U visa, which exists specifically for victims of certain crimes who are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. Although the INA specifically allows U visa holders to petition to bring certain family members to the United States on immigrant visas, the Proclamation is silent as to whether such family members are excepted

CLASS ACTION COMPLAINT

from the Proclamation, either under the "law enforcement" provision or otherwise. At best, such silence on the topic creates uncertainty for U-derivative immigrant family members; at worst, it indicates that such family members are subject to the Proclamation's requirements, notwithstanding the fact that the INA expressly provides for the reunification of U visa families.

**2.    Very Few, if Any of the Proclamation's "Approved Health Plans" Are Available to Visa Applicants**

53.    Beyond the Proclamation's vague and ill-defined terminology, most of the Proclamation's "approved" health insurance plans are not practically or legally available to most or all prospective immigrants residing outside the country or within their first 30 days of arrival.

54.    Medicare plans, for example, are an approved type of health insurance under the Proclamation, Proclamation § 1(b)(viii), but such coverage is unavailable to immigrants unless they are over 65 years old *and have been living continuously in the United States for five years*.

55.    TRICARE plans and other related coverage, "approved" under § 1(b)(iv) of the Proclamation, are only available to members of the United States military, their spouses, and children up to 26 years of age.

56.    Employer-sponsored plans also constitute "approved plans" under the Proclamation § 1(b)(i), but employers are permitted under federal law to impose a waiting period of up to 90 days before new employees can be covered by employer-sponsored coverage.[7] Seventy-one percent of employers impose a waiting period, with waiting periods on average lasting 1.9 months.[8] Beyond that, over two-thirds of immigrants are the beneficiaries of family petitions or other non-

---

[7] 42 U.S.C. § 300gg-7.

[8] *2018 Employer Health Benefits Survey,* KAISER FAMILY FUND, (Oct. 3, 2018), https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-3-employee-coverage-eligibility-and-participation/

CLASS ACTION COMPLAINT

employment-based visa applications, and therefore are unlikely to have an employer-sponsored plan before even arriving in the United States and acquiring valid work authorization.

57.     Although a "family member's plan" is "approved" under the Proclamation, § 1(b)(v), it is highly unlikely that most immigrants will be able to obtain coverage through a family member unless they are a spouse or a child under 27. All other relations are not usually considered a "dependent" eligible to be included in a family health insurance plan.[9]

58.     The Proclamation states that a "catastrophic health plan" may constitute an approved plan, Proclamation § 1(b)(iv), but under the ACA, "catastrophic" plans are available only to individuals living in the United States, and eligible enrollees must be either under 30 years of age or have qualified for a hardship or affordability exemption. 42 U.S.C. § 18022(e).[10]

59.     The list of "approved" health insurance includes "an unsubsidized health plan offered in the individual market within a State," Proclamation § 1(b)(ii), but an intending immigrant would not be able to obtain such coverage from abroad. Like an ACA-compliant catastrophic plan, any other "unsubsidized" health plan offered in an ACA marketplace is only available to individuals living in the United States, in the marketplace's service area. 45 C.F.R. § 155.305(a)(3)(i).

60.     Further logistics could impede the immigrant's ability to acquire not only an "unsubsidized health plan" but also a "catastrophic health plan" (whether through the ACA

---

[9] An employer health plan is only a benefit excludable from income tax if it limits eligibility to spouses, children who have not yet attained age 27, and tax dependents. 26 U.S.C. § 105(b), 26 C.F.R. § 1.106-1(a). Employers are permitted to limit eligibility further, and indeed, coverage of family members other than children and spouses or domestic partners is very rare. *See* https://www.theabdteam.com/blog/eligibility-parents-group-health-plan/

[10] *Are You Eligible to Use the Marketplace?*, HEALTHCARE.GOV, https://www.healthcare.gov/quick-guide/eligibility/

CLASS ACTION COMPLAINT

Exchanges or outside of them) within 30 days of entering the United States. Under rules governing an insurance policy's effective date, a newly purchased policy becomes effective on the first day of the next month after purchase—but only if the policy was purchased before the fifteenth day of the current month.[11] Otherwise, the effective date rolls to the first day of the subsequent month. In other words, if an immigrant is so fortunate as to enter the United States under the Proclamation, but unluckily arrives on the 20th of the month, her insurance coverage will not take effect until well after 30 days of arriving in the country. The Proclamation is silent on whether such a possibility would prevent a prospective immigrant from satisfying the "approved health insurance" requirement to gain entry.

61.    When accounting for the fact that Medicare, TRICARE and other military plans, employer-sponsored plans, family members' plans, and unsubsidized and catastrophic plans available under the ACA are all practically or legally impossible for most prospective immigrants to acquire, the two remaining options for "approved health insurance" under the Proclamation are visitor insurance plans or short-term limited duration insurance ("STLDI") plans, which in either case must last for a minimum of 364 days. But STLDI plans lasting the minimum required 364 days are not available in almost half the states,[12] and many disqualify an individual from coverage if that person is not a United States citizen or resident.[13] Neither visitor plans nor STLDI plans, moreover, are required to cover individuals with preexisting conditions or pregnant women, and

---

[11] *See* 45 C.F.R. § 155.420(b)(1); 45 C.F.R. § 147.104(b)(2).

[12] *Is Short-term Health Insurance Right for You?,* HEALTHINSURANCE.ORG, https://www.healthinsurance.org/short-term-health-insurance/

[13] *Short Term Health Insurance Eligibility Information for Short Term Health Insurance, or STM,* ELIGIBILITY.COM (Updated Jan. 28, 2019), https://eligibility.com/short-term-health-insurance

many do not.[14] Such plans can also adjust premiums based on an individual's health history, gender, or (outside specified parameters) age and make them prohibitively, and exploitatively, expensive.[15] Indeed, many states are concerned that unscrupulous insurance brokers and STLDI insurers provide misleading information about the costs, deductibles, and coverage associated with these plans.[16]

62.     Even assuming prospective immigrants can acquire visitor insurance plans or STLDI plans, it remains unclear that such insurance plans actually further the Proclamation's goal of "addressing the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care." Visitor and STLDI plans are not required under the ACA to provide "essential health benefits," such as hospitalization, prescription drugs, emergency services, and maternity and newborn care. Indeed, the fine print of such policies can exclude coverage for prescription drugs, a tonsillectomy, hernia surgery, prenatal care, treatment of pre-existing conditions an individual does not know about, or even "treatment of injury resulting from participation in organized sports," like care for a concussion a child receives during soccer.[17] As a result, the coverage provided by such plans can leave an individual

---

[14] *Id.*

[15] *Id.*; *see also* Rachel Schwab, *Coming Up Short: The Problem with Counting Short-Term, Limited Duration Insurance as Coverage,* CHIRBLOG.ORG (June 7, 2019), *Id.*; *see also* http://chirblog.org/coming-short-problem-counting-short-term-limited-duration-insurance-coverage/

[16] S. Corlette et al., *The Marketing of Short-Term Health Plans,* ROBERT WOOD JOHNSON FOUNDATION (Jan. 31, 2019) https://www.rwjf.org/en/library/research/2019/01/the-marketing-of-short-term-health-plans.html

[17] https://www.cbpp.org/research/health/key-flaws-of-short-term-health-plans-pose-risks-to-consumers

CLASS ACTION COMPLAINT                                                    24

effectively uninsured for relatively mundane needs like prescriptions or a prenatal checkup, as well as for hospital interventions.

63.     A Pennsylvania man, for example, was hospitalized for an abnormal heartbeat but was denied coverage under his STLDI plan because of a previous doctor visit for high blood pressure, which led the insurer to claim his hospitalization was actually for a preexisting condition.[18] Similarly, a Washington, D.C. man's STLDI plan had a stated maximum payout of $750,000, but it paid only $11,780 towards a $211,690 hospitalization bill for heart surgery, in part due to a denial of coverage based on his father's medical history.[19] In another case, a woman from Illinois went to the hospital with heavy vaginal bleeding and ended up needing a hysterectomy and a five-day hospital stay. She was denied coverage under her STLDI plan on the ground that her menstrual cycle constituted a pre-existing condition.[20]

64.     Indeed, a substantial share of uncompensated care costs are due to underinsured individuals with high deductibles, excluded services, or low annual limits, which are all common characteristics of visitor and STLDI plans.[21] Even the insurers who offer short-term limited

---

[18] Sarah Lueck, *Key Flaws of Short-Term Health Plans Pose Risks to Consumers,* CTR. ON BUDGET AND POLICY PRIORITIES (Sept. 20, 2018) https://www.cbpp.org/research/health/key-flaws-of-short-term-health-plans-pose-risks-to-consumers

[19] Cheryl Fish-Parcham, Families USA, to Alex Azar et al., "Comments on Short-Term Limited Duration Insurance Proposed Rule (CMS-9924-P)," Apr. 23, 2018 (https://www.regulations.gov/document?D=CMS-2018-0015-8801).

[20] *Id.*

[21] Susan Morse, *Increase in Uncompensated Hospital Care Could be One Effect of Short-term Coverage Rule,* HEALTHCARE FINANCE NEWS (Aug. 1, 2018) https://www.healthcarefinancenews.com/news/increase-uncompensated-hospital-care-could-be-one-effect-short-term-coverage-ruleRick Pollack, *AHA Statement on Final Rule on Short-Term, Limited-Duration Health Insurance Plans,* AMERICAN HOSPITAL ASSOCIATION (Aug. 1, 2018); https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance

CLASS ACTION COMPLAINT

duration insurance or visitor coverage do not consider it to be a replacement for ordinary health insurance.[22]

65.    The table below summarizes the options for "approved health insurance" under the Proclamation and the reasons why such plans are not attainable at all, or attainable by an insignificant number of intending immigrants:

| Approved Health Insurance Plans | Limitations on Availability | Additional Barriers to Enrollment |
|---|---|---|
| Employer-sponsored plan | Available only to individuals who have an offer of employment that includes employer-sponsored insurance, as well as work authorization. | Most employers impose a waiting period before a new employee can be covered by employer-sponsored insurance; waiting periods last on average for 1.9 months, or well over 30 days. |
| Unsubsidized health plan offered in the individual market within a State | Available only to individuals living in the United States. | Newly arrived immigrants may not be enrolled within 30 days based on their date of arrival and the effective date that their coverage begins. |
| Short-term limited duration health policy effective for a minimum of 364 days | Available only in about half the States with the 364-day minimum; often not available to individuals living outside the United States. | Usually not available to individuals with pre-existing conditions. |
| Catastrophic plan | Available only to individuals living in the United States who are either 30 or younger or who have a | Newly arrived immigrants may not be enrolled within 30 days based on their date of arrival and the effective date that their coverage begins. |

---

[22] Comment of American Cancer Society Cancer Action Network et al., Apr. 23, 2018, at 3 (noting that sellers of short-term limited duration insurance plans "acknowledge that such plans are 'designed solely to provide temporary insurance during unexpected coverage gaps'") (citation omitted).

| | hardship/affordability exemption | |
|---|---|---|
| Family member's plan | Generally available only to spouses and children 26 or younger. | |
| Medical Plan under 10 U.S.C. § 55, including TRICARE | Available only to members of the U.S. military, their spouses, and children 26 or younger. | |
| Visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days | | Usually not available to individuals with pre-existing conditions. |
| Medicare | Available only to individuals at least 65 years old who have been living continuously in the United States for 5 years. | |

### 3.    The Proclamation Is Internally Inconsistent with Its Stated Goals

66.    The Proclamation provides no explanation for how incentivizing—if not effectively requiring—immigrants to buy non-comprehensive or STLDI plans, many of which will likely leave an immigrant underinsured after she arrives, is likely to shield taxpayers or hospitals from such uncovered emergency costs, which the Proclamation decries as "driv[ing] hospitals into insolvency" and "saddl[ing] our healthcare system, and subsequently American taxpayers, with higher costs."

67.    Indeed, the Proclamation appears to be even more self-defeating considering its exclusion of "subsidized" ACA health insurance from the list of "approved health insurance" plans that would enable immigrants to enter the United States. Unlike visitor insurance or short-term limited duration insurance plans, any ACA-marketplace health insurance plan that also offers

CLASS ACTION COMPLAINT

financial assistance is a comprehensive plan that covers a wide range of essential health benefits, including prescription drugs, hospitalization, prenatal and maternity care, and mental health care. Financial assistance to purchase such qualified health plans is available to individuals with household incomes of 100 to 400 percent FPL. Indeed, when passing the ACA, Congress extended the same benefits to immigrants on even more permissive terms, explicitly making assistance available to legally present immigrants even with incomes under 100 percent FPL, including newly arrived immigrants in their first five years in the country, who are otherwise generally excluded from most other federal means-tested benefits. But, although Congress expressly made such benefits available to newly arrived immigrants—and in fact intended for such immigrants to arrive, through this country's legislatively enacted immigration system—the Proclamation operates to ban those immigrants who would benefit from assistance provided under the ACA.

68.     Although an immigrant who receives financial assistance under the ACA to purchase comprehensive health insurance would be *better* insured than an immigrant who purchases non-comprehensive visitor or STLDI insurance, the Proclamation bars the former and allows the latter, in the name of protecting this nation's health care system from uncompensated costs incurred by uninsured individuals.

69.     Viewed as a whole, the Proclamation is far less than the sum of its parts. Its standards and terse language are opaque when they are not vague or ill-defined. The Proclamation's array of various "approved health insurance" options are, for a significant majority of intending immigrants, merely a set of legal or practical impossibilities. When taken to their logical consequence, the incentives it creates for prospective immigrants lead to results that almost certainly will not further the Proclamation's goal of reducing the burden of uncompensated care

CLASS ACTION COMPLAINT

for uninsured individuals. At best, these disparate parts form an internally inconsistent whole; at worst, they smack of bad faith.

70. Given the draconian sweep of the Proclamation—indeed, by some estimates, it has the potential to reduce legal immigration by nearly two thirds and affect most, if not nearly all, family-based and diversity immigrants—the structure, text, and import of the Proclamation all suggest that its ostensible purpose of addressing the burden that uninsured individuals place on this country's health care system is merely a pretext to rework this country's immigration system in the manner that the President sees fit, in contravention of the laws passed by Congress.

71. The Proclamation, moreover, does not operate in a vacuum. It will be enforced in a legal landscape already shaped by numerous Congressional enactments, including the Immigration and Nationality Act, the Public Responsibility and Work Opportunity Reconciliation Act, the Illegal Immigration Reform and Immigrant Responsibility Act, the Children's Health Insurance Program Reauthorization Act, and the Affordable Care Act; and the regulations of the Administration's recently promulgated "public charge rule," which establishes new criteria for determining whether a would-be immigrant may be deemed inadmissible because she is likely to become a "public charge". As set out in more detail below, the Proclamation is in tension, if not direct conflict, with each of these statutory and regulatory schemes, and therefore also with Congress's legislative intent.

