**Stephen Manning** (SBN 013373)
stephen@innovationlawlab.org
**Nadia Dahab** (SBN 125630)
nadia@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733

**Karen C. Tumlin** (*pro hac vice* pending)
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (*pro hac vice* pending)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page.)*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; and LATINO NETWORK,

Plaintiffs,

v.

DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA,

Defendants.

Case No.: 3:19-cv-01743-SB

**MOTION FOR TEMPORARY RESTRAINING ORDER**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

STATUTORY AND FACTUAL BACKGROUND ........ 2

I. THE IMMIGRATION AND NATIONALITY ACT ("INA") ........ 2

II. THE AFFORDABLE CARE ACT (THE "ACA"), THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996 ("PRWORA"), AND THE CHILDREN'S HEALTH INSURANCE PLAN REAUTHORIZATION ACT ("CHIPRA") ........ 4

III. THE PROCLAMATION ........ 6

IV. THE DEFENDANT AGENCIES' AND GOVERNMENT OFFICIALS' IMPLEMENTATION OF THE PROCLAMATION ........ 11

LEGAL STANDARD ........ 14

ARGUMENT ........ 15

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........ 15

A. The Proclamation and its Implementation Conflict with the INA's Public Charge Statute. ........ 15

B. Defendants' Implementation of the Proclamation is Arbitrary and Capricious in Violation of the APA ........ 19

C. Defendants' Implementation of the Proclamation Violates the Procedural Requirements of the APA. ........ 22

1. The proclamation facially violates the APA's notice-and-comment rulemaking requirements. ........ 23

2. None of the APA's exceptions to notice-and-comment rulemaking apply. ... 24

II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ........ 25

III. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGHS IN FAVOR OF ISSUING A TRO AND PRESERVING THE STATUS QUO ........ 33

IV. A NATIONWIDE INJUNCTION IS NECESSARY ........ 35

CONCLUSION ........ 37

## TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)........ 15

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009)........ 15

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (2000)........ 22

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016)........ 16

*California Dep't of Water Res. V. F.E.R.C.*,
341 F.3d 906 (9th Cir. 2003)........ 23

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018)........ 37

*Camenisch*,
451 U.S. (1981)........ 16

*CASA de Maryland v. Trump*,
No. PWG-19-2715, 2019 WL 5190689 (D. Md. Oct. 14, 2019)........ 36

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)........ 26

*City & Cty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018)........ 36

*City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*,
No. 19-cv-04717-PJH, 2019 WL 5100718 (N.D. Cal. Oct. 11, 2019)........ 18

*Clear Channel Outdoor, Inc. v. City of L.A.*,
340 F.3d 810 (9th Cir. 2003)........ 15

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) (en banc........ 29, 31

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017)........ 15

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014)........ 34

*East Bay Sanctuary Covenant v. Trump* (*"East Bay I"*), 349 F. Supp. 3d 838, 855 (N.D. Cal. 2018), F. Supp. 3d 838, 855 (N.D. Cal. 2018).......... 15, 29

*East Bay Sanctuary Covenant v. Trump (East Bay II)*, 909 F.3d 1219 (9th Cir. 2018).......... 34

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (2018).......... 20, 25, 36, 37

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 202, 515 (2009), .S. 202, 515 (2009).......... 20

*Gegiow v. Uhl*, 239 U.S. 3 (1915).......... 19

*Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F*.3d 60, 66 (2d Cir. 2007), F.3d 60, 66 (2d Cir. 2007).......... 27

*Greater Yellowstone Coal., Inc. V. Servheen*, 665 F.3d 1015 (9th Cir. 2011).......... 20

*Haddon Twp. Bd. of Educ. v. New Jersey Dep't of Educ.*, 476 F. Supp. 681 (D.N.J. 1979).......... 26

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *rev'd on other grounds, 138 S.* Ct. 2392 (2018).......... 28

*Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017).......... 34, 36, 37

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017).......... 28, 35

*Hou Ching Chow v. Attorney General*, 362 F. Supp. 1288 (D.D.C. 1973).......... 26

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995).......... 23, 24

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).......... 34

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011).......... 28

*Make the Road N.Y. v. McAleenan*, No. 19-cv-2369 (KBJ), 2019 WL 4738070 (D.D.C. Sept. 27, 2019).......... 36, 37

*Matter of Perez*,
15 I. & N. Dec. 136 (BIA 1974) .......... 17

*N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
702 F.3d 755 (4th Cir. 2012).......... 24

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) .......... 36

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018).......... 27

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 34

*Norsworthy v. Beard*,
87 F. Supp. 3d 1164 (N.D. Cal. 2015) .......... 35

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956.......... 20

*Perez v. Mortgage Bankers Ass'n*,
135 S. Ct. 1199 (2015) .......... 26

*Perfect 10, Inc. v. Google, Inc.*,
653 F.3d 976 (9th Cir. 2011).......... 27

*Pickett v. Hous. Auth of Cook Cty.*,
114 F. Supp. 3d 663 (N.D. Ill. 2015) .......... 34

*Regents of the Univ. of Cal. v. U.S. D.H.S.*,
908 F.3d.......... 37

*Shalala v. Guernsey Mem'l Hosp.*,
514 U.S. 87 (1995) .......... 26

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999).......... 27

*Stanley v. Illinois*,
405 U.S. 645 (1972) .......... 28

*United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010),
3d 1159, 1164 (9th Cir. 2010).......... 25

*Walczak v. EPL Prolong, Inc.*,
198 F.3d 725 (9th Cir. 1999).......... 15

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) (*per curium*), *reconsideration en banc denied*, 853 F.3d 933 & 858F.3d 1168 (9th Cir. 2017), *cert denied sub nom. Golden v. Washington*, 138 S.Ct. 448 (2017) .......... 36, 37

*Washington v. U.S. D.H.S.*, No. 19-CV-5210-RMP,
2019 WL 5100717 (E.D. Wash. Oct. 11, 2019) .......... 38

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .......... 34

*Yassini v. Crosland*,
618 F.2d 1356 (9th Cir. 1980) .......... 25

**Statutes**

5 U.S.C. § 553(a)(1) .......... 25

5 U.S.C. § 553(b) .......... 23

5 U.S.C. § 553(b)(2) .......... 24

5 U.S.C § 553(c) .......... 23, 24

5 U.S.C. § 553(d)(1) .......... 26

5 U.S.C. § 706(2) .......... 36

5 U.S.C. § 706 (2)(A) .......... 20

8 U.S.C. § 1151 .......... 3

8 U.S.C. § 1151(b) .......... 3

8 U.S.C. § 1152 .......... 3

8 U.S.C. § 1182(a) .......... 5

8 U.S.C. § 1182(a)(4) .......... 16, 18

8 U.S.C. § 1182(a)(4)(A) .......... 16, 20

8 U.S.C. § 1182(a)(4)(B)(i) .......... 17

8 U.S.C. § 1182(a)(4)(B)(ii) .......... 17

8 U.S.C. § 1182(a)(9)(B) .......... 4

8 U.S.C. § 1183a .......... 17

26 U.S.C. § 36(b)(c)(1)(B) ........................................ 6

26 U.S.C. § 36B ........................................ 6

26 U.S.C. § 105(b) ........................................ 10

42 U.S.C. § 300gg-7 ........................................ 10

42 U.S.C. § 18022(b)(1) ........................................ 5

42 U.S.C. § 18022(e) ........................................ 11

42 U.S.C. §§ 300gg-3, 300gg-11 ........................................ 6

**Regulations**

8 C.F.R. § 212.7(e) ........................................ 4

26 C.F.R. § 1.106-1(a) ........................................ 10

45 C.F.R. § 155.305(a)(3)(i) ........................................ 11

84 Fed. Reg. 53,991 ........................................ 22

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,* 64 Fed. Reg. 28,689 (Mar. 26, 1999) ........................................ 18

**Other Authorities**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996) ........................................ 19

*Immigration Control & Financial Responsibility Act of 1996*, H.R. 2202, 104th Cong. § 202 (1996) ........................................ 19

Proclamation § 2(b)(vii) ........................................ 9

S. Rep. No. 104-249, at *63−64 (1996) (Senator Leahy’s remarks) ........................................ 20

Plaintiffs respectfully move this Court to enter an immediate temporary restraining order preventing Defendants from enforcing Proclamation No. 9945, "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation"), **which is scheduled to begin being implemented on November 3, 2019.**

## INTRODUCTION

Unless this Court acts, the affirmative immigrant visa system will largely cease to function on **Sunday, November 3, 2019** at 12.01a.m, Eastern time; Saturday, November 2, 2019 9.01p.m. Pacific time. The immigrant visa system reflects Congress's intent that foreign nationals who meet certain qualifications are eligible to immigrate to the United States. On Sunday, it will cease to meaningfully function *not* because Congress so intended; rather, because without warning or notice, and in contravention of the plain statutory language of the nation's immigration laws, the President so proclaimed, and the Department of State is acting to implement it without regard for its obligations under our nation's laws.

