**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; and LATINO NETWORK, | Case No. 3:19-cv-01743-SB **TEMPORARY RESTRAINING ORDER** |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, | |
| Defendants. | |

**Michael H. Simon, District Judge.**

On October 4, 2019, the President of the United States issued Proclamation No. 9945, titled "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation"). President Donald J. Trump directed that the Proclamation become effective at 12:01 a.m. eastern daylight time on November 3, 2019. On October 29, 2019, the U.S. Department of State issued a "Notice of Information Collection" for "Emergency Review" (the "Emergency Notice"), which was published in the *Federal Register* on October 30, 2019, and provided a comment period of less than 48 hours. The Emergency Notice states that "to implement [the Proclamation] when it goes into effect on November 3, 2019," consular officers "will verbally ask immigrant visa applicants covered by [the Proclamation] whether they will be covered by health insurance in the United States within 30 days of entry to the United States and, if so, for details relating to such insurance." If the applicant says yes, "consular officers will ask for applicants to identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary." The Emergency Notice further adds that visa applicants will not be suspended "if they do not have coverage but possess financial resources to pay for reasonably foreseeable medical expenses." It defines "reasonably foreseeable medical expenses" as "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication."

On October 30, 2019, seven U.S. citizens and a nonprofit organization (collectively, "Plaintiffs") filed a nationwide class action complaint against the President, the U.S. Department of Homeland Security, the U.S. Department of Health and Human Services, the U.S. Department of State, and related Cabinet Secretaries (collectively, "Defendants"), challenging both the

Proclamation and the Emergency Notice. Plaintiffs contend that the Proclamation is contrary to law. Plaintiffs also argue that the Emergency Notice is "arbitrary and capricious" under the Administrative Procedure Act ("APA") and also fails to follow the "notice and comment" procedures required by the APA. On November 1, 2019, Plaintiffs filed a Motion for Temporary Restraining Order ("TRO"), seeking to preserve the status quo and prevent Defendants from implementing or enforcing the Proclamation, at least until after the Court can hear and decide a motion for preliminary injunction. On Saturday, November 2, 2019, at 2:00 p.m. Pacific daylight time, the Court held a hearing pursuant to Rule 65(b) of the Federal Rules of Civil Procedure to consider Plaintiffs' TRO motion. All parties appeared through counsel, although Defendants have not yet had an opportunity to submit their arguments in writing.

At this early stage of the proceedings, the Court is satisfied that Plaintiffs have shown either a substantial likelihood of success on the merits or at least serious questions going to the merits regarding their arguments that the Proclamation and its plan of implementation and enforcement conflict with the "public charge" provisions in Congress' Immigration and Nationality Act ("INA") and related federal health care statutes. Plaintiffs have also shown, at least at this stage of the litigation, serious questions going to the merits regarding whether the Emergency Notice was arbitrary and capricious and, thus, in violation of the APA. At this time, the Court declines to reach whether the Emergency Notice also violated the procedural "notice and comment" requirements of the APA. Further, Plaintiffs have shown, at least thus far, that they are likely to suffer irreparable harm in the absence of temporary relief, that the balance of hardships tips sharply toward Plaintiffs, and temporary relief is in the public interest. Accordingly, Plaintiffs' motion for TRO is granted, for a period not to exceed 28 days, to allow the parties sufficient time to brief and argue whether the Court should issue a preliminary

injunction suspending the implementation and enforcement of the Proclamation until the issues presented in this lawsuit have been resolved on the merits.

## STANDARDS

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## DISCUSSION

### A.  Overview of the Immigration and Nationality Act and National Healthcare Statutes

The INA has, through a series of congressional amendments since its enactment in 1952, created a system that allows the United States to grant up to 675,000 permanent immigrant visas each year, as well as an unlimited number of permanent immigrant visas for the admission of U.S. citizens' spouses, parents, and children. Congress adopted this system to further four principal goals: reunifying families, admitting immigrants with skills that are useful to the United States economy, protecting refugees and others in need of humanitarian resettlement, and promoting diversity.

