**Stephen Manning** (SBN 013373)
stephen@innovationlawlab.org
**Nadia Dahab** (SBN 125630)
nadia@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733

**Karen C. Tumlin** (admitted *pro hac vice*)
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (admitted *pro hac vice*)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
Telephone: +1 323 316-0944

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page.)*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; and LATINO NETWORK, | Case No.: 3:19-cv-01743-SB |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

STATUTORY AND FACTUAL BACKGROUND ........................................... 2

    I.      THE IMMIGRATION AND NATIONALITY ACT ("INA")............................ 2

    II.     THE AFFORDABLE CARE ACT (THE "ACA"), THE PERSONAL
           RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT
           OF 1996 ("PRWORA"), AND THE CHILDREN'S HEALTH INSURANCE
           PLAN REAUTHORIZATION ACT ("CHIPRA") ................................. 4

    III.    THE PROCLAMATION .................................................................. 6

    IV.    THE DEFENDANT AGENCIES' AND GOVERNMENT OFFICIALS'
           IMPLEMENTATION OF THE PROCLAMATION ........................................... 10

LEGAL STANDARD.................................................................................... 12

ARGUMENT ................................................................................................ 13

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................... 13

        A.    The Proclamation is Unconstitutional Because it Violates
             Separation of Powers Principles. ............................................. 13

             1.    The Proclamation Contradicts the INA's Public
                  Charge Provision.................................................... 14

             2.    The Proclamation Contradicts the INA's "Financial Burden"
                  Exemption for Immigrant Family Members of Victims
                  of Violent Crime & Domestic Violence. ..................... 19

        B.    Defendants' Implementation of the Proclamation
             Violates the APA ................................................................. 20

             1.    Defendants' Implementation of the Proclamation
                  Constitutes Final Agency Action ................................. 20

                (a)    The DOS Implementing Announcement
                     Is Final Agency Action ..................................... 21

                (b)    The Emergency Notice Constitutes
                     Final Agency Action ......................................... 23

             2.    Defendants' Implementation of the Proclamation
                  is Arbitrary, Capricious and Not in Accordance with Law .......... 24

             3.    Defendants' Implementation of the Proclamation
                  Violates The Procedural Requirements of the APA ..................... 29

         4.     Defendants' Implementation of the Proclamation
is In Excess of Statutory Authority and Contrary
to Constitutional Right ................................................................ 31

    C.    Defendants' Actions Violate the Due Process Clause ............................ 32

    1.    There is No Facially Legitimate, Bona Fide
Justification for the Proclamation's Requirements. .................................. 32

    2.    The Proclamation is Inconsistent with the Text
and History of the Due Process Clause. ................................................... 34

II.    PLAINTIFFS WILL LIKELY SUFFER IRREPARABLE HARM .................... 35

III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST
FACTORS TIP SHARPLY IN FAVOR OF GRANTING A
PRELIMINARY INJUNCTION ........................................................... 38

IV.    A NATIONWIDE INJUNCTION IS NECESSARY ......................................... 41

CONCLUSION ...................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. FCC*,
   823 F.2d 1554 (D.C. Cir. 1987) (per curiam) .......................................................30

*Action on Smoking and Health v. C.A.B.*,
   713 F.2d 795 (D.C. Cir. 1983) ............................................................................31

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ........................................................................13, 16

*Allergan, Inc. v. Burwell*,
   2016 WL 1298960 (D.D.C. Mar. 31, 2016)..........................................................23

*Am. Mining. Cong. v. EPA*,
   965 F.2d 759 (9th Cir. 1992) .............................................................................30

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (2000)...................................................................................22, 23

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 .................................................................................................23

*Bowsher v. Synar*,
   478 U.S. 714 (1986).........................................................................................14

*Bustamante v. Mukasey*,
   531 F.3d 1059 (9th Cir. 2008) ...........................................................................32

*Cal. Dep't of Water Res. v. F.E.R.C.*,
   341 F.3d 906 (9th Cir. 2003) .............................................................................22

*Cal. v. Azar*,
   911 F.3d 558 (9th Cir. 2018) .............................................................................42

*Casa de Md. v. Trump*,
   2019 WL 5190689 (D. Md. Oct. 14, 2019) ........................................................41

*Chamber of Commerce of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ...........................................................................20

*Ching v. Mayorkas*,
   725 F.3d 1149 (9th Cir. 2013) ...........................................................................35

*Ciba-Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986) ........................................................23

*City & Cty. of S.F. v. U.S. Citizenship & Immigration Servs.*,
    2019 WL 5100718 (N.D. Cal. Oct. 11, 2019) ...............................17, 41

*Columbia Riverkeeper v. U.S. Coast Guard*,
    761 F.3d 1084 (9th Cir. 2014) ........................................................22

*Cook Cty., Ill.v. McAleenan*,
    2019 WL 5110267 (N.D. Ill. Oct. 14, 2019) ....................................17

*Custis v. United States*,
    511 U.S. 485 (1994) .......................................................................18

*Dep't of Commerce v. N.Y.*,
    139 S. Ct. 2551 (2019) ......................................................29, 30, 33

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ........................................................38

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .............................................20, 31, 42

*Emami v. Nielsen*,
    365 F. Supp. 3d 1009 (N.D. Cal. 2019) ...........................................23

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...................................................................25

*Faith Int'l Adoptions v. Pompeo*,
    345 F. Supp. 3d 1314 (W.D. Wash. 2018) ........................................23

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................24, 29

*Franklin v. Mass.*,
    505 U.S. 788 (1992) (Scalia, J., concurring) ....................................21

*Gegiow v. Uhl*,
    239 U.S. 3 (1915) ..........................................................................17

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*,
    283 F. Supp. 2d 1249 (D. N.M. 2003) ............................................21

*Greater Yellowstone Coal., Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) ........................................................24

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) ................................................................................................... 14

*Havens Realty v. Coleman*,
   455 U.S. 363 (1982) ....................................................................................................... 38

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017) .................................................................................... 40, 42

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ....................................................................................................... 18

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ........................................................................................ 40

*Home Box Office v. FCC*,
   567 F.2d 9 (D.C. Cir. 1977) .......................................................................................... 30

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ........................................................................................ 30

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
   559 U.S. 573 (2010) ....................................................................................................... 18

*Kerry v. Din*,
   135 S. Ct. 2128 (2015) ................................................................................................... 34

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................................... 40

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ........................................................................................ 35

*Make the Road N.Y. v. McAleenan*,
   2019 WL 4738070 (D.D.C. Sept. 27, 2019) ............................................................ 41, 42

*Medellin v. Texas*,
   552 U.S. 491 (2008) ....................................................................................................... 15

*N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
   702 F.3d 755 (4th Cir. 2012) ........................................................................................ 30

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) .................................................................................... 41

*Navajo Nation v. U.S. Dept. of Interior*,
   819 F.3d 1084 (9th Cir. 2016) ...................................................................................... 23

*Norsworthy v. Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) .................................................................40

*Perez v. Mort. Bankers' Ass'n*,
   135 S. Ct. 1199 (2015) .........................................................................................29

*Matter of Perez*,
   15 I. & N. Dec. 136 (BIA 1974) ..........................................................................16

*Pickett v. Hous. Auth of Cook Cty.*,
   114 F. Supp. 3d 663 (N.D. Ill. 2015) ...................................................................40

*San Diego Air Sports Ctr., Inc. v. F.A.A.*,
   887 F.2d 966 (9th Cir. 1989) ...............................................................................24

*Sessions v. Dimaya*,
   138 S. Ct. 1204 (2018) (Gorsuch, J., concurring)................................................34

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ...............................................................................31

*Truckers United for Safety v. Fed. Highway Admin.*,
   139 F.3d 934 (D.C. Cir. 1998)..............................................................................24

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018)...........................................................................14, 19, 32, 33

*Turner v. Rogers*,
   564 U.S. 431 (2011)..............................................................................................32

*United States v. Garcia-Martinez*,
   228 F.3d 956 (9th Cir. 2000) ...............................................................................32

*Wash. v. Trump*,
   847 F.3d 1151 (9th Cir. 2017), *reconsideration en banc denied*, 853 F.3d 933......................42

*Wash. v. U.S. D.H.S.*,
   2019 WL 5100717 (E.D. Wash. Oct. 11, 2019) ...................................................43

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................13, 38

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952).......................................................................................*passim*

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015).........................................................................................15

**Statutes**

5 U.S.C. § 553(b) ........................................................................................................................29

5 U.S.C § 553(c) .........................................................................................................................30

5 U.S.C. § 553(d) ........................................................................................................................29

5 U.S.C. § 704 .............................................................................................................................20

5 U.S.C. § 706(2) ........................................................................................................................20

8 U.S.C. § 1101(a)(15)(U)(iii) ....................................................................................................20

8 U.S.C. § 1104(a) ......................................................................................................................21

8 U.S.C. § 1151 .............................................................................................................................2

8 U.S.C. § 1151(b)(2)(A)(i) ..........................................................................................................3

8 U.S.C. § 1152 .............................................................................................................................3

8 U.S.C. § 1154(a)(1)(A)(iii)-(vi) ...............................................................................................20

8 U.S.C. § 1182(a) ........................................................................................................................4

8 U.S.C. § 1182(a)(4)(A) ......................................................................................................16, 18

8 U.S.C. § 1182(a)(4) (INA § 212(a)(4)) ........................................................................14, 15, 16

8 U.S.C. § 1182(a)(4)(B)(i) .........................................................................................................16

8 U.S.C. § 1182(a)(4)(B)(ii) ........................................................................................................16

8 U.S.C. § 1182(a)(4)(E) (*Violence Against Women Reauthorization Act of 2013,*
    Pub. L. No. 113-4, 127 Stat. 54, 111 § 804 (Mar. 7, 2013)) ...............................................19

8 U.S.C. § 1182(a)(9)(B) ...............................................................................................................3

8 U.S.C. § 1182(A)(9)(B) (INA § 212(A)(9)(B)) .......................................................................37

8 U.S.C. § 1182 (INA § 212) ...................................................................................................4, 14

26 U.S.C. § 36(b)(c)(1)(B) ............................................................................................................5

26 U.S.C. § 36B .............................................................................................................................5

42 U.S.C. § 212(f) (INA § 212(f)) .........................................................................................14, 19

42 U.S.C. §§ 300gg-3 .....................................................................................................................5

42 U.S.C. § 300gg-7 ....................................................................................................8

42 U.S.C. § 300gg-11 ..................................................................................................5

42 U.S.C. § 1395o ........................................................................................................8

42 U.S.C. § 1395i-2(a) .................................................................................................8

42 U.S.C. § 1395w-21(a)(3) .........................................................................................8

42 U.S.C. § 1395w-101(a)(3)(A) ..................................................................................8

42 U.S.C. § 18022(b)(1) ...............................................................................................4

42 U.S.C. § 18022(e) ....................................................................................................8

42 U.S.C. § 18116 (ACA § 1557)..................................................................................5

8 U.S.C. § 1182(a)(4)(E) (*Violence Against Women Reauthorization Act of 2013*,
     Pub. L. No. 113-4, 127 Stat. 54, 111 § 804 (Mar. 7, 2013))...................................19

**Other Authorities**

8 C.F.R. § 212.7(e)........................................................................................................3

22 C.F.R. § 42.11 ........................................................................................................20

45 C.F.R. § 155.305(a)(3)(i) .........................................................................................8

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*,
     64 Fed. Reg. 28,689 (Mar. 26, 1999)......................................................................17

*Immigration Control & Fin. Responsibility Act of 1996*,
     H.R. 2202, 104th Cong. § 202 (1996).....................................................................18

S. Rep. No. 104-249 (1996) ........................................................................................18

U.S. Const. amend. V..................................................................................................32

U.S. Const. art. I, § 8..................................................................................................15

*Visas: Ineligibility Based on Public Charge Grounds*,
     84 Fed. Reg. 54996, 54997 (Oct. 11, 2019).............................................................10

Plaintiffs respectfully move this Court to enter a preliminary injunction preventing Defendants and their agents from implementing or enforcing Proclamation No. 9945, "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation"). Consistent with Local Rule 7-2, the parties made a good faith effort to resolve this dispute but could not reach a resolution.

## <u>INTRODUCTION</u>

This case is about Defendants' attempt to rewrite our country's immigration laws and fundamentally shift the balance of power between the branches of government within the spheres of federal spending, domestic economics, and healthcare policy. Presidential Proclamation No. 9945 bars fully qualified immigrant visa applicants from receiving visas unless they can establish "to the satisfaction of a consular officer" that they either "will be covered by approved health insurance" within 30 days after entry or can "pay for reasonably foreseeable medical costs." This new requirement could bar up to 375,000 otherwise qualified immigrants each year, many of whom would be eligible for healthcare coverage that Congress deliberately and expressly made available to arriving immigrants through the Affordable Care Act ("ACA"). Implementation of the Proclamation will have a devastating and irreparable effect on Plaintiffs, our immigration system, our country, and the separation of powers essential to our national government.

Defendants' actions are an affront to the Constitution and the laws of our country. This is not a case about national security or foreign relations where the Constitution might provide some authority for executive action. The President cites unsubstantiated concerns about the domestic health care system as the basis for his Proclamation. But he is not free to unilaterally tighten federal purse strings that the Constitution placed securely in the hands of Congress. Nor can he make executive determinations about the financial burden of arriving immigrants when Congress has already made those determinations and codified its views in federal legislation. Congress has never given the executive *any* authority to undo the laws in this sphere. As the Court observed, *Youngstown* guides the analysis here because the President's actions are neither authorized by

statute nor the Constitution, and Congress has consistently refused to adopt the kind of financial burden test that the President has now proclaimed. Under *Youngstown*, the President's actions are plainly unlawful; nothing the Supreme Court has said since 1952 changes that result.

Defendants' actions to implement the Proclamation are unlawful for the same reasons, and also because they violate the Administrative Procedure Act ("APA"), and the Due Process Clause. The APA serves as an independent legislative check on agency action; here, Defendants neither satisfied the APA's substantive standards nor its procedural requirements. Defendants' arbitrary and unauthorized exercise of executive power treads on the due process rights of American citizens seeking to be reunited with their families. Their unlawful conduct interferes with Plaintiffs' freedom of personal choice without any bona fide justification.

As this Court has recognized, harm from implementation of the Proclamation would be immediate and irreparable. The comments that have poured in from the public only confirm that the balance of hardships and public interest factors tip sharply in Plaintiffs favor. For these reasons, the Court should enjoin Defendants from implementing or enforcing the Proclamation.

## STATUTORY AND FACTUAL BACKGROUND

### I.     THE IMMIGRATION AND NATIONALITY ACT ("INA")

The Immigration and Naturalization Act ("INA") has, through a series of congressional amendments since its enactment in 1952, created a comprehensive system that allows this country to grant up to 675,000 permanent immigrant visas each year, as well as an unlimited number of permanent immigrant visas for the admission of U.S. citizens' spouses, parents, and children. Congress adopted this system to further four principal goals: reunifying families, admitting immigrants with skills that are useful to the United States economy, protecting refugees and others in need of humanitarian resettlement, and promoting diversity.

Consistent with these goals, Congress set allocations for "family-based visas" (a minimum of 266,000), "employment-based visas" (a minimum of 144,000), and "diversity-based" visas (a maximum of 55,000). 8 U.S.C. § 1151. Congress also set certain per-country

limits on the numbers of visas that can be granted, so that no single nation can receive more than 7 percent of the total green cards issued in a year. 8 U.S.C. § 1152. In recognition of the singular importance of family reunification, however, Congress has prioritized visas for "immediate relatives," defined as "the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age," and there are no limits on the number of visas granted to such individuals, regardless of their country of national origin. 8 U.S.C. § 1151(b)(2)(A)(i). Under this system set out in the INA, family-based petitions account for approximately 65% of the immigrant visas granted every year. The diversity lottery visa system accounts for approximately 4.5%.

U.S.-based family members and employers may sponsor a noncitizen for an immigrant visa. Once a sponsorship petition is approved, the noncitizen may apply for an immigrant visa. If the individual is outside the United States, she must apply to a U.S. consulate abroad and appear for a consular interview. For individuals in the United States, some may be eligible to apply for immigrant visas domestically, without having to travel to a consulate, but others must leave the country to appear for a consular interview abroad. Individuals in this latter category include noncitizens who have accrued more than 180 days of unlawful presence in the United States but have obtained an I-601A waiver of inadmissibility to excuse the unlawful presence bar under 8 U.S.C. § 1182(a)(9)(B).[1] Diversity visas are available through a lottery to individuals from countries with historically low rates of immigration to the United States; the lottery winners self-petition and apply to a consulate for their visa. Certain humanitarian visas are also available to victims of certain crimes who are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. These individuals also self-petition and may need to appear for a consular interview abroad if they are outside the United States.

---

[1] The I-601A waiver process allows those individuals who are statutorily eligible for an immigrant visa (immediate relatives, family-sponsored or employment-based immigrants as well as Diversity Visa selectees) who only need a waiver of inadmissibility for unlawful presence to apply for that waiver in the United States and remain with their family members before they depart for their immigrant visa interview abroad.  See 8 C.F.R. § 212.7(e).

PAGE 3 – PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Before issuance of an immigrant visa, noncitizens must demonstrate eligibility for admission to the country. Section 1182 of Title 8, is titled "Inadmissible Aliens" and sets forth ten classes of noncitizens "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a) (prescribing the inadmissibility of, *inter alia*, noncitizens with a communicable disease of public health significance, those convicted of two or more criminal offenses, and those who engaged in terrorist activities).

## II.    THE AFFORDABLE CARE ACT (THE "ACA"), THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996 ("PRWORA"), AND THE CHILDREN'S HEALTH INSURANCE PLAN REAUTHORIZATION ACT ("CHIPRA")

A series of related and interacting statutes, including the ACA, PRWORA, and CHIPRA, have created the health care system currently in effect in this country. The following features of this statutory scheme, among others, reflect Congress's intent to expand access to meaningful and affordable health insurance coverage for all U.S. residents, including immigrants, at a guaranteed minimum level of coverage.

First, the ACA required the creation of a marketplace, or exchange, in each state to allow residents to shop for insurance and to facilitate broad enrollment nationwide.

Second, it required all health insurers, regardless of whether they offered insurance on or off the state and federal Exchanges, and with only very narrow and limited exceptions, to provide plans that cover "essential health benefits," including hospitalization, prescription drugs, mental health services, maternity and newborn care, and pediatric services. 42 U.S.C. § 18022(b)(1). All plans on the state and federal Exchanges, including ACA-defined and regulated catastrophic health plans, must provide such essential health benefits, must cover preexisting conditions and may not impose annual or lifetime dollar limits on core coverage.[2] Short-term limited duration insurance ("STLDI") plans are ACA-exempt, cannot be offered or purchased on

---

[2] 42 U.S.C. §§ 300gg-3, 300gg-11, *held unconstitutional as not severable by Texas v. United States*, 340 F. Supp. 3d 579 (N.D. Tex. 2018).

an Exchange, do not provide the full range of essential health benefits, and are non-comprehensive. They also can and often do deny coverage based on preexisting conditions, and can and often do impose annual or lifetime dollar limits on core coverage.

Third, the ACA provides financial assistance in the form of income-related, premium-based tax credits ("PTCs" or "APTCs") to individuals with household incomes between 100 and 400% of the federal poverty line. 26 U.S.C. § 36B. For newly arrived immigrants, the ACA allows PTCs on more permissive terms, also including individuals below 100% of the federal poverty line. 26 U.S.C. § 36(b)(c)(1)(B). It also expressly prohibits discrimination on the basis of race, national origin, disability, or certain other factors in healthcare programs or activities administered or funded by DHHS. ACA § 1557, codified at 42 U.S.C. § 18116.

Fourth, although PRWORA sharply limited the eligibility of some immigrants for federal means-tested benefits, it nevertheless expressly devolved "gap-filling" authority to the states to use state-only funds to offer state means-tested benefit programs as a substitute for lost federal benefits for some immigrants. Congress subsequently reinforced this grant of power to the states specifically with regards to health care through the Children's Health Insurance Plan ("CHIP") and its reauthorization act, CHIPRA, which established new options and federal funding for states to provide coverage under Medicaid or CHIP for immigrant children and immigrant pregnant women during their first five years in the country. In the same vein as PRWORA, the original CHIP also authorized States to use state funds to provide coverage to newly arrived immigrant children, who were otherwise ineligible to enroll in either Medicaid or CHIP for their first five years in the country. Thirty-one states, plus the District of Columbia, now cover immigrant children, immigrant pregnant women, or both under CHIPRA.

The benefits available under the ACA, especially when considered in connection with the benefits that the states and federal government have made available to newly and recently arrived legal immigrants under PRWORA and CHIPRA, make clear that Congress intended for immigrants to be able to receive specific health care-related benefits to ensure a minimum level of health care coverage upon their arrival in the United States.

PAGE 5 – PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### III.    THE PROCLAMATION

Under the Proclamation, an intending immigrant who has satisfied *all statutory requirements set out in the INA* will nevertheless be permanently barred from entering the United States if she cannot show, to the satisfaction of a consular officer, that she either "will be covered by approved health insurance" within 30 days of entering the United States, or "possesses the financial resources to pay for reasonably foreseeable medical costs." Ex. 1. With narrow exceptions, the Proclamation will be applied to all intending immigrants. The Proclamation was set to go into effect at 12:01 am eastern daylight time on November 3, 2019, and is expected to affect nearly two-thirds of all legal immigrants, with a disproportionate impact on immigrants from Latin America, Africa, and Asia.

Ostensibly, the Proclamation is meant to "address[] the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care" given to "people who lack health insurance or the ability to pay for their healthcare." The Proclamation further states that uninsured individuals "strain Federal and State government budgets through their reliance on publicly funded programs, which ultimately are financed by taxpayers," and rely on emergency care for non-emergency conditions, "causing overcrowding and delays for those who truly need emergency services." The Proclamation claims that "data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance." It declares that "[c]ontinuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests." If a prospective immigrant will not "be covered by approved health insurance" "within 30 days of the alien's entry into the United States," or if the immigrant does not have "the financial resources to pay for reasonably foreseeable medical costs," he is deemed someone who will "financially burden the United States healthcare system" and whose entry into the United States is therefore "suspended."

The Proclamation sets out eight types of "approved health insurance" described in vague or imprecise terms: (1) an employer-sponsored plan; (2) an "unsubsidized health plan offered in the individual market within a State;" (3) an STLDI plan "effective for a minimum of 364 days;" (4) a catastrophic plan; (5) a family member's plan; (6) TRICARE and similar plans made available to the U.S. military; (7) a visitor health insurance plan "that provides adequate coverage for medical care for a minimum of 364 days;" or (8) Medicare.

A prospective immigrant may also obtain a "health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee," but the Proclamation provides no guidance as to how "adequate coverage" is defined. DHHS has provided no public information or guidance about how such determinations would be made. Without clarifying the meaning of "subsidized," the Proclamation excludes from the scope of "approved health insurance" any "subsidized" healthcare offered in the individual market within a State under the ACA, as well as Medicaid for individuals over 18 years of age.

The Proclamation also contains exceptions for noncitizens "whose entry would further important United States law enforcement objectives," or "whose entry would be in the national interest," as "determined by the Secretary of State or his designee." Ex. 1 at § 2(b)(vii), (viii). Again, however, the Proclamation provides no procedure for would-be immigrants either to learn or to demonstrate how they would qualify for such exceptions.

The Proclamation's eight types of "approved health insurance" are legally or practically unavailable to many immigrants, including most immigrants seeking family-based visas:

- Medicare is effectively an impossible option: it is unavailable to immigrants unless they are over 65 years old *and have been living continuously in the United States for five years*.[3]

- TRICARE plans and other similar plans are only available to members of the United States military, their spouses, and children up to 26 years of age.[4]

---

[3] *See* 42 U.S.C. §§ 1395o, 1395i-2(a), 1395w-21(a)(3), and 1395w-101(a)(3)(A).
[4] *See TRICARE Eligibility Check*, ELIGIBILITY.COM, https://eligibility.com/tricare.

- Family member plans are often only available, if at all, to spouses and children under 27 years old. Any other relation, such as a parent and a child over 27, is not normally considered an eligible "dependent."[5]

- Employer-sponsored plan: Approximately two thirds of immigrant visa applicants are family-based visa applicants and therefore exceedingly unlikely to have an offer of employment before arriving in the United States and acquiring work authorization. Even immigrants with employer-sponsored visas may not be able to show, to a consular officer's satisfaction, that they will have employer-sponsored health insurance within 30 days of their arrival. Employers are permitted under federal law to impose a waiting period of up to 90 days before new employees can be covered by employer-sponsored coverage.[6] Seventy-one percent of employers impose a waiting period, with waiting periods on average lasting 1.9 months.[7]

- Catastrophic and "unsubsidized" insurance bought on an ACA marketplace are only available to individuals residing within the United States.[8] Catastrophic insurance, moreover, is only available to individuals under 30 years old and those who qualify for a hardship or affordability exception.[9]

- STLDI plans are often unavailable to individuals outside the United States or to individuals with pre-existing conditions.[10] Half of the states do not offer STLDI plans with coverage for 364 days, the minimum required by the Proclamation.[11]

- Visitor plans often do not cover individuals with pre-existing conditions, and they are not available to individuals already in the United States.[12]

---

[5] *See Eligibility of Parents for a Group Health Plan*, INS. & FIN. SERVS., (Apr. 7, 2017), *available at* https://www.theabdteam.com/blog/eligibility-parents-group-health-plan/.

[6] 42 U.S.C. § 300gg-7.

[7] *2018 Employer Health Benefits Survey*, KAISER FAMILY FUND, (Oct. 3, 2018), *available at* https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-3-employee-coverage-eligibility-and-participation/.

[8] 45 C.F.R. § 155.305(a)(3)(i); *Are You Eligible to Use the Marketplace?*, HEALTHCARE.GOV, *available at* https://www.healthcare.gov/quick-guide/eligibility/.

[9] 42 U.S.C. § 18022(e).

[10] *Short Term Health Insurance Eligibility Information for Short Term Health Insurance, or STM*, ELIGIBILITY.COM (Updated Jan. 28, 2019), *available at* https://eligibility.com/short-term-health-insurance; Rachel Schwab, *Coming Up Short: The Problem with Counting Short-Term, Limited Duration Insurance as Coverage*, CHIRBLOG.ORG (June 7, 2019), *available at* http://chirblog.org/coming-short-problem-counting-short-term-limited-duration-insurance-coverage/.

[11] *Is Short-term Health Insurance Right for You?*, HEALTHINSURANCE.ORG, *available at* https://www.healthinsurance.org/short-term-health-insurance/.

[12] *See, e.g., Visitors Medical Insurance – Pre-Existing Medical Conditions FAQ*, INSUBUY.COM, *available at* https://www.insubuy.com/visitor-medical-insurance-pre-existing-conditions/

The only options for "approved health insurance" under the Proclamation appear to be visitor insurance plans, and possibly STLDI plans, primarily because neither can be offered or purchased on ACA Exchanges and therefore may not automatically exclude individuals living outside the United States.[13] The fact that they are not offered on ACA Exchanges, however, means that they are less regulated and non-comprehensive. Unlike plans available on ACA Exchanges, visitor and STLDI plans are not required to provide "essential health benefits," which include hospitalization, prescription drugs, emergency services, and maternity and newborn care. They often leave individuals underinsured or effectively uninsured.[14] But, because visitor and STLDI plans are the most realistically accessible "approved health insurance" plans available to comply with the Proclamation, the Proclamation effectively incentivizes prospective immigrants to purchase a non-comprehensive plan that will likely leave the immigrant underinsured after she arrives. Even though an immigrant who receives financial assistance under the ACA to purchase comprehensive health insurance would be better insured than an immigrant who purchases non-comprehensive visitor or STLDI insurance, the Proclamation bars the former and allows the latter.

If an intending immigrant cannot demonstrate that she will have "approved health insurance" within 30 days of her arrival, she must show that she has sufficient "financial

---

(providing a survey of six visitor insurance companies, none of whom cover preexisting conditions).

[13] Indeed, the Chief Executive of a company that sells travel insurance to U.S. visitors and immigrants, "said online search traffic for immigrant plans on his website increased by 150% after the proclamation." Kristina Cooke & Mica Rosenberg, "Trump Rule on Health Insurance Leaves Immigrants, Companies Scrambling for Answers," REUTERS (Oct. 31, 2019), *available at* https://www.reuters.com/article/us-usa-immigration-insurance/trump-rule-on-health-insurance-leaves-immigrants-companies-scrambling-for-answers-idUSKBN1XA1G6.

[14] Susan Morse, "Increase in Uncompensated Hospital Care Could Be One Effect of Short-Term Coverage Rule," HEALTHCARE FINANCE (Aug. 1, 2018), *available at* https://www.healthcarefinancenews.com/news/increase-uncompensated-hospital-care-could-be-one-effect-short-term-coverage-rule; see also Rick Pollack, *AHA Statement on Final Rule on Short-Term, Limited-Duration Health Insurance Plans*, AMERICAN HOSPITAL ASSOCIATION (Aug. 1, 2018), *available at* https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance.

resources to pay for reasonably foreseeable medical costs." The Proclamation, however, does not define what "reasonably foreseeable medical costs" are, and it does not indicate how a consular officer with no medical training should evaluate what medical costs may be "reasonably foreseeable" for a specific prospective immigrant, or how the consular offer should assess whether that individual has sufficient "financial resources" to cover such costs.

## IV.    THE DEFENDANT AGENCIES' AND GOVERNMENT OFFICIALS' IMPLEMENTATION OF THE PROCLAMATION

The State Department made clear that the Proclamation would be enforced on its effective date and took steps to implement the policy change. On October 11, 2019, DOS issued an interim final rule that set forth the Proclamation's requirements, but stated the requirements would be used as part of the "public charge" rule.[15] At least two weeks before the Proclamation's effective date, the State Department issued an implementing announcement on its website that not only outlined visa applicants' new obligations under the Proclamation but also stated how consular officers would process and consider visa applications under the Proclamation.[16] Ex. 1. The announcement stated definitively that "if you are applying for an immigrant visa" on or after November 3, 2019 "you must demonstrate at the time of the interview" that you meet the Proclamation's requirements. It warned prospective immigrants that an "inability" to meet the Proclamation's requirements at the time of the interview "will result in the denial of the visa application." It specified that "[d]uring the visa interview," applicants will need to demonstrate that they satisfy the requirements of the Proclamation, and informed applicants that consular officers "will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation as needed." It also includes a link to the Proclamation itself.

---

[15] *Visas: Ineligibility Based on Public Charge Grounds*, 84 Fed. Reg. 54996, 54997 (Oct. 11, 2019).

[16] *Presidential Proclamation on Health Care*, U.S. Dep't of State, Travel.State.Gov, *available at* https://travel.state.gov/content/travel/en/us-visas/immigrate/Presidential-Proclamation-on-Health-Care.html.

The State Department also issued a "Notice of Information Collection" for "Emergency Review"(the "Emergency Notice") on October 29, 2019, which was published in the *Federal Register* the next day on October 30, 2019, and provided a comment period that ends just one day later at 11:59pm on October 31, 2019. *See* Ex. 26. The Emergency Notice made clear that the State Department had taken definitive steps to enforce the Proclamation, and settled on a manner of implementation for doing so beginning November 3, 2019. It purported to announce a "methodology" adopted by the Secretary of State, as authorized by Section 3 of the Proclamation, "to establish standards and procedures for governing such determinations." The Emergency Notice stated that "to implement [the Proclamation] when it goes into effect on November 3, 2019," consular officers "will verbally ask immigrant visa applicants covered by [the Proclamation] whether they will be covered by health insurance in the United States within 30 days of entry to the United States and, if so, for details relating to such insurance." *Id.* If the applicant says yes, "consular officers will ask for applicants to identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary." *Id.* It also defined "reasonably foreseeable medical expenses" as "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication." *Id.*

The Emergency Notice stated that "[a]ll public comments must be received by October 31, 2019," providing a comment period of well less than 48 hours, especially when taking into account that the on-line comment submission page did not go live until the mid-morning of October 30, 2019. *Id.* The Emergency Notice claimed that, because the Proclamation "was signed on October 4, 2019, [] emergency review of this information collection is necessary for the Department to prepare consular officers to implement [the Proclamation] when it goes into effect on November 3, 2019."[17] Between October 30, 2019, and 11:59pm on October 31, 2019,

---

[17] The late posting of the Emergency Notice and extremely short notice-and-comment period stand in stark contrast to a "60-Day Notice of Proposed Information Collection" published in the Federal Register six days prior on October 24, 2019 (the "Notice"). That Notice also proposed

Defendants received over 300 comments. Ex. 28. Yet, Defendants approved the Emergency

Notice less than 24 hours later on November 1, 2019, stating that the "information collection is

necessary to implement Presidential Proclamation 9945." Ex. 27. By their own admission,

Defendants did not consider comments when they approved the Emergency Notice. *See* Ex. 28.

Instead, they are "currently"—that is, after beginning implementation of the Proclamation—

"reviewing all submissions to identify responsive comments, and will respond to those

comments as appropriate." *Id.* The Court's temporary restraining order halted this unlawful chain

of events. As explained below, the Court should now preserve the status quo ante with a

preliminary injunction. Even after this Court issued a temporary restraining order, DOS

continued to take steps to implement the Proclamation. As late as November 6, 2019, the

National Visa Center sent emails to visa applicants who were preparing for consular processing

with the message that their visa applications would be denied unless they could satisfy the

Proclamation's requirements at the time of their interviews.[18]

## **LEGAL STANDARD**

Plaintiffs seeking a preliminary injunction generally must show that: (1) they are likely to

succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3)

the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v.

Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). In the Ninth Circuit, "'serious questions

going to the merits' and a hardship balance that tips sharply toward the plaintiff can support

---

and solicited public comments on a new written form, DS-5540, that would ostensibly collect
information intended to assist consular officers "in assessing whether an applicant is likely to
become a public charge," but the Notice stated that a consular officer could ask a visa applicant
to fill out certain questions on the same form to assess whether the applicant meets the
Proclamation's requirements. *See 60-Day Notice of Proposed Information Collection: Public
Charge Questionnaire*, FED. REGISTER, *available at*
https://www.federalregister.gov/documents/2019/10/24/2019-23219/60-day-notice-of-proposed-
information-collection-public-charge-questionnaire (last visited Oct. 27, 2019).
[18] Dagmar Butte Declaration at ¶¶ 3-4 (Butte Decl.).

issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All.*
*for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

## ARGUMENT

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs move for a preliminary injunction on three grounds: (1) the Proclamation is
*ultra vires* and violates both the Constitutional separation of powers and express provisions of
federal statutes; (2) implementation of the Proclamation violates the APA; and (3) Defendants'
actions violate the Due Process Clause of the Constitution.

### A.     The Proclamation is Unconstitutional Because it Violates Separation of Powers Principles.

The Proclamation is an unconstitutional attempt to rewrite a key provision of the INA by
executive fiat. The INA embraces a multi-factor approach—a totality-of-the-circumstances test
that has roots in statutory text and immigration law practice stretching back more than one-
hundred years— in determining who, among all immigrants, would be so financially burdensome
to the United States that they must be excluded from entry on that ground alone. The
Proclamation effectively strikes these venerable provisions of the INA, replacing them with a
dispositive, single factor test: whether the individual will "financially burden" the United States,
in the sense of not being able to demonstrate in advance that he or she will have either a specific
pre-approved form of health insurance or, absent that, some unstated and indeterminate ability to
pay out of pocket for health care costs. Bizarrely, the Proclamation *excludes from consideration*
certain forms health insurance made available under the ACA. If an individual lacks "approved"
health care insurance (including because they have or could obtain ACA-based insurance that
would pay for health care but nonetheless is not qualifying) and cannot otherwise demonstrate
that they currently have the financial resources to pay for medical care she is deemed *per se* to be
a financial burden and the applicant will not be admitted. The Proclamation overwrites the multi-
factor public charge scheme that Congress explicitly chose to adopt and maintain, INA § 212

(a)(4), [19] and supplants it with a "legislative" approach that Congress specifically rejected—a test that would treat the receipt of non-cash benefits as a one-factor measure of financial burden.

Although Section 212(f) provides a broad delegation of discretion to the President, no such delegation is unlimited—nor could it be, consistent with the non-delegation doctrine. *Gundy v. United States*, 139 S. Ct. 2116, 2123, 2125 (2019). Section 212(f) does not empower the President to rewrite the INA by contradicting its explicit provisions. *Trump v. Hawaii*, 138 S. Ct. 2392, 2411–12 (2018). Because the Proclamation does just that, it violates Constitutional separation of powers.

### 1.    The Proclamation Contradicts the INA's Public Charge Provision

The separation of powers doctrine is one of the defining features of the U.S. Constitution. It serves as a "structural protection[] against abuse of power." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). Within this constitutional design, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Id.* at 585. Justice Jackson's *Youngstown* concurrence provides the operative test here. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083 (2015) ("In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework."). First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring); *see also Medellin v. Texas*, 552 U.S. 491, 524 (2008). Second, "in absence of either a congressional grant or denial of authority" there is a "zone of twilight in which he and Congress may have concurrent authority," and where "congressional inertia, indifference or quiescence may" invite the exercise of executive power. *Youngstown*, 343 U.S. at 637. Third, "[w]hen the President takes measures incompatible with the expressed or implied

---

[19] INA § 212 is codified at 8 U.S.C. § 1182.

will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id*. This case falls within the third *Youngstown* category—Congress has expressly exercised its legislative powers to control an area placed explicitly within its domain by the Constitution. And the President has attempted by executive function to override Congress's decision.

The power to regulate the admission of immigrants lies with Congress. *See* U.S. Const. art. I, § 8 (granting Congress power "[t]o establish an uniform Rule of Naturalization"). "Under basic separation-of-powers principles, it is for the Congress to enact the laws." *Zivotofsky*, 135 S. Ct. at 2087. Moreover, Congress has expressly exercised that power through the INA, a complex statute that sets forth a carefully articulated set of conditions that shall govern the entry and admission of noncitizens into the United States. The Proclamation, however, is replete with "incompatibl[ities] with the expressed or implied will of Congress." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

The Proclamation's reliance on health care insurance status as the sole factor for determining inadmissibility as a public charge conflicts with 8 U.S.C. § 1182(a)(4).

First, Congress has spoken directly to the circumstances in which an individual may be deemed so likely to become a "financial burden" to the United States that entry must be denied altogether. *See* 8 U.S.C. § 1182(a)(4)(A). This provision states that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(B)(i). When determining whether an individual may become a public charge, the statute enumerates the factors that are to be considered "at a minimum" to include the applicant's age; health; family status; assets, resources, and financial status; and education and skills.[20] The statute outlines the permissible factors in the public charge determination and nowhere mentions an individual's health care

---

[20] An additional factor is whether an "affidavit of support under section 213A [8 U.S.C. § 1183a]" was executed.  8 U.S.C. § 1182(a)(4)(B)(ii).

insurance status as one of the permissible factors. Given the statute's enumeration of age and health, the statute's omission of "health care insurance status" is important.

Second, the statute *expressly precludes* any single factor from being treated as a sole and dispositive factor. 8 U.S.C. § 1182(a)(4) unambiguously *requires* application of a totality of the circumstances test. *All* of the identified factors must, "at a minimum" be considered in determining whether an individual will "financially burden" the United States. It necessarily follows that *none* may be excluded from the calculus, contrary to the Proclamation's announcement that all other factors must be thrown out if the immigrant does not have (a) one of the types of health insurance that the President personally deems satisfactory, or (b) the level of wealth that a consular officer will deem sufficient for a particular applicant in his or her discretion. The totality of the circumstances test has long been a feature of the public charge ground even before Congress statutorily mandated it in 1996. *See*, *e.g.*, *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974). The Proclamation, however, seeks to rewrite the statutory language by deeming an individual to be a financial burden based solely on her health care insurance status, and eschewing all the other statutory factors.

Longstanding precedent directly contradicts the Proclamation's announcement that henceforth, an individual may be denied entry based solely on an individual's short-term inability to demonstrate access to qualifying health insurance directly. *City & Cty. of S.F. v. U.S. Citizenship & Immigration Servs.*, 2019 WL 5100718, at *28 (N.D. Cal. Oct. 11, 2019) (the public charge statute has had a "longstanding allowance for short-term aid"). The United States Supreme Court has explained that to be a financial burden to the United States as a public charge, an individual's "*permanent* personal" characteristics are the only relevant factors. *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915). In *Gegiow*, the Supreme Court examined the meaning of "public charge" in the statute, and concluded that it authorized exclusion of immigrants only "on the ground of *permanent* personal objections," and thus not according to local or temporary conditions impacting their self-sufficiency. *Id*. (emphasis added). *Gegiow* thus "teaches that 'public charge' does not … encompass persons who receive benefits, whether modest or

substantial, due to being temporarily unable to support themselves entirely on their own." *Cook Cty., Ill. v. McAleenan*, 2019 WL 5110267, at *9 (N.D. Ill. Oct. 14, 2019).[21] Decades of agency practice provide further confirmation that the statutory "public charge" provision mandates a holistic rather than a single-factor approach to determining whether an immigrant will be a financial burden. In 1999, the then-Immigration and Naturalization Service explained that to "help alleviate public confusion over the meaning of the term 'public charge' in immigration law and its relationship to the receipt of Federal, State, and local public benefits," it issued "field guidance" ("the 1999 Field Guidance"). INS, *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (Mar. 26, 1999). The 1999 Field Guidance was the distillation of "over one hundred and twenty years" of Executive branch interpretation of the public charge. *City & Cty. of S.F.*, 2019 WL 5100718, at *2. The Field Guidance explained that under the INA, an individual may be deemed a public charge if the person is "*primarily dependent on the government for subsistence*, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." *Field Guidance* at 28,692 (emphasis added). When Congress enacted the current version of the "public charge" statute, it incorporated this longstanding agency interpretation. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 589-90 (2010) ("We have often observed that when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.") (citations, internal quotation marks, and ellipsis omitted); *Custis v. United States*, 511 U.S. 485, 500-01 (1994); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 385-86 (1983).

Finally, the Proclamation revives a test for financial burden—the receipt of non-cash benefits—that Congress has rejected. *Youngstown*, 343 U.S. at 637-38. In 1996, Congress

---

[21] Although *Gegiow* addresses a previous version of the statute, "the term 'public charge' entered the statutory lexicon in 1882 and has been included in nearly identical inadmissibility provisions ever since," such that *Gegiow*'s interpretation of the term still addresses "what it means today." *Cook Cty.*, 2019 WL 5110267, at *8.

enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996), which amended the INA by codifying five factors relevant to a public charge determination. In the course of enacting IIRIRA, members of Congress debated whether to expand the public charge definition to include use of non-cash public benefits. *See Immigration Control & Fin. Responsibility Act of 1996*, H.R. 2202, 104th Cong. § 202 (1996) (early House bill that would have defined public charge for purposes of removal to include receipt by a non-citizen of Medicaid, supplemental food assistance, SSI, and other means-tested public benefits). The Senate rejected the effort to include previously unconsidered, non-cash public benefits in the public charge test and to create a bright-line framework of considering whether the immigrant has received public benefits for an aggregate of twelve months as "too quick to label people as public charges for utilizing the same public assistance that many Americans need to get on their feet." S. Rep. No. 104-249, at *63−64 (1996) (Senator Leahy's remarks). In its final bill, Congress declined to include the receipt of Medicaid, CHIP, supplemental food assistance, SSI, and other means-tested public benefits as determinative of a public charge. *See* 8 U.S.C. § 1182(a)(4)(A). In attempting to make the receipt of means-tested public benefits (e.g., ACA subsidies) effectively determinative of public charge status, the Proclamation reverses Congress's considered judgment on that very issue.

The government will likely argue that none of this is a problem because the Proclamation is actually exercising delegated legislative authority pursuant to INA § 212(f), which "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Trump v. Hawaii*, 138 S. Ct. at 2408. The *Hawaii* decision, however, draws a clear distinction between Oval-Office-made requirements that "supplement" the INA, *id.* at 2412, and those that would "expressly override particular provisions of the INA." *Id.* at 2411. Consistent with Justice Jackson's tripartite framework, *Hawai'i* approves only the former. The Supreme Court had no cause to go further in *Hawai'i* because it concluded that there was no

"contradiction" between the proclamation at issue in that case and any provision of the INA.[22] *See id.* at 2411–12. This case is very different. For the reasons explained above, the Proclamation *does* conflict squarely with provisions of the INA. As a result, § 212(f) does not grant the President any applicable authority or in any way justify his effort to unilaterally rewrite the "public charge" provision of the INA.

**2.       The Proclamation Contradicts the INA's "Financial Burden" Exemption for Immigrant Family Members of Victims of Violent Crime & Domestic Violence.**

The Proclamation contradicts Congress's express command that immigrant family members of victims of violent crime or domestic violence are exempt from *any* "financial burden" restriction—the public charge provisions simply do not apply *at all*. Congress has specifically provided that the immigrant spouse, child, and parent of a victim of violent crime are categorically exempt from a "financial burden" calculus. *See Violence Against Women Reauthorization Act of 2013*, Pub. L. No. 113-4, 127 Stat. 54, 111 § 804 (Mar. 7, 2013) (codified at 8 U.S.C. § 1182(a)(4)(E)). Congress provided that immigrant relatives of victims of violent crime such as felony assault, sexual assault, incest, kidnapping, trafficking, and other crimes, *see* 8 U.S.C. § 1101(a)(15)(U)(iii), or victims who were subjected to battering and extreme cruelty are exempt entirely from the public charge determination, 8 U.S.C. § 1154(a)(1)(A)(iii)-(vi).

Yet, under the Proclamation, immigrant family members of violent crime victims are deemed to be "financial burdens" to the United States. *See* Proclamation at § 2(a) (suspension of entry applies to noncitizens "seeking to enter the United States pursuant to an immigrant visa."). Immigrant family members of violent crime victims comprise at least *twenty* different categories of noncitizens seeking to enter the United States pursuant to an immigrant visa. 22 C.F.R. § 42.11. The President's Proclamation is thus incompatible with Congress's expressed will.

---

[22] In all events, the Proclamation does not pass muster under even the most generous reading of *Hawai'i* because it contains no factual findings that support the entry suspension it imposes, and is not "plausibly related to the Government's stated objective." 138 S.Ct. at 2408, 2420.

Congress plainly stated that the public charge provision "shall not apply" and therefore these especially vulnerable individuals are eligible to enter the United States *even if* they would otherwise be deemed inadmissible under the public charge standard that Congress explicitly wrote into law. The President has no power to reverse that determination.

### B.   Defendants' Implementation of the Proclamation Violates the APA

Defendants' implementation of the Proclamation is (1) arbitrary, capricious and not in accordance with law; (2) in excess of statutory authority; (3) contrary to Constitutional right; and (4) without observance of procedure required by law. 5 U.S.C. § 706(2). The fact that the agencies seek to implement a Presidential Proclamation does not shield their actions from APA review. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018). On the contrary, the APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And the fact that judicial review of Defendants' actions may cast doubt on the Proclamation's validity does not immunize Defendants' conduct from review. *E. Bay Sanctuary Covenant*, 932 F.3d at 770 ("[W]e may review the substantive validity of the Rule together with the Proclamation."); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, *even if the validity of the Order were thereby drawn into question*.") (emphasis added); *cf. Franklin v. Mass.*, 505 U.S. 788, 808 (1992) (Scalia, J., concurring) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.").

### 1.   Defendants' Implementation of the Proclamation Constitutes Final

Agency Action

The Proclamation is not self-executing. By statute and practice, the Department of State ("DOS") implements policies that pertain to the issuance of immigrant visas.[23] At this stage in the litigation, only Defendants know the full extent of actions they have taken to implement the Proclamation because they have yet to produce the administrative record.[24] But at a minimum, DOS issued an implementing announcement on its website and an Emergency Notice of Information Collection that constitute final agency action.

(a)    The DOS Implementing Announcement Is Final Agency Action

DOS implemented the Proclamation with an announcement on its website. The website announcement was not limited to providing a link to the "White House Announcement" and the executive's posting of the Proclamation. Instead, it issued additional DOS directives, and a new set of requirements for visa interviews not mentioned in the Proclamation itself. Ex. 2. The website informed visa applicants that they must prove visa eligibility under the Proclamation "at the time of the interview." *Id.* Using mandatory language, DOS emphasized that failure to satisfy the new interview requirement "will result in the denial of a visa application." *Id.* Before the DOS announcement, visa applicants were not obligated to arrive at their interviews with any evidence of their health insurance status. It was with their website announcement that DOS

---

[23] *See* 8 U.S.C. § 1104(a) ("The Secretary of State shall be charged with the administration and the enforcement of the provisions of [the INA] relating to … the powers, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas …."); U.S. Dep't of State, About Us - Bureau of Consular Affairs (accessed Nov. 6, 2019), *available at* https://www.state.gov/about-us-bureau-of-consular-affairs ("The Bureau of Consular Affairs formulates and implements policy relating to immigration …. Consular Affairs (CA) is the public face of the Department of State for millions of people around the world.")

[24] Nadia Dahab Declaration. Plaintiffs are entitled to the Administrative Record and will be filing a motion to compel production of the Administrative Record.  At this stage in the litigation, it is unclear what Defendants will produce and whether there may have been unwritten agency action implementing the Proclamation.  *See, e.g.*, *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D. N.M. 2003) (rejecting the proposition that "an agency action, to be final and judicially reviewable, must be in writing").

placed new burdens on visa applicants to appear at their interviews with evidence that they could meet the arbitrary, internally inconsistent, and vague requirements of the Proclamation. The announcement also commanded consular officers to make judgments about applicants' health and finances during interviews, without any explanation of criteria they would apply.

By announcing implementation of the Proclamation on its website, DOS communicated its "marching orders" for visa applicants and consular officers, and indicated that it expected them "to fall in line." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021, 1023 (2000). The announcement's unequivocal commands together with the November 3 deadline "amount[] to a definite statement of the agency's position," that has a "direct and immediate effect" on the rights and obligations of regulated parties, and makes clear that "immediate compliance is expected." *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003)*; Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014) (explaining "even if the agency does not label its decision or action as final" it may still be subject to APA review if "immediate compliance with its terms is expected.'" (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2004)). "As a practical matter" the implementing announcement has "binding effect" on the agency and visa applicants. *Appalachian Power*, 208 F.3d at 1023. It "leads private parties to believe" that they will be unable to obtain a visa unless they satisfy the health insurance requirement at their interview. *See id.* at 1021. "It commands, it requires, it orders, it dictates." *Id.* at 1023.

It does not matter that DOS announced its new rule online instead of a more formal publication. Whenever an agency makes a policy announcement expecting that regulated parties will "conform to [the agency's] position" the agency "voluntarily relinquishe[s] the benefit of postponed judicial review." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986). "With the advent of the Internet, the agency does not need [] official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or

memoranda or policy statement on its website." *Appalachian Power*, 208 F.3d at 1020.[25] An

agency may publish on the internet because it can do so "quickly and inexpensively, without

following any statutorily prescribed procedures." *Id.*(quotations and citations omitted). Also, the

agency may (incorrectly) believe such informal action will "immuniz[e] its lawmaking from

judicial review." *Id.* The issue is not the form of announcement but the effect on regulated parties

and agency staff. *Id.* at 1021. Here, the agency signaled that it "view[ed] its deliberative process

as sufficiently final to demand compliance with its announced position" on November 3; its

unequivocal demand for immediate compliance constitutes "final" action subject to judicial

review. *See Ciba-Geigy Corp*., 801 F.2d at 436.

    (b)    The Emergency Notice Constitutes Final Agency Action

       The Emergency Notice is also subject to APA review because it announced that DOS had

settled on a "methodology" established by the Secretary of State, "to establish standards and

procedures for governing determinations" necessary under the Proclamation. The notice was

issued on October 30, 2019 and stated that the new methodology would be used beginning on

November 3. Ex. 26. The timeline confirms that by the time the Notice was released, DOS had

already consummated its decision-making process for all practical purposes. Like the

announcement on the website, the Emergency Notice reflects the agency's demand for

---

[25] *See also Navajo Nation v. U.S. Dept. of Interior*, 819 F.3d 1084, 1091 (9th Cir. 2016) (email
and confirmation letter constituted final agency action where the text of the message stated a
"legal determination" expressing what the agency believed it was "required" to do under the
law); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1020 (N.D. Cal. 2019) (noting DOS referred to its
online postings as "outward facing guidance" and analyzing an APA claim in part based on
statements in online FAQs); *Faith Int'l Adoptions v. Pompeo*, 345 F. Supp. 3d 1314 (W.D.
Wash. 2018) (statements in an email and an announcement posted on a website constituted final
agency action); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) ("Internet posting" of
spreadsheet announcing the 2012 Medicare fractions was the basis for a challenge under a
Medicare-specific analogue to the APA); *Allergan, Inc. v. Burwell*, 2016 WL 1298960, at *6
(D.D.C. Mar. 31, 2016) (agency email constituted final agency action because it "unequivocally
stated the agency's position" and "required 'immediate compliance'").

immediate compliance, and places unprecedented new burdens on regulated parties and consular officers untrained in evaluating health or healthcare costs. The fact that Defendants' labeled their actions a "Notice of Information Collection" does not matter for APA purposes. *Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 939 (D.C. Cir. 1998); *San Diego Air Sports Ctr., Inc. v. FAA*, 887 F.2d 966, 970 (9th Cir. 1989)) ("A time-honored principle of administrative law is that the label an agency puts on its actions is not necessarily conclusive."). In context, the Emergency Notice implements a new legislative rule demanding immediate compliance, and constitutes final agency action under the APA. Defendants' unprecedented use of an Emergency Notice absent any exigency and with only a 48-hour comment period suggests the Emergency Notice process was meaningless from the start. In context, it appears to be thin cover for an attempt to achieve the same ends Defendants sought to accomplish with their unlawful Public Charge Rule but without following required rulemaking procedures. *See* Section I.B.3, *infra*.

### 2. Defendants' Implementation of the Proclamation is Arbitrary, Capricious and Not in Accordance with Law

Defendants' implementation of the Proclamation is arbitrary and capricious because Defendants have neither "considered the relevant factors," nor have they "articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (citation omitted). Because they have failed to show there are "good reasons for the new policy," Plaintiffs are likely to succeed in showing implementation of the Proclamation should be set aside under the APA. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, Defendant agencies have "said almost nothing" to justify their actions; "conclusory statements do not suffice" to explain a change in position so

"inconsistent with the Department's longstanding earlier position." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

Implementation of the Proclamation conflicts with the clear legislative intent of the ACA and the Medicaid Statutes and would undermine legislation designed to promote access to quality health care. *See* Section 1.A.1, *supra*. For example, it excludes arriving immigrants from gaining access to health insurance coverage through Marketplaces, contrary to the purpose of the ACA and the Proclamation's stated purpose of increasing the share of the population with health care coverage. Because immigrants will not be able to seek health insurance through Marketplaces, the Proclamation is also likely to impact the overall risk pool to the determent of the domestic health care system.[26] The Proclamation also places a barrier between arriving immigrants and access to Medicaid, even though the legislature and states have deemed access beneficial to public health. [27] Also, the Proclamation's approval of non-ACA-compliant short term health plans—also known as "junk plans"—would increase uncompensated care costs and limit access to care, at the expense of public health.[28] It does not appear that Defendants considered this perverse result of their policy.

In fact, DOS implemented the Proclamation without any articulation of facts found or choices made beyond providing a link on its website to the Proclamation itself. But nothing in the Proclamation justifies the new policy, much less the treatment of the issue as an emergency that necessitated action on November 3, before any reasoned choice could possibly be made. To the contrary, the Proclamation is unfounded and irrational in several respects.

First, it asserts that uninsured immigrants are damaging the American healthcare system. But according to a recent U.S. government report, the uninsured rate has fallen 35 percent and the uncompensated care costs as a share of hospital operating expenses has fallen by 30

---

[26] Comment Letter from Massachusetts Commonwealth Health Insurance Connector Authority (Ex. 16), at 3-4.
[27] Joan Watson-Patko Declaration at ¶¶ 7, 9.
[28] Comment Letter from DC Health Benefit Exchange Authority (Ex. 10), at 2.

percent.[29] There is simply no evidence of a new crisis in the healthcare system, and certainly not one caused by uninsured immigrants.[30]

Second, the new policy is purportedly based on the assertion that lawful immigrants are three times more likely than U.S. citizens to lack health insurance but does not estimate the costs of recent immigrants, who are the policy's direct target. But immigrants generally use far less medical care than those who are not recent immigrants.[31] Federal survey data suggests that uninsured recent immigrants are responsible for less than one-tenth of one percent of the country's total medical costs.[32] And "the average annual medical expenditure per recent uninsured immigrant is $933, less than one-fifth the amount used by the largest group, insured adults who are not recent immigrants ($5,071)."[33]

Third, Defendants claim "uncompensated care costs"—in excess of "$35 billion in each of the last 10 years," or "$7 million on average for each hospital in the United States"—without stating the basis for those figures. Even if those figures are correct, they are not relevant to whether *uninsured immigrants* are responsible for any meaningful share of those uncompensated costs. Put another way, if those uncompensated costs are attributable solely to uninsured *citizens*, it would be irrational to try to control those costs by excluding arriving immigrants, as Defendants' actions would do. And even if some portion of those uncompensated costs were traceable to uninsured immigrants specifically, Defendants have not explained why the measures they have chosen are rationally connected to the asserted goal of reducing those costs.

---

[29] Medicaid and CHIP Payment and Access Commission, "Report to Congress on Medicaid and CHIP" (March 2018) (Ex. 25); *see also* Pam MacEwan Declaration at 8.

[30] *See* Leighton Ku Declaration ¶ 9.

[31] *See Id.* ¶ 18.

[32] *President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage*, KAISER FAMILY FUND (Oct. 10, 2019), *available at* https://www.kff.org/disparities-policy/factsheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/

[33] *See* Ku Decl. ¶ 18.

Defendants' actions are arbitrary and irrational in other respects too. For example, the new policy would bar entry of an immigrant who would be *fully insured* with comprehensive coverage under the ACA after arrival—albeit with financial assistance. Defendants have not made any findings that could square this result with the Proclamation's express purpose of reducing the financial burden imposed by *uninsured* individuals.[34] And they do not explain how the entry of an immigrant who would be underinsured (or effectively uninsured) with visitor insurance or a short-term limited duration insurance plan would further the stated purpose.[35]

Many of the "approved health insurance" options in the Proclamation are also legally or practically impossible to acquire before a consular interview. For example, an individual applying for commercial unsubsidized coverage through a Marketplace must show proof of residency in that state as well as lawful presence, which would not be possible for a visa

---

[34] *See* MacEwan Decl. ¶ 8 (precluding [visa-seeking immigrants and their families] from getting affordable, comprehensive coverage through [the Exchange] and instead steering them toward coverage that is not ACA-compliant "will increase uncompensated care costs"); Comment Letter from Commonwealth of Massachusetts Health Insurance Connecter Authority (Ex. 14), at 2-3 (providing access to subsidized comprehensive health insurance reduces uncompensated care costs).

[35] To the contrary, these plans would be contrary to the Proclamation's stated purpose. Stacey Pogue Declaration ("Pogue Decl.") ¶¶ 17-20 (describing how STLDI and visitor insurance plans result in uncompensated care costs); Dania Palanker  Declaration ¶¶ 23-34 (describing same); Comment Letter from MNSure (Ex. 15), at 2; Comment Letter from the American Occupational Therapy Association (Ex. 22), at 2; Comment Letter from Center for Elder Law and Justice (Ex. 6), at 2.

applicant to prove.[36] Likewise, some of the "approved health insurance" options are not permitted under state laws[37] or unavailable for people with pre-existing conditions.[38]

Defendants also provide no guidance as to how consular officers will make determinations necessary to implement the Proclamation.[39] Even experienced health care scholars are unable to discern the meaning of vague terms and internally inconsistent aspects of the Proclamation.[40]

Defendants' irrational and irregular approach to such a major change to the obligations of immigrants suggests the entire exercise is pretext. Defendants appear to be using the Proclamation, their online announcement and Emergency Notice to make an end-run around the rulemaking process they know applies as to the substance of their actions because they just engaged in the process for the attempted Public Charge Rule.[41] In all events, it does not appear that their actions are part of a lawful and well-considered plan to achieve their stated goals, and

---

[36] Comment Letter from Commonwealth of Massachusetts Health Insurance Connector Authority (Ex. 14), at 2; Comment Letter from Asian & Pacific Islander American Health Forum (Ex.5), at 5; MacEwan Decl. ¶ 10; Palanker Decl. ¶¶ 11-12.

[37] Palanker Decl. ¶¶ 17-18 (STLDI plans are banned or limited in some states); MacEwan Decl. ¶ 12 (Washington does not permit short-term limited duration insurance plans that are effective for a minimum of 364 days as Proclamation requires); Watson-Patko Decl. ¶ 15 (describing states that restrict sale of STLDI plans); Comment Letter from Legal Aid Society (Ex. 13), at 6 ("New York prohibits the sale of junk plans in the state precisely to protect New Yorkers' physical and financial health.").

[38] Pogue Decl. ¶ 16 (describing that STLDI plans are medically underwritten and applicants can be denied coverage due to pre-existing conditions); Palanker Decl. ¶ 20 (STLDI plans not available to people with many medical conditions or even symptoms of medical conditions).

[39] Palanker Decl. ¶ 23 (describing lack of guidance, standards, and procedures on how consular officers, who lack serious medical training, will assess expenses related to existing medical conditions at the time of visa adjudication).

[40] Palanker Decl. ¶¶ 13, 23 (Proclamation fails to define "catastrophic plan," and Notice fails to provide guidance on scope of what "medical conditions" or "health issues" may be relevant).

[41] *See, e.g.*, *Make the Road New York v. Cuccinelli*, 19-cv-7993-GBD, 19-cv-7777-GBD (consolidated) (S.D.N.Y. Oct. 11, 2019) (nationwide injunction); *State of Washington v. U.S. Dept. Homeland Security*, 19-cv-5210-RMP (E.D. Wa., Oct. 11, 2019) (same); *City and County of San Francisco v. U.S. Citizenship and Immigration Services*, 19-cv-04717-PJH, 19-cv-4980-PJH, 19-cv-4975-PJH (consolidated) (N.D. Cal., Oct 11, 2019) (injunction as to San Francisco City or County, Santa Clara County, California, Oregon, the District of Columbia, Maine, and Pennsylvania).

the court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551, 2574 (2019) (quoting *United States v. Stanchich*, 550 F. 2d 1294, 1300 (2d Cir. 1977)). There are countless other ways to reduce the share of the population without insurance that the Administration did not appear to consider, including expanding access to Medicaid and insurance available on exchanges. The court should—based on the whole administrative record—see implementation of the Proclamation for what it is: agency action based on "contrived reasons" designed to exclude and discourage eligible immigrants, evade substantive and procedural legislative constraints on the executive so the President can unilaterally start shutting down family-based migration, and establish an institutional preference for high-income immigrants, all while reducing judicial review to nothing more than "an empty ritual." *Id.* at 2576.[42] Nothing Defendants have said justifies their actions; their failure to provide reasoned support for such a drastic change in policy is arbitrary and capricious, and their actions to implement the Proclamation should be set aside.

### 3.    Defendants' Implementation of the Proclamation Violates The Procedural Requirements of the APA

Under the APA, "[g]eneral notice of proposed rule-making shall be published in the Federal Register [and] shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Unless an exception applies, the APA requires agencies to provide notice and opportunity for public comment at least 30 days before the rule becomes effective. 5 U.S.C. § 553(d). After providing notice, the agency "shall give interested persons an opportunity

---

[42] Defendants cannot dispute that implementation of the Proclamation will lead to massive disruption for U.S. citizen families that have relied on the ability to emigrate their qualified relatives to help with child care, health care, and financial support. And because they have taken the novel position that they are not required to produce an administrative record, there is no evidence to show consideration of harms to U.S. families and entities such as states, employers and communities. *Fox Television*, 556 U.S. at 515-16; *Perez v. Mort. Bankers' Ass'n*, 135 S. Ct. 1199, 1209 (2015).

to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C § 553(c). "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). An agency must "respond to 'significant' comments, *i.e.*, those which raise relevant points and which, if [the agency's decision is] adopted, would require a change in the agency's proposed rule." *Am. Mining. Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (quoting *Home Box Office v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977)). Comments which "cast doubt on the reasonableness of a position taken by the agency" and have a factual and policy basis are significant because they can show an agency's proposed rule is "arbitrary and capricious." *Home Box Office*, 567 F.2d at 35 n.58.

Defendants have utterly failed to provide the public with an "opportunity to participate in the rule making." 5 U.S.C. § 553(c). A one-day comment period is unprecedented. Even 10-day comment periods have been deemed insufficient without "exigent circumstances in which agency action was required in a mere matter of days." *See N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012). Here, the agency action was so objectionable to the public that, even with a one-day comment period, the agencies received over 250 comments opposing implementation of the Proclamation.[43] In all events, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *ACLU v. FCC*, 823 F.2d 1554, 1581 (D.C. Cir. 1987) (per curiam) (quoting *Ala. Power Co. v. Costle*, 636 F.2d 323, 384 (D.C. Cir. 1979) (per curiam)). It is clear from the timeline that Defendants never intended to respond to comments before implementing the Proclamation. *See Dep't of Commerce*, 139 S. Ct. at 2574.

---

[43] Plaintiff Latino Network, together with several other organizations, submitted a letter expressing their opposition to the Proclamation and their concern that the Proclamation unlawfully would result in prolonged or permanent family separation; provides vague, if any, guidance on how to obtain a qualifying plan; and leaves prospective immigrants without any legally or practically available options. *See* Ex. 12.

There is no excuse for the agencies' conduct. Neither the Proclamation nor the agencies' implementing actions pertain to matters involving foreign affairs. *See E. Bay Sanctuary Covenant*, 932 F.3d at 775-76 (foreign affairs exception applies only if application of "the public rulemaking provisions [will] provoke definitely undesirable international consequences" (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980))). Nor have Defendants offered any reason why notice-and-comment procedures were "impracticable, unnecessary, or contrary to the public interest," which means they have forfeited the possibility of meeting the good cause exception. *See Action on Smoking and Health v. C.A.B.*, 713 F.2d 795, 799 (D.C. Cir. 1983) ("[C]ourts have repeatedly held that *post hoc* rationalizations 'are unacceptable substitutions for a *contemporaneous* basis and purpose statement.' " (citations omitted)). Finally, Defendants cannot pretend that they have announced interpretive rather than substantive rules given the nature of the rights at issue and the immediacy of the compliance demanded. *See* Part I.B.1(A), *supra*. For all these reasons, no exception to the APA's requirements apply and Plaintiffs are likely to succeed on the merits of their APA claims.

### 4. Defendants' Implementation of the Proclamation is In Excess of Statutory Authority and Contrary to Constitutional Right

Defendants' Implementation of the Proclamation is also in excess of statutory authority because the INA does not authorize DOS or any other agency to replace the INA's totality of the circumstances public charge test with a single-factor determination of financial burden based on healthcare insurance. *See* Section ___, *supra*. The agencies' actions to implement the proclamation are in excess of statutory authority for the same reasons the Proclamation itself conflicts with the INA. But even if this Court finds that Defendants have not exceeded their statutory authority, Defendants' implementation of the Proclamation still violates procedural due process rights. *See Sierra Club v. Trump*, 929 F.3d 670, 697 (9th Cir. 2019) ("It cannot be that simply by pointing to any statute, governmental defendants can foreclose a constitutional claim."). The Proclamation interferes with Plaintiffs' "[f]reedom of personal choice in matters of

marriage and family life," which is, "of course, one of the liberties protected by the Due Process Clause." *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008). Further, Defendants have not provided any "facially legitimate and bona fide reason." *Trump v. Hawaii*, 138 S. Ct. at 2419 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972)). Therefore, Defendants' implementation of the Proclamation violates the APA because it runs contrary to a Constitutional right.

### C.    Defendants' Actions Violate the Due Process Clause

Plaintiffs are likely to succeed on the merits of their claim that the Proclamation violates their rights under the Due Process Clause. In particular, the Proclamation burdens Plaintiffs' liberty interests without providing any facially legitimate, bona fide justification. Moreover, the Proclamation attempts to deprive Plaintiffs of property based on a vague standard inconsistent with the original meaning of the Fifth Amendment.

#### 1.    There is No Facially Legitimate, Bona Fide Justification for the Proclamation's Requirements.

To invoke due process, Plaintiffs must have suffered a deprivation of "life, liberty, or property." U.S. Const. amend. V. They have. The Proclamation interferes with Plaintiffs' "[f]reedom of personal choice in matters of marriage and family life," which is, "of course, one of the liberties protected by the Due Process Clause." *Bustamante*, 531 F.3d at 1062. Plaintiffs are United States citizens who wish to obtain immigrant visas for their eligible family members. The Proclamation forecloses that possibility, thus triggering the constitutional requirement of adequate process.

Once invoked, the Due Process Clause ordinarily requires the court to weigh the plaintiff's interests against the burden that additional procedural safeguards would place on the government. *See Turner v. Rogers*, 564 U.S. 431, 444-45 (2011); *United States v. Garcia-Martinez*, 228 F.3d 956, 961 (9th Cir. 2000). But when "the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen" courts engage only in "a circumscribed judicial

inquiry." *Trump v. Hawaii*, 138 S. Ct. at 2419. This circumscribed inquiry asks whether "the
Executive exercises [a] delegated power negatively on the basis of a facially legitimate and bona
fide reason." *Id.* (quoting *Kleindienst*, 408 U.S. at 770). The Proclamation fails to satisfy this
standard.

First, Defendants are not exercising a "delegated power." *See supra*, Part I.A.(1). On the
contrary, the Proclamation and its enforcement are an *ultra vires* exercise of authority. Congress
did not empower the executive branch to pick and choose which prospective immigrants are
wealthy enough, or healthy enough, to receive visas. Instead, Congress determined that consular
officers must consider a multitude of factors when determining whether to issue an immigrant
visa. Absent a delegated power, the Proclamation cannot supply Defendants with a facially
legitimate or bona fide reason to interfere with Plaintiffs' liberty interests.

Second, even if Defendants were exercising a delegated power, the Proclamation does not
provide a facially legitimate, bona fide reason for interfering with Plaintiffs' liberty interests in
family life. The Court should take the President and the other Defendants at their word. As
explained in Plaintiffs' complaint, the current administration has engaged in a long history of
antipathy toward noncitizens, specifically immigrants seeking to come to the United States.
Defendants have reserved particular vitriol for immigrants of color, including those from
countries such as Mexico, Haiti, and Nigeria, and regions such as Central and Latin America,
Africa, and the Middle East. *See* Complaint at ¶¶ 161-78. Contrary to the President's repeated
public assertions, Plaintiffs' relatives and others like them are well-educated, experienced, and
ready to contribute to the nation. *Id.* Defendants' counterfactual narrative betrays an animus that
cannot be ignored. "If judicial review is to be more than an empty ritual, it must demand
something better than the explanation offered for the action taken in this case." *Dep't of
Commerce*, 139 S. Ct. at 2576.

Moreover, the Proclamation seeks to address and remedy the taxpayer burdens that have
resulted from the costs of uncompensated care. But implementing the Proclamation will only add
to this burden; there is no rational relationship between the stated purpose of the Proclamation

PAGE 33 – PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

and the results it yields. *See* Part I.B(2), *supra.* Therefore, the Proclamation does not supply a facially legitimate or bona fide reason to interfere with Plaintiffs' liberty interests.

> **2.      The Proclamation is Inconsistent with the Text and History of the Due Process Clause.**

Due Process requires that Plaintiffs receive fair notice of the legal requirements they must satisfy. Neither the Proclamation nor its implementation satisfies this requirement, resulting in an unwarranted intrusion on Plaintiffs' property interests. The Fifth Amendment's Due Process Clause traces its content back to the Magna Carta, which forbade government intrusion upon certain of a citizen's rights except "by lawful judgment of his peers, or by the law of the land." *Kerry v. Din*, 135 S. Ct. 2128, 2132 (2015) (plurality op.) (quoting Magna Carta, ch. 29, in 1 E. Coke, The Second Part of the Institutes of the Laws of England 45 (1797)). The latter phrase—"by the law of the land"—had, by time the constitution was ratified in 1791, come to be synonymous with the Fifth Amendment's invocation of "due process of law." *Id.* This equivalence show the Due Process Clause "sought to ensure that the people's rights are never any less secure against government invasion than they were at common law." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring). One of the common law's "most basic" protections was "the demand of fair notice." *Id.* at 1225. It was the "law of the land" that a citizen "could not be taken by surprise." *Id.* (quoting *Goldington v. Bassingburn*, Y.B. Trin. 3 Edw. II, f. 27b (1310)). In both civil and criminal actions, the due process of law required fair notice before a government deprivation.

The Proclamation has taken Plaintiffs by surprise, depriving them of the constitutionally-required fair notice. First, Defendants unilaterally, and without more than a few days' warning imposed a new set of completely unprecedented rules and requirements on Plaintiffs and their non-citizen family members. Although executive branch rules and regulations certainly change over time, the Proclamation was more than a mere incremental evolution; it was a sea change for which Plaintiffs had no warning. Second, the Proclamation is so vague that no Plaintiff or

member of the U.S. Petitioners Subclass can confidently predict whether or not she is in compliance with the Proclamation's requirements. Absent fair notice of what the rules require, Plaintiffs' only option will be to purchase additional insurance to ensure that their loved ones have favorable consular meetings.[44] In so doing, Plaintiffs will be forced surrender their property due to a lack of fair notice of what the Proclamation requires. The Proclamation's lack of fair notice, and as a result is inconsistent with the text and history of the Due Process Clause.

## II.      PLAINTIFFS WILL LIKELY SUFFER IRREPARABLE HARM

Implementation of the Proclamation will likely inflict irreparable harm on the Plaintiffs and putative class members. It imminently threatens potentially indefinite family separation, either blocking prospective immigrants from entering the United States to reunite with families,[45] or preventing presently undocumented individuals from leaving to receive their immigrant visas at a consular post because of the risk they will be denied re-entry.[46] The "separation from family members" and the mental damage concomitant with such separation constitutes irreparable harm.[47] *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (quotation marks omitted); *see also Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the

---

[44] *See, e.g.*, Kristina Cooke & Mica Rosenberg, *Trump Rule on Health Insurance Leaves Immigrants, Companies Scrambling for Answers*, REUTERS (Oct. 31, 2019), *available at* https://www.reuters.com/article/us-usa-immigration-insurance/trump-rule-on-health-insurance-leaves-immigrants-companies-scrambling-for-answers-idUSKBN1XA1G6.

[45] *See* Declaration of Jane Doe #3 ("Jane Doe #3 Decl."), Jane Doe 32 Decl. ¶4, 11-13; JaneJane Doe #3 Decl., ¶ 4, 15-20; Declaration of Iris Angelina Castro ("Castro Decl."), ¶ 4, 12-14; Declaration of Brenda Villaruel ("Villaruel Decl."), ¶¶ 6, 8-11.

[46] *See* John Doe #1 Decl., ¶ 12-14; Declaration of Juan Ramon Morales ("Morales Decl."),¶16-20Morales Decl. ¶16-20; Declaration of Blake Doe ("Blake Doe Decl."), ¶ 13; Ramos Decl., ¶ 13-22.

[47] *See, e.g.*, Doe #1 ("John Doe #1 Decl."), ¶ 12, 13; Morales Decl., ¶ 16-21; Declaration of Jane Doe #2 ("Jane Doe #2 Decl."),¶ 11-13; Jane Doe #3 Decl., 15-22; Castro Decl., ¶¶ 10, 12-14; BlakeBlake  Doe Decl., ¶ 15; Villaruel Decl., ¶ 9-11; Declaration of Gabino Soriano Castellanos ("Castellanos Decl."), 9-11; Declaration of Dulce Yaneli Ramos ("Ramos Decl."), ¶ 15-22.

individual' and that cannot be taken away without procedural due process.") (quoting *Landon v. Plasencia*, 459 U.S. 21, 34-35 (1982)).

The harm to holders of I-601A waivers and their loved ones is particularly acute. An approved I-601A waiver demonstrates that the U.S.-based family member of an undocumented indivudal would suffer extreme hardship if separated from their loved one. But it does not protect the undocumented individual from the threat of removal proceedings. As Mr. Morales put it, the Proclamation puts these families "in a terrible bind;"[48] if undocumented loved ones depart for consular processing they will be denied re-entry due to the Proclamation and their I-601A waivers will be revoked, 9 FAM 302.11-3(D)(1), but if they fail to depart they must live without work authorization and in constant fear of being placed in removal proceedings.

The threat of irreparable harm to Plaintiffs is not hypothetical or conjectural. Most, if not all, of the options the Proclamation provides for "approved health insurance" are legally or practically impossible for the family members of individual Plaintiffs and members and clients of Latino Network to acquire, which means that they will likely be banned under the Proclamation.[49] And all of the plaintiffs' families have financial difficulties with either paying for private health insurance or demonstrating sufficient resources to pay for reasonably foreseeable medical costs.[50] Plaintiffs therefore all have legitimate reasons to believe that, if the Proclamation is implemented, their loved ones will be denied visas and entry (or, for those already here, re-entry) to the United States after a consular interview, likely to occur within

---

[48] Morales Decl., ¶ 20.

[49] *See* John Doe #1 Decl.", ¶ 3, 9; Morales Decl., ¶ 1, 3, 5, 6, 7, 14; Jane Doe #2 Decl., ¶ 3, 10, 14; Jane Doe #3 Decl., ¶ 3, 11, 13; Castro Decl., ¶ 3, 11; Blake Doe Decl., ¶¶ 10-12; Villaruel Decl., ¶ 4, 9; Castellanos Decl., ¶ 9; Declaration of Daniel Rhoads ("Rhoads Decl."), ¶ 11, 13, 15; Ramos Decl., ¶ 3, 13, 17; Declaration of Carmen Rubio ("Rubio Decl."), ¶ 18.

[50] *See* John Doe #1 Decl., ¶ 3, 9, 10; Morales Decl., ¶ 6, 7, 15; Jane Doe #2 Decl., ¶ 9,10; Jane Doe #3, ¶ 11, 12; Castro Decl., ¶ 10, 11; Blake Doe Decl., ¶¶ 12;  Villaruel Decl., ¶  9; Castellanos Decl., ¶ 9; Rhoads Decl., ¶ 11; Ramos Decl., ¶ 7, 15, 17.

months in each instance. Indeed, Plaintiffs with interviews scheduled for November have postponed them to avoid the possibility, if not likelihood, of being denied a visa.[51]

Although the government suggested that an intending immigrant whose visa is denied "could obtain reconsideration of that visa refusal under a relatively expedited time frame," this representation is grounded more in principle than in practice.[52] In reality, the reconsideration process "is extremely complex to navigate even for the most seasoned attorneys," requiring "multiple emails, phone calls, and letters" to navigate each consulate's different set of rules.[53] For an intending immigrant with I-601A waivers, moreover, a visa denial results in a concurrent cancellation of the I-601A provisional waiver, forcing the individual to reapply for a regular I-601 waiver—which can take over a year to be adjudicated.[54] During the entire reapplication process for a visa and, if necessary, an I-601 waiver, the intending immigrant must remain outside the United States, separated from her family.[55]

The impact the Proclamation has on individuals and families is compounded for organizational plaintiff Latino Network, many of whose members have family members subject to the Proclamation living in dangerous and life-threatening situations.[56] Latino Network has diverted significant resources to provide assistance to its members and community,[57] spending "countless hours trying to research what available federal, state, and private health care plans our members and future immigrants who remain abroad may obtain" to comply with the Proclamation.[58] Latino Network has also been compelled to allocate "thousands of dollars on

---

[51] *See* John Doe #1 Decl., ¶ 14; Villaruel Decl., ¶ 9; Castellanos Decl., ¶ 9.
[52] Dkt. 34, TRO Hearing Tr. at 29.
[53] Declaration of Charles Kuck ("Kuck Decl."), ¶ 5.
[54] Understanding Unlawful Presence Under INA § 212(A)(9)(B) And Waivers Of Unlawful Presence, I-601 And I-601A, IMMIGR. LEGAL RES. CTR. (Mar. 2019), *available at* https://www.ilrc.org/sites/default/files/resources/understanding_unlawful_presence_march_2019 .pdf.
[55] *Id.*; *see also* Kuck Decl., ¶ 3, 4.
[56] Rubio Decl., ¶ 9.
[57] *Id.*, ¶ 14.
[58] *Id.*, ¶ 15.

new, unforeseen education and outreach initiatives" to "combat the disastrous consequences of the Proclamation for members and their relatives who have or may use a non-approved plan or cannot pay for foreseeable medical costs."[59] Addressing the Proclamation and its impact on the community Latino Network serves has perceptibly impaired Latino Network's programs, making it more difficult for Latino Network to carry out its mission of helping Latino youth and parents live with dignity and develop social support, sustain physical and mental health, and achieve housing and financial stability.[60] *See Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982). For these reasons too, Plaintiffs will suffer irreparable harm absent an injunction.

## III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FACTORS TIP SHARPLY IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION

Plaintiffs have established that "the balance of the equities tip in [their] favor and that an injunction is in the public interest" because of widespread detrimental effects the Proclamation will cause if it takes effect. *See Winter*, 555 U.S. at 20. When the federal government is a party, the balance of the equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The government cannot identify any real harm that would result from an injunction. There is no urgent need to upset the decades-long status quo.[61] And the public interest articulated in the Proclamation—reducing uncompensated healthcare costs—is better served by granting an injunction.[62] The Proclamation's arbitrary limits on approved options would decrease

---

[59] *Id.*, ¶¶ 17, 18.
[60] *Id.*, ¶¶ 2, 4.
[61] Ku Decl. ¶¶ 9, 18-19.
[62] Lueck Decl. ¶ 6; Pogue Decl. ¶ 14; Comment Letter from Covered California (Ex. 9), at 1 (concern that Proclamation will "take California backward, but also the nation as a whole" with respect to reducing the rate of uninsured individuals); Comment Letter from Massachusetts Health Insurance Connector Authority (Ex.14), at 2 (Proclamation will risk "hard-won progress over the past 13 years" to ensure affordable health care); Comment Letter from Consortium for Citizens with Disabilities (Ex. 8), at 1 (Proclamation "put the nation's health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health

access to affordable comprehensive insurance,[63] encourage underinsurance,[64] and undermine the

commercial insurance market by eliminating lawfully present immigrants who represent

"favorable" insurance risk.[65] The Proclamation is also likely to increase uncompensated care

costs.[66]

---

coverage"); *see also* Comment Letter from Virginia Garcia Memorial Health Center (Ex. 23), at 1 (describing various taxes paid by immigrants that help cover federal and state services).

[63] Lueck Decl. ¶¶ 8-14; Pogue Decl. ¶14; Comment Letter from Covered California (Ex. 9), at 2; Comment Letter from American Medical Association (Ex. 4), at 5;  Comment Letter from Oregon Primary Care Association (Ex. 21), at 1; Comment Letter from AIDS United (Ex. 3), at 1; Comment Letter from the D.C. Health Benefit Exchange Authority (Ex. 10), at 2; Comment Letter from National Health Law Program (Ex. 18) at 2; Comment Letter from the National Association of Pediatric Nurse Practitioners (Ex.16), at 1; Comment Letter from National Immigration Law Center (Ex.19), at 3; Comment Letter from National Disability Rights Network (Ex. 17), at 3; Comment Letter from Asian and Pacific Islander American Health Forum (Ex. 5), at 2-3 (Proclamation excludes insurance plans that provide ACA's language access protections, thereby increasing risk that visa applicants will purchase inadequate insurance plans); Comment Letter from Legal Aid Society (Ex. 13) at 5.

[64] Pogue Decl. ¶¶ 17-20 (describing short term limited insurance plans as excluding coverage for care, including preventive care; containing "policy maximums;" and permitting policy rescission); MacEwan Decl. ¶¶ 12-15 (short-term limited duration insurance plans required by Proclamation are unlawful in the state of Washington and could increase uncompensated care costs); Declaration of Louise Norris, ¶¶ 6-7 (describing limitations on coverage in visitor plans); Comment Letter from Legal Aid Society at 6 ("New York prohibits the sale of junk plans in the state precisely to protect New Yorkers' physical and financial health."); Comment Letter from MNSure (Ex. 15), at 2; Comment Letter from the American Occupational Therapy Association (Ex.22), at 2; Comment Letter from Center for Elder Law and Justice (Ex. 6), at 2.

[65] MacEwan Decl. ¶¶ 8, 10-11; Massachusetts Health Insurance Connector Authority (Ex. 14), at 3 (describing insurance risk pools and effect of exclusion of immigrants); Comment Letter from Covered California (Ex. 9), at 3.; Comment Letter from Oregon Department of Consumer and Business Services (Ex. 20), at 3; Comment Letter from Children's Health Watch (Ex. 7), at 2.

[66] Lueck Dec. ¶¶ 15-16; MacEwan Decl. ¶ 8 ("The Proclamation is also likely to harm the state by increasing uncompensated care—for which the state will likely bear the cost—and adversely impact the broader state economy."); Palanker Dec. ¶¶ 23-34 (describing how STLDI and visitor insurance plans result in uncompensated care costs); Comment Letter from Massachusetts Connector Authority (Ex. 14) at 3; Comment Letter from Disability Rights California (Ex. 11), at 2; Comment Letter from Legal Aid Society (Ex. 13), at 5 ("Not only does this Proclamation undermine Congress, but it undermines its own stated goals: when people cannot afford comprehensive health insurance, uncompensated care goes up and individuals and their communities become less healthy.").

In contrast, the Proclamation will cause widespread irreparable harm to Plaintiffs and class members. Implementing the changes Defendants have proposed under the Proclamation indeed would have a devastating impact—affecting an estimated two-thirds of all legal immigrants, or 375,000 people.[67] Without an injunction, the government successfully could prevent family members of Plaintiffs and other class members from lawfully receiving visas, entering the United States, and remaining in the United States, all because of an inability to qualify for or afford the government's limited options for "approved" health insurance.[68] That failure to secure insurance within the restricted time window will result in the separation of families.[69] The "prolonged separation from family members" outweighs any harm the government might attempt to articulate. *Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017), *rev'd on other grounds*, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *see also Pickett v. Hous. Auth of Cook Cty.*, 114 F. Supp. 3d 663 (N.D. Ill. 2015) ("[T]he public interest is seriously disserved by [Plaintiff] family's separation.").

An injunction also serves the public interest by reducing "the indirect hardship to . . . family members" of the Plaintiffs and class members. *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). Furthermore, because the Proclamation and its implementation conflict with the INA and ACA and fail to comply with the APA, the public interest is served by an injunction. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."). Allowing Plaintiffs and putative class members to continue to be systematically denied immigration status based on arbitrary health insurance requirements untethered from the law runs contrary to the public interest. *See Norsworthy v. Beard*, 87 F.

---

[67] Comment Letter from Latino Network (Ex. 14), at 5.
[68] *See, e.g.*, John Doe #1 Decl., ¶¶ 3, 9; Jane Doe #2 Decl. ¶¶ 3, 10; Jane Doe #3 Decl., ¶ 3, ¶¶ 11-14; Castro Decl., ¶¶ 3, 11; Villaruel Decl., ¶¶ 4, 9; Blake Doe Decl., ¶ 5 (all describing inability to qualify or afford Proclamation's limited options for health insurance).
[69] Kuck Decl. ¶¶ 2-7 (describing family separations caused by consular officers' denials of visas and inadequacy of visa reconsideration process).

Supp. 3d 1164, 1194 (N.D. Cal. 2015) (noting that "[t]here is no public interest in [Plaintiff]'s continued suffering during the pendency of this litigation"). Plaintiffs and other individuals who are unable to afford available health insurance options will, as a result of this Proclamation, be denied immigration status they have qualified for under federal law.

Given the size and success of the Nation's legal immigration system, the costs to the Nation from this Proclamation, and the impact it will cause to thousands of individuals and families worldwide, would be nothing short of staggering.[70] For that reason, the balance of the equities and the public interest overwhelmingly weighs in favor of issuing an injunction and preserving the status quo.

## IV.    A NATIONWIDE INJUNCTION IS NECESSARY

The Ninth Circuit has "upheld nationwide injunctions when 'necessary to give Plaintiff a full expression of their rights.'" *City & Cty. of S.F.*, 897 F.3d at 1244 (quoting *Hawaii v. Trump*, 878 F.3d at 701, and citing *Wash. v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) (per curium), *reconsideration en banc denied*, 853 F.3d 933 & 858 F.3d 1168 (9th Cir. 2017), *cert denied sub nom. Golden v. Wash.*, 138 S. Ct. 448 (2017). For the following reasons, this Court's injunction should apply universally and nationwide to fully maintain the status quo and adequately protect the class of Plaintiffs from irreparable harm.

First, the APA unequivocally establishes that the remedy for "defective rulemaking after a plaintiff successfully challenges the process that an agency has used to promulgate a rule" is for "the reviewing court must 'hold unlawful and set aside" the challenged agency action…as a preliminary matter, pending full litigation of the issues in this case." *Make the Road N.Y. v. McAleenan*, 2019 WL 4738070, at *3 (D.D.C. Sept. 27, 2019) (quoting 5 U.S.C. § 706(2)); *see also Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Nationwide temporary relief "ensures that the Rule is not effective until its validity is fully

---

[70] Ku Decl. ¶ 22 (describing implications of "large and sudden reduction of legal immigration to the United States").

adjudicated." *Casa de Md. v. Trump*, 2019 WL 5190689, at *17 (D. Md. Oct. 14, 2019). Setting aside defective agency action, moreover, "pertains *only* to an agency's act of enacting the defective rule; it is addressed *only* to the agency that has failed to adhere to the required rulemaking procedures; and it binds *only* that particular entity with respect to the rule in question." *Make the Road N.Y.*, 2019 WL 4738070, at *3.

Second, any affected individual and intending immigrant abroad will be harmed from the Proclamation. Therefore, the scope of the injunction must be universal if it is to afford Plaintiffs the relief to which they are entitled. *See, e.g.*, *Cal. v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) ("Although there is no bar against nationwide relief in federal district court…such broad relief must be necessary to give prevailing parties the relief to which they are entitled." (internal quotation marks and citation omitted)). With respect to immigration matters in particular, the Ninth Circuit has "consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant*, 932 F.3d at 779 (citing *Regents of the Univ. of Cal. v. U.S. D.H.S.*, 908 F.3d 476, 511 (9th Cir. 2018); *see also Hawaii v. Trump*, 878 F.3d at 701 ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."); *Wash*, 847 F.3d at 1166-67 ("[A] fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."). This is because national immigration policies require uniformity. *See Hawaii v. Trump*, 878 F.3d at 701. Indeed, a preliminary injunction limited only to the named plaintiffs in this case would not remedy the harm of unlawful agency action; otherwise, "after a plaintiff successfully establishes that an agency rule violates the law, the federal courts must stand by while the agency acts in direct defiance of that court's legal determination by continuing to apply the invalid rule with respect to any person who is not the individual who filed the legal action that is before the Court." *MTRNY*, 2019 WL 4738070, at * 48. Such a prospect is "untenable." *Id*.

Finally, a geographically limited injunction could spur mass confusion with different consular officials overseas applying the enjoined policy. Only a nationwide injunction can

address the irreparable harm that the Proclamation inflicts on individuals worldwide who, but for the Proclamation, would be able to enter the United States to reunite with family here, or would be able to leave to consular process and return without fear of permanent separation from their families, as well as on their families here in the United States and Latino Network, whose mission is to serve such families. *See Wash. v. U.S. D.H.S.*, 2019 WL 5100717, at *22 (E.D. Wash. Oct. 11, 2019) (observing that "postponing the effective date of [an unlawfully promulgated agency rule], in its entirety, provides [the plaintiffs] the necessary relief to 'prevent irreparable injury,' as section 705 [of the APA] instructs").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court immediately issue a nationwide preliminary injunction preventing Defendants and their agents from implementing or enforcing the Proclamation.

DATED this 8th day of November, 2019.

|  |  |
|---|---|
|  | INNOVATION LAW LAB |
|  | s/ *Stephen W Manning* |
| **Karen C. Tumlin** (admitted *pro hac vice*) | **Stephen Manning** (SBN 013373) |
| karen.tumlin@justiceactioncenter.org | stephen@innovationlawlab.org |
| **Esther H. Sung** (admitted *pro hac vice*) | **Nadia Dahab** (SBN 125630) |
| esther.sung@justiceactioncenter.org | nadia@innovationlawlab.org |
| JUSTICE ACTION CENTER | 333 SW Fifth Avenue #200 |
| P.O. Box 27280 | Portland, OR 97204 |
| Los Angeles, CA  90027 | Telephone: +1 503 241-0035 |
| Telephone: +1 323 316-0944 | Facsimile: +1 503 241-7733 |
|  |  |
|  | -and- |
|  |  |
|  | **Scott D. Stein** (admitted *pro hac vice*) |
|  | sstein@sidley.com |
|  | **Kevin M. Fee** (to be admitted *pro hac vice*) |
|  | kfee@sidley.com |
|  | SIDLEY AUSTIN LLP |
|  | One South Dearborn St. |
|  | Chicago, IL 60603 |

Telephone: +1 312 853-7520
Facsimile: +1 312 853-7036

**Jesse Bless** (to be admitted *pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G. Street, Ste. 300
Washington, D.C. 20005
Telephone: +1 781 704-3897
Facsimile: +1 202 783-7853

*Attorneys for Plaintiffs*