**Stephen Manning** (SBN 013373)
stephen@innovationlawlab.org
**Nadia Dahab** (SBN 125630)
nadia@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733

**Karen C. Tumlin** (admitted *pro hac vice*)
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (admitted *pro hac vice*)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
Telephone: +1 323 316-0944

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; and LATINO NETWORK, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, <br><br> Defendants. | Case No.: 3:19-cv-01743-SB <br><br><br><br><br> **DECLARATION OF MS. CARMEN RUBIO IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

## Declaration of Ms. Carmen Rubio

I, Carmen Rubio, declare as follows:

1.    I am the Executive Director of Latino Network ("LatNet" or "organization"), in Portland, Oregon.  The information in this declaration is based on my personal knowledge and on data that LatNet maintains in its ordinary course of business.  As Executive Director, I am responsible for leading our Latino-led education organization, which is grounded in culturally specific practices and services and which lifts up youth and families to reach their full potential. I joined Latino Network as the Executive Director in 2009.  Previously, I served on staff for former Multnomah County Commissioner Serena Cruz Walsh, former Portland Mayor Tom Potter, and Portland City Commissioner Nick Fish.  I currently serve on the boards of the Oregon Shakespeare Festival, Coalition of Communities of Color and the University of Oregon Alumni Association.  I also serve as an appointed Commissioner on the State of Oregon's Higher Education Coordinating Commission.  I am a 2015 Marshall Memorial Fellow, an American Leadership Forum of Oregon Fellow, and a member of the International Women's Forum.

2.    LatNet was founded in 1996 by community leaders concerned about the lack of adequate resources to meet the needs of the growing Latino community in Portland and the surrounding area.  Since then, we have evolved to become an organization that also provides transformational programs aimed at educating and empowering Multnomah County Latinos. Low achievement scores, unavailability of adequate health services, youth violence, and high drop-out rates undermine the Latino community's potential. We address these issues with programs and outreach efforts to promote early literacy, encourage parent involvement, work with gang-involved and adjudicated youth and families, and provide academic support and activities to high-school-aged youth.  One of the largest challenges facing our community is the

devastating affects that flow from the separation of families due to immigration-related obstacles. Through LatNet's community partnerships, we have been able to guide our members and their families to available health- and job-related services to assist them become self-sufficient as soon as possible. Through our work, we build local youth and adults' leadership skills, positively transform the lives of Latino youth and families, and strengthen these vulnerable communities. Our programs foster united, healthy and strong families thereby lifting up our community.

      3.    Like other human-rights organizations, LatNet recognizes the monumental importance that family unity plays in an individual's social development and economic integration. Government efforts to prevent individuals from reuniting with children, spouses, parents, and siblings are fundamentally at odds with our mission and values. Likewise, availability of, and access to, health-related benefits plays a vital role in youth educational development and is essential for newly arrived immigrant families.

      4.    Today, LatNet addresses its mission to positively transform the lives of Latino youth, families and communities through educational and advocacy programs aimed at helping the Latino community in three key areas. LatNet is dedicated to helping Latino youth and parents: (1) live with dignity and develop social support; (2) sustain physical and mental health; and (3) achieve housing and financial stability.

      5.    LatNet fulfills its mission by offering various programs and services, including Early Childhood Services, Community-Based Programs, School-Based Programs, Arts & Culture Youth Programs, Health and Wellness Programs, and Civic Leadership Programs. Each of these programs and services are built around the goal of helping our participants become self-sufficient, healthy, and productive members of society. For example, LatNet's health and

wellness programs for our youth members work to eliminate stigma associated with mental illness, sexual orientation, and teen pregnancy, as well as increase conversations around health and sexuality. Together these programs carve out a space for dialogue, strengthen family communication, and broaden the spectrum of public services in our county.  Our Community Healing Initiative ("CHI") engages at-risk and gang-involved youth and their family members to reduce violence and involvement in the juvenile justice system. CHI mentors, case managers, and parent engagement workers work to support entire families as they overcome systemic barriers, build on strengths, and set and achieve goals.

6.      Support for immigration and successful integration of immigrants into our community represent fundamental principles of our organization. Many of our members are newly arriving immigrants, recently arrived immigrants, or are in the process of sponsoring their family members, many overseas, for immigrant visas.  LatNet staff includes an Immigration Navigator who educates clients and connects them to legal service providers to assist with family reunification applications through the immigrant visa process.

7.      LatNet staff also assists community members and their families in navigating employment services (assessment, job readiness, employment counseling, job placement, and retention), language classes, and other social services, including green card and citizenship applications, healthcare, short-term financial assistance, and other benefit services.

8.      I am familiar with the "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation").  It is my understanding that the Proclamation bans otherwise qualified immigrant visa applicants from receiving visas and entering the United States unless they can establish, "to the satisfaction of a consular officer," that they either "will be covered by approved

Page 3 - DECLARATION OF MS. CARMEN RUBIO IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

health insurance" within 30 days after entry or are wealthy enough "to pay for reasonably foreseeable medical costs." It is my understanding that the Proclamation seeks to further restrict the ability of applicants to obtain an immigrant visa by excluding any federal or state means-tested health insurance benefits, such as tax credits under the Affordable Care Act ("ACA") or coverage under Medicaid or the Children's Health Insurance Program ("CHIP") from the definition of approved health insurance.

9.      Because of the Proclamation, many LatNet members have expressed a fear that they will never be reunited with their family members abroad, many of whom live in dangerous and life-threatening situations.

10.      Many of LatNet's clients have increasingly become concerned about sharing the details of their situations publicly, for fear that it could affect their immigration status or applications, or those of their relatives.

11.      For example, our Immigration Navigator recently spent two and half hours in a telephone conversation with a client, "J1". J1 is a naturalized American citizen, married with two children. One of her children requires special care. J1 has a job that allows her to cover the basic needs of her family, but there is no extra money left after covering monthly family expenses. J1 has waited for more than 10 years to be reunited with her oldest sister, who is preparing to immigrate to the US through a family-based petition that has finally been approved. J1 is worried that after waiting for so many years for the possibility of reunifying permanently with her sister, that opportunity will disappear because none of them could prove to a consular office, at the moment of the upcoming consular interview, that they have the money to pay for medical insurance. The possibility that her sister's permanent residence application could now be denied not only affects J1, but also affects other members of her family. J1's parents are

permanent residents of the United States and live in Portland, Oregon. They are an elderly

couple. Together they have created a strong and united family atmosphere and hope that their

eldest daughter can join them here through J1's immigration petition; however, this new

Proclamation has caused them undue trauma, stress and anxiety because they don't know if their

eldest daughter will ever have the opportunity to live close to them permanently. In this case, the

Navigator, after hearing J1's worries, sadness and frustration, responded by providing her with

emotional support and directing her to resources where she could review different medical

insurance plan options.

12.    The function of LatNet's Immigration Navigator is to assist community members

in finding the appropriate legal services. The populations that our Navigator serves are mainly

immigrants and their families who are low-income, have few financial resources, and who view

our organization as a reliable source of information for their families.  Since October 4, our

Navigator has experienced an increase in the number of individual consultations with members

of our community who are concerned about how the implementation of the Proclamation will

affect their ability to obtain health insurance and to sponsor family members in the process of

applying for an immigrant visa to reunite their families. During those consultations, our

Navigator has encountered great confusion, concern, and despair, since many family-based

petitioners have many questions about what is considered acceptable as "financial resources for

foreseeable medical cost" and concerns that they may never be reunited with their family

members abroad.

13.    Our Immigration Navigator has reported that there is increased fear among

members of our community that believe that this new measure will prevent them from ever being

reunited with their loved ones because they do not have the resources to pay for private medical

insurance. This crisis has forced our Immigration Navigator to divert a large percentage of his primary responsibility away from assisting families find cost-effective immigration-related legal services and toward a new role as a consultant about the Proclamation and how families can cope with its consequences or try and meet its requirements. This represents a new and unforeseen workload for our Immigration Navigator, and he has had to deviate from the core responsibilities included in his job description such as the planning and development of educational workshops for the community focused on immigration legal services, or meeting with clients to find legal advice at low cost. He has had to postpone individual service intake interviews with clients who are eligible for legal representation and also has had to reschedule meetings with community partners with whom he meets continuously to promote the well-being of Latino students and their families. Our Navigator has also invested many hours to conduct research on the different medical insurance alternatives that could be approved under the Proclamation and that could be accessible to our community. He has had to adopt a new role and quickly attempt to learn about the complicated system of medical insurance companies, which is far outside of the regular scope of his work.

14.     Another example of how LatNet has had to adapt to this crisis is the way in which our Immigration Navigation Program has had to shift its community education efforts. This program has within its original objectives the designing and delivery of workshops to immigrant and refugee communities. Usually during these workshops, the information provided to attendees has educational components so participants can learn about their rights and obligations in the United States. In addition, information about family emergency preparedness and financial literacy is also provided. However, the Proclamation has forced my staff to change the initial focus of the work in these workshops and instead address the questions and fears that the

Page 6 - DECLARATION OF MS. CARMEN RUBIO IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Proclamation has caused in our community. For example, in a recent community workshop, the facilitator had to modify the content of the original presentation and instead dedicate most of the time to answering questions and concerns from participants related to the Proclamation. Approximately 60 percent of the total time of this workshop was devoted to explaining the difference between the Proclamation and the proposed Public Charge rule, so participants could understand that they are different regulations with different implications. Therefore, a new workshop will have to be scheduled at the same location to meet the original objective of our community education work. Latino Network will have to modify our work plan in this area in order to fulfill the contractual requirements that fund of this area of our services. This will cost us more time and financial resources that were not considered in the original budget. The extra work created by this Proclamation, of course, was not contemplated in our Immigration Navigation Program's planned efforts.

15.    The Proclamation targets immigrant families, and thus our organization's efforts to lift up our immigrant families, and we have no choice but to reallocate Latino Network agency resources in order to respond. We have had to assign our Early Childhood Director, a senior member of our executive team, to lead and coordinate our organizational response, which pulls her away from the strategic priorities in her work plan. In order to coordinate our response efforts—including researching the rules, regulations and implications associated with the Proclamation, coordinating our outreach and education plans and developing a staff training strategy so that our front line staff is prepared to respond to community concerns—she has had to postpone critical work on projects that are core to LatNet's mission, including program expansion planning, fundraising for our early childhood programs, and quality and fidelity management of our affiliate partners. Clearly, managing the fallout from the Proclamation is

outside of the normal scope of work of our Early Childhood Director. She should instead be spending her time on the core programmatic functions of her department.

16.     This is only the beginning of the impact on our organization, and reflects the harm we have experienced in roughly one month's time. The Proclamation has and will continue to severely restrict and frustrate LatNet's ability to fulfill its organizational mission and carry out our core service approach which includes counseling and referring our low- and moderate-income immigrant clientele to services that will enable them to obtain adequate health-related benefits. Every family separated under the Proclamation makes our effort to promote the well-being of youth through family unity and health that much harder.

17.     The Proclamation has forced LatNet to divert significant resources to identify what services members of our community may use to adjust to the new rules, comply with the Proclamation, and remain eligible to sponsor family members for immigrant visas.

18.     The vague language of what counts as "approved medical care" has caused and will continue to cause LatNet staff members to spend countless hours trying to research what available federal, state, and private health care plans our members and future immigrants who remain abroad may obtain. The time and expense of this research necessarily takes away from other organizational efforts. We have looked at the approved health insurance and have found that most of our members will not qualify or cannot afford any option. For example, most of our members are not old enough to qualify for Medicare, short-term plans lasting the minimum-required 364 days are not available in Oregon, and TRICARE is only available for certain members of the armed forces.

19.     Prior to the Proclamation, we steered members and clients toward subsidized health-plans to meet their needs and family members' needs, when necessary. We now have

some members who asked us whether they should cancel their plans because they fear that it will jeopardize either their own immigration status or their ability to sponsor family members for immigrant visas. The Proclamation has caused a crisis in our community; as an organization dedicated to serving our community, we have been forced to drop other strategic initiatives and respond to this crisis.

20.    We have been forced to divert resources to new training and education programs that we felt were necessary to combat the disastrous consequences of the Proclamation for members and their relatives who have or may use a non-approved plan or cannot pay for foreseeable medical costs.

21.    At LatNet, we must make every available dollar count by investing in quality assurance and program sustainability and expansion, in order to deliver high quality, effective programs and direct services. This Proclamation has and will continue to squeeze vital resources from our core business and force us to materially shift how we invest our resources and staff time in order to serve our community's needs to adjust to this Proclamation and its effects. We must devote dedicated time and money on training the entire staff on the Proclamation's effects and how immigrant families can navigate its requirements. We do not have such health-based staff in the normal course of business, but to appropriately meet our mission we must now do so.

22.    For example, we had planned to invest in training our staff on key components of our program quality improvement model and service delivery initiatives in the next few months. We have stopped that investment as a result of the Proclamation. Instead, the Proclamation and its effects will effectively force us to use these resources and that staff development time to ensure all staff are informed and prepared to respond and support community members in navigating the Proclamation's new rules. As staff and community members continue to bring

new questions and concerns about the Proclamation, this will increasingly take staff away from their core function of delivering critical direct education and non-health related services to clients.

23.     In order to respond to the questions and concerns from community members, program participants and partners, we have and will continue to invest considerable staff time to research restrictions and regulations arising from this Proclamation, identify acceptable health insurance options under the new rules, train our direct service staff on the details of the restrictions and acceptable options for families, develop informational materials in multiple languages to inform our community, and field questions and concerns from our participants.

24.     Our regular practice is to ensure our front line staff is trained to refer community members to low cost, subsidized, and free health insurance resources, through our local state Medicaid expansion program. Additionally, we were preparing to partner with other statewide organizations to conduct outreach and enrollment in our state health insurance program for immigrant children and their families. This Proclamation has disrupted our core business and forced us to develop new outreach and training programs to respond to these policy changes. This represents a completely new and unanticipated challenge and hardship for our organization and our staff.

25.     We estimate that it will cost us $9,784.00 to train all of our staff on the Proclamation's new rules and restrictions. Additionally, we estimate that it will cost LatNet $3,963.00 to conduct the necessary research, develop informational materials for staff and community members, and identify acceptable options for health insurance that would satisfy the Proclamation's terms. These estimated costs, however, do not represent the full extent to which the Proclamation frustrates LatNet's ability to carry out its mission and divert resources. The

estimates, for example, do not account for the likely decrease in service delivery in our vital, direct service programs that will result from diverting staff to address this Proclamation and associated questions and concerns.

26.    I am aware of no mechanism in the Proclamation or any federal program by which LatNet could be compensated for lost productivity or increased costs, and many of the expected impacts to LatNet and its clients and even its other programs could not be mitigated financially in any event.

27.    Beyond the burdens that the Proclamation places on LatNet's budget, operations, and organizational mission, the Proclamation will undoubtedly require us to divert resources to address inquiries and concerns arising out of its implementation.  We estimate that a significant percentage of staff members' time—up to 15% of paid staff members' weekly time during business hours—will be spent responding to client concerns and inquiries in the coming weeks and months as knowledge and fear of the Proclamation grows, and as further future effects materialize.

28.    The family separation that this Proclamation intends to cause will strain our resources in other ways as well. Our clients and their families will have fewer income-earning adults in their households, which will exacerbate existing financial and housing issues in our low- and moderate-income immigrant community. LatNet will have greater future demand for our other core services while at the same time having to divert resources from those services to address the Proclamation's more immediate effects for immigrants and their families seeking admission to the United States.

29.    Furthermore, the emotional and developmental toll that family separation exacts from our vulnerable community members cannot be overstated. Without the support and

presence of stable, unified families, our community's vulnerable children and youth will face

greater obstacles in their efforts to (1) live with dignity and develop social support; (2) sustain

physical and mental health; and (3) achieve housing and financial stability. As such, our

community and clientele will have greater need than before for our core programs and services,

including Early Childhood Services, Community-Based Programs, School-Based Programs, Arts

and Culture Youth Programs, Health and Wellness Programs, and Civic Leadership Programs.

But because our resources have been and will be diverted to respond to the Proclamation's

immediate effects on immigration, LatNet will have fewer resources to devote to that increased

need.

       30.    As such, the Proclamation has caused much more than a mere setback to LatNet's

abstract interests. We have experienced and will experience real harm to our capacity to carry out

our organization purpose: (a) we have been forced to alter our resource base to respond to and

attempt to mitigate the Proclamation's immediate effects; (b) those diverted resources would

have been allocated in a balanced manner toward our core services and programs; (c) devoting

staff and resources to meeting and assisting affected families with health-care options in light of

the Proclamation diminishes our ability to support our education-based and youth-based

community outreach and programs; and (d) we have devoted and will necessarily continue to

devote time to monitor our membership and educate our community about the Proclamation and

its effects.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct. Executed at Portland, Oregon on November 7, 2019.