JOSEPH H. HUNT
Assistant Attorney General, Civil Division
BILLY J. WILLIAMS
United States Attorney
AUGUST E. FLENTJE
Special Counsel, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section
COURTNEY E. MORAN
Trial Attorney
BRIAN C. WARD
Senior Litigation Counsel
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
(202) 616-9121
brian.c.ward@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; and LATINO NETWORK, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, <br><br> Defendants. | CASE NO. 3:19-cv-01743-SI <br><br><br> **DOCUMENTS PRODUCED TO PLAINTIFFS PURSUANT TO ECF NO. 83** |

## DECLARATION OF RACHEL SUNDEN

I, Rachel Sunden, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am employed by the U.S. Department of State as a Special Assistant in the Visa Office, Bureau of Consular Affairs.

2. In that capacity, I monitor and manage the creation process, clearance, and movement of official government records within the Visa Office, including those official government records that are referred to other offices in the Department of State for higher level clearance.

3. I have reviewed an Action Memorandum from Assistant Secretary for Consular Affairs Carl Risch to Secretary of State Pompeo, which reflects that on October 28, 2019, Secretary Pompeo approved updates to 9 FAM 302.14. The attached document labeled as "9 FAM 302.14-11 (U) Presidential Proclamation 9945" is the text Secretary Pompeo approved.

4. The only authoritative text of the Foreign Affairs Manual is the text that the Department of State's Office of Directives Management (A/GIS/DIR) posts and maintains on its Internet, Intranet, and ClassNet websites, pursuant to 18 FAM 201.1-1(A)(c). The updates labeled "9 FAM 302.14-11 (U) Presidential Proclamation 9945" were never published by A/GIS/DIR.

5. The Department of State was awaiting approval from the Office of Management and Budget for an approved information collection, as required by the Paperwork Reduction Act, before publishing "9 FAM 302.14-11 (U) Presidential Proclamation 9945" as authoritative FAM guidance. That approval was received after the close of business on November 1, 2019. If the court had not issued a temporary restraining order in this case, the Visa Office within the Department of State's Bureau of Consular Affairs planned to send "9 FAM 302.14-11 (U) Presidential Proclamation 9945" to A/GIS/DIR for publication on November 4, 2019.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

November 20, 2019

Rachel Sunden
Special Assistant
Visa Office
Bureau of Consular Affairs
United States Department of State

# 9 FAM 302.14-11  (U) PRESIDENTIAL PROCLAMATION 9945

## 9 FAM 302.14-11(A)  (U) Grounds

*(CT:VISA-XXX;   XX-XX-2019)*

a. **(U)** On October 4, 2019, President Trump issued Presidential Proclamation 9945 on the Suspension of Entry of Immigrants who will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans.

b. **(U)** INA 212(f) provides that whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he deems necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

c. **(U)** P.P. 9945 takes effect on November 3, 2019, at 12:01 EDT, and suspends and limits entry of aliens as immigrants who cannot demonstrate that they will be covered by approved health insurance within 30 days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs in the United States.

## 9 FAM 302.14-11(B)  (U) Application

### 9 FAM 302.14-11(B)(1)  (U) P.P. 9945 Applicable to Certain Immigrant Visa Applicants

*(CT:VISA-XXX;   XX-XX-2019)*

**(U)** The suspension and limitation on entry pursuant to P.P. 9945 applies only to aliens seeking to enter the United States pursuant to an immigrant visa.  The suspension and limitation on entry does not apply to:

SENSITIVE BUT UNCLASSIFIED

(1) **(U)** Any alien holding (or who held) a valid immigrant visa as of November 3, 2019;

(2) **(U)** Any alien seeking to enter the United States pursuant to a Special Immigrant Visa, in either the SI or SQ classification, who is also a national of Afghanistan or Iraq, and/or his or her spouse and children, if any;

(3) **(U)** Any alien who is the child, whether adopted, biological, or step-child, of a United States citizen or who is seeking to enter the United States pursuant to an IR-2, CR-2, IR-3, IR-4, IH-3, or IH-4 visa;

(4) **(U)** Any alien seeking to enter the United States pursuant to an IR-5 visa, provided that the alien or the alien's sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system;

(5) **(U)** Any alien seeking to enter the United States pursuant to a SB-1 visa;

(6) **(U)** Any alien under the age of 18, except for any alien accompanying a parent who is also immigrating to the United States and subject to P.P. 9945;

(7) **(U)** Any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee;

(8) **(U)** Any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis; or

(9) **(U)** Any alien entering the United States without an immigrant visa, such as nonimmigrant visa applicants, including K visa applicants, lawful permanent residents, refugees, and asylees.

## 9 FAM 302.14-11(B)(2)  (U) Inapplicable to Nonimmigrants

*(CT:VISA-XXX;   XX-XX-2019)*

**(U)** P.P. 9945 is not applicable to nonimmigrants.

## 9 FAM 302.14-11(B)(3)  (U) Qualifying Insurance or Ability to Pay for Reasonably Foreseeable Medical Costs

*(CT:VISA-XXX;   XX-XX-2019)*

a. **(U)** P.P. 9945 suspends and limits the entry as immigrants of aliens who will financially burden the United States healthcare system.  The P.P. provides that an alien will financially burden the United States healthcare system unless the alien will be covered by approved health insurance within 30 days of the alien's entry into the United States, or the alien possesses the financial resources to pay for reasonably foreseeable medical costs.

b. **(U)** Approved health insurance means coverage under any of the following plans or programs:

   (1) **(U)** an employer-sponsored plan, including retiree plans, association health plans, and coverage provided by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA);

   (2) **(U)** an unsubsidized health plan offered in the individual market within a State;

   (3) **(U)** a short-term limited duration health policy effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States;

   (4) **(U)** a catastrophic plan;

   (5) **(U)** a family member's plan;

   (6) **(U)** a medical plan under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;

   (7) **(U)** a visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days or until the beginning of planned, extended travel outside the United States;

   (8) **(U)** a medical plan under the Medicare program; or

(9) **(U)** any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee.

c. **(U)** For persons over the age of 18, approved health insurance does not include coverage under the Medicaid program.

d. **(U)** A family member's plan is an approved health insurance plan even if subsidized, except that it may not include coverage under the Medicaid program for persons over the age of 18, but may include coverage under the Medicaid program for persons under the age of 18.

## 9 FAM 302.14-11(B)(4)  (U) Determining Ineligibility Under P.P. 9945

*(CT:VISA-xxx;   xx-xx-2019)*

a. **(U) Approved health insurance.**  Applicants subject to P.P. 9945 must demonstrate, to the satisfaction of the consular officer, eligibility for coverage under an approved health insurance plan or program, including the means to pay for premiums, if any, for such a plan, and the intent to enroll such a plan or program within 30 days of arrival to the United States. As many forms of health insurance cannot be secured prior to establishing a U.S. residence, this determination may be made in the course of the visa interview rather than through document submission.

b. **(U) Financial resources.**  In lieu of approved health insurance, the applicant may demonstrate possession of the financial resources to pay for reasonably foreseeable medical costs in the United States.  P.P. 9945 does not include a time-bound limitation on how far into the future officers should look when assessing "reasonably foreseeable medical costs," and officers should not engage in unsupported speculation.  To assess "reasonably foreseeable medical costs," consular officers should evaluate costs based on an applicant's current medical state as reflected in the medical report by the panel physician.  Officers should not speculate on an applicant's potential future health and may only make this determination based on the applicant's

current medical state.  An officer should consider the applicant's financial resources as well as funds that could be provided by the applicant's sponsor, which can be determined using Form I-864. For example, if an officer finds that an applicant with a properly filed, non-fraudulent and sufficient Form I-864 is healthy and has no "reasonably foreseeable medical costs," the officer can reasonably conclude that the applicant meets the requirements of the P.P. for visa issuance.

c. **(U) IR-5:** IR-5 applicants are largely exempted from P.P. 9945 provided that the alien or the alien's sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system.  To determine if an alien's health will not impose a substantial burden, officers should rely on the medical exam to determine if there are current health issues, including acute or chronic conditions, which will require extensive medical care and likely result in particularly high medical costs.  If the applicant has such a condition, officers must determine if the applicant has either health insurance or funds to cover foreseeable medical costs.

d. **Applicants Under the Age of 18:**  P.P. 9645 applies to derivative applicants under the age of 18 who are accompanying a parent who is also immigrating to the United States and subject to P.P. 9945.  "Accompanying" means derivative applicants who are: (1) in the physical company of the principal applicant; or (2) issued an immigrant visa within six months of the date of issuance of a visa to the principal applicant, the date of adjustment of status in the United States of the principal applicant, or the date on which the principal applicant personally appears and registers before a consular officer abroad to confer foreign state chargeability or immigrant status upon the child. Applicants under the age of 18 who are not considered "accompanying," (i.e., the beneficiary of an immediate relative petition, the principal beneficiary of a family preference petition, or who are following to join the principal applicant) are exempt from P.P. 9645.

e. **(U) Case Note:** If you find the applicant either has or will have approved health insurance within 30 days of entry or possesses

SENSITIVE BUT UNCLASSIFIED

financial resources to pay for reasonably foreseeable medical costs, you must enter a clear case note stating why the applicant overcomes the P.P. 9945's limitation on entry.

## 9 FAM 302.14-11(B)(5)  (U) No Documentary Requirement

*(CT:VISA-xxx;  xx-xx-2019)*

**(U)** Consular officers should determine an alien's eligibility under P.P. 9945 in the course of the visa interview and adjudication; consular officer should request documentation only as they deem necessary.  Applicants are not required to bring supporting documentation to the interview, but a consular officer should deny the case under INA 221(g) if the officer deems the documentation necessary to determine eligibility under P.P. 9945, to allow the applicant time to provide documentation.  If documentation is provided, it does not have to be scanned or included in the applicant's file – the consular officer should simply make a case note of the applicant's ability to meet the requirement.  Applicants are not required to provide information establishing that they meet this requirement to the National Visa Center (NVC) in order to be considered documentarily qualified.

## 9 FAM 302.14-11(B)(6)  (U) Refusals

*(CT:VISA-xxx;  xx-xx-2019)*

a. **(U) HC1 Refusal:**  If an applicant is not able to establish, to the consular officer's satisfaction, that he or she will have approved health insurance within 30 days of entry or, that he or she possesses financial resources to pay for reasonably foreseeable medical costs, the applicant should be refused under the refusal code HC1. Applicants may overcome an HC1 refusal by submitting additional evidence to establish that they have or will have appropriate health insurance within 30 days of arrival, or that they have the financial resources to pay for reasonably foreseeable medical expenses in the absence of health insurance. For applicants with an approved provisional unlawful presence waiver (I-601-A), a determination that the applicant is ineligible to receive an IV pursuant to P.P. 9945 will result in automatic

revocation of the waiver, even if the refusal is subsequently overcome.   See 9 FAM 302.11-3(D)(1).

b. **(U) INA 221(G) versus HC1 Refusals:**  If, at the time of interview, the consular officer requests additional information to establish that the applicant has qualifying insurance or the ability to pay for appropriate healthcare, the case should first be refused under INA 221(g) in order to allow the applicant to submit the requested documentation.  If the applicant submits documents that are insufficient to overcome the INA 221(g) refusal, the applicant must be refused HC1.

c. **(U) P.P. 9945 and Public Charge:**  Refusal under P.P. 9945 is distinct from ineligibility under INA 212(a)(4) for public charge. Consular officers will make this determination irrespective of whether or not an applicant is found likely to become a public charge.  Should a consular officer also find an applicant ineligible under public charge, they must refuse the applicant under both 4A and HC1.

d. (U) Consular officers may use the following refusal language when refusing an applicant HC1:

This office regrets to inform you that a consular officer refused your visa application because you have been found ineligible to receive a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9945, which suspends and limits entry into the United States as immigrants individuals who either will not be covered by approved health insurance within 30 days of their entry into the United States, or who do not possess the financial resources to pay for reasonably foreseeable medical costs.

No waiver is available for the grounds of ineligibility.  While you are ineligible for a visa at this time, you may overcome this ineligibility in the future by providing additional evidence that you will be covered by approved health insurance or that you possess the financial resources to pay for reasonably foreseeable medical costs.

## 9 FAM 302.14-11(B)(7)  (U) Law Enforcement Exemption

SENSITIVE BUT UNCLASSIFIED

*(CT:VISA-xxx;   xx-xx-2019)*

**(U)** The P.P. 9945 limitation on entry does not apply to any alien whose entry would further important U.S. law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee.  The Secretary's authority has been delegated to the Assistant Secretary of Consular Affairs and the Deputy Assistant Secretary of the Visa Office.  If you are contacted by a representative from a U.S. law enforcement agency at post about a particular applicant or if the Department informs you that a U.S. law enforcement agency has expressed interest in a particular applicant, you should refuse the applicant under INA 221(g) and submit an email to your VO/F post liaison officer to request the Department's approval of an exemption.

## 9 FAM 302.14-11(B)(8)  (U) National Interest Exemption

*(CT:VISA-xxx;   xx-xx-2019)*

**(U)** The P.P. 9945 limitation on entry provides an exception for "any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis."  That authority has been delegated to the Assistant Secretary of Consular Affairs and the Deputy Assistant Secretary of the Visa Office.  Consular officers should only consider the following circumstances as possibly satisfying the national interest exception:

- Foreign Relations:  Refusal of the immigrant visa application would become a bilateral irritant or be raised by a foreign government with a high-ranking U.S. government official;
- National Security:  Admission to the United States would advance a U.S. national security interest;
- Significant Public Interest:  Admission to the United States would advance a significant U.S. public interest; or
- Urgent Humanitarian or Medical Reasons:  Admission to the United States is warranted due to urgent humanitarian or medical reasons.

**(U)** If you determine that an applicant is ineligible under P.P. 9645, but you believe the applicant's entry may be in the national interest, you should refuse the applicant under INA 221(g) and submit an email to your VO/F post liaison officer to request the Department's approval of an exemption.

# 9 FAM 302.14-11(C)  (U) Waiver

## 9 FAM 302.14-11(C)(1)  (U) Waivers for Immigrants

*(CT:VISA-xxx;   xx-xx-2019)*

**(U)** No waiver is available for immigrant visa applicants ineligible under P.P. 9945.

## 9 FAM 302.14-11(C)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-XXX;   XX-XX-2019)*

**(U)** P.P. 9945 is not applicable to nonimmigrants.

# 9 FAM 302.14-11(D)  (SBU) ████████████

## 9 FAM 302.14-11(D)(1)  (SBU) ████████

*(CT:VISA-XXX;   XX-XX-2019)*

**(SBU)** ████████████████████████████
████████████████████████
████████████████████

## 9 FAM 302.14-11(D)(2)  (SBU) ████████

*(CT:VISA-XXX;   XX-XX-2019)*

**(SBU)** ████████████████████████████
████████████████████████
████████████████

SENSITIVE BUT UNCLASSIFIED

REC1|APPROVE|10-28-2019|S approved.
REC2|APPROVE|10-28-2019|S approved.



201922031
**United States Department of State**

*Washington, D.C.   20520*

~~SENSITIVE BUT UNCLASSIFIED~~                    October 23, 2019

**ACTION MEMO FOR THE SECRETARY**

FROM:        CA -- Carl C. Risch

SUBJECT:    ~~(SBU)~~ Standards and Procedures for Presidential Proclamation 9945

BLUF:        ~~(SBU)~~ CA proposes the attached standards and procedures for implementing
             Presidential Proclamation 9945 (P.P. 9945), *Suspension of Entry of Immigrants
             Who Will Financially Burden the United States Healthcare System, in Order to
             Protect the Availability of Healthcare Benefits for Americans.*

**Recommendations**
~~(SBU)~~ That you:
   (1) Approve the attached ALDAC and Foreign Affairs Manual (FAM) guidance with
       standards and procedures for implementing P.P. 9945.  CA will then transmit the
       ALDAC and publish the FAM guidance.  (Approve/Disapprove by 10/29/19)

   (2) Designate the Assistant Secretary for CA and the Deputy Assistant Secretary for Visa
       Services to determine that an alien's entry would advance important United States law
       enforcement objectives under Section 2(b)(vii) or that an alien's entry would be in the
       national interest under Section 2(b)(viii) of the proclamation.  (Approve/Disapprove
       by 10/29/19)


**Background**
(U) P.P. 9945 suspends the entry of aliens as immigrants to the United States under
Section 212(f) of the Immigration and Nationality Act (8 USC 1182(f)) when the alien's entry
will financially burden the United States healthcare system.  Pursuant to P.P. 9945, an alien
seeking admission to the United States as an immigrant will financially burden the United States
healthcare system unless the alien will be covered by approved health insurance as defined in
Section 1, subsection (b) of P.P. 9945 or possesses the financial resources to pay for reasonably
foreseeable medical costs.  Section 3(a) of P.P. 9945 states the Secretary of State may establish
the standards and procedures to be used by consular officers to determine an alien's ineligibility
for entry under P.P. 9945.  Section 2(b)(vii) authorizes the Secretary of State or his designee to
determine, based on a recommendation of the Attorney General or his designee, that an alien's
entry is not suspended under P.P. 9945 because the alien's entry would further important
United States law enforcement objectives.  Section 2(b)(viii) authorizes the Secretary of State or
his designee to determine on a case-by-case basis that an alien's entry is not suspended under
P.P. 9945 because the alien's entry would be in the national interest.  P.P. 9945 authorizes the

SENSITIVE BUT UNCLASSIFIED
-2-

Secretary of State to select someone to serve as "his designee" for the authority to determine that an alien's entry would further important law enforcement objectives or be in the national interest.

(SBU) A/S Risch believes the recommended CA officials would be appropriate designees for the authority to determine, based on a recommendation of the Attorney General or his designee, that an alien's entry would further important United States law enforcement objectives and also to determine that an alien's entry would be in the national interest. Given the potentially large number of applicants for these exceptions, the complicated process involved, and the coordination with consular officers that will be required, CA is well-positioned to make these determinations.

(SBU) CA has drafted standards and procedures to implement P.P. 9945. With your approval of the guidance, which is required under P.P.9945, CA will publish the guidance at 9 FAM 302.14-11 and announce it by ALDAC. To inform applicants of this new requirement, CA will update travel.state.gov. The National Visa Center and Kentucky Consular Center will send a message to all immigrant and diversity visa applicants. CA will also encourage posts to engage in a concerted effort to inform applicants so that they are adequately prepared to discuss their plans for health care coverage during the visa interview. In addition, CA/P is preparing a handout that posts can distribute to applicants.

Attachments:
        Tab 1 – Proposed ALDAC on P.P. 9945
        Tab 2 – Proposed FAM Guidance
        Tab 3 – P.P. 9945

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED
-3-

| | | |
|---|---|---|
| Approved: | CA: Carl C. Risch | (CCR) |
| Drafted: | CA/VO/L/R – | |
| Cleared: | CA: IGBrownlee | (OK) |
| | CA: | (OK) |
| | CA: | (OK) |
| | CA/VO: ERamotowski | (OK) |
| | CA/VO: | (OK) |
| | CA/VO/L: | (OK) |
| | CA/VO/F: | (OK) |
| | L/CA: | (OK) |
| | CA/VO/F: | (OK) |
| | CA/P: | (OK) |
| | CA/P: | (OK) |
| | CA/P: | (OK) |
| | CA/P: | (OK) |
| | CA/EX: DBenning | (OK) |
| | CA/EX: | (OK) |
| | CA/EX/PAS: | (OK) |
| | S/P: | (OK) |
| | P: | (OK) |
| | D: | (OK) |
| | GPA: | (OK) |
| | R: | (INFO) |
| | M: | (OK) |

SENSITIVE BUT UNCLASSIFIED

**UNCLASSIFIED**
~~SBU~~



| | |
|---|---|
| **MRN:** | 19 STATE 115030 |
| **Date/DTG:** | Oct 30, 2019 / 301514Z OCT 19 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | CVIS, CMGT |
| **Captions:** | ~~SENSITIVE~~ |
| **Subject:** | Presidential Proclamation: Suspension of Entry of Immigrants Who Will Financially Burden The United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans |

1. (U) SUMMARY:  On October 4, 2019, the President issued Presidential Proclamation (P.P.) 9945 titled "Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans." P.P. 9945 takes effect November 3, 2019, at 12:01 EDT, and suspends and limits entry for aliens as immigrants who cannot demonstrate that they will be covered by approved health insurance within 30 days of entry into the United States or that they have the financial resources to pay for reasonably foreseeable medical costs. Implementation of PP 9945 is contingent on OMB approval of certain information collection, which is still pending. Please see paragraph 18 for details. P.P. 9945 applies to individuals seeking to enter the United States pursuant to an immigrant visa only; it does not apply to nonimmigrant visa applicants, including K visa applicants.  P.P. 9945 also includes a number of exceptions, which are discussed in paragraph 3. The types of approved health insurance plans are discussed in paragraph 4.  Note: this ALDAC provides an overview of the presidential proclamation and implementation; consular officers should refer to 9 FAM 302.14-11 for full adjudication guidance. End Summary.

**Suspension and Limitation on Entry for Certain Immigrant Aliens**

2. (U) The President issued P.P. 9945 pursuant to his authority under sections 212(f) and 215(a) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3 of the United States Code.  The suspension and limitation on entry only applies to immigrant and diversity visa applicants (i.e., aliens seeking to enter the United States as immigrants).

**Exceptions to P.P. 9945**

3. (U) The P.P. includes a number of exceptions.  It does not apply to:
     (A) any alien who is holding (or who held) a valid immigrant visa as of November 3,

014

2019;
(B) aliens seeking and qualifying for the following immigrant visa classifications:
> (1) SI and SQ for Iraqi and Afghan special immigrants and/or their spouses and children;
> (2) IR-2, CR-2, IR-3, IR-4, IH-3, and IH-4 for children, whether adopted, biological, and step-children, of U.S. citizens; and
> (3) SB-1 for an immigrant admitted for permanent residence who is returning from a temporary visit abroad;

(C) any alien seeking to enter the United States pursuant to an IR-5 visa, "provided that the alien or the alien's sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system."
(D) any alien under the age of 18, except for those accompanying a parent who is also immigrating to the United States and is subject to P.P. 9945 ;
(E) any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee;
(F) any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis; and
(G) any alien entering the United States without an immigrant visa, such as nonimmigrant visa travelers, including K visa applicants, lawful permanent residents, refugees, and asylees.


**Qualifying Insurance or Ability to Pay for Reasonably Foreseeable Medical Costs**

4.  (U) In order to overcome the suspension and limitations on entry imposed by P.P. 9945, immigrant visa applicants—other than those covered by exceptions enumerated in paragraph three—must demonstrate, to the satisfaction of a consular officer, either A) eligibility for coverage under an approved health insurance plan or program, including the means to pay for premiums, if any, for such a plan, and the intent to enroll in such a plan or program within thirty days of entry to the United States or, B) that they possess the financial resources to pay for reasonably foreseeable medical costs.  P.P. 9945 indicates that approved health insurance plans or programs include:

> (A) an employer-sponsored plan, including retiree plans, association health plans, and coverage provided by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA);
> (B) an unsubsidized health plan offered in the individual market within a State;
> (C) a short-term limited duration health policy effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States;
> (D) a catastrophic plan;
> (E) a family member's plan;
> (F) a medical plan under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;
> (G) a visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days or until the beginning of planned, extended travel outside the United

States;

  (H) a medical plan under the Medicare program;

  (I) for individuals 18 or younger, coverage under the Medicaid program; or

  (J) any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee.

5. (SBU) Medicaid does not constitute approved health insurance for individuals over the age of 18. Non-U.S. citizens are only eligible for Medicare after five years in LPR status; therefore, immigrant applicants may not be able to rely on the Medicare program as viable coverage to meet the requirements under P.P. 9945, even though it is an approved program. The provider of an approved health insurance plan or program does not need to be a U.S.-based company, but the plan or program must provide coverage for healthcare costs incurred in the United States.

6. (SBU) Alternatively, applicants may demonstrate qualification for entry through possession of financial resources to pay for reasonably foreseeable medical costs. Given the fact that all IV applicants undergo a medical examination and most must also overcome public charge, consular adjudicators will already have sufficient medical and financial information at their disposal to determine whether or not an individual has a medical condition that will require care once in the United States and what financial resources the applicant possesses to cover the cost of that care. For the purposes of this assessment, consular officers may consider financial resources of sponsors that are available to the applicant.

**Processing**

7. (SBU) For those applicants to whom this mandate applies, during the immigrant visa interview consular officers must determine if the applicant currently has or will have (within 30 days of entry) health insurance, for instance the applicant has a plan to obtain health insurance within 30 days via an employer, under a family member's plan, or through any of the other approved mechanisms specified above. Especially since many forms of health insurance cannot be secured prior to establishing a U.S. residence, this determination may be made in the course of the visa interview rather than through document submission. Consular officers should request documentation only as they deem necessary. Applicants are not required to bring documentation to the interview, but should be denied under INA section 221(g) to provide documentation, as the consular officer deems necessary. If documentation is provided, it does not have to be scanned or included in the applicant's file.

8. (SBU) In lieu of health insurance, the applicant may demonstrate possession of financial resources to pay for reasonably foreseeable medical costs in the United States. P.P. 9945 does not include a time-bound limitation on how far into the future officers should look when assessing "reasonably foreseeable medical costs," and officers should not engage in unsupported speculation. To assess "reasonably foreseeable medical costs," consular officers should evaluate costs based on an applicant's current medical state as reflected in the medical report by the panel physician. Officers should not speculate on an applicant's potential future health and may only make this determination based on the applicant's current medical state. An officer should consider the applicant's financial resources as well as funds that may be provided by the applicant's sponsor, which can be determined using Form I-864. For example, if an officer

016

UNCLASSIFIED                  Page 3 of 7

finds that an applicant with a properly filed, non-fraudulent and sufficient Form I-864, is healthy, and has no "reasonably foreseeable medical costs," the officer can reasonably conclude that the applicant meets the P.P 9945 requirements for visa issuance.

9. (SBU) IR-5 applicants are largely exempted from P.P. 9945, provided that the alien or the alien's sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system. To determine if an alien's health will not impose a substantial burden, officers should rely on the medical exam to determine if there are current health issues, including acute or chronic conditions, that will require extensive medical care and likely result in particularly high medical costs. If the applicant has such a condition, officers must determine if the applicant has either health insurance or funds that will be available to cover foreseeable medical costs.

10. (SBU) P.P. 9945 applies to derivative applicants under the age of 18 who are accompanying a parent who is also immigrating to the United States and subject to P.P. 9945 "Accompanying" means derivative applicants who are: (1) in the physical company of the principal applicant; or (2) issued an immigrant visa within six months of the date of issuance of a visa to the principal applicant, the date of adjustment of status in the United States of the principal applicant, or the date on which the principal applicant personally appears and registers before a consular officer abroad to confer foreign state chargeability or immigrant status upon the child. Applicants under the age of 18 who are not considered "accompanying," (i.e., the beneficiary of an immediate relative petition, the principal beneficiary of a family preference petition, or who are following to join the principal applicant) are exempt from P.P. 9945.

11. (SBU) If the consular officer is satisfied that the applicant either has, or will have, health insurance within 30 days of entry or possesses sufficient financial resources to pay for reasonably foreseeable medical costs, the officer must make a clear case note stating why the applicant overcomes P.P. 9945.'s limitation on entry, e.g. "Applicant plans to obtain health insurance through spouse's health insurance policy." As the applicant is overcoming the limitations of P.P. 9945 rather than receiving a waiver, consular officers may proceed directly to issuance without entering any refusal codes. If the consular officer is not satisfied that the applicant overcomes P.P. 9945, the officer should refuse the applicant under the new refusal code "HC1."

12. (SBU) Applicants will not be required to provide information demonstrating their eligibility under P.P. 9945 to the National Visa Center (NVC) in order to be considered documentarily qualified. Therefore, if at the time of interview the consular officer requests additional evidence to establish that the applicant has approved health insurance or the financial resources to pay for medical costs, the case should first be refused under INA 221(g) in order to allow the applicant to submit the requested documentation. If the applicant submits documents that are insufficient to overcome the reasons for the INA 221(g) refusal, the applicant must be refused using the refusal code HC1. Applicants may still overcome an HC1 refusal by submitting additional evidence to convince you that they have or will have approved health insurance within 30 days of entry, or that they have the financial resources to pay for reasonably foreseeable medical costs in the absence of health insurance. Per Department regulations, an IV applicant may present evidence that he or she overcomes a ground of refusal up to one year from the date of

refusal.  See 9 FAM 504.11-4(A) and (C).  For applicants with an approved provisional unlawful presence waiver (I-601A), a determination that the applicant is ineligible to receive an IV pursuant to P.P. 9945 will result in automatic revocation of the waiver, even if the refusal is subsequently overcome.   See 9 FAM 302.11-3(D)(1).

13. (SBU) As P.P.9945's effective date is November 3, 2019, it will apply to immigrant visa cases that were refused under INA 221(g) or any other ground of refusal before November 3, 2019, but are subsequently overcome or waived.  Consular officers reviewing such a case on or after November 3, 2019 will need to determine whether the applicant overcomes  P.P. 9945's limitation on entry and may need to request additional information from the applicant to do so.

14. (SBU) Consular officers may use the following refusal language when refusing an applicant HC1:

> This office regrets to inform you that a consular officer refused your visa application because you have been found ineligible to receive a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9945, which suspends and limits entry into the United States as immigrants individuals who either will not be covered by approved health insurance within 30 days of their entry into the United States, or who do not possess the financial resources to pay for reasonably foreseeable medical costs.
> No waiver is available for the grounds of ineligibility.  While you are ineligible for a visa at this time, you may overcome this ineligibility in the future by providing additional evidence that you will be covered by approved health insurance or that you possess the financial resources to pay for reasonably foreseeable medical costs.

15. (SBU) The HC1 refusal is distinct from the public charge ground of ineligibility under INA 212(a)(4)(A) (4A) and thus, consular officers will make this determination irrespective of whether or not an applicant is found ineligible under public charge.  Should a consular officer find an applicant is subject to P.P. 9945 and ineligible under public charge, they must refuse the applicant under both 4A and HC1.

16. (SBU)P.P. 9945 provides an exception for "any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis." Consular officers should only consider the following circumstances as possibly satisfying the national interest exception:

- Foreign Relations:  Refusal of the immigrant visa application would become a bilateral irritant or be raised by a foreign government with a high-ranking U.S. government official;

- National Security:  Admission to the United States would advance a U.S. national security interest;

- Significant Public Interest:  Admission to the United States would advance a significant U.S. public interest; or

- Urgent Humanitarian or Medical Reasons:  Admission to the United States is

warranted due to urgent humanitarian or medical reasons.

If a consular officer determines that an applicant is ineligible under this P.P. 9945 but believes the applicant's entry may be in the national interest under this criteria, then the consular officer should refuse the applicant under INA 221(g) and submit an email to their VO/F post liaison officer to request the Department's approval of an exemption.

17.  (U) To inform applicants of this new requirement, CA will update the travel.state.gov website, and the National Visa Center and Kentucky Consular Center will also send a message to all immigrant visa and diversity visa applicants.  However, posts should also engage in a concerted effort to inform applicants so that they are adequately prepared to address this issue during the visa interview.

18.  (SBU) Posts may not begin implementing P.P.9945 until we update the FAM after receiving approval from the Office of Management and Budget (OMB), under the Paperwork Reduction Act, of our proposed information collection concerning health insurance-related information.  A notice of the Department's proposed information collection will be published in the *Federal Register* on October 30, 2019.  We expect OMB approval on November 1 and VO will send an e-mail to posts as soon as we learn of OMB's decision.  If OMB approves prior to November 3, 2019, as expected, then posts must begin implementation of P.P. 9945 on November 3, 2019, in accordance with the terms of P.P. 9945.  If OMB does not approve the information collection prior to November 3, 2019, posts should continue to await further instruction before implementing P.P 9945.

19.  (SBU) 9 FAM 302.14-11 will be updated to reflect the new guidelines.  Post may address questions to the IV portfolio holder in CA/VO/F.

SENSITIVE BUT UNCLASSIFIED

| Signature: | Pompeo |
|---|---|

| Drafted By: | CA/VO/F:Lee, Edith |
|---|---|
| Cleared By: | CA:Brownlee, Ian G |
| | CA:Stoddard, Kaitlin V |
| | CA:Whiteley, John W |
| | CA/VO:Ramotowski, Edward J |
| | CA/VO/F:Craig, Sara M |
| | CA/VO/F/IE:Marwaha, Brianne C |
| | CA/VO/F/IE:Tyson, Amanda J |
| | CA/VO/L:Herndon, Megan |
| | CA/VO/L:Newman, David S |
| | CA/VO/L/A:McNeil, Matthew C |
| | CA/VO/L/A:Fifield, Joel A |
| | L/CA:Scimeca, Natalya K |
| | CA/P:Henderson, Lindsay N |
| | CA/P:Hillman, Ian T |
| | CA/P:Landry, Kelly C |

CA/P:Kierski, David A
CA:Benning, Douglass R
CA/EX:Glazeroff, Josh
CA/EX/PAS:Evans, Michael P
S/P:Weiland, Cart
P:Ruppel, Emily A
D:Daucher, Kevin G
WHA/EX:Hamilton, Conard C
EUR-IO/EX/PMO:Kilburg, Keely Z
EAP/EX:LaMontagne, David M
NEA-SCA/EX:Moore, Anne Marie
AF/EX:Dille, Benjamin B
GPA:Chulick, Nicole A
R:Spellberg, Jason P
WHA/PPC:Slusher, Rhonda L
SES\YooJL

**Approved By:**      CA:Risch, Carl C
**Released By:**      CA_FO:Corby, Julie H
**XMT:**             BASRAH, AMCONSUL; CARACAS, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; ALEXANDRIA, AMCONSUL

**Dissemination Rule:**    Archive Copy

**UNCLASSIFIED**
~~SBU~~


# Presidential Documents

Proclamation 9945 of October 4, 2019

## Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order To Protect the Availability of Healthcare Benefits for Americans

### By the President of the United States of America

### A Proclamation

Healthcare providers and taxpayers bear substantial costs in paying for medical expenses incurred by people who lack health insurance or the ability to pay for their healthcare. Hospitals and other providers often administer care to the uninsured without any hope of receiving reimbursement from them. The costs associated with this care are passed on to the American people in the form of higher taxes, higher premiums, and higher fees for medical services. In total, uncompensated care costs—the overall measure of unreimbursed services that hospitals give their patients—have exceeded $35 billion in each of the last 10 years. These costs amount to approximately $7 million on average for each hospital in the United States, and can drive hospitals into insolvency. Beyond uncompensated care costs, the uninsured strain Federal and State government budgets through their reliance on publicly funded programs, which ultimately are financed by taxpayers.

Beyond imposing higher costs on hospitals and other healthcare infrastructure, uninsured individuals often use emergency rooms to seek remedies for a variety of non-emergency conditions, causing overcrowding and delays for those who truly need emergency services. This non-emergency usage places a large burden on taxpayers, who reimburse hospitals for a portion of their uncompensated emergency care costs.

While our healthcare system grapples with the challenges caused by uncompensated care, the United States Government is making the problem worse by admitting thousands of aliens who have not demonstrated any ability to pay for their healthcare costs. Notably, data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance. Immigrants who enter this country should not further saddle our healthcare system, and subsequently American taxpayers, with higher costs.

The United States has a long history of welcoming immigrants who come lawfully in search of brighter futures. We must continue that tradition while also addressing the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care. Continuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

Section 1. *Suspension and Limitation on Entry.* (a) The entry into the United States as immigrants of aliens who will financially burden the United States healthcare system is hereby suspended and limited subject to section 2 of this proclamation. An alien will financially burden the United States healthcare system unless the alien will be covered by approved health insurance, as defined in subsection (b) of this section, within 30 days of the alien's entry into the United States, or unless the alien possesses the financial resources to pay for reasonably foreseeable medical costs.

(b) Approved health insurance means coverage under any of the following plans or programs:

(i) an employer-sponsored plan, including a retiree plan, association health plan, and coverage provided by the Consolidated Omnibus Budget Reconciliation Act of 1985;

(ii) an unsubsidized health plan offered in the individual market within a State;

(iii) a short-term limited duration health policy effective for a minimum of 364 days—or until the beginning of planned, extended travel outside the United States;

(iv) a catastrophic plan;

(v) a family member's plan;

(vi) a medical plan under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;

(vii) a visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days—or until the beginning of planned, extended travel outside the United States;

(viii) a medical plan under the Medicare program; or

(ix) any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee.

(c) For persons over the age of 18, approved health insurance does not include coverage under the Medicaid program.

Sec. 2. *Scope of Suspension and Limitation on Entry.* (a) Section 1 of this proclamation shall apply only to aliens seeking to enter the United States pursuant to an immigrant visa.

(b) Section 1 of this proclamation shall not apply to:

(i) any alien holding a valid immigrant visa issued before the effective date of this proclamation;

(ii) any alien seeking to enter the United States pursuant to a Special Immigrant Visa, in either the SI or SQ classification, who is also a national of Afghanistan or Iraq, or his or her spouse and children, if any;

(iii) any alien who is the child of a United States citizen or who is seeking to enter the United States pursuant to an IR–2, IR–3, IR–4, IH–3, or IH–4 visa;

(iv) any alien seeking to enter the United States pursuant to an IR–5 visa, provided that the alien or the alien's sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system;

(v) any alien seeking to enter the United States pursuant to a SB–1 visa;

(vi) any alien under the age of 18, except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation;

(vii) any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee; or

(viii) any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis.

(c) Consistent with subsection (a) of this section, this proclamation does not affect the entry of aliens entering the United States through means other than immigrant visas, including lawful permanent residents. Further, nothing in this proclamation shall be construed to affect any individual's eligibility for asylum, refugee status, withholding of removal, or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, consistent with the laws and regulations of the United States.

**Sec. 3**. *Implementation and Enforcement.* (a) An alien subject to this proclamation must establish that he or she meets its requirements, to the satisfaction of a consular officer, before the adjudication and issuance of an immigrant visa. The Secretary of State may establish standards and procedures governing such determinations.

(b) The review required by subsection (a) of this section is separate and independent from the review and determination required by other statutes, regulations, or proclamations in determining the admissibility of an alien.

(c) An alien who circumvents the application of this proclamation through fraud, willful misrepresentation of a material fact, or illegal entry shall be a priority for removal by the Department of Homeland Security.

**Sec. 4**. *Reports on the Financial Burdens Imposed by Immigrants on the Healthcare System.* (a) The Secretary of State, in consultation with the Secretary of Health and Human Services, the Secretary of Homeland Security, and the heads of other appropriate agencies, shall submit to the President a report regarding:

(i) the continued necessity of and any adjustments that may be warranted to the suspension and limitation on entry in section 1 of this proclamation; and

(ii) other measures that may be warranted to protect the integrity of the United States healthcare system.

(b) The report required by subsection (a) of this section shall be submitted within 180 days of the effective date of this proclamation, with subsequent reports submitted annually thereafter throughout the effective duration of the suspension and limitation on entry set forth in section 1 of this proclamation. If the Secretary of State, in consultation with the heads of other appropriate executive departments and agencies, determines that circumstances no longer warrant the continued effectiveness of the suspension or limitation on entry set forth in section 1 of this proclamation or that circumstances warrant additional measures, the Secretary shall immediately so advise the President.

(c) The Secretary of State and Secretary of Health and Human Services shall coordinate any policy recommendations associated with the reports described in subsection (a) of this section.

**Sec. 5**. *Severability*. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of the proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 6**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) United States Government obligations under applicable international agreements;

(ii) the authority granted by law to an executive department or agency, or the head thereof; or

(iii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 7**. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on November 3, 2019.

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of October, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-fourth.

[FR Doc. 2019–22225
Filed 10–8–19; 8:45 am]
Billing code 3295–F0–P



**United States Department of State**

*Washington, D.C. 20520*

October 25, 2019

Oliver Potts, Director
Office of the Federal Register (F)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Director Potts:

Pursuant to 5 CFR § 1320.13, the Department of State requests OMB emergency approval to begin a new collection of information for DS-5541, Immigrant Health Insurance Coverage.

*The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* ("PP 9945") was signed on October 4, 2019. Proclamation No. 9945, 84 FR 53991 (Oct. 4, 2019). PP 9945 requires immigrant visa applicants to establish, to the satisfaction of a consular officer, that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs, or if an exception in Section 2(b) applies. Section 3 of the Proclamation authorizes the Secretary of State to establish standards and procedures for governing such determinations.

Therefore, the Department of State requests emergency OMB review and approval for this collection by November 1, 2019, to implement PP9945 when it goes into effect on November 3, 2019.

Sincerely,

Edward J. Ramotowski,
Deputy Assistant Secretary

# JUSTIFICATION FOR EMERGENCY REVIEW
### *Immigrant Health Insurance Coverage*

*The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* ("PP 9945") was signed on October 4, 2019.  Proclamation No. 9945, 84 FR 53991 (Oct. 4, 2019).  PP 9945 requires immigrant visa applicants to establish, to the satisfaction of a consular officer, that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs, or if an exception in Section 2(b) applies.  Section 3 of the Proclamation authorizes the Secretary of State to establish standards and procedures for governing such determinations.  Emergency review of this information collection is necessary for the Department to implement PP 9945 when it goes into effect on November 3, 2019.  The Department cannot reasonably comply with the normal procedures by the implementation deadline of November 3, 2019.

The Department has therefore determined that:

1.  This collection is needed prior to the expiration of time periods normally associated with a routine submission for review under the provisions of the Paperwork Reduction Act;

2.  This collection is essential to the mission of the Department of State; and

3.  The use of normal clearance procedures would prevent the Department from complying with PP 9945 when it takes effect on November 3, 2019.

Therefore, the Department of State requests emergency OMB review and approval for this collection by October 25, 2019.

# LEGAL AUTHORITIES
# PAPERWORK REDUCTION ACT SUBMISSION
Immigrant Health Insurance Coverage
OMB Number 1405-XXXX

1. <u>INA section 212(f), 8 U.S.C. § 1182(f)</u>
2. <u>INA section 215(a), 8 U.S.C. § 1185(a)</u>
3. <u>INA section 221(a), 8 U.S.C. § 1201(a)</u>
4. <u>INA section 222(a), 8 U.S.C. § 1202(a)</u>
5. <u>INA section 203, 8 U.S.C. § 1153</u>
6. <u>22 CFR 42.63</u>
7. <u>Proclamation No. 9945, 84 FR 53991 (Oct. 4, 2019)</u>

SBU - LEGAL

# SUPPORTING STATEMENT FOR
# PAPERWORK REDUCTION ACT SUBMISSION
# Immigrant Health Insurance Coverage
# OMB Number 1405-XXXX

## A.    JUSTIFICATION

1.  *Why is this collection necessary and what are the legal statutes that allow this?*

Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(f) and § 1185(a), and 3 U.S.C. § 301, *The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* ("PP 9945") requires immigrant visa applicants to establish, to the satisfaction of a consular officer, that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs.  Proclamation No. 9945, 84 FR 53991 (Oct. 4, 2019).  Section 3 of the Proclamation authorizes the Secretary of State to establish standards and procedures for governing such determinations. *Id.*  Emergency review and approval of this information collection is necessary for the Department to implement PP 9945 when it goes into effect on November 3, 2019.  PP 9945 was signed on October 4, 2019, and the Department cannot comply with the normal procedures, if it is to implement the Presidential Proclamation on the date it takes effect.

2.  *What business purpose is the information gathered going to be used for?*

Consular officers will use the information provided to determine whether an immigrant visa applicant will be covered by an approved health insurance plan within 30 days of entry to the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs, as required by Presidential Proclamation 9945.

3.  *Is this collection able to be completed electronically (e.g. through a website or application)?*

No, consular officers will ask applicants questions regarding health insurance coverage in the United States verbally at the time of interview.

4.  *Does this collection duplicate any other collection of information?*

This collection is not duplicative of another existing collection.  However, the Department is seeking approval of a separate proposed information collection (DS 5540, Public Charge Questionnaire) through standard procedures that will incorporate this question into a form asking for other financial information from applicants.

5.  *Describe any impacts on small business*

This information collection does not directly impact small businesses or other small entities.

6.  *What are consequences if this collection is not done?*

This information collection is essential for determining whether certain applicants will be covered by an approved health insurance plan within 30 days of entry to the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs.

7. ***Are there any special collection circumstances (e.g. responding in less than 30 days, excessive record retention, or requiring submission of proprietary trade secrets)?***
Other than the November 3, 2019, effective date of Presidential Proclamation 9945, no special circumstances exist.

8. ***Document publication (or intent to publish) a request for public comments in the Federal Register***

The Department of State (Visa Office, Bureau of Consular Affairs) will solicit public comments on this collection via a Public Notice in the Federal Register.

9. ***Are any payments or gifts given to the respondents?***

No payment or gift is provided to respondents.

10. ***Describe assurances of privacy/confidentiality***

In accordance with INA section 222(f), 8 U.S.C. § 1202(f), information obtained from applicants in the nonimmigrant or immigrant visa application process is considered confidential and is to be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States, except that, in the discretion of the Secretary of State, it may be made available to a court or provided to a foreign government if the relevant requirements stated in INA section 222(f), 8 U.S.C. § 1202(f), are satisfied.

11. ***Are any questions of a sensitive nature asked?***

The questions in the collection are designed to solicit the information necessary to determine whether an applicant will be covered by an approved health insurance plan within 30 days of entry to the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs.

The proposed questions are similar in nature to questions currently on the immigrant visa application forms and thus do not, for the most part, present new or unusual sensitivities. The Department recognizes that medical conditions can be inherently sensitive information, however, this information collection does not solicit any additional questions about medical conditions.  The Department has separate medical forms, Forms DS-3030, DS-2054, DS-3025, and DS-3026, which specifically collect information on medical conditions.  These questions simply request information necessary to determine whether the applicant will be covered by an approved health insurance plan within 30 days of entry to the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs.

12. ***Describe the hour time burden and the hour cost burden on the respondent needed to complete this collection***

3

The Department estimates that 450,500 individuals per year will be asked to answer these questions. The average burden per response is estimated to be 10 minutes.

Therefore, the Department estimates that the annual hour burden to visa applicants posed by the additional healthcare insurance coverage question is 75,083 hours (450,500 applicants x 10 minutes). The weighted wage hour cost burden for this collection is $1,875,573 based on the calculation of $24.98[1] (average hourly wage) x 75,083 hours = $1,875,573.

13. ***Describe any monetary burden on the respondent needed to complete this collection***

There are no anticipated monetary burdens associated with the additional questions posed as part of this information collection. While Presidential Proclamation 9945 may add monetary burdens to certain immigrant applicants by requiring health insurance coverage, this information collection is not imposing a burden and is only necessary to implement PP 9945.

14. ***Describe the cost to the Federal Government to complete this collection***

There are no additional costs to the federal government as a result of the additional questions.

15. ***Explain any changes/adjustments to this collection since the previous submission***

This is a new information collection.

16. ***Specify if the data gathered by this collection will be published***

The information gathered by this collection will not be published.

17. ***Explain the reasons for seeking approval to not display the OMB expiration date***

The OMB expiration date cannot be displayed because the Department will not be using a form for this information collection. Rather, consular officers will verbally ask applicants at the time of the visa interview. However, the Department is seeking approval of a separate proposed information collection (DS-5540, Public Charge Questionnaire) through standard procedures that will incorporate this question into a form asking for other financial information from applicants.

18. ***Explain any exceptions to the OMB certification statement***

The Department is not requesting any exceptions to the certification statement requirements.

**B.    COLLECTION OF INFORMATION EMPLOYING STATISTICAL METHODS**

This collection does not employ statistical methods.

---

[1] Source: Data from the U.S. Bureau of Labor Statistics' May 2018 National Occupational Employment and Wage Estimates for all occupations (https://www.bls.gov/oes/current/oes_nat.htm#00-0000). Retrieved September 23, 2019.

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date      11/01/2019

Department of State

Administration of Foreign Affairs

FOR CERTIFYING OFFICIAL:      Stuart McGuigan

FOR CLEARANCE OFFICER:      Zachary Parker

In accordance with the Paperwork Reduction Act, OMB has taken action on your request received

10/22/2019

ACTION REQUESTED:    New collection (Request for a new OMB Control Number)

TYPE OF REVIEW REQUESTED:      Emergency

ICR REFERENCE NUMBER:      201910-1405-001

AGENCY ICR TRACKING NUMBER:

TITLE:      Immigrant Health Insurance Coverage

LIST OF INFORMATION COLLECTIONS:  See next page

OMB ACTION:  Approved with change

OMB CONTROL NUMBER:      1405-0231

The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).

EXPIRATION DATE:  05/31/2020                    DISCONTINUE DATE:

| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 0 | 0 | 0 |
| New | 450,500 | 75,083 | 0 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | 450,500 | 75,083 | 0 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:

OMB Authorizing Official:      Dominic J. Mancini

Deputy and Acting Administrator,

Office Of Information And Regulatory Affairs

| List of ICs | | | |
|---|---|---|---|
| IC Title | Form No. | Form Name | CFR Citation |
| Immigrant Health Insurance Coverage | DS-5541 | Immigrant Healthcare Questionnaire | |



*Federal Register* / Vol. 84, No. 210 / Wednesday, October 30, 2019 / Notices

**58199**

address listed above or other locally announced locations.

The following areas have been determined to be adversely affected by the disaster:

*Primary Counties:* Brevard, Duval, Flagler, Indian River, Martin, Nassau, Osceola, Palm Beach, Putnam, Saint Johns, Saint Lucie, Seminole.

The Interest Rates are:

|  | Percent |
|---|---|
| *For Physical Damage:* | |
| Non-Profit Organizations with Credit Available Elsewhere ... | 2.750 |
| Non-Profit Organizations without Credit Available Elsewhere ..................................... | 2.750 |
| *For Economic Injury:* | |
| Non-Profit Organizations without Credit Available Elsewhere ..................................... | 2.750 |

The number assigned to this disaster for physical damage is 161628 and for economic injury is 161630.

(Catalog of Federal Domestic Assistance Number 59008)

**James Rivera,**
*Associate Administrator for Disaster Assistance.*

[FR Doc. 2019–23663 Filed 10–29–19; 8:45 am]

**BILLING CODE 8026–03–P**

## DEPARTMENT OF STATE

[Public Notice: 10934]

### Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage

**ACTION:** Notice of request for emergency review and approval by OMB and public comment.

**SUMMARY:** The Department of State ("Department") has submitted the information collection request described below to the Office of Management and Budget ("OMB") for review and approval in accordance with the emergency review procedures of the Paperwork Reduction Act of 1995. The purpose of this notice is to allow for public comment from all interested individuals and organizations. Emergency review and approval of this collection has been requested from OMB by November 1, 2019. If granted, the approval is only valid for 180 days. The Department is separately submitting a 3 year approval through OMB's normal PRA clearance process.

**ADDRESSES:** Direct any comments on this request to both the Department of

State Desk Officer in the Office of Information and Regulatory Affairs at the Office of Management and Budget (OMB) and to the Department of State's Bureau of Consular Affairs, Office of Visa Services.

All public comments must be received by October 31, 2019.

You may submit comments to OMB by the following methods:

• *Email:* oira_submission@ omb.eop.gov. You must include the DS form number, information collection title, and OMB control number in the subject line of your message.

• *Fax:* 202–395–5806. Attention: Desk Officer for Department of State. You may submit comments to the Bureau of Consular Affairs, Visa Office by the following methods:

• *Web:* Persons with access to the internet may comment on this notice by going to *www.Regulations.gov.* You can search for the document by entering "Docket Number: DOS–2019–0039" in the Search field. Then click the "Comment Now" button and complete the comment form.

• *Email: PRA_BurdenComments@ state.gov.* You must include *Emergency Submission Comment on "information collection title"* in the subject line of your message.

You must include the DS form number (if applicable), information collection title, and the OMB control number in any correspondence.

**FOR FURTHER INFORMATION CONTACT:** Direct requests for additional information regarding the collection listed in this notice, including requests for copies of the proposed collection instrument and supporting documents to Megan Herndon, who may be reached at (202) 485–7586 or at *PRA_ BurdenComments@state.gov.*

**SUPPLEMENTARY INFORMATION:**
• *Title of Information Collection:* Immigrant Health Insurance Coverage.
• *OMB Control Number:* None.
• *Type of Request:* Emergency Review.
• *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO).
• *Form Number:* DS–5541 (oral information collection).
• *Respondents:* Certain immigrant visa applicants.
• *Estimated Number of Respondents:* 450,500.
• *Estimated Number of Responses:* 450,500.
• *Average Time Per Response:* 10 minutes.
• *Total Estimated Burden Time:* 75,083 hours.
• *Frequency:* Once per respondent's application.

• *Obligation to Respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

• Evaluate the accuracy of our estimate of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review

### Abstract of Proposed Collection

*The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* ("PP 9945") requires immigrant visa applicants to establish, to the satisfaction of a consular officer, that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs. Proclamation No. 9945, 84 FR 53991 (Oct. 4, 2019). Section 3 of the Proclamation authorizes the Secretary of State to establish standards and procedures for governing such determinations. *Id.* PP 9945 was signed on October 4, 2019, and emergency review of this information collection is necessary for the Department to prepare consular officers to implement PP 9945 when it goes into effect on November 3, 2019.

### Methodology

Consular officers will verbally ask immigrant visa applicants covered by PP 9945 whether they will be covered by health insurance in the United States within 30 days of entry to the United States and, if so, for details relating to such insurance. Proclamation No. 9945, 84 FR 53991 (Oct. 4, 2019). PP 9945 only applies to applicants seeking to enter the United States pursuant to an immigrant visa. If applicants answer affirmatively, consular officers will ask for applicants to identify the specific health insurance plan, the date coverage will begin, and such other information

related to the insurance plan as the consular officer deems necessary. PP 9945 does not suspend or limit the entry of applicants if they do not have coverage, but possess financial resources to pay for reasonably foreseeable medical expenses. Reasonably foreseeable medical expenses are those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication.

PP 9945 does not apply to holders of valid immigrant visas issued before the effective date of the proclamation; aliens seeking to enter the United states pursuant to a Special Immigrant Visa, in either the SI or SQ classification; any alien who is seeking to enter the United States pursuant to an IR–2, CR–2, IR–3, IR–4, IH–3, or IH–4 visa; aliens seeking to enter pursuant to an IR–5 visa, provided the alien or alien's sponsor demonstrates to the satisfaction of consular officers that they will not impose a substantial burden on the United States healthcare system; aliens seeking to enter the United States pursuant to a SB–1 visa; any alien under the age of 18, except for any alien accompanying a parent who is also immigrating to the United States and subject to PP 9945; any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation from the Attorney General or his designee; or aliens whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis.

**Edward J. Ramotowski,**
*Deputy Assistant Secretary, Visa Services, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2019–23639 Filed 10–29–19; 8:45 am]
**BILLING CODE 4710–06–P**

# DEPARTMENT OF TRANSPORTATION

## Federal Railroad Administration

[Docket Number FRA–2019–0087]

## Petition for Waiver of Compliance

Under part 211 of title 49 of the Code of Federal Regulations (CFR), this document provides the public notice that on October 16, 2019, the Northeast Illinois Regional Commuter Railroad Corporation (Metra) petitioned the Federal Railroad Administration (FRA) for a waiver of compliance from certain provisions of the Federal railroad safety regulations contained at 49 CFR 236.566, *Locomotive of each train*

*operating in train stop, train control or cab signal territory; equipped.* FRA assigned the petition Docket Number FRA–2019–0087.

Specifically, Metra requests to operate positive train control (PTC) equipped controlling locomotives with the automatic cab signals (ACS) cut-out. The relief is to be within a PTC revenue service demonstration (RSD) area on the Rock Island District, on which a PTC system (Interoperable Electronic Train Management System) is installed and operative; the PTC system is successfully initialized; and a locomotive engineer trained and qualified in the operation of PTC is present for the operation of the train with the ACS cut-out.

Locations of the requested relief on the Rock Island District are:
• Track No. 1, Westward—MP 14.5 to MP 39.9; Eastward—MP 39.9 to MP 14.5
• Track No. 2, Westward—MP 14.5 to MP 39.9; Eastward—MP 39.9 to MP 14.5
• Main Track, MP 39.9 to 40.5.

If the PTC system fails and/or is cut-out en route, the train crew will cut-in the ACS onboard system, perform a departure test, and if successful, continue the trip through the project limits under ACS operation. If the ACS onboard system cut-in and/or departure test are not completed successfully, the train will continue to operate under the provisions of § 236.567, *Restrictions imposed when device fails and/or is cut out en route.*

Metra notes that the ACS and PTC systems are not integrated on the locomotive, and their concurrent use would be potentially confusing and distracting to the train crew due to differences in the content of their displays, audible and visual alerts provided, and required acknowledgement protocols.

A copy of the petition, as well as any written communications concerning the petition, is available for review online at *www.regulations.gov* and in person at the U.S. Department of Transportation's Docket Operations Facility, 1200 New Jersey Ave. SE, W12–140, Washington, DC 20590. The Docket Operations Facility is open from 9 a.m. to 5 p.m., Monday through Friday, except Federal Holidays.

Interested parties are invited to participate in these proceedings by submitting written views, data, or comments. FRA does not anticipate scheduling a public hearing in connection with these proceedings since the facts do not appear to warrant a hearing. If any interested parties desire

an opportunity for oral comment and a public hearing, they should notify FRA, in writing, before the end of the comment period and specify the basis for their request.

All communications concerning these proceedings should identify the appropriate docket number and may be submitted by any of the following methods:
• *Website: http:// www.regulations.gov.* Follow the online instructions for submitting comments.
• *Fax:* 202–493–2251.
• *Mail:* Docket Operations Facility, U.S. Department of Transportation, 1200 New Jersey Ave. SE, W12–140, Washington, DC 20590.
• *Hand Delivery:* 1200 New Jersey Ave. SE, Room W12–140, Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal Holidays.

Communications received by December 16, 2019 will be considered by FRA before final action is taken. Comments received after that date will be considered if practicable.

Anyone may search the electronic form of any written communications and comments received into any of our dockets by the name of the individual submitting the comment (or signing the document, if submitted on behalf of an association, business, labor union, etc.). Under 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its processes. DOT posts these comments, without edit, including any personal information the commenter provides, to *www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *www.transportation.gov/ privacy.* See also *http:// www.regulations.gov/#!privacyNotice* for the privacy notice of *regulations.gov.*

Issued in Washington, DC.

**John Karl Alexy,**
*Associate Administrator for Railroad Safety, Chief Safety Officer.*

[FR Doc. 2019–23669 Filed 10–29–19; 8:45 am]
**BILLING CODE 4910–06–P**

# DEPARTMENT OF TRANSPORTATION

## Federal Railroad Administration

[Docket No. FRA–2019–0004–N–19]

## Proposed Agency Information Collection Activities; Comment Request

**AGENCY:** Federal Railroad Administration (FRA), U.S. Department of Transportation (DOT).

**Response to public comments received in response to the notice of request for emergency OMB review and approval of the DS-5541, Immigrant Health Insurance Coverage**

The Department of State ("Department") published a notice of request for emergency OMB review and approval in the *Federal Register* on October 30, 2019 (84 FR 58199), and solicited public comments on the DS-5541, Immigrant Health Insurance Coverage. This collection, which will authorize consular officers to ask certain immigrant visa applicants about their intended health insurance coverage in the United States, is necessary to implement Presidential Proclamation 9945, which requires immigrant visa applicants to establish, to the satisfaction of a consular officer, that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs, or if an exception applies. The comment period closed on October 31, 2019 at 11:59 PM, and the Department has received over 300 comments.

The Department has determined that the majority of comments fall within one of the categories below:

- At least 11 comments recommend providing a longer time period for public comment. To these comments, the Department generally responds that the time available to accept public comments was constrained by the effective date of the Proclamation;
- At least 29 comments expressed concern about the acceptance of short-term health insurance plans. To these comments, the Department generally responds that the categories of approved health plans were decided by the President and, consequently, the comments are nonresponsive, as they fall outside the scope of issues relevant to this information collection;
- At least 3 comments identified specific criteria that should be considered in the collection's time and cost burden estimates; and
- Many comments stated opposition to the requirement in Presidential Proclamation 9945 that immigrant visa applicants obtain health insurance coverage. To these comments, the Department generally responds that the requirement relating to health insurance were decided by the President and, consequently, the comments are nonresponsive, as they the comments fall outside the scope of issues relevant to this information collection.

The Department cannot respond to all comments prior to the implementation deadline of Presidential Proclamation 9945 on November 3, 2019. The Department is, however, currently reviewing all submissions to identify responsive comments, and will respond to those comments as appropriate.

**CA Press Guidance**
**October 4, 2019**

## VISAS: Presidential Proclamation on Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System

- On October 4, 2019, the President issued a Presidential Proclamation (P.P.) titled "Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, In Order to Protect the Availability of Healthcare Benefits for Americans."

- Beginning November 3, 2019, in order to demonstrate qualification for entry, immigrant visa applicants — other than those covered by certain exceptions — must demonstrate to a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States, or that they possess the financial resources to pay for reasonably foreseeable medical costs. Inability to do so will result in the denial of the visa application.

- Visa applicants subject to this proclamation must establish that they meet its requirements, to the satisfaction of a consular officer, prior to and in connection with the adjudication and issuance of an immigrant visa.

## Q&A

**Q.  What are the exceptions?**

A.  The P.P. includes a number of exceptions.  The limitation on entry does not apply to:

- Individuals with a valid immigrant visa issued before November 3, 2019

- Iraqi and Afghan special immigrant visas (SI and SQ visas)

- Adopted, biological, and step-children of U.S. citizens (IR2, IR3, IR4, IH3, and IH4)

- Returning Resident SB-1 applicants

- Aliens entering the United States without an immigrant visa, including lawful permanent residents, refugees, and asylees

- Any alien seeking to enter the United States pursuant to an IR-5 visa, provided that the alien or the alien's sponsor demonstrates to the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system

- Any alien under the age of 18 except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation

- Any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee

- Any alien whose entry would  be in the national interest,  as determined by the Secretary of State or his designee on a case-by-case basis

**Q.  What is approved health insurance?**

A.  Approved health insurance includes:

- Employer-sponsored health plans, including retiree plans

- Unsubsidized health plans offered in the individual market within a state

- Short-term, limited duration health plans effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Catastrophic plans

- Coverage by a family member's health plan

- U.S. military health plans, including TRICARE

- Visitor health insurance plans with adequate medical coverage for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Medical plans under the Medicare program

- Any other health plan with adequate coverage as determined by the Secretary of Health and Human Services

For further information and requirements, immigrant visa applicants should review the information provided on travel.state.gov.

**Q.  Does Medicaid or the Children's Health Insurance Program (CHIP) count as approved health insurance?**

A.  Approved health insurance does not include coverage under the Medicaid program, except for health insurance under subchapter XXI of chapter 7 of title 42, United States Code.

**Q.  What is the effective date of the change?**

A.  The Proclamation is effective 30 days from its signing on October 4 2019.

**Q. What would be considered sufficient "financial resources to pay for reasonably forseeable medical costs?"**

A.  Affected applicants must demonstrate that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.  All applications are adjudicated on a case-by-case basis.

**Q.  Who makes the determination of whether an immigrant is qualified or not, and what standards do they use?**

A.  A consular officer will determine whether the applicant is eligible for an immigrant visa based on U.S. law and available information when the applicant applies for a U.S. visa.

**Q.  How are applicants expected to demonstrate they meet this requirement?**

A.  Applicants should be able to demonstrate to the satisfaction of a consular officer that they possess the financial resources to pay for reasonably foreseeable medical costs or, have a plan and ability to obtain health insurance within 30 days of arrival.   Officers will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation if needed.

**Q.  How exactly is an applicant expected to secure health insurance prior to traveling to the U.S.?**

A.  Applicants are not required to secure health insurance prior to traveling to the United States, but must demonstrate to the satisfaction of a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.

**Q.  Why are new immigrants required to purchase health insurance when existing U.S. citizens are exempt from this mandate?**

A.  As the Proclamation notes, admitting aliens as immigrants into this country who are unable to pay for their own healthcare costs puts the burden on American taxpayers and our health infrastructure.  The President has made the determination that immigrants' entry into this country should not burden taxpayers and the healthcare system.

**Q.  Isn't this just another way to restrict family-based immigration, on top of recent changes to Public Charge regulations?**

A.  The Proclamation notes "The United States has a long history of welcoming immigrants who come lawfully in search of the American Dream.  This proclamation continues that tradition while addressing the challenges facing our healthcare infrastructure.  It recognizes that it is in the interests of the United States to protect our healthcare system from the burdens of uncompensated care and that the entry into the United States of certain immigrants who lack health insurance or the ability to pay for their healthcare would be detrimental to these interests."

## <u>Background</u>

Link to/text of P.P. goes here.

Drafted by: ▓▓▓▓▓▓▓▓ 09-11-2019, ▓▓▓▓

Clearances:

| | |
|---|---|
| VO/F: ▓▓▓ | OK |
| VO/L: ▓▓▓▓ | OK |
| CA/P: ▓▓▓▓▓▓ | OK |
| P: ▓▓▓ | OK |
| D: ▓▓▓▓ | OK |
| S/P: ▓▓▓▓ | OK |
| M: ▓▓▓▓ | OK |
| L: ▓▓▓ | OK |
| WH: ▓▓▓▓ | OK |

**Talking Points for Congressional Call**
**October 4, 2019**

### VISAS: Presidential Proclamation on Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System

- Today, the President issued a Presidential Proclamation (P.P.) titled "Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, In Order to Protect the Availability of Healthcare Benefits for Americans."

- When the proclamation goes into effect in 30 days (November 3), U.S. immigrant visa applicants will be required to demonstrate to the satisfaction of a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States, *or* that they possess the financial resources to pay for reasonably foreseeable medical costs. Inability to satisfy the stated requirements will result in the denial of the visa application. There will be limited exceptions to the proclamation. (FULL LIST OF EXCEPTIONS FOLLOWS BELOW IN QUESTION 1).

- The proclamation will apply to U.S. immigrant visas only. Nonimmigrant visas will not be impacted.

## Q&A

**Q1. What are the exceptions?**

A. The P.P. includes a number of exceptions. The limitation on entry does not apply to:

- Individuals with a valid immigrant visa issued before November 3, 2019

- Iraqi and Afghan special immigrant visas (SI and SQ visas)

- Adopted, biological, and step-children of U.S. citizens (IR2, IR3, IR4, IH3, and IH4)

- Returning Resident SB-1 applicants

- Aliens entering the United States without an immigrant visa, including lawful permanent residents, refugees, and asylees

- Any alien seeking to enter the United States pursuant to an IR-5 visa, provided that the alien or the alien's sponsor demonstrates to the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system

- Any alien under the age of 18 except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation

- Any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee

- Any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis


**Q2.  What is approved health insurance?**

A.  The proclamation defined approved health insurance.  Approved health insurance includes:

- Employer-sponsored health plans, including retiree plans

- Unsubsidized health plans offered in the individual market within a state

- Short-term, limited duration health plans effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Catastrophic plans

- Coverage by a family member's health plan

- U.S. military health plans, including TRICARE

- Visitor health insurance plans with adequate medical coverage for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Medical plans under the Medicare program

- Any other health plan with adequate coverage as determined by the Secretary of Health and Human Services


**Q3.  Does Medicaid or the Children's Health Insurance Program (CHIP) count as approved health insurance?**

A.  Approved health insurance does not include coverage under the Medicaid program, except for health insurance under subchapter XXI of chapter 7 of title 42, United States Code (the Children's Health Insurance Program (CHIP)).


**Q3.  What is the effective date of the change?**

A.  The Proclamation is effective 30 days from its signing on October 4, 2019.

**Q4.  How much money does an immigrant need to have to be allowed into the U.S.?**

A.  An applicant does not need a set amount of money to qualify for an immigrant visa.  Rather, affected applicants must demonstrate that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.  All applications are adjudicated on a case-by-case basis.

**Q5.  Who makes the determination of whether an immigrant is qualified or not, and what standards do they use?**

A.  A consular officer will determine whether the applicant is eligible for an immigrant visa based on U.S. law and available information when the applicant applies for a U.S. visa.

**Q6.  How are applicants expected to demonstrate they meet this requirement?**

A.  Applicants should be able to demonstrate to the satisfaction of a consular officer that they possess the financial resources to pay for reasonably foreseeable medical costs or, have a plan and ability to obtain health insurance within 30 days of arrival.   Officers will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation if needed.  Applicants may choose to bring documentation of their approved health insurance, ability to obtain approved health insurance, or financial resources to the visa interview, although they are not required to do so.  Consular officers may request additional information or documentation if needed.

**Q7.  How exactly is an applicant expected to secure health insurance prior to traveling to the U.S.?**

A.  Applicants are not required to secure health insurance prior to traveling to the United States, but must demonstrate to the satisfaction of a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.

**Q8.  Why are new immigrants required to purchase health insurance when existing U.S. citizens are exempt from this mandate?**

A.  As the Proclamation notes, admitting aliens as immigrants into this country who are unable to pay for their own healthcare costs puts the burden on American taxpayers and our health

infrastructure.  The President has made the determination that immigrants' entry into this country should not burden taxpayers and the healthcare system.

**Q9.  Isn't this just another way to restrict family-based immigration, on top of recent changes to Public Charge regulations?**

A.  The Proclamation notes "The United States has a long history of welcoming immigrants who come lawfully in search of brighter futures.  We must continue that tradition while also addressing the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care.  Continuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests."

Drafted by: ▨▨▨▨

Clearances:
     VO/F: ▨▨▨       (ok)
     CA/VO: ERamotowski     (ok)
     CA/VO: ▨▨▨▨     (ok)

U.S. Department of State

OMB APPROVAL NO.1405-XXXX
EXPIRATION Date: XX/XX/20XX
ESTIMATED BURDEN: 10 MINUTES

# IMMIGRANT HEALTHCARE QUESTIONNAIRE

## PART 1 - INFORMATION ABOUT YOU

1. Your Current Legal Name (Do not provide a nickname)
   Family Name (Last Name) Given Name (First Name) Middle Name

## PART 2 - YOUR HEALTH

2. Will you be covered by health insurance in the United States within 30 days of your entry into the United States?

   ☐ Yes   ☐ No

3. If you answered "yes" to Question 2, identify the specific health insurance plan and date coverage will begin.

4. If you answered "no" to Question 2, how will you pay for healthcare for your existing medical conditions in the United States?

### Federal Agency Disclosure and Authorizations

PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 10 minutes per response, including time required for searching existing data sources, gathering the necessary documentation, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: PRA_BurdenComments@state.gov.

CONFIDENTIALITY STATEMENT

INA Section 222(f) provides that visa issuance and refusal records shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States. Visa records may be disclosed in certain situations, as described in INA Section 222(f), including disclosure to a court as needed in a case pending before the court.

DS-5541
10-2019

UNCLASSIFIED

**From:**  Garcia, Gabriel C
**Subject:**  Message to Posts: Health Insurance Proclamation
**Date:**  Monday, October 7, 2019 11:25:26 AM

Dear Colleagues,

On October 4, 2019, the President issued a Presidential Proclamation (P.P.) titled "Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, In Order to Protect the Availability of Healthcare Benefits for Americans." This proclamation is effective November 3, 2019 at 12:01 Eastern Daylight Time. In order to demonstrate qualification for entry, immigrant and diversity visa applicants — other than those covered by certain exceptions — must demonstrate to a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States, or that they possess the financial resources to pay for reasonably foreseeable medical costs. Visa applicants subject to this proclamation must establish that they meet its requirements, to the satisfaction of a consular officer, at the time of visa adjudication. The Visa Office will provide more in depth guidance to the field via ALDAC and in FAM updates within the next two weeks.

Many thanks,

The Visa Office

SENSITIVE BUT UNCLASSIFIED

**From:**  McMillian, James J
**Subject:**  MESSAGE TO POSTS: PP 9945 Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System
**Date:**  Friday, November 1, 2019 6:07:23 PM

Dear Colleagues,

Presidential Proclamation (P.P.) 9945, which suspends and limits entry for aliens as immigrants who cannot demonstrate that they will be covered by approved health insurance within 30 days of entry into the United States or that they have the financial resources to pay for reasonably foreseeable medical costs, is effective November 3, 2019 at 12:01 Eastern Daylight Time.  We anticipate approval from the Office of Management and Budget of our proposed information collection concerning health insurance-related information.  **Posts must begin implementation of P.P. 9945 on November 3, 2019.**

In addition, you may have read media reports about a lawsuit filed recently regarding P.P. 9945.  As of now, the case does not prevent the Department from implementing P.P. 9945.  We will provide additional guidance if there are any developments that may affect case processing at post.

Thank you,

The Visa Office

~~SBU - IMMIGRATION~~

## Presidential Proclamation on Health Care

If you are applying for an immigrant visa, including a diversity visa, on or after November 3, 2019, you must demonstrate to the consular officer at the time of interview that you will be covered by approved health insurance within 30 days of entry into the United States or have the financial resources to pay for reasonably foreseeable medical costs. Inability to meet this requirement will result in the denial of the visa application.

**This requirement will apply to all immigrant visa applicants and individuals seeking to enter the United States on an immigrant visa, except:**

- Individuals who are holding (or who held) a valid immigrant visa as of November 3, 2019

- Iraqi and Afghan special immigrant visa applicants and their spouses and children  (SI and SQ visas)

- Applicants who are children, whether adopted, biological, and step-children, of a U.S. citizen applying in the IR-2, CR-2, IR-3, IR-4, IH-3, or IH-4 visa classifications

- Returning Resident SB-1 applicants

- Applicants for K fiancé(e) visas and other aliens entering the United States without an immigrant visa, including lawful permanent residents, refugees, and asylees.

- Applicants for IR-5 visas and alien seeking to enter the United States pursuant to an IR-5 visa, provided that the alien or the alien's sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system

- Any alien under the age of 18, except for any alien seeking to accompany a parent who is also immigrating to the United States and subject to this proclamation

- Any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee

- Any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis

## Qualifying Insurance or Financial Resource to Pay for Medical Costs

If you are not covered by the exceptions above, you will need to show to a consular officer or immigration official that you will be covered by approved health insurance within 30 days of

SENSITIVE BUT UNCLASSIFIED

entry to the United States or that you have the financial resources to pay for reasonably foreseeable medical costs.

Approved health insurance includes:

- Employer-sponsored health plans, including retiree plans

- Unsubsidized health plans offered in the individual market within a State

- Short-term, limited duration health plans effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Catastrophic plans

- Coverage by a family member's health plan

- U.S. military health plans, including TRICARE

- Visitor health insurance plans with adequate medical coverage for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Medical plans under the Medicare program

- Any other health plan with adequate coverage as determined by the Secretary of Health and Human Services

For individuals over the age of 18, approved health insurance does not include coverage under the Medicaid program.


**Requirement at visa interview**

During the visa interview, applicants should be able to demonstrate to the satisfaction of the consular officer that they have the financial resources to pay for reasonably foreseeable medical costs or will have approved health insurance from the list above within 30 days of entry into the United States.  Officers will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation as needed. Prior to the visa interview, applicants may wish to review costs and eligibility requirements for approved health insurance plans or consider how they would pay for the reasonably foreseeable medical costs of any current medical condition they may have.

SENSITIVE BUT UNCLASSIFIED

**19712**   **Federal Register** / Vol. 84, No. 87 / Monday, May 6, 2019 / Rules and Regulations

BILLING CODE 4910–13–C

(2) For seats identified by RECARO SB No. 3510–25–609, Original Issue, dated June 20, 2016 ("RECARO SB No. 3510–25–609"):

(i) Review Planning Information, paragraph 1.A., Tables 2 and 3, in RECARO SB No. 3510–25–609, to determine if a modification is required for the specific P/N seat.

(ii) Follow the Accomplishment Instructions, paragraphs 3.A., 3.B., 3.C., 3.D., and 3.E. in RECARO SB No. 3510–25–609.

(3) For seats identified by RECARO SB No. 3510–25–752, Original Issue, dated May 20, 2016 ("RECARO SB No. 3510–25–752"):

(i) Review Planning Information, paragraph 1.A., Tables 2 and 3, in RECARO SB No. 3510–25–752, to determine if a modification is required for the specific P/N seat.

(ii) Follow the Accomplishment Instructions, paragraphs 3.A., 3.B., 3.C., 3.D., and 3.E. in RECARO SB No. 3510–25–752.

(4) For seats identified by RECARO SB No. 3510–25–753, Original issue, dated June 23, 2016 ("RECARO SB No. 3510–25–753"):

(i) Review Planning Information, paragraph 1.A., Tables 2 and 3, in RECARO SB No. 3510–25–753, to determine the required modification for the specific P/N seat.

(ii) Follow the Accomplishment Instructions, paragraphs 3.A., 3.B., 3.C., 3.D., and 3.E. in RECARO SB No. 3510–25–753.

**(h) Installation Prohibition**

After the effective date of this AD, do not install an affected RECARO model passenger seat on any aircraft, unless the seat has been modified and re-identified in accordance with paragraph (g)(2), (3), or (4) of this AD.

**(i) Alternative Methods of Compliance (AMOCs)**

(1) The Manager, Boston ACO Branch, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19. In accordance with 14 CFR 39.19, send your request to your principal inspector or local Flight Standards District Office, as appropriate. If sending information directly to the manager of the certification office, send it to the attention of the person identified in paragraph (j)(1) of this AD.

(2) Before using any approved AMOC, notify your appropriate principal inspector, or lacking a principal inspector, the manager of the local flight standards district office/certificate holding district office.

**(j) Related Information**

(1) For more information about this AD, contact Dorie Resnik, Aerospace Engineer, Boston ACO Branch, FAA, 1200 District Avenue, Burlington, MA 01803; phone: 781–238–7693; fax: 781–238–7199; email: *dorie.resnik@faa.gov.*

(2) Refer to European Union Aviation Safety Agency (EASA) AD 2017–0192, dated September 28, 2017, for more information. You may examine the EASA AD in the AD docket on the internet at *http://www.regulations.gov* by searching for and locating it in Docket No. FAA–2018–1019.

**(k) Material Incorporated by Reference**

(1) The Director of the Federal Register approved the incorporation by reference (IBR) of the service information listed in this paragraph under 5 U.S.C. 552(a) and 1 CFR part 51.

(2) You must use this service information as applicable to do the actions required by this AD, unless the AD specifies otherwise.

(i) RECARO Service Bulletin (SB) No. 3510–25–609, Original issue, dated June 20, 2016.

(ii) RECARO SB No. 3510–25–752, Original issue, dated May 20, 2016.

(iii) RECARO SB No. 3510–25–753, Original issue, dated June 23, 2016.

(3) For RECARO Aircraft Seating GmbH & Co. KG service information identified in this AD, contact RECARO Aircraft Seating GmbH & Co. KG, Daimlerstrasse 21, 74523 Schwabisch Hall, Germany; phone: 49 791 503 7855; fax: 49 791 503 7935; email: *technical.support@recaro-as.com.*

(4) You may view this service information at FAA, Engine & Propeller Standards Branch, 1200 District Avenue, Burlington, MA 01803. For information on the availability of this material at the FAA, call 781–238–7759.

(5) You may view this service information that is incorporated by reference at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal-register/cfr/ibr-locations.html.*

Issued in Burlington, Massachusetts, on May 1, 2019.

**Robert J. Ganley,**

*Manager, Engine and Propeller Standards Branch, Aircraft Certification Service.*

[FR Doc. 2019–09184 Filed 5–3–19; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF STATE**

**22 CFR Part 40**

**[Public Notice: 10571]**

**RIN 1400–AE72**

**Visas: Waiver for Ineligible Nonimmigrants Under Section 212(d)(3)(A)(i) of the Immigration and Nationality Act**

**AGENCY:** Department of State.

**ACTION:** Final rule.

**SUMMARY:** Under the Immigration and Nationality Act (INA), a visa applicant found inadmissible is ineligible for a visa and for admission to the United States. The INA provides the Secretary of State and consular officers the authority to recommend that the U.S. Department of Homeland Security (DHS) approve a waiver, of most grounds of inadmissibility, that will allow the nonimmigrant visa applicant to be issued a visa and seek admission to the United States. This rule amends U.S. Department of State ("State") regulations relating to consular officer recommendations relating to DHS waivers for nonimmigrant visa applicants, including the requirement that a consular officer, upon the request of an applicant, must submit a report to State concerning a waiver. Under the revised rule, consular officers will be required to refer waiver requests to State only when they involve security-related inadmissibility grounds or, with respect to applicant requests, only if the case meets circumstances where a referral is required by State guidance. The rule does not infringe current consular officer discretion to refer cases to State or to make recommendations directly to the Department of Homeland Security.

**DATES:** This rule is effective on May 6, 2019.

**FOR FURTHER INFORMATION CONTACT:** Taylor Beaumont, Acting Chief, Legislation and Regulations Division, Legal Affairs, Office of Visa Services, Bureau of Consular Affairs, 600 19th Street NW, Washington, DC 20522, 202–485–8910, *VisaRegs@state.gov.*

**SUPPLEMENTARY INFORMATION:** Aliens are ineligible to receive visas if they are inadmissible under any of the grounds in section 212(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(a). Section 212(d)(3)(A)(i) of the INA, 8 U.S.C. 1182(d)(3)(A)(i), authorizes the Department of Homeland Security to approve a waiver covering most grounds in section 212(a) of the INA, if the Secretary of State or a consular officer recommends that the alien be admitted temporarily into the United States, despite the inadmissibility. This provision does not authorize waivers under INA sections 212(a)(3)(A)(i)(I) (espionage or sabotage), (3)(A)(ii) (unlawful activity), (3)(A)(iii) (opposition to or overthrow of United States Government or opposition by force, violence, or unlawful means), (3)(C) (serious adverse foreign policy consequences), (3)(E)(i) (participation in Nazi persecutions), or (3)(E)(ii) (participation in genocide)). State regulations at 22 CFR 40.301 describe the authority of consular officers to recommend waivers.

For cases in which a nonimmigrant visa applicant is inadmissible based on an inadmissibility ground for which a waiver may be granted under section 212(d)(3)(A)(i) of the INA, and the consular officer has decided not to recommend a DHS waiver on the officer's own authority, but the applicant or an interested party insists on pursuing a waiver, 22 CFR 40.301 currently requires the consular officer to refer the request to State for a possible exercise of the Secretary of State's authority to recommend a waiver to

DHS. Neither section 212(d)(3)(A)(i) of the INA nor Department regulations prescribe standards or criteria for the consular officers making referrals to State. While the INA makes no express provision for the submission by nonimmigrant visa applicants of requests for section 212(d)(3)(A)(i) waivers, State created an avenue for such requests in 22 CFR 40.301(a). *See* 24 FR 6678, 6686 (1959) (formerly 22 CFR 41.95(a)).

This final rule modifies the non-statutory requirement for consular officers to refer section 212(d)(3)(A)(i) waiver requests to State for consideration based on an applicant's request, by limiting it to specified circumstances. This rule will increase transparency for inadmissible aliens seeking an exercise of the Secretary's authority to recommend DHS grant a waiver, and will limit the requirement that consular officers refer waiver requests to circumstances that involve a key State interest, as reflected in the enumerated criteria. This rule has no impact on cases involving security-related grounds of inadmissibility, which consular officers must consider in accordance with other State guidance, on consular officers' existing discretion to pursue waivers on behalf of ineligible visa applicants, or on the factors DHS considers in exercising its section 212(d)(3)(A) waiver authority.

Under this rule, which constitutes an exercise of the Secretary of State's authority under section 212(d)(3)(A)(i) of the INA, consular officers are required to refer waiver requests to State in response to a request from the Secretary of State, whose request shall be presumed to meet one of the criteria (paragraphs 1–5) enumerated below, or in response to a request from a visa applicant for a case that the consular officer has reason to believe involves one of the following circumstances:

1. *Foreign Relations:* Refusal of the nonimmigrant visa application would become a bilateral irritant or be raised by a foreign government with a high ranking United States Government official;

2. *National Security:* The nonimmigrant visa applicant's admission to the United States would advance a U.S. national security interest;

3. *Law Enforcement:* The nonimmigrant visa applicant's admission to the United States would advance an important U.S. law enforcement objective;

4. *Significant Public Interest:* The nonimmigrant visa applicant's admission to the United States would

advance a significant U.S. public interest ; or

5. *Urgent humanitarian or medical reasons:* The nonimmigrant visa applicant's admission to the United States is warranted due to urgent humanitarian or medical reasons.

Consistent with this exercise of the Secretary's authority to recommend a waiver under section 212(d)(3)(A)(i) of the INA, this rule also clarifies that requests by the Secretary for a consular officer to submit a report to State are presumed to involve one of the enumerated circumstances. In addition, this rule includes technical edits to improve the structure and clarity of 22 CFR 40.301, revise the heading of paragraph (b) to clarify that consular officers are permitted to submit recommendations to a designated DHS office, and eliminate the requirement that the Secretary of State define certain categories of cases for which consular officers may recommend waivers directly to DHS.

The rule clarifies existing State guidance that consular officers may refer to State, but may not submit directly to DHS, a recommendation to DHS to waive certain security-related grounds of inadmissibility and the rule narrows the scope of other situations in which consular officers must refer waiver cases to State, upon request of the applicant or on their own initiative, to those cases the consular officer believes meet one of the criteria enumerated below. This rule does not affect consular officers' existing authority or discretion to submit non-security related waiver recommendations directly to DHS or refer cases to State. The vast majority of waiver recommendations to DHS under section 212(d)(3)(A)(i) of the INA are initiated by consular officers without applicant requests. The rule does not limit, in any way, DHS's independent discretionary authority to approve or deny a waiver. Finally, the rule applies only to visa applications for which the consular officer conducts an in person interview under section 222(h) of the INA on or after the rule's effective date.

*In all cases in which the consular officer:* (1) Determines a nonimmigrant visa applicant is not eligible for a visa due to inadmissibility; (2) decides not to recommend directly that DHS grant a waiver; (3) would choose not to refer the case to State to consider pursuing a waiver, but the applicant continues to request a waiver; (4) determines that there is no reason to believe that one of the criteria for referral to State are met; the officer will refuse the visa application without referring the case to State, notwithstanding the applicant's

request. In cases where an applicant requests a waiver referral to State, the adjudicating consular officer will determine whether the case involves one of the enumerated five criteria and will inform the applicant whether or not the officer will make the referral to State. While there is no mechanism for applicants to seek reconsideration or appeal of a consular officer's determination that the request does not satisfy one of the enumerated criteria, affected applicants may submit new nonimmigrant visa applications with information justifying a waiver under one of the enumerated grounds.

**Regulatory Findings**

*Administrative Procedure Act*

This rule constitutes a rule of policy and procedure, and as a result, it is exempt from notice and comment under 5 U.S.C. 553(b)(3)(A). This final rule limits the non-statutory requirement that consular officers refer requests for waivers under INA section 212(d)(3)(A) to the Department, by specifying limited circumstances, based on a new policy, in which such referrals are required. Because this is a rule of policy and procedure, it is effective upon publication in the **Federal Register**.

*Regulatory Flexibility Act/Executive Order 13272: Small Business*

Because this final rule is exempt from notice and comment rulemaking under 5 U.S.C. 553, it is exempt from the regulatory flexibility analysis requirements set forth by the Regulatory Flexibility Act (5 U.S.C. 603 and 604). Nonetheless, consistent with the Regulatory Flexibility Act (5 U.S.C. 605(b)), the Department of State certifies that this rule will not have a significant economic impact on a substantial number of small entities.

*Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1532, generally requires agencies to prepare a statement before proposing any rule that may result in an annual expenditure of $100 million or more by State, local, or tribal governments, or by the private sector. This rule does not require the Department of State to prepare a statement because it will not result in any such expenditure, nor will it significantly or uniquely affect small governments. This rule involves visas, which involves individuals, and does not directly or substantially affect, state, local, or tribal governments, or businesses.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined in 5 U.S.C. 804, for purposes of congressional review of agency rulemaking under the Small Business Regulatory Enforcement Fairness Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or adverse effects on competition, employment, investment, productivity, innovation, or the ability of United States-based companies to compete with foreign-based companies in domestic and import markets.

*Executive Orders 12866 and 13563*

Executive Orders 13563 and 12866 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). These Executive Orders stress the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Department of State has examined this rule in light of Executive Order 13563, and has determined that the rulemaking is consistent with the guidance therein. The Department of State has reviewed this rulemaking to ensure its consistency with the regulatory philosophy and principles set forth in Executive Order 12866. The Office of Information and Regulatory Affairs (OIRA) has determined this rule to be a significant, though not economically significant, regulatory action. Consequently, OIRA has reviewed this rule. This rule will ensure consistency with U.S. and international law and the increased clarity will benefit the U.S. public. There are no anticipated direct costs to the public associated with this rule.

*Executive Orders 12372 and 13132: Federalism*

This regulation will not have substantial direct effect on the States, on the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government. Nor will the rule have federalism implications warranting the application of Executive Orders 12372 and 13132.

*Executive Order 12988: Civil Justice Reform*

The Department of State has reviewed the rule in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175—Consultation and Coordination With Indian Tribal Governments*

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not pre-empt tribal law. Accordingly, the requirements of Section 5 of Executive Order 13175 do not apply to this rulemaking.

*Executive Order 13771*

This rule is not subject to the requirements of Executive Order 13771 because it is *de minimis.*

*Paperwork Reduction Act*

This rule does not impose any new reporting or record-keeping requirements subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35.

**List of Subjects in 22 CFR Part 40**

Aliens, Immigration, Visas.

Accordingly, for the reasons set forth in the preamble, 22 CFR part 40 is amended to read as follows:

**PART 40—REGULATIONS PERTAINING TO BOTH NONIMMIGRANTS AND IMMIGRANTS UNDER THE IMMIGRATION AND NATIONALITY ACT, AS AMENDED**

■ 1. The authority citation for part 40 is revised to read as follows:

**Authority:** 8 U.S.C. 1104, 8 U.S.C. 1182.

■ 2. Section 40.301 is revised to read as follows:

**§ 40.301   Waiver for ineligible nonimmigrants under INA 212(d)(3)(A).**

(a) *Recommendations under INA 212(d)(3)(A)(i).* (1) Consular officers, on their own initiative in cases they believe meet one of the criteria in paragraphs (a)(2)(i) through (v) of this section, may submit a report to the Department for possible transmission to the designated DHS office pursuant to INA 212(d)(3)(A)(i) (8 U.S.C. 1182(d)(3)(A)(i)), in the case of an alien who is classifiable as a nonimmigrant but who the consular officer knows or believes is ineligible to receive a nonimmigrant visa due to inadmissibility under the provisions of INA 212(a) (8 U.S.C. 1182(a)), other than INA 212(a)(3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), (3)(E)(i), or (3)(E)(ii).

(2) In response to a request from the Secretary of State, which shall be presumed to meet one of the criteria in paragraphs (a)(2)(i) through (v) of this section, or in response to a request from a visa applicant for a case that the consular officer has reason to believe meets one of the criteria in paragraphs (a)(2)(i) through (v), consular officers are required to submit a report to the Department for possible transmission to the designated DHS office pursuant to INA 212(d)(3)(A) in the case of an alien who is classifiable as a nonimmigrant but whom the consular officer knows or believes is ineligible to receive a nonimmigrant visa due to inadmissibility under the provisions of INA 212(a), other than INA 212(a)(3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), (3)(E)(i), or (3)(E)(ii).

(i) *Foreign Relations:* Refusal of the nonimmigrant visa application would become a bilateral irritant or be raised by a foreign government with a high ranking United States government official;

(ii) *National security.* The nonimmigrant visa applicant's admission to the United States would advance a U.S. national security interest;

(iii) *Law enforcement.* The nonimmigrant visa applicant's admission to the United States would advance an important U.S. law enforcement objective;

(iv) *Significant public interest.* The nonimmigrant visa applicant's admission to the United States would advance a significant U.S. public interest, or

(v) *Urgent humanitarian or medical reasons.* The nonimmigrant visa applicant's admission to the United States may be warranted due to urgent humanitarian or medical reasons.

(b) *Recommendation to designated DHS office.* Consular officers may recommend directly to the designated DHS office that the alien be admitted temporarily despite his or her inadmissibility in any case where a waiver may be available, unless the consular officer has reason to believe that the applicant is inadmissible under INA 212(a)(3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(B), (3)(C), (3)(D), (3)(E)(i), (3)(E)(ii), (3)(E)(iii), (3)(F), or (3)(G) . The Department may recommend that the Secretary of Homeland Security waive ineligibility under any ground in section 212(a) of the INA, except for sections 212(a)(3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), (3)(E)(i), and (3)(E)(ii).

(c) *Secretary of Homeland Security may impose conditions.* When the Secretary of Homeland Security authorizes the temporary admission of an inadmissible alien as a nonimmigrant and the consular officer is so informed,

the consular officer may proceed with the issuance of a nonimmigrant visa to the alien, subject to the conditions, if any, imposed by the Secretary of Homeland Security.

**Carl C. Risch,**

*Assistant Secretary for Consular Affairs, Department of State.*

[FR Doc. 2019–09185 Filed 5–3–19; 8:45 am]

**BILLING CODE 4710–06–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 100**

**[Docket No. USCG–2019–0010]**

**RIN 1625–AA08**

**Special Local Regulation; Sail Grand Prix 2019 Race Event; San Francisco, CA**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing a temporary special local regulation in the navigable waters of San Francisco Bay in San Francisco, CA in support of the San Francisco Sail Grand Prix 2019 race periods on May 4, 2019 and May 5, 2019. This special local regulation is necessary to ensure the safety of mariners transiting the area from the dangers associated with high-speed sailing activities associated with the Sail Grand Prix 2019 race event. This temporary special local regulation will temporarily restrict vessel traffic adjacent to the city of San Francisco waterfront in the vicinity of the Golden Gate Bridge and Alcatraz Island and prohibit vessels and persons not participating in the race event from entering the dedicated race area.

**DATES:** This rule is effective from 10:30 a.m. on May 4, 2019 through 3:00 p.m. on May 5, 2019.

**ADDRESSES:** To view documents mentioned in this preamble as being available in the docket, go to *https:// www.regulations.gov,* type USCG–2019– 0010 in the "SEARCH" box and click "SEARCH." Click on Open Docket Folder on the line associated with this rule.

**FOR FURTHER INFORMATION CONTACT:** If you have questions about this rule, call or email Lieutenant Emily K. Rowan, U.S. Coast Guard District 11, Sector San Francisco, at 415–399–7443, *SFWaterways@uscg.mil.*

**SUPPLEMENTARY INFORMATION:**

**I. Table of Abbreviations**

CFR   Code of Federal Regulations
DHS   Department of Homeland Security
FR   Federal Register
NPRM   Notice of Proposed Rulemaking
§   Section
COTP   Captain of the Port
PATCOM   Patrol Commander
U.S.C.   United States Code

**II. Background, Purpose, and Legal Basis**

On October 12, 2018, the LeadDog Marketing Corporation notified the Coast Guard of an intention to conduct the "Sail Grand Prix 2019" in San Francisco Bay. Sail Grand Prix is a sailing league featuring world-class sailors racing 50-foot foiling catamarans. The inaugural season started February 2019 in five iconic cities throughout the world, traveling to San Francisco Bay in May 2019. In San Francisco, they proposed to take advantage of the natural amphitheater that central bay and city waterfront provide.

In response, on March 18, 2019, the Coast Guard published a notice of proposed rulemaking (NPRM) titled "Special Local Regulation; Sail Grand Prix 2019 Race Event; San Francisco, CA" (84 FR 9727). There we stated why we issued the NPRM and invited comments on our proposed regulatory action related to this sailing event. During the comment period that ended on April 17, 2019, we received one comment.

Based off lessons learned during the multi-agency planning process, we are implementing an additional zone to the Special Local Regulation, Zone "D". Zone "D" will be a no loitering or anchoring area along the San Francisco Waterfront that will allow vessels to transit, allowing for more accessibility to the waterfront areas. Additionally, to accommodate the updated, finalized event agenda, the times were altered to minimize impact to San Francisco Waterfront.

Under 5 U.S.C. 533(d)(3), the Coast Guard finds that good cause exists for making this rule effective less than 30 days after publication in the **Federal Register**.

This special local regulation will encompass all navigable waters of the San Francisco Bay, from surface to bottom, within the area formed by connecting the following latitude and longitude points in the following order: 37°48′18″ N, 122°27′44″ W; thence to 37°48′30″ N, 122°27′56″ W; thence to 37°49′14″ N, 122°27′59″ W; thence to 37°49′30″ N, 122°25′36″ W; thence to 37°49′10″ N, 122°25′10″ W; thence to 37°48′45″ N, 122°25′10″ W; thence to

37°48′42″ N, 122°25′13″ W and thence along the shore to the point of beginning. Located within this footprint, there will be three separate regulated areas: Zone "A", the Official Race Box Area; Zone "B", the Spectator Area; Zone "C", the Regulated Waterfront Transit Area; and Zone "D" the No Loitering or Anchoring Zone.

Zone "A", the Official Race Box Area, will be marked by approximately 12 colored visual markers. The position of these markers will be specified via Broadcast Notice to Mariners at least 3 days prior to the event. Because of the hazards posed by the sailing competition, Zone "A" is necessary to provide protection from the operation of the high-speed sailing vessels within this area.

Zone "B", the Spectator Area, will include specified parts of the waters immediately adjacent to racing Zone "A" and will be defined by latitude and longitude points as per Broadcast Notice to Mariners. Zone "B" will be further divided into three additional sub-areas: Zone "B1 East", Zone "B1 West", and Zone "B2". Zone "B1 East" and Zone "B1 West" will be the general spectator zone that is open to all vessel spectators. Zone "B2" will be a separate designated spectator area marked by approximately four colored buoys that will be managed by marine event sponsor officials. The designation of Zone "B", to include Zone "B1 East", Zone "B1 West", and Zone "B2", will allow spectators to observe the Sail Grand Prix 2019 race event in a regulated area at a safe distance from the sailing race occurring in Zone "A".

Zone "C" will be the designated Waterfront Transit Area along the city of San Francisco waterfront marked by buoys on one side and the shoreline on the other. This one-directional lane will provide vessels the opportunity to pass along the San Francisco waterfront, avoiding interference with the other established areas. Vessels will be authorized to transit through this zone with approval from the COTP or designated authority. Zone "C" is essential to provide vessels the opportunity to transit along the city of San Francisco waterfront while maintaining the integrity of the regulated areas for the race event. Due to the dynamic nature of the Sail Grand Prix 2019, there is a need for a Waterfront Transit Area so mariners along the waterfront can transit the impacted waterways at designated times. This Zone "C" is necessary for the protection of waterway users and participants in the sailing race event while minimizing the impact to the city of San Francisco maritime community.



1

## Rules of Engagement

- Please mute your phone
- Presentation will be recorded and posted on CAWeb
- Questions should be asked in the chat box. If we are not able to answer your question either during or at the end of the presentation, we will respond to Post directly.
- Be sure to regularly check CAWeb for updates as FAQs and additional resources are forthcoming.
- If you have questions, reach out to your VO/F and VO/L/A post liaisons.



# Presenters

Visa Office/Legal Affairs/Advisory Opinions (VO/L/A)

Visa Office/Field Operations (VO/F)

3

## Agenda

- Presidential Proclamation 9945

- New Public Charge Rule



Today's webinar will cover two items: first, a recent Presidential Proclamation regarding health care for immigrants.  And second, a new rule regarding the      public charge ineligibility.

## Implementation Timeline

When should posts begin to apply Presidential Proclamation 9945 and the Public Charge Rule?



The Presidential Proclamation and the Public Charge Rule have both been issued. However, you should not begin to implement them until you receive additional guidance from the Visa Office.  We are working through an interagency clearance process to clear certain forms and implementing guidance.  Until that is done, we cannot implement either the Health Care Presidential Proclamation or the public charge rule.

**Due to certain legal considerations, we cannot say exactly when these will be implemented.  The Presidential Proclamation may be ready for implementation by the effective date, November 3, so posts should prepare for that possibility.**

In the meantime, you should continue to follow current guidance in the FAM.  We will let you know when these changes are ready to be implemented with as much advance notice as possible.  We appreciate your patience.

This webinar will provide a general overview of these two changes.

059

## P.P. 9945

- Presidential Proclamation 9945
  Suspends entry for immigrants who cannot demonstrate:
  (1) Coverage by approved health insurance within 30 days of entry into the United States, or
  (2) Financial resources to pay for reasonably foreseeable medical costs

- Effective November 3, 2019 at 12:01 EDT

- Only applies to IV and DV applicants



While the effective date is November 3, 2019, post should not begin implementing the Proclamation until notified by the Department.

## How to Adjudicate P.P. 9945

1. Does an Exception Apply?

2. Financial Resources?

3. Approved Health Care?



The Presidential Proclamation on Healthcare will essentially follow a three-step process.

First – Does the applicant fall within one of the exceptions to the proclamation?  If yes, then you are done.  If not,

Second – Does the applicant have sufficient financial resources to pay for reasonably foreseeable medical costs?  If yes, then you are done.  If not, then

Third – Will the applicant be covered by approved health insurance within 30 days of entry to the United States?  If yes, then you are done. If not, then you would either refuse the applicant 221(g) for additional evidence or under a new refusal code, ____, as subject to the Proclamation's suspension and limitation of entry.

## 1. Exceptions

- Individuals with a valid immigrant visa as of November 3, 2019



The P.P. is not retroactive.  If someone has a valid IV, they are not subject to the Proclamation even if they have not yet travelled.

062

8

## Exceptions, Cont'd

- Children of a U.S. citizen (IR-2, CR-2, IR-3, IR-4, IH-3, or IH-4 visas)



The child of a U.S. citizen includes biological children, adopted children, and step-children.

## Exceptions, Cont'd

- IR-5 applicants, if the applicant's healthcare will not impose a substantial burden on the United States healthcare system



IR-5 applicants are largely exempted from the Proclamation, provided that they or their sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a **substantial** burden on the United States healthcare system.  To determine if an alien's healthcare will not impose a substantial burden, you should rely on the medical exam to determine if there are current health issues, including acute or chronic conditions, that will require extensive medical care and likely result in particularly high medical costs.  If the applicant has such a condition, officers must determine if the applicant has either approved health insurance or funds that will be available to cover foreseeable medical costs.  If the applicant has no such conditions, then you can conclude that the alien's healthcare will not impose a substantial burden on the U.S. healthcare system.

## Exceptions, Cont'd

- Any alien under the age of 18, except for those accompanying a parent who is also immigrating to the United States and subject to P.P. 9945



"Accompanying" means derivative applicants who are: (1) in the physical company of the principal applicant; or (2) issued an immigrant visa within six months of the date of issuance of a visa to the principal applicant, the date of adjustment of status in the United States of the principal applicant, or the date on which the principal applicant personally appears and registers before a consular officer abroad to confer foreign state chargeability or immigrant status upon the child.  Applicants under the age of 18 who are not considered "accompanying," (i.e., the beneficiary of an immediate relative petition, the principal beneficiary of a family preference petition, or who are following to join the principal applicant) are exempt from the Proclamation.

This can be a bit tricky, so here are some examples.

11



The Proclamation **does not** apply because the F2A is under the age of 18 and not accompanying a parent who is also immigrating to the United States and subject to P.P. 9945

## Example 2

- Derivative Child (age 17) accompanying F2A Spouse of an LPR



The Proclamation **does** apply because it is a child under 18 accompanying their parent who is also subject to the P.P.

067

13

## Example 3

- Derivative child (age 17) following-to-join an F1 son or daughter of a U.S. Citizen



The Proclamation **does not** apply because it is a child under 18 who is not accompanying their parent (even though the parent would have been subject to the P.P.), as long as it has been more than 6 months since the issuance of the visa to their parent.

14

## Example 4

- CR2 child accompanying their parent, a CR1 spouse

The Proclamation **does not** apply because a child of a U.S. citizen, including a CR-2 stepchild, falls under its own exception.  However, the CR1 spouse will be subject to the Proclamation.

## Exceptions, Cont'd

- Iraqi and Afghan special immigrant visa applicants and their spouses and children  (SI and SQ visas)

- Returning Residents (SB-1)

- K fiancé(e) visas, other aliens entering the United States without an immigrant visa, including LPRs, refugees, and asylees



16

## Exceptions, Cont'd

- Law enforcement

- National interest:

  – Foreign Relations

  – National Security

  – Significant Public Interest

  – Urgent Humanitarian or Medical Reasons



Law Enforcement: If you are contacted by a representative from a U.S. law enforcement agency at post about a particular applicant or if the Department informs you that a U.S. law enforcement agency has expressed interest in a particular applicant, you should refuse the applicant under INA 221(g) and submit an email to your VO/F post liaison officer to request the Department's approval of an exemption.

National Interest: The Department (either the A/S or the DAS for Visa Services) can approve an exception on a case-by-case basis in limited circumstances, which will be detailed in the FAM.  If you believe one of those is met, you should refuse the applicant 221(g) and submit an email to VO/F.

## 2. Financial Resources

- Review case file
  - Medical examination
  - Financial information, Affidavit of Support, etc.

- Reasonably foreseeable medical costs
  - Based on **current** medical state



If you have determined that an exception does not apply, you should then consider whether the applicant has sufficient financial resources to pay for reasonably foreseeable medical costs.

To make this determination, you should consider the medical report by the panel physician and financial information available in an Affidavit of Support, if required.  You can consider funds available to an applicant from a sponsor, as reported on the I-864 Affidavit of Support.

You should only consider the applicant's **current** medical state as reported in the medical exam and should not speculate on an applicant's potential future health.

072

18

## Example 1

- IR-1 applicant with "No Class" medical report presents an I-864 from the petitioner that meets the Federal Poverty Guidelines



If you find that an applicant has a qualifying I-864 Affidavit of Support, is healthy and has no reasonably foreseeable medical costs, you can reasonably conclude that the applicant meets the requirement of the Presidential Proclamation for visa issuance.

073

19

## Example 2

- DV applicant with "No Class" medical report, limited savings, and no family or friends in the United States. Applicant has reasonable prospects for employment based on education and work experience.



DV applicants aren't required to submit an Affidavit of Support. Even though the applicant does not have any current medical condition, you may find that his or her limited savings represent insufficient financial resources to pay for reasonably foreseeable medical costs. In that case, you would want to look at whether the applicant has or will have approved health insurance within 30 days.

## Example 3

- F4 applicant with "Class B" medical condition and I-864 from a joint sponsor that barely meets the FPG.



In this case, although the applicant has a qualifying Affidavit of Support, you need to consider whether the joint sponsor can be expected to provide sufficient financial resources to pay for reasonably foreseeable medical costs. You should consider the expected cost of the medical condition and can look at the applicant's additional financial resources. However, if the medical condition is expected to result in significant medical costs, you will need to consider whether the applicant has or will have approved health insurance within 30 days.

075

## 3. Approved Health Insurance

- Currently covered
- Will be covered within 30 days
  - Eligible for an approved health plan
  - Financial means to pay for plan
  - Intent to purchase



If the applicant does not meet one of the exceptions, and does not have sufficient financial resources to pay for reasonably foreseeable medical costs, you should consider whether they currently have or will have within 30 days of entry, "approved health insurance."

Current coverage: Can the applicant show you an insurance card, or their insurance policy?

Coverage within 30 days: Does the applicant have an idea of what plan they intend to apply for and the eligibility requirements, do they have the financial means to pay for the plan, and do they have the intent to obtain the plan within 30 days?

# 3. Approved Health Insurance

- Employer-sponsored health plans, including retiree plans

- Unsubsidized health plans offered in the individual market within a State

- Short-term, limited duration health plans effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Catastrophic plans

- Coverage by a family member's health plan

- U.S. military health plans, including TRICARE

- Visitor health insurance plans with adequate medical coverage for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Medical plans under the Medicare program

- Any other health plan with adequate coverage as determined by the Secretary of Health and Human Services



The Presidential Proclamation provides a list of approved health insurance plans. They are listed in the ALDAC and will be published in the FAM.

077

23

## Example 1

- E3 Skilled Worker whose position includes employer-sponsored heath insurance.



Employer-sponsored health plans are approved health insurance.

## Example 2

- F2B unmarried daughter, age 23, can be added to her petitioning parent's subsidized health insurance plan. The insurance company is unwilling to provide a quote without a medical exam, which the applicant cannot obtain until she immigrates.



Coverage by a family member's health plan qualifies as approved health insurance. This is true even if the coverage is a subsidized health plan on a state's individual market.

## Example 3

- F2A spouse can be added to the petitioner's plan, but the insurance company is unwilling to provide a quote without a medical exam, which the applicant cannot obtain until after he or she immigrates.



While the applicant may not know the exact cost of health insurance, they should be able to provide some estimate as to what they expect to have to pay. You should evaluate the likelihood that they will be able to afford the insurance and intend to do so, based on the information provided by the applicant, the panel physician's medical report, and the Affidavit of Support.

## Example 4

- CR-1 spouse who will be added to the petitioner's plan, but no sooner than 45 days after entry to the United States, due to the insurance company's enrollment process.



The Presidential Proclamation requires coverage within 30 days, so the applicant would not be able to satisfy the approved health insurance requirement. However, you should consider whether the applicant has sufficient financial resources to pay for reasonably foreseeable medical costs for the amount of time until he or she is able to obtain approved health insurance. If they have those resources, you can find that they satisfy the requirements of the Proclamation.

081

## Processing

- Interview
- Case note:

  - "P.P. 9945 met – applicant plans to obtain health insurance through spouse's health insurance policy"



In most cases, you should be able to make a determination regarding ▢ at the time of the visa interview.  You should enter a clear case note as to whether the applicant meets or does not meet the requirements of the Presidential Proclamation.

If you are satisfied that the applicant either has, or will have, health insurance within 30 days of entry or possesses sufficient financial resources to pay for reasonably foreseeable medical costs, you must make a clear case note stating why the applicant overcomes the P.P.'s limitation on entry, e.g. "Applicant plans to obtain health insurance through spouse's health insurance policy."

28

## Processing, Cont'd

- Documentation not required, but may be requested
- INA 221(g)
- New refusal code, █████
- Overcoming an ████ refusal



Applicants are not required to provide information demonstrating their eligibility under the Proclamation to NVC in order to be considered documentarily qualified. Therefore, if at the interview , you request additional evidence to establish that the applicant meets the requirements of the Proclamation, you should first refuse the case 221(g) in order to allow the applicant to submit the requested documentation.

If the applicant submits documents that are insufficient to overcome the 221(g) refusal, you should refuse the applicant using the refusal code ████ Applicants may still overcome an ████ refusal by submitting additional evidence to convince you that they have or will have approved health insurance within 30 days of entry, or that they have the financial resources to pay for reasonably foreseeable medical costs in the absence of health insurance. An IV applicant may present evidence that he or she overcomes a ground of refusal up to one year from the date of refusal, after which they will need to file a new visa application and pay the fee again.

083

29

## Processing, Cont'd

- I-601A Provisional Unlawful Presence Waivers



For applicants with an approved provisional unlawful presence waiver (I-601A), an refusal will result in automatic revocation of the waiver, even if the refusal is subsequently overcome.

084

# P.P. 9945 and Public Charge

- ▮▮▮ and ▮▮ are distinct and separate considerations
- You should adjudicate both ▮▮▮ and ▮▮ where applicable
- Related issues:
  - Health
  - Financial resources
  - Family status



The ▮▮ refusal is distinct from the public charge ground of ineligibility and thus, consular officers will make this determination irrespective of whether or not an applicant is found ineligible under public charge.  Should you find an applicant is subject to the Presidential Proclamation and also ineligible under public charge, you must refuse the applicant under both ▮▮ and ▮▮

While ▮▮ and ▮▮ are distinct, they rely on some of the same evidence and raise similar issues, such as the applicant's health, financial resources, and family status.

085

# Resources

- ALDACs

- FAM

- CAWeb Public Talking Points

- Visa Office





*Total Estimated Annual Hour Burden:* 11,660.

**Curtis Rich,**
*Management Analyst.*
[FR Doc. 2019–23199 Filed 10–23–19; 8:45 am]
**BILLING CODE 8026–03–P**

---

## SMALL BUSINESS ADMINISTRATION

**[Disaster Declaration #15944 and #15945; Mississippi Disaster Number MS–00111]**

**Presidential Declaration Amendment of a Major Disaster for Public Assistance Only for the State of Mississippi**

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Amendment 5.

**SUMMARY:** This is an amendment of the Presidential declaration of a major disaster for Public Assistance Only for the State of Mississippi (FEMA–4429–DR), dated 04/23/2019.

*Incident:* Severe Storms, Straight-line Winds, Tornadoes, and Flooding.

*Incident Period:* 02/22/2019 through 08/23/2019.

**DATES:** Issued on 10/16/2019.

*Physical Loan Application Deadline Date:* 06/24/2019.

*Economic Injury (EIDL) Loan Application Deadline Date:* 01/23/2020.

**ADDRESSES:** Submit completed loan applications to: U.S. Small Business Administration, Processing and Disbursement Center, 14925 Kingsport Road, Fort Worth, TX 76155.

**FOR FURTHER INFORMATION CONTACT:** A. Escobar, Office of Disaster Assistance, U.S. Small Business Administration, 409 3rd Street SW, Suite 6050, Washington, DC 20416, (202) 205–6734.

**SUPPLEMENTARY INFORMATION:** The notice of the President's major disaster declaration for Private Non-Profit organizations in the State of Mississippi, dated 04/23/2019, is hereby amended to re-establish the incident period for this disaster as beginning 02/22/2019 and continuing through 08/23/2019.

All other information in the original declaration remains unchanged.

(Catalog of Federal Domestic Assistance Number 59008)

**Rafaela Monchek,**
*Acting Associate Administrator for Disaster Assistance.*
[FR Doc. 2019–23193 Filed 10–23–19; 8:45 am]
**BILLING CODE 8026–03–P**

---

## DEPARTMENT OF STATE

**[Public Notice: 10932]**

**60-Day Notice of Proposed Information Collection: Public Charge Questionnaire**

**ACTION:** Notice of request for public comment.

**SUMMARY:** The Department of State (''Department'') is seeking Office of Management and Budget (OMB) approval for the information collection described below. In accordance with the Paperwork Reduction Act of 1995, we are requesting comments on this collection from all interested individuals and organizations. The purpose of this notice is to allow 60 days for public comment preceding submission of the collection to OMB.

**DATES:** The Department will accept comments from the public up to December 23, 2019.

**ADDRESSES:** You may submit comments by any of the following methods:

• *Web:* Persons with access to the internet may comment on this notice by going to *www.Regulations.gov.* You can search for the document by entering ''Docket Number: DOS–2019–0037'' in the Search field. Then click the ''Comment Now'' button and complete the comment form.

• *Email: PRA_BurdenComments@ state.gov.*

You must include the DS form number (if applicable), information collection title, and the OMB control number in any correspondence.

**FOR FURTHER INFORMATION CONTACT:** Direct requests for additional information regarding the collection listed in this notice, including requests for copies of the proposed collection instrument and supporting documents to Megan Herndon, who may be reached over telephone at (202) 485–7586 or email at PRA_BurdenComments@ state.gov.

**SUPPLEMENTARY INFORMATION:**

• *Title of Information Collection:* Public Charge Questionnaire.

• *OMB Control Number:* New Collection.

• *Type of Request:* New Collection.

• *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO).

• *Form Number:* DS–5540.

• *Respondents:* Immigrant visa applicants, including diversity visa applicants, and certain nonimmigrant visa applicants.

• *Estimated Number of Respondents:* 450,500.

• *Estimated Number of Responses:* 450,500.

• *Average Time per Response:* 60 minutes (10 minutes for applicants completing only questions 4 and 4A, estimated to be 500 of the 450,500 total applicants).

• *Total Estimated Burden Time:* 450,084 hours.

• *Frequency:* Once per respondent's application.

• *Obligation to respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments that assist the Department in:

• Evaluating whether the proposed information collection is necessary for the proper functions of the Department;

• Evaluating the accuracy of our estimate of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used;

• Enhancing the quality, utility, and clarity of the information to be collected; and,

• Minimizing the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review.

**Abstract of Proposed Collection**

The Department seeks to better ensure that aliens subject to the public charge inadmissibility ground are self-sufficient and will not rely on public resources to meet their needs, but rather, will rely on their own capabilities, as well as the resources of sponsors. Through the DS–5540, the Department will collect information in a standardized format regarding applicants' ability to financially support themselves following entry into the United States, without depending on government assistance. Fields primarily pertain to the applicant's health, family status, assets, resources, financial status, education, skills, health insurance coverage, and tax history. The DS–5540 would also require applicants to provide information on whether they have received certain specified public benefits from a U.S. Federal, state, local or tribal government entity on or after October 15, 2019. Consular officers will use the completed forms in assessing whether an applicant is likely to become a public charge, and is thus ineligible for a visa under section 212(a)(4)(A) of the Immigration and Nationality Act (''INA''). This collection is consistent with the burden of proof on applicants

under section 291 of the INA to establish that they are eligible to receive a visa, including that they are not inadmissible under any provision of the INA.

Sponsors of immigrant visa applicants must currently provide information regarding their ability to financially support the applicant on an I–864, Affidavit of Support, which consular officers use in considering whether the applicant is likely to depend on certain forms of government assistance. Visa applicants provide limited optional input on the I–864 regarding their assets. The DS–5540 will be used to collect more detailed information on an applicant's ability to support himself or herself. Consular officers will use the information to assess whether the applicant is likely to become a public charge, based on the totality of the circumstances.

Applicants for immigrant visas, including diversity visas, will be required to complete the DS–5540, except for categories of applicants that are exempt from the public charge ground of inadmissibility. The exempted categories are listed in 8 CFR 212.23(a). Exempted categories include applicants seeking immigrant visas based on qualified service to the U.S. government as an interpreter in Afghanistan or Iraq, visas based on a self-petition under the Violence Against Women Act, and visas for special immigrant juveniles. Additionally, a consular officer has discretion to require a nonimmigrant visa applicant to complete the DS–5540, when the officer determines the information is needed, for example, if the officer is not satisfied, based on other available information, that the applicant would be self-sufficient during his or her period of stay. A consular officer may also request any immigrant visa applicant not subject to public charge, but subject to *The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* (Oct. 4, 2019), to complete questions 4 and 4A from Form DS–5540 to establish that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, or that the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs.

**Methodology**

The DS–5540 will be available online in fillable PDF format. Immigrant visa applicants will download the completed form and then upload and submit the completed DS–5540 and other supporting documentation as a part of their immigrant visa application through the Consular Electronic Application Center (CEAC). Nonimmigrant visa applicants who are required to submit this form will be able to do so via email or in hard copy.

**Carl C. Risch,**

*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2019–23219 Filed 10–23–19; 8:45 am]

**BILLING CODE 4710–06–P**

---

**DEPARTMENT OF STATE**

**[Public Notice: 10931]**

**Notice of Determinations: Culturally Significant Object Imported for Exhibition—Determinations: "Raphael and the Pope's Librarian" Exhibition**

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that a certain object to be exhibited in the exhibition "Raphael and the Pope's Librarian", imported from abroad for temporary exhibition within the United States, is of cultural significance. The object is imported pursuant to a loan agreement with the foreign owner or custodian. I also determine that the exhibition or display of the exhibit object at the Isabella Stewart Gardner Museum, Boston, Massachusetts, from on or about October 31, 2019, until on or about January 30, 2020, at possible additional exhibitions or venues yet to be determined, is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Chi D. Tran, Paralegal Specialist, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, SA–5, Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.*; 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, and Delegation of Authority No. 236–3 of August 28, 2000.

**Marie Therese Porter Royce,**

*Assistant Secretary, Educational and Cultural Affairs, Department of State.*

[FR Doc. 2019–23218 Filed 10–23–19; 8:45 am]

**BILLING CODE 4710–05–P**

---

**SURFACE TRANSPORTATION BOARD**

**[Docket No. AB 33 (Sub–No. 342X)]**

**Union Pacific Railroad Company and Jackson County, Mo.—Abandonment Exemption—in Jackson County, Mo.**

On October 4, 2019, Union Pacific Railroad Company (UP) and Jackson County, Mo. (the County) (collectively, Petitioners), jointly filed with the Board a petition under 49 U.S.C. 10502 for exemption from the prior approval requirements of 49 U.S.C. 10903 to abandon the railroad line extending between milepost 288.3 and milepost 270.6 in Jackson County, Mo. (the Line). The Line traverses U.S. Postal Service Zip Codes 64063, 64081, 64082, 64086, 64129, 64133, 64138, and 64139.

According to Petitioners, based on information in their possession, the Line does not contain federally granted rights-of-way. Petitioners further state that any documentation in the County's or UP's possession will be made available promptly to those requesting it.

In 2016, the County received authority through the Board's class exemption process at 49 CFR 1150.31 to acquire from UP and operate the Line. Recently, however, the Board revoked the County's acquisition and operation exemption. *See Jackson Cty., Mo.— Acquis. & Operation Exemption—Union Pac. R.R.*, FD 35982 (STB served July 31, 2019). Petitioners state that, in light of that decision, to avoid doubt on how to proceed, they jointly seek an exemption to abandon the Line. Petitioners state that there are no shippers on the Line and that there has not been any rail traffic on the Line in more than 20 years.

The County and UP indicate that they intend to enter into an interim trail use/rail banking agreement pursuant to the National Trails System Act, 16 U.S.C. 1247(d). If a NITU [1] is issued, the County anticipates salvaging track and track materials.

The interest of railroad employees will be protected by the conditions set forth in *Oregon Short Line Railroad— Abandonment Portion Goshen Branch Between Firth & Ammon, in Bingham & Bonneville Counties, Idaho*, 360 I.C.C. 91 (1979).

By issuing this notice, the Board is instituting an exemption proceeding pursuant to 49 U.S.C. 10502(b). A final

---

[1] Although the County and UP indicate that the County will seek issuance of a certificate of interim trail use or abandonment (CITU) (Pet. 8), the Board issues CITUs in abandonment application proceedings and notices of interim trail use or abandonment (NITUs) in abandonment exemption proceedings.

# DEPARTMENT OF STATE

## 22 CFR Part 40

**[Public Notice: 10922]**

**RIN 1400–AE87**

## Visas: Ineligibility Based on Public Charge Grounds

**AGENCY:** State Department.

**ACTION:** Interim final rule; request for public comment.

**SUMMARY:** This final rule amends Department of State ("Department") regulations by prescribing how consular officers will determine whether an alien is ineligible for a visa under the Immigration and Nationality Act ("INA"), because he or she is likely at any time to become a public charge. Aliens who seek a visa, application for admission, or adjustment of status must establish that they are not likely at any time to become a public charge, unless Congress has expressly exempted them from this ground of ineligibility or if the alien obtained a waiver. This interim final rule adds certain definitions, including definitions of public charge, public benefit, alien's household, and receipt of public benefit. This interim final rule reflects the Department's interpretation of the pertinent section of the INA as it applies to visa applicants. This rulemaking is also intended to align the Department's standards with those of the Department of Homeland Security, to avoid situations where a consular officer will evaluate an alien's circumstances and conclude that the alien is not likely at any time to become a public charge, only for the Department of Homeland Security to evaluate the same alien when he seeks admission to the United States on the visa issued by the Department of State and finds the alien inadmissible on public charge grounds under the same facts. The Department is also removing the reference to fee collection for review and assistance with submitting an affidavit of support at consular posts as consular posts do not collect this fee, and an obsolete process related to bonds.

**DATES:** This interim final rule is effective 12 a.m., Eastern Time, October 15, 2019. The Department of State will accept comments up to November 12, 2019.

**ADDRESSES:** You may send comments, identified by [DOS–2019–0035 and/or RIN: 1400–AE87], by the Federal eRulemaking Portal: *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Megan Herndon, Deputy Director for Legal Affairs, Visa Services, Bureau of Consular Affairs, Department of State, 600 19th St NW, Washington, DC 20006, (202) 485–7586, *VisaRegs@state.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. What changes are in § 40.41?

This interim final rule codifies changes to 22 CFR 40.41, which is the Department of State's ("Department") interpretation and implementation of the public charge ground of visa ineligibility, section 212(a)(4) of the Immigration and Nationality Act ("INA" or "Act"), 8 U.S.C. 1182(a)(4). This interim final rule supersedes all prior inconsistent guidance on the public charge visa ineligibility. Accordingly, this supersedes all Department guidance that previously limited the interpretation of "likely at any time to become a public charge" as likely to become primarily dependent on the government (federal, state, or local) for subsistence (previously limited to public cash assistance for income maintenance or institutionalization for long-term care at government expense).

The INA renders inadmissible (and therefore ineligible for a visa, ineligible for admission to the United States, and ineligible for adjustment of status) any alien who, in the opinion of a consular officer (or the Departments of Homeland Security ("DHS") or Justice ("DOJ"), as applicable) is likely at any time to become a public charge. The statute does not define the term "public charge." The statutory public charge provision provides that administering agencies must "at a minimum consider the alien's age; health; family status; assets, resources, and financial status; and education and skills." The agencies may also consider any affidavit of support, under section 213A of the INA, 8 U.S.C. 1183a, (*i.e.,* Form I–864, Affidavit of Support Under Section 213A of the INA) submitted on the alien's behalf. INA 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B). In general, the public charge ineligibility applies to both nonimmigrants and immigrants, although some classes of nonimmigrants and immigrants are exempt from the ineligibility ground. The DHS regulation at 8 CFR 212.23(a) lists the categories of exempt aliens. This interim final rule neither alters the classifications of aliens who are exempt from this ineligibility ground nor bears on the classifications of visas available to aliens.

The interim final rule makes several changes to paragraph (a) *Basis for Determination of Ineligibility.* First, the interim final rule adds language from

the statute, "at any time," to the existing regulatory language. Next, the interim final rule adds a reference to INA 212(a)(4)(D), 8 U.S.C. 1182(a)(4)(D), the requirement that an employment-based immigrant whose relative filed the immigrant visa petition or has a significant ownership interest in the entity that filed the immigrant visa petition, is ineligible unless such relative has executed a sufficient affidavit of support for such alien. The interim final rule adds language indicating that the consular officer will "consider whether any third party" listed in the affidavit of support will be "willing and able to financially support the alien while the alien is in the United States." The Department is not changing the temporal reference for the consular officer's determination, which currently and under the interim final rule, is any time "after admission."

Next, in paragraph (a), the interim final rule incorporates "more likely than not," the preponderance of the evidence standard, as the Department's interpretation of "likely" relating to the standard that consular officers will use when evaluating whether an alien is likely to become a public charge.

Additionally in paragraph (a), the interim final rule cites to the statutory requirement from section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), that consular officers will at the time of visa application take into account statutory factors, including the alien's age; health; family status; assets, resources, financial status; and education and skills. More specifically, the interim final rule codifies Department of State Foreign Affairs Manual ("FAM") guidance that consular officers must consider, at a minimum, those factors as part of the totality of the applicant's circumstances. This interim final rule then explains the Department's interpretation of each factor.

*Age:* Consular officers will consider whether the alien's age makes the alien more likely than not to become a public charge in the totality of the circumstances, such as by impacting the alien's ability to work. Consular officers will consider an alien's age between 18 and 62 as a positive factor. Age will be considered a negative factor for aliens who are under the age of 18 or over 62. However, consular officers may consider other factors, such as the support provided to a minor child by a parent, legal guardian, or other source, that in the totality of the circumstances may offset the alien's age as a negative factor. This generally restates current FAM guidance that being under 18 years old is a negative factor in the totality of the circumstances if the visa applicant

is neither accompanied by a parent or guardian or following to join a parent or guardian. The interim final rule also codifies into regulation existing FAM guidance that an applicant's age is a negative factor in the totality of the circumstances, if the consular officer believes it adversely affects the person's ability to obtain or perform work or may increase the potential for healthcare related costs that would be borne by the public.

*Health:* Under the interim final rule, consular officers will consider whether the alien's health serves as a positive or negative factor in the totality of the circumstances, including whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work (if authorized). This new provision clarifies current FAM guidance. The new provision adds that consular officers will consider the report of a medical examination performed by the panel physician where such examination is required, including any medical conditions noted by the panel physician. A Class B medical condition, including Class B forms of communicable diseases of public health significance, as defined in 42 CFR part 34, will not, standing alone, result in a finding of ineligibility for public charge. In assessing the effect of the alien's health on a public charge determination, the interim final rule provides that the consular officer will consider evidence of health insurance or the ability to pay for reasonably foreseeable medical expenses in the United States a positive factor in the totality of the circumstances. Under this standard, lack of health insurance alone would not make an alien more likely than not to become a public charge at any time, but would instead be considered in the totality of the alien's circumstances. This standard generally reflects existing guidance that certain health issues could increase the burden on the applicant to provide information demonstrating the ability to pay for medical expenses in the United States, potentially including proof of health insurance.

*Family status:* The interim final rule reflects that when considering an alien's family status, consular officers will consider the size of the alien's household, and whether the alien's household size makes the alien likely to become a public charge at any time in the future. The term "alien's household" is defined in paragraph (d). Household size is a positive factor if the

family size makes the alien unlikely to receive public benefits at any time in the future.

*Assets, resources, and financial status:* The interim final rule specifies several nonexclusive aspects of the alien's assets, resources, and financial status consular officers will consider. First, with regard to an alien's household gross income, the interim final rule specifies that annual gross income for the applicant's household size of at least 125 percent of the most recent Federal Poverty Guidelines based on the applicant's household size (or 100 percent for an applicant on active duty, other than training, in the Armed Forces), is a positive factor. Second, if the applicant's annual household gross income is less than 125 percent of the most recent Federal Poverty Guidelines (or 100 percent for an applicant on active duty, other than training, in the Armed Forces) based on the applicant's household size, the applicant can submit evidence of ownership of assets, which may affect the consular officer's determination. If the total value of the household assets, offsetting for liabilities, is at least five times the difference between the applicant's household gross income and 125 percent of the Federal Poverty Guidelines (or 100 percent for an applicant on active duty, other than training, in the Armed Forces) for the applicant's household size, then that will be considered a positive factor. However, if the alien is the spouse or child of a U.S. citizen, assets totaling three times the difference between the alien's household gross income and 125 percent of the Federal Poverty Guidelines (100 percent for those on active duty, other than training, in the Armed Forces) for the alien's household size is a positive factor. If the alien is a child who will be adopted in the United States and who will likely receive citizenship under INA 320, 8 U.S.C. 1432, then assets equivalent to or greater than the difference between the alien's household gross income and 125 percent of the Federal Poverty Guidelines (100 percent for those on active duty, other than training, in the Armed Forces) for the alien's household size is a positive factor. This reflects a change from existing FAM guidance, which recognizes income above 125 percent of the Federal Poverty Guideline and assets in the amount of five times 125 percent of the Federal Poverty Guideline generally as sufficient resources for overcoming public charge concerns.

The interim final rule provides that, when considering an alien's assets, resources, and financial status, consular

officers may not consider any income from illegal activities or sources, such as proceeds from illegal gambling or drug sales, or income from public benefits, as defined in the interim final rule. This policy is being explicitly articulated for the first time. The interim final rule then lists several specific nonexclusive factors consular officers will consider in evaluating whether the alien's assets, resources, and financial status make an alien likely to become a public charge. These include the alien's household gross income; the alien's cash assets and resources; non-cash assets and resources that can be converted into cash within twelve months of the date of the visa application; the alien's financial liabilities; whether the alien has applied for, been certified to receive or approved to receive, or received, one or more public benefits, as defined in paragraph (c) of this section on or after October 15, 2019, or whether the alien has disenrolled or requested to be disenrolled from such benefits; whether the alien has received an immigration benefit fee waiver from DHS on or after the interim final rule's effective date; and whether the applicant has private health insurance or other financial resources sufficient to pay for reasonably foreseeable medical costs. This interpretation introduces two factors: past DHS fee waivers and private health insurance or other means to cover reasonably foreseeable medical costs, both of which have direct bearing on the visa applicant's assets, resources, and financial status.

The interim final rule also changes how consular officers will consider past receipt of public benefits. Current FAM guidance directs consular officers to consider receipt of public assistance of any type by the visa applicant or a family member in the visa applicant's household when determining the likelihood a visa applicant would become a public charge. The interim final rule explicitly addresses the applicant's receipt of public benefits, and incorporates the Department's new definition of public benefit. Consular officers will only consider listed public benefits received on or after October 15, 2019, except that consular officers will consider as a negative factor, but not a heavily weighted negative factor, receipt of cash assistance for income maintenance or programs supporting institutionalization for long term care in the United States, received, or certified for receipt before October 15, 2019. Additionally, the current FAM guidance does not specifically limit a consular officer's consideration to U.S. forms of public assistance, but the interim final

rule only covers United States (federal, state, local, or tribal) public assistance.

*Education and skills:* When considering an alien's education and skills, consular officers will consider both positive and negative factors associated with whether the alien has adequate education and skills to either obtain or maintain lawful employment with an income sufficient to avoid being likely to become a public charge. In assessing whether the alien's level of education and skills makes the alien likely to become a public charge, the consular officer must consider, among other factors, the alien's history of employment, educational level (high school diploma, or its equivalent, or a higher educational degree), any occupational skills, certifications, or licenses, and proficiency in English or proficiency in other languages in addition to English. This standard provides additional detail and in some respects changes the guidance currently given to consular officers in the FAM. Currently, FAM guidance directs consular officers to consider the applicant's skills, length of employment, and frequency of job changes, and permitted consular offices to consider that work experience is evidence of skills. The Department is superseding the FAM's treatment of work experience as evidence of skills, by requiring only that consular officers consider the alien's history of employment. The Department is also introducing the new concept of whether an alien is a primary caregiver, considering as a positive factor under the totality of the circumstances if the alien is over 18 years of age and has "significant responsibility for actively caring for and managing the well-being of a minor, elderly, ill, or disabled person residing in the alien's household, such that the alien lacks an employment history or current employment, or is not employed full time."

*Prospective Visa Classification:* The interim final rule adds consideration of the alien's prospective visa classification.

*Affidavit of Support:* The interim final rule states that a sufficient Affidavit of Support Under Section 213A of the INA, where it is required, is a positive factor in the totality of the circumstances if the sponsor is likely to actually provide the alien with the statutorily required amount of financial support and other related considerations that may indicate the ability or willingness of the sponsor to provide support. Department guidance has reflected this interpretation since January 2018. Also, in paragraph (a)(7), the Department

removed reference to fee collection for review and assistance with submitting an affidavit of support at consular posts, as consular posts do not collect an affidavit of support fee overseas.

*Heavily Weighted Factors:* The interim final rule then introduces certain factors and factual circumstances that will weigh heavily in determining whether an alien is likely to become a public charge, including negative and positive factors. The heavily weighted negative factors are:

• The alien is not a full-time student and is authorized to work, but is unable to satisfy the consular officer that he or she is currently employed, has recent employment history, or a reasonable prospect of future employment;

• The alien has received, or has been certified or approved to receive, one or more public benefits, as defined in 22 CFR 40.41(c), for more than 12 months in the aggregate within any 36-month period (such that for instance receipt of two benefits in one month, counts as two months' worth of benefits), beginning no earlier than 12 a.m., October 15, 2019, or 36 months prior to the adjudication of the alien's visa application, whichever is later;

• The alien has been diagnosed with a medical condition that is likely to require extensive treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work;

• The alien has no health insurance for use in the United States and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition;

• The alien was previously found inadmissible or deportable on public charge grounds by an Immigration Judge or the Board of Immigration Appeals.

The heavily weighted positive factors are:

• The alien's household has income, assets, resources, or support of at least 250 percent of the Federal Poverty Guidelines for the alien's household size. Consular officers may not consider any income from illegal activities, *e.g.,* proceeds from illegal gambling or drug sales, or any income derived from any public benefit as defined in 22 CFR 40.41(c);

• The alien is authorized to work and is currently employed with an annual income of at least 250 percent of the Federal Poverty Guidelines for the alien's household size. Consular officers may not consider any income from illegal activities, *e.g.,* proceeds from illegal gambling or drug sales; and

• The alien has private health insurance (other than health insurance obtained with premium tax credits under the Affordable Care Act) for use in the United States covering the expected period of admission.

*Treatment of forms of public assistance received before October 15, 2019.* Under this interim final rule, consular officers will consider as a negative factor, but not as a heavily weighted negative factor as described in paragraph (a)(8) of this section, forms of assistance received prior to October 15, 2019 only if such assistance would have been considered in the public charge determination between May 25, 1999 and January 2, 2018. These are limited to (1) any amount of cash assistance for income maintenance, including Supplemental Security Income ("SSI"), Temporary Assistance for Needy Families ("TANF"), State and local cash assistance programs that provide benefits for income maintenance (often called "General Assistance" programs), and (2) programs (including Medicaid) supporting aliens who are institutionalized for long-term care, received before October 15, 2019. Short-term institutionalization for rehabilitation (including under Medicaid), received before October 15, 2019, will not be considered in the public charge determination under the interim final rule. Under this interim final rule, the Department will no longer authorize consular officers to consider other forms of public assistance, domestic or foreign, in the totality of the circumstances public charge calculation.

*Public Charge Definition:* In paragraph (b), the interim final rule introduces a new definition of public charge. Under previous Department guidance in effect since May 1999, consular officers considered an applicant likely to become a public charge if the applicant is likely, at any time after admission, to become primarily dependent on the U.S. Government (which includes Federal, state, or local governments) for subsistence. Public charge, for purposes of INA 212(a)(4)(A) and (B), 8 U.S.C. 1182(a)(4)(A) and (B), is defined under the interim final rule as an alien who receives one or more public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits).

*Public Benefit Definition:* In paragraph (c), the interim final rule introduces a new definition of public benefit. Prior guidance limited the types of benefits to receipt of public cash assistance for income maintenance and

institutionalization for long-term care at U.S. Government expense. The Department adopted this interpretation in the FAM based on the former Immigration and Naturalization Service ("INS") interpretation of the public charge inadmissibility, as explained in the INS Notice, *Field Guidance on Deportability and Inadmissibility on Public Charge* Grounds, 64 FR 28689 (May 26, 1999).

Under the Department's new definition, "public benefit" means:

• Any Federal, State, local, or tribal cash assistance for income maintenance (other than tax credits), including:

○ Supplemental Security Income (SSI), 42 U.S.C. 1381 *et seq.;*

○ Temporary Assistance for Needy Families (TANF), 42 U.S.C. 601 *et seq.;*

○ Federal, State or local cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which also exist under other names);

• Supplemental Nutrition Assistance Program (SNAP), 7 U.S.C. 2011 *et seq.;*

• Medicaid under 42 U.S.C. 1396 *et seq.,* except for:

○ Benefits received for an emergency medical condition as described in section 1903(v)(2)–(3) of Title XIX of the Social Security Act, 42 U.S.C. 1396b(v)(2)–(3), 42 CFR 440.255(c);

○ services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act (IDEA) 20 U.S.C. 1400 *et seq.;*

○ school-based services or benefits provided to individuals who are at or below the oldest age eligible for secondary education as determined under State or local law; or

○ benefits received by an alien under 21 years of age, or a woman during pregnancy (and during the 60-day period beginning on the last day of the pregnancy).

• Public housing and rental assistance programs under sections 8–9 of the Housing Act of 1937, 42 U.S.C. 1437f–g.

*Exclusions from the Public Benefit Definition:* Public benefit, under the interim final rule, does not include any public benefit received by an alien who at the time of receipt of the public benefit, or at the time of visa application or visa adjudication, is or was:

• Enlisted in the U.S. Armed Forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2) (or is the spouse or child of such person),

• serving in active duty or in the Ready Reserve component of the U.S. Armed Forces (or is the spouse or child of such person), or

• the spouse or child of an individual enlisted in the U.S. Armed Forces under

the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), or in the Ready Reserve component of the U.S. Armed Forces.

For the purpose of visa adjudication for which the public charge ground of ineligibility applies, public benefit, as defined in this section, does not include any public benefit received by an alien during periods in which the alien was present in the United States in an immigration category that is exempt from the public charge ground of inadmissibility, as set forth in 8 CFR 212.23(a), or for which the alien received a waiver of public charge inadmissibility from DHS. Public benefit does not include health services for immunizations and for testing and treatment of communicable diseases, including communicable diseases of public health significance as defined in 42 CFR part 34. Public benefits are limited to benefits received from governmental and tribal entities in the United States and does not include benefits from foreign governments. Public benefit also does not include any public benefit received by:

• Children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent will result automatically in the child's acquisition of citizenship under the Child Citizenship Act of 2000, Public Law 106–395, 114 Stat. 1631 (INA section 320(a)–(b), 8 U.S.C. 1431(a)–(b) in accordance with 8 CFR part 320);

• children of U.S. citizens whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship upon finalization of adoption, if the child satisfies the requirements applicable to adopted children under INA 101(b)(1), 8 U.S.C. 1101(b)(1) in the United States by the U.S. citizen parent(s) and meets other eligibility criteria as required by the Child Citizenship Act of 2000, Public Law 106–395, 114 Stat. 16341 (INA section 320(a)–(b), 8 U.S.C. 1431(a)–(b), in accordance with 8 CFR part 320); or

• children of U.S. citizens who are entering the United States for the purpose of attending an interview under section 322 of the INA, 8 U.S.C. 1433, in accordance with 8 CFR part 322.

Additionally, the interim final rule makes clear that only certain forms of public assistance received on or after 12:00 a.m., October 15, 2019 fall within the definition of "public benefit" for the purpose of applying the public charge ground of ineligibility, with the exception of cash assistance for income

maintenance and programs supporting institutionalization for long term care in the United States, as detailed in § 40.41(a)(9).

*Alien's Household:* The interim final rule sets out new standards to determine the members of an "alien's household" at paragraph (d). One standard applies to aliens who are twenty-one years of age or older and also applies to married individuals under twenty-one, whereas a separate standard applies to children, who are defined by the INA as unmarried persons under twenty-one years of age. If the alien is twenty-one years of age or older, or married and of any age, the alien's household includes:

• The alien;

• The alien's spouse, if physically residing or intending to physically reside with the alien in the United States;

• The alien's children, as defined in 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1), if physically residing or intending to physically reside with the alien;

• The alien's other children, as defined in section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1), not physically residing or not intending to physically reside with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

• Any other individuals (including a spouse not physically residing or not intending to physically reside with the alien) to whom the alien provides, or is required to provide, at least 50 percent of the individual's financial support or who are listed as dependents on the alien's United States federal income tax return; and

• Any individual who provides to the alien at least 50 percent of the alien's financial support, or who lists the alien as a dependent on his or her federal income tax return.

If the alien is a child as defined in section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1), the alien's household includes the following individuals:

• The alien;

• The alien's children as defined in section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1), physically residing or intending to physically reside with the alien;

• The alien's other children as defined in section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1), not physically residing or not intending to physically reside with the alien, for whom the alien provides or is required to provide

at least 50 percent of the children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

• The alien's parents, legal guardians, or any other individual providing or required to provide at least 50 percent of the alien's financial support to the alien as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided to the alien;

• The parents' or legal guardians' other children as defined in section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1), physically residing or intending to physically reside with the alien;

• The alien's parents' or legal guardians' other children as defined in section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1), not physically residing or not intending to physically reside with the alien for whom the parent or legal guardian provides or is required to provide at least 50 percent of the other children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the parents or legal guardians; and

• Any other individual(s) to whom the alien's parents or legal guardians provide, or are required to provide at least 50 percent of such individual's financial support or who is listed as a dependent on the parent's or legal guardian's federal income tax return.

This definition varies in certain aspects from existing FAM guidance. First, the Department is adopting different standards for applicants who are at least 21 years of age (or married and any age), and children. Prior guidance did not make such distinctions and placed more focus on the alien's sponsor, if required. However, the text of INA 212(a)(4), 8 U.S.C. 1182(a)(4), focuses on whether the visa applicant will become a public charge and requires the Department to consider the applicant's family status.

*Receipt of Public Benefit:* In paragraph (e), the interim final rule sets out new standards for what constitutes "receipt of public benefit." Receipt of public benefit occurs when a public benefit granting agency provides a public benefit, as defined in § 40.41(c), to the visa applicant as a beneficiary, whether in the form of cash, voucher, services, or insurance coverage. Application or certification for a public benefit does not constitute receipt of public benefit, but it may be considered as a factor suggesting likelihood of future receipt. An alien's receipt of, application for, or certification for, a public benefit solely on behalf of another individual does not constitute receipt of, application for, or certification for, such alien, regardless of whether the alien might gain personally from the third party's benefit. This new standard will help consular officers implement the new "public charge" definition at paragraph (b), referring to an alien who receives one or more public benefits, as defined in paragraph (c) of this section, for more than 12 months in the aggregate within any 36-month period. It also clarifies that consular officers must evaluate whether the alien is likely to receive one or more public benefits, the impact of certification for future receipt of a public benefits, and that the relevant consideration is the alien's future receipt, or expected receipt, of public benefits, not an application or certification solely on behalf of another person. Because 40.41(c) limits the definition of "public benefit" to specified forms of public assistance received on or after 12 a.m., October 15, 2019, an alien will not be considered to have received a public benefit before that date.

The paragraph in § 40.41 titled *Prearranged Employment,* formerly (e), is redesignated (f). The interim final rule does not change the text of these sections. Finally, the Department is removing *Posting of a Bond,* formerly (d), and *Joint Sponsors,* formerly paragraph (c) and *Use of the Federal Poverty Line Where INA 213A Not Applicable,* formerly paragraph (f). These paragraphs were removed because language was not necessary; they either restated statutory requirements or were obsolete.

## II. Why is the Department promulgating this rule?

### A. Background

On August 14, 2019, DHS issued a final rule outlining its new interpretation of the public charge ground of inadmissibility. *See Inadmissibility on Public Charge Grounds,* 84 FR 41292. Under DHS's prior interpretation of "public charge" an alien would be inadmissible if he or she would be "primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." Since May 1999, Department guidance has used the same standard. As a consequence, an alien's reliance on or receipt of non-cash benefits such as SNAP, Medicaid, housing vouchers and other housing subsidies, and other programs that DHS now considers "public benefit" pursuant to its new definition of "public charge" were not previously considered by DHS or the Department in determining whether an alien is deemed likely at any time to become a public charge.

DHS revised its interpretation of "public charge" to incorporate consideration of such benefits in order to better ensure that aliens subject to the public charge inadmissibility ground are not dependent on public resources to meet their needs, but rather rely on their own capabilities, as well as the resources of family members, sponsors, and private organizations. The DHS rule redefines the term "public charge" to mean an alien who receives one or more designated public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits). The DHS final rule defines the term 'public benefit' with a finite list of public benefits that are considered for purposes of the public charge determination, including Federal, state, local or tribal cash assistance for income maintenance, Supplemental Security Income ("SSI"), SNAP, most forms of Medicaid, Section 8 Housing Assistance under the Housing Choice Voucher ("HCV") Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing. *See* Inadmissibility on Public Charge Grounds, 84 FR 41292 (Aug. 14, 2019).

Because section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), renders inadmissible aliens ineligible to receive visas and ineligible to be admitted to the United States, the Department is also modifying its interpretation in some respects. The Department's new standards are intended to avoid situations where a consular officer will evaluate an alien's circumstances and conclude that the alien is not likely at any time to become a public charge, only for DHS to evaluate the same alien when he seeks admission to the United States on the visa issued by the Department of State and finds the alien inadmissible on public charge grounds under the same facts. Although the Department has chosen to follow DHS's approach in many respects, this interim final rule reflects the Department's independent interpretations and policies. In addition, some aspects of the rule may deviate from the DHS approach due to the differing circumstances of visa applicants, who

reside outside the United States and typically have not spent substantial time in the United States, as contrasted with applicants for USCIS-administered benefits, which applicants commonly are in the United States and have spent substantial time there.

*B. Specific Provisions*

In addition to the reasons cited in Section (II)(A), the Department adopts the interpretations set forth in the interim final rule based on the additional considerations below.

*1. Basis for Determination of Ineligibility*

The new reference to the Affidavit of Support provision for certain employment-based immigrants reflects the statutory requirement that aliens who are the beneficiary of petitions filed pursuant to section 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D), by a relative or an entity in which a relative has a significant ownership interest are ineligible without an Affidavit of Support from such relative. Significant ownership interest means 5 percent or more under existing Department guidance. *See also* 8 CFR 213a.1. This addition does not reflect a policy change. The Department is also clarifying that consular officers will consider whether a third party is willing and able to financial support the alien in the United States. A third party could be the sponsor, or, for example, for a B–1/B–2 applicant, the alien's parent or child. This clarifies current policy and is not a policy change.

Also in paragraph (a), the interim final rule incorporates "more likely than not" as the standard that consular officers will use when evaluating whether an alien is "likely" to become a public charge. Section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), specifies that the public charge ground will apply to "any alien who, in the opinion of the consular officer . . . is likely at any time to become a public charge". The Department believes that the word "likely" could be ambiguous to consular officers, particularly given the overall subjective nature of the standard ("in the opinion of the consular officer"), and that both consular officers and visa applicants would benefit from having a more clear standard of proof and adjudicatory framework.

The requisite degree of proof in civil matters is generally a preponderance of the evidence, which is synonymous with "more likely than not." The standard of proof specified by the INA that must be met by individuals applying for visas is "to the satisfaction of the consular officer." *See* INA 291, 8

U.S.C. 1361. However, most provisions in section 212(a) of the INA, 8 U.S.C. 1182(a), also require consular officers either to have a "reason to believe" or to evaluate whether as a factual matter something has happened in the past (*e.g.,* that a visa applicant was convicted of a particular crime or engaged in trafficking activity). The public charge provision, like certain other provisions, requires a consular officer to assess the likelihood of an event happening in the future, which here serves as the sole criterion for whether the ineligibility applies. To clarify the standard for consular officers, the Department is interpreting "likely" as "more likely than not" in the context of the public charge ineligibility ground, which will eliminate ambiguity from the phrase "likely at any time" by requiring a consular officer to make a finding that it is probable, *i.e.,* more likely than not, that an applicant will at any time in the future become a public charge for this ground of ineligibility to apply. Conversely, this standard makes clear to applicants that they can avoid application of the public charge ground of ineligibility by demonstrating that it is *not* more likely than not that they will become a public charge at any time in the future.

The interim final rule also cites in paragraph (a) to the statutory requirement from section 212(a)(4)(B) of the INA, 8 U.S.C. 1182(a)(4)(B), that consular officers will, at the time of visa application, take into account statutory factors, including the alien's age; health; family status; assets, resources, financial status; and education and skills. The rule also explains that consular officers must consider those factors, among others, as part of the totality of the applicant's circumstances. The interim final rule then explains the Department's interpretation of each factor. The Department's standards will be implemented through guidance that is consistent with standards announced in the DHS final rule, and will mitigate against the possibility that consular officers would issue a visa to an individual whom DHS would find inadmissible based on the same facts. However, the Department's standards are in some ways tailored specifically for unique aspects of visa adjudication.

*a. Age*

Consular officers will consider whether the alien's age makes the alien more likely than not to become a public charge in the totality of the circumstances, such as by impacting the alien's ability to obtain and perform work. Consular officers will consider an alien's age between 18 and 62 as a

positive factor, which takes into consideration "early retirement age" for Social Security set forth in 42 U.S.C. 416(l)(2). The 18-through-62 age range is based on the ages at which people are generally able to work full-time and prior to an individual's general ability to retire with some social security retirement benefits under Federal law.

Under this provision, being under 18 would be a negative factor. The Department notes this approach reflects the common understanding of when people are generally able to work full-time and that children under the age of 18 generally face difficulties working full-time. Federal laws, such as the Fair Labor Standards Act, and some state laws place restrictions on the ability of children under the age of 18 to work full-time. Additionally, individuals under the age of 18 may be more likely to qualify for and receive public benefits. For example, the U.S. Census reported that persons under the age of 18 were more likely to receive means-tested benefits than other age groups. *See* Jessica L. Semega et al., U.S. Census Bureau, *Income and Poverty in the United States: 2016,* at 13 tbl.3 (Sept. 2017), available at *https://www.census.gov/content/dam/Census/library/publications/2017/demo/P60-259.pdf.*

However, consular officers will also review the support provided by a parent or other source (assets, resources, and financial status) as part of the totality of the circumstances. For example, in the case of a 17-year old child in a United States boarding school, consular officers would consider age to be a negative factor. However, the alien's financial status or support, such as having education and living expenses paid for by someone else, would be a positive factor that in the totality of the circumstances could lead to the conclusion that the applicant is not likely to become a public charge. Likewise, in the case of a 17-year-old who has a credible offer of lawful employment that would make him- or herself-sufficient, the alien's age would be a negative factor, but a credible offer of employment that would make the alien self-sufficient would be a positive factor.

In codifying existing FAM guidance that an applicant's age above early retirement age is a negative factor in the totality of the circumstances if the consular officer believes it negatively affects the person's ability to work or may increase the potential for healthcare related costs, the Department does not intend this standard to imply that individuals over early retirement age are unable to work. These factors

will be weighed by consular officers in analyzing the totality of the applicant's circumstances.

b. Health

The interim final rule generally restates FAM guidance that directs consular officers to consider a visa applicant's health when assessing whether the applicant is likely to become a public charge. As explained below, the rule introduces additional factors related to assets, resources, and financial status, including whether an applicant will have health insurance or other means to cover reasonably foreseeable medical costs (relating to health issues existing at the time of visa adjudication). Lack of health insurance alone would not make an alien more likely than not to become a public charge at any time, but would instead be considered in the totality of the alien's circumstances.

c. Family Status

Under the interim final rule, consular officers will consider whether the alien has a household to support, or whether the alien is being supported by another household and whether the alien's household size makes the alien likely to become a public charge. Household size is a positive factor if the family size makes the alien unlikely to receive public benefits at any time in the future.

The Department notes that consular officers will frequently view family status in connection with, among other things, the alien's assets and resources, because the amount of assets and resources necessary to support a larger number of people in a household is generally greater. Thus, as described in the section below on ''Assets, resources, and financial status,'' consular officers will consider annual gross income for the applicant's household size of at least 125 percent of the most recent Federal Poverty Guidelines based on the applicant's household size (or 100 percent for an applicant on active duty, other than training, in the Armed Forces) a positive factor. The Department also recognizes DHS analyses showing that receipt of non-cash benefits generally increases as family size increases, and therefore family size is relevant to assessing whether an alien is likely to become a public charge. *See Inadmissibility on Public Charge Grounds,* 83 FR 51114, 51185, Tables 16 and 17 (proposed Oct. 10, 2018). Regardless of household size, an alien may present other factors (*e.g.,* assets, resources, financial status, education, and skills) that weigh for or against a finding that the alien is likely to become a public charge. For instance,

an alien who is part of a large household may have his or her own income or access to additional assets and resources that would assist in supporting the household. All of these factors would be considered in the totality of the circumstances.

The Department notes that this approach deviates somewhat from the DHS rule, in that the Department's approach focuses on the alien's intended household in the United States, rather than any members of his foreign household he or she will leave behind. This difference in effect aligns the two Departments' approaches.

d. Assets, Resources, and Financial Status

The Department's interpretation of this factor in the interim final rule comports with the totality of the circumstances test. Household gross income above 125 percent of the Federal Poverty Guidelines for the alien's household size (100 percent for an alien on active duty, other than training, in the Armed Forces), or assets five times the difference between the applicant's household gross income and the Federal Poverty Guidelines for the applicant's household, is a positive factor. However, if the alien is the spouse or child of a U.S. citizen, assets totaling three times the difference between the alien's household gross income and 125 percent of the Federal Poverty Guidelines (100 percent for those on active duty, other than training, in the Armed Forces) for the alien's household size is a positive factor. If the alien is a child who will be adopted in the United States and who will likely receive citizenship under INA 320, 8 U.S.C. 1432, then assets equivalent to or greater than the difference between the alien's household gross income and 125 percent the Federal Poverty Guidelines (100 percent for those on active duty, other than training, in the Armed Forces) for the alien's household size is a positive factor. This significant assets provision allows an alien whose income is below the applicable income threshold to demonstrate assets to support himself or herself, thereby reducing the likelihood of becoming a public charge. This reflects a change from existing FAM guidance, which recognizes income above 125 percent of the Federal Poverty Guidelines and assets in the amount of five times 125 percent of the Federal Poverty Guidelines generally as sufficient resources for overcoming public charge concerns. This new standard is more consistent with DHS Affidavit of Support requirements, outlined in 8 CFR 213a.2(c)(2)(iii)(B), and the

framework DHS will use for public charge inadmissibility determinations. *See* 8 CFR 212.22(b)(4).

It is still possible that other factors, such as an alien's health and inability to pay for reasonably foreseeable health costs, could mean that a consular officer could find an alien with such financial resources likely to become a public charge. The Department recognizes that this factor will be more relevant to immigrant visa applicants who will reside permanently in the United States than nonimmigrant applicants who intend to travel to the United States for a short duration.

The interim final rule introduces two factors related to assets, resources, and financial status: Previous DHS fee waivers and health insurance or other means to cover foreseeable medical costs. DHS fee waivers are based on an individual's inability to pay. 8 CFR 103.7(c). A recently granted fee waiver is relevant to whether an applicant is likely to become a public charge, although the factor is less relevant if the applicant's financial status has materially improved since the waiver was granted. Additionally, a fee waiver granted by DHS is not considered as a factor in the public charge inadmissibility determination if the alien applied for and was granted a fee waiver as part of an application for a benefit request for which a public charge inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) was not required.

The interim final rule's addition of private health insurance as a factor relevant to assets, resources, and financial status reflects the fact that medical costs can be significant and certain public benefits are designed to help individuals with limited resources to cover medical costs. The fact that an applicant has health insurance or other sufficient financial resources makes it less likely that an alien will resort to public benefits to cover medical expenses. A consular officer will consider an alien's health insurance coverage or other financial resources, in light of reasonably foreseeable medical costs (those related to medical issues existing at the time of visa adjudication), in the totality of the applicant's circumstances. Lack of health insurance alone would not make an alien more likely than not to become a public charge at any time, but would instead be considered in the totality of the alien's circumstances.

The Department also considered whether to include a visa applicant's credit score or credit report among the other factors relevant to assets, resources, and financial status. The

Department is aware that the DHS final rule includes an alien's credit history and credit score among the types of evidence USCIS adjudicators consider. The Department did not include credit history or credit score in this interim final rule, primarily because visa applicants generally would not have an active or recent credit history in the United States.

The interim final rule codifies some changes to how consular officers will consider past receipt of public benefits. Current guidance directs consular officers to consider receipt of public assistance of any type by the visa applicant or a family member in the visa applicant's household when determining the likelihood a visa applicant would become a public charge. The interim final rule revises this by focusing on receipt of public benefits only by the applicant and incorporates the Department's new definition of public benefit. Both of these elements align with the DHS rule, ensure consistent administration of the INA's public charge provisions, and minimize the possibility of a consular officer issuing a visa to an alien who is later found to be inadmissible by DHS on the same facts.

The Department's new definition of "public benefit" includes only certain forms of public assistance received on or after 12 a.m., October 15, 2019, although, as explained below in Section (II)(B)(1)(i), consular officers may consider any amount of cash assistance for income maintenance, including Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), State and local cash assistance programs that provide benefits for income maintenance (often called "General Assistance" programs), and programs (including Medicaid) supporting aliens who are institutionalized for long-term care, received, or certified for receipt, before October 15, 2019 as a negative factor (but not a heavily weighted negative factor).

e. Education and Skills

When considering an alien's education and skills, consular officers will consider whether the alien has adequate education and skills to either obtain or maintain lawful employment with an income sufficient to avoid being likely to become a public charge. In assessing whether the alien's level of education and skills makes the alien likely to become a public charge, the consular officer must consider, among other factors, the alien's history of employment, educational level (high school diploma or higher educational degree), any occupational skills, certifications or licenses, and language proficiency. Current guidance directs consular officers to consider the applicant's skills, length of employment, and frequency of job changes, and permitted consular offices to consider work experience as evidence of skills. Although the interim final rule does not treat work experience as evidence of skills, it does require that consular officers consider the alien's history of employment. Section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), directs officers to consider the alien's education and skills. The interim final rule implements Congress's directive on this mandatory statutory factor. This formulation is also more similar to the new DHS guidance, and is aimed to mitigate against situations where a consular officer will issue a visa to an alien who is later found inadmissible by DHS on the same facts.

The interim final rule introduces a requirement that consular officers consider the following additional information relevant to education and skills: Educational level (high school diploma, or its equivalent, or higher educational degree), any occupational skills, certifications or licenses, and language proficiency. Various studies and data show that a higher level of education and skills is a positive indicator of self-sufficiency. The U.S. Bureau of Labor Statistics (BLS) observed in 2016 a relationship between educational level and the unemployment rate. *See* U.S. Bureau of Labor Statistics, Employment Projections, Unemployment Rates and Earnings by Educational Attainment, 2016, available at *https://www.bls.gov/emp/chart-unemployment-earnings-education.htm* (last updated Mar. 27, 2018). According to that report, the unemployment rate for an individual with a doctoral degree was only 1.6 percent, compared to 7.4 percent for an individual with less than a high school diploma. According to the U.S. Census Bureau, lower educational attainment was associated with higher public benefit program participation rates for people over the age of 18. *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance*? (May 2015), available at *https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.* That report reflected that in 2012, 37.3 percent of people who did not graduate from high school received means-tested benefits, compared with 21.6 percent of high

school graduates and 9.6 percent of individuals with one or more years of college.

Additionally, data suggest that people who have lower education levels are not only more likely to receive public benefits but also more likely to receive them for longer periods. For example, 49.4 percent of people with less than four years of high school who received public benefits from a major means-tested program between January 2009 and December 2012 continued to participate in the benefit program for 37 to 48 months. In contrast, only 39.3 percent of high school graduates and 29.0 percent of those with one or more years of college who received public benefits during the same time period continued to participate in the public benefit program for 37 to 48 months. *See id.* The data suggests that a lack of education increases the likelihood of poverty and unemployment, which may in turn increase the likelihood of applying for, and participating in, public assistance programs.

The Department's treatment of education and skills in the interim final rule is supported by DHS's analysis of Survey of Income and Program Participation data, which shows a relationship between education level and self-sufficiency. *See Inadmissibility on Public Charge Grounds,* 83 FR 51114, 51190–51196 (proposed Oct. 10, 2018).

The interim final rule recognizes the implications of whether the alien is a primary caregiver. This factor is intended to take into consideration difficult-to-monetize contributions by aliens who may lack current employment or an employment history due to their full-time, unpaid care of household members. For example, a visa applicant may care for a household member who will not travel with the visa applicant to the United States. The visa applicant's employment history would not accurately reflect the alien's unpaid work as a primary caregiver. In this respect, serving as a primary caregiver could be a positive factor in the totality of the circumstances.

f. Prospective Visa Classification

The interim final rule adds that consular officers will consider the visa classification sought. This factor relates to the alien's ability to financially support himself or herself and the members of his or her household while in the United States. For example, a consular officer's public charge analysis of an applicant for a B–1 nonimmigrant visa, who plans to attend a week-long business meeting, would differ from a longer term nonimmigrant applicant, such as an H–1B nonimmigrant

specialty worker, who would reside and work in the United States for years at a time, and would differ even more from an immigrant visa applicant who intends to reside permanently in the United States and may not have pre-arranged employment. In this respect, the visa classification, including the purpose and duration of travel, are relevant to assessing the likelihood that an alien would avail himself or herself of public benefits (noting that in many cases visa applicants may not be eligible for public benefits in the United States), and therefore consular officers must evaluate these factors on a case-by-case basis.

That is not to say that a B–1 nonimmigrant applicant is subject to a lower standard than an H–1B nonimmigrant or immigrant under the statute or this interim final rule, but the immigration status sought by the applicant will be highly relevant context for the consular officer's totality of the circumstances determination. An applicant with a serious chronic health condition seeking medical treatment in the United States on a tourist visa would be expected to establish that he or she has the means and intent to pay for all reasonably foreseeable treatment. By demonstrating the ability to cover the medical expenses anticipated on a short-term trip to the United States, the applicant can demonstrate that even though health presents as a negative factor, the applicant has financial resources that make it unlikely the applicant would avail himself or herself of one or more public benefits. However, an immigrant visa applicant with the same serious chronic health condition and need for ongoing treatment would have to satisfy a consular officer that he or she has the means to pay for long-term care.

g. Affidavit of Support

The interim final rule provides that a properly filed, non-fraudulent, and sufficient Affidavit of Support, in those cases where it is required, is a positive factor in the totality of the circumstances. In the totality of the circumstances review, the consular officer would take into consideration the likelihood that the sponsor actually would provide the required financial support, based on the any available relevant information about the sponsor. Since January 2018, FAM guidance has reflected that a properly filed, non-fraudulent Affidavit of Support, in those cases where it is required, is a positive factor in the totality of the circumstances analysis, and that an alien who is required to submit an Affidavit of Support but who fails to

submit a sufficient Affidavit of Support is ineligible as a public charge. To be sufficient, an Affidavit of Support must meet the requirements of 8 CFR part 213a. Also, in paragraph (b), the Department removed reference to fee collection for review and assistance with submitting an affidavit of support at consular posts because consular posts do not collect an affidavit of support fee overseas.

h. Heavily Weighted Factors

The interim final rule provides that certain factors or factual circumstances will weigh heavily in determining whether an alien is likely to become a public charge. The mere presence of one of these enumerated circumstances would not, alone, be determinative. A heavily weighted factor could be outweighed by countervailing evidence in the totality of the circumstances. While heavily weighted factors are circumstances the Department considers particularly indicative of the likelihood an alien will become a public charge, they are evaluated in conjunction with other relevant positive and negative factors in the totality of the alien's circumstances.

i. Heavily Weighted Negative Factors

The interim final rule provides that certain factors are weighted as heavily negative because these factors are particularly indicative of a likelihood that the alien would become a public charge, particularly with regard to the alien's ability to be self-sufficient. Heavily weighted negative factors include:

a. Lack of Recent Employment or Prospect of Future Employment

As long as an alien is not a full-time student and is authorized to work in the alien's place of residence abroad and, if relevant, in the United States, the interim final rule sets the absence of current employment, employment history, or reasonable prospect of future employment as a heavily weighted negative factor. Self-sufficiency generally involves people being capable and willing to work and being able to secure and maintain gainful employment. Various studies and data show that a person's education, skills, and employment history, are positive factors for self-sufficiency. *See* Section (II)(B)(1)(e), above. In addition, the lack of positive employment history and demonstrable marketable skills are indicative of an increased likelihood that an individual would avail himself or herself of public benefits. This concept is supported by two Census Bureau studies covering 2004 to 2007

and 2009 to 2012, which show that, in each of the covered years, individuals with full-time work were less likely to receive means-tested benefits during the year (ranging from 4.5 percent to 5.1 percent of full-time workers who received benefits) than those who were unemployed (ranging from 24.8 percent to 31.2 percent of unemployed individuals who received benefits). *See* Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance?* (July 2012), available at *https://www2.census.gov/library/ publications/2012/demo/p70-130.pdf;* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* (May 2015), available at *https://www.census.gov/content/ dam/Census/library/publications/2015/ demo/p70-141.pdf.* The Department recognizes that not everyone authorized to work needs to work and thus the Department does not require a working age alien to have an employment history as part of the public charge determination. Some aliens may have sufficient assets and resources, including a household member's income and assets, which may overcome any negative factor related to lack of employment. For example, some student visa applicants may have scholarships that cover the cost of education as well as living expenses during the time of their studies. Further, students generally acquire skills as part of their studies so that post-education they will be able to obtain employment. Consular officers will review those considerations in the totality of the circumstances.

b. Current or Certain Past Receipt of Public Benefits

Under § 40.41(a)(8)(i)(B), receipt of one or more public benefits, as defined in § 40.41(c), is a heavily weighted negative factor in a consular officer's public charge determination if an alien has received or has been certified or approved to receive one or more public benefits for more than 12 months in the aggregate within any 36-month period, beginning no earlier than 36 months prior to the alien's visa application or after October 15, 2019, whichever is later. Under this interim final rule, receipt of two benefits in one month counts as two months' worth of benefits. Current receipt of one or more public benefits, alone, will not always justify a finding of ineligibility on public charge grounds. However, an alien's current

receipt of one or more public benefits suggests that the alien may continue to receive one or more public benefits in the future and would be more likely to be a public charge as defined under § 40.41(b).

With regard to current receipt of public benefits, according to U.S. Census Bureau data, the largest share of participants (43.0 percent) who benefited from one or more means-tested assistance programs between January 2009 and December 2012 continued to receive program benefits for between 37 and 48 months. *See* U.S. Census Bureau, *News Release: 21.3 Percent of U.S. Population Participates in Government Assistance Programs Each Month* (May 28, 2015), available at *https://www.census.gov/newsroom/ press-releases/2015/cb15-97.html*. A separate U.S. Census Bureau study showed that an individual who received benefits at any point during a two-year timespan was likely to receive benefits every month during the period studied, suggesting relatively long periods of receipt of benefits. Between January 2004 and December 2005, a greater share of the population received one or more means-tested benefits for the entire 24-month study period (10.2 percent) than for either one to 11 months (8.5 percent) or 12 to 23 months (6.5 percent). *See* Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance?* (July 2012), available at *https://www2.census.gov/library/ publications/2012/demo/p70-130.pdf*. The Department views current receipt of public benefits as a strong indicator that an alien will continue to receive public benefits after admission to the United States and is, therefore, likely to become a public charge. However, an alien may be able to establish circumstances indicating that the receipt of public benefits will stop in the near future, prior to admission to the United States on the visa being sought.

An alien's past receipt of public benefits at any time on or after October 15, 2019, for more than 12 months in the aggregate within the 36 months immediately preceding his or her application is a heavily weighted negative factor in determining whether the alien is likely to become a public charge. However, an alien's past receipt of T any designated public benefits is considered a negative factor, even if not a heavily weighted one. For example, the receipt of a public benefit five years ago (assuming the evaluation was on or after October 1, 2024) would be a negative factor; however, a public

benefit received within the previous three years prior to the visa application and for more than twelve months (assuming the twelve months occurred after October 15, 2019 and was for more than 12 of 36 months in the aggregate) is considered a heavily weighted negative factor. The weight given to the receipt of public benefits will depend not only on how long ago and for how long the alien received the benefits, but also on whether the alien received multiple benefits.

The interim final rule makes clear that consular officers will only consider past receipt of public benefits on or after October 15, 2019, as a heavily weighted negative factor. The definition of ''public benefit'' in § 40.41(c) only applies to benefits received on or after October 15, 2019.

### c. Lack of Financial Means to Pay for Medical Costs

An alien presents a high risk of becoming a public charge if he or she does not have private health insurance and also lacks the prospect of obtaining private health insurance or the financial resources to pay for reasonably foreseeable medical costs related to an existing medical condition. The risk increases if the alien is likely to require extensive medical treatment or institutionalization or the condition will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work. If the applicant has no medical conditions existing at the time of visa adjudication, he or she would have no reasonably foreseeable medical costs.

Certain chronic medical conditions can be costly to treat and an alien is at a high risk of incurring significant medical costs if he or she has such a condition. *See* U.S. Dep't of Health & Human Servs., *Research In Action, Issue #19: The High Concentration of U.S. Health Care Expenditures* (June 2006), available at *https://archive.ahrq.gov/ research/findings/factsheets/costs/ expriach/expendria.pdf*; *see also https://www.cdc.gov/chronicdisease/ about/costs/index.htm* (costs associated with certain chronic diseases).

Certain conditions may adversely affect an applicant's ability and capacity to obtain and retain gainful employment. Other conditions could result in long-term institutionalization in a health care facility. *Id.* According to the *Multiple Chronic Conditions Chartbook 2010 Medical Expenditure Panel Survey* Data, 86 percent of the nation's $2.7 trillion annual health care expenditures were for individuals with chronic or mental health conditions. *Id.* Consular officers will learn of medical

conditions through panel physician medical examinations or the alien's disclosure of a medical condition. If a consular officer has reason to believe a visa applicant's medical condition will require extensive medical treatment or institutionalization, or will interfere with the alien's ability to provide for himself or herself, attend school, or work, the consular officer will require the visa applicant to explain how he or she will cover medical costs in the United States. It is a heavily weighted negative factor if such an alien does not have private health insurance to cover such expenses in the United States and has neither the prospect of obtaining private health insurance to cover medical expenses in the United States, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition.

### d. Prior Public Charge Inadmissibility or Deportability Finding

A prior finding by an Immigration Judge or the Board of Immigration Appeals that the visa applicant was inadmissible under INA 212(a)(4), 8 U.S.C. 1182(a)(4), or deportable under INA 237(a)(5), 8 U.S.C. 1227(a)(5) (for having become a public charge within five years after date of entry to the United States, not from causes affirmatively shown to have arisen since entry) is a heavily weighted negative factor; however, a past public charge finding is not necessarily dispositive of whether the individual subsequently will be denied a visa on public charge grounds. The Department recognizes that individual circumstances can change with the passage of time. This approach aligns with the DHS final rule.

### ii. Heavily Weighted Positive Factors

The interim final rule provides that certain factors will be weighted as heavily positive, because they strongly indicate the alien would not become a public charge. Heavily weighted positive factors include:

### a. Alien's Household Has Income, Assets, Resources, or Support of at Least 250 Percent of the Federal Poverty Guidelines

If the alien's household has financial assets, resources, support or annual income of at least 250 percent of the Federal Poverty Guidelines for the alien's household size, then that will be considered a heavily weighted positive factor in the totality of the circumstances. DHS's analysis of Survey of Income and Program Participation data on income and participation in public benefit programs shows that participation in programs that

administer "public benefits," as defined for the purpose of this rule, declines significantly for individuals with an income at least 250 percent of the Federal Poverty Guidelines. *See Inadmissibility on Public Charge Grounds,* 83 FR 51206, (October 10, 2018) (noting, *e.g.,* that use of SNAP benefits declines from a 21.2 percent participation rate for those with income between 125–250 percent of the Federal Poverty Guidelines to 15 percent for those with incomes between 250–400 percent of the Federal Poverty Guidelines). This approach aligns with the DHS final rule. Accordingly, the Department will treat income, assets, resources, or support that is at least 250 percent of the Federal Poverty Guidelines as a heavily weighted positive factor.

b. Alien With Work Authorization Has Income of at Least 250 Percent of the Federal Poverty Guidelines

The Department will consider an alien with work authorization and income of at least 250 percent of the Federal Poverty Guidelines as a heavily weighted positive factor. In addition to the reasons provided in the prior paragraph, this level of income suggests that the alien has obtained a level of self-sufficiency and that he or she would be less likely to become a public charge, barring unforeseen changes in circumstances. This aligns with the DHS final rule.

c. Alien Has Private Health Insurance

Additionally, consular officers will consider as a heavily weighted positive factor that an alien is covered by private health insurance (other than health insurance obtained with premium tax credits under the Affordable Care Act) that can be used in the United States during the entire period of the alien's anticipated stay in the United States. This approach is supported by DHS's analysis of Survey of Income and Program Participation data, which indicates that the fact that an alien has health insurance is indicative of the alien's ability to be self-sufficient. *See Inadmissibility on Public Charge Grounds,* 84 FR 41292, 41449 (Aug. 14, 2019). In excluding health insurance obtained with premium tax credits under the Affordable Care Act from the category of heavily weighted positive factors, though not from consideration as a positive factor, the Department observes that DHS adopted this approach in its final rule.

i. Treatment of Benefits Received Before October 15, 2019

Under the interim final rule, consular officers will consider, as a negative factor, but not as a heavily weighted negative factor, any amount of cash assistance for income maintenance, including Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), State and local cash assistance programs that provide benefits for income maintenance (often called "General Assistance" programs), and programs (including Medicaid) supporting aliens who are institutionalized for long-term care, received, or certified for receipt, before October 15, 2019. This is reflective of the fact that under previous Department guidance in effect since May 1999, consular officers considered an applicant likely to become a public charge if the applicant was likely, at any time after admission, to become primarily dependent on the U.S. Government (which includes Federal, state, or local governments) for subsistence. However, the mere receipt of these benefits does not automatically make an alien ineligible for the visa. Consular officers will make each determination on a case-by-case basis in the context of the totality of the circumstances. The Department will not consider as a negative factor any other public assistance received, or certified for receipt, before October 15, 2019.

2. Public Charge Definition

The Department's interim final rule interprets public charge as the receipt of one or more public benefits, as defined in paragraph (b) of § 40.41, for more than 12 months in the aggregate within any 36-month period. Receipt of two benefits in one month counts as receiving benefits for two months. Prior Department guidance limited the interpretation of "likely to become a public charge" to "likely to become primarily dependent on the U.S. Government (which includes Federal, state, or local governments) for subsistence" (previously meaning receipt of public cash assistance for income maintenance or institutionalization for long-term care at U.S. Government expense). The Department believes this new, more rigorous implementation of the public charge visa ineligibility is consistent with section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), and congressional objectives stated in the Personal Responsibility and Work Opportunity Act of 1996 (PRWORA), where Congress noted that aliens subject to the public charge visa ineligibility should "not

depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *See* 8 U.S.C. 1601(2)(A).

There is a scarcity of legislative guidance and case law interpreting public charge. Legislative history, however, suggests a link between public charge and the receipt of public benefits. According to a 1950 Senate Judiciary Committee report, which led up to passage of the INA in 1952, a Senate subcommittee highlighted concerns raised by an immigration inspector about aliens receiving old age assistance. The Senate subcommittee recommended against establishing a strict statutory definition of public charge. Because the circumstances that indicate any given individual's likelihood of becoming a public charge vary, the subcommittee instead recommended that the determination of whether an alien is likely to become a public charge should rest within the discretion of consular officers and the Commissioner. *See* 1950 Omnibus Report of the Senate Judiciary Committee, S. Rep. No. 81–1515, at 349 (1950).

In setting the standard as receipt of public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits) the Department recognizes that States have developed widely varying approaches to the imposition of time limits for the receipt of public benefits. On the Federal level, PRWORA established a 60-month time limit on the receipt of federally funded Temporary Assistance for Needy Families (TANF) program benefits. *See* 42 U.S.C. 608(a)(7) and 45 CFR 264.1. Some states have adopted shorter lifetime limits on benefit receipt; in 2017, fourteen States had lifetime limits of less than 60 months and nine states had intermittent time limits. *See* Heffernan, Christine, Benjamin Goehring, Ian Hecker, Linda Giannarelli, and Sarah Minton (2018). Welfare Rules Databook: State TANF Policies as of July 2017, OPRE Report 2018- 109, Washington, DC: Office of Planning, Research, and Evaluation, Administration for Children and Families, U.S. Department of Health and Human Services *https://wrd.urban.org/ wrd/data/databooks/2017%20Welfare %20Rules%20Databook%20(final %2010%2031%2018).pdf* (last visited Sept. 13, 2019).

The Department's position is that an individual who receives public benefits for more than 12 months, in the aggregate, during a 36-month period is

neither self-sufficient nor on the road to achieving self-sufficiency, and may appropriately be considered a public charge. The Department's implementation deems receipt of public benefits for such a duration as exceeding what could reasonably be defined as a nominal level of support that merely supplements an alien's independent ability to meet his or her basic living needs. This new definition aligns with the new DHS rule.

3. Public Benefit

*In general:* As described above, the Department's prior guidance interpreted the public charge ground of ineligibility to include only specific cash assistance for income maintenance and institutionalization for long-term care at U.S. Government expense. Guidance on public cash assistance for income maintenance was further clarified to include supplemental security income (SSI); TANF cash assistance, but not supplemental cash benefits or any non-cash benefits provided under TANF; and state and local cash assistance programs that provide for income maintenance (often referenced as "state general assistance"). This previous guidance explicitly excluded other benefits including non-cash benefits such as the SNAP, Medicaid, housing vouchers and other housing subsidies, and other programs. The Department adopted this interpretation based on an INS interpretation of the public charge inadmissibility, as explained in the INS Notice, *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,* 64 FR 28689 (May 26, 1999).

The new rule broadens the Department's interpretation of "public benefit" for purposes of applying the public charge ground of ineligibility to include public cash assistance for income maintenance, SNAP, most forms of Medicaid, Section 8 Housing Assistance under the Housing Choice Voucher (HCV) Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing.

The Department believes this interpretation of public benefit is consistent with INA section 212(a)(4), 8 U.S.C. 1182(a)(4). The sparse statutory language and legislative history allows for a wide range of interpretations, including both the Department's previous more limited definition of public benefit focused on cash assistance and this broader definition.

The definition of "public benefit" in this interim final rule is also consistent with PRWORA. That statute includes broad definitions of "federal public benefit" and "state or local public

benefit" that extend significantly beyond the Department's prior guidance in the public charge context. While PRWORA allows some aliens to receive certain benefits covered under its expansive definitions, Congress did not exclude the lawful receipt of such benefits from consideration for purposes of INA section 212(a)(4), 8 U.S.C. 1182(a)(4). Further, the Department's definition of "public benefit" is consistent with the Congressional goals articulated in PRWORA, specifically that aliens subject to the public charge visa ineligibility should "not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." See 8 U.S.C. 1601(2)(A). The Department chose to include the specific non-cash benefits covered under the definition of "public benefit" because these benefits assist recipients in meeting basic living requirements, namely food, housing, and medical care. The receipt of any of the listed benefits indicates that the recipient, rather than being self-sufficient, needs the government's assistance to meet basic living requirements.

Since 1999, the Department, when applying the public charge ineligibility ground, has considered only whether an alien is likely to become primarily dependent for subsistence on the U.S. Government, which includes Federal, state, or local governments, by resorting to income maintenance and institutionalization for long-term care at government expense. However, current FAM guidance says:

There are many forms of public assistance that an applicant may have accepted in the past, or that you may reasonably believe an applicant might receive after admission to the United States, that are of a non-cash and/or supplemental nature and should not be considered to be benefits when examining the applicant under INA 212(a)(4), and may only be considered as part of the totality of the applicant's circumstances in determining whether an applicant is likely to become a public charge.

Under the interim final rule, the Department will only treat receipt of the specified forms of public assistance on or after 12:00 a.m., October 15, 2019 as a "public benefit" for the purposes of applying the public charge ground of ineligibility, and will only consider cash assistance for income maintenance and programs supporting institutionalization for long term care in the United States that are not included in the new definition of "public benefit" that were received or certified for receipt prior to October 15, 2019. The Department believes that consideration of these

forms of assistance represent an appropriately comprehensive and also readily administrable application of the public charge ground of ineligibility. The interim final rule will supersede the current policy, which allows consular officers to consider past receipt of any forms of public assistance, at any time. The Department observes that DHS proposed a similar approach in its NPRM, but, following public comments, opted for the approach reflected in this interim final rule when it finalized its rule. For consistency with the DHS standard, as well as for increased transparency and to provide a clear and helpful limitation on the scope of review for consular officers and visa applicants, the Department is adopting the DHS final rule's approach.

a. Exception for Certain Individuals Enlisted or Serving in the U.S. Armed Forces, Spouse, and Children

Under the interim final rule, consular officers will not consider receipt of public benefits by those enlisted in the U.S. Armed Forces, or serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, and their families, when assessing whether such individuals are likely to become a public charge. The United States Government is profoundly grateful for the unparalleled sacrifices of the members of our armed services and their families. The Department recognizes that some service members, during their service, or their family members, qualify for and receive public benefits in addition to the salary and benefits provided by the U.S. government. Their sacrifices, including risking life and limb, are so vital to the public's safety and security that the Department finds this exception warranted. The Department understands that many of the individuals who enlist in the military are early in their careers, and therefore, consistent with statutory pay authorities, earn relatively low salaries that are supplemented by certain other allowances and tax advantages provided by the U.S. government. *See Inadmissibility on Public Charge Grounds, 84 FR 41371;* see also *Final Rule, Inadmissibility on Public Charge Grounds; Correction,* 84 FR 52357 (Oct. 10, 2019). This approach is consistent with the DHS rule. For these reasons, the Department's interim final rule excludes consideration of the receipt of any public benefits by active duty service members and their spouses and children.

b. Exception for Aliens Present in the United States in an Immigration Category Exempt from the Public Charge Ground

For the purpose of immigration benefit adjudication, DHS does not consider public benefits received by an alien during periods in which the alien was present in the United States in an immigration category that is exempt from the public charge ground of inadmissibility or for which the alien received a waiver of public charge inadmissibility. 8 CFR 212.21(b)(8). Likewise, for the purpose of adjudicating visa applications, consular officers will not consider public benefits an alien received during any periods in which the alien was present in the United States in an immigration category that is exempt from the public charge ground of visa ineligibility, or if the alien was the recipient of a waiver of the public charge ground of ineligibility.

c. Exception for Foreign-Born Children of U.S. Citizens

In some cases, the children of U.S. citizens will acquire citizenship upon finalization of their adoption in the United States, under section 320 of the INA, 8 U.S.C. 1431, or the children will naturalize upon taking the Oath of Allegiance (or having it waived) under section 322 of the INA, 8 U.S.C. 1433. In other cases, the children of U.S. citizens will acquire citizenship upon taking up residence in the United States in the legal and physical custody of their U.S. citizen parent pursuant to a lawful admission. The definition of "public benefits" does not include any benefits that were or will be received by aliens described in this paragraph.

Children of U.S. citizens eligible for automatic acquisition of citizenship under section 320 of the INA, 8 U.S.C. 1431, are exempt from the affidavit of support requirement. See *Child Citizenship Act,* Public Law 106–395, 114 Stat. 1631 (Oct. 30, 2000); 8 CFR 213a.2(a)(2)(ii)(E). Therefore, consular officers will not require any affidavit of support forms from sponsors of visa applicants who will benefit from section 320 of the INA, 8 U.S.C. 1431.

Children of U.S. citizens, including those adopted abroad, typically receive one of several types of immigrant visas as listed below and are lawfully admitted to the United States for permanent residence. Such children may become U.S. citizens (1) automatically, (2) following their admission to the United States and upon the finalization of their adoption, or (3) upon meeting other eligibility

criteria. International adoptions vary depending on the laws of the country of origin, the laws of the U.S. State of residence, and multiple other factors. In the majority of cases, adoptions are finalized in the country of origin before the child enters the United States and the child automatically acquires U.S. citizenship upon admission to the United States. Children whose adoptions are not finalized until after their admission or who were subject to custody orders permitting immigration to and adoption in the United States do not automatically acquire citizenship after admission. They may acquire citizenship, however, upon completing an adoption in the United States or having the foreign adoption recognized by the State where they are permanently residing, after which they would be eligible to naturalize. See *U.S. Dep't of State, 2018 Annual Report on Intercountry Adoptions,* available at *https://travel.state.gov/content/travel/ en/Intercountry-Adoption/adopt_ref/ adoption-publications.html.*

The following categories of children acquire citizenship upon lawful admission for permanent residence and beginning to reside in the legal and physical custody of their U.S. citizen parent(s):

• IR–2/IR–7 (Child of a U.S. citizen)—requires an approval of a Form I–130 (Petition for Alien Relative). These children, excluding stepchildren who have not been adopted by the U.S. citizen parent, are generally lawfully admitted for permanent residence or their status is adjusted to that of lawful permanent resident. The child must then file a Form N–600 (Application for Certificate of Citizenship) to receive the Certificate of Citizenship. The Certificate generally uses the date the child was lawfully admitted for permanent residence.

• IR–3/IR–8 (Orphan adopted abroad by a U.S. citizen)—requires an approval of the Form I–600 (Petition to Classify Orphan as an Immediate Relative). These children are generally admitted for permanent residence, and USCIS will send a Certificate of Citizenship to the child without a Form N–600 being filed or adjudicated.

• IH–3 (Hague Convention orphan adopted abroad by a U.S. citizen)—requires an approval of the Form I–800 (Petition to Classify Convention Adoptee as an Immediate Relative). These children are generally admitted for permanent residence and USCIS will send a Certificate of Citizenship to the child without a Form N–600 being filed or adjudicated.

The following categories of children are lawfully admitted for permanent residence for finalization of adoption:

• IR–4/IR–9 (Orphan to be adopted by a U.S. citizen). Generally, the parent(s) must complete the adoption in the United States. However, the child will also be admitted as an IR–4 if the foreign adoption was obtained without either parent having seen the child during the adoption proceedings, or when the parent(s) must establish that they have either "readopted" the child or obtained recognition of the foreign adoption in the State of residence (this requirement can be waived if there is a statute or precedent decision that clearly shows that the foreign adoption is recognized in the State of residence). See 8 CFR 320.1.

• IH–4 (Hague Convention Adoptee to be adopted by a U.S. citizen). These children are lawfully admitted for permanent residence and the parent(s) must complete the adoption in the United States. INA section 101(b)(1), 8 U.S.C. 1101(b).

Furthermore, children of U.S. citizens, who are residing outside of the United States and are eligible to naturalize under section 322 of the INA, 8 U.S.C. 1433, must apply for an immigrant or nonimmigrant visa to enter the United States before they naturalize. These children are generally issued a B–2 nonimmigrant visa in order to complete the process for naturalization through an interview and take the Oath of Allegiance under section 322 of the INA, 8 U.S.C. 1433. Congress has enacted numerous laws over the last two decades to ensure that foreign-born children of U.S. citizens are not subject to adverse immigration consequences in the United States on account of their foreign birth. Most notably, the Child Citizenship Act of 2000 provides that children, including adopted children, of U.S. citizen parents automatically acquire U.S. citizenship if certain conditions are met. See *Dep't of State, FAQ: Child Citizenship Act of 2000, available at https:// travel.state.gov/content/travel/en/ Intercountry-Adoption/adopt_ref/ adoption-FAQs/child-citizenship-act-of- 2000.html* (last visited July 30, 2019). See also 8 CFR part 320. The same year, Congress passed the Intercountry Adoption Act of 2000 (IAA), 42 U.S.C. 14901–14954, to implement the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, which established international standards of practices for intercountry adoptions. The United States signed the Convention in 1994, and the Convention entered into force for the United States

on April 1, 2008. *Deposit of Instrument of Ratification by the United States of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption,* 72 FR 71730 (Dec. 18, 2007). The full text of the Convention is available at *https:// www.hcch.net/en/instruments/ conventions/full-text/?cid=69* (last visited July 30, 2019). The IAA protects the rights of children, birth families, and adoptive parents, and improves the Government's ability to assist U.S. citizens seeking to adopt children from abroad. IAA section 2, 42 U.S.C. 14901(a). See also *Hague Convention on Intercountry Adoption; Intercountry Adoption Act of 2000; Accreditation of Agencies; Approval of Persons,* 71 FR 8064 (Feb. 15, 2006).

Many U.S. citizens seek to adopt children with disabilities or serious medical conditions, and a significant proportion of children adopted abroad by U.S. citizens have special medical needs. U.S. citizens seeking to adopt foreign-born children abroad generally must undergo a rigorous home study that includes a detailed assessment of finances, emotional, mental, and physical health, and other factors to determine their eligibility and suitability as prospective adoptive parents. See 8 CFR 204.3(e), 204.311(g)(3). Accordingly, such parents generally will have sufficient financial resources to provide for the child. See 8 CFR 204.311(h) (financial considerations); see also USCIS, Home Study Information, available at *https:// www.uscis.gov/adoption/home-study-information* (last visited July 30, 2019).

Nevertheless, many U.S. citizens who have adopted or are in the process of adopting foreign-born children with special medical needs may seek Medicaid for their children. See Public Law 97–248, 96 Stat. 324. Medicaid programs vary by State, and may be based on the child's disability alone rather than financial means of the parents, or have higher income eligibility thresholds. As enrollment in Medicaid programs by children who are under 21 years of age will not be considered a "public benefit" for the purposes of this interim final rule, and because the adoptive parents have been found to have sufficient resources to meet the needs of their adoptive child, these visa applicants will not be considered likely to become public charges. Specifically, Congress has already imposed a requirement on adoptees under INA sections 101(b)(1)(F) or (G), 8 U.S.C. 1101(b)(1)(F) or (G), that requires their parents to demonstrate to the government that "proper care will be

furnished the child if admitted to the United States." Federal regulations already require submission of a home study in cases involving the proposed adoption of children with special needs. The home studies in those cases must assess the adoptive parents' "preparation, willingness, and ability" to provide proper care for such children. 8 CFR 204.3(e)(4) and 204.311(p). The Department believes that Congress, by imposing a parental suitability determination that must be satisfied before an immigrant petition may be approved or a visa may be granted, has frontloaded aspects of the public charge determination for certain adoptive children and conveyed a preference that concerns directly related to public charge for adoptive families be assessed at early stages of the immigration process, rather than waiting until the time of the visa application at the very end of the process. Additionally, excluding consideration of the receipt of public benefits by such children is consistent with Congress' strong interest in supporting U.S. citizens seeking to adopt and welcome foreign-born children into their families, as reflected in the IAA section 2, 42 U.S.C. 14901(a). *See also* 146 Cong. Rec. S8938–01, S8938 (daily ed. Sept. 21, 2000) (statement by Sen. Landrieu) ("I have said it before and I believe it rings true here, adoption brings people, whether they are Republican, Democrat, conservative, liberal, American, Russian or Chinese, together. United by the belief that all children deserve to grow in the love of a permanent family. Adoption breaks down barriers and helps build families."). *See also* Public Law 106–139, 113 Stat. 1696 (1999) (amending the definition of "child" in section 101(b)(1)(E) of the INA, 8 U.S.C. 1101(b)(1)(E), a change that allowed children adopted abroad to maintain their familial relationship with their natural siblings, making it easier for siblings to be adopted together).

Furthermore, because these children are being brought to the United States by their U.S. citizen parents (including adoptive parents) and will generally become U.S. citizens upon or after admission, and because the adoptive families have been found to have the resources to care for them, such an interpretation is not at odds with Congress' concerns in enacting PRWORA, or as reflected in concurrent immigration legislation restating the public charge ground of visa ineligibility noting that aliens should rely on their own capabilities and the resources of their families, their sponsors, and private organizations; and

that the availability of public benefits should not constitute an incentive for immigration to the United States. 8 U.S.C. 1601.

This provision also aligns with the DHS final rule. Accordingly, the interim final rule excludes receipt of benefits by foreign-born children of United States citizens from its interpretation of "public benefits," as explained in Section I, above.

#### 4. Alien's Household

The federal poverty guidelines do not define how to determine household size, and different agencies and programs have different requirements. See *Annual Update of the HHS Poverty Guidelines,* 84 FR 1167 (Feb. 1, 2019). Public benefit-granting agencies generally consider an applicant's income for purposes of public benefit eligibility and either use the household size or family size to determine the income threshold needed to qualify for a public benefit. Each federal program administrator or State determines the general eligibility requirements needed to qualify for the public benefits and how to determine whose income is included for purposes of determining income based eligibility thresholds. For example, SNAP uses the term "household" to include "individuals who live together and customarily purchase food and prepare meals together for home consumption." 7 U.S.C. 2012(m)(1). The Department did not incorporate the SNAP definition because an alien may have significant financial obligations to children who do not reside in the same residence. Instead, the standard in the interim final rule takes into account individuals for whom the alien or the alien's parent(s) or legal guardian(s) or other individual is providing at least 50 percent of financial support because such expenditure would have significant bearing on whether the alien has sufficient assets, resources, and financial status in the context of a public charge determination.

The U.S. Department of Housing and Urban Development (HUD) uses the term "families," which includes:

[F]amilies with children and, in the cases of elderly families, near-elderly families, and disabled families, means families whose heads (or their spouses), or whose sole members, are elderly, near-elderly, or persons with disabilities, respectively. The term includes, in the cases of elderly families, near-elderly families, and disabled families, 2 or more elderly persons, near-elderly persons, or persons with disabilities living together, and 1 or more such persons living with 1 or more persons determined under the public housing agency plan to be essential to their care or well-being.

42 U.S.C. 1437a(b)(3). The U.S. Housing Act of 1937 (the 1937 Act), 42 U.S.C. 1437 to 1437zz–10, requires that dwelling units assisted under it must be rented only to families who are low-income at the time of their initial occupancy. Section 3 of the 1937 Act also defines income, with respect to a family, as:

[I]ncome received from all sources by each member of the household who is 18 years of age or older or is the head of household or spouse of the head of the household, plus unearned income by or on behalf of each dependent who is less than 18 years of age, as determined in accordance with the criteria prescribed by the Secretary [of Housing and Urban Development], in consultation with the Secretary of Agriculture [. . .].

42 U.S.C. 1437a(b)(4), as amended by the Housing Opportunity Through Modernization Act of 2016, Public Law 114–201, section 102, 130 Stat. 782, 787 (2016). Beyond the statutory framework defining families, and as provided by the 1937 Act, HUD allows public housing agencies the discretion to determine particularities related to family composition, as determined under each public housing agency's plan.

"Alien's household," under paragraph (e) of the interim final rule, encompasses many of the individuals identified in various HUD definitions of "family," including spouses and children as defined under the INA. The definition of child in INA section 101(b), 8 U.S.C. 1101(b), generally includes unmarried persons under 21 years of age who are born in or out of wedlock, stepchildren, legitimated children, adopted children if adopted under the age of 16 or the age of 18 if natural siblings of another adopted child. In addition, the Department's interpretation focuses on both individuals who the alien anticipates will live in the alien's home or physically reside with the alien in the United States, as well as individuals not living in the alien's home but for whom the alien and/or the alien's parent(s)/ legal guardian(s) is providing or is required to provide at least 50 percent of financial support, whether in the United States or abroad.

The IRS defines "dependent" to include a qualifying child or a qualifying relative. See 26 U.S.C. 152; see also *IRS Publication 501* (Jan 2, 2018), available at *https://www.irs.gov/ pub/irs-pdf/p501.pdf*. These tests generally include some type of relationship to the person filing (including step and foster children and their children) whether or not the dependent is living with the person filing and the amount of support being provided by the person filing (over 50 percent). *IRS Publication 501* (Jan 2, 2018), available at *https://www.irs.gov/ pub/irs-pdf/p501.pdf*. In general, the dependent must also be a U.S. citizen or lawful permanent resident in order to qualify as a dependent for tax purposes. *Id.*

The IRS definition of "dependent" would generally exclude nonresident aliens. However § 40.41(d) does not. This will result in a larger number of people being included than if the Department tracked the IRS's definition of "dependent" in order to more accurately capture the alien's actual financial obligations. As used in paragraph (d), "alien's household" also considers those individuals who are supported by the alien and are themselves aliens, or those who may be contributing to the alien's income, in order to determine whether the alien's financial resources are sufficient to support the alien and other members of the alien's household. For example, if an alien resides with a younger sibling who is attending school and the alien provides 50 percent or more financial support for the younger sibling, that sibling is a part of the alien's household, even though the younger sibling may be earning some wages from a part-time job. Those part-time wages would be counted toward the requisite income threshold. Similarly, if the alien has an older sibling who is providing 50 percent or more of financial support to the alien but not residing with the alien, that older sibling would also be included in the alien's household and his/her income counted toward the requisite income threshold along with any income earned by the alien.

As used in § 40.41(d), "alien's household" adopts the IRS standard of the amount of support being provided to the individual (50 percent) as the standard for deeming an individual part of the household in the public charge determination. See *Internal Revenue Serv., Dependency Exemptions,* available at *https://apps.irs.gov/app/ vita/content/globalmedia/4491_ dependency_exemption.pdf* (last visited Jul. 30, 2019); see also Internal Revenue Serv., *Table 2: Dependency Exemption for Qualifying Relative,* available at *https://apps.irs.gov/app/ vita/content/globalmedia/table_2_ dependency_exemption_relative_ 4012.pdf* (last visited Jul. 30, 2019). The Department believes that the "at least 50 percent of financial support" standard used by the IRS is reasonable to apply to the determination of who is a member of an alien's household, without regard to whether these individuals physically reside in the alien's home. This would include those individuals the alien may not have a legal responsibility to support but may nonetheless be supporting. For example, this could include a parent, sibling, or a grandparent living with the alien, or an adult child, sibling, or any other adult who the alien may be supporting or required to support or who contributes to the alien's financial support.

## 5. Receipt of Public Benefits

The interim final rule clarifies that receipt of public benefits occurs when a public benefit-granting agency provides a public benefit, as defined in § 40.41(c), to the visa applicant as a beneficiary, whether in the form of cash, voucher, services, or insurance coverage. The Department clarifies that application or certification for a public benefit does not constitute receipt of public benefits, but it may be considered as a factor suggesting likelihood of future receipt. Likewise, certification for future receipt of a public benefit does not constitute receipt of public benefits, although it may suggest a likelihood of future receipt. An alien's receipt of, application for, or certification for, public benefits solely on behalf of another individual does not constitute receipt of, application for, or certification for, such alien. This standard will help consular officers implement the new "public charge" definition at § 40.41(b) as an alien who receives one or more public benefits, as defined in paragraph (c) of § 40.41, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits). It also clarifies that consular officers must evaluate whether the alien is likely to receive one or more public benefits, the impact of certification for future receipt of public benefits, and that the relevant consideration is the alien's receipt of public benefits, not application or certification solely on behalf of another person.

## 6. Deletion of Posting of Bond

The Department removed the provision in former 22 CFR 40.41(d), which said that a consular officer may issue a visa to an alien who is within the purview of INA 212(a)(4), 8 U.S.C. 1182(a)(4), upon receipt of notice from DHS of the giving of a bond, and provided the consular officer is satisfied that the giving of such bond removes the likelihood that the alien will become a public charge. The Department is removing this provision because it reflects an obsolete process.

**7. Deletion of Use of the Federal Poverty Line Where INA 213A Not Applicable**

The Department removed the discussion in former 22 CFR 40.41(f), which stated that an immigrant visa applicant, not subject to the requirements of INA 213A, 8 U.S.C. 1183a, and relying solely on personal income to establish eligibility under INA 212(a)(4), 8 U.S.C. 1182a(a)(4), who does not demonstrate an annual income above the Federal poverty line, as defined in INA 213A(h), 8 U.S.C. 1183a(h), and who is without other adequate financial resources, shall be presumed ineligible under INA 212(a)(4), 8 U.S.C. 1182a(a)(4). The new language in sections (a) through (g) provide the framework consular officers will use to assess the public charge visa ineligibility, including for immigrant visa applicants who are subject to the public charge ground of ineligibility, but not the Affidavit of Support requirement. Instead of retaining a second framework for one subset of individuals subject to the public charge ground, the Department will apply this standard uniformly.

**8. Deletion of Joint Sponsor**

The Department removed the discussion in former 22 CFR 40.41(g), which stated that submission of one or more additional affidavits of support by a joint sponsor is required if the relative sponsor's income and assets and the immigrant's assets do not meet the Federal poverty requirements. This language has been deleted as it merely restates statutory requirements of INA 213A, 8 U.S.C. 1183a, and as such is not necessary in the 22 CFR 40.41.

**Regulatory Findings**

*Administrative Procedure Act*

The Department has concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule, as the delay associated with notice and comment rulemaking would be impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. 553(b)(3)(B); 5 U.S.C. 553(d)(3). Those exceptions relieve agencies of the notice-and-comment requirement in emergency situations, or in circumstances where ''the delay created by the notice and comment requirements would result in serious damage to important interests.'' *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), aff'd, 925 F.2d 1454 (Fed. Cir. 1991); *see also United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010); *Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982).

Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. On August 14, 2019, DHS published a final rule on inadmissibility on public charge grounds of inadmissibility. 84 FR 41292. That rule, which will be effective October 15, 2019, changes how DHS interprets the public charge ground of inadmissibility, section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4). Coordination of Department and DHS implementation of the public charge inadmissibility ground is critical to the Department's interest in preventing inconsistent adjudication standards and different outcomes between determinations of visa eligibility and determinations of admissibility at a port of entry. If implementation of the rule is delayed pending completion of notice and comment, consular officers would apply public charge-related ineligibility standards differing from those applied by DHS and, consequently, might issue visas to applicants who would later arrive at a port of entry and be found inadmissible by U.S. Customs and Border Protection under the new DHS public charge standards, based on the same information that was presented to the adjudicating consular officer. This inconsistency between the two agencies' adjudications would create a public harm and would significantly disrupt the Department's interest in issuing visas only to individuals who appear to qualify for admission to the United States. The Department has determined that the need to minimize the occurrence of situations in which visa holders arrive at a port of entry and are found inadmissible under the new DHS public charge standards supports a finding of good cause under 5 U.S.C. 553.

*Regulatory Flexibility Act/Executive Order 13272: Small Business*

Because this interim final rule is exempt from notice-and-comment rulemaking under 5 U.S.C. 553, it is exempt from the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). Nonetheless, consistent with the Regulatory Flexibility Act, the Department certifies that this rule will not have a significant economic impact on a substantial number of small entities because this rule only regulates individual visa applicants and does not regulate any small entities or businesses.

*Small Business Regulatory Enforcement Fairness Act of 1996*

The Office of Information and Regulatory Affairs has determined that

this is not a major rule as defined by 5 U.S.C. 804.

*Executive Orders 12866, 13563, and 13771*

The new public charge standards will impose additional costs on many individuals, by requiring applicants to provide detailed information about their age, health, family status, finances, and education and skills. These costs are analyzed in the notice required under the Paperwork Reduction Act of a new form, the DS–5540, Public Charge Questionnaire, which certain categories of applicants will be required to complete to help inform the consular officer's public charge assessment. The Department is separately seeking OMB approval of a new information collection (form) for this purpose. The Department estimates 12,736,034 visa applicants per year will be affected by this interim final rule based on the average number of visa applicants subject to the public charge ineligibility ground for the years 2017 and 2018. Specifically, in 2017, 624,317 immigrant visa applications were subject to the public charge ineligibility ground. The number was 630,340 in 2018. In 2017, 12,356,864 nonimmigrant visa applications were in categories subject to the public charge ineligibility, and 11,860,545 in 2018. While the Department estimates 12,736,034 visa applicants will be affected by this interim final rule per year, the Department estimates that only 450,000 applicants per year will be asked to submit this information; given that the majority of nonimmigrant visa applicants would not overcome 214(b) if they were also deemed likely to be a public charge and thus would be refused as such. The average burden per response is estimated to be 60 minutes. The Department estimates that the annual hour burden to visa applicants posed by the additional questions is 450,000 hours (450,000 applicants × 60 minutes). The weighted wage hour cost burden for this collection is $15,737,400 based on the calculation of $24.98 [1] (average hourly wage) × 1.4 (weighted wage multiplier) × 450,000 hours.

The Department believes the benefits of rigorously applying the public charge ineligibility ground, informed by relevant information that can only be provided by applicants, outweighs the costs associated with the new rule. Visa applicants and their representatives will already need to adjust to the new DHS

---

[1] Source: Data from the U.S. Bureau of Labor Statistics' May 2018 National Occupational Employment and Wage Estimates for all occupations (*http://www.bls.gov/oes*). Retrieved September 10, 2019.

public charge inadmissibility standard, so the information requested for the purpose of enforcing the Department's new rule substantially overlaps with the information requested by DHS when the applicant applies for admission or other immigration-related benefits in the United States. Most importantly, this interpretation seeks to mitigate against the possibility that consular officers would issue a visa to an individual who DHS would find inadmissible and deny U.S. entry, based on the same facts. This benefits applicants by preventing the investment of time and expenditure of personal funds on travel to the United States in the event that DHS ultimately finds them inadmissible.

This rule is an E.O. 13771 regulatory action.

*Executive Orders 12372 and 13132: Federalism*

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government. The Department does not expect that this interim final rule will impose substantial direct compliance costs on State and local governments, or preempt State law. The rule will not have federalism implications warranting the application of Executive Orders 12372 and 13132.

*Executive Order 12988: Civil Justice Reform*

The Department has reviewed the regulation in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175—Consultation and Coordination With Indian Tribal Governments*

The Department has determined that this rulemaking will not have a substantial direct effect on one or more Indian tribes, will not impose substantial direct compliance costs on Indian tribal governments, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes, and will not pre-empt tribal law. Accordingly, the requirements of Section 5 of Executive Order 13175 do not apply to this rulemaking.

*Paperwork Reduction Act*

This rule imposes a new information collection requirements under the

provisions of the Paperwork Reduction Act, 44 U.S.C. Chapter 35. The Department is separately seeking OMB approval of a new form, which certain applicants will be required to complete to assist with the consular officer's public charge assessment.

**List of Subjects in 22 CFR Part 40**

Administrative practice and procedure, foreign relations, passports and visas, aliens.

For the reasons stated in the preamble, the Department amends 22 CFR part 40 as follows:

**PART 40—REGULATIONS PERTAINING TO BOTH NONIMMIGRANTS AND IMMIGRANTS UNDER THE IMMIGRATION AND NATIONALITY ACT, AS AMENDED**

■ 1. The authority citation for part 40 is revised to read as follows:

**Authority:** 8 U.S.C. 1104, 1182, 1183a, 1641

■ 2. Section 40.41 is revised to read as follows:

**§ 40.41  Public charge.**

(a) *Basis for determination of ineligibility.* Any determination that an alien is ineligible under INA 212(a)(4) must be predicated upon circumstances indicating that, taking into account any Affidavit of Support under section 213A of the INA that may have been filed on the alien's behalf, the alien is likely at any time to become a public charge after admission, or, if applicable, that the alien has failed to submit a sufficient Affidavit of Support Under Section 213A of the INA as set forth in either INA 212(a)(4)(C) or 212(a)(4)(D). Consular officers will consider whether any identified third party is willing and able to financially support the alien while the alien is in the United States. When considering the likelihood of an alien becoming a public charge at any time through receipt of public benefits, as defined in paragraph (c) of this section, consular officers will use a more likely than not standard and take into account the totality of the alien's circumstances at the time of visa application, including at a minimum: The alien's age; health; family status; assets, resources, and financial status; and education and skills. None one enumerated factor alone, apart from the lack of a sufficient Affidavit of Support under section 213A of the Act where required, will make the alien more likely than not to become a public charge. For immigration classifications exempt from the public charge ground of ineligibility, see 8 CFR 212.23(a).

(1) *The alien's age.* Consular officers will consider whether the alien's age makes the alien more likely than not to become a public charge in the totality of the circumstances, such as by impacting the alien's ability to work. Consular officers will consider an alien's age between 18 and early retirement age as defined in 42 U.S.C. 416(l)(2) as a positive factor. Age is a negative factor for aliens who are under the age of 18. However, consular officers may consider other factors, such as the support provided to a minor child by a parent, legal guardian, or other source, that in the totality of the circumstances may offset the alien's age as a negative factor. An alien's age above early retirement age is a negative factor in the totality of the circumstances, if the consular officer believes it adversely affects the alien's ability to obtain or perform work, or may increase the potential for healthcare related costs that would be borne by the public.

(2) *The alien's health.* Consular officers will consider whether the alien's health is a positive or negative factor in the totality of the circumstances, including whether the alien, has been diagnosed with a medical condition that is likely to require extensive medical care or institutionalization, or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work, if authorized. Consular officers will consider the report of a medical examination performed by the panel physician where such examination is required, including any medical conditions noted by the panel physician. An individual with a Class B medical condition, including Class B forms of communicable diseases of public health significance, as defined in 42 CFR part 34, is not alone a determinative factor for public charge purposes. The medical condition will be taken into consideration with all factors under the totality of circumstances. In assessing the effect of the alien's health on a public charge ineligibility determination, the consular officer will consider evidence of health insurance or the ability to pay for reasonably foreseeable medical expenses in the United States a positive factor in the totality of the circumstances.

(3) *The alien's family status.* When considering an alien's family status, consular officers will consider the size of the alien's household, as defined in paragraph (e) of this section, and whether the alien's household size is a positive or negative factor in the totality of the circumstances.

(4) *The alien's assets, resources, and financial status*—(i) *In general.* Consular

officers will consider, among other relevant factors, the following aspects of an alien's assets, resources, and financial status:

(A) If the alien's annual gross income for the alien's household size is at least 125 percent of the most recent Federal Poverty Guidelines based on the alien's household size (or 100 percent for an alien on active duty, other than training, in the Armed Forces), consular officers will consider the alien's income a positive factor;

(B) If the alien's annual household gross income is less than 125 percent of the most recent Federal Poverty Guidelines (100 percent for those on active duty, other than training, in the Armed Forces) based on the alien's household size, consular officers will consider a total value of the household assets and resources that is at least five times the difference between the alien's household gross income and 125 percent of the Federal Poverty Guidelines for the alien's household size as a positive factor. However, if the alien is the spouse or child of a U.S. citizen, assets totaling three times the difference between the alien's household gross income and 125 percent of the Federal Poverty Guidelines (100 percent for those on active duty, other than training, in the Armed Forces) for the alien's household size is a positive factor. If the alien is a child who will be adopted in the United States and who will likely receive citizenship under section 320 of the INA, then assets equivalent to or greater than the difference between the alien's household gross income and 125 percent the Federal Poverty Guidelines (100 percent for those on active duty, other than training, in the Armed Forces) for the alien's household size is a positive factor.

(ii) *Factors to consider.* When considering an alien's assets, resources, and financial status, consular officers must consider assets, resources, and financial status including:

(A) The alien's household annual gross income;

(B) The alien's cash assets and resources;

(C) Non-cash assets and resources that can be converted into cash within twelve months of the visa application;

(D) The alien's financial liabilities;

(E) Whether the alien has applied for, been certified to receive, been approved to receive, or received one or more public benefits, as defined in paragraph (c) of this section on or after October 15, 2019, or whether the alien has disenrolled or requested to be disenrolled from such public benefits.

(F) Whether the alien has received an immigration benefit fee waiver from DHS on or after October 15, 2019, unless the fee waiver was applied for or granted as part of an application for which a public charge inadmissibility under section 212(a)(4) of the Act was not required; and

(G) Whether the alien has private health insurance or other financial resources sufficient to cover reasonably foreseeable costs related to a medical condition in the United States.

(iii) *Income from illegal activities or sources.* Consular officers may not consider any income from illegal activities or sources, such as proceeds from illegal gambling or drug sales, or income from any public benefit listed in paragraph (c) of this section.

(5) *The alien's education and skills.* When considering an alien's education and skills, consular officers will consider both positive and negative factors associated with whether the alien has adequate education and skills to either obtain or maintain lawful employment with an income sufficient to avoid being likely to become a public charge. In assessing whether the alien's level of education and skills makes the alien likely to become a public charge, the consular officer must consider, among other factors, the alien's history of employment, educational level (high school diploma, or its equivalent, or higher educational degree), any occupational skills, certifications or licenses, and English language proficiency or proficiency in languages in addition to English. Consular officers will take into positive consideration an alien who is a primary caregiver 18 years of age or older who has significant responsibility for actively caring for and managing the well-being of a minor, elderly, ill, or disabled person residing in the alien's household, such that the alien lacks an employment history or current employment, or is not employed full time. Only one alien within a household can be considered a primary caregiver of the same individual within the household.

(6) *Prospective visa classification.* When considering the likelihood at any time of an alien becoming a public charge, consular officers will consider the visa classification sought.

(7) *Affidavit of Support Under Section 213A of the Act.* Any alien seeking an immigrant visa under INA 201(b)(2), 203(a), or 203(b), based upon a petition filed by a relative of the alien (or in the case of a petition filed under INA 203(b) by an entity in which a relative has a significant ownership interest), shall be required to present to the consular officer an Affidavit of Support Under

Section 213A of the INA on a form that complies with terms and conditions established by the Secretary of Homeland Security. A properly filed, non-fraudulent, sufficient Affidavit of Support Under Section 213A of the INA, in those cases where it is required, is a positive factor in the totality of the circumstances if the sponsor is likely to actually provide the alien with the statutorily-required amount of financial support and other related considerations.

(8) *Heavily weighted factors.* The factors below will weigh heavily in an ineligibility determination based on public charge.

(i) *Heavily weighted negative factors.* The following factors will weigh heavily in favor of a finding that an alien is likely at any time in the future to become a public charge:

(A) The alien is not a full-time student and is authorized to work in his or her country of residence or the United States, as appropriate, but is unable to satisfy the consular officer that he or she is currently employed, has recent employment history, or a reasonable prospect of future employment;

(B) The alien has received or has been certified or approved to receive one or more public benefits, as defined in paragraph (c) of this section, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits), beginning no earlier than October 15, 2019, or for more than 12 months in the aggregate within the 36 month period prior to the adjudication of the alien's visa application, whichever is later.

(C)(*1*) The alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work; and

(*2*) The alien has no health insurance for use in the United States and has neither the prospect of obtaining private health insurance for use in the United States, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition;

(D) The alien was previously found inadmissible or deportable on public charge grounds by an Immigration Judge or the Board of Immigration Appeals.

(ii) *Heavily weighted positive factors.* The following factors will weigh heavily in favor of a finding that an alien is not likely at any time to become a public charge:

(A) The alien's household has income, assets, resources, or support of at least

250 percent of the Federal Poverty Guidelines for the alien's household size. Consular officers may not consider any income from illegal activities, *e.g.*, proceeds from illegal gambling or drug sales, or any income derived from any public benefit as defined in paragraph (c) of this section;

(B) The alien is authorized to work and is currently employed with an annual income of at least 250 percent of the Federal Poverty Guidelines for the alien's household size. Consular officers may not consider any income from illegal activities, *e.g.*, proceeds from illegal gambling or drug sales;

(C) The alien has private health insurance (other than health insurance obtained with premium tax credits under the Affordable Care Act) for use in the United States covering the expected period of admission.

(9) *Treatment of benefits received before October 15, 2019.* When considering whether an alien is more likely than not to become a public charge under this section, consular officers will consider, as a negative factor, but not as a heavily weighted negative factor as described in paragraph (a)(8) of this section, any amount of cash assistance for income maintenance, including Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), State and local cash assistance programs that provide benefits for income maintenance (often called "General Assistance" programs), and programs (including Medicaid) supporting aliens who are institutionalized for long-term care, received, or certified for receipt, before October 15, 2019.

(b) *Public charge.* Public charge means, for the purpose of INA 212(a)(4)(A) and (B), an alien who receives one or more public benefits, as defined in paragraph (c) of this section, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits).

(c) *Public benefit.* (1) Public benefit means any of the following forms of assistance received on or after October 15, 2019:

(i) Any Federal, State, local, or tribal cash assistance for income maintenance (other than tax credits), including:

(A) Supplemental Security Income (SSI), 42 U.S.C. 1381 *et seq.;*

(B) Temporary Assistance for Needy Families (TANF), 42 U.S.C. 601 *et seq.;*

(C) Federal, State or local cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which also exist under other names); and

(ii) Supplemental Nutrition Assistance Program (SNAP), 7 U.S.C. 2011 *et seq.;*

(iii) Housing Choice Voucher Program, as authorized under section 8(o) of the United States Housing Act of 1937 (42 U.S.C. 1437f);

(iv) Project-Based Rental Assistance (including Moderate Rehabilitation) authorized under section 8 of the United States Housing Act of 1937 (42 U.S.C. 1437f);

(v) Medicaid under 42 U.S.C. 1396 *et seq.,* except for:

(A) Benefits received for an emergency medical condition as described in section 1903(v)(2)–(3) of Title XIX of the Social Security Act, 42 U.S.C. 1396b(v)(2)–(3), 42 CFR 440.255(c);

(B) Services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act (IDEA) 20 U.S.C. 1400 *et seq.;*

(C) School-based services or benefits provided to individuals who are at or below the oldest age eligible for secondary education as determined under State or local law; and

(D) Benefits received by an alien under 21 years of age, or a woman during pregnancy (and during the 60-day period beginning on the last day of the pregnancy).

(vi) Public Housing under section 9 of the U.S. Housing Act of 1937 (42 U.S.C. 1437g).

(2) Public benefit, as defined in this section, does not include any form of assistance listed in paragraphs (c)(1)(i) through (vi) of this section received by an alien who at the time of receipt of the public benefit, or at the time of visa application or visa adjudication, is or was:

(i) Enlisted in the U.S. Armed Forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), or

(ii) Serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or

(iii) Is the spouse or child as defined in INA101(b), of an individual described in paragraph (c)(2)(i) or (ii) of this section, or of a citizen of the United States described in paragraph (c)(2)(i) or (ii).

(3) Public benefit, as defined in this section, does not include any form of assistance listed in paragraphs (c)(1)(i) through (vi) of this section received by an alien during periods in which the alien was present in the United States in an immigration category that is exempt from the public charge ground of inadmissibility, as set forth in 8 CFR 212.23(a), or for which the alien received a waiver of public charge inadmissibility from DHS. Public

benefit does not include health services for immunizations and for testing and treatment of communicable diseases, including communicable diseases of public health significance as defined in 42 CFR part 34.

(4) Public benefit, as defined in this section, does not include any form of assistance listed in paragraphs (c)(1)(i) through (vi) of this section that were or will be received by:

(i) Children of U.S. citizens whose lawful admission as permanent residents and subsequent residence in the legal and physical custody of their U.S. citizen parent will result automatically in the child's acquisition of citizenship;

(ii) Children of U.S. citizens whose lawful admission as permanent residents will result automatically in the child's acquisition of citizenship upon finalization of adoption; or

(iii) Children of U.S. citizens who are entering the United States for the purpose of attending an interview under INA 322 in accordance with 8 CFR part 322.

(d) *Alien's household.* For purposes of public charge ineligibility determinations under INA 212(a)(4):

(1) If the alien is 21 years of age or older, or under the age of 21 and married, the alien's household includes:

(i) The alien;

(ii) The alien's spouse, if physically residing or intending to physically reside with the alien in the United States;

(iii) The alien's children, as defined in INA 101(b)(1), if physically residing or intending to physically reside with the alien in the United States;

(iv) The alien's other children, as defined in INA 101(b)(1), not physically residing or not intending to physically reside with the alien for whom the alien provides or is required to provide at least 50 percent of financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(v) Any other individuals (including a spouse not physically residing or intending to physically reside with the alien) to whom the alien provides, or is required to provide, at least 50 percent of the individual's financial support or who are listed as dependents on the alien's United States federal income tax return; and

(vi) Any individual who provides to the alien at least 50 percent of the alien's financial support, or who lists the alien as a dependent on his or her federal income tax return.

(2) If the alien is a child as defined in INA 101(b)(1), the alien's household includes the following individuals:

(i) The alien;

(ii) The alien's children as defined in INA 101(b)(1), physically residing or intending to physically reside with the alien in the United States;

(iii) The alien's other children as defined in INA 101(b)(1) not physically residing or intending to physically reside with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(iv) The alien's parents, legal guardians, or any other individual providing or required to provide at least 50 percent of the alien's financial support to the alien as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided to the alien;

(v) The alien's parents' or legal guardians' other children as defined in INA 101(b)(1), physically residing or intending to physically reside with the alien in the United States;

(vi) The alien's parents' or legal guardians' other children as defined in INA 101(b)(1), not physically residing or intending to physically reside with the alien for whom the parent or legal guardian provides or is required to provide at least 50 percent of the other children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the parents or legal guardians; and

(vii) Any other individual to whom the alien's parents or legal guardians provide, or are required to provide at least 50 percent of each individual's financial support, or who is listed as a dependent on the parent's or legal guardian's federal income tax return.

(e) *Receipt of public benefit.* Receipt of public benefit occurs when a public benefit-granting agency provides a public benefit, as defined in paragraph (c) of this section, to the alien as a beneficiary, whether in the form of cash, voucher, services, or insurance coverage. Application or certification for a public benefit does not constitute receipt of public benefit, but it may be considered as a factor suggesting likelihood of future receipt. An alien's receipt of, application for, or certification for public benefit solely on behalf of another individual does not constitute receipt of, application for, or certification for such alien.

(f) *Prearranged employment.* An immigrant visa applicant relying on an offer of prearranged employment to establish eligibility under INA 212(a)(4), other than an offer of employment certified by the Department of Labor pursuant to INA 212(a)(5)(A), must provide written confirmation of the relevant information sworn and subscribed to before a notary public by the employer or an authorized employee or agent of the employer. The signer's printed name and position or other relationship with the employer must accompany the signature.

**Carl C. Risch,**
*Assistant Secretary for Consular Affairs, Department of State.*
[FR Doc. 2019–22399 Filed 10–10–19; 8:45 am]
**BILLING CODE 4710–06–P**



U.S. Department of State
# PUBLIC CHARGE QUESTIONNAIRE

OMB CONTROL NO. 1405-XXXX
EXPIRES:  XX/XX/20XX
ESTIMATED BURDEN: 60 Minutes

**PART 1 - INFORMATION ABOUT YOU**

1. Your Current Legal Name *(Do not provide a nickname)*

Family Name *(Last Name)*          Given Name *(First Name)*          Middle Name

2. Date of Birth *(mm-dd-yyyy)*

3. Have you ever been to the United States before?

☐ Yes      ☐ No

**PART 2 - YOUR HEALTH**

4. Do you currently have health insurance coverage in the United States?

☐ Yes      ☐ No

If you answered "Yes" to Item number 4, attach evidence of health insurance and skip to Part 3.
If you answered "No" to Item number 4, proceed to Item A.

4A. Will you be covered by health insurance in the United States within 30 days of your entry into the United States?

☐ Yes      ☐ No

If you answered "yes" to Item A, identify the specific health insurance plan and date coverage will begin.

**PART 3 - YOUR HOUSEHOLD SIZE**

5. What is your expected household size in the United States? Household size includes anyone physically residing with you, any dependents for whom you are responsible for at least 50% of their livelihood, and any individual who provides at least 50% of your financial support or who listed you as a dependent on his or her United States tax return. List expected members of your household in the table below. If you need additional space to complete any item number in this Part, use the space provided in Part 8, Additional Information.

| Name | Age | Relationship to you | Current Job | United States Citizen *(yes / no)* | On active duty, other than training, in the U.S. Armed Forces or Ready Reserve? *(yes / no)* |
|------|-----|---------------------|-------------|------------------------------------|-----------------------------------------------------------------------------------------------|
|      |     |                     |             |                                    |                                                                                               |
|      |     |                     |             |                                    |                                                                                               |
|      |     |                     |             |                                    |                                                                                               |
|      |     |                     |             |                                    |                                                                                               |
|      |     |                     |             |                                    |                                                                                               |

**PART 4 - YOUR ASSETS, RESOURCES, AND FINANCIAL STATUS**

6. List below all U.S. federal tax returns you have filed within the last three years and attach your IRS transcript (or copy of the complete, filed tax return) for your most recent U.S. federal tax return.

| Federal Tax Year | Did you file a Federal tax return? | Gross Income (U.S. dollars) |
|------------------|------------------------------------|------------------------------|
|                  | ☐ Yes      ☐ No                    |                              |
|                  | ☐ Yes      ☐ No                    |                              |
|                  | ☐ Yes      ☐ No                    |                              |

7. Did you work in the United States in the last three years but not file a U.S. federal tax return?

☐ Yes      ☐ No

If you answered "yes", explain.

**DS-5540**
**09-2019**

**Page 1 of 4**

**8. Income**

| 8A. What is your current salary in U.S. dollars? | 8B. If you currently have a job awaiting your arrival in the United States, who is the employer and what is the annual salary in U.S. dollars? |
|---|---|
| | |

8C. List below any income not listed above that you will continue to receive after your arrival in the United States (for example, rent, stock dividends, foreign pension, child support). Consular Officers may request additional information or evidence for confirmation.

| Type of Income | How often do you receive this income? (annually, monthly, etc.) | Amount (U.S. Dollars) |
|---|---|---|
| | | |
| | | |
| | | |
| | Total | |

9. List the assets available to you in the table below. For example, cash assets may include checking and savings accounts, etc. Non-cash assets may include equity in real estate, annuities, securities, etc.

| Type of Asset | Location of Asset | Amount (U.S. Dollars) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total | | |

10. List your liabilities and/or debts in the table below.

| Type of Liability or Debt | Amount (U.S. Dollars) |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| Total | |

DS-5540

11. For purposes of this form, a public benefit means any of the following forms of assistance received on or after October 15, 2019: 1) Any Federal, state, local, or tribal cash assistance for income maintenance, including supplemental security income (SSI) and Temporary Assistance for Needy Families (TANF); 2) Supplemental Nutrition Assistance Program (SNAP); 3) Housing Choice Voucher Program; 4) Project-Based Rental Assistance (including Moderate Rehabilitation); 5) Subsidized Housing; or 6) Medicaid, except for benefits received for an emergency medical condition, services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act (IDEA), school-based services or benefits provided to individuals of secondary school age, benefits received by an alien under 21 years of age, or benefits received by a woman during pregnancy or during the 60-day period beginning on the last day of the pregnancy.

Have you requested or received public benefits in the United States from any Federal, state, local, or tribal government entity on or after October 15, 2019?

☐ Yes   ☐ No   If you answered "Yes," provide the information below.

| 11A. | Type of Benefit | | Agency That Grants The Benefit |
|---|---|---|---|
| | Date Benefit Was Granted (mm-dd-yyyy) | Date Benefit Ended or Expires (mm-dd-yyyy) | Reason For Requesting or Receiving The Benefit |
| 11B. | Type of Benefit | | Agency That Grants The Benefit |
| | Date Benefit Was Granted (mm-dd-yyyy) | Date Benefit Ended or Expires (mm-dd-yyyy) | Reason For Requesting or Receiving The Benefit |
| 11C. | Type of Benefit | | Agency That Grants The Benefit |
| | Date Benefit Was Granted (mm-dd-yyyy) | Date Benefit Ended or Expires (mm-dd-yyyy) | Reason For Requesting or Receiving The Benefit |

12. Are you likely to request or receive any of the public benefits described in Question 11 in the future in the United States from any Federal, state, local, or tribal government entity?

☐ Yes   ☐ No

If you answered "Yes," provide an explanation.

13. Have you ever received a fee waiver when applying for an immigration benefit from USCIS?

☐ Yes   ☐ No

If you answered "Yes," provide the information in the table below. In Part 8. Additional Information, explain the circumstances that caused you to apply for a fee waiver and if those circumstances have changed.

| Date Fee Waiver Received (mm/dd/yyyy) | Type of Immigrant Benefit (Form Number) | Receipt Number |
|---|---|---|
| | | |
| | | |
| | | |

**PART 5 - YOUR EDUCATION AND SKILLS**

14. Have you graduated high school or earned a high school equivalent diploma?

☐ Yes   ☐ No   If you answered "No," then list the highest grade completed. _____

If you answered "Yes," list any other educational degrees you have earned.. _____

15. Do you have any occupational skills?

☐ Yes   ☐ No   If you answered "Yes," provide the information below.

| 15A. | Certification/License Type/Occupational Skill | | Date Obtained (mm/dd/yyyy) |
|---|---|---|---|
| | Who issued your license? (if any) | License Number (if any) | Expiration/Renewal Date (if any) |
| 15B. | Certification/License Type/Occupational Skill | | Date Obtained (mm/dd/yyyy) |
| | Who issued your license? (if any) | License Number (if any) | Expiration/Renewal Date (if any) |
| 15C. | Certification/License Type/Occupational Skill | | Date Obtained (mm/dd/yyyy) |
| | Who issued your license? (if any) | License Number (if any) | Expiration/Renewal Date (if any) |

DS-5540

**PART 6 - TRANSLATOR**

16. Did you use a translator to help you complete this form?  (If yes, provide the following information about the translator you used.)

☐ Yes    ☐ No

16A. Translator's Name

Family Name *(Last Name)*          Given Name *(First Name)*          Middle Name

16B.  Translator's Business or Organization name? *(if any)*

16C.  Translator's Street Address

16D.  Translator's City

16E.  Translator's State/Province

16F.  Translator's Postal/Zip Code    16G.  Translator's Country

16H.  Translator's Phone Number    16I.  Translator's Email Address

**PART 7 - PREPARER**

17. Did anyone, other than a translator, help you complete this form?  (If yes, provide the following information about the preparer you used.)

☐ Yes    ☐ No

17A. Preparer's Name

Family Name *(Last Name)*          Given Name *(First Name)*          Middle Name

17B.  Preparer's Business or Organization name? *(if any)*

17C.  Preparer's Street Address

17D.  Preparer's City

17E.  Preparer's State/Province

17F.  Preparer's Postal/Zip Code    17G.  Preparer's Country

17H.  Preparer's Phone Number    17I.  Preparer's Email Address

**PART 8 - ADDITIONAL INFORMATION** *(if needed)*

If further space is required, attach additional sheets.  Please ensure you specify to what question(s) you are responding.

**PART 9 - DECLARANT'S SIGNATURE**

I understand all the information I have provided in, or in support of, this application may be provided to other U.S. government agencies authorized to use such information for purposes including enforcement of the laws of the United States. I understand all of the information contained in this form and I certify under penalty of perjury under the laws of the United States of America that the foregoing is complete, true, and correct. I understand that any willfully false or misleading statement or willful concealment of a material fact made by me herein may result in refusal of the visa, denial of admission to the United States, and may subject me to criminal prosecution and/or removal from the United States.

_____          _____
Signature                                  Date

_____
Name Printed

*Federal Agency Disclosure and Authorization*

**PAPERWORK REDUCTION ACT STATEMENT:**
   Public reporting burden for this collection of information is estimated to average 60 minutes per response, including time required for searching existing data sources, gathering the necessary documentation, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: PRA_BurdenComments@state.gov.

**CONFIDENTIALITY STATEMENT:**
   INA Section 222(f) provides that visa issuance and refusal records shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States. Visa records may be disclosed in certain situations, as described in INA Section 222(f), including disclosure to a court as needed in a case pending before the court.

DS-5540                                                              Page 4 of 4