# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOHN DOE #1**; *et al.*, | Case No. 3:19-cv-1743-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **DONALD TRUMP**, *et al.*, | |
| Defendants. | |

Stephen Manning and Nadia Dahab, INNOVATION LAW LAB, 333 SW Fifth Avenue, Suite 200, Portland, OR 97204; Karen C. Tumlin and Esther H. Sung, JUSTICE ACTION CENTER, PO Box 27280, Los Angeles, CA 90027; Scott D. Stein and Naomi Igra, SIDLEY AUSTIN LLP, One South Dearborn Street, Chicago IL 60603. Of Attorneys for Plaintiffs.

Joseph H. Hunt, Assistant Attorney General; Billy J. Williams, United States Attorney for the District of Oregon; August E. Flentje, Special Counsel; William C. Peachey, Director, Office of Immigration Litigation; Brian C. Ward, Senior Litigation Counsel; Courtney E. Moran, Trial Attorney; U.S. DEPARTMENT OF JUSTICE, PO Box 868, Ben Franklin Station, Washington D.C., 20044. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

On October 4, 2019, the President of the United States issued Proclamation No. 9945, titled "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation"). The question presented in this case is not whether it is good public policy to require applicants for immigrant

visas to show proof of health insurance before they may enter the United States legally, as the President directed in the Proclamation. Under our constitutional system of separation of powers, that is a question for the elected branches of government. Instead, the principal question before the Court is whether the Constitution assigns to Congress or to the President the responsibility for deciding that policy question. Under Article I, section 8 of the United States Constitution, clause 3 gives Congress the power to "regulate Commerce with foreign Nations" and clause 4 states that Congress shall establish a "uniform Rule of Naturalization." Under Article II of the Constitution, section 1, clause 1 provides that "[t]he executive Power shall be vested in a President of the United States," and section 3 directs that the President "shall take Care that the Laws be faithfully executed."

At various times in our nation's history, Congress established a uniform rule of naturalization. Most recently, Congress did so in the Immigration and Nationality Act of 1965 ("INA"), as amended. In that law, including later amendments, Congress comprehensively established the immigration policy of the United States. Last year, in the case of *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court confirmed that although Congress may delegate certain powers to the Executive Branch, the President may not execute those powers in a way that "expressly override[s] particular provisions" of the INA. *Id*. at 2411. For the reasons explained in the following pages, the President's Proclamation requiring legal immigrants to show proof of health insurance before being issued a visa by the State Department is inconsistent with the INA. In addition, and independently, the Proclamation was not issued under any properly delegated authority. It is, therefore, the duty of the Court in this case to preliminarily enjoin enforcement of that Proclamation.

**STANDARDS**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

**STATUTORY FRAMEWORK**

**A.  The Immigration and Nationality Act**

Congress has legislated immigration since 1882. *See* An Act to Regulate Immigration, 22 Stat. 214 (1882). Since then, Congress amended the immigration laws several times, until passing the Immigration and Nationality Act of 1952. This statute was significantly revised by the Immigration and Nationality Act of 1965, the early version of the current INA. Aspects of this law has been amended many times through the passage of other laws, but most significantly

through direct amendments in the Immigration Reform and Control Act of 1986, the Immigration

Act of 1990, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

Congress adopted an immigrant visa system to further four principal goals: reunifying

families, admitting immigrants with skills that are useful to the United States economy,

protecting refugees and others in need of humanitarian resettlement, and promoting diversity.

Congress gave priority, however, to family reunification when it established the current

immigration system. The allocation of visas reflects this goal. The INA authorizes an unlimited

number of permanent visas to "immediate relatives," who are defined as "the children, spouses,

and parents of a citizen of the United States, except that, in the case of parents, such citizens

shall be at least 21 years of age." 8 U.S.C. § 1151(b). These visas are granted regardless of

country of national origin, even though other visa categories have caps based on country of

national origin and total number of allocated visas. Other family-based preference categories,

such as those for adult children, siblings, and relatives of Legal Permanent Residents, are capped

at 480,000 per year (with a statutory *minimum* of 226,000), as compared to 140,000 maximum

annual employment immigrant visas and 55,000 maximum annual diversity immigrant visas. 8

U.S.C. § 1151(c)-(e). Family-based petitions account for 65 percent of immigrant visas granted

each year.

The first step in both the family-based and employment visa application process is for a

relative or employer in the United States to file a sponsorship petition on behalf of the

prospective immigrant. After the sponsorship petition is approved, the prospective immigrant

applies for a visa and submits supporting documentation. When the U.S. Citizenship and

Immigration Services ("USCIS") deems the application complete, the immigrant visa applicant is

interviewed. Applicants who are outside the United States must interview at a United States

consulate abroad. For applicants who are inside the United States, some may be eligible to apply for immigrant visas domestically, without having to travel to a consulate, but others must leave the country to appear for a consular interview abroad. Individuals in this latter category include noncitizens who have accrued more than 180 days of unlawful presence in the United States but have obtained an I-601A waiver of inadmissibility to excuse the unlawful presence bar under 8 U.S.C. § 1182(a)(9)(B). *See* 8 C.F.R. § 212.7(e). To obtain an I-601A waiver, applicants must show that refusal of admission of the immigrant applicant and would cause "extreme hardship" to eligible family members. *See* 8 C.F.R. § 212.7(e)(3)(vi) (incorporating the "extreme hardship" standard of 8 U.S.C. § 1182(a)(9)(B)(v)). Diversity visas are available through a lottery to individuals from countries with historically low rates of immigration to the United States; the lottery winners self-petition and apply to a consulate for their visa.

At the interview, the consular officer determines whether the immigrant visa applicant is eligible for admission to the United States. In the INA, Congress established ten categories of "Inadmissible Aliens" who are "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a). If the visa applicant falls into one of these categories, his or her application will be denied. Most relevant to the pending lawsuit is the "public charge" category: "Any alien who, in the opinion of the consular officer at the time of application for a visa . . . is likely to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). Congress's 1996 amendment to the INA clarified how consular officers should make the public charge determination.

An early proposed House bill in the 1996 amendment required a visa applicant to demonstrate to a consular officer based on "age, health, family status, assets, resources, financial status, education, skills, or a combination thereof, or an affidavit of support" that the visa

applicant would not become a public charge. H.R. Rep. 104-469, 89 (1996). This proposed bill also defined "public charge" to include an immigrant who received any of six categories of non-cash public benefits, including Medicaid, for an aggregate of 12 months within seven years from the date of entry. *Id.* at 90. An early proposed Senate bill designated an immigrant as a public charge based on receipt of any means-tested cash or non-cash public benefits for an aggregate of 12 months during the immigrant's first five years in the United States. *See* S. Rep. 104-249, 48 (1996). Congress ultimately, however, rejected receipt of non-cash benefits as determinative, and instead outlined five relevant factors that must be considered. At a minimum, the INA now requires consideration of the applicant's (1) age; (2) health; (3) family status; (4) assets, resources, and financial status, and (5) education and skills. 8 U.S.C. § 1182(a)(4)(B)(i). The consular officer also may consider any affidavit of support filed with the application. *Id.* § (a)(4)(B)(ii). In addition, after listing specific categories of inadmissibility, Congress provided that the President may, upon finding that the entry of any aliens or class of aliens into the United States "would be detrimental to the interests of the United States," by proclamation suspend the entry of any class of aliens as immigrants or impose on the entry of aliens any additional restrictions he may deem to be appropriate. *Id.* § 1182(f).

　　If the consular officer denies the applicant's immigrant visa at the interview, the applicant must navigate the complex reconsideration process while remaining outside the United States. When an application is denied, I-601A waivers are automatically revoked. Applicants for whom family separation was found by USCIS to create an extreme hardship will be separated. They cannot return to the United States until they either obtain reconsideration of their visa denial, or obtain a new provisional waiver.

**B.  Statutes Governing Healthcare for Immigrants in the United States**

Other statutes besides the INA also apply to legal immigrants, including those affected by the Proclamation. These laws include the Personal Responsibility and Work Opportunity Act of 1996 ("PRWORA"), the Children's Health Insurance Program Reauthorization Act of 2009 ("CHIPRA"), and the Patient Protection and Affordable Care Act of 2010 ("ACA"). Both PRWORA and CHIPRA contemplate that states would use funds to provide benefits to newly arrived legal immigrants. PRWORA limits the availability of means-tested federal benefits to legal newly arrived immigrants, but authorizes states to use state funds to offer means-tested state benefits. CHIPRA is more explicit, providing states with federal funding to provide medical coverage to newly arrived legal immigrant children. The ACA is also explicit in its support of legal immigrants, affirmatively allowing newly arrived legal immigrants to use premium tax credits to buy insurance offered on local, state-based markets (or "exchanges"). Indeed, premium tax credits are more broadly available to legal immigrants than they are to United States citizens. All plans on the exchanges must cover certain "essential health benefits."

## FACTUAL BACKGROUND

**A.  The Proclamation**

### 1.  Overview of the Proclamation

On October 4, 2019, President Donald J. Trump issued the Proclamation. It barred otherwise qualified legal immigrants, visa applicants primarily seeking reunification with family members, from entering the United States unless they can show the consular officer that they will not financially burden the United States healthcare system. President Trump directed that the Proclamation become effective at 12:01 a.m. eastern daylight time on November 3, 2019. On November 2, 2019, the Court entered a Temporary Restraining Order ("TRO"), temporarily

enjoining Defendants from taking any action to implement or enforce the Proclamation through

November 30, 2019, and setting a preliminary injunction hearing for November 22, 2019.

The Proclamation estimated "uncompensated [health] care costs" at more than $35 billion

in each of the last 10 years. The Proclamation measured these costs as "unreimbursed services

that hospitals give their patients." The Proclamation does not explain the source of this figure or

how it was calculated. For example, it is not clear whether the underlying "unreimbursed

services" costs are the amount billed by hospitals—which is often substantially higher than the

cost actually paid by insurance companies or patients who individually pay their bills—or a

"market" figure such as an average "allowed amount" that insurance plans would have paid for

such care. It is also not clear whether all of these "unreimbursed services" are for uninsured

persons or whether they also include amounts not paid from insured persons who are unable to

pay co-insurance amounts, co-pays, or deductibles.

The Proclamation links the burden of "uncompensated care costs" to legal immigrants

with a single unsourced sentence: "data show that lawful immigrants are about three times more

likely than US citizens to lack health insurance." Based on this, the President concluded that

allowing certain otherwise qualified legal immigrants into the United States would "saddle" the

U.S. healthcare system and the American taxpayer with increases costs. Under the Proclamation,

a visa applicant intending lawfully to immigrate to the United States will presumptively

financially burden the healthcare system and American taxpayers unless the applicant "will be

covered by approved health insurance . . . within 30 days of the [applicant's] entry into the

United States," or "unless the [applicant] possesses the financial resources to pay for reasonably

foreseeable healthcare costs."

The Proclamation does not discuss any data or provide any estimate regarding how much of the estimated $35 billion in "uncompensated costs" actually stems from recent uninsured legal immigrants or how often recent uninsured legal immigrants use the nation's healthcare system. On the other hand, Plaintiffs provide the opinion of an expert, Dr. Leighton Ku, a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University in Washington, DC., with more than 25 years of experience as a health policy researcher. ECF 54. Dr. Ku opines that recent uninsured immigrants use less than one-tenth of one percent (0.06 percent) of total American medical resources and only 0.08 percent of emergency room services. *Id.* at 10. If only *legal* uninsured immigrants were considered (the group included in the Proclamation), the numbers would be even lower. *Id*.[1]

### 2. Types of Approved Health Insurance and Barriers to Access

The Proclamation lists eight types of approved health insurance: (1) employer-sponsored plans; (2) "unsubsidized" ACA market plans on state exchanges; (3) Short Term Limited Duration Insurance ("STLDI") plans effective for at least 364 days; (4) catastrophic plans; (5) family member plans; (6) TRICARE and the like; (7) visitor health plans effective for at least 364 days; and (8) Medicare. The Proclamation does not clarify what is meant by "unsubsidized" ACA market plans, but the Court assumes that it refers to plans purchased without the assistance of premium tax credits.

Many of these approved plans are legally or practically unavailable to intending, or prospective, immigrants. Employer-sponsored plans are often not an option for family-based visa

---

[1] *Amici* cite to an American Medical Association letter stating that immigrants' overall healthcare expenditures are generally one-half to two-thirds those of U.S. born individuals, across all age groups. ECF 88 at 20.

applicants, who are unlikely to have a job offer waiting before arriving in the United States. Family-based visa applicants have difficulty applying for jobs before entry because when they might receive approval to enter the United States is unknown and approval may take years. Even those fortunate enough to have secured employment may fall short. Most employers impose a waiting period before coverage begins, and the average waiting period is longer than the Proclamation's 30-day coverage deadline. Market-rate ACA plans can be prohibitively expensive and have high deductibles. The Proclamation does not explain why "unsubsidized" ACA plans are allowed yet "subsidized" ACA plans are not.

STLDI plans are banned or restricted in California, Massachusetts, New Jersey, New York, and Rhode Island. Twenty states have contract term limitations making STLDI plans ineligible under the Proclamation. Nineteen states limit the contract term to 11 months or less and Maine requires that the insurance contract end on December 31st, making it highly unlikely the contract term will last for 364 days. STLDI plans also do not cover essential health benefits and are thus unavailable on exchanges. Unlike exchange plans, STDLI plans can deny coverage based on preexisting conditions and impose dollar caps on core coverage.

There are additional barriers to the other "approved" plans. Family-member plans are only available to applicants younger than 27 years old. Visitor's insurance plans are designed for short-term visits, have caps on individual coverage and lifetime benefits, and often exclude preexisting conditions, mental health conditions, and maternity care. Such plans often result in significant uncompensated care. People who receive insurance through state Medicaid programs may not be able to add their family members to their plan. Catastrophic plans are only available to people who are already legally present. Even then, only people under 30 (or who obtain a special hardship exemption) are eligible to enroll. TRICARE is available only to members of the

United States military and their close relatives. Medicare is perhaps the least feasible option—only intending immigrants older than 65 who have already been living continuously in the United States for five years may enroll.

**B.  The Named Plaintiffs in this Putative Class Action**

    **1.  Latino Action Network**

Latino Action Network ("Latino Network") is an organization that provides programs aimed at educating and empowering Multnomah County Latinos. The Proclamation has already significantly affected Latino Network's ability to accomplish its mission.

Latino Network employs an "Immigration Navigator," who helps clients move through the complicated immigrant visa process. After the President issued the Proclamation, the workload of Latino Network's Immigration Navigator dramatically increased. Normally, the Immigration Navigator connects families with low-cost legal services and develops educational workshops on immigration legal services. He has put these duties on hold since the Proclamation was issued and has had to postpone individual intake interviews and cancel workshops to serve essentially as a consultant on how the Proclamation will affect worried families. The Proclamation's burden falls upon other Latino Network employees as well. The Executive Director had to reassign the Early Childhood Director to coordinate Latino Network's response to the Proclamation. As a result, Latino Network's childhood development programs are essentially on hold.

Latino Network's Executive Director estimates that responding to the Proclamation will consume up to 15 percent of paid staff members' weekly time. Training staff and conducting the necessary research will cost Latino Network almost $14,000—money not in their budget. The time and money that Latino Network employees spend responding to the Proclamation is time and money they are unable to spend fulfilling their core mission.

### 2.  Individual Named Plaintiffs

The individual named plaintiffs submitted declarations describing their personal circumstances, health, and financial situation and explaining why they and their relatives would not be able to comply with the requirements of the Proclamation. These plaintiffs are United States citizens who are sponsoring immediate family members for immigrant visas. They seek only legally to reunite with their family members.

Plaintiff John Doe #1 is a U.S. citizen who lives in Oregon with his U.S. citizen son and noncitizen wife. He and his son have coverage through the Oregon Health Plan, Oregon's Medicaid program. He sponsored an immigrant visa for his wife, a national of Mexico. Her application was approved in July 2017. She also received an I-601A conditional waiver. John Doe #1 is no longer able to work due to a disability. He had heart surgery in 2018 and is receiving social security disability benefits. The family expects that after his wife receives lawful immigrant status, she will work and help financially support the family. Additionally, given the health problems of John Doe #1 and his son, his wife currently takes care of both of them. If her I-601A visa is revoked, it will result in extreme difficulty for the family. She had a consulate interview scheduled for November 6, 2019, in Mexico, but on November 1, 2019, she requested the interview be postponed because of the Proclamation and her fear that her immigrant visa would be denied and her waiver would be revoked. John Doe #1 and his wife have reviewed the Proclamation's acceptable insurance plans, and they are either unavailable to them or unaffordable.

Plaintiff Juan Ramon Morales is a U.S. citizen who lives in New York with his U.S. citizen daughter, lawful permanent resident step-daughter, and noncitizen wife. He sponsored an immigrant visa for his wife, a national of Mexico. Her application was approved in July 2017. She also received an I-601A waiver in April 2019. He and his wife are both currently employed.

He and his children all have health insurance coverage. His children are covered by subsidized plans and he is covered by a catastrophic plan through his employer. His wife's employer does not provide health insurance. Mr. Morales is not able to add his wife to his plan until she has a social security number. Thus, after she has received her immigrant visa, she can be added, but until then she cannot be added to his plan. He has asked his employer for documentation to this effect, but there is nothing that guarantees that she will have coverage within 30 days of her eligibility to be added to his employer-sponsored plan. Mr. Morales has reviewed the other options allowable through the Proclamation and they are either unavailable to his wife or unaffordable. His wife had emergency brain surgery in 2010 and suffers from seizures and headaches. Her preexisting conditions make other available insurance and her reasonably anticipated medical expenses cost prohibitive.

Plaintiff Jane Doe #2 is a United States citizen who lives in California and is a single mother to her two U.S. citizen children. She is insured through Medi-Cal, California's Medicaid program. She sponsored immigrant visas for her parents, who currently reside in Nicaragua. Their petitions were approved in July 2019. They are collecting the necessary information for the visa application process. Jane Doe #2 has reviewed the Proclamation and the available medical options and does not believe that she and her parents can afford any of the options. Her parents do not currently have health insurance.

Plaintiff Jane Doe #3 is a United States citizen who lives in California. Her husband is an architect who teaches architectural theory and design and is a German national, living in Germany. She and her husband have been apart for more than two years. Her sponsorship petition for her husband was approved earlier this year. Jane Doe #3 has a disability, is unable to work, and has health insurance through Medi-Cal. Because it is unknown when her husband may

be permitted entry into the United States, he is unable to apply for jobs before entry. His employment prospects are good and part of the benefit of having him living in this country is his expected financial support as well as family reunification and emotional, psychological, and physical support. He is unable, however, to show that he will be employed and have health insurance within 30 days of entry. He also has multiple sclerosis, which requires expensive treatments. They do not have the resources to show that they can pay cash for his reasonably anticipated medical expenses or to purchase "acceptable" insurance given his preexisting conditions, because it is unknown exactly when he will be employed. Thus, he is likely to be denied entry as a result of the Proclamation.

Plaintiff Iris Angelina Castro is a U.S. Citizen living in Massachusetts with her U.S. citizen son. She recently had to leave her job as a teacher when her son became sick. She currently has MassHealth insurance, Massachusetts's Medicaid. She sponsored an immigrant visa for her husband, who currently lives in and is a national of the Dominican Republic. His visa application was approved in May 2019. Ms. Castro anticipates that her husband will have all necessary paperwork submitted by mid-November, and notes that the consulate in the Dominican Republic generally is quick to schedule an interview after all paperwork has been submitted. Without her job, she does not believe she and her husband can show the necessary financial resources to pay for health care costs and without her health insurance benefits her Medicaid plan is not an approved plan. She contacted insurance companies when she learned of the Proclamation, but the price quotes were more than she could afford, and were plans that provided incomplete coverage. She currently is pregnant and desires to have her husband living with her to help emotionally, physically, mentally, and financially.

Plaintiff Blake Doe attends Oregon State University as a senior, studying civil engineering. His wife works full time. His noncitizen parents also live in Oregon, but are nationals of Mexico. He sponsored his parent's family visa petition in 2017, and the State Department approved that petition in January 2018. On June 11, 2019, USCIS granted Blake Doe's parents an I-601A provisional unlawful status waiver. Blake has reviewed the approved health insurance options, and he and his parents cannot afford any of them. His mother has health conditions and he does not believe that his parents will be able to show that they have the resources to pay for reasonably anticipated medical costs, despite the fact that his father is employed. His father's employer does not provide medical insurance.

Plaintiff Brenda Villarruel is a U.S. citizen living in Illinois with her U.S. citizen son and parents and noncitizen husband. She sponsored an immigrant visa for her husband, who is a national of and currently lives in Mexico. His application was approved in September 2016. Ms. Villarruel works part-time as a medical assistant and part-time at her husband's tattoo shop, in his absence. Her husband is a professional tattoo artist who used to live with her in Chicago but has been in Mexico since March 2018. He has more than 100 customers awaiting his return to have him place their tattoos. Ms. Villarruel's husband had his consular interview scheduled for November 5, 2019, but after learning of the Proclamation and researching the acceptable insurance plans, they requested that the interview be postponed. They did not believe that they could meet the terms of the Proclamation because the acceptable plans are either not available or unaffordable.

## ANALYSIS

### A.  Likelihood of Success on the Merits

At the preliminary injunction stage, Plaintiffs carry the burden for the same elements that they must prove at trial, and Defendants carry the burden for the elements and affirmative

defenses that they must prove at trial. *Gonzales v. O Centro Espirita Beneficente UNIAO do Vegetal*, 546 U.S. 418, 429 (2006) ("The point remains that the burdens at the preliminary injunction stage track the burdens at trial."). Plaintiffs argue that they are likely to succeed on the merits in proving their challenges to the Proclamation and to agency action implementing and incorporating the Proclamation.

The President issued the Proclamation under authority delegated to him by Congress in 8 U.S.C. §§ 1182(f) and 1185(a).[2] Plaintiffs argue that if the President's delegated authority is as broad as Defendants' assert, it violates the nondelegation doctrine. Plaintiffs also argue that the Proclamation is unconstitutional because it violates the fundamental principle of separation of powers. Plaintiffs further argue that the Proclamation violates their due process rights under the Fifth Amendment. Plaintiffs also challenge agency action implementing the Proclamation as violating the Administrative Procedure Act ("APA").

Defendants respond that Plaintiffs' claims challenging the Proclamation are judicially not reviewable, and even if they were, Plaintiffs would not be able to succeed on their challenges to the Proclamation. Defendants argue that the President exercised properly-delegated and inherently broad authority under 8 U.S.C. § 1182(f) to issue the Proclamation, that the Proclamation does not contravene any provision of the INA but instead properly supplements that statute, and that the Proclamation does not violate Plaintiffs' due process rights because it was issued based on a facially legitimate and bona fide reason. Defendants further contend that

---

[2] Although Defendants note that the President issued the Proclamation under authority delegated by Congress in both 8 U.S.C. § 1182(f) and 1185(a), Defendants do not assert any separate arguments under § 1185(a) and instead focus their arguments on the President's authority under § 1182(f). The Court, therefore, will focus its analysis on § 1182(f). *See Trump v. Hawaii*, 138 S. Ct. 2392, 2407 n.1 (2018) (noting that the two provisions substantially overlap and that the Supreme Court need not resolve the relationship between the two provisions).

the agencies' actions are not final and reviewable, and even if they were, they do not violate the

APA. The Court begins by evaluating the likelihood of success of Plaintiffs' claims challenging

the Proclamation.

### 1. Justiciability

Defendants cite to *Fiallo v. Bell*, 430 U.S. 787 (1977), for their argument that Plaintiffs'

claims challenging the Proclamation are not judicially reviewable. *Fiallo* involved a challenge to

certain provisions of the INA. *Id.* at 788. The Supreme Court noted that "it is important to

underscore the limited scope of judicial inquiry into immigration *legislation*." *Id.* at 792.

(emphasis added). The Supreme Court continued, discussing earlier cases that had noted that the

types of decisions involved in immigration cases "are frequently of a character more appropriate

to either the Legislature or the Executive than to the Judiciary" and that those types of cases

"dictate a narrow standard of review of decisions made by the Congress or the President in the

area of immigration and naturalization." *Id.* at 796 (quotation marks omitted). The court in

*Fiallo*, however, expressly rejected the government's argument that the plaintiff's challenges to

the INA were not reviewable, noting that "[o]ur cases reflect acceptance of a limited judicial

responsibility under the Constitution even with respect to the power of Congress to regulate the

admission and exclusion of aliens." *Id.* at 793 n.5.

*Fiallo*, therefore, does not support Defendants' contention that a Presidential

proclamation involving immigration is not reviewable by a court when it is alleged to be

unconstitutional or to contravene the INA, among other federal statutes. Despite emphasizing the

complete *legislative* power of Congress in the field of immigration, the Supreme Court in *Fiallo*

nevertheless reviewed the challenge on the merits. *Id.* at 797-99. Moreover, the Supreme Court

has reviewed on the merits challenges to Presidential proclamations involving immigration,

including proclamations under § 1182(f). *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ("*Hawaii*"); *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 188 (1993).

Defendants argue, however, that the permissible review is only for constitutional challenges and that any non-constitutional claims are unreviewable. Defendants contend that Plaintiffs' separation of powers claim is merely a statutory claim—a claim that the Proclamation contravenes the INA and other statutes—and is not a constitutional claim. The Supreme Court addressed a similar argument in *Hawaii*. 138 S.Ct. at 2407. In that case, the court noted that in *Sale* it had reviewed such a challenge on the merits over the government's justiciability argument and that there is no provision of the INA that strips the court of its jurisdiction over such claims, concluding that it could therefore "assume without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue." *Id.*

Additionally, the Ninth Circuit has expressly addressed and rejected this argument. *Hawaii v. Trump*, 859 F.3d 741, 768 (9th Cir. 2017) ("*Hawaii II*"), *rev'd on other grounds and remanded*, 138 S. Ct. 2392 (2018); *Washington v. Trump*, 847 F.3d 1151, 1162-63 (9th Cir.), *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017), *reconsideration en banc denied*, 858 F.3d 1168 (9th Cir. 2017), and *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448, 199 L. Ed. 2d 331 (2017). The Ninth Circuit noted that when a plaintiff challenges a President's promulgation of sweeping immigration policy, "[c]ourts can and do review both constitutional and statutory 'challenges to the substance and implementation of immigration policy.'" *Hawaii II*, 859 F.3d at 768 (quoting *Washington*, 847 F.3d at 1163). The Ninth Circuit further explained:

> This case is justiciable because Plaintiffs seek judicial review of EO2, contending that EO2 exceeds the statutory authority

> delegated by Congress and constitutional boundaries. "This is a familiar judicial exercise*." Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). We reject the Government's argument that the Order is not subject to judicial review. Although "[t]he Executive has broad discretion over the admission and exclusion of aliens, [ ] that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).
>
> Whatever deference we accord to the President's immigration and national security policy judgments does not preclude us from reviewing the policy at all. *See Rostker v. Goldberg*, 453 U.S. 57, 70 (1981) ("[D]eference does not mean abdication."); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role.").

*Id.* at 768-69.

Plaintiffs also dispute Defendants' characterization of Plaintiffs' separation of powers challenge as non-constitutional and merely statutory. The Ninth Circuit's holding that both statutory and constitutional challenges to executive orders regarding immigration issues are reviewable by a court, however, has not been disturbed by the Supreme Court and remains binding on this Court. Moreover, the Court sees no reason to forego review on the merits when the Supreme Court has twice engaged in such review. Accordingly, regardless of how Plaintiffs' separation of powers claim is characterized, it is judicially reviewable.

### 2. Nondelegation Doctrine

Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)). Congress may, however, "obtain the assistance of its coordinate Branches" and may "confer substantial discretion" on the Executive branch. *Id.*

(alteration and quotation marks omitted). Thus, "a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* (alterations in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). "The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* "In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination*." J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). "[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 475 (2001).[3]

"Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. . . . that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Galvan v. Press*, 347 U.S. 522, 531 (1954). The Supreme Court "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo*, 430 U.S. at 792 (quotation marks omitted). Congress established in § 1182(a) "classes of aliens ineligible for visas or admission." Specific subsections bar immigrants based on numerous specific grounds, including health-related grounds, criminal-related grounds, whether the visa applicant would cause "potentially serious adverse foreign policy

---

[3] Concerns with broad delegations of unconstrained discretion are applicable to the President. *See, e.g.*, *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414-15 (1935).

consequences," participation in acts of genocide or torture, membership in a totalitarian political party, or whether the visa applicant would become a "public charge." 8 U.S.C. § 1182(a).

Congress delegated authority to the President to make additional limitations or to suspend entry of aliens. The delegation of authority in § 1182(f) provides, in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be *detrimental to the interests of the United States*, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f) (emphasis added).

On its face, this provision provides no guidance whatsoever for the exercise of discretion by the President. The only limit to the President's discretion is the requirement to make the finding that entry would be "detrimental to the interests of the United States." There is no "intelligible principle" provided as to what it means to be "detrimental," what the "interests" of the United States are, what degree of finding is required, or what degree of detriment is required. This is the type of unrestrained delegation of legislative power that the Supreme Court has invalidated. *See, e.g.*, *Whitman*, 531 U.S. at 474 (noting that statutes have been stricken under the nondelegation doctrine when they have "provided literally no guidance for the exercise of discretion" or they have "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition'"). It is "a standard so indefinite as to confer an unlimited power." *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co. (Station WIBO)*, 289 U.S. 266, 285 (1933).

Defendants argue that this delegation of authority does not present nondelegation concerns because the Supreme Court has already addressed the issue in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). In *Shaughnessy*, the Supreme Court evaluated the

lawfulness of the delegation of authority to the President in a precursor statute to the INA. This

precursor statute, however, delegated to the President authority as follows:

> When the United States is at war or during the existence of the
> national emergency proclaimed by the President on May 27, 1941,
> or as to aliens whenever there exists a state of war between, or
> among, two or more states, and the President shall find that the
> interests of the United States require that restrictions and
> prohibitions in addition to those provided otherwise than by this
> Act be imposed upon the departure of persons from and their entry
> into the United States, and shall make public proclamation thereof,
> it shall, until otherwise ordered by the President or Congress, be
> unlawful . . . .

338 U.S. at 540 n.1.

In evaluating this delegation of authority, which was applicable only in times of war or

the 1941 national emergency, the Supreme Court stated that excluding aliens was not only a

legislative function but also "inherent in the executive power to control the foreign affairs of the

nation." *Id.* at 542. The Supreme Court thus concluded:

> the decision to admit or to exclude an alien may be lawfully placed
> with the President . . . . Normally Congress supplies the conditions
> of the privilege of entry into the United States. But because the
> power of exclusion of aliens is also inherent in the executive
> department of the sovereign, Congress may in broad terms
> authorize the executive to exercise the power, e.g., as was done
> here, for the best interests of the country *during a time of national
> emergency*.

*Id.* at 543 (emphasis added).

The Supreme Court mentioned the President's authority under § 1182(f) in *Sale*. In that

case, however, the Supreme Court did not address the specific issue of nondelegation. Further,

that case involved the Haitian immigrant crisis that arose after a military coup in 1991 deposed

that country's first democratically-elected President, Jean Bertrand Aristide. 509 U.S. at 162.

The number of immigrants from Haiti rose dramatically and could not safely be processed on

U.S. Coast Guard cutters as they had been for the previous decade, or in Guantanamo. *Id.* at 163.

The immigrants were attempting to arrive in unseaworthy vessels and many drowned. *Id.*

Allowing screening of the immigrants for refugee status on U.S. soil would defeat the attempt to

control illegal immigration, impede diplomatic efforts to restore the democratic government

Haiti, and posed a life-threatening danger to the immigrants attempting to arrive in dangerous

craft. *Id.* at 164. Refusing to screen the immigrants at all would deny them potential refuge at a

politically tumultuous time. *Id.*

  Ultimately, President George H.W. Bush ordered the Coast Guard to "intercept vessels

illegally transporting passengers from Haiti to the United States and to return those passengers to

Haiti without first determining whether they may qualify as refugees." *Id.* at 158. The Supreme

Court held that "neither § 243(h) [of the INA] nor Article 33 of the United Nations Protocol

Relating to the Status of Refugees applies to action taken by the Coast Guard on the high seas."

*Id.* at 159 (footnote omitted). In so holding, the Supreme Court noted that under § 1182(f) the

President had "ample power to establish a naval blockade that would simply deny illegal Haitian

migrants the ability to disembark on our shores" and that whether the President's chosen method

of dealing with this immigrant emergency "poses a greater risk of harm to Haitians who might

otherwise face a long and dangerous return voyage is irrelevant to the scope of his authority to

take action that neither the Convention nor the statute clearly prohibits." *Id.* at 187-88. The

Supreme Court then noted that Congressional statutes generally do not have *extraterritorial*

application unless such intent is clearly manifested and this presumption is particularly

applicable when "construing treaty and statutory provisions that may involve foreign and

military affairs for which the President has unique responsibility." *Id.* at 188. Notably, *Sale* did

not turn on the question of the President's power under § 1182(f), because the question presented

in *Sale* related to § 1253(d) of the INA. The Supreme Court's discussion of § 1182(f), therefore, was *dicta*.

The Supreme Court directly analyzed the President's authority under § 1182(f) in *Hawaii*. Again, however, the Supreme Court did not specifically address the nondelegation doctrine. The Supreme Court noted the "comprehensive delegation" of authority in § 1182(f) and that § 1182(f) "exudes deference" to the President. *Hawaii*, 138 S. Ct. at 2408. That case involved the President's proclamation resulting in the "travel" or "Muslim" ban. That proclamation "sought to improve vetting procedures by identifying ongoing deficiencies in the information needed to assess whether nationals of particular countries present 'public safety threats'" and "placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate." *Id.* at 2404. It "reflect[ed] the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies." *Id.* at 2421. In discussing the sufficiency of the President's findings under § 1182(f), the Supreme Court quoted *Sale* regarding the deference given to a President in his "chosen method" for dealing with foreign relations problems and stated that "when the President adopts 'a preventive measure . . . in the context of international affairs and national security,' he is 'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Id.* at 2409 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010)).

In evaluating the nondelegation issues raised by § 1182(f), the Court considers what these three cases addressing the authority granted to the President in § 1182(f) and a similar earlier provision instruct. *Knauff* does not support the conclusion that the current version of § 1182(f) does not present any nondelegation issues. *Knauff* involved a much narrower delegation of

authority, only in time of war or national emergency. The discussion in *Knauff* regarding

immigration involving both executive and legislative power, although not limited to times of war

or national emergency, was focused on the President's authority to govern "foreign affairs." The

proclamation in *Knauff* was also issued during a time of war, when the President's authority is at

its zenith. *Sale* involved several issues relating to foreign affairs in an emergency and

extraterritorial context. These included the diplomatic concerns in trying to restore a democratic

government in Haiti and concerns regarding the lives of tens of thousands of Haitians, most of

whom were not going to qualify for refugee status, who were risking their lives attempting to

travel by boat to the United States in dangerous crafts. This was a political and humanitarian

emergency occurring beyond the borders of the United States. *Hawaii* also involved important

issues of national security and foreign affairs. The proclamation at issue was an attempt to

enhance detection of "terrorists" and other similar "public safety threats." 138 S. Ct. at 2404-05.

It also involved activities occurring beyond the borders of the United States, because it dealt with

vetting processes taking place in foreign countries.

The Court extrapolates from these cases that when Congress delegates authority to the

President in the immigration context and that authority involves foreign relations or national

security, especially in an emergency or extraterritorial context, then the nondelegation concerns

are lessened because the President has his own inherent powers under Article I. That appears to

be the intent of Congress in enacting the broad authority of § 1182(f). It also appears to be how

§ 1182(f) has been previously exercised, until now.[4] The Proclamation, however, uses § 1182(f)

to engage in *domestic* policymaking, without addressing any foreign relations or national

---

[4] Based on the proclamations discussed by the parties. The Court did not conduct an
independent review of all proclamations issued under § 1182(f) or earlier, similar provisions.

security issue or emergency. In this wholly domestic context, the delegation by Congress is without any intelligible principle and thus fails under the nondelegation doctrine.

Defendants argue that because immigrants come from foreign countries, anything to do with immigration is inherently "foreign relations." The Court, however, does not accept such a broad construction. As the text of Article I and more than two centuries of legislative practice and judicial precedent make clear, the Constitution vests Congress, not the President, with the power to set immigration policy. If the fact that immigrants come from other countries inherently made their admission foreign relations subject to the President's Article II power, then all of this law would be superfluous.

### 3. Separation of Powers

Even if the Proclamation is not an unconstitutional exercise of domestic lawmaking authority under the nondelegation doctrine, it would still be unconstitutional under separation of powers. Plaintiffs contend that the Proclamation is an unconstitutional attempt to rewrite a key provision of the INA through "executive fiat." Plaintiffs argue that they are likely to succeed on their claims that the President's exercise of his discretion in issuing the Proclamation violates the Constitution's bedrock principle of separation of powers because the Proclamation contravenes or overrides specific provisions of the INA.

Defendants respond that this claim is not a constitutional claim, but a statutory claim that the Proclamation was issued outside the President's authority delegated by Congress in § 1182(f) of the INA. Whether the claim is evaluated as a statutory claim or a constitutional separation of powers claim, the result is the same. The Supreme Court has stated that when the President exercises his authority under § 1182(f), the Court "may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Hawaii*, 138 S. Ct. at 2411.

Thus, if the Proclamation contravenes a provision of the INA, it is both a statutory violation and a constitutional violation of separation of powers.

The constitutional principle of separation of powers embodies "the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989). Separation-of-powers concerns are primarily aimed at preventing aggrandizement by one branch encroaching into the sphere of authority of another. *Id.* at 382 ("It is this concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence[.]"); *Buckley v. Valeo*, 424 U.S. 1, 122 (1976) (*per curiam*) ("The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other."). Accordingly, the Supreme Court has "not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." *Mistretta*, 488 U.S. at 382.

"The Constitution and its history evidence the 'unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.'" *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983)). Thus, "[t]he power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998) (quoting *Chadha*, 462 U.S. at 951). Further, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438.

The President issued the Proclamation purportedly based on authority granted to him by Congress in § 1182(f) of the INA. The President may not, however, exercise his discretion granted under § 1182(f) to "override" a provision of the INA. *Hawaii*, 138 S. Ct. at 2411. Thus, the primary question is whether the Proclamation overrides, contravenes, or is otherwise incompatible with any provision of the INA. As explained by Justice Jackson in his concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*:

> When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

343 U.S. 579, 637-38 (1952) (Jackson, J., concurring); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083 (2015) ("In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-638 (1952) (concurring opinion).").

Plaintiffs assert that the Proclamation conflicts with 8 U.S.C. § 1182(a)(4), the "public charge" provision of the INA. Plaintiffs argue that the Proclamation impermissibly establishes healthcare insurance as the sole factor determining inadmissibility based on creating a "financial burden" to the United States, even though the public charge provision directly legislates inadmissibility based on the concern of creating a financial burden on the United States. The public charge provision enumerates a list of factors that *must* be considered "at a minimum" in evaluating whether a visa applicant will become a public charge, including: age; health; family status; assets, resources, and financial status; and education and skills, and the consular officer

also may consider whether an affidavit of support was filed. 8 U.S.C. § 1182(a)(4)(B)(i)-(ii). These factors were expressly added to the INA by Congress in 1996.

Before the 1996 legislation was passed, some legislators proposed having public charge inadmissibility tied to the receipt of certain non-cash public benefits, but that effort failed. These non-cash benefits included Medicaid, Supplemental Security Income, Aid to Families with Dependent Children, supplemental nutrition assistance, and other means-tested public assistance. *See* H.R. Rep. 104-469, 89. In 2013, the U.S. Senate voted down two proposed amendments to the public charge provision. One would have expanded the criteria for public charge to include the requirement that visa applicants show that they were not likely to receive benefits under Medicaid or the Children's Health Insurance Program. *See* S. Rep. No. 113-40, at 42 (2013); *see also City and Cty. of San Francisco v. U.S. Citizenship and Immig. Svcs.* ("*USCIS*"), --- F. Supp. 3d ---, 2019 WL 5100718, at * 25 (N.D. Cal. Oct. 11, 2019). The second would have expanded the definition of "public charge" to ensure that persons who received non-cash health benefits could not become permanent legal residents and that visa applicants who would be likely to receive such benefits in the future would be denied entry. *See* S. Rep. No. 113-40, at 63 (2013); *see also USCIS*, 2019 WL 5100718, at *26.

The public charge provision as amended in 1996 mandates that the consular officer or the Attorney General "shall at a minimum consider" *all* of the enumerated factors. 8 U.S.C. § 1182(a)(4)(B)(i). This codified the longstanding practice of evaluating the "totality of the circumstances" of the applicant. *USCIS*, 2019 WL 5100718, at *21, 25. That subsection ensures that no one single factor is dispositive.

Defendants argue that the Proclamation does not contravene or supplant the public charge provision, but instead merely supplements it. Defendants argue that the focus of the

Proclamation is not on whether on an applicant will become a public charge, but on fixing the burden to the healthcare infrastructure *and* taxpayers. Defendants note that a visa applicant now must meet the requirements of both the public charge provision of the INA and the Proclamation. Defendants' arguments are not persuasive.

The Proclamation discusses the burden on the national healthcare infrastructure and its effect on American taxpayers. The Proclamation supplants § 1182(a)(4)(B), however, because it is designed to stop immigrants from being a burden on taxpayers by using public resources such as Medicaid, subsidized ACA plans, and free emergency room and medical services. This is the purview of the public charge provision. Additionally, the primary concern of the Proclamation is the burden on taxpayers and not the burden on private industry. The Proclamation states: "Immigrants who enter this country should not further saddle our healthcare system, and subsequently American taxpayers, with higher costs." This also is the purview of the public charge provision.

The Proclamation does not create an additional factor, health insurance, to be considered in the totality of the circumstances that Congress has mandated be considered in evaluating whether a visa applicant will create an undue burden on the resources of the United States. Instead, it makes the ability to pay for anticipated care needs a single, dispositive factor, first by requiring an assessment of the applicant's available health insurance, a new factor, and then by requiring an assessment only of the applicant's health and financial resources, which are two of many factors that Congress has mandated must *all* be considered.

Moreover, the Proclamation is executive lawmaking in a manner that Congress expressly rejected in the public charge provision. The Proclamation excludes in its permissible insurance plans mean-tested health benefits such as Medicaid and subsidized plans under the ACA,

notwithstanding the fact that Congress has repeatedly refused to include Medicaid and other

mean-tested non-cash public benefits in the public charge inadmissibility standards. *See*

*Youngstown*, 343 U.S. at 588 ("[T]he President's order does not direct that a congressional

policy be executed in a manner prescribed by Congress—it directs that a presidential policy be

executed in a manner prescribed by the President."); *cf. Hawaii*, 138 S. Ct. at 2411 (finding that

the travel ban executive order "supports Congress's individualized approach for determining

admissibility"). The Proclamation does not, therefore, support the INA's approach for

determining admissibility but instead essentially amends or supplants the INA in a manner

similar to which Congress has previously refused, contravening Congress's will.

The Proclamation also purports to "impose on the entry of aliens [a] restriction[]" the

President deems necessary under § 1182(f). In effect, however, it actually bars entry from an

entire class of immigrants—those who cannot afford health insurance or afford to pay for

reasonably necessary medical costs. There are two problems with this restriction.

The first problem is that this bar to entry is not a "suspension" as is authorized by

§ 1182(f), but is indefinite. The President expressly cites the reason for the suspension as the

widespread problem of "uncompensated costs" in the nationwide healthcare system. There is no

reasonable interpretation of the Proclamation showing that this intractable problem is going to

end any time soon, particularly when the only evidence in the record supports that recent

immigrant use of medical services is less than one-tenth of one percent. The Proclamation,

therefore, is unlikely to make any meaningful difference to address the problem and its

implementation will not result in a reduction to the problem that would then, in turn, result in the

restriction no longer being necessary. Moreover, the President provides no guidance in the

Proclamation for determining under what circumstances the necessity for the Proclamation

would be over. This is unlike the travel ban Proclamation, which involved specific deficiencies in a handful of country's vetting systems that triggered that proclamation—if those deficiencies all were cured, that proclamation would no longer be needed. *See Hawaii*, 138 S. Ct. at 2410 ("[T]he Proclamation makes clear that its 'conditional restrictions' will remain in force only so long as necessary to 'address' the identified 'inadequacies and risks' within the covered nations."). The restrictions to entry were directly connected to the problem that triggered that proclamation and there were identifiable solutions that would result in the revocation of the suspension to entry. Here, the identified "inadequacies and risks" are a massive, estimated $35 billion-per-year domestic systemic health care problem. That is the "triggering condition." The Supreme Court held in *Hawaii* that a proclamation may be a proper "suspension" of entry so long as in the proclamation the President "may link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition." *Id.* at 2410. The Proclamation, however, contains no guidance for how this domestic problem of $35 billion in "uncompensated costs" can or will be solved any time in the foreseeable future. Thus, despite the fact that the President instructs in the Proclamation for a report on the "continued necessity" of the "suspension and limitation" contained in the Proclamation within 180 days and then annually thereafter, that instruction may not reasonably be interpreted as providing any possible foreseeable end date. Therefore, the Proclamation may not reasonably be interpreted as imposing merely "conditional restrictions." It may only reasonably be interpreted as a categorical exclusion for any affected immigrant who cannot afford health insurance or reasonably anticipated medical costs. Such an indefinite bar to entry is not within the President's authority under § 1182(f). *See Hawaii*, 138 S. Ct. at 2409-10.

The second problem is that this bar to entry is reinstating a bar that Congress expressly eliminated from the INA—the bar to "paupers." In the 1891 amendment to the immigration law, Congress provided that: "That the following classes of aliens shall be excluded from admission into the United States . . . : All idiots, insane persons, paupers or persons likely to become a public charge . . . ." An Act in Amendment to the Various Acts Relative to Immigration and the Importation of Aliens Under Contract or Agreement to Perform Labor, 26 Stat. 1084, Chap. 551 § 1 (1891). "Paupers" continued to be included in the classes of aliens that were excluded for decades. Congress, however, expressly removed, among others, "paupers" from the categories of aliens excluded from § 1182 in the 1990 amendments to the INA. *See* Immigration Act of 1990, 104 Stat. 4978, Title 6 § 601 (1990).[5] The President simply does not have the constitutional authority to amend a statute. *Clinton*, 524 U.S. at 438.

The Proclamation also contravenes and overrides § 1182(a)(4)(E).[6] Congress exempted from the public charge financial burden restriction certain victims of violent crime or domestic violence and their family members. The Proclamation does not provide the same broad exemption. Defendants argue that very few applicants will actually fall within the exemption of § 1182(a)(4)(E) and be effected by the Proclamation, but nonetheless at least some will.[7] The

---

[5] Whether the United States should categorically exclude "paupers" from entry as immigrants is a policy decision that Congress may make in its law-making capacity, using its "step-by-step, deliberate and deliberative process," *Chadha*, 462 U.S. at 959, and its "single, finely wrought and exhaustively considered, procedure." *Clinton*, 524 U.S. at 439-40 (quotation marks omitted). Such decisions are not for the President to make in his law-executing capacity, particularly when Congress has already explicitly rejected that categorical exclusion.

[6] The Court expresses no opinion at this stage of the litigation about whether the Proclamation also contravenes or overrides various healthcare laws and other immigration laws and provisions, as argued by Plaintiffs.

[7] Defendants also argue that no named Plaintiffs falls within the category of persons affected by this subsection, but Plaintiffs are seeking in this putative class action a uniform injunctive remedy that would apply to all putative class members, and are not requesting any

Proclamation stands in direct contravention to a statute passed by Congress after Congress's "exhaustively considered," *Clinton*, 524 U.S. at 439-40, and "deliberate and deliberative process." *Chadha*, 462 U.S. at 959.

The Proclamation is anticipated to affect approximately 60 percent of all immigrant visa applicants. The President offers no national security or foreign relations justification for this sweeping change in immigration law. Instead, the President attempts to justify the Proclamation based on an asserted burden to the United States healthcare system and federal taxpayers. Whether a visa applicant is a burden on the resources of the United States and, thus, taxpayers, however, is precisely the sphere governed by § 1182(a)(4).

Further, the Proclamation is, significantly, unlike the executive order at issue in *Hawaii*. In that case, the executive order was challenged as being inconsistent with a completely different provision of the INA, § 1152(a)(1)(A), and the Supreme Court found that the two provisions "operate in different spheres." 138 S. Ct. at 2414. The Proclamation, however, contravenes two provisions of § 1182(a)(4), which operate in the same sphere as § 1182(f). Indeed, it has been noted that "[t]he President's sweeping proclamation power thus provides a safeguard against the danger posed by any particular case of class of cases that *is not covered* by one of the categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986 (Ginsburg, J.) (emphasis added).

The Court finds that § 1182(a)(4) and 1182(f) are in the same sphere. Congress has already spoken in § 1182(a)(4) on the issue of limiting immigrant admissibility based on the potential financial burden on the resources of the United States, and the Proclamation

---

specific relief under the Violence Against Women Act or § 1182(a)(4)(E). At this stage of the litigation, the Court is treating Plaintiffs as adequate class representatives for all putative class members. *See* Section D, *infra*.

contravenes and overrides Congress's explicitly stated direction and will. As previously stated, the President may not take action to "enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. Plaintiffs, therefore, have shown a likelihood of success on the merits on their claim that the Proclamation violates the Constitution's principle of separation of powers and is outside the scope of the President's authority granted in § 1182(f). Because the Court finds that Plaintiffs have shown a likelihood of success on the merits of this claim (as well as serious questions going to the merits) and their argument that the Proclamation violates the nondelegation doctrine, the Court does not at this time reach Plaintiffs' due process challenge to the Proclamation or challenges to agency action under the APA.

## B.  Likelihood of Irreparable Harm

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Winter*, 555 U.S. at 22). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22).

Defendants argue that Plaintiffs will not suffer irreparable harm because their family members' visas will only be "delayed." The Ninth Circuit already has rejected a very similar argument. *See Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017) ("*Hawaii III*"), *rev'd on other grounds and remanded*, 138 S. Ct. 2392 (2018) (holding that the immigrant family member plaintiffs' claims of "prolonged separation from family members" constituted "indefinite delay" sufficient to satisfy irreparable harm to support preliminary injunction); *Washington*, 847 F.3d at 1169 (identifying "separated families" as among the substantial and irreparable harms); *cf. Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503-04 (1977) (explaining that "the

Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition").

Rejection of Defendants' argument is particularly appropriate in this case. At least two named Plaintiffs had interviews scheduled that were postponed due to the Proclamation. It is likely that those interviews will be rescheduled before a decision on the merits. Those Plaintiffs are not likely to meet the requirements of the Proclamation, and there is no indication that they will otherwise fail any of the requirements of § 1182(a). One of those Plaintiffs risks having his wife's I601-A waiver automatically revoked if she is denied a visa at the interview. She will be unable to return to the United States and live with him and their son. She takes care of both of them, who suffer from health problems. Other Plaintiffs also have I601-A waivers for their sponsored family members, who risk being forced to leave the United States for an indefinite period of time. These are immigrant applicants for whom it has already been determined it would be an "extreme hardship" on family members for them to be separated.

Defendants also argue that Plaintiffs can avoid harm simply by purchasing insurance. Plaintiffs, however, have stated that they cannot afford the plans that are available to them. Defendants also argue that an applicant who is "healthy" can easily meet the Proclamation's requirements because there will not be an "reasonably necessary medical expenses." Many Plaintiffs, however, describe existing health problems that will result in reasonably medical expenses. The Court finds that the individual Plaintiffs have shown a likelihood that they will suffer sufficiently immediate irreparable harm. It is also likely that putative class members will suffer similar irreparable harm.

Additionally, Defendants do not address the irreparable harm claimed by Plaintiff Latino Network. Latino Network has had to divert significant resources to deal with the Proclamation

even before it went into effect, preventing Latino Network from engaging in its core mission.

Latino Network would have to continue to divert resources and abandon a significant portion of

its core mission if the Proclamation were allowed to go into effect. This qualifies as sufficient

irreparable harm. *See E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D.

Cal. 2018) ("Given the injuries described above, the Organizations 'have established a likelihood

of irreparable harm' based on their showing of serious 'ongoing harms to their organizational

missions,' including diversion of resources and the non-speculative loss of substantial funding

from other sources." (citation omitted)).

## C.  Balancing the Equities and Public Interest

In weighing equities, a court "must balance the competing claims of injury and must

consider the effect on each party of the granting or withholding of the requested relief."

*Winter*, 555 U.S. at 24 (citation omitted). When the government is the defendant, generally the

balancing of the equities and the public interest factors merge. *See, e.g.*, *League of Wilderness

Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

When determining the public interest, a court "primarily addresses impact on non-parties rather

than parties." *Id.* (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 947 (9th Cir.

2002). When the alleged action by the government violates federal law, the public interest factor

generally weighs in favor of the plaintiff. *See Valle del Sol*, 732 F.3d at 1029; *see also Inland

Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26,

2018) ("In addition, the Court again notes the public interest that exists in ensuring that the

government complies with its obligations under the law and follows its own procedures."

(quotation marks omitted)); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1344 (N.D. Ga. 2017) ("[T]he

public has an interest in government agencies being required to comply with their own written

guidelines instead of engaging in arbitrary decision making.").

Twenty-one states,[8] the District of Columbia, and the City of New York City (collectively "Government *Amici*") filed an *amici* brief outlining their interests and the significant harm these states and other governmental entities will suffer if the Proclamation is allowed to go into effect. They explain that immigrants "are vital to the economic, civic, and social fabric of our states and city." They describe how family reunification benefits the economic, social, and psychological well-being of the affected individuals, while family separation results in myriad harms, including mental and behavioral health issues, lower academic achievement among children, toxic stress, cognitive impairment, and symptoms of post-traumatic stress disorder. They quote the 1981 Select Commission on Immigration and Refugee Policy, a congressionally-appointed commission tasked with studying immigration policy, describing the necessity of family reunification:

> [R]eunification . . . serves the national interest not only through the humaneness of the policy itself, but also through the promotion of the public order and well being of the nation. Psychologically and socially, the reunion of family members with their close relatives promotes the health and welfare of the United States.

ECF 88 at 13.

Government *Amici* also describe how immigrants benefit economies. They note that immigrants have "enriched our country's social and cultural life, injecting new ideas into our intellectual fabric, offering path-breaking contributions in science, technology, and other fields, and ultimately making our diverse communities engines of innovation and more desirable places to live." They explain that because the Proclamation will dramatically decrease the number of lawful immigrants, it will "cause substantial economic harm to *Amici*, including by diminishing

---

[8] The states are California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington.

revenue collection, dampening small business creation, and reducing employment in key sectors of the economy."

Government *Amici* detail that immigrants pay nationally more than $405.4 billion in taxes, and immigrant-owned companies employ more than 7.9 million workers. Government *Amici* detail the billions in taxes paid and spending power exercised in each state by immigrants. For example, in 2014 immigrant-led households paid more than $26 billion in state and local taxes in California, $1.1 billion in state and local taxes in Minnesota, and $736.6 million in state and local taxes in Oregon. These households exercised more than $240 billion in spending power in California, $8.9 billion in spending power in Minnesota, and $7.4 billion in spending power in Oregon. With respect to New York City, immigrants contributed $195 billion, or 22 percent, to the gross domestic product of 2017. Immigrants own 52 percent of businesses in New York City, creating jobs and providing essential goods and services.

Government *Amici* further detail the harm to certain employment sectors, which are disproportionately filled with immigrants. For example, in California, more than two-thirds of the jobs in agricultural sectors, 45.6 percent of manufacturing positions, 43 percent of the construction workers, and 41 percent of workers in computer and mathematical sciences are filled by immigrants. In Oregon 39.5 percent of workers in the farming, fishing and forestry sector, nearly 20 percent of the workers in manufacturing positions, and 18.4 percent of accommodation and food service workers are filled by immigrants.

Finally, Government *Amici* explain how the Proclamation likely will harm their interests with respect to the state-based health insurance marketplace. The ACA authorized the creation of exchanges presenting affordable insurance coverage choices for consumers in order to "increase the number of Americans covered by health insurance and decrease the cost of health care."

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). The ACA provides premium

tax credits for purchasing insurance on the exchange to help offset the cost. 26 U.S.C. § 36B.

Congress extended those tax credits to any taxpayer who "is an alien lawfully present in the

United States . . ." *Id.* at § 36B(c)(1)(B)(ii). The Proclamation only allows "unsubsidized" ACA

plans, which although undefined, appears to mean plans that do not utilize the tax credit.

Government *Amici* describe how the fact that legal immigrants will be unable to obtain

comprehensive plans under the ACA, and will instead be forced to buy unregulated plans such as

STLDI and some of the other "approved" plans will result in the immigrants being left

underinsured. This underinsurance will, in turn, burden local and state governments because

underinsured persons are at *higher* risk of uncompensated cost than if they were permitted to

purchase a comprehensive subsidized plan under the ACA. For example, Government *Amici*

discuss how STLDI plans typically exclude coverage of preexisting conditions or charge

exorbitant premiums to cover those conditions, and that one recent study shows that 43 percent

of such plans did not cover mental health services, 62 percent did not cover substance abuse

treatment, 71 percent did not cover outpatient prescription drugs, and 100 percent did not cover

maternity care.

Legal immigrants also may be subject to deceptive marketing and fraudulent insurance

products in response to the Proclamation, which will result in Government *Amici* having an

increased regulatory burden to increase oversight to protect consumers. The proliferation of non-

ACA compliant plans may make it difficult or impossible for states to regulate such plans,

increasing harm to consumers and the insurance market and resulting in greater uncompensated

care and costs.

Nine nonprofit organizations[9] (collectively, "Nonprofit *Amici*") also filed an *amici* brief in support of the Court issuing a preliminary injunction. They describe the effect the issuance of the Proclamation has had on their ability to provide their services, and how if the Proclamation were to go into effect it would further erode their ability to provide services. For example, Virginia Garcia Memorial Health Center provides health care services for Washington and Yamhill County, with a focus on seasonal and migrant workers. They have already seen patients refusing to obtain care out of fear of the changing rules and requirements for immigrant status, including a pregnant woman declining maternity care.

Nonprofit *Amici* describe the fear and anxiety they encounter in the immigrant communities they serve, the increasing family separation they have witnessed in the past few years, and how it effects their constituents and services. This includes immigrants refusing services and the Nonprofit *Amici* having to work harder to provide services that previously were welcomed, even services as important as food benefits.

Defendants' only argument with respect to the balance of the equities and the public interest is that the $35 billion problem of uncompensated health care costs is a serious national problem and thus the Proclamation should be allowed to go into effect. Defendants, however, provide no evidence that the Proclamation will have any effect in reducing the asserted $35 billion in uncompensated costs. The Proclamation did not make such a finding. The Proclamation merely noted that legal immigrants are more likely to be uninsured than U.S. citizens, but that statistic says nothing about whether and in what amount recent legal immigrants

---

[9] The nonprofit organizations are Adelante Mujeres, Catholic Charities Immigration Legal Services, Causa, Centro Latino Americano, El Programa Hispano Católico, The Immigrant and Refugee Community Organization, Oregon Interfaith Movement for Immigrant Justice, Virginia Garcia Memorial Health Center, and VIVA Inclusive Migrant Network.

use national health care resources, or whether they make any meaningful contribution to the $35 billion in uncompensated costs. There is no evidence in the record that immediate implementation of the Proclamation is necessary to help the "national interest" of reducing uncompensated healthcare costs. On the other hand, there is significant evidence that allowing the Proclamation to go into immediate effect will have an irreparably harmful effect on Plaintiffs, putative class members, state and local governments, and *amici*. Weighing all the interests, the balance of the equities and the public interest tips sharply in favor of Plaintiffs, and supports preserving the *status quo* until the Court renders its decision on the merits.

## D.  Conclusion

All four *Winter* factors weigh in favor of granting a preliminary injunction. Plaintiffs have met their burden to demonstrate a need for preliminary injunctive relief until the Court decides the merits of this case.

## E.  Scope of Injunctive Relief

Plaintiffs have moved for certification of a nationwide class, consisting of two subclasses, as follows:

U.S. Petitioner Subclass

> Individuals in the United States who currently have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa, or who will soon file such a petition; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs"; and

Visa Applicant Subclass

> Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the

> satisfaction of a consular officer that they "will be covered by
> approved health insurance" within 30 days after entry or will be
> able "to pay for reasonably foreseeable medical costs."

The motion for class certification has not yet been fully briefed, had a hearing, or been resolved. Defendants argue that they should be permitted additional time to engage in some discovery relating to the named Plaintiffs, and assert that they did not have sufficient time to prepare their brief in response to the motion for class certification. Plaintiffs seek to include additional plaintiffs in the motion for class certification, and have not yet been able to move to amend their complaint to add those plaintiffs given the expedited process for the preliminary injunction. Thus, items remain outstanding with respect to class certification.

Defendants argue that the if the Court finds that a preliminary injunction is appropriate at this time, the Court should only enter an injunction with respect to the specific named Plaintiffs and not a "nationwide" or "universal" injunction because the Court has not yet certified this lawsuit as a nationwide class action. This argument is not persuasive considering the conduct and harm alleged in this case.

"[T]he scope of [a] remedy is determined by the nature and extent of the . . . violation." *Milliken v. Bradley*, 433 U.S. 267, 270 (1977). "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). "An injunction may extend 'benefit or protection' to nonparties 'if such breadth is necessary to give prevailing parties the relief to which they are entitled.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987)). Although in 2018 and 2019 the Ninth Circuit has remanded some cases for specific findings relating to the scope of an injunction, that court has also reaffirmed that "[i]n immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *Id.* (citing *Regents of*

*the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *cert.*

*granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 139 S. Ct. 2779

(2019); *Hawaii III*, 878 F.3d at 701; *Washington*, 847 F.3d at 1166-67.

Additionally, when a plaintiff requests preliminary injunctive relief before class

certification has been decided, a court may consider the harm to the putative class and grant

classwide appropriate preliminary injunctive relief to preserve the *status quo*, particularly when,

as in this case, there is alleged classwide harm and conduct aimed at a class of persons. *See J.L.*

*v. Cissna*, 341 F. Supp. 3d 1048, 1070 (N.D. Cal. 2018) (granting a classwide injunction when

"preliminary injunctive relief is necessary to preserve the status quo and to prevent irreparable

harm for all Plaintiffs and the putative class"); *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1164

(C.D. Cal. 2018) (granting a classwide injunction before certification when "an injunction is

necessary to forestall harm to putative class members that is likely to transpire before the parties

can litigate a motion for class certification"); *see also Just Film, Inc. v. Merch. Servs., Inc.*, 474

F. App'x 493, 495 (9th Cir. 2012) (affirming the scope of a class-wide preliminary injunction

that was "tailored to maintain the *status quo* where class certification is pending and a class-wide

injunction is necessary to remedy the alleged class-wide harm").[10] "This relief may be narrowed

---

[10] District courts outside the Ninth Circuit have similarly reached this same conclusion. *See Abdi v. Duke*, 280 F. Supp. 3d 373, 400 (W.D. N.Y. 2017) ("Under appropriate circumstances, a court may grant preliminary injunctive relief in favor of putative class members before class certification, and correspondingly, assess the harm to putative class members when considering the preliminary injunction motion."); *Hamama v. Adducci*, 261 F. Supp. 3d 820, 840 n.13 (E.D. Mich. 2017) (issuing a classwide preliminary injunction and stating: "The Court notes that its issuance of a preliminary injunction comes prior to a decision on class certification. However, the Sixth Circuit has held that 'there is nothing improper about a preliminary injunction preceding a ruling on class certification.'" (quoting *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 433 (6th Cir. 2012))); *Planned Parenthood of Kansas v. Mosier, Medicare & Medicaid P 305668*, 2016 WL 3597457, at *26 (D. Kan. July 5, 2016) ("[C]ase law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding a class certification motion."); *Rodriguez v. Providence Cmty. Corrections, Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) ("[A] district court may, in its discretion, award appropriate classwide injunctive

in the event Plaintiffs are unable to justify certification of a class." *Cissna*, 341 F. Supp. 3d at 1070; *see also Just Film*, 474 F. App'x at 495 (noting that a court should "review the continued existence and the scope of the preliminary injunction, if and when a class is certified").

Providing such preliminary classwide relief does not first require that the Court engage in some version of an analysis under Rule 23 of the Federal Civil Rules of Civil Procedure, as argued by Defendants. As the authorities cited above show, the important question for imposing classwide relief is whether it is necessary to prevent classwide harm for alleged classwide conduct. Here, the Proclamation is directed against a class of persons and would cause the same alleged harm to the entire putative class—being forced to meet the dispositive requirement of purchasing health insurance or showing sufficient financial resources or face an inadmissibility determination. Having putative class members suffer this alleged irreparable harm merely because the preliminary injunction had to be litigated in an expedited fashion before class certification could be fully litigated is contrary to the purposes behind class actions and preliminary injunctive relief to preserve the *status quo*. Thus, classwide relief at this stage is appropriate.

---

relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers." (alteration in original) (quoting *Thomas v. Johnston*, 557 F. Supp. 879, 917 (W.D. Tex. 1983))); *Lee v. Orr*, 2013 WL 6490577, *2 (N.D. Ill. 2013) ("The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling, under its general equity powers. The lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons." (quoting *Illinois League of Advocates for the Developmentally, Disabled v. Illinois Dept. of Human Services*, 2013 WL 3287145, *3 (N.D. Ill. 2013))); *N.Y. State Nat. Org. For Women v. Terry*, 697 F. Supp. 1324, 1336 (S.D.N.Y. 1988) (holding that "the Court acted in the only reasonable manner it could under the circumstances, ruling on the continuation of [the] temporary restraining order and leaving the question of class certification for another day").

The record evidence sufficiently shows the significant harm the Proclamation would cause to 21 states, the District of Columbia, and New York City, and the putative class members that reside in these locations. The record also sufficiently shows the harm to the named Plaintiffs, their families, and additional persons who are members of the putative class (and willing to serve as additional class representatives).

The record further shows irreparable harm to Plaintiff Latino Network, which an injunction limited to only the individual Plaintiffs would not redress. There also currently are not any other pending lawsuits addressing the Proclamation, eliminating the concern some commentators and court opinions have expressed that a "universal" injunction "would unnecessarily 'stymie novel legal challenges and robust debate' arising in different judicial districts." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (quoting *Trump*, 897 F.3d at 1243-44). An injunction only affecting, for example, named Plaintiffs and immigrants intending to come to Oregon or sponsored by someone in Oregon (to address the harm to Plaintiff Latino Network), or some other subset of persons, also would create significant administrative difficulties. *See, e.g.*, *E. Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019). It would lead to uneven enforcement. It may also lead to unintended consequences for the State of Oregon. This is unlike the more narrowly-crafted injunctions that involved a specific border crossing entry point, which could more easily be geographically segregated.

A comprehensive injunction precluding enforcement of the Proclamation, thus, is necessary to provide Plaintiffs and putative class members with relief at this stage of the litigation and to preserve the *status quo*. The Court may revisit such relief after Plaintiffs' motion for class certification has been decided.

**F. Stay**

Defendants request that if the Court were to issue an injunction, the Court stay the injunction pending interlocutory appeal. The Court denies Defendants' request for a stay of the injunction. The Proclamation does not involve an issue of national security, sensitive diplomatic relations, or even general foreign relations. The Proclamation also does not contain any specific findings supporting the conclusion that its implementation will have any effect on the problem that it is purporting to address, the claimed $35 billion in domestic uncompensated health care costs, and certainly not during the time needed for appellate review. The irreparable harm to Plaintiffs and the putative class, however, is immediate and significant. Accordingly, a stay is not appropriate.

**G. Bond**

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))). The Court has considered

the relative hardships and the likelihood of success on the merits and concludes that to require

any security in this case would be unjust. Thus, the Court waives the requirement of a bond.

## PRELIMINARY INJUNCTION

Plaintiffs' Motion for a Preliminary Injunction (ECF 46) is **GRANTED**. Until the Court

resolves this case on the merits or orders otherwise, or until such time as the parties agree in

writing to amend, supersede, or terminate this Preliminary Injunction, **IT IS ORDERED** that

Defendants are enjoined from taking any action to implement or enforce Presidential

Proclamation No. 9945, "Presidential Proclamation on the Suspension of Entry of Immigrants

Who Will Financially Burden the United States Healthcare System."

DATED this 26th day of November, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge