# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOHN DOE #1**; *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>**DONALD TRUMP**, *et al.*,<br><br>　　　　　Defendants. | Case No. 3:19-cv-1743-SI<br><br>**OPINION AND ORDER** |

Stephen Manning and Nadia Dahab, INNOVATION LAW LAB, 333 SW Fifth Avenue, Suite 200, Portland, OR 97204; Karen C. Tumlin and Esther H. Sung, JUSTICE ACTION CENTER, PO Box 27280, Los Angeles, CA 90027; Scott D. Stein and Kevin M. Fee, SIDLEY AUSTIN LLP, One South Dearborn Street, Chicago IL 60603; and Jesse Bless, AMERICAN IMMIGRATION LAWYERS ASSOCIATION, 1301 G. Street, Suite 300, Washington D.C. 20005. Of Attorneys for Plaintiffs.

Joseph H. Hunt, Assistant Attorney General; Billy J. Williams, United States Attorney for the District of Oregon; August E. Flentje, Special Counsel; William C. Peachey, Director, Office of Immigration Litigation; Brian C. Ward, Senior Litigation Counsel; Courtney E. Moran, Trial Attorney; U.S. DEPARTMENT OF JUSTICE, Office of Immigration Litigation, District Court Section, PO Box 868, Ben Franklin Station, Washington D.C., 20044. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

On October 4, 2019, the President of the United States issued Proclamation No. 9945,

titled "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will

Financially Burden the United States Healthcare System" (the "Proclamation"). The

Proclamation requires certain immigrants to show proof of health insurance or sufficient financial resources to pay for the costs of anticipated health care before those immigrants may qualify for immigrant visas. On October 30, 2019, Plaintiffs filed their putative class action complaint, alleging that: (1) Defendants violated the Administrative Procedure Act ("APA"); (2) Defendants violated the Fifth Amendment Due Process clause's requirement of equal protection based on race, ethnicity, and national origin; (3) Defendants' actions are *ultra vires*, including that the President's issuance of the Proclamation violates the separation of powers doctrine and is outside the authority delegated to him in 8 U.S.C. § 1182(f); and (4) Defendants violated the Fifth Amendment Due Process clause's procedural due process guarantee.

On November 2, 2019, the Court entered a Temporary Restraining Order, temporarily enjoining Defendants from taking any action to implement or enforce the Proclamation through November 30, 2019. On November 26, 2019, the Court entered a preliminary injunction order, enjoining Defendants from taking any action to implement or enforce the Proclamation until the Court resolves this case on the merits. The Court then permitted discovery relating to Plaintiffs' motion for class certification and allowed supplemental briefing on that motion. Plaintiffs' motion for class certification is now before the Court. Plaintiffs request certification of two classes: (1) a class of United States citizens who are petitioners sponsoring a visa for family members; and (2) a class of foreign nationals who are visa applicants. For the reasons discussed below, Plaintiffs' motion is GRANTED, with a modest modification of the requested definition of the class of United States citizen petitioners.

## STANDARDS

Federal class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. The plaintiff "must be prepared to prove" that each of the applicable requirements of the rule is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rule 23 sets forth more than

a "mere pleading standard." *Id.* Rule 23 also provides district courts with broader discretion to

certify a class than to deny certification. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952,

956 (9th Cir. 2013).

A party seeking class certification must satisfy each of the four requirements of

Rule 23(a) and at least one requirement of Rule 23(b). *Wang v. Chinese Daily News, Inc.*, 737

F.3d 538, 542 (9th Cir. 2013). Under Rule 23(a), a district court may certify a class only if:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law and fact common to
> the class; (3) the claims or defenses of the representative parties
> are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a). In other words, a proposed class must meet the requirements of

numerosity, commonality, typicality, and adequacy of representation. *Mazza v. Am. Honda*

*Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

Along with the requirements of Rule 23(a), a party seeking to maintain a class action also

must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*

*Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs seek to certify the proposed class under

Rule 23(b)(2) or, alternatively, Rule 23(b)(1)(A). Under Rule 23(b)(2), a class action may

proceed if "the party opposing the class has acted or refuses to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Under Rule 23(b)(1)(A), a

class action may proceed if "prosecuting separate actions by or against individual class members

would create a risk of: (A) inconsistent or varying adjudications with respect to individual class

members that would establish incompatible standards of conduct for the party opposing the

class." Fed. R. Civ. P. 23(b)(1)(A).

The Rule 23 analysis is "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351 (quotation marks omitted); *Comcast*, 569 U.S. at 33-34. That said, Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* A district court, however, "*must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (emphasis in original).

## BACKGROUND

### A. Immigration and Nationality Act

Congress began legislating immigration in 1882. *See* An Act to Regulate Immigration, 22 Stat. 214 (1882). Since then, Congress amended the immigration laws several times. In 1952, Congress passed the Immigration and Nationality Act of 1952. Congress later significantly amended this statute when it enacted the Immigration and Nationality Act of 1965 ("INA"). Aspects of the INA have been amended many times through the passage of other laws, but most significantly through direct amendments in the Immigration Reform and Control Act of 1986, the Immigration Act of 1990, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

Congress adopted an immigrant visa system to further four main goals: reunifying families, admitting immigrants with skills that are useful to the United States economy, protecting refugees and others in need of humanitarian resettlement, and promoting diversity. Congress gave priority, however, to family reunification when it established the current immigration system. The method of allocating visas reflects this goal. The INA authorizes an

unlimited number of permanent visas to "immediate relatives," who are defined as "the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age." 8 U.S.C. § 1151(b). These visas are granted regardless of country of national origin, even though other visa categories have limits, or caps, based on country of national origin and total number of allocated visas. Other family-based preference categories, such as those for adult children, siblings, and relatives of Legal Permanent Residents, are capped at 480,000 per year (with a statutory *minimum* of 226,000), as compared to 140,000 maximum annual employment immigrant visas and 55,000 maximum annual diversity immigrant visas. 8 U.S.C. § 1151(c)-(e). Family-based petitions account for 65 percent of immigrant visas granted each year.

The first step in both the family-based and employment visa application process is for a relative or employer in the United States to file a sponsorship petition on behalf of the prospective immigrant. After the sponsorship petition is approved, the prospective immigrant applies for a visa and submits supporting documentation. Thus, this Opinion and Order references the "petition" (from the sponsoring family member) and the "application" (from the immigrant). These differing terms also are important in the context of the two different proposed subclasses.

When the U.S. Citizenship and Immigration Services ("USCIS") finds the application complete, the immigrant visa applicant is interviewed. Applicants who are outside the United States must interview at a United States consulate abroad. For applicants who are inside the United States, some may be eligible to apply for immigrant visas domestically, without having to travel to a consulate, but others must leave the country to appear for a consular interview abroad. Individuals in this latter category include noncitizens who have accrued more than 180 days of

unlawful presence in the United States but have obtained an I-601A waiver of inadmissibility to excuse the unlawful presence bar under 8 U.S.C. § 1182(a)(9)(B). *See* 8 C.F.R. § 212.7(e). To obtain an I-601A waiver, applicants must show that refusal of admission of the immigrant applicant would cause "extreme hardship" to eligible family members. *See* 8 C.F.R. § 212.7(e)(3)(vi) (incorporating the "extreme hardship" standard of 8 U.S.C. § 1182(a)(9)(B)(v)). Diversity visas are available through a lottery to individuals from countries with historically low rates of immigration to the United States; the lottery winners self-petition and apply to a consulate for their visa.

At the interview, the consular officer determines whether the immigrant visa applicant is eligible for admission to the United States. As part of the INA, Congress established ten categories of "Inadmissible Aliens" who are "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a). If a visa applicant falls into one of these categories, his or her application will be denied. In addition, after listing specific categories of inadmissibility, Congress provided that the President may, upon finding that the entry of any aliens or class of aliens into the United States "would be detrimental to the interests of the United States," by proclamation suspend the entry of any class of aliens as immigrants or impose on the entry of aliens any additional restrictions he may deem to be appropriate. *Id.* § 1182(f).

If the consular officer denies the applicant's immigrant visa at the interview, the applicant may choose to attempt to navigate the complex reconsideration process while remaining outside the United States. When an application is denied, I-601A waivers are automatically revoked. Applicants for whom family separation was found by USCIS to create an extreme hardship thus will be separated. They cannot return to the United States until they either obtain reconsideration of their visa denial, or obtain a new provisional waiver.

### B. Proclamation

#### 1. Overview of the Proclamation

On October 4, 2019, President Donald J. Trump issued the Proclamation. It barred otherwise qualified legal immigrants, visa applicants primarily seeking reunification with family members, from entering the United States unless they can show the consular officer that they will not financially burden the United States healthcare system. President Trump directed that the Proclamation become effective at 12:01 a.m. eastern daylight time on November 3, 2019. Before the Proclamation went into effect, the Court preliminarily enjoined Defendants from taking any action to implement or enforce the Proclamation, first with the Temporary Restraining Order and then with the Preliminary Injunction Order.

The Proclamation estimated "uncompensated [health] care costs" at more than $35 billion in each of the last 10 years. The Proclamation measured these costs as "unreimbursed services that hospitals give their patients." The Proclamation does not explain the source of this figure or how it was calculated. For example, it is not clear whether the underlying "unreimbursed services" costs are the amount billed by hospitals—often much higher than the cost actually paid by insurance companies or patients who individually pay their bills—or a "market" figure such as an average "allowed amount" that insurance plans would have paid for the care. It is also unclear whether all of these "unreimbursed services" are for uninsured persons or whether they also include amounts not paid from insured persons who are unable to pay co-insurance amounts, co-pays, or deductibles.

The Proclamation links the burden of "uncompensated care costs" to legal immigrants with a single unsourced sentence: "data show that lawful immigrants are about three times more likely than US citizens to lack health insurance." Based on this, the President concluded that allowing certain otherwise qualified legal immigrants into the United States would "saddle" the

U.S. healthcare system and the American taxpayer with increased costs. Under the Proclamation, a visa applicant intending lawfully to immigrate to the United States will presumptively financially burden the healthcare system and American taxpayers unless the applicant "will be covered by approved health insurance . . . within 30 days of the [applicant's] entry into the United States," or "unless the [applicant] possesses the financial resources to pay for reasonably foreseeable healthcare costs."

The Proclamation does not discuss any data or provide any estimate for how much of the estimated $35 billion in "uncompensated costs" stems from recent uninsured legal immigrants or how often recent uninsured legal immigrants use the nation's healthcare system. On the other hand, Plaintiffs provide the opinion of an expert, Dr. Leighton Ku, who has more than 25 years of experience as a health policy researcher.[1] ECF 54. Dr. Ku opines that recent uninsured immigrants use less than one-tenth of one percent (0.06 percent) of total American medical resources and only 0.08 percent of emergency room services. *Id.* at 10. Moreover, if only *legal* uninsured immigrants were considered (the group included in the Proclamation), the numbers would be even lower. *Id.*

## 2. Types of Approved Health Insurance and Barriers to Access

The Proclamation lists eight types of approved health insurance: (1) employer-sponsored plans; (2) "unsubsidized" ACA market plans on state exchanges; (3) Short Term Limited Duration Insurance ("STLDI") plans effective for at least 364 days; (4) catastrophic plans; (5) family member plans; (6) TRICARE and the like; (7) visitor health plans effective for at least 364 days; and (8) Medicare. The Proclamation does not clarify what is meant by

---

[1] Dr. Ku is a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health of George Washington University in Washington, D.C.

"unsubsidized" ACA market plans, but the Court assumes that it refers to plans bought without the help of premium tax credits.

Many of these approved plans are legally or practically unavailable to intending, or prospective, immigrants. Employer-sponsored plans are often not an option for family-based visa applicants, who are unlikely to have a job offer waiting before arriving in the United States. Family-based visa applicants have difficulty applying for jobs before entry because when they might receive approval to enter the United States is unknown and approval may take years. Even those fortunate enough to have secured employment may fall short. Most employers impose a waiting period before coverage begins, and the average waiting period is longer than the Proclamation's 30-day coverage deadline. Market-rate ACA plans can be prohibitively expensive and have high deductibles. The Proclamation does not explain why "unsubsidized" ACA plans are allowed yet "subsidized" ACA plans are not.

STLDI plans are banned or restricted in California, Massachusetts, New Jersey, New York, and Rhode Island. Twenty states have contract term limitations making STLDI plans ineligible under the Proclamation. Nineteen states limit the contract term to 11 months or less and Maine requires that the insurance contract end on December 31st, making it improbable the contract term will last for 364 days. STLDI plans also do not cover essential health benefits and are thus unavailable on exchanges. Unlike exchange plans, STDLI plans can deny coverage based on preexisting conditions and impose dollar caps on core coverage.

There are additional barriers to the other "approved" plans. Family-member plans are only available to applicants younger than 27 years old. Visitor's insurance plans are designed for short-term visits, have caps on individual coverage and lifetime benefits, and often exclude preexisting conditions, mental health conditions, and maternity care. Such plans often result in

significant uncompensated care. People who receive insurance through state Medicaid programs may not be able to add their family members to their plan. Catastrophic plans are only available to people who are already legally present. Even then, only people under 30 (or who obtain a special hardship exemption) are eligible to enroll. TRICARE is available only to members of the United States military and their close relatives. Medicare is perhaps the least feasible option— only intending immigrants older than 65 who have already been living continuously in the United States for five years may enroll.

## C.  Named Plaintiffs in this Putative Class Action

### 1.  Latino Network

Latino Network is an organization that provides programs aimed at educating and empowering Multnomah County Latinos. The Proclamation has already significantly affected Latino Network's ability to accomplish its mission.

Latino Network employs an "Immigration Navigator," who helps clients move through the complicated immigrant visa process. After the President issued the Proclamation, the workload of Latino Network's Immigration Navigator ballooned. Normally, the Immigration Navigator connects families with low-cost legal services and develops educational workshops on immigration legal services. He has put these duties on hold since the Proclamation was issued and has had to postpone individual intake interviews and cancel workshops to serve essentially as a consultant on how the Proclamation will affect worried families. The Proclamation's burden falls upon other Latino Network employees as well. The Executive Director had to reassign the Early Childhood Director to coordinate Latino Network's response to the Proclamation. As a result, Latino Network's childhood development programs are essentially on hold.

Latino Network's Executive Director estimates that responding to the Proclamation will consume up to 15 percent of paid staff members' weekly time. Training staff and conducting the

necessary research will cost Latino Network almost $14,000—money not in its budget. The time and money that Latino Network employees spend responding to the Proclamation is time and money they are unable to spend fulfilling its core mission.

## 2. Individual Named Plaintiffs

The individual named plaintiffs submitted declarations describing their personal circumstances, health, and financial situation and explaining why they and their relatives would not be able to comply with the requirements of the Proclamation. Defendants also submitted interrogatory responses provided by the named plaintiffs. Other than Plaintiff Gabino Soriano Castellanos, added as a Plaintiff in the First Amended Class Action Complaint, the named plaintiffs are United States citizens who are sponsoring immediate family members for immigrant visas. Mr. Castellanos is a foreign national visa applicant who is the husband of a U.S. citizen, another named plaintiff, who sponsored the petition for Mr. Castellanos's visa. All Plaintiffs seek only legally to reunite with their family members.

Plaintiff John Doe #1 is a U.S. citizen who lives in Oregon with his U.S. citizen son and noncitizen wife. He and his son have coverage through the Oregon Health Plan, Oregon's Medicaid program. He sponsored an immigrant visa for his wife, a national of Mexico. Her application was approved in July 2017. She also received an I-601A conditional waiver. John Doe #1 is no longer able to work due to a disability. He had heart surgery in 2018 and is receiving social security disability benefits. The family expects that after his wife receives lawful immigrant status, she will work and help financially support the family. Additionally, given the health problems of John Doe #1 and his son, his wife currently takes care of both of them. If her I-601A visa is revoked, it will cause extreme hardship for the family. She had a consulate interview scheduled for November 6, 2019, in Mexico, but on November 1, 2019, she requested the interview be postponed because of the Proclamation and her fear that her immigrant visa

would be denied and her waiver would be revoked. The interview is now scheduled for May 28, 2020. John Doe #1 investigated potential approved insurance options with his attorney and could not find an available and reasonably affordable plan. John Doe #1 also contacted some insurers himself, and was quoted unaffordable premiums, including premiums of $450 and $500 per month. John Doe #1 cannot add his wife to his plan because he is on Medicare.

Plaintiff Juan Ramon Morales is a U.S. citizen who lives in New York with his U.S. citizen daughter, lawful permanent resident step-daughter, and noncitizen wife. He sponsored an immigrant visa for his wife, a national of Mexico. Her application was approved in July 2017. She also received an I-601A waiver in April 2019. The National Visa Center has informed Mr. Morales and his wife that they have received all the requested documentation and his wife is "in the queue" for an interview. He and his wife are both currently employed. He and his children all have health insurance coverage. His children, however, are covered by subsidized plans, and he is covered by a catastrophic plan through his employer. His wife's employer does not provide health insurance. Mr. Morales is not able to add his wife to his plan until she has a social security number. Thus, after she has received her immigrant visa, she can be added, but until then she cannot be added to his plan. He has asked his employer for documentation to this effect, but nothing guarantees that she will have coverage within 30 days of her eligibility to be added to his employer-sponsored plan. Mr. Morales called at least three different health insurance companies about buying a plan for his wife, but he could not purchase a plan for her without her having a social security number. Mr. Morales investigated potential approved insurance options with his attorney and could not find an available and reasonably affordable plan. His wife had emergency brain surgery in 2010 and suffers from seizures and headaches.

Her preexisting conditions make other available insurance and her reasonably anticipated medical expenses cost prohibitive.

Plaintiff Jane Doe #2 is a United States citizen who lives in California and is a single mother to her two U.S. citizen children. She is insured through Medi-Cal, California's Medicaid program. She sponsored immigrant visas for her parents, who currently reside in Nicaragua. Their petitions were approved in July 2019. They are collecting the necessary information for the visa application process. Jane Doe #2 investigated potential approved insurance options with her attorney and could not find an available and reasonably affordable plan for her parents.

Plaintiff Jane Doe #3 is a United States citizen who lives in California. Her husband is an architect who teaches architectural theory and design and is a German national, living in Germany. She and her husband have been apart for more than two years. Her sponsorship petition for her husband was approved in April 2019. The documents for his application have been submitted but no interview had yet been scheduled. Jane Doe #3 has a disability, is unable to work, and has health insurance through Medi-Cal. Because it is unknown when her husband may be permitted entry into the United States, he is unable to apply for jobs before entry. His employment prospects are good and part of the benefit of having him living in this country is his expected financial support as well as family reunification and emotional, psychological, and physical support. He is unable, however, to show that he will be employed and have health insurance within 30 days of entry. He also has multiple sclerosis ("MS"), which requires treatment. They cannot show that they can pay cash for his reasonably anticipated medical expenses or can purchase "acceptable" insurance given his preexisting conditions, because it is unknown exactly when he will be employed. Jane Doe #3 researched different insurance options and discovered that she cannot add her husband to her Medi-Cal plan, TriCare is not an option

because she never served in the military, and STLDI plans are unavailable in California. Her husband researched options from German insurance companies, but they would not cover his chronic condition of MS, only would cover emergencies, and required his residence be in Germany. Jane Doe #3 also researched unsubsidized plans on the California exchange, which were unaffordable. These plans premiums ranging from $350 to $500 per month. Jane Doe #3 and her husband can afford a subsidized plan, but those are not approved under the Proclamation.

Plaintiff Iris Angelina Castro is a U.S. Citizen living in Massachusetts with her U.S. citizen son. She had to leave her job as a teacher when her son became sick. She currently has MassHealth insurance, Massachusetts's Medicaid. She sponsored an immigrant visa for her husband, who currently lives in and is a national of the Dominican Republic. Ms. Castro's petition was approved in May 2019. Ms. Castro and her husband believe they have submitted all necessary paperwork as of December 2019. Ms. Castro notes that the consulate in the Dominican Republic generally promptly schedules an interview after all paperwork has been submitted. Without her job, Ms. Castro does not believe that she and her husband can show the necessary financial resources to pay for health care costs, and without her health insurance benefits her Medicaid plan is not an approved plan. Ms. Castro investigated potential approved insurance options with her attorney and could not find an available and reasonably affordable plan. She also contacted insurance companies on her own, but the prices quoted were more than she could afford and were plans that provided incomplete coverage. For example, one plan would cost $315 per month but would not cover mental health care or maternity care. At the time Ms. Castro filed her declaration, she was pregnant. She also was unemployed and could not afford the premium. Ms. Castro desires to have her husband living with her to help emotionally, physically, mentally, and financially.

Plaintiff Blake Doe attends Oregon State University, studying civil engineering. His wife works full time. His noncitizen parents also live in Oregon, but are nationals of Mexico. He sponsored his parent's family visa petition in 2017, and the State Department approved that petition in January 2018. On June 11, 2019, USCIS granted Blake Doe's parents an I-601A provisional unlawful status waiver. As of February 2020, Blake and his parents were informed that all of his parents' necessary paperwork has been received and they are "queued" for an interview. Blake investigated insurance options with his attorney and could not find an available and reasonably affordable plan for his parents. Quoted premiums were $2,500 or more per month. His mother has health conditions, and he does not believe that his parents will be able to show that they have the resources to pay for reasonably anticipated medical costs, even though his father is employed. His father's employer does not provide medical insurance. His parents cannot be added to his student insurance or his wife's insurance through her employment.

Plaintiff Brenda Villarruel is a U.S. citizen living in Illinois with her U.S. citizen son and parents and noncitizen husband. She sponsored an immigrant visa for her husband, Plaintiff Gabino Soriano Castellanos, who is a citizen of Mexico. Her petition was approved in September 2016. Ms. Villarruel works part-time as a medical assistant and part-time at her husband's tattoo shop. Mr. Soriano is a professional tattoo artist who previously lived with Ms. Villarruel in Chicago but went to Mexico in March 2018. Mr. Castellanos had more than 100 customers awaiting his return for tattoos. Mr. Castellanos had his interview scheduled for November 5, 2019, but after learning of the Proclamation and researching insurance plans, he and Ms. Villarruel requested that his interview be postponed. They did not believe that they could meet the terms of the Proclamation. The interview was rescheduled for January 28, 2020. At that time, the consular officer granted Mr. Castellanos's application for an immigrant visa.

**ANALYSIS**

## A. Class Certification

Plaintiffs move to certify the following two subclasses:

> (1) Individuals in the United States who currently have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa, or who will soon file such a petition; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs" ("U.S. Petitioner Subclass"); and

> (2) Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs" ("Visa Applicant Subclass").

Defendants argue that certification is inappropriate because: (1) Mr. Castellanos received his visa, mooting his claims and rendering the Visa Applicant Subclass without a class representative; (2) Plaintiffs in the U.S. Petitioner Subclass lack standing; and (3) the U.S. Petitioner Subclass does not satisfy the requirements of Rules 23(a), 23(b)(2), or 23(b)(1)(a) of the Federal Rules of Civil Procedure.

### 1. Visa Applicant Subclass—Representative

Plaintiffs moved for class certification on November 8, 2019, noting that they would be filing an amended complaint adding Plaintiff Gabino Soriano Castellanos to represent the Visa Applicant Subclass. Plaintiffs included Mr. Castellanos's declaration with their materials supporting the motion for class certification. When filing their amended complaint on November 27, 2019, Plaintiffs noted that they filed it as a matter of course under

Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, because Defendants had not yet filed an answer or otherwise responded to Plaintiffs' original complaint, citing *American Realty Investors, Inc. v. Prime Income Asset Mgmt., LLC*, 2013 WL 5663069, at *5 (D. Nev. Oct. 15, 2013) ("A complaint is a pleading to which a responsive pleading is required. Therefore, under Rule 15(a)(1)(B), a party has an absolute right to amend its complaint at any time from the moment the complaint is filed until 21 days after the earlier of the filing of a responsive pleading or a motion under Rule 12(b), (e), or (f)." (quoting *Villery v. Dist. of Columbia*, 277 F.R.D. 218, 219 (D.D.C. 2011)). Plaintiffs filed their reply brief in support of their motion for class certification on November 27, 2019, the same day that Plaintiffs filed their First Amended Class Action Complaint.

The Court issued its Opinion and Order granting Plaintiffs' motion for preliminary injunction on November 26, 2019. On November 27, 2019, the Court issued a scheduling order, requesting that the parties confer on a schedule for class discovery and supplemental briefing on the motion for class certification. On December 26, 2019, the Court issued a case management scheduling order, permitting discovery relating class certification and setting a deadline of February 24, 2020 for Defendants to file a supplemental surresponse in opposition to Plaintiffs' motion for class certification and March 9, 2020 for Plaintiffs' to file their surreply in support of their motion. On January 29, 2019, Plaintiffs filed a "Notice of Additional Facts," which described certain changed circumstances since they filed their motion and supporting documents in November 2019, including that Mr. Castellanos had been approved for his immigrant visa during his January 2020 interview.

Defendants argue in their surresponse that the changed circumstance of Mr. Castellanos receiving his immigrant visa moots his claim in this lawsuit and renders him an invalid class

representative. This, argue Defendants, "dooms" Plaintiffs' request to certify the Visa Applicant

Subclass. Defendants note that when "the plaintiff's claim becomes moot before the district court

certifies the class, the class action normally also becomes moot." *Slayman v. FedEx Ground

Package Sys. Inc.*, 765 F.3d 1033, 1048 (9th Cir. 2014). Defendants further argue that because

Plaintiffs invoked no exception to mootness, such as that the class claims are "inherently

transitory," Plaintiffs may not invoke such an exception in their surreply.

The Court rejects Defendants' argument that Plaintiffs waived their opportunity to invoke

the inherently transitory mootness exception. Plaintiffs added Mr. Castellanos in their First

Amended Complaint, filed November 27, 2019, the same day that Plaintiffs filed their reply in

support of their motion for class certification. Plaintiffs had no reason to argue a mootness

exception to Mr. Castellanos's claims in that reply—Plaintiffs had just added Mr. Castellanos as

a named plaintiff. He did not even have a consular interview scheduled at that time. The next

brief that Plaintiffs filed in which they could raise a mootness exception was their surreply filed

on March 9, 2020, and in which Plaintiffs' invoked the exception. Plaintiffs, therefore, did not

waive the inherently transitory mootness exception.

In their surreply, Plaintiffs cite the Supreme Court's discussion of the inherently

transitory mootness exception in *Nielsen v. Preap*, 139 S. Ct. 954 (2019). In *Nielsen*, two classes

of aliens brought a class action complaint challenging the INA's provision relating to mandatory

detention without bond. *Id.* at 960-61. The government argued that because the putative class

representatives had "obtained either cancellation of removal or bond hearings" by the time of

class certification, the class action was moot. *Id.* at 963. The Supreme Court noted, "Class

actions are '[n]ormally . . . moot if no named class representative with an unexpired claim

remain[s] at the time of class certification.'" *Id.* at 962 (alterations in original). The Court

concluded, however, "that general norm is no hurdle here." *Id.*

The Supreme Court held that there was at least one plaintiff with a live claim at the time

that the class was certified. *Id.* at 963. The Court explained:

> Even if that had not been so, these cases would not be moot
> because the fact that a class "was not certified until after the named
> plaintiffs' claims had become moot does not deprive us of
> jurisdiction" when, as in these cases, the harms alleged are
> transitory enough to elude review. Respondents claim that they
> would be harmed by detention without a hearing pending a
> decision on their removal. Because this type of injury ends as soon
> as the decision on removal is made, it is transitory. So the fact that
> the named plaintiffs obtained some relief before class certification
> does not moot their claims.

*Id.* (citations omitted).

Like the immigration decisions in *Nielsen*, the type of injury alleged here ends as soon as

the consular interview is held and the visa decision is made at the interview. It is transitory.

Thus, the fact that Mr. Castellanos obtained some relief before class certification does not moot

his claims and does not render the Visa Applicant Subclass unable to be adjudicated. *Id.*; *see also*

*Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1087, 1089-90 (9th Cir. 2011).

### 2. U.S. Petitioner Subclass—Standing

Defendants argue that the U.S. Petitioner Subclass named plaintiffs lack standing.

Defendants' primary argument relating to standing, like arguments they assert against many of

the Rule 23 factors, is that these plaintiffs lack standing because the Court enjoined Defendants

from enforcing or applying the Proclamation before it went into effect and thus no consular

officer applied the Proclamation to any immigrant. Defendants' argument is premised on an

assumption that only immigrants against whom the Proclamation has actually been applied or

their sponsoring family members have standing. This argument is rejected.

To demonstrate standing to seek injunctive relief under Article III,

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

A plaintiff may not assert claims that are "imaginary or speculative," but "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) ("The injury requirement does not force a plaintiff to 'await the consummation of threatened injury to obtain preventive relief.'" (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974))). As the Ninth Circuit has explained:

> It is well-established that, although a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of a statute's operation or enforcement," a plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979) (internal quotation marks omitted). Thus, Santiago need not await prosecution to challenge § 13-2929. *Id.* ("[I]t is not necessary that [the plaintiff] first expose himself to actual arrest or a prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.") (internal quotation marks omitted). "[I]t is 'sufficient for standing purposes that the plaintiff intends to engage in a 'course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the provision will be invoked against the plaintiff.'" *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (quoting *Babbitt*, 442 U.S. at 298)).

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (alterations in original); *see also Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013 (holding that a "'credible

threat' that a probabilistic harm will materialize" is enough to support standing) (quoting *Covington v. Jefferson Cty.*, 358 F.3d 626, 641 (9th Cir. 2004)).

Defendants also argue that the U.S. Petitioner Subclass Plaintiffs have not established that the threatened injury from the Proclamation is sufficiently imminent, because they have not shown that a consular officer would apply the Proclamation to deny their family members a visa. These Plaintiffs, however, do not have to prove that their family members will be denied visas to establish standing. Plaintiffs need only prove that based on their course of conduct, there is a "realistic danger" or a "credible threat" that operation or enforcement of the Proclamation would cause them injury. *Valle del Sol*, 732 F.3d at 1015; *Nat. Res. Def. Council*, 735 F.3d at 878. These Plaintiffs' visa petitions have been approved for sponsored family members. Their family members have completed applications and are all awaiting interviews, one of which is scheduled for May 2020, to see if their visas will be granted or denied. The U.S. Petitioner Plaintiffs' declarations and answers to interrogatories are sufficient to show that their family members have health issues and financial constraints. In their declarations and responses to interrogatories, these Plaintiffs also describe that they or their family members investigated various health insurance options approved under the Proclamation and those options are not reasonably available or affordable.[2]

Defendants highlight certain named plaintiffs who responded to interrogatories by describing low out-of-pocket health care costs for their sponsored immigrant family members in

---

[2] Defendants dispute the thoroughness with which Plaintiffs investigated insurance options, arguing that Plaintiffs need to show that they could not obtain any possible insurance that may somehow conceivably fall within the parameters of the Proclamation. Defendants cite no authority for such a stringent standard to show injury for standing. Plaintiffs describe multiple attempts at researching possible insurance options and describe injury that is imminent and not hypothetical or conjectural. That is what is required to support standing. *Summers*, 555 U.S. at 493.

the preceding year. Defendants argue that it is likely those named plaintiffs would not be injured by the Proclamation because their sponsored family members would be found by a consular officer to be able to pay for their own anticipated health care costs. Those named plaintiffs, however, describe how their sponsored immigrant visa applicant family members have certain health concerns or conditions and that they were unable to seek medical care for those concerns or conditions because of costs. Thus, there is a realistic danger that a consular officer would find that there are anticipated health care costs associated with those medical concerns and conditions and would evaluate the immigrant visa applicant's ability to pay for those anticipated costs. These Plaintiffs describe how they would be unable to afford the associated medical costs. Considering the record, the Court finds that the U.S. Petitioner Plaintiffs have shown a credible threat or realistic danger of injury from the Proclamation.

Finally, Defendants argue that even if unadjudicated visa petitions could provide standing, all the named plaintiffs in the U.S. Petitioner Subclass, except one based on newly changed circumstances, lack standing because their claims are not ripe. Defendants assert that these Plaintiffs' claims are unripe because their immigrant family members do not have interviews scheduled with a consular officer.[3] It is Defendants, however, that schedule the consular interviews. Many Plaintiffs and their family members have submitted all the requested documentation and are waiting for the interview of their family members to be scheduled—the

---

[3] Defendants' concept of justiciability is quite narrow. Defendants argue that the claim is moot for the Visa Applicant Subclass Plaintiff who kept his interview and the claims are unripe for Plaintiffs whose family members do not have an interview. This allows standing only for persons during the narrow window of time between when an interview is scheduled and when it takes place, or if the visa is denied at the interview and the harm has then occurred. This view of standing, as discussed above, is rejected because a plaintiff does not have to wait for a credibly threatened threat of injury to occur to have standing, and the requirement that standing is conferred only in the months between an interview being scheduled and it taking place is unreasonably narrow and incompatible with the purposes of a Rule 23(b)(2) class.

scheduling is outside their control. Others are gathering additional documents requested. In any

event, Plaintiffs in this subclass face the same imminent injury, with or without an interview

currently scheduled for the visa applicant. They are all persons who have sponsored an

immigrant whose petition has been approved, the sponsored immigrant's application is complete

or nearly complete, and the immigrant is waiting for an interview at which time the visa will be

approved or denied. That approval decision will be significantly affected by whether the

Proclamation is in force at the time of the interview. As discussed above, a plaintiff "does not

have to await the consummation of threatened injury to obtain preventive relief." *Valle del Sol*,

732 F.3d at 1015 (quoting *Babbitt*, 442 U.S. at 298). Based on *Plaintiffs'* course of conduct, there

is a credible threat that the Proclamation will cause them injury, and that is sufficient for

standing. *Id.*

### 3. Rule 23(a) Requirements

#### a. Numerosity

In this district, there is a "rough rule of thumb" that 40 class members is sufficient to

meet the numerosity requirement. *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 590 (D.

Or. 2013); *see also Wilcox Dev. Co. v. First Interstate Bank of Or., N.A.*, 97 F.R.D. 440, 443 (D.

Or. 1983) (same); 1 *McLaughlin on Class Actions* § 4:5 (15th ed.) ("The rule of thumb adopted

by most courts is that proposed classes in excess of 40 generally satisfy the numerosity

requirement."). Further, when plaintiffs seek injunctive or declaratory relief, "the numerosity

requirement is relaxed and plaintiffs may rely on the reasonable inference arising from plaintiffs'

other evidence that the number of unknown and future members of [the proposed class] is

sufficient to make joinder impracticable." *Sueoka v. United States*, 101 F. App'x 649, 653 (9th

Cir. 2004); *see also Nightingale v. U.S. Citizenship & Immigration Servs.*, 333 F.R.D. 449, 457

(N.D. Cal. 2019).

Defendants argue that this element is not met because no person currently is affected by the Proclamation because the Court enjoined the Proclamation before it went into effect. Defendants' argument is based on Defendants' theory that no one has standing to challenge the Proclamation until it is enforced against an immigrant. Because the Court rejects this theory, Defendants' contention that numerosity is not met also is rejected. Defendants concede that the Proclamation will apply to tens of thousands, if not hundreds of thousands, of immigrants. It is a reasonable inference, as Defendants assert in their arguments about purported conflicts (arguing that the subclasses will be extremely large), that many of those immigrants will fall within the definition of the putative subclasses. Given the "relaxed" numerosity standard in cases requesting injunctive and declaratory relief and the fact that Plaintiffs may rely on the reasonable inference of unknown and future members, numerosity is met in this case.

### b. Commonality

To satisfy the commonality requirement, a representative plaintiff must show that the putative class members suffered the "same injury," *i.e.*, that their claims depend on a "common contention." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation marks omitted). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* But class members need not have *every* issue in common: Commonality requires only "a single significant question of law or fact" in common. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012); *see also Wal-Mart*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do." (alterations and quotation marks omitted)).

"[C]ommon questions may center on 'shared legal issues with divergent factual predicates [or] a common core of salient facts coupled with disparate legal remedies.'" *Jimenez*

*v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (first alteration added, second alteration in original) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998)); *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) ("Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists."); *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) ("Differences among the class members with respect to the merits of their actual document fraud cases, however, are simply insufficient to defeat the propriety of class certification. What makes the plaintiffs' claims suitable for a class action is the common allegation that the INS's procedures provide insufficient notice."). Thus, the Ninth Circuit has rejected arguments that factual variations preclude a finding of commonality, particularly in civil rights cases, explaining: "We have previously held, in a civil-rights suit, that commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005); *see also Parsons v. Ryan*, 754 F.3d 657, 682 (9th Cir. 2014) ("In a civil rights suit such as this one . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. Under such circumstances, individual factual differences among class members pose no obstacle to commonality." (quoting *Rosas v. Baca*, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012) (Pregerson, J.))

Plaintiffs' alleged harm is that they and all putative class members will be subject to the Proclamation, which Plaintiffs allege is unconstitutional and the implementation and enforcement of which Plaintiffs allege violates Constitution and the APA. Plaintiffs also seek the same relief for themselves and the putative class—a permanent injunction preventing

implementation and enforcement of the Proclamation. Defendants focus on the fact that Plaintiffs and the individual visa applicants have varying factual circumstancing relating to their financial and medical circumstances, and thus there will be differing circumstances for consular officers to consider when making specific visa determinations.[4] That, however, is not the dispositive question for commonality in this case. Plaintiffs are not challenging specific visa determinations. Plaintiffs are challenging the legality of the implementation and enforcement of a broadly-applicable change to how immigration visas are to be processed and whether the President violated the Constitution in issuing the Proclamation.

There are many alleged common issues of law and fact. These include: (1) whether in issuing the Proclamation President Trump violated the doctrine of separation of powers, such as by the Proclamation conflicting with provisions of the INA; (2) whether in issuing the Proclamation President Trump exceeded the powers delegated to him in 8 U.S.C. § 1182(f), such as by being indefinite or otherwise not complying with the statutory authority granted to the President by Congress; (3) whether under the circumstances of this case and this exercise of authority, the Proclamation, by relating only to domestic, non-national security issues, violated the non-delegation doctrine; (4) whether Defendants violated the APA; (5) whether Defendants violated Plaintiffs' rights under the Equal Protection Clause; (5) whether Defendants violated Plaintiffs' rights under the Due Process Clause; (6) whether the Proclamation contains terms that

---

[4] Defendants also assert that commonality is lacking because Plaintiffs "have not asserted that they have researched every health insurance plan available in every single state, district, and territory in the United States, or in every single country in the world, and that there are no options available to any of them—nor could they make such an assertions." Commonality does not require such an assertion. Commonality requires "common contentions whose truth or falsity can be determined in one stroke" and that are the "'glue' that holds together the putative class," meaning that each of the challenged "policies and practices is unlawful as to every [class member] or it is not." *Parsons*, 754 F.3d at 678. Those parameters are met in this case.

are vague or unworkable, rendering uniform application impossible; (7) whether the Proclamation was self-executing or required agency action; and (8) whether the Proclamation was motived by racial animus. These, and other, common issues are not determined by any individual plaintiff's factual circumstances. They are all subject to classwide resolution. Moreover, resolving these issues is central to the validity of Plaintiffs' claims and will "drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. Finally, the remedy sought is the same for Plaintiffs and the putative class members.

The Court finds, however, that there is not commonality among the U.S. Petitioner Subclass named plaintiffs, whose petitions were approved sponsoring family members for an immigrant visa, and those putative class members who may "soon" file a petition but have not yet filed a petition. It is too speculative whether the alleged injury will befall persons who may soon file a petition but have not yet done so. Someone who may intend to file a petition may not actually file a petition and then will not be subject to the Proclamation. Plaintiffs assert that their intent in including such persons in the class definition was to ensure that future petitioners would be included in the class. Future U.S. citizens who actually file a petition, however, would then be persons who have a pending petition, and they would fall within the subclass definition of persons who have a petition pending. Plaintiffs' concern can be resolved by adding "will have" to the class definition, ensuring that future persons who actually file petitions will be in the class. Deleting persons who will "soon" file a petition excludes persons who are only intending to file petitions but may not file them for some reason. This results in a modified subclass definition of:

> Individuals in the United States who currently have or will have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30

days after entry or will be able "to pay for reasonably foreseeable medical costs."

This modified definition creates a subclass not frozen in time and allows for future putative class members that are similarly situated to join the class as the case progresses. *See Rodriguez v. Ha*yes, 591 F.3d 1105, 1118, 1124 (9th Cir. 2010) ("The inclusion of future class members in a class is not itself unusual or objectionable.") (collecting cases); *accord Ms. L. v. U.S. Immigration & Customs Enf't*, 331 F.R.D. 529, 541 (S.D. Cal. 2018) (certifying a class of adults who "have been, are, or will be detained in immigration custody" and "have a minor child who is or will be separated from them"); *Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *7-8 (C.D. Cal. Feb. 26, 2018) (certifying a class that includes those who "will have their DACA terminated without notice or process").

"[D]istrict courts have broad discretion to modify class definitions." *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 575 (N.D. Cal. 2018) (alteration in original) (quoting *Williams v. City of Antioch*, 2010 WL 3632199, at *3 (N.D. Cal. Sept. 2, 2010) and *Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 619 (6th Cir. 2007)); *see also* 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1759 (3d ed.).The Court therefore modifies the definition of the U.S. Petitioner Subclass as set forth above. As modified, the Court finds that commonality is met for both proposed subclasses. This finding comports with many courts that have found commonality to be satisfied in cases involving challenges to systemic immigration *policies and procedures*, even though immigration *decisions* ultimately involve discretionary decisions by consular officers. *See, e.g*, *Doe v. Wolf*, 2020 WL 209919, at *7 (S.D. Cal. Jan. 14, 2020); *Ms. L. v. U.S Immigration & Customs Enf't*, 330 F.R.D. 284, 289 (S.D. Cal. 2019); *Ms. L. v. U.S. Immigration & Customs Enf't*, 331 F.R.D. at 538; *Inland Empire-Immigrant Youth Collective*, 2018 WL 1061408, at *8; *Hernandez v.*

*Lynch*, 2016 WL 7116611, at *17 (C.D. Cal. Nov. 10, 2016), *aff'd sub nom. Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017).

Defendants also argue that the Visa Applicant Subclass is unable to meet the commonality requirement because unadmitted and nonresident aliens have no constitutional right of entry to the United States and have to right to cause of action in furtherance of their claim for admission. Defendants cite *Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015), and *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972), both of which involved plaintiffs requesting court orders requiring admission into the country of certain persons. Those cases are distinguishable because Plaintiffs are not claiming a constitutional right of entry for the Visa Applicant Subclass. Nor are Plaintiffs requesting the remedy of an order allowing members of this subclass, or any plaintiff, to enter the country or any similar type of injunctive relief. This is not a case in furtherance of any plaintiffs' specific application for admission. It is a civil rights case challenging a generally applicable policy and procedure. The Court rejects Defendants' argument.

### c. Typicality

To meet the typicality requirement, a representative plaintiff must show that his or her claims or defenses are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). Under the "permissive standards" of Rule 23(a)(3), a "representative's claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). To determine whether claims and defenses are typical, courts look to "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of

conduct." *Id.* (quotation marks omitted); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).

Defendants argue that Plaintiffs' claims are not typical because they lack standing. The Court has rejected Defendants' argument that Plaintiffs lack standing. Defendants also argue that Plaintiffs' claims are not typical because Plaintiffs and their family members all have different financial and personal circumstances that could affect the individual determination by the consular officer at the interview. This, however, is not the standard for typicality. Typicality examines the claims in the case and whether they are typical of the claims of the absent class members. The claims here are not dependent on the unique factual circumstances of any specific Plaintiff. For example, whether a particular named plaintiff has financial resources has no bearing on whether President Trump violated the separation of powers doctrine in issuing the Proclamation. Similarly, whether a particular named plaintiff may be eligible for an approved insurance plan does not affect the legal analysis about whether the agencies' engaged in final agency action and, if so, whether that action violated the APA.

"Defendants' typicality challenge fails to the same extent as their commonality challenge. Even if the named plaintiffs' individual cases contain some factual variations, that does not change the fact that all are challenging the legality of [the Proclamation, its implementation and enforcement] under the APA and due process clause." *Inland Empire-Immigrant Youth Collective*, 2018 WL 1061408, at *10; *see also Parsons*, 754 F.3d at 686 ("It does not matter that the named plaintiffs' may have in the past suffered varying injuries or that they may currently have different health care needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other to every class member."); *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) ("The particular characteristics of the Petitioner or

any individual detainee will not impact the resolution of this general statutory question and, therefore, cannot render Petitioner's claim atypical."). With the Court's modified definition of the U.S. Petitioner Subclass, the Court finds that the typicality requirement is met.

### d. Adequacy of representation

Rule 23(a)(4) states that before a class can be certified, a court must find that "the representative parties will fairly and adequately protect the interests of the class." This requirement turns on two questions: (1) whether "the named plaintiffs and their counsel have any conflicts of interest with other class members"; and (2) whether "the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020. The adequacy requirement is based on principles of constitutional due process, and so a court cannot bind absent class members if class representation is inadequate. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940); *Hanlon*, 150 F.3d at 1020.

Defendants argue that Plaintiffs are inadequate because the subclasses will be so large (despite Defendants' contradictory arguments that numerosity is not met because the subclasses have a size of zero) that there will surely be conflicts within them. Defendants speculate that some subclass members will have health insurance and some will not, and there will be conflicts between those that do and those that do not. Immigrant visa applicants with health insurance will not be class members, and Defendants do not explain how Plaintiffs, most of whom do have health insurance, have conflicts with one another or putative class members because of their health insurance or lack thereof. "'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.'" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (quoting William B. Rubenstein *et al.*, 1 NEWBERG ON CLASS ACTIONS § 3.58 (5th ed. 2011)). "A conflict is fundamental when it goes to the specific issues in controversy." *Id.* (quoting

NEWBERG ON CLASS ACTIONS § 3.58). Defendants describe no purported conflicts that go to the heart of Plaintiffs' claims in this lawsuit.

Defendants also presume that there will be conflicts between the two subclasses, because requiring the foreign immigrant subclass members to have health insurance reduces a financial burden on the U.S. citizen subclass members. Defendants submit no evidence, no statistics, no studies, nor anything other than rampant speculation and attorney argument to support their arguments relating to purported conflicts. The Court rejects Defendants' speculation. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 942 ("However, we do not 'favor denial of class certification on the basis of speculative conflicts.'" quoting *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)).

Defendants also argue that counsel are inadequate because counsel did not submit their resumes. Counsel described their extensive and relevant experience and cases on which they have been found to be adequate class counsel. This is sufficient, and the Court does not find Defendants' objection persuasive.

### e. Ascertainability

Defendants argue that Plaintiffs also must show that the requirement of ascertainability is met. Plaintiffs respond that ascertainability is not required in the Ninth Circuit and especially not in cases seeking certification under Rule 23(b)(2). In cases involving certification under Rule 23(b)(3), courts in this district have previously considered the issue of "ascertainability" in deciding whether to certify a class seeking money damages. *See, e.g., Ott v. Mortg. Inv'rs Corp. of Ohio, Inc.*, 65 F. Supp. 3d 1046, 1064 (D. Or. 2014). This Court, however, did not require a showing of ascertainability when considering class action certification solely in the context of injunctive relief. *See, e.g., A.F. ex rel. Legaard v. Providence Health Plan*, 300 F.R.D. 474 (D.

Or. 2013) (granting class certification solely under Rule 23(b)(2), without discussing ascertainability).

In *A.F.*, the Court did not specifically discuss the applicability, or lack thereof, of the judicially created "implicit" factor of ascertainability to certification under Rule 23(b)(2). There is some disagreement among courts about the applicability of this requirement. *Compare Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004) (holding that the lower court erred in requiring ascertainability of a Rule 23(b)(2) class and explaining that "while the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2)") with *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495-97 (7th Cir. 2012) (finding a lack of ascertainability fatal to a Rule 23(b)(2) class certification because the class definition was too indefinite). The majority view, however, appears to favor either a lower standard for the ascertainability requirement or no requirement at all in the 23(b)(2) context. *See, e.g.*, *Shelton v. Bledsoe*, 775 F.3d 554, 561-62 (3d Cir. 2015) (finding the "judicially-created implied requirement of ascertainability . . . inappropriate for (b)(2) classes"); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1325-26 (W.D. Wash. 2015) (noting "many courts have determined that [ascertainability] is of less importance or not applicable at all when considering certification under Rule 23(b)(2)"). The Ninth Circuit has not specifically discussed "ascertainability" in the context of a Rule 23(b)(2) class.

In 2017, the Ninth Circuit decided *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). In that case, the Ninth Circuit rejected the argument that class plaintiffs in a Rule 23(b)(3) class must show "an administratively feasible way to identify putative class members." *Id*. at 1133. For similar reasons, this Court declines to hold that administrative feasibility is a requirement for class certification under Rule 23(b)(2).

To the extent any aspect of ascertainability remains in this circuit after *Briseno*, under a Rule 23(b)(2) class, the Court finds persuasive the Third Circuit's reasoning in *Shelton v. Bledsoe*. As discussed by the Third Circuit, a class under Rule 23(b)(2) is indivisible by nature and the alleged conduct can be declared unlawful as to all class members or none of them. 775 F.3d at 561. There is no right to opt out of such a class, the focus of this type of class is on the remedy sought, and the class must be cohesive as derived from Rule 23(b)(2), not ascertainability. *Id.* Because the focus is on the remedy sought, "and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action." *Id.* That also is why a court need not analyze predominance and superiority in a Rule 23(b)(2) class. *Id.* As further explained by the Third Circuit:

> Indeed, an Advisory Committee note to Rule 23 notes that "illustrative" examples of a Rule 23(b)(2) class "are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration.*" Fed. R. Civ. P. 23 advisory committee's note (1966) (emphasis added). In light of this guidance, a judicially-created implied requirement of ascertainability—that the members of the class be *capable* of specific enumeration—is inappropriate for (b)(2) classes. Moreover, the enforcement of the remedy usually does not require individual identification of class members in (b)(2) class actions: "If relief is granted . . . the defendants are legally obligated to comply, and it is usually unnecessary to define with precision the persons entitled to enforce compliance, since presumably at least the representative plaintiffs would be available to seek . . . relief if necessary." *Rice v. City of Phila.*, 66 F.R.D. 17, 19 (E.D. Pa. 1974).

*Id.* (emphasis in original). Thus, the Court declines to find that ascertainability is required in this case.

### 4. Rule 23(b)(2)—Nationwide Injunctive Relief Class

Plaintiffs request certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Rule 23(b)(2) permits class treatment when "the party opposing the class has acted or refuses to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2009). The requirements of Rule 23(b)(3) of predominance and superiority do not apply to a class under Rule 23(b)(2). *See Wal-Mart*, 564 U.S. at 362. There is also no requirement of notice or that class members be allowed to opt-out. *See id.*

Additionally, the primary relief sought must be injunctive or declaratory. *Wang*, 737 F.3d at 544 (citing *Wal-Mart*, 564 U.S. at 360). The principle undergirding this requirement is that the "indivisible nature of the injunctive or declaratory remedy" justifies certification because the "conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (April 2009)). The Advisory Committee Notes explain that subdivision (b)(2) was intended to reach situations when the final relief settles the "legality of the behavior with respect to the class as a whole." Advisory Committee Notes to 1966 amendments to Rule 23(b)(2). Rule 23(b)(2) does not authorize certification "when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360 (emphasis in original); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011) (same). Moreover,

claims for monetary relief that are "not incidental to the injunctive or declaratory relief" are ineligible for class certification under Rule 23(b)(2). *Wal-Mart*, 564 U.S. at 360.

Defendants do not dispute that the elements to certify a nationwide class under Rule 23(b)(2) are met here. Defendants only dispute standing and the elements under Rule 23(a). Resolving Plaintiffs' proposed injunctive relief class would finally settle the legality of Defendants' "behavior with respect to the class a whole." Advisory Committee Notes to 1966 amendments to Rule 23(b)(2). The proposed class also involves conduct that "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. As a result, certification of a nationwide injunctive relief class under Rule 23(b)(2) is appropriate. Because the Court certifies the class under Rule 23(b)(2), the Court does not reach Plaintiffs' alternative argument under Rule 23(b)(1)(a).

**B.  Class Counsel and Class Representatives**

Under Rule 23(g), the Court appoints Karen C. Tumlin and Esther H. Sung of Justice Action Center; Stephen Manning, Nadia Dahab, and Tess Hellgren of Innovation Law Lab; Scott D. Stein and Kevin M. Fee of Sidley Austin; and Jesse Bless of American Immigration Lawyers Association as Class Counsel. The Court also appoints Plaintiffs John Doe #1; Juan Ramon Morales; Jane Doe #2; Jane Doe #3; Iris Angelina Castro; Blake Doe; Brenda Villarruel; Gabino Soriano Castellanos, and Latino Network as class representatives.

## CONCLUSION

Plaintiffs' Motion for Class Certification (ECF 44) is GRANTED, with a modified subclass definition. The Court certifies under Rule 23(b)(2) of the Federal Rules of Civil Procedure these two subclasses:

(1) <u>U.S. Petitioner Subclass</u>:

Individuals in the United States who currently have or will have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs"; and

(2) <u>Visa Applicant Subclass:</u>

Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs."

**IT IS SO ORDERED.**

DATED this 7th day of April, 2020.

<u>/s/ *Michael H. Simon*        </u>
Michael H. Simon
United States District Judge