**Stephen Manning** (SBN 013373)
stephen@innovationlawlab.org
**Nadia Dahab** (SBN 125630)
nadia@innovationlawlab.org
**Tess Hellgren** (SBN 191622)
tess@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733

**Karen C. Tumlin** (admitted *pro hac vice*)
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (admitted *pro hac vice*)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page.)*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; GABINO SORIANO CASTELLANOS; and LATINO NETWORK, | Case No.: 3:19-cv-01743-SI |
| Plaintiffs, | |
| v. | PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO 28 U.S.C. § 1651(a) |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

Page 1 – EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO 28 U.S.C. § 1651(a)

## INTRODUCTION

The Presidential Proclamation issued on April 22, 2020, which suspends the entry of many immigrants to the United States, threatens serious harm to immigrant family members whose chance to reunite after many long years of waiting has been suddenly been curtailed.[1] The changes made by this Presidential Proclamation, without warning, eliminate the urgent and emergency visa adjudication services that had been available to prevent children, "in immigration lingo," from "ag[ing] out." *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 45 (2014). Urgent and emergency visa adjudication services have remained available during the COVID-19 response, but the Presidential Proclamation now cuts off access to these emergency services for individuals subject to the Proclamation's entry suspension. Plaintiffs file this motion under the All Writs Act, *see* 28 U.S.C. § 1651(a), seeking a narrow band of relief to protect members of the certified class in this action. Under the All Writs Act, the Court should order Defendants to restore urgent and emergency consular processing and visa adjudication services to class member children who are in danger of losing their place in the visa queue.

## MOTION

Pursuant to 28 U.S.C. § 1651(a), Plaintiffs respectfully move this Court for an emergency order restraining the implementation and enforcement of the Presidential Proclamation to the extent that the Proclamation prevents certain underage members of the Visa Applicant Subclass from accessing currently available emergency and urgent consular processing services to prevent their aging out of their place in the visa queue. An emergency order is necessary to restore such access.

Without access to such emergency services, children whose underage preference relative status will result in unnecessary and prolonged family separation "for years—or even decades."

---

[1]    Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economy Following the COVID-19 Outbreak (Apr. 22, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-suspending-entry-immigrants-present-risk-u-s-labor-market-economic-recovery-following-covid-19-outbreak/ (referred to herein as "the Presidential Proclamation").

*Cuellar de Osorio*, 573 U.S. at 50.[2]  An emergency order is therefore also necessary to prevent the frustration of the Court's earlier orders in this case.

Plaintiffs' motion presents urgent cause for this Court to invoke its inherent authority under the All Writs Act to protect its ongoing exercise of jurisdiction in these proceedings and prevent the frustration of the Court's previously issued equitable relief.  *See* 28 U.S.C. § 1651(a); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 n.6 (9th Cir. 2020) (holding that an All Writs Act injunction was "properly issued" to restrain the enforcement of a rule "not challenged in [Plaintiff's] operative complaint" because the rule would "extinguish some provisional class members' asylum claims while they sought access to the asylum process through their metering challenge").[3]

Plaintiffs request that the temporary restraining order be in effect for no more than 21 days.  Before filing this motion, counsel for Plaintiffs notified counsel for Defendants by email of their intent to file this motion.

## MEMORANDUM OF LAW

This Court has the authority to immediately and temporarily restrain Defendants' implementation of the Presidential Proclamation to the extent that that the Proclamation prevents members of the Visa Applicant Subclass from requesting emergency and urgent consular

---

[2]    Although Plaintiffs need not show irreparable harm for the purposes of this motion, *see Klay v. United Healthgrp., Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) (so stating), members of the Visa Applicant Subclass who age out of their family preference category—and lose their place in line—certainly would suffer irreparable harm under the Presidential Proclamation.  As described below, aging out could lead to the separation of those children from their parents for years, and possibly decades.  *Cuellar de Osorio*, 573 U.S. at 50.  That undeniably constitutes irreparable harm.  *See Hawai'i v. Trump*, 859 F.3d 741, 782–83 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011).

[3]    *See also FTC v. Dean Foods Co.*, 384 U.S. 597, 608 (1966) (a court has "express authority under the All Writs Act to issue such temporary injunctions as may be necessary to protect its own jurisdiction"); *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) (relief under the All Writs Act appropriate to "prevent the frustration of orders [the Court] has previously issued in exercise of jurisdiction").

processing and visa adjudication services to prevent their aging out of their preference relative

status.  That authority falls well within the scope of the All Writs Act, 28 U.S.C. § 1651(a),

which provides a mechanism for the Court to preserve its jurisdiction and protect the rights of the

class members in this case.

I.      **FACTUAL BACKGROUND**

      A.      **Plaintiffs' Underlying Civil Action and the Court's Existing Injunction**

Plaintiffs filed their underlying class action complaint in October 2018, challenging the

implementation of Presidential Proclamation No. 9945 ("the Healthcare Proclamation").  ECF 1.

Issued under the authority granted to the President by 8 U.S.C. § 1182(f), the Healthcare

Proclamation requires certain immigrants to establish, to a consular officer's satisfaction, proof

of certain "approved" health insurance plans or proof of sufficient financial resources to pay for

"reasonably foreseeable medical costs" before they receive an immigrant visa.  The operative

complaint in this case alleges that Defendants' implementation and enforcement of the

Healthcare Proclamation (1) violates the Administrative Procedure Act, (2) violates the Fifth

Amendment's Due Process Clause's requirement of equal protection, and (3) is *ultra vires* in

violation of the separation of powers principles of the U.S. Constitution and outside the authority

delegated to the President under § 1182(f), and (4) violates the Fifth Amendment's Due Process

Clause's procedural due process guarantee.  ECF 100, at 90–96.

In November 2019, this Court issued an order restraining Defendants from implementing

or enforcing the Healthcare Proclamation during the pendency of this litigation.  ECF 95.  In that

order, the Court held that the Healthcare Proclamation "is not within the President's authority

under § 1182(f)" because it functions as a "categorical exclusion for any affected immigrant who

cannot afford health insurance or reasonably anticipated medical costs," and therefore "stands in

direct contravention to a statute passed by Congress after Congress's exhaustively considered

and deliberate and deliberative process."  ECF 95 at 32, 34 (internal citations and quotation

marks omitted).[4]  The Court's injunction applies on a classwide basis.  The certified class to which the injunction applies includes two certified subclasses, the "U.S. Petitioner Subclass" and the "Visa Applicant Subclass," which are defined as follows.

(1) U.S. Petitioner Subclass:

Individuals in the United States who currently have or will have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs"; and

(2) Visa Applicant Subclass:

Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs."

ECF 132, at 36–37.  The Court's existing injunction protects the members of the Visa Applicant Subclass and their rights to have their immigrant visa applications processed without being subject to the additional requirements that the Healthcare Proclamation would impose, against the irreparable harm of prolonged, and possibly indefinite, family separation.

## B.    Immigrant Visa Adjudication and COVID-19

On March 20, 2020, the U.S. Department of State ("State Department") suspended the operation of all routine visa services at all U.S. embassies and consulates because of the COVID-

---

[4]      Defendants appealed this Court's order and filed an Urgent Motion for an Administrative Stay and an Emergency Motion for a Stay Pending Appeal.  The Ninth Circuit denied Defendants' Urgent Motion for an Administrative Stay and has not yet decided the Emergency Motion.  The case is fully briefed on the appeal, but the Ninth Circuit has not scheduled argument on the merits.

19 pandemic.[5]  The State Department explained that routine services would resume as soon as possible, but that urgent and emergency visa services would continue to the extent resources remained available.[6]

Before April 24, 2020, members of the Visa Applicant Subclass with an urgent matter or need to travel immediately to the United States had the opportunity to seek an emergency appointment to obtain an immigrant visa.[7]

### C.    Presidential Proclamation Suspending Entry of Immigrants

On April 22, 2020, the President issued a "Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak" (the "Presidential Proclamation").[8]  The Presidential Proclamation took

---

[5]    Travel.state.gov, U.S. Department of State–Bureau of Consular Affairs, Suspension of Routine Visa Services (Mar. 20, 2020), https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html.

[6]    *Id.*

[7]    *See, e.g.*, COVID-19 Notices for U.S. Embassy in Czech Republic, https://cz.usembassy.gov/visas/immigrant-visas/ ("If you have an urgent matter regarding an immigrant a Non-Immigrant or Immigrant Visa, please contact our Consular Section at ConsPrague@state.gov to request an emergency appointment."); U.S. Embassy in Finland, https://fi.usembassy.gov/consular-update-regarding-novel-coronavirus-march-16-2020/ ("If you have an urgent matter and need to travel immediately, please follow the guidance provided at https://ustraveldocs.com/fi/ to request an emergency appointment."); U.S. Embassy in France, https://fr.usembassy.gov/visas/ (providing for emergency services); U.S. Embassy in Germany, https://de.usembassy.gov/visas/immigrant-visas/ (same); U.S. Embassy in Ireland, https://ie.usembassy.gov/visas/ (same); U.S. Embassy in Israel, https://il.usembassy.gov/visas/ (same); U.S. Embassy in Mexico, https://mx.usembassy.gov/status-of-u-s-consular-operations-in-mexico-in-light-of-covid-19/ ("For immigrant visa cases, please contact us at https://mx.usembassy.gov/embassy-consulates/ciudad-juarez/visas-2/ and use the inquiry form to request an emergency appointment.").

[8]    The President announced his intent to issue the Proclamation via Twitter, where he proclaimed, "In light of the attack from the Invisible Enemy, as well as the need to protect the jobs of GREAT American Citizens, I will be signing an Executive Order to temporarily suspend immigration into the United States."  @realDonaldTrump, Donald J. Trump, https://twitter.com/realDonaldTrump/status/1252418369170501639 (Apr. 20, 2020, 7:06 PM).

effect one day later on Thursday, April 23 at 11:59 pm EDT. Like the Healthcare Proclamation, the Presidential Proclamation was issued using the President's authority under 8 U.S.C. § 1182(f). It suspends the entry of certain immigrant visa applicants who were outside of the United States on the effective date of the Proclamation, with enumerated exceptions, including for healthcare workers and medical researchers, EB-5 investors,[9] and the spouses and minor children of U.S. citizens.[10] It does not contain exceptions that preserve the opportunity to request urgent or emergency services for immigrant visa applicants, including for children of immigrants who are at risk of aging out of their current visa eligibility status "by the simple passage of time." *Cuellar de Osorio*, 573 U.S. at 51.

The Presidential Proclamation's justification for its sweeping entry suspension is the protection of "already disadvantaged and unemployed Americans from the threat of competition for scarce jobs from new lawful permanent residents." According to the Proclamation's preamble, "[e]xcess labor supply . . . is particularly harmful to workers at the margin between employment and unemployment," who are "likely to bear the burden of excess labor supply disproportionately." The President further claims in the preamble that because "[t]he vast majority of immigrant visa categories do not require employers to account for displacement of United States workers," "[e]xisting immigrant visa processing protections are inadequate for recovery from the COVID-19 outbreak" and therefore a categorical entry suspension is necessary.[11] Although the Proclamation's entry suspension ostensibly expires after 60 days, it

---

[9]     This is the fifth employment preference category set by Congress defined as follows: Employment Creation:  7.1% of the worldwide level, not less than 3,000 of which reserved for investors in a targeted rural or high-unemployment area, and 3,000 set aside for investors in regional centers by Sec. 610 of Pub. L. 102-395.

[10]     The Proclamation does not apply to nonimmigrant visa applicants.

[11]     The Proclamation does not mention the provisions of the Immigration and Nationality Act ("INA") in which Congress explicitly allocated the number of visas available annually to family-sponsored, employment-based, and diversity immigrants. *See* 8 U.S.C. §§ 1151(c)–(e) (setting worldwide levels), 1152 (setting country-specific limitations), 1153(a)–(c) (allocating

"may be continued as necessary" and requires only that the Secretary of Homeland Security, in consultation with the Secretaries of State and Labor, recommend whether the president "should continue or modify this proclamation."[12]

The Presidential Proclamation's entry suspension applies to the preference categories that Congress created for the allotment of family-sponsored,[13] employment-based,[14] and diversity[15] immigrant visas under 8 U.S.C. § 1153(a).[16]  Estimates based on immigrant visas granted in

---

visas for sub-categories of immigrants based on family relationship and employment qualifications).

[12]     Given that leading scientists project that COVID-19's impact will continue for years, it is likely that the Proclamation's entry suspension will likewise continue indefinitely.  Dennis Thompson, *Annual 'COVID-19 Season' May Be Here to Stay, Scientists Predict*, U.S. News & World Report (Apr. 14, 2020), https://www.usnews.com/news/health-news/articles/2020-04-14/annual-covid-19-season-may-be-here-to-stay-scientists-predict; Katie Rogers, *Trump's Scientist Push Back on His Claim That Virus May Not Return This Fall*, N.Y. Times (Apr. 22, 2020), https://www.nytimes.com/2020/04/22/us/politics/trump-coronavirus-fall.html.

[13]     The Immigration and Nationality Act permits qualifying U.S. citizens and lawful permanent residents to petition certain family members to obtain immigrant visas.  A non-immediate family member who is sponsored for a visa is placed in a preference category based on his or her relationship with the petitioning family member.  8 U.S.C. §§ 1153(a)(1)–(4); *see Cuellar de Osorio*, 573 U.S. at 46–48.

[14]     Section 203(b) of the INA provides at least 140,000 employment-based immigrant visas each fiscal year based on individuals' professional qualifications and capabilities.  8 U.S.C. § 1153(b).

[15]     Section 203(c) of the INA provides up to 55,000 immigrant visas each fiscal year to permit additional immigration opportunities for persons from countries with low admissions during the previous five years.  8 U.S.C. § 1153(c).

[16]     The family-based immigration preference classes set by Congress are:

First: (F1) Unmarried Sons and Daughters of U.S. Citizens: 23,400 plus any numbers not required for fourth preference.

Second: Spouses and Children, and Unmarried Sons and Daughters of Permanent Residents: 114,200, plus the number (if any) by which the worldwide family preference level exceeds 226,000, plus any unused first preference numbers:

---

2019 suggest that the Presidential Proclamation will reduce those allocations by approximately

26,000 visas a month.[17]

### D.    Harm to Members of the Visa Applicant Subclass Who Need Emergency Consular Services

The Proclamation harms certain members of the Visa Applicant Subclass who need

access to the currently available emergency and urgent consular processing services to prevent

the loss of their immigrant preference status—and their place in the visa queue.  *Cuellar de

Osorio*, 573 U.S. at 53 ("Every day the alien stands in that line is a day he grows older, under the

immigration laws no less than in life.").  As time ticks by, the denial of access to currently

available emergency consular processing services endangers these class members' immigration

status and frustrates the relief afforded in this case.

---

A. (F2A) Spouses and Children of Permanent Residents: 77% of the overall second preference limitation, of which 75% are exempt from the per-country limit;

B. (F2B) Unmarried Sons and Daughters (21 years of age or older) of Permanent Residents: 23% of the overall second preference limitation.

Third: (F3) Married Sons and Daughters of U.S. Citizens: 23,400, plus any numbers not required by first and second preferences.

Fourth: (F4) Brothers and Sisters of Adult U.S. Citizens: 65,000, plus any numbers not required by first three preferences.

Section 203(b) of the INA, 8 U.S.C. § 1153(b), prescribes preference classes for allotment of employment-based immigrant visas.

[17]    @MigrationPolicy, Migration Policy Institute, https://twitter.com/MigrationPolicy/status/ 1253111954429878274 (Apr. 22, 2020, 5:02 PM).  Notably, the economic justification of the Presidential Proclamation flatly contradicts established economic research, which shows that suspending immigration actually "will make it more difficult for the United States to accelerate economic growth and recover from the current downturn."  Stuart Anderson, *Trump Does It: An Executive Order to Suspend Immigration*, Forbes.com (Apr. 21, 2020, 2:42 AM), https://www.forbes.com/sites/stuartanderson/2020/04/21/trump-does-it-an-executive-order-to-suspend-immigration/#4fe03bf4c6be (explaining that "the premise of the executive order—that reducing legal immigration would lower the U.S. unemployment rate—is faulty").

Page 9 – EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER PURSUANT
    TO 28 U.S.C. § 1651(a)

As this Court has previously found, Congress has allocated immigrant visas among four family-sponsored "preference relative" categories.  ECF 95, at 4–6 (citing to 8 U.S.C. §§ 1151(b)(2)(A), 1153(a) and describing the immigrant visa allocation system).  Of particular importance here, the children of lawful permanent residents—that is, the children of immigrants—can lose their preference classification through the passage of time.

The road to obtaining any family-based immigrant visa begins when a sponsoring U.S. citizen or lawful permanent resident files a petition on behalf of a foreign relative, termed the principal beneficiary.  For a family preference beneficiary, that approval results not in getting a visa then and there, but only in getting a place in line.  The law caps the number of visas issued each year in the five family preference categories, and demand regularly exceeds the supply.  *See Cuellar de Osorio*, 573 U.S. at 48.  As a consequence, the principal beneficiary of an approved petition is placed in a queue with others in her preference category in order of "priority date"— that is, the date a petition was filed with USCIS.  *Id*.  Every month, the State Department sets a cut-off date for each family preference category, indicating that visas are available for beneficiaries with priority dates earlier than the cut-off.  *Id.*; 8 C.F.R. § 245.1(g)(1); 22 C.F.R. § 42.51(b).  "After a sponsoring petition is approved, but before a visa application can be filed, a family-sponsored immigrant may stand in line for years—or even decades—just waiting for an immigrant visa to become available."  *Cuellar de Osorio*, 537 U.S. at 50.

"And as the years tick by, young people grow up, and thereby endanger their immigration status."  *Id*.  A beneficiary who turns twenty-one before her application is processed or a visa becomes available in her preference category loses her qualifying "child" status and thus becomes ineligible for her preference relative classification.  Due to adjudicative delays and limited visa availability, countless children who applied as dependents of their parents have lost eligibility and had to switch into an adult visa category when they reached their twenty-first

birthday, at which point they were no longer considered "child" dependents under immigration law.[18]

Those children have, however, had the opportunity to seek emergency consular interviews when visas were available to them and the age-out would occur due to the lack of an interview.  Thus, before the Presidential Proclamation was issued, children who would be in danger of aging out (and thereby losing their underage preference relative eligibility) had the opportunity to seek an emergency appointment with a U.S. consulate abroad.  Indeed, recognizing the dire stakes of visa applicants on the threshold of "aging out," the U.S. Embassy and Consulate in Mexico has explicitly instructed that "[i]mmigrant visa emergency appointment requests will be considered only when the applicant will age out of his or her case, or in case of emergencies."  *See* Status of U.S. Consular Operations in Mexico in Light of COVID-19 (Apr. 13, 2020), https://mx.usembassy.gov/status-of-u-s-consular-operations-in-mexico-in-light-of-covid-19/.[19]

---

[18]    The Child Status Protection Act (CSPA), 116 Stat. 927 (2002), "ensures that the time Government officials have spent processing immigration papers will not count against the beneficiary in assessing his status."  *Cuellar de Osorio*, 573 U.S. at 45 (citing 8 U.S.C. § 1153(h)); *see also* 9 FAM 502.1-1(D)(4)(a) (describing how the CSPA impacts the age calculation for preference category and derivative petitions).  Section 3 of the CSPA, now codified at 8 U.S.C. § 1153(h), contains three interlinked "complex" and "perplexing" paragraphs that mitigate, but do not solve, the "aging out" problem for F2A preference children of LPRs who automatically convert to F2A preference family members, and upon such conversion move from having a visa immediately available to having to wait years or decades more.  *Cuellar de Osorio*, 573 U.S. at 51, 64–65.

[19]    Also available at https://perma.cc/V5AK-U9DP. Emergency and expedited services to aging out children is common.  *See, e.g.*, U.S. Dep't of State, Apply for A U.S. Visa in the Philippines, Frequently Asked Questions, https://www.ustraveldocs.com/ph/ph-gen-faq.asp ("If visa numbers are available for you (or your visa case becomes current for processing) and your child is *aging out* (or turning 21), we are prepared to expedite the processing of the application."); Questions for NVC/AILA DOS Liaison Committee Meeting (Nov. 4, 2014), AILA InfoNet Doc. No. 14111420 (posted Dec. 13, 2014), at 11, *available at* https://travel.state.gov/content/dam/visas/AILA/AILA%20NVC%20November%202014.pdf (noting that National Visa Center provides expedited processing for age-out cases); USCIS Policy Memorandum, *Requests to Expedite Adjudication of Form I-601, Application for Waiver of Grounds of Inadmissibility, Filed by Individuals Outside the United States; Update to*

Under the Presidential Proclamation, however, children of lawful permanent residents and other derivative beneficiaries who are about to "age out" of their visa category, including those who are members of the Court's certified Visa Applicant Subclass, will be unable to avail themselves of the opportunity to seek these emergency appointments and the resulting issuance of immigrant visas.  Such lack of access will have a devastating and irreversible impact on their immigration prospects.  In that respect, the Presidential Proclamation subverts Congress's family unification system by prolonging the separation of families of lawful permanent residents for years—and in many cases, decades—beyond what Congress intended.  If the Presidential Proclamation is not immediately restrained to allow minor children to preserve their opportunity to request urgent or emergency consular services, members of the Visa Applicant Subclass will suffer immediate and serious harm.

## II.    ARGUMENT

The All Writs Act affords this Court the authority to "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[n] and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  Its purpose is to provide the Court the ability to construct a remedy to right a "wrong [which] may [otherwise] stand uncorrected," *United States v. Morgan*, 346 U.S. 502, 512 (1954), and to "prevent the frustration of orders it has previously issued in exercise of jurisdiction otherwise obtained," *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977); *see also FTC v. Dean Foods Co.*, 384 U.S. 597, 608 (1966) (a court has "express authority under the All Writs Act to issue such temporary injunctions as may be necessary to protect its own jurisdiction"); *Michael v. INS*, 48 F.3d 657, 661 (2d Cir. 1995) (All Writs Act injunction of a prisoner's deportation proper to preserve the court's jurisdiction over the pending appeal).  The Ninth Circuit has held that the All Writs Act "should be broadly construed,"

---

*Adjudicators Field Manual (AFM) Chapter 41.7 & Appendix 41-5 (AFM Update AD12-09)* (June 6, 2012), available at https://www.uscis.gov/sites/default/files/USCIS/ Laws/Memoranda/2012/June%202012/Revised%20Expedited%20I-601%20PM.pdf ("Similarly, the applicant may request that the case be expedited to prevent a child not covered by the Child Status Protection Act from aging out before visa issuance.").

*Hamilton v. Nakai*, 453 F.2d 152, 157 (9th Cir. 1971), to "achieve all rational ends of law," *California v. M&P Invs.*, 46 F. App'x 876, 878 (9th Cir. 2002) (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)). "Courts normally exercise their jurisdiction . . . in order to protect the legal rights of parties," *New York Tel. Co.*, 434 U.S. at 175 n.23, and have "broad power" and "significant flexibility in exercising their authority under the Act," *United States v. Catoggio*, 698 F.3d 64, 67 (2d Cir. 2012).[20]

This Court, using its equitable authority as identified in the All Writs Act, should issue a limited, immediate, and temporary order restraining Defendants from enforcing the Presidential Proclamation against the Visa Applicant Subclass, to the extent that the Proclamation would prevent members of the Visa Applicant Subclass from having the opportunity to request emergency and urgent consular processing of their immigrant visa to preserve their place in the visa processing queue and their ability to receive visas under their current preference category. An order restraining the Presidential Proclamation may be fashioned in a manner that is "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). As explained below, an All Writs Act injunction is necessary to prevent irreparable harm to those members of the Visa Applicant Subclass, to preserve the relief this Court already has issued to the benefit of those class members, and to avoid frustration of the Court's existing injunction and class certification order.

---

[20] An issuing court need not consider the merits of an underlying action when issuing an All Writs Act injunction, *Makekau v. State,* 943 F.3d 1200, 1204 (9th Cir. 2019), and the traditional test for issuing an injunction does not apply, *Klay*, 376 F.3d at 1100 (so stating); *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985) (holding that "[i]njunctions issued under the authority of the All-Writs Act stem from very different concerns than those motivating preliminary injunctions governed by Fed. R. Civ. P. 65" and therefore such an injunction need "not comply with the [Rule's] requirements"); *see also Flores v. Barr*, 407 F. Supp. 3d 909, 929 n.16 (C.D. Cal. 2019) ("The Ninth Circuit does not appear to require courts to examine the traditional requirements for obtaining injunctive relief in order to issue such relief under the All Writs Act." (citing *M&P Invs.*, 46 F. App'x at 878)).

A.      **An immediate, limited order is necessary and appropriate to aid this Court's jurisdiction.**

Plaintiffs' request for an immediate, limited, and temporary order is necessary and appropriate to aid in the exercise of this Court's jurisdiction.  As the Ninth Circuit has acknowledged, "[o]ne of the recognized applications of the All Writs Act is the issuance of orders necessary to ensure the integrity of orders previously issued" and to " 'prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.' " *Nat'l Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544 (9th Cir. 1987) (quoting *New York Tel. Co.*, 434 U.S. at 172).  Importantly, the "jurisdiction" to be aided by the Act is flexibly understood—thus, courts may restrain acts that have the "practical effect" of frustrating or threatening a court's power to achieve the ends of justice.  *Klay*, 376 F.3d at 1102 (internal quotation marks omitted); *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (injunction aids the court's jurisdiction if it operates to "curb conduct which threatened improperly to impede or defeat" the power of the court).

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020), should guide this Court's analysis. There, the district court provisionally certified a class of individuals subject to the defendants' so-called "metering policy"—*i.e.*, the policy of turning back individuals seeking asylum at the southern U.S. border and instructing that they return to the U.S. port of entry at a later date—and enjoined the implementation of the metering policy on a classwide basis.  *Id.* at 1002.  The defendants then issued a second policy (an "asylum ban"), a policy not challenged in the plaintiffs' operative complaint, that would have rendered some class members ineligible for asylum altogether unless they had applied for asylum in a country they had passed through on the way to the southern U.S. border.  *Id.*  Under the All Writs Act, the Ninth Circuit affirmed the district court's order enjoining implementation of the asylum ban, concluding that the asylum ban would potentially have "extinguish[ed] some provisional class members' asylum claims while they sought access to the asylum process through their metering challenge (even if other metered asylum seekers' claims would survive)."  *Id.* at 1006 n.6.  The Ninth Circuit held that the injunction "was a proper exercise of the [district] court's equitable powers" because both the

plaintiffs' underlying complaint and the injury claimed in their motion for injunctive relief related to the ability "to preserve class members' access to the asylum process."  *Id.*

Like the plaintiffs in *Al Otro Lado*, who in their operative complaint were challenging a metering policy that would block their access to the asylum process, Plaintiffs in this case are challenging the Healthcare Proclamation, a policy that would block their access to immigrant visas unless class members could prove that they have "approved" health insurance or funds to pay for "reasonably foreseeable medical costs."  And like the asylum ban that would effectively have removed certain *Al Otro Lado* class members from the asylum processing queue by extinguishing their potential asylum claims, the Presidential Proclamation here has the effect of not only preventing certain Visa Applicant Subclass members from receiving visas, but also foreclosing their ability to have their application processed in the first place by extinguishing the special visa processing preference Congress gave them because of their vulnerable status as children.

If members of the Visa Applicant Subclass, including children who face an imminent risk of "aging out" of their preference status, become entirely unable to access consular processing and visa adjudication services—even just for 60 days—their current visa eligibility will be extinguished.  For those class members, the Presidential Proclamation thus undermines the benefits and protections of the Court's existing order, which allows class members to access the visa adjudication process without being subject to the additional requirements that the Healthcare Proclamation would impose.  In other words, as in *Al Otro Lado*, the Presidential Proclamation potentially would extinguish the rights of certain members of the Visa Applicant Subclass by potentially eliminating their access to the immigrant visa process under their current visa preference category, even if rights of other members of the Visa Applicant Subclass would remain protected.  Because that injury and Plaintiffs' underlying complaint both seek to preserve class members' access to a fair visa adjudication process, an All Writs Act injunction is a proper exercise of this Court's equitable power.  *See id*.

**B.    The emergency order is consistent with the usages and principles of law.**

The All Writs Act permits the issuance of relief that is "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court has explained that courts should "fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage." *Harris v. Nelson*, 394 U.S. 286, 299 (1969). Plaintiffs' requested relief—an injunction restraining implementation of the Presidential Proclamation to the extent that it would prevent members of the Plaintiff Class from accessing emergency and urgent consular processing services necessary to preserve their visa eligibility under their current preference categories—is equitable in nature and fashioned around common court practices and sound principles of law. *See, e.g.*, *Al Otro Lado*, 952 F.3d at 1006 n.6 (upholding a similar form of injunction).

## III.    REMEDY

The All Writs Act leaves to the sound discretion of the Court the scope of appropriate relief and instructs the court to "avail itself of [the Act] when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it." *New York Tel. Co.*, 434 U.S. at 172–73 (internal quotation marks omitted). Under the Act, the Court is "empower[ed] . . . to fashion extraordinary remedies when the need arises." *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985).

Plaintiffs respectfully request that the Court issue an emergency order immediately restraining the implementation and enforcement of the Presidential Proclamation to the extent that the Proclamation precludes child members of the Visa Applicant Subclass from accessing currently available emergency and urgent consular processing and visa adjudication services to prevent their "aging out" of the visa queue. An emergency order is necessary to protect those children, whose underage preference status is threatened, against unnecessary and prolonged family separation caused by their "aging out" of their visa preference category, and therefore their current visa eligibility. An emergency order is also necessary to prevent the frustration of

this Court's existing injunction, which preserves class members' access to the immigrant visa system and their status in the immigrant visa queue.

The circumstances here warrant immediate issuance of an All Writs Act injunction for a period of no more than 21 days. *See* Fed. R. Civ. P. 65(b)(1). Under Federal Rule of Civil Procedure 65, the Court may issue an immediate order without notice so long as the order is set to expire after 14 days, and may extend the order for a like period for good cause. Fed. R. Civ. P. 65(b)(2). All Writs Act injunctions generally need not strictly comply with the requirements of Rule 65, however. *FTC v. Ames. for Fin. Reform*, 720 F. App'x 380, 383 (9th Cir. 2017) (authority afforded under the All Writs Act is broader than that afforded under Rule 65); *United States v. Yielding*, 657 F.3d 722, 727 (8th Cir. 2011) ("[I]njunctive relief under the All Writs Act need not rigidly comply with Rule 65's prescriptions so long as the injunction is 'specific and definite enough to apprise those within its scope of the conduct that is being proscribed.'" (quoting *In re Baldwin-United Corp.*, 770 F.2d at 338)). Plaintiffs provided notice to Defendants of their intent to file this motion, request a hearing on the motion, and seek temporary relief for a period of only 21 days.

## CONCLUSION

Plaintiffs have demonstrated that an immediate, limited, and temporary order from this Court is necessary and appropriate to protect or preserve the ongoing exercise of this Court's jurisdiction in these proceedings. *See* 28 U.S.C. § 1651(a). Accordingly, Plaintiffs respectfully request that the Court grant this emergency motion, issue an immediate order, and provide any other relief that the Court deems just and proper.

DATED this 25th day of April, 2020.

INNOVATION LAW LAB

**Karen C. Tumlin** (admitted *pro hac vice*)
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (admitted *pro hac vice*)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
Telephone: +1 323 316-0944

/s/ *Stephen W Manning*
**Stephen Manning** (SBN 013373)
stephen@innovationlawlab.org
**Nadia Dahab** (SBN 125630)
nadia@innovationlawlab.org
**Tess Hellgren** (SBN 191622)
tess@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733

-and-

**Scott D. Stein** ( admitted *pro hac vice*)
sstein@sidley.com
**Kevin M. Fee** (admitted *pro hac vice*)
kfee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: +1 312 853-7000
Facsimile: +1 312 853-7036

**Jesse Bless** (admitted *pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G. Street, Ste. 300
Washington, D.C. 20005
Telephone: +1 781 704-3897
Facsimile: +1 202 783-7853

*Attorneys for Plaintiffs*