JOSEPH H. HUNT
Assistant Attorney General, Civil Division
BILLY J. WILLIAMS
United States Attorney
AUGUST E. FLENTJE
Special Counsel, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section
BRIAN C. WARD
Senior Litigation Counsel
COURTNEY E. MORAN
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
(202) 514-5487
courtney.e.moran@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | | |
|---|---|---|
| JOHN DOE #1, et al., | ) | CASE NO. 3:19-cv-01743-SI |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' DOCUMENTS** |
| DONALD TRUMP, in his official capacity as | ) | **LODGED PURSUANT TO ECF NO. 134** |
| President of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

| | **Title** | **Page(s)** |
|---|---|---|
| **17** | Certification of the Supplementation of the Administrative Record | 000134 - 000135 |
| **18** | Public Comments in Response to the *Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage* | |
| *a* | Declaration of Taylor Beaumont | 000136 |
| *b* | Spreadsheet of Public Comments | 000137 - 000228 |
| *c* | Supporting PDF Letters and Comments Attached to Public Comments | 000229 - 000489 |
| **19** | Supplementation to CA/VO Webinar on PP 9945 (October 24, 2019) | |
| *a* | Declaration of James McMillian | 000490 |
| *b* | Chat Transcript from Webinar 1 (October 24, 2019) | 000491 - 000492 |
| *c* | Chat Transcript from Webinar 2 (October 24, 2019) | 000493 |
| **20** | Action Memo for the Secretary – Standards and Procedures for Presidential Proclamation 9945 (Approved on October 28, 2019) [Names Unredacted] | 000494 - 000496 |
| **21** | CA Press Guidance on PP 9945 (October 4, 2019) [Names Unredacted] | 000497 - 000501 |
| **22** | CA Talking Points for Congressional Call on PP 9945 (October 4, 2019) [Names Unredacted] | 000502 - 000506 |
| **23** | CA/VO Webinar Presidentation on PP 9945 (with notes) (October 24, 2019) [Names Unredacted] | 000507 - 000550 |
| **24** | U.S. Department of Health & Human Services, Public Health Service, Agency for Healthcare Research and Quality, *Research In Action: The High Concentration of U.S. Health Care Expenditures* (June 2006) | 000551 - 000561 |
| **25** | Centers for Disease and Control Prevention, National Center for Chronic Disease Prevention and Health Promotion, *Health and Economic Costs of Chronic Diseases* (page last reviewed March 23, 2020) | 000562 - 000564 |
| **26** | Department of Homeland Security, Notice of Proposed Rulemaking: *Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018) | 000565 - 000747 |
| **27** | Department of Homeland Security, Final Rule: *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) | 000748 - 000964 |

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| JOHN DOE #1, *et al.*, | Case No. 3:19-cv-01743-SI |
| Plaintiffs, | |
| v. | Judge: Hon. Michael H. Simon |
| DONALD TRUMP, *et al.*, | |
| Defendants. | |

## DEFENDANTS' CERTIFICATION OF THE SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD

I, Brianne Marwaha, hereby state as follows:

1. I am the Division Chief of the Immigration and Employment Division of the Office of Field Operations in the Visa Office in the Bureau of Consular Affairs of the U. S. Department of State.

2. I have reviewed the court's opinion and order of April 13, 2020, ECF No. 134, and these documents are produced consistent with that order. I certify, based on my position and information provided to me in the course of my official duties, that the attached non-classified, non-privileged documents represent the full and complete supplementation of the administrative record, as required by the court, to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C., this 5th day of June, 2020.

Brianne Marwaha

Division Chief, Immigration and Employment Division
Office of Field Operations
Visa Office
Bureau of Consular Affairs
U.S. Department of State

## **DECLARATION OF TAYLOR BEAUMONT**

I, Taylor Beaumont, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Acting Chief of the Legislation and Regulations Division, Office of Legal Affairs, Office of Visa Services in the Bureau of Consular Affairs of the U.S. Department of State.

2. My office is responsible for compiling public comments submitted in response to public notices that the Department of State publishes in the Federal Register regarding visa-related information collections.

3. Based on information provided to me in the course of my official duties, I declare that the documents attached are the complete record of all public comments received by the Department of State, including those received through the Office of Management and Budget (OMB), in response to the Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage, published in the Federal Register on October 30, 2019. 84 Fed. Reg. 58, 1919 (Oct. 30, 2019). The information collection proposed in this public notice lists the standardized questions that consular officers would ask immigrant visa applicants covered by Presidential Proclamation 9945, Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System in Order to Protect the Availability of Healthcare Benefits for Americans, 84 Fed. Reg. 53, 991 (Oct. 9, 2019). The public notice instructed individuals to submit comments to the Office of Management and Budget by email, fax, or through submission of a comment on OMB's online portal, www.regulations.gov. The public notice also instructed that individuals could submit comments directly to the Department of State at PRA_BurdenComments@state.gov, with specific instructions for labeling emails to facilitate the Department's sorting of comments attributable to this public notice. The attached spreadsheet represents a record of all comments received via these methods, including those comments received by OMB, which then transmitted these comments to the Department of State. These methods also allowed individuals to attach supporting documentation in the form of letters or comments as PDF files. The spreadsheet notes the comments that were accompanied by a letter or comment as a PDF file with a notation that reads "See Attached."

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C. this 5th day of June, 2020.

Taylor Beaumont, Acting
Division Chief Visa Office
Bureau of Consular Affairs
U.S. Department of State

| | A | B |
|---|---|---|
| 1 | **Name** | **Organization** |
| 2 | El Bachir Bouchra | |
| 3 | Mouad Mour | |
| 4 | Anonymous | |
| 5 | Moheb Nesseim | |
| 6 | Naceri Almad | |
| 7 | Holly Miller | |
| 8 | Ahmed Soussi | |
| 9 | Lhassan Bouja | |
| 10 | islam Ahmed Abdalla | |
| 11 | Basma Hussein | |
| 12 | Mounir Benhachoum | |
| 13 | Manaf El Fatimi | |
| 14 | Anonymous | |
| 15 | Anonymous | |

| | C |
|---|---|
| 1 | **Comment** |
| 2 | my comment will be just a small words express the pain and the sadness we are in since the gouvermanr announce that new law of immigrant helath inssurance coverage i mean for real how we can get inssurance and we dont have a social secuirty its not enoupgh for you that we are far away from our spouses and our kids its not enoupgh for you that i cant see my wife that if she became pregnant and gonna have the birth for our baby im<br><br>not gonna be abble to see him on he is first day of he is life pleaass pleass we are beggin you to cancel this new law we are not bad peoples why this racism against us why more and more racist laws against the immigrant |
| 3 | i think that the last decisions of the president trump about the insurance are totally unfair. of course we will do our insurance when we will be at the USA but how we can do it from other countries.<br>please. we are against this decision. so if you could. juat stop it |
| 4 | I dont agree with that . Trump takes easy issues |
| 5 | This act is racist and not fair or even logic!<br>How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!?<br>And why this discrimination to the new immigrants while you allow many Amirican citizens to remain out of the health insurance umbrella ! |
| 6 | too much exaggerated, I vote for the cancellation of this decree |
| 7 | We should welcome all immigrants that are vetted by the appropriate Departments, regardless of their ability to immediately access health insurance. As a a health care provider I know how important health insurance is for families. However, there are often barriers to insurance coverage/enrollment that are outside of a patient's control. Immigrants should not be denied the opportunity to immigrate based on access to insurance coverage alone. This is discriminatory and not in keeping with the ideals of the USA. |
| 8 | We should welcome all immigrants that are vetted by the appropriate Departments, regardless of their ability to immediately access health insurance. As a a health care provider I know how important health insurance is for families. However, there are often barriers to insurance coverage/enrollment that are outside of a patient's control. Immigrants should not be denied the opportunity to immigrate based on access to insurance coverage alone. This is discriminatory and not in keeping with the ideals of the USA. |
| 9 | I do not agree |
| 10 | I reject this decision strongly because it is a decision that will make it impossible to leave and live in America, and we come to America to live by god and ourselves. |
| 11 | I do not agree with this decision because it is unfair |
| 12 | Please do not want to implement this law America will suffer from a shortage of labor with this strict law |
| 13 | This law will be a grandicious in the right of migrant, migrant, which aspires to a good and stable life in America, America is a democratic country of a country of human rights, if the decision will be a hit to all dreams of migrants who dream of my best life in your country Thrace in the migration of America's mostly the most hopeful in better life |
| 14 | This is not only harmful to new immigrants but to current immigrants as well! By establishing they are able to pay for insurance immigrants will not be willing to come to the USA for having to prove they can afford health insurance.<br>We will lose out on great talent, people, and innovators for applying this unnecessary requirements.<br>If our ancestors were barred from entering the country because of finance, many of the rich today would not be able to say they are rich. We have to let everyone, man, women, and child to have the freedom to reach the American dream |
| 15 | It's not a good idea , I think that , this rool makes people afread of USA |

| | A | B |
|---|---|---|
| 16 | Katherine Moran | |
| 17 | Ahmad Moahmed | |
| 18 | Hamad Abdelsamad | |
| 19 | Justin Nguyen | |
| 20 | Sami Hani | |
| 21 | Soufiane Boussaidi | |
| 22 | Anonymous | |
| 23 | Haouach Samir | |
| 24 | Hazem Habib | |

| C |
|---|

| 16 | The expectation that immigrants be able to acquire insurance within thirty days is an unreasonable burden, one that even American citizens would have a difficult time fulfilling if it were required of them. America especially needs immigrants who are capable of doing the hard, low-paying work that doesn't come with benefits, agricultural and maintenance work that doesn't pay enough for expensive insurance plans. I believe that this requirement will damage the American economy if enacted, because if those jobs can't be filled by immigrants, there aren't Americans willing to pick fruit all day for three bucks an hour. |
|---|---|
| 17 | This act is racist and not fair or even logic!<br>How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!?<br>And why this discrimination to the new immigrants while you allow many Amirican citizens to remain out of the health insurance umbrella ! |
| 18 | With full respect for all the American people, but this decision by many racists must be eased |
| 19 | With this proclamation, the Trump administration claims it is trying to keep healthcare accessible to people who are already here. However, the administration has a long track record of supporting policies that make healthcare LESS accessible and LESS affordable, especially with its efforts to dismantle and reverse the gains made by the Affordable Care Act.<br>Moreover, immigrants pay more into the health care system than they get out of it (https://www.latimes.com/business/la-fi-immigrant-healthcare-20181002-story.html). This proclamation isn't about saving money. It's clearly an attack on poorer immigrants from Asian and Latin countries who simply want to reunite with their families.<br>The Trump administration should recognize the enormous economic and cultural capital that all immigrants bring to this country and reverse this harmful proclamation. |
| 20 | A racist law that contradicts the US Constitution and US values and harms the reputation of the United States |
| 21 | This is not fair, this will harm the poor and middle class, who want to go to America to work and improve their levels of living. Pleas do not apply this. |
| 22 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 23 | This decision does not serve America This is shattered for the dreams of many young people who want opportunities that were not available for several reasons I wish to help the displaced and yes to the American dream |
| 24 | Thank you for your interest in our opinion, this decision is unacceptable, we love the United States of America and we want to go to work and do not want to be effective in addition to that we want to benefit from your scientific progress |

| | A | B |
|---|---|---|
| 25 | El Mokhtar Ezzaaboul | |
| 26 | Adam Lofti | |
| 27 | Mohssine Wahiana | |
| 28 | Mouatax Billah Boudaoud | |
| 29 | Anonymous | |
| 30 | Mohamed Ateya | |
| 31 | Anonymous | |
| 32 | Badr Hada | |
| 33 | Katie Noe | |
| 34 | Mohammad Daichou | |
| 35 | Zakriya Cheniguer | |
| 36 | Collinn Cannon | Immigrant & Refugee Center of Northern Colorado |

| C |
|---|
| **25** This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new proposed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| **26** we completely refuse this unfair rule. |
| **27** This proposed new declaration of health is not practical because most of those who submit to the American lottery the goal of changing his financial situation and also to his family.Most of the winners in the lottery are able to pay $ 4000 and this will cause him to reject the day of the interview, so I hope the US government not to approve this decision. |
| **28** This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. America Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| **29** The decision to cover health insurance for immigrants is definitely rejected |
| **30** This decision is unfair As medical insurance costs the individual and the family a very large amount in America and we come from the countries of the dollar exchange rate is very high I hope that this unfair decision of the immigrant to the United States will be canceled |
| **31** This new law on health insurance is a barrier for new immigrants, who are looking for a new life and hope for a better future for themselves and their families. |
| **32** am against the health insurance decision of President Trump |
| **33** As a citizen concerned with fairness, I think it is unrealistic to require immigrants to know where their health insurance will come from prior to entering the United States. Even American citizens struggle to find and pay for health insurance in this country. It is incredibly challenging to navigate the process of finding affordable health insurance without an employer who is providing it, and many immigrants do not enter with employee benefits. The language and cultural barrier for entering immigrants makes this process more daunting. Fortunately, once people arrive in country, there are state, federal, and local resources available to help immigrants find health insurance, but someone coming from outside the country could not be expected to access those resources before entering. This regulation is just another strategy to keep people with modest financial resources from entering the country, when the truth is that our country and our employers need and value immigrants who want to come here to do humble work and create a good life for their families. That is the essence of the American dream. I hope this administration will not rush through this unwise regulation. |
| **34** I do not support this decision and I hope it will be reviewed. Thank you |
| **35** Hi . First we thank you for giving us a chance to give our opinion. I am one of the first to reject the health insurance decision. I really reject the health insurance decision. it's has harm to immigrants. I hope you also reject this decision and thank you very much |
| **36** Pleasee see attached comments. |

| | A | B |
|---|---|---|
| 37 | Mouataz Billah Boudaoud | |
| 38 | Anonymous | |
| 39 | Jane Ross Laguna | |
| 40 | Lane Pickett | |

| C |
|---|

| 37 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. America Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
|---|---|
| 38 | The health insurance decision is unjust and unfair, so we ask the US government to prevent the implementation of this decision because it harms the public interest. Thank you. With all my respect |
| 39 | Dear Sir/Madam:<br>I do not believe the draft form DS-5541 should be approved, especially on an emergency basis with 2 day's notice. The only emergency is that a proclamation was made on 10/4/19 which stated the new policy would be effective 11/3/19. The draft form was only made available today for review. Comments are due by tomorrow. The new policy goes into effect in less than one week. This extremely narrow window did not allow enough time for thoughtful comments from stakeholders and for OMB to properly review the form and it's impact. Asking for emergency review is a waste of taxpayer resources given the mere 180 days that the approval would be valid. Instead of approving this form, the DOS should delay implementing PP 9945 until a proper roll-out may be managed.<br>If this form were approved and put into use next Monday 11/4/19, the result will be chaos for Embassies, Consulates, immigrant visa applicants and their families and legal representatives due to inconsistent immigrant visa interview decisions and added costs of delayed decisions. The roll-out to all interviewing officers throughout the world would be haphazard at best. The fact that the information would be taken verbally at the interview would ensure confusion especially since there's already a lack of transparency at immigrant interviews abroad which legal representatives are not allowed to attend. Furthermore, burdening interviewing officers with an additional estimated 10 minute verbal process would be a hardship to them as they already are under pressure with an overwhelming number of applications at busier posts.<br>While the form itself is straightforward, the information requested is not. The form requires applicants to answer questions that many U.S. citizens cannot. This is especially true for applicants who plan to obtain health insurance through an employer, as do over 50% of the U.S. population per KFF.org. Immigrants sometimes wait up to 6 months to receive their Legal Permanent Resident card once they arrive in the U.S. due to backlogs at USCIS. They cannot work until they receive it. Once they have proper documentation and obtain a job, most employers have a waiting period of a few months before employees are eligible for health insurance coverage. These people would be able to answer the questionnaire but not until about a year after they arrive in the U.S. Requiring the information at the interview is a wealth test that will discriminate against working families and I believe that is un-American, if not illegal. |
| 40 | I cannot believe there is only a 2 day comment period for people to oppose this proclamation.<br>This proclamation is cruel, and is another attempt for the Trump Administration to harm immigrants and their families. Health care can be very confusing - even if immigrants coming into the U.S. who will be covered still might not have the documents to prove they will be covered. However, that should not be a prerequisite for someone to enter into our country to better their lives. |

|    | A | B |
|----|---|---|
| 41 | Djawad Delimi | |
| 42 | Berrouanee Abderrahmane | |
| 43 | Anonymous | |
| 44 | Yassine Ammouri | |
| 45 | Marzouq jamila | |
| 46 | Abdelhakim Ouafi | |
| 47 | Saad Harti | |
| 48 | Mary Johnson | |
| 49 | Samantha Watier | |
| 50 | Anonymous | |
| 51 | ABDERRAHIM TOUCH | |

| | C |
|---|---|
| 41 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 42 | I'm against this decision. |
| 43 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 44 | I categorically reject this decision because it is unfair to immigrants to the United States |
| 45 | This decision is invalid. I hope that it will be suspended |
| 46 | I don't accept this new decision |
| 47 | I'm not agree with this new law and especially the DS5540, I always think that USA have the best democracy in the world but with DS5540 you don't give chance to poor people to go to the USA and hwo knows may be a poor person turne to be rich, so please don't prevent poor people to get to the USA |
| 48 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 49 | Collecting health insurance information from immigrant visa applicants living abroad is an unnecessary and unfair burden on applicants. This is a transparent stunt to make it easier to deny applicants visas for no good reason. |
| 50 | No.This is a difficult decision that causes problems Refusal to reject a decision |
| 51 | I don't like this law, please don't. For me it is difficult for new immigrants. |

| | A | B |
|---|---|---|
| 52 | Moustafa Kaddouri | |
| 53 | Jessica Voerding | |
| 54 | Salim Hamoumi | |
| 55 | Anonymous | |
| 56 | Moheb Nesseim | |
| 57 | Ahmed Soussi | |
| 58 | islam Ahmed Adballa | |
| 59 | Manaf El Fatimi | |
| 60 | Anonymous | |
| 61 | Katharine Moran | |

| C |
| --- |

| | |
| --- | --- |
| 52 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 53 | This is an inhumane and unethical proposal for human beings who are seeking to take care of themselves. It is necessary to dismiss this proposal as The United States of America is made richer by a diversity of people and traditions AND we are a nation that cares - about ALL. |
| 54 | We do not agree with this decision because it will affect the group that will migrate to the USA, which will only go to the rich and they cannot work |
| 55 | i think dv lottery health insurance is not a solution because there are so many poor people there is no money how to pay for 1 year insurance and people who are looking for dv lottrey to travel and make and build new life and work to help their families<br>and money from a year of health insurance if he has to spend it will not conduct DV does a project in the country originate better than go to use |
| 56 | This act is racist and not fair or even logic!<br>How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!?<br>And why this discrimination with the new immigrants while you allow many Amirican citizens to remain out of the health insurance umbrella ! |
| 57 | I do not agree with the law on health insurance |
| 58 | I reject this decision strongly because it is a decision that will make it impossible to leave and live in America, and we come to America to live by god and ourselves. |
| 59 | This law will be a grandicious in the right of migrant, migrant, which aspires to a good and stable life in America, America is a democratic country of a country of human rights, if the decision will be a hit to all dreams of migrants who dream of my best life in your country Thrace in the migration of America's mostly the most hopeful in better life |
| 60 | This is not only harmful to new immigrants but to current immigrants as well! By establishing they are able to pay for insurance immigrants will not be willing to come to the USA for having to prove they can afford health insurance.<br><br>We will lose out on great talent, people, and innovators for applying this unnecessary requirements.<br><br>If our ancestors were barred from entering the country because of finance, many of the rich today would not be able to say they are rich. We have to let everyone, man, women, and child to have the freedom to reach the American dream. |
| 61 | The expectation that immigrants be able to acquire insurance within thirty days is an unreasonable burden, one that even American citizens would have a difficult time fulfilling if it were required of them. America especially needs immigrants who are capable of doing the hard, low-paying work that doesn't come with benefits, agricultural and maintenance work that doesn't pay enough for expensive insurance plans. I believe that this requirement will damage the American economy if enacted, because if those jobs can't be filled by immigrants, there aren't Americans willing to pick fruit all day for three bucks an hour. |

|    | A | B |
|----|---|---|
| 62 | Ahmad Moahmed | |
| 63 | Anonymous Lubenau | |
| 64 | Ibrahim Darwish | |
| 65 | Kheir eddine Boutalba | |
| 66 | test person test lastname | |
| 67 | anonymous | |
| 68 | abdelfattah lahmiche | |
| 69 | Mohamed Belhachmi | |
| 70 | Wessam Elbouaz | |
| 71 | Anonymous | |
| 72 | Ahmed Bader | |
| 73 | Cristina Ortiz | |

| | C |
|---|---|
| 62 | This act is racist and not fair or even logic!<br>How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!?<br>And why this discrimination to the new immigrants while you allow many Amirican citizens to remain out of the health insurance umbrella ! |
| 63 | I oppose the Department of State's decision to begin collecting immigrant health insurance coverage information. I do not see this as an emergency situation at all. In fact, I don't even see this as necessary. Uninsured immigrants are certainly not the main problem with our health care system. In fact, research shows that immigrants are healthier than most US citizens when they enter this country. Furthermore, there are many barriers to an incoming immigrant to obtain health insurance coverage. Some plans require waiting periods of up to 90 days. Moreover, the proclamation does not allow for the subsidized plans which are eligible for lawful permanent residents. Instead it allows short-term plans that are often priced very high and do not offer the coverage deemed essential by the Affordable Care Act. Please re-consider this new requirement. It doesn't seem to be about promoting health, but rather about limiting new immigration. Please remember that our nation was founded by immigrants and we can not try to unravel or change the characteristic diversity of our country to meet the desires of our current President! |
| 64 | It's not important to convince the people to do med insurance before they travel<br>I hope that you will find other way to insure that people have the coast for this |
| 65 | This law is of no use except to prevent citizens from immigrating to America or at least makes it difficult for them. In this country !! I think that immigration to America is aimed at cultural diversity and the search for intellectual brains that help the development of the country, but these decisions prevent this, I hope to reject this decision because it affects more negatively than affects affirmatively |
| 66 | this is my test |
| 67 | This decision is unfair and it is necessary to at least hold a global referendum for this decision, because it is unfair to deny a citizen or any person who wants to work and earn his power in halal, but the applicant for the random lottery is a human being and not anything else. Humanity is a universal principle, and the shadow of the lottery is not rich, but more than those who are advancing are desperate. |
| 68 | I DO NOT ACCEPT THIS DECISION |
| 69 | to whom it may concern, This new proposed Health proclamation is neither practical, nor fair as it is targeting a specific group of people, New Immigrants, who are aspiring to come to the united States to start a new life and hope for a build a better future for themselves and thier families. The proclamation actually threatens to undermine the nation 's health. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality. this new propsed law goes against those very principals and values that We take pride in as Americans. The proclamation allows short - term plans, which do not comply with the Affordable Care Act 's consumer protections, to qualify as acceptable "coverage. Frequently referred to as" junk plans, "short - term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre - existing conditions.Our nations Healthcare deserves better. So please before the proclamation goes into effect.We call on you to rescind this proclamation, |
| 70 | I reject this decision |
| 71 | TO Whom it may concern.. I agree to the decision because it is the right decision and achieves social justice for all who live on American Land... Greeting to you |
| 72 | we hope that the federal judges over the USA they will stop this proclaim forever because it`s not familiar with the USA values .<br>IMMIGRATION IS A HUMAN`S RIGHTS BUT THE RIGHT PRESIDENT OF USA FIGHT AGAINST US FOR NO REASON . |
| 73 | This is an unnecessary and illogical restriction on immigration that attempts to create a catch-22 situation in which no matter what immigrants do, they get classified as ineligible. Its unconscionable and should never be enacted as policy. In addition, limiting the public comment period to only 2 days is an affront to transparency and democracy. |

| | A | B |
|---|---|---|
| 74 | Benslimane Olthman | |
| 75 | Abderrahim Aboul-kacim | |
| 76 | County Welfare Directors Association of California Association | County Welfare  Directors Association of California Association |
| 77 | Anonymous | |
| 78 | Mohamed Aliouat | |
| 79 | Sena Kindy | |
| 80 | hafida El Briri | |
| 81 | Kathleen Kerr | |
| 82 | Elhassan Bensarag | |
| 83 | Khalid Douane | |

| | C |
|---|---|
| 74 | Insurance a 1 month is good but 12 month I'm not agree with it way they put obstacles at green holder |
| 75 | Hello United States as you know and everyone knows is that President Donald Trump has put in place the law that everyone considers a border is the law of medical insurance we reassure you that everyone in the world is not sick and of course that this law is very logical but not at first because we are not all rich in addition we are in charge of the costs of procedures in case of selection, because the rich we do not need lottery to get the visa, I reassure you that most immigrants are qualified, they rely on themselves we are asked to give us a chance, with taxes and taxes the state builds hospitals, schools institutions. .. And these taxes of course come from the inhabitants and we will never benefit if we do not attribute its creation it's logical but we just want to have work, after we will pay our tax and of course contribution we promise you to become good citezen please please please please give people a chance |
| 76 | Please see attached comments. |
| 77 | This decision on health insurance is gonna harm all people who want to enter the United States of America through random immigration This decision is not good and we do not want to implement it |
| 78 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 79 | the decision<br>concerning insurance for foreigners has no sense I hope that will be canceled as soon as possible |
| 80 | I completely reject the health insurance decision because it will cause problems and does not suit us I hope that this decision will be deleted. Thank you |
| 81 | This is an unduly burdensome regulation that should not be implemented. This will add to paperwork, government bureaucracy, the backlog to our immigration system, and is disrespectful of human rights. Immigrants are not an economic burden; repeated research proves that they contribute more economically. This regulation is motivated by a nationalist anti-immigrant agenda that is racist. A 2 day comment period is an insult to democracy. |
| 82 | I am against this law because it shatters all the dreams of new immigrants |
| 83 | to whom it may concern, This new proposed Health proclamation is neither practical, nor fair as it is targeting a specific group of people, New Immigrants, who are aspiring to come to the united States to start a new life and hope for a build a better future for themselves and thier families. The proclamation actually threatens to undermine the nation 's health. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality. this new propsed law goes against those very principals and values that We take pride in as Americans. The proclamation allows short - term plans, which do not comply with the Affordable Care Act 's consumer protections, to qualify as acceptable "coverage. Frequently referred to as" junk plans, "short - term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre - existing conditions.Our nations Healthcare deserves better. So please before the proclamation goes into effect.We call on you to rescind this proclamation, |

| | A | B |
|---|---|---|
| 84 | Mohammed Bachir | |
| 85 | Richard Bedwell | |
| 86 | Nagy Youssef | |
| 87 | Ilyas Hadji | |
| 88 | Anonymous | |
| 89 | Houssam Bechar | |
| 90 | Ouassila Ferrah | |
| 91 | Mohcine Taqine | |
| 92 | Mouhcine Fliki | |
| 93 | Azizi Hassan | |

| | C |
|---|---|
| 84 | Please don t pass this law it will kill the American dream.America is a country based and founded by the hands of immigrants..even George washington will not pass this law |
| 85 | The government is moving the goal posts and changing the rules of the game for those who have already spent thousands of dollars and waited years for a visa. This new requirement should only apply to those who start a petition after November 3 or the affective date.<br>The private insurance industry is not prepared for this new requirement. Most, if not all, companies will not provide a quote until the immigrant is in the US.<br>This is a heavy burden to meet and for many they cannot meet it. Please reconsider the timeline for this new requirement.<br>One day for comments is outrageous. What is the emergency? |
| 86 | as a winner of the 2020 diversity lottery visa i see a this proclamation is a Racist and unfair call, because if this proclamation is applied about two-thirds the number of legal immigrants admitted will not be qualified to pass the visa interview, Not having health insurance does not necessarily mean that immigrants are a financial burden on the U.S. healthcare system. A Tufts University School of Medicine study asserts that when immigrants arrive in the U.S., they are healthier than most U.S. citizens and do not need or use as much healthcare as native-born Americans. And, if they eventually obtain health insurance, they actually subsidize U.S. citizens because they pay premiums but do not draw as much out of the system. While the data is limited, eliminating the barriers to coverage actually might be more beneficial to the healthcare system than preventing immigration.even those who will be able to gain coverage may not be able to do that within 30 days of entry because, under federal law, group health plans and those offering group health insurance coverage can have waiting periods of as long as 90 days which lead us to realize that this proclamation is ILLEGAL . all this info above is based on Documented studies for several Universities and organization, and finally when i applied for this lottery i had a dream , the american dream to be accurate, to live in a country that respect the human and his rights , a country believes in equality, a country encourage you to work hard so you can live a respectful life, i won this lottery after 6 years of applying, now after i won and read about this proclamation, i see is a big chance that my dream will be destroyed . PLEASE STOP THIS PROCLAMATION |
| 87 | Holle .This decision that I did not like and does not suit anyone who wants to immigrate to America, please hope to review this unfair decision |
| 88 | I'm disagree with decision will take for insurance coverage,<br>Then will winner in DV,I don't have capacity to supported 12 months,<br>My goal for DV is change my life for better because l live bad life her in Africa ,for that please don't applicable ,if I have this money I will stay in my country,don't clause the door of my dream.<br>Have nice day .<br>Mohammad azoukenni form Morocco |
| 89 | I reject this decision because it has negative effects on immigrants in general due to living conditions that vary from person to person |
| 90 | cordially<br>This new proposed proclamation does not arouse any individual his dream of having an American nationality for him and for these children, and to have a better future. The proclamation is a great deterrent to the rich, which contradicts with the United States, that it is a country of democracy and equality.<br>I have a dream help me realize it<br>greetings |
| 91 | I hope that the American government will not ratify this law because it will weaken our chances of success and realizing our dreams in your beautiful country. |
| 92 | Hi my wife is notify me that i cant get a insurance health while im still outside of the USA because i will need a social security number first so its make my case very difficult<br>I hope this decision shall not come into force<br>Thank you sincerely |
| 93 | We do not want this proposal regarding the insurance law that you are requested to cancel as soon as possible. New immgrants who aspiring to come to usa to start new life and hope for a build new futur for themselves and for their families. |

000155

| | A | B |
|---|---|---|
| 94 | Walid Houari | |
| 95 | Brahim Amennou | |
| 96 | Ahmed Abbas | |
| 97 | Issam Romih | |
| 98 | Adam Cheild | |
| 99 | Rachid Lhbouli | |
| 100 | Mahmoud Youssef | |

| | C |
|---|---|
| 94 | I think this law is unfair and unjust and racist against immigrants, it violates the foundations of the United States in addition to violating a human right of the United Nations. |
| 95 | Hi,<br>It is regrettable that such a decision is issued and I do not agree with this resolution. We respect the law of the United States of America and its sponsorship of human rights. We don't want to be a burden on anyone. But such a decision would cripple the ability of foreign nationals to emigrate. Of course, health insurance is a duty for every immigrant. And decent living our duty to respect the laws and the performance of taxes as well as health insurance only ask to reconsider this decision and reverse it.<br>Thank you for reading. |
| 96 | America country of dreams and freedom. Always help people who suffering in their counteries. We hope to go to america to feel free and work hard to make a good future to our children. This proclamation is destroy this dream. We will come to work hard not to take any aids. We dont need any aids. Please please think in people and families that looking for better life to their children and that what america always does. God bless america |
| 97 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamatio |
| 98 | I totally refuse this law young immigrants who in 90% of th cases dont have a stable salary or good amount of money Will .be good projects To invest in we can five birth to new entrepreneurs and great directors by giving them the chance to enter the us without charges |
| 99 | Please, as immigrants, we categorically reject this decision (health insurance) because of its severe damage and many disadvantages to many immigrants and those involved in it, which is not in everyone's interest. |
| 100 | Presidential Proclamation about Health Insurance<br>Immigrant Health Insurance Coverage<br>Bureau of Consular Affairs, Visa Office (CA/VO).<br>DS-5541 |

|  | A | B |
|---|---|---|
| 101 | Nicole Lamourex | National Assosicaitn of Free and Charitable Clinics |
| 102 | Anonymous | |
| 103 | Malih Boujemaa | |

| C |
|---|

To whom it may concern:

On behalf of the National Association of Free and Charitable Clinics, our member organizations, our volunteers and our patients, we appreciate the opportunity to write in response Docket Number: DOS-2019-0039 Emergency Submission Comment on Immigrant Health Insurance Coverage.

We support a nation where all are truly equal and where individuals have access to comprehensive, affordable health care. Annually, our member organizations provide health care at no required charge to 2 million people in this country who do not have health insurance, and we do this with no federal dollars.

The first concern that we have with the proclamation is that it restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

The second concern we have with the proclamation is that it allows for the purchase of short-term health insurance plans that lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. This may very well lead to higher health care costs for providers, when patients cant afford needed health care that is not covered by these bare-bones plans.

Thank you for reviewing our comments.

101

---

to whom it may concern, This new proposed Health proclamation is neither practical, nor fair as it is targeting a specific group of people, New Immigrants, who are aspiring to come to the united States to start a new life and hope for a build a better future for themselves and thier families. The proclamation actually threatens to undermine the nation 's health. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality. this new propsed law goes against those very principals and values that We take pride in as Americans. The proclamation allows short - term plans, which do not comply with the Affordable Care Act 's consumer protections, to qualify as acceptable "coverage. Frequently referred to as" junk plans, "short - term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre - existing conditions.Our nations Healthcare deserves better. So please before the proclamation goes into effect.We call on you to rescind this proclamation

102

---

This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.

103

| | A | B |
|---|---|---|
| 104 | Mohamed Essam | |
| 105 | Anonymous | |
| 106 | Mouhamed Yousef | |
| 107 | Ahmed Moustafa | EGYPT |
| 108 | Diana Chamberlain | Chamberlain Sanchez Immigration Law PLC |
| 109 | KKllm Hussein | |
| 110 | Anonymous | |
| 111 | Fahd Mohamed Hamed | |

| C |
|---|
| Greetings sir,<br>Hope you are doing well..<br>About the Presidential Proclamation on Health Care for immigrants. How would immigrants from poor countries with low income to be able to provide such a thing.<br>We try to immigrate to the US to live a better life and also become extraordinary in our fields to achieve for us and the US a great success.<br>USA will become our country and we will do our best to help in building it in every major.<br>But how is that possible if the immigration is only for rich people.<br>Kindly it is a major request to end this law.<br>104 Best Regards. |
| 105 Actually i feel ashamed to see this discrimination in the presidential proclamation which is totally against the US constitution |
| How can America be the country of liberties and equality?<br>It makes an unjust decision to prevent certain people from entering its territoryIs this the justice that America is talking about?<br>106 I reject Trump's decision on health insurance |
| 107 I disagree with our health insurance decision that will force many visa applicants not to go to America This decision must be well studied |
| This 48-hour comment period and the underlying proclamation itself is not necessitated by any emergency under any definition of that word. A regular comment period should be utilized.<br><br>This regulation - and the underlying proclamation itself - is misguided and illegal. In addition, any alleged "emergency" is of this Administration's own doing. The Administration has created its own pressure on the healthcare system as the number of people in the United States without health insurance increased last year for the first time in more than a decade due to elimination of the individual mandate and the market being flooded with expensive, substandard plans. Forcing immigrant visa applicants to purchase an expensive, unnecessary, substandard plan in order to be granted a visa has no valid basis in law, equity, or common sense.<br><br>This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the enjoined public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.<br><br>The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress already allows for subsidized plans for LPRs and others lawfully present. The proclamation forces individuals to unnecessarily buy costly and less comprehensive junk health coverage such as short-term plans that do not comply with the Affordable Care Acts consumer protections.<br><br>The President is just looking for another way to have immigrants applications for legal status be denied.<br>108 |
| 109 no no no |
| 110 I hope that the American government will not ratify this law because it will weaken our chances of success and realizing our dreams in your beautiful country. |
| You are killing the dreams of peoples to travel to America .. And to live in them .. These are very difficult decisions for most immigration providers .. Most providers are waiting for immigration from year to year .. Because if they have enough money for tourist travel or any other country .. How can I take insurance Healthy outside of America .. Or get a lot of money before travelingPlease review the decisions .. and allow Lottery 111 winners to travel as before |

| | A | B |
|---|---|---|
| 112 | Lenni Benson | NYU Law School, The Safe Passage Project |
| 113 | Rachid Chikhi | |
| 114 | Mbarek filali | |
| 115 | Sarah Leneave | |
| 116 | Mehdi Badr Eddine | |
| 117 | Abderrahim Ennaouri | |
| 118 | Samah Shady | |
| 119 | Sana Ait Hammadi | |
| 120 | Jaouad Kari | |
| 121 | Anonymous | |
| 122 | Mohamed Hussein | |

| | C |
|---|---|
| | To the Office of Manage and Budget and the Burea of Immigrant Affairs, Department of State:<br><br>Docket Number: DOS-2019-0039<br><br>I will comment briefly. First, a two day notice period for comment on something as complex as providing evidence of health insurance is unconscionable. As you well know, the immigrant visa process is a lengthy complicated process where families may spend months gathering documents and satisfying the myriad requirements of the Immigration and Nationality Act (INA). To obtain a certificate of insurance or insurance coverage before a family member has entered the United States may be very difficult as not all employers or insurance contracts automatically allow the addition of dependents. Moreover, some insurers may require identification information such as a social security number. An immigrant cannot obtain a social security number until he or she has successfully completed the immigration process (unless she or he was already authorized to study or work within the United States). Asking an immigrant to orally certify compliance when the insurance industry is unlikely to be prepared is not appropriate and will generate lengthy and unnecessary stress and delays for both the agencies and the individuals in the process.<br><br>Second, the assessment that this collection will only take ten minutes is patently misleading. While it is possible a DOS interviewer might complete a form in ten minutes, it would take me hours to explain all of the options in health care coverage to a well educated person and one already conversant with U.S. customs and business practice. The alternative of proving wealth as adequate to cover health coverage is too vague and too subjective. The process articulated invites arbitrary and inconsistent treatment of immigrants across consulates. This is not a fair or orderly process. The rush to satisfy and solve an illusory problem is simply wrong. The attorneys and administrators within the Department of State and OMB surely realize this and I urge you to use your talent, experience and discretion to withdraw this ill conceived approach.<br><br>Third, I do not mean to waive other meaningful objections about the fundamental legal authority to make this requirement of insurance before immigration or other legal objections. There are many but the manner in |
| 112 | which you opened this comment period and the 48 hour period necessitates this simple and summary |
| 113 | No accepted that forms |
| 114 | Hir for me i do not accept this decision because it is very expensive and I will not be able to pay insurance dues for twelve months |
| 115 | This rule is unfair and will be very difficult to enforce. |
| 116 | Im not agree with this law |
| 117 | I am really against this law. Thank you for noting that it is against the principle of devircity |
| 118 | I don't approve of Trump's law. This is illegal |
| 119 | Hi in my opinion, this decision is not agreed completly,because it is a major obstacle to entry into America.we love America and we have a great desire to work and also our children dream of studying and working in USA.we have a great experience and skills to work there.please please do not break our ambitions with this dicision.thank you so much.from morroco |
| 120 | We, as immigrants from poor countries, do not have enough money for this decision. We do not want to apply this law because it is really unfair to the poor. |
| 121 | I reject that decision Because it's too much of a decision, since no immigrant can afford health insurance for 12 months. |
| 122 | This act is not fair or even logic!<br>How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!? |

| | A | B |
|---|---|---|
| 123 | Walid Omar | |
| 124 | John Mina | |
| 125 | Anonymous | |
| 126 | Franois Mho | |
| 127 | Anonymous | |
| 128 | Zizo Med | |

| C |
|---|

| | |
|---|---|
| 123 | as a winner of the 2020 diversity lottery visa i see a this proclamation is a Racist and unfair call, because if this proclamation is applied about two-thirds the number of legal immigrants admitted will not be qualified to pass the visa interview, Not having health insurance does not necessarily mean that immigrants are a financial burden on the U.S. healthcare system. A Tufts University School of Medicine study asserts that when immigrants arrive in the U.S., they are healthier than most U.S. citizens and do not need or use as much healthcare as native-born Americans. And, if they eventually obtain health insurance, they actually subsidize U.S. citizens because they pay premiums but do not draw as much out of the system. While the data is limited, eliminating the barriers to coverage actually might be more beneficial to the healthcare system than preventing immigration.even those who will be able to gain coverage may not be able to do that within 30 days of entry because, under federal law, group health plans and those offering group health insurance coverage can have waiting periods of as long as 90 days which lead us to realize that this proclamation is ILLEGAL . all this info above is based on Documented studies for several Universities and organization, and finally when i applied for this lottery i had a dream , the american dream to be accurate, to live in a country that respect the human and his rights , a country believes in equality, a country encourage you to work hard so you can live a respectful life, i won this lottery after 6 years of applying, now after i won and read about this proclamation, i see is a big chance that my dream will be destroyed . PLEASE STOP THIS PROCLAMATION |
| 124 | Actually i feel ashamed to see this discrimination in the presidential proclamation which is totally against the US constitution |
| 125 | Actually i feel ashamed to see this discrimination in the presidential proclamation which is totally against the US constitution |
| 126 | I Reject the Decision in Question Presidential Proclamation about Immigrant Health Insurance Coverage |
| 127 | Hello, I am a participant in the American lottery and this decision will affect us all. Please appeal to this decision and we are ready to move to America to complete my study and work, God willing. |
| 128 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.

Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation.
 This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.

Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |

| | A | B |
|---|---|---|
| 129 | Anonymous | |
| 130 | Karim Ettoukhsini | |
| 131 | Joseph youssef Refaat | |
| 132 | Amine Kourbali | |
| 133 | Kamal Belhadj | |
| 134 | Awad Hussein | |
| 135 | Remon Selah | |

| C |
|---|
| **129** This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| **130** Lawyers<br>We do not agree with such decisions. Because most of the candidates are middle class if not poor. But with the great qualifications the American world needs, I hope you will take my opinion into account and cancel this at your ban meeting on Friday.<br>Think you<br>Karim |
| **131** I don't aprrove the health insurance act because its a racist decision and this is not in accordance with the American principles |
| **132** This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| **133** to whom it may concern, This new proposed Health proclamation is neither practical, nor fair as it is targeting a specific group of people, New Immigrants, who are aspiring to come to the united States to start a new life and hope for a build a better future for themselves and their families. The proclamation actually threatens to undermine the nation 's health. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality. this new propsed law goes against those very principals and values that We take pride in as Americans. The proclamation allows short - term plans, which do not comply with the Affordable Care Act 's consumer protections, to qualify as acceptable "coverage. Frequently referred to as" junk plans, "short - term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre - existing conditions.Our nations Healthcare deserves better. So please before the proclamation goes into effect.We call on you to rescind this proclamation |
| **134** The decision of healthcare insurance in the case of winning the lottery in which it is difficult for the applicant, especially if the winner is the wife ... If the wife can prove that her husband can pay health insurance to all family members and he has the money to meet all the demands of healthcare insurance and all related to insurance. The subject is not clear regarding this case, please clarify further<br>thank you very much |
| **135** Actually i feel ashamed to see this discrimination in the presidential proclamation which is totally against the US constitution |

000167

| | A | B |
|---|---|---|
| 136 | Ehab Ashmawy | |
| 137 | Mohamed Mowafy | |
| 138 | karim abdelfattah | |
| 139 | George Hepner | |
| 140 | Hazem Mohamed | |

| C |
|---|

**136**

This act is racist and not fair or even logic!
How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!?
And why this discrimination to the new immigrants while you allow many Amirican citizens to remain out of the health insurance umbrella!

**137**

I dont accept for this paper
Because in the interview the consulate asks me about my financial ability to live in the U.S. after moving there and of course this financial ability will afford me to have a medical insurance plan.
Also i cant have medical insurance plan without having a social security no. In the U.S.
Which I will not have before moving to the U.S.

**138**

we are very disappointed from such a law that is not legal to be effective because america is land of freedom and chances
many of DV lottery winners will not be able to provide medical insurance at the interview
but also they willing to cove them selves with medical insurance while access states land
you can make them sign that they will not take a free governmental medical insurance
but not prevent them from a right to live a better life for them and for their children's
they immigrate to america to work and to contribute in the life with hard work
so i hope this law will be declined
to be as always
america for all

**139**

I am writing in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment periodand the entire underlying proclamationis not an emergency. It is simply another effort by the Trump Administration to create This is just the latest brick in your administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.

We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, we support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.

I oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. I also oppose the underlying October 4, 2019 proclamation mandating that visa applcants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm the poor, who tend not to be white and are often NOT Christian. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.

The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

**140**

This act is racist and not fair or even logic!
How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!?
And why this discrimination to the new immigrants while you allow many Amirican citizens to remain out of the health insurance umbrella !

| | A | B |
|---|---|---|
| 141 | Kermit Kubitz | |
| 142 | Mahsa Khanbabai | |
| 143 | Sayed Bin Fadl | |
| 144 | mohammed ragab ali | |
| 145 | Sarah Grusin | National Health Law program |

| | C |
|---|---|
| 141 | This information collection:<br>Seems hastily and undesignedly implemented.<br>Contains a variety of exceptions (at the designation of the Sec of State) which could be arbitrary and unreasonably applied.<br>Not productive of the desired result because as other comments have suggested may encourage acquisition of ineffective or expensive or inadequate insurance coverage.<br>Not clearly mandated by a public purpose or national interest.<br>Inconsistent with the objectives of national health insurance policy.<br>The information collection should be denied and not implemented until more fully analyzed, justified, and organized so as to not produce arbitrary, unreasonable, and ineffective results. |
| 142 | Dear Ms. Herndon and State Desk Officer:<br><br>I respectfully submit the following comments in response to the above-referenced notice.I am a practicing immigration attorney and I am extremely concerned about this notice for a number of reasons. In the 20 years I have been practicing, I have not seen a comment window this narrow, it is underheard of, as is its taking effect on a Sunday.<br><br>The proclamation could undermine the health of many individuals and restricts the ability to purchase comprehensive health insurance available through the ACA marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because it advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and requiring individuals to buy costly & less comprehensive health coverage.<br><br>The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. This does not promote health insurance & could increase costs for providers.<br><br>The ICR Should Not be Granted because it must undergo a 60-Day and 30-Day Notice for public comment. Emergency approvals of ICRs, without appropriate public notice and comment, should only be granted in rare instances and only when certain legal criteria have been met, which have not in this case. The agency must demonstrate the existence of 1 of 4 circumstances and it has failed to do so.<br><br>(1) Public harm is likely if normal procedures are followed; or<br>(2) An unanticipated event has occurred; or<br>(3) The use of normal procedures is likely to prevent or disrupt the collection; or |
| 143 | This decision is extremely racist! If enforced, this decision would end the dreams of some immigrants who cannot determine financial competence outside the states. Some immigrants come to the United States to work hard. And amend their status in a legal manner |
| 144 | This act is racist and not fair or even logic! its against americas values |
| 145 | Please see attached comments. |

| | A | B |
|---|---|---|
| 146 | Isabel Sanchez | Coalition for Humane Immigrant Rights (CHIRLA) |
| 147 | Karen Nicolson | Center for Elder Law and Justice (CELJ) |
| 148 | Rebecca Novick | The Legal Aid Society |
| 149 | Anonymous | |

| | C |
|---|---|
| | On behalf of the Coalition for Humane Immigrant Rights (CHIRLA), the largest statewide immigrant rights organization in California, I write in response to the Department of States notice of request for emergency review and approval of, as well public comment regarding, information collection on Immigrant Health Insurance Coverage.<br><br>This 48-hour review and comment period as well as the entire underlying Presidential Proclamation 9945 (PP 9945") are not characterized by any kind of emergency. However, it may well create one for Californian and other families across the nation. This is just the latest brick in the Administrations invisible wall that puts an extremist anti-immigrant agenda ahead of the nations interests and the law of the land. The justifications found in PP 9945 stress the issues raised by uninsured individuals yet the criteria outlined to purportedly address this are ill-conceived and would lead to a larger number of underinsured in this country.<br><br>California families will particularly devastated by this proclamation. With the states high cost of living, many families turn to Covered California, the states Affordable Care Act (ACA) marketplace, or Medi-Cal, the states Medicaid program, for affordable health insurance. These comprehensive plans do not meet the arbitrary, cruel and diffuse criteria of the proclamation even though they are the very plans in which many immigrant family members would normally enroll upon entering the United States.<br><br>We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, we support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade. |
| 146 | This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it |
| 147 | Please see attached comments. |
| 148 | Please see attached comments. |
| 149 | I oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In addition, I strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.<br><br>In addition, the 48-hour comment period is inexcusable. The entire underlying proclamation is not an emergency. This is just the latest brick in your administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.<br><br>The Department states that it is soliciting public comments to permit the Department to:<br>Evaluate whether the proposed information collection is necessary for the proper functions of the Department.<br>My Response: It is absolutely not necessary for the Department of State to know whether people applying for resident status have health insurance. In no way<br>Evaluate the accuracy of our estimate of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used.<br>My Response: This initiative is a complete waste of time at taxpayers expense. There is no way that accurate information will be obtained, and the net effect will be to turn away all but the wealthiest applicants and/or to increase the burden of uncompensated care on hospitals and clinics. It will worsen the problem that it purports to solve.<br>Enhance the quality, utility, and clarity of the information to be collected.<br>My Response: The quality of the information is likely to be poor. Few American citizens understand the complexities of our health-care insurance system. Health insurance literacy is estimated to be as low as 4% in some areas of the country. The federal government has funded navigators and eligibility specialists to help people choose health care plans, even with the much-needed simplifications and requirements that the ACA |

|  | A | B |
|---|---|---|
| 150 | Anonymous | |
| 151 | Laura Hooper | American Occupational Therapy Association (AOTA) |
| 152 | Smail Nacer | |
| 153 | Marty Carty | Oregon Primary Care Association |
| 154 | Madeline Cronin | |
| 155 | Jill Marie Bussey | Catholic Legal information Network (CLINIC) |

| C |
| --- |
| 150 | ok i respect roles but how i have mony and i come to usa looking for life for hope for country<br>how i have mony<br>and how we reach in my case just i need work only work need life and stay only this<br> ok i respect roles but how i have mony and i come to usa looking for life for hope for country<br>how i have mony<br>and how we reach in my case just i need work only work need life and stay only this |
| 151 | Please see attached comments. |
| 152 | IM NOT AGREE WITH PRESIDENT ABOUT THIS NEW LAW BECAUSE IMMIGRANT PEOPLE WHOS WILL BE IN UNITED STATES THEY ARE POOR PEOPLE AND THEY WANT TO GO THERE JUST FOR WORK AND FOR THERE FAMILY. |
| 153 | Please see attached comments. |
| 154 | I am writing in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment periodand the entire underlying proclamationis not an emergency. What are you really doing? It is your administrations creation of a wall that puts an extremist racial and political agenda ahead of the law and ultimately the U.S.' interests.<br><br>The U.S. is supposed to be a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, we support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.<br><br>I oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. I strongly oppose the underlying October 4, 2019 proclamation mandating that visa applcants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.<br><br>The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage. |
| 155 | Please see attached comments. |

|     | A | B |
| --- | --- | --- |
| 156 | Rachel Fabi | |
| 157 | New York State Department of Health | New York State Department of Health |
| 158 | Mnsure- Minnesota's State Based Marketplace Exchange | Mnsure- Minnesota's State Based Marketplace Exchange |

| | C |
|---|---|
| 156 | I am writing to oppose the proposed regulation change. This policy is unjust, economically wrong-headed, and incompatible with American values. Additionally, the "emergency" procedure through which this policy is being promulgated does not comply with the Administrative Procedure Act.

It is unjust to require immigrants to provide proof of insurance in order to obtain a visa. This is especially problematic given the current administration's stated opposition to the individual mandate under the Affordable Care Act. If American citizens cannot be required to have insurance, there is no valid reason why a different standard should apply to immigrants.

Immigrants are excluded from most public insurance, so this policy is essentially a wealth test, not unlike the one implemented by the currently enjoined public charge rule. Given that several courts have held that the public charge rule is likely to fail on the merits, it seems likely that this policy will similarly fail. It is a waste of taxpayer dollars to pursue this policy. Additionally, immigrants tend to be healthier than American citizens. Excluding them from entry because of their lack of insurance, like excluding them from public insurance, simply deprives the American public of healthy economic contributors who would help subsidize the risk pool of public insurance.

Finally, the emergency procedure being applied for this rule is a transparent attempt to ram this policy through without appropriate public engagement. The public notice and comment period exists to give citizens an opportunity to express their views on new regulations, and depriving citizens of this right is inappropriate and wrong. |
| 157 | The New York State Department of Health strongly opposes a requirement that immigrants obtain health insurance prior to entering the United States, as this obligation would be nearly impossible to meet for many immigrants. Although moving to the U.S. from another country would qualify an individual for a Special Enrollment Period for a Qualified Health Plan (QHP), pursuant to the Affordable Care Act, U.S. residency is an eligibility requirement to apply for such coverage. Further, requiring that coverage be in place within 30 days of entry similarly ensures that most immigrants will not be able to comply, as such coverage is often not available for 45 days. Although this coverage may ultimately be available retroactively, it is highly unlikely that immigrants would have details relating to such insurance as required in the proposed rule. The policy does not afford consular officers any discretion in relaxing these requirements. For these reasons, the policy announced in the proclamation fails to address the realities of how immigrants actually obtain health insurance. |
| 158 | Please see attached comments. |

| | A | B |
|---|---|---|
| 159 | Miranda Brown | |
| 160 | Anonymous | |

| | C |
|---|---|
| 159 | I am writing in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. I help people enroll in health coverage. I support access to comprehensive, affordable health care for all people in the United Statesand I support efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.<br><br>I oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. I strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color.<br><br>The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.<br><br>Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. This isnt promoting health insurancethis is putting a barrier between individuals and the coverage for which they are eligible. In fact, forcing immigrants to avoid comprehensive insurance could increase uncompensated care costs for providers, when patients cant afford needed health care that is not covered by these bare- bones plans |
| 160 | This burdensome requirement does not increase access to health care or ensure future coverage. Instead, it is another hoop for intending immigrants to jump through that is a windfall for insurance companies and does nothing to benefit our society. It is a rule that encourages intending immigrants to likely purchase the cheapest plans available, plans that will not serve their health care needs but will simply meet the superfluous requirements this government mandates to keep legal immigration low. This rule will harm people of color and individuals who cannot afford legal representation. This proclamation should be rescinded before its effective date. |

|    | A | B |
|----|---|---|
| 161 | Daniel Goldstein | |
| 162 | Shelby Gonzales | Cente ron Budgetand Policy priorities |
| 163 | Molly McClurg | Connect for Health Colorado |
| 164 | Salma Haddi | |
| 165 | Jamie Sawyer | Silver State Health Insurance Exchange Nevada |
| 166 | Omar Abdelhamid | |
| 167 | Jason Burruel | Covered California (state-based marketplace) |
| 168 | Anonymous | |
| 169 | Charlotte Bruce | Children's HealthWatch |
| 170 | Samantha Nelson | |
| 171 | Gehad Darwish | |
| 172 | Mohamad Arja | |
| 173 | Victor Garcia | |

| | C |
|---|---|
| | I teach in a school of public health (although my comments are my own) and I am concerned that actions taken with respect to this proclamation interferes with the health of the American population. The mission of public health is to assure the conditions in which people can be healthy, and while it may seem that this proclamation is narrow in scope, it fundamentally changes one of the defining stories of the United States. My research is in narrative ethics, and I explore how the stories that circulate in our society impacts the health of the population. Our founding narrative, that we are a nation of immigrants and that we stand as a beacon of hope and refuge for people fleeing violence and persecution is fundamentally altered with this proclamation. According to two important sources (referenced below) it is based on unsubstantiated evidence, will make it more difficult for immigrants from lower income countries to flee to safety, misrepresents the reasons why health care costs are burdensome (especially to US citizens), and creates a mandate for health insurance which the Republican controlled Senate thought was wrong and eliminated. With respect to this last point, the proclamation's claim that an insurance mandate is now required for one group of people but not for another is both hypocrisy and an injustice. This proclamation is another step in trying to create a story through policy to convince the American people that all immigration should be curtailed; most importantly, it takes us away from our founding story that immigration makes the United States a strong and powerful nation (sources below)<br><br>https://www.healthaffairs.org/do/10.1377/hblog20191028.484680/full/<br><br>https://www.migrationpolicy.org/news/health-insurance-test-green-card-applicants-could-sharply-cut-future-us-legal-immigration<br><br>https://www.forbes.com/sites/steveforbes/2016/10/04/immigration-made-us-strong-and-can-do-so-again/#f6e8cd4fd385<br><br>https://www.vox.com/policy-and-politics/2017/4/3/14624918/the-case-for-immigration |
| 161 | |
| 162 | Please see attached comments. |
| 163 | Please see attached comments. |
| 164 | This decision is unfair to many youth seeking their dreams to become successful professionals who could contribute positively to your country. |
| 165 | Please see attached comments. |
| 166 | I refuse and oppose this resolution because it's personal affair, yes you have the right to not let the person become a public charge but not to make them completely unable to migrate. |
| 167 | Please see attached comments. |
| 168 | I disagree with proclamation and hope to be suspended soon .. |
| 169 | Please see attached comments. |
| 170 | This would place further hardship on new Americans entering this country, and would again be targeting low-income immigrants. We need to help people as they transition into their New American life, and this could have devastating effects to some individuals. |
| 171 | I am against the health insurance decision and with respect to the US government this decision should be commuted |
| 172 | I disagree with this decision because it creates inequality between people and is really strict. It is an obstacle to applicants for immigration and we decided to emigrate to the United States because it enjoys justice and equality between social classes and does not discriminate between societies and does not have racism against any person, society or state, so the United States of America remains at the forefront of the countries that the individual wishes to emigrate. So we dream of getting American citizenship |
| 173 | Please see attached comments. |

| | A | B |
|---|---|---|
| 174 | Magdy Omran | |
| 175 | DC Health Benefit Exchange Authority | DC Health Benefit Exchange Auhtority |
| 176 | Anonymous | |

| C |
| --- |

| | |
| --- | --- |
| | as a winner of the 2020 diversity lottery visa i see a this proclamation is a Racist and unfair call, because if this proclamation is applied about two-thirds the number of legal immigrants admitted will not be qualified to pass the visa interview, Not having health insurance does not necessarily mean that immigrants are a financial burden on the U.S. healthcare system. A Tufts University School of Medicine study asserts that when immigrants arrive in the U.S., they are healthier than most U.S. citizens and do not need or use as much healthcare as native-born Americans. And, if they eventually obtain health insurance, they actually subsidize U.S. citizens because they pay premiums but do not draw as much out of the system. While the data is limited, eliminating the barriers to coverage actually might be more beneficial to the healthcare system than preventing immigration.even those who will be able to gain coverage may not be able to do that within 30 days of entry because, under federal law, group health plans and those offering group health insurance coverage can have waiting periods of as long as 90 days which lead us to realize that this proclamation is ILLEGAL . all this info above is based on Documented studies for several Universities and organization, and finally when i applied for this lottery i had a dream , the american dream to be accurate, to live in a country that respect the human and his rights , a country believes in equality, a country encourage you to work hard so you can live a respectful life, i won this lottery after 6 years of applying, now after i won and read about this proclamation, i see is a big chance that my dream will be destroyed . PLEASE STOP THIS PROCLAMATION |
| 174 | |
| 175 | Please see attached comments. |
| 176 | To the tune of Josie and the Pussycats (Curtin, Hanna and Barbera)<br><br>Donnie and the Kleptocrats<br>Swamp dwelling sewer rats<br>Free stuff for plutocrats<br>Dumb, scum, a crooked bunch<br>Lobbyists let's power lunch.<br><br>Plunder, Plunder!<br><br>See us lie to Congress<br>(It's such a thrill)<br>We're open for business<br>(In unmarked bills)<br>Love to see pollution<br>(And oil spills)<br>We are Putin's willing fools<br>Come and join us right-wing tools.<br><br>C'mon, Losers!<br><br>Donnie and the Kleptocrats<br>Spray tans in MAGA hats<br>Dictator welcome mats<br>Any time there's stuff to steal<br>We're all set to wheel and deal |

|   | A | B |
|---|---|---|
| 177 | Diane Howard | National Disability Rights Network (NDRN) |
| 178 | Anonymous | |
| 179 | Disability Rights California | Disability Rights California |
| 180 | rachel Wener | |
| 181 | Cheryl Roeming | |
| 182 | Felicita Monteblanco | Virginia Garcia Memorial Health Center |
| 183 | Margaret Bradbury | |

| | C |
|---|---|
| 177 | Please see attached comments.<br><br>The National Disability Rights Network (NDRN) writes to express our strong opposition to the October 4, 2019 Presidential Proclamation mandating that visa applicants abroad buy certain approved health insurance and the efforts by the State Department and the Office of Management and Budget to implement the proclamation. The health insurance requirement is arbitrary and discriminatory against people with disabilities and pre-existing conditions.<br><br>NDRN is the non-profit membership organization for the federally mandated Protection and Advocacy (P&A) agencies for individuals with disabilities. The P&As were established by Congress to protect the rights of people with disabilities and their families. The P&As are in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Territories (American Samoa, Guam, Northern Mariana Islands, and the U.S. Virgin Islands), and there is a P&A affiliated with the Native American Consortium in the Four Corners region of the Southwest. Collectively, the 57 P&As are the largest provider of legally based advocacy services to people with disabilities in the United States. |
| 178 | This sort of policy would might make sense if there was a mandate on US citizens and taxpayers to pay for health insurance to reduce the cost of the healthcare system and if working immigrants had access to the same medical coverage options as citizens. However, this administration worked very hard to make sure that the healthcare mandate and related fines were repealed and that American citizens are not required to have insurance, pay for insurance, or have a plan to cover forseeable medical expenses - thus increasing overall healthcare costs.<br><br>This makes this policy a direct attack attack on immigrants, and about limiting immigration to those who are wealthy, have a job lined up, or who have no "preexisting medical conditions". (How does the administration intend to define preexisting medical conditions? Is that like "had a previous pregnancy" or "had cancer three years ago" or currently diabetic?) America is supposed to be a land of opportunity - not only legally open to those who already have financial means. |
| 179 | Please see attached comments. |
| 180 | I strongly oppose this proposed regulation. It is a cruel way to keep families from reuniting in the US, and discriminating against all but the very richest immigrants. We should be an open and welcoming country. |
| 181 | I believe it is something that should be considered on a case by case basis. In my profession, the impact that this rule will have could be detrimental. While I understand the need for the revisions, more study and discussion should happen before this takes effect. |
| 182 | Please see attached comments. |
| 183 | I think that immigrants should be provided for their basic human rights and that there should be no increase in the burden for them to have health insurance as a condition to their status. Especially nonsensical when this administration has happily dismantled the ACA with the intended consequence of ensuring poor black and brown people are made sick so that they are no longer a threat to the GOP. |

|  | A | B |
|---|---|---|
| 184 | PAUL GLICKMAN | |
| 185 | Richard Calderone | Tahirih Justice Center |
| 186 | Steve Nelson | |
| 187 | Anonymous | |
| 188 | Ellen Sullivan | |

| | C |
|---|---|
| | The undersigned organizations write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment periodand the entire underlying proclamationis not an emergency. This is just the latest brick in your administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.<br><br>We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, we support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.<br><br>We specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, we strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.<br><br>The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage. |
| 184 | Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts |
| 185 | Please see attached comments. |
| 186 | I am disagree with new law of immigrant health insurance coverage , as American citizen thats will effect me if i want to apply for my parent who lives outside the united states to move to live with me as permanent resident. |
| 187 | Really i feel ashamed to see this discrimination in the presidential proclamation which is totally against the US constitution |
| | I write I in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment periodand the entire underlying proclamationis not an emergency. This is just the latest brick in your administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.<br><br>I support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, I support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.<br><br>I specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, we strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.<br><br>The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage. |
| 188 | Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts |

| | A | B |
|---|---|---|
| 189 | Dania Palanker | Georgetown university |
| 190 | | National Association of Pediatric Nurse Practitioners |
| 191 | Alameda County Board of Supervisors | Alameda County (CA) Board of Supervisors |
| 192 | Hila Ahmed | |
| 193 | Fern Jones | |
| 194 | Center for Public Representation | Center for Public Representaton |
| 195 | David Super | Georgetown law |
| 196 | Rita Espinosa Arguello | Colectiva Legal del Pueblo |
| 197 | James madara | American medical Association |

| C |
|---|
| 189 | Please see attached comments. |

190

On behalf of more than 9,000 pediatric nurse practitioners (PNPs) and pediatric-focused advanced practice registered nurses (APRNs) committed to providing optimal health care to children, the National Association of Pediatric Nurse Practitioners (NAPNAP) appreciates the opportunity to provide its comments in response to the October 30, 2019 notice of information collection (Docket # DOS-2019-0039; Public Notice 10934 Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage; 84 Fed. Reg. 210; pp. 58199-58200) requesting review and approval of information collection on immigrant health insurance coverage in accordance with the emergency review procedures of the Paperwork Reduction Act of 1995. NAPNAP strongly objects to the use of these procedures, permitting only a 48-hour comment period, for an administrative action that is clearly not an emergency, and for rushing to implement a policy that would cause significant harm to immigrant children and their families.

We believe the only appropriate solution is for the administration to immediately rescind this proclamation before it goes into effect and to follow the appropriate administrative and regulatory procedures before it considers proposing a policy that would have such seriously harmful effects on the health of immigrant children and families.  Please see attached comments.

191 | Please see attached comments.

192 | am against the decision to impose health coverage on immigrants because it is against the principles of the United States of America because it is a country of freedom and equality

193

The proclamation would be harmful because it increases barriers to healthcare access and could increase healthcare costs.

The information collected is not necessary for the proper functioning of the Department of State.
Thank you.
 The proclamation would be harmful because it increases barriers to healthcare access and could increase healthcare costs.

The information collected is not necessary for the proper functioning of the Department of State.
Thank you.

194 | Please see attached comments.

195 | Please see attached comments.

196

This 48-hour comment periodand the entire underlying proclamationis not an emergency. The Administration has created its own pressure on the healthcare system as the number of people in the United States without health insurance increased last year for the first time in more than a decade due to elimination of the individual mandate and the market being flooded with expensive substandard plans.
This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.
The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces in which Congress already allows for subsidized plans for LPRs and others lawfully present. The proclamation forces individuals to buy costly and less comprehensive junk health coverage such as short-term plans that do not comply with the Affordable Care Acts consumer protections.
The President is just looking for another way to have immigrants applications for legal status be denied.
We call on you to rescind this proclamation before it goes into effect.

197 | Please see attached comments.

| | A | B |
|---|---|---|
| 198 | Wael Hassan | |
| 199 | T S Boileau | |
| 200 | Asmaa Sobhy | |

| C |
|---|
| **198** as a winner of the 2020 diversity lottery visa i see a this proclamation is a Racist and unfair call, because if this proclamation is applied about two-thirds the number of legal immigrants admitted will not be qualified to pass the visa interview, Not having health insurance does not necessarily mean that immigrants are a financial burden on the U.S. healthcare system. A Tufts University School of Medicine study asserts that when immigrants arrive in the U.S., they are healthier than most U.S. citizens and do not need or use as much healthcare as native-born Americans. And, if they eventually obtain health insurance, they actually subsidize U.S. citizens because they pay premiums but do not draw as much out of the system. While the data is limited, eliminating the barriers to coverage actually might be more beneficial to the healthcare system than preventing immigration.even those who will be able to gain coverage may not be able to do that within 30 days of entry because, under federal law, group health plans and those offering group health insurance coverage can have waiting periods of as long as 90 days which lead us to realize that this proclamation is ILLEGAL . all this info above is based on Documented studies for several Universities and organization, and finally when i applied for this lottery i had a dream , the american dream to be accurate, to live in a country that respect the human and his rights , a country believes in equality, a country encourage you to work hard so you can live a respectful life, i won this lottery after 4 years of applying, now after i won and read about this proclamation, i see is a big chance that my dream will be destroyed . PLEASE STOP THIS PROCLAMATION |
| **199** It is always a good idea for an immigrant to have health coverage. However, within 30 days of entry is such a short period of time. More importantly, the proclamation sounds like a condition that is being unfair. If we are going to force it 30 days is too short time, 90 days may be sufficient time for a new comer to get settled to follow to rule.<br>The concerns are raised with this request to have health coverage or a strong financial ability to pay for their own sickness. Why we need to do it?<br>What is the motivation? What about humanity to treat everyone equally.<br>In a realty, we all know the ideal world is for everyone to have health coverage. It showed with the cruel penalty, it does make the health care and health care cost creeped closed to stability. When we have more uninsured citizens, the risk is not well spread out. Having said forcing and conditioning immigrants to have coverage within short period of time does make thing being unfair. |
| **200** Actually i feel ashamed to see this discrimination in the presidential proclamation which is totally against the US constitution |

|     | A | B |
| --- | --- | --- |
| 201 | Molly Coe | |
| 202 | Sheri Campbell | Multnomah County, Oregon |
| 203 | Jason Miller | |
| 204 | Margo Rowder | |

| C |
|---|
| I submit this comment to oppose vehemently this process for commenting as well as the underlying change. This 48-hour comment period (in actual fact fewer than 48 hours)and the entire underlying proclamationwas not prompted by an emergency. This is simply the latest brick in this administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.<br><br>I am an immigration lawyer at a non-profit organization. (This comment is submitted in my personal capacity and does not necessarily reflect the views of my organization.) I am attempting to obtain health insurance information for a client scheduled for an uncoming consular interview. Today, we had one health insurance company require that the client have a social security number to apply, and another required proof of lawful status in the United States. This change creates an impossible Catch-22 for intending immigrants -- no health insurance without an SSN or green card, but no SSN or green card without health insurance. The U.S.-based health insurance companies have not been provided sufficient information or time to respond to people who will now be contacting them from abroad to inquire about available plans.<br><br>This new requirement is in blatant violation of the Americans with Disabilities Act (ADA), in addition to its clear violations of the Adminstrative Procedures Act. Consular officers will consider as "reasonably foreseeable medical expenses" those which are "expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication," heightening barriers to entry for individuals with chronic illnesses or disabilities. Rendering the parents and family members of U.S. citizens and green card holders inadmissible to the United States by virtue of their health needs is clear discrimination on the basis of ability.<br><br>I reserve the right to provide further objections about the administration's predicate legal authority to make this change, but this comment window has deprived the public of the ability to make thorough analyses and provide complete responses. |
| 201 | Molly Coe |
| 202 | Please see attached comments. |
| 203 | I am against this undue burden. Why is there only a two day comment period? We must "welcome the stranger" especially those escaping violence. |
| 204 | This proclamation is pure political theater, and incredibly harmful.<br>This proclamation increases barriers to healthcare access. It could Increase healthcare cost. What's more, the information collection proposed is completely unnecessary for the proper function of the Department of State. This is yet another abuse of power by our current administration.<br><br>IMMIGRATION STATUS is a protected class, and this move is unconstitutional. |

| | A | B |
|---|---|---|
| 205 | Gayle Ghitelman | |
| 206 | Karim Belkahla | |
| 207 | nick Wallace | American Academy of Pediatrics (AAP) |

| C |
|---|

**205** The undersigned organizations write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment periodand the entire underlying proclamationis not an emergency. This is just the latest brick in your administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.

We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, we support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.

We specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, we strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.

The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts

**206** All my life i thought the united states of America is the land of chances by giving immigrant and foreigns the oppurtunities to participate at the state's economy and starts a new and a better life that they had before But now it seems all that turns to a big lie by making a such a difficult financial obstacles , if the foreigns had 10.000 $ for health assurance why would they would travel to the USA ? non i don't think so because 10.000 $ is a humble price to start a humble project in their countries, So please just say you don't need anymore immigrants don't make misleadings to us
thank you and all my respects

**207** On behalf of the American Academy of Pediatrics (AAP), a non-profit professional organization of 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists dedicated to the health, safety and well-being of infants, children, adolescents, and young adults, I write to oppose the collection of information in this notice as well as the underlying Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System.

This Proclamation would not improve immigrant families access to care. Instead, it would force immigrant families seeking a visa to lawfully enter the U.S. towards less comprehensive coverage options, higher costs, and fewer consumer protections. We fear that the policy changes outlined in the Proclamation, combined with the chilling effect of policies like public charge, will deter immigrant families from enrolling in insurance coverage and will lead to some children losing coverage altogether. In fact, according to the Migration Policy Institute, the Proclamation may render two-thirds of green card applicants ineligible.

We strongly oppose the Proclamation and call for its immediate rescission. Our specific comments are attached.

| | A | B |
|---|---|---|
| 208 | Michael Wilk | TMG Visa LLC |
| 209 | Jordan Cunnings | Innovation Law Lab |
| 210 | Emma Morgenstern | |

| | C |
|---|---|

I write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage.

I specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. I strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration.

The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. This isnt promoting health insurancethis is putting a barrier between individuals and the coverage for which they are eligible. In fact, forcing immigrants to avoid comprehensive insurance could increase uncompensated care costs for providers, when patients cant afford needed health care that is not covered by these plans.

**208**

**209** Please see attached comments.

**210** This information collection effort is an abuse of the consular processing system and our administrative government structure. To issue a proclamation on October 4, 2019 set to go into effect on November 3 is already a capricious and careless way to approach people who have been engaging in the consular process for years. To then open a comment period at around ~11:00am on October 30 and set it to close at 11:59pm on October 31 is a clear obstruction of a respected process to engage the voices of the people in government policies and procedures. This agency has provided less than 24 hours for individuals to submit comments on this proposal. In addition to disapproving the content of this proposal, I would also like to register my disappointment at this deficient public comment process.

Substantively, this proposal is yet another arbitrary and capricious "policy of exclusion in search of a justification" (Daniels, J.), a gross violation of the Administrative Procedures Act (APA) by an administration fixed on a racist immigration policy which aims to keep people of color and people without enormous financial means out of the United States. This change is arbitrary and capricious, as there is no rational justification provided for a rule that stands to cut migration to the U.S. by up to 65%. See https://www.vox.com/2019/10/9/20903541/trump-proclamation-legal-immigration-health-insurance (discussing the likely far-reaching outcomes of this change in policy).

This information collection effort and the underlying rule change are also clearly unconcerned with ensuring that hospitals and care providers get paid. While evidence of so-called "junk plans" (high-cost, low coverage temporary plans) is being accepted, full coverage free healthcare is not, meaning the main beneficiaries of this proclamation will be unscrupulous insurance agencies, not hard-working healthcare professionals.

Further, the proposal is in violation of the Americans with Disabilities Act (ADA), in addition to its clear violations of the APA. This document informs us that consular officers will consider as "reasonably foreseeable medical expenses. . .expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication," heightening barriers to entry for individuals with ongoing health challenges, in addition to those

|     | A | B |
| --- | --- | --- |
| 211 | Payam T | |
| 212 | William McColl | AIDS United |
| 213 | Saad mouleriche | |
| 214 | Chiqui Flowers | State of Oregon Department of Consumer and Business Services Health Insurance Marketplace |
| 215 | Anonymous | |
| 216 | Julie Ward | Consortium for Citizens with Disabilities |
| 217 | Elizabeth Oseguera | CPCA |
| 218 | Louis Gutierrez | Massachusetts Health Connector |
| 219 | Ahmed Aglan | |
| 220 | Lena O'Rourke | 400+ Organizations signed |
| 221 | Lara Estes | |

| C |
|---|

| 211 | The rule would be extremely discriminating against family reunification and those who would otherwise meet the minimum poverty guideline would still become inadmissible as they are required to meet a much higher standard compared to US residents and citizens and also those who are seeking non-immigrant visas. Keeping families apart would not improve the US health system as it does not solve the problem.

Additionally, the rule is extremely vague as to what could be acceptable insurance, or in absence of it, what type and amount of financial evidence would be acceptable to overcome the inadmissibility.

The rule also does not consider the fact that it is impossible for aliens to acquire health insurance when they have no social security number. Even if it were possible for an alien to acquire insurance, still this would be extremely unfair to require an alien to purchase insurance plan before their visa is adjudicated. This puts a great financial burden on the alien who is not certain of his/her visa or when the visa would be issued and they would not be able to predict a start date for their health care plan as it is required by the new rule.
Note that NVC advises all immigrants that they should not sell their assets or make any financial changes in their life before their visa adjudication is final, therefore the new rule completely contradicts that long-lasting advice to aliens as it requires them to make great financial changes in their life. The only advantage of this rule is quick money in insurance companies' pockets at the expense of aliens and their US citizen families who are defenseless and have no assurance of adjudication of their visa. |
| 212 | Please see attached comments. |
| 213 | I reject this law and it does not help me at all |
| 214 | Please see attached comments. |
| 215 | There is no need for this policy which punishes poor people. The current system with regards to health insurance is fine. If anything, the system should be more open to human beings who just want to live life like the rest of us. |
| 216 | Please see attached comments. |
| 217 | Please see attached comments. |
| 218 | Please see attached comments. |
| 219 | This is unfair and not logical as how to get insurance option as immigrant before arriving to US. What if I have got employed and my company is dealing with better insurance company and better covering plan |
| 220 | Please see attached comments. |
| 221 | This proclamation place an undue burden on those who wish to immigrate to this country as those wish to come to this country are not aware of the restructions, cost or requirement necessary to obtain health coverage. Nor does th proposal clearly define what actually defines healthcare coverage. It also does not clearly define if this will apply to those who are seeking asylum. This proclamation is poorly thought out and is deliberately vague and therefore should be denied. |

|  | A | B |
|---|---|---|
| 222 | Shara Svendsen | |
| 223 | Rushad Thomas | The Episcopal Church |
| 224 | Judith Hospedales | |
| 225 | Gabrielle Lessard | National Immigration Law Center |
| 226 | Elizabeth Cullen | The Jewish Federations of North America and the Network of Jewish Human Service Agencies |

| | C |
|---|---|
| 222 | 1. There is no "emergency" requiring either a mere 48-hour comment period of the entire underlying proclamation. This Administration has purposefully created pressure on the healthcare system by eliminating the individual mandate and allowing the market to be flooded with expensive yet substandard plans. The Administration's actions have led to an increase - for the first time in more than a decade - of the number of uninsured people in the United States.<br><br>2. The President's proclamation is not actually designed or intended to improve access to health care or making sure that hospitals are paid. Instead, the proclamation appears solely designed to serve as a constraint on legal immigration by imposing a wealth test that will disproportionely harm people of color. The message that the Administration is sending is that - contrary to the words on the Statute of Liberty - if you're not white and wealthy, you're not welcome. The President is just looking for another way that immigrants' applications for legal status be denied.<br><br>3. Instead of improving health case, the proclamation actually serves to undermine the nation's health. It restricts immigrants' ability to purchase comprehensive health insurance through the Affordable Care Act (ACA) marketplaces, even though Congress has already allowed for legal permanent residents and others lawfully |
| 223 | Please see attached comments. |
| 224 | I, Judith Hospedales of the J.Hospedales Law Firm write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment periodand the entire underlying proclamationis not an emergency. This is just the latest brick in your administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.<br><br>I support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, I support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.<br><br>I specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, I strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.<br><br>The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.<br><br>Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts |
| 225 | Please see attached comments. |
| 226 | Pleasee see attached comments. |

000201

|   | A | B |
|---|---|---|
| 227 | Whitney Wootton | |
| 228 | Eugene Tozzi | |
| 229 | Margaret Seiler | |

| C |
|---|

The entire immigration process is extremely costly in both time and money - from hiring an attorney to file a visa petition, to paying the exorbitant filing fees, to waiting for months for an interview, to traveling to attend the interview, to paying for a medical evaluation. Now, this Administration is asking individuals and families to carry an additional and incredibly heavy burden - health insurance.

This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.

The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces in which Congress already allows for subsidized plans for LPRs and others lawfully present. The proclamation forces individuals to buy costly and less comprehensive junk health coverage such as short-term plans that do not comply with the Affordable Care Acts consumer protections.

Further, this 48-hour comment periodand the entire underlying proclamationis not an emergency. The Administration has created its own pressure on the healthcare system as the number of people in the United States without health insurance increased last year for the first time in more than a decade due to elimination of the individual mandate and the market being flooded with expensive substandard plans.

You must rescind this proclamation before it goes into effect.

**227**

I think this proposal is a very bad idea. I have known many immigrant families that have made a fine contribution to our society but may have needed medicaid assistance during the first few months in the US. In our area restaurants, hotels and other service industries are experiencing an extreme lack of sufficient workers due to the low unemployment situation. The very workers that they need are likely to be immigrants who would need medicaid in their first months in the US. People are needed to wash dishes, prepare rooms, assist the elderly. This rule would make it ever more difficult to fill these low level jobs.

**228**

I am writing in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment periodand the entire underlying proclamationis not an emergency. This is just the latest brick in your administrations invisible wall that puts an extremist racial and political agenda ahead of the nations interests and the law of the land.

We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born. As part of this vision, we support access to comprehensive, affordable health careand efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.

We specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, we strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.

The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

**229** Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts

| | A | B |
|---|---|---|
| 230 | Anonymous | |
| 231 | Anomymous | |
| 232 | CO | Colorado groups |
| 233 | Charles Ralic-Moore | |

| | C |
|---|---|
| 230 | I believe the 48-hour comment period should be extended to allow additional comments to be submitted considering the end of the comment period falls on Halloween. More importantly, I oppose the implementation of the proposed October 4, 2019 proclamation to collect information on health insurance status from visa applicants at consular interviews. I also strongly oppose the proclamations mandate to require said applicants to buy health insurance.<br><br>As other comment submissions mentioned, this proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome in the U.S.<br><br>The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nations health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.<br><br>Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. This isnt promoting health insurancethis is putting a barrier between individuals and the coverage for which they are eligible. In fact, forcing immigrants to avoid comprehensive insurance could increase uncompensated care costs for providers, when patients cant afford needed health care that is not covered by these bare- bones plans. |
| 231 | this proclamation is not fair as it will hurt the new immigrants. How can they make health insurance although they outside USA. |
| 232 | Please see attached comments. |
| 233 | It is antithetical to the spirit and foresight of our founding fathers to require health insurance of immigrants as a condition to come to the United States. This country was founded on the principle that the people could govern one another free from tyranny. Every generation since the founding has had the fortune of seeing this country as an outpost for the repressed. To place arbitrary barriers to that now, when so many seek to flee terrible situations in their home countries, is to abandon out values. My grandfather came to the United States to free he and his family from the strictures of communism sprouting in Cuba. When he came here, he sought a better life for he and his family, including my mother. Today, he would be proud to have so many defendants thriving as United States citizens. But he never would have been admitted under this policy. Dont dash future families hopes before they have even had a chance. |

000205

| | A | B |
|---|---|---|
| 234 | Ahmed Ali | |
| 235 | othmane arif | |
| 236 | Mohamed Rabie | |
| 237 | Anonymous | |
| 238 | Manaf El Fatimi | |
| 239 | Anika Ades | |
| 240 | Anonymous | |

| | C |
|---|---|
| 234 | God bless usa<br>I wish i could to stop this action for puplic rechareg<br>I really miss my wife so much<br>And wish from american justice to denied this law<br>I love usa and i dont need puplic recharge<br>I just neef to be with my wife like husband and wife<br>I miss my family there my bestwishes for USA<br>We are one<br>Plz its so hard how i get the puplic recharge and dont have ssn<br>Regards<br>Ahmed<br> God bless usa<br>I wish i could to stop this action for puplic rechareg<br>I really miss my wife so much<br>And wish from american justice to denied this law<br>I love usa and i dont need puplic recharge<br>I just neef to be with my wife like husband and wife<br>I miss my family there my bestwishes for USA<br>We are one<br>Plz its so hard how i get the puplic recharge and dont have ssn<br>Regards<br>Ahmed |
| 235 | I hope he rejects this law because it will cause a lot of problems for America |
| 236 | Please cancel this low we put the United states in our heart to make a better future please help us |
| 237 | I refuse the policy of the health insurance for the new immegrant. |
| 238 | This law will be unfair to the immigrant, the immigrant who aspires to a good and stable life in America, America is a civilized and democratic country a human rights country, if you implement this decision would be a blow to all the dreams of immigrants who dream of a better life in your country In a better life |
| 239 | This is an illegal and inhumane extension of the judicially-blocked Public Charge rule announced earlier this year. Without carveouts for applicants seeking humanitarian immigration relief such as SIJS, asylum, or even temporary work visas, this creates an insurmountable barrier to seeking safety, meaningful income, and the opportunity to meaningfully contribute to the American economy. This would be a burdensome and difficult to administer rule, and would facially preference wealthier, whiter immigrants. We should not outsource our weak healthcare system by expecting all visitors to be able to afford our criminally expensive medical system. Instead, we should expect our government fulfill its statutory duties in processing qualified immigrants arriving at our borders, and ensure their safe and expedient arrival, regardless of their financial situation. |
| 240 | This rule is not an emergency. It is has nothing to do with improving access to health and nothing to do with what this nation stands for. I completely disagree with this proclamation.<br><br>The language is too broad and gives too much power to the consular officer to interpret the instructions in many different ways. It is not clear what constitutes a satisfactory answer. Since the officer can ask anything they deem relevant about the health plan, is there a limit to the scope? How will this other information play into their decision-making?<br><br>Would Medicaid or state programs qualify as sufficient health insurance coverage? Is there a mechanism in place for immigrants to get linked prior to entering the country?<br><br>This rule would continue to inspire fear in the immigrant communities already in the US. It would make current immigrants afraid of accessing health care that they do qualify for. This would lead to more emergency room visits, since immigrants would be less likely to access preventative care. This would only increase the financial burden on the health care system. |

000207

| | A | B |
|---|---|---|
| 241 | Anonymous | |
| 242 | Ahmed Aboheiba | |
| 243 | ridha Rezag | |
| 244 | YOUNES BENANI | |
| 245 | Otmane Lazrak | |
| 246 | Debra Ness | National Partnership for Women & Families |
| 247 | Fadwa El-ouady | |
| 248 | Souhail Abrouk | |
| 249 | Brad Porterfield | |
| 250 | Reza Abode | |
| 251 | Anonymous | |
| 252 | Danan Bouchaib | |

| | C |
|---|---|
| 241 | The proposed health care requirement for new immigrants is unAmerican and just one more immoral attempt to keep people out without having to take the time to review and assess their request to become citizens. Show some real leadership and patriotism, and stop this now. |
| 242 | Please stop this proclamation when I applied for this lottery I had a dream,the American dream to be accurate, to live in a country that respect the human and his right,a country believe in equality a country encourage you to work hard so you can live a respectful life. |
| 243 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.

Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 244 | It is regrettable that such a decision is issued and I do not agree with this resolution. We respect the law of the United States of America and its sponsorship of human rights. We do not want to be a burden on anyone.But such a decision would cripple the ability of foreign nationals to emigrate. Of course, health insurance is a duty for every immigrant. And decent living our duty to respect the laws and the performance of taxes as well as health insurance only ask to reconsider this decision and reverse it. |
| 245 | I am not at all satisfied with this decision Please do not agree to this decision, which will cause us obstacles in reaching America |
| 246 | Please see attached comments. |
| 247 | This new proposed health proclamation will harm all candidates. Please don't apply it |
| 248 | Hello, I hope you are doing well today. I'm here to give my opinion about health proclamation so I think that it will harm all candidates and it is a wrong move from a developed country such USA, I just hope to review this decision, I'm not a USA citizen but I'd like to comment because I have family and friends there. Thank you. |
| 249 | I would like to share that I believe that only giving two days for public comment on this matter is insufficient. I also think the description of the matter is unclear without enough detail regarding which classes of immigrants this would apply to. It also does not provide enough information about the type of health insurance that will be considered sufficient. We should not burden immigrants unnecessarily by requiring expensive coverage that would cause a hardship. It is also imperative that no one or few providers of the insurance benefit via referrals vs providing a fairly comprehensive list of options. |
| 250 | We categorically reject this decision, and I hope the federal government cancels this decision because it is unfair for immigrants to insure for 12 months. |
| 251 | Hello, We have registered in the US random lottery because we reject this decision as health insurance is a material harm to immigrants. |
| 252 | I am not satisfied with this decision because it will harm us so much and destroy our future aspirations. |

000209

|     | A | B |
| --- | --- | --- |
| 253 | David Anderson | |
| 254 | Ester Mikhail | |
| 255 | Noureddine Chaib | |
| 256 | Samir Samura | |
| 257 | Anonymous | |
| 258 | Souki Aomar | |

| C |
|---|

| | |
|---|---|
| | I would like to comment on this rule to require certain classes of immigrants to show insurance coverage.<br><br>First, this is not an emergency. Two days of notice and comment is a farce.<br><br>Secondly, health insurance is an extraordinarily complex field. Consular agents are unlikely to have the familiarity with the wide array of products that could provide catastrophic financial protection for both the applicant and the public purse. Many types of insurance are capable of providing this protection that may be excluded by street level bureaucrats. More training and a standardized reference list would be required.<br><br>Thirdly, there is a pragmatic problem. The allowable forms of insurance under the public proclamation may not cover pre-exisiting conditions or be immediately available. This is a bald face attempt to screen lawfully viable potential immigrants and visa applicants by income. Recent litigation about the public charge actions have shown that the courts are extraordinarily suspicious of the claimed expansion of authority and interpretation. |
| 253 | |
| 254 | Actually i feel ashamed to see this discrimination in the presidential proclamation which is totally against the US constitution |
| 255 | I find this new rules are hurting Citizens who waiting to reunion with their relatives by preventing them to enter USA even they have followed the legal process and here is some negative effect:<br>- its putting more stress to both sides applicants and petitioners<br>- its delaying the reunion with the loved ones<br>- its overburdening the both side with more spending while they need to save that money to building the new life<br>- its compels them to disclose their personal accounts<br>- its a legal challenge to cover a non-resident with local health cares<br>- it will put more work for consulates officers to process the applications<br>For these reasons and many more I request to withhold this new rules |
| 256 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.<br><br>Our nations Healthcare deserves better.<br>So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 257 | The United States of America is - except for the American Indians and Alaska Natives - a nation of immigrants. Most of us are colonizers here - some more recently than others. This proclamation is simply another racist act by the Trump Administration to discriminate against some of us.<br><br>This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here. |
| 258 | I reject this decision about health insurance altogether because it is aimed at legal immigrants. |

| | A | B |
|---|---|---|
| 259 | lauren Kennedy | |
| 260 | Anonymous | |
| 261 | Housaam Zaki | |
| 262 | Adel Sadi | |
| 263 | Anonymous | |
| 264 | Zizo Ziz | |
| 265 | Anonymous | |

| | C |
|---|---|
| | Immigrants are typically healthier than Americans. https://www.ncbi.nlm.nih.gov/pubmed/15191127

In contrast, the new insurance test does not even assert a national security or foreign policy rationale. Instead, it rests entirely on a concern for minimizing health care costs. That concern is legitimate as a policy matter, but the administration should have addressed it as Homeland Security did in dealing with the INAs public charge provision. While an interagency process led to the administrations new public charge rule, the insurance test did not emerge from that interagency process and indeed would short-circuit many of the new public charge rules criteria. In effect, the insurance test reduces those elaborate criteria to a single question: Does the immigrant have health insurance?

Allowing the administration to issue a proclamation to undermine its own final rule would make a mockery of both the APA and Congress carefully constructed immigration framework. Upholding the insurance test would set the stage for unbridled executive efforts to overhaul the INAs framework in areas far removed from national security and foreign relations. Under the general/specific canon, courts should reject the inference that Congress intended a general provision like 1182(f) to decimate more specific statutory measures.

In other, more accurate, more specific words, your racism is showing. The public is documenting all of your disgusting steps to strengthen white supremacy and you will be remembered for your ugliness and weakness.

The New Colossus", Emma Lazarus

Keep, ancient lands, your storied pomp! cries she
With silent lips. Give me your tired, your poor,
Your huddled masses yearning to breathe free,
The wretched refuse of your teeming shore. |
| 259 | Send these, the homeless, tempest-tost to me, |
| 260 | Hello. I ask you to prevent the health insurance decision because this decision is unfair and we do not accept it and reject it completely. I ask the federal government to intervene to prevent the implementation of this decision. Thank you. |
| | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions.

Our nations Healthcare deserves better.So please before the proclamation goes into effect. We call on you to rescind this proclamation. |
| 261 | |
| 262 | I think the decision of applying the health insurance before the immigration is quite difficult for us, i think it is hard to afford regrading to the Moroccan salary, and that's enough reason to stop the immigration documents process, i hope your honored decision to cancel this |
| | This act is illogical and does not contain enough information about it
How to use it
also It should not apply to immigrants 2020 because they did not have information about this when applying for immigration, and how to apply for health insurance for new immigrants in the United States while abroad and it has not been approved because my health insurance requires a social security number that is not available to new immigrants. |
| 263 | This is racist |
| | This law is very racist because touch only poor people that can not able to pay the high amount of health |
| 264 | insurance |
| 265 | We reject the decision once and for all.8 |

000213

| | A | B |
|---|---|---|
| 266 | aziz sizou | |
| 267 | Fatiha Azoukni | |
| 268 | Anonymous | |
| 269 | Abdellah Ebenyouness | |
| 270 | | |
| 271 | | |
| 272 | | |
| 273 | | |
| 274 | | |
| 275 | | |
| 276 | | |
| 277 | | |
| 278 | | |

| | C |
|---|---|
| 266 | This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. |
| 267 | I think This new proposed Health proclamation is neither practical ,nor fair as it is targeting a specific group of people , New Immigrants, who are aspiring to come to the united states to start a new life and hope for a build a better future for themselves and thier families .The proclamation actually threatens to undermine the nations health. It restricts immigrants ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. The united States has always been a beacon for democracy promotion of fairness and equality . this new propsed law goes against those very principals and values that we take pride in as Americans .The proclamation allows short-term plans, which do not comply with the Affordable Care Acts consumer protections, to qualify as acceptable coverage. Frequently referred to as junk plans, short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. |
| 268 | This act is racist and not fair or even logic! How come you ask new legal immigrants to buy health insurance while they are still out of USA and dont even know how to apply for the same without a social security number!? And why this discrimination to the new immigrants while you allow many Amirican citizens to remain out of the health insurance umbrella ! |
| 269 | Hello Sir, this decision is frankly we reject, that many people do not have enough dirty money for health insurance, but after reaching America there at work can get insurance from his employer, I hope you can eliminate this condition miracle, We always want and aspire to improve the social situation and build America's economy by the work and the random immigration that helps, please reject this decision on health insurance. |
| 270 | |
| 271 | |
| 272 | |
| 273 | |
| 274 | |
| 275 | |
| 276 | |
| 277 | |
| 278 | |

|   | A | B |
|---|---|---|
| 2 | Karen Sullican | Catholic Legal information Network |
| 3 | Erin markel | erin markel |
| 4 | Melissa Kepler | melissa kepler |
| 5 | Megan Uzzell | Democracy Forward |
| 6 | Leighton Ku | George Washington University |

| | C |
|---|---|
| 2 | Good morning,<br>Your emergency review 2-day comment period on the Immigrant Health Insurance information collection has started, but the "comment now" button on regulations.gov is not active. The Notice indicates that you intended applicants to be able to submit comments through regulations.gov. Please activate the button as soon as possible so that the public is not dissuaded from commenting.<br>Regards,<br>Karen Sullivan<br>Karen Sullivan<br>Advocacy Attorney, Federal Advocacy and Liaison<br>Catholic Legal Immigration Network, Inc. (CLINIC)<br>8757 Georgia Avenue, Suite 850<br>Silver Spring, MD 20910 |
| 3 | I am strongly against this proposed policy. The United States claims to be a bastion of liberty and equality but it's becoming more and more clear that that's only for the rich. We have a responsibility in the world, particularly to the people whose countries our past sins have destabilized, to help others.<br>This rule will basically make it impossible for low income, unemployed,  disabled, and chronically ill people to immigrate here, at least, through the established system. I am fully opposed. |
| 4 | Melissa Kepler <meldemy@gmail.com> This restriction will basically make it impossible for low income, unemployed,  disabled, and chronically ill people to immigrate here (at least, through the |
| 5 | Meg Uzzell <muzzell@democracyforward.org> Per the Federal Register notice, I am writing to request the Immigrant Health Insurance Coverage's proposed collection instrument and reporting documents (Docket  DOS-2019-0039).<br>I can receive the materials at this email address.<br>If additional information is necessary please contact me via this email or at 202-701-1784.<br>Thank you, |
| 6 | Attachment comments\Leighton Ku comment letter on information collection DS 5541.pdf |

|  | A | B |
|---|---|---|
| 7 | Guadalupe Fernandez | |
| 8 | Kathleen Campbell Walker | |
| 9 | Gabrielle Lessard | National Immigration Law Center |
| 10 | Ali Merzouk | |
| 11 | Fahd Rty | |
| 12 | Renee Butkus | American College of Physicians |

| C |
|---|
| Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget<br>Department of State's Bureau of Consular Affairs, Office of Visa Services<br>Docket Number: DOS-2019-0039<br><br>Re: Emergency Submission Comment on Immigrant Health Insurance Coverage<br><br>October 31, 2019<br><br>To whom it may concern:<br>I submit a comment via email as the WEB process is not available--the regulations.gov page to the document states that comment period is closed, though it also states that all public comments to OBM must be received by 10/31/19.<br>I write as a concerned American tax-paying citizen and as an individual who helps victims of domestic and sexual violence access care and services.<br><br>I do not agree with the accuracy of the proposed estimate of the time and cost burden of this proposed collection. I disagree with the validity of the methodology and assumptions used. With that, I have concerns on the quality, utility, and clarity of the information to be collected.<br>The abstract of the proposed collection cites PP9945 that "immigrant visa applicants to establish, to the satisfaction of a consular officer, that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs."<br>7   In order for quality, unity and clarity, and even the to evaluate whether the proposed information |
| 8   Dear Ms. Herndon - Based on the referenced notice for emergency review, would you please send me the DS-5541 proposed form as soon as possible. Thank you.  Kind regards, Kathleen<br><br>Kathleen Campbell Walker Practice Group Chair - Immigration<br>Board Certified In Immigration And Nationality Law<br>By The Texas Board Of Legal Specialization |
| 9   Please send me a copy of the Form DS-5540. My organization intends to submit comments.<br>Gabrielle Lessard \| Senior Policy Attorney<br>(pronouns: she, her, hers)<br>National Immigration Law Center<br>(213) 639-3900 x 1023<br>www.nilc.org |
| 10   I strongly refuse the new rule because it effects us as citizens of United States who have families abroad and we need to exempt who is filing CR1 and IR1 visas  thank you Sent from my iPhone |
| 11   You are killing the dreams of peoples to travel to America and live in them .. Very difficult decisions for immigrants regarding health insurance and financial security .. If so, why open the door of |
| 12   Attachment comments\ACP emergency comment.pdf |

000219

|    | A | B |
|----|---|---|
| 13 | Cheryl Fish-Parcham | |

| C |
|---|

October 31, 2019

Comment regarding Public Notice 10934
Form Number: DS-5541
Emergency Submission Comment on Information Collection Title: Immigrant Health Insurance
Coverage
By email to PRA_BurdenComments@state.gov

I write to comment on the request for emergency review and public comment on the paperwork burden of the "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System."  As I understand it, the notice opened a two-day public comment period only on the information collection, its time and cost burden to the agency and the reporting burden on respondents – you have not sought public comments on the proclamation itself. I therefore offer the following comments:

1      I believe the proclamation to be illegal, and you have not estimated the burden of litigation. Courts have already issued nationwide preliminary injunctions against the public charge rule because it would discriminate against low-income immigrant families and discourage them from getting assistance to which they are lawfully entitled, and had no support in the history of U.S. immigration law. The proclamation has all of these same flaws. For example, lawfully present immigrants are entitled to subsidized coverage under the Affordable Care Act. This proclamation would deny entry to someone with "foreseeable health expenses" who does not have an employer offering coverage and who intends to enroll in individual coverage with premium tax credits upon entry. In addition to litigation to block the proclamation, the Department should anticipate litigation concerning individual cases if this goes into effect. The proclamation gives consular officials unbounded authority to determine "foreseeable medical expenses" and an applicants' 13 ability to pay those expenses. We anticipate litigation about whether officials have acted properly

000221

|    | A | B |
|----|---|---|
| 14 | Jill Hanken | Virginia Poverty Law Center |
| 15 | Kevin Schmidt | Cause of Action Institute/ Americans for Prosperity |

| C | |
|---|---|
| | The Virginia Poverty Law Center represents the interests of low income Virginians, including immigrants who reside in the Commonwealth.  We are responding to the Emergency Submission Comment on Immigrant Health Insurance Coverage which improperly limits comment on this extremely important issue to a short 48-hour comment period.  We object to this process and to the substance of the proposal.<br><br>We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born.  As part of this vision, we support access to comprehensive, affordable health care—and efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients.<br><br>The proposal requires the collection of information on health insurance status for immigrants legally entering the U.S.  We strongly oppose this, as well as the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. That proclamation is not about improving access to health care.  It is simply another constraint on legal immigration, which will disproportionately hurt lower income immigrants.  Along with other anti-immigrant policies sought/implemented by the Administration, this proposal sends one message: If you're not white and wealthy, you're not welcome here.<br><br>The proclamation actually threatens to undermine the nation's health. It restricts immigrants' ability to legally purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces.  It also undermines duly-enacted health programs in Virginia which are available to legally-residing immigrants, including children and pregnant women.  The proclamation puts the nation's health at risk by limiting access to these affordable, comprehensive health options and instead requiring individuals to buy costly and limited health coverage. |
| 14 | |
| 15 | Attachment comments\AFP 2019.10.31 AFP Reg Comment re Immigrant Health Insurance Coverage.pdf |

000223

|   | A | B |
|---|---|---|
| 16 | Maria Windham | |
| 17 | Ben D'Avanzo | Asian & Pacific Islander American health Forum |
| 18 | Governor of MN Tim Walz (submitted by Cassandra Moore) | Governor of MN (State of Minesota) |

| C | |
|---|---|
| | who is scheduled for an immigrant interview at a U.S. Consulate in November 2019.  The interview will be held during the proposed 180-day period of the proposed Information Collection regarding "Immigrant Health Insurance Coverage".  Therefore, my clients are directly affected by the information collection identified in the above-referenced notice.  The request for approval of information collection by the Department of State should not be granted by the OMB for the following reasons, organized according to the points of evaluation described in 84 Federal Register 58199 (Oct. 30, 2019):<br><br>1.  Evaluation Whether the Proposed Information Collection Is Necessary for the Proper Functions of the Department.<br><br>•Comment 1.A:  The Proposed Information Collection is not necessary for the proper functions of the Department of State for all of the legal and factual reasons described in the Complaint filed in the lawsuit Doe v. Trump, 3:19-cv-01743-SB (D. Oregon. Oct. 30, 2019),  which asks a federal court to enjoin implementation of Presidential Proclamation PP9945, on which the proposed collection of information is based, because PP9945 is unlawful and unlawfully imposes new and unrealistic requirements to prove purchase of limited types of health insurance in conflict with existing U.S. law.   A copy of the referenced Complaint is attached to this comment.<br><br>•Comment 1.B:  Even assuming PP9945 was lawful, the Proposed Information Collection is not necessary because it unreasonably requires the immigrant visa applicant to give a "yes" or "no" answer to the question "whether they will be covered by health insurance in the United States within 30 days of entry to the United States," despite the fact that in many cases paperwork processing required to obtain insurance will make obtaining insurance within the strict 30-day period uncertain.  My clients have made and continue to make efforts to obtain and pay for eligible health insurance for the immigrant visa applicant.  However, most insurance companies that offer reasonable health insurance for a reasonable cost have been unwilling or unable to process an application until the immigrant visa applicant spouse is granted a social security |
| 16 | number and resides in the United States.  See also the barriers to obtaining qualified insurance within 30 |
| 17 | Attachment comments\APIAHF Comments on Department of State on Health Care Proclamation OMB Emergency Review_2019.10.31.pdf |
| 18 | Please see attached comments. |

| | B |
|---|---|
| 1 | **<u>Organization</u>** |
| 2 | Unknown |
| 3 | Colorado Division of Insurance |

| | C |
|---|---|
| 1 | **<u>Comment</u>** |
| 2 | Wants a copy of the 5541 |
| 3 | Wants to Submit commnet even though comment period ended |

000227

| | B |
|---|---|
| 1 | **Organization** |
| 2 | Colorado State government |
| 3 | Unknown |
| 4 | Colorado- Division of Insurance |

| C |
|---|
| **Comment** |

| | |
|---|---|
| 1 | **Comment** |
| 2 | I am writing to find out if there is a way to submit a comment on the Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage (document number: 2019-23639).<br><br>We were not able to post it through regulations.com portal last night prior to the midnight deadline, but are still seeking to have the comments of the Colorado Commission of Insurance reviewed and considered.<br><br>Thank you in advance for your time and assistance. |
| 3 | THE IMMIGRANT SHOUDL HAVE THIS INSURANCE WHEN HE ENTERS THE USA. HE SHOUDL NOT HAVE 30 DAYS TO GET INSURANCE BECUASE THEY WILL COME INTO THE USA AND NEVER GET IT AND THEN THE TAXPAYERS WILL BE BANKRUPTED PAYING FOR GUYS TO GO OUT AND MAKE SURE THEY HAVE INSURANCE. THE INSURANCE SHOULD BE PRESENTED WHEN THEY APPLY TO COME HERE. NOT 30 DAYS LATER TO GIVE THEM TIME TO LIE TO US. CLEARLY THESE PEOPLE HAVE BEEN LYING COMPLETELY AND TOTALY ABOUT EVERYGING AND EVERYTHIGN THEY SAY IS A LIE. SO WE CANNOT COUNTENANCE GIVING THEM<br>30 DAYS TO SECURE INSURANCE. THEY NEVER WILL SECURE IT. THIS IS A STUPID DIRECTIVE. MAKE THEM HAVE THE INSURNCE WHEN THEY APPLY TO COME HERE FOR A VISA. AND MAKE THE VISA THAT THEY GET FOR 30 DAYS TURN COLOR FROM WHITE TO RED WHEN THE 30 DAYS ARE UP AND THEY HAVE TO GO HOME. WE ARE BEING SNOOKERED BY THESE LYING IMMIGRANTS. WE CANT TAKE IT ANYMORE.<br><br>CERTAINLY WE HAVE NO DEARTH OF THEM WHEN 450,000 COME HERE. AND THEN CAUSE US TROUBLE. WE NEED CHANGES IN THIS DIRECTIVE WHICH WAS NOT THOUGHT THROUGH PROPERLY TO PROTECT AMERICAN CITIZENS FROM TEH LYING AND CHEATING OF SO MANY OF THESE IMMIGRANTS. THEY LIE LIKE A RUG TO COME HERE. NONE OF THEM ARE TELLING THE TRUTH. AND THEN THEY COME HERE AND STAY HERE WHEN THEY TOLD US THEY WERE ONLY COMNING FOR A SHORT STAY. WE CANNOT TRUS THESE PEOPLE TO BE HONEST WITH US. REQUIRE THE INSURANCE WHEN THEY APPLY TO COME HERE. |
| 4 | Please see attached comments. |

000229

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

Re: Emergency Submission Comment on Immigrant Health Insurance Coverage

October 31, 2019

To whom it may concern:

The undersigned organizations write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. This 48-hour comment period—and the entire underlying proclamation—is not an emergency. This is just the latest brick in your administration's "invisible wall" that puts an extremist racial and political agenda ahead of the nation's interests and the law of the land.

We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born.  As part of this vision, we support access to comprehensive, affordable health care—and efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Unfortunately, due largely to the policies of this administration, the number of people in the United States without health insurance increased last year for the first time in more than a decade.

We specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, we strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color. Like the Muslim ban or the public charge regulation, it sends one message: if you're not white and wealthy, you're not welcome here.

The proclamation actually threatens to undermine the nation's health. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nation's health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Act's consumer protections, to qualify as "acceptable" coverage. Frequently referred to as "junk plans," short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. This isn't promoting health insurance—this is putting a barrier between individuals and the coverage for which they are eligible. In fact, forcing immigrants to avoid comprehensive insurance could increase uncompensated care costs for providers, when patients can't afford needed health care that is not covered by these bare- bones plans.

There is still time to protect the nation's health before the proclamation goes into effect. We call on you to rescind this proclamation before it goes into effect.

Sincerely,

Access Living
Action Together Walpole
ADAPT Montana
Advocates for Basic Legal Equality, Inc.
Advocates for Youth
African Communities Together
African Services Committee
AIDS Foundation of Chicago
Alabama Arise
Alameda Health Consortium
Alliance for African Assistance
American Federation of Teachers
API Chaya
APLA Health
AR Hunger Relief Alliance
Arab American Association of NY
Arizona Coalition to End Sexual and Domestic Violence
Asian & Pacific Islander American Health Forum
Asian American Federation (AAF)
Asian American Legal Defense and Education Fund (AALDEF)
Asian Americans Advancing Justice - LA
Asian Americans Advancing Justice | Chicago
Asian Americans Advancing Justice| AAJC
Asian Health Services
Asian Law Alliance
Asian Pacific American Labor Alliance, AFL-CIO
Asian Pacific Institute on Gender-Based Violence
Asian Pacific Policy and Planning Council
Asian Services In Action, Inc. (ASIA, Inc.)
Association for Community Living in Boulder & Broomfield Counties
Association of Asian Pacific Community Health Organizations (AAPCHO)
Association Of Moroccan Immigrant Network (A.M.I.N)
Association of Nurses in AIDS Care
Austin Region Justice for Our Neighbors
Autistic Self Advocacy Network
Bay Area Regional Health Inequities Initiative
Bellingham Deaf and Disability Justice Collective
Berkeley Journal of Employment and Labor Law
Berkshire Immigrant Center
BIDMC Immigration Advocacy Team
BiNet USA
Black Alliance for Just Immigration (BAJI)
Bread for the World
BronxCare Hospital/Mt. Sinai Hospital
Brooklyn Defender Services
Cabrini Immigrant Services of NYC
California Alliance for Retired Americans
California Association of Food Banks

California Food Policy Advocates
California Immigrant Policy Center
California Pan-Ethnic Health Network
California Partnership to End Domestic Violence
California Primary Care Association
California Reinvestment Coalition
California Teachers Association
Californians Together
Campaign for New York Health
Cape Cod Coalition for Safe Communities
Caritas of Waco
Catholic Charities
Catholic Charities Diocese of Monterey
Catholic Charities Hawaii
Center Against Sexual & Domestic Abuse, Inc.
Center for Health Policy and Law at Northeastern University School of Law
Center for Health Progress
Center for Independence of the Disabled, NY
Center for Law and Social Policy (CLASP)
Center for Public Policy Priorities
Center for Reproductive Rights
Center for the Study of Social Policy
CenterLink: The Community of LGBT Centers
Central American Resource Center of California (CARECEN LA)
Centro Latino Americano
Changing The Future Outcome
Charlotte Center for Legal Advocacy
Chhaya Community Development Organization
Chicago Alliance Against Sexual Exploitation
Child Care Law Center
Children First for Oregon
Children's Defense Fund - Texas
Children's Defense Fund-New York
Children's HealthWatch
Chinese American Planning Council
Chinese for Affirmative Action
Chinese-American Planning Council
Christian Reformed Church Office of Social Justice
Church World Service
Citizen Action of Wisconsin
City of Tucson, Arizona
Clinicians for Progressive Care
Coalition Ending Gender-Based Violence
Coalition for Asian American Children and Families
Coalition for Disability Health Equity
Colorado Cross-Disability Coalition
Colorado Developmental Disabilities Council
Colorado Fiscal Institute
Colorado Foundation for Universal Health Care
Columbia Legal Services

Community Action Board of Santa Cruz County, Inc.
Community Action Marin
Community Action Partnership of SLO County
Community Catalyst
Community Clinic Association of Los Angeles County
Community Clinic Consortium of Contra Costa and Solano
Community Growth Center
Community Health Care Association of New York State (CHCANYS)
Community Healthcare Network
Community Legal Aid Society Inc.
Community Resource Center
Compass Family Services
Connecticut Institute for Refugees and Immigrants
Connecticut Oral Health Initiative, Inc.
Council for Global Equality
Council on American-Islamic Relations, San Diego Office
CRLA Foundation
CT Shoreline Indivisible
Daya inc
Dayle McIntosh Center
DC-MD Justice For Our Neighbors
Detroit Disability Power
Disability Community Resource Center, Inc.
Disability Rights Education & Defense Fund
Disability Rights Pennsylvania
Disciples Refugee & Immigration Ministries
Doctors for America
DQIA: disabled queers in ACTION!
Education and Leadership Foundation
El Centro, Inc.
Emerald Isle Immigration Center
Empire Justice Center
Empower Missouri
Empowering Pacific Islander Communities (EPIC)
End Domestic Abuse Wisconsin: The Wisconsin Coalition Against Domestic Violence
Entre Hermanos
Equality California
Equality North Carolina
EverThrive Illinois
Fair Immigration Reform Movement (FIRM)
Faith Action Network
Families Belong Together
Families USA
Family Advocates, Inc.
Family Equality
Family Voices of Tennessee
Feeding Texas
First 5 Marin Children and Families Commission
First Focus Campaign for Children
First Parish Immigration Justice Task Force

Florida Health Justice Project
Florida Impact to End Hunger
Florida Policy Institute
Food for People, the Food Bank for Humboldt County
Food Research & Action Center
Freedom Network USA
Gay Men's Health Crisis (GMHC)
Georgia ADAPT
Georgians for a Healthy Future
GirlForward
Greater Philadelphia Coalition Against Hunger
Guadalupe Centers High School
Gulfcoast Legal Services, Inc.
Guttmacher Institute
Hand in Hand: The Domestic Employers Network
Health & Medicine Policy Research Group
Health Care For All
Health Care for All New York
Health Care for America Now (HCAN)
Health Law Advocates
Healthy House Within A MATCH Coalition
Heartland Alliance
Heights Friends of Immigrants
HIAS Pennsylvania
Hispanic Federation
Hispanic Health Council
Homeless and Housing Coalition of Kentucky
Housing Action Illinois
Houston Immigration Legal Services Collaborative
Hunger Free Vermont
Idaho Voices for Children
Illinois Coalition Against Domestic Violence
Illinois Coalition for Immigrant and Refugee Rights
Immigrant and Refugee Community Organization
Immigrant Connection
Immigrant Law Center of Minnesota
Immigrant Legal Advocacy Project
Immigrant Legal Resource Center
Immigrant Rights Action
Immigrants Contribute
Immigration Justice Task Force - First Parish in Concord
In Our Own Voice: National Black Women's Reproductive Justice Agenda
Indiana Coalition for Human Services
Indivisible Eastside -WA
Interfaith Anti Bias Task Force
International Community Health Services
InterReligious Task Force on Central America and Colombia (IRTF Cleveland)
Iowa Coalition Against Domestic Violence (ICADV)
Irish International Immigrant Center
Japanese American Social Services, Inc.

000234

Jefferson County Immigrant Rights Advocates
Jewish Family & Children's Service
Jewish Family Service of Los Angeles
Jewish Vocational Service, Boston
Jubilee Immigration Advocates
Just Harvest
Justice Center of Southeast MA
Justice for Our Neighbors Michigan
Justice in Aging
Kentucky Equal Justice Center
Kentucky Voices for Health
KIAC Kitsap Immigrant Assistance Center Bremerton, WA
Kids for College
Korean American Family Services (KFAM)
Korean Community Center of the East Bay
Korean Community Services of Metropolitan NY Inc.
La Casa Norte
La Clinica de La Raza
La Union del Pueblo Entero
Lana'i Community Health Center
Latino Coalition for a Healthy California
Law Foundation of Silicon Valley
LeadingAge
Legal Aid Society of San Mateo County
Legal Council for Health Justice
Lenox Hill Neighborhood House
Linda Vista United Methodist Church
Literacy Volunteers Winchester Area
Long Island Activists
Long Island Inclusive Communities Against Hate
Long Island Language Advocates Coalition
Los Angeles Christian Health Centers
Lutheran Social Services of New York
Make the Road New York
Maryland Citizens' Health Initiative Education Fund Inc.
Maryland Hunger Solutions
Massachusetts Immigrant and Refugee Advocacy Coalition
Massachusetts Law Reform Institute
Maternal and Child Health Access
Maxwell Street Legal Clinic
McLennan County Hunger Coalition
Metro New York Health Care for All
MI Disability Rights Coalition
Mi Familia Vota
Michigan Coalition to End Domestic & Sexual Violence
Michigan Immigrant Rights Center
Michigan League for Public Policy
Migrant and Immigrant Community Action Project
MinKwon Center for Community Action
Minnesota Budget Project

000235

Mississippi Center for Justice
Missouri Kansas AILA Chapter Member
MLPBprimary
Modern Military Association of America
MomsRising
Montana Primary Care Association
Muslim Public Affairs Council (MPAC)
NASTAD
National Asian Pacific American Women's Forum
National Asian Pacific Center on Aging (NAPCA)
National Association for the Education of Young Children (NAEYC)
National Association of Pediatric Nurse Practitioners
National Association of Social Workers
National Center for Law and Economic Justice
National Center for Transgender Equality
National Coalition Against Domestic Violence
National Coalition for the Homeless
National Consumer Law Center
National Council of Jewish Women
National Employment Law Project
National Hispanic Council on Aging
National Immigrant Justice Center
National Immigration Law Center
National Justice for Our Neighbors
National Latina Institute for Reproductive Health
National LGBTQ Task Force
National Low Income Housing Coalition
National Partnership for Women & Families
National WIC Association
National Women's Law Center
NC Child
Nebraska Appleseed
Nebraska Coalition to End Sexual and Domestic Violence
NETWORK Lobby for Catholic Social Justice
New Mexico Center on Law and Poverty
New York Immigration Coalition
New York Justice for Our Neighbors
New York Legal Assistance Group
NM Voices for Children
North Carolina Justice Center
North County Immigrant Task Force
North East Medi-Cal Services (NEMS)
North Suburban Legal Aid Clinic
Northwest Harvest
Northwest Health Health and Human Rights
Northwest Health Law Advocates
NYC Coalition to Dismantle Racism in the Health System
NYCD16 Indivisible
Oasis Legal Services
Ohio Domestic Violence Network

Oklahoma Policy Institute
OneAmerica
Opening Doors International Services, Inc.
Operation Access
Oregon Food Bank
Pacific Asian Counseling Services
Pan Asian Volunteer Health Clinic
Parent Possible
Partnership for America's Children
Pax Christi Illinois
Pennsylvania Immigration and Citizenship Coalition
PFLAG National
Physicians for a National Health Program - NY Metro
Placer Independent Resource Services
Planned Parenthood Affiliates of California
Planned Parenthood Federation of America
Positive Women's Network-USA
Presentation Sisters at Caminando Juntos
Prevention Institute
Progressive Doctors
Project IRENE
Protect Our Care Illinois Coalition
Public Health Justice Collective
Public Justice Center
Rainbow House Domestic Abuse Services, Inc.
RefugeeOne
RESULTS
Robert F. Kennedy Human Rights
Rosie's Place
Safe Horizon Immigration Law Project
SAGE
San Diego Immigrant Rights Consortium
San Francisco Latino Democratic Club
Sauti Yetu Center for African Women and Families
Seattle/King County Coalition on Homelessness
SEIU
Services, Immigrant Rights & Education Network (SIREN)
Sexuality Information and Education Council of the United States (SIECUS)
Show Up Long Island
Shriver Center on Poverty Law
Silver State Equality-Nevada
Snohomish Immigration Advocacy
Social Justice Task Force, San Mateo County Democracy for America
Solano CountySupervisor District 2
South Asian Fund For Education, Scholarship and Training (SAFEST)
South Asian Network
South Bronx United
South Carolina Appleseed Legal Justice Center
Southeast Asia Resource Action Center (SEARAC)
Southern Poverty Law Center

Southwest Center for Independence
St. Paul Community Literacy Consortium
Statewide Poverty Action Network
Student National Medical Association (SNMA)
SYL Foundation
TakeAction Minnesota
Tennessee Justice Center
The Achievable Foundation
The Black Women's Health Imperative
The Children's Partnership
The Coelho Center for Disability Law, Policy and Innovation
The Fenway Institute
The Inland Empire Immigrant Youth Collective
The Leadership Conference on Civil and Human Rights
The Legal Aid Society
The Right to Immigration Institute
Tiburcio Vasquez Health Center, Inc.
Together We Will Long Island
Treatment Action Group (TAG)
Ujima Inc.: The National Center on Violence Against Women in the Black Community
UnidosUS
Union for Reform Judaism
Union of North American Vietnamese Student Associations
United African Organization
United Cambodian Community
Unity Health Care
Universal Health Care Action Network
Universal Health Care Foundation of Connecticut
University YMCA New American Welcome Center
UPLAN (United Parent Leaders Action Network)
Utahns Against Hunger
UURISE - Unitarian Universalist Refugee and Immigrant Services and Education
Valley Settlement
Vermont Affordable Housing Coalition
Vermont Legal Aid
Vermont Network Against Domestic and Sexual Violence
Violence Free Colorado
Violence Free Minnesota
Virginia Garcia Memorial Health Center
Wallingford Indivisible
Washington State Coalition Against Domestic Violence (WSCADV)
Wayne Action for Racial Equality
We Are One, Inc. - www.WeAreOne.cc - WAO
WeCount!
Welcome Project Inc
West Valley Neighborhoods Coalition
West Virginians for Affordable Health Care
West Virginians Together for Medicaid
Western Center on Law & Poverty
Whitman-Walker Health

Wisconsin Faith Voices for Justice
World Relief
WV FREE
YWCA Pierce County

000239

 Center for Public
Representation

October 31, 2019

Edward J. Ramotowski
Deputy Assistant Secretary
Department of State, Bureau of Consular Affairs
Office of Visa Services
600 19th Street, NW
Washington, DC 20036

Department of State Desk Officer
Office of Management and Budget
Office of Information and Regulatory Affairs
725 17th St NW
Washington, DC 20503

Re: Notice of Information Collection Under OMB Emergency Review: Immigrant Health
Insurance Coverage
DS Form No.: DS-5541
OMB Control No.: None

Dear Assistant Secretary Ramotowski,

The Center for Public Representation (CPR) writes to express our strong opposition the State
Department's request for emergency review and collection of information regarding its
implementation of the presidential proclamation issued October 4, 2019 mandating that visa
applicants abroad buy certain approved health insurance or have the financial means to cover
foreseeable medical expenses. CPR is a national legal advocacy organization that promotes the
full integration and community participation of people with disabilities. We are deeply
concerned by the discriminatory nature of the underlying proclamation the State Department
seeks to implement and believe it will prove to be enormously harmful to immigrants with
disabilities.

The proclamation -- which not only requires proof of coverage or the financial means to cover
expenses, but limits that coverage to plans that typically do not meet the needs of people with
disabilities -- will bar many people with disabilities from lawful entry into the United States.
Furthermore, emergency review to allow the State Department to implement the proclamation
upon its effective date of November 3, 2019 is inappropriate. Emergency review is limited and

"in every case, the agency must show that . . . [t]he collection of information is essential to the mission of the agency."[1] The implementation of a presidential proclamation that requires the State Department to track and monitor immigrants' health care coverage, an area in which the State Department has not previously been involved, is clearly not central to the mission of the agency. Beyond that, as described below, the underlying proclamation also conflicts with existing law, and it is not the job of the State Department to implement illegal policy.

The proclamation illegally restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces by denying them access to subsidized insurance offered through the marketplaces, which lawful permanent residents (including those with incomes at or below 100% of the federal poverty line who are not otherwise eligible for Medicaid) are entitled to,[2] ignoring the law's language, its intent, and Congressional will. The proclamation instead permits the purchase of more costly, less comprehensive coverage, including ACA-compliant catastrophic coverage and short term limited duration insurance (STLDIs)  and association health plans (AHPs) that are not required to comply with the essential health benefits (EHBs) that are mandatory for all ACA plans. AHPs and STLDIs thus do not have to provide the ACA's key protections for people with disabilities and in fact are allowed to refuse coverage on the basis of pre-existing conditions, meaning immigrants with disabilities would not be able to purchase those plans even if they wanted to do so. Denying access to more comprehensive coverage and instead promoting less comprehensive coverage is likely to increase uncompensated care, not decrease it, the very issue the proclamation claims to address.

The approved coverage under the proclamation also specifically bars Medicaid coverage for adults. Medicaid is generally the only provider of home and community based services for people with disabilities since they are not typically covered by private insurance. These services are critical to the independence and community integration of many people with disabilities, who rely on them to work, live in their own homes, and participate in their communities. Restricting people who do qualify from accessing Medicaid runs counter to Medicaid's express purpose of increasing access to health care and conflicts with exceptions to the five year ban on Medicaid coverage for lawful permanent residents explicitly provided for under the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) and the Children's Health Insurance Program Reauthorization Act (CHIPRA).[3]

---

[1] *Paperwork Reduction Act Guide* 11 (Office of Personnel Mgmt. 2011), https://www.opm.gov/about-us/open-government/digital-government-strategy/fitara/paperwork-reduction-act-guide.pdf (citing  5 C.F.R. § 1320.13(a)(1)).

[2] 26 U.S.C. § 36B(c)(1).

[3] Complaint at 37-39, *Doe v. Trump*, No. 3:19-cv-01743-SB (D. Or. Oct. 30, 2019).

000241

Immigrants with disabilities must have a fair opportunity to enter and reside legally in the United States, without unnecessary or discriminatory restrictions. The proclamation the State Department seeks to implement is another unwelcome throwback to the historical exclusion of people with disabilities. It will deny productive, valuable individuals entry to the United States based on stereotypes and fears about disability. In the interest of maintaining the integrity of our immigration system and respect for Congressional authority, we respectfully ask that the proclamation and policies related to its implementation be rescinded before it goes into effect.

Sincerely,

Alison Barkoff
Director of Advocacy
abarkoff@cpr-us.org

Erin Shea
Policy Associate
eshea@cpr-us.org

000242


**OPCA**
Oregon Primary
Care Association

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

Re: Emergency Submission Comment on Immigrant Health Insurance Coverage

October 31, 2019

To whom it may concern:

On behalf of the Oregon Primary Care Association (OPCA), we respectfully request that the proposed rule be immediately withdrawn. OPCA is a non-profit organization, with a mission to support Oregon's 32 community health centers, also known as federally qualified health centers, in leading the transformation of primary care to achieve health equity for all. Community health centers deliver integrated primary care, including dental and behavioral health services, to over **430,000 Oregonians annually**. Community health centers are providers within the CCO networks, providing care to some of Oregon's most vulnerable populations, including **one in four Oregon Health Plan (Medicaid) members**.

We support a nation where all are truly equal, immigration is recognized as a strength, and individuals have access to the essentials of life without regard to where they were born.  As part of this vision, we support access to comprehensive, affordable health care—and efforts to strengthen and protect community health centers and providers who work tirelessly to deliver high quality care to their patients.

We specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, we strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color.

The proclamation actually threatens to undermine the nation's health. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nation's health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Act's consumer protections, to qualify as "acceptable" coverage. Frequently referred to as "junk plans," short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. This isn't promoting health insurance—this is putting a barrier between individuals and the coverage for which they are eligible. In fact, forcing immigrants to avoid comprehensive insurance could increase uncompensated care costs for providers, when patients can't afford needed health care that is not covered by these bare- bones plans.

There is still time to protect the nation's health before the proclamation goes into effect. We call on you to rescind this proclamation before it goes into effect.

Sincerely,

*M. E. Carty*

Marty Carty
Policy Manager

000243

# American Academy of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN®

**AAP Headquarters**
345 Park Blvd
Itasca, IL 60143
Phone: 630/626-6000
Fax: 847/434-8000
E-mail: kidsdocs@aap.org
www.aap.org

**Reply to**
**AAP Washington Office**
601 13th St NW, Suite 400N
Washington, DC 20005
Phone: 202/347-8600
E-mail: kids1st@aap.org

**Executive Committee**

**President**
Kyle Yasuda, MD, FAAP

**President-Elect**
Sara H. Goza, MD, FAAP

**Immediate Past President**
Colleen A. Kraft, MD, FAAP

**Secretary/Treasurer**
Anthony D. Johnson, MD, FAAP

**CEO/Executive Vice President**
Mark Del Monte, JD

**Board of Directors**

**District I**
Wendy S. Davis, MD, FAAP
Burlington, VT

**District II**
Warren M. Seigel, MD, FAAP
Brooklyn, NY

**District III**
Margaret C. Fisher, MD, FAAP
Long Branch, NJ

**District IV**
Jane Meschan Foy, MD, FAAP
Winston-Salem, NC

**District V**
Richard H. Tuck, MD, FAAP
Zanesville, OH

**District VI**
Dennis M. Cooley, MD, FAAP
Topeka, KS

**District VII**
Anthony D. Johnson, MD, FAAP
Little Rock, AR

**District VIII**
Martha C. Middlemist, MD, FAAP
Centennial, CO

**District IX**
Yasuko Fukuda, MD, FAAP
San Francisco, CA

**District X**
Lisa A. Cosgrove, MD, FAAP
Merritt Island, FL

October 31, 2019

VIA ELECTRONIC SUBMISSION

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

**RE: Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage**

To whom this may concern:

On behalf of the American Academy of Pediatrics (AAP), a non-profit professional organization of 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists dedicated to the health, safety and well-being of infants, children, adolescents, and young adults, I write to oppose the collection of information in this notice as well as the underlying Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System.

The Proclamation would suspend entry of immigrants unless they can prove they will be covered by approved health insurance within 30 days of entry into the U.S. or that they have financial resources to pay for reasonably foreseeable medical costs. Under the proclamation, approved health insurance would include employer-sponsored and other private coverage, including unsubsidized coverage through the Affordable Care Act (ACA) Marketplaces, Short-Term Limited Duration Insurance plans, traveler plans, or catastrophic plans. Subsidized Marketplace coverage and Medicaid coverage for adults would not be considered approved coverage.

This Proclamation would not improve immigrant families' access to care. Instead, it would force immigrant families seeking a visa to lawfully enter the U.S. towards less comprehensive coverage options, higher costs, and fewer consumer protections. We fear that the policy changes outlined in the Proclamation, combined with the chilling effect of policies like public charge, will deter immigrant families from enrolling in insurance coverage and will lead to some children losing coverage altogether. In fact, according to the Migration Policy Institute, the Proclamation may render two-thirds of green card applicants ineligible.

We strongly oppose the Proclamation and call for its immediate rescission. Our specific comments are below.

000244

It is the official policy of the Academy that all children, adolescents, and young adults from birth to the age of 26 years who reside within our borders, regardless of income, family composition, or immigration status, should be covered by an affordable, quality health insurance plan that allows access to comprehensive essential care.[1] Health insurance for all children should offer a comprehensive, age-appropriate essential benefit package that includes the full range of essential pediatric services.[2] Moreover, the AAP insists that documented and undocumented immigrant children should have the same access to insurance coverage or to essential health care as children who are US citizens.[3]

Comprehensive, quality health insurance coverage allows children to receive essential pediatric services, including care provided through a medical home. When children see providers who know their medical history and can monitor their physical and socio-emotional development, they are more likely to have better overall health, be up-to-date on immunizations, perform better in school, and receive care in the most cost-effective way.[4] Moreover, child health is a strong predictor of adult health. Addressing health and development during childhood—from birth through adolescence—leads to improved life outcomes in many areas. Conversely, the inability to access health care services threatens the physical, mental, and social health and well-being of children and their caregivers.[5]

According to the Proclamation, approved health insurance coverage would include plans that do not meet the standards as outlined in AAP Policy, including Association Health Plans (AHP) and Short-Term Limited-Duration Insurance (STLDI) plans. As we noted in our prior comment letters opposing the expansion of AHPs[6] and STLDI plans,[7] families who purchase these plans could be subject to pre-existing condition exclusions, annual or lifetime limits, limited benefits with no guaranteed coverage of essential health benefits (EHBs) such as prescription drug coverage and pediatric and maternity benefits, rating restrictions based on health status, and no guaranteed renewability without medical underwriting. Consequently, children enrolled in these plans may not have access to a full range of in-network pediatric providers to ensure they receive all necessary pediatric care, given the lack of network adequacy requirements for these plans. Similarly, women enrolled in these plans may be left without prenatal and maternity coverage if they become pregnant.

Under current law, states have the option of expanding Medicaid coverage to lawfully residing immigrant pregnant women. This Proclamation does not include Medicaid coverage as acceptable coverage for immigrant adults, which would supersede state law in the 25 states that have taken up this option, and force pregnant women to find alternative coverage that is less comprehensive and does not meet their unique needs. As outlined above, ACA-noncompliant plans provide inadequate coverage for pregnant women and will have a direct negative impact on the health and well-being of pregnant women in the United States.

[1] Committee on Child Health Financing. Pediatrics Sep 2017, 140 (3) e20172098; DOI: 10.1542/peds.2017-2098 Available at https://pediatrics.aappublications.org/content/140/3/e20172098#sec-12

[2] This includes prenatal and newborn care; postnatal home visits; preventive and wellness services; urgent and emergency care; acute, inpatient, and chronic care services; developmentally appropriate habilitative and rehabilitative therapies and devices; dental services; behavioral and mental health services; transition to adult care services; reproductive health and pregnancy-related services; and treatment of substance abuse disorders. Insurance should also cover oral health and vision care services; home-based care, including private duty nursing and personal care services; palliative and hospice care services; durable medical equipment; interpreter services; specialty formulas; and prescription drugs in formulations appropriate for children.

[3] Council on Community Pediatrics. Providing care for immigrant, migrant, and border children. Pediatrics. 2013;**131**(6). Available at: www.pediatrics.org/cgi/content/full/131/6/e2028

[4] Murphey, David. "Health Insurance Coverage Improves Child Well-Being." Child Trends, May 2017. https://www.childtrends.org/wp-content/uploads/2017/05/2017-22HealthInsurance_finalupdate.pdf.

[5] AAP Blueprint for Children, 2016 https://www.aap.org/en-us/Documents/BluePrintForChildren.pdf

[6] https://downloads.aap.org/DOFA/SKGAHP.pdf

[7] https://downloads.aap.org/DOFA/SKGSTLDI.pdf

Additionally, as the health of mothers and children is interrelated and affected by multiple factors, inadequate coverage for pregnant women can lead to complications that ultimately negatively impact the long-term health of their newborn children.[8]

Furthermore, because the AHPs and STLDIs are not subject to the ACA's consumer protection requirements, children, pregnant women, and their families could have their coverage rescinded at any time. This would be detrimental for a family with a child who develops a health condition during the plan period and requires services that are not covered under the plan, or a woman who becomes pregnant and needs to access maternity care. Gaps in needed services can have long-term implications for a growing child's ability to reach his or her full potential to become a contributing member of society, especially if the child is experiencing developmental delays or has ongoing health problems.

While the Proclamation recognizes Medicaid as approved coverage for legal immigrants under 18 years of age, we are deeply concerned that the chilling effect of the public charge regulations will deter parents from enrolling their children in coverage. While the courts have prevented changes to the public charge test from being implemented, the rule has already deterred immigrant families from accessing health and human service programs, like Medicaid, that they often need and are eligible for in order to lead a healthy and productive life.[9] Our pediatrician members report increases in no-show or cancellation rates for routine health care appointments.  One pediatrician in Texas commented that her clinic is seeing a huge increase in Hispanic parents allowing their children's Medicaid enrollment to lapse, even though their U.S. citizen children are eligible for Medicaid.

Additionally, we are troubled that the Proclamation's list of approved coverage does not consider the Children's Health Insurance Program (CHIP), which covers more than 9 million children and pregnant women. For more than two decades, CHIP has been a national success story, giving states the ability to provide coverage that meets the needs of families who are employed but still make too little to afford private insurance. CHIP has a history of strong bipartisan support, most recently demonstrated by the ten-year extension of the program as part of the Bipartisan Budget Act of 2018.

CHIP continues to play an important role in the coverage landscape for children and pregnant women. CHIP benefits were specifically designed with children in mind and offer pediatric-appropriate networks of primary care pediatricians, pediatric subspecialists, pediatric surgical specialists, and children's hospitals so children may access medically and developmentally appropriate care. Nineteen states also use CHIP to provide necessary prenatal care to pregnant women to ensure that they have healthy pregnancies and give birth to healthy infants.

Finally, this Proclamation comes at a time when children's coverage is heading in the wrong direction. From 2017 to 2018, Medicaid and CHIP saw an enrollment decrease of more than 828,000, or 2.2 percent, of children.[10] Similarly, recently released data from the U.S. Census Bureau shows that in 2018, 4.3 million

---

[8] Pregnancy Complications. Centers for Disease Control and Prevention, 23 Oct. 2018,
https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregnancy-complications.html?CDC_AA_refVal=https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregcomplications.htm.
[9] Bernstein, H., Gonzalez, D., Karpman,M., Zuckerman, S. One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018 (Urban Institute, May 2019) Available at
https://www.urban.org/sites/default/files/publication/100270/one_in_seven_adults_in_immigrant_families_reported_avoiding_publi_7.pdf
[10] https://data.medicaid.gov/Enrollment/State-Medicaid-and-CHIP-Applications-Eligibility-D/n5ce-jxme/data

children in the United States were uninsured – an increase of 425,000 uninsured children in a single year. According to the Census data, this decline is not due to commensurate gains in private coverage and can instead be largely attributed to the decline in Medicaid enrollment.[11]

By not including Medicaid in the list of approved coverage sources for adults, and by omitting CHIP entirely, the Proclamation undermines the validity of these vital safety net programs. As pediatricians, we know that parents who are enrolled in coverage are more likely to have children enrolled in coverage, and parents with coverage are also more likely to maintain their children's coverage over time.[12] Whereas children whose parents are insured are almost always insured themselves, 21.6 percent of children whose parents are uninsured are also uninsured, meaning when parents lose coverage, so do their children.[13] Consequently, we fear that any coverage losses suffered as a result of the Proclamation to immigrant parents will have downstream negative effects on their children, including U.S. citizen children.

Children's coverage is susceptible to changes in federal and state policies and operations.[14] The Presidential Proclamation will create uncertainty and unnecessary barriers to accessing coverage. As such, the AAP calls on the Departments to rescind the Proclamation and to instead work to improve children's access to comprehensive, affordable coverage. If you have any questions, please do not hesitate to contact Stephanie Glier in our Washington, D.C. office at 202-347-8600 or sglier@aap.org.

Sincerely,

Kyle E. Yasuda, MD, FAAP
President

KY/nw

---

[11] https://www.census.gov/library/stories/2019/09/uninsured-rate-for-children-in-2018.html
[12] Venkataramani, M., Pollack, C. E., & Roberts, E. T. (2017). Spillover Effects of Adult Medicaid Expansions on Children's Use of Preventive Services. *Pediatrics*. doi:10.1542/peds.2017-0953, Available at http://pediatrics.aappublications.org/content/pediatrics/early/2017/11/09/peds.2017-0953.full.pdf
[13] Karpman, M. and G. Kenney. "Health Insurance Coverage for Children and Parents: Changes Between 2013 and 2017" Urban Institute, September 7, 2017. Available at http://hrms.urban.org/quicktakes/health-insurance-coveragechildren-parents-march-2017.html
[14] https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementonPublicHealthInsuranceEnrollmentNumbers.aspx



October 31, 2019


The Honorable Edward J. Ramotowski
Deputy Assistant Secretary for Visa Services
Bureau of Consular Affairs
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520


RE: Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage


Dear Deputy Assistant Secretary Ramotowski:

The American College of Physicians (ACP) is writing in response to the Notice of Information Collection under OMB Emergency Review: Immigrant Health Insurance Coverage (Docket No. DOS-2019-0039). ACP is the largest medical specialty organization and the second-largest physician group in the United States. ACP members include 159,000 internal medicine physicians (internists), related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness.

We strongly oppose the collection of information on health insurance status as proposed in this notice and the underlying October 4, 2019 Presidential Proclamation, Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System.  The proclamation requires immigrants to demonstrate that they will be covered by approved health insurance within 30 days of entry into the U.S. or that they have financial resources to pay for "reasonably foreseeable medical costs."

Under the proclamation, approved health insurance would include employer-sponsored and other private coverage, including unsubsidized coverage through the Affordable Care Act (ACA) Marketplaces, short-term, traveler, or catastrophic plans. Medicaid coverage for adults and federally subsidized ACA Marketplace plans would not be considered approved coverage.  The proclamation restricts immigrants' ability to purchase comprehensive health insurance available through the ACA marketplaces and instead requires them to obtain costly and potentially less comprehensive health coverage, such as short-term plans, in order to qualify as "acceptable" coverage.

Short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. Because they were meant to be used for a limited time period, the plans are not required to meet many of the patient protections required by standard insurance regulations and known to improve health outcomes. Plans that are not required to cover essential health benefits; not required to cover people with pre-existing health conditions; and that may place annual or lifetime limits on coverage, are not providing the same access to care that comprehensive health insurance does.

The proclamation will also make it more difficult for lower-income immigrants to enter the U.S. According to the Migration Policy Institute, the proclamation may render two-thirds of applicants for immigrant visas ineligible.  In addition, fear and confusion surrounding this proclamation and other immigration policy changes may deter immigrants who are lawfully present from enrolling in programs they are eligible for.

In our 2011 paper, National Immigration Policy and Access to Health Care, ACP called for a national immigration policy on health care that balances the needs of the country to control its borders, provides access to health care equitably and appropriately, and protects the public's health. ACP believes that national immigration policy should differentiate treatment of persons who fully comply with the law in establishing legal residency from that of persons who break the law in the determination of access to subsidized health coverage and treatment. At the same time, national immigration policies should ensure that all residents of the United States, without regard to their legal residency status, have access to medical care, especially for primary and preventive care and vaccinations against communicable diseases. The proclamation would impede access to health related benefits for immigrants and would not only have negative consequences for the impacted individuals and their families but also their communities.

We urge you to rescind this proclamation before it goes into effect.  If you have any questions, please contact Renee Butkus, Director Health Policy at rbutkus@acponline.org.

Sincerely,

Robert McLean, MD, FACP
President

 

October 31, 2019

**Via Email**

Edward J. Ramotowski
Deputy Assistant Secretary
Office of Visa Services
Bureau of Consular Affairs
Department of State
PRA_BurdenComments@state.gov

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget
The White House
oira_submission@omb.eop.gov

Re:    **Notice of Information Collection Under OMB Emergency Review:
Immigrant Health Insurance Coverage**

On behalf of Americans for Prosperity[1] and The LIBRE Initiative,[2] I write in response to the State Department's proposed information-collection request regarding immigrant health insurance coverage.[3]  As currently written, the proposal creates unanswered questions and relies on ambiguous standards that will cause confusion in consular offices and potentially disrupt the immigration system. The State Department's request for emergency review should be rejected and the proposal should go through the normal notice-and-comment process.

**I.    OMB Should Reject the State Department's Request for Emergency Review**

The President published Proclamation No. 9945 ("PP 9945"), on October 4, 2019, but this cursory notice from the State Department came seventeen business days later with an inexplicable one-day deadline for public comments.[4]  If the State Department had a legitimate justification for using emergency procedures, this argument is undercut by its decision to take seventeen business days to publish its notice. The public comment period should not be curtailed due to the lack of urgency on the part of the government to prepare a routine notice seeking public comment. The notice provides no justification for the delay or lack of a robust public comment period, and the

---

[1] *See* AMERICANS FOR PROSPERITY *About*, www.americansforprosperity.org/about.

[2] *See* THE LIBRE INITIATIVE *About*, https://thelibreinitiative.com/about-us/.

[3] State Department, Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage, 84 Fed. Reg. 58,199 (Oct. 30, 2019).

[4] Proclamation No. 9945, 84 Fed. Reg. 53,991 (Oct. 4, 2019).

Emergency Review Comment re Immigrant Health Insurance Coverage
Document No: 2019-23639
October 31, 2019
Page 2

Office of Management and Budget ("OMB") should not approve the request for emergency review. Further, the State Department should publicly disclose the reasons, if any, that it gave to OMB to justify its request for emergency review.

II.    **The State Department Should Postpone the Implementation of Information Collection Until It Clarifies Requirements and Goes Through a Normal PRA Clearance Process**

Even if OMB approves the State Department's request for emergency review, the State Department should delay implementation until it clarifies the numerous issues with the current methodology and completes the normal Paperwork Reduction Act ("PRA") clearance process with public comments. Implementing this rule as currently written would harm immigrants, American citizens, and permanent residents. As the State Department estimates, this proposal could affect more than 450,000 immigrants, many of whom are likely related to U.S. citizens and immediate family members of lawful permanent residents. Implementation of the proposal should be postponed until it completes the normal PRA process.

We stand ready to work with anyone to improve our immigration system and ensure it is focused on promoting opportunities for individuals to participate fully and contribute to our great nation. If you have any questions about this comment, please contact me by e-mail at Kevin.Schmidt@causeofaction.org. Thank you for your attention to this matter.

*Kevin Schmidt*
KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS
CAUSE OF ACTION INSTITUTE

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

Re: Emergency Submission Comment on Immigrant Health Insurance Coverage

October 31, 2019

To whom it may concern:

AIDS United feels it is necessary to respond to the Trump Administration's Emergency Submission
Comment on Immigrant Health Insurance Coverage. As an organization, AIDS United is devoted to
ending the HIV epidemic and providing every person who is living with or affected by HIV in the United
States with the quality health care and supportive services that they deserve. This devotion to ending
the epidemic and taking care of people impacted by HIV extends to all immigrants currently living in the
United States and those seeking a better life in here. HIV makes no exceptions based on a person's
nationality, ethnicity, or net worth and neither does AIDS United.

The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the
United States Healthcare System (PP 9945) demands that immigrants prove they will be able to obtain
unsubsidized health insurance within 30 days of their arrival or that they possess "the financial
resources to pay for reasonably foreseeable medical costs" as a prerequisite for the approval of a visa.
As such, all immigrants will have to obtain their health insurance without the use of Medicaid or
Affordable Care Act health insurance subsidies.

AIDS United strongly condemns this proclamation as a behind the scenes end-run to restrict legal
immigration to the United States. This proclamation is a wealth and health test for any immigrant trying
to come to the United States. And, when combined with the Public Charge rule change that came before
it, the proclamation will serve as an almost insurmountable roadblock for any immigrant living with HIV
seeking to live in the U.S.

AIDS United has been very active in partnering with the Trump administration in their Ending the HIV
Epidemic: A Plan For America and wishes to see it be as successful as possible. Unfortunately, the policy
changes proposed in PP 9945 run counter to public health best practices and will further increase the
sense of distrust between immigrants living with and affected by HIV in the United States—both
documented and undocumented—and the health care systems they need to access to treatment and
prevention services that will allow them to live long, healthy lives.

We also find it very problematic that PP 9945 allows for the use of short term, limited duration
insurance (STLDI) plans to qualify as "acceptable" coverage for immigrants. These plans will harm
patients and their families as well as others in the health care system by undermining access to quality,
affordable coverage. These plans also threaten to bring back abusive practices that harm consumers
specifically prohibited by the Affordable Care Act, effectively sanctioning discrimination by the insurance
industry and denying access to thousands including people living with HIV.  AIDS United is currently
challenging recent regulations on STLDI plans in court in *Association for Community Affiliated Plans et al
v. U.S. Department of Treasury et al*. and urges the administration to move away from using these plans
to short circuit the ACA and specifically for immigrants.

000252

Finally, we object to the 48 hour comment window which will prevent many organizations and individuals who wish to comment from doing so.  This is not a fair process for many who are most likely to be impacted by these changes.

AIDS United strongly encourages the Trump administration to rescind this Presidential Proclamation and to ensure that a person's HIV status or finances does not determine their ability to seek citizenship.

Sincerely,

William McColl
Vice President for Policy and Advocacy
AIDS United

000253



# B O A R D   O F   S U P E R V I S O R S

*Keith Carson*
*Supervisor, 5th District*

*Supervisor, 5th District*

October 30, 2019

Department of State Desk Officer
Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services

RE:    OPPOSE - EMERGENCY REVIEW COMMENT ON IMMIGRANT HEALTH INSURANCE
COVERAGE:
DOCKET NUMBER: DOS-2019-0039

To Whom It May Concern:

The County of Alameda submits these comments in response to the Request for Office of Management and
Budget (OMB) Emergency Review:  Immigrant Health Insurance Coverage.  Alameda County strongly objects
to the determination that instituting a two-day comment period and the underlying Presidential Proclamation is
in response to an 'emergency'.  There is no emergent crisis with respect to immigrants requesting to enter the
United States legally.  The Presidential Proclamation will likely have the effect of denying thousands of law-
abiding immigrants' entry into the United States.  Alameda County opposes the proposed Presidential
Proclamation and urges it to be rescinded immediately.

Alameda County is one of the most ethnically diverse counties in the nation, home to over 1.6 million people, of
which approximately 500,000 are immigrants.  The Alameda County Social Services Agency (SSA) offers an
array of programs and services to assist immigrants, refugees, and asylees entering our communities.  These
programs include Refugee Social Services, Protective Services, CalWORKs, Refugee Cash Assistance, General
Assistance (GA), CalFresh, California Food Assistance Program, and Medi-Cal.

Effective November 3, 2019, the Proclamation targets individuals who are complying with U.S. immigration
laws and are seeking a family-based immigrant visa, but who may be unable to demonstrate that they will have
health insurance within 30 days of entering the country.  The proclamation would affect people abroad who
wish to join their U.S. citizen or legal permanent resident (LPR) spouse or fiancé; children of LPR's who are
18-21 years of age; adults who seek to join their U.S. citizen or LPR parents; or parents of U.S citizen children,
among other groups.  The sweeping proclamation also would deny entry into the country if U.S. consular
officers determine that the applicant may not be able to pay for "reasonably foreseeable medical expenses."

Under the proclamation, persons would be denied entry if they would otherwise be eligible for public health
care coverage programs, such as the Affordable Care Act (ACA)/Covered California, including the subsidies
contained in the program, and Medicaid/Medi-Cal.  Such a policy undermines the goals of those programs to
cover all who are here legally and meet the income eligibility guidelines.

Data and research demonstrate that immigrants contribute greatly to our local, state, and federal economy and
social fabric.  Local and state policies have been implemented recognizing and supporting those contributions.
Furthermore, California made a policy choice to make lawfully residing immigrants eligible for subsidized

000254

marketplace coverage because doing so advances the health of our nation.  The Proclamation ignores those federal, state and local policies enabling otherwise eligible legal immigrants to purchase comprehensive public health insurance.  It allows, however, the purchase of Administration-supported, non-ACA compliant short-term health plans which do not provide comprehensive care nor protect the consumer.  This is a disservice to our communities and to the legal immigrants who help to enhance the diversity of our County, and does little to eliminate uncompensated care costs.  The Migration Policy Institute estimates that the practical effect of the policy could exclude two-thirds of future immigrants.  The majority of intending immigrants will be unable to meet the 30-day window of either identifying a private health insurance plan or finding a job providing such coverage.

As an County, we welcome all and remain committed to and supportive of access to services of all individuals and families living in Alameda County, including immigrants contrary to the proclamation which is even more egregious in that it is denying entry to the U.S. of those immigrants who are abiding by U.S. immigration law and wish to be with their families.

For these reasons, Alameda County opposes the Proclamation and urges that it be rescinded immediately.

Sincerely,

Keith Carson
Chair, Personnel, Administration and Legislative (PAL) Committee
Board Supervisor, District 5

CC:  Alameda County Board of Supervisors

000255



JAMES L. MADARA, MD
EXECUTIVE VICE PRESIDENT, CEO

ama-assn.org
t (312) 464-5000

October 31, 2019


The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
600 19th Street NW
Washington, DC 20006

Re: Visas: Ineligibility Based on Public Charge Grounds [DOS–2019–0035 and/or RIN: 1400–AE87] and
    60-Day Notice of Proposed Information Collection: Public Charge Questionnaire ''Docket Number:
    DOS–2019–0037'' and Notice of Information Collection Under OMB Emergency Review:
    Immigrant Health Insurance Coverage ''Docket Number: DOS–2019–0039''

Dear Secretary Pompeo:

On behalf of the physician and medical student members of the American Medical Association (AMA), I
am writing to provide comments to the U.S. Department of State (DoS) in response to the Interim Final
Rule on "Visas: Ineligibility Based on Public Charge Grounds" (interim final rule), the 60-Day Notice of
Proposed Information Collection: Public Charge Questionnaire, and the Notice of Information Collection
regarding immigrant health insurance coverage. We are deeply concerned about the interim rule's
negative impact on individuals and families who are seeking visas to enter the U.S to access health care
services. The AMA strongly opposes any proposed rule, regulation, or policy that would deter
immigrants/nonimmigrants seeking visas and/or their dependents from utilizing non-cash public benefits
such as, but not limited to, Medicaid, Supplemental Nutrition Assistance Program (SNAP), and housing
assistance. Impeding access to non-cash public benefits for these individuals and families could
undermine population health in general, and thus we strongly urge the DoS to rescind the interim final
rule. With regards to the public charge questionnaire, we believe that the proposed collection of
information is not necessary for the proper function of the DoS and will have a negative impact on the
health and well-being of individuals and families who are seeking visas. The AMA also opposes the
collection of information on health insurance status as proposed in the emergency submission comment as
well as the underlying Presidential Proclamation that is the basis for the collection of information.

## VISAS: INELIGIBILITY BASED ON PUBLIC CHARGE GROUNDS

### Public Charge Definition

The AMA strongly opposes the change in the definition of public charge. In previous guidance issued by
the DoS and in effect since May 1999, the federal government defined public charge for purposes of
admission/adjustment as "an alien who is likely to become primarily dependent on the U.S. government
for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance
or (ii) institutionalization for long-term care at government expense." The interim final rule substantially
broadens the definition of public charge as an alien who receives one or more public benefits for more
than 12 months in the aggregate within any 36-month period. It is our understanding that this definition

The Honorable Mike Pompeo
October 31, 2019
Page 2

would mean, for instance, that receipt of two benefits in one month counts as two months' worth of benefits.

The interim final rule is more than a technical change to U.S. immigration/visa policy, it is a dramatic shift. When coupled with an additional list of heavily weighted positive/negative factors immigration officials may consider in determining visa ineligibility, we believe the proposed change in the definition of public charge will further exacerbate the negative impacts on population health resulting from the U.S. Department of Homeland Security's (DHS) final rule on Inadmissibility on Public Charge Grounds.[1]

**Public Benefit Definition**

The DoS seeks to align its public benefit definition with the definition in the DHS final rule to include for the first-time non-emergency Medicaid, SNAP, and public housing and rental assistance programs. It is our understanding that the DoS in its interim final rule proposes to allow consular officers to deny visa applications to applicants if the officer determines that the applicant "could become at any time a public charge" under the expanded definition. We believe these proposed changes will negatively impact population health.

**Consideration of Additional Negative Factors and the Totality of the Circumstances Test**

It is our understanding that under the DoS interim final rule, consular officers will use a "more likely than not" standard and take into account the totality of a foreign national's circumstances at the time of a visa application when considering the likelihood of the individual's becoming a public charge. At a minimum, the factors would include the alien's: age; health; family status; assets, resources, and financial status; and education and skills.

- *Age:* A consular officer will consider 18 to 62 years of age as a positive factor; under age 18 and over age 62 will be considered a negative factor.

- *Health:* A consular officer will consider whether the individual has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with his/her ability to work/attend school as a negative. The new provision adds that consular officers will consider the report of a medical examination performed by the panel physician where such examination is required, including any medical conditions noted by the panel physician.

- *Assets, Resources, and Financial Status:* A consular officer will consider in evaluating whether the individual's assets, resources, and financial status make him/her likely to become a public charge. The officer will review whether the individual has applied for, been certified to receive or approved to receive, or received, one or more public benefits on or after October 15, 2019, or whether the alien has disenrolled or requested to be disenrolled from such benefits; whether the alien has received an immigration benefit fee waiver from DHS on or after the interim final rule's

---

[1] On Oct. 11, 2019, judges before the U.S. District Courts for the Southern District of New York, Northern District of California, Eastern District of Washington, Northern District of Illinois, and District of Maryland ordered that DHS cannot implement and enforce the final rule on the public charge ground of inadmissibility under section 212(a)(4) of the Immigration and Nationality Act. The court orders also postpone the effective date of the final rule until there is final resolution in the cases. Most of the injunctions are nationwide and prevent USCIS from implementing the rule anywhere in the United States. https://www.uscis.gov/greencard/public-charge.

The Honorable Mike Pompeo
October 31, 2019
Page 3

effective date; and whether the applicant has private health insurance or other financial resources sufficient to pay for reasonably foreseeable medical costs.

- *Prospective Visa Classification:*  The interim final rule adds consideration of the individual's prospective visa classification. Specifically, the DoS states in its interim final rule that "the visa classification, including the purpose and duration of travel, are relevant to assessing the likelihood that an alien would avail himself or herself of public benefits (noting that in many cases visa applicants may not be eligible for public benefits in the United States), and therefore consular officers must evaluate these factors on a case-by-case basis." The DoS goes on to provide the following example, "An applicant with a serious chronic health condition seeking medical treatment in the United States on a tourist visa would be expected to establish that he or she has the means and intent to pay for all reasonably foreseeable treatment. By demonstrating the ability to cover the medical expenses anticipated on a short-term trip to the United States, the applicant can demonstrate that even though health presents as a negative factor, the applicant has financial resources that make it unlikely the applicant would avail himself or herself of one or more public benefits."

The AMA strongly opposes the expansion of health-related factors that consular officers, with no substantial health care training, must consider in determining visa eligibility. The interim final rule places consular officers in the precarious position of making a visa determination based on a forward-looking, more expansive public charge test; even if a person is not currently or has not previously used a public benefit (which may be the case in visa applicants applying overseas), this means that an officer must subjectively assess the likelihood of future use by the individual on a case-by-case basis. Many families are considered mixed-status families, meaning the family includes members with different immigration statuses and/or visas and it is our firm belief that this expanded public charge test will continue to foster and increase toxic stress, confusion, and fear within families that could be torn apart due to the subjective determination of consular officials. According to one survey conducted prior to the DHS final rule, one in seven adults in immigrant families reported avoiding public benefit programs for fear of risking future green card status, and more than one in five adults in low-income immigrant families reported this fear.[2] We believe the DoS interim final rule, like the DHS final rule, will continue to have a chilling effect on immigrant families and be utilized to deter these individuals and families from applying for visas.

**New Requirements for Nonimmigrants and the Impact on J-1 and H-1B Visa Physicians**

It is our understanding that nonimmigrants applying for a visa will also be subject to the new public charge standard under the interim final rule. As part of the application process, nonimmigrants, such as physicians on J-1 and H-1B visas, will need to demonstrate they are not using or receiving, nor are likely to use or receive, public benefits such as the medical and nutritional services described in the interim final rule. Additionally, it is our understanding that physicians on J-1 and H-1B visas would also be subject to the new expanded "Totality of the Circumstances Test" factors which would include English language proficiency and negative health factors such as being diagnosed with a medical condition that requires extensive medical treatment. As a result, the AMA's International Medical Graduate (IMG) members would be directly impacted by the interim final rule. In 2016, 897,783 physicians were practicing in the U.S., 206,030 (23 percent) of whom did not graduate from a U.S. or Canadian medical school. Also, in 2016, 30,000 IMG residents were in U.S.-based residency training programs. Additionally, 36 percent of all practicing internists (i.e., primary care) were IMGs, (i.e., foreign-trained physicians) in 2016.

---

[2] https://www.urban.org/research/publication/one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018.

The Honorable Mike Pompeo
October 31, 2019
Page 4

Once accepted into a residency program via the match process, physicians who are foreign nationals must obtain a visa that permits participation in U.S. medical training. Foreign-born medical school graduates commonly apply for a J-1 visa through the U.S. Exchange Visitor Program, which allows the Educational Commission for Foreign Medical Graduates (ECFMG) to sponsor visas for physicians participating in clinical training programs. However, the amount of time clinical trainees can stay in the U.S. through the ECFMG is limited generally to seven years, which is the time typically required to complete a residency program and a subsequent fellowship for sub-specialty training. After completing their residency, J-1 visa holders must generally return to their home countries for two years before they can return to the U.S., often on an H-1B (temporary highly skilled nonimmigrant) or L-1 (intracompany transferee) visa. International residency or fellowship graduates who are willing to work in medically underserved areas or with underserved patients for three years can apply for a waiver of the two-year residency requirement. There are several federal agencies that sponsor international physicians for these types of waivers, including the Department of Veterans Affairs. The interim final rule has the potential to negatively impact the VA's ability to obtain physicians to provide timely, quality care to our nation's veterans.

Whether the physician trains in the U.S. in J-1 status and then obtains a waiver of the two-year home residency requirement, or performs research, teaches or provides direct patient care to U.S. citizens in H-1B status, the path to lawful permanent resident status following the completion of training is not guaranteed due to extreme backlogs in the federal government's processing of these applications. Thus, IMGs do not need any additional obstacles put in their path as they seek to become permanent U.S. citizens and continue to provide care to our most vulnerable residents in rural and underserved parts of our nation. Nearly 21 million people live in areas of the U.S. where foreign-trained doctors account for at least half of all doctors. As such, the impact of the interim final rule on this physician cohort could significantly undermine current efforts to address the worsening physician shortage, and directly impact patient populations across the U.S. considered medically underserved.[3] The U.S. is facing a serious shortage of physicians, largely due to the growth and aging of the population and the impending retirements of older physicians. According to recent data, the U.S. could see a shortage of up to 120,000 physicians by 2030, impacting patient care across the nation.[4]

**Impact on Population Health**

The U.S. Centers for Disease Control and Prevention (CDC) defines population health as providing "an opportunity for health care systems, agencies and organizations to work together in order to improve the health outcomes of the communities they serve."[5] We all have an important role to play in population health. According to the CDC there are numerous advantages to developing policies that improve population health such as: a reduction in mortality, a reduction in medical costs, and a reduction in life expectancy inequity. Linking individuals and families to needed medical and social supports is a core public health function that can add both health and economic value.[6] We believe that neither health costs nor public health concerns are driving these drastic changes in public charge policy by the Administration and we strongly urge the rescission of the interim final rule by the DoS.

---

[3] https://www.americanimmigrationcouncil.org/sites/default/files/research/foreign-trained_doctors_are_critical_to_serving_many_us_communities.pdf.
[4] https://aamc-black.global.ssl.fastly.net/production/media/filer_public/85/d7/85d7b689-f417-4ef0-97fb-ecc129836829/aamc_2018_workforce_projections_update_april_11_2018.pdf.
[5] https://www.cdc.gov/pophealthtraining/whatis.html.
[6] https://works.bepress.com/glen_mays/307/.

The Honorable Mike Pompeo
October 31, 2019
Page 5

**60-Day Notice of Proposed Information Collection:  Public Charge Questionnaire and Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage**

On October 24, 2019, the DoS published a request for public comment on the form DS-5540 or the public charge questionnaire. The DoS concedes in the notice that the questionnaire is more expansive than in the past. Almost two decades ago, the federal government clarified that the use of services such as health coverage or nutrition assistance would not be considered in the public charge determination. Only the receipt of cash assistance for monthly income maintenance or government-funded long-term care could be considered. Additionally, any negative factor could be outweighed by positive factors—most importantly the sponsor's Affidavit of Support—in determining whether the individual was likely to rely on cash assistance or long-term care in the future. However, the DoS proposes to use the DS–5540 "to collect more detailed information on an applicant's ability to support himself or herself. Consular officers will use the information to assess whether the applicant is likely to become a public charge, based on the totality of the circumstances." The DoS' proposal seems to emphasize that the Affidavit of Support is a positive factor in the totality of the circumstances test but is not sufficient on its own to protect an individual from being determined likely to become a public charge. This is a dramatic shift in the intent and use of the public charge questionnaire. As a result, the AMA believes that the proposed information collection is not necessary for the proper function of the DoS and will have a negative impact on the health and well-being of individuals and families who are seeking visas.

**Application to the Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System (Presidential Proclamation)**

Under the DoS' notice for the public charge questionnaire, a consular officer may request any immigrant visa applicant not subject to the public charge determination to be subject instead to the Presidential Proclamation to ensure the applicant will be covered by approved health insurance within 30 days of entry into the U.S. or that they have financial resources to pay for reasonably foreseeable medical costs. Under the Presidential Proclamation, approved health insurance would include employer-sponsored and other private coverage, including unsubsidized coverage through the Affordable Care Act (ACA) marketplaces, short-term plans, traveler plans, or catastrophic plans. Subsidized marketplace coverage and Medicaid coverage for adults would not be considered approved coverage. The Presidential Proclamation claims that suspension is necessary to protect the health care system and taxpayers from uncompensated care costs. We disagree. As outlined in our letter to the President, we believe the Presidential Proclamation will cause confusion and have a chilling effect by discouraging non-citizens, especially pregnant women and children, from applying for certain public benefits even if they are eligible. In addition, we believe the Presidential Proclamation will increase the usage of short-term limited duration insurance plans resulting in consumers purchasing inadequate, skimpy coverage, exempt from the consumer protection provisions and benefit standards of the ACA.[7]

It is our understanding that under the Presidential Proclamation, the Secretary of State is authorized to establish standards and procedures for governing the determinations of approved health insurance. On October 30, 2019, the DoS issued a "Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage." The DoS gave the public approximately 48-hours to comment on the collection of information included in the emergency notice regarding the Presidential Proclamation. The AMA believes the information collection request does not rise to the level of an emergency and

---

[7] https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2019-10-22-Letter-to-Trump-re-Presidential-Proclamation.pdf

The Honorable Mike Pompeo
October 31, 2019
Page 6

therefore does not require an abbreviated comment period. According to the DoS the Presidential Proclamation does not suspend or limit the entry of applicants if they do not have coverage but possess financial resources to pay for reasonably foreseeable medical expenses. Reasonably foreseeable medical expenses are those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication. The emergency submission comment does not appear to fully explain how a consular officer would effectively evaluate reasonably foreseeable medical expenses related to an applicant's existing medical condition. The AMA firmly opposes the collection of information on health insurance status as proposed in this emergency submission comment. As detailed in our October 22, 2019 letter to the President of the United States, the AMA opposes the underlying Presidential Proclamation and we also strongly oppose its application in any circumstance by the DoS.

**Data and Privacy Concerns**

A potentially serious unintended consequence of both the interim final rule and the public charge questionnaire is its impact on patient data. As a result of the proposed changes to the public charge, physicians may feel compelled not to include data about any public benefit immigrant families are receiving—though information about such benefits are part of the social determinants of health assessment seen as key to care coordination. To complicate the matter further, immigration authorities may seize electronic health records as part of their investigations, which raises several questions about both the accuracy and security of patient data and privacy of health information. Of concern, there may be potential violations to the Health Insurance Portability and Accountability Act of 1996 depending on how the federal government seeks to track insurance coverage and an individual's medical condition. Therefore, we remain deeply concerned about the impact the interim final rule and potentially the questionnaire will have on patient data and privacy.

**Impact on Certain Nonimmigrants**

We strongly urge the DoS to consider another unintended impact of this change in policy on the children of H-1B visa holders. It is our understanding that an applicant for a student visa F and/or an individual seeking to change their status from an F to a H-1B would fall under the DoS' sweeping new proposal for the visa eligibility determination under the public charge grounds and by extension the revised DoS public charge questionnaire. This means that children of H-1B visa holders, who may have turned age 21 or aged out and no longer fall under the H-4 classification, may now be included in the DoS interim final rule and required to complete the public charge questionnaire. The DoS should consider the implications of the interim final rule on the ability of these individuals to study and share their skills/talents in the U.S. workforce.

**Conclusion**

The AMA believes every individual, regardless of immigration status, deserves timely, accessible, quality health care, nutrition, and housing. The policy changes in the interim final rule have the potential to worsen population health in general. We urge the Administration to rethink these proposed policy changes, rescind the interim final rule, the public charge questionnaire and the collection of immigrant health insurance information under the Presidential Proclamation and instead work with the AMA and other health care professionals to develop policies that ensure the health of children and families is protected throughout the immigration process.

000261

The Honorable Mike Pompeo
October 31, 2019
Page 7


If you have any questions, please contact Margaret Garikes, Vice President for Federal Affairs, at margaret.garikes@ama-assn.org, or by calling 202-789-7409.

Sincerely,

James L. Madara, MD

000262



*Occupational Therapy:*
*Living Life To Its Fullest®*

*Submitted via www.Regulations.gov*

October 31, 2019

Edward J. Ramotowski
Deputy Assistant Secretary
Visa Services
Bureau of Consular Affairs
Department of State

Department of State Desk Office
Office of Information and Regulatory Affairs
Office of Management and Budget

Regarding Immigrant Health Insurance Coverage Docket Number DOS-2019-0039 Form
Number DS-5541

Dear Deputy Assistant Secretary Ramotowski:

The American Occupational Therapy Association (AOTA) is the national professional
association representing the interests of more than 213,000 occupational therapists, occupational
therapy assistants, and students of occupational therapy. The practice of occupational therapy is
science-driven, evidence-based, and enables people of all ages to live life to its fullest by
promoting health and minimizing the functional effects of illness, injury, and disability. We
appreciate this opportunity to comment on the implementation of the October 4, 2019
Presidential Proclamation mandating that immigrant visa applicants buy certain approved health
insurance products or prove that they can pay for reasonably foreseeable medical expenses.

Occupational therapy helps individuals access and fully participate in society – to engage in
activities that are meaningful to them, to work, go to school, and achieve self-sufficiency.
Occupational therapy practitioners have a responsibility to address barriers to participation in
society and inequities that lead to health disparities.[1] AOTA is concerned that this proclamation,
which does not permit Medicaid or subsidized ACA marketplace plans to fulfill the new health
insurance requirements, will weigh particularly heavily on people with disabilities, barring them
from lawful entry to the United States.

The proclamation's approved forms of coverage may not be appropriate for people with
disabilities. Many people with disabilities rely on Medicaid for the services and supports they
need to work, go to school, and achieve self-sufficiency because Medicaid offers home and
community-based services that are not available in private plans. The proclamation also blocks
access to subsidized ACA marketplace coverage, which has important protections for people

---

[1] *See* American Occupational Therapy Association. (2014). Occupational therapy's commitment to
nondiscrimination and inclusion. *American Journal of Occupational Therapy, 68*(Suppl. 3), S23-24.
https://doi.org/10.5014/ajot.2014.686S05 *and* American Occupational Therapy Association. (2013). AOTA's
societal statement on health disparities. *American Journal of Occupational Therapy, 67*(Suppl. 6), S7-S8.
https://doi.org/10.5014/ajot.2013.67S7

with disabilities and chronic conditions. ACA marketplace plans cannot deny coverage or charge more based on a pre-existing condition, and they are required to cover a comprehensive set of essential health benefits, including rehabilitative and habilitative services. Instead, immigrant visa applicants would be pointed to types of coverage like short-term and catastrophic plans that may lack the protections they need.

Short-term plans can deny coverage or charge more based on a person's medical history, and they are not required to cover essential benefits like rehabilitation and habilitation. We are concerned that immigrant visa applicants are being steered into types of coverage that are not required to cover occupational therapy services. We are also concerned that requiring our new neighbors to avoid comprehensive plans will lead to increased uncompensated care costs when they need health care services that aren't covered by less-comprehensive forms of coverage.

We ask the Administration not to move forward with implementing this proclamation and urge the President to rescind it.

Sincerely,

Laura Hooper
Manager, Health Policy



October 31, 2019 (Submitted Via Email)

Secretary Mike Pompeo
United States Department of State
2201 C St NW, Washington, DC 20520

Director Mick Mulvaney
Office of Management and Budget
725 17th St NW, Washington, DC 20503

Re: Notice of Information Collection Under Office of Management and Budget (OMB) Emergency
Review: Immigrant Health Insurance Coverage

Dear Secretary Pompeo and Director Mulvaney,

Thank you for the opportunity to comment on the Department of State's Notice of Information
Collection Under Office of Management and Budget (OMB) Emergency Review: Immigrant Health
Insurance Coverage regarding Form DS-5541. We write out of deep concern and opposition to both the
request for emergency review and on the underlying proposal.

**Background and Expertise of APIAHF**

The Asian & Pacific Islander American Health Forum (APIAHF) is the nation's leading health policy
organization working to advance the health and well-being of over 20 million Asian Americans, Native
Hawaiians and Pacific Islanders (AA and NHPI) across the U.S. and territories. APIAHF works to improve
access to and the quality of care for communities who are predominately immigrant, many of whom are
limited English proficient, and may be new to the U.S. health care system or unfamiliar with private or
public coverage. We have longstanding relationships with over 150 community based organizations in
32 states, to whom we provide capacity building, advocacy and technical assistance. As such, we have a
strong understanding of the needs and barriers in immigrant communities and the impact changes in
immigration and public assistance policy would have on them.

For over 32 years, APIAHF has worked extensively on both the issues of immigration and health; areas of
policy that this proposed rule would upend. Through research, analysis and community partnerships,
these issues are the core of our expertise. APIAHF and our partners have consistently advocated for the
importance of access to health care and other public assistance for all families, regardless of their
citizenship status. We know from experience that access to quality health care, not burdened by
obstacles like finances, means families can thrive and contribute to their communities. At the same
time, we are reminded that our country has a deep history of racial discrimination that has contributed
to health disparities among communities of color, including AA and NHPIs.

**Two Day Comment Period Is Unacceptable**

OMB should not grant emergency review of this information collection. The State Department (State) justifies the need for review based on the November 3 implementation date. However, State provides no evidence for why this implementation date is needed nor does it appear to have considered alternative dates. State does not offer any other justification for why emergency review is justified.

This Notice was published on October 30, 2019, and will close for comments on October 31. This two-day review period is not sufficient to properly review the proposed information collection implementing the Presidential proclamation. While this comment attempts, under this short time frame, to outline some initial concerns, a full 60 day or longer comment period is needed to fully understand the complex implications of this policy on the 450,500 immigrants that State has assessed it will impact, including the costs that it will lead to for immigrants, their families, and the U.S. health care system.

**The 10 Minute Estimation of Completion Time Is Inaccurate**

This Notice proposes that consular offices, in implementing the Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, will ask each applicant for an immigration visa a series of questions about her plan for being covered by health insurance within 30 days of entering the United States including:

- The specific health insurance plan;
- The date coverage will begin;
- "Such other information," which is not elaborated on in the Notice; and
- Whether, if not planning to purchase health insurance, the applicant has financial resources to pay for reasonably foreseeable medical expenses.

State claims that the Average Time Per Response to comply with the Information Collection will be 10 minutes. We believe that time estimate is inaccurate, particularly given the proposed questions. This Notice requires hundreds of thousands of immigrants who otherwise may have waited until arriving in the U.S. to purchase health insurance to spend time in their home country researching their health insurance options, finding a plan that will accept customers who are not yet residing in the country and signing up. The information requested by the Notice will be impossible to provide otherwise, given that an applicant will be unable to know the start date, or even whether their chosen insurance carrier will accept them as a customer, without applying for coverage itself. This process could take hours or even days. Evaluating only the time it takes for a consular officer to ask a series of questions and not the time it takes to prepare for the set of questions is not a valid analysis of the impact of this Notice.

This Average Time Per Response not does account for the fact that many visa applicants will be unfamiliar with the U.S. health care system, which is complex due to the web of private and public insurance options, and varying eligibility for immigrants within those options.[1] Many immigrants may be coming from countries where private health insurance is not available or looks completely different.

---

[1] "Snapshot: Immigrant Health in the United States," Asian & Pacific Islander American Health Forum (August 2019). Available at: https://www.apiahf.org/resource/snapshot-immigrant-health-in-the-united-states/.

One review of refugees experiences found that a lack of knowledge about their host country's health care systems led to confusion and poor quality of care.[2]

**A Majority of Visa Holders May Be Denied Entry**

According to the Migration Policy Institute, 375,000 immigrants may be denied entry to the U.S. under the Presidential proclamation.[3] This analysis also reviews potential ways that State could implement the policy that may vary the number of immigrants impacted. This Notice, by requiring visa applicants to have pre-selected a plan, likely maximizes the number of denials that could occur.

State does not specify how or whether it will train staff to understand the different types of health insurance and whether a plan meets the conditions required under the Presidential proclamation. This means that there is potential for a visa applicant to be incorrectly denied because his officer does not understand our complex health care system. This concern is born-out by the inconsistent way the Public Charge update to the Foreign Affairs Manual has been carried out, with some countries seeing disproportionately high increases in denials.[4]

This Notice may have a disproportionate impact on immigrants from Asian and Pacific Islander countries. 31% percent of the 1.1 million immigrants receiving green cards this year are from Asia and the Pacific Islands, including 40 percent of family based immigrants and 54 percent of employment-based immigrants.[5]

**The Notice Discriminates Against Limited English Proficient Populations**

We are concerned this Notice will discriminate against individuals who are Limited English Proficient (LEP), meaning they speak English less than "very well." Over 6 million people of Asian and Pacific Islander background in the United States are LEP.[6] While language access protections exist for those trying to sign up for health insurance in the U.S. under Section 1557 of the Affordable Care Act, they only apply to health insurance plans that receive federal funding. However, under the Presidential proclamation, most of those plans are explicitly deemed not acceptable forms of insurance that would allow visa applicants to be admitted. The remaining options, such as Short Term Limited Duration and Travel Insurance plans, may have no or low quality information or assistance available to consumers in

---

[2] Mangrio, E. and Sjögren Forss, K. (2017). Refugees' experiences of healthcare in the host country: a scoping review. BMC health services research, 17(1), 814. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5721651/.

[3] Galatt, Julia and Mark Greenberg, "Health Insurance Test for Green-Card Applicants Could Sharply Cut Future U.S. Legal Immigration", Migration Policy Institute (October 2018). Available at: https://www.migrationpolicy.org/news/health-insurance-test-green-card-applicants-could-sharply-cut-future-us-legal-immigration.

[4] Hesson, Ted, "Exclusive: Visa Denials To Poor Mexicans Skyrocket Under Trump's State Department," Politico (August 6, 2019). Available at: https://www.politico.com/story/2019/08/06/visa-denials-poor-mexicans-trump-1637094.

[5] "Public Charge Proposals is an Attack on AAPI Families," Asian & Pacific Islander American Health Forum (November 2018). Available at: https://www.apiahf.org/wp-content/uploads/2018/09/December2018_Public-Charge-Factsheet.pdf.

[6] "Protections For Language Access Are At Risk", Asian & Pacific Islander American Health Forum (August 2019). Available at: https://www.apiahf.org/resource/protections-for-language-access-are-at-risk/.

their preferred language. This may mean that either visa applicants who are LEP will be unable to find insurance, or they will find inaccurate information that leads them to purchasing insurance that is either not compliant with the Presidential proclamation or will not cover their health care needs.

In addition to our concern that this lack of support for LEP individuals may make it extremely difficult for them to comply with this Notice, it also makes it likely that they will be vulnerable to fraudulent companies and bad actors seeking to take advantage of visa applicants with low health literacy. It would be easy to set up a website in multiple languages claiming to offer health insurance for immigrants to the U.S., ask for payment up front, and then provide no or extremely low quality coverage. Because these sites may operate internationally, immigrants may have no recourse when they arrive in the country and discover their insurance does not cover what they thought it did. In one example of such fraud, British tourists to Spain paid travel health insurance companies for health insurance that did not cover services beyond those they were already covered for under the country's national health care system.[7] State provides no explanation for how or whether consular officers will evaluate whether a health insurance plan provides real coverage or not.

**The Presidential Proclamation Is Incorrectly Justified**

The Presidential proclamation that this Information Collection is being proposed under incorrectly justifies its need by claiming that immigrants contribute to uncompensated care costs in a significant way. The Presidential proclamation states, "While our healthcare system grapples with the challenges caused by uncompensated care, the United States Government is making the problem worse by admitting thousands of aliens who have not demonstrated any ability to pay for their healthcare costs."[8] However, the Kaiser Family Foundation has found that lawfully present immigrants make up just 15 percent of the uninsured and that immigrants may actually improve health care risk pools, lowering costs, because they tend to be younger and healthier.[9]

In fact, the Presidential proclamation may worsen uncompensated care costs by shifting immigrants from subsidized comprehensive plans under the Affordable Care Act to low-cost Short Term Limited Duration Plans, which cover much less and likely will lead to higher out of pocket costs that the customers cannot afford.[10] One health system executive recently said that, under expansion of these plans, the "longer coverage period of the policies and lack of essential coverage inherently puts health

---

[7] Willmore, Simon, "Thousands of British tourists have travel insurance policies that only cover public healthcare," Travel Daily Media (July 9, 2019). Available at: https://www.traveldailymedia.com/brits-insurance-only-public-healthcare/.

[8] "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System," The White House (October 4, 2019). Available at: https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/.

[9] "President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage," Kaiser Family Foundation (October 10, 2019). Available at: https://www.kff.org/disparities-policy/fact-sheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/.

[10] "ACA Open Enrollment: For Consumers Considering Short-Term Policies," Kaiser Family Foundation (October 25, 2019). Available at: https://www.kff.org/health-reform/fact-sheet/aca-open-enrollment-for-consumers-considering-short-term-policies/.

000268

systems at risk for increases in uncompensated care."[11] Given that these plans are misleadingly marketed, many immigrants may not even realize that their health insurance does not cover many medical treatments.[12]

We also express concern that other forms of health insurance that are acceptable under the Presidential proclamation, such as unsubsidized plans offered within the individual market, will be unavailable to those who are not yet residents of the U.S. Purchasing a health insurance plan that not does come with Premium Tax Credits under the ACA through the marketplaces still requires demonstration of residency in the state and county that the plan is being offered. Additionally, while employer sponsored insurance is deemed acceptable, employers are allowed to require new employees to wait 90 days until their insurance is activated.[13] This Notice says that visa applicants, however, will be required to demonstrate that they will have health insurance within 30 days of entry.

Because of the reasons described above, we believe this proposal should be withdrawn both because of the insufficient time to review and because of the irreversible flaws in the policy itself.

Thank you for your willingness to consider our comments. If you would like any additional information, please contact Ben D'Avanzo, Senior Policy Analyst, at bdavanzo@apiahf.org or 202-706-6767.

Sincerely,

Kathy Ko Chin

President & CEO
Asian & Pacific Islander American Health Forum

---

[11] Kern, Howard, "Commentary: Short-term, limited-duration health plans pose risks for patients, healthcare providers," Modern Healthcare (February 23, 2019). Available at: https://www.modernhealthcare.com/article/20190223/NEWS/190229983/commentary-short-term-limited-duration-health-plans-pose-risks-for-patients-healthcare-providers.

[12] Corlette, Sabrina, et al, "The Marketing of Short-Term Health Plans," Robert Wood Johnson Foundation (January 31, 2019). Available at: https://www.rwjf.org/en/library/research/2019/01/the-marketing-of-short-term-health-plans.html.

[13] Andrews, Michelle, "A Reader Asks: Can New Employees Be Forced To Wait 90 Days For Coverage?," Kaiser Health News (June 27, 2014). Available at: https://khn.org/news/michelle-andrews-on-delays-in-employer-provided-coverage/.

000269



October 31, 2019 (Submitted Via Email)

Secretary Mike Pompeo
United States Department of State
2201 C St NW, Washington, DC 20520

Director Mick Mulvaney
Office of Management and Budget
725 17th St NW, Washington, DC 20503

Re: Notice of Information Collection Under Office of Management and Budget (OMB) Emergency
Review: Immigrant Health Insurance Coverage

Dear Secretary Pompeo and Director Mulvaney,

Thank you for the opportunity to comment on the Department of State's Notice of Information
Collection Under Office of Management and Budget (OMB) Emergency Review: Immigrant Health
Insurance Coverage regarding Form DS-5541. We write out of deep concern and opposition to both the
request for emergency review and on the underlying proposal.

**Background and Expertise of APIAHF**

The Asian & Pacific Islander American Health Forum (APIAHF) is the nation's leading health policy
organization working to advance the health and well-being of over 20 million Asian Americans, Native
Hawaiians and Pacific Islanders (AA and NHPI) across the U.S. and territories. APIAHF works to improve
access to and the quality of care for communities who are predominately immigrant, many of whom are
limited English proficient, and may be new to the U.S. health care system or unfamiliar with private or
public coverage. We have longstanding relationships with over 150 community based organizations in
32 states, to whom we provide capacity building, advocacy and technical assistance. As such, we have a
strong understanding of the needs and barriers in immigrant communities and the impact changes in
immigration and public assistance policy would have on them.

For over 32 years, APIAHF has worked extensively on both the issues of immigration and health; areas of
policy that this proposed rule would upend. Through research, analysis and community partnerships,
these issues are the core of our expertise. APIAHF and our partners have consistently advocated for the
importance of access to health care and other public assistance for all families, regardless of their
citizenship status. We know from experience that access to quality health care, not burdened by
obstacles like finances, means families can thrive and contribute to their communities. At the same
time, we are reminded that our country has a deep history of racial discrimination that has contributed
to health disparities among communities of color, including AA and NHPIs.

**Two Day Comment Period Is Unacceptable**

OMB should not grant emergency review of this information collection. The State Department (State) justifies the need for review based on the November 3 implementation date. However, State provides no evidence for why this implementation date is needed nor does it appear to have considered alternative dates. State does not offer any other justification for why emergency review is justified.

This Notice was published on October 30, 2019, and will close for comments on October 31. This two-day review period is not sufficient to properly review the proposed information collection implementing the Presidential proclamation. While this comment attempts, under this short time frame, to outline some initial concerns, a full 60 day or longer comment period is needed to fully understand the complex implications of this policy on the 450,500 immigrants that State has assessed it will impact, including the costs that it will lead to for immigrants, their families, and the U.S. health care system.

**The 10 Minute Estimation of Completion Time Is Inaccurate**

This Notice proposes that consular offices, in implementing the Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, will ask each applicant for an immigration visa a series of questions about her plan for being covered by health insurance within 30 days of entering the United States including:

- The specific health insurance plan;
- The date coverage will begin;
- "Such other information," which is not elaborated on in the Notice; and
- Whether, if not planning to purchase health insurance, the applicant has financial resources to pay for reasonably foreseeable medical expenses.

State claims that the Average Time Per Response to comply with the Information Collection will be 10 minutes. We believe that time estimate is inaccurate, particularly given the proposed questions. This Notice requires hundreds of thousands of immigrants who otherwise may have waited until arriving in the U.S. to purchase health insurance to spend time in their home country researching their health insurance options, finding a plan that will accept customers who are not yet residing in the country and signing up. The information requested by the Notice will be impossible to provide otherwise, given that an applicant will be unable to know the start date, or even whether their chosen insurance carrier will accept them as a customer, without applying for coverage itself. This process could take hours or even days. Evaluating only the time it takes for a consular officer to ask a series of questions and not the time it takes to prepare for the set of questions is not a valid analysis of the impact of this Notice.

This Average Time Per Response not does account for the fact that many visa applicants will be unfamiliar with the U.S. health care system, which is complex due to the web of private and public insurance options, and varying eligibility for immigrants within those options.[1] Many immigrants may be coming from countries where private health insurance is not available or looks completely different.

---

[1] "Snapshot: Immigrant Health in the United States," Asian & Pacific Islander American Health Forum (August 2019). Available at: https://www.apiahf.org/resource/snapshot-immigrant-health-in-the-united-states/.

One review of refugees experiences found that a lack of knowledge about their host country's health care systems led to confusion and poor quality of care.[2]

**A Majority of Visa Holders May Be Denied Entry**

According to the Migration Policy Institute, 375,000 immigrants may be denied entry to the U.S. under the Presidential proclamation.[3] This analysis also reviews potential ways that State could implement the policy that may vary the number of immigrants impacted. This Notice, by requiring visa applicants to have pre-selected a plan, likely maximizes the number of denials that could occur.

State does not specify how or whether it will train staff to understand the different types of health insurance and whether a plan meets the conditions required under the Presidential proclamation. This means that there is potential for a visa applicant to be incorrectly denied because his officer does not understand our complex health care system. This concern is born-out by the inconsistent way the Public Charge update to the Foreign Affairs Manual has been carried out, with some countries seeing disproportionately high increases in denials.[4]

This Notice may have a disproportionate impact on immigrants from Asian and Pacific Islander countries. 31% percent of the 1.1 million immigrants receiving green cards this year are from Asia and the Pacific Islands, including 40 percent of family based immigrants and 54 percent of employment-based immigrants.[5]

**The Notice Discriminates Against Limited English Proficient Populations**

We are concerned this Notice will discriminate against individuals who are Limited English Proficient (LEP), meaning they speak English less than "very well." Over 6 million people of Asian and Pacific Islander background in the United States are LEP.[6] While language access protections exist for those trying to sign up for health insurance in the U.S. under Section 1557 of the Affordable Care Act, they only apply to health insurance plans that receive federal funding. However, under the Presidential proclamation, most of those plans are explicitly deemed not acceptable forms of insurance that would allow visa applicants to be admitted. The remaining options, such as Short Term Limited Duration and Travel Insurance plans, may have no or low quality information or assistance available to consumers in

---

[2] Mangrio, E. and Sjögren Forss, K. (2017). Refugees' experiences of healthcare in the host country: a scoping review. BMC health services research, 17(1), 814. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5721651/.

[3] Galatt, Julia and Mark Greenberg, "Health Insurance Test for Green-Card Applicants Could Sharply Cut Future U.S. Legal Immigration", Migration Policy Institute (October 2018). Available at: https://www.migrationpolicy.org/news/health-insurance-test-green-card-applicants-could-sharply-cut-future-us-legal-immigration.

[4] Hesson, Ted, "Exclusive: Visa Denials To Poor Mexicans Skyrocket Under Trump's State Department," Politico (August 6, 2019). Available at: https://www.politico.com/story/2019/08/06/visa-denials-poor-mexicans-trump-1637094.

[5] "Public Charge Proposals is an Attack on AAPI Families," Asian & Pacific Islander American Health Forum (November 2018). Available at: https://www.apiahf.org/wp-content/uploads/2018/09/December2018_Public-Charge-Factsheet.pdf.

[6] "Protections For Language Access Are At Risk", Asian & Pacific Islander American Health Forum (August 2019). Available at: https://www.apiahf.org/resource/protections-for-language-access-are-at-risk/.

their preferred language. This may mean that either visa applicants who are LEP will be unable to find insurance, or they will find inaccurate information that leads them to purchasing insurance that is either not compliant with the Presidential proclamation or will not cover their health care needs.

In addition to our concern that this lack of support for LEP individuals may make it extremely difficult for them to comply with this Notice, it also makes it likely that they will be vulnerable to fraudulent companies and bad actors seeking to take advantage of visa applicants with low health literacy. It would be easy to set up a website in multiple languages claiming to offer health insurance for immigrants to the U.S., ask for payment up front, and then provide no or extremely low quality coverage. Because these sites may operate internationally, immigrants may have no recourse when they arrive in the country and discover their insurance does not cover what they thought it did. In one example of such fraud, British tourists to Spain paid travel health insurance companies for health insurance that did not cover services beyond those they were already covered for under the country's national health care system.[7] State provides no explanation for how or whether consular officers will evaluate whether a health insurance plan provides real coverage or not.

**The Presidential Proclamation Is Incorrectly Justified**

The Presidential proclamation that this Information Collection is being proposed under incorrectly justifies its need by claiming that immigrants contribute to uncompensated care costs in a significant way. The Presidential proclamation states, "While our healthcare system grapples with the challenges caused by uncompensated care, the United States Government is making the problem worse by admitting thousands of aliens who have not demonstrated any ability to pay for their healthcare costs."[8] However, the Kaiser Family Foundation has found that lawfully present immigrants make up just 15 percent of the uninsured and that immigrants may actually improve health care risk pools, lowering costs, because they tend to be younger and healthier.[9]

In fact, the Presidential proclamation may worsen uncompensated care costs by shifting immigrants from subsidized comprehensive plans under the Affordable Care Act to low-cost Short Term Limited Duration Plans, which cover much less and likely will lead to higher out of pocket costs that the customers cannot afford.[10] One health system executive recently said that, under expansion of these plans, the "longer coverage period of the policies and lack of essential coverage inherently puts health

---

[7] Willmore, Simon, "Thousands of British tourists have travel insurance policies that only cover public healthcare," Travel Daily Media (July 9, 2019). Available at: https://www.traveldailymedia.com/brits-insurance-only-public-healthcare/.

[8] "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System," The White House (October 4, 2019). Available at: https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/.

[9] "President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage," Kaiser Family Foundation (October 10, 2019). Available at: https://www.kff.org/disparities-policy/fact-sheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/.

[10] "ACA Open Enrollment: For Consumers Considering Short-Term Policies," Kaiser Family Foundation (October 25, 2019). Available at: https://www.kff.org/health-reform/fact-sheet/aca-open-enrollment-for-consumers-considering-short-term-policies/.

000273

systems at risk for increases in uncompensated care."[11] Given that these plans are misleadingly marketed, many immigrants may not even realize that their health insurance does not cover many medical treatments.[12]

We also express concern that other forms of health insurance that are acceptable under the Presidential proclamation, such as unsubsidized plans offered within the individual market, will be unavailable to those who are not yet residents of the U.S. Purchasing a health insurance plan that not does come with Premium Tax Credits under the ACA through the marketplaces still requires demonstration of residency in the state and county that the plan is being offered. Additionally, while employer sponsored insurance is deemed acceptable, employers are allowed to require new employees to wait 90 days until their insurance is activated.[13] This Notice says that visa applicants, however, will be required to demonstrate that they will have health insurance within 30 days of entry.

Because of the reasons described above, we believe this proposal should be withdrawn both because of the insufficient time to review and because of the irreversible flaws in the policy itself.

Thank you for your willingness to consider our comments. If you would like any additional information, please contact Ben D'Avanzo, Senior Policy Analyst, at bdavanzo@apiahf.org or 202-706-6767.

Sincerely,

Kathy Ko Chin

President & CEO
Asian & Pacific Islander American Health Forum

---

[11] Kern, Howard, "Commentary: Short-term, limited-duration health plans pose risks for patients, healthcare providers," Modern Healthcare (February 23, 2019). Available at: https://www.modernhealthcare.com/article/20190223/NEWS/190229983/commentary-short-term-limited-duration-health-plans-pose-risks-for-patients-healthcare-providers.

[12] Corlette, Sabrina, et al, "The Marketing of Short-Term Health Plans," Robert Wood Johnson Foundation (January 31, 2019). Available at: https://www.rwjf.org/en/library/research/2019/01/the-marketing-of-short-term-health-plans.html.

[13] Andrews, Michelle, "A Reader Asks: Can New Employees Be Forced To Wait 90 Days For Coverage?," Kaiser Health News (June 27, 2014). Available at: https://khn.org/news/michelle-andrews-on-delays-in-employer-provided-coverage/.

000274

**CONNECT for HEALTH**
**COLORADO®**

4600 South Ulster Street | Suite 300
Denver, CO 80237

October 31, 2019

BY ELECTRONIC DELIVERY

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget (OMB)

and

Office of Visa Services
Bureau of Consular Affairs
Department of State

**RE: DS-5541 Information Collection: Immigrant Health Insurance Coverage
(Emergency Submission) DOS-2019-0039**

To whom it may concern:

The staff at Connect for Health Colorado (C4HCO), the state-based health insurance
marketplace (SBM) for Colorado, appreciate the opportunity to comment on the
Immigrant Health Insurance Coverage Notice of Information Collection.

While we applaud the Department of State's support encouraging all non-citizens to
enroll in health coverage, we firmly believe that the directive requiring all qualified
non-citizens to have coverage, along with the recent changes to the Public Charge
rule, create, at best, an environment of confusion, and, at worst, promote a culture of
fear and uncertainty. This new proclamation requires coverage for a public benefit,
while the Public Charge rule penalizes individuals for seeking benefits. The
contradictory directives by the Administration leaves Coloradans in a precarious
situation.

New immigrants are a vulnerable population. While C4HCO and many others are
working to lower the cost of health coverage in Colorado, affordability is still a
significant barrier to accessing coverage for some.

ConnectforHealthCO.com

000275

We strongly encourage the Administration to consider all the barriers this proposed directive puts in the way of immigrants entering the country. If an individual has a hardship in enrolling for coverage, we urge you to consider exemptions from this requirement.

C4HCO also opposes the emergency nature of this process. Absent clear information that there is an actual emergency, the public would greatly benefit from more deliberate policymaking. Moreover, the aim of this directive to encourage greater participation in health insurance would be better served by a more open and collaborative approach. We suggest the creation and distribution of materials for customers, brokers, navigators and immigration advocates to mitigate confusion and anxiety. Providing these resources would prove that the intent of this directive is to help those in need.

C4HCO remains committed to increasing health insurance access, affordability and choice for all individuals and their families. We will do our part to ensure that correct, accurate information and assistance is available to every Coloradan.


Sincerely,


Connect for Health Colorado Staff



2

000276



October 31, 2019

Edward J. Ramotowski
Deputy Assistant Secretary
Visa Services
Bureau of Consular Affairs
Department of State

Department of State Desk Office
Office of Information and Regulatory Affairs
Office of Management and Budget

Regarding Immigrant Health Insurance Coverage Docket Number DOS-2019-0039 Form
Number DS-5541

Dear Deputy Assistant Secretary Ramotowski:

The undersigned co-chairs of the Consortium for Citizens with Disabilities' (CCD) Health,
Rights, and Long Term Supports and Services Task Forces write to express our strong opposition
to the October 4, 2019 Presidential Proclamation mandating that visa applicants abroad buy
certain approved health insurance and the efforts by the State Department and the Office of
Management and Budget to implement the proclamation. The health insurance requirement is
arbitrary and discriminatory against people with disabilities and pre-existing conditions. CCD is
the largest coalition of national organizations working together to advocate for federal public
policy that ensures the self-determination, independence, empowerment, integration and
inclusion of children and adults with disabilities in all aspects of society.

This proclamation, declaring that Medicaid coverage for adults and subsidized State marketplace
plans do not meet the new health insurance requirements, will discourage many people with
disabilities from lawful entry into the United States.

The proclamation restricts immigrants' ability to purchase comprehensive health insurance
available through the Affordable Care Act (ACA) marketplaces, coverage that includes
protections including requirements that an insurer cannot charge more or deny coverage based on
a pre-existing health condition. Congress elected to make lawfully residing immigrants eligible
for subsidized marketplace coverage because doing so advances the health of our nation. The
proclamation puts the nation's health at risk by ignoring Congress and instead requiring
individuals to buy costly and less comprehensive health coverage.

Medicaid coverage for adults also does not count as approved health insurance. Medicaid remains the largest insurer in this country for the long-term services and supports, and mental health and substance use disorder treatment. . Most home and community-based services are not available through private insurance. Many people with disabilities rely on Medicaid to work, attend school, remain healthy and participate in the community with the necessary supports that many of the "approved" options will not provide.

Notably, while rejecting the types of coverage that many people with disabilities rely on for comprehensive care, the proclamation allows catastrophic coverage and short-term plans to qualify as acceptable coverage. Short-term plans, for example, lack comprehensive coverage, can be prohibitively expensive for individuals with pre-existing conditions, and can deny people coverage based on their medical history and set arbitrary service limits. This proclamation is not about protecting existing taxpayer resources or promoting health insurance. It puts a barrier between individuals and the coverage they need and for which they may be eligible, and it establishes yet another administrative hurdle to limit who can obtain a valid visa. It also encourages new immigrants who may be unfamiliar with our health care system to purchase inadequate plans that may not fit their health needs and could expose them to high financial risk after entry. In fact, encouraging immigrants to avoid comprehensive insurance that includes the benefits they need could increase uncompensated care costs when immigrants can't afford needed health care that is not covered by these bare-bones plans.

Immigrants with a disability must have a fair opportunity to enter and reside legally in the United States, without unnecessary or discriminatory restrictions based on their disability. The approved health care proclamation is another unwelcome throwback to the historical isolation, segregation and exclusion of people with disabilities. It will deny immigration to individuals based on stereotypes and fears about disability and chronic illness. The Administration should not move forward to implement this proclamation and it should be rescinded by The President.

Sincerely,

The Undersigned Task Force Co-Chairs:

Alison Barkoff, Center for Public Representation
Julia Bascom, Autistic Self Advocacy Network
David Machledt, National Health Law Program
Sarah Meek, ANCOR
Rachel Patterson, Epilepsy Foundation
Julie Ward, The Arc of the United States

CENTER FOR ELDER LAW AND JUSTICE PUBLIC COMMENT IN RESPONSE TO
PRESIDENTIAL PROCLAMATION 9945 REGARDING
IMMIGRANT HEALTH INSURANCE AND 2-DAY COMMENT PERIOD

The Center for Elder Law and Justice strongly opposes both Presidential Proclamation 9945 requiring that immigrants provide proof of acquisition of health insurance, or of funds sufficient to acquire health insurance after arriving in the US, and the 2 day "emergency" comment period enacted by the Department of State with regard to the Presidential Proclamation. The Proclamation itself is overbroad and unduly vague, and also places an unjustified burden on immigrants to obtain only limited types of health insurance plans. The 2-day "emergency" comment period is an affront to due process and an unfair limitation on all Americans' First Amendment rights to petition the government for redress of grievances.

The Proclamation, set to go into effect in a matter of days, sets hasty and ill-thought-out limitations on immigrants with respect to health insurance without proper guidance as to how these immigrants can abide by the new rule. In this respect it is arbitrary and capricious. The Proclamation requires, for example, immigrants who do not already have health insurance in the United States to provide evidence of funds sufficient to purchase insurance. Nowhere in the Proclamation does it state how much money is needed to be deemed "sufficient." It also does not state how long an immigrant needs to prove that he or she can afford to maintain health insurance. Immigrants will appear for their visa interviews not knowing how much money they should have saved up in the one-month period of time between the issue of the Proclamation and the date it is set to take effect. Nor will they know whether they need to prove that they can buy one month, one year, or a lifetime's worth of health insurance in order to come to the United States. For immigrants who are coming to the United States on employment visas, they may not yet have information from their employers on the specific health insurance plans that will be available to them from their new employers, if their new employers offer coverage. Since the Proclamation offers no guidance as to how immigrants can demonstrate compliance, it should be repealed in its entirety.

Further, the Proclamation does nothing to achieve its stated "justification" that the government needs to lessen the number of immigrants who require Medicaid coverage or other

government-subsidized care. Although the Proclamation seeks to achieve this goal by forbidding immigrants from using Medicaid eligibility or eligibility for subsidies to purchase coverage on Affordable Care Act exchanges, in reality the Proclamation does nothing to prevent immigrants from using those products once they arrive in the United States. Although the Proclamation states that coverage through Medicaid or the Affordable Care Act subsidized plans is not adequate to demonstrate compliance with the health insurance rule, it does allow the purchase of short-term plans that do not meet the ACA's health insurance plan requirements to qualify. These "junk plans," as they are more commonly known, provide almost no realistic coverage. Once immigrants who have purchased these plans (or demonstrated the financial ability to do so) have arrived in the United States, they will still need comprehensive health insurance in order to secure their access to health care. This means they will still need to sign up for either Medicaid or plans on ACA exchanges, as Congress has not passed any law forbidding immigrants from accessing these products. Thus, the only real achievement of the Proclamation is to funnel unnecessary spending into "junk plan" markets by immigrants. The government will still subsidize their eventual Medicaid or ACA exchange health insurance plans, after a *de facto* kickback to the companies that issue "junk plans." Since the Proclamation does nothing to meet its stated goal of reducing government spending on immigrant health insurance, it should be repealed in its entirety.

Finally, the 2 day comment period set by the Department of State is an affront to the public's right to respond. Since this was not a law duly passed by our elected officials, a comment period is the only way in which the public can petition the government for redress in response to this Proclamation. Offering a comment period of merely 2 days, with little public notice of said comment period, is the functional equivalent to offering no comment period at all. Drafting well-researched and thoughtful commentary to new regulations is a process that takes time and effort. Allowing only 2 days for public comment on such a flawed regulation effectively violates the public's First Amendment rights to adequately respond to the Proclamation. Putting aside the glaring flaws in the Proclamation itself, the fact that it was issued with only a 2 day "emergency" comment period is reason enough for it to be repealed until the American people can have adequate time to properly express their opinions on this issue.

000280



1275 First Street NE ■ Suite 1200 ■ Washington DC 20002
(202)408-1080 ■ fax (202)408-1056 ■ center@cbpp.org ■ www.cbpp.org

October 31, 2019

To:     Office of Management and Budget, State Desk Officer in the Office of Information and
        Regulatory Affairs
        The Department of State's Bureau of Consular Affairs, Office of Visa Services

Re:     Public Notice: 10934. Notice of Information Collection Under OMB Emergency Review:
        Immigrant Health Insurance Coverage (Docket Number: DOS–2019–0039)

To whom it may concern:

    The Center on Budget and Policy Priorities is a nonpartisan research and policy organization
based in Washington, D.C.  Founded in 1981, the Center conducts research and analysis to inform
public debates and policymakers about a range of budget, tax and programmatic issues affecting
individuals and families with low or moderate incomes.  We are submitting comments in opposition
to the information collection process and underlying policies outlined in the notice of information
collection related to the Presidential Proclamation issued on October 4, 2019, which is under Office
of Management and Budget emergency review.

    This notice of information collection details a process that is flawed and unworkable.  If
implemented, it will burden both individuals and families in the United States who are seeking to
have their family members lawfully immigrate to our nation and staff at consular officers who will be
asked to conduct reviews they have neither the expertise nor information to execute.

    In addition to these concerns about the information collection process, explained in detail
below, we have serious concerns about the underlying policy created by the Proclamation and
believe the government should rescind the policy in its entirety.  The policy may result in severely
and unnecessary constraining lawful immigration so that only immigration applicants who are
already fairly wealthy will have the opportunity to enter the United States lawfully.  And while the
stated purpose of the Proclamation is to reduce uncompensated health care costs, it will likely

reduce the number of people enrolled in comprehensive health coverage, which could *increase* uncompensated care:

- First, the Proclamation steers new immigrants away from comprehensive coverage through Medicaid or the Affordable Care Act's marketplace plans with premium tax credits to offset the cost of premiums and toward short-term plans or other coverage that is likely to leave consumers vulnerable to significant financial risk if they need to use medical services. If individuals opt for such a plan and they get sick or injured, they may not be able to afford out-of-pocket expenses and medical providers will be left carrying the burden of uncompensated care.

- Second, the new policy — which is slated to take effect just days after the ACA's marketplace open enrollment period starts—is likely to create additional fear and confusion among families that include immigrants and may prevent some from enrolling. Some people who aren't subject to this assessment may fear signing up for coverage with ACA premium tax credits or Medicaid will negatively impact their families' immigration goals. For example, a family may not sign their children up for Medicaid because they fear it could leave a parent unable to immigrate to the United States. As a result, the proclamation will raise uninsured rates among lawfully present immigrants and potentially their U.S. citizen family members. That, in turn, will increase uncompensated care costs, exacerbating the very problem the proclamation purports to address.[1]

We also strongly object to OMB allowing this notice of information collection to have a 48-hour comment period under an emergency review process.  Emergency processing is intended to be used in cases when events outside of the control of an agency require immediate action that will not allow for compliance with the normal comment process.  Such examples include, responding to a natural disaster, meeting a deadline required by law or a court ruling, or preventing severe harm to the public if the completion of the process is delayed.[2]  In this case, the government had full control over the date it issued the Proclamation and the implementation date it selected.  The agency has offered no argument for why the Proclamation must take effect immediately or what harm would result from delaying implementation to allow for a more reasonable comment period.  The extremely short comment period has not allowed for experts in the field who might provide valuable insight to the government or stakeholders that will be directly and indirectly impacted by this new information collection process to fully analyze or understand the problems it will create.  With additional time, we anticipate that we would identify additional ways the proposed process is burdensome and unworkable for both individuals and agency staff.

We strongly recommend that the Department halt its implementation of the mandate until at the very least it has had time to create processes that are informed by a suitable public comment period.  We respond below to your specific request for comments to assist the Department evaluating the information collection process:

---

[1] Brief of Amici Curiae, City and County of San Francisco and County of Santa Clara v. U.S. Citizenship and Immigration Services, et al., No. 4:19-CV-04717, https://www.aha.org/system/files/media/file/2019/09/amici-curiae-brief-of-aha-hospital-groups-on-dhs-public-charge-rule-9-11-1019.pdf

[2] 5 CFR § 1320.13 - Emergency processing.

**Evaluate whether the proposed information collection is necessary for the proper functions of the Department:**

The information collection is not necessary for the proper function of the Department. The information collection is implementing a policy that will create a health insurance mandate for certain individuals seeking lawful immigration to the United States. This in no way advances any legitimate objective of the State Department, and, as explained above, the policy in fact undermines some of its stated objectives.

The Department has no expertise in implementing a health insurance mandate and the mandate serves no purpose that furthers the objectives of the Department. Design and implementation of mandates to obtain health insurance is extremely complicated, as evidenced by the extensive deliberations and rule-making the Department of the Treasury, the Department of Health and Human Services, and other agencies undertook over several years to implement the Affordable Care Act. The Department lacks the expertise that those agencies relied upon and thus is certainly incapable of designing a workable mandate without a meaningful opportunity for public comment to enlighten it about the various choices involved.

**Evaluate the accuracy of our estimate of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used.**

We have serious concerns about the validity of the methodology used for data collection and assumptions used. Consular officers will be required to ask immigrant visa applicant verbally whether they will be covered by health insurance within 30 days of entry into the United States and to also provide details of such coverage (identify insurance plan, date coverage will begin and other information about the insurance the consular deems necessary.) Problems with this method include:

- Many consumers will not be able to enroll in health insurance coverage until they enter and begin residing in the state in which they will obtain coverage. This means they are unlikely to have detailed information about the coverage when they are applying for their status. For example, in most cases they won't be able to provide an accurate effective date since their insurance start date will be contingent on the move to the state in which they will enroll in coverage.
- The method gives consular officers discretion on requesting other information that is related to the insurance. These officers are not health insurance experts and are unlikely to know what would be a reasonable and not reasonable request for information related to coverage, or how to evaluate information they are given. Requiring them to make judgments in areas where they have neither expertise nor information will result in arbitrary, inconsistent decisions.
- The Proclamation allows visa applicants with no health coverage to enter the United States if they have the financial resources to pay for reasonably anticipated medical expenses. Officers are unlikely to understand what it would cost to treat medical conditions, indeed often consumers are unaware of costs associated with treatment and services especially those

provided in a hospital setting. Immigration officers are not doctors that would have the expertise to evaluate treatment that will likely be needed, nor are they health policy experts with information on what the costs would be for services needed for a variety of health conditions.  Again, requiring them to make judgments in areas where they have neither expertise nor information will result in arbitrary, inconsistent decisions.

- It's especially troubling that this information gathering process depends on a verbal collection and assessment of information.  For those visa applicants that do have information about expected coverage, it will be unclear to them what information they should be prepared to provide when verbally asked for the information.  This verbal interaction seems vulnerable to inequitable collection and assessment.  Decisions made in this verbal data collection will also be difficult to challenge if a visa applicant feels he/she was improperly denied or delayed entry.  Consular officers, with the best of intentions, may make erroneous decisions based on miscommunications with applicants that neither party can detect from what they recall of a verbal request.  Health insurance policies, and important transactions relating to those policies, are almost uniformly conducted in writing precisely because of the complexity of these issues and the high potential for error.  When consular officers, rather than health insurance professionals, are involved the risk of error increases.

Your estimate of the burden of this information collection seems erroneous for several reasons.  First, because of the likelihood of miscommunications and misunderstandings, many applicants will have to supply information several times.  The lack of coherent standards for consular officers to rely upon in assessing what applicants supply means that many are likely to request additional information several times before making a decision.

Second, ten minutes seems a wildly optimistic estimate of the amount of time each applicant will be required to spend on these requests.  As noted above, many will not be able to obtain insurance in the U.S. until they have established residency here or have started employment.  Most insurance will not be available, therefore, until the applicant arrives some time in the future.  Proving the likelihood of future insurance that is contingent on the immigrant's arrival likely will require collecting numerous documents not otherwise within the applicant's control, such as detailed conditional offers of employment and the health insurance policies of prospective employers.  Gathering this information will require hours or days, not minutes.  In addition, those seeking to qualify on the basis of having sufficient funds to cover treatment for illnesses they have may need to obtain detailed information about their diagnoses, about the costs of treatment in the U.S. (which may be very different than those with which they are familiar in their country of origin), and the policies of prospective health care providers.  Many health care providers have multiple rate structures:  one for Medicare, another for Medicaid, still more for various private health insurance plans, and even more for persons seeking to pay out-of-pocket.  They may have difficulty determining which rate structure the provider will apply to them, which would require time-consuming back-and-forth interactions with these prospective providers.  Because different providers have very different rates, they may need to "shop" for providers long-distance to obtain rate information that will allow them to qualify.  Because this is not the manner in which most health care providers accept new patients, several calls may be necessary to overcome initial resistance to provide rate quotes to prospective patients they have never met or examined.  Thus, for the great majority of applicants, much more than ten minutes will be required to provide an adequate response to this information request.

October 31, 2019

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services

RE: DOS-2019-0039 – Emergency Submission Comment on Immigrant Health Insurance Coverage

To Whom It May Concern:

The undersigned organizations write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. We write to express strong opposition to the administration's proclamation. We welcome and value the contributions of those who have immigrated to the United States and settled in Colorado. They are our friends and neighbors, they are the parents and grandparents of Colorado kids, and they help drive our economies and enrich the culture and future of our state.

The proclamation at issue runs counter to our values of a fair and welcoming Colorado. It will, without authorization from Congress, drastically limit the number of people who are able to obtain a green card and unify with their family members in the United States, including in Colorado. It will also undermine rather than promote access to comprehensive health coverage and will create more complexity in the already complex and backlogged U.S. immigration system. In addition, we object to the implementation of this policy through an emergency process, which limits public oversight of this drastic measure.

**Impact on legal immigration**

The Migration Policy Institute (MPI) estimates that the proclamation could prevent one-third of all green card applicants from obtaining permanent residence and uniting with their U.S.-based family members.[1] In order to arrive at their estimate, MPI looked at recent green-card recipients and found that 65 percent of that population would not meet the coverage requirements outlined in the proclamation.

Importantly, nearly half of the 65 percent who would not meet the proclamation's requirements do have comprehensive health insurance coverage.[2] In line with eligibility laws set by Congress, 34 percent of recent-green card recipients have coverage through Medicaid or a subsidized health insurance program according to MPI. In the Patient Protection and Affordable Care Act (ACA), Congress explicitly recognized both Medicaid and subsidized coverage as health insurance for the purposes of satisfying the individual mandate. The proclamation runs counter to the clear intention of Congress in making recent immigrants eligible for coverage and in recognizing Medicaid and subsidized coverage as comprehensive insurance.

**Impact on the number of people with comprehensive health coverage**

---

[1] https://www.migrationpolicy.org/news/health-insurance-test-green-card-applicants-could-sharply-cut-future-us-legal-immigration
[2] Id.

1

The administration claims that the proclamation is necessary to reduce uncompensated care for uninsured patients in our health care system. However, the proclamation will likely have the opposite effect to the extent that it incentivizes more people to purchase short-term "insurance" products that do not meet the ACA's coverage requirements. The reason is that people with these short-term plans are effectively uninsured for the purposes of many common conditions and health care needs. In addition to being able to exclude coverage for pre-existing conditions, short-term plans can categorically exclude certain benefits, such as routine maternity and newborn care, prescription drugs, mental health care, substance use services, and preventive services like birth control and tobacco cessation. High-cost services that are provided to people with short-term plans are likely to go uncompensated when they are not covered by the plan.

**Adding complexity to the U.S. immigration system**

The proclamation was issued without warning and without necessary detail regarding implementation. Most notably, the proclamation does not outline how future green-card applicants will be asked to prove that they can find insurance coverage within 30 days of arrival. Satisfying this requirement will be especially challenging because the proclamation works at cross-purposes with existing law. Under the ACA, green-card holders are eligible to purchase subsidized health insurance. But those who anticipate accessing health insurance with the help of a subsidy will not qualify under the new health insurance test. It is unclear how green-card applicants will be required to prove that they will purchase health insurance without the help of subsidies they would be eligible for and entitled to, according to Congress.

Some green-card applications may be able to show that they can get a short-term plan. However, Colorado[3] and several other states have restricted or banned these plans because they fail to provide adequate protections for consumers. In addition, short-term plans may discriminate against certain people and are thus not uniformly accessible. For example, gender-rating (the practice of charging women higher premiums than men) is commonplace among insurers selling short-term plans. In addition, health questionnaires are often used by short-term plans to identify and deny coverage to people with preexisting conditions. It is unclear whether green-card applicants will be required to show that they can afford and can qualify for a short-term plan and how they will be expected to do so.

**No public oversight**

The proclamation comes on top of a new public charge rule that, if implemented, is expected to greatly restrict future legal immigration.[4] The process of changing the public charge rule has required –

- Publication of a proposed rule in the Federal Register
- A 60-day public comment period, during which over a quarter million comments were submitted, largely in opposition to the change
- Department of Homeland Security (DHS) review of the comments submitted
- DHS publication of a final rule in the Federal Register, including publication of comments and agency responses; and

---

[3] 3 C.C.R. 702-4, sec. 4-2-59
[4] https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration

- A 60-day delay in implementation after publication of the final rule, during which several courts issued primary injunctions barring implementation of the rule.

The insurance proclamation is stricter than the public charge test proposed by DHS because it looks at just one factor: the ability to quickly find health insurance coverage. As MPI points out, it is highly possible that someone could pass the public charge test by showing relatively high educational attainment, strong English skills, and other factors, only to be denied access to a green card because of the new proclamation. Yet, despite the huge impact the proclamation is likely to have, there has been no meaningful opportunity for public oversight of this substantial change in administrative policy. A presidential proclamation that goes into effect four weeks after it is issued is an inappropriate vehicle for a policy change of this magnitude.

**Conclusion**

Without warning, clarity about implementation, or consultation with key stakeholders this proclamation is a recipe for more confusion and delay in the U.S. immigration system. We urge the administration not to proceed with implementing the proclamation and we stand together in support of an inclusive society that truly honors the dignity of all people and the contributions immigrants have made to the economic strength and cultural vitality of our country.

Boulder County
    Board of County Commissioners

Caring for Colorado Foundation

Center for Health Progress

Clinica Colorado

Colorado Center on Law & Policy

Colorado Children's Campaign

Colorado Community Health Network

Colorado Consumer Health Initiative

Colorado Cross Disability Coalition

Colorado Health Foundation

Colorado Hospital Association

Colorado Immigrant Rights Coalition

Colorado Organization for Latina
    Opportunity and Reproductive Rights

Colorado Safety Net Collaborative

Hispanic Affairs Project

Hunger Free Colorado

LiveWell Colorado

Mile High United Way

NARAL Pro-Choice Colorado

Planned Parenthood of the Rocky Mountains

Progress Now Colorado

Rose Community Foundation

STRIDE Community Health Center          Tri-County Health Network

000288



**Immigrant &
Refugee Center**
OF NORTHERN COLORADO

Department of State, Office of Information and Regulatory Affairs, Office of Management and
Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

Re: Emergency Submission Comment on Immigrant Health Insurance Coverage

<u>**October 30, 2019**</u>

To Whom It May Concern:

The Immigrant & Refugee Center of Northern Colorado is submitting this public
comment in response to the "Emergency Submission Comment on Immigrant Health Insurance
Coverage" now opened by the Department of State. This move by the Department, made in
response to the Trump Administration's proclamation[i] from October 4th, not only creates an
undue burden on aspiring immigrants coming to the United States, but it also worsens public
health and undercuts our creedal commitments to justice and equality before the law. Enacting
this restriction cannot be allowed, and it is the duty of the Department to rescind this motion
immediately.

This directive—specifically the instruction to collect insurance coverage information
from visa applicants as a means of adjudicating the applicant's viability for acceptance — is an
attempt to circumvent the Congress in order to curtail legal immigration. As observed by the
Migration Policy Institute[ii], such a threshold for visa acceptance would prevent nearly *two thirds*
of applicants from being accepted to rejoin family in the United States, contribute to our
economy, or fulfill the promise of American democracy or meritocracy. It is not coincidental that
this process of moving through the Department of State, rather than through more conventional
immigration offices, and allowing the public a mere two days for responding to the issue, is
occurring just after the sweeping injunctions against the proposed rule changes to Public Charge
have been issued. When one cannot get what one seeks through conventional means, one resorts
to surreptitious, unconventional means. It is, in other words, an attempt to govern by decree
instead of by legislation. Such a decree, as well as a precedent for such massive shifts in standing
US policy overnight without substantive public input, cannot be allowed to go into effect.

There is also the issue of this directive being counterproductive to its stated aims:
removing financial burdens from the healthcare system and improving public health. The time-
bound restrictions for entry and proof of insurance, based upon the applicant's time of
application, does not give room for enrollment into insurance marketplaces provided under the
Affordable Care Act (ACA). This oversight creates incentives for immigrants eager to enter the
country to purchase less comprehensive, more expensive insurances through private providers, or
to enroll through ACA without a chance for subsidies. This worsened coverage for greater cost
produces the very outcomes the Administration is predicating this directive upon; it is
counterproductive[iii].

000289



**Immigrant &
Refugee Center**
OF NORTHERN COLORADO

At a most foundational level, this move, beyond its curtailing of Congressional authority and beyond its false predicate on public health, betrays the creedal aspirations and promises of our great nation enshrined within our national motto, *E Pluribus Unum.* The Trump Administration has a history replete with overt statements indicating interest to hurt communities of color and policy aims to cut all forms of immigration, as it sees these groups as fundamentally not belonging in the United States. The Administration is wrong. In these moves, the Administration is smothering the very engine of our economic prosperity, the very source of our exceptionalism, and the very fountain of democracy itself. We write this comment to the Department of State in the hopes that this great Department—one with a proud history of elevating the value of diplomacy, rule of law, and the growth that emerges from pluralism and reciprocity—can stand up to its own calling and reject this policy directive. A better, safer America is not one where this policy exists. We encourage the Department to remove this policy directive from the Register.

Thank you for your time and consideration,

Lisa Taylor                                     Collin Cannon
Executive Director                         Director of Advocacy

[i] PP 9945 84 FR 53991 (October 4, 2019)  *"The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/
[ii] Gelatt, J., & Greenberg, M. (2019, October 10). Health Insurance Test for Green-Card Applicants Could Sharply Cut Future U.S. Legal Immigration. Retrieved from https://www.migrationpolicy.org/news/health-insurance-test-green-card-applicants-could-sharply-cut-future-us-legal-immigration
[iii] Published: Oct 10, 2019. (2019, October 10). President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage. Retrieved from https://www.kff.org/disparities-policy/fact-sheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/.

Comments re: Department of State, Public Notice: 10934

Docket Number: DOS-2019-0039

To whom it may concern:


I earnestly provide the comments below from the perspective of someone who also works in a government agency, albeit at a state level, from a practical problem-solving perspective.

Like many, my initial reaction to the 2-day comment period of the notice was one of cynical skepticism. Upon reading it, however, I quickly saw it for what I believe it is: a bureau of a federal department attempting to comply with both a mandate from an executive proclamation, and a standing statutory requirement regarding the new collection of information, in an unreasonably short amount of time.

I have never responded this type of notice before, but felt compelled to in this instance. The injustice of Presidential Proclamation 9945 (PP 9945) for immigrants is immediately apparent to any literate person with a notion of how U.S. laws work, but the ripple effects of the practical inefficiencies passed on to the agencies tasked with implementing these pointless absurdities is less obvious.

The notice has requested comment to permit the Department of State (Department) to:

(1) Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

(2) Evaluate the accuracy of our estimate of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used.

(3) Enhance the quality, utility, and clarity of the information to be collected.

(4) Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

While I am no one of consequence whose word carries no weight, I've attempted to approach this as though I were in this position: tasked with practically implementing a political mandate created by people without the faintest notion of how a process actually works.

1. Necessity: In saying that the information collection is not necessary for the "proper functions of the Department", I'm not saying anything the Department doesn't already know.  Viewed objectively through the lenses of its Vision Statement, Mission Statement, and Professional Ethos, the Department's only use for this information is to satisfy a mandate in a proclamation created for an Executive as a bullhorn to amplify a dog whistle, with no other practical application. The collection of the information in PP 9945 creates a new standard and, consequently, a new, unnamed category of immigrants. Immigrants in this new category are in all of the same previous visa types with all of the same requirements, save one: they are subject to an insurance requirement based on financial resources,

while simultaneously having removed from them the options available to all other current American citizens and legal immigrants to make that standard affordable through state insurance marketplaces.

As a metaphor, participation in the marathon is optional for people that are already here, but people in this new category are forced to run – and they may not wear shoes. Failure to complete the race shoeless and in adequate time results in denial of entry to the U.S., despite meeting all other requirements. I see only contradictions to the stated Department vision, mission, and ethos – but I also see the department being forced into that position by the proclamation.

2. Accuracy, Methodology:  To summarize what I see, PP 9945 mandates that the Department determine to the "satisfaction of a consular official", who is not required to be an expert in health insurance, whether an immigrant subject to the requirements will be covered by one of nine different categories of "approved health insurance coverage" within 30 days of entering the country. Some of those categories have subcategories, some are not defined, some rely on confirmation from third parties, and some types of insurance will require visa approval prior to actual purchase.

The notice estimates an average time for response of 10 minutes, with a total estimated burden time of 75,083 hours over 450,500 responses for the Department. Given the variables described above, I would suggest that a verbal confirmation of how an immigrant subject to the requirements intends to comply with PP 9945 by supplying the name of the insurance plan and estimated date of coverage should be sufficient to "satisfy" a consular official within reasonable expectations. Anything more would appear to fall outside of the scope of knowledge to be reasonably expected of said consular official, and additional collection of "such other information related to the insurance plan" would likely push the estimated average response and total burden times well beyond the estimates. Additional information may not be readily available in the moment the official asks, necessitating follow-up that may not be practicable.

The other side of that coin is the unspecified methodology to evaluate "financial resources" for "reasonably foreseeable medical expenses… related to existing medical conditions". Assuming that the Department's current Form I-864 is to be used to determine the immigrant and sponsor's combined net financial resources, determining a dollar amount to attach to specific "health issues existing at the time of visa adjudication" in order to determine sufficiency of those resources would be as complex as actual medical billing. Some hospital financial administration or insurance actuarial expertise would be required to create a fairly and equally applied methodology for that determination, which in practice would be unique to each presentation of any given medical condition. Which is all to say: essentially impossible for the Department to administer correctly and fairly to the letter of that provision within the scope of its mission and statutorily defined duties.

Lastly, though perhaps out of scope for purposes of the notice, the estimates do not account for the time and materials necessary to develop and administer the training and job aides that consular officials will require to apply the criteria defined (or not defined) in PP 9945 properly. To paraphrase what our President has already said so eloquently, the complexity and variety of these insurance products cannot be understated. For consular officials, the complexity of answers to PP 9945's questions will match it. Giving officials the authority to ask for additional details that they do not possess the expertise to

000292

evaluate appears on its face to be wasteful, counterintuitive, and essentially impossible to administer equally for all applicants.

3. Enhancing quality, utility, clarity: Like a digital photograph, the quality and clarity of the information collected cannot be enhanced beyond its origin. The proposed insurance information to be collected during the visa application may reside in either the present or the future; the requirement is not that an immigrant is already covered, only that coverage will be effective within 30 days of entering the country. The details provided may then be subject to change depending on variables ranging from insurance price fluctuations to the zip code where the person actually ends up residing before the end of that 30 days. Thus, information collected beyond yes or no, and the presumed details at that time, is merely additional layers of speculation.

As for utility, there appears to be none for the department, other than compliance with a mandate in a proclamation. Once an immigrant is approved to enter the country, there is no mechanism to validate the actual outcome of the answers provided to the Department in either the methodology described in the notice, or in PP 9945, and this data otherwise has no bearing on the department's stated mission.

4. Minimizing reporting burden: As a an oral response to an application interview question, the reporting burden rests entirely within the Department. Capturing the answers within an existing application framework will not likely pose too great a challenge, if the answers are limited to pre-defined fields. If the "such other information related to the insurance plan" standard is used, this would require the use of either an open-ended field or additional documentation to be collected, which would then require a qualified person to review those fields or documents, etc. – with no added value resulting from the additional information.

The reason these sorts of process changes usually come through statutes or rules is that there is a budgetary vetting process associated with them. While the outcomes are often still political in nature, there is at least been an initial accounting for the probable expenses and mechanisms to practically implement the proposed legislation. A presidential proclamation has no associated considerations, and in this case, the change is mandated to occur in less than a month. I would assume that the Department must still operate within the statutory requirements and budget it has been allotted, and anything contrary to either of those parameters would require additional authorization.

To conclude, PP 9945 seeks to use the Department as a pawn to realize its intent, which is at odds with the Department's vision, mission, and ethos statements. However, like any other piece, the movement of pawns is restricted by the rules of the game. PP 9945 does not consider the limitations of the Department's budget, nor the impact that the additional burden the collection of the information has on the Department's efficiency, nor the Department's lack of the expertise required to evaluate insurance coverage and medical condition costs required by PP 9945 – which lies well outside of the scope of knowledge that would reasonably be required of a consular official. To avoid the risk of unfairly applying undefined criteria, I would humbly suggest that the Department collect only the proposed information regarding the "specific health insurance plan" and "date coverage will begin" for the satisfaction requirement. Any further detail, or the criteria regarding the "financial resources to pay for reasonably

000293

foreseeable medical expenses" should be deferred to the Department of Health and Human Services to establish that criteria before attempting to penalize immigrants against it, since that lies well outside of the State Department's ability to determine properly within the scope of its statutory duties.

Sincerely,

Victor Garcia, Oregon resident

Stephen Manning (SBN 013373)
smanning@ilgrp.com
Nadia Dahab (SBN 125630)
nadia@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 241-0035
Facsimile: +1 503 241-7733

Karen C. Tumlin (*pro hac vice* forthcoming)
karen.tumlin@justiceactioncenter.org
Esther H. Sung (*pro hac vice* forthcoming)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944

*Attorneys for Plaintiffs*
*(additional counsel listed on signature page)*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

|  |  |
|---|---|
| JOHN DOE #1; JUAN RAMON MORALES; JANE DOE #2; JANE DOE #3; IRIS ANGELINA CASTRO; BLAKE DOE; BRENDA VILLARRUEL; and LATINO NETWORK,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 6

PARTIES ............................................................................................................................ 6

  PLAINTIFFS ................................................................................................................... 6

  DEFENDANTS ............................................................................................................... 9

FACTUAL ALLEGATIONS ........................................................................................... 10

  A.  The Proclamation ................................................................................................ 10

  B.    Agency Implementation of the Proclamation ................................................. 14

  C.  The Proclamation is Vague, Internally Contradictory, and
  Inconsistent with Existing Law in Ways State Department Action has Not Addressed .............. 18

    1.    The Proclamation Uses Unclear, Undefined Terms and Standards ................................. 18

    2.    Very Few, if Any of the Proclamation's "Approved Health Plans"
    Are Available to Visa Applicants ............................................................................ 21

    3.    The Proclamation Is Internally Inconsistent with Its Stated Goals .................................. 27

THE PROCLAMATION IMPERMISSIBLY RESHAPES THE NATION'S
CONGRESSIONALLY-ENACTED HEALTH BENEFIT SYSTEM FOR IMMIGRANTS
BY PRESIDENTIAL FIAT ............................................................................................. 30

  A.  The Immigration and Nationality Act ("INA") ................................................... 30

  B.  The Personal Responsibility Work Opportunity Reconciliation Act of 1996 ...................... 37

  C.  The Children's Health Insurance Plan ("CHIP") and CHIP Reauthorization Act ............. 38

  D.  The Affordable Care Act ........................................................................................ 40

REGULATORY BACKGROUND .................................................................................. 43

THE PROCLAMATION, LIKE THE RECENT PUBLIC CHARGE RULE, ATTEMPTS
TO RADICALLY REWRITE CONGRESS' CHOICES ON WHICH IMMIGRANTS MAY
ENTER THE COUNTRY, BASED ON WEALTH CONSIDERATIONS ..................................... 44

THE PROCLAMATION AND ITS IMPLEMENTATION ARE UNLAWFUL ........................... 55

  A.  The Proclamation Does Not Pass Muster Under Section 212(f) or
  Rational Basis Review ............................................................................................. 55

    **B.**    **The Proclamation Does Not Pass Muster Under Equal Protection**........................................ 65

**THE PROCLAMATION AND ITS IMPLEMENTATION HARM PLAINTIFFS** ....................... 75

**CLASS ALLEGATIONS** ............................................................................................................ 86

**CAUSES OF ACTION** ............................................................................................................... 90

  **FIRST CLAIM FOR RELIEF**
  **(Violation of the Administrative Procedure Act)**
  **(On behalf of All Plaintiffs, including the Class)** ....................................................... 90

  **SECOND CLAIM FOR RELIEF**
  **(Equal Protection)**
  **(On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)** ...................................... 93

  **THIRD CLAIM FOR RELIEF**
  **(Ultra Vires)**
  **(On behalf of All Plaintiffs, including the Class)** ....................................................... 94

  **FOURTH CLAIM FOR RELIEF**
  **(Procedural Due Process)**
  **(On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)** ...................................... 95

**PRAYER FOR RELIEF** ............................................................................................................. 96

# INTRODUCTION

1.      Late on Friday night, October 4, 2019, President Trump issued a presidential proclamation that, effective November 3, 2019, will block nearly two thirds of all prospective legal immigrants, mostly from predominantly nonwhite countries, from receiving visas and coming to the United States.

2.      The "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation") bars qualified immigrant visa applicants from receiving visas and entering the United States unless they can establish, "to the satisfaction of a consular officer," that they either "will be covered by approved health insurance" within 30 days after entry or are wealthy enough—and/or healthy enough—"to pay for reasonably foreseeable medical costs."

3.      The Proclamation seeks to unilaterally rewrite this country's immigration laws, imposing a new ground of inadmissibility that Congress has expressly rejected, and creating requirements that will be extremely difficult, or impossible, for most otherwise qualified immigrant visa applicants to satisfy. In doing so, the Proclamation contravenes well-established and duly enacted immigration and healthcare laws, exceeds the scope of the President's statutory authority, and violates Constitutional separation of powers and equal protection principles.

4.      In implementing the Proclamation, the U.S. Department of State has publicly announced on its website that, beginning November 3, 2019, all applicants for immigrant visas who are subject to the Proclamation "must demonstrate to the consular officer at the time of interview" that they will be covered by "approved" health insurance under the Proclamation within 30 days of entry or have the financial resources to pay for reasonably foreseeable medical costs"— and that "[i]nability to meet this requirement will result in the denial of the visa application."

CLASS ACTION COMPLAINT                                                                                    1

000298

5.     In addition to imposing new requirements for immigrant visa applicants that are unmoored from the existing statutory and regulatory framework, the Proclamation and agency implementation actions provide staggeringly few options to satisfy this barrier. While the Proclamation lists a number of health insurance options that would-be immigrants ostensibly could obtain in order to satisfy the new requirement, it in fact provides few or even no options that are available to these individuals in reality. First, most of the "approved health insurance" plans that are listed as satisfying the Proclamation's requirement are not actually legally or practically available to the vast majority of prospective immigrants—like Medicare, which requires a recipient to have lived in the United States for five years, or any plan available under the Affordable Care Act, with or without financial assistance, because such plans are only available to individuals living in the United States. Second, under the Proclamation, any kind of coverage involving common federal- or state-provided health insurance benefits, such as premium tax credits under the Affordable Care Act ("ACA") for plans sold on the individual market or Medicaid coverage for any individual over age 18, does not allow prospective immigrants to surmount this new barrier to entry. By imposing these restrictions on "approved" types of health insurance, the Proclamation excludes benefits and assistance that Congress has specifically and explicitly made available by statute to certain immigrants in the United States. Third, a number of the "approved" health insurance options are not available in all states, or, in many cases, allow denials and exclusions based on pre-existing conditions, such that many would-be immigrants would not qualify for or have access to such plans. Fourth, the coverage provided under certain "approved" options is limited and does not provide for "minimum essential coverage" as defined under the ACA.

6.     The Proclamation is therefore poised to create a new class of otherwise qualified immigrants who are barred from entry on the sole ground of the health insurance requirement, as

000299

well as a new class of underinsured individuals with non-comprehensive coverage in the United States. These effects frustrate both existing immigration laws and established healthcare laws, and create further concerns for public health and the healthcare system. Under its terms and agency implementation actions, the Proclamation would *ban* an immigrant who would receive financial assistance under the ACA to purchase comprehensive individual health insurance coverage, but would *allow* an immigrant who purchased an "approved," non-comprehensive visitor or short-term limited duration insurance plan, even though the former would be *better* insured and far less likely to incur uncompensated care costs than the latter. In effect, the Proclamation and its implementation incentivize, if not require, would-be immigrants to purchase non-comprehensive plans to satisfy the Proclamation's health insurance requirement because those plans are in many cases the most realistically accessible to immigrants. In doing so, the Proclamation and its implementation undermine not only Congress's intent, as expressed through the ACA, to provide a certain minimum level of coverage to all legal immigrants and citizens in the United States, but also the Proclamation's own stated goal of addressing the burdens of uncompensated care provided to uninsured individuals.

7. The Proclamation and its implementation are similar (yet even more egregious) in effect to the Administration's recently promulgated—and currently enjoined by several courts— "Public Charge" Rule, which attempts to redefine what it means for an immigrant to be a "public charge" and therefore inadmissible to the United States. Both the Proclamation requirements and the Public Charge Rule provisions are tools that the Trump Administration is seeking to use in order to exclude prospective immigrants who have satisfied all statutory requirements under the Immigration and Nationality Act ("INA") to enter the United States; both favor so-called "unsubsidized" ACA health insurance over subsidized; both consider the use of Medicaid to be a

negative or disqualifying factor for individuals age 18 and over; and both involve some analysis on the part of a consular officer as to whether an intending immigrant has sufficient financial resources to cover "reasonably foreseeable medical costs." The Public Charge rule, while still problematic and under challenge on various grounds (as reflected in the pending lawsuits challenging the rule and the preliminary injunction orders recently issued by several courts), was at least promulgated through a notice and comment rulemaking process, as required by the Administrative Procedure Act. The Proclamation did not go through any such a process and seeks to impose the same, or even a heightened, draconian effect on the immigration system through presidential fiat and corresponding agency action to carry out the new requirement.

8.      Indeed, the Proclamation is unprecedented in its scope and impact, the largest ever suspension on the entry of immigrants of its kind. It will affect mostly immigrants from Latin America, Africa, and Asia, by drastically reducing, if not eliminating, the numbers of immigrants who enter the United States with family-sponsored visas, humanitarian visas, or diversity visas. With no termination point or procedure by which a prospective immigrant may seek a waiver of the Proclamation's suspension on entry, the Proclamation will separate families—especially nonwhite families—indefinitely, in contravention of one of the bedrock principles of this country's immigration system.

9.      Such anticipated effects of the Proclamation are striking, but perhaps hardly surprising. Like the Public Charge Rule (and the failed RAISE Act of 2017), the Proclamation reflects the President's often expressed belief that, unlike immigrants who would enter via a "merit-based" system, immigrants who currently enter the country through family-based and diversity visas do not contribute to the United States but instead present a threat to the country's economy and security. "Why are we having all these people from shithole countries come here?"

CLASS ACTION COMPLAINT                                                                          4

he reportedly asked during a 2018 Oval Office discussion of protections for immigrants from Haiti, El Salvador, and certain African countries. "Why do we need more Haitians?" he asked. During that same discussion, he suggested that the United States should instead bring more people from countries like Norway—which is regularly ranked as one of the wealthiest countries in the world.

10.    The Proclamation is but the latest effort of the Trump Administration to unilaterally rewrite Congressionally enacted laws governing who may come to this country as an immigrant. It is also the one of the most drastic. Based on the latest data, up to an estimated 375,000 immigrants are at risk each year of being banned due to a lack of "approved" health insurance coverage, or close to two-thirds of all qualified immigrant visa applicants, many of whom are people of color. This is repugnant not only to our values, but also our nation's laws and Constitution.

11.    Plaintiffs challenge the Proclamation and Defendants' implementation of its requirements under this Court's inherent authority to review executive actions that exceed statutory grants of authority, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(D), and the equal protection guarantee of the Due Process Clause of the Fifth Amendment. Plaintiffs respectfully request that the Court issue appropriate declaratory relief and preliminarily and permanently enjoin the Proclamation as a whole.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution and federal statutes. The Court has additional remedial authority under 28 U.S.C. §§ 2201–02.

13.     Venue is proper under 28 U.S.C. § 1391 and Local Rule 3.2. Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States. Plaintiff John Doe #1 resides in the Portland Division of this District and Plaintiff Latino Network is a non-profit organization based in Portland. Moreover, on information and belief, the proposed class includes numerous members residing in this District who will be affected by the actions of Defendants. No real property is involved in this action.

## PARTIES

### PLAINTIFFS

14.     Plaintiff John Doe #1 is a United States citizen of Mexican origin who resides in Beaverton, Oregon, with his wife, a Mexican citizen, and his fourteen-year-old United States citizen son. John Doe #1, who is not able to work due to a disability, sponsored an immigrant visa for his wife so that she can have legal status to live and work in the United States. Her immigrant visa consular interview is scheduled for November 6, 2019. Under the Proclamation and Defendants' implementation of its requirements, John Doe #1 and his wife cannot afford or qualify for an "approved" health insurance option for her and fears that they lack sufficient financial resources to pay foreseeable medical costs out of pocket.

15.     Plaintiff Juan Ramon Morales is a United States citizen originally from Puerto Rico who now resides in Liberty, New York with his wife, Vianca Morales, a Mexican citizen; their daughter; and Ramon's step-daughter. Mr. Morales has sponsored his wife for an immigrant visa

CLASS ACTION COMPLAINT                                                                                   6

and she is waiting to schedule her consular interview, but he is not able to add his wife to his employer-sponsored health insurance or obtain another "approved" health insurance plan under the Proclamation due to cost.

16.     Jane Doe #2 is a United States citizen of Nicaraguan origin and a single mother of two children who resides in Rancho Cucamonga, California. She has an approved I-130 petition for her parents, who are living in Nicaragua and waiting to schedule their consular interview. She has been unable to find available and affordable health insurance for her parents that complies with the Proclamation, and it is unlikely that they will be able to show the ability to pay for reasonably foreseeable medical costs as required under the Proclamation and Defendants' implementation of its provisions.

17.     Plaintiff Jane Doe #3 is a U.S. citizen who currently resides in Los Angeles, California. She is unable to work due to a disability and has insurance through Medi-Cal, California's Medicaid program. Jane Doe #3 has an approved I-130 petition for her husband, a German citizen who currently resides in Berlin, Germany and is an architect who teaches architectural theory and design. Although he is gathering documents for consular processing, Jane Doe #3 does not believe that her husband will be able to prove at a consular interview that he would be covered by approved health insurance within 30 days of his entry into the United States because they do not believe that they have the financial resources to afford "approved" health insurance as defined in the Proclamation or to pay his foreseeable medical expenses out of pocket as required by the Proclamation and Defendants' implementation of it.

18.     Plaintiff Iris Angelina Castro is a United States citizen who lives in Springfield, Massachusetts with her son, who is a U.S. citizen. She recently became unemployed and currently has state health insurance. She has an approved I-130 visa petition for her husband, Hermogenes

000304

Castro Molina, a Dominican citizen, so that they can reunite in the United States. He is currently in the process of filing all necessary documents so that they can schedule a consular interview, but they do not believe that he will be able to prove that he can obtain available and affordable "approved" health insurance within 30 days of entering the U.S. or pay for foreseeable medical costs as required under the Proclamation and Defendants' implementation of its provisions.

19.     Plaintiff Blake Doe is a U.S. citizen living in Corvallis, Oregon, with his wife. He has approved I-130 immigrant petitions for his parents, both Mexican citizens, with whom he had lived his entire life in Oregon until going to college at Oregon State University to study civil engineering. Blake Doe's parents are currently waiting to have their consular interview scheduled in Ciudad Juarez, Mexico. Blake Doe and his parents do not believe that they would be able to prove that his parents would be able to obtain available and affordable "approved" health insurance within 30 days of their entry into the U.S. or to pay foreseeable medical expenses out of pocket as required under the Proclamation and Defendants' implementation of its provisions.

20.     Plaintiff Brenda Villarruel is a U.S. citizen who currently resides in Chicago, Illinois, with her United States citizen son and United States citizen parents.  Ms. Villarruel works part time as a licensed medical assistant.  She does not have medical insurance and receives health care, when necessary, through a clinic that charges based on income.  Ms. Villarruel has sponsored an immigrant visa for her husband, a Mexican citizen who currently resides in Mexico City, Mexico, and is awaiting consular processing.  Ms. Villarruel and her husband do not have the resources to obtain available and affordable "approved" health insurance coverage for him or to pay his foreseeable medical expenses out of pocket as required under the Proclamation and Defendants' implementation of its provisions.

21.     Plaintiff Latino Network is a non-profit organization based in Portland, Oregon. Latino Network's organization mission is to educate and empower Multnomah County Latinos to achieve physical and mental health, safe housing, sustainable financial stability, and social support. Latino Network does so by offering a variety of programs and services, including early childhood services, community-based programs, school-based programs, arts and culture programs for youth, health and wellness programs, and civic leadership programs. The impending effective date of the Proclamation has forced Latino Network to divert resources from its core activities to address the Proclamation's fallout within the community the organization serves.

## DEFENDANTS

22.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation.

23.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. The Proclamation assigns DOS a variety of responsibilities regarding its implementation and enforcement.

24.     Defendant Kevin McAleenan is the Acting Secretary of Homeland Security and has responsibility for overseeing enforcement and implementation of the Proclamation by all Department of Homeland Security staff. He is sued in his official capacity.

25.     Defendant U.S. Department of Health and Human Services ("DHHS") is a cabinet-level department of the United States federal government. The Proclamation assigns DHHS a variety of responsibilities regarding its implementation and enforcement.

000306

26.     Defendant Alex M. Azar II is the Secretary of Health and Human Services and has responsibility for overseeing enforcement and implementation of the Proclamation by all Department of Health and Human Services staff. He is sued in his official capacity.

27.     Defendant U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government. DOS is responsible for the issuance of immigrant visas abroad. The Proclamation assigns DOS a variety of responsibilities regarding its implementation and enforcement.

28.     Michael Pompeo is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Proclamation by all Department of State staff. He is charged by statute with the administration and enforcement of the Immigration and Naturalization laws, including those related to the powers, duties, and functions of consular officers not reserved to the officers themselves. 8 U.S.C. § 1104. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.     The Proclamation

29.     Late on Friday night, October 4, 2019, President Trump signed the "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System" (the "Proclamation").  A copy of the Proclamation can be viewed at https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/ and is attached as Exhibit 1.

30.     Beginning at 12:01 a.m. eastern daylight time on November 3, 2019, the Proclamation will ban would-be immigrants from receiving visas and entering the United States unless they can demonstrate, "to the satisfaction of a consular officer," that they will be able to

obtain "approved" health insurance coverage within 30 days after arriving in the United States, or are wealthy enough to "pay for reasonably foreseeable medical costs."

31.    The Proclamation, by its own terms, was not issued for national security reasons. Ostensibly, the Proclamation is meant to "address[] the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care" given to "people who lack health insurance or the ability to pay for their healthcare." The Proclamation notes that hospitals and other health care providers "often administer care to the uninsured without any hope of receiving reimbursement from them." Such uncompensated costs "are passed on to the American people in the form of higher taxes, higher premiums, and higher fees for medical services." The Proclamation further states that uninsured individuals "strain Federal and State government budgets through their reliance on publicly funded programs, which ultimately are financed by taxpayers," and rely on emergency care for non-emergency conditions, "causing overcrowding and delays for those who truly need emergency services."

32.    Given these challenges, the Proclamation asserts that "the United States Government is making the problem worse by admitting thousands of aliens who have not demonstrated any ability to pay for their healthcare costs," and claims that "data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance." Accordingly, the Proclamation declares that "[c]ontinuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests." If a prospective immigrant will not "be covered by approved health insurance" "within 30 days of the alien's entry into the United States," or if the immigrant does not have "the financial resources to pay for reasonably foreseeable medical costs,"

CLASS ACTION COMPLAINT                                                    11

the immigrant is deemed to be someone who will "financially burden the United States healthcare system" and whose entry into the United States is therefore "suspended."

33.    Simply put, under the Proclamation, a lack of "approved" insurance, or the inability to prove that an intending immigrant can pay for "reasonably foreseeable" medical care, absolutely bars the entry of that individual to the United States who meets *all qualifications* mandated by Congress in the Immigration and Nationality Act.

34.    The Proclamation sets out a narrow range of health insurance plans that qualify as "approved health insurance." No "subsidized" health plan offered in the individual market within a State under the ACA qualifies. Proclamation § 1(b)(ii). Nor does Medicaid qualify as "approved health insurance" for any individual over 18, Proclamation § 1(c), even though some states have chosen to make Medicaid available to certain adults over 18, including certain new and recently arrived immigrants. "Approved health insurance" under the Proclamation includes only:

- employer-sponsored plans (Proclamation § 1(b)(i));

- catastrophic plans (Proclamation § 1(b)(iv));

- certain health plans available to the U.S. military (Proclamation § 1(b)(vi));

- the health plans of family members (Proclamation § 1(b)(v));

- Medicare (Proclamation § 1(b)(viii));

- short-term, limited duration health policies effective for at least 364 days (Proclamation § 1(b)(iii)); and

- visitor health insurance plans that provide "adequate coverage for medical care," also for at least 364 days (Proclamation § 1(b)(vii)).

CLASS ACTION COMPLAINT                                                           12

As explained below, the Proclamation's "approved" health insurance plans are not practically or legally available to most or all prospective immigrants residing outside the country or within their first 30 days of arrival.

35.     A prospective immigrant may also obtain a "health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee," but the Proclamation provides no guidance as to how "adequate coverage" is defined. (Proclamation § 1(b)(ix)).

36.     Subject to limited exceptions, the Proclamation applies to nearly all individuals seeking to enter the United States with an immigrant visa. Indeed, based on insurance coverage alone, most adults who were granted green cards over the last three years would have been banned had the Proclamation been in effect.[1] The only exceptions from the Proclamation's suspension of entry cover very small populations, including:

- certain Special Immigrant Visa applicants specifically from Iraq and Afghanistan (Proclamation § 2(b)(ii));

- green card holders returning to the U.S. on a "Returning Resident" visa after remaining abroad for more than one year (Proclamation § 2(b)(v));

- biological and adopted children under 21, but only if those children are not accompanying a parent who is also immigrating to the United States and is subject to the Proclamation (Proclamation § 2(b)(iii), (vi)); and

- parents of U.S. citizen children over the age of 21 arriving with an IR-5 visa, but only if the parent or the U.S. citizen-child sponsor "demonstrates to the satisfaction of the consular

---

[1] Nicole Narea, *Trump just quietly cut legal immigration by up to 65%*, Vox, https://www.vox.com/2019/10/9/20903541/trump-proclamation-legal-immigration-health-insurance (last visited Oct. 27, 2019).

officer that the [parent's] healthcare will not impose a substantial burden on the United

States healthcare system" (Proclamation § 2(b)(iv)).

With respect to this last exception, the Proclamation provides no guidance as to how the parent or

U.S. citizen-child sponsor must demonstrate, nor how a consular officer should evaluate, whether

the parent's health care will impose a "substantial burden on the United States healthcare system."

37.     Notably, certain types of plans that qualify as "approved" coverage under the

Proclamation provide only very limited benefits and/or allow exclusions based on preexisting

conditions, such that they may be either unavailable to many individuals or may result in

"underinsurance"—which has itself been shown to impose a "substantial burden on the United

States healthcare system." Yet, the Proclamation would encourage underinsurance among newly

arrived immigrants.

38.     The Proclamation also contains exceptions for noncitizens "whose entry would

further important United States law enforcement objectives," or "whose entry would be in the

national interest," as "determined by the Secretary of State or his designee." Proclamation §

2(b)(vii), (viii). Again, however, the Proclamation provides no procedure for would-be immigrants

either to learn or to demonstrate how they would qualify for such exceptions.

**B.     Agency Implementation of the Proclamation**

39.     In implementing the Proclamation, the Department of State created a page on its

website that informs and instructs visa applicants and consular officers of their new obligations

under the Proclamation ("Posting"), available at https://travel.state.gov/content/travel/en/us-

visas/immigrate/Presidential-Proclamation-on-Health-Care.html (Exhibit 2).

40.     The Posting states definitively that "if you are applying for an immigrant visa" on

or after November 3, 2019 "you must demonstrate at the time of the interview" that you meet the

Proclamation's requirements. It also specifies that an "inability" to meet the Proclamation's requirements at the time of the interview "will result in the denial of the visa application." The Posting then lists the same exceptions that appear in the Proclamation and the same list of approved health insurances. Under the heading "Requirement at visa interview," the Posting specifies that "[d]uring the visa interview," applicants will need to demonstrate that they satisfy the requirements of the Proclamation. It informs that applicants that consular officers "will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation as needed." The Posting also includes a link to the Proclamation itself.

41.     By its terms, the Posting unequivocally makes clear not only that visa applicants have the obligation to satisfy the Proclamation's requirements or be denied a visa, but also that consular officers will enforce the Proclamation, which has significant legal and practical consequences for visa applicants and their families. It did so without satisfying any of the requirements for agency action under the Administrative Procedure Act ("APA") or demonstrating good cause for diverging from standard agency practice.

42.     Eleventh-hour action by the State Department purports to offer the opportunity for notice and comment for "information collection" related to the Proclamation, but this only highlights the agency's failure to act according to the requirements of the APA. Just yesterday, on October 29, 2019, the Department of State issued a "Notice of Information Collection" for "Emergency Review"[2] (the "Emergency Notice"), which was published in the *Federal Register*

---

[2] *60-Day Notice of Proposed Information Collection: Public Charge Questionnaire*, FED. REGISTER, https://www.federalregister.gov/documents/2019/10/24/2019-23219/60-day-notice-of-proposed-information-collection-public-charge-questionnaire (last visited on Oct. 27, 2019). https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-23639.pdf

today (October 30, 2019) and purports to announce a "methodology" established by the Secretary

of State, as authorized by Section 3 of the Proclamation, "to establish standards and procedures

for governing such determinations." 84 Fed. Reg. 58199 (Oct. 30, 2019); *see also* Advance Print

Emergency Notice (issued Oct. 29, 2019), *available at* https://s3.amazonnews.com/public-

inspection.federalregister.gov/2019-23639. The Emergency Notice states that "to implement [the

Proclamation] when it goes into effect on November 3, 2019," consular officers "will verbally ask

immigrant visa applicants covered by [the Proclamation] whether they will be covered by health

insurance in the United States within 30 days of entry to the United States and, if so, for details

relating to such insurance." If the applicant says yes, "consular officers will ask for applicants to

identify the specific health insurance plan, the date coverage will begin, and such other information

related to the insurance plan as the consular officer deems necessary." The Emergency Notice

further adds that visa applicants will not be suspended "if they do not have coverage, but possess

financial resources to pay for reasonably foreseeable medical expenses." It defines "reasonably

foreseeable medical expenses" as "those expenses related to existing medical conditions, relating

to health issues existing at the time of visa adjudication."

43.     The Emergency Notice provides a comment period of less than 48 hours, an

unusually short period of time, stating that "[a]ll public comments must be received by October

31, 2019." It notes that the Proclamation "was signed on October 4, 2019, and emergency review

of this information collection is necessary for the Department to prepare consular officers to

implement [the Proclamation] when it goes into effect on November 3, 2019."[3] The Emergency

---

[3] The late posting of the Emergency Notice and extremely short notice-and-comment period
stand in stark contrast to a "60-Day Notice of Proposed Information Collection" in the Federal
Register six days prior on October 24, 2019 (the "Notice"). That Notice proposed and solicited
public comments on a new written form, DS-5540, that would ostensibly collect information

CLASS ACTION COMPLAINT                                                                    16

Notice was not, however, implemented in direct response to any particular event impacting foreign relations.

44.     Taken together, the Emergency Notice and the Posting make clear that, effective November 3, consular officers are empowered to determine whether prospective immigrants meet the Proclamation's requirements, resulting in a direct impact on the rights of immigrants and their families. These are definitive actions that reflect the consummation of the agency's decision-making process and that affect the substantive rights and obligations of regulated individuals.

45.     The Posting and the last-minute Emergency Notice confirm press reports that government officials were scrambling earlier this month to implement and enforce the Proclamation by its effective date. On information and best belief, these efforts necessarily include DOS officials as well as DHHS and DHS officials. For example, as indicated above, the DHHS Secretary "or his designee" has authority under the Proclamation to determine whether a "health plan . . . provides adequate coverage for medical care" (though provides no guidance as to how "adequate coverage" is defined for such purpose). Proclamation § 1(b)(ix). According to one media report published a week after the Proclamation was signed, government health officials "are wrestling with highly technical questions" as they attempt to implement the Proclamation, despite

---

intended to assist consular officers "in assessing whether an applicant is likely to become a public charge," but stated that a consular officer could ask a visa applicant to fill out certain questions on the same form to assess whether the applicant meets the Proclamation's requirements. *See 60-Day Notice of Proposed Information Collection: Public Charge Questionnaire*, FED. REGISTER, *See* https://www.federalregister.gov/documents/2019/10/24/2019-23219/60-day-notice-of-proposed-information-collection-public-charge-questionnaire (last visited on Oct. 27, 2019).https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-23219.pdf

CLASS ACTION COMPLAINT                                                           17

000314

"concerns" that its mandate "may be unworkable and even illegal."[4] Indeed, officials "are confused about numerous aspects of the proclamation, such as whether implementing the new health insurance requirements would fall to [the Center for Consumer Information and Insurance Oversight, within the Department of Health and Human Services] or the State Department."[5] None of these deliberations or concerns, which have a direct impact on the legal rights of visa applicants, have been presented to the public as part of any administrative process.

46.     It is no surprise that officials were at least initially confused about how to implement the Proclamation, given that the Proclamation is inconsistent with existing immigration and healthcare laws, contrary to core constitutional principles, and, moreover, is riddled with undefined terms and imprecise standards and appears to ignore many of the practical realities of both this country's immigration and health care systems.

**C.     The Proclamation is Vague, Internally Contradictory, and Inconsistent with Existing Law in Ways State Department Action has Not Addressed**

**1.     The Proclamation Uses Unclear, Undefined Terms and Standards**

47.     The Proclamation's list of "approved health insurance" plans includes several options that are unclear and undefined. "Catastrophic health insurance," for example, is one "approved" option, but the term can be used generically, to refer to certain high-deductible plans, or specifically, as defined by the ACA with certain coverage parameters and eligibility requirements. The Proclamation does not specify what it means when it allows "catastrophic health insurance" as "approved health insurance."

---

[4] Dan Diamond, *Health officials: Trump immigration order could be illegal*, POLITICO, https://www.politico.com/news/2019/10/11/trump-immigrants-health-insurance-illegal-044716 (last visited on Oct. 27, 2019).

[5] *Id*.

CLASS ACTION COMPLAINT

48.     Likewise, a variety of forms of financial assistance under the ACA are broadly available to individuals seeking health insurance on the ACA Exchanges—indeed, an Exchange enrollee may qualify for some level of assistance if she has a household income from 100 to 400 percent of the federal poverty level ("FPL"),[6] and lawfully present immigrants qualify for assistance even if their household income is below 100% FPL if they are not otherwise eligible for Medicaid. Such financial assistance can take the form of "premium tax credits" offered to eligible enrollees, as well as certain cost-sharing reductions tied to specific "silver" plans, for which eligibility is based on income. The ACA, however, does not define either of these forms of financial assistance as a "subsidy." The Proclamation is silent as to which forms of assistance would render a plan "subsidized," and therefore not "approved," health insurance.

49.     In addition, the Proclamation states that "an alien will financially burden the United States healthcare system . . . unless the alien possesses the financial resources to pay for reasonably foreseeable medical costs"—but provides no guidance on what might constitute a "reasonably foreseeable medical cost." Nor does the Proclamation indicate how a consular officer with no medical training should evaluate what medical costs may be "reasonably foreseeable" for a specific prospective immigrant, or how the consular offer should assess whether that individual has sufficient "financial resources" to cover such costs. The State Department's Emergency Notice, published today in the *Federal Register*, defines "reasonably foreseeable medical expenses" as "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication" but, again, does not clarify how consular officers are to make that assessment.

---

[6] In 2019, the income level necessary for a family of four to qualify for financial assistance ranged from $25,100 at 100% FPL to $100,400 at 400% FPL.

50.     Likewise, the Proclamation states that a visitor health insurance plan may qualify as an "approved" health plan if it provides "adequate coverage for medical care"—but provides no standards or definitions that would enable either a would-be immigrant or a non-medically trained consular officer to assess what coverage qualifies as "adequate." Similarly, the Secretary of Health and Human Services may approve "any other health plan that provides adequate coverage for medical care," but the Proclamation is devoid of guidance as to how the Secretary should determine that a plan's coverage is "adequate," to say nothing of guidance that would enable prospective immigrants to evaluate whether a potential plan not already enumerated in the Proclamation provides sufficiently "adequate" coverage to qualify as "approved."

51.     The Proclamation does provide exceptions to the entry suspension for immigrants "whose entry would be in the national interest," as determined by the Secretary of State, or "whose entry would further important United States law enforcement objectives," as determined by the Secretary of State based on a recommendation of the Attorney General. But the Proclamation does not explain what such terms as "national interest" or "important United States law enforcement objectives" mean. There is no indication, in either the text of the Proclamation or the Department of State website, of how a prospective immigrant may seek such a determination from the Secretary of State or demonstrate her qualifications for such a determination.

52.     When making an exception for immigrants whose entry would further "law enforcement objectives," moreover, the Proclamation makes no mention of a special visa, the U visa, which exists specifically for victims of certain crimes who are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. Although the INA specifically allows U visa holders to petition to bring certain family members to the United States on immigrant visas, the Proclamation is silent as to whether such family members are excepted

CLASS ACTION COMPLAINT                                                            20

from the Proclamation, either under the "law enforcement" provision or otherwise. At best, such silence on the topic creates uncertainty for U-derivative immigrant family members; at worst, it indicates that such family members are subject to the Proclamation's requirements, notwithstanding the fact that the INA expressly provides for the reunification of U visa families.

**2.     Very Few, if Any of the Proclamation's "Approved Health Plans" Are Available to Visa Applicants**

53.     Beyond the Proclamation's vague and ill-defined terminology, most of the Proclamation's "approved" health insurance plans are not practically or legally available to most or all prospective immigrants residing outside the country or within their first 30 days of arrival.

54.     Medicare plans, for example, are an approved type of health insurance under the Proclamation, Proclamation § 1(b)(viii), but such coverage is unavailable to immigrants unless they are over 65 years old *and have been living continuously in the United States for five years*.

55.     TRICARE plans and other related coverage, "approved" under § 1(b)(iv) of the Proclamation, are only available to members of the United States military, their spouses, and children up to 26 years of age.

56.     Employer-sponsored plans also constitute "approved plans" under the Proclamation § 1(b)(i), but employers are permitted under federal law to impose a waiting period of up to 90 days before new employees can be covered by employer-sponsored coverage.[7] Seventy-one percent of employers impose a waiting period, with waiting periods on average lasting 1.9 months.[8] Beyond that, over two-thirds of immigrants are the beneficiaries of family petitions or other non-

---

[7] 42 U.S.C. § 300gg-7.

[8] *2018 Employer Health Benefits Survey,* KAISER FAMILY FUND, (Oct. 3, 2018), https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-3-employee-coverage-eligibility-and-participation/

employment-based visa applications, and therefore are unlikely to have an employer-sponsored plan before even arriving in the United States and acquiring valid work authorization.

57.    Although a "family member's plan" is "approved" under the Proclamation, § 1(b)(v), it is highly unlikely that most immigrants will be able to obtain coverage through a family member unless they are a spouse or a child under 27. All other relations are not usually considered a "dependent" eligible to be included in a family health insurance plan.[9]

58.    The Proclamation states that a "catastrophic health plan" may constitute an approved plan, Proclamation § 1(b)(iv), but under the ACA, "catastrophic" plans are available only to individuals living in the United States, and eligible enrollees must be either under 30 years of age or have qualified for a hardship or affordability exemption. 42 U.S.C. § 18022(e).[10]

59.    The list of "approved" health insurance includes "an unsubsidized health plan offered in the individual market within a State," Proclamation § 1(b)(ii), but an intending immigrant would not be able to obtain such coverage from abroad. Like an ACA-compliant catastrophic plan, any other "unsubsidized" health plan offered in an ACA marketplace is only available to individuals living in the United States, in the marketplace's service area. 45 C.F.R. § 155.305(a)(3)(i).

60.    Further logistics could impede the immigrant's ability to acquire not only an "unsubsidized health plan" but also a "catastrophic health plan" (whether through the ACA

---

[9] An employer health plan is only a benefit excludable from income tax if it limits eligibility to spouses, children who have not yet attained age 27, and tax dependents. 26 U.S.C. § 105(b), 26 C.F.R. § 1.106-1(a). Employers are permitted to limit eligibility further, and indeed, coverage of family members other than children and spouses or domestic partners is very rare. *See* https://www.theabdteam.com/blog/eligibility-parents-group-health-plan/

[10] *Are You Eligible to Use the Marketplace?*, HEALTHCARE.GOV, https://www.healthcare.gov/quick-guide/eligibility/

CLASS ACTION COMPLAINT                                                    22

Exchanges or outside of them) within 30 days of entering the United States. Under rules governing an insurance policy's effective date, a newly purchased policy becomes effective on the first day of the next month after purchase—but only if the policy was purchased before the fifteenth day of the current month.[11] Otherwise, the effective date rolls to the first day of the subsequent month. In other words, if an immigrant is so fortunate as to enter the United States under the Proclamation, but unluckily arrives on the 20th of the month, her insurance coverage will not take effect until well after 30 days of arriving in the country. The Proclamation is silent on whether such a possibility would prevent a prospective immigrant from satisfying the "approved health insurance" requirement to gain entry.

61.    When accounting for the fact that Medicare, TRICARE and other military plans, employer-sponsored plans, family members' plans, and unsubsidized and catastrophic plans available under the ACA are all practically or legally impossible for most prospective immigrants to acquire, the two remaining options for "approved health insurance" under the Proclamation are visitor insurance plans or short-term limited duration insurance ("STLDI") plans, which in either case must last for a minimum of 364 days. But STLDI plans lasting the minimum required 364 days are not available in almost half the states,[12] and many disqualify an individual from coverage if that person is not a United States citizen or resident.[13] Neither visitor plans nor STLDI plans, moreover, are required to cover individuals with preexisting conditions or pregnant women, and

---

[11] *See* 45 C.F.R. § 155.420(b)(1); 45 C.F.R. § 147.104(b)(2).

[12] *Is Short-term Health Insurance Right for You?,* HEALTHINSURANCE.ORG, https://www.healthinsurance.org/short-term-health-insurance/

[13] *Short Term Health Insurance Eligibility Information for Short Term Health Insurance, or STM,* ELIGIBILITY.COM (Updated Jan. 28, 2019), https://eligibility.com/short-term-health-insurance

CLASS ACTION COMPLAINT

many do not.[14] Such plans can also adjust premiums based on an individual's health history, gender, or (outside specified parameters) age and make them prohibitively, and exploitatively, expensive.[15] Indeed, many states are concerned that unscrupulous insurance brokers and STLDI insurers provide misleading information about the costs, deductibles, and coverage associated with these plans.[16]

62.    Even assuming prospective immigrants can acquire visitor insurance plans or STLDI plans, it remains unclear that such insurance plans actually further the Proclamation's goal of "addressing the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care." Visitor and STLDI plans are not required under the ACA to provide "essential health benefits," such as hospitalization, prescription drugs, emergency services, and maternity and newborn care. Indeed, the fine print of such policies can exclude coverage for prescription drugs, a tonsillectomy, hernia surgery, prenatal care, treatment of pre-existing conditions an individual does not know about, or even "treatment of injury resulting from participation in organized sports," like care for a concussion a child receives during soccer.[17] As a result, the coverage provided by such plans can leave an individual

---

[14] *Id.*

[15] *Id.*; *see also* Rachel Schwab, *Coming Up Short: The Problem with Counting Short-Term, Limited Duration Insurance as Coverage,* CHIRBLOG.ORG (June 7, 2019), *Id.*; *see also* http://chirblog.org/coming-short-problem-counting-short-term-limited-duration-insurance-coverage/

[16] S. Corlette et al., *The Marketing of Short-Term Health Plans,* ROBERT WOOD JOHNSON FOUNDATION (Jan. 31, 2019) https://www.rwjf.org/en/library/research/2019/01/the-marketing-of-short-term-health-plans.html

[17] https://www.cbpp.org/research/health/key-flaws-of-short-term-health-plans-pose-risks-to-consumers

CLASS ACTION COMPLAINT

effectively uninsured for relatively mundane needs like prescriptions or a prenatal checkup, as well as for hospital interventions.

63.    A Pennsylvania man, for example, was hospitalized for an abnormal heartbeat but was denied coverage under his STLDI plan because of a previous doctor visit for high blood pressure, which led the insurer to claim his hospitalization was actually for a preexisting condition.[18] Similarly, a Washington, D.C. man's STLDI plan had a stated maximum payout of $750,000, but it paid only $11,780 towards a $211,690 hospitalization bill for heart surgery, in part due to a denial of coverage based on his father's medical history.[19] In another case, a woman from Illinois went to the hospital with heavy vaginal bleeding and ended up needing a hysterectomy and a five-day hospital stay. She was denied coverage under her STLDI plan on the ground that her menstrual cycle constituted a pre-existing condition.[20]

64.    Indeed, a substantial share of uncompensated care costs are due to underinsured individuals with high deductibles, excluded services, or low annual limits, which are all common characteristics of visitor and STLDI plans.[21] Even the insurers who offer short-term limited

---

[18] Sarah Lueck, *Key Flaws of Short-Term Health Plans Pose Risks to Consumers,* CTR. ON BUDGET AND POLICY PRIORITIES (Sept. 20, 2018) https://www.cbpp.org/research/health/key-flaws-of-short-term-health-plans-pose-risks-to-consumers

[19] Cheryl Fish-Parcham, Families USA, to Alex Azar et al., "Comments on Short-Term Limited Duration Insurance Proposed Rule (CMS-9924-P)," Apr. 23, 2018 (https://www.regulations.gov/document?D=CMS-2018-0015-8801).

[20] *Id.*

[21] Susan Morse, *Increase in Uncompensated Hospital Care Could be One Effect of Short-term Coverage Rule,* HEALTHCARE FINANCE NEWS (Aug. 1, 2018) https://www.healthcarefinancenews.com/news/increase-uncompensated-hospital-care-could-be-one-effect-short-term-coverage-ruleRick Pollack, *AHA Statement on Final Rule on Short-Term, Limited-Duration Health Insurance Plans,* AMERICAN HOSPITAL ASSOCIATION (Aug. 1, 2018); https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance

CLASS ACTION COMPLAINT

duration insurance or visitor coverage do not consider it to be a replacement for ordinary health insurance.[22]

65.  The table below summarizes the options for "approved health insurance" under the Proclamation and the reasons why such plans are not attainable at all, or attainable by an insignificant number of intending immigrants:

| Approved Health Insurance Plans | Limitations on Availability | Additional Barriers to Enrollment |
|---|---|---|
| Employer-sponsored plan | Available only to individuals who have an offer of employment that includes employer-sponsored insurance, as well as work authorization. | Most employers impose a waiting period before a new employee can be covered by employer-sponsored insurance; waiting periods last on average for 1.9 months, or well over 30 days. |
| Unsubsidized health plan offered in the individual market within a State | Available only to individuals living in the United States. | Newly arrived immigrants may not be enrolled within 30 days based on their date of arrival and the effective date that their coverage begins. |
| Short-term limited duration health policy effective for a minimum of 364 days | Available only in about half the States with the 364-day minimum; often not available to individuals living outside the United States. | Usually not available to individuals with pre-existing conditions. |
| Catastrophic plan | Available only to individuals living in the United States who are either 30 or younger or who have a | Newly arrived immigrants may not be enrolled within 30 days based on their date of arrival and the effective date that their coverage begins. |

---

[22] Comment of American Cancer Society Cancer Action Network et al., Apr. 23, 2018, at 3 (noting that sellers of short-term limited duration insurance plans "acknowledge that such plans are 'designed solely to provide temporary insurance during unexpected coverage gaps'") (citation omitted).

| | hardship/affordability exemption | |
|---|---|---|
| Family member's plan | Generally available only to spouses and children 26 or younger. | |
| Medical Plan under 10 U.S.C. § 55, including TRICARE | Available only to members of the U.S. military, their spouses, and children 26 or younger. | |
| Visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days | | Usually not available to individuals with pre-existing conditions. |
| Medicare | Available only to individuals at least 65 years old who have been living continuously in the United States for 5 years. | |

### 3.    The Proclamation Is Internally Inconsistent with Its Stated Goals

66.    The Proclamation provides no explanation for how incentivizing—if not effectively requiring—immigrants to buy non-comprehensive or STLDI plans, many of which will likely leave an immigrant underinsured after she arrives, is likely to shield taxpayers or hospitals from such uncovered emergency costs, which the Proclamation decries as "driv[ing] hospitals into insolvency" and "saddl[ing] our healthcare system, and subsequently American taxpayers, with higher costs."

67.    Indeed, the Proclamation appears to be even more self-defeating considering its exclusion of "subsidized" ACA health insurance from the list of "approved health insurance" plans that would enable immigrants to enter the United States. Unlike visitor insurance or short-term limited duration insurance plans, any ACA-marketplace health insurance plan that also offers

CLASS ACTION COMPLAINT

000324

financial assistance is a comprehensive plan that covers a wide range of essential health benefits, including prescription drugs, hospitalization, prenatal and maternity care, and mental health care. Financial assistance to purchase such qualified health plans is available to individuals with household incomes of 100 to 400 percent FPL. Indeed, when passing the ACA, Congress extended the same benefits to immigrants on even more permissive terms, explicitly making assistance available to legally present immigrants even with incomes under 100 percent FPL, including newly arrived immigrants in their first five years in the country, who are otherwise generally excluded from most other federal means-tested benefits. But, although Congress expressly made such benefits available to newly arrived immigrants—and in fact intended for such immigrants to arrive, through this country's legislatively enacted immigration system—the Proclamation operates to ban those immigrants who would benefit from assistance provided under the ACA.

68.     Although an immigrant who receives financial assistance under the ACA to purchase comprehensive health insurance would be *better* insured than an immigrant who purchases non-comprehensive visitor or STLDI insurance, the Proclamation bars the former and allows the latter, in the name of protecting this nation's health care system from uncompensated costs incurred by uninsured individuals.

69.     Viewed as a whole, the Proclamation is far less than the sum of its parts. Its standards and terse language are opaque when they are not vague or ill-defined. The Proclamation's array of various "approved health insurance" options are, for a significant majority of intending immigrants, merely a set of legal or practical impossibilities. When taken to their logical consequence, the incentives it creates for prospective immigrants lead to results that almost certainly will not further the Proclamation's goal of reducing the burden of uncompensated care

for uninsured individuals. At best, these disparate parts form an internally inconsistent whole; at worst, they smack of bad faith.

70.     Given the draconian sweep of the Proclamation—indeed, by some estimates, it has the potential to reduce legal immigration by nearly two thirds and affect most, if not nearly all, family-based and diversity immigrants—the structure, text, and import of the Proclamation all suggest that its ostensible purpose of addressing the burden that uninsured individuals place on this country's health care system is merely a pretext to rework this country's immigration system in the manner that the President sees fit, in contravention of the laws passed by Congress.

71.     The Proclamation, moreover, does not operate in a vacuum. It will be enforced in a legal landscape already shaped by numerous Congressional enactments, including the Immigration and Nationality Act, the Public Responsibility and Work Opportunity Reconciliation Act, the Illegal Immigration Reform and Immigrant Responsibility Act, the Children's Health Insurance Program Reauthorization Act, and the Affordable Care Act; and the regulations of the Administration's recently promulgated "public charge rule," which establishes new criteria for determining whether a would-be immigrant may be deemed inadmissible because she is likely to become a "public charge".  As set out in more detail below, the Proclamation is in tension, if not direct conflict, with each of these statutory and regulatory schemes, and therefore also with Congress's legislative intent.

72.     The Proclamation, moreover, is but the latest link in a long chain of statements and actions by this President and his Administration expressing antipathy toward all noncitizens, but also specifically toward immigrants seeking to come to the United States—particularly immigrants of color, from Central and Latin America, Africa, and the Middle East. Since the early days of his Administration, the President has consistently called for eliminating the two main ways that

immigrants from predominantly nonwhite countries receive visas—the family preference system and the diversity visa lottery. After a legislative attempt—the RAISE Act—that failed in 2017, and an administrative attempt—the public charge rule—that received overwhelmingly negative public comment, and which has since been enjoined, the Proclamation now appears to be an attempt by presidential fiat. The laws and the Constitution of this country do not countenance such executive overreach.

## THE PROCLAMATION IMPERMISSIBLY RESHAPES THE NATION'S CONGRESSIONALLY-ENACTED HEALTH BENEFIT SYSTEM FOR IMMIGRANTS BY PRESIDENTIAL FIAT

### A.    The Immigration and Nationality Act ("INA")

73.    The Immigration and Nationality Act ("INA") was originally enacted in 1952 and has since been amended significantly multiple times. Although it now represents "a long series of legislative accretions,"[23] it nevertheless creates a system by which this country may grant up to 675,000 permanent immigrant visas each year, as well as an unlimited number of permanent immigrant visas for the admission of U.S. citizens' spouses, parents, and children under the age of 21. In doing so, the INA, 8 U. S. C. § 1101 *et seq.*, expresses and reflects Congress's intent that foreign nationals who meet certain qualifications may immigrate to the United States, in furtherance of the goals of reunifying families, admitting immigrants with skills that are useful to the United States economy, and promoting diversity.[24]

74.    A series of related and interacting statutes, including the Public Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), the Children's Health Insurance Program

---

[23] Adam B. Cox & Christina M. Rodriguez, *The President and Immigration Law Redux*, 125 YALE L.J. 104, 158-59 (2015).

[24] *See Elkins v. Moreno*, 435 U.S. 647, 664 (1978).

Reauthorization Act ("CHIPRA"), and the Affordable Care Act ("ACA"), likewise express and reflect Congress's intent to extend certain health care-related benefits to legal immigrants. Through PRWORA, Congress made significant changes to health care eligibility for noncitizens and simultaneously devolved substantial power to the states to allow the states to replace benefits to legal immigrants through Medicaid, and later through the Children's Health Insurance Programs ("CHIP"), and to receive federal matching funds when providing such coverage. Through CHIPRA, Congress affirmatively provided federal dollars to fund care for newly arrived legal immigrant children and legal immigrant pregnant women during their first five years in this country. And through the ACA, Congress made financial assistance in the form of premium tax credits available to both United States citizens and legal immigrants to purchase comprehensive health coverage.

75.    The interaction of these statutes reflects Congress' intent to keep important health care benefits available to both newly arrived immigrants and qualified foreign nationals, especially the spouses, children, and parents of United States citizens, to ensure that such individuals are allowed to immigrate to the United States in the first instance to reunite with family, contribute their skills to the United States economy, be afforded humanitarian protections, and/or promote diversity.

76.    In rendering inadmissible all immigrants who are unable either to purchase certain enumerated kinds of health insurance or pass an opaque wealth test through categorizing such individuals as "detrimental to the United States"—particularly immigrants who would otherwise be eligible to enter the United States and receive health insurance benefits like Medicaid, CHIP, or financial assistance under the ACA—the Proclamation expressly contravenes Congress's legislative intent.

CLASS ACTION COMPLAINT

000328

77.     The bedrock pillars of U.S. immigration law allow immigration for family reunification, for business purposes, for humanitarian considerations, and to promote diversity. To that end, Congress has set forth a comprehensive system to allow limited "worldwide immigration" based on an allocation of "family-based visas," "employment-based visas" and "diversity-based" visas. 8 U.S.C. § 1151(a). Section 1151 of the INA sets an annual *minimum* family-sponsored preference limit of 226,000; the worldwide level for annual employment-based preference immigrants is *at least* 140,000. A maximum of fifty-five thousand visas each year are available through a diversity visa lottery, open to nationals of countries with historically low rates of immigration to the United States.

78.     A family member or employer seeking to "sponsor" a noncitizen for an immigrant visa must first file either a Form I-130, Petition for Alien Relative, or Form I-140, Petition for Alien Workers, with the United States Citizenship and Immigration Service on behalf of the "beneficiary." This form establishes the necessary family or employer-employee relationship that exists to allow for an immigrant visa. Once the beneficiary of an approved immigrant petition has an immigrant visa number that is immediately available, there are two ways to apply for lawful permanent resident status ("Green Card"). If the beneficiary is outside of the United States, he or she must apply at a U.S. Department of State consulate abroad for an immigrant visa in order to come to the United States and be admitted as a permanent resident. This pathway is referred to as consular processing. If the beneficiary is already in the United States, she may attempt to apply for permanent resident status without having to return to her home country to complete processing. This process is called adjustment of status.[25] *See* 8 U.S.C. § 1255(a).

---

[25] If an individual present in the United States does not qualify for adjustment of status, she must travel abroad for a consular interview to obtain her immigrant visa. Some applicants who have accrued more than 180 days of unlawful presence while in the United States, but have no other

000329

79.    Section 1152 of the INA prescribes that the per-country limit for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference limits, i.e., 25,620.  The dependent area limit is set at 2%, or 7,320.  This means that no single nation can receive more than 7 percent of the total green cards issued in a year (unless they would otherwise go unused).

80.    Among family-based immigrants, Congress has prioritized the admission of "immediate relatives," which is defined as "the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age."  8 U.S.C. § 1151(b). These familial relations have been carved out of certain exceptions to the various numerical limitations on immigrant visas, and thus visas are always and immediately available for these qualifying family members

81.    The allocation of immigrant visas subject to the numerical limitations is governed by 8 U.S.C. § 1153. Subsection (a) sets forth preference allocations for family-sponsored immigrants; subsection (b) sets forth the preference allocations for employment-based visas.  *See*, *e.g.*, 8 U.S.C. § 1153(a)(1) ("Qualified Immigrants who are the unmarried sons and daughters of citizens of the United States shall be allocated visas in a number not to exceed 23,400.").

82.    Section 1153(e) provides that family-sponsored and employment-based preference visas "shall" be issued to eligible immigrants in the order in which a petition on behalf of each has been filed, that is, according to the "priority date" of the visa petition.

---

bars to admissibility, may obtain an I-601A waiver of inadmissibility to overcome the unlawful presence bars under 8 U.S.C. § 1182(a)(9)(B) before they can return. The I-601A waiver process allows those individuals who are statutorily eligible for an immigrant visa (immediate relatives, family-sponsored or employment-based immigrants as well as Diversity Visa selectees) who only need a waiver of inadmissibility for unlawful presence to apply for that waiver in the United States and remain with their family members before they depart for their immigrant visa interview abroad. *See* 8 C.F.R. § 212.7(e).

000330

83.    A family member or employee may not apply for lawful permanent residence abroad until a visa is immediately available. The Department of State issues a monthly Visa Bulletin organized according to country of origin and visa preference category.[26]

84.    If there are sufficient visas available for applicants from a specific country and of a specific preference category, then the Visa Bulletin lists that combination as "current," and all applicants matching that combination may file an application regardless of their priority date, or the date the visa was received by the agency.  If there are insufficient visas available for all known applicants of a specific combination, however, the Visa Bulletin lists a cut-off date, and only those applicants who have priority dates earlier than the cut-off date may file an application.  Sometimes, a cut-off date may retrogress, meaning that fewer visas are available than previously projected. When that happens to an applicant whose application is already filed, the applicant is forced to wait until the cut-off date again progresses past his priority date for his application to be adjudicated.

85.    Before the issuance of an immigrant visa, the noncitizen must establish that she is eligible for admission to the country. Section 1101(a)(13)(A) of Title 8 defines "admission" to mean "the lawful entry of a noncitizen into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

86.    Section 1182 of Title 8, INA § 212, is titled "Inadmissible Aliens" and sets forth ten classes of noncitizens "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a) (prescribing the inadmissibility of, *inter alia*, noncitizens who have a

---

[26] *See, e.g.*, *Visa Bulletin for November 2019*, TRAVEL.STATE.GOV, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2020/visa-bulletin-for-november-2019.html (last visited Oct. 27, 2019).

communicable disease of public health significance, those convicted of two or more criminal offenses, those who engaged in terrorist activities).

87.     Under the system set out in the INA, family-based petitions account for approximately 65% of the immigrant visas granted every year. The diversity lottery visa system accounts for approximately 4.5%.

88.     In addition to the comprehensive system for the allocation of family-based, employment-based, and diversity visas, Congress has authorized multiple special categories for immigrants from abroad based on specific humanitarian considerations.  For example, a qualifying battered spouse, child or parent may file an immigrant visa petition under the Immigration and Nationality Act (INA), as amended by the Violence Against Women Act (VAWA).  *See generally 8 U.S.C. § 1154(a)(1), 8 U.S.C. § 1186(c)(4).* Among other sympathetic considerations to victims of abuse, VAWA created special provisions in United States immigration law to protect victims of abuse who are not citizens of the United States. *Id.* In cases of domestic violence, US immigration law allows certain victims of abuse who are not citizens to obtain lawful status without having to rely on their abuser to petition. *Id.* Qualifying applicants may apply self-petition for an immigrant visa abroad and subsequently enter the United States as immigrants if the abuser is an employee of the U.S. government, the abuser is a member of the uniformed services, or the applicant was subjected to battery or extreme cruelty in the United States. 8 U.S.C. §§ 1154(a)(1)(A)(v), (a)(1)(B)(iv).

89.     In addition, the U nonimmigrant status (U visa) is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity; it provides a pathway to lawful permanent residence and subsequently citizenship after 3 years of residence in the United

000332

States. *See generally* 8 U.S.C. § 101(a)(15)(U). Congress created the U nonimmigrant visa with the passage of the Victims of Trafficking and Violence Protection Act (including the Battered Immigrant Women Protection Act, Pub. L. 106-386) in October 2000. Under the provisions of this statute, a U nonimmigrant may also petition for certain family members to receive a "derivative U visa." While many such eligible family members will already have entered the United States with a derivative U visa before the principal U nonimmigrant receives a green card after three years of residence, those family members who do not may apply for an immigrant visa abroad. *See* 8 U.S.C. § 245(m)(3) (upon the approval of an adjustment of status application for a principal U nonimmigrant, "the Secretary of Homeland Security may adjust the status or issue an immigrant visa to a spouse, a child, or in the case of an alien child, a parent who did not receive a [derivative U visa] under section 101(a)(15)(U)(ii)" of the INA.); 8 C.F.R. § 245.24(g).

90.    The Proclamation's suspension of entry does violence to this legislatively enacted immigration scheme that synthesizes considerations of national origin, merit, race, humanitarian, and family-based preferences—principles that have formed the bedrock of this nation's immigration system for decades—and replaces it with a single inquiry: does the prospective immigrant have a specific kind of health insurance or sufficient financial resources to pay for what a consular officer considers to be reasonably foreseeable medical costs? The United States immigration system has never countenanced anything approaching such a standard for admission, which would disproportionately affect immigrants who are from predominantly nonwhite countries and either seeking to reunite with family already here in the United States, or fear being separated from family in the United States when they leave for a consular interview. Once effective, the Proclamation will ban nearly two thirds of all noncitizens legally permitted under the INA to immigrate to the United States, and will separate thousands of families indefinitely.

000333

91.     In effectively barring most legal and otherwise qualified immigrants from entering the country because they cannot afford health care completely out of pocket, the Proclamation thwarts the carefully considered Congressional scheme that provides health care-related benefits to new and recently arrived immigrants via a combination of federal and state-elected programs. Over the past two decades, Congress—and the States, at Congressional behest—have acted to provide certain benefits specifically to such immigrants. But the Proclamation would ban most immigrants from entering the United States precisely because they would be entitled to such benefits if they came.

**B.      The Personal Responsibility Work Opportunity Reconciliation Act of 1996**

92.     Under the Personal Responsibility Work Opportunity Reconciliation Act ("PRWORA"), passed in 1996, Congress restricted the availability of certain means-tested benefits for newly arrived immigrants, but gave states the ability to fill in this gap by electing to provide coverage to such individuals. Before PRWORA's enactment, legal immigrants living in the United States were eligible for public benefits on similar terms as citizens. After enactment, however, PRWORA has generally barred all new legal immigrants, excepting certain humanitarian categories, including but not limited to asylees and refugees, from receiving federal means-tested public benefits, such as Medicaid, TANF, SNAP, and SSI, for five years after their arrival in the United States.

93.     Despite redrawing immigrant eligibility for federal benefits, PRWORA expressly devolved broad new powers to the states, in relevant part authorizing, but not requiring, states to use state-only funds to offer food, cash, and health-related benefit programs as a substitute for lost federal benefits for legal immigrants. A number of states took advantage of this "gap-filling" authority to use state funds to provide TANF, SNAP, SSI, and/or Medicaid to legal immigrants

subject to the five-year bar. States were, for example, given the option under PRWORA to use state funds to continue coverage to immigrants under Medicaid during their first five years in the country.

## C.    The Children's Health Insurance Plan ("CHIP") and CHIP Reauthorization Act

94.    Congress subsequently reinforced PRWORA's grant of power to the states to provide health care-related benefits to legal immigrants under federal health care programs through the Children's Health Insurance Plan ("CHIP"). The original State Children's Health Insurance Program was enacted in 1997 with bi-partisan support to act as a complement to Medicaid, the nation's major health coverage for low-income children, by giving states financial support to provide coverage to uninsured, low-income children who do not qualify for Medicaid. The program was reauthorized on February 4, 2009, through the Children's Health Insurance Program Reauthorization Act ("CHIPRA"), which passed with bi-partisan support and was one of the first pieces of legislation signed by President Obama.

95.    The original CHIP expanded health insurance coverage to low-income children ineligible for Medicaid by providing block grants to states that must be matched with state dollars. Under the law, states could use their federal CHIP funds to finance coverage for children whose family incomes are too high to qualify for Medicaid, either by expanding their already existing Medicaid programs, creating a separate CHIP program, or a combination of those two approaches. Indeed, under the matching rates required under the program, the federal government bears a higher percentage of the overall cost of CHIP than it does under Medicaid. All states, plus the District of Columbia, currently use CHIP funds to expand publicly funded health insurance coverage to uninsured children who are ineligible for Medicaid; most states cover children up to

CLASS ACTION COMPLAINT                                                                38

or above 200% of the federal poverty level.[27] In the same vein as PRWORA, the original CHIP also authorized States to provide coverage to newly arrived legal immigrant children, who were otherwise ineligible to enroll in either Medicaid or CHIP for their first five years in the country, but States doing so had to fund such coverage with state-only dollars.

96.     CHIPRA reauthorized CHIP and provided states with significant new funding, new programmatic options such as dental coverage, and a range of new incentives to provide Medicaid and CHIP coverage to uninsured, low-income children, especially those who may be eligible for Medicaid or CHIP but who are not enrolled. CHIPRA also established new options and federal funding for states to cover pregnant women, as well as legal immigrant children and legal immigrant pregnant women during their first five years in the country. Thirty-one states, plus the District of Columbia, now cover legal immigrant children, legal immigrant pregnant women, or both under CHIPRA.[28] Under the Proclamation, however, Medicaid is expressly excluded from the "approved" types of health insurance coverage for all individuals over the age of 18, even though CHIPRA expressly extends CHIP coverage eligibility to children up to age 19, and Medicaid eligibility to individuals up to age 21 and to pregnant women, including immigrants lawfully residing in the United States within their first five years of having legal status.

---

[27] *Medicaid/CHIP Coverage of Lawfully-Residing Immigrant Children and Pregnant Women*, KAISER FAMILY FUND, https://www.kff.org/health-reform/state-indicator/medicaid-chip-coverage-of-lawfully-residing-immigrant-children-and-pregnant-women/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D. Medicaid currently covers children at 133% of the federal poverty level; *Where Are States Today? Medicaid and CHIP Eligibility Levels for Children, Pregnant Women, and Adults*, KAISER FAMILY FOUND., https://www.kff.org/medicaid/fact-sheet/where-are-states-today-medicaid-and-chip/. Medicaid currently covers children at 138% of the federal poverty level. *Id.*
[28] *Medicaid and CHIP Coverage of Lawfully Residing Children and Pregnant Women*, MEDICAID.GOV, https://www.medicaid.gov/medicaid/outreach-and-enrollment/lawfully-residing/index.html

CLASS ACTION COMPLAINT

39

### D.      The Affordable Care Act

97.      In 2010, Congress passed comprehensive health reform, the Patient Protection and Affordable Care Act ("PPACA"), as amended by the Health Care and Education Reconciliation Act ("HCERA") (together, the "Affordable Care Act" or "ACA," or "Obamacare") into law. 124 Stat. 119. The PPACA contains 10 titles covering over 900 pages, as well as additional provisions under the HCERA. In at least three relevant ways, the ACA was intended to expand access to meaningful and affordable health insurance coverage for all U.S. residents, including legal immigrants, at a guaranteed minimum level of coverage.

98.      First, to facilitate broad health insurance enrollment nationwide, the ACA required the creation of a marketplace, or exchange, in each state so that residents can shop for insurance. These marketplaces took the form of state-run-exchanges, a federally facilitated exchange available at the healthcare.gov website, or a hybrid of the two.[29]

99.      Second, to ensure a certain standard of coverage, the ACA required health insurers, including those who participated in the state and federal Exchanges and those selling plans outside of it, to provide plans that cover "essential health benefits," including hospitalization, prescription drugs, mental health services, ambulatory patient services, maternity and newborn care, mental health and substance use disorder services, preventive and wellness services, and pediatric services, including oral and vision care. 42 U.S.C. § 18022(b)(1). All individual market plans, including ACA-defined and regulated catastrophic health plans, must provide such essential health

---

[29] As enacted, the ACA required most United States citizens and legal residents to purchase and maintain health insurance or pay a penalty. However, President Trump and a Republican-controlled Congress eliminated the financial penalty that an individual would incur if she failed to maintain health insurance as part of the Tax Cuts and Jobs Act of 2017 (*see* https://www.congress.gov/115/bills/hr1/BILLS-115hr1enr.pdf).

benefits, must cover preexisting conditions and may not impose annual or lifetime dollar limits on core coverage.[30] Short-term limited duration insurance plans, however, are ACA-exempt and cannot be offered or purchased on ACA exchanges. As a result, they are non-comprehensive and do not provide the full range of essential health benefits, can and often do deny coverage based on preexisting conditions, and can and often do impose annual or lifetime dollar limits on core coverage.

100.    Third, the ACA provides financial assistance in the form of income-related, premium-based tax credits ("PTCs" or "APTCs") to individuals with household incomes between 100 and 400% of the federal poverty line. 26 U.S.C. § 36B. For newly arrived legal immigrants who are subject to PRWORA's five-year bar on means-tested public benefits, the ACA allows PTCs on more permissive terms, also including individuals below 100% of the federal poverty line. 26 U.S.C. § 36(b)(c)(1)(B). In 2019, under DHHS Federal Poverty Guidelines, the income level necessary for a family of four to qualify for financial assistance ranged from $25,100 at 100% FPL to $100,400 at 400% FPL.

101.    Taken together, these three components of the ACA promote the overarching goals of robust nationwide enrollment, protections for consumers through coverage that is comprehensive and does not bar eligibility based on preexisting conditions, and increased affordability for health insurance coverage. Robust enrollment in comprehensive coverage plans promotes insurance market stability and more affordable premiums across the market, as the robust enrollment of healthy individuals allows distributing costs for less healthy individuals across a larger pool of enrollees. More affordable premiums, in turn, spurs more robust enrollment.

---

[30] 42 U.S.C. § 300gg-3, 300gg-11.

CLASS ACTION COMPLAINT                                                                                41

000338

102.    The ACA's structure and operation also evinces Congress's intent that legal immigrants, including newly and recently arrived immigrants, be able to participate fully in the ACA marketplace to enroll in comprehensive health care and to receive financial assistance if necessary. The benefits available under the ACA, especially when considered in connection with the benefits that the states and federal government have made available to newly and recently arrived legal immigrants under PRWORA and CHIPRA, make clear that Congress intended for legal immigrants to be able to receive specific health care-related benefits to ensure a minimum level of health care coverage upon their arrival in the United States.

103.    The Proclamation directly conflicts with this benefits scheme, disqualifying "subsidized" health insurance offered on ACA Exchanges as "approved health insurance" that would permit entry to the United States. The effect of the Proclamation is to prevent would-be immigrants, who would otherwise be fully qualified under the INA to come to the United States, from entering and receiving the benefits Congress expressly intended for them to have.

104.    Moreover, as noted above, visitor insurance and STLDI plans are the only two options for "approved health insurance" that are realistically and feasibly available to most prospective immigrants outside the United States, especially those who are not entering with an offer of employment that includes employer-sponsored health insurance. Because such plans are less regulated under the ACA than individual market plans, carriers of such plans will no doubt rise to meet the new demand the Proclamation will invariably create. But in driving a majority of new immigrants towards these non-comprehensive plans—for a minimum of 364 days, no less, or their first year in the United States—the Proclamation undermines not only the ACA's goal of providing a certain minimum level of coverage to all legal immigrants in the United States, but

CLASS ACTION COMPLAINT

also its own stated goal of addressing the burdens of uncompensated care provided to uninsured individuals.

## REGULATORY BACKGROUND

105.    In addition to entering a stage already set by PRWORA, CHIPRA, and the ACA, the Proclamation follows hot on the heels of the Trump Administration's recently promulgated (and recently enjoined) "Public Charge Rule," which attempts to change what it means to be deemed a "public charge," one of the ten enumerated grounds of inadmissibility under the INA. Ignoring decades of legislation and case law, the new Rule attempts to redefine the term "public charge" and reshape the "totality of circumstances" framework that immigration officials apply to determine whether a person seeking admission is likely to become a public charge. The new Rule was enjoined from taking effect on October 15, 2019 by numerous courts.  Each court found the new definition of "public charge" contrary to Congress' plain meaning and intent.[31]

106.    Both the Proclamation and the new Rule effectively turn the question of admissibility to the United States into a receipt-of-benefits issue. The Rule was promulgated by the Department of Homeland Security via formal notice-and-comment rulemaking under the APA; the Proclamation was not.

---

[31] *New York v. U.S. Dep't of Homeland Security*,  No. 19 Civ. 7777 (GBD), 2019 U.S. Dist. LEXIS 177323 (S.D.N.Y. Oct. 11, 2019); *Make the Rd. N.Y. v. Cuccinelli*, 19 Civ. 7993 (GBD), 2019 U.S. Dist. LEXIS 177316 (S.D.N.Y. Oct. 11, 2019);) *City & Cty. of San Francisco v. U.S.US Citizenship & Immigration Servs.*, No. 4:19-cv-0471704980-PJH, 2019 U.S. Dist. LEXIS 177379 (N.D. Cal. Oct. 11, 2019); *Washington v. Dep't Homeland Security*, No. 4:19-cv-05210-RMP, 2019 U.S. Dist. LEXIS 178854 (E.D. Wash. Oct. 11, 2019); *Cook Cty. v. McAleenan*, No. 19 C 6344, 2019 U.S. Dist. LEXIS 177759 (N.D. Ill. Oct. 14, 2019); *Casa De Md., Inc. v. Trump*, No. PWG-19-2715, 2019 U.S. Dist. LEXIS 177797 (D. Md. Oct. 14, 2019).

**THE PROCLAMATION, LIKE THE RECENT PUBLIC CHARGE RULE, ATTEMPTS TO RADICALLY REWRITE CONGRESS' CHOICES ON WHICH IMMIGRANTS MAY ENTER THE COUNTRY, BASED ON WEALTH CONSIDERATIONS**

107.    The State Department's actions to implement the Proclamation without satisfying the requirements of notice and comment rulemaking layer one form of lawlessness on another. The Proclamation, like the recent Public Charge Rule, attempts to radically rewrite Congressional decision about which immigrants may enter the country based on wealth considerations.

108.    The nation's immigration laws have long included a prohibition on admitting non-citizens deemed to be a "public charge" on the country.  This definition has evolved over time but has never erected the kind of broad entry barrier that the Proclamation permits.

109.    In 1882, Congress enacted the country's first immigration laws, which refused foreign nationals permission "to land" in the United States "if on such examination there shall be found among such passengers any convict, lunatic, idiot, or **any person unable to take care of himself or herself without becoming a public charge**."  *See An Act to Regulate Immigration*, 22 Stat. 214, Chap. 376 § 2 (1882) ("1882 Act") (emphasis added).

110.    In 1891, Congress amended the 1882 Act to provide, in part,

> That the following classes of aliens shall be excluded from admission into the United States . . . : All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and . . . .

*An Act in Amendment to the Various Acts Relative to Immigration and the Importation of Aliens Under Contract or Agreement to Perform Labor*, 26 Stat. 1084, Chap. 551 ("1891 Act") §§ 1, 11 (1891).

CLASS ACTION COMPLAINT

44

111.    Congress subsequently amended immigration laws in 1903, 1907, and 1910 without

materially altering the authorization to refuse entry to a noncitizen deemed a "public charge."[32]

The 1910 Act provided, for example:

> That the following classes of aliens shall be excluded from
> admission into the United States: All idiots, imbeciles, feeble-
> minded persons, epileptics, insane persons, and persons who have
> been insane within five years previous; persons who have had two
> or more attacks of insanity at any time previously; paupers; persons
> likely to become a public charge; professional beggars; persons
> afflicted with tuberculosis or with a loathsome or dangerous
> contagious disease; persons not comprehended within any of the
> foregoing excluded classes who are . . . mentally or physically
> defective, such mental or physical defect being of a nature which
> may affect the ability of such alien to earn a living; persons who
> have been convicted of or admit having committed a felony or other
> crime or misdemeanor involving moral turpitude; polygamists, or .
> . . ."

1910 Act § 2.

112.    In 1915, The Supreme Court considered a "single question, . . . whether an alien

can be declared likely to become a public charge on the ground that the labor market in the city of

his immediate destination is overstocked." *See Gegiow v. Uhl*, 239 U.S. 3, 9-10 (1915).

113.    In answering "no" to the question, the Supreme Court interpreted the term "Persons

likely to become a public charge" in context, that is, as "mentioned between paupers and

professional beggars, and along with idiots, persons dangerously diseased, persons certified by the

examining surgeon to have a mental or physical defect of a nature to affect their ability to earn a

living, convicted felons, prostitutes and so forth."  *Id.*   The Court held that "[t]he persons

enumerated in short are to be excluded on the ground of permanent personal objections

---

[32] *An Act to Regulate the Immigration of Aliens Into the United States*, 32 Stat. 1213, Chap. 1012
§ 2 (1903); *An Act to Regulate the Immigration of Aliens Into the United States*, 34 Stat. 898,
Chap. 1134 § 2 (1907); *An Act to Amend an Act entitled An Act to Regulate the Immigration of
Aliens Into the United States*, 36 Stat. 263, Chap. 128 § 2 (1910).

accompanying them irrespective of local conditions," and thus not according to local or temporary conditions impacting their self-sufficiency. *Id.* at 10.

114. After *Gegiow*, federal courts and immigration officials universally understood the term public charge as referring to persons with "a mental or physical defect of a nature to affect their ability to make a living," that is, those substantially, if not entirely, dependent on government assistance on a long-term basis.[33]

115. In the century since the *Gegiow* decision, Congress has made numerous changes to immigration law, most notably the Immigration and Nationality Act of 1952. *An Act to Revise the Laws Relating to Immigration, Naturalization, and Nationality; and for Other Purposes*, 66 Stat. 163, 183, Title 2, Chap. 2 ("1952 Act") § 212 (1952). It has continued to use "public charge" as a basis for denying entry to noncitizens, but it has never offered its own definition of the term. It has, however, rejected attempts to adopt a definition contrary to the understanding developed in legislative history and case law.

116. In 1996, for example, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996), which amended the INA by codifying five factors relevant to a public charge determination. In the course of enacting IIRIRA, members of Congress debated whether to expand the public charge definition to include use of non-cash public benefits such as Medicaid and CHIP. *See Immigration Control & Financial Responsibility Act of 1996*, H.R. 2202, 104th Cong. § 202

---

[33] *See, e.g.*, *United States ex rel. De Sousa v. Day*, 22 F.2d 472, 473-74 (2d Cir. 1927); *United States ex rel. La Reddola v. Tod*, 299 F. 592, 592-93 (2d Cir. 1924); *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917); *Ng Fung Ho v. White*, 266 F. 765, 769 (9th Cir. 1920), *rev'd on other grounds,* 259 U.S. 276 (1922); *Ex parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923); *In re Martinez-Lopez*, 10 I. & N. Dec. 409, 421–22 (B.I.A. 1962); *In re Harutunian*, 14 I. & N. Dec. 583, 589 (B.I.A. 1974); *In re Perez*, 15 I. & N. Dec. 136, 137 (B.I.A. 1974).

CLASS ACTION COMPLAINT

(1996) (early House bill that would have defined public charge for purposes of removal to include receipt by a non-citizen of Medicaid, supplemental food assistance, SSI, and other means-tested public benefits). The Senate, however, rejected the effort to include previously unconsidered, non-cash public benefits in the public charge test. It also rebuffed the attempt to create a bright-line framework of considering whether the immigrant has received public benefits for an aggregate of twelve months as "too quick to label people as public charges for utilizing the same public assistance that many Americans need to get on their feet." S. Rep. No. 104-249, at *63−64 (1996) (Senator Leahy's remarks). Accordingly, in its final bill, Congress did not include the receipt of Medicaid, CHIP, supplemental food assistance, SSI, and other means-tested public benefits. as determinative of a public charge.[34] *See* 8 U.S.C. § 1182(a)(4)(A).

117. The public charge ground of inadmissibility, as amended in IIRIRA, provides: "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."[35] 8 U.S.C. § 1182(a)(4)(A). When determining whether an applicant is inadmissible as a public charge, the statute instructs the officer to consider "at a minimum" the applicant's age; health; family status; assets, resources, and financial status; and education and skills. 8 U.S.C. § 1182(a)(4)(B)(i). The officer "may also consider any affidavit of support under section 213A [8 U.S.C. § 1183a] for purposes of exclusion" on the public charge ground. 8 U.S.C. § 1182(a)(4)(B)(ii).

---

[34] Congress rejected a similar attempt to expand the public charge definition in 1994 when considering the Immigration Stabilization Act, *see* S. 1923 (103rd), § 501 (https://www.govtrack.us/congress/bills/103/s1923/text).

[35] Certain groups of noncitizens, such as asylum seekers and refugees, are not subject to exclusion based on an assessment that they are likely to become a public charge. *See* 8 U.S.C. § 1157 (refugee); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1159(c) (refugee).

118.    In 1999, the Immigration and Naturalization Service ("INS"), a precursor to the US

Citizenship and Immigration Services ("USCIS"), issued a notice of proposed rulemaking and

field guidance intended to "summarize longstanding law with respect to public charge and provide

new guidance on public charge determinations" following the passage of IIRIRA. 64 Fed. Reg.

26,689 (May 26, 1999) (the "Field Guidance"). *Notice of Proposed Rulemaking, Inadmissibility

and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676 (May 26, 1999) (to be codified

at 8 C.F.R., pts. 212 & 237) ("1999 Proposed Rule"); *Field Guidance on Deportability and

Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (Mar. 26, 1999) ("1999 Field

Guidance").  The 1999 Proposed Rule and Field Guidance defined "public charge" to mean "an

alien who is likely to become primarily dependent on the Government for subsistence as

demonstrated by either (i) The receipt of public cash assistance for income maintenance purposes,

or (ii) Institutionalization for long-term care at Government expense (other than imprisonment for

conviction of a crime)."  1999 Proposed Rule, 64 Fed. Reg. at 28,681; 1999 Field Guidance, 64

Fed. Reg. at 28,689.  The 1999 Rulemaking clarified in particular that the INS had adopted this

definition "based on the plain meaning of the word 'charge,' the historical context of public

dependency when the public immigration provisions were first enacted more than a century ago,

and the expertise of the benefit-granting agencies that deal with subsistence issues." 64 Fed. Reg.

at 28,677.

119.    The Field Guidance further directed service officers "to assess the financial

responsibility of the alien by examining the 'totality of the alien's circumstances' *at the time of his

or her application* * * * The existence or absence of a particular factor *should never be the sole

criterion* for determining if an alien is likely to become a public charge."  1999 Field Guidance,

64 Fed. Reg. at 28,690 (emphasis in original).

CLASS ACTION COMPLAINT                                                                                        48

120.    The 1999 Field Guidance, which was made consistent with the Department of State's understanding, reaffirmed that "[i]t has never been Service policy that any receipt of services or benefits paid for in whole or in part from public funds renders an alien a public charge, or indicates that the alien is likely to become a public charge. The nature of the public program must be considered.  For instance, attending public schools, taking advantage of school lunch or other supplemental nutrition programs, or receiving emergency medical care would not make an alien inadmissible as a public charge, despite the use of public funds."  1999 Field Guidance, 64 Fed. Reg. at 28,692 (*citing* FAM § 40.41 n.9.1 (1999)).

121.    The 1999 Field Guidance also emphasized that the purpose in issuing the proposed rule and field guidance was intended to end "confusion about the relationship between the receipt of public benefits and the concept of 'public charge' [that] has deterred eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive. This reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare." 1999 Field Guidance, 64 Fed. Reg. at 28,692.

122.    The 1999 Field Guidance specifically exempted "Medicaid and other health insurance and health services (including public assistance for immunizations and for testing and treatment of symptoms of communicable diseases; use of health clinics, short-term rehabilitation services, and emergency medical services) other than support for long-term institutional care" from public charge determinations. 1999 Field Guidance, 64 Fed. Reg. at 28,693.

123.    Although the 1999 Proposed Rule was never finalized, the 1999 Field Guidance has governed public charge admissibility determinations since that time—nearly two decades.

CLASS ACTION COMPLAINT                                                                                    49

124.    On October 10, 2018, DHS published a notice of proposed rulemaking (the "Rule" or the "Public Charge Rule"), *Inadmissibility on Public Charge Grounds*, which rescinded the 1999 Rulemaking, redefined "public charge," and amended the totality-of-the-circumstances standard prescribed by the 1999 Field Guidance. 83 Fed. Reg. 51,114 (Oct. 10, 2018) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245 and 248).

125.    The proposed rule followed President Trump's failed attempt to garner broad congressional support for the 2017 the Reforming American Immigration for a Strong Economy (RAISE) Act, which would have eliminated the INA's system of allocating immigration visas according to family, employment, and diversity categories and replacing it with a points-based "merit" system "to prioritize immigrants based on the skills they bring to our Nation while safeguarding the jobs of American workers."[36]

126.    After a 60-day notice-and-comment period, in which it received 266,077 comments, DHS finalized and issued the Rule on August 14, 2019, notwithstanding the fact that the "vast majority of [comments] . . . opposed the rule." 84 Fed. Reg. at 41,304. The Rule was scheduled to become effective on October 15, 2019.

127.    The Rule redefined a "public charge" to include any noncitizen  "who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36 month period (such that, for instance, receipt of two benefits in one month counts as two months)." 84 Fed. Reg. 41,501 (to be codified at 8 C.F.R. § 212.21(a)).  Unlike the previous Field Guidance definition of "public charge," which focused specifically on the receipt of *cash* benefits or long-term institutionalization, the Rule defines "public benefit" as both cash benefits *and noncash benefits*,

---

[36] *President Donald J. Trump Backs RAISE Act,* WHITEHOUSE.GOV (Aug. 2, 2017) https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-backs-raise-act/

including Temporary Assistance for Needy Families ("TANF"), Supplemental Nutrition Assistance Program ("SNAP," also known as "food stamps"), Medicaid, and public housing and Section 8 housing assistance. *Id.*; *see also* 8 C.F.R. § 212.21(b).

128.    The Rule also significantly altered the totality-of-the-circumstances framework, assigning different weights to certain factors labeled as positive, negative, heavily positive, and heavily negative, which a DHS officer must weigh "individually and cumulatively." 84 Fed. Reg. at 41,397; *see also id.* at 41,502-04.

129.    A prospective immigrant is given heavy negative weight if, for example, she has a medical condition requiring "extensive medical treatment" and is "uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition." 84 Fed. Reg. 41,504; *see also* 8 C.F.R. § 212.22(c)(1)(i), (iii).  A prospective immigrant would receive heavy positive weight for "an annual income . . . of at least 250 percent of the [Federal Poverty Guidelines] for the alien's household size" or for "private health insurance that is not subsidized under the Affordable Care Act." *See* 8 C.F.R. § 212.22(c)(2)(ii), (iii). The consular officer must also consider, among other things, the immigrant's age; household income; household size; credit score; education; occupational skills, certifications, or licenses; and English fluency. *See* 8 C.F.R. § 212.22(b).

130.    As Trump Administration officials have acknowledged, the cumulative effect of these changes would substantially burden immigrants with disabilities and lower incomes—and in particular, non-white immigrants who are not from Europe—to demonstrate their admissibility. When Ken Cuccinelli, acting director of USCIS, was asked whether the proposed Rule conflicted with the *New Colossus* poem by Emma Lazarus inscribed at the base of the Statue of Liberty, he amended the poem as follows: "Give me your tired and your poor who can stand on their own two

CLASS ACTION COMPLAINT                                                                51

feet, and who will not become a public charge."[37] Shortly thereafter, he clarified his understanding that *New Colossus* "was referring to people coming from Europe."[38]

131.  Expert analysis confirmed that the Rule "could shift legal immigration away from Latin America and towards Europe" due to its emphasis on income.[39] The Migration Policy Institute, for example, examined immigrants who had received legal permanent residence within the last five years to explore the potential scope of the Rule's impact. MPI analysts found that 69% of immigrants who had received legal permanent residence within the last five years had at least one negative factor under the Rule, and that the Rule would have "a disproportionate effect on women, children, and the elderly."[40] In particular, among "recently arrived legally present noncitizens[,] 71 percent of Mexicans and Central Americans, 69 percent of Africans, and 52 percent of Asian immigrants would fail to meet the threshold" of incomes or financial assets above 250% of the federal poverty line, a heavily weighted factor under the Rule.[41] In short, "the impact

---

[37] Jacey Fortin, *'Huddled Masses' in Statue of Liberty Poem Are European, Trump Official Says,* NY TIMES (Aug. 14, 2019) https://www.nytimes.com/2019/08/14/us/cuccinelli-statue-liberty-poem.html

[38] *Id.*

[39] Randy Capps et al., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration,* MIGRATION POLICY INST. (Nov. 2018) https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration

[40] *Id.*; *see also* Abigail Hauslohner et al., *Trump Officials Move to Deny Green Cards, Path to Citizenship for Poor Immigrants,* WASH. POST (Aug. 12, 2019) *Id.*; *see also* https://www.washingtonpost.com/immigration/trump-administration-aims-to-make-citizenship-more-difficult-for-immigrants-who-rely-on-public-assistance/2019/08/12/fe3f8162-b565-11e9-8949-5f36ff92706e_story.html

[41] Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public Charge" Rule,* MIGRATION POLICY INST. (Aug. 2018) https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule. Notably, MPI also found that 40 percent of US-born citizens would fail to meet this threshold and would be at risk of being deemed a public charge under the Rule.

CLASS ACTION COMPLAINT

of the new standard would fall most heavily upon Asian, Latin American, and African immigrants, making the proposal something of a modern-day version of the National Origins Quota Act of 1924. That since-repudiated law sought to tilt immigration to Western Europe."[42]

132.    Although multiple courts have since enjoined the Rule, it nevertheless constitutes an attempt to radically reshape what it means to be a public charge, and by doing so, constitutes an attempt to radically reshape which noncitizens are allowed to immigrate to or adjust status in the United States. Analysis of the characteristics of recent green-card recipients, compared with the negative and heavily weighted negative factors in the public charge test, reveals that 69% had at least one negative factor and 43% had at least two.[43] More significantly, the effects of the rule "are likely to be less for Europe, Canada, and Oceana, where 27 percent had two or more negative factors."[44] In contrast, "impacts will be far greater for Central America and Mexico, where 60 percent had two or more such factors,"[45] and in general for "Latin America and Africa, where incomes are generally lower than the rest of the world."[46] Researchers have predicted that "people

---

[42] Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public Charge" Rule,* MIGRATION POLICY INST. (Aug. 2018) https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule

[43] Jeanne Batalova et al., *Millions Will Feel Chilling Effects of U.S. Public-Charge Rule That is Also Likely to Reshape Legal Immigration,* MIGRATION POLICY INST., (Aug. 2019) https://www.migrationpolicy.org/news/chilling-effects-us-public-charge-rule-commentary

[44] *Id.*

[45] *Id.*

[46] Abigail Hauslohner et al., *Trump Officials Move to Deny Green Cards, Path to Citizenship for Poor Immigrants,* WASH. POST (Aug. 12, 2019) https://www.washingtonpost.com/immigration/trump-administration-aims-to-make-citizenship-more-difficult-for-immigrants-who-rely-on-public-assistance/2019/08/12/fe3f8162-b565-11e9-8949-5f36ff92706e_story.html

who are granted green cards – the major step towards winning citizenship – will become wealthier but their numbers will shrink."[47] In other words, "[m]ore green cards will go to immigrants with a good education and a measure of self-sufficiency; fewer will be granted simply because someone has a family member in the United States"[48]—a result President Trump has long championed when promoting a "merit-based" immigration system to replace the current one.

133.    The anticipated effects of the Proclamation are similar to those of the now-enjoined Rule. This can hardly be surprising, given that both share significant similarities: Both favor "unsubsidized" ACA coverage over subsidized; the use of Medicaid is a negative or disqualifying factor for adults 18 and over; and both involve some analysis on the part of a consular officer as to whether an intending immigrant has sufficient financial resources to cover "reasonably foreseeable medical costs."

134.    How the Rule and the Proclamation achieve these effects, however, is where the two differ. When promulgating the Rule, the Trump Administration made at least some attempt to comply with the strictures of the Administrative Procedure Act—just as Senators Tom Cotton and David Perdue, two allies of the President in the Senate, attempted to comply with the legislative processes of Congress when sponsoring the RAISE Act. The Proclamation, by contrast, is an improper attempt to legislate by presidential fiat, followed by invalid agency action to implement those improper orders. Here, with a single sweep of the President's pen, the Proclamation attempts to overwrite and overturn more than a century of Congressional intent to admit qualified noncitizens as immigrants, regardless of wealth, health, race, or national origin.

---

[47] Michael D. Shear et al., *Trump's Policy Could Alter the Face of the American Immigrant,* NY TIMES (Aug. 14, 2019) https://www.nytimes.com/2019/08/14/us/immigration-public-charge-welfare.html

[48] *Id.*

CLASS ACTION COMPLAINT                                                                                        54

**THE PROCLAMATION AND ITS IMPLEMENTATION ARE UNLAWFUL**

**A.    The Proclamation Does Not Pass Muster Under Section 212(f) or Rational Basis Review**

135.    The Proclamation purports to be grounded in the President's authority under 8 U.S.C. § 1182(f), which allows the President to "suspend the entry of all aliens or any class of aliens" whenever the President "finds that the entry" of such "aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But in suspending the entry of potentially *two thirds* of all legal immigrants to the United States, the Proclamation represents an unprecedented abuse of the §1182(f) power.  Although the Supreme Court found that the Muslim Ban represented a permissible exercise of the President's broad authority to impose entry restrictions under § 1182(f) based on national security considerations, the Proclamation strains even the generous analysis of *Trump v. Hawaii*, 138 S. Ct. 2392  (2018).

136.    Indeed, the Supreme Court's decision in *Hawaii* is bound up in the circumstances of the proclamation at issue in that case, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." The Court took pains to note, for example, that the Muslim Ban "supports Congress's individualized approach for determining inadmissibility" because it was intended to "promote[] the effectiveness of the [consular officer] vetting process by helping to ensure the availability" of "sufficient (and sufficiently reliable) information" to assess a visa applicant's admissibility. *Hawaii,* 138 S. Ct. at 2411. It also observed that previous suspensions under § 1182(f) often involved foreign policy judgments: Some such suspensions "broadly suspended entry on the basis of nationality due to ongoing diplomatic disputes;" others "were directed at subsets of aliens from the countries at issue;" but as a general rule, the Court found that previous Presidents "repeatedly

000352

suspended entry" under § 1182(f) "to retaliate for conduct by their governments that conflicted with foreign policy interests." *Id.* at 2413.

137. Within this context, the Court found that the President had satisfied the "sole requisite set forth in § 1182(f)"—i.e., that the President "find that the entry of covered aliens would be detrimental to the interests of the United States."8 U.S.C. § 1182(f). As the Court observed, the President had ordered DHS and other agencies "to conduct a comprehensive evaluation," then "set[] forth extensive findings" justifying why "it was in the national interest to restrict entry of aliens who could not be vetted with adequate information—both to protect national security and public safety, and to induce improvement by their home countries." The Court also highlighted language in the Muslim Ban noting that the Administration had "crafted country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, while securing the Nation until such time as improvements occur." Indeed, the Court found that "[t]he 12-page Muslim Ban—which thoroughly describes the process, agency evaluations, and recommendations underlying the President's chosen restrictions—is more detailed than any prior order a President has issued under § 1182(f)." *Hawaii,* 138 S. Ct. at 2409.

138. Given these findings, especially within a national security setting, the Court found that the Muslim Ban "is squarely within the scope of Presidential authority under the INA." *Id.* at 2415.

139. The Court also noted, however, that it "has engaged in a circumscribed inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Id.* at 2419. The limits on such an inquiry, pursued under *Kleindienst v. Mandel,* have "particular force in admission and immigration cases that overlap with the area of national security" for two reasons: First, judicial inquiry into national security concerns potentially "intrud[es] on the President's

constitutional responsibilities in the area of foreign affairs," raising separation of powers concerns. *Id.* at 2398. Second, the courts are not well positioned "when it comes to collecting evidence and drawing inferences on questions of national security." *Id.*

140.    Thus, when evaluating the Plaintiffs' constitutional challenges to the Ban, the Court articulated a standard of review that "considers whether the entry policy is plausibly related to the Government's stated objective." *Id.* at 2420.

141.    Although the Supreme Court found that the Muslim Ban ultimately met this standard, it was careful to note that its analysis was grounded in the national security context. It was this context that allowed the Court to find that "the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility," *Id.* at 2421, despite acknowledging "a series of statements by the President and his advisers casting doubt on the official objective of the Proclamation," *Id.* at 2417. In so finding, the Court gave express deference to "the Executive's evaluation of the underlying facts . . .particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" *Id.* at 2422.

142.    In addition, the Court credited three specific features of the Ban and its predecessors that "support the Government's claim of a legitimate national security interest." *Id.* at 2402.

143.    First, three Muslim-majority countries had already been removed from the list of banned countries, and the Proclamation stated that for countries remaining on the list, the tailored entry suspensions would "remain in force only so long as necessary to address" the security concerns posed by each country. *Id.* at 2410.

144.    Second, the Ban "includes significant exceptions for various categories of foreign nationals," permitting "nationals from nearly every covered country to travel to the United States

CLASS ACTION COMPLAINT                                                          57

on a variety of nonimmigrant visas," which make up the majority of visas issued to nationals from the banned countries. *Id.* at 2422.

145.    Third, "the Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants," and "directs DHS and the State Department to issue guidance elaborating upon the circumstances that would justify a waiver." *Id.* at 2422-23.  The Court found this program, which identifies specific eligibility criteria, to be similar to humanitarian exceptions set forth in a similar country-specific suspension imposed by President Carter during the Iran hostage crisis.

146.    Given these considerations, the Court held that the plaintiffs had failed to demonstrate a likelihood of success on the merits of their constitutional claims because "the Government has set forth a sufficient national security justification to survive rational basis review," and remanded the case to the lower courts for further proceedings. *Id.* at 2423.

147.    The Supreme Court found that § 1182(f) "grants the President broad discretion to suspend the entry of aliens into the United States." *Id.* at 2408.  But such authority is not limitless. If the Proclamation is allowed to ban *two thirds* of immigrants whom Congress has expressly permitted to seek and receive immigrant visas based on wealth or self-sufficiency, such a reading of § 1182(f) would provide the President with unfettered discretion to rewrite the INA as he sees fit. Such a reading cannot muster under even the most generous reading of *Hawaii*.

148.    As an initial matter, unlike the Muslim Ban, the Proclamation does nothing to "support[] Congress's individualized approach for determining admissibility" under the INA. There is nothing in the text of the Proclamation indicating that one of its purposes is to "improve the screening and vetting protocols and procedures associated with" the visa-issuance process. 82 Fed. Reg. 45162 (Sept. 27, 2017). To the contrary, the Proclamation expressly has nothing to do

with national security, bearing a "HEALTHCARE" label on the White House website.[49] By its terms, the Proclamation's purpose is to protect the country's health care system and taxpayers "from the burdens of uncompensated care" by suspending the "entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare." Thus, instead of a relatively targeted, country-specific approach intended to "encourage foreign governments to improve their . . . practices" in vetting and information sharing, the Proclamation sweeps far more broadly and indiscriminately, affecting hundreds of thousands of immigrants solely on the basis of their ability to afford health insurance. 82 Fed. Reg. 45,162.

149.    Second, the Proclamation does not even attempt to set forth factual findings justifying its sweeping ban on nearly two thirds of all prospective immigrants seeking to enter the United States. Unlike the Muslim Ban, the Proclamation is not grounded in any comparable multi-agency, comprehensive evaluation that led to "extensive findings" set forth in the Proclamation, justifying why it is in the national interest to restrict the entry of aliens through country-specific restrictions crafted to "encourage cooperation given each country's distinct circumstances." *Hawaii,* 138 S. Ct. at 2409 (citation and internal quotations omitted).

150.    Instead, in a short preamble that ostensibly justifies the details of the suspension that follows, the Proclamation merely claims that uninsured individuals burden the country's health care system for two main reasons: because "[h]ealthcare providers and taxpayers bear substantial costs in paying for medical expenses incurred by people who lack health insurance;" and because "uninsured individuals often use emergency rooms to seek remedies for a variety of

---

[49] *Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System,* WHITEHOUSE.GOV (Oct. 4, 2019) https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/

CLASS ACTION COMPLAINT                                                                    59

non-emergency conditions," which burdens taxpayers, "who reimburse hospitals for a portion of their uncompensated emergency care costs." 84 Fed. Reg. 53,991.  According to an unsupported assertion in the preamble, "[i]n total, uncompensated care costs – the overall measure of unreimbursed services that hospitals give their patients – have exceeded $35 billion in each of the last 10 years." *Id.* The Proclamation then asserts that "data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance." *Id.*  The Proclamation does not provide or cite to any support for these claims.

151.    It is these unsupported assertions alone that purport to justify the Proclamation's indiscriminate ban on hundreds of thousands of prospective immigrants across the globe.

152.    The lack of factual support for the Proclamation's entry suspension is evident. While claiming that "lawful immigrants are about three times more likely than United States citizens to lack health insurance," the Proclamation ignores the fact that United States citizens actually account for 75% of the total 27.4 million uninsured in this country, or 20.55 million uninsured individuals.[50] In comparison, according to figures provided by the Kaiser Family Foundation for 2017, uninsured immigrants represent only 11% of uninsured in this country, or 3 million uninsured individuals.

153.    In attaching a dollar amount to the "uncompensated care costs"—in excess of "$35 billion in each of the last 10 years," or "$7 million on average for each hospital in the United States"—the Proclamation provides no evidentiary support for these figures. Nor does it set forth any factual findings identifying what percentage of this total overall figure is attributable to the 75% of uninsured United States citizens versus the 11% uninsured immigrants in this country,

---

[50] *President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage,* KAISER FAMILY FUND (Oct. 10, 2019) https://www.kff.org/disparities-policy/fact-sheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/

such that the continued entry of such uninsured immigrants to the United States "would be detrimental" to the interests of "protecting both [our health care system] and the American taxpayer from the burdens of uncompensated care." 84 Fed. Reg. 53,991.

154.    The Proclamation, moreover, sets forth no factual findings explaining how the conditions of its suspension further the stated goal of reducing the burden of uninsured health care costs. This is in stark contrast to the Muslim Ban, which articulated country-specific deficiencies in vetting and information-sharing; justifications for the suspension of specific visas from specific countries; and express instructions to the Secretary of State to engage in diplomatic efforts with these countries to improve the identified deficiencies, using the suspension of specific visas from those countries "to ensure that adequate standards are established to prevent infiltration by foreign terrorists." 82. Fed. Reg. 13,213. The Proclamation, by contrast, imposes a far broader suspension, barring all immigrants worldwide except for the limited few who can arrange for certain types of United States-based health insurance or demonstrate an unspecified level of wealth at their visa interview. There are no factual findings explaining how, for example, the entry of an immigrant who would be *fully insured* with comprehensive coverage under the ACA after arrival—albeit with financial assistance—would be detrimental to the Proclamation's express purpose of reducing the financial burden imposed by *uninsured* individuals. There are likewise no factual findings explaining how the entry of an immigrant who would be underinsured or effectively uninsured with visitor insurance or a short-term limited duration insurance plan would further this purpose.

155.    Third, in infringing the Plaintiffs' constitutional rights, the Proclamation's policy of suspending entry for *all* new immigrants unless they can afford only certain types of health insurance, or demonstrate an unspecified level of wealth, is not plausibly related to the Government's stated objective of "addressing the challenges facing our healthcare system,

including protecting both it and the American taxpayer from the burdens of uncompensated care." 84 Fed. Reg. 53,991.

156.    As noted above, the Proclamation's broad suspension on entry, combined with its limited array of "approved health insurance" options, effectively incentivizes—if not requires—most prospective immigrants to purchase non-comprehensive visitor insurance or short-term limited duration insurance to satisfy the Proclamation's requirements. This is because the vast majority of immigrants entering the United States have historically been family-based visa applicants, who would not have access to "approved" employer-based insurance before entering the United States and obtaining work authorization. Many of the other "approved health insurance" plans under the Proclamation (i.e., Medicare, TRICARE, family members' plans, and catastrophic and "unsubsidized" ACA plans) are not practically or legally available to most prospective immigrants outside of the country. Even for employment-based visa applicants, employer-sponsored insurance is far from guaranteed, as the vast majority of employers impose a waiting period before employees can be participate in employer-sponsored coverage, with waiting periods lasting 1.9 months on average.[51] Visitors insurance and STLDI plans are, as a practical matter, the only options realistically available to most would-be immigrants, and those will generally not be available to cover preexisting conditions.

157.    These options, however, provide extremely limited coverage and would likely leave individuals underinsured or uninsured for common needs such as prescription drugs, to say

---

[51] *2018 Employer Health Benefits Survey,* KAISER FAMILY FUND (Oct. 3, 2018) https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-3-employee-coverage-eligibility-and-participation/

CLASS ACTION COMPLAINT                                                                              62

nothing of hospitalization or emergency care.[52] The Proclamation, moreover, requires prospective immigrants to purchase such coverage for the maximum time period allowed, 364 days.[53] Once that 364-day period expires, the immigrant would not be able to switch immediately to a regular, comprehensive plan, regardless of whether she wanted to and had the resources to do so, with or without financial assistance: instead, the immigrant would be required to wait until the next regular open enrollment period (November 1 through December 15 each year) to change coverage. Allowing and in fact encouraging the entry of immigrants covered by visitor and STLDI plans, and requiring that coverage for their first year in a new country or likely longer, contravenes the Proclamation's goal of reducing uncompensated costs associated with uninsured health care.

158.    In fact, although the Proclamation highlights the $35 billion in uncompensated care costs incurred by this nation's hospitals, the American Hospital Association ("AHA") criticized STLDI plans earlier this year when the Trump Administration proposed a new rule to make STLDI plans more available and longer in duration. The AHA warned that STLDI products "could end up costing a patient far more by covering fewer benefits and ensuring fewer critical protections, like covering pre-existing conditions," such that patients "could find themselves responsible for their entire medical bill without any help from their 'health plan.'"[54] Accordingly, "[f]or providers,

---

[52] Karen Pollitz et al., *Understanding Short-Term Limited Duration Health Insurance,* KAISER FAMILY FUND (Apr. 23, 2018) https://www.kff.org/health-reform/issue-brief/understanding-short-term-limited-duration-health-insurance/; https://www.commonwealthfund.org/blog/2018/short-term-health-plan-gaps-and-limits-leave-people-risk

[53] As noted above, see FN 51, STLDI plans lasting 364 days are only available in about half the states.

[54] https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance

CLASS ACTION COMPLAINT

000360

[STLDI] products will lead to increased bad debt, with underinsured patients unable to afford the care they need but that is not covered," and "[i]ncreased bad debt will further strain hospitals' and health systems' ability to provide a full range of services to their patients and communities, including the most vulnerable."[55] Other commenters to the final rule warned increasing the availability of STLDI plans that "are not qualifying health plans mandated to cover the essential benefits of the Affordable Care Act" could "lead to an increased reliance on emergency departments as consumers delay or do not seek primary care."[56] If President Trump sincerely wished to address the problem of uncompensated care costs borne by hospitals, especially "uncompensated emergency care costs" incurred by emergency rooms, driving new immigrants towards STLDI and similar non-comprehensive plans like visitor insurance is not a reasonable solution.

159.    The Proclamation likewise fails to address why the Trump Administration, after laboring for a year to repeal the individual mandate of the Affordable Care Act and celebrating that repeal of the penalty associated with that statutory mandate for almost two years since, has now identified the "burdens of uncompensated care" for uninsured individuals as a problem that must be alleviated by imposing the individual mandate (and a stark penalty of inadmissibility into the country for failure to comply) specifically and solely on newly arriving immigrants—notwithstanding the fact that only 11% of uninsured individuals in this country are immigrants, while 75% of uninsured individuals are citizens.

---

[55] *Id.*

[56] Rick Pollack, *AHA Statement on Final Rule on Short-Term, Limited-Duration Health Insurance Plans,* AMERICAN HOSPITAL ASSOCIATION (Aug. 1, 2018) https://www.aha.org/press-releases/2018-08-01-aha-statement-final-rule-short-term-limited-duration-health-insurance https://www.healthcarefinancenews.com/news/increase-uncompensated-hospital-care-could-be-one-effect-short-term-coverage-rule

160.    Although the President's authority to suspend entry under § 1182(f) may be broad, it is not absolute—especially not when the exercise of that authority does not comply with either the text of the statutory provision and is patently unrelated in any rational fashion to its stated objective.

**B.    The Proclamation Does Not Pass Muster Under Equal Protection**

161.    The President's § 1182(f) powers, moreover, do not give him license to run roughshod over the Constitution's guarantee of equal protection. From the time he announced his candidacy through his entire tenure in the White House, President Trump has openly expressed antipathy toward not only all noncitizens, but also specifically toward immigrants seeking to come to the United States—particularly immigrants of color, including those from countries such as Mexico, Haiti, and Nigeria, and regions such as Central and Latin America, Africa, and the Middle East. The Proclamation is but the latest in an iterative string of attempts to deny immigrant visas to foreign nationals on the basis of their national origin or race—a motivation President Trump has expressed since he was a candidate.

162.    Indeed, in the same speech in which he announced his presidential bid, then-candidate Trump declared: "When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you." Rather, he warned his audience, "They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists." And, he added, "They're not sending us the right people. It's coming from more than Mexico. It's coming from all over South and Latin America,

and it's coming probably—probably—from the Middle East. But we don't know. Because we have no protection and we have no competence, we don't know what's happening."[57]

163.    Notwithstanding immediate public backlash to his remarks equating all Mexicans with "rapists," then-candidate Trump doubled down shortly thereafter in an interview on CNN. When asked about the North American Free Trade Agreement, then-candidate Trump pivoted to the topic of immigration and volunteered: "I love the Mexican people. I do business with the Mexican people, but you have people coming through the border that are from all over. And they're bad. They're really bad." He further clarified: "But you have people coming in and I'm not just saying Mexicans, I'm talking about people that are from all over that are killers and rapists and they're coming into this country."[58]

164.    The themes that then-candidate Trump presented in these early statements of his candidacy have recurred in his public remarks about immigrants ever since. He has repeatedly and consistently associated immigrants with crime and a lack of national security.[59] He has repeatedly and consistently presented immigrants as not only undesirable to this country,[60] but also different

---

[57] *Full text: Donald Trump Announces a Presidential Bid,* WASH. POST (June 16, 2015) https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/

[58] http://cnnpressroom.blogs.cnn.com/2015/06/28/donald-trump-on-cnns-state-of-the-union-im-in-it-to-win-it-i-will-make-our-country-great-again/

[59]  "They're rapists;" "It's coming from all over" and "we have no protection;" *see also Donald Trump on CNN's State of the Union: "I'm in it to win it…I will make our country great again"* CNN (June 28, 2015) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/  ("In recent weeks, two terrorist attacks in New York were made possible by the visa lottery and chain migration.  In the age of terrorism, these programs present risks we can no longer afford.").

[60] "When Mexico sends its people, they're not sending their best;" "They're not sending us the right people." *See also* Alana Abramson*, 'I Can Be More Presidential Than Any Other President.' Read Donald Trump's Ohio Rally Speech*, TIME (July 26, 2017)See also:

CLASS ACTION COMPLAINT                                                                          66

from the American public.[61] And he has repeatedly and consistently advanced the notion that these undesirable immigrants come from Latin America, the Middle East, or Africa[62]  and enter this country in an unregulated fashion because of the problems in the current immigration system.[63]

165.    Indeed, in speeches, remarks to the press, and tweets, President Trump has consistently attacked the two primary ways that noncitizens from predominantly nonwhite countries receive immigrant visas: the family preference system, which allows United States citizens and lawful permanent residents to sponsor close family members for immigrant visas; and the diversity visa lottery, which was originally established in 1990 to diversify the country's immigrant population by selecting immigrants from countries with historically low rates of immigration to the United States. The former accounts for approximately 65% of all immigrant

---

https://time.com/4874161/donald-trump-transcript-youngstown-ohio/  (criticizing "today's low-skill system, just a terrible system where anybody comes in. People that have never worked, people that are criminals, anybody comes in. . . . We don't want people that come into our country and immediately go on welfare and stay there for the rest of their lives.").

[61] "They're not sending you." *See also President Trump Remarks at Conservative Political Action Conference,* CSPAN (Feb. 23, 2018)*See also* https://www.c-span.org/video/?441592-1/president-trump-pushes-concealed-carry-teachers-cpac-speech (describing the diversity visa lottery: "You have a country, they put names in. Do you think they are giving us the good people? Not too many of you people are going to be a lottery.")

[62] "It's coming from more than Mexico. It's coming from all over South and Latin America, and it's coming probably—probably—from the Middle East." *See also* @realdonaldtrump, Twitter https://twitter.com/realdonaldtrump/status/980961086546632705 ("Honduras, Mexico and many other countries that the U.S. is generous to, sends many of their people to our country through our WEAK IMMIGRATION POLICIES.")

[63] "It's coming from all over," but "[b]ecause we have no protection and we have no competence, we don't know what's happening." *See also* https://twitter.com/realdonaldtrump/status/953406553083777029 ("We need to keep America safe, including moving away from a random chain migration and lottery system, to one that is merit-based.")

visas granted every year; the latter accounts for about 4.5%.[64] President Trump has repeatedly criticized both family-based preferences and the diversity visa lottery by claiming that they admit immigrants through "random chance,"[65] threatening the country's economy and security[66] and "put[ting] pressure on our social safety net and generous welfare programs."[67]

166. For example, President Trump regularly portrays family-based immigration in derogatory terms, dismissing family preferences as "chain-based migration" that "can continue without limit,"[68] even though the INA strictly limits the types and numbers of family-sponsored immigrants.[69] In continually emphasizing "chain" metaphor, he raises the specter of a "virtually

---

[64] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2017/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2016/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2015/table10

[65] *Remarks by President Trump on Modernizing Our Immigration System for a Stronger America,* WHITEHOUSE.GOV (May 16, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-modernizing-immigration-system-stronger-america/

[66] See, e.g., *Remarks by President Trump and Vice President Pence in a Meeting on Immigration with Republican Members of the Senate*, WHITEHOUSE.GOV (Jan. 4, 2018) See, e.g., https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-meeting-immigration-republican-members-senate/

[67] *Remarks by President Trump on Modernizing Our Immigration System for a Stronger America,* WHITEHOUSE.GOV (May 16, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-modernizing-immigration-system-stronger-america/

[68] @realdonaldtrump, Twitter, https://twitter.com/realdonaldtrump/status/960907362109452288

[69] David Bier, *Five Myths about Chain Migration,* CATO INST. (Feb. 14, 2018) https://www.cato.org/publications/commentary/five-myths-about-chain-migration

CLASS ACTION COMPLAINT

unlimited"[70] influx of "low-skilled and unskilled"[71] migrants who "come in and just immediately go and collect welfare."[72]  Chain migration," according to President Trump, is "bringing many, many people with one, and often it doesn't work out very well. Those many people are not doing us right."[73]

167.    Contrary to the President's suppositions and assertions, the truth remains that nearly half of adults who receive family-based visas have college degrees (compared with less than a third of U.S. natives) and family-sponsored immigrants are the most upwardly mobile American workers.[74]

168.    It is also a common set-piece in President Trump's speeches for him to bring up the diversity visa lottery, play-act drawing names out of a hat, and characterize the "winners" as criminals and "the worst of the worst:"[75] "The country puts the name in the basket and you pick people out of the lottery. This one is a murderer. This one robbed four banks. This one I better not

---

[70] *President Donald J. Trump's State of the Union Address*, WHITEHOUSE.GOV (Jan. 30, 2018) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/

[71] *President Donald J. Trump Backs RAISE Act,* WHITEHOUSE.GOV (Aug. 2, 2017) https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-backs-raise-act/

[72] *Trump Administration Immigration Policy Announcement*, CSPAN (Aug. 2, 2017) https://www.c-span.org/video/?432076-1/president-backs-gop-senators-skilled-based-immigration-bill

[73] *Remarks by President Trump in Meeting with Bipartisan Members of Congress on Immigration*, WHITEHOUSE.GOV (Jan. 9, 2018) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-bipartisan-members-congress-immigration/

[74] David Bier, *Five Myths about Chain Migration,* CATO INST. (Feb. 14, 2018) https://www.cato.org/publications/commentary/five-myths-about-chain-migration

[75] *Remarks by President Trump in Meeting with Bipartisan Members of Congress on Immigration*, WHITEHOUSE.GOV (Jan. 9, 2018) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-bipartisan-members-congress-immigration/

CLASS ACTION COMPLAINT                                                    69

say. This one another murderer. Ladies and gentlemen, another murderer."[76] President Trump regularly mischaracterizes the program as a way for countries to send their undesirable citizens to the United States, claiming, "[y]ou have a country, they put names in. Do you think they are giving us the good people? . . . They are not giving us their best people, folks. Use your heads."[77] He likewise routinely denigrates the diversity visa lottery as "a program that randomly hands out green cards without any regard for skill, merit, or the safety of our people"[78]—

169.    The truth remains that individuals must apply for the diversity visa lottery and possess either a high school education or demonstrate two years of work experience in a sufficiently skilled occupation.  Applicants must then pass the exact same criminal, national security, and medical checks as all other immigrants if they are so fortunate to win a diversity visa.[79]

170.    Notably, most family-based visa immigrants in recent years have originated in Asia, Africa, and South America; most diversity visa lottery winners have originated in Africa and Asia.[80] In other words, when attacking family-based or diversity visa immigration—both long-

---

[76] *President Trump in Cincinnati, Ohio*, CSPAN (Aug. 1, 2019) https://www.c-span.org/video/?463078-1/president-trump-holds-campaign-rally-cincinnati-ohio&start=1937

[77] *See also President Trump Remarks at Conservative Political Action Conference,* CSPAN (Feb. 23, 2018) https://www.c-span.org/video/?441592-1/president-trump-pushes-concealed-carry-teachers-cpac-speech

[78] *President Donald J. Trump's State of the Union Address*, WHITEHOUSE.GOV (Jan. 30, 2018) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/

[79] *See generally* Alex Nowrasteh, *The Cheap Assault on the Immigration Visa Lottery,* CATO INST. (Jan. 28, 2018)  *See generally* https://www.cato.org/publications/commentary/cheap-assault-immigration-visa-lottery

[80] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-

standing features of the American immigration system—President Trump is attacking nonwhite immigration.

171.    While criticizing family-based preferences and the diversity visa lottery as "outdated programs that hurt our national and economic security,"[81] President Trump has also consistently advocated for a new, "merit-based" system. Such a system "admits people who are skilled, who want to work, who will contribute to our society, and who will love and respect our country"[82]—in contrast with family-based and diversity immigrants, who are "mostly low-wage and low skilled," and who "come into our country and immediately go onto welfare and stay there for the rest of their lives."[83] President Trump has constantly portrayed merit-based immigrants as people who "have skills, who can support themselves financially, and contribute to our economy," and who will come to the country to "work hard."[84]

172.    Most employment-based immigrant visas in the current United States immigration system, which are awarded predominantly to highly skilled and white-collar workers with advanced degrees—i.e., the types of individuals President Trump's proposed merit-based system

---

statistics/yearbook/2017/table10.  In these statistics, figures for Africa include countries from the Middle East.

[81] @realdonaldtrump, Twitter, https://twitter.com/realdonaldtrump/status/960907362109452288

[82] *President Donald J. Trump's State of the Union Address*, WHITEHOUSE.GOV (Jan. 30, 2018) https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/

[83] Alana Abramson, *'I Can Be More Presidential Than Any Other President.' Read Donald Trump's Ohio Rally Speech*, TIME (July 26, 2017) https://time.com/4874161/donald-trump-transcript-youngstown-ohio/

[84] *President Trump Remarks at Conservative Political Action Conference,* CSPAN (Feb. 23, 2018) https://www.c-span.org/video/?441592-1/president-trump-pushes-concealed-carry-teachers-cpac-speech

CLASS ACTION COMPLAINT                                                              71

would favor—go to individuals from Europe and Asia.[85] Employment-based immigrant visas represent approximately 13% of the immigrant visas granted annually by the United States.[86]

173.    That President Trump divides immigrants into these two categories—undesirable family-based and diversity immigrants from predominantly non-white countries on the one hand, and employment- or "merit-" based immigrants who are either European or at least willing to "work hard" on the other—is no surprise in the context of other statements he has made evincing racial and nation-based animus grounded in ugly stereotypes.

174.    During a White House briefing on how many immigrants had received visas to enter in 2017, for example, Trump reportedly grumbled that Haitians "all have AIDS" and that after seeing the United States, Nigerians would never "go back to their huts" in Africa once he heard how many immigrants from each country had been admitted.[87] At a similar briefing on protections for Haiti, El Salvador, and African countries in 2018, President Trump is said to have asked, "Why are we having all these people from shithole countries come here?" He then suggested

---

[85] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2017/table10

[86] *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2017*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2017/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2016/table10; *Table 10. Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Birth: Fiscal Year 2016*, DHS https://www.dhs.gov/immigration-statistics/yearbook/2015/table10

[87] Michael D. Shear and Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda,* NY TIMES (Dec. 23, 2017) https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html

CLASS ACTION COMPLAINT                                                            72

that the United States should bring in more people from countries such as Norway.[88] More recently, he tweeted that four Congresswomen of color "originally came from countries whose governments are a complete and total catastrophe, the worst, most corrupt and inept anywhere in the world," and "should go back and help fix the totally broken and crime infested places from which they came"—despite the fact that each Member of Congress is a United States citizen and only one, Ilhan Omar, had come to the United States as a child, fleeing from Somalia as a refugee.[89]

175.    Taken in aggregate, President Trump's public statements have repeatedly and consistently evinced an animus towards nonwhite immigrants. And since entering the White House, President Trump has tried various ways to effectuate his desire to limit nonwhite immigration by limiting family-based and diversity visa immigration.

176.    Early in his presidency, for example, President Trump championed the RAISE Act, a bill that "favors applicants who can speak English, who can support themselves financially, and who demonstrate valuable skills that will strengthen our economy and strengthen our country."[90] The same bill would cut family-based immigration in half by eliminating many currently existing categories for family-sponsored immigration, and by permitting only spouses and minor children

[88] Josh Dawsey, *Trump Derides Protections for Immigrants from 'shithole' Countries,* WASH. POST (Jan. 12, 2018) https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html

[89] Felicia Sonmez and Mike DeBonis, *Trump Tells Four Liberal Congresswomen to 'go back' to Their Countries, Prompting Pelosi to Defend Them,* WASH. POST (July 14, 2019) https://www.washingtonpost.com/politics/trump-says-four-liberal-congresswomen-should-go-back-to-the-crime-infested-places-from-which-they-came/2019/07/14/b8bf140e-a638-11e9-a3a6-ab670962db05_story.html

[90] *President Trump Rally in Huntington*, *West Virginia*, CSPAN, https://www.c-span.org/video/?431931-1/president-trump-holds-rally-west-virginia

of United States citizens and lawful permanent residents to seek immigrant visas—moves that would disproportionately affect nationals of the predominantly nonwhite countries of Mexico, the Dominican Republic, the Philippines, China, India, and Vietnam.[91] The RAISE Act also introduced a point system for awarding visas, granting more points to intending immigrants for having a high-paying job offer, high English test scores, high educational attainment, or financial resources to invest over a million dollars in the United States.[92] In addition, under the bill, "you cannot get welfare for five years when you come into our country. You can't just come in like in past weeks, years, and decades you come in, immediately start picking up welfare."[93] In mid-2017, the RAISE Act failed in the Senate without a vote.

177.    Around the same time that the Senate passed on voting on the RAISE Act, USCIS introduced the new Public Charge rule, another attempt by the Trump Administration to curtail the immigration of nonwhite individuals entering the country through family-based preferences or the diversity visa. Echoing the point system of the RAISE Act, the Public Charge rule places varying positive or negative weights on certain factors that are then assessed in determining whether an applicant should be deemed inadmissible on public charge grounds. Under one of the heavily weighted positive factors—having income or financial assets over 250% of the federal poverty line—"71% of Mexicans and Central Americans, 69% of Africans, and 52% of Asian immigrants

---

[91] Julia Gelatt, *The RAISE Act: Dramatic Change to Family Immigration, Less So for the Employment-Based System*, MIGRATION POLICY INST. (Aug. 2017) https://www.migrationpolicy.org/news/raise-act-dramatic-change-family-immigration-less-so-employment-based-system

[92] *Id.*

[93] Factbase Videos, *Weekly Address: Donald Trump - Washington, DC - August 25, 2017*, YOUTUBE (Oct. 18, 2017)Video: https://www.youtube.com/watch?v=Mx7k8mk5PPo&t=54

CLASS ACTION COMPLAINT                                                                              74

would fail to meet the threshold." Accordingly, like the RAISE Act, the Public Charge rule "would have pronounced regional, national-origin and—by extension—racial effects on flows," having the most negative impact on "Asian, Latin American, and African immigrants."[94]

178.    The Proclamation follows in the footsteps of the failed RAISE Act and the enjoined Public Charge rule. Like the RAISE Act and the Public Charge rule, the Proclamation has the potential to drastically cut family-based immigration. Unlike its predecessors, however, the Proclamation is promulgated by presidential fiat, and thus untethered to the legislative or administrative rulemaking processes. But although the RAISE Act, the Public Charge rule, and the Proclamation each takes a different form and function, the intended result of each is the same: to reduce immigration from predominantly nonwhite countries.

## THE PROCLAMATION AND ITS IMPLEMENTATION HARM PLAINTIFFS

179.    The Proclamation will go into effect at 12:01 am, Eastern daylight time, on Sunday, November 3, 2019, and all publicly available information reflects that the State Department has been taking, and will take, definitive and concrete action to implement and enforce it. The press, for example, has reported that "[m]ore than two dozen health officials are wrestling with highly technical questions, like which health plans would comply with the new requirements," and that some are "confused about numerous aspects of the proclamation."[95] Information made publicly available on the State Department's website, moreover, expressly instructs would-be immigrants

---

[94] Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public Charge" Rule,* MIGRATION POLICY INST. (Aug. 2018) https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule

[95] Dan Diamond, *Health Officials: Trump Immigration Order Could be Illegal,* POLITICO (Oct 11, 2019) https://www.politico.com/news/2019/10/11/trump-immigrants-health-insurance-illegal-044716

that "[i]f [they] are applying for an immigrant visa, including a diversity visa, on or after November 3, 2019," they *must* satisfy the Proclamation's requirements and that "[i]nability to meet this requirement *will result in the denial* of the visa application.[96] The State Department information page further states that "[d]uring the visa interview, applicants should be able to demonstrate to the satisfaction of the consular officer" that they meet the Proclamation's requirements, and that "[o]fficers will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation as needed."[97] Such assertions reflect the fact, or at very least support the logical inference, that the State Department is already implementing and, starting on November 3, 2019, will enforce the Proclamation, resulting in a direct impact on the rights of qualified prospective immigrants.

180.    When implemented and enforced, the Proclamation will cause Plaintiffs [and their members and clients] substantial, concrete, and particularized injury. The entry suspension of the Proclamation is indefinite; the Proclamation provides no waiver from its suspension; and the Proclamation provides no way to appeal the denial of a visa due to the Proclamation's de facto wealth test. As a result, the Proclamation will permanently separate close family members and inflict irreparable harm.

181.    **John Doe #1**, a U.S. citizen, can no longer work due to a disability. He has applied for wife, a Mexican citizen with an approved I-601A waiver, to obtain legal status so that she can live and work here in the United States, supporting both him and his fourteen-year-old United

---

[96] *Presidential Proclamation on Health Care*, TRAVEL.STATE.GOV, https://travel.state.gov/content/travel/en/us-visas/immigrate/Presidential-Proclamation-on-Health-Care.html

[97] *Id.*

000373

States citizen son. But he fears that his wife will not be able to show that she meets the Proclamation's health insurance and financial resources requirements at her consular interview.

182.    John Doe #1 has not worked since May 2018 and had heart surgery in July 2018. He currently has a pacemaker. Around April 2019, he received his Social Security Disability determination and since he stopped working, Social Security Disability benefits have been his only income source. Both he and his son have health insurance through the Oregon Health Plan, Oregon's Medicaid program, but, because he can no longer work, he cannot obtain insurance through an employer or afford private health insurance.

183.    Money is tight in John Doe #1's family. After receiving approval for his wife's family-based visa petition and her I-601A provisional unlawful presence, completing her application for an immigrant visa, submitting documents to the National Visa Center, and scheduling a consulate interview for Wednesday, November 6, 2019 in Ciudad Juarez, Chihuahua, Mexico, John Doe #1 thought that his wife would finally become a legal resident and would be able to work. He thought his family would finally be able to breathe a financial sigh of relief after enduring a significant medical hardship, as well as anxiety about her legal status.

184.    But then they received news of the Proclamation. John Doe #1 does not believe that his wife will be eligible to receive a visa now; she does not have health insurance and they do not have sufficient financial resources, especially after his disability, to afford health insurance for her or pay her foreseeable health insurance costs.

185.    The Proclamation will be destructive to John Doe #1's family in many ways. He cannot imagine living apart from his wife. He and their son depend on her.  Their son suffers from health complications and is currently in the hospital. Given his own health issues, John Doe #1 cannot care for his son by himself; he needs his wife. If granted a visa, she could work to support

CLASS ACTION COMPLAINT

the family financially since John Doe #1 cannot work himself. Due to the significant medical issues facing John Doe #1 and his son, he does not know what he would do if his wife goes to her November 6th interview and her visa is denied.

186.    **Juan Ramon Morales**, a U.S. citizen, would be able to enroll his wife, Vianca Morales, as a dependent in his employer's health insurance plan, but the Proclamation makes both this and the prospect of acquiring an immigrant visa for her his impossible.

187.    Mr. Morales's employer told him that they could not add his wife as a dependent on his health insurance plan unless she obtained a Social Security Number; once she does so, she can be added. But she cannot do so until she receives legal status in the United States, and the Proclamation requires that she show proof, which she cannot obtain, that she would be enrolled in health insurance within 30 days of her admission into the United States.  Through his research, Mr. Morales learned that Social Security Numbers and "Green Cards" are typically not mailed quickly enough to arrive within 30 days after admission to the U.S. is granted.  Thus, even though Mr. Morales would be able to enroll his wife in health insurance were she to receive permanent residence, the Proclamation's stringent requirements make it impossible.

188.    Nor could the Morales family afford to purchase health insurance for Ms. Morales or her foreseeable medical expenses. Ms. Morales, who has lived in the U.S. since 2006, is diagnosed with leukemia and has had emergency brain surgery. She also is epileptic and suffers from seizures. To manage these, she pays for prescription medicine out of pocket. Mr. Morales likewise currently has significant medical costs; he carries significant debt due to back surgery he had. Mr. Morales' daughter, a U.S. citizen, and his step-daughter, a legal permanent resident, both have subsidized health insurance that costs approximately $30 per month. Mr. Morales has

000375

researched health insurance options to cover his wife, but has not found any available plans that he could afford.

189.     When Mr. Morales first learned about the Proclamation, he felt tremendous anxiety and despair. Mr. Morales and his family had already gone through a long and laborious journey to get to where they are today in the immigrant visa process: they had their I-130 petition approved in July 2017; Ms. Morales filed a provisional unlawful presence waiver application in May 2018 based on the extreme hardship Mr. Morales would suffer if she could not be able to obtain permanent residence in the U.S, and the application was approved in April 2019; Ms. Morales had completed all of the other required steps of the Consular Process; and now the family was waiting for her interview to be scheduled in Ciudad Juarez, Mexico. If his wife is denied permanent residency, Mr. Morales and his children will suffer extreme psychological, emotional, financial, and physical hardship. It was while waiting for this interview that the Morales family first heard about the Proclamation. Given the strict 30 day timeline, Ms. Morales' health conditions, and Mr. Morales' limited financial resources, Mr. Morales does not believe that Ms. Morales will have health insurance, that she will be able to prove that she will be able to obtain health insurance 30 days after her admittance into the U.S., or that she will be able to afford foreseeable medical costs at the time of her visa interview.

190.     As part of Ms. Morales' waiver application, Vianca demonstrated that Mr. Morales would suffer extreme hardship if Ms. Morales' unlawful presence was not forgiven, including extreme psychological, emotional, financial, and physical hardship.  If she is denied an immigrant visa, Mr. Morales would be separated from the love of his life and would have to raise his daughters alone. The thought that Ms. Morales may be denied her immigrant visa—and thus indefinitely separated from him—has caused Mr. Morales significant stress.

CLASS ACTION COMPLAINT                                                                                79

000376

191.    As a single mother of two children and a victim of domestic abuse, **Jane Doe #2**, a U.S. citizen who was naturalized in 2018, has faced many obstacles in the United States.  Yet, she has seen the beauty and opportunities that this country has to offer.  The United States has given her a sense of hope and happiness for the future: even though she is not where she would like to be, she feels like she is getting there. She now wishes to bring her parents to the United States to be with her and their grandchildren, but fears she will not be able to do so if the Proclamation is in effect.

192.    Her experiences as a victim of domestic abuse, a single mother, and an immigrant to the United States have often made Jane Doe #2 feel very alone. She particularly misses her parents. She has been living apart from her 59-year old parents, who live in Nicaragua, for 13 years. This separation has been exceptionally painful. She can only communicate with her parents twice a week, at most, because they live in a remote location.  It has been extremely stressful and distressing to Jane Doe #2 to have experienced domestic violence without being able to turn to her parents for help. And the fact that they have not been able to witness the beautiful moments—like the birth of her children—breaks her heart. Not only has she been separated from her parents, but her children have never met their grandparents. Jane Doe #2 sponsored two immigrant visas for her parents to reunite with them in the United States to change that.

193.    On or around December 19, 2018, Jane Doe #2 applied for her parents to come to the United States. The visa petitions were approved on or around July 9, 2019.  Her parents have received the requisite letters from the National Visa Centers to proceed with the Consular Process. Her family is currently collecting information and documents to submit the DS-260 and immigrant documents. They were waiting for their interview when they heard news of the Proclamation.

CLASS ACTION COMPLAINT

000377

194.     When she heard about the Proclamation, Jane Doe #2 felt crushed. She cannot explain the feeling of going through so many awful moments in her life and finally obtaining some hope of a light at the end of the tunnel by the possibility of reuniting with her family, only to have that hope ripped away from her by the Proclamation.

195.     Currently, Jane Doe #2's parents do not have health insurance. They go to clinics in Nicaragua for their medical needs. As a single mother of two, Jane Doe #2's financial resources are limited. She has searched for an available health insurance option for them that she could afford, but has not been successful and does not believe an "approved" and available insurance option is affordable.

196.     **Jane Doe #3**, a U.S. citizen, can no longer work due to a disability, which also makes it difficult for her to keep up with household tasks. After being separated from her husband for almost two years, she hopes that having her husband, a German citizen, with her in the U.S. will make things better. Living apart has been miserable for Jane Doe #3. Although they talk often, she rarely gets to see her husband, and she needs to incur debt whenever she goes to visit him in Germany. Having her husband in the U.S. would help in almost every way. But she now believes that her husband will not be able to meet the new requirements that the Proclamation created.

197.     Jane Doe #3 met her husband in Los Angeles in 2006, and they were married in February 2018. After getting married, they decided to settle in the U.S. instead of Germany because of Jane Doe #3's desire to stay close to her family. She lives nearby her immediate family, and is especially thankful to be able to leave near her grandmother, who is a Holocaust survivor. Accordingly, she filed an immigrant visa petition for her husband in July 2018, and he returned to Germany so that he would not overstay his visitor visa. The I-130 petition was approved in April

2019, and since then, they have been gathering documents required for consular processing and looking forward to the time when they can be reunited.

198.     The Proclamation has forced them to put their plans for a future together on hold. Jane Doe #3 does not know how her husband will be able to prove at a consular interview that he will have approved health insurance within 30 days of entering the United States. Jane Doe #3 is currently enrolled in California's Medicaid program and she cannot add her husband to this coverage.

199.     While her husband likely has good employment prospects in Los Angeles—he is an architect who currently teaches architectural theory and design and he speaks both English and German fluently—it is extremely difficult for him to secure employment without knowing when he will enter the United States. Even if he were to be able to obtain insurance through an employer, he would almost certainly not be able to secure such employment at the time of his consular interview. Furthermore, his current German health insurance will not cover him when he moves to the United States. In the past, when he has visited Jane Doe #3, he purchased traveler's insurance, but it is his understanding that he would also not be eligible to receive such insurance if he moves permanently to the U.S. Doe's husband has multiple sclerosis, and his treatments are expensive. She believes that she and her husband do not have the financial resources to afford health insurance for him or to pay his foreseeable medical expenses out of pocket.

200.     **Iris Angelina Castro**, a U.S. citizen, is currently pregnant with her second child and separated from her husband, Hermogenes Castro Molina, a national and resident of the Dominican Republic. She wishes to reunite with her husband in the United States because when her first son became very ill, she was forced to quit her job to take care of him, and she is now unemployed with no income source.

000379

201.    Ms. Castro was previously employed as a teacher, but she has since lost all her benefits when she stopped working to stay at home with her first son. Having Mr. Molina here in the United States will help their whole family; he can work while she cares for the children.

202.    Ms. Castro filed an immigrant petition for her husband on November 14, 2018, which was approved on May 30, 2019. They have since been filing all the required documents so that they can schedule a consular interview.

203.    News of the Proclamation devastated Ms. Castro. Because she is unemployed, she does not believe that they have sufficient financial resources to prove that Mr. Castro would be able to obtain health insurance within 30 days of his entry into the U.S. or pay for foreseeable medical costs. She has already been living apart from her husband for almost a year and that separation has been exceptionally painful. Furthermore, she is pregnant with their first child together. It is painful for her to think that her daughter's father will not be here for her birth and that she will have to raise her daughter without her father. Without him and his potential financial support, she believes that she will be forced to use public benefits for survival.

204.    **Blake Doe**, a U.S. citizen and senior college student at Oregon State University, lived with his parents, Mexican citizens, in Oregon from the time he was born until he went to college. His parents are amazing people, and he aspires to live up to the values of compassion, hard work, and responsibility that they have always tried to instill in him. Due to their sacrifices, Blake Doe will be the first person in his family to graduate from college in June 2020. He has approved I-130 petitions for his parents, but they are afraid that if they leave the country for their consular interview, they will be banned from coming back under the Proclamation.

205.    Blake Doe is seeking to permanently unify his family in Oregon because it is where he has lived his whole life. He sponsored immigrant visas for his parents on or around April 17,

2017, and on or around January 17, 2018, their I-I30 petitions were approved. On June 11, 2019, United States Citizenship and Immigration Services (USCIS) determined that members of his family would suffer an extreme hardship if his parents' visas were denied, and accordingly, approved an extreme hardship waiver so that his parents could complete the immigration process. His parents are currently waiting to have an interview scheduled at the Consulate in Ciudad Juarez, Mexico.

206.    Blake Doe's mother's health has declined recently. She has two painful conditions—rheumatoid arthritis and lupus erythematosus. She currently pays for medical care out of pocket; her treatment is necessary to allow her to live without pain. She has tried to obtain health insurance, but has been told she is ineligible due to her immigration status. Blake Doe's father has tried to obtain health insurance for her, but has not been successful. Through research, Blake Doe has found that it would be very expensive for him to obtain health insurance for his mother and father.

207.    As a full-time college student, Blake Doe has no income and has about $20,000 worth of student loan debt. He cannot afford health insurance for his parents. Therefore, Blake Doe does not believe that he has sufficient financial resources to prove that his parents would be able to obtain approved health insurance within 30 days of their admittance into the U.S. or pay for foreseeable medical costs.

208.    Given that the Proclamation has no waiver or termination date, Blake Doe is resigned to the fact that his parents will not be able to complete the immigration process. He believes that they will continue to live in fear and that he will continue to live in fear every day of permanent separation from his parents. This fear is causing him feelings of depression and makes him constantly worried.

CLASS ACTION COMPLAINT

000381

209.    **Brenda Villarruel**, a U.S. citizen, and her minor son, who is a United States citizen, have been separated from her husband and the child's step-father, for almost two years. She now fears that the Proclamation will make that separation permanent.

210.    Ms. Villarruel is employed as a licensed medical assistant, but does not have health insurance through her work and pays out of pocket for medical services when necessary.  Ms. Villarruel has sponsored her husband, who currently resides in Mexico City, Mexico, for an immigrant visa and, after receiving an approved waiver, has been scheduled for his final immigrant interview on November 5, 2019.

211.    Ms. Villarruel needs her husband, Mr. Gabino Soriano Castellanos, in the United States so that he can rejoin their thriving tattoo business and continue to be the father and caretaker of their son, who has battled depression due to the separation from the only father he has ever known. News of the Proclamation has devastated the entire family. Ms. Villarruel, having researched the costs of approved insurance, does not believe that the family has sufficient financial resources to prove that she and Mr. Castellanos would be able to obtain approved health insurance to comply with the President's Proclamation within 30 days of Mr. Castellanos admittance into the U.S. or pay for foreseeable medical costs.

212.    This is a time when Ms. And Mr. Castellanos should be building their thriving tattoo business and raising their son. Instead, they live in fear of living apart from each other indefinitely and being financially wiped-out due to the family separation.

213.    **Latino Network** functions as an "immigration services navigator" to educate clients and connect them with legal-services providers who can assist with obtaining immigrant visas for family members, and provides information to low- and moderate-income immigrant families about options for health-care benefits. The Proclamation has and will continue to

CLASS ACTION COMPLAINT

000382

severely restrict and frustrate Latino Network's ability to fulfill its objectives of counseling and referring low- and moderate-income immigrants to services that will enable them to obtain adequate health-care benefits.

214.    The Proclamation has forced and will continue to force Latino Network to divert significant resources: to identify viable health-care options for members who need to comply with the Proclamation; to retrain Latino Network staff members, who had been previously trained to help members find free, low-cost, or subsidized health-care plans, and who must now learn to help members navigate the Proclamation's terms; and to develop and publish information materials to inform our community. Latino Network's need to devote resources to respond to the Proclamation and mitigate its effects on the Portland Latino community necessarily limit the resources available to carry out its core services and programs, and frustrate its ability to carry out its organizational purpose.

## CLASS ALLEGATIONS

215.    Individual Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), on behalf of themselves and all other persons for whom Defendants' implementation of the Proclamation interferes with family reunification or the processing of their visa petitions in a manner consistent with applicable law. The individual plaintiffs seek certification of a class (the "Plaintiff Class") consisting of:

>    a.    Individuals in the United States who currently have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa, or who will soon file such a petition; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance"

CLASS ACTION COMPLAINT

000383

within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs." ("U.S. Petitioner Subclass")

b.  Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs." ("Visa Applicant Subclass")

216.    This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

217.    The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1).  Analysis by the Migration Policy Institute, based on data from the Census Bureau's 2014-16 American Community Survey ("ACS"), indicates that roughly 375,000 immigrants, mainly family-based immigrants, would be affected by the Proclamation each year.  In addition, the class action is the only appropriate procedural avenue for the protections of the class members' constitutional rights and rights under the APA.

218.    The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' Proclamation and its implementation exceeds the statutory authority provided Defendants by the Immigration and Nationality Act; violates Plaintiff Class members' rights under the APA; and violates Plaintiff Class members' rights under the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution.

219.    The claims of the Plaintiff Class members share common issues of fact, including, but not limited to:

CLASS ACTION COMPLAINT

a. whether the Proclamation and Defendants' actions taken to implement it were motivated by racial animus, sought to reduce immigration by people of color, or were otherwise based on the race, ethnicity, and/or national origin of the individuals affected;

b. whether Defendants fail to address the Proclamation's discriminatory impact;

c. whether, in issuing and implementing the Proclamation, Defendants relied on factors Congress did not intend for it to consider;

d. whether, in issuing and implementing the Proclamation, Defendants failed to consider important aspects of the problem it is addressing;

e. whether, in issuing and implementing the Proclamation, Defendants explained its decision counter to the evidence before it;

f. whether Defendants quantified or considered harms that would result from the Proclamation and its implementation;

g. whether Defendants failed to follow required procedures, including notice and opportunity for public comment, before issuing and implementing the Proclamation;

h. whether the Proclamation's requirements are, in practice, irrational, vague and unworkable, rendering impossible the uniform application of the laws or review of decisions for consistency with facts and evidence;

i. whether the Proclamation is being or will be enforced so as either to prevent class members from reuniting here in the United States, or to force their separation when a noncitizen family member must leave the country for a consular interview.

CLASS ACTION COMPLAINT

j.   whether class members have suffered harm as a result of the Proclamation and Defendants' actions taken to implement it.

220.   Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff, and satisfy Rule 23(a)(2).

221.   The claims or defenses of the named Plaintiffs are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Plaintiffs have been harmed, among other things, by Defendants' failure to lawfully abide by statutory limitations on their actions.  They have further been harmed by Defendants' failure to proceed through proper notice-and-comment and other required procedures when issuing and implementing its Proclamation, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems it is addressing.  They have further been harmed by Defendants' failure adequately to explain its decision to issue the Proclamation or describe its implementation in a manner that it may reasonably be followed by those it affects. They have been harmed by Defendants' premising the Proclamation and its implementation on racial animus in violation of the equal protection guarantee of the Fifth Amendment.  Each of these actions, independently and collectively, have caused harm to Plaintiffs and the Plaintiff Class members.

222.   The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4).  The named Plaintiffs will defend the rights of all proposed class members fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class.  The attorneys representing the named Plaintiffs include

CLASS ACTION COMPLAINT                                             89

experienced civil rights and immigration attorneys who are considered able practitioners in federal constitutional litigation. These attorneys should be appointed as class counsel.

223.    The members of the proposed class are readily ascertainable through Defendants' records.

224.    Through implementation and enforcement of the Proclamation at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore by properly certified under Federal Rule of Civil Procedure 23(b)(2).

225.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore by properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Violation of the Administrative Procedure Act)
### (On behalf of All Plaintiffs, including the Class)

226.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

227.    The Proclamation will go into effect on November, 3, 2019. Defendants have stated that they will begin implementing the Proclamation on this date in the manner described on the State Department's website.

228.    Defendants have taken actions to implement the Proclamation, including informing visa applicants and consular officials of new requirements effective November 3, 2019, that will result in a direct impact on the rights of qualified prospective immigrants and constitute final

agency action(s) within the meaning of the Administrative Procedure Act. *See Bennett v. Spear*, 520 U.S. 154 (1997).

229.    Defendants' actions constitute violations of the APA in at least the following respects:

  a.   Defendants failed to reasonably justify their departure from settled practice.

  b.   Defendants failed to address conflicts with other laws and legislative intent, including but not limited to the specific scheme Congress mandated in the INA through provisions such within 8 U.S.C. § 1151; 8 U.S.C. § 1153; 8 U.S.C § 1182; 8 U.S.C § 1182; 8 U.S.C § 1154; 8 USC § 1186; 8 U.S.C. § 245, and numerous health care laws, such as the ACA, PRWORA, CHIP and CHIPRA, and numerous regulations duly promulgated under these and other laws.

  c.   Defendants implemented the Proclamation in a manner that is not "consistent with applicable law" for reasons including that their actions replaced a statutory totality of the circumstances test for public charge with a new test that is vague, arbitrary, and unsupported by the evidence.

  d.   Defendants' implementation of the Proclamation is pretextual because Defendants seek to reduce immigration by people of color.

  e.   Defendants fail to address the Proclamation's discriminatory impact.

  f.   Defendants did not quantify or consider harms that will result.

  g.   Defendants states requirements that are irrational, vague and unworkable, rendering impossible the uniform application of the laws or review of decisions for consistency with facts and evidence.

  h.   Defendants acted in excess of statutory authority.

CLASS ACTION COMPLAINT

    i.    Defendants' actions exceed the delegation of statutory authority to the President in U.S.C. § 1182(f) for reasons including that Congress did not delegate unfettered discretion to indefinitely rewrite the immigration or health care laws, allow for suspensions that are unconstitutional and/or unsupported by adequate findings, create permanent and specific classes of inadmissibility, or eliminate the opportunity for visa applicants' opportunity to show that they are unlikely to become a "public charge" by the terms Congressional mandated.

    j.    Defendants' actions implement the Proclamation in a manner that is not consistent with 8 U.S.C. § 1182(a)(4) for reasons including that it replaces Congress' specific scheme for assessing who may become a "public charge," and when admission may be authorized for those who cannot show they are unlikely to become a public charge.

    k.    Defendants violate their own rules and regulations and binding norms to the prejudice of others. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

    l.    Defendants failed to follow required procedures including notice and opportunity for public comment, particularly with respect to the Posting and Emergency Notice.

230.    Defendants' actions implementing the Proclamation are based on legal error; fail to consider all relevant factors; and lack a rational explanation, and are therefore arbitrary and capricious and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

231.    Defendants' actions implementing the Proclamation are contrary to constitutional rights, discriminating on the basis of national origin and race, thereby violating the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

232.    Defendants' actions implementing the Proclamation are ultra vires and in excess of any authority granted by the Proclamation, regulation, or statute, and not otherwise in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

233.    Defendants' actions implementing the Proclamation affect Plaintiffs' substantive rights and were made without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).

234.    Defendants' action are without good cause.

235.    Defendants' violation of the APA causes ongoing harm to Plaintiffs.

236.    Plaintiffs have no adequate alternative to immediate review under the APA.

### SECOND CLAIM FOR RELIEF
### (Equal Protection)
### (On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)

237.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

238.    The Due Process Clause of the Fifth Amendment states that no person will "be deprived of life, liberty, or property, without due process of law."

239.    The Fifth Amendment prohibits Defendants from intentionally discriminating against Plaintiffs and Class Members based on race, ethnicity, and/or national origin.

240.    The Proclamation and Defendants' actions taken to implement the Proclamation are unconstitutional because they burden a fundamental right of Plaintiffs and Class Members

CLASS ACTION COMPLAINT

and were motivated by intentional discrimination and/or animus based on race, ethnicity, and/or national origin.

241.    The Proclamation furthers no legitimate purpose, let alone a compelling one.

### THIRD CLAIM FOR RELIEF
### (Ultra Vires)
### (On behalf of All Plaintiffs, including the Class)

242.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

243.    The Proclamation is illegal and is therefore ultra vires.

244.    Courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command."  Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 681 (1986).

245.    The President's attempt to indefinitely ban certain immigrants based on the inability to obtain specific types of health insurance or pay for medical care, and to create a new ground of inadmissibility that Congress has previously considered and chosen not to include in the INA, exceeds Congress's delegated power to the President's power to suspend the entry of noncitizens and issue reasonable rules for the entry of noncitizens.

246.    The President's attempt to ban certain immigrants based on the inability to obtain specific types of health insurance or pay for medical care violates constitutional separation of powers principles because it contravenes Congress's expressed intent to provide a certain minimum level of coverage to all legal immigrants and citizens in the United States and to extend certain health care-related benefits to legal immigrants.

## FOURTH CLAIM FOR RELIEF
### (Procedural Due Process)
### (On behalf of Resident Plaintiffs/U.S. Petitioners Subclass)

247.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

248.    The Proclamation state that an individual seeking an immigrant visa must demonstrate, "to a consular officer's satisfaction," that she either "will be covered by approved health insurance" within 30 days of her entry to the United States, or "possesses the financial resources to pay for reasonably foreseeable medical costs." The Emergency Notice and Posting published by the Department of States confirm that consular officers will be questioning visa applicants and asking for medical and financial documentation. The Emergency Notice, furthermore, specifies that "reasonably foreseeable medical expenses" are "those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication."

249.    A prospective immigrant's entry to the United States therefore depends on a determination made by a consular officer with no medical training to accurately assess existing medical conditions and health issues existing at the time of the visa adjudication.

250.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law."

251.    Congress has created statutory rights related to the petitioning for and issuance of visas and other immigration benefits.

252.    Federal agencies have created regulatory rights related to the petitioning for and issuance of visas and other immigration benefits.

253.    Individuals must be given due process prior to the deprivation of these statutory and regulatory rights.

CLASS ACTION COMPLAINT

254.    Additionally, United States citizens and lawful permanent residents have constitutionally protected liberty interests in family reunification. Individuals must be given due process prior to any deprivation of these liberty interests.

255.    Defendants' actions, as set forth above, deprive individuals, including Plaintiffs and their members or clients, of the aforementioned statutory and regulatory rights, and liberty interests, without due process.

256.    Defendants' actions, as set forth above, thus violate the procedural due process guarantee of the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any part of the Proclamation;

B.    A declaration pursuant to 28 U.S.C. § 2201 that the Proclamation is, in its entirety, unlawful and invalid;

C.    An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

D.    Such other relief as this Court deems equitable, just and proper.

Dated:  October 30, 2019

Karen C. Tumlin*
karen.tumlin@justiceactioncenter.org
Esther Sung*
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER

Respectfully Submitted,

/s/ *Stephen W Manning*
Stephen Manning (SBN 013373)
smanning@ilgrp.com
Nadia Dahab (SBN 125630)
nadia@innovationlawlab.org
INNOVATION LAW LAB

CLASS ACTION COMPLAINT

000393

P.O. Box 27280
Los Angeles, CA  90027
Telephone: +1 323 316-0944

333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 971 801-6034
Facsimile: +1 503 241-7733

Scott D. Stein*
sstein@sidley.com
Kevin M. Fee*
kfee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: +1 312 853-7520
Facsimile: +1 312 853-7036

Jesse Bless*
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G. Street, Ste. 300
Washington, D.C. 20005
Telephone: +1 781 704-3897
Facsimile: +1 202 783-7853

* Application for admission *Pro Hac Vice* forthcoming

CLASS ACTION COMPLAINT

97

000394



925 L Street, Suite 350
Sacramento, CA 95814
p: 916.443.1749  |  f: 916.443.3202
cwda.org

October 31, 2019

Department of State Desk Officer, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services

RE:  EMERGENCY REVIEW COMMENT ON IMMIGRANT HEALTH INSURANCE
       COVERAGE: DOCKET NUMBER: DOS-2019-

To Whom It May Concern:

The County Welfare Directors Association of California (CWDA) is responding to the Request for Office of Management and Budget (OMB) Emergency Review: Immigrant health Insurance Coverage. CWDA represents the human services directors in California's 58 counties. California has the largest state-supervised, county-administered health and human services system in the nation.

We object strongly to the determination that instituting a two-day comment period and the underlying Presidential Proclamation is in response to an 'emergency'. There is no emergent crisis with respect to immigrants requesting to enter the United States legally. The Presidential Proclamation will likely have the effect of denying thousands of law-abiding immigrants' entry into the United States.

Effective November 3, 2019, the Proclamation targets individuals who are complying with U.S. immigration law and are seeking a family-based immigrant visa , but who may be unable to demonstrate that they will have health insurance within 30 days of entering the country. The proclamation would affect people abroad who wish to join their U.S. citizen or legal permanent resident (LPR) spouse or fiancé; children of LPR's who are 18-21 years of age; adults who seek to join their U.S. citizen or LPR parents; or parents of U.S citizen children, among other groups. The sweeping proclamation also would deny entry into the country if U.S. consular officers determine that the applicant may not be able to pay for "reasonably foreseeable medical expenses."

Under the proclamation, persons would be denied entry if they would otherwise be eligible for public health care coverage programs, such as the Affordable Care Act (ACA)/Covered California, including the subsidies contained in the program, and Medicaid/Medi-Cal. Such a policy undermines the goals of those programs to cover all who are here legally and meet the income eligibility guidelines.

Data and research demonstrate that immigrants contribute greatly to our economy and social fabric. In California, we have implemented state and local policies recognizing and supporting those contributions. Furthermore, Congress made a policy choice to make lawfully residing immigrants

000395

eligible for subsidized marketplace coverage because doing so advances the health of our nation. The Proclamation ignores those federal, state and local policies enabling otherwise eligible legal immigrants to purchase comprehensive public health insurance. It allows, however, the purchase of Administration-supported, non-ACA compliant short-term health plans which do not provide comprehensive care nor protect the consumer. This is a disservice to our communities and to the legal immigrants who help to enhance our diverse country.

The Migration Policy Institute estimates that the practical effect of the policy could exclude two-thirds of future immigrants. The majority of intending immigrants will be unable to meet the 30-day window of either identifying a private health insurance plan or finding a job providing such coverage.

CWDA opposes the Proclamation and urges that it be rescinded. It is contrary to our nation's historic ethos of welcoming immigrants who have contributed to America economically and culturally. The proclamation is even more egregious in that it is denying entry to the U.S. of those immigrants who are abiding by U.S. immigration law and wish, appropriately, to be with their families.

Thank you for the opportunity to provide comments. If you have any questions about them, please contact Cathy Senderling-McDonald, CWDA Deputy Executive Director, at csend@cwda.org or 916.443.1749, or Tom Joseph, Director of CWDA's Washington Office at tj@paragonlobbying.com or 202.898.1446.

Sincerely

Frank J. Mecca  |  Executive Director



October 31, 2019


Edward J. Ramotowski
Deputy Assistant Secretary
Office of Visa Services
Bureau of Consular Affairs
U.S. Department of State
600 19th Street, NW
Washington, DC 20036

Dear Mr. Ramotowski:

With this letter, Covered California respectfully provides comments regarding the "Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage." Covered California is California's state-based Marketplace through which consumers can purchase affordable, high-quality health coverage. Central to Covered California's mission are efforts to enroll eligible Californians into coverage to help reduce the state's uninsured rate and maintain a healthy risk pool that makes coverage more affordable for the entire market including consumers who purchase coverage outside of Covered California. As such, Covered California has significant concerns with the recent Presidential Proclamation on the Suspension of Entry of Immigrants who will Financially Burden the United States Healthcare System (PP 9945 or Proclamation).

Since the launch of the Affordable Care Act, California has made remarkable progress in reducing the rate uninsured individuals, which has reached historic lows. Over 1.4 million California consumers are enrolled in coverage through Covered California. The strong, stable enrollment in Covered California has contributed to the state's standing as having one of the healthiest risk pools in the nation, and some of the lowest average premium rate changes in the country. This year, California enacted a landmark package of health reforms creating a state subsidy program for low- and middle-income individuals (including lawfully present immigrants) and restoring the individual mandate and penalty at the state level which is also applicable to lawfully present immigrants. These investments demonstrate California's continued commitment to expanding access to affordable coverage.

We are strongly concerned that the federal policy set forth in the PP 9945 would not only take California backward, but also the nation as a whole. The PP 9945 will undermine and introduce significant risks to efforts made to ensure all lawful residents have access to comprehensive affordable health care in California and states across the country.

**COVERED CALIFORNIA**™          **1601 EXPOSITION BOULEVARD, SACRAMENTO, CA 95815**          **WWW.COVEREDCA.COM**

**BOARD MEMBERS**    Dr. Mark Ghaly, Chair    Paul Fearer    Jerry Fleming    Dr. Sandra Hernandez    Art Torres    **EXEC. DIRECTOR**  Peter V. Lee

Below is an outline of significant implications of the PP 9945 that merit serious consideration:

1. ***PP 9945 effectively precludes visa-seeking immigrants from gaining access to health insurance coverage through Marketplaces, directly contravening the Affordable Care Act and the stated purpose of the Proclamation itself.*** PP9945 does not contemplate its practical details of how such a policy would be carried out and does not demonstrate sufficient consideration for the procedural norms and requirements that must be carried out in the health coverage arena. For example, while the Proclamation contemplates that unsubsidized commercial coverage obtained through a Marketplace like Covered California would qualify as adequate coverage, it fails to recognize the practical challenges, if not impossibility, of establishing proof of such coverage while abroad. Under federal law and regulations associated with the Affordable Care Act, an individual applying for commercial unsubsidized coverage through a Marketplace must show proof of residency in that state, as well as lawful presence. This contradicts PP 9945's supposition that the individual could have already obtained such coverage or be able to prove that it is forthcoming in order to obtain a visa to enter the country.

   PP 9945 also creates a catch-22. Under existing federal law, immigrants cannot access insurance through Marketplaces without verifying residency and lawful presence through a strict eligibility process. However, under PP 9945, those seeking to establish residency and lawful presence through proper immigration channels cannot do so without verifying insurance status. As a result, individuals who otherwise could become lawfully present immigrants and qualify for health insurance under federal law will be barred from both aims. This paradox is contrary to federal law and does not logically follow in its practical result.

2. ***PP 9945 does not hold regard for the economic and health benefits of ensuring health insurance coverage for all immigrant residents, including the working poor who are working toward economic security.*** California has a longstanding array of public coverage programs, including the recently enacted Individual Market Assistance Program which reduces premium costs for eligible individuals with household incomes at or below 600 percent of the federal poverty level (FPL). This affordability support is available to lawfully present immigrants, at the direction of the Affordable Care Act and now under the direction of California state law. PP 9945 risks undermining those legal rights by introducing countervailing requirements potentially blocking access to such coverage. To do so undermines the health and economic security of those immigrants, their communities, and the state economy at large. Covered California's experience demonstrates that providing affordable coverage opportunities along with requiring coverage is an effective way to reduce uncompensated care costs. The Proclamation fails to acknowledge the criticality of affordable options to increasing insurance coverage rates.

3. ***Because immigrants will not be able to seek health insurance through Marketplaces, PP 9945 undermines the health of California's insurance market, potentially affecting coverage for immigrants and non-immigrants alike.*** Beyond the immediate harms to lawfully present immigrants being barred from accessing insurance through Marketplaces like Covered California, the Proclamation undermines our commercial insurance market by seeking to excise lawfully present immigrants from the coverage to which they are legally entitled. Lawfully present immigrants in California are more likely to represent "favorable" insurance risk, because they are often younger, healthier, or lower-than-average utilizers of health care services when compared to the general insured population. Several studies have concluded that immigrants are net contributors to both private coverage and Medicare, paying more in insurance premiums than they receive in benefits.

Similarly, Covered California's own data demonstrates that its immigrant enrollees, on average, have 10 percent lower medical claims than its citizen members, a variance attributable both to the lower age of immigrant enrollees as well as lower utilization of medical services. As a result, declines in take-up or retention of immigrant coverage related to the proposed rules could have a negative impact on the overall risk pool—in turn leading to commercial market premium increases for citizens and immigrants alike. Increased premiums will lead to higher uninsured rates among all Americans, increasing the uncompensated care burden the Proclamation purports to address. By attempting to discourage immigrants from enrolling in coverage to which they are legally entitled, the action of the federal Administration and result of this Proclamation is likely to hurt Californians through increases in commercial market premiums.

Of further concern, the proclamation seeks to permit Short-Term, Limited Duration Insurance (STLDI) coverage, which does not comply with the Affordable Care Act's consumer protections.[1] California law prohibits carriers from offering or selling STLDI in California because such products have been widely demonstrated to lack critical comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions, and often exclude coverage of pre-existing conditions altogether. PP 9945 will divert qualified legal immigrants from meaningful, comprehensive coverage to which they are legally entitled and direct them towards companies that engage in medical underwriting, spend the majority of premium revenue on non-medical expenses, and are known to exclude core benefits like maternity, mental health, and substance use disorder treatment threatens both the individual health and financial well-being of this population. STDLI can also lead to increased uncompensated care costs when the care consumers need is not covered or exceeds their coverage limits.

---

[1] Because visa applicants residing abroad cannot obtain even unsubsidized health insurance through the Marketplace until they arrive in the United States, STDLI may well be the only option available to consumers in states that allow such plans.

4. ***A two-day comment period is not sufficient for a Presidential Proclamation of this magnitude.*** PP 9945 would profoundly affect our immigration and health care systems. Two days is wholly inadequate to allow for sufficient public consideration of a policy with of this significance. The policies set forth in the Proclamation are not rooted in an emergency; and, given its sweeping impacts and likely detriments to access to coverage and market impact, the public deserves to have sufficient time to understand and accordingly comment on PP 9945.

Given all of these concerns, Covered California urges the withdrawal of PP 9945 for reconsideration of the policies therein. This policy would significantly and negatively impact California and the rest of the nation by deterring eligible individuals from getting the health care coverage they need.

Sincerely,

Peter V. Lee
Executive Director

cc: Covered California Board of Directors

    

   

    

  

 

To:     Office of Management and Budget, State Desk Officer in the Office of Information and Regulatory Affairs
The Department of State's Bureau of Consular Affairs, Office of Visa Services

Re:     Public Notice: 10934. Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage (Docket Number: DOS–2019–0039)

To whom it may concern:

The undersigned organizations representing health centers in California and Nationwide, write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. As safety net providers to nearly 7 million patients in California and 29 million patients nationwide, we are deeply concerned about how this proclamation will impact our communities and patients. Already, community health centers (CHCs) have seen an increase in mental health concerns in our patient population due to fear and confusion about hurtful immigration policies that this Administration has proposed. **Given that the form we are asked to use for comment was just made public late yesterday, we strongly request that the proclamation be rescinded in its entirety, and ask that a proper public comment period be provided.**

CHCs are the backbone of the care delivery system in California and the nation, ensuring access to medical, behavioral, oral health, and social services for the most vulnerable populations, including 1 out of every 3 Medi-Cal (Medicaid) beneficiaries. CHCs provide healthcare services to California's most vulnerable populations, including over 340,000 homeless patients. By mission CHCs focus on providing culturally and linguistically diverse services to low income and non-English speaking communities regardless of their ability to pay and immigration status.  Health centers are also rooted in their communities and have a history of implementing models of care that are responsive to their community's needs, particularly through integration of primary care and behavioral health services. However, this and other policies being promulgated by this Administration have created significant barriers in our patients' access to health care services and benefits.

The undersigned in this letter are representing the needs and concerns of community health centers and their patients. CaliforniaHealth+ Advocates, the advocacy affiliate of the California Primary Care Association, advocates on behalf of California's 1,330 community health centers that provide high-quality, comprehensive care to nearly 7 million people in California each year.

The undersigned strongly oppose the underlying October 4, 2019 proclamation mandating that those granted a visa from abroad show that they will be covered by insurance within 30 days after entering into the country for the following reasons:
1.  The proclamation increases barriers to healthcare access
2.  The proclamation will Increase healthcare costs
3.  The information collection is not necessary for the proper function of the Department of State (Department) & the Department has no expertise in implementing a health insurance mandate, which does not furthers the objectives of the Department.
4.  We have serious concerns about the validity of the methodology used for data collection and the assumptions made.
5.  This is an improper use of Emergency Comment Submission

**Proclamation Increases Barriers to Healthcare Access**

This proclamation is not about improving access to health care or making sure hospitals, health centers and healthcare providers are paid since, according to a report by One Nation Coalition, the "immigrants in the United States are less likely to use public benefits than U.S. born individuals."[1] More specifically, in California where we have decided to expand access to health benefits for our immigrant populations, we see that 70 percent of Medicaid / Medi-Cal enrollees are U.S. born citizens.[2] Given this data, we believe this proclamation is responding to a non-existing issue. Instead, it serves as yet another constraint on legal immigration, imposing a wealth test that will disproportionately harm people of color.

This new policy—which is slated to take effect just days after the Affordable Care Act's marketplace open enrollment period starts—is likely to create additional fear and confusion among families that include immigrants and may prevent some from enrolling. Some people who are not subject to this assessment may fear that signing up for coverage with ACA premium tax credits or Medicaid will negatively impact their families' immigration goals. For example, a family may not sign their children up for Medicaid because they fear it could leave a parent unable to immigrate to the United States. As a result, the proclamation will raise uninsured rates among lawfully present immigrants and potentially their U.S. citizen family members. That, in turn, will increase uncompensated care costs, exacerbating the very problem the proclamation purports to address.[3]

**Proclamation could Increase Healthcare Costs**

The proclamation threatens to undermine the health of U.S. citizens as well as the stability of the healthcare delivery system. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nation's health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

Notably, the proclamation allows short-term plans, which do not comply with the ACA's consumer protections, to qualify as "acceptable" coverage. Frequently referred to as "junk plans," short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. This is not promoting health insurance—this is putting a barrier between individuals and the coverage for which they are eligible. In fact, forcing immigrants to avoid comprehensive insurance could increase uncompensated care costs for providers, when patients cannot afford needed health care that is not covered by these bare-bones plans. If individuals opt for such a plan and they get sick or injured, they may not be able to afford out-of-pocket expenses. With consumers unable to pay out of pocket expenses, costs will rise for all, as medical providers and the health system will be left to carry the burden.

**Evaluating the Information Collection Process per Department's Request**

Per the Department's request, below are some thoughts on the information collection process. We strongly believe that the Department is underestimating the burden of this request to both the applicant and Department itself.

*Evaluate whether the proposed information collection is necessary for the proper functions of the Department.*

The information collection is not necessary for the proper function of the Department.   The information collection is implementing a policy that will create a health insurance mandate for certain individuals seeking lawful immigration to the United States.  This in no way advances any legitimate objective of the State Department, and the policy in fact undermines some of its stated objectives.

The Department has no expertise in implementing a health insurance mandate and the mandate serves no purpose that furthers the objectives of the Department.  Design and implementation of mandates to obtain health insurance is extremely complicated, as evidenced by the extensive deliberations and rule-making the Department of the

---

[1] One Nation Commission. One Nation Built on the Strength of Immigrants. October 2019.

[2] Nowrasteh A, Orr R. Immigration and the Welfare State: Immigrant and Native Use Rates and Benefits Levels for Means-Tested Welfare Entitlement Programs. Ma 10, 2018. Cato Institute. https://www.cato.org/publications/immigration-research-policy-brief/immigration-welfare-state-immirant-native-use-rates.

[3] Brief of Amici Curiae, City and County of San Francisco and County of Santa Clara v. U.S. Citizenship and Immigration Services, et al., No. 4:19-CV-04717, https://www.aha.org/system/files/media/file/2019/09/amici-curiae-brief-of-aha-hospital-groups-on-dhs-public-charge-rule-9-11-1019.pdf

Treasury, the Department of Health and Human Services, and other agencies undertook over several years to implement the Affordable Care Act. The Department lacks the expertise that those agencies relied upon and thus is certainly incapable of designing a workable mandate without a meaningful opportunity for public comment to enlighten it about the various choices involved.

*Evaluate the accuracy of our estimate of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used.*

The undersigned have serious concerns about the validity of the methodology used for data collection and assumptions used. Consular officers will be required to ask immigrant visa applicant verbally whether they will be covered by health insurance within 30 days of entry into the United States and to also provide details of such coverage (identify insurance plan, date coverage will begin and other information about the insurance the consular deems necessary.) Problems with this method include:

- Many consumers will not be able to enroll in health insurance coverage until they enter and begin residing in the state in which they will obtain coverage.
  - This means they are unlikely to have detailed information about the coverage when they are applying for their status. For example, in most cases they won't be able to provide an accurate effective date since their insurance start date will be contingent on the move to the state in which they will enroll in coverage.

- The method gives consular officers discretion on requesting other information that is related to the insurance.
  - These officers are not health insurance experts and are unlikely to know what would be a reasonable and not reasonable request for information related to coverage, or how to evaluate information they are given. Requiring them to make judgments in areas where they have neither expertise nor information will result in arbitrary, inconsistent decisions.

- It's especially troubling that this information gathering process depends on a verbal collection and assessment of information.
  - For those visa applicants that do have information about expected coverage, it will be unclear to them what information they should be prepared to provide when verbally asked for the information.
  - Decisions made in this verbal data collection will also be difficult to challenge if a visa applicant feels he/she was improperly denied or delayed entry.
  - Consular officers, with the best of intentions, may make erroneous decisions based on miscommunications with applicants that neither party can detect from what they recall of a verbal request. Health insurance policies, and important transactions relating to those policies, are almost uniformly conducted in writing precisely because of the complexity of these issues and the high potential for error. When consular officers, rather than health insurance professionals, are involved the risk of error increases.

Additionally, your estimate of the burden of this information collection seems erroneous for several reasons.
- First, because of the likelihood of miscommunications and misunderstandings, many applicants will have to supply information several times.
  - The lack of coherent standards for consular officers to rely upon in assessing what applicants supply means that many are likely to request additional information several times before making a decision.

- Second, ten minutes is an optimistic estimate of the amount of time each applicant will be required to spend on these requests.
  - Most insurance will not be available until the applicant arrives sometime in the future. Proving the likelihood of future insurance that is contingent on the immigrant's arrival likely will require collecting numerous documents not otherwise within the applicant's control, such as detailed conditional offers of employment and the health insurance policies of prospective employers.
  - Gathering this information will require hours or days, not minutes.

- Third, those seeking to qualify on the basis of having sufficient funds to cover treatment for pre-existing illnesses may need to obtain detailed information about their diagnoses, the costs of treatment in the U.S. (which may be very different than those with which they are familiar in their country of origin), and the policies of prospective health care providers.

- o   Many health care providers have multiple rate structures: one for Medicare, another for Medicaid, still more for various private health insurance plans, and even more for persons seeking to pay out-of-pocket. They will undoubtedly face difficulty determining which rate structure the provider will apply to them, which would require time-consuming back-and-forth interactions with these prospective providers.

## Improper Use of Emergency Comment Submission

We also strongly object to OMB allowing this notice of information collection to have a 48-hour comment period under an emergency review process.  Emergency processing is intended to be used in cases when events outside of the control of an agency require immediate action that will not allow for compliance with the normal comment process.  Such examples include: responding to a natural disaster, meeting a deadline required by law or a court ruling, or preventing severe harm to the public if the completion of the process is delayed.[4]  In this case, the government had full control over the date it issued the Proclamation and the implementation date it selected.

The agency has offered no argument for why the Proclamation must take effect immediately or what harm would result from delaying implementation to allow for a more reasonable comment period.  The extremely short comment period has not allowed for experts in the field who might provide valuable insight to the government or stakeholders that will be directly and indirectly impacted by this new information collection process to fully analyze or understand the problems it will create.  With additional time, we anticipate that we would identify additional ways the proposed process is burdensome and unworkable for both individuals and agency staff.

## Impact to Communities

To be clear, this rule does not only impact those abroad attempting to enter the country; it also impacts our patients who may be sponsoring family members, and possibly those forced to leave and reenter the country through their green card applications. We appreciate the intent of lowering health costs, but this proclamation does the exact opposite. It benefits health insurance corporations, especially those selling "junk plans," while leaving the health care safety net to cover the remaining costs. Already we have had patients express fear and concerns in using services due to confusion of this proclamation and how it may impact their ability to sponsor a family member or obtain their green card.

**As organizations representing the needs of safety net providers of whom this proclamation claims to be helping, we ask that the Administration NOT move forward with implementation, and rescind this proclamation in its totality.** The proclamation will help to increase, not decrease, health care costs while also possibly encouraging more illegal immigration since this would create yet another obstacle to legally immigrating to this country.


Sincerely,

- -   CaliforniaHealth+ Advocates
- -   Asian Health Services
- -   San Francisco Community Clinic Consortium
- -   Association of Asian Pacific Community Health Operations
- -   Foothill Community Health Center
- -   Washington Association for Community Health
- -   North East Medical Services
- -   Nevada Primary Care Association
- -   Community Health Network of Washington
- -   Maple City Health Care Center
- -   Kheir Clinic
- -   International Community Health Services
- -   Community Clinic Association of Los Angeles County
- -   HealthRIGHT 360
- -   Clinica Romero
- -   Venice Family Clinic
- -   AltaMed
- -   Salud Para La Gente

---

[4] 5 CFR § 1320.13 - Emergency processing.

000404

000405



# GEORGETOWN LAW

David A. Super
Professor of Law

October 31, 2019

Ms. Megan Herndon                          State Desk Officer
Mr. Edward J. Ramotowski, Deputy Ass't Sec'y    Office of Information and Reg. Affairs
Office of Visa Services                     Office of Management and Budget
Bureau of Consular Affairs                  725 17th St., NW
U.S. Department of State                    Washington, DC 20503
2201 C St NW
Washington, DC 20520

          Re:    *Information Collection Burden Assessment*
                 DS-5541 -- Public Notice: 10934
                 84 Fed. Reg. 58,199 (Oct. 30, 2019)

Dear Ms. Herndon, Mr. Ramotowski and Desk Officer:

   I am writing in response to the request for public comments published yesterday concerning the information collection burden associated with the Department's planned policy of barring entry by immigrants who cannot demonstrate that they will have certain kinds of health insurance coverage when they arrive in the United States.

   I note at the outset that a two-day comment period cannot possibly gather the kinds of comments that can adequately help OIRA and the Department evaluate either the accuracy or the advisability of this information collection activity. Most people who might have expertise that could help the agencies will be unaware of this notice until well after the comment deadline has passed. Even those that do see it are unlikely to be able to drop all of their other commitments to comment so quickly. And even among those that do comment, the depth, breadth, and precision of their comments will undoubtedly suffer. That certainly is the case for me: these comments are at best a superficial overview of what I would have developed had your agencies provided a normal comment period.

   Although the notice suggests that emergency approval is being sought, it gives no basis for granting such treatment. Emergency approvals are limited to circumstances beyond the agency's control and that the agency could not anticipate. Surely the State Department was aware of, and consulted about, the President's Proclamation. Moreover, if it cannot obtain a

000406

Ms. Megan Herndon
Mr. Edward J. Ramotowski, Deputy Ass't Sec'y
State Desk Officer, OIRA
October 31, 2019
Page 2

lawful estimate of the information collection burden, consistent with the Paperwork Reduction Act and informed by the results of a standard public comment period, by November 1, it can and should postpone implementation of this policy. No law requires action by November 1, and nothing in either the notice or the Proclamation gives any basis for believing that the problems resulting from uninsured immigrants have suddenly gotten worse. To the contrary, as this Administration has reduced immigrants' entry into this country through various other means, the number of newly admitted immigrants needing uncompensated medical care has surely declined. Thus, taking adequate time to develop, seek comments on, and scrutinize an estimate of the burdens of the information collection will not cause any significant harm, much less a harm so great as to necessitate the approval of this information collection estimate. Indeed, the State Department will have to implement this process after November 1 (unless OIRA does not plan to read or consider the comments it receives) as the deadline for comments expires only moments before November 1 begins. OIRA could not possibly consider all comments received by this accelerated deadline in time to revise these estimates before November 1. If implementation must be delayed beyond November 1 anyway, it should be further delayed to permit proper public comment. As the Department's notice points out, the Proclamation only provides that the Secretary of State "may" establish standards to implement this policy; it imposes no deadline on the establishment of those standards. The Department should do so in a thoughtful and transparent manner, soliciting public comment in the usual manner for a period sufficient to draw useful information from the public.

I turn now to the specific questions on which the agency sought comment.

**Whether the proposed information collection is necessary for the proper functions of the Department.**

This information collection is not necessary for the Department to function properly. The Department is ill-equipped to ascertain whether someone will have health insurance upon their arrival in the U.S. because few people living abroad have U.S. health insurance – and fewer still have it when they are moving to the U.S. for the first time. Therefore, if the Administration is going to change policy to address uninsured immigrants receiving uncompensated care, that should be done after the immigrants have entered the U.S. and their actual insurance status may be addressed – and by agencies with far more expertise in the domestic health insurance system than the State Department has or can plausibly and efficiently gain.

Consular officers play a vital role in screening prospective entrants to safeguard the interests of this country and its people. Adding a new, complex responsibility that, even if perfectly executed will glean only tentative or speculative conclusions about whether prospective entrants will receive uncompensated care, risks distracting these officers from functions that only they can perform.

000407

Ms. Megan Herndon
Mr. Edward J. Ramotowski, Deputy Ass't Sec'y
State Desk Officer, OIRA
October 31, 2019
Page 3

At most, consular officers should seek declarations from potential entrants of their intent to seek health insurance upon their entry to the U.S. and leave follow-up either to USCIS or to federal or state officials with experience regulating health insurance or providers. The value of any additional information consular officers will obtain beyond that intent is suspect at best.

As Justice Jackson noted in his famous concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the President's power is at its nadir when addressing matters on which Congress has spoken in an inconsistent way. In passing the Patient Protection and Affordable Care Act in 2010, Congress made a very specific judgment about which immigrants could, and could not, receive publicly funded health insurance through the health insurance exchanges. During the debates leading up to the enactment of that statute, as well as debates in prior years concerning the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA, Public Law No. 104-193) and various amendments to the Medicaid statute (Title XIX of the Social Security Act), the same considerations that the President cited in his Proclamation were raised. Congress ended up resolving those concerns in favor of barring some immigrants from publicly financed health care but finding immigrants' receipt of Medicaid and other forms of subsidized health care to be in the national interest for a much wider array of immigrants than the Proclamation does. The President may not unilaterally amend an act of Congress. *Clinton v. City of New York*, 524 U.S. 417 (1998).

At the same time Congress was enacting PRWORA, it also considered Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA, Division C of Public Law No. 104-208). Part of the debate on IIRIRA was how immigrants' potential receipt of public benefits, particularly Medicaid, should affect their admissibility to the United States. Here again, precisely the concerns the Proclamation articulates were raised, vigorously debated, and rejected in favor of an approach built around stronger affidavits of support. Here again, the President lacks the power unilaterally to overrule the choices Congress made in a duly enacted statute.

Many of those whom consular officers will be interviewing are people whom Congress determined would be appropriate for Medicaid or insurance premium tax credits. The President may propose legislation to change that law, but he is not free to ignore it himself and lacks the power to authorize consular officers to disregard it. Burdensome information requests to pursue a policy Congress has considered and rejected is not a proper function for a Department composed entirely of officers sworn to uphold and defend the Constitution and laws of the United States. If the Department will not abandon these inquiries altogether, it should pare them down to the bare minimum as the less-than-tenuous legal authority underlying them cannot support a greater burden. Because the vast majority prospective immigrants cannot obtain health insurance prior to entering the U.S., these inquiries at most seek speculation. They therefore should be limited to asking whether the immigrant intends to seek health insurance upon arriving in the United States without any pretense of gathering further information that is inherently unreliable.

Ms. Megan Herndon
Mr. Edward J. Ramotowski, Deputy Ass't Sec'y
State Desk Officer, OIRA
October 31, 2019
Page 4

Moreover, the Proclamation operates effectively as an individual health insurance mandate. Here again, Congress – this time at the behest of this very Administration – has rejected the concept of individual insurance mandates as a means of reducing uncompensated care when it eliminated the penalties for lacking health insurance under the Affordable Care Act. Whether or not that choice was wise, Congress has made it and the President declined to veto that legislation. The President is not empowered to reverse that approach to uncompensated health care now in the absence of a further congressional enactment.

This activity also is an inappropriate function for the Department because, although the federal government employs numerous experts in health insurance, they are not housed in the Department. Some of the questions about prospective issuance of policies and estimation of their cost are exceedingly complex. Countless actuaries, economists, health care experts, and other experts in several branches of the Department of Health and Human Services, the Department of Veterans Affairs, the Department of the Treasury, and other departments have spent years seeking to understand and regulate these processes. Consular officers, whose primary responsibilities are to facilitate beneficial immigration while keeping our country safe, lack this training and expertise. Consular interviews appropriately focus on a prospective immigrant's past, her or his present situation, and her or his plans and intentions upon arriving in the United States. The information collection proposed here goes far beyond that to seek proof of concrete future events that are almost certainly unprovable – the issuance of health insurance – and that cannot be understood without expertise and training consular officers do not have and cannot plausibly be given consistent with the State Department's mission. These matters should be handled by other agencies whose missions include understanding and intervening in the health insurance market.

**Whether the Department's estimate is accurate in terms of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used.**

The Department's estimate is highly implausible for several reasons. Its three most serious flaws are in the likely number of respondents, in the number of times each prospective immigrant will be subject to the collection request, and in the likely time required to comply with it. Were the agency to provide a more adequate comment period, other defects (and more detail on these defects) likely would become apparent on more careful analysis than time permits here.

The estimate assumes that only immigrants applying for entry to the United States will be subject to the information request. That is incorrect. Much of the information sought will be available only from their sponsors in the U.S. or from organizations assisting immigrants through the resettlement process. Although the request will formally be directed at the prospective immigrants, if it is obvious that other persons within the U.S. will, in fact, be the ones having to comply, they should be included as respondents in the burden assessment. For example, even though the IRS collects certain information directly from employers, it is understood that employers would be unable to provide that information if they did not, in turn, demand it from their

Ms. Megan Herndon
Mr. Edward J. Ramotowski, Deputy Ass't Sec'y
State Desk Officer, OIRA
October 31, 2019
Page 5

000409

employees. It is inconsistent with the purpose and terms of the Paperwork Reduction Act to obscure the true burden of an information request in this manner.

The health insurance system in the United States is extremely complex and idiosyncratic. It may well be the most complicated in the world, and it certainly is very different from any other system with which a prospective immigrant may be familiar. Few prospective immigrants will understand how it works, what steps are necessary to obtain health insurance coverage, the distinctions between having a policy in their own right and being included on the policy of another, the difference between various levels of coverage, and so forth. Naturally, they will turn to the persons assisting their entry and prospective resettlement in the U.S. for guidance on these matters. Those persons may then have to do research with their own insurance carriers to determine if the prospective immigrant can be added to their coverage and with the insurance exchange or other providers and provider networks to determine the availability of coverage for the prospective immigrant. Non-profit organizations and other entities assisting immigrants' resettlement will need to make inquiries of health insurance providers with which they may be unfamiliar, potentially across several markets, to ascertain the availability of coverage. Because the Proclamation specifies non-subsidized coverage, inquiries of the most straightforward and transparent sources of health insurance, such as Medicaid, will be of no avail. Moreover, because it recognizes many forms of coverage that do not operate through the Affordable Care Act's exchange system, a long series of individual inquiries may be necessary to garner the information that the consular officers will be seeking. These inquiries are likely to take several hours in many cases and will almost never be brief and simple. These respondents should be included in the estimate along with a reasonable approximation of the burdens they bear.

The estimate assumes that each visa applicant will need to provide information only once. Under the policy as laid out in the Proclamation, that is unlikely. Because few prospective immigrants can prove extant coverage before entering the country, they will have to reach a level of suggestive evidence that suffices to win the consular officer's approval. The Proclamation and the abstract of the policy published in the *Federal Register* offer little guidance as to what that evidence might be. In practice, many immigrants – when faced with the prospect of being barred from entry to this country, and perhaps the chance to reunify with their family – will need to make several efforts to produce sufficient evidence to win over the consular officer.

Finally, the estimate of ten minutes per inquiry is absurd. Because few health insurers will issue policies to someone who has not yet arrived in the U.S. – and who hence does not have residence in any of the states those insurers serve – the questions here are inherently complex and speculative. With the vast majority of prospective immigrants unable to produce proof of extant coverage, this information collection effectively requires them to gather sufficient pieces of circumstantial evidence to make the future issuance of health insurance appear likely. If the coverage contemplated is from a prospective employer of the prospective immigrant, this will require gathering information indicating the likelihood that a given employer will, indeed, employ this prospective immigrant as well as information on the coverage that employer provides to

000410

Ms. Megan Herndon
Mr. Edward J. Ramotowski, Deputy Ass't Sec'y
State Desk Officer, OIRA
October 31, 2019
Page 6

its employees. If the immigrant expects to pursue opportunities with several possible employers, this will require gathering information on their labor needs and hiring practices as well as the insurance coverage that each of them provides when it does hire a worker. Where the contemplated coverage is on the policy of a relative, prospective spouse, or other person, the prospective immigrant will need to obtain information on the rules for adding people to that coverage as well as the nature of the coverage itself. All of this will almost certainly require numerous contacts and extensive research to garner sufficient information, entailing many hours of compliance burden.

When a prospective immigrant cannot specific likely coverage, she or he will need to gather other information that persuades the consular officer that she or he is likely to obtain coverage. This could entail a wide range of pieces of information, many of them quite difficult to obtain. For example, the immigrant might wish to show that she or he has participated in health insurance schemes when offered at prior employers. Those employers, however, may be in a country different from the one where the prospective immigrant is applying for entry to the United States and may be hostile to the prospective immigrant or afraid to be perceived as helping the prospective immigrant if she or he is perceived as being unfriendly to the regime in the former employer's country. Gathering this information is likely to be highly time-consuming.

The prospective immigrant might, instead, wish to show that she or he is very likely to become employed quickly in an industry in the U.S. where adequate employer-sponsored health insurance is common. Understanding the hiring propensities of an industry in this country is a major undertaking for highly trained labor economists operating here; it would be a staggering burden for a prospective immigrant overseas.

Finally, if the prospective immigrant fails to persuade the consular officer that she or he is likely to obtain sufficient health insurance coverage in this country, she or he will need to try to persuade the consular officer that she or he can afford to pay for any care that she or he may need. This likely will require obtaining extensive information about the prospective immigrant's medical conditions, the treatments they will require, and the costs of those treatments in the U.S. Because health care providers routinely have very different price scales for private payors (or sometimes different kinds of private payors) and various insurance plans, this will be a difficult and burdensome process. Once that is completed, of course, the immigrant also will have to establish her or his financial resources, which often will be burdensome in its own right.

This task will further be complicated by the Department's need to comply with the Americans with Disabilities Act (ADA) and the Rehabilitation Act, both of which prohibit the federal government from discriminating against persons with disabilities. As Administrations going back to the George H.W. Bush Administration have determined, systems that impose greater burdens on those with conditions requiring more extensive health care are unlawful. Requiring a showing of greater financial resources by immigrants with disabilities such as

Ms. Megan Herndon
Mr. Edward J. Ramotowski, Deputy Ass't Sec'y
State Desk Officer, OIRA
October 31, 2019
Page 7

chronic medical conditions would be unlawful. Designing these information collection requests to avoid such discrimination will further complicate these already difficult tasks.

**How the Department can enhance the quality, utility, and clarity of the information to be collected.**

The Department can enhance the quality, utility, and clarity of the information to be collected by limiting the request to information readily known by the prospective immigrant. In most cases, all a prospective immigrant knows is whether she or he intends to seek health insurance coverage upon arrival in the U.S. or, if not, whether she or he has a given level of financial resources. All further questions will obtain speculation of low quality, little if any practical utility, and almost complete opacity. The Department should limit its information collection request to those facts alone.

**How the Department can minimize the reporting burden on those who are to respond, including the use of automated collection or other forms of information technology.**

Because, as noted above, what this information collection seeks is essentially speculation, it cannot be gathered through automated collection or other forms of information technology. To the extent that it seeks to determine whether individuals who do not plan to obtain health insurance will have the financial resources to pay for care themselves, it may be possible to gather information electronically on their assets, depending on the rules and available technology in their country of departure and other countries where those assets may be held. Unfortunately, any efficiencies available in this manner will be effective in only a minuscule fraction of cases.

I reiterate that, although several serious problems with this request were apparent on a superficial reading, as set out above, a proper comment period of the usual duration is necessary to obtain the guidance of experts in the fields this request touches upon, particularly the health insurance field, that would guide the agencies in minimizing the burdens of this information collection and in more accurately estimating its likely effects.

Thank you very much for your consideration.

Sincerely yours,

David A. Super
Professor of Law

000412



**DC Health Benefit
Exchange Authority**

October 31, 2019

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

Visa Services
Bureau of Consular Affairs
Department of State
600 19th Street NW
Washington, DC 20006

Re: Information Collection Title: Immigrant Health Insurance Coverage, DS Form Number DS-5541, OMB Control No. None, Proclamation No. 9945, 84 FR 53991 (Oct. 9, 2019); DOS-2019-0039-0001

To Whom It May Concern:

The District of Columbia Health Benefit Exchange Authority (HBX) appreciates your consideration of our comments on the above-cited Presidential Proclamation No. 9945 on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System.[1]

By way of background, HBX is a private-public partnership established by the District of Columbia (District) to develop and operate the District's on-line health insurance marketplace, DC Health Link (DCHealthLink.com). We cover approximately 100,000 people -- District residents and people who work for District small businesses. DC Health Link fosters competition and transparency in the private health insurance market, enabling individuals and small businesses to compare health insurance prices and benefits and to purchase affordable, quality health insurance. Since we've opened for business, we have cut the uninsured rate by 50% and now nearly 97% of District residents have health coverage.

We strongly oppose Presidential Proclamation No. 9945 ("Proclamation") and request it be withdrawn in its entirety. The Proclamation will undermine the District's health insurance coverage gains and access to quality, affordable health care – reversing years of progress. Additionally, the Proclamation contradicts existing federal law -- the Affordable Care Act (ACA), and its issuance is in violation of the Administrative Procedure Act (APA).

---

[1] Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, No. 9945, Oct. 4, 2019. https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/.



1 2 2 5   E y e   S t r e e t   N W ,   4 t h   F l o o r ,   W a s h i n g t o n ,   D C   2 0 0 0 5

**The Detrimental Effect on Health Coverage**

The Proclamation will adversely impact the District's private individual health insurance market and hurt District residents. The District is ranked second among all states for the lowest uninsured rate and in 2019, the District had the fifth lowest average individual market premiums in the country.[2] These gains are put at risk because the Proclamation:

1. Encourages prospective immigrants to purchase junk plans like short-term limited-duration insurance (STLDI);
2. Undermines the purchase of marketplace coverage by requiring health insurance coverage be secured before entry into the United States; and
3. Seems to change, making worse already problematic guidance recently finalized in the Public Charge rule issued by the Department of Homeland Security[3] related to the purchase of subsidized private health insurance.

First, the Proclamation lists STLDI as approved coverage to meet the healthcare coverage requirements necessary for certain immigrants to enter the United States. As we noted in our comments to the Administration's rule on STLDI, these junk plans are exempt from consumer protections under the ACA applicable to individual health insurance.[4] They exclude coverage for preexisting conditions, use medical underwriting to keep people with medical needs out, cap benefits using annual and lifetime dollar limits, and do not cover all of the benefits considered "essential" like mental health and maternity services. Even with these severe limitations, STLDI plans are specifically promoted under the Proclamation. Consequently, rather than protect the health care system and the American taxpayer from the "burdens of uncompensated care," as the Proclamation states, allowing prospective immigrants to purchase such junk plans as opposed to marketplace coverage will likely *increase* uncompensated care when immigrants need health care services not covered under these junk plans. For the District of Columbia, actuaries from Oliver Wyman estimate that individual market claims cost will increase by as much as 21.4% from the proliferation of junk plans. The Proclamation's policy puts secure quality health insurance coverage of District residents (citizens and noncitizens) at risk.

Second, the Proclamation further undermines the purchase of marketplace coverage by requiring coverage prior to entry. Specifically, while the Proclamation contemplates that unsubsidized private health insurance coverage obtained through a marketplace (like DC Health Link) would qualify as meeting health coverage requirements for entry into the U.S., it fails to recognize the practical difficulty, if not impossibility, of establishing such coverage while abroad. Under the ACA and related regulations, an individual applying for private health insurance coverage through a Marketplace must show proof of residency in a U.S. state or territory as well as lawful presence to become eligible for such coverage.[5] A person applying for entry into the U.S. by definition does not yet have lawful presence.

---

[2] Centers for Medicare & Medicaid Services. 2019 Marketplace Open Enrollment Period Public Use Files. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/2019_Open_Enrollment.html
[3] U.S. Department of Homeland Security. Final Rule. "Inadmissibility on Public Charge Grounds," 84 Federal Register 41292, 41299 (Aug. 14, 2019).
[4] Comment on Short-Term, Limited-Duration Insurance- CMS-9924-P from Mila Kofman, Executive Director of D.C. Health Benefit Exchange Authority to Dept. of Health and Human Services, Centers for Medicaid and Medicare Services, April 19, 2018.
https://hbx.dc.gov/sites/default/files/dc/sites/hbx/publication/attachments/DC_HBX_Comment_CMS_9924-P.PDF.
[5] U.S.C. § 18032(f); 45 C.F.R. 155.305(a).

000414

Third, this Proclamation and the recent Department of Homeland Security Public Charge rule seem to be at odds with respect to the effect of enrolling in subsidized private health insurance coverage (private insurance with tax credits).[6]  While the Proclamation states that the visa applicant must be enrolled in unsubsidized coverage, the Public Charge rule views all private coverage (including subsidized private coverage) positively in the asset/resources analysis.[7] Importantly, while we oppose the anti-immigrant policies reflected in the Proclamation and the Public Charge Rule, we expect consistency in standards used. The Proclamation adds further confusion and increases the Public Charge Rule's chilling effect.

### Contradictory to the ACA

The Proclamation directly conflicts with provisions of the ACA that provide immigrants access to marketplace coverage.

Current federal law, as established by the ACA, allows lawfully present individuals, both immigrants and non-immigrants, to purchase *subsidized* health insurance coverage through health insurance exchanges.[8] In the ACA, Congress specifically exempted recent immigrants from the 100 percent federal poverty level floor on eligibility for premium tax credit subsidies because they are not eligible for Medicaid due to their recent immigration status.[9] Thus the Proclamation's requirement that immigrants acquire unsubsidized coverage is akin to amending the ACA without Congress. In other words, the Proclamation is restricting the ACA subsidized coverage provision under 26 U.S.C. §36B(c)(1)(B)("Special rule for certain individuals lawfully present in the United States") to only apply to immigrants already here. And over time as this pool of people becomes smaller, there will be zero enrollment under §36B(c)(1)(B). The Administration does not have authority to amend the ACA.

### Contrary to the APA

The two-day comment period violates the APA. The President is requiring the State Department to use a new standard for issuing visas.  The Proclamation requiring the new standard is therefore a rule under the APA.  The APA provides the public an opportunity for review and input to agencies with respect to rules and rule changes.  The two-day comment period does not meet the comment period and the Proclamation does not meet rule-making process required by the APA for policy changes.

### Conclusion

We ask that the Proclamation be withdrawn in its entirety.

Sincerely,

Mila Kofman
Executive Director
DC Health Benefit Exchange Authority

---

[6] *Supra*, note 3.
[7] *Id.*
[8] 26 U.S.C. §18032(f)(3).
[9] 26 U.S.C. §36B(c)(1)(B)("Special rule for certain individuals lawfully present in the United States").

000415



**BAY AREA REGIONAL OFFICE**
1330 Broadway, Ste. 500
Oakland, CA 94612
Tel: (510) 267-1200
TTY: (800) 719-5798
Toll Free: (800) 776-5746
Fax: (510) 267-1201
www.disabilityrightsca.org

October 31, 2019

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

RE:   Docket Number: DOS-2019-0039
      Notice of Information Collection Under OMB Emergency Review:
      Immigrant Health Insurance Coverage

October 31, 2019

To whom it may concern:

Disability Rights California (DRC) writes to express strong opposition to the "*The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System* ("PP 9945")".  We also oppose the 48-hour comment period for this proclamation which does not provide adequate time for interested parties to comment.

DRC is the designated protection and advocacy agency for California, mandated to advance the civil rights of Californians with disabilities.  Since 1978, DRC has provided critical advocacy services for people with disabilities and last year alone responded to advocacy requests from nearly 26,000 Californians with disabilities.  Our legal work includes individual and impact litigation, direct advocacy services, outreach and training, and investigations of abuse and neglect.  DRC protects and advocates for the rights of all Californians with disabilities, regardless of their ethnicity, cultural background, language or immigration status.  DRC advocates on

000416

RE: Docket Number: DOS-2019-0039
October 31, 2019
Page 2

behalf of individuals who will be negatively impacted by the proposed proclamation.

We specifically oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment as well as the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. This proclamation will not improve access to health care or ensure payments to hospitals. Rather it is yet another constraint on legal immigration, one which will disproportionately harm people with disabilities and people of color.

The proclamation actually threatens to undermine the nation's health. It restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nation's health at risk by requiring individuals to buy costly and less comprehensive health coverage.

Notably, the proclamation allows short-term plans, which do not comply with the Affordable Care Act's consumer protections, to qualify as "acceptable" coverage. Frequently referred to as "junk plans," short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. Forcing immigrants, particularly those with disabilities, to avoid comprehensive insurance will increase uncompensated care costs for providers, when patients can't afford needed health care that is not covered by these inadequate plans.

We strongly urge you to withdraw this proclamation.

Sincerely,

Catherine Blakemore
Executive Director

000417



# THE *Episcopal* CHURCH

Department of State
Office of Information and Regulatory Affairs, Office of Management and Budget
Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

Re: Emergency Submission Comment on Immigrant Health Insurance Coverage

October 31, 2019

To whom it may concern:

We write in response to the Emergency Submission Comment on Immigrant Health Insurance Coverage. We oppose the collection of information on health insurance status as proposed in this Emergency Submission Comment. In fact, we strongly oppose the underlying October 4, 2019 proclamation mandating that visa applicants abroad buy health insurance. We do not believe this proclamation will improve access to health care or making sure hospitals are paid. Instead, it serves as another constraint on legal immigration, imposing a wealth test that may limit the ability of low-income foreigners to come to the United States for numerous valid reasons.

The 1997 General Convention of The Episcopal Church calls upon the U.S. Government to "ensure that needy immigrants are not unfairly denied essential services and benefits." This proclamation contradicts that call by restricting immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation.

We call on you to rescind this proclamation before it goes into effect.

Sincerely,

Rushad L. Thomas
Policy Advisor
Office of Government Relations
The Episcopal Church



The Jewish Federations
OF NORTH AMERICA | Strategic Health
Resource Center

**Mark Wilf**
CHAIR, BOARD OF TRUSTEES

**Jodi J. Schwartz**
VICE CHAIR, BOARD OF
TRUSTEES

**David T. Brown**
NATIONAL CAMPAIGN CHAIR

**Shelly Kupfer**
CHAIR, NATIONAL WOMEN'S
PHILANTHROPY

**Harold Gernsbacher**
TREASURER

**Julie Platt**
SECRETARY

**David J. Butler**
CHAIR, ISRAEL AND
OVERSEAS

**David Golder**
CHAIR, DOMESTIC POLICY &
GOVERNMENT AFFAIRS

**Rachel Hoffer**
CO-CHAIR, NATIONAL YOUNG
LEADERSHIP

**Adam Miller**
CO-CHAIR, NATIONAL YOUNG
LEADERSHIP

**Cynthia D. Shapira**
CHAIR, UNITED ISRAEL
APPEAL

**Eric D. Fingerhut**
PRESIDENT & CEO

**William C. Daroff**
SENIOR VICE PRESIDENT
FOR PUBLIC POLICY &
DIRECTOR OF THE
WASHINGTON D.C. OFFICE

**Jonathan S. Westin**
SENIOR DIRECTOR, HEALTH
INITIATIVES

**Elizabeth A. Cullen**
COUNSEL, HEALTH POLICY

1720 I Street, NW
Washington, DC 20006

p 202.785.5900
f 202.785.4937
JewishFederations.org

 @jfederations

**SUBMITTED ELECTRONICALLY VIA *REGUATIONS.GOV***

October 31, 2019

Department of State
Office of Information and Regulatory Affairs
Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

**RE: Emergency Submission Comment on Immigrant Health Insurance Coverage (DOS-2019-0039)**

To Whom It May Concern,

The Jewish Federations of North America and the Network of Jewish Human Service Agencies oppose the "Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Health Care System" (Proclamation) signed on October 4, 2019, by President Trump, and the Department of State's Information Collection Request (ICR) submitted to the Office of Management and Budget (OMB) for review and approval on October 30, 2019. The Proclamation and associated ICR threaten to deter the entry of lower income *legal* immigrants, people served by our many partner provider agencies throughout the country as clients/patients and who comprise a substantial segment of their workforces. The Proclamation and associated ICR also threaten to harm immigrants who are allowed entry to the country but who are effectively forced to secure severely inadequate insurance that puts their health and financial well-being at risk. This new restriction on legal immigration not only runs counter to our joint mission of promoting the dignity and quality of life of all individuals in our communities, but also undermines the ability of our Jewish communal health, long-term care, behavioral health, and other human service agencies to care for their clients/patients. At a time when the number of uninsured across the country is rising, this restriction actually will add to the demand for uncompensated care from our partner agencies and simultaneously make it far more difficult for our agencies to enlist the most qualified health care workers in furtherance of our mission.

We also strongly oppose the issuance of the Proclamation as an emergency and the 48-hour comment period. Regardless of our position on the underlying proposal, this proposed change in federal policy should be subject to formal rulemaking in accordance with the Administrative Procedures Act, a process that

would allow for close examination of the full implications and consequences of this dramatic policy change by all stakeholders. We, therefore, urge the Administration to rescind the Proclamation and halt adoption of the ICR.

**About The Jewish Federations of North America**

JFNA represents a network of 146 Jewish federations and 300 independent communities, serving most major population centers across North America. Together, we raise and distribute more than $3 billion annually for social welfare, social services, and educational needs, making us one of the largest philanthropies in the nation.

Our federations support the services of hundreds of non-profit communal provider agencies, including 15 leading academic medical centers/health systems, 100 nursing homes and aging communities, 125 family & children's agencies, and 14 group homes. Our extensive network of agencies provide the full range of health, mental health, long-term care services, nutrition, and other supports to more than one million Jewish and non-Jewish clients at all socioeconomic levels who come to our doors seeking help.

Through JFNA's network of federations and partner agencies, we represent one of the largest, strongest, and most enduring networks of social services in North America. We are committed to ensuring that everyone in our communities can live with dignity and achieve a decent quality of life, and committed to protecting our partner agencies' ability to continue providing high quality care to the people living in their communities.

**About the Network of Jewish Human Service Agencies**

The Network of Jewish Human Service Agencies (NJHSA) represents 140 non-profit human service organizations in the United States, Canada and Israel. NJHSA's members provide a full range of human services for the Jewish community and beyond, regardless of faith, background, ethnicity, and ability to pay. Services include supplemental food assistance, health care, career, and employment and mental health services, as well as programs for youth, family and seniors, Holocaust survivors, immigrants and refugees, people with disabilities, and caregivers.

**The Proclamation and associated ICR will negatively affect *legal* immigrants in our communities who seek services as clients/patients or jobs as health care or service workers.**

After examining the Proclamation and associated ICR, we recognize that many of the clients/patients and health care or service workers throughout our network of communities and partner agencies are legal immigrants who would be affected by this proposed Proclamation and ICR. As a result, we have serious concerns about this policy change.

The ICR proposes to ask individuals applying to enter the United States pursuant to an immigrant visa whether they will be covered by health insurance in the United States within 30 days of entry, and if so, to provide the details relating to such coverage.  Consular officers would not suspend or limit entry of applicants who they do not have coverage but possess the financial resources to pay for "reasonably foreseeable" medical expenses.  The ICR describes "reasonably

000420

foreseeable" medical expenses as those expenses "related to existing medical conditions, relating to health issues existing at the time of visa adjudication."

Like the Public Charge Regulation, in effect, the Proclamation imposes a wealth test on legal immigrants, effectively barring entry to those who do not have health insurance or money. As a community of people whose forebears came to this country as immigrants -- many of them low-income as well -- we cannot support such a wealth test on immigration. In fact, the Proclamation goes a step further than the now enjoined Public Charge Rule by seeking to implement an outright ban on entry of immigrants who rely on Medicaid.

Moreover, this new restriction threatens to undermine health coverage and thereby the affected immigrant's health, as well as the nation's health overall. Specifically, the Proclamation restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. In the ACA, Congress made legal immigrants eligible for subsidized marketplace coverage because this supports the nation's overall health. The Proclamation instead requires individuals to purchase costly and less comprehensive health coverage by barring consideration of Medicaid and ACA subsidized plans, while allowing coverage through short-term plans that are not required to comply with the ACA's consumer protections. Frequently referred to as "junk insurance," these short-term plans lack both essential benefits and comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. In effect, the Proclamation forces immigrants to choose junk insurance plans that will fail to cover needed care and puts their health and financial security at risk. This in turn will lead to increased demand for uncompensated care and increased costs for our providers who care for their clients/patients regardless of ability to pay.

Further, many of our agencies from our hospitals to our nursing homes rely on substantial numbers of immigrant workers to provide care to their patients. Many of these health care workers are employed in lower paid positions and by income level may be eligible for Medicaid or ACA subsidized plans, both of which are prohibited from consideration as possible sources of health insurance by the terms of the Proclamation. If failure to have health insurance coverage is a barrier to entry, far fewer immigrants will be available to serve in our nation's health care workforce. The shortage of qualified health care workers has been recognized as a serious problem. The U.S. Census Bureau reported in May 2014 that by 2050, the number of U.S. residents age 65 and over is projected to be 83.7 million, almost double its estimated population of 43.1 million in 2012.[1]  Meanwhile, according to the Bureau of Labor Statistics, 1.2 million vacancies will emerge for registered nurses between 2014 and 2022.[2]  At a time when demand for health care services continues to outpace the supply of health care workers, we cannot support a policy that potentially amplifies this discrepancy and jeopardizes our agencies' ability to care for the vulnerable populations they serve and indeed the health care of all Americans.

---

[1] Jennifer M. Ortman, Victoria A. Velkoff, and Howard Hogan, "An Aging Nation: The Older Population in the United States," United States Census Bureau Report Number P25-1140 (May 2014).

[2] Heather Cygan, "Are you up to date on the latest nursing shortage predictions?," Nurse.com (January 17, 2018), http://mediakit.nurse.com/blog/are-you-up-to-date-on-nursing-shortage-predictions/.

**The two-day comment period for the proposed ICR is woefully inadequate and, if the Department of State insists on proceeding with the proposed ICR, the agency should subject it through the ordinary Paperwork Reduction Act clearance process.**

JFNA is disappointed that the Department of State has provided only a 2-day comment period for such a significant ICR that represents a dramatic shift in policy and may bar an entire class of immigrant applicants from entry into our country. Although the Department of State states that the proposed ICR's expedited review timeframe is requested under the emergency review provisions of the Paperwork Reduction Act (PRA) of 1995, the agency provides no evidence that the emergency review requirements are satisfied in this instance. In particular, an agency may request emergency review of a proposed ICR only when the agency determines that:

> (A) a collection of information—
> > (i) is needed prior to the expiration of time periods established under this subchapter; and
> > (ii) is essential to the mission of the agency; and
> (B) the agency cannot reasonably comply with the provisions of this subchapter because—
> > (i) public harm is reasonably likely to result if normal clearance procedures are followed;
> > (ii) an unanticipated event has occurred; or
> > (iii) the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed.[3]

Here, the agency has failed to demonstrate that it cannot reasonably comply with the ordinary PRA clearance process. The agency solely cites to the Proclamation's effective date as support for emergency review, but the underlying statute authorizing emergency review bears no indication that a Presidential Proclamation's deadline is sufficient to bypass the procedural strictures of the PRA, particularly when a showing of public harm, an unanticipated event, or a statutory/court deadline is absent from the agency's request. Accordingly, we view the Department of State's request for emergency review of its proposed ICR as unwarranted. Instead, the agency should submit the proposed ICR through the normal PRA clearance process and allow sufficient time for stakeholders to review the proposed ICR, consider its implications and potential consequences, and respond with informed comments.

**Conclusion**

This Proclamation and ICR impede the ability of JFNA and NJHSA to fulfill our charitable missions by restricting access to health care of incoming immigrants, putting legal immigrants who purchase junk insurance in jeopardy, shifting more costs of uncompensated care to non-profit providers, and interfering with our agencies' ability to hire qualified legal immigrants.

---

[3] 44 U.S.C. § 3507(j)(1).

000422

Accordingly, we ask that the Trump Administration rescind the Proclamation and not adopt the ICR.

Sincerely,

Jonathan S. Westin,
Senior Director, Health Initiatives
The Jewish Federations of North America

Elizabeth A. Cullen,
Counsel for Health Policy
The Jewish Federations of North America

Reuben D. Rotman,
President & CEO
Network of Jewish Human Service Agencies

5

000423



CATHOLIC LEGAL
IMMIGRATION
NETWORK, INC.

NATIONAL OFFICE

8757 Georgia Avenue, Suite 850, Silver Spring, MD 20910 | Tel: 301.565.4800 | Fax: 301.565.4824 | Website: www.cliniclegal.org

*Submitted via regulations.gov*

October 31, 2019

Edward J. Ramotowski, Deputy Assistant Secretary
Department of State, Bureau of Consular Affairs
600 19th St NW
Washington, D.C. 20006

Department of State Desk Officer
Office of Management and Budget, Office of Information and Regulatory Affairs
725 17th Street, NW
Washington, D.C. 20503

**RE: Public Comments on Agency Information Collection Activities; Proposals, Submissions, and Approvals: Immigrant Health Insurance Coverage, Docket No. DOS-2019-0039**

Dear Mr. Ramotowski and OIRA DOS Desk Officer:

The Catholic Legal Immigration Network, Inc. (CLINIC) submits these comments in response to the Department of State's (DOS's) proposed Information Collection entitled "Immigrant Health Insurance Coverage," posted October 30, 2019. CLINIC opposes the collection of information regarding immigrant health insurance, and the use of emergency Paperwork Reduction Act (PRA) review to enact this change, resulting in only a two-day public commenting period.

CLINIC supports a national network of community-based legal immigration services programs that primarily serve low-income immigrants and regularly advise and assist individuals in filing family-based immigration applications, naturalization applications, humanitarian forms of relief, and more. This network includes over 370 programs operating in 49 states and the District of Columbia. As a faith-based organization, we have consistently stood by the principle that all immigrants deserve an immigration system that is fair and ensures due process for all. In this vein, CLINIC submits the following comments in opposition to the proposed information collection.

**I.    General Comments**

CLINIC opposes the information collection for immigrant health insurance, the Presidential Proclamation that prompted its issuance, and the emergency PRA review used to seek clearance. The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, issued on October 4, 2019, would not reduce the burden on the healthcare system as it purports. It would only succeed in targeting low-income families to deny reunification, and reduce access to affordable health care for the immigrants who are admitted. Furthermore, this information collection is open for only two days of public

comments due to a purported "emergency" need for expedited clearance, and is not accompanied by a rulemaking under the Administrative Procedure Act (APA). CLINIC opposes the method for promulgating this new requirement, as it is not an emergency and the proposed changes are so profound that they require review not only under the PRA, but also under the APA with a full public comment process.

## II.    The Proposed Oral Examination Questions Violate the Proclamation

The Presidential Proclamation applies only to "aliens who will financially burden the United States healthcare system," and it suspends their admission until they have been screened for possession or intended possession of health insurance. The proclamation does not apply to all immigrant visa applicants, but only those who the United States has an objective reason to believe will incur medical costs that will be borne by the government. The purpose of the proclamation is to prevent the admission of those who will incur "reasonably foreseeable medical costs." If the applicant does not possess any existing medical condition, then it is not possible to calculate future medical costs. There is nothing on which to base such a calculation.

The proclamation also designates certain groups of immigrant visa applicants who are specifically exempted from the proclamation; those immigrant visa applicants will not be screened even if they do pose a health care concern. However, the designation of these groups does not diminish or affect the premise that the proclamation does not apply to immigrant applicants who do not possess any health care concerns.

The agency proposes to ask three questions of all immigrant visa applicants not specifically exempted, rather than limiting its questioning to those applicants who "will financially burden the United States healthcare system." The agency should limit its questioning to applicants who have been identified by a designated panel physician, after an official medical examination, as suffering from a medical condition. This is now part of the immigrant visa process, and the results of this medical exam are submitted by the immigrant visa applicant in a sealed envelope on Form I-693, Report of Medical Exam and Vaccination Record. The consular officers should be limiting their health insurance screening to applicants identified as having a Class B certification or an existing medical condition that would warrant future medical care.

## III.    The Proposed Oral Examination Questions Are Arbitrary and Vague, and Leave Too Much Discretion to Consular Officials

According to the public announcement, consular officers will ask the following three questions of immigrant visa applicants:

- whether they will be covered by health insurance in the United States within 30 days of entry to the United States
- If yes: identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary.
- If no: do you have financial resources to pay for reasonably foreseeable medical expenses (Reasonably foreseeable medical expenses are those expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication.)

The terms that DOS uses—"financial resources," "reasonably foreseeable medical expenses," and "existing medical conditions"—are too vague and ambiguous, and they will give too much discretion to consular officers.

Consular officers are provided no standards to determine what value and what type of financial resources will be considered adequate to pay for medical expenses. Must the applicant have to show cash in a bank account, or can he or she show other resources, such as stocks and bonds and funds in a retirement account? Do "financial resources" include assets that can be converted to cash in the United States within a reasonable amount of time, such as real estate, automobiles, and other significant property? How much money is it necessary to demonstrate? Would the amount of money depend on the potential medical expenses?

Consular officers are provided no standards to determine what are "reasonably foreseeable medical expenses." These officials have no medical background or expertise and thus are in no position to determine future medical costs of any specific health condition. That is the precise reason that determinations regarding health-related grounds of inadmissibility are made by panel physicians and not consular officials.

Consular officers are provided no standards to determine what is an "existing medical condition." Apart from information on the Form I-693, are consular officials now expected to perform their own physical exam and ask the applicant questions about any and all health conditions? Are only medical conditions that require treatment to be considered, or do those that are in remission or are treatable with over-the-counter medication also included?

Finally, what standards will be used to determine the ability and intention of the immigrant visa applicant to purchase medical insurance within 30 days of admission? If the applicant answers that question in the affirmative, what follow-up questions will the consular officer ask or what form of proof will be required?

Consular officials depend on interpretations of key legal terms and rely on the Foreign Affairs Manual (FAM) or other instructions. These instructions are noticeably lacking here. This will result in inconsistent decision-making and in officers applying their own definitions to these important words. The FAM requires the agency to notify visa applicants of what to expect at the consular interview. 9 FAM 302.8-2(B)(2). This proposed procedure would violate that fundamental principle.

## IV.   The Proposed Oral Examination Questions Improperly Limit Eligibility for Applicants with Financial Resources

DOS' proposed questions limit the ability of immigrant visa applicants to demonstrate adequate financial resources in lieu of medical insurance; that question is asked only to those who have an existing medical condition. However, the proclamation makes no such restriction.

Consular officers will ask the third question only to applicants who do not have a health insurance policy and will need to qualify for admission by demonstrating adequate financial resources. Yet the question applies only to those who have "financial resources to pay for reasonably foreseeable medical expenses (Reasonably foreseeable medical expenses are those

expenses related to existing medical conditions, relating to health issues existing at the time of visa adjudication.)"

But the proclamation states that: "An alien will financially burden the United States healthcare system unless the alien will be covered by approved health insurance, as defined in subsection (b) of this section, within 30 days of the alien's entry into the United States, or unless the alien possesses the financial resources to pay for reasonably foreseeable medical costs." While it is CLINIC's position that the proclamation only applies to applicants who have an existing medical condition, if DOS is requiring *all* visa applicants except those specifically exempted to be screened for health insurance, then it should not limit the third category—financial resources in lieu of health insurance—to those who have an existing medical condition.

## V.    The Information Collection Is Not an Emergency, and Should be Subject to the APA

DOS has issued this information collection with only two days' comment period, invoking the emergency exception under the PRA. In order to merit a rare emergency exception to the normal procedures under the PRA, an agency must demonstrate that delay of the information collection will result in likely public harm (such as the delivery of resources after a natural disaster) or missing a court-ordered or statutory deadline.[1] Collecting health insurance information is does not comport with either requirement. There is no public harm that will result from a delay in collecting information about immigrant health insurance. As described above, the primary result will be to impede lawful immigration and increase the cost of health insurance for low-income families. The effective date of the Presidential Proclamation is November 3, 2019, however, it is not a statutory or court-ordered deadline, and the proclamation states that it "shall be implemented consistent with applicable law…"

The PRA is applicable law that requires two comment periods of 60 and 30 days respectively, with exceptions only rarely granted. The proclamation does not state any change in conditions that makes immigrant health insurance an emergent need this month more than it was last month, or that it cannot wait until after the full PRA comment period. The foregoing issues notwithstanding, an emergency clearance with only two days' public comment period is an unreasonable amount of time to expect the public to learn about the information collection and draft a thoughtful response. DOS should not be granted emergency clearance, and should be required to undergo the full PRA clearance process.

Some of the requirements imposed by the proposed information collection are not appropriate for PRA review and must be cleared through the APA as a proposed rule. The notice goes beyond collecting information, and imposes requirements that would change the outcome of immigrant visa applications, and establishes definitions for terms. As described above, the information collection would have results inconsistent with the Presidential Proclamation. The information collection defines "reasonably foreseeable medical expense," a term not otherwise defined in the proclamation or in regulation. The aspects of the information collection that would change

---

[1] Office of Management and Budget, "A Guide to the Paperwork Reduction Act," available at https://pra.digital.gov/clearance-types/.

000427

immigrant visa adjudication and have legal consequences for applicants are not appropriate for this proposed information collection.

## VI.    Conclusion

For the above stated reasons, CLINIC strongly opposes the proposed information collection and the proclamation on which it is based. The information collection will have the opposite effect that it purports to intend, and it is an improper use of both the emergency clearance process and of the PRA itself. We respectfully request that the information collection be withdrawn.

Thank you for the opportunity to submit these comments. We appreciate your consideration. Please do not hesitate to contact Jill Marie Bussey, Advocacy Director, at jbussey@cliniclegal.org should you have any questions about our comments or require further information.

Sincerely,

Jill Marie Bussey, Esq.
Director of Advocacy
Catholic Legal Immigration Network, Inc.

October 31, 2019

Submitted via www.regulations.gov

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

Re: Emergency Submission Comment on Presidential Proclamation No. 9945, Requiring Immigrant Health Insurance Coverage

To Whom It May Concern,

On behalf of Latino Network, Casa of Oregon, Catholic Charities Immigration Legal Services, Causa Oregon, Centro Cultural de Washington County, Centro Latino Americano, Innovation Law Lab, the Justice and Ministry Team of the United Church of Christ's Central Pacific Conference, LatinX Alliance of Lane County, Metropolitan Public Defender's Immigrant Defense Oregon, Oregon AFL-CIO, the Rural Organizing Project, Unidos Bridging Community, VIVA Inclusive Migrant Network, and Voz Workers Rights Education Project, we write to express our opposition to the Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, (hereinafter, "the Proclamation"), which requires immigrant visa applicants to establish, to the satisfaction of a consular officer, that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, unless the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs.

## I.    Organizational Signatories

Latino Network is a non-profit organization based in Portland, Oregon.  Latino Network's organizational mission is to positively transform the lives of Latino youth, families, and communities.  Latino Network works to educate and empower Multnomah County Latinos to achieve physical and mental health, safe housing, sustainable financial stability, and social support by offering a variety of programs and services, including early childhood services, community-based programs, school-based programs, arts and culture programs for youth, health and wellness programs, and civic leadership programs.

000429

Casa of Oregon began 30 years ago to help local organizations provide housing for farmworkers and other marginalized populations in primarily rural areas. While focusing on those who are often unable to advocate for themselves, Casa positions itself as a liaison to the community with government, industry and community organizations. Casa works alongside community organizations to provide programs and resources that strengthen families' financial well-being.

Catholic Charities Immigration Legal Services is a nonprofit law program providing low-cost consultations and legal representation to immigrants and refugees throughout Oregon and southwest Washington. The organization also educates the public, immigrant communities, and the organizations who serve them to promote justice for all newcomers and support conditions for their full participation in American society. Legal Services provides representation to support family reunification and assistance to the most vulnerable immigrants and refugees, including survivors of domestic violence, sexual assault, and human trafficking.

Causa is Oregon's immigrant rights organization. Causa works to improve the lives of Latino immigrants and their families in Oregon through advocacy, coalition building, leadership development, and civic engagement. Latino immigrants and their families are the heart of Causa and inspire, implement, and champion the organization's work. Causa envisions a world where all people have the opportunities and resources needed to thrive; and a community that welcomes and values the contributions, strengths, and assets of Latino immigrants and their families.

Centro Cultural is Oregon's oldest Latino non-profit. Founded in 1972, Centro Cultural's legacy is built on community leadership and Latino heritage. Today, its mission promotes personal growth and empowerment for Washington County communities of color and low income families. Centro serves Washington County and the Portland Metro Area by offering Arts & Culture, Civic Leadership & Advocacy, Community Wellness, Prosperidad Economic Empowerment, and Youth Development services. At the heart of Centro Cultural's programming is a commitment to engage and activate the potential of our local families to achieve community resilience.

Centro Latino Americano is a bilingual, multicultural agency that serves Latino families in Lane County, Oregon. Centro Latino Americano was formed in 1972 by a group of activist Chicano students from Lane Community College and the University of Oregon to meet the needs of Mexican immigrant families in Lane County. The organization has continued to serve as the main avenue for the social and civic integration of the Latino population in Lane County. Centro Latino Americano empowers Latino families by providing opportunity and building bridges for a stronger community. Its vision is a thriving, connected community where all people are valued.

000430

Innovation Law Lab is a nonprofit organization dedicated to upholding the rights of immigrants and refugees.  Founded in 2014, in response to the mass detention and deportation of asylum-seeking immigrant families, Innovation Law Lab specializes in the creation of scalable, highly replicable, and connected sites of resistance that create paradigm shifts in immigration representation, litigation, and advocacy.  By bringing technology to the fight for immigrant justice, Innovation Law Lab empowers advocates to scale their impact and provide effective representation to immigrants in detention and in hostile immigration courts across the country.

The Justice and Witness Ministry Team is a part of the Central Pacific Conference of the United Church of Christ.  The team provides the focus and support for the Conference and local churches to actively participate in ministries of compassion, advocacy and reconciliation, including with our immigrant community members, and supports the Conference's goals of experiencing and sharing the varied gifts of God's love, celebrating and enhancing congregational vision and vitality, and demonstrating and promoting peace and justice.

The Latinx Alliance of Lane County is a coalition of community organizations and members, organized to coordinate efforts and better support Latinos in the Lane County area in the face of federal attacks against Latino immigrants.

Metropolitan Public Defender (MPD) has been on the cutting edge of public defense since its inception in 1971, with the goal of providing quality legal representation for people living in poverty.  MPD is a 501(c)(3) non-profit law firm that provides public defense, including criminal cases from misdemeanors to capital murder, juvenile cases from delinquency to dependency, mental health cases from civil commitments to mental health courts, and specialty projects from drug courts to community court. Its Community Law Division hosts, among other projects, Immigrant Defense Oregon, which is made up of a team of immigration attorneys who defend Oregonians who have been targeted for deportation, educate our communities on deportation proceedings and ongoing changes in immigration enforcement, ensure that our immigrant neighbors understand their rights and due process protections within the U.S. immigration system, and provide advice to MPD's public defenders regarding the potential immigration consequences of a criminal conviction. MPD is committed to the shared vision of standing in solidarity and support with our immigrant communities.

The Oregon American Federation of Labor- Congress of Industrial Organizations (AFL-CIO) primarily focuses on building power for working people.  Oregon AFL-CIO accomplishes this in every facet of its Federation's work, especially in its four pillar programs which are devoted to organizing new workers; electing leaders and advocating for legislation which supports working people; and engaging with communities in Oregon and with organizations outside of the labor movement.

000431

The Rural Organizing Project (ROP) is a statewide organization of locally-based groups that work to create communities accountable to a standard of human dignity: the belief in the equal worth of all people, the need for equal access to justice and the right to self-determination. Starting in 1992, ROP's challenges to the anti-democratic right have earned ROP a national reputation for being an effective grassroots organization that takes on the hard issues. Today, ROP works with over 65 member groups to organize on issues that impact human dignity and to advance inclusive democracy.  ROP's mission is to strengthen the skills, resources, and vision of primary leadership in local autonomous human dignity groups with a goal of keeping such groups a vibrant source for a just democracy.

UNIDOS Bridging Community is a diverse and welcoming nonprofit organization that advocates for Latino immigrant families and builds bridges of support and understanding among Latino and non-Latino communities in rural Yamhill County, Oregon.  With many dedicated volunteers and a small and energetic staff, UNIDOS achieves its goals through education, leadership development, active collaboration, and relationships built on the respect of each other's story.

VIVA Inclusive Migrant Network is a nonprofit organization that supports Oregon migrant communities. VIVA defends migrant communities by helping them identify useful tools about their rights and ending family separation. VIVA believes that the criminalization of immigration is immoral because migration is a human right. By uniting forces and working together, VIVA seeks to make a difference for humanity. Voz Workers' Rights Education Project is the only organization in the state of Oregon working with the day laborer community. Day laborers are temporary workers, many of them immigrants, many of them homeless, many of them facing multiple barriers to long-term employment.

Voz builds leadership and economic power in this community through economic empowerment, leadership development, and grassroots organizing. Voz has almost 20 years of experience organizing day laborers in Portland and is a founding member of the National Day Laborer Organizing Network. Voz believes that sustainable and transformative social justice work must be led by the communities most affected. Voz models this philosophy by striving to be a fully worker-led organization, and by empowering Portland day laborers not just through economic opportunities, but through opportunities to become leaders in their community.

Latino Network and the other signatory organizations are all members of Oregon Ready. Oregon Ready is a coalition of immigrant rights groups from throughout the state who came together to create a stronger immigrant rights infrastructure; meshing community-based organizing, immigrant defense work, immigrant rights policy development, and public discourse. Together, these organizations strongly oppose the Proclamation and the immediate and devastating effect it will have on immigrant Oregonians.

## II.    The Proclamation is Unlawful

Latino Network, along with several individual plaintiffs, has recently filed a lawsuit against the Proclamation. *John Doe #1 v. Donald Trump,* No. 3:19-cv-01743-SB (D. Or.) (filed Oct. 30, 2019).  For the reasons outlined in the complaint, and described in this comment, the Proclamation is unlawful and should not be implemented.

First, the Proclamation will immediately cause family separation by preventing reunification of immigrant families in Oregon, and also limit Oregon's immigrant diversity by blocking immigrants coming on other types of visas from the United States.  In fact, the Proclamation applies to a significant majority of immigrants seeking to enter the United States on an immigrant visa, with very limited exceptions.  Researchers estimate that close to **two-thirds** of future immigrants otherwise entitled to admission would be kept out of the country under the Proclamation.[1]  Many Oregonians who have already endured years-long waits, and expensive and complex legal processes, in order to bring close relatives to the United States will be forced into prolonged, and perhaps permanent, separation under the Proclamation's rule.  The Proclamation will have an especially devastating effect on low-income immigrants, who will struggle to find an affordable and qualifying healthcare plan on such short notice.

Second, even for those immigrants who can afford a healthcare plan, the requirements for obtaining a qualifying plan are vague and nearly impossible to decipher.  For example, a "catastrophic" health care plan will supposedly qualify- but this term can be used to refer both to high-deductible plans generally, and to certain Affordable Care Act (ACA)-defined plans specifically.  The Proclamation provides no further guidance as to which specific plans will satisfy its requirements.  There is also a troubling lack of guidance on how consular officers are to interpret the Proclamation's suspension of entry of those who do not have the financial resources to pay for reasonably foreseeable medical costs." We especially fear that this standard could be manipulated to discriminate against older and disabled intending immigrants.

Moreover, the narrow range of plans available to satisfy the Proclamation's requirements are largely unavailable to the vast majority of intending immigrants, especially within the first 30 days of their arrival to the United States.  Medicare, for example, is only available to persons over 65 years of age who have resided in the United States for at least five years, making it entirely inaccessible to intending immigrants.  Other qualifying plans are available only to specific and narrow groups, like members of the military and their immediate family members, or the plans of family members, which are only available to spouses or to children under the age

---

[1] Nicole Narea, *Trump just quietly cut legal immigration by up to 65%,* VOX, https://www.vox.com/2019/10/9/20903541/trump-proclamation-legal-immigration-health-insurance (last visited Oct. 30, 2019).

of 27.  Similarly, employer plans are only available to intending immigrants who have already secured employment, and even in that case, many employers impose a waiting period of more than 30 days post-hire before benefits are actually extended.[2] That leaves, in large part, only short-term limited duration insurance plans as an option.  But many of these plans require U.S. citizenship or lawful permanent residence as a coverage requirement; and in almost *half* of U.S. states, these plans do not extend to the 364-day duration required by the Proclamation.[3]  Indeed, Oregon law limits the duration of such plans to only *three months*, including renewals.[4]

### III.    The Office of Management and Budget Should Not Grant Emergency Clearance for this Information Collection Request (ICR)

Finally, we strenuously object to the extremely short, and unlawful, 48-hour period provided comments.  Under the Paperwork Reduction Act (PRA), Information Collection Requests (ICRs) such as this one must undergo a 60- and 30-day notice for public comment.[5] Emergency approvals are "discouraged" and "granted only rarely,"[6] and must meet narrow legal criteria that are not met here.  According to the PRA Guide:

> An agency may request emergency clearance only when it needs to begin collecting the information more quickly than the time a full clearance will require. In every case, the agency must show that: (1) The collection of information must be needed prior to the expiration of the normal time periods; and (2) The collection of information is essential to the mission of the agency. In addition to those two criteria, the agency must, in every case, demonstrate that one of the following four circumstances is present: (1) Public harm is likely if normal procedures are followed; or (2) An unanticipated event has occurred; or (3) The use of normal procedures is likely to prevent or disrupt the collection; or (4) The use of normal procedures is likely to cause a statutory or court ordered deadline to be missed.[7]

Neither of the two preliminary requirements, nor any one of the four circumstances, are present in this case.  The Proclamation imposes monumental changes on our nation's immigration laws and will cause serious harm to immigrant communities throughout the United

---

[2] *See* 2018 Employer Health Benefits Survey, KAISER FAMILY FUND, (Oct. 3, 2018), https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-3-employeecoverage-eligibility-and-participation/.

[3] *Is Short-term Health Insurance Right for You?,* HEALTHINSURANCE.ORG, https://www.healthinsurance.org/short-term-health-insurance/; Short Term Health Insurance Eligibility Information for Short Term Health Insurance, or STM, ELIGIBILITY.COM (Updated Jan. 28, 2019), https://eligibility.com/short-term-healthinsurance.

[4] Or. Rev. Stat. § 743B.005(16)(b)(H).

[5] U.S. Office of Personnel Management, Paperwork Reduction Act (PRA) Guide, Version 2.0 (April 2011) at p. 9.

[6] *Id.*

[7] *Id.*

States.  There is no reasonable justification for such a shortened comment period, and the time allotted does not provide a meaningful opportunity for the Office of Management and Budget to review public input.   Moreover, as described above, the Proclamation that the ICR seeks to implement is unlawful, making the proposed information collection "[un]necessary for the proper functions of the [State] Department" and therefore inappropriate.[8]  The emergency request should be denied.

IV.    **Conclusion**

For the above stated reasons, Latino Network, Casa of Oregon, Catholic Charities Immigration Legal Services, Causa Oregon, Centro Cultural de Washington County, Centro Latino Americano, Innovation Law Lab, the Justice and Ministry Team of the United Church of Christ's Central Pacific Conference, LatinX Alliance of Lane County, Metropolitan Public Defender's Immigrant Defense Oregon, Oregon AFL-CIO, the Rural Organizing Project, Unidos Bridging Community, VIVA Inclusive Migrant Network, and Voz Workers Rights Education Project strongly oppose the Proclamation and its changes to our immigration system.  All of this shows the true intent behind the Proclamation: to limit lawful immigration to the United States, and, in particular, to close the door even more forcefully on intending immigrants of color. Our nation's immigrant visa system is governed by statute, and prioritizes immigration for the purposes of family unity, business, humanitarian reasons, and diversity.  These priorities, which have been enshrined in the Immigration and Nationality Act since 1952, should not be eviscerated by an ill-considered and facially nonsensical Presidential Proclamation.  If allowed to remain in place, the Proclamation will effectively eviscerate long-standing and Congressionally established avenues to lawful status in the United States.  After waiting years to reunite with family members in the United States, many vulnerable and low-income immigrants will face indefinite family separation because of this cruel and illogical policy.

The Proclamation's intended effect on the immigrant community is not unanticipated.  Indeed, Latino Network and other signatory Oregon Ready members have spent significant time over the past year developing educational materials, conducting outreach, and answering community questions regarding the recently blocked public charge rule, which shares many of the same problems, and xenophobic goals, as the Proclamation.  While we will continue advocacy in our local communities, we raise our voices to strenuously object to the Proclamation and its impending implementation.  The integrity of our immigration system should not be undermined in this significant way.

Thank you for the opportunity to submit these comments. Please do not hesitate to contact any of the organizational representatives listed below should you have any questions about our comments or require further information.

---

[8] 84 Fed. Reg. 58199.

Carmen Rubio
Executive Director
LATINO NETWORK

Peter Hainley
Executive Director
CASA OF OREGON

John Herrera
Director
CATHOLIC CHARITIES IMMIGRATION LEGAL SERVICES

Cristina Marquez
Interim Executive Director
CAUSA OREGON

Maria Caballero Rubio
Executive Director
CENTRO CULTURAL DE WASHINGTON COUNTY

David Saez
Executive Director
CENTRO LATINO AMERICANO
LATINX ALLIANCE OF LANE COUNTY

Stephen Manning
Executive Director
INNOVATION LAW LAB

Karen Kulm
Co-Chair
JUSTICE AND MINISTRY TEAM, UCC CPC

Samantha Ratcliffe
Staff Attorney
METROPOLITAN PUBLIC DEFENDER, IMMIGRANT DEFENSE OREGON

Graham Trainor
President
OREGON AFL-CIO

000436

Jessica Campbell and Cara Shufelt
Co-Directors
RURAL ORGANIZING PROJECT

Miriam Vargas Corona
Executive Director
UNIDOS BRIDGING COMMUNITY `

Francisco Aguirre
Executive Director
VIVA INCLUSIVE MIGRANT NETWORK

Osmani Alcarez Ochoa
Executive Director
VOZ WORKERS' RIGHTS EDUCATION PROJECT



October 31, 2019

Edward J. Ramtowski
Deputy Assistant Secretary, Visa Services
U.S. State Department
Bureau of Consular Affairs
600 19th Street, NW
Washington, DC 20036

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

Via www.regulations.gov

*Title of Information Collection:* Immigrant Health Insurance Coverage
*Docket Number*: DOS-2019-0039
*Form Number:* DS-5541

Dear Mr. Ramotowski:

We write to **provide comment on the State Department's** "Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage."

We understand Presidential Proclamation 9945 allows consular officers to investigate whether an applicant **for an immigrant visa would be considered a "burden" if they are not covered by approved health insurance** within 30 days of their arrival unless they have the financial resources available to pay for reasonably foreseeable medical costs.

We are concerned about how this new requirement **would impact individuals using Minnesota's marketplace.** Specifically, MNsure is concerned that this Proclamation encourages underinsurance among newly arrived immigrants, promotes an atmosphere of consumer fear and confusion, and discourages individuals from seeking the insurance coverage and health care they need.

As a state-based health insurance exchange, MNsure acts as the streamlined, single front door for Minnesotans to apply for health insurance, including public health programs administered by the state, and private health insurance managed by private insurance companies.



1

000438



As written, the Proclamation categorizes approved coverage options that only provide very limited benefits, and in some cases allow exclusions based on preexisting conditions. This means that many individuals may not have access to insurance coverage or may end up with insufficient coverage and thus **"underinsured,"** which could impose a substantial burden on **Minnesota's healthcare system.** Simply put, the Proclamation encourages underinsurance among newly arrived immigrants and potentially dissuades individuals and families who are eligible to receive tax credits from applying through MNsure.

Further, the Proclamation undermines the legislative intent of the Affordable Care Act. Specifically, Congress expressly intended to ensure that a minimum level of insurance coverage is available to all legal immigrants and citizens. However, under the Proclamation, several of the types of plans that qualify as approved coverage only provide very limited benefits and/or allow exclusions based on preexisting conditions. The Proclamation will reduc**e immigrants' access to the insurance coverage and health care they need**, as anticipated by Congress when enacting the ACA. The Proclamation seems to disregard the fact that lawful permanent residents who meet the requirements set forth in Federal and State law are allowed to apply for coverage under the ACA, including those entering on immigrant visas.

In particular, MNsure is concerned that the Proclamation will discourage individuals and families from applying for comprehensive private program health care coverage altogether, as the proclamation excludes refundable tax credit benefits and assistance that Congress has specifically and explicitly stated immigrants in the United States are legally entitled to receive. Treating a tax credit that is intended to reduce the tax burden of individuals who purchase individual market insurance as a penalizable benefit undermines the intent of the ACA to improve insurance affordability.

We urge that you not implement a policy that will confuse and discourage consumers (including new immigrants) from applying for tax credits that enable them to purchase health insurance coverage. This policy would disempower our market and our consumers and could cause significant economic ripple effects for all Minnesotans if the uninsured rate increases. This policy will reduce access to comprehensive health care and **put individuals' future health at risk.**

For these reasons, we urge you to withdraw and reconsider this policy, and we request that reasonable time be provided for public analysis and comment on any subsequent related proposal.

Thank you for your consideration of our comment.

Sincerely,

Nate Clark
CEO





**THE GEORGE WASHINGTON UNIVERSITY**

WASHINGTON, DC

Department of Health Policy and Management

October 30, 2019

To:     Dept. of State Desk Officer
        Office of Information and Regulatory Affairs
        Office of Management and Budget
        (Email: oira_submission@omb.eop.gov)

        Bureau of Consular Affairs
        Office of Visa Services
        Department of State
        (Email: PRA_BurdenComments@state.gov)

Subject:  Emergency Submission Comment on Inflation collection title"
          DS-5541 (oral information collection) regarding Immigrant Health Insurance Coverage
          OMB Control number: none
          Per Public Notice 10934, Federal Register Oct. 30, 2019
          Docket DOS-2019-0039

Dear Sir or Madam:

I am responding to comment on the notice of information collection about Immigrant Health Insurance Coverage (see relevant numbers above).

OIRA and the Department of State should reject/withdraw approval and implementation of the information collection proposed in the notice, relating to Presidential Proclamation # 9945, dated October 4, 2019.  There is no sound justification for emergency implementation of this change to immigrant visa processes, nor for emergency approval of the information collection.

Asking for information about insurance coverage and/or funding sufficient to cover medical expenses, in the event someone is not covered, will be unduly burdensome and will pose a major burden on immigration visa applicants and almost certainly reduce the number of immigrants approved to enter the nation and harm the nation.

The notice estimates the number of applicant asked to complete the form will be 450,500.  But I am unaware of any analysis of the effect of this policy and information collection.  But the implications of this policy are mostly unknown.  Prior to implementing the policy and the information collection, OMB and the Department of State should provide:

- Estimates of the number of immigrants applying for visas previously by health insurance status and the number of immigrants expected to be approved by health insurance status after implementation of these policies.  This would provide a basis to determine how many visa applications may be either denied or not completed because of the policy, which is needed to properly understand the impact of the policy.  To the best of my knowledge, neither the Office of President, Department of State or OMB have provided such information to reasonably assess the expected impact of this policy or to assess the reason for the determination of the policy.

- Estimates of changes in the number and cost of short-term insurance policies sold, which are encouraged under the Presidential Proclamation. as a way to show that the immigrant has insurance coverage.  Short-term insurance plans are an extremely expensive and inefficient form of health insurance.  For example, a recent analysis noted that "short-term plans benefit insurance companies more than the patients who purchase them." (*Modern Healthcare* magazine, August 6, 2019 https://www.modernhealthcare.com/insurance/short-term-health-plans-spend-little-medical-care) On average, less than 40% of the cost of the insurance premium for a short-term plan is actually spent on medical care, the majority is profit and administrative costs for the insurance companies .  By comparison, regular health insurance plans spend about twice as much of the money collected on actual medical care.  (And in comparison, the administrative costs for Medicaid are even lower, about 7%, making it far more efficient than short term or regular health insurance plans.)

- The alternative noted is to show that the visa applicant has sufficient funds to cover the cost of "reasonably foreseeable medical expenses" according to the notice, but does not indicate how a consular officer will make this evaluation.  It is worth noting that the average cost of an emergency room visit for an uninsured person was $1,332 in 2016, according to the Health Care Cost Institute (https://www.healthcostinstitute.org/blog/entry/er-facility-prices-charges-2009-2016) and is surely much higher today.

- Numerous analyses have shown how immigration benefits the United States (e.g., National Academy of Sciences, *The Economic and Fiscal Consequences of Immigration,* https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration).  This effort to lower legal immigration to the United States will almost certainly create economic and social damage to our nation.

The notice states that there will be a regular non-emergency information collection notice issued.  Can I ask whether the State Department will also issue a proposed notice, subject to comment, on the implementation of the policy itself?  Without such a change, the government would be violating the Administrative Procedures Act.  The government has not provided a reasonable basis for emergency implementation.

There is no reasonable basis for emergency approval of the information collection nor the implementation of this policy.  OMB and the Department of State should withdraw this proposed information collection and policy.

Yours truly,

Leighton Ku, PhD, MPH
Professor of Health Policy and Management
Director, Center for Health Policy Research
Professor of Public Policy and Management
Email: lku@gwu.edu
Phone: 202-994-4143

000441



*The Commonwealth of Massachusetts*
*Commonwealth Health Insurance Connector Authority*
*100 City Hall Plaza*
*Boston, MA  02108*

CHARLES D. BAKER
Governor

MARYLOU SUDDERS
Board Chair

KARYN POLITO
Lieutenant Governor

LOUIS GUTIERREZ
Executive Director

October 31, 2019

Edward J. Ramotowski
Deputy Assistant Secretary
Office of Visa Services
Bureau of Consular Affairs
U.S. Department of State
600 19th Street, NW
Washington, DC 20036

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

**Re: Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage (Published in Federal Register Volume 84, Number 210, page 58199 on October 30, 2019)**

Dear Mr. Ramotowski:

The Massachusetts Health Connector respectfully avails itself of the opportunity provided by the U.S. Department of State to comment on the "**Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage.**"

The Massachusetts Health Connector ("Health Connector") is a state-based Marketplace ("SBM") authorized under state law and the Affordable Care Act (ACA). The Health Connector is designed to connect Massachusetts residents with high quality, affordable health coverage and to promote universal health coverage in the Commonwealth. Today, the Health Connector serves over a quarter-million Massachusetts residents, including approximately 290,000 individuals as well as over 7,000 small business employees. The Health Connector's efforts have contributed to the Commonwealth's status as one of the healthiest states in the nation,[1] with a

---

[1] *See* www.mass.gov/news/massachusetts-named-healthiest-state-in-the-nation.

nation-leading health insurance rate of over 97 percent,[2] and the lowest-cost average Marketplace premiums in the country for the past three consecutive years.[3]

In 2006, Massachusetts enacted a landmark package of health care reforms, including state subsidy programs for low- and moderate-income individuals, including for lawfully present immigrants, as well as a state-level individual mandate to have health insurance, which is also applicable to lawfully present immigrants.

The Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System ("PP 9945") will introduce significant risks to the Commonwealth's hard-won progress over the past 13 years to ensure all lawful residents have access to affordable health care and prevent the Commonwealth from maintaining its steady and high insurance rate and limits access to health coverage supports our Commonwealth has worked to make available for immigrants. As such, **we strongly object to the Proclamation in principle and for the infeasibility and lack of care contemplated in its implementation. Further, we strongly object to the clearly inadequate public comment period being made available, particularly in light of the significant implications of this proposal**. Specifically:

**1. As a practical matter, PP 9945 effectively precludes visa-seeking immigrants from gaining access to health insurance coverage through Marketplaces, in contravention of the Affordable Care Act and the stated purpose of the Proclamation.**

The Proclamation and Notice of Information Collection suggest insufficient thought has gone into contemplating the practical details of how such a policy would be carried out for affected individuals, and it shows little understanding of procedural norms or requirements in the health benefits arena. For example, while the Proclamation contemplates that unsubsidized commercial coverage obtained through a Marketplace (like the Health Connector) would qualify as adequate coverage, it fails to recognize the practical difficulty, if not impossibility, of establishing proof of such coverage while abroad. Under federal law and regulation associated with the Affordable Care Act, an individual applying for commercial unsubsidized coverage through a Marketplace must show proof of residency in that state as well as lawful presence, which contradicts the Proclamation's supposition that the individual could have already obtained such coverage or be able to prove that it is forthcoming.

PP 9945 creates a Catch-22: Under existing federal law, immigrants cannot access insurance through Marketplaces without verifying residency and lawful presence through a strict eligibility process this federal Administration has championed. Yet under PP 9945, those seeking to establish residency and lawful presence through proper immigration channels cannot do so without verifying insurance status. As a result, individuals who otherwise could become lawfully present immigrants and qualify for health insurance under federal law will be barred from both aims. This paradox is contrary to federal law and illogical in its practical result.

**2. PP 9945 shows disregard for the economic and health benefits of ensuring health insurance coverage for all immigrant residents, including the working poor who are still in progress on the path to economic security.**

The Commonwealth has maintained a requirement for over a decade that all adults have access to health insurance if affordable. This approach to promoting widespread coverage was developed with careful consideration and coordination with subsidy supports and public coverage to ensure that lower-income residents can access coverage that is affordable and comprehensive. In Massachusetts, we have a longstanding array of public coverage programs, like the Health Connector's ConnectorCare program which lowers the premiums and cost sharing for eligible individuals and families that are at or below 300 percent of the federal poverty level (FPL). These affordability supports are available to lawfully present immigrants, at the direction of the United States Congress when it passed the Affordable Care Act, and at the direction of Massachusetts

---

[2] U.S. Census Bureau, at www2.census.gov/programs-surveys/demo/tables/p60/264/table6.pdf.
[3] Analysis of CMS Public Use Files, at www.cms.gov/CCIIO/Resources/Data-Resources/marketplace-puf.html.

state law. This Proclamation risks undermining those legal rights by introducing countervailing requirements blocking access to such coverage. To do so undermines the health and economic security of those immigrants, and their communities and the state economy. Massachusetts's experience demonstrates that providing affordable coverage opportunities along with requiring coverage is an effective way to reduce uncompensated care costs. The Proclamation fails to acknowledge the criticality of affordable options to increasing insurance coverage rates.

**3. Because immigrants will not be able to seek health insurance through Marketplaces, PP 9945 undermines the health of Massachusetts's insurance market, potentially affecting coverage for immigrants and non-immigrants alike.**

Beyond the immediate harms to lawfully present immigrants being barred from accessing insurance through Marketplaces like the Health Connector, the Proclamation undermines our commercial insurance market by seeking to excise lawfully present immigrants from the coverage to which they are legally entitled. Lawfully present immigrants in Massachusetts are more likely to represent "favorable" insurance risk, because they are often younger, healthier, or lower-than-average utilizers of health care services when compared to the general insured population. Several studies have concluded that immigrants are net contributors to both private coverage and Medicare, paying more in insurance premiums than they receive in benefits.[4] Similarly, the Health Connector's own data demonstrates that its immigrant enrollees, on average, have 25% lower medical claims than its citizen members, a variance attributable both to the lower age of immigrant enrollees as well as lower utilization of medical services.[5] As a result, declines in take-up or retention of immigrant coverage related to the proposed rules could have an impact on the overall risk pool—in turn leading to commercial market premium increases for citizens and immigrants alike.  Increased premiums will lead to higher rates of uninsurance among all Americans, increasing the uncompensated care burden the Proclamation purports to address.

By attempting to discourage immigrants from enrolling in coverage to which they are legally entitled, the federal Administration is likely to increase commercial market premiums in Massachusetts, hurting individuals as well as small businesses because of our unique "merged market" structure. In Massachusetts, individuals and small businesses share a risk pool, insurance products, and premiums. As a result, changes to the Health Connector's individual enrollment can extend to a broader pool that includes Massachusetts's small business community, potentially increasing premiums across the board.

Of further concern, the proclamation seeks to permit Short-Term Limited Duration Plan (STLDP) coverage, which do not comply with the Affordable Care Act's consumer protections, nor those codified in Massachusetts General Laws, to qualify as "acceptable" coverage. Such plans have been widely demonstrated to lack critical comprehensive coverage[6] and can be prohibitively expensive for individuals with pre-existing conditions. Further, such plans do not satisfy Massachusetts's own individual mandate requirements or meet state-based legal requirements governing the sale of insurance coverage to individuals in the Commonwealth of Massachusetts. Diverting qualified legal immigrants from meaningful, comprehensive coverage to which they are legally entitled and instead directing them towards companies that engage in medical underwriting, spend

---

[4] Zallman, L., Woolhandler, S., Touw, S., Himmelstein, D.U., and Finnegan K.E. (2018). Immigrants pay more in private insurance premiums than they receive in benefits. Health Affairs 2018 37:10, 1663-1668.

[5] Health Connector analysis of claims data.

[6] A Kaiser Family Foundation analysis of STLDI sold in 2018 shows that 43% did not cover mental health services, 62% did not cover services for substance abuse treatment, and 71% did not cover outpatient prescription drugs. No plans covered maternity care, and, in seven states, STLDI covered none of these four benefit categories. These policies had out-of-pocket maximums as high as $30,000 and lifetime limits on care ranging from $250,000 to $2 million. A separate study from Georgetown University found that the best-selling STLDI policies in five states had out-of-pocket maximums from $7,000 to $20,000 for only three months (compared to the maximum of $7,150 for 12 months for an ACA-compliant plan that year). See: Karen Pollitz et al., *Understanding Short-Term Limited Duration Health Insurance*, Kaiser Family Foundation (Apr. 2018). Even when these benefits are covered by STLDI, they are subject to a number of limitations and exclusions, such as dollar limits on care; and Dania Palanker et al., *New Executive Order: Expanding Access to Short-Term Health Plans is Bad for Consumers and the Individual Market*, The Commonwealth Fund (Oct. 2017).

the majority of premium revenue on non-medical expenses[7], and are known to exclude core benefits like maternity, mental health, and substance use disorder treatment threatens both individuals' health and financial well-being.  Further, it encourages insurers to profit off of immigrants seeking a new life in the United States, and sets affected immigrants up for failure to meet Massachusetts's individual mandate requirements, interfering with our long-standing stewardship of health coverage options for our residents, including lawfully present immigrants.

In addition to these specific concerns with the implementation and policy shortcomings of the subject Proclamation, we wish to voice our fundamental opposition to a policy that is designed to exclude lower-income immigrants from entering the United States and accessing meaningful health coverage. This policy is counter to the mission of the Health Connector, which is to ensure that all Massachusetts residents have access to affordable, comprehensive health coverage to ensure their ability to live safe, productive, and fulfilling lives in our Commonwealth and in our nation.

Finally, we strongly object to the two-day comment period afforded to the public on this proposal, which will profoundly affect our immigration and health care systems. Two days is wholly inadequate to allow for the sufficient public consideration that a policy of this significance merits, and this policy in no way constitutes an emergency.

We therefore urge you to withdraw and reconsider this policy, and we request that reasonable time be provided for public analysis and comment on any subsequent related proposal.


We thank you for consideration of our comments.


Sincerely,


Louis Gutierrez
Executive Director

---

[7] Data from the National Association of Insurance Commissioners (NAIC) shows that STLDI insurers had an average loss ratio of 64.6% in 2017 (compared to 80% for ACA-compliant individual market policies). The three largest insurers offering STLDI had even lower loss ratios of 43.7%, 34.0%, and 52.1%. In other words, the majority of STLDI premium revenue for those insurers went to profit, marketing, and other expenses unrelated to medical care. See: National Association of Insurance Commissioners, *2017 Accident and Health Policy Experience Report*, at 83 (2018).

000445



# STATE OF MINNESOTA
## Office of Governor Tim Walz

75 Reverend Dr. Martin Luther King Jr. Blvd. ♦ Suite 130 ♦ Saint Paul, MN 55155-1611

October 31, 2019

Edward J. Ramtowski
Deputy Assistant Secretary, Visa Services
U.S. State Department
Bureau of Consular Affairs
600 19th Street, NW
Washington, DC 20036

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

Via www.regulations.gov

*Title of Information Collection:* **Immigrant Health Insurance Coverage**
**Docket Number: DOS-2019-0039**
*Form Number:* **DS-5541**

Dear Mr. Ramotowski:

I'm writing to provide comment on the State Department's "Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage".

As I understand it, under the Presidential Proclamation 9945, consular officers may consider whether an applicant for an immigrant visa would be considered a "burden" if they are not covered by approved health insurance within 30 days of their arrival unless they have the financial resources available to pay for reasonably foreseeable medical costs.

I have two concerns to outline for you today. First, the premise that any person, whether they are an immigrant or person born in the United States, could be considered a "burden" is inconsistent with the values of Minnesotans. Rules, proclamations, and other government regulations that make reference to, imply, or categorize any person in this way is inappropriate.

Second, for state regulators, impacted industries, and the public to meaningfully comment and recommend changes to proposed rules and proclamations, adequate time should be provided to review and consider the changes and write a meaningful response. Opening the comment period on October 30, 2019 and subsequently closing the comment period on October 31, 2019 does not allow for meaningful comment. Substantive changes like this proposal have the potential to cause confusion and chaos for impacted people, especially when the process is rushed.

000446

For these reasons, I urge you to withdraw and reconsider this policy. If you choose to proceed with this policy, I request reasonable time be provided for analysis and comment by state regulators, impacted industries, and members of the public. I also request that the language used to describe people in rules, proclamations, and regulations recognizes the dignity and respect that each human deserves.

Thank you for your consideration.

Sincerely,

Tim Walz
Governor

000447



**Headquarters**
5 Hanover Square
Suite 1401
New York, NY  10004
P.917-746-8300
www.napnap.org

October 31, 2019

Department of State Desk Officer                Office of Visa Services
Office of Information and Regulatory Affairs     Bureau of Consular Affairs
Office of Management and Budget                 Department of State
725 17th Street, NW                             2201 C St., NW
Washington, DC  20503                           Washington, DC 20520

Re:    **Docket # DOS-2019-0039; Public Notice 10934 – Notice of Information Collection Under OMB**
       **Emergency Review: Immigrant Health Insurance Coverage**
       (*Submitted via www.regulations.gov; oira_submission@omb.eop.gov; PRA_BurdenComments@state.gov*)

Dear Officers:

On behalf of more than 9,000 pediatric nurse practitioners (PNPs) and pediatric-focused advanced practice registered nurses (APRNs) committed to providing optimal health care to children, the National Association of Pediatric Nurse Practitioners (NAPNAP) appreciates the opportunity to provide its comments in response to the October 30, 2019 notice of information collection (Docket # DOS-2019-0039; Public Notice 10934 – Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage; 84 Fed. Reg. 210; pp. 58199-58200) requesting review and approval of information collection on immigrant health insurance coverage in accordance with the emergency review procedures of the Paperwork Reduction Act of 1995.  NAPNAP strongly objects to the use of these procedures, permitting only a 48-hour comment period, for an administrative action that is clearly not an emergency, and for rushing to implement a policy that would cause significant harm to immigrant children and their families.

Pediatric nurse practitioners (PNPs) and fellow pediatric-focused advanced practice registered nurses (APRNs) are committed to providing optimal health care to children in primary, specialty and acute care settings.  APRNs who concentrate on children's care, including PNPs, have attained enhanced education in pediatric nursing and health care using evidence-based practice guidelines.  They have provided quality, accessible, affordable healthcare to children and families for more than 50 years in an extensive range of community practice settings including pediatric offices, clinics, schools, and hospitals.  Practicing in primary care, specialty, and acute care, they diagnose illnesses, prescribe medications and are fully qualified to provide both primary and acute healthcare services to children in a trauma-informed, culturally responsive, evidence-based manner.  They are often the front-line health care providers treating immigrant children who, due to the physical and emotional hardships they have endured, are in need of significant and often prolonged medical and mental health care.

NAPNAP and its members are committed to ensuring that all children have access to comprehensive health care, without regard to where they were born.  We honor that commitment by providing essential services in the hospitals, community health centers, and pediatric offices that care for those children.  Based on that commitment, we strongly oppose the collection of information on health insurance status as proposed in this emergency submission and in the underlying Presidential Proclamation (PP 9945) it seeks to implement without adequate analysis of its impact.  We are concerned that the proclamation threatens to undermine the nation's health, restricting the ability of immigrant children and their families to purchase comprehensive health insurance available through Affordable Care Act marketplaces even though Congress acted to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation also allows short-term plans, which do not comply with the Affordable Care Act's consumer protections, to qualify as "acceptable" coverage. These short-term plans lack comprehensive coverage, particularly when it comes to the services children need, and they often fail to provide access to qualified pediatric providers such as APRNs focused on children's care.  They can also be prohibitively expensive for individuals with pre-existing conditions.  Forcing immigrant families to choose less comprehensive coverage could increase uncompensated care costs for providers, when patients can't afford needed health care that is not covered by these limited plans.

Desk Officers, Office of Management and Budget, Department of State                          Page 2
October 31, 2019

In summary, NAPNAP is extremely disappointed that the administration has chosen to attempt to impose such a needlessly burdensome requirement on immigrant families and children – and to attempt to do so without allowing the appropriate time for experts and stakeholders to analyze the proposal and assess its impact on vulnerable populations and the health care professional who serve them.  We believe the only appropriate solution is for the administration to immediately rescind this proclamation before it goes into effect and to follow the appropriate administrative and regulatory procedures before it considers proposing a policy that would have such seriously harmful effects on the health of immigrant children and families.

Sincerely,

*Rajashree Koppolu*

Rajashree Koppolu, RN, MSN, CPNP-PC/AC, MSL
President

000449



**Headquarters**
5 Hanover Square
Suite 1401
New York, NY  10004
P.917-746-8300
www.napnap.org

October 31, 2019

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, DC  20503

Office of Visa Services
Bureau of Consular Affairs
Department of State
2201 C St., NW
Washington, DC 20520

Re:    **Docket # DOS-2019-0039; Public Notice 10934 – Notice of Information Collection Under OMB**
       **Emergency Review: Immigrant Health Insurance Coverage**
       (*Submitted via www.regulations.gov; oira_submission@omb.eop.gov; PRA_BurdenComments@state.gov*)

Dear Officers:

On behalf of more than 9,000 pediatric nurse practitioners (PNPs) and pediatric-focused advanced practice registered
nurses (APRNs) committed to providing optimal health care to children, the National Association of Pediatric Nurse
Practitioners (NAPNAP) appreciates the opportunity to provide its comments in response to the October 30, 2019
notice of information collection (Docket # DOS-2019-0039; Public Notice 10934 – Notice of Information Collection
Under OMB Emergency Review: Immigrant Health Insurance Coverage; 84 Fed. Reg. 210; pp. 58199-58200)
requesting review and approval of information collection on immigrant health insurance coverage in accordance with
the emergency review procedures of the Paperwork Reduction Act of 1995.  NAPNAP strongly objects to the use of
these procedures, permitting only a 48-hour comment period, for an administrative action that is clearly not an
emergency, and for rushing to implement a policy that would cause significant harm to immigrant children and their
families.

Pediatric nurse practitioners (PNPs) and fellow pediatric-focused advanced practice registered nurses (APRNs) are
committed to providing optimal health care to children in primary, specialty and acute care settings.  APRNs who
concentrate on children's care, including PNPs, have attained enhanced education in pediatric nursing and health
care using evidence-based practice guidelines.  They have provided quality, accessible, affordable healthcare to
children and families for more than 50 years in an extensive range of community practice settings including
pediatric offices, clinics, schools, and hospitals.  Practicing in primary care, specialty, and acute care, they diagnose
illnesses, prescribe medications and are fully qualified to provide both primary and acute healthcare services to
children in a trauma-informed, culturally responsive, evidence-based manner.  They are often the front-line health
care providers treating immigrant children who, due to the physical and emotional hardships they have endured, are
in need of significant and often prolonged medical and mental health care.

NAPNAP and its members are committed to ensuring that all children have access to comprehensive health care,
without regard to where they were born.  We honor that commitment by providing essential services in the hospitals,
community health centers, and pediatric offices that care for those children.  Based on that commitment, we strongly
oppose the collection of information on health insurance status as proposed in this emergency submission and in the
underlying Presidential Proclamation (PP 9945) it seeks to implement without adequate analysis of its impact.  We
are concerned that the proclamation threatens to undermine the nation's health, restricting the ability of immigrant
children and their families to purchase comprehensive health insurance available through Affordable Care Act
marketplaces even though Congress acted to make lawfully residing immigrants eligible for subsidized marketplace
coverage because doing so advances the health of our nation. The proclamation also allows short-term plans, which
do not comply with the Affordable Care Act's consumer protections, to qualify as "acceptable" coverage. These
short-term plans lack comprehensive coverage, particularly when it comes to the services children need, and they
often fail to provide access to qualified pediatric providers such as APRNs focused on children's care.  They can
also be prohibitively expensive for individuals with pre-existing conditions.  Forcing immigrant families to choose
less comprehensive coverage could increase uncompensated care costs for providers, when patients can't afford
needed health care that is not covered by these limited plans.

Desk Officers, Office of Management and Budget, Department of State                                    Page  2
October 31, 2019

In summary, NAPNAP is extremely disappointed that the administration has chosen to attempt to impose such a needlessly burdensome requirement on immigrant families and children – and to attempt to do so without allowing the appropriate time for experts and stakeholders to analyze the proposal and assess its impact on vulnerable populations and the health care professional who serve them.  We believe the only appropriate solution is for the administration to immediately rescind this proclamation before it goes into effect and to follow the appropriate administrative and regulatory procedures before it considers proposing a policy that would have such seriously harmful effects on the health of immigrant children and families.

Sincerely,

Rajashree Koppolu, RN, MSN, CPNP-PC/AC, MSL
President



**Elizabeth G. Taylor**
Executive Director

**Board of Directors**

**Robert N. Weiner**
**Chair**
Arnold & Porter, LLP

**Ann Kappler**
**Vice Chair**
Prudential Financial, Inc.

**Miriam Harmatz**
**Secretary**
Florida Health Justice Project

**Nick Smirensky, CFA**
**Treasurer**
New York State Health Foundation

**L.D. Britt, MD, MPH**
Eastern Virginia Medical School

**Ian Heath Gershengorn**
Jenner & Block

**Robert B. Greifinger, MD**
John Jay College of
Criminal Justice

**John R. Hellow**
Hooper, Lundy & Bookman, PC

**Michele Johnson**
Tennessee Justice Center

**Lourdes A. Rivera**
Center for Reproductive Rights

**William B. Schultz**
Zuckerman Spaeder

**Donald B. Verrilli, Jr.**
Munger, Tolles & Olson

**Ronald L. Wisor, Jr.**
Hogan Lovells

**Senior Advisor to the Board**
**Rep. Henry A. Waxman**
Waxman Strategies

**General Counsel**
**Marc Fleischaker**
Arent Fox, LLP

October 31, 2019

Via email: oira_submission@omb.eop.gov and
PRA_BurdenComments@state.gov

Department of State Desk Officer, Office of Information and
Regulatory Affairs, Office of Management and Budget, and
Bureau of Consular Affairs, Office of Visa Services
Department of State

Docket Number: DOS-2019-0039

**RE: Emergency Submission Comment on Immigrant
Health Insurance Coverage (DS05541)**

To whom it may concern,

The National Health Law Program (NHeLP) submits the
following comments in response to the Notice of Request
for OMB Emergency Review on Immigrant Health
Insurance Coverage. NHeLP, founded in 1969, protects
and advances the health rights of low-income and
underserved individuals and families by advocating,
educating, and litigating at the federal and state levels.

We vigorously oppose the proposal to collect information as
set forth in the notice, the truncated process to solicit public
comments, and the underlying October 4, 2019 Presidential
Proclamation ("PP 9945") mandating visa applicants
abroad to purchase health insurance coverage. There is no
evidence of an emergency situation to warrant a 48-hour
comment period, and there is certainly no evidence that
mandating insurance coverage of individuals applying for
immigrant visas will address the nation's growing number of
uninsured individuals.

The Proclamation is not about improving access to health
care or making sure hospitals and health care providers are
paid. Instead, it serves as yet another constraint on legal
immigration, imposing a wealth test that will
disproportionately harm people of color, particularly those

with low incomes.

The Proclamation seeks to revive the arbitrary, unlawful multi-factor public charge test, by converting it to a single-factor test for immigrants abroad that evaluates one's ability to obtain health insurance or pay for foreseeable medical care. Just as the public charge rule, it seeks to overturn a century of immigration law. However, this time it is done through presidential fiat.

We believe the Proclamation puts the health of communities, families, and individuals at risk because it will force people to buy costly health insurance that likely provides less comprehensive coverage instead of more affordable plans that cover a robust set of services for which they are eligible. The purported goal of the Proclamation is to decrease the cost of uncompensated care in the U.S., yet the Proclamation excludes many of the options that have been shown to reduce uncompensated care costs, such as Medicaid coverage for adults and subsidized qualified health plans offered through the marketplace.[1] Instead, the Proclamation recognizes short-term plans, which do not comply with the Affordable Care Act's consumer protections, to qualify as "acceptable" coverage. Frequently referred to as "junk plans," short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions and people with disabilities. Furthermore, short-term plans routinely exclude coverage of important categories of services, such as maternity care, prescription drugs, and mental health services, leaving individuals without the ability to pay, and resulting in uncompensated care for providers and ultimately higher costs for the federal government.[2] In fact, because of the financial harms associated with expanding access

---

[1] *See, e.g.*, Craig Palosky, Kaiser Family Found.,  *A Comprehensive Review of Research Finds That the ACA Medicaid Expansion Has Reduced the Uninsured Rate and Uncompensated Care Costs in Expansion States, While Increasing Affordability and Access to Care and Producing State Budget Savings* (Aug. 15, 2019), https://www.kff.org/medicaid/press-release/a-comprehensive-review-of-research-finds-that-the-aca-medicaid-expansion-has-reduced-the-uninsured-rate-and-uncompensated-care-costs-in-expansion-states-while-increasing-affordability-and-access-to-c/; Larisa Antonisse et al., Kaiser Family Found., *The Effects of Medicaid Expansion under the ACA: Updated Findings from a Literature Review* (Aug. 15, 2019), https://www.kff.org/medicaid/issue-brief/the-effects-of-medicaid-expansion-under-the-aca-updated-findings-from-a-literature-review-august-2019/; Jessica Schubel & Matt Broaddus, Ctr. on Budget & Policy Priorities, *Uncompensated Care Costs Fell in Nearly Every State as ACA's Major Coverage Provisions Took Effect* (May 23, 2018), https://www.cbpp.org/research/health/uncompensated-care-costs-fell-in-nearly-every-state-as-acas-major-coverage.

[2] *See, e.g.*, Linda J. Blumberg et al. Urban Inst*., Updated: The Potential Impact of Short-Term Limited-Duration Policies on Insurance Coverage, Premiums, and Federal Spending* (Mar. 2018), https://www.urban.org/sites/default/files/publication/96781/2001727_updated_finalized.pdf; Karen Politz et al., Kaiser Family Found., *Understanding Short-Term Limited Duration Health Insurance* (Apr. 23, 2018), https://www.kff.org/health-reform/issue-brief/understanding-short-term-limited-duration-health-insurance/; Laura Ungar, NPR, *A Woman's Grief Led To A Mental Health Crisis And A $21,634 Hospital Bill* (Oct. 31, 2019), https://www.npr.org/sections/health-



000453

to short-term plans, some states have banned all or most short-term plans and twenty-two states limit the initial duration of a short-term plan to less than 12 months.[3] The Proclamation is simply creating an unnecessary barrier to comprehensive health coverage and will increase uncompensated care costs for providers, when patients cannot afford needed health care services that are not covered by these junk plans.

Moreover, this policy is slated to take effect just days after the ACA's marketplace open enrollment period starts in most of the country. As a result, it is likely to create additional fear and confusion among families that include immigrants and may prevent some from enrolling out of fear that enrolling in subsidized Marketplace plans will negatively impact their families' immigration goals. As a result, the proclamation will raise uninsured rates among lawfully present immigrants and potentially their U.S. citizen family members. That, in turn, will increase uncompensated care costs, exacerbating the very problem the proclamation purports to address.

In the public notice, the Department of State (Department) seeks approval to verbally ask immigrant visa applicants covered by PP 9945 whether they will have health insurance coverage within 30 days of entry to the U.S., or the financial resources to pay for reasonably foreseeable medical expenses. Individuals who cannot fulfill this requirement will be denied entry into the U.S. While the Department does not seek documentation or completion of a written form to collect this information, the requirement will nonetheless create an unnecessary burden on visa applicants who must navigate an already burdensome and costly filing and application process. Visa applicants will be required to have an understanding of the U.S. health insurance system, research and select a specific health insurance plan, enroll in coverage, and know the specific date coverage will begin—all from outside of the U.S. Moreover, the Department's proposed methodology for consular officers to ask for applicants to identify "such other information related to the insurance plan as the consular officer deems necessary" means that the type of information asked and collected will likely vary from consular officer to consular office, and be inconsistently applied across the consular offices. This inconsistency will increase confusion over the requirements and will likely create inequities in approval and processing among visa applicants.

This inconsistency will be further exacerbated by the fact that the Department of State and consular officers lack expertise in evaluating different types of health insurance

---

shots/2019/10/31/771397503/a-womans-grief-led-to-a-mental-health-crisis-and-a-21-634-hospital-bill; American Cancer Society Cancer Action Network, *Inadequate Coverage: An ACS CAN Examination of Short-Term Health Plans* (May 13, 2019), https://www.fightcancer.org/sites/default/files/ACS%20CAN%20Short%20Term%20Paper%20FINAL.pdf.

[3] *See* Dania Palanker et al., Commonwealth Fund., *States Step Up to Protect Insurance Markets and Consumers from Short-Term Health Plans* (May 2, 2019), https://www.commonwealthfund.org/publications/issue-briefs/2019/may/states-step-up-protect-markets-consumers-short-term-plans.



000454

coverage. Consular officers will not know what information is reasonable to request from a health insurance plan or how to evaluate the information that is given. In fact, because of the lack of regulation on short-term plans, and the way those plans are marketed, it is often difficult for consumers to distinguish between short term and ACA-compliant plans.[4] Consular officers, who are not health insurance experts, may likewise mistake short-term plans for Marketplace plans, resulting in erroneous and arbitrary denials of visas.

In conclusion, NHeLP opposes the Proclamation in its entirety, and the information collection request on health insurance status as proposed in this notice.

We have included numerous citations to supporting research, including direct links to the research. We direct the Department to each of the studies we have cited and made available through active links, and we request that the full text of each of the studies cited, along with the full text of our comment, be considered part of the formal administrative record for purposes of the Administrative Procedure Act.

Please contact Priscilla Huang (huang@healthlaw.org) or Sarah Grusin (grusin@healthlaw.org) if you need any additional information.

Sincerely,

Elizabeth Taylor,
Executive Director

---

[4] *See, e.g.*, Sabrina Corlette et al., Urban Inst., The Marketing of Short-Term Health Plans: An Assessment of Industry Practices and State Regulatory Responses (Jan. 2019), https://www.urban.org/sites/default/files/publication/99708/moni_stldi_final_0.pdf; Nat'l Ass'n of Insurance Comm'rs, Report on Testing Consumer Understanding of a Short-Term Health Plan (April 2019), https://healthyfuturega.org/wp-content/uploads/2019/04/Consumer-Testing-Report_NAIC-Consumer-Reps.pdf.



4



October 31, 2019

Edward J. Ramotowski
Deputy Assistant Secretary
Visa Services
Bureau of Consular Affairs
Department of State

Department of State Desk Office
Office of Information and Regulatory Affairs
Office of Management and Budget

Regarding Immigrant Health Insurance Coverage Docket Number DOS-2019-0039 Form Number
DS-5541

Dear Deputy Assistant Secretary Ramotowski:

The National Disability Rights Network (NDRN) writes to express our strong opposition to the
October 4, 2019 Presidential Proclamation mandating that visa applicants abroad buy certain
approved health insurance and the efforts by the State Department and the Office of
Management and Budget to implement the proclamation. The health insurance requirement is
arbitrary and discriminatory against people with disabilities and pre-existing conditions.
NDRN is the non-profit membership organization for the federally mandated Protection and
Advocacy (P&A) agencies for individuals with disabilities. The P&As were established by
Congress to protect the rights of people with disabilities and their families. The P&As are in all
50 states, the District of Columbia, Puerto Rico, and the U.S. Territories (American Samoa,
Guam, Northern Mariana Islands, and the U.S. Virgin Islands), and there is a P&A affiliated with
the Native American Consortium in the Four Corners region of the Southwest. Collectively, the
57 P&As are the largest provider of legally based advocacy services to people with disabilities in
the United States.

This proclamation, declaring that Medicaid coverage for adults and subsidized State
marketplace plans do not meet the new health insurance requirements, will bar many people

000456

with disabilities from lawful entry into the United States. This is an issue of great concern to our network as it will impact people with disabilities, and their families who wish to travel with them to the U.S.

Medicaid coverage for adults does not count as approved health insurance. Medicaid is the largest insurer in this country for long-term services and supports, and mental health and substance abuse treatment, filling the gaps left by insurance plans that are not required to cover many of these services. Most home and community-based services are not available through private insurance. Many people with disabilities rely on Medicaid to work, attend school, remain healthy and participate in the community with the necessary supports that many of the "approved" options will not provide.

The proclamation also restricts immigrants' ability to purchase comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces, coverage that includes protections including requirements that an insurer cannot charge more or deny coverage based on a pre-existing health condition. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The proclamation puts the nation's health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

Notably, while rejecting the types of coverage that many people with disabilities rely on, the proclamation allows catastrophic coverage and short-term plans to qualify as acceptable coverage. Short-term plans, for example, lack comprehensive coverage, can be prohibitively expensive for individuals with pre-existing conditions, and can deny people coverage based on their medical history and set arbitrary service limits. This proclamation is not about protecting existing taxpayer resources or promoting health insurance. It puts a barrier between individuals and the coverage they need and for which they may be eligible, and it establishes yet another administrative hurdle to limit who can obtain a valid visa. In fact, forcing immigrants to avoid comprehensive insurance that includes the benefits they need could increase uncompensated care costs for providers, when patients can't afford needed health care that is not covered by these bare-bones plans.

Immigrants with a disability must have a fair opportunity to enter and reside legally in the United States, without unnecessary or discriminatory restrictions based on their disability. The approved health care proclamation is another unwelcome throwback to the historical isolation, segregation and exclusion of people with disabilities. It will deny immigration to  individuals based on stereotypes and fears about disability and chronic illness. The Administration should not move forward to implement this proclamation and it should be rescinded by.

000457

Sincerely,

Curt Decker
Executive Director



October 31, 2019


To:     Office of Management and Budget, State Desk Officer in the Office of Information and
        Regulatory Affairs
        The Department of State's Bureau of Consular Affairs, Office of Visa Services

Re:     Public Notice: 10934. Notice of Information Collection Under OMB Emergency Review:
        Immigrant Health Insurance Coverage (Docket Number: DOS–2019–0039)

To whom it may concern:

The National Immigration Law Center (NILC) is responding to the notice of information collection
referenced above, to express our serious concerns about the "Immigrant Health Insurance
Questionnaire" (DS-5541) and its underlying policy. NILC opposes the proposed form for collecting
information on immigrant health insurance, the Presidential Proclamation that prompted its issuance,
and the emergency PRA review used to seek clearance.

Founded in 1979, NILC is the leading advocacy organization in the U.S. exclusively dedicated to
defending and advancing the rights and opportunities of low-income immigrants and their families. We
focus on issues that promote the well-being and economic security of immigrants and their families:
health care and safety net programs; education and training; workers' rights; and federal and state
policies affecting immigrants. To advance our mission, we use three integrated strategies: litigation,
state and federal policy advocacy, and strategic communications.

For nearly four decades, NILC has been at the forefront of many of the country's greatest challenges in
addressing immigration issues. NILC is a leading organization in the immigrant justice movement,
playing a central role in shaping policy—including at the state and local level—and in initiating creative
litigation strategies that expand opportunities for immigrant families with low incomes.

Both the process and the underlying requirement contemplated by the DS-5541 are unworkable. If
implemented, they will require consular staff to conduct reviews that are outside the scope of their
expertise.  They will impose new burdens on U.S residents who seek to remain with or reunite with their
family members, and on individuals who are otherwise eligible to immigrate to this country.

**Form DS-5541**

The DS-5541 is intended to implement Presidential Proclamation 9945 (the Proclamation), which
requires that persons immigrating to the U.S. be covered by 'approved' health insurance within 30 days
of their arrival in this country, unless they have the resources to pay for 'reasonably foreseeable'
medical costs. Certain categories of persons are exempt from this requirement, including returning
lawful permanent residents, persons with Special Immigrant Visas, refugees, and children under 18
unless entering with an immigrating parent. Parents of adult U.S. citizens (persons seeking IR-5 visas)

www.nilc.org

LOS ANGELES (Headquarters)
3450 Wilshire Blvd. Box #108 – 62
Los Angeles, CA 90010
213 639-3900
213 639-3911 fax

WASHINGTON, DC
PO Box No. 34573
Washington, DC 20043
202 216-0261
202 216-0266 fax

must be able to show that their health care would not impose a substantial burden on the U.S. health care system.  The information required on the DS-5541 is intended to be presented in an oral interview format.

The DS-5541 is wholly insufficient to implement this problematic policy. It provides no information about how the consular officer is to determine whether the person being interviewed is subject to its scope. For example, it fails to explain the standards or process for determining that an IR-5 visa applicant's health care costs won't 'impose a substantial burden' on the U.S. health care system. The form fails to communicate what types of health insurance satisfy the Proclamation's requirements and leaves unclear whether the oral interview will be the first time an intending immigrant learns about this new obligation. In addition, it provides no information about the evidence an applicant needs to present.

Moreover, the proposed implementation of the information collection as an oral interview presents the risk of inconsistent questioning and inequitable outcomes, with no formal collection of information to be preserved for later review. No standards are provided to determine the applicant's ability or intention to purchase medical insurance within 30 days of admission.

**The Proclamation**

In addition to our concerns about the information collection process, we strongly object to the underlying policy created by the Proclamation.

The stated reason for the Proclamation is a pretense for adopting another policy that would restrict immigration. The Proclamation pretends to suspend the entry of persons whom the President finds detrimental to the interests of the U.S., by denying immigrant visas to individuals whose entry would "financially burden the U.S. healthcare system." In support of this claim, the Proclamation asserts, without reference to research, that care provided to the uninsured results in uncompensated care costs that are passed on to "the American people" as higher taxes, higher premiums and higher fees for medical services. The Proclamation further asserts, without providing a source, that the health care system's problems with uncompensated care are exacerbated by the admission of persons who have not demonstrated the ability to pay for their health care costs.

The Proclamation's stated rationale ignores the fact that a small fraction of the U.S. uninsured population is comprised of immigrants, as well as the reasons that immigrants are uninsured at higher rates than U.S. Citizens. Of the 27.4 million nonelderly persons without insurance in the U.S., only about 15% are lawfully present immigrants.[1] The vast majority are U.S. citizens. Immigrants are more likely to be uninsured because of policy choices, including restrictive eligibility rules in public programs, and policies, such as public charge, that discourage eligible immigrants from participating in programs for which they are eligible.[2]

The Proclamation's claims about the effects of uninsured immigrants are likewise suspect. When people without insurance seek health care, they are generally billed for services and are often asked to pay before receiving treatment for non-emergency conditions. Moreover, public and private programs often offset the costs of uncompensated care, and there is limited evidence that uncompensated care causes hospitals to charge higher prices to others. In fact, immigrants benefit the health care system. They are generally younger and healthier and use less health care than the U.S. population as a whole,

---

[1] President Trump's Proclamation Suspending Entry for Immigrants without Health Coverage (Kaiser Family Foundation, October 10, 2019) https://www.kff.org/disparities-policy/fact-sheet/president-trumps-proclamation-suspending-entry-for-immigrants-without-health-coverage/
[2] Id.

pay more in health insurance premiums than they receive in benefits, and are net contributors to the Medicare trust fund.[3]

No explanation or justification is offered for the Proclamation's 30-day timeline, the designation of the insurance products that are 'approved' or the exclusion of Medicaid for adults and private insurance plans purchased with the subsidies created by the Affordable Care Act (ACA).

The Proclamation is unworkable by design. The U.S. health insurance market is so uniquely complex that the Centers for Medicare and Medicaid Services (CMS) spends millions of dollars each year for outreach, education, and enrollment assistance to help consumers enroll in coverage.[4] It is unreasonable to assume that people residing outside of the U.S. will understand the available options and choose a health insurance product.

Some applicants may be able to select a plan through the assistance of U.S.-resident relatives. However, consumers will rarely be able to enroll in health insurance coverage until they begin residing in the state in which they will obtain coverage.  This means they are unlikely to have detailed information about the coverage at the time of their consular interview.

While the stated purpose of the Proclamation is to reduce uncompensated health care costs, it is more likely to reduce the number of people enrolled in comprehensive health insurance.

Congress intended that lawfully present immigrants, including recent entrants, with incomes under 400% of the Federal Poverty Line obtain comprehensive coverage through Medicaid or if ineligible, through ACA marketplace plans with premium tax credits. The Proclamation effectively puts those sources of coverage out of the reach of new immigrants, driving those without employer, family or TriCare coverage toward short-term or other substandard plans that may not cover needed medical services. If individuals opt for such a plan and get sick or injured, they will have trouble affording out-of-pocket expenses, and medical providers will carry the burden of uncompensated care.

Implementation of the Proclamation, which is slated to occur just days after the beginning of the ACA's open enrollment period, will add to the fear and confusion affecting immigrant and mixed-status families and discourage them from enrolling. U.S. residents may fear that enrolling in coverage with ACA premium tax credits or Medicaid will interfere with their families' immigration goals. As a result, the proclamation will raise uninsured rates among lawfully present immigrants and their U.S. citizen family members. This, in turn, will increase the need for uncompensated care, exacerbating the very problem the proclamation purports to address.[5]

---

[3] Lila Flavin, Leah Zallman, Danny McCormick, and J. Wesley Boyd, Medical Expenditures on and by Immigrant Populations in the United States: A Systematic Review, (Boston, MA: Tufts University School of Medicine, 2018), https://doi.org/10.1177%2F0020731418791963; Leah Zallman, Steffie Woolhandler, Sharon Touw, David U. Himmelstein, and Karen E. Finnegan, Immigrants Pay More In Private Insurance Premiums Than They Receive In Benefits (Health Affairs, October, 2018) https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2018.0309, Leah Zallman, Steffie Woolhandler, David Himmelstein, David Bor, and Danny McCormick, Immigrants Contributed An Estimated $115.2 Billion More To The Medicare Trust Fund Than They Took Out In 2002–09, https://www.healthaffairs.org/doi/10.1377/hlthaff.2012.1223
[4] Katie Keith, CMS To Maintain Navigator Funding At $10 Million For 2020, 2021 (Health Affairs, May 29, 2019) https://www.healthaffairs.org/do/10.1377/hblog20190529.659554/full/, New Call for Applications: $ 6 Million Available to Help Increase Enrollment of American Indian and Alaska Native Children in Medicaid and CHIP, InsureKidsNow.Gov, https://www.insurekidsnow.gov/campaign/funding-opportunity/index.html
[5] Brief of Amici Curiae, City and County of San Francisco and County of Santa Clara v. U.S. Citizenship and Immigration Services, et al., No. 4:19-CV-04717, https://www.aha.org/system/files/media/file/2019/09/amici-curiae-brief-of-aha-hospital-groups-on-dhs-public-charge-rule-9-11-1019.pdf

**Emergency Review Process**

OMB has not provided a satisfactory explanation for its publication of the information collection notice with a 48-hour comment period. Emergency approvals are to be used in very limited circumstances where the standard Paperwork Reduction Act (PRA) period would result in public harm or cause the agency to miss a court date or statutory deadline. There is no law that requires implementation of the Proclamation by November 3, and there is no basis for believing that any problems resulting from the presence of uninsured immigrants will be exacerbated during a standard PRA clearance process.

Taking adequate time to develop, seek comments on, and evaluate an estimate of the burdens of the information collection will not cause any significant harm, much less a harm so great as to necessitate the emergency approval of this information collection instrument.  As the Department's notice points out, the Proclamation only provides that the Secretary of State "may" establish standards to implement this policy; it imposes no deadline on the establishment of those standards.  The Department should do so in a thoughtful and transparent manner, soliciting public comment in the usual manner for a period sufficient to draw useful information from the public.

**Evaluate whether the proposed information collection is necessary for the proper functions of the Department:**

The information collection implements a policy that creates a new health insurance mandate for certain individuals seeking to immigrate to the United States.  This is not necessary for the proper functioning of the Department.

The Department has no expertise in implementing a health insurance mandate and the mandate serves no purpose that furthers the objectives of the Department.  Design and implementation of mandates to obtain health insurance is extremely complicated, as evidenced by the extensive deliberations and rule-making the Department of the Treasury, the Department of Health and Human Services, and other agencies undertook over several years to implement the Affordable Care Act.  The Department lacks the expertise that those agencies relied upon and certainly cannot design a workable mandate without a meaningful opportunity for public comment.

**Evaluate the accuracy of our estimate of the time and cost burden of this proposed collection, including the validity of the methodology and assumptions used.**

The estimate of ten minutes per response is highly implausible. First, the fact that the questions will be asked in an oral interview will inevitably lead to questions from applicants, prolonging the interview process. Second, if applicants know about the Proclamation's requirements in advance, the ten-minute estimate fails to account for the time they will need to spend learning about the complex U.S. insurance market, researching the availability of health insurance products that can be purchased from outside the country (if any) and selecting a product.

The ten-minute estimate is particularly problematic in the case of applicants who plan to rely on their own resources. These individuals and consular officers would need to understand their health status, the treatment protocols accepted in the U.S. for their health conditions and the costs of those treatments. Because different providers have very different rates, applicants may need to "shop" for providers long-distance to obtain rate information that will allow them to qualify. In a country in which

000462

'surprise medical bills' resonates as a political issue, it's hard to imagine how anyone outside the U.S. could estimate the cost of receiving treatment here accurately.[6]

**How the Department can enhance the quality, utility, and clarity of the information to be collected.**

The Department can enhance the quality, utility, and clarity of the information to be collected by limiting the request to information readily known by the prospective immigrant.  In most cases, prospective immigrants know only whether they intend to seek health insurance coverage upon arrival in the U.S. or, if not, whether they have a given level of financial resources.  The Department should limit its information collection request to those facts alone.

**Conclusion**

NILC strongly opposes the proposed information collection and the proclamation on which it is based. We respectfully request that the information collection be withdrawn.

Please contact me if additional information is required. I can be reached by email at lessard@nilc.org.

Respectfully,


Gabrielle Lessard
Senior Policy Attorney

---

[6] Emmarie Huetteman, Legislation To End Surprise Medical Bills Has High Public Support — In Both Parties (Kaiser Health News, Sept. 119, 2019) https://khn.org/news/legislation-to-end-surprise-medical-bills-has-high-public-support-in-both-parties/



**national partnership**
**for women & families**
Because actions speak louder than words.

October 31, 2019

Department of State, Office of Information and Regulatory Affairs, Office of Management and
Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

**Re: Notice of Information Collection Under OMB Emergency Review; Immigrant
Health Insurance Coverage**

To whom it may concern:

I write on behalf of the National Partnership for Women & Families in response to the
Emergency Submission Comment on Immigrant Health Insurance Coverage. The National
Partnership works to improve the lives of women and families by achieving equality for all
women, and I write to register our adamant opposition to the presidential proclamation on
Immigrant Health Insurance Coverage.

The Administration's move to deny entry or residency to those without proof of health insurance
is the latest assault on the health and well-being of women and families in a relentless campaign.

That includes the callous separation of children from their parents at the border, the deaths of
migrant children while in U.S. custody, placing pregnant women in detainment, the inhumane
conditions for in detention, and the threat to deport immigrants who seek Medicaid or any public
assistance.

 This shameful policy places immigrant women and their families at tremendous risk.
Proponents of the policy make the dubious claim that it will alleviate high health care costs.  But
the reality is that it is yet one more attempt to sabotage the Affordable Care Act-completely
failing to address the underlying challenges of our health care system, while further victimizing
immigrants. If enacted, it will disproportionately harm immigrant women of color and poorer
immigrants. The message could not be more explicit, only those who are wealthy and white are
welcome.

This proclamation violates the core principles of our democracy, as exemplified by the 48-hour
comment period under the pretense of an emergency. We strongly urge the Administration to
rescind this proclamation before it goes into effect.

Sincerely,

Debra L. Ness
President

1875 connecticut avenue, nw ~ suite 650 ~ washington, dc 20009 ~ phone: 202.986.2600 ~ fax: 202.986.2539
email: info@nationalpartnership.org ~ web: nationalpartnership.org



**Department of Consumer and Business Services**
Oregon Health Insurance Marketplace
350 Winter St. NE
P.O. Box 14480
Salem, OR 97309-0405
855-268-3767
Fax: 503-315-9144
oregonhealthcare.gov

October 31, 2019

Submitted Electronically Only (www.regulations.gov)
Department of State Desk Officer in the Office of Information and Regulatory Affairs at the
Office of Management and Budget (OMB)
Department of State's Bureau of Consular Affairs, Office of Visa Services.

Re: Notice of Information Collection Under OMB Emergency Review: Immigrant Health
Insurance Coverage; Docket Number: DOS-2019-0039; DN: 2019-23639;

To Whom It May Concern:

I write this letter on behalf of the Oregon Health Insurance Marketplace (Marketplace) to
comment on the Notice of Information Collection Under OMB Emergency Review: Immigrant
Health Insurance Coverage published in the Federal Register on Oct. 30, 2019.

The Marketplace helps Oregonians get coverage when they are not eligible for the Oregon
Health Plan and don't get health insurance through their job or another program. It is a state-
based marketplace using the federal platform (SBM-FP) authorized under state law and the
Affordable Care Act (ACA). The Marketplace is tasked to ensure Oregonians have equitable
access to high-quality, affordable health coverage and to promote universal health coverage in
the state. Today, the Marketplace covers more than 148,000 Oregonians.

You requested comments to permit the Department of State to:

(1) Evaluate whether the proposed information collection is necessary for the proper functions of
the Department.

(2) Evaluate the accuracy of our estimate of the time and cost burden of this proposed collection,
including the validity of the methodology and assumptions used.

(3) Enhance the quality, utility, and clarity of the information to be collected.

(4) Minimize the reporting burden on those who are to respond, including the use of automated
collection techniques or other forms of information technology.

The Department of State, through its consular officers proposes to "verbally ask immigrant visa applicants covered by [Presidential Proclamation 9945 (]PP 9945[)] whether they will be covered by health insurance in the United States within 30 days of entry to the United States and, if so, for details relating to such insurance." "If applicants answer affirmatively, consular officers will ask for applicants to identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary."

The information requested is not necessary for the "proper functions of the Department." The Department could certainly function, as it has for decades, without requesting or receiving the indicated information.

The State of Oregon opposes the Department of State's overbroad and vague grant of authority to consular officers to ask "such other information related to the insurance plan as the consular officer deems necessary." The grant fails to create a single standard for all similarly situated individuals, which will result in similarly situated immigrants treated differently based on the whims of a consular officer. The grant also presumes a level of expertise in identifying the types of health insurance coverage named in PP 9945 that would be unreasonable to expect from a consular official.

The State of Oregon agrees that a verbal ask for the name of the insurance plan and the date coverage is to begin is reasonable and poses a minimal burden on an immigrant. However, we cannot say the same for the request of "such other information related to the insurance plan as the consular officer deems necessary." Depending on what information the consular officer believes is necessary, the information requested could be burdensome and could result in the erroneous denial of a visa. The State of Oregon urges the government to limit the request to the name of the insurance plan and date of coverage so that all similarly situated people are afforded the same protection and benefit under the law.

The Marketplace supports the verbal ask and receipt of information as an appropriate and minimally burdensome method for obtaining the information. While the method of collecting the information is certainly reasonable, the underlying policy basis for requesting the information is not. It is unreasonable for PP 9945 to impose an individual mandate to purchase health insurance coverage on new immigrants when neither Congress nor this administration supports an individual mandate on citizens and existing immigrants.

PP 9945 creates a catch-22 situation: Under existing federal law, immigrants cannot access insurance through Marketplaces without verifying residency and lawful presence through a strict eligibility process this federal administration has championed. Yet, under PP 9945, those seeking to establish residency and lawful presence through proper immigration channels cannot do so without verifying insurance status. As a result, people who otherwise could become lawfully present immigrants and qualify for health insurance under federal law will be barred from both aims. This paradox is contrary to federal law and illogical in its practical result.

000466

The United States is a country of immigrants. In recognition of this fact, Congress has created laws that benefit immigrants. The ACA is, in part, one such law. The ACA allows legally present immigrants to benefit from premium tax credits. PP 9945 negates this part of the ACA by denying entrance to the United States to immigrants based on their legal and legitimate right to premium tax credits.

PP 9945 shows disregard for the economic and health benefits of ensuring access to health insurance coverage for all immigrant residents, including the working poor who are still in progress on the path to economic security.

Because immigrants will not be able to seek health insurance through marketplaces, PP 9945 undermines the health of Oregon's insurance market, potentially affecting coverage for immigrants and nonimmigrants alike.

Beyond the immediate harms to lawfully present immigrants being barred from accessing insurance through marketplaces such as HealthCare.gov, the proclamation undermines our commercial insurance market by seeking to excise lawfully present immigrants from the coverage to which they are legally entitled. Lawfully present immigrants in Oregon are more likely to represent "favorable" insurance risk, because they are often younger, healthier, or lower-than-average users of health care services when compared to the general insured population. Several studies have concluded that immigrants are net contributors to both private coverage and Medicare, paying more in insurance premiums than they receive in benefits.

Of further concern, the proclamation seeks to permit Short-Term Limited-Duration Plan (STLDP) coverage to qualify as "acceptable" coverage. This type of coverage does not comply with the Affordable Care Act's consumer protections, nor those codified in Oregon's insurance code. Such plans have been widely demonstrated to lack critical comprehensive coverage and can be prohibitively expensive for people with pre-existing conditions. Qualified legal immigrants' health and financial well-being are threatened when they are diverted from meaningful, comprehensive coverage to which they are legally entitled and instead directed towards companies that engage in medical underwriting, spend the majority of premium revenue on nonmedical expenses, and are known to exclude core benefits such as maternity, mental health, and substance use disorder treatment. This will also lead to people with such coverage, winding up with unpaid medical bills, placing undue financial burden on the state's hospital system.

Finally, we strongly object to the two-day comment period afforded to the public on this proposal, which will profoundly affect our immigration and health care systems. Two days is wholly inadequate to allow for the sufficient public consideration that a policy of this significance merits, and this policy in no way constitutes an emergency.

000467

Therefore, we urge you to withdraw and reconsider this policy, and we request that reasonable time be provided for public analysis and comment on any subsequent related proposal.

Chiqui Flowers
Administrator
Oregon Health Insurance Marketplace
Department of Consumer and Business Services
State of Oregon

000468

October 31, 2019

U.S. Secretary of State Michael R. Pompeo
U.S. Department of State
2201 C Street NW
Washington, DC 20520

RE: Notice of Information Collection Under OMB Emergency Review: Immigrant Health
Insurance Coverage, Public Notice 10934, Form Number DS-5541

Dear Secretary Pompeo:

While the methodology proposed for implementing the Presidential Proclamation on the
Suspension of Entry of Immigrants Who Wil Financially Burden the United States Healthcare
System ("PP 9945") seems to be relatively simple, the proposal fails to understand the
complexity of obtaining health insurance coverage for the United States. As a result, the
proposed methodology would limit visa applicants to fewer insurance options than are including
in PP 9945 and open visa applicants up to be victims of fraudulent or misleading sale of
insurance. I am writing as an expert in health insurance in the United States that studies some of
the insurance markets discussed in PP 9945.

**PP 9945 Fails to Meet Its Own Stated Goal to Ensure Immigrants Can Cover Foreseeable
Medical Expenses**

The limitations included in PP 9945 already limit visa applicants to in the type of insurance that
would qualify for entry into the United States. However, included in the list of insurance that
does qualify are some types of insurance that actually fail to meet the stated goal of the
proclamation to cover reasonably foreseeable medical costs. This is because some of the
insurance products that are listed in PP 9945, including short-term limited duration insurance and
travel insurance, have numerous limits in coverage, including limits in how much they will
reimburse for services, a maximum amount the policy will pay in claims, and exclusions for
preexisting conditions. Given that potential immigrants could foresee having medical expenses
related to preexisting conditions, encouraging visa applicants to purchase insurance that excludes
coverage for such conditions seems counter to the goal as it will leave immigrants with
uncovered medical expenses for foreseeable conditions. At the same time, PP 9945 specifically
prohibits enrollment in an individual market health insurance plan using a tax subsidy, even
though such plans are not allowed to exclude coverage for preexisting conditions and have to
meet numerous coverage requirements laid out in the Patient Protection and Affordable Care Act
(ACA), including the coverage of the essential health benefits, a limit on the total amount of out-
of-pocket costs an enrollee will be liable for, and a prohibition on annual or lifetime maximums
on the amount the insurer will reimburse. As a result, PP 9945 is already creating a difficult
framework for the State Department.

Overview of Short-Term Limited Duration Insurance

Short-term limited duration insurance (short-term plans) are plans that were initially designed for brief gaps in coverage. These are insurance plans that are not designed to be comprehensive in nature or to meet all foreseeable medical expenses. Almost all short-term plans require enrollees answer medical questions to determine eligibility. Applicants can be denied a short-term plan because they are pregnant, undergoing fertility treatment, or an expectant father. In addition, applicants can be denied coverage because in the last five years they "showed signs or symptoms of" things such as chest pain, diabetes, or any neurological disorder. The image below is a health questionnaire for the short-term insurer National General.

*Required

## Eligibility Questions

Please answer for you and any of your dependents applying for coverage.

* 1. Will any applicant have other health insurance in force on the policy effective date or be eligible for Medicaid?  [Yes] [No]

* 2. Are you or any applicant:  [Yes] [No]

  a. Now pregnant, an expectant father, in process of adoption, or undergoing infertility treatment?

  b. Over 300 pounds if male or over 250 pounds if female?

* 3. Within the last 5 years has any applicant been diagnosed, treated, or taken medication for or experienced signs or symptoms of any of the following: cancer or tumor, stroke, heart disease including heart attack, chest pain or had heart surgery, COPD (chronic obstructive pulmonary disease) or emphysema, Crohn's disease, liver disorder, degenerative disc disease or herniation/bulge, rheumatoid arthritis, kidney disorder, diabetes, degenerative joint disease of the knee, alcohol abuse or chemical dependency, or any neurological disorder?  [Yes] [No]

* 4. Within the last 5 years has any applicant been diagnosed or treated by a physician or medical practitioner for Acquired Immune Deficiency Syndrome (AIDS) or tested positive for Human Immunodeficiency Virus (HIV)?  [Yes] [No]

* 5. Have you been hospitalized for mental illness in the last 5 years or have you seen a psychiatrist more than 5 times during the last 12 months?  [Yes] [No]

2

Some short-term plans may not be available to recent immigrants to the United States. A part of the application for short-term plans for United Health One ask "Has any applicant lived in the 50 states of the USA or the District of Columbia for **less than** the past 12 months?"

For immigrants that are able to obtain short-term plans, the coverage is often very limited. Short-term plans do not provide coverage for maternity except for complications of pregnancy.[1] This means that even immigrants who become pregnant after moving to the United States will not have insurance coverage for the pregnancy, being forced to pay out of pocket or having uncompensated care. In addition, since the plans exclude prenatal care there is a great chance that the pregnancy will not be healthy. In addition, one study found only 57% of short-term plans covered mental health services, 37% cover substance use treatment, and 29% cover prescription drugs.[2] Short-term plans often have limits on the amount they will reimburse well below the actual cost of services, leaving enrollees with huge medical bills. For example, some plans will limit hospital room and board to $1000 a day, adding only $250 more for intensive care.[3] And a plan that does cover substance use treatment only reimburses $100 a day for inpatient services which would not cover any medication assisted inpatient treatment. In addition, short-term plans limit the total amount they will pay in claims during a contract period, sometimes as low as $100,000. It is because of these very limitations that ten states passed new laws or issued new regulations in 2018 alone to limit or even ban short-term plans.[4]

Overview of Travel Insurance

Travel insurance is primarily designed for people visiting the United States and not for people expecting to be long term residents. These plans generally have various limits that may not be easily understood to people unfamiliar with health costs in the United States. For example, a brochure for one carrier appears to offer very comprehensive coverage, but the summary of benefits is not clear if it pays for inpatient hospital services not specifically listed.[5] While the summary of benefits does list a maximum reimbursement for hospital room and board and information on surgeon fees, it is not clear if all inpatient hospital services that would traditionally be covered by an insurance plan on the individual market in the United States are covered. This could potentially leave enrollees with tens of thousands in uncovered costs. This plan also has a $50,000 lifetime maximum on preexisting conditions which means an individual that has a very high cost surgery, such as a ten-hour heart surgery, could face tens of thousands of dollars in uncovered costs if the heart condition is determined to be a preexisting condition.

Other travel insurance is very limited and not even close to what is offered on the individual health insurance market in the United States. For example, one carrier offers plans that have limit

---

[1] Karen Pollitz, et. al., *Understanding Short-Term Limited Duration Health Insurance*, Kaiser Family Foundation (April 2018).

[2] IBID.

[3] Dania Palanker, JoAnn Volk, and Kevin Lucia, *Short-Term Health Plans Gaps and Limits Leave People at Risk*, Commonwealth Fund To The Point Blog (Oct. 2018).

[4] Dania Palanker, Maanasa Kona, and Emily Curran, *States Step Up To Protect Insurance Markets from Short-Term Health Plans*, Commonwealth Fund (May 2019).

[5] Global Medical Insurance, Plan Brochure, IMG

the amount the insurer will pay under the contract to between $50,000 and $150,000.[6] The plans appear to be what is known as fixed indemnity coverage, which is insurance that pays a fixed dollar amount for every covered service which can be well below the actual cost of service. For example, this carrier limits surgeon fees to between $4,000 and $7,500 per surgical session, which could be well below the cost of surgeon fees for a very long, complicated surgery. This insurer also only covers between $400 and $800 per emergency room visit, even though emergency room visits can cost thousands of dollars. Finally, the plans only cover $350 towards prescriptions during the coverage period, which would effectively leave any enrollee on a high cost medication without prescription drug coverage. These plans also exclude preexisting conditions, allowing applicants to purchase a rider that covers only three physician visits for the preexisting condition and limiting reimbursement for medications for preexisting conditions to $100 and limiting reimbursement or for emergency room or inpatient services to $1000 for preexisting conditions, therefore effectively not covering hospitalization for preexisting conditions. Plans such as these do not actually provide protection to immigrants for foreseeable health needs.

**Visa Applicants Cannot Purchase Most Insurance Before Entering the United States**

In general, individuals are required to reside within a state before purchasing a health insurance plan. While there have been political discussions and proposals to allow the sale of health insurance across state lines, state regulators have resisted such proposals as they undermine the states' abilities to protect their residents.[7] This is because non-employment based health insurance is primarily regulated by the states. In order for states to have regulatory authority over the product, the plan must be sold and issued within the state. As a result, visa applicants are not actually able to obtain health insurance prior to moving to the United States. While applicants may be able to choose a plan they will apply for, there is no guarantee of coverage before becoming a resident of the United States. In fact, the ACA specifically require that plans sold on the marketplace, even without a subsidy, are only eligible to lawfully present individuals. This means that an individual applying for a visa cannot be found eligible for such coverage. They can be eligible after they move to the United States. As a result, the request for specific information about the health insurance plan, and the date coverage will begin, is unworkable for most types of insurance coverage that meet the requirements of PP 9945. The two exceptions are employer based coverage, if an applicant knows that they are eligible for coverage through their employer or as a dependent of an employee, and travel insurance. There are some potential concerns with timing of employer based coverage that could push applicants to have to purchase travel insurance as the only option. Employers are allowed to have a waiting period of up to 90 days before coverage begins. Some visa applicants may choose to move to the United States weeks or months before a job begins in an effort to settle into a new country.

This leaves visa applicants with travel insurance as the primary option of insurance if they are required to know the start date and have other information or any guaranty that they have been

---

[6] Choice America, Plan Brochure, Visitors Coverage.
[7] Sabrina Corlette and Kevin Lucia,
https://www.healthaffairs.org/do/10.1377/hblog20170223.058888/full/
Health Affairs Blog (Feb. 2017).

approved for coverage. This is contrary to PP 9945 which clearly lists other types of insurance that can qualify for a obtaining a visa. It also leaves immigrants with only the option to purchase coverage that is not designed for people residing in the United States, but rather for tourists and people making short trips. It also leaves visa applicants with only a option that has numerous coverage limits including many plans that exclude coverage for what could be seen as foreseeable medical expenses, especially since the Department seems to be defining foreseeable medical expenses as expenses related to a preexisting condition, as it states "relating to health issues existing at the time of visa adjudication." As a result, this proposal will limit visas to individuals without any medical conditions unless they are wealthy or have an offer of employment related coverage that will begin within 30 days of moving to the United States. Such a proposal could exclude visa applicants with a variety of health conditions and could be seen as inadvertently only allowing healthy visa applicants to be awarded visas.

**The Department and Consular Offices Need to Be Prepared for Fraud and Misleading Sales Practices**

The change to visa requirements opens the doors for bad actors to mislead visa applicants into purchasing coverage that either does not meet the requirements of PP 9945, does not provide the coverage the immigrant is expecting, or does not provide coverage at all. States are already expressing concern about misleading or fraudulent sale of health insurance within the United States.[8] For individuals shopping for coverage online, if marketing practices are similar to within the United States it will make it very difficult for many visa applicants to make an informed choice. To begin with, health insurance in the United States is very complicated. There are many terms that even Americans are not always familiar with that would be foreign concepts to many visa applicants, such as "deductible," "coinsurance," "copayments," "out of pocket maximum," and "formularies." This makes the process for shopping for travel insurance online extremely difficult for visa applicants.

However, something to add even more complexity is how health insurance s sold online, at least within the United States. When people shop for health insurance online, they are often directed by search engines to websites that are not selling the type of insurance they are looking for. In many instances, websites that show are up are something called lead generating sites. Lead generating sites do not sell health insurance. They may connect consumers to other websites selling insurance, but the often just gather personal contact information that is farmed out to agents, brokers, and call centers. When attempting to search for comprehensive coverage, consumers may be directed to a lead generating site that results in calls from brokers trying to sell short-term insurance or other limited benefit products.[9] Once a consumer provides

---

[8] Dania Palanker, JoAnn Volk, Maanasa Kona, *Seeing Fraud and Misleading Marketing, States Warn Consumers About Alternative Health Insurance Products*, Commonwealth Fund To The Point Blog (Oct. 2019).

[9] Sabrina Corlette, et. al., *The Marketing of Short-Term Health Plans: An Assessment of Industry Practices and State Regulatory Responses*, Robert Wood Johnson Foundation and Urban Institute (Jan. 2019).

000473

information to a lad generating website, they can be inundated with phone calls from brokers and agents, some of whom are selling limited benefit plans. The phone calls with these broker and agents are fast moving sales calls. Credit card numbers for first months' premiums and association fees are required before any information is provided in writing.[10] If similar practices are used to sell insurance to visa applicants in other countries, then applicants may be sold products without understanding their limitations. In some instances, the products may not meet the requirements necessary to receive a visa. However, the United States would likely have no authority to regulate these types of sales practices as they are occurring mostly in other countries. Visa applicants could be denied applications after spending hundreds of dollars on what they believe is qualifying insurance, or may be approved for a visa with a belief that they have good health insurance that will fail to meet their needs. This is especially true given the high cost of health care in the United States which may make it harder for visa applicants to comprehend how low the limits in travel insurance are compared to the actual cost of care.

Sincerely,

Dania Palanker
Assistant Research Professor
Georgetown University, McCourt School of Public Policy

---

[10] Ibid.

6

000474



801 Albany Street
1st Floor
Boston, MA 02119

Phone: 617.414.6366
Fax: 617.414.7915
www.childrenshealthwatch.org

October 31, 2019

Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget

Office of Visa Services
Bureau of Consular Affairs
Office of Visa Services

Re: "Notice of Information collection Under OMB Emergency Review: Immigrant Health Insurance Coverage"
Docket Number: DOS-2019-0039

To Whom It May Concern:

Thank you for the opportunity to comment on the Department of State's (DOS) interim final rule for "Notice of Information collection Under OMB Emergency Review: Immigrant Health Insurance Coverage" published on October 30, 2019. On behalf of Children's HealthWatch, a network of pediatricians, public health researchers, and policy and child health experts, please accept these comments and our opposition in the strongest possible terms to this rule change that will threaten the health and well-being of families of immigrants, including children.

Access to affordable health care is critical for the health of young children and their parents. Our research shows when families with infants and toddlers are unable to afford health care for themselves or their children, or have to sacrifice other basic needs to afford medical care, the health of their child is placed at risk.[1] Public health insurance, however, buffers families from the high costs of medical care and prescription medicines, ensuring they are able to seek care when they need it. Research from other groups shows children with adequate health insurance coverage are more likely to receive preventive care and immunizations than those who lack coverage.[2] Conversely, studies indicate that reducing health insurance coverage among children has long-term negative effects on children's health, educational attainment, and financial stability as adults.[3] The Proclamation threatens to undermine the nation's health and the health of children and families by restricting immigrants' ability to purchase such comprehensive health insurance available through the Affordable Care Act (ACA) marketplaces. Congress elected to make lawfully residing immigrants eligible for subsidized marketplace coverage because doing so advances the health of our nation. The Proclamation puts the nation's health at risk by ignoring Congress and instead requiring individuals to buy costly and less comprehensive health coverage.

To support the health of all people in the U.S., we support a nation where all are able to thrive. Immigrants are vital members of our communities and ensuring they have access to the essentials of life without regard to where they were born is critical for our nation's health. As part of this vision, we support access to comprehensive, affordable health care—and efforts to strengthen and protect the hospitals, community health centers, and providers who work tirelessly to deliver high quality care to their patients. Despite its claim, the President's Proclamation is not about improving access to health care or making sure hospitals are paid. Instead, it serves as yet another constraint on legal immigration by imposing a wealth test that will disproportionately harm people of color. Further, this Proclamation

acts as an extension to the Department of Homeland Security Public Charge rule, which we oppose and is currently under injunction and is the subject of twenty-one lawsuits.  These lawsuits argue that the new regulations discriminate against low-income people from developing countries and undermine the well-being of children whose families might avoid using nutritional, health and other assistance programs.[4] This Proclamation and other recent and proposed immigration policies are unacceptable. Research tells us that immigrants come to the U.S. for many reasons, including fleeing violence, relocating after natural disasters, seeking economic opportunity, and more. By only allowing those with existing wealth and resources to immigrate to the United States, we are distancing ourselves from the American value of opportunity, forgetting the lower income origins of many of our forebears, and harming the health of children and vital communities within our country.

The President has further justified this Proclamation by saying that legal immigrants are more likely than American citizens to lack health insurance, making them a burden on hospitals and taxpayers in the United States. While many immigrant parents work, often holding full-time jobs, they are disproportionately more likely to work low-wage jobs that do not provide private health insurance.[5] Because of this, Medicaid and other health insurance available on the ACA marketplace provide critical health coverage to families and children with noncitizen parents. Notably, the Proclamation allows short-term plans, which do not comply with the ACA's consumer protections, to qualify as "acceptable" coverage. Frequently referred to as "junk plans," short-term plans lack comprehensive coverage and can be prohibitively expensive for individuals with pre-existing conditions. Increasing access to these plans could siphon off healthy individuals from traditional health insurance, driving up premiums and putting the market at risk.[6] By only allowing immigrants to participate in or purchase these types of plans, instead of affordable and comprehensive health insurance, the change under the Proclamation would actually increase health care costs. Furthermore, forcing immigrants to avoid comprehensive insurance could increase uncompensated care costs for providers, when patients can't afford needed health care that is not covered by these bare-bones plans. This does not qualify as promoting health insurance – this is, rather, putting a barrier between individuals and the coverage for which they are eligible. By doing so, scientific evidence tells us that the health of children and adults will be harmed.

This Proclamation does harm: It will drive up national healthcare and education costs and impair over the long-term our national health, educational achievement, and economic status. It builds an invisible wall to keep out legal immigrants, and is an affront to the American Dream of the opportunity for prosperity and success through hard work and upward mobility. However, there is still time to protect the nation's health and values before the proclamation goes into effect. We strongly oppose any administrative action that would harm the health of children and their families and urge the administration to immediately withdraw this Proclamation in its entirety.

Sincerely,

Megan Sandel MD, MPH
Co-Lead Principal Investigator, Children's
HealthWatch
Boston, MA

Diana Becker Cutts, MD
Co-Lead Principal Investigator, Children's
HealthWatch
Minneapolis, MN

Stephanie Ettinger de Cuba, MPH
Executive Director, Children's HealthWatch

Mariana Chilton, PhD, MPH
Director, Center for Hunger-Free Communities
Principal Investigator, Children's HealthWatch

Deborah A. Frank, MD
Principal Investigator and Founder, Children's
HealthWatch
Boston, MA

John Cook, PhD, MAEd
Principal Investigator, Children's HealthWatch
Boston, MA

Eduardo Ochoa Jr., MD
Principal Investigator, Children's HealthWatch
Little Rock, AR

Patrick H. Casey, MD
Principal Investigator, Children's HealthWatch
Little Rock, AR

Maureen Black, PhD
Principal Investigator, Children's HealthWatch
Baltimore, MD

000477

801 Albany Street
1st Floor
Boston, MA 02119

Phone: 617.414.6366
Fax: 617.414.7915
www.childrenshealthwatch.org

[1] Ettinger de Cuba S, Sheward R, Poindexter D, Bovell-Ammon A, Ochoa E. Affordable health care keeps children and families healthy. Children's HealthWatch. 2018.

[2] Artiga A, Ubri P. Key Issues in Children's Health Coverage. Kaiser Family Foundation. 2017; Retrieved from: https://www.kff.org/medicaid/issue-brief/key-issues-in-childrens-health-coverage/

[3] Berkowitz S, Seligman H, Rigdon J. Supplemental Nutrition Assistance Program (SNAP) participation and health care expenditures among low-income adults. JAMA, 2017;177(11):1642-1649

[4] Jordan M. Judges strike several blows to Trump immigration policies. *The New York Times*. October 11, 2019. Available at https://www.nytimes.com/2019/10/11/us/immigration-public-charge-injunction.html

[5] Kaiser Family Foundation. Health Coverage of Immigrants. December 2017. Available at: https://www.kff.org/disparities-policy/fact-sheet/health-coverage-of-immigrants/

[6] The Commonwealth Fund. Non-ACA-compliant health plans. Available at https://www.commonwealthfund.org/trending/non-aca-compliant-health-plans

**Steve Sisolak**
*Governor*

**Florence Jameson, MD**
*Chairwoman*

000478

**Heather Korbulic**
*Executive Director*

# Silver State Health Insurance Exchange

2310 South Carson Street, Suite 2      Carson City, NV 89701      T: 775-687-9939      F: 775-687-9932

www.nevadahealthlink.com/sshix

October 31, 2019

Edward J. Ramotowski
Deputy Assistant Secretary
Office of Visa Services
Bureau of Consular Affairs
U.S. Department of State
600 19th Street, NW
Washington, DC 20036

**Subject**: Notice of Information Collection under OMB Emergency Review: Immigrant Health Insurance Coverage

Dear Mr. Ramotowski,

The Silver State Health Insurance Exchange ("SSHIX") is the state-based Marketplace ("SBM") authorized under state law and the Affordable Care Act ("ACA"). SSHIX doing business as Nevada Health Link, is designed to connect qualified Nevadan's to affordable insurance. Currently it is estimated that roughly 80% of Nevada's consumers using the SBM are eligible to receive subsides. Under the Presidential Proclamation on the suspension of entry of immigrants who will financially burden the United States healthcare system will pose risks with ensuring lawful residents have access to affordable health care and prevent SSHIX from providing qualified lawful residents access to affordable healthcare.

SSHIX objects to the Proclamation as it will create barriers for lawful residents to access affordable care through the utilization of subsidies which they would otherwise be eligible for. In addition, this policy creates a concern as to the enforcement and reporting metrics associated with the Proclamation.

Respectfully,

Jamie Sawyer

Policy and Compliance Manager

000479



Protecting Immigrant
Women and Girls
Fleeing Violence

October 31, 2019

U.S. Department of State Desk Officer
Office of Information and Regulatory Affairs
Office of Management and Budget

Office of Visa Services
Bureau of Consular Affairs
U.S. Department of State

*Submitted via* https://www.regulations.gov/document?D= DOS-2019-0039-0001

**Re:    Comments in Response to Notice of Information Collection Under OMB
Emergency Review: Immigrant Health Insurance Coverage, Docket No.
DOS-2019-0039, 84 Fed. Reg. 58,199**

Dear Desk Officer:

The Tahirih Justice Center (Tahirih) is pleased to submit the following
comments in response to the Notice of Information Collection Under OMB
Emergency Review: Immigrant Health Insurance Coverage. The Notice, which was
published in the Federal Register on October 30, 2019, relates to the
implementation of Presidential Proclamation 9945, which purports to require
applicants for immigrant visas to establish that they will be covered by an
"approved health insurance plan within 30 days of entry into the United States."
84 Fed. Reg. at 58,199.

Tahirih is a national, nonpartisan policy and direct services organization
that has assisted over 25,000 immigrant survivors of gender-based violence
throughout the past twenty-one years. Our clients endure unimaginable
atrocities such as human trafficking, domestic violence, forced marriage, honor
crimes, and sexual assault.

Tahirih urges that the Notice be immediately withdrawn, because the
Proclamation it seeks to implement is illegal and therefore lacks the force of law.
As an initial matter, the underlying Proclamation exceeds the authority of the
executive branch. The Proclamation could affect up to two-thirds of applicants
for immigrant visas. Far from constituting a rational implementation of the
Immigration and Nationality Act, such a sweeping ban directly undermines the
statutory scheme.

The Proclamation nevertheless invokes presidential authority under 8
U.S.C. § 1182(f) to find that the entry of certain individuals "would be
detrimental to the interests of the United States." But the Proclamation contains

**Baltimore**
201 N. Charles St.
Suite 920
Baltimore, MD 21201
Tel: 410-999-1900
Fax: 410-630-7539
Baltimore@tahirih.org

**Greater DC | National**
6402 Arlington Blvd.
Suite 300
Tel: 571-282-6161
Fax: 571-282-6162
TTY: 711
Falls Church, VA 22042
GreaterDC@tahirih.org
Justice@tahirih.org

**Houston**
1717 St. James Place
Suite 450
Houston, TX 77056
Tel: 713-496-0100
Fax: 713-481-1793
Houston@tahirih.org

**San Francisco Bay Area**
881 Sneath Lane
Suite 115
San Bruno, CA 94066
Tel: 650-270-2100
Fax: 650-466-0006
SFBayArea@tahirih.org

www.tahirih.org

no findings of fact to support its claim that immigrants who cannot immediately obtain the listed types of health insurance are detrimental to the United States. And there is no plausible justification, on national security grounds or otherwise, for such a finding.

The Proclamation's effects on survivors of domestic abuse exemplify its underlying infirmities. The Proclamation appears on its face to apply to self-petitioners under the Violence Against Women Act (VAWA) who file their petitions outside the United States. As the Department of Homeland Security has recognized, Congress enacted the self-petitioning regime to allow survivors of "domestic violence, battery, and extreme cruelty" to "independently seek legal immigration status in the" United States. USCIS, *Fact Sheet: USCIS Issues Guidance for Approved Violence Against Women Act (VAWA) Self-Petitioners*, https://www.uscis.gov/archive/archive-news/fact-sheet-uscis-issues-guidance-approved-violence-against-women-act-vawa-self-petitioners. Congress did so because abusers routinely "threaten to withhold immigration sponsorship as a tool of abuse." *Id.*; *see also* USCIS, *Battered Spouse, Children & Parents*, https://www.uscis.gov/humanitarian/battered-spouse-children-parents (self-petitioning allows survivors "to seek both safety and independence from their abuser, who is not notified of the filing"). By requiring self-petitioners outside the United States to seek "approved" health insurance, however, the Proclamation effectively requires many survivors to remain dependent on their abusers, who can now threaten to withhold health insurance—and thus immigration status—as a tool of abuse. That result directly undermines VAWA and therefore unquestionably exceeds presidential authority under § 1182(f).

The Proclamation also appears to apply to derivatives of VAWA self-petitioners who are between 18 and 21 years old and to all children and spouses of former asylees and former T- and U-visa holders who are now lawful permanent residents. These family members will be barred from entering the country unless they can afford the expensive types of health insurance that are considered "approved." And the types of insurance that are approved make clear that this bar is not intended to improve health outcomes or the U.S. economy. Rather, it is—like the illegal public-charge rules previously issued by the Department of State and the Department of Homeland Security—simply a method of barring entry to poorer immigrants. After all, subsidized, comprehensive health insurance plans under the Affordable Care Act is not approved under the Proclamation—but expensive, short-term, non-comprehensive "junk" insurance plans *are* approved.

In addition to exceeding executive authority under § 1182(f), the Proclamation is also illegal for a host of other reasons. At a minimum, the Proclamation violates the equal-protection and due process rights of prospective immigrants; violates the substantive provisions of the Administrative Procedure Act (APA) because it is both arbitrary and contrary to law; and violates the procedural aspects of the APA because it announces a sweeping change in policy without a rational explanation and without prior notice and comment.

000481

Furthermore, because the Proclamation is illegal, it lacks the force of law. There is accordingly no basis for attempting to force OMB review to completion on an emergency basis—and the issuance of the Notice with only a 2-day comment period has prejudiced Tahirih and other potential commenters by preventing them from fully responding to the issues raised in the Notice and the underlying Proclamation. The Notice should accordingly be withdrawn. Instead, the Department of State should issue a request for substantive comments on the implementation of the Proclamation (as required by the APA) and then seek OMB review in the ordinary course.

Sincerely,

s/Richard Caldarone

Richard Caldarone
Litigation Counsel

000482

**THE**
**LEGAL AID**
**SOCIETY**
**CIVIL**

Law Reform Unit
199 Water Street
New York, NY 10038
(212) 577-3300
www.legal-aid.org

Tel  (212) 577-3320
Fax  (646) 616-4018
SEWelber@legal-aid.org

Blaine (Fin) V. Fogg
*President*

Janet E. Sabel
*Attorney-in-Chief*
*Chief Executive Officer*

Adriene L. Holder
*Attorney–in–Charge*
Civil Practice

Judith Goldiner
*Attorney-in-Charge*
Law Reform Unit

October 31, 2019

*Submitted via www.regulations.gov*

United States Department of State
Office of Information and Regulatory Affairs
Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa
Services

Re:  *Docket ID No. DOS-2019-0039, Notice of Information*
*Collection Under OMB Emergency Review: Immigrant Health*
*Insurance Coverage; Form DS-5541*

To Whom it May Concern:

The Legal Aid Society hereby responds to the request for comments on the Notice of
Information Collection Under Office of Management and Budget Emergency Review for the
Immigrant Health Insurance Coverage ("Information Collection Request") published in the Federal
Register on October 30, 2109, 84 Fed. Reg. 58,199 (Oct. 30, 2019), concerning The Presidential
Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the U.S.
Healthcare System (the "Proclamation"), 84 Fed. Reg. 53,991 (Oct. 4, 2019), due to go into effect on
November 3, 2019. The Proclamation represents yet another illegal attempt by this Administration to
close the door on family reunification, which has long been the cornerstone of our immigration
policy. It forces immigrants into an impossible choice between purchasing unaffordable, possibly
low-quality health coverage, or missing out on an opportunity to come to this country to be with
their families and contribute to our communities. Accordingly, The Legal Aid Society calls on the
Office of Management and Budget (OMB) not to grant emergency clearance for this Information
Collection Request and to further reject the Proclamation and disapprove its implementation. The
Department of State (DOS) does not meet the requirements for an emergency clearance, and the
Proclamation should not go into effect because it would fundamentally change our nation's
immigration law and is based on a fundamental misunderstanding of our health insurance system.

## I.  Background.

The Legal Aid Society was founded in 1876 to defend the individual rights of German
immigrants who could not afford a lawyer as they pursued a better life in New York City. Today we
stand as the nation's oldest and largest not-for-profit legal services organization. Through three
major practice areas—Civil, Criminal, and Juvenile Rights—the Society's 2,000 attorneys, paralegal
case handlers, support staff and volunteers coordinated by our *Pro Bono* program handle
approximately 300,000 cases a year in city, state, and federal courts through a network of borough,

**Justice in Every Borough.**

neighborhood, and courthouse-based offices in 27 locations in New York City. We provide comprehensive legal services to fulfill our mission that no New Yorker should be denied access to justice because of poverty.

Immigrants, rich and poor, constitute vast swaths of the U.S. population and make vital contributions to our country generally and to New York City especially. The positive contributions of immigrants are felt in every corner of our communities, in myriad ways. Immigrants help fuel the strength and growth of our economy. Immigrants occupy numerous positions within our government. They work in the city's medical facilities. They are teachers and university students and corporate employees. In addition, they are consumers, and their presence keeps our city's industries thriving.

Though Legal Aid has broadened its practice over time, we have remained committed to our original mission: helping low-income immigrant communities. Our Immigration Law Unit utilizes the expertise of more than 60 attorneys, paralegals, and social workers to serve low-income immigrant New Yorkers seeking legal assistance before the U.S. Citizenship and Immigration Services (USCIS) and in immigration and federal courts. We represent people threatened with removal, some of whom are in detention, file habeas petitions seeking the release of people unlawfully detained, represent unaccompanied minors fleeing violence in Central America, assist numerous Deferred Action for Childhood Arrivals and Temporary Protected Status recipients with renewing their status and seek a wide range of immigration relief, including naturalization, adjustment of status, Violence Against Women Act self-petitions, U visas, T visas, asylum, Special Immigration Juvenile Status, removal of conditions and family petitions. We also seek relief in court when there is no other way to protect our clients. *See, e.g., Make the Road NY et al. v. Cuccinelli*, 19-cv-7993 (S.D.N.Y. filed Aug. 27, 2019).

Our Health Law Unit provides advice and representation to low-income New Yorkers, including to immigrant New Yorkers who face barriers accessing health insurance and health care services to which they are entitled by law. We advocate for access to health care for all New Yorkers through individual representation as well as policy and legislative advocacy, and have been instrumental in establishing access to health care for non-citizens in New York. *See, e.g., Aliessa v. Novello,* 754 N.E.2d 1085 (2001).

Immigrants are not only served by our Immigration Law Unit and our Health Law Unit. We serve low-income immigrants in every area of our practice – whether preventing the loss of an apartment in housing court, obtaining disability and other government benefits, addressing wage and hour law violations, providing tax advice or handling divorce and custody matters.

**Justice in Every Borough.**

Comments of The Legal Aid Society
October 31, 2019
Page 3

**II.  The Legal Aid Society calls on the Office of Management and Budget not to grant the DOS request for emergency clearance for the Information Collection Request and to reject the Proclamation and disapprove its implementation.**

**A.  OMB Should Not Grant Emergency Clearance for the Information Collection Request**

This Comment focuses on the impact the Proclamation would have on immigration and health care, but as a threshold matter, we urge OMB to deny emergency clearance for the Information Collection Request for the following reasons.

*First*, the public has been given less than 48 hours to respond to the Information Collection Request.  This is insufficient time for the public, including many key stakeholders, to provide meaningful feedback, and this is reason alone to deny the request for emergency clearance. *Second*, the DOS fails to meet the criteria for emergency clearance under the Paperwork Reduction Act.[1] The November 3, 2019 deadline for implementation of the Proclamation is arbitrary and not justified where the Proclamation is fundamentally flawed and illegal, for some of the reasons described below. Nor is there any cognizable emergency that the Proclamation is necessary to address. In contrast, the Proclamation will *create* emergencies for many immigrant families, as described below. *Finally*, the Information Collection Request fails to offer any meaningful guidance regarding how an applicant for an immigrant visa would establish that he or she will not impose a burden on the U.S. healthcare system as required under the Proclamation.

**B.  The Health Proclamation Should Never Be Implemented**

The health Proclamation is fundamentally flawed, and should be withdrawn immediately for the following reasons as discussed below: (1) the Proclamation would fundamentally change U.S. immigration law by causing approximately 375,000 immigrants, or close to two-thirds of non-citizens being denied entry and admission to the U.S.;[2] (2) the Proclamation would undermine U.S. policy to promote access to quality health care; and (3) the Proclamation will result in barring Legal Aid's low-income immigrant clients, especially immigrants of color, from the U.S. in a discriminatory way, and undermine New York State's successful efforts to promote access to affordable health care.

**1.  The Proclamation Would Fundamentally Change U.S. Immigration Law by Causing Approximately 375,000 Non-Citizens to be Denied Entry and Admission**

---

[1] *See* "A guide to the Paperwork Reduction Act," Office of Information and Regulatory Affairs (OIRA), OMB at https://pra.digital.gov.

[2] Nicole Narea and Alex Ward, *Trump quietly cut legal immigration by up to 65%*, Vox, Oct. 30, 2019, https://www.vox.com/2019/10/9/20903541/trump-proclamation-legal-immigration-health-insurance.

**Justice in Every Borough.**

Comments of The Legal Aid Society
October 31, 2019
Page 4

to the U.S.

The Proclamation would deny entry into the U.S. to people seeking family-based immigrant visas and some others if they cannot establish that they will be covered by specific insurance products within 30 days after entry or if they cannot show they are healthy and/or wealthy enough to pay out-of-pocket for "reasonably foreseeable medical expenses."

The Proclamation would apply to people seeking immigrant visas abroad, including: spouses of U.S. citizens and lawful permanent residents (LPRs); children of LPRs who are 18-21 years old; children under 18 if travelling with a parent who is also immigrating; adult sons and daughters of U.S. citizens and LPRs; people with diversity visas or employment-based immigrant visas; and some religious workers. The Proclamation would also apply to parents of U.S. citizens who cannot show that their health care will not impose a substantial burden on the U.S. health care system. If enacted, the Proclamation is estimated to reduce legal immigration to the U.S. by nearly two-thirds (375,000 people), and affect nearly all diversity and family-based immigrants.[3]

These 375,000 people are noncitizens who otherwise would have been legally permitted under the Immigration and Nationality Act (INA), a law duly passed by Congress, to immigrate to the United States. In issuing this Proclamation, the President and the Administration contravene Congress and seek to undermine the U.S. immigration system.

**2. The Proclamation Would Undermine U.S. Policy to Promote Access to Quality Health Care.**

The stated purpose of the health Proclamation is to ensure that providers are paid and that people pay less in taxes and premiums to cover medical expenses for those "who lack health insurance or the ability to pay for their healthcare,"[4] yet the Proclamation would undermine rather than further its stated purpose. There are three major areas of concern discussed below: (1) by deeming subsidized, comprehensive Affordable Care Act (ACA) plans unacceptable, the Proclamation would make access to comprehensive health insurance impossible for all but a narrow group of intending immigrants; (2) the Proclamation's approval of non-ACA-compliant short-term health plans (a/k/a "junk plans"), would increase uncompensated care costs and would limit access to care, making individuals and communities sicker; and (3) the Proclamation will further add to the "chilling effect" caused by other Trump Administration policies such as the Public Charge rule,

---

[3] *See* Narea and Ward, *supra* note 2.
[4] Donald J. Trump, Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System (issued Oct. 4, 2019), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-suspension-entry-immigrants-will-financially-burden-united-states-healthcare-system/ (last visited Oct. 31, 2019).

**Justice in Every Borough.**

creating fear in immigrant communities that prevents immigrants from accessing health insurance coverage and health services to which they are legally entitled.

> **a. By deeming subsidized, comprehensive ACA plans unacceptable, the Proclamation would make access to comprehensive health insurance impossible for all but a narrow group of intending immigrants**.

By deeming subsidized, comprehensive ACA plans unacceptable, the Proclamation would make access to comprehensive health insurance impossible for all but a narrow group of intending immigrants. For those immigrants who do not qualify for Medicare or TRICARE, or for those whose employers do not provide insurance or who cannot enroll in a family member's plan, they will have to choose between a prohibitively costly, unsubsidized comprehensive health insurance plan or a short-term, "junk" plan.

Comprehensive health insurance – that is, health insurance that actually protects consumers' as well as providers' interests – is, if unsubsidized, prohibitively expensive in New York State. For instance, in 2019, the average monthly premium for a Silver plan for a 40-year-old nonsmoker seeking insurance only for herself hovers between $581-627.[5] If she seeks coverage for herself, her husband and her two minor children, the monthly cost of an unsubsidized Silver plan increases to somewhere between $1656-1789.[6] Immigrants seeking to come to this country in search of a better life may work low-wage and often undesirable jobs that do not offer health insurance. Paying out-of-pocket for unsubsidized, comprehensive health insurance is entirely out of the question.

Through the ACA, Congress elected to make health insurance and corresponding subsidies available to lawfully residing immigrants. Not only does this Proclamation undermine Congress, but it undermines its own stated goals: when people cannot afford comprehensive health insurance, uncompensated care goes up and individuals and their communities become less healthy. The Proclamation also disregards the fact that subsidized insurance is available to those earning up to 400% of the Federal Poverty Limit, or more than $103,000 for a family of four. The fact that the minimally subsidized insurance available to families with six figures of income is unacceptable under the Proclamation clearly shows that it is intended to limit admission to this country to only the wealthiest immigrants.

> **b. The Proclamation Would Result in the Use of Junk Plans in Contravention of the ACA.**

By approving non-ACA-compliant short-term health plans (a/k/a "junk plans"), the

---

[5] *See* New York State of Health, Compare Plans and Estimate Cost, https://nystateofhealth.ny.gov/individual/searchAnonymousPlan/search (last visited Oct. 31, 2019).
[6] *See id.* https://www.kff.org/interactive/subsidy-calculator/

**Justice in Every Borough.**

Comments of The Legal Aid Society
October 31, 2019
Page 6

Proclamation would increase uncompensated care costs and would limit access to care, making individuals and communities sicker.

Immigrants seeking to come to New York, home to approximately 2.02 million noncitizens,[7] do not have the option of purchasing a short-term/junk plan. New York prohibits the sale of junk plans in the state[8] precisely to protect New Yorkers' physical and financial health. Junk plans are insufficient in the face of a serious medical condition or emergency: for instance, they do not have to cover preventive services, maternity care, and prescription drugs, and impose dollar limits on coverage. In other words, these short-term/junk plans do not cover essential health benefits. Moreover, because these junk plans do not comply with insurance renewability requirements under New York law, by barring the sale of junk plans, New York has limited uncompensated care costs for hospitals and providers and protected its residents. At least one rationale claimed for the Proclamation is the need to prevent use of emergency rooms for non-emergency conditions and to prevent uncompensated care. Allowing short-term/junk plans but not subsidized, comprehensive, ACA-compliant coverage only increases the likelihood of emergency room use for non-emergency conditions and the prospect of uncompensated care, putting further strain on the health providers and taxpayers the Proclamation purports to protect.

> c. **The Proclamation will exacerbate the "chilling effect" preventing immigrants from accessing health insurance and health care services, harming community health and the economy.**

Trump Administration policies targeting immigrants, including the currently enjoined Public Charge rule, have already created a significant chilling effect that has prevented immigrants from accessing health insurance coverage to which they are entitled, and even caused some to forgo essential health treatments because of fear of negative immigration consequences. The Proclamation will add to the environment of fear around accessing health coverage and other public benefits. Immigrants who forgo needed health treatments may suffer from preventable illnesses, adding to the long-term costs on the health care system.

> 3. **The Proclamation Will Result in Barring Legal Aid's Low-income Immigrant Clients, Especially Immigrants of Color, from the U.S. in a Discriminatory Way and Undermine New York State's Successful Efforts to Promote Access to Affordable Health Care.**

---

[7] Migration Policy Institute (MPI), State Immigration Data Profiles: New York (2016), available at: https://www.migrationpolicy.org/data/state-profiles/state/demographics/NY (deriving tabulations of data from the U.S. Census Bureau's American Community Survey (ACS) and Decennial Census).

[8] Letter from Lisette Johnson, Bureau Chief, Health Bureau, New York State Department of Financial Services to All Insurers Authorized to Write Accident and Health Insurance in New York State, Article 43 Corporations, and Health Maintenance Organizations, Re: Prohibition on Short-Term Limited Duration Plans (June 21, 2018), available at: https://www.dfs.ny.gov/insurance/circltr/2018/cl2018_07.htm.

**Justice in Every Borough.**

Comments of The Legal Aid Society
October 31, 2019
Page 7

The Administration not only does a poor job disguising its goal to impose a wealth test on people – who are primarily people of color – seeking to come to this country, but it puts the nation's health at risk and in so doing wastes the nation's dollars in ineffective and hurtful ways.

The Presidential Proclamation would serve to effectively bar almost all of our family-based intending immigrant clients, who are all low-income (by definition, being clients of The Legal Aid Society). Purchasing at least 364 days of approved health insurance would be impossibly expensive for most of them, if not all. Very few clients would satisfy the alternate prong of having the financial resources to pay for their reasonably foreseeable medical costs. The Proclamation is one more attempt by this Administration to radically transform immigration by closing the door on family reunification, which has long been the cornerstone of our immigration policy.

For all the foregoing reasons, The Legal Aid Society calls on the Office of Management and Budget to refrain from granting emergency clearance for the Information Collection Request and to further reject the Proclamation and disapprove its implementation.

Sincerely,

Rebecca Antar Novick, Director, Health Law Unit
Lillian Ringel, Staff Attorney, Health Law Unit
Susan E. Welber, Staff Attorney, Law Reform Unit
Civil Practice
The Legal Aid Society
199 Water Street
New York, NY 10038
Tel: (212) 577-3300
RANovick@legal-aid.org
LRingel@legal-aid.org
SEWelber@legal-aid.org

**Justice in Every Borough.**

000489



PO Box 6149
Aloha, OR 97007

3305 NW Aloclek
Drive
Hillsboro, OR 97124

**P** (503) 352.8647
**F** (503) 359.8532

VirginiaGarcia.org

October 31, 2019

Department of State, Office of Information and Regulatory Affairs, Office of Management and Budget
Department of State's Bureau of Consular Affairs, Office of Visa Services
Docket Number: DOS-2019-0039

Re: Emergency Submission Comment on Immigrant Health Insurance Coverage

On behalf of Virginia Garcia Memorial Health Center, we appreciate the opportunity to comment on *DOS-2019-0039 Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage.*

The proposed changes would deny entry into the US to low-income immigrants without proof of access to insurance or the ability to pay for insurance. This new rule would cause serious harm to the thousands of immigrants coming to the US.

The notion that any new resident of the US could be called a "burden" is inaccurate – our new US residents pay taxes, contribute to civic life and strengthen the very backbone of our country. According to the National Immigration Forum: "[i]mmigrants pay the same taxes we all do — federal income tax, social security tax, Medicare tax, property tax, state income tax, sales tax, and so on. The taxes they pay help to cover federal and state services that benefit communities everywhere. In 2014, immigrants paid an estimated $328 billion in state, local, and federal taxes. Immigrants paid more than a quarter of all taxes in California, and they paid nearly a quarter of all taxes in New York and New Jersey."

This proposal also fails to recognize that the Medicaid program was created to ensure broader access to health care to those with barriers, as well as to ultimately decrease costs to tax payers by ensuring people are healthy and not utilizing the emergency room. This proposal also fails to recognize that our new residents will be paying into this program as part of their paycheck – and therefore are entitled to access as anyone else.

The proposed rule should be immediately withdrawn. It is misguided and unfairly targets immigrants and low-income families.

Sincerely,

Gil Muñoz
CEO

## <u>DECLARATION OF JAMES MCMILLIAN</u>

I, James McMillian, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am employed by the U.S. Department of State, as a Visa Policy Analyst in the Education and Tourism Division, Office of Field Operations of the Visa Office, Bureau of Consular Affairs. The Field Operations Office supports and monitors visa operations at Foreign Service posts around the world.

2. In that capacity, I helped coordinate logistics for two webinars conducted on October 24, 2019, by the Visa Office with consular sections at Foreign Service posts around the world.  We delivered the webinar using a platform called Adobe Connect, which allowed the presenters from the Visa Office to display a slideshow prepared using the software application PowerPoint while they gave their presentation.  Officers who participated at our consular sections around the world were able to communicate with the presenters using a chat feature, which allowed the audience to ask questions or make comments. The presenters then responded orally to the questions and comments from participants. After the webinars concluded, I downloaded a copy of the chat transcripts from Adobe Connect of both webinars.  I certify that the transcripts accurately reflect the content of the chat transcripts that were generated from the October 24 webinars.


I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

June 5, 2020
/s/ James J. McMillian
James J. McMillian, Visa Policy Analyst
Education and Tourism Division
Office of Field Operations, Visa Office
Bureau of Consular Affairs
United States Department of State

000491

**Wooten, April J**

---

| | |
|---|---|
| **From:** | McMillian, James J |
| **Sent:** | Thursday, October 24, 2019 6:36 AM |
| **To:** | Lee, Edith H; Fifield, Joel A |
| **Subject:** | FW: Adobe Connect - Chat Transcript from Presidential Proclamation on Protecting Healthcare Benefits |

Here's the text from the chat history just in case you'd like to use it to formulate or ad lib for your next presentation.
-James

SBU - DELIBERATIVE PROCESS

-----Original Message-----
From: McMillianJJ@state.gov <McMillianJJ@state.gov>
Sent: Thursday, October 24, 2019 9:33 AM
To: McMillian, James J <McMillianJJ@state.gov>
Subject: Adobe Connect - Chat Transcript from Presidential Proclamation on Protecting Healthcare Benefits

  Joel Fifield & Edie Lee:Welcome everyone, we will begin at 8:30
  KUWAIT 2:Is anybody else having trouble with the access code?
  Islamabad IV Unit:it worked ok for us
  KUWAIT 2:Thank you
  Bill Gilbert (Beirut):access code?
  Joel Fifield & Edie Lee:██████████
  Nairobi IV:The access code is not working for us.
  Kingston IV:Ref access code - press 0 to speak to an operator, and they'll take care of it
  Abidjan Consular:We were able to call in with the access code but the sound keeps cutting out. Can you repeat - does this apply to K visa applicants?
  Angola:Abidjan - I believe he said no
  Joel Fifield & Edie Lee:It does not apply to K visas
  Kim 2:yet IR5 applicant are more likely to have greater likely need of health care.
  Islamabad IV Unit:With the IR5 exception, does that mean that if the med exam shows no medical conditions, officers may assume they will NOT be a burden and are therefore exempt?
  Guayaquil:Are adult children covered unde the exception or just minor children?
  Kathmandu:Questions from Kathmandu: Will other SIVs (outside of Iraq and Afghanistan) be impacted?
  Bill Gilbert (Beirut):sound quality is breaking up
  Amman CONS:How are we mean to determine what is an expected cost of a given medical condition?
  Rio de Janeiro IV:can we assume that the insurance will cover in the absence of information, or 221G for a letter from the insurance company about what they will do?
  Kim 2:sound is breaking up
  IV Santo Domingo:will post have to CLOKDEL an HC1 refusal that has been overcome?
  Nairobi IV:Are there any court cases pending about the PP?  Will we be informed if it is enjoined?
  Dakar:For applicants subject to the PP, is a verbal statement during the interview that he or she has or intends to obtain insurance within 30 days of entry sufficient to overcome?
  Abidjan Consular:Did anyone else just lose the call?
  Accra FPU:Thinking about FPU resources, to what extent should we be verifying documentation of health care coverage?

000492

Cairo:Since we are not medical providers, how do we know what various conditions costs and also what is considered substantial?

Rio de Janeiro IV:how much money is enough to treat diabetes?

Montreal:you just said IR1 and CR1 are exempt regardless of age. Did you mean IR2 and CR2?

London IV:how do we consider pregnancy in this review if applicant is class A?

Amman CONS:Can you please say again when/if the AOS or JS docs may be sufficient to confirm resources?

RCO Bangkok - Abby Aronson:Is post required to dig into the insurance to make sure pre-existing/the condition the app has will be covered?

Paris NIV/IV Team:Paris is also intersted to hear about how/whether to consider pregnancy as part of this assessment.

Kingston IV:a search on Google of 'how much does it cost to treat diabetes', for example, reveals an answer of about $85,000 over a lifetime

Athens:Will there be a list of states where immigrants can participate in ACA marketplaces?

Lima:Or will post receive a resource list to refer people looking for health insurance?

Port-au-Prince IV:Could you please repeat the information about HC1 and the automatic revocation of an approved I601A waiver?

ankara:I think you skipped the pregnancy one from London - could you address it?

Paris NIV/IV Team:They covered it- said that it's a foreseeable medical expense and should be assessed accordingly.

Paris NIV/IV Team:Either with financial means to cover pregnancy/birth costs or health insurance.

Rio de Janeiro IV:an 8 year old and an 85 year old with diabetes might have different costs of treatment over their lifetime.  it is complicated.

Guayaquil:Not to mention Type 1 Diabetes costs versus Type 2

Guayaquil:Will you be sending out the slidedeck?

Amman CONS:At ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Embassy Kabul:▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Islamabad IV Unit:▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Kathmandu:▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

London IV:will CA/P have talking points when this is implemented?

yerevan:Will ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Gabe:Where can we find these slides?

Dakar:How long is "reasonably foreseeable"? Is it one year, the validity of the current medical exam, something less?

Amman CONS:With the NOV 3 impelmentation date of the PP....to clarify, if we have ISSUED prior to NOV 3, the PP does not apply.  But if we interviewed on the 2nd, for example, but didn't print, we must then retroactively apply the PP to these cases for issuance?

Athens:Barring HC1 exceptions, how can someone inelgible under HC1 overcome a 4 ineligibility?

Rio de Janeiro IV:just to be clear, we can use the information in 5540 to satisfy the Presidential Proclamation requirements, correct?

Islamabad IV Unit:Could you please reiterate what you said about the relationship between an I-184 that meets 213A and HC1?  Did you said that if an applicant has a sponsor who has an I-184 that is sufficient mean the applicant has demonstrated that he/she is OK on HC1?

Islamabad IV Unit:ok. thanks for the clarification

Rio de Janeiro IV:thanks

Amman CONS:thank you!

Joel Fifield & Edie Lee:Thank you everyone!

**Wooten, April J**

| | |
|---|---|
| **From:** | McMillian, James J |
| **Sent:** | Wednesday, November 20, 2019 4:57 AM |
| **To:** | Lee, Edith H |
| **Subject:** | FW: Adobe Connect - Chat Transcript from Presidential Proclamation on Protecting Healthcare Benefits |

Edie,
Here you are.

-----Original Message-----
From: McMillianJJ@state.gov <McMillianJJ@state.gov>
Sent: Wednesday, November 20, 2019 7:56 AM
To: McMillian, James J <McMillianJJ@state.gov>
Subject: Adobe Connect - Chat Transcript from Presidential Proclamation on Protecting Healthcare Benefits

Joel Fifield & Edie Lee:Welcome everyone, we will get started in a few minutes.
Joel Fifield & Edie Lee:If you have any questions, you can type them in the chat and we will respond.
Chris Lyerla:Someone asked in a prior webinar if we had any data on immigrant welfare use in the U.S. Here it is: https://cis.org/Report/Welfare-Use-Immigrant-and-Native-Households
CDJ:⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
Kingston (Bates, Ryan):Is any information on the PP being provided to applicants that are currently in the filing process? Second, is a standardized letter prepared when we may refuse under the PP?
La Paz 2:⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
Joel Fifield & Edie Lee:⬛⬛⬛⬛⬛
Sean Boshard:In your opinion what is the likely date of implementation?
CDJ:⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
CDJ:⬛⬛⬛⬛⬛⬛
Ellen in MTL:ICan you go over the exception for minors again?
Ellen in MTL:Yes
Guest 5:A quick note: there's a link in this chat pointing to data on immigrant welfare us in the U.S.  The link provided was from cis.org, (Center for Immigration Studies) , not to be confused with USCIS.  The Center for Immigration Studies is a think tank: https://en.wikipedia.org/wiki/Center_for_Immigration_Studies

000494

```
REC1|APPROVE|10-28-2019|S approved.
REC2|APPROVE|10-28-2019|S approved.
```

201922031
**United States Department of State**

*Washington, D.C.  20520*

~~SENSITIVE BUT UNCLASSIFIED~~                    October 23, 2019

**ACTION MEMO FOR THE SECRETARY**

FROM:       CA – Carl C. Risch

SUBJECT:    ~~(SBU)~~ Standards and Procedures for Presidential Proclamation 9945

BLUF:       ~~(SBU)~~ CA proposes the attached standards and procedures for implementing Presidential Proclamation 9945 (P.P. 9945), *Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans.*

**Recommendations**
~~(SBU)~~ That you:

(1) Approve the attached ALDAC and Foreign Affairs Manual (FAM) guidance with standards and procedures for implementing P.P. 9945.  CA will then transmit the ALDAC and publish the FAM guidance.  (Approve/Disapprove by 10/29/19)

(2) Designate the Assistant Secretary for CA and the Deputy Assistant Secretary for Visa Services to determine that an alien's entry would advance important United States law enforcement objectives under Section 2(b)(vii) or that an alien's entry would be in the national interest under Section 2(b)(viii) of the proclamation.  (Approve/Disapprove by 10/29/19)

**Background**
(U) P.P. 9945 suspends the entry of aliens as immigrants to the United States under Section 212(f) of the Immigration and Nationality Act (8 USC 1182(f)) when the alien's entry will financially burden the United States healthcare system.  Pursuant to P.P. 9945, an alien seeking admission to the United States as an immigrant will financially burden the United States healthcare system unless the alien will be covered by approved health insurance as defined in Section 1, subsection (b) of P.P. 9945 or possesses the financial resources to pay for reasonably foreseeable medical costs.  Section 3(a) of P.P. 9945 states the Secretary of State may establish the standards and procedures to be used by consular officers to determine an alien's ineligibility for entry under P.P. 9945.  Section 2(b)(vii) authorizes the Secretary of State or his designee to determine, based on a recommendation of the Attorney General or his designee, that an alien's entry is not suspended under P.P. 9945 because the alien's entry would further important United States law enforcement objectives.  Section 2(b)(viii) authorizes the Secretary of State or his designee to determine on a case-by-case basis that an alien's entry is not suspended under P.P. 9945 because the alien's entry would be in the national interest.  P.P. 9945 authorizes the

~~SENSITIVE BUT UNCLASSIFIED~~

SENSITIVE BUT UNCLASSIFIED
-2-

Secretary of State to select someone to serve as "his designee" for the authority to determine that an alien's entry would further important law enforcement objectives or be in the national interest.

(SBU) A/S Risch believes the recommended CA officials would be appropriate designees for the authority to determine, based on a recommendation of the Attorney General or his designee, that an alien's entry would further important United States law enforcement objectives and also to determine that an alien's entry would be in the national interest.  Given the potentially large number of applicants for these exceptions, the complicated process involved, and the coordination with consular officers that will be required, CA is well-positioned to make these determinations.

(SBU) CA has drafted standards and procedures to implement P.P. 9945.  With your approval of the guidance, which is required under P.P.9945, CA will publish the guidance at 9 FAM 302.14-11 and announce it by ALDAC.  To inform applicants of this new requirement, CA will update travel.state.gov.  The National Visa Center and Kentucky Consular Center will send a message to all immigrant and diversity visa applicants.  CA will also encourage posts to engage in a concerted effort to inform applicants so that they are adequately prepared to discuss their plans for health care coverage during the visa interview.  In addition, CA/P is preparing a handout that posts can distribute to applicants.

Attachments:
      Tab 1 – Proposed ALDAC on P.P. 9945
      Tab 2 – Proposed FAM Guidance
      Tab 3 – P.P. 9945

SENSITIVE BUT UNCLASSIFIED
-3-

| Approved: | CA: Carl C. Risch | (CCR) |
|---|---|---|
| Drafted: | CA/VO/L/R – Michael Yohannan, | |

| Cleared: | CA: IGBrownlee | (OK) |
|---|---|---|
| | CA: KStoddard | (OK) |
| | CA: JWhiteley | (OK) |
| | CA/VO: ERamotowski | (OK) |
| | CA/VO: SCraig | (OK) |
| | CA/VO/L: DNewman | (OK) |
| | CA/VO/F: SCraig | (OK) |
| | L/CA: NScimeca | (OK) |
| | CA/VO/F: BMarwaha | (OK) |
| | CA/P: LHenderson | (OK) |
| | CA/P: IHillman | (OK) |
| | CA/P: KLandry | (OK) |
| | CA/P: DKierski | (OK) |
| | CA/EX: DBenning | (OK) |
| | CA/EX: JGlazeroff | (OK) |
| | CA/EX/PAS: MEvans | (OK) |
| | S/P: CWeiland | (OK) |
| | P: ERuppel | (OK) |
| | D: KDaucher | (OK) |
| | GPA:NChulick | (OK) |
| | R: JSpellburg | (INFO) |
| | M: LOckerman | (OK) |

**CA Press Guidance**
**October 4, 2019**

### VISAS: Presidential Proclamation on Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System

- On October 4, 2019, the President issued a Presidential Proclamation (P.P.) titled "Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, In Order to Protect the Availability of Healthcare Benefits for Americans."

- Beginning November 3, 2019, in order to demonstrate qualification for entry, immigrant visa applicants — other than those covered by certain exceptions — must demonstrate to a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States, or that they possess the financial resources to pay for reasonably foreseeable medical costs. Inability to do so will result in the denial of the visa application.

- Visa applicants subject to this proclamation must establish that they meet its requirements, to the satisfaction of a consular officer, prior to and in connection with the adjudication and issuance of an immigrant visa.

## Q&A

**Q. What are the exceptions?**

A. The P.P. includes a number of exceptions. The limitation on entry does not apply to:

- Individuals with a valid immigrant visa issued before November 3, 2019

- Iraqi and Afghan special immigrant visas (SI and SQ visas)

- Adopted, biological, and step-children of U.S. citizens (IR2, IR3, IR4, IH3, and IH4)

- Returning Resident SB-1 applicants

- Aliens entering the United States without an immigrant visa, including lawful permanent residents, refugees, and asylees

- Any alien seeking to enter the United States pursuant to an IR-5 visa, provided that the alien or the alien's sponsor demonstrates to the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system

- Any alien under the age of 18 except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation

- Any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee

- Any alien whose entry would  be in the national interest,  as determined by the Secretary of State or his designee on a case-by-case basis

**Q.  What is approved health insurance?**

A.  Approved health insurance includes:

- Employer-sponsored health plans, including retiree plans

- Unsubsidized health plans offered in the individual market within a state

- Short-term, limited duration health plans effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Catastrophic plans

- Coverage by a family member's health plan

- U.S. military health plans, including TRICARE

- Visitor health insurance plans with adequate medical coverage for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Medical plans under the Medicare program

- Any other health plan with adequate coverage as determined by the Secretary of Health and Human Services

For further information and requirements, immigrant visa applicants should review the information provided on travel.state.gov.

**Q.  Does Medicaid or the Children's Health Insurance Program (CHIP) count as approved health insurance?**

A.  Approved health insurance does not include coverage under the Medicaid program, except for health insurance under subchapter XXI of chapter 7 of title 42, United States Code.

**Q.  What is the effective date of the change?**

A.  The Proclamation is effective 30 days from its signing on October 4 2019.

**Q. What would be considered sufficient "financial resources to pay for reasonably forseeable medical costs?"**

A.  Affected applicants must demonstrate that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.  All applications are adjudicated on a case-by-case basis.

**Q.  Who makes the determination of whether an immigrant is qualified or not, and what standards do they use?**

A.  A consular officer will determine whether the applicant is eligible for an immigrant visa based on U.S. law and available information when the applicant applies for a U.S. visa.

**Q.  How are applicants expected to demonstrate they meet this requirement?**

A.  Applicants should be able to demonstrate to the satisfaction of a consular officer that they possess the financial resources to pay for reasonably foreseeable medical costs or, have a plan and ability to obtain health insurance within 30 days of arrival.   Officers will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation if needed.

**Q.  How exactly is an applicant expected to secure health insurance prior to traveling to the U.S.?**

A.  Applicants are not required to secure health insurance prior to traveling to the United States, but must demonstrate to the satisfaction of a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.

**Q.  Why are new immigrants required to purchase health insurance when existing U.S. citizens are exempt from this mandate?**

A.  As the Proclamation notes, admitting aliens as immigrants into this country who are unable to pay for their own healthcare costs puts the burden on American taxpayers and our health infrastructure.  The President has made the determination that immigrants' entry into this country should not burden taxpayers and the healthcare system.

**Q.  Isn't this just another way to restrict family-based immigration, on top of recent changes to Public Charge regulations?**

A.  The Proclamation notes "The United States has a long history of welcoming immigrants who come lawfully in search of the American Dream.  This proclamation continues that tradition while addressing the challenges facing our healthcare infrastructure.  It recognizes that it is in the interests of the United States to protect our healthcare system from the burdens of uncompensated care and that the entry into the United States of certain immigrants who lack health insurance or the ability to pay for their healthcare would be detrimental to these interests."

## **Background**

Link to/text of P.P. goes here.

Drafted by:  David Kierski, 09-11-2019, ▮▮▮▮▮

Clearances:
    VO/F:  NAli          OK
    VO/L:  JFifield       OK
    CA/P:  JWeinshenker  OK
    P:  ERuppel          OK
    D:  KDaucher        OK
    S/P:  CWeiland      OK
    M:  LOckerman     OK
    L:  NScimeca       OK
    WH:  AKennedy     OK

000502

**Talking Points for Congressional Call**
**October 4, 2019**

### VISAS: Presidential Proclamation on Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System

- Today, the President issued a Presidential Proclamation (P.P.) titled "Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, In Order to Protect the Availability of Healthcare Benefits for Americans."

- When the proclamation goes into effect in 30 days (November 3), U.S. immigrant visa applicants will be required to demonstrate to the satisfaction of a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States, *or* that they possess the financial resources to pay for reasonably foreseeable medical costs. Inability to satisfy the stated requirements will result in the denial of the visa application. There will be limited exceptions to the proclamation. (FULL LIST OF EXCEPTIONS FOLLOWS BELOW IN QUESTION 1).

- The proclamation will apply to U.S. immigrant visas only. Nonimmigrant visas will not be impacted.

## Q&A

**Q1. What are the exceptions?**

A. The P.P. includes a number of exceptions. The limitation on entry does not apply to:

- Individuals with a valid immigrant visa issued before November 3, 2019

- Iraqi and Afghan special immigrant visas (SI and SQ visas)

- Adopted, biological, and step-children of U.S. citizens (IR2, IR3, IR4, IH3, and IH4)

- Returning Resident SB-1 applicants

- Aliens entering the United States without an immigrant visa, including lawful permanent residents, refugees, and asylees

- Any alien seeking to enter the United States pursuant to an IR-5 visa, provided that the alien or the alien's sponsor demonstrates to the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system

- Any alien under the age of 18 except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation

- Any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee

- Any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis

**Q2.  What is approved health insurance?**

A.  The proclamation defined approved health insurance.  Approved health insurance includes:

- Employer-sponsored health plans, including retiree plans

- Unsubsidized health plans offered in the individual market within a state

- Short-term, limited duration health plans effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Catastrophic plans

- Coverage by a family member's health plan

- U.S. military health plans, including TRICARE

- Visitor health insurance plans with adequate medical coverage for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Medical plans under the Medicare program

- Any other health plan with adequate coverage as determined by the Secretary of Health and Human Services

**Q3.  Does Medicaid or the Children's Health Insurance Program (CHIP) count as approved health insurance?**

A.  Approved health insurance does not include coverage under the Medicaid program, except for health insurance under subchapter XXI of chapter 7 of title 42, United States Code (the Children's Health Insurance Program (CHIP)).

**Q3.  What is the effective date of the change?**

A.  The Proclamation is effective 30 days from its signing on October 4, 2019.

**Q4.  How much money does an immigrant need to have to be allowed into the U.S.?**

A.  An applicant does not need a set amount of money to qualify for an immigrant visa.  Rather, affected applicants must demonstrate that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.  All applications are adjudicated on a case-by-case basis.

**Q5.  Who makes the determination of whether an immigrant is qualified or not, and what standards do they use?**

A.  A consular officer will determine whether the applicant is eligible for an immigrant visa based on U.S. law and available information when the applicant applies for a U.S. visa.

**Q6.  How are applicants expected to demonstrate they meet this requirement?**

A.  Applicants should be able to demonstrate to the satisfaction of a consular officer that they possess the financial resources to pay for reasonably foreseeable medical costs or, have a plan and ability to obtain health insurance within 30 days of arrival.   Officers will review the medical and financial documentation that is already part of the applicant's case file and may request additional information or documentation if needed.  Applicants may choose to bring documentation of their approved health insurance, ability to obtain approved health insurance, or financial resources to the visa interview, although they are not required to do so.  Consular officers may request additional information or documentation if needed.

**Q7.  How exactly is an applicant expected to secure health insurance prior to traveling to the U.S.?**

A.  Applicants are not required to secure health insurance prior to traveling to the United States, but must demonstrate to the satisfaction of a consular officer that they will be covered by approved health insurance within thirty days of entry into the United States or that they possess the financial resources to pay for reasonably foreseeable medical costs.

**Q8.  Why are new immigrants required to purchase health insurance when existing U.S. citizens are exempt from this mandate?**

A.  As the Proclamation notes, admitting aliens as immigrants into this country who are unable to pay for their own healthcare costs puts the burden on American taxpayers and our health

000505

infrastructure.  The President has made the determination that immigrants' entry into this country should not burden taxpayers and the healthcare system.

**Q9.  Isn't this just another way to restrict family-based immigration, on top of recent changes to Public Charge regulations?**

A.  The Proclamation notes "The United States has a long history of welcoming immigrants who come lawfully in search of brighter futures.  We must continue that tradition while also addressing the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care.  Continuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests."

000506

Drafted by:    Dan Rhodes

Clearances:
       VO/F: ATyson                    (ok)
       CA/VO: ERamotowski           (ok)
       CA/VO:MMesquita               (ok)



# Rules of Engagement

- Please mute your phone
- Presentation will be recorded and posted on CAWeb
- Questions should be asked in the chat box. If we are not able to answer your question either during or at the end of the presentation, we will respond to Post directly.
- Be sure to regularly check CAWeb for updates as FAQs and additional resources are forthcoming.
- If you have questions, reach out to your VO/F and VO/L/A post liaisons.



2

000509

# Presenters

Visa Office/Legal Affairs/Advisory Opinions (VO/L/A)
        Joel Fifield

Visa Office/Field Operations (VO/F)
        Edith Lee



## Agenda

- Presidential Proclamation 9945

- New Public Charge Rule



Today's webinar will cover two items: first, a recent Presidential Proclamation regarding health care for immigrants. And second, a new rule regarding the    public charge ineligibility.

4

## Implementation Timeline

When should posts begin to apply Presidential Proclamation 9945 and the Public Charge Rule?



The Presidential Proclamation and the Public Charge Rule have both been issued. However, you should not begin to implement them until you receive additional guidance from the Visa Office.  We are working through an interagency clearance process to clear certain forms and implementing guidance.  Until that is done, we cannot implement either the Health Care Presidential Proclamation or the public charge rule.

**Due to certain legal considerations, we cannot say exactly when these will be implemented.  The Presidential Proclamation may be ready for implementation by the effective date, November 3, so posts should prepare for that possibility.**

In the meantime, you should continue to follow current guidance in the FAM.  We will let you know when these changes are ready to be implemented with as much advance notice as possible.  We appreciate your patience.

This webinar will provide a general overview of these two changes.

# P.P. 9945

- Presidential Proclamation 9945

   Suspends entry for immigrants who cannot demonstrate:

   (1) Coverage by approved health insurance within 30 days of entry into the United States, or

   (2) Financial resources to pay for reasonably foreseeable medical costs

- Effective November 3, 2019 at 12:01 EDT

- Only applies to IV and DV applicants



While the effective date is November 3, 2019, post should not begin implementing the Proclamation until notified by the Department.

6

000513

## How to Adjudicate P.P. 9945

1. Does an Exception Apply?

2. Financial Resources?

3. Approved Health Care?

The Presidential Proclamation on Healthcare will essentially follow a three-step process.

First – Does the applicant fall within one of the exceptions to the proclamation?  If yes, then you are done.  If not,

Second – Does the applicant have sufficient financial resources to pay for reasonably foreseeable medical costs?  If yes, then you are done.  If not, then

Third – Will the applicant be covered by approved health insurance within 30 days of entry to the United States?  If yes, then you are done. If not, then you would either refuse the applicant 221(g) for additional evidence or under a new refusal code, , as subject to the Proclamation's suspension and limitation of entry.

# 1. Exceptions

- Individuals with a valid immigrant visa as of November 3, 2019



The P.P. is not retroactive.  If someone has a valid IV, they are not subject to the Proclamation even if they have not yet travelled.

8

## Exceptions, Cont'd

- Children of a U.S. citizen (IR-2, CR-2, IR-3, IR-4, IH-3, or IH-4 visas)



The child of a U.S. citizen includes biological children, adopted children, and step-children.

## Exceptions, Cont'd

- IR-5 applicants, if the applicant's healthcare will not impose a substantial burden on the United States healthcare system



IR-5 applicants are largely exempted from the Proclamation, provided that they or their sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a **substantial** burden on the United States healthcare system.  To determine if an alien's healthcare will not impose a substantial burden, you should rely on the medical exam to determine if there are current health issues, including acute or chronic conditions, that will require extensive medical care and likely result in particularly high medical costs.  If the applicant has such a condition, officers must determine if the applicant has either approved health insurance or funds that will be available to cover foreseeable medical costs.  If the applicant has no such conditions, then you can conclude that the alien's healthcare will not impose a substantial burden on the U.S. healthcare system.

## Exceptions, Cont'd

- Any alien under the age of 18, except for those accompanying a parent who is also immigrating to the United States and subject to P.P. 9945



"Accompanying" means derivative applicants who are: (1) in the physical company of the principal applicant; or (2) issued an immigrant visa within six months of the date of issuance of a visa to the principal applicant, the date of adjustment of status in the United States of the principal applicant, or the date on which the principal applicant personally appears and registers before a consular officer abroad to confer foreign state chargeability or immigrant status upon the child. Applicants under the age of 18 who are not considered "accompanying," (i.e., the beneficiary of an immediate relative petition, the principal beneficiary of a family preference petition, or who are following to join the principal applicant) are exempt from the Proclamation.

This can be a bit tricky, so here are some examples.



## Example 1

- F2A Child of an LPR (age 17)

The Proclamation **does not** apply because the F2A is under the age of 18 and not accompanying a parent who is also immigrating to the United States and subject to P.P. 9945



## Example 2

- Derivative Child (age 17) accompanying F2A Spouse of an LPR

The Proclamation **does** apply because it is a child under 18 accompanying their parent who is also subject to the P.P.

## Example 3

- Derivative child (age 17) following-to-join an F1 son or daughter of a U.S. Citizen



The Proclamation **does not** apply because it is a child under 18 who is not accompanying their parent (even though the parent would have been subject to the P.P.), as long as it has been more than 6 months since the issuance of the visa to their parent.

14



# Example 4

- CR2 child accompanying their parent, a CR1 spouse

The Proclamation **does not** apply because a child of a U.S. citizen, including a CR-2 stepchild, falls under its own exception. However, the CR1 spouse will be subject to the Proclamation.

## Exceptions, Cont'd

- Iraqi and Afghan special immigrant visa applicants and their spouses and children (SI and SQ visas)

- Returning Residents (SB-1)

- K fiancé(e) visas, other aliens entering the United States without an immigrant visa, including LPRs, refugees, and asylees



16

## Exceptions, Cont'd

- Law enforcement
- National interest:
  - Foreign Relations
  - National Security
  - Significant Public Interest
  - Urgent Humanitarian or Medical Reasons



Law Enforcement: If you are contacted by a representative from a U.S. law enforcement agency at post about a particular applicant or if the Department informs you that a U.S. law enforcement agency has expressed interest in a particular applicant, you should refuse the applicant under INA 221(g) and submit an email to your VO/F post liaison officer to request the Department's approval of an exemption.

National Interest: The Department (either the A/S or the DAS for Visa Services) can approve an exception on a case-by-case basis in limited circumstances, which will be detailed in the FAM. If you believe one of those is met, you should refuse the applicant 221(g) and submit an email to VO/F.

17

## 2. Financial Resources

- Review case file
  - Medical examination
  - Financial information, Affidavit of Support, etc.

- Reasonably foreseeable medical costs
  - Based on **current** medical state



If you have determined that an exception does not apply, you should then consider whether the applicant has sufficient financial resources to pay for reasonably foreseeable medical costs.

To make this determination, you should consider the medical report by the panel physician and financial information available in an Affidavit of Support, if required.  You can consider funds available to an applicant from a sponsor, as reported on the I-864 Affidavit of Support.

You should only consider the applicant's **current** medical state as reported in the medical exam and should not speculate on an applicant's potential future health.

## Example 1

- IR-1 applicant with "No Class" medical report presents an I-864 from the petitioner that meets the Federal Poverty Guidelines



If you find that an applicant has a qualifying I-864 Affidavit of Support, is healthy and has no reasonably foreseeable medical costs, you can reasonably conclude that the applicant meets the requirement of the Presidential Proclamation for visa issuance.

## Example 2

- DV applicant with "No Class" medical report, limited savings, and no family or friends in the United States. Applicant has reasonable prospects for employment based on education and work experience.



DV applicants aren't required to submit an Affidavit of Support. Even though the applicant does not have any current medical condition, you may find that his or her limited savings represent insufficient financial resources to pay for reasonably foreseeable medical costs. In that case, you would want to look at whether the applicant has or will have approved health insurance within 30 days.

## Example 3

- F4 applicant with "Class B" medical condition and I-864 from a joint sponsor that barely meets the FPG.



In this case, although the applicant has a qualifying Affidavit of Support, you need to consider whether the joint sponsor can be expected to provide sufficient financial resources to pay for reasonably foreseeable medical costs. You should consider the expected cost of the medical condition and can look at the applicant's additional financial resources. However, if the medical condition is expected to result in significant medical costs, you will need to consider whether the applicant has or will have approved health insurance within 30 days.

## 3. Approved Health Insurance

- Currently covered
- Will be covered within 30 days
  - Eligible for an approved health plan
  - Financial means to pay for plan
  - Intent to purchase



If the applicant does not meet one of the exceptions, and does not have sufficient financial resources to pay for reasonably foreseeable medical costs, you should consider whether they currently have or will have within 30 days of entry, "approved health insurance."

Current coverage: Can the applicant show you an insurance card, or their insurance policy?

Coverage within 30 days: Does the applicant have an idea of what plan they intend to apply for and the eligibility requirements, do they have the financial means to pay for the plan, and do they have the intent to obtain the plan within 30 days?

# 3. Approved Health Insurance

- Employer-sponsored health plans, including retiree plans

- Unsubsidized health plans offered in the individual market within a State

- Short-term, limited duration health plans effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Catastrophic plans

- Coverage by a family member's health plan

- U.S. military health plans, including TRICARE

- Visitor health insurance plans with adequate medical coverage for a minimum of 364 days or until the beginning of planned, extended travel outside the United States

- Medical plans under the Medicare program

- Any other health plan with adequate coverage as determined by the Secretary of Health and Human Services



The Presidential Proclamation provides a list of approved health insurance plans. They are listed in the ALDAC and will be published in the FAM.

23



Employer-sponsored health plans are approved health insurance.

## Example 2

- F2B unmarried daughter, age 23, can be added to her petitioning parent's subsidized health insurance plan. The insurance company is unwilling to provide a quote without a medical exam, which the applicant cannot obtain until she immigrates.



Coverage by a family member's health plan qualifies as approved health insurance. This is true even if the coverage is a subsidized health plan on a state's individual market.

## Example 3

- F2A spouse can be added to the petitioner's plan, but the insurance company is unwilling to provide a quote without a medical exam, which the applicant cannot obtain until after he or she immigrates.



While the applicant may not know the exact cost of health insurance, they should be able to provide some estimate as to what they expect to have to pay. You should evaluate the likelihood that they will be able to afford the insurance and intend to do so, based on the information provided by the applicant, the panel physician's medical report, and the Affidavit of Support.

## Example 4

- CR-1 spouse who will be added to the petitioner's plan, but no sooner than 45 days after entry to the United States, due to the insurance company's enrollment process.



The Presidential Proclamation requires coverage within 30 days, so the applicant would not be able to satisfy the approved health insurance requirement. However, you should consider whether the applicant has sufficient financial resources to pay for reasonably foreseeable medical costs for the amount of time until he or she is able to obtain approved health insurance. If they have those resources, you can find that they satisfy the requirements of the Proclamation.

000534

## Processing

- Interview
- Case note:

  – "P.P. 9945 met – applicant plans to obtain health insurance through spouse's health insurance policy"



In most cases, you should be able to make a determination regarding ▇ at the time of the visa interview. You should enter a clear case note as to whether the applicant meets or does not meet the requirements of the Presidential Proclamation.

If you are satisfied that the applicant either has, or will have, health insurance within 30 days of entry or possesses sufficient financial resources to pay for reasonably foreseeable medical costs, you must make a clear case note stating why the applicant overcomes the P.P.'s limitation on entry, e.g. "Applicant plans to obtain health insurance through spouse's health insurance policy."

## Processing, Cont'd

- Documentation not required, but may be requested
- INA 221(g)
- New refusal code, ▮▮▮
- Overcoming an ▮▮▮ refusal



Applicants are not required to provide information demonstrating their eligibility under the Proclamation to NVC in order to be considered documentarily qualified. Therefore, if at the interview , you request additional evidence to establish that the applicant meets the requirements of the Proclamation, you should first refuse the case 221(g) in order to allow the applicant to submit the requested documentation.

If the applicant submits documents that are insufficient to overcome the 221(g) refusal, you should refuse the applicant using the refusal code ▮▮▮ Applicants may still overcome an ▮▮▮ refusal by submitting additional evidence to convince you that they have or will have approved health insurance within 30 days of entry, or that they have the financial resources to pay for reasonably foreseeable medical costs in the absence of health insurance. An IV applicant may present evidence that he or she overcomes a ground of refusal up to one year from the date of refusal, after which they will need to file a new visa application and pay the fee again.



For applicants with an approved provisional unlawful presence waiver (I-601A), an refusal will result in automatic revocation of the waiver, even if the refusal is subsequently overcome.

## P.P. 9945 and Public Charge

- ▢ and ▢ are distinct and separate considerations
- You should adjudicate both ▢ and ▢ where applicable
- Related issues:
  - Health
  - Financial resources
  - Family status



The ▢ refusal is distinct from the public charge ground of ineligibility and thus, consular officers will make this determination irrespective of whether or not an applicant is found ineligible under public charge. Should you find an applicant is subject to the Presidential Proclamation and also ineligible under public charge, you must refuse the applicant under both ▢ and ▢

While ▢ and ▢ are distinct, they rely on some of the same evidence and raise similar issues, such as the applicant's health, financial resources, and family status.

000538

000539

000540

000541

000542

000543

000544

000545

000546

000547

000548

000549

# Resources

- ALDACs

- FAM

- CAWeb Public Talking Points

- Visa Office





# RESEARCH IN ACTION

*Issue #19*                                                                                      *June 2006*

## The High Concentration of U.S. Health Care Expenditures

### Introduction

As policymakers consider various ways to contain the rising costs of health care, it is useful to examine the patterns of spending on health care throughout the United States. In 2004, the United States spent $1.9 trillion, or 16 percent of its gross domestic product (GDP), on health care. This averages out to about $6,280 for each man, woman, and child.

However, actual spending is distributed unevenly across individuals, different segments of the population, specific diseases, and payers. For example, analysis of health care spending shows that:

- Five percent of the population accounts for almost half (49 percent) of total health care expenses.
- The 15 most expensive health conditions account for 44 percent of total health care expenses.
- Patients with multiple chronic conditions cost up to seven times as much as patients with only one chronic condition.

Further detailed analyses of these spending patterns, how they change over time, and how they affect different payers such as Medicare, Medicaid, private insurers, employers, and consumers shed important light on how to best target efforts to contain rapidly rising health care costs.

Much of the information included in this report comes from the Medical Expenditure Panel Survey. (See Box 1.)

### Background

Health care expenses in the United States rose from $1,106 per person in 1980 ($255 billion overall) to $6,280 per person in 2004 ($1.9 trillion overall).[1] During this period, health care costs grew faster than the economy as a whole. As a consequence, health spending now accounts for 16 percent of the GDP, compared to 9 percent in 1980. With the aging of the population and the accelerating pace of medical innovation, this trend is likely to continue.

Those struggling to develop strategies to reduce or contain costs consider whether efforts should be targeted broadly across the entire health care system or more narrowly at specific areas or aspects of care. For example, is the continuing rise in health care expenses due to the increased

**Making a Difference**

- In 2002, the 5 percent of people with the greatest health care expenses in the U.S. population spent 49 percent of the overall health care dollar…Page 2
- The lower 50 percent of spenders accounted for 3 percent of the total national health care dollar…Page 2
- The proportion of spenders who remained among the top 1% of spenders for two years in a row doubled between 1996-97 and 2002-03 …Page 5
- The five most expensive health conditions are heart disease, cancer, trauma, mental disorders, and pulmonary disorders…Page 6

Author: Mark W. Stanton, M.A.

Managing Editor: Margaret Rutherford

Design and Production: Frances Eisel

Suggested citation: Stanton MW, Rutherford MK. The high concentration of U.S. health care expenditures. Rockville (MD): Agency for Healthcare Research and Quality; 2005. Research in Action Issue 19. AHRQ Pub. No. 06-0060.




Agency for Healthcare Research and Quality
Advancing Excellence in Health Care • www.ahrq.gov

## Box 1. The Medical Expenditure Panel Survey (MEPS)

The Medical Expenditure Panel Survey (MEPS) is a large, ongoing nationally representative survey of households, medical providers, and employers conducted by the Agency for Healthcare Research and Quality (AHRQ). Data derived from MEPS and analyzed by AHRQ-funded and other researchers show where health care expenses are concentrated and how this distribution has changed over time. The distribution of medical expenses is determined by ranking individuals in descending order according to their total medical expenses and then determining aggregate spending at specific percentiles of the population.

MEPS is unique in its ability to link data on individuals and households (including demographics, health status, health conditions, health insurance, employment, and income) to detailed information on their use of and expenses for health care. MEPS interviewers ask households for detailed information about each health care visit, hospital stay, prescription drug fill, and other medical services, including out-of-pocket expenses and sources of payment. Followback surveys of the hospitals, physicians, and home health agencies used by MEPS households provide further information about payments made by Medicaid, Medicare, private health plans, and other sources. MEPS has been continuously conducted since 1996, and its design makes it possible to examine how health care use, expenses, sources of payment, and insurance coverage change over time. No other survey contains such a wide range of data essential for relating health spending and insurance coverage to individual and family characteristics such as age, race and ethnicity, health conditions and health status, and family income.

MEPS estimates of health care expenses differ from the aggregate spending estimates contained in the National Health Accounts (NHA), primarily because MEPS covers the civilian noninstitutionalized population and excludes some populations with high expenses such as people residing in nursing homes.

cost of treatment per case? To the growth and aging of the population? To the rise in the number of people treated for the most expensive conditions?

Examining the distribution of health care expenses among the U.S. population helps to determine the expenses for different segments of the population, what diseases cost the most, and how public and private payers are affected. This information sheds light on areas where changes in policy might bring about the greatest savings.

## How are U.S. health care expenses distributed?

### A small proportion of the total population accounts for half of all U.S. medical spending

Half of the population spends little or nothing on health care, while 5 percent of the population spends almost half of the total amount.[2] In 2002, the 5 percent of the U.S. community (civilian noninstitutionalized) population that spent the most on health care accounted for 49 percent of overall U.S. health care spending (Chart 1). Among this group, annual medical expenses (exclusive of health insurance premiums) equaled or exceeded $11,487 per person. In contrast, the 50 percent of the population with the lowest expenses accounted for only 3 percent of overall U.S. medical spending, with annual medical spending below $664 per person. Thus, those in the top 5 percent spent, on average, more than 17 times as much per person as those in the bottom 50 percent of spenders.[2]

From 1977 to 1996, the overall distribution of health care expenses among the U.S. population remained remarkably stable (Table 1), according to data from MEPS and its predecessor surveys.[3,4] In 1977, the 1 percent of the population with the highest expenses accounted for 27 percent of all expenses, the top 5 percent accounted for 55 percent, and the bottom 50 percent accounted for 3 percent. However, the concentration of expenses at the top has decreased in recent years. The total expenses accounted for by the top 1 percent of spenders declined from 28 percent in 1996 to 22 percent in 2002, and the amount for the top 5 percent dropped from 55 to 49 percent in the same time period.[4] The lower 50 percent of spenders remained at 3 to 4 percent of total expenditures during this period.



**Chart 1. Percent of total health care expenses incurred by different percentiles of U.S. population: 2002**

**Source:** Conwell LJ, Cohen JW. Characteristics of people with high medical expenses in the U.S. civilian noninstitutionalized population, 2002. Statistical Brief #73. March 2005. Agency for Healthcare Research and Quality, Rockville, MD. Web site: http://www.meps.ahrq.gov/PrintProducts/PrintProdLookup.asp?ProductType=StatisticalBrief. Accessed April 7, 2006.

**Note:** Figures in parentheses are expenses per person.

## Table 1. Distribution of health care expenses for the U.S. population, by percent of total: Selected years, 1977-2002

| Percent of U.S. population ranked by expenses | 1977 | 1980 | 1987 | 1996 | 2002 |
|---|---|---|---|---|---|
| Top 1 percent | 27% | 29% | 28% | 28% | 22% |
| Top 5 percent | 55% | 55% | 56% | 56% | 49% |
| Bottom 50 percent | 3% | 4% | 3% | 3% | 3% |

**Sources:** Berk ML, Monheit AC. The concentration of health expenditures: an update. Health Aff (Millwood) 1992 Winter: 145-9. Yu WW, Ezzati-Rice TM. Concentration of health care expenses in the U.S. civilian noninstitutionalized population. Statistical Brief #81. May 2005. Agency for Healthcare Research and Quality, Rockville, MD Web site: http://www.meps.ahrq.gov/PrintProducts/PrintProdLookup.asp?ProductType= StatisticalBrief. Accessed April 7, 2006.

### Older people are much more likely to be among the top-spending percentiles

The elderly (age 65 and over) made up around 13 percent of the U.S. population in 2002, but they consumed 36 percent of total U.S. personal health care expenses. The average health care expense in 2002 was $11,089 per year for elderly people but only $3,352 per year for working-age people (ages 19-64).[5] Similar differences among age

groups are reflected in the data on the top 5 percent of health care spenders. People 65-79 (9 percent of the total population) represented 29 percent of the top 5 percent of spenders. Similarly, people 80 years and older (about 3 percent of the population) accounted for 14 percent of the top 5 percent of spenders (Chart 2).[2] However, within age groups, spending is less concentrated among those age 65 and over than for the under-65 population. The top 5 percent of elderly spenders accounted for 34 percent of all expenses by the elderly in 2002, while the top 5 percent of non-elderly spenders accounted for 49 percent of expenses by the non-elderly.[4] A principal reason why health care spending is spread out more evenly among the elderly is that a much higher proportion of the elderly than the non-elderly have expensive chronic conditions.

### Studies show initial persistence of expenses

The data just cited show that health care expenses are heavily concentrated in a single year. Over a 2-year period, there is a fairly high degree of persistence of expenditures.[6] Of those individuals ranked at the top 1 percent of the health care expenditure distribution in 2002, 25 percent maintained this ranking with respect to their 2003 health care expenditures (Chart 3). The proportion of the population that remained in the top 1 percent from 1996 to



**Chart 2. Percent of health care expenses incurred by the top 5 percent of health care spenders within different age groups: United States, 2002**

**Source:** Conwell LJ, Cohen JW. Characteristics of people with high medical expenses in the U.S. civilian noninstitutionalized population, 2002. Statistical Brief #73. March 2005. Agency for Healthcare Research and Quality, Rockville, MD. Web site: http://www.meps.ahrq.gov/PrintProducts/PrintProdLookup.asp?ProductType=StatisticalBrief. Accessed April 7, 2006.



**Chart 3. Persistence in the level of health care expenses: United States,  2002-03**

**Source:** Cohen SC, Yu W. The persistence in the level of health care expenditures over time: estimates for the U.S. population, 2002-2003. Statistical Brief #124. May 2006. Agency for Healthcare Research and Quality, Rockville, MD. Web site: http://www.meps.ahrq.gov/PrintProducts/PrintProdLookup.asp?ProductType=StatisticalBrief. Accessed May 15, 2006.

1997 was only 14 percent. This means that the proportion of the population in the highest percentile of the health care expenditure distribution that retained this ranking from 2002 to 2003 was nearly double the proportion in the 1996-97 period.[7]

In 2002, the top 5 percent of the population accounted for 49 percent of health care expenditures. Of people ranked in the top 5 percent of the health care expenditure distribution, 34 percent retained this ranking with respect to their 2003 health care expenditures. Similarly, the top 10 percent of the population accounted for 64 percent of overall health care expenditures in 2002, and 42 percent of this subgroup retained the top decile ranking with respect to their 2003 health care expenditures.

Over longer periods of time, a considerable leveling of expenses takes place.  In a study of Medicare enrollees, researchers found that although the top 1 percent of spenders accounted for 20 percent of expenses in a particular year, the top 1 percent of spenders over a 16-year period accounted for only 7 percent of expenses.[8]  The researchers concluded that there is a substantial leveling of expenses across a population when looking over several years or more compared to just a single year.  An acute episode of pneumonia or a motor vehicle accident might lead to an expensive hospitalization for an otherwise healthy person, who might be in the top 1 percent for just that year but have few expenses in subsequent years. Similarly, many people have chronic conditions, such as diabetes and asthma, which are fairly expensive to treat on an ongoing basis for the rest of their lives, but in most cases will not put them at the very top of health care spenders. However, each year some of those with chronic conditions will have acute episodes or complications requiring a hospitalization or other more expensive treatment.

The Medicare study just discussed[8] did not control for factors such as the overall increase in the quantity and intensity of services over time.  Another study controlled for these factors in examining how the distribution of expenses changes over the major phases of an average person's lifetime.[9]  The study used insurance company data on 3.75 million enrollees and data from the Medicare Current Beneficiary Survey.[a]  It found that 8 percent of health care expenses occurred during childhood (under age

20), 13 percent during young adulthood (20-39 years), 31 percent during middle age (40-64 years), and nearly half (49 percent) occurred after 65 years of age.  Among people age 65 and older, three-quarters of expenses (or 37 percent of the lifetime total) occurred among individuals 65-84 and the rest (12 percent of the lifetime total) among people 85 and over.  The total per capita lifetime expense was calculated to be $316,600.

## People with high overall health expenses also have high out-of-pocket expenses relative to income

Out-of-pocket costs can impose a significant financial burden on individuals and families. These expenses include deductibles, copayments, and payments for services that are not covered by health insurance.  Over half the people in the top 5 percent of all health care spenders had out-of-pocket expenses (not including out-of-pocket health insurance premiums) over 10 percent of family income.  More specifically:

- Thirty-four percent had out-of-pocket medical expenses that exceeded 10 percent of family income.
- Eighteen percent had out-of-pocket expenses in excess of 20 percent of family income.

People in the bottom 50 percent of the distribution were much less likely to have financial burdens from medical care.  For example:

- Five percent of people in the bottom 50 percent had out-of-pocket expenses that exceeded 10 percent of family income.
- Three percent had out-of-pocket expenses greater than 20 percent of family income.[2]

## People with high health care expenses have lower health status

How people view their own health is strongly correlated with their level of health care expenses.  Using a respondent-reported overall health status measure (ranging from poor to excellent), a study based on MEPS 2002 data found that people in the highest 5 percent of the distribution of medical expenses were 11 times as likely to be in fair or poor physical health as people in the bottom half of that distribution (45 percent vs. 4 percent).[b] Similarly, 21 percent of people in the top 5 percent were in

---

[a] This study used cross-sectional data from 1997 and held constant factors such as health care technology and price, and the incidence, severity, and outcomes of disease.

[b] MEPS respondents were asked to rate the health of each person in the family by the following categories: excellent, very good, good, fair, and poor.

fair or poor mental health, compared with 3 percent of people in the bottom 50 percent.[2]

## Managed care has a neutral effect on the concentration of health care expenses

The rapid growth of health maintenance organizations (HMOs) and other forms of managed care from the 1970s onward as a means to control costs led to major changes in the delivery of health care in the United States. But did managed care change the concentration of health care expenses? According to a study using 1996 MEPS data, the answer is no.[10] Looking at the under-65 population with employer-provided health insurance, researchers found no statistically significant differences in concentration between those enrolled in HMOs and other types of gatekeeper plans and those enrolled in indemnity or preferred provider organizations (PPOs). For example, the top 5 percent of spenders accounted for 51 percent of expenses for those enrolled in HMOs, compared with 50 percent of expenses for those in HMOs and other "gatekeeper" managed care combined and 53 percent of expenses for those in indemnity plans and some PPOs.[c]

---------------

[c] The PPOs included were those that billed on a fee-for-service basis.

## Despite relatively similar distributions, the privately insured spend much more than the uninsured

In relative terms, health care expenses are distributed comparably among the uninsured and those with private insurance. For example, in 1996, the top 5 percent of spenders accounted for 51 percent of all expenses among those with private insurance and 60 percent of spending by the uninsured. However, the top 5 percent with private insurance spent an average of $17,800, compared to $6,700 for the top 5 percent of the uninsured.[10]

## What are the most expensive conditions?

### Some diseases are very costly to treat

In 2002, the five most expensive health conditions were heart disease, cancer, trauma, mental disorders, and pulmonary conditions (Chart 4). Heart disease and trauma ranked first and second as the two most expensive conditions in terms of total health care spending; however, with respect to per-person costs, cancer was the most expensive and heart disease the second most expensive.[11] Taken together, these five conditions accounted for a substantial proportion of total health expenditures in 2002.



**Chart 4. The five most costly conditions as a percentage of total health expenditures: United States, 2002**

| Condition | Percentage |
|-----------|-----------|
| Heart conditions | 8.3% |
| Cancer | 6.0% |
| Trauma | 6.9% |
| Mental disorders | 5.9% |
| Pulmonary conditions | 5.6% |

Source: Olin GL, Rhoades JA. The five most costly medical conditions, 1997 and 2002: estimates for the U.S. civilian noninstitutionalized population. Statistical Brief #80. Agency for Healthcare Research and Quality, Rockville, MD. Web site: http://www.meps.ahrq.gov/PrintProducts/PrintProdLookup.asp?ProductType=StatisticalBrief. Accessed April 7, 2006.

The 15 most costly medical conditions in the United States accounted for 44 percent of total U.S. health care spending in 1996.[12]

## Chronic conditions contribute to higher health care costs

Twenty-five percent of the U.S. community population were reported to have one or more of five major chronic conditions: mood disorders, diabetes, heart disease, asthma, and hypertension.  Spending to treat these five conditions alone amounted to $62.3 billion in 1996.[13]  Moreover, people with chronic conditions tend to have other conditions and illnesses.

When the other illnesses are added in, total expenses for people with these five major chronic conditions rise to $270 billion, or 49 percent of total health care costs, according to 1996 MEPS data.  On an individual level, treatment for the average patient with asthma was $663 per year in 1996, but when the full cost of care for asthma and other coexistent illnesses is taken into account, the average cost was $2,779.  Expenses for people with one chronic condition were twice as great as for those without any chronic conditions.  Spending for those with five or more chronic conditions was about 14 times greater than spending for those without any chronic conditions.[14]  Persons with five or more conditions also have high hospital expenditures. In New York State during 2002, of the 1.3 million different persons admitted to the hospital, the 27 percent with five or more chronic conditions accounted for 47 percent of all inpatient costs.[15]

## Expensive conditions contribute to the growth in health care costs

One study found that a small number of conditions accounted for most of the growth in total health care spending between 1987 and 2000—with the top five medical conditions (heart disease, pulmonary disorders, mental disorders, cancer, and trauma) accounting for 31 percent.[16]  For 7 of the top 15 conditions, a rise in the proportion of the U.S. population being treated, rather than rising treatment costs per case or population growth, accounted for the greatest part of the spending growth.[d]

## How much does the rise in number of people being treated explain the overall growth in private insurance spending?

The rise in the number of people being treated for expensive conditions has had an impact on the growth in private insurance spending similar to that on overall health care spending.  The rise in the number of people being treated, rather than the rise in spending per treated case, was the most important determinant of the growth in private insurance spending between 1987 and 2002, according to a recent study.[17]  For 16 of the 20 most expensive conditions, the rise in the number of people being treated accounted for more than half the growth in private insurance health care spending.  Researchers attribute the additional numbers of people being treated to three factors: (1) the continued rise in the share of privately insured adults classified as obese, (2) changes in clinical treatment guidelines and standards for treating patients without symptoms or with mild symptoms only, and (3) the availability of new medical technologies to diagnose and treat patients.

Especially important is the increase in the number of people treated for conditions clinically linked to obesity. From 1987 to 2002, the proportion of the population treated increased 64 percent for diabetes (accounting for 80 percent of the increase in costs) and increased 500 percent for hyperlipidemia (accounting for almost 90 percent of the increase in costs).  A number of factors might explain the substantial increase in treatment rates for conditions linked to obesity.  These factors include a rise in the number of people with obesity-related conditions, a rise in the number of more seriously ill patients, a greater emphasis on preventive care, and the introduction of broader treatment options.

## The cost of public programs is affected by highly expensive conditions

### Medicare

In 2001, 5 percent of Medicare fee-for-service beneficiaries accounted for 43 percent of total spending, with 25 percent accounting for 85 percent of all spending.  Chronic

---

[d] This is also referred to as "treated prevalence," or the proportion of the population currently receiving care for that condition.

conditions were closely linked to high expenditure levels: more than 75 percent of high-cost beneficiaries (the 25 percent of Medicare beneficiaries with the highest costs) had one or more of seven major chronic conditions.[18]  The top-spending 25 percent of Medicare beneficiaries incurred average per-person costs of $24,800.  In this group, 42 percent had coronary artery disease, 30 percent had congestive heart failure, and 30 percent had diabetes.

### Medicaid

The elderly and disabled, who constituted around 25 percent of the Medicaid population, accounted for about 70 percent of Medicaid spending on services in 2003.  People with disabilities accounted for 43 percent of Medicaid spending and the elderly for 26 percent.[19]  The remaining 75 percent of the Medicaid population, who were not elderly or disabled, accounted for only 30 percent of spending.

## Geographic variation in health care expenses

Studies point to major differences in health care expenses by geographic area.  One study, which divided the country into 306 hospital referral regions, or regional markets for health care, found that patients in the higher spending areas receive 60 percent more care.[20]  For example, in 1996, Medicare fee-for-service patients had average expenses of $8,414 in the Miami, Florida, region, and $3,341 in the Minneapolis, Minnesota, region.  The authors found that these differences were due not to differences in prices, average levels of illness, or socioeconomic status but rather to the overall quantity of medical services provided and to the relatively higher proportions of internists and medical subspecialists in high-cost regions.

## Conclusions

Analyses of health care spending patterns shed important light on how best to focus efforts to help restrain rising health care costs.  Recognition that a relatively small group of individuals account for a large fraction of spending in Medicare, Medicaid, private plans, and the population as a whole serves to inform more focused cost-containment strategies.  The concentration of health care expenses also has implications for the effective design of consumer directed health plans.  Research also continues to raise awareness of the importance of chronic conditions in overall spending and as a major driver of cost increases,

leading to disease management programs and other efforts to both improve quality and reduce the costs of conditions such as diabetes, asthma, hypertension, heart disease, and obesity.

## References

1.    Centers for Medicare & Medicaid Services, Office of the Actuary:  Table 1. National Health Expenses Aggregate and Per Capita Amounts, Percent Distribution, and Average Annual Percent Growth, by Source of Funds: Selected Calendar Years 1980-2003. Web site: http://www.cms.hhs.gov/ NationalHealthExpendData/02_NationalHealth AccountsHistorical.asp#TopOfPage  Accessed April 7, 2006.

*2.    Conwell LJ, Cohen JW.  Characteristics of people with high medical expenses in the U.S. civilian noninstitutionalized population, 2002.  Statistical Brief #73. March 2005. Agency for Healthcare Research and Quality, Rockville, MD. Web site: http://www.meps.ahrq.gov/PrintProducts/PrintProd Lookup.asp?ProductType=StatisticalBrief.  Accessed April 7, 2006.

*3.    Berk ML, Monheit AC.  The concentration of health expenditures: an update.  Health Aff  (Millwood) 1992 Winter; 145-9

*4.    Yu WW, Ezzati-Rice TM. Concentration of health care expenses in the U.S. civilian noninstitutionalized population.  Statistical Brief #81. May 2005. Agency for Healthcare Research and Quality, Rockville, MD. Web site: http://www.meps.ahrq.gov/ PrintProducts/PrintProdLookup.asp?ProductType= StatisticalBrief.  Accessed April 7, 2006.

5.    Keehan SP, Lazenby HC, Zezza MA, et al.  Age Estimates in the National Health Accounts.  Health Care Financing Review 2004 Dec. 2; 1(1); Web Exclusive.

*6.    Cohen S, Yu W.  The persistence in the level of health care expenditures over time: estimates for the U.S. population, 2002-2003.  Statistical Brief #124. May 2006. Agency for Healthcare Research and Quality, Rockville, MD. Web site: http://www.meps.ahrq.gov /PrintProducts/PrintProdLookup.asp?ProductType= StatisticalBrief.  Accessed May 15, 2006.

*AHRQ-funded/supported research

*7.  Monheit AC. Persistence in health expenditures in the short run: prevalence and consequences.  Med Care 2003; 41(7) suppl:III-53-64.

8.  Gornick M, McMillan A, Lubitz J.  A longitudinal perspective on patterns of Medicare payments.  Health Aff 1993 Summer; 12(2):140-50.

9.  Alemayehu B, Warner KE.  The lifetime distribution of health care costs. Health Serv Res 2004; 39(3): 627-42.

*10.  Berk ML, Monheit AC.  The concentration of health expenditures, revisited.  Health Aff  (Millwood) 2001; 20(2):9-18.

*11.  Olin GL, Rhoades JA.  The five most costly medical conditions, 1997 and 2002: estimates for the U.S. civilian noninstitutionalized population. Statistical Brief #80.  Agency for Healthcare Research and Quality, Rockville, MD.  Web site: http://www.meps.ahrq.gov/PrintProducts/PrintProd Lookup.asp?ProductType=StatisticalBrief.  Accessed April 7, 2006.

12.  Druss BG, Marcus SC, Olfson M, et al.  The most expensive medical conditions in America. Health Aff (Millwood) 2002; 21(4): 105-111.

13.  Druss BG, Marcus SC, Olfson M, et al. Comparing the national economic burden of five chronic conditions. Health Aff (Millwood) 2001; 20(6): 233-41.

14.  Partnership for Solutions, Johns Hopkins University. Chronic Conditions: Making the Case for Ongoing Care. Prepared for the Robert Wood Johnson Foundation.  Baltimore, MD, 2002.

*15.  Friedman B, Jiang HJ, Elixhauser A, et al.  Hospital inpatient costs for adults with multiple chronic conditions.  Med Care Res Rev 2006; 63(3):1-20.

16.  Thorpe KE, Florence CS, Joski P, et al. Which medical conditions account for the rise in health care spending? Health Aff (Millwood) 2005 Jul-Dec; Suppl Web Exclusives: W4-480-6.

17.  Thorpe KE, Florence CS, Howard DH, et al. The rising prevalence of treated disease: effects on private health insurance spending.  Health Aff (Millwood) 2005 Jan-Jun; Suppl Web Exclusives: WS-317-WS-325.

18.  Congressional Budget Office. High-cost Medicare beneficiaries. A CBO Paper. May 2005. Web site: http://www.cbo.gov/showdoc.cfm?index=6332&sequence=0. Accessed April 7, 2006.

19.  Kaiser Commission on Medicaid and the Uninsured. Medicaid: A Primer. Washington. July 2005.

20.  Fisher ES, Wennberg DE, Stukel TA, et al. The implications of regional variations in Medicare spending. Part 1: The content, quality, and accessibility of care. Ann Intern Med 2003;138(4): 273-87.

***AHRQ-funded/supported research***

Previous issues of Research in Action are available for free from the AHRQ Publications Clearinghouse: 1-800-358-9295. Please specify the AHRQ publication number when you call.

| Issue | Title | Publication Number |
|---|---|---|
| 18 | Chronic Care for Low-Income Children with Asthma: Strategies for Improvement | AHRQ 05-0073 |
| 17 | Employer-Sponsored Health Insurance: Trends in Cost and Access | AHRQ 04-0085 |
| 16 | Programs and Tools to Improve the Quality of Mental Health Services | AHRQ 04-0061 |
| 15 | Women and Domestic Violence: Programs and Tools That Improve Care for Victims | AHRQ 04-0055 |
| 14 | Hospital Nurse Staffing and Quality of Care | AHRQ 04-0029 |
| 13 | Dental Care: Improving Access and Quality | AHRQ 03-0040 |
| 12 | Advance Care Planning: Preferences for Care at the End of Life | AHRQ 03-0018 |
| 11 | AHRQ Tools for Managed Care | AHRQ 03-0016 |
| 10 | AHRQ Tools and Resources for Better Health Care | AHRQ 03-0008 |
| 9 | Reducing Costs in the Health Care System: Learning From What Has Been Done | AHRQ 02-0046 |
| 8 | Prescription Drug Therapies: Reducing Costs and Improving Outcomes | AHRQ 02-0045 |
| 7 | Improving Treatment Decisions for Patients with Community-Acquired Pneumonia | AHRQ 02-0033 |
| 6 | Medical Informatics for Better and Safer Health Care | AHRQ 02-0031 |
| 5 | Expanding Patient-Centered Care to Empower Patients and Assist Providers | AHRQ 02-0024 |
| 4 | Managing Osteoarthritis: Helping the Elderly Maintain Function and Mobility | AHRQ 02-0023 |
| 3 | Preventing Disability in the Elderly With Chronic Disease | AHRQ 02-0018 |
| 2 | Improving Care for Diabetes Patients Through Intensive Therapy and a Team Approach | AHRQ 02-0005 |
| 1 | Reducing and Preventing Adverse Drug Events To Decrease Hospital Costs | AHRQ 01-0020 |

000561



**U.S. Department of
Health and Human Services**

Public Health Service
Agency for Healthcare Research and Quality
540 Gaither Road
Rockville, Maryland 20850


www.ahrq.gov

AHRQ Pub. No. 06-0060
June 2006

4/16/2020    Case 3:19-cv-01743-SI    Document 149    Filed 06/09/20    Page 431 of 833
Health and Economic Costs of Chronic Disease | CDC
000562

 Centers for Disease Control and Prevention

# National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP)

# Health and Economic Costs of Chronic Diseases

 

**90% of the nation's $3.5 trillion in annual health care expenditures** are for people with chronic and mental health conditions.[1,2]

Chronic diseases have significant health and economic costs in the United States. Preventing chronic diseases, or managing symptoms when prevention is not possible, can reduce these costs.

## Diseases

### Heart Disease and Stroke



Nothing kills more Americans than heart disease and stroke. More than 859,000 Americans die of heart disease or stroke every year—that's one-third of all deaths. These diseases take an economic toll, as well, costing our health care system $199 billion per year and causing $131 billion in lost productivity on the job.[3]

### Cancer



Each year in the United States, more than 1.6 million people are diagnosed with cancer, and almost 600,000 die from it, making it the second leading cause of death. The cost of cancer care continues to rise and is expected to reach almost $174 billion by 2020."[4]

### Diabetes



More than 34.2 million Americans have diabetes, and another 88 million adults in the United States have a condition called prediabetes, which puts them at risk for type 2 diabetes. Diabetes can cause serious complications, including heart disease, kidney failure, and blindness. In 2017, the total estimated cost of diagnosed diabetes was $327 billion in medical costs and lost productivity.[5]

## Obesity



Obesity affects almost 1 in 5 children and 1 in 3 adults, putting people at risk for chronic diseases such as diabetes, heart disease, and some cancers. Over a quarter of all Americans 17 to 24 years are too heavy to join the military. Obesity costs the US health care system $147 billion a year.[6]

## Arthritis



Arthritis affects 54.4 million adults in the United States, which is about 1 in 4 adults. It is a leading cause of work disability in the United States, one of the most common chronic conditions, and a common cause of chronic pain. The total cost attributable to arthritis and related conditions was about $304 billion in 2013. Of this amount, nearly $140 billion was for medical costs and $164 billion was for indirect costs associated with lost earnings.[7]

## Alzheimer's Disease



Alzheimer's disease, a type of dementia, is an irreversible, progressive brain disease that affects about 5.7 million Americans. It is the sixth leading cause of death among all adults and the fifth leading cause for those aged 65 or older. In 2010 , the costs of treating Alzheimer's disease were estimated to fall between $159 billion and $215 billion.[8] By 2040, these costs are projected to jump to between $379 billion and $500 billion annually.

## Epilepsy



In the United States, about 3 million adults and 470,000 children and teens younger than 18 have active epilepsy—meaning that they have been diagnosed by a doctor, had a recent seizure, or both. Adults with epilepsy report worse mental health, more cognitive impairment, and barriers in social participation compared to adults without epilepsy. Average direct health care costs for a person with epilepsy range from $10,200 to $47,900 per year (in 2013 dollars).[9]

## Tooth Decay



Cavities (also called tooth decay) are one of the most common chronic diseases in the United States. One in five children aged 6 to 11 years and one in four adults have untreated cavities. Untreated cavities can cause pain and infections that may lead to problems eating, speaking and learning. On average, 34 million school hours are lost each year because of unplanned (emergency) dental care, and over $45 billion is lost in productivity due to dental disease.[10,11]

# Risk Factors

## Cigarette Smoking



Cigarette smoking is the leading cause of preventable death and disease in the United States. More than 16 million Americans have at least one disease caused by smoking. This amounts to $170 billion in direct medical costs that could be saved every year if we could prevent youth from starting to smoke and help every person who smokes quit.[12]

## Lack of Physical Activity



Not getting enough physical activity comes with high health and financial costs. It can lead to heart disease, type 2 diabetes, some cancers, and obesity. In addition, lack of physical activity costs the nation $117 billion annually for related health care.[13]

## Excessive Alcohol Use



Excessive alcohol use is responsible for 88,000 deaths in the United States each year, including 1 in 10 deaths among working-age adults. [14,15] In 2010, excessive alcohol use cost the US economy $249 billion, or $2.05 a drink, and $2 of every $5 of these costs were paid by the public. Binge drinking is responsible for over half the deaths and three-quarters of the costs due to excessive alcohol use.[16]

References                                                                    +

Page last reviewed: March 23, 2020, 12:00 AM

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, 213, 214, 245 and 248**

**[CIS No. 2499–10; DHS Docket No. USCIS–2010–0012]**

**RIN 1615–AA22**

## Inadmissibility on Public Charge Grounds

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The U.S. Department of Homeland Security (DHS) proposes to prescribe how it determines whether an alien is inadmissible to the United States under section 212(a)(4) of the Immigration and Nationality Act (INA) because he or she is likely at any time to become a public charge. Aliens who seek adjustment of status or a visa, or who are applicants for admission, must establish that they are not likely at any time to become a public charge, unless Congress has expressly exempted them from this ground of inadmissibility or has otherwise permitted them to seek a waiver of inadmissibility. Moreover, DHS proposes to require all aliens seeking an extension of stay or change of status to demonstrate that they have not received, are not currently receiving, nor are likely to receive, public benefits as defined in the proposed rule.

DHS proposes to define "public charge" as the term is used in sections 212(a)(4) of the Act. DHS also proposes to define the types of public benefits that are considered in public charge inadmissibility determinations. DHS would consider an alien's receipt of public benefits when such receipt is above the applicable threshold(s) proposed by DHS, either in terms of dollar value or duration of receipt. DHS proposes to clarify that it will make public charge inadmissibility determinations based on consideration of the factors set forth in section 212(a)(4) and in the totality of an alien's circumstances. DHS also proposes to clarify when an alien seeking adjustment of status, who is inadmissible under section 212(a)(4) of the Act, may be granted adjustment of status in the discretion of DHS upon the giving of a public charge bond. DHS is also proposing revisions to existing USCIS information collections and new information collection instruments to accompany the proposed regulatory changes. With the publication of this proposed rule, DHS withdraws the proposed regulation on public charge

that the former Immigration and Naturalization Service (INS) published on May 26, 1999.

**DATES:** Written comments and related material to this proposed rule, including the proposed information collections, must be received to the online docket via *www.regulations.gov*, or to the mail address listed in the **ADDRESSES** section below, on or before December 10, 2018.

**ADDRESSES:** You may submit comments on this proposed rule, including the proposed information collection requirements, identified by DHS Docket No. USCIS–2010–0012, by any one of the following methods:

• *Federal eRulemaking Portal (preferred): www.regulations.gov.* Follow the website instructions for submitting comments.

• *Mail:* Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2140. To ensure proper handling, please reference DHS Docket No. USCIS–2010–0012 in your correspondence. Mail must be postmarked by the comment submission deadline.

**FOR FURTHER INFORMATION CONTACT:** Mark Phillips, Residence and Naturalization Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts NW, Washington, DC 20529–2140; telephone 202–272–8377.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
  A. Major Provisions of the Regulatory Action
  B. Costs and Benefits
III. Purpose of the Proposed Rule
  A. Self-Sufficiency
  B. Public Charge Inadmissibility Determinations
IV. Background
  A. Legal Authority
  B. Immigration to the United States
  C. Extension of Stay and Change of Status
  D. Public Charge Inadmissibility
  1. Public Laws and Case Law
  2. Public Benefits Under PRWORA
  (a) Qualified Aliens
  (b) Public Benefits Exempt Under PRWORA
  3. Changes Under IIRIRA
  4. INS 1999 Interim Field Guidance
  E. Public Charge Bond
V. Discussion of Proposed Rule
  A. Applicability, Exemptions, and Waivers
  1. Applicants for Admission
  2. Extension of Stay and Change of Status Applicants
  3. Adjustment of Status Applicants

  4. Exemptions
  5. Waivers
  B. Definition of Public Charge and Related Terms
  1. Public Charge
  2. Public Benefit
  (a) Types of Public Benefits
  (b) Consideration of Monetizable and Non-Monetizable Public Benefits
  i. "Primarily Dependent" Standard and Its Limitations
  ii. Fifteen Percent of Federal Poverty Guidelines (FPG) Standard for Monetizable Benefits
  iii. Twelve Month Standard for Non-Monetizable Benefits
  iv. Combination of Monetizable Benefits Under 15 Percent of FPG and One or More Non-Monetizable Benefits
  (c) Monetizable Public Benefits
  i. Supplemental Security Income (SSI)
  ii. Temporary Assistance for Needy Families (TANF)
  iii. General Assistance Cash Benefits
  iv. Supplemental Nutrition Assistance Program (SNAP) v. Housing Programs
  a. Section 8 Housing Choice Voucher Program
  b. Section 8 Project-Based Rental Assistance
  (d) Non-Monetizable Public Benefits
  i. Medicaid
  a. Description of Program
  b. Exceptions for Certain Medicaid Services
  c. Exception for Receipt of Medicaid by Foreign-Born Children of U.S. Citizens
  ii. Institutionalization for Long-Term Care
  iii. Premium and Cost Sharing Subsidies Under Medicare Part D
  iv. Subsidized Public Housing
  (e) Receipt of Public Benefits by Active Duty and Reserve Servicemembers and Their Families
  (f) Unenumerated Benefits
  (g) Request for Comment Regarding the Children's Health Insurance Program (CHIP)
  (h) Request for Comment Regarding Public Benefit Receipt by Certain Alien Children
  (i) Request for Comment Regarding Potential Modifications by Public Benefit Granting Agencies
  3. Likely at Any Time To Become a Public Charge
  4. Household
  (a) Definition of Household in Public Charge Context
  (b) Definitions of "Household" and Similar Concepts in Other Public Benefits Contexts
  (c) Definitions of Household and Similar Concepts in Other Immigration Contexts
  C. Public Charge Inadmissibility Determination
  1. Absence of a Required Affidavit of Support
  2. Prospective Determination Based on Totality of Circumstances
  D. Age
  E. Health
  1. USCIS Evidentiary Requirements
  2. Potential Effects for Aliens With a Disability, Depending on Individual
  F. Family Status

G. Assets, Resources, and Financial Status
1. Evidence of Assets and Resources
2. Evidence of Financial Status
(a) Public Benefits
(b) Fee Waivers for Immigration Benefits
(c) Credit Report and Score
(d) Financial Means To Pay for Medical Costs
I. Education and Skills
1. USCIS Evidentiary Requirements
J. Prospective Immigration Status and Expected Period of Admission
K. Affidavit of Support
1. General Consideration of Sponsorship and Affidavits of Support
2. Proposal To Consider Required Affidavits of Support
L. Heavily Weighed Factors
1. Heavily Weighed Negative Factors
(a) Lack of Employability
(b) Current Receipt of One or More Public Benefit
(c) Receipt of Public Benefits Within Last 36 Months of Filing Application
(d) Financial Means To Pay for Medical Costs
(e) Alien Previously Found Inadmissible or Deportable Based on Public Charge
2. Heavily Weighed Positive Factors
(f) Previously Excluded Benefits
M. Summary of Review of Factors in the Totality of the Circumstances
1. Favorable Determination of Admissibility
2. Unfavorable Determination of Admissibility
N. Valuation of Monetizable Benefits
O. Public Charge Bonds for Adjustment of Status Applicants
1. Overview of Immigration Bonds Generally
2. Overview of Public Charge Bonds
(a) Public Charge Bonds
(b) Current and Past Public Charge Bond Procedures
(c) Relationship of the Public Charge Bond to the Affidavit of Support
(d) Summary of Proposed Changes
3. Permission To Post a Public Charge Bond
4. Bond Amount and Submission of a Public Charge Bond
5. Public Charge Bond Substitution
6. Public Charge Bond Cancellation
(a) Conditions
(b) Definition of Permanent Departure
(c) Bond Cancellation for Lawful Permanent Residents After 5 Years and Cancellation if the Alien Obtains an Immigration Status Exempt From Public Charge Grounds of Inadmissibility Following the Initial Grant of Lawful Permanent Resident Status
(d) Request To Cancel the Bond, and Adjudication of the Cancelation Request
(e) Decision and Appeal
7. Breach of a Public Charge Bond and Appeal
(a) Breach Conditions and Adjudication
(b) Decision and Appeal
(c) Consequences of Breach
8. Exhaustion of Administrative Remedies
9. Public Charge Processing Fees
10. Other Technical Changes
11. Concurrent Surety Bond Rulemaking
VI. Statutory and Regulatory Requirements

A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)
1. Summary
2. Background and Purpose of the Rule
3. Population
(a) Population Seeking Adjustment of Status
*i. Exemptions From Determination of Inadmissibility Based on Public Charge Grounds*
ii. Exemptions From the Requirement To Submit an Affidavit of Support
(b) Population Seeking Extension of Stay of Change of Status
4. Cost-Benefit Analysis
(a) Baseline Estimates of Current Costs
i. Determination of Inadmissibility Based on Public Charge Grounds
a. Form I-485, Application to Register Permanent Residence or Adjust Status
b. Form I-693, Report of Medical Examination and Vaccination Record
c. Form I-912, Request for Fee Waiver
d. Affidavit of Support Forms
ii. Consideration of Receipt, or Likelihood of Receipt of Public Benefits Defined in Proposed 212.21(b) for Applicants Requesting Extension of Stay or Change of Status
a. Form I-129, Petition for a Nonimmigrant Worker
b. Form I-129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker
c. Form I-539, Application To Extend/Change Nonimmigrant Status
(b) Costs of Proposed Regulatory Changes
i. Form I-944, Declaration of Self-Sufficiency
ii. Extension of Stay/Change of Status Using Form I-129, Petition for a Nonimmigrant Worker; Form I-129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker; or Form I-539, Application To Extend/Change Nonimmigrant Status
iii. Public Charge Bond
(c) Transfer of Payments and Indirect Impacts of Proposed Regulatory Changes
(d) Discounted Direct Costs and Reduced Transfer Payments
i. Discounted Direct Costs
ii. Discounted Reduction in Transfer Payments
(e) Costs to the Federal Government
(f) Benefits of Proposed Regulatory Changes
B. Regulatory Flexibility Act
C. Congressional Review Act
D. Unfunded Mandates Reform Act
E. Executive Order 13132 (Federalism)
F. Executive Order 12988 (Civil Justice Reform)
G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments
H. Family Assessment
I. National Environmental Policy Act (NEPA)
J. Paperwork Reduction Act
VII. List of Subjects and Regulatory Amendments

**Table of Abbreviations**

AFM—Adjudicator's Field Manual
ASEC—Annual Social and Economic Supplement of the Current Population Survey
BIA—Board of Immigration Appeals
BLS—U.S. Bureau of Labor Statistics
CDC—Centers for Disease Control and Prevention
CBP—U.S. Customs and Border Protection
CFR—Code of Federal Regulations
CHIP—Children's Health Insurance Program
CNMI—Commonwealth of the Northern Mariana Islands
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
FAM—Foreign Affairs Manual
FCRA—Fair Credit Reporting Act
FPG—Federal Poverty Guidelines
FPL—Federal Poverty Level
Form DS-2054—Medical Examination For Immigrant or Refugee Applicant
Form I-129—Petition for a Nonimmigrant Worker
Form I-129CW—Petition for a CNMI-Only Nonimmigrant Transitional Worker
Form I-130—Petition for Alien Relative
Form I-140—Immigrant Petition for Alien Worker
Form I-290B—Notice of Appeal or Motion
Form I-356—Request for Cancellation of Public Charge Bond
Form I-407—Record of Abandonment of Lawful Permanent Resident Status
Form I-485—Application to Register Permanent Residence or Adjust Status
Form I-539—Application to Extend/Change Nonimmigrant Status
Form I-600—Petition to Classify Orphan as an Immediate Relative
Form I-693—Report of Medical Examination and Vaccination Record
Form I-800—Petition to Classify Convention Adoptee as an Immediate Relative
Form I-864—Affidavit of Support Under Section 213A of the INA
Form I-864A—Contract Between Sponsor and Household Member
Form I-864EZ—Affidavit of Support Under Section 213A of the Act
Form I-864P—HHS Poverty Guidelines for Affidavit of Support
Form I-864W—Request for Exemption for Intending Immigrant's Affidavit of Support
Form I-912—Request for Fee Waiver
Form I-94—Arrival/Departure Record
Form I-944—Declaration of Self-Sufficiency
Form I-945—Public Charge Bond
Form N-600—Application for Certificate of Citizenship
Form N-600K—Application for Citizenship and Issuance of Certificate Under Section 322
GA—General Assistance
GAO—U.S. Government Accountability Office
HHS—U.S. Department of Health and Human Services
ICE—U.S. Immigration and Customs Enforcement IIRIRA—Illegal Immigration Reform and Immigrant Responsibility Act of 1996
INA—Immigration and Nationality Act
INS—Immigration and Naturalization Service

IRCA—Immigration Reform and Control Act
of 1986
NHE—National Health Expenditure
PRA—Paperwork Reduction Act
PRWORA—Personal Responsibility and
Work Opportunity Reconciliation Act of
1996
RFE—Request for Evidence
SAVE—Systematic Alien Verification for
Entitlements
Secretary—Secretary of Homeland Security
SIPP—Survey of Income and Program
Participation
SNAP—Supplemental Nutrition Assistance
Program
SSA—Social Security Administration
SSI—Supplemental Security Income
TANF—Temporary Assistance for Needy
Families
USDA—U.S. Department of Agriculture
U.S.C.—United States Code
USCIS—U.S. Citizenship and Immigration
Services
WIC—Special Supplemental Nutrition
Program for Women, Infants, and Children

## I. Public Participation

All interested parties are invited to participate in this rulemaking by submitting written data, views, comments and arguments on all aspects of this proposed rule. DHS also invites comments that relate to the economic, legal, environmental, or federalism effects that might result from this proposed rule. Comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to U.S. Citizenship and Immigration Services (USCIS) in implementing these changes will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that supports such recommended change.

*Instructions:* If you submit a comment, you must include the agency name and the DHS Docket No. USCIS–2010–0012 for this rulemaking. Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *http://www.regulations.gov,* referencing DHS Docket No. USCIS–2010–0012. You may also sign up for email alerts on the online docket to be notified when comments are posted or a final rule is published.

The docket for this rulemaking does not include any comments submitted on the related notice of proposed rulemaking published by INS in 1999.[1] Commenters to the 1999 notice of proposed rulemaking that wish to have their views considered should submit new comments in response to this notice of proposed rulemaking.

## II. Executive Summary

DHS seeks to better ensure that aliens subject to the public charge inadmissibility ground are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rather rely on their own capabilities, as well as the resources of family members, sponsors, and private organizations.[2] DHS proposes to define the term "public charge" in regulation and to identify the types, amount, and duration of receipt of public benefits that would be considered in public charge inadmissibility determinations. DHS proposes to amend its regulations to interpret the minimum statutory factors for determining whether an alien is inadmissible because he or she is likely to become a public charge. This proposed rule would provide a standard for determining whether an alien who seeks admission into the United States as a nonimmigrant or as an immigrant, or seeks adjustment of status, is likely at any time to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS also provides a more comprehensive framework under which USCIS will consider public charge inadmissibility. DHS proposes that certain paper-based applications to USCIS would require additional evidence related to public charge considerations. Due to operational limitations, this additional evidence would not generally be required at ports of entry.

DHS also proposes amending the nonimmigrant extension of stay and change of status regulations by exercising its authority to set additional conditions on granting such benefits. Finally, DHS proposes to revise its regulations governing the discretion of the Secretary of Homeland Security

---

[1] *See Inadmissibility and Deportability on Public Charge Grounds,* 64 FR 28676 (May 26, 1999).
[2] *See* 8 U.S.C. 1601(1), (2)(A).

(Secretary) to accept a public charge bond under section 213 of the Act, 8 U.S.C. 1183, for those seeking adjustment of status.

### A. Major Provisions of the Regulatory Action

DHS proposes to include the following major changes:

• Amending 8 CFR 103.6, Surety bonds. The amendments to this section set forth DHS's discretion to approve public charge bonds, cancellation, bond schedules, and breach of bond, and move principles governing public charge bonds to 8 CFR 213.1, as proposed to be revised in this NPRM.

• Amending 8 CFR 103.7, adding fees for new Form I–945, Public Charge Bond, and Form I–356, Request for Cancellation of Public Charge Bond.

• Adding 8 CFR 212.20, Applicability of public charge inadmissibility. This section identifies the categories of aliens that are subject to the public charge inadmissibility determination.

• Adding 212.21, Definitions. This section establishes key regulatory definitions, including public charge, public benefit, likely at any time to become a public charge, and household.

• Adding 212.22, Public charge determination. This section clarifies that evaluating the likelihood of becoming a public charge is a prospective determination based on the totality of the circumstances. This section provides details on how the statute's mandatory factors would be considered when making a public charge inadmissibility determination.

• Adding 212.23, Exemptions and waivers for the public charge ground of inadmissibility. This section provides a list of statutory and regulatory exemptions from and waivers of inadmissibility based on public charge.

• Adding 212.24 Valuation of monetizable benefits. This section provides the methodology for calculating the annual aggregate amount of the portion attributable to the alien for the monetizable benefits and considered in the public charge inadmissibility determination.

• Amending 8 CFR 213.1, Adjustment of status of aliens on submission of a public charge bond. The updates to this section change the title of this section and add specifics to the public charge bond provision for aliens who are seeking adjustment of status, including the discretionary availability and the minimum amount for a public charge bond.

• Amending 8 CFR 214.1, Requirements for admission, extension, and maintenance of status. These amendments provide that, with limited

000568

exceptions, an application for extension of nonimmigrant stay will be denied unless the applicant demonstrates that he or she has not received since obtaining the nonimmigrant status he or she seeks to extend, is not receiving, and is not likely to receive, public benefits as described in 8 CFR 212.21(b). Where section 212(a)(4) of the Act does not apply to the nonimmigrant category that the alien seeks to extend, this provision does not apply.

• Amending 8 CFR 245.4 Documentary requirements. These amendments require applicants for adjustment of status to file the new USCIS Form I–944, Declaration of Self-Sufficiency, to facilitate USCIS' public charge inadmissibility determination.

• Amending 8 CFR 248.1, Change of nonimmigrant classification eligibility. This section provides that with limited exceptions, an application to change nonimmigrant status will be denied unless the applicant demonstrates that he or she has not received since obtaining the nonimmigrant status from which the alien seeks to change, is not currently receiving, nor is likely to receive public benefits in the future, as described in proposed 8 CFR 212.21(b). Where section 212(a)(4) of the Act does not apply to the nonimmigrant category to which the alien requests a change of status this provision does not apply.

*B. Costs and Benefits*

This proposed rule would impose new costs on the population applying to adjust status using Application to Register Permanent Residence or Adjust Status (Form I–485) that are subject to the public charge grounds on inadmissibility. DHS would now require any adjustment applicants subject to the public charge inadmissibility ground to submit Form I–944 with their Form I–485 to demonstrate that they are not likely to become a public charge.

The proposed rule would also impose additional costs for seeking extension of stay or change of status by filing Form I–129 (Petition for a Nonimmigrant Worker); Form I–129CW (Petition for a CNMI-Only Nonimmigrant Transitional Worker); or Form I–539 (Application to Extend/Change Nonimmigrant Status) as applicable. The associated time burden estimate for completing these forms would increase because these applicants would be required to demonstrate that they have not received, are not currently receiving, nor are likely in the future to receive, public benefits as described in proposed 8 CFR 212.21(b). These

applicants may also incur additional costs if DHS determines that they are required to submit Form I–944 in support of their applications for extension of stay or change of status. Moreover, the proposed rule would impose new costs associated with the proposed public charge bond process, including new costs for completing and filing Form I–945 (Public Charge Bond), and Form I–356 (Request for Cancellation of Public Charge Bond).

DHS estimates that the additional total cost of the proposed rule would range from approximately $45,313,422 to $129,596,845 annually for the population applying to adjust status who also would be required to file Form I–944, the population applying for extension of stay or change of status that would experience opportunity costs in time associated with the increased time burden estimates for completing Form I–485, Form I–129, Form I–129CW, and Form I–539, and the population requesting or cancelling a public charge bond using Form I–945 and Form I–356, respectively.

Over the first 10 years of implementation, DHS estimates the total quantified new direct costs of the proposed rule would range from about $453,134,220 to $1,295,968,450 (undiscounted). DHS estimates that the 10-year discounted total direct costs of this proposed rule would range from about $386,532,679 to $1,105,487,375 at a 3 percent discount rate and about $318,262,513 to $910,234,008 at a 7 percent discount rate.

The proposed rule would impose new costs on the population seeking extension of stay or change of status using Form I–129, Form I–129CW, or Form I–539. For any of these forms, USCIS officers would then be able to exercise discretion in determining whether it would be necessary to issue a request for evidence (RFE) requesting the applicant to submit Form I–944. DHS conducted a sensitivity analysis estimating the potential cost of filing Form I–129, Form I–129CW, or Form I–539 for a range of 10 to 100 percent of filers receiving an RFE requesting they submit Form I–944. The costs to Form I–129 beneficiaries who may receive an RFE to file Form I–944 range from $6,086,318 to $60,863,181 annually and the costs to Form I–129CW beneficiaries who may receive such an RFE from $114,132 to $1,141,315 annually. The costs to Form I–539 applicants who may receive an RFE to file Form I–944 range

from $3,164,375 to $31,643,752 annually.

Simultaneously, DHS is proposing to eliminate the use and consideration of the Request for Exemption for Intending Immigrant's Affidavit of Support (Form I–864W), currently applicable to certain classes of aliens. In lieu of Form I–864W, the alien would indicate eligibility for the exemption of the affidavit of support requirement on Form I–485, Application to Register Permanent Residence or Adjust Status.

The proposed rule would potentially impose new costs on individuals or companies (obligors) if an alien has been found to be inadmissible on public charge grounds, but has been given the opportunity to submit a public charge bond, for which USCIS intends to use the new Form I–945. DHS estimates the total cost to file Form I–945 would be at minimum about $34,234 annually.[3] The proposed rule would also impose new costs on aliens or obligors who would submit a Form I–356; DHS estimates the total cost to file Form I–356 would be approximately $825 annually.[4]

Moreover, the proposed rule would also result in a reduction in transfer payments from the federal government to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Individuals may make such a choice due to concern about the consequences to that person receiving public benefits and being found to be likely to become a public charge for purposes outlined under section 212(a)(4) of the Act, even if such individuals are otherwise eligible to receive benefits. For the proposed rule, DHS estimates that the total reduction in transfer payments from the federal and state governments would be approximately $2.27 billion annually due to disenrollment or foregone enrollment in public benefits programs by aliens who may be receiving public benefits. DHS estimates that the 10-year discounted transfer payments of this proposed rule would be approximately $19.3 billion at a 3 percent discount rate and about $15.9 billion at a 7 percent discount rate. Because state

---

[3] Calculation: $35.66 (cost per obligor to file Form I–945) * 960 (estimated annual population who would file Form I–945) = $34,233.60 = $34,234 (rounded) annual total cost to file Form I–945.

[4] Calculation: $33.00 (cost per obligor to file Form I–356) * 25 (estimated annual population who would file Form I–356) = $825.00 annual total cost to file Form I–356.

51118    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

participation in these programs may vary depending on the type of benefit provided, DHS was only able to estimate the impact of state transfers. For example, the federal government funds all SNAP food expenses, but only 50 percent of allowable administrative costs for regular operating expenses.[5] Similarly, Federal Medical Assistance Percentages (FMAP) in some HHS programs like Medicaid can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[6] However, assuming that the state share of federal financial participation (FFP) is 50 percent, the 10-year discounted amount of state transfer payments of this proposed policy would be approximately $9.65 billion at a 3 percent discount rate and about $7.95 billion at a 7 percent discount rate. DHS recognizes that reductions in federal and state transfers under federal benefit programs may have downstream and upstream impacts on state and local economies, large and small businesses, and individuals. For example, the rule might result in reduced revenues for healthcare providers participating in Medicaid, pharmacies that provide prescriptions to participants in the Medicare Part D Low Income Subsidy (LIS) program, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs.

Additionally, the proposed rule would add new direct and indirect costs on various entities and individuals associated with regulatory familiarization with the provisions of this rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this proposed rule. An entity, such as a non-profit or advocacy group, may have more than one person that reads the rule. Familiarization costs incurred by those not directly regulated are indirect costs. DHS estimates the time that would be necessary to read this proposed rule would be approximately 8 to 10 hours per person, resulting in opportunity costs of time.

The primary benefit of the proposed rule would be to help ensure that aliens who apply for admission to the United States, seek extension of stay or change of status, or apply for adjustment of status are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their family, sponsor, and private organizations.[7] DHS also anticipates that the proposed rule would produce some benefits from the elimination of Form I–864W. The elimination of this form would potentially reduce the number of forms USCIS would have to process, although it likely would not reduce overall processing burden. DHS estimates the amount of cost savings that would accrue from eliminating Form I–864W would be $35.78 per petitioner.[8] However, DHS is unable to determine the annual number of filings of Form I–864W and, therefore, is currently unable to estimate the total annual cost savings of this change. A public charge bond process would provide benefits to applicants as they potentially would be given the opportunity to adjust their status if otherwise admissible, at the discretion of DHS, after a determination that they are likely to become public charges.

Table 1 provides a more detailed summary of the proposed provisions and their impacts.

BILLING CODE 4410–10–P

---

[5] Per section 16(a) of the Food and Nutrition Act of 2008. *See also* Per section 16(a) of the Food and Nutrition Act of 2008. *See also* USDA, FNS Handbook 901, p. 41 available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_internet_Ready_Format.pdf*

[6] *See* Dept. of Health and Human Services, "Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2016 through September 30, 2017." ASPE FMAP 2017 Report. Dec. 29, 2015. Available at *https://aspe.hhs.gov/basic-report/fy2017-federal-medical-assistance-percentages.* Accessed Sept. 13, 2018.

[7] 8 U.S.C. 1601(2).

[8] Calculation for the opportunity cost of time for completing and submitting Form I–864W: ($34.84 per hour * 1.0 hours) = $34.84.

| Table 1. Summary of Major Provisions and Economic Impacts of the Proposed Rule | | |
|---|---|---|
| **Provisions** | **Purpose** | **Expected Impact of Proposed Rule** |
| Adding 8 CFR 212.20. Purpose and applicability of public charge inadmissibility. | To define the categories of aliens that are subject to the public charge inadmissibility determination. | **Quantitative:**<br><br>Benefits<br>• Cost savings of $35.78 per petitioner from no longer having to complete and file Form I-864W.<br><br>Costs:<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determinations. |
| Adding 8 CFR 212.21. Definitions. | To establish key definitions, including public charge, public benefit, likely to become a public charge, and household. | |
| Adding 8 CFR 212.22. Public charge determination. | Clarifies that evaluating public charge is a prospective determination based on the totality of the circumstances.<br><br>Outlines minimum and additional factors considered when evaluating whether an alien is inadmissible as likely to become a public charge. Positive and negative factors are weighed to determine an individual's likelihood of becoming a public charge at any time in the future. | **Qualitative:**<br>Benefits<br>• Better ensure that aliens who are admitted to the United States or apply for adjustment of status are self-sufficient through an improved review process of the mandatory statutory factors. |
| Adding 8 CFR 212.23. Exemptions and waivers for public charge ground of inadmissibility. | Outlines exemptions and waivers for inadmissibility based on public charge grounds. | |
| Adding 212.24. Valuation of monetizable benefits. | Provides the methodology for calculating value of the benefit attributable to the alien in proportion to the total number of people covered by the benefit in the public charge inadmissibility determination. | |
| Adding 8 CFR 214.1(a)(3)(iv) and amending 8 CFR 214.1(c)(4). Nonimmigrant general | To provide, with limited exceptions, that an application for extension of stay or change of nonimmigrant status will be denied unless the applicant demonstrates that he or she | **Quantitative:**<br>• Potential annual costs for those filing Form I-129 range from $6.09 million to $60.9 million depending on how many |

| requirements; and amending 8 CFR 248.1(a) and adding 8 CFR 248.1(c)(4) Change of nonimmigrant classification eligibility. | has not received, is not currently receiving, nor is likely to receive, public benefits as defined in proposed 8 CFR 212.21(b). | • beneficiaries are sent an RFE by USCIS to complete Form I-944.<br>• Potential annual costs for those filing Form I-129CW range from $0.11 million to $1.14 million depending on how many beneficiaries are sent an RFE by USCIS to complete Form I-944.<br>• Potential annual costs for those filing Form I-539 applicants range from $3.16 million to $31.6 million depending on how many beneficiaries are sent an RFE by USCIS to complete Form I-944<br><br>**Qualitative:**<br>Benefits<br>• Better ensure that aliens who are not exempt from the section 212(a)(4) inadmissibility ground who apply for extension of stay or change of status continue to be self-sufficient during the duration of their temporary stay.<br>• Reduce the likelihood that an alien will receive a public benefit at any time in the future. |
| Amending 8 CFR 245. Adjustment of status to that of a person admitted for permanent residence. | To outline requirements that aliens submit a declaration of self-sufficiency on the form designated by DHS and any other evidence requested by DHS in the public charge inadmissibility determination. | **Quantitative:**<br>Direct Costs<br>• Total annual direct costs of the proposed rule would range from about $45.3 to $129.6 million, including:<br>  • $26.0 million to applicants who must file Form I-944;<br>  • $0.69 million to applicants applying to adjust status using Form I-485 with an increased time burden;<br>  • $12.1 to $66.9 million for an increased time burden for completing and filing Form I-129;<br>  • $0.23 to $1.25 million for an increased time burden for completing and filing Form I-129CW and potential RFE to complete Form I-944;<br>  • $6.29 to $34.8 million for an increased time burden for completing and filing Form I-539 and potential RFE to complete Form I-944;<br>  • $0.34 million to obligors for filing Form I-945; and<br>  • $825 million to filers for filing Form I-356. |

- Total direct costs over a 10-year period would range from:
  - $453.1 million to $1.30 billion for undiscounted costs;
  - $386.5 million to $1.11 billion at a 3 percent discount rate; and
  - $318.3 to $910.2 million at a 7 percent discount rate.

Transfer Payments

- Total annual transfer payments of the proposed rule would be about $2.27 billion from foreign-born non-citizens and their households who disenroll from or forego enrollment in public benefits programs. The federal-level share of annual transfer payments would be about $1.51 billion and the state-level share of annual transfer payments would be about $756 million.
- Total transfer payments over a 10-year period, including the combined federal- and state-level shares, would be:
  - $22.7 billion for undiscounted costs;
  - $19.3 billion at a 3 percent discount rate; and
  - $15.9 billion at a 7 percent discount rate.

**Qualitative**:

Benefits

- Potential to improve the efficiency for USCIS in the review process for public charge inadmissibility.

Costs

- DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determinations.
- DHS also anticipates costs to various entities and individuals associated with regulatory familiarization with the provisions of the rule. Costs would include the opportunity cost of time to read the proposed rule and subsequently determine applicability of the proposed rule's provisions. DHS estimates that the time to read this proposed rule in its

| | | entirety would be 8 to 10 hours per individual. |
|---|---|---|
| **Public Charge Bond Provisions** | | |
| Amending 8 CFR 103.6. Public charge bonds. | To set forth the Secretary's discretion to approve bonds, cancellation, bond schedules, and breach of bond, and to move principles governing public charge bonds to proposed 8 CFR 213.1. | **Quantitative:**<br><br>Costs<br><br>• $0.34 million annually to obligors for submitting Public Charge Bond (Form I-945); and<br>• $825 annually to filers for submitting Request for Cancellation of Public Charge Bond (Form I-356).<br>• Fees paid to surety bond companies to secure public charge bond. Fees could range from 1 – 15 percent of the public charge bond amount based on an individual's credit score. |
| Amending 8 CFR 103.7. Fees. | To add fees for new Form I-945, Public Charge Bond, and Form I-356, Request for Cancellation of Public Charge Bond. | **Qualitative:**<br><br>Benefits<br><br>• Potentially enable an alien who was found inadmissible on public charge grounds to be admitted by posting a public charge bond with DHS. |
| Amending 8 CFR 213.1. Adjustment of status of aliens on giving of a public charge bond. | In 8 CFR 213.1, to add specifics to the public charge bond provision for aliens who are seeking adjustment of status, including the discretionary availability and the minimum amount required for a public charge bond. | Costs<br><br>• USCIS will need to staff a unit to administer this process. |
| Source: USCIS analysis. | | |

BILLING CODE 4410-10-C

## III. Purpose of the Proposed Rule

### A. Self-Sufficiency

DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their family, sponsor, and private organizations.[9] Under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), an alien is inadmissible if, at the time of an application for a visa, admission, or adjustment of status, he or she is likely at any time to become a public charge. The statute requires DHS to consider the following minimum factors that reflect the likelihood that an alien will become a public charge: The alien's age; health; family status; assets, resources, and financial status; and education and skills. DHS may also consider any affidavit of support submitted by the alien's sponsor and any other factor relevant to the likelihood of the alien becoming a public charge.

As noted in precedent administrative decisions, determining the likelihood of an alien becoming a public charge involves "consideration of all the factors bearing on the alien's ability or potential ability to be self-supporting." [10] These decisions, in general, conclude that an alien who is incapable of earning a livelihood, who does not have sufficient funds in the United States for support, and who has no person in the United States willing and able to assure the alien will not need public support generally is inadmissible as likely to become a public charge.[11] Furthermore, the following congressional policy statements relating to self-sufficiency, immigration, and public benefits inform DHS's proposed administration of

---

[9] *See* 8 U.S.C. 1601(2).

[10] *Matter of Vindman,* 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977).

[11] *See, e.g., Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r 1977); *Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) Aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations; and

(B) The availability of public benefits not constitute an incentive for immigration to the United States.[12]

Within this administrative and legislative context, DHS's view of self-sufficiency is that aliens subject to the public charge ground of inadmissibility must rely on their own capabilities and secure financial support, including from family members and sponsors, rather than seek and receive public benefits to meet their needs. Aliens subject to the public charge ground of inadmissibility include: Immediate relatives of U.S. citizens, fiancé(e)s, family-preference immigrants, most employment-based immigrants, diversity visa immigrants, and certain nonimmigrants. Most employment-based immigrants are coming to work for their petitioning employers; DHS believes that by virtue of their employment, such immigrants should have adequate income and resources to support themselves without resorting to seeking public benefits. Similarly, DHS believes that, consistent with section 212(a)(4), nonimmigrants should have sufficient financial means or employment, if authorized to work, to support themselves for the duration of their authorized admission and temporary stay. In addition, immediate relatives of U.S. citizens, fiancé(e)s, most family-preference immigrants, and some employment-based immigrants require a sponsor and a legally binding affidavit of support under section 213A of the Act showing that the sponsor agrees to provide support to maintain the alien at an annual income that is not less than 125 percent of the FPG.[13]

DHS's view of self-sufficiency also informs other aspects of this proposal. DHS proposes that aliens who seek to change their nonimmigrant status or extend their nonimmigrant stay generally should also be required to continue to be self-sufficient and not remain in the United States to avail themselves of any public benefits for which they are eligible, even though the public charge inadmissibility determination does not directly apply to them. Such aliens should have adequate financial resources to maintain the status they seek to extend or to which they seek to change for the duration of their temporary stay, and must be able to support themselves.

*B. Public Charge Inadmissibility Determinations*

DHS seeks to interpret the term "public charge" for purposes of making public charge inadmissibility determinations. As noted above, Congress codified the minimum mandatory factors that must be considered as part of the public charge inadmissibility determination under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4): Age, health, family status, assets, resources, financial status, education, and skills.[14] In addition to these minimum factors, the statute states that any affidavit of support under section 213A of the Act may also be considered.[15] In fact, since an affidavit of support is required for family-sponsored immigrant applicants and certain employment-sponsored immigrant applicants, these aliens are inadmissible as likely to become a public charge if they do not submit such a sufficient affidavit of support.[16]

Although INS[17] issued a proposed rule and Interim Field Guidance in 1999, neither the proposed rule nor Interim Field Guidance sufficiently described the mandatory factors or explained how to weigh these factors in the public charge inadmissibility determination.[18] The 1999 Interim Field Guidance allows consideration of the receipt of cash public benefits when determining whether an applicant meets the definition of "public charge," but excluded consideration of non-cash public benefits. In addition, the 1999 Interim Field Guidance placed its emphasis on primary dependence on cash public benefits. This proposed rule would improve upon the 1999 Interim Field Guidance by removing the artificial distinction between cash and non-cash benefits, and aligning public charge policy with the self-sufficiency principles set forth in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[19] The proposed rule would provide clarification and guidance on the mandatory factors, including how these factors would be evaluated in relation to the new proposed definition of public charge and in making a public charge inadmissibility determination.[20]

## IV. Background

Three principal issues[21] have framed the development of public charge inadmissibility: (1) The factors involved in determining whether or not an alien is likely to become a public charge, (2) the relationship between public charge and receipt of public benefits, and (3) the consideration of a sponsor's affidavit of support within public charge inadmissibility determinations.

---

[12] Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, 110 Stat. 2105, codified in part at 8 U.S.C. 1601.

[13] *See* INA section 213A(a), 8 U.S.C. 1183a(a).

[14] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(B)(ii).

[15] *See* INA section 212(a)(4)(B)(iii), 8 U.S.C. 1182(a)(B)(iii).

[16] *See* INA section 212(a)(4)(C), 8 U.S.C. 1182(a)(4)(C).

[17] On March 1, 2003, INS functions were transferred from the Department of Justice to DHS. *See* Homeland Security Act of 2002, Public Law 107–296, sections 402(3), 441, 116 Stat. 2135, 2178, 2192.

[18] *See Inadmissibility and Deportability on Public Charge Grounds,* 64 FR 28676 (May 26, 1999); *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,* 64 FR 28689 (May 26, 1999). Due to a printing error, the **Federal Register** version of the field guidance appears to be dated "March 26, 1999" even though the guidance was actually signed May 20, 1999, became effective May 21, 1999 and was published in the **Federal Register** on May 26, 1999, along with the NPRM.

[19] Public Law 104–193, 110 Stat. 2105.

[20] Moreover, this proposed policy change is consistent with the March 6, 2017 Presidential Memorandum directing DHS to issue new rules, regulations, and/or guidance to enforce laws relating to such grounds of inadmissibility and subsequent compliance. *See Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits, Ensuring Enforcement of All Laws for Entry Into the United States, and Increasing Transparency Among Departments and Agencies of the Federal Government and for the American People,* 82 FR 16279 (Apr. 3, 2017), *available at https://www.whitehouse.gov/the-press-office/2017/03/06/memorandum-secretary-state-attorney-general-secretary-homeland-security.*

[21] *See, e.g., Report of the Committee of the Judiciary Pursuant to S. Res. 137,* S. Rep. No. 81–1515, at 346–50 (1950). Prior to passage of the INA of 1952, the Senate Judiciary Committee issued a report assessing issues within the immigration system, including public charge. The committee recommended retention of public charge exclusion in the statute but highlighted two main problems related to its implementation: (1) How to determine who is likely to become a public charge and (2) how to find a better way of meeting the purpose for which affidavits of support were executed on the alien's behalf. The committee noted that there was no definition of the term "likely to become a public charge" and that the meaning of the term had been left to the interpretation of administrative officials and the courts. Factors such as financial status, business ownership, health, and employability were considerations, as were decisions rendered by the courts and in public charge determinations made by consular and immigration officers. The committee advised against defining public charge in the INA. Instead, it recommended that the determination of whether an alien falls into the public charge category should rest within the discretion of consular and immigration officials because the elements constituting public charge are varied. It also recommended the use of a bond or suitable undertaking over the practice of using affidavits of support.

## A. Legal Authority

DHS's authority for making public charge inadmissibility determinations and related decisions is found in several statutory provisions. Section 102 of the Homeland Security Act of 2002 (Pub. L. 107–296, 116 Stat. 2135), 6 U.S.C. 112, and section 103 of the Immigration and Nationality Act (INA, or the Act), 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States. In addition to establishing the Secretary's general authority for the administration and enforcement of immigration laws, section 103 of the Act enumerates various related authorities including the Secretary's authority to establish regulations and prescribe such forms of bond as are necessary for carrying out her authority. Section 212 of the Act, 8 U.S.C. 1182, establishes classes of aliens that are ineligible for visas, admission, or adjustment of status and paragraph (a)(4) of that section establishes the public charge ground of inadmissibility, including the minimum factors the Secretary must consider in making a determination that an alien is likely to become a public charge. Section 212(a)(4) of the Act also establishes the affidavit of support requirement as applicable to certain family-based and employment-based immigrants, and exempts certain aliens from both the public charge ground of inadmissibility and the affidavit of support requirement. Section 213 of the Act, 8 U.S.C. 1183, provides the Secretary with discretion to admit into United States an alien who is determined to be inadmissible as a public charge under section 212(a)(4) of the Act, but is otherwise admissible, upon the giving of a proper and suitable bond. That section authorizes the Secretary to establish the amount and conditions of such bond. Section 213A of the Act, 8 U.S.C. 1183a, sets out requirements for the sponsor's affidavit of support, including reimbursement of government expenses where the sponsored alien received means-tested public benefits. Section 214 of the Act, 8 U.S.C. 1184, addresses requirements for the admission of nonimmigrants, including authorizing the Secretary to prescribe the conditions of such admission through regulations and when necessary establish a bond to ensure that those admitted as nonimmigrants or who change their nonimmigrant status under section 248 of the Act, 8 U.S.C. 1258, depart if they violate their nonimmigrant status or after such status expires. Section 245 of the Act, 8 U.S.C. 1255, generally establishes eligibility criteria for adjustment of status to lawful permanent residence. Section 248 of the Act, 8 U.S.C. 1258, authorizes the Secretary to prescribe conditions under which an alien may change his or her status from one nonimmigrant classification to another. The Secretary proposes the changes in this rule under these authorities.

## B. Immigration to the United States

The INA governs whether an alien may obtain a visa, be admitted to or remain in the United States, or obtain an extension of stay, change of status, or adjustment of status.[22] The INA establishes separate processes for aliens seeking a visa, admission, change of status, and adjustment of status. For example, where an immigrant visa petition is required, USCIS will adjudicate the petition. If USCIS approves the petition, the alien may apply for a visa with the U.S. Department of State (DOS) and thereafter seek admission in the appropriate immigrant classification. If the alien is present in the United States, he or she may be eligible to apply to USCIS for adjustment of status to that of a lawful permanent resident. In the nonimmigrant context, the nonimmigrant typically applies directly to the U.S. consulate or embassy abroad for a visa to enter for a limited purpose, such as to visit for business or tourism.[23] Applicants for admission are inspected at or, when encountered, between the port of entry. The inspection is conducted by immigration officers in a timeframe and setting distinct from the visa adjudication process. If a nonimmigrant alien is present in the United States, he or she may be eligible to apply to USCIS for an extension of nonimmigrant stay or change of nonimmigrant status.

DHS has the discretion to waive certain grounds of inadmissibility as designated by Congress. Where an alien is seeking an immigration benefit that is subject to a ground of inadmissibility, DHS cannot approve the immigration benefit being sought if a waiver of that ground is unavailable under the INA, the alien does not meet the statutory and regulatory requirements for the waiver, or the alien does not warrant the waiver in any authorized exercise of discretion.

## C. Extension of Stay and Change of Status

Pursuant to section 214(a)(1) of the Act, 8 U.S.C. 1184(a)(1), DHS permits certain nonimmigrants to remain in the United States beyond their current period of authorized stay to continue engaging in activities permitted under their current nonimmigrant status. The extension of stay regulations require a nonimmigrant applying for an extension of stay to demonstrate that he or she is admissible to the United States.[24] For some extension of stay applications, the applicant's financial status is an element of the eligibility determination.[25] DHS has the authority to set conditions in determining whether to grant the extension of stay request.[26] The decision to grant an extension of stay application, with certain limited exceptions, is discretionary.[27]

Under section 248 of the Act, 8 U.S.C. 1258, DHS may permit an alien to change his or her status from one nonimmigrant status to another nonimmigrant status, with certain exceptions, as long as the nonimmigrant is continuing to maintain his or her current nonimmigrant status and is not inadmissible under section 212(a)(9)(B)(i) of the Act, 8 U.S.C. 1182(a)(9)(B)(i).[28] An applicant's financial status is currently part of the determination for changes to certain nonimmigrant classifications.[29] Like extensions of stay, change of status adjudications are discretionary determinations, and DHS has the authority to set conditions that apply for a nonimmigrant to change his or her status.[30]

## D. Public Charge Inadmissibility

Section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), provides that an alien applicant for a visa, admission, or adjustment of status is inadmissible if he or she is likely at any time to become a public charge. The public charge ground of inadmissibility, therefore, applies to any alien applying for a visa to come to the United States temporarily or permanently, for admission, or for

---

[22] *See, e.g.,* INA section 212(a), 8 U.S.C. 1182(a) (listing grounds of inadmissibility).

[23] Certain nonimmigrant classifications are subject to petition requirements and require that a petition be filed and approved by USCIS prior to application for a visa. *See, e.g.,* INA section 214(c), 8 U.S.C. 1184(c). In addition, certain aliens are not subject to a visa requirement in order to seek admission as a nonimmigrant. *See, e.g.,* INA section 217, 8 U.S.C. 1187.

[24] *See* 8 CFR 214.1(a)(3)(i).

[25] *See., e.g.,* 8 CFR 214.2(f)(1)(i)(B).

[26] *See* INA section 214(a)(1), 8 U.S.C. 1184(a)(1); 8 CFR 214.1(a)(3)(i).

[27] *See* 8 CFR 214.1(c)(5).

[28] *See* INA section 248(a), 8 U.S.C. 1258(a); 8 CFR 248.1(a).

[29] *See., e.g.,* Adjudicator's Field Manual Ch. 30.3(c)(2)(C) (applicants to change status to a nonimmigrant student must demonstrate that they have the financial resources to pay for coursework and living expenses in the United States) [hereinafter AFM].

[30] *See* INA section 248(a), 8 U.S.C. 1258(a); 8 CFR 248.1(a).

adjustment of status to that of a lawful permanent resident.[31] Section 212(a)(4) of the Act, does not, however, directly apply to applications for extension of stay or change of status because extension of stay and change of status applications are not applications for a visa, admission, or adjustment of status.

The INA does not define public charge. It does, however, specify that when determining if an alien is likely at any time to become a public charge, consular officers and immigration officers must, at a minimum, consider the alien's age; health; family status; assets, resources, and financial status; and education and skills.[32]

Some immigrant and nonimmigrant categories are exempt from the public charge inadmissibility ground. DHS proposes to list these categories in the regulation. DHS also proposes to list in the regulation the applicants that the law permits to apply for a waiver of the public charge inadmissibility ground.[33]

Additionally, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), permits the consular officer or the immigration officer to consider any affidavit of support submitted under section 213A of the Act, 8 U.S.C. 1183a, on the applicant's behalf when determining whether the applicant may become a public charge.[34] In fact, with very limited exceptions, aliens seeking family-based immigrant visas and adjustment of status, and a limited number of employment-based immigrant visas or adjustment of status, must have a sufficient affidavit of support or will be found inadmissible as likely to become a public charge.[35]

In general, an alien whom DHS has determined to be inadmissible based on the public charge ground may, if otherwise admissible, be admitted at the discretion of the Secretary upon giving a suitable and proper bond or undertaking approved by the Secretary.[36] The purpose of issuing a public charge bond is to ensure that the alien will not become a public charge in the future.[37] Since the introduction of enforceable affidavits of support in section 213A of the Act, the use of public charge bonds has decreased and USCIS does not currently have a public charge bond process.[38] This rule would outline a process under which USCIS could, in its discretion, offer public charge bonds to applicants for adjustment of status who are inadmissible only on public charge grounds.

### 1. Public Laws and Case Law

Since at least 1882, the United States has denied admission to aliens on public charge grounds.[39] The INA of 1952 excluded aliens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Government at the time of application for admission, are likely at any time to become public charges.[40] The Government has long interpreted the words "in the opinion of" as evincing the subjective nature of the determination.[41]

A series of administrative decisions after passage of the Act clarified that a totality of the circumstances review was the proper framework for making public charge determinations and that receipt of welfare would not, alone, lead to a finding of likelihood of becoming a public charge. In *Matter of Martinez-Lopez*, the Attorney General opined that the statute "require[d] more than a showing of a possibility that the alien will require public support. Some *specific* circumstance, such as mental or physical disability, advanced age, or other fact showing that the burden of supporting the alien is likely to be cast on the public, must be present. A healthy person in the prime of life cannot ordinarily be considered likely to become a public charge, especially where he has friends or relatives in the United States who have indicated their ability and willingness to come to his assistance in case of emergency." [42] In

*Matter of Perez*, the Board of Immigration Appeals (BIA) held that "[t]he determination of whether an alien is likely to become a public charge . . . is a prediction based upon the totality of the alien's circumstances at the time he or she applies for an immigrant visa or admission to the United States. The fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge." [43] As stated in *Matter of Harutunian*,[44] public charge determinations should take into consideration factors such as an alien's age, incapability of earning a livelihood, a lack of sufficient funds for self-support, and a lack of persons in this country willing and able to assure that the alien will not need public support.

The totality of circumstances approach to public charge inadmissibility determinations was codified in relation to one specific class of aliens in the 1980s. In 1986, Congress passed the Immigration Reform and Control Act (IRCA), providing eligibility for lawful status to certain aliens who had resided in the United States continuously prior to January 1, 1982.[45] No changes were made to the language of the public charge exclusion ground under former section 212(a)(15) of the Act, but IRCA contained special public charge rules for aliens seeking legalization under 245A of the Act. Although IRCA provided otherwise eligible aliens an exemption or waiver for some grounds of excludability, the aliens generally remained excludable on public charge grounds.[46] Under IRCA, however, if an applicant demonstrated a history of self-support through employment and without receiving public cash assistance, he or she would not be ineligible for adjustment of status on public charge grounds.[47] In addition, aliens who were "aged, blind or disabled" as defined in section 1614(a)(1) of the Social Security Act, could obtain a waiver from the public charge provision.[48]

[31] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[32] See INA section 212(a)(4)(B)(i), 8 U.S.C. 1182(a)(4)(B)(i).

[33] See proposed 8 CFR 212.23.

[34] See INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii). When required, the applicant must submit an Affidavit of Support Under Section 213A of the INA (Form I–864).

[35] See INA section 212(a)(4)(C), (D), 8 U.S.C. 1182(a)(4)(C), (D).

[36] See INA section 213, 8 U.S.C. 1183.

[37] See Matter of Viado, 19 I&N Dec. 252 (BIA 1985).

[38] See AFM Ch. 61.1(b).

[39] See Immigration Act of 1882, ch. 376, sections 1–2, 22 Stat. 214, 214. Section 11 of the Act also provided that an alien who became a public charge within 1 year of arrival in the United States from causes that existed prior to his or her landing, was deemed to be in violation of law, and was to be returned at the expense of the person or persons, vessel, transportation, company or corporation who brought the alien into the United States.

[40] See INA of 1952, ch. 477, section 212(a)(15), 66 Stat. 163, 183.

[41] See Matter of Harutunian, 14 I&N Dec. 583, 588 (Reg'l Comm'r 1974) ("[T]he determination of whether an alien falls into that category [as likely to become a public charge] rests within the discretion of the consular officers or the Commissioner . . . Congress inserted the words 'in the opinion of' (the consul or the Attorney General) with the manifest intention of putting borderline adverse determinations beyond the reach of judicial review." (citation omitted)); Matter of Martinez-Lopez, 10 I&N Dec. 409, 421 (Att'y Gen. 1962) ("[U]nder the statutory language the question for visa purposes seems to depend entirely on the consular officer's subjective opinion.").

[42] 10 I&N Dec. 409, 421–23 (BIA 1962).

[43] 15 I&N Dec. 136, 137 (BIA 1974).

[44] See 14 I&N Dec. 583, 589 (Reg'l Comm'r 1974).

[45] See IRCA of 1986, Public Law 99–603, section 201, 100 Stat. 3359, 3394.

[46] See INA section 245A(d)(2)(B)(ii)(IV), 8 U.S.C. 1255(d)(2)(B)(ii)(IV).

[47] See INA section 245A(d)(2)(B)(iii), 8 U.S.C. 1255(d)(2)(B)(iii).

[48] See INA section 245A(d)(2)(B)(ii); see also 42 U.S.C. 1382c(a)(1). DHS does not propose to apply this proposed rule to legalization applications filed pursuant to section 245A of the INA or otherwise amend the regulations at 8 CFR part 245a. That provision is subject to legal standards and settlement agreements that impact public charge inadmissibility determinations in this specific context. See, e.g., Catholic Soc. Servs., Inc. v. Meese, vacated sub nom. Reno v. Catholic Soc.
Continued

INS promulgated 8 CFR 245a.3,[49] which established that immigration officers would make public charge determinations by examining the "totality of the alien's circumstances at the time of his or her application for legalization." [50] According to the regulation, the existence or absence of a particular factor could never be the sole criterion for determining whether a person is likely to become a public charge.[51] Further, the regulation established that the determination is a "prospective evaluation based on the alien's age, health, income, and vocation." [52] A special provision in the rule stated that aliens with incomes below the poverty level are not excludable if they are consistently employed and show the ability to support themselves.[53] Finally, an alien's past receipt of public cash assistance would be a significant factor in a context that also considers the alien's consistent past employment.[54] In *Matter of A-*,[55] INS again pursued a totality of circumstances approach in public charge determinations. "Even though the test is prospective," INS "considered evidence of receipt of prior public assistance as a factor in making public charge determinations." INS also considered an alien's work history, age, capacity to earn a living, health, family situation, affidavits of support, and other relevant factors in their totality.[56]

The administrative practices surrounding public charge inadmissibility determinations began to crystalize into legislative changes in the 1990s. The Immigration Act of 1990 reorganized section 212(a) of the Act and re-designated the public charge provision as section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).[57] In 1996, PRWORA [58] and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) [59] altered the legislative landscape of public charge considerably.[60] Through PRWORA, which is commonly known as the 1996 welfare reform law, Congress declared that aliens generally should not depend on public resources and that these resources should not constitute an incentive for immigration to the United States.[61] Congress also created section 213A of the Act and made a sponsor's affidavit of support for an alien beneficiary legally enforceable.[62] The affidavit of support provides a mechanism for public benefit granting agencies to seek reimbursement in the event a sponsored alien received means-tested public benefits.[63]

## 2. Public Benefits Under PRWORA

PRWORA also significantly restricted alien eligibility for many Federal, State, and local public benefits.[64] With certain exceptions, Congress defined the term "Federal public benefit" broadly as:

(A) Any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

(B) Any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.[65]

## (a) Qualified Aliens

Generally, under PRWORA, "qualified aliens" are eligible for federal means-tested benefits after 5 years and are not eligible for "specified federal programs," and states are allowed to determine whether the qualified alien is eligible for "designated federal programs." [66] The following table provides a list of immigration categories that are qualified aliens under PRWORA.[67]

*Servs., Inc.,* 509 U.S. 43 (1993); *League of United Latin Am. Citizens* v. *INS, vacated sub nom. Reno* v. *Catholic Soc. Servs., Inc.,* 509 U.S. 43 (1993).

[49] *See Adjustment of Status for Certain Aliens,* 54 FR 29442 [Jul. 12, 1989].

[50] 8 CFR 245a.3(g)(4)(i).

[51] 8 CFR 245a.3(g)(4)(i).

[52] 8 CFR 245a.3(g)(4)(i).

[53] 8 CFR 245a.3(g)(4)(iii).

[54] *See* 8 CFR 245a.3(g)(4)(iii).

[55] 19 I&N Dec. 867 (Comm'r 1988).

[56] *See* 19 I&N Dec. 867, 869 (Comm'r 1988).

[57] *See* Immigration Act of 1990, Public Law 101–649, section 601(a), 104 Stat. 4978, 5072.

[58] Public Law 104–193, 110 Stat. 2105.

[59] Public Law 104–208, div. C, 110 Stat 3009–546.

[60] In 1990, Congress reorganized INA section 212(a), redesignated the public charge provision as INA section 212(a)(4), and eliminated the exclusion of paupers, beggars, and vagrants as these grounds were sufficiently covered under the public charge provision. *See* Immigration Act of 1990, Public Law 101–649, section 601(a), 104 Stat. 4978, 5072.

[61] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (codified at 8 U.S.C. 1601).

[62] *See* Public Law 104–193, section 423, 110 Stat. 2105, 2271 (codified at INA section 213A, 8 U.S.C. 1183a). The provision was further amended with the passage of IIRIRA.

[63] *See* INA section 213A(b), 8 U.S.C. 1183a(b).

[64] *See* 8 U.S.C. 1601–1646.

[65] *See* Public Law 104–193, section 401(c), 110 Stat. 2105, 2262 (1996) (codified as amended at 8 U.S.C. 1611(c)). Congress provided that such term shall not apply—

(A) to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99–239 or 99–658 (or a successor provision) is in effect;

(B) with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 *et seq.*] qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Attorney General, after consultation with the Secretary of State; or

(C) to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States. 8 U.S.C. 1611(c)(2).

[66] *See* Public Law 104–193, tit. IV, 110 Stat. 2105, 2260–77.

[67] *See* Public Law 104–193, section 431, 110 Stat. 2105, 2274 (codified at 8 U.S.C. 1641); Trafficking Victims Protection Act of 2000 section 107(b)(1), 22 U.S.C. 7105(b)(1).

| Table 2. Qualified Aliens under PRWORA | |
|---|---|
| **Category** | **Subject to Public Charge Inadmissibility under 212(a)(4)?** |
| An alien who is lawfully admitted for permanent residence under the INA | Generally no,[68] however, a lawful permanent resident is subject to public charge inadmissibility under section 212(a)(4) if one of the situations in section 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C), applies. |
| An alien who is granted asylum under section 208 of the Act | No |
| A refugee who is admitted to the United States under section 207 of the Act | No |
| An alien who is paroled into the United States under section 212(d)(5) of the Act for a period of at least 1 year[69] | Yes[70] |
| An alien whose deportation is being withheld under section 243(h) of the Act[71] or section 241(b)(3) of the Act, as amended | No |
| An alien who is granted conditional entry under section 203(a)(7) of the Act as in effect before April 1, 1980 | No |
| An alien who is a Cuban and Haitian entrant as defined in section 501(e) of the Refugee Education Assistance Act of 1980 | No |

The Trafficking Victims Protection Act of 2000 further provided that an alien who is a victim of a severe form of trafficking in persons, or an alien classified as a nonimmigrant under section 101(a)(15)(T)(ii) of the Act, 8 U.S.C. 1101(a)(15)(T)(ii), is eligible for benefits and services under any Federal or State program or activity funded or administered by any official or agency.[72] These individuals are generally exempt from the public charge inadmissibility ground.[73]

With certain exceptions, aliens who were not ''qualified aliens,'' including nonimmigrants and unauthorized aliens, were generally barred from obtaining Federal benefits.[74] In addition to the federal public benefits definitions, PRWORA categorizes the benefits into the following categories:

• Specified Federal Programs;
• Designated Federal Programs; and
• Federal Means-Tested Benefits.

The following tables provide a summary of the definition of federal public benefit and the three categories of public benefits under PRWORA as applicable to aliens and qualified aliens.

**BILLING CODE 4410-10-P**

---

[68] Lawful permanent residents seeking entry into the United States typically are not applicants for admission, and therefore, generally are not subject to section 212(a) of the INA, 8 U.S.C. 1182(a), including INA section 212(a)(4), 8 U.S.C 1182(a)(4), but lawful permanent residents described in INA section 101(a)(13)(C), 8 U.S.C. 1101(a)(13)(C), are regarded as seeking admission and generally are subject to inadmissibility grounds.

[69] Parole is not a category of admission. See INA section 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B); INA section 212(d)(5), 8 U.S.C. 1182(d)(5).

[70] While an alien paroled into the United States is not subject to an admission determination at the time the decision to parole the alien is made, if an alien who has been paroled into the United States is applying for an immigration benefit for which admissibility is required, e.g. adjustment of status, the parolee will be subject to section 212(a)(4) of the Act in the context of seeking the subsequent immigration benefit.

[71] As in effect immediately before the effective date of section 307 of division C of Public Law 104–208, 110 Stat. 3009–546.

[72] See Trafficking Victims Protection Act of 2000 section 107(b)(1), 22 U.S.C. 7105(b)(1).

[73] However, while lawful permanent residents seeking entry into the United States typically are not applicants for admission, and therefore, generally are not subject to section 212(a) of the INA (including section 212(a)(4)), a lawful permanent resident described in section 101(a)(13)(C) of the INA is regarded as seeking admission and is subject to section 212(a)(4).

[74] See PRWORA, Public Law 104–193, section 401(a), 110 Stat. 2105, 2261 (codified at 8 U.S.C. 1611(a)).

| Table 3. PRWORA Public Benefits Summary | |
|---|---|
| **Federal Public Benefit** | |
| **Definition** 8 U.S.C. 1611(c)(1) | • Any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and<br>• Any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States. |
| 8 U.S.C. 1611(c)(2) | The definition of federal public benefit does not include the following:<br>• Any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States or to a citizen of a freely associated state;[75]<br>• Benefits where there is a reciprocal treaty agreement for payment with another country for nonimmunigrants aliens authorized to work or aliens admitted as lawful permanent residents; or<br>• Professional license issued to or renewed by a foreign national not physically present in the United States. |
| **Exceptions from the definition** 8 U.S.C. 1611(b) | • Medical assistance for emergency medical condition (42 U.S.C. 1396(v)(3))<br>• Short-term, non-cash, in-kind emergency disaster relief.<br>• Public health assistance for immunizations for immunizable diseases and for testing and treatment of symptoms of communicable diseases.<br>• Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) as specified by the Attorney General, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.[76]<br>• Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development, any program under title V of the Housing Act of 1949 or any assistance under section 1926c of title 7 which the alien is receiving since before August 22, 1996.<br>• Any benefit payable under title II of the Social Security Act[77] to an alien who is lawfully present[78] in the United States, any benefit if nonpayment of such benefit would contravene an international agreement described in section 233 of the Social Security Act,[79] any benefit if nonpayment would be contrary to section 202(t) of the Social Security Act,[80] or any benefit payable under title II of the Social Security Act to which entitlement is based on an application filed in or before August 1996.<br>• Any benefit[81] relating to the Medicare program to an alien who is lawfully present in the United States[82] with respect to benefits payable under part A of such title,[83] who was authorized to be employed with respect to wages attributable such benefits.<br>• Any benefit payable under the Railroad Retirement Act of 1974[84] or the Railroad Unemployment Insurance Act[85] to an alien who is lawfully present in the United States or to an alien residing outside the United States.<br>• Receipt of benefits on or before August 22, 1996 (including SSI and SNAP (Food Stamps)). |
| **Categories of Aliens Eligible** 8 U.S.C. 1611(a) | • Qualified aliens |
| **Categories of Aliens Not Eligible** | • Aliens not listed as qualified aliens |

| 8 U.S.C. 1611(a) | |
|---|---|
| **Specified Federal Program** | |
| **Definition** 8 U.S.C 1612(a)(3) | • SSI[86] <br> • SNAP (Food Stamps)[87] |
| **Exemption** | • Qualified aliens eligible after 5 years <br>   Certain grandfathering provision for aliens already receiving SSI[88] and SNAP[89] <br><br> SNAP (Food-Stamps) specific exemptions: <br><br> • Children under 18.[90] <br> • SNAP (Food Stamps) by- aliens who were lawfully residing in the United States on August 22, 1996 and were over the age of 65. <br> • SNAP (Food Stamps) Hmong and Highland Laotians tribe members who are lawfully residing in the United States and were  members of a Hmong or Highland Laotian tribe at the time that the tribe rendered assistance to United States personnel by taking part in a military or rescue operation during the Vietnam era.[91] and the spouse, unmarried dependent child, or un-remarried surviving spouse of such  individuals. |
| **Categories of Aliens Eligible** | • Lawful permanent residents with 40 Social Security quarters[92] <br> • Veterans and active duty military with honorable service lawfully residing in the United States, and their spouses and unmarried dependent children[93] <br> • American Indians born in Canada[94] or who are members of an Indian tribe[95] <br> • Aliens who were receiving SSI on August 22, 1996[96] <br> • Aliens who were lawfully residing in the United States on August 22, 1996 and blind or disabled[97] <br><br> The following categories are eligible for benefits within the first 7 years:[98] <br> • Refugee from the time of admission and asylee from the time status was granted; <br> • Aliens whose deportation was withheld under section 243(h) of the Act, 8 U.S.C. 1253[99] or section 241(b)(3) of such Act, as amended;[100] <br> • Cuban and Haitians entrant from the time the status was granted;[101] and Amerasians[102] |
| **Categories of Aliens Not Eligible** | • Qualified aliens and all other aliens. |
| **Designated Federal Programs[103]** | |
| **Definition** 8 U.S.C. 1612(b) | • TANF[104] <br> • Social Services Block Grant[105] <br> • Medicaid[106] |
| **Categories of Aliens Eligible** | States are authorized to determine the eligibility of an alien who is a qualified alien (as defined in 8 U.S.C. 1641) for any designated Federal program. <br><br> The following categories are eligible for Designated Federal programs without a time limit: <br> • Lawful permanent residents with 40 Social Security quarters[107] <br> • Veterans and active duty personnel lawfully residing in the United States, with a discharge of honorable service who fulfill minimum active-duty service requirements, and their spouse and unmarried dependent child or unmarried surviving spouse[108] <br> • American Indian born in Canada  or who is a member of an Indian tribe would still be eligible for Medicaid[109] |

| | |
|---|---|
| | **Specified Federal Program** |
| | Medicaid, the following categories are eligible for benefits within the first 7 years and Social Services Block Grants and TANF for the first 5 years:[110] |
| | • Refugee from the time of admission and asylee from the time status was granted; |
| | • Aliens whose deportation was withheld under section 243(h) of the Act, 8 U.S.C. 1253[111] or section 241(b)(3) of such Act, as amended;[112] |
| | • Cuban and Haitians entrant from the time the status was granted;[113]  and |
| | • Amerasians[114] |
| **Categories of Aliens Not Eligible** | Aliens not listed as qualified aliens |
| | **Federal Means-Tested Benefits** |
| **Definition** 8 U.S.C. 1613 | No statutory definition under PRWORA, however, some agencies have defined which benefits would be considered means-tested.[115] |
| **Categories of Aliens Eligible** | In addition, qualified aliens eligible for all other means-tested benefits after 5 years of entry.<br><br>However, all aliens are eligible for the following programs:[116]<br>• Emergency Medical assistance 8 U.S.C. 1611(b)(1)(A)<br>• Short-term, non-cash, in-kind emergency disaster relief.<br>• National School Lunch Act<br>• Child Nutrition Act of 1966<br>• Public health assistance for immunizations<br>• Payments for foster care and adoption<br>• Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter)<br>• Programs of student assistance the Higher Education Act of 1965<br>• Means-tested programs under the Elementary and Secondary Education Act of 1965<br>• Benefits under the Head Start Act<br>• Benefits under title I of the Workforce Innovation and Opportunity Act<br>• Food Stamps for children under 18<br><br>In addition, the following aliens are eligible for federal means-tested benefits:[117]<br>• Refugees and asylees;<br>• Aliens whose deportation was withheld under section 243(h) of the Act, 8 U.S.C. 1253;<br>• Cuban and Haitian entrants;[118]<br>• Amerasians;[119]<br>• Veterans lawfully residing in the United States, with a discharge of honorable service who fulfill minimum active-duty service requirement, and active duty personnel lawfully residing in the United States, and their spouse and unmarried dependent child or unmarried surviving spouse;[120] and<br>• American Indian born in Canada  or who is a member of an Indian tribe[121] |
| **Categories of Aliens Not Eligible** | Aliens who enter the United States on or after August 22, 1996, not listed as qualified aliens |

BILLING CODE 4410–10–C

Congress chose not to restrict eligibility for certain benefits, including

---

[75] If section 141 of the applicable compact of free association approved in Public Law 99–239 or 99–658 (or a successor provision) is in effect.

[76] See Final Specification of Community Programs Necessary For Protection Of Life Or Safety Under Welfare Reform Legislation, 66 FR 3613 (Jan. 16, 2001); see also Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 61 FR 45985 (Aug. 30, 1996).

[77] See 42 U.S.C. 401–434.

[78] See 8 CFR 1.3(a).

[79] 42 U.S.C. 433.

[80] 42 U.S.C. 402(t).

[81] Benefits payable under title XVIII of the Social Security Act. See 42 U.S.C. 1395–1395lll.

[82] See 8 CFR 1.3(a).

emergency medical assistance; short-term, in-kind, non-cash emergency disaster relief; and public health assistance related to immunizations and

treatment of the symptoms of a communicable disease.[122]

PRWORA defined the term "State or local public benefit" in broad terms except where the term encroached upon the definition of Federal public benefit.[123] With certain exceptions for qualified aliens, nonimmigrants, or parolees, PRWORA also limited aliens' ability to obtain certain State and local public benefits.[124] Under PRWORA, States may enact their own legislation to provide public benefits to certain aliens not lawfully present in the United States.[125] PRWORA also provided that a State that chooses to follow the Federal "qualified alien" definition in determining aliens' eligibility for public assistance "shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy." [126] Still, some States and localities have funded public benefits (particularly medical and nutrition benefits) that aliens may be not eligible for federally.[127]

While PRWORA allows both qualified aliens and non-qualified aliens to receive certain benefits (e.g., emergency benefits (all aliens); SNAP (qualified alien children under 18)), Congress did not exempt the receipt of such benefits from consideration for purposes of INA section 212(a)(4)." [128] Therefore, DHS may take into consideration for purposes of a public charge determination, receipt of public benefits even if an alien may receive such benefits under PRWORA.

**(b) Public Benefits Exempt Under PRWORA**

Although PRWORA provided a broad definition of public benefits that only qualified aliens are eligible to receive,[129] it also made certain public

benefits available even to non-qualified aliens.[130] Congress excluded certain benefits, such as contracts, professional licenses, and commercial licenses from the "federal public benefit" definition.[131] In addition, Congress further provided that the following public benefits are available to all aliens, regardless of whether an individual is a qualified alien: [132]

• Medical assistance under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] (or any successor program to such title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903(v)(3) of such Act [42 U.S.C. 1396b(v)(3)]) of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the State plan approved under such title (other than the requirement of the receipt of aid or assistance under title IV of such Act [42 U.S.C. 601 et seq.], supplemental security income benefits under title XVI of such Act [42 U.S.C. 1381 et seq.], or a State supplementary payment).

• Short-term, non-cash, in-kind emergency disaster relief.[133]

• Public health assistance (not including any assistance under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.]) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

• Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance

---

[83] See 42 U.S.C. 1395c to 1395i–5.

[84] See 45 U.S.C. 231–231v.

[85] See 45 U.S.C. 351–369.

[86] See 42 U.S.C. 1381–1383f.

[87] See Food Stamp Act of 1977.

[88] In addition, there are certain extensions for SSI benefits through fiscal year 2011. See 8 U.S.C. 1612(a)(2)(M).

[89] See 8 U.S.C. 1612(a)(2)(D).

[90] See 8 U.S.C. 162(a)(2)(J).

[91] As defined in 38 U.S.C. 101.

[92] See 8 U.S.C. 1612(a)(2)(B).

[93] See 8 U.S.C. 1612(a)(2)(C).

[94] See 8 U.S.C. 1612(a)(2)(G); see also INA section 289, 8 U.S.C. 1359.

[95] See 8 U.S.C. 1612(a)(2)(G); see also 25 U.S.C 5304(e) (defining Indian tribe).

[96] See 8 U.S.C. 1612(a)(2)(E).

[97] See 8 U.S.C. 1612(a)(2)(F).

[98] See 8 U.S.C. 1612(a)(2)(A).

[99] As in effect immediately before the effective date of section 307 of division C of Public Law 104–208.

[100] 8 U.S.C. 1231(b)(3).

[101] As defined in section 501(e) of the Refugee Education Assistance Act of 1980.

[102] See section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988 (as contained in section 101(e) of Public Law 100–202, 101 Stat. 1329, and amended by the 9th proviso under migration and refugee assistance in title II of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, Public Law 100–461, 102 Stat. 2268, as amended).

[103] An alien who was lawfully residing in the United States and receiving benefits on August 2, 1996, would have continued to receive benefits until January 1, 1997. In addition, an alien who was receiving SSI would still be eligible to receive Medicaid. See 8 U.S.C. 1612(b)(2)(F).

[104] See 42 U.S.C. 601–619.

[105] See 42 U.S.C. 1397–1397h.

[106] See 42 U.S.C. 1396 to 1396w–5.

[107] See 8 U.S.C. 1612(b)(2)(B).

[108] See 8 U.S.C. 1612(b)(2)(C).

[109] See 8 U.S.C. 1612(b)(2)(E).

[110] See 8 U.S.C. 1612(b)(2)(A).

[111] As in effect immediately before the effective date of section 307 of division C of Public Law 104–208, 110 Stat. 3009.

[112] 8 U.S.C. 1231(b)(3).

[113] As defined in section 501(e) of the Refugee Education Assistance Act of 1980.

[114] See section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988 (as contained in section 101(e) of Pub. L. 100–202, 101 Stat. 1329, and amended by the 9th proviso under migration and refugee assistance in title II of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, Pub. L. 100–461, 102 Stat. 2268, as amended).

[115] See Federal Means-Tested Public Benefits, 63 FR 36653 (July 7, 1998).

[116] See 8 U.S.C. 1613(c).

[117] See 8 U.S.C. 1613(b)(1).

[118] See section 501(e) of the Refugee Education Assistance act of 1980.

[119] See 8 U.S.C. 1612(a)(2)(A)(i)(V).

[120] See 8 U.S.C. 1613(b)(2).

[121] See 8 U.S.C. 1613(d).

[122] See 8 U.S.C. 1611(b)(1); see also Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 66 FR 3613 (Jan. 16, 2001); Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 FR 61344 (Nov. 17, 1997).

[123] See 8 U.S.C. 1621(c).

[124] See generally 8 U.S.C. 1621.

[125] See 8 U.S.C. 1621(d).

[126] 8 U.S.C. 1601(7).

[127] See U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, Overview of Immigrants Eligible for SNAP, TANF, Medicaid and CHIP (Mar. 27, 2012), available at http://aspe.hhs.gov/hsp/11/ImmigrantAccess/Eligibility/ib.shtml.

[128] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[129] See Public Law 104–193, section 401(c), 110 Stat. 2105, 2262 (codified as amended at 8 U.S.C. 1611(c)). Only qualified aliens may be eligible for certain benefits. See 8 U.S.C. 1641.

[130] See 8 U.S.C. 1611(b).

[131] See 8 U.S.C. 1611(c)(2).

[132] See 8 U.S.C. 1611(b).

[133] Such relief would include a range of services and benefits provided by the Federal Emergency Management Agency and other agencies. For instance, it would include the Disaster Supplemental Nutrition Assistance Program (D–SNAP), which "gives food assistance to low-income households with food loss or damage caused by a natural disaster." See DHS, Disaster Assistance.gov, Disaster Supplemental Nutrition Assistance Program (D–SNAP), available at https://www.disasterassistance.gov/get-assistance/forms-of-assistance/5769 (last updated June 25, 2018).

**51132**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.

• Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development, any program under title V of the Housing Act of 1949 [42 U.S.C. 1471 *et seq.*], or any assistance under section 1926c of title 7, to the extent that the alien is receiving such a benefit on August 22, 1996.

These benefits, which are described in 8 U.S.C. 1611(b), were further clarified by the Department of Justice and some of the agencies that administer these public benefits. On January 16, 2001, the Department of Justice published a notice of final order, "Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation," [134] which indicated that PRWORA does not preclude aliens from receiving police, fire, ambulance, transportation (including paratransit), sanitation, and other regular, widely available services programs, services, or assistance. In addition, the notice provided for a three-part test in identifying excluded benefits and services for the protection of life and safety. Specified programs must satisfy all three prongs of this test:

1. The government-funded programs, services, or assistance specified are those that: Deliver in-kind (non-cash) services at the community level, including through public or private non-profit agencies or organizations; do not condition the provision, amount, or cost of the assistance on the individual recipient's income or resources; and serve purposes of the type described in the list below, for the protection of life or safety.

2. The community-based programs, services, or assistance are limited to those that provide in-kind (non-cash) benefits and are open to individuals needing or desiring to participate without regard to income or resources. Programs, services, or assistance delivered at the community level, even if they serve purposes of the type described, are not within this specification if they condition on the individual recipient's income or resources: (a) The provision of assistance; (b) the amount of assistance

provided; or (c) the cost of the assistance provided on the individual recipient's income or resources.

3. Included within the specified programs, services, or assistance determined to be necessary for the protection of life or safety are the following types of programs:

• Crisis counseling and intervention programs; services and assistance relating to child protection, adult protective services, violence and abuse prevention, victims of domestic violence or other criminal activity; or treatment of mental illness or substance abuse;

• Short-term shelter or housing assistance for the homeless, for victims of domestic violence, or for runaway, abused, or abandoned children;

• Programs, services, or assistance to help individuals during periods of heat, cold, or other adverse weather conditions;

• Soup kitchens, community food banks, senior nutrition programs such as meals on wheels, and other such community nutritional services for persons requiring special assistance;

• Medical and public health services (including treatment and prevention of diseases and injuries) and mental health, disability, or substance abuse assistance necessary to protect life or safety;

• Activities designed to protect the life or safety of workers, children and youths, or community residents; and

• Any other programs, services, or assistance necessary for the protection of life or safety.

In congressional debates leading up to the passage of IIRIRA, Senator Kennedy stated that "[t]hese benefit all, because they relate to the public health and are in the public interest. Where the public interest is not served, we should not provide the public assistance to illegal immigrants." [135] Therefore, these benefits were provided to all aliens including illegal aliens. These benefits would not be part of the public charge determination under the proposed rule.[136]

### 3. Changes Under IIRIRA

Under IIRIRA,[137] the public charge inadmissibility statute changed

significantly. IIRIRA codified the following minimum factors that must be considered when making public charge determinations: [138]

• Age;
• Health;
• Family status;
• Assets, resources, and financial status; and
• Education and skills.[139]

Congress also generally permitted but did not require consular and immigration officers to consider an enforceable affidavit of support as a factor in the determination of inadmissibility,[140] except in certain cases where an affidavit of support is required and must be considered at least in that regard.[141] The law required affidavits of support for most family-based immigrants and certain employment-based immigrants and provided that these aliens are inadmissible unless a satisfactory affidavit of support is filed on their behalf.[142] In the Conference Report, the committee indicated that the amendments to INA section 212(a)(4), 8 U.S.C. 1182(a)(4), were designed to expand the public charge ground of inadmissibility.[143] The report indicated that self-reliance is one of the fundamental principles of immigration law and aliens should have affidavits of support executed.[144]

DHS believes that the policy goals articulated in PRWORA and IIRIRA should inform its administrative implementation of the public charge ground of inadmissibility. There is no tension between the availability of public benefits to some aliens as set forth in PRWORA and Congress's intent to deny visa issuance, admission, and adjustment of status to aliens who are likely to become a public charge. Indeed, Congress, in enacting PRWORA and IIRIRA very close in time, must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge grounds of inadmissibility, even though receipt of such benefits could render the alien inadmissible as likely to become a public charge.

---

[134] *See Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation,* 66 FR 3613 (Jan. 16, 2001); *see also Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation,* 61 FR 45985 (Aug. 30, 1996).

[135] *See* 142 Cong. Rec. S3282 (daily ed. Apr. 15, 1996) (statement of Sen. Kennedy), *available at https://www.congress.gov/crec/1996/04/15/CREC-1996-04-15-pt1-PgS3276.pdf.*

[136] *See* 8 U.S.C. 1611(b)(1)(B); *see also Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation,* 66 FR 3613 (Jan. 16, 2001); *Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation,* 61 FR 45985 (Aug. 30, 1996).

[137] Public Law 104–208, div. C, 110 Stat 3009–546 (1996).

[138] Public Law 104–208, div. C, section 531, 110 Stat. 3009–546, 3009–674 (1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)).

[139] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[140] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii).

[141] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4); INA section 213A, 8 U.S.C. 1183A.

[142] *See* INA section 212(a)(4)(C) and (D), 8 U.S.C. 1182(a)(4)(C) and (D).

[143] *See* H.R. Rep. No. 104–828, at 240–41 (1996) (Conf. Rep.); *see also* H.R. Rep. No. 104–469(I), at 143–45 (1996).

[144] *See* H.R. Rep. No. 104–828, at 241 (1996) (Conf. Rep.).

Under the carefully devised scheme envisioned by Congress, aliens generally would not be issued visas, admitted to the United States, or permitted to adjust status if they are likely to become public charges. This prohibition may deter aliens from making their way to the United States or remaining in the United States permanently for the purpose of availing themselves of public benefits.[145] Congress must have understood, however, that certain aliens who were unlikely to become public charges when seeking a visa, admission, or adjustment of status might thereafter reasonably find themselves in need of public benefits that, if obtained, would render them a public charge. Consequently, in PRWORA, Congress made limited allowances for that possibility. But Congress also did not correspondingly limit the applicability of the public charge statute; if an alien subsequent to receiving public benefits wished to adjust status in order to remain in the United States permanently or left the United States and later wished to return, the public charge inadmissibility consideration (naturally including consideration of receipt of public benefits) would again come into play. In other words, although an alien may obtain public benefits for which he or she is eligible, the receipt of those benefits may be considered for future public charge inadmissibility determination purposes.

4. INS 1999 Interim Field Guidance

On May 26, 1999, INS issued interim *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds.*[146] This guidance identified how the agency would determine if a person is likely to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a), for admission and adjustment of status purposes, and whether a person is deportable as a public charge under section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5).[147] INS proposed promulgating these policies as regulations in a proposed rule issued on May 26, 1999.[148] DOS also issued a cable to its consular officers at that time implementing similar guidance for visa adjudications, and its Foreign Affairs Manual (FAM) was similarly updated.[149] USCIS has continued to follow the 1999 Interim Field Guidance in its adjudications, and DOS has

continued following the public charge guidance set forth in the FAM.[150]

In the 1999 proposed rule, INS proposed to "alleviate growing public confusion over the meaning of the currently undefined term 'public charge' in immigration law and its relationship to the receipt of Federal, State, or local public benefits."[151] INS sought to reduce negative public health and nutrition consequences generated by the confusion and to provide aliens, their sponsors, health care and immigrant assistance organizations, and the public with better guidance as to the types of public benefits that INS considered relevant to the public charge determinations.[152] INS also sought to address the public's concerns about immigrants' fears of accepting public benefits for which they remained eligible, specifically in regards to medical care, children's immunizations, basic nutrition and treatment of medical conditions that may jeopardize public health. With its guidance, INS aimed to stem the fears that were causing noncitizens to refuse limited public benefits, such as transportation vouchers and child care assistance, so that they would be better able to obtain and retain employment and establish self-sufficiency.[153]

INS defined public charge in its proposed rule and 1999 Interim Field Guidance to mean "the likelihood of a foreign national becoming primarily dependent [154] on the government for subsistence, as demonstrated by either:

• Receipt of public cash assistance for income maintenance; or

• Institutionalization for long-term care at government expense."

When developing the proposed rule, INS consulted with Federal benefit-granting agencies such as the Department of Health and Human Services (HHS), the Social Security Administration (SSA), and the Department of Agriculture (USDA). The Deputy Secretary of HHS, which administers Temporary Assistance for Needy Families (TANF), Medicaid, the Children's Health Insurance Program (CHIP), and other benefits, advised that the best evidence of whether an individual is relying primarily on the government for subsistence is either the

receipt of public cash benefits for income maintenance purposes or institutionalization for long-term care at government expense.[155] The Deputy Commissioner for Disability and Income Security Programs at SSA agreed that the receipt of SSI "could show primary dependence on the government for subsistence fitting the INS definition of public charge provided that all of the other factors and prerequisites for admission or deportation have been considered or met."[156] And the USDA's Under Secretary for Food, Nutrition and Consumer Services advised that "neither the receipt of food stamps nor nutrition assistance provided under the Special Nutrition Programs administered by [USDA] should be considered in making a public charge determination."[157] While these letters supported the approach taken in the 1999 proposed rule and Interim Field Guidance, the letters specifically focused on the reasonableness of a given INS interpretation; *i.e.* primary dependence on the government for subsistence. The letters did not foreclose the agency adopting a different definition consistent with statutory authority.

The 1999 proposed rule provided that non-cash, supplemental and certain limited cash, special purpose benefits should not be considered for public charge purposes, in light of INS' decision to define public charge by reference to primary dependence on public benefits. Ultimately, however, INS did not publish a final rule conclusively addressing these issues.

*E. Public Charge Bond*

If an alien is determined to be inadmissible on public charge grounds under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), he or she may be admitted in the discretion of the Secretary of Homeland Security, if otherwise admissible, upon the giving of a suitable and proper bond.[158]

---

[145] H.R. Rep. No. 104–469(I), at 144–45 (1996).

[146] *See* 64 FR 28689 (May 26, 1999).

[147] *See* 64 FR 28689 (May 26, 1999).

[148] *See Inadmissibility and Deportability on Public Charge Grounds,* 64 FR 28676 (May 26, 1999).

[149] *See* 64 FR 28676, 28680 (May 26, 1999).

[150] *See* Children's Health Insurance Program Reauthorization Act of 2009, Public Law 111–3, section 214, 123 Stat. 8, 56; 9 FAM 302.8–2(B)(2), Determining "Totality of Circumstances," (g) Public Charge Bonds, *available at https://fam.state.gov/fam/09fam/09fam030208.html.*

[151] *See* 64 FR 28676, 28676 (May 26, 1999).

[152] *See* 64 FR 28676, 28676–77 (May 26, 1999).

[153] *See* 64 FR 28676, 28676–77 (May 26, 1999).

[154] Former INS defined "primarily dependent" as "the majority" or "more than 50 percent."

[155] *See* 64 FR 28676, 28686–87 (May 26, 1999).

[156] 64 FR 28676, 28687 (May 26, 1999).

[157] 64 FR 28676, 28688 (May 26, 1999). The USDA letter did not include supportive reasoning. As noted in greater detail elsewhere in this preamble, DHS no longer believes that primary dependence on the government for subsistence is the appropriate standard for public charge determination purposes. In light of the proposed change in the public charge standard and the passage of time, DHS does not believe that the views expressed in those interagency consultations remain fully relevant. DHS has nonetheless considered such views, and has addressed the relevant considerations—legal authority, predictability, administrability, and adverse impacts—throughout this proposed rule.

[158] *See* INA section 213, 8 U.S.C. 1183; *see also* 8 CFR 103.6; 8 CFR 213.1.

Historically, bond provisions started with states requiring certain amounts to assure an alien would not become a public charge.[159] Bond provisions were codified in federal immigration laws in 1903.[160] Notwithstanding codification in 1903, the acceptance of a bond posting in consideration of an alien's admission and to assure that he or she will not become a public charge apparently had its origin in federal administrative practice earlier than this date. Beginning in 1893, immigration inspectors served on Boards of Special Inquiry that reviewed exclusion cases of aliens who were likely to become public charges because the aliens lacked funds or relatives or friends who could provide support.[161] In these cases, the Board of Special Inquiry usually admitted the alien if someone could post bond or one of the immigrant aid societies would accept responsibility for the alien.[162]

The present language of section 213 of the Act, 8 U.S.C. 1183, has been in the law without essential variation since 1907.[163] Under section 21 of the Immigration Act of 1917, an immigration officer could admit an alien if a suitable bond was posted. In 1970, Congress amended section 213 of the Act to permit the posting of cash received by the U.S. Department of the Treasury and to eliminate specific references to communicable diseases of public health significance.[164] At that time, Congress also added, without

further explanation or consideration, the phrase that any sums or other security held to secure performance of the bond shall be returned "except to the extent forfeited for violation of the terms thereof" upon termination of the bond.[165] Subsequently, IIRIRA amended the provision yet again when adding a parenthetical which clarified that a bond is provided in addition to, and not in lieu of, the affidavit of support and the deeming requirements under section 213A of the Act, 8 U.S.C. 1183A.[166] Regulations implementing the public charge bond were promulgated in 1964 and 1966,[167] and are currently found at 8 CFR 103.6 and 8 CFR 213.1.

## V. Discussion of Proposed Rule

This proposed rule would establish a proper nexus between public charge and receipt of public benefits by defining the terms public charge and public benefit, among other terms. DHS proposes to interpret the minimum statutory factors involved in public charge determinations and to establish a clear framework under which DHS would evaluate those factors to determine whether or not an alien is likely at any time in the future to become a public charge. DHS also proposes to clarify the role of a sponsor's affidavit of support within public charge inadmissibility determinations.

In addition, DHS proposes that certain factual circumstances would weigh heavily in favor of determining that an alien is not likely to become a public charge and other factual circumstances would weigh heavily in favor of determining that an alien is likely to become a public charge.[168] The purpose of assigning greater weight to certain factual circumstances is to provide clarity for the public and immigration officers with respect to how DHS would fulfill its statutory duty to assess public charge admissibility. Ultimately, each determination would be made in the totality of the circumstances based on consideration of the relevant factors. In addition, DHS proposes that for applications for adjustment of status, the alien would be required to submit a Form I–944.

DHS also proposes to establish a public charge bond process in the adjustment of status context, and proposes to clarify DHS's authority to set conditions for nonimmigrant

extension of stay and change of status applications.

Finally, this proposed rule interprets the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), not the public charge deportability ground under section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5). Department of Justice precedent decisions would continue to govern the standards regarding public charge deportability determinations.

### A. Applicability, Exemptions, and Waivers

This rule would apply to any alien subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), who is applying for admission to the United States or is applying for adjustment of status to that of lawful permanent resident before DHS.[169] DOS screens applicants who are subject to public charge inadmissibility grounds and who are seeking nonimmigrant or immigrant visas at consular posts worldwide. Nearly sixty percent of the 2.7 million immediate relatives, family-sponsored,[170] employment-based, and diversity visa-based immigrants who obtained lawful permanent resident status in the United States between fiscal years 2014 and 2016 consular processed immigrant visa applications overseas prior to being admitted to the United States as lawful permanent residents at a port-of-entry. Fifty-one percent of immediate relatives, ninety-two percent of family-sponsored immigrants, and ninety-eight percent of diversity visa immigrants obtained an immigrant visa at a consular post overseas before securing admission as a lawful permanent resident at a port-of-entry between fiscal years 2014 and 2016.[171]

This rule also addresses eligibility for extension of stay and change of

---

[159] *See, e.g., Mayor, Aldermen & Commonalty of City of N.Y.* v. *Miln,* 36 U.S. 102 (1837) (upholding a New York statute that required vessel captains to provide certain biographical information about every passenger on the ship and further permitting the mayor to require the captain to provide a surety of not more than $300 for each noncitizen passenger to indemnify and hold harmless the government from all expenses incurred to financially support the person and the person's children); *see also* H.D. Johnson & W.C. Reddall, *History of Immigration* (Washington, 1856).

[160] *See* Immigration Act of 1903, ch. 1012, 32 Stat. 1213 (repealed by Act of Feb. 20, 1907, ch. 1134, 34 Stat. 898, and Immigration Act of 1917, ch. 29, 39 Stat. 874).

[161] Immigration Act of 1891, ch. 551, 26 Stat. 1084, created the Office of the Superintendent of Immigration within the Treasury Department. The Superintendent oversaw a new corps of U.S. Immigrant Inspectors stationed at the country's principal ports of entry. *See* USCIS History and Genealogy, Origins of Federal Immigration Service, *https://www.uscis.gov/history-and-genealogy/our-history/agency-history/origins-federal-immigration-service* (last updated Feb. 4, 2016).

[162] *See* USCIS History and Genealogy, *Origins of Federal Immigration Service, https://www.uscis.gov/history-and-genealogy/our-history/agency-history/origins-federal-immigration-service* (last updated Feb. 4, 2016).

[163] *See* Act of February 20, 1907, ch. 1134, section 26, 34 Stat. 898, 907.

[164] *See* Public Law 91–313, 84 Stat. 413, 413 (1970); *see also* 116 Cong. Rec. S9957 (daily ed. June 26, 1970).

[165] *See* Public Law 91–313, 84 Stat. 413, 413 (1970).

[166] *See* Public Law 104–208, div. C, section 564(f), 110 Stat. 3009–546, 3009–684.

[167] *See Miscellaneous Amendments to Chapter,* 29 FR 10579 (July 30, 1964); *Miscellaneous Edits to Chapter,* 31 FR 11713 (Sept. 7, 1966).

[168] *See* proposed 8 CFR 212.22.

[169] *See* proposed 8 CFR 212.20.

[170] Including first, second, third and fourth preferences of family sponsored immigrants and immediate relatives. *See* DHS, *Yearbook of Immigration Statistics 2016, Table 6, Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2014 to 2016, available at https://www.dhs.gov/immigration-statistics/yearbook/2016/table6* (last updated Dec. 18, 2017).

[171] *See* DHS, *Yearbook of Immigration Statistics 2016, Table 6, Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2014 to 2016, available at https://www.dhs.gov/immigration-statistics/yearbook/2016/table6* (last updated Dec. 18, 2017). The 2016 Yearbook of Immigration Statistics is a compendium of tables that provide data on foreign nationals who are granted lawful permanent residence (*i.e.,* immigrants who receive a "green card"), admitted as temporary nonimmigrants, granted asylum or refugee status, or are naturalized.

status.[172] Because the processes, evidentiary requirements, and nature of the stay in the United States for aliens seeking a visa, admission, extension of stay, change of status, and adjustment of status differ, DHS proposes public charge processes appropriately tailored to the benefit the alien seeks. For instance, aliens seeking adjustment of status undergo a different process than a temporary visitor for pleasure from Canada seeking admission to the United States. The length and nature of the stay of these two subsets of aliens differs significantly, as does frequency of entry. Accordingly, the processes and evidentiary requirements proposed in this rule vary in certain respects depending on the type of benefit and status an alien is seeking, as set forth below.

1. Applicants for Admission

Under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), any alien who is applying for a visa or for admission to the United States is inadmissible if he or she is likely at any time to become a public charge. A nonimmigrant is admitted into the United States to stay for the limited period and purpose of the classification under which he or she was admitted and, in most instances, then is expected to depart the United States and return to his or her country. A visa applicant applies directly to a U.S. consulate or embassy abroad for a nonimmigrant visa to travel to the United States temporarily for a limited purpose, such as to visit for business or tourism.[173] DOS consular officers assess whether the alien would be inadmissible, including under section 212(a)(4) of the Act, as applicable.

Applicants for admission are inspected at, or when encountered between, ports of entry. They are inspected by immigration officers to assess, among other things, whether they are inadmissible under section 212(a) of the Act, including section 212(a)(4). Under the proposed rule, the type of nonimmigrant status and the duration of the nonimmigrant's stay in the United States would be considered in assessing whether the applicant has met his or her burden of demonstrating that he or she is likely to become a public charge. For example, in

determining whether an applicant for admission as a B–2 nonimmigrant visitor for pleasure who is coming to the United States for a one-week vacation is inadmissible on public charge grounds, DHS would consider that this temporary visit is short in nature and that the individual likely would only need financial resources to cover the expenses associated with the vacation.

Similarly, an alien who is the beneficiary of an immigrant visa petition approved by USCIS may apply to a DOS consulate abroad for an immigrant visa to allow him or her to seek admission to the United States as an immigrant.[174] As part of the immigrant visa process, DOS determines whether the applicant is eligible for the visa, which includes a determination of whether the alien has demonstrated that he or she is admissible to the United States and that no inadmissibility grounds in section 212(a) of the Act apply. In determining whether the applicant has demonstrated that he or she is not inadmissible on the public charge ground, DOS reviews all of the mandatory factors, including any required affidavits of support submitted under section 213A of the Act, 8 U.S.C. 1183a.

This process would not change under the proposed rule, but it is likely that DOS will amend its guidance to prevent the issuance of visas to inadmissible aliens,[175] except as otherwise provided in the Act. DOS would continue to review affidavits of support and screen aliens for public charge inadmissibility in accordance with applicable regulations and instructions prior to the alien undergoing inspection and applying for admission at a pre-inspection location or port-of-entry.

Additionally, although lawful permanent residents generally are not considered to be applicants for admission upon their return from a trip abroad, in certain limited circumstances a lawful permanent resident will be considered an applicant for admission and, therefore, subject to an inadmissibility determination.[176] This

inadmissibility determination includes whether the alien is inadmissible as likely to become a public charge, which will be determined upon the lawful permanent resident's return to the United States.

2. Extension of Stay and Change of Status Applicants

As mentioned above, a nonimmigrant is admitted into the United States to stay for the limited period and purpose of the classification under which he or she was admitted and, in most instances, then is expected to depart the United States and return to his or her country. However, consistent with the INA and controlling regulations, DHS may, in its discretion, extend an alien's nonimmigrant status or change an alien's nonimmigrant status from one classification to another.[177] Furthermore, DHS is authorized under the INA to set conditions on the extension of stay or change of status. Consistent with this authority, DHS is proposing to require an applicant for an extension of stay or change of status to attest that he or she has neither received since obtaining the nonimmigrant status he or she seeks to extend or to which he or she seeks to change, is not receiving, nor is likely to receive at any time in the future one or more public benefits as defined in this proposed rule.

Although section 212(a)(4) of the Act by its terms only applies to applicants for visas, admission, and adjustment of status, and thus does not, by its terms, render aliens who are likely to become a public charge ineligible for the extension of stay or change of status, the government's interest in a nonimmigrant alien's ability to maintain self-sufficiency for the duration of the temporary stay does not end with his or her admission as a nonimmigrant. In particular, the government has an interest in ensuring that aliens present in the United States do not depend on public benefits to meet their needs.[178] Aliens therefore should remain self-sufficient for the entire period of their stay, including any extension of stay or additional period of stay afforded by a change of status. Accordingly, DHS is proposing to consider whether the alien

---

[172] *See* proposed 8 CFR 214.1(a)(3)(iv); proposed 8 CFR 214.1(c)(4)(iv); proposed 8 CFR 248.1(a); proposed 8 CFR 248.1(c)(4).

[173] Certain nonimmigrant classifications are subject to petition requirements, and a petition generally must be approved on an alien's behalf by USCIS prior to application for a visa. *See, e.g.,* INA section 214(c), 8 U.S.C. 1184(c). In addition, certain aliens are not subject to a visa requirement in order to seek admission as a nonimmigrant. *See, e.g.,* INA section 217, 8 U.S.C. 1187; *see also* 8 CFR 212.1.

[174] *See* INA sections 221 and 222, 8 U.S.C. 1201 and 1202; 8 CFR 204; 22 CFR part 42.

[175] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[176] Lawful permanent residents are regarded as applicants for admission in the following circumstances: (1) Lawful permanent residents who have abandoned or relinquished that status; (2) lawful permanent residents who have been outside the United States for a continuous period in excess of 180 days; (3) lawful permanent residents who have engaged in illegal activity after departing the United States; (4) lawful permanent residents who have departed the United States while under legal process seeking removal of the alien from the United States, including removal proceedings and extradition proceedings; (5) lawful permanent residents who have committed an offense identified

in section 212(a)(2) of the INA, 8 U.S.C. 1182(a)(2), unless granted a waiver of inadmissibility for such offense or cancellation of removal; and (6) lawful permanent residents attempting to enter at a time or place other than as designated by immigration officers or who have not been admitted to the United States after inspection and authorization by an immigration officer. *See* INA section 101(a)(13)(C), 8 U.S.C. 1101(a)(13)(C).

[177] *See* INA sections 214(a)(1) and 248(a), 8 U.S.C. 1184(a)(1) and 1258(a); *see also* 8 CFR 214.1, 248.1.

[178] See 8 U.S.C. 1601(2)(A).

**51136** **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

has received since obtaining the nonimmigrant status he or she seeks to extend or to which he or she seeks to change, is currently receiving, or is likely to receive public benefits as defined in the proposed rule, when adjudicating an application to extend a nonimmigrant stay or change a nonimmigrant status.

Extension of stay and change of status applicants are already required to provide evidence of maintenance of their current nonimmigrant status.[179] As part of that determination, for some applicants, DHS considers the alien's financial status[180] and believes it sound policy to extend that consideration to extensions of stay and change of status generally, rather than to just subsets of nonimmigrants. Although the INA does not indicate that aliens seeking an extension of stay or change of status must establish self-sufficiency, consideration of such alien's self-sufficiency aligns with the aforementioned policy statements set forth in PRWORA.[181]

Except where the nonimmigrant status that the alien seeks to extend or to which the alien seeks to change is exempted by law from section 212(a)(4) of the Act, in order for an alien to demonstrate that he or she has neither received since obtaining the nonimmigrant status he or she seeks to extend or from which he or she seeks to change, nor is currently receiving or

likely to receive any such public benefits, DHS will require applicants to answer questions on their application form,[182] under penalty of perjury, regarding their receipt of these public benefits. The responses to these questions would be used in determining whether the applicant has met his or her burden to establish eligibility for extension of stay or change of status under the proposed regulation.

In adjudicating whether the applicant has demonstrated that he or she is not likely to receive public benefits as defined in the proposed rule, at any time in the future, DHS would consider the status to which the alien seeks to extend or to which to change, as well as the anticipated additional period of stay. DHS would also consider whether the applicant has provided evidence of maintenance of status and that he or she has sufficient financial means to maintain the status he or she seeks, or that he or she will be gainfully employed in such status, as applicable. Based on the information the alien provides in support of the application for extension of stay or change of status, USCIS would determine whether the applicant should also submit Form I–944 in order to demonstrate that he or she is unlikely to receive public benefits during the temporary stay in the United States.

For example, if the alien is a B–2 nonimmigrant who was admitted to the United States to seek medical treatment and is seeking to extend his or her visit because he or she requires additional medical treatment that was unanticipated at the time of admission, the alien would need to submit evidence that he or she has the financial

means to pay for this additional medical treatment and otherwise support himself or herself during the extended duration of his or her temporary stay. An alien seeking to extend his or her stay in, or change status to, F–1 or M–1 nonimmigrant status would submit evidence of his or her financial ability to pay for his or her study and to financially support himself or herself.[183] An alien seeking to extend stay in or change to an employment-based nonimmigrant status, such as H–2B temporary non-agricultural worker status, would need to submit evidence such as tax return transcripts, W–2, or other documentation evidencing income from gainful employment appropriate to the nonimmigrant status being sought.[184]

Table 4 below provides a summary of nonimmigrant categories and the applicability of the public charge condition to such categories.

BILLING CODE 4410–10–P

---

[179] See INA 214(a)(1), 8 U.S.C. 1184; 8 CFR 214.1(c)(4); INA 248(a), 8 U.S.C. 1258; 8 CFR 248.1(a).

[180] See 8 CFR 214.2(f)(1)(i)(B); AFM Ch. 30.2(c)(2)(F) ("Students seeking reinstatement must submit evidence of eligibility, including financial information . . . ."); AFM Ch. 30.3(c)(2)(C) (applicants applying to change status to a nonimmigrant student must demonstrate that they have the financial resources to pay for coursework and living expenses in the United States).

[181] 8 U.S.C. 1601.

[182] Aliens in nonimmigrant classifications whose employers will be filing Form I–129 or Form I–129CW on their behalf will be required to provide this information to their employer.

[183] See 8 CFR 214.2(f)(1)(i)(B) (students must present "documentary evidence of financial support in the amount indicated on the SEVIS Form I–20 (or the Form I–20A–B/I–20ID)"); AFM Ch. 30.2(b)(2)(F) ("(F) Students seeking reinstatement must submit evidence of eligibility, including financial information and a current I–20."); AFM Ch. 30.3(c)(2)(C) ("Aliens seeking F–1 or M–1 status must submit the appropriate Form I–20 and evidence of financial ability to maintain the new status. Aliens seeking J–1 status must submit Form IAP–66."); AFM Ch. 30.3(b)(3)(D) ("[T]he applicant [for change of status] must demonstrate he or she is able to maintain him or herself in the status sought, particularly financially. This issue needs particular examination when the applicant seeks a prolonged stay in any status where employment is not a routine part of the status, for example student status.").

[184] See, e.g., AFM Ch. 30.3(b)(3)(E) ("Because the alien applicant on Form I–129 will be gainfully employed once the new status is granted, it is generally not necessary to further explore an applicant's ability to maintain status financially (unless the rate of remuneration is so low that the principal would be unable to support him/herself and all dependents).").

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| A-1 - Ambassador, Public Minister, Career Diplomat or Consular Officer, or Immediate Family A-2 - Other Foreign Government Official or Employee, or Immediate Family INA 101(a)(15)(A), 22 CFR 41.21 | No.  Not applicable as admitted for Duration of Status, 8 CFR 214.1(c)(3)(v) | Yes. Files I-539,  8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |
| A-3 - Attendant, Servant, or Personal Employee of A-1 or A-2, or Immediate Family INA 101(a)(15)(A), 22 CFR 41.21 | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. INA 102; 22 CFR 41.21(d)(3) |
| B-1 -Temporary Visitor for Business B-2 - Temporary Visitor for Pleasure * not admitted under Visa Waiver Program INA 101(a)(15)(B) | Yes. Files Form I-539, 8 CFR 214.1(c)(2), 8 CFR 214.2(b)(1) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |
| C-1 - Alien in Transit C-1/D - Combined Transit and Crewmember Visa INA 101(a)(15)(C) and (D), INA 212(d)(8) | No. 8 CFR 214.1(c)(3)(ii) | No. 8 CFR 248.2(a)(2), except for change to T and U, 8 CFR 214.2(b) using Form I-914 or I-918 | Not Applicable as not eligible for extension of stay or change of status |
| C-2 - Alien in Transit to United Nations Headquarters District Under Section 11.(3), (4), or (5) of the Headquarters Agreement INA 101(a)(15)(C) and (D), INA 212(d)(8) | No. Not applicable as admitted for Duration of Status, 8 CFR 214.1(c)(3)(ii) | No, 8 CFR 248.2(a)(2) , except for change to T and U, 8 CFR 248.2(b) using Form I-914 or I-918 | No. 22 CFR 41.21(d) |
| C-3 - Foreign Government Official, Immediate Family, Attendant, Servant or Personal Employee, in Transit INA 101(a)(15)(C) and (D), INA 212(d)(8) | No. 8 CFR 214.1(c)(3)(ii) | No, 8 CFR 248.2(a)(2) , except for change to T and U, 8 CFR 248.2(b) using Form I-914 or I-918 | No. 22 CFR 41.21(d) |

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| CW-1 - Commonwealth of Northern Mariana Islands Transitional Worker Section 6(d) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229. 8 CFR 214.2(w) | Yes. Files Form I-129CW, 8 CFR 214.1(c)(2) and 8 CFR 214.2(w)(17) | Yes. Files Form I-129CW, 8 CFR 248.1(a); 8 CFR 214.2(w)(18) | Yes. |
| CW-2 - Spouse or Child of CW-1 | Yes. Files Form I-539, 8 CFR 214.1(c)(2) and 8 CFR 214.2(w)(17)(v) | Yes. Files Form I-539, 8 CFR 248.1(a); 8 CFR 214.2(w)(18) | |
| D - Crewmember (Sea or Air) D-2 - Crewmember departing from a different vessel than one of arrival INA 101(a)(15)(D) | No. 8 CFR 214.1(c)(3)(iii) | No. 8 CFR 248.2(a)(2), except for change to T and U, 248.2(b) using Form I-914 or Form I-918 | Yes. |
| E-1, E-2 - Treaty Trader (Principal) INA 101(a)(15)(E) | Yes. Files Form I-129, 8 CFR 214.1(c)(1); 8 CFR 214.2(e)(20) | Yes, Files Form I-129, 8 CFR 248.1(a), 8 CFR 214.2(e)(21)(i) | Yes. |
| E-1, E-2 - Treaty Trader, Spouse or Child INA 101(a)(15)(E) | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, 8 CFR 214.2(e)(21)(ii). | Yes. |
| E-2-CNMI - Commonwealth of Northern Mariana Islands Investor (Principal) Section 6(c) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229. 8 CFR 214.2(e)(23) | Yes. Files Form I-129, 8 CFR 214.2(e)(23)(xii) | Yes. Files Form I-129,8 CFR 248.1(a), 8 CFR 214.2(e)(23)(xiii) | Yes. |
| E-2-CNMI - Commonwealth of Northern Mariana Islands Investor, Spouse or Child Section 6(c) of Public Law 94–241. as added by Section 702(a) of Public Law 110–229. 8 CFR 214.2(e)(23)(x) | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| E-3 – Australian Treaty Alien coming to the United States Solely to Perform Services in a Specialty Occupation | Yes. Files Form I-129, 8 CFR 214.1(c)(1) and (2) | Yes. Files Form I-129, 8 CFR 248.1(a) | Yes. |
| E-3D – Spouse or Child of E-3 E-3R – Returning E-3 INA 101(a)(15)(E)(iii) | Yes. Files I-539, 8 CFR 214.1(c)(1) and (2) | Yes. Files I-539, 8 CFR 248.1(a) | Yes. |
| F-1 – Student in an academic or language training program (principal) INA 101(a)(15)(F). | Yes, only if the F-1 requesting reinstatement to F-1 status or if the F-1 received a date-specific admission to attend high school and is now seeking an extension to D/S to attend college. 8 CFR 214.1(c)(3)(v); 8 CFR 214.2(f)(7); 8 CFR 214.2(f)(16) | Yes. Files Form I-539, 8 CFR 248.1(a). | Yes. |
| F-2 – Spouse or Child of F-1 INA 101(a)(15)(F). | No, not applicable as admitted for Duration of Status. 8 CFR 214.1(c)(3)(v); 8 CFR 214.2(f)(3) | Yes. Files Form I-539, 8 CFR 214.2(f)(3) | Yes. |
| G-1 – Principal Resident Representative of Recognized Foreign Government to International Organization, Staff, or Immediate Family G-2 – Other Representative of Recognized Foreign Member Government to International Organization, or Immediate Family G-3 – Representative of | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. 22 CFR 41.21(d) |

000591

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| Nonrecognized or Nonmember Foreign Government to International Organization, or Immediate Family G-4 - International Organization Officer or Employee, or Immediate Family INA 101(a)(15)(G). | | | |
| G-5 - Attendant, Servant, or Personal Employee of G-1 through G- 4, or Immediate Family. | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |
| H-1B - Alien in a Specialty Occupation, Fashion Models of Distinguished Merit and Ability, and workers performing services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project INA 101(a)(15)(H)(i)(b); Section 222 of Pub. L. 101-649. | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form I-129.8 CFR 248.1(a) | Yes. |
| H-1B1 - Chilean or Singaporean National to Work in a Specialty Occupation INA 101(a)(15)(H)(i)(b1). | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form I-129, 8 CFR 248.1(a) | Yes. |
| H-1C[185] - Nurse in health professional shortage area INA 101(a)(15)(H)(i)(c). | Yes. Filed Form I-129, 8 CFR 212.2(h)(4)(v)(E) | Yes. Filed Form I-129, 8 CFR 212.2(h)(4)(v)(E) | Yes. |
| H-2A- Temporary Worker Performing Agricultural Services Unavailable in the United States INA 101(a)(15)(H)(ii)(a). | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form I-129 | Yes. |
| H-2B - Temporary Worker Performing Other Services Unavailable in the United States INA 101(a)(15)(H)(ii)(b). | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form I-129 | Yes. |
| H-3 - Trainee INA 101(a)(15)(H)(iii) | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form I-539 | Yes. |

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| H-4 - Spouse or Child of Alien Classified H1B/B1/C, H2A/B, or H–3 INA 101(a)(15)(H)(iv). | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |
| I - Representative of Foreign Information Media, Spouse and Child INA 101(a)(15)(I). | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539 | Yes. |
| J-1 - Exchange Visitor J-2 - Spouse or Child of J1 INA 101(a)(15)(J). | No, not applicable, as generally admitted for Duration of Status[186] 8 CFR 214.1(c)(3)(v) | Yes, subject to receiving a waiver of the foreign residence requirement, if necessary. Files I-539. 8 CFR 248.2(a)(4); may apply for change to T and U, using for Form I-914 or I-918, 8 CFR 248.2(b) | Yes. |
| K-1 - Fiance(e) of United States Citizen K-2 - Child of Fiance(e) of U.S. Citizen INA 101(a)(15)(K). | No. 8 CFR 214.1(c)(3)(iv) | No. 8 CFR 248.2(a)(2) except for change to T and U, 248.2(b) using Form I-914 or I-918 | Not Applicable |
| K-3 - Spouse of U.S. Citizen awaiting availability of immigrant visa K-4 - Child of K-3 INA 101(a)(15)(K). | Yes. Files Form I-539, 8 CFR 214.1(c)(2) and 8 CFR 214.2(k)(10) | No. 8 CFR 248.2(a)(2) except for change to T and U, 248.2(b) using Form I-914 or I-918 | Yes. |
| L-1 - Intracompany Transferee (Executive, Managerial, and Specialized Knowledge Personnel Continuing Employment with International Firm or Corporation) INA 101(a)(15)(L). | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form I-129, 8 CFR 248.1(a) | Yes. |
| L-2 - Spouse or Child of Intracompany Transferee | Yes. Files I-539 8 CFR 214.1(c)(1) and (2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |
| M-1 - Vocational Student or Other Nonacademic Student INA 101(a)(15)(M). | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, Not eligible if requesting F-1, 8 CFR 248.1(c)(1) | Yes. |

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| M-2 - Spouse or Child of M-1 INA 101(a)(15)(M). | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539 | Yes. |
| N-8 - Parent of an Alien Classified SK3 (Unmarried Child Employee of International Organization) or SN-3 N-9 - Child of N-8 or of SK-1 (Retired Employee International Organization), SK-2 (Spouse), SK-4 (surviving spouse), SN-1 (certain retired NATO 6 civilian employee), SN-2 (spouse) or SN-4 (surviving spouse) INA 101(a)(15)(N). | Yes. Files Form ] I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, 8 CFR 248.1(e) | Yes. |
| NATO-1 - Principal Permanent Representative of Member State to NATO (including any of its Subsidiary Bodies) Resident in the U.S. and Resident Members of Official Staff; Secretary General, Assistant Secretaries General, and Executive Secretary of NATO; Other Permanent NATO Officials of Similar Rank, or Immediate Family Art. 12, 5 UST 1094; Art. 20, 5 UST 1098. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |
| NATO-2 - Other Representative of member state to NATO (including any of its Subsidiary Bodies) including Representatives, Advisers, and Technical Experts of Delegations, or Immediate Family; Dependents of Member of a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement or in Accordance with the provisions of the "Protocol on the Status of International Military Headquarters"; Members of Such a Force if Issued Visas Art. 13, 5 UST 1094; Art. 1, 4 UST 1794; Art. 3, 4 UST 1796. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| **Category** | **Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)\*** | **Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)\*** | **Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4)** |
| NATO-3 - Official Clerical Staff Accompanying Representative of Member State to NATO (including any of its Subsidiary Bodies), or Immediate Family Art. 14, 5 UST 1096. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |
| NATO-4 - Official of NATO (Other Than Those Classifiable as NATO1), or Immediate Family Art. 18, 5 UST 1098. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |
| NATO-5 - Experts, Other Than NATO Officials Classifiable Under NATO 4, Employed in Missions on Behalf of NATO, and their Dependents Art. 21, 5 UST 1100. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |
| NATO-6 - Member of a Civilian Component Accompanying a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement; Member of a Civilian Component Attached to or Employed by an Allied Headquarters Under the "Protocol on the Status of International Military Headquarters" Set Up Pursuant to the North Atlantic Treaty; and their Dependents Art. 1, 4 UST 1794; Art. 3, 5 UST 877. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |
| NATO 7 - Attendant, Servant, or Personal Employee of NATO 1, NATO 2, NATO 3, NATO 4, NATO 5, and NATO 6 Classes, or Immediate Family Arts. 12–20, 5 UST 1094–1098 | Yes. Files Form I-539, 8 CFR 214.2(s)(1)(ii). | Yes. Files Form I-539, 8 CFR 248.1(a) | No. INA 102; 22 CFR 41.21(d) |

**Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition**

| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| O-1 - Alien with Extraordinary Ability in Sciences, Arts, Education, Business or Athletics or Extraordinary Achievement in the Motion Picture or Television Industry O-2 - Essential Support Workers Accompanying and Assisting in the Artistic or Athletic Performance by O-1 INA 101(a)(15)(O). | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form I-129, 8 CFR 248.1(a) | Yes. |
| O-3 - Spouse or Child of O-1 or O-2 INA 101(a)(15)(O). | Yes. Files Form I-539, 8 CFR 214.1(c)(1) and (2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |
| P-1 - Internationally Recognized Athlete or Member of Internationally Recognized Entertainment Group P-2 - Artist or Entertainer in a Reciprocal Exchange Program P-3 - Artist or Entertainer in a Culturally Unique Program INA 101(a)(15)(P). P-1S/P-2S/P-3S – Essential Support Workers 8 CFR 214.2(p) | Yes. Files Form I-129, 8 CFR 213.1(c)(3)(i) | Yes. Files Form I-129, 8 CFR 248.1(a) | Yes. |
| P-4 - Spouse or Child of P-1, P-2, or P-3 INA 101(a)(15)(P). | Yes. Files Form I-539, 8 CFR 214.1(c) (1) and (2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |
| Q-1 - Participant in an International Cultural Exchange Program INA 101(a)(15)(Q)(i). | Yes. Files Form I-129, 8 CFR 213.1(c)(3)(i) | Yes. Files Form I-129, 8 CFR 248.1(a) | Yes. |
| R-1 - Alien in a Religious Occupation INA 101(a)(15)(R). | Yes. Files Form I-129, 8 CFR 213.1(c)(3)(i) | Yes. Files Form I-129, 8 CFR 248.1(a) | Yes. |
| R-2 - Spouse or Child of R-1 INA 101(a)(15)(R). | Yes. Files Form I-539, 8 CFR 214.1(c)(1) and (2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| S-5 - Certain Aliens Supplying Critical Information Relating to a Criminal Organization or Enterprise S-6 - Certain Aliens Supplying Critical Information Relating to Terrorism S-7 - Qualified Family Member of S-5 or S-6 INA 101(a)(15)(S). | No. 8 CFR 213.1(c)(3)(vi) | No. 8 CFR 248.2(2) except for change to T and U, 248.2(b) using Form I-914 or I-918 | Yes. |
| T-1 - Victim of a severe form of trafficking in persons INA 101(a)(15)(T). | Yes. Files Form I-539, INA § 214(o)(7)(B); 8 CFR 214.11(l)(1) and (2); 8 CFR 214.1(c)(2). | Yes. Files Form I-539, 8 CFR 248.1(a). | No. |
| T-2 - Spouse of T-1 T-3 - Child of T-1 T-4 - Parent of T-1 under 21 years of age T-5 - Unmarried Sibling under age 18 of T-1 T-6 - Adult or Minor Child of a Derivative Beneficiary of a T-1 INA 101(a)(15)(T). | Yes. Files Form I-539, INA 214(o)(7)(B); 8 CFR 214.1(c)(2) | Yes. Files Form Files I-539, 8 CFR 248.1(a) | No. |
| TN - NAFTA Professional INA 214(e)(2) | Yes. Files Form I-129, 8 CFR 214.1(c)(1) | Yes. Files Form Files I-129, 8 CFR 248.1(a) | Yes. |
| TD - Spouse or Child of NAFTA Professional INA 214(e)(2) | Yes. Files Form I-539, 8 CFR 214.1(c)(2) | Yes. Files Form I-539, 8 CFR 248.1(a) | Yes. |
| U-1 - Victim of criminal activity U-2 - Spouse of U-1 U-3 - Child of U-1 U-4 - Parent of U-1 under 21 years of age U-5 - Unmarried Sibling under age 18 of U-1 under 21 years of age INA 101(a)(15)(U). | Yes. Files Form I-539, 8 CFR 214.1(c)(2); 8 CFR 214.14(g)(2) | Yes. Files Form I-539, 8 CFR 248.1(a) | No. |

**51146**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

| Table 4. Summary of Nonimmigrant Categories Subject to Public Benefits Condition | | | |
|---|---|---|---|
| Category | Eligible to apply for Extension of Stay (i.e. May File Form I-129 or Form I-539)* | Eligible to apply for Change of Status (i.e. May File Form I-129 or I-Form 539)* | Subject to Public Benefit Condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
| V-1 - Spouse of a Lawful Permanent Resident Alien Awaiting Availability of Immigrant Visa V-2 - Child of a Lawful Permanent Resident Alien Awaiting Availability of Immigrant Visa V-3 - Child of a V-1 or V-2 INA 101(a)(15)(V)(i) or INA 101(a)(15)(V)(ii), INA 203(d). | Yes.  Files Form I-539, 8 CFR 214.1(c)(2); 8 CFR 214.15(g)(3) | Yes.  Files Form I-539, 8 CFR 248.1(a); 214.15(g)(3) | Yes. |
| W-B - Visa Waiver for visitor for business, W-T - visitor for pleasure, Visa Waiver Program INA 217 | No. 8 CFR 214.1(c)(3)(i) and 214.1(c)(3)(viii) | No, except for change to T and U, using Form I-914 or I-918; INA 248.2(b) | Not Applicable |

*Includes questions on Form I-129 and Form I-539 about previous applications for or receipt of public benefits, and applicant may be required to File Form I-944 if requested by USCIS. Whether the alien must file an I-129 or an I-539 depends on the status the alien is applying to change to or extend.

BILLING CODE 4410–10–C

3. Adjustment of Status Applicants

In general, an alien who is physically present in the United States may be eligible to apply for adjustment of status before USCIS to that of a lawful permanent resident if the applicant was inspected and admitted or paroled, is eligible to receive an immigrant visa, is admissible to the United States, and has an immigrant visa immediately available at the time of filing the adjustment of status application.[187] As part of the adjustment process, USCIS is responsible for determining whether the applicant has met his or her burden of proof to establish eligibility for the benefit,[188] which includes a determination of whether the alien has demonstrated that no inadmissibility grounds in section 212(a) of the Act apply (or, if they do apply, the alien is eligible for a waiver of the inadmissibility ground). In determining whether the adjustment applicant has demonstrated that he or she is not inadmissible on the public charge ground, DHS proposes to review the mandatory statutory factors together with any required affidavit of support and any other relevant information, in the totality of the circumstances.

Tables 5 through 9 below provide a summary of immigrant categories for adjustment of status and the applicability of the public charge inadmissibility determination to such categories.

BILLING CODE 4410–10–P

---

[185] This classification can no longer be sought as of December 20, 2009. See the Nursing Relief for Disadvantaged Areas Reauthorization Act of 2005, Public Law 109–423.

[186] J nonimmigrant who are admitted for a specific time period are not eligible for an extension of stay.

[187] See INA section 245, 8 U.S.C. 1255. Aliens in removal proceedings before an immigration judge may also apply for adjustment of status pursuant to 8 CFR 1245.

[188] See INA section 291, 8 U.S.C. 1361.

| Table 5. Applicability of INA 212(a)(4) to Family-Based Adjustment of Status Applications[189] | | |
|---|---|---|
| **Category** | **Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency? \*** | **INA 213A and Form I-864, Affidavit of Support Required or Exempt?** |
| Immediate Relatives of U.S. citizens including spouses, children and parents[190] | Yes. INA 212(a)(4)(A) | Required. INA 212(a)(4)(C) |
| Family-Based First Preference: Unmarried sons/daughters of U.S. citizens and their children[191] | Yes. INA 212(a)(4)(A) | Required. INA 212(a)(4)(C) |
| Family-Preference Second: Spouses, children, and unmarried sons/daughters of alien residents[192] | Yes. INA 212(a)(4)(A) | Required. INA 212(a)(4)(C) |
| Family Preference Third: Married sons/daughters of U.S. citizens and their spouses and children[193] | Yes. INA 212(a)(4)(A) | Required. INA 212(a)(4)(C) |
| Family Preference Fourth: Brothers/sisters of U.S. citizens (at least 21 years of age) and their spouses and children[194] | Yes. INA 212(a)(4)(A) | Required. INA 212(a)(4)(C) |
| Fiancé[195] \* admitted as nonimmigrant K-1/K2 | Yes. INA 212(a)(4)(A) | Required. INA 212(a)(4)(C) |
| Amerasians based on preference category -born between December 31, 1950 and before October 22, 1982.[196] | Yes. INA 212(a)(4)(A) | Exempt. Amerasian Act, Pub. L. 97-359 (Oct. 22, 1982). |
| Amerasians, born in Vietnam between 1/1/62-1/1/76 Immediate Relative : AM-6, AR-6 Children  Amerasians under Amerasian Homecoming Act, ;Pub. L. 100-202 (Dec. 22, 1987)[197] - born between 1/1/1962-1/1/1976 | No. (I-360 and adjustment) Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Pub. L. 100-202 | Exempt. Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Pub. L. 100-202 |
| IW-6 Spouses, widows or widowers | Yes. INA 212(a)(4)(A) | Exempt. 8 CFR 204.2 and 71 FR 35732. |

| Table 5. Applicability of INA 212(a)(4) to Family-Based Adjustment of Status Applications[189] | | |
|---|---|---|
| Category | Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency? * | INA 213A and Form I-864, Affidavit of Support Required or Exempt? |
| Immediate Relative VAWA applicant, including spouses and children[198] | No. INA 212(a)(4)(E) | Exempt. INA 212(a)(4)(E) |
| First Preference VAWA B-16 Unmarried sons/daughters of U.S. citizens, self-petitioning B-17 Children of B-16 | No. INA 212(a)(4)(C)(i) | Exempt. INA 212(a)(4)(C)(i) |
| Second Preference VAWA applicant, including spouses and children[199] | No. INA 212(a)(4)(C)(i) | Exempt. INA 212(a)(4)(C)(i) |
| Third Preference VAWA Married son/daughters of U.S. citizen, including spouses and children[200] | No. INA 212(a)(4)(C)(i) | Exempt. INA 212(a)(4)(C)(i) |

* If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I-945). A public charge bond may be cancelled (Form I-356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), permanent departure of the alien, or otherwise as outlined in proposed 8 CFR 213.1(g), if the alien did not receive any public benefits as defined in the proposed rule.

**Table 6. Applicability of INA 212(a)(4) to Employment-Based Adjustment of Status Applications**

| Category | Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency?* | INA 213A, and Form I-864, Affidavit of Support Required or Exempt? |
|---|---|---|
| First Preference : Priority workers[201] | Yes.  INA 212(a)(4)(D) | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more)[202] in filed Form I-140.  INA 212(a)(4)(D), 8 CFR 213a.1 |
| Second Preference: Professionals with advanced degrees or aliens of exceptional ability[203] | Yes.  INA 212(a)(4)(D) | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) in filed Form I-140.  INA 212(a)(4)(D), 8 CFR 213a.1 |
| Third: Skilled workers, professionals, and other workers[204] | Yes.  INA 212(a)(4)(D) | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) in filed Form I-140.  INA 212(a)(4)(D), 8 CFR 213a.1 |
| Fifth: I-526 Immigrant Petition by Alien Entrepreneur (EB-5)[205]<br><br>INA 203(b)(5), 8 CFR 204.6 | Yes.  INA 212(a)(4)(D) | Not Applicable[206] |

\* If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I-945).  A public charge bond may be cancelled (Form I-356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), r permanent departure of the alien, or upon the fifth year of the alien's anniversary of the adjustment of status, or, if the alien, following the initial grant of lawful permanent resident status, obtains a status that is exempt from the public charge ground of inadmissibility, and provided that the alien did not receive any public benefits as defined in the proposed rule.

| Table 7. Applicability of INA 212(a)(4) to Special Immigrant Adjustment of Status Application | | |
|---|---|---|
| **Category** | **Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency? \*** | **INA 213A, and Form I-864, Affidavit of Support Required or Exempt?** |
| Special Immigrant (EB-4)- Religious Workers[207] 8 CFR 204.5(m); INA 101(a)(27)(C) | Yes. INA 212(a)(4) | Not Applicable[208] |
| Special Immigrant (EB-4) – International employees of US government abroad[209] INA 101(a)(27)(D), 22 CFR 42.32(d)(2) | Yes. INA 212(a)(4) | Not Applicable[210] |
| Special Immigrant (EB-4) Employees of Panama Canal[211] 22 CFR 42.32(d)(3); INA 101(a)(27)(E), INA 101(a)(27)(F), and INA 101(a)(27)(G) | Yes. INA 212(a)(4) | Not Applicable[212] |
| Special Immigrant (EB-4) - Foreign Medical School Graduates[213] INA 101(a)(27)(H), INA 203(b)(4) | Yes. INA 212(a)(4) | Not Applicable[214] |
| Special Immigrant (EB-4) -Retired employees of International Organizations including G-4 International Organization Officer[215] International Organizations (G-4s international organization officer/ Retired G-4 Employee)[216] INA 101(a)(27)(I) and INA 101(a)(27)(L) ; 8 CFR 101.5; 22 CFR 42.32(d)(5); 22 CFR 41.24;22 CFR 41.25 | Yes. INA 212(a)(4) | Not Applicable[217] |
| Special Immigrant (EB-4) -SL-6 Juvenile court dependents, adjustments | No. SIJ are exempt under 245(h). | Not Applicable. INA 245(h) |
| Special Immigrant (EB-4)- U.S. Armed Forces Personnel[218] INA 101(a)(27)(K) | Yes. INA 212(a)(4) | Not Applicable[219] |
| Special Immigrant - International Broadcasters[220] INA 101(a)(27)(M) ; 8 CFR 204.13 | Yes - INA 212(a)(4) | Not Applicable[221] |
| Special Immigrant (EB-4) - Special immigrant interpreters who are nationals of Iraq or Afghanistan[222] | No. Section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006, as amended; Public Law 109–163—Jan. 6, 2006, Section 1244(a)(3) of the National Defense | Exempt. Section 602(b)(9) of the Afghan Allies Protection Act of 2009, Title VI of Pub. L. 111-8, 123 Stat. 807, 809 (March 11, 2009) which states that INA 245(c)(2), INA |

| Table 7. Applicability of INA 212(a)(4) to Special Immigrant Adjustment of Status Application | | |
|---|---|---|
| **Category** | **Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency? *** | **INA 213A, and Form I-864, Affidavit of Support Required or Exempt?** |
| | Authorization Act for Fiscal Year 2008, as amended ; Pub. L. 110–181 (Jan. 28, 2008) Section 602(b) of the Afghan Allies Protection Act of 2009, as amended section (a)(2)(C), Pub. L. 111-8 (Mar. 11, 2009) | 245(c)(7), and INA 245(c)(8) do not apply to special immigrant Iraq and Afghan nationals who were employed by or on behalf of the U.S. government (for Section 602(b) and 1244 adjustment applicants who were either paroled into the United States or admitted as nonimmigrants). See Section 1(c) of Pub. L. 110-36, 121 Stat. 227, 227 (June 15, 2007), which amended Section 1059(d) of the National Defense Authorization Act for Fiscal Year 2006, Pub. L. 109-163, 119 Stat. 3136, 3444 (January 6, 2006) to state that INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8) do not apply to Iraq or Afghan translator adjustment applicants. |

* If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I-945). A public charge bond may be cancelled (Form I-356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

**Table 8. Applicability of INA 212(a)(4) to Refugee, Asylee, and Parolee Adjustment of Status Applications**

| Category | Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency? * | INA 213A, and Form I-864, Affidavit of Support Required or Exempt? |
|---|---|---|
| Asylees[223] | No. INA 209(c) | Exempt. INA 209(c) |
| Indochinese Parolees from Vietnam, Cambodia, and Laos<br>IC-6 Indochinese refugees (Pub. L. 95-145 of 1977)<br>IC-7 Spouses or children of Indochinese refugees not qualified as refugees on their own | No. Section 586, Pub. L. 106-429 (Nov. 6, 2000) | Exempt. Section 586, Pub. L. 106-429 (Nov. 6, 2000) |
| Polish and Hungarian Parolees (Poland or Hungary who were paroled into the United States from November 1, 1989 to December 31, 1991)[224] | No. Title VI, Subtitle D, Section 646(b), Pub. L. 104-208; 8 CFR 245.12 | Exempt. Title VI, Subtitle D, Section 646(b), Pub. L. 104-208; 8 CFR 245.12 |
| Refugees[225] | No. INA 207(c)(3); INA 209(c) | Exempt. INA 207; INA 209(c) |
| Cuban-Haitian Entrant under IRCA- CH-6, CH-7[226] | No. Section 202, Pub. L. 99-603, 100 Stat. 3359 (1986) (as amended), 8 U.S.C. 1255a. | Exempt. Section 202, Pub. L. 99-603, 100 Stat. 3359 (1986) (as amended), 8 U.S.C. 1255a. |
| HRIFA – Principal HRIFA Applicant who applied for asylum before December 31, 1995[227] | No. Section 902 Pub. L. 105-277, 112 Stat. 2681 (Oct. 21, 1998), 8 U.S.C. 1255. | Exempt. Section 902 Pub. L. 105-277, 112 Stat. 2681 (Oct. 21, 1998), 8 U.S.C. 1255. |

* If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I-945). A public charge bond may be cancelled (Form I-356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

| Table 9. Applicability of INA 212(a)(4) to Other Applicants Who Must be Admissible | | |
|---|---|---|
| **Category** | **Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency? \*** | **INA 213A, and Form I-864, Affidavit of Support Required or Exempt?** |
| Diplomats Section 13 | Yes. Section 13 of Public Law 85-316 (September 11, 1957), as amended by Public Law 97-116 (December 29, 1981); 8 CFR 245.3. | Exempt, by statute, as they are not listed in INA 212(a)(4) as a category that requires an Affidavit of Support. |
| Individuals Born in the US under Diplomatic Status (NA-3) 8 CFR 101.3 | Yes. INA 212(a)(4) | Exempt. 8 CFR 101.3 |
| Diversity, DV-1 diversity immigrant, spouse and child | Yes. INA 212(a)(4) | Exempt, by statute, as they are not listed in INA 212(a)(4) as a category that requires an Affidavit of Support. Diversity visas are issued under INA 203(c) which do not fall under INA 212(a)(4)(C) or (D). |
| W-16 Entered without inspection before 1/1/82 W-26 Entered as nonimmigrant and overstayed visa before 1/1/82. Certain Entrants before January 1, 1982 | Yes. INA 212(a)(4) (except for certain aged, blind or disabled individuals as defined in 1614(a)(1) of the Social Security Act). INA 245A(b)(1)(C)(i) and (a)(4)(a)) – application for adjustment 42 U.S.C. 1382c(a)(1). Special Rule for determination of public charge - See INA 245A(d)(2)(B)(iii). | Exempt, by statute as they are not listed in INA 212(a)(4) as a category that requires an Affidavit of Support. |
| T, T-1 victim, spouse, child, parent, sibling INA 101(a)(15)(T), INA 212(d)(13)(A) | Yes. Under INA 212(d)(13)(A), INA 212(a)(4) only does not apply at the nonimmigrant status stage. However, a waiver is available for T nonimmigrant adjustment applicants. INA 245(l)(c) INA 101(a)(15)(T). | Exempt, by statute as they are not listed in INA 212(a)(4) as a category that requires an Affidavit of Support. Adjustment of status based on T nonimmigrant status is under INA 245(l) which does not fall under INA 212(a)(4)(C) or (D). |
| American Indians - INA 289 | No. INA 289 | Exempt. INA 289 |
| Texas Band of Kickapoo Indians of the Kickapoo Tribe of Oklahoma, Pub. L. 97-429 (Jan. 8, 1983) | No. Pub. L. 97-429 (Jan. 8, 1983) | Exempt. Pub. L. 97-429 (Jan. 8, 1983) |

| Table 9. Applicability of INA 212(a)(4) to Other Applicants Who Must be Admissible | | |
|---|---|---|
| Category | Subject to INA 212(a)(4) and must file Form I-944, Declaration of Self-Sufficiency? * | INA 213A, and Form I-864, Affidavit of Support Required or Exempt? |
| KIC - Kickapoo Indian Citizen<br>KIP - Kickapoo Indian Pass | | |
| S (Alien witness or informant) | Yes, but there is a waiver available - INA 245(j); INA 101(a)(15)(S); 8 CFR 214.2(t)(2); 8 CFR 1245.11 (Waiver filed on Form I-854, Inter-Agency Alien Witness and Informant Record) | Exempt. INA 245(j); INA 101(a)(15)(S); 8 CFR 214.2(t)(2); 8 CFR 1245.11 (Waiver filed on I-854, Inter-Agency Alien Witness and Informant Record) |
| Private Immigration Bill providing for alien's adjustment of status | Dependent on the text of the Private Bill. | Dependent on the text of the Private Bill. |
| NACARA (202)[228]<br>Principal NC-6, (NC 7-9) spouse and children | No. Section 202(a), Pub. L. 105-100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. | Exempt. Section 202(a), Pub. L. 105-100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. |
| NACARA 203<br>Cancellation of removal (Z-13) Battered spouses or children (Z-14) Salvadoran, Guatemalan and former Soviet bloc country nationals (Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA)) | No. Section 203, Pub. L. 105-100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. | Exempt. Section 203, Pub. L. 105-100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. |
| Lautenberg, LA-6[229] | No. Section 599E, Pub. L. 101-167, 103 Stat. 1195 (Nov. 21, 1989), 8 U.S.C.A. 1255. | Exempt. Section 599E, Pub. L. 101-167, 103 Stat. 1195 (Nov. 21, 1989), 8 U.S.C.A. 1255. |
| Registry, Z-66 - Aliens who entered the United States prior to January 1, 1972 and who meet the other conditions | No. INA 249 of the Act and 8 CFR part 249 | Exempt. INA 249 of the Act and 8 CFR part 249 |
| U, U-1 Crime Victim, spouse, children and parents, and siblings under INA 245(m) | No. INA 212(a)(4)(E) | Exempt. INA 212(a)(4)(E) |
| Temporary Protected Status (TPS) | No. 8 CFR 244.3(a)[230] | Exempt. 8 CFR 244.3(a)[231] |

* If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I-945). A public charge bond may be cancelled (Form I-356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

[189] Applicants who filed a Form I-485 prior to December 19, 1997 are exempt from the Affidavit of Support requirement. *See* Public Law 104-208, div. C., section 531(b), 110 Stat. 3009-546, 3009-675; 8 CFR 213a.2(a)(2)(i) (adjustment applicants) and 213a.2(a)(2)(ii)(B) (applicants for admission). Aliens who acquired citizenship under section 320

of the Act upon admission to the United States are exempt from submitting an affidavit of support. *See* 8 CFR 213a.2(a)(2)(ii)(E); Child Citizenship Act, Public Law 106-395, section 101, 114 Stat. 1631, 1631 (2000) (amending INA section 320). In addition, the surviving spouses, children, and parents of a deceased member of the military who obtain citizenship posthumously are exempt from a public charge determination. *See* National Defense

Authorization Act For Fiscal Year 2004, Public Law 108-136, section 1703(e), 117 Stat. 1392, 1695 (2003).

[190] Including the following categories: IR-6 Spouses; IR-7 Children; CR-7 Children, conditional; IH-8 Children adopted abroad under the Hague Adoption Convention; IH-9 Children coming to the United States to be adopted under the Hague Adoption Convention; IR-8 Orphans

adopted abroad; IR–9 Orphans coming to the United States to be adopted; IR–0 Parents of adult U.S. citizens. Note children adopted abroad generally do not apply for adjustment of status.

[191] Including the following categories: A–16 Unmarried Amerasian sons/daughters of U.S. citizens F–16 Unmarried sons/daughters of U.S. citizens; A–17 Children of A–11 or A–16; F–17 Children of F–11 or F–16; B–17 Children of B–11 or B–16.

[192] Including the following categories: F–26 Spouses of alien residents, subject to country limits; C–26 Spouses of alien residents, subject to country limits, conditional; FX–6 Spouses of alien residents, exempt from country limits; CX–6 Spouses of alien residents, exempt from country limits, conditional; F–27 Children of alien residents, subject to country limits; C–28 Children of -C–26, or C–27, subject to country limits, conditional; B–28 Children of B–26, or B–27, subject to country limits; F–28 Children of F–26, or F–27, subject to country limits; C–20 Children of C–29, subject to country limits, conditional; B–20 Children of B–29, subject to country limits; F–29 Children of F–29, subject to country limits; C–27 Children of alien residents, subject to country limits, conditional; FX–7 Children of alien residents, exempt from country limits; CX–8 Children of CX–7, exempt from country limits, conditional; FX–8 Children of FX–7, or FX–8, exempt from country limits; CX–7 Children of alien residents, exempt from country limits; F–29 Unmarried sons/daughters of alien residents, subject to country limits, conditional; C–29 Unmarried children of alien residents, subject to country limits, conditional.

[193] Including the following categories: A–36 Married Amerasian sons/daughters of U.S. citizens; F–36 Married sons/daughters of U.S. citizens; C–36 Married sons/daughters of U.S. citizens, conditional; A–37 Spouses of A–31 or A–36; F–37 Spouses of married sons/daughters of U.S. citizens; C–37 Spouses of married sons/daughters of U.S. citizens, conditional; B–37 Spouses of B–31 or B–36; A–38 Children of A–31 or A–36, subject to country limits; F–38 Children of married sons/daughters of U.S. citizens; C–38 Children of C–31 or C–36, subject to country limits, conditional; B–38 Children of B–31 or B–36, subject to country limits.

[194] Includes the following categories: F–46 Brothers/sisters of U.S. citizens, adjustments; F–47 Spouses of brothers/sisters of U.S. citizens, adjustments; F–48 Children of brothers/sisters of U.S. citizens, adjustments.

[195] Includes the following categories: CF–1 Spouses, entered as fiance(e), adjustments conditional; IF–1 Spouses, entered as fiance(e), adjustments.

[196] Includes the following categories: Immediate Relative AR–6 Children, Amerasian, First Preference: A–16 Unmarried Amerasian sons/daughters of U.S. citizens; Third Preference A–36 Married Amerasian sons/daughters of U.S. citizens; See INA 204(f). Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[197] Includes the following categories: AM–1 principal (born between 1/1/1962–1/1/1976); AM–2 Spouse, AM–3 child; AR–1 child of U.S. citizen born Cambodia, Korea, Laos, Thailand, Vietnam. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[198] Includes the following categories: IB–6 Spouses, self-petitioning; IB–7 Children, self-petitioning; IB–8 Children of IB–1 or IB–6; IB–0 Parents battered or abused, of U.S. citizens, self-petitioning.

[199] Includes the following categories: B–26 Spouses of alien residents, subject to country limits, self-petitioning; BX–6 Spouses of alien residents, exempt from country limits, self-petitioning; B–27

Children of alien residents, subject to country limits, self-petitioning; BX–7 Children of alien residents, exempt from country limits, self-petitioning; BX–8 Children of BX–6, or BX–7, exempt from country limits; B–29 Unmarried sons/daughters of alien residents, subject to country limits, self-petitioning.

[200] Includes the following categories: B–36 Married sons/daughters of U.S. citizens, self-petitioning B–37 Spouses of B–36, adjustments; B–38 Children of B–36, subject to country limits; Third Preference VAWA; B–36 Married sons/daughters of U.S. citizens, self-petitioning; B–37 Spouses of B–36, adjustments B–38 Children of B–36, subject to country limits; Third Preference VAWA; B–37 Spouses of B–36, adjustments; B–38 Children of B–36, subject to country limits.

[201] Includes the following categories: E–16 Aliens with extraordinary ability; E–17 Outstanding professors or researchers; E–18 Certain Multinational executives or managers; E–19 Spouses of E–11, E–12, E–13, E–16, E–17, or E–18; E–10 Children of E–11, E–12, E–13, E–16, E–17, or E–18.

[202] Relative means a husband, wife, father, mother, child, adult son, adult daughter, brother, or sister. Significant ownership interest means an ownership interest of 5 percent or more in a for-profit entity that filed an immigrant visa petition to accord a prospective employee an immigrant status under section 203(b) of the Act. *See* 8 CFR.213a.1.

[203] Includes the following categories: E–26 Professionals holding advanced degrees; E8–6 Soviet scientists; E–27 Spouses of E–21 or E–26; E–28 Children of E–21 or E–26.

[204] Includes the following categories: EX–6 Schedule—A worker; EX–7 Spouses of EX–6; EX–8 Children of EX–6; E–36 Skilled workers; E–37 Professionals with baccalaureate degrees; E–38 Spouses of E–36, or E–37; E–30 Children of E–36, or E–37; EW–6 Other workers; EW–0 Children of EW–8; EW–9 Spouses of EW–8; EC–6 Chinese Student Protection Act (CSPA) principals; EC–7 Spouses of EC–6; EC–8 Children of EC–6.

[205] Includes the following categories: C–56 Employment creation, not in targeted area, adjustments, conditional E–56 Employment creation; I–56 Employment creation, targeted area, pilot program, adjustments, conditional; T–56 Employment creation, targeted area, conditional; R–56 Investor pilot program, not targeted, conditional; C–57 Spouses of C–51 or C–56, conditional; E–57 Spouses of E–51 or E–56; I–57 Spouses of I–51 or I–56, conditional; T–57 Spouses of T–51 or T–56, conditional; R–57 Spouses of R–51 or R–56, conditional; C–58 Children of C–51 or C–56, conditional; E–58 Children of E–51 or E–56; I–58 Children of I–51 or I–56, conditional; T–58 Children of T–51 or T–56, conditional; R–58 Children of R–51 or R–56, conditional.

[206] EB–5 applicants are Form I–526, Immigrant Petition by Alien Entrepreneur, self-petitioners. The regulation at 8 CFR 213a.1 relates to a person having ownership interest in an entity filing for a prospective employee and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[207] Includes the following categories: SD–6 Ministers; SD–7 Spouses of SD–6; SD–8 Children of SD–6; SR–6 Religious workers; SR–7 Spouses of SR–6; SR–8 Children of SR–6.

[208] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers (for example, a religious institution), would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[209] Includes the following categories: SE–6 Employees of U.S. government abroad, adjustments; SE–7 Spouses of SE–6; SE–8 Children of SE–6. Note

that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[210] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers (for example, the U.S. armed forces), would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[211] Includes the following categories: SF–6 Former employees of the Panama Canal Company or Canal Zone Government; SF–7 Spouses or children of SF–6; SG–6 Former U.S. government employees in the Panama Canal Zone; SG–7 Spouses or children of SG–6; SH–6 Former employees of the Panama Canal Company or Canal Zone government, employed on April 1, 1979; SH–7 Spouses or children of SH–6. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[212] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers generally would not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[213] Includes the following categories: SJ–6 Foreign medical school graduate who was licensed to practice in the United States on Jan. 9, 1978; SJ–7 Spouses or children of SJ–6; Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[214] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[215] Includes the following categories: SK–6 Retired employees of international organizations; SK–7 Spouses of SK–1 or SK–6; SK–8 Certain unmarried children of SK–6; SK–9 Certain surviving spouses of deceased international organization employees.

[216] Includes SN–6 Retired NATO–6 civilian employees; SN–7 Spouses of SN–6; SN–9 Certain surviving spouses of deceased NATO–6 civilian employees; SN–8 Certain unmarried sons/daughters of SN–6.

[217] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[218] Includes the following categories: SM–6 U.S. Armed Forces personnel, service (12 years) after 10/1/91 SM–9 U.S. Armed Forces personnel, service (12 years) by 10/91; SM–7 Spouses of SM–1 or SM–6; SM–0 Spouses or children of SM–4 or SM–9; SM–8 Children of SM–1 or SM–6.

[219] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[220] Includes the following categories: BC–6 Broadcast (IBCG of BBG) employees; BC–7 Spouses of BC–1 or BC–6; BC–8 Children of BC–6.

[221] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of

Continued

BILLING CODE 4410–10–C

4. Exemptions

The public charge inadmissibility ground does not apply to all applicants who are seeking a visa, admission, or adjustment of status.[232] Congress has specifically exempted certain groups from the public charge inadmissibility ground and DHS regulations permit waivers of the ground for certain other groups, as follows:

• Refugees and asylees at the time of admission and adjustment of status to lawful permanent resident, pursuant to

support under INA section 212(a)(4)(D) is inapplicable.

[222] Includes the following categories: SI–6 Special immigrant interpreters who are nationals of Iraq or Afghanistan; SI–6, SI–7, SI–8—spouse and child of SI–6; SQ–6 Certain Iraqis and Afghans employed by U.S. Government SQ–6, SQ–7, SQ–8 Spouses and children of SQ–6; SI–6 Special immigrant interpreters who are nationals of Iraq or Afghanistan; SI–7 Spouses of SI–1 or SI–6; SI–8 Children of SI–1 or SI–6.

[223] Including the following categories: AS–6 Asylees; AS–7 Spouses of AS–6; AS–8 Children of AS–6; SY–8 Children of SY–6; GA–6 Iraqi asylees; GA–7 Spouses of GA–6; GA–8 Children of GA–6.

[224] Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[225] Includes the following categories: RE–6 Other refugees (Refugee Act of 1980, Public Law 96–212, 94 Stat. 102); RE–7 Spouses of RE–6; RE–8 Children of RE–6; RE–9 Other relatives.

[226] Note that this program has a sunset date of two years after enactment, however, some cases may still be pending.

[227] Includes the following categories: 1995—HA–6 Principal HRIFA Applicant; Spouse of HA–6, HA–7 and Child of HA–6, HA–8; Unmarried Son or Daughter 21 Years of Age or Older of HA–6, HA–9 Principal HRIFA Applicant paroled into the United States before December 31, 1995- HB–6; Spouse of HB–6, HB–7; Child of HB–6, HB–8; Unmarried Son or Daughter 21 Years of Age or Older of HB–6 HB–9; Principal HRIFA Applicant who arrived as a child without parents in the United States HC–6; Spouse of HC–6, HC–7; Child of HC–6, HC–8; Unmarried Son or Daughter 21 Years of Age or Older of HC–6, HC–9; Principal HRIFA Applicant child who was orphaned subsequent to arrival in the United States HD–6, Spouse of HD–6, HD–7; Child of HD–6, HD–8; Unmarried Son or Daughter 21 Years of Age or Older of HD–6, HD–9 Principal HRIFA Applicant child who was abandoned subsequent to arrival and prior to April 1, 1998—HE–6; Spouse of HE–6, HE–7; Child of HE–6, HE–8; Unmarried Son or Daughter 21 Years of Age or Older of HE–6, HE–9. Note that this program has a sunset date of March 31, 2000; however, dependents may still file for adjustment of status.

[228] Note that this program has a sunset date of April 1, 2000; however, some cases may still be pending.

[229] Note that this program sunset date of September 30, 2014, only applies to parole. Eligible applicants may still apply for adjustment of status.

[230] INA section 244(c)(2)(ii), 8 U.S.C. 1254a(c)(2)(ii), authorizes DHS to waive any section 212(a) ground, except for those that Congress specifically noted could not be waived.

[231] See INA section 244(c)(2)(ii), 8 U.S.C. 1254a(c)(2)(ii).

[232] See proposed 8 CFR 212.23(a).

sections 207(c)(3) and 209(c) of the Act, 8 U.S.C. 1157(c)(3), 1159(c);

• Amerasian immigrants at admission, pursuant to in section 584(a)(2) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202, 101 Stat. 1329–183 (Dec. 22, 1987) (as amended), 8 U.S.C. 1101 note 5;

• Afghan and Iraqi Interpreter, or Afghan or Iraqi national employed by or on behalf of the U.S. Government, pursuant to section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006 Public Law 109–163 (Jan. 6, 2006), section 602(b) of the Afghan Allies Protection Act of 2009, as amended Public Law 111–8 (Mar. 11, 2009), and section 1244(g) of the National Defense Authorization Act for Fiscal Year 2008, as amended Public Law 110–181 (Jan. 28, 2008);

• Cuban and Haitian entrants at adjustment, pursuant to section 202 of the Immigration Reform and Control Act of 1986 (IRCA), Public Law 99–603, 100 Stat. 3359 (Jan. 3, 1986) (as amended), 8 U.S.C. 1255a, note;

• Aliens applying for adjustment of status, pursuant to the Cuban Adjustment Act, Public Law 89–732 (Nov. 2, 1966) as amended; 8 U.S.C. 1255, note;

• Nicaraguans and other Central Americans who are adjusting status, pursuant to section 202(a) and section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100, 111 Stat. 2193 (Nov. 19, 1997) (as amended), 8 U.S.C. 1255 note;

• Haitians who are adjusting status, pursuant to section 902 of the Haitian Refugee Immigration Fairness Act of 1998, Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), 8 U.S.C. 1255 note;

• Lautenberg parolees, pursuant to section 599E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Public Law 101–167, 103 Stat. 1195 (Nov. 21, 1989), 8 U.S.C.A. 1255 note;

• Special immigrant juveniles, pursuant to section 245(h) of the Act, 8 U.S.C. 1255(h);

• Aliens who entered the United States prior to January 1, 1972, and who meet the other conditions for being granted lawful permanent residence under section 249 of the Act, 8 U.S.C. 1259, and 8 CFR part 249;

• Aliens applying for Temporary Protected Status, pursuant to section 244(c)(2)(ii) of the Act, 8 U.S.C. 1254a(c)(2)(ii) and 8 CFR 244.3(a);[233]

[233] INA section 244(c)(2)(ii), 8 U.S.C. 1254a(c)(2)(ii), authorizes DHS to waive any INA

• A nonimmigrant described in section 101(a)(15)(A)(i) and (A)(ii) of the Act, 8 U.S.C. 1101(a)(15)(A)(i) and (A)(ii) (Ambassador, Public Minister, Career Diplomat or Consular Officer, or Immediate Family or Other Foreign Government Official or Employee, or Immediate Family), pursuant to section 102 of the Act, 8 U.S.C. 1102, 22 CFR 41.21(d);

• A nonimmigrant classifiable as C–2 (alien in transit to U.N. Headquarters) or C–3 (foreign government official), pursuant to 22 CFR 41.21(d);

• A nonimmigrant described in section 101(a)(15)(G)(i), (G)(ii), (G)(iii), and (G)(iv), of the Act (Principal Resident Representative of Recognized Foreign Government to International Organization, and related categories),[234] 8 U.S.C. 1101(a)(15)(G)(i), (G)(ii), (G)(iii), and (G)(iv), pursuant to section 102 of the Act, 8 U.S.C. 1102, 22 CFR 41.21(d);

• A nonimmigrant classifiable as a NATO representative and related categories,[235] pursuant to 22 CFR 41.21(d);

section 212(a), 8 U.S.C. 1182(a) ground, except for those that Congress specifically noted could not be waived.

[234] Includes the following categories: G–1—Principal Resident Representative of Recognized Foreign Government to International Organization, Staff, or Immediate Family; G–2—Other Representative of Recognized Foreign Member Government to International Organization, or Immediate Family; G–3—Representative of Non-recognized or Nonmember Foreign Government to International Organization, or Immediate Family; G–4—International Organization Officer or Employee, or Immediate Family; G–5—Attendant, Servant, or Personal Employee of G–1 through G–4, or Immediate Family.

[235] Includes the following categories: NATO 1—Principal Permanent Representative of Member State to NATO (including any of its Subsidiary Bodies) Resident in the U.S. and Resident Members of Official Staff; Secretary General, Assistant Secretaries General, and Executive Secretary of NATO; Other Permanent NATO Officials of Similar Rank, or Immediate Family; NATO 2—Other Representative of member state to NATO (including any of its Subsidiary Bodies) including Representatives, Advisers, and Technical Experts of Delegations, or Immediate Family; Dependents of Member of a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement or in Accordance with the provisions of the "Protocol on the Status of International Military Headquarters"; Members of Such a Force if Issued Visas; NATO 3—Official Clerical Staff Accompanying Representative of Member State to NATO (including any of its Subsidiary Bodies), or Immediate Family; NATO–4—Official of NATO (Other Than Those Classifiable as NATO–1), or Immediate Family; NATO–5—Experts, Other Than NATO Officials Classifiable Under NATO–4, Employed in Missions on Behalf of NATO, and their Dependents; NATO 6—Member of a Civilian Component Accompanying a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement; Member of a Civilian Component Attached to or Employed by an Allied Headquarters Under the "Protocol on the Status of International Military Headquarters" Set Up Pursuant to the North Atlantic Treaty; and their

• A nonimmigrant described in section 101(a)(15)(T) of the Act (Victim of Severe Form of Trafficking), 8 U.S.C. 1101(a)(15)(T), pursuant to section 212(d)(13)(A) of the Act, 8 U.S.C. 1182(d)(13)(A), at time of admission;

• An applicant for, or who is granted, nonimmigrant status under section 101(a)(15)(U) of the Act, 8 U.S.C. 1101(a)(15)(U) (Victim of Criminal Activity), pursuant to section 212(a)(4)(E)(ii) of the Act, 8 U.S.C. 1182(a)(4)(E)(ii);

• Nonimmigrants who were admitted under section 101(a)(15)(U) (Victim of Criminal Activity) of the Act, 8 U.S.C. 1101(a)(15)(U), at the time of their adjustment of status under section 245(m) of the Act, 8 U.S.C. 1155(m), and 8 CFR 245.24;

• An alien who is a VAWA self-petitioner as defined in section 101(a)(51) of the Act, 8 U.S.C. 1101, pursuant to section 212(a)(4)(E)(i) of the Act, 8 U.S.C. 1182(a)(4)(E)(i);

• A qualified alien described in section 431(c) of the PRWORA of 1996 (8 U.S.C. 1641(c)) (certain battered aliens as qualified aliens), pursuant to section 212(a)(4)(E)(iii) of the Act, 8 U.S.C. 1182(a)(4)(E)(iii);

• Applicants adjusting status under section National Defense Authorization Act For Fiscal Year 2004, Public Law 108–136, 117 Stat. 1392 (Nov. 24, 2003) (posthumous benefits to surviving spouses, children, and parents);

• American Indians Born in Canada, pursuant to section 289 of the Act, 8 U.S.C. 1359; and

• Nationals of Vietnam, Cambodia, and Laos adjusting status, pursuant to section 586 of Public Law 106–429 (Nov. 1, 2000).

In general, the aforementioned classes of aliens are vulnerable populations of immigrants and nonimmigrants. Some have been persecuted or victimized and others have little to no private support network in the United States. These individuals tend to require government protection and support. Admission of these aliens also serves distinct public policy goals separate from the general immigration system. Other legal provisions may permit waivers of public charge provisions under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

5. Waivers

The proposed regulation at 8 CFR 212.23(b) lists the categories of applicants Congress has authorized to apply for waivers of the public charge inadmissibility ground, as follows:

Dependents; NATO–7—Attendant, Servant, or Personal Employee of NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, and NATO–6 Classes, or Immediate Family.

• Nonimmigrants who were admitted under section 101(a)(15)(T) of the Act, 8 U.S.C. 1101(a)(15)(T) (Victims of Severe Form of Tracking in Persons) at the time of their adjustment of status under section 245(l)(2)(A) of the Act, 8 U.S.C. 1255(l)(2)(A);

• S (alien witness or informant) nonimmigrants described in section 101(a)(15)(S), of the Act, 8 U.S.C. 1101(a)(15)(S);

• Applicants for admission and adjustment of status under section 245(j) of the Act, 8 U.S.C. 1255(j) (alien witness or informant); and

• Other waivers of the public charge inadmissibility provisions in section 212(a)(4) of the Act permissible under the law.

B. Definitions of Public Charge and Related Terms

DHS proposes to add several definitions that apply to public charge inadmissibility determinations.

1. Public Charge

The term "public charge," as used in section 212(a)(4) of the Act, is not defined.[236] DHS is proposing to define a public charge as an alien who receives one or more public benefits, as defined in 8 CFR 212.21(b).[237] DHS believes that its proposed definition of public charge is consistent with legislative history, case law, and the ordinary meaning of public charge.

Consistent with the public charge inadmissibility statute[238] and Congressional objectives announced in PRWORA, DHS proposes that aliens subject to the public charge inadmissibility ground[239] should "not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations."[240]

There is a scarcity of legislative guidance and case law defining public charge. Legislative history, however, suggests a link between public charge and the receipt of public benefits. According to a 1950 Senate Judiciary Committee report, which preceded the passage of the 1952 Act, a Senate

[236] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).
[237] See proposed 8 CFR 212.21(a) and (c).
[238] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4) (emphasis added). The alien is inadmissible if he or she "is likely at any time to become a public charge."
[239] Aliens subject to the public charge ground of inadmissibility are aliens outside the United States seeking admission to the country, seeking a visa to permit them to apply for admission as a nonimmigrant or immigrant to the United States, or in the United States seeking to adjust status to that of lawful permanent residents.
[240] See 8 U.S.C. 1601(2)(A).

subcommittee highlighted concerns raised by an immigration inspector about aliens receiving old age assistance. The Senate subcommittee recommended against establishing a strict definition of the term public charge by law. Because the elements that could constitute any given individual's likelihood of becoming a public charge vary, the subcommittee instead recommended that the determination of whether an alien is likely to become a public charge should rest within the discretion of consular officers and the Commissioner.[241]

Before Congress passed IIRIRA in 1996, debates on public charge exclusion and deportation grounds considered the significance of an alien's use of public benefits and self-sufficiency.[242] One Senator opined that immigrants, upon seeking admission, make a "promise to the American people that they will not become a burden on the taxpayers,"[243] and expressed that it is not "unreasonable for the taxpayers of this country to require recently arrived immigrants to depend on their sponsors for the first 5 years under all circumstances if the sponsor has the assets."[244] Congress through PRWORA[245] further emphasized that "the availability of public benefits not constitute an incentive for immigration to the United States."[246]

Absent a clear statutory definition, some courts and administrative authorities have tied public charge to receipt of public benefits without quantifying the level of public support or the type of public support required. For example, in analyzing the term public charge in the context of deportability under section 19 of the

[241] See The 1950 Omnibus Report of the Senate Judiciary Committee, S. Rep. No. 81–1515, at 349 (1950); see also Matter of Harutunian, 14 I&N Dec. 583 (Reg'l Comm'r 1974).
[242] See 142 Cong. Rec. S4609 (May 2, 1996) (statement of Sen. Byrd) ("[S]elf-sufficiency will be the watchword for those coming to the United States. By making noncitizens ineligible for Federal means-tested programs, and by 'deeming' a sponsor's income attributable to an immigrant, the American taxpayer will no longer be financially responsible for new arrivals."), available at https:// www.congress.gov/crec/1996/05/02/CREC-1996-05-02-pt1-PgS4592.pdf.
[243] 142 Cong. Rec. S4495 (May 1, 1996) (statement of Sen. Simon), available at https:// www.congress.gov/crec/1996/05/01/CREC-1996-05-01-pt1-PgS4457.pdf.
[244] 142 Cong. Rec. S4495 (May 1, 1996) (statement of Sen. Simon), available at https:// www.congress.gov/crec/1996/05/01/CREC-1996-05-01-pt1-PgS4457.pdf.
[245] 8 U.S.C. 1601(2)(A).
[246] 8 U.S.C. 1601(2)(B).

Immigration Act of 1917,[247] the U.S. District Court for the Northern District of California in *Ex parte Kichmiriantz* explained that public charge should be interpreted as "a money charge upon, or an expense to, the public for support and care." [248] The court made clear that the money charge or expense must be upon the public, rather than relatives, but did not specifically identify how much public support renders a person a public charge. Similarly, the U.S. District Court for the Northern District of New York and the U.S. District Court for the Southern District of New York, in *Ex parte Mitchell* and *In re Keshishian* respectively, indicated that a public charge is one who is supported at public expense without qualifying or quantifying the level of support at public expense necessary.[249] Furthermore, when the Fifth Circuit Court of Appeals considered criminal misconduct and imprisonment within the context of public charge in *Coykendall* v. *Skrmetta,* the court opined: "It cannot well be supposed that the words in question were intended to refer to anything other than a condition of dependence on the public for support." [250] The Second Circuit Court of Appeals, in *Iorio* v. *Day,* likewise stated: "The language (sic) itself, 'public charge,' suggests rather dependency than imprisonment." [251] Neither circuit court elaborated on the degree of dependence required to sustain a public charge finding.

In *Matter of Martinez-Lopez,* the Attorney General indicated that public support or the burden of supporting the alien being cast on the public was a fundamental consideration in public charge inadmissibility determinations.[252] While an alien's past receipt of welfare alone does not establish that he or she is likely to become a public charge, case law strongly suggests that an alien's ability or inability to remedy his or her past or current reliance on public welfare for financial support plays a critical role in the outcome of a public charge inadmissibility determination.[253] For

example, in *Matter of Perez,* the BIA acknowledged the respondent's ability to remedy her reliance on welfare in determining that she may be able to overcome the public charge ground inadmissibility in a prospective application for a visa.[254] On the other hand, in *Matter of Harutunian* and *Matter of Vindman,* the respondents failed to show a capacity to overcome their dependence on public support.[255] INS expected them to continue receiving public support and determined that they were inadmissible as public charges.[256]

Bearing in mind the operative legislative history and case law examined above, DHS is proposing a new definition of public charge.[257] The definitions cited in the 1999 Interim Field Guidance and proposed rule indicates that a person becomes a public charge when he or she is committed to the care, custody, management, or support of the public, but DHS does not believe that these definitions suggest or require a primary dependence on the government in order for someone to be a public charge.[258] DHS believes that a person should be considered a public charge based on the receipt of financial support from the general public through government funding (*i.e.,* public benefits).

This is consistent with various dictionary definitions of public charge and "charge" also support a definition that involves the receipt of public benefits. The current edition of the Merriam-Webster Dictionary defines public charge simply as "one that is supported at public expense." [259] Black's Law Dictionary (6th ed.) further defines public charge as "an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty." [260] In addition, the term "charge" is defined

in Merriam-Webster Dictionary as "a person or thing committed into the care of another" [261] and Black's Law Dictionary defines charge as "a person or thing entrusted to another's care," *e.g.,* "a charge of the estate." [262] These definitions generally suggest that an impoverished or ill individual who receives public benefits for a substantial component of their support and care can be reasonably viewed as being a public charge. The proposed definition of public charge is also consistent with the concept of an indigent, which is defined as "one who is needy and poor . . . and ordinarily indicates one who is destitute of means of comfortable subsistence so as to be in want." [263] DHS believes its proposed definition reflects Congress's intent in having aliens be self-sufficient and not reliant on the government (*i.e.,* public benefits) for assistance to meet their needs.

2. Public Benefit

DHS proposes to define public benefit [264] to include a specific list of cash aid and noncash medical care, housing, and food benefit programs where either (1) the cumulative value of one or more such benefits that can be monetized (*i.e.,* where DHS can determine the cash value of such benefit) exceeds 15 percent of the Federal Poverty Guidelines (FPG) for a household of one within a period of 12 consecutive months based on the per-month FPG for the months during which the benefits are received (hereafter referred to as the 15 percent of FPG or the proposed 15 percent standard or threshold); or (2) for benefits that cannot be monetized, the benefits are received for more than 12 months in the aggregate within a 36-month period. The proposed definition also addresses circumstances where an alien receives a combination of monetizable benefits equal to or below the 15 percent threshold together with one or more benefits that cannot be monetized. In such cases, DHS proposes that the threshold for duration of receipt of the non-monetizable benefits would be 9 months in the aggregate within a 36-month period.[265]

As proposed in this rule, DHS would consider the following public benefits:

---

[247] Section 19 of the Immigration Act of 1917 addresses aliens who are deportable within five years of entry.

[248] 283 F. 697, 698 (N.D. Cal. 1922).

[249] *See Ex parte Mitchell* 256 F. 230, 234 (N.D. NY 1919) and *In re Keshishian* 299 F. 804 (S.D. NY 1924).

[250] *See Coykendall* v. *Skrmetta* 22 F.2d 121 (5th Cir. 1927).

[251] *See Iorio* v. *Day* 34 F.2d 921 (2d Cir. 1929).

[252] *See Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1964)

[253] *See, e.g., Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r 1977); *Matter of Perez,* 15 I&N Dec. 136 (BIA 1974); *Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

[254] *See Matter of Perez,* 15 I&N Dec. at 137.

[255] *See Matter of Harutunian,* 14 I&N Dec. at 590 and *Matter of Vindman,* 16 I&N Dec. at 132.

[256] *See id.*

[257] *See, e.g., Taniguchi* v. *Kan Pac. Saipan, Ltd.,* 566 U.S. 560, 566 (2012) ("When a term goes undefined in statute, we give the term its ordinary meaning.").

[258] DHS acknowledges the importance of increasing access to health care and helping people to be self-sufficient in certain contexts (such as with respect to other agencies' administration of government assistance programs). The INA, however, does not dictate advancement of those goals in the context of public charge inadmissibility determinations.

[259] Merriam-Webster Online Dictionary, *Definition of Public Charge,* https://www.merriam-webster.com/dictionary/public%20charge (last visited Sept. 4, 2018).

[260] *Black's Law Dictionary* 233 (6th ed. 1990), *available at* http://www.republicsg.info/dictionaries/1990_black's-law-dictionary-edition-6.pdf.

[261] Merriam-Webster Online Dictionary, *Definition of Charge,* https://www.merriam-webster.com/dictionary/charge (last updated Sept. 5, 2018).

[262] *Black's Law Dictionary* Charge (10th ed. 2014).

[263] *Black's Law Dictionary* 773 (6th ed. 1990), *available at* http://www.republicsg.info/dictionaries/1990_black's-law-dictionary-edition-6.pdf.

[264] *See* proposed 8 CFR 212.21(b).

[265] *See* proposed 8 CFR 212.21(c).

- Monetizable benefits:
  ○ Any Federal, State, local, or tribal cash assistance [266] for income maintenance, including: Supplemental Security Income (SSI),[267] Temporary Assistance for Needy Families (TANF),[268] and Federal, State or local cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which may exist under other names);
  ○ Benefits that can be monetized in accordance with proposed 8 CFR 212.24:
- Supplemental Nutrition Assistance Program (SNAP, or formerly called "Food Stamps"), 7 U.S.C. 2011 to 2036c;
- Public housing defined as Section 8 Housing Choice Voucher Program; [269]
- Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation); [270] and
- Non-cash benefits that cannot be monetized:
  ○ Benefits paid for by Medicaid, 42 U.S.C. 1396 et seq., except for emergency medical conditions as prescribed in in section 1903(v) of Title XIX of the Social Security Act, 42 U.S.C. 1396b(v), 42 CFR 440.255(c), and for services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act (IDEA); and benefits provided to foreign-born children of U.S. citizen parents;
  ○ Premium and Cost Sharing Subsidies for Medicare Part D; [271] Benefits provided for institutionalization for long-term care at government expense;
  ○ Subsidized Housing under the Housing Act of 1937, 42 U.S.C. 1437 et seq.

(a) Types of Public Benefits

In formulating the proposed definition of public benefits, DHS contemplated pertinent case law, the definition of public benefits in PRWORA, and the treatment of certain public benefits under the current public charge policy. The cases examined draw a distinction between the types of public benefits that are appropriately considered in public charge determinations, and the types that are not. In Matter of Harutunian, an INS Regional Commissioner noted a fundamental difference between consideration of "individualized public support to the needy" and "essentially supplementary benefits directed to the general welfare of the public as a whole." [272] The BIA similarly observed a distinction between individualized receipt of welfare benefits and "the countless municipal and State services which are provided to all residents, alien and citizen alike, without specific charge of the municipality or the State, and which are paid out of the general tax fund" in assessing the relevance of receipt of a government benefit or service to public charge determinations. [273] Specific public benefits considered relevant to public charge determinations have included old age assistance, Supplemental Security Income (SSI), and receipt of "public funds from the New York Department of Social Services." [274]

PRWORA, with certain exceptions, defined Federal public benefits as "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and . . . any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." [275] DHS believes the definition of public benefits used in PRWORA is in some respects too broad for public charge inadmissibility determinations. The principal reason PRWORA's definition does not work in the public charge inadmissibility determination is that it includes grants, contracts, and licensures that are transactional in nature and may involve the exchange of government resources for value provided by the alien. [276] Because they are value-exchanged benefits and do not evidence a lack of self-sufficiency, DHS does not believe that grants, contracts, and licensures are appropriate for consideration in public charge inadmissibility determinations.

Certain cash aid and non-cash benefits directed toward food, housing, and healthcare, on the other hand, are directly relevant to public charge inadmissibility determinations. Food, shelter, and necessary medical treatment are basic necessities of life. A person who needs the public's assistance to provide for these basic necessities is not self-sufficient.

DHS proposes to consider specific public benefit programs as part of the public charge inadmissibility analysis. Consistent with the 1999 Interim Field Guidance, DHS is proposing to consider all federal, state, local, and tribal cash assistance for income maintenance as part of the public benefits definition. The receipt of these public benefits indicates that the recipient, rather than being self-sufficient, needs the government's assistance to meet basic living requirements such as housing, food, and medical care. Therefore, DHS believes that continuing to consider these benefits in the public charge inadmissibility consideration is appropriate. [277]

DHS also proposes consideration of certain non-cash benefits, because receipt of such benefits is relevant to determining whether an alien is self-sufficient. DHS recognizes that the universe of non-cash benefits is quite large, and that some benefits are more commonly used, at greater taxpayer expense, than others. In addition, incorporating specific non-cash benefit programs into the public charge inadmissibility determination entails certain indirect costs—for instance, as a result of a final rule, the benefits-granting agency may make changes to forms or to enrollment or disenrollment procedures. In light of these considerations, and to provide consistency in adjudications and appropriate certainty for aliens and benefits-granting agencies, DHS proposes to incorporate consideration of a limited list of non-cash benefits in the public charge inadmissibility determination context. Specifically, as indicated above, DHS would consider the following non-cash benefits: Nonemergency Medicaid, Premium and Cost Sharing Subsidies for Medicare Part D; the Supplemental Nutrition Assistance Program (SNAP); benefits provided for institutionalization for

[266] Cash assistance would include any government assistance in the form of cash, checks or other forms of money transfers, or instruments.

[267] See 42 U.S.C. 1381–1383f

[268] See 42 U.S.C. 601–619.

[269] See 24 CFR part 984; 42 U.S.C. 1437f and 1437u.

[270] See 24 CFR parts 5, 402, 880–884 and 886.

[271] See 42 U.S.C. 1395w–14.

[272] See Matter of Harutunian, 14 I&N Dec. 583, 589 (Reg'l Comm'r 1974).

[273] See Matter of B —, 3 I&N Dec. 323, 324–25 (BIA 1948).

[274] See Matter of Harutunian 14 I&N Dec. 583, 590 (Reg'l Comm'r 1974) (considering old age assistance for public charge excludability purposes); Matter of Vindman, 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977) (receipt of public funds from the New York Department of Social Services).

[275] See 8 U.S.C. 1611(c)(1) and (2).

[276] See 8 U.S.C. 1611(c).

[277] Not all cash assistance would qualify as cash assistance for income maintenance under the proposed rule. For instance, DHS would not consider Stafford Act disaster assistance, including financial assistance provided to individuals and households under Individual Assistance under the Federal Emergency Management Agency's Individuals and Households Program (42 U.S.C. 5174) as cash assistance for income maintenance. The same would hold true for comparable disaster assistance provided by State, local, or tribal governments. Other categories of cash assistance that are not intended to maintain a person at a minimum level of income would similarly not fall within the definition.

long-term care at government expense; and housing programs, including Section 8 Housing Assistance under the Housing Choice Voucher Program, Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation), and Subsidized Public Housing.

Cash aid and non-cash benefits directed toward food, housing, and healthcare account for significant federal expenditure on low-income individuals and bear directly on self-sufficiency. Table 10 illustrates the estimated average annual public benefits payments and average annual benefit for each assistance program under consideration in this rule.

| Table 10. Public Benefit Programs under Consideration for Public Charge Purposes[278] | | | |
|---|---|---|---|
| Program | Average Annual Public Benefits Payments[279] | Average Annual Benefit[280] | Included in Proposal? |
| Medicaid[281] | $477,395,691,240 | $7,426.59 per person | Yes |
| Supplemental Nutrition Assistance Program (SNAP) | $69,192,042,274 | $1,527.59 per person | Yes |
| Supplemental Security Income (SSI) | $54,743,370,400 | $6,593.72 per person | Yes |
| Federal Rental Assistance[282] | $41,020,000,000 | $8,121.16 per household | Yes |
| Low Income Subsidy (LIS) for Medicare Part D Prescription Drug Coverage[283] | $25,400,000,000 | $2,099.17 per person | Yes |
| Children's Health Insurance Program (CHIP) | $15,026,000,000[284] | $2,324.52 per person[285] | Being Considered, Requesting Comments |
| Temporary Assistance for Needy Families (TANF) (cash aid only) | $4,389,219,525 | $1,272.56 | Yes |

In addition to federal expenditure impact, participation rates in these cash and non-cash benefits programs are significant. In fact, participation rates in some non-cash programs are far higher than participation rates in some cash programs, regardless of a person's immigration status or citizenship. Using the 2014 Panel of the Survey of Income and Program Participation (SIPP), DHS analyzed data detailing the participation rates for various cash and non-cash federal public benefits programs.[286] The results suggest that receipt of non-cash public benefits is more prevalent than receipt of cash benefits.[287] When analyzed by nativity and citizenship status, the results also suggest comparable levels of program participation by native-born individuals, foreign-born individuals, and noncitizens.[288] DHS recognizes that the SIPP Panel includes respondent-provided data on nativity, citizenship status, and initial immigration status, but does not provide data on current immigration classification. Additionally, the categories represented in the SIPP immigration status item do not align precisely with the populations covered by this rule—for instance, the results include refugees, asylees, and other populations that may access public benefits but are not subject to the public charge ground of inadmissibility. The SIPP data and DHS's analysis of this data do not examine whether the receipt of public benefits was authorized, and DHS did not examine program payment rate error information

[278] For a list of federal expenditures by program, see fiscal year 2016 data from table 2 of Gene Falk et al., Cong. Research Serv., R45097, *Federal Spending on Benefits and Services for People with Low Income: In Brief* (2018), *available at https://fas.org/sgp/crs/misc/R45097.pdf.*

[279] See Table 50: *Estimated Average Annual Benefit per Person, by Public Benefit Program,* unless otherwise noted.

[280] *Ibid.*

[281] Note that per enrollee Medicaid costs will vary by eligibility group and State.

[282] Note that "Federal Rental Assistance" includes HUD Section 8 Project-based Rental Assistance, HUD Section 8 Housing Choice Vouchers, HUD Public Housing, HUD Section 202/811, and USDA Section 521.

[283] Note that spending on LIS beneficiaries varies by individual.

[284] *See* U.S. Dep't of Health and Human Servs. (HHS), Centers for Medicare & Medicaid (CMS), *Expenditure Reports from MBES/CBES. Available at https://www.medicaid.gov/medicaid/finance/state-expenditure-reporting/expenditure-reports/index.html.* (Accessed Aug. 2, 2018).

[285] The estimated CHIP enrollment is 6,464,117, which is shown in the *Medicaid & CHIP Enrollment Data Highlights, available at https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights/index.html* (last visited Aug. 23, 2018).

[286] The 2014 Panel represents the most recent full year of data, and may not represent current participation rates.

[287] The SIPP is a longitudinal survey providing detailed information about public benefit receipt and the economic status of the U.S. civilian non-institutionalized population residing in households or group quarters. *See* U.S. Census Bureau, *Survey of Income and Program Participation: 2014 Panel Users' Guide* (2016), *available at https://www.census.gov/content/dam/Census/programs-surveys/sipp//-SIPP-Panel-Users-Guide.pdf.* In this proposed rule, estimates of income, poverty, and program participation by immigration status are produced from the September 27, 2017 re-release of Wave 1 of the SIPP. *See* U.S. Census Bureau, *Release Notes: 2014 SIPP Wave 1, available at https://www2.census.gov/programs-surveys/sipp/tech-documentation/2014/2014-wave1-releasenotes.pdf.* The 2014 Panel may be used for estimates representative of any month in calendar year 2013. In the tables presenting SIPP data throughout this preamble, annual averages are presented, which are averages across the 12 monthly estimates for the calendar year. Estimates represent persons residing in the household at the time of the interview, and exclude those who lived in the household during the month but not at the time of interview (referred to as "Type 2" people in SIPP documentation). *See id.; see also Memorandum from James B. Treat, Chief, Demographic Statistical Methods Div., to Jason Fields, Survey Director, Source and Accuracy Statement for Wave 1 Public Use Files (S&A–20)* (Apr. 7, 2017), *available at https://www2.census.gov/programs-surveys/sipp/tech-documentation/source-accuracy-statements/2014/sipp-2014-source-and-accuracy-statement.pdf* [hereinafter Source and Accuracy Statement].

[288] For this study, the foreign-born include those who were not born in the U.S. and were either noncitizens or became citizens through naturalization, military service, or adoption. Noncitizens are identified by self-responses to the question of whether they are citizens of the United States.

for this purpose. Notwithstanding these limitations, DHS believes the SIPP data on noncitizen participation is instructive with respect to the receipt of non-cash benefits by the noncitizen population on the whole. DHS welcomes comments on its use of this data, and whether alternative reliable data sources are available.

Table 11 shows public benefit participation, by nativity and citizenship status, in 2013. The total population studied was 310,867,000. The data shows that the rate of receipt for either cash or non-cash public benefits was approximately 20 percent among the native-born and foreign-born, including noncitizens. The rate of receipt of cash benefits was only 2 to 4 percent for these populations, with receipt of non-cash benefits dominating the overall rate.[289]

---

[289] In the discussion of SIPP data in this proposed rule, the estimates provided are based on a sample, which may not be identical to the totals and rates if all households and group quarters in the population were interviewed. The standard errors provided in the tables give an indication of the accuracy of the estimates. Any estimate for which the estimate divided by its standard error (the relative standard error) is greater than 30 percent is considered unreliable. The standard errors

themselves are estimates, and were calculated using design effects described in the Source and Accuracy Statement. Participation in Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), and General Assistance (GA) for a given month is identified by the monthly coverage variables for those benefits. These variables identify household members who were eligible for the benefit and were reported as being covered in the given month. Supplemental Security Income (SSI) and Medicaid receipt are defined by the coverage spell; if a given month is contained in the range of months of coverage, then the individual is identified as a recipient of the benefit for that month. The rent subsidy benefit for a given month indicates the respondent reported that their rent was lower because of a federal, state, or local government housing program, and the housing voucher benefit furthermore indicates that the renter was able to choose where to live. Finally, the 2014 Panel of SIPP does not distinguish between Medicaid, CHIP, and other types of comprehensive medical assistance for low-income people. For a number of reasons, DHS anticipates that CHIP enrollees represent a relatively small portion of the "Medicaid/CHIP" population. Typically, only persons below age 20 are eligible for CHIP, which reduces its impact on the overall estimates of Medicaid/CHIP. Furthermore, using data from the 2008 Panel of SIPP (Wave 13, reference month 1, representing September through December, 2012), it was found that 0.7 percent of noncitizen respondents reported receiving CHIP, and 23% of noncitizen Medicaid/CHIP recipients below age 20 overall reported receiving CHIP. For general reference, see the following publications, in addition to the cited sources in the preceding footnotes: Carmen DeNavas-Walt & Bernadette D.

Table 11 also shows Medicaid participation rates were 16.1 percent (43,301,000) among native-born individuals and 15.1 percent (6,272,000) among foreign-born persons, while rates among noncitizens were 15.5 percent (3,130,000). Participation rates in SNAP among native-born, foreign-born, and noncitizen populations are 11.6 percent (31,308,000), 8.7 percent (3,605,000), and 9.1 percent (1,828,000), respectively. The rate of receipt of cash benefits was 3.5 percent among the native-born and foreign-born, and about 2 percent among noncitizens. Although these results do not precisely align with the categories of aliens subject to this rule, they support the general proposition that non-cash public benefits play a significant role in the Nation's social safety net, including with respect to noncitizens generally.

---

Proctor, U.S. Census Bureau, *Current Population Reports: Income and Poverty in the United States: 2013* (Sept. 2014), *available at https://www2.census.gov/library/publications/2014/demographics/p60-249.pdf;* Kayla Fontenot et al., U.S. Census Bureau, *Monthly and Average Monthly Poverty Rates by Selected Demographic Characteristics: 2013* (Mar. 2017), *available at https://www.census.gov/content/dam/Census/library/publications/2017/demo/p70br-145.pdf.*

**Table 11: Public Benefit Participation by Nativity and Citizenship, 2013 (in thousands)**

| | Total population | | | Native-born | | |
|---|---|---|---|---|---|---|
| | Population 310,867 | | | Population 269,413 | % of Total Population 86.7% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 65,038 | 20.9% | 0.2% | 56,385 | 20.9% | 0.2% |
| Cash benefits | 10,799 | 3.5% | 0.1% | 9,285 | 3.4% | 0.1% |
| SSI | 7,906 | 2.5% | 0.1% | 6,590 | 2.4% | 0.1% |
| TANF | 2,254 | 0.7% | 0.0% | 2,124 | 0.8% | 0.0% |
| GA | 947 | 0.3% | 0.0% | 844 | 0.3% | 0.0% |
| Non-cash benefits | 63,527 | 20.4% | 0.2% | 55,082 | 20.4% | 0.2% |
| Medicaid | 49,573 | 15.9% | 0.2% | 43,301 | 16.1% | 0.2% |
| SNAP | 34,913 | 11.2% | 0.2% | 31,308 | 11.6% | 0.2% |
| Housing vouchers | 4,932 | 1.6% | 0.1% | 4,215 | 1.6% | 0.1% |
| Rent subsidy | 12,431 | 4.0% | 0.1% | 10,455 | 3.9% | 0.1% |

| | Foreign-born citizens and non-citizens | | | Foreign-born noncitizens | | |
|---|---|---|---|---|---|---|
| Total Population 310,867 | Population 41,454 | % of Total Population 13.3% | | Population 20,163 | % of Total Population 6.5% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 8,653 | 20.9% | 0.6% | 4,558 | 22.6% | 0.9% |
| Cash benefits | 1,514 | 3.7% | 0.3% | 370 | 1.8% | 0.3% |
| SSI | 1,316 | 3.2% | 0.3% | 254 | 1.3% | 0.2% |
| TANF | 130 | 0.3% | 0.1% | *73 | *0.4% | 0.1% |
| GA | *103 | *0.2% | 0.1% | *47 | *0.2% | 0.1% |
| Non-cash benefits | 8,445 | 20.4% | 0.6% | 4,498 | 22.3% | 0.9% |
| Medicaid | 6,272 | 15.1% | 0.6% | 3,130 | 15.5% | 0.8% |
| SNAP | 3,605 | 8.7% | 0.4% | 1,828 | 9.1% | 0.6% |
| Housing vouchers | 718 | 1.7% | 0.2% | 287 | 1.4% | 0.3% |
| Rent subsidy | 1,976 | 4.8% | 0.3% | 869 | 4.3% | 0.4% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
* Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

Table 12 reflects that noncitizens showed comparable rates of program participation regardless of whether their status at admission to the U.S. was as a lawful permanent resident or not. For example, approximately 20 percent of noncitizens who were lawful permanent residents at admission to the U.S., as well as noncitizens who were not lawful permanent residents at admission, received non-cash benefits, and approximately 2 percent of these populations receive cash benefits. Among the cash benefits considered, about 1 percent of noncitizens who were lawful permanent residents at admission, as well as those who were not, received SSI while less than 1 percent received either TANF or General Assistance.

Table 12: Public Benefit Participation of Noncitizens, by Class of Admission to the U.S. (Lawful Permanent Resident or Other), 2013 (in thousands)

| | Noncitizen and LPR at admission | | | Noncitizen and not LPR at admission | | |
|---|---|---|---|---|---|---|
| Total Population 310,867 | Population 11,268 | % of Total Population 3.6% | | Population 8,895 | % of Total Population 2.9% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 2,658 | 23.6% | 1.2% | 1,900 | 21.4% | 1.3% |
| Cash benefits | 219 | 1.9% | 0.4% | 151 | 1.7% | 0.4% |
| SSI | 131 | 1.2% | 0.3% | 123 | 1.4% | 0.4% |
| TANF | *65 | *0.6% | 0.2% | *8 | *0.1% | 0.1% |
| GA | *22 | *0.2% | 0.1% | *25 | *0.3% | 0.2% |
| Non-cash benefits | 2,630 | 23.3% | 1.2% | 1,868 | 21.0% | 1.3% |
| Medicaid | 1,926 | 17.1% | 1.1% | 1,205 | 13.5% | 1.1% |
| SNAP | 1,069 | 9.5% | 0.8% | 760 | 8.5% | 0.9% |
| Housing vouchers | 163 | 1.4% | 0.3% | 124 | 1.4% | 0.4% |
| Rent subsidy | 490 | 4.4% | 0.6% | 379 | 4.3% | 0.6% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
* Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

In sum, the data from Tables 11 and 12 show that for native-born and foreign-born populations alike, non-cash public benefits play a significant role in many peoples' lives. DHS does not believe it is appropriate to ignore the receipt of non-cash benefits in its public charge inadmissibility analysis. Further, we note that certain non-cash benefits, just like cash benefits, provide assistance to those who are not self-sufficient. DHS, therefore, proposes to consider cash benefits and non-cash public benefits. DHS believes that consideration of cash and non-cash benefit receipt represents an appropriately comprehensive and also readily administrable application of the public charge ground of inadmissibility.

(b) Consideration of Monetizable and Non-Monetizable Public Benefits

While an alien's receipt of one or more of these benefits alone would not establish that he or she is likely at any time in the future to become a public charge, as explained above, case law strongly suggests that an alien's self-sufficiency, i.e., the alien's ability to meet his or her needs without depending on public resources, plays a critical role in the outcome of a public charge inadmissibility determination.[290]

DHS recognizes the challenges of quantifying or qualifying reliance or dependence on public benefits. Indeed, in the course of evaluating welfare dependence or dependence on public benefits, HHS acknowledges that "welfare dependence, like poverty, is a continuum, with variations in degree and in duration." [291] As discussed below, DHS believes that its proposed monetizable, non-monetizable, and combined standards appropriately capture sufficient levels of dependence on public benefits in degree and duration to sustain a finding of public charge or likelihood of becoming a public charge. In arriving at these thresholds, DHS considered the current policy's "primarily dependent" standard, other agencies' definitions of dependence, and the Federal Poverty Guidelines. DHS notes, as discussed elsewhere in the rule, that for admissibility and adjustment of status purposes, the receipt of such benefits would be determined on a prospective basis, i.e., likely at any time to receive benefits above the proposed threshold(s). For extension of stay and change of status applicants, the determination regarding the receipt of such benefits above the proposed

threshold is not exclusively prospective and is instead based on whether an alien has received since obtaining the nonimmigrant status that the alien seeks to end or from which the alien seeks to change, is receiving, or is likely at any time to receive benefits above the proposed threshold(s).

i. "Primarily Dependent" Standard and Its Limitations

The proposed 15 percent of FPG threshold would represent a change from the standard set forth in the 1999 INS proposed rule and Interim Field Guidance, which generally define a public charge as a person who is "primarily dependent" on public benefits, i.e., a person for whom public benefits represent more than half of their income and support. INS stated that the primary dependence model of public assistance provided context to the development of public charge exclusion in immigration in the late 19th century, because individuals who became dependent on the Government were institutionalized in asylums or placed in "almshouses" for the poor. At the time, the wide array of limited-purpose public benefits now available did not yet exist. After consulting with SSA, HHS, and USDA, INS suggested that the best evidence of primary dependence on the government was the receipt of cash assistance for income maintenance or institutionalization for

[290] See, e.g., Matter of Vindman, 16 I&N Dec. 131 (Reg'l Comm'r 1977); Matter of Perez, 15 I&N Dec. 137 (BIA 1974); Matter of Harutunian 14 I&N Dec. 583 (Reg'l Comm'r 1974).

[291] See U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), available at https://aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress.

long-term care at government expense. INS further argued that non-cash public benefits generally provide only "supplementary" support in the form of vouchers or direct services to support nutrition, health, and living condition needs.

The current policy's definition is consistent, in some respects, with how other agencies have defined dependence in certain contexts. For example, in certain congressional reports, HHS has defined welfare dependence as "the proportion of individuals who receive more than half of their total family income in one year from the Temporary Assistance for Needy Families (TANF) program, the Supplemental Nutrition Assistance Program (SNAP) and/or the Supplemental Security Income (SSI) program." [292] The IRS has also defined a qualifying dependent child as one who cannot have provided more than half of his or her own support for the year and a qualifying dependent relative as generally someone who depends on another for more than half of his or her total support during the calendar year.[293] Within the context of preparing reports to Congress on welfare dependence or constructing certain tax rules, a "primary dependence" approach may be appropriate. As HHS has noted, "using a single point—in this case 50 percent—yields a relatively straightforward measure that can be tracked easily over time, and is likely to be associated with any large changes in total dependence." [294]

DHS agrees with HHS that although a 50 percent threshold creates a bright line that may be useful for certain purposes, it is possible and likely probable that individuals below such threshold will lack self-sufficiency and be dependent on the public for support. Because of the nature of the public benefits that would be considered under this rule—which are generally means-tested and provide cash for income maintenance and for basic living needs such as food, medical care, and housing—DHS believes that receipt of such benefits even in a relatively small amount or for a relatively short duration

would in many cases be sufficient to render a person a public charge. This is because a person with limited means to satisfy basic living needs who uses government assistance to fulfill such needs frequently will be dependent on such assistance to such an extent that the person is not self-sufficient.

In addition, as noted above, DHS considers the current policy's focus on cash benefits to be insufficiently protective of the public budget, particularly in light of significant public expenditures on non-cash benefits. Therefore, the DHS proposal takes into account a finite list of non-cash benefits, including some that can be monetized and some that cannot. DHS proposes to apply the aforementioned 15 percent threshold for the cumulative value of benefits only to the former, and to apply a standard tied to the duration of receipt of public benefits to the latter, as discussed in more detail below.

In sum, DHS does not believe that the plain text of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), requires an alien to be "primarily" (50 percent or more) dependent on the government or rely on only cash assistance to be considered a public charge. Nor does DHS believe that such limitations are mandated by the principles of PRWORA or the century-plus of case law regarding the public charge ground of inadmissibility. As discussed above, the term public charge is ambiguous as to how much government assistance an individual must receive or the type of assistance an individual must receive to be considered a public charge. The statute and case law do not prescribe the degree to which an alien must be receiving public benefits to be considered a public charge. Given that neither the statute nor the case law prescribe the degree to which an alien must be dependent on public benefits to be considered a public charge, DHS has determined that it is permissible and reasonable to propose a different approach.

ii. Fifteen Percent of Federal Poverty Guidelines (FPG) Standard for Monetizable Benefits

DHS proposes to consider receipt of monetizable public benefits as listed in 8 CFR 212.21(b)(1), where the cumulative value of one or more of the listed benefits exceeds 15 percent of the Federal Poverty Guidelines (FPG) for a household of one within any period of 12 consecutive months, based on the per-month average FPG for the months during which the benefits are received. This proposed threshold is most straightforward to calculate within the context of a 12-month period that spans a single calendar year (January through

December). For example, this 15 percent of FPG threshold would exclude up to $1,821 worth of monetizable public benefits for a household of one if the monetizable public benefits are received from January 2018 through December 2018.[295] On the other hand, the threshold requires a slightly more complex calculation when evaluating 12 consecutive months spanning two calendar years. To illustrate, an alien receives monetizable public benefits between April 2017 and March 2018. DHS would compare the amount received for the 12 consecutive month period against 15 percent of FPG applicable to each month in question. Fifteen percent of FPG is $150.75 per month for April through December 2017 and $151.75 per month for January through March 2018 based on the respective poverty guidelines in effect for calendar years 2017 and 2018, which would equal $1,812 for this 12 month consecutive period. In evaluating likely receipt of future monetizable public benefits, DHS would use the FPG in effect on the date of adjudication.

In formulating this 15 percent of FPG threshold, DHS proposes to use FPG as the baseline for the percentage of monetizable public benefits receipt being considered in the totality of the circumstances because the poverty guidelines are authoritative and transparent. The poverty guidelines are a simplified version of the Census Bureau's poverty thresholds, which Census uses to prepare its estimates of the number of individuals and families in poverty.[296] HHS updates and adjusts the FPG annually based on the Consumer Price Index for All Urban Consumers (CPI–U).[297] As HHS notes, a number of federal programs use the poverty guidelines as an eligibility criterion.[298] "Some federal programs use a percentage multiple of the guidelines (for example, 125 percent or 185 percent of the guidelines)" to determine public benefit eligibility.[299] In the immigration context, DHS uses the FPG as a standard for purposes of the affidavit of support requirement under section 213A of the Act, 8 U.S.C.

---

[292] The Welfare Indicators Act of 1994 requires HHS to submit annual welfare dependence indicators reports to Congress. *See* U.S. Dep't of Health & Human Servs., *Welfare Indicators and Risk Factors* 1 (2018), *available at https://aspe.hhs.gov/pdf-report/welfare-indicators-and-risk-factors-seventeenth-report-congress.*

[293] *See* IRS Publication 501 (Jan. 2, 2018), *available at https://www.irs.gov/pub/irs-pdf/p501.pdf.*

[294] *See* U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at 1–2 (2015), *available at https://aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress.*

[295] The calculation is an FPG of $12,140 for a household of one, multiplied by 0.15. *See* U.S. Dep't of Health & Human Servs., *HHS Poverty Guidelines for 2018, available at https://aspe.hhs.gov/poverty-guidelines* (last visited Feb. 11, 2018).

[296] *See Annual Update of the HHS Poverty Guidelines,* 83 FR 2642 (Jan. 18, 2018).

[297] *See Annual Update of the HHS Poverty Guidelines,* 83 FR 2642 (Jan. 18, 2018).

[298] *See Annual Update of the HHS Poverty Guidelines,* 83 FR 2642 (Jan. 18, 2018).

[299] *See Annual Update of the HHS Poverty Guidelines,* 83 FR 2642 (Jan. 18, 2018).

1183a.[300] DOS also uses FPG to evaluate immigrant visa applicants who are not subject to the requirements of 213A of the Act, 8 U.S.C. 1183a, and who are relying solely on personal income to establish eligibility under section 212(a)(4) of the Act, 8 U.S.C. 1183a.[301] The poverty guidelines thus provides a proven, useful, and easily administrable measure of the level of income and resources below which a person becomes increasingly likely to need public benefits to satisfy basic living (and other) needs.

DHS believes that the 15 percent threshold is a reasonable approach. The threshold would not lead to unintended consequences, as could be the case if there was no threshold or the threshold was much smaller. Indeed, DHS recognizes that individuals may receive public benefits for relatively small amounts to supplement their ability to meet their needs and the needs of their household without seriously calling into question their self-sufficiency.

At the same time, DHS believes that an individual who receives monetizable public benefits in excess of 15 percent of FPG is neither self-sufficient nor on the road to achieving self-sufficiency. Receipt of monetizable public benefits above the 15 percent threshold exceeds what could reasonably be defined as a nominal level of support that merely supplements an alien's independent ability to meet his or her basic living needs; individuals who receive the designated benefits in such an amount are not self-sufficient and so would be considered public charges under this rule.

DHS believes the proposed 15 percent threshold is consistent with DHS's interpretation of the term public charge and would achieve the policy aims of this proposed rulemaking. The proposed threshold is consistent with the self-sufficiency policy objective set forth in PRWORA that aliens should be able to financially support themselves with their own resources or by relying on the aid of family members, without depending on government's assistance.[302] Though not defined in PRWORA, self-sufficiency, as used in PRWORA, is tied to an alien's ability to support him or herself without depending on public benefits.[303] DHS seeks public comments on whether the proposed 15 percent threshold applicable to monetizable public benefits is an appropriate threshold in

light of the stated goals of the rule. For instance, DHS welcomes the submission of views and data regarding whether the proposed standard is appropriate, too low, or too high for assessing reliance on public benefits (and why), and whether there is a more appropriate basis for a monetizable threshold, other than value as a percentage of the FPG or duration of receipt, that indicates whether an alien is a public charge.

DHS also seeks public comments on whether DHS should consider the receipt of designated monetizable public benefits at or below the 15 percent threshold as evidence in the totality of the circumstances. For instance, DHS could revise the rule to allow adjudicators to assign some weight to past or current receipt of designated monetized public benefits in an amount equal to 10 percent of FPG, and less weight to past or current receipt of such benefits in an amount equal to 5 percent of FPG. The ultimate inquiry would remain whether the alien is likely in the totality of the circumstances to become a public charge, *i.e.,* to receive the designated public benefits above the applicable threshold(s), either in terms of dollar value or duration of receipt.

### iii. Twelve Month Standard for Non-Monetizable Benefits

In addition to proposing a 15 percent threshold for assessing the alien's likelihood to remain or become self-sufficient in the context of receipt of monetizable public benefits (*e.g.,* cash assistance and SNAP), DHS is proposing to consider the receipt of certain non-monetizable public benefits (*e.g.,* Medicaid) if received for more than 12 cumulative months during a 36-month period. As indicated above, DHS believes that it is appropriate to expand the list of previously included public benefits (under the 1999 INS Interim Field Guidance) to include certain non-cash benefits based on the Federal government's expenditures and non-citizen participation rates in those programs. However, following consultation with interagency partners such as HHS and HUD, DHS lacks an easily administrable standard for assessing the monetary value of an alien's receipt of some non-cash benefits. DHS believes that, like the 15 percent of FPG threshold described above, the duration of the alien's receipt of these benefits over a period of time is also reasonable proxy for assessing an alien's reliance on public benefits.

The duration of receipt is a relevant factor under the existing guidance with respect to covered benefits and is specifically accounted for in the guidance's inclusion of long-term

institutionalization at government's expense.[304] Additionally, in the context of both state welfare reform efforts and the 1990s Federal welfare reform, Federal government and state governments imposed various limits on the duration of benefit receipt as an effort to foster self-sufficiency among recipients and prevent long-term or indefinite dependence. States have developed widely varying approaches to time limits. Currently, 40 states have time limits that can result in the termination of families' welfare benefits; 17 of those states have limits of fewer than 60 months.[305] Similarly, on the Federal level, PRWORA established a 60-month time limit on the receipt of TANF.[306]

As with the proposed 15 percent of FPG standard, DHS believes that an individual who receives monetizable public benefits for more than 12 cumulative months during a 36-month period is neither self-sufficient nor on the road to achieving self-sufficiency. Receipt of public benefits for such a duration exceeds what could reasonably be defined as a nominal level of support that merely supplements an alien's independent ability to meet his or basic living needs. In DHS's view, individuals who receive the non-monetizable public benefits covered by this rule for more than 12 months are unable to meet their basic needs without government help; they therefore are not self-sufficient and so would be considered public charges under this rule.

By way of illustration, under the proposed policy, an alien's receipt of Medicaid for 9 months and receipt of public housing for 6 months, if both occurred within the same 36-month period, would amount to 15 months of receipt of non-monetizable benefits, regardless of whether these periods of time overlapped, were consecutive, or occurred at different points in time during the 36-month period. As such, the receipt of those benefits would be considered for purposes of this rule.

---

[300] *See* INA section 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E).

[301] See 22 CFR 40.41(f).

[302] *See* 8 U.S.C. 1601(a)(2).

[303] *See* 8 U.S.C. 1601(a)(2).

[304] In assessing the probative value of past receipt of public benefits, ''the length of time . . . is a significant factor.'' 64 FR 28689, 28690 (May 26, 1999) (internal quotation marks and citation omitted).

[305] *See, e.g.,* MDRC, formerly Manpower Demonstration Research Corporation, Welfare Time Limits State Policies, Implementation, and Effects on Families. *https://www.mdrc.org/sites/default/files/full_607.pdf* (last visited Sep. 12, 2018).

[306] *See* Temporary Assistance for Needy Families Program (TANF), Final Rule; 64 FR 17720, 17723 (Apr. 12, 1999) (''The [Welfare to Work (WtW)] provisions in this rule include the amendments to the TANF provisions at sections 5001(d) and 5001(g)(1) of Pub. L. 105–33. Section 5001(d) allows a State to provide WtW assistance to a family that has received 60 months of federally funded TANF assistance . . .'').

DHS seeks public comments on this proposed approach, including any alternatives for assessing self-sufficiency based on the receipt of non-monetizable benefits. DHS seeks public comments on whether the proposed 12-month threshold applicable to non-monetizable public benefits is an appropriate threshold in light of the stated goals of the rule. For instance, DHS welcomes the submission of views and data regarding whether the proposed standard is appropriate, too low, or too high for assessing reliance on public benefits (and why), and whether there is a more appropriate basis for a non-monetizable threshold, other than duration of receipt, that indicates whether an alien is a public charge.

DHS also seeks public comments on whether DHS should consider the receipt of one or more designated non-monetizable public benefits for any period less than 12 months in the aggregate as part of the public charge inadmissibility determination. For instance, similar to the potential alternative described in the call for comment in the preceding section, DHS could revise the rule to allow adjudicators to assign some weight to past or current receipt of 2 designated non-monetized benefits for a total of 8 months, and less weight to past or current receipt of such benefits for a total of 4 months. The ultimate inquiry would remain whether the alien is likely in the totality of the circumstances to become a public charge, *i.e.*, to receive the designated public benefits above the applicable threshold(s), either in terms of dollar value or duration of receipt.

DHS is also considering whether there are other potential approaches to monetizing these benefits, and seeks comments on any such alternatives. In addition, DHS seeks comments on the proposed timeframes, including, if applicable, any studies or data that would provide a basis for an alternative duration.

**iv. Combination of Monetizable Benefits Under 15 Percent of FPG and One or More Non-Monetizable Benefits**

DHS is proposing a separate approach when an alien receives a combination of monetizable benefits in an amount that is equal to or less than the proposed 15 percent threshold while also receiving one or more non-monetizable public benefits. This approach is intended to address circumstances where an alien's self-sufficiency is in question by virtue of a combination of receipt of both monetizable and non-monetizable benefits, even if his or her receipt of monetizable designated public benefits

does not reach the 15 percent threshold and his or her receipt of non-monetizable benefits does not surpass the 12-month duration threshold. Under this proposal, if an alien receives a combination of monetizable benefits equal to or below the 15 percent threshold together with one or more benefits that cannot be monetized, the threshold for duration of receipt of the non-monetizable benefits would be 9 months in the aggregate (rather than 12 months) within a 36-month period (*e.g.*, receipt of two different non-monetizable benefits in one month counts as two months, as would receipt of one non-monetizable benefit for one month in January 2018 and another such benefit for one month in June 2018).

DHS believes that reducing the 12-month timeframe by 3 months to account for use of monetizable benefits is a reasonable and easily administrable guideline for determining whether an individual who receives both monetizable and non-monetizable public benefits is self-sufficient or on the road to achieving self-sufficiency. In line with the other thresholds described above, receipt of a designated non-monetizable public benefits for three-quarters of a year, compounded by receipt of a designated monetizable public benefit, exceeds what could reasonably be defined as a nominal level of support that merely supplements an alien's independent ability to meet his or basic living needs. In DHS's view, individuals who receive public benefits in these combinations are unable to meet their basic needs without government help, consequently are not self-sufficient, and therefore would be considered public charges under this rule.

DHS seeks public comments on this approach, including any alternatives for addressing receipt of a combination of public benefits, some of which can be monetized and others which cannot to ensure a consistent methodology for treating recipients of these two types of benefits.

**(c) Monetizable Public Benefits**

**i. Supplemental Security Income (SSI)**

SSI, which is monetizable public benefit, provides monthly income payments intended to help ensure that a disabled, blind, or aged person with limited income and resources has a minimum level of income.[307] Unlike

Social Security retirement benefits, which are financed through payroll taxes, SSI is financed by general revenues.[308] According to one analysis, SSI expenditures totaled approximately $54.7 billion in fiscal year 2017, and represented one of the largest Federal expenditures for low-income people.[309]

**ii. Temporary Assistance for Needy Families (TANF)** [310]

TANF, which is a monetizable public benefit, provides monthly income assistance payments to low-income families and is intended to foster self-sufficiency, economic security, and stability for families with children.[311] According to one analysis, TANF cash assistance expenditures totaled approximately $4.4 billion in fiscal year 2016, and represented one of the largest Federal expenditures out of all Federal programs for low-income people.[312]

**iii. General Assistance Cash Benefits**

Federal, State, local, and tribal cash benefit programs for income maintenance (often called "General Assistance" in the State context, but sometimes given other names), is a term used to describe "aid provided by State and local governments to needy individuals or families who do not qualify for major assistance programs and to those whose benefits from other

*Income (SSI) Overview—2018 Edition, available at* https://www.ssa.gov/ssi/text-over-ussi.htm (last visited July 27, 2018).

[308] *See* U.S. Soc. Sec. Admin., Office of Research, Statistics, & Policy Analysis, *Annual Report of the Supplemental Security Income Program* 46 tbl.IV.B9, 47 tbl.IV.C1 (2017), *available at* https://www.ssa.gov/oact/ssir/SSI17/ssi2017.pdf (last visited July 31, 2018); *see also* U.S. Soc. Sec. Admin., Office of Research, Statistics, & Policy Analysis, *SSI Monthly Statistics, January 2018, available at* https://www.ssa.gov/policy/docs/statcomps/ssi_monthly/2018-01/table01.html (last visited July 31, 2018).

[309] *See* Gene Falk et al., Cong. Research Serv., R45097, *Federal Spending on Benefits and Services for People with Low Income: In Brief* (2018), *available at* https://fas.org/sgp/crs/misc/R45097.pdf.

[310] *See* 42 U.S.C. 601.

[311] *See* U.S. Dep't of Health & Human Servs., Admin. for Children & Families, Office of Family Assistance, *About TANF, available at* https://www.acf.hhs.gov/ofa/programs/tanf/about (last visited February 23, 2018); U.S. Dep't of Health and Human Servs., Admin. for Children and Families, Office of Family Assistance, *TANF 12th Report to Congress.*

[312] *See* Gene Falk et al., Cong. Research Serv., R45097, *Federal Spending on Benefits and Services for People with Low Income: In Brief* (2018), *available at* https://fas.org/sgp/crs/misc/R45097.pdf; U.S. Dep't of Health & Human Servs., Office of Family Assistance. *TANF Financial Data—FY 2016, available at* https://www.acf.hhs.gov/ofa/resource/tanf-financial-data-fy-2016 (last visited June 11, 2018). Note that the latter link shows fiscal year 2016 TANF financial data, but links to financial data for other fiscal years can also be accessed.

[307] *See* U.S. Soc. Sec. Admin., *Social Security Handbook*, Ch. 21, section 2102.1, *available at* https://www.ssa.gov/OP_Home%2Fhandbook/handbook.21/handbook-2102.html (last updated Feb. 24, 2009); U.S. Soc. Sec. Admin., *Social Security, Understanding Supplemental Security*

assistance programs are insufficient to meet basic needs. General assistance is often the only resource for individuals who cannot qualify for unemployment insurance, or whose benefits are inadequate or exhausted. Help may either be in cash or in kind, including such assistance as groceries and rent.'' [313] To the extent that such aid is in the form of cash, check, or money instrument (as compared to in-kind goods or services through vouchers and similar means) and intended for income maintenance, it would qualify as a cash public benefit under this rule. For example, in Minnesota, the ''General Assistance (GA) program helps people without children pay for basic needs. It provides money to people who can[no]t work enough to support themselves, and whose income and resources are very low.'' [314]

### iv. Supplemental Nutrition Assistance Program (SNAP)

DHS proposes to consider SNAP [315] benefits, because the program is among the largest Federal expenditures for low-income people, and because receipt of SNAP benefits indicates a lack of self-sufficiency in satisfying a basic living need, *i.e.,* food and nutrition. SNAP, which is a non-cash, monetizable public benefit, provides nutrition assistance to low-income individuals and households [316] who must meet certain income and resource limitations to be eligible. An eligible person or household receives SNAP benefits on an Electronic Benefit Transfer (EBT) card on which the dollar amount of benefits are automatically available each month. The household can then purchase eligible food at authorized retail food stores. [317]

### v. Housing Programs

DHS is also proposing to include certain high-expenditure housing-related benefits. As noted in Table 10 above, the Federal government expends significant resources on Section 8 Housing Choice Vouchers, Section 8 Project-Based Rental Assistance, and Public Housing. These programs impose a significant expense upon multiple levels of government, and because these benefits relate to a basic living need (*i.e.,* shelter), receipt of these benefits suggests a lack of self-sufficiency. At the same time, DHS recognizes that these programs do not involve the same level of expenditure as the other programs listed in this proposed rule, and that noncitizen participation in these programs is currently relatively low. [318] DHS nonetheless proposes to consider these programs as part of public charge determinations, for the above-stated reasons and because the total Federal expenditure for the programs overall remains significant.

There are also numerous programs that provide incentives for private-sector affordable housing preservation and development. [319] The Housing Act of 1961 [320] provides housing to low- and moderate-income households through the private sector. [321] U.S. Department of Housing and Urban Development (HUD) oversees and administers the various programs. There are various programs within the public housing program which provide payment for rent or housing either to the person or the housing unit or owner on behalf of the person (privately owned subsidized housing).

These programs provide low-income individuals and families with housing at below-market rent or rent subsidies for market-rate housing. While there are important variations between these programs, they all use the same or similar standard when establishing income eligibility and contribution towards rent. Specific to aliens, DHS notes that Section 214 of the HCD Act of 1980 requires that HUD may not make financial assistance available for the benefit of any alien, notwithstanding any other provision of law, unless that alien is a resident of the United States and fits into one of the clearly enumerated 7 categories. [322]

#### a. Section 8 Housing Choice Voucher Program

The Section 8 Housing Choice Voucher Program, [323] which is a non-cash public benefit that can be monetized, provides assistance to very low-income families to afford decent, safe, and sanitary housing. [324] The Housing Choice Vouchers are administered locally by Public Housing Agencies. The participant is responsible for finding their own suitable housing unit, where the owner agrees to rent under the program. Once an owner has been identified, the public housing agency enters into a housing assistance payment contract with the landlord. The PHA pays the landlord housing subsidies based on a payment standard established by HUD and the participant is responsible for paying the difference between the actual rent charged and the amount subsidized by the program. [325] Under certain circumstances, housing vouchers may also be used to purchase homes. [326]

#### b. Section 8 Project-Based Rental Assistance

The Section 8 Project-Based Rental Assistance Program (including Moderate Rehabilitation), which is a non-cash but monetizable public benefit, provides rental assistance for extremely low- to low-income households in obtaining decent, safe, and sanitary housing in private accommodations. [327] This program refers to a category of federally assisted housing produced through a public-private partnership to build and maintain affordable rental housing for low-income households. HUD provides subsidies to private owners of multifamily housing to lower rental costs for low-income families and help offset construction, rehabilitation, and

[313] See U.S. Soc. Sec. Admin., *Social Security Programs in the United States—General Assistance, available at https://www.ssa.gov/policy/docs/progdesc/sspus/genassist.pdf* (last visited June 24, 2018).

[314] See Minn. Dep't of Human Servs., *General Assistance (GA), available at https://mn.gov/dhs/people-we-serve/adults/economic-assistance/income/programs-and-services/ga.jsp* (last visited June 24, 2018).

[315] Formerly called ''Food Stamps.'' *See* 7 U.S.C. 2011–2036c.

[316] See USDA, Food and Nutrition Service, *Supplemental Nutrition Assistance Program (SNAP), available at https://www.fns.usda.gov/snap/supplemental-nutrition-assistance-program-snap* (last visited Feb. 24, 2018).

[317] The listing of SNAP would not include Disaster SNAP, which is provided under a separate legal authority, under different circumstances. *See* 42 U.S.C. 5179.

[318] An analysis of Wave 13 of the 2008 Panel of the Survey of Income and Program Participation (SIPP) suggests that 0.2% of noncitizens lived in Section 8 housing, while 0.4% lived in housing subsidized through some other government program. Similarly, 0.7 percent of noncitizens reported receiving CHIP benefits.

[319] See Public Law 86–372, 73 Stat. 654. *See also* Maggie McCarty et al., Cong. Research Serv., RL34591, *Overview of Federal Housing Assistance Programs and Policy* 3 (2014), *available at https://www.hsdl.org/?view&did=752738.*

[320] See Public Law 87–70, 75 Stat. 149.

[321] See Maggie McCarty et al., Cong. Research Serv., RL34591, *Overview of Federal Housing Assistance Programs and Policy* 4 (2014), *available at https://www.hsdl.org/?view&did=752738.*

[322] See section 214 of the Housing and Community Development Act of 1980, 42 U.S.C. 1436a.

[323] See 24 CFR part 982; 42 U.S.C. 1437f, 1437u.

[324] See U.S. Dep't of Housing & Urban Dev., *Housing Choice Vouchers Fact Sheet, available at https://www.hud.gov/topics/housing_choice_voucher_program_section_8* (last visited Feb. 24, 2018).

[325] See U.S. Dep't of Housing & Urban Dev., *Housing Choice Vouchers Fact Sheet, available at https://www.hud.gov/topics/housing_choice_voucher_program_section_8* (last visited Feb. 24, 2018).

[326] See U.S. Dep't of Housing & Urban Dev., *Housing Choice Vouchers Fact Sheet, available at https://www.hud.gov/topics/housing_choice_voucher_program_section_8* (last visited July 11, 2018).

[327] U.S. Dep't of Housing & Urban Dev., *Moderate Rehabilitation, available at https://www.hud.gov/program_offices/public_indian_housing/programs/ph/modrehab* (last visited July 3, 2018).

preservation costs. The rental assistance is the difference between what the household can afford and the approved rent for the housing unit in the multifamily project. Authority to use project-based rental assistance for new construction or substantial rehabilitation was repealed in 1983. Therefore, HUD renews Section 8 project-based housing assistance payments ("HAP") contracts for units already assisted with project-based Section 8 renewal assistance.[328] The contracts are with private owners of multifamily rental housing including both profit-motivated and nonprofit or cooperative organizations.

(d) Non-Monetizable Public Benefits

i. Medicaid

a. Description of Program

Medicaid, which is a non-cash, non-monetizable public benefit, is a joint Federal and state program that provides health coverage to individuals in the United States.[329] Medicaid is generally available to needy persons who meet specific income and resource requirements. Certain individuals are generally covered under Medicaid, including low-income families, qualified pregnant women and children, and people already receiving SSI.[330] In addition, a State may opt to cover other groups.[331] Medicaid provides continuous coverage, services, and funding for medical treatment and can impose substantial costs on multiple levels of government, and a person's participation generally indicates a lack of ability to be self-sufficient in satisfying a basic living need, i.e., medical care. As indicated in Table 10 above, the total Federal expenditure for the Medicaid program overall is larger by far than any other programmatic Federal expenditure for low-income people.[332] Table 13 below highlights average costs per enrollee by eligibility group as a percentage of FPG.

| Table 13: Estimated Medicaid Expenditures Per Enrollee by Enrollment Group and as Percentage of the Federal Poverty Guidelines | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Eligibility Group | 2011 | % of 2011 FPG | 2012 | % of 2012 FPG | 2013 | % of 2013 FPG | 2014 | % of 2014 FPG | 2015 | % of 2015 FPG |
| Children | $2,851 | 26% | $2,700 | 24% | $2,807 | 24% | $3,141 | 27% | $3,389 | 29% |
| Adults | $4,362 | 40% | 4,101 | 37% | $4,391 | 38% | $4,914 | 42% | $4,986 | 42% |
| Persons with Disabilities | $17,958 | 165% | 17,255 | 154% | $17,352 | 151% | $18,789 | 161% | $19,478 | 165% |
| Aged | $15,931 | 146% | $15,688 | 140% | $15,483 | 135% | $15,113 | 130% | $14,323 | 122% |

Sources: See United States Department of Health & Human Services, Centers for Medicare & Medicaid Services, Office of the Actuary, 2012-2016 Actuarial Reports on the Financial Outlook for Medicaid at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/MedicaidReport.html. (Site last checked 9/10/2018) and Prior HHS Poverty Guidelines and Federal Register References at https://aspe.hhs.gov/prior-hhs-poverty-guidelines-and-federal-register-references (Site last checked 9/13/2018), which shows the following FPG figures for a household size of 1:

2011 – $10,890
2012 – $11,170
2013 – $11,490
2014 – $11,670
2015 – $11,770

DHS divided expenditures per enrollee by enrollment group for each year by FPG for each corresponding year (e.g. $2,851 for children in 2011 divided by $10,890 for 2011) to calculate expenditures per enrollee by enrollment group for each year as a percentage of FPG for each corresponding year (e.g. 26 percent).

Child Medicaid enrollees include non-disabled children, children of unemployed parents, and foster care children. Adult Medicaid enrollees include non-disabled non-aged adults, unemployed adults, and women covered under the Breast and Cervical Cancer Act expansion. Disabled Medicaid enrollees include blind or disabled persons.

On the whole, Medicaid expenditures per enrollee by enrollment group are significant and are particularly pronounced among persons with disabilities and the aged. In its 2016 report, HHS observes that these average costs reflect the relatively healthier status of children and adults enrolled in the program as compared to aged

---

[328] U.S. Dep't of Housing & Urban Dev., Moderate Rehabilitation, available at https://www.hud.gov/program_offices/public_indian_housing/programs/ph/modrehab (last visited July 3, 2018).

[329] See Ctrs. for Medicare & Medicaid Services, Eligibility, available at https://www.medicaid.gov/medicaid/eligibility/index.html (last visited Feb. 23, 2018).

[330] See Ctrs. for Medicare & Medicaid Services, Eligibility, available at https://www.medicaid.gov/

medicaid/eligibility/index.html (last visited Feb. 23, 2018).

[331] See Ctrs. for Medicare & Medicaid Services, Eligibility, available at https://www.medicaid.gov/medicaid/eligibility/index.html (last visited Feb. 23, 2018).

[332] See Table 26–1 Policy, Net Budget Authority by Function, Category, and Program, available at https://www.whitehouse.gov/wp-content/uploads/2018/02/26-1-fy2019.pdf (last visited Aug. 8, 2018).

Expenditure amounts are net outlays unless otherwise noted. See also Gene Falk et al., Cong. Research Serv., R45097, Federal Spending on Benefits and Services for People with Low Income: In Brief (2018), available at https://fas.org/sgp/crs/misc/R45097.pdf. Note however that neither HHS nor DHS are able to disaggregate emergency and non-emergency Medicaid expenditures. Therefore, this rule considers overall Medicaid expenditures.

enrollees and persons with disabilities, who represent the smallest enrollment groups in Medicaid but account for the majority of expenditures.[333] Despite the high level of Medicaid expenditure in aggregate and per enrollee by enrollment group, Medicaid is one of the most daunting public benefits to monetize on an individual basis. Medicaid eligibility, enrollment, and receipt vary state-by-state and receipt of goods and services vary enrollee-to-enrollee. Therefore, DHS does not propose a methodology to monetize Medicaid benefits for purposes of the 15 percent of FPG standard. Rather, DHS Medicaid would be categorized as a non-monetizable benefit under the proposed rule.

b. Exceptions for Certain Medicaid Services

Notwithstanding DHS's proposal to consider benefits under Medicaid, DHS proposes to exclude two main types of Medicaid services from consideration. First, DHS proposes to except consideration of assistance for an "emergency medical condition" as provided under section 1903(v) of Title XIX of the Social Security Act, 42 U.S.C. 1396b(v) and in implementing regulations at 42 CFR 440.255(c). These provisions specifically indicate that payment may be made to a State for medical assistance furnished to an alien under certain specific emergency circumstances.[334] Under 42 CFR 440.255(c), " 'emergency medical condition' means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.'' States determine whether an illness or injury is an "emergency medical condition" and provide payment to the healthcare provider as appropriate. Under this proposed rule, DHS would exclude receipt of Medicaid if the State determines that the relevant treatment falls under 42 U.S.C. 1396b(v) and 42 CFR 440.255(c).

In 8 U.S.C. 1611(b), Congress specifically excluded emergency medical conditions from the definition of Federal public benefits, and States are required to provide Medicaid payments for "emergency medical conditions" regardless of the alien's status. PRWORA sets apart treatment for emergency medical conditions and makes funds available for the reimbursement of states regardless of an alien's immigration status, and regardless of whether or not an alien would be subject to INA section 212(a)(4) or other grounds of inadmissibility.[335] Congress intended that PRWORA exceptions generally, and treatment of emergency medical conditions in particular, be narrowly construed. To qualify for emergency medical condition exclusion, medical conditions must be of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit. The same principle applies to pre-natal or delivery care assistance; it was intended to be of emergency nature. Similarly, treatment for mental health disorders was intended to be limited to circumstances in which the alien's condition is such that he is a danger to himself or to others and has therefore been judged incompetent by a court of appropriate jurisdiction.[336] Over the years since the enactment of PRWORA, courts have refined the definition of emergency medical condition. Depending on the state, and the medical condition, categorization as an "emergency medical condition" for purposes of Medicaid reimbursement may not be limited to hospital emergency room visits. For example, in Szewczyk v. Department of Social Services,[337] the Supreme Court of Connecticut indicated that coverage for an "emergency medical condition" did

not limit an alien patient to treatment rendered in the emergency room, but applied to treatment for leukemia that had "reached a crisis stage" and required "immediate medical treatment, without which the patient's physical well-being would likely be put in jeopardy or serious physical impairment or dysfunction would result." However, in Diaz v. Division of Social Services and Div. of Medical Assistance, North Carolina Dept. of Health and Human Services,[338] the Supreme Court of North Carolina indicated that an alien's acute lymphocytic leukemia was not an "emergency medical condition" where there was nothing to indicate that the prolonged chemotherapy treatments must have been "immediate" to prevent placing the alien's health in serious jeopardy, or causing serious impairment or dysfunction.[339]

In addition, DHS believes that preservation of life from an immediate threat is an important policy consideration. "Emergency medical services" are often involuntary and must be provided by doctors and hospitals regardless of the ability to pay,[340] such as medical services at a hospital after a car accident. Further, Congress did not authorize any consideration of an alien's immigration status for purposes of eligibility for these benefits or to allow for continuous services/treatment relating to them. Therefore, DHS will not consider treatment for emergency medical

[333] See United States Department of Health & Human Services, Centers for Medicare & Medicaid Services, Office of the Actuary, 2016 Actuarial Reports on the Financial Outlook for Medicaid, pp. 7–8, at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2016.pdf. (Site last checked 9–11–2018).

[334] See 42 U.S.C. 1396b(v); 42 CFR 440.255(c).

[335] H.R. Rep. No. 104–469 (VI), at 263–64 (1996) ("This section provides that sections 601 and 602 shall not apply to the provision of emergency medical services, public health immunizations, short-term emergency relief, school lunch programs, child nutrition programs, and family violence services. Section 601 restricted unauthorized aliens from receiving public assistance, contracts, and licenses, and section 602 made unauthorized aliens ineligible for employment benefits.")

[336] H.R. Rept. 104–469 (VI), at 264–65 (1996). This report also discusses treatment of communicable diseases and indicates that such treatment is intended "to only apply where absolutely necessary to prevent the spread of such diseases. This is only a short term measure until the deportation of an alien who is unlawfully present in the U.S. It is not intended to provide authority for continued long-term treatment of such diseases as a means for illegal aliens to delay their removal from the country."

[337] See 881 A.2d 259, 273 (Conn. 2005) (quoting Greenery Rehab. Grp., Inc. v. Hammon, 150 F.3d 226, 233 (2d Cir.1998)).

[338] See 628 S.E.2d 1, 5 (N.C. 2006).

[339] See also Greenery Rehab. Grp., Inc. v. Hammon, 150 F.3d 226, 233 (2d Cir. 1998) (aliens who suffered serious traumatic head injuries initially satisfied the plain meaning of Sec. 1902(v)(3), but the continuous and regimented care subsequently provided to them did not constitute emergency medical treatment pursuant to the statute); Luna ex rel. Johnson v. Div. of Soc. Servs., 589 S.E.2d 917, 920 (N.C. 2004) (the absence of the continued medical services could be expected to result in one of the three consequences outlined in the Medicaid statute for cancer patient that underwent surgery after presenting at hospital's emergency room with weakness and numbness in the lower extremities); Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin., 75 P.3d 91, 98 (Ariz. 2003) (medical conditions had not ceased when patients' conditions had been stabilized and they had been transferred from an acute ward to a rehabilitative type ward after initial injury); Spring Creek Mgmt., L.P. v. Dep't of Pub. Welfare, 45 A.3d 474, 483–84 (Pa. Commw. Ct. 2012) (alien's condition as result of stroke, which had sent her to emergency room, was not "emergency medical condition" where alien received medical services from rehabilitation and health care center even though alien could eventually, suffer another stroke or other medical problem; coverage was not being sought for an acute condition, but for long term or open-ended nursing care); Quiceno v. Dep't of Soc. Servs., 728 A.2d 553, 554 (Conn. Super. Ct. 1999) (permanent dialysis treatment was not for "emergency medical condition").

[340] See Emergency Medical Treatment & Labor Act (EMTALA), 42 U.S. Code 1395dd.

**51170**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

conditions funded by Medicaid in the context of a public charge determination.

The second proposed exclusion is for services or benefits under the Individuals with Disabilities Education Act (IDEA)[341] and school-based benefits provided to children who are at or below the oldest age of children eligible for secondary education as determined under State law. The IDEA protects educational opportunities for all students with disabilities and requires schools to provide certain services to all children with disabilities. States and school districts may bill and receive reimbursement for the cost of providing special education and health care related services from a State's public insurance program (e.g., Medicaid). Benefits or services under these laws generally are not based on income eligibility, and where a reimbursement is available, it is provided to the school or eligible entity. For example, under the statutory framework created by Congress for Part B of IDEA, school districts, in meeting their obligation to make a free appropriate public education available to all children with disabilities, may receive reimbursement for the cost of providing special education and related services if parents provide consent for the school districts to release their personally identifiable information to a State public insurance program (e.g., Medicaid) for billing purposes. Subject to parental consent, schools, and not individual parents or students, may obtain reimbursement for the cost of providing certain health-related services included in a child's individualized education program (IEP) that are considered covered services under such subsidized health insurance programs. The IDEA provides in 20 U.S.C. 1412(a)(12)(B) that, when a non-educational public agency, such as a State Medicaid agency, is assigned responsibility under State or Federal law to provide or pay for any services that are also considered special education and related services, the financial responsibility of the State Medicaid agency or other public insurer of children with disabilities must precede that of the LEA or State agency responsible for developing a child's IEP. Also, 20 U.S.C. 1412(e) reinforces that Part B of the IDEA may not be construed to permit a State to reduce medical or other assistance available, or to alter eligibility, under the Social Security Act. There are no restrictions on how school districts and schools are permitted to spend any funds that Medicaid or other public insurance

program reimburses for the provision of IDEA services. By excluding services provided under IDEA that may be funded in whole or in part by Medicaid, DHS would better ensure that schools continue to receive financial resources to cover the cost of special education and related services, which they would be legally required to provide at no cost to the parents regardless of the outcome of this rulemaking.

c. Exception for Receipt of Medicaid by Foreign-Born Children of U.S. Citizens

DHS proposes to exclude consideration of the receipt of all Medicaid benefits by foreign-born children as defined in section 101(c) of the Act who either have U.S. citizen parents, who have been adopted by U.S. citizens, or who are coming to the United States to be adopted by U.S. citizens, where such children will automatically acquire U.S. citizenship under section 320 of the Act or be eligible to naturalize under section 322 of the Act upon or after being admitted to the United States. In some cases, these children will acquire citizenship upon finalization of their adoption in the United States, under section 320 of the Act, or the children will naturalize upon taking the Oath of Allegiance (or having it waived) under section 322 of the Act. In other cases, the children will acquire citizenship upon taking up residence in United States in the legal and physical custody of their U.S. citizen parent as a lawful permanent resident.

Alien children of U.S. citizens, who must first establish eligibility for admission, are subject to section 212(a)(4) even though they may automatically acquire U.S. citizenship upon taking up residence in the United States after admission as lawful permanent residents.[342] Children of U.S. citizens eligible for acquisition of citizenship under section 320 of the Act, however, are exempt from the affidavit of support requirement.[343]

Children of U.S. citizens, including those adopted abroad, typically receive one of several types of immigrant visas as listed below and are admitted to the United States as lawful permanent residents. Such children may become U.S. citizens (1) automatically, (2) following their admission to the United States and upon the finalization of their adoption, or (3) upon meeting other eligibility criteria.[344]

The following categories of children acquire citizenship upon admission as lawful permanent residents and beginning to reside in the legal and physical custody of their U.S. citizen parent(s):

• IR–2/IR–7 (Child of a U.S. citizen)—requires an approval of a Form I–130 (Petition for Alien Relative). These children are generally admitted as lawful permanent residents or their status is adjusted to that of lawful permanent resident. The child must then file a Form N–600 (Application for Certificate of Citizenship) to receive the Certificate of Citizenship. The certificate generally would be dated as of the date the child was admitted as a lawful permanent resident.

• IR–3/IR–8 (Orphan adopted abroad by a U.S. citizen)—requires an approval of the Form I–600 (Petition to Classify Orphan as an Immediate Relative). These children are generally admitted as lawful permanent residents, and USCIS will send a Certificate of Citizenship to the child without a Form N–600 being filed or adjudicated.

• IH–3 (Hague Convention orphan adopted abroad by a U.S. citizen)—requires an approval of the Form I–800 (Petition to Classify Convention Adoptee as an Immediate Relative). These children are generally admitted as lawful permanent residents and USCIS will send a Certificate of Citizenship to

---

[341] See 20 U.S.C. 1400–1482.

[342] Note that children born abroad to U.S. citizen parents may also acquire U.S. citizenship at birth under certain circumstances, such as where both parents are U.S. citizens and one parent had resided in the United States prior to the child's birth, or where one parent is a U.S. citizen who was physically present in the United States for at least five years, two of which were after age 14. Such children would enter the United States as U.S. citizens and would not be subject to an admissibility determination. See INA sections 301 and 309, 8 U.S.C. 1401 and 1409. DOS would issue a Consular Report of Birth Abroad upon request. See Dep't of State, Birth of U.S. Citizens Abroad, available at https://travel.state.gov/content/travel/en/international-travel/while-abroad/birth-abroad.html (last visited Aug. 28, 2018).

[343] See Child Citizenship Act, Public Law 106–395, 114 Stat. 1631 (Oct. 30, 2000); 8 CFR

213a.2(a)(2)(ii)(E). Stepchildren of U.S. citizens are not eligible for acquisition of citizenship under section 320 of the Act or naturalization under section 322 of the Act unless the child is adopted by the U.S. citizen step-parent. See INA section 101(c)(1), 8 U.S.C. 1101(c)(1).

[344] International adoptions vary depending on the laws of the country of origin, the laws of the U.S. state of residence, and multiple other factors. In the majority of cases, adoptions are finalized in the country of origin before the child enters the United States and the child automatically acquires U.S. citizenship. A minority of children whose adoptions are not finalized until after their admission do not automatically acquire citizenship after admission, but may acquire it upon being readopted, and are eligible to naturalize after they have been finally adopted in the United States or had the foreign adoption recognized by the state where they are permanently residing. See U.S. Dep't of State, 2017 Annual Report on Intercountry Adoptions, available at https://travel.state.gov/content/dam/NEWadoptionassets/pdfs/Annual%20Report%20on%20Intercountry%20Adoptions%20FY2017%20(release%20date%20March%2023%2020..._.pdf.

the child without a Form N–600 being filed or adjudicated.

The following categories of children are admitted as lawful permanent residents for finalization of adoption:

• IR–4/IR–9 (Orphan to be adopted by a U.S. citizen). Generally, the parent(s) must complete the adoption in the United States. However, the child will also be admitted as an IR–4 if the foreign adoption was obtained without either parent having seen the child, or when the parent(s) must establish that they have either ''readopted'' the child or obtained recognition of the foreign adoption in the State of residence (this requirement can be waived if there is a statute or precedent decision that clearly shows that the foreign adoption is recognized in the State of residence).[345]

• IH–4 (Hague Convention Adoptee to be adopted by a U.S. citizen). These children are admitted as lawful permanent residents and the parent(s) must complete the adoption in the United States.[346]

Furthermore, children of U.S. citizens, who are residing outside of the United States and are eligible to naturalize under section 322 of the Act,[347] must apply for an immigrant or nonimmigrant visa to enter the U.S. before they naturalize. These children are generally issued a B–2 nonimmigrant visa in order to complete the process for naturalization through an interview and taking the Oath of Allegiance under section 322 of the Act.

Congress has enacted numerous laws over the last two decades to ensure that foreign-born children of U.S. citizens are not subject to adverse immigration consequences in the United States on account of their foreign birth. Most notably, the Child Citizenship Act of 2000 [348] provides that children, including adopted children, of U.S. citizen parents automatically acquire U.S. citizenship if certain conditions are met.[349] The same year, Congress passed

the Intercountry Adoption Act of 2000 (IAA) [350] to implement the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption,[351] which established international standards of practices for intercountry adoptions. The IAA protects the rights of children, birth families, and adoptive parents, and improves the Government's ability to assist U.S. citizens seeking to adopt children from abroad.[352]

DOS has advised DHS that many U.S. citizens seek to adopt children with disabilities or serious medical conditions, and that a significant proportion of children adopted abroad have special medical needs. U.S. citizens seeking to adopt foreign-born children abroad generally must undergo a rigorous home study that includes a detailed assessment of finances, emotional, mental, and physical health, and other factors to determine their eligibility and suitability as prospective adoptive parents.[353] Accordingly, such parents generally will have sufficient financial resources to provide for the child.[354]

Nevertheless, many U.S. citizens who have foreign-born children with special medical needs may seek Medicaid for their children.[355] Medicaid programs vary by state, and may be based on the

child's disability alone rather than financial means of the parents. Excluding consideration of the receipt of public benefits by such children would be consistent with Congress' strong interest in supporting U.S. citizens seeking to welcome foreign-born children into their families.

Additionally, because the children are being brought to the United States by their U.S. citizen parents (including adoptive parents) and will generally become U.S. citizens upon or after admission, and because their families have been found to have the resources to care for them, such a reading is not at odds with Congress' concerns in enacting PRWORA, or as reflected in its concurrent enactment of the public charge grounds of inadmissibility, that aliens should rely on their own capabilities and the resources of their families, their sponsors, and private organizations; and that the availability of public benefits should not constitute an incentive for immigration to the United States.[356]

Accordingly, DHS proposes to exclude from consideration for purposes of the public charge inadmissibility determination receipt of Medicaid benefits by children of U.S. citizen parents:

• Whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of the U.S. citizen parent will result automatically in the child's acquisition of citizenship or whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship upon finalization of the adoption in the United States by the U.S. citizen parent(s) or upon meeting other eligibility criteria pursuant to the Child Citizenship Act of 2000, Public Law 106–395 (section 320(a)–(b) of the Act, 8 U.S.C. 1431(a)–(b)), in accordance with 8 CFR part 320; or

• Who are entering the United States for the primary purpose of attending an interview under the Child Citizenship Act of 2000, Public Law 106–395 (section 322 of the Act, 8 U.S.C. 1433)), in accordance with 8 CFR part 322.

### ii. Institutionalization for Long-Term Care

Consistent with the 1999 Interim Field Guidance, DHS proposes to consider institutionalization for long-term care at government expense—at any level of government—as a form of government assistance included in the definition of public benefit.

[345] *See* 8 CFR 320.1.

[346] *See* INA section 101(b)(1), 8 U.S.C. 1101(b).

[347] These children would file the N–600K, Application for Citizenship and Issuance of Certificate Under Section 322 and then receive an interview notice to in come into the United States.

[348] Public Law 106–395, section 101(a), 114 Stat. 1631, 1631 (codified at INA section 320(a)–(b), 8 U.S.C. 1431(a)–(b)); *see also Children Born Outside the United States; Applications for Certificate of Citizenship,* 66 FR 32138 (June 13, 2001). The CCA applies to children who were under 18 as of February 27, 2001. The law was passed after several high-profile cases in which children who were adopted abroad were subject to deportation despite having grown up in the United States and having believed that they were United States citizens.

[349] *See* 8 CFR part 320; *see also* Dep't of State, *FAQ: Child Citizenship Act of 2000, available at* https://travel.state.gov/content/travel/en/

*Intercountry-Adoption/adopt_ref/adoption-FAQs/ child-citizenship-act-of-2000.html* (last visited Aug. 16, 2018).

[350] Public Law 106–279, 114 Stat. 1631 (codified at 42 U.S.C. 14901–14954); *see also Hague Convention on Intercountry Adoption; Intercountry Adoption Act of 2000; Accreditation of Agencies; Approval of Persons,* 71 FR 8064 (Feb. 15, 2006).

[351] The United States signed the Convention in 1994, and the Convention entered into force for the United States on April 1, 2008. *Deposit of Instrument of Ratification by the United States of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption,* 72 FR 71730 (Dec. 18, 2007). The full text of the Convention is *available at* https:// www.hcch.net/en/instruments/conventions/full-text/?cid=69 (last visited Aug. 16, 2018).

[352] IAA § 2, 42 U.S.C. 14901(a); *see also* 146 Cong. Rec. S8938–01, S8938 (daily ed. Sept. 21, 2000) (statement by Sen. Landrieu) (''I have said it before and I believe it rings true here, adoption brings people, whether they are Republican, Democrat, conservative, liberal, American, Russian or Chinese, together. United by the belief that all children deserve to grow in the love of a permanent family. Adoption breaks down barriers and helps build families.''). A year earlier, Congress passed Public Law 106–139, 113 Stat. 1696 (1999), to amend the definition of ''child'' in section 101(b)(1)(E) of the INA, 8 U.S.C. 1101(b)(1)(E), a change that allowed children adopted abroad to maintain their familial relationship with their natural siblings, making it easier for siblings to be adopted together.

[353] *See* 8 CFR 204.3(e), 204.311(g)(3).

[354] *See* 8 CFR 204.311(h) (financial considerations); *see also* USCIS, *Home Study Information, available at* https://www.uscis.gov/ adoption/home-study-information (last visited Aug. 16, 2018).

[355] *See* Public Law 97–248, 96 Stat. 324.

[356] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (codified at 8 U.S.C. 1601).

Institutionalization for long-term care at government expense is a non-cash, non-monetizable public benefit. The U.S. government subsidizes health insurance, which pays for expenses associated with institutionalization of individuals in the United States for both long-term care; therefore, the receipt of benefits to provide for the costs of institutionalization indicates a lack of self-sufficiency in satisfying a basic living need, *i.e.,* cost of medical care, housing, and food. There are certain inpatient, comprehensive services provided by institutions which may be covered under Medicaid or the Social Security Act, including hospital services, Intermediate Care Facilities for People with Intellectual disability (ICF/ID), Nursing Facility (NF), Preadmission Screening & Resident Review (PASRR), Inpatient Psychiatric Services for Individuals Under Age 21, and Services for Individuals Age 65 or Older in an Institution for Mental Diseases.[357]

Institutions are residential facilities, and assume total care of the basic living requirements of individuals who are admitted, including room and board.[358] Benefits provided by Medicaid for institutions may depend on the person's need and institutional level of care.[359] In general, DHS would not assume that a child or a person who is severely disabled or has severe medical conditions that may need institutionalization would be inadmissible under the public charge ground. Instead, DHS would, in the totality of the circumstances, take into account the assets, resources, and financial status of the alien's parents or legal guardians to determine whether there is sufficient income and resources to provide for his or her care. Parents and legal guardians at the time of adjudication of a petition may have sufficient sources to provide for the alien in the future and may also have the ability to gather assets and resources for the alien's future care (*i.e.* long-term care insurance).

### iii. Premium and Cost Sharing Subsidies Under Medicare Part D

Like Medicaid, Medicare helps an individual satisfy a basic living need, *i.e.,* medical care. Medicare provides health insurance for people 65 or older, certain people under 65 with disabilities, and people of any age with End-Stage Renal Disease (permanent kidney failure requiring dialysis or a kidney transplant).[360] Medicare has four parts. Medicare Part A is for hospital coverage and is mandatory for eligible participants; Part B provides optional medical coverage; Part C provides a managed care option through contracts with commercial insurers; and Part D is the optional Prescription Drug Plan.[361] In general, people over age 65 or young people with disabilities are eligible for Medicare [362] if the person or his or her spouse worked and paid Medicare taxes for at least 10 years.[363] People who did not pay Medicare taxes, are age 65 or older, and are U.S. citizens or lawful permanent residents may also be able to buy Medicare.[364] Generally, DHS does not propose to consider all of Medicare as part of the definition of public benefits. DHS is only proposing to consider Premium and Cost Sharing Subsidies (*i.e.,* low-income subsidies) for Medicare Part D as part of the definition of public benefits, for the reasons stated below.

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), provides subsidies for prescription drugs for eligible individuals whose income and resources are limited.[365] Beneficiaries may apply for the Low-Income Subsidy with the Social Security Administration (SSA) or with their State Medicaid agency.[366] The provision of a Part D low-income subsidy to an individual can impose substantial costs on multiple levels of government and generally indicates a lack of ability to be self-sufficient in satisfying a basic living need, *i.e.,* medical care. As noted above, by at least one measure, this program entails one of the most largest Federal expenditures for low-income people.[367]

### iv. Subsidized Public Housing

The considerations leading to inclusion of high-expenditure housing-related benefits, generally, including subsidized public housing, are outlined above. Subsidized public housing is available to low-income individuals in certain areas. Public housing was "established to provide decent and safe rental housing for eligible low-income families, the elderly, and persons with disabilities by entering into Annual Contributions Contracts (ACC) with Public Housing Agencies, which are state-created agencies with jurisdiction to operate within a clearly delineated area." [368] Public housing may include single-family houses or high-rise apartments.[369] HUD administers "[f]ederal aid to local housing agencies (HAs) that manage the housing for low-income residents at rents they can afford." [370] HUD uses the median income of the county or metropolitan area of where the person chooses to live to determine the income eligibility standards.[371] Specially, HUD sets the "lower income limits at 80% and very low income limits at 50% of the median income." [372]

---

[357] *See* Ctrs. for Medicare & Medicaid Servs., *Institutional Long Term Care, available at https:// www.medicaid.gov/medicaid/ltss/institutional/ index.html* (last visited Feb. 26, 2018).

[358] *See* Ctrs. for Medicare & Medicaid Servs., *Institutional Long Term Care, available at https:// www.medicaid.gov/medicaid/ltss/institutional/ index.html* (last visited Feb. 26, 2018).

[359] *See* Ctrs. for Medicare & Medicaid Servs., *Institutional Long Term Care, available at https:// www.medicaid.gov/medicaid/ltss/institutional/ index.html* (last visited Feb. 26, 2018).

[360] *See* Ctrs. for Medicare and Medicaid Servs., *A Quick Look at Medicare* (October 2017), *available at https://www.medicare.gov/Pubs/pdf/11514-A-Quick-Look-at-Medicare.pdf.* Medicare may also be subsidized if he or she qualifies for both Medicare and Medicaid. *Medicare.gov, Are Medicare Advantage Plans Subsidized?, available at https:// medicare.com/medicare-advantage/are-medicare-advantage-plans-subsidized* (last visited Feb. 27, 2018).

[361] *See id.*

[362] *See* HHS, *Who is Eligible for Medicare?, available at https://www.hhs.gov/answers/ medicare-and-medicaid/who-is-elibible-for-medicare/index.html* (last visited Feb. 24, 2018).

[363] *See* HHS, *Who is Eligible for Medicare?, available at https://www.hhs.gov/answers/ medicare-and-medicaid/who-is-elibible-for-medicare/index.html* (last visited Feb. 24, 2018).

[364] *See* HHS, *Who is Eligible for Medicare?, available at https://www.hhs.gov/answers/ medicare-and-medicaid/who-is-elibible-for-medicare/index.html* (last visited Feb. 24, 2018).

[365] *See* Ctrs. for Medicare & Medicaid Servs., *Guidance to States on the Low Income Subsidy Guidance* 5 (Feb. 2009), *available at https:// www.cms.gov/Medicare/Eligibility-and-Enrollment/ LowIncSubMedicarePresCov/Downloads/ StateLISGuidance021009.pdf.*

[366] *See* Ctrs. for Medicare & Medicaid Servs., *Guidance to States on the Low Income Subsidy Guidance* 5 (Feb. 2009), *available at https:// www.cms.gov/Medicare/Eligibility-and-Enrollment/ LowIncSubMedicarePresCov/Downloads/ StateLISGuidance021009.pdf.*

[367] *See* Table 26–1 Policy, Net Budget Authority by Function, Category, and Program, *available at https://www.whitehouse.gov/wp-content/uploads/ 2018/02/26-1-fy2019.pdf* (last visited Aug. 8, 2018). Expenditure amounts are net unless otherwise noted. *See also* Gene Falk et al., Cong. Research Serv., R45097, *Federal Spending on Benefits and Services for People with Low Income: In Brief* (Feb. 6, 2018), *available at https://fas.org/ sgp/crs/misc/R45097.pdf.*

[368] *See* U.S. Dep't of Housing & Urban Dev., *HUD's Public Housing Program, available at https:// www.hud.gov/topics/rental_assistance/phprog* (last visited July 3, 2018).

[369] *See* U.S. Dep't of Housing & Urban Dev., *HUD's Public Housing Program, available at https:// www.hud.gov/topics/rental_assistance/phprog* (last visited July 3, 2018).

[370] *See* U.S. Dep't of Housing & Urban Dev., *HUD's Public Housing Program, available at https:// www.hud.gov/topics/rental_assistance/phprog* (last visited July 3, 2018).

[371] *See* U.S. Dep't of Housing & Urban Dev., *HUD's Public Housing Program, available at https:// www.hud.gov/topics/rental_assistance/phprog* (last visited July 3, 2018).

[372] *See* U.S. Dep't of Housing & Urban Dev., *HUD's Public Housing Program, available at https:// www.hud.gov/topics/rental_assistance/phprog* (last visited July 3, 2018).

(e) Receipt of Public Benefits by Active Duty and Reserve Servicemembers and Their Families

DHS proposes to exclude consideration of the receipt of any public benefits by active duty servicemembers, including those in the Ready Reserve of the U.S. Armed Forces, and their families. The United States Government is profoundly grateful for the unparalleled sacrifices of the members of our armed services and their families. Servicemembers who, during their service, receive public benefits, in no way burden the public; indeed, their sacrifices are vital to the public's safety and security. The Department of Defense (DOD) has advised DHS that many of the aliens who enlist in the military are early in their careers, and therefore, consistent with statutory pay authorities, earn relatively low salaries that are supplemented by certain allowances and tax advantages.[373] Although data limitations exist, evidence suggests that as a consequence of the unique compensation and tax structure afforded by Congress to aliens enlisting for military service, some active duty alien servicemembers, as well as their spouses and children, as defined in section 101(b) of the Act, may rely on SNAP [374] and other listed public benefits. As a result, the general standard proposed in this rule could

result in a finding of inadmissibility under section 212(a)(4) when such aliens apply for adjustment of status.

Following consultation with DOD, DHS has concluded that such an outcome may give rise to concerns about servicemembers' immigration status or the immigration status of servicemembers' spouses and children as defined in section 101(b) of the Act, which would reduce troop readiness and interfere significantly with U.S. armed forces recruitment efforts. This exclusion is consistent with DHS's longstanding policy of ensuring support for our military personnel who serve and sacrifice for our nation, and their families, as well as supporting military readiness and recruitment.

Accordingly, DHS proposes to exclude the consideration of the receipt of all benefits listed in 8 CFR 212.21(b) from the public charge inadmissibility determination, when received by active duty servicemembers, including those in the Ready Reserve and their spouses and children. Applicants that fall under this exclusion would be required to submit proof that the servicemember is serving in active duty or the Ready Reserve.

(f) Unenumerated Benefits

The definition of the term "public charge" would not include receipt of any non-cash public benefit not listed under the proposed 8 CFR 212.21(b). Benefits such as Social Security retirement benefits, general Medicare, and a wide range of Veteran's benefits would not be included in the definition. Similarly, the proposed definition would not include social insurance programs such as worker's compensation and non-cash benefits that provide education, child development, and employment and job training. Furthermore, DHS believes that exclusion of education-related benefits is justifiable in the interest of administrability (e.g., many such benefits are received indirectly through schools). In sum, under this proposal, any exclusively state, local or tribal public benefit that is not cash assistance for income maintenance, institutionalization for long-term care at government expense, or another public benefit program not specifically listed in the regulation, would not be included in the definition of the term "public charge."

As noted above, the definition of public charge is based on DHS's preference to prioritize those programs that impose the greatest cost on the Federal government as well as those programs that assist an individual with satisfying basic living needs. DHS

welcomes comment regarding whether it should expand the list of designated public benefits in a final rule, to include specific public benefits that recipients are generally aware they receive and must opt into receipt and otherwise similar in nature to the benefits currently designated under the proposed rule, i.e., other benefits intended to help low-income people meet basic living needs. Consistent with the proposal described in the section of this preamble entitled "Previously Excluded Benefits", any such expansion would be prospective in nature (i.e., not effective until following publication of a final rule).

In addition, DHS seeks public comments on whether an alien's receipt of benefits other than those proposed to be included in this rule as public benefits should nonetheless be considered in the totality of circumstances, either above the thresholds set forth in the proposed rule for public monetizable and non-monetizable public benefits, or at some other threshold. DHS could construct a process under which it provides appropriate notice for consideration of such benefits to the extent that they have a bearing on the public charge inquiry, i.e., whether the alien is likely in the totality of the circumstances to receive the designated public benefits above the applicable threshold(s), either in terms of dollar value or duration of receipt. DHS welcomes comments and data on this potential alternative.

(g) Request for Comment Regarding the Children's Health Insurance Program (CHIP)

In addition to the public benefits listed in proposed 8 CFR 212.21(b), DHS is considering adding to the list of included benefits. The Children's Health Insurance Program (CHIP),[375] formerly known as the State Children's Health Insurance Program (SCHIP),[376] provides low-cost health coverage to children in families that earn too much money to qualify for Medicaid but still need assistance to pay for healthcare.[377] CHIP is administered by states in accordance with federal requirements. Eligibility for CHIP is based on income

---

[373] See, e.g., 37 U.S.C. 201–212, 401–439 (Basic Pay and Allowances Other than Travel and Transportation Allowances, respectively); Lawrence Kapp, Cong. Research Serv., *Defense Primer: Regular Military Compensation* 2 tbl.1 (Jan. 2, 2018), *available at https://fas.org/sgp/crs/natsec/IF10532.pdf* (reporting average regular military compensation of $41,384 at the E–1 level in 2017, comprised of $19,199 in average annual basic pay, plus allowances and tax advantage); Lawrence Kapp et al., Cong. Research Serv., RL33446, *Military Pay: Key Questions and Answers* 6–9 (2018), *available at https://fas.org/sgp/crs/natsec/RL33446.pdf* (describing types of military compensation and federal tax advantages).

[374] See U.S. Gov't Accountability Office, GAO–16–561, *Military Personnel: DOD Needs More Complete Data on Active-Duty Servicemembers' Use of Food Assistance Programs* (July 2016), *available at https://www.gao.gov/assets/680/678474.pdf* (reporting estimates ranging from 2,000 active duty servicemembers receiving SNAP to 22,000 such servicemembers receiving SNAP). Effective FY16, Congress implemented a recommendation by the Military Compensation and Retirement Modernization Commission to sunset DOD's Family Subsistence Supplemental Allowance Program within the United States, Puerto Rico, the U.S. Virgin Islands, and Guam; SNAP reliance may have increased somewhat following termination of the program. See Public Law 114–92, div. A, § 602, 129 Stat. 726, 836 (2015); Military Comp. & Ret. Modernization Comm'n, *Final Report* 187 (Jan. 2015) ("The [Family Subsistence Supplemental Allowance Program] should be sunset in the United States, Puerto Rico, Guam, and other U.S. territories where SNAP or similar programs exist, thereby reducing the administrative costs of a duplicative program.").

[375] See 42 U.S.C. 1397aa to 1397mm.

[376] Beginning with the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA), SCHIP was referred to simply as CHIP. Older references to SCHIP were not changed, and any statutory or regulatory reference to one applies interchangeably to the other. See Public Law 111–3, 123 Stat. 8.

[377] See HealthCare.gov, *The Children's Health Insurance Program (CHIP), available at https://www.healthcare.gov/medicaid-chip/childrens-health-insurance-program* (last visited Feb. 23, 2018).

**51174**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

levels and the upper income level varies by state. According to the Centers for Medicare & Medicaid Services, 46 States and the District of Columbia cover children up to or above 200 percent the Federal Poverty Level (FPL), and 24 of these states offer coverage to children in families with income at 250 percent of the FPL or higher. States may get the CHIP enhanced match for coverage up to 300 percent of the FPL.[378] While coverage differs from state to state, all states provide comprehensive coverage, like routine check-ups, immunizations, doctor visits, and prescriptions. The program is funded jointly by states and the federal government.[379]

As noted in Table 10, the Federal government expends significant resources on CHIP.[380] CHIP imposes a significant expense upon multiple levels of government, and because these benefits relate to a basic living need (*i.e.*, medical care), receipt of these benefits suggests a lack of self-sufficiency. At the same time, DHS recognizes that this program does not involve the same level of expenditure as most of the other programs listed in this proposed rule, and that noncitizen participation in these programs is currently relatively low.[381]

DHS is nonetheless considering including this program in a final rule, because the total Federal expenditure for the program remains significant, and because it does provide for basic living needs (*i.e.*, medical care), similar to Medicaid (elements of which are included on the proposed list of public benefits). DHS specifically requests public comments on whether to include CHIP in the final rule.

**(h) Request for Comment Regarding Public Benefit Receipt by Certain Alien Children**

The language of the public charge statute under section 212(a)(4)(B)(i) of the Act states that an alien's "age" shall be one of several minimum enumerated considerations in a public charge determination, alongside "health,"

"family status," "assets, resources, and financial status," and "education and skills." Each of these factors must be taken into account in determining whether an alien will be a charge on the federal taxpayer. The United States has separate immigration programs, such as refugee admissions and asylum, where aliens regardless of age and financial circumstance are exempted from public charge inadmissibility. Alien children who are not asylees, refugees, or otherwise exempt from the public charge ground of inadmissibility are subject to it, just as adult aliens are. However, because the public charge inadmissibility determination is a prospective determination in the totality of the circumstances, the circumstances surrounding an alien's receipt of public benefits as a child, including the age at which such benefits were received, are a relevant consideration. For instance, as alien children approach or reach adulthood, they may age out of eligibility for certain benefits, choose to disenroll from such benefits (for which their parents may have enrolled them), or modify their chances of becoming self-sufficient depending upon whether they acquire education and skills, secure employment, and accumulate assets and resources. Therefore, DHS seeks public comment on the best mechanism to administer public charge inadmissibility determinations for those aliens who receive benefits while under the age of majority (frequently 18) or while still children under section 101(b) of the INA, 8 U.S.C. 1101(b). DHS is particularly interested in views and data that would inform whether and to what extent DHS should weigh past or current receipt of benefits by such an alien in the totality of the circumstances as a potential indicator of likely future receipt of public benefits.

**(i) Request for Comment Regarding Potential Modifications by Public Benefit Granting Agencies**

DHS recognizes that as a result of a future final rule, some benefit-granting agencies may decide to modify enrollment processes and program documentation for designated benefits programs. For instance, agencies may choose to advise potential beneficiaries of the potential immigration consequences of receiving certain public benefits. DHS requests public comments regarding such potential modifications, including information regarding how long it would take to make such modifications, and the resources required to make such modifications. DHS may use this information to determine the appropriate effective date for a final rule, among other purposes.

DHS seeks comments and recommendations from potentially affected state, local and tribal governments and from the public generally.

**3. Likely at Any Time To Become a Public Charge**

DHS proposes to define "likely at any time to become a public charge" to mean likely at any time in the future to receive one or more public benefits, as defined in 8 CFR 212.21(b), based on the totality of the alien's circumstances. Under this proposed definition, DHS would find an alien inadmissible as a public charge if DHS finds the alien is likely *at any time in the future* to receive one or more public benefits, as defined in 8 CFR 212.21(b), in an amount or for a duration exceeding the thresholds described above.

DHS proposes to distinguish between an alien who is a public charge based on current receipt of public benefits and an alien who is likely to become a public charge at any time in the future. This distinction is consistent with the prospective nature of the statute. DHS understands that its proposed definition of public charge may suggest that DHS would automatically find an alien who is *currently* receiving public benefits, as defined in this proposed rule, to be inadmissible as likely to become a public charge. But DHS does not propose to establish a *per se* policy whereby an alien is likely at any time to become a public charge if the alien is receiving public benefits at the time of the application for a visa, admission, or adjustment of status. Under the "likely at any time to become a public charge" definition, an alien who is currently receiving public benefits is not necessarily inadmissible, because current receipt of public benefits does not automatically mean that the alien is likely to receive public benefits at any time in the future.

As discussed above and explained further below, receiving public benefits by itself does not establish that an alien is likely to become a public charge; rather, as set forth in the statute, a public charge inadmissibility determination requires a determination predicated on an opinion as to the likelihood of future events.[382] Accordingly, as set forth in proposed 8 CFR 212.21, DHS proposes that an alien who is currently receiving public benefits is not necessarily inadmissible, because such current receipt of public benefits does not necessarily mean that

---

[378] *See Medicaid.gov, Eligibility, available at https://www.medicaid.gov/chip/eligibility-standards/index.html* (last visited Feb. 23, 2018).

[379] *See Benefits.gov, State Children's Health Insurance Program, available at https://www.benefits.gov/benefit-details/607* (last visited July 11, 2018).

[380] DHS would not consider services or benefits funded by CHIP but provided under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. 1400–1482, nor would DHS consider school-based services provided to children who are at or below the oldest age of children eligible for secondary education as determined under State law.

[381] An analysis of Wave 13 of the 2008 Panel of the Survey of Income and Program Participation (SIPP) suggests that 0.7 percent of noncitizens reported receiving CHIP benefits.

[382] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

the alien will continue to receive public benefits at any time in the future.

4. Household

For purposes of public charge inadmissibility determinations under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS proposes to consider the alien's household size as part of the family status factor, as well as the assets, resources, and financial status factor. The number of people in the alien's household has an effect on the alien's assets and resources, and in many cases may influence the likelihood that an alien will become a public charge. Household size would be used to determine whether the alien's household income is at least 125 percent of the FPG in the public charge inadmissibility determination, because the alien is either a head of household who has responsibilities to the household or is a member of a household who is supported by other members of the household beyond the sponsor. DHS notes that while the number of children, including U.S. citizen children, may count towards an alien's household size for purposes of determining inadmissibility on the public charge ground, the direct receipt of public benefits by those children would not factor into the public charge inadmissibility determination.

As discussed in greater detail below, in developing the proposed definition of an alien's household, DHS reviewed the individuals that public benefit granting agencies include as part of a household and/or as dependents in determining eligibility for a public benefit, as well as how USCIS determines household size and income in the affidavit of support context. The individuals identified as part of the alien's household are intended to include individuals who are financially interdependent with the alien, either legally or otherwise.

(a) Definition of Household in Public Charge Inadmissibility Context

DHS proposes to define an alien's household for the purposes of making a public charge inadmissibility determination as follows. First, if the alien is 21 years of age or older, or under the age of 21 and married, and therefore not a child as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), the alien's household would include:

• The alien;
• The alien's spouse, if physically residing with the alien;
• The alien's children, as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), physically residing with the alien;

• The alien's other children, as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), not physically residing with the alien for whom the alien provides or is required to provide at least 50 percent of financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided to the alien;

• Any other individuals (including a spouse not physically residing with the alien) to whom the alien provides, or is required to provide, at least 50 percent of the individual's financial support, or who are listed as a dependent on the alien's federal income tax return; and

• Any individual who provides to the alien at least 50 percent of the alien's financial support, or who lists the alien as a dependent on his or her federal income tax return.

Thus, for example, the applicant's household size would include the applicant, her children, and her parents, if:

• The applicant is an unmarried 23 year-old applicant for adjustment of status;

• The applicant lives with two children and her parents, who provide 53 percent of financial support to the applicant; and

• The applicant has no other individuals for whom she provides or is required to provide (or from whom she receives) financial support or who list her on their tax return.

DHS would consider the income, assets, and resources of all these household members (total of 5) in determining whether the applicant has income at or above 125 percent of the FPG.

Second, if the alien is a child as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), the alien's household would include:

• The alien;
• The alien's children, as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), physically residing with the alien;

• The alien's other children, as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), not physically residing with the alien, for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

• The alien's parents, legal guardians, or any other individuals providing or

required to provide at least 50 percent of financial support to the alien as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

• The parents' or legal guardians' other children, as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), physically residing with the alien;

• The parents' or legal guardians' other children, as defined in section 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), not physically residing with the alien for whom the parent or legal guardian provides or is required to provide at least 50 percent of the other children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the parents or legal guardians; and

• Any other individuals to whom the alien's parents or legal guardians provide or are required to provide at least at least 50 percent of the individuals' financial support, or who are listed as a dependent on the parents' or legal guardians' federal income tax return.

For example, if a five year old is applying for adjustment of status, the applicant's household would include the applicant, the applicant's mother and father, the applicant's two siblings, and the applicant's maternal grandparents, if:

• The applicant lives with his mother, father, and two siblings and has no other siblings;

• The mother and father provide 52 percent of the financial support to the mother's parents (*i.e.*, the alien's maternal grandparents) and do not and are not required to provide financial support to anyone else;

• Nobody else provides financial support to the applicant;

• Neither the mother or the father have any other children and have no other dependents listed on their tax return; and

• The mother and father do not receive financial support from anyone else.

DHS would consider the income of all of the above individuals in determining whether the alien can meet 125 percent of the FPG.

As another example, if an 18 year old is applying for adjustment of status, the alien's household would only include the alien and the alien's daughter, if:

• The 18 year old lives in her own apartment with only her 1 year old daughter;

• The applicant has no other children or siblings;

• The applicant does not receive any financial support from his or her parents or any other individual and has no legal guardian;

• No individuals are required to provide the applicant with any financial support; and

• The applicant's parents and the applicant do not provide and are not required to provide any support to anyone else and list no one else as a dependent on their federal income tax returns.

The proposed household definition would not include any person employed by the household who is living in the home, such as a nanny, or an individual who is renting of the home from one of the household members, or a landlord, unless such individual otherwise meets one of the enumerated criteria.

(b) Definitions of ''Household'' and Similar Concepts in Other Public Benefits Contexts

The poverty guidelines do not define who should be considered part of the household, and different agencies and programs have different requirements.[383] Public benefit granting agencies generally consider an applicant's income for purposes of public benefit eligibility and either use the household size or family size to determine the income threshold needed to qualify for a public benefit. Each federal program or State determines the general eligibility requirements needed to qualify for the public benefits and how to define whose income is included for purposes of determining income based eligibility thresholds. For example, SNAP uses the term ''household'' and includes everyone who lives together and purchases and prepares meals together. DHS is not proposing to incorporate the SNAP definition because an alien or an individual who is financially responsible for the alien's support may not have the legal responsibility to support each person living in the home. Instead, the proposed DHS definition would take into account individuals for whom the alien or the alien's parent(s) or legal guardian(s) or other individual is providing at least 50 percent of financial support because such expenditure would have significant bearing on whether the alien has

sufficient assets and resources in the context of a public charge determination.

The U.S. Department of Housing and Urban Development (HUD), per the 1937 Act, uses the term ''families''[384] which includes: (i) Single persons in the case of an elderly person, a disabled person, a displaced person, the remaining member of a tenant family, and any other single persons; or (ii) families with children and in the cases of elderly families, near-elderly families, and disabled families respectively.[385] The U.S. Housing Act of 1937 (The 1937 Act)[386] requires that dwelling units assisted under it must be rented only to families who are low-income[387] at the time of their initial occupancy. Section 3 of the 1937 Act also defines income as income from all sources of each member of the household, excluding earned income of minors, as determined by the Secretary. Beyond the statutory framework defining families, and as provided by the 1937 Act, HUD allows public housing agencies the discretion to determine particularities related to family composition, as determined under each public housing agency's plan.

While DHS's proposed definition does not precisely track HUD's definition, it would encompass many of the individuals identified in the HUD definition including spouses and children as defined under the Act.[388] In

addition, the DHS definition focuses on both individuals living in the alien's home, as well as individuals not living in the alien's home but for whom the alien and/or the alien's parent(s)/legal guardian(s) is providing or is required to provide at least 50 percent of financial support.

The IRS defines ''dependent'' to include a qualifying child (which has a 5-part test), or a qualifying relative (which has a 4-part test).[389] These tests generally include some type of relationship to the person filing (including step and foster children and their children) whether or not the dependent is living with the person filing and the amount of support being provided by the person filing (over 50 percent).[390] In general, the dependent must also be a U.S. citizen or lawful permanent resident in order to qualify as a dependent for tax purposes.[391]

Because the IRS definition of ''dependent'' would generally exclude alien dependents and the DHS definition would not, DHS's proposed definition of household results in a larger number of people being captured than if DHS simply tracked the IRS's definition of ''dependent.'' DHS also proposes to consider those individuals who are supported by the alien and are themselves aliens, or those who may be contributing to the alien's income, in order to determine whether the alien's financial resources are sufficient to support the alien and other members of the alien's household. For example, if an alien is living with a younger sibling who is attending school and providing 51 percent or more financial support for the younger sibling, that sibling is a part of the alien's household, even though the younger sibling may be earning some wages from a part-time job. Similarly, if the alien has an older sibling who is providing 51 percent of support to the alien, that older sibling would also be included in the alien's household and his/her income counted toward the requisite income threshold along with any income earned by the alien. DHS's definition would adopt the IRS consideration of the amount of support being provided to the individuals (50 percent) as the threshold for considering as an individual as part

[383] *See Annual Update of the HHS Poverty Guidelines,* 83 FR 2642 (Jan. 18, 2018).

[384] *See* U.S. Dep't of Hous. & Urban Dev., *Occupancy Handbook* ch. 3 (June 2007), *available at* https://www.hud.gov/sites/documents/DOC_35645.PDF.

[385] The term includes in cases of elderly, near-elderly, and disabled families, 2 or more elderly persons, near-elderly persons, or persons with disabilities living together, and 2 or more such persons living with 1 or more persons determined under the public housing agency plan to be essential to their care of well-being. *See* U.S. Dep't of Hous. & Urban Dev., Occupancy Handbook ch. 3 (June 2007), *available at* https://www.hud.gov/sites/documents/DOC_35645.PDF. HUD also makes their income determination based on Median Family Income estimates and Fair Market Rent area definitions for each metropolitan area, parts of some metropolitan areas, and each non-metropolitan county. *See* U.S. Dep't of Hous. & Urban Dev., Office of Policy Dev. & Research, *Income Limits, available at* https://www.huduser.gov/portal/datasets/il.html (last visited June 14, 2018). The 1937 Act also provides that the temporary absence of a child from the home due to placement in foster care shall not be considered in determining family composition and family size.

[386] *See* ch. 896, 50 Stat. 888 (codified as amended at 42 U.S.C. 1437 to 1437zz–10).

[387] Section 3 of the 1937 Act defines ''low-income families'' as those families whose incomes do not exceed 80 percent of the median income for the area, as determined by the Secretary.

[388] The definition of child in INA section 101(b), 8 U.S.C. 1101(b), generally includes unmarried persons under 21 years of age who are born in or out of wedlock, stepchildren, legitimated children, adopted children if adopted under the age of 16 or

the age of 18 if natural siblings of another adopted child.

[389] *See* 26 U.S.C. 152; *see also* IRS Publication 501 (Jan 2, 2018), *available at* https://www.irs.gov/pub/irs-pdf/p501.pdf.

[390] *See* IRS Publication 501 (Jan 2, 2018), *available at* https://www.irs.gov/pub/irs-pdf/p501.pdf.

[391] *See* IRS Publication 501 (Jan 2, 2018), *available at* https://www.irs.gov/pub/irs-pdf/p501.pdf.

of the household in the public charge determination, rather than consider any support being provided.[392]

DHS believes that the "at least 50 percent of financial support" threshold as used by the IRS is reasonable to apply to the determination of who belongs in an alien's household, without regard to whether these individuals physically reside in the alien's home. This would include those individuals the alien may not have a legal responsibility to support but may nonetheless be supporting. For example, this may include a parent, legal guardian, sibling, or a grandparent living with the alien, or an adult child, sibling, or any other adult who the alien may be supporting or required to support or who contributes to the alien's financial support.

(c) Definitions of Household and Similar Concepts in Other Immigration Contexts

DHS also considered how household size is determined in the affidavit of support context. There, USCIS defines the terms "household income" and "household size."[393] "Household income" is used to determine whether a sponsor meets the minimum income requirements based on the FPG.[394] The affidavit of support household income generally includes the income of:

• The sponsor;
• The sponsor's spouse;
• Any other person included in determining the sponsor's household size who must also be over the age of 18 and must have signed the additional household member contract through the Form I–864A; and
• The intending immigrant only if he or she either is the sponsor's spouse or has the same principal residence as the sponsor and certain additional criteria.[395]

Also, in the affidavit of support context, the "household size" is generally defined as the total number of people including:

• The sponsor;
• The intending immigrant(s) being sponsored on the Form I–864;[396]

• The sponsor's spouse;
• All of the sponsor's children as defined in 101(b)(1) of the Act, 8 U.S.C. 1101(b)(1), (including a stepchild who meets the requirements of 101(b)(1)(b) of the Act, 8 U.S.C. 1101(b)(1), unless the stepchild does not reside with the sponsor, is not claimed by the sponsor as a dependent for tax purposes, and is not seeking to immigrate based on the stepparent/stepchild relationship), except those children that have reached the age of majority or are emancipated under the law of the person's domicile and are not claimed as dependents on the sponsor's most recent tax return;
• Any other persons (whether related to the sponsor or not) whom the sponsor has claimed as dependents on the sponsor's federal income tax return for the most recent tax year, even if such persons do not have the same principal residence as the sponsor;
• Any aliens the sponsor has sponsored under any other affidavit of support for whom the sponsor's support obligation has not terminated; and
• If the sponsor elects, any siblings, parents, and/or adult children who have the same principal residence as the sponsor, and have combined their income with the sponsor's income by submitting Form I–864A.[397]

The affidavit of support is part of the public charge determination in that an alien who is required to submit an affidavit of support pursuant to sections 212(a)(4)(C) and (D) of the Act but does not submit a sufficient affidavit of support is de facto deemed to be inadmissible as likely to become a public charge. In addition, because the affidavit of support serves as an agreement that the sponsor will use his or her resources to support the alien if necessary, DHS is proposing to consider the affidavit of support in the totality of the circumstances when determining whether the alien is likely at any time to become a public charge. However, the proposed definition of household in this rule does not specifically include or exclude the sponsor and the sponsor's household. Rather, DHS is only including those persons who rely upon or contribute to the alien's assets and resources. Therefore, if the sponsor is already providing 50 percent or more of financial support to the alien, the sponsor would be included in the proposed definition of household. For example, when a child, as defined in section 101(b) of the Act, 8 U.S.C.

1101(b)(1), is filing for adjustment of status as the child of a U.S. citizen or lawful permanent resident, the affidavit of support sponsor would also be the parent. Because the parent is part of the household, the parent's income would be included as part of the household income.[398] The parent's income would be reviewed as part of the assets, resources, and financial status factor based on the total household value. However, for example, if there is a co-sponsor, who is the alien's cousin and who is not physically residing with the alien, then the cousin would not be counted as part of the household and his or her income would not be included as part of the assets, resources or financial status unless the sponsor is already contributing 50 percent or more of the alien's financial support.

In addition, if the sponsor is a member of the alien's household and included in the calculation of the 125 percent of the FPG, DHS would only count the sponsor's income once for purposes of determining the alien's total household assets and resources. A sponsor's income as reported on the affidavit of support would be added to the income of the other members of the alien's household. The sponsor's income that is added to the alien's total household assets and resources would not be increased because the sponsor also submitted an affidavit of support promising to support the alien at least 125 percent of the FPG for the sponsor's household size. For example, assuming the alien and sponsor's household sizes are the same, if the sponsor's total income reported on the affidavit of support is 250 percent of the FPG for the household size, that income would be added to the alien's assets and resources; the alien's total household income would then be at least 250 percent of the FPG, which constitutes a heavily weighed positive factor.

As discussed above, in proposing this definition of household, DHS aims to account for both (1) the persons whom the alien is supporting and (2) those persons who are contributing to the household, and thus the alien's assets and resources. DHS believes that an alien's ability to support a household is relevant to DHS's consideration of the alien's assets, resources, financial status, and family status. DHS recognizes that household circumstances can vary and expects the proposed definition could in certain circumstances be over- or under-inclusive. DHS welcomes public comments on who should be counted as members of a household, and whose

---

[392] See Internal Revenue Serv., *Dependency Exemptions, available at https://apps.irs.gov/app/vita/content/globalmedia/4491_dependency_exemptions.pdf* (last visited Aug. 10, 2018); *see also* Internal Revenue Serv., *Table 2: Dependency Exemption for Qualifying Relative, available at https://apps.irs.gov/app/vita/content/globalmedia/table_2_dependency_exemption_relative_4012.pdf* (last visited Aug. 10, 2018).

[393] See 8 CFR 213a.1.

[394] See INA section 213A, 8 U.S.C. 1183a.

[395] See 8 CFR 213a.1.

[396] If a child, as defined in INA section 101(b)(1), 8 U.S.C. 1101(b)(1), or spouse of the principal intending immigrant is an alien who does not currently reside in the United States and who either

is not seeking to immigrate at the same time as, or will not seek to immigrate within six months of the principal intending immigrant's immigration, the sponsor may exclude that child or spouse in calculating the sponsor's household size.

[397] See 8 CFR 213a.1, 213a.2(c)(2)(i)(C)(1).

[398] See INA section 213A(3)(f), 8 U.S.C. 1183a(3)(f).

income, assets and resources should be reviewed in the totality of the circumstances when USCIS makes a public charge inadmissibility determination.

### C. Public Charge Inadmissibility Determination

DHS proposes codifying the public charge inadmissibility determination as a prospective determination based on the totality of an alien's circumstances at the time of adjudication. As provided by statute, if an alien is required to provide an affidavit of support and the affidavit is insufficient, the alien will be found inadmissible based on public charge regardless of any other evidence the alien may submit.[399]

### 1. Absence of a Required Affidavit of Support

Section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), permits DHS to consider any submitted affidavit of support under 213A of the Act, 8 U.S.C. 1183a, in public charge inadmissibility determinations. The absence of a statutorily required affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, conclusively establishes an alien's inadmissibility on public charge grounds.[400] Family-sponsored immigrants and employment-based immigrants petitioned by a relative (or by an entity in which a relative has a significant ownership interest) are subject to such a requirement.[401] Other than failure to submit an affidavit of support when required under section 213A of the Act, 8 U.S.C. 1183a, DHS would not make a public charge determination based on any single factor.[402]

### 2. Prospective Determination Based on Totality of Circumstances

As noted above, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), uses the words "likely at any time." [403] DHS's review is predictive: An assessment of an alien's likelihood at any time in the future to become a public charge.[404]

DHS would, as required by the statute, assess whether the alien is likely to become a public charge and not whether the alien is currently a public charge. While past or current receipt of public benefits may make an alien, at present, a public charge, the past or current receipt of public benefits, alone, is insufficient to sustain a finding that an alien is likely to become a public charge at any point in the future.[405] Other than an absent or insufficient required affidavit of support,[406] no single factor or circumstance that Congress mandated DHS to consider, or which DHS may otherwise determine to consider, would determine the outcome of a public charge inadmissibility determination.

Consistent with the statute, DHS proposes to codify the totality of the circumstances standard,[407] as follows: An alien's age; health; family status; assets, resources, and financial status; and education and skills. In the Government's discretion, the determination can also account for an affidavit of support filed under section 213A of the Act, 8 U.S.C. 1183a. Courts previously considered similar factors when evaluating the likelihood of an alien to become a public charge.[408] INS, the Board, and DHS have consistently reviewed the totality of the circumstances in determining whether

an alien is likely to become a public charge.[409]

DHS's proposed totality of the circumstances standard would involve weighing all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[410] If the negative factors outweigh the positive factors, then the alien would be found to be inadmissible as likely to become a public charge; if the positive factors outweigh the negative factors, then the alien would not be found inadmissible as likely to become a public charge.

The proposed totality of the circumstances approach is also consistent with the body of administrative case law that has developed over the past 50 years, which generally directs the agency to "consider[ ] all the factors bearing on the alien's ability or potential ability to be self-supporting . . . ." [411] On the whole, this case law strongly supports the forward-looking totality of the circumstances approach, considering the following factors, where no one factor is outcome-determinative:

• The ability of the alien to earn a living, as evidenced or impacted by the alien's age, health, work history, current employment status, future employment prospects, and skills;

• The sufficiency of the alien's funds for self-support;

• The obligation and sufficiency of sponsorship to assure that the alien will not need public support; and

• The ability of the alien to remedy any current dependence on public benefits in the United States, as evidenced or impacted by the alien's age, health, ability to earn a living, funds, and sponsorship.[412]

To illustrate, in *Matter of Martinez-Lopez*,[413] rather than concluding that the respondent was likely to become a public charge based solely on the fact that the respondent had no job offer in

---

[399] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[400] See INA section 212(a)(4)(C), 8 U.S.C. 1182(a)(4)(C); 8 CFR 213a.2.

[401] See INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4), 1183a.

[402] See generally Matter of Martinez-Lopez, 10 I&N Dec. 409, 421–22 (Att'y Gen. 1964).

[403] The "likely" language in the public charge inadmissibility provision also appeared in the initial codification in the INA of 1952. See ch. 477, 66 Stat. 163, 183.

[404] See Matter of Perez, 15 I&N Dec. 136, 137 (BIA 1974) (concluding that the determination of whether an alien is likely to become a public charge requires consideration of the totality of circumstances, including specific circumstances such as mental or physical disability, health, age, current reliance on welfare benefits, capacity to find

employment, and friends or relatives in the United States willing and able to provide assistance); see also Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28689–93 (May, 26 1999) (in addition to the statutory factors, the public charge inadmissibility analysis also includes consideration of the alien's current and past receipt of cash public assistance for income maintenance, repayment of cash public assistance, current or past institutionalization for long-term care at government expense, specific circumstances "reasonably tending to show that the burden of supporting the alien is likely to be cast on the public," and whether the alien has a sponsor who is willing and able to assist).

[405] See Matter of Perez, 15 I&N Dec. 136, 137 (BIA 1974) ("The fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge.").

[406] See INA section 213A, 8 U.S.C. 1183a.

[407] See proposed 8 CFR 212.22.

[408] See, e.g., Matter of Perez, 15 I&N Dec. 136, 137 (BIA 1974); see also Zambrano v. INS, 972 F.2d 1122 (9th Cir. 1992), vacated on other grounds, 509 U.S. 918 (1993); Matter of Martinez-Lopez, 10 I&N Dec. 409, 421–22 (Att'y Gen. 1964) (in determining whether a person is likely to become a public charge, factors to consider include age, health and physical condition, physical or mental defects which might affect earning capacity, vocation, past record of employment, current employment, offer of employment, number of dependents, existing conditions in the United States, sufficient funds or assurances of support by relatives or friends in the United States, bond or undertaking, or any "specific circumstance . . . reasonably tending to show that the burden of supporting the alien is likely to be cast on the public"); Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689 (May 26, 1999).

[409] See Matter of A—,19 I&N Dec. 867, 869 (Comm'r 1988) (citing Matter of Perez, 15 I&N Dec. 136, 137 (BIA 1974)).

[410] See proposed 8 CFR 212.22.

[411] See Matter of Vindman 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977).

[412] DHS derived this framework from its analysis of the statements and findings in Matter of Martinez-Lopez, 10 I&N Dec. 409 (Att'y Gen. 1964), Matter of Harutunian 14 I&N Dec. 583 (Reg'l Comm'r 1974), Matter of Perez 15 I&N Dec. 136 (BIA 1974), Matter of Vindman 16 I&N Dec. 131 (Reg'l Comm'r 1977), and Matter of A—, 19 I&N Dec. 867 (Comm'r 1988).

[413] See 10 I&N Dec. 409 (Att'y Gen. 1964).

the United States, the Attorney General considered the respondent's future ability to earn a living based on his 10-year work history in the United States, his age, and his health.[414] The Attorney General also considered the fact that the respondent had a brother and other close family members who could provide financial support.[415] In *Matter of Perez,*[416] the Board made clear that the respondent's past and current receipt of welfare was not determinative as to whether she was likely to become a public charge in the future, instead looking to the totality of her circumstances, including her age, health, ability to find employment in the future, and the availability of family support.[417] In *Matter of A—,*[418] although the respondent and her husband had been unemployed for the 4 years prior to the filing of her application for temporary resident status, the INS Commissioner held that the respondent was not likely to become a public charge "due to her age and ability to earn a living," as shown by her recent employment among other factors.[419]

An INS Regional Commissioner took a similar totality of the circumstances approach in *Matter of Harutunian*[420] and determined that the respondent in that case was inadmissible as likely to become a public charge because the respondent lacked the means to support herself, the ability to earn a living, and the presence of a sponsor to assure that she would not need public support.[421] Furthermore, the alien was increasingly likely to become dependent, disabled, and sick because of her older age, and accordingly was expected to become dependent on old-age assistance for support.[422] Similarly, an INS Regional Commissioner, in *Matter of Vindman,* held that a husband and wife were inadmissible as likely to become public charges, because they had been receiving public benefits for approximately three years, they were unemployed in the United States, and

they presented no prospect of future employment.[423]

DHS proposes that certain factors and circumstances would generally carry heavy weight, as discussed below. The weight given to an individual factor not designated as carrying heavy weight would depend on the particular facts and circumstances of each case and the relationship of the factor to other factors in the analysis. Some facts and circumstances may be positive while other facts and circumstances may be negative. Any factor or circumstance that decreases the likelihood of an applicant becoming a public charge is positive; any factor or circumstance that increases the likelihood of an applicant becoming a public charge is negative. Multiple factors operating together may be weighed more heavily since those factors in tandem may show that the alien is already a public charge or is or is not likely to become one.

For example, an alien's assets, resources, and financial status together would frequently carry considerable positive weight, because they are the most tangible factors to consider in public charge determinations. An alien's assets, resources, and financial status examined together may show that the alien is not likely to be a public charge despite concerns about the alien's age, education, skills, and health. At the same time, an alien's assets, resources, and financial status examined together may be so limited that a finding that the alien is not likely to become a public charge would have to be based on positive attributes associated with the alien's education, skills, health, family status, age, or sponsorship.

Ultimately, DHS recognizes that, as the Attorney General has noted, "the statute requires more than a showing of a possibility that the alien will require public support. Some specific circumstance, such as mental or physical disability, advanced age, or other fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public, must be present."[424] Indeed, if DHS finds that the specific positive factors and circumstances outweigh the specific negative factors and circumstances in an alien's case, indicating that the alien is less likely than not to receive one or more public benefits at any time in the future as described in 8 CFR 212.21(b), then DHS would conclude that the alien is not likely to become a public charge. If DHS finds that the specific negative

factors and circumstances outweigh the specific positive factors and circumstances in an alien's case indicating that the alien is more likely than not to receive public benefits as described in 8 CFR 212.21(b), at any time in the future, then DHS would conclude that the applicant is likely to become a public charge.[425]

*D. Age*

An alien's age is a mandatory factor that must be considered when determining whether an alien is likely to become a public charge in the future.[426] As discussed below, a person's age may impact his or her ability to legally or physically work and is therefore relevant to being self-sufficient, and the likelihood of becoming a public charge. Accordingly, DHS proposes to consider the alien's age primarily in relation to employment or employability, and secondarily to other

---

[414] *See* 10 I&N Dec. 409, 422–23 (Att'y Gen. 1964).

[415] *See* 10 I&N Dec. 409, 423 (Att'y Gen. 1964).

[416] 15 I&N Dec. 136 (BIA 1974).

[417] 15 I&N Dec. 136, 137 (BIA 1974).

[418] 19 I&N Dec. 867 (Comm'r 1988). DHS notes, however, that this case involves the special public charge rule applicable only to applications under INA section 245A, 8 U.S.C. 1255a.

[419] *See* 19 I&N Dec. 867, 870 (Comm'r 1988).

[420] *Matter of Harutunian* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

[421] *See* 14 I&N Dec. 583, 589–90 (Reg'l Comm'r 1974).

[422] *See* 14 I&N Dec. 583, 589–90 (Reg'l Comm'r 1974).

[423] *See Matter of Vindman,* 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977).

[424] *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1964).

[425] As explained, the proposed public charge policy is consistent with the totality of the circumstances approach undertaken by the former INS Commissioner in *Matter of A—.* We recognize the Commissioner, in that decision, cited an earlier decision of the Attorney General for the proposition that "[a] healthy person in the prime of life cannot ordinarily be considered likely to become a public charge, especially where he has friends or relatives in the United States who have indicated their ability and willingness to come to his assistance in case of emergency." 19 I&N Dec. 867, 869 (Comm'r 1988) (quoting *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421–22 (Att'y Gen. 1964)). In *Matter of A—* and *Matter of Martinez-Lopez,* the INS Commissioner and the Attorney General, respectively, implicitly acknowledge that, although individuals in the prime of life will not *ordinarily* become public charges, they certainly may; otherwise, it would have been pointless to assert that what ordinarily is the case is especially true in certain instances. *See Matter of A—,* 19 I&N Dec. 867, 869 (Comm'r 1988) (acknowledging that "all factors should be considered in their totality" in determining whether an individual is likely to become a public charge). Accordingly, adverse factors particular to a given circumstance may counterbalance what otherwise is ordinarily true in a vacuum, such that aliens may still be found inadmissible under INA section 212(a)(4), 8 U.S.C. 1182(a)(4) notwithstanding their being "in the prime of life." Also consistent with those decisions, which instruct that additional positive weight should be afforded where friends or relatives in the United States are willing and able to assist in emergencies, DHS would give positive weight to a Form I–864, Affidavit of Support, that satisfies statutory and regulatory requirements and to income and resources of certain household members, although the filing of the Form I–864 and shared resources likewise would not be determinative. To the extent this proposed rule may be viewed as inconsistent with *Matter of A—,* however, including because the scope of the public benefits covered by this proposed rule is broader than under the longstanding administration of the public charge ground, and the threshold for being considered a public charge under the definition of that term in this proposed rule is lower than it has been for at least the past two decades, that decision would be superseded if this rule is finalized as drafted.

[426] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

factors as relevant to determining whether someone is likely to become a public charge.

Specifically, DHS proposes to assess whether the alien is between 18 and the minimum ''early retirement age'' for social security purposes (*see* 42 U.S.C. 416(*l*)(2)) (61 as of 2017), and whether the alien's age otherwise makes the alien more or less likely to become a public charge, such as by impacting the alien's ability to work. DHS would consider a person's age between 18 and 61 as a positive factor in the totality of the circumstances, and consider a person's age under 18 or over 61 to be a negative factor in the totality of the circumstances when determining the likelihood of becoming a public charge. However, DHS acknowledges that people under the age of 18 and over the age of 61 may be working or have adequate means of support, and would recognize such means as positive factors.

The 18 through 61 age range is based on the age at which people are generally able to work full-time and the age at which people are generally able to retire with some social security retirement benefits under Federal law.[427] At one end of the spectrum, children under the age of 18 generally face difficulties working full-time.[428] In general, the Fair Labor Standards Act sets 14 years of age as the minimum age for employment, and limits the number of hours worked by children until the age of 16.[429] States have varying laws addressing at what age and for how many hours children

may work up to the age of 18.[430] Further, most States require children to attend school until a certain age, generally until the ages of 16 or 18.[431] DHS notes that the Fair Labor Standards Act provides for certain exemptions for children under 16 to work,[432] and children may be otherwise able to work.

At the other end of the age range, retirement is the age at which a person may begin receiving retirement benefits from Social Security.[433] The minimum age for retirement for purposes of Social Security is generally 62.[434] People who are at the minimum retirement age may stop working and start receiving retirement benefits such as Social Security. If a person does have access to Social Security benefits or a retirement pension, he or she may not need public benefits for income maintenance or other benefits to be self-sufficient as the income from Social Security or the pension may suffice.

Other age-related considerations may also be relevant to public charge inadmissibility determinations, in individual circumstances. Individuals under the age of 18 may be more likely to qualify for and receive public benefits. The U.S. Census Bureau reported that 18 percent of persons under the age of 18 (13,253,000) and

11.1 percent of persons aged 18 and over (27,363,000) lived below the poverty level in 2016.[435] The U.S. Census Bureau also reported that persons under the age of 18 were more likely to receive means-tested benefits than all other age groups.[436]

Similarly, studies show a relationship between advanced age and receipt of public benefits. DHS's analysis of SIPP data in Tables 14 and 15 shows noncitizens age 62 and older were more likely to receive cash and non-cash benefits than U.S. citizens in the same age group. Of noncitizens age 62 and older, 11.8 percent received SSI, TANF, or GA in 2013 compared to 4.5 percent of U.S. citizens age 62 and older. The rate of receipt of either cash or non-cash benefits was about 40 percent among U.S. citizens and noncitizens age 0 to 17. Among noncitizens, the receipt of non-cash benefits was much lower among individuals between age 18 and 61 (19.3 percent) than individuals under age 18 (40.2 percent), or individuals over age 61 (36.3 percent). Among U.S. citizens, the receipt of non-cash benefits was lower among individuals between age 18 and 61 (15.3 percent) than individuals under age 18 (39.7 percent), and higher among individuals over age 61 (11.4 percent).

**BILLING CODE 4410–10–P**

---

[427] *See* 29 U.S.C. 213(c), 42 U.S.C. 416(*l*)(2).

[428] *See* 29 U.S.C. 213(c); 29 CFR part 570; *see also* Dep't of Labor, *Table of Employment/Age Certification Issuance Practice Under State Child Labor Laws, available at https://www.dol.gov/whd/ state/certification.htm* (last updated Jan. 1, 2018).

[429] *See* 29 U.S.C. 213(c); 29 CFR part 570; *see also* Dep't of Labor, *Table of Employment/Age Certification Issuance Practice Under State Child Labor Laws, available at https://www.dol.gov/whd/ state/certification.htm* (last updated Jan. 1, 2018).

[430] *See* 29 U.S.C. 213(c); 29 CFR part 570; *see also* Dep't of Labor, *Table of Employment/Age Certification Issuance Practice Under State Child Labor Laws, available at https://www.dol.gov/whd/ state/certification.htm* (last updated Jan. 1, 2018).

[431] *See* Nat'l Ctr. for Educ. Statistics, *Table 5.1: Compulsory School Attendance Laws, Minimum and Maximum Age Limits for Required Free Education, by State: 2015, available at https:// nces.ed.gov/programs/statereform/tab5_1.asp* (last visited Sept. 10, 2018).

[432] *See* 29 CFR 570.122.

[433] *See* 42 U.S.C. 416(l); *see also* U.S. Soc. Sec. Admin., *Retirement Planner: Benefits by Year of Birth, available at https://www.ssa.gov/planners/ retire/agereduction.html* (last visited Sept. 10, 2018).

[434] *See* 42 U.S.C. 416(l); *see also* U.S. Soc. Sec. Admin., *Retirement Planner: Benefits by Year of Birth, available at https://www.ssa.gov/planners/ retire/agereduction.html* (last visited Sept. 10, 2018).

[435] *See* Jessica L. Semega et al., U.S. Census Bureau, *Income and Poverty in the United States: 2016,* at 13 tbl.3 (Sept. 2017), *available at https:// www.census.gov/content/dam/Census/library/ publications/2017/demo/P60-259.pdf.* Statistics provided for those aged 18 and over were inferred.

[436] In an average month during 2012, 39.2 percent of children received some type of means-tested benefit. *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Household Economic Studies, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 6 (May 2015), *available at https:// www.census.gov/content/dam/Census/library/ publications/2015/demo/p70-141.pdf; see also* U.S. Census Bureau, News Release, *21.3 Percent of U.S. Population Participates in Government Assistance Programs Each Month* (May 28, 2015), *available at https://www.census.gov/newsroom/press-releases/ 2015/cb15-97.html.*

**Table 14. Public Benefit Participation Among U.S. Citizens by Age, 2013 (in thousands)**

| Total Population 310,867 | 0-17 | | | 18-61 | | | 62+ | | |
|---|---|---|---|---|---|---|---|---|---|
| | Population 68,689 | % of Total Population 22.1% | | Population 167,058 | % of Total Population 53.7% | | Population 54,957 | % of Total Population 17.7% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 27,406 | 39.9% | 0.5% | 26,251 | 15.7% | 0.3% | 6,824 | 12.4% | 0.4% |
| | | | | | | | | | |
| Cash benefits | 2,715 | 4.0% | 0.2% | 5,268 | 3.2% | 0.1% | 2,446 | 4.5% | 0.3% |
| SSI | 1,005 | 1.5% | 0.1% | 4,295 | 2.6% | 0.1% | 2,352 | 4.3% | 0.2% |
| TANF | 1,564 | 2.3% | 0.2% | 606 | 0.4% | 0.0% | *11 | *0.0% | 0.0% |
| GA | 240 | 0.3% | 0.1% | 502 | 0.3% | 0.0% | 158 | 0.3% | 0.1% |
| | | | | | | | | | |
| Non-cash benefits | 27,246 | 39.7% | 0.5% | 25,529 | 15.3% | 0.3% | 6,254 | 11.4% | 0.4% |
| Medicaid | 25,225 | 36.7% | 0.5% | 17,084 | 10.2% | 0.2% | 4,133 | 7.5% | 0.3% |
| SNAP | 14,158 | 20.6% | 0.4% | 15,738 | 9.4% | 0.2% | 3,188 | 5.8% | 0.3% |
| Housing vouchers | 1,801 | 2.6% | 0.2% | 2,296 | 1.4% | 0.1% | 549 | 1.0% | 0.1% |
| Rent subsidy | 3,915 | 5.7% | 0.3% | 5,676 | 3.4% | 0.1% | 1,970 | 3.6% | 0.2% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
* Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

**Table 15. Public Benefit Participation Among Noncitizens by Age, 2013 (in thousands)**

| Total Population 310,867 | 0-17 | | | 18-61 | | | 62+ | | |
|---|---|---|---|---|---|---|---|---|---|
| | Population 1,705 | % of Total Population 0.5% | | Population 17,006 | % of Total Population 5.5% | | Population 1,452 | % of Total Population 0.5% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 685 | 40.2% | 3.5% | 3,326 | 19.6% | 0.9% | 547 | 37.6% | 3.8% |
| | | | | | | | | | |
| Cash benefits | *29 | *1.7% | 0.9% | 169 | 1.0% | 0.2% | 172 | 11.8% | 2.5% |
| SSI | - | - | - | *91 | *0.5% | 0.2% | 163 | 11.2% | 2.5% |
| TANF | *29 | *1.7% | 0.9% | *44 | *0.3% | 0.1% | - | - | - |
| GA | - | - | - | *38 | *0.2% | 0.1% | *9 | *0.6% | 0.6% |
| | | | | | | | | | |
| Non-cash benefits | 685 | 40.2% | 3.5% | 3,286 | 19.3% | 0.9% | 527 | 36.3% | 3.8% |
| Medicaid | 592 | 34.8% | 3.4% | 2,123 | 12.5% | 0.8% | 415 | 28.6% | 3.5% |
| SNAP | 258 | 15.1% | 2.5% | 1,339 | 7.9% | 0.6% | 232 | 16.0% | 2.9% |
| Housing vouchers | *51 | *3.0% | 1.2% | 209 | 1.2% | 0.3% | *27 | *1.9% | 1.1% |
| Rent subsidy | 104 | 6.1% | 1.7% | 625 | 3.7% | 0.4% | 140 | 9.6% | 2.3% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
* Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

BILLING CODE 4410-10-C

Regardless of age, DHS recognizes that an alien may have financial assets, resources, benefits through employment, education or skills, family, or other means of support that decrease his or her likelihood of becoming a public charge. For example, the alien or the alien's spouse or parent may have sufficient income, or savings, investments, or other resources—including Social Security benefits and Medicare—to support him or herself and the household. In addition, as people age, they may become eligible for certain earned benefits including Social Security benefits, health insurance from Medicare, and benefits from an employer pension or retirement benefit.

*E. Health*

An alien's health is a factor that must be considered when determining whether an alien is likely to become public charge in the future.[437] Prior to Congress establishing health as a factor for the public charge determination, the

[437] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

courts, the BIA and INS had also held that a person's physical and mental condition was of major significance to the public charge determination, generally in relation to the ability to earn a living.[438] Accordingly, DHS proposes that when considering an alien's health, DHS will consider whether the alien has any physical or mental condition that, although not considered a condition or disorder that would render the alien inadmissible under the health-related ground of inadmissibility,[439] is significant enough to interfere with the person's ability to care for him- or herself or to attend school or work, or that is likely to require extensive medical treatment or institutionalization in the future.

The mere presence of a medical condition would not render an alien inadmissible. Instead, DHS would consider the existence of a medical condition in light of the effect that such medical condition is likely to have on the alien's ability to attend school or work, and weigh such evidence in the totality of the circumstances. As part of the assets, resources and financial status factor, DHS would consider whether the alien has private health insurance, or the financial resources to pay for associated medical costs.

Research and data establish that healthcare is costly, particularly for the government. In 2016, the National Health Expenditure (NHE) grew to $3.3 trillion, or $10,348 per person, which represents an increase of 4.3 percent from 2015.[440] Medicaid spending, which is 17 percent of the total NHE, grew by 3.9 percent to $565.5 billion.[441] The Federal Government (28.3 percent) and households (28.1 percent) paid the largest shares of total health spending.[442]

An alien's medical conditions may impose costs that a person is unable to afford, and may also reduce that person's ability to attend school, work,

or financially support him or herself. Such medical conditions may also increase the likelihood that the alien could resort to Medicaid, or Premium and Cost Sharing Subsidies for Medicare Part D.[443] However, DHS recognizes that regardless of the alien's health status, the alien may have financial assets, resources, or support, including private health insurance or the means to purchase it, that allows him or her to be self-sufficient.[444]

Nevertheless, an alien's inability to work due to a medical condition, and failure to maintain health insurance or the financial resources to pay for the medical costs, could make it likely that such alien would become a public charge. In addition, long-term health care expenses to treat such a medical condition could decrease an individual's available financial resources.

### 1. USCIS Evidentiary Requirements

DHS proposes that USCIS' review of the health factor would include, but not be limited to, the consideration of the following types of evidence: (1) Any required Report of Medical Examination and Vaccination Record (Form I–693) or applicable DOS medical examination form [445] submitted in support of the application for the diagnosis of any medical conditions; [446] or (2) evidence of a medical condition that is likely to require extensive medical treatment or institutionalization after arrival, or that will interfere with the alien's ability to care for him- or herself, to attend school, or to work.

The specific reference to the Form I–693 or similar form is intended to help standardize USCIS' assessment of health as a factor for public charge consideration and avoid multiple medical examinations for the alien. Most immigrant visa applicants applying with the DOS and those aliens applying for adjustment of status with USCIS are required to submit a medical examination.[447] Nonimmigrants applying with DOS and nonimmigrants seeking a change of status or extension of stay with USCIS are generally not required to submit a medical examination with their applications. However, nonimmigrants seeking a

change of status to that of a spouse of a legal permanent resident (V–1) or child (V–2) status must submit a medical examination.[448] In addition, a consular officer may request a medical examination if the officer has concerns that the applicant may be inadmissible on health-related grounds.[449] Likewise, a CBP officer at a port of entry may require a nonimmigrant to submit to a medical examination to determine medical inadmissibility.[450]

Civil surgeons and panel physicians test for Class A [451] and Class B [452] medical conditions, and report the findings on the appropriate medical examination form. An alien is inadmissible on a health-related ground for being diagnosed with a Class A medical condition unless a waiver is available and authorized.[453] Class A medical conditions, as defined in HHS regulations, include the following: [454]

• Communicable disease of public health significance, including gonorrhea, Hansen's Disease (infectious), syphilis (infectious stage), and active tuberculosis; [455]

• Failure to meet vaccination requirements; [456]

• Present or past physical or mental disorders with associated harmful behavior or harmful behavior that is likely to recur; [457] and

• Drug abuse or addiction.[458]

In identifying a Class A medical condition, the HHS regulations direct physicians conducting the immigration medical examinations to explain on the medical report ''the nature and extent of the abnormality; the degree to which the alien is incapable of normal physical activity; and the extent to which the condition is remediable . . . [as well as] the likelihood, that because of the condition, the applicant will require

[438] See, e.g., Matter of Martinez-Lopez, 10 I&N Dec. 409, 421–23 (Att'y Gen. 1964); see also Matter of A-, 19 I&N Dec. 867, 869 (Comm'r 1988) (citing Matter of Harutunian, 14 I&N Dec. 583 (Reg'l Comm'r 1974); Matter of Vindman, 16 I&N Dec. 131 (Reg'l Comm'r 1977)).

[439] See INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[440] See Ctrs. for Medicare & Medicaid Servs., NHE Fact Sheet, available at https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited Feb. 3, 2018).

[441] See Ctrs. for Medicare & Medicaid Servs., NHE Fact Sheet, available at https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited Feb. 3, 2018).

[442] See Ctrs. for Medicare & Medicaid Servs., NHE Fact Sheet, available at https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited Feb. 3, 2018).

[443] See 42 U.S.C. 1395w–114.

[444] For example, a person may have savings, investments or trust funds.

[445] This is currently the Immigrant or Refugee Applicant (Form DS–2054).

[446] The medical examination documentation indicates whether the applicant has either a Class A or Class B medical condition. In addition, the alien must provide a vaccination record. Class A and Class B medical conditions are defined in the HHS regulations. See 42 CFR 34.2.

[447] See INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[448] See INA section 101(a)(15)(v), 8 U.S.C. 1101(a)(15)(v); see also 8 CFR 214.15.

[449] See INA section 221(d), 8 U.S.C. 1201(d).

[450] See INA section 232, 8 U.S.C. 1222.

[451] The alien would be inadmissible for health-related grounds under INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[452] Class B medical conditions do not make an alien inadmissible on health-related grounds under INA section 212(a)(1), 8 U.S.C. 1182(a)(1), but are relevant to the public charge determination.

[453] See INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[454] See 42 CFR 34.2(d). The alien with a Class A medical condition would be inadmissible based on health-related grounds under INA section 212(a)(1), 8 U.S.C. 1182(a)(1). However, these medical conditions may also be considered as part of the public charge inadmissibility determination.

[455] See 42 CFR 34.2(b) and (d)(1); see also INA section 212(a)(1)(i), 8 U.S.C. 1182(a)(1)(i).

[456] See 42 CFR 34.2(d); see also INA section 212(a)(1)(ii), 8 U.S.C. 1182(a)(1)(ii).

[457] See 42 CFR 34.2(d); see also INA section 212(a)(1)(iii), 8 U.S.C. 1182(a)(1)(iii).

[458] See 42 CFR 34.2(d), (h), (i); see also INA section 212(a)(1)(iv), 8 U.S.C. 1182(a)(1)(iv).

extensive medical care or institutionalization." [459] A waiver of the health-related ground of inadmissibility is available for communicable diseases of public health significance, physical or mental disorder accompanied by harmful behavior, and lack of vaccinations.[460]

A Class B medical condition is defined as a physical or mental condition, disease, or disability serious in degree or permanent in nature.[461] Currently, the CDC Technical Instructions for Medical Examinations of Aliens, which direct physicians to provide information about Class B conditions, describe a Class B condition as one that, although it does not "constitute a specific excludable condition, represents a departure from normal health or well-being that is significant enough to possibly interfere with the person's ability to care for him- or herself, to attend school or work, or that may require extensive medical treatment or institutionalization in the future." [462]

If the physician conducting the immigration medical examination identifies a Class B medical condition that is "a substantial departure from normal well-being," [463] the HHS regulations direct the physician to explain in the medical notification [464] "the degree to which the alien is incapable of normal physical activity, and the extent to which the condition is remediable . . . [and] the likelihood, that because of the condition, the applicant will require extensive medical care or institutionalization." [465]

DHS would consider any of the above-described conditions in the totality of the circumstances. Any such condition would not serve as the sole factor considered in whether an alien is likely to become a public charge. Absence of a diagnosis of such a condition would be a positive factor. DHS recognizes that some conditions that are Class A and Class B are treatable and the person may in the future be able to work or attend school. These circumstances, as identified by a civil surgeon or panel physician, would also be taken into consideration in the totality of circumstances.

In addition to the types of evidence described above, DHS would also take into consideration any additional medical records or related information provided by the alien to clarify any medical condition included on the medical form or other information that may outweigh any negative factors. Such documentation may include, for instance, a licensed doctor's attestation of prognosis and treatment of a medical condition.

The presence or absence of a medical condition would only be considered a positive or negative factor as it pertains to the alien's likelihood of becoming a public charge; frequently, this would entail consideration of whether, in light of the alien's health, the alien will be able to adequately care for him- or herself, to attend school, or to work.[466]

2. Potential Effects for Aliens With a Disability, Depending on Individual Circumstances

As noted above, DHS would consider any immigration medical examination submitted with the alien's application, as well as any other evidence demonstrating that the individual has a medical condition that will affect the alien's ability to work, attend school, or otherwise support himself or herself. As part of the immigration medical examination, when identifying a Class B medical condition, civil surgeons and panel physicians are required to report on certain disabilities, including the nature and severity of the disability, its impact on the alien's ability to work, attend school, or otherwise support himself or herself, and whether the disability will require hospitalization or institutionalization. Under the proposed rule, DHS would only consider disability as part of the health factor to the extent that such disability, in the context of the alien's individual circumstances, impacts the likelihood of the alien becoming a public charge. Frequently, this would entail consideration of the potential effects on the alien's ability to work, attend school or otherwise support him or herself.

---

[459] 42 CFR 34.4(b)(2).

[460] See INA section 212(g)(1), 8 U.S.C. 1182(g)(1). Although a waiver is unavailable for inadmissibility due to drug abuse or addiction, an applicant may still overcome this inadmissibility if his or her drug abuse or addiction is found to be in remission. See Ctrs. for Disease Control & Prevention, *Technical Instructions for Panel Physicians and Civil Surgeons, Remission, available at https:// www.cdc.gov/immigrantrefugeehealth/exams/ti/ civil/mental-civil-technical-instructions.html* (last updated Oct. 23, 2017).

[461] See 42 CFR 34.2(b)(2).

[462] See Ctrs. for Disease Control & Prevention, *Required Evaluations—Other Physical or Mental Abnormality, Disease, or Disability, Technical Instructions For Medical Examination Of Aliens, available at https://www.cdc.gov/ immigrantrefugeehealth/exams/ti/panel/technical-instructions/panel-physicians/other-physical-mental.html* (last updated Nov. 23, 2016); Ctrs. for Disease Control & Prevention, *Required Evaluation Components Other Physical or Mental Abnormality, Disease or Disability, Technical Instructions for the Medical Examination of Aliens in the United States, available at https://www.cdc.gov/ immigrantrefugeehealth/exams/ti/civil/technical-instructions/civil-surgeons/required-evaluation-components/other-disease-disability.html* (last

updated Aug. 3, 2010). The HHS regulations require physicians conducting medical examinations for an alien to comply with the CDC's Technical Instructions for Medical Examinations of Aliens. 42 CFR 34.3(i).

[463] See 42 CFR 34.4(c)(1).

[464] See 42 CFR 34.2(*l*) (defining a medical notification as "[a] medical examination document issued to a U.S. consular authority or DHS by a medical examiner").

[465] 42 CFR 34.4(c)(2).

[466] Relatedly, as part of the assets, resources and financial status factor, DHS would consider whether the alien either has sufficient household assets and resources, including private health insurance, to cover any reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work.

The Rehabilitation Act of 1973[467] and the Americans with Disabilities Act (ADA) of 1990[468] prohibit discrimination against individuals based on their disabilities.[469] Both laws require, among other things, that employers provide reasonable accommodations for individuals with disabilities who need them to apply for a job, perform a job's essential functions, or enjoy equal benefits and privileges of employment, absent undue hardship (*i.e.,* significant difficulty or expense). The Individuals with Disabilities Education Act (IDEA)[470] ensures equality of educational opportunity and assists States in providing special education and related services to children with disabilities. Further, DHS is specifically prohibited from discriminating against individuals with disabilities and otherwise preventing individuals with disabilities from participating in benefits programs.[471] Congress has noted that "[d]isability is a natural part of the human experience and in no way diminishes the right of individuals to . . . contribute to society; pursue meaningful careers; and enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society." [472] Individuals with disabilities have substantial contributions to the American economy. For example, in 2010, 41.1 percent of people with disabilities between the ages of 21 to 64 were employed (27.5 percent of adults with severe disability and 71.2 percent of adults with non-severe disabilities were employed) during a study conducted by the CDC.[473] The ADA,[474] the Rehabilitation Act of 1973,[475] and the IDEA [476] provide further protections for individuals with disabilities to better ensure that such individuals have the opportunity to make such contributions.[477]

Ultimately, DHS has determined that considering, as part of the health factor, an applicant's disability diagnosis that, in the context of the alien's individual circumstances, affects his or her ability to work, attend school, or otherwise care for him or herself, is not inconsistent with federal statutes and regulations with respect to discrimination, as the alien's disability is treated just as any other medical condition that affects an alien's likelihood, in the totality of the circumstances, of becoming a public charge. Under the totality of the circumstances framework, an alien with a disability is not being treated differently, or singled out, and the disability itself would not be the sole basis for an inadmissibility finding. In other words, as with any other factor and consideration in the public charge inadmissibility determination, DHS would look at each of the mandatory factors, and the affidavit of support, if required, as well as all other factors in the totality of the circumstances.

In sum, an applicant's disability could not be the sole basis for a public charge inadmissibility finding. In addition, as part of its totality of the circumstances determination, DHS would always recognize that the ADA, the Rehabilitation Act, IDEA, and other laws provide important protections for individuals with disabilities, including with respect to employment opportunities. Furthermore, as it relates to a determination of inadmissibility under section 212(a)(4) of the Act, DHS does not stand in the position of an employer vis-a-vis when the alien is applying for the immigration benefit. DHS is also not proposing to include employee benefits of any type in the definition of public benefit.

*F. Family Status*

An applicant's family status is a factor that must be considered when determining whether the alien is likely to become a public charge in the future.[478] When considering an alien's family status, DHS proposes to consider whether the alien has a household to support, or whether the alien is being supported by another household and whether the alien's household size makes the alien more or less likely to become a public charge. DHS notes that it would frequently view family status in connection with, among other things, the alien's assets and resources, because the amount of assets and resources necessary to support a larger number of people in a household is generally greater. Thus, as described in the Assets, Resources, and Financial Status section below, DHS's proposed standard for evaluating assets, resources and financial status requires DHS to consider whether the alien can support him or herself and the household as defined in 8 CFR 212.21(d), at the level of at least 125 percent of the most recent FPG based on the alien's household size.

As noted in the description above of the proposed definition of the "alien's household," an alien who has no dependents would have a household of one, and would only have to support him or herself. By contrast, a child alien who is part of a parent's household would be part of a larger household, and would have to demonstrate that his or her own assets, resources and financial status and his or her parent's or legal guardian's assets, resources, and financial status are sufficient to support the alien and the rest of the household.

The research and data below discuss how the number of household members may affect the likelihood of receipt of public benefits. Table 16 and Table 17 show that among both U.S. citizens and noncitizens, the receipt of non-cash benefits generally increased as family size increased. Among U.S. citizens, individuals in families with 3 or 4 persons were more likely to receive non-cash benefits compared to families of 2, while individuals in families of 5 or more were about three times as likely to receive non-cash benefits as families of 2. Among noncitizens in families with 3 or 4 people, about 20 percent received non-cash assistance, while about 30 percent of noncitizens in families of 5 or more received non-cash benefits. Across family sizes, the rate of receipt of cash assistance ranged from about 3 to 5 percent among U.S. citizens, and about 1 to 3 percent among noncitizens. The rate of receipt of either TANF or GA

---

[467] Public Law 93–112, section 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. 794) (prohibiting discrimination solely on the basis of disability in Federal and federally-funded programs and activities).

[468] Public Law 101–336, 104 Stat. 327 (codified as amended at 42 U.S.C. 12101–12213).

[469] *See* 42 U.S.C. 12112(b)(5); *see also* 29 CFR 1630.2(o), 1630.9.

[470] Public Law 108–446, 118 Stat 2647 (2004) (codified as amended at 20 U.S.C. 1400–1482).

[471] *See* 6 CFR 15.30(b)(1)(i) ("The Department, in providing any aid, benefit, or service, may not directly or through contractual, licensing, or other arrangements, on the basis of disability . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service . . . ."); 6 CFR 15.30(b)(4) ("The Department may not, directly or through contractual or other arrangements, utilize criteria or methods of administration the purpose or effect of which would [s]ubject qualified individuals with a disability to discrimination on the basis of disability; or [d]efeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with a disability.").

[472] *See* 29 U.S.C. 701(3).

[473] *See* Mathew W. Brault, U.S. Census Bureau, *Americans With Disabilities: 2010*, at 10 (2012), *available at https://www2.census.gov/library/publications/2012/demo/p70-131.pdf*.

[474] *See* Public Law 101–336, 104 Stat. 327 (1990) (codified as amended at 42 U.S.C. 12101–12213).

[475] *See* Public Law 93–112, section 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. 794).

[476] *See* Public Law 108–466, 118 Stat 2647 (2004) (codified as amended at 20 U.S.C. 1400–1482).

[477] *See generally* Dep't of Justice, Civil Rights Div., Disability Rights Sec., *A Guide to Disability Rights Laws* (July 2009), *https://www.ada.gov/cguide.htm*.

[478] *See* proposed 8 CFR 212.2; *see also* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

was about 1 percent or less regardless of family size or citizenship status.

**BILLING CODE 4410–10–P**

| Table 16.  Public Benefit Participation Among U.S. Citizens by Family Size, 2013 (in thousands) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Nonfamily household | | | Family size 2 | | | Family size 3 | | |
| **Total Population** 310,867 | Population 59,207 | % of Total Population 19.0% | | Population 76,493 | % of Total Population 24.6% | | Population 51,516 | % of Total Population 16.6% | |
| **Benefit program** | Total | Pct. | S.E. | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 11,002 | 18.6% | 0.5% | 9,867 | 12.9% | 0.4% | 11,296 | 21.9% | 0.5% |
| Cash benefits | 3,072 | 5.2% | 0.3% | 2,221 | 2.9% | 0.2% | 2,000 | 3.9% | 0.2% |
| *SSI* | 2,795 | 4.7% | 0.3% | 1,794 | 2.3% | 0.2% | 1,332 | 2.6% | 0.2% |
| *TANF* | *83 | *0.1% | 0.0% | 269 | 0.4% | 0.1% | 544 | 1.1% | 0.1% |
| *GA* | 279 | 0.5% | 0.1% | 222 | 0.3% | 0.1% | 194 | 0.4% | 0.1% |
| Non-cash benefits | 10,640 | 18.0% | 0.5% | 9,451 | 12.4% | 0.4% | 11,014 | 21.4% | 0.5% |
| *Medicaid* | 6,617 | 11.2% | 0.4% | 7,108 | 9.3% | 0.3% | 8,920 | 17.3% | 0.5% |
| *SNAP* | 6,095 | 10.3% | 0.4% | 5,231 | 6.8% | 0.3% | 6,154 | 11.9% | 0.4% |
| *Housing vouchers* | 1,038 | 1.8% | 0.2% | 747 | 1.0% | 0.1% | 938 | 1.8% | 0.2% |
| *Rent subsidy* | 3,488 | 5.9% | 0.3% | 2,170 | 2.8% | 0.2% | 2,058 | 4.0% | 0.3% |

| | Family size 4 | | | Family size 5+ | | |
|---|---|---|---|---|---|---|
| **Total Population** 310,867 | Population 53,883 | % of Total Population 17.3% | | Population 49,604 | % of Total Population 16.0% | |
| **Benefit program** | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 11,200 | 20.8% | 0.5% | 17,115 | 34.5% | 0.6% |
| Cash benefits | 1,342 | 2.5% | 0.2% | 1,796 | 3.6% | 0.2% |
| *SSI* | 708 | 1.3% | 0.1% | 1,023 | 2.1% | 0.2% |
| *TANF* | 592 | 1.1% | 0.1% | 693 | 1.4% | 0.2% |
| *GA* | *81 | *0.2% | 0.0% | 124 | 0.3% | 0.1% |
| Non-cash benefits | 11,035 | 20.5% | 0.5% | 16,888 | 34.0% | 0.6% |
| *Medicaid* | 9,387 | 17.4% | 0.5% | 14,412 | 29.0% | 0.6% |
| *SNAP* | 5,895 | 10.9% | 0.4% | 9,709 | 19.6% | 0.5% |
| *Housing vouchers* | 802 | 1.5% | 0.2% | 1,121 | 2.3% | 0.2% |
| *Rent subsidy* | 1,668 | 3.1% | 0.2% | 2,179 | 4.4% | 0.3% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.
**Nonfamily households consist of an individual living alone or living only with nonrelatives.

**Table 17. Public Benefit Participation Among Noncitizens by Family Size, 2013 (in thousands)**

| | Nonfamily household | | | Family size 2 | | | Family size 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| **Total Population**<br>310,867 | **Population**<br>3,638 | **% of Total Population**<br>1.2% | | **Population**<br>3,268 | **% of Total Population**<br>1.1% | | **Population**<br>3,411 | **% of Total Population**<br>1.1% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 533 | 14.7% | 1.7% | 632 | 19.3% | 2.2% | 768 | 22.5% | 2.2% |
| Cash benefits | 97 | 2.7% | 0.8% | *81 | *2.5% | 0.9% | *35 | *1.0% | 0.5% |
| *SSI* | *79 | *2.2% | 0.7% | *56 | *1.7% | 0.7% | *20 | *0.6% | 0.4% |
| *TANF* | *4 | *0.1% | 0.2% | *25 | *0.8% | 0.5% | *8 | *0.2% | 0.2% |
| *GA* | *14 | *0.4% | 0.3% | *4 | *0.1% | 0.2% | *8 | *0.2% | 0.3% |
| Non-cash benefits | 516 | 14.2% | 1.7% | 624 | 19.1% | 2.2% | 761 | 22.3% | 2.2% |
| *Medicaid* | 308 | 8.5% | 1.4% | 372 | 11.4% | 1.8% | 547 | 16.0% | 1.9% |
| *SNAP* | 225 | 6.2% | 1.2% | 216 | 6.6% | 1.4% | 240 | 7.0% | 1.3% |
| *Housing vouchers* | *17 | *0.5% | 0.3% | *69 | *2.1% | 0.8% | *49 | *1.4% | 0.6% |
| *Rent subsidy* | 178 | 4.9% | 1.1% | 209 | 6.4% | 1.4% | 130 | 3.8% | 1.0% |

| | Family size 4 | | | Family size 5+ | | |
|---|---|---|---|---|---|---|
| **Total Population**<br>310,867 | **Population**<br>4,056 | **% of Total Population**<br>1.3% | | **Population**<br>5,789 | **% of Total Population**<br>1.9% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 842 | 20.7% | 1.9% | 1,783 | 30.8% | 1.8% |
| Cash benefits | *52 | *1.3% | 0.5% | 104 | 1.8% | 0.5% |
| *SSI* | *43 | *1.0% | 0.5% | *57 | *1.0% | 0.4% |
| *TANF* | *8 | *0.2% | 0.2% | *29 | *0.5% | 0.3% |
| *GA* | *1 | *0.0% | 0.1% | *19 | *0.3% | 0.2% |
| Non-cash benefits | 837 | 20.6% | 1.9% | 1,760 | 30.4% | 1.8% |
| *Medicaid* | 655 | 16.1% | 1.7% | 1,247 | 21.6% | 1.6% |
| *SNAP* | 342 | 8.4% | 1.3% | 804 | 13.9% | 1.3% |
| *Housing vouchers* | *39 | *1.0% | 0.5% | 113 | 2.0% | 0.5% |
| *Rent subsidy* | 111 | 2.7% | 0.8% | 241 | 4.2% | 0.8% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.
**Nonfamily households consist of an individual living alone or living only with nonrelatives.

BILLING CODE 4410–10–C

In light of the above data on the relationship between family size and receipt of public benefits, DHS proposes that in evaluating family status for purposes of the public charge inadmissibility determination, DHS would consider the number of people in a household as defined in the proposed 8 CFR 212.21(d). As with the other factors, household size, on its own, would never dictate the outcome of a public charge inadmissibility determination. Regardless of household size, that an alien may present other factors (*e.g.*, assets, resources, financial status, education, and skills) that weigh for or against a finding that the alien is likely to become a public charge. For instance, an alien who is part of a large household may have his or her own income or access to additional assets and resources that would assist in supporting the household and therefore would also be considered in the totality of the circumstances.

*G. Assets, Resources, and Financial Status*

In addition to age, health, and family status, USCIS must consider an applicant's assets, resources, and financial status in making a public charge determination. The statute does not define these terms, but the agency has historically interpreted these terms to include information that would provide an overview of the alien's financial means and overall financial health. Since Legacy INS issued the 1999 Interim Field Guidance, the practical focus has been primarily on the sufficiency of an Affidavit of Support submitted on the alien's behalf. However, given that the statute sets out the Affidavit of Support as a separate

---

[479] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

requirement and the statute includes the mandatory review of assets, resources and financial status as a factor,[480] DHS is proposing to consider in the totality of the circumstances whether the alien can, taking into account both the alien's assets and liabilities, establish the ability to support himself or herself and the household as defined in the proposed 8 CFR 212.21(d).

All else being equal, the more assets and resources an alien has, the more self-sufficient the alien is likely to be, and the less likely the alien is to receive public benefits. On the other hand, an alien's lack of assets and resources, including income, makes an alien more likely to receive public benefits. Whether a person may be qualified for public benefits frequently depends on where the person's household income falls with respect to the FPG.[481] Federal, State, and local public benefit granting agencies frequently use the FPG to determine eligibility for public benefits.[482] Some major means-tested programs, however, rely on different income-related measurements for purposes of determining eligibility.[483]

Because assets and resources include the employment income earned by an alien and the members of an alien's household, and are an important factor in determining whether the alien is likely to receive public benefits in the future, DHS proposes that when considering an alien's assets and resources, DHS will consider whether the alien has gross household income of at least 125 percent of the FPG based on the household size. If the alien's household income is less than 125 percent of the FPG, the alien's other household assets and resources should be at least 5 times the difference between the household income and 125

of the FPG based on the household size.[484]

DHS has chosen a household income of at least 125 percent of the FPG, which has long served as a touchpoint for public charge inadmissibility determinations.[485] As of February 2018, 125 percent of FPG ranges from approximately $20,300 for a family of two to $51,650 for a family of eight.[486] Additionally, consistent with the affidavit of support context, if the alien's household income is under 125 percent of the FPG, the alien may use his or her assets, as well household members' assets, to meet the minimum income threshold to avoid the alien's household income being considered a negative factor in the totality of the circumstances review.[487] If using household assets to demonstrate that the alien can meet the 125 percent of FPG threshold, the alien must present evidence that the assets total value is at least 5 times the difference between the household income and 125 percent of FPG for the household size.

The following example illustrates how an applicant would be able to use his or her household assets and resources to demonstrate that he or she has financial support at 125 percent of the FPG. The applicant has filed an application for adjustment of status. The applicant has a household size of 4, where 125 percent of the FPG for that household size is $31,375. The applicant's household income is $24,000, which is $7,375 below 125 percent of the FPG for a household of 4. Therefore, in order to avoid DHS determining that the applicant's household income is a negative factor in the totality of the circumstances, the alien would need $36,875 in household assets and resources.

An alien's financial status would also include the alien's liabilities as evidenced by the alien's credit report and score, as well as whether the alien has in the past, or is currently, receiving public benefits, among other considerations. Below, DHS describes the proposed rule's evidentiary requirements for this factor.

DHS welcomes public comments on whether 125 percent of the FPG is an appropriate threshold in considering the alien's assets and resources or if there

are other potential alternatives, including any studies or data that would provide a basis for a different measure or threshold.

1. Evidence of Assets and Resources

DHS proposes that USCIS would consider certain types of evidence when reviewing this factor. USCIS consideration of an alien's assets and resources would include, but not be limited to, a review of such information as:

• The alien's annual gross household income (i.e., all sources of income before deductions), excluding any income from public benefits;

• Any additional income from individuals not included in the alien's household as defined in the proposed 8 CFR 212.21(d) who physically reside with the alien and whose income will be relied on by the alien to meet the proposed standard of household income at or above 125 percent of FPG;

• Any additional income to the alien from another person or source not included in the alien's household on a continuing monthly or yearly basis for the most recent calendar year, excluding any income from public benefits;

• The household's cash assets and resources, including as reflected in checking and savings account statements in the last 12 months;

• The household's non-cash assets and resources that can be converted into cash within 12 months, such as net cash value of real estate holdings minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home; annuities; securities; retirement and educational accounts; and any other assets that can be converted into cash easily.

All of this information is potentially relevant to a determination of the alien's assets and resources, and likelihood of becoming a public charge.

2. Evidence of Financial Status

When reviewing whether the alien has any financial liabilities or past reliance on public benefits that make the alien more or less likely to become a public charge, DHS proposes to review the following evidence:

• Evidence that the alien has applied for or received any public benefit, as defined in the proposed 8 CFR 212.21(b), on or after the effective date of the final rule;

• Been certified or approved to receive public benefits, as defined in 8 CFR 212.21(b), on or after the effective date of the final rule;

• Evidence that the alien has applied for or received a fee waiver for

---

[480] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[481] The poverty guidelines are updated periodically in the **Federal Register** by HHS. The U.S. Census Bureau definition of family and family household can be found in U.S. Census Bureau, *Current Population Survey 2017 Annual Social and Economic Supplement (ASEC)* 9–1 to 9–2, *available at https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar17.pdf* (last visited Sept. 13, 2018).

[482] Different Federal programs use different percentages of the FPG such as 125 percent, 150 percent, or 185 percent. *See* U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Frequently Asked Questions Related to the Poverty Guidelines and Poverty, What Programs Use the Federal Poverty Guidelines, available at* https://aspe.hhs.gov/frequently-asked-questions-related-poverty-guidelines-and-poverty #collapseExample9 (last visited Sept. 8, 2018).

[483] *See* U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Frequently Asked Questions Related to the Poverty Guidelines and Poverty, What Programs Use the Federal Poverty Guidelines, available at* https://aspe.hhs.gov/frequently-asked-questions-related-poverty-guidelines-and-poverty#collapse Example9 (last visited Sept. 8, 2018).

[484] This is consistent with the provisions for assets under the affidavit of support in 8 CFR 213a.2(c)(2)(iii)(B)(3).

[485] *See* INA section 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E).

[486] *Annual Update of the HHS Poverty Guidelines*, 83 FR 2642 (Jan. 18, 2018).

[487] *See* INA section 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E).

immigration benefits after the effective date of the final rule;

• Credit histories and credit scores; and

• Whether the alien has the private health insurance or the financial resources to pay for medical costs associated with a medical condition identified in 8 CFR 212.22(b)(2).

(a) Public Benefits

Current or past applications for or receipt of public benefits, as defined in the proposed 8 CFR 212.21(b), suggests that the alien's overall financial status is so weak that he or she is or was unable to fully support him or herself without government assistance, *i.e.,* that the alien will receive such benefits in the future. DHS, therefore, proposes to consider any current and past receipt of public benefits as set forth in 8 CFR 212.21(b) as a negative factor in the totality of the circumstances, because it is indicative of a weak financial status and increases the likelihood that the alien will become a public charge in the future. The weight given to this factor would depend on how recently the alien has received public benefits, and whether the person has received public benefits for an extended period of time (*i.e.,* receives public benefits for multiple years) or at multiple different time periods (*i.e.,* 3 times in the last two years).[488]

DHS would also consider whether the alien has been certified or approved to receive public benefits, as defined in 8 CFR 212.21(b), on or after the effective date of the final rule. For example, a person may be certified for SNAP benefits for a month or up to 24 months at one time and then receive the benefits from the EBT card on a monthly basis. In general, an alien who is certified or preapproved for benefits in the future is likely to continue to receive public benefits in the future. An alien nevertheless may otherwise establish that he or she has terminated the receipt of those benefits through documentation from the benefit-granting agency.

DHS recognizes that a person who previously received public benefits may have changed circumstances and DHS would review those circumstances as part of the totality of the circumstances. For example, where an alien is currently unemployed and finishing a college education and received benefits, the alien may provide evidence that he or she has pending employment with benefits upon graduation from college and attaining a degree. It is possible that

[488] This proposed policy is generally consistent with longstanding policy affording less weight to benefits that were received longer ago in the past.

in the review of the totality of the circumstances, the alien would not be found likely to become a public charge.

Review of past applications for or receipt of public benefits would include a review of both cash and non-cash public benefits as defined in the proposed 8 CFR 212.21(b). According to the U.S. Census Bureau, in 2012, approximately 52.2 million people in the United States (or 21.3 percent of the overall population) participated in major means-tested government assistance programs each month.[489] In addition, among those with family income below the poverty level [490] an average of 61.3 percent participated in at least one major means tested benefit.[491] Participation rates were highest for Medicaid (15.3 percent) and SNAP (13.4 percent).[492] The largest share of participants (43.0 percent) who benefited from one or more means-tested assistance programs between January 2009 and December 2012 stayed in the programs between 37 and 48 months.[493]

[489] *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* (May 2015), *available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf; see also* U.S. Census Bureau, *News Release: 21.3 Percent of U.S. Population Participates in Government Assistance Programs Each Month* (May 28, 2015), *available at https://www.census.gov/newsroom/press-releases/2015/cb15-97.html.* The U.S. Census Bureau included Temporary Assistance for Needy Families (TANF), General Assistance (GA), Supplemental Security Income (SSI), Supplemental Nutrition Assistance Program (SNAP), Medicaid, and housing assistance as major means-tested benefits as major means-tested government benefits.

[490] *See* U.S. Census Bureau, *News Release: 21.3 Percent of U.S. Population Participates in Government Assistance Programs Each Month* (May 28, 2015), at 5, *available at https://www.census.gov/newsroom/press-releases/2015/cb15-97.html.* Note that the Census reports use the term income to poverty ratio." A ratio of less than 1 indicates a person's income is below the poverty level. The census report refers to average monthly participation rates.

[491] *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Household Economic Studies, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 6 (May 2015), *available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.* This report includes Temporary Assistance for Needy Families (TANF), General Assistance (GA), Supplemental Security Income (SSI), Supplemental Nutrition Assistance Program (SNAP), Medicaid, and housing assistance as major means-tested benefits.

[492] *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Household Economic Studies, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 6 (May 2015), *available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.*

[493] *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Household Economic Studies, Dynamics of Economic Well-Being: Participation in*

(b) Fee Waivers for Immigration Benefits

Under INA section 286(m), 8 U.S.C. 1356(m), USCIS collects fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including the costs of providing similar services without charge to asylum applicants and other immigrants. USCIS may waive fees for specific immigration benefit forms if a person demonstrates "inability to pay." [494]

DHS proposes that USCIS would consider past receipt of a fee waiver as part of the financial status factor.[495] Requesting or receiving a fee waiver for an immigration benefit suggests a weak financial status. Since fee waivers are based on an inability to pay, a fee waiver for an immigration benefit suggests an inability to be self-sufficient. In addition, the Senate Appropriations Report, which accompanied the fiscal year 2017 Department of Homeland Security Appropriations Act,[496] expressed concern about the increased use of fee waivers, as those paying fees are forced to absorb costs for which they receive no benefit.[497] The committee specifically expressed concern that those unable to pay fees are less likely to live in the United States independent of government assistance.[498]

DHS would not consider a fee exemption as part of the determination of whether an alien is likely to become a public charge,[499] as such exemption would have no bearing on whether an alien would be likely to become a public charge in the future. Fee exemptions are not fee waivers and are not affirmatively requested by an alien based on an inability to pay. Instead, fee exemptions are provided either to specific forms or immigrant categories based on statutory authority, regulations, or agency policy.

(c) Credit Report and Score

As also noted above, DHS also proposes that USCIS would consider an alien's liabilities and information of

*Government Programs, 2009–2012: Who Gets Assistance?* 6 (May 2015), *available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.*

[494] *See* 8 CFR 103.7(c).

[495] This would be inclusive of fee exceptions where an applicant actively requests a fee waiver under 8 CFR 103.7(d).

[496] *See* Public Law 115–31, div. F, 131 Stat. 135, 404.

[497] *See* S. Rep. No. 114–264, at 125 (2016).

[498] *See* S. Rep. No. 114–264, at 125 (2016).

[499] *See* 8 CFR 103.7(d); *see also* 22 CFR 41.107(c) (listing categories of aliens exempt from nonimmigrant visa fees); 9 FAM 403.4–3 (same). Diplomats, UN visitors, U.S. Government employees, and those coming to perform charitable work are typical classes of aliens whose nonimmigrant visa fees are exempted.

such liabilities in a U.S. credit report and score as part of the financial status factor. Not everyone has a credit history in the United States. Nevertheless, a good credit score in the United States is a positive factor that indicates a person is likely to be self-sufficient and support the household. Conversely, a lower credit score or negative credit history in the United States may indicate that a person's financial status is weak and that he or she may not be self-sufficient. Credit reports contain information about a person's bill payment history, loans, current debt, and other financial information.[500] Credit reports may also provide information about work and residences, lawsuits, arrests, and bankruptcies in the United States.[501]

A U.S. credit score is a number that rates a person's credit risk at a point in time.[502] It can help creditors determine whether to give the person credit, affect the terms of credit the person is offered, or impact the rate the person will pay for a loan in the United States.[503] U.S. banks and other entities use credit scoring to determine whether a person is likely to repay any loan or debt. A credit report takes into account a person's bill-paying history, the number and type of accounts with overdue payments, collection actions, outstanding debt, and the age of the accounts in the United States.[504] Because credit reports and scores provide information on a person's financial status, DHS is proposing that USCIS would review any available U.S. credit reports as part of its public charge inadmissibility determinations. USCIS would generally consider a credit score characterized as "good" or better to be a positive factor as it demonstrates an applicant may be able to support him or herself and any dependents assuming all other financial records are sufficient. A "good" credit report is generally near or slightly above the average of U.S.

consumers,[505] and therefore the person may be self-sufficient and less likely to become a public charge. A poor credit report is well below the average of U.S. consumers.[506]

DHS recognizes that not everyone has a credit report in the United States. The absence of an established U.S. credit history would not necessarily be a negative factor when evaluating public charge in the totality of the circumstances. Absent a U.S. credit report or score, USCIS may give positive weight to an alien who can show little to no debt and a history of paying bills timely. An alien may provide evidence of regular and timely payment of bills, and limited balances on credit cards and loans. In addition, USCIS would not consider any error on a credit score that has been verified by the credit agency in determining whether an alien is likely to become a public charge in the future. DHS welcomes comments on whether DHS should also consider credit scores that are categorized less than "good," the types of credit reports to be considered and the type of information from the credit history that should be reviewed.

(d) Financial Means To Pay for Medical Costs

DHS also proposes that USCIS would consider evidence of whether an alien has the financial means for pay for certain reasonably foreseeable medical costs, including through private health insurance, as part of the financial factor for public charge inadmissibility determinations.

Health insurance helps cover the cost of health care and being covered by health insurance programs, other than the ones included in the definition of public benefits under proposed 8 CFR 212.21(b). Some aliens currently obtain health insurance with government funding.[507]

Having private health insurance would be a positive factor in the totality

of the circumstances. DHS would not consider health insurance provided through government employment as a public benefit, but instead consider it a positive factor in the totality of the circumstances. By contrast, lack of health insurance or lack of the financial resources to pay for the medical costs would be a negative factor in the totality of the circumstances for any person.[508]

While having health insurance would generally be a positive factor in the totality of the circumstances, recent (within the past 36 months) or current receipt of health insurance that constitutes a public benefit under proposed 8 CFR 212.21(b), would generally be weighed heavily as a negative factor. Regardless of health status, DHS recognizes that an alien may have financial assets, resources, earned benefits, education or skills, or other support that may decrease his or her likelihood of becoming a public charge and would consider those factors in the totality of the circumstances.

I. Education and Skills

An applicant's education and skills are mandatory statutory factors that must be considered when determining whether an alien is likely to become a public charge in the future.[509] In general, an alien with educational credentials and skills is more employable and less likely to become a public charge. DHS, therefore, proposes that when considering this factor, DHS would consider whether the alien has adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge, if authorized for employment.[510]

---

[500] See USA.gov, Credit Reports and Scores, available at https://www.usa.gov/credit-reports (last updated Mar. 8, 2018).

[501] See USA.gov, Credit Reports and Scores, available at https://www.usa.gov/credit-reports (last updated Mar. 8, 2018).

[502] See USA.gov, Credit Reports and Scores, available at https://www.usa.gov/credit-reports (last updated Mar. 8, 2018).

[503] See USA.gov, Credit Reports and Scores, available at https://www.usa.gov/credit-reports (last updated Mar. 8, 2018).

[504] See Fed. Trade Comm'n, Consumer Information: Credit Scores (Sept. 2013), available at https://www.consumer.ftc.gov/articles/0152-credit-scores#how.

[505] MyFICO, Understanding FICO Scores 5, available at https://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf (last visited Aug. 6, 2018).

[506] MyFICO, Understanding FICO Scores 5, available at https://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf (last visited Aug. 6, 2018).

[507] See Jessica C. Barnett & Edward R. Berchick, U.S. Census Bureau, Health Insurance Coverage in the United States: 2016 Current Population Reports (Sept. 2017), available at https://www.census.gov/content/dam/Census/library/publications/2017/demo/p60-260.pdf.

[508] In 2016, 6,147,000 (26 percent) noncitizens and 1,726,000 (8.4 percent) naturalized citizens did not have health insurance. See U.S. Census Bureau, Current Population Survey, available at https://www.census.gov/cps/data/cpstablecreator.html (last visited Feb. 20, 2018) (Nativity and Health Insurance Coverage). In 2005, the estimated number of uninsured noncitizens was 45 percent (9.6 million people); U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, Estimating The Number Of Individuals in the U.S. Without Health Insurance, Table: Immigration Status (Apr. 8, 2005), available at https://aspe.hhs.gov/dataset/table-1immigration-status.

[509] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[510] The level of education may be an indicator for continued employment. See U.S. Bureau of Labor Statistics, Employment Projections, Unemployment Rates and Earnings by Educational Attainment, 2016, available at https://www.bls.gov/emp/ep_chart_001.htm (last updated Mar. 27, 2018).

Various studies and data support the concept that a person's education and skills are positive factors for self-sufficiency. The U.S. Bureau of Labor Statistics (BLS) observed in 2016 that there was a relationship between the educational level and unemployment rate.[511] The unemployment rate for an individual with a doctoral degree was only 1.6 percent compared to 7.4 percent for an individual with less than a high school diploma.[512] According to the U.S. Census Bureau, lower educational attainment was associated with higher public benefit program participation rates for people over the age of 18.[513] In 2012, 37.3 percent of people who did not graduate from high school received means-tested benefits, compared with 21.6 percent of high school graduates and 9.6 percent of individuals with 1 or more years of college.[514]

Additionally, the data suggest that people who have lower education levels are not only more likely to receive public benefits but they tend to stay on them longer. For example, 49.4 percent of people with less than 4 years of high school who received public benefits from a major means-tested program between January 2009 and December 2012 stayed on the benefit program for 37 to 48 months. In contrast, only 39.3 percent of high school graduates and 29.0 percent of those with 1 or more years of college who received public benefits during the same time period stayed on the public benefit program for 37 to 48 months.[515] The National Center for Education Statistics found that ''[i]n 2015, the poverty rate for children under age 18 was highest for those whose parents had not completed high school (52 percent) and lowest for those whose parents had attained a bachelor's or higher degree (4 percent).'' [516] The data suggests that a lack of education increases the likelihood of poverty and unemployment, which may in turn increase the likelihood to need public assistance.

The results of DHS's analysis of the SIPP data also show a relationship between education level and self-sufficiency. Tables 18 and 19 indicate a relationship between education level and public benefit participation rates among both U.S. citizens and noncitizens in 2013. U.S. citizens with less than a high school education were more likely to participate in either cash or non-cash welfare programs compared to U.S. citizens with any other education level. In particular, 37.2 percent of U.S. citizens with less than a high school education received either cash or non-cash benefits, while 19.2 percent of those with a high school degree and about 13.3 percent with some college received those benefits. When examining the cohort of U.S. citizens that have attained a college degree, only 5.5 percent with a Bachelor's degree, and 2.8 percent with a graduate degree received those benefits. For the noncitizen population, the rate of receipt of cash or non-cash benefits among those with less than a high school education was 28.2 percent, while among those with a diploma had a rate of receipt at 23.6 percent. Among those with some college the rate of receipt for cash and non-cash benefits was 18.0 percent, and with a Bachelor's or graduate degree, the rate was about 10 percent. For U.S. citizens and noncitizens alike, the rate of receipt of cash benefits was much higher among those without a high school education (12.2 percent of U.S. citizens and 3.7 percent of noncitizens) than among any other education group (ranging from between 1 and 4 percent of U.S. citizens, and 1 percent or less of noncitizens).

**BILLING CODE 4410–10–P**

[511] *See* U.S. Bureau of Labor Statistics, *Employment Projections, Unemployment Rates and Earnings by Educational Attainment, 2016, available at https://www.bls.gov/emp/ep_chart_001.htm* (last updated Mar. 27, 2018).

[512] *See* U.S. Bureau of Labor Statistics, *Employment Projections, Unemployment Rates and Earnings by Educational Attainment, 2016, available at https://www.bls.gov/emp/ep_chart_001.htm* (last updated Mar. 27, 2018).

[513] *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 10 (May 2015), *available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.*

[514] *See* Shelley K. Irving &Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 10 (May 2015), *available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.*

[515] *See* Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 10 (May 2015), *available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.*

[516] *See* Nat'l Ctr. for Educ. Statistics, *Characteristics of Children's Families, available at https://nces.ed.gov/programs/coe/indicator_cce.asp#* (last updated May 2018).

| Table 18. Public Benefit Participation of U.S. Citizens Age 18+, by Education Level, 2013 (in thousands) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Less than High School | | | High School graduate | | | Some college/Associate's degree | | |
| Total Population 310,867 | Population 23,141 | % of Total Population 7.4% | | Population 65,539 | % of Total Population 21.1% | | Population 67,138 | % of Total Population 21.6% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 8,607 | 37.2% | 0.9% | 12,577 | 19.2% | 0.4% | 8,896 | 13.3% | 0.4% |
| Cash benefits | 2,823 | 12.2% | 0.6% | 2,835 | 4.3% | 0.2% | 1,453 | 2.2% | 0.2% |
| SSI | 2,489 | 10.8% | 0.6% | 2,438 | 3.7% | 0.2% | 1,182 | 1.8% | 0.1% |
| TANF | 198 | 0.9% | 0.2% | 242 | 0.4% | 0.1% | 141 | 0.2% | 0.1% |
| GA | 232 | 1.0% | 0.2% | 228 | 0.3% | 0.1% | 163 | 0.2% | 0.1% |
| Non-cash benefits | 8,250 | 35.7% | 0.9% | 12,152 | 18.5% | 0.4% | 8,587 | 12.8% | 0.4% |
| Medicaid | 5,904 | 25.5% | 0.8% | 8,131 | 12.4% | 0.4% | 5,478 | 8.2% | 0.3% |
| SNAP | 5,176 | 22.4% | 0.7% | 7,435 | 11.3% | 0.4% | 5,051 | 7.5% | 0.3% |
| Housing vouchers | 808 | 3.5% | 0.3% | 993 | 1.5% | 0.1% | 811 | 1.2% | 0.1% |
| Rent subsidy | 2,155 | 9.3% | 0.5% | 2,728 | 4.2% | 0.2% | 2,004 | 3.0% | 0.2% |
| | Bachelor's degree | | | Graduate degree | | | | | |
| Total Population 310,867 | Population 42,426 | % of Total Population 13.6% | | Population 23,771 | % of Total Population 7.6% | | | | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. | | | |
| Cash or non-cash | 2,319 | 5.5% | 0.3% | 676 | 2.8% | 0.3% | | | |
| Cash benefits | 414 | 1.0% | 0.2% | 189 | 0.8% | 0.2% | | | |
| SSI | 367 | 0.9% | 0.1% | 170 | 0.7% | 0.2% | | | |
| TANF | *17 | *0.0% | 0.0% | *19 | *0.1% | 0.1% | | | |
| GA | *37 | *0.1% | 0.0% | - | - | - | | | |
| Non-cash benefits | 2,186 | 5.2% | 0.3% | 608 | 2.6% | 0.3% | | | |
| Medicaid | 1,309 | 3.1% | 0.3% | 396 | 1.7% | 0.3% | | | |
| SNAP | 930 | 2.2% | 0.2% | 335 | 1.4% | 0.2% | | | |
| Housing vouchers | 197 | 0.5% | 0.1% | *35 | *0.1% | 0.1% | | | |
| Rent subsidy | 609 | 1.4% | 0.2% | 151 | 0.6% | 0.2% | | | |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

**Table 19. Public Benefit Participation of Noncitizens Age 18+, by Education Level, 2013 (in thousands)**

| | Less than High School | | | High School graduate | | | Some college/Associate's degree | | |
|---|---|---|---|---|---|---|---|---|---|
| **Total Population** 310,867 | Population | % of Total Population | | Population | % of Total Population | | Population | % of Total Population | |
| | 6,881 | 2.2% | | 4,518 | 1.5% | | 2,749 | 0.9% | |
| **Benefit program** | Total | Pct. | S.E. | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 1,943 | 28.2% | 1.6% | 1,067 | 23.6% | 1.9% | 493 | 18.0% | 2.3% |
| Cash benefits | 252 | 3.7% | 0.7% | *53 | *1.2% | 0.5% | *22 | *0.8% | 0.5% |
| *SSI* | 200 | 2.9% | 0.6% | *34 | *0.8% | 0.4% | *17 | *0.6% | 0.5% |
| *TANF* | *21 | *0.3% | 0.2% | *19 | *0.4% | 0.3% | *4 | *0.2% | 0.2% |
| *GA* | *31 | *0.4% | 0.2% | - | - | - | *4 | *0.2% | 0.2% |
| Non-cash benefits | 1,911 | 27.8% | 1.6% | 1,057 | 23.4% | 1.9% | 485 | 17.7% | 2.2% |
| *Medicaid* | 1,268 | 18.4% | 1.4% | 681 | 15.1% | 1.6% | 338 | 12.3% | 1.9% |
| *SNAP* | 856 | 12.4% | 1.2% | 452 | 10.0% | 1.4% | 172 | 6.2% | 1.4% |
| *Housing vouchers* | 118 | 1.7% | 0.5% | 67 | 1.5% | 0.5% | 34 | 1.2% | 0.6% |
| *Rent subsidy* | 386 | 5.6% | 0.8% | 200 | 4.4% | 0.9% | 108 | 3.9% | 1.1% |

| | Bachelor's degree | | | Graduate degree | | |
|---|---|---|---|---|---|---|
| **Total Population** 310,867 | Population | % of Total Population | | Population | % of Total Population | |
| | 2,502 | 0.8% | | 1,808 | 0.6% | |
| **Benefit program** | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 247 | 9.9% | 1.9% | 122 | 6.7% | 1.9% |
| Cash benefits | *13 | *0.5% | 0.5% | *2 | *0.1% | 0.3% |
| *SSI* | *3 | *0.1% | 0.2% | - | - | - |
| *TANF* | - | - | - | - | - | - |
| *GA* | *10 | *0.4% | 0.4% | *2 | *0.1% | 0.3% |
| Non-cash benefits | 238 | 9.5% | 1.9% | 122 | 6.7% | 1.9% |
| *Medicaid* | 189 | 7.6% | 1.7% | *61 | *3.4% | 1.4% |
| *SNAP* | *70 | *2.8% | 1.1% | *21 | *1.1% | 0.8% |
| *Housing vouchers* | *18 | 0.7% | 0.5% | - | - | - |
| *Rent subsidy* | *29 | *1.2% | 0.7% | *41 | *2.3% | 1.2% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

Moreover, according to the National Center for Education Statistics, increased education is associated with increased employment productivity and increased earnings.[517] Unemployment decreases as skills gained through education increase.[518] In 2013, only 27 percent of U.S. jobs required less than a high school degree, while 74 percent required skills associated with formal education (39 percent required a high school degree, 18 percent required a bachelor's degree, and 16 percent required more than a bachelor's degree).[519]

Tables 20 and 21 below show that among U.S. citizens and noncitizens, individuals holding professional certificates or licenses had lower rates of non-cash means-tested public benefits participation compared to their respective overall populations in 2013.

In particular, 8.5 percent of U.S. citizens and 13.7 percent of noncitizens with professional certificates or licenses received non-cash benefits compared to about 20 percent of the overall U.S. citizen and noncitizen populations. The rate of receipt of cash benefits among those with a professional certificate was 1.4 percent for U.S. citizens and 0.4 percent for noncitizens, compared to a rate of 3.6 percent among U.S. citizens

[517] *See* Nat'l Ctr. for Educ. Statistics, *Education and the Economy: An Indicators Report* (Mar. 1997), *available at* https://nces.ed.gov/pubs97/web/97939.asp.

[518] *See* U.S. Bureau of Labor Statistics, *Employment Projections, Unemployment Rates and Earnings by Educational Attainment, 2016, available at* https://www.bls.gov/emp/ep_chart_001.htm (last updated Mar. 27, 2018).

[519] *See* U.S. Bureau of Labor Statistics, *Education Level and Jobs: Opportunities by State* (Sept. 2014), *available at* https://www.bls.gov/careeroutlook/2014/article/education-level-and-jobs.htm.

overall, and 1.8 percent among
noncitizens overall.

| Table 20. Public Benefit Participation of U.S. Citizens Overall, and with a Professional Certification or License, 2013 (in thousands) | | | | | | |
|---|---|---|---|---|---|---|
| | Citizen | | | Citizen with prof. cert. | | |
| **Total Population** 310,867 | Population 290,704 | % of Total Population 93.5% | | Population 52,514 | % of Total Population 16.9% | |
| **Benefit program** | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 60,480 | 20.8% | 0.2% | 4,683 | 8.9% | 0.4% |
| Cash benefits | 10,429 | 3.6% | 0.1% | 724 | 1.4% | 0.2% |
| *SSI* | 7,652 | 2.6% | 0.1% | 571 | 1.1% | 0.1% |
| *TANF* | 2,181 | 0.8% | 0.0% | *76 | *0.1% | 0.0% |
| *GA* | 900 | 0.3% | 0.0% | *93 | *0.2% | 0.1% |
| Non-cash benefits | 59,029 | 20.3% | 0.2% | 4,447 | 8.5% | 0.4% |
| *Medicaid* | 46,443 | 16.0% | 0.2% | 2,808 | 5.3% | 0.3% |
| *SNAP* | 33,085 | 11.4% | 0.2% | 2,579 | 4.9% | 0.3% |
| *Housing vouchers* | 4,645 | 1.6% | 0.1% | 381 | 0.7% | 0.1% |
| *Rent subsidy* | 11,562 | 4.0% | 0.1% | 1,032 | 2.0% | 0.1% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

| Table 21. Public Benefit Participation of Noncitizens Overall, and with a Professional Certification or License, 2013 (in thousands) | | | | | | |
|---|---|---|---|---|---|---|
| | Noncitizen | | | Noncitizen with prof. cert. | | |
| **Total Population** 310,867 | Population 20,163 | % of Total Population 6.5% | | Population 2,020 | % of Total Population 0.6% | |
| **Benefit program** | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 4,558 | 22.6% | 0.9% | 280 | 13.8% | 2.4% |
| Cash benefits | 370 | 1.8% | 0.3% | *8 | *0.4% | 0.4% |
| *SSI* | 254 | 1.3% | 0.2% | *8 | *0.4% | 0.4% |
| *TANF* | *73 | *0.4% | 0.1% | - | - | - |
| *GA* | *47 | *0.2% | 0.1% | - | - | - |
| Non-cash benefits | 4,498 | 22.3% | 0.9% | 276 | 13.7% | 2.4% |
| *Medicaid* | 3,130 | 15.5% | 0.8% | 197 | 9.8% | 2.1% |
| *SNAP* | 1,828 | 9.1% | 0.6% | *63 | *3.1% | 1.2% |
| *Housing vouchers* | 287 | 1.4% | 0.3% | *16 | *0.8% | 0.6% |
| *Rent subsidy* | 869 | 4.3% | 0.4% | *65 | *3.2% | 1.3% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

Similar to those holding professional certificates or licenses, the rates of non-cash participation among the U.S. citizen and noncitizen populations were lower for those having an educational certificate compared to their respective overall populations in 2013, as highlighted in Tables 22 and 23. For example, among U.S. citizens, the participation rate for non-cash benefits was 12.7 percent for those having an educational certificate compared to 20.3 percent overall. Among noncitizens, the participation rate for non-cash benefits was very similar to that of U.S. citizens, with a rate of 13.1 percent among those having an educational certificate compared to 21.3 percent overall. The

rate of receipt of cash benefits among those having an educational certificate was about 2.4 percent among U.S. citizens and 0.8 percent among noncitizens.

| Table 22. Public Benefit Participation of U.S. Citizens Overall, and with an Educational Certificate from a College, University, or Trade School, 2013 (in thousands) | | | | | |
|---|---|---|---|---|---|
| | Citizen | | | Citizen with ed. certificate | |
| **Total Population**<br>310,867 | Population<br>290,704 | % of Total Population<br>93.5% | | Population<br>32,068 | % of Total Population<br>10.3% |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 60,480 | 20.8% | 0.2% | 4,250 | 13.3% | 0.6% |
| | | | | | | |
| Cash benefits | 10,429 | 3.6% | 0.1% | 764 | 2.4% | 0.3% |
| *SSI* | 7,652 | 2.6% | 0.1% | 624 | 1.9% | 0.2% |
| *TANF* | 2,181 | 0.8% | 0.0% | *75 | *0.2% | 0.1% |
| *GA* | 900 | 0.3% | 0.0% | *86 | *0.3% | 0.1% |
| | | | | | | |
| Non-cash benefits | 59,029 | 20.3% | 0.2% | 4,061 | 12.7% | 0.5% |
| *Medicaid* | 46,443 | 16.0% | 0.2% | 2,504 | 7.8% | 0.4% |
| *SNAP* | 33,085 | 11.4% | 0.2% | 2,587 | 8.1% | 0.4% |
| *Housing vouchers* | 4,645 | 1.6% | 0.1% | 442 | 1.4% | 0.2% |
| *Rent subsidy* | 11,562 | 4.0% | 0.1% | 1,022 | 3.2% | 0.3% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).[520]
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

---

[520] The SIPP includes questions on professional certification and licenses developed by the Interagency Working Group on Expanded Measures of Enrollment and Attainment (GEMEnA). *See* Nat'l Ctr. for Educ. Statistics, *Working Definitions of Non-Degree Credentials, https://nces.ed.gov/surveys/gemena/definitions.asp* (last visited Sept. 12, 2018); *see also* U.S. Bureau of Labor Statistics, *Adding Questions on Certifications and Licenses to the Current Population Survey* (Nov. 2016), *available at https://www.bls.gov/opub/mlr/2016/article/pdf/adding-questions-on-certifications-and-licenses-to-the-current-population-survey.pdf.* GEMEnA developed working definitions that categorize certification as a credential awarded by a non-governmental body, and involve successfully passing an examination. A license is awarded by a government agency and provides legal authority to do a specific job. Both certifications and licenses are time-limited, so must be renewed periodically. Educational certificates are awarded by an educational institution and need not be renewed. See also *See* U.S. Bureau of Labor Statistics, *Education Level and Jobs: Opportunities by State* (Sept. 2014), *available at https://www.bls.gov/careeroutlook/2014/article/education-level-and-jobs.htm.*

| Table 23. Public Benefit Participation of Noncitizens Overall, and with an Educational Certificate from a College, University, or Trade School, 2013 (in thousands) | | | | | |
|---|---|---|---|---|---|
| | Noncitizen | | | Noncitizen with ed. certificate | |
| **Total Population** 310,867 | Population 20,163 | % of Total Population 6.5% | | Population 1,178 | % of Total Population 0.4% |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 4,558 | 22.6% | 0.9% | 159 | 13.5% | 3.1% |
| Cash benefits | 370 | 1.8% | 0.3% | *9 | *0.8% | 0.8% |
| SSI | 254 | 1.3% | 0.2% | *9 | *0.8% | 0.8% |
| TANF | *73 | *0.4% | 0.1% | - | - | - |
| GA | *47 | *0.2% | 0.1% | - | - | - |
| Non-cash benefits | 4,498 | 22.3% | 0.9% | 155 | 13.1% | 3.0% |
| Medicaid | 3,130 | 15.5% | 0.8% | 106 | 9.0% | 2.6% |
| SNAP | 1,828 | 9.1% | 0.6% | *55 | *4.7% | 1.9% |
| Housing vouchers | 287 | 1.4% | 0.3% | *3 | *0.3% | 0.5% |
| Rent subsidy | 869 | 4.3% | 0.4% | *40 | *3.4% | 1.6% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).[521]
* Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

Relatedly, English language proficiency is a skill that also is relevant in determining whether an alien is likely to become a public charge in the future. An inability to speak and understand English may adversely affect whether an alien can obtain employment.[522] Aliens who cannot speak English may be unable to obtain employment in areas where only English is spoken. People with the lowest English speaking ability tend to have the lowest employment rate, lowest rate of full-time employment, and lowest median earnings.[523] According to U.S. Census Bureau data, people who spoke a language other than English at home were less likely to be employed, and less likely to find full-time work when employed.[524] In a 2005 study, "on average, workers who spoke only English earned $5,600 more than people who spoke another language," [525] however, between the people who spoke English "very well" and people who spoke only English the difference was only $966.[526] People who spoke English "very well" had higher earnings than people who spoke English "well"—an earning differential of $7,000.[527]

Table 24 highlights a relationship between English language proficiency and public benefit participation in 2013.

Among the noncitizen adults who speak a language other than English at home, the participation rates for both cash and non-cash benefits are higher among those who do not speak English well, or at all, than among those who speak the language well. The SIPP data indicate that the rate of coverage of non-cash benefits among those who spoke English either well or very well (about 15 to 20 percent) was significantly lower than the rate among those who either spoke English poorly or not at all (about 25 to 30 percent). The rate of receipt of cash benefits for each of these groups ranged from about 1 to 5 percent.

[521] See Nat'l Ctr. for Educ. Statistics, *Working Definitions of Non-Degree Credentials, https:// nces.ed.gov/surveys/gemena/definitions.asp* (last visited Sept. 12, 2018).

[522] See Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 2 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf*.

[523] See Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 6 (2005), *available*

*at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf*.

[524] See Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 6 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf*.

[525] See Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 6 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf*.

[526] See Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 6 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf*.

[527] See Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 6 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf*.

**Table 24: Public Benefit Participation of Noncitizens Age 18+ who Speak a Language other than English at Home, by How Well English is Spoken, 2013 (in thousands)**

| | Very well | | | Well | | |
|---|---|---|---|---|---|---|
| **Total Population** | **Population** | **% of Total Population** | | **Population** | **% of Total Population** | |
| 310,867 | 4,274 | 1.4% | | 3,157 | 1.0% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 703 | 16.5% | 1.8% | 567 | 18.0% | 2.1% |
| Cash benefits | *50 | *1.2% | 0.5% | *32 | *1.0% | 0.5% |
| *SSI* | *28 | *0.6% | 0.4% | *22 | *0.7% | 0.5% |
| *TANF* | *10 | *0.2% | 0.2% | *10 | *0.3% | 0.3% |
| *GA* | *13 | *0.3% | 0.3% | *4 | *0.1% | 0.2% |
| Non-cash benefits | 680 | 15.9% | 1.8% | 554 | 17.6% | 2.0% |
| *Medicaid* | 426 | 10.0% | 1.4% | 393 | 12.4% | 1.8% |
| *SNAP* | 230 | 5.4% | 1.1% | 273 | 8.7% | 1.5% |
| *Housing vouchers* | *29 | *0.7% | 0.4% | *34 | *1.1% | 0.6% |
| *Rent subsidy* | 121 | 2.8% | 0.8% | *61 | *1.9% | 0.7% |
| | **Not well** | | | **Not at all** | | |
| **Total Population** | **Population** | **% of Total Population** | | **Population** | **% of Total Population** | |
| 310,867 | 3,243 | 1.0% | | 1,558 | 0.5% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 797 | 24.6% | 2.2% | 488 | 31.3% | 3.4% |
| Cash benefits | *65 | *2.0% | 0.7% | *84 | *5.4% | 1.7% |
| *SSI* | *49 | *1.5% | 0.6% | *79 | *5.1% | 1.6% |
| *TANF* | *8 | *0.2% | 0.2% | - | - | - |
| *GA* | *8 | *0.3% | 0.3% | *5 | *0.3% | 0.4% |
| Non-cash benefits | 797 | 24.6% | 2.2% | 481 | 30.8% | 3.4% |
| *Medicaid* | 524 | 16.2% | 1.9% | 350 | 22.5% | 3.1% |
| *SNAP* | 275 | 8.5% | 1.4% | 210 | 13.5% | 2.5% |
| *Housing vouchers* | *47 | *1.5% | 0.6% | *20 | *1.3% | 0.8% |
| *Rent subsidy* | 180 | 5.6% | 1.2% | 97 | 6.2% | 1.8% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

BILLING CODE 4410–10–C

Additionally, numerous studies have shown that immigrants' English language proficiency or ability to acquire English proficiency directly correlate to a newcomer's economic assimilation into the United States.[528]

[528] Barry R. Chiswick & Paul W. Miller, *Immigrant Earnings: Language Skills, Linguistic Concentrations and the Business Cycle*, 15 J. Population Econ., 31, 31–57 (2002); Christian Dustmann, *Fluency, Writing Fluency, and Earnings of Migrants*, 7 J. Population Econ., 133, 133–156 (1994); Ingo E. Isphording, IZA Discussion Paper No. 7360, *Disadvantages of Linguistic Origin: Evidence from Immigrant Literacy Scores* (2013), *available at http://ftp.iza.org/dp7360.pdf*; Org. for Econ. Cooperation & Dev./European Union, *Indicators of Immigrant Integration 2015: Settling In*

DHS may also consider an applicant's proficiency in other languages in addition to English, with appropriate consideration given to market demand, when reviewing the education and skills factor.

1. USCIS Evidentiary Requirements

DHS proposes that USCIS would consider certain types of evidence when reviewing this factor. For the reasons expressed above, USCIS' review would include, but not be limited to:

• Evidence of the alien's recent history of employment;

(2015), *available at http://www.oecd.org/els/mig/ Indicators-of-Immigrant-Integration-2015.pdf*.

• The alien's academic degree or certifications including a high school degree (or equivalent) or higher;

• The alien's occupational skills, certifications, or licenses; and

• The alien's proficiency in English or proficiencies in additional languages.

*J. Prospective Immigration Status and Expected Period of Admission*

DHS would also take into consideration the immigration status and duration of admission sought by an alien, and the classification the alien is seeking, as part of this determination. The type of evidence generally required of an applicant for an immigrant visa,

admission as an immigrant, or adjustment of status would generally differ in scope from the evidence required of a bona fide applicant seeking a nonimmigrant visa or admission as a nonimmigrant. For example, an alien seeking permanent residence in the United States may be eligible for certain public benefits upon his or her entry as a permanent resident or after five years. As a result, there is a chance that he or she would avail him or herself of the available public benefit. USCIS would consider this possibility in the totality of the circumstances.

On the other hand, aliens who are coming to the United States temporarily as a nonimmigrant may be less likely to avail themselves of public benefits, particularly if they are coming to the United States for a short period of time or if they are coming to the United States for employment purposes. For example, an alien coming to the United States on a nonimmigrant visitor (B–2) for a vacation in the United States for two weeks must establish he or she has sufficient funds to cover any expenses in the United States. Therefore, generally, a nonimmigrant visitor would be unlikely to avail him or herself of any public benefits for which he or she would be eligible based on being lawfully present in the United States. Therefore, such an alien, if otherwise entitled to a nonimmigrant visa and admission as a nonimmigrant, generally would not be subject to the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), although it is possible that evidence may exist that gives rise to a public charge concern.

### K. Affidavit of Support

Failure to submit a required affidavit of support when required under section 212(a)(4)(C) or section 212(a)(4)(D) of the Act, 8 U.S.C. 1182(a)(4)(C) or 1182(a)(4)(D), necessarily results in a determination of inadmissibility based on the public charge ground without review of any other statutory factors.[529] For aliens who submit an affidavit of support, the statute allows DHS to consider the affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, in public charge inadmissibility determinations.[530] DHS, therefore, proposes to consider any required

affidavit of support[531] as part of the totality of the circumstances.

#### 1. General Consideration of Sponsorship and Affidavits of Support

DHS would consider a sponsor's facially sufficient affidavit of support as a positive factor in the totality of the circumstances, but a sufficient affidavit of support alone would not result in a finding that an alien is unlikely at any time to become a public charge due the statute's requirement to consider the mandatory factors. Moreover, DHS has concerns about relying on sponsors to ensure that aliens will not become a public charge, as submitting a sufficient affidavit of support does not guarantee that the alien will not receive public benefits in the future.

PRWORA and IIRIRA amended the INA by setting forth requirements for submitting what would be an enforceable affidavit of support, *i.e.,* current Form I–864.[532] Approximately 1 month after PRWORA was enacted, Congress amended the public charge inadmissibility ground, through passage of IIRIRA, to require certain applicants for lawful permanent resident status to submit an affidavit of support in accordance with section 213A of the Act, 8 U.S.C. 1183a.[533] An Affidavit of Support under Section 213A of the INA (Form I–864)[534] is a contract between the sponsor and the U.S. Government that imposes on the sponsor a legally enforceable obligation to support the alien. The sponsor generally must demonstrate that he or she is able to maintain the sponsored alien at an annual income of not less than 125 percent of the FPG.[535] By creating these requirements in section 213A of the Act, 8 U.S.C. 1183a, Congress intended to ensure that affidavits of support were enforceable and that public benefit-granting agencies could be reimbursed for certain aid provided to the sponsored alien.[536]

As part of PRWORA, benefit-granting agencies assess the combined income and resources of the sponsor (and his or her spouse) and the alien to determine whether the combined income and resources meet the eligibility requirements.[537] This is called "sponsor-to-alien deeming." Public benefits agencies, however, have encountered challenges obtaining information about the sponsor's income when determining the alien's eligibility for public benefits. A U.S. Government Accountability Office (GAO) 2009 report found that although the number of sponsored noncitizens potentially affected by such deeming is unknown, most recent information then available suggested that 11 percent (473,000) of sponsored aliens in 2007 applied for TANF, Medicaid, or SNAP during the course of 2007, and less than one percent applied for SSI.[538] In addition, according to a 2002 study of the New York and Los Angeles areas by the Urban Institute for the Office of the Assistant Secretary for Planning and Evaluation of HHS, individuals who have become lawful permanent residents since the affidavit of support under section 213A of the Act was enacted in 1996 were poorer (with incomes below 100 percent of the FPL) than those who arrived earlier.[539] "Legal immigrants who entered the country since 1996 are poorer than those who arrived earlier, despite new policies requiring their sponsors to demonstrate incomes over 125 percent of the [FPL]." [540] The report also indicates that some immigrant families with incomes below twice the poverty level[541] received SNAP, TANF or Medicaid from 1999–2000.[542] For example, in Los Angeles 13 percent and in New York City 22 percent of noncitizen families

---

[529] Certain applicants are exempt from filing the affidavit of support under INA section 213A, 8 U.S.C. 1183a.

[530] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii); *see also* proposed 8 CFR 212.22(b)(7).

[531] *See* INA section 212(a)(4)(C) and (a)(4)(D), 8 U.S.C. 1182(a)(4)(C) and 1182(a)(4)(D).

[532] *See* INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4) and 1183a.

[533] *See* IIRIRA, Public Law 104–208, div. C, section 531(b), 110 Stat. 3009–546, 3009–675.

[534] The Affidavit of Support Under Section 213A of the INA, Form I–864EZ, may be used instead of Form I–864 in certain circumstances. References to the affidavit of support in this rule include Form I–864EZ.

[535] *See* INA section 213A, 8 U.S.C. 1183a.

[536] In explaining the provision, Congress continued to emphasize that the affidavits of support (before 1996) were previously unenforceable. Congress highlighted the difference between the situation at the time, before 1996, and the new law which would make the affidavits enforceable and permit benefit-providing agencies to seek reimbursement. *See* H.R. Rep. No. 104–651, at 1449 (1996).

[537] *See* PRWORA, Public Law 104–193, section 423, 11 Stat. 2105, 2271–74.

[538] *See* U.S. Gov't Accountability Office, GAO–09–375, *Sponsored Noncitizens and Public Benefits* (May 2009), *available at https://www.gao.gov/products/GAO-09-375.*

[539] *See* Randy Capps et al., *How Are Immigrants Faring After Welfare Reform? Preliminary Evidence from Los Angeles and New York City* ii (Mar. 4, 2002), *available at https://aspe.hhs.gov/system/files/pdf/72691/report.pdf.*

[540] Randy Capps et al., *How Are Immigrants Faring After Welfare Reform? Preliminary Evidence from Los Angeles and New York City* ii (Mar. 4, 2002), *available at https://aspe.hhs.gov/system/files/pdf/72691/report.pdf.*

[541] The report describes these families as low-income families.

[542] *See* Randy Capps et al., *How Are Immigrants Faring After Welfare Reform? Preliminary Evidence from Los Angeles and New York City* iv (Mar. 4, 2002), *available at https://aspe.hhs.gov/system/files/pdf/72691/report.pdf.* Note that this report uses a household centered approach to evaluate data.

with income below twice the poverty level received food stamps (SNAP).[543]

## 2. Proposal To Consider Required Affidavits of Support

Certain aliens are required to submit an affidavit of support.[544] With certain exceptions, the requirement to submit an affidavit of support applies to immediate relatives (including orphans), family-preference immigrants, and those employment-based immigrants whose petitioners are relatives or a firm in which a U.S. citizen or lawful permanent resident relative holds a significant ownership interest.[545] Immigrants seeking admission or adjustment of status in these categories are inadmissible under subparagraphs (C) and (D) of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4)(C) and (D), unless an appropriate sponsor has completed and filed a sufficient affidavit of support.[546]

A sufficient affidavit of support does not guarantee that the alien will not receive public benefits in the future and, therefore, DHS would only consider the affidavit of support as one factor in the totality of the circumstances. When determining the weight to give an affidavit of support in the totality of the circumstances, USCIS would assess the sponsor's annual income, assets, resources, and financial status, relationship to applicant, the likelihood that the sponsor would actually provide financial support to the alien, and any other related considerations.

In order to assess the sponsor's likelihood of meeting his or her obligation to support the alien, DHS would look at how close of a relationship the sponsor has to the alien, as close family members would be more likely to financially support the alien if necessary. DHS would also look at whether the sponsor lives with this alien, as this could be indicative of the sponsor's willingness to support the alien if needed. Additionally, DHS would look at whether the sponsor has submitted affidavit of support with respect to other individuals, as this may be indicative of the sponsor's

willingness or ability to financially support the alien.

To the extent that the initial evidence submitted by the sponsor is insufficient to make this determination, USCIS would request additional information from the sponsor or interview the sponsor to determine whether the sponsor is willing and able to support the alien on a long-term basis. The inability or unwillingness of the sponsor to financially support the alien may be viewed as a negative factor in the totality of the circumstances. DHS expects that a sponsor's sufficient affidavit of support would not be an outcome-determinative factor in most cases; the presence of a sufficient affidavit of support does not eliminate the need to consider all of the mandatory factors in the totality of the circumstances.[547]

### L. Heavily Weighed Factors

DHS proposes a number of factors or factual circumstances that it has determined would generally weigh heavily in determining whether an alien is likely to become a public charge in the future.[548] The mere presence of any one enumerated circumstance would not, alone, be determinative. A heavily weighed factor could be outweighed by countervailing evidence in the totality of the circumstances. Other negative and positive factors, including factors not enumerated elsewhere in this rule, may also be weighed heavily in individual determinations, as circumstances warrant.

#### 1. Heavily Weighed Negative Factors

DHS proposes to consider certain factors listed below as heavily negative because these factors are particularly indicative of a likelihood that the alien would become a public charge.

##### (a) Lack of Employability

As long as an alien is not a full-time student and is authorized to work, DHS proposes that the absence of current employment, employment history, or reasonable prospect of future employment will be a heavily weighed negative factor.[549] Self-sufficiency

generally involves people being capable and willing to work and being able to maintain gainful employment. A person who is capable and able to work but does not work demonstrates a lack of self-sufficiency. As previously discussed, various studies and data support the concept that a person's education and skills may be positive factors for purposes of evidencing self-sufficiency, including the SIPP data reviewed in the Education and Skills section, and the U.S. Census Bureau report that indicates that lower educational attainment is associated with higher public benefit program participation rates for people over the age of 18.[550]

In addition, the concept that a person's education and skills may be positive factors for purposes of evidencing self-sufficiency is supported by two Census Bureau studies covering 2004 to 2007 and 2009 to 2012, showing that in each of the covered years, individuals with full-time work were less likely to receive means-tested benefits during the year (ranging from 4.5 percent to 5.1 percent) than those with either part-time work (ranging from 12.6 percent to 14.2 percent) or those who were unemployed (ranging from 24.8 percent to 31.2 percent).[551]

DHS recognizes however, that not everyone authorized to work needs to work. Some aliens may have sufficient assets and resources, including a household member's income and assets, which may overcome any negative factor related to lack of employment. DHS would review those considerations in the totality of the circumstances.

##### (b) Current Receipt of One or More Public Benefits

DHS proposes that current receipt of one or more public benefits, as defined

---

[543] See Randy Capps et al., *How Are Immigrants Faring After Welfare Reform? Preliminary Evidence from Los Angeles and New York City* iv (Mar. 4, 2002), *available at* https://aspe.hhs.gov/system/files/pdf/72691/report.pdf.

[544] See INA section 212(a)(4).

[545] See INA sections 212(a)(4)(C) and (D), 8 U.S.C. 1182(a)(4)(C) and (D); *see also* 8 CFR 213a.2(a)(2).

[546] Certain immigrant categories are exempt from the affidavit of support requirements including: Qualified battered spouses and children (and their eligible family members) and qualified widow(er)s of citizens, if these aliens have filed visa petitions on their own behalf. For more information on who must file an affidavit of support, *see* AFM Ch. 20.5.

[547] However, the statute requires a finding of inadmissibility on public charge grounds if the alien is required to submit an affidavit of support and fails to do so. INA section 212(a)(4)(D), 8 U.S.C. 1182(a)(4)(D).

[548] See proposed 8 CFR 212.22.

[549] See proposed 8 CFR 212.22(c)(1)(ii). While a full-time student must still demonstrate he or she is not likely to become a public charge, because the public charge determination is based on the totality of the circumstances under the proposed 8 CFR 212.22(d) that includes consideration of the alien's immigration status, the lack of employment or employment history is not counted as a heavily

weighed negative factor when making public charge determinations regarding full-time students. The full-time student is working toward a degree, which makes the student more employable in the future, and as such, has a reasonable prospect of employment in the future.

[550] See Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 10 (May 2015), *available at* https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.

[551] See Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance?* 12 (July 2012), available at *https://www2.census.gov/library/publications/2012/demo/p70-130.pdf*; Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance?* 10 (May 2015), *available at* https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf.

in proposed 212.21(b), would be a heavily weighed negative factor in a public charge inadmissibility determination.[552] Current receipt of public benefits, alone, would not justify a finding of inadmissibility on public charge grounds. However, an alien's current receipt of one or more public benefits means that the alien is currently a public charge as defined under proposed 8 CFR 212.21(a), and suggests that the alien may continue to receive public benefits in the future and be more likely to continue to be a public charge.

Research indicates that the largest share of participants (43.0 percent) who benefited from one or more means-tested assistance programs between January 2009 and December 2012 stayed in the programs between 37 and 48 months.[553] DHS is also aware that a separate study showed that receipt of benefits across a two-year timespan is likely to occur in all months, suggesting relatively long welfare spell lengths. Between January 2004 and December 2005, a greater share of the population received one or more means-tested benefits for the entire 24-month study period (10.2 percent) than for either one to 11 months (8.5 percent) or 12 to 23 months (6.5 percent).[554] These studies, though, do not directly address the issue of individuals who stopped receiving benefits later returning to these programs.

Some studies suggest that although most people who leave welfare programs are working after they leave those programs, people may come back to receive additional public benefits.[555] In a research study funded by HHS, *A Profile of Families Cycling On and Off Welfare,* researchers conclude that people who left welfare (leavers) experienced ''a fair amount of employment instability—the median proportion of people employed in all four post-exit quarters was 37 percent. Thus, job loss among welfare leavers may give rise to cycling back to

welfare.'' [556] Regarding Medicaid and food stamp participation among leavers, the authors found ''the proportion of leavers who receive these benefits at some point in the year after exit is much higher than the proportion who receives them in any given quarter, suggesting a fair amount of cycling into and out of these programs.'' [557]

HHS also funds various research projects on welfare. Across fifteen state and county welfare studies funded by HHS, it was found that the number of leavers who received food stamps within one year of exit was between 41 and 88 percent.[558] Furthermore, TANF leavers returned to the program at a rate ranging between 17 and 38 percent within one year of exit.[559] Twelve of these studies included household surveys, with some conducting interviews less than a year post-exit, and some as much as 34 months after exit.[560] A review of these surveys found that among those who left Medicaid, the rate of re-enrollment at the time of interview was between 33 and 81 percent among adults, and between 51 and 85 percent among children. Employment rates at the time of interview ranged between 57 and 71 percent.[561]

DHS thus would view current receipt of public benefits as a strong indicator that an alien will continue to receive public benefits, and is therefore likely to become a public charge. However, an

alien may be able to establish circumstances indicating that the receipt of public benefits will stop in the near future and he or she will have sufficient income to support him or herself.

(c) Receipt of Public Benefits Within 36 Months of Filing Application

Similarly, DHS proposes that an alien's past receipt of public benefits within the 36 months immediately preceding his or her application also carries significant weight in determining whether the alien is likely to become a public charge. The weight given to this factor will depend on how recently the alien has received public benefits, and whether the person has received public benefits for an extended period of time (*i.e.,* receives public benefits for multiple years) or at multiple different time periods (*i.e.,* 3 times in the last two years).[562]

As previously discussed, some studies suggest that although most people who leave welfare programs are working after they leave those programs, people may come back to receive additional public benefits.[563] In a research study funded by HHS, *A Profile of Families Cycling On and Off Welfare,* researchers conclude that people who left welfare (leavers) experienced ''a fair amount of employment instability—the median proportion of people employed in all four post-exit quarters was 37 percent. Thus, job loss among welfare leavers may give rise to cycling back to welfare.'' [564] Regarding Medicaid and food stamp participation among leavers, the authors found ''the proportion of leavers who receive these benefits at some point in the year after exit is much higher than the proportion who receives them in any given quarter, suggesting a fair amount of cycling into and out of these programs.'' [565]

HHS also funds various research projects on welfare. Across fifteen state and county welfare studies funded by

[552] *See* proposed 8 CFR 212.22(c)(1)(ii) and (iii).

[553] *See* U.S. Census Bureau, *News Release: 21.3 Percent of U.S. Population Participates in Government Assistance Programs Each Month* (May 28, 2015), *available at* https://www.census.gov/newsroom/press-releases/2015/cb15-97.html.

[554] *See* Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance?* 4 fig.4 (July 2012), *available at* https://www2.census.gov/library/publications/2012/demo/p70-130.pdf.

[555] *See* Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf.

[556] Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004) (citing Gregory Arcs & Pamela Loprest, U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Final Synthesis Report of Findings from ASPE ''Leavers'' Grants* (2001)), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf. This study was based on the first and fourth quarter.

[557] Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf.

[558] *See* U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[559] *See* U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[560] *See* U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[561] *See* U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[562] This proposed policy is generally consistent with longstanding policy affording less weight to benefits that were received longer ago in the past.

[563] *See* Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf.

[564] Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004) (citing Gregory Arcs & Pamela Loprest, U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Final Synthesis Report of Findings from ASPE ''Leavers'' Grants* (2001)), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf. This study was based on the first and fourth quarter.

[565] Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf.

HHS, it was found that the number of leavers who received food stamps within one year of exit was between 41 and 88 percent.[566] Furthermore, TANF leavers returned to the program at a rate ranging between 17 and 38 percent within one year of exit.[567] Twelve of these studies included household surveys, with some conducting interviews less than a year post-exit, and some as much as 34 months after exit.[568] A review of these surveys found that among those who left Medicaid, the rate of re-enrollment at the time of interview was between 33 and 81 percent among adults, and between 51 and 85 percent among children. Employment rates at the time of interview ranged between 57 and 71 percent.[569]

DHS would view past receipt of public benefits within 36 months as a strong indicator that an alien will continue to receive public benefits, and therefore is likely to become a public charge. However, the weight given to public benefits will depend on whether the alien received multiple benefits, how long ago the benefits were received, and the amounts received.[570] For example, the receipt of a public benefit 5 years ago would be a negative factor; however, a public benefit received six months before the adjustment of status application would be considered a heavily weighed negative factor.

DHS welcomes public comments on the appropriate period of time to examine. DHS is particularly interested in data regarding how frequently individuals who previously used public benefits later do so again, and whether a 24-month or 48-month timeframe would be more appropriate.

(d) Financial Means To Pay for Medical Costs

An alien is a high risk of becoming a public charge if he or she does not have private health insurance or the financial resources to pay for reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work. However, the alien may provide evidence of the prospect of obtaining health insurance, such as pending employment that provides employer-sponsored health insurance.

DHS proposes this factual circumstance as a heavily weighed negative factor in 8 CFR 212.22(c)(1)(iv). Certain chronic medical conditions can be costly to treat.[571] Certain conditions may adversely affect an applicant's ability and capacity to obtain and retain gainful employment. Other conditions could result in long-term institutionalization in a health care facility at government expense. According to the *Multiple Chronic Conditions Chartbook 2010 Medical Expenditure Panel Survey Data*,[572] 86 percent of the nation's $2.7 trillion annual health care expenditures were for individuals with chronic and mental health conditions.[573] The Centers for

Disease Control and Prevention (CDC) has listed the five most expensive health conditions as heart disease, cancer, trauma, mental disorders, and pulmonary conditions.[574] These are all classified as costly medical conditions.[575] In the United States, chronic diseases and conditions that cause them account for most of the health care costs.[576]

• From 2012 to 2013, the total annual direct medical costs for heart disease and strokes were $190 billion;[577]

• Cancer care cost $157 billion in 2010 dollars;[578] and

• In 2017, the total estimated direct medical cost for diagnosed diabetes was $237 billion.[579]

---

[566] See U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[567] See U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[568] See U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[569] See U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001.

[570] This proposed policy is generally consistent with longstanding policy affording less weight to benefits that were received longer ago in the past.

[571] See U.S. Dep't of Health & Human Servs., *Research In Action, Issue #19: The High Concentration of U.S. Health Care Expenditures* (June 2006), *available at* https://archive.ahrq.gov/research/findings/factsheets/costs/expriach/expendia.pdf; *see also* Ctrs. for Medicare & Medicaid Servs., *NHE Fact Sheet*, *available at* https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last modified Sept 13, 2018) (in 2016, NHE grew to $3.3 trillion). For a discussion of expenditures, *see generally* Ctrs. for Medicare & Medicaid Servs., *National Health Expenditure Data*, *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData (last modified Sept 13, 2018); *see also* Ctrs. for Disease Control & Prevention, *Chronic Disease Prevention and Health Promotion, Chronic Disease Data available at* https://www.cdc.gov/chronicdisease/data/index.htm (last visited Sept. 13, 2018). The CDC collects large amounts of data on numerous major chronic diseases. In addition, the CDC provides an overview of chronic diseases in the United States, including prevalence and cost. *See* Ctrs. for Disease Control & Prevention, *National Center for Chronic Disease Prevention and Health Promotion, About Chronic Diseases, Health and Economic Costs of Chronic Diseases, available at* https://www.cdc.gov/chronicdisease/about/costs/index.htm (last visited Sept. 13, 2018).

[572] As cited by the CDC. *See* Ctrs. for Disease Control & Prevention, *National Center for Chronic Disease Prevention and Health Promotion, About Chronic Diseases, Health and Economic Costs of Chronic Diseases, available at* https://www.cdc.gov/chronicdisease/about/costs/index.htm (last visited Sept. 13, 2018).

[573] See Ctrs. for Disease Control & Prevention, *National Center for Chronic Disease Prevention and*

*Health Promotion, About Chronic Diseases, Health and Economic Costs of Chronic Diseases, available at* https://www.cdc.gov/chronicdisease/about/costs/index.htm (last visited Sept. 13, 2018).

[574] See U.S. Dep't of Health & Human Servs., *Research In Action, Issue #19: The High Concentration of U.S. Health Care Expenditures* (June 2006), *available at* https://archive.ahrq.gov/research/findings/factsheets/costs/expriach/expendia.pdf; *see also* Ctrs. for Disease Control & Prevention, *National Center for Chronic Disease Prevention and Health Promotion, About Chronic Diseases, Health and Economic Costs of Chronic Diseases, available at* https://www.cdc.gov/chronicdisease/about/costs/index.htm (last visited Sept. 13, 2018). *See also generally* the Ctrs. for Disease Control & Prevention, *Statistics on Chronic Disease Prevention and Health Promotion, Chronic Disease Data available at* https://www.cdc.gov/chronicdisease/data/index.htm (last visited Sept. 13, 2018).

[575] See U.S. Dep't of Health & Human Servs., *Research In Action, Issue #19: The High Concentration of U.S. Health Care Expenditures* (June 2006), *available at* https://archive.ahrq.gov/research/findings/factsheets/costs/expriach/expendia.pdf; *see also* for Disease Control & Prevention, *National Center for Chronic Disease Prevention and Health Promotion, About Chronic Diseases, Health and Economic Costs of Chronic Diseases, available at* https://www.cdc.gov/chronicdisease/about/costs/index.htm (last visited Sept. 13, 2018). *See also generally* the Ctrs. for Disease Control & Prevention, *Statistics on Chronic Disease Prevention and Health Promotion, Chronic Disease Data available at* https://www.cdc.gov/chronicdisease/data/index.htm (last visited Sept. 13, 2018).

[576] See Ctrs. for Disease Control & Prevention, *National Center for Chronic Disease Prevention and Health Promotion, About Chronic Diseases, Health and Economic Costs of Chronic Diseases, available at* https://www.cdc.gov/chronicdisease/about/costs/index.htm (last visited Sept. 13, 2018).

[577] See Ctrs. for Disease Control & Prevention, *National Center for Chronic Disease Prevention and Health Promotion, About Chronic Diseases, Health and Economic Costs of Chronic Diseases, available at* https://www.cdc.gov/chronicdisease/about/costs/index.htm (last visited Sept. 13, 2018).

[578] See Nat'l Cancer Inst., *Cancer Prevalence and Cost of Care Projections, http://costprojections.cancer.gov/* (last visited Sept. 13, 2018).

[579] See American Diabetes Association, *The Cost of Diabetes, available at* http://www.diabetes.org/advocacy/news-events/cost-of-diabetes.html (last visited Sept. 13, 2018). *See also* for Disease Control & Prevention, *National Center for Chronic Disease Prevention and Health Promotion, About Chronic Diseases, Health and Economic Costs of*

Individuals in poor to fair health are more likely to access public benefits to treat their medical condition. Tables 25 and 26 show a relationship between health and receipt of public benefits irrespective of citizenship status, with higher rates of participation in most programs among those who reported their health as fair or poor than those who reported their health as excellent, very good, or good.

DHS also acknowledges that the health of certain individuals may have improved because of their access to these subsidized health insurance and other public benefits. In other cases, individuals may have needed the public benefits because of their compromised health. About 40 percent of U.S. citizens and 50 percent of noncitizens [580] who described their health as poor received some form of cash or non-cash public benefit. Moreover, about 20 percent of U.S. citizens and noncitizens who reported their health as excellent participated in at least one type of cash or non-cash benefit program in 2013. The rate of receipt of cash or non-cash benefits was about 20 percent among U.S. citizens who reported their health as excellent, very good, or good; and the rate was 30 to 40 percent among U.S. citizens who reported their health as fair or poor. Among noncitizens, the rate of receipt of these benefits among those who reported their health as excellent, very good, or good was similarly about 20 percent, while among those who reported their health as fair or poor, the rate was 30 to 50 percent. About 1 to 2 percent of both U.S. citizens and noncitizens who reported their health as excellent or good received at least one of SSI, TANF, or GA, which was a rate much lower than those who reported their health as either good (10.0 percent of U.S. citizens and 7.1 percent of noncitizens) or excellent (17.3 percent of citizens and 12.8 percent of noncitizens).[581]

---

*Chronic Diseases, available at https://www.cdc.gov/ chronicdisease/about/costs/index.htm* (last visited Sept. 13, 2018).

[580] The difference in rates between citizens and noncitizens who describe their health as poor is not statistically significant.

[581] *See* Amy Finkelstein et al., Nat'l Bureau of Econ. Research, Working Paper 17190, *The Oregon Health Insurance Experiment: Evidence from the First Year* (July 2011), *available at http:// www.nber.org/papers/w17190.pdf.*

**Table 25: Public Benefit Participation of U.S. Citizens, by Health Status, 2013 (in thousands)**

| | Excellent | | | Very good | | | Good | | |
|---|---|---|---|---|---|---|---|---|---|
| **Total Population** 310,867 | **Population** 99,975 | **% of Total Population** 32.2% | | **Population** 85,478 | **% of Total Population** 27.5% | | **Population** 66,323 | **% of Total Population** 21.3% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 19,702 | 19.7% | 0.4% | 13,987 | 16.4% | 0.4% | 13,383 | 20.2% | 0.4% |
| Cash benefits | 1,659 | 1.7% | 0.1% | 1,577 | 1.8% | 0.1% | 2,468 | 3.7% | 0.2% |
| *SSI* | 584 | 0.6% | 0.1% | 921 | 1.1% | 0.1% | 1,932 | 2.9% | 0.2% |
| *TANF* | 927 | 0.9% | 0.1% | 542 | 0.6% | 0.1% | 460 | 0.7% | 0.1% |
| *GA* | 201 | 0.2% | 0.0% | 130 | 0.2% | 0.0% | 185 | 0.3% | 0.1% |
| Non-cash benefits | 19,539 | 19.5% | 0.4% | 13,680 | 16.0% | 0.4% | 12,980 | 19.6% | 0.4% |
| *Medicaid* | 16,520 | 16.5% | 0.4% | 10,934 | 12.8% | 0.3% | 9,700 | 14.6% | 0.4% |
| *SNAP* | 9,946 | 9.9% | 0.3% | 7,405 | 8.7% | 0.3% | 7,506 | 11.3% | 0.4% |
| *Housing vouchers* | 1,347 | 1.3% | 0.1% | 1,085 | 1.3% | 0.1% | 1,075 | 1.6% | 0.1% |
| *Rent subsidy* | 3,122 | 3.1% | 0.2% | 2,599 | 3.0% | 0.2% | 2,658 | 4.0% | 0.2% |

| | Fair | | | Poor | | |
|---|---|---|---|---|---|---|
| **Total Population** 310,867 | **Population** 27,631 | **% of Total Population** 8.9% | | **Population** 11,298 | **% of Total Population** 3.6% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 8,795 | 31.8% | 0.8% | 4,614 | 40.8% | 1.2% |
| Cash benefits | 2,770 | 10.0% | 0.5% | 1,954 | 17.3% | 1.0% |
| *SSI* | 2,467 | 8.9% | 0.5% | 1,749 | 15.5% | 0.9% |
| *TANF* | 189 | 0.7% | 0.1% | *63 | *0.6% | 0.2% |
| *GA* | 195 | 0.7% | 0.1% | 189 | 1.7% | 0.3% |
| Non-cash benefits | 8,448 | 30.6% | 0.8% | 4,382 | 38.8% | 1.2% |
| *Medicaid* | 6,058 | 21.9% | 0.7% | 3,231 | 28.6% | 1.1% |
| *SNAP* | 5,444 | 19.7% | 0.7% | 2,784 | 24.6% | 1.1% |
| *Housing vouchers* | 749 | 2.7% | 0.3% | 389 | 3.4% | 0.5% |
| *Rent subsidy* | 2,067 | 7.5% | 0.4% | 1,116 | 9.9% | 0.8% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP). Medicaid coverage is associated with higher rates of self-reported health status as good, very good, or excellent, which would lead to higher rates of Medicaid enrollment in those categories.[581]

\* Estimate is considered unreliable due to a high relative standard error.

- Estimate of zero.

**Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules    **51203**

**Table 26: Public Benefit Participation of Noncitizens, by Health Status, 2013 (in thousands)**

| Total Population 310,867 | Excellent | | | Very good | | | Good | | |
|---|---|---|---|---|---|---|---|---|---|
| | Population 6,494 | % of Total Population 2.1% | | Population 5,792 | % of Total Population 1.9% | | Population 5,646 | % of Total Population 1.8% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 1,181 | 18.2% | 1.5% | 1,185 | 20.5% | 1.6% | 1,349 | 23.9% | 1.7% |
| Cash benefits | *39 | *0.6% | 0.3% | *84 | *1.4% | 0.5% | *59 | *1.0% | 0.4% |
| SSI | *14 | *0.2% | 0.2% | *42 | *0.7% | 0.3% | *34 | *0.6% | 0.3% |
| TANF | *25 | *0.4% | 0.2% | *32 | *0.5% | 0.3% | *11 | *0.2% | 0.2% |
| GA | *1 | *0.0% | 0.0% | *11 | *0.2% | 0.2% | *14 | *0.2% | 0.2% |
| Non-cash benefits | 1,181 | 18.2% | 1.5% | 1,156 | 20.0% | 1.6% | 1,337 | 23.7% | 1.7% |
| Medicaid | 815 | 12.6% | 1.2% | 794 | 13.7% | 1.4% | 949 | 16.8% | 1.5% |
| SNAP | 436 | 6.7% | 0.9% | 487 | 8.4% | 1.1% | 533 | 9.4% | 1.2% |
| Housing vouchers | 108 | 1.7% | 0.5% | *56 | *1.0% | 0.4% | *93 | *1.7% | 0.5% |
| Rent subsidy | 240 | 3.7% | 0.7% | 213 | 3.7% | 0.8% | 223 | 4.0% | 0.8% |

| Total Population 310,867 | Fair | | | Poor | | |
|---|---|---|---|---|---|---|
| | Population 1,705 | % of Total Population 0.5% | | Population 526 | % of Total Population 0.2% | |
| Benefit program | Total | Pct. | S.E. | Total | Pct. | S.E. |
| Cash or non-cash | 584 | 34.2% | 3.4% | 259 | 49.2% | 6.5% |
| Cash benefits | 121 | 7.1% | 1.8% | *67 | *12.8% | 4.3% |
| SSI | 108 | 6.3% | 1.7% | *57 | *10.8% | 4.0% |
| TANF | *4 | *0.3% | 0.4% | *1 | *0.2% | 0.6% |
| GA | *13 | *0.8% | 0.6% | *9 | *1.7% | 1.7% |
| Non-cash benefits | 575 | 33.7% | 3.4% | 248 | 47.2% | 6.5% |
| Medicaid | 383 | 22.5% | 3.0% | 189 | 36.0% | 6.2% |
| SNAP | 257 | 15.1% | 2.6% | 115 | 21.9% | 5.4% |
| Housing vouchers | *24 | *1.4% | 0.8% | *6 | *1.2% | 1.4% |
| Rent subsidy | 121 | 7.1% | 1.8% | *72 | *13.7% | 4.5% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP). Medicaid coverage is associated with higher rates of self-reported health status as good, very good, or excellent, which would lead to higher rates of Medicaid enrollment in those categories. *See* Amy Finkelstein et al., Nat'l Bureau of Econ. Research, Working Paper 17190, *The Oregon Health Insurance Experiment: Evidence from the First Year* (July 2011), *available at* http://www.nber.org/papers/w17190.pdf.
* Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

As noted in the discussion of the health factor above, USCIS would rely on panel physician and civil surgeon medical examination for purposes of whether an individual's circumstances gives rise to this heavily weighted negative factor. USCIS would consider it a heavily weighed negative factor if the panel physician or civil surgeon reports a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide for him- or herself, attend school, or work; and the alien is uninsured or has health insurance that constitutes a public benefit under 212.21(b), or the alien has no prospect of obtaining private health insurance, or other non-governmental means of paying for medical treatment.

(e) Alien Previously Found Inadmissible or Deportable Based on Public Charge

DHS is proposing to consider an alien previously found inadmissible or deportable based on public charge grounds to be a high risk of becoming a public charge in the future.[582] Absent countervailing positive factors and evidence to show that current

[582] *See* proposed 8 CFR 212.22(c)(1)(v).

circumstances outweigh the conditions that supported the finding of inadmissibility, the previous finding will carry heavy weight in determining that an alien is likely to be a public charge again.

2. Heavily Weighed Positive Factors

Significant income, assets, and resources play a major role in whether an individual is likely to become a public charge. In addition, as described above, Tables 27 and 28 show a relationship between the FPG and welfare participation rates among both U.S. citizens and noncitizens in receipt of non-cash benefits in 2013. The percentage of people receiving these public benefits generally goes down as the income percentage increases. Specifically, 52.0 percent of U.S. citizens living below 125 percent of the FPG received non-cash benefits compared to 42.4 percent of those living between 125 and 250 percent of the FPG, 36.9 percent of those living between 250 and 400 percent of the FPG, and 13.5 percent of those above 400 percent of the FPL. Noncitizen

participation rates in non-cash benefit programs among those living below 125 percent of the FPG was about 40 percent, compared to about 35 percent of those either between 125 and 250 percent of the FPG or 250 and 400 percent of the FPG.[583] Among noncitizens living above 400 percent of the FPG, the rate of receipt was 17.1 percent. Among U.S. citizens, the rate of receipt of cash benefits among those living below 125 percent of the FPG was 12.9 percent, compared to a rate of 10.3 percent among those living between 125 and 250 percent of the FPG, 5.5 percent among those living between 250 and 400 percent of the FPG, and 1.9 percent of those living above 400 percent of the FPG. Among noncitizens, the rates of receipt were 6.7 percent among those living below 125 percent of the FPG, about 2 to 3 percent among those either living between 125 to 250 percent of the

FPG or living between 250 to 400 percent of the FPG, and 1.1 percent among those living above 400 percent of the FPG. Because many public benefit programs determine eligibility based on the FPG, individuals living above 250 percent of the FPG are less likely to receive public benefits.

For these reasons, and based on the data that follows, DHS proposes to consider it a heavily weighed positive factor if the alien has financial assets, resources, support, or annual income of at least 250 percent of the FPG in the totality of the circumstances.[584] However, DHS notes that an alien with an annual income of less than 250 percent of FPG would not automatically be inadmissible based on public charge. Instead, all the factors as discussed above would be considered in the totality of the circumstances, which may be favorable to be person regardless of whether the income is below 250 percent of the FPG.

---

[583] The difference in rates between noncitizens living below 125 percent of the FPG and those living either between 125 and 250 percent of the FPG, or 250 and 400 percent of the FPG, was not statistically significant.

---

[584] Income between 125 and 250 percent of the FPL is considered a positive factor in the public charge inadmissibility analysis.

**Table 27. Public Benefit Participation Among U.S. Citizens by Federal Poverty Guidelines (FPG), 2013 (in thousands)**

| Total Population | 0-125% FPG | | | >125-250% FPG | | |
|---|---|---|---|---|---|---|
| | Population | % of Total Population | | Population | % of Total Population | |
| 310,867 | 19,947 | 6.4% | | 20,790 | 6.7% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 10,506 | 52.7% | 1.0% | 9,006 | 43.3% | 0.9% |
| | | | | | | |
| Cash benefits | 2,572 | 12.9% | 0.6% | 2,138 | 10.3% | 0.6% |
| *SSI* | 1,909 | 9.6% | 0.6% | 1,480 | 7.1% | 0.5% |
| *TANF* | 463 | 2.3% | 0.3% | 561 | 2.7% | 0.3% |
| *GA* | 240 | 1.2% | 0.2% | 178 | 0.9% | 0.2% |
| | | | | | | |
| Non-cash benefits | 10,368 | 52.0% | 1.0% | 8,819 | 42.4% | 0.9% |
| *Medicaid* | 7,844 | 39.3% | 0.9% | 6,545 | 31.5% | 0.9% |
| *SNAP* | 7,596 | 38.1% | 0.9% | 6,215 | 29.9% | 0.9% |
| *Housing vouchers* | 1,455 | 7.3% | 0.5% | 956 | 4.6% | 0.4% |
| *Rent subsidy* | 3,671 | 18.4% | 0.7% | 2,558 | 12.3% | 0.6% |
| **Total Population** | >250-400% FPG | | | >400% FPG | | |
| | Population | % of Total Population | | Population | % of Total Population | |
| 310,867 | 26,101 | 8.4% | | 223,865 | 72.0% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 9,774 | 37.4% | 0.8% | 31,194 | 13.9% | 0.2% |
| | | | | | | |
| Cash benefits | 1,439 | 5.5% | 0.4% | 4,280 | 1.9% | 0.1% |
| *SSI* | 1,036 | 4.0% | 0.3% | 3,227 | 1.4% | 0.1% |
| *TANF* | 313 | 1.2% | 0.2% | 844 | 0.4% | 0.0% |
| *GA* | 120 | 0.5% | 0.1% | 361 | 0.2% | 0.0% |
| | | | | | | |
| Non-cash benefits | 9,635 | 36.9% | 0.8% | 30,207 | 13.5% | 0.2% |
| *Medicaid* | 7,528 | 28.8% | 0.8% | 24,525 | 11.0% | 0.2% |
| *SNAP* | 6,107 | 23.4% | 0.7% | 13,167 | 5.9% | 0.1% |
| *Housing vouchers* | 995 | 3.8% | 0.3% | 1,240 | 0.6% | 0.0% |
| *Rent subsidy* | 2,103 | 8.1% | 0.5% | 3,229 | 1.4% | 0.1% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

**Table 28. Public Benefit Participation Among Noncitizens by Federal Poverty Guidelines (FPG), 2013 (in thousands)**

| | 0–125% FPG | | | >125–250% FPG | | |
|---|---|---|---|---|---|---|
| **Total Population** | **Population** | **% of Total Population** | | **Population** | **% of Total Population** | |
| 310,867 | 1,580 | 0.5% | | 1,495 | 0.5% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 629 | 39.8% | 3.6% | 526 | 35.1% | 3.6% |
| | | | | | | |
| Cash benefits | 106 | 6.7% | 1.8% | *42 | *2.8% | 1.3% |
| *SSI* | *67 | *4.2% | 1.5% | *38 | *2.6% | 1.2% |
| *TANF* | *27 | *1.7% | 0.9% | *4 | *0.3% | 0.4% |
| *GA* | *13 | *0.8% | 0.6% | – | – | – |
| | | | | | | |
| Non-cash benefits | 619 | 39.2% | 3.5% | 523 | 34.9% | 3.6% |
| *Medicaid* | 501 | 31.7% | 3.4% | 363 | 24.2% | 3.3% |
| *SNAP* | 274 | 17.4% | 2.8% | 317 | 21.2% | 3.1% |
| *Housing vouchers* | *65 | *4.1% | 1.4% | *56 | *3.7% | 1.4% |
| *Rent subsidy* | 206 | 13.0% | 2.4% | 106 | 7.1% | 1.9% |
| | >250–400% FPG | | | >400% FPG | | |
| **Total Population** | **Population** | **% of Total Population** | | **Population** | **% of Total Population** | |
| 310,867 | 2,377 | 0.8% | | 14,711 | 4.7% | |
| **Benefit program** | **Total** | **Pct.** | **S.E.** | **Total** | **Pct.** | **S.E.** |
| Cash or non-cash | 849 | 35.7% | 2.9% | 2,554 | 17.4% | 1.0% |
| | | | | | | |
| Cash benefits | *55 | *2.3% | 0.9% | 167 | 1.1% | 0.3% |
| *SSI* | *45 | *1.9% | 0.8% | 104 | 0.7% | 0.2% |
| *TANF* | *5 | *0.2% | 0.3% | *37 | *0.3% | 0.1% |
| *GA* | *4 | *0.2% | 0.3% | *30 | *0.2% | 0.1% |
| | | | | | | |
| Non-cash benefits | 840 | 35.3% | 2.9% | 2,516 | 17.1% | 0.9% |
| *Medicaid* | 516 | 21.7% | 2.5% | 1,751 | 11.9% | 0.8% |
| *SNAP* | 357 | 15.0% | 2.1% | 880 | 6.0% | 0.6% |
| *Housing vouchers* | *57 | *2.4% | 0.9% | 110 | 0.7% | 0.2% |
| *Rent subsidy* | 181 | 7.6% | 1.6% | 377 | 2.6% | 0.4% |

Source: USCIS analysis of Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).
*Estimate is considered unreliable due to a high relative standard error.
- Estimate of zero.

(f) Previously Excluded Benefits

DHS would not consider public benefits under the proposed 8 CFR 212.21(b) that were previously excluded under the 1999 Interim Field Guidance if received before effective date of the final rule. DHS, however, would continue to consider cash benefits for income maintenance SSI, TANF and benefits for long-term institutionalization (*i.e.* those previously considered under the 1999 Interim Field Guidance) that an alien

received before the effective date of the final rule.[585]

[585] Under the 1999 Interim Field Guidance, DHS would consider the current receipt of cash benefits for income maintenance or long-term institutionalization at government expense in the totality of the circumstances. *See Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,* 64 FR 28689, 28690 (May 26, 1999) ("If at the time of application for admission or adjustment an alien is receiving a cash public assistance for income maintenance or is institutionalized for long-term care (as discussed in section 6, below), that benefit should be taken into account under the totality of the circumstances test, along with the other statutory factors under section 212(a)(4)(B)(i) and any [adjustment of status]."). DHS would also consider past receipt of cash benefits for income maintenance or long-term institutionalization at government expense in the

Public benefits previously considered under the 1999 Interim Field Guidance and received prior to the effective date of this rule would be considered as a negative factor in the totality of the circumstances analysis when determining whether an alien is inadmissible as likely at any time to become a public charge. However, the

totality of the circumstances. *See Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,* 64 FR 28689, 28690 (May 26, 1999) ("[P]ast receipt of cash income-maintenance benefits does not automatically make an alien inadmissible as likely to become a public charge, nor does past institutionalization for long-term care at government expense. Rather this history would be one of many factors to be considered in applying the totality of the circumstances test.").

receipt of such benefits would not be considered as a heavily weighed negative factor.

Table 29 provides a summary of how benefits received prior to and after the effective date of this proposed rule would be considered under the proposed rule.

| Table 29. Consideration of Benefits Received Prior to and After the Effective Date of this Rule | | |
|---|---|---|
| | **Benefits received before the effective date of this rule** | **Public Benefits received after the effective date of this rule** |
| **Benefits excluded under the 1999 Interim Field Guidance**<br><br>**Example: SNAP**[586] | Not considered | Considered, as set forth in 8 CFR 212.21(b). |
| **Benefits considered under the 1999 Interim Field Guidance**<br><br>**Example:  cash assistance for income maintenance, including SSI, TANF, General Assistance programs, programs supporting aliens who are institutionalized for long-term care** | Considered.  DHS will consider as a negative factor any amount of these benefits received as provided under the 1999 Interim Field Guidance.[587] | Considered, as set forth in in 8 CFR 212.21(b). |

Examples

The following examples illustrate how DHS will consider benefits received prior to the effective date of the rule for the purposes of making public charge inadmissibility determinations. These examples are for illustrative purposes only and assume a closed universe of facts for purposes of simplicity. The examples are not intended to represent actual possible outcomes, as each case is reviewed individually on its own merits. Under the proposed rule, benefits received prior to the effective date of the rule would be excluded from consideration unless such benefits would have been considered under the 1999 Interim Field Guidance.[588] However, benefits received after the effective date of the rule would be considered to the extent that they are a public benefit, as defined in 8 CFR 212.21(b).

*Example 1:* Benefits Excluded Under the 1999 Interim Field Guidance

Example 1 is based on the following scenario: The DHS rule on public charge

inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), goes into effect on January 1, 2019. The alien is the only member of the household, has been paroled into the United States pursuant to section 212(d)(5) of the Act for over five years, and is seeking to adjust status based on a visa category subject to public charge inadmissibility. The alien files the adjustment of status application on May 1, 2019, and the application is adjudicated on September 1, 2019. HHS published the new FPG in early January 2019, which contains the same values as the 2018 FPG for purposes of this example. For a household of 1, the FPG is $12,140. Fifteen percent of the FPG is $1,821 in a 12-month period. The alien is certified to receive SNAP benefits for 36 months, beginning on January 1, 2018. For the consecutive 12-month period between January 1, 2018 and December 31, 2018, the alien receives $2,160 in SNAP benefits. For the consecutive twelve-month period between January 1, 2019 and December 31, 2019, the alien receives $2,160 in SNAP benefits. The alien received no other public benefits. SNAP was previously excluded under the 1999 Interim Field Guidance, but is included in proposed 8 CFR 212.21(b).

Under proposed 8 CFR 212.22(d), the SNAP benefits the alien received before

January 1, 2019, the effective date of the public charge rule, would not be considered. However, the SNAP benefits the alien received on or after January 1, 2019 would be considered if the aggregate annual value of SNAP benefits received since the effective date of the rule exceeds $1,821 (fifteen percent of the FPG for the household of one within any period of consecutive twelve consecutive months). For the consecutive twelve-month period between January 1, 2019 and September 1, 2019, the date of adjudication, the alien had only received a total of $1,620 in SNAP benefits, which is less than the threshold amount. However, because the alien is certified to receive $2,160 in SNAP benefits for a consecutive twelve-month period beginning after the rule's effective date, and such amount exceeds fifteen percent of the FPG, these benefits would be considered as a heavily weighed negative factor in the totality of the circumstances, as illustrated in Table 30. In this case, absent other evidence tending to show that the alien is unlikely to receive the benefits covered by the certification, USCIS would probably find that the alien is likely to become a public charge and is ineligible for adjustment of status.[589]

---

[586] SNAP benefits received after the effective date of the proposed rule will be valued as set forth in proposed 8 CFR 212.24(a).

[587] The 1999 Interim Field Guidance suggests that any past or current receipt of the type of public benefits included for consideration will be included in the public charge inadmissibility determination. *See Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,* 64 FR 28689, 28690 (May 26, 1999) (''If at the time of application for admission or adjustment an alien is receiving a cash public assistance for income maintenance or is institutionalized for long-term care (as discussed in section 6, below), *that benefit*

should be taken into account under the totality of the circumstances test, along with the other statutory factors under section 212(a)(4)(B)(i) and any AOS . . . . Past receipt of cash income-maintenance benefits does not automatically make an alien inadmissible as likely to become a public charge, nor does past institutionalization for long-term care at government expense. Rather this history would be one of many factors to be considered in applying the totality of the circumstances test. In the case of an alien who has received cash income-maintenance benefits in the past or who has been institutionalized for long-term care at government expense, a Service officer determining admissibility should assess the totality

of the alien's circumstances at the time of the application for admission or adjustment and make a forward-looking determination regarding the likelihood that the alien will become a public charge after admission or adjustment.'' (emphasis added)).

[588] *See* proposed 8 CFR 212.21(c).

[589] Pursuant to proposed 8 CFR 212.24(a), for SNAP benefits, DHS would calculate the value of the benefit attributable to the alien in proportion to the total number of people covered by the benefit, based on the amount(s) deposited as defined in 212.21(b) which the benefits are received in the Electronic Benefits Transfer (EBT) card account.

| Table 30. Example 1, Benefits Excluded Under the 1999 Interim Field Guidance | | | |
|---|---|---|---|
| **Consecutive 12 Month Period** | **Benefit Received** | **Total Amount Received During Consecutive 12-month Period/Total Amount Certified for Consecutive 12-Month Period** | **Considered for purposes of the public charge inadmissibility determination under the proposed rule?** |
| Jan. 1, 2018 to Dec. 31, 2018 | SNAP[589] | $2,160/certified for $2,160 | No – SNAP benefits were previously excluded under the 1999 Interim Field Guidance, and therefore, any amount received prior to the effective date of the rule would not be considered. |
| Jan. 1, 2019 to to December 31, 2020 | SNAP | $1,620 received as of date of adjudication/certified for $2,160 | Yes – although the proportional amount of SNAP benefits received during this consecutive 12-month period does not exceed 15 percent of the 2019 FPG ($1,821) for a household size at the time of adjudication, because the alien was certified to receive SNAP for this entire period, in an amount that exceeds 15% of the FPG, this certification would be a heavily weighed negative factor in the totality of the circumstances. |

*Example 2:* Benefits Excluded Under the 1999 Interim Field Guidance

Example 2 is based on the following scenario: The DHS rule on public charge inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), goes into effect on January 1, 2019. An alien is the only member of the household, has been paroled pursuant to section 212(d)(5) of the Act for over five years, and is seeking to adjust status based on a visa category subject to a public charge inadmissibility determination. The alien files the adjustment of status application on May 1, 2020, and the application is adjudicated on September 1, 2020. HHS publishes the calendar year 2019 FPG in early January 2019 and the 2020 FPG in early January 2020. For the purposes of this example, the FPG for 2019 and 2020 contains the same values as the FPG for 2018, which is $12,140. Fifteen percent of the FPG for 2018, 2019 and 2020 would be $1,821 in the relevant consecutive

12-month periods for this example .The alien was certified to receive SNAP for 36 months beginning in January 2018. The alien received no other public benefits. For the consecutive twelve-month period between January 1, 2018 and December 31, 2018, the alien received $2,160 in SNAP benefits. For the consecutive twelve-month period between January 1, 2019 and December 31, 2019, the alien received $2,160 in SNAP benefits. Beginning on January 1, 2020, however, the alien no longer receives any SNAP benefits. The alien provided a benefits termination letter as evidence along with the alien's adjustment application.

Under proposed 8 CFR 212.22(d), the SNAP benefits the alien received before January 1, 2019, the effective date of the public charge rule, would not be considered. However, the SNAP benefits the alien received on or after January 1, 2019 would be considered if the aggregate annual value

of SNAP benefits received since the effective date of the rule exceeds $1,821 (fifteen percent of the FPG for the household of one within any period of consecutive twelve consecutive months). For the consecutive twelve-month period between January 1, 2019 and December 31, 2019, the SNAP benefits the alien received exceeded the fifteen percent threshold, and therefore would be considered. Because the receipt was within the 36 months immediately preceding the application, it is a heavily weighed factor in the totality of the circumstances. The termination letter suggests, however, that the alien is unlikely to receive future public benefits. DHS would weigh the termination letter along with the other evidence, in the totality of the circumstances. The preceding analysis is summarized in Table 31.[590]

---

[590] Pursuant to proposed 8 CFR 212.24(a), for SNAP benefits, DHS would calculate the value of the benefit attributable to the alien in proportion to

the total number of people covered by the benefit, based on the amount(s) deposited as defined in

212.21(b) which the benefits are received in the Electronic Benefits Transfer (EBT) card account.

| Table 31. Example 2 Benefits Excluded Under the 1999 Interim Field Guidance | | | |
|---|---|---|---|
| Consecutive 12 Month Period | Benefit Received | Total Amount Received During Consecutive 12-month Period/Total Amount Certified for Consecutive 12-Month Period | Receipt of Public Benefits considered for purposes of the public charge determination under the proposed rule? |
| Jan. 1, 2018 to Dec. 31, 2018 | SNAP[591] | $2,160 | No – SNAP benefits were previously excluded under the 1999 Interim Field Guidance, and therefore, would not be considered because received prior to the effective date of this rule. |
| Jan. 1, 2019 to Dec. 31, 2019 | SNAP | $2,160 | Yes – $2,160 in proportional SNAP benefits received for 12 consecutive months beginning in January 2019 and concluding in December 2019 exceeded 15 percent of the 2019 FPG ($1,821) for a household size of one.<br><br>Also, as the benefit was received within 36 months of the time of filing the application (May 1, 2020), the receipt would be a heavily weighed negative factor in the totality of the circumstances under proposed 8 CFR 212.22(c)(1)(ii). |
| Jan. 1, 2020 to September 1, 2020 | None | None | N/A |

*Example 3:* Benefits Previously Excluded and Included Under the 1999 Interim Field Guidance

The example is based on the following scenario: The DHS rule on public charge inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), goes into effect on January 1, 2019. An alien has been paroled into the United States pursuant to section 212(d)(5) of the Act for over five year and is seeking to adjust status based on a visa category subject to the public charge inadmissibility determination. The alien's household of three includes the alien and the alien's two U.S. citizen children. The alien files an adjustment of status application on May 1, 2019, and the application is adjudicated on September 1, 2019. HHS publishes the calendar year 2019 FPG in early January 2019. For the purposes of this example, the FPG for 2019 contains the same values as the FPG for 2018. The relevant FPG based on a household of one in a consecutive twelve-month period is $12,140. Fifteen percent of the average FPG for the consecutive twelve-month period between January 1, 2018 and FPG for December 31, 2018 is $1,821. Fifteen percent of the average FPG for the consecutive twelve-month period between January 1, 2019 and FPG for December 31, 2019 is also $1,821.

For the consecutive twelve-month period between January 1, 2018 and December 31, 2018, the alien's household of 3 receives $2,400 in SNAP benefits. The proportional value of the $2,4000 SNAP benefit attributable to the alien based on her household size of 3 for this consecutive twelve-month period would be $800, or one third of $2,400. Similarly, for the consecutive twelve-month period between January 1, 2019 and December 31, 2019, the alien's household is certified to receives $1,800 in SNAP benefits for a household size of 3.

The alien is also receiving TANF. For the consecutive twelve-month period between January 1, 2018 until December 31, 2018, the alien also receives a proportionate share of $100 per month in TANF benefits or $1,200 for the twelve-month period. The alien is certified to continue to receive TANF at this level through December 2019, and there is no evidence that the alien has terminated receipt.

Under proposed 8 CFR 212.22(d), the SNAP benefits the alien received before January 1, 2019, the effective date of the public charge rule, would not be considered. However, the SNAP benefits the alien received on or after January 1, 2019 would be considered if the cumulative value of all monetizable benefits received exceeded

$1,821. TANF was considered under the 1999 Interim Field Guidance and therefore, the total value of the benefit received prior January 1, 2019 would be considered as a negative factor in the totality of the circumstances.[591] TANF benefits received after January 1, 2019 would be considered if the total value of the alien's receipt of one or more public benefits exceeded $1,821 during the relevant consecutive twelve-month period. At the time the alien's application was adjudicated on September 1, 2019, the alien received $600 in proportional SNAP benefits and $900 in TANF benefits during the consecutive 12-month period between January 1, 2019 and September 1, 2019, which, cumulatively, is less than 15 percent of the FPG in the amount of $1,821. Therefore, the alien's receipt of SNAP and TANF in 2019 would not be considered past receipt of public benefits within the 36-month period immediately preceding the application. However, because the alien was certified to receive both SNAP and TANF for the entire consecutive twelve-month period between January 1, 2019 and December 31, 2019 in a cumulative amount that exceeds the fifteen percent threshold, this would be a heavily weighed factor in the totality of the circumstances, as illustrated in Table 32.

---

[591] Note that considering the past receipt of previously included benefits as a negative factor in the totality of the circumstances is consistent with how such benefits were treated under the 1999 Interim Field Guidance, under which an ''officer determining admissibility should assess the totality of the alien's circumstances at the time of the application for admission or adjustment . . . The

longer ago an alien received such benefits or was institutionalized, the *less weight* these factors will have as a predictor of future need. Also, the 'length of time an applicant has received public cash assistance is a significant factor.' The longer an alien has received cash income-maintenance benefits in the past and the greater the amount of benefits, *the stronger the implication that the alien*

*is likely to become a public charge. The negative implication of past receipt of such benefits* or past institutionalization [sic], *however, may be overcome by positive factors in the alien's case demonstrating an ability to be self-supporting.*' *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,* 64 FR 28689, 28690 (May 26, 1999).

| Table 32. Example 3, Benefits Previously Excluded and Included Under the 1999 Interim Field Guidance | | | |
|---|---|---|---|
| **12 Consecutive Months Period** | **Benefit Type Received** | **Total Amount Received During Consecutive 12-month Period/Total Amount Certified for Consecutive 12-Month Period** | **Receipt of Public Benefits considered for purposes of the public charge determination under the proposed rule?** |
| Jan. 1, 2018 to Dec. 31, 2018 | SNAP | $800 | No – SNAP benefits were previously excluded under the 1999 Interim Field Guidance, and therefore, any amount received prior to the effective date of the rule would not be considered. |
| | TANF | $1,200 | Yes – TANF benefits were included for consideration under the 1999 Interim Field Guidance. Considered as a negative factor in the totality of the circumstances. |
| Jan. 1, 2019 to Sept. 1, 2019 (but certified through Dec. 31, 2019) | SNAP | $600 received (as of 9/2019), but certified to receive $800 for the consecutive 12-month period between January 1 and December 31, 2019 | Yes – the alien was certified to receive a cumulative amount of SNAP and TANF for the consecutive 12 month period between January 1 and December 31, 2019 that exceeds 15 percent of FPG based on a household of one, and therefore, is a heavily weighed negative factor in the totality of the circumstances. |
| | TANF | $900 received (as of 09/2019) but certified to receive $1,200 for the consecutive 12-month period between January 1 and December 31, 2019 | |
| | Total | Received $1,500 but certified to receive a cumulative total of $2,000 for the consecutive 12-month period between January 1 and December 31, 2019 | |

DHS notes that the proposed exclusion of certain benefits received before the effective date may provide an opportunity for public benefit granting agencies to communicate the consequences of receiving public benefits, to the extent such agencies deem appropriate. In addition, the proposed exclusion provides advance notice to aliens that DHS is considering to change which public benefits it will consider for purposes of public charge inadmissibility determinations. If finalized, this provision, coupled with the proposed 60-day effective date,

would give aliens an opportunity to stop receiving public benefits and obtain other means of support before filing for immigration benefits.

DHS welcomes comment on whether DHS should consider receipt of public benefits previously considered under the 1999 Interim Field Guidance as described in Table 29 at all, or if DHS should consider the benefit(s) in some other way than as a negative factor in the totality of the circumstances.

*M. Summary of Review of Factors in the Totality of the Circumstances*

An alien's likelihood of becoming a public charge, as discussed above, is prospective and based on the totality of the alien's circumstances. The Form I–944, Declaration of Self-Sufficiency, would be used by DHS to assess whether the alien is likely to become a public charge based on the totality of the circumstances. Table 33 below, provides a brief summary of the totality of the circumstances framework for public charge inadmissibility determinations. [592]

---

[592] The family status factor consideration entails determining the alien's household size and whether the alien has his or her own household or is a part

of another individual's household. Among noncitizens in families with 3 or 4 people, about 20 percent received non-cash assistance, while about

30 percent of noncitizens in families of 5 or more received non-cash benefits.

**Table 33. Totality of Circumstances Framework for Public Charge Determinations**

| Factor | Considerations | Examples of Positive or Negative Findings By Factor | Weight of Factor |
|---|---|---|---|
| **Age** | • $18 \leq$ age $\leq 61$<br>• Age > 61<br>• Age < 18 | **Positive**<br>• $18 \leq$ age $\leq 61$<br><br>**Negative**<br>• Age > 61 unless alien can demonstrate employment or sufficient household assets and resources<br>• Age < 18 unless alien can demonstrate employment or sufficient household assets and resources | The degree to which the alien's age affects otherwise makes the alien more or less likely to become a public charge, such as by impacting the alien's ability to work |
| **Health** | • Evidence of any medical condition(s) that:<br>(1) Is likely to require extensive treatment or institutionalization, or<br><br>(2) Will interfere with the alien's ability to care for him- or herself, to attend school, or to work | **Positive**<br>• Absence of any medical conditions that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to care for him- or herself, to attend school, or to work<br><br>**Negative**<br>• Presence of any medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to care for him- or herself, to attend school, or to work. | The degree to which the alien's health makes the alien more or less likely to become a public charge, including whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for him- or herself, to attend school, or to work upon admission or adjustment of status |
| **Family Status** | • Whether alien has a household that he or she supports<br>• Whether another household is supporting the alien | **Positive/ Negative**[592]<br>Alien's household size in relation to alien's household assets and resources | The degree to which the alien's household size makes the alien more or less likely to become a public charge |
| **Assets, Resources, and Financial Status** | • Annual gross household income excluding any income from public benefits<br>• Any additional income from individuals not included in the alien's household who physically reside with the alien<br>• Additional income to the alien by or source outside of the household on a continuing monthly or yearly basis for the most recent calendar year excluding any income from public benefits | **Positive**<br>• Annual gross household income $\geq$ 125% of the most recent FPG based on the household size; or Household assets and resources $\geq$ 5 times the difference between the total household income and 125% of the FPG for the household size<br><br>• Alien has sufficient household assets and resources to cover any reasonably foreseeable medical costs related to a medical condition that is | **In General**<br>The degree to which the alien's household's income, assets, and resources make the alien more or less likely to become a public charge<br><br>**Heavily Weighed Positive**<br>• Household assets, resources, and support $\geq$ 250% of the FPG for the household size<br><br>• Alien is authorized to work and currently employed with an annual household income $\geq$ 250% of the FPG for the household size<br><br>**Heavily Weighed Negative**<br>• Alien cannot demonstrate current employment, employment history, or reasonable prospect of future employment |

**Table 33. Totality of Circumstances Framework for Public Charge Determinations**

| Factor | Considerations | Examples of Positive or Negative Findings By Factor | Weight of Factor |
|---|---|---|---|
| | • Household cash assets and resources, including as reflected in checking and savings account statements covering 12 months prior to filing the application<br>• Non-cash assets and resources that can be converted into cash within 12 months, such as net cash value of real estate holdings minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home; annuities; securities; retirement and educational accounts; and any other assets that can be converted into cash easily<br>• Financial liabilities<br>• Applied for or received any public benefit as defined in 212.21(b) on or after the effective date<br>• Been certified or approved to receive public benefits, as defined in 8 CFR 212.21(b), on or after the effective date<br>• Applied for or received a fee waiver for an immigration benefit request on or after the effective date<br>• Credit history and credit score<br>• Private health insurance or the financial resources to pay for reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work | likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work<br>• Alien has not applied for or received any public benefits, as defined in 8 CFR 212.21(b), on or after effective date of the rule<br>• Alien was not certified or approved to receive public benefits, as defined in 8 CFR 212.21(b), on or after the effective date of the rule<br>• Alien has not applied for or received an immigration fee waiver on or after the effective date<br>• Alien has good credit and a credit score<br>• Alien has private health insurance or financial resources to pay for reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work<br><br>**Negative**<br>• Alien's assets and resources < than 125% of the most recent FPG based on household size; or Alien's household assets and resources < than 5 times the difference between the household income and 125% of the FPG for the household size | • Alien is currently receiving one or more public benefits, as defined 8 CFR 212.21(b).<br><br>• Alien has received one or more public benefits, as defined in 8 CFR 212.21(b), within 36 months immediately preceding filing his or her application for a visa, admission, or adjustment of status<br><br>• Alien was diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for him- or herself, attend school, or work; and the alien is uninsured and has neither the prospect of obtaining private health insurance, or the financial resources to pay for reasonably foreseeable medical costs related to a the medical condition<br><br>• Alien was previously found inadmissible or deportable on public charge grounds |

| Factor | Considerations | Examples of Positive or Negative Findings By Factor | Weight of Factor |
|---|---|---|---|
| | | • Alien has insufficient assets and resources to cover any reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide care for him- or herself-care, to attend school, or to work<br><br>• Financial liabilities<br><br>• Alien has applied for or received any public benefits, as defined in 8 CFR 212.21(b), on or after effective date of the rule<br><br>• Alien has been certified or approved to receive public benefits, as defined in 8 CFR 212.21(b), on or after effective date of the rule<br><br>• Alien has received an immigration benefit fee waiver on or after the effective date<br><br>• Alien has bad credit and a low credit score<br><br>Alien does not have private health insurance or financial resources to pay for reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work | |
| **Education and Skills** | • Employment history<br>• High school diploma or higher education<br>• Occupational skills, certifications, or licenses<br>• Proficiency in English or in additional languages | **Positive**<br>• Alien has adequate education and skills to obtain or maintain employment sufficient to avoid becoming a public charge in the United | The degree to which the alien has adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge, if authorized for employment. |

**Table 33. Totality of Circumstances Framework for Public Charge Determinations**

| *Factor* | *Considerations* | *Examples of Positive or Negative Findings By Factor* | *Weight of Factor* |
|---|---|---|---|
| | | States<br><br>• Alien is sufficiently proficient in English or additional languages to enter the U.S. job market<br><br>• Alien can obtain skilled or higher paid labor<br><br>**Negative**<br>• No employment history<br><br>• Lack of high school diploma or higher education<br><br>• Alien does not have adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge, if authorized for employment<br><br>• Not familiar with the English language sufficient to enter the job market | |
| **Affidavit of Support**[593] **(if required)** | • Sponsor's annual income, assets, and resources<br>• Sponsor's relationship to the applicant<br>• Likelihood that the sponsor would actually provide financial support to the alien | **Positive**<br>• **Assets and resources ≥ 125% of the most recent Federal Poverty Guidelines** based on the sponsor's household size<br>• Likely that sponsor would provide financial support to the alien<br><br>**Negative**<br>• Unlikely that sponsor would provide financial support to the alien | **Disqualifying - Inadmissible**<br>• Assets and resources < 125% of the most recent FPG based on household size |

**Analysis**

- Evaluate all factors and circumstances within each factor. The mere presence of any one enumerated circumstance is not, alone, determinative.[594]
- Assess whether each factor is positive or negative – Any factor or circumstance that decreases the likelihood of an alien becoming a public charge is positive. Any factor or circumstance that increases the likelihood of an alien becoming a public charge is negative.
- Assess the degree to which each factor is positive or negative – Other than the heavily weighed factors, the weight given to an individual factor would generally depend on the particular facts and circumstances of each case and the relationship of the factor to other factors in the analysis.
- Heavily weighed factors – Certain enumerated factors will generally weigh heavily in favor of finding that an alien is likely to become a public charge or finding that an alien is not likely to become a public charge.
- Other than a required but absent or insufficient sponsor's affidavit of support, no one factor alone establishes an alien's admissibility or inadmissibility.

**Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules    **51215**

| Table 33. Totality of Circumstances Framework for Public Charge Determinations | | | |
|---|---|---|---|
| *Factor* | *Considerations* | *Examples of Positive or Negative Findings By Factor* | *Weight of Factor* |
| **Admissible or Inadmissible** • *Admissible* – If DHS finds that the alien's positive factors and circumstances outweigh the alien's negative factors and circumstances, such that the alien is not likely to receive one or more public benefits at any time in the future as defined in 8 CFR 212.21(b), then DHS would conclude that the alien is not inadmissible likely to become a public charge. • *Inadmissible* – If DHS finds that the alien's negative factors and circumstances outweigh the alien's positive factors and circumstances, such that the alien is likely to receive public benefits at any time in the future as defined in 8 CFR 212.21(b), then DHS would conclude that the applicant is inadmissible as likely to become a public charge. | | | |

Below, DHS provides examples of potential public charge inadmissibility determinations. These examples are for illustrative purposes only and assume a closed universe of facts for purposes of simplicity. The examples are not intended to represent actual possible outcomes, as each case is reviewed individually on its own merits.

1. Favorable Determination of Admissibility

The following is an example (Table 34) of a set of facts that would likely result in a favorable determination of admissibility for public charge purposes. An alien would need to meet all other admissibility and eligibility requirements of the immigration benefit the alien is seeking.

---

[593] A sponsor must be able to demonstrate the means to maintain an income of *at least* 125 percent of the Federal Poverty Guidelines for the sponsor's household size. *See* INA section 213A, 8 U.S.C. 1183a. For aliens who are subject to the sponsor requirements, if a sponsor is not able to have a sufficient affidavit of support, the alien is inadmissible based on public charge under INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4) and 1183a.

[594] Except that the absence of a sufficient affidavit of support, where required, will lead to an inadmissibility finding. *See* INA 212(a)(4)(C), (D), 8 U.S.C. 1182(a)(4)(C), (D).

**Table 34. Example Applicant A**

| Factor | Considerations | Positive or Negative, Findings By Factor | Weight of Factor |
|---|---|---|---|
| Age | • 30 | Positive (within Working age of 18-61) | Neutral |
| Health | • No medical conditions | Positive | Neutral |
| Family Status | • household of 1 | Positive | Neutral |
| Education and Skills | • Currently working full-time and attending bachelor's degree program | Positive | Neutral |
| Assets, Resources and Financial Status | • Employed with income at 120 percent of the FPG<br><br>• Has not received any public benefits or any immigration fee waivers<br><br>• Has a good credit report and score<br><br>• Has no health insurance | Negative (income, no health insurance)<br><br>Positive<br><br>Positive<br><br>Negative | Neutral |
| Affidavit of Support | Not required, not applicable | Not applicable | Neutral |
| Prospective Immigration Status and Period of Stay | • Applying for Adjustment of Status under Employment Category - Unskilled worker (Cook) EW-6<br>• LPR/Permanent period of stay | Positive | Neutral |
| Analysis in the totality of the circumstances: | The alien does not have any heavily weighed negative factors and the alien is applying for an employment-based immigrant status, which is a positive factor in the prospective immigration status factor. Although the alien has no current health insurance, the alien has no medical conditions that are likely to require extensive medical treatment, institutionalization, or that that will affect her ability to work, go to school, or otherwise care for herself. The applicant is not receiving and has not received public benefits or immigration fee waivers, is young, healthy, employed, attending college, and not responsible for providing financial support for any household members. Based on a consideration of these facts and circumstances in the totality, the alien is not likely to receive public benefits in the future, and therefore, would not be found inadmissible on the public charge ground. | | |

2. Unfavorable Determination of Admissibility

The following is an example (Table 35) of a set of facts that would likely result in an unfavorable determination of admissibility for public charge purposes. The alien may also be subject to other inadmissibility grounds.

**Table 35: Example Applicant B**

| Factor | Considerations | Positive or Negative Findings By Factor | Weight of Factor |
|---|---|---|---|
| Age | • 68 | Negative | Neutral |
| Health | • Arthritis and heart disease (Class B medical conditions) that affect ability to work and require extensive medical treatment, as indicated in the medical examination | Negative | Neutral |
| Family Status | • Widow, adult child is providing alien with over 50% of support. Household of 6 (alien, alien's adult child, and the adult child's spouse, and 3 children) | Positive - in comparison to assets and resources | Neutral |
| Assets, Resources and Financial Status | • Alien has no earned income | Negative | Neutral |
| | • Annual household gross income is at 125 percent of the FPG for household of 6 (including adult child's income) | Positive | Neutral |
| | • Alien has no pension and no additional assets or resources | Negative | Neutral |
| | • Currently receiving a state cash benefit for income maintenance in excess of 15 percent of FPG consecutively for over the last 12 months | Negative | Heavily Weighed |
| | • Has not received any immigration fee waivers | Positive | Neutral |
| | • No information on credit history or score | Not applicable | Neutral |
| | • The alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for herself or work; and the alien is uninsured and has neither the prospect of obtaining private health insurance, or the financial resources to pay for reasonably foreseeable medical costs related to the medical condition. | Negative | Heavily weighed |
| Education and Skills | • No history of employment<br>• No high school diploma or other education or skills | Negative | Neutral |
| Affidavit of Support | • Sufficient Affidavit of Support from adult child at 125 percent of the FPG for household of 6 | Positive | Neutral |
| Prospective Immigration Status and Period of Stay | • Applying for Adjustment of Status under Family Category - Parent of a U.S. citizen (IR-0)<br>• LPR/Permanent period of stay | Neutral | Neutral |
| Analysis in the totality of the circumstances: | Although the alien's family status, assets, sources, and financial status (household income is at 125 percent of the FPG), and sufficient affidavit of support are positive factors, the alien's negative factors outweigh the alien's positive factors. The alien's health, lack of employment history, and lack of education and skills indicate that the alien is unlikely to work in the future to meet her needs. Moreover, the alien has two heavily weighed negative factors. The alien has Class B medical conditions that are likely to require extensive medical treatment, and the alien has no earned income, personal assets and resources, or prospect of private health insurance to cover the cost of medical care to treat the diagnosed Class B medical conditions. | | |

The alien is also current receiving a state cash benefit for income maintenance in excess of the 15 percent threshold.

In this example, USCIS issued a RFE or NOID, giving the alien the opportunity to provide evidence of termination of public benefits and evidence of newly acquired assets or resources that would allow her to overcome the negative factors in her case. However, the alien's response did not provide any additional information relevant to the public charge inadmissibility factors. Based on a consideration of these facts and circumstances in the totality, USCIS concluded that the alien is likely to receive public benefits in the future, as defined in 8 CFR 212.21(b), and accordingly found the alien inadmissible based on the public charge ground.

*N. Valuation of Monetizable Benefits*

DHS has consulted with the relevant Federal agencies regarding the inclusion and consideration of certain monetizable public benefits, and is proposing a benefit-specific methodology to establish a value for certain monetizable benefits in order to determine whether the alien has received in excess of the 15 percent threshold. This methodology ensures that for benefits which are provided on the basis of a household and not the individual, USCIS would only take into consideration the portion of the benefit that is attributable to the alien. However, in circumstances where the alien is not eligible for a given benefit but is part of a household that receives the benefit (such as by living in a household that receives a housing benefit by virtue of other household members' eligibility), such benefit based on the eligibility and receipt of such benefit(s) by his/her household members, USCIS would not consider such use for purpose of a public charge inadmissibility determination.

In valuing the cash monetizable benefits, USCIS would calculate the amount of the benefit attributable to the alien in proportion to the other household members. Thus, for instance, a household cash benefit of $600, shared among three eligible individuals, would be attributed to the alien in the amount of $200.

In valuing the non-cash monetizable benefits, DHS would use the same methodology, as follows:

• With respect to the Supplemental Nutrition Assistance Program (SNAP, or formerly called "Food Stamps"), 7 U.S.C. 2011 to 2036c, DHS would calculate the annual aggregate amount of the benefit attributable to the alien alone, based on the amount(s) deposited monthly in the Electronic Benefits Transfer (EBT) card account. This calculation would be performed based on the alien's reporting of the monthly amounts deposited. DHS would divide

the amount received by the number of eligible household members enrolled in the benefit.

• With respect to the Section 8 Housing Assistance under the Housing Choice Voucher Program, as administered by HUD under 24 CFR part 984; 42 U.S.C. 1437f and 1437u, DHS would calculate the proportional value of the voucher attributable to the eligible alien alone, based on the amount of the benefit received. In calculating the proportional value of the benefit, DHS would use the same methodology—it would divide the value of the benefit by the number of people receiving it. DHS also welcomes comments on a potential alternative methodology, under which DHS would assign value to the benefit using HUD rules at 24 CFR 5.520.

• With respect to Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation) under 24 CFR parts 5, 402, 880–884 and 886, DHS would calculate the proportional value of the rental assistance attributable to the eligible alien alone, based on the amount of the benefit received. In calculating the proportional value of the benefit, DHS would use the same methodology as above—it would divide the value of the benefit by the number of people receiving it. DHS also welcomes comment on a potential alternative methodology, under which DHS would assign value to the benefit using HUD rules at 24 CFR 5.520.

DHS seeks public comments on these proposed approaches described above, including any studies or data that would support an alternative approach.

*O. Public Charge Bond for Adjustment of Status Applicants*

DHS has the broad authority to prescribe forms of bonds as is deemed necessary for carrying out the Secretary's authority under the provisions of the Act.[595] Additionally, an alien who DHS has determined to be

inadmissible based on public charge grounds may, if otherwise admissible, be admitted at the discretion of the Secretary upon giving a suitable and proper bond.[596] Currently, the regulatory authority for posting a public charge bond can be found in 8 CFR 103.6 and 8 CFR 213.1.

1. Overview of Immigration Bonds Generally

Immigration bonds may generally be secured by cash or cash equivalents, or may be underwritten by a surety company certified by the Department of Treasury under 31 U.S.C. 9304–9308.[597] A bond, including a surety bond, is a contract between the United States (the obligee) and an individual or a company (obligor) who pledges a sum of money to guarantee a set of conditions set by the government concerning an alien.[598] Surety bonds are bonds in which the surety company and its agents serve as co-obligors on the bond. Such company and its agents are jointly and severally liable for the payment of the face amount of the bond if the bond is breached.[599]

2. Overview of Public Charge Bonds

(a) Public Charge Bonds

Public charge bonds are intended to hold the United States and all states, territories, counties, towns, municipalities and districts harmless against aliens becoming a public charge.[600] A public charge bond is issued on the condition that the alien does not become a public charge. If the government permits the alien to submit a public charge bond, the government

---

[595] *See* INA section 103(a)(3), 8 U.S.C. 1103(a)(3).

[596] *See* INA section 213, 8 U.S.C. 1183.

[597] *See generally* 8 CFR 103.6.

[598] *See, e.g., Matter of Allied Fid. Ins. Co.,* 19 I&N Dec. 124, 125–26 (BIA 1984) (discussing the contractual nature of delivery bonds submitted under 8 CFR 103.6); *see* Merriam-Webster Online Dictionary, *Definition of Bond, https://www.merriam-webster.com/dictionary/bond* (last updated Sept. 3, 2018).

[599] *See* 8 CFR 103.6(e).

[600] *See* INA section 213, 8 U.S.C. 1183.

admits the alien despite having found the alien inadmissible as likely to become a public charge.

If an alien admitted after submitting a public charge bond becomes a public charge, the bond is breached. The bond is breached regardless of whether a demand for payment of the public expense has been made otherwise, as reflected below.[601]

### (b) Current and Past Public Charge Bond Procedures

Regulations governing public charge bonds can be found at 8 CFR 103.6 and 8 CFR 213.1. Agency guidance is provided in the Adjudicator's Field Manual (AFM), Chapter 61.1. According to the AFM, although DHS has the authority to require public charge bonds, the authority has rarely been exercised since the passage of IIRIRA in 1996, which codified the enforceable affidavit of support requirements.[602] Consequently, USCIS does not currently have a process

in place to regularly accept public charge bonds.

Prior to 1996, INS had issued public charge bond guidance in the Operating Instructions (OI) 103.6 and 213.1,[603] and its predecessor, the Examinations Handbook, at Part VI, VI–88 through VI–98.[604] Although these manuals do not appear to comprehensively address public charge bonds, the following summarizes parameters of past public charge bond practices:

A consular officer would advise an immigrant visa applicant required to post a bond in writing, specifying the amount to be posted with INS. Without such a letter, INS would not accept the posting of a bond.[605] INS informed the DOS of the posting of the bond as soon as an alien-designated obligor in the United States posted the bond.[606] According to 8 CFR 213.1, a public charge bond had to be at least $1,000. As soon as a bond was posted, INS monitored the bond periodically.[607] Any interested party could request the review and cancellation of the bond at any time.[608] Upon receiving the request, INS would notify the alien of his or her opportunity to present evidence to establish that the bond was not breached and that the alien was not likely to become a public charge in the future; receipt of public assistance was ordinarily sufficient to warrant the continuation of the bond.[609] According to the OIs, if no request to cancel the bond was made, INS would review the bond every 5 years to determine whether INS should cancel the bond. Ordinarily, and in addition to the statutory reasons for cancellation, a bond was cancelled after the initial 5-year period (or earlier, if warranted) if the review showed that the alien had not and would not likely become a public charge.[610] Additionally, and in

accordance with 8 CFR 103.6(c)(1), the bond could be cancelled if INS determined that there is no likelihood that the alien would become a public charge.[611]

If the alien became a public charge by using public assistance, the bond was breached in the necessary amount with any remainder continued in effect.[612] According to the Examinations Handbook, if the alien had received any public funds, and the agency from which the alien had obtained the funds requested repayment, the obligor was required to pay the actual expenses to INS within thirty days. If no payment was made, the obligor was then required to pay the total amount due plus $200 to the INS. If the payment was not made, the amount was then extracted from the bond itself.[613]

The 1999 public charge guidance did not detail any procedures on public charge bonds.[614] The current USCIS guidance in the Adjudicator's Field Manual addresses the possibility of a bond in certain circumstances, and outlines that upon termination on account of the statutory reasons, the sums or other security held to secure its performance, except to the extent it is forfeited for violation of its terms, must be returned to the person who posted the bond, or to his legal representatives.[615]

Although the current bond form used by U.S. Immigration and Customs Enforcement (ICE), Immigration Bond (Form I–352), references public charge bonds, ICE does not administer public charge bonds. However, Form I–352 does specify that the obligor shall pay to the United States or to any State, territory, county, town, municipality or district that provided public assistance any and all charges up to the total amount of the bond. In the event that the public authority providing assistance is not authorized to accept reimbursement, the obligor agrees that he or she will pay DHS.

---

[601] See INA section 213, 8 U.S.C. 1183; see also Matter of Viado, 19 I&N Dec. 252, 253–54 (BIA 1985).

[602] See AFM, Chapter 61.1 ("(b) Policy. Although USCIS has the authority to require a public charge bond, such authority is rarely exercised in light of the statutory changes contained in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) which created the enforceable affidavit of support (see Chapter 20.5 of this field manual)." IIRIRA section 564(f) amended INA section 213, 8 U.S.C. 1183. In addition to the regular bonding requirements, IIRIRA section 564(a) through (e) also established 3-year pilot programs in 5 district offices of INS to require aliens to post a bond in addition to the affidavit requirements under INA section 213, 8 U.S.C. 1183a, and the deeming requirements under section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 8 U.S.C. 1631. Congress provided that any pilot program established pursuant to this subsection shall require an alien to post a bond in an amount sufficient to cover the cost of benefits described in INA section 213A(d)(2)(B), 8 U.S.C. 1183a, and for the alien and the alien's dependents, and shall remain in effect until the departure, naturalization, or death of the alien. See IIRIRA, Public Law 104–208, div. C, section 564(a), 110 Stat 3009–546, 3009–683. Suit on that bond was supposed to be brought under the terms and conditions of INA section 213A, 8 U.S.C. 1183a. Within 180 days after the date of IIRIRA, which was on September 30, 1996, the Attorney General was directed to issue regulations establishing the pilot program, including criteria and procedures for certification of bonding companies, debarment of any such company that fails to pay a bond, and criteria for setting the amount of the bond to assure that the bond is in an amount that is not less than the cost of providing benefits under INA section 213A(d)(2)(B) for the alien and the alien's dependents for 6 months. See IIRIRA, Public Law 104–208, div. C, section 564(b), 110 Stat 3009–546, 3009–683 to –684. Congress furthermore imposed an annual reporting requirement, starting 9 months after the date of the implementation of the program. See IIRIRA, Public Law 104–208, div. C, section 564(d), 110 Stat 3009–546, 3009–684. DHS is unable to locate implementing materials relating to this pilot program.

[603] See INS Operating Instructions (Nov. 1997) [hereinafter OI]. INS removed Operating Instructions in 1998 and transferred the parts relating to the bond to the Inspector's Field Manual, Chapter 45. See Transmittal Memo (TM2), M–450 Inspector's Field Manual, Dated March 13, 1998, and Transmittal Memo (TM1), M–450 Inspector's Field Manual, Dated June 24, 1997. No further guidance on public charge bond processing appears to have been issued.

[604] See INS Examinations Handbook, Part VI, VI–88 through VI–98 (Oct. 1, 1988) [hereinafter Examinations Handbook].

[605] See Examinations Handbook, Part VI, at VI–89; see OI 213.1.

[606] See Examinations Handbook, Part VI, at VI–89; see OI 213.1.

[607] See Examinations Handbook, Part VI, at VI–91 and VI–92; see OI 103.6(c)(1).

[608] See Examinations Handbook, Part VI, at VI–94; see OI 103.6(c)(1).

[609] See Examinations Handbook, Part VI, at VI–94; see OI 103.6(c)(1).

[610] See Examinations Handbook, Part VI, at VI–94; see OI 103.6(c)(1).

[611] See Examinations Handbook, Part VI, at VI–94; see OI 103.6(c)(1).

[612] See Examinations Handbook, Part VI, at VI–95; see OIs 103.6(c)(1).

[613] See Examinations Handbook, Part VI, at VI–95.

[614] Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689 (May 26, 1999).

[615] See AFM Ch. 61.1, Posting, Cancellation and Breaching of Public Charge Bonds. As already mentioned, USCIS' bond authority is rarely exercised in light of the statutory changes contained in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) which created the enforceable affidavit of support.

(c) Relationship of the Public Charge Bond to the Affidavit of Support

The Affidavit of Support and the public charge bond are distinct, but complementary, means to recover costs associated with the alien's receipt of public benefits. As discussed above, certain applicants seeking immigrant status must submit an enforceable Affidavit of Support under Section 213A of the INA (Form I–864).[616] The affidavit of support is a contract between the alien's sponsor and the U.S. Government that imposes on the sponsor a legally enforceable obligation to support the alien. The obligation may be enforced against the sponsor by the sponsored alien, the Federal Government, any State or any political subdivision thereof, or by any other entity that provides any means-tested public benefit.[617] According to section 213A(b) of the Act, 8 U.S.C. 1183a(b), a non-governmental entity that provided such benefit(s) or the appropriate entity of the Federal Government, a State, or any political subdivision of the State must request reimbursement by the sponsor in the amount of the unreimbursed costs of the benefits or, after non-payment, bring an action against the sponsor under section 213A of the Act, 8 U.S.C. 1183A, no later than 10 years after the date on which the sponsored alien last received any means-tested benefit to which the affidavit of support applies.[618] Section 213A of the Act, 8 U.S.C. 1183a, does not require a sponsored immigrant to request the sponsor or joint sponsor to comply with the support obligation before bringing an action to compel compliance.[619] Neither USCIS nor DHS are directly involved in enforcing an Affidavit of Support sponsor's obligation to reimburse an agency. USCIS does, however, make information about the sponsor available to an agency seeking reimbursement.[620]

Under section 213 of the Act, 8 U.S.C. 1183, an alien may be admitted to the United States at the discretion of the Attorney General upon the giving of a suitable and proper bond. In contrast to the affidavit of support, which is a contract between the government and the sponsor, a bond, including a surety bond, is a contract between the United States (the obligee) and an individual or a company (obligor) who pledges a sum of money to guarantee conditions set by the government concerning an alien.[621] Thus, there are distinct differences between the affidavit of support and the bond. For example, unlike the affidavit of support, in which the alien as well as the government entity may have a cause of action to recover expenses, only the government entity being part of the bond contract may pursue recovery from the obligor if the bond is breached and only the obligor may challenge the breach determination.[622]

In section 213 of the Act, 8 U.S.C. 1183, Congress directly addresses the affidavit of support and the deeming requirement imposed in section 213 of the Act when it added a parenthetical to the public charge bond provision stating that the alien may be admitted "(subject to the affidavit of support requirement and attribution of sponsor's income and resources under Section 213A)" upon having posted a suitable bond.[623] In the provision amending section 213 of the Act, section 564(f) of IIRIRA, Congress emphasized that the bond was to be considered in addition to the sponsor and deeming requirements under section 213A of the Act, 8 U.S.C. 1183A, and not instead of them.[624] The Joint Explanatory Statement in the House Conference Report for IIRIRA confirms that Congress intended that bonds "should be required in addition to, and not in lieu of, the new sponsorship and deeming requirements of section 213A of the Act, 8 U.S.C. 1183a."[625] Correspondingly, Congress also retained in section 213 of the Act, 8 U.S.C. 1183, the longstanding concept that suit on the bond may be made irrespective of the reasons for the breach and irrespective of whether a demand for payment of public expenses have been made.[626]

(d) Summary of Proposed Changes

In this rule, DHS proposes to clarify when an alien seeking adjustment of status will be permitted to post a public charge bond under DHS's authority outlined in sections 103 and 213 of the Act, 8 U.S.C. 1103 and 1183. Additionally, as reflected below, DHS proposes to establish a new minimum bond amount of $10,000 (adjusted annually for inflation), explain the circumstances under which a public charge bond will be cancelled, as well as establish specific conditions under which a public charge bond will be breached.[627] Finally, DHS proposes processing fees for the initial submission of the Public Charge Bond (Form I–945) and for the Request for Cancellation of Public Charge Bond (Form I–356); both fees would be initially set at $25. USCIS plans to establish a process to accept and process public charge bonds, which would be available on the effective date of the final rule. DHS welcomes comments on any aspect of the public charge bond or public charge bond process, including whether the minimum public charge bond amount should be higher or lower, and possible ranges for that amount.

3. Permission To Post a Public Charge Bond

First, the proposed regulation clarifies that permitting an alien who is found inadmissible as a public charge but is otherwise admissible to submit a public charge bond is within DHS's discretion.[628] Section 213 of the Act gives DHS discretion to allow an alien

---

[616] *See* INA section 213A, 8 U.S.C. 1183a.

[617] *See* INA section 213A(a)(1)(B), 8 U.S.C. 1183a(a)(1)(B).

[618] *See* INA section 213A(b), 8 U.S.C. 1183A(b). Implementing regulations on the request for reimbursement and actions to compel reimbursement can be found at 8 CFR 213a.4. Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in 28 U.S.C. 3201 (Judgement liens), 28 U.S.C. 3203 (Execution), 28 U.S.C. 3204 (Installment payment order), or 28 U.S.C. 3205 (Garnishment), as well as an order for specific performance and payment of legal fees and other costs of collection and include corresponding remedies available under State law. *See* INA section 213A(c), 8 U.S.C. 1183a(c). A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of 31 U.S.C. Chapter 37 (Claims of the United States Government). *See* INA section 213A(c), 8 U.S.C. 1183a(c).

[619] *See* 8 CFR 213a.4(a)(2).

[620] *See* 8 CFR 213a.4(a)(3). Upon receipt of a duly issued subpoena, USCIS will provide the agency with a certified copy of a sponsor's Form I–864. Additionally, USCIS routinely provides the sponsor's name, address and Social Security number to Federal, state, and local agencies providing means-tested benefits.

[621] *See, e.g., Matter of Allied Fid. Ins. Co.,* 19 I&N Dec. 124, 125–26 (BIA 1984).

[622] *Compare* INA section 213A(b)(2), 8 U.S.C. 1183a, *with* INA section 213, 8 U.S.C. 1183. *See also Matter of Ins. Co. of N. Am.,* 17 I&N Dec. 251, 251 (BIA 1978) (finding that only the obligor and the obligee are party to the contract and that only the obligor, but not the alien, may challenge the government breach determination).

[623] *See* IIRIRA, Public Law 104–208, div. C, section 564(f), 110 Stat. 3009–546, 3009–684.

[624] *See* IIRIRA, Public Law 104–208, div. C, section 564(f), 110 Stat. 3009–546, 3009–684 ("[i]f Bonds in addition to sponsorship and deeming requirements—Section 213 (8 U.S.C. 1183) is amended by inserting '(subject to the affidavit of support requirement and attribution of sponsor's income and resources under Section 213A)' after 'in the discretion of the Attorney General.' ").

[625] *See* H.R. Conf. Rep. No. 104–828, at 243 (1996) (Conf. Rep.).

[626] *See* INA section 213, 8 U.S.C. 1183; *see also Matter of Viado,* 19 I&N Dec. 252, 253 (BIA 1985) (distinguishing inadmissibility under section 212(a)(4) of the Act and a public charge bond from deportability under section 237(a)(5) of the Act); *Matter of B,* 3 I&N Dec. 323, 326 (BIA 1948) (holding that before an alien could be considered deportable on public charge ground, the state authorities must have demanded repayment of charges for services rendered and the charges must thereafter have remained unpaid.).

[627] *See* proposed 8 CFR 213.1.

[628] *See* proposed 8 CFR 213.1.

**Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules **51221**

to post a ''suitable and proper'' public charge bond if the alien is otherwise admissible. Therefore, DHS proposes that in circumstances under which USCIS determines, after a finding of inadmissibility on the public charge ground that a favorable exercise of discretion is warranted, USCIS will notify the alien of the possibility to submit a bond and USCIS will specify the bond amount and bond conditions. The alien would then be permitted to submit the appropriate form for the public charge bond in accordance with the form instructions and with the appropriate fee. DHS proposes that a public charge bond could only be submitted on the alien's behalf after USCIS makes this option available to the alien, and that USCIS would reject any unsolicited attempt to submit a bond.

The same factors that weighed positively when making the public charge inadmissibility determinations will generally indicate that offering the option of a public charge bond to an alien is warranted. Ultimately, the purpose of the public charge bond is to allow DHS to admit an alien who is inadmissible as likely to become a public charge, but who warrants a favorable exercise of discretion. DHS believes that offering a public charge bond in the adjustment of status context would generally only be warranted in limited circumstances in which the alien has no heavily weighed negative factors, but the presence of such factors would not automatically preclude DHS from offering a public charge bond. As explained above, DHS would consider the heavily weighed negative factors particularly indicative of the likelihood that an alien would become a public charge. However, as is the case with any discretionary determination, DHS may also consider any of a range of positive and negative factors applicable to the alien's case when determining whether the alien should be offered the option to post a public charge bond and be admitted to the United States on bond. For example, an officer could consider whether allowing the alien to become a lawful permanent resident would offer benefits to national security, or would be justified for exceptional humanitarian reasons. Another example in which USCIS may offer an alien the possibility to post a bond would be if an alien had a weak financial status, had received public benefits 40 months prior to applying for immigration status, and had a medical condition, but the alien's prospect of obtaining medical insurance (that does not meet the definition of a public benefit under proposed 8 CFR

212.21(b)) is good and the grant of admission upon public bond would be in the interest of family unity.

4. Bond Amount and Submission of a Public Charge Bond

DHS proposes that, in cases in which USCIS has determined that offering a public charge bond to an alien is warranted, the public charge bond be set at no less than $10,000, annually adjusted for inflation based on the Consumer Price Index for All Urban Consumers (CPI–U),[629] and rounded up to the nearest dollar. This would raise the amount that is currently stated in 8 CFR 213.1 from no less than $1,000 to no less than $10,000.

Proposing a base amount sufficient for a public charge bond based on historical public benefit data is difficult, because the amount of average public benefit being considered under the proposed rule depends on the public benefit the person receives and how long the person receives the benefit. The broad range of public benefits available to individuals on the Federal, State, and local level, but not necessarily to immigrants, renders such a determination even more complex.

As indicated above, DHS proposes to set the base amount of the public charge bond at $10,000. The current 8 CFR 213.1 refers to a bond amount of at least $1,000. 8 CFR 213.1 was promulgated in July of 1964.[630] This provision has not been updated and inflation has never been accounted to represent present dollar values. Simply adjusting the amount for inflation using CPI–U would bring the bond floor in June 2018 to about $8,100.[631] DHS notes that bond amounts could be $1,000 or more (in 1964 dollars) and once adjusted for inflation, these amounts are equivalent to $8,100 or more in present dollar values. Additionally, when examining previous public charge bonds granted by legacy immigration agencies, DHS has found that the minimum amount of approved public charge bonds remained relatively stable in inflation-adjusted dollars and fluctuated around or above

$10,000.[632] Accordingly, DHS proposes that $10,000 would be an amount that would provide USCIS with an appropriate starting point when determining the public charge bond amount that is minimally necessary to ensure that United States can recoup cost of public benefits received by the alien. Additionally, as with determining whether to offer an alien the option of posting a public charge bond, USCIS will consider the alien's individual circumstances when determining the exact amount of the bond the alien is required to post.

If USCIS determines that the alien seeking adjustment of status may submit a public charge bond, neither the alien nor an obligor, including a surety company, would be able to appeal the amount of the bond required.[633] As discussed more fully in this preamble, DHS has discretion to allow an alien to post a public charge bond ''in such amount and containing such conditions'' as DHS may prescribe. Given the discretionary nature of DHS's authority under section 213 of the Act, 8 U.S.C. 1183, DHS has determined that the bond amount would not be appealable administratively either to the AAO or the BIA, because neither administrative body has jurisdiction over this discretionary determination.[634]

As indicated above, under this proposed rule, USCIS would notify the alien of the bond amount and conditions, including the type of bond the alien may submit. Each submission would be on the form designated and in accordance with the applicable instructions and fees prescribed in 8 CFR 103.7. While the proposed rule

---

[629] U.S. Bureau of Labor Statistics, *Consumer Price Index for All Urban Consumers*, https://data.bls.gov/cgi-bin/surveymost?cu (select "U.S. All items, 1982–84=100—CUUR0000SA0") (last visited Sept. 5, 2018).

[630] *Miscellaneous Amendments to Chapter,* 29 FR 10579 (July 30, 1964).

[631] DHS uses the semi-annual average for the first half of 2018 and the annual average from 1964 from the historical CPI–U for U.S. City Average, All Items. *See* https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201806.pdf.

Calculation: Annual average for 1st half of 2018 (250.089)/annual average for 1964 (31) = 8.1; CPI–U adjusted present dollar amount = $1,000 * 8.1 = $8,100.

[632] *See, e.g., Wallis* v. *U.S. ex rel. Mannara,* 273 F. 509, 511 (2d Cir. 1921) ($1000 public charge bond posted in September 1920, which would amount to about $12,600.30 in July 2018); *Matter of Viado,* 19 I&N Dec. 252, 252 (BIA 1985) ($5000 bond posted in February 1979, which would amount to about $$18,234.88 in July 2018); *In re Obligor,* 2007 WL 5326596, at *1 (AAO June 6, 2007) (adjustment upon $10,000 bond in June 1999, which would amount to about $15,162.82 in July 2018). For purposes of these calculations, DHS used the CPI Inflation Calculator from the Bureau of Labor Statistics at https://www.bls.gov/data/inflation_calculator.htm (last visited Aug. 20th, 2018).

[633] *See* proposed 8 CFR 213.1(b).

[634] *See United States ex rel. Chanin* v. *Williams,* 177 F. 689, 690 (2d Cir. 1910) (''The matter of admission under bond of a person once found to be likely to become a public charge is by the statute confided to the Secretary, and we do not see why his refusal to admit is not an adverse exercise of such discretion in any particular case. His reasons for refusal may or may not seem persuasive to a court; but it is to him, not to the court, that Congress has confided the discretion.''); *see also In re Obligor,* 2007 WL 5326596, at *1 (AAO June 6, 2007) (sustained appeal that public charge bond was not breached). The BIA does not have jurisdiction. 8 CFR 1003.1(b)

**51222**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

retains the options for a surety bond or a cash or cash equivalent such as a cashier's check or money order deposit and agreement to secure a bond, due to operational feasibility considerations USCIS plans to initially allow for only surety bonds.[635] For example, surety bonds do not involve the actual exchange of money until the bond is breached, while the undertaking of cash bonds involves additional accounting mechanisms, including the management of interest. DHS proposes to use new USCIS Form I–945, Public Charge Bond for this purpose. As discussed in greater detail below, DHS is proposing a $25 public charge bond processing fee to be submitted with the Form I–945.

For all public charge surety bonds, an acceptable surety company is generally one that appears on the current Treasury Department Circular 570 as a company holding the requisite certificate of authority to act as a surety on Federal bonds.[636] Treasury-certified sureties have agents throughout the United States from whom aliens could seek assistance in procuring an appropriate bond.[637] The Department of the Treasury certifies companies only after having evaluated a surety company's qualifications to underwrite Federal bonds, including whether those sureties meet the specified corporate and financial standards. Under 31 U.S.C. 9305(b)(3), a surety (or the obligor) must carry out its contracts and comply with statutory requirements, including prompt payment of demands arising from an administratively final determination that the bond had been breached.

If an alien successfully posts a public charge bond in the amount and under the conditions specified in the form instructions and USCIS notice, USCIS will continue to adjudicate the alien's application for adjustment of status and will grant such application if all eligibility criteria are met. Additionally, if the bond has been successfully posted, USCIS must ensure that the bond is maintained during the effective period of the bond. To achieve this goal, DHS proposes that an obligor would need to notify DHS within 30 days of any change in the obligor's or the alien's physical and mailing address. Given the contractual nature of the public charge bond, the change of address requirement imposed is similar to the one imposed on a sponsor's change of address

requirement for purposes of the affidavit of support under 8 CFR 213a.3, except that the obligor would also need to notify USCIS of the bonded alien's change of address. An alien would still need to comply with the change of address requirements under section 265 of the Act, 8 U.S.C. 1305, and 8 CFR 265.1 to notify USCIS of his or her change of address.

If the alien does not respond to the notice soliciting a public charge bond, or the bond submitted does not comply with the bond amount and conditions set by USCIS, USCIS will deny the alien's application. Given the complexity of a bond process, DHS plans to issue separate guidance addressing the specifics of public charge bond submission.

### 5. Public Charge Bond Substitution

DHS proposes that if USCIS accepts a bond of limited duration, the bond on file must be substituted with a new bond 180 days before the bond on file with USCIS expires.[638] A bond of limited duration is a bond that expires on a date certain regardless of whether the statutory terms for cancellation of such a bond have been met (*i.e.,* naturalization, permanent departure, or death of the alien). A bond of unlimited duration is a bond that does not have a specific end date but ends upon USCIS canceling the bond. Bonds of limited duration are sometimes easier and cheaper to obtain and DHS is proposing to allow for this option so long as a substitute bond is valid and effective before the expiration date of the bond on file. Because a bond has to be maintained until cancelled by USCIS, substitution ensures continuous indemnification of the United States against the alien receiving public benefits until the conditions for the cancellation of the bond have been met. Additionally, requiring that the substitute bond for a bond of limited duration is submitted to DHS at least 180 days before the expiration of the bond previously submitted expires permits USCIS to allow for some time to adjudicate the sufficiency of any substitute bonds, which further ensures continuous indemnification of the United States against the alien receiving public benefits.

Either the obligor, a substitute obligor, or the alien would be able to submit the substitute bond at any time and regardless of the reasons. The substitute bond would need to be valid, properly submitted with the appropriate fee, and effective on the day the previously submitted bond on file with USCIS

expires. The substitute bond would need to meet all of the requirements applicable to the bond on file with USCIS, as required by 8 CFR 103.6 and 8 CFR 213.1. To ensure continued bond coverage of the alien as required under section 213 of the Act, the substitute bond would also need to cover a bond breach that occurred before USCIS accepted the substitute bond, in the event USCIS does not have knowledge of the breach until after the expiration or cancellation of the bond on file with USCIS. If USCIS determined that the substitute bond proffered is sufficient, it would accept the bond and the bond would become effective on the day the bond currently on file expires or when the new bond takes effect, if prior to the expiration of the bond on file.[639] Additionally, the bond previously on file would be cancelled, if needed.[640] If the substitute bond was insufficient, USCIS would notify the obligor of the substitute bond so that the obligor could correct the deficiency within the timeframe stipulated in the notice. USCIS may also send a copy of the notification to the alien, the alien's representative (if any), and the initial obligor. If the deficiency is not corrected within the timeframe stipulated in the notice, the substitute bond would be rejected.

### 6. Public Charge Bond Cancellation

#### (a) Conditions

A public charge bond must remain in effect until the alien naturalizes or otherwise obtains U.S. citizenship, permanently departs the United States, or dies, until the bond is substituted with another bond, or until the bond is otherwise cancelled by DHS.[641] During this period, as a condition of the bond, an alien on whose behalf a public charge bond has been accepted agrees to not receive public benefits, as defined in 8 CFR 212.21(b), after the alien's adjustment of status to that of a legal permanent resident and until the bond is cancelled according to proposed 8 CFR 212.21(g). The alien also has to comply with any other conditions imposed as part of the bond. That means that a bond is considered breached if the alien receives public benefits, as defined in proposed 8 CFR 212.21(b), after the

---

[635] See proposed 8 CFR 213.1(b)(1).

[636] See 8 CFR 103.6(b); *see also* proposed 8 CFR 103.6, as published in 83 FR 25951 (June 5, 2018).

[637] See Dep't of Treasury Circular 570, *Listing of Approved Sureties* (July 1, 2018).

[638] See proposed 8 CFR 213.1.

[639] See proposed 8 CFR 213.1.

[640] For purposes of this type of cancellation, neither the obligor nor the alien must submit Form I–356. Form I–356 is submitted to assess whether the alien has received any public benefits, as defined in 8 CFR 212.21(b), or otherwise breached a condition of the bond. At the time for substitution, USCIS does not engage in a breach assessment as the bond is substituted with another, not actually cancelled according to the terms of proposed 8 CFR 213.1(g).

[641] See INA section 213, 8 U.S.C. 1183; *see also* proposed 8 CFR 213.1.

alien's adjustment of status to that of a lawful permanent resident and until the bond is cancelled under proposed 8 CFR 213.1(g). A bond is also considered breached if the alien fails to comply with any other condition of the bond. In these situations, USCIS cannot cancel the bond. Public benefits, as defined in proposed 8 CFR 212.21(b), received by an alien present in the United States in an immigration status that is exempt from the public charge ground of inadmissibility under section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), and public benefits received after the alien obtained U.S. citizenship are not counted towards any breach determination, and therefore, also for purposes of the cancellation determination.[642] Additionally, consistent with the public benefits definition proposed in this rule, DHS would not consider as part of a public charge bond cancellation determination any public benefits received by an alien enlisted in the U.S. armed forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or if received by such an individual's spouse or child as defined in section 101(b) of the Act, 8 U.S.C. 1101(b), regardless of whether such receipt occurred prior to the alien enlisting into the U.S. Armed Forces.

(b) Definition of Permanent Departure

According to section 213 of the Act, a public charge bond must be cancelled when the alien naturalizes or otherwise obtains U.S. citizenship, permanently departs the United States, or dies. When codifying section 213 of the Act, Congress did not define "permanent" and the concept of permanent departure does not exist in other areas of immigration law. However, "permanent" is defined in section 101(a)(31) of the Act, 8 U.S.C. 1101(31), as "a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law." "Departing" or "departure" is not defined in the INA, but DHS believes that it is reasonable to conclude that permanent departure for the purposes of canceling a public charge bond means that the alien has left the United States on a lasting, non-temporary basis after losing the lawful permanent resident status either voluntarily or involuntarily, and is physically outside the United States. Losing lawful

permanent resident status either voluntarily or involuntary coupled with physically leaving the United States is consistent with the INA's definition for permanent. The proposed rule will clarify that an alien has permanently departed for bond cancellation when he or she has (1) lost or abandoned lawful permanent resident status, whether involuntary by operation of law or voluntarily, and (2) physically left the United States.[643] An alien must establish that both elements, as described above, have been met before USCIS may cancel the bond.

DHS further proposes that an alien is only deemed to have involuntarily lost lawful permanent resident status in removal proceedings with the entry of a final order of removal [644] or through rescission of adjustment of status.[645] An alien may be found to have abandoned LPR status, even if the assessment is made outside of removal proceedings and if the alien's actions were unintentional.[646] If an alien loses his or her LPR status through operation of law, the alien would be required to provide evidence of the loss of status by submitting evidence of the official determination of loss of LPR status before USCIS will cancel the bond.[647]

Generally, determining whether an alien has abandoned his or her status is highly fact specific and courts consider factors such as the length of an alien's absence from the United States, family and employment ties, property holdings, residence, and the alien's intent or actions.[648] An alien may

intentionally relinquish lawful permanent resident status through his or her voluntary actions, such as by submitting a declaration of intent to abandon LPR status. Neither the INA nor DHS regulations direct how aliens may formally inform the U.S. Government of their abandoning their lawful permanent resident status. To simplify the process, USCIS had developed, in the past, Form I-407, Record of Abandonment of Lawful Permanent Resident Status as a means by which an alien may formally record that they have abandoned LPR status. The purpose of the form is to create a record and to ensure that the alien acts voluntarily and willingly, and is informed of the right to a hearing before an Immigration Judge and has knowingly, willingly, and affirmatively waived that right.[649]

Given that it is difficult to assess whether an alien voluntarily abandoned his or her lawful permanent resident status, DHS proposes that an alien may demonstrate voluntarily relinquishment of the lawful permanent resident status for purposes of bond cancellation only by showing proof that he or she has submitted Form I-407 to the U.S. Government.[650] In addition to the advantages of the Form I-407 enumerated above, requiring evidence of a Form I-407 filing would ensure consistent adjudication of bond cancellation requests because officers have the necessary information and would not have to otherwise determine

---

[642] See proposed 8 CFR 213.1(h).

[643] See proposed 8 CFR 213.1.

[644] See 8 CFR 1.2; see also Matter of Lok, 18 I&N Dec. 101, 105–06 (BIA 1981).

[645] See INA section 246, 8 U.S.C. 1256.

[646] Abandonment is not directly addressed in the INA. The question typically arises in the context of LPRs returning to the United States. INA section 101(a)(20), 8 U.S.C. 1101(a)(20), defines the term "lawfully admitted for permanent residence" as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed" (emphasis added). INA section 211(b), 8 U.S.C. 1181, provides for a waiver of the documentary requirements for admission for one who can qualify as a "returning resident immigrant" as defined in INA section 101(a)(27)(A), 8 U.S.C. 1101(a)(27)(A), that is as "an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad." Finally, according to INA section 101(a)(13)(C)(i), 8 U.S.C. 1101(a)(13)(C)(i), an alien lawfully admitted for permanent residence in the United States is not regarded as seeking admission into the United States, unless the alien has abandoned or relinquished that status. See also INA section 223, 8 U.S.C. 1203.

[647] For example, if the alien has his or her lawful permanent resident status in removal proceedings, the alien must present a copy of the removal order.

[648] See, e.g., Matter of Huang, 19 I&N Dec. 749, 755–57 (BIA 1988) (considering the alien's absence from the United States because of her husband's work and study abroad, as well as her own

employment abroad, to find that her absence was not temporary in nature and that she had abandoned her LPR status); Matter of Kane, 15 I&N Dec. 258, 265 (BIA 1975) (alien who spent 11 months per year living in her native country operating a lodging house abandoned her LPR status; her desire to retain her status, without more, was not sufficient); Matter of Quijencio, 15 I&N Dec. 95, 97–98 (BIA 1974) (alien's lawful permanent resident status considered abandoned after 12 year absence); Matter of Castro, 14 I&N Dec. 492, 494 (BIA 1973) (alien who severed his ties to the United States for six years, moved abroad, acquired land, built a house and obtained steady employment, but made brief business trips to the United States was not a returning resident and had abandoned his status); Matter of Montero, 14 I&N Dec. 399, 400–01 (BIA 1973) (alien who returned to her native country to join her husband, children, home, employment and financial resources without fixed intent to return within a fixed period had abandoned her lawful permanent resident status); cf. Khoshfahm v. Holder, 655 F.3d 1147, 1154 (9th Cir. 2011) (alien child who was out of the country for 6 years and prevented from returning due to the father's heart condition and the events of September 11 did not abandon his lawful permanent resident status).

[649] See Purpose of Form I-407 and its instructions at www.uscis.gov/i-407. Even though an alien completed and submitted Form I-407, the alien may still challenge the declaration of abandonment as part of removal proceedings because a declaration is not dispositive.

[650] See proposed 8 CFR 213.1.

**51224** Federal Register / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

the alien's intent in regards to the voluntary abandonment of the lawful permanent resident status and the permanent departure. Requesting the filing of a declaration would also be consistent with evidence required in the BIA precedent *Matter of De Los Santos,* in which the bond was cancelled after the alien was required, among other things, to submit a formal statement attesting to the desire to abandon permanent resident status.[651] Form I–407 would not have a fee.

(c) Bond Cancellation for Lawful Permanent Residents After 5 Years and Cancellation If the Alien Obtains an Immigration Status Exempt From Public Charge Ground of Inadmissibility Following the Initial Grant of Lawful Permanent Resident Status

Currently, 8 CFR 103.6(c)(1) requires that DHS cancel a public charge bond submitted for an alien after the fifth anniversary of admission of the immigrant, provided that the alien has filed a request to cancel the bond and provided that the alien did not become a public charge prior to the fifth anniversary.[652] The provision was added in 1984 based on INS's belief that the public would be adequately protected even with such a limitation on the bond liability.[653] INS reasoned that if an alien is self-sustaining for a five-year period, it would not be probable that the alien becomes a public charge after five years because the reason for the becoming a public charge is based on factors in existence prior to admission as an immigrant.[654] Additionally, INS explained that limiting the bond liability in this manner parallels the deportation liability.[655]

DHS proposes to continue to cancel the public charge bond after the fifth anniversary of the alien's adjustment of status to that of a lawful permanent resident, provided that the alien files a request to cancel the bond and the alien has not received any public benefits as defined in 8 CFR 212.21(b) after obtaining lawful permanent resident status or otherwise violated the conditions of the public charge bond. Retaining the possibility for this type of cancellation of the public charge bond

is not just consistent with the current period of time in which an alien may become removable for receiving public benefits after entry for causes that existed prior to entry,[656] but is also consistent with the 5-year ineligibility period for certain public benefits under PRWORA.[657] Finally, as noted previously, the public charge bond statutory provision requires DHS to cancel the bond upon the alien's death, naturalization, or permanent departure from the United States.[658] However, DHS believes that section 213 of the Act sets forth the situations when DHS must cancel the public charge bond, but leaves to DHS the discretion of canceling the bond for other reasons.[659] Therefore, retaining the cancellation provision is consistent with the statutory text and the purpose of this rule.

In addition, DHS is proposing to not retain the discretion to cancel a public charge bond at any time if it subsequently determines that the alien is not likely to become a public charge.[660] First, for many aliens who adjust status in the United States, DHS is unlikely to make a second public charge determination under section 212(a)(4) of the Act.[661] Second, given that Congress selected a 5-year timeframe in related contexts (in the parallel deportation statue under section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5), under PRWORA at 8 U.S.C. 1613, and as part of naturalization requirements

under INA section 316, 8 U.S.C. 1427), DHS believes that retaining a bond for at least 5 years is a reasonable timeframe that will ensure the ability of U.S. government to recoup the costs of public benefits that may be received by aliens before most of them are generally eligible to naturalize.

Finally, DHS proposes that USCIS would cancel the public charge bond if an alien subject to a public charge bond obtains an immigration status while present in the United States that is exempt from public charge grounds of inadmissibility, as listed in 8 CFR 212.23, following the initial grant of status as a lawful permanent resident, provided that the alien or the obligor has filed a request for cancellation of public charge bond, on the form designated by DHS, in accordance with form instructions, and provided that the alien has not breached the bond conditions as described in paragraphs (h) of proposed 8 CFR 213.1. An example of when this ground of cancellation may apply is if an alien loses or abandons his or her LPR status but nonetheless qualifies for another status not subject to public charge inadmissibility, *e.g.* asylum. DHS believes that maintaining the bond in this situation no longer serves the intended purpose of the bond if the population is exempt from public charge grounds of inadmissibility, as the purpose of the public charge bond is to ensure that the alien does not become a public charge.[662] As discussed in the section on exemptions, most of these aliens are, at that time, members of a vulnerable population, and the status provided to these aliens serves distinct policy goals separate from the general immigration system.

As with other bases for bond cancellation, however, if a request for cancellation of a public charge bond is not filed, the bond shall remain in effect until the form is filed, reviewed, and a decision is rendered. Additionally, if these aliens adjust status in the future on a basis that is subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), they may again be subject to public charge grounds of inadmissibility and DHS may assess whether a bond is appropriate at that time.

(d) Request To Cancel the Bond, and Adjudication of the Cancelation Request

DHS proposes that USCIS would cancel the bond upon request by the alien, following a determination that the conditions of a bond have been met and the bond has not been breached, as outlined in proposed 8 CFR 213.1.

---

[651] *Matter of De Los Santos,* 11 I&N Dec. 121, 121 (BIA 1965).

[652] *See* 8 CFR 103.6(c)(1).

[653] *See Powers and Duties of Service Officers, Availability of Service Records; Public Charge Bonds,* 49 FR 24010, 24011 (June 11, 1984).

[654] *See* 49 FR 24010, 24011.

[655] *See* 49 FR 24010, 24011 ("The Service believes that the public will be adequately protected by limiting the duration of liability of public charge bonds to a five-year period which parallels the deportation liability.")

[656] *See* INA section 237(a)(5), 8 U.S.C. 1227(a)(5).

[657] *See* 8 U.S.C. 1611–1646.

[658] *See* INA section 213, 8 U.S.C. 1183 ("Such bond or undertaking *shall* terminate upon the permanent departure from the United States, the naturalization, or the death of such alien, and any sums or other security held to secure performance thereof, except to the extent forfeited for violation of the terms thereof, shall be returned to the person by whom furnished, or to his legal representatives." (emphasis added)).

[659] *See* 8 CFR 103.6(c)(1) ("The district director may cancel a public charge bond at any time if he/she finds that the immigrant is not likely to become a public charge. A bond may also be cancelled in order to allow substitution of another bond. A public charge bond shall be cancelled by the district director upon review following the fifth anniversary of the admission of the immigrant, provided that the alien has filed Form I–356, Request for Cancellation of Public Charge Bond, and the district director finds that the immigrant did not become a public charge prior to the fifth anniversary. If Form I–356 is not filed, the bond shall remain in effect until the form is filed and the district director reviews the evidence supporting the form and renders a decision to breach or cancel the bond.").

[660] *See* 8 CFR 103.6(c)(1).

[661] *See* INA section 101(a)(13)(C), 8 U.S.C. 1101(a)(13)(C), under which an LPR would be considered an applicant for admission only under specifically outlined circumstances (*e.g.,* if he or she has abandoned LPR status, was absent from the United States continuously longer than 180 days, has engaged in illegal activity after departing the United States, etc.).

[662] *See* INA section 213, 8 U.S.C. 1183.

Return of the bond amount is "to the extent [the bond] has been forfeited for violation of the terms thereof." [663] DHS proposes to interpret this authority to allow DHS to impose, as a condition of the bond, forfeiture of the entire amount in the event of a breach. Once USCIS determines that the alien has violated the bond conditions by receiving public benefits, USCIS would declare the bond breached and collect. The request to cancel the bond would be submitted on the form designated by DHS, according to its instructions, and with any mandatory fee. USCIS proposes to designate Form I–356, Request for Cancellation of Public Charge Bond, to be used to request cancellation of a public charge bond. As discussed in more detail below, DHS is also proposing an initial processing fee of $25 to be submitted with the Form I–356. Given the obligor's and the alien's interest in having the bond cancelled, the alien, or the obligor or co-obligor, would be able to submit a request to cancel the public charge bond to USCIS.

A request to cancel the bond is necessary because typically, after an alien obtains an immigration benefit from USCIS or enters as an immigrant, USCIS has little interaction with the alien until he or she seeks another immigration benefit. In addition, USCIS is typically not notified if an alien has permanently departed or died. Information currently collected by DHS is insufficient for USCIS to determine on its own whether the alien intended a departure to be permanent. Therefore, as part of the cancellation request, the alien would need to submit evidence of naturalization or otherwise having obtained U.S. citizenship, permanent departure, or if the person is deceased, the alien's executor would submit a death certificate. Additionally, the alien or the alien's executor must also submit the information requested in Form I–356 regarding receipt of public benefits as defined in 8 CFR 212.21(b). [664] Any information collected would be in accordance with relevant privacy laws.

The obligor and the alien would have the burden to establish, by a preponderance of the evidence, that the conditions for cancellation of the public charge bond have been met. [665] If USCIS finds that the information included in the request is insufficient to determine whether cancellation is appropriate, USCIS may request additional information in accordance with 8 CFR part 103.

(e) Decision and Appeal

If USCIS determines that the request warrants a cancellation of a bond, USCIS would notify the obligor, and return the full value of any cash or cash equivalent, such as a cashier's check or money order deposited by the obligor to secure the bond plus interest, similar to current practice. [666] When the bond is cancelled, the obligor would be released from liability. [667]

If USCIS denies the request to cancel the bond, it will notify the obligor of the reasons why and of the right to appeal in accordance with the requirements of 8 CFR part 103, subpart A. [668] A bond obligor could appeal the denial to cancel the bond to the Administrative Appeals Office (AAO) of USCIS by filing Notice of Appeal or Motion (Form I–290B) together with the appropriate fee and required evidence. *See* 8 CFR 103.1; 103.3. For operational efficiency, DHS proposes that an obligor may only file a motion after an unfavorable decision by the Administrative Appeals Office (AAO) on appeal. As part of an appeal, the regulations a 8 CFR 103.3(a)(2) require the officer rendering the initial decision to review the initial decision; if the reviewing officer agrees that the decision is incorrect, he or she may treat the appeal as a motion and may enter a favorable decision. [669] USCIS would also inform the alien and the alien's representative (if any) of the denial. The alien would not be able to appeal a denial because the bond contract is between the obligor and the U.S. government; the alien is not party to the contract. [670]

7. Breach of a Public Charge Bond and Appeal

(a) Breach Conditions and Adjudication

A bond would be considered breached if the alien has received public benefits, as defined in proposed 8 CFR 212.21(b), after the alien's adjustment of status to that of a lawful permanent resident and until the public charge bond is cancelled under 8 CFR 213.1(g). Consistent with other proposed regulatory provisions contained in this NPRM, public benefits received during periods while an alien is present in the United States in a status exempt from the public charge ground of inadmissibility, as listed in 8 CFR 212.23, following the initial grant of lawful permanent resident status, would not be considered when determining

whether the conditions of the bond have been breached. Additionally, consistent with the public benefits definition proposed in this rule, DHS would not consider as part of a public charge bond breach determination any public benefits received by an alien enlisted in the U.S. armed forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or if received by such an individual's spouse or child as defined in section 101(b) of the Act, 8 U.S.C. 1101(b), regardless of whether such receipt occurred prior to the alien enlisting into the U.S. Armed Forces. Finally, DHS would not consider public benefits received after the alien who is the subject of the public charge bond obtains U.S. citizenship, as U.S. citizens are no longer subject to public charge grounds of inadmissibility, and therefore, the term of the public charge bond.

A bond would be considered breached if any other condition imposed by USCIS as part of the public charge bond is breached. [671]

Under current 8 CFR 103.6, an immigration bond is considered breached when there has been a substantial violation of the stipulated conditions. The term "substantial violation" is generally interpreted according to contractual principles. [672] However, public charge bonds have been distinguished from other immigration bonds in this regard, given that the public charge bond's condition is that the alien will not become a public charge. [673] Therefore, DHS proposes to not retain the phrase "substantial violation" in the proposed public charge bond provision at 8 CFR 213.1. Instead, DHS proposes to incorporate the substantial violation standard via incorporating principles that govern the public charge and public benefits definitions at proposed 8 CFR 212.21(a) and (b) (defining public charge and public benefits). Under the proposed approach, the bond would be

---

[663] *See* INA section 213, 8 U.S.C. 1183.

[664] *See* proposed 8 CFR 213.1.

[665] *See* proposed 8 CFR 213.1.

[666] *See* 8 CFR 103.6(c) and proposed 8 CFR 213.1.

[667] *See* proposed 8 CFR 213.1.

[668] *See* proposed 8 CFR 213.1.

[669] *See* 8 CFR 103.3(a)(2)(ii)–(v).

[670] *See* proposed 8 CFR 213.1.

[671] *See* proposed 8 CFR 213.1(d) and 8 CFR 213.1(h)

[672] *See, e.g., Aguilar* v. *United States,* 124 Fed. Cl. 9, 16 (2015) (substantial violation under 8 CFR 103.6(e) of a delivery immigration bond is a matter of contract interpretation, in which courts have looked to four factors: (1) The extent of the breach; (2) whether the breach was intentional or accidental; (3) whether the breach was in good faith; and (4) whether the obligor took steps to make amends or place himself in compliance).

[673] *See Matter of Viado,* 19 I&N Dec. 252, 253 (BIA 1985) (each of the other types of immigration bonds provided in the regulation has its own specific conditions; the public charge bond's condition is that the alien will not become a public charge, and the lack of knowledge or good faith of the alien did not render the breach insubstantial).

**51226** Federal Register / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

considered breached if the alien receives public benefits after the alien's adjustment of status to that of a lawful permanent resident and until the bond is cancelled pursuant to 8 CFR 213.1(g), or if the alien breaches any other condition imposed as part of the bond.[674]

If USCIS learns of the breach, and declares a bond breached based on information that is not otherwise protected from the disclosure to the obligor, USCIS would disclose such information to the obligor to the extent permitted by law. For example, USCIS may learn of an alien's having received public benefits, as defined in 8 CFR 212.21(b), if the public benefit-granting agency notifies USCIS that it provided a public benefit(s) to the alien who was admitted on bond.[675] Or, USCIS may learn from the alien, as part of a bond cancellation request that he or she received public benefits, as defined in 8 CFR 212.21(b).

If USCIS found that it has insufficient information to determine whether a breach occurred, USCIS would request additional information from the benefits granting agency, or USCIS would request additional information from alien or the obligor as outlined in 8 CFR part 103. USCIS would also provide the obligor with the opportunity to respond and submit rebuttal evidence, including specifying a deadline for a response. DHS furthermore proposes that it would send a copy of any notification to the obligor or co-obligor regarding the breach also to the alien and the alien's representative (if any).[676]

(b) Decision and Appeal

After the obligor's response or after the deadline for a response has passed, USCIS would make a breach determination, and inform the obligor of the right to appeal in accordance with the requirements of 8 CFR 103, subpart A. *See* proposed 8 CFR 213.1(h). A bond obligor would have the possibility to appeal a breach determination to the Administrative Appeals Office (AAO) of USCIS by filing a Notice of Appeal or Motion (Form I–290B) together with the appropriate fee and required evidence. *See* 8 CFR 103.1; 103.3. Under this rule, DHS proposes that the obligor would only be able to file a motion under 8 CFR 103.5 as part of the unfavorable decision on appeal. DHS believes that such an approach reasonable and

operationally efficient; additionally, it provides clarity as to when a breach determination becomes administratively final, as defined in 8 CFR 213.1(h). First, as part of an appeal, pursuant to 8 CFR 103.3(a)(2), a USCIS officer who made the initial breach determination must review the decision before the appeal can be forwarded to the AAO.[677] If the USCIS agrees with the appealing party that favorable action may be warranted, he or she may treat the appeal as a motion and then take favorable action, which would resolve the appeal.[678] However, the official is also not precluded from reopening a proceeding or reconsidering a decision on his or her own motion under 8 CFR 103.5(a)(5)(i). If the reviewing official is not inclined to take a favorable action, the reviewing official will forward the appeal to the AAO. Once the AAO issues the decision, however, an obligor may file a motion of the AAO's decision in accordance with 8 CFR 103.5.[679] Thus, limiting when a motion can be filed is efficient for both the obligor and USCIS. Additionally, a breach determination would be administratively final, among other instances, if the appeals period to the AAO expires; filing a motion does not toll the appeals period stated in 8 CFR 103.3, and if the obligor fails to appeal, the breach determination would become administratively final unless the motion is granted. The denial of a motion can then be appealed to the AAO, and the AAO decision itself, if unfavorable, may be motioned in accordance with 8 CFR 103.5. Additionally, USCIS may reopen a breach determination at any time pursuant to 8 CFR 103.5, even if an appeal is pending. For these reasons, it appears to be more efficient for all parties if the obligor simply appeals a breach determination in the first instance, if review of the initial breach determination is desired.

If the appeal is dismissed or rejected, or the obligor fails to appeal, the breach determination becomes the final agency determination, and USCIS would issue a demand for payment, if the bond was a surety bond, pursuant to 31 CFR 901.2.[680] The alien may not appeal the breach determination or file a motion because the bond contract is between

the obligor and the U.S. government; the alien is not party to the contract.[681]

(c) Consequences of Breach

If USCIS determines that the bond has been breached, DHS proposes that USCIS would collect on the bond in full, meaning the total monetary amount of the bond as liquidated damages. This practice appears to differ from the practice described in legacy INS' Operating Instructions, which contemplate forfeiture only of the amount of public benefits received.[682] The total damages to the government go beyond the simple amount of the benefits received, and are difficult if not impossible to calculate with precision. Liquidated damages are an appropriate remedy in such situations, and were an accepted practice in prior immigration bond cases.[683]

8. Exhaustion of Administrative Remedies

A final determination that a bond has been breached would create a claim in favor of the United States. The claim in favor of the United States may not be released or discharged by an immigration officer.[684]

Under the proposed rule, a party must first exhaust all administrative remedies and obtain a final decision from USCIS in accordance with 8 CFR part 103, before being able to bring suit challenging USCIS cancellation or bond breach determination in Federal district court.[685]

Although enforcement and suits may be based on various causes of action, courts have determined that bond breach determinations are always reviewed under the Administrative Procedure Act (APA) framework.[686]

[674] *See* proposed 8 CFR 213.1(h).

[675] *See* INA section 213, 8 U.S.C. 1183. Receipt of public benefits, however, is sufficient to cause a breach of the public charge bond, even in the absence of a demand for repayment. *See Matter of Viado*, 19 I&N Dec. 252, 253 (BIA 1985).

[676] *See* proposed 8 CFR 213.1.

[677] *See* 8 CFR 103.3(a)(2); *see also* Adjudicator's Field Manual, Chapter 10.8.

[678] *See* 8 CFR 103.3(a)(2); *see also* Adjudicator's Field Manual, Chapter 10.8.

[679] *See* 8 CFR 103.5; *see* Administrative Appeal's Office Practice Manual, Chapter 4, Motions to Reopen and Reconsider.

[680] *See* 8 CFR 103.6(e); *see* proposed 8 CFR 213.1; *see generally United States* v. *Gonzales & Gonzales Bonds & Ins. Agency, Inc.* 728 F. Supp. 2d 1077, 1089–91 (N.D. Cal. 2010); *Safety Nat'l Cas. Corp.* v. *DHS*, 711 F. Supp. 2d 697, 703–04 (S.D. Tex. 2008).

[681] *See* proposed 8 CFR 213.1. *See also, e.g., Matter of Ins. Co. of N. Am.*, 17 I&N Dec. 251, 251 (BIA 1978) (An immigration bond is a contract between the Service and the obligor; the obligor and his or her attorney-in-fact is the proper party to appeal the service's decision).

[682] *See* OI 103.6(c) (If it is found that the alien has become a public charge, the bond shall be breached in the necessary amount with any remainder continued in effect).

[683] *See United States* v. *Goldberg*, 40 F.2d 406 (2d Cir. 1930); *Matta* v. *Tillinghast*, 33 F.2d 64 (1st Cir. 1929); *Ill. Surety Co.* v. *United States*, 229 F. 527 (2d Cir. 1916); *United States* v. *Andreano*, 36 F. Supp. 821 (D.R.I. 1941); *United States* v. *Rubin*, 227 F. 938 (E.D. Pa. 1915); *Matter of B–* , 1 I&N Dec. 121 (BIA 1941).

[684] *See* proposed 8 CFR 213.1.

[685] *See* proposed 8 CFR 213.1(j).

[686] *See United States* v. *Gonzales & Gonzales Bonds & Ins. Agency, Inc.*, 728 F. Supp. 2d 1077, 1089–90 (N.D. Cal. 2010); *Bahramizadeh* v. *INS*, 717 F.2d 1170, 1173 (7th Cir. 1983) (reviewing bond-breach determinations under the APA framework); *Castaneda* v. *Dep't of Justice*, 828 F.2d 501, 502 (8th Cir. 1987) (immigration bond-breach determination reviewed under the APA framework); *Ruiz-Rivera* v. *Moyer*, 70 F.3d 498, 500–01 (7th Cir.

DHS invites public comments on the proposed public charge bond and its procedures, including the public charge bond type, bond amount, duration, substitution, cancellation and any other aspects of a public charge bond.

9. Public Charge Bond Processing Fees

DHS is proposing to charge for the processing of public charge bonds and cancellation requests. In this rule, DHS proposes to charge $25 for the posting of a public charge bond, $25 for the posting of a substitute public charge bond, and $25 when the alien, obligor or co-obligor requests to cancel the public charge bond (*i.e.,* when the Form I–356 is filed). INA section 286(m), 8 U.S.C. 1356(m), authorizes DHS to set fees for providing adjudication and naturalization services at a level that will ensure recovery of the full costs of providing all such services. USCIS must expend resources to process public charge bonds and bond cancellation requests, including start-up costs to operationalize a public charge bond process. USCIS is primarily funded by immigration and naturalization benefit request fees charged to applicants and petitioners. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account (IEFA) and used to fund the cost of processing immigration benefit requests and providing related services (*i.e.,* biometric collections).[687] In addition, DHS complies with the requirements and principles of the Chief Financial Officers Act of 1990, 31 U.S.C. 901–03, (CFO Act), and Office of Management and Budget (OMB) Circular A–25. USCIS reviews the fees deposited into the IEFA biennially and, if necessary, proposes adjustments to ensure recovery of costs necessary to meet national security, customer service, and adjudicative processing goals. USCIS typically uses projected volume data and completion rates (the average time for adjudication of an immigration benefit request) to set the fees for specific immigration benefit requests, and related services.

The proposed $25 fees will not result in recovery of the full cost of intake and adjudication the proposed Forms I–945 and I–356. However, at this time, DHS is not able to estimate the start-up costs

for establishing a public charge bond process, nor the number of public charge bonds or cancellation requests that it will receive during any period of time because both the form and process are new to USCIS, and USCIS does not have a reasonable proxy on which to rely for an estimate. In addition, public charge bonds are very fact-specific; USCIS will make a case-by-case determination on whether to offer the submission of a bond to an applicant. Similarly, whether a cancellation request is submitted will be driven by the particular circumstances of each alien by whom or on whose behalf a bond is posted, depending on whether conditions for cancellation have been met. Nevertheless, to recover at least some of the costs of adjudicating Forms I–945 and I–356, and avoid other fee payers having to fund the public charge bond process entirely, DHS is proposing a $25 fee for the initial public charge bond submission, and a $25 fee for the bond cancellation request, with no option to request a fee waiver. Once USCIS implements a public charge bond process, it will be able to obtain data on the volume and burden of public charge bonds and cancellation requests and adjust these fees to amounts necessary to recover the relative costs of these adjudications next time that USCIS reviews the fees deposited into the IEFA.

10. Other Technical Changes

In addition to amending 8 CFR 103.6 and 213.1 to update and establish requirements specific to public charge bonds, this proposed rule would make technical changes to 8 CFR 103.6 to update references to offices and form names.

11. Concurrent Surety Bond Rulemaking

On June 5, 2018, DHS published a proposed rule that would set forth procedures and standards under which DHS would decline surety immigration bonds from Treasury-certified companies.[688] The June 5 proposed rule would also create administrative exhaustion requirements applicable to sureties. This public charge proposed rule is not intended to displace or otherwise affect the proposed changes to 8 CFR 103.6 in the June 5, 2018 proposed rule, although a final public charge rule may depart from the June 5 rule with respect to surety bonds breach determinations, as described above.

DHS plans to conduct the two rulemakings concurrently.

VI. Statutory and Regulatory Requirements

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs) directs agencies to reduce regulation and control regulatory costs.

This proposed rule is designated a ''significant regulatory action'' that is economically significant since it is estimated that the proposed rule would have an annual effect on the economy of $100 million or more, under section 3(f)(1) of Executive Order 12866. Accordingly, OMB has reviewed this proposed regulation.

1. Summary

As previously discussed, DHS is proposing to modify its regulations to add new regulatory provisions for inadmissibility determinations based on public charge grounds under the INA. DHS is proposing to prescribe how it determines whether an alien is inadmissible because he or she is likely at any time to become a public charge and identify the types of public benefits that are considered in the public charge determinations. An alien applying for a visa, admission at the port of entry, or adjustment of status generally must establish that he or she is not likely at any time to become a public charge. DHS proposes that certain factors may be weighed positively or negatively, depending on how the factor impacts the immigrant's likelihood to become a public charge. DHS is also proposing to revise existing regulations to clarify when and how it considers public charge when adjudicating change of status and extension of stay applications. Finally, DHS is proposing to revise its regulations governing the Secretary's discretion to accept a public

---

1995) (determining whether ''INS' decision that the bond conditions were substantially violated was plainly erroneous or inconsistent with 8 CFR 103.6(e)''); *Ahmed* v. *United States,* 480 F.2d 531, 534 (2d Cir. 1973) (analyzing substantial breach, as required by 8 CFR 103.6).

[687] *See U.S. Citizenship and Immigration Services Fee Schedule,* 81 FR 26904, 26940 (May 4, 2016).

[688] *See Procedures and Standards for Declining Surety Immigration Bonds and Administrative Appeal Requirement for Breaches,* 83 FR 25951 (June 5, 2018).

**51228**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

charge bond or similar undertaking under section 213 of the Act, 8 U.S.C. 1183. Similar to a waiver, a public charge bond permits an alien deemed inadmissible on the public charge ground to obtain adjustment of status, if otherwise admissible.[689]

This proposed rule would impose new costs on the population applying to adjust status using Form I–485 that are subject to the public charge grounds on inadmissibility who would now be required to file the new Form I–944 as part of the public charge inadmissibility determination. DHS would require any adjustment applicants subject to the public charge inadmissibility ground to submit Forms I–944 with their Form I–485 to demonstrate they are not likely to become a public charge. In addition, Form I–129 and Form I–129CW beneficiaries, and Form I–539 filers may also incur additional costs should they receive a RFE to file Form I–944 to determine inadmissibility based on public charge grounds under the provisions of this proposed rule. The proposed rule would also impose additional costs for completing Forms I–485, I–129, I–129CW, and I–539 as the associated time burden estimate for completing each of these forms would increase. Moreover, the proposed rule would impose new costs associated with the proposed public charge bond process, including new costs for completing and filing Form I–945, Public Charge Bond, and Form I–356, Request for Cancellation of Public Charge Bond. DHS estimates that the additional total cost of the proposed rule would range from approximately $45,313,422 to $129,596,845 annually to the population applying to adjust status who also would be required to file Form I–944, for the opportunity cost of time associated with the increased time burden estimates for Forms I–485, I–129, I–129CW, and I–539, and for requesting or cancelling a public charge bond using Form I–944 and Form I–356, respectively.

Over the first 10 years of implementation, DHS estimates the total quantified new direct costs of the proposed rule would range from about $453,134,220 to $1,295,968,450 (undiscounted). In addition, DHS estimates that the 10-year discounted total direct costs of this proposed rule would range from about $386,532,679 to $1,105,487,375 at a 3 percent discount rate and about $318,262,513 to

$910,234,008 at a 7 percent discount rate.

The proposed rule would impose new costs on the population seeking extension of stay or change of status using Form I–129, Form I–129CW, or Form I–539 since, for any of these forms, USCIS adjudication officers would then be able to exercise discretion in determining whether it would be necessary to issue a RFE whereby a Form I–129 or I–129CW beneficiary or a Form I–539 applicant may then have to submit Form I–944. DHS conducted a sensitivity analysis estimating the potential cost of filing Form I–129, Form I–129CW, or Form I–539 for a range of 10 to 100 percent of beneficiaries or filers, respectively, receiving a RFE to submit Form I–944. The costs to Form I–129 beneficiaries who may receive a RFE to file Form I–944 range from $6,086,318 to $60,863,181 annually and the costs to Form I–129CW beneficiaries who may receive such a RFE from $114,132 to $1,141,315 annually. The costs to Form I–539 applicants who may receive a RFE to file Form I–944 range from $3,164,375 to $31,643,752 annually.

The proposed rule would also potentially impose new costs on individuals or companies (obligors) if an alien has been found to be a public charge, but has been given the opportunity to submit a public charge bond, for which USCIS intends to use the new Form I–945. DHS estimates the total cost to file Form I–945 would be at minimum about $34,234 annually.[690]

Moreover, the proposed rule would potentially impose new costs on aliens or obligors (individuals or entities) who would submit Form I–356 as part of a request to cancel the public charge bond. DHS estimates the total cost to file Form I–356 would be approximately $825 annually.[691]

The proposed rule would also result in a reduction in transfer payments from the federal government to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Individuals who might choose to disenroll from or forego future enrollment in a public benefits program include foreign-born non-citizens as well as U.S. citizens who are members of mixed-status households.[692] DHS

estimates that the total reduction in transfer payments from the federal and state governments would be approximately $2.27 billion annually due to disenrollment or foregone enrollment in public benefits programs by foreign-born non-citizens who may be receiving public benefits. DHS estimates that the 10-year discounted federal and state transfer payments reduction of this proposed rule would be approximately $19.3 billion at a 3 percent discount rate and about $15.9 billion at a 7 percent discount rate. However, DHS notes there may be additional reductions in transfer payments that we are unable to quantify. There may also be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Because state participation in these programs may vary depending on the type of benefit provided, DHS was only able to estimate the impact of state transfers. For example, the federal government funds all SNAP food expenses, but only 50 percent of allowable administrative costs for regular operating expenses.[693] Similarly, Federal Medical Assistance Percentages (FMAP) in some HHS programs like Medicaid can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[694] However, assuming that the state share of federal financial participation (FFP) is 50 percent, the 10-year discounted amount of state transfer payments of this proposed policy would be approximately $9.65 billion at a 3 percent discount rate and about $7.95 billion at a 7 percent discount rate. Finally, DHS recognizes that reductions in federal and state transfers under federal benefit programs may have downstream and upstream impacts on state and local economies, large and small businesses, and individuals. For example, the rule might result in reduced revenues for healthcare providers participating in Medicaid, pharmacies that provide prescriptions to

---

[689] There is no mention of "waiver" or "waive" in INA section 213, 8 U.S.C. 1183. However, the BIA has viewed that provision as functioning as a waiver of the public charge ground of inadmissibility. *See Matter of Ulloa,* 22 I&N Dec. 725, 726 (BIA 1999).

[690] Calculation: $35.66 (cost per obligor to file Form I–945) * 960 (estimated annual population who would file Form I–945) = $34,233.60 = $34,234 (rounded) annual total cost to file Form I–945.

[691] Calculation: $33.00 (cost per obligor to file Form I–356) * 25 (estimated annual population who would file Form I–356) = $825.00 annual total cost to file Form I–356.

[692] DHS uses the term "foreign-born non-citizens" because it is the term used by the Census Bureau

for which much of the data in this analysis is based on. DHS generally interprets this term to mean alien in this analysis.

[693] Per section 16(a) of the Food and Nutrition Act of 2008. *See also* USDA, FNS Handbook 901, p. 41 *available at: https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_Internet_Ready_Format.pdf.*

[694] *See* Dept. of Health and Human Services, "Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2016 through September 30, 2017." ASPE FMAP 2017 Report. Dec. 29, 2015. *Available at https://aspe.hhs.gov/basic-report/fy2017-federal-medical-assistance-percentages.* Accessed Sept. 13, 2018.

participants in the Medicare Part D low-income subsidy (LIS) program, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs.

Additionally, the proposed rule would add new direct and indirect impacts on various entities and individuals associated with regulatory familiarization with the provisions of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. A foreign-born non-citizen (such as those contemplating disenrollment or foregoing enrollment in a public benefits program) might review the rule to determine whether they are subject to the provisions of the proposed rule and may incur familiarization costs. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those individuals or entities the rule directly regulates, a wide variety of other entities would likely choose to read the rule and, therefore, would incur familiarization

costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this proposed rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule in order to provide information to those foreign-born non-citizens that might be affected by a reduction in federal and state transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs.

DHS estimates the time that would be necessary to read this proposed rule would be approximately 8 to 10 hours per person, resulting in opportunity costs of time. An entity, such as a non-profit or advocacy group, may have more than one person that reads the rule.

The primary benefit of the proposed rule would be to help ensure that aliens who are admitted to the United States, seek extension of stay or change of status, or apply for adjustment of status are not likely to receive public benefits and will be self-sufficient, *i.e.,* individuals will rely on their own financial resources, as well as the

financial resources of the family, sponsors, and private organizations.[695] DHS also anticipates that the proposed rule would produce some benefits from the elimination of Form I–864W. The elimination of this form would potentially reduce the number of forms USCIS would have to process. DHS estimates the amount of cost savings that would accrue from eliminating Form I–864W would be $35.78 per petitioner.[696] However, DHS notes that we are unable to determine the annual number of filings of Form I–864W and, therefore, we are currently unable to estimate the total annual cost savings of this change. Additionally, a public charge bond process would also provide benefits to applicants as they potentially would be given the opportunity to be adjusted if otherwise admissible, at the discretion of DHS, after a determination that he or she is likely to become a public charge.

Table 36 provides a more detailed summary of the proposed provisions and their impacts.

BILLING CODE 4410–10–P

---

[695] 8 U.S.C. 1601(2).

[696] Calculation of savings from opportunity cost of time for no longer having to complete and submit Form I–864W: ($35.78 per hour * 1.0 hours) = $35.78.

| Table 36 Summary of Major Provisions and Economic Impacts of the Proposed Rule | | |
|---|---|---|
| **Provisions** | **Purpose** | **Expected Impact of Proposed Rule** |
| Adding 8 CFR 212.20. Purpose and applicability of public charge inadmissibility. | To define the categories of aliens that are subject to the public charge determination. | **Quantitative:**<br><br>Benefits<br>• Cost savings of $35.78 per petitioner from no longer having to complete and file Form I-864W. |
| Adding 8 CFR 212.21. Definitions. | To establish key definitions, including public charge, public benefit, likely to become a public charge, and household. | Costs<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determinations. |
| Adding 8 CFR 212.22. Public charge determination. | Clarifies that evaluating public charge is a prospective determination based on the totality of the circumstances.<br><br>Outlines minimum and additional factors considered when evaluating whether an alien immigrant is inadmissible based on the public charge ground. Positive and negative factors are weighed to determine an individual's likelihood of becoming a public charge at any time in the future. | **Qualitative:**<br>Benefits<br>• Better ensure that aliens who are admitted to the United States or apply for adjustment of status are self-sufficient through an improved review process of the mandatory statutory factors. |
| Adding 8 CFR 212.23. Exemptions and waivers for public charge ground of inadmissibility. | Outlines exemptions and waivers for inadmissibility based on public charge grounds. | |
| Adding 212.24. Valuation of monetizable benefits. | Provides the methodology for calculating the annual aggregate amount of the portion attributable to the alien for the monetizable non-cash benefits and considered in the public charge inadmissibility determination. | |
| Adding 8 CFR 214.1(a)(3)(iv) and amending 8 CFR 214.1(c)(4). Nonimmigrant general requirements; and | To provide, with limited exceptions, that an application for extension of stay or change of nonimmigrant status will be denied unless the applicant demonstrates that he or she has not received, is not currently receiving, nor is likely to | **Quantitative:**<br>Costs<br>• Potential annual costs for those Form I-129 beneficiaries range from $6.09 million to $60.9 million depending on |

| | | |
|---|---|---|
| amending 8 CFR 248.1(a) and adding 8 CFR 248.1(c)(4). Change of nonimmigrant classification eligibility. | receive, public benefits as defined in proposed 8 CFR 212.21(b). | how many beneficiaries are sent a RFE by USCIS to complete Form I-944.<br>• Potential annual costs for those Form I-129CW beneficiaries range from $0.11 million to $1.14 million depending on how many beneficiaries are sent a RFE by USCIS to complete Form I-944.<br>• Potential annual costs for those Form I-539 applicants range from $3.16 million to $31.6 million depending on how many applicants are sent a RFE by USCIS to complete Form I-944.<br><br>**Qualitative:**<br><u>Benefits</u><br>• Better assurance that aliens who are not exempt from the section 212(a)(4) inadmissibility ground who apply for extension of stay or change of status continue to be self-sufficient during the duration of their stay.<br>• Reduce the likelihood that an alien will receive a covered public benefit at any time in the future. |
| Amending 8 CFR 245. Adjustment of status to that of a person admitted for permanent residence. | To outline requirements that aliens submit a declaration of self-sufficiency on the form designated by DHS and any other evidence requested by DHS in the public charge inadmissibility determination. | **Quantitative:**<br><u>Direct Costs</u><br>• Total annual direct costs of the proposed rule would range from about $45.3 to $129.6 million, including:<br>  • $26.0 million to applicants who must file Form I-944;<br>  • $0.69 million to applicants applying to adjust status using Form I-485 with an increased time burden;<br>  • $12.1 to $66.9 million for an increased time burden for completing and filing Form I-129 and potential RFE to complete Form I-944;<br>  • $0.23 to $1.25 million for an increased time burden for completing and filing Form I-129CW and potential RFE to complete Form I-944;<br>  • $6.29 to $34.8 million for an increased time burden for completing and filing Form I-539 and potential RFE to complete Form I-944;<br>  • $0.34 million to obligors for filing Form I-945; and<br>  • $825 to filers for filing Form I-356. |

|  |  | • Total costs over a 10-year period would range from:<br>  • $453.1 million to $1.30 billion for undiscounted costs;<br>  • $386.5 million to $1.11 billion at a 3 percent discount rate; and<br>  • $318.3 to $910.2 million at a 7 percent discount rate.<br><br>Transfer Payments<br>• Total annual transfer payments of the proposed rule would be about $2.27 billion from foreign-born non-citizens and their households who disenroll from or forego enrollment in public benefits programs. The federal-level share of annual transfer payments would be about $1.51 billion and the state-level share of annual transfer payments would be about $756 million.<br>• Total transfer payments over a 10-year period, including the combined federal- and state-level shares, would be:<br>  • $22.7 billion for undiscounted costs;<br>  • $19.3 billion at a 3 percent discount rate; and<br>  • $15.9 billion at a 7 percent discount rate.<br><br>**Qualitative**:<br>Benefits<br>• Potential to improve the efficiency for USCIS in the review process for public charge inadmissibility.<br><br>Costs<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination.<br>• Costs to various entities and individuals associated with regulatory familiarization with the provisions of the proposed rule. Costs would include the opportunity cost of time to read the proposed rule and |

| | | subsequently determine applicability of the proposed rule's provisions. DHS estimates that the time to read this proposed rule in its entirety would be 8 to 10 hours per individual. |
|---|---|---|
| **Public Charge Bond Provisions** | | |
| Amending 8 CFR 103.6. Public charge bonds. | To set forth the Secretary's discretion to approve bonds, cancellation, bond schedules, and breach of bond, and to move principles governing public charge bonds to proposed 8 CFR 213.1. | **Quantitative:** <br> Costs <br> • $0.34 million annually to obligors for submitting Public Charge Bond (Form I-945); and <br> • $825 to annually filers for submitting Request for Cancellation of Public Charge Bond (Form I-356). <br> • Fees paid to surety bond companies to secure public charge bond. Fees could range from 1 – 15 percent of the public charge bond amount based on an individual's credit score. |
| Amending 8 CFR 103.7. Fees. | To add fees for new Form I-945, Public Charge Bond, and Form I-356, Request for Cancellation of Public Charge Bond. | **Qualitative:** <br> Benefits <br> • Potentially enable an alien who was found inadmissible on public charge grounds to be admitted by posting a public charge bond with DHS. |
| Amending 8 CFR 213.1. Admission or adjustment of status of aliens on giving of a public charge bond. | In 8 CFR 213.1, to add specifics to the public charge bond provision for aliens who are seeking adjustment of status, including the discretionary availability and the minimum amount required for a public charge bond. | |
| Source: USCIS analysis. | | |

In addition to the impacts summarized above and as required by OMB Circular A–4, Table 37 presents the prepared accounting statement showing the costs associated with this proposed regulation.[697]

---

[697] OMB Circular A–4 is *available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.*

**Table 37. OMB A-4 Accounting Statement (S, 2018)**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation |
|---|---|---|---|---|
| **BENEFITS** | | | | |
| Monetized Benefits | Form I-485 applicants would no longer have to file Form I-864W. Applicants would save approximately $35.78 per petition based on the opportunity cost of time. | | | Preamble |
| Annualized quantified, but un-monetized, benefits | 0 | 0 | 0 | Preamble |
| Unquantified Benefits | The primary benefit of the proposed rule would be to ensure that aliens who are admitted to the United States or apply for adjustment of status would not use or receive one or more public benefits which they are entitled to receive, and instead, would rely on their financial resources, and those of family members, sponsors, and private organizations. Potential to improve the efficiency for USCIS in the review process for public charge inadmissibility. | | | Preamble |
| **COSTS** | | | | |
| Annualized monetized costs (discount rate in parenthesis) | (3%) $82,772,721 | $45,313,422 | $129,596,845 | Preamble |
| | (7%) $82,772,721 | $45,313,422 | $129,596,845 | Preamble |
| Annualized quantified, but un-monetized, costs | N/A | | | Preamble |
| Qualitative (unquantified) costs | DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination. Costs to various entities and individuals associated with regulatory familiarization with the provisions of the rule. Costs would include the opportunity cost of time to read the proposed rule and subsequently determine applicability of the proposed rule's provisions. DHS assumes that the time to read this proposed rule in its entirety would be 8 to 10 hours per individual. Fees paid by aliens to obligors to secure public charge bond. Other qualitative, unquantified effects of the proposed rule could include: <br> • Potential lost productivity, | | | Preamble |

| | | | | |
|---|---|---|---|---|
| | • adverse health effects, <br> • additional medical expenses due to delayed health care treatment, and <br> • increased disability insurance claims | | | |
| **TRANSFERS** | | | | |
| Annualized monetized transfers: "on budget" | ($2,267,842,067) | N/A | N/A | Preamble |
| From whom to whom? | Reduction in transfer payments from the federal government and state governments to public benefits recipients who are members of households that include foreign-born non-citizens. This amount includes the estimated federal- and state-level shares of transfer payments to foreign-born non-citizens. DHS estimates that the state-level share of transfer payments is 50 percent of the estimated amount of federal transfer payments. DHS estimates the annual federal-level share would be about $1.51 billion and the annual state-level share of transfer payments would be about $756 million. | | | Preamble |
| Annualized monetized transfers: "off-budget" | N/A | N/A | N/A | Preamble |
| From whom to whom? | N/A | N/A | N/A | Preamble |
| *Miscellaneous Analyses/Category* | *Effects* | | | *Source Citation* |
| Effects on state, local, and/or tribal governments | None | | | Preamble |
| Effects on small businesses | DHS believes there may be some impacts to those small entities that file Form I-129 or Form I-129CW for beneficiaries that extend stay or change status. These petitioners would have an increase in time burden for completing and filing Form I-129 or Form I-129CW and possibly have labor turnover costs if the Form I-129 or Form I-129CW EOS/COS request was denied and the beneficiary had to leave the U.S. or the Commonwealth of the Northern Mariana Islands (CNMI), respectively. DHS also believes that some surety companies that are small entities may be impacted by filing Form I-356. DHS estimates the total annual cost to file Form I-356 would be about $825. | | | Preamble |
| Effects on wages | None | | | None |
| Effects on growth | None | | | None |

BILLING CODE 4410–10–C

2. Background and Purpose of the Rule

As discussed in the preamble, DHS seeks to ensure appropriate application of the public charge ground of inadmissibility. Under the INA, an alien who, at the time of application for a visa, admission, or adjustment of status, is deemed likely at any time to become a public charge is inadmissible to the United States.[698]

While the INA does not define public charge, Congress has specified that when determining if an alien is likely at any time to become a public charge, consular and immigration officers must, at a minimum, consider certain factors

including the alien's age, health, and family status; assets, resources, and financial status; and education and skills.[699] Additionally, DHS may consider any affidavit of support submitted under section 213A of the Act, 8 U.S.C. 1183a, on behalf of the applicant when determining whether the applicant may become a public charge.[700] For most family-based and some employment-based immigrant visas or adjustment of status applications, applicants must have a sufficient affidavit of support or they

will be found inadmissible as likely to become a public charge.[701]

However, in general, there is a lack of academic literature and economic research examining the link between immigration and public benefits (i.e., welfare), and the strength of that connection.[702] It is also difficult to determine whether immigrants are net contributors or net users of government-supported public assistance programs since much of the answer depends on the data source, how the data are used, and what assumptions are made for

[698] See INA section 212(a)(4); 8 U.S.C. 1182(a)(4).

[699] See INA section 212(a)(4)(B)(i); 8 U.S.C. 1182(a)(4)(B)(i).

[700] See INA section 212(a)(4)(B)(ii). When required, the applicant must submit Form I-864, Affidavit of Support Under Section 213A of the INA.

[701] See INA section 212(a)(4)(C) and (D), 8 U.S.C. 1182(a)(4)(C) and (D).

[702] See Borjas, G.J. (2016) *We wanted workers: Unraveling the immigration narrative.* Chapter 9, pp. 175–176, 190–191. W.W. Norton & Company, New York.

analysis.[703] Moreover, DHS also was not able to estimate potential lost productivity, health effects, additional medical expenses due to delayed health care treatment, or increased disability insurance claims as a result of this proposed rule.

Currently, the public charge inadmissibility ground does not apply to all applicants seeking a visa, admission, or adjustment of status. Several immigrant and nonimmigrant categories, by law or regulation, are exempt from the public charge ground of inadmissibility grounds.[704]

The costs and benefits for this proposed rule focus on individuals applying for adjustment of status using Form I–485. Such individuals would be applying from within the United States, rather than applying for a visa from outside the United States at a DOS consulate abroad. In addition, the impact of this proposed rule on nonimmigrants who are seeking an extension of stay or a change of status are also examined in this analysis.

The new process DHS is proposing for making a determination of inadmissibility based on public charge incorporates a new form—Form I–944—in the current process to apply for adjustment of status. Currently, as part of the requirements for filing Form I–485, applicants submit biometrics collection for fingerprints and signature, and also file Form I–693 which is to be completed by a designated civil surgeon. Form I–693 is used to report results of a medical examination to USCIS.

Form I–864 (Affidavit of Support Under Section 213A of the INA) is also filed to satisfy the requirements of section 213A of the Act for most family-based immigrants and some employment-based immigrants to show that they have adequate means of financial support and are not likely to become a public charge. When a sponsor completes and signs Form I–864 in support of an intending immigrant, the sponsor agrees to use his or her resources, financial or otherwise, to support the intending immigrant named in the affidavit, if it becomes necessary.

Immigrants required to submit Form I–864 completed by a sponsor to obtain an immigrant visa overseas or to adjust status to that of lawful permanent resident in the United States, include (1) immediate relatives of U.S. citizens (spouses, unmarried children under 21

years of age, and parents of U.S. citizens 21 years of age and older); (2) family-based preference immigrants (unmarried sons and daughters of U.S. citizens, spouses and unmarried sons and daughters of lawful permanent residents, married sons and daughters of U.S. citizens, and brothers and sisters of U.S. citizens 21 years of age and older); and (3) employment-based preference immigrants in cases only when a U.S. citizen, lawful permanent resident, or U.S. national relative filed the immigrant visa petition or such relative has a significant ownership interest (5 percent or more) in the entity that filed the petition. However, immigrants seeking certain visa classifications are exempt from the requirement to submit a Form I–864 as are intending immigrants who have earned or can receive credit for 40 qualifying quarters (credits) of work in the United States.

Additionally, some sponsors for intending immigrants may be able to file an Affidavit of Support Under Section 213A of the INA (Form I–864EZ). Form I–864EZ is a shorter version of Form I–864 and is designed for cases that meet certain criteria. A sponsor may file Form I–864EZ only if: (1) The sponsor is the person who filed or is filing a Petition for Alien Relative (Form I–130) for a relative being sponsored; (2) the relative being sponsored is the only person listed on Form I–130; and (3) the income the sponsor is using for qualification is based entirely on salary or pension and is shown on one or more Internal Revenue Service (IRS) Form W–2s provided by employers or former employers.

Form I–864 includes attachment, Contract Between Sponsor and Household Member (Form I–864A), which may be filed when a sponsor's income and assets do not meet the income requirements of Form I–864 and the qualifying household member chooses to combine his or her resources with the income and/or assets of a sponsor to meet those requirements. A sponsor must file a separate Form I–864A for each household member whose income and/or assets the sponsor is using to meet the affidavit of support income requirements. The Form I–864A contract must be submitted with Form I–864. The Form I–864A serves as a contractual agreement between the sponsor and household member that, along with the sponsor, the household member is responsible for providing financial and material support to the sponsored immigrant.

In cases where the petitioning sponsor cannot meet the income requirements by him or herself, an individual seeking an immigrant visa or adjustment of

status may also meet the affidavit of support requirement by obtaining a joint sponsor who is willing to accept joint and several liability with the petitioning sponsor as to the obligation to provide support to the sponsored alien. The joint sponsor must demonstrate income or assets that independently meet the requirements to support the sponsored immigrant(s) as required under section 213A(f)(2) and (f)(5)(A) of the Act, 8 U.S.C. 1883a(f)(2) and (f)(5)(A). The joint sponsor's income and assets may not be combined with the income/assets of the petitioning sponsor or the sponsored immigrant. Both the petitioning sponsor and the joint sponsor must each complete a Form I–864.

Certain classes of immigrants currently are exempt from the requirement to file Form I–864 or Form I–864EZ and therefore must file Form I–864W. DHS proposes to eliminate Form I–864W and instead individuals would now be required to provide the information previously requested on the Form I–864W using Form I–485. Based on the information provided in the Form I–485, an officer can verify whether an alien is statutorily required to file an affidavit of support.

Some applicants seeking adjustment of status may be eligible for a fee waiver when filing Form I–485. An applicant who is unable to pay the filing fees or biometric services fees for an application or petition may obtain a fee waiver by filing a Request for Fee Waiver (Form I–912). If an applicant's Form I–912 is approved, the agency will waive both the filing fee and biometric services fee. Therefore, DHS assumes for the purposes of this economic analysis that the filing fees and biometric services fees required for Form I–485 are waived if an approved Form I–912 accompanies the application.

When filing Form I–485, a fee waiver is only available if the applicant is applying for adjustment of status based on:

• Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Afghan or Iraqi national employed by or on behalf of the U.S. Government; or

• An adjustment provision that is exempt from the public charge grounds of inadmissibility under section 212(a)(4) of the INA, including but not limited to the Cuban Adjustment Act, the Haitian Refugee Immigration Fairness Act (HRIFA), and the Nicaraguan Adjustment and Central American Relief Act (NACARA), or similar provisions; continuous residence in the United States since before January 1, 1972, "Registry,"

[703] See Borjas, G.J. (2016) We wanted workers: Unraveling the immigration narrative. Chapter 9, p. 175. W.W. Norton & Company, New York.

[704] See proposed 8 CFR 212.23(a).

Asylum Status under section 209(b) of the INA, Special Immigrant Juvenile Status, and Lautenberg parolees.

Additionally, the following individuals seeking adjustment of status may apply for a fee waiver for Form I–485:

• Battered spouses of A, G, E–3, or H nonimmigrants;

• Battered spouses or children of a lawful permanent resident or U.S. citizen under INA section 240A(b)(2);

• T nonimmigrants;

• U nonimmigrants; or

• VAWA self-petitioners.

DHS is proposing to facilitate the current Form I–485 application process by creating a new form—Form I–944—which would collect information to the extent allowed by relevant laws based on factors such as age; health; family status; assets, resources, and financial status; education and skills; and any additional financial support through an affidavit of support, so that DHS could determine whether an applicant applying for adjustment of status who is subject to public charge review would be inadmissible to the United States based on public charge grounds. For the analysis of this proposed rule, DHS assumes that all individuals who apply for an adjustment of status using Form I–485 are required to submit Form I–944, unless he or she is in a class of applicants that is exempt from review for determination of inadmissibility based on public charge at the time of adjustment of status according to statute or regulation.

In addition to those applying for an adjustment of status, any alien applying for an extension of stay or change of status as a nonimmigrant in the United States would now be required to demonstrate that he or she is neither using nor receiving, nor likely to receive, public benefits as defined in this proposed rule unless the applicant is in a class of admission or is seeking to change to a class of admission that is exempt from inadmissibility on public charge grounds.

For applicants seeking adjustment of status or an immigrant visa who are likely to become a public charge after the review for determination of inadmissibility based on public charge, DHS is proposing to establish a bond

process for such aliens. DHS currently does not have a specific process or procedure in place to accept public charge bonds, though it has the authority to do so. The proposed public charge bond process would include DHS acceptance of a public charge bond posted on an adjustment of status applicant's behalf if the adjustment of status applicant was deemed inadmissible based on public charge. The process would also include the possibility to substitute an existing bond, the requirement to substitute a bond before the bond on file with DHS expires, the DHS determination of breach of a public charge bond, the possibility to file an appeal upon a breach determination, cancellation of a public charge bond, and the possibility to submit an appeal upon denial of the cancellation request.

3. Population

This proposed rule would affect individuals who are present in the United States who are seeking an adjustment of status to that of a lawful permanent resident. According to statute, an individual who is seeking adjustment of status and is at any time likely to become a public charge is ineligible for such adjustment.[705] The grounds of inadmissibility set forth in section 212 of the Act also apply when certain aliens seek admission to the United States, whether for a temporary purpose or permanently. However, the grounds of public charge inadmissibility (including ineligibility for adjustment of status) do not apply to all applicants since there are various classes of admission that Congress expressly exempted from the public charge inadmissibility ground. Within USCIS, this proposed rule would affect individuals who apply for adjustment of status since these individuals would be required to be reviewed for a determination of inadmissibility based on public charge grounds as long as the individual is not in a class of admission that is exempt from review for public charge. In addition, the proposed rule would affect individuals applying for an extension of stay or change of status

because these individuals would have to demonstrate that they have not received, are not currently receiving, and are not likely to receive public benefits in the future, as defined in the proposed rule. This analysis estimates the populations from each of these groups that would be subject to review for receipt of public benefits. DHS notes that the population estimates are based on aliens present in the United States who are applying for adjustment of status or extension of stay or change of status, rather than individuals outside the United States who must apply for an immigrant visa through consular processing at a DOS consulate abroad.

(a) Population Seeking Adjustment of Status

With this proposed rule, DHS intends to ensure that aliens who apply for adjustment of status are self-sufficient and will rely on their own financial resources, as well of those of their families, sponsors, and private organizations. Therefore, DHS estimates the population of individuals who are applying for adjustment of status using Form I–485.[706] Under the proposed rule, these individuals would undergo review for determination of inadmissibility based on public charge grounds, unless an individual is in a class of admission that is exempt from review for public charge determination.

Table 38 shows the total population in fiscal years 2012 to 2016 that applied for adjustment of status. In general, the annual population of individuals who applied to adjust status was consistent. Over the 5-year period, the population of individuals applying for adjustment of status ranged from a low of 530,802 in fiscal year 2013 to a high of 565,427 in fiscal year 2016. In addition, the average population of individuals over 5 fiscal years who applied for adjustment of status over this period was 544,246.

---

[705] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[706] Data on the population of individuals who are applying for adjustment of status and the class of admission come from U.S. Department of Homeland Security, Yearbook of Immigration Statistics for years 2012 to 2016. See U.S. Department of Homeland Security. Yearbook of Immigration Statistics. Office of Immigration Statistics. Available at https://www.dhs.gov/immigration-statistics/yearbook/ (accessed Jan. 24, 2018).

**Table 38. Total Population that Applied for Adjustment of Status, Fiscal Year 2012 to 2016.**

| Fiscal Year | Total Population Applying for Adjustment of Status |
|---|---|
| 2012 | 547,559 |
| 2013 | 530,802 |
| 2014 | 535,126 |
| 2015 | 542,315 |
| 2016 | 565,427 |
| **Total** | **2,721,229** |
| **5-year average** | **544,246** |

Source: USCIS analysis of United States Department of Homeland Security, Yearbook of Immigration Statistics for years 2012 to 2016. Available at https://www.dhs.gov/immigration-statistics/yearbook. Accessed Jan. 24, 2018. For example, *see* United States Department of Homeland Security, Yearbook of Immigration Statistics: 2016, Table 7. Washington, D.C., U.S. Department of Homeland Security, Office of Immigration Statistics, 2017.
Note: The most recent data available are from fiscal year 2016, hence data from fiscal year 2017 are not yet available.

DHS welcomes any public comments on our estimates of the total number of individuals applying for adjustment of status in the United States as the primary basis for developing population estimates of those who would be subject to review for determination of inadmissibility based on public charge grounds.

i. Exemptions From Determination of Inadmissibility Based on Public Charge Grounds

There are exemptions and waivers for certain classes of admission that are not subject to review for determination of inadmissibility based on public charge grounds. Table 39 shows the classes of applicants for admission, adjustment of status, or registry according to statute or regulation that are exempt from inadmissibility based on public charge grounds.

**BILLING CODE 4410–10–P**

**Table 39. Classes of Applicants for Admission, Adjustment of Status, or Registry Exempt from Inadmissibility Based on Public Charge According To Statute or Regulation.**

| | |
|---|---|
| • Refugees and asylees as follows: at the time admission under section 207 of the Act (refugees) or grant under section 208 of the Act (asylees adjustment of status to lawful permanent resident under sections 207(c)(3) and 209(c) of the Act; | • Amerasian immigrants at the time of application for admission as described in sections 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100-202, 101 Stat. 1329-183, section 101(e) (Dec. 22, 1987), as amended, 8 U.S.C. 1101 note; |
| • Afghan and Iraqi Interpreter, or Afghan or Iraqi national employed by or on behalf of the U.S. Government as described in section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006 Public Law 109–163 (Jan. 6, 2006), as amended, section 602(b) of the Afghan Allies Protection Act of 2009, Public Law 111–8, title VI (Mar. 11, 2009), as amended, 8 U.S.C. 1101 note, and section 1244(g) of the National Defense Authorization Act for Fiscal Year 2008, as amended Public Law 110-181 (Jan. 28, 2008); | • Cuban and Haitian entrants applying for adjustment of status under in section 202 of the Immigration Reform and Control Act of 1986 (IRCA), Public Law 99-603, 100 Stat. 3359 (Nov. 6, 1986), as amended, 8 U.S.C. 1255a note; |
| • Aliens applying for adjustment of status under the Cuban Adjustment Act, Public Law 89-732 (Nov. 2, 1966), as amended, 8 U.S.C. 1255 note; | • Nicaraguans and other Central Americans applying for adjustment of status under sections 202(a) and section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105-100, 111 Stat. 2193 (Nov. 19, 1997), as amended, 8 U.S.C. 1255 note; |
| • Haitians applying for adjustment of status under section 902 of the Haitian Refugee Immigration Fairness Act of 1998, Public Law 105-277, 112 Stat. 2681 (Oct. 21, 1998), as amended, 8 U.S.C. 1255 note; | • Lautenberg parolees as described in section 599E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Public Law 101-167, 103 Stat. 1195, title V (Nov. 21, 1989), as amended, 8 U.S.C. 1255 note; |
| • Special immigrant juveniles as described in section 245(h) of the Act; | • Aliens who entered the United States prior to January 1, 1972 and who meet the other conditions for being granted lawful permanent residence under section 249 of the Act and 8 CFR part 249 (Registry); |
| • Aliens applying for or re-registering for Temporary Protected Status as described in section 244 of the Act in accordance with section 244(c)(2)(A)(ii) of the Act and 8 CFR 244.3(a); | • A nonimmigrant classified under section 101(a)(15)(T) of the Act, in accordance with section 212(d)(13)(A) of the Act; |
| • An applicant for, or individual who is granted, nonimmigrant status under section 101(a)(15)(U) of the Act in accordance | • Nonimmigrants classified under section 101(a)(15)(U) of the Act applying for adjustment of status under section 245(m) |

| | |
|---|---|
| with section 212(a)(4)(E)(ii) of the Act; | of the Act and 8 CFR 245.24; |
| • An alien who is a VAWA self-petitioner under section 212(a)(4)(E)(i) of the Act; | • A qualified alien described in section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 8 U.S.C. 1641(c), in accordance with section 212(a)(4)(E)(iii) of the Act; |
| • Applicants adjusting status who qualify for a benefit under section 1703 of the National Defense Authorization Act, Public Law 108-136, 117 Stat. 1392 (Nov. 24, 2003), 8 U.S.C. 1151 note (posthumous benefits to surviving spouses, children, and parents); | • American Indians Born in Canada as described in section 289 of the Act; |
| • Nationals of Vietnam, Cambodia, and Laos applying for adjustment of status under section 586 of Public Law 106-429 under 8 CFR 245.21; and | • Polish and Hungarian Parolees who were paroled into the United States from November 1, 1989 to December 31, 1991 under section 646(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104-208, Div. C, Title VI, Subtitle D (Sept. 30, 1996), 8 U.S.C. 1255 note. |

Source: USCIS.

BILLING CODE 4410–10–C

To estimate the annual total population of individuals seeking to adjust status who would be subject to review for inadmissibility based on public charge grounds, DHS examined the annual total population of individuals who applied for adjustment of status for fiscal years 2012 to 2016. For each fiscal year, DHS removed individuals from the population whose classes of admission are exempt from public charge review for inadmissibility, as shown in table 39, leaving the total population that would be subject to such review. Further discussion of these exempt classes of admission can be found in the preamble.

Table 40 shows the total estimated population of individuals seeking to adjust status under a class of admission that is exempt from review for inadmissibility based on public charge grounds for fiscal years 2012 to 2016 as well as the total estimated population that would be subject to public charge review.[707] In fiscal year 2016, for example, the total number of persons who applied for an adjustment of status across various classes of admission was 565,427 (see table 38). After removing individuals from this population whose classes of admission are exempt from examination for public charge, DHS estimates the total population of adjustment applicants in fiscal year 2016 that would be subject to public charge review for inadmissibility is 382,769.[708]

---

[707] Calculation of total estimated population that would be subject to public charge review: (Total Population Applying for Adjustment of Status) − (Total Population Seeking Adjustment of Status that is Exempt from Public Charge Review for Inadmissibility) = Total Population Subject to Public Charge Review for Inadmissibility.

[708] Calculation of total population subject to public charge review for inadmissibility for fiscal year 2016: 565,427 − 182,658 = 382,769.

**Table 40. Total Estimated Population of Individuals Seeking Adjustment of Status Who Were Exempt from Public Charge Adjudication.**

| Fiscal Year | Total Population Seeking Adjustment of Status that is Exempt from Public Charge Review for Inadmissibility | Total Population Subject to Public Charge Review for Inadmissibility |
|---|---|---|
| 2012 | 163,333 | 384,226 |
| 2013 | 132,814 | 397,988 |
| 2014 | 154,912 | 380,214 |
| 2015 | 176,190 | 366,125 |
| 2016 | 182,658 | 382,769 |
| Total | 809,907 | 1,911,322 |
| 5-year average | 161,981 | 382,264 |

Source: USCIS analysis of United States Department of Homeland Security, Yearbook of Immigration Statistics for years 2012 to 2016. Available at https://www.dhs.gov/immigration- statistics/yearbook. Accessed Jan. 24, 2018. For example, see United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, D.C., U.S. Department of Homeland Security, Office of Immigration Statistics, 2017.

DHS estimates the projected annual average total population of adjustment applicants that would be subject to public charge review for inadmissibility by DHS is 382,264. This estimate is based on the 5-year average of the annual estimated total population subject to public charge review for inadmissibility from fiscal year 2012 to fiscal year 2016. Over this 5-year period, the estimated population of individuals applying for adjustment of status subject to public charge review ranged from a low of 366,125 in fiscal year 2015 to a high of 397,988 in fiscal year 2013.

DHS welcomes any public comments on our estimates of the total population of individuals seeking to adjust status under a class of admission that is exempt from review for inadmissibility based on public charge grounds as well as the total population that would be subject to public charge review. DHS notes that the population estimates are based on immigrants present in the United States who are applying for adjustment of status, rather than immigrants outside the United States who must apply for an immigrant visa through consular processing at DOS consulate abroad.

ii. Exemptions From the Requirement To Submit an Affidavit of Support

In addition to the exemptions from inadmissibility based on public charge, certain classes of admission are exempt from the requirement to submit an affidavit of support for applicants for admission, adjustment of status, or registry. Certain applicants applying for adjustment of status are required to submit an affidavit of support from a sponsor or otherwise be found inadmissible as likely to become a public charge. When an affidavit of support is submitted, a contract is established between the sponsor and the U.S. Government to establish a legally enforceable obligation to support the applicant financially.

Table 41 shows the estimated total population of individuals seeking adjustment of status who were exempt from the requirement to submit an affidavit of support from a sponsor over the period fiscal year 2012 to fiscal year 2016.[709] The table also shows the total estimated population that was required to submit an affidavit of support showing evidence of having adequate means of financial support so that an applicant would not be found inadmissible as likely to become a public charge for failure to submit a sufficient affidavit of support. Further discussion of these exempt classes of admission can be found in the preamble. The estimated annual average population of individuals seeking to adjust status who were required to submit a public charge affidavit of support from a sponsor over the 5-year period was 257,610. Over this 5-year period, the estimated population of individuals required to submit a public charge affidavit of support from a sponsor ranged from a low of 247,011 in fiscal year 2015 to a high of 272,451 in fiscal year 2016.

[709] Data on the population of individuals who are applying for adjustment of status and the class of admission come from U.S. Department of Homeland Security, Yearbook of Immigration Statistics for years 2012 to 2016. *See* U.S. Department of Homeland Security. Yearbook of Immigration Statistics. Office of Immigration Statistics. Available at *https://www.dhs.gov/immigration-statistics/yearbook/* (accessed Jan. 24, 2018).

Table 41.  Total Estimated Population of Individuals Seeking Adjustment of Status Who Are Exempt from the Requirement to Submit Public Charge Affidavit of Support.

| Fiscal Year | Total Population Exempt from Submitting Affidavit of Support | Total Population Required to Submit a Public Charge Affidavit of Support |
|---|---|---|
| 2012 | 288,951 | 258,608 |
| 2013 | 272,222 | 258,580 |
| 2014 | 283,726 | 251,400 |
| 2015 | 295,304 | 247,011 |
| 2016 | 292,976 | 272,451 |
| **Total** | **1,433,179** | **1,288,050** |
| **5-year average** | **286,636** | **257,610** |

Source: USCIS analysis of United States Department of Homeland Security, Yearbook of Immigration Statistics for years 2012 to 2016.  Available at https://www.dhs.gov/immigration-statistics/yearbook.  Accessed Jan. 24, 2018.  For example, *see* United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, D.C., U.S. Department of Homeland Security, Office of Immigration Statistics, 2017.

DHS estimates the projected annual average total population that would be subject to the requirement to submit an affidavit of support from a sponsor is 257,610. This estimate is based on the 5-year average of the annual estimated total population of applicants applying for adjustment of status that would be subject to the requirement to submit an affidavit of support from a sponsor from fiscal year 2012 to fiscal year 2016. Over this 5-year period, the estimated population of such individuals applying for adjustment of status ranged from a low of 247,011 in fiscal year 2015 to a high of 272,451 in fiscal year 2016.

DHS welcomes any public comments on our estimates of the total population of individuals seeking adjustment of status who were exempt from the requirement to submit an affidavit of support as well as the total population that was required to submit an affidavit of support showing evidence of having adequate means of financial support so that an applicant would not be found inadmissible as likely become a public charge for failure to submit a sufficient affidavit of support. DHS notes that the population estimates are based on immigrants present in the United States who are applying for adjustment of status, rather than immigrants outside the United States who must apply for an immigrant visa through consular processing at a U.S. Department of State consulate abroad.

**(b) Population Seeking Extension of Stay or Change of Status**

Nonimmigrants in the United States may apply for an extension of stay or change of status by having Form I–129 filed by an employer on his or her behalf. An employer uses Form I–129 to petition USCIS for a beneficiary to enter the United States temporarily as a nonimmigrant to perform services or labor, or to receive training. The Form I–129 can also be used to request an extension or change in status. In addition, an employer may use Form I–129CW to petition USCIS for a foreign national who is ineligible for another employment-based nonimmigrant classification to work as a nonimmigrant in the Commonwealth of the Northern Mariana Islands (CNMI) temporarily as a CW–1, CNMI-Only Transitional Worker. Moreover, an employer may also use Form I–129CW to request an extension of stay or change of status for a CNMI-Only Transitional Worker.

A nonimmigrant may file Form I–539 so long as the nonimmigrant is currently in an eligible nonimmigrant category. A nonimmigrant generally must submit an application for extension of stay or change of status before his or her current authorized stay expires. In addition to determining inadmissibility based on public charge for individuals seeking adjustment of status, DHS is proposing to conduct reviews of nonimmigrants who apply for extension of stay or change of status to determine whether the applicant has demonstrated that he or she has not received, is not receiving, nor is likely to receive, public benefits, as defined in the proposed rule.[710] However, DHS proposes that such determinations would not require applicants seeking extension of stay or change of status to file Form I–944. Instead, USCIS officers would be able to exercise discretion regarding whether it would be necessary to issue a RFE whereby an applicant would then have to submit Form I–944.

Table 42 shows the total estimated population of beneficiaries seeking extension of stay or change of status through an employer petition using Form I–129 for fiscal years 2012 to 2016. DHS estimated this population based on receipts of Form I–129 in each fiscal year. Over this 5-year period, the estimated population of individuals who would be subject to a determination of inadmissibility on public charge grounds ranged from a low of 282,225 in fiscal year 2013 to a high of 377,221 in fiscal year 2012. The estimated average population of individuals seeking extension of stay or change of status over the five-year period fiscal year 2012 to 2016 was 336,335. DHS estimates that 336,335 is the average annual projected population of beneficiaries seeking extension of stay or change of status through an employer petition using Form I–129 and

---

[710] Past or current receipt of public benefits, alone, would not justify a finding of inadmissibility on public charge grounds.

therefore subject to the discretionary
RFEs for public charge determination.

| Table 42. Total Estimated Population of Beneficiaries Seeking Extension of Stay or Change of Status through an Employer Petition Using Form I-129, Fiscal Year 2012 – 2016. | | | |
|---|---|---|---|
| **Fiscal Year** | **Receipts** | **Approvals** | **Denials** |
| 2012 | 377,221 | 249,172 | 127,555 |
| 2013 | 282,225 | 221,229 | 60,413 |
| 2014 | 306,159 | 242,513 | 63,087 |
| 2015 | 340,338 | 277,010 | 62,175 |
| 2016 | 375,733 | 321,783 | 52,430 |
| **Total** | **1,681,676** | **1,311,707** | **365,660** |
| **5-year average** | **336,335** | **262,341** | **73,132** |

Source: USCIS analysis of data provided by USCIS, Office of Performance & Quality.
Notes: Denials include the number of applications that were denied, terminated, revoked, or withdrawn during the reporting period. Cases may have been adjudicated in a later year than the one in which they were received.

Table 43 shows the total estimated population of beneficiaries seeking extension of stay or change of status through an employer petition using Form I–129CW for fiscal years 2012 to 2016. DHS estimated this population based on receipts of Form I–129CW in each fiscal year. Over this 5-year period, the estimated population of individuals who would be subject to a determination of inadmissibility on public charge grounds ranged from a low of 5,249 in fiscal year 2013 to a high of 8,273 in fiscal year 2016. The estimated average population of individuals seeking extension of stay or change of status through Form I–129CW over the five-year period fiscal year 2012 to 2016 was 6,307. DHS estimates that 6,307 is the average annual projected population of beneficiaries seeking extension of stay or change of status through an employer petition using Form I–129CW and therefore subject to discretionary RFEs for public charge determination.

| Table 43. Total Estimated Population of Beneficiaries Seeking Extension of Stay or Change of Status through an Employer Petition Using Form I-129CW, Fiscal Year 2012 – 2016. | | | |
|---|---|---|---|
| **Fiscal Year** | **Receipts** | **Approvals** | **Denials** |
| 2012 | 5,973 | 4,083 | 238 |
| 2013 | 5,249 | 5,053 | 521 |
| 2014 | 6,700 | 5,554 | 535 |
| 2015 | 5,339 | 4,906 | 340 |
| 2016 | 8,273 | 7,580 | 540 |
| **Total** | **31,534** | **27,176** | **2,174** |
| **5-year average** | **6,307** | **5,435** | **435** |

Source: USCIS analysis of data provided by USCIS, Office of Performance & Quality.
Notes: Denials include the number of applications that were denied, terminated, revoked, or withdrawn during the reporting period. Cases may have been adjudicated in a later year than the one in which they were received.

Table 44 shows the total estimated population of individuals seeking extension of stay or change of status using Form I–539 for fiscal years 2012 to 2016. DHS estimated this population based on receipts of Form I–539 in each fiscal year. Over this 5-year period, the estimated population of individuals who would be subject to a determination of inadmissibility on public charge grounds ranged from a low of 149,583 in fiscal year 2013 to a high of 203,695 in fiscal year 2016. The estimated average population of individuals seeking extension of stay or change of status over the 5-year period from fiscal year 2012 to 2016 was 174,866. DHS estimates that 174,866 is the average annual projected population of individuals who would seek an extension of stay and change of status using Form I–539 and therefore would be subject to the discretionary RFEs for public charge determination.

| Table 44. Total Estimated Population of Individuals Seeking Extension of Stay or Change of Status Using Form I-539, Fiscal Year 2012 – 2016. | | | |
|---|---|---|---|
| Fiscal Year | Receipts | Approvals | Denials |
| 2012 | 154,309 | 135,379 | 18,781 |
| 2013 | 149,583 | 130,600 | 18,826 |
| 2014 | 185,515 | 136,298 | 22,053 |
| 2015 | 181,226 | 154,184 | 26,162 |
| 2016 | 203,695 | 138,870 | 17,492 |
| Total | 874,328 | 695,331 | 103,314 |
| 5-year average | 174,866 | 139,066 | 20,663 |

Source: USCIS analysis of data provided by USCIS, Office of Performance & Quality.
Notes: Denials include the number of applications that were denied, terminated, revoked, or withdrawn during the reporting period. Cases may have been adjudicated in a later year than the one in which they were received.

DHS welcomes any public comments on our estimates of the total population of employers filing on behalf of individuals seeking extension of stay or change of status using Form I–129 or Form I–129CW as well as the total of individuals seeking extension of stay or change of status using Form I–539, where DHS proposes that the total population using each of these forms would be subject to review on a discretionary basis for determination of inadmissibility based on public charge grounds. DHS notes that the population estimates are based on nonimmigrants present in the United States who are applying for extension of stay or a change of status, rather than individuals outside the United States who must apply for a nonimmigrant visa through consular processing at a DOS consulate abroad.

4. Cost-Benefit Analysis

DHS expects this proposed rule to produce costs and benefits associated with the procedures for examining individuals seeking entry into the United States for inadmissibility based on public charge.

For this proposed rule, DHS generally uses the federal minimum wage plus weighted average benefits of $10.66 per hour ($7.25 federal minimum wage base plus $3.41 weighted average benefits) as a reasonable proxy of time valuation to estimate the opportunity costs of time for individuals who are applying for adjustment of status and must be reviewed for determination of inadmissibility based on public charge grounds.[711] DHS also uses $10.66 per hour to estimate the opportunity cost of time for individuals who cannot or choose not to participate in the labor market as these individuals incur opportunity costs and/or assign valuation in deciding how to allocate their time. This analysis uses the federal minimum wage rate since approximately 80 percent of the total number of individuals who obtained lawful permanent resident status were in a class of admission under family-sponsored preferences and other non-employment-based classifications such as diversity, refugees and asylees, and parolees.[712] Therefore, DHS assumes many of these applicants hold positions in occupations that are likely to pay around the federal minimum wage.

The federal minimum wage of $7.25 is an unweighted hourly wage that does not account for worker benefits. DHS accounts for worker benefits when estimating the opportunity cost of time by calculating a benefits-to-wage multiplier using the most recent Department of Labor, BLS report detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS estimates that the benefits-to-wage multiplier is 1.47 and, therefore, is able to estimate the full opportunity cost per applicant, including employee wages and salaries and the full cost of benefits such as paid leave, insurance, and retirement.[713]

---

[711] See 29 U.S.C. 206—Minimum wage, available at https://www.gpo.gov/fdsys/pkg/USCODE-2011-title29/html/USCODE-2011-title29-chap8-sec206.htm (accessed Jan. 24, 2018).

[712] See United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, DC, U.S. Department of Homeland Security, Office of Immigration Statistics, 2017. Available at https://www.dhs.gov/immigration-statistics/yearbook/2016 (accessed Jan. 24, 2018).

[713] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/(Wages and Salaries per hour) = $36.32/$24.77 = 1.466 = 1.47 (rounded). See Economic News Release, Employer Cost for Employee Compensation (March 2018), U.S. Dept. of Labor, BLS, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group. June 8, 2018,

DHS notes that there is no requirement that an individual be employed in order to file Form I–485 and many applicants may not be employed. Therefore, in this proposed rule, DHS calculates the total rate of compensation for individuals applying for adjustment of status as $10.66 per hour in this proposed rule using the benefits-to-wage multiplier, where the mean hourly wage is $7.25 per hour worked and average benefits are $3.41 per hour.[714]

However, DHS uses the unweighted mean hourly wage of $24.34 per hour for all occupations to estimate the opportunity cost of time for some populations in this economic analysis, such as those submitting an affidavit of support for an immigrant seeking to adjust status and those requesting extension of stay or change of status. For populations such as this, DHS assumes that individuals are dispersed throughout the various occupational groups and industry sectors of the U.S. economy. For the population submitting an affidavit of support, therefore, DHS calculates the average total rate of compensation as $35.78 per hour, where the mean hourly wage is $24.34 per

hour worked and average benefits are $11.46 per hour.[715][716]

DHS welcomes public comments on its use of $10.66 per hour as the opportunity cost of time for most populations in a class of admission under family-sponsored preferences and other non-employment-based preferences) and $35.78 per hour as the opportunity cost of time for other populations, such as those submitting an affidavit of support for an immigrant seeking to adjust status.

(a) Baseline Estimate of Current Costs

The baseline estimate of current costs is the best assessment of costs and benefits absent the proposed action. For this proposed rule, DHS estimates the baseline according to current operations and requirements and to that compares the estimated costs and benefits of the provisions set forth in the proposed rule. Therefore, DHS defines the baseline by assuming ''no change'' to DHS regulations to establish an

appropriate basis for evaluating the provisions of the proposed rule. DHS notes that costs detailed as part of the baseline include all current costs associated with completing and filing Form I–485, including required biometrics collection and medical examination (Form I–693) as well as any affidavits of support (Forms I–864, I–864A, I–864EZ, and I–864W) or requested fee waivers (Form I–912). As noted previously in the background section, the source of additional costs imposed by this proposed rule would come from the proposed requirements to submit Form I–944 detailing information about an applicant regarding factors such as age, health, family status, finances, and education and skills. These costs are analyzed later in this economic analysis.

Table 45 shows the estimated population and annual costs of filing for adjustment of status and requesting an extension of stay or change of status for the proposed rule. These costs primarily result from the process of applying for adjustment of status, including filing Form I–485 and Form I–693 as well as, if necessary, an affidavit of support and/ or Form I–912. The costs are derived from the process of applying for extension of stay or change of status, including filing Form I–129, Form I–129CW, or Form I–539.

**BILLING CODE 4410–10–P**

---

available at https://www.bls.gov/news.release/ archives/ecec_06082018.pdf (viewed June 20, 2018).

[714] The calculation of the weighted federal minimum hourly wage for applicants: $7.25 per hour * 1.47 benefits-to-wage multiplier = $10.658 = $10.66 (rounded) per hour.

[715] The national mean hourly wage across all occupations is reported to be $24.34. See Occupational Employment and Wage Estimates United States. May 2017. Department of Labor, BLS, Occupational Employment Statistics program; available at https://www.bls.gov/oes/2017/may/oes_ nat.htm.

[716] The calculation of the weighted mean hourly wage for applicants: $24.34 per hour * 1.47 = $35.779 = $35.78 (rounded) per hour.

**Table 45. Total Average Annual Baseline (Current) Costs.**

| Form | Estimated Average Annual Population | Total Annual Cost |
|---|---|---|
| **I-485, Application to Register Permanent Residence or Adjust Status** | **382,264** | **$519,114,512** |
| Filing Fee | | $435,780,960 |
| Opportunity Cost of Time (OCT) | | $25,470,250 |
| Biometrics Services Fee | | $32,492,440 |
| Biometrics Services OCT | | $14,954,168 |
| Biometrics Services Travel Costs | | $10,416,694 |
| **I-693, Report of Medical Examination and Vaccination Record** | **382,264** | **$198,930,186** |
| Medical Exam Cost | | $187,309,360 |
| Opportunity Cost of Time (OCT) | | $10,187,336 |
| Postage Costs | | $1,433,490 |
| **I-912, Request for Fee Waiver** | **58,558** | **$949,811** |
| Opportunity Cost of Time (OCT) | | $730,218 |
| Postage Costs | | $219,593 |
| **Affidavit of Support Forms (I-864, I-864A, I-864EZ, I-864W)** | **257,610** | **$55,303,715** |
| Opportunity Cost of Time (OCT) | | $55,303,715 |
| **I-129, Petition for a Nonimmigrant Worker** | **336,335** | **$184,136,686** |
| Filing Fee | | $154,714,100 |
| Opportunity Cost of Time (OCT) | | $28,161,330 |
| Postage Costs | | $1,261,256 |
| **I-129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker** | **6,307** | **$5,154,963** |
| Filing Fee | | $4,477,970 |
| Opportunity Cost of Time (OCT) | | $676,993 |
| **I-539, Application to Extend/Change Nonimmigrant Status** | **174,866** | **$76,463,656** |
| Filing Fee | | $64,700,420 |
| Opportunity Cost of Time (OCT) | | $11,763,236 |
| **Total Baseline Costs** | | **$1,040,053,529** |

Source: USCIS analysis.

BILLING CODE 4410–10–C

i. Determination of Inadmissibility Based on Public Charge Grounds

a. Form I–485, Application To Register Permanent Residence or Adjust Status

The basis of the quantitative costs estimated for this proposed rule is the cost of filing for adjustment of status using Form I–485, the opportunity cost of time for completing this form, any other required forms, and any other incidental costs (*e.g.,* travel costs) an individual must bear that are required in the filing process. DHS reiterates that costs examined in this section are not additional costs that would be imposed by the proposed rule, but costs that applicants currently incur as part of the application process to adjust status. The current filing fee for Form I–485 is $1,140. The fee is set at a level to recover the processing costs to DHS. As previously discussed in the population section, the estimated average annual population of individuals who apply for adjustment of status using Form I–485 is 382,264. Therefore, DHS estimates that the annual filing cost associated for Form I–485 is approximately $435,780,960.[717]

DHS estimates the time burden of completing Form I–485 is 6.25 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.[718] Using the total rate of compensation for minimum wage of $10.66 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–485 would be $66.63 per applicant.[719] Therefore, using the total population estimate of 382,264 annual filings for Form I–485, DHS estimates the total opportunity cost of time associated with completing Form I–485 is approximately $25,470,250 annually.[720]

USCIS requires applicants who file Form I–485 to submit biometric information (fingerprints and signature)

by attending a biometrics services appointment at a designated USCIS Application Support Center (ASC). The biometrics services processing fee is $85.00 per applicant. Therefore, DHS estimates that the annual cost associated with biometrics services processing for the estimated average annual population of 382,264 individuals applying for adjustment of status is approximately $32,492,440.[721]

In addition to the biometrics services fee, the applicant would incur the costs to comply with the biometrics submission requirement as well as the opportunity cost of time for traveling to an ASC, the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles and takes 2.5 hours on average to complete the trip.[722] Furthermore, DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours.[723] Using the total rate of compensation of minimum wage of $10.66 per hour, DHS estimates the opportunity cost of time for completing the biometrics collection requirements for Form I–485 is $39.12 per applicant.[724] Therefore, using the total population estimate of 382,264 annual filings for Form I–485, DHS estimates the total opportunity cost of time associated with completing the biometrics collection requirements for Form I–485 is approximately $14,954,168 annually.[725]

In addition to the opportunity cost of providing biometrics, applicants would

incur travel costs related to biometrics collection. The cost of travel related to biometrics collection would equal $27.25 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.545 per mile.[726] DHS assumes that each applicant would travel independently to an ASC to submit his or her biometrics, meaning that this rule would impose a travel cost on each of these applicants. Therefore, DHS estimates that the total annual cost associated with travel related to biometrics collection for the estimated average annual population of 382,264 individuals applying for adjustment of status is approximately $10,416,694.[727]

In sum, DHS estimates the total current annual cost for filing Form I–485 is $519,114,512. The total current annual costs include Form I–485 filing fees, biometrics services fees, opportunity cost of time for completing Form I–485 and submitting biometrics information, and travel cost associated with biometrics collection.[728] DHS notes that a medical examination is generally required as part of the application process to adjust status. Costs associated with the medical examination are detailed in the next section. Moreover, costs associated with submitting an affidavit of support and requesting a fee waiver are also detailed in subsequent sections since such costs are not required for every individual applying for an adjustment of status.

b. Form I–693, Report of Medical Examination and Vaccination Record

USCIS requires most applicants who file Form I–485 seeking adjustment of status to submit Form I–693 completed by a designated civil surgeon. Form I–693 is used to report results of a medical examination to USCIS. For this analysis, DHS assumes that all individuals who apply for adjustment of status using Form I–485 are required to submit Form I–693. DHS reiterates that costs examined in this section are not

---

[717] Calculation: Form I–485 filing fee ($1,140) * Estimated annual population filing Form I–485 (382,264) = $435,780,960 annual cost for filing Form I–485.

[718] Source: Paperwork Reduction Act (PRA) Supporting Statement for Form I–485 (OMB control number 1615–0023). The PRA Supporting Statement can be found at Question 12 on Reginfo.gov at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201706-1615-001.*

[719] Calculation for opportunity cost of time for filing Form I–485: ($10.66 per hour * 6.25 hours) = $66.625 = $66.63 (rounded) per applicant.

[720] Calculation: Form I–485 estimated opportunity cost of time ($66.63) * Estimated annual population filing Form I–485 (382,264) = $25,470,250.13 = $25,470,250 (rounded) annual opportunity cost of time for filing Form I–485.

[721] Calculation: Biometrics services processing fee ($85) * Estimated annual population filing Form I–485 (382,264) = $32,492,440 annual cost for associated with Form I–485 biometrics services processing.

[722] See "Employment Authorization for Certain H–4 Dependent Spouses; Final rule,'' 80 FR 10284 (25 Feb. 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule,'' 78 FR 536, 572 (3 Jan. 2013).

[723] Source for biometric time burden estimate: Paperwork Reduction Act (PRA) Supporting Statement for Form I–485 (OMB control number 1615–0023). The PRA Supporting Statement can be found at Question 12 on Reginfo.gov at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201706-1615-001.*

[724] Calculation for opportunity cost of time to comply with biometrics submission for Form I–485: ($10.66 per hour * 3.67 hours) = $39.12 (rounded) per applicant.

[725] Calculation: Estimated opportunity cost of time to comply with biometrics submission for Form I–485 ($39.12) * Estimated annual population filing Form I–485 (382,264) = $14,954,167.68 = $14,954,168 (rounded) annual opportunity cost of time for filing Form I–485.

[726] See U.S. General Services Administration website for Privately Owned Vehicle (POV) Mileage Reimbursement Rates, *https://www.gsa.gov/travel/plan-book/transportation-airfare-rates-pov-rates-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates* (accessed January 7, 2018).

[727] Calculation: (Biometrics collection travel costs) * (Estimated annual population filing Form I–485) = $27.25 * 382,264 = $10,416,694 annual travel costs related to biometrics collection for Form I–485.

[728] Calculation: $435,780,960 (Annual filing fees for Form I–485) + $25,470,250 (Opportunity cost of time for filing Form I–485) + $32,492,440 (Biometrics services fees) + $14,954,168 (Opportunity cost of time for biometrics collection requirements) + $10,416,694 (Travel costs for biometrics collection) = $519,114,512 total current annual cost for filing Form I–485.

additional costs that would be imposed by the proposed rule, but costs that applicants currently incur as part of the application process to adjust status. The medical examination is required to establish that an applicant is not inadmissible to the United States on health-related grounds. While there is no filing fee associated with Form I–693, the applicant is responsible for paying all costs of the medical examination, including the cost of any follow-up tests or treatment that is required, and must make payments directly to the civil surgeon or other health care provider. In addition, applicants bear the opportunity cost of time for completing the medical exam form as well as sitting for the medical exam and the time waiting to be examined.

USCIS does not regulate the fees charged by civil surgeons for the completion of a medical examination. In addition, medical examination fees vary by physician. DHS notes that the cost of the medical examinations may vary widely, from as little as $20 to as much as $1,000 per respondent (including vaccinations to additional medical evaluations and testing that may be required based on the medical conditions of the applicant).[729] DHS estimates that the average cost for these activities is $490 and that all applicants would incur this cost.[730] Since DHS assumes that all applicants who apply for adjustment of status using Form I–485 must also submit Form I–693, DHS estimates that based on the estimated average annual population of 382,264 the annual cost associated with filing Form I–693 is $187,309,360.[731]

DHS estimates the time burden associated with filing Form I–693 is 2.5 hours per applicant, which includes

understanding and completing the form, setting an appointment with a civil surgeon for a medical exam, sitting for the medical exam, learning about and understanding the results of medical tests, allowing the civil surgeon to report the results of the medical exam on the form, and submitting the medical exam report to USCIS.[732] DHS estimates the opportunity cost of time for completing and submitting Form I–693 is $26.65 per applicant based on the total rate of compensation of minimum wage of $10.66 per hour.[733] Therefore, using the total population estimate of 382,264 annual filings for Form I–485, DHS estimates the total opportunity cost of time associated with completing and submitting Form I–693 is approximately $10,187,336 annually.[734]

In addition to the cost of a medical exam and the opportunity cost of time associated with completing and submitted Form I–693, applicants must bear the cost of postage for sending the Form I–693 package to USCIS. DHS estimates that each applicant will incur an estimated average cost of $3.75 in postage to submit the completed package to USCIS.[735] DHS estimates the total annual cost in postage based on the total population estimate of 382,264 annual filings for Form I–693 is $1,433,490.[736]

In sum, DHS estimates the total current annual cost for filing Form I–693 is $198,930,186. The total current annual costs include medical exam costs, the opportunity cost of time for completing Form I–693, and cost of postage to mail the Form I–693 package to USCIS.[737]

c. Form I–912, Request for Fee Waiver

Some applicants seeking an adjustment of status may be eligible for

a fee waiver when filing Form I–485. An applicant who is unable to pay the filing fees or biometric services fees for an application or petition may be eligible for a fee waiver by filing Form I–912. If an applicant's Form I–912 is approved, USCIS, as a component of DHS, will waive both the filing fee and biometric services fee. Therefore, DHS assumes for the purposes of this economic analysis that the filing fees and biometric services fees required for Form I–485 are waived if an approved Form I–912 accompanies the application. Filing Form I–912 is not required for applications and petitions that do not have a filing fee. DHS also notes that costs examined in this section are not additional costs that would be imposed by the proposed rule, but costs that applicants currently could incur as part of the application process to adjust status.

Table 46 shows the estimated population of individuals that requested a fee waiver (Form I–912), based on receipts, when applying for adjustment of status in fiscal years 2012 to 2016, as well as the number of requests that were approved or denied each fiscal year. During this period, the number of individuals who requested a fee waiver when applying for adjustment of status ranged from a low of 42,126 in fiscal year 2012 to a high of 76,616 in fiscal year 2016. In addition, the estimated average population of individuals applying to adjust status who requested a fee waiver for Form I–485 over the 5-year period fiscal year 2012 to 2016 was 58,558. DHS estimates that 58,558 is the average annual projected population of individuals who would request a fee waiver using Form I–912 when filing Form I–485 to apply for an adjustment of status.[738]

---

[729] Source for medical exam cost range: Paperwork Reduction Act (PRA) Report of Medical Examination and Vaccination Record (Form I–693) (OMB control number 1615–0033). The PRA Supporting Statement can be found at Question 13 on Reginfo.gov at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201609-1615-004.*

[730] Source for medical exam cost estimate: Paperwork Reduction Act (PRA) Report of Medical Examination and Vaccination Record (Form I–693) (OMB control number 1615–0033). The PRA Supporting Statement can be found at Question 13 on Reginfo.gov at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201609-1615-004.*

[731] Calculation: (Estimated medical exam cost for Form I–693) * (Estimated annual population filing Form I–485) = $490 * 382,264 = $187,309,360 annual estimated medical exam costs for Form I–693.

[732] Source for medical exam time burden estimate: Paperwork Reduction Act (PRA) Report of

Medical Examination and Vaccination Record (Form I–693) (OMB control number 1615–0033). The PRA Supporting Statement can be found at Question 13 on Reginfo.gov at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201609-1615-004.*

[733] Calculation for medical exam opportunity cost of time: ($10.66 per hour * 2.5 hours) = $26.65 per applicant.

[734] Calculation: (Estimated medical exam opportunity cost of time for Form I–693) * (Estimated annual population filing Form I–485) = $26.65 * 382,264 = $10,187,335.60 = $10,187,336 (rounded) annual opportunity cost of time for filing Form I–485.

[735] Source for medical exam form package postage cost estimate: Paperwork Reduction Act (PRA) Report of Medical Examination and Vaccination Record (Form I–693) (OMB control number 1615–0033). The PRA Supporting Statement can be found at Question 13 on Reginfo.gov at *https://*

*www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201609-1615-004.*

[736] Calculation: (Form I–693 estimated cost of postage) * (Estimated annual population filing Form I–693) = $3.75 * 382,264 = $1,433,490 annual cost in postage for filing Form I–693.

[737] Calculation: $187,309,360 (Medical exam costs) + $10,187,336 (Opportunity cost of time for Form I–693) + $1,433,490 (Postage costs for biometrics collection) = $198,930,186 total current annual cost for filing Form I–693.

[738] DHS notes that the estimated population of individuals who would request a fee waiver for filing Form I–485 includes all visa classifications for those applying for adjustment of status. We are unable to determine the number of fee waiver requests for filing Form I–485 that are associated with specific visa classifications that are subject to public charge review.

**Table 46. Total Population Requesting A Fee Waiver (Form I–912) when Filing Form I–485, Adjustment of Status.**

| Fiscal Year | Receipts | Approvals | Denials |
|---|---|---|---|
| 2012 | 42,126 | 34,890 | 7,236 |
| 2013 | 52,453 | 41,615 | 10,838 |
| 2014 | 58,534 | 47,629 | 10,905 |
| 2015 | 63,059 | 53,615 | 9,444 |
| 2016 | 76,616 | 68,641 | 7,975 |
| **Total** | **292,788** | **246,390** | **46,398** |
| **5-yr average** | **58,558** | **49,278** | **9,280** |

Source: USCIS analysis.

To provide a reasonable proxy of time valuation for applicants, as described previously, DHS assumes that applicants requesting a fee waiver for Form I–485 earn the total rate of compensation for individuals applying for adjustment of status as $10.66 per hour, where the value of $10.66 per hour represents the federal minimum wage with an upward adjustment for benefits. The analysis uses this wage rate because DHS expects that applicants who request a fee waiver are asserting that they are unable to afford to pay the USCIS filing fee. As a result, DHS expects such applicants to hold positions in occupations that have a wage below the mean hourly wage across all occupations. DHS also notes that this proposed rule may reduce the number of fee waiver requests received, but, at this time, we cannot determine the extent to which this will occur.

DHS estimates the time burden associated with filing Form I–912 is 1 hour and 10 minutes per applicant (1.17 hours), including the time for reviewing instructions, gathering the required documentation and information, completing the request, preparing statements, attaching necessary documentation, and submitting the request.[739] Therefore, using $10.66 per hour as the total rate of compensation, DHS estimates the opportunity cost of time for completing and submitting Form I–912 is $12.47 per applicant.[740] Using the total population estimate of 58,558 requests for a fee waiver for Form I–485, DHS estimates the total opportunity cost of time associated with completing and submitting Form I–912 is approximately $730,218 annually.[741]

In addition to the opportunity cost of time associated with completing and submitting Form I–912, applicants must bear the cost of postage for sending the Form I–912 package to USCIS. DHS estimates that each applicant will incur an estimated average cost of $3.75 in postage to submit the completed package to USCIS.[742] DHS estimates the annual cost in postage based on the total population estimate of 58,558 annual approved requests for a fee waiver for Form I–485 is $219,593.[743]

In sum, DHS estimates the total current annual cost for filing a fee waiver request (Form I–912) for Form I–485 is $949,811. The total current annual costs include the opportunity cost of time for completing Form I–912 and cost of postage to mail the Form I–912 package to USCIS.[744]

**d. Affidavit of Support Forms**

As previously discussed, submitting an affidavit of support using Form I–864 is required for most family-based immigrants and some employment-based immigrants to show that they have adequate means of financial support and are not likely to become a public charge. Additionally, Form I–864 includes attachment Form I–864A which may be filed when a sponsor's income and assets do not meet the income requirements of Form I–864 and the qualifying household member chooses to combine his or her resources with the income and/or assets of a sponsor to meet those requirements. Some sponsors for intending immigrants may be able to file an affidavit of support using Form I–864EZ, provided certain criteria are met. Moreover, certain classes of immigrants currently are exempt from the requirement to file Form I–864 or Form I–864EZ and therefore must file Form I–864W, Request for Exemption for Intending Immigrant's Affidavit of Support. However, DHS proposes to eliminate Form I–864W, and instead individuals would be required to provide the information previously requested on the Form I–864W using Form I–485. Based on the information provided in the Form I–485, an officer can verify whether an immigrant is statutorily required to file an affidavit of support.

There is no filing fee associated with filing Form I–864 with USCIS. However, DHS estimates the time burden associated with a sponsor filing Form I–864 is 6 hours per petitioner, including the time for reviewing instructions, gathering the required documentation and information, completing the affidavit, preparing statements, attaching necessary documentation, and

---

[739] Source for fee waiver time burden estimate: Paperwork Reduction Act (PRA) Request for Fee Waiver (Form I–912) (OMB control number 1615–0116). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201506-1615-006.*

[740] Calculation for fee waiver opportunity cost of time: ($10.66 per hour * 1.17 hours) = $12.47.

[741] Calculation: (Estimated opportunity cost of time for Form I–912) * (Estimated annual population of approved Form I–912) = $12.47 * 58,558 = $730,218.26 = $730,218 (rounded) annual opportunity cost of time for filing Form I–944 that are approved.

[742] Source for fee waiver postage cost estimate: Paperwork Reduction Act (PRA) Request for Fee Waiver (Form I–912) (OMB control number 1615–0116). The PRA Supporting Statement can be found at Question 13 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201506-1615-006.*

[743] Calculation: (Form I–912 estimated cost of postage) * (Estimated annual population of approved Form I–912) = $3.75 * 58,558 = $219,592.50 = $219,593 (rounded) annual cost in postage for filing Form I–912 that is approved.

[744] Calculation: $730,218 (Opportunity cost of time for Form I–912) + $219,593 (Postage costs for biometrics collection) = $949,811 total current annual cost for filing Form I–912.

**51250**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

submitting the affidavit.[745] Therefore, using the average total rate of compensation of $35.78 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–864 would be $214.68 per petitioner.[746] DHS assumes that the average rate of total compensation used to calculate the opportunity cost of time for Form I–864 is appropriate since the sponsor of an immigrant, who is agreeing to provide financial and material support, is instructed to complete and submit the form. Using the estimated annual total population of 257,610 individuals seeking to adjust status who are required to submit an affidavit of support using Form I–864, DHS estimates the opportunity cost of time associated with completing and submitting Form I–864 is $55,303,715 annually.[747] DHS estimates this amount as the total current annual cost for filing Form I–864, as required when applying to adjust status.

There is also no filing fee associated with filing Form I–864A with USCIS. However, DHS estimates the time burden associated with filing Form I–864A is 1 hour and 45 minutes (1.75 hours) per petitioner, including the time for reviewing instructions, gathering the required documentation and information, completing the contract, preparing statements, attaching necessary documentation, and submitting the contract.[748] Therefore, using the average total rate of compensation of $35.78 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–864A will be $62.62 per petitioner.[749]

DHS assumes the average total rate of compensation used for calculating the opportunity cost of time for Form I–864 since both the sponsor and another household member agree to provide financial support to an immigrant seeking to adjust status. However, the household member also may be the intending immigrant. While Form I–864A must be filed with Form I–864, DHS notes that we are unable to determine the number filings of Form I–864A since not all individuals filing I–864 need to file Form I–864A with a household member.

As with Form I–864, there is no filing fee associated with filing Form I–864EZ with USCIS. However, DHS estimates the time burden associated with filing Form I–864EZ is 2 hours and 30 minutes (2.5 hours) per petitioner, including the time for reviewing instructions, gathering the required documentation and information, completing the affidavit, preparing statements, attaching necessary documentation, and submitting the affidavit.[750] Therefore, using the average total rate of compensation of $35.78 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–864EZ will be $89.45 per petitioner.[751] However, DHS notes that we are unable to determine the number filings of Form I–864EZ and, therefore, rely on the annual cost estimate developed for Form I–864.

There is also no filing fee associated with filing Form I–864W with USCIS. However, DHS estimates the time burden associated with filing this form is 60 minutes (1 hour) per petitioner, including the time for reviewing instructions, gathering the required documentation and information, completing the request, preparing statements, attaching necessary documentation, and submitting the request.[752] Therefore, using the average total rate of compensation of $35.78 per hour, DHS estimates the opportunity

cost of time for completing and submitting Form I–864EZ will be $35.78 per petitioner.[753] However, DHS notes that we are unable to determine the number filings of Form I–864W and, therefore, rely on the annual cost estimate developed for Form I–864. Moreover, the proposed rule would eliminate Form I–864W as a form for use in filing an affidavit of support. Filers who would have been required to file Form I–864W instead would be instructed to provide the information previously requested on the Form I–864W using Form I–485, as amended by this proposed rule. Based on the information provided in the Form I–485, an officer could verify whether an immigrant is statutorily required to file an affidavit of support.

DHS is also proposing to amend the HHS Poverty Guidelines for Affidavit of Support (Form I–864P), by removing certain language describing means-tested public benefits. Form I–864P is used to determine the minimum level of income required to sponsor most family-based immigrants and some employment-based immigrants. These income requirements are to show that a sponsor has adequate means of financial support and is not likely to rely on the government for financial support. Form I–864P is for informational purposes and used for completing Form I–864. DHS does not anticipate additional costs or benefits as a result of any proposed changes to Form I–864P.

ii. Consideration of Receipt, or Likelihood of Receipt of Public Benefits Defined in Proposed 212.21(b) for Applicants Requesting Extension of Stay or Change of Status

Nonimmigrants in the United States may apply for extension of stay or change of status by either having an employer file Form I–129 or Form I–129CW, as applicable, on his or her behalf, or by filing Form I–539, so long as the nonimmigrant is currently in an eligible nonimmigrant category. This proposed rule seeks to require nonimmigrants who are seeking extension of stay or change of status to demonstrate that they have not previously received, are not currently receiving, nor are likely to receive public benefits in the future, as defined in this rule in 8 CFR 212.21(b. DHS also notes that costs examined in this section are not additional costs that would be imposed by the proposed rule, but costs that petitioners and applicants currently would incur as part of the application

---

[745] Source for I–864 time burden estimate: Paperwork Reduction Act (PRA) Affidavit of Support Under Section 213A of the INA (Forms I–864, I–864A, I–864EZ, I–864W) (OMB control number 1615–0075). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201705-1615-004.*

[746] Calculation opportunity cost of time for completing and submitting Form I–864, Affidavit of Support Under Section 213A of the INA: ($35.78 per hour * 6.0 hours) = $214.68 per applicant.

[747] Calculation: (Form I–864 estimated opportunity cost of time) * (Estimated annual population filing Form I–864) = $214.68 * 257,610 = $55,303,714.80 = $55,303,715 (rounded) total annual opportunity cost of time for filing Form I–864.

[748] Source for I–864A time burden estimate: Paperwork Reduction Act (PRA) Affidavit of Support Under Section 213A of the INA (Forms I–864, I–864A, I–864EZ, I–864W) (OMB control number 1615–0075). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201705-1615-004.*

[749] Calculation opportunity cost of time for completing and submitting Form I–864A, Contract Between Sponsor and Household Member: ($35.78 per hour * 1.75 hours) = $62.615 = $62.62 (rounded) per petitioner.

[750] Source for I–864EZ time burden estimate: Paperwork Reduction Act (PRA) Affidavit of Support Under Section 213A of the INA (Forms I–864, I–864A, I–864EZ, I–864W) (OMB control number 1615–0075). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201705-1615-004.*

[751] Calculation opportunity cost of time for completing and submitting Form I–864EZ, Affidavit of Support Under Section 213A of the INA: ($35.78 per hour * 2.5 hours) = $89.45.

[752] Source for I–864W time burden estimate: Paperwork Reduction Act (PRA) Affidavit of Support Under Section 213A of the INA (Forms I–864, I–864A, I–864EZ, I–864W) (OMB control number 1615–0075). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201705-1615-004.*

[753] Calculation opportunity cost of time for completing and submitting Form I–864W: ($35.78 per hour * 1.0 hours) = $35.78.

process to request an extension of stay or change of status.

a. Form I–129, Petition for a Nonimmigrant Worker

The current filing fee for Form I–129 is $460.00. The fee is set at a level to recover the processing costs to DHS. As previously discussed, the estimated average annual population of employers filing on behalf of nonimmigrant workers seeking EOS/COS using Form I–129 is 336,335. Therefore, DHS estimates that the annual cost associated with filing Form I–129 is approximately $154,714,100.[754]

DHS estimates the time burden for completing Form I–129 is 2 hours and 20 minutes (2.34 hours), including the time for reviewing instructions, gathering the required documentation and information, completing the request, preparing statements, attaching necessary documentation, and submitting the request.[755] Using the average total rate of compensation of $35.78 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–129 will be $83.73 per petitioner.[756] Therefore, using the total population estimate of 336,335 annual filings for Form I–129, DHS estimates the total opportunity cost of time associated with completing and submitting Form I–129 is approximately $28,161,330 annually.[757]

In addition to the filing fee and the opportunity cost of time associated with completing and submitting Form I–129, applicants must bear the cost of postage for sending the Form I–129 package to USCIS. DHS estimates that each applicant will incur an estimated average cost of $3.75 in postage to submit the completed package to USCIS.[758] DHS estimates the total

annual cost in postage based on the total population estimate of 336,335 annual filings for Form I–129 is approximately $1,261,256.[759]

In sum, DHS estimates the total current annual cost for filing Form I–129 is $184,136,686. The total current annual costs include Form I–129 filing fees, opportunity cost of time for completing Form I–129, and cost of postage to mail the Form I–129 package to USCIS.[760]

b. Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker

The current filing fee for Form I–129CW is $460.00. The fee is set at a level to recover the processing costs to DHS. In addition, an employer filing Form I–129CW for a CNMI-Only Nonimmigrant Transitional Worker must submit an additional $200 for a supplemental CNMI education fee per beneficiary, per year and a $50 fee for fraud prevention and detection with each petition. Thus, the total fees associated with filing Form I–129CW is $710 per beneficiary.[761] As previously discussed, the estimated average annual population of employers filing on behalf of nonimmigrant workers seeking EOS/COS using Form I–129CW is 6,307. Therefore, DHS estimates that the annual cost associated with filing Form I–129 is approximately $4,477,970.[762]

DHS estimates the time burden for completing Form I–129CW is 3 hours (3.0 hours), including the time for reviewing instructions, gathering the required documentation and information, completing the petition, preparing statements, attaching necessary documentation, and submitting the request.[763] Using the

average total rate of compensation of $35.78 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–129CW will be $107.34 per petitioner.[764] Therefore, using the total population estimate of 6,307 annual filings for Form I–129CW, DHS estimates the total opportunity cost of time associated with completing and submitting Form I–129CW is approximately $676,993 annually.[765]

In sum, DHS estimates the total current annual cost for filing Form I–129CW is $5,154,963. The total current annual costs include Form I–129CW filing fees and opportunity cost of time for completing Form I–129.[766]

c. Form I–539, Application To Extend/Change Nonimmigrant Status

The current filing fee for Form I–539 is $370 per application.[767] The fee is set at a level to recover the processing costs to DHS. As previously discussed, the estimated average annual population seeking EOS/COS using Form I–539 is 174,866. Therefore, DHS estimates that the annual cost associated with filing Form I–539 is approximately $64,700,420.[768]

DHS estimates the time burden for completing Form I–539 is 1 hour and 53 minutes (1.88 hours), including the time necessary to read all instructions for the form, gather all documents required to complete the collection of information, obtain translated documents if necessary, obtain the services of a preparer if necessary, and complete the

---

[754] Calculation: (Form I–129 filing fee) * (Estimated annual population filing Form I–129) = $460 * 336,335 = $154,714,100 annual estimated cost for filing Form I–129 seeking an extension of stay or change of status.

[755] Source for petition for nonimmigrant workers time burden estimate: Paperwork Reduction Act (PRA) Petition for Nonimmigrant Worker (Form I–129) (OMB control number 1615–0009). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-1615-001.*

[756] Calculation for estimated opportunity cost of time for completing Form I–129: ($35.78 per hour * 2.34 hours) = $83.725 = $83.73 (rounded) per applicant.

[757] Calculation: (Form I–129 estimated opportunity cost of time) * (Estimated annual population filing Form I–129) = $83.73 * 336,335 = $28,161,329.55 = $28,161,330 (rounded) annual estimated opportunity cost of time for filing Form I–129.

[758] Source for petition for nonimmigrant workers form package postage cost estimate: Paperwork Reduction Act (PRA) Petition for Nonimmigrant Worker (Form I–129) (OMB control number 1615–

0009). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-1615-001.*

[759] Calculation: (Form I–129 estimated cost of postage) * (Estimated annual population filing Form I–129) = $3.75 * 336,335 = $1,261,256.25 = $1,261,256 (rounded) total in postage for filing Form I–129.

[760] Calculation: $154,714,100 (Filing fees for Form I–129) + $28,161,330 (Opportunity cost of time for Form I–129) + $1,261,256 (Postage costs for Form I–129) = $184,136,686 total current estimated annual cost for filing Form I–129.

[761] This economic analysis assumes that each Form I–129CW filed will also be required to include the additional $200 supplemental CNMI education fee and the $50 fraud prevention and detection fee.

[762] Calculation (Form I–129CW filing fee) * (Estimated annual population filing Form I–129CW) = $710 * 6,307 = $4,477,970 annual estimated cost for filing Form I–129 seeking an extension of stay or change of status.

[763] Source for petition for nonimmigrant workers time burden estimate: Paperwork Reduction Act (PRA) Petition for CNMI-Only Nonimmigrant Transition Worker (Form I–129CW) (OMB control number 1615–0111). The PRA Supporting

Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201803-1615-006.*

[764] Calculation for estimated opportunity cost of time for completing Form I–129: ($35.78 per hour * 3.0 hours) = $107.34 per petitioner.

[765] Calculation: (Form I–129CW estimated opportunity cost of time) * (Estimated annual population filing Form I–129CW) = $107.34 * 6,307 = $676,993.38 = $676,993 (rounded) annual estimated opportunity cost of time for filing Form I–129CW.

[766] Calculation: $4,477,970 (Filing fees for Form I–129CW) + $676,993 (Opportunity cost of time for Form I–129CW) = $5,154,963 total current estimated annual cost for filing Form I–129CW.

[767] Source for petition for nonimmigrant workers time burden estimate: Paperwork Reduction Act (PRA) Application to Extend/Change Nonimmigrant Status (Form I–539) (OMB control number 1615–0003). The PRA Supporting Statement can be found at Question 13 on Reginfo.gov at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-1615-006.* DHS notes that certain A and G nonimmigrants are not required to pay a filing fee for Form I–539. In addition, a biometrics services fee of $85 is required for V nonimmigrants and for certain applicants in the CNMI applying for an initial grant of nonimmigrant status.

[768] Calculation: (Form I–539 filing fee) * (Estimated annual population filing Form I–539) = $370 * 176,866 = $64,700,420 annual cost for filing Form I–539.

**51252**    **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

form.[769] Using the average total rate of compensation of $35.78 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–539 will be $67.27 per applicant.[770] Therefore, using the total population estimate of 174,866 annual filings for Form I–539, DHS estimates the total opportunity cost of time associate with completing and submitting Form I–539 is approximately $11,763,236 annually.[771]

In sum, DHS estimates the total current annual cost for filing Form I–539 is $76,463,656. The total current annual cost include Form I–539 filing fees and the opportunity cost of time for completing Form I–539.[772]

(b) Costs of Proposed Regulatory Changes

The primary source of quantified new costs for the proposed rule would be from the creation of Form I–944. This form would be used to collect information based on factors such as age; health; family status; assets, resources and financial status; and education and skills, so that USCIS could determine whether an applicant

would be inadmissible to the United States based on public charge grounds. The proposed rule would require individuals who are applying for adjustment of status to complete and submit the form to establish that they are not likely to become a public charge. At the agency's discretion, Form I–129 and Form I–129CW beneficiaries, and Form I–539 applicants seeking an extension of stay or change of status may be required to submit Form I–944 to be reviewed for public charge determination.

The proposed rule would also add costs from an additional 10-minute increase in the time burden estimate to complete Form I–485. Additionally, the proposed rule would add costs from an additional time burden increase of 30 minutes for completing and filing Form I–129, Form I–129CW, and Form I–539.

The proposed rule would also impose new costs by establishing a public charge bond process. At the agency's discretion, certain aliens who are found likely to become a public charge may be provided the opportunity to post a public charge bond. As part of the proposed public charge bond process, an individual would have an obligor submit a public charge bond using a new Form I–945, Public Charge Bond, on the alien's behalf, and the alien or an acceptable surety (individual or a company) would use Form I–356, Request for Cancellation of Public Charge Bond, as part of a request to cancel a public charge bond. DHS notes that if the alien permanently departed the United States, as defined in proposed 8 CFR 213.1, and the loss of LPR status was voluntarily, we would also require a Form I–407 submission. If the request for cancellation is denied, DHS would notify the obligor and inform the obligor of the possibility to appeal the determination to the USCIS

Administrative Appeals Office (AAO) using Form I–290B, Notice of Appeal or Motion.[773] In addition, upon learning of a breach of public charge bond, DHS would notify the obligor that the bond has been declared breached and inform the obligor of the possibility to appeal the determination to the USCIS Administrative Appeals Office (AAO) using Form I–290B, Notice of Appeal or Motion.[774]

The following costs are new costs that would be imposed on the population applying to adjust status using Form I–485 or on the population that would be seeking extension of stay or change of status using Forms I–129, I–129CW, or I–539. However, individuals seeking extension of stay or change of status would only be required to submit Form I–944 at the discretion of adjudication officers. Table 47 shows the estimated annual costs that the proposed rule would impose on individuals seeking to adjust status using Form I–485 who also would be required to file Form I–944. The table also presents the estimated new costs the proposed rule would impose associated with a 10-minute increase in the time burden estimate for completing Form I–485, from additional time burden increases of 30 minutes each for completing and filing Form I–129, Form I–129CW, and Form I–539. The table also shows the range of costs that Form I–129 and Form I–129CW beneficiaries, and Form I–539 filers would incur should they receive a RFE to file Form I–944 to determine inadmissibility based on public charge grounds under the provisions of this proposed rule. Finally, the table includes the estimated new cost associated with the proposed public charge bond process.

---

[769] Source for petition for nonimmigrant workers time burden estimate: Paperwork Reduction Act (PRA) Application to Extend/Change Nonimmigrant Status (Form I–539) (OMB control number 1615–0003). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-1615-006.*

[770] Calculation for the opportunity cost of time for completing Form I–539: ($35.78 per hour * 1.88 hours) = $67.266 = $67.27 (rounded) per applicant.

[771] Calculation: (Form I–539 estimated opportunity cost of time) * (Estimated annual population filing Form I–539) = $67.27 * 174,866 = $11,763,235.82 = $11,763,236 (rounded) annual estimated opportunity cost of time for filing Form I–539.

[772] Calculation: $64,700,420 (Filing fees for Form I–539) + $11,763,236 (Opportunity cost of time for Form I–539) = $76,463,656 total current annual cost for filing Form I–539.

[773] *See* proposed 8 CFR 213.1(g).

[774] *See* proposed 8 CFR 213.1(h).

### Table 47. Total New Quantified Direct Costs of the Proposed Rule.

| Form | Estimated Annual Population | Total Annual Cost[1] |
|---|---|---|
| **Form I-944, Declaration of Self-Sufficiency** | 382,264 | $25,963,371 |
| Opportunity Cost of Time (OCT) | | $18,337,204 |
| Credit Report/Credit Score Costs | | $7,626,167 |
| **Form I-485, Application to Register Permanent Residence or Adjust Status** | 382,264 | $691,898 |
| OCT – Additional to Baseline (Current) Costs | | $691,898 |
| **Form I-129, Petition for a Nonimmigrant Worker – To Request Extension of Stay/Change of Status** | 336,335 | $12,103,351 to $66,880,214 |
| OCT – Additional to Baseline (Current) Costs | | $6,017,033 |
| Costs to beneficiaries who receive a RFE to complete and submit Form I-944, including OCT and credit report/credit score costs. | | $6,086,318 to $60,863,181 |
| **Form I-129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker – To Request Extension of Stay/Change of Status** | 6,307 | $227,015 to $1,254,198 |
| OCT – Additional to Baseline (Current) Costs | | $112,883 |
| Costs to beneficiaries who receive a RFE to complete and submit Form I-944, including OCT and credit report/credit score costs. | | $114,132 to $1,141,315 |
| **Form I-539, Application to Extend/Change Nonimmigrant Status** | 174,866 | $6,292,728 to $34,772,105 |
| OCT – Additional to Baseline (Current) Costs | | $3,128,353 |
| Costs to beneficiaries who receive a RFE to complete and submit Form I-944, including OCT and credit report/credit score costs. | | $3,164,375 to $31,643,752 |
| **Form I-945, Public Charge Bond** | 960 | $34,234 |
| Filing Fee | | $24,000 |
| OCT | | $10,234 |
| **Form I-356, Request for Cancellation of Public Charge Bond** | 25 | $825 |
| Filing Fee | | $625 |
| OCT | | $200 |

| Total New Quantified Costs of the Proposed Rule | $45,313,422 to $129,596,845 |
| --- | --- |

Source: USCIS analysis.
Notes:
[1] Not all nonimmigrants who apply for extension of stay or change of status would be required to file Form I–944 to detail their financial, health, and education status. Instead, USCIS officers would be able to exercise discretion regarding whether it would be necessary to issue a RFE for the submission of Form I–944. DHS is unable to estimate the actual number of RFEs that adjudication officers may issue to Form I–129 and Form I–129CW beneficiaries, and Form I–539 filers to submit Form I–944 since such RFEs would be issued on a discretionary basis. However, DHS is able to present a range of RFEs that could be issued based on total population estimates and the estimated annual cost associated with such RFE. Therefore, the total annual cost for Form I–129, Form I–129CW, and Form I–539 is shown in the table as a range based on a RFE rate of 10 to 100 percent.

i. Form I–944, Declaration of Self-Sufficiency and Form I–485, Application To Register Permanent Residence or Adjust Status

In this proposed rule, DHS is proposing to create a new form for collecting information from those applying for immigration benefits with USCIS, such as adjustment of status or extension of stay or change in status, to demonstrate that the applicant is not likely to become a public charge under section 212(a)(4) of the Act. Form I–944 would collect information based on factors such as age; health; family status; assets, resources, and financial status; and education and skills, so that USCIS could determine whether an applicant would be inadmissible to the United States based on public charge grounds. For the analysis of this proposed rule, DHS assumes that all individuals who apply for adjustment of status using Form I–485 are required to submit Form I–944, unless the individual is in a class of applicants that is exempt from review for determination of inadmissibility based on public charge at the time of adjustment of status according to statute or regulation.

There is currently no filing fee associated with Form I–944. However, DHS estimates the time burden associated with filing Form I–944 is 4 hours and 30 minutes (4.5 hours) per applicant, including the time for reviewing instructions, gathering the required documentation and information, completing the declaration, preparing statements, attaching necessary documentation, and submitting the declaration. Therefore, using the total rate of compensation of minimum wage of $10.66 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–944 would be $47.97 per applicant.[775] Using the total population estimate of 382,264 annual filings for Form I–485,

DHS estimates the total opportunity cost of time associated with completing and submitting Form I–944 is approximately $18,337,204 annually.[776]

In addition to the opportunity cost of time associated with completing and filing Form I–944, applicants must bear the cost of obtaining a credit report and credit score from any one of the three major credit bureaus in the United States to be submitted with the application.[777] Consumers may obtain a free credit report once a year from each of the three major consumer reporting agencies (i.e., credit bureaus) under the Fair Credit Reporting Act (FCRA).[778] However, consumers are not necessarily entitled to a free credit score, for which consumer reporting agencies may charge a fair and reasonable fee.[779] DHS does not assume that all applicants are able to obtain a free credit report under FCRA specifically for fulfilling the requirements of filing Form I–944 and acknowledges that obtaining a credit score would be an additional cost. Therefore, DHS assumes that each applicant would bear the cost of obtaining a credit report and credit score from at least one of the three major credit bureaus. DHS estimates the cost of obtaining a credit report and credit score would be $19.95 per applicant, as

this is the amount that two of the three major credit bureaus charge.[780] DHS notes that it would be required that all applicants who apply for adjustment of status using Form I–485 must also submit Form I–944 and comply with its requirements. Therefore, DHS estimates that based on the estimated average annual population of 382,264 the total annual cost associated with obtaining a credit report and credit score as part of the requirements for filing Form I–944 would be $7,626,167.[781]

In sum, DHS estimates that the total cost to complete and file Form I–944 would be $25,963,371. The total estimated annual costs include the opportunity cost of time to complete the form and the cost to obtain a credit report and credit score as required for the total population estimate of 382,264 annual filings for Form I–485.[782]

The proposed rule would include additional instructions for filing Form I–485 and, as a result, applicants would spend additional time reading the instructions increasing the estimated time to complete the form. The current estimated time to complete Form I–485 is 6 hours and 15 minutes (6.25 hours). For the proposed rule, DHS estimates that the time burden for completing

[775] Calculation for declaration of self-sufficiency opportunity cost of time: ($10.66 per hour * 4.5 hours) = $47.97 per applicant.

[776] Calculation: (Estimated opportunity cost of time for Form I–944) * (Estimated annual population filing Form I–485) = $47.97 * 382,264 = $18,337,204.08 = $18,337,204 (rounded) annual opportunity cost of time for filing Form I–944.

[777] The three major credit bureaus are Equifax, Experian, and TransUnion. Each of these bureaus is a publicly-traded, for-profit company that is not owned by the Federal Government. DHS notes that there may be differences in the information contained in the credit reports from each of the three major credit bureaus since one credit bureau may have unique information on a consumer that is not captured by the other credit bureaus.

[778] See FCRA, Section 612, Charges for Certain Disclosures. 15 U.S.C. 1681j. Available at https://www.consumer.ftc.gov/articles/pdf-0111-fair-credit-reporting-act.pdf (accessed Jan. 26, 2018).

[779] See FCRA, Section 609(f), Disclosures to Consumers, Disclosure of Credit Scores. 15 U.S.C. 1681g. Available at https://www.consumer.ftc.gov/articles/pdf-0111-fair-credit-reporting-act.pdf (accessed Jan. 26, 2018).

[780] Each of the three major credit charge the following prices for a credit report, including a credit score:

Experian—$19.95, available at https://www.experian.com/consumer-products/compare-credit-report-and-score-products.html (accessed Jan. 26, 2018);

Equifax—$19.95, available at https://www.equifax.com/personal/products/credit/report-and-score (accessed Jan. 26, 2018); and

TransUnion—$11.50, available at https://disclosure.transunion.com/dc/disclosure/disclosure.jsp (accessed Jan. 26, 2018).

[781] Calculation: (Estimated cost for credit score and credit report) * (Estimated annual population filing Form I–485) = $19.95 * 382,264 = $7,626,166.80 = $7,626,167 (rounded) estimated annual costs for obtaining a credit report and credit score as part of the requirements for filing Form I–944.

[782] Calculation: $18,337,204 (Opportunity cost of time to complete Form I–944) + $7,626,167 (Cost of credit report and credit score) = $25,963,371 total estimated cost to complete Form I–944.

Form I–485 would increase by 10 minutes. Therefore, in the proposed rule, the time burden to complete Form I–485 would be 6 hours and 25 minutes (6.42 hours).

The time burden includes the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.[783] Using the total rate of compensation for minimum wage of $10.66 per hour, DHS currently estimates the opportunity cost of time for completing and filing Form I–485 would be $66.63 per applicant.[784] Therefore, using the total population estimate of 382,264 annual filings for Form I–485, DHS estimates the current total opportunity cost of time associated with completing Form I–485 is approximately $25,470,250 annually.[785]

For the proposed rule, DHS estimates that the time burden for completing Form I–485 is 6.42 hours per response. Using the total rate of compensation for minimum wage of $10.66 per hour, DHS estimates the opportunity cost of time for completing and filing Form I–485 would be $68.44 per applicant.[786] Therefore, using the total population estimate of 382,264 annual filings for Form I–485, DHS estimates the proposed total opportunity cost of time associated with completing Form I–485 is approximately $26,162,148 annually.[787]

The new costs imposed by this proposed rule would be the difference between the current estimated opportunity cost of time to complete Form I–485 and the proposed estimated opportunity cost of time due to the increased Form I–485 time burden estimate. As a result, DHS estimates that the proposed rule would impose

additional new costs in the amount of $691,898 to Form I–485 applicants.[788]

ii. Extension of Stay/Change of Status Using Form I–129, Petition for a Nonimmigrant Worker; Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker; or Form I–539, Application To Extend/Change Nonimmigrant Status

The proposed rule would require petitioners to read additional instructions and provide additional information on Form I–129, which would increase the estimated time to complete the form. The current estimated time to complete Form I–129 is 2 hours and 20 minutes (2.34 hours). For the proposed rule, DHS estimates that the time burden for completing Form I–129 would increase by 30 minutes to account for the additional time petitioners would spend reading the form and providing additional information. Therefore, DHS proposes the time burden to complete Form I–129 to petitioners would be 2 hours and 50 minutes (2.84 hours).

The time burden for Form I–129 includes the time for reviewing instructions, gathering the required documentation and information, completing the request, preparing statements, attaching necessary documentation, and submitting the request.[789] Using the average total rate of compensation of $35.78 per hour, DHS estimates the current opportunity cost of time for completing and filing Form I–129 is currently $83.73 per petitioner.[790] Therefore, using the total population estimate of 336,335 annual filings for Form I–129, DHS estimates the current total opportunity cost of time associated with completing and filing Form I–129 is approximately $28,161,330 annually.[791]

For the proposed rule, DHS estimates that the opportunity cost of time for

completing and filing Form I–129 would be $101.62 per petitioner based on the 30-minute increase in the time burden estimate.[792] Therefore, using the total population estimate of 336,335 annual filings for Form I–129, DHS estimates the proposed total opportunity cost of time associated with completing and filing Form I–129 is approximately $34,178,363 annually.[793]

The new costs imposed by this proposed rule would be the difference between the current estimated opportunity cost of time to complete Form I–129 and the proposed estimated opportunity cost of time to complete the form due to the increased time burden estimate. As a result, DHS estimates that the proposed rule would impose additional new costs of $6,017,033 to Form I–129 applicants.[794]

The proposed rule would require petitioners to read additional instructions and provide additional information on Form I–129CW, which would increase the estimated time to complete the form. The current estimated time to complete Form I–129CW is 3 hours (3.0 hours). For the proposed rule, DHS estimates that the time burden for completing Form I–129CW would increase by 30 minutes to account for the additional time petitioners would spend reading the form and providing additional information. Therefore, DHS proposes the time burden to complete Form I–129CW to petitioners would be 3 hours and 30 minutes (3.5 hours).

The time burden for Form I–129CW includes the time for reviewing instructions, gathering the required documentation and information, completing the request, preparing statements, attaching necessary documentation, and submitting the request.[795] Using the average total rate

---

[783] Source: Paperwork Reduction Act (PRA) Supporting Statement for Form I–485 (OMB control number 1615–0023). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201706-1615-001.*

[784] Calculation for opportunity cost of time for filing Form I–485: ($10.66 per hour * 6.25 hours) = $66.625 = $66.63 (rounded) per applicant.

[785] Calculation: Form I–485 estimated opportunity cost of time ($66.63) * Estimated annual population filing Form I–485 (382,264) = $25,470,250.32 = $25,470,250 (rounded) annual opportunity cost of time for filing Form I–485.

[786] Calculation for opportunity cost of time for filing Form I–485: ($10.66 per hour * 6.42 hours) = $68.437 = $68.44 (rounded) per applicant.

[787] Calculation: Form I–485 estimated opportunity cost of time ($68.44) * Estimated annual population filing Form I–485 (382,264) = $26,162,148.16 = $26,162,148 (rounded) annual opportunity cost of time for filing Form I–485.

[788] Calculation of estimated new costs for completing Form I–485: Proposed estimate of opportunity cost of time to complete Form I–485 ($26,162,148) – Current estimate of opportunity cost of time to complete Form I–485 ($25,470,250) = $691,898 estimated new costs of the proposed rule.

[789] Source for petition for nonimmigrant workers time burden estimate: Paperwork Reduction Act (PRA) Petition for Nonimmigrant Worker (Form I–129) (OMB control number 1615–0009). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-1615-001.*

[790] Calculation of estimated opportunity cost of time for completing Form I–129: ($35.78 per hour * 2.34 hours) = $83.725 = $83.73 (rounded) per applicant.

[791] Calculation: (Form I–129 estimated opportunity cost of time) * (Estimated annual population filing Form I–129) = $83.73 * 336,335 = $28,161,329.55 = $28,161,330 (rounded) annual estimated opportunity cost of time for completing Form I–129.

[792] Calculation of proposed opportunity cost of time for completing Form I–129: ($35.78 per hour * 2.84 hours) = $101.615 = $101.62 (rounded) per applicant.

[793] Calculation: (Proposed Form I–129 estimated opportunity cost of time) * (Estimated annual population filing Form I–129) = $101.62 * 336,335 = $34,178,362.70 = $34,178,363 (rounded) proposed annual estimated opportunity cost of time for filing Form I–129.

[794] Calculation of estimated new costs for completing Form I–129: Proposed estimate of opportunity cost of time to complete Form I–129 ($34,178,363) – Current estimate of opportunity cost of time to complete Form I–129 ($28,161,330) = $6,017,033 estimated new costs of the proposed rule.

[795] Source for petition for nonimmigrant workers time burden estimate: Paperwork Reduction Act (PRA) Petition for CNMI-Only Nonimmigrant Transition Worker (Form I–129CW) (OMB control number 1615–0111). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201803-1615-006.*

**51256** Federal Register / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

of compensation of $35.78 per hour, DHS estimates the current opportunity cost of time for completing and filing Form I–129CW is currently $107.34 per petitioner.[796] Therefore, using the total population estimate of 6,307 annual filings for Form I–129CW, DHS estimates the current total opportunity cost of time associated with completing and filing Form I–129CW is approximately $676,993 annually.[797]

For the proposed rule, DHS estimates that the opportunity cost of time for completing and filing Form I–129CW would be $125.23 per petitioner based on the 30-minute increase in the time burden estimate.[798] Therefore, using the total population estimate of 6,307 annual filings for Form I–129CW, DHS estimates the proposed total opportunity cost of time associated with completing and filing Form I–129CW is approximately $789,826 annually.[799]

The new costs imposed by this proposed rule would be the difference between the current estimated opportunity cost of time to complete Form I–129CW and the proposed estimated opportunity cost of time to complete the form due to the increased time burden estimate. As a result, DHS estimates that the proposed rule would impose additional new costs of $112,883 to Form I–129CW applicants.[800]

The proposed rule would also include additional instructions and collection of information for filing Form I–539, which would increase the estimated time to complete the form. Applicants, therefore, would spend additional time reading the form instructions and providing additional information about the request, stay, or receipt of public benefits. The current estimated time to completing Form I–539 is 1 hour and 53 minutes (1.88 hours).[801] For the

proposed rule, DHS estimates that the time burden for completing Form I–539 would increase by 30 minutes. Therefore, in the proposed rule, DHS proposes the time burden for completing Form I–539 would be 2 hours and 23 minutes (2.38 hours).

The time burden for Form I–539 includes the time necessary to read all instructions for the form, gather all documents required to complete the collection of information, obtain translated documents if necessary, obtain the services of a preparer if necessary, and complete the form.[802] Using the average total rate of compensation of $35.78 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–539 is currently $67.27 per applicant.[803] Therefore, using the total population estimate of 174,866 annual filings for Form I–539, DHS estimates the current total opportunity cost of time associated with completing and filing Form I–539 is approximately $11,763,236 annually.[804]

For the proposed rule, DHS estimates that the opportunity cost of time for completing and filing Form I–539 would be $85.16 per applicant based on the 30-minute increase in the time burden estimate.[805] Therefore, using the total population estimate of 174,866 annual filings for Form I–539, DHS estimates the proposed total opportunity cost of time associated with completing and filing Form I–539 is approximately $14,891,589.[806]

The new costs imposed by this proposed rule would be the difference between the current estimated opportunity cost of time to complete Form I–539 and the proposed estimated opportunity cost of time to complete the form due to the increased time burden

estimate. As a result, DHS estimates that the proposed rule would impose additional new costs in the amount of $3,128,353 to Form I–539 applicants.[807]

While individuals seeking adjustment of status would be reviewed to determine inadmissibility based on public charge grounds under the provisions of this proposed rule, DHS proposes to conduct reviews of nonimmigrants who apply for extension of stay or change of status to determine whether they have demonstrated that they have not received, are not receiving, or likely to receive public benefits. Not all nonimmigrants who apply for extension of stay or change of status would be required to file Form I–944 to detail their financial, health, and education status. Instead, USCIS officers would be able to exercise discretion regarding whether it would be necessary to issue a RFE for the submission of Form I–944.

As previously noted, there is currently no fee associated with filing Form I–944, but DHS estimates the costs for filing Form I–944 would include the opportunity cost of time (4.5 hours) and the cost to obtain credit report and credit score ($19.95 per beneficiary). In addition, DHS estimated that the average annual population that would request EOS/COS by filing Form I–129 is 336,335, Form I–129CW is 6,307, and Form I–539 is 174,866.

For Form I–129 petitioners who receive a RFE for a beneficiary to complete and submit Form I–944, DHS estimates the opportunity cost of time for completing Form I–129 would be $161.01 per beneficiary using the average total rate of compensation of $35.78 per hour.[808] In addition, DHS estimates the cost to obtain a credit report and credit score is $19.95 per beneficiary. DHS assumes that while a petitioner would receive the RFE to file Form I–944, the beneficiary would be the individual to complete the form and provide all required information. Therefore, based on the total population estimate of 336,335 annual filings for Form I–129, DHS estimates the total annual opportunity cost of time associated with completing Form I–944 would be approximately $54,153,298 annually and the total cost to obtain a credit report and credit score would be

---

[796] Calculation for estimated opportunity cost of time for completing Form I–129: ($35.78 per hour * 3.0 hours) = $107.34 per petitioner.

[797] Calculation: (Form I–129CW estimated opportunity cost of time) * (Estimated annual population filing Form I–129CW) = $107.34 * 6,307 = $676,993.38 = $676,993 (rounded) annual estimated opportunity cost of time for completing Form I–129.

[798] Calculation of proposed opportunity cost of time for completing Form I–129: ($35.78 per hour * 3.5 hours) = $125.23 per applicant.

[799] Calculation: (Proposed Form I–129 estimated opportunity cost of time) * (Estimated annual population filing Form I–129) = $125.23 * 6,307 = $789,825.61 = $789,826 (rounded) proposed annual estimated opportunity cost of time for filing Form I–129.

[800] Calculation of estimated new costs for completing Form I–129CW: Proposed estimate of opportunity cost of time to complete Form I–129CW ($789,826) − Current estimate of opportunity cost of time to complete Form I–129CW ($676,993) = $112,883 estimated new costs of the proposed rule.

[801] Source for petition for nonimmigrant workers time burden estimate: Paperwork Reduction Act

(PRA) Application to Extend/Change Nonimmigrant Status (Form I–539) (OMB control number 1615–0003). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-1615-006.*

[802] *See id.*

[803] Calculation of opportunity cost of time for completing Form I–539: ($35.78 per hour * 1.88 hours) = $67.266 = $67.27 (rounded) per applicant.

[804] Calculation: (Form I–539 estimated opportunity cost of time) * (Estimated annual population filing Form I–539) = $67.27 * 174,866 = $11,763,235.82 = $11,763,236 (rounded) annual estimated opportunity cost of time for filing Form I–539.

[805] Calculation of proposed opportunity cost of time for completing Form I–539: ($35.78 per hour * 2.38 hours) = $85.156 = $85.16 (rounded) per applicant.

[806] Calculation: (Proposed Form I–539 estimated opportunity cost of time per applicant) * (Estimated annual population filing Form I–539) = $85.16 * 174,866 = $14,891,588.56 = $14,891,589 (rounded) proposed annual estimated opportunity cost of time for filing Form I–539.

[807] Calculation of estimated new costs for completing Form I–539: Proposed estimate of opportunity cost of time to complete Form I–539 ($14,891,589) − Current estimate of opportunity cost of time to complete Form I–539 ($11,763,236) = $3,128,353 estimated new costs of the proposed rule.

[808] Calculation for Form I–129 petition opportunity cost of time to complete Form I–944: ($35.78 per hour * 4.5 hours) = $161.01.

about $6,709,883.[809] In sum, DHS estimates that total cost for Form I–129 beneficiaries who receive a RFE to complete and submit Form I–944 would be approximately $60,863,181 annually.[810]

Similarly, for Form I–129CW petitioners who receive a RFE for a beneficiary to complete and submit Form I–944, DHS estimates the opportunity cost of time for completing Form I–129CW would be $161.01 per beneficiary using the average total rate of compensation of $35.78 per hour.[811] In addition, DHS estimates the cost to obtain a credit report and credit score is $19.95 per beneficiary. DHS assumes that while a petitioner would receive the RFE to file Form I–944, the beneficiary would be the individual to complete the form and provide all required information. Therefore, based on the total population estimate of 6,307 annual filings for Form I–129CW, DHS estimates the total annual opportunity cost of time associated with completing Form I–944 would be approximately $1,015,490 annually and the total cost to obtain a credit report and credit score

would be about $125,825.[812] In sum, DHS estimates that total cost for Form I–129CW beneficiaries who receive a RFE to complete and submit Form I–944 would be approximately $1,141,315 annually.[813]

For filers of form I–539 who are required to complete and submit Form I–944, DHS estimates the opportunity cost of time for completing Form I–539 would also be $161.01 per filer using the average total rate of compensation of $35.78 per hour. DHS estimates the cost to obtain a credit report and credit score is $19.95 per applicant. DHS estimates the total opportunity cost of time associated with completing Form I–944 would be approximately $28,155,175 annually based on the total population estimate of 174,866 annual filings for Form I–539 and the total cost to obtain a credit report and credit score would be about $3,488,577.[814] In sum, DHS estimates

that total cost for Form I–539 applicants who receive a RFE to complete and submit Form I–944 would be approximately $31,643,752 annually.[815]

DHS is unable to estimate the actual number of RFEs that adjudication officers may issue to Form I–129 beneficiaries, Form I–129CW beneficiaries, and Form I–539 filers to submit Form I–944 since such RFEs would be issued on a discretionary basis. However, we are able to present a range of RFEs that could be issued based on total population estimates and the estimated annual cost associated with such RFE. Table 48 presents a range of potential annual costs related to submission of Form I–944 based on the percentage of the maximum number of Form I–129 beneficiaries, Form I–129CW beneficiaries, and Form I–539 applicants who could be issued a RFE. DHS estimates the annual cost if all beneficiaries were issued a RFE for 100 percent of the total population estimate of 336,335 annual filings for Form I–129 would be about $60.1 million. For the total population estimate of 6,307 annual filings for Form I–129CW, DHS estimates the annual cost would be approximately $1.1 million if all beneficiaries were issued a RFE. Moreover, DHS estimates the annual cost if all applicants were issued a RFE for 100 percent of the total population estimate of 336,335 annual filings for Form I–539 would be about $31.6 million.

---

[809] Calculation: (Form I–944 estimated opportunity cost of time) * (Estimated annual population filing Form I–129) = $161.01 * 336,335 = $54,153,298.35 = $54,153,298 (rounded) annual opportunity cost of time for filing Form I–944. Calculation: (Cost to obtain a credit report and credit score) * (Estimated annual population filing Form I–129) = $19.95 * 336,335 = $6,709,883.25 = $6,709,883 (rounded) annual cost to obtain a credit report and credit score.

[810] Calculation: (Annual opportunity cost of time for filing Form I–944) + (Annual cost to obtain a credit report and credit score for Form I–944) = $54,153,298 + $6,709,883 = $60,863,181 annual total cost for Form I–129 beneficiaries who must file Form I–944.

[811] Calculation for Form I–129CW petition opportunity cost of time to complete Form I–944: ($35.78 per hour * 4.5 hours) = $161.01.

[812] Calculation: (Form I–944 estimated opportunity cost of time) * (Estimated annual population filing Form I–129CW) = $161.01 * 6,307 = $1,015,490.07 = $1,015,490 (rounded) annual opportunity cost of time for filing Form I–944. Calculation: (Cost to obtain a credit report and credit score) * (Estimated annual population filing Form I–129CW) = $19.95 * 6,307 = $125,824.65 = $125,825 (rounded) annual cost to obtain a credit report and credit score.

[813] Calculation: (Annual opportunity cost of time for filing Form I–944) + (Annual cost to obtain a credit report and credit score for Form I–944) = $1,015,490 + $125,825 = $1,141,315 annual total cost for Form I–129CW beneficiaries who must file Form I–944.

[814] Calculation: (Form I–944 estimated opportunity cost of time) * (Estimated annual population filing Form I–539) = $161.01 * 174,866 = $28,155,174.66 = $28,155,175 (rounded) annual opportunity cost of time for filing Form I–944. Calculation: (Cost to obtain a credit report and credit score) * (Estimated annual population filing Form I–539) = $19.95 * 174,866 = $3,488,576.70 = $3,488,577 (rounded) annual cost to obtain a credit report and credit score.

[815] Calculation: (Annual opportunity cost of time for filing Form I–944) + (Annual cost to obtain a credit report and credit score for Form I–944) = $28,155,175 + $3,488,577 = $31,643,752 annual total cost for Form I–539 applicants who must file Form I–944.

| | Percentage of Applicants Issued Request for Evidence (RFE) to Submit Form I-944 | Estimated Annual Population | Estimated Annual Cost |
|---|---|---|---|
| **Form I-129** | 100% | 336,335 | $60,863,181 |
| | 90% | 302,702 | $54,776,863 |
| | 75% | 252,251 | $45,647,386 |
| | 50% | 168,168 | $30,431,591 |
| | 25% | 84,084 | $15,215,795 |
| | 10% | 33,634 | $6,086,318 |
| **Form I-129CW** | 100% | 6,307 | $1,141,315 |
| | 90% | 5,676 | $1,027,184 |
| | 75% | 4,730 | $855,986 |
| | 50% | 3,154 | $570,658 |
| | 25% | 1,577 | $285,329 |
| | 10% | 631 | $114,132 |
| **Form I-539** | 100% | 174,866 | $31,643,752 |
| | 90% | 157,379 | $28,479,377 |
| | 75% | 131,149 | $23,732,814 |
| | 50% | 87,433 | $15,821,876 |
| | 25% | 43,716 | $7,910,938 |
| | 10% | 17,487 | $3,164,375 |

**Table 48.  Estimated Annual Costs for Requests for Evidence (RFE) Issued to Submit Form I-944 with Form I-129 and Form I-539.**

Source: USCIS analysis.

Notes: The analysis assumes the average total rate of compensation of $35.78 per hour for filers of Forms I-129, I-129CW, and I-539.

*iii. Public Charge Bond*

DHS does not currently have a process or procedure in place to accept public charge bonds, though it has the authority to do so. DHS is proposing to amend its regulations and establish a bond process for those seeking adjustment of status to that of a permanent resident who have been deemed likely to become a public charge. A public charge bond may generally be secured by cash or cash equivalents such as cashier's checks or money orders in the full amount of the bond, or may be underwritten by a surety company certified by the Department of Treasury under 31 U.S.C. 9304–9308.[816] DHS approval of the public charge bond and DHS determination of whether the bond has

been breached would be based on whether the alien has received public benefits as defined in the proposed rule or whether the alien has breached any other condition imposed as part of the public charge bond.

As discussed elsewhere in the preamble, DHS has the broad authority to prescribe forms of bonds as is deemed necessary for carrying out the Secretary's authority under the provisions of the Act.[817] Additionally, an alien whom DHS has determined to be inadmissible based on public charge grounds may, if otherwise admissible, be admitted at the discretion of the Secretary upon giving a suitable and proper bond.[818] The purpose of issuing a public charge bond is to better ensure that the alien will not become a public charge in the future. If an alien receives

public benefits, as defined in proposed 8 CFR 212.21(b), after the alien's adjustment of status to that of a lawful permanent resident, DHS would declare the bond breached. A bond may also be breached if the conditions that are otherwise imposed as part of the public charge bond are breached.[819]

DHS is proposing that public charge bonds would be issued at the Secretary's discretion when an alien seeking adjustment of status has been found to be inadmissible based on public charge grounds. DHS may require an alien to submit a surety bond or cash or cash equivalent, such as a cashier's check or money order, to secure a bond.[820] DHS would notify the alien if he or she is permitted to post a public charge bond and of the type of bond that may be submitted. If DHS accepts a surety bond

[816] *See generally* 8 CFR 103.6. However, USCIS plans to initially allow for only surety bonds only.

[817] *See* INA section 103(a)(3), 8 U.S.C. 1103(a)(3).
[818] *See* INA section 213, 8 U.S.C. 1183.

[819] *See* 8 CFR 213.1(h).

[820] USCIS plans to initially allow surety bonds.

Federal Register / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

51259

as a public charge bond, DHS would accept only a bond underwritten by surety companies certified by the Department of the Treasury, as outlined in proposed 8 CFR 103.6(b).[821] DHS proposes that the amount of a public charge bond cannot be less than $10,000 annually adjusted for inflation and rounded up to the nearest dollar, but the amount of the bond required would otherwise be determined at the discretion of the adjudication officer. After reviewing an alien's circumstances and finding of inadmissibility based on public charge grounds, an adjudication officer would notify the alien through the issuance of a RFE or a Notice of Intent to Deny (NOID) that a surety bond may be submitted to USCIS.

An individual or entity would submit a public charge bond on behalf of the alien by using the new Public Charge Bond form (Form I–945), and related forms. DHS proposes that it would use Form I–356, Request for Cancellation of Public Charge Bond, as part of a request to cancel a public charge bond.

The proposed rule would require that an alien must complete and submit Form I–407 when the alien or obligor/co-obligor seeks to cancel the public charge bond on account of the alien's permanent departure from the United States. Form I–407 records an alien's abandonment of status as a LPR. When filing Form I–407, an alien abandoning their LPR status is informed of the right to a hearing before an immigration judge who would decide whether the alien lost his or her lawful permanent resident status due to abandonment and that the alien has knowingly, willingly, and affirmatively waived that right. Form I–407 is used by lawful permanent resident aliens who are outside the United States or at a Port of Entry who want to abandon LPR status.

A public charge bond would be considered breached if the alien receives any public benefits, as defined in proposed 8 CFR 212.21, after DHS accepts a public charge bond submitted on that alien's behalf. The bond would also be breached if the alien does not comply with the conditions that are otherwise imposed with the public charge bond.[822] Upon learning of a breach of public charge bond, DHS would notify the obligor that the bond

has been declared breached and inform the obligor of the possibility to appeal the determination to the USCIS Administrative Appeals Office (AAO).[823] Notice of Appeal or Motion (Form I–290B) is used to file an appeal or motion to reopen or reconsider certain decisions.

Finally, a public charge bond must be canceled when an alien with a bond dies, departs the United States permanently, or is naturalized or otherwise obtains U.S. citizenship, provided the individual has not received public benefits, as defined in proposed 8 CFR 212.21(c) prior to death, departure, or naturalization (or otherwise obtaining U.S. citizenship), and a request for cancellation has been filed.[824] DHS must also cancel the bond following the fifth anniversary of the admission of the lawful permanent resident provided that he or she files a request for cancellation of the public charge bond and provided that the alien has not received any public benefits, as defined in 8 CFR 212.21, after the alien's adjustment of status to that of a lawful permanent resident. Additionally, the public charge bond must be cancelled if the alien obtains an immigration status that is exempt from public charge inadmissibility after the initial grant of lawful permanent resident status, provided that a request for cancellation of the public charge bond has been filed and provided that the alien did not breach the bond conditions.[825] To have the public charge bond cancelled, an obligor (individual or entity) would request the cancellation of the public charge and as part of the request, submit Form I–356. If DHS determines that the bond cannot be cancelled, the bond remains in place; the obligor may appeal the denial to the AAO by filing Form I–290B.[826] Additionally, a public charge bond may be cancelled by DHS after a suitable substitute has been submitted for an unlimited bond or a bond of limited duration that bears an expiration date. For this type of cancellation, no request to cancel the bond must be filed to allow substitution of another bond, as outlined in proposed 8 CFR 213.[827]

When posting a surety bond, an individual generally pays between 1 percent to 15 percent of the bond

amount for a surety company to post a bond.[828] The percentage that an individual must pay may be dependent on the individual's credit score where those with higher credit scores would be required to pay a lower percentage of the bond to be posted. DHS notes that an individual as another possible option for securing a public charge bond may be allowed to submit cash or cash equivalent, such as a cashier's check or money order and agreement.

With the creation of Form I–945, DHS proposes to charge a filing fee of $25.00 to submit a public charge surety bond, which would cover administrative costs of processing the form. DHS estimates the time burden associated with filing Form I–945 is 60 minutes (1.0 hour) per obligor, including the time for reviewing instructions, gathering the required documentation and information, completing the form, preparing statements, attaching necessary documentation, and submitting the form.[829] Therefore, using the total rate of compensation of minimum wage of $10.66 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–945 would be $10.66 per applicant.[830]

In addition to the opportunity cost of time associated with completing Form I–945, aliens who may be permitted to have a public charge bond posted on their behalf, must secure a surety bond through a surety bond company that is certified by the Department of Treasury, Bureau of Fiscal Service. DHS notes that the public charge bond amount required would be determined at the discretion of an adjudication officer, so long as it is over the minimum amount. However, DHS estimates the cost per obligor would be $35.66 per obligor at minimum, including $25.00 to file Form I–945 and $10.66 per obligor for the opportunity cost of time for completing the form. In addition, each alien posting a public charge bond through a surety company would be required to pay any fees required by the surety company to secure a public charge bond. While the proposed public charge bond process would be new and historical data are

821 See 31 U.S.C. 9304–9308. See also Bureau of the Fiscal Service, U.S. Department of Treasury, available at https://www.fiscal.treasury.gov/fsreports/ref/suretyBnd/surety_home.htm. See also proposed 8 CFR 103.6(b)(1) as proposed by ICE, Procedures and Standards for Declining Surety Immigration Bonds and Administrative Appeal Requirement for Breaches, 83 FR 25951 (June 5, 2018).

822 See proposed 8 CFR 213.1(h).

823 See proposed 8 CFR 213.1(h).

824 See INA section 213, 8 U.S.C. 1183; see 8 CFR 103.6(c).

825 See proposed 8 CFR 213.1(d)[Conditions of the bond] and proposed 8 CFR 213.1(h)[Breach].

826 See proposed 8 CFR 213.1(g).

827 See proposed 8 CFR 213.1(f)[Substitution]. Because USCIS does not examine whether the bond could be breached, the substitution does not have to be accompanied with a filing of Form I–356.

828 For example, see https://suretybondauthority.com/frequently-asked-questions/ and https://suretybondauthority.com/learn-more/. DHS notes that the company cited is for informational purposes only.

829 Source for immigration bond time burden estimate: Supporting Statement, Immigration Bond, ICE Form I–352, (OMB control number 1653–0022). The PRA Supporting Statement can be found at Question 12 on Reginfo.gov at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201705-1653-001.

830 Calculation for public charge surety bond opportunity cost of time: ($10.66 per hour * 1.0 hour) = $10.66 per applicant.

not available, DHS estimates that approximately 960 aliens would be eligible to file for a public charge bond annually. Therefore, in sum, DHS estimates the total cost to file Form I–945 would be at minimum about $34,234 annually.[831]

As noted previously, an obligor (individual or a company) or the alien would file Form I–356 as part of a request to cancel a public charge bond. With the creation of Form I–356, DHS proposes to charge a filing fee of $25.00 to request cancellation of a public charge bond, which would cover administrative costs of processing the form. DHS estimates the time burden associated with filing Form I–356 is 45 minutes (0.75 hours) per obligor or alien requesting cancellation of a public charge bond, including the time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the required information. Using the total rate of compensation of minimum wage of $10.66 per hour, DHS estimates the opportunity cost of time for completing and submitting Form I–356 would be $8.00 per filer.[832] Therefore, DHS estimates the cost per filer would be $33.00, including $25.00 to file Form I–356 and $8.00 per obligor or alien for the opportunity cost of time for completing the form. While the proposed public charge bond process would be new and historical data are not available, DHS estimates that approximately 25 aliens would request to cancel a public charge bond annually. Therefore, in sum, DHS estimates the total cost to file Form I–356 would be approximately $825 annually.[833]

The filing fee for Form I–290B is $675 per obligor wishing to file an appeal to challenge the denial of a request to cancel the public charge bond or the breach determination. The fee is set at a level to recover the processing costs to DHS. However, the fee for Form I–290B may be waived using Form I–912 if the party appealing the adverse decision can provide evidence of an inability to pay.[834] In addition, DHS estimates the time burden associated with filing Form I–290B is 1 hour and 30 minutes (1.5 hours) per obligor, including the time

for reviewing instructions, gathering the required documentation and information, completing the form, preparing statements, attaching necessary documentation, and submitting the form.[835] Therefore, using the total rate of compensation of minimum wage of $10.66 per hour, DHS estimates the opportunity cost of time for completing Form I–290B would be $15.99 per obligor.[836]

In addition to the filing fee and the opportunity cost of time associated with completing Form I–290B, obligors must bear the cost of postage for sending the Form I–290B package to USCIS. DHS estimates that each obligor will incur an estimated average cost of $3.75 in postage to submit the completed package to USCIS.[837]

Additionally, the proposed public charge bond process would be new and historical data are not available to predict future estimates. Therefore, DHS also is not able to estimate the total annual cost of the proposed public charge bond process. However, DHS estimates the total cost per applicant submitting a bond would be $693.74 for completing and filing Form I–290B, excluding the cost of obtaining a bond.[838]

Finally, the new DHS requirement in this proposed rule that an alien must complete and submit Form I–407 when seeking to cancel the public charge bond upon permanent departure from the United States. However, this proposed rule would not impose additional new costs to Form I–407 filers.

(c) Transfer Payments and Indirect Impacts of Proposed Regulatory Changes

DHS estimates the direct costs of the proposed rule, but also estimates the reduction in transfer payments from the federal and state government to certain individuals who receive public benefits and also discusses certain indirect impacts that would likely occur as a result of the proposed regulatory

changes. These indirect impacts are borne by entities that are not specifically regulated by this rule, but may incur costs due to changes in behavior caused by this rule. The primary sources of the reduction in transfer payments from the federal government of this proposed rule would be the disenrollment or foregone enrollment of individuals in public benefits programs. The primary sources of the consequences and indirect impacts of the proposed rule would be costs to various entities that the rule does not directly regulate, such as hospital systems, state agencies, and other organizations that provide public assistance to aliens and their households. Indirect costs associated with this rule include familiarization with the rule for those entities that are not directly regulated but still want to understand the changes in federal and state transfer payments due to this rule.

Moreover, this rule, if finalized, could lead to an additional reduction in transfer payments because some aliens outside the United States who are likely to become a public charge in the United States would not be admitted and therefore would not receive public benefits in the United States. For example, CBP could find that an alien arriving at a port of entry seeking admission, either pursuant to a previously issued visa or as a traveler for whom visa requirements have been waived, is likely to become a public charge if he or she is admitted. However, DHS is not able to quantify the number of aliens who would possibly be denied admission based on a public charge determination pursuant to this proposed rule, but is qualitatively acknowledging this potential impact.

Under the proposed rule, DHS would consider past or current receipt of public benefits, defined in 212.21(b), as identified a heavily weighed factor for purposes of public charge determination. Earlier in the preamble, DHS provides a list and description of public benefits programs the proposed rule identifies for consideration of public charge inadmissibility. Should an individual be found to have received or is currently receiving certain public benefits identified in the proposed rule, he or she may be found likely to become a public charge. Individuals who might choose to disenroll from or forego future enrollment in a public benefits program include foreign-born non-citizens as well as U.S. citizens who are members of mixed-status households.

Table 49 shows the estimated population of public benefits recipients who are members of households that

---

[831] Calculation: $35.66 (cost per obligor to file Form I–945) * 960 (estimated annual population who would file Form I–945) = $34,233.60 = $34,234 (rounded) annual total cost to file Form I–945.

[832] Calculation for opportunity cost of time for completing Form I–356: ($10.66 per hour * 0.75 hours) = $7.995 = $8.00 (rounded) per applicant.

[833] Calculation: $33.00 (cost per obligor to file Form I–356) * 25 (estimated annual population who would file Form I–356) = $825.00 annual total cost to file Form I–356.

[834] See 8 CFR 103.7(c).

[835] Source for notice for appeal or motion time burden estimate: Supporting Statement for Notice of Appeal or Motion (Form I–290B) (OMB control number 1615–0095). The PRA Supporting Statement can be found at Question 12 on Reginfo.gov at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201609-1615-002.

[836] Calculation for appeal or motion opportunity cost of time: ($10.66 per hour * 1.5 hours) = $15.99 per applicant.

[837] Source for notice for appeal or motion time burden estimate: Supporting Statement for Notice of Appeal or Motion (Form I–290B) (OMB control number 1615–0095). The PRA Supporting Statement can be found at Question 13 on Reginfo.gov at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201609-1615-002.

[838] Calculation: $674 filing fee + $15.99 opportunity cost of time + $3.75 postage cost = $693.74 per applicant.

include foreign-born non-citizens. The table also shows estimates of the number of households with at least 1 foreign-born non-citizen family member that may have received public benefits.[839],[840] Based on the number of

households with foreign-born non-citizen family members, DHS estimated the number of public benefits recipients who are members of households that include foreign-born non-citizens that may have received benefits using the U.S. Census Bureau's estimated average

household size for foreign-born households.[841],[842]

---

[839] *See* U.S. Census Bureau. *American Community Survey 2016 Subject Definitions.* Available at *https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2016_ACSSubjectDefinitions.pdf.* Accessed June 18, 2018. The foreign-born population includes anyone who was not a U.S. citizen or a U.S. national at birth, which includes respondents who indicated they were a U.S. citizen by naturalization or not a U.S. citizen. The ACS questionnaires do not ask about immigration status, but uses responses to determine the U.S. citizen and non-U.S. citizen populations as well as to determine the native and foreign-born populations. The population surveyed includes all people who indicated that the United States was their usual place of residence on the survey date. The foreign-born population includes naturalized U.S. citizens, lawful permanent residents (*i.e.* immigrants), temporary migrants (*e.g.,* foreign students), humanitarian migrants (*e.g.,* refugees),

and unauthorized migrants (*i.e.* people illegally present in the United States).

[840] To estimate the number of households with at least 1 foreign-born non-citizen family member that have received public benefits, DHS calculated the overall percentage of total U.S. households that are foreign-born non-citizen as 6.97 percent. Calculation: [22,214,947 (Foreign-born non-citizens)/318,558,162 (Total U.S. population)] * 100 = 6.97 percent. *See* U.S. Census Bureau American FactFinder Database. "S0501: Selected Characteristics of the Native and Foreign-born Populations 2012–2016 American Community Survey (ACS) 5-year Estimates." Available at *https://factfinder.census.gov/.* Accessed June 16, 2018.

[841] *See* U.S. Census Bureau American FactFinder Database. "S0501: Selected Characteristics of the Native and Foreign-born Populations 2012–2016 American Community Survey (ACS) 5-year Estimates." Available at *https://factfinder.census.gov/.* Accessed June 16, 2018. The average foreign-born household size is reported as 3.35 persons. DHS multiplied this figure by the estimated number of households with at least 1 foreign-born non-citizen receiving benefits to estimate the population of foreign-born non-citizen receiving benefits.

[842] In this analysis, DHS uses the American Community Survey (ACS) to develop population estimates along with beneficiary data from each of the benefits program. DHS recognizes that in other places in this preamble, the SIPP data is used rather than the ACS data, which may cause differences in estimates. DHS notes that the ACS data was used for the purposes of this analysis because it provided a cross-sectional survey based on a random sample of the population each year including current immigration classifications. Both surveys reflect substantial reliance by aliens on the public benefits included in the proposed rule.

**Table 49. Estimated Population of Public Benefits Recipients Who Are Members of Households that Include Foreign-Born Non-Citizens.**

| Public Benefits Program | Average Annual Total Number of Recipients[1] | Households that May Be Receiving Benefits[2] | Households with at Least 1 Foreign-Born Non-Citizen Who May Be Receiving Benefits[3] | Public Benefits Recipients Who Are Members of Households Including Foreign-Born Non-Citizens[4] |
|---|---|---|---|---|
| Medicaid[5] | 64,281,954 | 24,349,225 | 1,697,141 | 5,685,422 |
| Low Income Subsidy (LIS) for Medicare Part D Prescription Drug Coverage[6] | 12,100,000 | 4,583,333 | 319,458 | 1,070,185 |
| Supplemental Nutrition Assistance Program (SNAP)[7] | 45,294,831 | 22,195,369 | 1,547,017 | 5,182,508 |
| Temporary Assistance for Needy Families (TANF)[8] | 3,449,124 | 1,306,486 | 91,062 | 305,058 |
| Supplemental Security Income (SSI)[9] | 8,302,356 | 3,144,832 | 219,195 | 734,303 |
| Federal Rental Assistance[10] | N/A | 5,051,000 | 352,055 | N/A |

Sources and Notes: USCIS analysis of data provided by the federal agencies that administer each of the listed public benefits program or research organizations.

[1] Figures for the average annual total number of recipients are based on 5-year averages, whenever possible, for the most recent 5-year period for which data are available. For more information, please see the document "Economic Analysis Supplemental Information for Analysis of Public Benefits Programs" in the online docket for the proposed rule.

[2] DHS estimated the number of households by dividing the number of people that received public benefits by the U.S. Census Bureau's estimated average household size of 2.64 for the U.S. total population. *See* U.S. Census Bureau American FactFinder Database. "S0501: Selected Characteristics of the Native and Foreign-born Populations 2012 – 2016 American Community Survey (ACS) 5-year Estimates." Available at https://factfinder.census.gov/. Accessed June 16, 2018. Note that HUD Rental Assistance and HUD Housing Choice Vouchers programs report data on the household level. Therefore, DHS did not use this calculation to estimate the average household size and instead used the data as reported.

[3] To estimate the number of households with at least 1 foreign-born non-citizen receiving benefits, DHS multiplied the estimated number of households receiving benefits in the United States by 6.97 percent, the foreign-born non-citizen population as a percentage of the U.S. total population using U.S. Census Bureau population estimates. *See* Ibid.

[4] To estimate the population of public benefits recipients who are members of households that include foreign-born non-citizens, DHS multiplied the estimated number of households with at least 1 foreign-born non-citizen receiving benefits by the average household size of 3.35 for those who are foreign-born using the U.S. Census Bureau's estimate. *See* Ibid.

[5] Medicaid – *See* U.S. Department of Health and Human Services (HHS), Centers for Medicare & Medicaid (CMS). *Monthly Medicaid & CHIP Application, Eligibility Determination, and Enrollment Reports & Data.* Available at https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/monthly-reports/index.html. Accessed May 31, 2018. Note that each annual total was calculated by averaging the monthly enrollment population over each year. The numbers that were used for the average can be found in Table 1A: Medicaid and CHIP for each month, using the number listed as the "Total Across All States." Also, note that per enrollee Medicaid costs vary by eligibility group and State.

[6] LIS – *See* U.S. Department of Health and Human Services (HHS), Centers for Medicare & Medicaid (CMS). *2018 Annual*

*Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds.* Table IV.B9.—Incurred Reimbursement Amounts per Enrollee for Part D Expenditures, p.145. Available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/Downloads/TR2018.pdf. Accessed July 31, 2018. The LIS number of recipients receiving benefits includes LIS in Medicare Advantage Prescription Drug (MAPD-LIS) and LIS in stand-alone Medicare Part D prescription drug plans (PDP-LIS). Note that spending on LIS beneficiaries varies by individual.

[7] SNAP – *See* U.S. Department of Agriculture, Food and Nutrition Service, Supplemental Nutrition Assistance Program. "Persons, Households, Benefits, and Average Monthly Benefit per Person & Household." Available at https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap. Accessed May 31, 2018.

[8] TANF – *See* U.S. HHS, Office of Family Assistance. "TANF Caseload Data." Available at https://www.acf.hhs.gov/ofa/resource/tanf-caseload-data-2016. Accessed June 11, 2018. Note: The number of participants are listed for the fiscal year, not calendar year since the dollar amount of assistance received is only presented for fiscal years.

[9] SSI – *See* U.S. Social Security Administration, Office of Research, Statistics, & Policy Analysis. *Annual Report of the Supplemental Security Income Program, 2017.* Table IV.B9, p. 46. Available at: https://www.ssa.gov/oact/ssir/SSI17/ssi2017.pdf. Accessed July 31, 2018.; *see also* U.S. Social Security Administration, Office of Research, Statistics, & Policy Analysis. "SSI Monthly Statistics, January 2018." Available at https://www.ssa.gov/policy/docs/statcomps/ssi_monthly/2018-01/table01.html. Accessed July 31, 2018.

[10] Federal Rental Assistance and HUD Housing Choice Vouchers – Data on annual total recipient households: *See* Center on Budget and Policy Priorities. National and State Housing Fact Sheets & Data. *See* Federal Rental Assistance, "Download the Data" and Housing Choice Voucher Program, "Download the Data." Available at https://www.cbpp.org/research/housing/national-and-state-housing-fact-sheets-data. Accessed Aug. 15, 2018. Note that "Federal Rental Assistance" includes HUD Section 8 Project-based Rental Assistance, HUD Section 8 Housing Choice Vouchers, HUD Public Housing, HUD Section 202/811, and USDA Section 521.

Consistent data are not available on the number of individuals receiving public benefits who are members of households that include foreign-born non-citizens. In order to estimate the economic impact of the proposed rule, it is necessary to estimate the size of this population. To arrive at the population estimates as shown in table 49, DHS first calculated the average annual number of people who received benefits over a 5-year period whenever possible as reported by the benefits granting agencies.[843] However, data for public benefits programs do not identify the nativity status of benefits recipients, *i.e.*, foreign-born or U.S. native. Therefore, DHS estimated the foreign-born non-citizen population by converting the average annual number of benefits recipients using the U.S. Census Bureau's American Community Survey (ACS) estimates. First, DHS estimated the number of households receiving benefits. Then, DHS estimated the number of households with at least one foreign-born non-citizen receiving benefits based on the percentage of foreign-born non-citizens compared to the total U.S. population. Finally, the number of public benefits recipients who are members of households that include foreign-born non-citizens

receiving benefits was estimated based on the average household size of households with at least one foreign-born individual.

For each of the public benefits programs analyzed, DHS estimated the number of households by dividing the number of people that received public benefits by the U.S. Census Bureau's estimated average household size of 2.64 for the U.S. total population.[844] According to the U.S. Census Bureau population estimates, the foreign-born non-citizen population is 6.97 percent of the U.S. total population.[845] While there may be some variation in the percentage of foreign-born non-citizens who receive public benefits, including depending on which public benefits program one considers, DHS assumes in this economic analysis that the percentage holds across the populations of the various public benefits programs. Therefore, to estimate the number of households with at least one foreign-born non-citizen who receives public benefits, DHS multiplied the estimated number of households for each public benefits program by 6.97 percent. This step may introduce uncertainty into the

estimate because the percentage of households with at least one foreign-born non-citizen may be greater or less than the percentage of foreign-born non-citizens in the population. However, if foreign-born non-citizens tend to be grouped together in households, then an overestimation of households that include at least one FBNC is more likely. DHS then estimated the number of foreign-born non-citizens who received benefits by multiplying the estimated number of households with at least one foreign-born non-citizen who receives public benefits by the U.S. Census Bureau's estimated average household size of 3.35 for those who are foreign-born.[846]

In this analysis, DHS uses the American Community Survey (ACS) to develop population estimates along with beneficiary data from each of the benefits program. DHS recognizes that in other places in this preamble, the SIPP data is used rather than the ACS data, which may cause differences in estimates. DHS notes that the ACS data was used for the purposes of this analysis because it provided a cross-sectional survey based on a random sample of the population each year including current immigration classifications. Both surveys reflect

---

[843] DHS estimated the annual average number of people who receive public benefits based on 5-year averages generally over the period fiscal year 2013–2017, including LIS, SNAP, and SSI. DHS calculated 5-year averages over the period fiscal year 2012–2016 for Medicaid and TANF.

[844] U.S. Census Bureau American FactFinder Database. "S0501: Selected Characteristics of the Native and Foreign-born Populations 2012–2016 American Community Survey (ACS) 5-year Estimates." Available at *https://factfinder.census.gov/*. Accessed June 16, 2018.

[845] Ibid. Calculation: [22,214,947 (Foreign-born non-citizens)/318,558,162 (Total U.S. population)] * 100 = 6.97 percent.

[846] U.S. Census Bureau American FactFinder Database. "S0501: Selected Characteristics of the Native and Foreign-born Populations 2012–2016 American Community Survey (ACS) 5-year Estimates." Available at *https://factfinder.census.gov/*. Accessed June 16, 2018.

substantial reliance by aliens on the public benefits included in the proposed rule. DHS welcomes comments on the use of data from the American Community Survey (ACS) to develop our estimates, and comments on whether other data sources would be useful in these calculations.

In the following analysis, the population estimate will be adjusted to reflect the percentage of aliens intending to apply for adjustment of status, but not to reflect the possibility that less than 100 percent of their household members will be sufficiently concerned about potential consequences of the policies proposed in this rule to disenroll or forgo enrollment in public benefits. The resulting transfer estimates will therefore have a tendency toward overestimation. DHS welcomes comment, especially concerning data or other evidence, that would allow for refinement of the estimate of the percentage of household members who would be dissuaded from public benefits participation.

DHS anticipates that a number of individuals would be likely to disenroll or forego enrollment in a public benefits program as a result of the proposed rule, which would result in a reduction of transfer payments from the federal government to such individuals. However, to estimate the economic impact of disenrollment or foregone enrollment from public benefits programs, it is necessary to estimate the average annual amount of public benefits a person receives for each public benefits program included in this economic analysis. Therefore, DHS estimated the average annual benefit received per person for each public benefit program in table 50. The average benefit per person is calculated for each public benefit program by dividing the average annual program payments for on public benefits by the average annual total number of recipients.[847] To the extent that data are available, these estimates are based on 5-year averages.

_____

[847] DHS notes that the amounts presented may not account for overhead costs associated with administering each of these public benefits programs. The costs presented are based on amounts recipients have received in benefits as reported by benefits-granting agencies.

### Table 50. Estimated Average Annual Benefit per Person, by Public Benefit Program

| Public Benefits Program | Average Annual Total Number of Recipients | Average Annual Public Benefits Payments | Average Annual Benefit per Person or Household[1] |
|---|---|---|---|
| Medicaid[2] | 64,281,954 | $477,395,691,240 | $7,426.59 |
| Low Income Subsidy (LIS) for Medicare Part D Prescription Drug Coverage[3] | 12,100,000 | $25,400,000,000 | $2,099.17 |
| Supplemental Nutrition Assistance Program (SNAP)[4] | 45,294,831 | $69,192,042,274 | $1,527.59 |
| Temporary Assistance for Needy Families (TANF)[5] | 3,449,124 | $4,389,219,525 | $1,272.56 |
| Supplemental Security Income (SSI)[6] | 8,302,356 | $54,743,370,400 | $6,593.72 |
| Federal Rental Assistance[7] | 5,051,000 | $41,020,000,000 | $8,121.16 |

Sources and notes: USCIS analysis of data provided by the federal agencies that administer each of the listed public benefits program or research organizations.

Note that figures for the average annual total number of recipients and the annual total public benefits payments are based on 5-year averages, whenever possible, for the most recent 5-year period for which data are available. For more information, please see the document "Economic Analysis Supplemental Information for Analysis of Public Benefits Programs" in the online docket for the proposed rule.

[1] Calculation: Average Annual Benefit per Person = (Average Annual Public Benefits Payments) / (Average Annual Total Number of Recipients). Note: Calculations may not be exact due to rounding.

[2] Medicaid – Data on annual program expenditure on public benefits: *See* U.S. Department of Health and Human Services (HHS), Centers for Medicare & Medicaid (CMS). *Expenditure Reports From MBES/CBES*. Available at https://www.medicaid.gov/medicaid/finance/state-expenditure-reporting/expenditure-reports/index.html. Accessed Aug. 2, 2018. Note that per enrollee Medicaid costs vary by eligibility group and State.

[3] LIS – Data on annual program expenditure on public benefits: *See* Ibid. Table IV.B10— Aggregate Part D Reimbursement Amounts on an Incurred Basis, p.145. Available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/Downloads/TR2018.pdf. Accessed July 31, 2018. Note that spending on LIS beneficiaries varies by individual.

[4] SNAP – Data on the annual program expenditure on public benefits: *See* U.S. Department of Agriculture, Food and Nutrition Service, Supplemental Nutrition Assistance Program. "Persons, Households, Benefits, and Average Monthly Benefit per Person & Household." Available at https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap. Accessed May 31, 2018.

[5] TANF – Data on annual program expenditure on public benefits: *See* U.S. HHS, Office of Family Assistance. "TANF Financial Data - FY 2016." See Table A.1.: Federal TANF and State MOE Expenditures Summary by ACF-196 Spending Category, Federal Funds for Basic Assistance. Available at https://www.acf.hhs.gov/ofa/resource/tanf-financial-data-fy-2016. Accessed June 11, 2018. Note that the link shows fiscal year 2016 TANF financial data, but links to financial data for other fiscal years can also be accessed.

[6] SSI – Data on annual program expenditure on public benefits: *See* U.S. Social Security Administration, Office of Research, Statistics, & Policy Analysis. *Annual Report of the Supplemental Security Income Program, 2017*. Table IV.B9—SSI Recipients with Federally Administered Payments in Current-Payment

Status, p. 46 (recipients) and Table IV.C1.—SSI Federal Payments, p. 47. Available at: https://www.ssa.gov/oact/ssir/SSI17/ssi2017.pdf. Accessed July 31, 2018.; See also U.S. Social Security Administration, Office of Research, Statistics, & Policy Analysis. "SSI Monthly Statistics, January 2018." Available at https://www.ssa.gov/policy/docs/statcomps/ssi_monthly/2018-01/table01.html. Accessed July 31, 2018.

[7] Federal Rental Assistance and HUD Housing Choice Vouchers – Data on annual total expenditure on public benefits: See Center on Budget and Policy Priorities. National and State Housing Fact Sheets & Data. Federal Rental Assistance, "Download the Data" and Housing Choice Voucher Program, "Download the Data." Available at https://www.cbpp.org/research/housing/national-and-state-housing-fact-sheets-data. Accessed Aug. 15, 2018.

Research shows that when eligibility rules change for public benefits programs there is evidence of a "chilling effect" that discourages immigrants from using public benefits programs for which they are still eligible. For example, the U.S. Department of Agriculture (USDA) published a study shortly after the Personal Responsibility and Work Opportunity Act of 1996 (PRWORA) took effect and found that the number of people receiving food stamps fell by over 5.9 million between summer 1994 and summer 1997.[848] The study notes that enrollment in the food stamps program was falling during this period, possibly due to strong economic growth, but the decline in enrollment was steepest among legal immigrants. Under PRWORA, legal immigrants were facing significantly stronger restrictions through which most would become ineligible to receive food stamps. The study also found that enrollment of legal immigrants in the food stamps program fell by 54 percent. Moreover, another study found evidence of a "chilling effect" due to enactment of PRWORA where non-citizen enrollment in public benefits programs declined more steeply than U.S. citizen enrollment over the period 1994 to 1997.[849] Overall, the study found that welfare enrollment in households headed by foreign-born individuals fell by about 21 percent.

To estimate the total transfer payments, DHS calculated the number of individuals who are likely to disenroll from or forego enrollment in a public benefit program equal to 2.5 percent of the number of foreign-born non-citizens previously estimated. While previous studies examining the effect of PRWORA in 1996 showed a reduction in enrollment from 21 to 54 percent, it is unclear how many individuals would actually disenroll from or forego enrollment in public benefits programs due to the proposed rule. The previous studies had the benefit of retrospectively analyzing the chilling effect of PRWORA using actual enrollment data, instead of being limited to prospectively estimating the number of individuals who may disenroll or forego enrollment in the affected public benefits programs. This economic analysis must rely on the latter. Moreover, PRWORA was directly changing eligibility requirements, whereas this proposed rule, if finalized, would change enrollment incentives. Therefore, DHS estimates this annual rate based on the number of foreign-born immigrants seeking to adjust status as a percentage of the foreign-born non-citizen population in the United States, under the assumption that the population likely to disenroll from or forego enrollment in public benefits programs would be individuals intending to apply for adjustment of status or individuals who have adjusted status within the past five years. DHS notes that this is likely an overestimate since it is unknown how many foreign-born non-citizens adjusting status are actually using public benefits. For the 5-fiscal year period 2012–2016, the foreign-born non-citizen population was estimated to be 22,214,947.[850] During the same 5-fiscal year period, 544,246 immigrants adjusted status annually in the United States on average.[851][852] Therefore, DHS assumes a 2.5 percent rate of disenrollment or foregone enrollment across each of the public benefits programs since the individuals intending to adjust status are most likely to disenroll from or forego enrollment in public benefits programs in order to preserve their chances of adjusting status.[853] Table 51 shows the estimated population that would be likely to disenroll or forego enrollment in a public benefits program as a result of this proposed rule.

[848] See Genser, J. (1999). Who is leaving the Food Stamps Program: An analysis of Caseload Changes from 1994 to 1997. Washington, DC: U.S. Department of Agriculture, Food and Nutrition Service, Office of Analysis, Nutrition, and Evaluation. Available at https://www.fns.usda.gov/snap/who-leaving-food-stamp-program-analysis-caseload-changes-1994-1997. (Accessed June 17, 2018).

[849] See Fix, M.E., and Passel, J.S. (1999). Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform: 1994–1997. Washington, DC: The Urban Institute. Available at https://www.urban.org/research/publication/trends-noncitizens-and-citizens-use-public-benefits-following-welfare-reform. (Accessed June 17, 2018).

[850] U.S. Census Bureau American FactFinder Database. "S0501: Selected Characteristics of the Native and Foreign-born Populations 2012–2016 American Community Survey (ACS) 5-year Estimates. Available at https://factfinder.census.gov/. Accessed June 16, 2018.

[851] See United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, DC, U.S. Department of Homeland Security, Office of Immigration Statistics, 2017. Available at https://www.dhs.gov/immigration-statistics/yearbook/2016 (accessed Jan. 24, 2018).

[852] Note that the population seeking extension of stay or change of status were not included in the calculation due to the nature of the populations involved, namely people employed in jobs and their dependents. DHS assumes that these individuals generally do not receive public benefits and have means of supporting themselves and their dependents.

[853] Calculation, based on 5-year averages over the period fiscal year 2012–2016: (544,246 adjustments of status/22,214,947 estimated foreign-born non-citizen population) * 100 = 2.45 = 2.5% (rounded).

**Table 51. Estimated Population of Members of Households Including Foreign-Born Non-Citizens that May Be Receiving Public Benefits and Likely to Disenroll or Forego Enrollment in a Public Benefits Program.**

| Public Benefits Program | Public Benefits Recipients Who Are Members of Households Including Foreign-Born Non-Citizens | Households with At Least 1 Foreign-Born Non-Citizen Receiving Benefits | Members of Households Including Foreign-Born Non-Citizens Who May Be Receiving Benefits Based On A 2.5% Rate of Disenrollment or Foregone Enrollment[1] | Households with At Least 1 Foreign-Born Non-Citizen Who May Be Receiving Benefits Based On A 2.5% Rate of Disenrollment or Foregone Enrollment[1] |
|---|---|---|---|---|
| Medicaid[2] | 5,685,422 | | 142,136 | |
| Low Income Subsidy (LIS) for Medicare Part D Prescription Drug Coverage[3] | 1,070,185 | | 26,755 | |
| Supplemental Nutrition Assistance Program (SNAP) | 5,182,508 | | 129,563 | |
| Temporary Assistance for Needy Families (TANF) | 305,058 | | 7,626 | |
| Supplemental Security Income (SSI) | 734,303 | | 18,358 | |
| Federal Rental Assistance | | 352,055 | | 8,801 |
| Totals | 12,977,476 | 352,055 | 324,438 | 8,801 |

Source : USCIS analysis.
Notes:
[1] DHS estimates the rate of disenrollment/foregone enrollment based on the number of foreign-born immigrants seeking to adjust status as a percentage of the foreign-born non-citizen population in the United States. Calculation: (Individuals adjusting status / Estimated foreign-born non-citizen population) *100 = Rate of disenrollment/foregone enrollment. To estimate the population that could choose to disenroll/forego enrollment, DHS multiplied the population of public benefits recipients who are members of households including foreign-born non-citizens receiving benefits or the number of households with at least 1 foreign-born non-citizen by 2.5 percent.
[2] Per enrollee Medicaid costs vary by eligibility group and State.
[3] Spending on LIS beneficiaries varies by individual.

Table 52 shows the estimated population that would be likely to disenroll from or forego enrollment in public benefits programs due to the provisions of the proposed rule and the total reduction in transfer payments paid by the federal government to this population. The table also presents the previously estimated average annual benefit per person who received benefits for each of the public benefits programs.[854] This proposed rule would result in a reduction of transfer payments from the federal government to those foreign-born non-citizens and associated household members who choose to disenroll from or forego future enrollment in a public benefits program. Transfer payments are payments from one group to another that do not directly affect total resources available to society.[855] DHS estimates the total annual reduction in transfer payments paid by the federal government to individuals who may choose to disenroll from or forego enrollment in public benefits programs is approximately $1.51 billion for an estimated 324,438 individuals and 14,532 households across the public benefits programs examined.

[854] As previously noted, the average annual benefits per person amounts presented may not account for overhead costs associated with administering each of these public benefits programs since they are based on amounts recipients have received in benefits as reported by benefits-granting agencies. Therefore, the costs presented may underestimate the total amount of transfer payments to the federal government.

[855] See Office of Management and Budget (OMB). Circular A–4. September 17, 2003. Available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.

**Table 52. Total Estimated Reduction in Transfer Payments Paid By the Federal Government Due to Disenrollment or Foregone Enrollment in Public Benefits Programs.**

| Public Benefits Program | Public Benefits Recipients Who Are Members of Households Including Foreign-Born Non-Citizens Based On A 2.5% Rate of Disenrollment or Foregone Enrollment | Households Receiving Benefits with At Least 1 Foreign-Born Non-Citizen Based On A 2.5% Rate of Disenrollment or Foregone Enrollment | Average Annual Benefit per Person or Household | Estimated Reduction in Transfer Payments Based On A 2.5% Rate of Disenrollment or Foregone Enrollment |
|---|---|---|---|---|
| Medicaid[1] | 142,136 | | $7,426.59 | $1,055,585,796 |
| Low Income Subsidy (LIS) for Medicare Part D Prescription Drug Coverage[2] | 26,755 | | $2,099.17 | $56,163,388 |
| Supplemental Nutrition Assistance Program (SNAP) | 129,563 | | $1,527.59 | $197,919,143 |
| Temporary Assistance for Needy Families (TANF) | 7,626 | | $1,272.56 | $9,704,543 |
| Supplemental Security Income (SSI) | 18,358 | | $6,593.72 | $121,047,512 |
| Federal Rental Assistance | | 8,801 | $8,121.16 | $1,055,585,796 |
| Totals | 324,438 | 8,801 | N/A | $1,511,894,711 |

Source: USCIS analysis.
Notes:
[1] Neither HHS nor DHS are able to disaggregate emergency and non-emergency Medicaid expenditures. Therefore, this rule considers overall Medicaid expenditures. Note that per enrollee Medicaid costs vary by eligibility group and State.
[2] Note that spending on LIS beneficiaries varies by individual.

Based on the rate of disenrollment or foregone enrollment calculated, DHS estimated the annual reduction in the amount of transfer payments paid by the federal government to foreign-born non-citizens and members of their households by multiplying the average annual benefits per person by the population of foreign-born non-citizens who are likely to disenroll from or forego enrollment in a public benefit program.[856]

However, DHS notes there may be additional reductions in transfer payments that we are unable to quantify. As these estimates reflect only federal financial participation in programs where states may share costs,

there may also be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Because state participation in these programs may vary depending on the type of benefit provided, DHS was unable to quantify the impact of state transfers. For example, the federal government funds all SNAP food expenses, but only 50 percent of allowable administrative costs for regular operating expenses.[857] Similarly, Federal Medical Assistance Percentages (FMAP) in some HHS programs like Medicaid can vary from

between 50 percent to an enhanced rate of 100 percent in some cases. However, assuming that the state share of federal financial participation (FFP) is 50 percent, then the 10-year discounted amount of state transfer payments of this proposed policy would be approximately $9.95 billion at a 3 percent discount rate and about $8.2 billion at a 7 percent discount rate. Finally, DHS recognizes that reductions in federal and state transfers under federal benefit programs may have downstream and upstream impacts on state and local economies, large and small businesses, and individuals. For example, the rule might result in reduced revenues for healthcare providers participating in Medicaid, pharmacies that provide prescriptions to participants in the Medicare Part D low-

[856] DHS analyzes federal funds only as we are not readily able to track down and identify the state funds.

[857] Per section 16(a) of the Food and Nutrition Act of 2008. *See also* USDA, FNS Handbook 901, p. 41 available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_internet_Ready_Format.pdf*.

income subsidy (LIS) program, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs.

However, the rate of disenrollment or foregone enrollment may result in an underestimate, to the extent that covered aliens may choose to disenroll from or forego enrollment in public benefits programs sooner than in the same year that the alien applies for adjustment of status. For instance, because DHS would consider past receipt of public benefits within at least 36 months as a heavily weighed factor under the proposed rule, prospective adjustment applicants may choose to disenroll or forego enrollment at least 36 months in advance of such application. Some aliens and members of their households may adjust their behavior in anticipation of eventually applying for adjustment of status, but not know exactly when they will submit such applications. In addition, because the proposed rule also affects inadmissibility determinations in contexts aside from adjustment of status, some percentage of the alien population is likely to disenroll from or forego enrollment in covered programs,

for such non-adjustment-related purposes as well.

On the other hand, the 2.5 percent rate of disenrollment or foregone enrollment estimate may result in an overestimate, insofar as it does not correct for those categories of aliens (such as asylees and refugees) that are exempt from the public charge ground of inadmissibility and assumes 100% are using public benefits which may not be true. DHS expects that the rule's effects on public benefit program enrollment and disenrollment by such categories of aliens and their households would be less pronounced. Additionally, some prospective adjustment applicants and associated household members may not choose to disenroll or forego public benefits because they may have other factors that counterbalance acceptance of public benefits when looked at in the totality of circumstances. DHS welcomes comments on the appropriate methodology for estimating the rate of disenrollment or foregone enrollment, including ways to improve upon the DHS methodology. DHS welcomes public comments on the estimation of the disenrollment or foregone enrollment rate used in this analysis.

However, in order to examine the impact if prospective adjustment applicants chose to disenroll or forego enrollment in public benefits at least 36 months in advance, DHS conducted a

sensitivity analysis based on this issue of the proximity of time to a review of public charge inadmissibility. In such cases, DHS would consider past receipt of public benefits within at least 36 months (3 years) as a heavily weighed negative factor under the proposed rule and that a prospective adjustment applicant may choose to disenroll or forego enrollment for at least 36 months in advance of such application. Table 53 presents the potential range of the population who may disenroll from or forego enrollment in public benefits programs as well as the potential total reduction in transfer payments paid by the federal government to this population. DHS estimates that the population range of foreign-born non-citizens who may disenroll from or forego enrollment in public benefits programs would range from approximately 333,239 to 999,717. In addition, the estimated reduction in transfer payments paid by the federal government to this population ranges from about $1.51 billion to $4.53 billion. For this economic analysis, the primary estimate upon which DHS bases its analysis is the 1-year estimate, as shown below in the table. However, DHS welcomes the public to comment on DHS's use of the 1-year estimate as its primary estimate as well as whether using the 3-years estimate is a more appropriate estimate to use as the primary estimate.

**Table 53. Estimated Annual Range of the Foreign-born Non-citizen Population Who May Disenroll from or Forego Enrollment in Public Benefits Programs and the Reduction in Transfer Payments.**

| Years Prior to Application | Households or Public Benefits-Receiving Members of Households with At Least 1 Foreign-Born Non-Citizen Based On A 2.5% Rate of Disenrollment or Foregone Enrollment | Estimated Reduction in Transfer Payments to Based On A 2.5% Rate of Disenrollment or Foregone Enrollment |
|---|---|---|
| 1 Year | 333,239 | $1,511,894,711 |
| 2 Years | 666,478 | $3,023,789,422 |
| 3 Years | 999,717 | $4,535,684,133 |
| Source: USCIS analysis. | | |

DHS presents this range since it is possible that the number of people who may disenroll from or forego enrollment in public benefits programs in one year could be as many as the combined three-year total of people who may disenroll or forego enrollment. Because

DHS plans to heavily weigh the receipt of public benefits within the past 36 months as a negative factor, individuals may begin to disenroll or forego enrollment in public benefits programs as early as three years prior to applying for adjustment of status. As a result, the

annual reduction in transfer payments could range between the three estimates presented in table 53.

Another source of impacts of the proposed rule would be costs to various individuals and other entities associated with familiarization with the provisions

of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. A foreign-born non-citizen (such as those contemplating disenrollment or foregoing enrollment in a public benefits program) might review the rule to determine whether they are subject to the provisions of the proposed rule. To the extent an individual or entity that is directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those being directly regulated by the rule, a wide variety of other entities would likely choose to read the rule and also incur familiarization costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may want to become familiar with the provisions of this proposed rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule in order to provide information to those foreign-born non-citizens and associated households that might be impacted by a reduction in federal transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs. DHS estimates the time that would be necessary to read the rule would be approximately 8 to 10 hours per person, resulting in opportunity costs of time. An entity, such as a non-profit or advocacy group, may have more than one person who reads the rule.

In addition, the proposed rule may impose costs that DHS is unable to quantify. Many federal agencies, such as USDA in administering the SNAP program, may need to update and re-write guidance documents or would need to update forms used. Moreover, there may be additional unquantified costs that state and local government may incur associated with similar activities. At each level of government, it will also be necessary to prepare training materials and retrain staff. Such changes will require staff time and have associated costs.

There are a number of consequences that could occur because of follow-on effects of the reduction in transfer payments identified in the proposed rule. DHS is providing a listing of the primary non-monetized potential consequences of the proposed rule below. Disenrollment or foregoing enrollment in public benefits program by aliens otherwise eligible for these programs could lead to:

• Worse health outcomes, including increased prevalence of obesity and malnutrition, especially for pregnant or breastfeeding women, infants, or children, and reduced prescription adherence;

• Increased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment;

• Increased prevalence of communicable diseases, including among members of the U.S. citizen population who are not vaccinated;

• Increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient; and

• Increased rates of poverty and housing instability; and

• Reduced productivity and educational attainment.

DHS notes that the proposed rule is likely to produce various other unanticipated consequences and indirect costs. For example, community based organizations, including small organizations, may provide charitable assistance, such as food or housing assistance, for individuals who forego enrollment in public benefit programs. DHS requests comments on other possible consequences of the rule and appropriate methodologies for quantifying these non-monetized potential impacts.

(d) Discounted Direct Costs and Reduced Transfer Payments

To compare costs over time, DHS applied a 3 percent and 7 percent discount rate to the total estimated costs associated with the proposed rule. Table 54 presents a summary of the quantified direct costs and reduced transfer payments from the federal government included in the proposed rule. The summary table presents costs in undiscounted dollars as well as dollars discounted at 3 percent and 7 percent rates over a 10-year period.

**Table 54. Summary of Estimated Direct Costs and Reduced Transfer Payments of the Proposed Rule.**

|  | Direct Costs | | Reduced Transfer Payments[1] | |
|---|---|---|---|---|
|  | **Annual Cost** | **Costs over 10-year Period** | **Annual Transfers** | **Transfers over 10-year Period** |
| Total Undiscounted Costs | $45,313,422 to $129,596,845 | $453,134,220 to $1,295,968,450 | $2,267,842,067 | $22,678,420,670 |
| Total Costs at 3 Percent Discount Rate |  | $386,532,679 to $1,105,487,375 |  | $19,345,152,833 |
| Total Costs at 7 Percent Discount Rate |  | $318,262,513 to $910,234,008 |  | $15,928,373,680 |

Source: USCIS analysis.

Note:
[1] The amount of transfer payments presented includes the estimated amounts of transfer payments to the federal government and to state governments from foreign-born non-citizens and their households who may disenroll or forego enrollment in public benefits programs. DHS assumes that the state governments' share of the total amount of transfer payments is 50 percent of the estimated total transfer payments to the federal government. For a breakout of the estimated total federal and state transfer payment amounts, see the summary table above at the beginning of this economic analysis (Table 36, Summary of Major Provisions and Economic Impacts of the Proposed Rule).

*i. Discounted Direct Costs*

DHS presents the total estimated costs for filing Form I–944 as part of the review for determination of inadmissibility based on public charge when applying for adjustment of status and the opportunity cost of time associated with the increased time burden estimate for completing Forms I–485, I–129, I–129CW, and I–539. See table 55. The total estimated costs are presented in undiscounted dollars, at a 3 percent discount rate, and at a 7 percent discount rate.

**Table 55. Total Estimated Direct Costs of the Proposed Rule with Total Estimated Direct Costs Discounted at 3 Percent and 7 Percent.**

| Form | Source of Cost | Total Estimated Annual Cost (Undiscounted) | Total Estimated Costs Over 10-year Period |
|---|---|---|---|
| Form I-944, Declaration of Self-Sufficiency | Opportunity cost of time (OCT) for completing form | $25,963,371 | $259,633,710 |
| Form I-485, Application to Register Permanent Residence or Adjust Status | OCT associated with the increased time burden for completing form | $691,898 | $6,918,980 |
| Form I-129, Petition for a Nonimmigrant Worker | OCT associated with the increased time burden for completing form<br><br>Costs to beneficiaries who receive a RFE to complete and submit Form I-944, including OCT and credit report/credit score costs. | $12,103,351 to $66,880,214 | $121,033,510 to $668,802,140 |
| Form I-129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker | OCT associated with the increased time burden for completing form<br><br>Costs to beneficiaries who receive a RFE to complete and submit Form I-944, including OCT and credit report/credit score costs. | $227,015 to $1,254,198 | $2,270,150 to $12,541,980 |
| Form I-539, Application To Extend/Change Nonimmigrant Status | OCT associated with the increased time burden for completing form<br><br>Costs to beneficiaries who receive a RFE to complete and submit Form I-944, including OCT and credit report/credit score costs. | $6,292,728 to $34,772,105 | $62,927,280 to $347,721,050 |
| Form I-945, Public Charge Bond | Filing fee<br><br>OCT for completing form | $34,234 | $342,340 |

| Form I-356, Request for Cancellation of Public Charge Bond | Filing fee<br><br>OCT for completing form | $825 | $8,250 |
|---|---|---|---|
| **Total Undiscounted Costs** | | $45,313,422 to $129,596,845 | $453,134,220 to $1,295,968,450 |
| **Total Costs at 3 Percent Discount Rate** | | | $386,532,679 to $1,105,487,375 |
| **Total Costs at 7 Percent Discount Rate** | | | $318,262,513 to $910,234,008 |
| Source: USCIS analysis. | | | |

Over the first 10 years of implementation, DHS estimates the quantified direct costs of the proposed rule would range from about $453,134,220 to $1,295,968,450 (undiscounted). In addition, DHS estimates that the 10-year discounted cost of this proposed rule to individuals applying to adjust status who would be required to undergo review for determination of inadmissibility based on public charge would range from about $386,532,679 to $1,105,487,375 at a 3 percent discount rate and about $318,262,513 to $910,234,008 at a 7 percent discount rate.

This economic analysis presents the quantified costs of this proposed rule based on the estimated population applying to adjust status subject to review for public charge determination and the opportunity cost of time associated with the increased time burden estimates for completing Forms I–485, I–129, I–129CW, and I–539. The economic analysis also presents the quantified costs associated with the proposed public charge bond process, including costs associated with completing and filing Forms I–945 and I–356. DHS reiterates we are unable to estimate the actual number of Form I–129 or Form I–129CW petitioners and Form I–539 filers that adjudication officers would require through a RFE to submit Form I–944 since such RFE would be issued on a discretionary basis as outlined in the proposed rule.

However, previously in this economic analysis, DHS presented a more detailed range of RFEs that could be issued based on total population estimates and the estimated annual cost associated with such RFEs. DHS welcomes any public comments on the discounted costs presented in this proposed rule.

*ii. Discounted Reduction in Transfer Payments*

DHS presents the total estimated quantified reduction in transfer payments from the federal government of the proposed rule in table 56. The total estimated costs are presented in undiscounted dollars, at a 3 percent discount rate, and at a 7 percent discount rate.

**Table 56. Total Estimated Reduction in Transfer Payments from the Federal Government to Foreign-Born Non-Citizens Who May Be Receiving of Public Benefits (Estimates Discounted at 3 Percent and 7 Percent).**

| Source of Costs | Total Estimated Annual Reduction in Transfer Payments (Undiscounted)[1] | Total Estimated Reduction in Transfer Payments Over 10-year Period |
|---|---|---|
| Estimated reduced transfer payments due to disenrollment / foregone enrollment from public benefits programs | $2,267,842,067 | $22,678,420,670 |
| **Total Undiscounted Transfer Reductions** | $2,267,842,067 | $22,678,420,670 |
| **Total Transfers Reductions at 3 Percent Discount Rate** | | $19,345,152,833 |
| **Total Transfer reductions at 7 Percent Discount Rate** | | $15,928,373,680 |

Source: USCIS analysis.

Note:

[1] The amount of transfer payments presented includes the estimated amounts of transfer payments to the federal government and to state governments from foreign-born non-citizens and their households who may disenroll or forego enrollment in public benefits programs. DHS assumes that the state governments' share of the total amount of transfer payments is 50 percent of the estimated total transfer payments to the federal government. For a breakout of the estimated total federal and state transfer payment amounts, see the summary table above at the beginning of this economic analysis (Table 36, Summary of Major Provisions and Economic Impacts of the Proposed Rule).

Over the first 10 years of implementation, DHS estimates the total quantified reduction in transfer payments from the federal government to foreign-born non-citizens and their households would be about $22.7 billion (undiscounted). In addition, DHS estimates that the 10-year discounted costs of this proposed rule would be approximately $19.3 billion at a 3 percent discount rate and about $15.9 billion at a 7 percent discount rate due to disenrollment or foregone enrollment in various federal public benefits programs. In addition, DHS assumes that the state share of federal financial participation (FFP) is 50 percent and therefore the 10-year discounted amount of the state-level share of transfer payments of this proposed rule would be approximately $9.65 billion at a 3 percent discount rate and about $7.95 billion at a 7 percent discount rate. Disenrollment or foregone enrollment in public benefits programs could occur whether or not such immigrants are directly affected by the provisions of the proposed rule, however, USCIS was unable to determine the exact percentage of individuals who would disenroll or forego enrollment. DHS notes that there may be a number of additional sources of transfer payments that could result from the proposed rule that DHS is not able to estimate and quantify at this time. Therefore, DHS welcomes public comments on additional sources of transfer payments that could result from the proposed rule.

(e) Costs to the Federal Government

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS notes that USCIS establishes its fees by assigning costs to an adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs such as clerical, officers, and managerial salaries and benefits, plus an amount to recover unassigned overhead (*e.g.,* facility rent, IT equipment and systems among other expenses) and immigration benefits provided without a fee charge. Consequently, since USCIS immigration fees are based on resource expenditures related to the benefit in question, USCIS uses the fee associated with an information collection as a reasonable measure of the collection's costs to USCIS. Therefore, DHS has established

the fee for the adjudication of Form I–485, Application to Register Permanent Residence or Adjust Status; Form I–129, Petition for a Nonimmigrant Worker; Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker; and Form I–539, Application to Extend/Change Nonimmigrant Status in accordance with this requirement. Other forms affected by this proposed rule do not currently charge a filing fee, including Form I–693, Medical Examination and Vaccination Record; Affidavit of Support forms (Form I–864, Form I–864A, Form I–864EZ, and I–864W); Form I–912, Request for Fee Waiver, and Form I–407, Record of Abandonment of Lawful Permanent Resident Status. DHS notes that the time necessary for USCIS to review the information submitted with each of these forms includes the time to adjudicate the underlying benefit request. While each of these forms does not charge a fee, the cost to USCIS is captured in the fee for the underlying benefit request form. DHS welcomes public comments on costs to the government from this proposed rule.

(f) Benefits of Proposed Regulatory Changes

The primary benefit of the proposed rule would be to better ensure that aliens who are admitted to the United States or apply for adjustment of status would not receive one or more public benefits as defined in the proposed 212.21(b) and instead, will rely on their financial resource, and those of family members, sponsors, and private organizations. As a result, DHS is establishing a more formal review process and improving the current review process to standardize the determination of inadmissibility based on public charge grounds. The proposed process would also help clarify to applicants the specific criteria that would be considered as inadmissible under public charge determinations.

DHS anticipates that the proposed rule would produce some benefits from the elimination of Form I–864W for use in filing an affidavit of support. The information previously requested on the Form I–864W would now be captured using Form I–485. Applicants, therefore, would not be required to file a form separate from the Form I–485. As noted previously, there is no filing fee associated with filing Form I–864W, but DHS estimates the time burden associated with filing this form is 60 minutes (1 hour) per petitioner.[858]

Therefore, using the average total rate of compensation of $35.78 per hour, DHS estimates the amount of benefits that would accrue from eliminating Form I–864W would be $35.78 per petitioner, which equals the opportunity cost of time for completing Form I–864W.[859] However, DHS notes that we are unable to determine the annual number filings of Form I–864W since we do not currently have information of how many of these filings are based on public charge determinations.

In addition, a benefit of establishing and modifying the public charge bond process, despite the costs associated with this process, would potentially allow an immigrant the opportunity to be admitted although he or she was deemed likely to become a public charge. DHS welcomes any public comments on the benefits of this proposed rule.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, or governmental jurisdictions with populations of less than 50,000.[860] This proposed rule would require an individual applying for a visa, seeking admission at the port of entry, or adjusting status to establish that he or she is not likely at any time to become a public charge. Most of this rule's proposed changes do not fall under the RFA because they directly regulate individuals who are not, for purposes of the RFA, within the definition of small entities established by 5 U.S.C. 601(6). However, DHS recognizes that there may be some provisions of this proposed rule that would directly regulate small entities, and, therefore,

---

[858] Source for I–864W time burden estimate: Paperwork Reduction Act (PRA) Affidavit of Support Under Section 213A of the INA (Forms I–

864, I–864A, I–864EZ, I–864W) (OMB control number 1615–0075). The PRA Supporting Statement can be found at Question 12 on *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201705-1615-004.*

[859] Calculation opportunity cost of time for completing and submitting Form I–864W: ($35.78 per hour * 1.0 hours) = $35.78.

[860] A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632.

DHS has examined the impact of this proposed rule on small entities.

This proposed rule would increase the time burden by an additional 30 minutes on petitioners who file Form I–129 or Form I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners. Additionally, the proposed provisions to establish a public charge bond process included in this proposed rule would allow for either an alien or an obligor (individual or an entity) to request a cancellation of a public bond. As a result, this proposed rule could have direct impacts on small entities that are obligors. DHS also recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.*, the employer) sought either an extension of stay or a change of status, may have to leave the U.S. if the employer's request was denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. DHS presents this Initial Regulatory Flexibility Analysis (IRFA) to examine these impacts.

Initial Regulatory Flexibility Analysis

The small entities that could be impacted by this proposed rule are petitioners who file Form I–129 or Form I–129CW on behalf of beneficiaries requesting an extension of stay or change of status as well as obligors that would request a cancellation of a public bond.

1. *A description of the reasons why the action by the agency is being considered.*

DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility are self-sufficient, *i.e.,* they will rely on their own financial resources as well as the financial resources of their family, sponsors, and private organizations as necessary.[861] Under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), an alien is inadmissible if, at the time of an application for a visa, admission, or adjustment of status, he or she is likely at any time to become a public charge. The statute requires DHS to consider the following minimum factors that reflect the likelihood that an alien will become a public charge: The alien's age; health; family status; assets, resources, and financial status; and education and skills. In addition, DHS may consider any affidavit of support submitted by

the alien's sponsor and any other factors relevant to the likelihood of the alien becoming a public charge.

2. *A succinct statement of the objectives of, and legal basis for, the proposed rule.*

DHS objectives and legal authority for this proposed rule are discussed in the preamble of the proposed rule.

3. *A description and, where feasible, an estimate of the number of small entities to which the proposed changes would apply.*

This proposed rule would increase the time burden by an additional 30 minutes on petitioners who file Form I–129 or Form I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners and entities.[862] As previously discussed in the E.O. 12866 section of this NPRM, DHS estimates an annual population of 336,335 beneficiaries seeking extension of stay or change of status through a petitioning employer using Form I–129. In addition, DHS estimates an annual population of 6,307 beneficiaries seeking extension of stay or change of status through a petitioning employer using Form I–129CW. DHS estimates that the 30-minute increase in the estimated time burden for these populations would increase the opportunity cost of time for completing and filing Form I–129 and Form I–129CW and would result in about $184 million and about $5 million in costs, respectively. For this population, DHS is unable to estimate the actual number of requests for evidence (RFEs) that adjudication officers may issue to Form I–129 beneficiaries to complete Form I–944 to provide evidence that they are not likely to become a public charge when they are extending stay or changing status. Therefore, DHS cannot determine the number of small entities that might be impacted by potential requests to complete the Form I–944 as part of an RFE.

The proposed provisions on the bond process included in this rule would allow a surety company to become an obligor on a public charge bond (proposed Form I–945) and, later, to request a cancellation of such a bond (proposed Form I–356). Therefore, this proposed rule could have some impacts to surety companies, some of which are small entities. A request for cancellation of a public bond using Form I–356 includes a time burden of 15 minutes

per request and a fee to DHS of $25.00. It is not known the number of surety bond companies that might complete and file Forms I–945 and I–356 due to a lack of historical data and uncertainty in the number individuals that may be granted the opportunity to post for public charge bond. However, DHS estimates that the filing volume for Form I–945 might be about 960 and the filing volume for Form I–356 might be approximately 25. While DHS cannot predict the exact number of surety companies that might be impacted by this proposed rule, nine out of 273 Treasury-certified surety companies in fiscal year 2015 posted new immigration bonds with DHS ICE.[863] DHS found that of the nine surety companies, four entities were considered "small" based on the number of employees or revenue being less than their respective Small Business Administration size standard.[864] Assuming these nine surety companies post public charge bonds with USCIS, we can assume that four surety companies may be considered as small entities. However, USCIS cannot predict the exact impact to these small entities at this time. We expect that obligors would be able to pass along the costs of this rulemaking to the aliens. DHS welcomes any public comments or data on the number of small entities that would be surety companies likely to post public charge bonds and any direct impacts on those small surety companies.

4. *A description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities that will be subject to the requirement and the types of professional skills necessary for preparation of the report or record.*

In addition to time burden costs discussed in Section C of this IFRA, DHS recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status, may have to leave the U.S. if the employer's request was denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. A 2012 report published by the Center for American Progress surveyed several

---

[861] *See* 8 U.S.C. 1601(2).

[862] In the context of Form I–129, a petitioner is typically an employer or the representative of an employer who files on behalf of a nonimmigrant worker (or beneficiary) to come to the United States temporarily to perform services or labor, or to receive training. See *https://www.uscis.gov/i-129.*

[863] *See* DHS, Procedures and Standards for Declining Surety Immigration Bonds and Administrative Appeal Requirement for Breaches NPRM, 83 FR 25951, 25962–25965 (June 5, 2018).

[864] U.S. Small Business Administration, Table of Small Business Size Standards Matched to North American Industry Classification System (NAICS) Codes, February 26, 2016. *https://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf.*

dozen studies that considered both direct and indirect costs and determined that turnover costs per employee ranged from 10 to 30 percent of the salary for most salaried workers.[865] An employer paid an average of about 20 percent of the worker's salary in total labor turnover costs. Specifically, for workers earning $50,000 or less, and for workers earning $75,000 or less, the average turnover cost was about 20 percent for both earning levels. According to the study, these earning levels corresponded to the 75th and 90th percentiles of typical earnings, respectively. Assuming Form I–129 and Form I–129CW beneficiaries are employed, DHS believes it is reasonable to assume an annual mean wage of $50,620 across all occupations.[866] Assuming an average labor turnover cost of 20 percent of $50,620, on average, an employer could incur costs of approximately $10,124 per beneficiary that would be separated from employment as a result of a denied request for an extension of stay or change of status. However, DHS does not know the number of small entities within this population of petitioners that might incur labor turnover costs.

Additionally, DHS also recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status and the request was denied, may still be able to get a visa and return to the U.S., including pursuant to other means. DHS welcomes any public comments or data on the impact to the petitioners or employers of Form I–129 or Form I–129CW beneficiaries who are denied an extension of stay or change of status due to public charge inadmissibility.

DHS does not believe that it would be necessary for Form I–129 or Form I–129CW petitioners, or for surety bond companies (obligors) to acquire additional types of professional skills as a result of this proposed rule. These petitioners and obligors should already possess the expertise to fill out the associated forms for this proposed rule. Additionally, these petitioners and obligors would be familiar with the proposed rule and such familiarization

costs are accounted for the in the E.O. 12866 sections.

*5. An identification of all relevant Federal rules, to the extent practical, that may duplicate, overlap, or conflict with the proposed rule.*

DHS is unaware of any duplicative, overlapping, or conflicting Federal rules, but invites any public comment and information regarding any such rules. Elsewhere in the preamble to the proposed rule, DHS addresses the relationship between this proposed rule and the standards governing alien eligibility for public benefits, as outlined in PRWORA.

*6. Description of any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and that minimize any significant economic impact of the proposed rule on small entities.*

DHS considered a range of potential alternatives to the proposed rule. First, under a ''no action'' alternative, DHS would continue administering the public charge ground of inadmissibility under the 1999 Guidance. For reasons explained more fully elsewhere in the preamble to the proposed rule, DHS determined that this alternative would not adequately ensure the self-sufficiency of aliens subject to the public charge ground of inadmissibility. Second, DHS considered including a more expansive definition of ''public benefit,'' potentially to include a range of non-cash benefit programs falling in specific categories (such as programs that provide assistance for basic food and nutrition, housing, and medical care). For reasons explained more fully elsewhere in the preamble to the proposed rule, DHS chose the approach contained in this proposed rule—a more limited list of high-expenditure non-cash benefits. DHS expects that, as compared to the broader alternative, the proposed approach may reduce the overall effect of the rule on transfers, but enhance its administrability and predictability. Employers filing Form I–129 and surety companies would have a better understanding of the types of non-cash benefits that may be covered under this proposed rule than they would under the broader alternative, and may realize cost savings as a result. In addition, certain indirect effects of the rule may be different as a result of the decision to reject this alternative.

*C. Congressional Review Act*

This proposed rule is a major rule as defined by 5 U.S.C. 804, also known as the ''Congressional Review Act,'' as enacted in section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–

121, 110 Stat. 847, 868 *et seq.* Accordingly, this rule, if enacted as a final rule, would be effective at least 60 days after the date on which Congress receives a report submitted by DHS under the Congressional Review Act, or 60 days after the final rule's publication, whichever is later.

*D. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The inflation-adjusted value of $100 million in 1995 is approximately $161 million in 2017 based on the Consumer Price Index for All Urban Consumers.[867]

This proposed rule does not contain such a mandate. The requirements of Title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

*E. Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. DHS does not expect that this proposed rule would impose substantial direct compliance costs on State and local governments, or preempt State law. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments*

This proposed rule does not have tribal implications under Executive

---

[865] *See* ''There Are Significant Business Costs to Replacing Employees,'' by Heather Boushey and Sarah Jane Glynn (2012), Center for American Progress, *available: https:// www.americanprogress.org/issues/economy/ reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/.*

[866] Bureau of Labor Statistics, May 2017 National Occupational Employment and Wage Estimates, All Occupations, *https://www.bls.gov/oes/2017/may/ oes_nat.htm.*

[867] U.S. Bureau of Labor Statistics, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, available at https://www.bls.gov/cpi/tables/historical-cpi-u-201712.pdf* (last visited Jan. 31, 2018).

Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

## H. Family Assessment

DHS has reviewed this proposed rule in line with the requirements of section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277. With respect to the criteria specified in section 654(c)(1), DHS has determined that the proposed rule may decrease disposable income and increase the poverty of certain families and children, including U.S. citizen children. For the reasons stated elsewhere in this preamble, however, DHS has determined that the benefits of the action justify the financial impact on the family. Further, the proposed action would expand the list of public benefits that DHS may consider for purposes of inadmissibility under section 212(a)(4) of the Act. As a result, the proposed regulatory action, if finalized, may increase the number of aliens found inadmissible under section 212(a)(4) of the Act. As described under the **SUPPLEMENTARY INFORMATION** section of this rule, DHS has compelling legal and policy reasons for the proposed regulatory action, including, but not limited to, better ensuring the self-sufficiency of aliens admitted or immigrating to the United States, and minimizing the financial burden of aliens on the U.S. social safety net.

## I. National Environmental Policy Act

DHS analyzes actions to determine whether NEPA applies to them and if so what degree of analysis is required. DHS Directive (Dir) 023–01 Rev. 01 and Instruction (Inst.) 023–01–001 rev. 01 establish the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508. The CEQ regulations allow federal agencies to establish, with CEQ review and concurrence, categories of actions

("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Instruction 023–01–001 Rev. 01 establishes such Categorical Exclusions that DHS has found to have no such effect. Inst. 023–01–001 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Inst. 023–01–001 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Inst. 023–01–001 Rev. 01 section V.B(1)–(3).

DHS analyzed this action and has concluded that NEPA does not apply due to the excessively speculative nature of any effort to conduct an impact analysis. Nevertheless, if NEPA did apply to this action, the action clearly would come within our categorical exclusion A.3(d) as set forth in DHS Inst. 023–01–001 Rev. 01, Appendix A, Table 1.

This proposed rule applies to applicants for admission or adjustment of status, as long as the individual is applying for an immigration status that is subject to the public charge ground of inadmissibility. In addition, the proposed rule would potentially affect individuals applying for an extension of stay or change of status because these individuals would have to demonstrate that they are neither receiving, nor likely to receive, public benefits as defined in the proposed rule. As discussed in detail above, this rule proposes to establish a definition of public charge and expand the types of public benefits that DHS would consider as part of its public charge inadmissibility determinations. The rule also proposes to establish a regulatory framework based on the statutory factors that must be considered in public charge determinations, including

enhanced evidentiary requirements for public charge inadmissibility determinations by USCIS. Finally, the rule proposes to revise the public charge bond process. Overall, the proposed regulatory changes, if finalized, would require a more in-depth adjudication of public charge issues and have the potential to result in more findings of inadmissibility, ineligibility for adjustment of status, or denials of requests for extension of stay or change of status, on public charge grounds.

Historically, there is a high demand for both immigrant and nonimmigrant visas. Even if larger numbers of aliens were now found to be inadmissible on public charge grounds as a result of this rule, there may be some replacement effect from others who would, in turn, be considered for the existing visas. Therefore, DHS cannot estimate with any degree of certainty to what extent the potential for increased findings of inadmissibility on public charge grounds would result in fewer individuals being admitted to the United States. DHS is also unable to estimate with any degree of certainty whether the proposed rule would result in increased denial of applications for extension of stay or change of status. DHS does not, however, anticipate that this proposed rule will cause an increase in the number of individuals found to be admissible, or eligible for an extension of stay, or adjustment or change of status. Even if DHS could estimate these numerical effects, any assessment of derivative environmental effect at the national level would remain unduly speculative.

This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, if NEPA were determined to apply, this rule would be categorically excluded from further NEPA review.

## J. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law 104–13, agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. Table 57 shows the summary of forms that are part of this rulemaking.

**Table 57. Summary of Forms**

| Form | Form Name | New or Updated Form | General Purpose of Form | General Categories Filing | Applicability to Public Charge |
|------|-----------|---------------------|--------------------------|----------------------------|--------------------------------|
| I-129 | Petition for Nonimmigrant Worker | Update – adds questions and instructions about receipt of public benefits | This form is used by an employer to petition USCIS for an alien beneficiary to come temporarily to the United States as a nonimmigrant to perform services or labor, or to receive training. This form is also used by certain nonimmigrants to apply for EOS or COS. | E-2 CNMI -- treaty investor exclusively in the Commonwealth of the Northern Mariana Islands (CNMI). H-1B -- specialty occupation worker; an alien coming to perform services of an exceptional nature that relate to a U.S. Department of Defense-administered project; or a fashion model of distinguished merit and ability. H-2A -- temporary agricultural worker. H-2B -- temporary nonagricultural worker. H-3 -- trainee. L-1 -- intracompany transferee. O-1 -- alien of extraordinary ability in arts, science, education, business, or athletics. O-2 -- accompanying alien who is coming to the United States to assist in the artistic or athletic performance of an O-1 artist or athlete. P-1 -- major league sports. P-1 -- internationally recognized athlete/entertainment group. P-1S -- essential support personnel for a P-1. P-2 -- artist/entertainer in reciprocal exchange program. P-2S -- essential support personnel for a P-2. P-3 -- artist/entertainer coming to the United States to perform, teach, or coach under a program that is culturally unique. P-3S -- essential support personnel for a P-3. | Non-receipt of public benefits and being unlikely to receive public benefits in the future is a condition of USCIS, at its discretion may request the applicant to file a Form I-944 to determine likelihood of receipt of public benefits in the future. |

| Form | Form Name | New or Updated Form | General Purpose of Form | General Categories Filing | Applicability to Public Charge |
|---|---|---|---|---|---|
| | | | | Q-1 -- alien coming temporarily to participate in an international cultural exchange program. Extension of Status E-1 -- treaty trader. E-2 -- treaty investor (not including E-2 CNMI treaty investors). E-3 -- Free Trade Agreement professionals from Australia. Free Trade Nonimmigrants -- H-1B1 specialty occupation workers from Chile or Singapore and TN professionals from Canada or Mexico. R-1 -- religious worker. | |

Table 57. Summary of Forms

**Table 57. Summary of Forms**

| Form | Form Name | New or Updated Form | General Purpose of Form | General Categories Filing | Applicability to Public Charge |
|------|-----------|---------------------|-------------------------|---------------------------|--------------------------------|
| I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Update – adds questions and instructions about receipt of public benefits | | This form is used by an employer to request an extension of stay or change of status for a Commonwealth of the Northern Mariana Islands (CNMI) temporarily to perform services or labor as a CW-1, CNMI-Only Transitional Worker. | Non-receipt of public benefits and being unlikely to receive public benefits in the future is a condition of EOS/COS. EOS/COS applicants will be required to USCIS, at its discretion may request the applicant to file a Form I-944 to determine likelihood of receipt of public benefits in the future. |
| I-356 | Request for Cancellation of a Public Charge Bond | Update – Previously discontinued | This form is used to request cancellation of the bond that was submitted on Form I-945, Public Charge Bond, on behalf of an alien. | An obligor who had posted an I-945 on the alien's behalf or an alien has had a Form I-945 posted on his or her behalf, and who seeks to cancel the bond (Form I-945) because the alien has either has permanently departed the United States, naturalized, or died, or the obligor or the alien seeks cancellation of the bond following the alien's fifth anniversary of admission to the United States as a lawful permanent resident, or the alien, following the initial grant of lawful permanent resident status, obtains an immigration status that it exempt from the public charge ground of inadmissibility. | After an obligor has posted an I-945 on behalf of the alien, or an alien on whose behalf the I-945 was posted, may request that a bond to be cancelled because the alien either has permanently departed the United States, naturalized or died, or the obligor or the alien request cancellation following the fifth anniversary of the alien's |

| Table 57. Summary of Forms | | | | | |
|---|---|---|---|---|---|
| Form | Form Name | New or Updated Form | General Purpose of Form | General Categories Filing | Applicability to Public Charge |
| | | | | | admission as a lawful permanent resident in the United States.; or or the alien, following the initial grant of lawful permanent resident status, obtains an immigration status that it exempt from the public charge ground of inadmissibility. |
| I-407 | I-407, Record of Abandonment of Lawful Permanent Resident Status | No Changes | This form is used to record an alien's abandonment of status as a lawful permanent resident in of the United States. | A lawful permanent resident who voluntarily abandons his lawful permanent resident status in the United States. | If a bond has been posted on the alien's behalf, the obligor or the alien may request that the bond be cancelled because the alien permanently departed the United States. The alien shows this by filing Form I-407 and physically departing. |
| I-485 | Application to Register Permanent Residence or Adjustment of Status | Update – clarifies what categories need to file Form I-944 and Form I-864 | Foreign nationals present in the United States to obtain LPR status | o Immediate relatives (spouses, children and parents of U.S. citizens) o Family-based immigrants (principal beneficiaries and their dependents) o Employment-based immigrants (principal beneficiaries and their dependents) | Adjustment of status applicants generally must be admissible, including with regard to the public charge inadmissibility ground |

**Table 57. Summary of Forms**

| Form | Form Name | New or Updated Form | General Purpose of Form | General Categories Filing | Applicability to Public Charge |
|------|-----------|---------------------|-------------------------|---------------------------|-------------------------------|
| | | | | o Those who entered as Ks (Fiancé(e)s or certain spouses of U.S. citizens, and their children) who are seeking LPR status based on the primary beneficiary's marriage to the U.S. citizen petitioner. | |
| I-539 | Application To Extend/ Change Nonimmigrant Status | Update – adds questions and instructions about receipt of public benefits | This form is used by certain nonimmigrants to apply for an extension of stay or change of status. In certain circumstances this form may be used as an initial nonimmigrant status, or reinstatement of F1 or M1 status (students). | • CNMI residents applying for an initial grant of status; • Student (F) and vocational students (M) applying for reinstatement; and • Persons seeking V nonimmigrant status or an extension of stay as a V nonimmigrant (spouse or child of an LPR who filed a petition on or before December 21, 2000) | Non-receipt of public benefits and being unlikely to receive public benefits in the future is a condition of EOS/COS. USCIS, at its discretion may request the applicant to file a Form I-944 to determine likelihood of receipt of public benefits in the future. |
| I-693 | Report of Medical Examination and Vaccination Record | No Changes | Form I-693 is used to report results of a medical examination to USCIS. | Generally, adjustment of status applicants are required to submit an I-693. Nonimmigrants seeking a change or extension of status are generally not required to submit an I-693, Nonimmigrants seeking a change of status to spouse of a legal permanent resident (V) status. See table in https://www.uscis.gov/policy manual/HTML/PolicyManual -Volume8-PartB-Chapter3.html | The I-693 is used as part of the Health Factor to identify medical conditions. |
| I-864 | Affidavit of Support Under Section 213A of the INA | Update – reference to Form I-864W, which is being discontinued, was removed | Statement/ contract provided by a sponsor to show that the sponsor has adequate financial resources to support the alien. | Generally most family-based immigrants and some employment-based immigrants. See additional tables for full list. | The Affidavit of Support when required is a factor in the public charge determination. |

## Table 57. Summary of Forms

| Form | Form Name | New or Updated Form | General Purpose of Form | General Categories Filing | Applicability to Public Charge |
|------|-----------|---------------------|-------------------------|---------------------------|-------------------------------|
| I-864EZ | Affidavit of Support Under Section 213A of the Act | Update – reference for Form I-864W, which is being discontinued, was removed | Statement/ contract provided by a sponsor to show that the sponsor has adequate financial resources to support the alien. This is a simpler version of Form I-864. | 1. The sponsor is the person who filed or is filing Form I-130, Petition for Alien Relative, for a relative being sponsored; 2. The relative the sponsor is sponsoring is the only person listed on Form I-130; and 3. The income the sponsor is using to qualify is based entirely on your salary or pension and is shown on one or more Internal Revenue Service (IRS) Form W-2s provided by your employers or former employers. | The Affidavit of Support when required is a factor in the public charge determination. |
| I-864W | Request for Exemption for Intending Immigrant's Affidavit of Support | Discontinued – information incorporated into Form I-485 | Certain classes of immigrants are exempt from the Form I-864 or Form I-864EZ requirement and therefore must file Form I-864W instead. | Aliens who have earned 40 quarters of SSA coverage. Children who will become U.S. citizens upon entry or adjustment into the United States under INA 320. Self-Petitioning Widow(er) Form I-360, Petition for Amerasian, Widow(er) or Special Immigrant; Self-Petitioning battered spouse or child. | Although some people may be exempt from the affidavit of support requirement, the person may still be subject to public charge. |
| I-912 | Requests for Fee Waiver | Update – provides warning that a request for a fee waiver may be a factor in the public charge determination. | This form may be filed with any USCIS immigrant benefit form in order to request a fee waiver. | Adjustment of Status (I-485) - may be filed for eligible applicants, generally for those not subject to public charge and humanitarian programs. Petition for Nonimmigrant Worker (I-129) may be filed for an applicant for E-2 CNMI investor nonimmigrant status under 8 CFR 214.2(e)(23) is eligible to request. Application for Extension/Change of Status (I-539) INA section 245(l)(7) or an applicant for E-2 Commonwealth of the Northern Mariana Islands is eligible for a fee waiver. | Request of a Fee Waiver is a factor in the determination of Public Charge. |

**Table 57. Summary of Forms**

| Form | Form Name | New or Updated Form | General Purpose of Form | General Categories Filing | Applicability to Public Charge |
|------|-----------|---------------------|-------------------------|---------------------------|-------------------------------|
| I-944 | Declaration of Self-Sufficiency | New | This form is used to demonstrate that an alien is not likely to become a public charge. | Anyone who is subject to public charge. See additional tables for full list. | This form is the primary basis of the public charge determination and asks questions about each one of the factors considered. |
| I-945 | Public Charge Bond | New | This form is the bond contract between USCIS and the obligor | For aliens inadmissible solely based on public charge and who are permitted to have a bond posted on his or her behalf. The form is completed by the obligor who posts the bond on the alien's behalf. | If an alien is found inadmissible solely based on public charge, he or she may be admitted to the United States upon the posting of a suitable and proper a bond at the discretion of USCIS. |

**USCIS Form I–944**

DHS invites comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

*Overview of information collection:*

1. *Type of Information Collection:* New Collection.

2. *Title of the Form/Collection:* Declaration of Self-Sufficiency and Public Benefits Worksheet.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–944; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS will require an individual applying to adjust status to lawful permanent residence (Form I–485) and who is subject to the public charge ground of inadmissibility to file Form I–944. On a case by case basis, USCIS may request that a nonimmigrant seeking to extend stay or change status (Form I–539 or Form I–129) and persons filing USCIS Form I–129CW to file Form I–944. The data collected on these forms will be used by USCIS to determine the likelihood of a declarant becoming a public charge based on the factors regarding health; family status; assets, resource, and financial status; and education and skills. The forms serve the purpose of standardizing public charge evaluation metrics and ensure that declarants provide all essential information required for USCIS to assess self-sufficiency and adjudicate the declaration. If USCIS determines that a declarant is likely to become a public charge, the declarant may need to provide additional resources or evidence to overcome this determination.

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–944 is 382,264 and

the estimated hour burden per response is 4 hours.

6. *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,720,188 hours.

7. *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $59,931,350.

USCIS Form I–485

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS invites comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0023 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

1. *Type of Information Collection:* Revision of a Currently Approved Collection.

2. *Title of the Form/Collection:* Application to Register Permanent Residence or Adjust Status.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–485 and Supplements A and J; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. The information collected is used to determine eligibility to adjust status under section 245 of the Immigration and Nationality Act.

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–485 is 382,264 and the estimated hour burden per response is 6.42 hours; the estimated total number of respondents for information collection Supplement A is 36,000 respondents and the estimated hour burden per response is 1.25 hours; the estimated total number of respondents for information collection Supplement J is 28,309 respondents and the estimated hour burden per response is 1 hour; the estimated total number of respondents for information collection biometrics processing is 305,811 respondents and estimated hour burden is 1.17 hours.

6. *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,885,242 hours.

7. *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $131,116,650.

USCIS Forms I–864; I–864A; I–864EZ

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS invites comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed discontinuation of the USCIS Form I–864W information collection instrument. The instructions for Form I–864 and I–864EZ were modified to remove references to Form I–864W. There are no changes to the Form I–864A.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0075 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

1. *Type of Information Collection:* Revision of a Currently Approved Collection.

2. *Title of the Form/Collection:* Affidavit of Support Under Section 213A of the INA; Contract Between Sponsor and Household Member; Affidavit of Support under Section 213 of the Act.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–864; I–864A; I–864EZ; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. *Form I–864:* USCIS uses the data collected on Form I–864 to determine whether the sponsor has the ability to support the sponsored alien under section 213A of the Immigration and Nationality Act. This form standardizes evaluation of a sponsor's ability to support the sponsored alien and ensures that basic information required to assess eligibility is provided by petitioners.

*Form I–864A:* Form I–864A is a contract between the sponsor and the sponsor's household members. It is only required if the sponsor used income of his or her household members to reach the required 125 percent of the FPG. The contract holds these household members jointly and severally liable for the support of the sponsored immigrant.

The information collection required on Form I–864A is necessary for public benefit agencies to enforce the Affidavit of Support in the event the sponsor used income of his or her household members to reach the required income level and the public benefit agencies are requesting reimbursement from the sponsor.

*Form I–864EZ:* USCIS uses Form I–864EZ in exactly the same way as Form I–864; however, USCIS collects less information from the sponsors as less information is needed from those who qualify in order to make a thorough adjudication.

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–864 is 453,345 and the estimated hour burden per response is 6 hours; the estimated total number of respondents for the information collection I–864A is 215,800 and the estimated hour burden per response is 1.75 hours; the estimated total number of respondents for the information collection I–864EZ is 100,000 and the estimated hour burden per response is 2.5 hours.

6. *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 3,347,720 hours.

7. *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $135,569,525.

USCIS Form I–912

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. Although this rule does not impose any new reporting or recordkeeping requirements under the PRA, this rule will require non-substantive edits to USCIS Form I–912, Request for Fee Waiver. These edits make clear to those who request fee waivers that an approved fee waiver can negatively impact eligibility for an immigration benefit that is subject to the public charge inadmissibility determination. Accordingly, USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.

USCIS Form I–945

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

1. *Type of Information Collection:* New Collection; Revision of a Currently Approved Collection.

2. *Title of the Form/Collection:* Public Charge Bond.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–945; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit. In certain instances, a bond can be posted on behalf of the alien to guarantee a set of conditions set by the government concerning an alien, *i.e.* that the alien will not become a public

charge as defined in proposed 8 CFR 212.21(a) because he or she will not receive public benefits, as defined in 8 CFR 213.21(b) after the alien's adjustment of status to that of a lawful permanent resident. An acceptable surety is generally any company listed on the Department of the Treasury's Listing of Approved Sureties (Department Circular 570) in effect on the date the bond is requested or an individual or an entity that deposits cash or a cash equivalent, such as a cashier's check or money order for the full value of the bond.[868]

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection (Enter form number) is 960 and the estimated hour burden per response is 1 hour.

6. *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 960 hours. (Multiply the burden for each submission by the number of respondents.)

7. *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0 as the company performing the bond service receives a fee.

USCIS Form I–356

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

---

[868] *See* 8 CFR 103.6(b).

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

1. *Type of Information Collection:* New Collection.

2. *Title of the Form/Collection:* Request for Cancellation of Public Charge Bond.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–356; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Aliens (on whose behalf a public charge bond has been posted) or the obligor (surety) (who is the obligor who posted a bond on the alien's behalf). The form is used to request cancellation of the public charge bond because of the alien's naturalization, permanent departure, or death. The form is also used by the alien or the obligor to request cancellation of the public charge bond upon the fifth anniversary of the alien's admission to the United States as a lawful permanent resident.

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection (Enter form number) is 25 and the estimated hour burden per response is .75 hours.

6. *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 18.75 hours.

7. *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $6,250.

USCIS Form I–129

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0009 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

1. *Type of Information Collection:* Revision of a Currently Approved Collection.

2. *Title of the Form/Collection:* Petition for Nonimmigrant Worker.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer (or agent, where applicable) uses this form to petition USCIS for an alien to temporarily enter as a nonimmigrant. An employer (or agent, where applicable) also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under certain nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129 is 552,000 and the estimated hour burden per response is 2.84 hours; the estimated total number of respondents for the information collection E–1/E–2 Classification Supplement to Form I–129 is 4,760 and the estimated hour burden per response is 0.67; the estimated total number of respondents for the information collection Trade Agreement Supplement to Form I–129 is 3,057 and the estimated hour burden per response is 0.67; the estimated total number of respondents for the information collection H Classification Supplement to Form I–129 is 255,872 and the estimated hour burden per response is 2; the estimated total number of respondents for the information collection H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement is 243,965 and the estimated hour burden per response is 1; the estimated total number of respondents for the information collection L Classification Supplement to Form I–129 is 37,831 and the estimated hour burden per response is 1.34; the estimated total number of respondents for the information collection O and P Classifications Supplement to Form I–129 is 22,710 and the estimated hour burden per response is 1; the estimated total number of respondents for the information collection Q–1 Classification Supplement to Form I–129 is 155 and the estimated hour burden per response is 0.34; the estimated total number of respondents for the information collection R–1 Classification Supplement to Form I–

129 is 6,635 and the estimated hour burden per response is 2.34.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,417,609 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $132,368,220.

USCIS Form I–129CW

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0009 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

1. *Type of Information Collection:* Revision of a Currently Approved Collection.

2. *Title of the Form/Collection:* Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129CW; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for-profit. USCIS uses the data collected on this form to determine eligibility for the requested immigration benefits. An employer uses this form to petition USCIS for an alien to temporarily enter as a nonimmigrant into the CNMI to perform services or labor as a CNMI-Only Transitional Worker (CW–1). An employer also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for these benefits, and ensuring that the basic information required to determine eligibility, is provided by the petitioners.

USCIS collects biometrics from aliens present in the CNMI at the time of requesting initial grant of CW–1 status. The information is used to verify the alien's identity, background information and ultimately adjudicate their request for CW–1 status.

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129CW is 3,749 and the estimated hour burden per response is 3.5 hours.

6. *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 13,121.5 hours.

7. *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $459,253.

USCIS Form I–539

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS invites comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule.

All submissions received must include the OMB Control Number 1615–0003 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

1. Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

1. *Type of Information Collection:* Revision of a Currently Approved Collection.

2. *Title of the Form/Collection:* Application to Extend/Change Nonimmigrant Status.

3. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–539 and Supplement A; USCIS.

4. *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. This form will be used for nonimmigrants to apply for an extension of stay, for a change to another nonimmigrant classification, or for obtaining V nonimmigrant classification.

5. *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–539 is 248,985 and the estimated hour burden per response is 2.38 hours; the estimated total number of respondents for the information collection Supplement A is 54,375 respondents and the estimated hour burden per response is .50 hours; the estimated total number of respondents for the information collection biometrics processing is

000740

373,477 and the estimated hour burden is 1.17 hours.

6. *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,056,740 hours.

7. *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $42,701,050.

USCIS Form I–407

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. This rule requires the use of USCIS Form I–407 but does not require any changes to the form or instructions and does not impact the number of respondents, time or cost burden. This form has previously been approved by OMB under the Paperwork Reduction Act. The OMB control number(s) for this information collection is 1615–0130.

List of Subjects and Regulatory Amendments

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 213*

Immigration, Surety bonds.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange programs, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 248*

Aliens, Reporting and recordkeeping requirements.

Accordingly, DHS proposes to amend chapter I of title 8 of the Code of Federal Regulations as follows:

PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2; Pub. L. 112–54.

■ 2. Section 103.6 is amended by:
■ a. Revising paragraphs (a)(1), (a)(2)(i), and (c)(1);
■ b. Adding paragraph (d)(3); and
■ c. Revising paragraph (e)
The revisions and additions read as follows:

§ 103.6   Surety bonds.

(a) * * *
(1) *Extension agreements; consent of surety; collateral security.* All surety bonds posted in immigration cases must be executed on the forms designated by DHS, a copy of which, and any rider attached thereto, must be furnished to the obligor. DHS is authorized to approve a bond, a formal agreement for the extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on the form designated by DHS, if any. All other matters relating to bonds, including a power of attorney not executed on the form designated by DHS and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, will be forwarded to the appropriate office for approval.
(2) *Bond riders*—(i) *General.* A bond rider must be prepared on the form(s) designated by DHS, and submitted with the bond. If a condition to be included in a bond is not on the original bond, a rider containing the condition must be executed.

* * * * *

(c) * * *
(1) *Public charge bonds.* Special rules for the cancellation of public charge bonds are described in 8 CFR 213.1.

* * * * *

(d) * * *
(3) *Public charge bonds.* The threshold bond amount for public charge bonds is set forth in 8 CFR 213.1.
(e) *Breach of bond.* Breach of public charge bonds is governed by 8 CFR 213.1. For other immigration bonds, a bond is breached when there has been a substantial violation of the stipulated conditions. A final determination that a

bond has been breached creates a claim in favor of the United States which may not be released by the officer. DHS will determine whether a bond has been breached. If DHS determines that a bond has been breached, it will notify the obligor of the decision, the reasons therefor, and inform the obligor of the right to appeal the decision in accordance with the provisions of this part.

* * * * *

■ 3. Section 103.7 is amended by adding paragraphs (b)(1)(i)(LLL) and (MMM) to read as follows:

§ 103.7   Fees.

* * * * *

(b) * * *
(1) * * *
(i) * * *

(LLL) Public Charge Bond, Form I–945. $25.

(MMM) Request for Cancellation of Public Charge Bond, Form I–356. $25.

PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 4. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

■ 5. Add §§ 212.20 through 212.24 to read as follows:

§ 212.20   Applicability of public charge inadmissibility.

8 CFR 212.20 through 212.24 address the public charge ground of inadmissibility under section 212(a)(4) of the Act. Unless the alien requesting the immigration benefit or classification has been exempted from section 212(a)(4) of the Act as listed in 8 CFR 212.23(a), the provisions of §§ 212.20 through 212.24 of this part apply to an applicant for admission or adjustment of status to lawful permanent resident.

§ 212.21   Definitions for public charge.

For the purposes of 8 CFR 212.20 through 212.24, the following definitions apply:
(a) *Public Charge.* Public charge means an alien who receives one or more public benefit, as defined in paragraph (b) of this section.
(b) *Public benefit.* Public benefit means:
(1) Any of the following monetizable benefits, where the cumulative value of one or more of the listed benefits exceeds 15 percent of the Federal

Poverty Guidelines (FPG) for a household of one within any period of 12 consecutive months, based on the per-month FPG for the months during which the benefits are received.

(i) Any Federal, State, local, or tribal cash assistance for income maintenance, including:

(A) Supplemental Security Income (SSI), 42 U.S.C. 1381 *et seq.;*

(B) Temporary Assistance for Needy Families (TANF), 42 U.S.C. 601 *et seq.;* or

(C) Federal, State or local cash benefit programs for income maintenance (often called ''General Assistance'' in the State context, but which may exist under other names); and

(ii) Non-cash benefits, monetized as set forth in 8 CFR 212.24:

(A) Supplemental Nutrition Assistance Program (SNAP, formerly called ''Food Stamps''), 7 U.S.C. 2011 to 2036c;

(B) Section 8 Housing Assistance under the Housing Choice Voucher Program, as administered by HUD under 24 CFR part 984; 42 U.S.C. 1437f and 1437u;

(C) Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation) under 24 CFR parts 5, 402, 880 through 884 and 886; and

(2) Any of one or more of the following non-monetizable benefits if received for more than 12 months in the aggregate within a 36 month period (such that, for instance, receipt of two non-monetizable benefits in one month counts as two months):

(i) Medicaid, 42 U.S.C. 1396 *et seq.,* except for:

(A) Benefits paid for an emergency medical condition as described in section 1903(v) of Title XIX of the Social Security Act, 42 U.S.C. 1396b(v), 42 CFR 440.255(c);

(B) Services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act (IDEA) 20 U.S.C. 1400 *et seq.;*

(C) School-based benefits provided to children who are at or below the oldest age of children eligible for secondary education as determined under State law;

(D) Medicaid benefits received by children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent will result automatically in the child's acquisition of citizenship or whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship upon finalization of adoption in the United States by the U.S. citizen parent(s) or, once meeting other

eligibility criteria as required by the Child Citizenship Act of 2000, Public Law 106–395 (section 320(a)–(b) of the Act, 8 U.S.C. 1431(a)–(b)), in accordance with 8 CFR part 320;

(E) Medicaid benefits received by the children of U.S. citizens who are entering the United States for the primary purpose of attending an interview under the Child Citizenship Act of 2000, Public Law 106–395 (section 322 of the Act, 8 U.S.C. 1433), in accordance with 8 CFR part 322.

(ii) Any benefit provided for institutionalization for long-term care at government expense;

(iii) Premium and Cost Sharing Subsidies for Medicare Part D, 42 U.S.C. 1395w–114;

(iv) Subsidized Housing under the Housing Act of 1937, 42 U.S.C. 1437 *et seq.*

(3) The receipt of a combination of monetizable benefits under paragraph (b)(1) of this section where the cumulative value of such benefits is equal to or less than 15 percent of the Federal Poverty Guidelines for a household size of one within any period of 12 consecutive months based on the per-month FPG for the months during which the benefits are received, together with one or more non-monetizable benefits under paragraph (b)(2) of this section if such non-monetizable benefits are received for more than 9 months in the aggregate within a 36 month period (such that, for instance, receipt of two non-monetizable benefits in one month counts as two months);

(4) DHS will not consider any benefits, as defined in paragraphs (b)(1) through (b)(3) of this section, received by an alien who, at the time of receipt, filing, or adjudication, is enlisted in the U.S. armed forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or if received by such an individual's spouse or child as defined in section 101(b) of the Act, in the public charge inadmissibility determination.

(c) *Likely at any time to become a public charge.* Likely at any time to become a public charge means likely at any time in the future to receive one or more public benefit as defined in paragraph (b) of this section based on the totality of the alien's circumstances.

(d) *Alien's household.* For purposes of public charge inadmissibility determinations under section 212(a)(4) of the Act:

(1) If the alien is 21 years of age or older, or under the age of 21 and married, the alien's household includes:

(i) The alien;

(ii) The alien's spouse, if physically residing with the alien;

(iii) The alien's children, as defined in 101(b)(1) of the Act, physically residing with the alien;

(iv) The alien's other children, as defined in section 101(b)(1) of the Act, not physically residing with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(v) Any other individuals (including a spouse not physically residing with the alien) to whom the alien provides, or is required to provide, at least 50 percent of the individual's financial support or who are listed as dependents on the alien's federal income tax return; and

(vi) Any individual who provides to the alien at least 50 percent of the alien's financial support, or who lists the alien as a dependent on his or her federal income tax return.

(2) If the alien is a child as defined in section 101(b)(1) of the Act, the alien's household includes the following individuals:

(i) The alien;

(ii) The alien's children as defined in section 101(b)(1) of the Act physically residing with the alien;

(iii) The alien's other children as defined in section 101(b)(1) of the Act not physically residing with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(iv) The alien's parents, legal guardians, or any other individual providing or required to provide at least 50 percent of the alien's financial support to the alien as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided to the alien;

(v) The parents' or legal guardians' other children as defined in section 101(b)(1) of the Act physically residing with the alien;

(vi) The alien's parents' or legal guardians' other children as defined in section 101(b)(1) of the Act, not physically residing with the alien for whom the parent or legal guardian provides or is required to provide at least 50 percent of the other children's

financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the parents or legal guardians; and

(vii) Any other individuals to whom the alien's parents or legal guardians provide, or are required to provide at least 50 percent of the individuals' financial support or who are listed as a dependent on the parent's or legal guardian's federal income tax return.

### § 212.22  Public Charge inadmissibility determination.

This section relates to the public charge ground of inadmissibility under section 212(a)(4) of the Act.

(a) *Prospective determination based on the totality of circumstances.* The determination of an alien's likelihood of becoming a public charge must be based on the totality of the alien's circumstances by weighing all factors that make the alien more or less likely at any time in the future to become a public charge, as outlined in this section.

(b) *Minimum factors to consider.* A public charge inadmissibility determination must entail consideration of the alien's age; health; family status; education and skills; and assets, resources, and financial status, as follows:

(1) *The alien's age*—(i) *Standard.* When considering an alien's age, DHS will consider whether the alien is between the age of 18 and the minimum "early retirement age" for Social Security set forth in 42 U.S.C. 416(*l*)(2), and whether the alien's age otherwise makes the alien more or less likely to become a public charge, such as by impacting the alien's ability to work.

(ii) [Reserved]

(2) *The alien's health*—(i) *Standard.* DHS will consider whether the alien's health makes the alien more or less likely to become a public charge, including whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for him- or herself, to attend school, or to work upon admission or adjustment of status.

(ii) *Evidence.* USCIS' consideration includes but is not limited to the following:

(A) A report of an immigration medical examination performed by a civil surgeon or panel physician where such examination is required; or

(B) Evidence of a medical condition that is likely to require extensive

medical treatment or institutionalization after arrival or that will interfere with the alien's ability to provide and care for him or herself, to attend school, or to work upon admission or adjustment of status.

(3) *The alien's family status*—(i) *Standard.* When considering an alien's family status, DHS will consider the alien's household size, as defined in 8 CFR 212.21(d), and whether the alien's household size makes the alien more or less likely to become a public charge.

(ii) [Reserved]

(4) *The alien's assets, resources and financial status*—(i) *Standard.* When considering an alien's assets, resources, and financial status, DHS will consider whether:

(A) The alien's household's annual gross income is at least 125 percent of the most recent Federal Poverty Guidelines based on the alien's household size as defined by § 212.21(d), or if the alien's household's annual gross income is under 125 percent of the recent Federal Poverty Guidelines, whether the total value of the alien's household assets and resources is at least 5 times the difference between the alien's household's gross annual income and the Federal Poverty Guideline for the alien's household size;

(B) The alien has sufficient household assets and resources to cover any reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work; and

(C) The alien has any financial liabilities or past receipt of public benefits as defined in 8 CFR 212.21(b) that make the alien more or less likely to become a public charge.

(ii) *Evidence.* USCIS' consideration includes but is not limited to the following:

(A) The alien's annual gross household income excluding any income from public benefits as defined in 8 CFR 212.21(b);

(B) Any additional income from individuals not included in the alien's household who physically reside with the alien and whose income will be relied on by the alien to meet the standard at 8 CFR 212.22(b)(4)(i);

(C) Any additional income provided to the alien by another person or source not included in the alien's household on a continuing monthly or yearly basis for the most recent calendar year excluding any income from public benefits as defined in 8 CFR 212.21(b);

(D) The household's cash assets and resources, including as reflected in checking and savings account statements covering 12 months prior to filing the application;

(E) The household's non-cash assets and resources that can be converted into cash within 12 months, such as net cash value of real estate holdings minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home; annuities; securities; retirement and educational accounts; and any other assets that can easily be converted into cash;

(F) Whether the alien has:

(*1*) Applied for or received any public benefit, as defined in 8 CFR 212.21(b), on or after [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE]; or

(*2*) Been certified or approved to receive public benefits, as defined in 8 CFR 212.21(b), on or after [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE];

(G) Whether the alien has applied for or has received a fee waiver for an immigration benefit request on or after [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE];

(H) The alien's credit history and credit score; and

(I) Whether the alien has private health insurance or the financial resources to pay for reasonably foreseeable medical costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for him- or herself, to attend school, or to work;

(5) *The alien's education and skills.* (i) *Standard.* When considering an alien's education and skills, DHS will consider whether the alien has adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge, if authorized for employment.

(ii) *Evidence.* USCIS' consideration includes but is not limited to the following:

(A) The alien's history of employment;

(B) Whether the alien has a high school degree (or its equivalent) or higher education;

(C) Whether the alien has any occupational skills, certifications, or licenses; and

(D) Whether the alien is proficient in English or proficient in other languages in addition to English.

(6) *The alien's prospective immigration status and expected period of admission.* (i) *Standard.* The immigration status that the alien seeks

and the expected period of admission as it relates to the alien's ability to financially support for himself or herself during the duration of their stay, including:

(A) Whether the alien is applying for adjustment of status or admission in a nonimmigrant or immigrant classification; and

(B) If the alien is seeking admission as a nonimmigrant, the nonimmigrant classification and the anticipated period of temporary stay.

(ii) [Reserved]

(7) *An affidavit of support, when required under section 212(a)(4) of the Act, that meets the requirements of section 213A of the Act and 8 CFR 213a*—(i) *Standard.* A sufficient affidavit of support must meet the sponsorship and income requirements of section 213A of the Act and comply with 8 CFR 213a.

(A) *Evidence.* USCIS' consideration includes but is not limited to the following:

(*1*) The sponsor's annual income, assets, and resources;

(*2*) The sponsor's relationship to the applicant; and

(*3*) The likelihood that the sponsor would actually provide the statutorily-required amount of financial support to the alien, and any other related considerations.

(c) *Heavily weighed factors.* The factors below will generally weigh heavily in a public charge inadmissibility determination. The mere presence of any one enumerated circumstance is not, alone, determinative.

(1) *Heavily weighed negative factors.* The following factors will generally weigh heavily in favor of a finding that an alien is likely to become a public charge:

(i) The alien is not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history or no reasonable prospect of future employment;

(ii) The alien is currently receiving or is currently certified or approved to receive one or more public benefit, as defined in 212.21(b);

(iii) The alien has received one or more public benefit, as defined in 212.21(b), within the 36 months immediately preceding the alien's application for a visa, admission, or adjustment of status;

(iv)(A) The alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to

provide for him- or herself, attend school, or work; and

(B) The alien is uninsured and has neither the prospect of obtaining private health insurance, or the financial resources to pay for reasonably foreseeable medical costs related to a medical condition; or

(v) The alien had previously been found inadmissible or deportable on public charge grounds.

(2) *Heavily weighed positive factors.* The following factors will generally weigh heavily in favor of a finding that an alien is not likely to become a public charge:

(i) The alien's household has financial assets, resources, and support of at least 250 percent of the Federal Poverty Guidelines for a household of the alien's household size; or

(ii) The alien is authorized to work and is currently employed with an annual income of at least 250 percent of the Federal Poverty Guidelines for a household of the alien's household size.

(d) *Benefits received before [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE].* For purposes of this regulation, DHS will consider as a negative factor any amount of cash assistance for income maintenance, including Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), State and local cash assistance programs that provide benefits for income maintenance (often called ''General Assistance'' programs), and programs (including Medicaid) supporting aliens who are institutionalized for long-term care, received, or certified for receipt, before [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE], as provided under the 1999 Interim Field Guidance, *also known as the 1999 Field Guidance on Deportability and Inadmissibility on Public Charge Grounds.* DHS does not consider any other public benefits received, or certified for receipt, before such date.

### § 212.23    Exemptions and waivers for public charge ground of inadmissibility.

(a) *Exemptions.* The public charge ground of inadmissibility does not apply, based on statutory or regulatory authority, to the following categories of aliens:

(1) Refugees at the time of admission under section 207 of the Act and at the time of adjustment of status to lawful permanent resident under section 209 of the Act;

(2) Asylees at the time of grant under section 208 of the Act and at the time of adjustment of status to lawful permanent resident under section 209 of the Act;

(3) Amerasian immigrants at the time of application for admission as described in sections 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202, 101 Stat. 1329–183, section 101(e) (Dec. 22, 1987), as amended, 8 U.S.C. 1101 note;

(4) Afghan and Iraqi Interpreter, or Afghan or Iraqi national employed by or on behalf of the U.S. Government as described in section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006 Public Law 109–163 (Jan. 6, 2006), as amended, and section 602(b) of the Afghan Allies Protection Act of 2009, Public Law 111–8, title VI (Mar. 11, 2009), as amended, 8 U.S.C. 1101 note, and section 1244(g) of the National Defense Authorization Act for Fiscal Year 2008, as amended Public Law 110–181 (Jan. 28, 2008);

(5) Cuban and Haitian entrants applying for adjustment of status under in section 202 of the Immigration and Control Act of 1986 (IRCA), Public Law 99–603, 100 Stat. 3359 (Nov. 6, 1986), as amended, 8 U.S.C. 1255a note;

(6) Aliens applying for adjustment of status under the Cuban Adjustment Act, Public Law 89–732 (Nov. 2, 1966), as amended, 8 U.S.C. 1255 note;

(7) Nicaraguans and other Central Americans applying for adjustment of status under sections 202(a) and section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100, 111 Stat. 2193 (Nov. 19, 1997), as amended, 8 U.S.C. 1255 note;

(8) Haitians applying for adjustment of status under section 902 of the Haitian Refugee Immigration Fairness Act of 1998, Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), as amended, 8 U.S.C. 1255 note;

(9) Lautenberg parolees as described in section 599E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Public Law 101–167, 103 Stat. 1195, title V (Nov. 21, 1989), as amended, 8 U.S.C. 1255 note;

(10) Special immigrant juveniles as described in section 245(h) of the Act;

(11) Aliens who entered the United States prior to January 1, 1972 and who meet the other conditions for being granted lawful permanent residence under section 249 of the Act and 8 CFR part 249 (Registry);

(12) Aliens applying for or re-registering for Temporary Protected Status as described in section 244 of the Act under section 244(c)(2)(A)(ii) of the Act and 8 CFR 244.3(a);

(13) A nonimmigrant described in section 101(a)(15)(A)(i) and (A)(ii) of the

Act (Ambassador, Public Minister, Career Diplomat or Consular Officer, or Immediate Family or Other Foreign Government Official or Employee, or Immediate Family), pursuant to section 102 of the Act, and 22 CFR 41.21(d);

(14) A nonimmigrant classifiable as C–2 (alien in transit to U.N. Headquarters) or C–3 (foreign government official), 22 CFR 41.21(d);

(15) A nonimmigrant described in section 101(a)(15)(G)(i), (G)(ii), (G)(iii), and (G)(iv), of the Act (Principal Resident Representative of Recognized Foreign Government to International Organization, and related categories), pursuant to section 102 of the Act pursuant to 22 CFR 41.21(d);

(16) A nonimmigrant classifiable as NATO–1, NATO–2, NATO–3, NATO–4 (NATO representatives), and NATO–6 pursuant to 22 CFR 41.21(d);

(17) A nonimmigrant classified under section 101(a)(15)(T) of the Act, in accordance with section 212(d)(13)(A) of the Act;

(18) An applicant for, or individual who is granted, nonimmigrant status under section 101(a)(15)(U) of the Act in accordance with section 212(a)(4)(E)(ii) of the Act;

(19) Nonimmigrants classified under section 101(a)(15)(U) of the Act applying for adjustment of status under section 245(m) of the Act and 8 CFR 245.24;

(20) An alien who is a VAWA self-petitioner under section 212(a)(4)(E)(i) of the Act;

(21) A qualified alien described in section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 8 U.S.C. 1641(c), under section 212(a)(4)(E)(iii) of the Act;

(22) Applicants adjusting status who qualify for a benefit under section 1703 of the National Defense Authorization Act, Public Law 108–136, 117 Stat. 1392 (Nov. 24, 2003), 8 U.S.C. 1151 note (posthumous benefits to surviving spouses, children, and parents);

(23) American Indians born in Canada determined to fall under section 289 of the Act;

(24) Texas Band of Kickapoo Indians of the Kickapoo Tribe of Oklahoma, Public Law 97–429 (Jan. 8, 1983);

(25) Nationals of Vietnam, Cambodia, and Laos applying for adjustment of status under section 586 of Public Law 106–429 under 8 CFR 245.21;

(26) Polish and Hungarian Parolees who were paroled into the United States from November 1, 1989 to December 31, 1991 under section 646(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, Title VI,

Subtitle D (Sept. 30, 1996), 8 U.S.C. 1255 note; and

(27) Any other categories of aliens exempt under any other law from the public charge ground of inadmissibility provisions under section 212(a)(4) of the Act.

(b) *Waiver.* A waiver for the public charge ground of inadmissibility may be authorized based on statutory or regulatory authority, for the following categories of aliens:

(1) Nonimmigrants who were admitted under section 101(a)(15)(T) of the Act applying for adjustment of status under section 245(l)(2)(A) of the Act;

(2) Applicants for admission as nonimmigrants under 101(a)(15)(S) of the Act;

(3) Nonimmigrants admitted under section 101(a)(15)(S) of the Act applying for adjustment of status under section 245(j) of the Act (witnesses or informants); and

(4) Any waiver of public charge inadmissibility that is authorized under law or regulation.

§ 212.24   Valuation of monetizable benefits.

In determining the cumulative value of one or more monetizable benefits listed in 8 CFR 212.21(b)(1)(ii) for purposes of a public charge inadmissibility determination under 8 CFR 212.22, DHS will rely on benefit-specific methodology as follows:

(a) With respect to the Supplemental Nutrition Assistance Program (SNAP, formerly called ''Food Stamps''), 7 U.S.C. 2011 to 2036c, DHS will calculate the value of the benefit attributable to the alien in proportion to the total number of people covered by the benefit, based on the amount(s) deposited within the applicable period of 12 consecutive months in which the benefits are received in the Electronic Benefits Transfer (EBT) card account;

(b) With respect to the Section 8 Housing Assistance under the Housing Choice Voucher Program, as administered by HUD under 24 CFR part 984; 42 U.S.C. 1437f and 1437u, DHS will calculate value of the voucher attributable to the alien in proportion to the total number of people covered by the benefit, based on the amount(s) within the applicable period of 12 consecutive months in which the benefits are received;

(c) With respect to Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation) under 24 CFR parts 5, 402, 880–884 and 886, DHS will calculate the value of the rental assistance attributable to the alien in proportion to the total number of people covered by the benefit, based on the

amount(s) received within the applicable period of 12 consecutive months in which the benefits are received; and

(d) With respect to any cash benefit received by the alien on a household (rather than individual) basis, DHS will calculate the value of the benefit attributable to the alien in proportion to the total number of people covered by the benefit, based on the amount(s) received within the applicable period of 12 consecutive months in which the benefit is received.

## PART 213—PUBLIC CHARGE BONDS

■ 6. The authority citation for part 213 is revised to read as follows:

**Authority:** 8 U.S.C. 1103; 1183; 8 CFR part 2.

■ 7. Revise the part heading to read as set forth above.

■ 8. Revise § 213.1 to read as follows:

§ 213.1   Adjustment of status of aliens on submission of a public charge bond.

(a) *Inadmissible aliens.* In accordance with section 213 of the Act, after an alien seeking adjustment of status has been found inadmissible as likely to become a public charge under section 212(a)(4) of the Act, DHS may allow the alien to submit a public charge bond, if the alien is otherwise admissible, in accordance with the requirements of 8 CFR 103.6 and this section. The public charge bond submitted on the alien's behalf must meet the conditions set forth in 8 CFR 103.6 and this section.

(b) *Discretion.* The decision to allow an alien inadmissible under section 212(a)(4) of the Act to submit a public charge bond is in DHS's discretion. If an alien has one or more heavily weighed negative factors as defined in 8 CFR 212.22 present in his or her case, DHS generally will not favorably exercise discretion to allow submission of a public charge bond.

(c) *Public Charge Bonds.* (1) *Types.* DHS may require an alien to submit a surety bond, or cash or any cash equivalent, as listed in 8 CFR 103.6, and agreement, to secure a bond. DHS will notify the alien of the type of bond that may be submitted. All bonds, and agreements covering cash or cash equivalents, as listed in 8 CFR 103.6, to secure a bond, must be executed on a form designated by DHS and in accordance with form instructions. When a surety bond is accepted, the bond must comply with requirements applicable to surety bonds in 8 CFR 103.6 and this section. If cash or a cash equivalent, as listed in 8 CFR 103.6, is being provided to secure a bond, DHS

must issue a receipt on a form designated by DHS.

(2) *Amount.* Any public charge bond, or agreements to secure a public charge bond on cash or cash equivalents, as listed in 8 CFR 103.6, must be in an amount decided by DHS, not less than $10,000, annually adjusted for inflation based on the Consumer Price Index for All Urban Consumers (CPI–U), and rounded up to the nearest dollar. The bond amount may not be appealed by the alien or the obligor.

(d) *Conditions of the bond.* A public charge bond must remain in effect until the alien naturalizes or otherwise obtains U.S. citizenship, permanently departs the United States, or dies, the alien requests cancellation after 5 years of being a lawful permanent resident, the alien changes immigration status to one not subject to public charge ground of inadmissibility, and the bond is cancelled in accordance with paragraph (g) of this section. An alien on whose behalf a public charge bond has been submitted may not receive any public benefits, as defined in 8 CFR 212.21(b), after the alien's adjustment of status to that of a lawful permanent resident, until the bond is cancelled in accordance with paragraph (g) of this section. An alien must also comply with any other conditions imposed as part of the bond.

(e) *Submission.* A public charge bond may be submitted on the alien's behalf only after DHS notifies the alien and the alien's representative, if any, that a bond may be submitted. The bond must be submitted to DHS in accordance with the instructions of the form designated by DHS for this purpose, with the fee prescribed in 8 CFR 103.7(b), and any procedures contained in the DHS notification to the alien. DHS will specify the bond amount and duration, as well as any other conditions, as appropriate for the alien and the immigration benefit being sought. USCIS will notify the alien and the alien's representative, if any, that the bond has been accepted, and will provide a copy to the alien and the alien's representative, if any, of any communication between the obligor and the U.S. government. An obligor must notify DHS within 30 days of any change in the obligor's or the alien's physical and mailing address.

(f) *Substitution.* A bond not eligible for cancellation under paragraph (g) of this section must be substituted prior to the expiration of the validity of the bond previously submitted to DHS.

(1) *Substitution Process.* Either the obligor of the bond previously submitted to DHS or a new obligor may submit a substitute bond on the alien's behalf. If the bond previously submitted to DHS is a limited duration bond because it expires on a date certain, the substitute bond must be submitted no later than 180 days before the bond previously submitted to USCIS expires and the substitute bond must be valid and effective on or before the day the bond previously submitted to DHS expires. If the bond previously submitted to DHS is a bond of unlimited duration because it does not bear a specific end date, the substitute bond must specify an effective date. The substitute bond must meet all of the requirements applicable to the initial bond as required by this section and 8 CFR 103.6, and if the obligor is different from the original obligor, the new obligor must assume all liabilities of the initial obligor. The substitute bond must also cover any breach of the bond conditions which occurred before DHS accepted the substitute bond, in the event DHS did not learn of the breach until after the expiration or cancellation of the bond previously submitted to DHS.

(2) *Acceptance.* Upon submission of the substitute bond, DHS will review the substitute bond for sufficiency. If the bond on file has not yet expired, DHS will cancel the bond previously submitted to DHS, and replace it with the substitute bond, provided the substitute bond is sufficient. If the substitute bond was submitted before the previously submitted bond expired, but is insufficient, DHS will notify the obligor of the substitute bond to correct the deficiency within the timeframe specified in the notice. If the deficiency is not corrected within the timeframe specified, and the previously submitted bond has not yet expired, the previously submitted bond will remain in effect.

(g) *Cancellation of the Public Charge Bond.* (1) An alien or obligor may request that DHS cancel a public charge bond if the alien:

(i) Naturalized or otherwise obtained United States citizenship;

(ii) Permanently departed the United States;

(iii) Died;

(iv) Reached his or her 5-year anniversary since becoming a lawful permanent resident; or

(v) Obtained a different immigration status not subject to public charge inadmissibility, as listed in 8 CFR 212.23, following the grant of lawful permanent resident status associated with the public charge bond.

(2) *Permanent Departure Defined.* For purposes of this section, permanent departure means that the alien lost or abandoned his or her lawful permanent resident status, whether by operation of law or voluntarily, and physically departed the United States. An alien is only deemed to have voluntarily lost lawful permanent resident status when the alien has submitted a record of abandonment of lawful permanent resident status, on the form prescribed by DHS, in accordance with the form's instructions.

(3) *Cancellation Request.* An alien must request that a public charge bond be cancelled by submitting a form designated by DHS, in accordance with that form's instructions and the fee prescribed in 8 CFR 103.7(b). If a request for cancellation of a public charge bond is not filed, the bond shall remain in effect until the form is filed, reviewed, and a decision is rendered.

(4) *Adjudication and Burden of Proof.* The alien and the obligor have the burden to establish, by a preponderance of the evidence, that one of the conditions for cancellation of the public charge bond listed in paragraph (g)(1) of this section has been met. If DHS determines that the information included in the cancellation request is insufficient to determine whether cancellation is appropriate, DHS may request additional information as outlined in 8 CFR 103.2(b)(8). DHS must cancel a public charge bond if DHS determines that the conditions of the bond have been met, and that the bond was not breached, in accordance with paragraph (h) of this section. For cancellations under paragraph (g)(1)(iv) of this section, the alien or the obligor must establish that the public charge bond has not been breached during the 5-year period preceding the alien's fifth anniversary of becoming a lawful permanent resident.

(5) *Decision.* DHS will notify the obligor, the alien, and the alien's representative, if any, of its decision regarding the request to cancel the public charge bond. When the public charge bond is cancelled, the obligor is released from liability. If the public charge bond has been secured by a cash deposit or a cash equivalent, DHS will refund the cash deposit to the obligor. If DHS denies the request to cancel the bond, DHS will notify the obligor and the alien, and the alien's representative, if any, of the reasons why, and of the right of the obligor to appeal in accordance with the requirements of 8 CFR part 103, subpart A. An obligor may file a motion pursuant to 8 CFR 103.5 after an unfavorable decision on appeal. Neither the alien nor the alien's representative may appeal a denial to cancel the public charge bond or file a motion.

(h) *Breach*—(1) *Breach and Claim in Favor of the United States.* An

**Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules    **51295**

administratively final determination that a bond has been breached creates a claim in favor of the United States. Such claim may not be released or discharged by an immigration officer. A breach determination is administratively final when the time to file an appeal with the Administrative Appeals Office (AAO) pursuant to 8 CFR part 103, subpart A, has expired or when the appeal is dismissed or rejected.

(2) *Breach of Bond Conditions.* (i) The conditions of the bond are breached if the alien has received public benefits, as defined in 8 CFR 212.21(b), after the alien's adjustment of status to that of a lawful permanent resident and before the bond is cancelled under paragraph (g) of this section. Public benefits, as defined in 8 CFR 212.21(b), received during periods while an alien is present in the United States in a category that is exempt from the public charge ground of inadmissibility, as set forth in 8 CFR 212.23, following the initial grant of status as a lawful permanent resident, and public benefits received after the alien obtained U.S. citizenship, may not be considered when determining whether the conditions of the bond have been breached. DHS will not consider any benefits, as defined in 8 CFR 212.21 (b)(1) through (b)(3), received by an alien who, at the time of receipt filing, adjudication or bond breach or cancellation determination, is enlisted in the U.S. armed forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or if received by such an individual's spouse or child as defined in section 101(b) of the Act.; or

(ii) The conditions of the bond otherwise imposed by DHS as part of the public charge bond are breached.

(3) *Adjudication.* DHS will determine whether the conditions of the bond have been breached. If DHS determines that it has insufficient information from the benefit granting agency to determine whether a breach occurred, DHS may request additional information from the benefit granting agency. If DHS determines that it has insufficient information from the alien or the obligor, it may request additional information as outlined in 8 CFR part 103 before making a breach determination. If DHS intends to declare a bond breached based on information that is not otherwise protected from disclosure to the obligor, DHS will disclose such information to the obligor to the extent permitted by law, and provide the obligor with an opportunity to respond and submit rebuttal evidence, including specifying a deadline for a response. DHS will send

a copy of this notification to the alien and the alien's representative, if any. After the obligor's response, or after the specified deadline has passed, DHS will make a breach determination.

(4) *Decision.* DHS will notify the obligor and the alien, and the alien's representative, if any, of the breach determination. If DHS determines that a bond has been breached, DHS will inform the obligor of the right to appeal in accordance with the requirements of 8 CFR part 103, subpart A. The obligor may only file a motion in accordance with 8 CFR 103.5 of an unfavorable decision on appeal. The alien or the alien's representative, if any, may not appeal the breach determination or file a motion.

(5) *Demand for Payment.* Demands for amounts due under the terms of the bond will be sent to the obligor or any agent/co-obligor after a declaration of breach becomes administratively final.

(6) *Amount of Bond Breach and Effect on Bond.* The bond must be considered breached in the full amount of the bond.

(i) *Exhaustion of administrative remedies.* Unless administrative appeal is precluded by regulation, a party has not exhausted the administrative remedies available with respect to a public charge bond under this section until the party has obtained a final decision in an administrative appeal under 8 CFR part 103, subpart A.

(ii) [Reserved]

## PART 214—NONIMMIGRANT CLASSES

■ 9. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 10. Section 214.1 is amended by:
■ a. Adding paragraph (a)(3)(iv);
■ b. Removing the term, ''and'' in paragraph (c)(4)(iii);
■ c. Redesignating paragraph (c)(4)(iv) as paragraph (c)(4)(v); and
■ d. Adding a new paragraph (c)(4)(iv). The additions read as follows:

### § 214.1 Requirements for admission, extension, and maintenance of status.

(a) * * *
(3) * * *

(iv) Except where the nonimmigrant classification for which the alien applies, or seeks to extend, is exempt from section 212(a)(4) of the Act or that

section has been waived, as a condition for approval of extension of status, the alien must demonstrate that he or she has not received since obtaining the nonimmigrant status he or she seeks to extend, is not receiving, nor is likely to receive, a public benefit as defined in 8 CFR 212.21(b). For the purposes of this determination, DHS will consider such public benefits received on or after [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE]. In assessing whether the alien has met his or her burden, DHS will consider the nonimmigrant classification the alien is seeking to extend, the reasons for seeking the extension of stay and the expected period of stay. For purposes of this determination, DHS may require the submission of a declaration of self-sufficiency on a form designated by DHS, in accordance with form instructions.

* * * * *

(c) * * *
(4) * * *

(iv) As set forth in 8 CFR 214.1(a)(3)(iv), except where the alien's nonimmigrant classification is exempted by law from section 212(a)(4) of the Act, the alien has not received since obtaining the nonimmigrant status for which he or she seeks to extend, is not currently receiving, nor is likely to receive, public benefits as described in in 8 CFR 212.21(b). For the purposes of this determination, DHS will consider public benefits received on or after [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE]; and

* * * * *

## PART 245—ADJUSTMENT OF STATUS TO THAT OF A PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 11. The authority citation for part 245 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 12. Section 245.4 is amended by redesignating the undesignated text as paragraph (a) and adding paragraph (b) to read as follows:

### § 245.4 Documentary requirements.

* * * * *

(b) For purposes of public charge determinations under section 212(a)(4) of the Act and 8 CFR 212.22, an alien who is seeking adjustment of status under this part must submit a declaration of self-sufficiency on a form designated by DHS, in accordance with form instructions.

## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 13. The authority citation for part 248 continues to read as follows:

 **Authority:** 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

■ 14. Section 248.1 is amended by:
■ a. Revising paragraph (a);
■ b. Redesignating paragraphs (b) through (e) as paragraphs (c) through (f), respectively; and
■ c. Adding a new paragraph (b); and
■ d. Revising newly redesignated paragraph (c)(4).

 The revisions and additions read as follows:

### § 248.1  Eligibility.

(a) *General.* Except for those classes enumerated in § 248.2 of this part, any alien lawfully admitted to the United States as a nonimmigrant, including an alien who acquired such status in accordance with section 247 of the Act, 8 U.S.C. 1257, who is continuing to maintain his or her nonimmigrant status, may apply to have his or her nonimmigrant classification changed to any nonimmigrant classification other than that of a spouse or fiance(e), or the child of such alien, under section 101(a)(15)(K) of the Act, 8 U.S.C.

1101(a)(15)(K), or as an alien in transit under section 101(a)(15)(C) of the Act, 8 U.S.C. 1101(a)(15)(C). Except where the nonimmigrant classification to which the alien seeks to change is exempted by law from section 212(a)(4) of the Act, as a condition for approval of a change of nonimmigrant status, the alien must demonstrate that he or she has not received since obtaining the nonimmigrant status from which he or she seeks to change, is not currently receiving, nor is likely to receive, public benefits as described in 8 CFR 212.21(b). DHS will consider public benefits received on or after [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE]. An alien defined by section 101(a)(15)(V), or 101(a)(15)(U) of the Act, 8 U.S.C. 1101(a)(15)(V) or 8 U.S.C. 1101(a)(15)(U), may be accorded nonimmigrant status in the United States by following the procedures set forth in 8 CFR 214.15(f) and 214.14, respectively.

(b) *Decision in change of status proceedings.* Where an applicant or petitioner demonstrates eligibility for a requested change of status, it may be granted at the discretion of DHS. There is no appeal from the denial of an application for change of status.

(c) * * *

(4) As a condition for approval, an alien seeking to change nonimmigrant classification must demonstrate that he or she has not received since obtaining the nonimmigrant status from which he or she seeks to change, is not receiving, nor is likely to receive, a public benefit as defined in 8 CFR 212.21(b). For purposes of this determination, DHS will consider such benefits received on or after [DATE 60 DAYS FROM DATE OF PUBLICATION OF THE FINAL RULE]. In assessing whether the alien has met his or her burden, DHS will consider the prospective nonimmigrant classification, the reasons for seeking the change of status, and the expected period of stay. DHS may require the submission of a declaration of self-sufficiency on a form designated by DHS, in accordance with form instructions. This provision does not apply to classes of nonimmigrants who are explicitly exempt by law from section 212(a)(4) of the Act.

* * * * *

**Kirstjen M. Nielsen,**

*Secretary.*

[FR Doc. 2018–21106 Filed 10–5–18; 8:45 am]

**BILLING CODE 4410–10–P**

**41292** Federal Register / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, 213, 214, 245 and 248**

[CIS No. 2637–19; DHS Docket No. USCIS–2010–0012]

RIN 1615–AA22

## Inadmissibility on Public Charge Grounds

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends DHS regulations by prescribing how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible to the United States under section 212(a)(4) of the Immigration and Nationality Act (INA or the Act), because he or she is likely at any time to become a public charge. The final rule includes definitions of certain terms critical to the public charge determination, such as "public charge" and "public benefit," which are not defined in the statute, and explains the factors DHS will consider in the totality of the circumstances when making a public charge inadmissibility determination. The final rule also addresses USCIS' authority to issue public charge bonds under section 213 of the Act in the context of applications for adjustment of status. Finally, this rule includes a requirement that aliens seeking an extension of stay or change of status demonstrate that they have not, since obtaining the nonimmigrant status they seek to extend or change, received public benefits over the designated threshold, as defined in this rule.

This rule does not create any penalty or disincentive for past, current, or future receipt of public benefits by U.S. citizens or aliens whom Congress has exempted from the public charge ground of inadmissibility. This rule does not apply to U.S. citizens, even if the U.S. citizen is related to an alien subject to the public charge ground of inadmissibility. The rule also does not apply to aliens whom Congress exempted from the public charge ground of inadmissibility (such as asylees, refugees, or other vulnerable populations listed as exempt in this final rule). Nor does this rule apply to aliens for whom DHS has statutory discretion to waive this ground of inadmissibility, if DHS has exercised such discretion.

In addition, this includes special provisions for how DHS will consider the receipt of public benefits, as defined in this rule, by certain members of the U.S. Armed Forces and their families; certain international adoptees; and receipt of Medicaid in certain contexts, especially by aliens under the age of 21, pregnant women (and women for up to 60 days after giving birth), and for certain services funded by Medicaid under the Individuals with Disabilities Education Act (IDEA) or in a school setting. Aliens who might qualify for these exemptions should study the rule carefully to understand how the exemptions work.

This final rule also clarifies that DHS will only consider public benefits received directly by the alien for the alien's own benefit, or where the alien is a listed beneficiary of the public benefit. DHS will not consider public benefits received on behalf of another. DHS also will not attribute receipt of a public benefit by one or more members of the alien's household to the alien unless the alien is also a listed beneficiary of the public benefit.

This final rule supersedes the 1999 Interim Field Guidance on Deportability and Inadmissibility on Public Charge Grounds.

**DATES:** This final rule is effective at 12:00 a.m. Eastern Time on October 15, 2019. DHS will apply this rule only to applications and petitions postmarked (or, if applicable, submitted electronically) on or after the effective date. Applications and petitions already pending with USCIS on the effective date of the rule (i.e., were postmarked before the effective date of the rule and were accepted by USCIS) will not be subject to the rule.

**FOR FURTHER INFORMATION CONTACT:** Mark Phillips, Residence and Naturalization Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts NW, Washington, DC 20529–2140; telephone 202–272–8377.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Proposed Rule
  D. Summary of Changes in the Final Rule
  1. Definitions
  2. Public Benefits
  3. Applicability to Nonimmigrants
  4. Totality of the Circumstances Determination
  5. Public Charge Bond for Adjustment of Status Applicants
  6. Other Changes
  E. Summary of Costs and Benefits
II. Background
  A. Public Charge Inadmissibility and Public Charge Bonds
  B. Current Public Charge Standards
  C. Final Rule
III. Public Comments on the Proposed Rule
  A. Summary of Public Comments
  B. Requests To Extend Comment Period
  C. Comments Expressing General Support for the NPRM
  D. Comments Expressing General Opposition to the NPRM
  1. Purpose of the Rule and Self Sufficiency
  2. Requests for Reconsideration and Withdrawal of NPRM
  3. Alternatives to the Public Charge Rule
  4. Discrimination and Disparate Impact
  5. Potential Disenrollment Impacts
  • Choice Between Public Benefits and Immigration Status
  • General Assertions as to Effects
  • Housing Benefit-Related Effects
  • Food and Nutrition Benefit-Related Effects
  • Health Benefit-Related Effects
  • Effects on Vulnerable Populations
  • Effects on U.S. Citizens
  • Increased Costs to Health Care Providers, States, and Localities
  6. Inconsistent With American Values and Historic Commitment to Immigrants
  7. Contributions to American Society and Consideration of Self-Sufficiency
  8. Adjudication and Processing
  9. Privacy Concerns
  E. General Comments Regarding Legal Authority and Statutory Provisions
  1. Lack of Statutory Authority/Inconsistent With Congressional Intent
  2. Additional Legal Arguments
  a. Allegations That the Rule Is Arbitrary and Capricious
  b. Alternatives
  c. Retroactivity
  d. Due Process/Vagueness and Equal Protection
  e. Coordination With Other Federal Agencies
  f. International Law and Related Issues
  g. Contract Law
  F. Applicability of the Public Charge Ground of Inadmissibility, and the Public Benefit Condition to Extension of Stay and Change of Status
  1. Applicability of the Public Charge Ground of Inadmissibility Generally
  2. Applicability and Content of the Public Benefits Condition
  a. Nonimmigrant Students and Exchange Visitors
  b. Workers
  c. Compact of Free Association Migrants
  3. Exemptions and Waivers With Respect to the Rule Generally
  a. General Comments
  b. Special Immigrant Juvenile
  c. Certain Employment Based Preference Categories, or National Interest Waiver
  d. Violence Against Women Act, T, and U
  4. Summary of Applicability, Exemptions, and Waivers
  G. Definitions
  1. Public Charge
  a. Threshold Standard
  "Primarily dependent" Based on Cash Public Benefit Receipt or Long-Term Institutionalization at Government Expense
  b. Standards for Monetizable and Non-Monetizable Benefits

Numerical Percentage Threshold
Valuation
Alternatives to the Duration Standard
Combination Standard
2. Public Benefits
a. Specific Groups and Public Benefits
Individuals With Disabilities
Vulnerable Populations
Receipt of Public Benefits by Children
b. Supplemental Security Income
c. Temporary Assistance for Needy
Families
d. State, Local and Tribal Cash Assistance
e. Supplemental Nutrition Assistance
Program
CalFresh
f. Housing
g. Institutionalization
h. Medicaid
Individuals With Disabilities Education
Act
Emergency Services Exclusion
Vaccinations
Substance Abuse
i. Medicare, Medicare Part D Low Income
Subsidy
j. Additional Considerations
Exhaustive List
Additional Programs
Dependents
Tax Credits
Special Supplemental Nutrition Program
for Women, Infants, and Children
School Breakfast/Lunch Programs
State and Local Benefits
Head Start
Healthy Start, The Emergency Food
Assistance Program, and Similar
Programs
Pell Grants
Children's Health Insurance Program
Disaster Supplemental Nutrition
Assistance
Social Security Disability Insurance
3. Likely at Any Time To Become a Public
Charge
4. Household
H. Public Charge Inadmissibility
Determination Based on Totality of
Circumstances
I. Age
1. Standard
2. Age Discrimination
J. Health
1. Standard
2. Health and Disability Discrimination
K. Family Status
L. Assets, Resources, and Financial Status
1. Income Standard
2. Evidence of Assets and Resources
3. Public Benefits
4. Fee Waivers for Immigration Benefits
5. Credit Report and Score
6. Financial Means To Pay for Medical
Costs
M. Education and Skills
1. Education
2. Language Proficiency
3. Skills
4. Employment
N. Affidavit of Support
O. Additional Factors To Consider
P. Heavily Weighted Factors General
Comments
Q. Heavily Weighted Negative Factors
1. Lack of Employability

2. Current Receipt of One or More Public
Benefit
3. Receipt of Public Benefits Within 36
Months Before Filing
4. Financial Means To Pay for Medical
Costs
5. Alien Previously Found Inadmissible or
Deportable Based on Public Charge
R. Heavily Weighted Positive Factors
1. Proposed Standard
2. Additional Positive Heavily Weighted
Factors
a. Affidavit of Support
b. Family Relationships
c. English Ability
d. Education
e. Private Health Insurance
f. Work History
g. Receipt of Grants, Contracts, and
Licensures
h. Caregivers
i. Ability To Work in the Future
S. Public Charge Bonds for Adjustment of
Status Applicants
1. Standard
2. Bond Amount
3. Public Charge Bond Cancellation
4. Breach of Public Charge Bond
T. Effective Date(s)
Benefits Received Before Effective Date and
Previously Excluded Benefits
U. Other Comments
V. Public Comments and Responses to the
NPRM's Statutory and Regulatory
Requirements Section
1. Comments on Costs and Benefits
a. Population Seeking Extension of Stay or
Change of Status
b. Other Comments on Affected Population
c. Determination of Inadmissibility Based
on Public Charge Grounds
d. Other Comments on Baseline Estimates
e. Costs to Applicants To Adjust Status
f. Lack of Clarity
g. Other Comments on Costs to Applicants
h. Costs Related to Public Charge Bond
i. Costs Related to Program Changes and
Public Inquiries
j. Costs Related to States and Local
Governments, and Public Benefit-
Granting Agencies
k. Regulatory Familiarization Costs
l. Costs to the Federal Government
m. Costs to Non-Citizens and Their
Communities
n. Healthcare-Related Costs
o. Housing and Homelessness-Related
Costs
p. Economic Costs
r. Economic Impact and Job Loss
s. Economic Impact on Healthcare System
t. Impact on U.S. Workforce
u. Economic Impacts Related to Nutrition
Programs
v. Other Economic Impacts
w. DHS Estimates of Discounted Direct
Costs and Reduced Transfer Payments
x. Benefits of Proposed Regulatory Changes
y. Cost Benefit Analysis Issues
2. Federalism Comments
3. Family Assessment Comments
4. Paperwork Reduction Act Comments
IV. Statutory and Regulatory Requirements
A. Executive Order 12866 (Regulatory
Planning and Review), Executive Order
13563 (Improving Regulation and

Regulatory Review), and Executive Order
13771 (Reducing Regulation and
Controlling Regulatory Costs)
1. Summary
B. Regulatory Flexibility Act
1. Final Regulatory Flexibility Analysis
a. A Statement of the Need for, and
Objectives of, the Rule
b. A statement of the significant issues
raised by the public comments in
response to the initial regulatory
flexibility analysis, a statement of the
assessment of the agency of such issues,
and a statement of any changes made in
the proposed rule as a result of such
comments.
c. The response of the agency to any
comments filed by the Chief Counsel for
Advocacy of the Small Business
Administration in response to the
proposed rule, and a detailed statement
of any change made to the proposed rule
in the final rule as a result of the
comments.
d. A description of and an estimate of the
number of small entities to which the
rule will apply or an explanation of why
no such estimate is available.
e. A description of the projected reporting,
recordkeeping, and other compliance
requirements of the rule, including an
estimate of the classes of small entities
that will be subject to the requirement
and the type of professional skills
necessary for preparation of the report or
record.
f. Description of the steps the agency has
taken to minimize the significant
economic impact on small entities
consistent with the stated objectives of
applicable statutes, including a
statement of factual, policy, and legal
reasons for selecting the alternative
adopted in the final rule and why each
one of the other significant alternatives
to the rule considered by the agency
which affect the impact on small entities
was rejected.
C. Congressional Review Act
D. Unfunded Mandates Reform Act
E. Executive Order 13132 (Federalism)
F. Executive Order 12988 (Civil Justice
Reform)
G. Executive Order 13175 Consultation and
Coordination With Indian Tribal
Governments
H. Family Assessment
I. National Environmental Policy Act
(NEPA)
J. Paperwork Reduction Act
V. List of Subjects and Regulatory
Amendments

Table of Abbreviations

AAO—Administrative Appeals Office
ACA—Affordable Care Act
ACTC—Additional Child Tax Credit
AFM—Adjudicator's Field Manual
ASEC—Annual Social and Economic
Supplement of the Current Population
Survey
BIA—Board of Immigration Appeals
BLS—U.S. Bureau of Labor Statistics
CDC—Centers for Disease Control and
Prevention
CBP—U.S. Customs and Border Protection

CFR—Code of Federal Regulations
CHIP—Children's Health Insurance Program
CNMI—Commonwealth of the Northern Mariana Islands
DACA—Deferred Action for Childhood Arrivals
DD Act—The Developmental Disabilities Assistance and Bill of Rights Act of 2000
DHS—U.S. Department of Homeland Security
DOJ—U.S. Department of Justice
DOS—U.S. Department of State
EITC—Earned Income Tax Credit
E.O.—Executive Order
EOIR—Executive Office for Immigration Review
FAM—Foreign Affairs Manual FCRA—Fair Credit Reporting Act
FPG—Federal Poverty Guidelines
FPL—Federal Poverty Level
Form DS–2054—Medical Examination for Immigrant or Refugee Applicant
Form I–129—Petition for a Nonimmigrant Worker
Form I–129CW—Petition for a CNMI-Only Nonimmigrant Transitional Worker
Form I–130—Petition for Alien Relative
Form I–140—Immigrant Petition for Alien Workers
Form I–290B—Notice of Appeal or Motion
Form I–356—Request for Cancellation of Public Charge Bond
Form I–407—Record of Abandonment of Lawful Permanent Resident Status
Form I–485—Application to Register Permanent Residence or Adjust Status
Form I–539—Application to Extend/Change Nonimmigrant Status
Form I–539A—Supplemental Information for Application to Extend/Change Nonimmigrant Status
Form I–600—Petition to Classify Orphan as an Immediate Relative
Form I–601—Application for Waiver of Grounds of Inadmissibility
Form I–693—Report of Medical Examination and Vaccination Record Form
I–800—Petition to Classify Convention Adoptee as an Immediate Relative
Form I–864—Affidavit of Support Under Section 213A of the INA
Form I–864A—Contract Between Sponsor and Household Member
Form I–864EZ—Affidavit of Support Under Section 213A of the Act
Form I–864P—HHS Poverty Guidelines for Affidavit of Support
Form I–864W—Request for Exemption for Intending Immigrant's Affidavit of Support
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
Form I–944—Declaration of Self-Sufficiency
Form I–945—Public Charge Bond
Form N–600—Application for Certificate of Citizenship
Form N–600K—Application for Citizenship and Issuance of Certificate Under Section 322
GA—General Assistance
GAO—U.S. Government Accountability Office
HHS—U.S. Department of Health and Human Services
HOPWA—Housing Opportunities for Persons with AIDS
HCV—Housing Choice Voucher

ICE—U.S. Immigration and Customs Enforcement
IEFA—Immigration Examinations Fee Account
IIRIRA—Illegal Immigration Reform and Immigrant Responsibility Act of 1996
INA—Immigration and Nationality Act
INS—Immigration and Naturalization Service
IRCA—Immigration Reform and Control Act of 1986
IRS—Internal Revenue Service
LIHEAP—Low Income Home Energy Assistance Program
LIS—Medicare Part D Low Income Subsidy
LPR—Lawful Permanent Resident
NEPA—National Environmental Policy Act of 1969
NHE—National Health Expenditure
NOID—Notice of Intent to Deny
NPRM—Notice of Proposed Rulemaking
PRA—Paperwork Reduction Act
PTC—Premium Tax Credit
PRWORA—Personal Responsibility and Work Opportunity Reconciliation Act of 1996
RFE—Request for Evidence
RFRA—Religious Freedom Restoration Act
SAVE—Systematic Alien Verification for Entitlements Secretary—Secretary of Homeland Security
SIPP—Survey of Income and Program Participation
SNAP—Supplemental Nutrition Assistance Program
SORN—System of Records Notice
SSA—Social Security Administration
SSI—Supplemental Security Income
TANF—Temporary Assistance for Needy Families
TPS—Temporary Protected Status
USDA—U.S. Department of Agriculture
U.S.C.—United States Code
USCIS—U.S. Citizenship and Immigration Services
VAWA—Violence Against Women Act
VAWA 2013—Violence Against Women Reauthorization Act of 2013
WAP—Weatherization Assistance Program
WIC—Special Supplemental Nutrition Program for Women, Infants, and Children

## I. Executive Summary

### A. Purpose of the Regulatory Action

This rule changes how the Department of Homeland Security (DHS) interprets and implements the public charge ground of inadmissibility.[1] The Immigration and Nationality Act (INA or the Act) renders inadmissible and therefore (1) ineligible for a visa, (2) ineligible for admission and (3) ineligible for adjustment of status, any alien [2] who, in the opinion of the DHS (or the Departments of State (DOS) or Justice (DOJ), as applicable),[3]

is likely at any time to become a public charge.[4] The statute does not define the term "public charge," but in a related statute, Congress has articulated a national policy that (1) "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations," and (2) "the availability of public benefits not constitute an incentive for immigration to the United States." [5] In addition, the public charge statute provides that in making the inadmissibility determination, administering agencies must "at a minimum consider the alien's age; health; family status; assets, resources, and financial status; and education and skills." [6] The agencies may also consider any affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, *i.e.,* Form I–864, Affidavit of Support Under Section 213A of the INA, submitted on the alien's behalf.[7]

Since 1999, the prevailing approach to public charge inadmissibility has been dictated primarily by the May 26, 1999, *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* (1999 Interim Field Guidance), issued by the former Immigration and Naturalization Service (INS).[8] Under

inadmissibility, each in a different context or contexts. DHS primarily applies the public charge ground of inadmissibility at ports of entry and when adjudicating certain applications for adjustment of status. This rule amends the standards applicable to those contexts, and also sets forth evidentiary requirements applicable to the adjustment of status context.

DOS Consular officers are responsible for applying the public charge ground of inadmissibility as part of the visa application process and for determining whether a visa applicant is ineligible for a visa on public charge grounds. This rule does not directly revise DOS standards or processes. DHS is working with DOS to ensure that the Foreign Affairs Manual appropriately reflects the standards in this rule.

DOJ is responsible for applying the public charge ground of inadmissibility in immigration court, where DHS may bring and prosecute the charge against certain inadmissible aliens. Immigration judges adjudicate matters in removal proceedings, and the Board of Immigration Appeals and in some cases the Attorney General adjudicate appeals arising from such proceedings. This rule does not directly revise DOJ standards or processes. DHS understands that the DOJ plans to conduct rulemaking to ensure that the standards applied in immigration court are consistent with the standards in this rule.

---

[1] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[2] Congress has by statute exempted certain categories of aliens, such as asylees and refugees, from the public charge ground of inadmissibility. *See, e.g.,* INA sections 207(c)(3) and 209(c), 8 U.S.C. 1157(c)(3), 1159(c). A full list of exemptions is included in this rule.

[3] Three different agencies are responsible for applying the public charge ground of

[4] *See* INA section 212(a)(4)(A), 8 U.S.C. 1182(a)(4)(A).

[5] *See* 8 U.S.C. 1601(2).

[6] *See* INA section 212(a)(4)(B)(i), 8 U.S.C. 1182(a)(4)(B)(i).

[7] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii).

[8] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689 (May 26, 1999). Due to a printing error, the **Federal Register** version of the field guidance

that approach, "public charge" has been interpreted to mean a person who is "primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." [9] As a consequence, an alien's reliance on or receipt of non-cash benefits such as the Supplemental Nutrition Assistance Program (SNAP), or food stamps; Medicaid; and housing vouchers and other housing subsidies are not currently considered by DHS in determining whether an alien is deemed likely at any time to become a public charge.

DHS is revising its interpretation of "public charge" to incorporate consideration of such benefits, and to better ensure that aliens subject to the public charge inadmissibility ground are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rather rely on their own capabilities, as well as the resources of family members, sponsors, and private organizations.[10] This rule redefines the term "public charge" to mean an alien who receives one or more designated public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). This rule defines the term "public benefit" to include cash benefits for income maintenance, SNAP, most forms of Medicaid, Section 8 Housing Assistance under the Housing Choice Voucher (HCV) Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing. DHS has tailored the rule to limit its effects in certain ways, such as for active duty military members and their families, and children in certain contexts.

This rule also explains how DHS will interpret the minimum statutory factors for determining whether "in the opinion of" [11] the officer, the alien is likely at any time to become a public charge. Specifically, the rule contains a list of negative and positive factors that DHS will consider as part of this determination, and directs officers to consider these factors in the totality of the alien's circumstances. For instance,

with respect to the statutory factor for the alien's age, DHS would generally consider it to be a negative factor if the alien is younger than 18 or older than 61, and a positive factor if the alien is between the ages of 18 and 61. These positive or negative factors operate as guidelines to help the officer determine whether the alien is likely at any time to become a public charge, *i.e.,* is more likely than not at any time in the future to receive one or more designated public benefits for more than 12 months in the aggregate within any 36-month period. The rule also contains lists of heavily weighted negative factors and heavily weighted positive factors. For example, the rule includes a heavily weighted negative factor for an alien who is not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment. DHS believes that these circumstances should be accorded heavy negative weight in a public charge inadmissibility determination because, as discussed in the preamble to the NPRM and in the preamble to this final rule, the presence of these circumstances suggests a greater likelihood that the alien will become a public charge than other negative factors suggest. The presence of a single positive or negative factor, or heavily weighted negative or positive factor, will never, on its own, create a presumption that an applicant is inadmissible as likely to become a public charge or determine the outcome of the public charge inadmissibility determination. Rather, a public charge inadmissibility determination must be based on the totality of the circumstances presented in an applicant's case.

With respect to applications for adjustment of status in particular, this rule also provides a more comprehensive evidentiary framework under which U.S. Citizenship and Immigration Services (USCIS) will consider public charge inadmissibility. Under this rule, applicants for adjustment of status who are subject to the public charge ground of inadmissibility must file a Declaration of Self-Sufficiency (Form I–944) with their Application to Register Permanent Residence or Adjust Status (Form I–485) to demonstrate they are not likely to become a public charge. The Form I–944 only applies to adjustment applicants and not applicants for admission at a port of entry.

In addition, applicants required to submit Form I–864, Affidavit of Support Under Section 213A of the INA, in

accordance with section 212(a)(4)(C) or (D), must generally submit Form I–944 with the Form I–485. Failure to submit each form, where required, may result in a rejection or a denial of the Form I–485 without a prior issuance of a Request for Evidence or Notice of Intent to Deny.[12]

This rule also revises DHS regulations governing the discretion of the Secretary of Homeland Security (Secretary) to accept a public charge bond under section 213 of the Act, 8 U.S.C. 1183, for those seeking adjustment of status. Additionally, this rule contains additional provisions that will render certain nonimmigrants ineligible for extension of stay or change of status if she or he received one or more public benefits for more than 12 months in the aggregate within any 36-month period since obtaining the status he or she wishes to extend or change.

Finally, DHS notes that the INA also contains a separate public charge ground of deportability.[13] This rule does not interpret or change DHS's implementation of the public charge ground of deportability.

*B. Legal Authority*

DHS's authority for making public charge inadmissibility determinations and related decisions is found in several statutory provisions. Section 102 of the Homeland Security Act of 2002,[14] 6 U.S.C. 112, and section 103 of the Act, 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States. In addition to establishing the Secretary's general authority for the administration and enforcement of immigration laws, section 103 of the Act, 8 U.S.C. 1103, enumerates various related authorities, including the Secretary's authority to establish regulations and prescribe such forms of bond as are necessary for carrying out such authority. Section 212 of the Act, 8 U.S.C. 1182, establishes classes of aliens that are ineligible for visas, admission, or adjustment of status; paragraph (a)(4) of that section establishes the public charge ground of inadmissibility, including the minimum factors the Secretary must consider in making a determination that an alien is likely to become a public charge. Section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), also establishes the enforceable affidavit of support requirement, as applicable, to certain family-based and employment-based

---

appears to be dated "March 26, 1999" even though the guidance was actually signed May 20, 1999, became effective May 21, 1999 and was published in the **Federal Register** on May 26, 1999.

[9] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28692 (May 26, 1999).

[10] *See* 8 U.S.C. 1601(1), (2)(A).

[11] *See* INA section 212(a)(4)(A), 8 U.S.C. 1182(a)(4)(A).

[12] *See* 8 CFR 103.2(a)(7), (b)(8)(ii).

[13] *See* INA section 237(a)(5), 8 U.S.C. 1227(a)(5).

[14] Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002).

immigrants, and exempts certain aliens from both the public charge ground of inadmissibility and the affidavit of support requirement. Section 213 of the Act, 8 U.S.C. 1183, provides the Secretary with discretion to admit into the United States an alien who is determined to be inadmissible as a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), but is otherwise admissible, upon the giving of a proper and suitable bond. That section authorizes the Secretary to establish the amount and conditions of such bond. Section 213A of the Act, 8 U.S.C. 1183a, sets out requirements for the sponsor's affidavit of support, including reimbursement of government expenses where the sponsored alien received means-tested public benefits. Section 214 of the Act, 8 U.S.C. 1184, addresses requirements for the admission of nonimmigrants, including authorizing the Secretary to prescribe the conditions of such admission through regulations and when necessary, establish a bond to ensure that those admitted as nonimmigrants or who change their nonimmigrant status under section 248 of the Act, 8 U.S.C. 1258, depart if they violate their nonimmigrant status or after such status expires. Section 245 of the Act, 8 U.S.C. 1255, generally establishes eligibility criteria for adjustment of status to lawful permanent residence. Section 248 of the Act, 8 U.S.C. 1258, authorizes the Secretary to prescribe conditions under which an alien may change his or her status from one nonimmigrant classification to another. The Secretary promulgates the changes in this rule under all of these authorities.

*C. Summary of the Proposed Rule*

On October 10, 2018, DHS published a Notice of Proposed Rulemaking (NPRM) entitled Inadmissibility on Public Charge Grounds.[15] The NPRM identified the groups of individuals generally subject to, or exempt from, the public charge inadmissibility ground. Further, DHS proposed definitions for the terms "public charge," "likely at any time to become a public charge," "public benefit," and "alien's household."

As part of the definition of public benefit, DHS proposed to designate an exhaustive list of public benefits that would be considered for purposes of a public charge inadmissibility determination, as well as for purposes of extension of stay and change of nonimmigrant status applications. DHS recognized that the universe of public

benefits is quite large, and that some benefits are more commonly used, at greater taxpayer expense, than others. In seeking to provide clear notice of the effects of the rule, and to limit certain indirect costs that may be associated with the rule, DHS elected to limit the number and types of non-cash public benefits that it would designate. DHS therefore proposed to designate just a few means-tested non-cash benefits related to food and nutrition, housing, and healthcare, which bear directly on the recipient's self-sufficiency and together account for significant federal expenditures on low-income individuals. DHS's proposed list of public benefits included cash benefits for income maintenance, institutionalization for long-term care at government expense, SNAP, most forms of Medicaid, Premium and Cost Sharing Subsidies for Medicare Part D (Medicare Part D LIS), Section 8 Housing Assistance under the HCV Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing. DHS also sought comment on the potential inclusion of other public benefits programs. As noted below, this final rule designates each of the above-referenced public benefits, except for institutionalization for long-term care at government expense and Medicare Part D LIS. DHS is not designating any additional programs.

DHS proposed to limit its consideration of an alien's receipt of these designated public benefits in two main ways, each of which DHS incorporated into the definition of public benefit. First, DHS proposed to establish "thresholds" for the amount or duration of public benefits that the alien must receive, before DHS will consider the alien to have received a public benefit. In other words, DHS proposed that it would not consider an alien's receipt of a given public benefit at all, unless the alien received the benefit in an amount, or for a duration, that met an applicable threshold. Specifically, DHS proposed the following thresholds:

• For public benefits that are "monetizable" (such as cash benefits, SNAP, and housing vouchers and rental assistance), DHS proposed a threshold of 15 percent of the Federal Poverty Guidelines (FPG) for a household of one within a period of 12 consecutive months.

• For public benefits that cannot be monetized (such as Medicaid, Medicare Part D LIS, subsidized housing, and institutionalization for long-term care at government expense), DHS proposed a threshold of receipt during more than 12

months in the aggregate within a 36-month period.

• DHS also proposed a threshold to address circumstances where an alien receives a combination of monetizable benefits equal to or below the 15 percent threshold, together with one or more benefits that cannot be monetized. In such cases, DHS proposed that the threshold for duration of receipt of the non-monetizable benefits would be more than 9 months in the aggregate within a 36-month period.

DHS expressly sought comment on these proposed thresholds, including whether DHS should consider an alien's receipt of benefits below any given threshold, as part of DHS's totality of the circumstances determination. As noted below, this final rule adopts a single threshold for all designated public benefits (including those that were considered "monetizable" under the proposed rule): More than 12 months in the aggregate within a 36-month period. And this final rule authorizes officers to consider receipt of benefits below that threshold, to the extent relevant in the totality of the circumstances.

Second, DHS proposed to tailor its rule to limit its effects in certain ways, for a range of reasons. For instance, DHS proposed to not consider the receipt of public benefits by certain aliens who, at the time of receipt, filing, or adjudication, are enlisted in the U.S. Armed Forces, serving in active duty or in the Ready Reserve, or if received by such an individual's spouse or children. DHS also proposed to not consider emergency Medicaid or Medicaid received for services provided under the Individuals with Disabilities Education Act (IDEA), and to not consider any school-based benefits provided to individuals who are at or below the maximum eligible age for secondary education, as determined under State law. Lastly, DHS proposed to exempt from consideration Medicaid benefits received by children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the custody of U.S. citizen parents will result automatically in the child's acquisition of citizenship, or upon finalization of adoption in the United States by the U.S. citizen parents (or upon meeting eligibility criteria) or children entering the United States for the prime purpose of attending a citizenship interview under the Child Citizenship Act of 2000.[16] As noted below, this final rule revises these

---

[15] Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed Oct. 10, 2018).

[16] *See* Public Law 106–395, 114 Stat. 1631, 1631–33 (Oct. 30, 2000) (codified at INA 320(a)–(b), 8 U.S.C. 1431(a)–(b)).

provisions in certain ways, and also includes an additional provision exempting Medicaid receipt by aliens under the age of 21 and pregnant women (including women for 60 days after the last day of pregnancy).

In addition to proposing new definitions, DHS proposed a regulatory framework for analyzing the aforementioned statutory factors that must be considered for purposes of the public charge inadmissibility determination. DHS also proposed to amend its existing regulations addressing public charge bonds. In addition, DHS proposed to require applicants seeking an extension of stay or change of nonimmigrant status to demonstrate that they have not received and are not currently receiving, nor are they likely to receive public benefits, as defined in the regulation, for the duration of their stay. Again, as noted below, this final rule revises these provisions in certain ways.

DHS received 266,077 comments on the proposed rule, the vast majority of which opposed the rule. The preamble to this final rule includes summaries of the significant issues raised by the comments, and includes responsive explanations, and policy changes.

*D. Summary of Changes in the Final Rule*

Following careful consideration of public comments received and relevant data provided by stakeholders, DHS has made several changes to the regulatory text proposed in the NPRM.[17] As discussed in detail elsewhere in this preamble, the changes in this final rule include the following:

1. Definitions

• *Definitions of "Public Charge" and "Public Benefit."* DHS has revised the definition of "public charge" and "public benefit" to clarify the threshold of public benefit receipt that renders an alien a public charge. As noted above, the proposed rule defined a public charge as an alien who receives one or more public benefits as defined in the proposed rule. The proposed rule incorporated the threshold concept into the definition of public benefit, and proposed different thresholds for "monetizable" and "non-monetizable" benefits. Following receipt of public comments regarding a variety of issues, including the complexity of the proposed standard for monetizing certain public benefits, DHS has revised the definitions for public charge and public benefits, and will now evaluate

all benefits with a single duration-based standard (*i.e.*, the proposed standard for non-monetizable benefits). DHS has also incorporated the single duration standard into the definition of "public charge," rather than the definition of "public benefit." Consequently, under this simplified duration standard, a public charge is an alien who receives one or more public benefit for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two public benefits in one month counts as two months).

• *Consideration of Receipt of Public Benefits below the Threshold, in the Totality of the Circumstances.* Under the proposed rule, DHS would not have considered the receipt of benefits below the applicable threshold in the totality of the circumstances. As a consequence, USCIS would have been unable to consider an alien's past receipt of public benefits below the threshold *at all*, even if such receipt was indicative, to some degree, of the alien's likelihood of becoming a public charge at any time in the future. Under this final rule, adjudicators will consider and give appropriate weight to past receipt of public benefits below the single durational threshold described above in the totality of the circumstances.[18]

• *Receipt of Public Benefits.* DHS has added a definition of "receipt" of public benefits, consistent with the explanation in the proposed rule preamble. The new definition clarifies that an application or certification for benefits does not constitute receipt, although it may serve as evidence of the alien's likelihood of receiving public benefits in the future. It also clarifies that when an alien receives, applies for, or obtains a certification for public benefits solely on behalf of another person, DHS does not consider the alien to have received the benefit.

• *Likely at Any Time to Become a Public Charge.* DHS has amended the definition of "likely at any time to become a public charge" to clarify that an alien is likely at any time to become a public charge if the alien is more likely than not at any time in the future to become a public charge, as determined based on the totality of the alien's circumstances.

• *Primary Caregiver.* DHS has included a new definition of "primary caregiver" to account for a new consideration in the totality of circumstances for aliens who may not

be currently employed or have employment history but are nonetheless contributing to their households by caring for others. DHS defines primary caregiver as an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

2. Public Benefits

• *Medicaid Received by Aliens Under Age 21 and Pregnant Women.* Following receipt of public comments addressing the nature of the Medicaid benefit for children and pregnant women. DHS has revised provisions under which DHS would have considered an alien's receipt of Medicaid, regardless of the alien's age. For purposes of this final rule, DHS has excluded consideration of the receipt of Medicaid by aliens under the age of 21 and pregnant women during pregnancy and during the 60-day period after pregnancy.

• *Medicare Part D Low-Income Subsidy.* The NPRM's definition for public benefit included Medicare Part D LIS. Following receipt of public comment regarding the nature of the Medicare Part D LIS, which is part of an overall benefit scheme that contains extensive work requirements, DHS has decided to exclude an alien's receipt of such subsidies from the public benefit definition for purposes of the public charge inadmissibility determination.

• *Benefits Received by Military Servicemembers and their Spouses and Children.* The NPRM's definition for public benefit excluded the consideration of public benefits received by an alien who at the time of receipt of the public benefit, filing, or adjudication, is enlisted in the U.S. Armed Forces, serving in the active duty or in the Ready Reserve component of the U.S. Armed Forces, or is the spouse or child of such servicemember. The NPRM did not make clear what immigration benefit types this provision applies to. DHS has revised the public benefit definition to clarify that this provision applies with respect to applications for admission, adjustment of status, and extension of stay or change of status.

• *Benefits Received while in a Status that is Exempt from the Public Charge Ground of Inadmissibility.* DHS has revised the public benefit definition to clarify that DHS will not consider any public benefits received by an alien during periods in which the alien was present in the United States in a classification that is exempt from the public charge ground of inadmissibility or for which the alien received a waiver

---

[17] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed Oct. 10, 2018).

[18] As stated in the Benefits Received Before Effective Date and Previously Excluded Benefits section of this rule, DHS will not apply this rule to benefits received before the effective date of the rule, except for those benefits that would have been considered under the 1999 Interim Field Guidance.

of the public charge inadmissibility ground.

• *Public Benefits Received by Children Eligible for Acquisition of Citizenship.* DHS has revised the proposed definition of public benefit that excluded from consideration Medicaid received by children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent will result automatically in the child's acquisition of citizenship, or whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship upon finalization of adoption in the United States by the U.S. citizen parent(s) or, upon meeting other eligibility criteria as required.[19] DHS has changed this provision to clarify that public benefits, as defined in the rule, do not include any public benefits that were or will be received by such children.

• *Benefits Provided for Institutionalization.* The NPRM's definition of public benefit included benefits for long-term institutionalization at government expense. Following receipt of public comment regarding specific benefits considered to provide for institutionalization, DHS has removed the reference to long-term institutionalization within the definition of public benefit, as the long-term institutionalization benefits that DHS has in the past considered, and intends to consider under this rule, are already part of the public benefit definition, *i.e.,* Temporary Assistance for Needy Families (TANF), Supplemental Security Income (SSI), and Medicaid.

### 3. Applicability to Nonimmigrants

• *"Likely to Receive" Public Benefits and "Currently Receiving" Public Benefits Condition.* Following receipt of public comments addressing the public benefit condition for nonimmigrants seeking extension of stay or change of status, DHS has revised this provision. Under the proposal, DHS would have considered whether such an alien has received, is currently receiving, or is likely to receive public benefits in excess of the designated thresholds since obtaining the nonimmigrant status the alien seeks to attend or from which the alien seeks to change. DHS has modified the provision by removing the

future-looking requirement. DHS will only consider whether the alien has received designated benefits for more than 12 months in the aggregate within a 36-month period since obtaining the nonimmigrant status they wish to extend or change, up until the time of adjudication of the extension of stay or change of status request.

• *Victim of Severe Form of Trafficking in Persons (T) Nonimmigrants Exemption.* DHS has revised several regulatory provisions relating to individuals who have a pending application setting forth a prima facie case for eligibility for T nonimmigrant status, or who are present in the United States in valid T nonimmigrant status. In the proposed rule, DHS provided that T nonimmigrants applying for adjustment of status were subject to the public charge inadmissibility ground and could request a waiver of inadmissibility. DHS has modified the provisions with respect to T nonimmigrants to accurately reflect changes codified by Congress in the Violence Against Women Reauthorization Act of 2013 (VAWA 2013).[20] DHS has revised the public charge inadmissibility exemption provision proposed in the NPRM and created new provisions to align these regulations with the changes to the law made by VAWA 2013. T nonimmigrants applying for adjustment of status will no longer need to submit a waiver of inadmissibility for public charge purposes.

• *Victims of Criminal Activity (U) Nonimmigrants Exemption.* DHS has revised the regulatory provisions relating to the exemption from public charge inadmissibility for individuals who have a pending application for U nonimmigrant status, or who are granted U nonimmigrant status, to align these regulations with the changes to the law made by VAWA 2013. In the proposed rule, U nonimmigrant petitioners or those granted U nonimmigrant status were exempted from the public charge inadmissibility ground for purposes of U nonimmigrant status or for purposes of adjustment of status under section 245(m) of the Act, 8 U.S.C. 1255(m). DHS has clarified that, in general, U visa petitioners and those granted U nonimmigrant status are exempt from a public charge inadmissibility determination in any future immigration benefit request that requires a finding of admissibility, not only adjustment of status under section 245(m) of the Act, 8 U.S.C. 1255(m).

• *VAWA 2013 Public Charge Exemptions and the Affidavit of Support Requirement for Certain Employment-Based Petitions.* DHS has revised several regulatory provisions relating to T nonimmigrants, U nonimmigrants, VAWA self-petitioners, and qualified aliens as described in 8 U.S.C. 1641(c). The proposed rule was silent on the applicability of section 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D), which requires an affidavit of support as described in section 213A of the INA, 8 U.S.C. 1183a, for certain employment-based immigrant petitions. DHS has modified the exemption provisions at 8 CFR 212.23(a) with respect to T nonimmigrants, U nonimmigrants, VAWA self-petitions, and certain qualified aliens to accurately reflect changes codified by Congress in VAWA 2013.[21] An alien who falls under one of the VAWA 2013 exemptions from public charge inadmissibility would not need to demonstrate that he or she is not likely at any time to become a public charge, but would need to submit a sufficient affidavit of support described in 213A of the INA, 8 U.S.C. 1183a, if adjusting under an employment-based category that requires one by statute.

### 4. Totality of the Circumstances Determination

• *The Alien is a Primary Caregiver for Household Member as a Consideration in the Education and Skills Factor:* DHS has added a provision that would take into consideration whether an alien is a primary caregiver of another in the alien's household, for example a child or elderly relative. This factor is intended to take into consideration difficult-to-monetize contributions by aliens who may lack current employment or an employment history due to their full time, unpaid care of household members.

• *Heavily Weighted Negative Factor for Receipt of Public Benefits above the Threshold.* Under the proposed rule, in conducting the public charge inadmissibility determination, there were two separate heavily weighted factors related to the receipt of public benefits: (1) The alien is currently receiving or is currently certified or approved to receive one or more public benefits and (2) an alien has received one or more public benefits above the applicable threshold within the 36-months immediately preceding the alien's application for a visa, admission or adjustment of status. DHS has consolidated these factors within one

---

[19] *See* Child Citizenship Act of 2000, Public Law 106–395, 114 Stat. 1631, 1631–33 (Oct. 30, 2000) (codified at section 320(a)–(b) of the Act, 8 U.S.C. 1431(a)–(b)), in accordance with 8 CFR part 320.

[20] *See* Public Law 113–4, 127 Stat. 54 (Mar. 7, 2013).

[21] *See* Public Law 113–4, 127 Stat. 54 (Mar. 7, 2013).

heavily weighted negative factor. The factor will apply in cases where the alien has received or has been certified or approved to receive one or more public benefits for more than 12 months within any 36-month period, beginning no earlier than 36 months prior to the alien's application for admission or adjustment of status.

• *Heavily Weighted Positive Factor for Private Health Insurance.* In this final rule DHS added a new heavily weighted positive factor for when the alien has private health insurance appropriate for the expected period of admission, and for which the alien does not receive subsidies in the form of premium tax credits (including advance premium tax credits) under the ACA. This heavily weighted positive factor is in addition to the positive factor that would apply in circumstances where an alien has sufficient household assets and resources (including health insurance not considered to be a public benefit under 8 CFR 212.22(b)) to cover reasonably foreseeable medical costs, including costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for himself or herself, to attend school, or to work.

• *Evidence of the Alien's Health.* In response to concerns regarding the qualifications of USCIS adjudicators to evaluate the alien's health, DHS has revised the rule to clarify that, if the alien is required to undergo an immigration medical examination from a civil surgeon or panel physician, DHS will generally defer to the immigration medical examination report when assessing whether the alien is more likely than not at any time in the future to become a public charge on account of a diagnosed medical condition unless there is evidence that the report is incomplete. DHS, however, continues to permit the use of other documentation regarding the alien's medical conditions, as proposed in the NPRM, to assess whether the alien's health makes the alien more likely than not to become a public charge at any time in the future.

• *Household Assets.* DHS has revised the rule to clarify that DHS considers an alien's ownership of significant assets similar to the standards in the affidavit of support regulations under 8 CFR 213a.2(c)(2)(iii)(B).

• *Household Income and Servicemembers of the Armed Forces.* DHS has revised the rule to clarify that if the applicant is on active duty, other than training, in the Armed Forces of the United States, the applicant's gross household income may be 100 percent of the most recent FPG for the alien's household size, and not 125 percent of the FPG for the alien's household size, as proposed in the NPRM, in order to serve as a positive factor in the public charge inadmissibility determination.

• *Household Income and Public Benefits.* DHS has revised the rule to clarify that the applicant's gross household income does not include any household income from public benefits, as defined in this rule.

• *Household Income from Illegal Activities.* DHS has revised the rule to clarify that household income from illegal activity or sources will not be considered as part of the income, assets, or resources factor in the public charge inadmissibility determination. DHS has also consolidated the consideration of income from sources other than household members into a single provision.

• *Household Income and Evidentiary Considerations.* DHS amended the rule to clarify that when assessing the alien's annual gross household income, DHS considers the most recent federal tax-year transcripts from the United States Internal Revenue Service (IRS) for each household member whose income will be considered. Additionally, DHS also clarified that if the most recent tax-year transcripts from the IRS are unavailable, DHS will consider other credible and probative evidence of the household member's income, including an explanation why the evidence is not available.

• *Fee Waivers and Categories Excluded from Public Charge.* DHS has revised the rule to state that a fee waiver request or receipt would not be considered for purposes of determining public charge inadmissibility if the fee waiver was applied for, or granted, as part of an application for which a public charge inadmissibility determination was not required.

• *Public Benefit Disenrollment and Eligibility.* DHS has clarified in the rule how USCIS will consider past public benefits receipt, in the totality of the circumstances. USCIS will consider whether an alien has disenrolled or requested to be disenrolled from the public benefit(s). USCIS will also consider, as part of the totality of the circumstances, any evidence that the alien submits from a Federal, State, local, or tribal agency administering a public benefit, that the alien has specifically identified as showing that the alien does not qualify or would not qualify for such public benefit by virtue of, for instance, the alien's annual gross household income or prospective immigration status, or length of stay. While an alien's prospective ineligibility for a given benefit would not be outcome-determinative, USCIS will consider the information in the totality of the circumstances.

• *Education and Skills.* To clarify additional types of documentation that establish a steady employment history, DHS has revised the evidentiary considerations for the education and skills factor, to require that applicants submit, with their adjustment of status applications, federal tax return transcripts for the previous three years or, if such transcripts are unavailable, other credible and probative evidence, including an explanation of the unavailability of such transcripts.

### 5. Public Charge Bond for Adjustment of Status Applicants

• *Breach of Bonds and Threshold of Public Benefit Receipt.* In the NPRM, DHS proposed that a public charge bond is considered breached if the bonded alien had used public benefits in the amount or for the duration established as the threshold in the proposed public benefits definition. In this final rule, DHS has modified the threshold to a single duration-based threshold and has moved that threshold from the proposed public benefits definition into the public charge definition. To ensure that the bond breach conditions remain the same in this final rule, DHS has revised the rule, and incorporated the single duration threshold "for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)" in the bond breach determination.

• *Substitution.* DHS has revised proposed 8 CFR 213.1 to indicate that DHS will only offer public charge bonds of unlimited duration. Correspondingly, DHS has removed text that references bonds of limited durations or provisions that addressed the substitution of a bond of limited duration. DHS has retained, however, the general bond substitution provision.

• *Cancellation on the basis of Permanent Departure from the United States.* DHS has clarified that an alien is only considered to have voluntarily lost lawful permanent resident status for the purposes of bond cancellation based on a permanent departure when the alien has submitted a record of abandonment of lawful permanent resident status on the form prescribed by DHS and in accordance with the form's instructions, while the alien is outside of the United States.

• *Discretionary Cancellation.* DHS has added language to this final rule to clarify that DHS retains discretion to cancel a public charge bond,

notwithstanding an absence of a written request from the obligor or alien, if DHS determines that an alien otherwise meets the applicable eligibility requirements.

• *Bond Amount.* In response to public comment, DHS has revised proposed 8 CFR 213.1 to reduce the minimum amount in which a public charge bond may be offered to $8,100, annually adjusted for inflation based on the Consumer Price Index for All Urban Consumers (CPI–U), and rounded up to the nearest dollar.

• *Bond Breach and Public Benefits Received while in a Status that is Exempt from the Public Charge Ground of Inadmissibility.* DHS has revised this rule to clarify that DHS will not consider, as part of a public charge bond breach determination, any public benefits received by an alien during periods for which the alien received a waiver of the public charge inadmissibility ground. In the NPRM, DHS had already proposed that public benefits received while in a public charge exempt status following the initial grant of status as a lawful permanent resident, and any public benefits received after the alien obtained U.S. citizenship, would not be counted towards the bond breach determination. These exemptions remain unchanged in this final rule.

6. Other Changes

• *Prospective Application of the Rule.* DHS clarified in 8 CFR 212.20, 214.1, and 248.1 that this final rule applies prospectively to applications and petitions postmarked (or, if applicable, submitted electronically) on or after the effective date. (DHS retained and further refined provisions addressing how it will consider receipt of public benefits before the effective date of this rule.)

• *Technical Changes.* DHS has made miscellaneous technical edits to reduce redundancy and improve readability and clarity.

• *Changes to Form I–539A.* DHS has made non-substantive changes to Supplemental Information for Application to Extend/Change Nonimmigrant Status (Form I–539A), which collects biographical information about derivative beneficiaries named on an applicant's Application to Extend/Change Nonimmigrant Status (Form I–539). Form I–539A was published as a new form on March 8, 2019, to replace Supplement A of Form I–539. In light of the creation of Form I–539A, DHS has moved the information collection regarding public benefits received by the derivative beneficiaries from Form I–539 to Form I–539A. Each derivative beneficiary of a Form I–539 will need to complete a separate Form I–539A, and provide information regarding the derivative beneficiary's applications for, or receipt of, public benefits, except where the nonimmigrant classification that the derivative beneficiary seeks to extend, or to which the alien seeks to change, is exempted from the public charge ground of inadmissibility.

*E. Summary of Costs and Benefits*

This rule will impose new costs on the population applying to adjust status using Form I–485 that are subject to the public charge ground of inadmissibility. DHS will now require any adjustment applicants subject to the public charge ground of inadmissibility and who are applying for adjustment of status on or after the effective date of this final rule to submit a Form I–944 with their Form I–485 to demonstrate they are not likely to become a public charge. Failure to submit the form, where required, may result in a rejection or a denial of the Form I–485 without a prior issuance of a Request for Evidence or Notice of Intent to Deny.[22] Additionally, the associated time burden estimate for completing Form I–485 will increase.

The rule will also impose additional costs for those seeking extension of stay or change of status by filing a Petition for a Nonimmigrant Worker (Form I–129); Petition for a CNMI-Only Nonimmigrant Transitional Worker (Form I–129CW); or Form I–539 and Form I–539A, as applicable. The associated time burden estimate for completing these forms will increase because these applicants will be required to demonstrate that they have not received, since obtaining the nonimmigrant status that they seek to extend or from which they seek to change, and through the adjudication, public benefits as described in final 8 CFR 212.21(b) for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). Moreover, the rule will impose new costs associated with the new public charge bond process, including new costs for completing and filing a Public Charge Bond (Form I–945), and Request for Cancellation of Public Charge Bond (Form I–356).

DHS estimates that the additional total cost of the rule will be approximately $35,202,698 annually. This cost includes the population applying to adjust status who are also required to file Form I–944, the opportunity costs of time associated with such filings, as well the increased time burden estimates for completing Forms I–485, I–129, I–129CW, and I–539, and for requesting or cancelling a public charge bond using Form I–945 and Form I–356, respectively.

Over the first 10 years of implementation, DHS estimates the total quantified new direct costs of the final rule will be about $352,026,980 (undiscounted). In addition, DHS estimates that the 10-year discounted total direct costs of this final rule will be about $300,286,154 at a 3 percent discount rate and about $247,249,020 at a 7 percent discount rate.

Simultaneously, DHS is eliminating the use and consideration of the Request for Exemption for Intending Immigrant's Affidavit of Support (Form I–864W), currently applicable to certain classes of aliens. In lieu of Form I–864W, the alien will indicate eligibility for the exemption of the affidavit of support requirement on Form I–485.

The final rule will also potentially impose new costs on obligors (individuals or companies) if an alien has been determined to be likely at any time in the future to become a public charge and will be permitted to submit a public charge bond, for which USCIS will use the new Form I–945. DHS estimates the total cost to file Form I–945 will be, at minimum, about $34,166 annually.[23]

Moreover, the final rule will potentially impose new costs on aliens or obligors who submit Form I–356 as part of a request to cancel the public charge bond. DHS estimates the total cost to file Form I–356 would be approximately $824 annually.[24]

The final rule will also result in a reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Individuals who might choose to disenroll from or forego future enrollment in a public benefits program include foreign-born non-citizens, as well as U.S. citizens who are members of mixed-status households,[25] who may otherwise be eligible for public benefits. DHS estimates that the total reduction in transfer payments from the Federal and State governments will be

---

[22] *See* 8 CFR 103.2(a)(7), (b)(8)(ii).

[23] Calculation: $35.59 (cost per obligor to file Form I–945) * 960 (estimated annual population who would file Form I–945) = $34,166.40 = $34,166 (rounded) annual total cost to file Form I–945.

[24] Calculation: $33.00 (cost per obligor to file Form I–356) * 25 (estimated annual population who would file Form I–356) = $825.00 annual total cost to file Form I–356.

[25] DHS uses the term "foreign-born non-citizen" since it is the term the Census Bureau uses. DHS generally interprets this term to mean alien in this analysis. In addition, DHS notes that the Census Bureau publishes much of the data used in this analysis.

approximately $2.47 billion annually due to disenrollment or foregone enrollment in public benefits programs by foreign-born non-citizens who may be receiving public benefits. DHS estimates that the 10-year discounted federal and state transfer payments reduction of this final rule will be approximately $21.0 billion at a 3 percent discount rate and about $17.3 billion at a 7 percent discount rate. However, DHS notes there may be additional reductions in transfer payments that we are unable to quantify.

There also may be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in public benefits program. For example, the Federal Government funds all SNAP food expenses, but only 50 percent of allowable administrative costs for regular operating expenses.[26] Similarly, Federal Medical Assistance Percentages (FMAP) in some U.S. Department of Health and Human Services (HHS) programs, like Medicaid, can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[27] Since the state share of federal financial participation (FFP) varies from state to state, DHS uses the average FMAP across all states and U.S. territories of 59 percent to estimate the amount of state transfer payments. Therefore, the 10-year undiscounted amount of state transfer payments of the provisions of this final rule is about $1.01 billion annually. The 10-year discounted amount of state transfer payments of the provisions of this final rule would be approximately $8.63 billion at a 3 percent discount rate, and about $7.12 billion at a 7 percent discount rate. Finally, DHS recognizes that reductions in federal and state transfers under federal benefit programs may have impacts on state and local economies, large and small businesses, and individuals. For example, the rule might

result in reduced revenues for healthcare providers participating in Medicaid, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs.

Additionally, the final rule will have new direct and indirect impacts on various entities and individuals associated with regulatory familiarization with the provisions of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. A foreign-born non-citizen (such as those contemplating disenrollment or foregoing enrollment in a public benefits program) might review the rule to determine whether he or she is subject to the provisions of the final rule and may incur familiarization costs. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those individuals or entities the rule directly regulates, a wide variety of other entities would likely choose to read and understand the rule and, therefore, would incur familiarization costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this final rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule to provide information to those foreign-born non-citizens that might be affected by a reduction in federal and state transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs.

DHS estimates the time that would be necessary to read this final rule would be approximately 16 to 20 hours per person depending on an individual's average reading speed and level of review, resulting in opportunity costs of time. An entity, such as a non-profit or advocacy group, may have more than one person that reads the rule. Using the average total rate of compensation as $36.47 per hour for all occupations, DHS estimates that the opportunity cost of time will range from about $583.52 to

$729.40 per individual who must read and review the final rule.

The final rule will produce some quantified benefits due to the regulatory changes DHS is making. The final rule will produce some benefits for T nonimmigrants applying for adjustment of status based on their T nonimmigrant status, as this population will no longer need to submit Application for Waiver of Grounds of Inadmissibility (Form I–601) seeking a waiver of the public charge ground of inadmissibility. DHS estimates the total benefit for this population is $15,176 annually.[28]

The primary benefit of the final rule would be to better ensure that aliens who are admitted to the United States, seek extension of stay or change of status, or apply for adjustment of status will be self-sufficient, *i.e.,* will rely on their own financial resources, as well as the financial resources of the family, sponsors, and private organizations.[29] DHS also anticipates that the final rule will produce some benefits from the elimination of Form I–864W. The elimination of this form will potentially reduce the number of forms USCIS would have to process. DHS estimates the amount of cost savings that will accrue from eliminating Form I–864W would be about $36.47 per petitioner.[30] However, DHS is unable to estimate the annual number of filings of Form I–864W and, therefore, currently is unable to estimate the total annual cost savings of this change. Additionally, a public charge bond process will also provide benefits to applicants as they potentially will be given the opportunity for adjustment if otherwise admissible, at the discretion of DHS, after a determination that he or she is likely to become a public charge.

Table 1 provides a more detailed summary of the final provisions and their impacts.

---

[26] Per section 16(a) of the Food and Nutrition Act of 2008, Public Law 110–234, tit. IV, 122 Stat. 923, 1092 (May 22, 2008) (codified as amended at 7 U.S.C. 2025). *See also* USDA, *FNS Handbook 901,* at p. 41 (2017). Available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_internet_Ready_Format.pdf,* (last visited July 26, 2019).

[27] *See* Dep't of Health and Human Servs. Notice, Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2016 through September 30, 2017, 80 FR 73779 (Nov. 25, 2015).

[28] Calculation: $14,880 (Filing fees for Form I–601) + $296.48 (Opportunity cost of time for Form I–601) = $15,176.48 = $15,176 (rounded) total current estimated annual cost for filing T nonimmigrants filing Form I–601 seeking a waiver of grounds of inadmissibility. Therefore, the estimated total benefits of the final rule for T nonimmigrants applying for adjustment of status using Form I–601 seeking a waiver on grounds of inadmissibility will equal the current cost to file Form I–601 for this population.

[29] *See* 8 U.S.C. 1601(1), (2)(A).

[30] Calculation of savings from opportunity cost of time for no longer having to complete and submit Form I–864W: ($36.47 per hour * 1.0 hours) = $36.47.

TABLE 1—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| Revising 8 CFR 212.18. Application for Waivers of Inadmissibility in connection with an application for adjustment of status by T nonimmigrant status holders.<br>Revising 8 CFR 245.23. Adjustment of aliens in T nonimmigrant classification. | To clarify that T nonimmigrants seeking adjustment of status are not subject to public charge ground of inadmissibility. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $15,176 annually to T nonimmigrants applying for adjustment of status who will no longer need to submit Form I–601 seeking a waiver on public charge grounds of inadmissibility.<br>*Costs:*<br>• None. |
| Adding 8 CFR 212.20. Purpose and applicability of public charge inadmissibility.<br>Adding 8 CFR 212.21. Definitions ...........<br>Adding 8 CFR 212.22. Public charge determination. | To define the categories of aliens that are subject to the public charge determination.<br>To establish key definitions, including "public charge," "public benefit," "likely to become a public charge," "household," and "receipt of public benefits."<br>Clarifies that evaluating public charge is a prospective determination based on the totality of the circumstances.<br>Outlines minimum and additional factors considered when evaluating whether an alien immigrant is inadmissible based on the public charge ground. Positive and negative factors are weighed to determine an individual's likelihood of becoming a public charge at any time in the future. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $36.47 per applicant from no longer having to complete and file Form I–864W.<br>*Costs:*<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for inadmissibility determinations.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensure that aliens who are seeking admission to the United States or apply for adjustment of status are self-sufficient through an improved review process of the mandatory statutory factors. |
| Adding 8 CFR 212.23. Exemptions and waivers for public charge ground of inadmissibility. | Outlines exemptions and waivers for inadmissibility based on the public charge ground. | |
| Adding 8 CFR 214.1(a)(3)(iv) and amending 8 CFR 214.1(c)(4)(iv). Nonimmigrant general requirements.<br>Amending 8 CFR 248.1(a) and adding 8 CFR 248.1(c)(4). Change of nonimmigrant classification eligibility. | To provide, with limited exceptions, that an application for extension of stay or change of nonimmigrant status will be denied unless the applicant demonstrates that he or she has not received public benefits since obtaining the nonimmigrant status that he or she is seeking to extend or change, as defined in final 8 CFR 212.21(b), for 12 months, in the aggregate, within a 36 month period. | **Quantitative:**<br>*Costs:*<br>• $6.1 million annually for an increased time burden for completing and filing Form I–129;<br>• $0.12 million annually for an increased time burden for completing and filing Form I–129CW;<br>• $2.4 million annually for an increased time burden for completing and filing Form I–539.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensures that aliens who are seeking to extend or change to a status that is not exempt from the section 212(a)(4) inadmissibility ground who apply for extension of stay or change of status continue to be self-sufficient during the duration of their nonimmigrant stay. |
| Amending 8 CFR 245. Adjustment of status to that of person admitted for lawful permanent residence. | To outline requirements that aliens submit a declaration of self-sufficiency on the form designated by DHS and any other evidence requested by DHS in the public charge inadmissibility determination. | **Quantitative:**<br>*Direct Costs:*<br>• Total annual direct costs of the final rule will range from about $45.5 to $131.2 million, including:<br>  • $25.8 million to applicants who must file Form I–944;<br>  • $0.69 million to applicants applying to adjust status using Form I–485 with an increased time burden;<br>  • $0.34 million to public charge bond obligors for filing Form I–945; and<br>  • $823.50 to filers for filing Form I–356.<br>• Total costs over a 10-year period will range from:<br>  • $352.0 million for undiscounted costs;<br>  • $300.1 million at a 3 percent discount rate; and<br>  • $247.2 million at a 7 percent discount rate.<br>*Transfer Payments*<br>• Total annual transfer payments of the final rule would be about $2.47 billion from foreign-born non-citizens and their households who disenroll from or forego enrollment in public benefits programs. The federal-level share of annual transfer payments will be about $1.46 billion and the state-level share of annual transfer payments will be about $1.01 billion. |

TABLE 1—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE—Continued

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| | | • Total transfer payments over a 10-year period, including the combined federal- and state-level shares, will be:<br>  • $24.7 billion for undiscounted costs;<br>  • $21.0 billion at a 3 percent discount rate; and<br>  • $17.3 billion at a 7 percent discount rate.<br>**Quantitative:**<br>*Benefits:*<br>• Potential to make USCIS' in the review of public charge inadmissibility more effective.<br>*Costs:*<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination.<br>• Costs to various entities and individuals associated with regulatory familiarization with the provisions of the final rule. Costs will include the opportunity cost of time to read the final rule and subsequently determine applicability of the final rule's provisions. DHS estimates that the time to read this final rule in its entirety would be 16 to 20 hours per individual. DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule. However, DHS cannot determine the number of individuals who will read the final rule. |
| Public Charge Bond Provisions | | |
| Amending 8 CFR 103.6. Public charge bonds. | To set forth the Secretary's discretion to approve bonds, cancellation, bond schedules, and breach of bond, and to move principles governing public charge bonds to final 8 CFR 213.1. | **Quantitative:**<br>*Costs:*<br>• $34,166 annually to obligors for submitting Public Charge Bond (Form I–945); and<br>• $823.50 annually to filers for submitting Request for Cancellation of Public Charge Bond (Form I–356). |
| Amending 8 CFR 103.7. Fees .................. | To add fees for new Form I–945, Public Charge Bond, and Form I–356, Request for Cancellation of Public Charge Bond. | • Fees paid to bond companies to secure public charge bonds. Fees could range from 1–15 percent of the public charge bond amount based on an individual's credit score. |
| Amending 8 CFR 213.1. Admission or adjustment of status of aliens on giving of a public charge bond. | In 8 CFR 213.1, to add specifics to the public charge bond provision for aliens who are seeking adjustment of status, including the discretionary availability and the minimum amount required for a public charge bond. | **Quantitative:**<br>*Benefits:*<br>• Potentially enable an alien who was found inadmissible only on the public charge ground to adjust his or her status by posting a public charge bond with DHS. |

Source: USCIS analysis.

DHS has prepared a full analysis of this rule according to Executive Orders (E.O.) 12866 and 13563. This analysis can be found in the docket for this rulemaking or by searching for RIN 1615—AA22 on *www.regulations.gov.*

## II. Background

### A. Public Charge Inadmissibility and Public Charge Bonds

Under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), an alien who is an applicant for a visa, admission, or adjustment of status is inadmissible if he or she is likely at any time to become a public charge. The public charge ground of inadmissibility, therefore, applies to any alien applying for a visa to come to the United States temporarily or permanently, for admission, or for adjustment of status to that of a lawful permanent resident.[31] Section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) does not directly apply to nonimmigrants seeking extension of stay or change of status,[32] because extension of stay and change of status applications are not applications for a visa, admission, or adjustment of status.

The INA does not define "public charge." It does specify that when determining if an alien is likely at any time to become a public charge, consular officers and immigration officers must consider the alien's age; health; family status; assets, resources, and financial status; and education and skills, at a minimum.[33] Some immigrant and nonimmigrant categories are exempt from the public charge inadmissibility ground and other applicants may apply for a waiver of the public charge inadmissibility ground.[34]

Additionally, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), permits the consular officer, immigration officer, or an immigration judge to consider any affidavit of support submitted under section 213A of the Act, 8 U.S.C. 1183a, on the applicant's behalf when determining whether the applicant may become a public charge.[35] In fact, with

---

[31] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[32] *See* INA section 214 and 248, 8 U.S.C. 1184 and 1258.

[33] *See* INA section 212(a)(4)(B)(i), 8 U.S.C. 1182(a)(4)(B)(i).

[34] *See* proposed 8 CFR 212.23.

[35] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii). When required, the applicant must
Continued

very limited exceptions, aliens seeking family-based immigrant visas and adjustment of status, and a limited number of employment-based immigrant visas and adjustment of status, must have a sufficient affidavit of support or will be found inadmissible as likely to become a public charge.[36]

In general, if DHS has determined that an alien is inadmissible based on public charge, but is otherwise admissible, DHS may admit the alien at DHS's discretion upon the alien posting a suitable and proper bond as determined by DHS.[37] The purpose of issuing a public charge bond is to ensure that the alien will not become a public charge in the future.[38]

### B. Current Public Charge Standards

As discussed in the NPRM,[39] DHS currently makes public charge determinations in accordance with the 1999 Interim Field Guidance.[40] This guidance explains how the agency determines if a person is likely at any time to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a), for admission and adjustment of status purposes, and whether a person has become a public charge within five years of entry from causes not affirmatively shown to have arisen since entry, and therefore deportable under section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5).[41] On May 26, 1999, INS issued a proposed rule that would have codified these policies in regulation. Ultimately, however, INS did not publish a final rule conclusively addressing these issues.[42] DOS also issued a cable to its consular officers at that time, implementing similar guidance for visa adjudications, and its Foreign Affairs Manual (FAM) was

similarly updated.[43] USCIS has continued to follow the 1999 Interim Field Guidance in its adjudications, and DOS has continued following the public charge guidance set forth in the FAM.[44]

In the 1999 Interim Field Guidance, public charge is defined to mean an alien who is likely to become primarily dependent[45] on the government for subsistence, as demonstrated by either:

• Receipt of public cash assistance for income maintenance; or

• Institutionalization for long-term care at government expense.

Under the 1999 Interim Field Guidance, DHS did not consider receipt of non-cash, supplemental and certain limited cash, and special purpose benefits. Similarly, DHS did not consider institutionalization for short periods of rehabilitation because it does not constitute primary dependence.[46] As discussed in the NPRM, the use of public charge bonds has decreased since the introduction of enforceable affidavits of support in section 213A of the Act, 8 U.S.C. 1183a.[47]

### C. Final Rule

Following careful consideration of public comments received, DHS has made modifications to the regulatory text proposed in the NPRM, as described above. The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid, except as described in this regulatory preamble. Section III of this preamble includes a detailed summary and analysis of the public comments. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov*, docket number USCIS–2010–0012.

### III. Public Comments on the Proposed Rule

#### A. Summary of Public Comments

On October 10, 2018, DHS, USCIS published a proposed rule in docket USCIS–2010–0012. The comment period associated with the proposed rule closed at the end of December 10, 2018. DHS received a total of 266,077 public comment submissions in Docket USCIS–2010–0012 in response to the proposed rule. The majority of comment submissions were from individual or anonymous commenters. Other commenters included healthcare providers; research institutes and universities; law firms and individual attorneys; federal, state, local, and tribal elected officials; State and local government agencies; religious and community organizations; advocacy groups; unions; Federal Government officials; and trade and business organizations. While some commenters provided support for the rule, the vast majority of commenters opposed the rule.

#### B. Requests To Extend Comment Period

*Comment:* Some commenters requested that DHS extend the comment period. An individual commenter said the 60-day comment period is not enough time for such a drastic policy and asserted it would be unfair to American people to proceed with the proposed changes. Another individual commenter asked USCIS to extend the notice and comment period for an additional 90 days. A commenter wrote that the 60-day comment period provided inadequate time for its members to meaningfully comment on the proposed rule, and requested a further 60-day extension. Another commenter urged that DHS consider extending the notice and comment period for the docket until all interested individuals have the opportunity to provide input. The commenter said it is standard practice for an agency to extend a notice and comment period when circumstance suggest that additional input may be beneficial.

*Response:* DHS believes that the 60-day comment period provided an adequate opportunity for public input, and declines to extend the comment period. The Administrative Procedure Act (APA) is silent regarding the duration of the public comment period, and does not establish a minimum duration.[48] However, the 60-day comment period is in line with E.O. 12866, which encourages agencies to provide at least 60 days for the public

---

submit an Affidavit of Support Under Section 213A of the INA (Form I–864).

[36] *See* INA section 212(a)(4)(C), (D), 8 U.S.C. 1182(a)(4)(C), (D). A sufficient affidavit of support is one in which the sponsor has demonstrated that he or she has enough income and/or assets to maintain the sponsored alien and the rest of the sponsor's household at 125% of the FPG for that household size (or at 100 percent of the FPG if the sponsor is active duty in the U.S. Armed Forces or U.S. Coast Guard).

[37] *See* INA section 213, 8 U.S.C. 1183; *see also* 8 CFR 103.6; 8 CFR 213.1.

[38] *Matter of Viado,* 19 I&N Dec. 252, 253 (BIA 1985).

[39] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[40] *See* 64 FR 28689 (May 26, 1999).

[41] *See* 64 FR 28689 (May 26, 1999). In addition to the 1999 Interim Field Guidance, INS proposed promulgating these policies through rulemaking, which was never concluded. *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676 (proposed May 26, 1999).

[42] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676 (proposed May 26, 1999).

[43] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676, 28680 (proposed May 26, 1999).

[44] *See* Children's Health Insurance Program Reauthorization Act of 2009, Public Law 111–3, sec. 214, 123 Stat. 8, 56 (Feb. 4, 2009); 9 FAM 302.8–2(B)(2), Determining "Totality of Circumstances," (g) Public Charge Bonds, *https://fam.state.gov/fam/09fam/09fam030208.html* (last visited July 26, 2019). Note, on July 10, 2018, DOS amended 9 FAM 302.8.

[45] Former INS defined "primarily dependent" as "the majority" or "more than 50 percent."

[46] Similar to DHS, DOS has been making public charge inadmissibility determinations using the same legal framework, as reflected in the FAM. *See* 9 FAM 302.8, Public Charge—INA 212(a)(4), *https://fam.state.gov/FAM/09FAM/09FAM030208.html* (last visited July 26, 2019).

[47] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51219 (proposed Oct. 10, 2018).

[48] *See* 5 U.S.C. 553(c).

to comment on economically significant rules. The sufficiency of the 60-day comment period provided in this rule is supported by the over 266,000 public comments received. The public, including attorneys; federal, state, local, and tribal elected officials; and advocacy organizations provided a great number of detailed and informative comments. In addition, DHS notes that the proposed rule had been listed in the publicly available Unified Agenda of Federal Regulatory and Deregulatory Actions since the Fall 2017 publication. Given the quantity and quality of comments received in response to the proposed rule, and other publicly available information regarding the rule, DHS believes that the 60-day comment period has been sufficient.

## C. Comments Expressing General Support for the NPRM

*Comment:* Many commenters stated that immigrants should be self-sufficient. Many commenters stated that aliens should not be permitted to accept government benefits or depend on U.S. taxpayer money to support themselves if they want to obtain green cards. Commenters stated that immigrants should be productive members of society to gain admission to the United States and should not be a burden on the state. One commenter said that migrants should not be able to obtain welfare unless they have a minimum working record in the United States. Another commenter supported the rule and said that illegal immigration needs to stop. One commenter said that this country does not need more poor people. A commenter said that immigrants who cannot support themselves should not come to the United States. Other commenters said that the United States should not be responsible for taking care of people from other countries. One commenter noted that this rule will address the problem of public assistance use by unauthorized aliens seeking to legalize their status, DACA recipients, and any other immigrants who want to legalize their status but who are unable to support themselves or their families. Another commenter indicated that the rule will encourage immigrants to work hard and become self-sufficient.

*Response:* DHS agrees that applicants for admission and adjustment of status who are subject to the public charge ground of inadmissibility should be self-sufficient and should not depend on the government to meet their needs, and this rule seeks to better ensure self-sufficiency. DHS firmly believes that this was Congress' intent in enacting section 212(a)(4) of the Act, 8 U.S.C.

1182(a)(4), including the changes to this ground made in 1996.[49] DHS, however, disagrees with comments suggesting that this rule addresses, or should address, eligibility for government benefits programs. DHS also disagrees that the rule addresses eligibility for public benefits by certain specified groups, such as aliens unlawfully present, or DACA recipients. Neither the public charge ground of inadmissibility nor this final rule govern eligibility for public benefits; they govern which aliens are inadmissible or ineligible for admission or adjustment of status. This final rule does not address the government's responsibility to care for foreign nationals and does not address which aliens are, or should be, eligible to receive public benefits.

DHS also disagrees with suggestions that this rule is aimed at making sure poor people are not able to enter the United States. As noted previously, the rule aims to ensure that aliens subject to the public charge ground of inadmissibility are self-sufficient. An alien's assets, resources, and financial status is one factor that is considered in the totality of the circumstances when making a public charge inadmissibility determination and is not outcome determinative.

*Comment:* Some commenters stated that the rule will have a positive impact on the U.S. economy and job creation, and will protect the social safety net. Numerous commenters mentioned that public assistance should be reserved for U.S. citizens who need help and not immigrants who arrive unable to contribute to the nation's well-being.

Other commenters stated that as more immigrants look to come to the United States, the proposed public charge rule is needed to preserve the ''American Dream'' for future generations and to prevent the current generation from having to shoulder the financial burden of paying for foreign nationals who cannot provide for themselves.

*Response:* This rule does not aim to address the U.S. economy, job creation, protection of the social safety net or the ''American dream,'' curtail spending on public assistance, or ensure that public assistance will be reserved for U.S. citizens. This rule also does not attempt to curtail efforts to address broader economic and health problems, including with respect to people outside

the United States. Rather, the purpose of this rule is to implement the public charge ground of inadmissibility consistent with the principles of self-sufficiency set forth by Congress, and to minimize the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits.[50] While the rule may result in reductions in overall alien enrollment in certain public benefit programs, improve the ability of U.S. citizens to obtain public benefits for which they are eligible, or otherwise benefit the U.S. economy, this rule does not directly regulate these matters.

*Comment:* Some commenters stated that there should be more stringent immigration standards generally and reductions in the number of immigrants in the United States. Some commenters stated that immigrants are ''abusing'' the U.S. welfare system. Other commenters offered general support for the NPRM without further explanation.

*Response:* DHS does not intend this rule to reduce overall immigration levels to the United States. Instead, this rule is an exercise of DHS's authority to interpret the public charge ground of inadmissibility. Fraud or abuse in alien enrollment in public benefits programs is of course problematic, but the public charge ground of inadmissibility applies to an alien who is likely at any time to become a public charge, regardless of whether such alien is likely to fraudulently obtain public benefits or abuse the public benefits system. With respect to comments about an alien receiving public benefits for which he or she was not eligible, DHS notes that to the extent that an alien obtains such a benefit by falsely claiming to be a U.S. citizen, the alien may be inadmissible for falsely claiming U.S. citizenship (section 212(a)(6)(C)(ii) of the Act, 8 U.S.C. 1182(a)(6)(C)(ii)), depending on the circumstances by which he or she received the benefits improperly. Additionally, to the extent that an applicant who has obtained public benefits through fraud or misrepresentation subsequently applies for an immigration benefit for which a favorable exercise of discretion is required, the fraud or misrepresentation can be considered in deciding whether to favorably exercise that discretion. However, public benefits that an alien obtains unlawfully are outside of the scope of this rulemaking, which only addresses inadmissibility based on the public charge ground of inadmissibility.

---

[49] *See* IIRIRA, Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)); H.R. Rep. No. 104–828 at 240–41 (1996) (Conf. Rep.) (''This section amends INA section 212(a)(4) to expand the public charge ground of inadmissibility. . . . Self-reliance is one of the most fundamental principles of immigration law.'').

[50] *See* 8 U.S.C. 1601.

**41306**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

*D. Comments Expressing General Opposition to the NPRM*

1. Purpose of the Rule and Self Sufficiency

*Comment:* Commenters stated that the proposed rule represented an ineffective solution to a non-existent problem—a lack of self-sufficiency among immigrants. A commenter indicated that the proposed rule emphasized that the self-sufficiency of immigrants is a long-standing congressional policy, yet did not provide sufficient data that dependency on the government and/or government benefits is a problem within immigrant communities, especially in light of data showing that immigrants have been shown generally to make very strong economic contributions to the country. The commenter stated that, for example, in 2014 immigrant-led households in Massachusetts paid nearly $10 billion dollars in federal, state, and local taxes, and represented nearly $28 billion dollars in spending power.

Additionally, commenters expressed concern that the text of the rule suggests that it is the main responsibility of our nation's immigration system—and the agencies which run it—to cultivate or maintain a national ethos of "self-sufficiency." A commenter indicated that immigration policies and systems are meant to achieve a number of different goals, such as family unity, diversity, humanitarian assistance, and ensuring sufficient labor. Commenters stated that safeguarding our nation from individuals that may at some point need government support is not the singular or even primary purpose of our system of immigration.

*Response:* DHS disagrees with the commenters that ensuring the self-sufficiency of immigrants is unnecessary, or that a lack of self-sufficiency is a non-existent problem. As outlined in the NPRM, Congress clearly declared, in its policy statement in PRWORA, that self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes and that it should continue to be a governing principle in the United States.[51] Congress also has maintained the public charge ground of inadmissibility in law since 1882. DHS believes that applicants for admission and adjustment of status who are subject to the public charge ground of inadmissibility should be self-sufficient and should not depend on the government to meet their needs, and DHS firmly believes that this was Congress' intent in enacting section

212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), including as recently as 1996.[52] DHS agrees with the commenter that immigration laws and policies serve many purposes, including goals such as family unity, diversity, humanitarian assistance. However, U.S. immigration laws balance competing values. For example, the criminal grounds of inadmissibility[53] are designed to protect the United States and its citizens from harm and threats to public safety,[54] while health-related grounds of inadmissibility are intended to protect the health of the United States population.[55] These grounds of inadmissibility are valid exercises of congressional authority, notwithstanding that such grounds of inadmissibility may sometimes impede family unity, and notwithstanding that in many individual aliens' cases, such grounds of inadmissibility may not be implicated. Similarly, here, Congress, though legislation, addressed various policy considerations when determining whether a foreign national should be admitted to the United States, including whether an individual who is likely at any time in the future to become a public charge should be admitted to the United States. Therefore, while self-sufficiency may not be the primary purpose of U.S. immigration laws, it is one consideration put into place by Congress.

DHS is under no obligation to demonstrate that all or most aliens in the United States are not self-sufficient. To the extent that an alien is self-sufficient, the alien is unlikely to be affected by this rule. In the NPRM, DHS did provide extensive data on the lack of self-sufficiency among certain aliens, and showed how the minimum statutory factors identified by Congress relate to the self-sufficiency of individuals and their receipt of public benefits.[56] DHS acknowledges that immigrants provide significant contribution to the United States as a whole and within their communities, as demonstrated by data and information provided by many commenters. However, the focus of the inquiry for public charge purposes is whether an

individual alien, who is seeking to be admitted to the United States or who is applying for adjustment of status, is likely to become a public charge at any time in the future. This determination is made following consideration of the totality of the alien's individual circumstances and is a predictive assessment.

*Comment:* A commenter stated that section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) neither mentioned or discussed self-sufficiency nor identified self-sufficiency as a criteria in the determination and therefore disagreed with primary purpose of the rule outlined in the NPRM. Given the close proximity in time when PRWORA and Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) passed, the commenter considered it significant that Congress restricted an immigrant's eligibility for public benefits with PRWORA, yet IIRIRA codified the minimum mandatory factors without PRWORA's articulated self-sufficiency principles as relied on by DHS in the NPRM. The commenter indicated that both PRWORA and IIRIRA, were considered in the 1999 Interim Field Guidance because PRWORA and IIRIRA had created widespread confusion about permissible public benefit receipt in relation to public charge inadmissibility. The commenter stated that the current rule failed to identify post-1999 laws, data, or experience, such as congressional authorities or other information not already taken into account by INS in developing the 1999 Interim Field Guidance that informed DHS's development of the proposed rule. The commenter therefore requested that DHS in its final rule identify and describe legal authorities or information other than the authorities which predated the 1999 Interim Field Guidance and that were relied on by INS, which DHS considered in developing its proposed definition of public charge. The commenter stated that if Congress had wanted to achieve the self-sufficiency or cost-savings goals identified by the NPRM it could alter the eligibility rules for the enumerated programs, but has not changed the public benefit eligibility requirements, and expanded eligibility for some programs following the enactment of PRWORA and IIRIRA in 1996, such as in 2002, when Congress restored SNAP eligibility for all qualified immigrant children.

*Response:* Although DHS agrees with the commenter that self-sufficiency is not mentioned in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS maintains, as outlined in the NPRM,

---

[51] *See* 8 U.S.C. 1601.

[52] *See* IIRIRA, Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)); H.R. Rep. No. 104–828 at 240–41 (1996) (Conf. Rep.) ("This section amends INA section 212(a)(4) to expand the public charge ground of inadmissibility. . . . Self-reliance is one of the most fundamental principles of immigration law.").

[53] *See* INA section 212(a)(2), 8 U.S.C. 1182(a)(2).

[54] *See* INA section 212(a)(2), 8 U.S.C. 1182(a)(2).

[55] *See* INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[56] *See* throughout the NPRM, Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed October 10, 2018).

that this principle, a congressional' policy objective, informs and has informed public charge determinations. Based on the administrative and legislative context discussed in the NPRM,[57] including congressional records relating to debates addressing self-sufficiency prior to Congress' passing of IIRIRA,[58] DHS's view of self-sufficiency and its role in the public charge determination remains unchanged. In fact, DHS considers the proximity of the passage of both PRWORA and IIRIRA as an indication that Congress associated public charge closely with the principles governing PRWORA, and that Congress must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge grounds of inadmissibility, even though receipt of such benefits could render the alien inadmissible as likely to become a public charge. Additionally, as outlined in the NPRM, DHS does not believe that the plain text of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), INS's discussion of PRWORA and IIRIRA, and the case law cited by INS or DHS requires the adoption of the legacy INS interpretations for purposes of public charge. As discussed in detail throughout the NPRM and below, the term public charge is ambiguous, and neither the statute nor case law prescribe the degree to which an alien must be receiving public benefits to be considered a public charge. DHS remains convinced that its interpretation is permissible and reasonable.

DHS disagrees with the commenter that the NPRM failed to identify post-1999 laws, data, or experience, such as congressional authorities or other information not already taken into account by INS in developing current public charge policy that informed DHS's development of the proposed rule. Post-PRWORA, Congress did restore some public benefit eligibility for aliens. DHS acknowledged these developments in the NPRM preamble.[59] For example, DHS incorporated the discussion that in 2002, the Farm Security and Rural Investment Act of

2002, Public Law 107–17, (May 13, 2002), Section 4401, restored SSI benefits for any person who was lawfully residing in the United States on August 22, 1996; restored SNAP for all children under 18; and provided that "qualified aliens"[60] were eligible for SNAP after five years of entry into the United States. In 2007, Section 525 of the Consolidated Appropriations Act for Fiscal Year (FY) 2008[61] provided for Iraqi and Afghan foreign nationals to obtain benefits.

These provision and others restoring or providing public benefit access to immigrants are incorporated in the statutory provisions governing PRWORA, 8 U.S.C. 1611. Therefore, this rule is informed by all the documentation and data presented before the 1999 Interim Field Guidance, as well as relevant subsequent legislation, and relevant case law. DHS would note that precedential decisions and other materials cited by DHS do not lose persuasive value for purposes of DHS's interpretation simply because they were also addressed in the 1999 proposed rule and 1999 Interim Guidance.[62] Further, although subsequent legislation, such as Congress's expansion of SNAP, expanded eligibility of public benefits to certain aliens, Congress has not subsequently changed the section 212(a)(4) of the Act, 8 U.S.C. 1182, which governs the public charge inadmissibility determination.[63]

*Comment:* A commenter stated that Congress, not DHS, may change statutory eligibility requirements for federally-administered public benefits programs, including the ones listed in the NPRM. The commenter stated that DHS's regulatory framework was designed to achieve the same effects as changing eligibility requirements—decreased and foregone enrollment in public benefit programs by certain populations—and therefore, usurped Congress' role.

*Response:* DHS strongly disagrees with the comment that that DHS's regulatory framework was designed to achieve the same effects as changing eligibility requirements—decreased and foregone enrollment in public benefit programs by certain populations—and therefore, usurped Congress' role. Although DHS acknowledges that the rule, once effective, may lead individuals to disenroll or choose to forego enrollment from public benefits, the rule does not change eligibility requirements for public benefits. The rule only provides for whether an alien is admissible into the United States, which is a matter of immigration law for the Federal Government and delegated to DHS.

2. Requests for Reconsideration and Withdrawal of NPRM

*Comment:* Several commenters asked that DHS reconsider the rule and withdraw it, stating that the rule is unnecessary and would place an undue burden on DHS and immigrants. One commenter stated the proposed rule's preamble does not establish a sufficient justification for the proposed revisions. Another commenter stated that the NPRM was too long and discouraged the public from commenting on the proposed rule. Some commenters expressed concern that the rule conflicts with local, state, and federal initiatives, including undermining community-based, non-profit efforts, and making the immigration system inefficient. Several commenters stated that DHS should focus on promoting a rule that strengthens, rather than undermines, immigrants' ability to support themselves. Some commenters requested that the rule be withdrawn in its entirety, and that the 1999 Interim Field Guidance remain in effect.

*Response:* DHS will not retract the proposed rule and is concluding the public charge inadmissibility rulemaking through the publication of this final rule. DHS is committed to implementing section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), consistent with the principles of self-sufficiency set forth by Congress. As required by the statute and reflected in this rule, DHS's public charge inadmissibility determinations will involve an assessment of the mandatory factors as they relate to the likelihood of an applicant becoming a public charge at any time in the future.

*Comment:* Multiple commenters said the rule should be withdrawn, the 1999 Interim Field Guidance should remain in place, and that the proposed rule is a drastic change from the 1999 Interim Field Guidance. Many said that the 1999

---

[57] *See* 83 FR 51114 (Oct. 10, 2018).

[58] *See* 142 Cong. Rec. S4609 (May 2, 1996) (statement of Sen. Byrd) ("[S]elf-sufficiency will be the watchword for those coming to the United States. By making noncitizens ineligible for Federal means-tested programs, and by 'deeming' a sponsor's income attributable to an immigrant, the American taxpayer will no longer be financially responsible for new arrivals."), *available at https:// www.congress.gov/crec/1996/05/02/CREC-1996-05-02-pt1-PgS4592.pdf*. (last visited July 26, 2019).

[59] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51126–51133 (proposed October 10, 2018).

[60] "Qualified aliens" generally includes lawful permanent resident aliens, refugees/asylees, and other non-temporary legal residents (such as Cuban/ Haitian entrants).

[61] Public Law 110–161 (Dec. 26, 2007).

[62] For example, precedent decisions issued by the Executive Office for Immigration Review (EOIR) and the Attorney General are binding on DHS until overruled. *See* 8 CFR 103.3(c), 103.10(b), 1003.1(g); *see, e.g., Matter of E–L–H–*, 23 I&N Dec. 814, 817 (BIA 2005) (finding that a published Board decision has precedential effect unless and until modified or overruled by the Attorney General, the Board, Congress, or a Federal court.)

[63] *Cf. Cyan, Inc.* v. *Beaver Cty. Emp. Ret. Fund*, 138 S. Ct. 1061, 1070 (2018) (explaining that, if Congress had wanted to deprive state courts of jurisdiction over certain class actions, it could have easily done so by inserting a provision).

**41308    Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

Interim Field Guidance is consistent with congressional intent and case law and should not be abandoned. One commenter noted that the 1999 Interim Field Guidance's exclusion of certain public health, nutrition, and in-kind community service programs was consistent with the intent of Congress as expressed in its 1996 Conference Report regarding PRWORA and that rule was a departure from this intent.

*Response:* DHS disagrees that the 1999 Interim Field Guidance should remain in place. DHS has chosen to define public charge more broadly than in the 1999 NPRM and 1999 Interim Field Guidance. DHS believes this broader definition is consistent with Congress' intention that aliens should be self-sufficient. Self-sufficiency is, and has long been, a basic principle of immigration law in this country.[64] DHS believes that this rule aligns DHS regulations with that principle.[65]

*Comment:* A commenter urged DHS to either withdraw the proposed rule or if moving to finalize it, to provide a full and complete analysis of all public comments received on the proposed rule, including the total number of comments, (and the number of those signing individual comments), composition of, relative numbers of commenters supporting and opposing the overall proposal, the volume and nature of comments regarding specific provisions, and the rationale for specific choices made by DHS in light of comments. The commenter stated that doing so would provide transparency regarding the extent to which DHS considered public input in accordance with the APA.

*Response:* DHS declines to withdraw the NPRM and will conclude rulemaking with the publication of this final rule. DHS has responded to public comments that raise substantive issues or offer significant alternatives.[66] In this final rule, DHS is providing both an overview of public comments and commenters, and a complete analysis of public comments including those addressing specific aspects of the proposed rule. DHS has fully considered the public input on this rule in accordance with the APA.

*Comment:* Commenters stated that DHS's position is inconsistent with the 1999 NPRM.

*Response:* DHS agrees that this rule takes a different approach to interpreting the public charge ground of inadmissibility than the 1999 NPRM, and withdrew the 1999 NPRM as part of the 2018 NPRM.[67] The 2018 NPRM explained DHS's proposed change of position. DHS is not bound by a twenty-year-old proposed rule, and believes that this rule represents a permissible implementation of the public charge inadmissibility standard that Congress provided when it enacted section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). This public charge inadmissibility rule provides long-absent guidance on how to interpret key statutory terms, which have never been fully defined by Congress, and which the agency has the authority and responsibility to define.

### 3. Alternatives to the Public Charge Rule

*Comment:* An individual commenter proposed creating a "self-sufficiency program" in place of the proposed rule, modeled after the Office of Refugee Resettlement's (ORR) Voluntary Agencies Matching Grant Program that provides intensive case management, English language and vocational training, and a variety employment services, which would serve as an alternative to public benefits receipt by immigrants and nonimmigrants. A commenter suggested that rather than creating this rule to disincentivize receipt of public assistance by revoking or denying citizenship status based on receipt of public assistance, DHS should instead create classes or provide resources to aliens to help them understand the importance of self-sufficiency.

*Response:* DHS notes that this rule does not address eligibility for citizenship and neither the statute nor this final rule permit revocation or denial of citizenship status based on the public charge inadmissibility ground. This rule establishes guidelines for determining whether aliens who are applicants for admission or adjustment of status, and who are subject to section 212(a)(4) of the Act, are inadmissible as likely to become a public charge at any time in the future.[68] DHS further notes that it will not create programs in lieu of this rule that will help aliens attain self-sufficiency, as DHS believes, consistent with Congress's intent set forth in PRWORA, that aliens should be self-sufficient before they seek admission or adjustment of status.

*Comment:* A commenter requested a national stakeholder workgroup be

convened to accomplish the Administration's goals rather than proceeding with the public charge rule, which the commenter asserted will have a negative impact on the health and financial security of aliens.

*Response:* DHS disagrees that a stakeholder working group is an alternative to this rulemaking. As indicated elsewhere in this rule, DHS is exercising its authority to interpret the INA consistent with its congressional mandate. This final rule provides necessary guidance for purposes of implementing section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), including, by defining statutory terms that have never been defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws.

The rulemaking process allowed for ample public participation. DHS notes that it received over 266,000 public comments. DHS also participated in over 20 OMB E.O. 12866 meetings with public stakeholders related to the proposed rule. Therefore, DHS does not believe that national stakeholder group would work as substitute for this rulemaking.

In addition, DHS notes that USCIS has a robust stakeholder communication and engagement program that covers all aspects of the agency's operations. This program will engage stakeholders when this rule becomes final to help ensure that applicants for immigration benefits and their representatives fully understand the new rule.

### 4. Discrimination and Disparate Impact

*Comment:* Several commenters stated that this rule discriminates against both aliens and citizens and unduly affects certain individuals. Commenters stated that the rule discriminates against immigrants based on age, gender, income, race, health, and social status. Some commenters expressed concerns that the proposed changes to the definition of public charge are inhumane and discriminatory to immigrants, particularly minors, the elderly, the poor, those will chronic medical conditions and disabilities, immigrants with limited English proficiency, Latinos, Black families, and other communities of color, and goes against core American values. A number of commenters stated this rule would discriminate against individuals with chronic health conditions, such as heart disease. Some commenters stated that the new definition of "likely at any time in the future to become a public charge" in 8 CFR 212.21(c) would be discriminatory towards blind individuals who rely on public

---

[64] *See* 8 U.S.C. 1601(1).

[65] *See Southern S.S. Co.* v. *N.L.R.B.*, 316 U.S. 31, 47 (1942) ("Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another. . . .").

[66] *Reytblatt* v. *U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997); *Northside Sanitary Landfill, Inc.* v. *Thomas*, 849 F.2d 1516 (D.C. Cir 1988).

[67] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed Oct. 10, 2018).

[68] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

assistance to make ends meet, due to the 70 percent unemployment rate for blind individuals. The commenters stated that the proposed definition exhibits a clear and inherent bias against the blind and other individuals with a disability and urged DHS to abandon the rule.

Commenters generally stated the rule creates an ageist system that favors wealthy, healthy, and highly educated individuals. One commenter said that this rule creates a ''merit-based'' system that punishes immigrants and discriminates against them based on their race, religion, and ethnicity. A commenter stated that the rule's consideration of an applicant's English proficiency amounts to discrimination.

Several commenters observed that U.S. born children often qualify for and receive assistance, because their immigrant parents are struggling. The commenters stated that DHS should not penalize the parents or the children for accepting public benefits that were legally available to them. One commenter questioned the legality of the rule and stated that the Supreme Court in *Plyler* v. *Doe*[69] held that states cannot discriminate against children on the basis of undocumented status. The commenter said numerous other cases have held that children cannot be penalized for their parentage (*e.g., Levy* v. *Louisiana,* 391 U.S. 68 (1968) and *Clark* v. *Jeter,* 486 U.S. 456 (1988)).

*Response:* To the extent that this rule, as applied, may result in negative outcomes for certain groups, DHS notes that it did not codify this final rule to discriminate against aliens based on age, race, gender, income, health, and social status, or to create an ''ageist'' system that selectively favors wealthy, healthy, and highly educated individuals. Rather, this rule is intended to better ensure that aliens subject to this rule are self-sufficient. To the extent that this rule specifically or disproportionately affects those of a particular age or those with lower incomes, less education, limited English proficiency, or poor health, DHS notes that Congress requires DHS to consider, among other factors, an applicant's age, assets, resources, financial status, education, and skills as part of the public charge inadmissibility determination.

Additionally, this rule does not create a merit-based system more broadly or apply a wealth or poverty litmus test to make public charge inadmissibility determinations. Instead, DHS has established a systematic approach to implement Congress' totality of the circumstances standard and has given the mandatory statutory factors

meaning, value, and weight strictly in relationship to determining whether or not an alien who is otherwise admissible or eligible for adjustment of status in the context of the existing system is likely at any time in the future to become a public charge. DHS acknowledges that one likely outcome of this change is that some individuals who would may have been able to immigrate under the 1999 Interim Field Guidance will now be deemed inadmissible as likely public charges.

Section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), sets forth the public charge ground of inadmissibility that makes aliens ineligible for visas, admission, and adjustment of status. Section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), also requires DHS to consider minimum factors in the public charge inadmissibility analysis. The Federal Government is responsible for ''regulating the relationship between the United States and our alien visitors,'' which includes regulating the manner and conditions of entry, as well as the residence of aliens.[70] DHS is the federal agency with the authority to establish regulations regarding the public charge inadmissibility determination.[71] As required by statute, DHS must consider how an alien's age, health, family status, assets and resources, financial status, education, and skills impact the alien's likelihood at any time of becoming a public charge. Under the statute, DHS may also consider an applicant's affidavit of support, if applicable. The statute does not direct DHS to consider an alien's race, gender, or social status. Consequently, DHS will not consider an alien's race, gender, or social status when making a public charge inadmissibility determination. Other than an absent or insufficient affidavit of support, where required, DHS will not find an alien inadmissible based on any single factor without consideration of all of the other factors and the totality of their effect on an applicant's likelihood of becoming a public charge at any time in the future.

In addition, rational basis scrutiny generally applies to immigration regulations applicable to aliens.[72] As set

forth in NPRM,[73] DHS's public charge rule is rationally related to the government's interest to minimize the incentive of aliens to immigrate to the United States because of the availability of public benefits and to promote the self-sufficiency of aliens within the United States.[74]

Equally important, the public charge inadmissibility rule does not discriminate against or penalize U.S. citizens, including children. The public charge inadmissibility rule does not directly regulate the conduct of U.S. citizens because the grounds of inadmissibility do not apply to U.S. citizens. Moreover, this rule does not regulate eligibility for, or access to, public benefits. Neither the NPRM nor this final rule take into consideration receipt of public benefits by U.S. citizens who are part of the alien's household, including benefits received by U.S. citizen children. The receipt of public benefits by household members is not considered as part of an alien's application, although such receipt is excluded from the alien's household income, assets, and resources.

Furthermore, DHS disagrees that this rule is inconsistent with *Plyler* v. *Doe* and the other cited cases. *Plyler* does not apply to this rule. As courts have recognized, *Plyler* relates to distinctions made by states rather than the Federal Government.[75] Similarly, neither *Levy* v. *Louisiana* nor *Clark* v. *Jeter* is applicable here. These cases did not address the immigration status of children or Federal regulations. Instead, both cases

---

[69] 457 U.S. 202 (1982).

[70] *Mathews* v. *Diaz,* 426 U.S. 67, 81–82 (1976).

[71] *See* Homeland Security Act of 2002, Public Law 107–296, sec. 102, 116 Stat. 2135, 2142–44 (Nov. 25, 2002) (codified at 6 U.S.C. 112); INA section 103, 8 U.S.C. 1103.

[72] *See Korab* v. *Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) (''[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis . . . The

difference between state and federal distinctions based on alienage is the difference between the limits that the Fourteenth Amendment places on discrimination by states and the power the Constitution grants to the federal government over immigration.'') (citation omitted); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir. 2001), citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000) (''We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration . . . .''). Generally, laws and regulations that neither involve fundamental rights nor include suspect classifications are reviewed under rational basis scrutiny, under which the person challenging the law must show that the government has no legitimate interest in the law or policy or that there is no rational link between the interest and the challenge law or regulation. *See also Heller* v. *Doe by Doe,* 509 U.S. 312, 319 (1993).

[73] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51122–23 (proposed Oct. 10, 2018).

[74] *See* 8 U.S.C. 1601.

[75] *See, e.g., Aleman* v. *Glickman,* 217 F.3d 1191, 1198 (9th Cir. 2000) (''*Plyler* [is] inapposite, however, because [it] involve[s] *state* classifications of aliens.'' (emphasis in the original)); *Rodriguez ex rel. Rodriguez* v. *U.S.,* 169 F.3d 1342, 1350 (11th Cir. 1999) (''*Plyler* is inapposite because it deals with a Fourteenth Amendment challenge to a *state's* classification of aliens.'' (emphasis in the original).

dealt with impacts of state laws on illegitimate children.[76]

5. Potential Disenrollment Impacts

Numerous commenters raised concerns about the rule's asserted ''chilling effect.'' Commenters indicated that the rule would cause aliens and citizens to either disenroll from public benefit programs or forego enrollment in public benefit programs, which would negatively impact the nation, states, local communities, families, vulnerable populations, and health care providers. Because most of these comments reflect the same theme, the discussion below provides a detailed breakdown of public comments separated by topic, followed by a consolidated DHS response.

Choice Between Public Benefits and Immigration Status

Commenters stated that the rule puts the country at risk by forcing choices no family should have to make. Commenters noted that alien parents will limit or forego their U.S. citizen children's receipt of public benefits to avoid adverse immigration consequences. Commenters stated that the rule would force eligible immigrants to withdraw their families from assistance programs for fear of adverse immigration consequences, which would undermine access to essential health, nutrition, and other critical benefits and services. Several commenters, expressing the view that no person in the United States should be denied federal assistance programs or public benefits, said that immigrants should not have to make impossible choices between their health or providing for their family's immediate needs and risking their immigration status or keeping their families together. Some commenters said that the proposed rule would cause patients diagnosed with cancer or HIV to choose between accessing needed health services or suffering adverse consequences with respect to their immigration status. A commenter stated that their state had the highest rate of insurance coverage in the nation, and that it is vital that patients and families continue to access care without fear of adverse immigration consequences. A number of commenters expressed concerns that families must choose between public housing or citizenship as a result of this rule.

Many commenters provided studies or data related to the current or potential number of individuals who will forego and/or disenroll from public

benefit programs, including specific groups of individuals, such as children. Commenters involved in social services reported that they were already seeing immigrants refraining from accessing services in clinics, food banks, childcare centers, emergency shelters, and local school districts, including immigrants who are exempt from public charge inadmissibility. Several commenters said that the chilling effect would not be limited to immigrants subject to the proposed rule and would discourage many legal residents from utilizing services to which they are legally entitled, leading to negative health and economic outcomes. For example, a commenter said that refugees, who are automatically enrolled in Medicaid upon arrival in its state, may believe they will be deported if they re-enroll in Medicaid after their initial resettlement period. Some commenters said the rule may provide an incentive for U.S. citizens and lawful permanent residents to terminate their subsidized health care in order to remain eligible to petition for their family members living abroad.

General Assertions as to Effects

Commenters said that the rule's disenrollment effect would have lasting impacts on the health and safety of our communities and that immigrant families are experiencing significant levels of fear and uncertainty that has a direct impact on the health and well-being of children. Citing studies and research, many commenters asserted that the chilling effect will increase hunger, food insecurity, homelessness and poverty. They added that the chilling effect will also decrease educational attainment and undermine workers' ability to acquire new skills for in-demand occupations. Many commenters stated that negative public health, social, and economic outcomes (e.g., hunger, food insecurity, decreased nutrition, unmet physical and mental health needs, unimmunized individuals, disease, decreased school attendance and performance, lack of education, poverty, homelessness) collectively damage the prosperity and health of our communities, schools, and country. Several commenters said that the rule would drive up uncompensated care costs, increase use of medical emergency departments, increase healthcare costs, endanger maternal and infant health and heighten the risk of infectious disease epidemics. One commenter indicated that the rule would make child poverty worse and harm communities as well as infrastructure that serves all of us.

Housing Benefit-Related Effects

Many commenters said some individuals will leave public housing as a result of this rule and become homeless or face housing instability. Commenter stated that the rule will cause disenrollment from subsidized housing programs, which will create additional costs for local governments. Commenters stated that the chilling effect on using HCVs will cause the loss of ''wraparound services'' for residents, including case management, mental healthcare, peer support, and child care. Commenters raised concerns about the effects of housing insecurity in specific cities, including health problems and downstream economic impacts. One commenter stated that while the proposed public charge rule does not directly count benefits received by the U.S. citizen children of immigrant parents, it would still interfere with the ability of U.S. citizens to receive housing assistance, because many citizens live in mixed-status households with individuals who are subject to the public charge ground of inadmissibility.

Food and Nutrition Benefit-Related Effects

Commenters noted that disenrollment from programs like SNAP would worsen food insecurity in the United States. Some commenters provided estimates of the number of children in certain states or cities currently accessing SNAP benefits who could be affected by the rule. Several commenters stated that the proposed rule would force millions of children and families to disenroll from the SNAP program. For example, one commenter cited a study that found that 2.9 million U.S. citizen children would forego SNAP benefits as a result of the proposed public charge rule. Another commenter stated that research shows that immigrants' loss of eligibility reduced participation in the ''Food Stamp Program'' among U.S.-born children of immigrants by 50 percent and reduced the average benefits they received by 36 percent. Some commenters stated that including SNAP in the public charge determination would worsen food insecurity primarily among families with older adults, children, and people with disabilities. Many commenters opined that the inability of individuals in need to access food assistance programs like SNAP would impact health outcomes and those health outcomes would impact healthcare utilization rates and costs. A few commenters emphasized that disenrollment from programs such as SNAP and Special Supplemental Nutrition Program for Women, Infants,

---

[76] *Levy* v. *Louisiana*, 391 U.S. 68 (1968); *Clark* v. *Jeter*, 486 U.S. 456 (1988).

and Children, (WIC) would specifically put children at risk for learning difficulties, increased emergency room visits, chronic asthma, and other diseases and would cause a steep decline in the health and well-being of pregnant women and infants.

Several commenters noted that the rule would increase the number of individuals seeking help from state and local non-profit feeding programs, which would burden local government facilities, volunteer-lead organizations and food pantries and compromise the amount and quality of nutritious food provided. Some commenters added that restricting access to nutrition benefits could make things harder in communities with high volumes of homeless residents.

Some commenters said decreased participation in SNAP or Medicaid will likely have a profound impact on WIC's ability to serve all eligible participants by introducing new barriers to access and heaping additional costs on WIC agencies. A few commenters stated that disenrollment from WIC could be as high as 20 percent. A commenter stated that enrollment in WIC dropped from 7.4 million to 6.8 million from January to May 2018, and the commenter stated that families feel forced to decide between their safety as immigrants and the food and services that their children need.

Health Benefit-Related Effects

A commenter opposed the rule, stating that DHS failed to present anything in the proposed rule that would discredit, or justify ignoring, the evidence in the 1999 Interim Field Guidance that aliens' reluctance to receive benefits for which they are eligible will have a negative impact on public health and general welfare. Commenters expressed concern that the rule would undo historic gains in health coverage and associated positive health outcomes over the past few years. Some commenters stated that the proposed rule would result in immigrants staying away from social service agencies and will negatively impact health in many ways. Another commenter noted that the rule will cause people to get sick or go hungry and indicated that "penalizing" immigrants who utilize benefits to support their family only worsens racial, gender, and economic inequality.

A number of commenters cited the Kaiser Family Foundation study, which provided estimates on Medicaid/ Children's Health Insurance Program (CHIP) disenrollment. The Kaiser Family Foundation estimated that if the proposed rule leads to Medicaid

disenrollment rates ranging from 15 percent to 35 percent, then between 2.1 million and 4.9 million Medicaid/CHIP enrollees living in a family with at least one noncitizen would disenroll. Many commenters said that DHS vastly underestimates the numbers of people who will disenroll from Medicaid and warned that DHS was underestimating the "negative consequences" in the proposed rule. Collectively, these commenters described the positive health and economic benefits associated with health coverage through programs like Medicaid. They also highlighted research findings about the dangers associated with being uninsured. They warned that decreased participation in Medicaid would lead to decreased utilization of preventative services, worse health outcomes and financial standing for families and children, increased health spending on preventable conditions, and heightened strain on the healthcare system.

Other commenters said the inclusion of Medicare Part D in the rule will cause affected individuals to disenroll or otherwise be restricted from Medicare access, resulting in negative health outcomes for individuals and communities (e.g., increased uninsured rated, decreased access to prescriptions). Another commenter said that seniors who use Medicare Part D will be deterred from filling prescriptions, which could increase acute care and overall healthcare costs. Several commenters stated that the sanctions associated with the use of Medicaid and Medicare Part D benefits would result in reduced access to medical care and medications for vulnerable populations, including pregnant women, children, people with disabilities, and the elderly. A couple of commenters said the inclusion of Medicare Part D would punish immigrants for accessing healthcare services. Another commenter said the proposed rule would dissuade thousands of low-income residents in its state from seeking health coverage.

Effects on Vulnerable Populations

Many commenters said that reduced enrollment in federal assistance programs would most negatively affect vulnerable populations, including people with disabilities, the elderly, children, survivors of sexual and domestic abuse, and pregnant women. Some of these commenters suggested that the chilling effect associated with the proposed rule would cause vulnerable individuals and families to avoid accessing services, even if they are legally residing in the United States and not subject to the proposed rule.

Several commenters said the proposed rule would adversely affect immigrant women, because they will be more likely to forego healthcare and suffer worsening health outcomes. A comment described the detrimental impact of reduced Medicaid enrollment on maternal and infant health. Multiple commenters said the proposed rule would lead to negative health outcomes in general, but especially for pregnant and breastfeeding women, infants, and children. Another commenter indicated that refugees and victims of trafficking, who are exempt from public charge, would also disenroll because of fear and gave the example that in 1996 the use of TANF fell 78 percent among the refugee population despite the fact that refugees were not subject to the public charge test.

Several commenters said the health of children is inextricably linked to the health of their parents, asserting that parents who are enrolled in health insurance are more likely to have children who are insured. Some of these commenters went on to say that disenrollment from health insurance by parents will result in a loss of coverage and access to preventive healthcare for their children. A couple of commenters said that they were already seeing these consequences due to confusion over the proposed rule, including parents choosing to avoid needed health services for their children. A couple of commenters said every child in America should have access to quality, affordable healthcare.

Many commenters, citing studies and research, stressed the chilling effect of this rule will negatively affect the health and well-being of children. Other commenters cited a study that predicted the numbers of children who would disenroll from Medicaid and included figures on the numbers of children with various medical conditions in need of medical attention. Healthcare providers said uninsured children would be less likely to receive preventative care and necessary treatment, and generally would be less healthy compared to children with health insurance. Several commenters said that fewer children with disabilities would receive home and community based services, because Medicaid covers these services. Another commenter said that many children receive critical dental services through Medicaid and that a lack of access to these services can cause oral diseases that impact diet, emotional well-being, sleep, and the ability to work and study.

Several commenters voiced concern about the adverse impact on Medicaid-funded health services in schools. A few commenters provided data on the

funding school districts receive from Medicaid for school-based health services and the numbers of students who benefit from these programs. The commenters pointed out that this funding is tied to the number of Medicaid-eligible students enrolled. Many commenters said the proposed rule's exemption of school-based health services was insufficient given the larger repercussions of the chilling effect and the likelihood that many children would be disenrolled. Commenters said that schools would need to provide healthcare and special education to children regardless of whether the school could request payment from Medicaid for such services. These commenters further stated that the school would need to use local funds to cover the cost of services that Medicaid would ordinary cover because parents would be unwilling to give consent to the school to enroll the children in Medicaid. Some commenters said special education administrators routinely engaged with families around issues related to health, wellness and school attendance, and said the proposed rule would diminish many students' chances for academic success. A commenter said that it was important for schools to create safe, supportive and inclusive communities, and that the proposed rule could undermine efforts to accomplish this goal. One commenter said Medicaid covers behavioral treatments for children and that providers often partner with schools who are not equipped to provide these targeted services. Two commenters said that the language of the proposed rule was concerning for children who receive services through the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) program, which is a federally mandated benefit that provides children with the routine and preventive care services they need to grow into healthy adults.

Effects on U.S. Citizens

Several commenters said that rule would cause the greatest harm to U.S. citizen children of immigrant parents. Many commenters said that U.S. citizen children need SNAP, CHIP, Medicaid, food stamps, and other public benefits to survive if their immigrant parents cannot afford such services, and U.S. citizen children have a right to these benefits. A commenter said research demonstrates that barriers to participation in public programs like Medicaid that affect immigrants also have harmful spillover effects on U.S. citizens, because many U.S. citizens live in mixed-status households. The commenter stated that in these cases,

research shows that U.S. citizens in the household are less likely to obtain needed services such as health insurance through Medicaid due to concerns about the immigration status of other family members. A number of commenters said the rule would discourage U.S. citizens who live in mixed-status households from accessing assistance programs for which they are eligible, including Medicaid and CHIP, or deprive them of the benefits of those programs entirely.

Increased Costs to Health Care Providers, States, and Localities

Many commenters particularly emphasized that disenrollment or foregoing enrollment would be detrimental to the financial stability and economy of communities, States, local organizations, hospitals, safety net providers, foundations, and healthcare centers. Commenters offering estimates on the number of people who would disenroll from Medicaid under the proposed rule warned that the costs associated with the resultant rise in uncompensated care would be borne by health systems, hospitals, and insured patients. A commenter said that this situation presents an ethical dilemma for physicians counseling patients on treatment options, who are "already beginning to field questions from patients and are having to explain the immigration risks of using healthcare services." A commenter citing research that found a high percentage of emergency room visits could be managed in physicians' offices warned that the proposed rule would increase costly emergency room usage.

A couple of commenters said that Medicaid was the largest source of funding for community health centers and provided estimates of financial losses due to reduced Medicaid reimbursement. A commenter said that Medicaid and CHIP were the underpinning for reimbursement for pediatric subspecialists. Commenters stated that the proposed rule would impact their reimbursements and would force them to cut patient services. One of these commenters cited a study on the anticipated reductions in services, which included an estimated $17 billion reduction in hospital payments. Other commenters said that Medicaid enables many individuals to access needed behavioral health services and that a rise in uncompensated care will diminish providers' ability to render these services. A commenter said reductions in federal funding for Medicaid and Medicare resulting from decreased enrollment would force States to increase funding levels, a challenge

that could potentially lead to increased wait list times, rolling enrollment freezes, and other program cuts that would impact the broader health system.

*Response:* With respect to the rule's potential "chilling effects" or disenrollment impacts, DHS notes that (1) the rule's overriding consideration, *i.e.,* the Government's interest as set forth in PRWORA, is a sufficient basis to move forward; (2) it is difficult to predict the rule's disenrollment impacts with respect to the regulated population, although DHS has attempted to do so in the accompanying Final Regulatory Impact Analysis; and (3) it is also difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule, although, again, DHS has attempted to do so in the accompanying Final Regulatory Impact Analysis.

First, as discussed above, this rule is rationally related to the Government's interest, as set forth in PRWORA, to: (1) Minimize the incentive of aliens who attempt to immigrate to, or adjust status in the United States due to the availability of public benefits; and (2) Promote the self-sufficiency of aliens within the United States.[77] DHS has defined public benefits by focusing on cash assistance programs for income maintenance, and an exhaustive list of non-cash food, housing, and healthcare, designed to meet basic living needs. This definition does not include benefits related exclusively to emergency response, immunization, education, or social services, nor does it include exclusively state and local non-cash aid programs. DHS acknowledges that individuals subject to this rule may decline to enroll in, or may choose to disenroll from, public benefits for which they may be eligible under PRWORA, in order to avoid negative consequences as a result of this final rule. However, DHS has authority to take past, current, and likely future receipt of public benefits into account, even where it may ultimately result in discouraging aliens from receiving public benefits.

Although individuals may reconsider their receipt of public benefits as defined by this rule in light of future immigration consequences, this rule does not prohibit an alien from obtaining a public benefit for which he or she is eligible. DHS expects that aliens seeking lawful permanent resident status or nonimmigrant status in the United States will make purposeful and well-informed decisions commensurate with the immigration status they are seeking. But regardless,

---

[77] *See* 8 U.S.C. 1601.

DHS declines to limit the effect of the rulemaking to avoid the possibility that individuals subject to this rule may disenroll or choose not to enroll, as self-sufficiency is the rule's ultimate aim.

Second, DHS finds it difficult to predict how this rule will affect aliens subject to the public charge ground of inadmissibility, because data limitations provide neither a precise count nor reasonable estimate of the number of aliens who are both subject to the public charge ground of inadmissibility and are eligible for public benefits in the United States. This difficulty is compounded by the fact that most applicants subject to the public charge ground of inadmissibility and therefore this rule are generally unlikely to suffer negative consequences resulting from past receipt of public benefits because they will have been residing outside of the United States and therefore, ineligible to have ever received public benefits. For example, most nonimmigrants and most immediate relative, family-sponsored, and diversity visa immigrants seek admission to the United States after issuance of a nonimmigrant or immigrant visa, as appropriate.[78] The majority of these individuals are likely to have been ineligible for public assistance in the United States, because they generally have resided abroad and are not physically present in the United States.

Aliens who are unlawfully present and nonimmigrants physically present in the United States also are generally barred from receiving federal public benefits other than emergency assistance.[79] For example, applicants for admission and adjustment of status—are

[78] The United States admitted over 541 million nonimmigrants between Fiscal Years 2015 and 2017. See DHS, Yearbook of Immigration Statistics 2017, Table 25. Nonimmigrant Admissions by Class of Admission: Fiscal Years 2015 to 2017, available at *https://www.dhs.gov/immigration-statistics/yearbook/2017/table25*. Among immediate relative, family sponsored, and diversity visa immigrants who acquired lawful permanent resident status between Fiscal Years 2015 and 2017, sixty-seven percent were admitted to the United States and thirty-three percent adjusted their status in the United States. See DHS, Yearbook of Immigration Statistics 2017, Table 6, Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2015 to 2017, available at *https://www.dhs.gov/immigration-statistics/yearbook/2017/table6*. The 2017 Yearbook of Immigration Statistics is a compendium of tables that provide data on foreign nationals who are granted lawful permanent residence (*i.e.,* immigrants who receive a "green card"), admitted as temporary nonimmigrants, granted asylum or refugee status, or are naturalized.

[79] DHS understands that certain aliens may be eligible for state-funded cash benefits. As there are multiple state, local, and tribal programs that may provide cash benefits, DHS does not have a specific list of programs or data on the number of aliens that may be affected by the rule by virtue of their enrollment in such programs.

generally ineligible for SNAP benefits and therefore, would not need to disenroll from SNAP to avoid negative consequences.[80] Once admitted, lawful permanent residents are generally prohibited from receiving SNAP benefits for a period of five years.[81] Notwithstanding the inclusion of SNAP as a designated public benefit, DHS will not consider for purposes of a public charge inadmissibility determination whether applicants for admission or adjustment of status are receiving food assistance through other programs, such as exclusively state-funded programs, food banks, and emergency services, nor will DHS discourage individuals from seeking such assistance.

DHS recognizes a plausible connection between the NPRM and reduction in alien enrollment in WIC to the extent that aliens who are subject to public charge inadmissibility are also eligible to receive WIC benefits. While DHS did not list WIC as a designated public benefit under proposed 8 CFR 212.21(b), DHS also did not expressly exclude WIC from consideration as a public benefit. Indeed, DHS sought public comments on whether an alien's receipt of benefits other than those proposed to be included in this rule as public benefits should nonetheless be considered in the totality of circumstances, which understandably could have given the impression that DHS was contemplating the inclusion of WIC among other public benefits. This final rule makes clear that WIC will not be an enumerated public benefit under 8 CFR 212.21(b).

DHS also acknowledges that under the NPRM, certain lawfully present children and pregnant women[82] in certain states and the District of Columbia might have chosen to disenroll from or forego enrollment in Medicaid if they are otherwise eligible to maintain or pursue an immigration benefit and are subject to public charge inadmissibility. As noted above, however, this final rule exempts receipt of Medicaid by such persons.

Third, DHS finds it difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule, such as people who erroneously believe themselves to be affected. This rule does not apply to U.S. citizens and aliens exempt from

[80] *See* 8 U.S.C. 1611(a); 8 U.S.C 1612(a)(2)(D)(ii).
[81] *See* 8 U.S.C. 1613(a).
[82] U.S. Department of Health and Human Services, Centers for Medicaid and Medicare Services, Medicaid and CHIP Coverage of "Lawfully Residing" Children and Pregnant Women (July 1, 2010), *https://www.medicaid.gov/Federal-Policy-Guidance/downloads/SHO10006.pdf* (last visited May 7, 2019).

public charge inadmissibility. In the proposed rule, DHS provided an exhaustive list of immigration classifications that are exempt from the public charge ground of inadmissibility, and this final rule retains those exemptions. DHS is including in the Applicability section of this final rule Tables 3 and 4 that are similar to those included in the NPRM, which also reflect additional clarifications made in this final rule with respect to T, U, and VAWA aliens. This rule does not prohibit or otherwise discourage individuals who are not subject to the public charge inadmissibility from receiving any public benefits for which they are eligible.

Because DHS will not consider the receipt of public benefits by U.S. citizens and aliens not subject to public charge inadmissibility, the receipt of public benefits by these individuals will not be counted against or made attributable to immigrant family members who are subject to this rule. Accordingly, DHS believes that it would be unwarranted for U.S. citizens and aliens exempt from public charge inadmissibility to disenroll from a public benefit program or forego enrollment in response to this rule when such individuals are not subject to this rule. DHS will not alter this rule to account for such unwarranted choices.

DHS appreciates the potential effects of confusion regarding the rule's scope and effect, as well as the potential nexus between public benefit enrollment reduction and food insecurity, housing scarcity, public health and vaccinations, education health-based services, reimbursement to health providers, and increased costs to states and localities. In response to comments, DHS will also issue clear guidance that identifies the groups of individuals who are not subject to this rule, including, but not limited to, U.S. citizens, lawful permanent residents returning from a trip abroad who are not considered applicants for admission, and refugees.

In addition, as explained in greater detail elsewhere in this rule, DHS has made a number of changes in the final rule that may mitigate some of the concerns raised by the public regarding disenrollment impacts. For example, DHS has excluded the Medicare Part D LIS from the definition of public benefit because DHS has determined that Medicare Part D benefits, including LIS, are earned by working or being credited with 40 qualifying quarters of work and establishing eligibility for Medicare. While children are not exempt from public charge inadmissibility, DHS has decided against the inclusion of CHIP in the definition of public benefit. DHS has

excluded from the public benefits definition, public benefits received by children eligible for acquisition of citizenship, and Medicaid benefits received by aliens under the age of 21 and pregnant women during pregnancy and 60 days following the last day of pregnancy.

In sum, DHS does not believe that it is sound policy to ignore the longstanding self-sufficiency goals set forth by Congress or to admit or grant adjustment of status applications of aliens who are likely to receive public benefits designated in this rule to meet their basic living needs in an the hope that doing so might alleviate food and housing insecurity, improve public health, decrease costs to states and localities, or better guarantee health care provider reimbursements. DHS does not believe that Congress intended for DHS to administer section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), in a manner that fails to account for aliens' receipt of food, medical, and housing benefits so as to help aliens *become* self-sufficient. DHS believes that it will ultimately strengthen public safety, health, and nutrition through this rule by denying admission or adjustment of status to aliens who are not likely to be self-sufficient.

**6. Inconsistent With American Values and Historic Commitment to Immigrants**

*Comment:* Several commenters said the rule puts immigration and/or obtaining ''green cards'' out of reach for working class or poor immigrant families and re-shapes, penalizes, or impedes legal immigration. Many commenters said the rule goes against fundamental American values and morality, including religious values and principles of faith, upon which this nation was built. Many commenters stated the importance of diversity and immigration to United States' history and strength, and expressed that the rule would fundamentally change our nation's historic commitment to welcoming immigrants where the United States would no longer be the country that serves as a beacon for the world's dreamers and strivers. Many commenters pointed out that many immigrants here today would not have been able to enter the country under the proposed rule. Several commenters said that the United States should be receptive to those seeking a better life in the United States and should not seek to penalize them, especially to those fleeing violence. One commenter stated that the rule will force more people to live in the shadows. Two commenters expressed that the rule is scapegoating, is the result of Congress' failure to

compromise on immigration policy, and is not a solution to immigration reform. Two other commenters said that the rule is motivated by fear and greed.

*Response:* While immigration and diversity have strengthened the United States, DHS strongly disagrees that this rule is motivated by fear or greed, or is un-American or immoral. DHS does not seek to frustrate the United States' long-standing commitment to family unity, humanitarian relief, and religious liberty through this rule. DHS also disagrees that this rule re-shapes, penalizes, or impedes the overall flow of legal immigration, and disagrees that the rule puts lawful permanent resident status beyond the reach of working-class and poor immigrant families. DHS reiterates that this rule does not and cannot alter the process of obtaining immediate relative, family-sponsored, employment-based, diversity, or nonimmigrant visas, as required and permitted by law. Rather, this rule clarifies the standard by which DHS will assess whether an alien subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), is inadmissible as likely to become a public charge at any time in the future. Through this final rule, DHS seeks to better ensure that applicants are self-sufficient. Even if an applicant has a low income, or belongs to a low-income family, that is only one consideration in the totality of the circumstances. Even if an applicant has household income that falls below 125 percent of FPG, DHS must consider the applicant's age, health, family status, education, and skills in determining whether the applicant is more likely than not to become a public charge at any time in the future. DHS also notes that the public charge inadmissibility ground does not apply to all applicants who are seeking a visa, admission, or adjustment of status. Congress specifically exempted certain groups, *e.g.,* refugees and asylees at the time of admission and adjustment of status, pursuant to sections 207(c)(3) and 209(c) of the Act, 8 U.S.C. 1157(c)(3), 1159(c).

**7. Contributions to American Society and Consideration of Self-Sufficiency**

*Comment:* Commenters stated that immigrants already significantly contribute to the economy, citing IRS data showing how much income tax the IRS received from immigrants and undocumented workers. Many commenters said that DHS should evaluate immigrants based on their contributions to communities in the United States and not based on their income level or financial status. Many commenters stated that the rule would

negatively affect immigrants who contribute to the American economy, including satisfying this country's need for younger workers. Several commenters stated that immigrants take jobs that Americans are not willing to perform (*e.g.,* landscaping, construction, caregivers, manufacturing) and that immigrants are hardworking and contributing members that increase the diversity of our culture and communities.

Several commenters stated that use of public benefits in a manner commensurate with their purpose should not be ''punishable.'' They emphasized that immigrants want to work and be self-sufficient, but that immigrants access public assistance programs to help them through periods of temporary hardship on the path to self-sufficiency and successfully contributes to society just as U.S. citizens do, if not less so. They added that immigrants often need public assistance due to insecure jobs, inadequate wages, lack of employer-sponsored health insurance, the high cost of medical care and housing, inaccessibility of health insurance, and other societal barriers. Multiple commenters provided anecdotes about how they or their family member's receipt of federal assistance helped them or their children go on to thrive and become productive members of American society. Similarly, some commenters told personal anecdotes about their interactions with hardworking immigrants who rely on temporary public assistance to survive and contribute to society. A few commenters added that a large portion of U.S. born citizens would not meet the public charge standards proposed by DHS.[83]

*Response:* DHS believes that immigrants, in general, make significant contributions to American society and enhance the culture of American life and communities. DHS also recognizes that public assistance programs provide food and nutrition, housing, and healthcare, and other benefits that meet individual needs, serve the public interest, and help people to become productive members of society. The relevant inquiry that this rule aims to address, however, is whether an applicant who is subject to the public charge ground of inadmissibility is likely to become a public charge at any time in the future. DHS believes that an alien who uses certain types of public benefits for the more than 12 months

---

[83] USCIS–2010–0012–0151; USCIS–2010–0012–0264; USCIS–2010–0012–1689; USCIS–2010–0012–13212 (Form Letter Master).

within a 36 month period of time can reasonably be said to lack self-sufficiency because her or she cannot meet his or her basic living needs. DHS has limited the type of public benefits to generally means-tested benefits that provide cash for income maintenance or meet the basic living needs of food and nutrition, housing, and healthcare. DHS believes that receipt of these public benefits alone for more than 12 months in the aggregate within any 36-month period suggests a lack of self-sufficiency, as such receipt exceeds what could reasonably be defined as a nominal or temporary need.

8. Adjudication and Processing

*Comment:* Multiple commenters stated that the rule would exacerbate USCIS and immigration court processing backlogs. Other commenters stated that the proposed rule outlined a process that was confusing at best, and would increase the number of appeals and deepen nationwide immigration processing delays. Similarly, several commenters said the rule, while not binding on the immigration courts, would further exacerbate an already record high case volume in the immigration courts. They further expressed concerns that increased evidentiary requirements, heightened scrutiny, and uncertainty as to what standard to apply, will delay adjudications, add to the backlog and result in inconsistent outcomes. One commenter said that this rule will further delay visa processing. Some commenters asserted that the proposed changes would greatly complicate the adjudication process by placing a greater burden on individuals who will be required to provide more evidence and paperwork to establish that they are not likely at any time to become a public charge and will require adjudicators to spend more time sifting through and verifying information. Several commenters stated that the rule's heightened evidentiary requirements and totality of the circumstances standard would exacerbate backlogs and cause uncertainty in adjudications.

Several commenters provided data on current processing times and estimated processing times under the proposed rule. Commenters stated that families would suffer the consequences of case processing delays such as job loss and food insecurity. Several commenters cited studies and stated that the increased processing times would hinder immigrants' ability to become or remain self-sufficient because the delays could financially impair immigrants

during the time they could not legally work.

A commenter wrote that the backlog for adjustment of status reviews was already significant, and new requirements in the proposed rules would simply exacerbate those conditions. A commenter stated that immigration officers and consular officers will have a limited amount of time to properly review documents and employment letters, and will not undertake an effective, case-by-case appraisal of applications. Similarly, supervising officers will not have enough time to review each denial thoroughly.

*Response:* As noted by commenters, this rule is not binding on the immigration courts or the Board of Immigration Appeals (BIA). It is DHS's understanding that DOJ is developing a public charge proposed rule, which would address DOJ's standard for assessing public charge inadmissibility and deportability. DHS will work with DOJ to ensure consistent application of the public charge ground of inadmissibility. DHS reiterates, however, that this final rule pertains only to public charge inadmissibility determinations made by DHS for applicants seeking admission or adjustment of status, public charge bonds, as well the conditions DHS has set for nonimmigrants applying for an extension of stay or change of status with USCIS. DHS believes that concerns about DOJ's adjudication of cases pending before immigration courts, including immigration court backlogs, are more appropriately addressed by DOJ in the context of their public charge rulemaking.

With respect to commenters' concerns that the DHS final rule would result in inconsistent outcomes, DHS disagrees with the assertion that the rule will lead to inconsistent determinations, or that it creates confusion, in a way that is at all inconsistent with congressional intent. Given the wording of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which states that the public charge inadmissibility determination is "in the opinion of" the Attorney General and based on consideration of a range of circumstances particular to the alien, DHS believes that the determination is inherently subjective in nature.[84]

Because each case will be determined on its own merits, and applicants' individual circumstances will vary, it is reasonable to expect that public charge inadmissibility determinations will vary.

Additionally, while the rule may increase USCIS processing times, such is the burden of robust enforcement of the law. USCIS is committed to timely, accurate, and lawful adjudications, and plans to increase resources for affected applications as appropriate. USCIS, as a fee funded agency, may set fees to support the additional workload associated with adjudication of cases subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). USCIS officers will receive training on the new standards set forth in this final rule, which will include training on how to treat public benefits received before the effective date of this rule. Any increases to adjudication time will not affect an applicant's ability to apply for an employment authorization document if otherwise eligible.[85]

Finally, with respect to comments regarding visa processing time for consular officers, DHS believes that such matters are more appropriately addressed by DOS. This rule only addresses DHS's public charge inadmissibility determinations in applications for admission or adjustment of status. However, it is DHS's understanding that DOS will update its FAM to ensure consistency with the DHS rule.

*Comment:* Many commenters addressed concerns about the adjudication of extension of stay and change of status applications, adjudication delays, and the uncertainty of being able to obtain a future status when seeking an extension of stay or change of status. Some commenters stated that the proposed rule failed to identify the potential Request for Evidence (RFE) and denial rate for applicants. Similarly, commenters stated that the proposed rule's RFE provision would cause significant uncertainty for employers, create obstacles to effective business planning, and increase costs for employers because of potential processing delays and backlogs. Many commenters raised concerns about adjudication delays for workers and other nonimmigrant categories, such as H–2A nonimmigrant workers and their employers, and other categories.

---

[84] *See Matter of Harutunian,* 14 I&N Dec. 583, 588 (Reg'l Comm'r 1974) ("[T]he determination of whether an alien falls into that category [as likely to become a public charge] rests within the discretion of the consular officers or the Commissioner . . . Congress inserted the words 'in the opinion of' (the consul or the Attorney General) with the manifest intention of putting borderline adverse determinations beyond the reach of judicial

review." (citation omitted)); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1962) ("[U]nder the statutory language the question for visa purposes seems to depend entirely on the consular officer's subjective opinion.").

[85] 8 CFR 274a.12(c)(9).

*Response:* DHS does not anticipate any significant processing delays in the adjudication of extension of stay and change of status requests filed by or on behalf of nonimmigrants based on the new conditions imposed in the rule relating to the past and current receipt of public benefits. This is especially so in light of that fact that DHS is removing the requirement that an officer assess the alien's likelihood of receiving public benefits in the future and that USCIS will no longer seek to request that the alien submit Form I–944. Overall, DHS is committed to ensuring that USCIS has the necessary resources to provide for the timely adjudication of immigration benefits. Additionally, USCIS believes that the number of RFEs actually issued relating to these rule changes will be relatively small as long as the employers and petitioners/beneficiaries submit properly documented petition.

### 9. Privacy Concerns

*Comment:* A commenter expressed concern about the lack of clarity on how DHS plans to use, store, access and protect the health data it receives. The commenter stated that copies of medical records provided by applicants may contain highly sensitive information unrelated to the immigration application or the likelihood of the person becoming a public charge. A few commenters expressed concern that the proposed rule's use of health insurance information and data raises data and privacy concerns, stating USCIS would accumulate an overbroad body of data, and this could violate the Health Insurance Portability and Accountability Act (HIPAA).

*Response:* DHS rejects the comment that the rule raises data and privacy concerns that could violate HIPAA. Congress mandated that DHS consider an applicant's health as part of every public charge inadmissibility determination.[86] In order to assess an alien's health in the totality of the circumstances, DHS will generally rely on medical information provided by civil surgeons on the Report of Medical Examination and Vaccination Record (Form I–693), or report of a panel physician, to assess whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work, upon admission or adjustment of status. DHS will also consider whether the alien has

resources to pay for reasonably foreseeable medical costs.

In other words, DHS will be relying on existing medical reports and information submitted with the alien's applications; such information, once submitted by the alien, will become a part of the alien's administrative record. Such data is collected and maintained consistent with the Privacy Act of 1974[87] (Privacy Act) and the System of Records Notice (SORN), which identifies the purpose for which Personally Identifiable Information (PII) is collected, from whom and what type of PII is collected, how the PII is shared externally (routine uses), and how to access and correct any PII maintained by DHS.[88]

Additionally, while USCIS is generally not a covered entity bound by HIPAA,[89] USCIS complies with the Privacy Act in safeguarding information in the applicable systems of records. Such information is generally confidential and is used primarily for immigration purposes.[90] The data is collected and kept in an alien's administrative record consistent with the Privacy Act,[91] which applies to information that is maintained in a "system of records" from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

### E. General Comments Regarding Legal Authority and Statutory Provisions

#### 1. Lack of Statutory Authority/ Inconsistent With Congressional Intent

*Comment:* Several commenters said DHS lacks statutory authority to promulgate the NPRM. Multiple commenters stated the rule is an over-reach, requires congressional consideration, involvement, or approval, and that only Congress can enact such specific policy changes. One commenter stated that the rule's attempt to change public charge policy in a regulation rather than in legislation is inconsistent with the Administration's stated goal to reduce the power of administrative agencies.

*Response:* The public charge inadmissibility rule is within DHS's authority and does not require congressional action. The Secretary has the authority to enforce and administer the immigration laws of the United States.[92] The Secretary is also authorized to prescribe regulations, forms, and instructions necessary to carry out the authority provided in section 103(a)(1) of the Act, 8 U.S.C. 1103(a)(1).[93] Additionally, the Secretary is charged with administering the public charge ground of inadmissibility. Therefore, this rule does not exceed or overreach the Secretary's authority, and further, does not require congressional involvement, consideration, or approval.

This public charge inadmissibility rule is a permissible implementation of the public charge inadmissibility statute enacted by Congress.[94] The public charge inadmissibility rule provides important guidance for purposes of implementing the statute, including by defining statutory terms that have never been defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws.

DHS believes the terms set forth in the public charge inadmissibility ground need clarification so that DHS can consistently adjudicate applications subject to public charge inadmissibility determinations in a manner that better ensures aliens are self-sufficient and not reliant on the government (*i.e.,* public benefits) for assistance to meet their basic needs.[95]

Finally, DHS disagrees that the public charge rule is inconsistent with the Administration's goals to reduce the role of executive agencies. The rule's

---

[86] *See* INA 212(a)(4), 8 U.S.C. 1182(a)(4).

[87] *See* 5 U.S.C. 552.

[88] *See generally* Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored.").

[89] *See* 45 CFR 160.103.

[90] *See also* E.O. No. 13768, Enhancing Public Safety in the Interior of the United States 82 FR 8799, 8802 (Jan. 30, 2017). Section 14 of E.O. 13768 limits the rights and protections of the Privacy Act, subject to applicable law, to U.S. citizens and lawful permanent residents. *See also* DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information (Apr. 25, 2017), *https://www.dhs.gov/ sites/default/files/publications/PPGM%202017- 01%20Signed_0.pdf* (last visited May 8, 2019). The latter memorandum sets out DHS policy requiring that decisions regarding the collection, maintenance, use, disclosure, retention, and disposal of information being held by DHS must be consistent with and take into consideration the Fair Information Practice Principles: Transparency, Individual Participation, Purpose Specification, Data Minimization, Use Limitation, Data Quality and Integrity, Security, and Accountability and Auditing.

[91] *See* 5 U.S.C. 552.

[92] INA section 103(a)(1), 8 U.S.C. 1103(a)(1).

[93] INA section 103(a)(3), 8 U.S.C. 1103(a)(3).

[94] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[95] *See* 8 U.S.C. 1601.

aims are consistent with the Administration's goal of rigorously enforcing all grounds of inadmissibility.[96]

*Comment:* A number of commenters stated that the rule is generally inconsistent with Congress' intent and past policies. Commenters said the proposed rule is a significant, unjustified change from the current public charge policy. One commenter said that DHS should not re-interpret a term that Congress had left undefined, and said that if future administrations similarly revised policy based on their understanding of congressional intent, such policy would "change wildly with every administration," and would result in "vast inconsistencies in the law." A commenter specifically stated that the rule is an "unlawful attempt to rewrite Congress's rules" and that DHS cannot "exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law" and needs to comply with Congress's intent in creating the public charge inadmissibility ground. One commenter said the proposed rule would effectively overturn decades of congressional and State decision-making regarding alien access to public benefits with one unilateral executive action. Multiple commenters said the rule is contrary to, or inconsistent with, current law, congressional intent, and the traditional interpretation of public charge, as well as inconsistent with the history of how public charge has been understood. One commenter noted that DHS's contention that "Congress 'must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge ground of inadmissibility, even though

receipt of such benefits could render the alien inadmissible as likely to become a public charge' . . . strains credulity and is simply not a reasonable interpretation of the statutes, as required by *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984)."

*Response:* This rule is not inconsistent with Congress's intent in enacting the public charge ground of inadmissibility in IIRIRA, or in enacting PRWORA. DHS believes that the policy goals articulated in PRWORA and underlying the creation of the mandatory factors for public charge inadmissibility determinations in IIRIRA inform DHS's administrative implementation of the public charge ground of inadmissibility. When passing IIRIRA, Congress added factors to consider in public charge inadmissibility determinations in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4)), but left it to DHS and DOJ to specify how and which public benefits should be considered in a public charge inadmissibility determination.[97] In the same year, Congress passed PRWORA with the clear intent to promote self-sufficiency of those entering the United States and to ensure that public benefits do not provide an incentive for immigration to the United States.[98] This public charge inadmissibility rule, in accordance with PRWORA, disincentivizes immigrants from coming to the United States in reliance on public benefits.[99] As explained in the NPRM and this final rule, DHS agrees that this rule takes a different approach to interpreting the public charge ground of inadmissibility than the 1999 Interim Field Guidance. In the NPRM, DHS acknowledged that it was making a change and provided a detailed explanation and justification for that change. Therefore, DHS disagrees that these changes are unjustified.

With respect to commenter statements that the rule departs from the historical and traditional understanding of what it means to be a public charge, DHS disagrees. As an initial matter, this is the first time that DHS is defining in regulation an ambiguous terms that Congress itself left undefined. As

discussed in greater detail in the section addressing the regulatory definition of public charge, DHS believes that its definition is consistent with what it means to be a public charge—a lack of self-sufficiency and a need to rely on the government for support. DHS believes that its rigorous and fair regulatory framework will ensure that aliens coming to or opting to stay in the United States permanently are self-sufficient. DHS explains the basis for its interpretation of the term "public charge" more fully below.

DHS also disagrees with commenters that this rule changes federal and state decision-making regarding aliens' access to public benefits. The rule itself does not prohibit any eligible alien or citizen from accessing public benefits for which they qualify. As explained above, DHS has the legal authority to promulgate the rule and believes the rule provides needed guidance to determine whether an alien is inadmissible as likely to become a public charge.

*Comment:* One commenter stated that "[c]ontrary to DHS's interpretation, the enactment of PRWORA and section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), close in time suggests that Congress assumed that receipt of these public benefits would *not* be counted against a person in determining whether the individual is likely to become a public charge." A commenter stated that the rule is "an intentional attempt at using the specific language within PRWORA as justification for a new, more restrictive rule which would override portions of PRWORA." Other commenters stated that the proposed rule is unnecessary in light of PRWORA's restrictions on access to benefits to certain immigrants and their families. One commenter noted that in advancing the Administration's goals, the rule undercuts Congress' original intent in creating nutrition, health, and human services programs.

*Response:* The public charge inadmissibility rule is not inconsistent with PRWORA, nor does it contravene PRWORA's requirements. When passing IIRIRA in 1996, Congress added the mandatory factors to be considered in public charge inadmissibility determinations to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), but left discretion to the relevant agencies, including DHS, to interpret those factors, including how to incorporate a consideration of public benefit receipt into the public charge inadmissibility determination. As discussed in the NPRM, consideration of receipt of public benefits was part of the public charge determination before Congress

---

[96] *See, e.g.,* Memorandum from the President to the Secretary of State, the Attorney General, and the Secretary of Homeland Security, Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits, Ensuring Enforcement of All Laws for Entry Into the United States, and Increasing Transparency Among Departments and Agencies of the Federal Government and for the American People, 82 FR 16279, 16280 (Apr. 3, 2017) ("I direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of all other relevant executive departments and agencies (as identified by the Secretary of Homeland Security) to rigorously enforce *all existing grounds of inadmissibility* and to ensure subsequent compliance with related laws after admission. The heads of all relevant executive departments and agencies shall issue new rules, regulations, or guidance (collectively, rules), as appropriate, to enforce laws relating to such grounds of inadmissibility and subsequent compliance. To the extent that the Secretary of Homeland Security issues such new rules, the heads of all other relevant executive departments and agencies shall, as necessary and appropriate, issue new rules that conform to them." (emphasis added)).

[97] *See* Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)).

[98] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601).

[99] *See Lewis* v. *Thompson,* 252 F.3d 567, 583–84 (2d Cir. 2001) ("it is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival . . . .")

passed IIRIRA and PRWORA.[100] At the same time that Congress added mandatory factors to be considered in the public charge inadmissibility analysis, Congress passed PRWORA, establishing eligibility restrictions for aliens receiving public benefits with the clear intent to promote the self-sufficiency of those entering the United States and to ensure that public benefits do not provide an incentive for immigrants to come to the United States.[101] Congress did nothing, however, to constrain DHS (then INS) from considering the receipt of public benefits in a public charge inadmissibility determination as INS had done previously. In light of this history, DHS's proposed public charge rule is consistent with the principles of PRWORA and aligns this regulation to those principles. As such, this public charge rule is rationally related to Congress' intent to create a disincentive for immigrants to rely on public benefits if they are seeking admission to the United States,[102] and a permissible interpretation of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

*Comment:* One commenter stated that the rule is inconsistent with congressional intent set forth in the IIRIRA Conference Report, because that report noted that certain benefits, such as public health, nutrition, and in-kind community service programs, should not be included in the prohibition on aliens receiving public benefits.[103] Other commenters stated that when Congress expanded the definition of "public charge" in 1996, it rejected a definition of "public charge" that would have included food and healthcare assistance; thus, expanding the definition of "public charge" to include such assistance would ignore Congress' legislative intent.

*Response:* It is not clear what the commenters are referencing when referring to Congress' rejection of a definition of public charge that included food and healthcare assistance. It may be a reference to the proposed ground of

*deportability* in the version that passed the U.S. Senate that included Medicaid and food stamps (now SNAP), among other programs, in the list of public benefits that were considered one of the grounds of deportability for public charge.[104] DHS notes that the Senate-passed bill would not have amended the public charge ground of inadmissibility.[105] Additionally, the administration of the public charge inadmissibility ground under this rule is significantly different from the public charge deportability provisions considered by the Senate. The proposed ground of deportability, for instance, made aliens automatically deportable (with certain exceptions) if they received certain public benefits, including Medicaid and food stamps, for 12 months within five years of admission. This rule, by contrast, focuses on future receipt of public benefits for more than 12 months in the aggregate in a 36-month period. The prospective nature of the determination under this rule renders the definition significantly different. With respect to past receipt, this rule requires DHS to evaluate such receipt as one of several factors to be considered in the totality of circumstances. This rule therefore does not impose the provision included in the Senate-passed bill that Congress had rejected.[106]

DHS notes that the quotation from IIRIRA Conference Report[107] does not relate to public charge inadmissibility, but to PRWORA and exceptions to the prohibition on aliens accepting certain public benefits. While language in a Conference Report, especially when discussing a separate piece of legislation, is not binding, the rule is not inconsistent with the language in the report because the public benefits covered by the rule do not include those excepted under PRWORA.

*Comment:* Commenters stated that reversing the policies set forth in the 1999 Interim Field Guidance, which have allowed immigrants to rely on the

previously excluded benefits for decades, is contrary to congressional intent. One commenter stated that the rule is inconsistent with congressional intent, which "recognizes the importance of access to preventive care and nutrition benefits for all people, including immigrants."

*Response:* DHS acknowledges that this rule is a departure from the 1999 Interim Field Guidance. DHS also acknowledges that some aliens subject to this rule will need to make decisions with respect to the receipt of public benefits for which they are eligible. Ultimately, however, DHS does not believe that its inclusion of previously-excluded benefits is contrary to congressional intent, particularly with respect to access to preventive care and nutrition benefits. In fact, DHS believes it would be contrary to congressional intent to promulgate regulations that encourage individuals subject to this rule to rely on any of the designated public benefits, or to ignore their receipt of such benefits, as this would be contrary to Congress's intent in ensuring that aliens within the United States are self-sufficient and rely on their own resources and capabilities, and those of their family, sponsors, and private organizations.[108]

To the extent that commenters are concerned with the consequences of receipt of previously-excluded public benefits, DHS notes that it is not considering an alien's receipt of previously excluded public benefits in the public charge inadmissibility determination, if such receipt occurred before the effective date of this final rule and receipt of such benefits was not considered under the 1999 Interim Field Guidance.[109] However, DHS is considering an alien's receipt of public benefits that were included in the 1999 Interim Field Guidance and received prior to the effective date of the rule as a negative factor in the totality of the circumstances analysis. DHS also is not considering past receipt of public benefits by an alien if such receipt occurred while the alien was in a classification or status that was exempt from public charge inadmissibility or for which a waiver of public charge inadmissibility was received.

*Comment:* Some commenters stated that DHS only has the authority to administer individual reviews of an applicant's likelihood of becoming dependent on the government in the future, and cannot consider government expenditures on means-tested programs. One of these commenters suggested that

---

[100] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018) ("In *Matter of Martinez-Lopez,* the Attorney General indicated that public support or the burden of supporting the alien being cast on the public was a fundamental consideration in public charge inadmissibility determinations"); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1964).

[101] *See* 8 U.S.C. 1601.

[102] *See Lewis* v. *Thompson,* 252 F.3d 567, 583–84 (2d Cir. 2001) ("it is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival . . . .").

[103] *See* H.R. Rep. No. 104–828, at 238 (1996) (Conf. Rep.).

[104] H.R. 2202, 104th Cong. sec. 202 (as amended and passed by Senate, May 2, 1996).

[105] *See* H.R. 2202, 104th Cong. sec. 202 (as amended and passed by Senate, May 2, 1996).

[106] *See Hamdan* v. *Rumsfeld,* 548 U.S. 557, 579–80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."); *see also Competitive Enterprise Inst.* v. *U.S. Dep't of Transp.,* 863 F.3d 911, 917 (DC Cir. 2017) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (citations and internal quotations omitted)).

[107] *See* H.R. Rep. No. 104–828, at 238 (1996) (Conf. Rep.).

[108] *See* 8 U.S.C. 1601(2)(A).

[109] *See* 8 CFR 212.22(d).

to the extent DHS is considering aggregate costs of public benefits, it also should consider aggregate benefits. This commenter suggested that DHS abandon its effort to use public charge reform as a back door means of realizing the political goals of reducing government expenditures on means-tested programs authorized by Congress. Another commenter stated that whether or not there is a large government expenditure on a particular program is irrelevant to the assessment of whether a particular individual may become a public charge.

*Response:* DHS believes that these commenters misunderstood DHS's proposal. DHS is not taking expenditures on public benefit programs into account for purposes of any single public charge inadmissibility determination. Rather, DHS has taken into consideration expenditures on public benefit programs in order to appropriately circumscribe, for the purpose of administrative efficiency, the list of public benefits that will be considered in public charge inadmissibility determinations. Therefore, under this rule, DHS will take into consideration all of the mandatory factors in the totality of the alien's circumstances, including whether the alien received public benefits as defined in 212.21(b).

## 2. Additional Legal Arguments

### a. Allegations That the Rule Is Arbitrary and Capricious

*Comment:* Many commenters stated that the proposed rule is arbitrary and capricious. Commenters said that the rule would be struck down under the APA. Commenters stated that DHS failed to provide a reasoned or adequate explanation for the rule, including one based on facts and data. Other commenters asserted that the public charge rule, as proposed, is unnecessary, has no legal justification, and is overbroad. Other commenters stated that the rule "address[es] a problem that doesn't even exist." One commenter stated that "DHS has not cited any evidence that the current statute is ineffective in promoting self-sufficiency or that there is some need for increasing the pool of inadmissibility. Without substantiating the need for this change, DHS is simply proposing unnecessary and harsh restrictions against immigrants." One commenter stated that current immigration policy provides sufficient protection for the nation's interests, including through existing eligibility limits for public benefits.

A few commenters stated that "DHS offered inadequate reasoning for

rejecting the 1999 Interim Field Guidance and making a massive change in the agency's interpretation of federal law." The commenter stated that DHS failed to provide an explanation as to why the interpretation used for the last 20 years is inappropriate, or to justify the particular articulation of resource and health factors contained in the rule. Many commenters stated that the rule failed to provide a reasonable or rational nexus between the data cited and the policy decisions made. One commenter claimed that the proposed rule did not offer adequate justification that access to public benefits create an incentive to migrate to the United States. The commenter also asserted that the proposal is based on inaccurate and misleading data concerning low-wage work, and thus fails to account for the societal benefit of low-wage workers who depend on benefits to supplement their income.

*Response:* DHS believes that it has provided adequate justification for the rule. DHS has interpreted its authorizing statute to clarify the criteria for when an alien would be found inadmissible as likely at any time to become a public charge, based on the consideration of statutory factors. DHS provided an explanation for why and how the proposed rule furthers congressional intent behind both the public charge inadmissibility statute and PRWORA in ensuring that aliens being admitted to and intending to settle permanently in the United States be self-sufficient and not reliant on public resources. DHS also explained the deficiencies of the current standard established by the 1999 Interim Field Guidance, including that the guidance assumed an overly permissible definition of dependence on public benefits by only including consideration of certain cash benefits, rather than a broader set of benefits, whether cash or non-cash, that similarly denote reliance on the government rather than the alien's own resources and capabilities, or the resources and capabilities of the alien's family, sponsors, and private organizations. In expanding the list of benefits to be considered, DHS explained why a broader list should be considered, and provided data to support the specific list proposed in the proposed rule. For instance, DHS referenced Federal Government data for the rates of participation in such benefit programs by non-citizens across factors related to the public charge inadmissibility determination, such as income. DHS disagrees that the data provided to support these conclusions was either inaccurate or misleading, and notes that

DHS followed accepted practices for making inferences at a 95 percent confidence level.

DHS also explained that the 1999 Interim Field Guidance failed to offer meaningful guidance for purposes of considering the mandatory factors and was therefore ineffective in guiding adjudicators in making a totality of the circumstances public charge inadmissibility determinations. In response to this deficiency, DHS proposed to establish definitive legal standards and evidentiary criteria for each of the mandatory factors as relevant to the determination of whether an alien will be more likely than not to become a public charge at any time in the future.

DHS agrees with commenters that the public charge inadmissibility rule constitutes a change in interpretation from the 1999 Interim Field Guidance. Courts have long established that agencies are not bound forever to maintain the same statutory interpretation.[110] To change its prior interpretation, an agency need not prove that the new interpretation is the best interpretation, but should acknowledge that it is making a change, provide a reasoned explanation for the change, and indicate that it believes the new interpretation to be better.[111] DHS has laid out the proposed changes from the 1999 Interim Field Guidance in great detail and provided a justification for each. DHS also explained why it believes the new rule to be a superior interpretation of the statute to the 1999 Interim Field Guidance and explained why such interpretation is desirable from a public policy perspective. Moreover, as explained above, DHS is clearly authorized to promulgate regulations interpreting the public charge inadmissibility ground. DHS carefully considered the public comments on this rule and made

---

[110] *See, e.g., Rust* v. *Sullivan,* 500 U.S. 173, 186–87 (1991) (acknowledging that changed circumstances and policy revision may serve as a valid basis for changes in agency interpretations of statutes); *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 863–64 (1984) ("The fact that the agency has from time to time changed its interpretation of the term 'source' does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (agencies "must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances'" (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 784 (1968))).

[111] *See generally FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502 (2009).

adjustments based on the input it received. Accordingly, DHS believes this rule has been issued in compliance with the APA.

DHS acknowledges that its broader definitions for public benefits and public charge may result in additional applicants being determined to inadmissible and therefore ineligible for admission or adjustment of status because they are likely at any time to become a public charge. However, as noted elsewhere in this rule, DHS believes that expanding the definitions of public benefits and public charge and any resulting denials of applications based on section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) are reasonable and consistent with Congress' intent and will better ensure that aliens seeking to come to the United States temporarily or permanently are self-sufficient.[112]

DHS also notes that as stated previously, available data neither provides a precise count nor reasonable estimates of the number of aliens who are both subject to the public charge ground of inadmissibility and are eligible for public benefits in the United States.

### b. Alternatives

*Comment:* Commenters stated that, under E.O. 13563 and other applicable authority, DHS should have considered other feasible regulatory alternatives to its proposed rule. One commenter asserted that the proposed rule failed to consider a less restrictive alternative, specifically, enforcing affidavits of support. This commenter stated that this failure makes the rule arbitrary and capricious.

*Response:* DHS disagrees with commenters who argued that the proposed rule failed to consider other alternatives to this rule, or that the proposed rule was unnecessary because DHS can simply increase enforcement of Form I–864. Under E.O. 13563, the agency must identify available alternatives. In this case, DHS did just that and explained the alternatives considered in the proposed rule, including a "no-action" alternative— continuing to administer this ground of inadmissibility under the 1999 Interim Field Guidance.[113] DHS also considered

a more expansive definition of "public benefit," that would have potentially included a range of non-cash benefit programs falling in specific categories (such as programs that provide assistance for basic needs such food and nutrition, housing, and healthcare). DHS rejected these alternatives for the reasons discussed in the proposed rule.[114]

With respect to enforcing Form I–864 as an alternative to this rule, DHS notes that this proposal is neither an adequate nor available alternative to this rule. As explained in the proposed rule, DHS's objective in promulgating this rule is to better ensure that aliens seeking admission or adjustment of status do not rely on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations. While Form I–864 serves a crucial function where required to be submitted by section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), it is not an alternative to consideration of the mandatory factors established by Congress in determining whether an alien is likely at any time to become a public charge. As discussed elsewhere in this rule, Form I–864 ensures that the sponsor is available to support the sponsored alien in the event the sponsored alien is unable or unwilling to support himself or herself and is also intended to provide a reimbursement mechanism for the government to recover from the sponsor the amount of public benefits distributed to the sponsored alien. In fact, the plain language of the statute permits sponsored aliens to sue to enforce the support obligation, if necessary.[115] In addition, Form I–864 *may* also be taken into consideration in the totality of the circumstances public charge inadmissibility determination.[116] Had Congress intended enforcement of Form I–864 to be the sole mechanism by which DHS could ensure that an alien does not become a public charge after admission or adjustment of status, Congress would have included it as the sole mandatory factor to be considered when making public charge inadmissibility determinations. Instead, Congress required DHS to consider the mandatory factors to assess whether the alien is likely at any time to become a public charge based on his or her present circumstances and relevant past

actions (*e.g.,* any past receipt of public benefits, employment history, etc.), even if a sufficient Form I–864 is submitted on behalf of an alien.[117]

In addition, if the sponsor does not provide financial support to the sponsored alien, the sponsored alien may bring a suit in the court of law.[118] In the event a sponsored alien receives public benefits, seeking reimbursement pursuant to the agreement made in Form I–864 requires deployment of relevant resources by the agency that granted the benefit and/or use of judicial resources.

Simply put, the affidavit of support is not a substitute for the assessment of the mandatory factors. For these reasons, DHS determined that simply enforcing the affidavit of support under section 213A of the Act was not an adequate legal or practical alternative to ensuring that DHS appropriately applies mandatory factors established by Congress to assess whether the alien is likely at any time in the future to become a public charge. Furthermore, considering a sufficient affidavit of support under section 213A of the Act does not, alone, achieve Congress' goal to limit the incentive to immigrate to the United States for the purpose of obtaining public benefits.

### c. Retroactivity

*Comment:* A commenter stated that, despite the apparent attempt to draft the proposed rule appropriately, its plain language would allow it to be applied retroactively. The commenter stated that because not all sections specifically exempt benefits received prior to the rule's effective date, DHS could apply the rule retroactively. For example, under 8 CFR 212.22(c), an alien's receipt of SNAP within 36 months preceding application for adjustment of status would weigh heavily in favor of a finding of public charge inadmissibility, but that paragraph does not specifically limit DHS's consideration of SNAP receipt to benefits received on or after the effective date of the rule. This commenter also stated that the proposed rule violated reasonable reliance law and violates the APA.

*Response:* DHS disagrees that the rule will be applied retroactively to aliens subject to the public charge ground of inadmissibility. As stated in the **DATES** section of this final rule, this rule will become effective 60 days after it is

---

[112] *See Nat'l Cable & Telecommunications Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967, 1001 (2005) ("the Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change."); *Competitive Enter. Inst.* v. *United States Dep't of Transportation,* 863 F.3d 911, 918 (D.C. Cir. 2017) ("The benefits of the regulation are also modest, but the Department reasonably concluded that they justify the costs.")

[113] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51276 (proposed Oct. 10, 2018).

[114] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51276 (proposed Oct. 10, 2018).

[115] *See* INA section 213A(a)(1)(B), 8 U.S.C. 1183a(a)(1)(B); 71 FR 35732, 35743 (Jun. 21, 2006).

[116] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii).

[117] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[118] *See, e.g., Wenfang Lieu* v. *Mund,* 686 F.3d 418 (7th Cir. 2012) (the sponsored immigrant is a third party beneficiary whose rights exist apart from whatever rights she might or might not have under Wisconsin divorce law, and she has no legal obligation to mitigate damages).

published in the **Federal Register**, and the rule will be applied to applications and petitions postmarked (or if applicable, electronically submitted) on or after that date. Thus, for instance, the public charge inadmissibility determination factors and criteria will apply only to applications that are postmarked (or if applicable, electronically submitted) on or after that date; applications that were postmarked before the effective date and accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2), and are pending on the effective date will be adjudicated under the criteria set forth in the 1999 Interim Field Guidance. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

Similarly, the condition related to public benefit receipt in the context of extensions of stay and change of status will only apply to petitions and applications postmarked (or if applicable, submitted electronically) on or after the effective date of this rule.

In addition, and as stated in this final rule, DHS will not apply the new expanded definition of public benefit to benefits received before the effective date of this final rule. Therefore, any benefits received before that date will only be considered to the extent they would have been covered by the 1999 Interim Field Guidance. In the commenter's example, SNAP benefits received by an alien prior to the effective date of the final rule would not be considered as part of the alien's public charge inadmissibility determination, because SNAP was not considered in public charge inadmissibility determinations under the 1999 Interim Field Guidance. By contrast, as explained in more detail later in this preamble, for applications postmarked (or if applicable, electronically submitted) on or after the effective date of this final rule, an applicant's receipt of cash assistance for income maintenance prior to the effective date of this rule will be treated as a negative factor in the totality of the circumstances. However, regardless of the length of time such benefits were received before the effective date of this rule, for the purposes of public charge inadmissibility determinations made for applications postmarked (or if applicable, submitted electronically) on or after the effective date, DHS will not

treat the receipt of these benefits as a heavily weighted negative factor.

*Comment:* One commenter noted that the rule punishes noncitizens for past conduct and therefore violates the *ex post facto* clause and is unconstitutionally retroactive.''

*Response:* DHS rejects the comment that the public charge inadmissibility rule violates that *ex post facto* clause of the U.S. Constitution. The *ex post facto* clause prohibits changes to the legal consequences (or status) of actions that were committed before the enactment of the law.[119] The *ex post facto* clause would generally only apply to laws that impose criminal penalties.[120] Although inadmissibility determinations are not criminal penalties, and so are generally not subject to the *ex post facto* clause,[121] this rule, in any event, is not impermissibly retroactive in application, as noted in the immediately preceding response.

### d. Due Process/Vagueness and Equal Protection

*Comment:* Commenters stated that the public charge inadmissibility determination called for by the proposed rule is too open-ended and unpredictable. Some commenters pointed to likely confusion about which benefits will be included or excluded for purposes of a public charge determination. These commenters further stated that failing to define the term ''likely,'' as that term is used in the phrase ''likely to become a public charge,'' would grant too much discretion to adjudicators in an complex weighing system that would lead to arbitrary outcomes. Another commenter recommended that the determination system be scored. Another commenter stated that that the vagueness of the proposed framework would lead to inconsistent and unfair determinations.

*Response:* DHS disagrees that the rule is vague or unpredictable. Some commenters who alleged that the rule is

vague did not provide specific details to identify which provisions of the rule they were referring and DHS is therefore unable to specifically address those claims other than stating general disagreement. In the NPRM, DHS provided specific examples of various concepts and laid out in great detail the applicability of the rule to different classes of aliens, and clearly identified the classes of aliens that would be exempt from the rule. DHS also provided an exhaustive list of the additional non-cash public benefits that would be considered, including receipt thresholds for all designated benefits. DHS explained that it would make public charge inadmissibility determinations in the totality of the circumstances, and following consideration of the minimum statutory factors. The ''vagueness'' associated with a totality of the circumstances determination is to a significant extent a byproduct of the statute's requirement that DHS consider a range of minimum factors as part of the public charge inadmissibility determination. DHS recognizes that the statutory multi-factor framework will likely result in more inadmissibility determinations when combined with the standard in this rule (as compared to the 1999 Interim Field Guidance), but fundamentally, as it relates to vagueness, the commenters' quarrel is with Congress, not with DHS.

In any case, in response to public comments, the list of public benefits has been revised in this final rule, and the threshold has been simplified such that there is only a single, objective duration-based threshold applicable to the receipt of all included public benefits. And DHS has determined, consistent with public commenter suggestions, that it will not consider the receipt of any benefits not listed in the rule, therefore removing potential uncertainty. In addition, DHS remains committed to providing clear guidance to ensure that there is adequate knowledge and understanding among the regulated public regarding which benefits will be considered and when, as well as to ensure that aliens understand whether they are or are not subject to the public charge ground of inadmissibility.

DHS has also further defined ''likely'' as more likely than not. While DHS agrees with commenters that the regulation must be sufficiently clear so that the regulated public can comply with it, DHS notes that some adjudicator discretion must exist where determinations are based on a totality of the circumstances examination that is highly fact-specific. Congress specifically called for a fact-specific,

---

[119] U.S. Const. art. I, sec. 9, cl. 3; *see Calder* v. *Bull,* 3 Dall. 386, 390–391, 1 L.Ed. 648 (1798) (opinion of Chase, J.).

[120] *See, e.g., Rhines* v. *Young,* 899 F.3d 482, 495 (8th Cir. 2018) (''A criminal or penal law has a prohibited *ex post facto* effect if it is ''retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.'') (citations omitted); *cert. denied,* No. 18–8030, 2019 WL 826426 (U.S. Apr. 15, 2019); *Bremer* v. *Johnson,* 834 F.3d 925, 932 (8th Cir. 2016);

[121] *Galvan* v. *Press,* 347 U.S. 522, 531 (1954) (Frankfurter, J.) (''[W]hatever might have been said at an earlier date for applying the *ex post facto* Clause, it has been the unbroken rule of this Court that it has no application to deportation.''); *Alvarado–Fonseca* v. *Holder,* 631 F.3d 385, 391–92 (7th Cir. 2011); *Montenegro* v. *Ashcroft,* 355 F.3d 1035, 1037 (7th Cir. 2004).

discretionary determination in the public charge context.[122] As is the case with most regulations, over the course of adjudications, new fact patterns arise that may require additional guidance to adjudicators; however this does not make the regulation impermissibly vague.[123]

DHS does not believe that a scoring system would be appropriate for this analysis, namely because of the wide variations between individual circumstances of aliens. Both the proposed rule and this final rule adequately explain how the criteria are to be applied and what evidence should be considered. USCIS will provide training to its adjudicators and will engage with the regulated public to the extent necessary to foster a better understanding and compliance with the regulation.

*Comment:* One commenter stated that although the Federal Government has great leeway to enact immigration laws, its actions are still subject to review for constitutionality. The commenter stated that proposed rule restricts the rights of non-citizens to access crucial healthcare benefits, housing vouchers, and other government benefits by using "heavily weighted factors," such as English proficiency, and "exorbitant" bond measures, and that the proposed rule would disproportionately impact women and people of color. The commenter stated that the Supreme Court has struck down state laws that restricted public benefits based on alienage and noted that in one such case, the Court reviewed the law under intermediate scrutiny. The commenter suggested that this rule could similarly be subject to intermediate scrutiny. The commenter stated that even if a heightened scrutiny argument loses, the rule would fail rational basis scrutiny because is not rationally related to a legitimate public interest since "there is no legitimate government interest furthered by the proposed rule, as 212(a)(4) [of the Act, 8 U.S.C. 1182(a)(4)] is already in place and effective." The commenter stated that the proposed measures will disparately impact female immigrants and immigrants of color and is not rationally related to a legitimate public interest. The commenter indicated that the "legitimate public interest (which in and of itself is contestable) is already served by the current provision." Another commenter similarly stated that the rule would have a disparate impact on immigrants of color and women. The commenter cited to a Manatt, Phelps & Phillips independent analysis of the U.S. Census Bureau's (Census Bureau) American Community Survey Data 5-year 2012–2016 data. The commenter stated that the application of the public charge rule would be unequally distributed along racial lines. According to the commenter, the effects of the proposed rule are expected to have a disparate impact on communities of color, affecting as many as 18.3 million members (or one-third) of the Hispanic and Latino community in the United States. The commenter stated that the DHS's proposed "250-percent-FPG threshold" would have disproportionate effects based on national origin and ethnicity, blocking 71 percent of applicants from Mexico and Central America, 69 percent from Africa, and 52 percent from Asia—but only 36 percent from Europe, Canada and Oceania. The commenter stated that "because the proposed rule facially implicates national origin, strict scrutiny applies."

*Response:* DHS disagrees that this rule would fail any level of scrutiny (*i.e.,* strict, intermediate, or rational basis scrutiny).[124] As discussed previously, DHS is not changing rules governing which aliens may apply for or receive public benefits, nor is this rule altering any eligibility criteria for such benefits. Instead, DHS is exercising its authority to administer the public charge ground of inadmissibility in a way that better ensures that aliens being admitted into the United States, or seeking to remain here permanently, are self-sufficient and not reliant on the government for support. While this rule may influence an alien's decision to apply for, or disenroll from, public benefits, it does not constitute a restriction on accessing such benefits. However, even if the rule did place additional restrictions on aliens, the Supreme Court, even prior to PRWORA, determined that the equal protection analysis of Federal action that differentiates between citizens and aliens in the immigration context is different from the equal protection analysis of State actions that differentiate between citizens of another state and citizens of another country. In *Mathews* v. *Diaz,* the Court specifically distinguished between state statutes that deny welfare benefits to resident aliens, or aliens not meeting duration residence requirements, from similar actions taken by the political branches of the Federal Government that are specifically empowered to regulate the conditions of entry and residence of aliens. 426 U.S. 67, 85–86 (1976). In that case, the court found that the enforcement of a 5-year residency requirement against aliens applying for a supplemental medical insurance program did not deprive the aliens of life, liberty or property without due process of law under the Due Process Clause of the Fifth Amendment.[125]

DHS agrees that if this rule were regulating eligibility for public benefits outside of the immigration context, heightened scrutiny might apply.[126] As explained above, however, the rule places no obstacles to aliens' eligibility for public benefits. Furthermore, the rule is not facially discriminatory and DHS does not intend a discriminatory effect based on race, gender, or any other protected ground.

Finally, the commenter misstated the proposed rule's income threshold as 250 percent of the FPG. While USCIS will generally consider 250 percent of the FPG to be a heavily weighted positive factor in the totality of the

---

[122] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4) ("Any alien, who *in the opinion* of the consular officer at the time of application for a visa, or *in the opinion* of the Attorney General at the time of the application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.") (emphasis added).

[123] *Cf., e.g., Freeman United Coal Mining Co.* v. *Fed. Mine Safety & Health Review Comm'n,* 108 F.3d 358, 362 (D.C. Cir. 1997) ("Regulations generally satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require.").

[124] *See Korab* v. *Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) ("[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis.") (citation omitted); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir. 2001) (describing the level of scrutiny owed under the constitution to federal regulation of immigration and naturalization as "highly deferential") (citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000).) Generally, laws and regulations that neither involve fundamental rights nor include suspect classifications are reviewed under rational basis scrutiny, under which the person challenging the law must show that the government has no legitimate interest in the law or policy or that there is no rational link between the interest and the challenge law or regulation. *Heller* v. *Doe by Doe,* 509 U.S. 312, 319 (1993).

[125] "The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship . . ." 426 U.S. at 79–80.

[126] *See, e.g., Personal Administrator of Mass* v. *Feeney,* 442 U.S. 256, 272 (1996) (Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns.), *McLaughlin* v. *Florida,* 379 U.S. 184, 196 (1964) ("Such classifications are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be 'necessary . . . to the accomplishment' of their legitimate purpose.'"); *United States* v. *Virginia,* 518 U.S. 515 (1996) (ruling that the Virginia Military Institute's gender-based admission policy violated the Equal Protection Clause).

circumstances, the minimum income threshold to be considered a positive factor in the totality of the circumstances is generally 125 percent of the FPG. More specifically, if the alien has income below that level, it will generally be a heavily weighed negative factor in the totality of the circumstances.

As set forth in NPRM,[127] DHS's public charge rule is rationally related to the government's interest in ensuring that aliens entering the United States or seeking to settle here permanently are not likely to become public charges, consistent with the requirements of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). The regulation minimizes the incentive of aliens to immigrate to the United States because of the availability of public benefits and promotes the self-sufficiency of aliens within the United States.[128] Finally, DHS does not understand commenters' statements about the "unequal application" of the public charge inadmissibility rule and disagrees that the public charge inadmissibility rule would be unequally applied to different groups of aliens along the lines of race or gender.

*Comment:* Several commenters objected that the rule violates due process and equal protection rights. One commenter said that aliens seeking adjustment of status should be granted due process rights closer to those of United States citizens, and this rule should be subject to stricter standards for judicial review to "ensure that more immigrants are protected from the detrimental effects of this proposal." The commenter stated that such a review "would require that Congress ha[ve] a dual review process." Another commenter stated that the DHS rule could be challenged on the grounds that it affords nonimmigrants inside the United States less due process rights than they should be afforded. The commenter stated that USCIS should construct an appeals process that satisfies due process and gives applicants the opportunity to present evidence of admissibility. The commenter also stated that a person should not have "their status as a resident revoked" prior to a full review of the case.

*Response:* DHS disagrees with comments asserting that this rule violates aliens' due process or equal protection rights. Although aliens present in the United States are protected by the due process and equal

protections clauses, federal immigration laws and their implementing regulations generally enjoy a highly deferential standard of review, even where the federal laws and regulations treat aliens differently from citizens and create distinctions between different classes of aliens (*i.e.,* lawful permanent residents vs. nonpermanent residents).[129] DHS's public charge inadmissibility rule falls within the agency's broad authority, granted by Congress, to regulate immigration matters, and therefore, if challenged on equal protection grounds as discriminating based on alienage, would be subject to rational basis scrutiny.[130] The public charge inadmissibility rule is indeed rationally related to the government's interest, as set forth in IIRIRA and PRWORA, to determine which aliens are inadmissible on public charge grounds in accordance with section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), minimize the incentive of aliens to immigrate to the United States due to the availability of public benefits, and promote the self-sufficiency of aliens within the United States.[131] This is true even if this rule results in a disincentive for aliens to avail themselves of public benefits for which they are eligible under PRWORA.[132] Moreover, although the rule could impact an alien's decision to access public benefits for which he or she is eligible under PRWORA and state and local laws, it does not directly regulate the right to apply for or receive public benefits, and the Due Process Clause would not be implicated by whether, due to the rule, an alien chooses not to access benefits for which he or she qualifies.[133] The Due Process

Clause of the Fifth Amendment "has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals." [134] Similarly, and as discussed in greater detail above, any potential chilling impacts of the rule would not violate the equal protection guarantee of the Fifth Amendment's Due Process Clause [135] because this rule is not facially discriminatory nor does DHS intend a discriminatory effect.[136]

The standards of judicial review are established by statute and judicial interpretation [137] and are therefore beyond the scope of this rulemaking. The proposal to institute a review by Congress is also beyond the scope of this rulemaking because only the legislative branch can create a role for itself.[138] DHS rejects the proposal to create an appellate process to allow applicants to present evidence of their admissibility since there is an existing process to present such evidence. Although not specific to this rule, USCIS will notify applicants of deficiencies in their applications with respect to any ineligibility including public charge in accordance with the principles outlined in 8 CFR 103.2 and USCIS policy in regard to notices, RFEs, or notices of intent to deny (NOIDs), and denials.[139] Likewise, DHS will not accept the proposal to decline to revoke a lawful permanent resident's status pending any appeals of a public charge

---

[127] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51122–23 (proposed Oct. 10, 2018).

[128] *See* 8 U.S.C. 1601.

[129] *See Korab* v. *Fink,* 797 F.3d 572, 579 (9th Cir. 2014); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir. 2001) (citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000)); *Brooks* v. *Ashcroft,* 283 F.3d 1268, 1274 (11th Cir. 2002) ("Classifications that distinguish among groups of aliens are subject to rational basis review, and will be found valid if not arbitrary or unreasonable").

[130] *See Mathews* v. *Diaz,* 426 U.S. 67, 81 n.17 (1976).

[131] *See* 8 U.S.C. 1601.

[132] *See Lewis* v. *Thompson,* 252 F.3d 567, 583–84 (2d Cir. 2001) ("[I]t is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival . . . Although it seems likely that many alien women will illegally immigrate to obtain the benefit of citizenship for their children, undeterred by ineligibility for prenatal care in the event of pregnancy, Congress is entitled to suppose that the denial of care will deter some of them. In the realm of immigration, where congressional discretion is extremely broad, this supposition, even if dubious, satisfies rational basis review.") (citations omitted).

[133] *In O'Bannon* v. *Town Court Nursing Ctr.,* 447 U.S. 773, 789 (1980), the Supreme Court concluded, consistent with long-standing precedent that "the due process provision of the Fifth Amendment does

not apply to the indirect adverse effects of governmental action."

[134] *O'Bannon* v. *Town Court Nursing Ctr.,* 447 U.S. 773, 789 (1980) (quoting *The Legal Tender Cases,* 79 U.S. 457, 551 (1870)).

[135] Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the Federal government, the Supreme Court in *Bolling* v. *Sharpe,* 347 U.S.497, 500 (1954), held that while "'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . discrimination may be so unjustifiable as to be violative of due process." In the case of racial discrimination in DC public schools, the Court found that no lesser Constitutional protections apply to the Federal government through the application of the Due Process Clause in the Fifth Amendment than by application of the Equal Protection Clause of the Fourteenth Amendment.

[136] *See Pers. Adm'r* v. *Feeney,* 442 U.S. 256, 272 (1979).

[137] *See, e.g.,* INA section 242(b)(4), 8 U.S.C. 1252(b)(4) (providing the scope and standard of judicial review of removal orders); *McNary* v. *Haitian Refugee Center, Inc.,* 498 U.S. 479, 493 (1991) (discussing the appropriate standard of review for challenges to the Special Agricultural Worker program).

[138] *See generally Trans Ohio Sav. Bank* v. *Director, Office of Thrift Supervision,* 967 F.2d 598, 620 (DC Cir. 1992) (agency promise to bind Congress would be *ultra vires* and unenforceable).

[139] DHS notes that the failure to submit a completed Form I–944 and Form I–864 with the Form I–485, when required, may result in a rejection or a denial of the Form I–485 without a prior RFE or NOID. *See* 8 CFR 103.2(a)(7), (b)(8)(ii).

**41324**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

finding. Revocation of existing status is generally distinct from the process of adjudicating applications for immigration benefits. For example, a person maintaining a valid nonimmigrant status whose adjustment of status application is denied because he or she is inadmissible on public charge grounds would not lose his or her nonimmigrant status based on the denial of adjustment.[140] To the degree the commenter's concerns relate to the loss of lawful permanent resident status, such status generally terminates upon the entry of a final order of removal[141] unless the alien voluntarily abandons lawful permanent resident status.

e. Coordination With Other Federal Agencies

*Comment:* Several commenters said the proposed definition of public charge conflicts with the definition of public charge used by DOS, which focuses on an alien's primary dependence on public benefits. Other commenters noted that the inconsistency with DOS's definition of public charge would lead to delays and denials of Application for Provisional Unlawful Presence Waiver (Form I–601A).

*Response:* DHS is working and will continue to work with DOS to ensure consistent application of the public charge ground of inadmissibility. As noted in the NPRM, DHS expects that DOS will make any necessary amendments to the FAM in order to harmonize its approach to public charge inadmissibility determinations with the approach taken in this final rule.[142] As previously, indicated, DHS does not believe that the rule would unduly increase the delays or denials of provisional unlawful presence waivers filed on Form I–601A, as such waivers are unrelated to the public charge ground of inadmissibility.[143]

*Comment:* Several commenters stated that in the absence of DOJ regulations on public charge inadmissibility, U.S. Immigration and Customs Enforcement (ICE) attorneys will be compelled to

argue in removal proceedings that DHS's public charge inadmissibility standard should be applied. And because there would not be binding precedent on DHS's interpretation of public charge inadmissibility, some immigration judges would adopt DHS's rule while others would not. This would result in inconsistent determinations and burden the immigration court system.

*Response:* DOJ has acknowledged ongoing work on a proposed public charge rule, which would propose to change how adjudicators within the Executive Office for Immigration Review (EOIR) determine whether an alien is inadmissible to the United States as a public charge consistent with section 212(a)(4) of the INA.[144] According to DOJ, the rule is intended to make certain revisions to more closely conform EOIR's regulations with the DHS public charge inadmissibility rule. DHS will work with DOJ to ensure consistent application of the public charge ground of inadmissibility. DHS reiterates, however, that this final rule pertains only to public charge inadmissibility determinations made by DHS for applicants seeking admission or adjustment of status, public charge bonds, as well the conditions DHS has set for applicants applying for an extension of stay or change of status before DHS.

If USCIS denies an adjustment of status application after determining that the applicant is likely at any time to become a public charge at any time, and the alien is not lawfully present in the United States, USCIS will generally issue a Notice to Appear (NTA),[145] which may charge the alien as inadmissible under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), if the alien is an alien is an arriving alien or an alien present in the United States without having been admitted or paroled. Under section 240(c)(2)(A) of the Act, 8 U.S.C. 1229a(c)(2)(A), an applicant for admission in removal proceedings has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212 of the Act, 8 U.S.C. 1182. The alien may renew the adjustment of status application before an immigration judge unless the immigration judge does not

have jurisdiction over the adjustment application.[146]

Additionally, when encountering an alien, who is an arriving alien or an alien present in the United State without admission or parole, ICE will use the criteria set forth in this rule with respect to determining whether to charge such an alien under section 212(a)(4), 8 U.S.C. 1182(a)(4).

DHS notes that it has no general authority over the EOIR inadmissibility determinations in removal proceedings and believes such matters are more appropriately addressed by DOJ in the context of its public charge rulemaking.

f. International Law and Related Issues

*Comment:* One commenter suggested, but did not explicitly state, that the rule would violate international refugee law. Another commenter suggested that the rule would discriminate against individuals waiting for their asylum applications to be adjudicated. Other commenters noted that the rule would be a violation of, or is inconsistent with, various international agreements such as the Universal Declaration of Human Rights (UDHR), the 1959 Declaration of the Rights of the Child, the International Convention on the Elimination of All Forms of Racial Discrimination (CERD), and the International Covenant on Civil and Political Rights (ICCPR). A commenter stated that treaties that have been ratified "should be considered as being Constitutional Amendments under the Supremacy Clause."

*Response:* DHS rejects the comment that this rule would violate the United States' international treaty obligations relating to refugees or that the rule discriminates against individuals in the United States who have asylum applications pending on the effective date of this rule. As noted in the NPRM, this rule does not apply to asylum applicants, those granted asylum (asylees), and those seeking to adjust their status to that of a lawful permanent resident based on their asylee or refugee status. Applicants for asylum are not required to demonstrate admissibility as part of demonstrating their eligibility for asylum.[147] Additionally, while asylees who travel outside of the United States are examined for admissibility upon returning to the United States with a refugee travel document and are admitted as such if admissible, asylees are not subject to the public charge inadmissibility ground when seeking readmission as an asylee.[148] Similarly,

---

[140] It is possible that the basis for the denial could also make the alien deportable under the different requirements for deportability at section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5). Aliens placed in removal will be afforded al due process rights accorded to aliens in removal proceedings. *See* INA section 240(b)(4), 8 U.S.C. 1229a(b)(4).

[141] *See* 8 CFR 1.2, definition of "lawfully admitted for permanent residence."

[142] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135 (proposed Oct. 10, 2018).

[143] Form I–601A is filed by aliens inside the United States to request a provisional waiver of the unlawful presence grounds of inadmissibility section 212 (a)(9)(B) of the Act, 8 U.S.C. 1182(a)(9)(B), before departing the United States to appear at a U.S. Embassy or Consulate for an immigrant visa interview.

[144] *See* Unified Agenda of Regulatory and Deregulatory Actions, DOJ, Inadmissibility on Public Charge Grounds, RIN 1125 AA74 (Spring 2019), *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201904&RIN=1125-AA84* (last visited June 11, 2019).

[145] INA sections 103(a) and 239, 8 U.S.C. 1103(a) and 1229; 8 CFR 2.1 and 239.1.

[146] 8 CFR 245.2(a)(5)(ii) and 1245.2(a)(1).

[147] *See* INA section 208, 8 U.S.C. 1158.

[148] *See* 8 CFR 223.3(d)(2).

asylees and refugees who are applying for adjustment of status are not subject to the public charge inadmissibility ground under section 209(c) of the Act, 8 U.S.C. 1159(c).[149] Because the rule does not apply to or otherwise impact asylum applicants, asylees, and applicants for asylee or refugee adjustment, the rule does not violate international treaty obligations relating to refugees, to the extent those obligations are applicable.[150]

DHS also disagrees that the rule would violate international treaties such as the CERD [151] and the ICCPR [152] or that it would be inconsistent with non-binding instruments such as the UDHR [153] and the 1959 Declaration of the Rights of the Child.[154] First, the rule is not inconsistent with those treaties and instruments. As discussed above, the rule does not prevent anyone subject to the public charge ground of inadmissibility from applying for and receiving any benefits for which they are eligible, including benefits related to food and nutrition, housing, and healthcare, and basic social services. Additionally, to the extent that this rule does have a negative effect on those from particular groups, it is not DHS's intent, in issuing this final rule, to target aliens from certain countries or of a particular race. Instead, DHS's intent in codifying the public charge inadmissibility rule is to better ensure the self-sufficiency of aliens who seek to come to or remain in the United States.

Second, the two referenced declarations do not bind DHS as a matter of U.S. domestic law. As the Supreme Court has held, the UDHR "does not of its own force impose obligations as a matter of international law." [155] The Declaration of the Rights of the Child, like the UDHR is a U.N. Declaration rather than a binding treaty. Moreover, the CERD and the ICCPR, were both ratified on the express understanding that they are not self-executing and therefore do not create

judicially enforceable obligations.[156] DHS disagrees with the comment that ratified treaties should be considered as constitutional amendments as this is legally inaccurate.[157]

g. Contract Law

*Comment:* A commenter said that it would contradict principles of contract law to hold a child responsible for the public benefits they receive before the age of majority.

*Response:* DHS rejects the suggestion that DHS would be precluded, under contract law principles, from considering the receipt of public benefits in a public charge inadmissibility determination by an alien under the age of 18. With the exception of the affidavit of support statute, section 213A of the Act, 8 U.S.C. 1183a, which requires a sponsor to be at least 18 years of age, decisions as to the admissibility of aliens subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), are questions regarding the burden the alien will place on the government in the future, and does not implicate contract law. While individuals under the age of 18 generally lack the capacity under most States' laws to enter into a contract, such considerations are inapposite to this rulemaking. Aliens under the age of 18 are subject to the provisions of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), except where Congress has specifically provided an exemption of public charge inadmissibility, or otherwise provided the possibility of a waiver of the public charge inadmissibility ground. By its

very nature, the public charge ground of inadmissibility frequently affects people who lack the capacity or competence to enter into contracts. Contract law does not limit DHS's ability to enforce the public charge ground of inadmissibility.

However, as noted elsewhere in this rule, DHS has decided, as a matter of policy, to exclude consideration of the receipt of Medicaid by aliens under the age of 21, as well as services or benefits funded by Medicaid but provided under the IDEA or school-based benefits provided to children who are at or below the oldest age of children eligible for secondary education as determined under State law. DHS has also excluded consideration of the receipt of all public benefits received by children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent(s) will result automatically in the child's acquisition of citizenship; or whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship as described in the rule.

*F. Applicability of the Public Charge Ground of Inadmissibility, and the Public Benefit Condition to Extension of Stay and Change of Status*

1. Applicability of the Public Charge Ground of Inadmissibility Generally

*Comment:* A commenter opposed the application of the rule to applicants for admission because, according to the commenter, it is impossible for DHS to make a prediction about future circumstances based upon the totality of the alien's circumstances at the time of the application for admission; the commenter said that life circumstances cannot be predicted. Many commenters said the proposed rule would directly affect a large number of individuals (some commenters cited 1.1 million individuals seeking to obtain lawful permanent resident status), half of whom already reside in the United States and would be subject to a public charge inadmissibility determination. Another commenter stated that the proposed rule would dramatically alter which immigrants are permitted to enter and stay in the United States. This commenter stated that quantitative and qualitative data, including the DHS Yearbook of Immigration Statistics, show that increases in restrictions to the legal means to immigration over the last hundred years are responsible for increases in unauthorized border crossings, visa overstays, and increases in an international network of private and public profiteers. Another

---

[149] "The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) shall not be applicable to any alien seeking adjustment of status under this section . . . ."

[150] Asylum is a discretionary benefit implementing Article 34 of the 1951 Convention Relating to the Status of Refugees (as incorporated in the 1967 Protocol Relating to the Status of Refugees), which is "precatory," *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987), and the 1967 Protocol is not self-executing, *e.g., Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017).

[151] 660 U.N.T.S. 195, U.N. Doc. A/6014 (1965).

[152] Dec. 16, 1966, 999 U.N.T.S. 171.

[153] G.A. Res. 217A (III), U.N. Doc. A/810 (1948).

[154] G.A. Res. 1386 (XIV), U.N. Doc. A/4354 (1959).

[155] *Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004).

[156] U.S. Reservations, Declarations, and Understandings, International Convention on the Elimination of All Forms of Racial Discrimination, 140 Cong. Rec. S7634–02 (1994) ("[T]he United States declares that the provisions of the Convention are not self-executing."); U.S. Reservations, Declarations and Understandings, International Covenant on Civil and Political Rights, 138 Cong. Rec. 8071 (1992) ("[T]he United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing."); *see also Alvarez-Machain,* 542 U.S. at 735 ("[T]he United States ratified the Covenant [on Civil and Political Rights] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts."); *Johnson* v. *Quander,* 370 F. Supp. 2d 79, 101 (D.D.C. 2005) (same—CERD), *aff'd,* 440 F.3d 489 (D.C. Cir. 2006).

[157] *See Reid* v. *Covert,* 354 U.S. 1, 18 (1957) ("This Court has also repeatedly taken the position that an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null."); *La Abra Silver Min. Co.* v. *United States,* 175 U.S. 423, 460 (1899) ("Congress by legislation, and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country which had been negotiated by the President and approved by the Senate." (citation omitted)).

**41326** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

commenter indicated that the new regulation would adversely affect immigrants and nonimmigrants alike and discourage people from lawfully entering the United States through visas offered by the DOS.

*Response:* DHS disagrees that the rule cannot apply to applicants for admission because it is impossible to make a prediction about future circumstances based upon the totality of the alien's circumstances at the time of the application for admission. As mandated by Congress under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), any alien applying for admission to the United States is inadmissible if he or she is likely at any time to become a public charge. DHS must make a public charge inadmissibility determination unless the applicant for admission is within one of the exempted categories. Only those categories of aliens designated by Congress are exempt from the public charge ground of inadmissibility.[158] Additionally, although it will impact all aliens subject to the public charge ground of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), the goal of this rule is to implement the public charge inadmissibility ground as established by Congress. DHS rejects the notion that there is a relationship between the implementation of the congressionally-mandated ground of inadmissibility through this rulemaking and any increase in the number of illegal border crossings or other illegal behavior.

*Comment:* Multiple commenters stated that the proposed rule would negatively affect those seeking a "green card" (lawful permanent residence) and would notably affect family-based immigration.

*Response:* Although this rule will impact those seeking lawful permanent resident status based on an approved family-based petition, only aliens who are subject to the public charge ground of inadmissibility will be required to demonstrate that they are not likely to become a public charge at any time in the future, as prescribed in the rule.

*Comment:* Another commenter indicated that current green card holders and other aliens lawfully present in the United States, like recipients of Deferred Action for Childhood Arrivals (DACA), could see their status jeopardized, as they may not meet the income standard in the proposed rule.

*Response:* DHS notes that a person who is already a lawful permanent resident has already undergone a public

charge inadmissibility determination, unless she or he was exempt from such a determination at the time of application for such status. Such a person would not undergo another public charge inadmissibility determination unless U.S. Customs and Border Protection (CBP) determines, upon the alien's return from a trip abroad, that the returning lawful permanent resident is an applicant for admission based on one of the criteria set forth in section 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C), such as the alien has been absent from the United States for more than 180 days. Aliens who are lawfully present in the United States as nonimmigrants have also undergone a public charge inadmissibility determination, where applicable, and this rule does not impact their status unless they are seeking an immigration benefit for which admissibility is required or if they are seeking an extension of stay or change of status.

With respect to DACA recipients, DHS notes that an alien is not required to demonstrate that he or she is not inadmissible on the public charge ground when requesting DACA. A DACA recipient would only be subject to this rule when applying for a benefit for which admissibility is required.

*Comment:* A commenter indicated that the NPRM excludes too many applicants for admission from public charge review. The commenter stated that the category of "applicants for admission" is clearly defined in section 235(a) of the Act, 8 U.S.C. 1225(a) as "aliens present in the United States who have not been admitted"[159] and "all aliens" who have not been "inspected by immigration officers." The commenter indicated that although most of these categories of aliens are barred from most of the public benefits designated under the proposed rule, the commenter's research indicates that the very high use of welfare programs by noncitizens cannot be explained unless at least half of the non-citizens surveyed in the Survey of Income and Program Participation (SIPP) data are in the country illegally. The commenter further stated that the NPRM fails to provide any guidance on how this population will be assessed for public charge inadmissibility.

*Response:* DHS disagrees that the rule excludes too many aliens from the public charge inadmissibility determination and disagrees that DHS failed to provide adequate guidance with respect to how DHS would apply

the public charge inadmissibility determination with respect to the population identified by the commenter. Congress identified which aliens are subject to the public charge ground of inadmissibility and specified which aliens are exempt from, or can obtain a waiver of, public charge inadmissibility. DHS does not have the authority to add additional categories of aliens that must establish admissibility based on public charge. This rule only applies to those categories of aliens that Congress has designated as subject to the public charge ground of inadmissibility.[160]

In addition, although the commenter indicated that DHS fails to specify how to determine that aliens illegally present in the United States are inadmissible on the public charge ground, this determination is only made when aliens subject to this ground of inadmissibility apply for an immigration benefit for which admissibility is required, such as adjustment of status, or when determining what charges to lodge on an NTA when initiating removal proceedings under section 240 of the Act, 8 U.S.C. 1229a.[161] DHS notes that the SIPP data on receipt of public benefits by noncitizens includes asylees and refugees and lawful permanent residents who are lawfully present in the United States.

*Comment:* Some commenters stated that the regulation would be arbitrary and capricious because DHS would apply it to lawful permanent residents who were abroad for a trip exceeding 180 days, but DHS did not estimate the size of this population in the proposed rule. These commenters further stated that if the returning lawful permanent resident is placed in removal proceedings, the burden of proof of inadmissibility should remain on the government to establish by "clear and convincing evidence"[162] that he or she is lawfully present in the United States pursuant to a prior admission. This burden, per the commenters, should not be transferred to the lawful permanent

---

[158] *See* 8 CFR 212.23.

[159] *See* INA section 235(a) and (b), 8 U.S.C. 1225(a) and (b).

[160] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4) (Any alien who, . . . in the opinion of the Attorney general at the time of application for admission . . . is likely to become a public charge, is inadmissible). *See* 8 CFR 212.20.

[161] For example, to be eligible for adjustment of status under INA section 245(a) and (c), 8 U.S.C. 1255(a) and (c), an applicant must generally have been, among other requirements, inspected and admitted or paroled, and in legal immigration status. Therefore, in most cases, the applicant must have been legally entered the United States and be legally present in the United States. In contrast, under INA section 244(a), 8 U.S.C. 1154a, an alien cannot be denied Temporary Protected Status on account of his or her immigration status or lack thereof.

[162] *See* INA section 240(a)(3), 8 U.S.C. 1229a(a)(3).

resident through completion of the Form I–944 or similar forms that CBP may request. The commenter stated that doing so, would violate the lawful permanent resident's due process rights as a permanent resident by shifting the burden of proof to returning lawful permanent residents, contrary to *Woodby* v. *INS,* 385 U.S. 276 (1966), *Landon* v. *Plasencia,* 459 U.S. 21 (1982), and *Matter of Rivens,* 25 I&N Dec. 623 (BIA 2011).

*Response:* DHS does not believe such a quantitative estimate is necessary. DHS further disagrees that the rule impermissibly shifts the government's burden of proof onto the returning lawful permanent residents, that the applicability of inadmissibility grounds to returning lawful permanent residents is unlawful, or that it would violate an alien's due process rights. Congress specified when lawful permanent residents returning from a trip abroad will be treated as applicants for admission, and also specified who bears the burden of proof in removal proceedings when such an alien is placed in proceedings. In general, the grounds of inadmissibility set forth in section 212(a) of the Act, 8 U.S.C. 1182(a), including public charge inadmissibility, do not apply to lawful permanent residents returning from a trip abroad.[163] Congress set forth the circumstances under which lawful permanent residents returning from a trip abroad are considered applicants for admission, and therefore, are subject to admissibility determinations, including an assessment of whether the alien is inadmissible as likely at any time to become a public charge.[164] If CBP

determines that the returning lawful permanent resident is an applicant for admission based on one of the criteria set forth in section 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C), including that the alien has been absent for more than 180 days, and that the alien is inadmissible under one of the grounds set forth in section 212(a) of the Act, 8 U.S.C. 1182(a), the law requires that the alien be placed into removal proceedings.[165] In such removal proceedings, DHS bears the burden of proof to demonstrate by clear and convincing evidence that the lawful permanent resident is properly considered an applicant for admission based on being outside of the United States for more than 180 days, or any of the grounds set forth in 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C).[166] And, if the lawful permanent resident is not an applicant for admission, but is removable from the United States for any reason, DHS may charge the alien under section 237 of the INA, 8 U.S.C. 1227.

For these reasons, DHS disagrees that the rule impermissibly places the burden on returning lawful permanent residents in violation of their rights under *Woodby* v. *INS,*[167] *Landon* v. *Plasencia,*[168] and *Matter of Rivens* as alleged by the commenters.[169] Specifically, in *Woodby* and *Landon,* which predate IIRIRA, the Court addressed the government's burden in deportation proceedings against a lawful permanent resident and indicated that the government would bear the burden to demonstrate that the alien is a returning resident seeking admission. Subsequently, with IIRIRA, Congress specified the circumstances under which a lawful permanent resident will be treated as an applicant for admission, and provided that when an alien is an applicant for admission that the alien has the burden to establish that he or she is clearly and beyond doubt entitled

to be admitted and is not inadmissible; however, Congress remained silent with respect to the burden and standard of proof required to determine whether an alien is an applicant for admission.[170] The BIA in *Matter of Rivens,*[171] did not deviate from longstanding case law on this question[172] and affirmed that DHS continues to bear the burden of proving by clear and convincing evidence that a returning lawful permanent resident should be treated as an applicant for admission.[173] This rule does not alter DHS's burden of proof with respect to the treatment of returning lawful permanent residents as applicants for admission in any way, *i.e.,* the only burden DHS bears is establishing that the returning lawful permanent resident should be treated as an applicant for admission.[174] The BIA, in *Matter of Rivens,* did not reach the issue of who then bears the burden of showing admissibility, or a lack of inadmissibility, once it has been determined that an alien is an applicant for admission.[175]

DHS notes, as was pointed out by the commenters, that under section 291 of the Act, 8 U.S.C. 1361, an applicant for admission always bears the burden of proof to establish that he or she is not inadmissible to the United States under any provision of the Act; similarly, under section 240(c)(2)(A) of the Act, 8 U.S.C. 1229a(c)(2)(A), an applicant for admission in removal proceedings has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212(a) of the Act, 8 U.S.C. 1182(a). Therefore, the burden still lies with the returning resident to establish that he or she is not inadmissible based on public charge.

*Comment:* One commenter asks whether the public charge regulation would apply to applicants seeking naturalization.

---

[163] Although Congress did not subject those admitted as lawful permanent residents to grounds of inadmissibility under INA section 212(a), 8 U.S.C. 1182(a), it did codify that an alien's certain conduct or conditions will lead to the alien's removal from the United States, including inadmissibility on public charge. *See* INA section 237, 8 U.S.C. 1227, generally, and INA section 237(a)(5), 8 U.S.C. 1227(a)(5). One basis of removal is an alien's inadmissibility at the time of admission or adjustment of status, including being inadmissible for public charge under INA section 212(a)(4), 8 U.S.C. 1182(a)(4). *See* INA section 237(a)(1)(A), 8 U.S.C. 1227(a)(1)(A). If the alien is charged as a deportable alien, the burden of proof is on the government to show by clear and convincing evidence that the alien, who has been admitted, is not deportable. *See* INA section 240(c)(3), 8 U.S.C. 1229a(c)(3).

[164] *See* INA section 101(a)(13)(C), 8 U.S.C. 1101(a)(13)(C). According to this provision, lawful permanent residents are regarded as an applicant for admission when they: (1) Have abandoned or relinquished that status; (2) have been outside the United States for a continuous period in excess of 180 days; (3) have engaged in illegal activity after departing the United States; (4) have departed the United States while under legal process seeking removal of the alien from the United States, including removal proceedings and extradition

proceedings; (5) have committed an offense identified in INA section 212(a)(2), 8 U.S.C. 1182(a)(2), unless granted a waiver of inadmissibility for such offense or cancellation of removal; and (6) are attempting to enter at a time or place other than as designated by immigration officers or who have not been admitted to the United States after inspection and authorization by an immigration officer.

[165] As explained above, lawful permanent resident s are not subject to grounds of inadmissibility after being properly admitted to the United States as an lawful permanent resident within the meaning of INA section 101(a)(20), 8 U.S.C. 1101(a)(20). *See* INA sections 235(b)(2)(A) and 240, 8 U.S.C. 1225(b)(2)(A) and 1229a.

[166] *See Matter of Rivens,* 25 I&N Dec. 623 (BIA 2011).

[167] *See Woodby* v. *INS,* 385 U.S. 276 (1966).

[168] *See Landon* v. *Plasencia,* 459 U.S. 21 (1982).

[169] *Matter of Rivens,* 25 I&N Dec. 623 (BIA 2011).

[170] *See* INA sections 235 and 240, 8 U.S.C. 1225 and 1229a; *see Matter of Rivens,* 25 I&N Dec. 623, 625 (BIA 2011). *See* INA sections 101(a)(13)(C), 240(c)(2), and 291, 8 U.S.C. 1101(a)(13)(C), 1229a(c)(2), and 1361.

[171] 25 I&N Dec. 623, 626 (BIA 2011).

[172] *See Matter of Rivens,* 25 I&N Dec. 623, 625 (BIA 2011) (citing *Matter of Huang,* 19 I&N Dec. 749 (BIA 1988); *Woodby* v. *INS,* 385 U.S. 276 (1966); and *Landon* v. *Plasencia,* 459 U.S. 21 (1982)).

[173] *See Matter of Rivens,* 25 I&N Dec. 623, 625 (BIA 2011).

[174] *See Matter of Rivens,* 25 I&N Dec. 623, 626 (BIA 2011).

[175] *See Matter of Rivens,* 25 I&N Dec. 623, 626 (BIA 2011) (not reaching the issue because it was unnecessary to address the ''open question of who then bears the burden of showing admissibility, or a lack of inadmissibility, once it has been determined that an alien is an applicant for admission.'').

*Response:* The laws governing naturalization can be found in Title III of the INA. The public charge ground of inadmissibility does not apply in naturalization proceedings. DHS notes, however, that USCIS assesses as part of the naturalization whether the applicant was properly admitted as a lawful permanent resident and therefore was eligible for adjustment based upon the public charge ground of inadmissibility at the time of the adjustment of status.[176]

*Comment:* Multiple commenters indicated that the proposed rule makes the path to citizenship more difficult and would give the Government the ability to deny a ''broad swath'' of applicants for green cards, especially children who are likely to be self-sufficient as adults, teenagers and students completing their education, infant caregivers, the elderly, immigrants from certain countries, and an immigrant previously deemed admissible who becomes disabled.

Many commenters stated that the rule should not apply to children, and that doing so would destabilize families, make children unhealthy or more likely than not to become a public charge as adults, and may cause some children to be excluded while the parent is admitted. Some commenters provided data on the number of children who would be impacted by the rule. A commenter proposed an exemption from public charge for all children up to age 18, because such children are subject to child labor laws and in most cases still engaged in mandatory education. The commenter also proposed a three-year grace period beyond age 18, until age 21. Finally, the commenter recommended further extending the commenter's proposed exemption for those aliens who are currently engaged in full-time college or vocational education, and for a three-year grace period after graduation or certification. The commenter stated that this will be a strong incentive for young immigrants toward self-sufficiency and positive GDP contribution. A few commenters added that children born in the United States to immigrant parents are United States citizens and therefore are eligible for public benefits under the same eligibility standards as all other United States citizens.

A commenter requested that asylum seekers and entrepreneurs, crime victims, victims and survivors of domestic violence, and T nonimmigrants seeking adjustment of status should be excluded from the rule and public charge ground of inadmissibility. Similarly, commenters stated that victims of domestic violence, human trafficking, and sexual assault would be harmed as a consequence since family members sponsored by victims would be impacted by the proposed rule.

*Response:* Generally, the public charge ground of inadmissibility applies to all aliens who are applicants for a visa, admission, or adjustment of status. However, as noted previously, Congress—not DHS—has the authority to specify which aliens are exempt from public charge inadmissibility determinations, as well as those who may obtain a waiver of public charge inadmissibility. Therefore, the public charge inadmissibility provisions set forth in this final rule will apply to all aliens seeking admission or adjustment of status, or any other immigration benefit for which admissibility is required, unless otherwise exempted by Congress, irrespective of the alien's age, medical condition, economic status, place of origin, or nationality. With respect to comments suggesting that DHS specifically exclude children, teenagers, caregivers of infants, the elderly, and entrepreneurs, and other categories of individuals from the public charge inadmissibility provisions, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), applies to such aliens applying for a visa, admission, or adjustment of status, unless otherwise specified by Congress. DHS has tailored the effects of this rule somewhat for certain populations. On the whole, however, DHS lacks the authority to create wholesale exemptions or provide a grace period for broad categories of aliens, as suggested by the commenters.

DHS notes that does have the authority to define public charge as it has in this rule and in doing so, decide which public benefits are considered for the purposes of this rule. As discussed in greater detail below, DHS has made some changes to the public benefits that DHS will consider, particularly as it relates to receipt of Medicaid benefits by aliens under the age of 21 and pregnant women, including women for the 60 days following pregnancy, and for receipt of Medicare Part D LIS. DHS has also clarified the role that age and other factors play in the public charge inadmissibility determination. DHS believes that these changes may at least partially address some of the

commenters' concerns, and that such changes are more in line with the statute.

With respect to the commenter's suggestions that asylees, crime victims, victims of domestic violence, and T nonimmigrants be exempt from this rule, DHS notes that such individuals are generally exempted by statute from public charge inadmissibility determinations, and that such exemptions are also set forth in 8 CFR 212.23.[177] As explained in the NPRM,[178] and addressed further below, DHS codified in the regulation those classifications of nonimmigrants and immigrants that Congress exempted from public charge grounds of inadmissibility. DHS will not, and cannot, exempt other classes of aliens unless these exemptions are created by Congress.[179]

## 2. Applicability and Content of the Public Benefits Condition

*Comment:* Citing to the statutory policy statement set forth in PRWORA, a commenter indicated that nonimmigrant applications or petitions for extension of stay or change in status should be subject to inadmissibility on public charge grounds in order to ensure their self-sufficiency. By contrast, some commenters stated that DHS lacked the authority to condition of eligibility for extension of stay or change of status on past, current, or future receipt of public benefits because the public charge inadmissibility ground does not apply to extension of stay or change of status; commenters stated that this provision was therefore not supported by the plain language of the statute and is unlawful. A commenter stated in regards to extension of stay and change of status that DHS's bald assertion that it generally has discretion to apply the test to new categories cannot overcome clear and unambiguous language from Congress to the contrary.

Some of these commenters also indicated that nobody would be eligible for extension of stay or change of status because the proposed regulation asks applicants to prove a negative. Another commenter disagreed with the proposed rule because no one can determine whether an applicant seeking an extension of stay or change of status will receive public benefits at any time in the future.

[176] *See* INA section 318, 8 U.S.C. 1429. Additionally, an individual may become removable on account of public charge while in lawful permanent resident status, which is a consideration which may be assessed at the time of naturalization. *See* INA section 237(a)(5), 8 U.S.C. 1227(a)(5). However, the assessment of removability for public charge is different from the assessment of public charge inadmissibility and is not a part of this rule.

[177] However, DHS notes that T nonimmigrants are not excluded from public charge inadmissibility when applying for employment-based adjustment of status. *See* INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E).

[178] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51156–57 (proposed Oct. 10, 2018).

[179] *See* 8 CFR 212.23.

One commenter stated that because employment-based nonimmigrant categories require the employer to demonstrate the ability to financially support the nonimmigrant, and further, because other nonimmigrants classifications such as F and M nonimmigrant students must demonstrate sufficient financial support during the duration of the nonimmigrant stay, that there are sufficient financial safeguards in place for these nonimmigrants such that this rule poses an unnecessary administrative burden. A commenter indicated that the expansion of the public charge rule to include additional classifications of nonimmigrants will reduce immigration or admission rates.

*Response:* Neither the NPRM nor this final rule is intended to apply the public charge ground of inadmissibility to extension of stay or change of status applicants. Instead, DHS is exercising its statutory authority to set a new condition for approval of extension of stay and change of status applications— that the applicant establish that the alien has not received since obtaining the nonimmigrant status he or she seeks to extend or from which he or she seeks to change, and through adjudication, one or more public benefits for more than 12 months in the aggregate within any 36-month period.[180] This condition will apply to any extension of stay or change of status application or petition postmarked (or if applicable, submitted electronically) on or after the effective date of the rule.

If the nonimmigrant status the individual seeks to extend or to which the applicant seeks to change is statutorily exempt from the public charge ground of inadmissibility,[181] then the public benefits condition will not apply.

After considering the comments, DHS agrees with the commenters that an assessment of whether the nonimmigrant is "likely to receive public benefits" for the expected period of stay, which included the option for USCIS to request submission of a Form I–944 as part of an RFE, might have been similar to a public charge inadmissibility assessment. In addition, applying a prospective element to the public benefits condition would likely be redundant and unnecessary given the finite nature of nonimmigrant status and stay. To the extent DHS grants an extension of stay to a nonimmigrant subject to the public benefit condition

after determining that the alien had not received public benefits, and a nonimmigrant subsequently wishes to apply for another, the condition would apply again. The same would apply to a change of status. If, however, an alien leaves the United States after holding nonimmigrant status, and seeks a new nonimmigrant or immigrant visa based on a classification that is subject to INA 212(a)(4), 8 U.S.C. 1182(a)(4), then the public charge ground of inadmissibility will apply. Similar to aliens who are not required to obtain a visa but are subject to INA 212(a)(4), 8 U.S.C. 1182(a)(4)— DHS would apply the public charge ground of inadmissibility at the port of entry.[182] Finally, with respect to an alien in the United States who is eligible to adjust status from a nonimmigrant classification to that of a lawful permanent resident, and the alien is subject to INA 212(a)(4), 8 U.S.C. 1182(a)(4), DHS will at the time of adjudication of an adjustment of status application make a public charge inadmissibility determination consistent with the requirements of INA 212(a)(4), 8 U.S.C. 1182(a)(4), and regulations promulgated through this rulemaking. Therefore, DHS removed the future-looking aspect of this condition and will not request applicants for an extension of stay or change of status to submit a Form I–944. Additionally, DHS made a technical edit to remove "currently receiving public benefits," as the reference to the alien having "received" public benefits is sufficiently inclusive of receipt up to the date of adjudication. According to preexisting DHS regulations, an applicant must meet an eligibility requirement or a condition not only at the time of filing but also at the time of adjudication,[183] which renders superfluous the proposed text regarding "currently receiving public benefits." Finally, because DHS has moved the public benefits receipt threshold from the public benefits definition to the public charge definition, DHS added the "for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)" threshold to the public benefits condition in the extension of stay and change of status provisions as well because the threshold applies to the receipt of public benefits in these provisions, as well.

Under this final rule, nonimmigrants who are seeking an extension of stay or a change of status must only demonstrate that they have not received, since obtaining the nonimmigrant status they seek to extend or from which they seek to change, *up to the time of the adjudication of the application,*[184] one or more public benefits for more than 12 months in the aggregate within any 36-month period.[185] This condition will apply to any extension of stay or change of status application or petition postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. DHS will not consider any receipt of public benefits prior to the rule's effective date, for purposes of the public benefits condition for extension of stay or change of status.

Imposing conditions on extension of stay and change of status applications is within DHS's authority, as Congress granted DHS the authority, in sections 214 and 248 of the Act, 8 U.S.C. 1184 and 1258, to regulate conditions and periods of admission of nonimmigrants and conditions for change of status, respectively. As explained in the NPRM, however, the government's interest in a nonimmigrant's ability to maintain self-sufficiency does not end with his or her initial admission as a nonimmigrant.[186] Therefore, given DHS's authority to set conditions[187] and Congress' policy statement "that aliens *within* the Nation's borders not depend on public resources to meet their needs,"[188] it is reasonable for DHS to require, as a condition of obtaining an extension of stay or change of status, evidence that nonimmigrants inside the United States have remained self-sufficient during their nonimmigrant stay.

DHS will continue to require that the alien meets his or her burden of proof that he or she is eligible for the status requested, including whether the alien has the financial means, if required by the laws governing the particular nonimmigrant classification. The two aspects of the adjudication (eligibility for the status requested and the public benefit condition) are not duplicative. DHS notes that although eligibility for a

---

[180] *See, e.g.,* INA sections 103(a)(3), 214(a)(1), 248(a).

[181] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135–36 (proposed Oct. 10, 2018).

[182] *See, e.g.,* 8 CFR 217.4(a)(1) (Visa Waiver Program participants must not be "inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act (other than for lack of a visa).").

[183] *See* 8 CFR 103.2(b).

[184] *See* 8 CFR 103.2(b) (*Demonstrating eligibility.* An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication.).

[185] *See* 8 CFR 214.1(a)(3)(iv) and (c)(4)(iv); *see* 8 CFR 248.1(a) and (c)(4).

[186] *See* PRWORA's policy statement at 8 U.S.C. 1601, reiterating that self-sufficiency of all aliens coming to the United States continues to be national policy.

[187] *See* INA sections 214 and 248, 8 U.S.C. 1184, 1258.

[188] 8 U.S.C. 1601(2)(A).

nonimmigrant status might require some indication of future self-support, it would generally not require an assessment of public benefits received since the alien obtained the nonimmigrant status he or she seeks to extend or from which he or she seeks to change.

*Comment:* One commenter said that, according to *Mathews* v. *Eldridge,* 424 U.S. 319 (1976), it would be improper to implement the public benefits condition for change of status applicants with no available appeal process. To comply with due process rights as prescribed by *Goldberg* v. *Kelly,* 397 U.S. 254 (1970), the commenter suggested that DHS give applicants a chance to respond with evidence that supports their admissibility, and that DHS should not revoke the status until the decision had been fully appealed through all stages of review.

*Response:* DHS disagrees that imposing the public benefits condition on extension of stay and change of status applications is improper because it violates due process. DHS notes that to the extent that USCIS obtains derogatory information unknown to the applicant relevant to the extension of stay or change of status application, consistent with 8 CFR 103.2(b)(16)(i), USCIS will provide notice of the derogatory information and give the applicant an opportunity to respond. Moreover, applicants for extension of stay and change of status will receive notice of deficiencies as appropriate and consistent with 8 CFR 103.2(b)(8) and consistent with USCIS' policy on the issuance of certain requests for evidence and notices of intent to deny,[189] before denying an application for an extension of stay or change of status. In general, under DHS regulations, a denial of an extension of stay or change of status application cannot be appealed.[190] Upon denial of an extension of stay or a change of status application, if the alien is removable, DHS can issue an NTA and place the alien in removal proceedings.[191] In removal proceedings, the alien can challenge the basis for removal, and appeal the immigration judge's decision, if desired.[192] These proceedings provide due process to the extent required by law.[193]

*Comment:* Many commenters noted that consular officers already conduct public charge inadmissibility assessments and CBP would conduct an admissibility determination at the port of entry. Others indicated that the proposed changes extension of stay and change of status applications create duplicative work for applicants and USCIS.

*Response:* As explained in the proposed rule,[194] DHS believes that the Government interest in ensuring an alien's self-sufficiency does not end once a nonimmigrant is admitted to the United States. The Government has an interest in ensuring that aliens present in the United States are self-sufficient. This interest does not end once the alien is admitted; aliens should remain self-sufficient for the entire period of their stay, including any extension of stay or additional period of stay due to a change of status. Indeed, as set forth by Congress in PRWORA, "aliens *within* the Nation's borders [should] not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [195] The fact that DHS already considers the applicant's financial status in adjudicating some extension of stay and change of status applications further supports this policy. Moreover, although the extension of stay or change of status provisions in the INA and the regulations do not specifically reference an alien's self-sufficiency, consideration of an alien's self-sufficiency in these applications is consistent with the self-sufficiency principles of PRWORA and aligns the INA to those principles.[196]

DHS therefore does not believe that considering an extension of stay or change of status applicant's past and current receipt of public benefits over the designated threshold in the United States is duplicative of the consular officer's public charge inadmissibility assessment at the nonimmigrant visa stage, given that a certain amount of time has passed between an alien's consular interview or the alien's admission to the United States in nonimmigrant status, and the alien's request for an extension of stay or change of nonimmigrant status.[197] The alien's financial situation may have changed since the visa was issued or the alien was admitted to the United States.

a. Nonimmigrant Students and Exchange Visitors

*Comment:* A commenter pointed out that the new public charge rule would apply to students and exchange visitors who would seek to change or extend their status. The commenter indicated that the new rule, therefore, would impose new standards and barriers for students. The commenter added that drops in international enrollment would have broader ripple effects for United States higher education institutions.

*Response:* To the extent that the rule may impose barriers to those seeking to extend their stay or change their status, as explained previously, given DHS's authority [198] and Congress' policy statement with respect to self-sufficiency,[199] it is reasonable for DHS to impose, as a condition of obtaining an extension of stay or change of status, the requirement that the alien demonstrate that he or she has not received public benefits as defined in 8 CFR 212.21(b).[200] As discussed previously, DHS has removed the forward-looking aspect of the public benefits condition. This may ameliorate the consequences of the public benefits condition for certain nonimmigrants.

*Comment:* Another commenter stated that subjecting extension of stay and change of status applications and petitions to the public charge test produces multiple legal contradictions: The commenter provided the example of international students in F–1 status who are not eligible to work more than 20 hours off campus or in federally-subsidized work study positions, asserting that these restrictions greatly reduced the amount of income students can earn and thus, reduces their self-sufficiency. The commenter stated that the determinations on self-sufficiency in one status bear no significance on an individual's ability to be self-sufficient within the legal confines of a different classification.

*Response:* As noted above, DHS disagrees that the rule would require

---

[189] *See* USCIS Policy Memorandum Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter 10.5(a), Chapter 10.5(b) PM–602–0163 (Jul. 13, 2018) (*https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/AFM_10_Standards_for_RFEs_and_NOIDs_FINAL2.pdf* (last visited June 21, 2019).

[190] *See* 8 CFR 214.1(c)(5) and 8 CFR 248.3(g).

[191] USCIS Policy Memorandum, Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens (June 28, 2018), *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-28-PM-602-0050.1-Guidance-for-Referral-of-Cases-and-Issuance-of-NTA.pdf* (last visited May 8, 2019).

[192] *See* INA sections 240 and 242, 8 U.S.C. 1229a and 1252.

[193] *E.g., Zadvydas* v. *Davis,* 533 U.S. 678, 693 (2001).

[194] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135–36 (proposed Oct. 10, 2018).

[195] *See* 8 U.S.C. 1601(2)(A).

[196] *See Southern S.S. Co.* v. *N.L.R.B.,* 316 U.S. 31, 47 (1942) (requiring "careful accommodation of one statutory scheme to another. . . .").

[197] DHS's authority to specify the conditions, as a matter of discretion, under which an alien is eligible for either a change of status or extension of stay can be found in INA section 214(a)(1) and INA section 248(a); 8 U.S.C. 1184(a)(1) and 1258(a); and 8 CFR 214.1 and 8 CFR 248.1.

[198] *See* INA section 214 and 248, 8 U.S.C. 1184 and 1258.

[199] *See* 8 U.S.C. 1601.

[200] *See* 8 CFR 214.1(a)(3)(iv) and (c)(4)(iv), and 8 CFR 248.1(c)(4).

individuals seeking extension of stay or change of status to show they are not inadmissible under section 212(a)(4), 8 U.S.C. 1182(a)(4). At the time of the application for a nonimmigrant visa, the alien must demonstrate to DOS that he or she is not likely at any time in the future to become a public charge. Similarly, at the time a nonimmigrant applies for admission, he or she must demonstrate to CBP that he or she is not likely at any time in the future to become a public charge.

However, when seeking an extension of stay or change of status as a nonimmigrant student[201] or nonimmigrant exchange visitor,[202] the alien will not need to establish that he or she is not likely at any time in the future to become a public charge because those seeking extension of stay or change of status are not subject to the public charge ground of inadmissibility. However, the alien will need to demonstrate that he or she has sufficient funds to pay tuition and related costs as part of the application for extension of stay or change of status to a nonimmigrant. Further, the alien must demonstrate that he or she has not received, since obtaining the nonimmigrant status he or she seeks to extend or change and through the time of filing and adjudication, one or more public benefits as defined in the rule, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months).

DHS disagrees that subjecting extension of stay and change of status applicants to this new condition is legally contradictory because a student's restriction on employment in the United States reduces an alien's self-

sufficiency. As explained above, a student is required, as part of the eligibility for the nonimmigrant classification, to establish that he or she has sufficient funds to study in the United States; students are thus admitted with the expectation of self-sufficiency. The public benefits condition created by this rule would not be inconsistent with such expectation.

b. Workers

*Comment:* A commenter pointed out that the new public charge rule applies to specialty workers and their dependents who would seek admission or those who seek to change or extend their status. A commenter indicated that the new rule would impose new standards and barriers not only on foreign workers, but also on employers because of the unpredictability of the public charge determination and because wages alone would not be the determining factor. Citing to research and data on the population size and impact that the rule would have on H–2A nonimmigrant workers, several other commenters stated that H–2A nonimmigrant workers would be affected and that the rule would isolate H–2A nonimmigrant workers. One commenter, for example, also stated that the rule's criteria for factors to be considered in the totality of the circumstances test disadvantages farmworkers who seek to either apply to adjust to lawful permanent resident status or apply for or extend their nonimmigrant status. The commenter indicated that many farmworkers, domestic, and H–2A workers would find themselves determined to be a public charge due to factors beyond their control, such as low wages, poverty-level income, and lack of health insurance. Commenters stated that H–2A nonimmigrant workers undergo a public charge assessment at the consular office, and once in the United States, they are not eligible for the vast majority of public benefits but are provided housing by their employer. A commenter also stated that H–2A nonimmigrant workers are already reluctant to seek services due to fear of employer retaliation, and that this rule's chilling effect could further isolate them from the communities where they work and live. Thus, H–2A nonimmigrant workers would face delays and uncertainty in the extension of their visa status, and may become more vulnerable to recruitment fees and agent costs which, while prohibited, are a common abuse. The commenters urged DHS to withdraw the rule in its entirety.

*Response:* For aliens seeking to extend their stay or change their status

to that of an H–2A nonimmigrant, absent any indication of an alien's receipt of the designated public benefits for more than 12 months in the aggregate in a 36-month period since obtaining the nonimmigrant status from which they seek to change, USCIS will approve the application if the alien meets the eligibility requirement for the nonimmigrant classification. Additionally, as commenters pointed out, nonimmigrants are generally ineligible for public benefits that would be considered in connection with this rule. DHS understands the concerns addressed by the commenter regarding the practices of nonimmigrant workers and potential abuses of the programs, and therefore encourages the reporting of any such abuse through the channels provided by DHS or the Department of Labor (DOL).[203]

As previously indicated, given Congress's policy statement with respect to self-sufficiency, and DHS's authority to promulgate a rule addressing public charge inadmissibility, it is reasonable for DHS to impose, as a condition of obtaining an extension of stay or change of status, the requirement that the alien demonstrate that he or she has not received any public benefits as defined in the rule. DHS notes that it has removed the forward-looking aspect of the public benefits condition. This may ameliorate the consequences of the public benefits condition for certain nonimmigrants.

*Comment:* One commenter stated that the proposed rule would be detrimental to South Asian organizations that sponsor nonimmigrant religious workers and the rule would deem most of them inadmissible to the United States as public charges. The commenter stated that as part of a petition from a sponsoring institution, usually a non-profit entity supported through volunteer contributions, it would provide free housing, all meals, and health insurance to the religious worker as part of the employment package and may offer a small stipend to cover incidental expenses in lieu of a salary. The commenter indicated that such an employment offer, with its mix of monetary and non-monetary compensation, might be insufficient to overcome the public charge grounds based on the totality of the

---

[201] See 8 CFR 214.1(f)(1)(B) (requiring that the student presents documentary evidence of financial support in the amount indicated on the SEVIS Form I–20 (or the Form I–20A–B/I–20ID)); 8 CFR 214.1(m)(1)(B) (requiring that student documents financial support in the amount indicated on the SEVIS Form I–20 (or the Form I–20M–N/I–20ID); *see* AFM Chapter 30.3(c)(2)(C) (applicants to change status to a nonimmigrant student must demonstrate that they have the financial resources to pay for coursework and living expenses in the United States); *see also* 22 CFR 41.61(b)(1)(ii) (requiring that F and M nonimmigrants possess sufficient funds to cover expenses while in the United States or can satisfy the consular officer that other arrangements have been made to meet those expenses).

[202] See 8 CFR 214.2(j)(1) (admission upon presentation of SEVIS Form DS–2019, issued by DOS); 22 CFR 41.62(b)(2) (requiring that J nonimmigrants possess sufficient funds to cover expenses or have made other arrangements to provide for expenses before DOS can approve DS–2019 and the visa). *See also* AFM Chapter 30.3(c)(2)(C) (applicant to change status to exchange visitor must show approved DS–2019 (formerly known as IAP–66).

[203] USCIS has web pages and email addresses dedicated to combating suspected H–1B and H–2B fraud or abuse. Anyone, including both U.S. and foreign workers who suspect they or others may be the victim of fraud or abuse, can email USCIS to submit tips, alleged violations, and other relevant information. *See* USCIS, Report Labor Abuses, *https://www.uscis.gov/working-united-states/information-employers-employees/report-labor-abuses* (last visited May 8, 2019).

**41332**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

circumstances test proposed in the NPRM.

*Response:* For aliens seeking to extend their stay or change their status to that of religious workers, absent any indication of an alien's receipt of the designated public benefits for more than 12 months in the aggregate in a 36-month period, USCIS will approve the application if the alien meets the eligibility requirement for the nonimmigrant classification. Additionally, as commenters pointed out, nonimmigrants are generally ineligible for public benefits that would be considered in connection with this rule.

As previously indicated, given Congress' policy statement with respect to self-sufficiency, and DHS's authority to promulgate a rule addressing public charge inadmissibility, it is reasonable for DHS to impose, as a condition of obtaining an extension of stay or change of status, the requirement that the alien demonstrate that he or she has not received public benefits as defined in the rule. DHS notes that it has removed the forward-looking aspect of the public benefits condition. This may ameliorate the consequences of the public benefits condition for certain nonimmigrants.

DHS acknowledges that, once the rule is effective, certain religious workers seeking admission to the United States as nonimmigrants could be impacted by this rule. As part of the determination of whether any alien is likely at any time in the future to become a public charge, DHS will consider whether the alien has sufficient assets and resources for the purpose of his or her stay in the United States upon admission.[204] DHS believes that this regulation, and other provisions of the INA and implementing regulations, can be administered consistently with the Religious Freedom Restoration Act of 1993 (RFRA).[205] As DHS has noted previously, "[a]n organization or individual who believes that the RFRA may require specific relief from any provision of this regulation may assert such a claim at the time they petition for benefits."[206] Similarly, DHS acknowledges that any individual or organization who identifies a substantial burden on his, her, or an organization's exercise of religion such that the RFRA may require specific relief may assert such a claim.[207] Note, the RFRA does not

create a wholesale "exemption" to a generally applicable regulation; rather, it permits an applicant to seek specific relief which may or may not be complied with. Whether the RFRA applies to a given applicant is a case-by-case determination.[208] Therefore, for extension of stay and change of status purposes, DHS would still apply the public benefit condition to religious workers and review each case and each request individually.

With respect to admission and adjustment of status, the fact that the alien has an employment offer to work in the United States as well as monetary and non-monetary compensation are positive factors that generally indicate that the alien has sufficient assets and resources to be self-sufficient while present in the United States.[209] As previously noted, the public charge determination is an assessment considering all statutory mandated factors in the totality of the circumstances and that one factor alone is not outcome determinative. Separately, if an individual is required to obtain a visa from the DOS to facilitate entry into the United States, the inadmissibility determination with respect to whether to issue a visa is in the jurisdiction of DOS.

### d. Compact of Free Association Migrants

*Comment:* Several commenters addressed Compact of Free Association (COFA) migrants from the Republic of the Marshall Islands, Federated States of Micronesia and the Republic of Palau, who are able to reside in the United States as nonimmigrants under treaty obligations. Commenters stated that while COFA migrants are not eligible for many federal public benefits, some do participate in state and local programs, especially health insurance, and COFA

migrant children and pregnant women are eligible for Medicaid. Commenters stated that workers may either disenroll from these types of programs because of the applicability to nonimmigrants seeking admission or be blocked from entering the United States. One commenter stated that "[t]his rule could be used to deny COFA entry and ability to live in the [United States] thereby abandoning our Nation's commitment to our Pacific allies, including the more than 61,000 COFA persons currently residing in the United States."

*Response:* DHS appreciates the comments on the impact of the rule on COFA migrants and appreciates the continued relationship between COFA nations and the United States. Under the agreements and resulting regulations, citizens of the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau may enter into the United States as nonimmigrants, lawfully engage in employment, and establish residence in the United States without regard to certain grounds of inadmissibility.[210] Certain COFA citizens are subject to a modified version of the public charge ground of deportability, which is not directly affected by this rule.[211] But Congress did not exempt foreign nationals entering the United States under COFA from the public charge ground of inadmissibility, or otherwise modify the applicability of such ground of inadmissibility with respect to COFA migrants. And Congress expressly reiterated DHS's authority under section 214(a)(1) of the INA, 8 U.S.C. 1184(a)(1), "to provide that admission as a nonimmigrant shall be for such time and under such conditions as the Government of the United States may by regulations prescribe."[212] DHS acknowledges that COFA migrants may be affected by this rulemaking when applying for admission at a port of entry

---

[204] *See* 8 CFR 214.2(r)(11).

[205] Public Law 103–141, sec. 3, 107 Stat. 1488, 1488 (Nov. 16, 1993).

[206] *Special Immigrant and Nonimmigrant Religious Workers,* 73 FR 72276, 72283 (2008) codified at 8 CFR pts. 204, 214, 299.

[207] Note that individuals "located outside sovereign United States territory at the time their

alleged RFRA claim arose" are not "person[s]" within the meaning of RFRA. *Rasul v. Myers,* 512 F.3d 644, 672 (D.C. Cir.), *cert. granted, judgment vacated on other grounds,* 555 U.S. 1083 (2008).

[208] See generally *Federal Law Protections for Religious Liberty,* 82 FR 49668, 49669 (Oct. 26, 2017) from DOJ.

[209] Regulations that permit certain religious workers to self-support, 8 CFR 214.2(r)(11)(ii), require submission of "verifiable evidence acceptable to USCIS" that document "the sources of self-support." These sources of self-support are a positive factor in the public charge determination. Additionally, as noted above, any individual or organization who identifies a substantial burden on his, her, or an organization's exercise of religion such that the RFRA may require specific relief from any provision of this rule may assert such a claim. Separately, as noted in the preamble of a different rule, "self-supporting religious workers who are not eligible for admission to the United States as R–1 nonimmigrant religious workers may pursue admission in the B–1 classification." *Special Immigrant and Nonimmigrant Religious Workers,* 73 FR 72282 (2008) codified at 8 CFR pts. 204, 214, 299.

[210] Under these compacts, foreign nationals falling under COFA are able to enter without regard to inadmissibility under INA section 212(a)(5) and (7)(B)(i)(II), 8 U.S.C. 1182(a)(5) and (7)(B)(i)(II). *See* Compact of Free Association Amendment Act of 2003, Public Law 108–188, 117 Stat. 2720 (Dec. 17, 2003); *see also* Compact Free Association Approval Act, Public Law 99–658, 100 Stat. 3672 (Nov. 14, 1986) (regarding the Republic of Palau); *see also* 8 CFR 212.1(d).

[211] *See* Public Law 108–188, 117 Stat. 2720, 2762, 2800 (Dec. 17, 2003) (providing that with respect to citizens of the Federated States of Micronesia and the Republic of the Marshall Islands, "section 237(a)(5) of [the INA] shall be construed and applied as if it reads as follows: 'any alien who has been admitted under the Compact, or the Compact, as amended, who cannot show that he or she has sufficient means of support in the United States, is deportable'"); 8 CFR 214.7(e)(1).

[212] *See* Public Law 108–188, 117 Stat. 2720, 2762, 2800 (Dec. 17, 2003).

or when applying for adjustment of status before USCIS, but respectfully submits that Congress never exempted COFA nonimmigrants from the public charge ground of inadmissibility.

DHS notes, however, that because COFA migrants are not required to obtain an extension of their nonimmigrant stay to remain in the United States pursuant to COFA, such nonimmigrants are unlikely to be affected by public benefits condition applicable to extension of stay applications. In addition, as noted elsewhere in this rule, to the extent that COFA migrant children under 21 and pregnant women receive Medicaid, such receipt would not be considered under this rule.

### 3. Exemptions and Waivers With Respect to the Rule Generally

#### a. General Comments

*Comment:* Many commenters supported the exemptions proposed in the NPRM, but a few of the commenters suggested that exemptions be clearly communicated. Some commenters requested that the discussion of exemptions should be moved earlier in the regulation or included in the executive summary of the preamble, to avoid any confusion. Other commenters expressed their support for the exemptions and waivers but indicated that DHS should ensure that immigrant communities and service providers be made aware of these exemptions.

Many commenters expressed concern about the rule's impact on the vulnerable populations specifically excluded from public charge requirements, such as refugees, asylum seekers, victims of trafficking, and VAWA petitioners, who may avoid applying for or accepting any public benefits for which they qualify, to avoid any negative impact on the adjudication of their benefit requests and for fear of future repercussions. One commenter indicated that the exemptions for asylees and refugees appear to be based on their status at the time of admission or grant of status but do not apply to those whose application for asylum or refugee status is pending and who may be eligible for public benefits during that period.

Multiple commenters stated that while the proposed rule exempts VAWA petitioners and U nonimmigrant status, the exemptions will not protect a large number of victims from the detrimental effects of the public charge rule since there are many victims of domestic violence and sexual assaults that seek status in other immigration categories. While a commenter agreed with the proposed rule's intention to streamline all abused-spouse applications under the VAWA umbrella, the commenter said USCIS and DHS must ensure there is no negative impact to survivors who choose to seek adjustment of status. A few commenters specifically stated that human trafficking survivors would be negatively impacted by the significant delays and increased adjudication expenses. Other commenters expressed concerns about permitting refugees and asylees to continue to receive healthcare while excluding foreign nationals who have immigrated here with the proper documentation (*i.e.,* legally) and are going through the process to obtain permanent residency here in the United States. These commenters said that this is logical fallacy, at best, and at worst, it is unjustified discrimination.

*Response:* DHS believes that the current organization of the regulations and exemptions clearly communicates who is exempt from the public charge ground of inadmissibility and who may be eligible for a waiver of the inadmissibility ground. DHS has also added the summary table in subsection III.F.4 below. DHS declines to implement the suggestions for reorganizing the final rule because the current organization sufficiently addresses visibility.

DHS does not agree that the rule should be more limited in scope and not consider public benefits as part of the public charge inadmissibility determination. The purpose of this rule is to implement the public charge ground of inadmissibility consistent with the principles of self-sufficiency set forth by Congress, and to minimize the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits.[213]

DHS disagrees with the commenters who indicated that this rule would negatively impact refugees, asylum seekers, victims of trafficking, and VAWA self-petitioners and that the exemptions should be broader. As noted in the NPRM and previous sections in this final rule, the public charge ground of inadmissibility does not generally apply to these populations. Congress expressly exempted refugees, asylees, and applicants for adjustment based on refugee or asylee status from the public charge inadmissibility ground.[214] Therefore, if an individual has a pending application for asylum, the individual will not be assessed for public charge for purposes of the asylum application and obtaining asylee status. Refugees who are seeking admission to the United States are not subject to public charge grounds of inadmissibility and DHS will not determine whether they may be likely to become a public charge in the United States as part of the refugee admission. Similarly, refugees or asylees seeking adjustment based on their refugee or asylee status, are not subject to the public charge inadmissibility ground, and therefore, the use of public benefits is not considered. Therefore, DHS believes that the commenters' concerns regarding the rule's impact on asylees and refugees are sufficiently addressed.

Similarly, applicants for T nonimmigrant visas are also generally exempt from the public charge inadmissibility ground,[215] and, as established below, DHS also agrees with the commenters that T nonimmigrants applying for adjustment of status should generally be exempt from public charge.[216] Additionally, Congress generally exempted VAWA self-petitioners from the public charge ground of inadmissibility.[217] Also, in response to comments and for reasons explained in the section addressing public benefits, DHS has amended 8 CFR 212.21(b) by providing that public benefits received by those who are in a status exempted from public charge will not be considered in a subsequent adjudication of a benefit that does subject the alien to the public charge ground of inadmissibility. This step should further alleviate concerns that a person in one of the listed categories would be subject to the public charge ground.

DHS also disagrees that this rule discriminates against aliens who are not asylees or refugees. Congress, in PRWORA, made the decision as to which noncitizens are eligible to apply for and receive certain public benefits. Congress decided that asylees and refugees should be eligible to apply for public benefits, and DHS does not have the authority to include or exclude any groups from the receipt of public benefits.

*Comment:* A commenter stated the rule should exempt people with disabilities and their families, stating many of these families come to the United States in order to receive adequate medical care. Commenters opposed including immigrants with

---

[213] *See* 8 U.S.C. 1601.

[214] *See* INA sections 207, 208, and 209; 8 U.S.C. 1157, 1158, and 1159.

[215] *See* INA sections 101(a)(15)(T) and 212(d)(13)(A), 8 U.S.C. 1101(a)(15)(T) and 1182(d)(13)(A).

[216] *See* INA sections 101(a)(15)(T) and 245(l)(2), 8 U.S.C. 1101(a)(15)(T) and 1255(l)(2).

[217] *See* INA section 212(a)(4)(E)(i), 8 U.S.C. 1182(a)(4)(E)(i).

disabilities in the proposed rule because disability is one of the strongest known factors that affect a household's food security and housing instability. Some commenters said DHS should make an exception for pregnant women. Another commenter asked that DHS provide more exemptions and waivers, suggesting that the rule should be narrowed to only apply to those seeking entry into the United States initially or to provide extra protection to those in the United States to lessen the fears of the proposed rule's negative effects.

*Response:* Congress generally specifies, in legislation, to whom grounds of inadmissibility apply and which classes of aliens are exempt from public charge. DHS understands that individuals with disabilities and pregnant women may be affected by this rule. However, Congress did not provide an exemption for individuals with disabilities or pregnant women in the statute.[218]

Additionally, DHS cannot limit the application of the ground of inadmissibility in a matter so that it only applies to those seeking entry into the United States or so that DHS provides extra protections because Congress, in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) specified that the ground of inadmissibility applies to those seeking a visa, admission to the United States, or adjustment of status in the United States. Classes of aliens exempt from the public charge ground of inadmissibility are listed in 8 CFR 212.23. Certain aspects of this rule limit some of the rule's effects, such as by relying on an exhaustive list of non-cash benefits, and excluding consideration of certain benefits for certain populations or circumstances. DHS believes that this is sufficient.

*Comment:* A commenter recommended adding exemptions from the public charge ground of inadmissibility for those who have been certified for benefits under the authorization of another person, such as the head of household or guardian. The commenter reasoned that the dependents may not have been aware that this occurred or even that they receive a benefit.

*Response:* DHS disagrees that it should exempt from the public charge ground of inadmissibility those who have been certified for benefits under the authorization of another, such as the head of household or guardian, if the beneficiary is an alien subject to the public charge ground of inadmissibility. In general, Congress has the authority to legislate which classes of aliens should

be subject to public charge ground of inadmissibility and which are exempt. Congress did not provide an exemption from the public charge ground of inadmissibility for aliens seeking a visa, admission, or adjustment of status and who may be have been certified for benefits under the authorization of another, such as the head of household or the guardian who applied on the alien's behalf. DHS acknowledges that those dependents who are certified for or receiving public benefits under the authorization of another, such as the head of the household or the guardian, may be unaware of the receipt of public benefits but will, once the rulemaking is effective, may be impacted by such receipt of public benefits, if they are subject to the public charge ground of inadmissibility.

After having reviewed the comments, however, DHS has decided to provide additional clarification regarding such matters. As explained in detail in the public benefits section in this preamble, DHS has added a new definition of "receipt of public benefits" to section 212.21(e) to clarify that DHS will only consider the alien to have received a public benefit if the alien is a named beneficiary of the benefit. An alien does not receive a benefit merely by virtue of having applied or been certified for such benefit, and has not received a public benefit if the alien acted not on his or her own behalf but on behalf of another person. Therefore, if an alien is the person receiving benefits on behalf of another (for instance as a parent, legal guardian) the alien will not be considered to have received, been certified for, or applied for such public benefit.

### b. Special Immigrant Juvenile

*Comment:* A commenter stated that the proposed rule would conflict with the purpose of Special Immigrant Juvenile (SIJ) status, asserting that the purpose of the status is to allow children to thrive in the United States and that children are not responsible for their circumstances. Although SIJ recipients are statutorily exempt from inadmissibility on public charge grounds, this rule would still affect SIJ youth indirectly because of its scope, secondary effects on families, and potential for confusion. Many of these youth live in homes with U.S. citizen or permanent resident adults or siblings who would be entitled to benefits but may be deterred from accessing them because of a fear of how it will affect the SIJ youth or other family members.

*Response:* DHS disagrees that this rule conflicts with the SIJ program. As stated in the proposed rule, aliens applying for

adjustment of status based on an SIJ determination are exempt from the public charge inadmissibility ground. If aliens who are not subject to the public charge ground of inadmissibility choose to disenroll from or forego public benefit receipt based on this rule, then the decision to disenroll from or forego enrollment is unwarranted. The NPRM provided an exhaustive list of individuals who are exempt from the public charge ground of inadmissibility, and this final rule retains that list of exemptions. DHS will not consider receipt of public benefits by aliens exempt from the public charge ground inadmissibility, even if the exempted alien has an alien family member who is not exempt. DHS notes that this rule also categorically exempts receipt of Medicaid by children under the age of 21, which should reduce the potential for confusion.

### c. Certain Employment Based Preference Categories, or National Interest Waiver

*Comment:* One commenter requested that individuals applying for lawful permanent resident status via approved EB–1A (extraordinary ability alien), EB–1B (outstanding researcher or scientist), or National Interest Waiver (NIW) petitions be added to the list of those exempted from the rule. The commenter stated that the vast majority of these individuals may need to resort to using the designated benefits, and it would be completely contrary to the intent of Congress in passing the EB–1A, EB–1B and NIW statutes to deny scientific researchers green cards who would otherwise be benefiting the lives of literally millions of U.S. citizens.

*Response:* DHS disagrees that this rule is contrary to congressional intent in passing the EB–1A, EB–1B and NIW statutes. Congress did not exempt employment based EB–1A or EB–1B categories, or those seeking an NIW, from the public charge ground of inadmissibility.[219] DHS neither has the

---

[218] *See* INA sections 212(a)(4), 8 U.S.C. 1182(a)(4).

[219] *See* INA section 203(b)(1)(A), 8 U.S.C. 1153(b)(1)(A) (aliens with extraordinary ability) or INA section 203(b)(1)(B), 8 U.S.C. 1153(b)(1)(B) (outstanding professors and researchers). *See* INA section 203(b)(2), 8 U.S.C. 1153(b)(2) (aliens who are members of the professions holding advance degrees or aliens of exceptional ability who are seeking a waiver of the job over in the national interest); *see also* comment USCIS 2010–0012– 31111. The commenter explained that the work these individuals perform is of great importance to the United States and have a profound impact on the U.S. economies. However, the commenter indicated, a vast majority of these individuals who are conducting scientific research earn low salaries below the 250% threshold and may need to resort to using these types of benefits the proposed regulation is seeking to prohibit, especially for their U.S. citizen children. The commenter indicated that it would be contrary to congressional intent to apply public charge to these workers.

authority to exempt an applicant or a group of applicants for admission or adjustment of status from the public charge ground of inadmissibility where Congress has not already done so,[220] nor has the authority to ignore the congressionally-mandated exemptions to the public charge ground of inadmissibility. Because Congress has expressly exempted asylees and refugees from the public charge inadmissibility ground, DHS cannot remove this exemption. Further, because Congress did not specifically exempt EB–1A or EB–1B workers, or those with NIWs, from the public charge ground of inadmissibility, DHS may not create an exemption for them in this rule.[221]

d. Violence Against Women Act, T, and U

*Comment:* A commenter provided the statutory amendment history of 8 U.S.C. Section 1641, and stated that VAWA, T, and U visa victims and all other immigrants covered by 8 U.S.C. 1641(c) cannot be subject to public charge under federal statutes. Another commenter indicated that the NPRM incorrectly applies the public charge ground of inadmissibility to applications for adjustment of status and extension of stay filed by T nonimmigrants. The commenter noted that both T nonimmigrant status seekers and T nonimmigrant status holders are exempt from the public charge ground of inadmissibility. The commenter also indicated that proposed 8 CFR 212.23(a)(17) should be amended to conform to section 804 of VAWA 2013,[222] exempting T nonimmigrants seeking to adjust status to lawful permanent residence or to extend status from the public charge ground of inadmissibility. The commenter indicated that section 804 of VAWA 2013, granted the same exemptions from the public charge ground of

inadmissibility to all foreign national victims who are "qualified aliens" under section 431(c) of PRWORA, 8 U.S.C. 1641(c), including T nonimmigrant status holders.[223]

*Response:* DHS agrees that qualified aliens under 8 U.S.C. 1641(c) (certain battered aliens as qualified aliens) are generally not subject to the public charge inadmissibility ground. Section 212(a)(4)(E)(iii) of the INA, 8 U.S.C. 1182(a)(4)(E)(iii), specifically excludes such individuals from the public charge ground.[224] VAWA 2013, which added section 212(a)(4)(E)(iii) of the INA, 8 U.S.C. 1182(a)(4)(E)(iii), specifically excludes individuals such as qualified aliens described in 8 U.S.C. 1641(c) (including T nonimmigrants and certain battered spouses and children of U.S. citizens), VAWA self-petitioners, and U nonimmigrants from sections 212(a)(4)(A), (B), and (C) of the INA, 8 U.S.C. 1182(a)(4)(A), (B), and (C).

Congress, however, did not include paragraph (D) among the exemptions in section 212(a)(4)(E) of the INA, 8 U.S.C. 1182(a)(4)(E). We must presume that Congress acted intentionally in requiring all aliens described in paragraph (D) to file the requisite affidavit of support, even if they are described in paragraph (E). The law does not permit DHS to add language to the statute. *See, e.g., Lamie* v. *U.S. Tr.,* 540 U.S. 526, 538 (2004) (counseling against interpretative methodologies that yield "not . . . a construction of [a] statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope"); *Yith* v. *Nielsen,* 881 F.3d 1155, 1164 (9th Cir. 2018) ("It is never our job to rewrite a constitutionally valid statutory text. Indeed it is quite mistaken to assume that whatever might appear to further the statute's primary objective must be the law." (citations, quotation marks, and alterations omitted)). Accordingly, in the unlikely event that an alien described in paragraph (E) is seeking admission or adjustment of status based on an immigrant visa issued under section 203(b) of the INA, 8 U.S.C. 1153(b), that individual must comply with the affidavit of support requirement in section 213A of the INA,

8 U.S.C. 1183a. Such individuals, however, would not need to demonstrate, as set forth in paragraphs 212(a)(4)(A) and (B), 8 U.S.C. 1182(A) and (B), that he or she is not likely at any time to become a public charge. Those applicants would not need to submit Form I–944. As such, such applicants would only have to submit a sufficient affidavit of support described in section 213A of the INA, 8 U.S.C. 1183a.

For the reasons stated above, DHS is amending proposed 8 CFR 212.23(a)(18), (19), (20), (21), and 8 CFR 212.23(b) in this final rule to clarify that aliens exempt under section 212(a)(4)(E) of the INA, 8 U.S.C. 1182(a)(4)(E), that are adjusting status based on an employment-based petition subject to section 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D), that requires the execution of an affidavit of support as described in section 213A of the Act, 8 U.S.C. 1183a, are not exempt from the entirety of section 212(a)(4) of the INA, 1182(a)(4), as they are still subject to section 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D).

Applicants seeking T nonimmigrant status, T nonimmigrants applying for adjustment of status, and T nonimmigrants seeking another immigration benefit that requires admissibility, are generally exempt from the public charge ground of inadmissibility under section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E). In accordance with section 804 of the VAWA 2013,[225] which added new section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E), individuals who have been granted T nonimmigrant status or have a pending application that sets forth a prima facie case for eligibility for T nonimmigrant status are generally exempt from the public charge inadmissibility determination.

Notwithstanding these changes, VAWA 2013 did not amend section 245(l)(2) of the Act, 8 U.S.C. 1255(l)(2),[226] which provides that DHS may waive the application of the public charge ground of inadmissibility if it is in the national interest to do so for a T nonimmigrant seeking to adjust status to lawful permanent residence under section 245(l) of the Act, 8 U.S.C. 1255(l). DHS concludes, however, that the VAWA 2013 amendments, which postdated the enactment of section 245(l)(2) of the Act, 8 U.S.C. 1255(l)(2),

---

[220] As explained in the NPRM, DHS derives its statutory authority for this rule and its authority to promulgate regulation based on section 102 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002) (codified at 6 U.S.C. 112) and INA section 103, 8 U.S.C. 1103, as well as INA section 212(a)(4), 8 U.S.C. 1182 and the relevant statutory provisions governing immigration benefits. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51124 (proposed Oct. 10, 2018).

[221] Providing for an exemption where Congress does not expressly authorize one, as it does for other immigration benefits applicants under the INA, would be beyond the scope of DHS's authority. *See Andrus* v. *Glover Const. Co.,* 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.").

[222] *See* Public Law 113–4 (March 7, 2013).

[223] The commenter indicated that DHS correctly recognized the full extent of exceptions that the same provisions made for VAWA-self petitioners, U visa applicants, and U visa holders for purposes of lawful permanent residency.

[224] While INA section 212(a)(4)(E)(iii), 8 U.S.C. 1182(a)(4)(E)(iii), excludes qualified aliens under 8 U.S.C. 1641(c) from public charge, that exclusion does not apply to the separate category of "qualified aliens" described in 8 U.S.C. 1641(b) who are subject to public charge unless otherwise subject to an exception.

[225] *See* Public Law 113–4, 127 Stat 54 (Mar. 7, 2013).

[226] *See* INA section 245(l), 8 U.S.C. 1255(l), which was created by the Victims of Trafficking and Violence Protection Act of 2000, Public Law 106–386, 114 Stat. 1464 (Oct. 8, 2000).

**41336** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

are controlling. That is, DHS has determined that T nonimmigrants seeking to adjust status under section 245(a) of the Act, 8 U.S.C. 1255(a) (with a limited exception) and section 245(l) of the Act, 8 U.S.C. 1255(l) are not subject to the public charge ground of inadmissibility for purposes of establishing eligibility for adjustment of status. However, for this exemption from public charge to apply, the T nonimmigrant must hold and be in valid T nonimmigrant status at the time the Form I–485 is properly filed in compliance with 8 CFR 103.2(a)(7) and throughout the pendency of an application.[227] For the reasons stated above, DHS is amending proposed 8 CFR 212.23(a)(17) in this final rule to clarify that T nonimmigrants seeking any immigration benefit subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4)—except those described in section 212(a)(4)(D) of the Act, 8 U.S.C. 1182(a)(4)(D), who must file an affidavit of support—are exempt from the public charge ground of inadmissibility, provided that the T nonimmigrant seeking the immigration benefit is in valid T nonimmigrant status at the benefit request is properly filed with USCIS and at the time the benefit request is adjudicated.[228] As section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E), is an additional authority for exempting T nonimmigrants, DHS has revised the authority for the exemption to refer to sections 212(a)(4)(E) and 212(d)(13)(A) of the Act, 8 U.S.C. 1182(a)(4)(E), (d)(13)(A).[229] Additionally, based on the same rationale provided above, DHS is also modifying current 8 CFR 212.18(b)(2) and 8 CFR 245.23(c)(3) to accurately reflect changes codified by Congress in 2013 in relation to those having a pending prima facie case for status under section 101(a)(15)(T) of the Act, 8 U.S.C. 1101(a)(15)(T), or is in valid T nonimmigrant status at the time of filing for an immigration benefit, and to clarify that these individuals—with the limited exception described in INA 212(a)(4)(D), 8 U.S.C. 1182(a)(4)(D)—are not subject to the public charge ground of inadmissibility. As discussed further under the PRA section of this final rule, DHS is also making conforming changes to the Form I–601 instructions.

Individuals seeking U nonimmigrant status and U nonimmigrants seeking adjustment of status on account of their U nonimmigrant status are generally exempt from the public charge ground.[230] In accordance with section 804 of the VAWA 2013,[231] which added new section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E), an individual who is an applicant for, or is granted U nonimmigrant status is exempt from the public charge ground of inadmissibility.[232] However, for this exemption from public charge to apply, the U nonimmigrant must hold and be in valid U nonimmigrant status at the time the Form I–485 is properly filed in compliance with 8 CFR 103.2(a)(7) and throughout the pendency of an application.[233] Therefore, DHS clarified in this final rule that these individuals are not subject to the public charge ground of inadmissibility when seeking an immigration benefit,[234] to accurately reflect changes enacted by Congress in VAWA 2013. Additionally, VAWA self-petitioners are generally exempt from the public charge ground of inadmissibility.[235] Similar to T nonimmigrants (and as described above), U nonimmigrants and VAWA self-petitioners who are adjusting status under an employment-based category that is required to execute an affidavit of support described in section 213A, 8 U.S.C. 1183a, under 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D), must still execute that affidavit of support to overcome the public charge ground of inadmissibility.

4. Summary of Applicability, Exemptions, and Waivers

The following tables provide a summary of all nonimmigrant and immigrant classification and whether they are subject to the public charge inadmissibility determination and submit an I–944 or are subject to the public benefit condition for extension of stay and change of status nonimmigrants.

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| A–1—Ambassador, Public Minister, Career Diplomat or Consular Officer, or Immediate Family; A–2—Other Foreign Government Official or Employee, or Immediate Family; INA 101(a)(15)(A), 22 CFR 41.21. | No. Not applicable as admitted for Duration of Status, 8 CFR 214.1(c)(3)(v). | Yes. Files I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| A–3—Attendant, Servant, or Personal Employee of A–1 or A–2, or Immediate Family; INA 101(a)(15)(A), 22 CFR 41.21. | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. INA 102; 22 CFR 41.21(d)(3). |
| B–1—Temporary Visitor for Business; B–2—Temporary Visitor for Pleasure; * not admitted under Visa Waiver Program; INA 101(a)(15)(B). | Yes. Files Form I–539, 8 CFR 214.1(c)(2), 8 CFR 214.2(b)(1). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |

[227] See 8 CFR 103.2(b)(1) (an applicant or petitioner must establish that he or she is eligible for the requested benefits at the time of filing and the benefit request and must continue to be eligible through adjudication); see also Matter of Alarcon, 20 I&N Dec. 557, 562 (BIA 1992) ("an application for admission to the United States is a continuing application, and admissibility is determined on the basis of the facts and the law at the time the application is finally considered").

[228] See 8 CFR 212.23(a)(17) and (18).

[229] See also INA section 212(s), 8 U.S.C. 1182(s) (excluding from the public charge determination consideration of benefits received by those eligible to receive benefits under 8 U.S.C. 1641(c)).

[230] See 8 CFR 212.23(a)(18).

[231] See Public Law 113–4, 127 Stat 54 (Mar. 7, 2013).

[232] See INA sections 212(a)(4)(E)(ii), 8 U.S.C. 1182(a)(4)(E)(ii), which exclude from public charge determinations an applicants for, or individuals granted, nonimmigrant status under section 1101(a)(15)(U).

[233] See 8 CFR 103.2(b)(1) (An applicant or petitioner must establish that he or she is eligible for the requested benefits at the time of filing and the benefit request and must continue to be eligible through adjudication). See also Matter of Alarcon, 20 I&N Dec. 557, 562 (BIA 1992) ("an application for admission to the United States is a continuing application, and admissibility is determined on the basis of the facts and the law at the time the application is finally considered.").

[234] See 8 CFR 212.23(a)(19).

[235] See 8 CFR 212.23(a)(21).

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| C–1—Alien in Transit; C–1/D—Combined Transit and Crewmember Visa; INA 101(a)(15)(C) and (D), INA 212(d)(8). | No. 8 CFR 214.1(c)(3)(ii) .......... | No. 8 CFR 248.2(a)(2), except for change to T and U, 8 CFR 248.2(b) using Form I–914 or I–918. | Not Applicable as not eligible for extension of stay or change of status. |
| C–2—Alien in Transit to United Nations Headquarters District Under Section 11.(3), (4), or (5) of the Headquarters Agreement; INA 101(a)(15)(C) and (D), INA 212(d)(8). | No. Not applicable as admitted for Duration of Status. 8 CFR 214.1(c)(3)(ii). | No, 8 CFR 248.2(a)(2), except for change to T and U, 8 CFR 248.2(b) using Form I–914 or I–918. | No. 22 CFR 41.21(d). |
| C–3—Foreign Government Official, Immediate Family, Attendant, Servant or Personal Employee, in Transit; INA 101(a)(15)(C) and (D), INA 212(d)(8). | No. 8 CFR 214.1(c)(3)(ii) .......... | No, 8 CFR 248.2(a)(2), except for change to T and U, 8 CFR 248.2(b) using Form I–914 or I–918. | No. 22 CFR 41.21(d). |
| CW–1—Commonwealth of Northern Mariana Islands Transitional Worker Section 6(d) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229. 8 CFR 214.2(w). | Yes. Files Form I–129CW, 8 CFR 214.1(c)(2) and 8 CFR 214.2(w)(17). | Yes. Files Form I–129CW, 8 CFR 214.1(a); 8 CFR 214.2(w)(18). | Yes. |
| CW–2—Spouse or Child of CW–1 ............ | Yes. Files Form I–539, 8 CFR 214.1(c)(2) and 8 CFR 214.2(w)(17)(v). | Yes. Files Form I–539, 8 CFR 248.1(a); 8 CFR 214.2(w)(18). | Yes. |
| D—Crewmember (Sea or Air); D–2—Crewmember departing from a different vessel than one of arrival; INA 101(a)(15)(D). | No. 8 CFR 214.1(c)(3)(iii) ........ | No, 8 CFR 248.2(a)(2), except for change to T and U, 248.2(b) using Form I–914 or Form I–918. | Yes. |
| E–1, E–2—Treaty Trader (Principal); INA 101(a)(15)(E). | Yes. Files Form I–129, 8 CFR 214.1(c)(1); 8 CFR 214.2(e)(20). | Yes. Files Form I–129, 8 CFR 248.1(a), 8 CFR 214.2(e)(21)(i). | Yes. |
| E–1, E–2—Treaty Trader, Spouse or Child; INA 101(a)(15)(E). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 214.2(e)(21)(ii),. | Yes. |
| E–2–CNMI—Commonwealth of Northern Mariana Islands Investor (Principal) Section 6(c) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229.8 CFR 214.2(e)(23). | Yes. Files Form I–129, 8 CFR 214.2(e)(23)(xii). | Yes. Files Form I–129, 8 CFR 248.1(a), 8 CFR 214.2(e)(23)(xiii). | Yes. |
| E–2–CNMI—Commonwealth of Northern Mariana Islands Investor, Spouse or Child Section 6(c) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229. 8 CFR 214.2(e)(23)(x). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| E–3—Australian Treaty Alien coming to the United States Solely to Perform Services in a Specialty Occupation. | Yes. Files Form I–129, 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| E–3D—Spouse or Child of E–3; E–3R—Returning E–3; INA 101(a)(15)(E)(iii). | Yes. Files I–539, 8 CFR 214.1(c)(1) and (2). | Yes. Files I–539, 8 CFR 248.1(a). | Yes. |
| F–1—Student in an academic or language training program (principal); INA 101(a)(15)(F). | Yes, only if the F–1 requesting reinstatement to F–1 status or if the F–1 received a date-specific admission to attend high school and is now seeking an extension to D/S to attend college. 8 CFR 214.1(c)(3)(v); 8 CFR 214.2(f)(7); 8 CFR 214.2(f)(16). | Yes. Files Form I–539, 8 CFR 248.1(a),. | Yes. |
| F–2—Spouse or Child of F–1; INA 101(a)(15)(F). | No, not applicable as admitted for Duration of Status. 8 CFR 214.1(c)(3)(v); 8 CFR 214.2(f)(3). | Yes. Files Form I–539, 8 CFR 214.2(f)(3). | Yes. |

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| G–1—Principal Resident Representative of Recognized Foreign Government to International Organization, Staff, or Immediate Family; G–2—Other Representative of Recognized Foreign Member Government to International Organization, or Immediate Family; G–3—Representative of Nonrecognized or Nonmember Foreign Government to International Organization, or Immediate Family; G–4—International Organization Officer or Employee, or Immediate Family; INA 101(a)(15)(G). | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. 22 CFR 41.21(d). |
| G–5—Attendant, Servant, or Personal Employee of G–1 through G–4, or Immediate Family. | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| H–1B—Alien in a Specialty Occupation, Fashion Models of Distinguished Merit and Ability, and workers performing services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project; INA 101(a)(15)(H)(i)(b); Section 222 of Pub. L. 101–649. | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129.8 CFR 248.1(a). | Yes. |
| H–1B1—Chilean or Singaporean National to Work in a Specialty Occupation; INA 101(a)(15)(H)(i)(b1). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129. 8 CFR 248.1(a). | Yes. |
| H–1C [236]—Nurse in health professional shortage area; INA 101(a)(15)(H)(i)(c). | Yes. Filed Form I–129, 8 CFR 212.2(h)(4)(v)(E). | Yes. Filed Form I–129, 8 CFR 212.2(h)(4)(v)(E). | Yes. |
| H–2A—Temporary Worker Performing Agricultural Services Unavailable in the United States; INA 101(a)(15)(H)(ii)(a). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129 .............. | Yes. |
| H–2B—Temporary Worker Performing Other Services Unavailable in the United States; INA 101(a)(15)(H)(ii)(b). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129 .............. | Yes. |
| H–3—Trainee; INA 101(a)(15)(H)(iii) ........ | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–539 .............. | Yes. |
| H–4—Spouse or Child of Alien Classified H1B/B1/C, H2A/B, or H–3; INA 101(a)(15)(H)(iv). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539. 8 CFR 248.1(a). | Yes. |
| I—Representative of Foreign Information Media, Spouse and Child; INA 101(a)(15)(I). | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539 .............. | Yes. |
| J–1—Exchange Visitor; J–2—Spouse or Child of J1; INA 101(a)(15)(J). | No, not applicable, as generally admitted for Duration of Status [237] 8 CFR 214.1(c)(3)(v). | Yes, subject to receiving a waiver of the foreign residence requirement, if necessary, Files I–539. 8 CFR 248.2(a)(4); may apply for change to T and U, using for Form I–914 or I–918, 8 CFR 248.2(b). | Yes. |
| K–1—Fiance(e) of United States Citizen; K–2—Child of Fiance(e) of U.S. Citizen; INA 101(a)(15)(K). | No. 8 CFR 214.1(c)(3)(iv) ........ | No. 8 CFR 248.2(a)(2) except for change to T and U, 248.2(b) using Form I–914 or I–918. | Not Applicable. |
| K–3—Spouse of U.S. Citizen awaiting availability of immigrant visa; K–4—Child of K–3; INA 101(a)(15)(K). | Yes. Files Form I–539, 8 CFR 214.1(c)(2) and 8 CFR 214.2(k)(10). | No. 8 CFR 248.2(2) except for change to T and U, 248.2(b) using Form I–914 or I–918. | Yes. |
| L–1—Intracompany Transferee (Executive, Managerial, and Specialized Knowledge Personnel Continuing Employment with International Firm or Corporation); INA 101(a)(15)(L). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| L–2—Spouse or Child of Intracompany Transferee. | Yes. Files I–539 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| M–1—Vocational Student or Other Nonacademic Student; INA 101(a)(15)(M). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539. Not eligible if requesting F–1, 8 CFR 248.1(c)(1). | Yes. |

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (*i.e.*, may file Form I–129 or Form I–539) * | Eligible to apply for change of status (*i.e.*, may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| M–2—Spouse or Child of M–1; INA 101(a)(15)(M). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539 ............. | Yes. |
| N–8—Parent of an Alien Classified SK3 (Unmarried Child Employee of International Organization) or SN–3; N–9—Child of N–8 or of SK–1 (Retired Employee International Organization), SK–2 (Spouse), SK–4 (surviving spouse), SN–1 (certain retired NATO 6 civilian employee), SN–2 (spouse) or SN–4 (surviving spouse); INA 101(a)(15)(N). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(e). | Yes. |
| NATO–1—Principal Permanent Representative of Member State to NATO (including any of its Subsidiary Bodies) Resident in the U.S. and Resident Members of Official Staff; Secretary General, Assistant Secretaries General, and Executive Secretary of NATO; Other Permanent NATO Officials of Similar Rank, or Immediate Family Art. 12, 5 UST 1094; Art. 20, 5 UST 1098. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–2—Other Representative of member state to NATO (including any of its Subsidiary Bodies) including Representatives, Advisers, and Technical Experts of Delegations, or Immediate Family; Dependents of Member of a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement or in Accordance with the provisions of the "Protocol on the Status of International Military Headquarters"; Members of Such a Force if Issued Visas Art. 13, 5 UST 1094; Art. 1, 4 UST 1794; Art. 3, 4 UST 1796. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–3—Official Clerical Staff Accompanying Representative of Member State to NATO (including any of its Subsidiary Bodies), or Immediate Family Art. 14, 5 UST 1096. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–4—Official of NATO (Other Than Those Classifiable as NATO1), or Immediate Family Art. 18, 5 UST 1098. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–5—Experts, Other Than NATO Officials Classifiable Under NATO 4, Employed in Missions on Behalf of NATO, and their Dependents Art. 21, 5 UST 1100. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–6—Member of a Civilian Component Accompanying a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement; Member of a Civilian Component Attached to or Employed by an Allied Headquarters Under the "Protocol on the Status of International Military Headquarters" Set Up Pursuant to the North Atlantic Treaty; and their Dependents Art. 1, 4 UST 1794; Art. 3, 5 UST 877. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO 7—Attendant, Servant, or Personal Employee of NATO 1, NATO 2, NATO 3, NATO 4, NATO 5, and NATO 6 Classes, or Immediate Family Arts. 12–20, 5 UST 1094–1098. | Yes. Files Form I–539, 8 CFR 214.2(s)(1)(ii).. | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |

**41340** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| O–1—Alien with Extraordinary Ability in Sciences, Arts, Education, Business or Athletics or Extraordinary Achievement in the Motion Picture or Television Industry; O–2—Essential Support Workers Accompanying and Assisting in the Artistic or Athletic Performance by O–1 INA 101(a)(15)(O). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| O–3—Spouse or Child of O–1 or O–2 INA 101(a)(15)(O). | Yes. Files Form I–539, 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| P–1—Internationally Recognized Athlete or Member of Internationally Recognized Entertainment Group; P–2—Artist or Entertainer in a Reciprocal Exchange Program; P–3—Artist or Entertainer in a Culturally Unique Program INA 101(a)(15)(P); P–1S/P–2S/P–3S—Essential Support Workers 8 CFR 214.2(p). | Yes. Files Form I–129, 8 CFR 213.1(c)(3)(i). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| P–4—Spouse or Child of P–1, P–2, or P–3; INA 101(a)(15)(P). | Yes. Files Form I–539, 8 CFR 214.1(c) (1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| Q–1—Participant in an International Cultural Exchange Program; INA 101(a)(15)(Q)(i). | Yes. Files Form I–129, 8 CFR 213.1(c)(3)(i). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| R–1—Alien in a Religious Occupation; INA 101(a)(15)(R). | Yes. Files Form I–129, 8 CFR 213.1(c)(3)(i). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| R–2—Spouse or Child of R–1; INA 101(a)(15)(R). | Yes. Files Form I–539, 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| S–5—Certain Aliens Supplying Critical Information Relating to a Criminal Organization or Enterprise; S–6—Certain Aliens Supplying Critical Information Relating to Terrorism; S–7—Qualified Family Member of S–5 or S–6 INA 101(a)(15)(S). | No. 8 CFR 213.1(c)(3)(vi) ......... | No. 8 CFR 248.2(2) except for change to T and U, 248.2(b) using Form I–914 or I–918. | Yes. |
| T–1—Victim of a severe form of trafficking in persons; INA 101(a)(15)(T). | Yes. Files Form I–539. INA § 214(o)(7)(B); 8 CFR 214.11(l)(1) and (2); 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. |
| T–2—Spouse of T–1; T–3—Child of T–1; T–4—Parent of T–1 under 21 years of age; T–5—Unmarried Sibling under age 18 of T–1; T–6—Adult or Minor Child of a Derivative Beneficiary of a T–1; INA 101(a)(15)(T). | Yes. Files Form I–539. INA 214(o)(7)(B); 8 CFR 214.1(c)(2). | Yes. Files Form Files I–539, 8 CFR 248.1(a). | No. |
| TN—NAFTA Professional; INA 214(e)(2) .. | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form Files I–129, 8 CFR 248.1(a). | Yes. |
| TD—Spouse or Child of NAFTA Professional; INA 214(e)(2). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| U–1—Victim of criminal activity; U–2—Spouse of U–1; U–3—Child of U–1; U–4—Parent of U–1 under 21 years of age; U–5—Unmarried Sibling under age 18 of U–1 under 21 years of age; INA 101(a)(15)(U). | Yes. Files Form I–539, 8 CFR 214.1(c)(2); 8 CFR 214.14(g)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. |
| V–1—Spouse of a Lawful Permanent Resident Alien Awaiting Availability of Immigrant Visa; V–2—Child of a Lawful Permanent Resident Alien Awaiting Availability of Immigrant Visa; V–3—Child of a V–1 or V–2 INA 101(a)(15)(V)(i) or INA 101(a)(15)(V)(ii); INA 203(d). | Yes. Files Form I–539, 8 CFR 214.1(c)(2); 8 CFR 214.15(g)(3). | Yes. Files Form I–539, 8 CFR 248.1(a); 214.15(g)(3). | Yes. |

Federal Register / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations    **41341**

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| W–B—Visa Waiver for visitor for business; W–T—visitor for pleasure, Visa Waiver Program; INA 217. | No. 8 CFR 214.1(c)(3)(i) and 214.1(c)(3)(viii). | No, except for change to T and U, using Form I–914 or I–918; INA 248.2(b). | Not Applicable. |

* Includes questions on Form I–129 and Form I–539 about receipt of public benefits since the nonimmigrant status was approved. Whether the alien must file and I–129 or an I–539 depends on the status the alien is applying to change to or extend. If more than one person is applying using the I–539 application, the Form I–539A, Supplemental Information for Application to extend/Change Nonimmigrant Status, is submitted to provide all of the requested information for each additional applicant listed.

TABLE 3—APPLICABILITY OF INA 212(a)(4) TO FAMILY-BASED ADJUSTMENT OF STATUS APPLICATIONS [238]

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A and Form I–864, affidavit of support under section 213A of the INA, required or exempt? |
|---|---|---|
| Immediate Relatives of U.S. citizens including spouses, children and parents [239]. | Yes. INA 212(a)(4) ........................ | Required. INA 212(a)(4)(C). |
| Family-Based First Preference: Unmarried sons/daughters of U.S. citizens and their children [240]. | Yes. INA 212(a)(4) ........................ | Required. INA 212(a)(4)(C). |
| Family-Preference Second: Spouses, children, and unmarried sons/daughters of alien residents [241]. | Yes. INA 212(a)(4) ........................ | Required. INA 212(a)(4)(C). |
| Family Preference Third: Married sons/daughters of U.S. citizens and their spouses and children [242]. | Yes. INA 212(a)(4) ........................ | Required. INA 212(a)(4)(C). |
| Family Preference Fourth: Brothers/sisters of U.S. citizens (at least 21 years of age) and their spouses and children [243]. | Yes. INA 212(a)(4) ........................ | Required. INA 212(a)(4)(C). |
| Fiancé, * admitted as nonimmigrant K–1/K2 [244] | Yes. INA 212(a)(4) ........................ | Required. INA 212(a)(4)(C). |
| Amerasians based on preference category-born between December 31, 1950 and before October 22, 1982 [245]. | Yes. INA 212(a)(4) ........................ | Exempt. Amerasian Act, Public Law 97–359 (Oct. 22, 1982). |

[236] This classification can no longer be sought as of December 20, 2009. See the Nursing Relief for Disadvantaged Areas Reauthorization Act of 2005, Public Law 109–423.

[237] J nonimmigrant who are admitted for a specific time period are not eligible for an extension of stay.

[238] Applicants who filed a Form I–485 prior to December 19, 1997 are exempt from the Affidavit of Support requirement. See Public Law 104–208, div. C., section 531(b), 110 Stat. 3009–546, 3009–675 (Sept. 30, 1996); 8 CFR 213a.2(a)(2)(i) (adjustment applicants) and 213a.2(a)(2)(ii)(B) (applicants for admission). Aliens who acquired citizenship under section 320 of the Act upon admission to the United States are exempt from submitting an affidavit of support. See 8 CFR 213a.2(a)(2)(ii)(E); Child Citizenship Act, Public Law 106–395, section 101, 114 Stat. 1631, 1631 (Oct. 30, 2000) (amending INA section 320). In addition, the surviving spouses, children, and parents of a deceased member of the military who obtain citizenship posthumously are exempt from a public charge determination. See National Defense Authorization Act For Fiscal Year 2004, Public Law 108–136, section 1703(e), 117 Stat. 1392, 1695 (Nov. 24, 2003). An alien who meets the conditions of new 8 CFR 212.23(a)(18), (19), (20), or (21) (e.g., certain T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) are exempt from the public charge inadmissibility ground and the affidavit of support requirement, and therefore do not need to File Form I–944 or Form I–864 regardless of what category the alien adjusts under.

[239] Including the following categories: IR–6 Spouses; IR–7 Spouses; CR–7 Children, conditional; IH–8 Children adopted abroad under the Hague Adoption Convention; IH–9 Children coming to the United States to be adopted under the Hague Adoption Convention; IR–8 Orphans adopted abroad; IR–9 Orphans coming to the United States to be adopted; IR–0 Parents of adult U.S. citizens. Note children adopted abroad generally do not apply for adjustment of status.

[240] Including the following categories: A–16 Unmarried Amerasian sons/daughters of U.S. Citizens; F–16 Unmarried sons/daughters of U.S. citizens; A–17 Children of A–11 or A–16; F–17 Children of F–11 or F–16; B–17 Children of B–11 or B–16.

[241] Including the following categories: F–26 Spouses of alien residents, subject to country limits; C–26 Spouses of alien residents, subject to country limits, conditional; FX–6 Spouses of alien residents, exempt from country limits; CX–6 Spouses of alien residents, exempt from country limits, conditional; F–27 Children of alien residents, subject to country limits; C–28 Children of C–26, or C–27, subject to country limits, conditional; B–28 Children of B–26, or B–27, subject to country limits; F–28 Children of F–26, or F–27, subject to country limits; C–20 Children of C–29, subject to country limits, conditional; B–20 Children of B–29, subject to country limits; F–20 Children of F–29, subject to country limits; C–27 Children of alien residents, subject to country limits, conditional; FX–7 Children of alien residents, exempt from country limits; CX–8 Children of CX–7, exempt from country limits, conditional; FX–8 Children of FX–7, or FX–8, exempt from country limits; CX–7 Children of alien residents, exempt from country limits, conditional; F–29 Unmarried sons/daughters of alien residents, subject to country limits; C–29 Unmarried children of alien residents, subject to country limits, conditional.

[242] Including the following categories: A–36 Married Amerasian sons/daughters of U.S. citizens; F–36 Married sons/daughters of U.S. citizens; C–36 Married sons/daughters of U.S. citizens, conditional; A–37 Spouses of A–31 or A–36; F–37 Spouses of married sons/daughters of U.S. citizens; C–37 Spouses of married sons/daughters of U.S. citizens, conditional; B–37 Spouses of B–31 or B–36; A–38 Children of A–31 or A–36, subject to country limits; F–38 Children of married sons/daughters of U.S. citizens; C–38 Children of C–31 or C–36, subject to country limits, conditional; B–38 Children of B–31 or B–36, subject to country limits.

[243] Includes the following categories: F–46 Brothers/sisters of U.S. citizens, adjustments; F–47 Spouses of brothers/sisters of U.S. citizens, adjustments; F–48 Children of brothers/sisters of U.S. citizens, adjustments.

[244] Includes the following categories: CF–1 Spouses, entered as fiance(e), adjustments conditional; IF–1 Spouses, entered as fiance(e), adjustments.

[245] Includes the following categories: Immediate Relative AR–6 Children, Amerasian, First Preference: A–16 Unmarried Amerasian sons/daughters of U.S. citizens; Third Preference A–36 Married Amerasian sons/daughters of U.S. citizens; See INA 204(f). Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

**41342** Federal Register / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

### TABLE 3—APPLICABILITY OF INA 212(a)(4) TO FAMILY-BASED ADJUSTMENT OF STATUS APPLICATIONS [238]—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A and Form I–864, affidavit of support under section 213A of the INA, required or exempt? |
| --- | --- | --- |
| Amerasians, born in Vietnam between 1/1/62–1/1/76. Immediate Relative: AM–6, AR–6 Children; Amerasians under Amerasian Homecoming Act, Public Law 100–202 (Dec. 22, 1987) [246]—born between 1/1/1962–1/1/1976. | No. (I–360 and adjustment) Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202. | Exempt. Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202. |
| IW–6 Spouses, widows or widowers ............................................. | Yes. INA 212(a)(4) ...................... | Exempt. 8 CFR 204.2 and 71 FR 35732. |
| Immediate Relative VAWA applicant, including spouses and children [247]. | No. INA 212(a)(4)(E) .................... | Exempt. INA 212(a)(4)(E). |
| First Preference VAWA, B–16 Unmarried sons/daughters of U.S. citizens, self-petitioning; B–17 Children of B–16. | No. INA 212(a)(4)(C)(i) ................. | Exempt. INA 212(a)(4)(C)(i). |
| Second Preference VAWA applicant, including spouses and children [248]. | No. INA 212(a)(4)(C)(i) ................. | Exempt. INA 212(a)(4)(C)(i). |
| Third Preference VAWA. Married son/daughters of U.S. citizen, including spouses and children [249]. | No. INA 212(a)(4)(C)(i) ................. | Exempt. INA 212(a)(4)(C)(i). |

* If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), permanent departure of the alien, or otherwise as outlined in proposed 8 CFR 213.1(g), if the alien did not receive any public benefits as defined in the proposed rule.

### TABLE 4—APPLICABILITY OF INA 212(a)(4) TO EMPLOYMENT-BASED ADJUSTMENT OF STATUS APPLICATIONS [250]

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
| --- | --- | --- |
| First Preference: Priority workers [251] ............................................. | Yes, in general. [252] INA 212(a)(4) .......... | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) [253] in filed Form I–140. INA 212(a)(4)(D), 8 CFR 213a. |
| Second Preference: Professionals with advanced degrees or aliens of exceptional ability [254]. | Yes in general. [255] INA 212(a)(4) .......... | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) in filed Form I–140. INA 212(a)(4)(D), 8 CFR 213a. |

[246] Includes the following categories: AM–1 principal born between 1/1/1962–1/1/1976); AM–2 Spouse, (AM–3 child; AR–1 child of U.S. citizen born Cambodia, Korea, Laos, Thailand, Vietnam. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[247] Includes the following categories: IB–6 Spouses, self-petitioning; IB–7 Children, self-petitioning; IB–8 Children of IB–1 or IB–6; IB–0 Parents battered or abused, of U.S. citizens, self-petitioning.

[248] Includes the following categories: B–26 Spouses of alien residents, subject to country limits, self-petitioning; BX–6 Spouses of alien residents, exempt from country limits, self-petitioning; B–27 Children of alien residents, subject to country limits, self-petitioning; BX–7 Children of alien residents, exempt from country limits, self-petitioning; BX–8 Children of BX–6, or BX–7, exempt from country limits; B–29 Unmarried sons/daughters of alien residents, subject to country limits, self-petitioning.

[249] Includes the following categories: B–36 Married sons/daughters of U.S. citizens, self-petitioning B–37 Spouses of B–36, adjustments; B–38 Children of B–36, subject to country limits; Third Preference VAWA; B–36 Married sons/daughters of U.S. citizens, self-petitioning; B–37 Spouses of B–36, adjustments B–38 Children of B–36, subject to country limits; Third Preference VAWA; B–37 Spouses of B–36, adjustments; B–38 Children of B–36, subject to country limits.

[250] An alien who meets the conditions of new 8 CFR 212.23(a)(18), (19), (20), or (21) (e.g., certain T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) are exempt from the public charge inadmissibility ground and the affidavit of support requirement, and therefore do not need to File Form I–944 or Form I–864 regardless of what category the alien adjusts under.

[251] Includes the following categories: E–16 Aliens with extraordinary ability; E–17 Outstanding professors or researchers; E–18 Certain Multinational executives or managers; E–19 Spouses of E–11, E–12, E–13, E–16, E–17, or E–18; E–10 Children of E–11, E–12, E–13, E–16, E–17, or E–18.

[252] If the alien is adjusting based on an employment-based petition where the petition is filed by either a qualifying relative, or an entity in which such relative has a significant ownership interest (5% or more), and the alien, at both the time of filing and adjudication of the Form I–485, also falls under a category exempted under INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E), (e.g., T

nonimmigrants, U nonimmigrants, and VAWA self-petitioners) the alien does not need to file Form I–944 (but is still required to file Form I–864).

[253] Relative means a husband, wife, father, mother, child, adult son, adult daughter, brother, or sister. Significant ownership interest means an ownership interest of five percent or more in a for-profit entity that filed an immigrant visa petition to accord a prospective employee an immigrant status under section 203(b) of the Act. See 8 CFR.213a.1.

[254] Includes the following categories: E–26 Professionals holding advanced degrees; ES–6 Soviet scientists E–27 Spouses of E–21 or E–26; E–28 Children of E–21 or E–26.

[255] If the alien is adjusting based on an employment-based petition where the petition is filed by either a qualifying relative, or an entity in which such relative has a significant ownership interest (five percent or more), and the alien, at both the time of filing and adjudication of the Form I–485, also falls under a category exempted under INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E), (e.g., T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) the alien does not need to file Form I–944 (but is still required to file Form I–864).

TABLE 4—APPLICABILITY OF INA 212(a)(4) TO EMPLOYMENT-BASED ADJUSTMENT OF STATUS APPLICATIONS [250]—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Third: Skilled workers, professionals, and other workers [256] ................................. | Yes in general.[257] INA 212(a)(4) ........... | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) in filed Form I–140. INA 212(a)(4)(D), 8 CFR 213a. |
| Fifth: I–526 Immigrant Petition by Alien Entrepreneur (EB–5) INA 203(b)(5), 8 CFR 204.6.[258] | Yes. INA 212(a)(4) ................................. | Not Applicable.[259] |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), permanent departure of the alien, or upon the fifth year of the alien's anniversary of the adjustment of status, or, if the alien, following the initial grant of lawful permanent resident status, obtains a status that is exempt from the public charge ground of inadmissibility, and provided that the alien did not receive any public benefits as defined in the proposed rule.

TABLE 5—APPLICABILITY OF INA 212(a)(4) TO SPECIAL IMMIGRANT ADJUSTMENT OF STATUS APPLICATION

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Special Immigrant (EB–4)—Religious Workers. 8 CFR 204.5(m); INA 101(a)(27)(C) [260]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[261] |
| Special Immigrant (EB–4)—International employees of U.S. government abroad. INA 101(a)(27)(D), 22 CFR 42.32(d)(2) [262]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[263] |
| Special Immigrant (EB–4)—Employees of Panama Canal. 22 CFR 42.32(d)(3); INA 101(a)(27)(E), INA 101(a)(27)(F), and INA 101(a)(27)(G) [264]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[265] |
| Special Immigrant (EB–4)—Foreign Medical School Graduates. INA 101(a)(27)(H), INA 203(b)(4) [266]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[267] |

[256] Includes the following categories: EX–6 Schedule—A worker; EX–7 Spouses of EX–6; EX–8 Children of EX–6; E–36 Skilled workers; E–37 Professionals with baccalaureate degrees; E–39 Spouses of E–36, or E–37; E–30 Children of E–36, or E–37; EW–8 Other workers; EW–0 Children of EW–8; EW–9 Spouses of EW–8; EC–6 Chinese Student Protection Act (CSPA) principals; EC–7 Spouses of EC–6; EC–8 Children of EC–6.

[257] If the alien is adjusting based on an employment-based petition where the petition is filed by either a qualifying relative, or an entity in which such relative has a significant ownership interest (5% or more), and the alien, at both the time of filing and adjudication of the Form I–485, also falls under a category exempted under INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E), (e.g., T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) the alien does not need to file Form I–944 (but is still required to file Form I–864).

[258] Includes the following categories: C–56 Employment creation, not in targeted area, adjustments, conditional E–56 Employment creation; I–56 Employment creation, targeted area, pilot program, adjustments, conditional; T–56 Employment creation, targeted area, conditional; R–56 Investor pilot program, not targeted, conditional; C–57 Spouses of C–51 or C–56, conditional; E–57 Spouses of E–51 or E–56; I–57 Spouses of I–51 or I–56, conditional; T–57 Spouses of T–51 or T–56, conditional; R–57 Spouses of R–51 or R–56, conditional; C–58 Children of C–51 or C–56, conditional; E–58 Children of E–51 or E–56; I–58 Children of I–51 or I–56, conditional; T–58

Children of T–51 or T–56, conditional; R–58 Children of R–51 or R–56, conditional.

[259] EB–5 applicants are Form I–526, Immigrant Petition by Alien Entrepreneur, self-petitioners. The regulation at 8 CFR 213a.1 relates to a person having ownership interest in an entity filing for a prospective employee and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[260] Includes the following categories: SD–6 Ministers; SD–7 Spouses of SD–6; SD–8 Children of SD–6; SR–6 Religious workers; SR–7 Spouses of SR–6; SR–8 Children of SR–6.

[261] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers (for example, a religious institution), would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[262] Includes the following categories: SE–6 Employees of U.S. government abroad, adjustments; SE–7 Spouses of SE–6; SE–8 Children of SE–6. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[263] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers (for example, the U.S. armed forces), would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[264] Includes the following categories: SF–6 Former employees of the Panama Canal Company

or Canal Zone Government; SF–7 Spouses or children of SF–6; SG–6 Former U.S. government employees in the Panama Canal Zone; SG–7 Spouses or children of SG–6; SH–6 Former employees of the Panama Canal Company or Canal Zone government, employed on April 1, 1979; SH–7 Spouses or children of SH–6. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[265] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers generally would not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[266] Includes the following categories: SJ–6 Foreign medical school graduate who was licensed to practice in the United States on Jan. 9, 1978; SJ–7 Spouses or children of SJ–6; Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[267] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

**41344**   **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

TABLE 5—APPLICABILITY OF INA 212(a)(4) TO SPECIAL IMMIGRANT ADJUSTMENT OF STATUS APPLICATION—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Special Immigrant (EB–4)—Retired employees of International Organizations including G–4 International Organization Officer. International Organizations (G–4s international organization officer/Retired G–4 Employee) INA 101(a)(27)(I) and INA 101(a)(27)(L); 8 CFR 101.5; 22 CFR 42.32(d)(5); 22 CFR 41.24; 22 CFR 41.25 [268] [269]. | Yes. INA 212(a)(4) ........................ | Not Applicable. [270] |
| Special Immigrant (EB–4)—SL–6 Juvenile court dependents, adjustments. | No. SIJ are exempt under 245(h) | Not Applicable. INA 245(h). |
| Special Immigrant (EB–4)—U.S. Armed Forces Personnel. INA 101(a)(27)(K) [271]. | Yes. INA 212(a)(4) ........................ | Not Applicable. [272] |
| Special Immigrant—International Broadcasters. INA 101(a)(27)(M); 8 CFR 204.13 [273]. | Yes. INA 212(a)(4) ........................ | Not Applicable. [274] |
| Special Immigrant (EB–4)—Special immigrant interpreters who are nationals of Iraq or Afghanistan [275]. | No. Section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006, as amended; Public Law 109–163—Jan. 6, 2006, Section 1244(a)(3) of the National Defense Authorization Act for Fiscal Year 2008, as amended; Public Law 110–181 (Jan. 28, 2008) Section 602(b) of the Afghan Allies Protection Act of 2009, as amended section (a)(2)(C), Public Law 111–8 (Mar. 11, 2009). | Exempt. Section 602(b)(9) of the Afghan Allies Protection Act of 2009, Title VI of Public Law 111–8, 123 Stat. 807, 809 (March 11, 2009) which states that INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8) do not apply to special immigrant Iraq and Afghan nationals who were employed by or on behalf of the U.S. government (for Section 602(b) and 1244 adjustment applicants who were either paroled into the United States or admitted as nonimmigrants). See Section 1(c) of Public Law 110–36, 121 Stat. 227, 227 (June 15, 2007), which amended Section 1059(d) of the National Defense Authorization Act for Fiscal Year 2006, Public Law 109–163, 119 Stat. 3136, 3444 (January 6, 2006) to state that INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8) do not apply to Iraq or Afghan translator adjustment applicants. |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

---

[268] Includes the following categories: SK–6 Retired employees of international organizations; SK–7 Spouses of SK–1 or SK–6; SK–8; Certain unmarried children of SK–6; SK–9 Certain surviving spouses of deceased international organization employees.

[269] Includes SN–6 Retired NATO–6 civilian employees; SN–7 Spouses of SN–6; SN–9; Certain surviving spouses of deceased NATO–6 civilian employees; SN–8 Certain unmarried sons/daughters of SN–6.

[270] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[271] Includes the following categories: SM–6 U.S. Armed Forces personnel, service (12 years) after 10/1/91 SM–9 U.S. Armed Forces personnel, service (12 years) by 10/91; SM–7 Spouses of SM–1 or SM–6; SM–0 Spouses or children of SM–4 or SM–9; SM–8 Children of SM–1 or SM–6.

[272] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[273] Includes the following categories: BC–6 Broadcast (IBCG of BBG) employees; BC–7 Spouses of BC–1 or BC–6; BC–8 Children of BC–6.

[274] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[275] Includes the following categories: SI–6 Special immigrant interpreters who are nationals of Iraq or Afghanistan; SI–6, SI–7, SI–8—spouse and child of SI–6; SQ–6 Certain Iraqis and Afghans employed by U.S. Government SQ–6, SQ–7, SQ–8 Spouses and children of SQ–6; SI–6 Special immigrant interpreters who are nationals of Iraq or Afghanistan; SI–7 Spouses of SI–1 or SI–6; SI–8 Children of SI–1 or SI–6.

TABLE 6—APPLICABILITY OF INA 212(a)(4) TO REFUGEE, ASYLEE, AND PAROLEE ADJUSTMENT OF STATUS APPLICATIONS

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
| --- | --- | --- |
| Asylees [276] ............................................. | No. INA 209(c) ............................... | Exempt. INA 209(c). |
| Indochinese Parolees from Vietnam, Cambodia, and Laos. IC–6 Indochinese refugees (Public Law 95–145 of 1977). IC–7 Spouses or children of Indochinese refugees not qualified as refugees on their own. | No. Section 586, Public Law 106–429 (Nov. 6, 2000). | Exempt. Section 586, Public Law 106–429 (Nov. 6, 2000). |
| Polish and Hungarian Parolees (Poland or Hungary who were paroled into the United States from November 1, 1989 to December 31, 1991) [277]. | No. Title VI, Subtitle D, Section 646(b), Public Law 104–208; 8 CFR 245.12. | Exempt. Title VI, Subtitle D, Section 646(b), Public Law 104–208; 8 CFR 245.12. |
| Refugees [278] ............................................. | No. INA 207(c)(3); INA 209(c) ....... | Exempt. INA 207; INA 209(c). |
| Cuban-Haitian Entrant under IRCA—CH–6, CH–7 [279] ......................... | No. Section 202, Public Law 99–603, 100 Stat. 3359 (1986) (as amended), 8 U.S.C. 1255a. | Exempt. Section 202, Public Law 99–603, 100 Stat. 3359 (1986) (as amended), 8 U.S.C. 1255a. |
| HRIFA—Principal HRIFA Applicant who applied for asylum before December 31, 1995 [280]. | No. Section 902 Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), 8 U.S.C. 1255. | Exempt. Section 902 Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), 8 U.S.C. 1255. |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

TABLE 7—APPLICABILITY OF INA 212(a)(4) TO OTHER APPLICANTS WHO MUST BE ADMISSIBLE

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
| --- | --- | --- |
| Diplomats Section 13 ............................................. | Yes. Section 13 of Public Law 85–316 (September 11, 1957), as amended by Public Law 97–116 (December 29, 1981); 8 CFR 245.3. | Exempt, by statute, as they are not listed in INA 212(a)(4) as a category that requires Form I–864. |
| Individuals Born in the U.S. under Diplomatic Status (NA–3) 8 CFR 101.3. | Yes. INA 212(a)(4) ....................... | Exempt. 8 CFR 101.3. |
| Diversity, DV–1 diversity immigrant, spouse and child ......................... | Yes. INA 212(a)(4) ....................... | Exempt, by statute, as they are not listed in INA 212(a)(4) as a category that requires Form I–864. Diversity visas are issued under INA 203(c) which do not fall under INA 212(a)(4)(C) or (D). |
| W–16 Entered without inspection before 1/1/82; W–26 Entered as nonimmigrant and overstayed visa before 1/1/82. Certain Entrants before January 1, 1982. | Yes. INA 212(a)(4) (except for certain aged, blind or disabled individuals as defined in 1614(a)(1) of the Social Security Act). INA 245A(b)(1)(C)(i) and (a)(4)(a))—application for adjustment 42 U.S.C. 1382c(a)(1). Special Rule for determination of public charge—See INA 245A(d)(2)(B)(iii). | Exempt, by statute as they are not listed in INA 212(a)(4) as a category that requires an Form I–864. |

---

[276] Including the following categories: AS–6 Asylees; AS–7 Spouses of AS–6; AS–8 Children of AS–6; SY–8 Children of SY–6; GA–6 Iraqi asylees; GA–7 Spouses of GA–6; GA–8 Children of GA–6.

[277] Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[278] Includes the following categories: RE–6 Other refugees (Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 (Mar. 17, 1980)); RE–7 Spouses of RE–6; RE–8 Children of RE–6; RE–9 Other relatives.

[279] Note that this program has a sunset date of two years after enactment, however, some cases may still be pending.

[280] Includes the following categories: 1995—HA–6 Principal HRIFA Applicant; Spouse of HA–6, HA–7 and Child of HA–6, HA–8; Unmarried Son or Daughter 21 Years of Age or Older of HA–6, HA–9 Principal HRIFA Applicant paroled into the United States before December 31, 1995- HB–6; Spouse of HB–6, HB–7; Child of HB–6, HB–8; Unmarried Son or Daughter 21 Years of Age or Older of HB–6 HB–9; Principal HRIFA Applicant who arrived as a child without parents in the United States HC–6; Spouse of HC–6, HC–7; Child of HC–6, HC–8; Unmarried Son or Daughter 21 Years of Age or Older of HC–6, HC–9; Principal HRIFA Applicant child who was orphaned

subsequent to arrival in the United States HD–6, Spouse of HD–6, HD–7; Child of HD–6, HD–8; Unmarried Son or Daughter 21 Years of Age or Older of HD–6, HD–9 Principal HRIFA Applicant child who was abandoned subsequent to arrival and prior to April 1, 1998—HE–6; Spouse of HE–6, HE–7; Child of HE–6, HE–8; Unmarried Son or Daughter 21 Years of Age or Older of HE–6, HE–9. Note that this program has a sunset date of March 31, 2000; however, dependents may still file for adjustment of status.

TABLE 7—APPLICABILITY OF INA 212(a)(4) TO OTHER APPLICANTS WHO MUST BE ADMISSIBLE—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| T, T–1 victim, spouse, child, parent, sibling; INA 101(a)(15)(T), INA 212(d)(13)(A). | No. INA 212(a)(4)(E). | Exempt, by statute as they are not listed in INA 212(a)(4) as a category that requires Form I–864. Adjustment of status based on T nonimmigrant status is under INA 245(l) which does not fall under INA 212(a)(4)(C) or (D). |
| American Indians—INA 289 | No. INA 289 | Exempt. INA 289. |
| Texas Band of Kickapoo Indians of the Kickapoo Tribe of Oklahoma, Public Law 97–429 (Jan. 8, 1983); KIC—Kickapoo Indian Citizen; KIP—Kickapoo Indian Pass. | No. Public Law 97–429 (Jan. 8, 1983). | Exempt. Public Law 97–429 (Jan. 8, 1983). |
| S (Alien witness or informant) | Yes, but there is a waiver available—INA 245(j); INA 101(a)(15)(S); 8 CFR 214.2(t)(2); 8 CFR 1245.11 (Waiver filed on Form I–854, Inter-Agency Alien Witness and Informant Record). | Exempt. INA 245(j); INA 101(a)(15)(S); 8 CFR 214.2(t)(2); 8 CFR 1245.11 (Waiver filed on Form I–854, Inter-Agency Alien Witness and Informant Record). |
| Private Immigration Bill providing for alien's adjustment of status | Dependent on the text of the Private Bill. | Dependent on the text of the Private Bill. |
| NACARA (202); Principal NC–6, (NC 7–9) spouse and children [281] | No. Section 202(a), Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255.. | Exempt. Section 202(a), Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. |
| NACARA 203; Cancellation of removal (Z–13) Battered spouses or children (Z–14) Salvadoran, Guatemalan and former Soviet bloc country nationals (Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)). | No. Section 203, Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. | Exempt. Section 203, Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. |
| Lautenberg, LA–6 [282] | No. Section 599E, Public Law 101–167, 103 Stat. 1195 (Nov. 21, 1989), 8 U.S.C.A. 1255. | Exempt. Section 599E, Public Law 101–167, 103 Stat. 1195 (Nov. 21, 1989), 8 U.S.C.A. 1255. |
| Registry, Z–66—Aliens who entered the United States prior to January 1, 1972 and who met the other conditions. | No. INA 249 of the Act and 8 CFR part 249. | Exempt. INA 249 of the Act and 8 CFR part 249. |
| U, U–1 Crime Victim, spouse, children and parents, and siblings under INA 245(m). | No. INA 212(a)(4)(E). | Exempt. INA 212(a)(4)(E). |
| Temporary Protected Status (TPS) | No. 8 CFR 244.3(a). [283] | Exempt. 8 CFR 244.3(a). [284] |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

### G. Definitions

#### 1. Public Charge

*Comment:* A commenter stated that the lack of a public charge definition is an issue that must be resolved because immigration is an important feature of America's culture and public policy, heightening the importance of having a consistent definition.

*Response:* DHS agrees that it is important to define public charge in the rulemaking—public charge is a term

---

[281] Note that this program has a sunset date of April 1, 2000; however, some cases may still be pending.

[282] Note that this program sunset date of September 30, 2014, only applies to parole. Eligible applicants may still apply for adjustment of status.

[283] INA section 244(c)(2)(ii), 8 U.S.C. 1254a(c)(2)(ii), authorizes USCIS to waive any section 212(a) ground, except for those that Congress specifically noted could not be waived.

[284] *See* INA section 244(c)(2)(ii), 8 U.S.C. 1254a(c)(2)(ii).

that has appeared in U.S. Federal immigration law since at least 1882, but has never been defined by Congress or in regulation. The rule provides a definition for public charge and DHS believes that prior to this rule there has been insufficient guidance on how to determine if an alien who is applying for admission or adjustment of status is likely to become a public charge at any time in the future.

*Comment:* Commenters stated that the proposed definition of public charge is "without precedent and contrary to the discretion provided to DHS under statute." A commenter stated that the proposed public charge definition relies on outdated case law, and that the 1999 Interim Field Guidance is preferable to the proposed rule, for three reasons. First, the commenter argued that the proposed rule undermined DHS's stated objectives, because it could stop an alien from accessing government

services that would make the alien more self-sufficient. Second, the commenter argued that the proposed rule could have adverse effects on aliens whose presence in the United States is a net benefit to the U.S. Government as a consequence of their productivity, associated tax revenues, etc. And third, the commenter argued that the proposed rule would bind adjudicators to a bright-line definition of "public charge" that could result in harsh consequences in some cases. By contrast, in the commenter's view, the "primarily dependent" standard under the 1999 Interim Field Guidance provided adjudicators with more discretion. Another commenter stated that the proposed rule does not comport with the law because it is contrary to the long-established common-law definition of public charge. A commenter stated that the use of non-monetizable benefits

for one third of the time period does not reflect ''primary dependence.''

*Response:* DHS disagrees that the public charge definition is contrary to the discretion provided to DHS under the INA, relies on outdated case law or is without precedent, or undermines the agency's objectives. As noted in the NPRM, DHS's authority to make public charge inadmissibility determinations and related decisions is found in several statutory provisions, including section 102 of the Homeland Security Act of 2002 (Pub. L. 107–296, 116 Stat 2135), 6 U.S.C. 112, section 103 of the Act, 8 U.S.C. 1103, as well as section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS may issue regulations implementing its authority under these statutes without further congressional authorization. Additionally, as noted in the NPRM, there is a scarcity of case law specifically defining public charge.[285] The cases cited in the NPRM and in this final rule include the most recent and relevant case law discussing the term public charge and the public charge ground of inadmissibility.[286]

With respect to the argument that the public charge rule may make it more difficult for some aliens to become self-sufficient, DHS has addressed this argument at length elsewhere in this preamble. In short, and as relevant here, the fact that an alien might rely on public benefits to *become* self-sufficient in the future has no bearing on whether such alien currently is self-sufficient or currently is or is not a public charge. DHS rejects the notion that it must interpret the term ''public charge'' in such a way as to allow aliens to rely on public benefits until such time as they are self-sufficient. DHS notes that its position on this aspect of the *definition* of public charge should not be taken as a rejection of the commenters' general point that an alien's past receipt of public benefits can result in greater self-sufficiency. If an alien received public benefits in the past and such benefits helped the alien become self-sufficient, DHS agrees that the alien's current self-sufficiency is relevant to the prospective public charge inadmissibility determination, but the alien's past receipt of public benefits is relevant to assessing the likelihood of future receipt of public benefits.

With respect to the argument regarding aliens who receive the designated public benefits, but may nonetheless be a net benefit to the U.S. Government or society, neither the Act

nor the case law requires DHS to weigh an alien's net impacts on government resources, such as by evaluating the potential tax receipts generated by the alien, as compared to the alien's receipt of public benefits. In addition, a definition that requires consideration of the alien's overall contributions to tax revenues, economic productivity, or society at large would be unjustifiably challenging to administer. For instance, as explained in the proposed rule, fully monetized thresholds (which would be required to make a dollars-to-dollars comparison) would not be administrable because some benefits, such as Medicaid, lack clearly monetizable value. In addition, DHS notes that taxes serve a variety of functions, and benefit the taxpayer regardless of whether she or he receives an individual, means-tested public benefit. A comparison of the alien's ''contributions'' (in the form of taxes) to the alien's ''withdrawals'' (in the form of public benefits) would therefore be incomplete, because it would not consider the other government programs and services, including national defense, infrastructure, law enforcement and emergency services, from which the alien benefits. Further, under this rule, DHS will not consider receipt of any public benefits for which the alien has paid into directly. Each of the designated benefits involves significant government subsidization. In this context, DHS does not believe that value of an alien's current or future tax contributions should ultimately have a bearing on whether the alien is a public charge.

With respect to the firmness of the definition, part of the rule's purpose is to provide a clearer definition; DHS will not institute a vague standard in order to avoid harsh consequences for some people.

Finally, as to the comment stating that the rule does not comport with the law because it is contrary to the long-standing common law definition of public charge, the commenter failed to identify any common law definition of public charge that DHS should have considered, or as the commenter stated, that DHS violated. As noted in the NPRM, DHS's definition for public charge is derived from a review of the minimal legislative history of the public charge ground of inadmissibility and the ordinary meaning of public charge. DHS's definition also relies on the limited case law addressing the definition of public charge, in which courts, in the absence of statutory definition for public charge, generally tied the definition of public charge to receipt of public benefits, without

quantifying the level of public support or the type of public support required to determine that the alien is likely to become a public charge at any time in the future.

DHS notes that even if there were a clear definition for public charge grounded in case law, which there does not appear to be, agencies responsible for administering federal law generally have the authority to interpret an ambiguous statute in a different manner than the manner in which a court interpreted the statute.[287] Therefore, DHS would be within its authority to create a different definition of ''public charge.'' [288]

*Comment:* Commenters provided a historical overview of public charge, and asserted that expanding the definition would represent a ''radical departure'' from over 100 years of U.S. immigration policy. The commenters discussed the laws governing public charge inadmissibility and deportability, and observed that, in the past, public charge inadmissibility and associated guidance have sometimes operated to the detriment of certain vulnerable populations, including Jews, women, and people from India. The commenters stated that the change in policy—from a focus on dependence on the government by cash support for subsistence or long-term institutionalization, to a focus on a broader range of benefits—would lead to a ''general erosion'' of benefits that legal immigrants may access.

*Response:* While this rule expands the list of public benefits covered in the INS 1999 Interim Field Guidance and the 1999 proposed rule, DHS does not believe that the rule is inconsistent with historical practice. DHS notes that this rule is not facially discriminatory, and that DHS does not intend the rule to have a discriminatory effect based on

---

[285] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[286] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[287] *Nat'l Cable & Telecomms. Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967, 983–84 (2005) (*Brand X*) (''Since *Chevron* teaches that a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, the agency's decision to construe that statute differently from a court does not say that the court's holding was legally wrong. Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes. In all other respects, the court's prior ruling remains binding law (for example, as to agency interpretations to which *Chevron* is inapplicable). The precedent has not been 'reversed' by the agency, any more than a federal court's interpretation of a State's law can be said to have been 'reversed' by a state court that adopts a conflicting (yet authoritative) interpretation of state law.'').

[288] *Brand X,* 545 U.S. at 1001 (''The Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change'').

**41348**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

race, gender, religion, or any other protected ground. Rather, the rule is consistent with existing precedents that have developed in the years since the earliest public charge laws, as well as Congress' codified policy statement that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration laws." [289] As noted in the NPRM,[290] courts have consistently tied the concept of public charge to an alien's receipt of public benefits, without quantifying the level of public support or requiring a certain type of public support, and the alien's ability to be self-sufficient. DHS acknowledges that individuals may disenroll from public benefits to avoid the consequences of this rule. As previously noted, the rule aims to align the principles of self-sufficiency set forth in PRWORA[291] with the public charge inadmissibility ground.

DHS does not believe that the history of the public charge ground of inadmissibility—which Congress has consistently chosen to retain as part of our immigration laws—precludes DHS from implementing a rigorous and fair regulatory framework for public charge inadmissibility determinations. DHS notes that our immigration laws have evolved to provide greater protections to vulnerable populations. For instance, refugees and asylees are exempt from the public charge ground of inadmissibility.

*Comment:* One commenter stated that the proposed rule greatly expands the definition of public charge, is a departure from existing policy and creates an unworkable, overly broad definition that will be impossible to implement fairly. The commenter also asserted that experts estimated that, under the new definition, 94% of all noncitizens who entered the United States without lawful permanent resident status have at least one characteristic that DHS could potentially weigh negatively in a public charge determination under the proposed rule. Another commenter stated that taking advantage of any federal, state, or local government program should have no impact on a pathway to residency or citizenship. The commenter suggested that instead, DHS evaluate each applicant based on whether the alien is employed or is caring for a family, has a violent felony conviction, and has a sponsor (such as a family member or corporate sponsor providing support).

*Response:* DHS agrees that the definition of public charge in this rule is broader than the existing definition and policy. However, as noted previously, DHS believes that this expanded definition for public charge is reasonable and consistent with Congress' intent and will better ensure that aliens seeking to come to the United States temporarily or permanently are self-sufficient.[292] DHS acknowledges that the implementation of the public charge ground of inadmissibility will be a complex adjudication, but USCIS is committed to taking necessary steps to ensure consistent implementation and fair adjudication, including through the issuance of adjudicative guidance and training. As noted elsewhere in this rule, DHS believes consideration of receipt of public benefits is appropriate in determining whether an alien is likely to become a public charge in the future.

*Comment:* Some commenters stated that the proposed rule would exceed DHS's authority because the proposed definition is over-inclusive, encompassing a wide range of people who are substantially self-supporting and not primarily dependent upon the government to meet their basic needs. Commenters also indicated the proposal did not provide a reasoned analysis for changing the long-standing definition of public charge from being primarily dependent on the government to a determination in which a person could become a public charge based on receipt of a smaller amount of public benefits, including non-cash benefits. Commenters also stated that the NPRM would foreclose the opportunity for a hard-working, self-sufficient individual who experiences a fleeting financial hardship to become a long-term resident of the United States.

Similarly, another commenter stated that "[t]he broader scheme of the [Immigration Act of] 1882 . . . confirms that Congress intended the term 'public charge' to refer to primary dependence on the government, not mere receipt of some public aid.'' The commenter suggested that because the Immigration Act of 1882 (1882 Act) authorized a fund "to defray the expense of regulating immigration . . . , for the care of immigrants arriving in the United States, [and] for the relief of such as are in distress,'' [293] Congress must have anticipated that some immigrants would be in need of short-term support, without becoming a public charge.

The commenter also cited a floor statement by a member of Congress in the months preceding enactment of the 1882 Act. According to the commenter, the floor statement supported the conclusion that Congress intended for the term "public charge'' to mean a person "primarily if not wholly dependent on the government." Specifically, the member of Congress incorporated into his floor statement an 1879 resolution passed by the New York Board of Charities, which concluded that many cities and towns in Europe sent "to this country blind, crippled, lunatic, and other infirm paupers, who ultimately become life-long dependents on our public charities"; and that many such persons "become permanent inmates of the charitable institutions supported by the State of New York." [294] The resolution called on Congress to exclude such individuals from the United States and to appropriate funds for returning such individuals to their home countries. The commenter suggested that because the resolution referred to "life-long dependents" and "permanent inmates," it is clear that Congress intended for the term "public charge" to refer to primary dependence on the Government for support.

*Response:* DHS rejects the notion that the public charge definition violates the law or is over-inclusive. DHS acknowledges that this is a change that likely will increase the number of individuals who will be deemed inadmissible or ineligible for adjustment of status based on the public charge ground. DHS disagrees, however, with the assertion that it did not provide a reasoned explanation why the prior standard is insufficient, why the change is necessary, and why non-cash benefits are included in the new public charge determinations. Longstanding agency practice and policy,[295] while generally accorded some weight, is not controlling or unalterable.[296] DHS provided

---

[289] 8 U.S.C. 1601(1).

[290] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[291] *See* 8 U.S.C. 1601.

[292] *Brand X*, 545 U.S. at 1001 ("the Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change").

[293] Immigration Act of 1882, 22 Stat. 214 (Aug. 3, 1882).

[294] *See* 13 Cong. Rec. 5109–10 (June 19, 1882) (Statement of Rep. John Van Voorhis).

[295] As of the date of the effective rule, the agency practice had not been codified in agency regulations as the NPRM published in May 1999 was never finalized. As explained in the NPRM, the agency also issued interim Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, in which it detailed its policy. *See* 64 FR 28689 (May 26, 1999). *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[296] *See, e.g., Judulang* v. *Holder*, 565 U.S. 42, 62 (2011) (indicating that longevity is "a slender reed

detailed reasoning why the changes are necessary in the NPRM. As explained in the NPRM, although the primarily dependence (more-than-50-percent dependence) on public assistance standard creates a bright line rule, it is possible and likely probable that many individuals whose receipt of public benefits falls below that standard lack self-sufficiency.[297] Because of the nature of the benefits that would be considered under this rule—*i.e.,* cash benefits for income maintenance and non-cash benefits for basic living needs such as food and nutrition, housing, and healthcare, that account for significant public expenditures on non-cash benefits [298]—DHS believes that receipt of such benefits for more than 12 months within any month 36-month period is sufficient to render a person a public charge.[299] This is because an individual with limited means to satisfy basic living needs who uses government assistance to fulfill such needs for that duration of time relies on such assistance to such an extent that the person is not self-sufficient.[300] Given that neither the wording of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), nor case law examining public charge inadmissibility, mandates the "primarily dependent" standard, and in light of Congress' unequivocal policy goal articulated in PRWORA, DHS has concluded that the "primarily dependent" standard is not the only permissible interpretation of what it means to be a public charge, and is in fact suboptimal when considered in relation to the goals of the INA and PRWORA.[301]

With respect to the commenter's arguments about the Immigration Act of 1882, the conclusions that the commenter draws from the funding mechanism in that Act appear to be largely unsupported. The commenter assumes, without articulating any basis for the assumption, that under the Immigration Act of 1882 aliens who received assistance through the fund could not also be public charges. DHS has no reason to believe that assumption is correct. But even if the Immigration Act of 1882 could be read as suggesting that an alien can rely on public funds for support without becoming a public charge, DHS is unaware of any binding case law requiring DHS to interpret the term "public charge" in this manner. And regardless, Congress has since amended the public charge ground of inadmissibility multiple times over the course of more than a century.

With respect to the New York State Board of Charities resolution referenced by the commenter, DHS notes that the resolution does not use the term "public charge" or implicitly define such term. DHS does not find the resolution or the surrounding floor statement particularly instructive for purposes of this rulemaking; they originate in a different historical context that preceded multiple modifications to and re-enactments of the public charge ground of inadmissibility in the 140 years since the passage of the 1879 resolution.[302]

*Comment:* A commenter stated that DHS's rationale for why the public charge definition is consistent with more than 40 years of case law—and specifically, DHS's citation of *Matter of Vindman* and *Matter of Harutunian* [303]—did not withstand scrutiny because these cases involved the receipt of cash benefits by the elderly, unemployed and unsponsored applicants, and therefore bears no relevance to the broad population affected by this rule. One commenter asserted that the cases cited do not support the proposed definition, and stated that the citation to these cases indicates that this rule is haphazardly put together and poorly researched.

*Response:* DHS rejects the notion that the case law cited does not support DHS's public charge definition. In particular, DHS disagrees that the case law cited in support of the public charge definition, and particularly *Vindman* and *Harutunian,*[304] bears no relevance to the population affected by this rule because the facts of *Vindman* and *Harutunian* were limited to cash assistance and elderly, unemployed, or unsponsored applicants. DHS cited these decisions to establish that its proposed regulation is consistent with case law. Absent a clear statutory or regulatory definition, some courts and administrative authorities have tied public charge to the receipt of public benefits.[305] DHS does not believe that *Vindman* or *Harutunian* specifically limited the general understanding of public charge to only those who are "elderly, unemployed or unsponsored" aliens. Both decisions were based on the understanding that Congress intended to exclude those who were unable to support themselves and who received public benefits.[306] Additionally, Congress later amended the law to specifically require sponsorship (by requiring an affidavit of support for some immigrants or considering an affidavit of support for others) as part of the public charge determination, and also codified statutory minimum factors to consider (including age, financial status, and education and skills). Therefore, DHS finds the commenters' assertion that DHS's reasoning does not withstand scrutiny for those non-elderly, employed, and sponsored aliens unpersuasive.

*Comment:* One commenter stated that the proposed public charge definition is nonsensical because DHS has asserted that legislative history and case law support the definition but has also noted that legislative history and case law on the subject are scarce.

*Response:* DHS does not believe that the public charge definition is nonsensical. While the case law and legislative history regarding the meaning of public charge is minimal, it is not non-existent. As outlined in the NPRM, DHS carefully analyzed the available legislative history and case law as part of this rulemaking.

*Comment:* A commenter indicated that DHS ignored Second Circuit case

---

to support a significant government policy"); *see Chevron, USA, Inc* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 863 (1984) (indicating that to engage in informed rulemaking, the agency must consider varying interpretations and the wisdom of its policy on a continuing basis and establish a reasonable choice); *United States* v. *Nat'l Ass'n of Sec. Dealers, Inc.,* 422 U.S. 694, 719 (1975) (longstanding interpretations by an agency are entitled to considerable weight but are not controlling).

[297] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[298] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[299] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[300] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[301] *See United States* v. *Mead Corp.,* 533 U.S. 218, 227 (2001) (well-reasoned views of the agency implementing a statute enjoys considerable weight); *see also Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 866 (1984) (judges have a duty to respect legitimate policy justices and resolving the struggle between competing views of the public interest are not judicial responsibilities—they are vested in the political branches).

[302] *NLRB* v. *SW General, Inc.,* 137 S. Ct. 929, 943 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").

[303] *See Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r 1977); *Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

[304] The commenter also suggested the age of the decisions. DHS notes that the age of a precedent decision does not invalidate the precedential effect

of the decision. Indeed, the Supreme Court has cited the age of a precedent as a reason to maintain it. *See Montejo* v. *Louisiana,* 556 U.S. 778, 792–93 (2009) (citing "the antiquity of the precedent" as a factor against overturning a decision).

[305] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157(proposed Oct. 10, 2018).

[306] *See Matter of Harutunian,* 14 I&N Dec. 583, 586 (Reg'l Comm'r 1974) ("The words 'public charge' had their ordinary meaning, that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute"); *Matter of Vindman,* 16 I&N Dec. at 132 (Congress intends that an applicant be excluded who is without sufficient funds to support himself, who has no one under any obligation to support him, and whose changes of becoming self-supporting decreases as time passes).

**41350** Federal Register / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

law such as *Howe* v. *United States ex rel. Savitsky,* 247 F. 292, 294 (2d Cir. 1917), and *Ex Parte Hosaye Sakaguchi,* 277 F. 913, 916 (9th Cir. 1922), which rejected a broad definition of the term public charge, tying it instead to a person's likelihood of becoming an occupant of almshouses for want of means of support. This commenter indicated that DHS's historical argument—that the late 19th century history and meaning are irrelevant because the wide array of limited-purpose public benefits now available did not exist at the time—was historically inaccurate. The commenter noted that contemporaneous sources and historical studies reveal that throughout the 19th century's governments, including the Federal Government, provided limited public assistance short of institutionalization. Additionally, the commenter indicated that even if limited-purpose public benefits had not been available, the argument is immaterial because such an expansion would not change the meaning of the term set out in the 1882 Act. In fact, according to the commenter, Congress has declined to change its original meaning of the term.[307]

*Response:* DHS is aware of the decisions in *Howe* and *Sakaguchi,* but DHS does not believe that these cases are inconsistent with the public charge definition set forth in this rule or with the suggested link between public charge and the receipt of public benefits. In fact, the cases support DHS's belief that courts generally have neither quantified the level of public support nor the type of public support required for purposes of a public charge inadmissibility finding. In *Howe,* the court reviewed whether the immigration inspector rightly attempted to classify the alien as a public charge because the immigration inspector believed the applicant to have engaged in a criminal matter but lacked the requisite evidence to charge the alien.[308] The court rejected such a broad use of the public charge provision, which would have rendered several other inadmissibility grounds

unnecessary.[309] Instead, the court emphasized that, in the context of public charge provision and its position within the statute, as it appeared at that time, Congress meant to exclude individuals who are likely to become occupants of government-run almshouses from the United States[310] for want of means to support themselves in the future.[311] The court did note that

at public expense, by reason of poverty, insanity and poverty, disease and poverty, idiocy and poverty, or, it might be, by reason of having committed a crime which, on conviction, would be followed by imprisonment. It would seem there should be something indicating the person is liable to become, or shows probability of her becoming, a public charge.''

''[i]f the words covered jails, hospitals, and insane asylums, several of the other categories of exclusion would seem to be unnecessary.'' [312] But other courts have ruled differently,[313] the surrounding grounds of inadmissibility have been amended many times since, and the fact that two INA provisions that may cover the same conduct does not make either unnecessary.[314] Likewise, DHS does not believe that the current public charge inadmissibility provision is limited to almshouses and its modern equivalents. Later decisions have considered other benefits such as old age assistance.[315]

*Skaguchi,*[316] a case in which the court based its holding in part on *Howe,*[317] is

---

[307] In support of the commenter's arguments, the commenter cited *Forest Grove Sch. Dist.* v. *T.A.,* 557 U.S. 230, 239–40 (2009); *Feltner* v. *Columbia Pictures Television, Inc.,* 523 U.S. 340, 358 (1998) (Scalia, J., concurring).

[308] *See Howe* v. *United States ex rel. Savitsky,* 247 F. 292, 294 (2d Cir. 1917). In *Howe,* the alien had been engaged in a contractual dispute in his home country on account of writing a bad check, which the immigration inspector regarded as a dishonest practice. Because the immigration inspector lacked the requisite proof to exclude the applicant on criminal grounds, however, the inspector attempted to deny entry on public charge grounds of inadmissibility under section 2 of the Immigration Act of 1907 (36 Stat 264).

[309] *Howe,* 247 F. at 294 (''Indeed, with such latitudinarian construction of the provision 'likely to become a public charge,' most of the other specific grounds of exclusion could have been dispensed with . . . We are convinced that Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future. If the words covered jails, hospitals, and insane asylums, several of the other categories of exclusion would seem to be unnecessary.'')

[310] DHS reviewed a variety of sources to identify a clear definition of the term ''almshouse,'' as it might relate to an interpretation of the term public charge. The Second Circuit, in *Howe,* did not further elaborate on the meaning of the term almshouse or the threshold level of support for purposes of determining whether an alien was likely to become a public charge. Almshouses have also been discussed in contexts other than public charge. For example, for purposes of claiming tax exemption, New York State courts emphasized that an almshouse only qualified for tax exemptions if it offered services free of charge; almshouses which offered services at a reduced charge, for example, did not qualify as almshouses for tax purposes. *See, e.g., In re Vanderbilt's Estate,* 10 N.Y.S. 239, 242 (Sur. 1890) (''The New York Protestant Episcopal City Mission Society claims exemption as an almshouse. It maintains a home and reading-rooms, etc., and provides lodgings and meals free. It also maintains a day nursery, for which it makes a small charge. This takes it out of the domain of pure charity,—a house wholly appropriated to the poor. I have already decided in several cases that a society, to be exempt from this tax as an almshouse, must be absolutely free,—all benefits given gratuitously.'') In *City of Taunton* v. *Talbot,* an almshouse attempted to recover the cost from one of its inmates. 186 Mass 341 (1904). The court denied relief because there were no records to tie the expenses specifically to the inmate, in particular because the agreement between the inmate and the almshouse included support in exchange for the inmate's work. *See id.* at 343. DHS is aware that INS used references to the term ''almshouse'' in its 1999 proposed regulation and in the 1999 Interim Field Guidance to explain, among other things, its primarily dependent model for purposes of public charge. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163 (proposed Oct. 10, 2018); *see also* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676 (proposed May 26, 1999) and Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689 (May 26, 1999). As explained in the NPRM, however, neither INS's reasoning nor any evidence provided, forecloses the agency adopting a different definition consistent with statutory authority. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[311] *Howe,* 247 F. at 294 (interpreting the public charge provision under Act of 1907); *see also Ex parte Mitchell,* 256 F. 229, 230 (N.D.N.Y. 1919) (explaining, in addressing the public charge provision of 1917, that ''I am unable to see that this change of location of these words in the act changes the meaning that is to be given them. A 'person likely to become a public charge' is one who for some cause or reason appears to be about to become a charge on the public, one who is to be supported

[312] *See Howe,* 247 F. at 294.

[313] *See generally* Leo M. Alpert, *The Alien and the Public Charge Clauses,* 49 Yale L.J. 18, 20–22 (1939) (discussing disagreements with part of the of the *Howe* decision). To be clear, DHS is not taking the position that some of the cases cited in the Alpert article did that someone who is incarcerated is likely to become a public charge based on penal incarnation.

[314] *See Kawashima* v. *Holder,* 565 U.S. 478, (2012) (holding that the aggravated felony provision for fraud or deceit includes tax offenses even though there is a separate aggravated felony provision concerns tax crimes).

[315] *See, e.g., Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

[316] *See Ex parte Hosaye Sakaguchi,* 277 F. 913 (9th Cir. 1922).

[317] The court in *Howe* cited to *Gegiow* v. *Uhl,* 239 U.S. 3 (1915), and *Ex Parte Mitchell,* 256 F. 229 (N.D. NY 1919), both cases that confirmed that a finding of public charge must be based on a defect of a nature that affects an individual's ability to earn a living and cannot be predicated on some external reason such as an overstocked labor market, *see Gegiow,* 239 U.S. at 10, and other speculative and remote conjectures that are unrelated to an alien's defect or other fact that shows or tends to show that the alien is unlikely to earn a living and therefore likely to become a public charge. In *Gegiow,* the Secretary of Labor deemed a group of illiterate aliens who lacked English language proficiency inadmissible as likely to become a public charge, because they had little money on hand, had no sponsor, and intended to travel to a city with a weak labor market. The Court wrote that on the record before it, ''the only ground for the order was the state of the labor market at Portland at that time; the amount of money possessed and ignorance of our language being thrown in only as makeweights.'' *Gegiow,* 239 U.S. at 9. The Court then interpreted the term public charge as similar in kind to the surrounding terms in the governing statute (which included terms such as pauper and beggar). The Court reasoned that because such surrounded terms related to permanent personal characteristics of the alien rather than the alien's destination, the Secretary of Labor could not consider conditions in the aliens' destination city as part of the public charge determination. The Court's characterization of the role of the aliens' assets and resources, as well as language proficiency, is *dicta* and has in any case

not inconsistent with DHS's proposed definition of public charge. As was the case in *Howe*, the court in *Skaguchi* rejected the use of the public charge ground of inadmissibility as a "catch-all" form of inadmissibility.[318] The court reiterated that to sustain a public charge inadmissibility finding, there must be evidence of a fact that tends to show that the burden of supporting the alien is likely to be cast upon the public.[319] Therefore, DHS rejects the commenter's suggestion that these cases mandate a result other than the DHS's public charge definition and the level of dependency assigned to it in the NPRM.

DHS agrees that it is immaterial to this rulemaking whether limited-purpose means-tested benefit programs expanded over the course of the last century-plus. DHS simply recited, without endorsing, INS reasoning for the primarily dependent standard in the NPRM, in an effort to explain the primarily dependent standard's limitations and why DHS proposed a different standard in this rule.[320] DHS's reasoning for changing the public charge definition is not based on this statement.

*Comment:* Some commenters indicated that the proposed rule was at odds with the recommendations of the very agencies that administer the federal programs included in the rule. The commenters also pointed out that, as indicated by DHS in the NPRM, INS had consulted with HHS, the Social Security Administration (SSA), and the Department of Agriculture (USDA) when developing the 1999 Interim Guidance and that these agencies had told INS unequivocally "that the best evidence of whether an individual is relying primarily on the government for subsistence is either the receipt of public cash benefits for income maintenance purposes or institutionalization for long-term care at government expense" and that "neither the receipt of food stamps nor nutrition assistance provided under [SNAP] should be considered in making a public charge determination." Commenters indicated that in the NPRM, DHS "dismissed all of this expertise, stating *ipse dixit* that such input from the federal agencies that actually administer these programs

'd[oes] not foreclose [the Department] adopting a different definition consistent with statutory authority.'" The commenter believed that this response was legally insufficient because it confused DHS's ability to take action under a statute with its independent obligation to adopt an approach based on sound reasoning. The commenter stated that merely asserting that DHS has the ability to reject other agencies' reasoned analyses (whether or not correct) does nothing to justify its choice to do so. The commenter concluded, therefore that DHS's response—like DHS's overall decision—failed to satisfy the APA's requirements.

*Response:* As explained in the NPRM,[321] DHS is aware that former INS consulted with various agencies that administer the federal programs. The letters were issued in the context of the approach taken in the 1999 proposed rule and 1999 Interim Field Guidance, and specifically opined on the reasonableness of that INS interpretation, that is, the primarily dependent on the government for subsistence definition. As noted in the NPRM, DHS does not believe that these letters supporting the interpretation set forth in the 1999 Interim Field Guidance foreclose this different interpretation, particularly where DHS's reasoning for the approach in this final rule is grounded in a different basis.

*Comment:* Some commenters objected to what they describe as the "per se" nature of the rule. Specifically, commenters expressed concerns that immigrants receiving any amount of public benefits would be deemed a public charge. An individual commenter said the rule would implicitly classify more than a fifth of Americans as a public charge.

*Response:* DHS disagrees with the commenters' characterization that the definition of public charge creates an inappropriate per se rule. DHS believes that the nexus between likelihood of becoming public charge at any time in the future, the receipt of public benefits, and self-sufficiency, as described and explained in the NPRM,[322] is consistent with Congress' intent [323] in enacting the

public charge inadmissibility ground. DHS also believes it is consistent with the premise underlying much of the public charge case law analyzing the public charge inadmissibility ground [324] that aliens who enter this country should be self-sufficient and not reliant on the government. As explained in the NPRM and detailed above, despite the lack of a definition in the statute and minimal case law defining public charge, there has always been a link between the receipt of public benefits and the public charge determination.[325] Absent a clear statutory definition, courts and administrative authorities have generally tied the concept of public charge to the receipt of public benefits without quantifying the level, type or duration of the public benefits received.[326] To create an administrable way to implement the statute, DHS's NPRM provided a list of specific benefits and a threshold amount that DHS believed reasonably balances an alien's lack of self-sufficiency against temporary welfare assistance that does not amount to a lack of self-sufficiency.[327] Additionally, by proposing to codify the totality of the circumstances approach to the prospective inadmissibility determination, DHS clarified that an alien's past receipt of public benefits

[318] *See Ex parte Hosaye Skaguchi*, 277 F. 913 (9th Cir. 1922).

[319] *See Ex parte Hosaye Skaguchi*, 277 F. 913, 916 (9th Cir. 1922).

[320] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163 (proposed Oct. 10, 2018).

[321] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[322] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[323] As outlined in the NPRM, legislative history suggests the link between public charge and the receipt of public benefits. For example, in the 1950 Senate Judiciary Committee report, preceding the passage of the 1952 Act, concerns were raised about aliens receiving old age assistance. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157 (proposed Oct. 10, 2018). Debates on public charge prior to Congress' passage of IIRIRA

in 1996 also highlighted that an immigrant should be relying on his or her own resources, rather than becoming a burden on the taxpayers. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157 (proposed Oct. 10, 2018). With the passage of PRWORA, Congress explicitly emphasized that self-sufficiency is a fundamental principle of the United States immigration law and connected receipt of public benefits with a lack of self-sufficiency, further stating that aliens within the Nation's borders should not depend on public resources to meet their needs. *See* 8 U.S.C. 1601(1) and (2). Courts likewise have connected public charge determinations to the receipt or the need for public resources *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (Oct. 10, 2018).

[324] *See, for example, Matter of Vindman*, 16 I&N Dec. 131 (Reg'l Comm'r, 1977) (concluding that Congress intends that an applicant for a visa be excluded who is without sufficient funds to support himself or herself, or who has no one under any obligation to support him, and whose chances of becoming self-supporting decreases as time passes, and that the respondents' receipt of assistance for approximately three years clearly put them into the confines of the public charge inadmissibility ground); *see also Matter of Harutunian*, 14 I&N Dec. 583 (Reg'l Comm'r 1974) (The words "public charge" had their ordinary meaning, that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute); *see* generally cases cited in Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[325] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–51158 (proposed Oct. 10, 2018).

[326] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–51158 (proposed Oct. 10, 2018).

[327] *See* 8 CFR 212.21(b).

alone, without consideration of the other factors, would not establish future likelihood of becoming a public charge. DHS further agrees with the commenters that under this new framework, the number of aliens being found inadmissible based on the public charge ground will likely increase.

*Comment:* Commenters objected to the proposed rule because it equates receipt of benefits with the lack of self-sufficiency. Others stated that the receipt of public benefits is not an indicator of a person's incapacity for self-sufficiency, but helps individuals to become self-sufficient. Many commenters expressed concern with the expansion of the public charge definition to include not just those primarily depending on cash benefits, but also individuals who use basic needs programs to supplement their earnings or need short-term help. Some commenters stated that immigrant women already face a heightened risk of economic insecurity, discrimination, and disproportionate responsibility for caregiving, and that participating in benefit programs is important to their ability to support themselves and their children. A commenter stated that many open jobs require specific training that can be provided through community colleges, and in order to obtain the education to become a contributing member of society, some immigrants draw on public benefits for a short period of time to enable them to complete their studies.

*Response:* DHS understands that individuals, including immigrant women and their families, as well as students, may supplement their income with public benefits, such as basic needs programs, because they may require short-term help, and that the goal of these benefits assists them to become self-sufficient in the short- and, eventually long-term. DHS also acknowledges that certain individuals who are depending on public benefits may choose to disenroll because of this rulemaking. However, the goals of public benefits programs and the public charge ground of inadmissibility are not the same. The public charge inadmissibility provision is not intended to ensure that aliens *can become* self-sufficient; in fact, Congress specifically articulated policy goals in PRWORA that provided that government welfare programs should not be an incentive for aliens to immigrate to the United States and that aliens inside the United States are expected to *be* self-sufficient. Correspondingly, DHS's assessment of whether an alien is likely at any time to become a public charge is not the same

as an assessment whether, at some separate point in the future, an alien who is likely to become a public charge will later become self-sufficient. With this rulemaking, DHS is implementing the public charge ground of inadmissibility and seeking to better ensure that those who are seeking admission to the United States and adjustment of status, as well as those seeking extension of stay or change of status, are self-sufficient, so that they do not need public benefits to become self-sufficient.

*Comment:* Some commenters provided input on the temporary nature of public benefits as they relate to future self-sufficiency. Commenters expressed a belief the rule's core assumption was that people dependent on the Government for subsistence will remain that way indefinitely.

*Response:* DHS disagrees that the rule inherently assumes that people who rely in the government for assistance rather than relying on their own capabilities and the resources of their families, sponsors, and private organizations will remain that way indefinitely. As noted above, neither section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), nor this final rule, assess whether an alien subject to the public charge ground of inadmissibility will remain a public charge indefinitely. Rather, the statute and the rule assess whether an alien is likely at any time in the future to become a public charge. An alien may be likely in the future to become a public charge in the future without remaining a public charge indefinitely. For example, a person could receive Medicaid for a number of years and then obtain employment that provides health insurance, avoiding the further need for Medicaid.

*Comment:* A commenter stated that changing the standard from "primarily dependent" upon cash assistance to "likely at any time in the future to receive one or more public benefits" will cause an individual to risk his or her immigration status when enrolling in specific programs. The commenter stated that this is problematic in part because aliens enroll in such programs consistent with government policy, and sometimes with the Government's encouragement. Another commenter stated that the INA includes the phrase "likely to become a public charge" but the proposed rule "defines 'public' and 'charge' as separate words, disconnected from each other or from the fact that the phrase also requires a likelihood that the person 'become' a public charge, as opposed to a likelihood that he or she will engage in a specific act." The commenter indicated that the proposed

approach to "likely at any time to become a public charge" departs from the plain meaning of the phrase, "likely to become a public charge" in the INA, unnecessarily discarding long-standing and well-developed fairness; relies on an inaccurate measure to predict whether an individual is likely to become a public charge; will eviscerate the totality of circumstances standard; is inefficient; not cost effective; and negatively impacts applicants, the agency, and the economy.[328] The commenter also questioned the focus on public benefits, indicating the case law was based on being "dependent on support" rather than focused on the likelihood of receiving a benefit that costs the government some amount of money. The commenter said changing the standard will deter immigrants from pursuing expensive adjustment of status applications if they fear they will be denied, thus forfeiting the corresponding employment authorization that permits access to better-paying jobs unavailable to unauthorized workers. The commenter concluded that such a result thwarts the purported self-sufficiency goals of the proposed rule.

*Response:* DHS disagrees with the commenters' assessment. As outlined in the NPRM, the approach suggested by INS in the 1999 NPRM and the 1999 Interim Field Guidance does not preclude DHS from suggesting a different approach. As DHS laid out in the NPRM, DHS's interpretation is consistent with the statutory wording which requires a public charge assessment that is prospective in nature, and made at the time of the application for a visa, admission, or adjustment of status."[329] DHS understands that certain individuals present in the United States may be impacted by this rule, and therefore hesitant to apply for adjustment of status. However, given the limited number of aliens present in the United States eligible for public benefits under PRWORA, DHS does not believe that the impact is as extensive as alleged by the commenters. Finally, as explained in the NPRM, the receipt of public benefits does not automatically render an alien inadmissible based on public charge; the determination is always based on the totality of the alien's circumstances.

---

[328] The commenter also indicates that the approach is inefficient, not cost effective, and negatively impact applicants, the agency and the economy.

[329] DHS notes the statutory wording includes the wording "at any time"—the commenter omitted the language when asserting that the interpretation is not consistent with the plain wording of the statute.

*Comment:* Several commenters provided feedback on the comparison between public benefits used by non-citizens and native-born residents. A commenter stated that a study concluded that non-citizen households have much higher use of food programs, Medicaid and cash programs compared to households headed by native-born citizens and therefore, a reform of the public charge doctrine is needed. Other commenters stated, providing statistics in support, that immigrants access benefits for which they are eligible at a far lower rate than native-born residents, suggesting that access to public benefits does not make immigrants more of a public charge than native-born residents.

A commenter stated that if the public charge rule were applied to native born citizens, it would exclude one in three U.S. born citizens, whereas the current rule would exclude one in twenty. Similarly, another commenter indicated that the definition would mean that most native-born, working-class U.S. citizens are or have been public charges and that substantial numbers of middle-class Americans are or have been public charges. A commenter stated that according to the MPI's recent analysis, about 69 percent of recent lawful permanent residents have at least one factor that would count against them under the new rule, as opposed to just three percent of noncitizens who make use of cash benefits under the existing standard.

*Response:* The proposed rule's analysis of public benefits receipt among citizens and noncitizens was meant to inform public understanding of the proposal. DHS need not resolve competing claims regarding the rates of public benefits use by various populations, because the primary basis for the NPRM is a revised interpretation of the term public charge, as informed by the statement of congressional policy in PRWORA. The proposal did not rest on a specific level of public benefits use by particular categories of individuals or households.

DHS notes, however, that the analysis in the NPRM included only a limited number of programs, and did not assume that eligibility for public benefits necessarily meant enrollment. Furthermore, the analysis concerned use by individuals and not households.

Additionally, this rulemaking does not apply to U.S. citizens. Even though some U.S. citizens would fall under the receipt threshold in the public charge definition, this fact is not relevant for the purposes of this rule, as the public charge ground of inadmissibility applies to aliens who are seeking a visa,

admission, or adjustment of status, not U.S. citizens. The purpose of this rule is to better ensure that aliens who enter the United States or remain in the United States are self-sufficient.

Statistics on the use of public benefits by non-citizens compared to the use of citizens are not indicative of an individual alien's self-sufficiency. Even though the use of public benefits by noncitizens may be lower than the native-born population for a given benefit, an alien may still qualify and receive public benefits in the future based on his or her particular circumstances and therefore may be likely to become a public charge. Similarly, it is immaterial whether the definition of "public charge" in the rule would affect one in twenty U.S. citizens or one in three. The relevant question is whether the rule's definition of public charge is consistent with the statute. DHS believes that it is consistent with the statute.

*Comment:* Commenters stated that immigrants use public benefits to escape the poverty cycle, using benefits as a ladder to prevent them from becoming public charges. Other commenters stated that the rule is self-defeating, because although DHS prefers self-sufficient families and individuals, the proposed rule dissuades individuals from using public benefits in order to become self-sufficient and thus enhances financial barriers. Many commenters said that those eligible for benefits are entitled to avail themselves of government benefits and should be able to do so without shame or guilt. Commenters stated that when eligible individuals receive such benefits, the outcomes are frequently better for the United States and the economy. Several commenters stated that the United States has always been open to those who needed assistance, and given that this country was founded on a nation of immigrants, a commenter indicated that it was the Government's responsibility to create policies that reflect the values of equal opportunity and humanitarian support. Another commenter indicated that even under existing policy, the United States has always integrated immigrants sufficiently, such that they become self-sufficient and contributing members of U.S. society.

*Response:* With this public charge inadmissibility rule, DHS neither seeks to stigmatize receipt of public benefits nor seeks to preclude an individual from seeking public benefits. DHS appreciates the input on the effect of public benefits payments and the role these benefits play in becoming self-sufficient, and on the economy as a

whole. DHS does not dispute these positive impacts of public benefits on an individual's long-term self-sufficiency, or the importance of these programs and their goals, including the integration of immigrants. DHS also does not dispute that benefits programs may produce more equal opportunities and provide humanitarian support, and does not intend to in any way diminish these opportunities. DHS, however, is implementing the congressional mandate to assess a prospective immigrant's likelihood of becoming a public charge in the future based on the criteria that Congress put into place. As previously indicated, the INA does not aim to achieve the same goals as public assistance programs; in fact, Congress specifically articulated policy goals in PRWORA that provided that government welfare programs should not be an incentive for immigrants and that immigrants are expected to be self-sufficient. Correspondingly, DHS's assessment of whether an alien is likely to become a public charge is not the same as an assessment of whether an alien is currently a public charge or whether, at some separate point in the future, an alien who is likely to become a public charge will later become self-sufficient.

*Comment:* Some commenters emphasized not just the self-sufficiency of the immigrants that use public benefits or programs, but their contributions to society as a whole. A few commenters stated that providing support to families is a necessary facet of our economic system and recipients provide more to communities than the aid they receive. A commenter stated that a study in Arizona found that immigrants generate $2.4 billion in tax revenue, which is more than the $1.4 billion in benefits they used. A few commenters stated that broadening the definition of public charge ignores the work, taxes, and other contributions immigrants are making to their communities, and makes a "false, negative comparison between immigrants' drain on public resources compared to other Americans' use." A few commenters said a "public charge" is not a person who uses government services that are funded via taxes which immigrants are expected to pay throughout their lifetime. Commenters also indicated that tying public benefits to the public charge definition is not appropriate as the foreign national is working, paying taxes, and contributing to the welfare of the United States and is entitled to public benefits.

*Response:* DHS appreciates the commenters' input. DHS did not, however, make any changes to the

**41354**    **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

public charge definition based on these comments. DHS recognizes the contributions foreign nationals have made to American society as a whole and to their communities. However, with this rulemaking, DHS seeks to better enforce the grounds of inadmissibility to ensure that those seeking admission to the United States are self-sufficient, *i.e.,* rely on their own capabilities and the resources of their family, sponsors, and private organizations.

Finally, DHS disagrees with the commenters who stated that tying public benefits to the public charge definition is not appropriate for aliens who are working, paying taxes, and contributing to the welfare of the United States and entitled to public benefits. Simply because an alien is working, paying taxes and contributing to the welfare of the United States does not guarantee an alien's self-sufficiency now or in the future.

Again, an individual may provide significant benefits to their communities, including to the tax base, but nonetheless be a public charge. With this rulemaking, DHS seeks to ensure that those coming to the United States are self-sufficient and not dependent on the government for subsistence now or in the future, even if they are currently contributing to the tax base. Furthermore, the public charge assessment is an assessment based on the individual's facts and circumstances; the greater the taxable income and other resources, the more likely an individual is self-sufficient, and the less likely he or she is to become a public charge. DHS encourages all applicants to bring forward any factors and circumstances they believe are relevant to their adjudication of public charge.

*Comment:* A commenter suggested that DHS more clearly separate the definition of public charge from the predictive process by moving any predictive language, along with any thresholds based on predictive value, from the definitions in 8 CFR 212 and 214 to a separate section listing factors to be considered as part of the public charge inadmissibility determination. The commenter stated that this would provide a clear separation between the question of what is a public charge, and whether a person is likely to become a public charge.

*Response:* With respect to the commenter's suggestion to more clearly distinguish between the definition of "public charge" and the prospective public charge inadmissibility determination, DHS notes that as proposed, and as codified in this final

rule, DHS has a separate definition for public charge and public benefits. In this final rule, DHS has also provided a more detailed definition for "likely at any time to become a public charge."[330] DHS believes that the framework and separate definitions provided with this final rule sufficiently permit its officers to make sound and reasonable public charge inadmissibility determinations, as intended by Congress.

*Comment:* A commenter stated that DHS's statutory interpretation of "public charge" is flawed. The commenter noted that in the proposed rule DHS stated that its proposed definition of public charge was consistent with various dictionary definitions of public charge, including the current edition of the Merriam-Webster Dictionary, which defines public charge simply as "one that is supported at public expense."[331] The commenter stated that DHS's interpretation is flawed, because DHS failed to define the term "support." The commenter stated that "looking to the Merriam-Webster Dictionary, which is the dictionary favored by the Supreme Court, 'support' is defined as 'pay[ing] the cost of' or 'provid[ing] a basis for the existence or subsistence of.'"[332] The commenter further stated that, in turn, "one who is 'supported at the public expense' must be having needs met entirely or at least nearly entirely by the government." Therefore, the commenter concluded, DHS failed to provide a justification for how DHS's proposal with its low thresholds for benefit use comports with that definition. Another commenter cited to various dictionary definitions of "charge" to support the proposition that the term "public charge" means a person with a very high level of dependence on the government. For instance, the commenter cited the 1828 edition of Webster's Dictionary, which defined "charge" as "The person or thing committed to another's [sic] custody, care or management; a trust."[333]

A commenter also stated that DHS's proposed statutory interpretation is at odds with how DHS justified the proposed thresholds for benefits use. The commenter explained in defining "public charge," DHS wrote that an individual "who receives public

benefits for a substantial component of their support and care can be reasonably viewed as being a public charge."[334] But in justifying the thresholds, DHS wrote that it "believes that receipt of such benefits, even in a relatively small amount or for a relatively short duration would in many cases be sufficient to render a person a public charge."[335] Another commenter stated that some households may be self-sufficient and capable of meeting their basic needs without public benefits, but nonetheless enroll in such benefits to supplement available resources.

*Response:* DHS disagrees with the commenter that Merriam-Webster's definition of "support" compels DHS to abandon the policy proposed in the NPRM.[336] The commenter is correct that some of Merriam-Webster's definitions of "support" reference paying the costs of another, or providing a basis for the existence or subsistence of another. Other definitions of "support" in the same dictionary do not specify a degree of assistance (for instance, Merriam-Webster's also defines support as "assist, help").[337]

But, the public benefits designated under this rule are specifically designed for the Government to pay the costs of the beneficiary with respect to basic necessities, *i.e.,* to provide a basis for the beneficiary's subsistence. This is the case with respect to cash benefits for income maintenance, Medicaid, SNAP, and all other designated benefits. DHS believes that its rule is consistent with all of the aforementioned definitions of "support" and especially with the definition of "public charge" as "one that is supported at public expense."[338] And for substantially the same reasons, DHS believes that its rule is broadly consistent with the 1828 Webster's Dictionary definition of the term "charge," as well. For instance, the definition cited by the commenter provides an example of appropriate usage: "Thus the people of a parish are

---

[330] *See generally* 8 CFR 212.21.

[331] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[332] Merriam-Webster, definition of "support," available at *https://www.merriam-webster.com/dictionary/supported* (last visited July 26, 2019).

[333] Webster's Dictionary 1828 Online Edition, definition of "charge," available at *http://webstersdictionary1828.com/Dictionary/charge* (last visited July 26, 2019).

[334] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[335] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51164 (proposed Oct. 10, 2018).

[336] In particular, DHS also disagrees with the commenter who indicated that DHS's citing to the 1990 edition of Black's Law Dictionary inappropriate because PRWORA redefined the term public charge. As explained throughout the NPRM and this final rule, PRWORA restricted access for aliens to certain benefits but did not define public benefits.

[337] *See* Merriam-Webster Online Dictionary, Definition of Support, *https://www.merriam-webster.com/dictionary/support* (last visited July 26, 2019).

[338] Merriam-Webster Online Dictionary, Definition of Public Charge, *https://www.merriamwebster.com/dictionary/public%20charge* (last visited July 8, 2019).

called the ministers [sic] charge.'' Just as a parishioner can be a ''charge'' of minister without being entrusted entirely to their care, a person can be a ''charge'' of the public if he or she relies on public benefits to meet basic needs.

Regardless, DHS does not believe that isolated definitions of ''support'' or the word ''charge'' standing alone conclusively determine the possible range of definitions for the term, public charge; neither term standing alone is used in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and neither term, standing alone, is used in the definition of ''public charge'' or ''public benefit'' in this rule. DHS disagrees with the comment that the reference to ''substantial component''[339] makes the statutory interpretation in the NPRM inconsistent with the justification which references a ''relatively small amount.''[340] The reference to ''substantial component'' was part of a summary of dictionary definitions and not the basis for the definition of public charge.[341] Nonetheless, as discussed elsewhere in this rule, DHS has revised 8 CFR 212.22 to limit public charge determinations to benefits received for 12 months in a 36-month period and is not considering the value of the amount of benefits received. Finally, DHS rejects the contention that an alien is not a public charge if the alien does not ''need'' the designated benefits that he or she or receives. DHS's view is that an alien, who receives designated benefits under this rule for the specific duration, is a public charge, whether he or she needs those benefits or not.

*Comment:* A commenter stated that DHS should not have cited to the 1990 Black's Law Dictionary's definition of ''public charge,'' because the edition is out of date and was written pre-PRWORA.

*Response:* In its NPRM, DHS was attempting to provide a historical review of the term public charge as defined in various reference materials. The 1990 edition would have preceded the IIRIRA amendments by only six years.

*Comment:* A commenter stated that DHS's recognition that active-duty U.S. servicemembers would qualify as ''public charges'' under the plain terms of the proposed rule is proof positive that the proposal is bad policy. The commenter stated that the exclusion of public benefits received by servicemembers and their families

confirms that the DHS has set the threshold for ''self-sufficiency''—or ''public charge''—in an unreasonable way and too high. The commenter stated that in setting the salary levels for members of the U.S. military, Congress has determined that the salary levels are sufficient to render our servicemembers ''self-sufficient,'' and therefore the rule conflicts with this determination. The commenter further stated that employment as an active-duty member of the U.S. military has long been viewed as an honorable, stable job that provides a gateway for all individuals in this country—regardless of race, economic background, social class, or other forms of difference—to succeed in life. The commenter stated that the answer is not to exempt active-duty servicemembers from the ''public charge'' regulation, but to embrace a reasonable definition of ''public charge'' so that active-duty servicemembers are not rendered ''public charges.''

*Response:* Contrary to the commenter's arguments, to the best of DHS's knowledge there is no indication that Congress considered the public charge ground of inadmissibility when it created the military compensation structure, or that the levels of pay afforded to active duty servicemembers are always adequate to ensure that servicemembers and their families will be self-sufficient for purposes of our immigration laws. In the NPRM, DHS recognized that as a consequence of the unique compensation and tax structure afforded by Congress to aliens enlisting for military service, some active duty alien servicemembers, as well as their spouses and children, as defined in section 101(b) of the Act, 8 U.S.C. 1101(b), may rely on SNAP and other listed public benefits.[342] DHS included a provision for these individuals, as reflected in the proposed rule and as discussed later in this preamble.

a. Threshold Standard

''*Primarily dependent" Based on Cash Public Benefit Receipt or Long-Term Institutionalization at Government Expense''*

*Comment:* Commenters indicated that DHS, through regulation, cannot institute a definition that Congress had already squarely rejected. The commenters noted that Congress, as part of IIRIRA debates, had rejected a proposal that would have defined a public charge as a person who receives means-tested public benefits. The commenters indicated that Congress'

rejection of the proposed definitions of public charge and means-tested public benefit meant that Congress retained the longstanding meaning of public charge as being primarily dependent on the government for subsistence.[343]

A commenter questioned DHS's assertion that the proposed definition of public charge reflects Congress's intent to have aliens be self-sufficient and not reliant on the government for assistance. The commenter indicated that the INA does not mention self-sufficiency and does not list it as a criterion for avoiding a finding of inadmissibility under public charge. Several commenters stated that the rule would drastically increase the scope of who would be considered a public charge to include people who use a much wider range of benefits and not just those who are primarily dependent on the government for subsistence. A few commenters stated that the proposed rule's definition of public charge would equate occasional or temporary use of benefits and services with primary reliance on benefits. A commenter agreed with the current standard, in that it does not penalize individuals from accepting all of the forms of support encompassed within this rule. A commenter, in considering only primary dependence on public benefits as the degree of dependency required to sustain a public charge finding, stated that the standard provides clear and effective guidelines for adjudicators and applicants without endangering the lives of immigrant families and children in this country.

*Response:* As noted above, although the INA does not mention self-sufficiency in the context of section

---

[339] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[340] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51164 (proposed Oct. 10, 2018).

[341] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[342] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51173 (proposed Oct. 10, 2018).

[343] The commenter indicated that during the debates leading up to IIRIRA, Congress stripped the bill of a provision defining public charge as a noncitizen who uses ''means-tested, public benefits,'' meaning ''any public benefit (including cash, medical, housing, food, and social services) . . . in which eligibility of an individual, household, or family eligibility unit for such benefit or the amount of such benefit, or both are determined on the basis of income, resources, or financial need of the individual household, or unit.'' *See* H.R. Rep. No. 104–208, at 144 (Sept. 24, 1996) (sec. 551 of H.R. 2202, proposing 8 U.S.C. 1183a(e)(defining ''means-tested public benefit''); *see* id. at 138 (sec. 532 of H.R. 2202, proposing 8 U.S.C. 1251(a)(5)(C)(99), (D) (defining term ''public charge'' [to] include[] any alien who receives . . . means-tested public benefits'); H.R. Rep. No. 104–863, at 564, 690–91 (Sept. 28, 1996) (absence of sec. 532 from prior H.R. 2202); *see* 142 Cong. Rec. 25868 (Sept. 28, 1996) (noting that sec 532 was stricken and that proposed subsection (e) to INA section 213A definition ''Federal means-tested public benefit'' was also stricken). Instead, the commenter stated, IIRIRA retained the term's longstanding meaning of primary dependence on the government for subsistence. The commenter further stated that Congress' rejection of the proposed provision was an express political choice to ensure that IIRIRA's passage, and not a clerical change.

**41356**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS believes that there is a strong connection between the self-sufficiency policy statements elsewhere in Title 8 of the United States Code (even if not codified in the INA itself) at 8 U.S.C. 1601 and the public charge inadmissibility language in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which were enacted within a month of each other.[344] Of particular significance and just prior to the passage of the revised public charge inadmissibility ground in IIRIRA, conference managers noted that the implementing section "amends INA section 212(a)(4) to expand the public charge ground of inadmissibility. Aliens have been excludable if likely to become public charges since 1882. Self-reliance is one of the most fundamental principles of immigration law." [345] Previous House and Senate Judiciary Committee reports included similar statements addressing self-sufficiency and receipt of public benefits in the context of public charge.[346]

Furthermore, DHS disagrees that either congressional actions leading up to IIRIRA or years of precedent mandate the adoption of the primarily dependent standard. As explained in the NPRM, the statute does not expressly prescribe a single method to define the level, type, or duration of public benefit receipt necessary to determine whether an alien is a public charge or is likely at any time to become a public charge.[347] DHS does not interpret the fact that Congress did not define public charge as "any alien who receives [means-tested public] benefits for an aggregate period of at least 12 months" prior to enactment of IIRIRA [348] as meaning DHS is precluded

from adopting a similar definition now.[349] Rather, DHS views Congress' failure to define "public charge" by statute as an affirmation of what the Senate Judiciary Committee acknowledged over 50 years ago, *i.e.,* that the meaning of public charge has been left to the judgment and interpretation of administrative officials and the courts. More specifically, that committee found that the determination whether the alien is a public charge or is likely to become a public charge should rest within the discretion of immigration officers, because the elements constituting public charge are so varied.[350] If Congress had wanted to conclusively define the term public charge as "primarily dependent," it could have done so.[351] DHS also notes that courts that have examined public charge have generally explained public charge in the context of dependence or reliance on the public for support without elaborating on the degree of dependence or reliance required to be a public charge.[352]

As discussed in the NPRM,[353] DHS believes that the primary dependence definition constitutes one permissible, but non-exclusive way of establishing a bright line for considering public benefit receipt relative to a public charge determination. Because Congress already identified certain classes of aliens, including those who are particularly vulnerable, and has exempted or authorized DHS to exempt them from the public charge ground of inadmissibility, DHS believes that with respect to other aliens not similarly protected, the current approach of excluding receipt of non-cash benefits and only finding to be inadmissible individuals who are likely to become

*primarily* dependent on the government, as a policy matter, does not go far enough in enforcing this ground of inadmissibility.

Given that the statute and case law do not prescribe the type or extent of public benefit receipt that makes an alien a public charge, DHS believes that benefits designated in this rule are directly relevant to public charge inadmissibility determinations. These enumerated public benefits are directed toward meeting the basic necessities of life through the provision of food and nutrition, housing, and healthcare.[354] This basic fact is underscored by the many comments identifying significant consequences for individuals who decide to disenroll from these benefits. Ultimately, the public charge ground of inadmissibility is targeted to individuals who, in the absence of government assistance, would lack the basic necessities of life. DHS acknowledges that this rule constitutes a change that will have a practical impact on aliens covered by this rule; however, it views the current policy as unduly restrictive in terms of which benefits are considered for public charge inadmissibility. Therefore, expanding the list of public benefits to include a broader list of public benefits that satisfy basic living needs as a policy matter better enforces this ground of inadmissibility.

Equally important, given that the statute and case law do not prescribe the *degree* or *duration* of public benefit receipt that make an alien a public charge, DHS has determined that it is permissible to adopt a threshold other than the primarily dependent standard. In its annual reports to Congress on welfare indicators and risk factors, HHS explains that defining welfare dependence and developing consensus around a single measure of welfare dependence are difficult and adopting any definition of welfare dependence has its limitations and represents a choice of demarcation beyond which someone is or will be considered dependent.[355] In HHS's efforts to examine the range of dependence from complete long-term dependence to total self-sufficiency, HHS acknowledges that

---

[344] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (enacting 8 U.S.C. 1601) and Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)).

[345] *See* United States. Cong. House. Committee on the Conference. *Illegal Immigration Reform and Immigrant Responsibility Act of 1996.* 104th Cong. 2nd Sess. H. Rpt. 828, at 240–241 (1996). *https:// www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf* (last visited 5/9/2019).

[346] *See* United States. Cong. House. Committee on the Judiciary. *Immigration in the National Interest Act of 1995.* 104th Cong. 2nd Sess. H. Rpt. 469, pt 1, at 109 (1996). *https://www.congress.gov/104/crpt/hrpt469/CRPT-104hrpt469-pt1.pdf* (last visited 5/9/2019). *See also* United States. Cong. Senate. Committee on the Judiciary. *Immigration Control and Financial Responsibility Act of 1996.* 104th Cong. 2nd Sess. S. Rpt. 249, at 5–7 (1996). *https:// www.congress.gov/104/crpt/srpt249/CRPT-104srpt249.pdf* (last visited 5/9/2019.).

[347] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163–51164 (proposed Oct. 10, 2018).

[348] United States. Cong. House. Committee on the Conference. *Illegal Immigration Reform and Immigrant Responsibility Act of 1996.* 104th Cong. 2nd Sess. H. Rpt. 828, at 138 (1996). *https://*

*www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf* (last visited 5/9/2019).

[349] *See Competitive Enterprise Inst.* v. *U.S. Dep't of Transp.,* 863 F.3d 917 (D.C. Cir. 2017) ("But 'Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.'" (citing *Consumer Elecs. Ass'n* v. *FCC,* 347 F.3d 291, 299 n.4 (DC Cir. 2003) (quoting *Pension Benefit Guar. Corp.* v. *LTV Corp.,* 4966 U.S. 633, 650 (1990))).

[350] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51123 n.21 (proposed Oct. 10, 2018). *See also* The 1950 Omnibus Report of the Senate Judiciary Committee, S. Rep. No. 81–1515, at 349 (1950).

[351] *See, e.g., Cyan, Inc.* v. *Beaver Cty. Emp. Ret. Fund,* 138 S. Ct. 1061, 1070 (2018) (explaining that, if Congress had wanted to deprive state courts of jurisdiction over certain class actions, it could have easily done so by inserting a provision.).

[352] *See* Inadmissibility on Public Charge Grounds, 83 FR 51158 (proposed Oct. 10, 2018).

[353] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163–51164 (proposed Oct. 10, 2018).

[354] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[355] *See* U.S. Dep't of Health & Human Servs., Indicators of Welfare Dependence: Annual Report to Congress, at Foreword and Chapter II (1997), *available at https://aspe.hhs.gov/report/indicators-welfare-dependence-annual-report-congress-1997* (last visited July 26. 2019). *See also* U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), *available at https:// aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress* (last visited July 26. 2019).

mere public benefit receipt is not a good measure of dependence [356] but that: "Welfare dependence, like poverty, is a continuum, with variations in degree and in duration." [357] As HHS explains, an individual may be more or less dependent based the share of total resources derived from public benefits or the amount of time over which the individual depends on the public benefit. As HHS further elaborates, "A summary measure of dependence . . . as an indicator for policy purposes must have some fixed parameters that allow one to determine [who] should be counted as dependent, just as the poverty line defines who is poor under the official standard." [358] In this context, DHS has determined that it is permissible to adopt a uniform duration threshold so long as the threshold has fixed parameters to allow DHS to determine who is considered a public charge. Accordingly, as explained further below, DHS has defined "public charge" in this final rule to mean a person who receives the designated benefits for more than 12 months in the aggregate within any 36-month period. This fixed standard will assist DHS to determine which aliens are inadmissible as likely to become a public charge at any time in the future based on the totality of the alien's circumstances.

b. Standards for Monetizable and Non-Monetizable Benefits

Numerical Percentage Threshold

*Comment:* One commenter supported the explanation in the NPRM that the 15 percent threshold is an acceptable proxy for benefits use, and indicated that the 15 percent threshold is "widely used and thus arguably more transparent than other alternatives."

In contrast, many commenters voiced general opposition to the 15 percent threshold, believing that the standards will likely reverse public health strides communities have made relating to vaccinations, communicable diseases and nutrition; that benefits amount received at that threshold level or any level, did not represent an individual's

inability to achieve self-sufficiency; or that the 15 percent threshold was unfair and unnecessary in scope because the minimal financial support provided by federally funded benefits did not promote dependency, but were a safety net for vulnerable families and therefore should not be linked to threats of deportation.

Commenters stated that DHS had offered no basis for its use of 15 percent as the relevant benchmark for who is a public charge. Commenters also indicated that DHS's own conclusory assumption that receipt of this level of funding represents a lack of self-sufficiency is rebutted by the ample research showing that immigrants pay more into the United States healthcare system than they take out and that most immigrants pay taxes. This commenter also indicated that DHS provided little to no guidance as to how DHS officials would go about predicting a person's future likelihood of receiving the requisite amount of benefits and that the use of a specific dollar benchmark belies the Department's assurances that it will not consider prior receipt of benefits to be the dispositive factor in public charge determinations. Another commenter indicated that DHS does not provide an explanation as to why the quantifiable amount of dependency was set at 15 percent rather than 50 percent, which would reflect primary dependency, or even 30 or 40 percent. Citing to *United States* v. *Dierckman,* 201 F.3d 915, 926 (7th Cir. 2000) and *Allied-Signal, Inc.* v. *Nuclear Reg. Comm'n,* 988 F.2d 146, 152 (D.C. Cir. 1993), the commenters indicated that DHS failed to provide the essential facts upon which the administrative decision is based. The commenter also stated that DHS's attempt to justify its public charge definition with existing case law that, according to DHS, failed to stipulate quantifying levels of public support required, may have explained DHS's proposal to quantify the amount, but failed to explain why that quantifiable amount should be 15 percent of FPG, and not a higher percentage like 30 or 40 percent, or another amount that is less than 51 percent.

Other commenters stated DHS did not provide adequate data to support using the 15 percent threshold in public charge determinations, that the threshold was contrary to the spirit of public charge and did not prove an immigrant is "primarily dependent" on government assistance; and that the standard ignored the economic realities of low-wage work.

Multiple commenters stated that the 15 percent threshold is too low or

restrictive, and arbitrary. A commenter also equated the threshold with having no threshold at all and stated that noncitizens will be too afraid to apply for benefits. Similarly, commenters stated that the 15 percent threshold is particularly low for immigrants living in areas with a high cost of living, for those receiving cash assistance, or for those receiving housing assistance, especially in cities or states where the cost of housing exceeds those detailed in the rule. Some commenters asserted that the standard should be 50 percent of the FPG, while other stated that DHS should conduct a sensitivity analysis comparing the economic impacts of using a 15 percent of the FPG cutoff versus a 50 percent of the FPG cutoff for benefits before determining the threshold. A commenter stated that the FPG have long been criticized for being inadequate and low—failing to take into account, for example, of geographical variances in cost of living, as well as expenses that are necessary to hold a job and to earn income (*e.g.,* child care and transportation costs). The commenter wrote that given these well-documented and critical flaws with the FPG, DHS's proposed thresholds are particularly egregious.

Many commenters provided examples of individuals who would be found to be public charges under the proposed benefit thresholds, despite being largely self-sufficient. Several commenters also stated that a noncitizen receiving slightly less than $5 per day, or roughly $1,800 per year, in benefits would be enough to trigger a public charge finding. Other commenters stated that a noncitizen family of four making 250 percent of the federal poverty line could be deemed public charges if they received $2.50 per person per day, although such a family would be about 95 percent self-sufficient. A commenter stated that therefore, DHS's standard to measure self-sufficiency had no rational connection with actual self-sufficiency. Many commenters cited studies finding that those who are widely self-sufficient, upwards of 90 percent, but who receive or previously received ten percent of their income in benefits could be found inadmissible under the proposed threshold, especially in light of the fact that past receipt counts as a heavily-weighted factor. Another commenter cited a study indicating that the rule could effectively ban a family of four making 175 percent of FPG, but which received $2.50 per day per person in government aid, even though this family is only receiving 8.6 percent of their income from the government and is 91.4 percent self-sufficient. A

---

[356] *See* U.S. Dep't of Health & Human Servs., Indicators of Welfare Dependence: Annual Report to Congress, at Chapter II (1997), *available at https://aspe.hhs.gov/report/indicators-welfare-dependence-annual-report-congress-1997* (last visited July 26. 2019).

[357] *See* U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), *available at https://aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress* (last visited July 26. 2019).

[358] *See* U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), *available at https://aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress* (last visited July 26. 2019).

**41358** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

commenter also stated that the proposed threshold could have the perverse effect of discouraging immigrants from accessing benefits they need to eventually become self-sufficient. One commenter stated that it would be unreasonable to use the receipt of public benefits in excess of 15 percent against an individual if the individual received the aid after an accident or emergency, as such use would not be evidence indicating that it will happen again. A commenter stated that the proposed threshold was so low that it would be more of an indicator that the alien is subject to the inherent uncertainties and exigencies of life, *e.g.,* if a sponsoring company goes out of business or with the occurrence of a heart attack or a child developing a disability, that it would be an indicator of the alien's ongoing dependence on public benefits. Another commenter stated that a higher threshold would better keep with the prudence dictated by the precautionary principle. The commenter wrote that significantly tightening the public benefits threshold from the old primary dependence paradigm will entail unanticipated consequences and ought to be conducted slowly.

Many commenters stated that the 15 percent threshold is overly complicated and would lead to widespread confusion. A commenter said that because of the low threshold, it would be difficult or impossible for families to understand how to utilize public safety nets without becoming a public charge, or to know at the time of an application if a specific benefit program would meet the 15 percent threshold. A commenter stated that the proposed cutoff of 15 percent would not serve to improve clarity when making public charge determinations, but would instead reduce the number of immigrants whose applications will be approved.

*Response:* After considering all of the public comments on the proposed thresholds for the receipt of public benefits, DHS decided against finalizing separate thresholds for monetizable and non-monetizable benefits, including the combination threshold. Instead, DHS has determined that a better approach from a policy and operational perspective, and one indicative of a lack of self-sufficiency is a single duration-based threshold, which this rule incorporates directly into the definition of public charge,[359] and the determination of likely to become a public charge.[360]

Therefore, under this final rule, DHS will consider an alien likely to become

a public charge at any time in the future if the alien is more likely than not to receive public benefits for longer than 12 months in the aggregate in any 36-month period. As with the proposed rule, current receipt or past receipt of more than 12 months of public benefits, in the aggregate, in any 36-month period will not necessarily be dispositive in the inadmissibility determination; *i.e.,* in determining whether the alien is likely to become a public charge at any time in the future, but will be considered a heavily weighted negative factor in the totality of the alien's circumstances.

By moving the threshold standard into the "public charge" definition, DHS intends to alleviate confusion about the threshold for being a public charge. As part of the inadmissibility determination, an officer will review the likelihood of whether an alien will receive public benefits over the durational threshold. The "public benefit" definition will only list the specific programs considered and the list of exclusions. Separating concepts of "public charge" and "public benefits" also clarifies that DHS will consider in the totality whether an alien has applied for, received, or been certified or approved to receive any public benefits, as defined in 8 CFR 212.21(b), in assessing whether he or she is likely to become a public charge as part of the totality of the circumstances.

DHS believes that this approach is particularly responsive to public comments that communicated concerns about the complexity of the bifurcated standard and lack of certainty. As revised, this determination includes the consideration of public benefit application, certification, or receipt over any period of time. However, as indicated above, the alien's application for, certification, or receipt of public benefits will only be weighted heavily in certain circumstances, namely where such application, certification, or receipt of public benefits exceeded 12 months in the aggregate within any 36-month period, beginning no earlier than 36 months prior to the alien's application for admission or adjustment of status on or after the effective date. Similarly, DHS has revised the public benefit condition that applies in the context of an extension of stay or change of status application or petition, to include this new standard as well.

Valuation

*Comment:* DHS also received comments on the valuation of monetizable benefits. A commenter acknowledged that the proposed rule including provisions for pro rata

attribution of monetizable benefits (such that benefits granted to a multi-person household would not all be attributed to a single person), but stated that the proposed rule was confusing, and that families are highly likely to avoid seeking social services entirely, rather than rely on the valuation formulas.

Some commenters suggested that it would be unreasonable to refer to FPG for a household of one, when evaluating an alien who is part of a large household. One commenter wrote that the correlation between household receipts of public benefits in absolute dollar terms and the likelihood that one member of that household will become a public charge can be assumed to be stronger, the smaller the size of the household. For a given level of receipt, a larger household is more likely to be self-sufficient. The commenter suggested that DHS set the threshold for monetary receipt based on actual household size. The commenter did not address the fact that the proposed valuation methodology called for prorating the benefit valuation based on household size.

*Response:* DHS appreciates these comments. Because DHS is eliminating the percentage-based threshold for monetizable benefits, as well as the combination threshold, DHS is not making any adjustments to the application of the FPG to the valuation of monetizable benefits because the entire valuation concept is being eliminated from the rule. Similarly, because DHS will not be monetizing public benefits, the household size applicable to the FPG (*i.e.,* the household size of one) is no longer relevant. That said, DHS does not believe that public benefits received by a member of the alien's household would serve as a reliable measure of the likelihood of an alien becoming a public charge at any time in the future because the receipt of benefits by a household member does not indicate that the applicant is likely to receive public benefits as well. Therefore, if someone in the household other than the applicant is receiving the public benefit, DHS will not consider receipt of the public benefit. Similarly if the recipient is a member of the alien's household, any income derived from such public benefit will be excluded from the calculation of household income. However, because DHS is eliminating the percentage-based threshold for monetizable benefits and instead establishing a single, duration-based threshold, the length of time an alien receives any public benefit, as defined in 8 CFR 212.21(b), will be considered in the totality of the circumstances,

---

[359] *See* 8 CFR 212.21(a).
[360] *See* 8 CFR 212.22(a).

regardless of whether the alien is the only person in the household receiving the benefit, or is one of the people receiving the same benefit. This differs from the approach in the proposed rule where valuation of certain benefits that are based on the household size (*e.g.,* SNAP) would have been proportionally attributed to the alien.[361]

*Comment:* DHS also received comments on the non-monetizable benefits standards. One commenter stated that the 12- and 9-month minimum use thresholds are acceptable proxies for being a public charge, but the NPRM provides almost no explanation of how or why DHS determined that the 12- and 9-month threshold for non-monetizable benefits was indicative that an alien is a public charge. The commenter said a more detailed analysis of the non-monetizable benefits threshold in a final rule would go a long way to legitimizing this rulemaking. Many commenters either voiced general opposition to the 12-month standard for non-monetizable benefits or indicated that the standard was unreasonable in the context of specific non-monetizable benefits, such as Medicaid (which according to the commenters is designed for continuous enrollment) and public housing (which frequently requires a year-long lease agreement. A commenter stated that the threshold would not be well understood by the public, or provide sufficient assurance that a brief period of enrollment would be worthwhile. For instance, with respect to Medicaid, if the alien learned about the thresholds at all, she or he might still be concerned about signing up for a brief period of coverage, fearing that they might experience more acute healthcare needs later and should refrain from using Medicaid until or unless that occurred. The alien might also know that Medicaid eligibility periods typically last a year and may be unclear about how that period can be shortened. Another commenter stated that the 12-month standard is arbitrary and would produce "absurd results" when applied in a real-world context. For example, someone with cancer might use Medicaid to help cover their expenses, and the 12-month standard could cause them to discontinue care too early, leading to devastating consequences. Commenters stated that using duration to determine dependency is particularly problematic in the context of Medicaid,

where the threshold does not allow DHS to determine the extent to which the benefit was used. A commenter suggested this threshold would be prohibitive for all households participating in federal housing programs, regardless of immigration status. The commenter also stated that durational receipt measures are meaningless in the context of health coverage since duration does not represent the extent of benefits actually used. Commenters stated that DHS's public charge assumption rests on arbitrary time periods for receiving benefits. Without citing to the source of information, one commenter stated that the average length a person is on SNAP is 8–10 months, Medicaid assistance for children is provided on average for 28 months, and the average length of receipt for public housing for families is no more than 4 years. Similarly without attributing the source of information, a commenter said a 20-year analysis makes clear that seemingly dependent immigrants will become self-sufficient and productive in the long-term. One commenter stated strong opposition to the double counting of months where more than one benefit is received.

*Response:* DHS has decided to adopt a uniform duration standard for the following reasons. First, the new standard is simpler and more administrable than the proposed approach for monetizable and non-monetizable benefits. It eliminates the need for complicated calculations and projections related to the 15 percent of FPG threshold. By eliminating the 15 percent of FPG threshold for monetizable benefits, DHS is also able to eliminate the complicated assessment for the combination of monetizable and non-monetizable benefits and the provision for the valuation of monetizable benefits, including the need to prorate such benefits.

Second, the standard is consistent with DHS's interpretation of the term "public charge." DHS believes that public benefit receipt for more than 12 cumulative months over a 36-month period is indicative of a lack of self-sufficiency. The threshold is intended to address DHS's concerns about an alien's lack of self-sufficiency and inability to rely on his or her own capabilities as well as the resources of family, sponsors, and private organizations to meet basic living needs. DHS believes that an alien who receives the designated public benefits for more than 12 months in the aggregate during a 36-month period is not self-sufficient. Receipt of public benefits for such a duration exceeds what DHS believes is a level of support that temporarily or

nominally supplements an alien's independent ability to meet his or basic living needs. Although an alien who receives the designated public benefits for more than 12 months in the aggregate may soon disenroll, the fact that she or he received such support for such a substantial period of time establishes that they are a public charge until such disenrollment occurs. DHS would consider the alien's request to disenroll in the totality of the circumstances review.

Ample basis exists for using a duration-based standard even if, as commenters noted, neither the 1999 Interim Field Guidance nor any other source provides an authoritative basis for a specific duration-based standard. As indicated in the NPRM, under the 1999 Interim Field Guidance, the duration of receipt is a relevant factor with respect to covered benefits and is specifically accounted for in the guidance's inclusion of long-term institutionalization at government's expense.[362] But the 1999 Interim Field Guidance did not create a standard by which an alien's long-term reliance on public benefits would indicate a lack of self-sufficiency. In addition, HHS has repeatedly cited and measured the duration of time individuals receive means-tested assistance as an indicator

---

[361] In the NPRM, DHS had proposed calculating the value of the benefit attributable to the alien in proportion to the total number of people covered by the benefit in determining the cumulative value of one or more monetizable benefits. *See* proposed 8 CFR 212.24, Valuation of Monetizable Benefits.

[362] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018). In assessing the probative value of past receipt of public benefits, "the length of time . . . is a significant factor." 64 FR 28680, 28690 (May 26, 1999) (internal quotation marks and citation omitted). The NPRM also noted that in the context of both state welfare reform efforts and the 1990s Federal welfare reform, Federal Government and state governments imposed various limits on the duration of benefit receipt as an effort to foster self-sufficiency among recipients and prevent long-term or indefinite dependence. States have developed widely varying approaches to time limits. Currently, 40 states have time limits that can result in the termination of families' welfare benefits; 17 of those states have limits of fewer than 60 months. *See, e.g.,* MDRC, formerly Manpower Demonstration Research Corporation, Welfare Time Limits State Policies, Implementation, and Effects on Families. *https://www.mdrc.org/sites/default/files/full_607.pdf* (last visited July 26, 2017). Similarly, on the Federal level, PRWORA established a 60-month time limit on the receipt of TANF. *See* Temporary Assistance for Needy Families Program (TANF), Final Rule; 64 FR 17720, 17723 (Apr. 12, 1999) ("The [Welfare to Work (WtW)] provisions in this rule include the amendments to the TANF provisions at sections 5001(d) and 5001(g)(1) of Public Law 105–33. Section 5001(d) allows a State to provide WtW assistance to a family that has received 60 months of federally funded TANF assistance . . ."). These time limits establish the outer limits of how long benefits are even *available* to a beneficiary as a matter of eligibility for the public benefit, and therefore how long an individual can receive those benefits. But DHS cannot use these time limits to establish a specific standard to determine how long an individual can receive such benefits while remaining self-sufficient for purposes of the public charge inadmissibility determination.

of welfare dependence in its annual reports on welfare dependence, indicators, and risk factors.[363] HHS states, ''The amount of time over which [an individual] depends on welfare might also be considered in assessing [the individual's] degree of dependence.'' [364]

This rule aims to create such a standard, in order to provide aliens and adjudicators with a bright-line rule upon which they can rely. The proposed rule cited longitudinal studies of welfare receipt, such as the Census Bureau's Dynamics of Economic Well-Being study,[365] and the welfare leaver study.[366] Both studies offer insight into the length of time that recipients of public benefits tend to remain on those benefits, and lend support to the notion that this rule's standard provides meaningful flexibility to aliens who may require one or more of the public benefits for relatively short periods of time, without allowing an alien who is not self-sufficient to avoid facing public charge consequences.[367]

For example, according to the Census Bureau, the largest share of participants (43.0 percent) who benefited from one or more means-tested assistance programs in the 48 months from January 2009 to December 2012, stayed in the program(s) between 37 and 48 months. By contrast, 31.2 percent of participants in such benefits stayed in the program(s) for between one and 12 months, and the remaining 25.8% of participants stayed in the program for between 13 and 36-months.[368] The study thus showed that a significant portion of the benefits-receiving population ended their participation within a year. In fact, the study compared participants' months of program participation across various income and age ranges, racial groups, family types, levels of educational attainment, and types of employment status, and found that nearly across the board, there was a relatively large group of people who participated for between one and 12 months, followed by relatively smaller groups who participated for between 13 and 24 months and between 25 and 36 months, respectively, followed by a relatively large group of people who participated for between 37 and 48 months. Similarly, an earlier study showed that across a 24-month period of study, those who were enrolled in one or more major assistance programs (approximately 25.2 percent of the overall population studied) were most likely to be enrolled for the entire 24-month period (10.2 percent).[369] But a substantial portion of the population enrolled in such programs only participated between one and 11 months (8.5 percent) or 12 to 23 months (6.5 percent).[370] All of this suggests that a 12-month standard is not absurd, as indicated by commenters, but in fact accommodates a significant proportion of short-term benefits use, while also providing a simple and accessible touchstone (more than a year) and an easily administrable cutoff that is a midpoint between the cutoffs established in the studies (36 months).

The ''welfare leaver'' study referenced above also provides support for a 12-month standard. Although most people who leave welfare programs work after they leave those programs, people may come back to receive additional public benefits.[371] In the welfare leaver study, researchers found that on average, ''cyclers'' received 27 months of cash assistance within the study's four-year observation period, compared with an average of 12 months for short-term recipients and 40 months for long-term recipients.[372]

DHS acknowledges that the duration standard is imperfect, because it is an exercise in line-drawing, it does not monetize public benefit receipt, and it is applied prospectively based on the totality of the alien's circumstances instead of an algorithm or formula. In some cases, DHS may find an alien admissible, even though the alien may receive thousands of dollars, if not tens of thousands of dollars, in public benefits without exceeding the duration threshold at any time in the future. DHS recognizes this scenario is plausible based on estimates of Medicaid costs and receipt of Medicaid only. For example, the Office of the Actuary in the Centers for Medicare and Medicaid Services estimated that annual Medicaid spending per enrollee ranged from approximately $3,000-$5,000 for children and adults to approximately $15,000-$20,000 for the aged and persons with disabilities in Fiscal Year 2014.[373] DHS's analysis of SIPP data shows that among individuals receiving SSI, TANF, GA, SNAP, Section 8 Housing Vouchers, Section 8 Rent Subsidy, or Medicaid in 2013, over 32 percent were receiving Medicaid only on average each month.[374]

In other cases, DHS may find an alien inadmissible under the standard, even though the alien who exceeds the duration threshold may receive only hundreds of dollars, or less, in public

[363] See, e.g., U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors (2014–2015) and U.S. Dep't of Health & Human Servs., Indicators of Welfare Dependence (1997–1998, 2000–2013), available at https://aspe.hhs.gov/indicators-welfare-dependence-annual-report-congress (last visited July 26, 2019).

[364] See U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), available at https://aspe.hhs.gov/system/files/pdf/78851/rpt_indicators.pdf (last visited July 26, 2019).

[365] See Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 10 (May 2015), available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70–141.pdf (last visited July 26, 2019).

[366] See Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare 4 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[367] See Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 10 (May 2015), available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70–141.pdf (last visited July 26, 2019). See also Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare 4 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[368] See Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Household Economic Studies, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 4 (May 2015), available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf (last visited July 26, 2019). This report includes TANF, General Assistance (GA), SSI, SNAP, Medicaid, and housing assistance as major means-tested benefits.

[369] The programs included in the study were TANF, GA, SNAP, SSI, and Housing Assistance, all of which are covered to at least some degree by this rule.

[370] See Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance? 4 (July 2012), available at https://www2.census.gov/library/publications/2012/demo/p70–130.pdf (last visited July 26, 2019).

[371] See Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare ES–1 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[372] For most analyses in the report, the report divides the samples into three key outcome groups, based on each sample member's pattern of welfare receipt: Cyclers, short-term recipients, and long-term recipients. The report states that this grouping reflects definitions used in the literature, combined with an examination of the full sample. The report defines a cycler as someone who had 3 or more spells of welfare receipt during the 4-year observation period. The report defines a short-term recipient as someone who had 1 or 2 spells and a total of up to 24 months of welfare receipt during the observation period. The report defines long-term recipients as sample members with 1 or 2 spells and a total of 25 to 48 months of welfare receipt during the observation period. See Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare 22 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[373] See United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, Table 21, page 61, at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited July 26, 2019).

[374] DHS analysis of Wave 1 of the 2014 Panel of the Survey of Income and Program Participation.

benefits annually. A DHS analysis of SIPP data related to public benefit receipt and amounts indicates that among the 25 percent of SNAP recipients in 2013 who only received SNAP (rather than SNAP and some other benefit), eight percent lived in households receiving between $11 and $50 per month, compared to 80 percent of recipients who lived in households receiving over $150 per month. Among the 3 percent of TANF recipients who only received TANF in 2013, nearly eight percent of recipients lived in households receiving between $11 and $50 per month compared to 60 percent of recipients who lived in households receiving over $150 per month. And among the 26 percent of TANF, SNAP, GA, and SSI recipients who only received one of those public benefits, six percent of recipients lived in households receiving between $11 and $50 per month compared to 80 percent of recipients who lived in households receiving over $150 per month. Among TANF, SNAP, GA, and SSI recipients receiving any of those public benefits, four percent lived in households receiving between $11 and $50 per month cumulatively across all such benefits received, compared to 87 percent of recipients who lived in households receiving over $150 per month.[375]

These potential incongruities are to some extent a consequence of having a bright-line rule that (1) provides meaningful guidance to aliens and adjudicators, (2) accommodates meaningful short-term and intermittent access to public benefits, and (3) does not excuse continuous or consistent public benefit receipt that denotes a lack of self-sufficiency during a 36-month period.[376] At bottom, DHS believes that this standard appropriately balances the relevant considerations, and that even an alien who receives a small dollar value in benefits over an extended period of time can reasonably be deemed a public charge, because of the nature of the benefits designated by this rule.

DHS also notes the operational difficulties associated with a monetary threshold particularly given that several of the benefits under consideration are benefits received by a family unit and the public charge determination is, by statute, an individual determination. For example, in the case of SNAP or a housing voucher it would be difficult to meaningfully assign proportions of the group benefit to individuals in the family, who may benefit in different amounts or account for less or more than a pro rata share of the benefit, from the benefits-granting agency's perspective. At its core, the prospective determination seeks to determine, based on the totality of the circumstances, the likelihood of an individual to use the public benefits enumerated in this rule to support themselves at any point in the future. This is a determination more aptly made by examining a pattern of behavior than by a monetary threshold which could represent a lump sum payment due to a one-time need. DHS believes that short-term benefits use may not be as reliable an indicator of an alien's lack of self-sufficiency, and believes that longer-term benefits use serves as a better indicator.

Of course, if an alien who receives a small dollar value in public benefits over an extended period of time disenrolls from a benefit and later applies for admission or adjustment of status, she or he will not necessarily be inadmissible or ineligible for adjustment of status by virtue of such past receipt. This is because, as noted throughout this preamble, the public charge inadmissibility determination is prospective in nature, and depends on DHS's evaluation of the totality of the circumstances. Moreover, the amount of past benefit receipt may be considered in the totality of the circumstances. For instance, all else being equal, an alien who previously received $15 in monthly SNAP benefits for a lengthy period of time, but has since disenrolled, is less likely to require such benefits in the future, as compared to an alien who only recently disenrolled from a $100 SNAP benefit monthly, or who recently left public housing after a lengthy stay.

Finally, DHS believes that it is appropriate to aggregate the 12 months, inasmuch as the aggregation ensures that aliens who receive more than one public benefit (which may be more indicative of a lack of self-sufficiency, with respect to the fulfillment of multiple types of basic needs) reach the 12-month limit faster. Namely, DHS believes that receipt of multiple public benefits in a single month is more indicative of a lack of self-sufficiency than receipt of a single public benefit in a single month because receipt of multiple public benefits indicates the alien is unable to meet two or more basic necessities of life. This is not an uncommon occurrence. For example, DHS's analysis of SIPP data reveals that among individuals who received the enumerated public benefits in 2013, at least nearly 35 percent of individuals received two or more public benefits on average per month. Table 7 provides additional context with respect to the concurrent receipt of multiple benefits.

TABLE 7—PUBLIC BENEFIT RECEIPT COMBINATIONS AMONG INDIVIDUALS RECEIVING ONE OR MORE ENUMERATED PUBLIC BENEFITS (AVERAGE PER MONTH), 2013

| Program | Percent of individuals with combination | DHS view |
|---|---|---|
| Individuals Receiving Public Benefits ........................................... | 100.0 | |
| Medicaid only ........................................................................... | 32.5 | Meeting healthcare needs. |
| Medicaid and Supplemental Nutrition Assistance Program (SNAP). | 22.8 | Meeting healthcare and food/nutrition needs. |
| SNAP Only ............................................................................... | 13.1 | Meeting food/nutrition needs. |
| Section 8 Rental Assistance Only ............................................. | 3.6 | Meeting housing needs. |
| Medicaid, SNAP, and Supplemental Security Income (SSI) ..... | 3.2 | Meeting healthcare, food/nutrition, and cash assistance needs. |
| Medicaid, SNAP, and Section 8 Rental Assistance ................... | 3.0 | Meeting healthcare, food/nutrition, and housing needs. |
| Medicaid and SSI ..................................................................... | 2.9 | Meeting healthcare and cash assistance needs. |

[375] DHS analysis of Wave 1 of the 2014 Panel of the Survey of Income and Program Participation.

[376] Cf., e.g., Harris v. FCC, 776 F.3d 21, 28–29 (D.C. Cir. 2015) (''An agency does not abuse its discretion by applying a bright-line rule consistently in order both to preserve incentives for compliance and to realize the benefits of easy administration that the rule was designed to achieve.''); Turro v. FCC, 859 F.2d 1498, 1500 (D.C. Cir. 1988) (''Strict adherence to a general rule may be justified by the gain in certainty and administrative ease, even if it appears to result in some hardship in individual cases.'').

TABLE 7—PUBLIC BENEFIT RECEIPT COMBINATIONS AMONG INDIVIDUALS RECEIVING ONE OR MORE ENUMERATED PUBLIC BENEFITS (AVERAGE PER MONTH), 2013—Continued

| Program | Percent of individuals with combination | DHS view |
|---|---|---|
| Medicaid, SNAP, Section 8 Housing Vouchers, and Section 8 Rental Assistance. | 2.8 | Meeting healthcare, food/nutrition, and housing needs. |
| SSI Only | 2.1 | Meeting cash assistance needs. |
| All other combinations | 13.3 | |

**Note:** Because of rounding, percentages may not sum to 100.0.
Source: This table was derived from DHS analysis of Wave 1 of the 2014 Panel of the Survey of Income and Program Participation.

DHS does not believe that the threshold should operate in a way that effectively ignores receipt of multiple benefits in a single month and results in differential treatment for an alien who receives one designated benefit in one month and another in the next month, as compared to an alien who receives each of those designated benefits in the same month. DHS appreciates the references one commenter makes to average durations of receipt for certain benefits but notes that the commenter's statements could not be evaluated without a reference to a study or sources data.

DHS strongly disagrees with commenters' assertion that the duration standard is problematic in the context of Medicaid because the standard does not take into account the extent to which Medicaid is used. As DHS explained in the NPRM, Medicaid serves as a last-resort form of health insurance for people of limited means. Medicaid expenditures are significant across multiple enrollee groups, and are particularly pronounced among persons with disabilities and the aged. The Office of the Actuary in the Centers for Medicare and Medicaid Services, HHS, most recently reported that Medicaid spending per enrollee in FY 2016 was $3,555 for children, $5,159 for adults, $19,754 for persons with disabilities, and $14,700 for the aged.[377] Even if a Medicaid enrollee claims that he or she did not or will not use Medicaid benefits (i.e., by going to the doctor or hospital) within a given time period, the value of Medicaid is not merely the value of claims paid out. Like any insurance plan, Medicaid protects against future potential expenses and ensures that enrollees can receive the services they need. Medicaid coverage constitutes a significant benefit received by enrollees regardless of direct expenditures, even if states require enrollees to pay subsidized premiums and pay for cost-sharing services.[378] According to the Centers for Medicare and Medicaid Services, Office of the Actuary, "beneficiary cost sharing, such as deductibles or copayments, and beneficiary premiums are very limited in Medicaid and do not represent a significant share of the total cost of healthcare goods and services for Medicaid enrollees."[379] Ninety-five percent of total outlays in 2016 were for medical assistance payments, such as acute care benefits, long-term care benefits, capitation payments and premiums, and disproportionate share hospital (DSH) payments. Capitation payments and other premiums, which include premiums paid to Medicaid managed care plans, pre-paid health plans, other health plan premiums, and premiums for Medicare Part A and Part B, represented 49 percent of Medicaid benefit expenditures in 2016.[380] Accordingly, the duration of an alien's receipt of non-monetizable benefits like Medicaid is a reasonable proxy for assessing an alien's reliance on public benefits. DHS also believes that benefits received, including Medicaid, over that timeframe likely exceeds a nominal level of support that merely supplements an alien's independent ability to meet his or her basic living needs.[381]

DHS also disagrees that the standard is arbitrary. As discussed in the NPRM and this final rule, researchers have shown that welfare recipients experienced future employment instability, and continued to move in and out of welfare benefit programs such as Medicaid and SNAP.[382] Based on this research, DHS considers any past receipt of public benefits a negative factor in the public charge determination, although the weight accorded to such receipt would vary according to the circumstances. Similarly, application for or certification to receive a public benefit, or current receipt of public benefits for longer periods of time or moving in and out of benefit programs for an aggregate period of more than 12 of the most recent 36 months preceding the filing of an application for admission or application for adjustment of status is considered a heavily-weighted negative factor.

The duration standard should provide a more predictable threshold that will better permit applicants to adjust their behavior as they deem necessary and appropriate. An applicant should be readily aware whether he or she has received public benefits for more than 12 cumulative months within a 36-month period. Note that this rule clarifies that DHS will take into consideration evidence that an alien made requested to be disenrolled from public benefits and has made clarifying edits in 8 CFR 212.22(b)(4)(ii)(E) to make such consideration explicit.

Finally, DHS notes that the change to a duration-only standard is responsive to comments indicating that the 15 percent of FPG threshold would be too low or unreasonable for those living in cities and areas with high costs of living. For example, under the NPRM,

[377] See United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, Table 21, page 61, at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited April 25, 2019).

[378] Premium means any enrollment fee, premium, or other similar charge. Cost sharing means any copayment, coinsurance, deductible, or other similar charge. See 42 CFR 447.51 for definitions.

[379] See U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, page 3, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited June 6, 2019).

[380] See United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, pages 5–6, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited June 6, 2019).

[381] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018).

[382] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018).

DHS would have considered an alien receiving a Section 8 Housing Voucher in an area where the eligibility requirement amounted to income more than 250 percent of the FPG in the same manner as another alien living area where the income eligibility was 50 percent of the FPG. Under the new standard, the effect of cost living is minimized.

DHS understands that certain applicants may be hesitant to receive certain benefits in light of the public charge assessment. DHS reiterates that this rule does not prevent individuals who are eligible for public benefits from receiving these benefits. And as explained below, in its public charge inadmissibility determination DHS will not consider receipt of Emergency Medicaid, the Medicare Part D LIS, Medicaid received by alien under age 21 or pregnant women, and a wide range of other benefits, such as emergency or disaster relief. This rule also explains the criteria under which DHS will determine whether an alien subject to section 212(a)(4), 8 U.S.C. 1182(a)(4), has established that he or she is not inadmissible on that ground. As explained, DHS will assess all factors and circumstances applicable to the public charge determination, including the past receipt of public benefits listed in 8 CFR 212.21(b). No one factor alone will render an applicant inadmissible on account of public charge; DHS will assess whether the alien is likely to become a public charge, *i.e.,* to receive the designated benefits above the threshold, in the totality of the circumstances.

DHS also acknowledges that the regulation may result in fewer numbers of nonimmigrants and immigrants being admitted to the United States or granted adjustment of status to that of a lawful permanent resident. DHS notes that the ground of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) applies to aliens seeking admission to the United States, or adjustment of status to that of a lawful permanent resident. The public charge ground of inadmissibility does not apply to nonimmigrants present in the United States seeking an extension of stay [383] or change of nonimmigrant status.[384] As indicated in the NPRM, however, when adjudicating an alien's application for extension of stay or change of status, DHS will assess whether the alien has demonstrated that he or she has not received, since obtaining the nonimmigrant status and through the

time of filing and adjudication, any public benefit, as defined in 8 CFR 212.21(b), for 12 months, in the aggregate, within a 36-month period.[385]

Finally, DHS understands that certain individuals may become self-sufficient in the long-term after a certain duration of benefits use and that individuals may use benefits for shorter or longer periods of time. But similar to the explanation above, the fact that a person may ultimately become self-sufficient is not the material question. The material questions is whether the person is likely to become a public charge at some point in the future. Therefore, DHS will not limit its definition of ''public charge'' based on the potential that an alien who is currently public charge may not remain so indefinitely. The appropriate way to address that nuance is through the totality of the circumstances prospective determination, rather than the definition of public charge. Accordingly, DHS properly considers the receipt of public benefits for more than 12 months in the aggregate within a 36-month period a heavily weighted negative factor in public charge inadmissibility determinations.

Alternatives to the Duration Standard

*Comment:* Some commenters recommended a ''grace period'' for foreign nationals coming to the United States to use public benefits and reach self-sufficiency, including an 18-month period to become a fully acclimated and productive person or to recover from emergencies or severe medical issues.

*Response:* As previously discussed, the purpose of this rule is to implement the public charge ground of inadmissibility consistent with the principles of self-sufficiency set forth by Congress, and to minimize the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits.[386] In particular, Congress indicated that the immigration policy continues to be that ''aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations.'' [387] When Congress enacted section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), it did not provide a grace period or a time period in which aliens could use public benefits after entering the United States. Therefore, DHS does not believe it is appropriate

to add a grace period for the receipt of public benefits. For purposes of this rule, there will be a period between the publication of this rule, and the rule's effective date, which would serve as a ''grace period'' of sorts. DHS has also specified how it will consider receipt of public benefits prior to the rule's effective date. Ultimately, however, all aliens who apply for admission or adjustment of status on or after the rule's effective date will be subject to a prospective public charge inadmissibility determination.

DHS notes that as part of the totality of the circumstances determination, DHS will consider evidence that is relevant to its determination whether an alien is likely to become a public charge at any time in the future. For example, if an alien received public benefits in excess of the threshold duration but has evidence that his or her circumstances have changes or that the alien has requested to be disenrolled from such benefits, DHS will take such evidence into consideration in the totality of the circumstances.

*Comment:* A commenter stated that the 12-month period ought to be lengthened to approximately 36 months, because according to a report, 45 percent of people who received government assistance for less than 36 months stop receiving assistance sometime after the first 12 months. According to the commenter, the 45 percent are people who are on their way out of poverty due to public benefit programs. By contrast, approximately 43 percent of welfare recipients stay dependent for at least 3 years. According to the commenter, these are the people who truly lack self-sufficiency, as they have failed to exit the welfare system.

*Response:* DHS disagrees with this recommendation. As discussed in the NPRM and above, while some recipients may disenroll from public benefits after 12 months, this only addresses short-term welfare recipients.[388] For example, as indicated in the NPRM, ''the proportion of [Medicaid and food stamp participation] leavers who receive these benefits at some point in the year after exit is much higher than the proportion who receives them in any given quarter, suggesting a fair amount of cycling into and out of these programs.'' [389] HHS also funds various research projects on welfare. Across fifteen state and county

---

[383] *See* 8 CFR 214.1.

[384] *See* INA section 248, 8 U.S.C. 1258; *see* 8 CFR 248.

[385] *See* 8 CFR 214.1(a)(3)(iv) and 8 CFR 248.1.

[386] *See* 8 U.S.C. 1601.

[387] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[388] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51199 (proposed Oct. 10, 2018).

[389] *See* Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

welfare studies funded by HHS, it was found that the number of leavers who received food stamps within one year of exit was between 41 and 88 percent. Furthermore, TANF leavers returned to the program at a rate ranging between 17 and 38 percent within one year of exit. Twelve of these studies included household surveys, with some conducting interviews less than a year post-exit, and some as much as 34 months after exit. A review of these surveys found that among those who left Medicaid, the rate of re-enrollment at the time of interview was between 33 and 81 percent among adults, and between 51 and 85 percent among children. Employment rates at the time of interview ranged between 57 and 71 percent.'' [390] For these reasons, DHS does not believe that it should lengthen the 12-month period to 36 months.

*Comment:* Commenters also stated that receipt of benefits after an event such as a natural disaster ought not render an alien a public charge, but that sometimes the effects of a natural disaster can last longer than 12 months. The commenter disagreed with DHS's statement in the proposed rule that ''an individual who receives monetizable public benefits for more than 12 cumulative months during a 36-month period is neither self-sufficient nor on the road to achieving self-sufficiency.'' [391] The commenter stated that it can take much longer than 12 months to recover from a natural disaster, and noted that following a tornado in the commenter's community in 2013, some families were still recovering in 2018, and required the designated benefits.

*Response:* As indicated in the NPRM, DHS will not consider public benefits beyond those covered under 8 CFR 212.21(b), but even within that category, DHS will not consider all cash assistance as cash assistance for income maintenance under the rule. For instance, DHS would not consider Stafford Act disaster assistance, including financial assistance provided to individuals and households under Individual Assistance under the Federal Emergency Management Agency's Individuals and Households Program (42 U.S.C. 5174) as cash assistance for income maintenance. The same would hold true for comparable disaster assistance provided by State, local, or tribal governments. Other categories of

cash assistance that are not intended to maintain a person at a minimum level of income would similarly not fall within the definition. In addition, DHS will not consider medical assistance for emergency medical condition (42 U.S. C. 1396v(3)) or short-term, non-cash, in-kind emergency disaster relief.[392] Finally as discussed above, DHS will also take into consideration evidence that an alien has disenrolled or requested to disenroll from public benefits in the totality of the circumstances when determining whether an alien is likely at any time in the future to become a public charge.

Combination Standard

*Comment:* DHS received comments on the proposed rule's provision for combining monetizable and non-monetizable benefits. Commenters generally opposed the proposed standard for combination of monetizable benefits under 15 percent of FPG and one or more non-monetizable benefits. Under this proposal, if an alien received a combination of monetizable benefits equal to or below the 15 percent threshold together with one or more benefits that cannot be monetized, the threshold for duration of receipt of the non-monetizable benefits would be 9 months in the aggregate (rather than 12 months) within a 36-month period (*e.g.,* receipt of two different non-monetizable benefits in one month counts as two months, as would receipt of one non-monetizable benefit for one month in January 2018, and another such benefit for one month in June 2018).[393]

Some commenters stated that the proposed combination standard lacked clarity in its explanation and some explained that they opposed this combination standard as it would have a similar effect to having no threshold at all, resulting in immigrants being too afraid to apply for and receive benefits. Commenters stated that DHS did not provide a rationale for the combination of monetizable benefits under 15 percent of the FPG and one or more non-monetizable benefits. One commenter suggested deleting this provision, because it would render a person a public charge based on any amount of SNAP or housing benefits, combined with 9 months of Medicaid coverage. The commenter indicated that this outcome was too severe.

*Response:* DHS disagrees with commenters that the combination standard lacked clarity or justification.

However, as indicated above, DHS has eliminated the threshold standard and is applying a single duration-based threshold standard to all covered public benefits. DHS believes that this approach is responsive to public comments that raised concerns about the complexity of the proposed standards as well as the need for certainty and predictability in public charge determinations.

2. Public Benefits

*Comment:* A majority of commenters recommended that public benefits encompassed by the definition of that term in the proposed rule (both monetizable and non-monetizable), such as SSI, SNAP, Medicaid, TANF, and housing not be included in the public charge determination and described the negative outcomes that would arise if immigrants' access to the benefits were reduced due to this rule. A commenter stated that public charge determinations never considered non-cash benefits in the past, and including them now is inhumane, and will cost the local, State, and Federal governments in the long-run. One commenter requested that the listed programs be removed, and that no additional programs be added to the determination. One commenter said that expanding the public benefits definition would result in sweeping negative consequences and cause detrimental effects to public access to benefits by discouraging vulnerable populations from seeking the services they need. A commenter asserted that this rule affects more than just immigration status determinations, as it would impede access to supplemental services that raise the standard of living for the individual and their family.

Another commenter indicated that lawfully present noncitizens who have jobs within needed sectors simply might not earn enough to provide quality healthcare, nutritious food, and safe, stable housing to their families. The commenter further indicated that programs like SNAP, CHIP, and Medicaid are designed to help individuals meet their families' basic needs to keep them healthy and safe, and to penalize hardworking families for using the program designed for them is morally bankrupt. A couple of commenters said the policy penalizes the use of public benefits, and indicated that safety-net programs are correlated with the positive health and education outcomes that help low-income families escape poverty. Commenters stated that access to non-cash programs and other public benefits offers dignity and comfort as individuals work to build a new and better life, acquiring the skills

---

[390] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51199 (proposed Oct. 10, 2018) (quoting Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004) (citation omitted)).

[391] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018).

[392] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51128, 51159 (proposed Oct. 10, 2018).

[393] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

and training to qualify for better-paying jobs. Several commenters that opposed the proposed rule stated that the inclusion of the public benefits included in the NPRM, including SNAP, in the public charge determination would reverse longstanding national policy.

Many commenters provided information and data on the general benefits of these public benefits programs; the number of people, children, and businesses affected; and the assistance that these public benefits provide to needy individuals and families. Comments referenced, for instance, the importance of TANF assistance for child care, Medicaid's role in helping families and communities manage healthcare costs, and SNAP's role in fighting food insecurity for children and families. Commenters stated that the proposed rule would exacerbate problems that the designated benefit programs are designed to address. Other commenters provided data suggesting that the designated public benefits help reduce homelessness and improve health outcomes. Commenters stated that these benefits are crucial for the health and development of children and individuals. Commenters also cited research that emphasized the important role public benefits and access to those benefits, including SNAP, plays for pregnant women and the elderly, including that the benefits make elderly individuals less likely to be admitted to nursing homes and hospitals; patients with medical problems, because public benefits reduce financial stress; and college and university students who are struggling with food insecurity.

Many commenters described adverse impacts of homelessness, including childhood depression and the positive impacts of affordable housing, including increased health benefits and chronic disease management and lowering the cost of healthcare. Another commenter cited studies where more students may experience homelessness under this rule, and described the negative impacts on rural subsidized housing and the agriculture economic market.

A commenter stated that receipt of public benefits, including SNAP, support work and improve a family's immediate and long-term prospects, decreasing the odds that the individuals will become primarily dependent on government benefits to support themselves. Similarly, another commenter stated that nutritional, healthcare, and housing assistance are all critical programs that support work, which the commenter identified as the ultimate path to self-sufficiency. A

commenter stated that SNAP supports employment by increasing access to nutritious foods that enable workers to stay healthy and productive, and by enabling families to spend more of their income on work-related expenses like transportation, childcare, and laundry. Many commenters stated the benefits of Medicaid for different people and groups, including better health outcomes for pregnant women and children throughout adulthood. Some commenters described how access to affordable health insurance like Medicaid enables workers to find and retain jobs, and how a lack of affordable insurance contributes to worse health outcomes, unmet physical, behavioral and mental health needs, and eventual joblessness. Commenters stated that access to affordable insurance leads to better performance on the job, an easier time staying employed or seeking employment, and less unpaid bills and other debt; and important economic benefits, such as increased tax contributions, decreased reliance on other public assistance programs, and more disposable income to spend in the local economy. Commenters stated that states that expanded Medicaid experienced savings in costs associated with uncompensated care and state-funded health programs, as well as growth in jobs and general fund revenue. A commenter stated that reimbursement for services rendered to Medicaid patients was especially important for hospitals, and cited research documenting positive effects on hospitals' financial performance in States which decided to expand Medicaid.

Other commenters discussed a study in which the use of certain housing vouchers and access to public housing reduced the chance of families living in crowded conditions, shelters, or on the street, help ease the burden of rent in high-cost cities, prevent or alleviate homelessness, allow the flexibility for families to pay for other necessities, and promote self-sufficiency. Commenters also said this rule will deter landlords from participating in the housing voucher program, affecting the private housing market. Some commenters discussed the difficulty of immigrants obtaining affordable housing.

Other commenters cited research on children's health outcomes, asserting that access to public housing creates long-term improvements in educational attainment, income, self-sufficiency, and children's health outcomes; child development; greater attendance and prospects at school. Commenters also noted that access to affordable housing has positive effects on family stability

and the economy overall, and that access to such housing frees up income for other living necessities. Others cited to research showing that public benefits, such as subsidized housing, positively impacts the health of children, people with disabilities, families, domestic violence victims, pregnant women and people of color; reduces poverty and homelessness, and promotes economic stability; helps low-earning immigrants increase their economic opportunities; facilitates upwards economic mobility; builds safe and affordable housing communities and decreases foreclosures; and benefits of immigrants to the housing market during economic downturns. Other commenters cited research showing that housing instability is associated with a broad range of health impacts, including worsening HIV side effects, heart disease, asthma, and cancer.

Several commenters stated that immigrants in high rent areas need public housing, specifically where income has not kept pace with rent prices. Some of these commenters cited research and figures on the rent prices in areas across the United States. Other commenters stated that only one in four families who need affordable housing receive it, arguing that even fewer families who need affordable housing receive it factoring in immigration status and family size. Multiple commenters stated that housing instability and unaffordability are strongly correlated with involuntary job loss and other economic barriers that undermine self-sufficiency, citing statistics. Several commenters stated that the rule undermines the mission of public housing. A commenter cited research indicating that including affordable housing in the rule may increase the poverty rate and disability rates.

In contrast, a few commenters supported the inclusion of the public benefits as part of the public charge determination. Some stated that only citizens should be eligible for the benefits. A commenter stated that the public charge rule should cover benefits that are provided for long periods of time, such as TANF.

*Response:* DHS appreciates the comments and recognizes that the public benefits listed in the rule provide assistance to needy individuals, and that rigorous application of the public charge ground of inadmissibility will inevitably have negative consequence for some individuals. DHS is aware that individuals may reconsider their receipt of public benefits in light of future immigration consequences. However, the rule does not prevent individuals from receiving any public benefits for

which they are eligible. Additionally, as noted in the NPRM, the rule, particularly the inclusion of the designated benefits into the public benefits definition, is consistent with congressional statements in 8 U.S.C. 1601 concerning self-sufficiency of foreign nationals. In particular, Congress indicated that the immigration policy continues to be that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [394] DHS will therefore continue to consider the public benefits proposed in the NPRM in public charge inadmissibility determinations with certain exceptions described below.

As discussed in the NPRM, the benefits that will be considered in this rule account for some of the largest federal expenditures on low-income individuals and bear directly on self-sufficiency.[395] The benefits listed are directed toward food and nutrition, housing, and healthcare, and are directly relevant to the public charge inadmissibility determination, because a person who needs the public's assistance to provide for these basic necessities of life and receives such benefits for longer periods of time is more likely to receive such benefits in the future.[396] DHS also notes, as updated in the regulatory text, that receipt of a public benefit occurs when a public benefit-granting agency provides such benefit, whether in the form of cash, voucher, services, or insurance coverage. Certification for future receipt of a public benefit does not constitute receipt, although it may suggest a likelihood of future receipt. With respect to Medicaid in particular, DHS would consider receipt to have occurred when coverage commences, regardless of whether the alien accesses services using such coverage.

*Comment:* A commenter said data refutes the notion that immigrant families rely disproportionately on all forms of public assistance, citing to a study from the National Academies of Sciences, Engineering, and Medicine indicating that just 4.2 percent of immigrant households with children utilize housing assistance as compared to 5.3 percent of U.S.-born households. A commenter stated that only 6.5

percent of people using public benefits are noncitizens and this rule will reach beyond that population. One commenter stated that immigrants use public benefits at a lower rate than U.S. born citizens, while other commenters stated that DHS did not consider whether the temporary benefits immigrants might receive would result in a net positive impact to the budget or society.

*Response:* DHS appreciates the comments and references to data. DHS does not assume, and has not based the rule on the assumption, that immigrant families rely disproportionately on public benefits. The statistical analysis provided in the preamble of the NPRM did not reach that conclusion. The NPRM provided data regarding both citizens and noncitizens in the discussion of the factors that may lead a person to receive public benefits. However, only aliens seeking admission to the United States or adjustment of status are subject to the public charge ground of inadmissibility. Therefore, whether citizens' receipt of public benefits is higher than that of aliens is immaterial. DHS notes that with respect to the comment that the temporary receipt of public benefits would result in a positive impact on the economy, such considerations are not the aim of this rule. This rule is intended to better ensure that aliens seeking to come to and remain in the United States are self-sufficient, and rely on their resources and those of their families, sponsors, and private organizations.

*Comment:* One commenter stated that including Medicaid, SNAP and housing assistance programs as public benefits "would undermine decades of the federal government's work to address poverty and build a clearer path to the middle class for millions of families," because individuals may decide to forego WIC, which is connected to SNAP or other similar benefits. A commenter stated that the inclusion of Medicaid/CHIP, SNAP and housing assistance in public charge review would undermine decades of the federal government's work to address poverty and build a clearer path to the middle class for millions of families.

*Response:* DHS understands that many public benefits may be interconnected, such that when a person enrolls in one benefit, the benefit-granting agency will automatically qualify that person in another benefit. In those circumstances, an alien's decision to forego enrollment in a designated public benefit could result in the alien not being automatically qualified in a non-designated benefit. Similar outcomes could occur if a state conditions eligibility for the second

benefit on enrollment in the first. That said, DHS disagrees that the rule would materially undermine decades of work to address poverty. The population affected by this rule is limited to those applicants seeking admission to the United States and adjustment of status, who are subject to public charge. The data and information provided by the commenter involves a much broader population that may not be affected by the rule.

*Comment:* A commenter stated that Congress had already made clear its intent on immigrants' eligibility for SNAP and Medicaid. The commenter went on to state that IIRIRA established criteria to be weighted by immigration authorities using a "totality of circumstances" test, and stated that the criteria specifically did not include receipt of public benefits. The commenter also stated that PRWORA established a set of eligibility rules for certain lawful immigrants to receive Medicaid, SNAP, and other means-tested programs, and Congress later modified these rules to allow Medicaid coverage for pregnant women without the typical five-year waiting period.

*Response:* Through PRWORA, Congress declared that aliens generally should not depend on public resources and that these resources should not constitute an incentive for immigration to the United States.[397] With IIRIRA, Congress codified minimum factors that must be considered when making public charge determinations:[398] Age; health; family status; assets, resources, and financial status; education and skills.[399]

As explained in the NPRM,[400] policy goals articulated in PRWORA and IIRIRA inform DHS's implementation of the public charge ground of inadmissibility. DHS does not believe there is tension between the availability of public benefits to some aliens as set forth in PRWORA and Congress' intent to deny admission, and adjustment of status to aliens who are likely to become a public charge. Indeed, DHS believes that Congress, in enacting PRWORA and IIRIRA very close in time, must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge ground of inadmissibility, even though receipt of such benefits could render the

[394] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[395] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

[396] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[397] *See* Public Law 104–193, sec. 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601).

[398] Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)).

[399] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[400] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51132 (proposed Oct. 10, 2018).

alien inadmissible as likely to become a public charge. Under the scheme envisioned by Congress, aliens generally would not be issued visas, admitted to the United States, or permitted to adjust status if they are likely to become public charges. This prohibition may deter aliens from making their way to the United States or remaining in the United States permanently for the purpose of availing themselves of public benefits.[401] DHS believes that Congress must have understood, however, that certain aliens who were unlikely to become public charges when seeking admission or adjustment of status might thereafter reasonably find themselves in need of public benefits. Consequently, in PRWORA, Congress made limited allowances for that possibility. Nevertheless, if an alien subsequent to receiving public benefits wishes to adjust status in order to remain in the United States permanently or leaves the United States and later wishes to return, the public charge inadmissibility consideration (including consideration of receipt of public benefits) would again come into play. In other words, although an alien may obtain public benefits for which he or she is eligible, the receipt of those benefits may be considered, consistent with IIRIRA and PRWORA, for future public charge inadmissibility determination purposes. DHS recognizes that Congress through CHIPRA expanded the Medicaid coverage for children and pregnant women who are lawfully residing in the United States, including those within their first five years of having certain legal status. In this final rule, DHS has exempted from consideration receipt of Medicaid by children under 21 and pregnant women during pregnancy and 60 days following pregnancy by amending the definition of public benefit in 8 CFR 212.21(b).

*Comment:* Some commenters stated that immigrants' eligibility for some of the public benefits is already restricted, including SSI, TANF, and housing programs. Another commenter said the inclusion of Medicaid in the proposed rule was unnecessary, since existing law already requires that lawful permanent residents wait five years before becoming eligible for Medicaid or Medicare.

*Response:* DHS recognizes that most aliens are ineligible for the public benefits listed in the rule. However, the public charge inadmissibility determination reviews the likelihood of a person receiving a public benefit at any time in the future, including points in time when an alien may become

eligible for the public benefits. In addition, some aliens are eligible for public benefits, as noted in Table 3 of the NPRM.[402]

*Comment:* A commenter indicated that immigrants contribute far more to America (*i.e.,* taxes, premiums, economic and military contributions) than they use in assistance. Other commenters indicated that immigrants contribute by paying taxes and the rule penalizes immigrants who file taxes and utilize programs to which they are legally entitled. Several commenters stated that immigrants make significant contributions to the economy, and the proposed rule would prevent immigrants from partaking in programs that their tax dollars support. Other commenters said that individuals covered by Medicaid or CHIP paid more in taxes and collected less in Earned Income Tax Credit (EITC) payments. According to a commenter, one study reviewing Medicaid expansion during the 1980s and 1990s estimated that, based on children's future earnings and tax contributions alone, the government would recoup 56 cents of each dollar spent on childhood Medicaid by the time the children turned 60.

*Response:* Paying taxes owed and filing tax returns is legally required for all individuals making a sufficient income in the United States.[403] The rule does not penalize those people who fulfill their legal responsibilities to do so. In addition, people are entitled to use benefits for which they qualify, and this rule does not prohibit anyone from using a benefit for which they qualify. However, DHS believes the use of certain benefits is appropriate to consider in determining public charge inadmissibility. Congress mandated the public charge assessment.[404] But Congress did not stipulate in legislation that public benefits received by eligible individuals should not be considered for public charge purposes; instead, Congress clearly stated the policy that those coming to the United States must be self-sufficient and not rely on public resources. Therefore, to implement Congress' requirement to consider public charge inadmissibility, DHS must consider the receipt of benefits by eligible individuals, as indeed the 1999 Interim Field Guidance did. DHS believes that the public charge rule strikes an appropriate balance with the benefits that are considered.

a. Specific Groups and Public Benefits

Individuals With Disabilities

*Comment:* Commenters stated that the inclusion of non-monetizable benefits in the proposed rule would disproportionately harm people with disabilities.[405] One commenter stated that ''[p]eople with disabilities would be uniquely affected by the inclusion of Medicaid-funded services in the public charge calculus, including Medicaid-funded community-based services that are efficiently delivered in homes and communities (the current public charge rule only requires consideration of Medicaid-funded institutional long-term care).'' Commenters said that because non-emergency benefits were included, the proposal would make it nearly impossible for immigrants with disabilities to become citizens unless they are independently wealthy. Many commenters indicated that the federal resources individuals with disabilities and their families depend on, such as Medicaid, SNAP, and housing vouchers, would be included in the determination of public charge under the rule. A commenter also noted that ''[p]eople with disabilities would be disproportionally impacted by the inclusion of housing and food assistance in the public charge test.'' One commenter stated that ''[b]y deeming immigrants who use such programs a 'public charge,' the regulations will disparately harm individuals with disabilities and impede their ability to maintain the very self-sufficiency that the Department purports to promote and which the Rehabilitation Act sought to ensure.''

Several commenters stated that individuals with disabilities rely on non-cash benefits disproportionately, often due to their disability, in order to continue working, stay healthy, and remain independent and productive members of the community. Some commenters stated that Medicaid is often the only program available to and appropriate for people with disabilities as many of the services covered by Medicaid, including housing services and community-based services, are often not covered by private insurance. Many commenters cited the statistic that about one-third of adults under age 65 enrolled in Medicaid have a disability, compared with about 12 percent of adults in the general population. Other commenters cited the statistic that more than one-quarter of individuals who use SNAP are also disabled. Several commenters stated that individuals with disabilities disproportionately experience poverty.

---

[401] H.R. Rep. No. 104–469(I), at 144–45 (1996).

[402] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51128–30 (proposed Oct. 10, 2018).

[403] *See* 26 U.S.C. 1 and 6012(a)(1).

[404] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

A commenter stated that the rule would require immigrants with disabilities to meet economic standards that do not take into account the barriers to employment and wealth accumulation issues that individuals with disabilities face. Another commenter added that food insecurity rates in households that include at least one disabled working-age adult are substantially higher, even where the disabled person is working, and that such food insecurity leads to chronic illnesses. Many commenters stated that the rule would cause many individuals with disabilities or families with individuals with disabilities to disenroll from public benefit programs. A commenter cited research indicating that the rate of disability drastically increases as poverty increases, and that by creating fear around participating in public anti-poverty programs, the proposed public charge rule will lead to an increase in disability and negative health impacts for an already vulnerable community of people.

*Response:* DHS understands that individuals with disabilities receive public benefits that are listed in the rule. However, Congress did not specifically provide for a public charge exemption for individuals with disabilities and in fact included health as a mandatory factor in the public charge inadmissibility consideration.[406] Therefore, DHS will retain the designation of Medicaid and SNAP as public benefits, notwithstanding the potentially outsized impact of such designation on individuals with disabilities. With respect to DHS's consideration of the alien's disability as such, DHS would consider disability as part of the health factor, to the extent such disability makes the alien more likely than not to become a public charge. This consideration is not new and has been part of public charge determinations historically.[407] Those

---

[406] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[407] *See, e.g., Ex parte Mitchell,* 256 F. 229 (N.D.N.Y. 1919) (referencing disease and disability as relevant to the public charge determination); *Ex parte Sakaguchi,* 277 F. 913, 916 (9th Cir. 1922) (taking into consideration that the alien was an able-bodied woman, among other factors, and finding that there wasn't evidence that she was likely to become a public charge); *Barlin* v. *Rodgers,* 191 F. 970, 974–977 (3d Cir. 1911) (sustaining the exclusion of three impoverished immigrants, the first because he had a "rudimentary" right hand affecting his ability to earn a living, the second because of poor appearance and "stammering" such that made the alien scarcely able to make himself understood, and the third because he was very small for his age); *United States ex rel. Canfora* v. *Williams,* 186 F. 354 (S.D.N.Y. 1911) (ruling that an amputated leg was sufficient to justify the exclusion of a sixty year old man even though the man had adult children who were able and willing to support him).

determinations include consideration of whether, in the context of the alien's individual circumstances, the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, such as by working or attending school. As noted in the proposed rule, as an evidentiary matter, USCIS would rely on medical determinations made by a medical professional. This would entail consideration of the potential effects of the disability on the alien's ability to work, attend school, or otherwise support himself or herself.

However, it is not the intent, nor is it the effect of this rule to find a person a public charge solely based on his or her disability. The public charge inadmissibility determination evaluates the alien's particular circumstances. Under the totality of the circumstances framework, the disability itself would not be the sole basis for an inadmissibility finding. DHS would look at each of the mandatory factors, and the affidavit of support, if required, as well as all other factors in the totality of the circumstances. For example, if an individual has a disability but there is no indication that such disability makes the alien more likely to become a public charge, the alien's disability will not be considered an adverse factor in the inadmissibility determination. This could occur if the individual is not currently enrolled in the designated benefits, has not previously been enrolled in any designated public benefit, and is employed or otherwise has sufficient income, assets and resources to provide for himself or herself, or has family willing and able to provide for reasonable medical costs, or the person has private health insurance or would soon be able to obtain private health insurance upon adjustment of status.

Vulnerable Populations

*Comment:* Some commenters identified specific groups of individuals who would be impacted by the inclusion of public benefits in the public charge determination. Several commenters stated that cash assistance provides crucial support for survivors of domestic violence and sexual assault, and would undermine Federal and State policies to support victims of domestic violence and assault by discouraging them to access critical services. A commenter stated that for many survivors, cash assistance, such as TANF or state-funded cash benefits, provides the crucial support they need

to begin the journey of stabilizing their lives and achieving self-sufficiency. The commenter provided a data from a survey in 2017, where 85 percent of respondents said that TANF was a critical resource for domestic violence and sexual assault survivors, and that two-thirds of respondents said that most domestic violence survivors rely on TANF to help address their basic needs and to establish safety and stability, and 45 percent of respondents said the same is true of most sexual assault survivors. The commenter indicated that financial instability poses limited options for escaping or recovering from abuse and that access to cash assistance is an important factor in survivors' decision-making about whether and how they can afford to leave a dangerous situation, and in planning how to keep themselves and their children healthy, fed, and housed. The commenter indicated that the rule risk significant physical, emotional, and mental harm to these populations. Commenters described a survey that found that nearly 80 percent of service providers included in the survey reported that most domestic violence survivors rely on SNAP to establish their safety and stability. Another commenter stated that being able to meet basic food and nutritional needs provides a means for survivors of domestic violence and sexual assault to take care of themselves and their children while working to address their trauma and take steps toward independence.

Other commenters stated that nearly half a million Asian American and Pacific Islander (AAPI) noncitizens rely on the SNAP program to feed their families, and the rule will lead to less food assistance within family units. A commenter stated that almost 48 percent of noncitizen recipients of SNAP benefits were women in 2017, compared to 40 percent who were men, and 12 percent who were children. Another commenter stated that 80 percent of most domestic violence victims and 55 percent of most sexual assault victims use the program to restore safety and stability in their lives would be heavily affected by limiting access to SNAP.

One commenter stated that the proposed rule would disproportionately affect communities of color who use public benefits and social services to make ends meet and work towards self-sufficiency. A commenter stated that the proposed rule would likely disproportionality cause Latinos to lose access to SNAP and Medicaid benefits, exacerbating existing health inequities, increasing instances of hunger and poverty among this population. Similarly, another commenter described

the benefits of access to SNAP for the Latino community and commented that a loss of SNAP benefits would cause more Latinos, including children, to experience poverty and suffer from hunger and malnutrition. Another commenter stated that including SNAP will harm college students, as SNAP is a critical resource for the many college students who struggle with food insecurity.

Other commenters provided information on individuals with specific medical conditions that need Medicaid, including treating thalassemia (a group of blood disorders) and cardiovascular disease. A commenter cited studies showing that people with opioid addiction who lacked Medicaid were half as likely to receive treatment as those covered by some form of insurance. A commenter said that parental mental health and substance abuse was a strong indicator of child mistreatment, and the services Medicaid provides to combat these issues help keep children safe.

Many commenters noted the negative impact of including the receipt of housing assistance in the public charge determination on a variety of groups, including infants and toddlers, women and single mothers, large and low-income families, Latinos, domestic violence survivors, agricultural workers, low-income communities, people of color, the Lesbian, Gay, Bisexual, Transgender Immigrants (LGBTQ) community, AAPI, elderly, minority groups, and disabled persons. Multiple commenters cited studies and addressed the specific costs of the rule for domestic violence survivors, arguing that a survivor's greatest unmet need is housing when recovering from abuse. Other commenters commented that the rule would make it more difficult for families with multiple children to obtain housing due to the prorated system.

*Response:* DHS appreciates the comments. DHS recognizes that some people currently in the United States do in fact depend on the government to meet their needs, and that this rule is likely to result in negative consequences for some of those people, and people like them. Such negative consequences are, to some extent, an inevitable consequence of more rigorous application of a statutory ground of inadmissibility that is targeted towards people who receive public benefits to meet their basic needs. DHS declines to modify the scope of the rule to accommodate all possible Federal and State policies supporting public benefits use by specific vulnerable populations. DHS notes that if an alien relied on

public benefits for a limited period time to escape a dangerous situation, but no longer relies on such benefits, the alien should make that clear to DHS, so that DHS can incorporate into its totality of the circumstances assessment the fact of the alien's changed circumstances.

DHS recognizes that it is possible that the inclusion of benefits such as SNAP and Medicaid may impact in greater numbers communities of color, including Latinos and AAPI, as well as those with particular medical conditions that require public benefits for treatment, and therefore may impact the overall composition of immigration with respect to these groups. DHS also recognizes that consideration of the receipt of public benefits while the alien was a child may also deter some parents from applying for these benefits on behalf of their children. But this is not DHS's intention in promulgating this rule. Instead, with this rule, DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status who are subject to the public charge ground of inadmissibility are self-sufficient.[408]

As provided by Congress, health is a mandatory factor in the public charge inadmissibility determination.[409] However, DHS will not find an alien inadmissible on public charge grounds based solely on an alien's medical condition or disability.

DHS's public charge inadmissibility determination evaluates the totality of an alien's individual circumstances. This totality of the circumstances approach weighs all the positive and negative evidence related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[410] If the factors establish, in the balance, that an alien is likely at any time in the future to become a public charge, he or she will be deemed inadmissible. As noted in precedent administrative decisions, determining the likelihood of an alien becoming a public charge involves "consideration of all the factors bearing on the alien's ability or potential ability to be self-supporting"[411] in the totality of the circumstances.[412]

DHS's view of self-sufficiency is that aliens subject to the public charge ground of inadmissibility must rely on their own capabilities and secure financial support, including from family members and sponsors, rather than seek and receive public benefits to meet their basic needs. Cash aid and non-cash benefits directed toward food and nutrition, housing, and healthcare account for significant Federal expenditure on low-income individuals and bear directly on self-sufficiency. Because of the nature of the public benefits that would be considered under this rule—which are generally means-tested and provide cash for income maintenance and for basic living needs such as food and nutrition, housing, and healthcare—DHS believes that receipt of such benefits may render a person a person with limited means to provide for his or her own basic living needs and who receives public benefits is not self-sufficient because his or her reliance.

DHS notes that this rule would not adversely impact certain victims of domestic and sexual abuse, as VAWA, T, and U applicants are generally not subject to the public charge inadmissibility determination, as set forth in 8 CFR 212.23.

*Comment:* Several commenters said that over 1.1 million noncitizens age 62 and older live in low- or moderate-income households. Other commenters stated that nearly seven million seniors age 65 and older are enrolled in both Medicare and Medicaid, and one in five Medicare beneficiaries relies on Medicaid to help them pay for Medicare premiums and cost-sharing. Several commenters said having health insurance is especially important for older adults because they have greater healthcare needs. This makes Medicare a lifeline for most seniors, providing coverage for hospital, doctors' visits, and prescription drugs, but many immigrant seniors are not eligible for Medicare.

A commenter stated this age standard would result in mistreatment of elders when trying to enter or stay in the United States and would undermine immigrants' access to essential healthcare, nutrition, and housing programs. A commenter stated low-income seniors also greatly benefit from programs such as HCV Program (Section 8) rental assistance and SNAP to meet their basic needs and if immigrant families are afraid to access nutrition assistance programs, older adults will be food insecure and at risk of unhealthy eating, which can cause or exacerbate other health conditions and

---

[408] *See* 8 U.S.C. 1601(2).

[409] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[410] *See* 8 CFR 212.22.

[411] *Matter of Vindman,* 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977).

[412] *See, e.g., Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r 1977); *Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

unnecessarily burden the healthcare system.

*Response:* DHS recognizes that eligibility for certain public benefits depends not only on a person's financial need but also on a person's age. However, Congress did not specifically exclude aliens of certain ages from the public charge inadmissibility determination and in fact included age as a mandatory factor in section 212(a)(4) of the Act, 8 U.S.C. 1184(a)(4).[413] Accordingly, DHS proposes to consider the alien's age primarily in relation to employment or employability and secondarily to other factors as relevant to determining whether someone is likely to become a public charge. DHS notes that the public charge inadmissibility determination evaluates the alien's particular circumstances. DHS's totality of the circumstances standard involves weighing all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[414] If the negative factors outweigh the positive factors, then the alien would be found to be inadmissible as likely to become a public charge; if the positive factors outweigh the negative factors, then the alien would not be found inadmissible as likely to become a public charge.

DHS also notes that receipt of Medicaid, even if received in conjunction with receipt of Medicare, would still be considered a public benefit in the totality of the circumstances for public charge inadmissibility.

*Comment:* One commenter indicated that the rule could allow a young adult to be deemed inadmissible as a public charge if at any point within the last year the person or a member of the household or certain members of the family received a few of these benefits for only a period of time. The commenter indicated that household definition leaves a very wide array of potential individuals who may receive a public benefit through no volition or interaction of the immigrant applicant but would, as a result, have an impact on the determination of admissibility for the immigrant's application including a child or a young family member. The commenter indicated that despite the applicant providing sufficient support

and having no need for public benefits, that family member or the primary caregiver for the family member may facilitate the application for and receipt of public benefits for that child or in relation to the care for that child.

*Response:* The public charge inadmissibility determination evaluates an alien's particular circumstances. DHS is not considering public benefits received by other household members as part of an alien's public charge inadmissibility determination. DHS has further clarified this inclusions of a definition for receipt of public benefits which indicates that an alien's receipt, application for or certification for public benefits solely on behalf of another individual does not constitute receipt of, application for or certification for such alien. But if the alien is a listed beneficiary, the alien is considered to have received the public benefit.

DHS's totality of the circumstances standard weighs all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[415]

In the definition of household,[416] DHS accounts for both (1) the persons whom the alien is supporting and (2) those persons who are contributing to the household, and thus the alien's assets and resources. DHS believes that an alien's ability to support a household is relevant to DHS's consideration of the alien's assets, resources, financial status, and family status. DHS believes this is an appropriate definition in the limited immigration context of public charge inadmissibility determinations. Public benefits received by household members do not count towards the alien's financial assets and income for purposes of the public charge inadmissibility determination.[417]

*Comment:* A commenter stated that the rule would deprive U.S. citizens who live in mixed-status households of their access to assistance programs for which they are eligible.

*Response:* DHS disagrees that the rule would deprive U.S. citizens of access to assistance programs for which they are eligible. This rule does not include consideration of public benefits

received by U.S. citizens in the public charge inadmissibility determination. The valuation of the public benefits is an individual determination and receipt of public benefits by other members of a household including U.S. citizens will not be considered in an applicant's public charge inadmissibility determination. In addition, DHS notes that this rule does not restrict an alien's access to public benefits for which the alien is eligible. Rather, this rule explains the criteria that DHS will use to determine whether an alien subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), has met his or her burden of demonstrating eligibility for the immigration benefit sought.

Receipt of Public Benefits by Children

*Comment:* Several commenters said a child's use of benefits should not impact their public charge inadmissibility determination, as public benefits are often vital to the development of children and for them to become productive members of society. Commenters also indicated that a child's use of benefits should not impact their immigration application once they come of age. These commenters cited research demonstrating that the use of these programs in childhood helps children complete their education and have higher incomes as adults, be healthy, have better educational opportunities, and become more likely to be economically secure and contribute to their communities as adults. Another commenter indicated that public benefits serve as crucial levers that reduce the intergenerational transmission of poverty. Commenters also noted that ''[b]ecause children do not decide whether or not to apply for benefits and because their financial situation as children is not necessarily indicative of their financial situation for life, children's receipt of benefits should not be counted in any public charge determination.'' Some commenters stated that considering an immigrant's past use of public benefits as a child in the public charge inadmissibility determination would deter immigrant parents from obtaining food and healthcare assistance for their children, and argued that this would result in adverse outcomes for the children themselves and impose significant costs on society. A commenter stated that low-income children with immigrant parents, including U.S. citizen children, are already less likely to receive Medicaid than those with U.S. born parents.

Many commenters cited to research indicating that the use of programs, such as SNAP, Medicaid, and CHIP, and

[413] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[414] *See* 8 CFR 212.22.

[415] *See* 8 CFR 212.22.

[416] *See* 8 CFR 212.21(d).

[417] *See* 8 CFR 212.22(b)(4)(ii), which provides that USCIS' considerations when assessing the alien's assets, resources, and financial status excludes any public benefits received by the alien as well as any public benefits received by another person of the household.

housing assistance in childhood, helps children complete their education and have higher incomes as adults, live in stable housing, receive needed health services and consume adequate and nutritious food, and fosters their future success in education and the workforce. A commenter noted the impact of this rule on their work to facilitate healthy brain development among children. A few commenters stated that multiple studies confirm early childhood or prenatal access to Medicaid and SNAP improves health and reduces reliance on cash assistance. The commenters stated that children with access to Medicaid have fewer absences from school, are more likely to graduate from high school and college, and are more likely to have higher paying jobs as adults. Another commenter stated that children with health insurance are more likely to have routine healthcare, improved health outcomes, and improved success in education. One commenter said that lack of access to affordable housing remains one of the main barriers to economic stability for many families and the proposed rule would further limit access to housing assistance for families with children. The commenter cited research that shows rental assistance for households with children results in significant positive effects for future child outcomes and family economic security. A few commenters stated this proposal could undermine the access to healthcare for children of immigrants or their aging family members.

*Response:* DHS recognizes that many of the public benefits programs aim to better future economic and health outcomes for minor recipients, and that parents may decide to disenroll their children from public benefits programs to avoid negative immigration consequences. However, this rule is aimed at better ensuring that aliens who are subject to the public charge ground of inadmissibility are self-sufficient.

DHS also recognizes that children who receive public benefits are not making the decisions to apply for such benefits. However, DHS notes that Congress did not exclude children from the public charge ground of inadmissibility unless the child is seeking a status that Congress expressly exempted from public charge inadmissibility and, moreover, specifically required that DHS consider an applicant's age in the public charge inadmissibility determination. Nonetheless, as explained more fully in the discussion of Medicaid, DHS will not consider the receipt of Medicaid by children under the age of 21.

Military/First Responders

*Comment:* Some commenters supported the NPRM's proposal to exclude from the public charge determination any public benefits received by active duty service members and their families. Some commenters also discussed the impact of the rule on military families, including increasing food security for active military families and allowing them to focus on protecting the United States rather than on whether they will be able to feed their family. Commenters stated that too many military families and veterans depend on SNAP to make ends meet because their military pay is not enough to meet their basic needs. One commenter, citing to data from FY 2013, stated that current and former military members and their families redeemed approximately $104 million in SNAP benefits at commissaries—a 300 percent increase since 2007. The commenter further stated that for military families who do not have base-housing and live in high-cost areas, like those in California, accessing SNAP can be complicated and this has led military families across the country to turn out of desperation to food pantries and food banks—many operating on base or nearby military installations—for emergency food assistance. The commenter further stated that in recent years the Department of Defense (DOD) and the Department of Veterans Affairs (VA) have issued policies to address high rates of hunger among low-income military and veteran families, because military leaders understand that soldiers are less prepared to serve their country if they are hungry or worried about their families going hungry. They also know that when veterans are largely living in poverty with unmet basic needs, it is more difficult to convince young people who live in their communities to sign up.

A commenter also cited to 2013 USDA data, and reported that in that year, $103.6 million of groceries were purchased with SNAP benefits at military commissaries, and that between 2,000 and 22,000 military households received SNAP benefits. The commenter stated that a Department of Defense Education Activity (DoDEA) showed that in September 2015, 24 percent of 23,000 children in DoDEA schools were eligible for free meals, while 21 percent were eligible for reduced-price meals.

Commenters, citing the 2.4 million children from military families who were enrolled in Medicaid or CHIP, noted that many families with family members enlisted in the military benefitted from enrollment in Medicaid

or CHIP, indicated that Medicaid enrollment leads to positive health outcomes.

*Response:* DHS acknowledges that military service members and their families who are applying for an immigration benefit for which admissibility is required and that is subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), will be required to demonstrate that they are not likely at any time in the future to become a public charge. However, consistent with the NPRM, DHS's public charge analysis will exclude consideration of the receipt of any public benefits by active duty servicemembers, including those in the Ready Reserve of the U.S. Armed Forces, and their spouses and children. As noted in the NPRM, the U.S. Government is profoundly grateful for the unparalleled sacrifices of the members of our armed services and their families. Servicemembers who, during their service, receive public benefits, in no way burden the public; indeed, their sacrifices are vital to the public's safety and security. The DOD has advised DHS that many of the aliens who enlist in the military are early in their careers, and therefore, consistent with statutory pay authorities, earn relatively low salaries that are supplemented by certain allowances and tax advantages.[418] Although data limitations exist, evidence suggests that as a consequence of the unique compensation and tax structure afforded by Congress to aliens enlisting for military service, some active duty alien servicemembers, as well as their spouses and children, as defined in section 101(b) of the Act, may rely on SNAP [419] and other listed public

---

[418] *See, e.g.,* 37 U.S.C. 201–212, 401–439 (Basic Pay and Allowances Other than Travel and Transportation Allowances, respectively); Lawrence Kapp, Cong. Research Serv., Defense Primer: Regular Military Compensation 2 tbl.1 (Dec. 17, 2018), available at *https://fas.org/sgp/crs/natsec/IF10532.pdf* (reporting average regular military compensation of $41,384 at the E–1 level in 2018, comprised of $19,660 in average annual basic pay, plus allowances and tax advantage) (last visited July 26, 2019); Lawrence Kapp et al., Cong. Research Serv., RL33446, Military Pay: Key Questions and Answers 6–9 (2019), available at *https://fas.org/sgp/crs/natsec/RL33446.pdf* (describing types of military compensation and federal tax advantages) (last visited July 26, 2019).

[419] *See* U.S. Gov't Accountability Office, GAO–16–561, Military Personnel: DOD Needs More Complete Data on Active-Duty Servicemembers' Use of Food Assistance Programs (July 2016), available at *https://www.gao.gov/assets/680/678474.pdf* (reporting estimates ranging from 2,000 active duty servicemembers receiving SNAP to 22,000 such servicemembers receiving SNAP) (last visited July 26, 2019). Effective FY16, Congress implemented a recommendation by the Military Compensation and Retirement Modernization Commission to sunset DOD's Family Subsistence

Continued

**41372** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

benefits. As a result, the general standard included in the proposed rule could result in a finding of inadmissibility under section 212(a)(4) when such aliens apply for adjustment of status.

As noted in the NPRM, following consultation with DOD, DHS has concluded that such an outcome may give rise to concerns about servicemembers' immigration status or the immigration status of servicemembers' spouses and children as defined in section 101(b) of the Act, 8 U.S.C. 1101(b), which would reduce troop readiness and interfere significantly with U.S. Armed Forces recruitment efforts. This exclusion is consistent with DHS's longstanding policy of ensuring support for our military personnel who serve and sacrifice for our nation, and their families, as well as supporting military readiness and recruitment.

Accordingly, DHS has excluded the consideration of the receipt of all benefits listed in 8 CFR 212.21(b) from the public charge inadmissibility determination, when received by active duty servicemembers, including those in the Ready Reserve, and their spouses and children. If a service member has since retired or otherwise been discharged from military service, receipt of public benefits while in the service will not be counted in the public charge consideration. Only public benefits receipted after discharge from the military would be considered. Applicants that fall under this exclusion must submit proof that the servicemember is serving in active duty or the Ready Reserve. DHS believes this should minimize any impact to military readiness.

*Comment:* Some commenters suggested that the exemption that applies to individuals serving in the Armed Forces should apply to other individuals, such as veterans and stated that failure to include military veterans within this carve-out is arbitrary and capricious. The commenter stated that once an individual leaves active or reserve duty, upon the completion of his or her enlistment, is honorably discharged, and takes up a private job at

the very same salary, the public benefit exemption would no longer apply and thus be ineligible for admissibility and adjustment of status. The commenter stated military service members should not be subject to public charge the moment they depart the military. A commenter said the rule would have an unintended negative impact on veterans of the U.S. military who do not have permanent status because they have access to the public benefits outlined in the rule. The commenter stated that their need for access to benefits may be directly tied to injuries resulting from their service.

A commenter stated that while applying the proposed rule to servicemembers would have negative policy consequences, the DHS lacks legal authority to exempt the "public charge" analysis from a whole segment of the population. The commenter stated that the relevant statute regarding "public charge" applies to "[a]ny alien," and DHS stated no basis on which it can exclude certain individuals from the generally applicable proposed definition of "public charge." The commenter stated that the rule would almost certainly apply to servicemembers like the rest of the population and therefore DHS should abandon the rule.

*Response:* DHS appreciates the comments and certainly appreciates the sacrifices that veterans have made for the United States. Among other factors, current servicemembers have a unique pay structure implemented by Congress that may involve the use of public benefits, and DHS has accordingly excluded the public benefits as listed in the rule for active duty service members in order to limit a possible impact on military readiness. DHS does not believe the same considerations are presented for veterans, as they do not currently serve, are not directly affected by the military compensation structure, and have access to a specific benefits scheme that Congress has designed for them (and that is not designated in this rule). Further, in light of that unique salary and benefit scheme created by Congress for active service members and their families, DHS disagrees with the commenter that it lacks authority to exempt use of the designated public benefits for such individuals and families from the definition of public charge. Rather, DHS has determined that it would be unreasonable, and contrary to congressional intent, to include use of public benefits by such individuals within the definition, where doing so could undermine the careful salary and benefits structure established by Congress and negatively affect recruitment and readiness.

*Comment:* Some commenters suggested that the exemption that applies to individuals serving in the Armed Forces should apply to other individuals, such as members of the public who have jobs of comparable importance to national security. The commenter stated as an example that there is no exemption for non-uniform support members working for or on behalf of the U.S. military, those working for State or local law enforcement, those working for prisons, or working as firefighters or as emergency medical technicians. The commenter stated that there is no doubt the U.S. "Government is profoundly grateful for the unparalleled sacrifices" of police officers, firefighters, and emergency medical technicians, but the rule does not exclude the public benefits received from these individuals. Other commenters indicated that the failure to exempt first responders and veterans or other groups was irrational, because military service members are not the only ones serving in roles important to national security.

*Response:* DHS refers the commenters to the explanations above regarding this rule's treatment of active duty servicemembers, including those in the Ready Reserve, and their spouses and children. DHS recognizes that many professionals, including first responders, also provide important services for the public, and make sacrifices that are critical and worthy of our gratitude. However, DHS believes that Armed Forces members and their spouses and children are uniquely positioned in this context, and that DHS should not extend similar treatment to other categories of applicants based on their employment or public service.

b. Supplemental Security Income

*Comment:* Multiple commenters opposed the inclusion of SSI and stated that SSI supports children with disabilities, and that a child who begins receiving SSI is less likely to fall below the poverty line. The commenters stated that the inclusion of SSI in the public charge rule threatens the health, safety, and well-being of the children and families that receive it. One commenter stated that SSI benefits represented 1.4 percent of the Federal Budget in FY 2012, and there is no reason to believe that the complete data recited in the "one analysis" relied on by the DHS for 2017 would be any different. The commenter stated that SSI was 0.33 percent of GDP in the years 2011 to 2012, and expected to decline to 0.23 percent in 2037. Further, the commenter said 86 percent of SSI benefits are paid to the disabled, concluding that it is

---

Supplemental Allowance Program within the United States, Puerto Rico, the U.S. Virgin Islands, and Guam; SNAP reliance may have increased somewhat following termination of the program. *See* Public Law 114–92, div. A, section 602, 129 Stat. 726, 836 (Nov. 25, 2015); Military Comp. & Ret. Modernization Comm'n, Final Report 187 (Jan. 2015) ("The [Family Subsistence Supplemental Allowance Program] should be sunset in the United States, Puerto Rico, Guam, and other U.S. territories where SNAP or similar programs exist, thereby reducing the administrative costs of a duplicative program.").

irrational to exclude individuals with disabilities by claiming that they are likely to become a public charge. In contrast, other commenters asserted that only U.S. citizens should receive SSI.

*Response:* DHS appreciates the comments, however, DHS has determined that it will consider SSI as described in the rule. DHS notes that this decision is consistent with the 1999 Interim Field Guidance, and that, as discussed in the NPRM, SSI represents one of the largest Federal expenditures for low-income people.[420] As provided in the NPRM, SSI was included as public benefit because it provides monthly income payments for people with limited resources, is financed through general revenues, and has high expenditures.[421] DHS has determined that considering SSI in the rule, consistent with the 1999 Interim Field Guidance, is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations.

c. Temporary Assistance for Needy Families

*Comment:* Several commenters opposed the inclusion of TANF in the rule. One commenter stated that TANF helps families achieve self-sufficiency through support that allows parents to send their children to high-quality child care programs, and that including consideration of TANF could therefore harm families. Some commenters stated that TANF is the only source of Federal cash assistance for families with children, and that research shows that children make up about 77 percent of recipients. The commenters went on to state that families use cash assistance to aid in achieving economic security and working towards upward mobility, and that the inclusion of TANF in the proposed rule will be detrimental to children during their developmental years. The commenters stated that families who disenroll from TANF would lose their eligibility to receive free school meals, which would result in hungry children, homeless and precariously housed families, sicker adults and children, and reduced access to behavioral health services. Another commenter indicated that while the majority of TANF recipients are children, there is a current decrease in children receiving cash assistance

(under 25 percent of all poor families with children) and the rule would further restrict access. The commenter also indicated that the rule fails to recognize that States are increasingly choosing to provide TANF to working families who earn too much to qualify for the basic cash assistance programs and that research has shown that such policies, which "make work pay," improve employment outcomes because they serve as an effective incentive for families to find and keep jobs.

*Response:* DHS appreciates the comments; however, DHS has determined that considering TANF in the rule, consistent with the 1999 Interim Field Guidance, is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. As provided in the NPRM, TANF was included as public benefit because it provides monthly income payments for low-income families and is intended to foster self-sufficiency, economic stability for families with children and has high expenditures.[422]

*Comment:* Some commenters added that TANF helps families enroll their children in childcare, which is a lifeline for working families. A commenter explained that, while the Child Care and Development Fund (CCDF) is the primary source of public funding for child care, a state may transfer up to 30 percent of its TANF funds to CCDF, or directly allocate its TANF funds, to provide child care subsidies to families in need. The commenter went on to provide statistics on the number of children in child-care and discussed the child-care support that TANF provides for working families. The commenter also provided data on the number of children in childcare and that one in six children eligible for CCDF services gain access to quality care.

*Response:* States may transfer TANF funding to other benefits including childcare, but this not considered cash TANF.[423] As only the "cash assistance for income maintenance" portion of TANF is considered in the public charge inadmissibility determination, direct TANF spending on child care and transfers to CCDF are excluded from the

definition of public benefit for purposes of this rule.

*Comment:* One commenter stated that TANF "child-only" grants should be exempted from the proposed rule as they support the needs of children raised by extended relatives without parents. The commenter indicated that unlike TANF family grants, "child-only" grants are based solely on the income of the child and are only to meet their needs whether outside or inside the foster care system. The commenter stated that many children living with relatives in foster care are only offered TANF child-only support, since many states do not routinely license relatives and the children are consequently ineligible for foster care maintenance payments.

*Response:* DHS appreciates the comments, but notes the "child-only grants" are based solely on the needs of the child (*i.e.,* does not take the adults' needs into account when calculating the assistance benefit)' as opposed to the income of the child.[424] TANF cash assistance provided to a child is considered a public benefit under this rule. States may fund a variety of child welfare activities using TANF funds, including services for family reunification, parenting education, in-home family services, and crisis intervention.[425] TANF is only considered in the public charge inadmissibility determination if it is in the form of cash assistance for income maintenance. Again, non-cash TANF funded services are not included in the rule. States may transfer TANF funding to other benefits including childcare, which is not being considered in the rule. However, as previously discussed, there is no public charge exemption for children, therefore, any cash benefit receipt, including TANF, by a child generally would still be considered as a public benefit in public charge inadmissibility determination.

d. State, Local and Tribal Cash Assistance

*Comment:* A commenter provided information on various Washington State programs designed to provide individuals and families with the resources and support. The commenter

[420] *See* Gene Falk et al., Cong. Research Serv., R45097, *Federal Spending on Benefits and Services for People with Low Income: In Brief* (2018), *available at https://fas.org/sgp/crs/misc/R45097.pdf* (last visited July 26, 2019).

[421] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

[422] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

[423] *See* PRWORA, Public Law 104–193 (Aug. 22, 1996). *See* HHS, Office of Family Assistance, 2014 Child Care Reauthorization and Opportunities for TANF and CCDF (Feb. 19, 2016), available at *https://www.acf.hhs.gov/ofa/resource/tanf-acf-im-2016-02-2014-child-care-reauthorization-and-opportunities-for-tanf-and-ccdf* (last visited July 26, 2019).

[424] See U.S. Department of Health and Human Services, Temporary Assistance For Needy Families, 12th Report to Congress Fiscal Years 2014 and 2015, available at *https://www.acf.hhs.gov/sites/default/files/ofa/12th_annual_tanf_report_to_congress_final.pdf* (last visited July 23, 2019).

[425] HHS, Child Welfare Information Gateway, Temporary assistance for Needy Families (TANF), available at *https://www.childwelfare.gov/topics/management/funding/program-areas/prevention/federal/nondedicated/tanf* (last visited July 26, 2019).

stated that in the FY 2017, approximately one in four Washington residents needed cash, food, child support, child care, and other services and that each day, more than two million individuals receive the support and resources they need from the state to transform their lives. The commenter stated that Washington invests general state funds to assist individuals and families who are ineligible for Federal programs to include lawfully present non-citizens who fail to meet federal eligibility qualifications established in the PRWORA. The commenter described the following programs: State Family Assistance; Food Assistance Program for Legal Immigrants; Aged, Blind, or Disabled Cash Assistance; Pregnant Women Assistance; Consolidated Emergency Assistance Program; Refugee Cash Assistance; Housing and Essential Needs Referral; Diversion Cash Assistance; and State Supplemental Payment. The commenter indicated that the rule would undermine the success of these programs that involve cash or non-monetized benefits and eligible applicants may refuse to receive these benefits.

*Response:* DHS appreciates the comments; however, DHS has determined that considering state cash assistance in the rule, consistent with the 1999 Interim Field Guidance, is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. The programs listed by the commenter that provide cash assistance would be considered public benefits in the public charge inadmissibility determination even if the funding is provided by the state unless they are provided to individuals not subject to public charge such as Refugee Cash Assistance or are not for general income maintenance (*e.g.,* if they are not means-tested or if they are provided for some specific purpose that is not for food and nutrition, housing, or healthcare). For example, LIHEAP (Low Income Home Energy Assistance Program) and emergency disaster relief would not be considered as a public benefit in the public charge inadmissibility determination even though they may be considered as a cash or cash equivalent benefits.

e. Supplemental Nutrition Assistance Program

*Comment:* Many commenters stated that the rule's inclusion of public benefits such as SNAP affects other public benefits including children's ability to access other needed benefits,

particularly at school. The commenters explained that some benefits received at school (*e.g.,* free school meals) are linked to enrollment in SNAP benefits and could be impacted. A commenter stated that the proposed rule is inhumane, affecting families' ability to access SNAP to get the adequate food and nutrition they need. The commenter stated that hunger and malnutrition affects a person's ability to focus, function, and fight off disease and that hunger is already a serious problem in the United States. The commenter stated that aiding the hunger epidemic through the consideration of SNAP is against the public interest and the progression of our society. A commenter said the onerous restrictions initially placed on immigrant participation in SNAP during the 1996 reforms were reversed at the next available opportunity—the 2002 Farm Bill—which illuminates the sound public policy of ensuring that every family living in the United States has access to the resources necessary to feed their children.[426] A commenter stated that only 40 percent of eligible citizen children living in households with immigrants received SNAP benefits after changes to immigration and welfare law in the 1990s.

*Response:* DHS appreciates the comments and recognizes the importance of SNAP. DHS also acknowledges that some people may choose to disenroll from SNAP. However, this rule does not change the eligibility requirements of SNAP and does not prohibit individuals from receiving SNAP. In addition, this rule does not include school lunch or breakfast programs in the definition of public benefit. Further, the expansion of SNAP provisions for children under 18 established by the 2002 Farm Bill,[427] is only applicable to the five-year waiting period; therefore children who become lawful permeant residents do not need to wait five years before being eligible for SNAP.[428] However, DHS will consider SNAP as part of the public charge inadmissibility determination. DHS has determined that considering SNAP is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. DHS believes that even though children and schools may no longer benefit from direct certification for school nutrition programs, a child's disenrollment from SNAP due to this rule would likely have no effect on the child's eligibility for

school nutrition programs, and would not stop the child and school from accessing these programs through existing enrollment processes other than direct certification. This rule would not prevent a child from applying for or receiving any school related nutrition program.

*Comment:* A couple of commenters said the rule would violate the prohibition in Section 8(b) of the Food and Nutrition Act from considering SNAP benefits as income or resources. For example, commenters stated that the inclusion of SNAP is inconsistent with the SNAP statute that states that ''the value of benefits that may be provided under this chapter shall not be considered income or resources for any purpose under any Federal, State, or local laws.'' Commenters also stated that the inclusion of SNAP is inconsistent with congressional intent to expand SNAP eligibility to immigrant children. Similarly, a commenter stated that SNAP should be excluded from the public charge definition because the legislative history of SNAP indicates that SNAP was intended to be supplemental in nature. The commenter suggested that it would be unreasonable to consider receipt of a supplemental benefit to be sufficient to render a person a public charge. Discussing the legislative history surrounding the past four Farm Bills, a commenter stated that SNAP enjoys bipartisan support and Congress has rejected efforts to reduce its reach. The commenter stated that the proposed rule would reduce benefits for low-income children of immigrant parents and that this was inconsistent with congressional intent. A commenter said the onerous restrictions initially placed on immigrant participation in SNAP during the 1996 reforms were reversed at the next available opportunity—the Farm Security and Rural Investment Act of 2002 (the 2002 Farm Bill)—which illuminates the sound public policy of ensuring that every family living in the United States has access to the resources necessary to feed their children.

*Response:* DHS disagrees that the rule is contrary to congressional intent. The fact that Congress has expanded which aliens can receive certain public benefits does not indicate a congressional intent that those benefits should not be considered in determining public charge. The rule abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional policy statements relating to self-sufficiency in 8 U.S.C. 1601. In these policy statements, Congress confirmed that the

---

[427] *See* Public Law 107–171, section 4401, 116 Stat. 134, 333 (May 13, 2002).

[428] *See* 8 U.S.C. 1612(a)(2)(J).

immigration policy continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [429]

Further, DHS disagrees that the inclusion of SNAP as one of the designated public benefits violates the Food and Nutrition Act of 2008. While Federal law allows certain qualified alien children under 18 to receive SNAP benefits,[430] this rule does not prohibit anyone from receiving a benefit for which they qualify. However, Congress did not prohibit the consideration of public benefits as part of any of the factors to be considered in the public charge inadmissibility determination. DHS believes the use of certain benefits is appropriate to consider in determining public charge inadmissibility. To implement Congress' requirement to administer the public charge ground of inadmissibility, DHS inevitably must consider benefits which individuals are eligible to receive, as did the 1999 Interim Field Guidance. DHS believes the rule strikes an appropriate balance as to which benefits are considered.

Further, DHS disagrees that the rule violates the restrictions in section 8(b) of the Food and Nutrition Act, 7 U.S.C. 2017(b). That section provides that the value of SNAP benefits "shall not be considered income or resources for any purpose under any Federal, State, or local laws." [431] The rule does not consider SNAP as income or resources. The rule explicitly excludes the value of public benefits including SNAP from the evidence of income to be considered.[432] Likewise, the consideration of the assets is limited to cash assets and resources and other assets and resources that can be converted into cash within 12 months.[433] Assets and resources do not include SNAP benefits, which are not cash, and selling SNAP benefits is illegal.[434]

*Comment:* Several commenters said that this rule conflicts with USDA's 1999 input as part of the 1999 proposed rule,[435] which advised that special nutrition programs should not be considered in the public charge analysis. A commenter cited to the 1999 Interim Field Guidance, and stated that historically, the receipt of SNAP benefits (or the typical use of Medicaid) does not indicate that an immigrant is or is likely to become primarily dependent on the Government for subsistence. The commenter stated that to qualify for benefits, a SNAP household's income generally must be at or below 130 percent of FPG, the household's net monthly income (after deductions for expenses like housing and childcare) must be less than or equal to 100 percent of the FPG, and its assets must fall below limits identified in Federal regulations. The commenter further stated that the average monthly benefit per household is $253, and the average monthly benefit per person is $125 per month, or $1.40 per meal.

*Response:* As indicated in the proposed rule, DHS determined that receipt of SNAP is relevant to the determination of whether or not the alien is self-sufficient, and therefore not likely to become a public charge. The 1999 proposed rule, and the associated letters, related to a proposed definition of public charge that this rule would change. Furthermore, while INS consulted with the relevant public benefit granting agencies in 1999, DHS was not bound by those agencies' recommendations, but adopted them based on its interpretation of the term public charge, as well as certain public policy objectives articulated in that rule. DHS believes including the program is consistent with Congress' intention that aliens should be self-sufficient.[436] DHS recognizes that some public benefits have higher income thresholds than the income thresholds that this rule identifies as most relevant to the totality of the circumstances determination. However, the general income threshold of 125 percent of the FPG in the public charge totality of the circumstances determination is just one factor; DHS will not exclude consideration of any benefit that does not match that threshold.

*Comment:* One commenter noted that the rule is inconsistent with SNAP eligibility. Commenters stated that the proposed rule undermines congressional intent and the

longstanding Federal commitment to helping those who struggle to have enough healthy food. Commenters stated that the proposed rule is inconsistent with clear congressional intent regarding eligibility for means-tested programs because it undermines those very rules set by Congress in law. One commenter stated that "Congress has made explicit choices to expand eligibility (or permit states to do so)," and increase immigrant access to programs like SNAP, CHIP and Medicaid, and therefore, "[t]he administration must defer to [c]ongressional intent on this issue."

*Response:* DHS does not agree that the inclusion of SNAP as a public benefit considered in the public charge inadmissibility determination is inconsistent with congressional intent. The rule intends to abide by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601: Specifically, that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [437] As discussed in the NPRM, benefits directed toward food and nutrition, housing, and healthcare are directly relevant to public charge inadmissibility determinations, because a person who needs the public's assistance to provide for these basic necessities is not self-sufficient.[438] In addition, these benefits account for significant Federal expenditure on low-income individuals and bear directly on self-sufficiency, as discussed in the NPRM.[439]

*Comment:* A commenter stated that the proposed rule's characterization of individuals receiving SNAP benefits even for modest periods of time as a public charge is inconsistent with extensive research showing that SNAP provides supplemental assistance to a large number of workers, both while they are employed in low-paying jobs and during brief periods of unemployment. The commenter stated that most non-disabled adults who participate in SNAP, including eligible immigrants, work in a typical month or within a year of that month. Specifically, the commenter asserted that over half of the individuals who

---

[429] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[430] *See* 8 U.S.C. 1612(a)(2)(J).

[431] Congress has also exempted children under 18 from sponsor deeming requirements for purposes of SNAP receipt, 7 U.S.C. 2014(i)(2)(E), but this provision does not affect the core reimbursement obligation. In the latter respect, this provision is materially different than the CHIPRA provision regarding Medicaid for children under 21 and pregnant women, discussed above.

[432] *See* 8 CFR 212.22(b)(4)(ii)(A) & (C) ("excluding any income from public benefits").

[433] *See* 8 CFR 212.22(b)(4)(ii)(D) & (E).

[434] *See* 7 U.S.C. 2024(b).

[435] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28,676, 28,688 (proposed May 26, 1999).

[436] *See* 8 U.S.C. 1601(1).

[437] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[438] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[439] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

were participating in SNAP in a typical month in mid-2012 were working in that month, and 74 percent worked in the year before or after that month. Similarly, many other commenters stated that the large majority of SNAP recipients who can work do work.

*Response:* DHS recognizes that people who are working may also lack self-sufficiency. The person's employment does not negate that the person is receiving the public benefit and the employment is not reimbursing the public benefit-granting agency for the cost of the public benefit. Under this rule, DHS would not treat past receipt of SNAP—or any other benefit—as outcome-dispositive. Instead, will assess such past receipt in the totality of the circumstances, to determine whether the alien is likely to become a public charge in the future.

CalFresh

*Comment:* A commenter stated that one in ten Californians receive nutrition assistance through CalFresh, which is California's SNAP program. The commenter stated that CalFresh is California's food stamp program and increases the food buying power in low income households. The commenter stated that if this proposed rule is enacted, school districts will see more children coming to school hungry because noncitizen families, regardless of whether the rule would affect their situation, will be afraid to apply for food stamps, either by deciding not to enroll, or by disenrolling current recipients.

*Response:* As CalFresh is the Federally-funded SNAP program under the State of California, it would be considered as a public benefit under this rule. As discussed with respect to SNAP generally, CalFresh is relevant to the determination of whether or not the alien is self-sufficient, and therefore not likely to become a public charge. DHS understands that some people may disenroll from SNAP/CalFresh and other SNAP funded State benefits. However, this rule does not change the eligibility requirements for these benefits and DHS believes that the inclusion of State SNAP benefits is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601.

f. Housing

*Comment:* Commenters opposed including project-based Section 8 housing in the definition of public charge, because the vouchers can help ease the burden of rent in high-cost cities, help alleviate homelessness, promote economic stability, allow the flexibility for families to pay for other necessities, and promote self-sufficiency. Commenters also provided information and data on the benefit of the programs. Many of these commenters stated that housing is a basic necessity and is or should be a human right. Several commenters discussed the administrative burden and costs the potential rule will have on housing providers, including local rule makers, housing agencies, and private landlords who administer public vouchers, such as the dissemination of information to tenants and providing them with evidentiary information. Other commenters raised concerns that DHS did not sufficiently address the potential costs to the housing market, including the inundation of homeless shelters, and the loss of Government funds going to the private market. A commenter raised concerns that the rule will divert funds from direct housing and resident services to help U.S. Department of Housing and Urban Development (HUD) residents understand the new rule.

*Response:* DHS appreciates the comments and recognizes the importance of housing programs. DHS has determined that considering housing programs, such as Section 8 Vouchers, Section 8 Rental Assistance and public housing, in the rule is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. These programs have high expenditure and relate to the basic living need of housing, and therefore the receipt of such housing related public benefit suggests a lack of self-sufficiency.[440] DHS will therefore consider the housing programs listed in the rule in the public charge inadmissibility determination. The rule intends to abide by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and be consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated, the immigration policies continue to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [441] However, housing programs that provide mortgage assistance or credits will not be considered in the public charge inadmissibility determination.

*Comment:* A commenter stated that receipt of a housing subsidy does not on its own accurately measure self-sufficiency, citing that 34 percent of assisted households are working and contributing to their housing costs. The commenter also stated that housing programs do not constitute an incentive for immigration. The average number of months a household spends on an agency waiting list before being admitted to the public housing or housing choice voucher program is 18 and 32, respectively. A commenter also stated that rental assistance is best understood as a supplemental benefit that reduces housing costs for low-income households but does not provide support for all of an individual's basic needs, instead recipients are generally required to provide housing costs up to 30 percent of their income. A commenter stated that a small share of individuals and households eligible for housing assistance actually receive it because of local housing conditions, wait list sizes, and preferences, DHS will not be able to predict that someone seeking status adjustment or lawful entry is likely to receive housing benefits.

*Response:* DHS understands that there are many conditions that may affect whether a person ultimately receives public housing. As previously indicated, DHS has determined that considering housing programs, such as Section 8 Vouchers, Section 8 Rental Assistance, and public housing, in the rule is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. As previously indicated, the past receipt of one public benefit will not on its own make a person inadmissible based on public charge grounds. Instead, DHS would review all the factors in the totality of the circumstances.

*Comment:* Some commenters stated that, by including housing programs, the rule directly contradicts the mission of public housing as public housing programs are meant to serve families and provide for housing.

*Response:* DHS appreciates that the mission of public housing is to provide low-income affordable housing to families. DHS also has a mission to abide by congressional mandates to review the inadmissibility of all aliens including based on public charge and congressional statements relating to self-sufficiency in 8 U.S.C. 1601.

*Comment:* A commenter stated that the rule would waste affordable housing

---

[440] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51167 (proposed Oct. 10, 2018).

[441] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

resources, including subsidized rental housing programs such as Low-Income Housing Tax Credit (LIHTC) housing, Section 515 rural housing, and Section 514/516 farm labor housing, leading to especially severe, negative impacts in rural California, and the commenter stated that the rule would further destabilize the farmworker population in our agricultural regions. The commenter indicated that from 1964 to 2004, Section 514 and 516 housing programs managed by USDA financed nearly 35,000 homes for farmworkers and rehabilitated thousands more and that that in the period that followed, farmworker housing development continued to be backed by annual Federal appropriations in the tens of millions of dollars. The commenter stated that housing programs have had varying eligibility requirements that have allowed individuals with a variety of immigration statuses and mixed-status families to secure stable, affordable housing; and the rule would therefore lead to significant dislocation of immigrant families, away from housing that was built precisely for their use.

*Response:* This rule does not include LIHTC housing, Section 515 rural housing, and Section 514/516 farm labor housing as public benefits. Further, although the rule may affect whether individuals apply for housing, the rules does not change the eligibility requirements for any public benefit. DHS also notes that under 20 CFR 655.122(d)(1), the employer must provide housing at no cost to the H–2A workers (temporary workers performing agricultural services), and those workers in corresponding employment who are not reasonably able to return to their residence within the same day. Further, under 20 CFR 655.122(d)(4), if public housing provided for migrant agricultural workers under the auspices of a local, county, or State government is secured by the employer, the employer must pay any charges normally required for use of the public housing units directly to the housing's management. DHS would not consider such housing under the definition of public benefit as the employer is required by regulation to pay for any associated costs.

*Comment:* A commenter said data refuted the notion that immigrant families rely disproportionately on all forms of public assistance, citing a study indicating that just 4.2 percent of immigrant households with children utilize housing assistance as compared to 5.3 percent of U.S.-born households. A couple of commenters cited research showing that most able-bodied adults

receiving rental assistance are employed, arguing that they are therefore self-sufficient.

*Response:* DHS appreciates the comment and recognizes that the availability of public benefits for aliens is limited. The purpose of the public charge rule is, however, to ensure that those seeking admission to or adjustment of status in the United States do not become public charges by using the public benefits in the future. The public charge inadmissibility determination is correspondingly one of an alien's likelihood of becoming a public charge through receipt of benefits in the future even if the person is employed. Further, as previously indicated, DHS recognizes that people receiving public benefit may nonetheless be working, but as they are receiving public benefits, such aliens are not self-sufficient. Therefore, DHS will continue to consider the public benefits as listed in the rule.

*Comment:* A commenter stated that DHS should specify in its rule that individuals in mixed-status families who are not recipients of Federal financial housing assistance do not receive a public benefit for public charge determination purposes.

*Response:* DHS will not consider a person who lives in any one of the listed housing programs as receiving public benefits unless the public benefit-granting agency actually designated the benefit for the applicant as a beneficiary, such as in a contract, lease, or other documentation.

*Comment:* A commenter stated that including housing to the public charge determination will cause recipients of public housing to be treated differently due to their immigration status, in contradiction to the Fair Housing Act[442] of 1968's prohibition against discrimination.

*Response:* DHS does not believe that the rule is contrary to the antidiscrimination provisions of the Fair Housing Act.[443] The antidiscrimination provisions prohibit discrimination on grounds covered by the Fair Housing Act by lenders, property sellers, and others covered by that law. In contrast, this rule is applicable in the immigration context where an alien must establish that he or she is admissible and is not inadmissible as likely at any time in the future to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

*Comment:* A few commenters asked whether homeownership programs are included under the rule.

*Response:* The rule does not consider homeownership programs, such as the Housing Choice Voucher Homeownership program,[444] in the public charge inadmissibility determination. DHS will only consider public housing benefits as listed in the rule.

*Comment:* A commenter requested that DHS add benefits received pursuant to Project Rental Assistance Contracts (PRAC), USDA rental assistance projects, or all HUD benefits to the public benefits definition.

*Response:* DHS appreciates the comment, however, DHS will not include additional housing programs. The programs listed by the commenters have low expenditures.[445]

In addition, DHS has removed references to 42 U.S.C. 1437u, the Family Self-sufficiency program, and 24 CFR part 402 Section 8 Project-Based Contract Renewal, which is a program associated with housing but is not itself a housing program.

*Comment:* A commenter associated with the City of Los Angeles reported that the beneficiaries of many city housing programs and policies will be directly negatively impacted by the proposed public charge rule. The

---

[442] *See* 42 U.S.C. 3604.

[443] *See* Title VIII (Fair Housing Act, as amended) of the Civil Rights Act of 1968, Public Law 90–284, 82 Stat. 73 (April 11, 1968) (codified in 42 U.S.C. 3601–19).

[444] *See* 24 CFR part 982, subpart M, 24 CFR 982.625–982.643. *See also HUD.gov*, Homeownership Vouchers, available at *https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/homeownership* (last visited April 19, 2019).

[445] For example, Supportive Housing for the Elderly, the 2019 Request for Outlays is $659,000,000, *see* HUD, Housing, Housing For The Elderly (Section 202), 2019 Summary Statement and Initiatives, available at *https://www.hud.gov/sites/dfiles/CFO/documents/25%20-%20FY19CJ%20-%20HSNG%20-%20Housing%20for%20the%20Elderly%20%28Section%202022%29%20-%20Updated.pdf* (last visited May 31, 2019); for Supportive Housing for Persons with Disabilities, the 2019 Request for Outlays is $188,000,000, Housing, Housing For Persons With Disabilities (Section 811), 2019 Summary Statement and Initiatives, available at *https://www.hud.gov/sites/dfiles/CFO/documents/26%20-%20FY19CJ%20-%20HSNG%20-%20Housing%20for%20Persons%20with%20Disabilities%20%28Section%20811%29%20-%20Updated.pdf* (last visited May 31, 2019); for Housing for Persons With AIDS (HOPWA), the 2019 Request for Outlays is $353,448,000, *see* Community Planning And Development Housing Opportunities For Persons With Aids 2019 Summary Statement And Initiatives, available at *https://www.hud.gov/sites/dfiles/CFO/documents/17%20-%20FY19CJ%20-%20CPD%20-%20Housing%20Opportunities%20for%20Persons%20with%20AIDS%20%28HOPWA%29.pdf* (last visited May 31, 2019); and for USDA Multi-Family Housing Rental Assistance, the 2019 appropriated funds is $1,331,400,000, *see* FY 2019 Appropriated Funds, available at *https://www.rd.usda.gov/newsroom/fy2019-appropriated-funding* (last visited May 31, 2019).

**41378** Federal Register / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

commenter cited programs such as permanent support housing, including Section 8 Vouchers; Housing Opportunities for Persons With HIV/AIDS; Domestic Violence Shelter Operations; and Family Source Center services. The commenter indicated that the rule will either dissuade immigrants who legally qualify for public assistance from seeking the necessary services or lead to high level of disenrollment. The commenter indicated that some program officials could not confidently offer aliens clear guidance on the immigration consequences of accessing certain services. The commenter stated that the rulemaking would exacerbate homelessness and has already led to a "chilling effect." The commenter also stated that the proposed rule was inconsistent with the commenter's commitment to ensure fair housing for its residents, and threatens its ability to enforce housing rights for local residents. The commenter stated that such commitment includes a requirement by HUD to certify that it would affirmatively further fair housing.

*Response:* The public charge rule does not prevent aliens from obtaining benefits they are legally entitled to under PRWORA. Given Congress' strong interest in an immigrant's self-sufficiency [446] and based on the fact that Congress did not exempt the receipt of such benefits from consideration for purposes of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4),[447] DHS will consider public benefits as listed in the rule. DHS notes that other housing programs not listed in the rule, such as Section 202 Supportive Housing for the Elderly, Section 811 Supporting Housing for Person with Disabilities, Housing Opportunities for Persons With AIDS (HOPWA), USDA Multi-Family Housing Rentals, and home loan and grant programs, will not be considered in the public charge inadmissibility determination.

*Comment:* A commenter asked whether the following benefits received as part of a lead paint abatement program would be considered public benefits for purposes of public charge; any stipend received as part of the program, including stipends or gift cards that are offered to encourage families to get their children tested for lead; the use of a city-operated lead safe house to which families may move during renovation of their home to remove lead; or receipt of HUD grant funds used to pay a landlord of a rental unit to rehabilitate a unit that has been found to have poisoned a child. The

commenter indicated that many of the funds used for lead abatement programs are HUD grant dollars, and to the extent that these payments are made available based upon the income of the renter, they could have an impact on the renter from a public charge standpoint.

*Response:* DHS will not consider any subsidies or grants provided to test for lead paint or to ameliorate homes with lead paint issues in the public charge determination. DHS will only consider those public housing programs enumerated in 8 CFR 212.21(b). HUD's Lead-Based Paint and Lead Hazard Reduction Demonstration Grant Programs are regulated under 24 CFR part 35, and do not fall under the list of enumerated benefits. Therefore, subsidies or grants for lead abatement programs are not considered a public benefit for purpose of the public charge inadmissibility determination.

g. Institutionalization

*Comment:* A commenter asked that institutionalization for long-term care be removed as a consideration in the public charge determination because the country has made progress with deinstitutionalization over the past several administrations. The commenter also stated that there is no evidence that people with significant disabilities are taking advantage of the Medicaid system. The commenter stated that the rule's potential effects on individuals with disabilities created an implication that individuals with disabilities were not welcomed citizens of the United States, and stated that this was an "appalling message." A commenter stated that despite deinstitutionalized supports and services becoming more and more prevalent, most people with disabilities receiving any Medicaid supports must first prove that they are at risk of institutionalization. The commenter stated that the requirement to prove risk of institutionalization applies to virtually every individual with an intellectual and/or developmental disability in the United States regardless of immigration status. The commenter stated that inclusion of institutionalization in the public charge rule would thus automatically cast a mark against a person with a disability under the proposed rule.

*Response:* DHS appreciates the comments. DHS does not believe that all individuals with an intellectual or developmental disability will necessarily be institutionalized, be likely to be institutionalized, or be inadmissible based on public charge

grounds. As explained in the NPRM,[448] the U.S. Government subsidizes health insurance, which pays for expenses associated with the institutionalization. The receipt of these benefits to provide for the cost of institutionalization indicates a lack of self-sufficiency in satisfying basic living needs of food and nutrition, housing, and healthcare. Additionally, institutions are residential facilities that assume the total care of individuals who are admitted, including room and board. However, DHS understands that the language in the NPRM could be interpreted as inclusive of other public benefits not listed in the rule, such as Social Security retirement benefits or Medicare. Therefore, DHS has removed the reference to long-term institutionalization within the definition of public benefit, as the long-term institutionalization benefits that DHS has in the past considered, and intends to consider under this rule, are already part of the public benefit definition, *i.e.,* TANF, SSI, and Medicaid.

Further, DHS disagrees that continuing to consider institutionalization for long-term care at government expense indicates that the United States does not welcome people with disabilities. DHS reiterates that a child or a person who is severely disabled or who has a severe medical condition and who lives in a long-term care facility at government expense would not be found inadmissible on the public charge ground solely on account of the past institutionalization. Instead, DHS will, in the totality of the circumstances, take into account whether there are sufficient assets and resources to provide for his or her future care in a privately-financed setting, including resources provided by guardians or relatives who may have the ability to support the alien and provide for the alien's future care.

*Comment:* One commenter stated that most of the population would eventually require long-term care in nursing homes. A commenter stated that including benefits provided for institutionalization is a virtually blanket conclusion that all immigrants are "likely" to become public charges, because a huge percentage of aging individuals in the United States will ultimately require some form of institutional care. The commenter cited to data that, according to the commenter, indicated nursing homes alone will ultimately care for 35 percent of the population. The commenter said

---

[446] As expressed in 8 U.S.C. 1601.

[447] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[448] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51171–72 (proposed Oct. 10, 2018).

considering these services as public benefits would render all immigrants inadmissible. A commenter stated that institutionalization cannot be predicted and asked what would happen if an alien previously deemed admissible later became disabled, but documented that they will not need benefits at any time in the future.

*Response:* DHS understands that people may need long-term care with age; however, DHS does not believe that everyone will need to be supported by the Government. For example, an alien or his or her family may have sufficient assets or resources to ensure that the alien has the necessary care, even in a circumstance where the alien cannot work or must be institutionalized. Or the alien could have adequate insurance to support institutionalization for long-term care, whether through a private insurer or through Medicare.

The public charge inadmissibility determination calls for a determination that it is more likely than not, in the totality of the circumstances, that the alien will become a public charge. For this reason, DHS would consider it unreasonable to assume, for purposes of the public charge determination, that all individuals will eventually live in nursing homes subsidized by the government. USCIS will not deny a person based on public charge solely because of a remote possibility that a person will need such care in advanced age. DHS also clarifies that the public charge inadmissibility determination does not necessarily involve a review of whether the person has actually received a public benefit after DHS has made its determination. DHS further understands that the language in the regulation may indicate that other public benefits not otherwise listed that may be used to fund institutionalization, including State benefits, Social Security retirement benefits, SSDI, or Medicare. When referring to public benefits used for long-term care at government expense, the 1999 Interim Guidance listed SSI, TANF, and Medicaid as examples of public benefits for long-term institutionalization at government expense that would be considered in the public charge inadmissibility determination.[449] Likewise, under this rule, DHS would consider such benefits as part of long-term institutionalization at Government expense and did not intend to consider other benefits may be used such as Social Security retirement benefits, SSDI, Medicare or veteran's

benefits. Social Security retirement benefits, SSDI, Medicare and veteran's benefits are considered earned benefits in that individuals pay into the programs as part of their employment and must work for a certain period of time before being eligible. Therefore, DHS is removing the provision for public benefits for long-term care at government expense as a separate provision in the definition of public benefits. Because the benefits considered for institutionalization under the rule are already within the rest of the list in the public benefit definition, DHS does not believe the additional provision is necessary and its deletion avoids confusion with other benefits that are not considered in the rule. Further, when a person is institutionalized and the person or a relative is paying for any cost associated with the institutionalization without the use of public benefits, DHS would not consider the institutionalization as a public benefit being received. DHS notes that institutionalization would otherwise be generally be considered as part of the health factor as described in the rule.

h. Medicaid

*Comment:* Many commenters stated that Medicaid should not be considered in public charge determinations. Commenters stated that the rule contradicts one of PRWORA's main policies, which extends Medicaid benefits to immigrants, as well as other laws that allow certain children and pregnant women to access Medicaid without a waiting period. One commenter stated that DHS should exempt up to two years of Medicaid when the individual has shown past ability and earning potential. The commenter did not provide a reason for the proposed two-year period, but stated that when a person applies for health insurance on the Affordable Care Act (ACA) marketplace, and is eligible for Medicaid, "the marketplace automatically forwards an application on their behalf to Medicaid, even if they never intended to apply for Medicaid, leaving them with no choice in the matter at all!" The commenter did not provide evidence to support his statement regarding how the ACA marketplace works. Some commenters supported the inclusion of Medicaid in the rule.

*Response:* DHS will continue to consider Medicaid. DHS agrees that Medicaid is beneficial to those who receive it. DHS, however, seeks to better ensure that applicants for admission to the United States and applicants for adjustment to lawful permanent

resident status, who are subject to the public charge ground of inadmissibility or are nonimmigrants applying for an extension of stay or change of status, are self-sufficient and do not rely on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, sponsors, and private organizations.[450] Further as previously discussed, the public charge inadmissibility rule is not inconsistent with PRWORA, nor does it contravene or overrule PRWORA.[451]

As indicated in Table 10 of the NPRM,[452] the total Federal expenditure for the Medicaid program overall is by far larger than any other program for low-income people.[453] In addition, the focus of this public charge rule is to ensure self-sufficiency that covers the basic necessities of life, such as food and nutrition, housing, and healthcare.[454] Medicaid is a federal benefits program that provides for a person's health insurance to cover the costs of healthcare, which, is a basic necessity of life that is directly relevant to public charge.[451]

However, DHS credits the many comments that DHS received regarding the receipt of Medicaid and CHIP by children and pregnant women, as well as the states that have expanded their Medicaid programs to allow access to such groups without a waiting period. DHS has decided to exclude consideration of Medicaid received by all aliens under the age of 21. The age limit of 21 for exempting Medicaid receipt from consideration reflects Congressional intent to allow states to extend coverage to this population (along with pregnant women as discussed below) without requiring them to wait five years as required by PRWORA, and without triggering a reimbursement requirement for the alien's sponsor under an affidavit of

---

[449] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28689 (May 26, 1999).

[450] *See* 8 U.S.C. 1601(2).

[451] *See* Part III, Section D, Comments Regarding Legal Authority/Inconsistency with Congressional Intent.

[452] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160 (Oct. 10, 2018).

[453] *See* Table 26–1 Policy, Net Budget Authority by Function, Category, and Program, available at *https://www.whitehouse.gov/wp-content/uploads/2018/02/26-1-fy2019.pdf* (last visited July 26, 2019). Expenditure amounts are net outlays unless otherwise noted. *See also* Gene Falk et al., Cong. Research Serv., R45097, Federal Spending on Benefits and Services for People with Low Income: In Brief (2018), *available at https://fas.org/sgp/crs/misc/R45097.pdf* (last visited July 26, 2019). Note however that neither HHS nor DHS are able to disaggregate emergency and non-emergency Medicaid expenditures. Therefore, this rule considers overall Medicaid expenditures.

[454] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

**41380** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

support.[455] The age limit also aligns with the limit most states offer free public education to children, and provides appropriate certainty to educators, parents, and children with respect to use of health care programs by children.[456]

DHS recognizes Congress did not exclude children from the public charge determination. But as noted in the proposed rule, the fact that an alien received public benefits as a child is a relevant consideration when determining the likelihood that the alien will receive public benefits in the future. As alien children approach or reach adulthood, they may age out of eligibility for certain benefits, choose to disenroll from such benefits (for which their parents may have enrolled them), or increase their chances of becoming self-sufficient depending upon whether they acquire education and skills, secure employment, and accumulate assets and resources. As a consequence, past receipt of public benefits as a child may be less indicative of future receipt, as compared to past receipt as an adult.

DHS recognizes that Medicaid and CHIP benefits for children also provide for other services or funding for in-school health services and serve as an important way to ensure that children receive the vaccines needed to protect public health and welfare. In addition, children may be enrolled in Medicaid through the school system or other programs which are required by law to provide services which may affect school budgets.

In sum, while children are not exempt from public charge inadmissibility, there are strong legal and policy reasons to assume that Congress did not intend DHS to treat receipt of Medicaid by alien children under the age of 21 in the same way as receipt of Medicaid by adult aliens. Congress expressly authorized states to expand Medicaid eligibility for aliens under the age of 21 without a waiting period, and expressly provided that receipt of such Medicaid would not trigger a reimbursement application under an affidavit of

support. Finally, Medicaid also funds the delivery of certain services through the educational system, which DHS intends to exempt. Therefore, DHS believes that it is appropriate to exclude Medicaid for individuals under the age of 21 from the public benefit definition.

In addition, and consistent with the foregoing, DHS has decided to exempt Medicaid received by pregnant aliens during pregnancy and during the 60-day period beginning on the last day of the pregnancy. This exemption aligns the rule with the exclusion of CHIP from consideration, as CHIP also provides coverage to pregnant women and children, and ensures parity under this rule for this population across two Federal benefits (Medicaid and CHIP). It also aligns the rule with the special treatment that Congress afforded children under 21 and pregnant women in under 42 U.S.C. 1396b(v)(4). Again, that authority allows states to extend coverage to pregnant women, and children under the age of 21, without regard to the 5-year limit under PRWORA, and without imposing reimbursement obligations on an alien's sponsor through an affidavit of support (as discussed above). DHS believes that Medicaid received by pregnant aliens, while providing a short-term benefit for the alien herself, in many cases ultimately benefits the U.S. citizen child(ren) who is born to such alien.

DHS appreciates the suggestion to incorporate a two-year "exemption period" for Medicaid. However, DHS will not include a two-year period in the rule. Although DHS agrees that through the health insurance marketplace, an eligible person may be *referred* for Medicaid eligibility, DHS understands that generally the referral must still be approved by the State and accepted by the potential beneficiary.[457] The person has a choice in accepting Medicaid through the health insurance marketplace. In addition, all individuals may voluntarily disenroll from Medicaid at any time.[458] As DHS will only consider Medicaid received after the effective date of the rule, and requires the alien to be likely to receive Medicaid (or other designated public

benefits) above the threshold in order for the alien to be likely to become a public charge, DHS does not believe that a two-year "exemption period" is necessary.

*Comment:* Some commenters said the durational limits on the use of Medicaid did not align with how Medicaid recipients use the program, and said that health insurance should be treated differently than other welfare programs. A commenter stated that the proposed 12-month threshold for Medicaid would produce absurd results when applied to a real-world context. The commenter stated that some treatments and services are intensive and span months, if not years. For example, a Medicaid enrollee with cancer could have a debilitating year-long treatment regimen. The proposed rule would force such an individual into an impossible situation where continued treatment would count against them for immigration purposes. Some commenters said insurance through programs like Medicaid reduces the likelihood that an individual will become bankrupt, and that the proposed rule may cause previously self-sufficient individuals to become reliant on government assistance. One commenter stated that individuals may be enrolled in Medicaid by hospitals without their knowledge if they are in an accident or presented to the ER with a serious health condition. The commenter said that at times, the patients do not even know that they are being enrolled in Medicaid and just think they are being enrolled into a sliding scale program. The commenter stated that looking at past receipt of Medicaid is too complicated and unhelpful in determining if a person may become a public charge, and recommended that if DHS insists on including Medicaid then the period of time should be reduced to a look back of maximum 12 months.

*Response:* DHS disagrees that Medicaid as health insurance should be treated differently. Medicaid has a large federal expenditure impact, similar to other public benefit programs included in the rule.[459] DHS believes the benefit programs considered in the public charge determination are appropriate as they directly relate to self-sufficiency, since they are providing basic necessities of life such as food and nutrition, housing, and healthcare. Because of the nature of the public benefits that would be considered under this rule—which are generally means-tested and provide cash for income maintenance and for basic living needs such as food and nutrition, housing, and

---

[455] Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. 111–3, section 214, 123 Stat. 8, 56 (Feb. 4, 2009) (Permitting States to Ensure Coverage Without a 5-Year Delay of Certain Children and Pregnant Women Under the Medicaid Program and CHIP) (codified as amended at 42 U.S.C. 1396B(v)(4)).

[456] State laws generally provide a maximum age limit for free public education. The limit ranges between 17 (Alabama) and 26 (Texas). As of 2017, 25 states allow for free public education until age 21. Department of Education, National Center for Education Statistics, Table 5.1 Compulsory school attendance laws, minimum and maximum age limits for required free education, by state: 2017 *https://nces.ed.gov/programs/statereform/tab5_1.asp* (last visited July 17, 2019)

[457] *See* Kalman Rupp and Gerald F. Riley, State Medicaid Eligibility and Enrollment Policies and Rates of Medicaid Participation among Disabled Supplemental Security Income Recipients, Social Security Bulletin, Vol. 76 No. 3, 2016, available at *https://www.ssa.gov/policy/docs/ssb/v76n3/v76n3p17.html* (last visited June 14, 2019).

[458] *See* CMS, Medicare-Medicaid Plan Enrollment and Disenrollment Guidance (June 14, 2013), available at *https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/Downloads/MMPFinalEnrollGuidance.pdf* (last visited July 26, 2019).

[459] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160 (proposed Oct. 10, 2018).

healthcare—DHS believes that receipt of such benefits is an important factor to consider, in the totality of the circumstances, when making a public charge determination. This is because a person with limited means to satisfy basic living needs who uses government assistance to fulfill these needs frequently will be dependent on such assistance to such an extent that the person is not self-sufficient. Medicaid, as a government subsidized health-insurance program, provides means to ensure sufficient healthcare. Regarding the concern that individuals may be enrolled in Medicaid without their knowledge when receiving emergency room services, DHS notes that the rule excludes consideration of emergency Medicaid. Additionally, individuals who are enrolled in Medicaid receive documentation informing them of their enrollment and may at any time disenroll from the public benefit.

DHS acknowledges the positive outcomes associated with public benefits programs, but the goals of programs such as Medicaid are different from the objectives of immigration in admission of aliens into the United States. The rule, therefore, abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated, the immigration policy continues to be that, ''aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations.'' [460] Therefore, the public charge inadmissibility ground and this rule serve to ensure that those coming to the United States will be self-sufficient.

*Comment:* One commenter opposed including Medicaid in the definition of public benefit and stated that such inclusion will harm the ability of disabled individuals to access reasonable accommodations. The commenter stated that such inclusion will result in individuals disenrolling from Medicaid and may adversely affect individuals' ability to obtain proof of disability from a doctor that is necessary to secure reasonable accommodations in housing. The commenter noted that such an individual, potentially with the assistance of social service or other organizations serving the individual, would have to find an alternative means

of proving the disability. The commenter stated that costs and delays associated with obtaining such proof ''would lead to fewer tenants being allowed to bring forward the defenses to which they are legally entitled, and would lead to further evictions in the greater Boston area.''

*Response:* DHS recognizes that an individual who disenrolls from Medicaid (or foregoes initial enrollment) as a consequence of this rule may face additional challenges in providing proof of disability for purposes of reasonable accommodation. As noted by the commenter, however, Medicaid is not a precondition to obtaining such proof of disability. An alien who relies on Medicaid for healthcare (including potential documentation of disabilities) for the period of time that meets the requisite threshold (more than 12 months in the aggregate during any 36-month period) may be found to be a public charge, notwithstanding that such outcome may have negative downstream effects for such alien or others.

*Comment:* A couple of commenters said there was no reason to distinguish between private and public health insurance in making a determination about self-sufficiency, and that private insurance for working-class people is often subsidized by the government through such mechanisms as special tax treatment for employer-provided insurance and refundable tax credits for private health insurance plans under the ACA.

*Response:* DHS appreciates the comments but disagrees. Medicaid can impose substantial costs on multiple levels of government and generally indicates a lack of ability to be self-sufficient in satisfying a basic living need, *i.e.,* healthcare. As noted in the NPRM, by at least one measure, this program entails some of the largest overall Federal expenditure for low-income people, by far. Although DHS agrees that government subsidies for private health insurance plans may also be amenable to consideration for public charge purposes, it is a reasonable approach to only designate Medicaid at this time.

*Comment:* Several commenters remarked that states have implemented programs, such as Medicaid Buy-In programs, to allow individuals with disabilities to retain the necessary Medicaid coverage while participating in the labor force. A commenter stated that Medicaid is one of many government programs that provide targeted assistance to individuals with disabilities. The commenter provided the example of New York, which

created a Medicaid Buy-In Program for Working People with Disabilities specifically to allow working people with disabilities to earn more income without risk of losing their health insurance. The commenter stated that many people qualify for Medicaid because an injury or disability has made them unable to work. Medicaid often covers services that are unavailable through private insurance, such as medical equipment, long-term care, and certain specialist care services. The commenter stated that the NPRM undermines the goals of these programs by broadly including ''health'' as a factor in the public charge determination and by heavily weighting receipt of health-related benefits as a negative factor in public charge determinations without distinguishing Medicaid recipients with disabilities.

*Response:* DHS appreciates that some people may be eligible for Medicaid based on other eligibility criteria or a higher income threshold, however, such Medicaid programs would also be included within the definition of public benefit for the purposes of the public charge inadmissibility determination. DHS does not intend to undermine the goals of Medicaid or Medicaid Buy-In programs in this rule. However, Congress provided for the mandatory factors, including health. [461] The interpretation of the public charge provision has long included consideration of the alien's receipt of government-funded healthcare programs. [462] Medicaid Buy-In programs are optional state Medicaid programs for workers with disabilities who have earnings in excess of traditional Medicaid rules. [463] These programs are still using the same source of government funding; the main difference is that they contain different eligibility requirements, such as a higher income threshold. Further, DHS, as previously discussed, understands that people may be employed and still receive public benefits and are therefore not self-sufficient. Aliens should be

---

[460] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[461] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[462] *See, e.g., Ex parte Nunez,* 93 F.2d 41 (9th Cir. 1937).

[463] *See* Medicaid.gov, Medicaid Employment Initiatives, available at *https://www.medicaid.gov/medicaid/ltss/employment/index.html* (last visited June 24, 2019). *See also* for example, New York State, Medicaid Buy-in Program for Working People with Disabilities, available at *https://www.health.ny.gov/health_care/medicaid/program/buy_in/index.htm* (last visited June 24, 2019). In order to qualify under the New York State program, a person must have a disability as defined by SSA, be engaged in paid work, and have a gross income that may be as high as about $63,492 for an individuals and $86,575 for a couple, among other requirements.

obtaining private health insurance other than Medicaid in order to establish self-sufficiency.

*Comment:* A commenter indicated that the rule is unclear on the meaning of Medicaid and unclear whether programs that are funded only by the state and provided under the auspices of Medi-Cal would be considered Medicaid for the purposes of a public charge analysis.

Another commenter stated that Medicaid is a Federal-State program; it is funded jointly by the Federal Government and the States, and each state operates its own program within broad Federal guidelines. The commenter indicated that States have numerous options as to the people and benefits they cover and a great deal of flexibility in designing and administering their programs. The commenter stated that consequently, Medicaid eligibility and benefits vary widely from state to state. For example, the commenter stated that Wisconsin is the only non-expansion state to cover childless adults at any income level. The commenter further stated that immigration authorities would have no way of predicting which states individuals would likely live in throughout their lives and therefore would not know which income thresholds would be relevant to consider when making a public charge determination, potentially leading them to assume that most people could end up using Medicaid at some point.

*Response:* Medicaid is a Federal-State partnership under which the Federal Government provides matching funds to states for certain expenditures at varying percentages (depending on the state). The form of Medicaid covered by this rule is any Medicaid program operated under the authority of Title XIX of the Social Security Act Amendments of 1965 (Pub. L. 89–97), for which the state seeks reimbursement from the Federal Government. In other words, any Medicaid benefit for which a state seeks reimbursement from the Federal Government will be considered in the public charge determination regardless of which state administers the program. Medi-Cal is how the State of California delivers Medicaid to its residents.[464] Any Medi-Cal receipt will therefore be considered in the totality of the circumstances in the public charge inadmissibility determination, unless the Medi-Cal is provided to the alien under a state-only authority at no expense to the Federal Government.

Medicaid administered by other states will also be considered in the public charge inadmissibility determination to the same extent as described above, regardless of the name used for Medicaid in such state. A state medical insurance program, funded exclusively by the state, is not included in the definition of public benefit under 8 CFR 212.21(b), and will not be considered as a public benefit in the public charge inadmissibility determination. To the extent that States give the same name to their Federal Medicaid program and the state-only funded health insurance program, aliens will not be required to report the receipt of the state-only funded health insurance. USCIS would assume that any Medicaid identified on the Form I–944 is Federal Medicaid.

*Comment:* A commenter agreed with the exception for school-based services, but said it underscores the need for clarification stating that public benefit programs and services provided to school children by public school systems will not be considered in immigration status determinations for a family member or member of the household. Moreover, the commenter said further clarification is needed that any application, documentation, or verification information collected by a public school for program eligibility, allocation, or qualification purposes would not be requested or subject to disclosure by the local education agencies or the student and their parents or guardians for DHS public charge consideration.

*Response:* DHS reiterates that only the public benefits listed in 8 CFR 212.21(b) are considered public benefits for purposes of the public charge inadmissibility determination. DHS also reiterates that under this rule, Medicaid-funded school-based benefits provided to children who are at or below the oldest age of children eligible for secondary education as determined under State law are not considered public benefits for purposes of the public charge determination, as are Medicaid-funded IDEA programs and Medicaid for children under the age of 21 are not included the are definition of public benefit. Additionally, public benefits received by household members are not considered in an alien's public charge inadmissibility determination.[465] Confidentiality or non-disclosure provisions relating to applications for or receipt of certain public benefits programs are generally

governed by laws relating to the specific public benefits program and are not within the scope of this regulation. Further, as part of the public charge inadmissibility determination, DHS does not intend to request information from schools that was collected by such school for program eligibility, allocation, or qualification purposes. Instead the students, or students' parents or guardians would provide documentation related to any Medicaid or SNAP, or other public benefit, application, documentation, or verification information collected by a public school for program eligibility, allocation, or qualification purposes.

Individuals With Disabilities Education Act

*Comment:* Multiple commenters stated that children with special healthcare needs (disabilities) depend on Medicaid, and that while the proposed rule includes exceptions for services funded by Medicaid but provided through IDEA, no plan has been put forward that would enable this carve-out to work in practice.

Many commenters discussed the positive effects of children being enrolled in Medicaid and the "chilling effect" or disenrollment associated with the proposed rule, and warned that decreased participation in Medicaid would lead to decreased utilization of preventative services, worse health outcomes for families and children, and significant economic costs. Many commenters said the proposed rule's exemption of school-based health services was insufficient given the larger repercussions of the "chilling effect" and the likelihood that many children would be disenrolled. Some commenters indicated that under IDEA, schools serve as a health care provider reimbursed by Medicaid but are not eligible for reimbursement if a family chooses not to enroll their child. A commenter provided data on the funding school districts receive from Medicaid for school-based health services, and the numbers of students who benefit from these programs. The commenters pointed out that this funding is tied to the number of Medicaid-eligible students enrolled. Schools said they already struggle to receive consent for school-based, Medicaid-reimbursable services, and warned that the proposed rule would exacerbate this problem. A commenter expressed concern that, even though medically necessary special education services provided to eligible children at school would be excluded under the rule, the fear of being labelled a public charge would cause some immigrant

---

[464] *Ca.gov,* Medi-Cal, available at *https://www.dhcs.ca.gov/services/Medi-cal/pages/default.aspx* (last visited Mar. 29, 2019).

[465] If a household member is obtaining public benefits, however, that amount will not be counted toward the household's annual gross income determinations. *See* 8 CFR 212.22(b)(4)(ii)(A).

parents to refrain from securing these services for children. A few commenters were concerned that the proposed rule would worsen health outcomes, increase food insecurity, and reduce educational attainment.

A commenter supported the exclusion of benefits under IDEA, but stated that it remained concerned about these services being used against parents who refuse to sign a specific consent form. Multiple commenters stated that children with special healthcare needs, including children with disabilities, depend on Medicaid. These commenters indicated that children with special needs cannot and do not receive Medicaid for educational services alone and the exclusion of Medicaid-funded IDEA services will likely do little to encourage families who are fearful of participating in Medicaid to maintain their enrollment. A commenter stated that IDEA funding is often insufficient and requires states to rely on Medicaid to fill funding gaps. The commenter added that if schools lost Medicaid funding, it could result in special education and even general education services being withheld and the loss of school nurses, whose salaries are subsidized by Medicaid. (Special education assistance programs, such as the New Jersey Special Education Medicaid Initiative addressed by one of the commenters, are school-based Medicaid reimbursement programs that allow school districts to obtain federal reimbursement of actual costs of Medicaid covered services under the IDEA).[466] One commenter who generally supported the rule stated opposition to the Medicaid exclusion under IDEA and recommended that all disabilities should be individually assessed.

*Response:* DHS recognizes the public benefits listed in the rule may be associated with other programs and that eligibility for other programs or reimbursements to organizations may be dependent or automatically provided based on the receipt of one of the enumerated public benefits. DHS also understands that it is possible that a parent would not be aware of which services in an Individualized Education Plan or any other education plan set up by a school for a child with disabilities are reimbursed by Medicaid or a different funding source. Parents may not receive notification that Medicaid was billed for services provided at school. In addition, DHS recognizes that Medicaid's assistance programs go beyond mere special education assistance under IDEA for Medicaid

covered benefits and that school-based programs also include services such as dental and vision services, (for example under the Early Periodic Screening Diagnostic and Treatment (EPSDT)) benefit or other preventative services.[467] DHS believes that by excluding any Medicaid received by an alien under the age of 21 (as well as any and all CHIP benefits), and retaining the exemptions for (1) services or benefits funded by Medicaid but provided under the IDEA and for (2) school-based benefits provided to children who are at or below the oldest age of children eligible for secondary education, DHS has effectively addressed many of the objections that commenters raised related to the potential indirect effects of this rule on school funding. With these changes, DHS believes that it has created a workable framework for purposes of the public charge assessment and the benefits these programs provide for school-age children.

*Comment:* A commenter stated that DHS's reasoning for excluding a program like IDEA should apply to the other benefits DHS proposes adding to the public charge determination. For example, according to the commenter, the proposed rule stated or implied that DHS proposed to exclude IDEA to avoid discriminating against people with disabilities. The commenter stated that DHS should consider other ways the proposed rule discriminates against vulnerable populations. Some commenters specifically requested that public benefits received by individuals with disabilities be excluded or that DHS exclude Medicaid and SNAP. Several commenters reasoned that individuals with disabilities rely on non-cash benefits disproportionately, often due to their disability, in order to continue working, stay healthy, and remain independent and productive members of the community.

*Response:* As indicated in the NPRM, DHS excluded services provided under IDEA that are generally funded in whole or in part by Medicaid to ensure that schools continue to receive financial resources to cover the cost of special education and related services which they would be legally required to provide at no cost regardless of the outcomes of the rulemaking.[468] But DHS also recognizes that Congress did not exclude applicants with disabilities or other medical conditions in the public

charge inadmissibility statute.[469] DHS considers any disability or other medical condition in the public charge inadmissibility determination to the extent the alien's health makes the alien more likely than not to become a public charge at any time in the future. USCIS' consideration of health-related issues will be largely limited to those conditions that are identified on the Form I–693 and affect an applicant's ability to work, attend school, or otherwise care for himself or herself. As noted in the proposed rule, after assessing Federal statutes and regulations protecting individuals with disabilities from discrimination, DHS believes that this rule's treatment of disability in the public charge context is not inconsistent with such statutes and regulations.[470]

*Comment:* A commenter stated that many of its members are childcare providers and child-care center teachers who raised questions about whether or not certain child-specific services through Medicaid and CHIP would be excluded. The commenter stated that children received essential services through these programs, including the EPSDT benefit, which is a federally mandated benefit, and ensures coverage for developmental assessments for infants and young children with the routine and preventive care services they need to grow into healthy adults.

*Response:* The EPSDT benefit is not a separately funded Medicaid program, but an integral part of the Medicaid benefit for children, as described in section 1905(r) of the Social Security Act. As EPSDT is a Medicaid program, and DHS determined that any services provided to aliens under the age of 21 based on Medicaid and CHIP will not be considered as part of the public charge determination, any benefits under EPSDT would also not be considered in the public charge inadmissibility determination.

Emergency Services Exclusion

*Comment:* A commenter opposed the exclusion of emergency services, stating that the failure to provide financially for the receipt of emergency services was a strong indicator of a lack of self-reliance. Another commenter stated that emergency Medicaid's applicability to births creates an immigration incentive by advertising a service, which will ultimately assist aliens' immigration process (by providing them with a new U.S. citizen as a family member). The commenter further stated that DHS

---

[466] *See* 20 U.S.C. 1400 *et seq.*

[467] Medicaid payments for necessary health services are covered under section 1905R of the Social Security Act, 42 U.S.C. part 441, Subpart B.

[468] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51170 (proposed Oct. 10, 2018). These services are typically not income-based.

[469] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[470] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

misconstrued 8 U.S.C. 1611(b), and did not consistently recognize the distinction in legislative intent to provide benefits to aliens that may nevertheless be considered as negative factors in a public charge determination. In contrast, some commenters supported the exclusion of emergency Medicaid. Some commenters indicated that immigrants would still be reluctant to access emergency services because many will not be aware that emergency services are excluded, or may not know if someone in their household was experiencing a true medical emergency.

*Response:* DHS appreciates and understands the commenters' concerns. However, DHS will exclude emergency Medicaid benefits in the rule, consistent with the policy underlying the PRWORA exclusion for care and services that are necessary for the treatment of an emergency medical condition. In 8 U.S.C. 1611(b), Congress specifically excluded this category of benefit from the definition of public benefits and as a result from allows non-qualified aliens to receive such emergency public benefits. DHS did not propose to designate any public benefits that are not defined as public benefits in PRWORA, because those exclusions may reflect a congressional judgment regarding the importance of ensuring that those benefits remain available to otherwise eligible aliens. DHS prefers to avoid any appearance of interfering with aliens' willingness or ability to access such public benefits. Accordingly, DHS excludes receipt of Medicaid under these provisions if the State determines that the relevant treatment falls under "emergency medical conditions."[471]

*Comment:* A commenter stated that hospitals are compelled to provide emergency services due to their mission and laws like the Emergency Medical Treatment and Active Labor Act (EMTALA), but those services will go uncompensated if patients are disenrolled from Medicaid due to the chilling effect. A commenter stated that the emergency services exemption would not be uniformly applied across states, resulting in hospitals bearing the unpaid costs of medical care. One commenter said different states will make different determinations about what constitutes an emergency, and this uncertainty will cause individuals with chronic, involuntary medical conditions to be denied admission or avoid treatment out of fear.

*Response:* DHS understands that the states determine whether a medical condition would be determined to be an emergency for purposes of Medicaid and that determination may be inconsistent throughout states. However, DHS does not have the authority to determine whether a medical condition is an emergency or whether a state must provide Medicaid for a particular medical condition. Congress enacted the EMTALA to ensure public access to emergency services regardless of ability to pay.[472] Medicare-participating hospitals that offer emergency services must provide a medical screening examination and provide stabilizing treatment regardless of an individual's ability to pay.[473] DHS acknowledges that increased use of emergency rooms and emergent care as a method of primary healthcare due to delayed treatment is possible and there is a potential for increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient. However, DHS does not have specific estimates on the increase cost for such services.

Vaccinations

*Comment:* Commenters indicated that the public charge rule would make immigrant families afraid to seek health-care, including vaccinations against communicable diseases, and therefore, endanger the U.S. population. The commenters stated that mass disenrollment from Medicaid would greatly restrict access to vaccines, which would result in adverse effects for the immigrant and general population, and would harm the public and the national security of the United States. For example, a commenter stated that in the event of a novel influenza outbreak, a critical first step would be to get individuals access to healthcare, which requires trust in governmental public health authorities. The commenter indicated that engaging with the public health system was critical to ensuring robust immunization to protect the population overall; if a subset of the community were fearful to access government healthcare services, regardless of whether a specific type of service qualified for a narrow exception, it would have a significant impact on the country's ability to protect and promote the public health. Another commenter indicated that its health

department anticipated that promulgation of the rule, as written in the NPRM, will result in decreased utilization of children's healthcare, including vaccinations, which will increase the risk for vaccine preventable diseases. According to the commenter, these effects will pose an immediate risk to the health of individual immigrants and is also likely result in increased transmission of tuberculosis or other infectious diseases, increasing the likelihood of an outbreak.

Some commenters stated that since many immigrants live in communities alongside people of the same national origin, reduced vaccinations could result in unvaccinated or under-vaccinated clusters of individuals. Commenters warned that research shows that uninsured individuals are much less likely to be vaccinated. One commenter stated that a recent study found that even a five percent reduction in vaccine coverage could trigger a significant measles outbreak. A commenter stated that many immigrant families were already cancelling appointments for flu vaccinations, and referred to a Centers for Disease Control and Prevention (CDC) estimate of the number of flu-related deaths in 2018 to underscore the severity of this issue. A commenter indicated that the proposal will cause worse health outcomes, increased use of emergency departments, and increases in communicable diseases due to less vaccination. Another commenter stated that the rule would increase the incidence of childhood diseases like chickenpox, measles, mumps and rubella and deter parents from vaccinating their children.

*Response:* With this rulemaking, DHS does not intend to restrict the access of vaccines for children or adults or intend to discourage individuals from obtaining the necessary vaccines to prevent vaccine-preventable diseases. The purpose of this rulemaking is to ensure that those seeking admission to the United States are self-sufficient and rely on themselves or family and friends for support instead of relying on the government for subsistence. As noted above, this final rule does not consider receipt of Medicaid by a child under age 21, or during a person's pregnancy, to constitute receipt of public benefits. This should address a substantial portion, though not all, of the vaccinations issue.

Vaccinations obtained through public benefits programs are not considered public benefits under 8 CFR 212.21(b), although if an alien enrolls in Medicaid for the purpose of obtaining vaccines, the Medicaid itself qualifies as a public

---

[471] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51169 (proposed Oct. 10, 2018).

[472] *See* CMS.gov, Emergency Medical Treatment & Labor Act (EMTALA), available at *https://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA/index.html* (last visited May 31, 2019).

[473] *See* CMS.gov, Emergency Medical Treatment & Labor Act (EMTALA), available at *https://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA/index.html* (last visited May 31, 2019).

benefit. DHS also notes that free or low cost vaccines are available to children who are not insured or underinsured through the Vaccines for Children (VFC) Program.[474] In addition, local health centers and state health departments provide preventive services that include vaccines that may be offered on a sliding scale fee based on income.[475] Therefore, DHS believes that vaccines would still be available for children and adults even if they disenroll from Medicaid.

Substance Abuse

*Comment:* Several commenters stated that the proposed rule would also discourage people from utilizing substance abuse disorder treatment services for which Medicaid is the largest insurer.

*Response:* DHS does not intend to discourage people from utilizing substance abuse disorder treatment services. DHS acknowledges however that, once this rule is effective, individuals may choose to disenroll from public benefits or not seek to receive such public benefits. DHS would like to note that local health centers and state health departments may provide certain health services addressing substance abuse and mental disorders.[476] Additionally, state-funded rehabilitation centers may offer affordable options, even if an individual disenrolls from Medicaid.[477] Benefits from local and state health departments or state-funded rehabilitation centers are generally not considered public benefits under this rule, unless they are obtained through Medicaid. Therefore, DHS believes that substance abuse disorder treatment will continue to be available to individuals even if they disenroll from Medicaid.

i. Medicare, Medicare Part D Low Income Subsidy

*Comment:* Commenters opposed DHS's proposal to include the Medicare Part D Low Income Subsidy (Medicare Part D LIS) in the definition of public

benefit. Commenters stated that inclusion of the Medicare Part D LIS may result in greater poverty and sickness, lack of access for seniors to prescription drugs, health services, worse health outcomes for Medicare enrollees and higher costs for Medicare non-drug spending. Commenters stated that Medicare Part D LIS helps seniors with chronic conditions, including breast cancer. Commenters also stated the rule, by including Medicare Part D LIS, targets disabled people, who use the program at higher rates than the general population. Commenters stated that the rule would force "millions" of seniors to disenroll from Medicare Part D, making it harder to afford necessary prescriptions. A commenter indicated that low- and moderate-income seniors who have been paying into Social Security like all other taxpayers would not be able access Medicare Part D subsidies. Commenters stated that prescription medication is very expensive and seniors who cannot afford having their prescriptions filled will end up in emergency rooms which will only cost their communities even more.

A commenter indicated that the Medicare Part D LIS program has higher financial eligibility thresholds than cash welfare programs and is available to more than the indigent, making it a bad indicator of dependence on the government. Citing a Kaiser Family Foundation report,[478] the commenter stated that individuals with income up to 150 percent of the FPL, and countable assets of $14,100 for an individual or $28,150 for a couple, qualify for Medicare Part D LIS in 2018. The commenter further stated that the scope of Medicare Part D LIS is limited to assistance in the cost of drugs which does not indicate dependence on government subsistence.

Commenters indicated that most non-citizen Medicare enrollees are lawful permanent residents, but that individuals who are "lawfully present" (*e.g.*, immigrants with TPS) and have a ten-year work history or have end-stage renal disease (ESRD) may also be eligible. A commenter indicated that individuals over the age of 65 and young individuals with disabilities who meet the income and employment guidelines are eligible for Medicare Part D LIS. A commenter stated that it is difficult to see any purpose to a rule that would deny admission to long term

elderly residents who have worked and paid taxes for 10 or more years for using a benefit as modest as the Medicare Part D LIS.

A commenter stated that the effect of the proposed rule may to increase the costs, which according to the commenter was not considered in the NPRM, paid for under Medicare Part A and B or C because the increased medication use and adherence achieved through expanded drug coverage for seniors have been associated with decreased spending for nondrug medical care and reduced hospitalization rates among Medicare enrollees. The commenter stated that the rule would adversely affect Massachusetts where 74 percent of Medicare enrollees in Massachusetts were enrolled in Part D plans, and 35 percent of Medicare Part D recipients also receive the LIS.

Several commenters stated that immigrants contribute more into the Medicare system than they take out of it, and pay more out of pocket for care than citizens, thus subsidizing the system. Commenters stated that the Medicare Part D LIS may be more heavily supported by general revenues, but funding for the entire Medicare Part D program comes mostly from general revenues, with premiums covering about one-quarter of all costs. The commenter provided data intended to show that for 2019, Medicare's actuaries estimate that Medicare Part D plans will receive direct subsidy payments averaging $296 per enrollee overall and $2,337 for enrollees receiving the LIS; employers are expected to receive, on average, $553 for retirees in employer-subsidy plans. The commenter stated that the average Medicare Part D LIS beneficiary is receiving added government assisted benefits of only $1,784 per year compared to retirees in employer plans, which would be less than the 15 percent of FPG threshold that would have applied under the proposed rule had the Medicare Part D LIS been considered a "monetized" benefit. Commenters stated that almost one in three Medicare beneficiaries enrolled in Medicare Part D prescription drug coverage get "extra help" with their premiums, out-of-pocket prescription costs, copays or percentage of the drug's costs through LIS. The commenter further stated that one in five people with Medicare (11.7 million) rely on Medicaid to afford their monthly Medicare Part B premiums or cost-sharing. Nearly 12 million older adults and people with disabilities are enrolled in both Medicare and Medicaid. A commenter stated that "Extra Help" is estimated to be worth approximately

[474] *See* CDC, Vaccines For Children (VFC), available at *https://www.cdc.gov/vaccines/programs/vfc/index.html* (last visited May 15, 2019). *See also* CDC, VFC Detailed Questions and Answers for Parents, available at *https://www.cdc.gov/vaccines/programs/vfc/parents/qa-detailed.html#eligibility* (last visited May 15, 2019).

[475] *See* HHS, vaccines.gov, How to Pay, available at *https://www.vaccines.gov/getting/pay* (last visited May 15, 2019).

[476] *See* Substance Abuse and Mental Health Services Administration (SAMHSA) *https://www.samhsa.gov/find-treatment* (last visited July 22, 2019).

[477] *See* SAMHSA, Directory of Single State Agencies for Substance Abuse Services (Dec. 16, 2016), *https://www.samhsa.gov/sites/default/files/ssadirectory.pdf* (last visited June 4, 2019).

[478] *See* Kaiser Family Foundation, Medicare Part D: An Overview of the Medicare Part D Prescription Drug Benefit (Oct. 12, 2018), *https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/* (last visited July 26, 2019).

**41386** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

$4,000 per year per individual which is a substantial support for medications that are often necessary to prevent disease or manage a chronic illness. The commenter stated that to forego needed medications due to cost will not only be a harm to an elderly person or someone living with a permanent disability, but to our overall healthcare system that will be burdened with more costly hospital-based and emergency care.

However, another commenter agreed with DHS's assertion that utilization of Medicare Part D LIS was an indicator of a lack of ability to remain self-sufficient in covering medical costs.

*Response:* DHS appreciates the comments and recognizes the importance of Medicare and the Medicare Part D LIS, as well as the heightened eligibility threshold for those programs. Someone who is not entitled to Medicare Part A and/or Part B is not eligible for Medicare Part D or the LIS.[479] In general, to be eligible for premium-free Medicare Part A, a person must be age 65 or older and worked (or the spouse worked) and paid Medicare taxes for at least 10 years.[480] A person must be a U.S. resident and either a citizen or an alien lawfully admitted for lawful permanent residence who has resided in the United States continuously for the five-year period immediately preceding the month the application is filed in order to qualify for Medicare Part B and, therefore, the associated Medicare Part D. An individual who is not a United States citizen or is not lawfully present in the United States is not eligible for Medicare Part D and may not enroll in a Medicare Part D plan.[481]

In addition, the Medicare Part D LIS lowers the premium and cost-sharing amounts owed by Medicare Part D plan enrollees; as such, individuals not enrolled in a Medicare Part D plan are not able to access the benefits of the subsidy. While included in the NPRM because of the large Federal expenditure,[482] Medicare Part D prescription drug coverage only provides medical prescription coverage, and not health insurance as a whole. Since 2006, it has been available to all Medicare recipients regardless of income, health status, or prescription drug usage.[483] DHS agrees with the commenters and removed Medicare Part D subsidies from consideration in the public charge inadmissibility determination. DHS also notes that it has not designated any other aspect of Medicare for consideration in the public charge inadmissibility determination. However, any receive of Medicaid as a subsidy for Medicare would be considered receipt of a public benefit in the public charge inadmissibility determination.

*Comment:* A commenter stated that in order to mitigate the negative public health consequences associated with deterring use of public health insurance benefits, Medicaid and Medicare Part D LIS should comprise a separate set of programs that may only be given "minimal negative weight" in the totality of the circumstances, whether they are currently received at the time of application or were received at some point in the 36 months prior to application and for whatever factor in the totality of circumstances their receipt is being considered. The commenter stated that this would mean that a person could not be determined to be a public charge when receiving or having received those benefits in the 36 months prior to applying without also having a heavily weighted negative factor present in his or her case. The commenter stated that with this modification in place, noncitizens applying for visas, lawful permanent resident status, or other status could expect to financially "rehabilitate" themselves without fear that receipt of public benefits in the remote past might weigh negatively against them. Additionally, the commenter indicated that with this change, the rule would effectively make receiving public health insurance benefits the "lightest" negative factor to be considered and provide noncitizens with assurance that seeking coverage will have only a small impact on their admissibility which would mitigate the deterrent effect of considering receipt of these benefits.

*Response:* As provided in the previous response, DHS is not including Medicare Part D LIS in the definition of public benefit and therefore, there is no need to address the weight given to Medicare Part D LIS. With respect to Medicaid, DHS refers the commenter to the specific discussion above regarding the basis for considering Medicaid

receipt. If an alien reports past Medicaid receipt as part of an adjustment of status application, the alien can also show that the alien is no longer receiving Medicaid and explain why the alien's past receipt of Medicaid does not make it more likely than not that the alien will receive any public benefit in the future.

j. Additional Considerations

Exhaustive List

*Comment:* An individual commenter stated that the agency should emphasize, in light of future congressional action, that the list outlined in the proposed rule is not exhaustive and any definition of public benefit would be best left to agency discretion, or be defined in a separate rule. A commenter stated that the list in the rule is hardly exhaustive when it comes to potential programs. The commenter stated that by one count, there are a total of 89 separate means-tested welfare programs spread across 14 departments and agencies, paid for by the Federal Government. The commenter provided examples including that more than $30 billion is spent annually by the Federal Government on Refundable Premium Assistance and cost-sharing tax credits to assist low-income people with buying health insurance and named other public benefits. The commenter stated that States also spend some $6 billion annually on their own as part of their Medicaid General Assistance programs and another $34 billion on other programs to help low-income people receive care, particularly at hospitals. The commenter stated that the vast number of overlapping and linked welfare programs means that recipients seldom use just one program.

In contrast, a commenter stated that the inclusion of a "catch-all" provision could leave the rule open to constitutional challenges. Additionally, other commenters stated that DHS should not allow public benefits that are not explicitly enumerated in the rule to be weighted negatively in the totality of the circumstances review. Commenters opposed to a "catch-all" provision suggested that its inclusion would remove the certainty an exhaustive list provides and would introduce a great potential for confusion as well as call into question whether the members of the regulated public have had sufficient notice that a certain benefit may be considered negatively in a public charge determination analysis, thus triggering due process concerns. Several commenters said they opposed the future inclusion of any "unenumerated

---

[479] The Centers For Medicare And Medicaid Services, Guidance To States On The Low-Income Subsidy (February 2009), available at *https://www.cms.gov/Medicare/Eligibility-and-Enrollment/LowIncSubMedicarePresCov/Downloads/StateLISGuidance021009.pdf* (last visited July 26, 2019).

[480] *See* HHS, Who is eligible for Medicare?, available at *https://www.hhs.gov/answers/medicare-and-medicaid/who-is-elibible-for-medicare/index.html#main-content* (last visited June 25, 2019).

[481] *See* 42 CFR 423.30.

[482] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51172 (proposed Oct. 10, 2018).

[483] *See* Medicare.gov, How to get drug coverage, available at *https://www.medicare.gov/drug-coverage-part-d/how-to-get-drug-coverage* (last visited June 14, 2019).

benefits'' into the scope of the proposed rule since the proposed rule already improperly considers non-cash benefits and because the addition of any more programs would increase harm to individuals, families, and communities. A commenter stated that DHS's request for public comment to expand the list of other benefits in the totality of circumstances was a ''catch-all provision'' that would allow the agency to consider all benefits an alien receives, regardless of whether they are listed in the regulation or not. Other commenters wrote that it is highly likely that individuals using the benefits outlined in the proposed rule are also using additional benefits not included in the rule.

*Response:* For clarity and consistency, DHS has specifically listed the public benefits that will be considered. The list of designated benefits is exhaustive, avoiding the Constitutional concerns raised by the commenters that may arguably come with a non-exhaustive list. Indicating that the list is non-exhaustive would add vagueness and confusion as to what public benefits would be considered. This does not preclude DHS from updating the list of benefits through future regulatory action. DHS believes that the rule is adequately protective as drafted.

Additional Programs

*Comment:* Many commenters opposed the inclusion of any additional programs in the rule. Commenters stated that the inclusion of additional programs would lead to further negative health impacts on families and children.

*Response:* DHS appreciates the comments. DHS has not designated additional public benefits for consideration under this final rule.

*Comment:* A commenter asked that public benefits provided by State and local governments to non-qualified aliens under authority of PRWORA be specifically included in the codified list. The commenter said these benefits are provided from ''appropriated funds'' and with few exceptions are accessed on an individualized basis using means-tested criteria. A commenter said its state had created a program called Alien Emergency Medical Program, which was designed to offer coverage to newly arrived immigrants, or those who had resided in-state for less than five years. The commenter said the proposed rule would target those who qualify for the program.

*Response:* A state medical insurance program that is not included in the rule's definition of public benefit will not be considered as a public benefit in the public charge inadmissibility

determination. DHS understands that the Washington State Alien Emergency Medical Program [484] is separate from Medicaid and is funded by Washington State, and is not a program listed in the public benefit definition in the rule. Further, emergency Medicaid is also not considered a public benefit for purposes of the public charge inadmissibility determination. Therefore, the Washington State Alien Emergency Medical Program would not be considered a public benefit for purposes of the public charge inadmissibility determination.

Dependents

*Comment:* A commenter indicated the new regulations should include welfare use by dependents. The commenter indicated that the very idea of self-sufficiency means that people can provide for themselves and their children and spouses without assistance from taxpayers. The commenter indicated that excluding the children's benefits including Medicaid, WIC, and free school lunch, from not being considered for public charge is like having an income tax that excludes all income from second jobs, investments, and rental properties. The commenter analyzed the 2014 public-use SIPP data and indicated that in 39 percent of immigrant-headed households (legal and illegal) receiving TANF, only the children receive the payments. The commenter indicated that much of the immigrant welfare use of this program would be missed if dependents are not considered. Another commenter stated that any receipt of means-tested anti-poverty benefits by immigrants or their dependents should count toward the public charge determination. Other commenters stated that DHS should never attribute to an alien applicant the receipt of benefits by the alien's dependents, including U.S. citizen children. The commenters stated that considering receipt of benefits by an alien's U.S. citizen children could give rise to constitutional issues.

*Response:* DHS appreciates the comments. DHS believes that the rule addresses self-sufficiency adequately without introducing consideration of a third party's receipt of public benefits, potentially to include U.S. citizen third parties such as non-custodial children. In consideration of these issues, as well as the many comments regarding the potential effects of the rule on U.S. citizen children, DHS respectfully

declines to expand the rule in this manner. DHS notes that although an inadmissibility determination is made for each person individually, the alien's income is reviewed in terms of the household, and the alien's family status is considered as well, as the statute requires. The ultimate question under this rule, however, is whether the alien (rather than his or her dependents) is likely to receive public benefits in the future above the applicable threshold.

Tax Credits

*Comment:* Some commenters stated that non-citizens should be unable to benefit from the EITC or the Additional Child Tax Credit (ACTC). Similarly, a few commenters said the exclusion of the refundable tax credits is problematic since the refundable portion of EITC and ACTC cost over $80 billion combined in 2016. The commenters asserted that these tax credits meet the definition of a means-tested anti-poverty benefit.

In contrast, another commenter stated that the receipt of EITC and Child Tax Credit (CTC) credits, which are funded through TANF and are actually employment incentives, should be explicitly exempted from the rule in order to eliminate possible misconceptions and prevent immigrants from failing to file their income tax returns out of fear of being disqualified from future citizenship. Another commenter said inclusion of EITC would punish hardworking immigrants.

*Response:* DHS appreciates the comments regarding the EITC, ACTC, and CTC. Only public benefits as defined in 8 CFR 212.21(b) will be considered in the public charge inadmissibility determination. Although EITC and ACTC benefits provide what may be considered cash assistance, DHS did not propose to include EITC or ACTC as public benefits in the public charge inadmissibility determination. DHS is not including tax credits because many people with moderate incomes and high incomes are eligible for these tax credits, and the tax system is structured in such a way as to encourage taxpayers to claim and maximize all tax credits for which they are eligible. In addition, DHS is unable to determine how much of the taxpayer's refund is attributable to any one tax credit, as compared to other aspects of the tax return (such as non-designated credits or deductions) or to any one person, as opposed to a spouse filing jointly. Finally, these tax credits may be combined with other tax credits between spouses. One spouse may be a U.S. citizen and the tax return may be filed jointly. Therefore, DHS would not

---

[484] *See* Washington State Department of Social and Health Services, Alien Emergency Medical Program, available at *https://www.dshs.wa.gov/esa/community-services-offices/alien-emergency-medical-programs* (last visited July 22, 2019).

be able to determine whether the alien or the U.S. citizen received the tax credit. DHS has revised the regulatory text to make clear that "cash assistance for income maintenance" does not include any tax credit programs.

*Comment:* One commenter stated that DHS should exempt up to two years of the ACA premium subsidy, also known as the Premium Tax Credit (PTC), usage when the individual has shown past ability and earning potential. In addition, the commenter indicated that the ACA premium subsidies are applied based on income levels without the individual choosing to apply for the subsidies. Another commenter suggested that DHS should not consider PTC for purchasing individual market coverage in a public charge determination at all. One commenter stated that, in addition to continuing to exclude exchange programs such as ACTC under the ACA [485] from public charge consideration, DHS should clarify the interaction between applications for exchange programs and other potentially impacted benefits. The commenter explained that marketplaces are required by law to feature a uniform application process for Medicaid and non-Medicaid health programs and stated that this could cause confusion because an individual attempting to apply for exchange insurance and programs could inadvertently be seen as a "Medicaid applicant."

In contrast, some commenters suggested that DHS should reconsider whether immigrants wishing to reside in the United States will have the ability to support themselves, and any subsequently born children, without using benefits like subsidies under the ACA. Another commenter indicated that serious consideration should be given to adding subsidies that underwrite more than 50 percent of premium costs to the list in 8 CFR 212.21(b). The commenter stated that these benefits are provided from appropriated funds and, with few exceptions, are accessed on an individualized basis using means-tested criteria.

*Response:* DHS has decided not to consider ACA subsidies or health insurance received through the health insurance marketplace outside of Medicaid as public benefits in the public charge inadmissibility determination, due to the complexity of assessing the value of the benefit and the higher income eligibility thresholds associated with the benefit, as compared to the eligibility thresholds for other

benefits. As discussed in section III.R of this preamble, DHS has added a heavily weighted positive factor for private health insurance appropriate to the expected period of admission. This heavily weighted positive factor would not apply in the case of a plan for which the alien receives subsidies in the form of premium tax credits.

Special Supplemental Nutrition Program for Women, Infants, and Children

*Comment:* Many comments opposed the potential inclusion of WIC, stating that consideration of benefits such as WIC would have a negative impact on the health and nutrition of families and individuals. Some commenters indicated that families and individuals should not have to choose between benefits such as WIC and an immigration status. Other commenters stated that programs like WIC help provide essential nutrition to children, pregnant women, and mothers, and result in improved health outcomes. Commenters provided anecdotes about how they or their family members' access to WIC helped them or their children thrive and become productive members of American society. Several commenters provided rationale, research, or data relating to important public health goals and the benefits of WIC enrollment, including the reduction or prevention of preterm birth and infant mortality, iron deficiency anemia, malnourishment, as well as increases in breastfeeding rates and hemoglobin levels of enrolled children. Other commenters provided that WIC food package with its nutritional value increased public health, specifically for Hispanics who have lived in the United States for less than five years. Sourcing research articles and studies, some commenters described that WIC's 2009 food package changes lead to a modest decline in severe childhood obesity among young children, and that children who received SNAP or Medicaid were more likely to finish high school and grow up to be successful adults.

A commenter stated that the reduction in programs like WIC will end up costing taxpayers much more than they might save in the short term, as healthcare costs will increase. Commenters stated that a decrease in WIC participation will have short and long-term economic implications. The commenters stated that for every dollar spent on WIC there is an associated savings in Medicaid costs during the first 60 days after birth from $1.77 to $3.13 for newborns and mothers, and $2.84 to $3.90 for newborns alone.

Additionally, the commenters provided further examples of Medicaid cost-savings associated with WIC.

Another commenter cited to data and stated that 74.9 percent of WIC participants are adjunctively eligible for SNAP and Medicaid, thereby reducing initial certification requirements and paperwork. Commenters added that the decreased participation in Medicaid or SNAP among WIC families would have a significant impact on WIC's certification process because income certification through adjunctive eligibility was more efficient than income screening involving pay stubs and other financial documents. The commenters, citing data and multiple studies, provided a state's estimate that income screening with financial documents costs $12.50 per participant, whereas the income screening with adjunctive eligibility is $3.75 per participant. The commenters stated that the increased costs would place a strain on WIC's state budgets, which would undercut WIC's efforts to improve efficiency, streamline certification processes, and focus WIC services on its core public health mission.

Other commenters said Congress has never sought to inhibit WIC's ability to serve immigrant populations due to the overriding public interest in promoting access to health services and nutrition assistance. A commenter noted that participating clients can only spend a maximum of five years on this program and receive limited benefits (only supplemental foods) not qualifying them a public charge. Some commenters said the rule would impact their ability to serve eligible WIC participants.

In contrast, some commenters suggested that USCIS reconsider whether immigrants wishing to reside in the United States will have the ability to support themselves, and any subsequently born children, without using benefits like WIC. The commenter said these benefits are provided from "appropriated funds" and with few exceptions are accessed on an individualized basis using means-tested criteria.

*Response:* WIC was not included in the public benefits designated for consideration in public charge inadmissibility determinations. Only public benefits as defined in 8 CFR 212.21(b) will be considered in a public charge inadmissibility determination. DHS understands that aliens subject to the public charge inadmissibility ground may choose to disenroll from public benefits, even if the benefit is not listed in 8 CFR 212.21(b). However, this rule does not, and cannot, preclude individuals from requesting or receiving

[485] Patient Protection and Affordable Care Act, Public Law 111–148, Section 1401(a), 124 Stat. 119, 213 (2010) (codified at 26 U.S.C. 36B).

any public benefits for which they qualify. As discussed in the NPRM, benefits directed toward food and nutrition, housing, and healthcare are directly relevant to public charge inadmissibility determinations, because a person who needs the public's assistance to provide for these basic necessities is not self-sufficient.[486] WIC [487] provides federal grants to States for supplemental foods, healthcare referrals, and nutrition education for low-income pregnant, breastfeeding, and non-breastfeeding postpartum women, and to infants and children up to age five who are found to be at nutritional risk.[488] But overall expenditures for WIC are low, and WIC is authorized under the Child Nutrition Act of 1966,[489] which is excluded under the limitations for qualified aliens from federal means-tested public benefits. Therefore, DHS believes WIC is appropriately excluded.

Additionally, as discussed later in DHS's responses to comments related to the economic analysis and in the economic analysis itself, DHS agrees that some entities, such as State and local governments or other businesses and organizations would incur costs related to the changes commenters identify. However, these costs are considered to be indirect costs of the rule since this rule does not directly regulate these entities and does not require them to make changes to their business processes or programs. Therefore, DHS considers these indirect costs as qualitative, unquantified effects of the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and the cost of making such changes. DHS agrees that there could be WIC applicants who are not adjunctively eligible due to disenrollment from Medicaid or SNAP although an individual who is a member of a family in which a pregnant woman or infant is certified as eligible to receive Medicaid may be deemed adjunctively eligible for WIC. DHS notes that households receiving WIC would be adjunctively eligible only through noncitizen participation in SNAP or Medicaid for those age 21 and over (or receiving Medicaid while pregnant) which would only apply to a very small percentage of households receiving WIC. Any costs associated with changes in adjunctive eligibility would be a consequence of DHS's decision to designate SNAP, which DHS has explained earlier in this preamble.

School Breakfast/Lunch Programs

*Comment:* A few commenters recommended that DHS include the National School Lunch Program (NSLP) and School Breakfast Program (SBP) for purposes of a public charge determination. The commenters stated that receiving public benefits indicates a person is not self-sufficient. Some commenters suggested that USCIS reconsider whether immigrants wishing to reside in the United States will have the ability to support themselves, and any subsequently born children, without using benefits from the NSLP. The commenter said these benefits are provided from ''appropriated funds'' and with few exceptions are accessed on an individualized basis using means-tested criteria. A commenter stated that in their local school district, hundreds of families had not reapplied for free/reduced meal program, which resulted in tens of thousands of dollars in lost revenue to its food service program, a negative impact to the farming community, and children who are hungry at school who cannot perform well. The commenter indicated that families were fearful of government assistance and the risk of being separated from their families or deported. A commenter stated that Federal nutrition assistance programs play a vital role in improving the nutritional well-being and food security of targeted segments of the United States population. The commenter stated that the California Department of Education Nutrition Services Division administers the NSLP, SBP, Seamless Summer Option, Afterschool Meal Supplement, Special Milk Program, Child and Adult Care Food Program, Summer Food Service Program, and the Fresh Fruit and Vegetable Program, which provide nutrition for low-income children. The commenter provided the number of children receiving benefits under the programs and indicated that the rule could create confusion and a chilling effect on families' perception that participating in any health and nutrition program will jeopardize their immigration status. A commenter stated that children who qualify for SNAP, or live with a child who receives SNAP, are automatically qualified for free meals under the NSLP ''direct certification'' under 42 U.S.C. 1758(b)(12) and that when a family disenrolls a child from the SNAP benefits, the school district may be unable to ''directly certify'' that child or his/her siblings for free meal status.

*Response:* Although school lunch programs provide for nutrition similar to SNAP, these benefits account for a relatively low overall expenditure, are specific to children in a school setting, and are administered by schools. In addition, assistance or benefits under the National School Lunch Act, (NSLP and the SBP) [490] and the Child Nutrition Act of 1966 are excluded under the limitations for qualified aliens from federal means-tested public benefits.[491] Under 8 U.S.C. 1613, qualified aliens are generally not eligible for ''means-tested public benefits'' until after five years of entry. However, the child nutrition programs, including the NSLP, are excluded from this ineligibility. In addition, the law prescribes that a person who receives free public education benefits under State or local law shall not be ineligible to receive benefits provided under the school lunch program under the Richard B. Russell National School Lunch Act [492] or the SBP under section 4 of the Child Nutrition Act of 1966 [493] on the basis of citizenship, alienage, or immigration status.[494] Therefore, DHS believes the NSLP is appropriately excluded. In addition, the other school related nutrition programs mentioned by the commenter, including Seamless Summer Option, Afterschool Meal Supplement, Special Milk Program, Child and Adult Care Food Program, Summer Food Service Program, and the Fresh Fruit and Vegetable Program, would not be considered public benefits under the public charge inadmissibility determination.

Further, DHS understands that a child may no longer automatically enroll in the school lunch programs or be automatically certified for the school programs. However, the child would

---

[486] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[487] *See Lewis v. Thompson,* 252 F.3d 567, 583 (2d Cir 2001). Although WIC may provide benefits to a pregnant woman's whose unborn child would otherwise be eligible for public benefits after birth based on U.S. citizenship, at least one circuit has determined that the denial of prenatal care to an unqualified alien pregnant woman had a rational basis and therefore did not violate equal protection. The court indicated that there were ''three rationales for the denial of prenatal care to unqualified alien pregnant mothers: deterrence of illegal immigration, self-sufficiency, and cost savings. The first alone suffices for rational basis review.''

[488] *See* USDA, Food and Nutrition Service, Special Supplemental Nutrition Program for Women, Infants, and Children, available at *https://www.fns.usda.gov/wic/women-infants-and-children-wic* (last visited June 14, 2019).

[489] *See* Public Law 104–193, section 403, 110 Stat. 2105, 2271–2247 (Aug. 22, 1996).

[490] *See* USDA, The School Breakfast Program, available at *https://fns-prod.azureedge.net/sites/default/files/sbp/SBPfactsheet.pdf* (last visited July 26, 2019).

[491] *See* Public Law 104–193, Section 403, 110 Stat. 2105, 2266 (Aug. 22, 1996) (codified at 8 U.S.C. 1613(c)(2)(D)).

[492] *See* 42 U.S.C. 1751 *et seq.*

[493] *See* 42 U.S.C. 1773.

[494] *See* 8 U.S.C. 1615.

still qualify for the programs based on the eligibility criteria and this rule does not change the programs' eligibility criteria or restrict who may apply for the programs.

State and Local Benefits

*Comment:* Referring to the PRWORA definition of public benefits,[495] a commenter asked that public benefits include State and local governments' public benefits provided to non-qualified aliens under the authority of PRWORA. This commenter also referenced federal and state retirement, health, disability, postsecondary education, and unemployment benefits, indicating that the eligibility for these benefits is generally determined using individualized adjudications of need, typically means-based. The commenter advised that in order to avoid APA challenges to the codification or arbitrary exclusions, DHS should include all of the statutory benefits that can be accessed individually by needy persons. In contrast, other commenters stated that benefits funded by states should not be included in public charge determinations.

*Response:* While the proposed rule included state and local and tribal cash benefits for income maintenance, DHS excluded state, local, and tribal non-cash benefits from consideration in the public charge inadmissibility determination because of the number of public benefits that exist and the administrative burden such a rule would have imposed on DHS and the state and local public benefit granting agencies. In addition, including all state and local benefits would add vagueness and confusion as to what public benefits would be considered. Consistent with the proposed rule, DHS will continue to exclude state, local, and tribal benefits that are not cash-benefits for these reasons. Further, DHS would not consider federal and state retirement, Social Security retirement benefits, Social Security Disability, postsecondary education, or unemployment benefits as public benefits under the public charge inadmissibility determination as these are considered to be earned benefits through the person's employment and specific tax deductions.

Head Start

*Comment:* A few commenters asked that DHS include Head Start, because this program also qualifies as a means-tested federal program and goes toward

a person's self-sufficiency. In contrast, a commenter objected to the proposed rule based on the commenter's assessment that programs such as Head Start and WIC will be impacted by the proposed changes and their "chilling effect." Commenters indicated that participation in Head Start programs has been shown to result in better educational and health outcomes as well as lower rates of incarceration, ultimately saving local, state, and federal tax dollars. A commenter stated that in Michigan farmworker families one or both parents work and receive low wages enough to for their children to qualify for Head Start.

*Response:* DHS appreciates the comments and understands other programs also provide for nutrition and healthcare. DHS believes that the focus of the rule is best served in considering certain general benefits directed toward food and nutrition, housing, and healthcare that have high expenditures. DHS has decided to continue to exclude Head Start. DHS notes that when Congress reauthorized the Improving Head Start for School Readiness Act,[496] in 2007, it focused, in part, on ways to make Head Start services more accessible to migrant and seasonal farmworker families. Because both parents typically work in the fields, Migrant and Seasonal Head Start (MSHS) programs offer 12 weeks to year-round, full-day services to accommodate local agricultural industries and harvest season workers. To be eligible for MSHS services, a family's income must come primarily from agricultural work and the family must be eligible otherwise for Head Start services (*i.e.,* poverty, homelessness, or foster care).[497] Head Start also has a low expenditure in comparison to other benefits. Therefore, DHS believes Head Start is appropriately excluded.

Healthy Start, The Emergency Food Assistance Program, and Similar Programs

*Comment:* A few commenters asked that DHS include Healthy Start. The commenters stated that this program also qualify as a means-tested federal program and illustrates a person's lack of self-sufficiency. Some commenters asked that DHS include The Emergency

Food Assistance Program (TEFAP), as this program also qualifies as a means-tested federal program and illustrates a person's lack of self-sufficiency. Commenters made similar points with respect to additional programs, such as programs that provide grants to localities or organizations to alleviate homelessness, programs that provide supplemental nutrition assistance to specific populations, and programs that provide low-income energy assistance or weatherization assistance.[498] Some commenters recommended that DHS exclude these and similar programs to avoid a range of costs that might be incurred by individuals, communities, and government agencies, if DHS included some or all of these programs.

*Response:* As stated earlier in this section, DHS believes that the focus of the rule is best served in considering certain general benefits directed toward food and nutrition, housing, and healthcare, which have high expenditures, and generally excluding emergency services or support. None of these programs have overall expenditures approaching the levels of the other listed benefits, and some provide emergency services or support, or involve providing funding to organizations, without an individual enrollment mechanism. In the interest of administrability, DHS will not consider these benefits at this time.

Pell Grants

*Comment:* Although several commenters were generally pleased that the proposed rule did not include public education benefits such as Pell Grants or other financial aid, one commenter stated that fear and confusion generated by the rule could deter greater numbers of immigrant youth or children of immigrants eligible for federal and state-funded aid programs from applying to college. A commenter indicated that the proposed rule could effect changes in the U.S. talent pipeline that would ultimately undermine our nation's global competitiveness and regional growth, and indicated that a highly educated workforce spurs economic growth and strengthens state and local economies. The commenter stated that the rule would discourage and may decrease the number of U.S.-citizen youth with non-U.S. citizen parents, lawful permanent residents, and undocumented immigrant youth who are long-term residents of the United States from completing college degrees and pursuing areas of national need

---

[495] Includes public benefits "provided by appropriated funds of the United States" or "a state or local government." 8 U.S.C. 1611(c)(1), 1621(c)(1).

[496] *See* Public Law 110–134, 121 Stat. 1363 (Dec. 12, 2007).

[497] *See* Office of Head Start Administration for Children and Families U.S. Department of Health and Human Services, Migrant And Seasonal Head Start Report To Congress (no date), available at *https://eclkc.ohs.acf.hhs.gov/sites/default/files/pdf/migrant-seasonal-congress-report-2009-2011.pdf* (last visited July 26, 2019).

[498] Such as LIHEAP and Weatherization Assistance Program (WAP).

particularly true in the fields of science, technology, engineering, and mathematics (STEM). Another commenter requested that DHS explicitly exclude Title IV federal student aid programs from the list of those considered for a public charge determination.

*Response:* Pell grants and student aid programs will not be considered in the public charge inadmissibility determination. As previously discussed, DHS's list of public benefits included in the regulation is an exhaustive list and only those benefits listed will be considered in a public charge inadmissibility determination. The focus of the rule is public benefits programs that provide cash assistance for income maintenance or support food nutrition, housing and healthcare with a relatively high overall expenditure. Pell grants and student aid programs are education-based and DHS is not considering them in the public charge inadmissibility determination. DHS decided to not include a list of those benefits that are not considered for public charge purposes because they are too numerous and benefits programs may change over time.

Children's Health Insurance Program

*Comment:* A commenter asked that USCIS consider the inclusion of additional welfare programs such as CHIP. Some commenters noted that CHIP ought to be part of a public benefit determination because it is still part of determining an applicant's overall self-sufficiency. Another commenter stated that CHIP should be included in the public charge determination for consistency purposes, because CHIP is a form of government support and applying consistent standards ensures the Government's goal of promoting self-sufficiency.

In contrast, numerous commenters requested that CHIP be explicitly exempt from public charge; these commenters cited to studies and indicated that millions of children and thousands of pregnant women rely on the program for health coverage. Others also discussed the importance and benefits of CHIP for children, such as providing vaccinations; keeping children healthy; reducing the rate of uninsured children across the United States; and improving children's health, education, and outcomes later in life; as well as long-term economic benefits into adulthood such as job attainment and paying more in taxes. Several commenters stated that CHIP provided a critical link for children who have experienced abuse or who are in homes where domestic violence is present to overcome trauma and address physical injuries inflicted by their abusers.

Many commenters generally warned that CHIP should not be included in public charge assessments because doing so would cause significant harm, including serious health consequences, costly long-term expenses for health care providers and patients, and food insecurity in children, which is especially detrimental to the health, educational performance, development, and well-being of children. A commenter stated that including CHIP would lead to parents having to choose between their child's health, and the public charge determination and immigration status. Numerous commenters said including CHIP in public charge assessments would be contrary to Congress' explicit intent in expanding coverage to lawfully present children and pregnant women for public health, economic, and social benefits. A commenter stated that the higher income thresholds for Medicaid and the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) state option represents a clear intent by Congress to ensure that pregnant immigrant women have access to the medical services necessary to ensure a healthy pregnancy and positive birth outcomes. Other commenters stated that including CHIP, a benefit explicitly created for working families, in public charge assessments would be contrary to the historical meaning of public charge as a person who depends on the government rather than working. Many commenters stated that Congress and states have historically demonstrated a high level of commitment to promoting health for lower-income children through CHIP, with 49 states now electing to cover children though CHIPRA and the Legal Immigrant Children's Health Improvement Act (ICHIA).

Commenters stated that penalizing the use of CHIP undercuts the sound public policies many states have put in place to ensure basic healthcare services are available to immigrants to protect their health and to promote healthy communities. Another commenter cited a study indicating that the inclusion of CHIP in the final rule would have significant public health and economic ramifications, including lower rates of healthcare utilization and poorer health among immigrants and their dependents as well as higher uncompensated care costs to federally qualified health centers and public hospitals. Many commenters stated that including CHIP in a public charge determination would lead to many parents of eligible children foregoing CHIP benefits and some commenters cited data on the number of people who would disenroll from CHIP. Many commenters suggested that those foregoing CHIP coverage due to the rule, may visit emergency departments for care that could have otherwise been obtained in a primary care setting and would cause a rise in the number of uninsured people and charity care, thereby transferring the financial burden to hospitals, and forcing hospitals to reduce the healthcare services that they are able to provide to communities.

Several commenters stated that by including CHIP, USCIS would be able to specifically target families with children who may be eligible for CHIP even if the family surpasses the 125 percent of the FPL standard laid out in the proposal. Numerous commenters stated that CHIP addresses a critical coverage gap, targeting working families that earn too much to be eligible for Medicaid but cannot afford traditional private insurance. Commenters stated that making the receipt of CHIP coverage a negative factor in the public charge test, or including it in the definition of "public charge," would place coverage for children out of reach. Other commenters stated that including CHIP in the final rule will create additional financial pressures on working families, and would penalize those who are moving toward self-sufficiency, as they do not qualify for Medicaid due to their increased income. A few commenters stated that past use of CHIP is not a predictor of future dependence on the Government for subsistence as an adult.

Many commenters stated that DHS's reasons for not including CHIP in the proposed rule have nothing to do with a public charge determination because CHIP does not involve the same level of expenditures as other programs; commenters stated that government expenditures are irrelevant to the assessment of whether an individual may become a public charge. Some stated that DHS's reasons for not including CHIP indicates that DHS recognizes that immigrants do not over-utilize the CHIP program and, thus, including CHIP in the final rule would only serve the purpose of denying immigrant children a benefit that supports their basic health needs. Other commenters stated that Federal CHIP funding is capped and, thus, reduced spending in states with larger immigrant populations will not reduce overall Federal spending, but will disadvantage those states relative to states with a smaller immigrant population. Another commenter stated that while the proposal exempts CHIP, it was unclear what would happen to beneficiaries in states that have opted to implement

**41392** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

CHIP as part of a Medicaid expansion rather than a separate program.

*Response:* DHS appreciates the comments and recognizes the importance of CHIP. DHS determined that it will not include CHIP in the public charge inadmissibility determination. States can use CHIP funding to cover children at higher incomes under CHIP.[499] CHIP enrollees have a higher income and states have greater flexibility in the benefit package provided.[500] An individual must be ineligible for Medicaid to quality for CHIP. CHIP primarily covers children, including lawfully residing children, and in a handful of states and covers pregnant women.[501] Eligible families have higher incomes (between 133–400 percent FPL).[502] In addition, states (and in turn the Federal Government) tend to spend less per person on CHIP than on Medicaid because the families have a higher income and thus fewer healthcare needs, and because children are less expensive to cover. Overall expenditures are also lower than Medicaid.[503] Finally, exclusion of CHIP is consistent with this rule's changes with respect to Medicaid received by a child under the age of 21 and receipt during an alien's pregnancy. Therefore, DHS believes it is appropriate to exclude CHIP from the public benefit definition in the public charge inadmissibility determination.

Disaster Supplemental Nutrition Assistance

*Comment:* A commenter recommended that Disaster Supplemental Nutrition Assistance (D–

SNAP) should be excluded from the public charge determination to allow families or persons who have experienced a catastrophic disaster, such as a fire or a hurricane, to receive D–SNAP benefits without fear of being subject to a public charge inadmissibility determination.

*Response:* D–SNAP and other emergency disaster relief assistance programs are not included in the rule. DHS also notes that, as provided in the NPRM, not all cash assistance would qualify as cash assistance for income maintenance under the proposed rule. For instance, DHS would not consider Stafford Act disaster assistance, including financial assistance provided to individuals and households under the Federal Emergency Management Agency's Individuals and Households Program, 42 U.S.C. 5174, as cash assistance for income maintenance. The same would hold true for comparable disaster assistance provided by State, local, or tribal governments.

Social Security Disability Insurance

*Comment:* A commenter stated that the rule should not consider Social Security Disability Insurance (SSDI) as part of the public charge inadmissibility determination because SSDI is an earned benefit which may be a parent of a child.

*Response:* DHS will only consider those public benefits as listed in the rule. SSDI is not one of the benefits listed under the definition of public benefits for purposes of public charge inadmissibility and therefore will not be considered as part of the rule.

3. Likely at Any Time To Become a Public Charge

*Comment:* A commenter stated that DHS interprets "likely at any time to become a public charge" to mean "likely at any time in the future to receive one or more public benefits. . . based on the totality of the circumstances," and DHS does not propose to establish a per se policy whereby an alien is likely to become a public charge if the alien is receiving benefits at the time of the application. The commenters stated that DHS's reasoning is "less than transparent" and conflicts with both pre-1999 practice and statutory interpretation. A commenter stated that Congress could have added the phrase "in the future" but has repeatedly declined to do so.

*Response:* DHS disagrees with the commenter that the interpretation of "likely at any time in the future" conflicts with the statutory wording and pre-1999 practice. As explained in the

NPRM,[504] the language of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), requires a predictive assessment. Terms such as "become" and "likely at any time" indicate that the assessment should be based on factors that tend to reasonably show that the burden of supporting the alien is likely to be cast on the public.[505] As established in the NPRM, case law supports this view and is therefore consistent with the pre-1999 approach to public charge and the definition of "likely at any time in the future to become a public charge" as added to 8 CFR 212.21(c).[506] While Congress could have added "in the future," Congress' wording of the public charge provision clearly indicates prospective determination; DHS added the words to clarify that any time is prospective and forward looking.[507]

*Comment:* Commenters stated that the proposed rule is impermissibly vague by failing to define "likely" as the term is used in "likely to become a public charge." One commenter indicated that DHS failed to define "likely" although it used the term throughout the entire rule. The commenter indicated that DHS used a specific dollar amount for purposes of the public charge determination, yet, DHS failed to provide a threshold amount for adjudicators to use to assess the likeliness of becoming a public charge in the future. Additionally, the commenter also indicated that although DHS provided numerous statistics on benefits use rates, DHS never clarified what likelihood is high enough to justify a denial.[508] Therefore, the commenter suggested defining the term "likely" as a "probability of becoming a public charge equal to or greater than 75 percent."

*Response:* DHS appreciates the comment and agrees that the meaning of likely at any time in the future to become a public charge needs clarification. However, DHS will not

---

[499] CHIP-funded Medicaid coverage generally can be used for children whose income is above the Medicaid income standard in effect in the state in 1997, when the CHIP program was first established.

[500] Medicaid.gov, CHIP Eligibility, available at *https://www.medicaid.gov/chip/eligibility-standards/index.html* (last visited June 13, 2019).

[501] *See* Medicaid.gov, Medicaid and CHIP Coverage of Lawfully Residing Children and Pregnant Women, available at *https://www.medicaid.gov/medicaid/outreach-and-enrollment/lawfully-residing/index.html* (last visited June 13, 2019).

[502] *See* Medicaid.gov, Medicaid, Children's Health Insurance Program, & Basic Health Program Eligibility Levels, available at *https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-eligibility-levels/index.html* (last visited July 27, 2019).

[503] *See* U.S. Dep't of Health and Human Servs. (HHS), Centers for Medicare & Medicaid (CMS), Expenditure Reports from MBES/CBES. Available at *https://www.medicaid.gov/medicaid/finance/state-expenditure-reporting/expenditure-reports/index.html* (last visited July 27, 2019). For a list of federal expenditures by program, *see* FY 2016 data from table 2 of Gene Falk et al., Cong. Research Serv., R45097, Federal Spending on Benefits and Services for People with Low Income: In Brief (2018), available at *https://fas.org/sgp/crs/misc/R45097.pdf* (last visited July 27, 2019).

[504] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51174–75, 51178–79 (proposed Oct. 10, 2018).

[505] *See, e.g., Matter of Martinez-Lopez,* 10 I&N Dec. 421 (Att'y Gen. 1964).

[506] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51174–75, 51178–79 (proposed Oct. 10, 2018).

[507] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51174–75, 51178–79 (proposed Oct. 10, 2018).

[508] The commenter referred to a 1999 Central Intelligence Agency study in which was concluded that NATO military officers did not interpret the words "likely" or "unlikely" in a consistent manner showing a wide variation. *See* Richard J. Heuer, Jr., Psychology of Intelligence Analysis, Central Intelligence Agency (1999), p. 155, *https://www.cia.gov/library/center-for-the-study-of-intelligence/csi-publications/books-and-monographs/psychology-of-intelligence-analysis/PsychofIntelNew.pdf* (last visited July 26, 2019).

accept the suggestion that likely at any time to become a public charge means a 75 percent likelihood that the alien would become a public charge at any time in the future. As with other key terms in the statute, Congress did not define or otherwise describe what it meant by likely at any time to become a public charge. DHS believes likely in the context of likely at any time to become a public charge is best considered as probable, *i.e.,* more likely than not. Although, as the commenter noted, the term ''likely'' has been inconsistently defined in some contexts,[509] equating likely at any time to more likely than not is nonetheless consistent with the approach many courts have taken in the determining the meaning of likely.[510] DHS believes that defining likely at any time to mean ''more likely than not'' is consistent with how the DHS regulations implementing withholding of removal and deferral of removal under the Convention Against Torture have used ''more likely than not'' interchangeably with ''likely to.''[511]

Therefore, DHS has amended the definition of likely to become a public

charge at 212.21(c) to clarify that a person is likely to become a public charge if it is ''more likely than not'' that the individual at any time in the future will receive one or more public benefits, as defined in 8 CFR 212.21(b), based on the totality of the alien's circumstances.[512]

4. Household

*Comment:* Several commenters expressed concern with the new definition of ''household.'' A commenter stated that this new definition is designed to apply to as many people as possible and would be the most expansive definition of ''household'' within the Executive Branch. A few commenters asserted that the proposed rule rejects both the HHS and the IRS definitions of ''dependent'' and ''household'' in favor of arbitrary standards set by DHS. Another commenter indicated that different agencies have their own definition of a ''household,'' which leads to variance and an uneven application of the law.

*Response:* DHS disagrees that the definition of household would be the most expansive in the Executive Branch or that it acts as a penalty. As discussed in the NPRM,[513] the poverty guidelines do not define who should be considered part of the household, and different agencies and programs have different standards for determining household size.[514] For example, and as explained in the NPRM,[515] SNAP uses the term ''household'' and includes everyone who lives together and purchases and prepares meals together, which is more expansive than the definition that DHS is adopting. DHS further disagrees that the standard is arbitrary. However, DHS does agree that different agencies have

their own definition of household as discussed in the NPRM.

Furthermore, as discussed in the NPRM, DHS is not fully adopting the IRS definition of ''dependent.''[516] That definition would generally require some type of relationship to the person filing (including step and foster children and their children) whether or not the dependent is living with the person filing and the amount of support being provided by the person filing (over 50 percent).[517] For tax purposes, dependents may include U.S. citizens, U.S. resident aliens, U.S. nationals, and residents of Canada or Mexico.[518] DHS's definition would adopt the IRS consideration of the amount of support being provided to the individuals (50 percent) as the threshold for considering an individual as part of the household in the public charge determination, rather than consider any support being provided.[519] As discussed in the NPRM, DHS believes that the ''at least 50 percent of financial support'' threshold as used by the IRS is reasonable to apply to the determination of who belongs in an alien's household, without regard to whether these individuals physically reside in the alien's home. This would include those individuals the alien may not have a legal responsibility to support but may nonetheless be supporting. DHS believes that an alien's ability to support a household is relevant to DHS's consideration of the alien's assets, resources, financial status, and family status.

*Comment:* Several commenters expressed concern with the definition classifying people as household members if the alien contributes 50 percent or more to their financial support. A commenter said that this requirement is vague and too expansive, asserting that many families live in

---

[509] For example, a review of state laws on determining when sex offenders are ''likely'' to reoffend found that ''states vary greatly on how they define likely'' with some states define it as greater than 50 percent or substantially probable while others have expressly rejected standard based on percentages. Jefferson C. Knighton, Daniel C. Murrie, Marcus T. Boccaccini, & Darrel B. Turner, *How Likely is 'Likely to Reoffend' in Civil Sex Offender Commitment Trials,* 38 Law & Hum. Behav. 293, 294–96 (2014). N.B. DHS is referencing sex offender statutes to show the lack of clarity in defining the word likely; DHS is not implying, in any way, any similarity between those who commit sexual crimes to those who are subject to public charge.

[510] *See, e.g., Southwest Sunsites, Inc.* v. *F.T.C.,* 785 F.2d 1431 (9th Cir.) (''First, the FTC must show probable, not possible, deception ('*likely* to mislead,' not '*tendency and capacity* to mislead').'' (emphasis in the original)), *cert. denied,* 479 U.S. 828 (1986); *Fermin* v. *Pfizer Inc.,* 215 F. Supp. 3d 209, 211 (E.D.N.Y. 2016) (''The term 'likely' indicates that deception must be probable, not just possible.''); *Siderca, S.A.I.C.* v. *United States,* 28 C.I.T. 1782, 350 F. Supp.2d 1223, 1226 (Ct. Int'l Trade 2004) (''The common meaning of 'likely' is 'probable,' or, to put it another way, 'more likely than not.' ''); *In re G.H.,* 781 NW2d 438, 445 (Neb. 2010) (holding that '' 'probable,' in other words, more likely than not'' satisfies the ''likely to engage in repeat acts of sexual violence'' standard under Nebraska law.).

[511] *Compare* 8 CFR 208.16(c)(4) (''If the immigration judge determines that the alien is *more likely than not* to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture.'') *with* 8 CFR 208.17(b)(2) (''The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is *likely* to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.'') (emphasis added). *See generally Matter of Chawathe,* 25 I&N Dec. 369, 376 (2010) (discussing the more likely than not standard).

[512] This change clarifies the definition of likely to become a public charge, but it does not alter the burden that adjustment applicants bear in demonstrating that they are admissible. As with any other ground of inadmissibility, an applicant for adjustment of status still has the burden of demonstrating that he or she is clearly and beyond doubt entitled to be admitted to the United States and is not inadmissible. *See Matter of Bett,* 26 I&N Dec. 437, 440 (BIA 2014). Adjustment applicants have the burden to show that they clearly and beyond doubt satisfy the standard of not being more likely than not to become a public charge in the future. *See generally House* v. *Bell,* 547 U.S. 518, 538 (2006) (discussing habeas petitioner's burden of showing ''more likely than not'' with the standard of ''no reasonable juror would find him guilty beyond a reasonable doubt.'')

[513] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018).

[514] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing Annual Update of the HHS Poverty Guidelines, 83 FR 2642 (Jan. 18, 2018). *See also* HHS Annual Update of the HHS Poverty Guidelines, 84 FR 1167 (Feb. 1, 2019).

[515] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018).

[516] *See* 26 U.S.C. 152; *see also* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing IRS Publication 501 (Jan 2, 2018), *available at https://www.irs.gov/pub/irs-pdf/p501.pdf* (last visited May 8, 2019).

[517] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing IRS Publication 501 (Jan 2, 2018), *available at https://www.irs.gov/pub/irs-pdf/p501.pdf.*

[518] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing IRS Publication 501 (Jan 2, 2018), *available at https://www.irs.gov/pub/irs-pdf/p501.pdf.*

[519] *See* Internal Revenue Serv., *Dependency Exemptions, available at https://apps.irs.gov/app/vita/content/globalmedia/4491_dependency_exemptions.pdf* (last visited July 26, 2017); *see also* Internal Revenue Serv., *Table 2: Dependency Exemption for Qualifying Relative, available at https://apps.irs.gov/app/vita/content/globalmedia/table_2_dependency_exemption_relative_4012.pdf* (last visited July 26, 2018).

extended family and close friend housing that share the cost of utilities, transportation, food, etc., which can lead to difficult miscalculations of this 50 percent threshold. Similarly, one commenter stated that household size is not predictive of a person's propensity to become a public charge, but is instead the natural consequence of working people pooling together their resources to support each other. Other commenters provided the example that many immigrants provide financial support to family members who remain in their countries of origin and in some countries, as little as $100 a month can constitute more than 50 percent of an individual's financial support, which would mean that the person should be counted as part of the immigrant's household size, which would drive up the earnings they would need to meet the threshold by much higher amounts. Multiple commenters asserted that immigrants could be penalized for providing family support to a sibling with disability or parents to whom they have no legal obligation. A commenter said the definition could cause harm to larger households who must show larger incomes or resources to support the larger numbers being counted, regardless of the reality of the financial benefits that households may be providing to society. This commenter also stated that it could be especially harmful to immigrant families who often care for extended family members in cases of emergencies without being legally required to do so.

*Response:* As explained in the NPRM,[520] DHS considers an alien's household size not only as part of the alien's asset, resources, and financial status but also for purposes of the family status. As is the case with all of the factors and consideration, DHS will consider the impact of the household size as part of the totality of the circumstances.[521] Therefore, having support from other household members may be a positive consideration while having assets below the 125 percent threshold for the household size may be a negative consideration because it indicates that an alien may be likely to become a public charge. For these reasons, DHS considers the household size a relevant consideration in the public charge assessment and predictive of the likelihood, within the totality of the circumstances, that an alien will become a public charge. DHS recognizes that multiple individuals in the household may be working to support the household.

With the definition of household, DHS aims to account for both the persons whom the alien is supporting and those who are contributing to the household to support the alien, and thus to the alien's assets and resources.[522] DHS will consider any of the family members supported, including those who are supported outside the United States and listed on Form I–944. DHS clearly outlined in the regulatory provision who is included in the definition of household and therefore DHS does not agree that the definition is vague or too expansive, but agrees that it may be, depending on the specific circumstances of the household, either over-or under-inclusive.

*Comment:* Commenters stated that, although the receipt of benefits by U.S. citizen children would not be a negative factor to their noncitizen parent's application, the mere fact that the children are in the household would be a downward factor for determining overall household income. Another commenter stated that children should not be included in the household calculation because most support agreements or orders do not contain information to determine whether a potential amount is 50 percent of the financial support of a child. A commenter stated that verifying which individuals provide to the applicant at least 50 percent of their financial support requires a fact-intensive review of not only cash support, but non-cash support such as room and board or payment of utilities that may only be partly attributable to the noncitizen. The commenters said this overly complicates the household size assessment, particularly as compared to the relatively straightforward determination used for the current Form I–864.

*Response:* As indicated in the NPRM, as part of the description of the definition of household and family status[523] research and data have shown that the number of household members may affect the likelihood of receipt of public benefits. However, the number of household members may also positively affect the financial status and household, depending on the alien's and household's circumstances, include other member's employment and financial contributions to the household. Therefore, DHS disagrees

with the commenters that children would be considered a downward factor for determining overall household income. DHS's definition of household member adopts the IRS consideration of the amount of support being provided to individuals (50 percent) as the threshold for considering an individual as part of the household. Therefore, DHS will retain the standard as proposed.

*Comment:* Several commenters remarked that this assessment would have a disproportionally negative impact on immigrant women, asserting that immigrant women are more likely than immigrant men to have one or more children living in the same household, and, therefore, more likely to have a large household. Some commenters stated this requirement directly imposes on an immigrant woman's bodily autonomy and agency, particularly if or when to have children, by counting having a large family against them as part of the public charge determination. A commenter discussed the definition's impact on domestic and sexual violence survivors, asserting that this population could be penalized for providing continuing support to former partners or family members if they were involuntarily coerced into providing such support or have ceased living with them due to abuse. The commenter added that the rule could penalize victims who often seek the help of family members to alleviate housing and childcare expenses and strengthen their ties to the United States.

*Response:* DHS is implementing a statutory ground of inadmissibility provided by Congress; the goal of the rule is not to penalize but to ensure that those coming to the United States are self-sufficient and not likely depend on public resources. DHS also incorporated exceptions provided by Congress, including those applicable to battered spouses and children.[524] Therefore, DHS disagrees that the rule penalizes domestic and sexual violence survivors. As it is the case for all, the public charge assessment will be made in the totality of the circumstance to determine whether an applicant is likely, at any time in the future, to become a public charge.

*Comment:* A commenter said the definition does not allow for the exclusion of the alien's household members who are not intending to immigrate within six months of the immigrant's application, which holds the applicant fiscally responsible for an individual that they will not be living with for at least 6 months after immigrating to the United States.

---

[520] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51175 (proposed Oct. 10, 2018).

[521] *See* 8 CFR 212.22(a).

[522] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51177 (proposed Oct. 10, 2018).

[523] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176–51178, 51184 (proposed Oct. 10, 2018).

[524] *See* 8 CFR 212.23.

*Response:* As explained in the NPRM, for purposes of the household definition, DHS will take into consideration both individuals living in the alien's home and individuals not living in the alien's home, including aliens living outside the United States, for whom the alien, and or the alien's parents or legal guardians are providing, or are required to provide, at least 50 percent of financial support.[525] DHS therefore does not focus on the location of the financially supported person, but on the fact that the person is receiving more than 50 percent of financial support from the applicant, rendering those funds unavailable to the applicant for his or her own support and self-sufficiency.

*Comment:* A commenter expressed their opposition to the NPRM assertion that ''the receipt of non-cash benefits generally increased as family size increased.'' This commenter referenced Table 17 in the NPRM, which the commenter stated indicated that non-cash benefit usage is higher among families of three (22.3 percent) than families of four (20.7 percent). The same commenter cited information claiming that among noncitizens in ''nonfamily households'' (*i.e.,* individuals), 2.7 percent received cash assistance and that number steadily decreased in larger households with only 1.8 percent of noncitizens in families of five or more receiving any cash benefit.

*Response:* DHS appreciates the comment. DHS acknowledges that certain data were not statistically significant, which in some cases was a consequence of small sample sizes. The statistics cited regarding non-cash benefit use among families of sizes three and four were not statistically significantly different from each other, so DHS would not conclude that one is higher or lower. Among noncitizens, the results that were statistically significant showed a lower rate of non-cash benefit use among nonfamily households, and a higher rate of non-cash benefit use among those with a family size bigger than five, compared with those having family sizes of two, three, and four. Among citizens, those having family sizes of two were shown to have a lower rate of non-cash benefit use than those with larger families. These findings suggest a generally higher rate of non-cash benefit use as family size increases. Regarding the rates of cash benefit use, the estimates cited for nonfamily households and those with families of size five or more were not statistically significantly different. The estimates of

cash benefit use among noncitizens in Table 17 in the NPRM had high variance, indicating only that the rates were about one to three percent across family size groups. Therefore, DHS believes that the data properly reflects that receipt of noncash benefits generally increases with an increase in family size.

*Comment:* A commenter stated that the rule ''contravenes PRWORA and IIRIRA by drastically limiting how a sponsor's income is considered as part of the public charge analysis—even though the sponsor's commitment is legally enforceable.'' The commenter stated that only considering the sponsor's income if (i) the sponsor physically lives with the noncitizen, or (ii) ''the sponsor is already contributing 50 percent or more of the alien's financial support,'' has no basis in either PRWORA or IIRIRA and ''would run contrary to the basic logic undergirding the sponsor affidavit provisions of both laws'' because under PRWORA and IIRIRA, a sponsor must have an income of at least 125 percent of the FPL, and both the sponsored noncitizen and benefit-granting agencies may legally enforce the affidavit of support as the sponsor's promise to maintain a noncitizen above 125 percent of the FPL. In addition, the commenter noted that PRWORA requires benefit-granting agencies to include a sponsor's income when determining whether a sponsored noncitizen is income-eligible for means-tested benefits. The commenter asserted that discounting the value of an affidavit of support in the public charge determination unless the sponsor is closely related to or lives with the noncitizen, would ignore the legally enforceable nature of the sponsor's promise and that the sponsor's income is deemed that of the noncitizen.

*Response:* DHS disagrees that the rule contravenes PRWORA and IIRIRA with respect to the manner in which DHS will consider a sponsor's income. DHS neither proposed any changes to how the sponsor's income is considered with respect to the enforceable affidavit of support, nor changed any applicable deeming rules. In addition, the INA requires a distinct public charge assessment for admission and adjustment of status even where an alien has an affidavit of support. Under this rule, the affidavit of support, where required, will still have to comply with the requirements of section 213A of the Act, 8 U.S.C. 1183a, and 8 CFR part 213a.

As noted previously, Congress set forth the mandatory factors that DHS must consider in the public charge

inadmissibility determination—these factors include the alien's assets, resources, and financial status. While the affidavit of support is required for most family-based applications and some employment-based applications, it is set apart from those factors, and *may* be considered in a public charge inadmissibility determination as a separate consideration.[526] This indicates that Congress intended for the affidavit of support and the public charge determination to serve similar, but not identical functions.

As discussed in the NPRM, DHS chose a definition of household that takes into account the definitions used by benefit-granting agencies and that captures individuals who are financially interdependent with the alien. In considering gross household income, USCIS will also consider any monthly or annual income from individuals who are not included in the alien's household, where the support to the household has been provided to the household on a continuing monthly or yearly basis during the most recent calendar year.[527] Accordingly, if the sponsor is already providing 50 percent or more of financial support or is otherwise providing income on a monthly or annual basis to the alien that the alien will rely on to meet the income threshold, the sponsor's income or payments would be included in the consideration of the alien's assets, resources, and financial status.[528] DHS

---

[525] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018).

[526] *See* INA section 212(a)(4)(B)(i) & (ii), 8 U.S.C. 1182(a)(4)(B)(i) & (ii).

[527] *See* 8 CFR 212.22(b)(4)(i)(B).

[528] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51177 (proposed Oct. 10, 2018). (''For example, when a child, as defined in INA section 101(b), 8 U.S.C. 1101(b)(1), is filing for adjustment of status as the child of a U.S. citizen or lawful permanent resident, the affidavit of support sponsor would also be the parent. Because the parent is part of the household, the parent's income would be included as part of the household income. The parent's income would be reviewed as part of the assets, resources, and financial status factor based on the total household size. However, for example, if there is a cosponsor, who is the alien's cousin and who is not physically residing with the alien, then the cousin would not be counted as part of the household and his or her income would not be included as part of the assets, resources or financial status unless the sponsor is already contributing 50 percent or more of the alien's financial support. In addition, if the sponsor is a member of the alien's household and included in the calculation of the 125 percent of the FPG, DHS would only count the sponsor's income once for purposes of determining the alien's total household assets and resources. A sponsor's income as reported on the affidavit of support would be added to the income of the other members of the alien's household. The sponsor's income that is added to the alien's total household assets and resources would not be increased because the sponsor also submitted an affidavit of support promising to support the alien at least 125 percent of the FPG for the sponsor's household size. For example, assuming the alien and sponsor's

Continued

declines to otherwise deem the sponsor's income in the public charge context, as this kind of automatic deeming would essentially render meaningless the public charge determination for any alien with an affidavit of support. DHS does not believe Congress would have retained the public charge ground of inadmissibility, had it intended such a result.

## H. Public Charge Inadmissibility Determination Based on Totality of Circumstances

*Comment:* Many commenters expressed general concern about the discretion that government workers would be given when making public charge determinations, which would result in inconsistent and unfair public charge inadmissibility determinations. One commenter noted that the rule change gives too much discretion to officers in making inadmissibility determinations. Another commenter noted that because the rule relies on officer discretion, there will be inconsistent adjudications and the rule is thus arbitrary and capricious. The commenter further stated that this proposed standard is also arbitrary and capricious because the required officer evaluation would be burdensome and inefficient. A commenter provided an estimate on the number of people adversely affected by the rule based on the factors.

Several commenters stated that the "totality of circumstances" test would require adjudicators to weigh a potentially unlimited number of "factors," and expressed confusion regarding the difference between "factors" and "considerations" under the proposed rule. A commenter noted that "[a]s a result, there could be an infinite number of factors that adjudicators could possibly assess, resulting in public charge determinations [that] will inevitably vary from adjudicator to adjudicator even when faced with very similarly situated cases." Two commenters stated that the proposed rule is not quantitative and the "totality of circumstances" test to determine public charge admissibility is vague and ambiguous. An individual commenter suggested that DHS remove the totality of circumstances language to ensure the

household sizes are the same, if the sponsor's total income reported on the affidavit of support is 250 percent of the FPG for the household size, that income would be added to the alien's assets and resources; the alien's total household income would then be at least 250 percent of the FPG, which constitutes a heavily weighted positive factor.").

rule will operate as intended and will not lead to inconsistent results.

An individual commenter stated that the existing statutory framework directs an adjudicator to consider an immigrant's personal and financial circumstances to determine the likelihood that they will become dependent on the government in the future, which is easily demonstrated by their employment prospects and the existence of support systems. However, the commenter stated that the proposed positive and negative weighted factor system was unworkable and provided no guidance on how these factors would be weighted. The commenter also stated that DHS should allow immigrants to prove themselves sufficient after immigrating. A commenter suggested DHS provide written documentation of the public charge determination and reasoning to the applicant and his/her legal representative. A few commenters described the proposed rule as extremely vague and open-ended regarding the issues that will be considered. The commenters also stated that DHS fails to state how it will measure the weighted factors. A commenter stated the alien must show by a preponderance of the evidence that he or she is eligible for the benefit sought but that the rule requires too high a standard of proof with respect to the applicant demonstrating he or she will not become a public charge.

Some commenters stated that the proposed rule contained vague standards, required adjudicators to consider a broad range of factors, and afforded such adjudicators significant discretion. The commenters stated that as a consequence, outcomes will be dependent on the particular adjudicator making the decision. Commenters indicated that they were especially concerned that this lack of predictability will make it nearly impossible for attorneys to adequately advise their clients. Commenters stated that such unpredictability would lead to a chilling effect with respect to aliens' use of public benefits.

Commenters stated that granting USCIS officers the discretion to evaluate the totality of circumstances would be inefficient, as they would require new training to evaluate criteria, such as credit reports, and that other agencies, such as DOL, already have education and skills criteria for work visas.

*Response:* DHS disagrees with the assertion that the rule provides too much discretion to adjudicators as a result of the totality of the circumstances approach and that the framework will lead to unfair and inconsistent determinations. DHS

acknowledges the complexity of this rule. This final rule is intended to provide greater clarification in response to comments. As with any new regulation, the regulated public may need to read and become familiar with the regulation to understand how it applies. DHS will also issue guidance, and may further revise such guidance as necessary after it has gained experience with the new regulatory regime.

As explained in the NPRM, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), provides that an alien who, "in the opinion of" the Secretary is likely to become a public charge is inadmissible.[529] The Government has long interpreted the phrase "in the opinion of" as describing an assessment that is subjective and discretionary in nature.[530] While authorizing this subjective, discretionary assessment, however, Congress also mandated that the public charge determination consider, at a minimum, the alien's age, health, family status, assets, resources, financial status, education, and skills. Consideration of these mandatory factors requires a case-by-case determination based on the totality of the alien's circumstances. This final rule will result in officers conducting a full analysis of the factors set forth in the statute and in this rule, and weighing all evidence submitted in the totality of the circumstances. Both the proposed rule and this final rule adequately explain how the criteria are to be applied and what evidence should be considered.

Unlike the 1999 Interim Field Guidance, which failed to interpret the statutory factors and provided no direction to adjudicators on how to consider them, this final rule is clear about the legal standard and evidentiary burden aliens must meet to demonstrate that they are not likely at any time in the future to become a public charge. In addition, USCIS will be conducting training for adjudicators and, as necessary, issuing sub-regulatory guidance to ensure consistency in adjudications. However, to the extent that each alien's individual circumstances constitute a unique fact

[529] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[530] *See Matter of Harutunian,* 14 I&N Dec. 583, 588 (Reg'l Cmm'r 1974) ("[T]he determination of whether an alien falls into that category [as likely to become a public charge] rests within the discretion of the consular officers or the Commissioner . . . Congress inserted the words 'in the opinion of' (the consul or the Attorney General) with the manifest intention of putting borderline adverse determinations beyond the reach of judicial review." (citation omitted)]); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1962) ("[U]nder the statutory language the question for visa purposes seems to depend entirely on the consular officer's subjective opinion.").

pattern, outcomes in public charge determinations will appropriately vary. In addition, DHS disagrees that public charge determinations will be burdensome and inefficient. USCIS will take care to effectively examine the evidence presented to determine whether the alien is likely to become a public charge at any time in the future, consistent with the statute.

DHS also disagrees that the standard used to determine public charge inadmissibility is too high. While the commenter is correct that, in general, an applicant applying for an immigration benefit must demonstrate eligibility by a preponderance of the evidence,[531] DHS has not changed that standard of proof with respect to applications subject to a public charge inadmissibility determination. Those applicants will still, unless otherwise specified, be required to show by a preponderance of the evidence that they are not likely at any time to become a public charge. DHS has defined likely at any time to become a public charge in this final rule as more likely than not at any time in the future to become a public charge. Therefore, applicants subject to a public charge inadmissibility determination will need to demonstrate by a preponderance of the evidence that they are not more likely than not at any time in the future to become a public charge.

Additionally, the public charge inadmissibility analysis is a prospective determination, as evidenced by the words "likely at any time to become" a public charge. Moreover, aliens subject to the public charge ground of inadmissibility must demonstrate that they are not likely at any time to become a public charge at the time of their application or a visa, admission, or adjustment of status. Therefore, DHS will not adopt the commenter's suggestion that an alien subject to the public charge ground of inadmissibility should be allowed to wait until after immigrating to the United States to demonstrate that he or she is likely at any time to become a public charge and thereby avoid becoming inadmissible on public charge grounds at the time of admission as an immigrant.

DHS also believes that the rule provides a clear framework for considering the mandatory factors in a public charge inadmissibility determination in the totality of the circumstances. DHS acknowledges,

however, that the adjudication of public charge inadmissibility is complex and that the determination of the likelihood at any time in the future to become a public charge is not governed by clear data regarding whether any given alien subject to this determination is more likely than not to receive public benefits for more than 12 months in the aggregate in a 36-month period at any time in the future, and therefore would be inadmissible when weighing all factors in the totality of the alien's circumstances.

To address these concerns, USCIS plans to take several steps. For one, to provide its officers with a solid foundation and knowledge on public charge inadmissibility determinations, USCIS plans to issue policy guidance in its USCIS Policy Manual (*https://www.uscis.gov/policy-manual*), which will include information from the NPRM and this final rule and can be accessed by potential applicants. In its policy guidance, USCIS will direct officers to determine:

• Whether the alien is more likely than not to receive one or more public benefits, as defined in 8 CFR 212.21(b), at any time in the future; and

• Whether the alien's likely receipt of one or more of the enumerated public benefits is more likely than not to exceed 12 months in the aggregate within any 36 month period (such that, for instance, receipt of two benefits in one month counts as two months) at any time in the future.

In making this determination, there is no bright-line test that USCIS officers will administer. For instance, past or current receipt of public benefits may make an alien a public charge at present, but past or current receipt of public benefits, alone, is insufficient to sustain a finding that an alien is likely to become a public charge at any point in the future.

Instead, there must be a nexus between the alien's circumstances and the alien's future likelihood of becoming a public charge. The mere presence of any one enumerated circumstance, alone, is not outcome determinative.[532] USCIS, therefore, will evaluate all of the alien's facts, circumstances, and evidence to determine whether factors in the analysis are *positive* or *negative*. Any factor that *decreases* the alien's future likelihood of receiving one or more public benefits above the 12 months in the aggregate in a 36-month period threshold is *positive*. Any factor

that *increases* the alien's future likelihood of an alien receiving one or more public benefits above the 12 aggregate months in a 36-month period threshold is *negative*.

USCIS will then weigh all factors individually and cumulatively. USCIS will assess the *weighted degree* to which each factor is *negative* or *positive*—the extent to which the factor affects the likelihood that the alien *will* or *will not* receive one or more public benefits above the threshold. Certain enumerated factors will weigh heavily in favor of finding that an alien is not likely to become a public charge or finding that an alien is likely to become a public charge. But, for example, depending on the alien's specific circumstances, a heavily weighted negative factor can be outweighed by a heavily weighted positive factor or some combination of positive factors in the totality of the circumstances. Otherwise, the weight given to an individual factor not designated a heavily weighted factor depends on the particular facts and circumstances of each case and the relationship of the individual factor to other factors in the analysis. Multiple factors operating together will carry more weight to the extent those factors in tandem show that the alien is more or less likely than not to become a public charge.

USCIS' totality of circumstances assessment will focus on, for instance, the following considerations:

• *Ability to Earn a Living*—The ability of the alien to earn sufficient income to pay for basic living needs (*i.e.*, food and nutrition, housing, and healthcare), as evidenced by or impacted by, for example, the alien's age, health, work history, current employment status, future employment prospects, education, and skills;

• *Sufficiency of Income, Assets, and Resources*—The sufficiency of the alien's household's income, assets, and resources to meet basic living needs (*i.e.*, food and nutrition, housing and healthcare);

• *Sufficiency and Obligation of Sponsorship*—The legal sufficiency of the affidavit of support, if required, and the likelihood that a sponsor would actually provide the statutorily-required amount of financial support to the alien, and other related considerations;

• *Ability to Overcome Receipt of Public Benefits or Certification or Approval to Receive Public Benefits Above the Designated Threshold*—The ability of the alien to overcome receipt of, or certification or approval to receive, one or more public benefits for more than 12 months in the aggregate in any 36 month period beginning no

---

[531] *See Matter of Chawathe,* 25 I&N Dec. 369, 375 (2010) ("Except where a different standard is specified by law, a petitioner or applicant in administrative immigration proceedings must prove by a preponderance of evidence that he or she is eligible for the benefit sought.") (citations omitted).

[532] Except that the absence of a sufficient affidavit of support, where required, will lead to an inadmissibility finding. *See* INA section 212(a)(4)(C), (D), 8 U.S.C. 1182(a)(4)(C), (D).

**41398**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

earlier than 36 months before the application for admission or adjustment of status.

Assessing an alien's ability to overcome the heavily weighted negative factor for recent receipt of, or certification or approval to receive, one or more public benefits above the designated threshold, in particular, will depend on the totality of the alien's circumstances and the existence of positive factors that alone or in combination could outweigh this heavily weighted negative factor such that the alien would not be likely to become a public charge at any time in the future. For example, the alien's assets and resources being at or above 250 percent of the FPG, the alien being healthy and between the ages of 18 and 61, the alien being currently employed, and evidence that the alien has disenrolled or requested to disenroll from public benefits could play a significant role in outweighing recent receipt of, or certification or approval to receive, public benefits above the designated threshold. Where a factor includes more than one consideration, including evidence related to such considerations, DHS will consider all evidence presented by the alien in the totality of the circumstances. For example, DHS will consider income above 125 percent and a good credit score and report as positive considerations in the totality of the circumstances.

If USCIS finds that the alien's positive factors outweigh the alien's negative factors, such that the alien is not likely to receive one or more public benefits above the designated threshold at any time in the future, then USCIS will conclude that the alien is not inadmissible as likely to become a public charge. On the other hand, if USCIS finds that the alien's negative factors outweigh the alien's positive factors, such that the alien is more likely than not to receive one or more public benefits above the designated threshold at any time in the future, then USCIS will find that the alien is inadmissible as likely to become a public charge.

USCIS, as with other applications, will notify applicants of deficiencies in their applications with respect to public charge inadmissibility in accordance with the principles outlined in 8 CFR 103.2 and USCIS policy in regard to notices, RFEs or NOIDs, and denials.[533]

If USCIS denies an alien's application for adjustment of status on public charge grounds under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), USCIS will explain why the negative factors outweigh the positive factors based on the alien's individual circumstances in making the alien more likely than not to receive one or more public benefits above the designated threshold at any time in the future.

Furthermore, to ensure consistency and quality control, USCIS will provide training to officers and continue to monitor adjudications. As is the case for any adjudication at USCIS, USCIS will apply its general quality control processes for adjudications involving public charge assessments. USCIS continues its ongoing data collection efforts on its adjudications as well as other information relevant to the adjudication, to continually assess and improve the adjudication processes, procedures and training.

However, DHS notes that officer discretion is not a new concept in USCIS immigration benefits adjudications. Several benefits provided under the Act are discretionary in nature, and involve an assessment and weighting of positive and negative factors. For example, an alien's adjustment of status application to that of lawful permanent resident under section 245 of the Act, 8 U.S.C. 1255, requires the officer to weigh all positive and negative factors in the alien's case to ultimately determine whether lawful permanent resident status should be granted as a matter of discretion.[534] DHS disagrees with commenters' characterization that the rule overall, the proposed framework for the public charge determination, and individual factors, as published in the NPRM, lack required specificity or are impermissibly vague. When creating implementing regulations under the APA, an agency must provide notice that, among other things, articulates the terms or substance of the proposed rule, or a description of the subjects and issues involved. A notice of proposed rulemaking must contain sufficient factual details and rationale to permit interested parties to comment meaningfully. An agency is accorded broad deference in selecting the level of

generality at which it may articulate regulations but a regulation is not deemed vague simply because it may contain a factor that is difficult to prove; it may be deemed vague or lacking in specificity if it is unclear as to what fact must be proven.[535] The NPRM and this rule both make abundantly clear what an alien must prove. DHS not only ensured that the public had a meaningful opportunity to comment by clearly articulating which factors USCIS will consider as part of the totality of the circumstances standard, but also by illustrating the application of the public charge determination framework and its factors in the preamble and in Table 33 of the NPRM.[536]

DHS also disagrees that the rule requires a high standard of proof. Congress established the mandatory factors that must be considered as part of the public charge determination and DHS is providing guidance on how to assess these factors.[537] Additionally, Congress established clear burdens and standards of proof relating to grounds of inadmissibility in immigration proceedings. The alien always has the burden to show that he or she is eligible for an immigration benefit and that he or she is not inadmissible.[538] In general, an alien must show by a preponderance of the evidence that he or she is eligible for the benefit sought.[539]

Finally, DHS understands that commenters believe that the submission of Form I–864 provides a method for objective public charge inadmissibility analysis and that the totality of the circumstances approach is inefficient because of training needs and because other agencies, such as the DOL, already evaluate education and skills criteria. It is true that the practical focus of DHS

---

[533] See USCIS Policy Memorandum Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (AFM) Chapter 10.5(a), Chapter 10.5(b), PM–602–0163 (Jul. 13, 2018) (*https:// www.uscis.gov/sites/default/files/USCIS/Laws/ Memoranda/AFM_10_Standards_for_RFEs_and_ NOIDs_FINAL2.pdf* (last visited June 21, 2019).

[534] See INA section 245, 8 U.S.C. 1255; see also USCIS Policy Manual Guidance on Adjustment of Status under INA section 245, Volume 7, Part B, 245(a) Adjustment.

DHS notes that the failure to submit a completed Form I–944, Declaration of Self-Sufficiency or Form I–864, Affidavit of Support with the Form I–485, Application to Register or Adjust Status, when required, may result in a rejection or a denial of the Form I–485 without a prior RFE or NOID. See 8 CFR 103.2(a)(7), (b)(8)(ii).

[535] See F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012); see also Connally v. General Constr. Co., 269 U.S. 385, 391 (1926).

[536] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51211 (proposed Oct. 10, 2018).

[537] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[538] See INA section 291, 8 U.S.C. 1361; 8 CFR 103.2(b)(1) ("An applicant or petitioner must establish that he or she is eligible for the requested benefit."); Matter of Brantigan, 11 I&N Dec. 493 (BIA 1966).

[539] See Matter of Bett, 26 I&N Dec. 437, 440 (BIA 2014) ("To be eligible for adjustment of status, an applicant has the burden to show that he is clearly and beyond doubt entitled to be admitted to the United States and is not inadmissible under section 212(a) of the Act."); Matter of Chawathe, 25 I&N Dec. 369, 375 (2010) ("Except where a different standard is specified by law, a petitioner or applicant in administrative immigration proceedings must prove by a preponderance of evidence that he or she is eligible for the benefit sought.") (citations omitted). See also Kirong v. Mukasey, 529 F.3d 800, 803–804 (8th Cir. 2008) (concluding that as an applicant for adjustment of status, the alien is put into the position of an alien seeking admission and must prove that he or she is clearly and beyond doubt admissible).

000855

in a public charge inadmissibility determination previously had been primarily on the sufficiency of an affidavit of support submitted on the alien's behalf. DHS, however, clarified the relationship between the Form I–864 and a public charge inadmissibility determination in the NPRM.[540] As explained in the NPRM, given that the statute[541] differentiates between the affidavit of support requirement and the mandatory factors of the public charge assessment, DHS considers it inconsistent with the statutory language to solely use the affidavit of support as a means to determine public charge inadmissibility. Similarly, while certain employment-based immigrant categories are required to obtain labor certifications from the DOL and to submit evidence of job qualifications, these requirements focus on an alien's ability to meet qualifications of the job offered and the employer's ability to pay the proffered wages[542] rather than an alien's likelihood of becoming a public charge because of age, health, financial status, education, skills, etc. Therefore, DOL's assessments and certifications obtained by DOL are not redundant to or a suitable substitute for public charge determinations.

*Comment:* Several commenters stated that, although the proposed rule acknowledges that the public charge determination is intended to be prospective, the proposed criteria are actually retrospective and offered without any evidence that they are relevant to the determination of whether an immigrant will become dependent on the Government for support in the future. Some commenters stated that the proposed rule completely ignores an individual's ability to learn, work, develop skills, and support himself or herself and his or her family. Several commenters recommended that DHS conduct research about the probability that an individual would be self-sufficient or not based on the weighted factors included in the public charge determination.

One commenter agreed with the use of data in Table 33 on the Totality of Circumstances Framework for Public Charge Determinations in the NPRM,[543] but this commenter and many others stated that positive and negative weighted factors are not treated the same, as there is an extensive list of negative factors and a short list of

positive factors. Therefore, these commenters believed that it would appear more likely an applicant could be disqualified based on weighted negative factors even if their application contains both positive and negative factors. Several commenters cited the MPI's analysis of American Community Survey (ACS) data from 2012–2016, that identified immigrants that are lawful permanent residents with fewer than five years of residency in the United States. The study showed that a significant number of these lawful permanent residents would have one or more negative factors counted against them, indicating substantial reduction in the number of potential green cards issued if the proposed rule was finalized.

Multiple commenters stated that, in order to improve one's education and skills and to be self-sufficient, it is often necessary to draw on short-term supportive services, but drawing on such means-tested public benefits would be a negative consideration in the totality of the circumstances test. Thus, the rule sets up a contradictory situation in which individuals attempting to strengthen their positive factors may instead add to the negative factors for their case. A commenter stated that the weighted factors used in the "totality of circumstances" test to determine inadmissibility is the "only interpretation that would be consistent with the governing statutory language and established methods of statutory construction."

*Response:* DHS disagrees that it is at all problematic for DHS to consider events in the alien's past as part of a prospective inadmissibility determination. As explained in the NPRM, DHS's proposed totality of the circumstances standard involves the weighing of positive and negative considerations in relation to the alien's age, health, financial assets, education and skills as well as the required affidavit of support and any other factor that warrants consideration in the alien's case. The totality of the circumstances approach, including consideration of events and circumstances in the alien's past, is consistent with the approach taken by the former INS, the BIA, and Article III case law.[544] Thus, although these factors may require some retrospective evaluation at the time of adjustment of status, Congress and courts deemed the alien's past as relevant to the alien's likelihood of becoming a public

charge.[545] DHS also discussed, in detail, the relevance of each factor in the public charge determination and supported its finding with relevant data. DHS, therefore, disagrees that it failed to provide a reasonable explanation why the factors are relevant.

Finally, although section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), lists required factors that must be considered, it does not preclude USCIS from considering other considerations relevant in an applicant's case. DHS agrees that officers will encounter various circumstances not specifically accounted for in the regulation, but plans to give officers the necessary tools through guidance and training to fairly adjudicate such cases, and believes that officers are able to exercise their judgment appropriately. As noted above, Congress specifically provided for the agency's discretion to account for all aspects in an individual's case.[546] DHS disagrees with the commenters that indicated that positive and negative factors are not treated equally because DHS in its regulations listed more negative factors than positive ones. Although having more negative factors may be a basis for finding a person inadmissible based on public charge, the number of negative factors does not by itself lead to a conclusion that a person is likely to become a public charge. USCIS will consider and weigh each factor presented in an alien's case in the totality of the circumstances.[547] DHS notes that it has added an additional heavily weighted positive factor in section III.R. of this preamble.

*Comment:* Some commenters also indicated that it appeared more likely that applicants would be disqualified based on heavily weighted negative factors even though their application contains both positive and negative factors.

*Response:* DHS agrees that some applicants may be found in the totality of circumstances likely to become a

---

[540] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51197 (proposed Oct. 10, 2018).

[541] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[542] *See* 20 CFR part 656.

[543] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51211 (proposed Oct. 10, 2018).

[544] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51179 (proposed Oct. 10, 2018).

[545] *See Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm's 1977) (consideration of past public benefits in determining the likelihood of becoming a public charge in the future); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421–22 (BIA 1962; Att'y Gen. 1964) (in determining whether a person is likely to become a public charge, factors to consider include age, health, and physical condition, physical or mental defects which might affect earning capacity, vocation, past record of employment, current employment, offer of employment, number of dependents, existing conditions in the United States, sufficient funds or assurances of support by relatives or friends in the United States, bond or undertaking, or any specific circumstances reasonably tending to show that the burden of supporting he alien is likely to be case on the public.)

[546] *See* INA section 212(a)(4), 8 U.S.C. 1184(a)(4).

[547] *See* 8 CFR 212.22(a).

**41400    Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

public charge even if they present positive factors. If negative factors in the alien's case (factors that increases an alien's likelihood of becoming a public charge) outweigh positive factors (factors that decrease the alien's likelihood of becoming a public charge), DHS would conclude, in the totality of the circumstances, that the applicant is inadmissible for likely becoming a public charge. Therefore, it may be that an alien is found inadmissible in light of a heavily weighted negative factor even if he or she may be able to present positive factors.

*Comment:* One commenter recommended that DHS provide guidance on how the "totality of circumstances" and likelihood determination should be reached using evidence-based methods, namely using a base rate as a prior probability which can be updated based on the evidence about a given alien. The commenter stated that starting from the "inside view" of the evidence about a given alien rather than the "outside view" of base rates about the reference class of all aliens would likely lead DHS to significantly more false positive determinations. The commenter stated that DHS should estimate a base rate—both before the rule takes effect and again after a sufficiently long interval to account for disenrollment—for the proportion of aliens non-exempt from public charge inadmissibility who would be considered public charges. This base rate should then be considered the prior probability that an alien is likely to become a public charge. The commenter also stated that DHS should also estimate average levels of receipt, duration, and other kinds of evidence in the totality of the circumstances so that officials may compare any given alien's evidence to average levels and make appropriate updates in the right direction. Another commenter suggested weighing factors using valid statistical methods, using administrative survey data to create a factor model to precisely calculate the probability of future use, and making the factor model available online for applicants to utilize before applying.

*Response:* The factors contained in this rule are based, in significant part, on data regarding the relationship between the minimum statutory factors and a person's likelihood of receiving public benefits. In the preamble to the proposed rule, for each positive and negative factor, DHS included supportive reasoning that related to either inferences regarding self-sufficiency or empirical data regarding the relationship between the factor and the likelihood that a person would

receive public benefits. DHS relied on such data for all heavily weighted factors. For instance, in proposing the heavily weighted negative factor for lack of employability, DHS relied not only on the reasonable premise that "[s]elf-sufficiency generally involves people being capable and willing to work and being able to maintain gainful employment," but also on Census Bureau data showing that individuals with full-time work were less likely to receive means-tested benefits during the year (ranging from 4.5 percent to 5.1 percent) than those with either part-time work (ranging from 12.6 percent to 14.2 percent) or those who were unemployed (ranging from 24.8 percent to 31.2 percent).[548]

That said, DHS cannot satisfy the commenter's request that DHS "estimate . . . base rates—both before the rule takes effect and again after a sufficiently long interval to account for disenrollment—for the proportion of aliens non-exempt from public charge inadmissibility." This is because as DHS acknowledged in the proposed rule, DHS lacks access to data regarding the specific categories of aliens that are subject to the public charge ground of inadmissibility, let alone data regarding such aliens' public benefits use as it relates to the statutory factors. For instance, the proposed rule explained that much of the data that DHS relied upon came from the 2014 Panel of the SIPP. The SIPP Panel includes respondent-provided data on nativity, citizenship status, and initial immigration status, but does not provide data on current immigration classification. Additionally, the categories represented in the SIPP immigration status item do not align precisely with the populations covered by this rule—for instance, the results include refugees, asylees, and other populations that may access public benefits but are not subject to the public charge ground of inadmissibility. Finally, the SIPP data and DHS's analysis of this data do not examine whether the receipt of public benefits was authorized, and DHS did not

examine program payment rate error information for this purpose. DHS sought comment on its use of the SIPP data, and whether alternative reliable data sources are available.[549] The commenter did not identify an alternative reliable data source that controls for whether an alien is subject to the public charge ground of inadmissibility.

Even if the commenter had identified such data, however, adjudicators would not have been able to rely heavily on such data, because the public charge assessment requires a prediction based on an assessment of the alien's particular circumstances within the framework of multiple statutory factors, and any other relevant considerations. A data set tailored to such particular individuals' circumstances may not be available, and in any event was not identified by the commenter.

DHS acknowledges that the predictive analysis it will be conducting based on an individual's particular circumstances leaves some room for error, however, so would any predictive algorithm or data-based "outside view" analysis, particularly given the data limitations DHS encountered and the likelihood that even if comprehensive data sets existed that could be utilized in the fashion the commenter suggests, they would not be detailed enough or sufficiently timely to account for changes in trends. For example, a dataset from the 2008–2010 timeframe may predict an appreciably higher rate of benefit receipt based on certain individual circumstances than a dataset from 2015–2017. Therefore, in the absence of adequate tools that would allow DHS to use a comprehensive quantitative framework for individual public charge inadmissibility determinations, USCIS officers will rely on their training and USCIS guidance to assess the relationship between factors and the likelihood to receive public benefits above the designated threshold at any time in the future. This analysis will include an assessment of all evidence provided by the alien in support of his or her application, including any credible and probative data that is relevant to the assessment. Furthermore, to the extent USCIS is able to identify credible and probative data sources that would provide context for

---

[548] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018) (citing Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance?* 12 (July 2012), available at *https:// www2.census.gov/library/publications/2012/demo/ p70–130.pdf* (last visited July 26, 2019); Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 10 (May 2015), available at *https:// www.census.gov/content/dam/Census/library/ publications/2015/demo/p70–141.pdf*) (last visited July 26, 2019).

[549] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160–61 (proposed Oct. 10, 2018). The commenter also suggested that DHS generate such data. But, it does not seem possible to estimate the probability of becoming a public charge by following up with aliens who were subject to the determination. For instance, many of those who were denied a benefit may not reside in the United States at a later date.

adjudicators in evaluating one or more mandatory factors, USCIS may provide such data sources to adjudicators and ensure consistent application through guidance and training.

*Comment:* A few commenters provided feedback on the review process. One commenter stated that immigration officers will have a limited amount of time to properly review documents and employment letters, and will not undertake an effective, case-by-case appraisal of applications. Similarly, commenters indicated that supervising officers will not have enough time to review each denial thoroughly.

*Response:* DHS understands the concerns that the public charge determination could increase the adjudication time of immigration benefits and that individuals, including attorneys, may have additional questions. DHS and USCIS are committed to putting the necessary resources into place, including additional adjudicators, to minimize any impact on current immigration benefits adjudications and to provide for thorough consideration of each case and appropriate supervisory review.

*Comment:* Many commenters voiced concern about the disproportionate negative impact of the application of the mandatory factors on marginalized communities. This included negative effects on immigrants belonging to the LGBTQ community, HIV positive immigrants, immigrants with chronic health conditions and disabilities, immigrants of color, Latino immigrants, AAPI immigrants, immigrants from countries that are poor and largely people of color, senior citizens, women, and victims of domestic violence and sexual abuse.

*Response:* Regardless of whether this rule will impact the groups specified in these comments, DHS is not promulgating this rule for a discriminatory purpose. Rather, this rule will better ensure that aliens seeking to enter or remain in the United States either temporarily or permanently are self-sufficient, and rely on their own capabilities and the resources of their family, sponsors, and private organizations, rather than the government.[550] DHS will determine an individual's inadmissibility on public charge grounds of inadmissibility in the totality of the circumstances, based on the statutorily mandated factors.[551] Additionally, Congress did not make applicable the public charge ground of inadmissibility to certain classes of aliens, including certain victims of

domestic violence, trafficking and other crimes. DHS therefore included these exemptions in this rulemaking.[552]

*Comment:* A few commenters cited the MPI study, which stated that of the over 2 million individuals granted lawful permanent residence status in the past five years (between 2012 and 2016), 69 percent of recent lawful permanent residents who are not refugees or other humanitarian admissions would have had at least one negative factor under the proposed new definition, 43 percent at least two negative factors, and 17 percent had at least three negative factors.[553] The same analysis reported that 39 percent of recent lawful permanent residents did not speak English well or not at all, 33 percent had household incomes below 125 percent of the FPG, 25 percent did not have a high school diploma, and 12 percent were under age 18 or over age 61. The analysis also estimated that 39 percent of recent lawful permanent residents had incomes at or above 250 percent of the FPG.

*Response:* DHS thanks commenters for citing the findings of the MPI study, which also highlighted that "the rule does not specify how many negative versus positive factors someone must have for their application to be denied."[554] While an alien may have one, two, three, or more negative factors, the mere fact that the alien's negative factors outnumber the alien's positive factors is not a sufficient basis to find the alien inadmissible. DHS must find that the alien's negative factors outweigh the alien's positive factors based on the totality of circumstances analysis, such that the alien is more likely than not at any time in the future to receive one or more public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period.

Once effective, DHS is aware that this rule will likely result in more findings of public charge inadmissibility and may result in fewer overall admissions and approved adjustment of status applications to the United States, as DHS seeks to better enforce the public charge ground of inadmissibility and to ensure that aliens are self-sufficient

when coming to the United States or seeking to adjust status. Notwithstanding, DHS will be bound by its own regulations in making public charge inadmissibility determinations based on the totality of the alien's circumstances, which includes considering and weighing all relevant factors that are favorable to the alien.

*Comment:* Commenters indicated that it is impossible to predict future self-sufficient behavior based on current resources of individuals who are, by definition, in transition (or trying to be) from living in another country to finding and creating opportunity in the United States.

*Response:* DHS disagrees that it is impossible to predict whether an individual is likely to become a public charge in the future based on the factors outlined in INA section 212(a)(4) of the Act, 8 U.S.C 1182(a)(4). The commenters' quarrel is with Congress, not DHS. While DHS acknowledges that the public charge determination is a complex assessment, DHS described at length in the NPRM how it would evaluate an alien's individual circumstances, including the minimum statutory factors, as part of the public charge determination. In Table 33 of the NPRM, DHS also outlined in detail the totality of the circumstances assessment and when the evidence in the totality of the circumstances may be indicative of the individual becoming a public charge. In this final rule, as explained below, DHS has further clarified and expanded on its approach.

*Comment:* Commenters pointed out that many who would be subject to the public charge rule are already barred from receiving public benefits for at least 5 years due to past welfare reform efforts.

*Response:* The commenters correctly pointed out that under PRWORA and other laws, most immigrants and nonimmigrants are not eligible for certain public benefits for a duration of at least five years. The public charge ground of inadmissibility, however, does not have any temporal limits in this regard and is prospective in nature; Congress directed the administering agencies to determine, for admissibility purposes, whether the alien is likely, "at any time" to become a public charge.

*I. Age*

1. Standard

*Comment:* A commenter expressed support for the proposed designation of the age range 18–61 as a positive factor and stated that there is a strong correlation between this prime working age range and a much lower rate of use

---

[550] 8 U.S.C. 1601(2)(A).
[551] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[552] *See* 8 CFR 212.23.
[553] MPI, Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration (Nov. 2018), *https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 25, 2019).
[554] *See* Capps, Randy et al, "Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration," Migration Policy Institute. (November 2018). Available at: *https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 26, 2019).

of public benefits, compared to individuals outside that age range. The commenter also added that that both minors and elderly aliens, like their citizen counterparts, are more likely to be financially dependent on resources other than employment income. One commenter suggested that DHS conduct a more lenient ''Public Charge Check'' for aliens younger than 21 or older than 55 (if one is needed at all), and a more thorough check for aliens aged between 21 and 55. A commenter stated that since the 19th century, courts have recognized that it would be absurd to exclude every child from our shores, since no child, by his personal efforts alone, can take care of himself.'' [555]

Another commenter said the rule provides no justification for why a minor under 18 years old should be scrutinized when they are not expected to be self-sufficient, or why immigrants over the age of 61, many of whom work or provide support to the rest of their family, should be penalized merely because of their age. The commenter stated that the rule did not explain why these age thresholds are predictors of future public benefit use. One commenter stated that these age-range requirements are overly broad, ignore the possibility of a familial sponsor, and raise the income requirements in a cruel way that is detrimental to society. One commenter asserted that DHS's analysis for an age standard overlooks the substantial benefits that minor children bring to a family, including future potential working capacity. One commenter similarly stated that the rule does not factor in the potential children have to add value to society and also stated that seniors often play a critical caregiver role which allows others to work. Another commenter added that an alien's unemployment at age 16 or 17 provides no evidence of their future employability. One commenter gave an example that 16-year old high-school students are not likely to be employed for many years in the future, but once they complete their education they can reach their true potential. A commenter stated that, although those under the age of 18 are less likely to work since they will be in school, and therefore are more likely to become a public charge, those individuals typically learn English very quickly, integrate readily, and after completing their education (often including higher education), go on to work, contribute, and pay taxes in the United States for decades. A few commenters cited a report by the National Academies of Sciences,

Engineering, and Medicine [556] for the proposition that second-generation child immigrants are the most fiscally positive of all immigrants to the United States.

Another commenter, in opposition to the age standard, said the question is not whether all children are likely to receive benefits, but rather whether children applying for lawful permanent resident status will. The commenter indicated that DHS cites no authority for its assertion that applicants who obtain lawful permanent resident status are more likely to become public charges simply due to their being under 18 years of age at the time of application. The commenter stated that because most aliens are not eligible for means-tested public benefits for at least the first five years after obtaining such status, the age range is too high. The commenter also stated that, for decades, DOS has used the age of 16 as the cut-off for when the child will be able to show employable job skills. The commenter sought justification for the change. One commenter stated that DHS bases this age standard on the minimum age at which one can start to claim retirement benefits under social security; however, this was never meant to be used to say that people are unable or even unlikely to work after that age. Some commenters stated that many over 61-year-olds are able to, willing to, and do work after immigrating.

*Response:* DHS agrees that the age range is appropriate due to the general correlation between the 18–61 age range and a lower rate of use of public benefits, and that people outside of this age range are, in general, more likely to be financially dependent on others.[557] DHS agrees that generally, most aliens are not eligible for means-tested public benefits for at least the first five years after obtaining such status; however, there are certain exceptions under PRWORA, including the availability of SNAP for children under 18.[558] DHS

also acknowledges that certain individuals, depending on their status and circumstances, may not be eligible for public benefits in the near term and would take that fact into consideration in the public charge inadmissibility determination. DHS disagrees with the suggestion that USCIS provide a more lenient review of public charge for those below 21 and above 55. USCIS will apply the same public charge framework for all cases subject to public charge. DHS disagrees that there was no justification in the NPRM for the age range and will maintain the age ranges as identified in the NPRM. As established by Congress, an alien's age is a mandatory factor that must be considered when determining whether an alien is likely to become a public charge in the future.[559] As discussed in the NPRM, a person's age may impact his or her ability to legally or physically work and is therefore relevant to the likelihood of an alien becoming a public charge.[560]

In addition, regardless of an alien's age, DHS recognizes, consistent with longstanding case law, that the alien may have financial assets, resources, benefits through employment, education or skills, family, or other means of support that decrease his or her likelihood of becoming a public charge. Therefore, age is but one factor in the totality of the circumstances. As discussed in the NPRM,[561] the 18 through 61 age range is based on the ages at which people are generally able to work full-time before being able to retire with some social security retirement benefits under Federal law.[562] DHS notes that considering 18 years old as the earliest age in which one is expected to be able to work is consistent with current DOS guidance which directs consular officers to consider what skills individuals 18 years of age or older have to make a living.[563] DHS declines the request from the commenter to justify why this rule is contrary to past DOS guidance since that guidance is from another Department and never was binding on DHS. DHS understands that children may continue their education and obtain employment in the future. DHS would not make a determination of

---

[555] *See In re Day,* 27 F. 678 (S.D.N.Y. 1886).

[556] *See* National Academies of Sciences, Engineering, and Medicine, The Economic and Fiscal Consequences of Immigration (2017).

[557] The rate of receipt of cash and noncash benefits among noncitizen children age 0–17 decreased with the removal of Medicaid from consideration for that age group, changing from about 40 percent when the benefit was included to about 20 percent when it was not. The receipt rate of cash and noncash benefits among noncitizen children age 0–17 was no longer significantly different from that of noncitizens aged 18–61 when Medicaid was included only for the older age group, and both of these age groups had much lower receipt of benefits than noncitizens aged 62 and over. However, due to the restrictions on employment by minors and the fact that children are dependent on their parents or legal guardians, as discussed in the NPRM, DHS still consider the age range appropriate.

[558] *See, e.g.,* 8 U.S.C. 1612(a)(2)(J).

[559] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[560] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51179–81 (proposed Oct. 10, 2018).

[561] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51179–81 (proposed Oct. 10, 2018).

[562] *See* 29 U.S.C. 213(c), 42 U.S.C. 416(*l*)(2) (''Early retirement age'' for social security purposes).

[563] *See* 9 FAM 302.8–2(B)(2), paragraph d, available at *https://fam.state.gov/FAM/09FAM/ 09FAM030208.html* (last visited May 15, 2019).

inadmissibility based on public charge solely based on the age of a child. Instead, USCIS would also review the support provided by a parent or other source in the totality of the circumstances.

*Comment:* Commenters stated DHS based the proposed age standard on the minimum age at which one can start to claim retirement benefits under social security; however, this was never meant to be used to say that people are unable or even unlikely to work after that age. Several commenters explained that if DHS finalized the rule as proposed, many U.S. citizens would no longer be able to welcome their own parents into the country because it would be difficult for older adults to pass the "public charge" test under the new criteria. A commenter stated that applications for parents account for almost 30 percent of all family-based applications. Some commenters stated that many seniors immigrate to the United States in order to help care for children and other family members. Commenters stated this rule fails to recognize the value of intergenerational families who support each other and the proposed rule "callously" labels parents and grandparents as a burden because of their age or health needs and ignores the critical roles many grandparents play in caring for their grandchildren and other family members, often enabling others to work.

A few commenters stated that the proposed rule fails to accord appropriate dignity and respect to community elders seeking immigration relief by treating them as economically disposable, and would have the effect of straining and fracturing families who seek to maintain seniors within the familial unit.

A commenter said having older adults at home can eliminate the cost of childcare, which is one of the highest budget items for many families and can approach 20 percent of household income for low-income families. Citing studies, a commenter stated that limiting the age of workers has been shown to have a negative economic impact on society. Another commenter remarked that the proposed rule could prevent many American citizens from maintaining the dignity of their families due to "exclusionary factors" assigned to advanced age or receipt of life-saving medical savings under Medicare Part D. The commenter also stated that this illustrates a critical flaw in the proposed rule: it undervalues the important role a parent or grandparent contributes to a family. A few commenters stated that if U.S. citizens are unable to bring their parents to the United States, they would

have to send money abroad for their care in their home country, which may require expensive residential care, financially hampering citizens and sending those dollars outside of the U.S. economy.

One commenter stated there is a priceless emotional benefit to U.S. citizens having their parents nearby for love, support, and for their families to be whole and enriched through the joyful and sorrowful life events of the birth of grandchildren and the passing of family elders. A commenter stated that some U.S. citizens bring their elderly parents to the United States because caring for them here will ease the burden of worrying about their care in countries that are many thousands of miles away. The commenter added that the ability to care for loved ones at the end stages of life is an important marker for all communities and nationalities, which would be nearly impossible if DHS finalized the rule as proposed.

*Response:* DHS disagrees that the age standard is arbitrary. As provided in the NPRM,[564] there is a correlation between the prime working age range and lower rates of public benefit use. As indicated in the NPRM,[565] the 18 through 61 age range is based on the ages at which people are generally able to work full-time before being able to retire with some social security retirement benefits under Federal law.[566] The age of 18 is based on the general age to be able to start working full-time;[567] the age of 61 is the year before the minimum "early retirement age" for social security purposes[568] (62 as of 2017). DHS will still consider the alien's age in relation to whether it makes the alien more or less likely to become a public charge, such as by impacting the alien's ability to work. DHS is not establishing the age range as a statement that people outside that range are unable to work. DHS acknowledges that people under the age of 18 and over the age of 61 may be working or have other adequate means of support, such as from family members. DHS would recognize such means as positive factors. In other words, a senior who establishes to DHS's satisfaction that she or he is not likely to become a public charge would

not be deemed inadmissible on public charge grounds.

DHS recognizes the tangible and intangible value to individuals and communities of strong family bonds and support across generations. DHS notes that where an alien can establish that he or she is not likely to become a public charge in light of all the relevant factors—including, for example, the support of one or more family members—the alien would not be found inadmissible as a public charge. Accordingly, DHS does not believe that this rulemaking will necessarily render it impossible for individuals to care for family members. Rather, the rule seeks to ensure that aliens rely on themselves and on private sources, including their families, to meet their needs, rather than relying on public benefits. DHS does acknowledge that the rule could affect a family member's admissibility or eligibility to adjust status in some cases, but notes that such effect would be a consequence of the statutory scheme, under which the family member is subject to the public charge ground of inadmissibility.

*Comment:* A commenter asserted the statistics DHS used to establish the 18–61 age standard do not distinguish between those who are refugees and asylees and those who obtained legal status through a family or employment-based petition. The commenter added that lawful permanent residents who immigrate or adjust through other means are barred for their first five years from accessing SSI, and they are subject to sponsor-to-alien deeming of income thereafter. The commenter stated that it is inappropriate to lump this latter group of lawful permanent residents in with refugees and asylees, who are in fact encouraged to participate in Federal benefit programs, and it is disingenuous to use it as a basis to make age above 61 years a negative factor.

*Response:* As discussed in the NPRM, DHS recognizes that the statistics provided do not distinguish the immigrant status of the alien, and "the results include refugees, asylees, and other populations that may access public benefits but are not subject to the public charge ground of inadmissibility."[569] The SIPP data and DHS's analysis of this data do not examine whether the receipt of public benefits was authorized, and DHS did not examine program payment rate error information for this purpose. Notwithstanding these limitations, DHS believes the SIPP data on noncitizen participation is instructive with respect

---

[564] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51180 (proposed Oct. 10, 2018).

[565] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51180 (proposed Oct. 10, 2018).

[566] *See* 29 U.S.C. 213(c), 42 U.S.C. 416(*l*)(2).

[567] *See* 29 U.S.C. 213(c); 29 CFR part 570; *see also* Dept't of Labor, *Table of Employment/Age Certification Issuance Practice Under State Child Labor Laws, available at* https://www.dol.gov/whd/state/certification.htm (last visited July 26, 2019).

[568] *See* 42 U.S.C. 416(*l*)(2).

---

[569] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160 (proposed Oct. 10, 2018).

to the receipt of non-cash benefits by the noncitizen population overall.

*Comment:* A few commenters stated this proposal could undermine access to healthcare, nutrition, and housing programs for children of immigrants and their aging family members. One commenter said the proposed consideration of age could contribute to family separations. The commenter added that by weighing age negatively in the totality of circumstances, immigrant children younger than 18 years of age are likely to see their green card or visa applications denied, which could lead to members of the same family obtaining differing immigration statuses, with some members unable to remain in the United States. A few commenters said the rule could increase family separation, which can cause emotional stress and trauma in children that leads to negative health outcomes. Another commenter cited an MPI analysis, which found that 45 percent of children who recently received green cards had two or more negative factors. The commenter added that depriving children, including U.S. citizens, of access to public benefits that would otherwise increase their families' ability to thrive will lead to deep stress, which studies show then in turn leads to reduced outcomes throughout life. A commenter indicated that being a child should not weigh against an individual in a public charge determination. The commenter stated that because children generally are not allowed to work, it is unlikely they could have an income or assets on their own equal to 125% or more of the FPG.

*Response:* DHS understands that individuals, including children, will be impacted by this rulemaking, once effective. When codifying section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), Congress did not generally exempt children from the public charge inadmissibility ground and an alien's age is a mandatory, statutory factor that DHS must be considered when determining whether an alien is likely at any time in the future to become a public charge.[570] Accordingly, DHS will consider whether the alien's age makes the alien more likely than not to become a public charge, such as if the alien's age affects an alien's ability to work. DHS understands that children are in a unique position in some respects, especially as it relates to employability. The commenter referred to the MPI's study, which attempted to measure the general impact of the proposed rule by examining the situations of recent green

card recipients. The MPI study estimated that among recent green card recipients, about 45 percent of the children would have had two or more negative factors if the proposed rule had been applied to them.[571] DHS appreciates the input on the potential impact. As indicated in the NPRM, however, DHS is not able to quantify the number of aliens, including children, who would possibly be denied admission based on a public charge determination under this rule. Again, DHS is qualitatively acknowledging this potential impact.

DHS would like to clarify, however, the following aspects of the inadmissibility determination in relation to children under the age of 18: DHS understands that children may continue their education and obtain employment in the future. As indicated throughout this preamble, DHS would not make a public charge inadmissibility determination solely based on the age of a child. Instead, USCIS will review the support provided by a parent or the parents, and any other evidence addressing the resources and assets available to the child in the totality of the circumstances when determining whether the child is more likely than not at any time in the future to become a public charge. DHS has also made a number of changes and clarifications in this final rule that are relevant to the rule's effects on children, including (1) excluding receipt of Medicaid by children under age 21, and (2) clarifying that receipt of benefits by another beneficiary's behalf is not attributed to the person who received it (such as a parent or legal guardian, for example). DHS does not anticipate outcomes that would require family members to live in different countries, so long as any family members who have applied for an immigration benefit for which admissibility is required can demonstrate that they are not inadmissible.

Overall, DHS notes that the public charge inadmissibility determination requires DHS to evaluate the alien child's particular circumstances. DHS's totality of the circumstances standard involves weighing all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or

circumstance that may warrant consideration in the public charge inadmissibility determination.[572] If the negative factors outweigh the positive factors, then the alien would be found inadmissible as likely to become a public charge; if the positive factors outweigh the negative factors, then the alien would not be found inadmissible as likely to become a public charge.

### 2. Age Discrimination

*Comment:* Some commenters stated that rule discriminates against people of certain ages. Commenters stated that the age standard is not only discriminatory towards children, but is also logically inconsistent as children have a lifetime of productive years ahead of them. Commenters stated that adding age and disability discrimination into our immigration regulations would unjustly deny U.S. citizens the ability to reunite with, receive support from, and if necessary, provide support to their family members.

*Response:* DHS does not agree that this rule adds discrimination based on age or disability. An alien's age is a mandatory factor that must be considered when determining whether an alien is likely to become a public charge in the future.[573] Therefore, the rule includes this factor. As DHS noted in the NPRM, a person's age may impact his or her ability to legally or physically work and is therefore relevant to being self-sufficient, and the likelihood of becoming a public charge. An alien's likelihood of becoming a public charge is prospective and based on the totality of the alien's circumstances. If an alien's positive factors outweigh the negative factors, then the alien would be found inadmissible as likely to become a public charge. No one factor, apart from the failure to submit a sufficient affidavit of support where required, is outcome determinative.

Additionally, to the extent that this rule may result in the denial of some applications filed by relatives of U.S. citizens, DHS disagrees that this rule would deny U.S. citizens the ability to reunite with, and support, their families. DHS acknowledges that the rule could affect a family member's admissibility or eligibility for adjustment of status, but such effect would be a consequence of the statutory scheme, under which the family member is subject to the public charge ground of inadmissibility. This rule does not change the criteria applicable to a U.S. citizen filing Petition for Alien

---

[570] *See* section INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[571] *See* Capps, Randy et al, "Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration," Migration Policy Institute. (November 2018). Available at: *https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 26, 2019).

[572] *See* 8 CFR 212.22.

[573] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

Relative (Form I–130), which does not require the beneficiary's admissibility. This rule addresses the criteria for establishing eligibility for admission or adjustment of status and for demonstrating that the applicant is not inadmissible as likely to become a public charge. In other words, even if an alien may be eligible statutorily to be granted adjustment of status based upon the approval of a Form I–130 filed by a U.S. citizen relative, the alien is not entitled to be admitted to the United States or granted adjustment,[574] and the U.S. citizen is not entitled to be reunified with the applicant.

### J. Health

#### 1. Standard

*Comment:* Several commenters stated that the rule perpetuates the "false assumption" that a medical diagnosis is solely determinative of an individual's current abilities and future prospects, with some asserting that chronic illness is not an accurate indicator of future self-sufficiency and full-time employment capabilities. One commenter stated that this policy assumes that the presence of a physical or mental condition is a financial risk to the state and fails to recognize the significant contributions that people with chronic health and other conditions can and do make as professionals and community members. One commenter stated the that consideration of disability in the health factor was a per se rule that is inconsistent with the fact that "health status is far from necessarily predictive of a person's ability to engage productively in work and other aspects of community life." Another commenter stated that DHS failed to consider that with access to health insurance (*e.g.,* Medicaid), preventive medical treatment, and health care professionals, individuals with chronic medical conditions can exhibit drastic improvements in their health and productivity. A different commenter stated that counting conditions that require extensive medical treatment and/or hospitalization as negative factors ignores the reality that a Class A or B medical condition, especially a curable one, is not an accurate indicator

of future self-sufficiency and full-time employment capabilities. Commenters noted that advances in medical technology could make certain conditions, such as HIV/AIDS more manageable in the future, with one noting that Type 1 Diabetes was a disabling condition in the 1950s but now adults and children with Type 1 Diabetes lead full, productive, and independent lives.

Conversely, one commenter agreed that the proposed health factor approach is appropriate for public charge purposes, so long as the inquiry is limited to whether aliens are likely to be able to pay for health-related expenses for themselves and any household dependents without the use of public resources.

*Response:* DHS recognizes that an individual with medical conditions may provide significant contributions to society. As established by Congress, an alien's health is a factor that must be considered when determining whether an alien is likely to become a public charge at any time in the future.[575] As indicated in the NPRM, the mere presence of a medical condition would not render an alien inadmissible.[576] Instead, DHS would consider the existence of a medical condition in light of the effect that such medical condition is likely to have on the alien's ability to provide and care for himself or herself; DHS will weigh such evidence in the totality of the circumstances. DHS officers will not be making medical determinations or determining the effects of the conditions. Instead, officers will review any required Form I–693 or applicable DOS medical examination form[577] submitted in support of the application for the diagnosis of medical conditions according to the procedures established by HHS;[578] or any other evidence of a medical condition that is likely to require extensive medical treatment or institutionalization after arrival, or that will interfere with the alien's ability to care for himself or herself, to attend school, or to work. The HHS regulations direct physicians conducting the immigration medical examinations for either Class A or Class B conditions to explain on the medical report "the

nature and extent of the abnormality; the degree to which the alien is incapable of normal physical activity; and the extent to which the condition is remediable . . . [as well as] the likelihood, that because of the condition, the applicant will require extensive medical care or institutionalization."[579] In addition, the CDC Technical Instructions for Medical Examinations of Aliens, directs physicians to provide information about Class B conditions, which, although do not "constitute a specific excludable condition, represents a departure from normal health or well-being that is significant enough to possibly interfere with the person's ability to care for himself or herself, to attend school or work, or that may require extensive medical treatment or institutionalization in the future."[580] Such an assessment would necessarily account for any recent advancements in treating the medical condition, and goes directly to the prospect of the alien being able to care for himself or herself and being able to attend school or go to work. And, of course, the alien could provide further information with the application.

*Comment:* One commenter stated that, while health has always been a factor in the public charge test, the proposed rule codifies and unduly weighs the specific standard for evaluating an individual's health. Similarly, another commenter stated that the proposed rule essentially counts the same health status as two negative factors and also as a heavily weighted negative factor: Once as a negative health factor; again as a negative assets, resources and financial status factor; and then again as a heavily weighted negative factor if the non-citizen is uninsured. A different commenter said the combination of penalizing someone's medical condition

---

[574] *See Mudric* v. *Att'y Gen. of U.S.,* 469 F.3d 94, 98 (3d Cir. 2006) ("While an alien may be eligible for a grant of . . . adjustment of status under the immigration laws, he is not entitled to such benefits as a constitutional matter."); *see also,* Matter of Ho, 19 I&N Dec. 582, 589 (BIA 1988) (holding that "[a]pproval of a visa petition is but a preliminary step in the visa or adjustment of status application process, and the beneficiary is not, by mere approval of the petition, entitled to an immigrant visa or to adjustment of status.")

[575] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[576] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51181–84 (proposed Oct. 10, 2018).

[577] This is currently the Immigrant or Refugee Application (Form DS–2054).

[578] The medical examination documentation indicates whether the applicant has either a Class A or a Class B medical condition. In addition, the alien must provide a vaccination record as part of the medical examination. Class A and Class B medical conditions are defined in the HHS regulations. *See* 42 CFR 34.2.

[579] 42 CFR 34.4(b)(2) (Class A); 42 CFR 34.4(c)(2) (Class B).

[580] *See* Ctrs. for Disease Control & Prevention, *Required Evaluations—Other Physical or Mental Abnormality, Disease, or Disability, Technical Instructions For Medical Examination Of Aliens, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/panel/technical-instructions/panel-physicians/other-physical-mental.html* (last updated Nov. 23, 2016) (last visited July 26, 2019); Ctrs. for Disease Control & Prevention, *Required Evaluation Components Other Physical or Mental Abnormality, Disease or Disability, Technical Instructions for the Medical Examination of Aliens in the United States, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/civil/technical-instructions/civil-surgeons/required-evaluation-components/other-disease-disability.html* (last updated Aug. 3, 2010) (last visited July 26, 2019). The HHS regulations require physicians conducting medical examinations for an alien to comply with the CDC's Technical Instructions for Medical Examinations of Aliens. 42 CFR 34.3(i).

and negatively weighting use of benefits and services that help to treat that medical condition will create an insurmountable bar for many older adults and people living with chronic illnesses or disabilities. Another commenter said health and disability are factors that are improperly considered twice under the rubric of the proposed rule.

*Response:* DHS disagrees that the review of the health factor in the public charge inadmissibility determination is an insurmountable bar for people with chronic illness or disabilities. The mere presence of a medical condition would not render an alien inadmissible. Instead, DHS would consider the existence of a medical condition in light of the effect that such medical condition is likely to have on the alien's ability to attend school or work, and weigh such evidence in the totality of the circumstances. As part of the assets, resources and financial status factor, DHS would also consider whether the alien has the resources to pay for associated medical costs.

As stated in the NPRM, an alien is at high risk of becoming a public charge if he or she does not have the resources to pay for reasonably foreseeable medical costs, including costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for himself or herself, to attend school, or to work.[581]

The mere presence, however, of any one enumerated circumstance, would not alone be determinative. A heavily weighted factor could be outweighed by countervailing evidence in the totality of the circumstances. DHS also disagrees that it is impermissibly counting factors twice. DHS acknowledges that multiple factors may coincide or relate to each other and emphasizes that the public charge determination reviews all factors in the totality of the circumstances. Therefore, the fact that a person has a medical condition that prevents him or her from working or going to school and lacks private health insurance is considered in the totality of the circumstances without assigning a point system or value to various factors. Finally, as discussed in section III. R. of this preamble, DHS has added a heavily weighted positive factor for private health insurance appropriate to intended the duration of the alien's stay.

*Comment:* Some commenters expressed concern that this aspect of the rule contained vague wording. One commenter stated that considering "any physical or mental condition" as part of the individual's health is overly broad and open to interpretation. Another commenter stated that the rule would stretch the INA's public charge language beyond recognition by adding vague references to "extensive medical treatment" and "interference" with an individual's ability to work, attend school, or otherwise be self-sufficient. The commenter stated that the manner in which DHS proposed to consider the health of an immigrant in making a forward-looking public charge determination leaves so much room for discretion that it renders the health factor consideration meaningless. A different commenter objected to using the standard of whether a health condition "interferes with work or school" as too broad, vague, and biased against people of color who will be prejudiced by this generic standard. The commenter stated that social determinants of health are one of the main inequalities between whites and persons of color. A commenter said that the proposed rule's consideration of medical conditions "likely" to require extensive medical treatment in the future was highly speculative, and that medical predictions about the future are notoriously inaccurate.

One commenter stated that, although the rule claims to use a physician's medical examination/report with two classes of medical conditions, it is vague, provides the physician with great latitude, and does not provide a clear definition of which medical conditions would be considered as a negative factor. This commenter stated that this suggests that any pre-existing condition may be counted against a green card applicant regardless of whether it will seriously undermine an individual's self-sufficiency.

Some commenters provided input on the role of DHS adjudicators as it relates to the health factor. Several commenters questioned the ability of an adjudicator to determine if someone living with a chronic condition will be a public charge in the future. One commenter said authorizing DHS personnel to make projections about whether a person's health condition could, in the future, affect their ability to work, study or care for themselves or require expensive treatment invites unbridled speculation and discrimination against persons with disabilities or other observable physical conditions. Another commenter stated that USCIS lays out no standards for determining whether a disability or other serious health condition will lead the agency to decide whether an applicant has a "reasonable prospect of future employment." A different commenter said the rule would authorize non-medically trained personnel to overrule a medical professional's determination about whether a person's health should be a barrier to admission. Another commenter said immigration officials lacking any specialized medical knowledge would rely on hastily composed medical reports (frequently from medical providers who would have no established medical relationship with an individual) to exclude a noncitizen from the immigration benefit solely because of the presence of a particular illness or disability that may appear "grave" or "costly" based on preconceived and often erroneous assumptions. Some commenters said the proposed rule discounts future advancements in medical science and social norms by allowing DHS officials to make present-day judgements about an individual's future capabilities. A couple of commenters stated that the rule does not provide meaningful guidance on permissible and impermissible considerations when factoring in a person's disability during a public charge inadmissibility finding, which leaves immigration officials with seemingly open-ended interpretation.

*Response:* DHS disagrees that the wording regarding the health factor is vague and does not provide guidance on the consideration of disability. DHS's language mirrors the language as provided by HHS regulations and CDC guidance. In identifying a Class A medical condition, the HHS regulations direct physicians conducting the immigration medical examinations to explain on the medical report "the nature and extent of the abnormality; the degree to which the alien is incapable of normal physical activity; and the extent to which the condition is remediable . . . [as well as] the likelihood, that because of the condition, the applicant will require extensive medical care or institutionalization."[582]

A Class B medical condition is defined as a physical or mental condition, disease, or disability serious in degree or permanent in nature.[583] Currently, the CDC Technical Instructions for Medical Examinations of Aliens, which direct physicians to provide information about Class B conditions, describe a Class B condition as one that, although it does not "constitute a specific excludable

---

[581] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51182 (proposed Oct. 10, 2018).

[582] 42 CFR 34.4(b)(2).

[583] *See* 42 CFR 34.2(b)(2).

condition, represents a departure from normal health or well-being that is significant enough to possibly interfere with the person's ability to care for himself or herself, to attend school or work, or that may require extensive medical treatment or institutionalization in the future."[584]

As discussed in the NPRM,[585] as part of the immigration medical examination, when identifying a Class B medical condition, civil surgeons and panel physicians are required to report on certain disabilities, including the nature and severity of the disability, its impact on the alien's ability to work, attend school, or otherwise support himself or herself, and whether the disability will require hospitalization or institutionalization. DHS would only consider disability as part of the health factor to the extent that such disability, in the context of the alien's individual circumstances, impacts the likelihood of the alien becoming a public charge; *i.e.,* the rule calls for a consideration of the potential effects on the alien's ability to work, attend school or otherwise support himself or herself. Further, if an immigration medical examination by a civil surgeon or panel physician is required, officers will generally defer to the report when assessing whether an individual's medical condition will affect a person's ability to care for himself or herself, work, or go to school. DHS would generally defer to such report, unless there is evidence that the report is incomplete. DHS has amended the regulatory text consistent with this approach. Consistent with the NPRM, however, DHS will also permit the alien to submit other documentation regarding the alien's medical conditions to assess whether the alien's health makes the alien more likely than not to become a public charge at any time in the future. This should provide ample

opportunity for the alien to provide the full context surrounding his or her health.

*Comment:* Another commenter stated that the Form I–693 medical exam could not be expected to detect ailments or conditions not indicated on Form I–693, and therefore, DHS may never be made aware of many health conditions among future applicants and petitioners. The commenter further indicated that an individual could delay seeking treatment for a condition, and could delay application for Medicaid or Medicare until after naturalizing. Another commenter expressed concern that the list of medical conditions included in the Form I–693 medical exam may be subject to additions after finalization of the proposed rule threatening the hard-won progress towards ending many epidemics in the United States.

*Response:* DHS's general reference for review of the health factor is the Form I–693. Civil surgeons test for Class A and Class B conditions and report the findings on the Form I–693, as directed by the CDC Technical Instructions; an officer would review the civil surgeon's findings in the totality of the circumstances. However, DHS would also take into consideration any additional medical records or related information provided by the alien to clarify any medical condition included on the medical form or other information that may outweigh any negative factors. Such documentation may include, for instance, a licensed doctor's attestation of prognosis and treatment of a medical condition. DHS would consider the evidence in the totality of the circumstances. DHS acknowledges that this approach is imperfect, but believes that it appropriately implements the statute in the context of adjudicators' limited expertise.

*Comment:* A commenter said the rule's inclusion of Class B medical conditions as impacting admissibility is an impermissible use of regulatory power. Specifically, the commenter said the proposed rule seeks to create a new ground of inadmissibility by finding those who are not inadmissible under section 212(a)(1) of the Act, inadmissible under section 212(a)(4) of the Act and is attempting to substitute medical determinations by congressionally enabled civil surgeons and panel physicians with its own determination about medical inadmissibility.

*Response:* DHS disagrees with the commenter that considering Class B medical conditions as part of the public charge determination is an

impermissible use of regulatory authority. As part of the public charge determination, Congress directed agencies to consider, among other factors, the health of the alien.[586] As explained in the NPRM,[587] prior to Congress establishing health as a factor for the public charge determination, the courts, the BIA and INS had also held that a person's physical and mental condition was of major significance to the public charge determination, generally in relation to the ability to earn a living.[588] Accordingly, DHS proposed that when considering an alien's health, DHS will consider whether the alien has any physical or mental condition that, although not considered a condition or disorder that would render the alien inadmissible under the health-related ground of inadmissibility,[589] is significant enough to interfere with the person's ability to care for himself or herself or to attend school or work, or that is likely to require extensive medical treatment or institutionalization in the future. USCIS-designated civil surgeons and DOS-designated panel physicians examine whether an alien has a condition that renders the alien inadmissible on medical grounds (a Class A medical condition according to HHS regulation)[590] or whether the alien has a medical condition that is significant enough to interfere with the person's ability to take care of himself or herself, to attend school or to work and would likely receive extensive medical treatment (a Class B condition).[591] If the alien is required to

[584] *See* Ctrs. for Disease Control & Prevention, *Required Evaluations—Other Physical or Mental Abnormality, Disease, or Disability, Technical Instructions For Medical Examination Of Aliens, available to https://www.cdc.gov/immigrant refugeehealth/exams/ti/panel/technical-instructions/panel-physicians/other-physical-mental.html* (last updated Nov. 23, 2016) (last visited July 26, 2019); Ctrs. for Disease Control & Prevention, *Required Evaluation Components Other Physical or Mental Abnormality, Disease or Disability, Technical Instructions for the Medical Examination of Aliens in the United States, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/civil/technical-instructions/civil-surgeons/required-evaluation-components/other-disease-disability.html* (last updated Aug. 3, 2010) (last visited July 26, 2019). The HHS regulations require physicians conducting medical examinations for an alien to comply with the CDC's Technical Instructions for Medical Examinations of Aliens. *See* 42 CFR 34.3(i).

[585] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51181–84 (proposed Oct. 10, 2018).

[586] *See* INA section 212(a)(4), 8 U.S.C. 1182.

[587] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51181–84 (proposed Oct. 10, 2018).

[588] *See, e.g., Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421–23 (Att'y Gen. 1964); *see also Matter of A-,* 19 I&N Dec. 867, 869 (Comm'r 1988) (*citing Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974); *Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r 1977)).

[589] *See* INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[590] *See* INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[591] A Class B condition is defined as a physical or mental condition disease or disability serious in degree or permanent in nature. *See* 42 CFR 34.2(b)(2). The Technical Instructions for the Medical Examination of Aliens directs physicians to provide information about Class B conditions in the medical forms submitted as part of the immigration benefits application. *See* Ctrs. for Disease Control & Prevention, *Required Evaluations—Other Physical or Mental Abnormality, Disease, or Disability, Technical Instructions For Medical Examination Of Aliens, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/panel/technical-instructions/panel-physicians/other-physical-mental.html* (last updated Nov. 23, 2016) (last visited July 26, 2019); Ctrs. for Disease Control & Prevention, *Required Evaluation Components Other Physical or Mental Abnormality, Disease or Disability, Technical Instructions for the Medical*

Continued

undergo an immigration medical examination, USCIS will generally defer to the findings from the civil surgeon or panel physician made in the immigration medical examination report (unless the report appears incomplete) in regard to the determination of the medical condition and its impact on the person's ability to take care of himself or herself, to attend school or to work, or whether the condition requires medical treatment. USCIS may also use other evidence of medical conditions in the alien's file.[592]

### 2. Health and Disability Discrimination

*Comment:* A commenter said the inclusion of "interfere[nce] with the alien's ability to provide and care for him- or herself" at 8 CFR 212.22(b)(2)(i) in the NPRM also raises concerns under *Olmstead* v. *L.C.,* 527 U.S. 581 (1999), which recognized that the Americans with Disabilities Act (ADA) mandate provides people with disabilities a life in the most integrated setting appropriate to their needs. Relatedly, a commenter stated that the proposed rule codifies discriminatory standards for evaluating a noncitizen's health and may be in violation of the ADA. The commenter also indicated that individuals with disabilities who would have been institutionalized before *Olmstead* live at home with their families, go to school, and hold jobs even though they cannot solely care for themselves. Therefore, the commenter indicated that the "ability to care for oneself" factor excludes many people who are not public charges and is likely to generate the kind of discrimination that *Olmstead* seeks to prevent.

*Response:* DHS disagrees with the commenter's assertion that the rule, as proposed, would generate the kind of discrimination that *Olmstead* sought to prevent. In *Olmstead,* the Court held that, in accordance with Title II of the ADA, and under the implementing regulations, states are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the

resources available to the State and the needs of others with mental disabilities.[593] At issue was whether the state interpreted the reasonable accommodation provision properly or incorrectly continued to institutionalize the plaintiff because community placement would have been costly.[594]

Title II of the ADA does not govern DHS's actions in this context. In addition, unlike in the ADA provision and the regulatory provision discussed in *Olmstead,* Congress did not single out disability in section 212(a)(4) of the Act. As explained in the NPRM,[595] DHS has carefully considered the interaction between various federal laws and regulations with respect to discrimination and determined that considering, as part of the health factor, an applicant's disability diagnosis, in the context of the alien's individual circumstances and how it affects his or her ability to work, attend school, or otherwise care for himself or herself, is not inconsistent with these laws. The alien's disability is treated just like any other medical condition that affects an alien's likelihood, in the totality of the circumstances, of becoming a public charge—it is neither singled out nor treated differently and, within the totality of the circumstances, is also not the sole basis for an inadmissibility finding.[596] Similarly, DHS does not single out or treat differently any one health-related or medical condition over another but has continuously emphasized that all factors will have to be considered in the totality of the alien's circumstances and that no one factor is determinative.

*Comment:* Several commenters expressed concern that the proposed changes would be discriminatory against or penalize immigrants based on their health status, particularly those with chronic health conditions and disabilities and the elderly. One commenter noted that "[w]hile it is illegal to discriminate against someone on the basis of disability, the proposed rule encourages this form of discrimination, and furthers the idea that some people are more worthy than others." A commenter expressed that individuals with the misfortune of suffering serious health issues or living with a disability will be at risk of a high rate of application denials under this proposed rule. One commenter stated

this rule would discriminate against individuals with chronic health conditions such as heart disease, which tend to disproportionally impact communities of color. One commenter noted that the very definition of disability, a condition that "'interferes' with a person's ability to do such things as go to school or work," means that "virtually every person with a health condition affecting her or his life could be deemed a public charge, no matter how well the person has coped with the condition." A couple of commenters warned that the discrimination against individuals with disabilities would have the unintended consequence of splitting up families, even in an asylum seeking application, or penalizing family members providing support for individuals with disabilities.

Several commenters stated that the rule penalizes and discriminates against individuals with serious medical conditions, such as cancer, cystic fibrosis, multiple sclerosis, heart, lung disease. Commenters also stated that, under this proposed policy, an individual cancer survivor would be penalized, regardless of the individual's type of cancer, period of survivorship, or long-term health outcome, which is discriminatory. An individual commenter said the classification of arthritis and heart disease as serious health conditions seems overly exaggerated and extreme, since almost 50 percent of individuals over 65 have doctor reported arthritis and healthy lifestyle can help reduce the negative consequences of heart disease.

Multiple commenters said the proposal would equate any person with a serious health condition as effectively having a "pre-existing condition" that disqualifies them for immigration, asserting that this would have a profound impact on racial and ethnic minorities who, because of many social determinants of health, disproportionately experience a number of chronic conditions (with many citing studies as support). One commenter pointed to studies indicating that social determinants of health are one of the main inequalities between whites and persons of color.

Numerous commenters expressed general concern about the rule's negative effects on aliens with disabilities and their families. Many commenters also expressed concern over the negative assessments that individuals with intellectual and developmental disabilities, psychiatric disabilities, or physical disabilities would receive under the "health" factor in public charge determination. The commenters indicated that the rule

---

*Examination of Aliens in the United States, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/civil/technical-instructions/ civil-surgeons/required-evaluation-components/ other-disease-disability.html* (last updated Aug. 3, 2010) (last visited July 26, 2019). The HHS regulations require physicians conducting medical examinations for an alien to comply with the CDC's Technical Instructions for Medical Examinations of Aliens. 42 CFR 34.3(i).

[592] *See* 8 CFR 212.22(b)(2)(ii).

[593] *Olmstead* v. *L.C. ex rel. Zimring,* 527 U.S. 581, 607 (1999).

[594] *See Olmstead* v. *L.C. ex rel. Zimring,* 527 U.S. 581, 598 (1999).

[595] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[596] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

discriminates against immigrants with disabilities because a range of medical conditions that constitute disabilities, as well as the existence of a disability, would be unduly weighted in the determination of whether an immigrant is likely to become a public charge. Multiple commenters remarked that individuals with disabilities often lack private health insurance and are currently using or recently used Medicaid, which are two heavily weighted negative factors. Other commenters expressed concern that the rule's health standard is overbroad, specifically in its inclusion of individuals with chronic health conditions, like heart disease, cancer, trauma, mental disorders, and pulmonary conditions, and potentially individuals who may need Individualized Education Plans to study or reasonable accommodations to work. Some commenters stated that the rule would perpetuate the false notion that a medical diagnosis is solely determinative of an individual's current abilities and future capabilities.

*Response:* DHS neither proposed to exclude from the United States individuals who have specific health conditions, nor sought to disproportionally impact communities of color or people with disabilities. DHS is required by statute to consider in the totality of the circumstances whether *any* health condition an alien may have would make the alien likely to become a public charge. This determination takes into account any health condition in the context of the alien's ability to support himself or herself and like all of the mandatory factors, is highly fact-specific; *i.e.,* dependent on the alien's precise circumstances. For example, an alien may have a health condition that does not impact the alien's ability to work or secure employment or constitute a drain on the alien's financial resources, and therefore such health condition would not make the alien likely to become a public charge. Similarly, an alien may have a health condition that if unmanaged would affect the alien's ability to work but if successfully managed would not impact the alien's ability to work or find employment or constitute a drain on the alien's financial resources. In those cases, USCIS would look at whether the alien has or is likely to obtain private health insurance or any other means to pay for medical treatment. Finally, even if an alien has a health condition that precludes employment, if the alien has the financial means to pay for medical treatment and is able to be self-sufficient

without working, then the alien may not have to become a public charge.

*Comment:* A commenter stated the rule should require immigration officials to take the letter and spirit of federal anti-discrimination laws into account when determining public charge. Multiple commenters stated that the rule "disfavor[s] people with disabilities in the public charge analysis," and will deem, inappropriately, people with disabilities, who contribute to the economy, public charges.

Several commenters stated that the rule is contrary to decades of bipartisan congressional lawmaking regarding disability inclusion, including the ADA, Section 1551 of the ACA, Fair Housing Act, and the Rehabilitation Act of 1973 (Rehab Act). A few commenters, in particular, warned that the rule would echo the types of bias and archaic attitudes about disability that the Rehab Act was meant to overcome. One commenter stated that, while the proposed changes to the totality of circumstances would especially affect people with disabilities, excluding them from the United States by claiming they are more likely to need government assistance, the Rehab Act makes it unlawful to discriminate against anyone on the basis of disability, whether or not they are a citizen. Some commenters stated that the proposed rule's broad reading of the statutory health and resources factors for public charge determinations are inconsistent with Section 504's prohibition on disability-based discrimination.

One commenter stated that the rule is inconsistent with the intent of the 1990 amendments to the INA, which ensured that individuals were not deemed inadmissible based on their disability status by deleting the prior grounds of exclusion for, among others, paupers and those with a physical disability. The same commenter stated that the rule is also contradictory to Section 504's bar on disability-based discrimination in DHS's programs and activities.

A couple of commenters stated that the rule would violate the Developmental Disabilities Assistance and Bill of Rights Act. One commenter noted that "that further clarification is needed explaining precisely how DHS will consider certain factors like a disability "to the extent that such disability . . . would entail consideration of the potential effects on the alien's ability to work, attend school or otherwise support himself or herself." Other commenters stated that the rule needs to make accommodations for individuals with disabilities and that

the proposed rule "reflects the types of bias and "archaic attitudes" about disabilities that the Rehab Act was meant to overcome." Other commenters stated that the proposed rule discriminates against individuals with disabilities. An individual commenter stated that, while DHS states that the impact of using health as a factor in determining if they will become a public charge would not violate IDEA or the ADA, it is hard to see how DHS actually thinks that will happen given that a disability is concretely being deemed a negative factor which needs to be "rectified" by ability to work. This and other commenters said DHS's interpretation seems to violate 6 CFR 15.30(b)(1)(i) by denying a benefit on the basis of disability.

*Response:* DHS disagrees with the comments stating that the rule discriminates against individuals with disabilities or those with specific medical conditions. As noted in the NPRM, in enacting section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), Congress required DHS to consider, as part of the public charge inadmissibility determination, an alien's health. Although Congress has, over time, significantly reduced the prohibitions on immigration for persons with mental and physical disabilities and also amended PRWORA to restore the ability of certain aliens with disabilities to receive certain public assistance, such as SSI,[597] Congress has never correspondingly prohibited the application of the public charge inadmissibility ground to aliens with disabilities who receive, or are likely to receive, disability benefits for which they are eligible.[598]

As noted in the NPRM, this rule is not inconsistent with federal statutes and regulations with respect to discrimination against aliens with disabilities, as an alien's disability is

---

[597] *See generally* Mark C. Weber, *Opening the Golden Door: Disability and the Law of Immigration,* by 8 Journal of Gender, Race, and Justice at pp. 4–5, 8 (Spring 2004) (discussing historical changes in 1986 and 1990 immigration laws that removed various prohibitions on aliens with mental and physical disabilities, unless they represented a threat to themselves or others; describing restoration of SSI disability benefits to aliens who had been receiving them before Aug. 22, 1996). *See also* John F. Stanton, *The Immigration Laws from a Disability Perspective: Where We Were, Where We Are, Where We Should Be,* 10 Geo. Immigr. L. J. 441 (Spring, 1996) (pre-PRWORA analysis).

[598] Congress did permit a waiver of INA section 212(a)(4), 8 U.S.C. 1182(a)(4), for aliens seeking lawful permanent resident status under the legalization provision of the Immigration Reform and Control Act of 1986 (IRCA) if they met the age, blindness, or disability standards for SSI. *See* INA section 245A(d)(2)(B)(ii)(IV), 8 U.S.C. 1255a(d)(2)(B)(ii)(IV).

treated just as any other medical condition that affects an alien's likelihood, in the totality of the circumstances, of becoming a public charge. A diagnosis of a disability is related to an alien's health, and therefore is properly considered as part of the public charge analysis.

An alien's health is not outcome determinative—that is, an alien's health cannot be the sole basis for a finding that an alien is inadmissible as likely to become a public charge. As such, a diagnosis that an alien has a disability, alone, will never result in a public charge inadmissibility finding. As with any other medical condition identified in the alien's application and supporting documentation, the alien's disability will be considered in the totality of the circumstances framework. An alien with a disability will neither be treated differently nor singled out, and the disability itself would not be the sole basis for an inadmissibility finding. In other words, as with any other mandated factor and consideration in the public charge inadmissibility determination, DHS would look at each of the mandatory factors, and the affidavit of support, if required, as well as all other relevant factors in the totality of the circumstances. Therefore, consideration of a disability in the context of the totality of circumstances does not violate the Rehabilitation Act's prohibition on denying a benefit "solely by reason of [an applicant's] disability." [599]

Likewise, DHS does not believe the rule is in violation of or inconsistent with the other cited authorities. For example, the rule is not inconsistent with the regulation that prohibits DHS from denying benefits to a "qualified individual with a disability . . . by reason of his or her disability." [600] Public charge determinations will be made based on the totality of circumstances and not on the basis of a disability, and the regulatory definition of a "qualified individual with a disability" requires a person to "meet the essential eligibility requirements." [601] The essential requirements in the context of admission and adjustment of status require that an applicant not be likely at any time in the future to become a public charge.

DHS does not believe the rule is inconsistent with the 1990 amendments to the INA and its revision of the prior

grounds of exclusion with the grounds of inadmissibility. The rule is not recreating the prior grounds of excludability that, prior to 1990, included persons certified to have a "physical defect, disease, or disability" who is required to work.[602] Rather, the rule is providing guidance to the public charge inadmissibility ground as it has existed since the 1990 amendments to the INA.[603]

As to the comment that the public charge inadmissibility rule violates the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act) (42 U.S.C. 15001 *et seq.*),[604] the statute was enacted to ensure that individuals with developmental disabilities and their families "participate in the design of and have access to needed community services, individualized supports, and other forms of assistance that promote self-determination, independence, productivity, and integration and inclusion in all facets of community life, through culturally competent programs. . . ." [605] The programs within the DD Act are funded through congressional appropriations for the Administration for Community Living, which are not related to Medicaid or TANF appropriations or other federal benefit programs covered by the proposed public charge rule. The State Councils on Developmental Disabilities, Protection and Advocacy Systems, University Centers of Excellence in Developmental Disabilities, and Projects of National Significance participate in capacity building, systems change, advocacy, protect legal and human rights of people with developmental disabilities, conduct research, provide inter-disciplinary training for students and fellows, leadership training, direct support services training, community based training, and clinical or other training to strengthen the workforce that serves individuals with developmental disabilities.

The DD Act is intended for all individuals with developmental disabilities and their families regardless of immigration status.[606] The DD Act states that: "there is a need to ensure that services, supports, and other assistance are provided in a culturally competent manner that ensures that individuals from racial and ethnic

minority backgrounds are fully included in all activities provided under this title."

Based on the language in the DD Act, DHS believes that services under the DD Act are not public benefits as defined in the rule, because all individuals with developmental disabilities, without regard to income, are eligible for services that the DD Act allows.

DHS further does not believe that the rule violates the DD Act. While the policy of the DD Act is to offer protections and advocacy to individuals with developmental disabilities, and while the services provided pursuant to the DD Act would not make an individual a public charge, DHS does not believe the DD Act would govern DHS's public charge determination regarding other benefits. The DD Act is silent regarding the issue of whether an individual can be considered a public charge based upon receipt of services that do not fall under the DD Act. Other HHS disability and aging statutes and programs such as the Traumatic Brain Injury Act, Limb Loss Act, Older Americans Act, and the Christopher and Dana Reeves Paralysis Act do not receive Medicaid or Medicare funds and do not have restrictions on immigration or citizenship status.

*Comment:* Some commenters suggested that the USCIS should estimate the extent to which any regulatory changes will impact the number of otherwise eligible applicants with disabilities when compared to the current and historical baselines, and then reconsider other less harmful alternatives.

*Response:* As indicated in the NPRM, DHS would only consider disability as part of the health factor to the extent that such disability, in the context of the alien's individual circumstances, impacts the likelihood of the alien becoming a public charge.[607] Although a study of the correlations between different disabilities and the array of positive and negative factors were not included in the text of the rule, DHS understands that those correlations may exist and may also be affected by the type and severity of the disability. However, DHS would not distinguish between Medicaid recipients who are disabled from those who are not disabled. Instead, DHS would look to the information provided in the medical certification as to whether it would affect the person's ability to work or attend school. DHS provided estimates of benefit use by an array of characteristics in the NPRM, and does

---

[599] 29 U.S.C. 794(a).
[600] 6 CFR 15.30(a). *See also* 6 CFR 15.30(b)(1)(i) (prohibiting denying a benefit "on the basis of a disability").
[601] 6 CFR 15.3(e)(2).

[602] *See* section 212(a)(7) of the Act, 8 U.S.C. 1182(a)(7) (1988).
[603] *See* Immigration Act of 1990, Public Law 101–649, section 601, 110 Stat. 4978, 5072 (Nov. 29, 1990).
[604] Public Law 106–402, 114 Stat. 1677 (Oct. 30, 2000).
[605] Id.
[606] *See* INA section 101(b) and 101(c).

[607] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

not believe additional tables for disability are needed in the justification for the rule.

*Comment:* Numerous commenters cited to the impact on individuals with disabilities and children with disabilities. Many commenters cited the statistic that roughly 2.6 million children in immigrant families have a disability or special healthcare need. Numerous commenters asserted that children with special health and developmental needs require medical, behavioral, and educational services above and beyond typical children, which makes immigrant families vulnerable to economic hardship. Many commenters cited the fact that children with disabilities are more likely to live in low-income households experiencing food insecurity and housing instability. Multiple commenters concluded that access to Medicaid is uniquely critical, as children with disabilities rely on the public health coverage for occupational, physical, or speech therapies and prescription drugs. One commenter stated that, although there is a Medicaid exception for foreign-born children adopted by U.S. citizens, there is not one for special needs children that are foreign-born with immigrant parents. One commenter stated that individuals with disabilities will be uniquely affected by the rule because of the inclusion of Medicaid-funded services, including services in the home and in communities, and will be disproportionately impacted by the inclusion of housing and food assistance programs.

*Response:* DHS appreciates the numerous programs that provide services to individuals with disabilities. As discussed in the NPRM,[608] as part of the immigration medical examination, when identifying a Class B medical condition, civil surgeons and panel physicians are required to report on certain disabilities, including the nature and severity of the disability, its impact on the alien's ability to work, attend school, or otherwise support himself or herself, and whether the disability will require hospitalization or institutionalization. DHS would only consider disability as part of the health factor to the extent that such disability, in the context of the alien's individual circumstances, impacts the likelihood of the alien becoming a public charge; *i.e.,* a consideration of the potential effects on the alien's ability to work, attend school, or otherwise support himself or herself.

As discussed in the NPRM,[609] DHS has determined that considering, as part of the health factor, an applicant's disability diagnosis that, in the context of the alien's individual circumstances, affects his or her ability to work, attend school, or otherwise care for himself or herself, is not inconsistent with federal statutes and regulations with respect to discrimination, as the alien's disability is treated just as any other medical condition that affects an alien's likelihood, in the totality of the circumstances, of becoming a public charge. Under the totality of the circumstances framework, an alien with a disability is not being treated differently, or singled out, and the disability itself would not be the sole basis for an inadmissibility finding. DHS would look at each of the mandatory factors, and the affidavit of support, if required, as well as all other factors in the totality of the circumstances.

Therefore, an applicant's disability could not be the sole basis for a public charge inadmissibility finding. In addition, DHS recognizes that the ADA, the Rehabilitation Act, IDEA, and other laws provide important protections for individuals with disabilities, including with respect to employment opportunities. Furthermore, as it relates to a determination of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), when the alien is applying for the immigration benefit, DHS does not stand in the position of an employer or school where additional provisions of the ADA and Rehab Act or IDEA would apply.

*Comment:* Numerous commenters expressed concern about the impact this rule would have on individuals living with HIV/AIDS. A commenter said most applicants with HIV will automatically have two heavily weighted negative factors: Having a health condition without private insurance to cover the cost of treatment and receiving a public benefit in the form of Medicaid. Some commenters expressed concern that, because treatment is prohibitively expensive unless subsidized by government programs, these individuals would be subjected to additional constraints regarding the enrollment of health insurance (*i.e.,* they would be forced into buying non-subsidized medical coverage, which does not typically cover anti-retroviral therapy, or buying additional coverage due to lack of adequate coverage from their government-subsidized plan). Multiple commenters said immigrants with HIV

will potentially forego subsidized healthcare treatment due to this rule, resulting in substantial negative health outcomes, not only to affected individuals but also the community at large. Multiple commenters stated that reports are already emerging of individuals who are considering waiting to begin life-saving treatment in the belief that this will ensure their eligibility.

Several commenters stated that the rule sends the signal that individuals with HIV/AIDS and other chronic health conditions are "undesirable." A couple of commenters said the proposal will create a "backdoor means" of excluding those with HIV from the United States by classifying HIV/AIDS as a Class B medical condition that can be used as a negative factor in determining public charge. Some commenters said the inclusion of HIV as a negatively weighted factor undoes congressional intent in removing HIV as a ground of inadmissibility and draws disturbing parallels to the 1987 HIV travel and immigration ban overturned in 2010.[610] A commenter said the rule could operate as a de facto ban on admission of HIV positive immigrants because it would be difficult for an HIV positive noncitizen to withstand the revised public charge analysis. This commenter also said the de facto ban on HIV positive noncitizens runs against the stated goal of the Trump Administration to lead a global effort against HIV/AIDS and undermines U.S. leadership in this area.

Many commenters said the rule ignores the reality that suffering from a chronic illness such as HIV/AIDS is not an accurate indicator of future self-sufficiency and full-time employment capabilities. One commenter stated that a large portion of people living with HIV/AIDS have incomes below the poverty line, which is not due to their inability to work due to health conditions, but rather due to the continued stigma of HIV/AIDS on people's ability to get work.

Another commenter stated that the disproportionate negative impact on people living with HIV/AIDS will also cause a disproportionate negative impact on LGBT immigrants who apply for admission to the United States because they account for a large portion of the HIV diagnoses.

For similar reasons expressed above relating to HIV, some commenters expressed concerns about the rule's impact on individuals with Hepatitis B

---

[608] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51182–84 (proposed Oct. 10, 2018).

[609] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51182–84 (proposed Oct. 10, 2018).

[610] 74 FR 56547 (Nov. 2, 2009) (removing HIV from the list of communicable diseases of public health significance at 42 CFR 34.2).

and Hepatitis C. One commenter said the proposed rule would undermine its approach, as a State agency, to combating HIV/AIDS and Hepatitis C.

*Response:* As indicated in the NPRM,[611] DHS will consider any medical condition diagnosed in the totality of the circumstances. The fact that an alien has been diagnosed with a medical condition would not serve as the sole factor considered when determining whether an alien is likely at any time in the future to become a public charge.[612] The consideration entails whether, in light of the alien's health, the alien will be able to care for himself or herself, to attend school, or to work.[613] Relatedly, as part of the assets, resources and financial status factor, DHS would consider whether the alien either has sufficient household assets and resources, including but not limited to private health insurance, to cover any reasonably foreseeable medical costs.[614] The rule does not focus on any specific medical condition and people living with certain conditions may still be able to care for themselves, attend school, or go to work,[615] which the medical professional would be able to affirm in the medical certification.

*K. Family Status*

*Comment:* Several commenters requested family size be removed from consideration as a public charge. One commenter indicated that the proposal would be harmful to families, including all members of the nuclear family, and may prohibit nuclear families from immigrating.

A few commenters voiced concerns about the statement that the applicant's household size would be counted in both the family status factor and the assets, resources, and financial status factor, claiming the rule has the potential to double-count negative factors. Another commenter stated that family status should not count as a negative factor if an immigrant has sufficient income and resources.

Conversely, a commenter expressed support for considering the size of an alien's household as the primary element of the family status factor, adding that this factor appropriately involves the assessment of whether an alien has a household to support, or is being supported by another household, when calculating the alien's household size. The commenter also stated that the NPRM correctly notes research showing that receipt of non-cash benefits increases as family size increases.

*Response:* DHS is required by statute to consider an applicant's family status when determining whether the alien is likely at any time in the future to become a public charge.[616] As discussed in the NPRM, DHS will consider whether the alien has a household to support or whether the alien is being supported by another household and whether the alien's household size makes the alien more or less likely to become a public charge.[617] The receipt of non-cash benefits generally increases as family size increases [618] and is relevant to assessing self-sufficiency. Therefore, DHS will retain the household size as a consideration in the public charge inadmissibility determination.

*Comment:* A commenter stated that DHS does not provide sufficient data or explanation for stakeholders to meaningfully comment on the way it will evaluate family status in a public charge determination, so the requirement to provide sufficient notice under the APA has not been met. A few commenters stated that the rule fails to provide any evidence that larger household sizes results in lack of self-sufficiency, pointing to research showing that household size, by itself, is not an indicator of future public benefit use or self-sufficiency. Another commenter said an extended family structure offers many advantages, including stability, coherence, and physical and psychological support, particularly in times of need and should not be counted as a negative factor.

*Response:* DHS disagrees that the NPRM does not provide data or an explanation about family status. The NPRM states that ''Table 16 and Table 17 show that among both U.S. citizens and noncitizens, the receipt of non-cash benefits generally increased as family size increased.'' [619] Based on that data, DHS would consider the number of people in a household as defined in the proposed 8 CFR 212.21(d). As with the other factors, household size, on its own, would never dictate the outcome of a public charge inadmissibility determination. Household size is also not an inherently negative factor under DHS's regulations, as certain commenters indicate. If an alien demonstrates that the alien's household structure and members offer advantages that decrease the alien's likelihood of receiving one or more public benefits at any time in the future above the 12 aggregate months in a 36-month period threshold, then DHS will consider household size a positive factor.

The rule also permits consideration of the alien's family status within the context of assessing the alien's household income, assets, and resources instead of simply the alien's own income, assets, and resources. Therefore, an alien may present evidence of how the alien's household provides advantages relevant to consideration under income, assets, and resources and makes the alien less likely at any time to become a public charge. For instance, an alien who is part of a large family may have more household assets and resources available to use or may have his or her own income or access to additional assets and resources that would assist in supporting the household. DHS would take these family status-related considerations into account when examining the totality of the alien's circumstances.

*Comment:* A commenter expressed concern for how family status could impact families that have a member with chronic conditions because family members would be spending a significantly higher proportion of their income and resources on the family member with that condition, which under the proposed rule would be weighted as a negative factor against those families.

*Response:* DHS recognizes that chronic conditions may impact a person's income availability. However, an applicant's family status is a factor that must be considered when determining whether the alien is likely to become a public charge in the future.[620] As explained in the NPRM, DHS's proposed totality of the circumstances standard would involve weighing all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.

---

[611] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[612] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[613] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[614] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[615] *See* HIV.gov, Aging with HIV available at *https://www.hiv.gov/hiv-basics/living-well-with-hiv/taking-care-of-yourself/aging-with-hiv* (last visited January 17, 2019); and HIV.gov, Working with HIV, available at *https://www.hiv.gov/hiv-basics/living-well-with-hiv/taking-care-of-yourself/employment-and-health* (last visited January 17, 2019).

[616] *See* 8 CFR 212.2; *see also* INA section 212(a)(4)(B)(i)(III), 8 U.S.C. 1182(a)(4)(B)(i)(III).

[617] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[618] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184–85 (proposed Oct. 10, 2018).

[619] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[620] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

However, DHS would not consider the medical conditions of a member of the alien's household. DHS would only consider the household size in relationship to the FPG level for the assets, resources and financial status factor.

Regardless of household size, an alien may present other factors (*e.g.,* assets, resources, financial status, education, and skills) that weigh for or against a finding that the alien is likely to become a public charge. For instance, an alien who is part of a large household may have his or her own income or access to additional assets and resources that would assist in supporting the household which would also be considered in the totality of the circumstances.

*Comment:* One commenter said this rule would punish applicants who have larger families, thus creating another disincentive to have children. Another commenter stated the rule would discriminate against immigrants from countries whose cultural or religious traditions encourage larger and multi-generational families, disregarding whether such interdependence was required or recognized by law. Similarly, a commenter suggested that Asian Americans would be most affected by this rule because they are the most likely to live in multigenerational homes. Another commenter said this aspect of the proposed rule would have the greatest impact on applicants from Mexico and Central America (71 percent), Africa (69 percent), and Asia (52 percent)—regions that typically account for substantial numbers of Muslim immigrants. The commenter stated this aspect would have substantially lower impacts on European or Canadian applicants. One commenter stated that DHS has not adequately analyzed the adverse impact this proposal would have on families seeking lawful permanent residence for a spouse or a child. One commenter asked if DHS would consider it more beneficial to be single and unmarried than to be in a committed relationship with children and/or parents living with the family.

*Response:* DHS appreciates the comments but disagrees that the rule punishes people with larger families. As discussed in the NPRM, DHS will consider whether the alien has a household to support, or whether the alien is being supported by another household and whether the alien's household size makes the alien more or less likely to become a public charge.[621]

As previously indicated Congress established that family status would be a factor in the public charge inadmissibility determination.[622] Having a larger family does not necessarily lead to a conclusion that the person is likely to be a public charge. The household may have multiple sources of income that increase the income, assets, and resources of the household allowing the person and household to be self-sufficient. Alternatively, a single person may or may not have additional income, assets, or resources to be self-sufficient. While the receipt of non-cash benefits generally increases as family size increases as discussed in the NPRM,[623] DHS will never determine that a person is likely to become a public charge based on family size alone. DHS recognizes that family status can also have positive benefits and would take all relevant factors into account when assessing the totality of the circumstances regarding the alien's likelihood to become a public charge.

### L. Assets, Resources, and Financial Status

#### 1. Income Standard

*Comment:* Multiple commenters expressed general concern that the income assessment would penalize low-income immigrants. One commenter said that the income threshold is arbitrary. Using hypotheticals to illustrate that someone seeking to adjust status might still be found to be likely to become a public charge despite minimal use of benefits and adequate family support, a commenter stated that having a low income and multiple negative or heavily weighted negative factors had no clear correlation to self-sufficiency, and that the rule slanted toward denials. One commenter stated that the assets, resources, and financial status factors are not realistic given the realities of low-wage work. Another commenter said that the proposed assets, resources, and financial status factor ignores the cultural and economic value of immigrants. Several commenters stated that having an income threshold is in conflict with the American ideal of upward mobility. Other commenters stated that the proposed income threshold of 125 percent of the FPG lacked rational basis in that the affidavit of support standard is unconnected with the likelihood of an applicant becoming a public charge and relates to whether the sponsor can

support someone else rather than themselves. An individual commenter said the proposed rule would affect spouses of individuals seeking a "green card" because the proposed rule requires the couple's income to be at $41,000. Therefore, the commenter said that this rule would result in making decisions on whom to marry based on a potential spouse's income, which could increase fraudulent marriages.

In contrast, one commenter voiced general support for the proposed threshold of 125 percent of the FPG, and another commenter suggested that the rule include a provision that requires applicants to show that they make an income high enough that neither they nor their dependents qualify for public benefits.

*Response:* Even though this rule considers an applicant's income in the totality of the circumstances, which may negatively impact low-income aliens, DHS disagrees with comments that this rule is aimed at denying the admission or adjustment of status of low income aliens. Instead, this rule is aimed at better ensuring the self-sufficiency of aliens seeking to reside in the United States.

As noted elsewhere in this final rule, an alien's income is one of many pieces of evidence that DHS will consider in the totality of the circumstances. As provided in the NPRM, DHS will generally consider whether the alien has a gross household income of at least 125 percent of the FPG based on the alien's household size. If the alien's household income is less than 125 percent of the FPG, DHS will generally consider whether the alien has assets and resources that is at least five times the difference between the household income and 125 percent of the FPG based on the household size.[624] DHS also disagrees that the standard is unconnected to becoming a public charge or should be raised to other levels. DHS is adopting the standard established by Congress with the affidavit of support, which has long served as a touchpoint for public charge inadmissibility determinations.[625] An alien subject to section 213A of the Act,

[621] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[622] *See* INA section 212(a)(4)(B)(i)(III), 8 U.S.C. 1182(a)(4)(B)(i)(III).

[623] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184–85 (proposed Oct. 10, 2018).

[624] This is consistent with the provisions for assets under the affidavit of support in 8 CFR 213a.2(c)(2)(iii)(B)(3). As explained below, in certain cases, the standard applied may be less than five times under 8 CFR 213a.2(c)(2)(iii)(B)(*1*) and (*2*). To be fully consistent with the affidavit of support provisions, DHS also applies the other standards for purposes of the public charge determination and amended the provision accordingly.

[625] *See* INA section 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E); *see* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

8 U.S.C. 1183a, who does not have a sponsor capable of supporting himself or herself, the household, and the alien would currently be found inadmissible based on public charge grounds.

DHS also notes that to the extent that aliens will make marriage decisions based how much income a potential spouse earns in order to avoid any negative consequences that might stem from having household income under 125 percent of the FPG, aliens who enter into marriage for the sole purpose of circumventing the immigration laws have not entered into a valid marriage for immigration purposes and would not be eligible for adjustment of status.[626]

*Comment:* One commenter opposed DHS's proposal that an alien who fails to demonstrate income greater than 125 percent of the FPG may overcome the deficiency by providing evidence of assets totaling at least five times the difference between the household income and 125 percent of the FPG for the household size. This commenter indicated that DHS failed to provide any arguments or evidence as to why this threshold is appropriate or relevant to the public charge determination. A commenter suggested that if the rule must include a ratio of assets to the difference between household income and 125 percent of the FPG, it should be a ratio of two times. The commenter stated that this would enable the individual or household to have a two-year period of financial security during which they may be able to increase their income.

*Response:* DHS disagrees that it failed to outline the appropriateness of the standard and that the standard is arbitrary and capricious. DHS will also not incorporate the commenter's suggestion to change the standard to a ratio of two times. DHS disagrees that two times the FPG is more appropriate because the commenter's reasoning relies on increasing income in the future and as discussed in the NPRM, whether a person may be qualified for public benefits frequently depends on where the person's household income falls with respect to the FPG.[627]

As explained in the NPRM,[628] DHS will consider whether the applicant has

a gross household income[629] of at least 125 percent of the FPG for the household size, and alternatively, whether the applicant has substantial assets as described in the rule and the FPG for the household size, because it has long served as a touchpoint for public charge inadmissibility determination and the enforceable affidavit of support.[630] The suggestion to reduce the standard to a ratio of two times was also a comment in response to the Affidavit of Support Rule promulgated in 2006 and was not incorporated because the purpose of the requirement was ''to ensure that a sponsor whose income is not sufficient will nevertheless be able to provide the needed support until the sponsorship obligation ends.''[631] Similarly, the significant assets provision in this rule allows an alien whose income is below the applicable income threshold to demonstrate sufficient assets to support himself or herself, thereby reducing the likelihood of becoming a public charge.

The five times the FPG was chosen for the Affidavit of Support because ''[i]n most cases, an alien is not eligible for naturalization until he or she has been a permanent resident alien for at least 5 years,''[632] to show that the sponsor has the assets to support the beneficiary until they generally qualified for naturalization. In addition to being similar to the support obligation, five times would also be consistent with the reasoning behind the bond cancellation authority under 8 CFR 103.6(c)(1) in 1984. As explained in the NPRM, INS reasoned that if an alien is self-sustaining for a five-year period, it would not be probable that the alien would become deportable as a public charge after five years because an alien is deportable as a public charge only if the reason for the becoming a public charge is based on factors in existence prior to admission as an immigrant.[633]

After further consideration and consistent with the explanation in the proposed rule, however, DHS has decided to adjust the amount to match the affidavit of support provision in

regards to income level used and amended the provision to reflect that those aliens on active duty, other than in training, in the U.S. Armed Forces have to establish household income reflecting 100 percent of the most recent FPG for the alien's household size.

Additionally, to be more consistent with the affidavit of support regulations, DHS also decided to define significant assets for purposes of the assets and resources factor in the public charge inadmissibility determination, using a similar standard, as that outlined in 8 CFR 213a.2(c)(2)(iii)(B), but applying it to the public charge rule and the alien's household. According to 8 CFR 213a.2(c)(2)(iii), if the sponsor is unable to meet the 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) income requirement, he or she can use significant assets to make up the difference between the sponsor's income and the required FPG standard according to a particular formula similarly in 8 CFR 213a.2(c)(iii)(B)(*1*), (*2*), and (*3*), as applicable to the sponsor's household.

In applying this provision for purposes of the public charge determination, the rule provides that an alien may establish ownership of significant assets, such as savings accounts, stocks, bonds, certificates of deposit, real estate or other assets, in which the combined cash value of all the assets (the total value of the assets less any offsetting liabilities) exceeds:

(1) If the intending immigrant is the spouse or child of a United States citizen (and the child has reached his or her 18th birthday), three times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size;

(2) If the intending immigrant is an orphan who will be adopted in the United States after the alien orphan acquires permanent residence (or in whose case the parents will need to seek a formal recognition of a foreign adoption under the law of the State of the intending immigrant's proposed residence because at least one of the parents did not see the child before or during the adoption), and who will, as a result of the adoption or formal recognition of the foreign adoption, acquire citizenship under section 320 of the Act, 8 U.S.C. 1431, the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size; or

---

[626] *See Matter of Patel,* 19 I&N Dec 774 (BIA 1988).

[627] The poverty guidelines are updated periodically in the **Federal Register** by HHS. The U.S. Census Bureau definition of family and family household can be found in U.S. Census Bureau, *Current Population Survey 2017 Annual Social and Economic Supplement (ASEC)* 9–1 to 9–2, *available at https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar17.pdf* (last visited July 26, 2019).

[628] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

[629] Gross income includes ''all income you receive in the form of money, goods, property, and services that isn't exempt from tax. It also includes income from sources outside the United States or from the sale of your main home (even if you can exclude all or part of it).'' *See* IRS Publication 17, Your Federal Income Tax, page 5 (2018), available at *https://www.irs.gov/pub/irs-pdf/p17.pdf* (last visited July 26, 2019).

[630] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018); *see also* INA sections 213A(f)(1)(E) and 213A(f)(6)(A)(ii), 8 U.S.C. 1183a(f)(1)(E) and 1183a(f)(1)(E) and 8 CFR 213a.2.

[631] *See* 71 FR 35731, 35739.

[632] *See* 71 FR 35731, 35739.

[633] *See* 49 FR 24010, 24011.

(3) In all other cases, five times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size.

*Comment:* Many commenters expressed general concern that the income assessment would penalize low-income immigrants, low-wage workers, members of "marginalized groups," and families and farmworkers. A commenter stated that counting wealth and income as indicators of a person's future contribution amounts to a sea change in U.S. immigration policy. Other commenters stated that the proposed income thresholds are biased against low and middle-income immigrants while unfairly favoring wealthy immigrants; disregard and devalue low wage-workers and their contributions to society; and ignore the ability of immigrants to raise their wages over time. A few commenters said the 125 percent income threshold is too high. Others provided data on starting salaries and on some of the fastest growing occupations that are in fields with low wages. A commenter stated that six of the 20 largest occupational fields in the country have median wages close to or below the poverty threshold for a family of three. According to the commenter, this means that lawfully present non-citizens who have jobs in these sectors through an employment visa may not be able to renew that visa. Another commenter indicated that immigrants increasingly are needed to fill middle-skill level jobs, referring to those jobs that require more than a high school diploma but less than a four-year degree. Therefore, the commenter asserted, businesses that largely employ individuals at low wages would suffer, as legally present non-citizens could become too encumbered to continue their employment, and those who have low wages would be penalized because they use benefits to supplement their wages, which allows them to thrive.

One commenter indicated that the threshold for household income would have a large impact on the eligibility for admission of intending immigrants and make it very difficult for entry level workers and other individuals to seek admission to the United States; this would harm the U.S. economy, educational institutions and businesses, and sends a message that only those with financial resources are welcome although study after study has shown that immigrants are job creators and provide a net benefit to the United States. Another commenter indicated that U.S. employers will find it more

difficult and less predictable to extend the status of highly skilled workers on H–1B nonimmigrant (skilled worker) visas or recruit students, unless the employer offers a salary of more than the newly created 250 percent threshold, or risk that the worker is not able to renew the work visa given the complex and subjective considerations from USCIS adjudicators.

Additionally, some commenters stated that if the proposed income tests are applied to U.S. citizens, many would fail the test and therefore the tests should not be applied. Another commenter further stated that if the proposed public charge test is applied to U.S. born citizens, only five percent would meet the criteria, as compared to 29 percent under current guidance. Another commenter indicated that currently, 21 percent of immigrants nationally fall below the 125 percent threshold and 17 percent of citizens do as well. The commenter asserted that if the current public charge rule was applied to all Kentuckians, just 8 percent would fall into the "public charge" category, but under the proposed rule 33 percent of all Kentuckians would.

Some commenters provided data on the number of people in the United States living below 125 percent of the FPL and facts about the affected low-income population. Other commenters stated that the 125 percent income threshold would be incredibly difficult for young adults working in entry-level jobs to overcome. A commenter noted that the 125 percent of FPG standard has been the income threshold to be met by sponsors who are required to submit an affidavit of support, not by the immigrant subject to the public charge inadmissibility determination. The commenter questioned why, if a sponsor is expected to care for his or her own needs and the person he or she is sponsoring based on an income of 125 percent of the FPG, the same standard would apply individually to the intending immigrant.

Several commenters indicated that those working for minimum wage would not be able to meet the proposed threshold even if working full time, and that the minimum wage has not kept pace with changes in the cost of living in the United States. A commenter stated that basing entry into this country and adjustment of status solely on the basis of wealth is not only anathema to longstanding American values of upward mobility, but it also destabilizes financial security of immigrant families already in the United States, particularly in instances of family-based green card petitions.

Some commenters warned that the proposed income threshold would be nearly impossible for immigrants from very poor countries to achieve, and would therefore disproportionately and negatively affect immigrants from poorer regions of the world compared to immigrants from wealthier regions, such as Europe and Canada. A commenter stated that the proposed income thresholds are arbitrary and unreasonable and will be compounded by income inequality and variations in cost of living in the United States.

Some commenters stated that the rule will have a disproportionate effect on low income workers, leading to shortages in industries in which immigrants make up a substantial portion of the workforce.

*Response:* DHS understands that the rule changes the public charge inadmissibility determination as set forth in the 1999 Interim Field Guidance. However, Congress mandates that, as part of the public charge inadmissibility assessment, officers consider the applicant's assets, resources, and financial status, which, as explained in the NPRM, includes consideration of whether the applicant's household income is at or above 125 percent of the FPG income. DHS chose the 125 percent of FPG threshold (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces) standard because Congress imposed it as part of the affidavit of support, which has long been a touchpoint for the public charge ground of inadmissibility.[634] Therefore, DHS disagrees that the threshold is arbitrary.

DHS also disagrees that if a sponsor is expected to demonstrate an income of 125 percent of the FPG, the alien should not be subject to the same standard. As noted elsewhere in this rule, Congress did not add the affidavit of support requirements as a substitute for a public charge inadmissibility determination or to supplant the mandatory factors set forth in section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B). Instead, Congress added the affidavit of support as an additional assurance that the alien will not become a public charge at any time in the future. As Congress believed that 125 percent was an appropriate minimum threshold in the affidavit of support context, DHS does not believe the threshold should be lowered. Although Congress believed that 125 percent of the FPG based on the sponsor's household income was a reasonable minimum threshold in the affidavit of support context to support the sponsored alien and the sponsor's household, it does not necessarily

---

[634] Under INA section 213A, 8 U.S.C. 1183a.

follow that Congress believed that half that amount (assuming the sponsor used half the amount to support himself or herself), or any amount lower than 125 percent of the FPG, would be sufficient to demonstrate that the alien is not more likely than not to become a public charge. Rather, Congress' retention of the public charge inadmissibility determination indicates that Congress believed it was necessary to consider the alien's assets, resources, financial status (including, of course, income), and other relevant factors in addition to requiring the affidavit of support. Further, household income below 125 percent of the FPG would be reviewed along with the other factors in the totality of the circumstances such that on its own, such income would not be a basis for a public charge inadmissibility determination.

DHS disagrees that the rule bases entry into this country and adjustment of status solely on wealth. DHS notes that it must consider an applicant's assets, resources, and financial status in making a public charge inadmissibility determination, which includes consideration of the applicant's household income.[635] However, DHS does not intend the rule to penalize or negatively affect any particular group, and being a low-income worker would not necessarily in itself render an applicant inadmissible on public charge grounds. The rule abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601, when Congress declared it to be the United States' continued immigration policy that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." Further, the data in the NPRM shows that the percentage of people receiving these public benefits generally goes down as the income percentage increases. Therefore, DHS will maintain the 125 percent of the FPG (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces) standard. After consideration of the comments, DHS also believes it necessary to clarify that when assessing the alien's annual gross household income, DHS will consider as evidence the most recent tax-year transcripts from the IRS, U.S. Individual Tax Return (Form 1040) from each household member whose income will

be considered.[636] If such a Federal income tax return transcript is unavailable, DHS will consider other credible and probative evidence of the household member's income, including an explanation why the evidence is not available,[637] which may include Form W–2, Wages and Tax Statement, Social Security Statements, or Form SSA– 1099, Social Security Benefit Statement.

Concerning nonimmigrants seeking extension of stay or change of status, DHS notes that the rule does not require them to demonstrate that they have income over 125 or 250 percent of the FPG. That threshold is a heavily weighted negative factor in the public charge inadmissibility determination, which is not applied to extension of stay and change of status. Further, as previously indicated, DHS is no longer reviewing whether the alien is likely to receive public benefits in the future in extension of stay and change of status determinations, and therefore, none of the factors in the public charge inadmissibility determination will be considered for nonimmigrants.

*Comment:* A few commenters stated that the heavy positive weight assigned to household income 250 percent above the poverty level discriminates against persons with disabilities because individuals with disabilities and their families are more likely to live in poverty than those without disabilities, and that such individuals will consequently not have the benefit of the heavily-weighted positive factor to offset any negative factors. In the same vein, commenters stated that individuals with disabilities will be disproportionately affected by the negative weight associated with incomes that fall below 125 percent of the poverty level.

*Response:* DHS disagrees that considering household income at or above 250 percent of the FPG a heavily weighted positive factor in the totality of the circumstances discriminates against persons with disabilities. DHS recognizes that any income threshold may affect aliens with low-income. However, DHS did not intend, in adding this income threshold as a heavily weighted positive factor, to discriminate against applicants on the basis of their applicant's race, nationality, medical condition, disability, or membership in any protected class. Even if applicants who have low income are unable to get the benefit of this heavily-weighted positive factor to offset any negative factors, the presence of any other positive factors could, in the totality of

the circumstances, render the alien admissible.

*Comment:* A few commenters stated the proposed threshold could lead to greater family separation and undermine family unity. Another commenter stated that the rule will have an immediate and direct effect on families and their ability to stay united, and could lead to the separation of U.S. citizen children from their immigrant parents. The commenter stated that U.S. citizens will also be directly harmed by the rule, as they will be unable to petition for and sponsor family members. The commenter provided an example of a U.S. citizen mother and wife, who relies on the income of her non-U.S. citizen husband who entered the U.S. on a visa and who would be unable to sponsor her husband under the NPRM because she has no income. The commenter stated that if the U.S. citizen's husband cannot demonstrate sufficient assets or earnings, she would need to find another sponsor for her husband.

Other commenters stated that the proposed income threshold would negatively affect U.S. citizen children, as having children would make meeting the standard more difficult, which is counter-productive to encouraging self-sufficiency because family-based immigration has a positive impact on immigrant success. A couple of commenters said that the proposed income threshold particularly affects multigenerational households, a common practice among Asian American families, and that it would discourage people from supporting family members. An individual commenter suggested that placing an income threshold at 125 percent FPG would decrease the number of immigrant families with a stay-at-home parent, despite the benefits to the family of having a stay-at-home parent.

*Response:* DHS disagrees that the 125 percent income threshold standard would lead to family separation, or otherwise undermines family unity. The rule is not intended to separate families or otherwise undermine the family, but instead ensures that the statutory requirements, as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) are implemented, which mandate that USCIS must consider an applicant's assets, resources, and financial status in making a public charge inadmissibility determination. This approach is also consistent with congressional policy statements relating to self-sufficiency in 8 U.S.C. 1601, which provides that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own

---

[635] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[636] *See* 8 CFR 212.2(b)(4)(ii)(A)(*1*).

[637] *See* 8 CFR 212.2(b)(4)(ii)(A)(*2*).

capabilities and the resources of their families, their sponsors, and private organizations.'' [638] As discussed in the NPRM, [639] DHS chose a household income of at least 125 percent of the FPG (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces), which has long served as a touchpoint for public charge inadmissibility determinations. [640] As discussed in the NPRM, DHS also cited data demonstrating that the percentage of people who receive public benefits generally decreases as income increases. In other words, the data established a correlation between having low income and the receipt of public benefits. [641] Therefore, DHS will maintain the 125 percent of the FPG standard. However, as reiterated in other areas, USCIS will not make a public charge determination based on one factor alone; rather, a determinations will be based on the totality of the alien's circumstances. Therefore, in addition to the household income determination, the review of public charge inadmissibility takes into consideration the other factors enumerated in this rule and all other relevant information.

DHS also disagrees that U.S. citizens will be directly harmed by the rule because they will be unable to petition for and sponsor family members. The rule does not directly impact who may file a family based immigration petition, or the sponsorship requirements under section 213A of the INA, 8 U.S.C. 1183a. DHS acknowledges that the rule may result in more family members of U.S. citizens being denied adjustment of status after being found inadmissible on public charge grounds, but believes that Congress intended that aliens be self-sufficient, and DHS has created through this rulemaking a fair and robust standard that is likely to have this result in more cases than under the current policy.

*Comment:* One commenter stated that the proposed income threshold does not take into account the value of unpaid labor a family member may provide, such as a stay at home parent or grandparent providing childcare. Commenters also stated that the proposed rule could cause a shortage in direct care workers who are unable to remain in the United States, leaving many older and disabled Americans without access to caregivers.

*Response:* DHS understands that some applicants or some families may have household members or family members that provide services within the family, such as caregivers, stay at home parents, and others who will not be readily able to document either their work or income. To account for this, DHS will consider the applicant's household income, which may include the income of other household members who are more able to document their income and who provide the applicant with financial support. Accordingly, an applicant who provides care to a relative without pay may still be able to demonstrate that his or her household income meets the 125 percent FPG threshold. DHS notes that there is no evidence, however, that being a caregiver of others, or living in a household with a caregiver, in and of itself, is indicative of self-sufficiency or lack thereof. Although caregivers may benefit the household by eliminating the need for childcare expenses, each person must establish he or she is not likely to be a public charge based on the totality of the factors based an individual's circumstances. However, as discussed further below, DHS has added a separate provision under the Education and Skills factor that would allow DHS to take into positive consideration that the alien is a primary caregiver of another person within his or her household where there is evidence that the alien is currently unemployed, under employed or lacks an employment history but expects to rejoin the workforce. As discussed in this final rule, DHS has also defined primary caregiver as an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

Additionally, as discussed elsewhere in the rule, DHS acknowledges that, once the rule is effective, it will likely result in more adverse determinations. DHS also acknowledges the possibility that this rule, in turn, may impact the admissions of certain types of workers such as direct care workers. Congress did not exempt such workers from the public charge inadmissibility ground. DHS anticipates that the employment of such individuals as direct care workers may diminish the likelihood that they will be considered public charges, but, if the totality of the circumstances establish they, like any other applicant, are likely to become public charges, consistent with this rule, they will be deemed inadmissible. DHS believes a more effective implementation of the congressionally mandated self-sufficiency policy aims as articulated in this rule are paramount.

*Comment:* A few commenters stated this portion of the rule would strongly impact farmworkers and their families. Other commenters cited to a family income below 100 percent FPL and that farm labor's wages are among some of the lowest in the nation. Another commenter indicated that many of their patients, including agriculture workers, live below 150 percent FPL. Many commenters echoed this sentiment and remarked that farmworkers earn an average of around $17,500 per year. With low wages, these workers are highly unlikely to have assets to rule out this negative factor. Another commenter indicated that the proposed rule would particularly affect farmworkers in Michigan, as the work is largely seasonal and farmworkers in the state are not subject to the state minimum wage if they work on small farms. One commenter stated that farmworkers provide valuable and skilled labor that contributes greatly to our nation's agricultural productivity.

*Response:* As previously indicated in the section discussing extension of stay and change of status, and as explained in the notice of proposed rulemaking, DHS will not apply the public charge inadmissibility grounds under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) to nonimmigrants (including farmworkers present in the United States under the temporary worker program for agricultural services (H–2A)), seeking an extension of their stay or a change of status to another nonimmigrant classification. Instead, DHS imposes as one of the terms and conditions of granting an extension of stay or change of status, that the alien establishes that he or she had not received, since obtaining the nonimmigrant status that he or she is seeking to extend or change, any public benefits as defined in 8 CFR 212.21(b), for 12 months in the aggregate within a 36-month period. Based on this information, USCIS would then issue the decision on the application for extension of stay or change of status.

*Comment:* A commenter said that the FPL is a poor guideline due to differences in cost of living throughout the United States. Another commenter stated that differences in costs of living could mean that two people working full time at minimum wage could fall short of affording adequate housing in the district they represent. Another commenter stated that due to the high cost of living in many large cities, reliance on public assistance is not a

[638] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[639] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

[640] *See* INA section 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E).

[641] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51204 (proposed Oct. 10, 2018).

sign of a lack of self-sufficiency, but rather a symptom of a high cost of living. Other commenters stated that the proposed rule would trap immigrants in a cycle of poverty instead of giving them the opportunity to prosper.

*Response:* DHS agrees that the cost of living is different across the United States but disagrees that reliance on public assistance for housing is not a sign of lack of self-sufficiency. Through this rule, DHS has defined public charge as an alien who receives one or more public benefit as defined in the rule for longer than the designated threshold, to include public housing or housing vouchers. HUD programs are based on the cost of living in the area, which denotes that a person is unable to pay for local rent and therefore unable to be self-sufficient and instead must use public benefits in order to afford the rent. Therefore, DHS will consider 125 percent of the FPG threshold in the totality of the circumstances rather than the cost of living.

*Comment:* One commenter stated that the proposed factors institutionalize income bias and discrimination. According to the commenter, this income bias disregards the fact that many full-time workers earning a minimum wage would fall well below the threshold for being accorded positive weight. This commenter noted that such a stringent test creates a policy that is biased against working families, and perpetuates the myth that immigrants are a drain on our society and overly dependent on Government benefits. Some commenters stated that the proposed income threshold of 125 percent FPG would have an outsized and disproportionate impact on members of marginalized groups including children; families; immigrants of color; survivors of domestic violence and sexual assault; people with disabilities; elderly; low-wage workers; AAPI; South Asian Americans; Latino immigrants; those living with HIV and their families; immigrants with disabilities; older adults and families attempting to reunify; LGBTQ immigrants; and women, especially women with other intersecting identities regarding race, ethnicity, and sexuality. Additionally, another commenter remarked that the proposed standards would penalize victims of sexual and domestic violence; and pregnant women.

*Response:* DHS disagrees with the comments that this rule institutionalizes bias and discrimination. The Federal Government is responsible for "regulating the relationship between the United States and our alien visitors," which includes regulating the manner and conditions of entry, as well as the residence of aliens.[642] DHS is the Federal agency with the authority to establish regulations regarding the public charge inadmissibility determination.[643] Section 212(a) of the INA, 8 U.S.C. 1182(a), sets forth the aliens who are ineligible for visas, admission, or adjustment of status, the public charge ground of inadmissibility and the minimum factors DHS is required to consider in the public charge inadmissibility analysis. DHS must consider an applicant's age, health, family status, assets, resources and financial status, and education and skills. The statute does not include the consideration of race, or any other characteristics and DHS did not propose to consider an alien applicant's race or any other characteristics when making a public charge determination. Similarly, DHS did not propose to take into account an applicant's "social status."

With respect to Immigration regulations applicable to aliens, the rational basis scrutiny applies.[644] DHS's public charge rule is rationally related to the Government's interest, as enacted in PRWORA, to minimize the incentive of aliens to attempt to immigrate to the United States, or to adjust status in this country, due to the availability of public benefits, as well as to promote the self-sufficiency of aliens within the United States.[645]

*Comment:* A commenter said the sum total of past income taxes paid by an individual, and their contribution to the welfare programs, should be balanced against the total value of benefits received by the individual. The

commenter stated that taxes paid in the past are indicative of ability and future potential, and surely has a strong correlation with the likelihood of drawing from a benefits program in the future. Another commenter stated that the proposed income threshold would discourage immigrants from entering the country legally. Commenters also indicated that DHS's own conclusory assumption that receipt of this level of funding represents a lack of self-sufficiency was rebutted by the ample research showing that immigrants pay more into the United States healthcare system than they take out and that most immigrant pay taxes.

*Response:* DHS declines to adopt the commenters' suggestion to consider the amount of income taxes paid as an indicator of a likelihood to receive public benefits. The public charge inadmissibility determination looks at a person's individual circumstances to determine whether he or she is likely to become a public charge in the future. Not everyone is required to pay taxes and even if a person pays taxes, he or she may be eligible for public benefits. Given that Congress reiterated that the immigration policy continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations,"[646] DHS believes that the proposed rule has properly and consistently balanced the value of assets and resources of the public charge determination to ensure that those seeking status in the United States do not become a public charge. With this rule, DHS is not seeking to deter immigration but to implement the congressional mandate given in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

*Comment:* A commenter stated that employment alone was not sufficient evidence of an immigrant's self-sufficiency and that the criteria should focus on an immigrant's ability to earn wages at least three times the FPL.

*Response:* DHS disagrees with the commenter's suggestions to consider three times the FPL as the threshold. DHS uses the FPG published by the HHS as a threshold in immigration matters. As explained in the NPRM,[647] the 125 percent household income threshold has long served as a touchpoint for public charge inadmissibility determinations as part of

---

[642] *Mathews* v. *Diaz,* 426 U.S. 67, 81–82, (1976).

[643] *See* Homeland Security Act of 2002 section 102, 6 U.S.C. 112; INA section 103, 8 U.S.C. 1103.

[644] *Korab* v. *Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) (" '[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis . . . The difference between state and federal distinctions based on alienage is the difference between the limits that the Fourteenth Amendment places on discrimination by states and the power the Constitution grants to the federal government over immigration.") (citation omitted); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir 2001), citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir.2000) ("We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration . . . ."). Generally, laws and regulations that neither involve fundamental rights nor include suspect classifications are reviewed under rational basis scrutiny, under which the person challenging the law must show that the government has no legitimate interest in the law or policy or that there is no rational link between the interest and the challenge law or regulation. *Heller* v. *Doe by Doe,* 509 U.S. 312, 319 (1993).

[645] *See* 8 U.S.C. 1601.

[646] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[647] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

affidavits of support and public charge. Therefore, DHS will continue to apply the 125 percent of the FPG threshold. DHS agrees, however, with the commenter that employment alone is insufficient evidence of self-sufficiency. The public charge determination reviews all factors in the totality of the circumstances and one factor alone, except for an insufficient affidavit of support when required, will not conclude that an alien is inadmissible based on public charge. An alien's education and skills, which reflect a person's ability to earn wages, are also considered in the totality of the circumstances.

*Comment:* One commenter suggested that community involvement be included when considering evidence of assets and resources.

*Response:* DHS recognizes that community involvement may be an asset to the community as a whole and appreciates the suggestion. However, community involvement does not establish the person's self-sufficiency or evidence of income, assets or financial status.

*Comment:* A commenter stated that the evidence of assets and resources requirement, namely the completion of the declaration of the declaration as proposed in 8 CFR 245.4(b),[648] does not change the fact that someone could become gravely ill and be unable to work and never be self-sufficient. The same commenter stated that the evidentiary requirements encourage people to lie or discourages them from completing the process of seeking adjustment of status altogether.

*Response:* DHS agrees that individuals' future circumstances may be different than the ones that exist at the time of adjudication and the public charge assessment. However, the statute requires DHS to rely on present and past conditions and circumstances as the best available evidence to determine an alien's likelihood of becoming a public charge. Although it is a remote possibility that everyone could become sick and not be able to work, DHS is not assuming that this will happen. DHS would review reasonable possibilities in the future based on the person's current and parent circumstances.

Further, while it is true that some applicants may not provide USCIS with honest answers, DHS expects all applicants and petitions to provide

honest and accurate information and requires information to be provided under penalty of perjury. DHS reiterates that not providing truthful information on immigration applications according to the best of an applicant's knowledge and ability may have immigration consequences, including denial of the benefit or ineligibility for benefits in the future.

DHS acknowledges that this rulemaking may discourage certain aliens from seeking adjustment of status that of a lawful permanent resident in the United States. However, with this rulemaking, DHS seeks to better enforce the public charge ground of inadmissibility codified by Congress. Additionally, DHS is also seeking to ensure that those seeking admission in the United States are self-sufficient upon admission and not likely to become a public charge at any time in the future.

*Comment:* Commenters indicated that the proposed rule seeks to set an income standard for income above 125% of the FPG, making it extremely difficult for low income immigrant young adults previously in foster care and earning less than 125 percent of the FPL ($31,375 annually for a family of four), meeting the new income threshold of the public charge test. Given that youth aging out of foster care often need to access public cash and shelter benefits to secure housing or to attend college or training, this could result in denying these young adults lawful permanent resident status. The commenter therefore believed that the proposed rule only serves to heavily favor immigrants with wealth, while punishing low-income immigrants, including immigrant young adults who are working in important, but low-wage jobs to sustain themselves and their families.

*Response:* With this rulemaking, DHS is seeking to better enforce the public charge ground of inadmissibility codified by Congress. DHS, therefore, disagrees with the commenters' statement that this rulemaking only serves to favor wealthy immigrants and to punish those with low-income. The determination whether somebody is likely at any time in the future to become a public charge is based on the totality of the alien's circumstances, and one factor alone, such as the financial status of the alien or the current receipt of public benefits, is not outcome determinative.

DHS acknowledges a possible impact of this rulemaking, once effective, on those in Federal, State, or tribal foster care or those who are aging out of foster care but may continue to obtain certain

Federal, State, or tribal public benefits. DHS also acknowledges the possibility that individuals, including those aging out of foster care, may be likely to disenroll from public benefits because of this rulemaking. DHS notes, however, that individuals are typically placed in out-of-home care, such as foster care, because of abuse, neglect or other violence. U.S. law provides certain protections and statuses for aliens who have become victims of violence, such as refugee or asylee status, T nonimmigrant status for certain victims of human trafficking, U nonimmigrant status for victims of certain crimes, VAWA protections for victims of battery or extreme cruelty, and Special Immigrant Juvenile status for victims of child abuse, neglect, abandonment, or a similar basis under State law. Generally, the public charge inadmissibility ground does not apply to these individuals and therefore, the level of income or the receipt of public benefits would be a consideration.

## 2. Evidence of Assets and Resources

*Comment:* Some commenters stated that the proposed rule penalizes immigrants for having a mortgage, despite real estate being a wise investment. Several other commenters said the criteria undervalues homeownership. A commenter stated that home ownership is a gauge of middle class status in the United States and that the longer an immigrant lives in the United States, the more likely they will own a home. Another commenter expressed doubts whether the assets and resources threshold would have the required predictive value for purposes of public charge. Additionally, the same commenter also expressed skepticism that real estate could be easily convertible into cash within 12 months. This commenter reasoned that such assets are typically the residence of the alien or his household, which cannot be readily liquidated without imposing offsetting new housing costs; and, in case of a commercial property, liquidation within twelve months is an unlikely prospect in most U.S. real estate markets. The commenter requested a better justification for the assets and resources threshold of five times the difference between the alien's household gross annual income and the FPG for the alien's household size, and the inclusion of real estate as an asset that could be converted into cash within 12 months; or, preferably, the elimination of these standards from the final rule.

*Response:* DHS disagrees that the rule penalizes immigrants for having mortgages. There is no requirement that

---

[648] The commenter referred to 245.5. 8 CFR 245.5 is the regulatory provision addressing the medical examination of individuals seeking adjustment of status. The NPRM proposed to amend 8 CFR 245.4 by requiring a new documentary requirement for purposes of the public charge determination under INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**41420** **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

an alien have a mortgage-free home; and an alien with a mortgage could use the total value of the home minus the amount of the mortgage to meet the assets threshold. In other words, homeownership could help the alien establish that he or she is meets the income threshold and is not likely to become a public charge where the alien can provide evidence that he or she has available assets through value in a home to overcome any negative factors of the absence of regular income through employment or substantial assets in bank accounts.

The "five times equivalency" test to establish significant assets to cover the difference between the 125 percent standard and the actual income has long been recognized for public charge inadmissibility in the affidavit of support context.[649] DHS disagrees that having assets to cover five times the difference between income below 125 percent of the FPG and the 125 percent amount fails to meet any predictive value, because such assets could be readily converted to cash and substitute for income, thereby helping ensure that the alien does not rely on public benefits to meet his or her basic needs.

DHS disagrees that typically the residence of the alien or his household cannot be readily liquidated without imposing offsetting new housing costs or in case of a commercial property, liquidation within twelve months is an unlikely prospect in most U.S. real estate markets. An alien may be able to liquidate the home and then obtain a new lower cost home or start renting.

Additionally, DHS also disagrees with the commenter about the assessment of the 12-month benchmark; this benchmark is used for affidavit of support purposes[650] which, again, has long been part of the public charge inadmissibility determination. The affidavit of support permits listing of assets that may be liquidated within one year only, and specifically includes the net value of the sponsor's or the sponsored immigrant's home as a permissible asset. Although the affidavit of support does not specifically address commercial property in terms of liquid assets, the commenter provided no

evidence to support the proposition that an alien would be unable to liquidate commercial property within 12 months, and DHS sees no reason to treat commercial property differently from residential property in this context. In addition, 8 CFR 213a.2(c)(2)(iii)(B) does specifically consider real estate in the calculation of significant assets, and it is similarly reasonable to consider commercial property as assets in this context. Therefore, DHS will continue to use the 12-month standard for liquidation of assets.

*Comment:* A commenter stated that the income threshold in the NPRM fails to exclude income from illegal conduct, unlike what the commenter states is the definition of income used by DOS.[651] The commenter reasoned that no alien may work in the United States without authorization, either by operation of law or by specific application.[652] The commenter strongly recommended that income from unauthorized employment should be excluded from the calculation of gross annual household income, in the same manner as unlawful income from drug dealing, gambling, or smuggling. The commenter further suggested that no evidence of irregular income that is not documented on a tax return or equivalent document, such as an IRS Wage and Tax Statement (Form W–2) or Return of Organization Exempt from Income Tax (Form 990), should be accepted; that income earned under a taxpayer identification number rather than a Social Security number should be presumptively unacceptable; and that this approach would streamline the adjudication of public charge determinations, by eliminating consideration of most evidence of income other than recognized IRS documentation.

*Response:* DHS appreciates the comments and would like to clarify that an alien's employment and income derived from employment without an employment authorization card or status which authorizes employment will be considered as part of the assets, resources and financial status factor and the education and skills factor. DHS believes that limiting consideration of employment and income to only that derived from authorized employment goes beyond the narrow purpose of this rule, which is ensuring that aliens are self-sufficient and do not rely on the government to meet their basic living needs. For purposes of a public charge

determination, the alien's household income is relevant to the determination of whether the alien's assets, resources and financial status make the alien more likely than not in the totality of the alien's circumstances to become a public charge. Whether or not the alien engaged in unauthorized employment and any immigration consequences flowing from such unauthorized employment is a separate determination.[653] DHS will therefore consider any past employment and any income derived from such employment in the public charge inadmissibility determination. In addition, as not all income is required to be reported in tax returns, DHS will continue to consider additional income that is not listed on the IRS forms as provided in the I–944 instructions.

However, DHS does agree that income derived from illegal activities or sources should be excluded from the calculation of gross annual household income including, but not limited to, income gained illegally from drug sales, gambling, prostitution, or alien smuggling.

3. Public Benefits

*Comment:* Some commenters referenced DHS's request regarding whether use of other benefits should be counted in the totality of circumstances test. Those commenters opposed considering the use of non-listed programs in the totality of circumstances test. Additionally, other commenters stated that DHS should not allow public benefits that are not explicitly enumerated in the rule to be weighted negatively in the totality of the circumstances review. Several commenters said that Federal assistance programs or public benefits should not be a deciding factor in the public charge inadmissibility determination. One commenter cited a study showing that immigrants have a lower unemployment rate than native-born citizens and requested the agency's rationale for focusing on discouraging immigrants from using public benefits, despite their lower unemployment rate as a demographic group.

Some commenters stated that receipt of benefits was not evidence of weak financial status, as benefits are used temporarily to help people get back on

---

[649] *See* 8 CFR 213a.2(c)(2)(iii)(B). *See also* 64 FR 54346, 54348 (October 20, 1997) (explaining the rationale for the significant asset rule as part of the interim affidavit of support rule) and 71 FR 35732, 35739 (June 21, 2006) (explaining the rational for adopting the current affidavit of support rule at 8 CFR 213a, which provides for additional standards for certain aliens). DHS has amended the public charge regulatory provision to reflect that DHS will adopt the three standards used in the significant asset provision for purposes of the public charge determination.

[650] *See* Form I–864, Instructions, Part 7.

[651] The commenter cited to the former FAM section on public charge at 9 FAM 40.41. The public charge FAM section is now located at 9 FAM 302.8.

[652] *See* INA sections 274A(a)(1), (h)(3), 8 U.S.C. 1324a(a)(1), (h)(3).

[653] Furthermore, a general limitation of the type suggested by the commenter could be in tension with USCIS policy. *See* USCIS Policy Memorandum PM–602–0119, *Qualifying U.S. Work Experience for Special Immigrant Religious Workers* (July 5, 2015), *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2015/2015-0705_Lawful_Status_PM_Effective.pdf*; *Shalom Pentecostal Church v. Acting Secretary DHS*, 783 F.3d 156 (3d Cir. 2015).

their feet. Another commenter stated that many of the public benefits considered under the proposed rule would in fact make someone less likely to be a public charge, especially when the benefits are received by children. A few other commenters expressed concern that using prior receipt of public benefits as evidence of financial status ignores the role public benefits play in promoting self-sufficiency. A commenter indicated that past receipt of benefits is not even mentioned by Congress as a factor that should be given any weight in the public charge determination. Another commenter cited a 1999 letter from HHS stating that it could not imagine any way in which an individual could become primarily dependent on public benefits. Another commenter asserted that the current provisions surrounding public benefits are sufficient to be used in public charge determinations. A few commenters stated that counting benefits as a negative factor when used by children in the public charge assessment is contrary to the purpose of the public charge ground of inadmissibility because benefits providing essential health, nutrition and housing assistance prepare children to be productive, working adults; counting it as a negative factor would unfairly base a child's future potential for self-sufficiency on their use of benefits as a child. A commenter stated that using prior receipt of benefits in public charge determinations is contrary to the totality of circumstances test. One commenter indicated that considering the use of public benefits as evidence of financial status would negatively and disproportionately impact LGBTQ immigrants and immigrants with disabilities. Another commenter stated that, since most applications for public assistance consider a wide range of benefits, immigrants would be kept from applying from all benefits, even those not mentioned in the proposed rule. Some commenters stated that including receipt of benefits as evidence of financial status would lead to a widespread chilling effect among immigrants and citizens alike. One commenter asserted that, unless DHS is willing to compel employers in agriculture and in other industries to provide a living wage and health benefits, it is cruel and unjust to punish hard-working immigrants who rely on public benefits but who also benefit the United States.

*Response:* DHS disagrees with the commenters and maintains that receipt of public benefits indicates weak financial status. DHS also disagrees

rates of public benefits receipt among aliens as a whole would warrant abandoning this rule, which applies the public charge ground of inadmissibility to individual aliens. As provided in the NPRM,[654] and elsewhere in this regulation, current or past applications for, or receipt of, or certification for future receipt of public benefits, as defined in 8 CFR 212.21(b), suggests that the alien's overall financial status is so weak that he or she is or was unable to fully support himself or herself without public benefits, *i.e.,* that the alien will receive such public benefits in the future. Accordingly, as discussed more fully in the discussion on the public benefits threshold section, DHS believes that it is reasonable to consider any application, approval, or certification for, or receipt of, public benefits as a negative factor in the totality of the circumstances, as this is relevant to determining the likelihood of becoming, at any time in the future, a public charge. DHS understands however, that certain individuals may have become self-sufficient over time after having received or having been certified to receive public benefits, and therefore, either have disenrolled, or have requested disenrollment from the public benefits. To account for these positive developments in an alien's life, DHS decided to include as a consideration evidence of the disenrollment, or a request for disenrollment or withdrawal from public benefit receipt.

Overall, however, Congress implicitly recognized that past receipt of public benefits can be considered in determining likelihood of someone becoming a public charge when it prohibited consideration of benefits that were authorized under 8 U.S.C. 1641(c) for "certain battered aliens."[655] Congress' prohibition of consideration of prior receipt of benefits by a specific class of aliens indicates Congress understood and accepted the agency's consideration of past receipt of benefits in other circumstances.

DHS agrees that public benefits play a role in promoting and helping people obtain self-sufficiency; however, the primary reason people seek public benefits is the inability to be self-sufficient. In addition, the 1999 Interim Field Guidance, in which other agencies commented, involved the "primary dependence" standard, which is different from the standard set forth in this final rule. While DHS understands that some people may choose not to

apply for benefits, however, the rule does not intend to disproportionally affect any group of people as previously discussed.

*Comment:* A commenter indicated that the proposed regulation states only that DHS would consider whether a noncitizen has "applied for" or "received" benefits or fee waivers, without defining those terms. The commenter wrote that the proposed rule did not plainly state that DHS will only consider a noncitizen's application for benefits on her own behalf. These omissions, according to the commenter, would allow immigration officers to penalize a noncitizen during a public charge determination when she is the formal applicant for, or payee of, benefits for which her children or others are the true beneficiaries.

Another commenter expressed concern that many affected families will include U.S. citizens. The commenter explained that although the proposed rule stated that DHS did not intend to consider benefits received by a mixed status household where a noncitizen would not be entitled to receive a benefit or was not counted for purposes of calculating household size, the proposed regulatory text did not clearly implement DHS's stated intent. The commenter stated that as a consequence, an immigrant applying for benefits exclusively on behalf of U.S. citizen dependents could still face adverse consequences in a public charge determination for the family's receipt of such benefits, leaving the household with the choice of either not applying for benefits and facing food and housing insecurity, or the applying for the benefits and increasing the likelihood of adverse immigration consequences for some family members.

Similarly, a commenter stated that the proposed regulatory text fails both to clearly explain how DHS will identify "the portion of the benefit that is attributable to the alien" (for example, when the individual lives in a household that receives housing assistance and he or she would not be eligible to receive such assistance). The commenter wrote that the proposed rule did not plainly state that DHS will only consider a noncitizen's application for benefits on her own behalf. Another commenter stated that DHS should commission research on the cash value equivalence when determining the discount factor for housing benefits.

*Response:* DHS agrees with commenters that additional clarification of when DHS will consider application, certification, or receipt of public benefits will weigh negatively in the totality of the circumstances could be

---

[654] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188 (proposed Oct. 10, 2018).

[655] INA section 212(s), 8 U.S.C. 1182(s).

**41422** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

helpful. Therefore, DHS has added a new definition of "receipt of public benefits" to 8 CFR 212.21(e) to clarify that DHS will only consider the alien to have received a public benefit if the alien is a named beneficiary of the benefit but not where an alien is applying, being certified, or receiving a public benefit not on his or her own behalf but on behalf of another person. For example, if a parent is applying for a public benefit on behalf of a U.S. citizen child, such application for public benefits will not be considered negatively against the parent. Similarly, if an alien is the legal guardian or power of attorney of the alien's lawful permanent resident parent and is applying for a benefit on behalf of such parent, such application and/or associated administration of the public benefit on behalf of the alien's parent will not count negatively against the alien. DHS would only count as a public benefit any benefit for which the alien is specifically listed as a beneficiary. The new definition also clarifies that application for a public benefit is not the same as receipt but is indicative of an alien's intent to receive such a benefit. Similarly, certification is not the same as receipt but may impact the likelihood that the alien will in the future receive such public benefit.

*Comment:* Commenters stated, in response to a call for comments in the proposed rule preamble, that DHS should not revise the rule to allow adjudicators to consider an alien's receipt of public benefits below the applicable threshold, as part of DHS's assessment of whether the alien is likely at any time in the future to become a public charge (*i.e.,* to receive benefits above the applicable threshold). A commenter wrote that all individuals, citizen or non-citizen alike, may have emergency situations or unanticipated job losses that could result in a need for benefits on a temporary basis. Another commenter wrote that if any benefit receipt below the threshold were to be considered in the totality of circumstances, the thresholds would become "entirely meaningless."

*Response:* No commenters established that receipt of designated public benefits below the applicable threshold has no bearing on whether the alien may, in the future, receive designated public benefits above the applicable threshold. In addition, the proposed rule, as drafted, would have effectively required DHS to be willfully blind to evidence of significant benefits use that fell short of the threshold. For instance, it was unclear whether the proposed rule would allow adjudicators to consider the fact that an alien had received non-monetized benefits for 11 consecutive months leading up to an application, even though such fact would be directly relevant to whether the alien is likely to exceed the applicable threshold in the future.

Following careful consideration of the issue, DHS has determined that it is reasonable to consider any application, approval, or certification for, or receipt of, public benefits as a negative factor in the totality of the circumstances, regardless of whether the benefits exceed the threshold for becoming a public charge. While DHS does not believe that past receipt of the benefits enumerated in this rule for 12 months or less, on its own, makes the alien likely to become a public charge in the future, such receipt will in some cases suggest that the alien is not self-sufficient, or may soon lack self-sufficiency. Accordingly, under the assets, resources, and financial status factor, DHS will consider it to be a negative factor (though not a heavily weighted negative factor) if the alien has applied for, been approved or certified for, or has received, public benefits for any amount of time.[656] The fact that an alien has in the past applied for, been approved or certified for, or has received public benefits for any amount of time, would never be dispositive on its own, but would be relevant to assessing an alien's likelihood of becoming at any time in the future a public charge. USCIS will consider the duration, amount, and recentness of an alien's past approval or certification for, or receipt of, public benefits, when deciding how much weight to give this past activity as part of the prospective totality of the circumstances determination.

*Comment:* An individual commenter stated that the proposed assets, resources, and financial status factors would treat immigrants who have been living in the country fundamentally different than those arriving at ports of entry and are therefore arbitrary. The commenter indicated that this difference in treatment is wholly inequitable and fundamentally wrong because an individual who has continually received public assistance in a foreign country could potentially be allowed to enter the United States. In contrast, individuals who are applying for adjustment of status within the United States could be denied adjustment of status for a brief, temporary use of a low dollar amount of public assistance.

*Response:* DHS disagrees that the proposal is arbitrary. DHS understands that public benefits and assistance programs exist in other countries. However, DHS did not propose and will not consider public benefits provided by foreign countries.[657] Public benefits in foreign countries have different standards and objectives. For example, in some countries, healthcare is provided on a national basis irrespective of income or need and is, therefore, not comparable to public benefits or to the public charge standard in the United States. In addition, the inadmissibility determination addresses whether a person is likely to become a public charge in the United States in the future.

Additionally, all applicants for admission and adjustment of status applicants must demonstrate that they are clearly and beyond a doubt not inadmissible to the United States.[658] The ground of inadmissibility under section 212(a) of the Act, 8 U.S.C. 1182, include the public charge grounds of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS explained in the proposed rule that it provided a more comprehensive framework for determining public charge inadmissibility, including certain and new paper-based applications, as additional evidence related to public charge considerations.[659] DHS also explained that, due to operational differences, this additional evidence would not generally be required at ports of entry.[660] Applicants for admission are inspected by immigration officers at or, when encountered, between ports of entry in a timeframe and setting distinct from the adjudications process. This, however, does not imply that DHS does not screen applicants for admission for grounds of inadmissibility, including public charge grounds of inadmissibility. Therefore, DHS does not fundamentally treat those who seek adjustment of status in the United States differently from those seeking admission to the United States.

*Comment:* One commenter stated that the proposed rule ignores that under PRWORA applicants for admission are and will remain ineligible for public benefits even after admission, and that applicants for adjustment of status are and will remain ineligible for most public benefits until they have green cards for five years. The same commenter stated that the rule's

---

[656] 8 CFR 212.22(b)(4)(ii)(F)(1), (2).

[657] *See* 8 CFR 212.21(b). *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158–51174 (proposed Oct. 10, 2018).

[658] *See* INA section 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A).

[659] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51116 (proposed Oct. 10, 2018).

[660] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51116 (proposed Oct. 10, 2018).

''weighing scheme'' is impermissibly vague. The commenter pointed to one of the examples in the proposed rule as indicative of the unpredictable nature of the determination, namely that an individual who is in school and employed with an income of 120 percent of the FPG and does not have health insurance but has no other negative factors would not be deemed likely to become a public charge. But the commenter noted that if the individual was not precluded by immigration status from receiving public benefits, the individual would be income-eligible for SNAP, Medi-Cal, and Federal housing assistance. The commenter stated that it is not clear why DHS would not deem the individual likely to become a public charge at any time in the future.

*Response:* DHS disagrees with the commenter that the rule fails to consider the alien's immigration status in determining whether an alien could qualify for public benefits, and has added language in the rule to clarify. DHS also disagrees that the totality of the circumstances determination is impermissibly vague and unpredictable, or that the example the commenter cited illustrates the unpredictability of the determination. In the proposed rule, DHS established as one of the mandatory regulatory factors the consideration of the alien's prospective immigration status and expected period of admission. DHS notes that there are a number of legal and practical limitations on DHS's ability to consider eligibility for public benefits as part of its totality of the circumstances determination. For instance, DHS does not have the expertise to apply the varied and often complex framework of public benefit eligibility criteria, either on a state-by-state basis or according to general Federal standards; cannot reliably predict the alien's likely state of residence at any time in the future; and cannot assume that all aliens who are ineligible for the designated benefits in the near-term will not use them in the long term.[661]

But if an alien provides evidence from a Federal, State, local, or tribal agency specifically identifying that alien does not qualify for one or more public benefits, USCIS can use that information

as part of its totality of the circumstances determination. DHS has therefore revised the regulatory text to make clear that DHS would consider evidence from a Federal, State, local, or tribal agency administering a particular benefit that shows the alien does not qualify for the public benefit, so long as the alien submits the necessary evidence and specifically identifies it as relating to eligibility.

For example, an alien could provide a letter from a benefit-granting agency indicating that the alien is not eligible for a particular benefit based on the alien's immigration status. In the alternative, the alien could provide information from a public benefit-granting agency listing the immigration classifications not eligible for public benefits and evidence of the alien's prospective immigration status that together indicate that the alien is not eligible for the benefit because the alien does not have an immigration classification that the public benefit-granting agency has identified as eligible. Similarly, the alien could provide evidence of his or her gross household income together with information from a public benefit agency's website showing the eligibility income threshold for the state in which the alien resides, or will reside upon becoming a lawful permanent resident, that specifically indicates that the alien's gross household income exceeds the threshold. DHS would consider such evidence in the totality of the circumstances. DHS notes that an assessment that an alien is not currently eligible for any or all designated public benefits may carry some weight in the totality of the circumstances, but will never be outcome determinative. DHS must consider all statutory factors to determine whether the alien is likely *at any time in the future* to become a public charge.

With respect to the specific example cited by the commenter, DHS notes that evidence of alien's income being below 125 percent of the FPG or evidence that the alien's immigration status may not be disqualifying, are not necessarily determinative factors in the totality of the circumstances. In the example commenter discusses (Table 34, example A in the proposed rule), DHS would determine that the alien is not likely to become a public charge notwithstanding the alien's lower income and lack of health insurance because the alien is fundamentally a young and healthy person (age 30) of a working age, with an employment history and education (attending a Bachelor's degree program), and the alien is an employment-based applicant

for adjustment of status. In making this determination, DHS would take into consideration the fact that the alien is working while in school and thus that the nature and hours of employment may be limited by his need to attend classes. DHS would also look at the likelihood that the alien's earning capacity would increase as a result of his education—for example, U.S. Census data shows that a college degree nearly doubles earnings.[662] Similarly, there is no evidence that the alien had previously received, or even attempted to apply for, or been certified to receive public benefits.[663] Therefore, notwithstanding the commenter's observation about potential future eligibility for such benefits, the alien, based on the facts, would not be more likely than not receive public benefits at any time in the future. However, if there were evidence that, the alien was discontinuing his or her education, or had a chronic health condition that would impair the alien's ability to work, or that the alien had attempted to apply for public benefits but had been found ineligible based on his immigration status, such evidence could tip the determination the other way and USCIS may determine that the alien is more likely than not to receive public benefits above the designated threshold at any time in the future. Therefore, DHS appreciates that a real world circumstance is likely to include facts beyond those included in the hypothetical fact pattern that could lead to a different adjudication.

4. Fee Waivers for Immigration Benefits

*Comment:* Many commenters said the rule overweighs receipt of one-time immigration fee waivers to predict whether a person will become a public charge by double counting, as use of a fee waiver is a function of income.

---

[661] *See, e.g.,* Medicaid.gov, Medicaid, Children's Health Insurance Program, & Basic Health Program Eligibility Levels, *https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-eligibility-levels/index.html* (discussing Medicaid eligibility from state to state) (last visited June 5, 2019); State TANF Policies: A Graphical Overview of State TANF Policies as of July 2016, available at *https://www.acf.hhs.gov/sites/default/files/opre/wrd_2016_databook_companion_piece_05_15_18_508.pdf* (last visited June 5, 2019).

[662] *See College Degree Nearly Doubles Annual Earnings: https://www.thoughtco.com/college-degree-nearly-doubles-annual-earnings-3320979* (last visited June 27, 2019); *U.S. Census Bureau Educational Attainment in the United States: 2004: https://www.census.gov/data/tables/2004/demo/educational-attainment/cps-detailed-tables.html* (last visited June 27, 2019); *U.S. Census Bureau Post-Secondary Employment Outcomes (PSEO) (Beta) https://lehd.ces.census.gov/data/pseo_beta.html.*

[663] Even though some studies show that low income earners receive one or more public benefits at higher rates, DHS would not necessarily find this trend to be outcome determinative in the case of an individual enrolled in a Bachelor's degree program. *See, e.g.,* The New York Times, *Working, but Needing Public Assistance Anyway https://www.nytimes.com/2015/04/13/business/economy/working-but-needing-public-assistance-anyway.html* (April 12, 2015) (last visited July 26, 2019); U.C. Berkeley Labor Center: High Public Cost of Low Wages *http://laborcenter.berkeley.edu/the-high-public-cost-of-low-wages/* (last visited June 27, 2019).

Another commenter stated that there is not enough data to determine whether one-time receipt of a fee waiver was related to a person being a public charge. A commenter noted that a separate consideration of the use of a fee waiver means that factors such as income would be unfairly counted twice—once based on their household income and a second time when the fee waiver is granted because of their income.

*Response:* DHS disagrees that the receipt of a fee waiver for an immigration benefit is over weighted. The fee waivers for immigration benefits is only one evidentiary consideration in the totality of the circumstances and it is not heavily weighted. As indicated in the NPRM,[664] since fee waivers are based on an inability to pay (*i.e.,* receipt of means-tested public benefits or income at the FPG level), a fee waiver for an immigration benefit suggests an inability to be self-sufficient. DHS recognizes that some of the factors required to obtain a fee waiver may be similar to those used as part of the public charge determination. These factors, however, are reviewed differently according to their respective purposes. For purpose of the public charge inadmissibility determination, all the factors and circumstances will be reviewed in the totality of the circumstances without a counting system currently used for fee waiver purposes, in which each factor is individually ranked or scored to assess whether a fee waiver is warranted. As such, DHS will consider the alien's financial liabilities and the request or the receipt of a fee waiver as evidence of financial liabilities and status in the totality of the circumstances. Other evidence may provide the same information and therefore, DHS would consider the evidence as a whole but not individually rank or score the evidence.

*Comment:* One commenter said it is impermissibly retroactive to consider the past receipt of a fee waiver because "it impermissibly penalizes applicants for their financial status on the date of the application for the fee waiver and not on the date of application for admission, adjustment of status, or for a visa.'' Commenters indicated that often, an individual's economic situation improves after receiving immigration benefits for which applicants receive a fee waiver. A commenter stated that even immigrants who applied for a fee waiver and were rejected for having

high income, would be counted under the proposed rule.

*Response:* DHS disagrees that the consideration of a fee waiver would be impermissibly retroactive. First, fee waivers applied for or received before the effective date will not be considered.[665] Second, any fee waiver received on or after the effective date of the rule, will be considered in the totality of circumstances and, alone, would not result in a finding that a person is likely at any time in the future to become a public charge. In the totality of the circumstances analysis, evidence of a change in circumstances, *e.g.,* steady employment and income, would also be taken into consideration. Third, simply because the regulation bases the consideration of public charge in part on an occurrence of a fee waiver on or after the effective date of the rule, does not make the regulation impermissibly retroactive.[666] Through this regulation, DHS simply specifies considerations as part of implementing the public charge determination, according to the best evidence available at the time of the adjudication, including past occurrences of a fee waiver request or grant as a consideration, in the totality of the alien's circumstances. Finally, and similar to the receipt of public benefits, DHS will, in the totality of the circumstances, consider how long ago the fee waiver was received. If the fee waiver was received recently, it would have more relevance to the public charge determination, whereas if the fee waiver was received some time ago, for example, before the alien obtained new, steady employment, the relevance of the fee waiver in the totality of the circumstances would be diminished.

*Comment:* Some commenters stated that the rule seemed to reduce or potentially eliminate the use of the application fee waivers and stated that the fee waiver program is founded on its own policy rationale, which, according to the commenters, is not the subject of this rule. A commenter stated that fee waivers are typically only available for applications not subject to the public charge ground of inadmissibility and stated that using fee waivers in public charge determinations will only serve to chill overall immigration applications. Another commenter further remarked

that the inclusion of fee waivers in public charge determinations would result in fewer immigrants being willing and able to seek citizenship. A commenter stated that many of their clients were worried about whether using a fee waiver would impact their chances of having their applications approved. A commenter stated that the fee waivers would be limiting the options immigrants have to file for immigration benefits and would harm families, citing a story about a client in the process of applying for citizenship. An individual commenter stated that it is cruel to offer fee waivers and then hold the use of said fee waiver against immigrants in their application. Additionally, another commenter stated that the standards for fee waivers are often more lenient than the finding of inadmissibility under the proposed rule, and therefore should not be used in public charge determinations. A different commenter stated that the use of fee waivers in public charge determination would likely disadvantage naturalized citizens in efforts to reunite their families. A couple commenters stated that receipt of a fee waiver often serves as a step toward self-sufficiency and decreases the likelihood that an immigrant will be dependent on government assistance in the future. Another commenter stated that fee waivers are often used when applying for work authorization, as at that time immigrants have no income, and considering fee waivers would lead to longer unemployment periods and increase use of public benefits. A commenter stated that often immigrants apply for fee waivers when they need to file an application in a timely manner, but do not have the time to save enough money to afford the application fee. Another commenter stated that including a fee waiver in public charge determinations would increase the burden on immigrants.

*Response:* DHS disagrees that the rule eliminates fee waiver requests. Applicants would still be able to request fee waivers in accordance with the applicable regulations and form instructions.[667] The consideration of a fee waiver in the public charge inadmissibility determination is but one factor in the totality of the circumstances. As indicated in the NPRM,[668] requesting or receiving a fee waiver for an immigration benefit suggests a weak financial status. Since fee waivers are based on an inability to pay, seeking or obtaining a fee waiver

---

[664] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188 (proposed Oct. 10, 2018).

[665] 8 CFR 212.22(b)(4)(ii)(G).

[666] ''A regulation has retroactive effect 'when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.' '' *See Mejia* v. *Gonzales,* 499 F.3d 991, 995—99 (9th Cir. 2007) (quoting *INS* v. *St. Cyr,* 533 U.S. 289, 321 (2001)).

[667] *See* 8 CFR 103.7(c).

[668] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188 (proposed Oct. 10, 2018).

for an immigration benefit suggests an inability to be self-sufficient. In addition, the Senate Appropriations Report for the Department of Homeland Security for FY 2017, stated that "the Committee is concerned about the increased use of fee waivers, as those paying fees are forced to absorb costs for which they receive no benefit. In addition, those unable to pay USCIS fees are less likely to live in the United States independent of government assistance.[669] However, the House Report on Department of Homeland Security Appropriations Bill, 2019, said "USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver." Therefore, DHS would not consider the request or receipt of reduced fee for the naturalization application as part of the public charge inadmissibility.

DHS also disagrees that this rule would deter individuals from applying for U.S. citizenship or otherwise imposes additional burdens on applicants. This rule addresses how DHS determines inadmissibility of aliens on account of public charge; and it does not apply to individuals seeking to be naturalized who would apply for a fee waiver request because the public charge ground of inadmissibility does not apply to naturalization proceedings.[670]

For clarification purposes, DHS has amended the regulatory text in 8 CFR 212.21(b) to provide that fee waiver requests submitted or granted as part of immigration benefits that are not subject to the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) will not be considered as part of the public charge determination. *See* 8 CFR 212.22(b)(4)(G).

*Comment:* One commenter stated that considering fee waivers would unfairly and disproportionately impact survivors of human trafficking and domestic violence who are less likely to have the ability to pay for fee-based forms. Another commenter further remarked that the use of fee waivers in public charge determination would disproportionately affect women, survivors of abuse, and people of color.

*Response:* As discussed in the NPRM, an alien who is a VAWA self-petitioner,

a T nonimmigrant at time of admission, and an applicant for, or individual who is granted, U nonimmigrant status are generally exempt from the public charge ground of inadmissibility. For reasons discussed earlier in this preamble, DHS amended this final rule to clarify that T nonimmigrants seeking any immigration benefit subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), are generally exempt from the public charge ground of inadmissibility, as previously discussed. Because these survivors of human trafficking and domestic violence are generally exempt from the public charge inadmissibility ground, they would not be impacted by this rule.

*Comment:* Several commenters stated that the consideration of receipt of a fee waiver would keep immigrants from accessing their right to justice in immigration proceedings.

*Response:* DHS disagrees that the consideration of requests for, and receipt of, fee waivers would prevent individuals in removal proceedings from applying for any benefits for which they are eligible. Although request and receipt of a fee waiver is a consideration in the public charge inadmissibility determination, it is but one factor in the totality of the circumstances, and could not, alone, form the basis of an inadmissibility determination. The consideration of fee waivers within public charge inadmissibility determinations conducted by immigration judges in removal proceeding is more appropriately addressed by DOJ in the context of their public charge rulemaking. DHS's rule only addresses the consideration of fee waivers in the context of matters before DHS.

## 5. Credit Report and Score

*Comment:* Several commenters noted that a credit scores and credit histories are not designed to assess an alien's likelihood of becoming a public charge, were not designed to be used in the immigration context, and do not assess an alien's self-sufficiency. A commenter also noted that credit reports do not address at all whether an alien can financially provide for himself or herself because credit reports do not reflect the subject's payment of rent, utilities, income, savings, or other financial resources. A few commenters stated that a person's credit history should not impact their ability to change immigration status. Many commenters said there is no correlation between a low credit score and the evaluation factor. Many commenters stated that credit reports are highly inaccurate. Further, a commenter remarked that credit reporting scores vary widely

between agencies, and that the score reported to a consumer may not be the same as the score used by lenders. Many commenters asserted that an applicant's credit history could be impacted by factors outside their control from which they may never recover. Additionally, a commenter indicated that credit report and income alone does not depict a clear picture of an immigrant's full financial situation or their ability to raise their credit score. A couple of other commenters stated that credit reports and scores do not contain enough information about an individual's earnings or incomes. Another commenter stated that many consumers who are credit invisible or unscoreable will be disadvantaged by the rule and provided data on the population who falls into these groups.

Many commenters stated that credit scores are a poor way to evaluate the past ability to pay bills, since scores do not reflect rent payments, which are often the largest recurring expense a household or individual will incur. Some commenters stated that medical debt is often reflected in credit reports and is not an accurate or reliable measure of an individual's financial status. One commenter stated that credit reports should not be included as a negative factor, but that individuals should be allowed to submit a good credit score as a positive factor if they so choose. An individual commenter stated that there may be additional credit data, which provides for non-traditional credit activity (*i.e.*, short-term payday lending, rent-to-own, auto lending data) that could be used in public charge determinations.

*Response:* A weaker financial status may, in the totality of the circumstances, lead to a public charge determination. As indicated in the NPRM,[671] USCIS would consider an alien's liabilities and information of such liabilities in a U.S. credit report and score as part of the financial status factor in the totality of the circumstances. As provided in the NPRM, a good credit score in the United States is a positive factor that indicates a person is likely to be self-sufficient and support the household. Conversely, a lower credit score or negative credit history in the United States may indicate that a person's financial status is weak and that he or she may not be self-sufficient. Credit reports and credit scores provide information about a person's bill paying history, loans, age of current accounts, current debts, as well as work, residences, lawsuits,

[669] *See* S. Rep. No. 114–264, at 125 (2016).

[670] *See* INA section 311–347, 8 U.S.C. 142–1458.

[671] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

**41426** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

arrests, collections, actions, outstanding debts and bankruptcies in the United States.[672] Credit reports generally assist creditors to determine the credit worthiness or risk of a person, and affect the terms of the credit the person is offered.[673] DHS's use of the credit report or scores focuses on the assessment of these debts, liabilities, and related indicators, as one indicator of an alien's strong or weak financial status, so that in the totality of the circumstances and as part of all considerations affecting the alien, the alien is more or less likely to become, in the future, a public charge. DHS believes it is useful information in determining whether aliens are able to support themselves. However, DHS understands that not everyone has a credit history in the United States and would not consider the lack of a credit report or score as a negative factor. DHS also understands that the three main different credit reporting agencies do not provide identical scores. DHS believes that the credit report and score are nonetheless sufficiently reliable to be useful in reviewing a person's financial status in determining whether an applicant is likely to become a public charge.[674] As the Consumer Finance Protection Board has said "A credit report generally is considered s reasonably reliable third-party record . . . for purposes of verifying items customarily found on a credit report, such as the consumer's current debt obligations, monthly debts, and credit history." [675] Further, if the alien has a confirmed error on the report or score, USCIS would not consider the report a negative factor. USCIS will review the latest credit report and score provided by the alien. DHS notes that a credit report or score alone would not lead to an inadmissibility determination based on public charge because the assessment of public charge is made in the totality of the circumstances and no one factor or consideration (with the exception of an insufficient affidavit of support or no affidavit of support, where required) is outcome determinative for being found inadmissible based on public charge.

*Comment:* A commenter expressed concern that inclusion of credit history in public charge determinations would amount to double counting of some of the evidence upon which such reports and scores are based and would already factor into the public charge determination.

*Response:* DHS recognizes that some of the factors enumerated in the public charge rule may be based on similar circumstances; however, some of the considerations may be reviewed differently depending on the factor. However, all the factors and circumstances will be reviewed in the totality of the circumstances without ranking the factors numerically. DHS would consider the alien's financial liabilities and past receipt of public benefits; the credit report and score would simply serve as evidence of financial liabilities and status. Other evidence may provide the same information and therefore DHS would consider the evidence as a whole but not individually rank or score the evidence.

*Comment:* One commenter stated that the guidelines in the proposed rule regarding credit score were broad and ambiguous. A commenter stated that using credit scores in public charge evaluation would lead to "arbitrary, inconsistent, and unfair" public charge determinations. The commenter further stated that the mechanics of going through immigrants' credit reports and scores are impractical.

*Response:* DHS disagrees that the language on credit scores is broad and ambiguous or that it would lead to an arbitrary, inconsistent and unfair public charge determination. As indicated in the NPRM,[676] USCIS would generally consider a credit score characterized as "good" or better to be a positive factor as it demonstrates an applicant may be able to support himself or herself and any dependents assuming all other financial records are sufficient. A "good" credit report is generally near or slightly above the average of U.S. consumers,[677] and therefore the person may be self-sufficient and less likely to become a public charge. A poor credit report is well below the average of U.S. consumers.[678]

*Comment:* Multiple commenters asked whether past poor credit would

be used as a negative factor in a public charge determination.

*Response:* DHS would only consider the information included in the latest credit report and score as provided by the alien at the time of adjudication for public charge inadmissibility purposes. The fact that some had a previous negative or positive score will not be taken into account in the public charge inadmissibility determination.

*Comment:* One commenter questioned how DHS plans to collect, protect, and manage sensitive data surrounding credit report scores. Another commenter noted that USCIS would be required to comply with the storage and disposal requirements for credit information at 15 U.S.C. 1681x.

*Response:* DHS takes seriously its responsibility to properly protect sensitive information in its possession.[679] DHS follows the Privacy Act requirements, which apply to information that is maintained in a "system of records" from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual. The materials in alien files (A-files) are considered permanent records and are transferred to the National Archives and Records Administration 100 years after the subject's birth,[680] and therefore not subject to the disposal requirements of the Fair Credit Reporting Act (FCRA). To the extent that credit information subject to the FCRA is maintained in other agency records systems, such records will be destroyed in accordance with applicable General and/or Agency Records Schedules which would be in compliance with the FCRA requirements.[681] As with all forms and private identifiable information, DHS will follow all applicable regulations and procedures to safeguard and protect any sensitive information.

*Comment:* A commenter indicated that if DHS includes credit reports in the public charge determination DHS should not exclude non-U.S. credit reports because credit reporting in the United States is exclusively the province of private-sector corporations, this is not the case in many countries. The commenter cited the World Bank, which stated that at least 30 countries

---

[672] *See* USA.gov, *Credit Reports and Scores, available at https://www.usa.gov/credit-reports* (last updated July 18, 2019) (last visited July 26, 2019).

[673] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[674] *See generally Marting Realty, Inc.* v. *Marks,* 1986 WL 4647 (Ohio Ct. App. 9th Dist. 1986) ("Credit reports are held to be highly reliable by the business world and should be admitted where such reliability is not challenged.") (citation omitted).

[675] Official Interpretation 43(c)(3)-3 to 12 CFR 1026.43(c)(3), published as part of Ability-to-Repay and Qualified Mortgage Standards Under the Truth in Lending Act (Regulation Z), 78 FR 6408, 6607 (Jan. 30, 2013).

[676] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[677] MyFICO, *Understanding FICO Scores* 5, *available at https://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf* (last visited July 26, 2019).

[678] MyFICO, *Understanding FICO Scores* 5, *available at https://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf* (last visited July 26, 2019).

[679] *See generally* Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored.").

[680] 82 FR 43556, 43564.

[681] *See* 15 U.S.C. 1681w; 16 CFR 682.3.

operate public credit registries, including seven nations in the European Union and 17 in Latin America and the Caribbean.

*Response:* DHS will not include credit reports from other countries in the public charge inadmissibility determination. DHS agrees that credit reporting systems vary significantly throughout the world, including but not limited to how they are established, the information collected, and the rating policy used.[682] As explained in the NPRM, the information obtained through a U.S. credit report may be indicative of a person's financial status and the person's self-sufficiency in the United States.[683] Given that the focus of the public charge determination is the alien's likelihood of becoming a public charge to the United States in the future, DHS believes that the U.S. credit report provides the best means to obtain relevant information regarding assets, resources and financial status. As it is the case with all factors, USCIS will assess the information obtained through a U.S. credit report or score and its impact on the public charge determination in the totality of the circumstances; USCIS will not base the inadmissibility determination solely on the results of the credit report or score.

*Comment:* Another commenter indicated that considering credit scores and reports as a negative factor is directly contrary to case law, citing to *Howe* v. *United States ex rel Savitsky,* 247 F. 292 (2d Cir. 1917). The commenter explained that in this case the immigration inspector found the alien to be a public charge for having drawn a check abroad which ultimately proved bad and that in a dispute arising from contractual matter, the alien had sold the equipment at issue and kept the proceeds.[684] The Second Circuit reversed the decision explaining that Congress meant the public charge provision to exclude persons who are likely to become occupants of almshouses for want of means with which to support themselves in the future.''

*Response:* DHS disagrees that considering credit scores and reports as a negative factor is directly contrary to the case law established in *Howe* v. *United States ex rel Savitsky.*[685] In *Howe,* the court criticized the public charge determination made by the immigration inspector, finding that immigration inspector's ''latitudinarian construction'' of the term public charge would render all other grounds redundant because everybody could be considered a public charge.[686] The court indicated that the public charge determination could not be simple conjecture but that there must be some indication that an otherwise physically fit individual were to become a public charge for want of means to support themselves in the future before he or she could be found inadmissible.[687] The court did not imply or mandate that any aspect of an individual's financial history be excluded from a public charge determination. Additionally, the case was decided based on the 1910 version of Section 2 of the Immigration Act of 1907; the provision at the time did not specifically require immigration officers to consider the alien's ''assets, resources and financial status'' as part of the public charge determination.[688] In contrast, with the 1996 amendments of IIRIRA, Congress specifically required immigration officers to consider these factors as part of the public charge determination.[689] As explained in the NPRM,[690] DHS considers an alien's liabilities and information of such liabilities in the U.S. credit report and score indicative of the state of an alien's assets, resources, and financial status and the person's ability to be self-sufficient.

*Comment:* Many commenters remarked that immigrants are more likely to have no credit history or an insufficient amount of information to generate a reliable score. A commenter stated that in their experience helping enroll immigrant populations in ACA open enrollment, credit scores were often either unavailable or inaccurate. A commenter stated that many immigrants are often victims of financial frauds and financial abuse, which could negatively affect their credit score. The commenter

further stated that the only people to prosper from the proposed rule would be the credit repair industry.

A few commenters stated that credit reports are not available in languages other than English, which can disadvantage immigrants with limited English proficiency from accessing their score and disputing mistakes made to their credit. Adding to this a commenter stated that immigrants often are not aware or are not able to correct errors on their credit score. One commenter stated that not using credit cards can negatively impact one's credit score even though not using credit cards can be a financially responsible choice. Adding to this, a few commenters stated that many people lack credit history because they are frugal which shows a lack of likelihood of becoming a public charge.

*Response:* DHS recognizes that the credit reports and scores may be unavailable or inaccurate. As provided in the NPRM,[691] the absence of an established U.S. credit history would not be a negative factor when evaluating public charge in the totality of the circumstances. Absent a U.S. credit report or score, USCIS may give positive weight to an alien who can show little to no debt and a history of paying bills timely. An alien may provide evidence of regular and timely payment of bills, and limited balances on credit cards and loans. In addition, USCIS would not consider any error on a credit score that has been verified by the credit agency in determining whether an alien is likely to become a public charge in the future.

*Comment:* Several commenters stated that considering credit scores will disparately affect ''marginalized communities.'' Additionally, a few commenters stated that using an immigrant's credit history in public charge determinations would have a disproportionate impact on immigrants of color; women; survivors of sexual and domestic abuse; people with lower levels of education; and local communities where credit scores there are lower than the national average. A commenter stated that the use of credit scores in public charge determinations may have the unintended consequence of trapping immigrants in a cycle of payday loans.

*Response:* DHS disagrees that consideration of credit scores will disparately affect certain groups of aliens. DHS must consider an applicant's assets, resources, and financial status in making a public

---

[682] The commenter cited to Margaret Miller, ''Credit Reporting Systems Around the Globe'' (Washington: World Bank, June 2000), *available at, http://siteresources.worldbank.org/INTRES/Resources/469232-1107449512766/Credit_Reporting_Systems_Around_The_Globe.pdf* (last visited July 24, 2019).

[683] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[684] *Howe* v. *United States ex rel Savitsky,* 247 F. 292 (2d Cir. 1917) (He had drawn a check for $113 before leaving Canada which proved bad and that in a dispute with one Solomon Cohen arising out of the purchase of a milk route, Cohen charged him with having sold some of the equipment and kept the proceeds.)

[685] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292 (2d Cir. 1917).

[686] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292, 294 (2d Cir. 1917).

[687] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292, 294 (2d Cir. 1917).

[688] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292, 293 (2d Cir. 1917). *See* Comp. St. 1916, Sec. 4244.

[689] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[690] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188–89 (proposed Oct. 10, 2018).

[691] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

charge determination.[692] The rule abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency set forth in 8 U.S.C. 1601. DHS does not believe that the use of credit scores will trap people into a cycle of payday loans since the rule in general, and the use of credit scores in particular, do not require anyone to incur any debts.

*Comment:* A few commenters said that if public charge determinations are made using credit reports or scores, it must be in compliance with user duties under the FCRA. Specifically, the commenters noted that the FCRA applies to USCIS as a Government agency,[693] and that FCRA requires persons to provide the consumer with a written notice if it takes an "adverse action" against that person "based in whole or in part" on a credit report.[694] A USCIS denial would qualify as an "adverse action" since it would be denying a "license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status." [695] USCIS would be required to provide the required written notice required under the FCRA. Some commenters stated that the burden caused by complying with the FCRA would outweigh the benefits from using the credit score.

*Response:* DHS appreciates the comments. DHS agrees that it would be subject to FCRA when it relied on whole or on part on a credit report or credit score obtained from a credit report or other consumer report to deny a benefit. In such cases, USCIS will include the information required by 15 U.S.C. 1681m(a) as part of its communication with applicants. However, DHS disagrees that the burden imposed upon USCIS would outweigh the benefits from using a credit score and will retain the score as part of the rule.

6. Financial Means To Pay for Medical Costs

*Comment:* One commenter supported the proposal to assess whether an immigrant has private medical insurance. Another commenter disagreed with the proposal to include financial means to cover medical costs. A couple commenters stated that the requirement that an immigrant have sufficient assets to cover the costs of medical care is vague and impossible to determine fairly. One commenter said considering lack of private health insurance seems "outlandish" when fewer than half of private employers in the United States provide health insurance to their workers. Similarly, a commenter said that many people who are employed do not have access to affordable healthcare coverage. Another commenter stated that immigrants are more likely than citizens to work in low-income industries that do not provide health insurance or pay enough for employees to afford health insurance. One commenter suggested the agency provide more information on how an immigrant can obtain insurance, since employer insurance is not always an option. Some commenters stated that low-wage workers should not be denied status because they lack health insurance. A couple commenters remarked that the lack of private health insurance in the United States provided the rationale behind the passing of the ACA. An individual commenter stated that the proposed financial means to pay for medical costs factor introduces a conundrum in deciding which will be weighted more heavily: Having private insurance now or previously having used public insurance. Another commenter stated that the proposed standard may be double counting with other factors in the public charge determination.

*Response:* As explained in the NPRM, USCIS will consider whether a person has health insurance or has the household assets and resources to pay for reasonably foreseeable medical costs.[696] In addition, as discussed in section III.R. below, based on DHS's review of the relevant data, DHS has determined to designate a heavily weighted positive factor for having private health insurance, so long as such insurance is appropriate to the expected period of admission, and the alien does not receive premium tax credits under the ACA for such insurance. DHS understands that certain individuals may choose to forego public health insurance, such as Medicaid, because of the impact on public charge. The rule, however, abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated that the immigration policies continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [697] Financial means to pay for reasonably foreseeable medical costs is part of being self-sufficient. In evaluating the alien's ability to pay for reasonably foreseeable medical costs, DHS will consider whether the alien has private health insurance (which, on its own, can constitute a heavily weighted positive factor in certain circumstances, as described below) or other household assets and resources. DHS notes that such an evaluation may in some cases require DHS to consider an alien's publicly funded or subsidized health insurance that is not defined as a public benefit under this rule. As previously indicated, DHS will not base the inadmissibility determination on simply one factor but will review all the factors and circumstances in the totality of the circumstances without a rating or numerical standard.

*Comment:* Some commenters stated that the proposed rule, with its statement that "individuals in poor to fair health are more likely to access public benefits to treat their medical condition" erroneously suggests that all immigrants suffer from preexisting conditions and that they will all access federally subsidized health insurance.

*Response:* DHS disagrees that the rule assumes that all immigrants suffer from pre-existing conditions and obtain federally subsidized health insurance. Whether a person has a medical condition is but one factor in the totality of the circumstances. DHS will also consider whether the alien has the resources to pay for reasonably foreseeable medical costs, and DHS will consider it a heavily weighted positive factor if the alien has private health insurance, so long as such insurance is appropriate for the expected period of admission and the alien does not receive premium tax credits under the ACA for such insurance.

*Comment:* Another commenter stated that requiring the financial means to pay for medical costs is in direct conflict with the goals of the ACA.

*Response:* DHS disagrees that requiring financial means to pay for medical costs is in conflict with the ACA. Although the ACA provides for affordable health insurance for a greater number of people, it also limits coverage to categories of immigrants eligible for subsidies and assistance through the

---

[692] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).
[693] 15 U.S.C. 1681a(b) (including government agencies in the definition of persons).
[694] 15 U.S.C. 1681m(a).
[695] 15 U.S.C. 1681b(a)(3)(D).

[696] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[697] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

ACA.[698] DHS is also not limiting the ability of people to receive subsidized health insurance, through the ACA or other programs. Insurance obtained from a private health insurance provider through the ACA marketplace would be considered private health insurance under this rule, although, as explained more fully in section III.R below, private health insurance for which the alien receives premium tax credits under the ACA would not qualify as private health insurance for purposes of the heavily weighted positive factor.

*Comment:* A commenter stated that the agency should provide the data used to determine the cost of caring for chronic disease treatment and that the agency should further analysis to reflect the cost to taxpayers. They further stated that DHS should illustrate how immigrants could access health insurance.

*Response:* The NPRM included a discussion of healthcare costs, and the importance of considering an individual's health when making the determination of public charge. DHS does not believe a more detailed analysis of the costs associated with chronic disease treatment is necessary. DHS does not have current information on all available health insurance plans, however, an applicant can seek information through HHS or through their local government.

*Comment:* Many commenters stated that this factor would negatively and disproportionately affect people with disabilities; people with chronic health conditions; immigrants of color; Asian Americans; victims of human trafficking; farmworkers; and survivors of sexual abuse and violence.

*Response:* DHS does not intend to disproportionately affect such groups. The rule abides by the requirements as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated that the immigration policies continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations."

## M. Education and Skills

### 1. Education

*Comment:* A commenter said that it should be unlawful to preclude individuals from immigrating to the United States for lack of education and that the new definition of public charge, in general, benefits the wealthy, putting them above hardworking families that actually help the country's economy. Another commenter equated the education requirement to a wealth test with no bearing on an individual's potential. In contrast, a commenter stated that education should be considered in a public charge determination because it is a key indicator of welfare use. The commenter added that, while the majority of immigrants come for work and most are employed, their lack of education results in low average income and heavy use of means-tested benefits programs. The commenter expressed support for an even higher standard and suggested that if an applicant has only a high school education or did not graduate high school, the burden must be on the applicant to show they will not be a public charge. Another commenter stated that, while the proposed evidentiary criteria to support the education requirement are all reasonable to consider as contributing factors, it is critical that they not be treated as separate elements, but as distinct ways to prove education and skills. The commenter concluded that treating each of these elements as separate factors is inconsistent with congressional intent and the general concept of a totality of the circumstances approach.

*Response:* When Congress amended section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), it directed officers to consider the alien's education and skills, and the rule implements Congress's directive on this mandatory statutory factor. Additionally, DHS cited in the NPRM to various studies and data supporting the concept that a person's education and skills, including skills in the English language, are correlated to an individual's self-sufficiency and therefore a positive factor.[699] The goal of this rule is to ensure an alien's self-sufficiency and therefore, the implementation of this factor, as proposed by the NPRM, is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. DHS will review and consider evidence brought forward by the applicant, including, but not limited to, evidence of the alien's employment history; an alien's degrees; occupational skills, licenses or certifications; and evidence of the alien's and proficiency in English.[700]

*Comment:* A commenter stated that the proposed rule assumes that individuals who have a highly recognized degree or a unique skill are more likely to succeed in the United States, but these individuals often experience downward mobility post-migration because their foreign degrees, credentials, and work experience are not directly transferable to the United States job market. The commenter further stated that recent data shows education is a misguided factor in a public charge determination citing one study that found that even though many first-generation Americans may face issues with lower education levels, subsequent generations dramatically improve their educational profiles. Another commenter stated that being employed or currently enrolled in STEM (science, technology, engineering, and mathematics) or information technology (IT) fields should be listed as a positive factor.

*Response:* As previously indicated, education and skills is a mandatory factor established by Congress.[701] DHS would individually review a person's education and skills to determine whether they are able to maintain or obtain employment to avoid becoming a public charge. As occupations vary in education and skills requirements, DHS is not limiting its review to specific education or occupations. Therefore, DHS does not find it necessary to specify in the rule education and occupations in STEM or other similar fields. It is DHS's intent that officer should examine every consideration, including education and skills, set forth by the alien in the totality of the circumstances when ascertaining whether an alien is likely to become a public charge based upon the applicability of the alien's education and skills to available employment at the time of adjudication.

*Comment:* Commenters stated that the education requirement discriminates against farm workers and other trade workers because they may not have a formal education, but could have been working in the United States for many years. A commenter indicated that, while individuals that lack a high school or equivalent education generally earn less than persons with more formal education, they have many opportunities for gainful employment. The commenter noted that there are numerous jobs with no formal educational requirement, primarily in the agricultural, food processing and preparation, and building trades sectors, which are essential to the economy.

---

[698] *See* Healthcare.gov, Immigration status and the Marketplace, available at *https://www.healthcare.gov/immigrants/immigration-status* (last visited July 24, 2019).

[699] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189–96 (proposed Oct. 10, 2018).
[700] *See* 8 CFR 212.22(a).

[701] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**41430**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

Another commenter said consideration of an immigrant's educational level is impermissible under the governing statute, in light of that factor's failure to accurately predict a likelihood of reliance on public benefits. The commenter suggested that studies have shown that low-skilled and low-educated immigrant men demonstrate "substantially higher rates of employment" than do comparable native-born men, particularly because of migrant selectivity in deciding where to locate and work. The commenter concluded by saying lack of a formal secondary education does not indicate, among immigrant populations, a likelihood of becoming a public charge and indicates the contrary.

*Response:* As indicated above, education is one of the mandatory factors in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) that DHS must consider in the public charge determination. Employment history will also be considered in the public charge inadmissibility determination to determine whether the alien may obtain or maintain employment. Therefore, while the lack of formal education such as the lack of a high school diploma or other education, are generally a negative consideration, the alien's employment history as well as any occupational skills, certifications or licenses are generally positive considerations. DHS agrees that there are many opportunities for gainful employment, but DHS disagrees that consideration of an immigrant's educational level is impermissible as it is part of Congress' mandatory factors to consider in section 212(a)(4) of the Act, 8 U.S.C. 1182(A)(4). Additionally, the NPRM showed a clear link between increased education and increased employability, employment productivity, as well as earnings, and a reduction in public benefits use.[702]

DHS will consider a range of evidence as to education and skills. To clarify additional types of documentation that establishes a steady employment history, DHS has revised the evidentiary considerations in the rule to indicate that applicants should include federal tax return transcripts for the previous 3 years, if applicable, or, if the alien was not required to file federal income taxes, other probative evidence of the alien's employment history including Form W–2 for the previous 3 years.

*Comment:* Some commenters stated that an education requirement would be more difficult for immigrant women, stating that immigrant women from certain countries, such as Mexico, El Salvador, and China, are less likely to have completed high school, and are therefore, less likely to overcome a negative assessment based on this factor. Similarly, a commenter stated that the negative weight for lack of a high school diploma and lack of employment history would impact a significant portion of women from Asian countries who are adjusting their status.

*Response:* DHS will examine the totality of the individual's circumstances, regardless of the individual's nationality, sex or other characteristic, to assess whether the individual is likely to become a public charge in the future. Among the factors to consider, education and skills is but one factor and is not outcome determinative on its own. When evaluating whether the alien has adequate education or skills to either obtain or maintain employment, USCIS' considerations include, but are not limited to the alien's past employment history; whether the alien has a high school degree or its equivalent, or any higher education; whether the alien has any occupational skills, certifications or licenses; and the alien's proficiency in the English or other languages in addition to English. DHS also encourages the applicant to bring forward any consideration he or she believes are relevant to the determination whether the alien has sufficient education or skills to not become a public charge at any time in the future.

*Comment:* A commenter stated that the level and quality of the education attained by a prospective immigrant can help predict how likely they are to become a public charge and suggested prioritizing higher education in the immigration process. The commenter stated that immigrants with a high school education or less should not qualify for a green card unless the applicant holds a skill(s) that is in high demand and can be expected to earn a high enough salary that they would not need to enroll in any welfare programs. Another commenter said not enough weight is being given to an education standard, noting that while 37 percent of households headed by noncitizens with at least some college use welfare, the rate rises to 81 percent for households headed by noncitizens with only a high school diploma or less.

*Response:* Congress legislates which individuals should be qualified for lawful permanent resident status, and not DHS. Therefore, DHS cannot implement the suggestion that immigrants with a high school education or less should not qualify for lawful permanent resident status unless the applicant holds a skill that is in high demand and for which the market pays a high salaries. Additionally, DHS disagrees that it does not give sufficient weight to the education standard: The public charge assessment considers each factor and circumstance applicable to the alien and each factor is accordingly weighted to determine whether an alien will be self-sufficient while in the United States. The DHS standard recognizes, consistent with the statute, that it is possible that an alien's other positive factors may outweigh the lack of formal education with the result that an alien is not deemed to be likely at any time in the future to become a public charge.

*Comment:* Several commenters expressed concern over the negative assessments that individuals with disabilities may encounter under the education and skills factor in public charge determination. One commenter noted that in order to work and go to school, many individuals with disabilities rely upon Medicaid-funded services that would be considered in the public charge inadmissibility determination's assets, resources and financial status factor, and will also impact the education and skills factor.

A few commenters added that unemployment rates for individuals with disabilities are drastically higher than those for individuals without disabilities. Many commenters addressed how the education requirements might negatively affect immigrants with disabilities, arguing that disparity in education and educational barriers for people with a disability have been ongoing in the United States for generations, resulting in lower rates of high school completion, and great disparities exist when comparing the attainment of higher-level degrees. A couple of commenters said attaining education and employment are areas where many people with disabilities often face significant discrimination based on their disability.

*Response:* DHS appreciates the comments and understands that employment opportunities individuals with disabilities are different. Officers will not find an individual inadmissible solely on account of his or her education, skills, or his or her disability. Rather, officers will assess, based on the totality of the circumstances, whether the individual is likely to be self-sufficient. As indicated in the NPRM,[703]

---

[702] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189–97 (proposed Oct. 10, 2018).

[703] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

Federal laws [704] and regulations prohibit discrimination against individuals with disabilities. DHS recognizes that individuals with disabilities and other conditions make substantial contributions to the American economy. DHS has analyzed these laws and regulations, and has determined that assessing an alien's education and skills, including work history, is not inconsistent with adhering to non-discrimination requirements with respect to individuals with disabilities.

*Comment:* A commenter expressed concern that adjudicators would apply the education and skills factor inconsistently with respect to the mission and duties of certain religious workers. The commenter stated that qualifying religious workers come from diverse educational backgrounds and perform a diverse range of work duties, depending on the nature and mission of the religious order. The commenter stated that work duties may include duties that do not produce any income at all, such as meditation and prayer, in those orders that pursue a more monastic way of life. Another commenter stated that the proposed education and skills factor could negatively impact those seeking visas as religious workers.

A commenter suggested that DHS exempt special immigrant religious worker category [705] from public charge inadmissibility determinations or clarify that these workers would still be admissible. The commenter stated that the regulations define a religious vocation as a ''formal lifetime commitment . . . to a religious way of life'' and cover religious workers who have taken a vow of poverty. The commenter indicated that as part of the vow of poverty, many religious workers relinquish personal property and assets, and are not permitted by their religious order to receive compensation. Instead, their religious order or community obligates itself to provide non-salaried support to its vowed member, such as room and board, health insurance, a small allowance, etc. In addition, the commenter stated that a religious order may be obligated to support this member as long as they remain a member. Given that ''assets, resources, and financial status'' is one of the main factors in the public charge determination, the commenter expressed concern that religious workers would be immediately disadvantaged.

Additionally, the commenter expressed concern about the administrative and economic burden imposed on religious organizations to demonstrate that special immigrant religious workers are not likely to become a public charge. The commenter indicated that sponsors of religious workers may not possess the financial ability of typical U.S. employers. The commenter also stated that the imposition of additional documentary and form requirements to demonstrate that a religious worker is not likely to become a public charge would increase costs to the religious worker sponsor. The commenter indicated that these organization will maximize their resources to serve their mission in the Catholic Church, and that to impose additional economic burdens on U.S. religious organizations seems contrary to American values of religious freedom and liberty.

Finally, the commenter expressed concern about the rule's negative impact on individuals and communities in the United States. The commenter stated that many international religious workers play a vital role in the daily lives of individuals and families in the United States. In addition to the spiritual and ministerial role played, many religious workers also participate in activities and duties supporting the communities directly. Therefore, the commenter requested clarification these special immigrant religious workers continue to qualify for the status or be exempt from public charge.

*Response:* DHS acknowledges that special immigrant religious workers, and immigrants who perform religious work generally, provide valuable contributions to the United States and are in a special position, as acknowledged by Congress in the special immigrant religious worker classification.[706] Congress, however, did not exempt these workers from the public charge ground of inadmissibility and, therefore, DHS will not exempt them in this rule. As noted elsewhere in this final rule, DHS believes that this regulation, and other provisions of the INA and implementing regulations, can be administered consistently with the RFRA. DHS acknowledges that any individual or organization who identifies a substantial burden on his, her, or an organization's exercise of religion such that the RFRA may require specific relief from any provision of this rule may assert such a claim.[707]

Among the requirements for a special immigrant religious worker, the sponsoring religious organization must provide an attestation, attesting, among other things, that the employee will be employed at least 35 hours a week, and that the worker will be provided a complete package of salaried or non-salaried compensation.[708] As part of the petition, the employer provides detailed evidence as to the compensation package being offered to the religious worker, which may include salaried and non-salaried compensation, such as room, board, and other remuneration.[709] Additionally, as part of the attestation, the sponsoring religious organization also has to demonstrate the ability and intention to compensate the alien at a level at which the alien and accompanying family members will not become public charges, and that funds to pay the alien's compensation do not include any monies obtained from the alien, excluding reasonable donations or tithing to the religious organization.[710] To the extent that the sponsoring religious organization complies with these evidentiary requirements with respect to the religious worker's compensation package, DHS does not anticipate, in general, that special immigrant religious workers, including those who have taken a vow of poverty are disadvantaged regarding consideration of their income, assets and resources because the sponsoring religious organization provides compensation to the religious worker such that the religious worker would generally be relying on private rather than on public benefits.

Additionally, DHS does not believe that considering the education and skills of a religious worker applicant may result in inconsistent adjudications or violate due process. As explained above, DHS is required to consider an applicant's education and skills as part of the public charge inadmissibility determination. As provide in the rule, when considering an alien's education and skills, DHS will consider whether the alien has adequate education and skills to either obtain or maintain

---

[704] *See, e.g.,* the Rehabilitation Act of 1973, Pub. L. 93–112, 87 Stat 355 (Sept. 26, 1973) (codified as amended, in pertinent part, at 29 U.S.C. 794), the Americans with Disabilities Act of 1990, Pub. L. 101–336, 104 Stat. 327 (July 26, 1990) (codified as amended at 42 U.S.C. 12101–12213), and the Individuals with Disabilities Education Act (IDEA), Pub. L. 108–446, 118 Stat 2647 (Dec. 3, 2004).

[705] *See* INA section 101(a)(27)(C), 8 U.S.C. 101(a)(27)(C).

[706] For example, special immigrant religious workers under INA section 101(a)(27)(C), 8 U.S.C. 1101(a)(27)(C) qualify for adjustment of status under INA section 245(a), notwithstanding certain bars under INA section 245(c).

[707] Note that that individuals "located outside sovereign United States territory at the time their alleged RFRA claim arose" are not "person[s]" within the meaning of RFRA. *Rasul v. Myers,* 512 F.3d 644, 672 (DC Cir.), *cert. granted, judgment vacated on other grounds,* 555 U.S. 1083 (2008).

[708] *See* 8 CFR 204.5(m)(7)(vi), (vii), and (xii).

[709] *See* 8 CFR 204.5(m)(10).

[710] *See* 8 CFR 204.5(m)(7)(xii).

employment in a lawful industry with income that is sufficient to avoid being more likely than not to become a public charge. In the context of a special immigrant religious worker, the relevant question is whether the alien's skills are suitable for the alien's intended occupation. DHS will not assume that the religious worker will be likely to receive a public benefit because of the nature of the employment or lack of income at the indicated threshold. Instead, DHS would consider provisions for housing, food, and medical care provided by the religious institution as available resources.

Further, this rule is not intended to negatively impact special immigrant religious workers or communities in which such workers would reside. Rather, this rule is aimed at better ensuring that those seeking admission to the United States are self-sufficient and rely on their own resources and the resources of their sponsors and private organizations.

2. Language Proficiency

*Comment:* A commenter said that it should be unlawful to preclude individuals from immigrating to the United States because of a language barrier and that the new definition of public charge, in general, benefits the wealthy, putting them above hardworking families that actually help the country's economy. One commenter said the United States has no official language, so there should be no language requirement. Many commenters stated that requiring English proficiency would mark a fundamental change from the nation's historic commitment to welcoming and integrating immigrants. A couple of commenters stated that the rule acknowledges the centrality of English language skills to economic self-sufficiency, but individuals commonly improve their English skills through participation in education programs and rely on Medicaid or other public benefits to enable them to succeed in their English language classes. A commenter indicated that the expanded negative weights for English language proficiency and educational/skills attainment conflict with longstanding policy and principles that support upward mobility and self-sufficiency.

Some commenters indicated that individuals who rely on Medicaid or other public benefits to enable them to succeed in their English language classes could be discouraged from continuing their education and improving their employability by fear of being found a public charge. Some commenters cited research showing a

strong connection between better basic skills and higher earnings, which means that as an immigrant improves their reading, math, and spoken English skills, they will be better able to contribute economically to American society. Stating that data demonstrates that the use of cash benefits by immigrant populations that are not English-proficient is so low as to be within the study's margin of error, a commenter reasoned that many immigrants with limited English proficiency (LEP) are taxpaying business owners, or work in white collar or blue-collar jobs. The commenter further noted that although lack of English-speaking skills may be a hindrance to obtaining certain employment, proficiency in a foreign language may bolster an immigrant's ability to obtain other employment. One commenter suggested investing in English language learning programs instead of "punishing" immigrants for lack of English language proficiency. Another commenter reasoned that the ability to immigrate lawfully increases opportunities and ability to improve English and by limiting access to legal immigration, the rule would perpetuate an underclass of immigrants who continue to be prohibited from service that could improve their lives, including their English.

*Response:* DHS disagrees with the commenters' suggestions to remove English language proficiency as a consideration in the public charge inadmissibility determination. DHS is not mandating English proficiency for admissibility. DHS recognizes that individuals who lack English proficiency may already participate in the workforce or may be able to obtain employment. However, as discussed in the NPRM,[711] people with the lowest English speaking ability tend to have the lowest employment rate, lowest rate of full-time employment, and lowest median earnings. Further as illustrated in Table 24 in the NPRM, among the noncitizen adults who speak a language other than English at home, the participation rates for both cash and non-cash benefits are higher among those who do not speak English well, or at all, than among those who speak the language well. The margin of error of an estimate, and likewise its standard error, are affected by the number of people surveyed to construct the estimate, which in the case of a percentage or rate will include those who respond that they have the characteristic and those who respond that they do not. A

relatively large standard error should not be interpreted to mean that the underlying rate being estimated is low. Findings from the SIPP tables were only discussed in the text of the NPRM if they are significant at the 95 percent confidence level.

DHS understands that aliens may improve their English skills in the future. The Form I–944 does allow a person to identify any courses or certifications in English. Furthermore, DHS is not mandating English proficiency for admissibility. Proficiency in English is one positive aspect for purposes of the education and skills factor to establish an alien's ability to obtain or maintain employment and that the alien, therefore, would be self-sufficient. Lack of English proficiency alone would not establish public charge inadmissibility, but would be one consideration in the totality of the circumstances.

*Comment:* One commenter stated that requiring English language proficiency could extend to all kinds of visas, which could have a negative impact on tourism.

*Response:* DHS reiterates that is not imposing an English proficiency requirement on nonimmigrants or immigrants—it is merely a consideration within the totality of the circumstances when determining for an immigrant applying for adjustment of status whether the alien is more likely than not to become a public charge in the United States. As previously discussed, DHS has removed the forward-looking aspect of the public benefits condition for extension of stay and change of status applications. Therefore, lack of English proficiency will not impact nonimmigrant visitors or the tourism industry. Further, for nonimmigrants seeking extension of stay or change of status are not subject to the public charge ground of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). Nonetheless, B nonimmigrant visitors would have to establish that they have maintained their status and that they have not received, since obtaining the nonimmigrant status that they are seeking to extend or change, any public benefits as defined in 8 CFR 212.21(b), for 12 months in the aggregate within a 36-month period.

*Comment:* A few commenters stated that most people who settle here permanently will develop English proficiency by the time they become citizens. These commenters reasoned that this is why is there is no English language test until an individual is being naturalized and that this method provides several years for immigrants to

---

[711] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51195–96 (proposed Oct. 10, 2018).

immerse themselves in the English language. Another commenter stated that Congress made English proficiency a requirement for citizenship and not the initial stage of becoming a legal permanent resident and that imposing an English proficiency requirement in this rule bypasses Congress. A commenter stated that the rule penalizes people for speaking languages other than English, an English proficiency requirement places strain on shared heritage as a source of social support and resiliency, as well as creates redundancy given that our immigration systems requirement of English fluency for citizenship. A commenter asserted that while English has long been a requirement for those seeking to become naturalized citizens of the United States, the rule would create an English language requirement for nonimmigrant visas, family-based, and employment-based visas, even when a language requirement is already a consideration, and even where it is irrelevant. A commenter stated that the proposed English-language proficiency factor would reduce family reunification.

*Response:* DHS is not imposing an English proficiency requirement or as a factor that is outcome determinative in the public charge determination. English proficiency is among the considerations evaluated when assessing education and skills; the alien may submit any evidence relevant to the factor.

DHS understands that certain individual's English will improve over time in the United States and that the ability to read, write and understand the English language is tested as part of naturalization proceedings. However, DHS has established, through data presented in the NPRM, that an individual's inability to speak and understand English may adversely affect an alien's employability, and may increase receipt of public benefits.[712] Therefore, DHS will consider the applicant's proficiency as one of the consideration for purposes of assessing education and skills; DHS will consider any factor applicable to the alien in the totality of the circumstances. DHS would also consider whether the alien is already employed or has education and skills that would allow the alien to obtain or maintain employment and avoid becoming a public charge.

*Comment:* Some commenters suggested that including English proficiency in the factor discriminates against deaf immigrants, individuals with hearing or speech disabilities, individuals who communicate through assistive devices, and immigrants with intellectual and developmental disabilities.

*Response:* DHS disagrees that the rule discriminates against deaf immigrants or other disabilities. DHS does not mandate English proficiency as a pre-requisite for legal immigration or as a determinative factor within the public charge inadmissibility determination. Adjudicators would not consider it a negative factor for a deaf immigrant to read and write English but not speak it. And in view of ADA requirements applicable to employers, adjudicators would give equal weight to a deaf immigrant's ability to communicate through American Sign Language. An alien's Form I–693 may also establish that a person has a hearing or speech disorder, for which DHS would provide the appropriate accommodation for any interview. Although DHS may consider any medical condition in the totality of the circumstances, the fact that an alien is deaf or hard of hearing or has hearing or speech disabilities, communicates through assistive devices, or that the alien has intellectual and developmental disabilities will not alone lead to a determination of inadmissibility based on the public charge ground.

*Comment:* Some commenters stated that USCIS does not have the authority to impose an official language and that there is no law that allows the Government to prefer those who speak English over those with LEP. Others stated that considering English proficiency in the public charge determination violates constitutional and statutory mandates prohibiting language-based discrimination, which the Supreme Court has interpreted as a form of national origin discrimination. One commenter stated that by discriminating based on English language proficiency the proposed rule violates laws banning national origin discrimination. Several commenters cited several Federal civil rights acts that show LEP persons are protected from discrimination on the basis of English proficiency and those acts included Title VI, the Civil Rights Act, the ACA, and more. Other commenters indicated that the INA, the U.S. Constitution's Equal Protection Clause and other authority demonstrate that individuals cannot be discriminated against on the basis of LEP.

Many commenters stated that consideration of English language proficiency would disproportionally impact women with LEP, citing to studies indicating that women with LEP are less likely to participate in the labor force than men and more than twice as likely to work in low-wage service occupations as women with English proficiency, and older immigrants with LEP. Another commenter stated that the proposed rule will cause additional harm to trafficking survivors who have yet to gain proficiency in English because they have newly entered the United States or have been intentionally barred from learning English or accessing education by their traffickers. Another commenter said that DHS's analysis fails to account for the fact that many immigrants reside in multigenerational households where the English-speaking capacity of younger generations serves to benefit older generations that do not speak English as readily. The commenter also noted that the vast majority of immigrants to the United States have not been English-speaking and this has not prevented immigrants from becoming contributing members of their communities. Some commenters addressed the adverse impact of the rule on immigrants of Asian descent because nearly three out of four speak languages other than English at home and 35 percent have limited English proficiency. Other commenters stated that this requirement favors immigrants from wealthier, European countries and potentially disfavor immigrants from Latin America, Africa, Asia, the Caribbean, Asia, South America and more.

*Response:* DHS disagrees that the rule imposes a language requirement or impedes LEP individuals from entering the United States. DHS is not imposing an English proficiency requirement for admission to the United States, but solely uses English proficiency as one consideration among others when assessing an alien's education and skills. Additionally, DHS disagrees that considering an alien's proficiency in the English language as a consideration impermissibly discriminates on the basis of national origin or otherwise violates the Equal Protection Clause. Courts have applied rational basis scrutiny to immigration regulations applicable to aliens,[713] and there is a

---

[712] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51190–97 (proposed Oct. 10, 2018).

[713] *Korab* v. *Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) ("[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis . . . The difference between state and federal distinctions based on alienage is the difference between the limits that the Fourteenth Amendment places on discrimination by states and the power the Constitution grants to the federal government over immigration.") (citation omitted); *Lewis* v.

Continued

rational and non-discriminatory basis for consideration of English proficiency as an element of the education and skills factor. As explained in the NPRM, consideration of English proficiency in determining whether an applicant is likely to become a public charge is based on the fact that an inability to speak and understand English may adversely affect whether an alien can obtain employment,[714] which is consistent with the Census Bureau study cited in the NPRM.[715] During the drafting of this final rule, DHS also considered the Social Security Administration analysis published in that agency's notice of proposed rulemaking that showed high levels of labor market participation among individuals with LEP, and an increase in LEP labor market participants over time.[716] Upon considering this information, DHS believes, however, that while individuals with LEP may be working in the United States, the jobs these individuals may be holding low skilled jobs which are typically available at lower pay. Because the purpose of this rule is to ensure that aliens are self-sufficient, such lower paying jobs may not denote the same

*Thompson,* 252 F.3d 567, 570 (2d Cir 2001) (citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000) (''We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration . . . .'')).

[714] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51195 (proposed Oct. 10, 2018).

[715] *See* Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 2 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf* (last visited July 26, 2019).

[716] Removing Inability To Communicate in English as an Education Category, Proposed Rule, 84 FR 1006, 1008 (Feb. 1, 2009). (''In absolute numbers, the working age population (ages 25–64) with LEP increased from approximately 5.4 to 17.8 million between 1980 and 2016, while more than doubling, from 5.1% to 10.5%, as a percentage of the population. Within this group, the number of individuals who spoke no English more than quadrupled from approximately 682,000 to 2.8 million (representing growth from 0.6% to 1.7%, as a percentage of the working age population). Between 1980 and 2016, the number of non-English speaking workers in the 25–64 age range grew from approximately 373,000 to 1.7 million. During the same period, the labor force participation rate for working age individuals who speak no English increased from approximately 54.7% to 61.5%.41. Notably, considering the working age population with ''less than high school diploma,'' the 2016 labor force participation rate for those speaking no English (60.5%) surpassed the labor force participation rate of those speaking ''only English'' (48.9%). In 1980, the reverse was true; working age individuals with less than a high school diploma speaking only English had a 60.7% labor force participation rate that exceeded the 54.5% rate for those speaking no English. The increase in labor force participation by individuals who lack English proficiency may be in part due to the increase in low-skilled work in the national economy.'' (internal citations omitted)).

level of self-sufficiency as jobs that may be held by an individual who are able to effectively communicate in English and who may be employed in a higher skilled, higher paying job. Therefore, DHS has retained the consideration of English proficiency.

The consideration of English proficiency is thus based on the factually neutral likelihood of someone obtaining sufficient employment to avoid becoming a public charge and not on a discriminatory motive. The alien is not precluded from bringing forth any other consideration, which will be considered under the circumstances of the particular alien.

*Comment:* A commenter stated the agency should indicate how it would test English language proficiency, as developing a test similar to the citizenship test would be costly in terms of development, training for immigration officers, and the time it takes to conduct the test at each individual interview. A few commenters said the rule has no fair or narrowly tailored process for assessing language ability, which will result in arbitrary decisions and will lead to abuse of discretion and discriminatory conduct. The commenters also stated that the proposed rule does not explain how DHS will make this determination and does not explain what level of English language proficiency is needed, how individuals can demonstrate that ability, or how staff will verify the appropriate level. A few commenters stated that, if English proficiency is to be considered, there needs to be a clear definition for what that means and how it will be determined and not left to the USCIS' opinion or sole determination. Another commenter expressed similar concerns over how the English proficiency requirement would be measured, remarking that the NPRM does not indicate what tests might be employed, whether they would be standardized, what questions might be asked so that a test is administered uniformly, whether an adjudicator would perform the test, whether there would be exceptions or accommodations available, whether the test would be in writing or administered orally, and how an officer would evaluate an applicant's proficiency in other languages.

*Response:* DHS disagrees with some commenters' assessment that the current content of the NPRM and the related documents provided as part of the proposed rulemaking insufficiently outlines the considerations that DHS will be employing to assessing the alien's education and skills. Evidentiary requirements for purposes of the public charge determination are outlined in the

rule and in Form I–944, which includes questions on education and language skills. In general, certifications in a language or other evidence demonstrating an alien's education in the English and any other languages, for example, may demonstrate that the alien has attained some proficiency in the English language or another language. DHS is not requiring an English proficiency written test or provide a reading or writing test. Instead, DHS would review the documentation of English proficiency such as certifications or an alien's transcript for a course of study that was primarily in English (such as a native speaker's secondary school transcript). In addition, USCIS may confirm an alien's speaking and understanding of the English language through the question and answer process of the I–485 form during the adjustment of status interview.

*Comment:* A commenter stated that English proficiency is not required for employment in the United States and cited employment statistics that indicate there is demand for a workforce that is not necessarily proficient in English. Other commenters asserted that the proposed rule fails to consider that immigrants may travel and secure employment in other areas where multiple languages are spoken alongside English. Similarly, other commenters indicated that this rule assumes that non-English speakers cannot perform jobs where English is not required, citing agriculture as an example and claiming the H–2A visa program itself does not require English to work temporarily in agriculture. Many commenters indicated that this rule would improperly reject many people with practical job skills doing essential work in our economy that have limited formal education and English proficiency and highlighted farmworkers as an example.

*Response:* DHS understands that English proficiency is not required to be employed in the United States. DHS is not requiring or mandating English proficiency as a requisite to immigrating to the United States. English proficiency is a consideration in the assessment whether the alien possesses education and skills sufficient to maintain or obtain employment as to not likely to become a public charge. As explained in the NPRM,[717] data on the relationship between the level of English proficiency and employment as well as public benefits participation highlights that proficiency in the English language is a

[717] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51195 (proposed Oct. 10, 2018).

relevant consideration. DHS will consider all circumstances of the alien's case and all factors in the totality of the circumstances; therefore, no single factor is outcome determinative in this assessment, including the lack or the existence of English proficiency. In individual circumstances, DHS would also consider the alien's employment as a positive factor despite lack of proficiency in English.

*Comment:* Many commenters addressed the 2014 SIPP data about the use of benefits by populations at various levels of English language ability cited by DHS. A commenter asserted that DHS failed to provide any causal linkage between the data cited and its conclusions. A commenter stated that the survey relied upon cross-sectional studies that capture information from a given point in time and that DHS does not cite longitudinal studies that follow the same population and capture relevant information over time. The commenter said DHS cannot predict whether an individual non-citizen is likely to become a public charge in the future based on such studies. One commenter cited information showing that while children of newly-immigrated families speak a non-English language at home, English language learning children are amongst the most successful students at school in the United States, especially once they become fully proficient in English. The commenter stated that this information contradicts studies cited by DHS.

*Response:* DHS discusses English proficiency as an indicator of potential public benefits receipt, which does not rely on an assumption that the relationship is cause-and-effect. The cross-sectional analysis showed that not being proficient in English is an indicator of public benefit receipt in the near term, which is considered in the public charge determination. The DHS analysis shows a relationship between public benefit receipt and English proficiency among adults age 18 and over, and does not describe outcomes for the population of English language learning children, so the results of the studies do not appear contradictory.

*Comment:* Multiple commenters stated that DHS failed to consider alternative reasons that people who are LEP may be more likely to access benefits, adding that that states that have high numbers of LEP populations, such as New York and California, also have high income thresholds for Medicaid. The commenters concluded by stating that three out of the four studies DHS cited used data derived from Europe, while the fourth relies on

Current Population Survey data nearly 30 years old, which is insufficient to support DHS's proposed change.

*Response:* DHS analysis showed that lack of English proficiency was a factor that affected the likelihood of receiving welfare. DHS does not dispute that likelihood of public benefits receipt may also be affected by the state of residency. DHS's findings were not interpreted to suggest that lack of English proficiency necessarily led to welfare receipt, or that there was any causal relationship between the two. As such, complex inter-relationships such as the one mentioned were not investigated. The studies provided by DHS regarding English proficiency included SIPP data representing U.S. noncitizens in 2013,[718] as well as a study using data from the 2000 Census.[719] One report that was referenced was international in its scope, and included a discussion of different European countries, as well as the United States.[720]

*Comment:* A few commenters stated multilingualism should be considered an asset. Another commenter indicated that DHS based its consideration of English proficiency or additional languages on the assumption that English skills are required to enter the U.S. job market. According to the commenter, however, the large number of Spanish speaking workers in the construction industry undermined the premise that English skills are required to enter the U.S. job market. The commenter acknowledged that DHS would consider other languages depending on their market value, but that the rule was silent on considerations guiding this determination, such as the market value assessment for Spanish skills. Therefore, the commenter suggested that the rule

should explicitly indicate that Spanish skills have a high market value, at least in the construction industry.

*Response:* DHS will consider the ability to speak other languages in addition to English as part of the totality of the circumstances when evaluating all of the relevant skills that apply to an alien's employability, education and skills. The ability to speak a language or language proficiency may have differing impacts depending on the nature of the work and the employer, and is best considered individually in the context of each alien's application in the totality of the circumstances. DHS recognizes that certain professions or employment require that an alien speak another language in addition to English. However, the public charge assessment is geared toward becoming a public charge in the United States; the data presented in the NPRM [721] clearly demonstrated a connection between the inability to speak and understand English in relation to employment, public benefit receipt, and financial status. Therefore, DHS retained the English proficiency provision. However, nothing in the regulation precludes an alien from presenting evidence and consideration relating to education or skills other than the considerations mentioned in the regulation; all considerations will be evaluated based on the totality of the circumstances.[722]

### 3. Skills

*Comment:* A commenter indicated that the expanded negative weights for educational/skills attainment conflict with longstanding policy and principles that support upward mobility and self-sufficiency. Another commenter indicated that DHS failed to describe how DHS will consider, among other things, the education and skills requirement. The commenter stated that the rule could prejudice the many foreign-born workers in the construction worker industry, who have little formal education but skills that are in high demand and that these workers earn a good wage. The commenter suggested that DHS should change the requirement that it considers "no high school diploma or other education or skills" as a negative factor in the public charge analysis, and that DHS should instead consider education only as a positive factor. The commenter suggested that in the alternative, the lack of education should only be considered a negative factor when coupled with unemployment. The commenter stated that DHS fails to

---

[718] *See* Table 24, Inadmissibility on Public Charge Grounds, 83 FR 51114, 51196 (proposed Oct. 10, 2018).

[719] *See* Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, How Does Ability to Speak English Affect Earnings? 6 (2005), available at *https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf* (last visited July 26, 2019).

[720] Barry R. Chiswick & Paul W. Miller, Immigrant Earnings: Language Skills, Linguistic Concentrations and the Business Cycle, 15 J. Population Econ., 31, 31–57 (2002); Christian Dustmann, Fluency, Writing Fluency, and Earnings of Migrants, 7 J. Population Econ., 133, 133–156 (1994); Ingo E. Isphording, IZA Discussion Paper No. 7360, Disadvantages of Linguistic Origin: Evidence from Immigrant Literacy Scores (2013), available at *http://ftp.iza.org/dp7360.pdf* (last visited July 26, 2019); Org. for Econ. Cooperation & Dev./European Union, Indicators of Immigrant Integration 2015: Settling In (2015), available at *http://www.oecd.org/els/mig/Indicators-of-Immigrant-Integration-2015.pdf* (last visited July 26, 2019).

[721] *See* 83 FR 51114, 51195–97.

[722] *See* 8 CFR 212.22(a) and 8 CFR 212.22(b)(5).

define "skills" and expressed concern that the skills that workers have may be difficult to demonstrate as an evidentiary matter and that this could cause DHS adjudicators to improperly discount skills that often take many years to develop. Along with providing certain data noting that a significant percentage of both foreign-born (over 90 percent) and native-born workers (over 85 percent) in the construction industry do not have a four-year college degree, the commenter pointed out that, for example, a brick layer may be highly skilled but lacks a way of demonstrating a formal certification. The commenter requested that the final rule explicitly indicate that Spanish language skills have a high market value, at least for those in the construction industry. The commenter also suggested that Form I–944 be amended to clarify that DHS will consider experience-based construction skills in the analysis, as the form as currently drafted largely focuses on the certification.

Another commenter suggested that DHS amend its consideration of education and skills as a prerequisite to legal immigration because the legal immigrants that are entering the direct care workforce are entering a career pathway to a successful lifelong career. The commenter stated that although many such immigrants have increasing levels of responsibility, the workforce is not highly skilled. The commenter reasoned that preventing some of the most eligible individuals from entering the United States prevents them from addressing the direct care workforce deficit, which will negatively impact people with disabilities and the elderly in the United States, which rely on this workforce to maintain their well-being and quality of life.

A couple of commenters stated that although agricultural work is considered unskilled labor under some technical definitions, it is in fact a skilled occupation requiring years of experience to gain the necessary knowledge, precision, exercise of judgment, endurance, and speed that many of these workers already have and which contribute to their employer's profitability. The commenters concluded by arguing that that the proposed rule would improperly reject the value of many farmworkers' contributions to our economy and society. Similarly, a commenter expressed their concern that the "skills" component of the education and skills factor is undervalued by the proposed rule. The commenter stated that this narrow view of skilled work will have a particularly harmful impact on immigrants who staff many vital

occupations, such as healthcare support and personal care, for which certification procedures do not exist, but on which many in the United States may depend.

*Response:* Education and skills are mandatory statutory factors as established by Congress under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS disagrees that it did not sufficiently outline the consideration of the factors in the NPRM.[723] DHS appreciates the suggestions from commenters, including the suggestions relating to the construction industry. However, DHS will not remove the lack of a high school diploma or other education or skills provisions from the rule as a negative factor in the public charge analysis. Further, DHS will consider both the positive and negative factors associated with education and skills, as described in the NPRM. As evidenced by the commenters addressing various industries, each industry and area of employment may be different. The DHS proposed rule is flexible enough to account for all factors and circumstances in any particular industry and an individual's case so that each alien may set forth the considerations applicable to him or her demonstrating why the individual is not likely to become a public charge.

As discussed in the NPRM, education has been found to have a significant impact on public benefit usage. As it is possible for an alien to be employed and still be a public charge, the mere fact of employment cannot categorically remove education from an analysis of the totality of the circumstance because education is a statutorily mandated factor. Although education would certainly weigh positively, the exact nature of the education (or lack thereof) and employment would have to be considered. The level and quality of the education attained by a prospective immigrant can help estimate how likely they are to become a public charge. Therefore, while not having high school diploma or other education or skills are generally a negative factor, the lack of a high school diploma, for example, may be overcome by skills or other positive circumstances.

DHS agrees that skills gained as part of employment are positive even when certifications are not available. Regardless of occupation, an alien may demonstrate that he or she has skills through employment that are positive factors. This showing will not be focused on construction, but generally,

be applicable to all job skills. Overall, education and skills will be considered as part of the totality of the circumstances. DHS is not mandating any particular level of education or skill to overcome a public charge inadmissibility determination.

*Comment:* One commenter stated that using both DOL, which already has education and skills criteria for immigrants entering the country to work, and DHS to evaluate labor needs and skills was redundant, unnecessary, and a waste of public funds.

*Response:* DHS disagrees that the rule conflicts with DOL's evaluation of labor needs and skills. Under this rule, DHS will be considering whether an alien possesses education and skills that would contribute to the alien being employable in the United States and thus able to be self-sufficient. This determination does not entail determining whether an alien meets an employer's minimum job requirements for a particular position or qualifies for employment in a particular occupational classification. In addition, even if an alien is found to not possess any education or skills but instead has sufficient financial means to support himself or herself and any dependents, DHS may determine in the totality of the circumstances that the alien is not likely to become a public charge. In contrast, DOL has a statutory mandate to certify before an alien may be admitted in certain employment-based immigrant classifications that there are no able, willing, qualified, and available U.S. workers to perform the job for which an employer seeks to hire the alien, and that the alien's employment will not have an adverse effect on the wages and working conditions of similarly employed U.S. workers. In doing so, DOL examines whether the alien's education, skills, and job qualifications meet the employers' stated minimum job requirements. Therefore, the two departments fulfill two different responsibilities in the immigration process.[724]

*Comment:* A commenter asserted that DHS does not have the ability to adequately evaluate occupational skills, certifications, or licenses, and many occupations do not require them. The commenter stated that this requirement would cause a great burden on employers and agencies who must comply with these new requests.

*Response:* DHS will evaluate all occupational skills, certifications, licenses, and any other evidence that

---

[723] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189–51196 (proposed Oct. 10, 2018).

[724] *See* INA section 212(a)(5)(A), 8 U.S.C. 1182(a)(5)(A), 20 CFR and 656.1 (DOL's labor certification requirements for immigrant workers).

establishes a skill in an occupation, as presented by the alien. The alien has the burden to establish that he or she qualifies for the immigration benefit and is not inadmissible.[725] Generally, forms and their instructions outline, in detail, the necessary evidence to apply for a benefit; similarly Form I–944 and its instructions outline possible evidence that an alien can submit to establish that he or she has the requisite education or skills as to be able to maintain or obtain employment. If USCIS believes that the alien has not submitted sufficient evidence to establish that he or she is not likely to become a public charge, where applicable, it may issue a RFE or a NOID to obtain clarification.[726]

### 4. Employment

*Comment:* A commenter indicated that because immigrants who are in the United States without work authorization are not able to work legally, it will be impossible for many immigrants to demonstrate their past employment history. The commenter stated that the proposed rule will therefore place immigrants in an impossible situation: if they comply with the law that prohibits them from working without having first obtained employment authorization, they will forfeit the ability to obtain legal status because they will be unable to show current employment or a recent history of employment. Another commenter stated that DHS cannot accurately assess an individual's likelihood of becoming a public charge if DHS does not first grant work authorization to such an individual.

Other commenters stated that certain visas, such as the K–1 fiancé visa, do not permit a grantee to work. Another commenter stated that the use of an employability factor in a public charge determination would put many immigrants in a catch-22 where their options would be to either work illegally and be denied citizenship or not work and be denied immigration status due to lack of employment. Another commenter suggested that an applicant should be given time to enter the country and work before being subject to the public charge test.

*Response:* As discussed in the NPRM, DHS recognizes that not everyone subject to this rule is authorized to work in the United States. Although an applicant may not be authorized for employment in the United States at the time of filing the adjustment of status application, he or she may have employment history in a foreign

country, or volunteer work experience in the United States, that will be considered as part of the totality of the alien's circumstances.

However, DHS notes that it would consider any employment history outside the United States as part of the public charge inadmissibility determination. Moreover, USCIS would also review the likelihood that the alien will work upon filing for or being granted adjustment of status, *i.e.,* when authorized to work. In addition, USCIS would consider whether the alien may have sufficient assets and resources, including a pension or a household member's assets and resources, which may overcome any negative factor related to lack of employment. The assets and resources would include those of the household, which may include a sponsor when the sponsor is part of the household.

DHS will not, however, include provisions in this rule to provide aliens subject to this rule time to enter the country and work before being subject to the public charge inadmissibility determination. As noted previously, the public charge ground of inadmissibility applies at the time of the alien's application for a visa, admission, or adjustment of status.

*Comment:* Some commenters provided input on how the employment history requirements impacts domestic violence survivors. These commenters indicated that DHS disregards the reality of many crime survivors who are faced with losing their jobs due to intense trauma, reduced productivity, harassment at work by perpetrators, and other reasons stemming from violence. One commenter stated that secure immigration status can help survivors of abuse access employment opportunities, escape violent relationships, and help alleviate the trauma they have suffered. This commenter stated that the proposed rule is actually setting up barriers to employment for survivors, which is also a barrier to self-sufficiency. Other commenters stated that several studies have documented how domestic violence perpetrators deliberately try to sabotage their victims' efforts to obtain and keep paid employment; that domestic violence survivors are forced to become dependent on their abusive partners' incomes; or that some survivors have had their work permits or lawful permanent residence cards taken by their abusers, making it impossible to show that they had legal authorization to work and had to, at times, pay filing fees to get their replacement documents. One commenter stated that half of women who experienced sexual assault

had to quit or were forced to leave their job within the first year and stated that by heavily weighting the lack of employment, the proposed rule doubly penalizes a victim for the economic effects that domestic violence and sexual assault abusers perpetrate.

*Response:* DHS appreciates the commenters' input. As explained in the NPRM, USCIS will assess the alien's education and skills with the focus whether the alien has adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge.[727] As part of the assessment, USCIS will consider the totality of the alien's circumstances, including any and all factors and considerations set forth by the alien. Furthermore, T and U nonimmigrants, VAWA self-petitioners, and others listed in 8 CFR 212.23, are generally exempt from inadmissibility on account of public charge and therefore, they are not likely impacted by this regulation.

*Comment:* One commenter stated requiring employment history would be problematic for many international students attending American universities, arguing that that foreign nationals on student visas are generally not permitted to work while engaging in studies on the F–1 visa. This commenter stated that nearly one-quarter (20 out of 91) of the billion-dollar startup companies had a founder who first came to the United States as an international student, and stated that holding student loan and credit card debt against the students could have a negative impact. The commenter stated that, under the proposed rule, these individuals would be subject to the public charge test even as nonimmigrants when seeking to change status from that of a student to that of an employee on an employment-based visa.

*Response:* DHS does not require that the alien have an employment history as part of the public charge determination. As discussed above, DHS has removed the forward-looking determination for nonimmigrant applicants for extension of stay or change of status. Therefore, DHS would not be reviewing the factors for nonimmigrants applicant for extension of stay or change of status, such as students. Further, the NPRM indicates that for purposes of the assessment of employment and skills, USCIS' considerations include, but are not limited to the alien's employment history.[728] In general, students acquire skills as part of their studies; also, USCIS would not consider it to be a

---

[725] *See* INA section 291, 8 U.S.C. 1361.
[726] *See generally* 8 CFR 103.2.

[727] *See* 8 CFR 212.22(b)(5).
[728] *See* 8 CFR 212.22(b)(5).

heavily weighted negative factor if a student, applying for adjustment of status for a valid basis, is not working because she or he lacks employment authorization. For these reasons, DHS does not believe that students in universities in the United States will be adversely impacted by DHS's consideration of the education and skills factor, as set forth in this rule.

*Comment:* A commenter stated that pregnant women may be forced to leave the work force and stay home to deal with medical complications of a pregnancy or to care for a child during the first months, due to reasons such as the high cost of out-of-home daycare, and that therefore, they will be less likely to show employment history. A few commenters stated that consideration of employment history would unfairly discriminate against women, particularly those who stay home and care for their children. Another commenter stated that often the work of a caregiver, such as a stay-at-home parent or grandparent, is vitally important for the emotional and financial well-being of a family. One commenter remarked that the rule unfairly penalizes individuals who may have additional caregiving responsibilities due to a child's special needs, inability to afford child-care, or even religious beliefs.

*Response:* As indicated throughout this rulemaking, DHS will assess the likelihood of becoming a public charge based on the totality of the circumstances of the individual's case. While there are certain temporary medical conditions or other conditions that may require an individual to interrupt a certain employment activity or have a temporary absence, one can hardly regard such incidents as negating an individual's employment history, or his or her education or skills generally. Additionally, the applicant may bring forward evidence to establish that he or she has adequate education and skills to either obtain or maintain employment to avoid becoming a public charge.

DHS acknowledges that an MPI paper observed that women could encounter difficulty with the totality of circumstances analysis, because women comprised 70 percent of the over 43 percent of recent green card holders who were neither employed nor in school. MPI added that many immigrant women do not work because of child care responsibilities and child care costs.[729] In instances such as this where

a mother is not currently employed and is raising children, DHS would not exclusively focus on the mother's lack of current employment. DHS would also take into full account other factors that could be favorable to the mother and could outweigh her current unemployment: her household's income, assets, and resources; an affidavit of support and relationship to her sponsor, if applicable; and her reasonable prospects to obtain and maintain lawful employment based on her age, education, skills, and any previous work history. This same level of consideration would also apply to other similarly situated parents, guardians, and caregivers who are currently unemployed or who are employed part-time.

Consistent with the above, and following consideration of these and other comments about contributions of caregivers, DHS is adding under the Education and Skills factor an additional positive consideration, namely whether the alien is a primary caregiver of another person in the alien's household. This will be taken into consideration in the totality of the circumstances, and is intended to account for difficult-to-monetize contributions by aliens who may lack current full time employment or recent employment history due to their unpaid engagement in the household. As with all other considerations, the consideration of whether an alien is a primary caregiver would not alone establish that an alien is not likely at any time in the future to become a public charge. Rather, DHS would not consider it a negative factor if an alien of a working age who would normally be employable lacks full time employment, or a recent employment history. This consideration could cover a range of circumstances, including, for example, a parent who stays at home to care for a newborn child, or an adult child who stays at home to care for an elderly parent. DHS has limited this consideration so that only one alien within the household can be considered the primary caregiver of the same person in his or her household. Because some commenters responding to various aspects of the totality of the circumstances analysis raised concerns about "double counting" negative factors, DHS notes that it will only take the primary caregiver role into consideration if relevant, *i.e.,* DHS will not use this consideration to negatively compound the absence of full time

employment or recent employment history if the alien is *not* a primary caregiver. As indicated above, DHS has also added a definition of "primary caregiver" under 8 CFR 212.21(f) to correspond to this provision; primary caregiver means an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

*Comment:* Multiple commenters wrote that the rule misunderstands the nature of low-wage work, indicating that there are not simply "people who work" and "people who receive benefits," rather there is an overlap between the two groups.

*Response:* DHS understands that there is an overlap between "people who work" and "people who receive benefits." People who are employed but nonetheless receive public benefits may not be self-sufficient. However, the fact that an alien who is subject to a public charge inadmissibility determination has in the past received public benefits is not outcome determinative. Whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge depends on a review of a range of factors, including work history, in the totality of the circumstances.

### N. Affidavit of Support

*Comment:* Several commenters stated that the affidavit of support is sufficient to satisfy the standard because the sponsor agrees to provide the necessary financial support or to reimburse providing agencies. One commenter stated that the Form I–864 already provides a method for objective public charge analysis. Many commenters stated that Form I–864 creates a legally binding contractual agreement between the petitioner/sponsor and the government that the intending immigrant will not receive public benefits. Some of the commenters indicated that relegating the Form I–864 to a mere factor and proposing to replace it with a bond eliminates the true potential of the Form I–864: to deter new immigrants from applying for government assistance. The commenters stated that in lieu of the Form I–864, the government now proposes to increase the use of public charge bonds and the bond amount to levels that most immigrants will not be able to pay, and involves a third party private bond company. One commenter stated that the proposed heavily weighted factors do not achieve the stated goals of the rule; the commenter indicated that the agency has not stated a sufficient reason

---

[729] *See* Capps, Randy et al, "Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration," Migration Policy Institute. (November 2018). Available at: *https://*

*www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 26, 2019).

why the existence of a binding contract from a financially-capable sponsor, such as the affidavit of support that used to be sufficient for public charge purposes would not satisfy the standard for purposes of public charge, and others stated that this is especially the case, when the question addressed with the affidavit of support is whether an immigrant is likely to become a public charge. Another commenter stated that the affidavit of support, by statutory definition, requires the immigrant to demonstrate financial support to ensure that he or she is not a public charge, but the rulemaking arbitrarily relegates the affidavit of support to a non-substantial factor. The commenter disagreed that the affidavit of support should just be one factor and stated that the proposed rule allows for the possibility of a heavily weighted factor to outweigh the contractual showing of the sponsorship, as outlined by Congress. The commenter also stated that without according the affidavit of support any weight, the NPRM effectively eviscerated the affidavit of support process and goes against congressional intent to establish clear guidelines and a meaningful measure of likelihood of becoming a public charge.

Two commenters stated this proposed regulation diminishes the consideration of a sufficient affidavit of support in the determination of likely to become a public charge, and drastically diminishes the sponsor's role as they exist within the current standards. One commenter said the affidavit of support requirement can be hard to meet for some potential adjustment of status applicants. The commenter said if the petitioner's income and assets are not adequate, it can be difficult to find another person (a ''joint sponsor'') who is willing to hand over their sensitive identification and financial documents and sign a binding contract to ensure the intending immigrant will not depend on public benefits.

A few commenters indicated that the current system already places a high burden on petitioners and immigrants, and that the affidavit of support system has done a good job in making sure that immigrants will not become public charges after entry. One commenter said the demotion of the affidavit of support is another way that the re-framed totality of circumstances would allow only those already with resources to enter or remain in this county. Similarly, commenters stated this rule would make it harder for low-income immigrants to get their green card or visa, and tilt away from family-based immigration to a wealth-based system that would be both deeply unethical and

entirely inconsistent with laws and policies in the United States.

Another commenter stated that the focus should remain on the sponsor and their ability to maintain the intending immigrant at 125 percent of the FPG, asserting that DHS should only consider the other heavily weighted factors in ''unusual cases.'' Another commenter stated that the proposed rule shifts the focus of an applicant's eligibility away from an applicant's sponsor and onto the applicant.

*Response:* DHS rejects the assertion that the rule shifts the emphasis away from the affidavit of support, as the statute does not require or even permit DHS to focus the public charge inadmissibility determination solely on the affidavit of support. In fact, the minimum mandatory factors that must be considered as part of the public charge inadmissibility determination under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), do not include the affidavit of support. Rather, Congress added that any affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, may be considered in the public charge inadmissibility determination.[730] An affidavit of support is required for most family-sponsored immigrant applicants and certain employment-sponsored immigrant applicants, and the absence of a sufficient affidavit of support will result in an inadmissibility finding.[731] Because the lack of a sufficient affidavit of support, when required, automatically results in a finding of public charge inadmissibility, it would be inconsistent with the statute to place an emphasis on the affidavit of support in the public charge determination. Under this rule, DHS will give positive weight to a sufficient affidavit of support, but it would not, and cannot under the statute, be outcome determinative.

*Comment:* Another commenter asserted that the proposed rule does not provide any standards for evaluating factors or the likelihood that the sponsor would actually provide the required financial support to the alien, and that such vagueness invites officers to make decisions on the basis of their personal assumptions and biases, which will almost certainly result in inconsistent application of the standards. Another commenter also stated that DHS's justification for independently considering the sponsor's income and resources, relationship to the applicant and the likelihood of supporting the

applicant, or any other related considerations, is inadequate as it fails to provide a standard for evaluating these standards, and will lead to inconsistent decisions that are also based on officer's assumptions and biases and exceeds the statutory wording in regard to affidavits of support. Additionally, referring to a 1998 DOS cable on the sufficiency of affidavits of support, the commenter indicated that the proposed provision upends, without justification, prior practice that instructed that the intent of the sponsor and the verification of the sources is not a consideration once a sufficient affidavit of support has been presented. The commenter furthermore indicated that DHS justification and evidence—referring to reports that are nine and sixteen years old—does not support the agency's position. Another commenter stated that the proposed rule creates opportunities for arbitrary decision-making when assessing one's family status or financial status, because the rule tasks the adjudicator with assessing the closeness of the sponsor-alien relationship and with the assumption that a close family member ''would be more likely to financially support the alien if necessary.'' The commenter indicated, however, that the closeness of a relationship is a subjective determination and not necessarily based on the existence of a blood relationship but rather on personal connections and history that an outside adjudicator would find difficult to comprehend. Similarly, another commenter provided that evaluating the relationship between a sponsor and an applicant may be particularly prejudicial if the agency fails to account for cultural differences in family dynamics. A commenter stated that, once an affidavit of support is determined to be legally sufficient, DHS should not substitute its agents' judgment for that of Congress by requiring a different income threshold or encouraging them to speculate about a sponsor's relationship to an applicant.

Another commenter said the guidance in the FAM, which explains that a joint sponsor ''can be a friend or a non-relative who does not reside in and is not necessarily financially connected with the sponsor's household'' was consistent with the statutory language at section 213A of the Act, 8 U.S.C. 1183a that defined the requirements of a ''sponsor'' but does not include a requirement that a joint sponsor have a familial relationship to the immigrant.

*Response:* DHS does not believe that the proposed public charge inadmissibility determination, including the consideration relating to

---

[730] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii).

[731] *See* INA section 212(a)(4)(C) and (D), 8 U.S.C. 1182(a)(4)(C) and (D).

**41440**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

the affidavit of support, is not sufficiently detailed or nebulous. DHS put forth a detailed assessment of the factors and how they are applied in the NPRM. Additionally, DHS provided additional information in the proposed forms and the form's instructions. As provided in the NPRM, a sufficient affidavit of support does not guarantee that the alien will not receive public benefits in the future and, therefore, DHS would only consider the affidavit of support as one factor in the totality of the circumstances.[732] The inability or unwillingness of the sponsor to financially support the alien may be viewed as a negative factor in the totality of the circumstances. DHS expects that a sponsor's sufficient affidavit of support would not be an outcome-determinative factor in most cases; the presence of a sufficient affidavit of support does not eliminate the need to consider all of the mandatory factors in the totality of the circumstances.

USCIS would assess the sponsor's annual income, assets, resources, and financial status, relationship to applicant, the likelihood that the sponsor would actually provide financial support to the alien, and any other related considerations. In order to assess the sponsor's likelihood of meeting his or her obligation to support the alien, DHS would look at how close of a relationship the sponsor has to the alien, as close family members would be more likely to financially support the alien if necessary. DHS would also look at whether the sponsor lives with this alien, as this could be indicative of the sponsor's willingness to support the alien if needed. Additionally, DHS would look at whether the sponsor has submitted an affidavit of support with respect to other individuals, as this may be indicative of the sponsor's willingness or ability to financially support the alien.

DHS furthermore disagrees with the commenters' assessment in regard to the weight provided to a sufficient and properly executed affidavit of support. The statute, under section 213A of the Act, 8 U.S.C. 1183a does not mandate that the affidavit is outcome determinative, nor does it limit DHS's discretion how to weigh the affidavit in the totality of the circumstances: It simply puts forth that ''[n]o affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not excludable as a public charge under section 1182(a)(4) of this title'' and

provides the requirements for a valid affidavit of support. The guidance of how to assess it is contained in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which specifically provides that the lack of an affidavit of support, where required, renders an applicant inadmissible on the public charge ground; the statute further states an officer may consider any affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, when assessing the public charge ground of inadmissibility.[733] DHS, therefore, determined that it will consider the affidavit of support as a factor in the totality of the circumstances.[734]

The statute under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) also does not mandate how much weight an affidavit of support must be given. Therefore, it is appropriate for DHS to regulate that the weight should be assessed based on the sponsor's annual income, assets, resources and his or her financial status, as well as the closeness of the relationship which would be indicative of the willingness and ability of the sponsor to financially support the alien.[735] DHS appreciates the reference to DOS' guidance on that issue, but DOS guidance is not binding on DHS.

In sum, the INA does not preclude DHS from establishing a framework for officers to provide the appropriate weight of the affidavit of support within the totality of the circumstances. In cases where the statute requires an alien to submit an affidavit of support and the alien fails to do so, the statute mandates a finding of public charge inadmissibility.[736] As explained in the NPRM,[737] however, the submission of a sufficient affidavit of support does not guarantee that the alien will not receive public benefits in the future. The submission of a sponsor's sufficient affidavit of support also does not eliminate the need to consider all of the mandatory factors in the totality of the circumstances.

*Comment:* A commenter suggested that DHS codify as a ground of exclusion on public charge, that a beneficiary sue the sponsor for reimbursement of listed public funds received, or else be deemed a public charge. The commenter explained beneficiaries have the option, but not the obligation, to initiate a private legal

action against a sponsor who fails to fulfill their contract obligations to support the alien financially. The commenter stated that integrating this as a factor or ground would significantly facilitate DHS's goal of ensuring self-sufficiency. The commenter also said the sponsored beneficiary could also meet this obligation if the sponsor was sued for reimbursement by the funding Government agency. Another commenter stated that, if the concern of DHS is to lessen the financial strain Federal public benefit programs create, then a more effective and less harmful to public-health-and-safety alternative would be to enforce the sponsor's affidavit of support, which is a binding contract as signed.

*Response:* DHS does not have the authority to create such a required ground of inadmissibility under authority of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). Additionally, DHS does not believe adding an additional factor to this rule regarding sponsor reimbursement of any amount of public benefits provided by an applicant is consistent with the public charge ground of inadmissibility, or that enforcing the sponsor's affidavit of support obligation is relevant to the public charge inadmissibility determination.

DHS notes that while the existence of a sufficient affidavit of support, where required to be submitted, is considered as a positive factor in any public charge inadmissibility determination, the sponsorship obligation set forth on the affidavit of support does not attach until *after* the application for an immigrant visa or adjustment of status is granted.[738] The subsequent action of enforcing the affidavit of support is distinct from the actual inadmissibility determination. Therefore, DHS will not, in adjudicating an adjustment of status application, consider the sponsor's potential future reimbursement in a public charge inadmissibility determination when there is not yet a reimbursement obligation. Rather, DHS will consider the existence of a sufficient affidavit of support and the likelihood that the sponsor would actually provide the statutorily-required amount of financial support to the alien, and any other related considerations.

Moreover, the statute is forward-looking and requires DHS to determine whether the alien is likely at any time to become a public charge. While past receipt of public benefits is a factor to consider, the fact that the beneficiary or the funding Government agency seeks

---

[732] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51197 (proposed Oct. 10, 2018).

[733] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[734] *See* 8 CFR 212.22(b)(7).

[735] *See* 8 CFR 212.22(b)(7); *see also* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[736] *See* INA section 212(a)(4)(C) and (D), 8 U.S.C. 1182(a)(4)(C) and (D).

[737] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[738] *See* INA section 213A, 8 U.S.C. 1183a; 8 CFR 213a.2(d).

reimbursement for such receipt is unrelated to an alien's likelihood of becoming a public charge in the future. Imposing such a requirement would not meaningfully contribute to DHS's goal of ensuring self-sufficiency of those foreign nationals in the United States. For these reasons, DHS will not include reimbursement of the cost of public benefits provided to an alien as part of the factors is an appropriate consideration.

*O. Additional Factors To Consider*

*Comment:* A commenter stated that being a past recipient of public benefits should not be a heavily weighted negative factor and suggested that certain positive factors, or considerations, should offset negative factors such as being a caregiver for a U.S. citizen child, being an elderly person or an individual with disabilities, having a child under the age of five, being recently pregnant, being someone who had a temporary health condition which caused the individual to be unable to work which has since improved, and those receiving Medicaid.

*Response:* Aside from the above-referenced clarification with respect to caregivers, DHS will not add additional factors or considerations to the rule along the lines proposed by the commenter. There is no evidence that these listed factors, such as being a caregiver for a U.S. citizen child, being an elderly person or an individual with disabilities, having a child under the age of five, or being a Medicaid recipient, is indicative of self-sufficiency. Although caregivers may benefit the household by eliminating the need for childcare or eldercare expenses, each person must establish he or she is not likely to be a public charge based on the totality of the factors of an individual's circumstances. However, as noted above, USCIS, on an individual basis, may take into consideration that a person is a caregiver for others in the household as part of the Education and Skills factor or that a sponsor provides sufficient support for the alien. When considering whether the alien is likely to become a public charge, DHS will consider the totality of the alien's circumstances. The alien is not precluded from advancing any argument or providing evidence that would indicate that, in the totality of the circumstances, the alien is not likely to become a public charge.

*Comment:* One commenter suggested that DHS should take reimbursement (or the possibility of reimbursement) of public benefits into account when determining whether an individual is

likely to become a public charge. The commenter, while noting that benefits such as costly long-term institutional care were unlikely to be reimbursed, stated that there was no reason to think that very modest amounts of Medicaid or SNAP benefits would not be reimbursed if the public entity providing the benefits sought reimbursement. This commenter noted that the Government has the authority to obtain reimbursement from a sponsor under an affidavit of support. The commenter noted that the current SNAP, Medicaid, SSI, and TANF programs permit reimbursement. This commenter stated that lower thresholds for public charge determinations increase the likelihood of receiving reimbursements of benefits that would push the amount of benefits received below the public charge threshold as set by DHS. And finally, the commenter requested that consideration of reimbursement, and how it will be determined, as part of the regulatory action on public charge, should be done with notice and comment because it is such a major aspect of the rule.

*Response:* Although an adjustment of status applicant who is required to submit a sufficient affidavit of support must submit Form I–864 with his or her application, the sponsor's obligations with respect to the applicant do not become effective until the adjustment of status application is granted. Therefore, at the time the applicant files an application for adjustment of status, there would not be anyone responsible for reimbursing a public benefit-granting agency. The reimbursement of public benefits may be more applicable in the deportability context and out of scope of this rule.

*P. Heavily Weighted Factors General Comments*

*Comment:* A commenter opposed proposed establishment of heavily weighted positive and negative factors in a public charge inadmissibility determination. The commenter indicated the proposed system of heavily weighted negative and positive factors effectively limits an adjudicator's ability to consider the totality of circumstances. Many commenters stated that the proposed rule would yield inconsistent outcomes as there is no clear guidelines to what extent heavily weighted positive or negative factors should inform a final decision. Another commenter stated that the proposed weighting scheme unreasonably under-weighs the most important factors (ability to work in the future and having potential family support) and overweighs several other marginal

factors in public charge determinations. The commenter also indicated that the general considerations are turned into a complex, variable-factor test that always involves more than five factors, and that it will massively increase the error rate for public charge decisions. The commenter indicated that the example in Table 35 in the NPRM and rule specify quantitative weights to the factors. The commenter indicated that the factor labeled "not applicable" has a presumed weight of zero and is not included in the numerator or denominator of any quantitative or qualitative final "score" of the proposed test; and that "heavily weighted factors" have a much greater weight than all other factors. The commenter further assumed that the agency intends each of the applicable factors to have a weight equal to one, and heavily weighted factors have a weight equal to two. The commenter concluded that that while this would be the most straightforward reading of the factors and the tables included in the NPRM, the commenter stated it is actually unclear what the rule requires.

*Response:* DHS disagrees that the standard of identifying heavily weighted factors limits an officer's ability to consider the totality of the circumstances.[739] The heavily weighted factors provide guidance as to how to weigh all the factors present in an alien's case. Each case has different circumstances that will be reviewed in the totality of the circumstances. DHS believes that while the heavily weighted factors are more indicative of an alien's likelihood to become a public charge, these factors, under the totality of the circumstances framework, are still evaluated in conjunction with the other relevant positive and negative factors, and accorded the weight they are due in an alien's individual circumstances. Further, one factor alone, even those that are heavily weighted, will not determine whether an alien is likely at any time to become a public charge.

The totality of the circumstances approach is consistent with the statutory requirement that DHS consider certain minimum factors, as well as a body of administrative case law that has developed over the past 50 years, which generally directs the agency to "consider all the factors bearing on the alien's ability or potential ability to be self-supporting."[740] Additionally, as discussed in the NPRM, DHS has determined that certain factual

[739] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51178 (proposed Oct. 10, 2018).
[740] *See Matter of Vindman* 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977).

**41442**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

circumstances would weigh heavily because DHS considered them to be particularly indicative of an alien being more of less likely to become a public charge.[741] In the sections that follow, DHS addresses public comments regarding specific heavily weighted factors.

Again, the inclusion of heavily weighted factors does not change that the public charge inadmissibility determination is one that is made based on the totality of the alien's individual facts and circumstances. Therefore, DHS disagrees with the commenter's assessment on the quantitative weight assessment of the factors. DHS does not review the factors quantitatively, so there is not a factor that has a weight equal to zero, one, or two. The use of the term "neutral" in the "Weight of Factor" column in Table 35 of the NPRM refers to the fact that the factor is not heavily weighted. The factors would still be positive or negative unless designated as heavily weighted factor.

*Comment:* A commenter stated that the heavily weighted negative factors are highly correlated and "puts a thumb on the scales" against low-income immigrants. A couple of commenters stated that the heavily weighted factors ignore the positive contributions of immigrants to society. A commenter stated that the heavily weighted factors in the proposed rule are not realistic given the realities of the current job market in the United States. A commenter stated that negatively weighted factors in the proposed rule, such as family size or being under the age of 18, are misaligned with efforts to grow the U.S. economy. Another commenter expressed concern that the negative weighted factors ignore the positive impacts receiving public benefits have on future self-sufficiency.

*Response:* As explained in the NPRM, the mere presence of any of the factual circumstances listed in the rule would not, alone, be outcome determinative. A circumstance that the rule designates as warranting heavy weight might be outweighed by countervailing evidence in the totality of the circumstances.[742] Other evidence may also be probative of an alien's likelihood to become a public charge in the context of an alien's individual circumstances.[743] Therefore, the public charge inadmissibility determination, as proposed in the NPRM and as set forth in this final rule,

is neither a formulaic scheme nor will it ignore important considerations in an alien's case, such as the alien's ability to work or the family support that she or he receives, or any other positive contributions by the alien that demonstrate self-sufficiency.

DHS also disagrees that the heavily weighted factors are not realistic given the realities of the current job market in the United States and that these factors are misaligned with efforts to grow the U.S. economy. This rule is designed to better ensure that those seeking to come to and remain in the United States either temporarily or permanently are self-sufficient, as directed by Congress.[744] However, DHS notes that as addressed elsewhere in this rule, this rule does not aim to address the U.S. economy or the U.S. job market.

*Comment:* Several commenters stated that four in ten noncitizens who entered the United States without a green card would have characteristics that would be considered heavily weighted negative factors. Many commenters stated that the heavily weighted factors would disproportionately affect immigrant women; survivors of domestic and sexual abuse; immigrants with disabilities; immigrants with HIV and other chronic health conditions; LGBTQ immigrants; children and families; seniors; multigenerational families; racial and ethnic minorities; and AAPI immigrants. For example, several commenters stated that the employability factor would negatively and disproportionately impact survivors of sexual and domestic violence. A commenter stated that women are more likely to be victims of harassment at work, and are more likely to face negative consequences if they speak out. Another commenter stated that the employability factor and receipt within the previous 36 months of one or more public benefits above the threshold would unfairly affect individuals with disabilities. Some commenters stated that survivors of domestic and sexual abuse would be disproportionately affected by heavily weighting recent receipt of one or more public benefits. A commenter stated that the proposed rule's lookback period will negatively impact pregnant women as well as women and families with children because they are eligible to receive benefits for a longer period of time. Another commenter stated that using recent receipt of public benefits as a heavily weighted negative factor would have disastrous effects on those receiving Medicaid. Several commenters stated that the heavily weighted

negative factor for lacking financial means to pay for reasonably foreseeable medical costs would disproportionately harm immigrants with disabilities, and those living with chronic medical conditions. Several commenters stated that this proposed factor would disproportionately affect survivors of domestic and sexual abuse, and certain subpopulations of Asian Americans.

*Response:* DHS understands that the rule may result in more public charge inadmissibility findings, which may have specific effects on certain groups. For example, the rule will affect some aliens who have low incomes; however, income is relevant to the alien's assets, resources, and financial status, which DHS is required to consider in determining whether an alien is likely at any time to become a public charge in the totality of the circumstances. Similarly, DHS understands that the rule will affect aliens who do not work, but employability has obvious relevance to whether a person is likely at any time to become a public charge. Again, an officer evaluates all of the factors in the totality of the circumstances and an alien may have positive factors that outweigh lack of past, current, or future employment. Finally, an alien's recent receipt of public benefits (or an alien's continuing enrollment in public benefits such as Medicaid) is also relevant to the alien's assets, resources, and financial status, which DHS is also required to consider in determining whether an alien is likely at any time to become a public charge. However, as noted previously, this is one relevant factor in the totality of the circumstances, and an alien could always show evidence of disenrollment, or evidence that the alien obtained private health insurance or other means of support to offset this heavily weighted negative factor.

As noted elsewhere in this rule, Congress has generally exempted certain vulnerable populations from the public charge ground of inadmissibility, such as VAWA, T, and U applicants, and DHS included these exemptions in the regulatory text in this final rule. DHS, however, will not adjust the statutory factors to otherwise accommodate specific groups whom Congress has made subject to the public charge ground of inadmissibility.

*Q. Heavily Weighted Negative Factors*

1. Lack of Employability

*Comment:* One commenter supported lack of employability as a heavily weighted negative factor, and stated that lack of employability should be the only disqualifying factor. Another commenter stated that employment

---

[741] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198–206 (proposed Oct. 10, 2018).

[742] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[743] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[744] *See* 8 U.S.C. 1601.

alone does not guarantee an immigrant's economic self-sufficiency, because much of the work done by immigrants is low-wage and does not fully cover the cost of living in the United States.

*Response:* DHS agrees that employment alone does not guarantee that a person will be self-sufficient. DHS disagrees, however, with the comment suggesting that the lack of employability should be disqualifying in the public charge inadmissibility determination. All the factors in the statute and this final rule, including the heavily weighted negative factors, are reviewed in the totality of the circumstances. The fact that an alien is not a full-time student and is authorized to work but cannot demonstrate employment history or a reasonable prospect of future employment will not be the sole factor that would lead to a determination that the applicant is inadmissible as likely at any time to become a public charge.[745] Even where an alien has this heavily weighted negative factor, that factor, in and of itself, will not render an applicant likely at any time to become a public charge in the totality of the circumstances analysis.

DHS will not implement the suggestion that the lack of employability be the only disqualifying factor. As noted above, none of the heavily weighted negative factors is disqualifying and further, DHS has determined that there are other factual circumstances (*e.g.*, income, assets, resources at or above 250 percent) apart from employability that are also particularly indicative of an alien being more of less likely to become a public charge and therefore, are heavily weighted negative factors.

*Comment:* A commenter stated that the factor is misleadingly characterized in the preamble as a "Lack of Employability." The commenter indicated that it is not clear how recently a person needs to have worked, or how they would demonstrate the prospect of future work, or even the type of work that would avoid the application of this heavily weighted negative factor. Some commenters stated that the employability heavily weighted negative factor was vague and poorly defined.

*Response:* DHS does not believe that the heading for this factor is misleading. The factor relates to whether an alien who is not a full-time student and is authorized to work, is able to demonstrate current employment, recent employment history, or a reasonable prospect of future

employment. Because this factor assesses whether an alien who has work authorization has worked or can demonstrate the ability to work in the future, it goes directly to whether the alien is employable, which DHS believes is particularly indicative of whether an alien is more likely to become a public charge.

With respect to the commenter's objections regarding vagueness, DHS believes it is reasonable and consistent with a totality of the circumstances approach to not limit the review of employability to specific time periods or specific types of employment. Form I–485 requests information on the last 5 years of employment. An applicant may be able to demonstrate prospects of future employment through their employment history and education and skills.

## 2. Current Receipt of One of More Public Benefit

*Comment:* A few commenters stated that considering current receipt of one or more public benefits is not in keeping with the totality of circumstances test. In addition to this, one commenter stated that including receipt of one or more public benefits to the public charge determination was a drastic change in the scope of the test. One commenter stated that including public benefits as a heavily weighted negative factor ignores the contributions of low-wage workers to society and the economy. A few commenters stated there was not sufficient evidence to state that receipt of one or more public benefits is indicative of someone becoming a public charge. Other commenters said that some people who are self-sufficient will access benefits, and that this has been supported by congressional intent.

*Response:* DHS disagrees that considering prior or current receipt of public benefits is inconsistent with the totality of the circumstances test. As discussed in the NPRM, DHS believes that receipt of benefits is a key gauge to determining the likelihood of future use of public benefits and becoming a public charge. All else being equal, a person who is currently receiving public benefits is more likely to receive public benefits in the future than a person who is not currently receiving such benefits. The 1999 Interim Field Guidance recognizes this by directing officers to consider current and past receipt of covered benefits.[746] DHS appreciates that low-wage workers contribute to

society and the economy but believes that including public benefits as a heavily weighted negative factor is an appropriate consideration in determining who is likely to become a public charge.

*Comment:* One commenter stated that the heavily weighted factors would impair rather than advance the financial stability of immigrants. A commenter stated the negative factors in the rule ignore the role public benefits and family support play in advancing self-sufficiency. Another commenter stated that using receipt of one or more public benefits as a heavily weighted factor would hurt the ability of public benefit-granting agencies to combine multiple benefits that work in concert to improve self-sufficiency of the recipients.

*Response:* DHS agrees that public benefits can assist in advancing self-sufficiency but believes the rule is a proper interpretation of the congressional mandate regarding the public charge provisions.[747] Further, the rule does not prevent public benefit-granting agencies from working to improve the self-sufficiency of recipients, although it does create consequences for an alien's receipt of certain public benefits.

*Comment:* One commenter said this factor was appropriately weighted but indicated that an alien's reliance on a foreign government assistance program should not be considered as a negative factor, as in many cases, the dependence on such programs is customary, or the program is designed to be one where the immigrant would not have had to opt into.

*Response:* DHS appreciates the comment and agrees that the factor is appropriately weighted. DHS did not propose and will not consider public benefits provided by foreign countries.[748] Public benefits in foreign country have different standards and objectives. For example, in some countries, such as Canada, healthcare is provided on a national basis and is not based on income eligibility and not aligned to a need-based standard. In addition, the inadmissibility determination is whether a person is likely to become a public charge in the United States.

## 3. Receipt of Public Benefits Within 36 Months Before Filing

*Comment:* Some commenters stated that a retrospective test is inconsistent with the prospective nature of the

[745] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51178 (proposed Oct. 10, 2018).

[746] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28690 (May 26, 1999).

[747] *See* 8 U.S.C. 1601.

[748] *See* 8 CFR 212.21(b). *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158–74 (proposed Oct. 10, 2018).

**41444**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

public charge inadmissibility determination. Other commenters asserted that weighing receipt of public benefits within the previous 36 months is inconsistent with the totality of circumstances test, and represented a significant and troubling departure from current federal policy. A commenter commented that the "studies provide zero evidence that previous receipt of the newly added benefits is an indicator of future use." A few commenters commented that receipt of public benefits is a clear benchmark that an immigrant was deemed eligible for a benefit by another Federal agency and it is therefore inappropriate to consider previous receipt of public benefits. Several commenters stated that if the specific circumstances that led to the use of public benefits no longer apply, the previous use of public benefits is irrelevant. One commenter added to this and said that they opposed the proposed addition of receipt of public benefits within last 36 months of filing application as there are many cases where someone needs help only temporarily. Another commenter stated that many individuals would just disenroll from benefits for 3 years and re-enroll once they receive adjustment of status, but in the meantime could suffer. Many commenters stated that a lookback period disregards the positive effects of public benefits, including future self-sufficiency. Several commenters stated that the 36-month rule is retrospective and has no place in a rule that is meant to be forward looking, and commented that prior receipt of public benefits has no bearing on whether an individual will be dependent on the Government in the future. A commenter indicated that the past receipt of public benefits should receive no weight. One commenter expressed concern that by using a lookback period, even individuals who were able to increase their earnings to a point where assistance is no longer needed will be penalized. Adding to this, a commenter that the proposed lookback period will disproportionately hurt those who are gainfully employed and may therefore be eligible to access benefits for longer than those who are not employed.

*Response:* DHS understands that a person may no longer need public benefits in the future if the circumstances that led to the use of public benefits no longer apply, and DHS would take that into consideration. DHS would take into consideration that the public benefit was used temporarily and that the person may not be likely to receive public benefits in the future. No longer receiving public benefits because of stable employment or income would be a consideration in the totality of the circumstances. However, DHS believes, as discussed in the NPRM, that past receipt of public benefits for more than 12 months in the aggregate within 36 months is an indicator that an alien will continue to receive (or again receive) public benefits, and therefore is likely to become a public charge.

*Comment:* A commenter indicated that the 36-month standard is unreasonable because the study conducted by HHS in 2001 is outdated and does not appear to provide a reasonable basis for the 36-month period that DHS has included in this proposed rule. A couple of commenters stated there was not adequate rationale to support negatively weighting receipt of public benefit within the prior 36 months. Another commenter stated that it was unclear how prior benefit use would be weighted. A couple of commenters stated that the 36-month rule is unfair because no one could have predicted this rule or can predict their circumstances, and would cause great fear and confusion.

*Response:* As discussed in the NPRM, some studies suggest that although most people who leave welfare programs are working after they leave those programs, people may come back to receive additional public benefits.[749] As explained in the NPRM, DHS would view past receipt of public benefits within 36 months as an indicator that an alien will continue to receive (or again receive) public benefits, and therefore is likely to become a public charge. With respect to the statement that the study is outdated or insufficient, DHS notes that although there are limitations to the data, this study was particularly of interest in that it examined repeated return to public benefit programs.

As explained elsewhere in this rule, DHS has also clarified as part of the definition of receipt of public benefits, that although an application or certification for public benefits is not considered receipt, DHS believes that the application for, or being certified to receive in the future to receive public benefits may suggest a likelihood of future receipt. Correspondingly, DHS also amended the heavily weighted factor to state an alien's receipt, being certified to receive, or approval to receive one or more public benefits, as defined, for more than 12 months within any 36 month period, beginning from 36 months prior to the alien's application for admission or adjustment of status, will be considered a heavily-weighted negative factor in the totality of the circumstances assessment.

The NPRM explains that the weight given to public benefits will depend on whether the alien received multiple benefits, how long ago the benefits were received, and the amounts received.[750] For example, the receipt of a public benefit five years ago may be a negative factor; however, a public benefit received six months before the adjustment of status application would be considered a heavily weighted negative factor. DHS will consider receipt of (or application or certification for) public benefits after the effective date of the rule. DHS will also consider those benefits that were previously considered under the 1999 Interim Field Guidance including SSI, TANF, State and local cash assistance programs that provide benefits for income maintenance (often called "General Assistance" programs), and those benefits received (including Medicaid) to support the alien's institutionalization for long-term care. The publication of the rule and effective date provides sufficient notice for people to cancel current receipt of public benefits.

*Comment:* One commenter requested an explanation of the necessity of the 36-month lookback period as most immigrants who would qualify for public benefits are either exempt from public charge determinations or have already adjusted status.

*Response:* As explained previously, the 36-month component of the public charge threshold is an appropriate timeframe to determine whether an alien is more likely than not to become a public charge at any time in the future. That said, DHS will not make a public charge inadmissibility determination with respect to aliens who are exempt from public charge inadmissibility or who have already adjusted status to that of a lawful permanent resident, and would not otherwise be considered applicants for admission. Therefore, DHS will not consider whether such aliens have received public benefits. With respect to other aliens, as discussed in this final rule, DHS has added the consideration of credible and probative evidence presented by the

---

[749] *See* Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at* https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019). *See also* U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at* https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001 (last visited July 26, 2019).

[750] This proposed policy is generally consistent with longstanding policy affording less weight to benefits that were received longer ago in the past.

alien from a Federal, state, or local government agency that demonstrates the alien is not eligible for one or more public benefits. This information will be taken into consideration in the totality of the circumstances.

4. Financial Means To Pay for Medical Costs

*Comment:* Some commenters stated that many people do not have the ability to afford their own healthcare due to low wages and the high cost of healthcare, making this factor unfair to low-wage workers and immigrants. Another commenter expanded on this and remarked that this factor will simply exclude individuals without substantial resources and who do not understand the complicated healthcare system in the United States. One commenter expressed concern that the rule asserts that a sign of self-sufficiency is having enough cash on-hand to deal with serious illness, asserting that most Americans born in this country could not pass this test. Another commenter stated that it is impossible to predict an individual's future healthcare costs.

*Response:* The basis for including Medicaid in the rule is discussed earlier in this preamble. Even if the alien does not have health insurance, he or she should have sufficient funds to provide for any reasonably foreseeable medical costs, which is only one consideration in the totality of the circumstances. Further, DHS will not consider assistance for an ''emergency medical condition'' as provided under section 1903(v) of Title XIX of the Social Security Act, 42 U.S.C. 1396b(v), and in implementing regulations at 42 CFR 440.255(c) as part of the public charge inadmissibility determination. Having health insurance or being able to pay for medical expenses is only one factor in the totality of the circumstances. This factor does not call for the alien to be able to pay for medical costs that are not reasonably foreseeable.

*Comment:* Commenters suggested that DHS eliminate the proposed heavily weighted negative factor for an alien who (1) has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work, and who (2) is uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to a medical condition. A commenter stated that the factor is applicable even if the applicant has not used public benefits and would keep most people with

disabilities from entering or remaining in the United States. The commenter further stated that assigning the factor a heavy weight would codify discriminatory assumptions regarding people with disabilities. The commenter stated that disability should remain a factor to be measured on a case-by-case basis free of an automatically assigned heavy negative weight.

*Response:* DHS will retain the heavily weighted negative factor based on the applicant's lack of financial means to pay for reasonably foreseeable medical costs if the alien does not have private health insurance. As established in the NPRM, certain chronic medical conditions can be costly to treat and certain conditions may adversely affect an applicant's ability to obtain and retain gainful employment, or to otherwise support himself or herself. Evidence outlined in the NPRM also indicated that individuals in poor to fair health are more likely to access public benefits to treat their medical condition. DHS agrees with the commenter that this factor may be applicable even if the applicant has not received any public benefits, but disagrees that this factor would keep most people with disabilities from entering or remaining in the United States. Since the public charge inadmissibility determination is made on a case-by-case basis and in the totality of the alien's individual circumstances, an applicant could overcome this heavily weighted negative factor through presentation of other evidence.

Additionally, DHS notes that the fact that an applicant has a disability does not mean that the applicant has this heavily weighted negative factor, and disagrees that the rule codifies discriminatory assumptions. As is the case with any other applicant, individuals with disability may establish their self-sufficiency notwithstanding their medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work. Such applicants may do so by providing proof of income, employment, education and skills, private health insurance, and private resources.

*Comment:* One commenter expressed concern that this factor would allow DHS personnel to overrule the opinions of medical professionals in a move that would invite ''unbridled speculation and discrimination.''

*Response:* DHS disagrees that this heavily weighted negative factor would permit DHS to overrule the opinions of medical professionals. In reviewing the

Form I–693 or DOS medical examination form, USCIS will be relying on the diagnoses set forth by the civil surgeon or designated panel physician on such forms submitted in support of the application for the diagnosis of any medical conditions; USCIS will also rely on evidence, as provided by the applicant, of a medical condition that is likely to require extensive medical treatment or institutionalization after arrival, or that will interfere with the alien's ability to care for himself or herself, to attend school, or to work. DHS will not speculate as to the cost of medical conditions or the ability of a person to provide for himself or herself or go to school or work.

*Comment:* Multiple commenters stated that farmworkers often lack health insurance, even if offered by their employer, because they cannot afford it, and stated this factor is unfair to these workers.

*Response:* For nonimmigrants' admission, DHS will also consider the proposed length of stay of the nonimmigrant and the assets, resources and financial status of the applicant. Some employers may provide for medical assistance for the duration of the alien's stay. Whether a person has the ability to pay for reasonably foreseeable medical costs is but one factor in the totality of the circumstances. As previously indicated for extension of stay and change of status purposes, DHS removed the forward looking determination and will only consider whether the nonimmigrant received public benefits during the stay.

5. Alien Previously Found Inadmissible or Deportable Based on Public Charge

*Comment:* Some commenters asserted that by using whether a person was previously found inadmissible or deportable as a public charge as a heavily weighted factor, DHS would be ignoring the prospective nature of the public charge assessment. One commenter stated that since the prior finding of *not* being a public charge is not accorded comparable weight in the proposed rule this factor would be arbitrary and unfair. The commenter stated that in addition, because the only heavily weighted positive factor that could counterbalance this one is income or assets above 250 percent of the FPG, reliance on such a factor would arbitrarily impose a more difficult evidentiary hurdle for immigrants below that level than for immigrants above it without rational justification, as well as disproportionately harm immigrants of color, who are less likely to earn above that level, as described infra in our

comments on the 250 percent criteria. Another commenter warned that this factor would be an arbitrary addition and would serve no purpose other than to deter individuals from applying for adjustment of status out of fear it would ruin their future attempts to gain lawful permanent residence status.

*Response:* DHS disagrees that considering a prior inadmissibility determination as a heavily weighted negative factor would be arbitrary and unfair or that considering an alien's prior admissibility under the public charge ground would merit comparable favorable treatment. A previous finding of inadmissibility on public charge grounds would likely be documented. By contrast, there would not necessarily be a statement of the Government's reasons for admitting the alien or approving his or her application for adjustment of status.

DHS acknowledges that an alien's circumstances may have changed since a previous application for admission or determination of inadmissibility or deportability based on the public charge ground. DHS would take those new circumstances into account in the totality of the circumstances when making a new public charge inadmissibility determination. There is no requirement to specifically ''balance out'' a heavily weighted negative factor with a heavily weighted positive one. Rather adjudicators will consider the alien's specific circumstances within the totality of the circumstances framework when assessing the alien's likelihood of becoming a public charge, and will afford specific facts the weight they are due in the context of this rule's adjudicative framework.

*R. Heavily Weighted Positive Factors*

1. Proposed Standard

*Comment:* Several commenters stated that having the 250 percent threshold as the sole heavily weighted positive factor in the public charge test would represent a fundamental change to immigration policy and the immigrant population. A commenter stated a bright-line positive or negative income threshold subverts the totality of circumstances consideration. Some commenters stated that the 250 percent threshold was another example of double counting in public charge inadmissibility determinations under the proposed rule. Another commenter stated the 250 percent threshold was there to prevent immigration through administrative means. Another commenter stated that those falling between 125 percent and 250 percent of the FPG would have their cases

improperly adjudicated. One commenter stated the 250 percent threshold does not go far enough to help qualified individuals overcome the public charge test. Other commenters stated that the proposed heavily weighted positive factor ignores the positive contributions of immigrants. One commenter stated that using 250 percent as the sole positive factor undermines and minimizes the value of other key economic and wealth building milestones. Additionally, some commenters stated that the proposed heavily weighted positive factors undervalue those who contribute to society in nonmonetary ways, such as stay at home parents. Another commenter stated that the 250 percent threshold functions as a ''wealth-test.'' Another commenter said that most legally present noncitizens would not meet the 250 percent FPG threshold. Similarly, other commenters stated that much of the U.S. population would not qualify for a heavily weighted positive factor. Many commenters said the threshold for a family of four is higher than the 2017 median household income for the United States ($63,000 vs. $61,372). One commenter stated that in some regions of the United States those earning above 250 percent FPG would be among the wealthiest in their communities. One commenter stated that the proposed 250 percent FPG threshold would do little to improve the systemic issues of income inequality in the United States.

*Response:* DHS disagrees that the rule provides a wealth test. The 250 percent FPG standard is a heavily weighted positive factor and not a requirement that aliens need to meet in order to overcome a public charge inadmissibility finding. As previously stated, income is one factor in the totality of the circumstances, and any income above 125 percent of the FPG is a positive factor.

*Comment:* Several commenters cited research showing there was not a statistically significant difference in receipt of benefits between immigrants above and below the 250 percent threshold. Some commenters stated that the 250 percent FPG threshold would have a perverse effect of discouraging people from supporting family members out of fear it would change their public charge determination.

*Response:* DHS acknowledges that certain tests involving estimates of noncitizens yielded results in Table 28 of the NPRM that were not statistically significant, which in some cases was a consequence of small sample sizes due to forming estimates on only noncitizens instead of foreign-born more

generally. DHS chose to study noncitizens specifically despite the inherent issues in making inferences from small sample sizes, since the population of noncitizens more closely corresponded to the individuals who would be subject to the public charge rule than foreign-born generally, which includes naturalized citizens. In Table 27 of the NPRM, DHS showed that there is lower public benefit program participation rates among those in higher income categories for the population of citizens in the tables listed in the NPRM. Lower participation rates may also be shown in the overall population by averaging across both citizens and noncitizens (*i.e.,* Tables 27 and 28 of the NPRM). Table 28 of the NPRM is not inconsistent with such a relationship. The justification still holds for using income as a percentage of FPG in the public charge determination, and persons with an income at a higher percentage of the FPG are less likely to the receive public benefits than those at a low percentage. Further, DHS disagrees that the 250 percent threshold would discourage people from supporting their families as 125 percent is the threshold for positive consideration in the totality the circumstances and the 250 percent threshold a heavily weighted positive factor but not a requirement. DHS acknowledges that the income threshold may be harder to meet if the alien has a larger household size, however, DHS would also take into account any income, assets, or resources the other household members also provide. Nevertheless, family status is still a mandatory factor as established by Congress.[751]

*Comment:* One commenter stated that heavily weighing household income at or above 250 percent FPG would confuse the threshold for the affidavit of support.

*Response:* The affidavit of support is a different requirement and has a specific form associated with it. The affidavit of support threshold is 125 percent of the FPG of the sponsor's income and that threshold is not being changed with this rule. The income threshold for the alien's household is part of this rule's totality of the circumstances public charge assessment is 250 percent of the FPG. Income at this level is considered a heavily weighted positive factor (as opposed to income at the 125 percent of the FPG (100 percent for member of the U.S. Armed forces in active duty), which is a positive consideration).

---

[751] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

*Comment:* Another commenter stated there may not be enough time for migrants under certain visa classifications to seek, obtain, and begin a job with the income necessary to meet the 250 percent of FPG level.

*Response:* The burden is upon the alien to establish that he or she is eligible to be admitted into the United States. Further, certain nonimmigrant and immigrant classifications require the employment to be established before the nonimmigrant visa is issued. That said, DHS notes that there is no requirement that an applicant subject to the public charge ground of inadmissibility demonstrate that he or she has income at or above 250 percent of the FPG in order to gain admission or adjustment of status. Rather, the fact that an applicant who has income at or above 250 percent of the FPG will weigh heavily in favor of finding the applicant is admissible in the totality of the circumstances, but is not outcome determinative. Therefore, an applicant who has household income below 250 percent of the FPG will not, based on that fact alone, be denied admission or adjustment of status.

*Comment:* Several commenters stated the proposed 250 percent heavily weighted positive threshold would disproportionately affect members of marginalized communities; hard-working low- and middle-income families; immigrants of color; South Asian immigrants; Latino immigrants; Muslim immigrants; immigrants with disabilities; those with pre-existing health conditions; women and single mothers; victims of domestic and sexual abuse; families with children who have special healthcare needs; and the health and well-being of children of immigrant parents.

A few commenters stated that the proposed heavily weighted positive factor would increase family separations and would have a negative impact on family-based immigration. Many commenters stated that the proposed heavily weighted positive factor would effectively bar lower income immigrants; disregards the efforts and contributions of low-wage workers; and that the majority of legally present noncitizens would fail to meet the 250 percent FPG threshold.

*Response:* DHS understands that the rule may affect certain groups who may have low incomes; however, income is but one factor in the totality of the circumstances and will not serve as the sole reason to find an alien inadmissible based on public charge grounds. As previously indicated, if an applicant has household income at or above 250 percent of the FPG it will be treated as

a heavily weighted positive factor because it is particularly indicative of an alien being less likely to become a public charge. An applicant subject to the public charge ground of inadmissibility is not required to demonstrate that he or she has income at or above 250 percent of the FPG in order to establish admissibility, and an alien's failure to demonstrate such income does not receive "negative" weight in the totality of the circumstances unless that income is below 125 percent of the FPG. The standard only serves to assist individuals in establishing self-sufficiency.

*Comment:* A commenter stated that many couples seeking adjustment of status would be affected by the 250 percent threshold, as many of these visas prohibit immigrants from working. The commenter stated that according to one analysis, about 31 percent of foreign-born spouses were unemployed when they applied for a marriage-based green card, as many were prohibited from working on their nonimmigrant visas, such as the F–1 or F–2 student visas, or B–2 visitor visas. For those who did work, about 22 percent of them held jobs that would unlikely meet the 250 percent income threshold, and even if DHS were to allow both spouses to pool their income to meet the new threshold, 36 percent of couples could still find themselves unable to qualify for a marriage green card. The commenter stated that it is basic common sense that a student who is prohibited from working would likely have some student loans, potentially credit card loans, and would not have significant savings, and that the rule would allow primarily the independently wealthy to be eligible for marriage-based adjustment of status.

One commenter said the proposed heavily weighted positive factor creates a "Catch-22" for nonimmigrants on student visas who are married to U.S. citizens because they are not allowed to work. Some commenters cited a study that many H–1B visa holders make less than the amount necessary to support a family of five and qualify for the proposed income threshold of 250 percent of FPG. Another commenter stated that the proposed rule would negatively impact skilled workers who are supporting families and are making prevailing, middle-class wages. One commenter mentioned that the vast majority of scientific researchers applying for permanent resident status based upon an approved EB–1A, EB–1B or NIW petition do not meet this 250 percent income requirement. Another commenter also stated that some highly

skilled employees such as post-doctoral research fellows may not make enough money to qualify for the heavily weighted positive factor. Some commenters remarked that many skilled workers are compensated with stock options as part of their regular income, and it is unclear if this will be considered under the heavily weighted positive factor. One commenter expressed concern that the 250 percent threshold does not take into account that many workers will increase their income the longer they work. A few commenters stated that the 250 percent threshold would pose a unique challenge for California, where it would make it more difficult to extend the status of H–1B visa holders and create a labor shortage for California's agriculture industry, which heavily relies on the H–2A visa program.

*Response:* DHS understands that not everyone is authorized to work or needs to work in order to be self-sufficient. As previously indicated the 250 percent of the FPG standard is not a requirement to establish admissibility and is one consideration in the totality of the circumstances. Further, when adjudicating a nonimmigrant's application for extension of stay or change of status, USCIS will review whether the alien has established that he or she has not received, since obtaining the nonimmigrant status he or she is seeking to extend or change, any public benefit as defined in 8 CFR 212.21(b), for more than 12 months, in the aggregate, within a 36 months period. The heavily weighted factors do not apply in that context.

2. Additional Positive Heavily Weighted Factors

*Comment:* One commenter said that the 250 percent of the FPG standard should be downgraded from "highly positive" to just considered. Some commenters stated that earning 125 percent of the FPG should be a heavily weighted positive factor.

*Response:* DHS declines to adopt the commenter's suggested changes in this final rule. The rule already provides for 125 percent of the FPG as a positive factor in the totality of the circumstances. Making 250 percent of the FPG a general positive factor instead of a heavily weighted positive factor would further limit an alien's ability to establish admissibility. An alien would not need to establish income at or above 250 percent of the FPG in other to be admitted into the United States. Any income between 125 percent and 250 percent of the FPG is still a positive factor in the totality of the circumstances. The 125 percent income

**41448    Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

threshold is based on the income threshold set by Congress for sponsors for a Form I–864, which is required for most family-based AOS applications and some employment-based AOS applications. In order to maintain consistency with the income threshold set forth in the Form I–864 context, DHS believes that the 125 percent threshold is appropriate for use in the public charge rule and will not lower the threshold. Any household income between 125 percent and 250 percent of the FPG is considered a positive factor in the totality of the circumstances.

### a. Affidavit of Support

*Comment:* A commenter stated that the proposed rule mandates denial for anyone who cannot provide an affidavit of support, yet the presence of one is not a heavily weighted positive factor under the proposed rule. Several commenters stated the filing of a legally enforceable affidavit of support by a sponsor should be a heavily weighted positive factor and it should be sufficient to overcome any heavily weighted negative factors.

*Response:* DHS appreciates the comments but declines to establish the affidavit of support as a heavily weighted positive factor. The submission of an affidavit of support under section 213A of the Act, 8 U.S.C. 1183a is a requirement for certain categories of immigrants. See section 212(a)(4)(C) and (D) of the Act, 8 U.S.C. 1182(a)(4)(C) and (D). Not all aliens are required to submit the affidavit of support. According to section 212(a)(4) of the Act, 8 U.S.C. 1182 (a)(4), the lack of a sufficient affidavit of support, where required, renders an alien inadmissible on the public charge ground. Congress mandated the presence of an affidavit of support in certain cases as a separate requirement, but did not establish submission of the affidavit of support as a mandatory factor in all public charge inadmissibility determinations.

There is no indication that Congress believed that a sufficient affidavit of support would warrant a finding that the alien is not likely becoming a public charge. Had Congress believed that to be true, Congress would have specified such a provision in the statute. Instead, Congress listed the other factors as the minimum mandatory factors in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which do not include the affidavit of support. For these reasons, and consistent with congressional intent, DHS will retain the affidavit of support as a factor considered in the totality of the circumstances, but will not make it a heavily weighted positive factor.

### b. Family Relationships

*Comment:* Commenters suggested that the rule add close family relationship to the U.S. citizen or lawful permanent resident, or having a relative in the United Stated providing support, as a heavily weighted positive factor because it is strongly associated with self-sufficiency. The commenter notes that immigrants overwhelmingly come to the United States to work and advance their own and their families' financial prospects. The commenter cited their own report that estimates that 2.25 million undocumented persons and 212,000 nonimmigrants have a qualifying family relationship to a U.S. citizen or lawful permanent resident living in their household that makes them potentially eligible for an immigrant visa or adjustment to lawful permanent resident status. The report further indicated that out of this population, 982,000 live in families that earn at least 250 percent of the FPG.

*Response:* DHS will not add a close family relationship to the U.S. citizen or lawful permanent resident as a heavily weighted positive factor. There is insufficient evidence that the fact that an applicant's household includes a U.S. citizen or lawful permanent resident is indicative of self-sufficiency, or that having family members in the United States is in and of itself indicative of self-sufficiency. As with every mandatory factor, an applicant's family status will not serve as the sole basis of a finding of inadmissibility, as this factor must be considered in the totality of the circumstances.

### c. English Ability

*Comment:* One commenter suggested that the ability to speak English well or very well should be a heavily weighted positive factor. The commenter indicated that the totality of the circumstances test affords insufficient weight to factors strongly associated with self-sufficiency and requested additional heavily weighted positive factors. The commenter's study found that 1.32 million of the 2.25 million that would be directly affected by the proposed rule speak English well or very well.

*Response:* DHS will consider whether the alien is proficient in English or proficient in other languages in addition to English as part of the public charge inadmissibility determination. The ''speaking English well or very well'' language comes from the SIPP survey analysis in which people assessed their own speaking abilities. As provided in the NPRM, the better the person spoke English, the higher the income he or she

obtained. People who spoke a language other than English at home were less likely to be employed, and less likely to find full-time work when employed.[752] The SIPP data provided in the NPRM indicates that the rate of coverage of non-cash benefits among those who spoke English either well or very well (about 15 to 20 percent) was significantly lower than the rate among those who either spoke English poorly or not at all (about 25 to 30 percent). Further, DHS understands that not all employment requires English proficiency. DHS believes that while it is appropriate to consider English proficiency in the consideration of likelihood to become a public charge in the future, it is inappropriate to include English proficiency as a heavily weighted positive factor in light of the fact that many jobs do not require it.

### d. Education

*Comment:* One commenter suggested that a high school education or beyond should be a heavily weighted factor. The commenter stated that the totality of the circumstances test affords insufficient weight to factors strongly associated with self-sufficiency and requesting additional heavily weighted positive factors.

*Response:* The rule provides that DHS would consider whether the alien has a high school degree or higher education as positive factors. However, a person's education may or may not assist him or her in becoming self-sufficient, depending on other factors specific to the alien's circumstances, such as the job market where the alien lives, outstanding liabilities and support obligations, or other personal or family circumstances. Therefore, DHS will not include education as a heavily weighted positive factor.

### e. Private Health Insurance

*Comment:* One commenter suggested that private health insurance coverage should be considered as a heavily weighted positive factor, as it is strongly associated with self-sufficiency. The commenter explained that 1.1 million individuals have health insurance (out of the 2.25 million that would be directly affected by this rule based on a study conducted by the commenter, a non-profit think-tank and educational institute focused on international migration) and argued that the rule's totality of the circumstances test affords

---

[752] *See* Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 6 (2005), *available at* https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf (last visited July 26, 2019).

insufficient weight to factors strongly associated with self-sufficiency.

*Response:* DHS agrees that having private health insurance is a strong indicator of self-sufficiency. DHS analyzed the SIPP data and found that individuals who have private health insurance are significantly less likely to be receiving one or more enumerated public benefits in this rule than those individuals who do not have private health insurance. The rate of receipt of public benefits among those covered by private health insurance was 4 percent for citizens and 6 percent for noncitizens, while the rate of receipt for those not covered by private health insurance was 40 percent for citizens and 30 percent for noncitizens. DHS has therefore revised the rule to include a heavily weighted positive factor for an alien who has private health insurance, subject to two provisos. First, the health insurance must be appropriate for the expected period of admission.[753] Second, the health insurance may not be subsidized via premium tax credits (including advance premium tax credits) authorized under the ACA. Although individuals receiving such benefits have significantly lower odds of concurrently receiving the public benefits designated in this rule, they receive government subsidies to fulfill a basic living need, and qualify on a means-tested basis.[754] DHS does not

[753] *See* USCIS analysis of private health insurance in Wave 1 of the 2014 Survey of Income and Program Participation (SIPP). Private health insurance includes coverage through another person in the household and Medigap, and does not include Medicaid, Medicare parts B or D, or military- or government-provided insurance.

[754] USCIS was unable to identify a variable in the SIPP data for private health insurance paid for using a premium tax credit. USCIS also analyzed the SIPP data on private health insurance and receipt of public benefits, while controlling for income levels. The data support the proposition that having private health insurance, regardless of income level, is a significant determinant of whether the individual receives the designated public benefits. For example, 13.2 percent of individuals *with* private health insurance at an income level between 125 percent and 250 percent of FPG receive the designated public benefits. By contrast, 54.8 percent of individuals *without* private health insurance, at that same income level, receive the designated public benefits. Similarly, 10.3 percent of individuals *with* private health insurance at an income level between 250 percent and 400 percent of FPG receive the designated public benefits. By contrast, 47.5 percent of individuals *without* private health insurance, at those same income levels, receive the designated public benefits. *See* USCIS analysis of private health insurance and income level in Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).

In addition, the data also appear to show a relationship between income level and receipt of public benefits, within the population of individuals who have private health insurance. For example, 15.3 percent of individuals *with* private health insurance below 125 percent of the FPG receive the designated public benefits. Receipt

believe it is appropriate to include a heavily weighted positive factor for this type of health insurance, although this type of health insurance would generally be considered positively as part of the consideration of the totality of the alien's circumstances, such as with respect to the alien's ability to pay for reasonably foreseeable health care costs. Private health insurance purchased through an ACA Marketplace without such credits will count for purposes of this heavily weighted positive factor.

**f. Work History**

*Comment:* One commenter stated that work history, without regard to wage history, should be a heavily weighted positive factor. This commenter stated that the essence of a "public charge" is where an individual is not willing or able to work and the rule should not focus on workers that earn low wages. This commenter explained that farm workers toil in extremely difficult conditions, performing work few others are willing to do, and at a low compensation rate that cannot possibly sustain a family, through no fault of their own. Another commenter stated that entrepreneurship should be considered a heavily weighted factor, as it is strongly associated with self-sufficiency.

*Response:* The rule provides for employment history to be considered as a positive factor. However, every factor must be considered in the totality of the circumstances. There might be instances where a person has long-term employment, but is not able to be self-sufficient and must receive public benefits and conversely, there might be instances that a person does not have long-term employment and would otherwise be self-sufficient. DHS believes that income is a proper consideration in the totality of circumstances and as a heavily weighted positive factor since it is indicative of self-sufficiency. DHS also recognizes that different types of employment may provide additional income, however, DHS does not believe it is appropriate to specify just one form of employment as a heavily weighted positive factor. Therefore, DHS will not include entrepreneurship as a heavily weighted positive factor.

levels decline as income rises (13.2 percent for individuals with income levels between 125 percent and 250 percent of FPG; 10.3 percent for individuals with income levels between 250 percent and 400 percent of FPG; and 3.2 percent for individuals with income levels above 400 percent of FPG). *See* USCIS analysis of private health insurance and income level in Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).

**g. Receipt of Grants, Contracts, and Licensures**

*Comment:* A commenter suggested that receipt of grants, contracts, and licensures should be a heavily weighted positive factor. The commenter stated that excluding grants, contracts, and licensures from consideration was not appropriate and that an individual's receipt of a grant, contract, or license is likely demonstrative of their ability to support themselves without recourse to public benefits, as such receipt is indicative of ongoing work, skills/proficiencies, and qualifications recognized by the relevant government entity. The commenter further indicated that grants, contracts, and licensures may have a direct bearing on the future likelihood of an individual becoming a public charge and thus should be recognized as a positive factor.

*Response:* DHS is not excluding grants, contracts, and licensures from the public charge inadmissibility determination. DHS agrees that grants, contracts, and licensures are indicative of an alien's likely self-sufficiency. As with other signs of likely self-sufficiency, these would be positive considerations in the totality of the circumstances. However, DHS does not agree that these specifically should be included as heavily weighted positive factors.

**h. Caregivers**

*Comment:* A commenter suggested that being a caregiver should be a heavily weighted positive factor. This commenter shared an anecdote regarding a single father petitioning on behalf of his elderly mother so she could enter the United States to provide care to his children while he worked full time and pointed out that some contributions may not be monetary or employment-based but will instead have a "trickle down" effect that benefits others.

*Response:* DHS declines to adopt this recommendation. As previously discussed, although caregivers may provide assistance to the overall household, the public charge inadmissibility determination is based on the totality of the alien's individual circumstances and being a caregiver does not establish self-sufficiency or strongly suggest that the person is not likely to receive the designated public benefits above the designated threshold. Although caregivers may benefit the household by eliminating the need for childcare or eldercare expenses, DHS does not believe that a person's status as a caregiver warrants a heavily weighted positive factor. DHS, as previously

discussed, did include a provision regarding caregivers within the Education and Skills factor.

i. Ability To Work in the Future

*Comment:* A commenter indicated that the ability to work in the future should be a heavily weighted positive factor and stated that it, along with having potential family support, had been one of the two heavily weighted factors for over a century under Federal law. The commenter questioned why work ability and having legally enforceable family support should be weighted less heavily than past receipt of Medicaid or SNAP. The commenter indicated that this kind of disparate treatment might be justifiable if Congress had drafted the public charge test in a way that explicitly directed the agency to give heavier weight to past receipt of benefits than to future employability and family support, which Congress did not. The commenter provided a list of twenty occupations that the commenter stated would have the most job growth over the next decade. The commenter stated that in nine of the 20 occupations, a full-time worker in a household of one who earns the median salary for such occupation would not meet the 250 percent of the FPG standard. The commenter also stated that in 14 of 20 occupations, a full-time worker in a household of two who earns the median salary for such occupation would not meet the 250 percent of the FPG standard. The commenter indicated that the agency provides no reason or evidence for a standard that effectively classifies millions of full-time, year-round workers in high-demand occupations as public charges, or as not self-sufficient.

*Response:* DHS disagrees that it is classifying millions of full-time, year-round workers in high-demand occupations as public charges. Under the education and skills factor, DHS would consider whether the alien has adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge if authorized for employment. The evidence DHS will consider includes the alien's employment and income derived from such employment. As noted above, the fact that the alien does not qualify for a heavily weighted positive factor does not render the alien likely to become a public charge. In fact, many of the median wages identified by the commenter would generally result in a positive consideration, because they exceed 125 percent of the FPG.

## S. Public Charge Bonds for Adjustment of Status Applicants

### 1. Standard

*Comment:* Several commenters supported the requirement that all new immigrants post a bond when they apply for entry into the United States. A commenter requested that DHS allow "any alien determined inadmissible" on public charge grounds to apply for a public charge bond.[755] One commenter stated that the public charge bond would be most useful in the category of immigrants that have an income between 125 percent and 250 percent of FPG.

*Response:* DHS appreciates these comments regarding the applicability of the public charge bond. However, DHS will not require all aliens seeking admission as immigrants to post a public charge bond. Section 213 of the Act, 8 U.S.C. 1183, neither requires all such aliens to post a public charge bond, nor authorizes DHS to require one from every intending immigrant. Instead, consistent with its statutory authority, USCIS will offer the public charge bond to certain applicants for adjustment of status, who are inadmissible only due to the likelihood of becoming a public charge and when a favorable exercise of discretion is warranted, based upon the totality of the alien's facts and circumstances.

*Comment:* One commenter noted that the public charge bond process might lead to pressure on DHS officials to make inadmissibility findings and offer public charge bonds.

*Response:* USCIS will not find an applicant is likely at any time in the future to become a public charge for the sole purpose of collecting a public charge bond. Although Congress has created certain exceptions and waivers to inadmissibility, the determination that an alien is inadmissible is mandatory where the alien meets any of the grounds described in section 212 of the Act, 8 U.S.C. 1182. USCIS is required to find an alien inadmissible if the alien is likely to become a public charge. As noted in the NPRM, a public charge bond in the adjustment of status context would generally only be offered in limited circumstances in which the alien has no heavily weighted negative factors and when offering the option of a public charge bond to an alien is warranted based upon the totality of the alien's facts and circumstances.

*Comment:* A number of commenters noted the standard DHS will use to determine when to offer a public charge bond. One commenter stated that the public charge bond must be offered only in rare cases. A few commenters further

stated that the NPRM does not provide a clear standard defining who should qualify for a public charge bond and that the proposed public charge bond system is vulnerable to an abuse of discretion. A commenter suggested that DHS codify a criteria for exercising discretion regarding whether or not to offer the bond in this rule, noting that there should be uniformity and predictability of enforcement on the part of DHS, and that the manner in which this discretion is utilized should be clear and objective. One commenter asked for the justification for warranting a public charge bond in certain circumstances and asked that DHS almost always allow for an individual to post a bond. Another commenter requested that DHS clarify when a public charge bond would be used and also provided recommendations, including that public charge bonds should be available only if the applicant has obtained private medical insurance, and the applicant is part of an existing family unit whose only reason for separation would be an adverse public charge inadmissibility determination. The commenter further stated that DHS should only offer a public charge bond to applicants who can demonstrate hardship such as extreme hardship or exceptional and extremely unusual hardship.

*Response:* DHS disagrees that the rule is unclear in describing how DHS will exercise its discretion to offer a public charge bond. Public charge bonds will be offered only in limited circumstances to those inadmissible aliens USCIS has determined warrant a favorable exercise of discretion, in the totality of the alien's facts and circumstances, and by weighing all positive and negative factors available. As noted in the NPRM, offering a public charge bond in the adjustment of status context, generally, will only be warranted if an alien has no heavily weighted negative factors, such as those that are particularly indicative of the likelihood that an alien would become a public charge. However, and as noted in the NPRM, the presence of heavily weighted negative factors will not automatically preclude USCIS from offering a public charge bond. Rather, as with any discretionary determination, USCIS could also find that the heavily weighted negative factor(s) are outweighed by certain positive factors like those that benefit national security, or would be justified for exceptional humanitarian reasons.

DHS thanks the commenters for the suggestion to codify a more "predictable" criteria for determining whether to offer an alien an opportunity to post a public charge bond, but

declines to do so. The criteria outlined in the rule balances the need for certainty and predictability with that for flexibility USCIS adjudicators need to account for a wide array of facts and circumstances. For similar reasons, DHS also declines to limit its discretion to only permit submission of a public charge bond by aliens who have obtained and will maintain private health insurance, or to aliens who are members of an existing family unit whose only reason for separation would be an adverse public charge inadmissibility determination. DHS believes that limited approach would not account for the variety of factual scenarios USCIS may encounter. Furthermore, DHS believes that limiting the opportunity to post a public charge bond to only a particular narrow range of circumstances would unreasonably exclude from the possibility of a bond applicants who might otherwise merit a positive exercise of discretion.[756] Given that a bond is offered to applicants as a matter of discretion on a case-by-case basis, USCIS reserves the right to determine, based on the particular facts of the case, when the alien's individual circumstances warrant a favorable exercise of discretion.

USCIS also disagrees that it should only offer public charge bonds to applicants who have demonstrated hardship. As is the case with any discretionary determination, USCIS may consider any of a range of positive and negative factors applicable to the alien's case when determining whether the alien should be offered the option to post a public charge bond and be admitted to the United States on bond. USCIS respectfully declines to limit its consideration in this regard.

*Comment:* A commenter stated that DHS should not offer a public charge bond to any applicant with a heavily weighted negative factor. Other commenters were concerned that an applicant with a heavily weighted negative factor, such as use of Medicaid to pay for services associated with his or her disability that are not covered by private medical insurance, will not be considered for a public charge bond. One commenter added that individuals with one or more heavily weighted factors will not have access to sufficient resources to be able to submit a public charge bond. Another commenter asked if USCIS would provide guidance, such as via the USCIS Policy Manual, with guidelines for officers to follow and that will be available for public review.

*Response:* DHS appreciates the comments and will retain the provision

that if an alien has one or more heavily weighted negative factors, as defined in 8 CFR 212.22, present in his or her case, USCIS generally will not favorably exercise its discretion to allow the alien to submit a public charge bond. USCIS notes that a disability that affects an applicant's ability to care for himself or herself, to attend school, or to work is not in itself a heavily weighted negative factor, but rather, one factor USCIS will consider in the totality of the circumstances. Accordingly, a disability alone could not be the sole basis for a determination that the alien is likely at any time in the future to become a public charge.

Similarly, an alien's disability, alone, will not serve as the sole basis for USCIS deciding not to exercise its discretion to permit an alien to submit a public charge bond.[757] In determining whether to offer the alien a public charge bond, USCIS will consider all of the positive and negative factors applicable to the alien's case. The NPRM provides examples where a bond may be offered, including instances where allowing the alien to become a lawful permanent resident would offer benefits to national security, or would be justified for exceptional humanitarian reasons. As provided in the NPRM, DHS believes that offering a public charge bond in the adjustment of status context will generally only be warranted in limited circumstances in which the alien has no heavily weighted negative factors, but the presence of any such factors will not automatically preclude USCIS from offering the alien the opportunity to submit a public charge bond.

As this rule is implemented, USCIS will provide training and guidance in the USCIS Policy Manual to all officers in making these discretionary determinations to allow an alien to submit a bond.

*Comment:* A commenter asked for clarification on "permitting an alien who is found inadmissible as a public charge but is otherwise admissible to submit a public charge bond is within DHS's discretion."

*Response:* An alien who is found to be inadmissible only on the public charge ground may be permitted to submit a public charge bond. In other words, under section 213 of the Act, 8 U.S.C. 1183, the alien cannot be inadmissible under any other ground but the public charge ground in order for USCIS to consider exercising its discretion to permit the alien to submit a public charge bond. The decision whether to issue a public charge bond is at the sole

discretion of USCIS; there is no right or entitlement to a public charge bond. Generally, USCIS will not favorably exercise its discretion in situations where the alien has one or more heavily weighted negative factors. In addition, USCIS is formulating training and policy guidance related to the exercise of this discretion to ensure that discretionary decisions on whether or not to offer a public charge bond are fair and consistent.

*Comment:* A commenter asked that DHS eliminate public charge bonds. A few commenters stated that the NPRM bond section lacks justification for changing current and longstanding procedure.

*Response:* DHS disagrees that the public charge bond should be eliminated. The public charge bond provision was established by Congress in the Immigration Act of 1952, in section 213 of the Act, 8 U.S.C. 1183,[758] and, as discussed in the NPRM,[759] has existed without essential variation since 1907.[760] Public charge bonds allow an alien who would otherwise be inadmissible because of the likelihood of becoming a public charge to nonetheless be admitted to the United States. Since the changes to immigration law implemented by IIRIRA, DHS has lacked a formal mechanism for the issuance of public charge bonds.[761] This rule creates a formal public charge bond procedure that conforms with both the statutory language and past practices.

*Comment:* Other commenters suggested that public charge bonds should be eliminated based on the history of monetary bonds in the criminal pre-trial context, which have been discredited as inefficient and unfair.

*Response:* DHS reiterates that public charge bonds are authorized under the Act,[762] and the Act provides a mechanism whereby DHS can nonetheless admit aliens who are inadmissible only under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS cannot ignore this authority and must consider whether to exercise its discretion on a case-by-case basis to allow such aliens to submit a public charge bond.

DHS disagrees that a public charge bond is directly comparable to a pre-trial appearance bond. The Act states that the purpose of the public charge is

---

[756] *See* INA section 213, 8 U.S.C. 1183.

[757] *See* INA section 213, 8 U.S.C. 1183.

[758] *See* INA of 1952, section 213, 66 Stat. 163, 188.

[759] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51134 (proposed Oct. 10, 2018).

[760] *See* Act of February 20, 1907, ch. 1134, section 26, 34 Stat. 898, 907.

[761] *See* Public Law 104–208 (Sept. 30, 1996).

[762] *See* INA section 213, 8 U.S.C. 1183.

to hold the United States, and all states, territories, counties, towns and municipalities and districts harmless against bonded aliens becoming public charges.[763] USCIS will provide officers with guidance and training to ensure that discretion is exercised in a fair, efficient, and consistent manner.

*Comment:* A commenter opposed the implementation of a public charge bond and stated that while DHS created a distinction between the affidavit of support and the public charge bond in this rule, it did not provide support for the idea that the affidavit of support is an insufficient safeguard. A commenter stated that affidavits of support already give the Government sufficient assurances that an individual will not become overly reliant on the social safety net, without forcing immigrants to freeze significant assets in Government-held bonds.

*Response:* DHS disagrees that the affidavit of support sufficiently safeguards against an alien becoming a public charge after admission. Had Congress intended a sufficient affidavit of support to be the sole basis to safeguard against an alien becoming a public charge after admission, Congress would not have added the mandatory factors in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), to determine an applicant's likelihood of becoming a public charge. Congress would have simply required all applicants subject to public charge inadmissibility to submit a sufficient affidavit of support without requiring an assessment of the applicant's age, health, family status, assets, resources and financial status, and education and skills.

Additionally, had Congress considered the affidavit of support alone to be the best way to safeguard against an alien becoming a public charge, Congress would have eliminated the public charge bond provision altogether, and certainly would not have provided in section 213 of the Act, 8 U.S.C. 1183, for DHS to exercise its discretion to offer a public charge bond to aliens who may also be subject to the affidavit of support requirement at section 213A of the Act, 8 U.S.C. 1183a.[764] That Congress created

the mandatory factors for consideration in a public charge determination at the same time it created the enforceable affidavit of support as a non-mandatory factor for consideration, while also retaining the public charge bond provision in section 213 of the Act, 8 U.S.C. 1183, suggests that Congress did not believe the enforceable affidavit of support, on its own, sufficiently safeguarded against an alien becoming a public charge after admission.

*Comment:* A few commenters stated that a public charge bond system is "redundant and nonsensical," stating that the Government has not provided sufficient reasoning for adding the public charge bond system to the immigration process while the affidavit of support already exists and allows the Government to recoup the cost of public benefits received by immigrants.

*Response:* DHS disagrees with the comments that the public charge bond provisions are redundant and nonsensical in light of the affidavit of support requirement. Although the public charge bond provision pre-dates the creation of the affidavit of support requirements in IIRIRA, Congress expressly amended the public charge bond provision in IIRIRA by amending section 213 of the Act, 8 U.S.C. 1183, to reference the affidavit of support and require it as a condition for admission in some cases in addition to the posting of a public charge bond.[765] This means that Congress was aware at the time it created the enforceable affidavit of support and amended the public charge bond provision that a public charge bond could still be offered to certain aliens at the agency's discretion, in addition to the alien's submission of a sufficient affidavit of support. DHS's inclusion of public charge bonds in this rule is consistent with Congress' intent in maintaining public charge bonds after IIRIRA created the enforceable affidavit of support.

*Comment:* Commenters stated that the bonds would have a disproportionately negative impact on minorities, communities of color, and their families, citing studies on custodial bonds. Another commenter said that the changes to public charge bonds will not prevent individuals from bypassing new regulations and will affect average immigrants by restricting access to services. A few commenters stated that

DHS should not expand the use of bonds because studies have shown that bonds have been proven to be highly discriminatory and increase financial instability. Many commenters provided research on the effects of custodial bonds and stated that bonds cause long-term hardship and increase the likelihood of financial instability. Many commenters said the use of public charge bonds would place an impossible burden on immigrant families, and there is no evidence that public charge bonds will prevent them from becoming dependent on government assistance in the future. Multiple commenters stated that families will face years of annual fees, non-refundable premiums and liens on the homes and cars put up as collateral charged by for-profit surety companies and their agents. A commenter stated that the bond system would result in a loss of money and adverse immigration consequences if the immigrant suffers an unexpected issue and is forced to forfeit their bond.

*Response:* As indicated above, DHS does not believe that the rule itself disproportionately negatively impacts certain groups, and does not believe the public charge bond provisions disproportionately impact particular groups. Although commenters cited studies on the effects of custodial bonds on particular communities, DHS does not believe the public charge bond is directly comparable to custodial bonds, and thus does not believe that such studies are directly applicable. Rather, public charge bonds offer an opportunity for an alien who is inadmissible, based only upon the likelihood of becoming a public charge, to be admitted to the United States. Breach of a public charge bond may result in loss of money and adverse immigration consequences. This is a result of the alien's action, and the longstanding statutory scheme. As noted above, USCIS will provide officers with guidance and training to ensure that USCIS' discretion to offer this opportunity is exercised in a fair and consistent manner.

*Comment:* A commenter stated that the public charge bond process would further complicate and increase inefficiency in the adjustment of status process. Specifically, the commenter said the creation of two new forms, and the accompanying processes and training, as well as the collection of any information therein, will be a waste of Government and applicant resources given the existence and ongoing adjudication of Form I–864. The commenter further stated that the public charge bond is unjust because it removes the intending immigrant as a

---

[763] *See* INA section 213, 8 U.S.C. 1183. While there is currently no statutory mechanism for DHS to directly reimburse benefit-granting agencies, the breached bond amounts will be deposited into an account designated by the U.S. Treasury for collecting breached immigration-related bond amounts.

[764] INA section 213, 8 U.S.C. 1183 reads, in part: "An alien inadmissible under paragraph (4) of section 1182(a) of this title may, if otherwise admissible, be admitted in the discretion of the Attorney General (*subject to the affidavit of support requirement and attribution of sponsor's income and resources under section 1183a of this title*)

upon the giving of a suitable and proper bond or undertaking approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States ( . . .). [*Emphasis added*].

[765] *See* IIRIRA, Public Law 104–208, div. C, section 534(f), 110 Stat. 3009–546, 3009–684 (Sept. 30, 1996).

party to the agreement, such that he or she neither has power to act against the obligor, nor has the ability to reply to the Government's decisions.

*Response:* DHS disagrees that the bond process would increase inefficiency or that the process and training would be a waste of Government and applicant resources. DHS also disagrees that the existence of the Form I–864 obviates the need for new forms to facilitate the public charge bond process. The public charge bond is authorized by statute (separately from, and in addition to, the affidavit of support).[766] USCIS may choose to exercise its discretion to allow an alien to submit a bond in a particular case, allowing for aliens who are inadmissible to the United States based only upon the likelihood of becoming a public charge to nonetheless be admitted to the United States. DHS cannot decide to never exercise this public charge bond authority. USCIS will review its resources and personnel to ensure that it will be able to efficiently carry out its discretionary public charge bond authority. DHS does not believe the public charge bond would be a waste of Government resources or creates an undue burden on aliens. DHS also disagrees that the public charge bond is unjust in that it removes the intending immigrant as a party to the agreement. Although the commenter states that this leaves the alien unable to defend himself or herself against a breach of contract action, a breach of contract action against the alien in the case of an alien with a surety bond could only be asserted by the obligor, with whom the alien would be in contractual privity. With regard to appealing a USCIS breach determination or a denial of a request to cancel a surety bond, the process will be similar to the existing process for seeking review of such determinations in the custodial immigration bond context: *i.e.,* the obligor may challenge the determination before the Administrative Appeals Office (AAO) pursuant to 8 CFR part 103, subpart A. Like the appeals process in the long-established custodial bond context, an alien with a surety bond lacks standing to seek review in public charge bond context and is not "removed" from the process. In the case of an alien with a cash or cash equivalent bond, the alien would be the obligor and thus have standing to appeal a denial of a cancellation request or a breach determination. DHS disagrees that this longstanding process is unjust.

*Comment:* A few commenters stated that the NPRM creates a new market

segment for commercial bond companies, but imposes an unfunded mandate on state and local insurance and financial services regulators. Similarly, these commenters and others said many non-citizens may accept the "exceptionally harsh" procedures and penalties and "crippling surety bond terms" to avoid family separation. The commenters stated that, in many cases, the non-citizen would have to pay the bond company up to 15 percent up-front, which could prove destabilizing for low and moderate-income families and stifle their ability to become self-sufficient. A commenter also stated that any new investment of USCIS resources to assess nonimmigrants on public charge would be an unnecessary administrative burden. Another commenter stated that broad and vague conditions governing breach of public charge bonds heighten the risk of exploitation by for-profit companies managing public charge bonds.

*Response:* DHS understands the concerns about exploitation concerning public charge bond terms and conditions, and about the potential challenges that bond terms and conditions may pose to aliens with limited resources. However, Congress has determined that the public charge ground of inadmissibility is necessary. DHS has congressional authority to consider whether to allow an alien, inadmissible only on the public charge ground, to submit a public charge bond, (including a surety bond), on a case-by case basis in the exercise of its discretion. DHS has decided to exercise its authority in cases involving applicants for adjustment of status who are inadmissible only under section 212(a)(4), 8 U.S.C. 1182(a)(4). As provided in the NPRM, DHS will accept surety bonds only from sureties certified by the Department of Treasury and listed in the Treasury Department Circular 570.[767] Department of Treasury-certified sureties have agents throughout the United States from whom aliens could seek assistance in procuring an appropriate bond.[768] The Department of the Treasury certifies companies only after having evaluated a surety company's qualifications to underwrite Federal bonds, including whether those sureties meet the specified corporate and financial standards. Under 31 U.S.C. 9305(b)(3), a surety (or the obligor) must be able to carry out its contracts and must comply with statutory requirements, including

prompt payment of demands arising from an administratively final determination that the bond has been breached. DHS believes these safeguards reduce the risk that aliens will be exploited. DHS also notes that whether the availability of public charge bonds imposes an unnecessary administrative burden on USCIS is a question for Congress, not DHS.

DHS also disagrees that it imposes an unfunded mandate on state and local insurance and financial services regulators through this rulemaking. As part of the NPRM, DHS analyzed any impact on State, local, and tribal governments in accordance with the Title II of the Unfunded Mandates Reform Act of 1995 (UMRA)[770] and with E.O. 13132 (Federalism). The obligation to regulate various aspects of the financial and securities markets within states is already a function of the Federal Government; DHS does not further impose any new unpaid mandate on State, local or tribal governments by implementing a public charge bond procedure in accordance with section 213 of the Act, 8 U.S.C. 1183. It is up to financial institutions, authorized to conduct business according to the provisions implemented by states, to offer public charge bond products. This rule does not impose any new obligations on states.

### 2. Bond Amount

*Comment:* One commenter said DHS should reduce the proposed bond amount. Commenters stated that a $10,000 bond was excessive and would create an opportunity for private bond companies to exploit immigrant families, the elderly, and minorities. Similarly, a few commenters stated that even the minimum amount may be beyond the means of most families. A couple of commenters stated that increasing the minimum amount of the bond by one thousand percent was grossly unfair. Many commenters added that the cost was prohibitive for applicants who earn low incomes. Many commenters stated that a family's self-sufficiency would be destabilized and provided example scenarios where families would be required to pay up to 15 percent of $10,000.

A commenter stated that DHS provided no guidance on how evaluation of public charge bond sizes will be made. Another commenter asked that the value of the public charge bond

---

[766] *See* INA section 213, 8 U.S.C. 1183.

[767] *See* 8 CFR 103.6(b); *see also* proposed 8 CFR 103.6, as published in 83 FR 25951 (June 5, 2018).

[768] *See* Dep't of Treasury Circular 570, *Listing of Approved Sureties* (July 1, 2018).

[769] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51276 (proposed Oct. 10, 2018).

[770] *See* Pub. L. 104–4, 109 Stat. 48 (Mar. 22, 1995).

be based on the value provided for monetizable benefits under 8 CFR 212.21, which is 15 percent of the per-month Federal Poverty Guidelines for a single person. A few individual commenters asked that the minimum public charge bond be set to specific amounts, such as $1,000 or $8,100.

In contrast, another commenter asked that DHS increase the minimum bond amount to $25,000 for the least educated or individuals with the most dependents. Similarly, a commenter stated that the $10,000 bond does not cover the potential cost of supporting individuals who need food, shelter, or medical treatment.

*Response:* DHS agrees with the commenter that for consistency with prior agency practice, a minimum bond amount of $8,100, adjusted annually for inflation, is appropriate, as this is equal to the prior bond minimum adjusted for inflation. The amount of the bond represents liquidated damages to compensate the Government for all harms caused by a bonded individual who violates the terms, not simply the value of the benefits used. Furthermore, some public benefits do not have an easily quantifiable dollar value. Operational challenges make separate determinations for public benefits that are distributed in quantifiable and non-quantifiable values unfeasible. Making liquidated damages in an amount similar to historical precedent is a reasonable remedy.

Under this rule, public charge bonds permit DHS to admit, in its discretion, an adjustment of status applicant who is inadmissible based only on the public charge ground. Should DHS not exercise its public charge bond authority in a particular case based on a review of the individual facts and circumstances of that case, DHS will deny the adjustment of status application. DHS acknowledges that an individual offered a bond has already been found likely to become a public charge and that bond expenses may further destabilize an applicant's self-sufficiency. However, the additional assurance provided by the bond is necessary to overcome the finding of inadmissibility due to likelihood of becoming a public charge. Each applicant offered the opportunity to post a public charge bond will have to evaluate whether accepting the obligations of the public charge bond is the right decision given his or her circumstances.

As part of the implementation of the public charge bond, USCIS will provide training and guidance to all officers in making these discretionary determinations to allow an alien to submit a public charge bond, and the amount of any such bond.

3. Public Charge Bond Cancellation

*Comment:* A commenter stated that the terms of cancellation of the public charge bond are unreasonable. The commenter stated that since DHS only predicts less than three percent of immigrants would be able to cancel their bond, surety companies would set costly parameters and payment schedules. The commenter further stated that the process of cancelling the public charge bond is difficult because an obligor must apply to have the bond cancelled, the application must be approved by DHS, and bonds are not automatically released after completion.

*Response:* DHS disagrees that the bond cancellation terms are unreasonable. Consistent with the statute, public charge bonds may be cancelled where an alien is no longer likely to become a public charge, either because the alien naturalized, died, or permanently departed the United States. Additionally, an alien may apply for cancellation of the bond if the alien obtains a different immigration status that is exempt from the public charge inadmissibility provisions, or if the alien has reached his or her five-year anniversary since becoming a lawful permanent resident. Cancellation is not automatic and does not limit the duration of the bond, which remains in effect until canceled.

DHS also disagrees that the cancellation process is unreasonable. An application for cancellation must be made so that DHS can verify that the alien or surety have met their burden of demonstrating that one of the public charge bond cancellation conditions has been met, including that the bond was not breached, before the public charge bond can be cancelled and the funds released. DHS carefully considered the suggestion that public charge bonds be automatically released upon completion of the terms of the bond, but determined that no viable mechanism would ensure that the necessary conditions have been met in each case.

4. Breach of Public Charge Bond

*Comment:* A few commenters stated that the NPRM prioritizes the revenue streams of private bond companies over family unity because in the event of a breach of public charge bond, the principal would have to reimburse the bond company the full amount of the breach penalty. Several commenters stated that DHS should not be entitled to recoup the entire bond amount in the event of a breach by receipt of a public benefit. The commenter also stated that DHS should allow use of Medicaid as an exception to the breach of the full bond.

*Response:* DHS disagrees that the rule prioritizes the revenue of bond companies over family unity. The public charge bond allows aliens who are inadmissible to nonetheless seek admission to the United States upon posting of a public charge bond, which facilitates family unity. Additionally, the fees and collateral submitted to the bond company are compensation for the risk a bond company takes in guaranteeing the alien's conduct under the bond. This rule is not aimed at enriching private bond companies, but rather at ensuring that aliens subject to the public charge ground of inadmissibility are self-sufficient and are relying on their resources and those of their family, friends, and sponsors.

As explained above, DHS will collect the full amount of the public charge bond, as liquidated damages, because DHS considers it difficult, if not impossible, to calculate the alien's public benefit receipt as well as the government's costs. DHS will not exempt Medicaid from the benefits listed that count towards the breach of a public charge bond. A public charge bond is issued on the condition that the alien does not become a public charge by not using the public benefits, as defined in 8 CFR 212.21(b) for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). As is generally the case for the benefits listed in 8 CFR 212.21(b), Medicaid is one of the public benefits that constitute a major expenditure for the United States and the use of it generally indicates to DHS that the person may not be self-sufficient. Correspondingly, a public charge bond is issued under the condition that the alien does not use the benefits listed in 8 CFR 212.21(b), including Medicaid, and DHS declines to exempt its use from being a breach condition.

*Comment:* A commenter presented research and stated that monetary bonds would not be efficient or effective. Other commenters stated that the minimum bond amount bears no real relationship to the value of the public benefit that is received. Several commenters stated that breach of public charge bond would lead to economic destabilization for families.

*Response:* The face value of the public charge bond constitutes liquidated damages for a breach of the conditions of that bond. As explained in the NPRM, liquidated damages are an appropriate remedy in situations such as the public charge bond, where the total damages to

the Government are difficult, if not impossible to calculate.[771] Additionally, these damages go beyond the simple amount of the benefits received (which are not always calculable), but also the overhead of the benefit agency in administering the benefit. DHS disagrees that monetary bonds are ineffective. The purpose of a bond is to provide some reimbursement for harms incurred should the alien violate the terms of the bond. As stated above, the $8,100 minimum amount of the public charge bond is consistent with the historical public charge bond minimum, that has been found reasonable and enforceable, adjusted for inflation.

*Comment:* A commenter said the rule's requirements around breach of the public charge bond are unfair, put immigrants in economic jeopardy, and are a huge departure from previous policy. The commenter also stated that the rule removes the phrase "substantial violation" from the conditions for breaching bond, meaning that any breach of the terms of the bond, which are not fully outlined in the rule, would render the obligor liable for the full amount of the bond. The commenter stated that this creates a punitive policy against intending immigrants instead of fulfilling the purported purpose of recouping losses from public benefits use. The commenter also stated that this unnecessarily puts immigrants at great financial risk.

*Response:* DHS disagrees with these comments. The conditions that constitute breach of a public charge bond are listed in 8 CFR 213.1(h)(1) and (2), and state that a public charge bond is breached if the alien received public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months) after the alien's adjustment of status to that of a lawful permanent resident or if any other condition of the public charge bond is violated, with limited exceptions. In particular, public benefits that are exempt from being considered, as outlined in 8 CFR 212.21(b), including while present in a status exempt from public charge, do not count towards the breach determination as explained in the NPRM. To make the bond provisions consistent with the amended public benefits definition of 8 CFR 212.21(b), DHS has also amended the regulatory bond provision to clarify that public benefits received after having been granted a waiver of inadmissibility from

public charge will not be considered as part of the breach determination.[772] As detailed in 8 CFR 213.1(h)(3), DHS will determine whether the conditions of the bond have been breached, and 8 CFR 213.1(h) provides that an administratively final determination that a bond has been breached creates a claim in favor of the United States. Such a breach determination is administratively final when the time to file an appeal with the AAO pursuant to 8 CFR part 103, subpart A, has expired or when the appeal is dismissed or rejected.

As explained in the NPRM,[773] under the breach of bond provisions at 8 CFR 103.6(e), an immigration bond is considered breached if there has been a substantial violation of the stipulated condition. The term "substantial violation" is generally interpreted according to contractual principles.[774] However, in the NPRM, DHS proposed to incorporate the substantial violation standard via incorporating principles that govern the public charge and public benefits definitions.[775] As explained in the statute, the public charge bond is intended to hold the United States, and all states, territories, counties, towns and municipalities and districts harmless against aliens becoming a public charge.[776] Whether the public charge bond is unnecessary or punitive is a question for Congress, not DHS.[777]

*Comment:* Some commenters stated that the Government receiving full bond payment in those circumstances when the public benefits paid out are less than the full amount of the bond is unfair, unjust, and unlawful. A commenter further stated that the proposed regulations imposed an unlawful and strict standard for accidental, or inadvertent violations of bond conditions. Another commenter said the NPRM does not offer a coherent explanation for why recovery of the entire amount is appropriate, asserting that it makes little sense to forfeit the entire bond since DHS itself asserts that the purpose of the bond is to "recoup [the] cost of public benefits received." A commenter stated that in the case of a breach of public charge bond, the individual should only be responsible for the specific amount of benefits

received rather than "arbitrary liquidated damages award."

A commenter indicated that the proposal to require forfeiture of the entire amount of the bond upon a showing that an alien has obtained any public benefit whatsoever is arbitrary, capricious and, as the commenter stated that DHS acknowledges, contrary to past practice, under which only the amount of the benefit would be forfeited. The commenter also indicated that this makes little sense particularly since many immigrants may be unclear as to the precise conditions that would result in forfeiture. The commenter stated that total forfeiture should be limited to the rare instances in which DHS can prove by a preponderance of the evidence that the alien intentionally sought public benefits with the knowledge that such benefits would result in bond forfeiture; in other instances, the commenter suggested, forfeiture should be limited to the amount of benefits received plus a surcharge for the administrative costs of collection.

*Response:* DHS disagrees. As explained in the NPRM, liquidated damages are an appropriate remedy in situations such as the public charge bond, where the total damages to the Government are difficult, if not impossible to calculate and the amount of the damages is reasonable.[778] Additionally, these damages go beyond the simple amount of the benefits received, encompassing not only the monetary value of the benefits received (which frequently are not calculable) but also the overhead of the benefit agency in administering the benefit.

As stated in the NPRM,[779] the minimum amount of the public charge bond is consistent with historical public charge bond amounts, adjusted for inflation, that have been found reasonable and enforceable. Historically, public charge bonds have been forfeited in their entirety upon breach.[780] The conditions that constitute breach of a public charge bond are delineated fully in 8 CFR 213.1(h)(1) and (2), and any alien offered a bond has ample opportunity to review the conditions and terms before agreeing to these terms. Additionally, as explained in the

---

[771] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51226 (proposed Oct. 10, 2018).

[772] *See* 8 CFR 213.1(h)(4).

[773] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51125 (proposed Oct. 10, 2018).

[774] *See, e.g., Aguilar* v. *United States,* 124 Fed. Cl. 9, 16 (2015) (discussing substantial violation under 8 CFR 103.6(a) in relation to a delivery immigration bond).

[775] *See* 8 CFR 212.21(a) and (b).

[776] *See* INA section 213, 8 U.S.C. 1183.

[777] *See* INA section 213, 8 U.S.C. 1183.

[778] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51226 (proposed Oct. 10, 2018).

[779] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51221 (proposed Oct. 10, 2018).

[780] *See, for example, United States* v. *Goldberg,* 40 F.2d 406 (2d Cir. 1930); *see Matta* v. *Tillinghast,* 33 F.2d 64 (1st Cir. 1929); *Ill. Surety Co.* v *United States,* 229 F. 527 (2d Cir. 1916); *United States* v. *Rubin,* 227 F. 938 (E.D.N Pa 1915); *Matter of B-,* 1 I&N Dec. 121 (BIA 1941).

**41456** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

NPRM,[781] under the current breach of bond provisions of 8 CFR 103.6(e), an immigration bond is considered breached if there has been a substantial violation of the stipulated condition. The term ''substantial violation'' is generally interpreted according to contractual principles.

*Comment:* A commenter stated that the NPRM's proposals for the appeal of public charge bond decisions are unfair because the obligor must pay a $675 fee to have the same officer who issued the initial denial review that decision, and because throughout the process, the alien must rely on the obligor to complete the steps, as the alien is not a party to the bond contract. A commenter further stated that the proposed rule would hinder the ability of noncitizens to meaningfully challenge harsh or arbitrary breach determinations.

*Response:* DHS disagrees. The public charge bond appeal process as described in the NPRM is a long established and accepted method of disputing initial USCIS determinations. It is possible for obligors to appeal errors in either law or fact through well-established administrative remedies via the AAO without having to resort to bringing suit in a Federal court. Although the alien is not a party to the surety bond contract with DHS, the rule does not impair his or her ability to pursue or defend against traditional contract actions with regard to the obligor, with whom he or she is in contractual privity. Similarly, if the alien is the obligor in that the alien submits a cash equivalent bond, the alien would be able to defend against a breach determination. Requiring USCIS to set up a separate and distinct review process for bond appeals would be unnecessarily burdensome and redundant.

*Comment:* An individual commenter said the NPRM would add further fees and expenses to an already costly process. Some commenters provided a discussion of the costs associated with filing a public charge bond application and filing an appeal. The commenters said immigrants would be inflicted with expensive fees and fines.

*Response:* USCIS is primarily funded by fees. Congress mandated that DHS may set IEFA fees in a manner commensurate with the expense of adjudicating the benefits in question.[782] The cost of filing a public charge bond may be assessed in the USCIS fee rule, as are other USCIS fees.

*Comment:* A commenter stated that the bond requirement should not be limited to surety bonds but should instead allow for cash, cashier's check, or money order. Another commenter stated that USCIS should accept only surety bonds, not cash or equivalents, until the effectiveness of the bonding process can be assessed in practice. This commenter recommended that only limited-duration bonds be accepted, at least initially. The commenter indicated that a periodic bond renewal process would provide valuable private sector monitoring of the alien's compliance, especially where the time period between bond acceptance and eligibility for cancellation extends over multiple years.

*Response:* DHS agrees that bonds should not be limited to surety, and plans to accept cash equivalents once the proper accounts and procedures can be established. DHS disagrees that it is necessary to wait until the effectiveness can be established before accepting cash bonds. The nature of cash bonds makes it unlikely that any situation would arise where DHS would have more difficulty collecting for a breached cash bond than for a breached surety bond. DHS also disagrees that only limited duration bonds be accepted initially. As a commenter has noted, public charge bonds of limited duration place an additional burden in both time and money on both the bonded alien and DHS, as they must be periodically renewed and these renewals must be reviewed by DHS. For this reason, DHS will only accept public charge bonds of unlimited duration.

*Comment:* One commenter stated that if immigrants can afford to pay the high cost of a guide to cross the border illegally, they can probably afford a bond to guarantee their stay in the United States.

*Response:* DHS appreciates concerns raised about illegal entry but stresses that the public charge inadmissibility rule assesses an applicant's likelihood of becoming a public charge at any time in the future. Whether an alien paid a guide to enter the United States without permission, in and of itself, is not relevant to the public charge inadmissibility determination, or to whether DHS should exercise its discretion and allow an alien inadmissible only on the public charge ground to submit a public charge bond.

*Comment:* A commenter stated that the government receiving full bond payment in those circumstances when the public benefits paid out are less than the full amount of the bond is unfair, unjust, and unlawful.

*Response:* DHS disagrees that forfeiture of the full bond amount in the event of breach is unfair, unjust, or unlawful. The amount is based on a review of the amount originally provided by 8 CFR 213.1 in 1964,[783] adjusted for inflation, to represent present dollar values.[784] Further, the face value of the bond constitutes liquidated damages for a breach of the conditions of that bond. As explained in the NPRM,[785] liquidated damages are an appropriate remedy in situations such as the public charge bond, where the total damages to the government are difficult, if not impossible to calculate. Additionally, these damages go beyond the simple amount of the benefits received, encompassing not only the monetary value of the benefits received but also the overhead of the benefit agency in administering the benefit.

The public charge bond is offered to allow aliens who are otherwise inadmissible due to a likelihood of becoming a public charge an opportunity to overcome that finding of inadmissibility. The conditions that constitute breach of a bond are delineated fully in 8 CFR 213.1(h)(1) and (2), and any alien offered a bond has ample opportunity to review them before agreeing to these terms. Additionally, as explained in the NPRM,[786] under the current breach of bond provisions of 8 CFR 103.6 an immigration bond is considered breached if there has been a substantial violation of the stipulated condition. The term ''substantial violation'' is generally interpreted according to contractual principles.[787] However, in the NPRM, DHS proposed to incorporate the substantial violation standard via incorporating principles that govern the public charge and public charge benefits definitions.[788] Whether the public charge bond is punitive is a matter for Congress; however, per the Act, the public charge bond's purpose is to hold the United States, and all states, territories, counties, towns and municipalities and districts harmless

---

[781] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51125 (proposed Oct. 10, 2018).

[782] *See* INA section 286(m), 8 U.S.C. 1356(m).

[783] Miscellaneous Amendments to Chapter, 29 FR 10579 (July 30, 1964).

[784] DHS uses the semi-annual average for the first half of 2018 and the annual average from 1964 from the historical CPI–U for U.S. City Average, All Items. *See https://www.bls.gov/cpi/tables/ supplemental-files/historical-cpi-u-201806.pdf* (last visited July 26, 2019).

Calculation: Annual average for 1st half of 2018 (250.089)/annual average for 1964 (31) = 8.1; CPI–U adjusted present dollar amount = $1,000 * 8.1 = $8,100.

[785] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51226 (proposed Oct. 10, 2018).

[786] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51125 (proposed Oct. 10, 2018).

[787] *See, e.g., Aguilar* v. *United States,* 124 Fed. CL 9, 16 (2015) (discussing substantial violation under 8 CFR 103.6(a) in relation to a delivery immigration bond.)

[788] *See* 8 CFR 212.21(a) and (b).

against bonded aliens becoming public charges.[789]

*Comment:* A commenter indicated that sponsors of religious workers may not possess the financial ability of typical U.S. employers, and may not be able to afford a bond.

*Response:* DHS acknowledges that special immigrant religious workers, and immigrants who perform religious work generally, provide valuable contributions to the United States and are in a special position, as acknowledged by Congress in the special immigrant religious worker classification.[790] Congress, however, did not exempt these workers from the public charge ground of inadmissibility and therefore, DHS will not exempt them in this rule. The public charge bond provides a way for individuals who would otherwise be inadmissible due to likelihood of becoming a public charge to overcome that finding. While DHS will take into account the totality of the circumstances regarding all applicants, and will adjudicate the applications of religious workers in light of the unique conditions under which many of them live and work, in those instances where a bond is offered it is already an extraordinary exercise of discretion to allow the alien to adjust status in the United States even when found inadmissible as likely to become a public charge. It is up to the applicant to determine whether it is in his or her best interests to accept the offered opportunity to post a public charge bond, and this rule does not require that the sponsor post the bond, rather this obligation is on the alien and the bond maybe posted by any entity or individual that can serve as an obligor under section 8 CFR 103.6 and 213.1. DHS declines to further modify this exercise of discretion based upon either the nature of the applicant's employment or the immigration classification in which the alien seeks to adjust status.

*T. Effective Date(s)*

*Comment:* Many commenters asked that the proposed rule be delayed as long as possible. One commenter noted that the verification requirements related to the Form I–944 would create new challenges and impose great burdens on State and local agencies. Another commenter requested that the rule be delayed as long as possible not only because of the impact on agencies

but also because of the impact on the legal services community and ethnic community-based organizations who would bear the brunt of dealing with immigrants fearful about how the new requirements will affect them and their families. Another commenter said DHS should time the publication of the final rule so that the effective date falls within an ACA marketplace open enrollment period, so that those who are currently using Medicaid or CHIP and who may be affected by this rule, may discontinue that benefit and switch to an ACA marketplace plan without an interruption in health insurance coverage. A couple of commenters stated that the 60-day effective date may be insufficient and reasoned that DHS should delay the effective date of any final regulation until at least January 1, 2020, or one year after the publication of the final rule, which would minimize disruption to the markets, decrease consumer confusion of mid-year changes, and allow affected entities to adjust their outreach, messaging, and technology to accommodate the changes. A commenter asked that the proposed rule be delayed a minimum of three years to allow states to implement a comprehensive education program. Another commenter stated that if any changes are implemented public agencies will need far longer than 60 days to prepare, noting that contracts will need to be obtained with vendors in order to reprogram computer systems, all materials pertaining to immigrant eligibility will need to be reviewed, workers will need to be trained, and funding will need to be appropriated in order to do these things through a state's budget cycle. The commenter cited to the Medicaid expansion which, though passed in 2010, was not set to be implemented until January 2014; computer systems and other processes were not ready nearly 4 years later, causing adverse impacts on Californians. Another commenter detailed other impacts or administrative burdens the rule would place on benefit-granting agencies. These impacts include needing to provide aliens with documentation regarding benefit receipt, responding to inquiries from the public, updating communication materials, and increased caseload.

*Response:* DHS is retaining the 60-day effective date. Relatedly, DHS is also clarifying that DHS will apply the public charge final rule only to applications and petitions (in the context of extensions of stay or changes of status) postmarked (or if applicable, electronically submitted) on or after the effective date of the final rule.

Applications and petitions pending with USCIS on the effective date of the rule, *i.e.* were postmarked before the effective date of the rule and were accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2)) will not be subject to the rule. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

In addition, DHS will not consider the receipt of public benefits excluded under the 1999 Interim Field Guidance unless such benefits are received on or after the effective date of the final rule.

As DHS stated elsewhere in this rule, DHS is not imposing any requirements on benefit-granting agencies through this final rule or a requirement that these agencies specifically verify the information provided on the Form I–944. While the Form I–944 includes a Federal Agency Disclosure and Authorization, that part of the form will only become relevant after DHS enters into information sharing agreements with specific agencies to obtain verification of the information supplied by applicants. DHS expects that this process will take time and will likely be in effect at some point in the future after the final rule becomes effective. In addition, any such information sharing will depend on the ability of the relevant agencies to share such information with DHS. Because this aspect of the rule's implementation will necessarily involve inter-agency collaboration, DHS does not believe that delaying the effective date of the final rule beyond 60 days will be necessary to address the agencies' concerns related to the verification of information on Form I–944.

DHS is also not altering an alien's eligibility for public benefits, and therefore does not believe that agencies would have to change their guidance in that regard. The rule specifies what public benefits will be considered in the public charge inadmissibility determination. DHS encourages agencies to update their web pages and guidance to direct recipients of public benefits to DHS guidance related to this final rule rather than repeat or explain what receipt of public benefits may make a person a public charge. While aliens may choose to disenroll from benefits to ensure the public benefit threshold is not triggered, DHS is moving to a duration-only threshold, aliens will have more time to adjust

---

[789] *See* INA section 213, 8 U.S.C. 1183.

[790] For example, special immigrant religious workers under section 101(a)(27)(C), 8 U.S.C. 1101(a)(27)(C) qualify for adjustment of status under INA section 245(a), notwithstanding certain bars under INA section 245(c).

**41458**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

their conduct in response to this rule. Therefore any potential increase in agencies' caseloads will likely be spread over a longer period of time which would eliminate the need to further extend the effective date of the final rule.

Finally, DHS is also not requiring that benefit-granting agencies develop new documentation of benefits provided, but will accept documentation already provided in the normal course of benefit administration. Such documentation should be adequate given that DHS is simplifying the threshold standard to focus exclusively on the duration of receipt and not the amount. DHS notes that examples of implementation of the Medicaid expansion program are not apt for comparison to the implementation of this rule for the reasons explained above, namely, that this rule imposes no direct obligations on benefit-granting/administering agencies, and it does not modify eligibility criteria for the benefits covered by this rule.

With respect to comments requesting time so aliens can move from Medicaid to obtaining private health insurance through the ACA marketplaces, DHS notes that it believes aliens will have sufficient time to obtain private health insurance through the ACA marketplaces. Additionally, Medicaid benefits included in the definition of public benefit will only be a heavily weighted negative factor in the totality of the circumstances if the alien receives Medicaid for more than 12 months in the aggregate, beginning 36 months before the alien filed for adjustment of status. The open enrollment period for 2020 will run from November 1, 2019 to December 15, 2019.[791] Because USCIS will only consider benefits covered under this final rule if received on or after the effective date of the final rule, and given that this rule published on August 14, 2019, aliens will have sufficient time to disenroll from Medicaid and enroll in private health insurance through the ACA marketplaces without incurring a heavily weighted negative factor for purposes of the public charge inadmissibility determination. Therefore, DHS will implement the rule within 60 days from the date of publication.

*Comment:* A commenter stated that DHS does not provide sufficient notice to noncitizen benefit recipients of TANF, SSI, or general assistance about the impact of benefits received prior to the effective date of the rule. The commenter requested that DHS use the

"primarily dependent" standard for TANF, SSI, and general assistance benefits received prior to the effective date of the rule.

*Response:* DHS disagrees that it has given recipients of public benefits inadequate time to make decisions about receiving public benefits before the effective date of this rule. Through the NPRM, DHS provided advance notice to the public that DHS was changing which public benefits would be considered in public charge inadmissibility determinations. The NPRM's provisions, coupled with the 60-day effective date of the final rule, provided adequate notice to the regulated public with respect to the possible consequences associated with the receipt of public benefits.[792]

DHS notes that in this final rule, DHS will not consider public benefits listed in 8 CFR 212.21(b) that were previously excluded under the 1999 Interim Field Guidance if received before the effective date of this final rule. DHS will continue to consider benefits listed in 8 CFR 212.21(b) that were previously considered under the 1999 Interim Field Guidance if received before the effective date of the final rule.[793] The receipt of such benefits would not be considered as a heavily weighted negative factor. In addition, DHS is clarifying that this final rule will not apply to any applications or petitions postmarked before the effective date and accepted by USCIS pursuant to 8 CFR 103.2(a)(7)(ii),

and are pending on the effective date of the final rule, but only to applications or petitions postmarked (or if applicable, electronically submitted) on or after the effective date of the final rule.

*Comment:* A commenter stated that the proposed rule should be applied to applications filed on or after the effective date. Pending applications would be affected by the new rule and would place a strain on DHS to re-interview and re-adjudicate applications that are already pending. In contrast, one commenter stated the rule, if implemented, needs to apply retroactively at some point in order to remove green cards from individuals who may have already received them and who could be deemed public charges under the proposed rule.

*Response:* DHS agrees that the rule will not be applied to applications pending on the effective date of the rule, *i.e.* were postmarked (or if applicable, electronically submitted) and were accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2) the effective date of the rule and were accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2). As discussed above, DHS will continue to review such cases under the 1999 Interim Field Guidance. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

DHS will only apply this final rule to applications for admission or applications or petitions for immigration benefits postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. DHS does not anticipate a strain on USCIS resources due to the effective date of this final rule. By applying the public charge rule to applications postmarked on or after the effective date, DHS ensures a smooth implementation and ample notice to applicants and petitioners.

Benefits Received Before Effective Date and Previously Excluded Benefits

*Comment:* Several commenters generally opposed the consideration of benefits received before the effective date of the rule, and that the 1999 Interim Field Guidance should be applied to any receipt of benefits prior to the effective date of the final rule. Some commenters disagreed with this portion of the rule, stating it runs counter to the original purpose of the

---

[791] *https://www.healthcare.gov/quick-guide/dates-and-deadlines/* (last visited May 1, 2019).

[792] *See, e.g., Alcaraz* v. *Block,* 746 F.2d 593, 611 (9th Cir. 1984) ("In addition to the pre-promulgation procedures, 5 U.S.C. 553(d) provides for a 30-day lag time between the rule's publication and its effective date. This post-adoption delay in effectiveness affords parties affected by the regulations reasonable time in which to adjust their conduct or take other measures.") (citations omitted).

[793] Under the 1999 Interim Field Guidance, DHS would consider the current receipt of cash benefits for income maintenance or long-term institutionalization at government expense in the totality of the circumstances. *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28690 (May 26, 1999) ("If at the time of application for admission or adjustment an alien is receiving a cash public assistance for income maintenance or is institutionalized for long-term care (as discussed in section 6, below), that benefit should be taken into account under the totality of the circumstances test, along with the other statutory factors under section 212(a)(4)(B)(i) and any [adjustment of status]."). DHS would also consider past receipt of cash benefits for income maintenance or long-term institutionalization at government expense in the totality of the circumstances. *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28690 (May 26, 1999) ("[P]ast receipt of cash income-maintenance benefits does not automatically make an alien inadmissible as likely to become a public charge, nor does past institutionalization for long-term care at government expense. Rather this history would be one of many factors to be considered in applying the totality of the circumstances test.").

public charge test and the 1999 Interim Field Guidance standard by which individuals are becoming a public charge. A commenter expressed disapproval of this section of the rule because it would impact family members who rely on cash benefits.

Another commenter stated that the proposed rule could be retroactively applied so that immigrants' receipt of benefits prior to the effective date of the rule would be considered in a public charge determination. The commenter provided readings of the proposed regulatory text against the 1999 Interim Field Guidance, arguing that SNAP, specifically, could "fall through the cracks." Other commenters stated that this part of the rule lacked clear guidance and proved difficult to implement, providing examples and saying this section would be unfair and unworkable. A commenter requested that DHS use the "primarily dependent" standard for TANF, SSI, and general assistance benefits received prior to the effective date of the rule. A commenter said this portion of the rule is in contrast with what many social workers have advised their clients on in the past.

*Response:* DHS acknowledges that the public charge inadmissibility standard in this final rule is a departure from the 1999 Interim Field Guidance. However, this final rule as it pertains to public charge inadmissibility will only apply to applications for admission or adjustment of status postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. For any application for admission or adjustment of status postmarked (or if applicable, electronically submitted) and pending before the effective date of the rule, USCIS will apply the 1999 Interim Field Guidance. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

Additionally, for any application for admission or adjustment of status postmarked (or if applicable, electronically submitted) on or after the effective date of the rule, if the alien received any included public benefit listed in the 1999 Interim Field Guidance (cash assistance for income maintenance, including SSI, TANF, and general assistance) before the effective date of the rule, DHS will consider those benefits as they would have been considered under the 1999 Interim Field Guidance. In other words, for

adjustment of status applications filed on or after the effective date of the rule, an applicant's receipt of any of the benefits listed in the 1999 Interim Field Guidance prior to the effective date of the rule will be treated as a negative factor in the totality of the circumstances, as they were in the 1999 Interim Field Guidance. Public benefits that were not considered in the 1999 Interim Field Guidance, such as SNAP, would not be considered at all in the public charge inadmissibility determination; they would only be considered if received on or after the effective date of the rule. However, regardless of the length of time such benefits were received before the effective date of this rule, or the monetary amount of such benefits, DHS will not treat the receipt of these benefits as a heavily weighted negative factor, as set forth in 8 CFR 212.22(d).

DHS believes that it has minimized any adverse effects on applicants as a result of having received benefits that were listed in the 1999 Interim Field Guidance before the effective date of this rule. DHS believes that recipients of public benefits listed in the 1999 Interim Field Guidance are being given adequate time to make decisions about receiving public benefits on or after the effective date of this rule. The NPRM's discussion of how DHS would treat past receipt of benefits listed in the 1999 Interim Field Guidance, this rule's explanation of how such benefits will be treated, and the proposed 60-day effective date of the final rule, provide aliens an opportunity to discontinue the receipt of any public benefits before filing an application for admission or adjustment of status and provides an opportunity for public benefit-granting agencies to communicate the consequences of receiving public benefits, to the extent such agencies deem appropriate.

With respect to the public benefit condition for extension of stay and change of status, DHS will not consider any receipt of public benefits that occurred before the effective date of this final rule.

*Comment:* A commenter proposed that a 3-year grace period be applied for the consideration of previously excluded benefits. The commenter indicated that, in some cases, the receipt of benefits for up to 3 years prior to the proposed rule's enactment could count against immigrants, and that such an outcome would be absurd in light of the standard 3-year cycle process for benefits. The commenter indicated that people should not be punished for following the standard 3-year cycle process for receiving benefits which are

currently excluded from the public charge determination, or for not being able to obtain a termination letter quickly enough.

*Response:* DHS appreciates the suggestion but declines to incorporate a 3-year grace period for previously received benefits. As previously indicated, the rule will only consider all benefits as listed in 8 CFR 212.21(b) if the application was filed on or after the effective date. For benefits received before the effective date and were also considered under the 1999 Interim Field Guidance, USCIS will only consider the benefits as they would have been considered under the 1999 Interim Field Guidance. The rule will become effective within 60 days, which DHS believes is sufficient time for aliens to terminate any currently received public benefits that may be reviewed in the public charge inadmissibility determination.

*Comment:* Commenters stated that such a rule should not be applied to immigrants already in the United States who are on a pathway to "legalization" (who are "in line").

*Response:* DHS disagrees with the comment that the rule will be applied to applicants with applications pending on the day the rule goes into effect. This rule only applies to applications for admission or adjustment of status postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. Individuals who have applications pending with DHS on the effective date of the rule will not be subject to this rule; USCIS will adjudicate such applications under the terms of the 1999 Interim Field Guidance.

*Comment:* A commenter argued that past acceptance of legally-obtained Federal assistance programs or public benefits should not count against immigrants already in the country, as it is often U.S. born children who have qualified for and are receiving assistance because their immigrant parents are struggling. Neither the parents nor the children should be penalized for accepting public benefits that were legally available for assistance.

*Response:* As noted elsewhere in this preamble, benefits received by or on behalf of a U.S. citizen child are not considered in the public charge inadmissibility determination.

*Comment:* A commenter requested that DHS use the "primarily dependent" standard for TANF, SSI, and general assistance benefits received prior to the effective date of the rule.

*Response:* As noted, under this rule, USCIS will continue to apply the

criteria set forth in the 1999 Interim Field Guidance to applications postmarked (or if applicable, electronically submitted) before, and pending on, the effective date of this rule, and therefore, the receipt of previously-included benefits in those applications will be considered pursuant to the ''primary dependence'' standard. However, for applications postmarked (or if applicable, electronically submitted) on or after the effective date of this rule in which the applicant received previously-included benefits before the effective date of the rule, DHS will consider the receipt of those benefits as a negative factor in the totality of the circumstances, but such receipt will not be considered a heavily weighted negative factor.

*U. Other Comments*

*Comment:* A commenter indicated that DHS did not affirmatively address whether it consulted with Federal benefit-granting agencies such as HHS, USDA, and HUD in developing its proposed definition of ''public charge'' as ''an alien who receives one or more public benefit[s]'' and abandoning the current ''primarily reliant'' standard. Although the commenter acknowledged that the NPRM indicated that DHS consulted these benefit-granting agencies on other, tangential issues such as methodologies for considering and quantifying an immigrant's receipt of non-cash, non-monetizable benefits, the commenter was requesting that DHS address, in the next public action, whether or not it formally consulted Federal benefit-granting agencies such as HHS, USDA, and HUD in developing its proposed definition of ''public charge,'' and if so, that DHS publicly disclose copies of any written feedback it received from these agencies.

*Response:* Interagency discussions are a part of the internal deliberative process associated with the rulemaking.

*Comment:* Another commenter indicated that the rule would arbitrarily prevent immigrants from obtaining or maintaining lawful immigration status, which data shows improves immigrants' hourly wages.

*Response:* DHS disagrees that the rule will impermissibly prevent immigrants from obtaining or maintaining lawful immigration status. This rule only addresses one ground of inadmissibility and does not otherwise affect eligibility for public benefits. As discussed elsewhere in this rule, DHS's objective in promulgating this rule is to better ensure that aliens seeking admission, adjustment of status, extension of stay, and change of status, rely on their own resources and capabilities and the not

government to meet their needs. DHS also intends that this rule provide a clear regulatory framework for assessing the factors Congress established as mandatory considerations with respect to the public charge ground of inadmissibility.

*Comment:* An individual commenter proposed creating a ''self-sufficiency program'' in place of the proposed rule. The commenter suggested the program be modeled after the ORR's Voluntary Agencies Matching Grant Program that provides intensive case management, English language and vocational training, and a variety employment services. A commenter suggested creating classes or having resources available to aliens to help them understand the importance of self-sufficiency and methods to obtain that ideal goal. The commenter indicated that those kinds of programs would provide more incentive to the aliens to avoid public assistance than revoking or denying their citizenship status just because they needed some help or might need it in the future.

*Response:* DHS appreciates the suggestion. However, this rule establishes guidelines for the inadmissibility of aliens based on the public charge ground of inadmissibility as established by Congress. The rule provides for the initial determination of admissibility; other immigration related benefits or activities fall beyond the scope of the rule. The programs offered to refugees are designated to assist people who are not subject to the public charge inadmissibility ground. Further, neither the statute nor this final rule permit revocation or denial of citizenship status based on inadmissibility on public charge grounds.

*Comment:* A commenter asked that a public information campaign be implemented that is targeted towards the general public to explain the rule changes.

*Response:* DHS will provide additional information and communication materials on the rule and its provisions as part of the implementation of the final rule.

*Comment:* Some commenters provided general comments and recommendations on and other aspects of the immigration system. Multiple commenters opposed the separation of families at the southwest border. Several commenters stated that asylum seekers and refugees are unfairly treated. Several commenters stated their support for suspension of all immigration via section 212(f) of the Act, 8 U.S.C. 1182(f). Commenters expressed concern regarding the lack of support provided

to Iraqi translators in the search for asylum.

*Response:* DHS appreciates the comments. However, these comments are outside of the scope of DHS's rulemaking. Through this rulemaking, DHS is exercising its authority to regulations implementing the public charge ground of inadmissibility and the public charge bond framework. DHS is also setting a public benefit condition related to extension of stay and change of status.

*Comment:* Some commenters stated that all individuals should be treated with dignity, compassion, and kindness.

*Response:* DHS believes that this rule implements the public charge ground of inadmissibility consistent with those values, as well as other values prioritized by Congress.

*Comment:* One commenter suggested that DHS should issue work authorization cards to all aliens subject to the public charge ground of inadmissibility and that USCIS should amend the rule to include a work authorization category for all pending applications. Another commenter suggested that USCIS amend the rule to include a work authorization category for all pending applications.

*Response:* These comments are outside of the scope of DHS's rulemaking. DHS will not offer employment authorization to all aliens subject to the public charge ground of admissibility. DHS notes that aliens with pending adjustment of status application may apply for employment authorization under 8 CFR 274a.12(c)(9).

*Comment:* One commenter requested that DHS affirmatively review and incorporate into the administrative record for this rulemaking the supporting evidence and authority cited in the approximately 300 footnotes contained in the commenter's submission. The commenter also submitted to the docket 22 additional documents, which included some but not all of the commenter's supporting evidence and authority.

*Response:* DHS has fulfilled its obligation to meaningfully consider and respond to the public comments. With respect to the commenter's additional request regarding the administrative record, the APA does not require DHS to conduct the exercise requested by the commenter, and DHS respectfully declines to do so.

*Comment:* A commenter recommended that the proposed rule include the ''protective effect of secure immigration status against abuse and exploitation, as well as the bolstering effects on family stability.'' The

commenter indicated that as recognized under VAWA, admission to the United States or adjustment of status can help victims access employment and increase their ability to escape the violence or overcome the trauma they've suffered. The commenter further stated that a stable immigration status helps individuals obtain secure better paying jobs, reducing the stress associated with exploitative working conditions, leading to better short-term and long-term outcomes for their families. The commenter provided information on research conducted among immigrant victims across the United States that indicated 65 percent of immigrant victims reported that their violent partner had used some form of a threat of deportation after arrival in the United States as a form of abuse. The commenter suggested that DHS should consider the supportive and protective effects of stable immigration status to victims. The commenter indicated that such a consideration would support the purpose and guidance of the important protections that Congress has afforded for victims in various Federal laws, even if they are not seeking admission under an exempt victim-specific category.

*Response:* DHS understands the concerns and emphasizes that VAWA, T and U applicant categories are generally not subject to the public charge inadmissibility determinations. Further DHS has provided that if a person receives a public benefit during a status exempt from public charge inadmissibility, and later applies for an immigration benefit under a different status where admissibility is required, such public benefit receipt would not be considered in the public charge inadmissibility determination.

*Comment:* A commenter expressed concern about restricting the possibility of filing Request for Fee Waiver (Form I–912), stating that many applicants have an income below the Federal Tax Filling Requirement Threshold, do not file tax returns, and will lack the evidence to submit this request. The commenter went on to say that forcing applicants to submit evidence through IRS tax filing will increase the amount of tax return moneys that low-income tax payers are eligible to obtain, thus canceling out any additional income received by DHS if these applicants are unable to qualify for the fee waiver.

*Response:* This rule not change the eligibility or evidentiary requirements of Form I–912. This comment seems misdirected as it appears to relate to a routine revision of Form I–912 and not this rule. Therefore, this comment is out of scope of this rule.

*Comment:* Some commenters provided general comments and recommendations on public benefits and the welfare system in the United States. For example, multiple commenters stated that immigrants are putting a burden on public services and U.S. taxpayers. One commenter summarized potential methods for saving money within the public welfare system in the United States, as an alternative to changing how the Government implements the public charge ground of inadmissibility. An individual commenter in support of the rule provided information and views regarding fraud and abuse in the U.S. public welfare system, along with brief recommendations on how to address such issues.

*Response:* DHS appreciates these comments. However, DHS's public charge inadmissibility rule is not intended to address public benefit fraud and abuse specifically. Rather, this rule is intended to align the self-sufficiency goals set forth by Congress with the public charge ground of inadmissibility.

*Comment:* One commenter requested that USCIS ensure employers are paying living wages to immigrants. The commenter stated that SNAP participants are either employed or seeking jobs, or are children or elderly. Similarly, another commenter asserted that, unless DHS is willing to compel employers in agriculture and in other industries to provide a living wage and health benefits, it is cruel and unjust to punish hard-working immigrants who rely on public benefits but who also benefit the United States.

*Response:* The vast majority of workers who enter the United States on employment-based nonimmigrant and immigrant visas, including temporary agricultural workers, enter based on the terms and the conditions that have been certified by DOL.[794] For a temporary agricultural worker (H–2A nonimmigrant),[795] the employer must offer the appropriate wage rate[796] and comply with other requirements as set by law and regulations.[797] As such, DOL deemed the financial aspect and conditions of the employment itself

sufficient for purpose of the alien's status.

With this rulemaking, DHS prevent individuals from receiving public benefits for which they are eligible. DHS understands that individuals may be hesitant to apply for or receive public benefits in light of this rulemaking. DHS, however, is implementing the congressional mandate provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) to assess, as part of an alien's application for admission or adjustment of status, whether the alien is likely at any time to become a public charge.

*Comment:* Commenters referenced DOS's January 2018, changes to public charge in the FAM. One commenter stated that if DOS adopted a standard similar to the proposed rule, it would result in significant increases of visa denials.

*Response:* This rule only pertains to aliens who seek admission into the United States as a nonimmigrant, or as an immigrant, or seek an adjustment of status or a change of status or extension of stay. Although the standards set forth in the rule pertain to DHS's determinations as a whole, the rule's cost analysis focuses on the impact to USCIS adjudications, as the rule most directly impacts USCIS adjudication of applications for adjustment of status, as well as applications for extension of stay and change of status. DHS did not include an analysis of the costs and benefits associated with public charge inadmissibility determinations made by the DOS in the immigrant and nonimmigrant visa context. DHS defers to DOS on any information related to the application of the public charge inadmissibility determination as part of the immigrant and nonimmigrant visa process.

*Comment:* A commenter urged DHS to defer to the DOS's public charge determination. Another commenter stated that DOS could further modify its own public charge guidance in response to the proposed rule from DHS. The commenters stated that this would cause more than one million individuals that seek visas from DOS annually to be subjected to arbitrary standards and potentially shut out of the country.

*Response:* DHS is collaborating with other departments and agencies with regard to the regulatory changes promulgated by this final rules. DHS is working, and will continue to work, with DOS to ensure consistent application of the public charge ground of inadmissibility. As noted in the NPRM, DHS expects that DOS will make any necessary amendments to the FAM in order to harmonize its approach to public charge inadmissibility

---

[794] *See* 20 CFR parts 655 and 656.

[795] *See* INA section 101(a)(15)(H)(ii)(a), 218, 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1188.

[796] *See* 20 CFR 655.120(l). Employers must pay H–2A workers and workers in corresponding employment, unless otherwise excepted by the regulations, at least the highest of the Adverse Effect Wage Rate (AEWR), the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining wage (if applicable), or the Federal or State minimum wage in effect at the time the work is performed.

[797] *See* 20 CFR 655.100–185.

determinations with the approach taken in this final rule.[798]

*Comment:* A commenter discussed the rule's impact on consular processing. A commenter stated that DOS is likely to adopt public charge rules consistent with DHS's rules, thus exasperating and extending costs to applicants to many types of visa programs. Multiple commenters stated the rule would result in increased administrative burdens to other organizations such as DOS, as the proposed rule would require every adjudicator to be trained to apply the proposed rule, which is already subjective and unclear.

*Response:* This rule provides a standard for determining whether an alien who seeks admission into the United States as a nonimmigrant or as an immigrant, or seeks adjustment of status, is likely at any time in the future to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS defers to DOS as to the procedure and timing for adopting changes consistent with the policy articulated in this final rule, as well as on the impact of any changes to visa processing times and costs incurred as a result of any such changes.

*Comment:* A commenter stated that DHS should consider the implications of defining the inadmissibility ground at section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), on the public charge deportability ground at section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5). The commenter stated that DHS should consider the impact and reasonableness of the proposed NPRM definition in the deportability context and how the definition "might further heighten fear and anxiety related to deportation among lawful permanent residents and others." The commenter that the Administration "will likely act quickly to adopt it for deportation purposes."

*Response:* DHS does not believe it is essential to consider the impact on the public charge deportability ground. The rule is limited to the ground of inadmissibility. Additionally, as explained in the NPRM, standards applicable to DOJ continue to govern the standard regarding the public charge deportability ground.[799] While the forward-looking inadmissibility ground and the past-looking deportability grounds both use the phrase "become a public charge," the two provisions are significantly different. Most notably, the deportability ground requires a two-step

determination absent in the inadmissibility ground. Specifically, the public charge ground of deportability applies to an alien who (1) within five years after the date of entry, has become a public charge (2) from causes not affirmatively shown to have arisen since entry.[800] Whereas, the public ground charge of inadmissibility is prospective and requires an analysis to determine whether there is a likelihood that an alien will become a public charge at any time in the future. In the event there are any regulatory changes to the interpretation of the public charge deportability ground, such changes will necessarily comply with the APA and other statutory and regulatory requirements.

*Comment:* A commenter discussed the rule's impact on immigration courts. The commenter indicated that although immigration judges are not bound by DHS rules, DOJ is in the process of creating a public charge rule that is likely to parallel the DHS proposed rule. However, until a DOJ rule is finalized, the DHS proposed rule is likely to be used as persuasive authority by immigration judges tasked with making public charge assessments. The commenter pointed out that this will occur in at least three scenarios: (1) Individuals without lawful status seeking to adjust status in removal proceedings; (2) returning lawful permanent residents who are treated as applicants for admission under section 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C); and (3) lawful permanent residents placed in removal proceedings who are seeking to re-adjust status with a waiver under section 212(h) of the Act, 8 U.S.C. 1182(h). Additionally, the commenter stated that the adjudication of adjustment of status applications in immigration courts will likely increase due to a 2018 policy change at USCIS, under which NTAs are issued in any case in which USCIS issues a denial, leaving the applicant with no legal status upon denial of the adjustment application. This, according to the commenter, will result in an increase of adjustment of status applications in front of an immigration judge, increasing the frequency of cases requiring a public charge adjudication. Until a DOJ rule is promulgated, ICE trial attorneys, who are bound by DHS regulations, will likely argue that immigration judges should apply the proposed rule's heightened standards. Lacking any binding precedent on the interpretation of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), some immigration judges will agree and will

rely on the proposed rule as a guide, while other immigration judges will not. The commenter stated that this will create inconsistencies in adjudication, and increase administrative inefficiencies through additional appeals and motions; will take significantly more court time for those cases already in front of the judge due to the heightened evidentiary requirements; and need additional and more detailed testimony. These heightened evidentiary requirements will also impact ICE attorneys, who will be required to review that evidence and prepare a response, as well as the respondent and his or her counsel, if represented. With an immigration court backlog that is already above 750,000 cases, the public charge rule would further exacerbate an already record high case volume. Additionally, increased evidentiary requirements, heightened scrutiny, and uncertainty as to what standard to apply will delay adjudications, add to the backlog, and result in inconsistent court adjudications.

*Response:* Comments regarding the manner in which EOIR will assess public charge inadmissibility are beyond the scope of DHS's rule. DHS's rule pertains to DHS's public charge inadmissibility determinations for applicants seeking admission to the United States and for applicants seeking adjustment of status. If DHS denies an adjustment of status application and places the applicant into removal proceedings, the alien may renew the adjustment of status application before an immigration judge unless the immigration judge does not have jurisdiction over the adjustment application.[801] DHS has no authority over EOIR's inadmissibility determinations.

DHS notes that all inadmissibility determinations are made on a case-by-case basis and depend on the facts and circumstances, as well as the available evidence, in each case. As such, it is impossible to anticipate the arguments that might be made or the evidence that might be submitted in support of a charge of inadmissibility. However, as noted above, under section 291 of the Act, 8 U.S.C. 1361, the burden of proof is on an applicant for admission to establish that he or she is not inadmissible to the United States under any provision of the Act. Similarly, under section 240(c)(2)(A) of the Act, 8 U.S.C. 1229a(c)(2)(A), an applicant for admission in removal proceedings has the burden of establishing that he or she is clearly and beyond doubt entitled to

---

[798] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135 (proposed Oct. 10, 2018).

[799] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51134 (proposed Oct. 10, 2018).

[800] *See* INA section 237(a)(5), 8 U.S.C. 1227(a)(5).

[801] 8 CFR 245.2(a)(5)(ii) and 8 CFR 1245.2(a)(1).

be admitted and is not inadmissible under section 212 of the Act, 8 U.S.C. 1182. As noted above, DHS believes that concerns about DOJ's adjudication of cases pending before immigration courts, including immigration court backlogs, are more appropriately addressed by DOJ in the context of their public charge rulemaking.

## V. Public Comments and Responses to the NPRM's Statutory and Regulatory Requirements Section

1. Comments on Costs and Benefits

a. Population Seeking Extension of Stay or Change of Status

*Comment:* Commenters stated the rule will have a disproportionate impact on South Asian immigrants seeking an extension of stay or change of status, stating that more than 550,000 from South Asian countries lawfully reside in the United States. Particularly, a commenter states that the rule will have a detrimental impact because it requires applicants for an extension or a change of status completing the Form I–129 or Form I–539 to complete an additional Form I–944.

*Response:* DHS appreciates the commenters' concerns regarding the impact this rule will have specifically on South Asian immigrants. DHS does not believe that the rule would impact all of the 550,000 aliens from South Asian countries that the commenter references, as it is unclear that all aliens from these countries would apply for an extension of stay or change of status. In addition, after reviewing the comments, DHS removed the requirement that individuals must establish that they are not likely to receive public benefits by submitting Form I–944. Under the revised standard, aliens seeking to change or extend their nonimmigrant status will have to demonstrate that they have not received any public benefit since obtaining the nonimmigrant status the alien is seeking to extend or change, as defined in 8 CFR 212.21, for more than 12 months, in the aggregate, within a 36-month period.

However, to the extent that South Asians may seek extension of stay or change of status in large numbers given their percentage of total foreign nationals present in the United States, the public benefit condition does not have a disparate impact that is "unexplainable on grounds other than" national origin.[802] Rather, under this rule, all applicants for extension of stay and change of status, regardless of national origin, will be required to

demonstrate that they have not received, since obtaining the nonimmigrant status they are seeking to extend or change, any public benefit, as defined in 8 CFR 212.21(b), for more than 12 months, in the aggregate, within a 36-month period. Although this rule may impact aliens from South Asian countries to a larger extent solely because they account for a larger percentage of foreign nationals who may apply for an extension of stay or change of status, DHS did not add the public benefits condition to extension of stay and change of status applications in order to specifically target aliens from South Asian countries or for any other discriminatory purpose. Instead, in including the public benefits condition, DHS is seeking to ensure that aliens present in the United States do not depend on public benefits to meet their needs.

b. Other Comments on Affected Population

*Comment:* Multiple commenters stated that if the rule is finalized it could negatively impact between 24 and 26 million immigrants and their family members. Commenters stated that this estimate was based on a study that determined the number of aliens and their family members with incomes below 250 percent of FPG. Another commenter stated that between 22.2 and 41.1 million noncitizens and their family members could be impacted by the rule, and that out of this population, an estimated 4.9 million legal immigrants would lose healthcare coverage. Other commenters estimated that nearly 40 percent of individuals who sought adjustment of status last year (380,000 of 1.1 million, according to the commenters) would be subject to a public charge determination.

A few commenters stated that the rule could increase the number of immigrants that would be considered a public charge from the current three percent to 47 percent. Other commenters argued the rule could reduce naturalization overall because immigrants would be deterred from adjusting status. Another commenter stated that DHS has not indicated an estimate of the number of noncitizens that will be denied admissibility under the rule.

*Response:* DHS appreciates the comments regarding the potential negative effects of the rule and the number of individuals who may be affected. The study the commenters cited estimated that 24 million to 26 million aliens and their family members would be affected by the rule's potential chilling effect, *i.e.,* a circumstance under which the rule results in fear and

confusion among aliens, who therefore voluntarily disenroll from or forgo enrollment in public benefits.[803] However, the study notes that most of the individuals who may experience a chilling effect are those who will not be subject to a public charge inadmissibility determination. DHS acknowledges that some individuals may disenroll or forego enrollment in public benefits programs even though they are not directly regulated by this rule. DHS has provided an estimate of the number of individuals that may choose to disenroll or forego enrollment due to the final rule, but it is unclear how long such individuals would remain disenrolled or forego enrollment.

As shown in the economic analysis of this rule, DHS estimates that the total population seeking to adjust status that will be subject to a public charge review for inadmissibility is about 382,264 annually. Further, DHS estimates that about 324,438 individuals who are members of households with foreign-born non-citizens and about 9,632 households with at least one foreign-born non-citizen will choose to disenroll from or forego enrollment in a public benefits program, based on a 2.5 percent rate of disenrollment or foregone enrollment.

Moreover, DHS notes that this rule does not force individuals who are eligible for public benefits to disenroll or forego enrollment in such benefits programs and acknowledges that those who choose to disenroll may need to rely on other means of support within their family or community. Nonetheless, through this rule, DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status who are subject to the public charge ground of inadmissibility are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.

*Comment:* Numerous commenters focused on the rule's impact on children, with some providing estimates of the number of impacted children. These include estimates that one in four children have at least one foreign-born parent, between nine and 10 million children who are U.S. citizens born of immigrant parents would be impacted by the rule, and that approximately 18.4 million children live in immigrant families and approximately 16 million

---

[802] *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977).

[803] *See* Fiscal Policy Institute, "How a Trump Rule's Chilling Effect Will Harm the U.S." Oct. 10, 2018. Available at *http://fiscalpolicy.org/wp-content/uploads/2018/10/US-Impact-of-Public-Charge.pdf,* (last visited May 21, 2019).

of those children were born in the United States. Other commenters noted estimates that approximately 90 percent of the children of foreign-born parents in the United States are citizens of the United States. Many commenters estimated that 45 percent of children who recently became permanent residents of the United States could have multiple negative factors that could prevent adjustment of status. Some commenters noted that approximately 14 million children enrolled in CHIP live in a household with at least one immigrant parent. Many commenters noted the support that public benefits programs, including Medicaid and other health services as well as nutrition assistance, provide for individuals and families, often pointing to the support these programs provide to children. Some commenters stated the rule would have negative consequences on families and "grand families," including family separation.

*Response:* DHS refers the reader to DHS's response regarding Potential Disenrollment Impacts in section III.D.5 of this preamble. With respect to comments that specifically referenced DHS's initial regulatory impact analysis, DHS notes that in consideration of the comments, it has revised the analysis for this final rule to include a range of potential disenrollment impacts.

*Comment:* Many commenters stated the rule would have a negative effect on low-wage workers with some stating it would reduce economic mobility and reduce the ability to support families. Commenters noted workers in specific industries, such as healthcare, construction, hospitality, agriculture, and recreation, would be negatively affected by the rule, as would those who benefit from these industries.

*Response:* DHS reiterates that the goal of this regulation is to ensure that aliens who are admitted to the United States, adjust status, or obtain extension of stay or change of status, are self-sufficient and do not depend on public benefits. This rule does not aim to reduce economic mobility or the ability to support families, but rather aims to do the opposite, by ensuring that those families who enter or remain in the United States are self-sufficient.

*Comment:* A commenter states the projected annual average of adjustment applicants subject to public charge review is underestimated. The commenter suggested using the publicly available USCIS datasets titled "Data Set: All USCIS Application and Petition Form Types," "All USCIS Application and Petition Form Types," and "Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form

Status," rather than using internal data or data from approvals.

*Response:* DHS does not have historical data to serve as a basis of how many applicants currently are subject to a negative public charge determination or how many are ultimately denied admission due to negative factors. Additionally, DHS notes that we use data from internal and external sources as appropriate, and ensures that all data are current, valid, reliable, and accurate. For this economic analysis, DHS used publicly available data in various years of DHS statistical reports, "Yearbook of Immigration Statistics," which are thoroughly vetted through the agency.[804] DHS used these data not only because of their quality, but because they provide the detailed classifications of those adjusting status to determine those who are exempt from inadmissibility based on the public charge ground and those who are not. Additionally, the USCIS data that the commenter cites does not provide enough detail to show the visa classifications of applicants for admission and adjustment of status. The information is necessary for DHS to tailor the analysis to those who are subject to the inadmissibility based on the public charge ground. The data cited only provide aggregate receipt totals whereby it is not possible to remove individuals from the population count who are exempt from a public charge review of inadmissibility. As the data used for the analysis considers all applicants who obtained lawful permanent resident status, the estimated number of individuals who disenroll or forego enrollment due to the rule is likely overestimated.

DHS notes that in the data cited by the commenter, there were approximately 567,640 applications for adjustment of status annually and about 532,887 approvals annually, based on the 5-year average number of application received during the period fiscal year 2012 to 2016.[805] The data the commenter cites only presents data in the broad categories of adjustments, including family-based, employment-based, asylum, and refugee, among others. In general, applicants in family-based and employment-based classifications will be subject to a public charge review of inadmissibility, while

applicants in asylum, refugee, and other classifications that are exempt from a public charge review. After removing the categories that are exempt from the data the commenter cited, there were approximately 417,390 applications for adjustment of status annually and about 388,724 approvals annually.

By contrast, the total population in the dataset DHS uses in its economic analysis (including those who are exempt from public charge) is about 544,246 lawful permanent resident approvals annually. After removing the classifications that are exempt from a public charge review of inadmissibility, DHS estimates approximately 382,264 law approvals annually. Thus, the difference between the data cited by the commenter that uses receipts with general categories of applicants that are exempt from a public charge review of inadmissibility and the approvals data DHS used in its analysis is approximately 35,126 applicants annually.

*Comment:* A commenter indicated that the NPRM fails to provide data regarding the specific impact it might have on the individual, beyond the opportunity cost of time taken to familiarize oneself with the changes in policies and the time taken to accurately fill out new forms.

*Response:* DHS provides the direct costs of this rule for individuals, which include the familiarization costs of the rule and the costs associated with filling out forms as well as any new or adjusted form fees. The commenter did not provide DHS with any specific data or additional costs for consideration. Additionally, the economic analysis of this final rule discusses several indirect impacts that are likely to occur because of the final regulatory changes in order to provide a more thorough overview of the costs of this rule. However, indirect costs are less certain and more variable, therefore making it more difficult to reliably estimate what those costs may be. The long term impacts are not known at this time.

c. Determination of Inadmissibility Based on Public Charge Grounds

*Comment:* A commenter noted that the cost estimates of filing Form I–485, Form I–693, and Form I–912 should not be considered as new and additional costs.

*Response:* DHS presents these forms and costs to establish the baseline for this analysis. The Office of Management and Budget (OMB) Circular A–4 directs agencies to include differences from the baseline as costs, benefits, or transfers in the analysis of the rule. DHS also provides estimates of the additional

---

[804] *See* Dept. of Homeland Security. *Yearbook of Immigration Statistics.* Available at: *https://www.dhs.gov/immigration-statistics/yearbook* (last visited July 26, 2019).

[805] DHS notes that using the 5-year average over the period fiscal year 2012 to 2016 is consistent with the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov.*

costs associated with the rule's changes to some of these forms.

### d. Other Comments on Baseline Estimates

*Comment:* A commenter stated that the rule incorrectly implies there is rampant abuse of public benefits by immigrants. The commenter cites the PRWORA and a Cato Institute working paper to note which immigrants have access to Federal public benefit programs, those who are not eligible for these programs, and who is likely to use certain public benefit programs compared to native born or naturalized citizens.

*Response:* DHS did not intentionally use language that would imply abuse of public benefits. DHS acknowledges the provisions in PRWORA that limit public assistance to eligible classes of aliens and confirms that this regulation is consistent with PRWORA. The Cato Institute working paper, which is based on Census data (and the Medical Expenditure Panel Survey), concludes that low-income non-citizen immigrants are less likely to receive public benefits than low-income native-born citizens and that the value of benefits received per recipient is less for immigrant groups.[806] These findings are not inconsistent with this final rule.

### e. Costs to Applicants To Adjust Status

*Comment:* Many commenters remarked the impact the rule would have on applicants who may apply to adjust status. One individual commenter stated that, given the overall objectives of this rule, the estimated increased cost to immigrants seeking to adjust their status and economic loss which might represent a significant barrier to filing the application. The commenter stated that such a barrier might in fact suit the agency's goals and therefore represent a benefit. The commenter stated that greater concern are the costs borne by existing resident aliens, with some existing status, who are not the target of the rule and yet stand to be affected by it significantly. The commenter suggested a careful review should be conducted to ensure that this impact on a non-target group of people is warranted, or weigh whether this group should be forced to file all or some of the new forms.

*Response:* DHS agrees that there are benefits to this rule that justify the new costs it will impose. DHS does not

consider the estimated opportunity cost of time for filling out the Form I–944 to be a ''benefit'' of the rule. DHS estimated the costs of this rule on those seeking to adjust status, or pursuing extension of stay or change of status. DHS also notes that costs and/or benefits of a rule are generally estimated from the perspective of what the societal costs and/or benefits of the rule will be. We have reviewed the data provided by commenters and where possible quantified the indirect impacts of the rule. Where quantification was not possible, the economic analysis provides a qualitative discussion of indirect impacts that might result due to this rule. To be clear, aliens who are already lawful permanent residents of the United States are not applying for adjustment of status, extension of stay, or change of status, and therefore generally, will not be directly affected by the rule. Elsewhere in this preamble, DHS addresses the suggestion that DHS apply the rule differently to those who are already in the United States, as compared to those who seek admission from abroad. The Form I–944 is intended to apply to all aliens who are subject to the public charge ground of inadmissibility and who apply for adjustment of status before USCIS.

*Comment:* One commenter stated that the rule changes are intended to prevent legal immigrants from applying to adjust status to lawful permanent resident as the fee increases are enormous and the bureaucratic hurdles outrageous.

*Response:* DHS disagrees the rule is intended to prevent eligible individuals from adjusting status to that of a lawful permanent resident. Rather, the rule is intended to better ensure that individuals seeking admission or adjustment of status are able to demonstrate that they are self-sufficient. DHS believes that the benefits to this rule justify the new costs it will impose. Where possible, DHS quantified the cost of completing the new forms.

### f. Lack of Clarity

*Comment:* Multiple commenters noted costs related to a lack of clarity and certainty around strongly positive and negative factors. One commenter noted this lack of clarity would make estimating compliance costs difficult. Another commenter wrote that the form is highly confusing, because it conflates negative consideration of non-monetary benefits if received for more than two months in the aggregate within a 36-month period, and lacks questions seeking to elicit factors that would provide a basis for a positive finding.

*Response:* DHS agrees that it is unable to quantify the full compliance costs of

this rule at this time. The Form I–944 is meant for the alien to provide information about the factors, which an immigration officer would then review to determine whether the alien is likely to become a public charge at any time in the future. The form has been updated for clarity.

*Comment:* Several commenters noted that applicants may incur additional costs as a result of having to pay for a credit report, an appraisal for a home, and retaining an attorney or accredited representative, and that applicants will need to expend time and effort to gather all documentation and estimate debts and assets from a variety of sources.

*Response:* DHS notes that applicants may incur additional costs associated with fulfilling the requirements of completing Form I–944 such as obtaining a credit report or appraisal for a home and includes theses costs in the economic analysis, where possible. The economic analysis that accompanies this rule can be found in the rule docket at *www.regulations.gov.* Completion of Form I–944, which includes gathering all necessary evidence, does entail time and cost burdens. DHS reported estimated time and cost burdens in the NPRM and in this final rule in compliance with the PRA.

*Comment:* A commenter stated that employers will likely not be able to prepare Form I–944 on their employees' behalf like more general immigration forms due to sensitive financial data requested.

*Response:* DHS has revised the public benefit condition for extension of stay and change of status, such that officer will not issue an RFE for the Form I–944 in that context. No employers will be required to complete the Form I–944.

*Comment:* One commenter stated the rule may discourage nonimmigrants from coming to or remaining in the United States, regardless of their financial status, and that the rule will reinforce the view that the United States has become an undesirable destination, damaging the nation's status as a welcoming country, and could deprive the U.S. economy of a substantial amount of tourism.

*Response:* The commenter did not provide evidence or sources to support the claim that the rule will discourage nonimmigrants from visiting, studying, or working in the United States. As stated above, this rule is intended to better ensure that aliens inside the United States ''do not depend on public resources to meet their needs, but rather rely on their own capabilities and the

---

[806] The Use of Public Assistance Benefits by Citizens and Non-Citizen Immigrants in the United States, Cato Institute Working Paper; Leighton Ku and Brian Bruen, February 19, 2013. *https://object.cato.org/sites/cato.org/files/pubs/pdf/workingpaper-13__1.pdf* (last visited July 26, 2019).

**41466** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

resources of their families, their sponsors, and private organizations.'' [807]

*Comment:* A commenter stated that an immigration service provider would need to develop expertise in all public benefit programs applicants may have used in any state where the applicant resided, that it will be virtually impossible for people to obtain proof that they did not trigger a negative factor for public charge test, and that their group will likely invest $500,000 to $1 million in trainings to assist the legal and service provider sector to understand this change, although the commenter stated that it still would not be able to advise with any certainty.

*Response:* The commenter did not explain how it developed the estimated training costs of $500,000 to $1 million. As discussed above, DHS will train and provide internal guidance to USCIS officials processing these forms so they can accurately adjudicate cases. DHS also notes that it considered the costs presented by commenters and provided estimates for additional indirect costs that might result from this rule in the RIA.

*Comment:* One commenter indicated there was no justification for imposing compliance costs on every alien seeking to adjust status, or on substantial numbers of nonimmigrants seeking routine extensions of status, even where nothing in that person's background or circumstances suggests the prospect that the public charge ground of inadmissibility might be an issue.

*Response:* DHS believes that the questions posed in the I–944 are relevant and necessary for the public charge inadmissibility determination and allows the alien an opportunity to provide all information regarding the factors as discussed in the rule. DHS reiterates that the public charge inadmissibility ground does not apply to those seeking a change of status or extension of stay. Additionally, DHS has decided against asking nonimmigrants seeking to extend or change such status to submit Form I–944. DHS notes that those categories of aliens exempt from the public charge inadmissibility ground by statute face no additional compliance costs as a result of this rule.

g. Other Comments on Costs to Applicants

*Comment:* One commenter stated that the agency acknowledges that most individuals this rule applies to would be making close to the Federal minimum wage of $7.25 an hour. The commenter stated that the agency's decision to base its estimates of

opportunity cost of time on the mean average for all occupations ($24.35 per hour) instead of the mean national minimum wage ($10.66 per hour) suggests ''a desire to minimize the negative impact of the proposed rule by offsetting the negative impact with what appears to be a net positive, despite the analyzed wage applying to only a small segment of the population that this proposed rule seeks to reach.'' Another commenter stated that USCIS should consider using a more varied rate for calculated opportunity costs. The commenter further stated that the RIA uses $10.66 an hour, but many individuals affected by the rule may have a higher hourly rate.

*Response:* DHS does not understand the commenter's arguments regarding minimizing the negative impact of the proposed rule. Where appropriate and based on the population of focus, DHS uses various wage rates to estimate opportunity costs of time. DHS uses the average hourly wage for all occupations ($24.34 per hour plus benefits) to estimate the opportunity cost of time for some, not all, populations in the economic analysis. Populations for which this hourly wage is applicable include those submitting an affidavit of support for an immigrant seeking to adjust status and those requesting extension of stay or change of status. For these populations, DHS assumes that individuals are dispersed throughout the various occupational groups and industry sectors of the U.S. economy. Therefore, DHS calculates the average total rate of compensation as $35.78 per hour, where the mean hourly wage is $24.34 per hour worked and average benefits are $11.46 per hour.[808] [809] As noted in the economic analysis of the rule, DHS generally uses $10.66 per hour ($7.25 Federal minimum wage base plus $3.41 weighted average benefits) as a reasonable proxy of time valuation to estimate the opportunity costs of time for individuals who are applying for adjustment of status and must be reviewed for determination of inadmissibility based on public charge grounds.[810] DHS also uses $10.66 per

hour to estimate the opportunity cost of time for individuals who cannot, or choose not to, participate in the labor market as these individuals incur opportunity costs and/or assign valuation in deciding how to allocate their time. Moreover, this analysis uses the Federal minimum wage rate since approximately 80 percent of the total number of individuals who obtained lawful permanent resident status were in a class of admission under family-sponsored preferences and other non-employment-based classifications such as diversity, refugees and asylees, and parolees.[811] Moreover, approximately 70 percent of the total number of individuals who obtained lawful permanent resident status were in a class of admission that were also subject to the public charge inadmissibility determination. Therefore, DHS assumes many of these applicants hold positions in occupations that are likely to pay around the Federal minimum wage.

*Comment:* There were a number of other general comments on costs and potential burdens to applicants:

• One commenter stated that the costs and fees imposed on applicants could burden non-citizens and require them to turn to public assistance programs as a result.

• Another commenter stated that USCIS did not consider ''departure costs'' such as plane tickets or broken leases/contracts for individuals that will need to leave the country due to the NPRM's provisions.

• A commenter stated that the NPRM places a significant burden on community organizations, requiring them to become experts on requirements to explain them to the community.

• Another commenter stated that NPRM would lead to a substantial increase in general legal costs related to applications citing a figure of $40 million for every 100,000 adjustments of status or immigrant visa applications.

*Response:* DHS appreciates comments regarding costs to applicants and the potential burdens that this rule may impose on those seeking immigration benefits. DHS notes that the purpose of this rule is to better ensure that aliens subject to the public charge inadmissibility ground are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, and rely on their own capabilities, as well as the resources of family members, sponsors,

---

[807] 8 U.S.C. 1601(2)(A).

[808] The national mean hourly wage across all occupations is reported to be $24.34. *See* Occupational Employment and Wage Estimates United States. May 2017. Department of Labor, BLS, Occupational Employment Statistics program; *available at https://www.bls.gov/oes/2017/may/oes_nat.htm* (last visited July 26, 2019).

[809] The calculation of the weighted mean hourly wage for applicants: $24.34 per hour * 1.47 = $35.779 = $35.78 (rounded) per hour.

[810] *See* 29 U.S.C. 206. *See also* U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of May 24, 2018. *See https://www.dol.gov/general/topic/wages/minimumwage* (last visited July 26, 2019).

[811] *See* United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, DC, U.S. Department of Homeland Security, Office of Immigration Statistics, 2017. Available at *https://www.dhs.gov/immigration-statistics/yearbook/2016* (last visited July 26, 2019).

and private organizations.[812] Moreover, DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests.

DHS appreciates receiving comments regarding the additional burden this rule imposes on community organizations, requiring them to become experts on the requirements in the rule to explain them to the community. DHS acknowledges that the final rule will add new direct and indirect impacts on various entities and individuals associated with regulatory familiarization with the provisions of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those individuals or entities the rule directly regulates, a wide variety of other entities would likely choose to read and understand the rule and, therefore, would incur familiarization costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this final rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule in order to provide information to those foreign-born non-citizens that might be affected by a reduction in Federal and state transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs such as those listed. DHS estimates the time that would be necessary to read this final rule would be approximately 16 to 20 hours per person, resulting in opportunity costs of time. Additionally, an entity, such as a non-profit or advocacy group, may have more than one person that reads the rule.

With regard to USCIS' consideration of "departure costs" for individuals who must leave the United States as a consequence of a public charge inadmissibility determination, DHS agrees that some people may be required to depart the United States due to the requirements of this rule. However, DHS is unable to quantify the departure costs listed by the commenter as we do not

have enough information on the number of immigrants who would incur departure costs nor the amount that each immigrant would incur.

DHS appreciates comments asserting that the rule would lead to a substantial increase in general legal costs related to applications of around $40 million per 100,000 adjustment of status or immigrant visa applications. DHS notes that the estimated costs of this rule are based on the estimated populations for relevant forms and the requirements for filing those forms, including any applicable filing fees, opportunity costs of time, travel costs for fulfilling a filing requirement such as submitting biometrics information, among other requirements. DHS has updated the economic analysis to account for additional legal costs as some applicants may retain a lawyer for help in filling out and filing the forms.

With respect to the comment that this rule will also impact legal costs associated with filing applications for immigrant visas, as noted above, DHS has estimated the costs for the populations that are directly regulated by this rule—applicants for adjustment of status, and those seeking change of status or extension of stay. DHS is unable to estimate costs and benefits associated with applicants for immigrant visas filed with DOS.

*Comment:* An individual commenter wrote that if USCIS took on credit score reporting costs from the beginning of the process it would lower the cost burden for applicants.

*Response:* It appears that this commenter misunderstands the credit report and score requirement in this rule and believes that DHS will reimburse the cost of obtaining a credit score and/ or report associated with the public charge inadmissibility determination. However, under this rule, DHS will not reimburse applicants for costs incurred as a result of obtaining a credit score and/or report to individuals. Aliens seeking immigration benefits who are subject to public charge inadmissibility will bear the cost of obtaining a credit score and/or report solely, as described in the final rule and economic analysis. DHS notes that an applicant may obtain a credit report for free, but in its estimates DHS assumed that applicants would pay for the report.

**h. Costs Related to Public Charge Bond**

*Comment:* One commenter noted that the public charge bond provision in the NPRM would increase the overall costs for applicants, and that USCIS has not provided sufficient evidence that public charge bonds will achieve the

administration's objective of ensuring immigrants remain self-sufficient.

The commenter indicated that USCIS has failed to adequately document and justify the costs related to how many people will secure public charge bonds; costs of bond for those using them to overcome the public charge definition; costs imposed on families; cost imposed on families that fall on hard times with a public charge bond; upfront and ongoing fees, bond cancellation fees, and fees related to ending a bond; benefits to bond surety companies; and costs to state and localities related to bonds.

A commenter wrote that the bond-related fees will never compensate for the additional administrative costs incurred by operation of the program, and these fees themselves will make the program cost prohibitive for many applicants and their families. Similarly, a commenter wrote that USCIS anticipates that the $25 filing fee for Forms I–945 and I–356 would cover the necessary administrative costs, but then later in the analysis suggests the fee would not fully recover intake costs. Another commenter wrote that the public bond cost should be subtracted from gross costs of the rule as it does not qualify as a marginal benefit.

*Response:* Although DHS agrees that there may be a cost associated a bond an alien choose to submit (if eligible), as described in the economic analysis, DHS disagrees that the amount of the bond was not properly justified. DHS had generally based the amount on the original regulatory amount adjusted for inflation. However, in order to more precisely match the effect of prior regulations, DHS has decided to make the minimum amount of the bond to be the exact amount as adjusted for inflation. The current *8 CFR 213.1* refers to a bond amount of at least $1,000. *8 CFR 213.1* was promulgated in July of 1964. This provision has not been updated and inflation has never been accounted to represent present dollar values. Simply adjusting the amount for inflation using CPI–U would bring the bond floor in June 2018 to about $8,100.[813]

Once the alien has been determined to likely to become a public charge, and provided the opportunity to submit a bond, the bond acts a deterrent and penalty if the bond is breach. Whether the public charge bonds will achieve the administration's objective of ensuring immigrants remain self-sufficient is not

---

[812] *See* 8 U.S.C. 1601(1), (2)(A).

[813] Calculation: Annual average for 1st half of 2018 (250.089)/annual average for 1964 (31) = 8.1; CPI–U adjusted present dollar amount = $1,000 * 8.1 = $8,100.

a necessary consideration as DHS would have already determine that the alien is likely to become a public charge and would be giving the alien the opportunity to be admitted with the condition that he or she not receive public benefits. Further, the bond provides was establish by Congress and therefore a requirement for DHS to consider affording the alien an opportunity to provide a bond even though he or she may be likely to become a public charge.[814]

When posting a surety bond, an individual generally would pay between 1 to 15 percent of the bond amount for a surety company to post a bond.[815] The percentage that an individual must pay may be dependent on the individual's credit score where those with higher credit scores would be required to pay a lower percentage of the bond to be posted. DHS notes that an individual may be allowed to submit cash or cash equivalent, such as a cashier's check or money order as another possible option for securing a public charge bond.

DHS will charge a filing fee of $25.00 to submit a public charge bond using Form I–945 and $25.00 to request cancellation of a public charge bond fee using Form I–356, which would cover the estimated administrative costs of processing these forms. Where possible, DHS sets fees at levels sufficient to cover the full cost of the corresponding services associated with fairly and efficiently adjudicating immigration benefit requests.[816] Congress has

provided that USCIS may set fees for providing adjudication and naturalization services at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants.[817] Moreover, USCIS conducts biennial reviews of the fee amounts charged for each immigration and naturalization benefit request. Fees are collected from individuals and entities filing immigration benefit requests and are deposited into IEFA. Those funds then are used to cost of adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants. The primary objective of the fee review is to determine whether current immigration and naturalization benefit fees will generate sufficient revenue to fund the anticipated operating costs associated with administering the nation's legal immigration system. Therefore, if the results of this review indicate that current fee levels are insufficient to recover the full cost of operations, DHS may propose to adjust USCIS fees. For the forms used in the newly established public charge bond process, should DHS determine that the fees set for these forms are not sufficient to cover the full cost of the associated services adjudicating these immigration benefit requests, the agency will propose to adjust these form fees.

A legal requirement to provide a monetized total cost estimate for this rule does not exist. The public charge bond process is newly established and, therefore, historical data is not available. DHS explained in the NPRM the many factors that were not within the control of DHS that would influence total costs. To the extent possible DHS quantified the costs of the bond provision, for example DHS estimates that approximately 960 aliens will be eligible to file for a public charge bond annually using Form I–945 and approximately 25 aliens will request to cancel a public charge bond annually using Form I–356. DHS does not have enough information to estimate the costs imposed on families that fall on hard times with a public charge bond, upfront and ongoing fees, benefits to bond surety companies, and costs to state and localities related to bonds.

With regard to the comment that the public bond cost should be subtracted from gross costs of the rule as it does not

qualify as a marginal benefit, DHS notes that the public charge bond process is being newly established and, therefore, any costs associated with the bond process are considered to be new costs to the public. Additionally, should DHS determine that the fees set for the relevant forms related to the public charge review process, including those for the bond process, are not sufficient to cover the full cost of the associated services adjudicating immigration benefit requests, the agency will propose to adjust these form fees in a subsequent fee rule. DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests. DHS also notes that the new costs estimated for the public charge bond process are considered costs, not benefits. As shown in the economic analysis, which can be found in the Public Charge final rule docket at *www.regulations.gov*, DHS estimates the baseline cost of the rule and then estimates the costs and benefits of the policy changes that the final rule will implement. The difference between the estimated current baseline costs and benefits and the estimated costs and benefits of the policy changes are considered to be, and presented as, the new costs and benefits of the final rule.

### j. Costs to U.S. Employers

*Comment:* Many commenters stated that the rule would impose significant compliance costs and administrative burdens on employers that would interfere with hiring and staff retention. Commenters also stated that such costs would increase for employers by reducing the supply of low-wage workers and skilled workers. The commenter indicated that the supply of skilled workers could be reduced as non-citizen residents reduce investments in human capital and skilled non-citizens are denied entry or discouraged from seeking entry into the United States. A commenter stated that the analysis does not include the effect on legal immigration to the United States, including how many applicants would be issued RFEs or estimating a potential denial rate. Several commenters stated that the RFE provision could cause potential delays and backlogs causing increased costs to employers. Many commenters stated that the rule change would make it harder for employers to extend H–1B visas or change students from F–1 to H–1B visas. A commenter stated the rule

---

[814] *See* INA section 213, 8 U.S.C. 1183.

[815] *See also* Surety Bond Authority, Frequently Asked Questions about Surety Bonds, *https://suretybondauthority.com/frequently-asked-questions/* (last visited May 8, 2019) and Surety Bond Authority, Learn More, *https://suretybondauthority.com/learn-more/* (last visited May 8, 2019). DHS notes that the company cited is for informational purposes only.

[816] *See* INA section 286(m), 8 U.S.C. 1356(m), provides broader fee-setting authority and is an exception from the stricter costs-for-services-rendered requirements of the Independent Offices Appropriations Act, 1952, 31 U.S.C. 9701(c) (IOAA). *See Seafarers Int'l Union of N. Am.* v. *U.S. Coast Guard,* 81 F.3d 179 (DC Cir. 1996) (IOAA provides that expenses incurred by agency to serve some independent public interest cannot be included in cost basis for a user fee, although agency is not prohibited from charging applicant full cost of services rendered to applicant which also results in some incidental public benefit). Congress initially enacted immigration fee authority under the IOAA. *See Ayuda, Inc.* v. *Attorney General,* 848 F.2d 1297 (DC Cir. 1988). Congress thereafter amended the relevant provision of law to require deposit of the receipts into the separate Immigration Examinations Fee Account of the Treasury as offsetting receipts to fund operations, and broadened the fee-setting authority. Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Public Law 101–515, section 210(d), 104 Stat. 2101, 2111 (Nov. 5, 1990). Additional values are considered in setting Immigration Examinations

Fee Account fees that would not be considered in setting fees under the IOAA. *See* 72 FR at 29866–7.

[817] *See* INA section 286(m), 8 U.S.C. 1356(m).

could lead employers to make their own public charge determinations. Multiple commenters wrote that a broad list of industries would experience a reduction in immigrant labor force or face challenges meeting their labor demand as a result of the rule.

*Response:* DHS disagrees with these commenters concerning the impact on the supply of labor to employers. This rule is not intended to change the composition of the labor market. Employers will still be permitted to seek extensions of stay and change of status for eligible nonimmigrants. Additionally, this rule is not intended to discourage nonimmigrants from seeking to extend their nonimmigrant stays or changing to another nonimmigrant status. Employers will still be permitted to file immigrant visa petitions for potential alien employees, who would still be able to file for adjustment of status. Instead, this rule as it pertains to extension of stay and change of status sets additional conditions, which are intended to better ensure that aliens present in the United States continue to remain self-sufficient for the duration of their nonimmigrant stay. DHS notes that aliens seeking extension of stay and change of status are not subject to the public charge ground of inadmissibility. Instead they are subject only to the condition that the applicant has not received public benefits since obtaining the nonimmigrant status from which he or she seeks to change, as described in 8 CFR 212.21(b) for more than 12 months, in the aggregate, within a 36-month period.

i. Costs Related to Program Changes and Public Inquiries

*Comment:* Several commenters noted that states, localities, universities, and healthcare providers will face the enormous task of reprogramming computer software, redesigning application forms and processes, and other aspects pertaining to benefit programs processes. As an example, a commenter stated that online application portals for public benefits often highlight disclaimers that applying for assistance will not affect immigration status. One commenter stated that in some states like Pennsylvania, individuals can submit an application for healthcare coverage and simultaneously be eligible for Medicaid, CHIP, or SNAP; however the rule will require local authorities to provide new systems to shield applicants from public charge risk. In addition, multiple commenters stated that ''churn'' is associated with higher administrative costs, increased clinic time spent on paperwork and

certification process, and worsened healthcare outcomes.

*Response:* DHS appreciates receiving comments regarding administrative changes that will be needed in response to the rule regarding, for example, reprogramming computer software and redesigning application forms and processing. DHS agrees that some entities may incur costs related to the changes commenters identified and describes these costs in the economic analysis based on the data provided by commenters. However, DHS is unable to determine the entities that will choose to make administrative changes to their business processes.

*Comment:* Many organizations said that states, localities, and healthcare providers will incur increased costs in many unprecedented ways, including handling general inquiries related to the rule, creating public awareness campaigns, providing notice to current participants, retraining and educating staff, hiring additional response staff, and providing aid to partner programs.

Other commenters said that states, localities, healthcare providers, and housing providers will be bombarded with requests from current and former program participants for official documentation verifying that they have not received public benefits during a specific time frame, requiring significant resources in gathering this historical data and responding to these requests while also obeying privacy restrictions and other technical constraints. According to a commenter, many agencies will not have older documentation available in their records, or records will be incomplete or inaccessible. According to a commenter, state and local officials will likely see a significant volume of communication related to questions about eligibility for certain programs and the impact on immigration status.

*Response:* DHS acknowledges that the final rule will add new direct and indirect impacts on various entities and individuals associated with the provisions of the rule. However, in response to the commenters' concerns about the availability of older documentation related to receipt of public benefits, DHS does not agree that the new requirements associated with public charge inadmissibility determinations would pose an unnecessary administrative burden, as DHS has determined that it is necessary to establish a public charge inadmissibility rule. While age and availability of record of public benefits receipts may vary among Federal and State agencies, it is the responsibility of the individual seeking immigration

benefits to provide the required documents and information. Beyond the indirect costs and other economic effects described in the economic analysis of this rule, it is unclear the effect that this rule will have on the entities mentioned by the commenters.

j. Costs Related to States and Local Governments, and Public Benefit-Granting Agencies

*Comment:* A commenter stated that most states have already established their budgets based on expected enrollment in programs such as SNAP and Medicaid. Another commenter wrote that resources for programs such as the USDA Community Eligibility Provision program are allocated based on direct certification data, which is based on SNAP enrollment, and that non-citizens in the program who disenroll based on public charge provisions will cause additional administrative work for the localities to adjust and compensate. Another commenter stated that local governments have already adjusted and planned services based on the location and living situations of immigrant communities that this rule could greatly affect. A commenter wrote that their state's housing investments could be destabilized by the rule.

*Response:* DHS appreciates the comments regarding the effects of the rule on State and local budgets. As discussed above, DHS agrees that some entities, such as State and local governments or other businesses and organizations, would incur costs related to the changes commenters identified. DHS considers these costs qualitatively in the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and what the cost of making such changes will be. DHS notes that, in the economic analysis accompanying this rule, which can be found in the rule docket at *www.regulations.gov,* we estimate the reduction in transfer payments from federal and state governments to certain individuals who receive public benefits and discusses certain indirect impacts that are likely to occur because of the final regulatory changes. These indirect impacts are borne by entities that are not specifically regulated by this final rule, but may incur costs due to changes in behavior caused by this final rule. The primary sources of the reduction in transfer payments from the federal government are the disenrollment or foregone enrollment of individuals in public benefits programs. The primary sources of the consequences and indirect impacts of the final rule are

**41470** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

costs to various entities that the final rule does not directly regulate, such as hospital systems, state agencies, and other organizations that provide public assistance to aliens and their households. Indirect costs associated with this rule include familiarization with the rule for those entities that are not directly regulated but still want to understand the final rule.

The commenter's statement that the rule could destabilize the state's housing investments is unclear. This rule does not directly regulate the availability of Federal housing benefits and how states choose to allocate those funds. Rather, the rule directly regulates only aliens who, at the time of application for admission or adjustment of status, are subject to the public charge inadmissibility ground, as well as aliens seeking extension of stay or change of status who are subject to the public benefits condition on eligibility. DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge and identifying the types of public benefits that will be considered in the public charge determinations. An alien applying for admission or adjustment of status generally must establish that he or she is not likely at any time in the future to become a public charge.

k. Regulatory Familiarization Costs

*Comment:* Many commenters expressed concerns that NPRM was very complex and therefore would cause confusion, stress, and fear among those directly and indirectly affected by it, including the immigrant community, lawyers, government agencies, educational and social service providers, and community and charitable organizations. Other commenters noted that familiarization costs would be particularly burdensome for applicants with multiple jobs or limited English proficiency, small and medium sized businesses, as well as large complex healthcare providers, groups assisting applicants including advocacy groups and state and local agencies. Some commenters argue that the complexity of the rule would result in almost all applicants needing legal assistance. Other commenters noted that the complexity of the rule, and the resulting confusion, could lead immigrants to face discrimination, receive incorrect legal advice, or forego public benefits even if they are not affected by this rule. Many commenters believe substantial training and administrative work would be needed in order to provide accurate guidance to immigrant applicants and their families,

specifically mentioned were issues related to education and employment. A commenter stated that state and local officials will incur costs related to not just familiarizing officials with the rule, but also in understanding recommendations, policies, and procedures with the general public. Some commenters said the rule would discourage workforce professionals, such as healthcare professionals and social workers, from providing advice to clients because of the risk of increased liability caused by providing advice beyond these workforce professionals' expertise. Some commenters wrote that USCIS would incur familiarization costs associated with the rule as well as understanding State laws and procedures associated with programs such as Medicaid eligibility. Research organizations suggested that the familiarization costs of eight to 10 hours is an underestimate and should be increased because of time spent on translation, public outreach, training, research, legal consultation, fielding questions, and dealing with the ''chilling effect.''

*Response:* DHS increased the expected familiarization burden to range between 16 to 20 hours after reviewing the time estimates in response to comments we received. DHS does not quantify the potential population that may incur familiarization costs associated with the rule due to the uncertainty surrounding the estimated number of people that will familiarize themselves with this rule. The net effect this rule will have on the population seeking an adjustment of status in terms of additional assistance sought is not known. However, to the extent possible DHS has incorporated the costs provided by commenters into the economic analysis.

As discussed above, USCIS has a robust stakeholder communication and engagement program that covers all aspects of the agency's operations. This program will engage stakeholders when this rule becomes final to help ensure that applicants for immigration benefits and their representatives fully understand the new rule. With respect to comments about healthcare professionals and social workers being concerned about liability and not providing advice, DHS notes that these professionals can provide information and disseminate that guidance that USCIS will issue to assist individuals understand and comply with this rule, but should not be providing legal advice without being licensed to practice law in the state.

l. Costs to the Federal Government

*Comment:* Several commenters discussed the costs of the rule to the Federal Government. Many commenters said the rule will add new adjudication costs to the Government while increasing the already overstretched and delayed processing and regulatory burden. Many commenters stated that the rule would impose an immense administrative burden on USCIS and require USCIS to conduct individualized public charge determinations and adjudications of Form I–944 for hundreds of thousands of applicants with increased evidentiary requirements, heightened scrutiny, and uncertainty as to what standards will apply. Multiple commenters highlighted the increased administrative burdens to USCIS and other organizations such as DOS, as the rule will require every adjudicator to be trained to apply rules which are already subjective and unclear.

According to a commenter, the increased complexity of applying the public charge definition would lead to increased work for USCIS related to adjudicating appeals. An individual commenter suggested USCIS would face additional costs related to removal proceedings as a result of the rule by requiring it to issue more NTAs. A couple of commenters said public charge assessments of individuals making requests to extend or change nonimmigrant status creates additional and unnecessary administrative burden on USCIS.

*Response:* DHS believes that the burdens associated with improved administration of the public charge ground of inadmissibility, including the expanded information collection, are justified. Adjudicators will be appropriately trained on Form I–944 and will make their determinations in as timely a manner as possible. In addition, DHS does not agree that the new requirements associated with public charge inadmissibility determinations would waste resources and be an unnecessary administrative burden, as DHS has determined that it is necessary to establish a public charge inadmissibility rule. Should DHS determine that the fees set for the relevant forms related to the public charge review process are not sufficient to cover the full cost of the associated services adjudicating immigration benefit requests, the agency will propose to adjust these form fees in a subsequent fee rule. DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with

administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests. DHS does not believe the costs of additional NTAs will be significant. As discussed above, while the rule may increase USCIS processing times, such is the burden of robust enforcement of the law.

m. Costs to Non-Citizens and Their Communities

*Comment:* A number of commenters highlighted the impact the proposed rule would have on non-citizens and their communities. Commenters stated that the rule holds non-citizen workers responsible for the low wages offered by employers utilizing visa programs, when instead the costs of the public charge determination should be placed on employers.

*Response:* DHS appreciates the comments concerning the impact on noncitizens and their communities. DHS does not agree that this rule holds noncitizen workers responsible for low wages offered by employers using visa programs. DHS also does not agree that employers should incur the costs of the public charge determination. As the alien has the burden of proof of establishing admissibility into the United States, the cost burden is appropriately on the individual seeking the immigration benefit in the United States.

n. Healthcare-Related Costs

*Comment:* A commenter wrote that the rule would increase costs related to general administrative burdens having to manage disenrollment, reenrollment, and inquiries related to the rule. A commenter stated that Medicaid coverage is heavily linked to the economic health of hospitals and, as a result, hospitals could realize significant costs due to the rule. Similarly, a commenter wrote that the rule could see administrative costs and uncompensated care significantly increase. Finally, another commenter wrote about concerns regarding costs related to the privacy of patient data and security as the rule may require USCIS to seize health records.

*Response:* As discussed elsewhere, this rule furthers the Government's interest, as set forth in PRWORA, to minimize the incentive of aliens to attempt to immigrate to the United States due to the availability of public benefits, as well as promote the self-sufficiency of aliens within the United States.[818] DHS addresses the rule's

[818] *See* 8 U.S.C. 1601.

potential "chilling effect," as well as the eligibility of affected aliens for the designated benefits, elsewhere in the preamble.

DHS appreciates concerns expressed about increasing healthcare costs, worse health outcomes, increased use of emergency rooms, and the economic health of hospitals. As explained in greater detail elsewhere in this rule, DHS has made a number of changes in the final rule itself. DHS has excluded the Medicare Part D LIS, receipt of public benefits by children eligible for acquisition of citizenship, and Medicaid receipt by aliens under the age of 18 from the definition of public benefit in the public charge determination. In addition, DHS is not including CHIP in the public benefit definition. DHS also adopted a simplified, uniform duration standard for public charge determinations for assessing the use of public benefits.

Finally, DHS does not agree that USCIS will "seize" health records of patients. Most adjustment of status applicants are already required to undergo an immigration medical examination and submit Form I–693 with their adjustment application. As noted previously, DHS will rely on the medical information provided by civil surgeons on the Form I–693, or report of a panel physician, to assess whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status. The data collected on Form I–693 is collected and kept in an alien's administrative record consistent with the Privacy Act and SORN. DHS must comply with the Privacy Act in safeguarding information in the applicable systems of records. As noted on the instructions to Form I–693, consistent with the Privacy Act, DHS may share the information an alien and the civil surgeon provide on Form I–693 with Federal, State, local, and foreign government agencies, and authorized organizations for law enforcement purposes, or in the interest of national security. The civil surgeon may share the results of the immigration medical examination with public health authorities.

o. Housing and Homelessness-Related Costs

*Comment:* Some commenters cited various studies regarding the costs of housing, homelessness, and healthcare. Another commenter referenced research showing that providing access to public

housing to those with serious mental illness would reduce healthcare costs by 24 percent, arguing that housing is pivotal to healthcare. Low-income households with children that pay more than half of their monthly income on rent spend considerably less on other basic necessities—they spend $200 less per month on food, nearly $100 less on transportation, and about $80 less on healthcare. An individual commenter stated that a homeless person on the street may cost more to public service providers and healthcare facilities, such as ambulances, city street clean-up, law enforcement, etc., than the annual cost of providing them housing. The commenter stated that housing is a basic need that provides stability for all things needed to be contributing members of society and that without quality affordable housing, families are forced to pay for unsafe and unsanitary living conditions, which results in negative consequences for society.

A commenter cited studies where more students may experience homelessness under this rule. Commenters stated there is an affordable housing and homelessness crisis across the country that would be exacerbated by this rule, including overcrowding, long wait lists and inundated housing authorities, and make public housing more necessary for immigrants and citizens. A commenter stated that the Government failed to consider a potential increased cost of homelessness to local governments and cited a cost benefit analysis. Commenters stated that they use HCV as additional funding to cover costs and support permanent public housing, arguing that this rule would add to their overall costs. Another commenter stated that even with access to food assistance, 57 percent of households that face food-insecurity are forced to choose between buying enough food and paying for housing. The commenter further stated that due in large part to California's booming economy, there is a significant need for affordable housing in the state. Renters struggle to find affordable housing, particularly in California cities, where the cost of living is higher than the national average (nearly one-third of renter households in California spend at least half of their income on rent). The commenter stated that of the approximately 491,000 low-income households in California that use Federal housing rental assistance, 90 percent include children, the elderly, or the disabled who would be disproportionately impacted by the rule.

*Response:* DHS appreciates the comments regarding the potential effects and costs the rule may have regarding

**41472**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

housing, homelessness, and healthcare and the citation to various studies that address and estimate these issues. However, in most cases, the studies that commenters reference are not the focus of the NPRM and its economic analysis, but instead look at different populations of interest (*e.g.,* specific metropolitan areas or very low-income individuals/households), and/or are not generalizable. For example, the commenter who referenced research showing that providing access to public housing to those with serious mental illness would reduce healthcare costs by 24 percent cited a case study that examines the Mercy Maricopa Integrated Care contract for the Phoenix, Arizona area, which is highly localized and not generalizable to the wider U.S. population.

Regarding the effect of this rule on homelessness, this rule does not directly regulate eligibility for Federal housing benefits or other public benefits that individuals who are homeless, or at risk of being homeless, may rely upon. Rather, the rule directly regulates only aliens who, at the time of application for admission or adjustment of status, are subject to the public charge inadmissibility ground, as well as aliens seeking extension of stay or change of status who are subject to the public benefits condition on eligibility.[819] Moreover, this rule does not eliminate funding for public benefits programs. As a result, DHS only estimated the potential effect on individuals who choose to disenroll or forego enrollment in a public benefits program. DHS provides estimates of the amount of the reduction in transfer payments from the Federal and State governments to certain individuals who receive public benefits in the RIA, which can be found in the public docket of this final rule.

*Comment:* A commenter stated that any disenrollment or return of housing assistance will not result in any cost savings to public housing authorities (PHA) or federal programs because the demand for such assistance far outstrips the available assistance. The commenter stated that PHAs will be faced with increased administrative costs given the anticipated disenrollment/new enrollment turnover. As a result, PHAs will have to proceed with processing the next individual on the waiting list, as well as closing out the family that is exiting the program.

Another commenter stated that the DHS estimates of reduce housing assistance payments by $71 million per year is highly problematic. That commenter takes issue with the

assertion of federal savings in housing programs, because HUD rental assistance programs are discretionary programs, not entitlements, and are provided with a fixed amount of funding that falls very far below what is needed to serve all eligible households. The commenter stated that therefore, net transfer payments for housing assistance would remain roughly the same as a result of the proposed rule and would yield no net savings for the Federal Government.

*Response:* DHS appreciates the comment regarding the effect the rule may have on PHAs. The commenter mischaracterizes "cost savings" in their comment to DHS. As DHS shows in the economic analysis of the rule, the effect of disenrollment or foregone enrollment by individuals in public benefits programs are likely to result in a reduction in transfer payments from Federal and State governments to certain individuals who receive public benefits, not a cost savings. Transfer payments are monetary payments from one group to another that do not affect total resources available to society. The reduction in transfer payments are quantified in the transfer payments section of the economic analysis of this rule in accordance with OMB's Circular A–4. However, DHS notes that there is great uncertainty regarding the effects that changes in transfer payments will have on the broader economy and estimating those effects are beyond the scope of this rule.

Additionally, with regard to administrative costs that PHAs may incur due to the rule, DHS agrees that some entities may incur costs, but these costs are considered to be indirect costs of the rule since this rule does not directly regulate these entities and does not require them to make changes to their business processes. DHS considers these indirect costs as qualitative, unquantified effects of the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and the cost of making such changes.

p. Economic Costs

*Comment:* A number of commenters had broad concerns about costs the rule would have on the economy as well as innovation and growth. Commenters wrote that the rule is essentially an unfunded mandate to businesses, nonprofits, and educational organizations with substantial compliance costs. A commenter wrote that the rule would stifle economic risk taking and the entrepreneurial spirit in immigrants, thus costing the American economy over the long term. One

commenter stated that the rule would reduce immigration and hurt the country's economic future given the need for immigrant workers to replenish an increasingly aging population. Similarly, a commenter stated that demographic shifts mean that immigrant communities represented the future of their state, and the rule would significantly harm those communities. A commenter wrote that approximately 20 percent of their local businesses are run by foreign-born individuals and, therefore, the rule would hurt not just non-citizen families, but also local communities.

*Response:* DHS appreciates the comments regarding the potential effect of the rule on the economy, innovation, and growth. Beyond the indirect costs and other economic effects described in the economic analysis of this rule, DHS is unable to determine the effect this rule will have on every economic entity mentioned or all aspects of future economic growth. DHS agrees that there may be effects on the U.S. economy and on individuals seeking immigration benefits. DHS describes the potential economic effects in the economic analysis of this rule, which can be found in the rule docket at *www.regulations.gov.*

However, this rule does not directly regulate businesses, nonprofits, or educational organizations. DHS notes that this rule directly regulates only aliens who, at the time of application for admission, or adjustment of status, are deemed likely at any time in the future to become a public charge or who are seeking extension of stay or change of status.[820] DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time to become a public charge and identify the types of public benefits that will be considered in the public charge determination or the public benefit condition.

*Comment:* Commenters stated that the number of noncitizens who will be forced to avoid benefits will have a significant impact on the U.S. economy. Commenters quoted cost estimates associated with the rule, including some estimates as high as $164.4 billion. Several commenters quoted an economic impact of $33.8 billion and a loss of 230,000 jobs. Similarly, one commenter stated that the annual income of workers potentially impacted by the rule is $96 billion, and losing these workers would have a $68 billion impact on the economy with $168 billion in damages total. A commenter wrote that the rule would have national

---

[819] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[820] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

effects across a number of sectors and industries in the economy. A commenter wrote that effects of the rule could total between $453 million and $1.3 billion due to various effects of increased poverty, reduced productivity, etc. Another commenter wrote that the rule would result in an increase in healthcare costs for their city of at least $45 million annually.

*Response:* DHS appreciates the comments regarding the impact of the rule on the U.S. economy. DHS does not agree that noncitizens will be forced to avoid benefits. Although individuals may choose to disenroll from or forego enrollment in public benefits programs for which they are eligible, this rule does not, and cannot, require individuals to do so and does not change the eligibility requirements for public benefits. Under the rule, DHS will conduct a public charge inadmissibility determination when an alien seeks an adjustment of status, by evaluating an alien's particular circumstances, including an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[821] In addition, DHS will only consider the applicant's own receipt of public benefits.

DHS also appreciates the comments that included cost estimates and the potential effects of the rule on the U.S. economy. DHS agrees that there may be some effects on the U.S. economy and on individuals seeking immigration benefits from the United States. In the economic analysis of this rule, which can be found in the rule docket at *www.regulations.gov*, DHS estimates the direct and indirect costs according to the methodology presented using the best available data; DHS also estimates the amount of the reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program.

In response to the commenter stating that the rule will cost as much as $164.4 billion dollars, DHS notes that this estimate is not comparable to the estimates DHS presents in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov*. The $164.4 billion estimated cost of the rule the commenter cites comes from an analysis from New American Economy and is comprised of the total annual income of workers who could be affected by this

[821] *See* 8 CFR 212.22.

rule.[822] In addition, the analysis estimates that there would be about $68 billion in indirect economic effects as part of the estimated $164.4 billion total cost. However, the validity and reliability of the analysis cited by the commenter is unclear as the calculations of the analysis are not presented, which makes it difficult to assess comparability with DHS's economic analysis.

The final rule, under section 3(f)(1) of E.O. 12866, is designated a ''significant regulatory action'' that is economically significant since it is estimated that the final rule would have an annual effect on the economy of $100 million or more (annualized costs are estimated to range from about $89.8 million to $144.4 million). In addition, DHS estimates approximately $2.47 billion for a reduction in transfer payments from the Federal Government and State governments to public benefits recipients who are members of households that include foreign-born non-citizens, which includes the estimated federal- and state-level shares of transfer payments to foreign-born non-citizens. While the commenters mentioned above provided estimates of the costs of the rule, DHS will maintain the cost and transfer payments estimates we presented in the economic analysis of the rule, which can be found in the rule docket at *www.regulations.gov*. Where possible, DHS discusses the costs presented by commenters and provides a range of additional costs that states, cities, businesses and people could incur because of this rule. However, DHS was unable to determine the number of entities and people that would be affected.

*Comment:* Some commenters noted the economic costs the rule would impose on aliens who have low income. One commenter stated that the most significant costs of the rule will be concentrated on the poorest communities in cities with large numbers of immigrants. A commenter wrote that if the Federal Government reduces transfer payments, the costs will be passed onto other entities such as food banks, pantries, religious organizations, etc. According to another commenter, the rule will incur costs to housing providers who will need to be prepared to answer inquiries from tenants and others related to the rule,

[822] *See* New American Economy Research Fund, ''*How Proposed Rule Change Could Impact Immigrants and U.S. Economy.*'' Oct. 31, 2018. Available at: *https:// research.newamericaneconomy.org/report/ economic-impact-of-proposed-rule-change-inadmissibility-on-public-charge-grounds/* (last visited July 26, 2019).

and possibly provide materials on request.

*Response:* DHS does not intend the rule to disproportionately affect poor communities. As described elsewhere, the purpose of the rule is to ensure the self-sufficiency of aliens who are subject to the public charge ground of inadmissibility. As described in the economic analysis accompanying this rule, which can be found in the rule docket at *www.regulations.gov*, some may incur indirect costs of the rule. Additionally, the final rule does not force individuals who are eligible for public benefits to disenroll or forego enrolling in public benefits programs and acknowledges that those who choose to disenroll may need to rely on other means of support within their family or community. Individuals may choose to disenroll from or forego enrollment in public benefits programs for which they are eligible, but this rule does not, and cannot, require individuals to do so and does not change the eligibility requirements for public benefits. As such, the Federal Government is not intentionally reducing transfer payments for public benefits programs through this rule, but DHS estimates there is likely to be a reduction in transfer payments from individuals to federal and state governments because a number of individuals may choose to disenroll from or forego enrollment in public benefits program for which they are eligible.

*Comment:* A number of commenters provided input on the cost analysis of the rule provided by USCIS. A commenter wrote that the rule does not attempt to engage with strategies for avoiding the costs imposed by the rule's changes to the public charge inadmissibility determination. A commenter wrote that USCIS did not accurately estimate of the number of people who will disenroll from or forego enrollment in public benefits programs as a result of the rule. The commenter also noted that DHS did not did not monetize the costs of this disenrollment and foregone enrollment; did not account for the costs to the U.S. economy of deeming a greater number of foreign-born persons inadmissible to the country; did not account for the non-financial costs of adverse public charge determinations for affected foreign-born noncitizens; and did not provide any evidence for its low estimate of the rule's familiarization costs. One commenter wrote that the rule acknowledges effects of changes on communities that could be harmful, but it fails to quantify this effect.

*Response:* DHS appreciates receiving comments regarding aspects of the cost-benefit analysis of this rule. The purpose of the economic analysis is not to provide suggestions for avoiding costs that regulated entities may impose. Instead, the purpose of the economic analysis is to estimate the costs and benefits of policy changes the agency is implementing through a regulation compared to current practices. Elsewhere in this preamble, DHS addresses specific alternatives and cost-saving recommendations submitted by commenters.

The final rule will affect individuals who are present in the United States and are seeking an adjustment of status to that of a lawful permanent resident and who are not expressly exempted, and individuals seeking extension of stay or change of status. DHS estimated the effect of the rule on foreign-born non-citizens as accurately as possible given the requirements that are being implemented for aliens to submit to a review for a public charge determination. However, due to serious data limitations, DHS is not able to estimate the effect of being deemed inadmissible as a public charge.

*Comment:* Commenters wrote that the inability to submit forms related to the rule electronically increases costs.

*Response:* DHS does not agree that not having the option to submit forms related to the rule electronically increases costs. Submitting forms via mail to USCIS is current practice, which is not changing with this final rule, and therefore estimated costs are expected to remain the same. However, USCIS is taking steps towards implementing a system for electronic filing of all immigration forms in the future, including the forms affected by this rule, which is expected to reduce costs to the agency and ultimately those who file forms with USCIS to request immigration benefits.

*Comment:* One commenter stated that DHS has disregarded the costs associated with the proposed age standard.

*Response:* DHS is unable to estimate the specific cost to individuals, society, or the Government, that a single factor considered as part of public charge reviews for inadmissibility may have because the public charge inadmissibility determination will be conducted based on an individual's "totality of the circumstances."

r. Economic Impact and Job Loss

*Comment:* Commenters cited studies pointing to the substantial impact on local economies and healthcare systems due to a significant drop in enrollment from public benefit programs, such as Medicaid and SNAP. Several commenters stated that this rule would pose substantial costs to New York City, which is home to a large number of immigrants and children with foreign-born parents. Other commenters provided data detailing the rule's economic impact to Los Angeles County, CA; Austin, TX; Minneapolis, MN; San Jose, CA; Philadelphia, PA; St. Paul, MN; Boston, MA; and Dallas, TX.

One commenter stated that the rule will undermine our nation's global competitiveness because a highly-educated workforce spurs economic growth and strengthens state and local economies. Similarly, a commenter noted that the rule will undermine our competitive advantage and allow other countries permitting natural immigration flows to take the United States' place on the global economic stage. The same commenter continued by writing that innovation carried out by immigrants has the potential to increase the productivity of native-born Americans, likely raising economic growth per capita. This commenter also cited a report finding that immigration has positive effects, with little to no negative effects, on wages and employment for native-born Americans.

Additionally, at the state level, several commenters noted that in California (the 5th largest economy in the world if it were a country), studies project a $718 million to $1.67 billion reduction in public benefits would lead to 7,600 to 17,700 lost jobs, $1.2 to 2.8 billion in lost economic output, and $65 to $151 million in lost State and local tax revenue. Several commenters cited a study concluding that reduced participation in California's Medicaid program, Medi-Cal, and California's SNAP program, CalFresh, could result in tens of thousands of jobs lost in California, as well as billions of dollars in lost federal funding and more than $150 million in lost tax revenue in California. Some commenters provided data relating to the rule's economic impact on specific states, such as Michigan, Oregon, New York, Washington, Pennsylvania, Rhode Island, Colorado, Florida, Ohio, Kentucky, Massachusetts, Illinois, Pennsylvania, Wisconsin, Maine, Georgia, Maryland, and North Carolina.

*Response:* DHS appreciates the comments concerning immigration and U.S. economic competitiveness. The final rule does not limit the number of individuals who may seek immigration benefits or restrict the existing categories of immigrants and nonimmigrants. Additionally, DHS does not agree that this final rule will have a negative effect on U.S. competitiveness or economic growth. Rather, through this final rule DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status who are subject to the public charge ground of inadmissibility, as well as applicants for extension of stay and change of status, are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.[823]

*Comment:* Several commenters stated that DHS's assessment of the downstream economic impacts of the rule is insufficient. A commenter said DHS provides no basis for its assertion that the state share of the total transfer impact of the rule would be 50 percent of the federal share, concluding that evaluation of the rule's impact on states should be part of any sound justification for the rule. A commenter similarly referenced DHS's statement that half of the savings will be from lower transfers from State and local governments and stated that, should DHS accept the commenter's recommendations to end various additional exemptions from the list of public charge-related benefits, these transfer payment savings would increase significantly. This commenter also stated that the cost-benefit ratio as proposed would thus be very favorable, between $14 to $37 in taxpayer saving for every dollar expended by the agency and the applicant to prepare and review documentation for a public charge determination.

*Response:* DHS appreciates the comments regarding downstream economic effects of the rule as well as DHS's estimate for the amount of transfer payments at the state-level. DHS notes there is not a legal requirement to provide a monetized total cost estimate for this rule. DHS explained in the proposed rule the many factors that were not within the control of DHS that would influence total costs. As previously explained, DHS described and monetized, where possible, the types of costs that would result from this rule and has added many additional costs that were provided by the commenters. For those costs and benefits that DHS was not able to quantify and monetize to calculate a total cost, the economic analysis includes a description of those costs and benefits and a reasoned discussion about why they could not be quantified or monetized.

---

[823] *See* 8 U.S.C. 1601(2).

DHS addressed its assumption that the state-level share of transfer payments is 59 percent of the estimated amount of Federal transfer payments. Because state participation in these programs may vary depending on the type of benefit provided, DHS is only able to estimate the impact of state transfers. For example, the Federal Government funds all SNAP food expenses, but only 59 percent of allowable administrative costs for regular operating expenses.[824] Similarly, Federal Medical Assistance Percentages (FMAP) in some HHS programs, like Medicaid, can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[825] However, upon consideration of the commenter's point and further review of the published FMAPs for each state and territory of the United States, DHS has revised its estimates of the state share of transfer payments from 50 percent to 59 percent, which is the national average FMAP.

*Comment:* Commenters said the strength of America's economic future is dependent on the well-being and success of children, who are our future workforce and tax base, and the rule could jeopardize our country's economic future by causing tax-paying individuals who are legally eligible for support to forego it.

*Response:* DHS appreciates the comments regarding children and the economic future of the United States. DHS agrees that children are part of what will continue to make the U.S. economy strong into the future. However, DHS does not agree that this rule will jeopardize the economic future of the United States. While DHS acknowledges the potential disenrollment (or foregone enrollment) from public benefits by aliens based on the final rule, the final rule does not force individuals who are legally eligible for public benefits to disenroll or forego enrolling in such benefits programs. Instead, through this final rule DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment to

lawful permanent resident status who are subject to the public charge ground of inadmissibility, as well as aliens seeking extension of stay or change of status, are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.[826]

s. Economic Impact on Healthcare System

*Comment:* Some commenters stated that the rule will result in decreased tax revenue and lower productivity for individuals who delay primary care.

*Response:* DHS appreciates the comment regarding decreased tax revenue and lower productivity for individuals who delay primary care. DHS agrees that working age individuals who fall ill would have lower productivity at their jobs and possibly cause decreased tax revenue if such individuals are forced to take unpaid sick leave or must quit working altogether. However, DHS does not agree that this rule would be the cause of such unfortunate events. DHS reiterates that the main purpose of the rule is to provide guidance on the public charge inadmissibility ground statutory provision for those seeking admission or adjusting status in establishing that the person is not likely at any time in the future to become a public charge.

*Comment:* Multiple commenters stated that the rule would cause reductions in reimbursement, patient use, and collectability, which would have substantial negative financial impacts on hospitals and health centers, with many citing supporting data on potentially lost revenue. Some commenters pointed to a study showing that enrollees affected by the rule account for $68 billion in Medicaid and CHIP healthcare services. One commenter calculated the amount of hospital Medicaid payments at risk for 13 million beneficiaries who are likely to experience a chilling effect from this rule, finding that hospitals could lose up to $17 billion annually in payments from these programs.

Many commenters stated that the rule would negatively impact the healthcare workforce, particularly direct care workers. Commenters cited data indicating that the rule will impact health and long-term care agencies' ability to hire and retain their health care workers, as approximately 25 percent of healthcare support workers, such as nursing and home health aides,

are immigrants, many of whom are paid low wages and rely on public assistance who would either leave the profession or forego health coverage and put their health at risk. Some commenters emphasized that this obstacle to expanding the workforce would be particularly impactful at a time when the need for home care workers is growing rapidly due to an aging U.S. population. Commenters state that an exacerbated direct care workforce shortage would particularly impact people with disabilities since many direct care workers are immigrants who often rely on publicly-funded programs due to low wages. Some commenters stated that if home health care workers are unable to continue working, vulnerable populations may be forced to leave their homes and receive more expensive care in nursing homes. Commenters stated that this would not only put these vulnerable populations at risk, but also would destroy decades of federal and state efforts, including millions of federal dollars spent, to reduce the number of individuals residing in nursing homes. Some commenters said the costs to hospitals and the public health system would amount to more than any cost-savings from lower enrollment in public programs.

*Response:* DHS agrees that some entities such as hospitals would incur costs related to the rule such as rule familiarization costs and various administrative costs. DHS considers these costs as qualitative, unquantified effects of the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and the cost of making such changes.

Additionally, in response to commenters' concern that this rule will cause a direct care worker shortage, DHS is unable to quantify or confirm these effects because DHS does not know how aliens will change their behavior in response to this rule. DHS reiterates that the intent of this rule is not to prevent individuals such as these from working, but to provide guidance on determining whether an alien seeking admission or adjustment of status is likely at any time in the future to become a public charge.

*Comment:* One commenter stated that, without the contributions made by immigrants to the healthcare system, health insurance premiums could be expected to rise for Americans who rely on that coverage, concluding that the rule neither mentions nor considers these costs to U.S. citizens in its economic analysis. This commenter also said DHS should take into account that

---

[824] Per section 16(a) of the Food and Nutrition Act of 2008. *See also* USDA, FNS Handbook 901, p. 41 available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_internet_Ready_Format.pdf* (last visited July 26, 2019).

[825] *See* Dept. of Health and Human Services, ''Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2016 through September 30, 2017.'' ASPE FMAP 2017 Report. Dec. 29, 2015. Available at *https://aspe.hhs.gov/basic-report/fy2017-federal-medical-assistance-percentages* (last visited July 26, 2019).

[826] *See* 8 U.S.C. 1601(2).

the rule would actually increase Federal Medicaid expenditures for HHS. The commenters points to three factors that were included in the proposed rule, or could be included in the final rule, that would exacerbate their concern. The commenters recommended not including them as part of the final rule. The concerns were: (1) Including Medicaid or Medicare Part D LIS as negative factors in public charge determinations; (2) including the Children's Health Insurance Program (CHIP) in public charge determinations; and (3) considering premium tax credits for purchasing individual market coverage in a public charge determination.

*Response:* The commenter states that health insurance premiums could rise and Federal Medicaid expenditures will increase as an effect of the rule. DHS notes that the Public Charge final rule no longer includes Medicare Part D LIS as a public benefits program considered in public charge determinations, nor does it include CHIP or Medicaid for aliens under the age of 21 or pregnant women. In addition, the final rule does not consider premium tax credits in public charge determinations. Therefore, these changes to the final rule is responsive to a number of the commenters' concerns.

*Comment:* Several commenters stated that, in the long-run, some of the uncompensated care incurred by hospitals will be reimbursed by the Federal Government in the form of Medicare and Medicaid disproportionate share hospital payments, which is another instance of unaccounted for cost shifting that the rule will cause. One commenter requested that USCIS systematically research the increased costs that this rule will cost our healthcare system. An individual commenter cited DHS's reference to the decrease in particular healthcare providers' revenues, but asserted that there is no reference to findings showing either an increased or a decreased percentage of uncompensated care. To determine if including both non-monetary and monetary public benefits is a positive, the commenter said there must be some information on the amount of uncompensated care that healthcare providers provide to non-citizen aliens.

*Response:* DHS acknowledges in the economic analysis accompanying this rule that various entities may incur indirect costs associated with the rule. Additionally, in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov*, DHS notes there are a number of consequences that

could occur because of follow-on effects of the reduction in transfer payments identified in the final rule. DHS is provides a list of the primary non-monetized potential consequences of the final rule where disenrollment or foregoing enrollment in public benefits programs by aliens who are otherwise eligible could lead to issues such as increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient. However, DHS notes that it is not able to estimate such costs at this time.

t. Impact on U.S. Workforce

*Comment:* Some commenters pointed to a study indicating that over 91 percent of all adults active in the labor force who would be affected by the public charge rule are employed in critical industries, such as farming, construction, mining, hospitality, manufacturing, and professional and business services. A commenter provided data indicating the rule's destabilizing impact on multiple sectors of the California workforce that are comprised of a large number of low-wage immigrants, including agriculture, construction, child care and early education, and students. Some commenters provided data regarding the rule's impact on the workforce in Massachusetts, particularly in the construction field. A commenter wrote about the rule's potential impact on the immigrants in the construction industry who have been helping to rebuild Houston after Hurricane Harvey and who contribute billions each year in state and local taxes. The commenter notes that this rule would prevent immigrants from partaking in benefits that their tax dollars help support and will cause confusion in the immigrant community for using benefits that lead to a better life. Another commenter stated that Maine faces extraordinary demands to replace an aging and retiring workforce.

Two commenters described the rule's impact on the workforce in areas such as agriculture, ranching, hotels, and restaurants. Two other individual commenters provided input on the rule's impact on the horse industry, stating that putting immigrants in situations where they are working in physically demanding jobs with no access to healthcare could be "disastrous" for all involved. Another individual commenter stated that, because the disenrollment and foregone enrollment figures are unclear or uncalculated, it is impossible to know what the immediate economic impact will be in agriculture, healthcare, retail, and rental markets.

After asserting that the rule will cause job losses and economic decline, a commenter said restricting the number of immigrants to the United States could leave the nation at a vulnerable position given the current national employment boom.

*Response:* DHS appreciates the comments regarding the impact on the U.S. workforce, particularly the effect that the rule will have on specific industries. DHS does not anticipate that this rule will have a strong or extensive effect on the U.S. workforce overall or across specific industries as discussed in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov*, and the Final Regulatory Flexibility Analysis. DHS estimates the potential impacts to businesses, states and small entities using the data provided by commenters. Small entities that could be impacted by this final rule are those who file Form I–129 or Form I–129CW as petitioners on behalf of beneficiaries requesting an extension of stay or change of status as well as obligors that would request a cancellation of a public charge bond.

u. Economic Impacts Related to Nutrition Programs

*Comment:* Some commenters said a significant drop in use of food stamps and other food programs will negatively affect farmers, local growers, and grocery sales at retailers and farmers markets. A commenter said reduced enrollment in SNAP will shift the burden to local communities and food banks that are already stretched to meet demand. A commenter stated that in 2017 more than \$22.4 million in SNAP benefits were spent at farmers markets. The commenter also asserted that many small farmers, farm workers, and their families are beneficiaries of SNAP, which the commenter concluded meant that they would be hit doubly hard by the proposed rule. Similarly, an academic commenter stated that limiting the ability of immigrants to use SNAP would hurt the American farming community and destabilize the American food system, reasoning that the revenues of farmers would be reduced and some farmworkers would lose access to SNAP benefits.

A commenter said the rule would withdraw nearly \$200 million in Federal SNAP funding, amounting to approximately \$358 million in lost economic activity when taking the economic multiplier into account. A couple of commenters stated that SNAP is an economic driver in local economies, especially rural communities. Commenters stated that

lower participation in SNAP means less federal funding to support local economies and lower worker productivity. Other commenters provided estimates for the amount of economic activity that would be lost in certain states as a result of immigrants foregoing critical nutritional benefits.

*Response:* DHS appreciates the comments regarding the economic effects of disenrollment or foregone enrollment in the SNAP benefits program. As noted in the NPRM, DHS recognizes that reductions in federal and state transfers under Federal benefit programs may have downstream impacts on state and local economies, large and small businesses, and individuals. However, DHS is generally not able to quantify these impacts due to uncertainty and availability of data. DHS estimated these impacts or discussed them qualitatively to the extent possible in the economic analysis for this final rule. For example, the rule might result in reduced revenues for grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs. DHS notes that the economic impact will result in a reduction in transfer payments from the Federal Government and State governments to individuals who may choose to disenroll from or forego enrollment in a public benefits program. However, the same amount of funding for public benefits programs, such as SNAP, will be available for qualified individuals. This final rule does not appropriate or disappropriate funding for public benefits programs, but ensures that applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility, as well as aliens seeking extension or change of status, are self-sufficient, *i.e.*, do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.[827]

*Comment:* A commenter stated that a reduction in SNAP enrollment could also reduce school reimbursement for free and reduced lunches in states that have extended SNAP benefits above 130 percent of FPL. A commenter indicated an expectation to see a decline in families willing to complete the forms in the Child and Adult Care Food Program center-based child care programs, which would result in less

federal nutrition funding to support healthy meals for children, the local retail and agriculture food economy, and revenue for child care businesses.

*Response:* DHS appreciates the comment regarding the effect of the final rule on enrollment in reduced and free school lunches. DHS does not believe the rule will reduce school reimbursement for reduced and free school lunches beyond the effect of individuals who may choose to disenroll from or forego enrollment in a public benefits program. Again, the final rule only regulates applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility, as well as aliens seeking change of status or extension of stay.[828]

### v. Other Economic Impacts

*Comment:* A commenter stated the rule will adversely impact colleges and universities, as even a slight decrease in international student enrollment has drastic impacts on higher education institutions because international students often receive little or no financial aid and pay higher out-of-state tuition at public universities. Similarly, a school said colleges across the country could see significant decrease in enrollment and increased burden on student health centers.

*Response:* DHS appreciates the comments regarding the effect of the rule on colleges and universities, including student health centers, as it relates to international student enrollment. However, this rule does not regulate international student enrollment in colleges and universities nor the amount of financial aid awards or the rate of tuition that colleges and universities charge. The final rule also does not regulate student health centers located at colleges and universities. Rather, the rule directly regulates aliens who, at the time of application for admission or adjustment of status, are deemed likely at any time in the future to become a public charge, as well as aliens seeking extension of stay or change of status.[829] DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge and identify the types of public benefits that will be considered in the public charge determinations. An alien applying for admission or adjustment of status generally must establish that he or she

is not likely at any time in the future to become a public charge.

As explained in the preamble of the rule,[830] DHS believes that the government interest in ensuring the self-sufficiency and non-reliance on public benefits of aliens, including nonimmigrants, as articulated by Congress in PRWORA,[831] applies to all aliens within the United States, including to those whose stays are temporary. Moreover, although the extension of stay or change of status provisions in the INA and the regulations do not specifically reference an alien's self-sufficiency, consideration of an alien's self-sufficiency in these applications is consistent with the principles of PRWORA and aligns DHS's administration of the INA to those principles.[832]

### w. DHS Estimates of Discounted Direct Costs and Reduced Transfer Payments

*Comment:* A commenter stated that USCIS characterization of reduced transfer payments as the primary benefit of the rule ignores long-standing principles of regulatory cost-benefit analysis distinguishing between benefits and transfers. This commenter suggests that the cost-benefit analysis should estimate the net effect that the reduced transfer payments would have on the larger economy. A commenter stated the exactness of the values used in our range of estimates leave little room for error as well as suggesting a more enhanced analysis given the broadness of the estimated range.

Another commenter questioned USCIS' approach in estimating costs and benefits of the rule stating that the reduction in transfer payments to non-citizens is itself a cost to those individuals per the guidelines of OMB Circular A–4 and should be defined as such in the regulatory impact analysis (RIA). A commenter also stated that cost savings of $2.27 billion will not be realized due to the effect on temporary visa applications and the potential that DOS starts applying public charge standards to applicants abroad. Another commenter said that the cost benefit analysis did not have sufficient documentation, and the rule's cost savings of $2.2 billion was chosen for its "wow" factor.

Finally, a commenter stated that USCIS highlights $23 billion in savings related to Medicaid, but fails to account for the beneficial impacts of the program

---

[827] *See id.*

[828] *See id.*

[829] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[830] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135–36 (proposed Oct. 10, 2018).

[831] *See* 8 U.S.C. 1601.

[832] *See Southern S.S. Co.* v. *N.L.R.B.,* 316 U.S. 31, 47 (1942) (requiring "careful accommodation of one statutory scheme to another. . . .").

and the effects of losing Medicaid coverage.

*Response:* DHS appreciates the comments regarding transfer payments. DHS notes that the $2.27 billion in cost savings that a commenter refers to are actually the estimated transfer payments of the rule as shown in the economic analysis, which can be found in the rule docket at *www.regulations.gov.* The method and calculation of the estimated transfer payments is shown as clearly as possible in the economic analysis of the rule. As previously discussed, DHS estimates the reduction in transfer payments from the Federal and State governments to certain individuals who receive public benefits and discusses certain indirect impacts that are likely to occur because of the final regulatory changes. The primary sources of the reduction in transfer payments from the Federal and State governments of this final rule are the disenrollment or foregone enrollment of individuals in public benefits programs. DHS notes there is not a legal requirement to provide a monetized total cost estimate for this rule. As previously explained, DHS described and monetized where possible the types of costs that would result from this rule and has added many additional costs provided by the commenters. For those costs and benefits that DHS was not able to quantify and monetize to calculate a total cost, the economic analysis includes a description of those costs and benefits and a reasoned discussion about why they could not be quantified or monetized. DHS does not agree that it is not adhering to long-standing principles of regulatory cost-benefit analysis. The economic analysis for this final rule was conducted based on the guidelines set forth in OMB's Circular A–4, which provides guidance to agencies for conducting cost-benefit analyses and, in this case, a discussion on the distinction between cost and/or benefits and transfer payments.[833] As noted in OMB Circular A–4 (p. 38), "[b]enefit and cost estimates should reflect real resource use. Transfer payments are monetary payments from one group to another that do not affect total resources available to society." The reduction in transfer payments are quantified in the transfer payments section of the economic analysis of this rule, in accordance with OMB's Circular A–4. A reduction in transfer payments is not quantified in the benefits section of this rule. There is great uncertainty

regarding the effects that changes in transfer payments will have on the broader economy and DHS is unable to estimate those effects.

**x. Benefits of Proposed Regulatory Changes**

*Comment:* A few commenters provided input on the benefits of the rule. A benefit noted by commenters is that the rule enforces the requirement that immigrants should be self-sufficient. One commenter provided scenarios and personal experiences as examples of fraudulent claims and behavior of immigrants. An educational institution said the rule ensures participation of immigrant families in federal or state-funded public benefit programs are monitored and limited. Two individual commenters provided comments, data, or studies relating to immigrants' dependence on public assistance programs causing continued decay on American culture. One commenter stated that the rule would save American taxpayers money. Another commenter noted the rule is non-discriminatory by creating a uniform process, and that the additional forms will allow better collection of information.

*Response:* DHS appreciates these comments. DHS's public charge inadmissibility rule is neither intended to address public benefit fraud and abuse nor ensure that alien access to public benefit programs is monitored and limited. As stated throughout this preamble, this rule is intended to align the self-sufficiency goals set forth in the PRWORA with the public charge ground of inadmissibility.

**y. Cost Benefit Analysis Issues**

*Comment:* Some commenters stated that DOS's January changes to public charge has led to improper denials, and that the rule may exacerbate that problem and lead to administrative inconsistency. Another commenter argued that DHS failed to adequately consider the costs of the rule on CBP application of the rule, citing studies.

*Response:* Although the standards set forth in the rule pertain both to whether an alien who seeks admission as a nonimmigrant or immigrant or seeks adjustment of status is inadmissible, the rule's economic analysis, which can be found in the rule docket at *www.regulations.gov,* focuses on the impact to USCIS adjudications, as the rule primarily impacts USCIS' adjudication of applications for adjustment of status, as well as applications for extension of stay and change of status. DHS is working closely with the Department of State to ensure

that they are aware of the requirements of this rule and to prevent any administrative inconsistency. In addition, DHS did not include an analysis of costs and benefits associated with public charge inadmissibility determinations made by CBP in the admission context. This rule would potentially limit entries into the United States in that CBP officers would deny admission to aliens at the ports of entry on public charge grounds, but CBP is already responsible for administering the public charge ground of inadmissibility and we do not anticipate a meaningful change in the amount of time the determination would take.

*Comment:* A commenter remarked on USCIS' approach to estimating costs and benefits of the rule noting that USCIS states the rule will have no effect on wages or growth, but this is unlikely given the rule will cause a fundamental change in future working populations. The commenter cited research with data and suggested using it as a model for this rule's economic analysis.[834]

*Response:* DHS does not expect this rule to have a direct effect on wages or economic growth as this rule does not regulate hiring practices of employers in the United States. This final rule requires an individual seeking admission or adjusting status to establish that he or she is not likely at any time in the future to become a public charge, and that aliens seeking change of status or extension of stay meet the public benefits condition. Moreover, DHS notes that the research the commenter cites is not relevant to a discussion of wages or economic growth that may result from this rule.[835] The research cited primarily discusses the effects on applicants when they are reviewed for public charge based on the factors that will be considered in the "totality of the circumstances."

*Comment:* Several commenters provided suggestions on how the analysis could have been done differently overall. One commenter said that USCIS should consider a general equilibrium analysis to better analyze the holistic impacts of the rule throughout the entire economy. Another commenter said in order to develop an

---

[833] OMB Circular A–4 is *available at https:// www.whitehouse.gov/sites/whitehouse.gov/files/ omb/circulars/A4/a-4.pdf* (last accessed July 26, 2019).

[834] *See* MPI, Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration (Nov. 2019), available at *https:// www.migrationpolicy.org/sites/default/files/ publications/MPI-PublicChargeImmigrationImpact_ FinalWeb.pdf* (last visited April, 18, 2019).

[835] *See* Capps, et al. (2018). Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration. Washington, DC: Migration Policy Institute, available at *https:// www.migrationpolicy.org/sites/default/files/ publications/MPI-PublicChargeImmigrationImpact_ FinalWeb.pdf* (last visited April, 18, 2019).

accurate portrayal of the rule's cost and benefits, USCIS must use actual benefit receipt information to determine the affected population rather than DHS summary statistics.

*Response:* DHS appreciates the commenters' suggestions. DHS did not consider a general equilibrium analysis to be appropriate here. We do not have enough data to build a general equilibrium model that would be able to estimate the impact of this rule. In addition, due to the complexity of potential benefits, issues of confidentiality, and data limitations, it was not possible to use actual benefit receipt information for the analysis.

*Comment:* A commenter stated that USCIS has not made any attempt to detail costs related to processing delays and noted that public charge determinations will inevitably slow down federal agency processing times, for which DHS did not estimate the opportunity cost of such delays.

*Response:* DHS appreciates the comment. DHS was unable to quantify such costs at this time. DHS notes that delays in processing various forms may occur, but that every effort is taken to avoid such delays whenever possible. DHS does not agree that the new requirements associated with public charge inadmissibility determinations would waste resources and be an unnecessary administrative burden, as DHS has determined that it is necessary to establish a public charge inadmissibility rule. Should DHS determine that the fees set for the relevant forms related to the public charge review process are not sufficient to cover the full cost of the associated services adjudicating immigration benefit requests, the agency will propose to adjust these form fees in a subsequent fee rule. DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests. As discussed above, while the rule may increase USCIS processing times, such is the burden of robust enforcement of the law.

*Comment:* A commenter stated that USCIS fails to properly estimate the impact of effects such as immigrants foregoing noncash benefits and other reductions in transfer payments. Another commenter stated that the impact that a loss of public benefits would have on immigrant communities should be calculated in a more robust way by using actuarial models or models used in personal injury

litigation that accurately capture the pain and suffering these individuals would undergo.

*Response:* DHS conducted its economic analysis to the best of its ability given the complexity of the analysis and the availability of data. DHS does not agree that the economic analysis should employ "actuarial models or models used in personal injury litigation" to estimate the economic effects of this rule. Actuarial models assess risk and probabilities utilizing a given set of parameters. Unfortunately, DHS does not have enough data on the usage of various subsidies nor the rate of disenrollment needed to create an accurate model. More specifically, in the case of actuarial models used in personal injury litigation, each person's situation is unique and DHS would need to know the specific impacts for each person in order to utilize that type of model. DHS reiterates that the main purpose of the rule is to provide guidance on the public charge inadmissibility ground statutory provision for those seeking admission or adjusting status in establishing that the person is not likely at any time in the future to become a public charge.

*Comment:* A commenter stated that the cost benefit analysis fails to consider the upward mobility of immigrant communities, the impact of lower levels of immigration on the economy, and other costs such as separation of families, businesses losing workers, and families going without needed assistance.

*Response:* Where possible, DHS has tried to quantify the indirect impacts of this rule, but DHS is unable to fully quantify the impact of lower immigration on the economy and other costs that could indirectly result from this rule.

*Comment:* A commenter stated that the cost benefit analysis details an increase in the number of denials for adjustment of status applications, but it does not provide a monetization of these impacts. A commenter stated that the proposed rule requires additional sensitivity analysis. Another commenter stated that USCIS fails to consider key impacts centered around increased denials for admission, change of status, or re-entry, and USCIS should complete a further literature review around these issues.

*Response:* DHS was able to detail an increase in the number of denials for adjustment of status applications, but did not have enough detailed information on specific aliens to monetize the impacts such denials may have on the economy. DHS disagrees

that the rule requires additional sensitivity analysis.

*Comment:* A commenter stated that USCIS significantly overestimated the average cost of housing assistance per person in calculating costs and benefits.

*Response:* DHS used the publicly available HUD Federal Rental Assistance and HUD HCV programs report data on the household level in order to estimate the number of households that may be receiving housing benefits. The average annual benefit of $8,121.16 is the estimate DHS calculated per household. DHS recognizes that actual average annual benefits may be less due to the size and location of a particular household.

*Comment:* A commenter stated that USCIS failed to estimate the number of applicants who will be deemed inadmissible, and the associated effects.

*Response:* DHS is unable to estimate the number of applicants who will be deemed inadmissible due to this rule. The review for public charge inadmissibility will be based on the totality of the circumstances that considers many positive and negative factors that are specific to each applicant. Therefore, DHS is unable to estimate the number of individuals who may be deemed inadmissible based on public charge. However, DHS estimated the annual population that will be subject to a public charge review for inadmissibility in the economic analysis for this rule, which can be found in the rule docket at *www.regulations.gov.*

*Comment:* A commenter stated that USCIS should monetize the costs of reduced participation in public benefits programs.

*Response:* DHS appreciates the comment regarding monetizing the costs of reduced participation in public benefits programs. DHS monetized the effect of disenrollment in public benefits programs to the extent possible based on the best available data. While DHS provides estimates of the direct costs of the final rule in the economic analysis, we also provide estimates and detailed methodology of the reduction in transfer payments from the Federal and State governments to certain individuals who receive public benefits such as those individuals who choose to disenroll or forego future enrollment in public benefits programs due to fear or confusion. As noted in OMB Circular A–4 (p. 38), "[b]enefit and cost estimates should reflect real resource use. Transfer payments are monetary payments from one group to another that do not affect total resources available to society." The reduction in transfer payments are quantified in the transfer section of the economic analysis

of this rule, in accordance with OMB's Circular A–4. However, a reduction in transfer payments are not quantified in the benefits section of this rule. DHS notes that there is great uncertainty regarding the effects changes in transfer payments will have on the broader economy, and estimating those effects are beyond the scope of this rule.

*Comment:* A commenter stated that USCIS includes the removal of Form I–864W as a benefit, but does not present a primary, minimum, or maximum estimate of the benefits.

*Response:* As noted in the economic analysis, which can be found in the rule docket at *www.regulations.gov,* DHS is eliminating Form I–864W and instead individuals will be required to provide the information previously requested on the Form I–864W using Form I–485. Based on the information provided in the Form I–485, an adjudication officer can verify whether an immigrant is statutorily required to file an affidavit of support. DHS estimated the cost per petitioner for filing Form I–864W, but was unable to determine the number filings of Form I–864W and was unable to estimate the total annual cost savings of eliminating this form.

*Comment:* A commenter stated that the lack of a sufficient economic model showing the potential impact this could have on families and the economy should be grounds to reject the proposed rule.

*Response:* DHS does not agree that DHS did not conduct a sufficient economic analysis for this final rule. E.O. 12866 directs agencies subordinate to the President to assess costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages, distributive impacts, and equity). In implementing E.O. 12866, OMB has provided further internal guidance to agencies through OMB Circular A–4 (Sept. 17, 2003), found at *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.* OMB Circular A–4 states that it ''is designed to assist analysts in the regulatory agencies by defining good regulatory analyses . . . and standardizing the way benefits and costs of Federal regulatory actions are measured and reported.'' OMB Circular A–4, at 3.

As previously explained, DHS described and monetized where possible the types of costs that would result from this rule and has added many additional costs provided by the commenters. For those costs and

benefits that DHS was not able to quantify and monetize to calculate a total cost, the economic analysis includes a description of those costs and benefits and a reasoned discussion about why they could not be quantified or monetized.

*Comment:* One commenter submitted a detailed comment on the cost-benefit analysis accompanying the proposed rule stating that over half of foreign-born spouses eligible for green cards would be impacted by USCIS' rule.[836] The commenter also stated that USCIS has not provided sufficient analysis to determine how many temporary visitors to the United States would be impacted, that the number of individuals likely to be impacted by the proposed rule's Form I–944 requirement on an annual basis is 436,029 as opposed to 382,264, and that the opportunity costs model used by USCIS is flawed largely due to the use of a weighted minimum wage rather than the average prevailing wage. The commenter stated that the number of individuals impacted by the proposed rule who receive minimum wage is likely significantly lower than 28.5%, and the minimum wage is often higher in a number of states than the national average. The commenter stated that the cost of attorney fees to applicants will be significantly higher than DHS recognizes. When correcting for these effects, the proposed rule would incur total costs of $2,260,448,302, or about 17 times greater than USCIS' estimate. A commenter stated that the cost savings related to healthcare provisions were unworkable given the disjointed nature of exempting some health services such as immunizations but punishing use of Medicaid and CHIP. A commenter stated that the proposed rule would lead to significant increase in administrative costs to deal with public charge provisions.

*Response:* DHS appreciates these comments. The analysis used the Federal minimum wage rate since approximately 80 percent of the total number of individuals who obtained lawful permanent resident status were in a class of admission under family-sponsored preferences and other non-employment-based classifications such as diversity, refugees and asylees, and parolees.[837] Further, the benefits-to-

wage multiplier raised the Federal minimum wage to $10.59, which could account for wages above $7.25 that do not receive non-wage benefits.[838] The cost savings presented in the analysis were based on the provisions of the proposed rule and have been updated in the final rule. Administrative costs were not calculated.

The analysis does not quantify potential effects on admissibility, as opposed to adjustment of status. Instead, the purpose of the rule is to determine whether an alien is inadmissible to the United States under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), because an alien is likely at any time in the future to become a public charge. Aliens who seek adjustment of status or a visa, or who are applicants for admission, must establish that they are not likely at any time to become a public charge, unless Congress has expressly exempted them from this ground of inadmissibility or has otherwise permitted them to seek a waiver of inadmissibility. Moreover, DHS will require all aliens seeking an extension of stay or change of status to demonstrate that they have not, since obtaining the nonimmigrant status they wish to extend or change, received public benefits, as defined in this rule, for more than 12 months in the aggregate within any 36-month period unless the nonimmigrant classification that they seek to extend, or to which they seek to change, is exempt from the public charge ground of inadmissibility.

In addition, DHS acknowledges the commenter's estimate of the population that would be affected by this rule's requirement to submit the new Form I–944. However, DHS notes that we use data from internal and external sources as appropriate, and ensures that all data are current, valid, reliable, and accurate. DHS declines use the commenter's population estimate in favor of the estimates we present in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov.* The data DHS used for its estimates were necessary since it provides detailed information showing the classes of applicants for admission, adjustment of status, or registry according to statute or regulation that are exempt from

[836] *See* Looming Immigration Directive Could Separate Nearly 200,000 Married Couples Each Year, Boundless Immigration Inc. (Sept. 24, 2018),*https://www.boundless.com/blog/looming-immigration-directive-separate-nearly-200000-married-couples.* (last visited July 26, 2019).

[837] *See* United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, DC, U.S. Department of Homeland Security, Office of Immigration

Statistics, 2017. Available at *https://www.dhs.gov/immigration-statistics/yearbook/2016.* (last visited July 26, 2019).

[838] Note that the benefits-to-wage multiplier of 1.47 used in the proposed rule has been updated to 1.46 for the final rule based on an annual data update released by the Bureau of Labor Statistics. Therefore, DHS updated its wage estimate using the Federal minimum wage plus benefits from $10.66 per hour to $10.59 per hour.

inadmissibility based on the public charge ground. Other data that are available are informative, but only provide aggregate receipt totals whereby it is not possible to remove individuals from the population count who are exempt from a public charge review of inadmissibility.

Finally, based on comments received, DHS amended its economic analysis, where possible, to account for individuals who choose to hire an attorney for legal representation on their behalf.

*Comment:* A commenter noted that though the rule impacts only a small number of immigrants, its chilling effect impacts will outweigh its intentional impacts. This, the commenter and others commenters asserted, is an abdication of DHS's APA duties to consider costs and benefits. Further, a commenter stated that DHS failed to satisfactorily justify the prospective harm of the chilling effect of this rule. Another commenter stated that DHS's cost analysis is arbitrary, stating that its estimates appear in some cases to reflect a range based on simply moving decimal places rather than evidence. Elsewhere, the commenters say estimates are inconsistent, such as the Form I–944 cost estimates in the PRA analysis versus elsewhere in the proposed rule. A few commenters noted that the public charge definition is not supported by or tied to any benefit to "health, well-being, businesses, economies, or communities." One commenter stated that the rule "does not point to any expected benefits for individual or public health, for national, state or local economies, for businesses, for healthcare systems, or for our communities."

*Response:* DHS disagrees with these comments. E.O. 13563 directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; the regulation is tailored to impose the least burden on society, consistent with achieving the regulatory objectives; and in choosing among alternative regulatory approaches, the agency has selected those approaches that maximize net benefits. E.O. 13563 recognizes that some benefits are difficult to quantify and provides that, where appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

## 2. Federalism Comments

*Comment:* A commenter stated that DHS did not conduct an adequate analysis of the NPRM's federalism implications. The commenter further stated that because of the serious impact the NPRM will have on the States, it is improper for DHS to forego the federalism summary impact statement. The commenter also stated that E.O. 13132 requires DHS to produce a federalism summary impact statement. One commenter stated that DHS did not engage in adequate consultation with governors pursuant to E.O. 13132, and requested that DHS engage in a meaningful and formal way before taking further action on the public charge rule. The commenter noted that the rule would likely impose significant financial and administrative burdens on states, including costly and labor-intensive changes in how states implement their shared eligibility systems among human services and health programs.

*Response:* This final rule does not have federalism implications because it does not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. Although this rule defines public benefit to include certain cash and non-cash benefits, some of which may be fully or partially administered by states or local governments, DHS is not purporting to regulate which aliens may receive such benefits or how states and local governments administer such programs. DHS does not expect that this final rule will impose substantial direct compliance costs on State and local governments, or preempt State law. Accordingly, in accordance with section 6 of E.O. 13132, this rule requires no further agency action or analysis.

*Comment:* A commenter stated that this rule impinges on a state's right to provide healthcare services and increases federal intrusion into local issues.

*Response:* DHS disagrees that this rule impinges on state's rights to provide healthcare services and increases federal intrusion into local issues. This rule enforces a law that has been in place, in one form or another, since the late 19th century. The review of public charge inadmissibility, which is an immigration matter, is a matter of Federal jurisdiction alone, as indicated by the Supreme Court.[839]

*Comment:* A commenter indicated that as a matter of law and effective policy, USCIS must consult with States and localities about the impact of the public charge rule on state and local choice and policy. The need for this consultation was apparent because the formulation of the guidance document this regulation proposes to replace considered state and local public health concerns.

*Response:* DHS has considered the relevant public comments and engaged in many meetings with state and local entities as part of the E.O. 12866 process. Aliens entitled to public benefits under State or local law may elect to receive such benefits and this rule does not, and cannot, change that fact. However, DHS believes that the consideration of an alien's receipt of designated public benefits is consistent with congressional intent, as set forth in PRWORA, that the receipt of public benefits should not be an incentive to come to the United States, and aligns DHS's administration of the INA to those principles.[840]

*Comment:* Some commenters stated that the rule violates state's rights to provide benefits to children and immigrants experiencing short-term crises. Some commenters said this rule impinges on a state's right to provide healthcare services and increases federal intrusion into local issues. Commenters stated that some state statutes and constitutions, as well as DHS's own 1999 Interim Field Guidance, make it a state interest to provide certain benefits to non-citizens.

Several commenters stated that the proposed rule impermissibly overrides state authority. Others stated that the proposed rule would bar their states' from providing state-funded aid to their own residents, regardless of immigration status. A commenter stated that the proposed rule violates the 10th Amendment of the U.S. Constitution because it commandeers state resources by compelling agencies to implement the rule, especially in providing notice and information to applicants. Another commenter stated that the rule violates a federalism principle by imposing an unfunded mandate. One commenter stated that the proposed rule will impose substantial costs on State and local governments such that federalism concerns are implicated. Other commenters stated that the proposed rule would harm their states. A commenter stated that the proposed rule would undermine a state statute that was passed with bipartisan support in order to extend CHIP.

---

[839] *See, e.g., Hines* v. *Davidowitz,* 312 U.S. 52 (1941); *see also Arizona* v. *United States,* 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.").

[840] *See Southern S.S. Co.* v. *N.L.R.B.,* 316 U.S. 31, 47 (1942) (requiring "careful accommodation of one statutory scheme to another.").

Another commenter asserted that, even if the proposed rule were passed in the form of a statute, it would violate Article I of the Spending Clause for coercively restricting state use of Federal grant money.

*Response:* DHS did not propose in the NPRM to, in any way, regulate or circumscribe the ability of states to offer public benefits to children and immigrants, or to require states to implement the DHS rule. Similarly, this final rule neither prohibits states from providing benefits to children and immigrants nor prohibits any category of immigrants from receiving any state or local benefits for which they are eligible. Furthermore, the rule's definition of public benefit does not include emergency aid, emergency medical assistance, or disaster relief. Likewise, the rule does not impact the Spending Clause since it does not restrict a state's ability to use Federal funds.

3. Family Assessment Comments

*Comment:* One commenter said that the rule violated Section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, which requires agencies to assess their policies' impact on family stability, families' ability to function, and other indicators of family well-being. Another commenter stated that DHS's Family Policymaking Assessment failed to fully and meaningfully evaluate the rulemaking's effects on family well-being under section 654(c)(1) and did not address 654(c)(2)–(7) at all. Other commenters generally agreed that the family assessment in the proposed rule is insufficient.

Several commenters stated this rule will unnecessarily harm family unity, such as by making it difficult for some spouses of U.S. citizens to enter the United States or adjust status. A commenter generally stated that the proposed rule's definition of ''household,'' along with the asset and income standards, would pressure families to separate. The commenter also stated that the proposal to subject residents to public charge determinations upon reentering the United States would discourage immigrants from preserving contact with family outside of the United States. A commenter added that it would make it especially difficult for immigrants to let their parents join them in the United States. Another commenter cited an article noting that there are 9,000,000 mixed status families in the United States, and many would be faced with the threat of coerced separation.

Another commenter stated that this rule could result in the separation of at least 200,000 married couples annually. Another commenter provided data on the impact of the study on marriage-based permanent residency applications, saying the proposed rule would undermine family unity and stability. A commenter stated that the proposed rule would chill access to their state's Department of Children and Families and Juvenile Court, leading to children remaining dependent on state child welfare programs.

Many commenters said this rule would dramatically hurt and jeopardize families, as well as place undue burden on all family members. A commenter stated that the proposed rule fails to analyze the rule's effect on the well-being of families, especially its impact to family stability, and on the disposable income of families and children. Some commenters provided studies showing how children could be severely and irreversibly harmed, including children's health, by separation as part of a strategy to prevent immigrants from legalizing their status.

A commenter stated that the rule contravenes international and domestic policies that support children's best interests, citing the U.N. Convention on the Rights of the Child.

*Response:* Section 654 of the Treasury and General Government Appropriations Act, 1999[841] requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being. Agencies must assess whether: (1) The action strengthens or erodes the stability or safety of the family and, particularly, the marital commitment; (2) the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children; (3) the action helps the family perform its functions, or substitutes governmental activity for the function; (4) the action increases or decreases disposable income or poverty of families and children; (5) the proposed benefits of the action justify the financial impact on the family; (6) the action may be carried out by State or local government or by the family; and whether (7) the action establishes an implicit or explicit policy concerning the relationship between the behavior and personal responsibility of youth, and the norms of society.

As discussed in the NPRM,[842] DHS has determined that the rule may decrease disposable income and increase the poverty of certain families and children, including U.S. citizen children. And as discussed previously, DHS has modified some provisions in ways that will mitigate the impact on families, such as by exempting receipt of Medicaid by aliens under 21 and pregnant women. Ultimately, however, DHS continues to believe that the financial impact on the family is justified.

Additionally, because the final rule considers receipt of public benefits that were not considered under the 1999 Interim Field Guidance, DHS determined that the aliens found inadmissible under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), will likely increase. However, given the compelling legal and policy reasons associated with this rulemaking, including but not limited to, better ensuring self-sufficiency, DHS determined that this rulemaking's impact is justified and no further actions are required. DHS also determined that this final rule will not have any impact on the autonomy or integrity of the family as an institution.

Furthermore, with this rulemaking, DHS does not intend to separate families. DHS's intent is to implement Congress' mandate to assess whether an alien has met his or her burden to demonstrate that he or she is not likely at any time to become a public charge under section 212(a)(4)(A) of the Act, 8 U.S.C. 1182(a)(4), given the congressional policy to ensure that those coming to the United States should be self-sufficient and not rely on the government for assistance to meet their needs.[843]

DHS agrees that family unity is a significant tenet of the family-based immigration system. As indicated above, the rule does not alter eligibility criteria for a family-based immigrant petition, although it could have some impact on the ultimate outcome of such petitions. DHS has taken certain steps that mitigate the potential effects of this rule on families. For instance, DHS will not attribute U.S. citizen children's receipt of public benefits to their parents who are subject to the public charge inadmissibility ground. Like all other applicants for admission or adjustment of status who are subject to the public charge or any other ground of inadmissibility, aliens are not guaranteed admission or adjustment of status merely by virtue of their

---

[841] Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998).

[842] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51277 (proposed Oct. 10, 2018).

[843] *See* 8 U.S.C. 1601(1) and (2).

relationship to a U.S. citizen or lawful permanent resident.[844]

## 4. Paperwork Reduction Act Comments

*Comment:* A commenter stated that the newly proposed Form I–944 is duplicative and unnecessary in light of the Form I–864. Another commenter stated that DHS has not shown that there are not less burdensome ways of gaining the information from I–944 than the form requires.

*Response:* DHS disagrees that the Form I–944 duplicates information collected on Form I–864 and is therefore duplicative. However, DHS has updated the forms to remove the questions about employment that are also on the I–485. In addition, DHS added language to the forms, indicating to the applicant that if tax forms were submitted as part of Form I–485, Form I–864 or Form I–944, the same tax returns do not need to be submitted with the I–864. Any document that is submitted as part of another form related to the immigrant benefit does not need to be submitted multiple times. Form I–864 is an affidavit of support submitted by an intending immigrant's sponsor, as required for certain categories of aliens subject to the affidavit of support requirements under section 213A of the Act, 8 U.S.C. 1183a. Form I–864 is a contract between the sponsor and the U.S. Government in which the sponsor agrees to use his or her income, assets, and resources to support the intending immigrants named in Form I–864, if it becomes necessary. The sponsor completing and signing Form I–864 must show that he or she has enough income and/or assets to maintain the intending immigrants listed on the affidavit and the rest of the sponsor's household at 125 percent of the FPG. The sponsor, therefore, is largely submitting information regarding his or her financial situation.

However, Form I–944 is completed by the intending immigrant, *i.e.,* applicant for adjustment of status, and requests information on the relevant factors as established by section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and the final rule, which are distinct from the requirements of the affidavit of support.

*Comment:* A commenter suggested a simplification of the declaration of self-sufficiency that targets aliens that might trigger public charge concerns, rather than, for example, all aliens who seek to adjust status. Another commenter stated that Form I–944 imposes undue burdens

and that DHS has failed to justify requiring it.

*Response:* DHS disagrees that the Form I–944 needs to be simplified and more carefully targeted or is overly burdensome. Form I–944 requests information about all the relevant factors as established by section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and the rule to determine whether the alien is inadmissible based on public charge ground.

The Form I–944 instructions state that only applicants filing Form I–485 who are subject to the public charge ground of inadmissibility must file Form I–944. The Form I–944 instructions also explain that an alien who is exempt from the public charge ground of inadmissibility does not need to file Form I–944, and subsequently lists all categories of aliens that are exempt from the public charge ground of inadmissibility. Therefore, DHS believes the declaration of self-sufficiency is appropriately targeted to the aliens that might trigger public charge concerns.

*Comment:* A commenter noted that there was no way to specify the receipt of public benefits was for an emergency on the Form I–944, nor did the form indicate that such services were excluded.

*Response:* DHS appreciates the comment and has updated the form to include questions regarding the exemptions and updated the description of the designated public benefits to clarify the information being sought.

*Comment:* A commenter opposed requiring that employees provide employers with certain information, whether through Form I–129, Form I–539, or Form I–944. The commenter stated that requiring a nonimmigrant to provide such personal information to his or her employer or prospective employer to overcome the presumption that he or she is or could become a public charge, such as medical payments, tax return transcripts, W–2s, or documents for temporary housing needs, is an unfair and unreasonable imposition on any employee. The commenter stated the employer should not know such personal information, and that the requirement could potentially expose an employer to liability. The commenter stated further that it is unclear who would be responsible to pay for the Form I–944, especially in the context of H–1B-based change or extension of status petitions, where the employer is generally required to pay the fees associated with the filing.

*Response:* Employees seeking employment-based nonimmigrant visas and those seeking to extend of change

to an employment-based nonimmigrant category, must provide certain biographical information to employers as part of the application process. Form I–129 and Form I–539/Form I–539A already provide for some information from both employers and employees when the benefit is related to employment-based immigration. As noted on the instructions for USCIS forms, the failure to provide requested information, or any other requested evidence, may delay adjudication or result in a denial of the benefit requested.

*Comment:* A commenter stated that DHS appears to be acting on the basis of either conflicting information or no information at all. For example, in the context of its PRA analysis, DHS estimates that 382,264 individuals will be required to fill out Form I–944, that the hour burden per response will be 4 hours, and that the monetary burden is $59,931,350. Those figures seem to directly conflict with DHS's earlier estimates that Form I–944 would take 4.5 hours to fill out and that the annual cost would be $25,963,371.[845] The commenter notes that the number of applicants is similarly in conflict. DHS also appears to assume that only applicants for adjustment will fill out Form I–944.[846] DHS overtly states, however, that at least some nonimmigrant visa applicants would have to fill out that form as well, and it provides statistics showing annual averages of those applicants over 200,000.[847] The commenter concludes from this information that DHS does not know how many people will have to fill out the form, how long it will take them, or how much it will cost on an annualized basis.

*Response:* DHS has corrected an error in the estimated time burden for Form I–944 from 4 hours to 4.5 hours. DHS uses historical data to estimate the populations and burdens reported. In some instances, DHS does not have historical data on a population and may need to derive these populations using statistical methods. For example, the 5-year average of those filing Form I–485 who are not exempt from the public charge inadmissibility determination is estimated at 382,264. DHS used this population for the Form I–944 estimate. Additionally, as part of the calculation of the 5-year average estimated population, DHS used the FY 2016 population of those who are not exempt

---

[844] *See Agyeman* v. *INS,* 296 F.3d 871, 879 (9th Cir. 2002) ("[A]pproval of the I–130 petition does not automatically entitle the alien to adjustment of status as an immediate relative of a United States citizen.").

[845] 83 FR 51284–85, at 51254.

[846] 83 FR 51284–85, at 51240 (calculating that 382,769 adjustment applicants would be subject to public charge review).

[847] 83 FR 51284–85, at 51243–44.

from public charge review (382,769 filers), which is very close to the 5-year average estimate. In sum, the economic analysis used the 5-year average of those filing Form I–485 of 382,264 and the FY 2016 population of those not exempt from public charge review, to estimate the population that will be subject to public charge inadmissibility determination and, therefore, will have to submit Form I–944.

Finally, DHS is required to estimate cost burden in multiple ways: (1) The PRA requires estimating cost burden based on the average hourly wage of the respondent; (2) the PRA also requires estimating the annual cost burden based on expenses incurred to complete the information collection including but not limited to attorney's fees, shipping and handling, etc., and (3) E.O. 12866 requires estimating the benefits and costs of the regulation, including the opportunity cost of time, among other costs.

*Comment:* A commenter stated that the proposed rule would also impose unreasonable burdens and financial costs on immigration benefit applicants and petitioners, specifically mentioning Form I–944. The comment indicated that though DHS projects an average Form I–944 preparation time of 4 hours and 30 minutes, the evidentiary requirements associated with the form and the public charge assessment overall suggest that DHS has seriously underestimated the time commitment. For example, using a method of assessing ''household size'' that differs significantly from the long-accepted definition used to evaluate Form I–864, the proposed rule and Form I–944 instructions require individuals to submit extensive supporting documentation of the financial status of the applicant's household, including all sources of household income and all cash and non-cash assets that can be converted into cash within 12 months. For every such asset, an applicant must provide a description of the asset, along with the value, basis of the claim for the value, and proof of ownership. The net value of a home may be included as an asset, but only if accompanied by documentation of ownership, evidence of all secured loans or liens, and a recent appraisal completed by a licensed appraiser (estimated to cost an average of $300 to $400 for a single family home). The commenter indicated that these requirements alone could consume significant amounts of time beyond the DHS estimate. In addition, multiple commenters stated that the documentation and information applicants would be required to collect and present is extensive (the commenter

stated that the Form I–944 would require the alien to list the name of every household member, amount of current assets and resources, recent Federal tax return history for the applicant and household members, credit score, proof of debts and liabilities, complete list of all public benefits applied for or received, and education and employment history), and that accurately completing the form and providing all required information with documentation would be a significant effort for non-citizens and their families.

*Response:* DHS acknowledges that the time that it would take each individual to complete Form I–944 could be more or less than the reported estimated average time burden, depending on the applicant's individual facts and circumstances. For example, some applicants would be children who do not have extensive education, assets, and liabilities to report on the Form I–944. In contrast, an older applicant could have extensive education, assets, and liabilities to report on the Form I–944. Moreover, in estimating the time burden, DHS does not include the time burden already accounted for by other information collections subject to the PRA nor inactive time to obtain the necessary evidence required. DHS also notes that an alien does not always have to provide information about the net value of a home and the related evidence. In general, the alien would need to provide information regarding the home and its net value if aliens using the home as evidence of his or her assets or resources. DHS will maintain the estimated time burden at 4.5 hours.

*Comment:* One commenter detailed several issues with Form I–944 and its requirements, saying that it will disproportionately harm low-income applicants and their families, place an unreasonable burden on families especially those who apply with their minor children, impose costly administrative burdens on Federal, State, and local government agencies, generate a huge workload for social services agencies, and undermine privacy rights of applicants. The commenter also noted that the rule will likely make it more difficult for low-income and vulnerable immigrants to remain on the path to U.S. citizenship, will dissuade many potential applicants from pursuing adjustment due to the costs of the application process, create financial hardship for people, and result in processing delays and lengthy wait times. One commenter said that the Form I–944 requirement would require states and counties to develop new work processes, require system updates, and

would likely result in hiring and specially training additional personnel. The commenter further indicated that counties will need to work with their respective states to develop standardized processes for receiving requests and providing information across the state that safeguards personal data. The commenter stated that this is not only a significant workload but also would include potentially major automation costs, given the level of detail required.

*Response:* The purpose of Form I–944 is to demonstrate that an adjustment of status applicant subject to the public charge ground of inadmissibility is not likely at any time in the future to become a public charge, as required by Congress in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). Form I–944 collects information relevant to the mandatory factors, such as age, family status, assets, resources, financial status, education, and skills. DHS is required to assess an applicant's assets and resources as part of the public charge inadmissibility determination, which entails a review of the alien's income. These factors are mandated by Congress in section 212(a)(4) of the Act, and DHS does not have the authority to disregard these factors. Additionally, the estimated burden on any alien submitting Form I–944 was provided in the NPRM.

DHS acknowledges in the economic analysis accompanying this rule that various government agencies may incur indirect costs associated with the rule such as, for example, the potential need to update administrative processes and provide additional training. However, Form I–944 imposes no requirements on Federal, State, or local government agencies. Instead, applicants required to submit Form I–944 must submit certain evidence from Federal, State, and local government agencies such as Federal income tax returns and documentation of receipt of public benefits. DHS has reviewed the data provided by commenters and updated the cost estimates to account for the indirect effects of this rule, where possible.

## IV. Statutory and Regulatory Requirements

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is

necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 13771 directs agencies to reduce regulation and control regulatory costs.

The Office of Information and Regulatory Affairs has designated this final rule as a "significant regulatory action" that is economically significant since it is estimated that the final rule would have an annual effect on the economy of $100 million or more, under section 3(f)(1) of E.O. 12866. Accordingly, OMB has reviewed this final regulation.

This rule is a regulatory action under E.O. 13771.

1. Summary

As discussed above, DHS is modifying its regulations to add new regulatory provisions for inadmissibility determinations based on the public charge ground under the INA. DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge and is identifying the types of public benefits that will be considered in the public charge determinations. An alien applying for admission at the port of entry, or adjustment of status generally must establish that he or she is not likely at any time in the future to become a public charge. DHS will weigh certain factors positively or negatively, depending on how the factor impacts the immigrant's likelihood to become a public charge. DHS is also revising existing regulations to require all aliens seeking an extension of stay or change of status to demonstrate that they have not received public benefits, as defined in this rule unless the nonimmigrant classification that they seek to extend or to which they seek to change is exempt from the public charge ground of inadmissibility. Finally, DHS is revising its regulations governing the Secretary's discretion to accept a public charge bond or similar undertaking under section 213 of the Act, 8 U.S.C. 1183. Similar to a waiver, a public charge bond permits an alien deemed inadmissible on the public charge ground to obtain adjustment of status, if otherwise admissible.[848]

This final rule will impose new costs on the population applying to adjust status using Form I–485 that are subject to the public charge ground of inadmissibility who will now be required to file the new Form I–944 as part of the public charge inadmissibility determination. DHS will require any adjustment applicants subject to the public charge inadmissibility ground to submit Form I–944 with their Form I–485 to demonstrate they are not likely at any time in the future to become a public charge. The final rule will also impose additional costs for completing Forms I–485, I–129, I–129CW, and I–539 as the associated time burden estimate for completing each of these forms will increase. Moreover, the final rule will impose new costs associated with the new public charge bond process, including new costs for completing and filing Forms I–945 and I–356. DHS estimates that the additional total cost of the final rule will be approximately $35,202,698 annually to the population applying to adjust status who is also required to file Form I–944, for the opportunity cost of time associated with the increased time burden estimates for Forms I–485, I–129, I–129CW, and I–539, and for requesting or cancelling a public charge bond using Form I–945 and Form I–356, respectively.

Over the first 10 years of implementation, DHS estimates the total quantified new direct costs of the final rule will be about $352,026,980 (undiscounted). In addition, DHS estimates that the 10-year discounted total direct costs of this final rule will be about $300,286,154 at a 3 percent discount rate and about $247,249,020 at a 7 percent discount rate.

The final rule will also potentially impose new costs on obligors (individuals or companies) if an alien has been determined to be likely at any time in the future to become a public charge and will be permitted to submit a public charge bond, for which USCIS will use the new Form I–945. DHS estimates the total cost to file Form I–945 will be, at minimum, about $34,166 annually.[849]

Moreover, the final rule will potentially impose new costs on aliens or obligors who submit Form I–356 as part of a request to cancel the public charge bond. DHS estimates the total

cost to file Form I–356 would be approximately $824 annually.[850]

The final rule will also result in a reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Individuals who might choose to disenroll from or forego future enrollment in a public benefits program include foreign-born non-citizens as well as U.S. citizens who are members of mixed-status households,[851] who otherwise may be eligible for the public benefits. DHS estimates that the total reduction in transfer payments from the Federal and State governments will be approximately $2.47 billion annually due to disenrollment or foregone enrollment in public benefits programs by foreign-born non-citizens who may be receiving public benefits. DHS estimates that the 10-year discounted federal and state transfer payments reduction of this final rule will be approximately $21.0 billion at a 3 percent discount rate and about $17.3 billion at a 7 percent discount rate. However, DHS notes there may be additional reductions in transfer payments, or categories of transfers such as increases in uncompensated health care or greater reliance on food banks or other charities, that we are unable to quantify.

There also may be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in a public benefits program. For example, the Federal Government funds all SNAP food expenses, but only 50 percent of allowable administrative costs for regular operating expenses.[852] Similarly, FMAP in some HHS programs, like Medicaid, can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[853] Since the state

[848] There is no mention of "waiver" or "waive" in INA section 213, 8 U.S.C. 1183. However, the BIA has viewed that provision as functioning as a waiver of the public charge ground of inadmissibility. *See Matter of Ulloa,* 22 I&N Dec. 725, 726 (BIA 1999).

[849] Calculation: $35.59 (cost per obligor to file Form I–945) * 960 (estimated annual population who would file Form I–945) = $34,166.40 = $34,166 (rounded) annual total cost to file Form I–945.

[850] Calculation: $33.00 (cost per obligor to file Form I–356) * 25 (estimated annual population who would file Form I–356) = $825.00 annual total cost to file Form I–356.

[851] DHS uses the term "foreign-born non-citizen" since it is the term the U.S. Census Bureau uses. DHS generally interprets this term to mean alien in this analysis. In addition, DHS notes that the Census Bureau publishes much of the data used in this analysis.

[852] Per section 16(a) of the Food and Nutrition Act of 2008, Pub. L. 110–234, tit. IV, 122 Stat. 923, 1092 (May 22, 2008) (codified as amended at 7 U.S.C. 2025). *See also* USDA, FNS Handbook 901, at p. 41 (2017). Available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_Internet_Ready_Format.pdf,* (last visited May 7, 2019).

[853] *See* Dept. of Health and Human Servs. Notice, Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons
Continued

share of FFP varies from state to state, DHS uses the average FMAP across all states and U.S. territories of 59 percent to estimate the amount of state transfer payments. Therefore, the estimated 10-year undiscounted amount of state transfer payments that could occur as a result of the provisions of this final rule is about $1.01 billion annually. The estimated 10-year discounted amount of state transfer payments of the provisions of this final rule would be approximately $8.63 billion at a 3 percent discount rate and about $7.12 billion at a 7 percent discount rate. Finally, DHS recognizes that reductions in federal and state transfers under Federal benefit programs may have downstream impacts on state and local economies, large and small businesses, and individuals. For example, the rule might result in reduced revenues for healthcare providers participating in Medicaid, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs.

Additionally, the final rule will have new direct and indirect impacts on various entities and individuals associated with regulatory familiarization with the provisions of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. A foreign-born non-citizen (such as those contemplating disenrollment or foregoing enrollment in a public benefits program) might review the rule to determine whether she or he is subject to its provisions and may incur familiarization costs. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those individuals or entities the rule directly regulates, a wide variety of other entities would likely choose to read and understand the rule and, therefore, would incur familiarization costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this final rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule in order to provide information to those foreign-born non-citizens that might be affected by a reduction in federal and state transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs.

DHS estimates the time that would be necessary to read this final rule would be approximately 16 to 20 hours per person depending on an individual's average reading speed and level of review, resulting in opportunity costs of time. An entity, such as a non-profit or advocacy group, may have more than one person that reads the rule. Using the average total rate of compensation as $36.47 per hour for all occupations, DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule.

The final rule will produce some quantified benefits due to the regulatory changes DHS is making. The final rule will produce some benefits for T nonimmigrants applying for adjustment of status based on their T nonimmigrant status, as this population will no longer need to submit Form I–601 seeking a waiver on the public charge ground of inadmissibility. DHS estimates the total benefits for this population is $15,176 annually.[854]

The primary benefit of the final rule would be to better ensure that aliens who are admitted to the United States, seek extension of stay or change of status, or apply for adjustment of status are not likely to receive public benefits and will be self-sufficient, *i.e.,* individuals will rely on their own financial resources, as well as the financial resources of the family, sponsors, and private organizations.[855] DHS also anticipates that the final rule will produce some benefits from the elimination of Form I–864W. The elimination of this form will potentially reduce the number of forms USCIS would have to process. DHS estimates the amount of cost savings that will accrue from eliminating Form I–864W will be about $36.47 per petitioner.[856] However, DHS is unable to determine the annual number of filings of Form I–864W and, therefore, currently is unable to estimate the total annual cost savings of this change. Additionally, a public charge bond process will also provide benefits to applicants as they potentially will be given the opportunity for adjustment if otherwise admissible, at the discretion of DHS, after a determination that he or she is likely to become a public charge.

Table 2 provides a more detailed summary of the final provisions and their impacts.

TABLE 2—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| Revising 8 CFR 212.18. Application for Waivers of Inadmissibility in connection with an application for adjustment of status by T nonimmigrant status holders.<br>Revising 8 CFR 245.23. Adjustment of aliens in T nonimmigrant classification. | To clarify that T nonimmigrants seeking adjustment of status are not subject to public charge ground of inadmissibility. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $15,176 annually to T nonimmigrants applying for adjustment of status who will no longer need to submit Form I–601 seeking a waiver on public charge grounds of inadmissibility.<br>*Costs:*<br>• None. |

for October 1, 2016 through September 30, 2017, 80 FR 73779 (Nov. 25, 2015).

[854] Calculation: $14,880 (Filing fees for Form I–601) + $296.48 (Opportunity cost of time for Form I–601) = $15,176.48 = $15,176 (rounded) total current estimated annual cost for filing T nonimmigrants filing Form I–601 seeking a waiver of grounds of inadmissibility. Therefore, the estimated total benefits of the final rule for T nonimmigrants applying for adjustment of status using Form I–601 seeking a waiver on grounds of inadmissibility will equal the current cost to file Form I–601 for this population.

[855] 8 U.S.C. 1601(2).

[856] Calculation of savings from opportunity cost of time for no longer having to complete and submit Form I–864W: ($36.47 per hour * 1.0 hours) = $36.47.

TABLE 2—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE—Continued

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| Adding 8 CFR 212.20. Purpose and applicability of public charge inadmissibility.<br>Adding 8 CFR 212.21. Definitions ............<br>Adding 8 CFR 212.22. Public charge determination. | To define the categories of aliens that are subject to the public charge determination.<br>To establish key definitions, including "public charge," "public benefit," "likely to become a public charge," "household," and "receipt of public benefits."<br>Clarifies that evaluating public charge is a prospective determination based on the totality of the circumstances.<br>Outlines minimum and additional factors considered when evaluating whether an alien immigrant is inadmissible based on the public charge ground. Positive and negative factors are weighed to determine an individual's likelihood of becoming a public charge at any time in the future. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $36.47 per applicant from no longer having to complete and file Form I–864W.<br>*Costs:*<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for inadmissibility determinations.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensure that aliens who are seeking admission to the United States or apply for adjustment of status are self-sufficient through an improved review process of the mandatory statutory factors. |
| Adding 8 CFR 212.23. Exemptions and waivers for public charge ground of inadmissibility. | Outlines exemptions and waivers for inadmissibility based on the public charge ground. | |
| Adding 8 CFR 214.1(a)(3)(iv) and amending 8 CFR 214.1(c)(4)(iv). Nonimmigrant general requirements.<br>Amending 8 CFR 248.1(a) and adding 8 CFR 248.1(c)(4). Change of nonimmigrant classification eligibility. | To provide, with limited exceptions, that an application for extension of stay or change of nonimmigrant status will be denied unless the applicant demonstrates that he or she has not received public benefits since obtaining the nonimmigrant status that he or she is seeking to extend or change, as defined in final 8 CFR 212.21(b), for 12 months, in the aggregate, within a 36 month period. | **Quantitative:**<br>*Costs:*<br>• $6.1 million annually for an increased time burden for completing and filing Form I–129;<br>• $0.12 million annually for an increased time burden for completing and filing Form I–129CW;<br>• $2.4 million annually for an increased time burden for completing and filing Form I–539.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensures that aliens who are seeking to extend or change to a status that is not exempt from the section 212(a)(4) inadmissibility ground who apply for extension of stay or change of status continue to be self-sufficient during the duration of their nonimmigrant stay. |
| Amending 8 CFR 245. Adjustment of status to that of person admitted for lawful permanent residence. | To outline requirements that aliens submit a declaration of self-sufficiency on the form designated by DHS and any other evidence requested by DHS in the public charge inadmissibility determination. | **Quantitative:**<br>*Direct Costs:*<br>• Total annual direct costs of the final rule will range from about $45.5 to $131.2 million, including:<br>  • $25.8 million to applicants who must file Form I–944;<br>  • $0.69 million to applicants applying to adjust status using Form I–485 with an increased time burden;<br>  • $0.34 million to public charge bond obligors for filing Form I–945; and<br>  • $823.50 to filers for filing Form I–356.<br>• Total costs over a 10-year period will range from:<br>  • $352.0 million for undiscounted costs;<br>  • $300.1 million at a 3 percent discount rate; and<br>  • $247.2 million at a 7 percent discount rate.<br>*Transfer Payments*<br>• Total annual transfer payments of the final rule would be about $2.47 billion from foreign-born non-citizens and their households who disenroll from or forego enrollment in public benefits programs. The federal-level share of annual transfer payments will be about $1.46 billion and the state-level share of annual transfer payments will be about $1.01 billion.<br>• Total transfer payments over a 10-year period, including the combined federal- and state-level shares, will be:<br>  • $24.7 billion for undiscounted costs;<br>  • $21.0 billion at a 3 percent discount rate; and<br>  • $17.3 billion at a 7 percent discount rate.<br>**Quantitative:**<br>*Benefits:*<br>• Potential to make USCIS' in the review of public charge inadmissibility more effective.<br>*Costs:* |

TABLE 2—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE—Continued

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| | | • DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination. |
| | | • Costs to various entities and individuals associated with regulatory familiarization with the provisions of the final rule. Costs will include the opportunity cost of time to read the final rule and subsequently determine applicability of the final rule's provisions. DHS estimates that the time to read this final rule in its entirety would be 16 to 20 hours per individual. DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule. However, DHS cannot determine the number of individuals who will read the final rule. |
| | Public Charge Bond Provisions | |
| Amending 8 CFR 103.6. Public charge bonds. | To set forth the Secretary's discretion to approve bonds, cancellation, bond schedules, and breach of bond, and to move principles governing public charge bonds to final 8 CFR 213.1. | **Quantitative:** *Costs:* • $34,166 annually to obligors for submitting Public Charge Bond (Form I–945); and • $823.50 annually to filers for submitting Request for Cancellation of Public Charge Bond (Form I–356). |
| Amending 8 CFR 103.7. Fees ................ | To add fees for new Form I–945, Public Charge Bond, and Form I–356, Request for Cancellation of Public Charge Bond. | • Fees paid to bond companies to secure public charge bonds. Fees could range from 1–15 percent of the public charge bond amount based on an individual's credit score. |
| Amending 8 CFR 213.1. Admission or adjustment of status of aliens on giving of a public charge bond. | In 8 CFR 213.1, to add specifics to the public charge bond provision for aliens who are seeking adjustment of status, including the discretionary availability and the minimum amount required for a public charge bond. | **Quantitative:** *Benefits:* • Potentially enable an alien who was found inadmissible only on the public charge ground to adjust his or her status by posting a public charge bond with DHS. |

Source: USCIS analysis.

DHS has prepared a full analysis according to E.O.s 12866 and 13563, and can be found in the docket for this rulemaking or by searching for RIN 1615–AA22 on *www.regulations.gov*. In addition to the impacts summarized above and as required by OMB Circular A–4, Table 8 presents the prepared accounting statement showing the costs associated with this final regulation.[857]

TABLE 8—OMB A–4 ACCOUNTING STATEMENT

[$, 2018]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| | | **BENEFITS:** | | |
| Monetized Benefits .............. | The final rule will produce some benefits for T nonimmigrants applying for adjustment of status based on their T nonimmigrant status, as this population will no longer need to submit Form I–601 seeking a waiver on grounds of inadmissibility. DHS estimates the total benefits for this population is $15,176 annually. Form I–485 applicants will no longer have to file Form I–864W. Benefits to applicants will be approximately $36.47 per petition based on the opportunity cost of time. | | | RIA. |
| Annualized quantified, but un-monetized, benefits. | ................................... | ................................... | ................................... | RIA. |
| Unquantified Benefits .......... | The primary benefit of the final rule is to ensure that aliens who are admitted to the United States or apply for adjustment of status will not use or receive one or more public benefits for which they are entitled to receive, and instead, will rely on their financial resources, and those of family members, sponsors, and private organizations. | | | RIA. |

[857] OMB Circular A–4 is *available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf*.

TABLE 8—OMB A–4 ACCOUNTING STATEMENT—Continued

[$, 2018]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| | Potential to improve the efficiency for USCIS in the review process for public charge inadmissibility. | | | |
| **COSTS:** | | | | |
| Annualized monetized costs (discount rate in parenthesis). | (3%) $35,202,698<br>(7%) $35,202,698 | N/A<br>N/A | N/A<br>N/A | RIA. |
| Annualized quantified, but un-monetized, costs. Qualitative (unquantified) costs. | N/A.<br><br>DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination.<br>Costs to various entities and individuals associated with regulatory familiarization with the provisions of the rule. Costs will include the opportunity cost of time to read the final rule and subsequently determine applicability of the final rule's provisions. DHS estimates that the time to read this final rule in its entirety would be 16 to 20 hours per individual. DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule. However, DHS cannot determine the number of individuals who will read the final rule.<br>Fees paid by aliens to obligors to secure public charge bond.<br>Other qualitative, unquantified effects of the final rule could include:<br>• Potential lost productivity,<br>• Adverse health effects,<br>• Additional medical expenses due to delayed health care treatment, and<br>• Increased disability insurance claims<br>• Administrative changes to business processes such as reprogramming computer software and redesigning application forms and processing. | | | RIA. |
| **TRANSFERS:** | | | | |
| Annualized monetized transfers: "on budget". | ($1,455,724,086) | N/A | N/A | RIA. |
| From whom to whom? | Reduction in transfer payments from the federal government to public benefits recipients who are members of households that include foreign-born non-citizens. This amount includes the estimated federal-level shares of transfer payments to members of households that include foreign-born non-citizens. | | | RIA. |
| Annualized monetized transfers: "off-budget". | ($1,011,604,874) | N/A | N/A | RIA. |
| From whom to whom? | Reduction in transfer payments from state governments to public benefits recipients who are members of households that include foreign-born non-citizens. This amount includes the estimated state-level shares of transfer payments to members of households that include foreign-born non-citizens. DHS estimates that the state-level share of transfer payments is 59 percent of the estimated amount of federal transfer payments. DHS estimates the annual federal-level share would be about $1.46 billion and the annual state-level share of transfer payments would be about $1.01 billion. | | | |
| Miscellaneous analyses/category | Effects | | | Source citation |
| Effects on state, local, and/ or tribal governments. | DHS believes that the rule may have indirect effects on state, local, and/or tribal government, but DHS does not know the full extent of the effect on state, local, and/or tribal governments. There may be costs to various entities associated with familiarization of and compliance with the provisions of the rule, including salaries and opportunity costs of time to monitor and understand regulation requirements, disseminate information, and develop or modify information technology (IT) systems as needed. It may be necessary for many government agencies to update guidance documents, forms, and webpages. It may be necessary to prepare training materials and retrain staff at each level of government, which will require additional staff time and will generate associated costs. | | | RIA. |
| Effects on small businesses | DHS believes there may be some impacts to those small entities that file Form I–129 or Form I–129CW for beneficiaries that extend stay or change status. These petitioners will have an increase in time burden for completing and filing Form I–129 or Form I–129CW and possibly have labor turnover costs if the Form I–129 or Form I–129CW EOS/COS request is denied and the beneficiary has to leave the United States or the Commonwealth of the Northern Mariana Islands (CNMI), respectively. DHS also believes that some surety companies that are small entities may be impacted by filing Form I–356. DHS estimates the total annual cost to file Form I–356 will be about $823.50. | | | RIA. |

| Miscellaneous analyses/category | Effects | Source citation |
|---|---|---|
| Effects on wages ................ | None .................................................................................................................................... | None. |
| Effects on growth ................ | None .................................................................................................................................... | None. |

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), imposes certain requirements on Federal agency rules that are subject to the notice and comment requirements of the APA, 5 U.S.C. 553(b), and are likely to have a significant economic impact on a substantial number of small entities. The RFA requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, or governmental jurisdictions with populations of less than 50,000.[858] This final rule requires an individual seeking admission at the port of entry or adjusting status to establish that he or she is not likely at any time in the future to become a public charge. Most of this rule's regulatory changes do not fall under the RFA because they directly regulate individuals who are not, for purposes of the RFA, within the definition of small entities established by 5 U.S.C. 601(6). However, DHS recognizes that there may be some provisions of this final rule that would directly regulate small entities, and, therefore, DHS has examined the impact of this final rule on small entities.

This final rule would increase the time burden by an additional 30 minutes for petitioners who file Form I–129 or Form I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners. Additionally, the provisions to establish a public charge bond process included in this final rule would allow for either an alien or an obligor (individual or an entity) to request a cancellation of a public bond. As a result, this final rule could have direct impacts on small entities that are obligors. DHS also recognizes that a Form I–129 or Form I–

129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status, may have to leave the United States if the employer's request was denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. DHS presents this Final Regulatory Flexibility Analysis (FRFA) to examine these impacts.

1. Final Regulatory Flexibility Analysis

The small entities that could be impacted by this final rule are those who file Form I–129 or Form I–129CW as petitioners on behalf of beneficiaries requesting an extension of stay or change of status as well as obligors that would request a cancellation of a public charge bond.

a. A Statement of the Need for, and Objectives of, the Rule

DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility are self-sufficient, *i.e.,* they will rely on their own financial resources as well as the financial resources of their family, sponsors, and private organizations as necessary.[859] Under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), an alien is inadmissible if, at the time of an application for admission or adjustment of status, he or she is likely at any time to become a public charge. The statute requires DHS to consider the following minimum factors that reflect the likelihood that an alien will become a public charge: The alien's age; health; family status; assets, resources, and financial status; and education and skills. In addition, DHS may consider any affidavit of support submitted by the alien's sponsor and any other factors relevant to the likelihood of the alien becoming a public charge.

Separate from these requirements, as a condition for permitting extension of stay or change of status for certain nonimmigrant aliens, this rule requires such aliens (or their petitioning employer) to establish that they have not received certain public benefits above a particular threshold since

obtaining the nonimmigrant status that they wish to extend or change. This "public benefit condition" serves the same policy goals as the rule generally.

b. A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments.

*Comment:* Some commenters stated that the rule will negatively impact small businesses. An individual commenter stated that the rule would undercut small and mid-sized businesses' ability to manage their talent pipelines. The commenter stated that nearly 48 percent of private-sector workers in the United States are employed in these small and mid-sized businesses, and that small businesses rely on strategic partnerships and related tools to ensure a strong talent pipeline of workers who are equipped with the skills they need. The commenter stated that the rule would penalize individuals who often draw upon public benefits to support themselves or their families during their training period or even when they first begin work. The commenter stated that in view of currently low unemployment, employers need access to labor that is able to attend training while still relying on public benefits programs to provide for their families' basic needs.

A commenter stated that the RFA mandates that DHS consider more impacts than it has such as labor turnover costs, or reduced productivity and educational attainment.

*Response:* DHS appreciates the comments regarding the effect of the rule on small entities, including small business, and DHS's RFA analysis. The RFA analysis discusses and estimates the potential direct costs that small businesses could incur and explains the limitations for providing a more thorough quantification of the potential costs to small businesses. Additionally, the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov,* discusses the direct and indirect effects of the rule, including on small businesses. Most of this rule's regulatory effects, such as the effects described in the comment summary above, do not fall under the RFA because they directly

---

[858] A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632.

[859] *See* 8 U.S.C. 1601(2).

regulate individuals who are not, for purposes of the RFA, within the definition of small entities established in 5 U.S.C. 601(6). However, DHS recognizes that there may be some provisions of this final rule that would directly regulate small entities, and, therefore, DHS has examined the impact of this final rule on small entities.

The primary effect on small entities is that this rule will increase the time burden for petitioners who file Form I–129 or Form I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners via opportunity costs of time. DHS also recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status, may have to leave the United States if the employer's request was denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. Additionally, this rule could have direct impacts on small entities as the provisions establish a public charge bond process included in this final rule would allow for either an alien or an obligor (individual or an entity) to request a cancellation of a public bond.

DHS believes it has considered all impacts that the RFA requires. The courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates them.[860] However, DHS notes that we have also considered other, indirect impacts in the economic analysis that accompanies this rule.

c. The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

No comments were filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA).

d. A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

This final rule will increase the time burden by an additional 30 minutes for petitioners who file Form I–129 or Form

I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners and entities.[861] As previously discussed in the E.O. 12866 section of this final rule, DHS estimates an annual population of 336,335 beneficiaries seeking extension of stay or change of status through a petitioning employer using Form I–129. In addition, DHS estimates an annual population of 6,307 beneficiaries seeking extension of stay or change of status through a petitioning employer using Form I–129CW. DHS estimates that the 30-minute increase in the estimated time burden for these populations would increase the opportunity cost of time for completing and filing Form I–129 and Form I–129CW and would result in about $6.1 million and about $115,040 million in costs, respectively.

The provisions regarding the bond process included in this final rule will allow a surety company to become an obligor on a public charge bond (Form I–945) and, later, to request a cancellation of such a bond (Form I–356). Therefore, this final rule could have some impacts to surety companies, some of which are small entities. A request for cancellation of a public bond using Form I–356 includes a time burden of 15 minutes per request and a fee to DHS of $25.00. The number of surety bond companies that might complete and file Forms I–945 and I–356 is not known due to a lack of historical data and uncertainty in the number individuals that may be granted the opportunity to post a public charge bond. However, DHS estimates that the filing volume for Form I–945 might be about 960 and the filing volume for Form I–356 might be approximately 25. While DHS cannot predict the exact number of surety companies that might be impacted by this final rule, nine out of 273 Treasury-certified surety companies in fiscal year 2015 posted new immigration bonds with ICE.[862] DHS found that of the nine surety companies, four entities were considered "small" based on the number of employees or revenue being less than their respective SBA size standard.[863] Assuming these nine surety

companies post public charge bonds with USCIS, we can assume that four surety companies may be considered as small entities. However, USCIS cannot predict the exact impact to these small entities at this time. We expect that obligors would be able to pass along the costs of this rulemaking to the aliens.

e. A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

In addition to time burden costs discussed in Section 4 of this FRFA, DHS recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status, may have to leave the United States if the employer's request is denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. A 2012 report published by the Center for American Progress surveyed several dozen studies that considered both direct and indirect costs and determined that turnover costs per employee ranged from 10 to 30 percent of the salary for most salaried workers.[864] An employer paid an average of about 20 percent of the worker's salary in total labor turnover costs. Specifically, for workers earning $50,000 or less, and for workers earning $75,000 or less, the average turnover cost was about 20 percent for both earning levels. According to the study, these earning levels corresponded to the 75th and 90th percentiles of typical earnings, respectively. Assuming Form I–129 and Form I–129CW beneficiaries are employed, DHS believes it is reasonable to assume an annual mean wage of $50,620 across all occupations.[865] Assuming an average labor turnover cost of 20 percent of $50,620, on average, an employer could incur costs of approximately $10,124 per beneficiary

---

[860] *See* U.S. Small Business Administration, Office of Advocacy. *The RFA in a Nutshell: A Condensed Guide to the Regulatory Flexibility Act.* Oct. 2010. Available at: *https://www.sba.gov/advocacy/rfa-nutshell-condensed-guide-regulatory-flexibility-act* (Last visited July 25, 2019).

[861] In the context of Form I–129, a petitioner is typically an employer or the representative of an employer who files on behalf of a nonimmigrant worker (or beneficiary) to come to the United States temporarily to perform services or labor, or to receive training. See *https://www.uscis.gov/i-129.*

[862] *See* DHS, Procedures and Standards for Declining Surety Immigration Bonds and Administrative Appeal Requirement for Breaches NPRM, 83 FR 25951, 25962–25965 (June 5, 2018).

[863] U.S. Small Business Administration, Table of Small Business Size Standards Matched to North

American Industry Classification System (NAICS) Codes, October 1, 2017. *https://www.sba.gov/sites/default/files/files/Size_Standards_Table_2017.pdf* (Last visited July 26, 2019).

[864] *See* "There Are Significant Business Costs to Replacing Employees," by Heather Boushey and Sarah Jane Glynn (2012), Center for American Progress, *available: https://www.americanprogress.org/issues/economy/reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/* (last visited July 26, 2019).

[865] Bureau of Labor Statistics, May 2017 National Occupational Employment and Wage Estimates, All Occupations *https://www.bls.gov/oes/2017/may/oes_nat.htm* (last visited July 26, 2019).

that would be separated from employment as a result of a denied request for an extension of stay or change of status. However, DHS does not know the number of small entities within this population of petitioners that might incur labor turnover costs.

Additionally, DHS also recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status and the request was denied, may still be able to get a visa and return to the U.S., including pursuant to other means.

DHS does not believe it would be necessary for Form I–129 or Form I–129CW petitioners, or for surety bond companies (obligors) to acquire additional types of professional skills as a result of this final rule. These petitioners and obligors should already possess the expertise to fill out the associated forms for this final rule. Additionally, these petitioners and obligors would be familiar with the final rule and such familiarization costs are accounted for the in the E.O. 12866 sections.

f. Description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

DHS considered a range of potential alternatives to the final rule. First, under a ''no action'' alternative, DHS would continue administering the public charge ground of inadmissibility under the 1999 Interim Field Guidance, and would not impose a public benefit condition for extension of stay and change of status. For reasons explained more fully elsewhere in the preamble to the final rule, DHS determined that this alternative would not adequately ensure the self-sufficiency of aliens subject to the public charge ground of inadmissibility. Second, DHS considered including a more expansive definition of ''public benefit,'' potentially to include a range of non-cash benefit programs falling in specific categories (such as other programs that provide assistance for basic food and nutrition, housing, and healthcare). For reasons explained more fully elsewhere in the preamble to the final rule, DHS chose the approach contained in this final rule—a more limited list of cash

benefits for income maintenance and high-expenditure non-cash benefits. DHS expects that, as compared to the broader alternative, the approach DHS decided to pursue may reduce the overall effect of the rule on transfers, but enhance its administrability and predictability. Employers filing Forms I–129 and I–129CW, and surety companies will have a better understanding of the types of non-cash benefits that may be covered under this final rule than they would under the broader alternative, and may realize cost savings as a result. In addition, certain indirect effects of the rule may be different as a result of the decision to reject this alternative.

DHS has revised the final rule to eliminate the future-looking aspect of the public benefit condition, which will reduce burden on small entities.

*C. Congressional Review Act*

DHS has sent this final rule to the Congress and to the Comptroller General under the Congressional Review Act, 5 U.S.C. 801 *et seq.* The Administrator of the Office of Information and Regulatory Affairs has determined that this rule is a ''major rule'' within the meaning of the Congressional Review Act. The rule therefore requires at least a 60-day delayed effective date.

*D. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The inflation-adjusted value of $100 million in 1995 is approximately $165 million in 2018 based on the Consumer Price Index for All Urban Consumers (CPI–U).[866]

This final rule does not contain such a mandate as it does not include any Federal mandate that may result in increased expenditures by State, local, or tribal governments; nor does it increase private sector expenditures by more than $165 million annually (inflation adjusted); nor does it

significantly or uniquely affect small governments. Accordingly, the UMRA requires no further agency action or analysis.

*E. Executive Order 13132 (Federalism)*

This final rule does not have federalism implications because it does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Accordingly, E.O. 13132, Federalism, requires no further agency action or analysis.

*F. Executive Order 12988 (Civil Justice Reform)*

This final rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3 of E.O. 12988.

*G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments*

This final rule does not have ''tribal implications'' because it does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

*H. Family Assessment*

Section 654 of the Treasury and General Government Appropriations Act, 1999 (Pub. L. 105–277) requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being. Agencies must assess whether the regulatory action: (1) Impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) if the regulatory action financially impacts families, are justified; (6) may be carried out by State or local government or by the family; and (7) establishes a policy

---

[866] U.S. Bureau of Labor Statistics, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, available at https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201902.pdf* (last visited April 25, 2019).

concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the determination is affirmative, then the Agency must prepare an impact assessment to address criteria specified in the law. As discussed in the NPRM,[867] DHS determined that the rule may decrease disposable income and increase the poverty of certain families and children, including U.S. citizen children. DHS continues to be of the opinion that the benefits of the action justify the financial impact on the family. Additionally, because the final rule considers public benefits for purposes of the inadmissibility determination that were not considered under the 1999 Interim Field Guidance, DHS determined that the aliens found inadmissible under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), will likely increase. However, given the compelling need for this rulemaking, including but not limited to ensuring self-sufficiency and minimizing the incentive to immigrate based on the U.S. social safety net, DHS determined that this rulemaking's impact is justified and no further actions are required. DHS also determined that this final rule will not have any impact on the autonomy or integrity of the family as an institution.

*I. National Environmental Policy Act (NEPA)*

DHS analyzes actions to determine whether NEPA applies to them and if so what degree of analysis is required. DHS Directive (Dir) 023–01 Rev. 01 and Instruction Manual (Inst.) 023–01–001 Rev. 01 establish the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508. The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions (''categorical exclusions'') which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Instruction 023–01–001 Rev. 01 establishes such Categorical Exclusions that DHS has found to have no such effect. Inst. 023–01–001 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Inst. 023–01–001 Rev. 01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions;

(2) the action is not a piece of a larger action; and

(3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Inst. 023–01–001 Rev. 01 section V.B(1)–(3).

DHS has analyzed this action and has concluded that NEPA does not apply due to the excessively speculative nature of any effort to conduct an impact analysis. This final rule fits within the Categorical Exclusion found in DHS Inst. 023–01–001 Rev. 01, Appendix A, Table 1, number A3(d): ''Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect.'' This final rule is not part of a larger action. This final rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this final rule is categorically excluded from further NEPA review.

This final rule applies to applicants for admission or adjustment of status, as long as the individual is applying for an immigration status that is subject to the public charge ground of inadmissibility. In addition, this final rule would potentially affect individuals applying for an extension of stay or change of status because these individuals would have to demonstrate that they have not received, since obtaining the nonimmigrant status they are seeking to extend or change, public benefits for a duration of more than 12 months in the aggregate within a 36-month period. As discussed in detail above, this final rule establishes a definition of public charge and expands the types of public benefits that DHS would consider as part of its public charge inadmissibility determinations. The final rule also proposes to establish a regulatory framework based on the statutory factors that must be considered in public charge determinations, including enhanced evidentiary requirements for public charge inadmissibility determinations by USCIS. Finally, the final rule revises the public charge bond process. Overall, the final rule requires an in-depth adjudication that may result in additional findings of inadmissibility, ineligibility for adjustment of status on public charge grounds, or denials of requests for extension of stay or change of status based on the public benefit condition.

DHS cannot estimate with any degree of certainty the extent to which any potentially increased findings of inadmissibility on public charge grounds would result in fewer individuals being admitted to the United States. DHS is similarly unable to estimate the extent to which there would be an increased denial of applications for extension of stay or change of status. Even if DHS could estimate any of these numerical effects, any assessment of derivative environmental effect at the national level would be unduly speculative. This final rule is not part of a larger action. This final rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this final rule is categorically excluded from further NEPA review.

*J. Paperwork Reduction Act*

Under the PRA, all Departments are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). Table 9 below is a listing of all forms impacted by this rule.

---

[867] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51277 (proposed Oct. 10, 2018).

**41494**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

## TABLE 9—SUMMARY OF FORMS

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|---|---|---|---|---|---|
| I–944 ....... | Declaration of Self-Sufficiency. | New ....................... | This form is used to demonstrate that an alien is not likely to become a public charge. | Anyone who is subject to a public charge inadmissibility determination. See Tables 2–7 for a full list. | This form is the primary basis for determining whether an applicant is inadmissible on public charge grounds, as it asks questions about the factors considered. |
| I–356 ....... | Request for Cancellation of a Public Charge Bond. | Update—Previously discontinued. | This form is used to request cancellation of the bond that was submitted on Form I–945, Public Charge Bond, on behalf of an alien. | An obligor who posted Form I–945 on the alien's behalf or an alien who posted Form I–945 posted on his or her own behalf, and who seeks to cancel Form I–945 because the alien has permanently departed the United States, naturalized, or died; the obligor or the alien seeks cancellation of the bond following the alien's fifth anniversary of admission to the United States as a lawful permanent resident; or the alien, following the initial grant of lawful permanent resident status, obtains an immigration status that is exempt from the public charge ground of inadmissibility. | This form is used to seek cancellation of the Form I–945 the criteria as provided in the rule. |
| I–945 ....... | Public Charge Bond | New ....................... | This form is the bond contract between USCIS and the obligor. | For aliens inadmissible only based on public charge and who are permitted to post bond. The form is completed by the obligor, who posts the bond on the alien's behalf. | If an alien seeking adjustment of status has been found inadmissible he or she may be admitted to the United States upon the posting of a suitable and proper a bond at the discretion of DHS. |
| I–485 ....... | Application to Register Permanent Residence or Adjust Status. | Update—adds questions and instructions to clarify what categories need to file Form I–944 and Form I–864. | This form is used by aliens present in the United States to obtain lawful permanent resident status.. | For aliens applying for adjustment of status including: Immediate relatives (spouses, children, and parents of U.S. citizens) Family-based immigrants (principal beneficiaries and their dependents) Employment-based immigrants (principal beneficiaries and their dependents) Those who entered as Ks (Fiance(e)s or certain spouses of U.S. citizens, and their children) who are seeking lawful permanent resident status based on the primary beneficiary's marriage to the U.S. citizen petitioner. | Adjustment of status applicants generally must be admissible, including with regard to the public charge inadmissibility ground. |
| I–864 ....... | Affidavit of Support Under Section 213A of the INA. | Update—reference to Form I–864W, which is being discontinued. | Statement/contract provided by a sponsor to show that the sponsor has adequate financial resources to support the alien. | Most family-based immigrants and some employment-based immigrants must have a sponsor submit this form. See additional Tables 2–7 for a full list. | The affidavit of support, when required, is part of the public charge inadmissibility determination. |

TABLE 9—SUMMARY OF FORMS—Continued

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|------|-----------|----------------------|-------------------------|---------------------------|-------------------------------------|
| I–864EZ ... | Affidavit of Support Under Section 213A of the Act. | Update—reference to Form I–864W, which is being discontinued. | Statement/contract provided by sponsor to show that the sponsor has adequate financial resources to support the alien. This is a simpler version of Form I–864. | The sponsor is the person who filed or is filing Form I–130, Petition for Alien Relative, for a relative being sponsored; the relative the sponsor is sponsoring is the only person listed on Form I–130; and the income the sponsor is using to qualify is based entirely on the sponsor's salary or pension and is shown on one or more Internal Revenue Service (IRS) Form W–2s provided by the sponsor's employers or former employers. | The affidavit of support, when required, is part of the public charge inadmissibility determination. |
| I–864W .... | Request for Exemption for Intending Immigrant's Affidavit of Support. | Discontinued—information incorporated into Form I–485. | Certain classes of immigrants are exempt from the affidavit of support, Form I–864, requirement and therefore must file Form I–864W instead. | Aliens who have earned 40 quarters of SSA coverage. Children who will become U.S. citizens upon entry or adjustment into the United States under INA 320. Self-Petitioning Widow(er) Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant; Self-Petitioning bettered spouse or child. | Although some people may be exempt from the affidavit of support requirement, the person may still be subject to public charge. |
| I–129 ....... | Petition for Nonimmigrant Worker. | Update—adds questions and instructions about receipt of public benefits. | This form issued by an employer to petition USCIS for an alien beneficiary to come temporarily to the United States as a nonimmigrant to perform services or labor, or to receive training. This form is also used by certain nonimmigrants to apply for EOS or COS. | • E–2 CNMI—treaty investor exclusively in the Commonwealth of the Northern Mariana Islands (CNMI). <br>• H–1B—specialty occupation worker; an alien coming to perform services of an exceptional nature that relate to a U.S. Department of Defense-administered project; or a fashion model of distinguished merit and ability. <br>• H–2A—temporary agricultural worker <br>• H–2B—temporary nonagricultural worker. <br>• H–3—trainee <br>• L–1—intracompany transferee <br>• O–1—alien of extraordinary ability in arts, science, education, business, or athletics. <br>• O–2—accompanying alien who is coming to the United States to assist in the artistic or athletic performance of an O–1 artist or athlete. <br>• P–1—major league sports <br>• P–1—internationally recognized athlete/entertainment group. <br>• P–1S—essential support personnel for a P–1. <br>• P–2—artist/entertainer in reciprocal exchange program. <br>• P–2S—essential support personnel for a P–2. <br>• P–3—artist/entertainer coming to the United States to perform, teach, or coach under a program that is culturally unique. <br>• P–3S—essential support personnel for a P–3. <br>• Q–1—alien coming temporarily to participate in an international cultural exchange program. Extension of Status. <br>• E–1—treaty trader <br>• E–2—treaty investor (not including E–2 CNMI treaty investors). <br>• E–3—Free Trade Agreement professionals from Australia. Free Trade Nonimmigrants—H–1B1 specialty occupation workers from Chile or Singapore and TN professionals from Canada or Mexico. <br>• R–1—religious worker | As a condition of granting extension of stay and change of status, the applicant must show that he or she has not received, since obtaining the nonimmigrant status he or she is seeking to extend or change public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate, within a 36-month period. |

TABLE 9—SUMMARY OF FORMS—Continued

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|------|-----------|----------------------|-------------------------|---------------------------|--------------------------------------|
| I–129CW | Petition for a CNMI-Only Non-immigrant Transitional Worker. | Update—adds questions and instructions about receipt of public benefits. | .............................. | This form is used by an employer to request an extension of stay or change of status for a Commonwealth of the Northern Mariana Islands (CNMI) temporarily to perform services or labor as a CW–1, CNMI-Only Transitional Worker. | As a condition of granting extension of stay and change of status, the applicant must show that he or she has not received, since obtaining the non-immigrant status he or she is seeking to extend or change public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within a 36-month period. |
| I–539 ....... | Application to Extend/Change Nonimmigrant Status. | Update—adds questions and instructions about receipt of public benefits for principal aliens. | This form is used by certain non-immigrants (principal filers) to apply for an extension of stay or change of status. In certain circumstances, this form may be used as an initial non-immigrant status, or reinstatement of F–1 or M–1 status (students). | CNMI residents applying for an initial grant of status; Student (F) and vocational students (M) applying for reinstatement; and Persons seeking V nonimmigrant status or an extension of stay as a V nonimmigrant (spouse or child of a lawful permanent resident who filed a petition on or before December 21, 2000). | As a condition of granting extension of stay and change of status, the applicant must show that he or she has not received since obtaining the non-immigrant status he or she is seeking to extend or from which he or she is seeking to change public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within a 36-month period. |
| I–539A ..... | ........................... | Update—adds questions and instructions about receipt of public benefits by co-applicants of I–539 applicants. | This form is used by certain non-immigrants (co-applicants of the primary I–539 applicants) to apply for an extension of stay or change of status. | Co-Applicants of I–539 principal filers .... | As a condition of granting extension of stay and change of status, the co-applicant must show that he or she has not received, since obtaining the non-immigrant status he or she is seeking to extend or from which he or she is seeking to change, public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within a 36-month period. |

TABLE 9—SUMMARY OF FORMS—Continued

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|------|-----------|----------------------|-------------------------|---------------------------|-------------------------------------|
| I–912 ....... | Request for Fee Waiver. | Update—provides a notice that a request for a fee waiver may be a factor in the public charge determination. | This form may be filed with certain USCIS applications, petitions, and requests in order to request a fee waiver. | Certain Form I–485 applicants, generally those who are not subject to the public charge ground of inadmissibility and those applying under certain humanitarian programs, may request a fee waiver on Form I–912. Applicants for E–2 CNMI investor nonimmigrant status under 8 CFR 214.2(e)(23) filing Form I–129 or Form I–539 may request a fee waiver.. | A request of a fee waiver is a factor in the determination of Public Charge. |
| I–407 ....... | Record of Abandonment of Lawful Permanent Resident Status. | No changes ............ | This form is used to record an alien's abandonment of status as a lawful permanent resident in the United States. | An alien who wants to record the voluntary abandonment of his or her lawful permanent resident status. | If a public charge bond has been posted on the alien's behalf, the obligor or the alien may request that the bond be cancelled because the alien permanently departed the United States. The alien shows that he or she voluntarily abandoned his or her status by submitting proof that he or she executed Form I–407 and that he or she physically departed the United States. |
| I–693 ....... | Report of Medical Examination and Vaccination Record. | No changes ............ | This form is used to report results of an immigration medical examination performed by a civil surgeon to USCIS.. | Generally, adjustment of status applicants are required to submit Form I–693. Nonimmigrants seeking a change or extension of status are generally not required to submit Form I–693, except for nonimmigrants seeking a change of status to spouse of legal permanent resident (V) status. See table in *https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume8-PartB-Chapter3.html.* | Form I–693 is used as part of the health factor to identify medical conditions that will affect an applicant's ability to provide and care for himself or herself, to attend school or to work. |

To conform with the requirements set forth by the PRA, on October 10, 2018, at 83 FR 51114, USCIS requested comments on the following information collection. USCIS did receive comments on some of these information collections after publishing that notice. USCIS responded to these comments above in Section III. At this time, the following forms are not open for comment.

USCIS Form I–944

(1) *Type of Information Collection Request:* New Collection.

(2) *Title of the Form/Collection:* Declaration of Self-Sufficiency.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–944; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS will require an individual applying to adjust status to lawful permanent residence (Form I–485) and who is subject to the public charge ground of inadmissibility to file Form I–944. The data collected on these forms will be used by USCIS to determine the likelihood of a declarant becoming a public charge based on the factors regarding age; health; family status; assets, resources, and financial status; and education and skills. The information collection serves the purpose of standardizing public charge evaluation metrics and ensures that declarants provide all essential information required for USCIS to assess self-sufficiency and adjudicate the declaration. If USCIS determines that a declarant is likely to become a public charge, the declarant may need to provide additional evidence to overcome this determination.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–944 is 382,264 and the estimated hour burden per response is 4.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,720,188 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $177,943,892.

USCIS Form I–356

(1) *Type of Information Collection Request:* New Collection.

(2) *Title of the Form/Collection:* Request for Cancellation of Public Charge Bond.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–356; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or household, business or other for profits. The alien (on whose behalf a public charge bond has been posted) or the obligor (surety) (who is the obligor who posted a bond on the alien's behalf). The form is used to request cancellation of the public charge bond because of the alien's naturalization, permanent departure, or death. The form is also used by the alien or the obligor to request cancellation of the public charge bond upon the fifth anniversary of the alien's admission to the United States as a lawful permanent resident.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–356 is 25 and the estimated hour burden per response is 0.75 hour.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 19 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $6,250.

USCIS Form I–945

(1) *Type of Information Collection Request:* New Collection.

(2) *Title of the Form/Collection:* Public Charge Bond.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–945; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households, business or other for profit. In certain instances, a surety bond, or cash or any cash equivalent and contract to secure the bond, can be posted on behalf of the alien to guarantee a set of conditions set by the Government concerning an alien, *i.e.*, that the alien will not become a public charge as defined in 8 CFR 212.21 because he or she will not receive public benefits, as defined in the rule, after the alien's

adjustment of status to that of a lawful permanent resident. An acceptable surety is generally any company listed on the Department of the Treasury's Listing of Approved Sureties (Department Circular 570) in effect on the date the bond is requested or an individual or an entity that deposits cash or a cash equivalent, such as a cashier's check or money order for the full value of the bond.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–945 is 960 and the estimated hour burden per response is one hour.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 960 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.

USCIS Form I–485

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Register Permanent Residence or Adjust Status.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–485; Supplement A; and Supplement J; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. The information collected is used to determine eligibility to adjust status under section 245 of the INA.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–485 is 382,264 and the estimated hour burden per response is 6.42 hours. The estimated total number of respondents for the information collection Supplement A is 36,000 and the estimated hour burden per response is 1.25 hours. The estimated total number of respondents for the information collection Supplement J is 28,309 and the estimated hour burden per response is one hour. The estimated total number of respondents for the information collection of Biometrics is 305,811 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,885,243 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $131,116,552.

USCIS Forms I–864; I–864A; I–864EZ

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Affidavit of Support Under Section 213A of the INA; Contract Between Sponsor and Household Member; Affidavit of Support under Section 213 of the Act.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–864; Form I–864A; and Form I–864EZ; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form I–864: USCIS uses the data collected on Form I–864 to determine whether the sponsor has the ability to support the sponsored alien under section 213A of the INA. This form standardizes evaluation of a sponsor's ability to support the sponsored alien and ensures that basic information required to assess eligibility is provided by petitioners. The information collection required on Form I–864A is necessary for public benefit agencies to enforce the affidavit of support in the event the sponsor used income of his or her household members to reach the required income level and the public benefit agencies are requesting reimbursement from the sponsor. Form I–864A: Form I–864A is a contract between the sponsor and the sponsor's household members. It is only required if the sponsor used income of his or her household members to reach the required 125 percent of the FPG. The contract holds these household members jointly and severally liable for the support of the sponsored immigrant. The information collection required on Form I–864A is necessary for public benefit agencies to enforce the affidavit of support in the event the sponsor used income of his or her household members to reach the required income level and the public benefit agencies are requesting reimbursement from the sponsor. Form I–864EZ: USCIS uses Form I–864EZ in exactly the same way as Form I–864; however, USCIS collects less information from the sponsors as

less information is needed from those who qualify in order to make an adjudication.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–864 is 453,345 and the estimated hour burden per response is 6 hours. The estimated total number of respondents for the information collection I–864A is 215,800 and the estimated hour burden per response is 1.75 hours. The estimated total number of respondents for the information collection I–864EZ is 100,000 and the estimated hour burden per response is 2.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 3,347,720 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $135,569,525.

USCIS Form I–129

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–129; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for-profit. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer (or agent, where applicable) uses this form to petition USCIS for an alien to temporarily enter as a nonimmigrant. An employer (or agent, where applicable) also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under certain nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–129 is 552,000 and the estimated hour burden per response is 2.84 hours. The estimated total number of respondents for the information collection I–129, E–1/E–2 Classification Supplement is 4,760 and the estimated hour burden per response is 0.67 hours. The estimated total number of respondents for the information collection I–129, Trade Agreement Supplement is 3,057 and the estimated hour burden per response is 0.67 hours. The estimated total number of respondents for the information collection I–129, H Classification Supplement is 255,872 and the estimated hour burden per response is two hours. The estimated total number of respondents for the information collection I–129, H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement is 243,965 and the estimated hour burden per response is one hour. The estimated total number of respondents for the information collection I–129, L Classification Supplement is 37,831 and the estimated hour burden per response is 1.34 hours. The estimated total number of respondents for the information collection I–129, O and P Classifications Supplement is 22,710 and the estimated hour burden per response is one hour. The estimated total number of respondents for the information collection I–129, Q–1 Classification Supplement is 155 and the estimated hour burden per response is 0.34 hours. The estimated total number of respondents for the information collection I–129, R–1 Classification is 6,635 and the estimated hour burden per response is 2.34 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,417,609 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $132,368,220.

USCIS Form I–129CW

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for a CNMI-Only Nonimmigrant Transitional Worker.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–129CW; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for profit. USCIS uses the data collected on this form to determine eligibility for the requested immigration benefits. An employer uses this form to petition USCIS for an alien to temporarily enter as a nonimmigrant to the CNMI to perform services or labor as a CNMI-Only Transitional Worker (CW–1). An employer also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for these benefits, and ensuring that the basic information required to determine eligibility, is provided by the petitioners. USCIS collects biometrics from aliens present in the CNMI at the time of requesting initial grant of CW–1 status. The information is used to verify the alien's identity, background information and ultimately adjudicate their request for CW–1 status.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–129CW is 3,749 and the estimated hour burden per response is 3.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 13,122 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $459,253.

USCIS Form I–539 and Form I–539A

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Extend/Change Nonimmigrant Status.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–539; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. This form will be used for nonimmigrants to apply for an extension of stay, for a change to another nonimmigrant classification, or for obtaining V nonimmigrant classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to*

*respond:* The estimated total number of respondents for the information collection Form I–539 paper filers is 174,289 and the estimated hour burden per response is two hours. The estimated total number of respondents for the information collection Form I–539 e-filers is 74,696 and the estimated hour burden per response is 1.08 hours. The estimated total number of respondents for the information collection I–539A is 54,375 and the estimated hour burden per response is 0.5 hour. The estimated total number of respondents for the information collection of Biometrics is 248,985 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 747,974 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The total estimated annual cost burden associated with this collection of information is $56,121,219.

USCIS Form I–912

Under the PRA DHS is required to submit to OMB, for review and approval, covered reporting requirements inherent in a rule. This rule will require non-substantive edits to USCIS Form I–912, Request for Fee Waiver. These edits make clear to those who request fee waivers that an approved fee waiver can negatively impact eligibility for an immigration benefit that is subject to the public charge inadmissibility determination. Accordingly, USCIS has submitted a PRA Change Worksheet, Form OMB 83–C, and amended information collection instrument to OMB for review and approval in accordance with the PRA.

USCIS Form I–407

Under the PRA, DHS is required to submit to OMB, for review and approval, covered reporting requirements inherent in a rule. This rule requires the use of USCIS Form I–407 but does not require any changes to the form or instructions and does not impact the number of respondents, time or cost burden. This form is currently approved by OMB under the PRA. The OMB control number for this information collection is 1615–0130.

USCIS Form I–693

Under the PRA, DHS is required to submit to OMB, for review and approval, covered reporting requirements inherent in a rule. This rule requires the use of USCIS Form I–693 but does not require any changes to the form or instructions and does not impact the number of respondents, time or cost burden. This form is currently approved by OMB under the PRA. The OMB control number for this information collection is 1615–0033.

**V. List of Subjects and Regulatory Amendments**

List of Subjects

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 213*

Immigration, Surety bonds.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange programs, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 248*

Aliens, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2; Pub. L. 112–54.

■ 2. Section 103.6 is amended by:
a. Revising paragraphs (a)(1), (a)(2)(i), and (c)(1);

■ b. Adding paragraph (d)(3); and

■ c. Revising paragraph (e) The revisions and additions read as follows:

**§ 103.6   Surety bonds.**

(a) * * *

(1) *Extension agreements; consent of surety; collateral security.* All surety bonds posted in immigration cases must be executed on the forms designated by DHS, a copy of which, and any rider attached thereto, must be furnished to the obligor. DHS is authorized to approve a bond, a formal agreement for the extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on the form designated by DHS, if any. All other matters relating to bonds, including a power of attorney not executed on the form designated by DHS and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, will be forwarded to the appropriate office for approval.

(2) *Bond riders*—(i) *General.* A bond rider must be prepared on the form(s) designated by DHS, and attached to the bond. If a condition to be included in a bond is not on the original bond, a rider containing the condition must be executed.

*        *        *        *        *

(c) * * *

(1) *Public charge bonds.* Special rules for the cancellation of public charge bonds are described in 8 CFR 213.1.

*        *        *        *        *

(d) * * *

(3) *Public charge bonds.* The threshold bond amount for public charge bonds is set forth in 8 CFR 213.1.

(e) *Breach of bond.* Breach of public charge bonds is governed by 8 CFR 213.1. For other immigration bonds, a bond is breached when there has been a substantial violation of the stipulated conditions. A final determination that a bond has been breached creates a claim in favor of the United States which may not be released by the officer. DHS will determine whether a bond has been breached. If DHS determines that a bond has been breached, it will notify the obligor of the decision, the reasons therefor, and inform the obligor of the right to appeal the decision in accordance with the provisions of this part.

■ 3. Section 103.7 is amended by adding paragraphs (b)(1)(i)(LLL) and (MMM) to read as follows:

**§ 103.7   Fees.**

*        *        *        *        *

(b) * * *

(1) * * *

(i) * * *

(LLL) Public Charge Bond, Form I–945. $25.

(MMM) Request for Cancellation of Public Charge Bond, Form I–356. $25.

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 4. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

■ 5. Amend § 212.18 by revising paragraph (b)(2) and (3) to read as follows:

### § 212.18 Application for Waivers of inadmissibility in connection with an application for adjustment of status by T nonimmigrant status holders

\* \* \* \* \* \*

(b) \* \* \*

(2) If an applicant is inadmissible under section 212(a)(1) of the Act, USCIS may waive such inadmissibility if it determines that granting a waiver is in the national interest.

(3) If any other applicable provision of section 212(a) renders the applicant inadmissible, USCIS may grant a waiver of inadmissibility if the activities rendering the alien inadmissible were caused by or were incident to the victimization and USCIS determines that it is in the national interest to waive the applicable ground or grounds of inadmissibility.

■ 6. Add §§ 212.20 through 212.23 to read as follows:

Sec.

\* \* \* \* \* \*

212.20    Applicability of public charge inadmissibility.
212.21    Definitions.
212.22    Public charge inadmissibility determination.
212.23    Exemptions and waivers for public charge ground of inadmissibility.

### § 212.20 Applicability of public charge inadmissibility.

8 CFR 212.20 through 212.23 address the public charge ground of inadmissibility under section 212(a)(4) of the Act. Unless the alien requesting the immigration benefit or classification has been exempted from section 212(a)(4) of the Act as listed in 8 CFR 212.23(a), the provisions of §§ 212.20 through 212.23 of this part apply to an applicant for admission or adjustment of status to lawful permanent resident, if the application is postmarked (or, if applicable, submitted electronically) on or after October 15, 2019.

### § 212.21 Definitions.

For the purposes of 8 CFR 212.20 through 212.23, the following definitions apply:

(a) *Public Charge.* Public charge means an alien who receives one or more public benefits, as defined in paragraph (b) of this section, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months).

(b) *Public benefit.* Public benefit means:

(1) Any Federal, State, local, or tribal cash assistance for income maintenance (other than tax credits), including:

(i) Supplemental Security Income (SSI), 42 U.S.C. 1381 *et seq.;*

(ii) Temporary Assistance for Needy Families (TANF), 42 U.S.C. 601 *et seq.;* or

(iii) Federal, State or local cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which also exist under other names); and

(2) Supplemental Nutrition Assistance Program (SNAP), 7 U.S.C. 2011 to 2036c;

(3) Section 8 Housing Assistance under the Housing Choice Voucher Program, as administered by HUD under 42 U.S.C. 1437f;

(4) Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation) under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f); and

(5) Medicaid under 42 U.S.C. 1396 *et seq.,* except for:

(i) Benefits received for an emergency medical condition as described in 42 U.S.C. 1396b(v)(2)–(3), 42 CFR 440.255(c);

(ii) Services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act (IDEA) 20 U.S.C. 1400 *et seq.;*

(iii) School-based services or benefits provided to individuals who are at or below the oldest age eligible for secondary education as determined under State or local law;

(iv) Benefits received by an alien under 21 years of age, or a woman during pregnancy (and during the 60-day period beginning on the last day of the pregnancy).

(6) Public Housing under section 9 of the U.S. Housing Act of 1937.

(7) Public benefits, as defined in paragraphs (b)(1) through (b)(6) of this section, do not include any public benefits received by an alien who at the time of receipt of the public benefit, or at the time of filing or adjudication of the application for admission or adjustment of status, or application or request for extension of stay or change of status is—

(i) Enlisted in the U.S. Armed Forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), or

(ii) Serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or

(iii) Is the spouse or child, as defined in section 101(b) of the Act, of an alien described in paragraphs (b)(7)(i) or (ii) of this section.

(8) In a subsequent adjudication for a benefit for which the public charge ground of inadmissibility applies, public benefits, as defined in this section, do not include any public benefits received by an alien during periods in which the alien was present in the United States in an immigration category that is exempt from the public charge ground of inadmissibility, as set forth in 8 CFR 212.23(a), or for which the alien received a waiver of public charge inadmissibility, as set forth in 8 CFR 212.23(b).

(9) Public benefits, as defined in this section, do not include any public benefits that were or will be received by—

(i) Children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent will result automatically in the child's acquisition of citizenship, upon meeting the eligibility criteria of section 320(a)–(b) of the Act, in accordance with 8 CFR part 320; or

(ii) Children of U.S. citizens whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship upon finalization of adoption (if the child satisfies the requirements applicable to adopted children under INA 101(b)(1)), in the United States by the U.S. citizen parent(s), upon meeting the eligibility criteria of section 320(a)–(b) of the Act, in accordance with 8 CFR part 320; or

(iii) Children of U.S. citizens who are entering the United States for the purpose of attending an interview under section 322 of the Act in accordance with 8 CFR part 322.

(c) *Likely at any time to become a public charge.* Likely at any time to become a public charge means more likely than not at any time in the future to become a public charge, as defined in 212.21(a), based on the totality of the alien's circumstances.

(d) *Alien's household.* For purposes of public charge inadmissibility determinations under section 212(a)(4) of the Act:

(1) If the alien is 21 years of age or older, or under the age of 21 and married, the alien's household includes:

(i) The alien;

(ii) The alien's spouse, if physically residing with the alien;

(iii) The alien's children, as defined in 101(b)(1) of the Act, physically residing with the alien;

(iv) The alien's other children, as defined in section 101(b)(1) of the Act, not physically residing with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(v) Any other individuals (including a spouse not physically residing with the alien) to whom the alien provides, or is required to provide, at least 50 percent of the individual's financial support or who are listed as dependents on the alien's federal income tax return; and

(vi) Any individual who provides to the alien at least 50 percent of the alien's financial support, or who lists the alien as a dependent on his or her federal income tax return.

(2) If the alien is a child as defined in section 101(b)(1) of the Act, the alien's household includes the following individuals:

(i) The alien;

(ii) The alien's children as defined in section 101(b)(1) of the Act physically residing with the alien;

(iii) The alien's other children as defined in section 101(b)(1) of the Act not physically residing with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(iv) The alien's parents, legal guardians, or any other individual providing or required to provide at least 50 percent of the alien's financial support to the alien as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided to the alien;

(v) The parents' or legal guardians' other children as defined in section 101(b)(1) of the Act physically residing with the alien; and

(vi) The alien's parents' or legal guardians' other children as defined in section 101(b)(1) of the Act, not physically residing with the alien for whom the parent or legal guardian provides or is required to provide at

least 50 percent of the other children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the parents or legal guardians; and

(vii) Any other individual(s) to whom the alien's parents or legal guardians provide, or are required to provide at least 50 percent of such individual's financial support or who is listed as a dependent on the parent's or legal guardian's federal income tax return.

(e) *Receipt of public benefits.* Receipt of public benefits occurs when a public benefit-granting agency provides a public benefit, as defined in paragraph (b) of this section, to an alien as a beneficiary, whether in the form of cash, voucher, services, or insurance coverage. Applying for a public benefit does not constitute receipt of public benefits although it may suggest a likelihood of future receipt. Certification for future receipt of a public benefit does not constitute receipt of public benefits, although it may suggest a likelihood of future receipt. An alien's receipt of, application for, or certification for public benefits solely on behalf of another individual does not constitute receipt of, application for, or certification for such alien.

(f) Primary caregiver means an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

### § 212.22 Public charge inadmissibility determination.

This section relates to the public charge ground of inadmissibility under section 212(a)(4) of the Act.

(a) *Prospective determination based on the totality of circumstances.* The determination of an alien's likelihood of becoming a public charge at any time in the future must be based on the totality of the alien's circumstances by weighing all factors that are relevant to whether the alien is more likely than not at any time in the future to receive one or more public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period. Except as necessary to fully evaluate evidence provided in paragraph (b)(4)(ii)(E)(*3*) of this section, DHS will not specifically assess whether an alien qualifies or would qualify for any public benefit, as defined in 8 CFR 212.21(b).

(b) *Minimum factors to consider.* A public charge inadmissibility determination must at least entail

consideration of the alien's age; health; family status; education and skills; and assets, resources, and financial status, as follows:

(1) *The alien's age*—(i) *Standard.* When considering an alien's age, DHS will consider whether the alien's age makes the alien more likely than not to become a public charge at any time in the future, such as by impacting the alien's ability to work, including whether the alien is between the age of 18 and the minimum "early retirement age" for Social Security set forth in 42 U.S.C. 416(*l*)(2).

(ii) [Reserved]

(2) *The alien's health*—(i) *Standard.* DHS will consider whether the alien's health makes the alien more likely than not to become a public charge at any time in the future, including whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status.

(ii) *Evidence.* USCIS' consideration includes but is not limited to the following:

(A) A report of an immigration medical examination performed by a civil surgeon or panel physician where such examination is required (to which USCIS will generally defer absent evidence that such report is incomplete); or

(B) Evidence of a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status.

(3) *The alien's family status*—(i) *Standard.* When considering an alien's family status, DHS will consider the alien's household size, as defined in 8 CFR 212.21(d), and whether the alien's household size makes the alien more likely than not to become a public charge at any time in the future.

(ii) [Reserved]

(4) *The alien's assets, resources, and financial status*—(i) *Standard.* When considering an alien's assets, resources, and financial status, DHS will consider whether such assets, resources, and financial status excluding any income from illegal activities or sources (*e.g.,* proceeds from illegal gambling or drug sales, and income from public benefits listed in 8 CFR 212.21(b)), make the alien more likely than not to become a public charge at any time in the future, including whether:

(A) The alien's household's annual gross income is at least 125 percent of the most recent Federal Poverty Guideline (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces) based on the alien's household size as defined by section 212.21(d);

(B) If the alien's household's annual gross income is less than 125 percent of the most recent Federal Poverty Guideline (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces), the alien may submit evidence of ownership of significant assets. For purposes of this paragraph, an alien may establish ownership of significant assets, such as savings accounts, stocks, bonds, certificates of deposit, real estate or other assets, in which the combined cash value of all the assets (the total value of the assets less any offsetting liabilities) exceeds:

(*1*) If the intending immigrant is the spouse or child of a United States citizen (and the child has reached his or her 18th birthday), three times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size;

(*2*) If the intending immigrant is an orphan who will be adopted in the United States after the alien orphan acquires permanent residence (or in whose case the parents will need to seek a formal recognition of a foreign adoption under the law of the State of the intending immigrant's proposed residence because at least one of the parents did not see the child before or during the adoption), and who will, as a result of the adoption or formal recognition of the foreign adoption, acquire citizenship under section 320 of the Act, the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size; or

(*3*) In all other cases, five times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size.

(C) The alien has sufficient household assets and resources to cover any reasonably foreseeable medical costs, including as related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care

for himself or herself, to attend school, or to work;

(D) The alien has any financial liabilities; and whether

(E) The alien has applied for, been certified to receive, or received public benefits, as defined in 8 CFR 212.21(b), on or after October 15, 2019.

(ii) *Evidence.* USCIS' consideration includes, but is not limited to the following:

(A) The alien's annual gross household income including, but not limited to:

(*1*) For each member of the household whose income will be considered, the most recent tax-year transcript from the U.S. Internal Revenue Service (IRS) of such household member's IRS Form 1040, U.S. Individual Income Tax Return; or

(*2*) If the evidence in paragraph (b)(4)(ii)(A)(*1*) of this section is unavailable for a household member, other credible and probative evidence of such household member's income, including an explanation of why such transcript is not available, such as if the household member is not subject to taxation in the United States.

(B) Any additional income from individuals not included in the alien's household provided to the alien's household on a continuing monthly or yearly basis for the most recent calendar year and on which the alien relies or will rely to meet the standard at 8 CFR 212.22(b)(4)(i);

(C) The household's cash assets and resources. Evidence of such cash assets and resources may include checking and savings account statements covering 12 months prior to filing the application;

(D) The household's non-cash assets and resources, that can be converted into cash within 12 months, such as net cash value of real estate holdings minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home; annuities; securities; retirement and educational accounts; and any other assets that can easily be converted into cash;

(E) Evidence that the alien has:

(*1*) Applied for or received any public benefit, as defined in 8 CFR 212.21(b), on or after October 15, 2019 or disenrolled or requested to be disenrolled from such benefit(s); or

(*2*) Been certified or approved to receive any public benefit, as defined in 8 CFR 212.21(b), on or after October 15, 2019 or withdrew his or her application or disenrolled or requested to be to disenrolled from such benefit(s);

(*3*) Submitted evidence from a Federal, State, local, or tribal agency administering a public benefit, as

defined in 212.21(b), that the alien has specifically identified as showing that the alien does not qualify or would not qualify for such public benefit by virtue of, for instance, the alien's annual gross household income or prospective immigration status or length of stay;

(F) Whether the alien has applied for or has received a USCIS fee waiver for an immigration benefit request on or after October 15, 2019, unless the fee waiver was applied for or granted as part of an application for which a public charge inadmissibility determination under section 212(a)(4) of the Act was not required.

(G) The alien's credit history and credit score in the United States, and other evidence of the alien's liabilities not reflected in the credit history and credit score (*e.g.,* any mortgages, car loans, unpaid child or spousal support, unpaid taxes, and credit card debt); and

(H) Whether the alien has sufficient household assets and resources (including, for instance, health insurance not designated as a public benefit under 8 CFR 212.21(b)) to pay for reasonably foreseeable medical costs, such as costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for himself or herself, to attend school, or to work;

(5) *The alien's education and skills.* (i) *Standard.* When considering an alien's education and skills, DHS will consider whether the alien has adequate education and skills to either obtain or maintain lawful employment with an income sufficient to avoid being more likely than not to become a public charge.

(ii) *Evidence.* USCIS' consideration includes but is not limited to the following: (A) The alien's history of employment, excluding employment involving illegal activities, *e.g.,* illegal gambling or drug sales. The alien must provide the following:

(*1*) The last 3 years of the alien's tax transcripts from the U.S. Internal Revenue Service (IRS) of the alien's IRS Form 1040, U.S. Individual Income Tax Return; or

(*2*) If the evidence in paragraph (b)(5)(ii)(A)(*1*) of this section is unavailable, other credible and probative evidence of the alien's history of employment for the last 3 years, including an explanation of why such transcripts are not available, such as if the alien is not subject to taxation in the United States;

(B) Whether the alien has a high school diploma (or its equivalent) or has a higher education degree;

(C) Whether the alien has any occupational skills, certifications, or licenses; and

(D) Whether the alien is proficient in English or proficient in other languages in addition to English.

(E) Whether the alien is a primary caregiver as defined in 8 CFR 212.21(f), such that the alien lacks an employment history, is not currently employed, or is not employed full time. Only one alien within a household can be considered a primary caregiver of the same individual within the household. USCIS' consideration with respect to this paragraph includes but is not limited to evidence that an individual in the alien's household, evidence of the individual's age, and evidence of the individual's medical condition, including disability, if any.

(6) *The alien's prospective immigration status and expected period of admission.*

(i) *Standard.* DHS will consider the immigration status that the alien seeks and the expected period of admission as it relates to the alien's ability to financially support for himself or herself during the duration of the alien's stay, including:

(A) Whether the alien is applying for adjustment of status or admission in a nonimmigrant or immigrant classification; and

(B) If the alien is seeking admission as a nonimmigrant, the nonimmigrant classification and the anticipated period of temporary stay.

(ii) [Reserved]

(7) *An affidavit of support under section 213A of the Act, when required under section 212(a)(4) of the Act, that meets the requirements of section 213A of the Act and 8 CFR 213a*—(i) *Standard.* If the alien is required under sections 212(a)(4)(C) or (D) to submit an affidavit of support under section 213A of the Act and 8 CFR part 213a, and submits such a sufficient affidavit of support, DHS will consider the likelihood that the sponsor would actually provide the statutorily-required amount of financial support to the alien, and any other related considerations.

(A) *Evidence.* USCIS consideration includes but is not limited to the following:

(*1*) The sponsor's annual income, assets, and resources;

(*2*) The sponsor's relationship to the applicant, including but not limited to whether the sponsor lives with the alien; and

(*3*) Whether the sponsor has submitted an affidavit of support with respect to other individuals.

(c) *Heavily weighted factors.* The factors below will weigh heavily in a public charge inadmissibility determination. The mere presence of any one heavily weighted factor does not, alone, make the alien more or less likely than not to become a public charge.

(1) *Heavily weighted negative factors.* The following factors will weigh heavily in favor of a finding that an alien is likely at any time in the future to become a public charge:

(i) The alien is not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment;

(ii) The alien has received or has been certified or approved to receive one or more public benefits, as defined in § 212.21(b), for more than 12 months in the aggregate within any 36-month period, beginning no earlier than 36 months prior to the alien's application for admission or adjustment of status on or after October 15, 2019;

(iii)(A) The alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work; and

(B) The alien is uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition; or

(iv) The alien was previously found inadmissible or deportable on public charge grounds by an Immigration Judge or the Board of Immigration Appeals.

(2) *Heavily weighted positive factors.* The following factors will weigh heavily in favor of a finding that an alien is not likely to become a public charge:

(i) The alien's household has income, assets, or resources, and support (excluding any income from illegal activities, *e.g.*, proceeds from illegal gambling or drug sales, and any income from public benefits as defined in § 212.21(b)) of at least 250 percent of the Federal Poverty Guidelines for the alien's household size;

(ii) The alien is authorized to work and is currently employed in a legal industry with an annual income, excluding any income from illegal activities such as proceeds from illegal gambling or drug sales, of at least 250 percent of the Federal Poverty Guidelines for the alien's household size; or

(iii) The alien has private health insurance, except that for purposes of this paragraph (c)(2)(iii), private health insurance must be appropriate for the expected period of admission, and does not include health insurance for which the alien receives subsidies in the form of premium tax credits under the Patient Protection and Affordable Care Act, as amended.

(d) *Treatment of benefits received before October 15, 2019.* For purposes of this regulation, DHS will consider, as a negative factor, but not as a heavily weighted negative factor as described in paragraph (c)(1) of this section, any amount of cash assistance for income maintenance, including Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), State and local cash assistance programs that provide benefits for income maintenance (often called "General Assistance" programs), and programs (including Medicaid) supporting aliens who are institutionalized for long-term care, received, or certified for receipt, before October 15, 2019, as provided under the 1999 Interim Field Guidance, also known as the 1999 Field Guidance on Deportability and Inadmissibility on Public Charge Grounds. DHS will not consider as a negative factor any other public benefits received, or certified for receipt, before October 15, 2019.

### § 212.23 Exemptions and waivers for public charge ground of inadmissibility.

(a) *Exemptions.* The public charge ground of inadmissibility under section 212(a)(4) of the Act does not apply, based on statutory or regulatory authority, to the following categories of aliens:

(1) Refugees at the time of admission under section 207 of the Act and at the time of adjustment of status to lawful permanent resident under section 209 of the Act;

(2) Asylees at the time of grant under section 208 of the Act and at the time of adjustment of status to lawful permanent resident under section 209 of the Act;

(3) Amerasian immigrants at the time of application for admission as described in sections 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202, 101 Stat. 1329–183, section 101(e) (Dec. 22, 1987), as amended, 8 U.S.C. 1101 note;

(4) Afghan and Iraqi Interpreter, or Afghan or Iraqi national employed by or on behalf of the U.S. Government as described in section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006 Public Law 109–163 (Jan. 6, 2006), as amended, and section 602(b) of the Afghan Allies Protection Act of 2009, Public Law 111–8, title VI

(Mar. 11, 2009), as amended, 8 U.S.C. 1101 note, and section 1244(g) of the National Defense Authorization Act for Fiscal Year 2008, as amended Public Law 110–181 (Jan. 28, 2008);

(5) Cuban and Haitian entrants applying for adjustment of status under section 202 of the Immigration Reform and Control Act of 1986 (IRCA), Public Law 99–603, 100 Stat. 3359 (Nov. 6, 1986), as amended, 8 U.S.C. 1255a note;

(6) Aliens applying for adjustment of status under the Cuban Adjustment Act, Public Law 89–732 (Nov. 2, 1966), as amended, 8 U.S.C. 1255 note;

(7) Nicaraguans and other Central Americans applying for adjustment of status under sections 202(a) and section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100, 111 Stat. 2193 (Nov. 19, 1997), as amended, 8 U.S.C. 1255 note;

(8) Haitians applying for adjustment of status under section 902 of the Haitian Refugee Immigration Fairness Act of 1998, Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), as amended, 8 U.S.C. 1255 note;

(9) Lautenberg parolees as described in section 599E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Public Law 101–167, 103 Stat. 1195, title V (Nov. 21, 1989), as amended, 8 U.S.C. 1255 note;

(10) Special immigrant juveniles as described in section 245(h) of the Act;

(11) Aliens who entered the United States prior to January 1, 1972, and who meet the other conditions for being granted lawful permanent residence under section 249 of the Act and 8 CFR part 249 (Registry);

(12) Aliens applying for or re-registering for Temporary Protected Status as described in section 244 of the Act in accordance with section 244(c)(2)(A)(ii) of the Act and 8 CFR 244.3(a);

(13) A nonimmigrant described in section 101(a)(15)(A)(i) and (A)(ii) of the Act (Ambassador, Public Minister, Career Diplomat or Consular Officer, or Immediate Family or Other Foreign Government Official or Employee, or Immediate Family), in accordance with section 102 of the Act and 22 CFR 41.21(d);

(14) A nonimmigrant classifiable as C–2 (alien in transit to U.N. Headquarters) or C–3 (foreign government official), 22 CFR 41.21(d);

(15) A nonimmigrant described in section 101(a)(15)(G)(i), (G)(ii), (G)(iii), and (G)(iv), of the Act (Principal Resident Representative of Recognized Foreign Government to International Organization, and related categories), in

accordance with section 102 of the Act and 22 CFR 41.21(d);

(16) A nonimmigrant classifiable as NATO–1, NATO–2, NATO–3, NATO–4 (NATO representatives), and NATO–6 in accordance with 22 CFR 41.21(d);

(17) An applicant for nonimmigrant status under section 101(a)(15)(T) of the Act, in accordance with 8 CFR 212.16(b);

(18) Except as provided in section 212.23(b), an individual who is seeking an immigration benefit for which admissibility is required, including but not limited to adjustment of status under section 245(a) of the Act and section 245(l) of the Act and who:

(i) Has a pending application that sets forth a prima facie case for eligibility for nonimmigrant status under section 101(a)(15)(T) of the Act, or

(ii) Has been granted nonimmigrant status under section 101(a)(15)(T) of the Act, provided that the individual is in valid T nonimmigrant status at the time the benefit request is properly filed with USCIS and at the time the benefit request is adjudicated;

(19) Except as provided in § 212.23(b), (i) A petitioner for nonimmigrant status under section 101(a)(15)(U) of the Act, in accordance with section 212(a)(4)(E)(ii) of the Act; or

(ii) An individual who is granted nonimmigrant status under section 101(a)(15)(U) of the Act in accordance with section 212(a)(4)(E)(ii) of the Act, who is seeking an immigration benefit for which admissibility is required, including, but not limited to, adjustment of status under section 245(a) of the Act, provided that the individual is in valid U nonimmigrant status at the time the benefit request is properly filed with USCIS and at the time the benefit request is adjudicated.

(20) Except as provided in section 212.23(b), any alien who is a VAWA self-petitioner under section 212(a)(4)(E)(i) of the Act;

(21) Except as provided in section 212.23(b), a qualified alien described in section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 8 U.S.C. 1641(c), under section 212(a)(4)(E)(iii) of the Act;

(22) Applicants adjusting status who qualify for a benefit under section 1703 of the National Defense Authorization Act, Public Law 108–136, 117 Stat. 1392 (Nov. 24, 2003), 8 U.S.C. 1151 note (posthumous benefits to surviving spouses, children, and parents);

(23) American Indians born in Canada determined to fall under section 289 of the Act;

(24) Texas Band of Kickapoo Indians of the Kickapoo Tribe of Oklahoma, Public Law 97–429 (Jan. 8, 1983);

(25) Nationals of Vietnam, Cambodia, and Laos applying for adjustment of status under section 586 of Public Law 106–429 under 8 CFR 245.21;

(26) Polish and Hungarian Parolees who were paroled into the United States from November 1, 1989 to December 31, 1991 under section 646(b) of the IIRIRA, Public Law 104–208, Div. C, Title VI, Subtitle D (Sept. 30, 1996), 8 U.S.C. 1255 note; and

(27) Any other categories of aliens exempt under any other law from the public charge ground of inadmissibility provisions under section 212(a)(4) of the Act.

(b) *Limited Exemption.* Aliens described in §§ 212.23(a)(18) through (21) must submit an affidavit of support as described in section 213A of the Act if they are applying for adjustment of status based on an employment-based petition that requires such an affidavit of support as described in section 212(a)(4)(D) of the Act.

(c) *Waivers.* A waiver for the public charge ground of inadmissibility may be authorized based on statutory or regulatory authority, for the following categories of aliens:

(1) Applicants for admission as nonimmigrants under 101(a)(15)(S) of the Act;

(2) Nonimmigrants admitted under section 101(a)(15)(S) of the Act applying for adjustment of status under section 245(j) of the Act (witnesses or informants); and

(3) Any other waiver of the public charge ground of inadmissibility that is authorized by law or regulation.

## PART 213—PUBLIC CHARGE BONDS

■ 7. The authority citation for part 213 is revised to read as follows:

**Authority:** 8 U.S.C. 1103; 1183; 8 CFR part 2.

■ 8. Revise the part heading to read as set forth above.

■ 9. Revise § 213.1 to read as follows:

### § 213.1  Adjustment of status of aliens on submission of a public charge bond.

(a) *Inadmissible aliens.* In accordance with section 213 of the Act, after an alien seeking adjustment of status has been found inadmissible as likely at any time in the future to become a public charge under section 212(a)(4) of the Act, DHS may allow the alien to submit a public charge bond, if the alien is otherwise admissible, in accordance with the requirements of 8 CFR 103.6 and this section. The public charge

bond must meet the conditions set forth in 8 CFR 103.6 and this section.

(b) *Discretion.* The decision to allow an alien inadmissible under section 212(a)(4) of the Act to submit a public charge bond is in DHS's discretion. If an alien has one or more heavily weighted negative factors as defined in 8 CFR 212.22 in his or her case, DHS generally will not favorably exercise discretion to allow submission of a public charge bond.

(c) *Public Charge Bonds.* (1) *Types.* DHS may require an alien to submit a surety bond, as listed in 8 CFR 103.6, or cash or any cash equivalents specified by DHS. DHS will notify the alien of the type of bond that may be submitted. All surety, cash, or cash equivalent bonds must be executed on a form designated by DHS and in accordance with form instructions. When a surety bond is accepted, the bond must comply with requirements applicable to surety bonds in 8 CFR 103.6 and this section. If cash or a cash equivalent, is being provided to secure a bond, DHS must issue a receipt on a form designated by DHS.

(2) *Amount.* Any public charge bond must be in an amount decided by DHS, not less than $8,100, annually adjusted for inflation based on the Consumer Price Index for All Urban Consumers (CPI–U), and rounded up to the nearest dollar. The bond amount decided by DHS may not be appealed by the alien or the bond obligor.

(d) *Conditions of the bond.* A public charge bond must remain in effect until USCIS grants a request to cancel the bond in accordance with paragraph (g) of this section, whereby the alien naturalizes or otherwise obtains U.S. citizenship, permanently departs the United States, dies, the alien has reached his or her 5-year anniversary since becoming a lawful permanent resident, or the alien changes immigration status to one not subject to public charge ground of inadmissibility. An alien on whose behalf a public charge bond has been submitted may not receive any public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 364month period (such that, for instance, receipt of two benefits in one month counts as two months, after the alien's adjustment of status to that of a lawful permanent resident, until the bond is cancelled in accordance with paragraph (g) of this section. An alien must also comply with any other conditions imposed as part of the bond.

(e) *Submission.* A public charge bond may be submitted on the alien's behalf only after DHS notifies the alien and the alien's representative, if any, that a bond may be submitted. The bond must be submitted to DHS in accordance with the instructions of the form designated by DHS for this purpose, with the fee prescribed in 8 CFR 103.7(b), and any procedures contained in the DHS notification to the alien. DHS will specify the bond amount and any other conditions, as appropriate for the alien and the immigration benefit being sought. USCIS will notify the alien and the alien's representative, if any, that the bond has been accepted, and will provide a copy to the alien and the alien's representative, if any, of any communication between the obligor and the U.S. government. An obligor must notify DHS within 30 days of any change in the obligor's or the alien's physical and mailing address.

(f) *Substitution.* (1) *Substitution Process.* Either the obligor of the bond previously submitted to DHS or a new obligor may submit a substitute bond on the alien's behalf. The substitute bond must specify an effective date. The substitute bond must meet all of the requirements applicable to the initial bond as required by this section and 8 CFR 103.6, and if the obligor is different from the original obligor, the new obligor must assume all liabilities of the initial obligor. The substitute bond must also cover any breach of the bond conditions which occurred before DHS accepted the substitute bond, in the event DHS did not learn of the breach until after DHS accepted the substitute bond.

(2) *Acceptance.* Upon submission of the substitute bond, DHS will review the substitute bond for sufficiency as set forth in this section. If the substitute bond is sufficient DHS will cancel the bond previously submitted to DHS, and replace it with the substitute bond. If the substitute bond is insufficient, DHS will notify the obligor of the substitute bond to correct the deficiency within the timeframe specified in the notice. If the deficiency is not corrected within the timeframe specified, the previously submitted bond will remain in effect.

(g) *Cancellation of the Public Charge Bond.* (1) An alien or obligor may request that DHS cancel a public charge bond if the alien:

(i) Naturalized or otherwise obtained United States citizenship;

(ii) Permanently departed the United States;

(iii) Died;

(iv) Reached his or her 5-year anniversary since becoming a lawful permanent resident; or

(v) Obtained a different immigration status not subject to public charge inadmissibility, as listed in 8 CFR 212.23, following the grant of lawful permanent resident status associated with the public charge bond.

(2) *Permanent Departure Defined.* For purposes of this section, permanent departure means that the alien lost or abandoned his or her lawful permanent resident status, whether by operation of law or voluntarily, and physically departed the United States. An alien is only deemed to have voluntarily lost lawful permanent resident status when the alien has submitted a record of abandonment of lawful permanent resident status, on the form prescribed by DHS, from outside the United States, and in accordance with the form's instructions.

(3) *Cancellation Request.* A request to cancel a public charge bond must be made by submitting a form designated by DHS, in accordance with that form's instructions and the fee prescribed in 8 CFR 103.7(b). If a request for cancellation of a public charge bond is not filed, the bond shall remain in effect until the form is filed, reviewed, and a decision is rendered. DHS may in its discretion cancel a public charge bond if it determines that an alien otherwise meets the eligibility requirements of paragraphs (g)(1) of this section.

(4) *Adjudication and Burden of Proof.* The alien and the obligor have the burden to establish, by a preponderance of the evidence, that one of the conditions for cancellation of the public charge bond listed in paragraph (g)(1) of this section has been met. If DHS determines that the information included in the cancellation request is insufficient to determine whether cancellation is appropriate, DHS may request additional information as outlined in 8 CFR 103.2(b)(8). DHS must cancel a public charge bond if DHS determines that the conditions of the bond have been met, and that the bond was not breached, in accordance with paragraph (h) of this section. For cancellations under paragraph (g)(1)(iv) of this section, the alien or the obligor must establish that the public charge bond has not been breached during the 5-year period preceding the alien's fifth anniversary of becoming a lawful permanent resident.

(5) *Decision.* DHS will notify the obligor, the alien, and the alien's representative, if any, of its decision regarding the request to cancel the public charge bond. When the public charge bond is cancelled, the obligor is released from liability. If the public charge bond has been secured by a cash deposit or a cash equivalent, DHS will refund the cash deposit and any interest earned to the obligor consistent with 8 U.S.C. 1363 and 8 CFR 293.1. If DHS denies the request to cancel the bond,

DHS will notify the obligor and the alien, and the alien's representative, if any, of the reasons why, and of the right of the obligor to appeal in accordance with the requirements of 8 CFR part 103, subpart A. An obligor may file a motion pursuant to 8 CFR 103.5 after an unfavorable decision on appeal.

(h) *Breach.* (1) *Breach and Claim in Favor of the United States.* An administratively final determination that a bond has been breached creates a claim in favor of the United States. Such claim may not be released or discharged by an immigration officer. A breach determination is administratively final when the time to file an appeal with the Administrative Appeals Office (AAO) pursuant to 8 CFR part 103, subpart A, has expired or when the appeal is dismissed or rejected.

(2) *Breach of Bond Conditions.* (i) The conditions of the bond are breached if the alien has received public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months), after the alien's adjustment of status to that of a lawful permanent resident and before the bond is cancelled under paragraph (g) of this section. DHS will not consider any public benefits, as defined in 8 CFR 212.21(b), received by the alien during periods while an alien was present in the United States in a category that is exempt from the public charge ground of inadmissibility or for which the alien received a waiver of public charge inadmissibility, as set forth in 8 CFR 212.21(b) and 8 CFR 212.23, and public benefits received after the alien obtained U.S. citizenship, when determining whether the conditions of the bond have been breached. DHS will not consider any public benefits, as defined in 8 CFR 212.21 (b)(1) through (b)(3), received by an alien who, at the time of receipt filing, adjudication or bond breach or cancellation determination, is enlisted in the U.S. Armed Forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or if received by such an individual's spouse or child as defined in section 101(b) of the Act; or

(ii) The conditions of the bond otherwise imposed by DHS as part of the public charge bond are breached.

(3) *Adjudication.* DHS will determine whether the conditions of the bond have been breached. If DHS determines that it has insufficient information from the benefit-granting agency to determine whether a breach occurred, DHS may request additional information from the benefit-granting agency. If DHS determines that it has insufficient information from the alien or the obligor, it may request additional information as outlined in 8 CFR part 103 before making a breach determination. If DHS intends to declare a bond breached based on information that is not otherwise protected from disclosure to the obligor, DHS will disclose such information to the obligor to the extent permitted by law, and provide the obligor with an opportunity to respond and submit rebuttal evidence, including specifying a deadline for a response. DHS will send a copy of this notification to the alien and the alien's representative, if any. After the obligor's response, or after the specified deadline has passed, DHS will make a breach determination.

(4) *Decision.* DHS will notify the obligor and the alien, and the alien's representative, if any, of the breach determination. If DHS determines that a bond has been breached, DHS will inform the obligor of the right to appeal in accordance with the requirements of 8 CFR part 103, subpart A. With respect to a breach determination for a surety bond, the alien or the alien's representative, if any, may not appeal the breach determination or file a motion.

(5) *Demand for Payment.* Demands for amounts due under the terms of the bond will be sent to the obligor and any agent/co-obligor after a declaration of breach becomes administratively final.

(6) *Amount of Bond Breach and Effect on Bond.* The bond must be considered breached in the full amount of the bond.

(i) *Exhaustion of administrative remedies.* Unless an administrative appeal is precluded by regulation, a party has not exhausted the administrative remedies available with respect to a public charge bond under this section until the party has obtained a final decision in an administrative appeal under 8 CFR part 103, subpart A.

(ii) [Reserved]

## PART 214—NONIMMIGRANT CLASSES

■ 10. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 11. Section 214.1 is amended by:
■ a. Adding paragraph (a)(3)(iv),

■ b. Removing the term, ''and'' in paragraph (c)(4)(iii);

The additions read as follows:

### § 214.1  Requirements for admission, extension, and maintenance of status.

(a) * * *
(3) * * *
(iv) Except where the nonimmigrant classification for which the alien seeks to extend is exempt from section 212(a)(4) of the Act or that section has been waived, as a condition for approval of extension of status, the alien must demonstrate that he or she has not received since obtaining the nonimmigrant status he or she seeks to extend one or more public benefits as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). For the purposes of this determination, DHS will only consider public benefits received on or after October 15, 2019 for petitions or applications postmarked (or, if applicable, submitted electronically) on or after that date.

\*    \*    \*    \*    \*

## PART 245—ADJUSTMENT OF STATUS TO THAT OF A PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 12. The authority citation for part 245 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 13. Amend § 245.4 by redesignating the undesignated text as paragraph (a) and adding paragraph (b) to read as follows:

### § 245.4  Documentary requirements.

\*    \*    \*    \*    \*

(b) For purposes of public charge determinations under section 212(a)(4) of the Act and 8 CFR 212.22, an alien who is seeking adjustment of status under this part must submit a declaration of self-sufficiency on a form designated by DHS, in accordance with form instructions.

■ 14. In § 245.23, revise paragraph (c)(3) to read as follows:

### § 245.23  Adjustment of aliens in T nonimmigrant classification.

\*    \*    \*    \*    \*

(c) * * *
(3) The alien is inadmissible under any applicable provisions of section 212(a) of the Act and has not obtained a waiver of inadmissibility in accordance with 8 CFR 212.18 or

214.11(j). Where the alien establishes that the victimization was a central reason for the applicant's unlawful presence in the United States, section 212(a)(9)(B)(iii) of the Act is not applicable, and the applicant need not obtain a waiver of that ground of inadmissibility. The alien, however, must submit with the Form I–485 evidence sufficient to demonstrate that the victimization suffered was a central reason for the unlawful presence in the United States. To qualify for this exception, the victimization need not be the sole reason for the unlawful presence but the nexus between the victimization and the unlawful presence must be more than tangential, incidental, or superficial.

## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 15. The authority citation for part 248 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

■ 16. Section 248.1 is amended by:

■ a. Revising paragraph (a);

■ b. Redesignating paragraphs (b) through (e) as paragraphs (c) through (f), respectively; and

■ c. Adding a new paragraph (b); and

■ d. Revising newly redesignated paragraph (c)(4).

The revisions and additions read as follows:

### § 248.1   Eligibility.

(a) *General.* Except for those classes enumerated in § 248.2 of this part, any alien lawfully admitted to the United States as a nonimmigrant, including an alien who acquired such status in accordance with section 247 of the Act who is continuing to maintain his or her nonimmigrant status, may apply to have his or her nonimmigrant classification changed to any nonimmigrant classification other than that of a spouse or fiance(e), or the child of such alien, under section 101(a)(15)(K) of the Act or as an alien in transit under section 101(a)(15)(C) of the Act. Except where the nonimmigrant classification to which the alien seeks to change is exempted by law or regulation from section 212(a)(4) of the Act, as a condition for approval of a change of nonimmigrant status, the alien must demonstrate that he or she has not received since obtaining the nonimmigrant status from which he or she seeks to change, public benefits, as described in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). DHS will only consider public benefits received on or after October 15, 2019 for petitions or applications postmarked (or, if applicable, submitted electronically) on or after that date . An alien defined by section 101(a)(15)(V) or 101(a)(15)(U) of the Act may be accorded nonimmigrant status in the United States by following the procedures set forth in 8 CFR 214.15(f) and 214.14, respectively.

(b) *Decision in change of status proceedings.* Where an applicant or petitioner demonstrates eligibility for a requested change of status, it may be granted at the discretion of DHS. There is no appeal from the denial of an application for change of status.

(c) * * *

(4) As a condition for approval, an alien seeking to change nonimmigrant classification must demonstrate that he or she has not received, since obtaining the nonimmigrant status from which he or she seeks to change, one or more public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). For purposes of this determination, DHS will only consider public benefits received on or after October 15, 2019 for petitions or applications postmarked (or, if applicable, submitted electronically) on or after that date. This provision does not apply to classes of nonimmigrants who are explicitly exempt by law or regulation from section 212(a)(4) of the Act.

*   *   *   *   *

Kevin K. McAleenan,

*Acting Secretary of Homeland Security.*

[FR Doc. 2019–17142 Filed 8–12–19; 8:45 am]

BILLING CODE 9111–97–P