72. The Proclamation, moreover, is but the latest link in a long chain of statements and actions by this President and his Administration expressing antipathy toward all noncitizens, but also specifically toward immigrants seeking to come to the United States—particularly immigrants of color, from Central and Latin America, Africa, and the Middle East. Since the early days of his Administration, the President has consistently called for eliminating the two main ways that

CLASS ACTION COMPLAINT

29

immigrants from predominantly nonwhite countries receive visas—the family preference system and the diversity visa lottery. After a legislative attempt—the RAISE Act—that failed in 2017, and an administrative attempt—the public charge rule—that received overwhelmingly negative public comment, and which has since been enjoined, the Proclamation now appears to be an attempt by presidential fiat. The laws and the Constitution of this country do not countenance such executive overreach.

### THE PROCLAMATION IMPERMISSIBLY RESHAPES THE NATION'S CONGRESSIONALLY-ENACTED HEALTH BENEFIT SYSTEM FOR IMMIGRANTS BY PRESIDENTIAL FIAT

**A.      The Immigration and Nationality Act ("INA")**

73.      The Immigration and Nationality Act ("INA") was originally enacted in 1952 and has since been amended significantly multiple times. Although it now represents "a long series of legislative accretions,"[23] it nevertheless creates a system by which this country may grant up to 675,000 permanent immigrant visas each year, as well as an unlimited number of permanent immigrant visas for the admission of U.S. citizens' spouses, parents, and children under the age of 21. In doing so, the INA, 8 U. S. C. § 1101 *et seq*., expresses and reflects Congress's intent that foreign nationals who meet certain qualifications may immigrate to the United States, in furtherance of the goals of reunifying families, admitting immigrants with skills that are useful to the United States economy, and promoting diversity.[24]

74.      A series of related and interacting statutes, including the Public Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), the Children's Health Insurance Program

---

[23] Adam B. Cox & Christina M. Rodriguez, *The President and Immigration Law Redux*, 125 YALE L.J. 104, 158-59 (2015).

[24] *See Elkins v. Moreno*, 435 U.S. 647, 664 (1978).

Reauthorization Act ("CHIPRA"), and the Affordable Care Act ("ACA"), likewise express and reflect Congress's intent to extend certain health care-related benefits to legal immigrants. Through PRWORA, Congress made significant changes to health care eligibility for noncitizens and simultaneously devolved substantial power to the states to allow the states to replace benefits to legal immigrants through Medicaid, and later through the Children's Health Insurance Programs ("CHIP"), and to receive federal matching funds when providing such coverage. Through CHIPRA, Congress affirmatively provided federal dollars to fund care for newly arrived legal immigrant children and legal immigrant pregnant women during their first five years in this country. And through the ACA, Congress made financial assistance in the form of premium tax credits available to both United States citizens and legal immigrants to purchase comprehensive health coverage.

75.    The interaction of these statutes reflects Congress' intent to keep important health care benefits available to both newly arrived immigrants and qualified foreign nationals, especially the spouses, children, and parents of United States citizens, to ensure that such individuals are allowed to immigrate to the United States in the first instance to reunite with family, contribute their skills to the United States economy, be afforded humanitarian protections, and/or promote diversity.

76.    In rendering inadmissible all immigrants who are unable either to purchase certain enumerated kinds of health insurance or pass an opaque wealth test through categorizing such individuals as "detrimental to the United States"—particularly immigrants who would otherwise be eligible to enter the United States and receive health insurance benefits like Medicaid, CHIP, or financial assistance under the ACA—the Proclamation expressly contravenes Congress's legislative intent.

CLASS ACTION COMPLAINT

77.     The bedrock pillars of U.S. immigration law allow immigration for family reunification, for business purposes, for humanitarian considerations, and to promote diversity.  To that end, Congress has set forth a comprehensive system to allow limited "worldwide immigration" based on an allocation of "family-based visas," "employment-based visas" and "diversity-based" visas. 8 U.S.C. § 1151(a). Section 1151 of the INA sets an annual *minimum* family-sponsored preference limit of 226,000; the worldwide level for annual employment-based preference immigrants is *at least* 140,000. A maximum of fifty-five thousand visas each year are available through a diversity visa lottery, open to nationals of countries with historically low rates of immigration to the United States.

78.     A family member or employer seeking to "sponsor" a noncitizen for an immigrant visa must first file either a Form I-130, Petition for Alien Relative, or Form I-140, Petition for Alien Workers, with the United States Citizenship and Immigration Service on behalf of the "beneficiary." This form establishes the necessary family or employer-employee relationship that exists to allow for an immigrant visa. Once the beneficiary of an approved immigrant petition has an immigrant visa number that is immediately available, there are two ways to apply for lawful permanent resident status ("Green Card"). If the beneficiary is outside of the United States, he or she must apply at a U.S. Department of State consulate abroad for an immigrant visa in order to come to the United States and be admitted as a permanent resident. This pathway is referred to as consular processing. If the beneficiary is already in the United States, she may attempt to apply for permanent resident status without having to return to her home country to complete processing. This process is called adjustment of status.[25] *See* 8 U.S.C. § 1255(a).

---

[25] If an individual present in the United States does not qualify for adjustment of status, she must travel abroad for a consular interview to obtain her immigrant visa.  Some applicants who have accrued more than 180 days of unlawful presence while in the United States, but have no other

79.     Section 1152 of the INA prescribes that the per-country limit for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference limits, i.e., 25,620.  The dependent area limit is set at 2%, or 7,320.  This means that no single nation can receive more than 7 percent of the total green cards issued in a year (unless they would otherwise go unused).

80.     Among family-based immigrants, Congress has prioritized the admission of "immediate relatives," which is defined as "the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age."  8 U.S.C. § 1151(b). These familial relations have been carved out of certain exceptions to the various numerical limitations on immigrant visas, and thus visas are always and immediately available for these qualifying family members

81.     The allocation of immigrant visas subject to the numerical limitations is governed by 8 U.S.C. § 1153. Subsection (a) sets forth preference allocations for family-sponsored immigrants; subsection (b) sets forth the preference allocations for employment-based visas. *See*, *e.g.*, 8 U.S.C. § 1153(a)(1) ("Qualified Immigrants who are the unmarried sons and daughters of citizens of the United States shall be allocated visas in a number not to exceed 23,400.").

82.     Section 1153(e) provides that family-sponsored and employment-based preference visas "shall" be issued to eligible immigrants in the order in which a petition on behalf of each has been filed, that is, according to the "priority date" of the visa petition.

---

bars to admissibility, may obtain an I-601A waiver of inadmissibility to overcome the unlawful presence bars under 8 U.S.C. § 1182(a)(9)(B) before they can return. The I-601A waiver process allows those individuals who are statutorily eligible for an immigrant visa (immediate relatives, family-sponsored or employment-based immigrants as well as Diversity Visa selectees) who only need a waiver of inadmissibility for unlawful presence to apply for that waiver in the United States and remain with their family members before they depart for their immigrant visa interview abroad. *See* 8 C.F.R. § 212.7(e).

CLASS ACTION COMPLAINT                                                      33

83.    A family member or employee may not apply for lawful permanent residence abroad until a visa is immediately available. The Department of State issues a monthly Visa Bulletin organized according to country of origin and visa preference category.[26]

84.    If there are sufficient visas available for applicants from a specific country and of a specific preference category, then the Visa Bulletin lists that combination as "current," and all applicants matching that combination may file an application regardless of their priority date, or the date the visa was received by the agency.  If there are insufficient visas available for all known applicants of a specific combination, however, the Visa Bulletin lists a cut-off date, and only those applicants who have priority dates earlier than the cut-off date may file an application.  Sometimes, a cut-off date may retrogress, meaning that fewer visas are available than previously projected. When that happens to an applicant whose application is already filed, the applicant is forced to wait until the cut-off date again progresses past his priority date for his application to be adjudicated.

85.    Before the issuance of an immigrant visa, the noncitizen must establish that she is eligible for admission to the country. Section 1101(a)(13)(A) of Title 8 defines "admission" to mean "the lawful entry of a noncitizen into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

86.    Section 1182 of Title 8, INA § 212, is titled "Inadmissible Aliens" and sets forth ten classes of noncitizens "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a) (prescribing the inadmissibility of, *inter alia*, noncitizens who have a

---

[26] *See, e.g.*, *Visa Bulletin for November 2019*, TRAVEL.STATE.GOV, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2020/visa-bulletin-for-november-2019.html (last visited Oct. 27, 2019).

CLASS ACTION COMPLAINT                                                             34

communicable disease of public health significance, those convicted of two or more criminal offenses, those who engaged in terrorist activities).

87.    Under the system set out in the INA, family-based petitions account for approximately 65% of the immigrant visas granted every year. The diversity lottery visa system accounts for approximately 4.5%.

88.    In addition to the comprehensive system for the allocation of family-based, employment-based, and diversity visas, Congress has authorized multiple special categories for immigrants from abroad based on specific humanitarian considerations.  For example, a qualifying battered spouse, child or parent may file an immigrant visa petition under the Immigration and Nationality Act (INA), as amended by the Violence Against Women Act (VAWA). *See generally 8 U.S.C. § 1154(a)(1), 8 U.S.C. § 1186(c)(4).* Among other sympathetic considerations to victims of abuse, VAWA created special provisions in United States immigration law to protect victims of abuse who are not citizens of the United States. *Id.* In cases of domestic violence, US immigration law allows certain victims of abuse who are not citizens to obtain lawful status without having to rely on their abuser to petition. *Id.* Qualifying applicants may apply self-petition for an immigrant visa abroad and subsequently enter the United States as immigrants if the abuser is an employee of the U.S. government, the abuser is a member of the uniformed services, or the applicant was subjected to battery or extreme cruelty in the United States. 8 U.S.C. §§ 1154(a)(1)(A)(v), (a)(1)(B)(iv).

89.    In addition, the U nonimmigrant status (U visa) is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity; it provides a pathway to lawful permanent residence and subsequently citizenship after 3 years of residence in the United

States. *See generally* 8 U.S.C. § 101(a)(15)(U). Congress created the U nonimmigrant visa with the passage of the Victims of Trafficking and Violence Protection Act (including the Battered Immigrant Women Protection Act, Pub. L. 106-386) in October 2000. Under the provisions of this statute, a U nonimmigrant may also petition for certain family members to receive a "derivative U visa." While many such eligible family members will already have entered the United States with a derivative U visa before the principal U nonimmigrant receives a green card after three years of residence, those family members who do not may apply for an immigrant visa abroad. *See* 8 U.S.C. § 245(m)(3) (upon the approval of an adjustment of status application for a principal U nonimmigrant, "the Secretary of Homeland Security may adjust the status or issue an immigrant visa to a spouse, a child, or in the case of an alien child, a parent who did not receive a [derivative U visa] under section 101(a)(15)(U)(ii)" of the INA.); 8 C.F.R. § 245.24(g).

90.    The Proclamation's suspension of entry does violence to this legislatively enacted immigration scheme that synthesizes considerations of national origin, merit, race, humanitarian, and family-based preferences—principles that have formed the bedrock of this nation's immigration system for decades—and replaces it with a single inquiry: does the prospective immigrant have a specific kind of health insurance or sufficient financial resources to pay for what a consular officer considers to be reasonably foreseeable medical costs? The United States immigration system has never countenanced anything approaching such a standard for admission, which would disproportionately affect immigrants who are from predominantly nonwhite countries and either seeking to reunite with family already here in the United States, or fear being separated from family in the United States when they leave for a consular interview. Once effective, the Proclamation will ban nearly two thirds of all noncitizens legally permitted under the INA to immigrate to the United States, and will separate thousands of families indefinitely.

CLASS ACTION COMPLAINT

91.     In effectively barring most legal and otherwise qualified immigrants from entering the country because they cannot afford health care completely out of pocket, the Proclamation thwarts the carefully considered Congressional scheme that provides health care-related benefits to new and recently arrived immigrants via a combination of federal and state-elected programs. Over the past two decades, Congress—and the States, at Congressional behest—have acted to provide certain benefits specifically to such immigrants. But the Proclamation would ban most immigrants from entering the United States precisely because they would be entitled to such benefits if they came.

**B.    The Personal Responsibility Work Opportunity Reconciliation Act of 1996**

92.     Under the Personal Responsibility Work Opportunity Reconciliation Act ("PRWORA"), passed in 1996, Congress restricted the availability of certain means-tested benefits for newly arrived immigrants, but gave states the ability to fill in this gap by electing to provide coverage to such individuals. Before PRWORA's enactment, legal immigrants living in the United States were eligible for public benefits on similar terms as citizens. After enactment, however, PRWORA has generally barred all new legal immigrants, excepting certain humanitarian categories, including but not limited to asylees and refugees, from receiving federal means-tested public benefits, such as Medicaid, TANF, SNAP, and SSI, for five years after their arrival in the United States.

93.     Despite redrawing immigrant eligibility for federal benefits, PRWORA expressly devolved broad new powers to the states, in relevant part authorizing, but not requiring, states to use state-only funds to offer food, cash, and health-related benefit programs as a substitute for lost federal benefits for legal immigrants. A number of states took advantage of this "gap-filling" authority to use state funds to provide TANF, SNAP, SSI, and/or Medicaid to legal immigrants

CLASS ACTION COMPLAINT                                                                 37

subject to the five-year bar. States were, for example, given the option under PRWORA to use state funds to continue coverage to immigrants under Medicaid during their first five years in the country.

**C.    The Children's Health Insurance Plan ("CHIP") and CHIP Reauthorization Act**

94.    Congress subsequently reinforced PRWORA's grant of power to the states to provide health care-related benefits to legal immigrants under federal health care programs through the Children's Health Insurance Plan ("CHIP"). The original State Children's Health Insurance Program was enacted in 1997 with bi-partisan support to act as a complement to Medicaid, the nation's major health coverage for low-income children, by giving states financial support to provide coverage to uninsured, low-income children who do not qualify for Medicaid. The program was reauthorized on February 4, 2009, through the Children's Health Insurance Program Reauthorization Act ("CHIPRA"), which passed with bi-partisan support and was one of the first pieces of legislation signed by President Obama.

95.    The original CHIP expanded health insurance coverage to low-income children ineligible for Medicaid by providing block grants to states that must be matched with state dollars. Under the law, states could use their federal CHIP funds to finance coverage for children whose family incomes are too high to qualify for Medicaid, either by expanding their already existing Medicaid programs, creating a separate CHIP program, or a combination of those two approaches. Indeed, under the matching rates required under the program, the federal government bears a higher percentage of the overall cost of CHIP than it does under Medicaid. All states, plus the District of Columbia, currently use CHIP funds to expand publicly funded health insurance coverage to uninsured children who are ineligible for Medicaid; most states cover children up to

CLASS ACTION COMPLAINT

or above 200% of the federal poverty level.[27] In the same vein as PRWORA, the original CHIP also authorized States to provide coverage to newly arrived legal immigrant children, who were otherwise ineligible to enroll in either Medicaid or CHIP for their first five years in the country, but States doing so had to fund such coverage with state-only dollars.

96.    CHIPRA reauthorized CHIP and provided states with significant new funding, new programmatic options such as dental coverage, and a range of new incentives to provide Medicaid and CHIP coverage to uninsured, low-income children, especially those who may be eligible for Medicaid or CHIP but who are not enrolled. CHIPRA also established new options and federal funding for states to cover pregnant women, as well as legal immigrant children and legal immigrant pregnant women during their first five years in the country. Thirty-one states, plus the District of Columbia, now cover legal immigrant children, legal immigrant pregnant women, or both under CHIPRA.[28] Under the Proclamation, however, Medicaid is expressly excluded from the "approved" types of health insurance coverage for all individuals over the age of 18, even though CHIPRA expressly extends CHIP coverage eligibility to children up to age 19, and Medicaid eligibility to individuals up to age 21 and to pregnant women, including immigrants lawfully residing in the United States within their first five years of having legal status.

---

[27] *Medicaid/CHIP Coverage of Lawfully-Residing Immigrant Children and Pregnant Women,* KAISER FAMILY FUND, https://www.kff.org/health-reform/state-indicator/medicaid-chip-coverage-of-lawfully-residing-immigrant-children-and-pregnant-women/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D. Medicaid currently covers children at 133% of the federal poverty level; *Where Are States Today? Medicaid and CHIP Eligibility Levels for Children, Pregnant Women, and Adults*, KAISER FAMILY FOUND., https://www.kff.org/medicaid/fact-sheet/where-are-states-today-medicaid-and-chip/. Medicaid currently covers children at 138% of the federal poverty level. *Id.*
[28] *Medicaid and CHIP Coverage of Lawfully Residing Children and Pregnant Women*, MEDICAID.GOV, https://www.medicaid.gov/medicaid/outreach-and-enrollment/lawfully-residing/index.html

CLASS ACTION COMPLAINT

**D.    The Affordable Care Act**

97.    In 2010, Congress passed comprehensive health reform, the Patient Protection and Affordable Care Act ("PPACA"), as amended by the Health Care and Education Reconciliation Act ("HCERA") (together, the "Affordable Care Act" or "ACA," or "Obamacare") into law. 124 Stat. 119. The PPACA contains 10 titles covering over 900 pages, as well as additional provisions under the HCERA. In at least three relevant ways, the ACA was intended to expand access to meaningful and affordable health insurance coverage for all U.S. residents, including legal immigrants, at a guaranteed minimum level of coverage.

98.    First, to facilitate broad health insurance enrollment nationwide, the ACA required the creation of a marketplace, or exchange, in each state so that residents can shop for insurance. These marketplaces took the form of state-run-exchanges, a federally facilitated exchange available at the healthcare.gov website, or a hybrid of the two.[29]

99.    Second, to ensure a certain standard of coverage, the ACA required health insurers, including those who participated in the state and federal Exchanges and those selling plans outside of it, to provide plans that cover "essential health benefits," including hospitalization, prescription drugs, mental health services, ambulatory patient services, maternity and newborn care, mental health and substance use disorder services, preventive and wellness services, and pediatric services, including oral and vision care. 42 U.S.C. § 18022(b)(1). All individual market plans, including ACA-defined and regulated catastrophic health plans, must provide such essential health

---

[29] As enacted, the ACA required most United States citizens and legal residents to purchase and maintain health insurance or pay a penalty. However, President Trump and a Republican-controlled Congress eliminated the financial penalty that an individual would incur if she failed to maintain health insurance as part of the Tax Cuts and Jobs Act of 2017 (*see* https://www.congress.gov/115/bills/hr1/BILLS-115hr1enr.pdf).

benefits, must cover preexisting conditions and may not impose annual or lifetime dollar limits on core coverage.[30] Short-term limited duration insurance plans, however, are ACA-exempt and cannot be offered or purchased on ACA exchanges. As a result, they are non-comprehensive and do not provide the full range of essential health benefits, can and often do deny coverage based on preexisting conditions, and can and often do impose annual or lifetime dollar limits on core coverage.

100.    Third, the ACA provides financial assistance in the form of income-related, premium-based tax credits ("PTCs" or "APTCs") to individuals with household incomes between 100 and 400% of the federal poverty line. 26 U.S.C. § 36B. For newly arrived legal immigrants who are subject to PRWORA's five-year bar on means-tested public benefits, the ACA allows PTCs on more permissive terms, also including individuals below 100% of the federal poverty line. 26 U.S.C. § 36(b)(c)(1)(B). In 2019, under DHHS Federal Poverty Guidelines, the income level necessary for a family of four to qualify for financial assistance ranged from $25,100 at 100% FPL to $100,400 at 400% FPL.

101.    Taken together, these three components of the ACA promote the overarching goals of robust nationwide enrollment, protections for consumers through coverage that is comprehensive and does not bar eligibility based on preexisting conditions, and increased affordability for health insurance coverage. Robust enrollment in comprehensive coverage plans promotes insurance market stability and more affordable premiums across the market, as the robust enrollment of healthy individuals allows distributing costs for less healthy individuals across a larger pool of enrollees. More affordable premiums, in turn, spurs more robust enrollment.

---

[30] 42 U.S.C. § 300gg-3, 300gg-11.

CLASS ACTION COMPLAINT

102.    The ACA's structure and operation also evinces Congress's intent that legal immigrants, including newly and recently arrived immigrants, be able to participate fully in the ACA marketplace to enroll in comprehensive health care and to receive financial assistance if necessary. The benefits available under the ACA, especially when considered in connection with the benefits that the states and federal government have made available to newly and recently arrived legal immigrants under PRWORA and CHIPRA, make clear that Congress intended for legal immigrants to be able to receive specific health care-related benefits to ensure a minimum level of health care coverage upon their arrival in the United States.

103.    The Proclamation directly conflicts with this benefits scheme, disqualifying "subsidized" health insurance offered on ACA Exchanges as "approved health insurance" that would permit entry to the United States. The effect of the Proclamation is to prevent would-be immigrants, who would otherwise be fully qualified under the INA to come to the United States, from entering and receiving the benefits Congress expressly intended for them to have.

104.    Moreover, as noted above, visitor insurance and STLDI plans are the only two options for "approved health insurance" that are realistically and feasibly available to most prospective immigrants outside the United States, especially those who are not entering with an offer of employment that includes employer-sponsored health insurance. Because such plans are less regulated under the ACA than individual market plans, carriers of such plans will no doubt rise to meet the new demand the Proclamation will invariably create. But in driving a majority of new immigrants towards these non-comprehensive plans—for a minimum of 364 days, no less, or their first year in the United States—the Proclamation undermines not only the ACA's goal of providing a certain minimum level of coverage to all legal immigrants in the United States, but

also its own stated goal of addressing the burdens of uncompensated care provided to uninsured individuals.

## REGULATORY BACKGROUND

105.    In addition to entering a stage already set by PRWORA, CHIPRA, and the ACA, the Proclamation follows hot on the heels of the Trump Administration's recently promulgated (and recently enjoined) "Public Charge Rule," which attempts to change what it means to be deemed a "public charge," one of the ten enumerated grounds of inadmissibility under the INA. Ignoring decades of legislation and case law, the new Rule attempts to redefine the term "public charge" and reshape the "totality of circumstances" framework that immigration officials apply to determine whether a person seeking admission is likely to become a public charge. The new Rule was enjoined from taking effect on October 15, 2019 by numerous courts.  Each court found the new definition of "public charge" contrary to Congress' plain meaning and intent.[31]

106.    Both the Proclamation and the new Rule effectively turn the question of admissibility to the United States into a receipt-of-benefits issue. The Rule was promulgated by the Department of Homeland Security via formal notice-and-comment rulemaking under the APA; the Proclamation was not.

---

[31] *New York v. U.S. Dep't of Homeland Security*,  No. 19 Civ. 7777 (GBD), 2019 U.S. Dist. LEXIS 177323 (S.D.N.Y. Oct. 11, 2019); *Make the Rd. N.Y. v. Cuccinelli*, 19 Civ. 7993 (GBD), 2019 U.S. Dist. LEXIS 177316 (S.D.N.Y. Oct. 11, 2019);) *City & Cty. of San Francisco v. U.S.US Citizenship & Immigration Servs.*, No. 4:19-cv-0471704980-PJH, 2019 U.S. Dist. LEXIS 177379 (N.D. Cal. Oct. 11, 2019); *Washington v. Dep't Homeland Security*, No. 4:19-cv-05210-RMP, 2019 U.S. Dist. LEXIS 178854 (E.D. Wash. Oct. 11, 2019); *Cook Cty. v. McAleenan*, No. 19 C 6344, 2019 U.S. Dist. LEXIS 177759 (N.D. Ill. Oct. 14, 2019); *Casa De Md., Inc. v. Trump*, No. PWG-19-2715, 2019 U.S. Dist. LEXIS 177797 (D. Md. Oct. 14, 2019).

**THE PROCLAMATION, LIKE THE RECENT PUBLIC CHARGE RULE, ATTEMPTS TO RADICALLY REWRITE CONGRESS' CHOICES ON WHICH IMMIGRANTS MAY ENTER THE COUNTRY, BASED ON WEALTH CONSIDERATIONS**

107.    The State Department's actions to implement the Proclamation without satisfying the requirements of notice and comment rulemaking layer one form of lawlessness on another. The Proclamation, like the recent Public Charge Rule, attempts to radically rewrite Congressional decision about which immigrants may enter the country based on wealth considerations.

108.    The nation's immigration laws have long included a prohibition on admitting non-citizens deemed to be a "public charge" on the country.  This definition has evolved over time but has never erected the kind of broad entry barrier that the Proclamation permits.

109.    In 1882, Congress enacted the country's first immigration laws, which refused foreign nationals permission "to land" in the United States "if on such examination there shall be found among such passengers any convict, lunatic, idiot, or **any person unable to take care of himself or herself without becoming a public charge**."  *See An Act to Regulate Immigration*, 22 Stat. 214, Chap. 376 § 2 (1882) ("1882 Act") (emphasis added).

110.    In 1891, Congress amended the 1882 Act to provide, in part,

> That the following classes of aliens shall be excluded from admission into the United States . . . : All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and . . . .

*An Act in Amendment to the Various Acts Relative to Immigration and the Importation of Aliens Under Contract or Agreement to Perform Labor*, 26 Stat. 1084, Chap. 551 ("1891 Act") §§ 1, 11 (1891).

111.    Congress subsequently amended immigration laws in 1903, 1907, and 1910 without materially altering the authorization to refuse entry to a noncitizen deemed a "public charge."[32] The 1910 Act provided, for example:

> That the following classes of aliens shall be excluded from admission into the United States: All idiots, imbeciles, feeble-minded persons, epileptics, insane persons, and persons who have been insane within five years previous; persons who have had two or more attacks of insanity at any time previously; paupers; persons likely to become a public charge; professional beggars; persons afflicted with tuberculosis or with a loathsome or dangerous contagious disease; persons not comprehended within any of the foregoing excluded classes who are . . . mentally or physically defective, such mental or physical defect being of a nature which may affect the ability of such alien to earn a living; persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude; polygamists, or . . . ."

1910 Act § 2.

112.    In 1915, The Supreme Court considered a "single question, . . . whether an alien can be declared likely to become a public charge on the ground that the labor market in the city of his immediate destination is overstocked." *See Gegiow v. Uhl*, 239 U.S. 3, 9-10 (1915).

113.    In answering "no" to the question, the Supreme Court interpreted the term "Persons likely to become a public charge" in context, that is, as "mentioned between paupers and professional beggars, and along with idiots, persons dangerously diseased, persons certified by the examining surgeon to have a mental or physical defect of a nature to affect their ability to earn a living, convicted felons, prostitutes and so forth." *Id.*   The Court held that "[t]he persons enumerated in short are to be excluded on the ground of permanent personal objections

---

[32] *An Act to Regulate the Immigration of Aliens Into the United States*, 32 Stat. 1213, Chap. 1012 § 2 (1903); *An Act to Regulate the Immigration of Aliens Into the United States*, 34 Stat. 898, Chap. 1134 § 2 (1907); *An Act to Amend an Act entitled An Act to Regulate the Immigration of Aliens Into the United States*, 36 Stat. 263, Chap. 128 § 2 (1910).

accompanying them irrespective of local conditions," and thus not according to local or temporary conditions impacting their self-sufficiency.  *Id.* at 10.

114.    After *Gegiow*, federal courts and immigration officials universally understood the term public charge as referring to persons with "a mental or physical defect of a nature to affect their ability to make a living," that is, those substantially, if not entirely, dependent on government assistance on a long-term basis.[33]

115.    In the century since the *Gegiow* decision, Congress has made numerous changes to immigration law, most notably the Immigration and Nationality Act of 1952.  *An Act to Revise the Laws Relating to Immigration, Naturalization, and Nationality; and for Other Purposes*, 66 Stat. 163, 183, Title 2, Chap. 2 ("1952 Act") § 212 (1952).  It has continued to use "public charge" as a basis for denying entry to noncitizens, but it has never offered its own definition of the term. It has, however, rejected attempts to adopt a definition contrary to the understanding developed in legislative history and case law.

116.    In 1996, for example, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996), which amended the INA by codifying five factors relevant to a public charge determination.  In the course of enacting IIRIRA, members of Congress debated whether to expand the public charge definition to include use of non-cash public benefits such as Medicaid and CHIP.  *See Immigration Control & Financial Responsibility Act of 1996*, H.R. 2202, 104th Cong. § 202

---

[33] *See, e.g.*, *United States ex rel. De Sousa v. Day*, 22 F.2d 472, 473-74 (2d Cir. 1927); *United States ex rel. La Reddola v. Tod*, 299 F. 592, 592-93 (2d Cir. 1924); *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917); *Ng Fung Ho v. White*, 266 F. 765, 769 (9th Cir. 1920), *rev'd on other grounds,* 259 U.S. 276 (1922); *Ex parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923); *In re Martinez-Lopez*, 10 I. & N. Dec. 409, 421–22 (B.I.A. 1962); *In re Harutunian*, 14 I. & N. Dec. 583, 589 (B.I.A. 1974); *In re Perez*, 15 I. & N. Dec. 136, 137 (B.I.A. 1974).

(1996) (early House bill that would have defined public charge for purposes of removal to include receipt by a non-citizen of Medicaid, supplemental food assistance, SSI, and other means-tested public benefits). The Senate, however, rejected the effort to include previously unconsidered, non-cash public benefits in the public charge test. It also rebuffed the attempt to create a bright-line framework of considering whether the immigrant has received public benefits for an aggregate of twelve months as "too quick to label people as public charges for utilizing the same public assistance that many Americans need to get on their feet." S. Rep. No. 104-249, at *63−64 (1996) (Senator Leahy's remarks). Accordingly, in its final bill, Congress did not include the receipt of Medicaid, CHIP, supplemental food assistance, SSI, and other means-tested public benefits. as determinative of a public charge.[34] *See* 8 U.S.C. § 1182(a)(4)(A).

117.    The public charge ground of inadmissibility, as amended in IIRIRA, provides: "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."[35] 8 U.S.C. § 1182(a)(4)(A). When determining whether an applicant is inadmissible as a public charge, the statute instructs the officer to consider "at a minimum" the applicant's age; health; family status; assets, resources, and financial status; and education and skills. 8 U.S.C. § 1182(a)(4)(B)(i). The officer "may also consider any affidavit of support under section 213A [8 U.S.C. § 1183a] for purposes of exclusion" on the public charge ground. 8 U.S.C. § 1182(a)(4)(B)(ii).

---

[34] Congress rejected a similar attempt to expand the public charge definition in 1994 when considering the Immigration Stabilization Act, *see* S. 1923 (103rd), § 501 (https://www.govtrack.us/congress/bills/103/s1923/text).

[35] Certain groups of noncitizens, such as asylum seekers and refugees, are not subject to exclusion based on an assessment that they are likely to become a public charge. *See* 8 U.S.C. § 1157 (refugee); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1159(c) (refugee).

CLASS ACTION COMPLAINT

118.    In 1999, the Immigration and Naturalization Service ("INS"), a precursor to the US Citizenship and Immigration Services ("USCIS"), issued a notice of proposed rulemaking and field guidance intended to "summarize longstanding law with respect to public charge and provide new guidance on public charge determinations" following the passage of IIRIRA. 64 Fed. Reg. 26,689 (May 26, 1999) (the "Field Guidance"). *Notice of Proposed Rulemaking, Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676 (May 26, 1999) (to be codified at 8 C.F.R., pts. 212 & 237) ("1999 Proposed Rule"); *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (Mar. 26, 1999) ("1999 Field Guidance").  The 1999 Proposed Rule and Field Guidance defined "public charge" to mean "an alien who is likely to become primarily dependent on the Government for subsistence as demonstrated by either (i) The receipt of public cash assistance for income maintenance purposes, or (ii) Institutionalization for long-term care at Government expense (other than imprisonment for conviction of a crime)."  1999 Proposed Rule, 64 Fed. Reg. at 28,681; 1999 Field Guidance, 64 Fed. Reg. at 28,689.  The 1999 Rulemaking clarified in particular that the INS had adopted this definition "based on the plain meaning of the word 'charge,' the historical context of public dependency when the public immigration provisions were first enacted more than a century ago, and the expertise of the benefit-granting agencies that deal with subsistence issues." 64 Fed. Reg. at 28,677.

119.    The Field Guidance further directed service officers "to assess the financial responsibility of the alien by examining the 'totality of the alien's circumstances' *at the time of his or her application * * * The existence or absence of a particular factor *should never be the sole criterion* for determining if an alien is likely to become a public charge."  1999 Field Guidance, 64 Fed. Reg. at 28,690 (emphasis in original).

120.    The 1999 Field Guidance, which was made consistent with the Department of State's understanding, reaffirmed that "[i]t has never been Service policy that any receipt of services or benefits paid for in whole or in part from public funds renders an alien a public charge, or indicates that the alien is likely to become a public charge. The nature of the public program must be considered.  For instance, attending public schools, taking advantage of school lunch or other supplemental nutrition programs, or receiving emergency medical care would not make an alien inadmissible as a public charge, despite the use of public funds."  1999 Field Guidance, 64 Fed. Reg. at 28,692 (*citing* FAM § 40.41 n.9.1 (1999)).

121.    The 1999 Field Guidance also emphasized that the purpose in issuing the proposed rule and field guidance was intended to end "confusion about the relationship between the receipt of public benefits and the concept of 'public charge' [that] has deterred eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive. This reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare."  1999 Field Guidance, 64 Fed. Reg. at 28,692.

122.    The 1999 Field Guidance specifically exempted "Medicaid and other health insurance and health services (including public assistance for immunizations and for testing and treatment of symptoms of communicable diseases; use of health clinics, short-term rehabilitation services, and emergency medical services) other than support for long-term institutional care" from public charge determinations. 1999 Field Guidance, 64 Fed. Reg. at 28,693.

123.    Although the 1999 Proposed Rule was never finalized, the 1999 Field Guidance has governed public charge admissibility determinations since that time—nearly two decades.

CLASS ACTION COMPLAINT

124.    On October 10, 2018, DHS published a notice of proposed rulemaking (the "Rule" or the "Public Charge Rule"), *Inadmissibility on Public Charge Grounds*, which rescinded the 1999 Rulemaking, redefined "public charge," and amended the totality-of-the-circumstances standard prescribed by the 1999 Field Guidance. 83 Fed. Reg. 51,114 (Oct. 10, 2018) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245 and 248).

125.    The proposed rule followed President Trump's failed attempt to garner broad congressional support for the 2017 the Reforming American Immigration for a Strong Economy (RAISE) Act, which would have eliminated the INA's system of allocating immigration visas according to family, employment, and diversity categories and replacing it with a points-based "merit" system "to prioritize immigrants based on the skills they bring to our Nation while safeguarding the jobs of American workers."[36]

126.    After a 60-day notice-and-comment period, in which it received 266,077 comments, DHS finalized and issued the Rule on August 14, 2019, notwithstanding the fact that the "vast majority of [comments] . . . opposed the rule." 84 Fed. Reg. at 41,304. The Rule was scheduled to become effective on October 15, 2019.

127.    The Rule redefined a "public charge" to include any noncitizen "who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36 month period (such that, for instance, receipt of two benefits in one month counts as two months)." 84 Fed. Reg. 41,501 (to be codified at 8 C.F.R. § 212.21(a)).  Unlike the previous Field Guidance definition of "public charge," which focused specifically on the receipt of *cash* benefits or long-term institutionalization, the Rule defines "public benefit" as both cash benefits *and noncash benefits*,

---

[36] *President Donald J. Trump Backs RAISE Act,* WHITEHOUSE.GOV (Aug. 2, 2017) https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-backs-raise-act/

including Temporary Assistance for Needy Families ("TANF"), Supplemental Nutrition Assistance Program ("SNAP," also known as "food stamps"), Medicaid, and public housing and Section 8 housing assistance. *Id.*; *see also* 8 C.F.R. § 212.21(b).

128.    The Rule also significantly altered the totality-of-the-circumstances framework, assigning different weights to certain factors labeled as positive, negative, heavily positive, and heavily negative, which a DHS officer must weigh "individually and cumulatively." 84 Fed. Reg. at 41,397; *see also id.* at 41,502-04.

129.    A prospective immigrant is given heavy negative weight if, for example, she has a medical condition requiring "extensive medical treatment" and is "uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition." 84 Fed. Reg. 41,504; *see also* 8 C.F.R. § 212.22(c)(1)(i), (iii).  A prospective immigrant would receive heavy positive weight for "an annual income . . . of at least 250 percent of the [Federal Poverty Guidelines] for the alien's household size" or for "private health insurance that is not subsidized under the Affordable Care Act." *See* 8 C.F.R. § 212.22(c)(2)(ii), (iii). The consular officer must also consider, among other things, the immigrant's age; household income; household size; credit score; education; occupational skills, certifications, or licenses; and English fluency. *See* 8 C.F.R. § 212.22(b).

130.    As Trump Administration officials have acknowledged, the cumulative effect of these changes would substantially burden immigrants with disabilities and lower incomes—and in particular, non-white immigrants who are not from Europe—to demonstrate their admissibility. When Ken Cuccinelli, acting director of USCIS, was asked whether the proposed Rule conflicted with the *New Colossus* poem by Emma Lazarus inscribed at the base of the Statue of Liberty, he amended the poem as follows: "Give me your tired and your poor who can stand on their own two

CLASS ACTION COMPLAINT

feet, and who will not become a public charge."[37] Shortly thereafter, he clarified his understanding that *New Colossus* "was referring to people coming from Europe."[38]

131.    Expert analysis confirmed that the Rule "could shift legal immigration away from Latin America and towards Europe" due to its emphasis on income.[39] The Migration Policy Institute, for example, examined immigrants who had received legal permanent residence within the last five years to explore the potential scope of the Rule's impact. MPI analysts found that 69% of immigrants who had received legal permanent residence within the last five years had at least one negative factor under the Rule, and that the Rule would have "a disproportionate effect on women, children, and the elderly."[40] In particular, among "recently arrived legally present noncitizens[,] 71 percent of Mexicans and Central Americans, 69 percent of Africans, and 52 percent of Asian immigrants would fail to meet the threshold" of incomes or financial assets above 250% of the federal poverty line, a heavily weighted factor under the Rule.[41] In short, "the impact

---

[37] Jacey Fortin, *'Huddled Masses' in Statue of Liberty Poem Are European, Trump Official Says,* NY TIMES (Aug. 14, 2019) https://www.nytimes.com/2019/08/14/us/cuccinelli-statue-liberty-poem.html

[38] *Id.*

[39] Randy Capps et al., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration,* MIGRATION POLICY INST. (Nov. 2018) https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration

[40] *Id.*; *see also* Abigail Hauslohner et al., *Trump Officials Move to Deny Green Cards, Path to Citizenship for Poor Immigrants,* WASH. POST (Aug. 12, 2019) *Id.*; *see also* https://www.washingtonpost.com/immigration/trump-administration-aims-to-make-citizenship-more-difficult-for-immigrants-who-rely-on-public-assistance/2019/08/12/fe3f8162-b565-11e9-8949-5f36ff92706e_story.html

[41] Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public Charge" Rule,* MIGRATION POLICY INST. (Aug. 2018) https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule. Notably, MPI also found that 40 percent of US-born citizens would fail to meet this threshold and would be at risk of being deemed a public charge under the Rule.

of the new standard would fall most heavily upon Asian, Latin American, and African immigrants, making the proposal something of a modern-day version of the National Origins Quota Act of 1924. That since-repudiated law sought to tilt immigration to Western Europe."[42]

132.    Although multiple courts have since enjoined the Rule, it nevertheless constitutes an attempt to radically reshape what it means to be a public charge, and by doing so, constitutes an attempt to radically reshape which noncitizens are allowed to immigrate to or adjust status in the United States. Analysis of the characteristics of recent green-card recipients, compared with the negative and heavily weighted negative factors in the public charge test, reveals that 69% had at least one negative factor and 43% had at least two.[43] More significantly, the effects of the rule "are likely to be less for Europe, Canada, and Oceana, where 27 percent had two or more negative factors."[44] In contrast, "impacts will be far greater for Central America and Mexico, where 60 percent had two or more such factors,"[45] and in general for "Latin America and Africa, where incomes are generally lower than the rest of the world."[46] Researchers have predicted that "people

---

[42] Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public Charge" Rule,* MIGRATION POLICY INST. (Aug. 2018) https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule

[43] Jeanne Batalova et al., *Millions Will Feel Chilling Effects of U.S. Public-Charge Rule That is Also Likely to Reshape Legal Immigration,* MIGRATION POLICY INST., (Aug. 2019) https://www.migrationpolicy.org/news/chilling-effects-us-public-charge-rule-commentary

[44] *Id.*

[45] *Id.*

[46] Abigail Hauslohner et al., *Trump Officials Move to Deny Green Cards, Path to Citizenship for Poor Immigrants,* WASH. POST (Aug. 12, 2019) https://www.washingtonpost.com/immigration/trump-administration-aims-to-make-citizenship-more-difficult-for-immigrants-who-rely-on-public-assistance/2019/08/12/fe3f8162-b565-11e9-8949-5f36ff92706e_story.html

who are granted green cards – the major step towards winning citizenship – will become wealthier but their numbers will shrink."[47] In other words, "[m]ore green cards will go to immigrants with a good education and a measure of self-sufficiency; fewer will be granted simply because someone has a family member in the United States"[48]—a result President Trump has long championed when promoting a "merit-based" immigration system to replace the current one.

133.    The anticipated effects of the Proclamation are similar to those of the now-enjoined Rule. This can hardly be surprising, given that both share significant similarities: Both favor "unsubsidized" ACA coverage over subsidized; the use of Medicaid is a negative or disqualifying factor for adults 18 and over; and both involve some analysis on the part of a consular officer as to whether an intending immigrant has sufficient financial resources to cover "reasonably foreseeable medical costs."

134.    How the Rule and the Proclamation achieve these effects, however, is where the two differ. When promulgating the Rule, the Trump Administration made at least some attempt to comply with the strictures of the Administrative Procedure Act—just as Senators Tom Cotton and David Perdue, two allies of the President in the Senate, attempted to comply with the legislative processes of Congress when sponsoring the RAISE Act. The Proclamation, by contrast, is an improper attempt to legislate by presidential fiat, followed by invalid agency action to implement those improper orders. Here, with a single sweep of the President's pen, the Proclamation attempts to overwrite and overturn more than a century of Congressional intent to admit qualified noncitizens as immigrants, regardless of wealth, health, race, or national origin.

---

[47] Michael D. Shear et al., *Trump's Policy Could Alter the Face of the American Immigrant,* NY TIMES (Aug. 14, 2019) https://www.nytimes.com/2019/08/14/us/immigration-public-charge-welfare.html

[48] *Id.*

CLASS ACTION COMPLAINT

## THE PROCLAMATION AND ITS IMPLEMENTATION ARE UNLAWFUL

**A.    The Proclamation Does Not Pass Muster Under Section 212(f) or Rational Basis Review**

135.    The Proclamation purports to be grounded in the President's authority under 8 U.S.C. § 1182(f), which allows the President to "suspend the entry of all aliens or any class of aliens" whenever the President "finds that the entry" of such "aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But in suspending the entry of potentially *two thirds* of all legal immigrants to the United States, the Proclamation represents an unprecedented abuse of the §1182(f) power.  Although the Supreme Court found that the Muslim Ban represented a permissible exercise of the President's broad authority to impose entry restrictions under § 1182(f) based on national security considerations, the Proclamation strains even the generous analysis of *Trump v. Hawaii*, 138 S. Ct. 2392  (2018).

136.    Indeed, the Supreme Court's decision in *Hawaii* is bound up in the circumstances of the proclamation at issue in that case, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." The Court took pains to note, for example, that the Muslim Ban "supports Congress's individualized approach for determining inadmissibility" because it was intended to "promote[] the effectiveness of the [consular officer] vetting process by helping to ensure the availability" of "sufficient (and sufficiently reliable) information" to assess a visa applicant's admissibility. *Hawaii,* 138 S. Ct. at 2411. It also observed that previous suspensions under § 1182(f) often involved foreign policy judgments: Some such suspensions "broadly suspended entry on the basis of nationality due to ongoing diplomatic disputes;" others "were directed at subsets of aliens from the countries at issue;" but as a general rule, the Court found that previous Presidents "repeatedly

suspended entry" under § 1182(f) "to retaliate for conduct by their governments that conflicted with foreign policy interests." *Id.* at 2413.

137.    Within this context, the Court found that the President had satisfied the "sole requisite set forth in § 1182(f)"—i.e., that the President "find that the entry of covered aliens would be detrimental to the interests of the United States."8 U.S.C. § 1182(f).  As the Court observed, the President had ordered DHS and other agencies "to conduct a comprehensive evaluation," then "set[] forth extensive findings" justifying why "it was in the national interest to restrict entry of aliens who could not be vetted with adequate information—both to protect national security and public safety, and to induce improvement by their home countries." The Court also highlighted language in the Muslim Ban noting that the Administration had "crafted country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, while securing the Nation until such time as improvements occur."  Indeed, the Court found that "[t]he 12-page Muslim Ban—which thoroughly describes the process, agency evaluations, and recommendations underlying the President's chosen restrictions—is more detailed than any prior order a President has issued under § 1182(f)."  *Hawaii,* 138 S. Ct. at 2409.

138.    Given these findings, especially within a national security setting, the Court found that the Muslim Ban "is squarely within the scope of Presidential authority under the INA."  *Id.* at 2415.

139.    The Court also noted, however, that it "has engaged in a circumscribed inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen."  *Id.* at 2419. The limits on such an inquiry, pursued under *Kleindienst v. Mandel,* have "particular force in admission and immigration cases that overlap with the area of national security" for two reasons: First, judicial inquiry into national security concerns potentially "intrud[es] on the President's

constitutional responsibilities in the area of foreign affairs," raising separation of powers concerns. *Id.* at 2398. Second, the courts are not well positioned "when it comes to collecting evidence and drawing inferences on questions of national security." *Id.*

140.    Thus, when evaluating the Plaintiffs' constitutional challenges to the Ban, the Court articulated a standard of review that "considers whether the entry policy is plausibly related to the Government's stated objective." *Id.* at 2420.

141.    Although the Supreme Court found that the Muslim Ban ultimately met this standard, it was careful to note that its analysis was grounded in the national security context. It was this context that allowed the Court to find that "the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility," *Id.* at 2421, despite acknowledging "a series of statements by the President and his advisers casting doubt on the official objective of the Proclamation," *Id.* at 2417. In so finding, the Court gave express deference to "the Executive's evaluation of the underlying facts . . .particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'"  *Id.* at 2422.

142.    In addition, the Court credited three specific features of the Ban and its predecessors that "support the Government's claim of a legitimate national security interest." *Id.* at 2402.

143.    First, three Muslim-majority countries had already been removed from the list of banned countries, and the Proclamation stated that for countries remaining on the list, the tailored entry suspensions would "remain in force only so long as necessary to address" the security concerns posed by each country. *Id.* at 2410.

144.    Second, the Ban "includes significant exceptions for various categories of foreign nationals," permitting "nationals from nearly every covered country to travel to the United States

CLASS ACTION COMPLAINT                                                                                    57

on a variety of nonimmigrant visas," which make up the majority of visas issued to nationals from the banned countries. *Id.* at 2422.

145.    Third, "the Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants," and "directs DHS and the State Department to issue guidance elaborating upon the circumstances that would justify a waiver." *Id.* at 2422-23.  The Court found this program, which identifies specific eligibility criteria, to be similar to humanitarian exceptions set forth in a similar country-specific suspension imposed by President Carter during the Iran hostage crisis.

146.    Given these considerations, the Court held that the plaintiffs had failed to demonstrate a likelihood of success on the merits of their constitutional claims because "the Government has set forth a sufficient national security justification to survive rational basis review," and remanded the case to the lower courts for further proceedings. *Id.* at 2423.

147.    The Supreme Court found that § 1182(f) "grants the President broad discretion to suspend the entry of aliens into the United States." *Id.* at 2408.  But such authority is not limitless. If the Proclamation is allowed to ban *two thirds* of immigrants whom Congress has expressly permitted to seek and receive immigrant visas based on wealth or self-sufficiency, such a reading of § 1182(f) would provide the President with unfettered discretion to rewrite the INA as he sees fit. Such a reading cannot muster under even the most generous reading of *Hawaii*.

148.    As an initial matter, unlike the Muslim Ban, the Proclamation does nothing to "support[] Congress's individualized approach for determining admissibility" under the INA. There is nothing in the text of the Proclamation indicating that one of its purposes is to "improve the screening and vetting protocols and procedures associated with" the visa-issuance process. 82 Fed. Reg. 45162 (Sept. 27, 2017). To the contrary, the Proclamation expressly has nothing to do

with national security, bearing a "HEALTHCARE" label on the White House website.[49] By its terms, the Proclamation's purpose is to protect the country's health care system and taxpayers "from the burdens of uncompensated care" by suspending the "entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare." Thus, instead of a relatively targeted, country-specific approach intended to "encourage foreign governments to improve their . . . practices" in vetting and information sharing, the Proclamation sweeps far more broadly and indiscriminately, affecting hundreds of thousands of immigrants solely on the basis of their ability to afford health insurance. 82 Fed. Reg. 45,162.

149.    Second, the Proclamation does not even attempt to set forth factual findings justifying its sweeping ban on nearly two thirds of all prospective immigrants seeking to enter the United States. Unlike the Muslim Ban, the Proclamation is not grounded in any comparable multi-agency, comprehensive evaluation that led to "extensive findings" set forth in the Proclamation, justifying why it is in the national interest to restrict the entry of aliens through country-specific restrictions crafted to "encourage cooperation given each country's distinct circumstances." *Hawaii,* 138 S. Ct. at 2409 (citation and internal quotations omitted).

150.    Instead, in a short preamble that ostensibly justifies the details of the suspension that follows, the Proclamation merely claims that uninsured individuals burden the country's health care system for two main reasons: because "[h]ealthcare providers and taxpayers bear substantial costs in paying for medical expenses incurred by people who lack health insurance;" and because "uninsured individuals often use emergency rooms to seek remedies for a variety of

---

[49] *Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System,* WHITEHOUSE.GOV (Oct. 4, 2019) https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/

non-emergency conditions," which burdens taxpayers, "who reimburse hospitals for a portion of their uncompensated emergency care costs." 84 Fed. Reg. 53,991.  According to an unsupported assertion in the preamble, "[i]n total, uncompensated care costs – the overall measure of unreimbursed services that hospitals give their patients – have exceeded $35 billion in each of the last 10 years." *Id.* The Proclamation then asserts that "data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance." *Id.*  The Proclamation does not provide or cite to any support for these claims.

151.    It is these unsupported assertions alone that purport to justify the Proclamation's indiscriminate ban on hundreds of thousands of prospective immigrants across the globe.

152.    The lack of factual support for the Proclamation's entry suspension is evident. While claiming that "lawful immigrants are about three times more likely than United States citizens to lack health insurance," the Proclamation ignores the fact that United States citizens actually account for 75% of the total 27.4 million uninsured in this country, or 20.55 million uninsured individuals.[50] In comparison, according to figures provided by the Kaiser Family Foundation for 2017, uninsured immigrants represent only 11% of uninsured in this country, or 3 million uninsured individuals.

153.    In attaching a dollar amount to the "uncompensated care costs"—in excess of "$35 billion in each of the last 10 years," or "$7 million on average for each hospital in the United States"—the Proclamation provides no evidentiary support for these figures. Nor does it set forth any factual findings identifying what percentage of this total overall figure is attributable to the 75% of uninsured United States citizens versus the 11% uninsured immigrants in this country,

---

[50] *President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage,* KAISER FAMILY FUND (Oct. 10, 2019) https://www.kff.org/disparities-policy/fact-sheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/

such that the continued entry of such uninsured immigrants to the United States "would be detrimental" to the interests of "protecting both [our health care system] and the American taxpayer from the burdens of uncompensated care."  84 Fed. Reg. 53,991.

154.    The Proclamation, moreover, sets forth no factual findings explaining how the conditions of its suspension further the stated goal of reducing the burden of uninsured health care costs. This is in stark contrast to the Muslim Ban, which articulated country-specific deficiencies in vetting and information-sharing; justifications for the suspension of specific visas from specific countries; and express instructions to the Secretary of State to engage in diplomatic efforts with these countries to improve the identified deficiencies, using the suspension of specific visas from those countries "to ensure that adequate standards are established to prevent infiltration by foreign terrorists." 82. Fed. Reg. 13,213. The Proclamation, by contrast, imposes a far broader suspension, barring all immigrants worldwide except for the limited few who can arrange for certain types of United States-based health insurance or demonstrate an unspecified level of wealth at their visa interview. There are no factual findings explaining how, for example, the entry of an immigrant who would be *fully insured* with comprehensive coverage under the ACA after arrival—albeit with financial assistance—would be detrimental to the Proclamation's express purpose of reducing the financial burden imposed by *uninsured* individuals. There are likewise no factual findings explaining how the entry of an immigrant who would be underinsured or effectively uninsured with visitor insurance or a short-term limited duration insurance plan would further this purpose.

155.    Third, in infringing the Plaintiffs' constitutional rights, the Proclamation's policy of suspending entry for *all* new immigrants unless they can afford only certain types of health insurance, or demonstrate an unspecified level of wealth, is not plausibly related to the Government's stated objective of "addressing the challenges facing our healthcare system,

CLASS ACTION COMPLAINT                                                                      61

including protecting both it and the American taxpayer from the burdens of uncompensated care." 84 Fed. Reg. 53,991.

156.    As noted above, the Proclamation's broad suspension on entry, combined with its limited array of "approved health insurance" options, effectively incentivizes—if not requires—most prospective immigrants to purchase non-comprehensive visitor insurance or short-term limited duration insurance to satisfy the Proclamation's requirements. This is because the vast majority of immigrants entering the United States have historically been family-based visa applicants, who would not have access to "approved" employer-based insurance before entering the United States and obtaining work authorization. Many of the other "approved health insurance" plans under the Proclamation (i.e., Medicare, TRICARE, family members' plans, and catastrophic and "unsubsidized" ACA plans) are not practically or legally available to most prospective immigrants outside of the country. Even for employment-based visa applicants, employer-sponsored insurance is far from guaranteed, as the vast majority of employers impose a waiting period before employees can be participate in employer-sponsored coverage, with waiting periods lasting 1.9 months on average.[51] Visitors insurance and STLDI plans are, as a practical matter, the only options realistically available to most would-be immigrants, and those will generally not be available to cover preexisting conditions.

157.    These options, however, provide extremely limited coverage and would likely leave individuals underinsured or uninsured for common needs such as prescription drugs, to say

---

[51] *2018 Employer Health Benefits Survey,* KAISER FAMILY FUND (Oct. 3, 2018) https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-3-employee-coverage-eligibility-and-participation/

CLASS ACTION COMPLAINT                                                                    62

nothing of hospitalization or emergency care.[52] The Proclamation, moreover, requires prospective immigrants to purchase such coverage for the maximum time period allowed, 364 days.[53] Once that 364-day period expires, the immigrant would not be able to switch immediately to a regular, comprehensive plan, regardless of whether she wanted to and had the resources to do so, with or without financial assistance: instead, the immigrant would be required to wait until the next regular open enrollment period (November 1 through December 15 each year) to change coverage. Allowing and in fact encouraging the entry of immigrants covered by visitor and STLDI plans, and requiring that coverage for their first year in a new country or likely longer, contravenes the Proclamation's goal of reducing uncompensated costs associated with uninsured health care.

158.    In fact, although the Proclamation highlights the $35 billion in uncompensated care costs incurred by this nation's hospitals, the American Hospital Association ("AHA") criticized STLDI plans earlier this year when the Trump Administration proposed a new rule to make STLDI plans more available and longer in duration. The AHA warned that STLDI products "could end up costing a patient far more by covering fewer benefits and ensuring fewer critical protections, like covering pre-existing conditions," such that patients "could find themselves responsible for their entire medical bill without any help from their 'health plan.'"[54] Accordingly, "[f]or providers,

---

[52] Karen Pollitz et al., *Understanding Short-Term Limited Duration Health Insurance,* KAISER FAMILY FUND (Apr. 23, 2018) https://www.kff.org/health-reform/issue-brief/understanding-short-term-limited-duration-health-insurance/; https://www.commonwealthfund.org/blog/2018/short-term-health-plan-gaps-and-limits-leave-people-risk

[53] As noted above, see FN 51, STLDI plans lasting 364 days are only available in about half the states.

[54] https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance

CLASS ACTION COMPLAINT

[STLDI] products will lead to increased bad debt, with underinsured patients unable to afford the care they need but that is not covered," and "[i]ncreased bad debt will further strain hospitals' and health systems' ability to provide a full range of services to their patients and communities, including the most vulnerable."[55] Other commenters to the final rule warned increasing the availability of STLDI plans that "are not qualifying health plans mandated to cover the essential benefits of the Affordable Care Act" could "lead to an increased reliance on emergency departments as consumers delay or do not seek primary care."[56] If President Trump sincerely wished to address the problem of uncompensated care costs borne by hospitals, especially "uncompensated emergency care costs" incurred by emergency rooms, driving new immigrants towards STLDI and similar non-comprehensive plans like visitor insurance is not a reasonable solution.

159.    The Proclamation likewise fails to address why the Trump Administration, after laboring for a year to repeal the individual mandate of the Affordable Care Act and celebrating that repeal of the penalty associated with that statutory mandate for almost two years since, has now identified the "burdens of uncompensated care" for uninsured individuals as a problem that must be alleviated by imposing the individual mandate (and a stark penalty of inadmissibility into the country for failure to comply) specifically and solely on newly arriving immigrants— notwithstanding the fact that only 11% of uninsured individuals in this country are immigrants, while 75% of uninsured individuals are citizens.

---

[55] *Id.*

[56] Rick Pollack, *AHA Statement on Final Rule on Short-Term, Limited-Duration Health Insurance Plans,* AMERICAN HOSPITAL ASSOCIATION (Aug. 1, 2018) https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance https://www.healthcarefinancenews.com/news/increase-uncompensated-hospital-care-could-be-one-effect-short-term-coverage-rule

CLASS ACTION COMPLAINT                                                              64

160.    Although the President's authority to suspend entry under § 1182(f) may be broad, it is not absolute—especially not when the exercise of that authority does not comply with either the text of the statutory provision and is patently unrelated in any rational fashion to its stated objective.

**B.    The Proclamation Does Not Pass Muster Under Equal Protection**

161.    The President's § 1182(f) powers, moreover, do not give him license to run roughshod over the Constitution's guarantee of equal protection. From the time he announced his candidacy through his entire tenure in the White House, President Trump has openly expressed antipathy toward not only all noncitizens, but also specifically toward immigrants seeking to come to the United States—particularly immigrants of color, including those from countries such as Mexico, Haiti, and Nigeria, and regions such as Central and Latin America, Africa, and the Middle East. The Proclamation is but the latest in an iterative string of attempts to deny immigrant visas to foreign nationals on the basis of their national origin or race—a motivation President Trump has expressed since he was a candidate.

162.    Indeed, in the same speech in which he announced his presidential bid, then-candidate Trump declared: "When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you." Rather, he warned his audience, "They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists." And, he added, "They're not sending us the right people. It's coming from more than Mexico. It's coming from all over South and Latin America,

and it's coming probably—probably—from the Middle East. But we don't know. Because we have no protection and we have no competence, we don't know what's happening."[57]

163.    Notwithstanding immediate public backlash to his remarks equating all Mexicans with "rapists," then-candidate Trump doubled down shortly thereafter in an interview on CNN. When asked about the North American Free Trade Agreement, then-candidate Trump pivoted to the topic of immigration and volunteered: "I love the Mexican people. I do business with the Mexican people, but you have people coming through the border that are from all over. And they're bad. They're really bad." He further clarified: "But you have people coming in and I'm not just saying Mexicans, I'm talking about people that are from all over that are killers and rapists and they're coming into this country."[58]

164.    The themes that then-candidate Trump presented in these early statements of his candidacy have recurred in his public remarks about immigrants ever since. He has repeatedly and consistently associated immigrants with crime and a lack of national security.[59] He has repeatedly and consistently presented immigrants as not only undesirable to this country,[60] but also different

---

[57] *Full text: Donald Trump Announces a Presidential Bid,* WASH. POST (June 16, 2015) https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/

[58] http://cnnpressroom.blogs.cnn.com/2015/06/28/donald-trump-on-cnns-state-of-the-union-im-in-it-to-win-it-i-will-make-our-country-great-again/

[59]  "They're rapists;" "It's coming from all over" and "we have no protection;" *see also Donald Trump on CNN's State of the Union: "I'm in it to win it…I will make our country great again"* CNN (June 28, 2015) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/  ("In recent weeks, two terrorist attacks in New York were made possible by the visa lottery and chain migration.  In the age of terrorism, these programs present risks we can no longer afford.").

[60] "When Mexico sends its people, they're not sending their best;" "They're not sending us the right people." *See also* Alana Abramson*, 'I Can Be More Presidential Than Any Other President.' Read Donald Trump's Ohio Rally Speech*, TIME (July 26, 2017)See also:

---

CLASS ACTION COMPLAINT

from the American public.[61] And he has repeatedly and consistently advanced the notion that these

undesirable immigrants come from Latin America, the Middle East, or Africa[62]  and enter this

country in an unregulated fashion because of the problems in the current immigration system.[63]

165.    Indeed, in speeches, remarks to the press, and tweets, President Trump has

consistently attacked the two primary ways that noncitizens from predominantly nonwhite

countries receive immigrant visas: the family preference system, which allows United States

citizens and lawful permanent residents to sponsor close family members for immigrant visas; and

the diversity visa lottery, which was originally established in 1990 to diversify the country's

immigrant population by selecting immigrants from countries with historically low rates of

immigration to the United States. The former accounts for approximately 65% of all immigrant

---

https://time.com/4874161/donald-trump-transcript-youngstown-ohio/  (criticizing "today's low-skill system, just a terrible system where anybody comes in. People that have never worked, people that are criminals, anybody comes in. . . . We don't want people that come into our country and immediately go on welfare and stay there for the rest of their lives.").

[61] "They're not sending you." *See also President Trump Remarks at Conservative Political Action Conference,* CSPAN (Feb. 23, 2018)*See also* https://www.c-span.org/video/?441592-1/president-trump-pushes-concealed-carry-teachers-cpac-speech (describing the diversity visa lottery: "You have a country, they put names in. Do you think they are giving us the good people? Not too many of you people are going to be a lottery.")

[62] "It's coming from more than Mexico. It's coming from all over South and Latin America, and it's coming probably—probably—from the Middle East." *See also* @realdonaldtrump, Twitter https://twitter.com/realdonaldtrump/status/980961086546632705 ("Honduras, Mexico and many other countries that the U.S. is generous to, sends many of their people to our country through our WEAK IMMIGRATION POLICIES.")

[63] "It's coming from all over," but "[b]ecause we have no protection and we have no competence, we don't know what's happening." *See also* https://twitter.com/realdonaldtrump/status/953406553083777029 ("We need to keep America safe, including moving away from a random chain migration and lottery system, to one that is merit-based.")

CLASS ACTION COMPLAINT

visas granted every year; the latter accounts for about 4.5%.[64] President Trump has repeatedly criticized both family-based preferences and the diversity visa lottery by claiming that they admit immigrants through "random chance,"[65] threatening the country's economy and security[66] and "put[ting] pressure on our social safety net and generous welfare programs."[67]

166.    For example, President Trump regularly portrays family-based immigration in derogatory terms, dismissing family preferences as "chain-based migration" that "can continue without limit,"[68] even though the INA strictly limits the types and numbers of family-sponsored immigrants.[69] In continually emphasizing "chain" metaphor, he raises the specter of a "virtually

---

[64] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2017/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2016/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2015/table10

[65] *Remarks by President Trump on Modernizing Our Immigration System for a Stronger America,* WHITEHOUSE.GOV (May 16, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-modernizing-immigration-system-stronger-america/

[66] See, e.g., *Remarks by President Trump and Vice President Pence in a Meeting on Immigration with Republican Members of the Senate*, WHITEHOUSE.GOV (Jan. 4, 2018) See, e.g., https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-meeting-immigration-republican-members-senate/

[67] *Remarks by President Trump on Modernizing Our Immigration System for a Stronger America,* WHITEHOUSE.GOV (May 16, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-modernizing-immigration-system-stronger-america/

[68] @realdonaldtrump, Twitter, https://twitter.com/realdonaldtrump/status/960907362109452288

[69] David Bier, *Five Myths about Chain Migration,* CATO INST. (Feb. 14, 2018) https://www.cato.org/publications/commentary/five-myths-about-chain-migration

CLASS ACTION COMPLAINT

unlimited"[70] influx of "low-skilled and unskilled"[71] migrants who "come in and just immediately go and collect welfare."[72]  Chain migration," according to President Trump, is "bringing many, many people with one, and often it doesn't work out very well. Those many people are not doing us right."[73]

167.    Contrary to the President's suppositions and assertions, the truth remains that nearly half of adults who receive family-based visas have college degrees (compared with less than a third of U.S. natives) and family-sponsored immigrants are the most upwardly mobile American workers.[74]

168.    It is also a common set-piece in President Trump's speeches for him to bring up the diversity visa lottery, play-act drawing names out of a hat, and characterize the "winners" as criminals and "the worst of the worst:"[75] "The country puts the name in the basket and you pick people out of the lottery. This one is a murderer. This one robbed four banks. This one I better not

---

[70] *President Donald J. Trump's State of the Union Address*, WHITEHOUSE.GOV (Jan. 30, 2018) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/

[71] *President Donald J. Trump Backs RAISE Act,* WHITEHOUSE.GOV (Aug. 2, 2017) https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-backs-raise-act/

[72] *Trump Administration Immigration Policy Announcement*, CSPAN (Aug. 2, 2017) https://www.c-span.org/video/?432076-1/president-backs-gop-senators-skilled-based-immigration-bill

[73] *Remarks by President Trump in Meeting with Bipartisan Members of Congress on Immigration*, WHITEHOUSE.GOV (Jan. 9, 2018) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-bipartisan-members-congress-immigration/

[74] David Bier, *Five Myths about Chain Migration,* CATO INST. (Feb. 14, 2018) https://www.cato.org/publications/commentary/five-myths-about-chain-migration

[75] *Remarks by President Trump in Meeting with Bipartisan Members of Congress on Immigration*, WHITEHOUSE.GOV (Jan. 9, 2018) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-bipartisan-members-congress-immigration/

CLASS ACTION COMPLAINT

say. This one another murderer. Ladies and gentlemen, another murderer."[76] President Trump regularly mischaracterizes the program as a way for countries to send their undesirable citizens to the United States, claiming, "[y]ou have a country, they put names in. Do you think they are giving us the good people? . . . They are not giving us their best people, folks. Use your heads."[77] He likewise routinely denigrates the diversity visa lottery as "a program that randomly hands out green cards without any regard for skill, merit, or the safety of our people"[78]—

169.     The truth remains that individuals must apply for the diversity visa lottery and possess either a high school education or demonstrate two years of work experience in a sufficiently skilled occupation.  Applicants must then pass the exact same criminal, national security, and medical checks as all other immigrants if they are so fortunate to win a diversity visa.[79]

170.     Notably, most family-based visa immigrants in recent years have originated in Asia, Africa, and South America; most diversity visa lottery winners have originated in Africa and Asia.[80] In other words, when attacking family-based or diversity visa immigration—both long-

---

[76] *President Trump in Cincinnati, Ohio*, CSPAN (Aug. 1, 2019) https://www.c-span.org/video/?463078-1/president-trump-holds-campaign-rally-cincinnati-ohio&start=1937

[77] *See also President Trump Remarks at Conservative Political Action Conference,* CSPAN (Feb. 23, 2018) https://www.c-span.org/video/?441592-1/president-trump-pushes-concealed-carry-teachers-cpac-speech

[78] *President Donald J. Trump's State of the Union Address*, WHITEHOUSE.GOV (Jan. 30, 2018) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/

[79] *See generally* Alex Nowrasteh, *The Cheap Assault on the Immigration Visa Lottery,* CATO INST. (Jan. 28, 2018)  *See generally* https://www.cato.org/publications/commentary/cheap-assault-immigration-visa-lottery

[80] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-

CLASS ACTION COMPLAINT                                                                          70

standing features of the American immigration system—President Trump is attacking nonwhite immigration.

171.    While criticizing family-based preferences and the diversity visa lottery as "outdated programs that hurt our national and economic security,"[81] President Trump has also consistently advocated for a new, "merit-based" system. Such a system "admits people who are skilled, who want to work, who will contribute to our society, and who will love and respect our country"[82]—in contrast with family-based and diversity immigrants, who are "mostly low-wage and low skilled," and who "come into our country and immediately go onto welfare and stay there for the rest of their lives."[83] President Trump has constantly portrayed merit-based immigrants as people who "have skills, who can support themselves financially, and contribute to our economy," and who will come to the country to "work hard."[84]

172.    Most employment-based immigrant visas in the current United States immigration system, which are awarded predominantly to highly skilled and white-collar workers with advanced degrees—i.e., the types of individuals President Trump's proposed merit-based system

statistics/yearbook/2017/table10.   In these statistics, figures for Africa include countries from the Middle East.

[81] @realdonaldtrump, Twitter, https://twitter.com/realdonaldtrump/status/960907362109452288

[82] *President Donald J. Trump's State of the Union Address*, WHITEHOUSE.GOV (Jan. 30, 2018) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/

[83] Alana Abramson, *'I Can Be More Presidential Than Any Other President.' Read Donald Trump's Ohio Rally Speech*, TIME (July 26, 2017) https://time.com/4874161/donald-trump-transcript-youngstown-ohio/

[84] *President Trump Remarks at Conservative Political Action Conference*, CSPAN (Feb. 23, 2018) https://www.c-span.org/video/?441592-1/president-trump-pushes-concealed-carry-teachers-cpac-speech

CLASS ACTION COMPLAINT

would favor—go to individuals from Europe and Asia.[85] Employment-based immigrant visas represent approximately 13% of the immigrant visas granted annually by the United States.[86]

173.    That President Trump divides immigrants into these two categories—undesirable family-based and diversity immigrants from predominantly non-white countries on the one hand, and employment- or "merit-" based immigrants who are either European or at least willing to "work hard" on the other—is no surprise in the context of other statements he has made evincing racial and nation-based animus grounded in ugly stereotypes.

174.    During a White House briefing on how many immigrants had received visas to enter in 2017, for example, Trump reportedly grumbled that Haitians "all have AIDS" and that after seeing the United States, Nigerians would never "go back to their huts" in Africa once he heard how many immigrants from each country had been admitted.[87] At a similar briefing on protections for Haiti, El Salvador, and African countries in 2018, President Trump is said to have asked, "Why are we having all these people from shithole countries come here?" He then suggested

---

[85] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2017/table10

[86] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2017/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2016/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2015/table10

[87] Michael D. Shear and Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda,* NY TIMES (Dec. 23, 2017) https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html

that the United States should bring in more people from countries such as Norway.[88] More recently, he tweeted that four Congresswomen of color "originally came from countries whose governments are a complete and total catastrophe, the worst, most corrupt and inept anywhere in the world," and "should go back and help fix the totally broken and crime infested places from which they came"—despite the fact that each Member of Congress is a United States citizen and only one, Ilhan Omar, had come to the United States as a child, fleeing from Somalia as a refugee.[89]

175.    Taken in aggregate, President Trump's public statements have repeatedly and consistently evinced an animus towards nonwhite immigrants. And since entering the White House, President Trump has tried various ways to effectuate his desire to limit nonwhite immigration by limiting family-based and diversity visa immigration.

176.    Early in his presidency, for example, President Trump championed the RAISE Act, a bill that "favors applicants who can speak English, who can support themselves financially, and who demonstrate valuable skills that will strengthen our economy and strengthen our country."[90] The same bill would cut family-based immigration in half by eliminating many currently existing categories for family-sponsored immigration, and by permitting only spouses and minor children

[88] Josh Dawsey, *Trump Derides Protections for Immigrants from 'shithole' Countries,* WASH. POST (Jan. 12, 2018) https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html

[89] Felicia Sonmez and Mike DeBonis, *Trump Tells Four Liberal Congresswomen to 'go back' to Their Countries, Prompting Pelosi to Defend Them,* WASH. POST (July 14, 2019) https://www.washingtonpost.com/politics/trump-says-four-liberal-congresswomen-should-go-back-to-the-crime-infested-places-from-which-they-came/2019/07/14/b8bf140e-a638-11e9-a3a6-ab670962db05_story.html

[90] *President Trump Rally in Huntington*, *West Virginia*, CSPAN, https://www.c-span.org/video/?431931-1/president-trump-holds-rally-west-virginia

of United States citizens and lawful permanent residents to seek immigrant visas—moves that would disproportionately affect nationals of the predominantly nonwhite countries of Mexico, the Dominican Republic, the Philippines, China, India, and Vietnam.[91] The RAISE Act also introduced a point system for awarding visas, granting more points to intending immigrants for having a high-paying job offer, high English test scores, high educational attainment, or financial resources to invest over a million dollars in the United States.[92] In addition, under the bill, "you cannot get welfare for five years when you come into our country. You can't just come in like in past weeks, years, and decades you come in, immediately start picking up welfare."[93] In mid-2017, the RAISE Act failed in the Senate without a vote.

177.    Around the same time that the Senate passed on voting on the RAISE Act, USCIS introduced the new Public Charge rule, another attempt by the Trump Administration to curtail the immigration of nonwhite individuals entering the country through family-based preferences or the diversity visa. Echoing the point system of the RAISE Act, the Public Charge rule places varying positive or negative weights on certain factors that are then assessed in determining whether an applicant should be deemed inadmissible on public charge grounds. Under one of the heavily weighted positive factors—having income or financial assets over 250% of the federal poverty line—"71% of Mexicans and Central Americans, 69% of Africans, and 52% of Asian immigrants

---

[91] Julia Gelatt, *The RAISE Act: Dramatic Change to Family Immigration, Less So for the Employment-Based System,* MIGRATION POLICY INST. (Aug. 2017) https://www.migrationpolicy.org/news/raise-act-dramatic-change-family-immigration-less-so-employment-based-system

[92] *Id.*

[93] Factbase Videos, *Weekly Address: Donald Trump - Washington, DC - August 25, 2017,* YOUTUBE (Oct. 18, 2017)Video: https://www.youtube.com/watch?v=Mx7k8mk5PPo&t=54

CLASS ACTION COMPLAINT

would fail to meet the threshold." Accordingly, like the RAISE Act, the Public Charge rule "would have pronounced regional, national-origin and—by extension—racial effects on flows," having the most negative impact on "Asian, Latin American, and African immigrants."[94]

178.    The Proclamation follows in the footsteps of the failed RAISE Act and the enjoined Public Charge rule. Like the RAISE Act and the Public Charge rule, the Proclamation has the potential to drastically cut family-based immigration. Unlike its predecessors, however, the Proclamation is promulgated by presidential fiat, and thus untethered to the legislative or administrative rulemaking processes. But although the RAISE Act, the Public Charge rule, and the Proclamation each takes a different form and function, the intended result of each is the same: to reduce immigration from predominantly nonwhite countries.

**THE PROCLAMATION AND ITS IMPLEMENTATION HARM PLAINTIFFS**

179.    The Proclamation will go into effect at 12:01 am, Eastern daylight time, on Sunday, November 3, 2019, and all publicly available information reflects that the State Department has been taking, and will take, definitive and concrete action to implement and enforce it. The press, for example, has reported that "[m]ore than two dozen health officials are wrestling with highly technical questions, like which health plans would comply with the new requirements," and that some are "confused about numerous aspects of the proclamation."[95] Information made publicly available on the State Department's website, moreover, expressly instructs would-be immigrants

---

[94] Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public Charge" Rule,* MIGRATION POLICY INST. (Aug. 2018) https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule

[95] Dan Diamond, *Health Officials: Trump Immigration Order Could be Illegal,* POLITICO (Oct 11, 2019) https://www.politico.com/news/2019/10/11/trump-immigrants-health-insurance-illegal-044716

CLASS ACTION COMPLAINT

that "[i]f [they] are applying for an immigrant visa, including a diversity visa, on or after November 3, 2019," they *must* satisfy the Proclamation's requirements and that "[i]nability to meet this requirement *will result in the denial* of the visa application.[96] The State Department information page further states that "[d]uring the visa interview, applicants should be able to demonstrate to the satisfaction of the consular officer" that they meet the Proclamation's requirements, and that "[o]fficers will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation as needed."[97] Such assertions reflect the fact, or at very least support the logical inference, that the State Department is already implementing and, starting on November 3, 2019, will enforce the Proclamation, resulting in a direct impact on the rights of qualified prospective immigrants.

180.    When implemented and enforced, the Proclamation will cause Plaintiffs [and their members and clients] substantial, concrete, and particularized injury. The entry suspension of the Proclamation is indefinite; the Proclamation provides no waiver from its suspension; and the Proclamation provides no way to appeal the denial of a visa due to the Proclamation's de facto wealth test. As a result, the Proclamation will permanently separate close family members and inflict irreparable harm.

181.    **John Doe #1**, a U.S. citizen, can no longer work due to a disability. He has applied for wife, a Mexican citizen with an approved I-601A waiver, to obtain legal status so that she can live and work here in the United States, supporting both him and his fourteen-year-old United

---

[96] *Presidential Proclamation on Health Care*, TRAVEL.STATE.GOV, https://travel.state.gov/content/travel/en/us-visas/immigrate/Presidential-Proclamation-on-Health-Care.html

[97] *Id.*

States citizen son. But he fears that his wife will not be able to show that she meets the Proclamation's health insurance and financial resources requirements at her consular interview.

182.    John Doe #1 has not worked since May 2018 and had heart surgery in July 2018. He currently has a pacemaker. Around April 2019, he received his Social Security Disability determination and since he stopped working, Social Security Disability benefits have been his only income source. Both he and his son have health insurance through the Oregon Health Plan, Oregon's Medicaid program, but, because he can no longer work, he cannot obtain insurance through an employer or afford private health insurance.

183.    Money is tight in John Doe #1's family. After receiving approval for his wife's family-based visa petition and her I-601A provisional unlawful presence, completing her application for an immigrant visa, submitting documents to the National Visa Center, and scheduling a consulate interview for Wednesday, November 6, 2019 in Ciudad Juarez, Chihuahua, Mexico, John Doe #1 thought that his wife would finally become a legal resident and would be able to work. He thought his family would finally be able to breathe a financial sigh of relief after enduring a significant medical hardship, as well as anxiety about her legal status.

184.    But then they received news of the Proclamation. John Doe #1 does not believe that his wife will be eligible to receive a visa now; she does not have health insurance and they do not have sufficient financial resources, especially after his disability, to afford health insurance for her or pay her foreseeable health insurance costs.

185.    The Proclamation will be destructive to John Doe #1's family in many ways. He cannot imagine living apart from his wife. He and their son depend on her.  Their son suffers from health complications and is currently in the hospital. Given his own health issues, John Doe #1 cannot care for his son by himself; he needs his wife. If granted a visa, she could work to support

the family financially since John Doe #1 cannot work himself. Due to the significant medical issues facing John Doe #1 and his son, he does not know what he would do if his wife goes to her November 6th interview and her visa is denied.

186.    **Juan Ramon Morales**, a U.S. citizen, would be able to enroll his wife, Vianca Morales, as a dependent in his employer's health insurance plan, but the Proclamation makes both this and the prospect of acquiring an immigrant visa for her his impossible.

187.    Mr. Morales's employer told him that they could not add his wife as a dependent on his health insurance plan unless she obtained a Social Security Number; once she does so, she can be added. But she cannot do so until she receives legal status in the United States, and the Proclamation requires that she show proof, which she cannot obtain, that she would be enrolled in health insurance within 30 days of her admission into the United States.  Through his research, Mr. Morales learned that Social Security Numbers and "Green Cards" are typically not mailed quickly enough to arrive within 30 days after admission to the U.S. is granted.  Thus, even though Mr. Morales would be able to enroll his wife in health insurance were she to receive permanent residence, the Proclamation's stringent requirements make it impossible.

188.    Nor could the Morales family afford to purchase health insurance for Ms. Morales or her foreseeable medical expenses. Ms. Morales, who has lived in the U.S. since 2006, is diagnosed with leukemia and has had emergency brain surgery. She also is epileptic and suffers from seizures. To manage these, she pays for prescription medicine out of pocket. Mr. Morales likewise currently has significant medical costs; he carries significant debt due to back surgery he had. Mr. Morales' daughter, a U.S. citizen, and his step-daughter, a legal permanent resident, both have subsidized health insurance that costs approximately $30 per month. Mr. Morales has

CLASS ACTION COMPLAINT

researched health insurance options to cover his wife, but has not found any available plans that he could afford.

189.    When Mr. Morales first learned about the Proclamation, he felt tremendous anxiety and despair. Mr. Morales and his family had already gone through a long and laborious journey to get to where they are today in the immigrant visa process: they had their I-130 petition approved in July 2017; Ms. Morales filed a provisional unlawful presence waiver application in May 2018 based on the extreme hardship Mr. Morales would suffer if she could not be able to obtain permanent residence in the U.S, and the application was approved in April 2019; Ms. Morales had completed all of the other required steps of the Consular Process; and now the family was waiting for her interview to be scheduled in Ciudad Juarez, Mexico. If his wife is denied permanent residency, Mr. Morales and his children will suffer extreme psychological, emotional, financial, and physical hardship. It was while waiting for this interview that the Morales family first heard about the Proclamation. Given the strict 30 day timeline, Ms. Morales' health conditions, and Mr. Morales' limited financial resources, Mr. Morales does not believe that Ms. Morales will have health insurance, that she will be able to prove that she will be able to obtain health insurance 30 days after her admittance into the U.S., or that she will be able to afford foreseeable medical costs at the time of her visa interview.

190.    As part of Ms. Morales' waiver application, Vianca demonstrated that Mr. Morales would suffer extreme hardship if Ms. Morales' unlawful presence was not forgiven, including extreme psychological, emotional, financial, and physical hardship.  If she is denied an immigrant visa, Mr. Morales would be separated from the love of his life and would have to raise his daughters alone. The thought that Ms. Morales may be denied her immigrant visa—and thus indefinitely separated from him—has caused Mr. Morales significant stress.

CLASS ACTION COMPLAINT                                                                                              79

191.    As a single mother of two children and a victim of domestic abuse, **Jane Doe #2**, a U.S. citizen who was naturalized in 2018, has faced many obstacles in the United States.  Yet, she has seen the beauty and opportunities that this country has to offer.  The United States has given her a sense of hope and happiness for the future: even though she is not where she would like to be, she feels like she is getting there. She now wishes to bring her parents to the United States to be with her and their grandchildren, but fears she will not be able to do so if the Proclamation is in effect.

192.    Her experiences as a victim of domestic abuse, a single mother, and an immigrant to the United States have often made Jane Doe #2 feel very alone. She particularly misses her parents. She has been living apart from her 59-year old parents, who live in Nicaragua, for 13 years. This separation has been exceptionally painful. She can only communicate with her parents twice a week, at most, because they live in a remote location.  It has been extremely stressful and distressing to Jane Doe #2 to have experienced domestic violence without being able to turn to her parents for help. And the fact that they have not been able to witness the beautiful moments—like the birth of her children—breaks her heart. Not only has she been separated from her parents, but her children have never met their grandparents. Jane Doe #2 sponsored two immigrant visas for her parents to reunite with them in the United States to change that.

193.    On or around December 19, 2018, Jane Doe #2 applied for her parents to come to the United States. The visa petitions were approved on or around July 9, 2019.  Her parents have received the requisite letters from the National Visa Centers to proceed with the Consular Process. Her family is currently collecting information and documents to submit the DS-260 and immigrant documents. They were waiting for their interview when they heard news of the Proclamation.

CLASS ACTION COMPLAINT

194.    When she heard about the Proclamation, Jane Doe #2 felt crushed. She cannot explain the feeling of going through so many awful moments in her life and finally obtaining some hope of a light at the end of the tunnel by the possibility of reuniting with her family, only to have that hope ripped away from her by the Proclamation.

195.    Currently, Jane Doe #2's parents do not have health insurance. They go to clinics in Nicaragua for their medical needs. As a single mother of two, Jane Doe #2's financial resources are limited. She has searched for an available health insurance option for them that she could afford, but has not been successful and does not believe an "approved" and available insurance option is affordable.

196.    **Jane Doe #3**, a U.S. citizen, can no longer work due to a disability, which also makes it difficult for her to keep up with household tasks. After being separated from her husband for almost two years, she hopes that having her husband, a German citizen, with her in the U.S. will make things better. Living apart has been miserable for Jane Doe #3. Although they talk often, she rarely gets to see her husband, and she needs to incur debt whenever she goes to visit him in Germany. Having her husband in the U.S. would help in almost every way. But she now believes that her husband will not be able to meet the new requirements that the Proclamation created.

197.    Jane Doe #3 met her husband in Los Angeles in 2006, and they were married in February 2018. After getting married, they decided to settle in the U.S. instead of Germany because of Jane Doe #3's desire to stay close to her family. She lives nearby her immediate family, and is especially thankful to be able to leave near her grandmother, who is a Holocaust survivor. Accordingly, she filed an immigrant visa petition for her husband in July 2018, and he returned to Germany so that he would not overstay his visitor visa. The I-130 petition was approved in April

CLASS ACTION COMPLAINT                                                           81

2019, and since then, they have been gathering documents required for consular processing and looking forward to the time when they can be reunited.

198.    The Proclamation has forced them to put their plans for a future together on hold. Jane Doe #3 does not know how her husband will be able to prove at a consular interview that he will have approved health insurance within 30 days of entering the United States. Jane Doe #3 is currently enrolled in California's Medicaid program and she cannot add her husband to this coverage.

199.    While her husband likely has good employment prospects in Los Angeles—he is an architect who currently teaches architectural theory and design and he speaks both English and German fluently—it is extremely difficult for him to secure employment without knowing when he will enter the United States. Even if he were to be able to obtain insurance through an employer, he would almost certainly not be able to secure such employment at the time of his consular interview. Furthermore, his current German health insurance will not cover him when he moves to the United States. In the past, when he has visited Jane Doe #3, he purchased traveler's insurance, but it is his understanding that he would also not be eligible to receive such insurance if he moves permanently to the U.S. Doe's husband has multiple sclerosis, and his treatments are expensive. She believes that she and her husband do not have the financial resources to afford health insurance for him or to pay his foreseeable medical expenses out of pocket.

200.    **Iris Angelina Castro**, a U.S. citizen, is currently pregnant with her second child and separated from her husband, Hermogenes Castro Molina, a national and resident of the Dominican Republic. She wishes to reunite with her husband in the United States because when her first son became very ill, she was forced to quit her job to take care of him, and she is now unemployed with no income source.

CLASS ACTION COMPLAINT

201.    Ms. Castro was previously employed as a teacher, but she has since lost all her benefits when she stopped working to stay at home with her first son. Having Mr. Molina here in the United States will help their whole family; he can work while she cares for the children.

202.    Ms. Castro filed an immigrant petition for her husband on November 14, 2018, which was approved on May 30, 2019. They have since been filing all the required documents so that they can schedule a consular interview.

203.    News of the Proclamation devastated Ms. Castro. Because she is unemployed, she does not believe that they have sufficient financial resources to prove that Mr. Castro would be able to obtain health insurance within 30 days of his entry into the U.S. or pay for foreseeable medical costs. She has already been living apart from her husband for almost a year and that separation has been exceptionally painful. Furthermore, she is pregnant with their first child together. It is painful for her to think that her daughter's father will not be here for her birth and that she will have to raise her daughter without her father. Without him and his potential financial support, she believes that she will be forced to use public benefits for survival.

204.    **Blake Doe**, a U.S. citizen and senior college student at Oregon State University, lived with his parents, Mexican citizens, in Oregon from the time he was born until he went to college. His parents are amazing people, and he aspires to live up to the values of compassion, hard work, and responsibility that they have always tried to instill in him. Due to their sacrifices, Blake Doe will be the first person in his family to graduate from college in June 2020. He has approved I-130 petitions for his parents, but they are afraid that if they leave the country for their consular interview, they will be banned from coming back under the Proclamation.

205.    Blake Doe is seeking to permanently unify his family in Oregon because it is where he has lived his whole life. He sponsored immigrant visas for his parents on or around April 17,

CLASS ACTION COMPLAINT                                                                                  83

2017, and on or around January 17, 2018, their I-I30 petitions were approved. On June 11, 2019, United States Citizenship and Immigration Services (USCIS) determined that members of his family would suffer an extreme hardship if his parents' visas were denied, and accordingly, approved an extreme hardship waiver so that his parents could complete the immigration process. His parents are currently waiting to have an interview scheduled at the Consulate in Ciudad Juarez, Mexico.

206.    Blake Doe's mother's health has declined recently. She has two painful conditions—rheumatoid arthritis and lupus erythematosus. She currently pays for medical care out of pocket; her treatment is necessary to allow her to live without pain. She has tried to obtain health insurance, but has been told she is ineligible due to her immigration status. Blake Doe's father has tried to obtain health insurance for her, but has not been successful. Through research, Blake Doe has found that it would be very expensive for him to obtain health insurance for his mother and father.

207.    As a full-time college student, Blake Doe has no income and has about $20,000 worth of student loan debt. He cannot afford health insurance for his parents. Therefore, Blake Doe does not believe that he has sufficient financial resources to prove that his parents would be able to obtain approved health insurance within 30 days of their admittance into the U.S. or pay for foreseeable medical costs.

208.    Given that the Proclamation has no waiver or termination date, Blake Doe is resigned to the fact that his parents will not be able to complete the immigration process. He believes that they will continue to live in fear and that he will continue to live in fear every day of permanent separation from his parents. This fear is causing him feelings of depression and makes him constantly worried.

CLASS ACTION COMPLAINT

84

209.    **Brenda Villarruel**, a U.S. citizen, and her minor son, who is a United States citizen, have been separated from her husband and the child's step-father, for almost two years. She now fears that the Proclamation will make that separation permanent.

210.    Ms. Villarruel is employed as a licensed medical assistant, but does not have health insurance through her work and pays out of pocket for medical services when necessary. Ms. Villarruel has sponsored her husband, who currently resides in Mexico City, Mexico, for an immigrant visa and, after receiving an approved waiver, has been scheduled for his final immigrant interview on November 5, 2019.

211.    Ms. Villarruel needs her husband, Mr. Gabino Soriano Castellanos, in the United States so that he can rejoin their thriving tattoo business and continue to be the father and caretaker of their son, who has battled depression due to the separation from the only father he has ever known. News of the Proclamation has devastated the entire family. Ms. Villarruel, having researched the costs of approved insurance, does not believe that the family has sufficient financial resources to prove that she and Mr. Castellanos would be able to obtain approved health insurance to comply with the President's Proclamation within 30 days of Mr. Castellanos admittance into the U.S. or pay for foreseeable medical costs.

212.    This is a time when Ms. And Mr. Castellanos should be building their thriving tattoo business and raising their son. Instead, they live in fear of living apart from each other indefinitely and being financially wiped-out due to the family separation.

213.    **Latino Network** functions as an "immigration services navigator" to educate clients and connect them with legal-services providers who can assist with obtaining immigrant visas for family members, and provides information to low- and moderate-income immigrant families about options for health-care benefits. The Proclamation has and will continue to

CLASS ACTION COMPLAINT

severely restrict and frustrate Latino Network's ability to fulfill its objectives of counseling and referring low- and moderate-income immigrants to services that will enable them to obtain adequate health-care benefits.

214.    The Proclamation has forced and will continue to force Latino Network to divert significant resources: to identify viable health-care options for members who need to comply with the Proclamation; to retrain Latino Network staff members, who had been previously trained to help members find free, low-cost, or subsidized health-care plans, and who must now learn to help members navigate the Proclamation's terms; and to develop and publish information materials to inform our community. Latino Network's need to devote resources to respond to the Proclamation and mitigate its effects on the Portland Latino community necessarily limit the resources available to carry out its core services and programs, and frustrate its ability to carry out its organizational purpose.

## CLASS ALLEGATIONS

215.    Individual Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), on behalf of themselves and all other persons for whom Defendants' implementation of the Proclamation interferes with family reunification or the processing of their visa petitions in a manner consistent with applicable law. The individual plaintiffs seek certification of a class (the "Plaintiff Class") consisting of:

> a.  Individuals in the United States who currently have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa, or who will soon file such a petition; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance"

CLASS ACTION COMPLAINT

86

within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs." ("U.S. Petitioner Subclass")

b. Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs." ("Visa Applicant Subclass")

216.    This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

217.    The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1).  Analysis by the Migration Policy Institute, based on data from the Census Bureau's 2014-16 American Community Survey ("ACS"), indicates that roughly 375,000 immigrants, mainly family-based immigrants, would be affected by the Proclamation each year.  In addition, the class action is the only appropriate procedural avenue for the protections of the class members' constitutional rights and rights under the APA.

218.    The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' Proclamation and its implementation exceeds the statutory authority provided Defendants by the Immigration and Nationality Act; violates Plaintiff Class members' rights under the APA; and violates Plaintiff Class members' rights under the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution.

219.    The claims of the Plaintiff Class members share common issues of fact, including, but not limited to:

CLASS ACTION COMPLAINT

a.  whether the Proclamation and Defendants' actions taken to implement it were motivated by racial animus, sought to reduce immigration by people of color, or were otherwise based on the race, ethnicity, and/or national origin of the individuals affected;

b.  whether Defendants fail to address the Proclamation's discriminatory impact;

c.  whether, in issuing and implementing the Proclamation, Defendants relied on factors Congress did not intend for it to consider;

d.  whether, in issuing and implementing the Proclamation, Defendants failed to consider important aspects of the problem it is addressing;

e.  whether, in issuing and implementing the Proclamation, Defendants explained its decision counter to the evidence before it;

f.  whether Defendants quantified or considered harms that would result from the Proclamation and its implementation;

g.  whether Defendants failed to follow required procedures, including notice and opportunity for public comment, before issuing and implementing the Proclamation;

h.  whether the Proclamation's requirements are, in practice, irrational, vague and unworkable, rendering impossible the uniform application of the laws or review of decisions for consistency with facts and evidence;

i.  whether the Proclamation is being or will be enforced so as either to prevent class members from reuniting here in the United States, or to force their separation when a noncitizen family member must leave the country for a consular interview.

CLASS ACTION COMPLAINT

j.  whether class members have suffered harm as a result of the Proclamation and Defendants' actions taken to implement it.

220.    Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff, and satisfy Rule 23(a)(2).

221.    The claims or defenses of the named Plaintiffs are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Plaintiffs have been harmed, among other things, by Defendants' failure to lawfully abide by statutory limitations on their actions.  They have further been harmed by Defendants' failure to proceed through proper notice-and-comment and other required procedures when issuing and implementing its Proclamation, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems it is addressing.  They have further been harmed by Defendants' failure adequately to explain its decision to issue the Proclamation or describe its implementation in a manner that it may reasonably be followed by those it affects. They have been harmed by Defendants' premising the Proclamation and its implementation on racial animus in violation of the equal protection guarantee of the Fifth Amendment.  Each of these actions, independently and collectively, have caused harm to Plaintiffs and the Plaintiff Class members.

222.    The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4).  The named Plaintiffs will defend the rights of all proposed class members fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class.  The attorneys representing the named Plaintiffs include

CLASS ACTION COMPLAINT

experienced civil rights and immigration attorneys who are considered able practitioners in federal constitutional litigation.  These attorneys should be appointed as class counsel.

223.    The members of the proposed class are readily ascertainable through Defendants' records.

224.    Through implementation and enforcement of the Proclamation at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole.  The Plaintiff Class may therefore by properly certified under Federal Rule of Civil Procedure 23(b)(2).

225.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore by properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Violation of the Administrative Procedure Act)
### (On behalf of All Plaintiffs, including the Class)

226.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

227.    The Proclamation will go into effect on November, 3, 2019. Defendants have stated that they will begin implementing the Proclamation on this date in the manner described on the State Department's website.

228.    Defendants have taken actions to implement the Proclamation, including informing visa applicants and consular officials of new requirements effective November 3, 2019, that will result in a direct impact on the rights of qualified prospective immigrants and constitute final

agency action(s) within the meaning of the Administrative Procedure Act. *See Bennett v. Spear*, 520 U.S. 154 (1997).

229.  Defendants' actions constitute violations of the APA in at least the following respects:

a.  Defendants failed to reasonably justify their departure from settled practice.

b.  Defendants failed to address conflicts with other laws and legislative intent, including but not limited to the specific scheme Congress mandated in the INA through provisions such within 8 U.S.C. § 1151; 8 U.S.C. § 1153; 8 U.S.C § 1182; 8 U.S.C § 1182; 8 U.S.C § 1154; 8 USC § 1186; 8 U.S.C. § 245, and numerous health care laws, such as the ACA, PRWORA, CHIP and CHIPRA, and numerous regulations duly promulgated under these and other laws.

c.  Defendants implemented the Proclamation in a manner that is not "consistent with applicable law" for reasons including that their actions replaced a statutory totality of the circumstances test for public charge with a new test that is vague, arbitrary, and unsupported by the evidence.

d.  Defendants' implementation of the Proclamation is pretextual because Defendants seek to reduce immigration by people of color.

e.  Defendants fail to address the Proclamation's discriminatory impact.

f.  Defendants did not quantify or consider harms that will result.

g.  Defendants states requirements that are irrational, vague and unworkable, rendering impossible the uniform application of the laws or review of decisions for consistency with facts and evidence.

h.  Defendants acted in excess of statutory authority.

CLASS ACTION COMPLAINT

i.  Defendants' actions exceed the delegation of statutory authority to the President in U.S.C. § 1182(f) for reasons including that Congress did not delegate unfettered discretion to indefinitely rewrite the immigration or health care laws, allow for suspensions that are unconstitutional and/or unsupported by adequate findings, create permanent and specific classes of inadmissibility, or eliminate the opportunity for visa applicants' opportunity to show that they are unlikely to become a "public charge" by the terms Congressional mandated.

j.  Defendants' actions implement the Proclamation in a manner that is not consistent with 8 U.S.C. § 1182(a)(4) for reasons including that it replaces Congress' specific scheme for assessing who may become a "public charge," and when admission may be authorized for those who cannot show they are unlikely to become a public charge.

k.  Defendants violate their own rules and regulations and binding norms to the prejudice of others. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

l.  Defendants failed to follow required procedures including notice and opportunity for public comment, particularly with respect to the Posting and Emergency Notice.

230.  Defendants' actions implementing the Proclamation are based on legal error; fail to consider all relevant factors; and lack a rational explanation, and are therefore arbitrary and capricious and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

CLASS ACTION COMPLAINT

231.    Defendants' actions implementing the Proclamation are contrary to constitutional rights, discriminating on the basis of national origin and race, thereby violating the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

232.    Defendants' actions implementing the Proclamation are ultra vires and in excess of any authority granted by the Proclamation, regulation, or statute, and not otherwise in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

233.    Defendants' actions implementing the Proclamation affect Plaintiffs' substantive rights and were made without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).

234.    Defendants' action are without good cause.

235.    Defendants' violation of the APA causes ongoing harm to Plaintiffs.

236.    Plaintiffs have no adequate alternative to immediate review under the APA.

## SECOND CLAIM FOR RELIEF
### (Equal Protection)
### (On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)

237.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

238.    The Due Process Clause of the Fifth Amendment states that no person will "be deprived of life, liberty, or property, without due process of law."

239.    The Fifth Amendment prohibits Defendants from intentionally discriminating against Plaintiffs and Class Members based on race, ethnicity, and/or national origin.

240.    The Proclamation and Defendants' actions taken to implement the Proclamation are unconstitutional because they burden a fundamental right of Plaintiffs and Class Members

CLASS ACTION COMPLAINT

and were motivated by intentional discrimination and/or animus based on race, ethnicity, and/or national origin.

241.    The Proclamation furthers no legitimate purpose, let alone a compelling one.

**THIRD CLAIM FOR RELIEF**
**(Ultra Vires)**
**(On behalf of All Plaintiffs, including the Class)**

242.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

243.    The Proclamation is illegal and is therefore ultra vires.

244.    Courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command."  Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 681 (1986).

245.    The President's attempt to indefinitely ban certain immigrants based on the inability to obtain specific types of health insurance or pay for medical care, and to create a new ground of inadmissibility that Congress has previously considered and chosen not to include in the INA, exceeds Congress's delegated power to the President's power to suspend the entry of noncitizens and issue reasonable rules for the entry of noncitizens.

246.    The President's attempt to ban certain immigrants based on the inability to obtain specific types of health insurance or pay for medical care violates constitutional separation of powers principles because it contravenes Congress's expressed intent to provide a certain minimum level of coverage to all legal immigrants and citizens in the United States and to extend certain health care-related benefits to legal immigrants.

CLASS ACTION COMPLAINT

## FOURTH CLAIM FOR RELIEF
### (Procedural Due Process)
### (On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)

247.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

248.    The Proclamation state that an individual seeking an immigrant visa must demonstrate, "to a consular officer's satisfaction," that she either "will be covered by approved health insurance" within 30 days of her entry to the United States, or "possesses the financial resources to pay for reasonably foreseeable medical costs." The Emergency Notice and Posting published by the Department of States confirm that consular officers will be questioning visa applicants and asking for medical and financial documentation. The Emergency Notice, furthermore, specifies that "reasonably foreseeable medical expenses" are "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication."

249.    A prospective immigrant's entry to the United States therefore depends on a determination made by a consular officer with no medical training to accurately assess existing medical conditions and health issues existing at the time of the visa adjudication.

250.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law."

251.    Congress has created statutory rights related to the petitioning for and issuance of visas and other immigration benefits.

252.    Federal agencies have created regulatory rights related to the petitioning for and issuance of visas and other immigration benefits.

253.    Individuals must be given due process prior to the deprivation of these statutory and regulatory rights.

CLASS ACTION COMPLAINT

254.    Additionally, United States citizens and lawful permanent residents have constitutionally protected liberty interests in family reunification. Individuals must be given due process prior to any deprivation of these liberty interests.

255.    Defendants' actions, as set forth above, deprive individuals, including Plaintiffs and their members or clients, of the aforementioned statutory and regulatory rights, and liberty interests, without due process.

256.    Defendants' actions, as set forth above, thus violate the procedural due process guarantee of the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any part of the Proclamation;

B.    A declaration pursuant to 28 U.S.C. § 2201 that the Proclamation is, in its entirety, unlawful and invalid;

C.    An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

D.    Such other relief as this Court deems equitable, just and proper.


Dated:  October 30, 2019

Karen C. Tumlin*
karen.tumlin@justiceactioncenter.org
Esther Sung*
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER

Respectfully Submitted,

/s/ Stephen W Manning
Stephen Manning (SBN 013373)
smanning@ilgrp.com
Nadia Dahab (SBN 125630)
nadia@innovationlawlab.org
INNOVATION LAW LAB


CLASS ACTION COMPLAINT

P.O. Box 27280
Los Angeles, CA  90027
Telephone: +1 323 316-0944

333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 971 801-6034
Facsimile: +1 503 241-7733

Scott D. Stein*
sstein@sidley.com
Kevin M. Fee*
kfee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: +1 312 853-7520
Facsimile: +1 312 853-7036

Jesse Bless*
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G. Street, Ste. 300
Washington, D.C. 20005
Telephone: +1 781 704-3897
Facsimile: +1 202 783-7853

* Application for admission *Pro Hac Vice* forthcoming