The President's Proclamation and the steps Defendants have taken to push through its implementation by Sunday are plainly illegal. By its terms, the Proclamation bars otherwise qualified immigrant visa applicants from receiving visas unless they can establish "to the satisfaction of a consular officer" that they either "will be covered by approved health insurance" within 30 days after entry or are both wealthy and healthy enough to "pay for reasonably foreseeable medical costs." This new requirement rewrites our immigration and healthcare laws by Presidential fiat and could effectively bars up to 375,000 otherwise qualified immigrants each year.

The Proclamation will harm the families who rely on the immigrant visa system to function fairly. The harm will be immediate and irreparable. The wife of Plaintiff John Doe #1 is scheduled for her consular interview for her immigrant visa in Mexico on November 6, 2019. John Doe #1 faces the prospect of raising his son here in the United States without the comfort and care of his wife and the child's mother simply because of the Proclamation. The Court should intervene now to prevent such irreparable harms. The Department of State has pushed through this latest immigration ban with a posting on its website that is effective this Sunday. Its purported rulemaking process gave interested parties less than 48 hours to provide comments and ended yesterday at 11:59 pm Eastern time. Both the substance and procedure of Defendants' actions are unlawful. Plaintiffs are likely to succeed on the merits of their claims that Defendants' actions exceed their statutory authority, conflict with the INA and health care laws, and constitute agency action that is also arbitrary, capricious, and irrational. Defendants have also implemented the Proclamation without required notice and comment procedures, which is reason enough to find that Plaintiffs are likely to succeed on the merits of their claim under the Administrative Procedures Act ("APA").

Accordingly, a Temporary Restraining Order universally enjoining the Proclamation is warranted given the important stakes, the vast nationwide disruption to the longstanding status quo, and serious claims at issue in this case. All the factors counsel in favor of an order that preserves the status quo until briefing and a hearing on the merits can occur.

## STATUTORY AND FACTUAL BACKGROUND

### I. THE IMMIGRATION AND NATIONALITY ACT ("INA")

The INA has, through a series of congressional amendments since its enactment in 1952, created a system that allows this country to grant up to 675,000 permanent immigrant visas each year, as well as an unlimited number of permanent immigrant visas for the admission of U.S.

citizens' spouses, parents, and children. Congress adopted this system to further four principal goals: reunifying families, admitting immigrants with skills that are useful to the United States economy, protecting refugees and others in need of humanitarian resettlement, and promoting diversity.

Consistent with these goals, Congress has set allocations for "family-based visas" (a minimum of 266,000), "employment-based visas" (a minimum of 144,000) and "diversity-based" visas (a maximum of 55,000). 8 U.S.C. § 1151. In addition to these allocations, Congress has set certain per-country limits on the numbers of visas that can be granted, so that no single nation can receive more than 7 percent of the total green cards issued in a year. 8 U.S.C. § 1152. In recognition of the singular importance of family reunification, however, Congress has prioritized visas for "immediate relatives," which is defined as "the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age," and there are no limits on the number of visas granted to such individuals, regardless of their country of national origin. 8 U.S.C. § 1151(b). Under this system set out in the INA, family-based petitions account for approximately 65% of the immigrant visas granted every year. The diversity lottery visa system accounts for approximately 4.5%.

U.S.-based family members and employers may sponsor a noncitizen for an immigrant visa. Once a sponsorship petition is approved, the noncitizen may apply for an immigrant visa. If the applicant is outside the United States, she must apply to a U.S. consulate abroad and appear for a consular interview. For applicants inside the United States, some may be eligible to apply for immigrant visas domestically, without having to travel to a consulate, but others must leave the country to appear for a consular interview abroad. Individuals in this latter category include noncitizens who have accrued more than 180 days of unlawful presence in the United States but

have obtained an I-601A waiver of inadmissibility to excuse the unlawful presence bar under 8 U.S.C. § 1182(a)(9)(B).[1] *See* 8 C.F.R. § 212.7(e). Diversity visas are available through a lottery to individuals from countries with historically low rates of immigration to the United States; the lottery winners self-petition and apply to a consulate for their visa.

Before the issuance of an immigrant visa, the noncitizen must establish that she is eligible for admission to the country. Section 1182 of Title 8, is titled "Inadmissible Aliens" and sets forth ten classes of noncitizens "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a) (prescribing the inadmissibility of, *inter alia*, noncitizens with a communicable disease of public health significance, those convicted of two or more criminal offenses, and those who engaged in terrorist activities).

## II. THE AFFORDABLE CARE ACT (THE "ACA"), THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996 ("PRWORA"), AND THE CHILDREN'S HEALTH INSURANCE PLAN REAUTHORIZATION ACT ("CHIPRA")

A series of related and interacting statutes, including the ACA, PRWORA, and CHIPRA, have created the health care system currently in effect today in this country. The following features of this statutory scheme reflect Congress's intent to expand access to meaningful and affordable health insurance coverage for all U.S. residents, including legal immigrants, at a guaranteed minimum level of coverage.

First, the ACA required the creation of a marketplace, or exchange, in each state to allow residents to shop for insurance and to facilitate broad enrollment nationwide.

[1] The I-601A waiver process allows those individuals who are statutorily eligible for an immigrant visa (immediate relatives, family-sponsored or employment-based immigrants as well as Diversity Visa selectees) who only need a waiver of inadmissibility for unlawful presence to apply for that waiver in the United States and remain with their family members before they depart for their immigrant visa interview abroad. *See* 8 C.F.R. § 212.7(e).

Second, the ACA required all health insurers, regardless of whether they offered insurance on or off the state and federal Exchanges, to provide plans that cover "essential health benefits," including hospitalization, prescription drugs, mental health services, maternity and newborn care, and pediatric services. 42 U.S.C. § 18022(b)(1). All plans on the state and federal Exchanges, including ACA-defined and regulated catastrophic health plans, must provide such essential health benefits, must cover preexisting conditions and may not impose annual or lifetime dollar limits on core coverage.[2] Short-term limited duration insurance plans are ACA-exempt, cannot be offered or purchased on an Exchange, do not provide the full range of essential health benefits, and are non-comprehensive. They also can and often do deny coverage based on preexisting conditions, and can and often do impose annual or lifetime dollar limits on core coverage.

Third, the ACA provides financial assistance in the form of income-related, premium-based tax credits ("PTCs" or "APTCs") to individuals with household incomes between 100 and 400% of the federal poverty line. 26 U.S.C. § 36B. For newly arrived legal immigrants, the ACA allows PTCs on more permissive terms, also including individuals below 100% of the federal poverty line. 26 U.S.C. § 36(b)(c)(1)(B).

Fourth, although PRWORA sharply limited the eligibility of immigrants for federal means-tested benefits, it nevertheless expressly devolved "gap-filling" authority to the states to use state-only funds to offer state means-tested benefit programs as a substitute for lost federal benefits for legal immigrants. Congress subsequently reinforced this grant of power to the states specifically with regards to health care through the Children's Health Insurance Plan ("CHIP") and its reauthorization act, CHIPRA. In the same vein as PRWORA, the original CHIP also

---

[2] 42 U.S.C. §§ 300gg-3, 300gg-11.

authorized States to use state funds to provide coverage to newly arrived legal immigrant children, who were otherwise ineligible to enroll in either Medicaid or CHIP for their first five years in the country. CHIPRA subsequently provided new federal funding for states to cover legal immigrant children and legal immigrant pregnant women during their first five years in the country. Thirty-one states, plus the District of Columbia, now cover legal immigrant children, legal immigrant pregnant women, or both under CHIPRA.

The benefits available under the ACA, especially when considered in connection with the benefits that the states and federal government have made available to newly and recently arrived legal immigrants under PRWORA and CHIPRA, make clear that Congress intended for legal immigrants to be able to receive specific health care-related benefits to ensure a minimum level of health care coverage upon their arrival in the United States.

## III. THE PROCLAMATION

Under the Proclamation, an intending immigrant who has satisfied *all statutory requirements set out in the INA* will nevertheless be permanently barred from entering the United States if she cannot show, to the satisfaction of a consular officer, that she either "will be covered by approved health insurance" within 30 days of entering the United States, or "possesses the financial resources to pay for reasonably foreseeable medical costs." With narrow exceptions, such as certain special Immigrant Visa applicants specifically from Iraq and Afghanistan, and unaccompanied biological and adopted children, the Proclamation will be applied to all intending immigrants. The Proclamation is set to go into effect at 12:01 am eastern daylight time on November 3, 2019, and is expected to affect nearly two-thirds of all legal immigrants, with a disproportionate impact on immigrants from Latin America, Africa, and Asia.

Ostensibly, the Proclamation is meant to "address[] the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of

uncompensated care" given to "people who lack health insurance or the ability to pay for their healthcare." The Proclamation notes that hospitals and other health care providers "often administer care to the uninsured without any hope of receiving reimbursement from them." Such uncompensated costs "are passed on to the American people in the form of higher taxes, higher premiums, and higher fees for medical services." The Proclamation further states that uninsured individuals "strain Federal and State government budgets through their reliance on publicly funded programs, which ultimately are financed by taxpayers," and rely on emergency care for non-emergency conditions, "causing overcrowding and delays for those who truly need emergency services."

Given these challenges, the Proclamation asserts that "the United States Government is making the problem worse by admitting thousands of aliens who have not demonstrated any ability to pay for their healthcare costs," and claims that "data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance." Accordingly, the Proclamation declares that "[c]ontinuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests." If a prospective immigrant will not "be covered by approved health insurance" "within 30 days of the alien's entry into the United States," or if the immigrant does not have "the financial resources to pay for reasonably foreseeable medical costs," the immigrant is deemed to be someone who will "financially burden the United States healthcare system" and whose entry into the United States is therefore "suspended."

The Proclamation sets out eight specific types of "approved health insurance" that an intending immigrant (1) an employer-sponsored plan; (2) an "unsubsidized health plan offered in the individual market within a State;" (3) a short-term limited duration insurance ("STLDI") plan

"effective for a minimum of 364 days;" (4) a catastrophic plan; (5) a family member's plan; (6) TRICARE and similar plans made available to the U.S. military; (7) a visitor health insurance plan "that provides adequate coverage for medical care for a minimum of 364 days;" or (8) Medicare.

A prospective immigrant may also obtain a "health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee," but the Proclamation provides no guidance as to how "adequate coverage" is defined. "Catastrophic plan" is similarly left undefined, so that it is unclear whether this term refers generically to certain high-deductible plans, or specifically to catastrophic plans defined by the ACA with certain coverage parameters and eligibility requirements. In addition, although the ACA provides various forms of financial assistance based on an enrollee's income level, the ACA does not refer to any of these forms of financial assistance as a "subsidy;" the Proclamation does not clarify what forms of assistance would render a plan "subsidized" and therefore not "approved."

The Proclamation excludes from the scope of "approved health insurance" any "subsidized" healthcare offered in the individual market within a State under the ACA, as well as Medicaid for individuals over 18 years of age, even though some states have chosen to make Medicaid available to certain adults over 18 years of age, including certain new and recently arrived immigrants.

The Proclamation also contains exceptions for noncitizens "whose entry would further important United States law enforcement objectives," or "whose entry would be in the national interest," as "determined by the Secretary of State or his designee." Proclamation § 2(b)(vii),

(viii). Again, however, the Proclamation provides no procedure for would-be immigrants either to learn or to demonstrate how they would qualify for such exceptions.

The Proclamation's eight types of "approved health insurance" are legally or practically unavailable to many immigrants, including most immigrants seeking family-based visas:

- Medicare is effectively an impossible option: it is unavailable to immigrants unless they are over 65 years old *and have been living continuously in the United States for five years*.
- TRICARE plans and other similar plans are only available to members of the United States military, their spouses, and children up to 26 years of age.
- Family member plans are often only available, if at all, to spouses and children under 27 years old. Any other relation, such as a parent and a child over 27, is not normally considered a "dependent" eligible to be included in a family health insurance plan.[3]
- Employer-sponsored plan: Approximately two thirds of immigrant visa applicants are family-based visa applicants and therefore exceedingly unlikely to have an offer of employment before arriving in the United States and acquiring work authorization. Even immigrants with employer-sponsored visas may not be able to show, to a consular officer's satisfaction, that they will have employer-sponsored health insurance within 30 days of their arrival. Employers are permitted under federal law to impose a waiting period of up to 90 days before new employees can be covered by employer-sponsored coverage.[4] Seventy-one percent of employers impose a waiting period, with waiting periods on average lasting 1.9 months.[5]
- Catastrophic and "unsubsidized" insurance bought on an ACA marketplace are only available to individuals residing within the United States.[6] Catastrophic insurance,

---

[3] An employer health plan is only a benefit excludable from income tax if it limits eligibility to spouses, children who have not yet attained age 27, and tax dependents. 26 U.S.C. § 105(b), 26 C.F.R. § 1.106-1(a). Employers are permitted to limit eligibility further, and indeed, coverage of family members other than children and spouses or domestic partners is very rare. *See* Eligibility of Parents for a Group Health Plan, INS. & FIN. SERVS., (Apr. 7, 2017), https://www.theabdteam.com/blog/eligibility-parents-group-health-plan/.

[4] 42 U.S.C. § 300gg-7.

[5] *2018 Employer Health Benefits Survey*, KAISER FAMILY FUND, (Oct. 3, 2018), https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-3-employee-coverage-eligibility-and-participation/.

[6] 45 C.F.R. § 155.305(a)(3)(i); *Are You Eligible to Use the Marketplace?*, HEALTHCARE.GOV, https://www.healthcare.gov/quick-guide/eligibility/.

moreover, is only available to individuals under 30 years old and those who qualify for a hardship or affordability exception.[7]

- STLDI plans are often unavailable to individuals outside the United States or to individuals with pre-existing conditions.[8] Half of the states do not offer STLDI plans with coverage for 364 days, the minimum required by the Proclamation.[9]

- Visitor plans often do not cover individuals with pre-existing conditions, and they are not available to individuals already in the United States.[10]

The only options for "approved health insurance" under the Proclamation appear to be visitor insurance plans, and possibly STLDI plans, primarily because neither can be offered or purchased on ACA Exchanges and therefore may not automatically exclude individuals living outside the United States.[11] The fact that they are not offered on ACA Exchanges, however, means that they are less regulated and non-comprehensive. Unlike plans available on ACA Exchanges, visitor and STLDI plans are not required to provide "essential health benefits," which include hospitalization, prescription drugs, emergency services, and maternity and newborn care. Moreover, they often leave individuals underinsured or effectively uninsured

---

[7] 42 U.S.C. § 18022(e).

[8] *Short Term Health Insurance Eligibility Information for Short Term Health Insurance, or STM*, ELIGIBILITY.COM (Updated Jan. 28, 2019), https://eligibility.com/short-term-health-insurance; Rachel Schwab, *Coming Up Short: The Problem with Counting Short-Term, Limited Duration Insurance as Coverage*, CHIRBLOG.ORG (June 7, 2019), http://chirblog.org/coming-short-problem-counting-short-term-limited-duration-insurance-coverage/.

[9] *Is Short-term Health Insurance Right for You?*, HEALTHINSURANCE.ORG, https://www.healthinsurance.org/short-term-health-insurance/.

[10] *See, e.g.*, *Visitors Medical Insurance – Pre-Existing Medical Conditions FAQ*, INSUBUY.COM, https://www.insubuy.com/visitor-medical-insurance-pre-existing-conditions/ (last visited Oct. 31, 2019) (providing a survey of six visitor insurance companies, none of whom cover preexisting conditions).

[11] Indeed, the Chief Executive of a company that sells travel insurance to U.S. visitors and immigrants, "said online search traffic for immigrant plans on his website increased by 150% after the proclamation." Kristina Cooke & Mica Rosenberg, "Trump Rule on Health Insurance Leaves Immigrants, Companies Scrambling for Answers," REUTERS (Oct. 31, 2019), https://www.reuters.com/article/us-usa-immigration-insurance/trump-rule-on-health-insurance-leaves-immigrants-companies-scrambling-for-answers-idUSKBN1XA1G6.

because they are non-comprehensive.[12] But, because visitor and STLDI plans are the most realistically accessible "approved health insurance" plans available to comply with the Proclamation, the Proclamation effectively incentivizes, if not requires, prospective immigrants to purchase a non-comprehensive plan that will likely leave the immigrant underinsured after she arrives. Indeed, although an immigrant who receives financial assistance under the ACA to purchase comprehensive health insurance would be *better* insured than an immigrant who purchases non-comprehensive visitor or STLDI insurance, the Proclamation bars the former and allows the latter.

If an intending immigrant cannot demonstrate that she will have "approved health insurance" within 30 days of her arrival, she must show that she has sufficient "financial resources to pay for reasonably foreseeable medical costs." The Proclamation, however, does not define what "reasonably foreseeable medical costs" are, and it does not indicate how a consular officer with no medical training should evaluate what medical costs may be "reasonably foreseeable" for a specific prospective immigrant, or how the consular offer should assess whether that individual has sufficient "financial resources" to cover such costs.

## IV. THE DEFENDANT AGENCIES' AND GOVERNMENT OFFICIALS' IMPLEMENTATION OF THE PROCLAMATION

The State Department has made clear not only that the Proclamation will be enforced on its effective date and has taken definitive steps to do so. At least two weeks before the effective

[12] Susan Morse, "Increase in Uncompensated Hospital Care Could Be One Effect of Short-Term Coverage Rule," HEALTHCARE FINANCE (Aug. 1, 2018), https://www.healthcarefinancenews.com/news/increase-uncompensated-hospital-care-could-be-one-effect-short-term-coverage-rule; see also Rick Pollack, *AHA Statement on Final Rule on Short-Term, Limited-Duration Health Insurance Plans*, AMERICAN HOSPITAL ASSOCIATION (Aug. 1, 2018), https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance.

date, the State Department posted guidance for prospective immigrants on its website (the "Posting") that not only outlines their new obligations under the Proclamation but also states how consular officers will process and consider visa applications under the Proclamation.[13] The Posting states definitively that "if you are applying for an immigrant visa" on or after November 3, 2019 "you must demonstrate at the time of the interview" that you meet the Proclamation's requirements. It also warns prospective immigrants that an "inability" to meet the Proclamation's requirements at the time of the interview "will result in the denial of the visa application." Under the heading "Requirement at visa interview," the Posting specifies that "[d]uring the visa interview," applicants will need to demonstrate that they satisfy the requirements of the Proclamation. It informs applicants that consular officers "will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation as needed." The Posting also includes a link to the Proclamation itself.

In addition to the Posting, the State Department issued a "Notice of Information Collection" for "Emergency Review"[14] (the "Emergency Notice") two days ago on October 29, 2019, which was published in the *Federal Register* the next day on October 30, 2019, and provided a comment period that ends today, October 31, 2019. Like the Posting, the Emergency Notice makes clear that the State Department has taken definitive steps to enforce the Proclamation, and indeed has settled on a manner of implementation for doing so, on its

[13] *Presidential Proclamation on Health Care*, U.S. DEP'T OF STATE, TRAVEL.STATE.GOV (last visited Oct. 31, 2019), https://travel.state.gov/content/travel/en/us-visas/immigrate/Presidential-Proclamation-on-Health-Care.html.
[14] *Notice of Information Collection under OMB Emergency Review: Immigrant Health Insurance Coverage*, FED. REGISTER, https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-23639.pdf (last visited Oct. 30, 2019).

scheduled effective date of this upcoming Sunday. The Emergency Notice purports to announce a "methodology" established by the Secretary of State, as authorized by Section 3 of the Proclamation, "to establish standards and procedures for governing such determinations." The Emergency Notice states that "to implement [the Proclamation] when it goes into effect on November 3, 2019," consular officers "will verbally ask immigrant visa applicants covered by [the Proclamation] whether they will be covered by health insurance in the United States within 30 days of entry to the United States and, if so, for details relating to such insurance." If the applicant says yes, "consular officers will ask for applicants to identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary."

The Emergency Notice further adds that visa applicants will not be barred from entry "if they do not have coverage, but possess financial resources to pay for reasonably foreseeable medical expenses." It defines "reasonably foreseeable medical expenses" as "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication." The Emergency Notice states that "[a]ll public comments must be received by October 31, 2019," providing a comment period of well less than 48 hours, especially when taking into account when the on-line comment submission page went live in the mid-morning of October 30, 2019. The Emergency Notice notes that the Proclamation "was signed on October 4, 2019, and emergency review of this information collection is necessary for the Department to prepare consular officers to implement [the Proclamation] when it goes into effect on November 3, 2019."[15]

---

[15] The late posting of the Emergency Notice and extremely short notice-and-comment period stand in stark contrast to a "60-Day Notice of Proposed Information Collection" published in the Federal Register six days prior on October 24, 2019 (the "Notice"). That Notice also proposed an

**LEGAL STANDARD**

To obtain a TRO, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *East Bay Sanctuary Covenant v. Trump ("East Bay I")*, 349 F. Supp. 3d 838, 855 (N.D. Cal. 2018) (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). Provided that the Court fully considers this familiar four-factor test, the Court may supplement its inquiry by considering whether "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [the requesting party's] favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (*quoting Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003)). Under the Ninth Circuit's "sliding scale" approach, as "more relative hardship is shown, the less likelihood of success must be shown and vice versa"; the factors are "extremes of a single continuum." *See Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999); *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). The purpose of a TRO is to preserve the status quo until a hearing on the merits can take place. *Univ. Camenisch*, 451 U.S. at 395 (1981); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016).

---

and solicited public comments on a new written form, DS-5540, that would ostensibly collect information intended to assist consular officers "in assessing whether an applicant is likely to become a public charge," but the Notice stated that a consular officer could ask a visa applicant to fill out certain questions on the same form to assess whether the applicant meets the Proclamation's requirements. *See 60-Day Notice of Proposed Information Collection: Public Charge Questionnaire*, FED. REGISTER , *See* https://www.federalregister.gov/documents/2019/10/24/2019-23219/60-day-notice-of-proposed-information-collection-public-charge-questionnaire (last visited Oct. 27, 2019).

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs move for a TRO on at least three grounds. First, the Proclamation violates the public charge rule of the INA, and therefore is contrary to law and ultra vires under the APA. Second, the Proclamation is arbitrary and capricious in violation of the APA. Third, in implementing the Proclamation, the Government disregarded the procedural requirements of the APA without sufficient justification. Showing a likelihood of success on one of these grounds is sufficient to warrant issuance of a TRO to preserve the status quo.

#### A. The Proclamation and its Implementation Conflict with the INA's Public Charge Statute.

The Proclamation relies on a single dispositive factor—the health care insurance status of an individual—to determine whether the individual will "financially burden" the United States. If an individual lacks an "approved" health care insurance and cannot otherwise demonstrate that they currently have the financial resources to pay for medical care – while deliberately excluding from consideration insurance plans (such as ACA plans) that would otherwise be available to them once they enter the country – she is deemed to be a financial burden and the applicant will not be admitted.

The Proclamation's reliance on the health care insurance status of an individual as the sole factor for determining inadmissibility as a public charge conflicts with 8 U.S.C. § 1182(a)(4) in at least five ways. First, Congress has spoken directly to the circumstances in which an individual may be deemed to become a "financial burden" to the United States and has rejected the Proclamation's core premise. *See* 8 U.S.C. § 1182(a)(4)(A). This provision states that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment

of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(B)(i). When determining whether an individual may become a public charge, the statute enumerates the factors that are to be considered "at a minimum" to include the applicant's age; health; family status; assets, resources, and financial status; and education and skills.[16] The statute outlines the permissible factors in the public charge determination and nowhere mentions an individual's health care insurance status as one of the permissible factors. Given the statute's enumeration of age and health, the statute's omission of "health care insurance status" is important.

Second the statute *precludes* any single factor from being a dispositive factor. Indeed, the statute *requires* a totality of the circumstances test to be applied. "[A]t a minimum" an individual's age, health, family status, assets, resources, financial status, education and skills must be must considered to determine whether an individual will "financially burden" the United States. The totality of the circumstances test has long been a feature of the public charge ground even before Congress statutorily mandated it in 1996. *See, e.g., Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974). The Proclamation, however, conflicts with the statutory language by deeming an individual to be a financial burden based solely on her health care insurance status and eschewing all the other statutory factors including, perhaps most incongruously, the *health* of the individual herself.

Third, the Proclamation's dispositive reliance on health care insurance status contravenes decades of agency interpretation. In 1999, the then-Immigration and Naturalization Service explained that to "help alleviate public confusion over the meaning of the term 'public charge' in

---

[16] An additional factor is whether an "affidavit of support under section 213A [8 U.S.C. § 1183a]" was executed. 8 U.S.C. § 1182(a)(4)(B)(ii).

immigration law and its relationship to the receipt of Federal, State, and local public benefits," it issued "field guidance" ("the 1999 Field Guidance") and a proposed rule to guide public charge determinations by INS officers. INS, *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (Mar. 26, 1999). While the rule was never enacted, the 1999 Field Guidance became the governing interpretation of the statute. The 1999 Field Guidance was the distillation of "over one hundred and twenty years" of Executive branch interpretation of the public charge. *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.,* No. 19-cv-04717-PJH, 2019 WL 5100718, at *2 (N.D. Cal. Oct. 11, 2019). Under the Field Guidance's interpretation of the statute, an individual may be deemed a public charge if the person is "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense," *Field Guidance* at 28,692, which has been the governing standard of the public charge determination for more than 20 years, conforms with the statutory language of 8 U.S.C. § 1182(a)(4). The 1999 Field Guidance rejects the premise that an individual's health care insurance status is a relevant, let alone dispositive factor, in the public charge determination.

Fourth, the Proclamation's reliance on an individual's accessing short-term health care benefits as a reason to find the person a "financial burden" has been expressly rejected. *City & Cty of S.F.*, 2019 WL 5100718 at *28 (the public charge statute has had a "longstanding allowance for short-term aid"). The United States Supreme Court has explained that to be a financial burden to the United States as a public charge, an individual's "permanent personal" characteristics are the only relevant factors. *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915). In *Gegiow*, the Supreme Court considered a "single question, . . . whether an alien can be declared likely to

become a public charge on the ground that the labor market in the city of his immediate destination is overstocked." *See Gegiow*, 239 U.S. at 9-10. In answering "no" to the question, the Supreme Court interpreted the term "Persons likely to become a public charge" in context, that is, as "mentioned between paupers and professional beggars, and along with idiots, persons dangerously diseased, persons certified by the examining surgeon to have a mental or physical defect of a nature to affect their ability to earn a living, convicted felons, prostitutes and so forth." *Id.* The Court held that "[t]he persons enumerated in short are to be excluded on the ground of permanent personal objections accompanying them irrespective of local conditions," and thus not according to local or temporary conditions impacting their self-sufficiency. *Id.* at 10.

Fifth, the Proclamation revives a test for financial burden—the receipt of non-cash benefits-- that Congress has rejected. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996), which amended the INA by codifying five factors relevant to a public charge determination. In the course of enacting IIRIRA, members of Congress debated whether to expand the public charge definition to include use of non-cash public benefits. *See Immigration Control & Financial Responsibility Act of 1996*, H.R. 2202, 104th Cong. § 202 (1996) (early House bill that would have defined public charge for purposes of removal to include receipt by a non-citizen of Medicaid, supplemental food assistance, SSI, and other means-tested public benefits). The Senate rejected the effort to include previously unconsidered, non-cash public benefits in the public charge test and to create a bright-line framework of considering whether the immigrant has received public benefits for an aggregate of twelve months as "too quick to label people as public charges for utilizing the same public assistance that many Americans need

to get on their feet." S. Rep. No. 104-249, at *63−64 (1996) (Senator Leahy's remarks). Accordingly, in its final bill, Congress did not include the receipt of Medicaid, CHIP, supplemental food assistance, SSI, and other means-tested public benefits. as determinative of a public charge. *See* 8 U.S.C. § 1182(a)(4)(A).

For these reasons, Defendants' actions are *ultra vires* and also "not in accordance with law" under the APA. 5 U.S.C. § 706 (2)(A); *see East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (2018) (concluding that an agency had unlawfully done what the "Executive cannot do directly; amend the INA").

**B. Defendants' Implementation of the Proclamation is Arbitrary and Capricious in Violation of the APA**

Defendant's implementation of the Proclamation constitutes final agency action that is "arbitrary, capricious, [or] an abuse of discretion." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015 (*en banc*) (quoting 5. U.S.C. 706(2)(A))). Defendants have neither "considered the relevant factors," nor have they "articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. V. Servheen,* 665 F.3d 1015 (9th Cir. 2011) (citation omitted). Because they have utterly failed to show that there are "good reasons for the new policy," their actions should be set aside under the APA. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 202, 515 (2009).

The Department of State has implemented the Proclamation without offering any articulation of facts found or choices made beyond providing a link on its website to the Proclamation itself. But nothing in the Proclamation justifies the new policy, much less the treatment of the issue as an emergency that necessitates action on Sunday, before any reasoned choice could possibly be made. To the contrary, the Proclamation offers only unsupported assumptions, not factual findings and reasoning.

First, it asserts that uninsured immigrants are damaging the American healthcare system. But according to a recent U.S. government report, the uninsured rate has fallen 35 percent and the uncompensated care costs as a share of hospital operating expenses has fallen by 30 percent. Medicaid and CHIP Payment and Access Commission, "Report to Congress on Medicaid and CHIP" (March 2018), https://www.macpac.gov/wp-content/uploads/2018/03/Report-to-Congress-on-Medicaid-and-CHIP-March-2018.pdf. There is simply no evidence of a new crisis in the healthcare system, and certainly not one caused by uninsured immigrants.

Second, the new policy is purportedly based on the assertion that lawful immigrants are three times more likely than U.S. citizens to lack health insurance. But this ignores the fact that United States citizens account for 75% of the total 27.4 million uninsured in this country, or 20.55 million uninsured individuals. In comparison, according to figures provided by the Kaiser Family Foundation for 2017, uninsured immigrants represent only 11% of uninsured in this country, or 3 million uninsured individuals.[17]

Third, Defendants claim "uncompensated care costs"—in excess of "$35 billion in each of the last 10 years," or "$7 million on average for each hospital in the United States"—without stating the basis for those figures. Even if they are correct, Defendants have not made any factual findings to show the percentage of costs attributable to the 75% of uninsured United States citizens versus the 11% uninsured immigrants. Nothing Defendants have articulated justifies calling an end to longstanding and considered immigration and healthcare policies. The mere assertion that admission of uninsured immigrants to the United States "would be detrimental" to the interests of "protecting both [our health care system] and the American

[17] *President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage*, KFF.ORG (Oct. 10, 2019), https://www.kff.org/disparities-policy/fact-sheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/.

taxpayer from the burdens of uncompensated care." 84 Fed. Reg. 53,991, is wholly inadequate under the APA.

Defendants' actions are arbitrary and irrational in other respects too. For example, the new policy would bar entry of an immigrant who would be *fully insured* with comprehensive coverage under the ACA after arrival—albeit with financial assistance. Defendants have not made any findings that could square this result with the Proclamation's express purpose of reducing the financial burden imposed by *uninsured* individuals. There are likewise no factual findings explaining how the entry of an immigrant who would be underinsured (or effectively uninsured) with visitor insurance or a short-term limited duration insurance plan would further this purpose. Nothing Defendants have said justifies their actions; their failure to provide reasoned support for such a drastic change in policy is arbitrary and capricious, and should be set aside.

Defendants cannot save their actions from APA review by acting now and promising justifications later. As a "practical matter," Defendants have already taken action with "binding effect" by posting on their website a set of "marching orders" for the agency and the public. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021, 1023 (2000); *id.* at 1020 ("With the advent of the Internet, the agency does not need [] official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its website."). They have told visa applicants what they "must do" at their interviews with "definitive statement[s]" and directives with an "immediate effect on the day-to-day" lives and legal status of otherwise eligible visa applicants. *California Dep't of Water Res. V. F.E.R.C.*, 341 F.3d 906, 909 (9th Cir. 2003). Given the November 3 effective date, it is clear that "immediate compliance is expected." *Id.* Whatever justifications Defendants may attempt to

offer in the future, the actions they have taken already constitute arbitrary and capricious agency action that must be set aside.

### C. Defendants' Implementation of the Proclamation Violates the Procedural Requirements of the APA.

The Proclamation also violates the procedural requirements of the APA. In implementing the Proclamation, which affects nearly two-thirds of all qualified immigrant visa applicants, Defendants failed entirely to provide adequate notice and opportunity for comment—bedrock APA principles that ensure public involvement in the formulation of government policy.

Under the APA, "[g]eneral notice of proposed rule-making shall be published in the Federal Register [and] shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Unless an exception applies, the APA requires agencies to provide notice and opportunity for public comment at least 30 days before the rule becomes effective. After providing notice, the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C § 553(c). "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). Defendants have not met the APA's requirements.

**1. The proclamation facially violates the APA's notice-and-comment rulemaking requirements.**

First, Defendants' published notice refers to no legal authority aside from the Proclamation itself[18] and therefore is facially deficient. *See* 5 U.S.C. § 553(b)(2) (requiring that rules refer to the legal authority pursuant to which they are proposed).

Second, the agency has failed to give any interested person a meaningful "opportunity to participate in the rule making." 5 U.S.C. § 553(c); *see also Idaho Farm Bureau Fed'n*, 58 F.3d at 1404. On October 30, 2019, *with one day's notice*, the State Department published its "Notice of Information Collection Under OMB Emergency Review," ("Emergency Notice"), which required all public comments "be received by October 31, 2019."[19] This one-day comment period is remarkable--and it is also illegal. Although the APA has not prescribed a minimum duration for a comment period, even 10-day comment periods have been deemed insufficient without "exigent circumstances in which agency action was required in a mere matter of days." *See N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012).

The government bypassed the APA's procedures entirely, implementing the Proclamation on an emergency basis without any justification. And it did so in the context of a rule destined to have devastating impacts on nearly two-thirds of all qualified immigrant visa applicants. If the Government's procedures are allowed to stand, the APA's guarantee, and Congress's command, of meaningful public involvement would be completely defeated, leaving the Government free to

[18] *Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage*, FED. REGISTER, https://www.federalregister.gov/documents/2019/10/30/2019-23639/notice-of-information-collection-under-omb-emergency-review-immigrant-health-insurance-coverage (last visited Oct. 30, 2019).

[19] *Id.*

subvert the democratic process for virtually every policy that it creates. That is particularly so where, as here, even with the absurdly truncated comment period, the agency received over 248 comments that, in large part, oppose implementation of the Proclamation.[20] If the Proclamation is implemented on Sunday, without any regard for those comments, the APA's guarantee will become meaningless.

**2. None of the APA's exceptions to notice-and-comment rulemaking apply.**

None of the exceptions to the APA's notice-and-comment rulemaking applies here. First, while there is an exception to matters involving foreign affairs 5 U.S.C. § 553(a)(1), neither the Proclamation nor the Emergency Notice purport to be based on any matters involving foreign affairs. To the contrary,[21] that is insufficient to meet the foreign affairs exception of the APA. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775-76 (9th Cir. 2018) (holding that foreign affairs exception requires a showing that the ordinary application of "the public rulemaking provisions [will] provoke definitely undesirable international consequences" (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980))).

Second, Defendants have not set forth any basis to satisfy the APA's good cause exception. Under Ninth Circuit precedent, an agency "must overcome a high bar if it seeks to invoke the good cause exception to bypass the notice and comment requirement." *United States*

[20] Plaintiff Latino Network, together with several other organizations, submitted a letter expressing their opposition to the Proclamation and their concern that the Proclamation unlawfully would result in prolonged or permanent family separation; provides vague, if any, guidance on how to obtain a qualifying plan; and leaves prospective immigrants without any legally or practically available options. Latino Network's comment letter, and the hundreds of other comments that were submitted yesterday, can be found at: https://www.regulations.gov/docket?D=DOS-2019-0039.

[21] *Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* (issued Oct. 4, 2019), available at https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/.

*v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010). Without any asserted basis at all, Defendants fail to meet that standard.

Finally, neither the Proclamation nor the Emergency Notice constitute interpretive rules, because neither was "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). Indeed, both the Proclamation and Emergency Notice are likely to affect the substantive rights of hundreds of thousands of otherwise qualified immigrant visa applicants. *See Hou Ching Chow v. Attorney General*, 362 F. Supp. 1288, 1292 (D.D.C. 1973) (looking "to such factors as the real effect of the rule, the source authority for its promulgation, and the force and effect which attach to the rule itself" to determine whether notice-and-comment rulemaking is required).

Both the Proclamation and the Emergency Notice are substantive rules that do not "grant[] or recognize[] an exemption or relieve[] a restriction." 5 U.S.C. § 553(d)(1). Thus, the notice the agencies provided is void *ab initio* for failure to comply with the APA. *See, e.g.*, *Chow*, 362 F. Supp. at 1292; *Haddon Twp. Bd. of Educ. v. New Jersey Dep't of Educ.*, 476 F. Supp. 681, 691 (D.N.J. 1979) ("Substantive rules will not carry the force of law, though, unless they are promulgated pursuant to the procedural requirements of the APA. 'In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decision-making require that agency decisions be made only after affording interested persons notice and an opportunity to comment.' " (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 312 (1979))).

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM

Plaintiffs will suffer irreparable harm if the Proclamation and the Emergency Notice are not enjoined pending a hearing on the merits. <u>A party moving to maintain the status quo via injunctive relief must demonstrate "a significant threat of irreparable injury, irrespective of</u>

the magnitude of the injury" that cannot be remedied if the court waits until a final trial on the merits. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999). "There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (citing *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011); *see also Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007). To establish irreparable harm, Plaintiffs must show that they will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* Because of the Proclamation, Plaintiffs will be forced to endure prolonged, and potentially permanent, family separation; anxiety and uncertainty that loved ones will become at risk of deportation, and decreased quality of life.[22] Each of those harms has been recognized as irreparable by the courts in the Ninth Circuit.

As set out above, many, if not all, of the options the Proclamation provides as "approved health insurance" are legally or practically impossible for the individual Plaintiffs and the members and clients of Latino Network to acquire. For Plaintiffs with loved ones abroad, this means they will suffer prolonged, and potentially permanent, separation from those loved ones if a consular officer decides they do not meet the Proclamation's requirements.[23] Those with undocumented family members in the United States face the threat of permanent separation from their loved ones if those family members leave the country for their consular interview and are barred from re-entry due to the Proclamation; in the meantime, these families face fear and

---

[22] *See* Declaration of Juan Ramon Morales (hereinafter "Morales Decl."), 19.

[23] *See* Jane Doe #2 Decl., ¶ 9; Jane Doe #3. Decl., ¶ 14; Castro Decl., ¶ 10, 11; Villaruel Decl., ¶ 11.

anxiety on a daily basis because even an approved I-601A waiver does not protect their loved ones from the threat of removal proceedings.[24] Such harms, including the mental and emotional harm that they could be torn from their homes and families by deportations, represent paradigmatic irreparable injury. "[S]eparation from family members" and the mental damage concomitant with such separation constitutes irreparable harm. *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (quotation marks omitted).

Prolonged separation from one's family constitutes irreparable injury. *See Hawaii v. Trump*, 859 F.3d 741, 782-83 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (recognizing that "important [irreparable harm] factors include separation from family members" (internal quotation marks omitted)); *see also Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of h[er] child[], and the child[] suffer[s] from uncertainty and dislocation."). Enforcement of the Proclamation poses irreparable and particularly severe harm to families who will either be separated or remain separated due to an inability to afford insurance in order to obtain immigration status. *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (affirming that courts can consider "indirect hardship to [immigrants'] friends and family members" to grant injunctive relief). Because the Proclamation will increase family separations, the Proclamation is likely to increase future demand for LatNet's core services. Moreover, Latino Network is diverting resources to address the Proclamation, which reduces the available

---

[24] *See* John Doe #1 Decl., ¶¶ 10, 11; Blake Doe Decl., ¶ 13; Morales Decl., ¶¶ 16-18. As Mr. Morales put it: "We are in a terrible bind right now. If we do not continue with the consular process, we risk losing all the work we have done over the last several years to get to this point. If we do continue with the process, there is a real risk that [my wife's] visa will be denied and she will be stuck in Mexico without me or our children."

resources for its other services. *See East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 849 (N.D. Cal. 2018) (explaining that "an organization may establish injury on its own behalf where 'a challenged statute or policy frustrates the organization's goals and requires the organization 'to expend resources in representing clients they otherwise would spend in other ways.'" (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc))). The need for immediate relief here could not be more acute.

The Proclamation therefore erects a significant, if not insurmountable, barrier before immigrants who have cleared all other statutory requirements to gain an immigrant visa and admission to the United States. This will cause immediate, significant and irreparable harm to affected individuals and families if the Proclamation is allowed to go into effect. Each of the individual Plaintiffs, for example, has sponsored a family-based visa petition for an immediate relative, and each believes it remains likely that their loved one will not be able to satisfy the Proclamation's health insurance requirement because "approved health insurance" is impossible to acquire and because they do not have sufficient financial resources to cover "reasonably foreseeable medical expenses."

Multiple plaintiffs, for example, receive health insurance through their respective state Medicaid programs, so adding their spouses (for John Doe #1, Jane Doe #3, and Ms. Castro) or parents (for Jane Doe #2) to these plans is not possible and, in any event, would not satisfy the Proclamation's "approved health insurance" requirement.[25] One—Ms. Villarruel—does not

[25] *See* Declaration of John Doe #1 (hereinafter "John Doe #1 Decl."), ¶ 3; Declaration of Jane Doe #2 (hereinafter "Jane Doe #2 Decl."), ¶ 3; Declaration of Jane Doe #3 (hereinafter "Jane Doe #3 Decl."), ¶ 3; Declaration of Iris Angelina Castro (hereinafter "Castro Decl."), ¶ 3.

have health insurance of her own.[26] The family members of some plaintiffs, moreover, have significant pre-existing conditions, such as leukemia (Mr. Morales's wife), multiple sclerosis (Jane Doe #3's husband), and rheumatoid arthritis and lupus (Blake Doe's mother), which means that these plaintiffs have not been able to find private health insurance for their loved ones, despite their efforts to obtain such insurance.[27] And all of the plaintiffs' families have financial difficulties with either paying for private health insurance or demonstrating sufficient resources to pay for reasonably foreseeable medical costs: one (Blake Doe) is still a college student; some (John Doe #1, Jane Doe #3, Ms. Castro) are unemployed due to disability, and/or to crisis or trauma in the family; and most are single-income or no-income households because an immigrant spouse is not able to work in the United States to provide financial support.[28] STLDI plans are either illegal or not available for the necessary 364-day minimum in each plaintiff's state.[29] Visitor insurance is almost certainly unavailable to Jane Doe #3's spouse because of his serious preexisting condition; it is affirmatively unavailable to the spouses of John Doe #1 and Mr. Morales, or to Blake Doe's parents, because they are already present in the United States. The plaintiffs therefore all have legitimate reasons to believe that, if the Proclamation is

---

[26] *See* Declaration of Brenda Villaruel, ¶ 4.

[27] *See* Morales Decl., ¶ 8; Jane Doe #3 Decl., ¶ 18; Declaration of Blake Doe (hereinafter "Blake Doe Decl."), ¶ 10.

[28] *See* Blake Doe Decl., ¶¶ 2, 12; John Doe #1 Decl., ¶¶ 3, 9; Jane Doe #3, ¶ 11, 12; Castro Decl., ¶ ¶ 3, 9; Villaruel Decl., ¶¶ 4, 8, 10; Morales Decl., ¶¶ 5, 13, 14.

[29] *See Is Short-Term Insurance Right for You?*, HEALTHINSURANCE.ORG, https://www.healthinsurance.org/short-term-health-insurance/ (last visited Oct. 31, 2019); *see also Duration & Renewals of 2019 Short Term Medical Plans by State*, HEALTHINSURANCE.ORG, https://www.healthinsurance.org/assets/img/landing_pages/stm_pdf/state-by-state-short-term-health-insurance.pdf (last visited Oct. 31, 2019). STLDI plans are illegal in California (Jane Doe #2, Jane Doe #3), Massachusetts (Ms. Castro), and New York (Mr. Morales); they are not available for the necessary duration in Oregon (John Doe #1, Blake Doe) or Illinois (Brenda Villaruel).

implemented, their loved ones will be denied visas and entry (or, for those already here, re-entry) to the United States after a consular interview.

The individual plaintiffs' situations are not unique. The healthcare industry, "for the most part, [has] not previously catered to those who are not yet in the country," and as a result, many families "are finding few options exist for them."[30] Affected individuals are calling multiple insurers in a panic and finding that they are either ineligible, because they need to show legal residence, or because the costs are prohibitively expensive.[31] The Proclamation therefore threatens permanent family separation, either blocking many prospective immigrants from entering the United States to reunite with families, or preventing the presently undocumented individuals from leaving to receive their immigrant visas at a consular post because they will be denied re-entry. These presently undocumented loved ones are in a Catch--22: if they depart for consular processing they will be denied re-entry due to the Proclamation, but if they fail to depart they must live with the constant fear of being placed in removal proceedings and their lack of federal work authorization.

The impact the Proclamation has on individuals and families is compounded for Latino Network, a Portland-based organization whose mission is to educate and empower Latinos in Multnomah County, Oregon, by helping Latino youth and parents live with dignity and develop social support, sustain physical and mental health, and achieve housing and financial stability.[32] Many Latino Network members have family members subject to the Proclamation living in

---

[30] Kristina Cooke & Mica Rosenberg, "Trump Rule on Health Insurance Leaves Immigrants, Companies Scrambling for Answers," REUTERS (Oct. 31, 2019), https://www.reuters.com/article/us-usa-immigration-insurance/trump-rule-on-health-insurance-leaves-immigrants-companies-scrambling-for-answers-idUSKBN1XA1G6.
[31] *Id.*
[32] *See* Declaration of Ms. Carmen Rubio, ¶¶ 2, 4.

dangerous and life-threatening situations,[33] and Latino Network has diverted significant resources to provide assistance to its members and community.[34] Like all individuals affected by the Proclamation searching for answers, Latino Network staff have spent "countless hours trying to research what available federal, state, and private health care plans our members and future immigrants who remain abroad may obtain" to comply with the Proclamation.[35] Because Latino Network had previously steered members and clients toward ACA- and state-subsidized health plans, both to meet their health needs and to improve overall health coverage for their entire community, Latino Network has also been compelled to allocate "thousands of dollars on new, unforeseen education and outreach initiatives" to "combat the disastrous consequences of the Proclamation for members and their relatives who have or may use a non-approved plan or cannot pay for foreseeable medical costs."[36] In addition, the family separation the Proclamation will invariably cause will result in Latino Network's member families having "fewer income-earning adults in their households, which will exacerbate existing financial and housing issues in our low- and moderate-income immigrant community," which will in turn place "greater future demand for [Latino Network's] other core services while at the same time having to divert resources from those services to address the Proclamation's more immediate effects for immigrants and their families."[37]

The devastating effects of the Proclamation are hardly surprising, as it "targets immigrants who have come to the U.S. legally under policies Trump and his advisers often

---

[33] *Id.*, ¶ 9.
[34] *Id.*, ¶ 14.
[35] *Id.*, ¶ 15.
[36] *Id.*, ¶¶ 17, 18.
[37] *Id.*, ¶ 26.

attack."[38] President Trump has long criticized this nation's immigration system for too freely allowing the entry of family-based and diversity immigrants, who he believes to be "mostly low-wage and low-skilled, and who come into our country and immediately go onto welfare and stay there for the rest of their lives."[39] The Proclamation is therefore the latest in a series of efforts to reduce the number of family-based and diversity visas issued by the United States, which together have historically accounted for more than two-thirds of the immigrant visas granted every year: based on insurance coverage data alone, "the majority of adults who were granted green cards over the last three years would have been shut out."[40] A majority of these family-based and diversity visas, moreover, go to immigrants from Latin America, Africa, and Asia.[41]

---

[38] Nicole Narea & Alex Ward, "Trump Quiety Cut Legal Immigation By Up to 65%," VOX.COM (Oct. 30, 2019), https://www.vox.com/2019/10/9/20903541/trump-proclamation-legal-immigration-health-insurance.

[39] *See also President Trump Remarks at Conservative Political Action Conference*, CSPAN (Feb. 23, 2018) https://www.c-span.org/video/?441592-1/president-trump-pushes-concealed-carry-teachers-cpac-speech; *see also President Donald J. Trump Backs RAISE Act*, WHITEHOUSE.GOV (Aug. 2, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-backs-raise-act/ (proposing a new immigration system to "reduce[] overall immigration numbers to limit low-skilled and unskilled labor entering the United States"); *Remarks by President Trump in Meeting with Bipartisan Members of Congress on Immigration*, WHITEHOUSE.GOV (Jan. 9, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-bipartisan-members-congress-immigration/ (claiming that family-based immigration amounts to "bringing many, many people with one, and often it doesn't work out very well. Those many people are not doing us right."); *President Trump in Cincinnati, Ohio*, CSPAN (Aug. 1, 2019), https://www.c-span.org/video/?463078-1/president-trump-holds-campaign-rally-cincinnati-ohio&start=1937 (characterizing diversity visa lottery winners as murderers or bank robbers); *President Donald J. Trump's State of the Union Address*, WHITEHOUSE.GOV (Jan. 30, 2018), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/ (criticizing the diversity visa lottery as "a program that randomly hands out green cards without any regard for skill, merit, or the safety of our people").

[40] Nicole Narea & Alex Ward, "Trump Quiety Cut Legal Immigation By Up to 65%," VOX.COM (Oct. 30, 2019), https://www.vox.com/2019/10/9/20903541/trump-proclamation-legal-immigration-health-insurance.

[41] Most family-based visa immigrants in recent years have originated in Asia, Africa, and South America; most diversity visa lottery winners have originated in Africa and Asia. *See Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-

## III. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGHS IN FAVOR OF ISSUING A TRO AND PRESERVING THE STATUS QUO

When the federal government is a party, the balance of the equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The government cannot identify any real harm that would result from the requested TRO. *See East Bay Sanctuary Covenant v. Trump (East Bay II)*, 909 F.3d 1219, 1254 (9th Cir. 2018) (rejecting the government's argument that the order enjoining prior asylum ban would inflict institutional injury). There is no urgency or emergency necessitating the Proclamation; indeed, the Proclamation upsets the decades-long status quo. In all events, "prolonged separation from family members" outweighs any harm the government might attempt to articulate. *Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017), *rev'd on other grounds, Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *see also Pickett v. Hous. Auth of Cook Cty.*, 114 F. Supp. 3d 663 (N.D. Ill. 2015) ("[T]he public interest is seriously disserved by [Plaintiff] family's separation.").

Plaintiffs have established that "an injunction is in the public interest" because of the widespread detrimental effects that the Proclamation will cause if it takes effect on Sunday. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."). Implementing the dramatic changes Defendants have proposed under the

statistics/yearbook/2017/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2016/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2015/table10. In these statistics, figures for Africa include countries from the Middle East.

Proclamation indeed would have a devastating impact—affecting an estimated two-thirds of all legal immigrants, or 375,000 people, from entering the country annually.

An injunction also serves the public interest by reducing "the indirect hardship to . . . family members" of the Plaintiffs and class members. *Hernandez,* 872 F.3d at 996. Without a TRO, the government successfully could prevent family members of Plaintiffs and other class members from lawfully receiving visas, entering the United States, and remaining in the United States, all because of an inability to afford the government's limited options for health insurance. A vast majority of visa applicants do not have employment-based health insurance; their reliance on family petitions means that failure to secure insurance within the restricted time window will result in the separation of families.[42]

Furthermore, allowing Plaintiffs and putative class members to continue to be systematically denied immigration status based on arbitrary health insurance requirements untethered from the law runs contrary to the public interest. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1194 (N.D. Cal. 2015) (noting that "[t]here is no public interest in [Plaintiff]'s continued suffering during the pendency of this litigation"). Plaintiffs and other individuals who are unable to afford available health insurance options will, as a result of this Proclamation, be denied immigration status they have qualified for under federal law.

Given the size and success of the Nation's legal immigration system, the costs to the Nation from this Proclamation, and the impact it will cause to thousands of individuals and families worldwide, would be nothing short of staggering. For that reason, the balance of the

[42] *See, e.g.*, John Doe #1 Decl., ¶ 3; Jane Doe #2 Decl. ¶ 3; Jane Doe #3 Decl., ¶ 3; Castro Decl., ¶3; Villaruel Decl., ¶ 4; Blake Doe Decl., ¶ 5.

equities and the public interest overwhelmingly weighs in favor of issuing a TRO and preserving the status quo.

**IV. A NATIONWIDE INJUNCTION IS NECESSARY**

The Ninth Circuit has "upheld nationwide injunctions when 'necessary to give Plaintiff a full expression of their rights.'" *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (quoting *Hawaii*, 878 F.3d at 701, and citing *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) (per curium), *reconsideration en banc denied*, 853 F.3d 933 & 858 F.3d 1168 (9th Cir. 2017), *cert denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017). For the following reasons, this Court's injunction should apply universally and nationwide to fully maintain the status quo and adequately protect the class of Plaintiffs from irreparable harm.

First, the APA unequivocally establishes that the remedy for "defective rulemaking after a plaintiff successfully challenges the process that an agency has used to promulgate a rule" is for "the reviewing court must 'hold unlawful and set aside" the challenged agency action . . . as a preliminary matter, pending full litigation of the issues in this case." *Make the Road N.Y. v. McAleenan*, No. 19-cv-2369 (KBJ), 2019 WL 4738070, at *3 (D.D.C. Sept. 27, 2019) (quoting 5 U.S.C. § 706(2)); *see also Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Nationwide temporary relief "ensures that the Rule is not effective until its validity is fully adjudicated." *CASA de Maryland v. Trump*, No. PWG-19-2715, 2019 WL 5190689, at *17 (D. Md. Oct. 14, 2019); *see also East Bay Sanctuary*, 932 F.3d at 779 ("[A] TRO should be restricted to preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." (citation and internal punctuation omitted)). Setting aside defective agency action, moreover, "pertains *only* to an agency's act of enacting the defective rule; it is addressed *only* to the agency that has failed to adhere to the

required rulemaking procedures; and it binds *only* that particular entity with respect to the rule in question." *Make the Road N.Y.*, 2019 WL 4738070, at *3.

Second, any affected individual and intending immigrant abroad will be harmed from the Proclamation. Therefore, the scope of the injunction must be universal if it is to afford Plaintiffs the relief to which they are entitled. *See, e.g., California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) ("Although there is no bar against nationwide relief in federal district court . . . such broad relief must be necessary to give prevailing parties the relief to which they are entitled." (internal quotation marks and citation omitted)). With respect to immigration matters in particular, the Ninth Circuit has "consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (citing *Regents of the Univ. of Cal. v. U.S. D.H.S.*, 908 F.3d at 511); *see also Hawaii*, 878 F.3d at 701 ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."); *Washington*, 847 F.3d at 1166-67 (9th Cir. 2017) ("[A] fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."). This is because national immigration policies require uniformity. *See Hawaii*, 878 F.3d at 701. Indeed, a TRO limited only to the named plaintiffs in this case would not remedy the harm of unlawful agency action; otherwise, "after a plaintiff successfully establishes that an agency rule violates the law, the federal courts must stand by while the agency acts in direct defiance of that court's legal determination by continuing to apply the invalid rule with respect to any person who is not the individual who filed the legal action that is before the Court." *MTRNY*, 2019 WL 4738070, at * 48. Such a prospect is "untenable." *Id.*

Finally, a geographically limited injunction could spur mass confusion with different consular officials overseas applying the enjoined policy. Only a nationwide injunction can address the irreparable harm that the Proclamation inflicts on individuals worldwide who, but for the Proclamation, would be able to enter the United States to reunite with family here, or would be able to leave to consular process and return without fear of permanent separation from their families, as well as on their families here in the United States and Latino Network, whose mission is to serve such families. *See Washington v. U.S. D.H.S.*, No. 19-CV-5210-RMP, 2019 WL 5100717, at *22 (E.D. Wash. Oct. 11, 2019) (observing that "postponing the effective date of [an unlawfully promulgated agency rule], in its entirety, provides [the plaintiffs] the necessary relief to 'prevent irreparable injury,' as section 705 [of the APA] instructs").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court immediately issue a temporary restraining order preventing Defendants from implementing or enforcing the Proclamation.

DATED this 1st day of November, 2019.


**Karen C. Tumlin** (to be admitted *pro hac vice*)
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (to be admitted *pro hac vice*)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944

INNOVATION LAW LAB

s/ *Nadia H. Dahab*
**Stephen Manning** (SBN 013373)
stephen@innovationlawlab.org
**Nadia Dahab** (SBN 125630)
nadia@innovationlawlab.org
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733


-and-

**Scott D. Stein** (to be admitted *pro hac vice*)
sstein@sidley.com
**Kevin M. Fee** (to be admitted *pro hac vice*)
kfee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: +1 312 853-7520
Facsimile: +1 312 853-7036

**Jesse Bless** (to be admitted *pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS ASSOCIATION
1301 G. Street, Ste. 300
Washington, D.C. 20005
Telephone: +1 781 704-3897
Facsimile: +1 202 783-7853

*Attorneys for Plaintiffs*