Consistent with these goals, Congress has set allocations for "family-based visas" (a minimum of 266,000), "employment-based visas" (a minimum of 144,000) and "diversity-based" visas (a maximum of 55,000). 8 U.S.C. § 1151. In addition to these allocations, Congress has set certain per-country limits on the numbers of visas that can be granted, so that no single nation can receive more than 7% of the total green cards issued in a year. 8 U.S.C. § 1152. In recognition of the singular importance of family reunification, however, Congress has prioritized visas for "immediate relatives," which are defined as "the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age." 8 U.S.C. § 1151(b). There are no limits on the number of visas granted to such individuals, regardless of their country of national origin. *Id.* Under this system set out in the INA, family-based petitions account for approximately 65% of the immigrant visas granted every year. The diversity lottery visa system accounts for approximately 4.5%.

U.S.-based family members and employers may sponsor a noncitizen for an immigrant visa. Once a sponsorship petition is approved, the noncitizen may apply for an immigrant visa. If the applicant is outside the United States, she must apply to a U.S. consulate abroad and appear

for a consular interview. For applicants inside the United States, some may be eligible to apply for immigrant visas domestically, without having to travel to a consulate, but others must leave the country to appear for a consular interview abroad. Individuals in this latter category include noncitizens who have accrued more than 180 days of unlawful presence in the United States but have obtained an I-601A waiver of inadmissibility to excuse the unlawful presence bar under 8 U.S.C. § 1182(a)(9)(B). *See* 8 C.F.R. § 212.7(e). Diversity visas are available through a lottery to individuals from countries with historically low rates of immigration to the United States; the lottery winners self-petition and apply to a consulate for their visa.

Before the issuance of an immigrant visa, the noncitizen must establish that she is eligible for admission to the country. Section 1182 of Title 8 is titled "Inadmissible Aliens" and sets forth ten classes of noncitizens "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a) (prescribing the inadmissibility of, among others, noncitizens with a communicable disease of public health significance, those convicted of two or more criminal offenses, and those who engaged in terrorist activities). In addition, several related and interacting healthcare statutes, including the Affordable Care Act ("ACA"), the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), and the Children's Health Insurance Plan Reauthorization Act, reflect Congress's intent to expand access to meaningful and affordable health insurance coverage for all U.S. residents, including legal immigrants, at a guaranteed minimum level of coverage.

## B. The Proclamation

Under the Proclamation, an intending immigrant who has satisfied all statutory requirements set out in the INA will nevertheless be permanently barred from entering the United States if that person cannot show, to the satisfaction of a consular officer, that he or she either "will be covered by approved health insurance" within 30 days of entering the United

States, or "possesses the financial resources to pay for reasonably foreseeable medical costs." With narrow exceptions, such as certain special Immigrant Visa applicants specifically from Iraq and Afghanistan, and unaccompanied biological and adopted children, the Proclamation will be applied to all intending immigrants. The Proclamation is set to go into effect at 12:01 am eastern daylight time on November 3, 2019. The Proclamation is expected to affect nearly two-thirds of all legal immigrants, with a disproportionate impact on immigrants from Latin America, Africa, and Asia.

The Proclamation provides eight specific types of "approved health insurance" for an intending immigrant: (1) an employer-sponsored plan; (2) an "unsubsidized health plan offered in the individual market within a State;" (3) a short-term limited duration insurance ("STLDI") plan "effective for a minimum of 364 days;" (4) a catastrophic plan; (5) a family member's plan; (6) TRICARE and similar plans made available to the U.S. military; (7) a visitor health insurance plan "that provides adequate coverage for medical care for a minimum of 364 days;" and (8) Medicare. A prospective immigrant may also obtain a "health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee," but the Proclamation provides no guidance as to how "adequate coverage" is defined. Similarly, "catastrophic plan" is undefined, and the Proclamation is unclear whether this term refers generically to certain high-deductible plans or specifically to catastrophic plans defined by the ACA with certain coverage parameters and eligibility requirements. In addition, although the ACA provides various forms of financial assistance based on an enrollee's income level, the ACA does not refer to any of these forms of financial assistance as a "subsidy," and the Proclamation does not clarify what forms of assistance would render a plan "subsidized" and therefore not "approved." The Proclamation excludes from the scope of "approved health

insurance" any "subsidized" healthcare offered in the individual market within a State under the ACA, as well as Medicaid for individuals over 18 years of age, even though some states have chosen to make Medicaid available to certain adults over 18 years of age, including certain new and recently arrived immigrants.

The Proclamation also contains exceptions for noncitizens "whose entry would further important United States law enforcement objectives," or "whose entry would be in the national interest," as "determined by the Secretary of State or his designee." Proclamation § 2(b)(vii), (viii). The Proclamation, however, provides no procedure for would-be immigrants either to learn or to demonstrate how they would qualify for such exceptions. For the following reasons, the Proclamation's eight types of "approved health insurance" are legally or practically unavailable to many immigrants, including most immigrants seeking family-based visas:

- Medicare is effectively an impossible option: it is unavailable to immigrants unless they are more than 65 years old and have been living continuously in the United States for five years.

- TRICARE plans and other similar plans are only available to members of the United States military, their spouses, and children up to 26 years of age.

- Family member plans are often only available, if at all, to spouses and children under 27 years old. Any other relation, such as a parent and a child over 27, is not normally considered a "dependent" eligible to be included in a family health insurance plan.

- Employer-sponsored plan: Approximately two thirds of immigrant visa applicants are family-based visa applicants and therefore exceedingly

unlikely to have an offer of employment before arriving in the United States and acquiring work authorization. Even immigrants with employer-sponsored visas may not be able to show, to a consular officer's satisfaction, that they will have employer-sponsored health insurance within 30 days of their arrival. Employers are permitted under federal law to impose a waiting period of up to 90 days before new employees can be covered by employer-sponsored coverage. One survey showed that 71% of employers impose a waiting period, with waiting periods on average lasting 1.9 months.

•       Catastrophic and "unsubsidized" insurance bought on an ACA marketplace are only available to individuals residing within the United States. Catastrophic insurance, moreover, is only available to individuals under 30 years old and those who qualify for a hardship or affordability exception.

•       STLDI plans may not be available to individuals who are not a United States citizen or resident. They are often unavailable to individuals with pre-existing conditions. Half of the states do not offer STLDI plans with coverage for 364 days, the minimum required by the Proclamation.

•       Visitor plans often do not cover individuals with pre-existing conditions.

The only viable options for "approved health insurance" under the Proclamation appear to be visitor insurance plans and possibly STLDI plans. Neither of these types of plans, however, are offered or purchased on ACA Exchanges. The fact that they are not offered on ACA

Exchanges means that they are less regulated and non-comprehensive. Unlike plans available on ACA Exchanges, visitor and STLDI plans are not required to provide "essential health benefits," which include hospitalization, prescription drugs, emergency services, and maternity and newborn care. Moreover, they often leave individuals underinsured or effectively uninsured because they are non-comprehensive. Because visitor and STLDI plans, however, are the most realistically accessible "approved health insurance" plans available to comply with the Proclamation, the Proclamation effectively incentivizes, if not requires, prospective immigrants to purchase a non-comprehensive plan that will likely leave the immigrant underinsured. Indeed, although an immigrant who receives financial assistance under the ACA to purchase comprehensive health insurance would be better insured than an immigrant who purchases non-comprehensive visitor or STLDI insurance, the Proclamation bars the former and allows the latter.

If an intending immigrant cannot demonstrate that she will have "approved health insurance" within 30 days of her arrival, she must show that she has sufficient "financial resources to pay for reasonably foreseeable medical costs." The Proclamation, however, does not define what "reasonably foreseeable medical costs" are, and it does not indicate how a consular officer with no medical training should evaluate what medical costs may be "reasonably foreseeable" for a specific prospective immigrant, or how the consular officer should assess whether that individual has sufficient "financial resources" to cover such costs. The Emergency Notice simply provides that a consular officer shall verbally ask questions and make the required assessment, and defines "reasonably foreseeable medical expenses" as "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication."

**C.  Plaintiffs**

Plaintiff John Doe #1 is a United States citizen of Mexican origin who resides in

**Beaverton, Oregon**, with his wife, a Mexican citizen, and his fourteen-year-old United States

citizen son. John Doe #1, who is not able to work due to a disability, sponsored an immigrant

visa for his wife so that she can have legal status to live and work in the United States. Her

immigrant visa consular interview is scheduled for November 6, 2019. Under the Proclamation

and Defendants' implementation of its requirements, John Doe #1 and his wife cannot afford or

qualify for an "approved" health insurance option for her and he fears that they lack sufficient

financial resources to pay foreseeable medical costs out of pocket. ECF 1, ¶ 14; ECF 28.

Plaintiff Juan Ramon Morales is a United States citizen originally from Puerto Rico who

now resides in **Liberty, New York** with his wife, Vianca Morales, a Mexican citizen; their

daughter; and Ramon's step-daughter. Mr. Morales has sponsored his wife for an immigrant visa

and she is waiting to schedule her consular interview, but he is not able to add his wife to his

employer-sponsored health insurance or obtain another "approved" health insurance plan under

the Proclamation due to cost. ECF 1, ¶ 15; ECF 26.

Jane Doe #2 is a United States citizen of Nicaraguan origin and a single mother of two

children who resides in **Rancho Cucamonga, California**. She has an approved I-130 petition for

her parents, who are living in Nicaragua and waiting to schedule their consular interview. She

has been unable to find available and affordable health insurance for her parents that complies

with the Proclamation, and it is unlikely that they will be able to show the ability to pay for

reasonably foreseeable medical costs as required under the Proclamation and Defendants'

implementation of its provisions. ECF 1, ¶ 16; ECF 29.

Plaintiff Jane Doe #3 is a U.S. citizen who currently resides in **Los Angeles, California**.

She is unable to work due to a disability and has insurance through Medi-Cal, California's

Medicaid program. Jane Doe #3 has an approved I-130 petition for her husband, a German

citizen who currently resides in Berlin, Germany and is an architect who teaches architectural

theory and design. Although he is gathering documents for consular processing, Jane Doe #3

does not believe that her husband will be able to prove at a consular interview that he would be

covered by approved health insurance within 30 days of his entry into the United States because

they do not believe that they have the financial resources to afford "approved" health insurance

as defined in the Proclamation or to pay his foreseeable medical expenses out of pocket as

required by the Proclamation and Defendants' implementation of it. ECF 1, ¶ 17; ECF 30.

　　　　Plaintiff Iris Angelina Castro is a United States citizen who lives in **Springfield,**

**Massachusetts** with her son, who is a U.S. citizen. She recently became unemployed and

currently has state health insurance. She has an approved I-130 visa petition for her husband,

Hermogenes Castro Molina, a Dominican citizen, so that they can reunite in the United States.

He is currently in the process of filing all necessary documents so that they can schedule a

consular interview, but they do not believe that he will be able to prove that he can obtain

available and affordable "approved" health insurance within 30 days of entering the U.S. or pay

for foreseeable medical costs as required under the Proclamation and Defendants'

implementation of its provisions. ECF 1, ¶ 18; ECF 24.

　　　　Plaintiff Blake Doe is a U.S. citizen living in **Corvallis, Oregon**, with his wife. He has

approved I-130 immigrant petitions for his parents, both Mexican citizens, with whom he had

lived his entire life in Oregon until going to college at Oregon State University to study civil

engineering. Blake Doe's parents are currently waiting to have their consular interview

scheduled in Ciudad Juarez, Mexico. Blake Doe and his parents do not believe that they would

be able to prove that his parents would be able to obtain available and affordable "approved"

health insurance within 30 days of their entry into the U.S. or to pay foreseeable medical expenses out of pocket as required under the Proclamation and Defendants' implementation of its provisions. ECF 1, ¶ 19; ECF 27.

Plaintiff Brenda Villarruel is a U.S. citizen who currently resides in **Chicago, Illinois**, with her United States citizen son and United States citizen parents. Ms. Villarruel works part time as a licensed medical assistant. She does not have medical insurance and receives health care, when necessary, through a clinic that charges based on income. Ms. Villarruel has sponsored an immigrant visa for her husband, a Mexican citizen who currently resides in Mexico City, Mexico, and is awaiting consular processing. Ms. Villarruel and her husband do not have the resources to obtain "approved" health insurance coverage for him or to pay his foreseeable medical expenses out of pocket as required under the Proclamation and Defendants' implementation of its provisions. ECF 1, ¶ 20; ECF 25.

Plaintiff Latino Network is a non-profit organization based in **Portland, Oregon**. Latino Network's organization mission is to educate and empower Multnomah County Latinos to achieve physical and mental health, safe housing, sustainable financial stability, and social support. Latino Network does so by offering a variety of programs and services, including early childhood services, community-based programs, school-based programs, arts and culture programs for youth, health and wellness programs, and civic leadership programs. The impending effective date of the Proclamation has forced Latino Network to divert resources from its core activities to address the Proclamation's fallout within the community the organization serves. ECF 1, ¶ 21; ECF 23.

**D. Delay**

Defendants argue that Plaintiffs unreasonably delayed in filing their motion for a TRO, creating their own "emergency" and making it impossible for Defendants to have a reasonable

opportunity to respond. Defendants argue that Plaintiffs primarily challenge the Proclamation, which was issued on October 4, 2019. Defendants assert that because Plaintiffs did not file their Complaint until October 30, 2019, and their motion for a TRO until November 1, 2019, only two days before the Proclamation was to go into effect, the motion should not be granted and should instead be converted to a motion for preliminary injunction.

The Ninth Circuit has noted that "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988). The Ninth Circuit also has noted that delay is most relevant when it "suggests that 'the harm has occurred and the parties cannot be returned to the status quo.'" *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993), *vacated on rehearing en banc on other grounds*, 19 F.3d 449 (9th Cir. 1994) (quoting *Tomco*, 853 F.2d at 750). Additionally, the court has emphasized that a "long delay" before seeking injunctive relief "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

The Court does not find that the delay in this case was unreasonable given the complexity of the factual and legal issues presented. The Complaint includes allegations on behalf of several Plaintiffs residing throughout the United States, and the Court accepts that it takes time to locate such persons willing to be plaintiffs in a federal lawsuit and obtain the facts needed to support their claims. The Court also does not find the 26-day was lengthy or created unfair prejudice to Defendants. Plaintiffs' Complaint and motion were filed before the alleged harm had occurred, and Defendants had the opportunity to respond at oral argument.

## E. Satisfaction of TRO Standards

The Proclamation relies on a single dispositive factor—the health care insurance status of an individual—to determine whether the individual will "financially burden" the United States.

If an individual lacks an "approved" health care insurance plan and cannot otherwise demonstrate that he or she currently has the financial resources to pay for medical care, while deliberately excluding from consideration insurance plans (such as ACA plans) that would otherwise be available to that person after he or she enters the country, that individual is deemed to be a financial burden and the applicant will not be admitted. The Proclamation's reliance on the health care insurance status of an individual as the sole factor for determining inadmissibility as a public charge conflicts with 8 U.S.C. § 1182(a)(4) in at least five ways. First, Congress has spoken directly to the circumstances in which an individual may be deemed to become a "financial burden" to the United States and has rejected the Proclamation's core premise. *See* 8 U.S.C. § 1182(a)(4)(A). This provision states that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(B)(i). When determining whether an individual may become a public charge, the statute enumerates the factors that are to be considered "at a minimum" to include the applicant's age; health; family status; assets, resources, and financial status; and education and skills. The statute outlines the permissible factors in the public charge determination and nowhere mentions an individual's health care insurance status as one of the permissible factors. Given the statute's enumeration of age and health, the statute's omission of "health care insurance status" is important.

Second the statute precludes any single factor from being a dispositive factor. Indeed, the statute requires a totality of the circumstances test to be applied. "[A]t a minimum" an individual's age, health, family status, assets, resources, financial status, education and skills must be must considered to determine whether an individual will "financially burden" the United

States. The totality of the circumstances test has long been a feature of the public charge ground even before Congress statutorily mandated it in 1996. *See, e.g.*, *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974). The Proclamation, however, conflicts with the statutory text by deeming an individual to be a financial burden based solely on her health care insurance status and eschewing all the other statutory factors including, perhaps most incongruously, the health of the individual herself.

Third, the Proclamation's dispositive reliance on health care insurance status contravenes decades of agency interpretation. Fourth, the Proclamation's reliance on an individual's accessing short-term health care benefits as a reason to find the person a "financial burden" has been expressly rejected. *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, 2019 WL 5100718, at *28 (N.D. Cal. Oct. 11, 2019) (the public charge statute has had a "longstanding allowance for short-term aid"). Fifth, the Proclamation revives a test for financial burden—the receipt of non-cash benefits—that Congress has rejected. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996), which amended the INA by codifying five factors relevant to a public charge determination. The Senate rejected the effort to include previously unconsidered, non-cash public benefits in the public charge test and to create a bright-line framework of considering whether the immigrant has received public benefits for an aggregate of twelve months as "too quick to label people as public charges for utilizing the same public assistance that many Americans need to get on their feet." S. Rep. No. 104-249, at *63-64 (1996) (Senator Leahy's remarks). Accordingly, in its final bill, Congress did not include the receipt of Medicaid, Children's Health Insurance Plan, supplemental food assistance, Supplemental

Security Income, and other means-tested public benefits as determinative of a public charge. *See* 8 U.S.C. § 1182(a)(4)(A).

For these reasons, Plaintiffs have shown, at least at this stage of the litigation, a substantial likelihood of success, or at least serious questions going to the merits, on whether Defendants' actions are *ultra vires* and also "not in accordance with law" under the APA. 5 U.S.C. § 706 (2)(A); *see East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (2018) (concluding that an agency had unlawfully done what the "Executive cannot do directly; amend the INA"). Further, for similar reasons, Plaintiffs have satisfied their burden of showing Defendants' implementation of the Proclamation likely constitutes final agency action that is "arbitrary, capricious, [or] an abuse of discretion." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting 5. U.S.C. 706(2)(A))).

In addition, Plaintiffs have shown a substantial likelihood that many, if not all, of the options the Proclamation provides as "approved health insurance" are legally or practically impossible for the individual Plaintiffs and the members and clients of Latino Network to acquire. Plaintiffs also have shown irreparable harm. Defendants argue that because any visa applicant who is denied a visa during the time period before any preliminary injunction might issue could file for reconsideration, Plaintiffs cannot suffer irreparable harm. Facing a likely risk of being separated from their family members and a delay in obtaining a visa to which family members would otherwise be entitled is irreparable harm. This is particularly true for Plaintiffs whose family members have already obtained an I-601A waiver, which means that they have already demonstrated an extreme hardship if the visa applicant were to be separated from family members.

Also, when the federal government is a party, the balance of the equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs have sufficiently shown that temporary injunctive relief is in the public interest because of the widespread detrimental effects that the Proclamation will cause if it takes effect before the parties can be heard on whether the Court should issue a preliminary injunction pending a final resolution on the merits.

## TEMPORARY RESTRAINING ORDER

1.      Defendants are hereby temporarily restrained and enjoined from taking any action to implement or enforce Presidential Proclamation No. 9945 ("Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System").

2.      In the interest of justice, Plaintiffs need not provide any security and all requirements under Rule 65(c) of the Federal Rules of Civil Procedure are waived.

3.      The Court will hold a hearing on Friday, November 22, 2019, at 1:00 p.m. in Courtroom 15B of the Mark O. Hatfield United States Courthouse in Portland, Oregon to determine whether a preliminary injunction should be issued. The Court will set a briefing schedule by separate order.

4.      This Order shall expire twenty-eight (28) days after entry, unless otherwise extended by stipulation of the parties or by further order of the Court.

**IT IS SO ORDERED.**

DATED this 2nd day of November, 2019, at 4:15 p.m.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge