**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 31 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JOHN DOE #1, *et al.*,<br><br>            Plaintiffs-Appellees,<br><br>   v.<br><br>DONALD TRUMP, *et al.*,<br><br>            Defendants-Appellants. | No. 19-36020<br><br>D.C. No. 3:19-cv-1743-SI<br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted September 3, 2020
Seattle, Washington

Before:  A. Wallace Tashima, Jay S. Bybee, and Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins;
Dissent by Judge Tashima

COLLINS, Circuit Judge:

On October 4, 2019, the President of the United States issued Proclamation
No. 9945, entitled "Suspension of Entry of Immigrants Who Will Financially
Burden the United States Healthcare System, in Order [t]o Protect the Availability
of Healthcare Benefits for Americans."  The Proclamation restricts entry of
immigrant visa applicants who cannot demonstrate that they either (1) will acquire
qualifying healthcare coverage within 30 days of entry or (2) have the ability to

pay for reasonably foreseeable healthcare expenses.  *See* Proclamation No. 9945, 84 Fed. Reg. 53991, 53992 (Oct. 9, 2019).  In November 2019, the district court granted a universal preliminary injunction blocking the implementation of this Proclamation and denied the Government's request for a stay pending appeal.  *See Doe #1 v. Trump*, 418 F. Supp. 3d 573, 605 (D. Or. 2019).  The Government filed motions for an administrative stay and for a stay pending appeal, which this court denied by a divided vote.  *See Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019); *Doe #1 v. Trump*, 957 F.3d 1050, 1070 (9th Cir. 2020).  We conclude that the Proclamation was within the President's statutory authority and therefore reverse the district court's order enjoining the Proclamation's implementation.

## I

### A

Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, an alien seeking lawful permanent residence in the United States generally must apply for and be issued an immigrant visa.  *Id.* § 1181(a).  The process for acquiring this type of visa is lengthy.  An alien ordinarily either must first obtain a sponsorship from a prospective employer or from a family member who is a United States citizen or lawful permanent resident or must qualify for a diversity-based visa.  *See id.* §§ 1151, 1153.  For family-based and employment-based visas, the alien's sponsor typically must submit, on the alien's behalf, a petition to U.S.

Citizenship and Immigration Services establishing the sponsor-applicant relationship. *Id*. § 1154(a)(1)(A)–(B), (F); 8 C.F.R. §§ 204.1(a)(1), 204.5(a). If that petition is approved, the alien then may "apply for a visa by submitting the required documents and appearing at a United States Embassy or consulate for an interview with a consular officer." *Kerry v. Din*, 576 U.S. 86, 89 (2015) (plurality) (citing 8 U.S.C. §§ 1201(a)(1), 1202). A consular officer then determines whether to issue or refuse the visa application. 8 U.S.C. § 1201(a)(1)(A), (g); *id*. § 1204; 22 C.F.R. §§ 42.71(a), 42.81(a).

Before the consular officer may issue a visa, he or she must first "ensure the alien is not inadmissible under any provision of the INA." *Din*, 576 U.S. at 89 (plurality) (citing 8 U.S.C. § 1361). There are a number of reasons why an alien may be inadmissible under the INA. *See* 8 U.S.C. § 1182(a). An alien may be deemed inadmissible, for example, based on health-related grounds, the alien's prior criminal convictions, security-related grounds (such as ties to terrorist activities), or the likelihood that the alien will "become a public charge." *See id*. In addition, under § 212(f) of the INA, the President may, by proclamation, and "for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens" or "impose on the entry of aliens any restrictions he may deem to be appropriate" whenever he "finds that the entry of [such] aliens or . . . class of aliens . . . would be detrimental to the interests of the United States." *Id*. § 1182(f);

*see also* INA § 215(a)(1), 8 U.S.C. § 1185(a)(1) ("Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.").

Invoking his authority under "the Constitution and . . . sections 212(f) and 215(a)" of the INA, the President issued Proclamation No. 9945 on October 4, 2019. *See* 84 Fed. Reg. at 53991. In the Proclamation, the President "find[s] that the unrestricted immigrant entry" of a defined class of aliens—generally consisting of those who lack "approved health insurance" or the "financial resources to pay for reasonably foreseeable medical costs"—would, with certain exceptions, "be detrimental to the interests of the United States." *Id*. at 53991–92. As explained in the Proclamation, this finding rests on the President's determination that such immigrants contribute to two significant problems facing the U.S. healthcare system. *Id*. at 53991.

First, the Proclamation states that uninsured persons (including both citizens and aliens) impose "substantial costs" on U.S. healthcare providers and taxpayers. *Id*. Specifically, "[h]ospitals and other providers often administer care to the uninsured without any hope of receiving reimbursement from them," and "uncompensated care costs . . . have exceeded $35 billion in each of the last 10

years" or about $7 million annually per U.S. hospital. *Id*. These costs, the

Proclamation states, "are passed on to the American people in the form of higher

taxes, higher premiums, and higher fees for medical services." *Id*. Moreover,

"[b]eyond uncompensated care costs, the uninsured strain Federal and State

government budgets through their reliance on publicly funded programs, which

ultimately are financed by taxpayers." *Id*.

Second, the Proclamation also states that "uninsured individuals often use

emergency rooms to seek remedies for a variety of non-emergency conditions,

causing overcrowding and delays for those who truly need emergency services."

*Id*. This "non-emergency usage" of emergency rooms further "places a large

burden on taxpayers, who reimburse hospitals for a portion of their uncompensated

emergency care costs." *Id*.

The Proclamation further finds that the U.S. Government is making these

problems worse "by admitting thousands of aliens who have not demonstrated any

ability to pay for their healthcare costs." *Id*. In reaching this conclusion, the

Proclamation references data showing that "lawful immigrants are about three

times more likely than United States citizens to lack health insurance." *Id*.

Accordingly, the President determined in the Proclamation that "[c]ontinuing to

allow entry into the United States of certain immigrants who lack health insurance

or the demonstrated ability to pay for their healthcare would be detrimental" to the

national interest.  *Id.*

Based on this finding, the Proclamation generally restricts the entry of immigrant visa applicants who cannot demonstrate, "to the satisfaction of a consular officer," that they either (1) "will be covered by approved health insurance" within thirty days of entry, or (2) "possess[] the financial resources to pay for reasonably foreseeable medical costs."  84 Fed. Reg. at 53992–93.  The Proclamation authorizes the Secretary of State to "establish standards and procedures governing such determinations."  *Id.* at 53993.  This review process "is separate and independent" from that "required by other statutes, regulations, or proclamations."  *Id.*

The Proclamation lists numerous healthcare plans that would qualify as "approved health insurance," including "an employer-sponsored plan"; "an unsubsidized health plan offered in the individual market within a State"; "a catastrophic plan"; "a family member's plan"; "a medical plan under the Medicare program"; or "any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee."[1]  84 Fed. Reg. at 53992.  Except to the extent that a visa applicant

---

[1] The Proclamation's definition of "approved health insurance" also specifically includes "a short-term limited duration health policy effective for a minimum of 364 days—or until the beginning of planned, extended travel outside the United States"; "a medical plan under chapter 55 of title 10, United States Code, including

alternatively shows that he or she has sufficient resources to cover "reasonably foreseeable medical costs," the applicant need only show that he or she "will be covered" by such approved health insurance "within 30 days of the alien's entry into the United States"—he or she need not necessarily obtain that coverage before entry. *Id.*

The Proclamation specifically exempts certain aliens from its scope. It does not apply, for example, to "any alien holding a valid immigrant visa issued before the effective date" of the Proclamation or those "entering the United States through means other than immigrant visas." 84 Fed. Reg. at 53992–93. It also exempts "any alien who is the child of a United States citizen or who is seeking to enter the United States pursuant to" specified categories of visas for children. *Id.* at 53992. Nor does it apply to "any alien under the age of 18, except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation." *Id.* It also does not cover "any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis." *Id.* at 53993. In addition, the Proclamation specifically does

---

coverage under the TRICARE program"; and "a visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days—or until the beginning of planned, extended travel outside the United States." 84 Fed. Reg. at 53992. The definition also makes clear that the phrase "an employer-sponsored plan" includes "a retiree plan, association health plan, and coverage provided by the Consolidated Omnibus Budget Reconciliation Act of 1985." *Id.*

not "affect any individual's eligibility for asylum, refugee status, withholding of removal, or protection under the Convention Against Torture." *Id*.

The Proclamation also establishes certain periodic review procedures. It instructs the Secretary of State to submit to the President, "in consultation with" certain agency heads, a report addressing "the continued necessity of and any adjustments that may be warranted to the [Proclamation's] suspension and limitation on entry." 84 Fed. Reg. at 53993. This must be done "within 180 days" of the Proclamation's effective date, and again annually thereafter. *Id*. The Proclamation states that "[i]f the Secretary of State, in consultation with the heads of other appropriate executive departments and agencies, determines that circumstances no longer warrant the continued effectiveness of the suspension or limitation on entry," the President is to be "immediately" advised. *Id*. The Proclamation stated that its provisions would take effect on November 3, 2019. *Id*. at 53994.

**B**

On October 30, 2019, the Latino Network and seven individuals filed this lawsuit against the United States and various federal officials and departments challenging the validity of the Proclamation.[2] The Latino Network—which

---

[2] Specifically, the complaint also named as Defendants the President; the Departments of State, Homeland Security, and Health and Human Services; and

sometimes refers to itself as "LatNet"—is an organization in Portland, Oregon, whose asserted "mission is to educate and empower Multnomah County Latinos to achieve physical and mental health, safe housing, sustainable financial stability, and social support." LatNet alleges that the Proclamation has forced it "to divert resources from its core activities to address the Proclamation's fallout within the community the organization serves." The seven individual Plaintiffs are all U.S. citizens who are sponsoring either their spouses (in five cases) or their parents (in the remaining two) for immigrant visas. The seven individual Plaintiffs allege that their respective sponsored relatives will be unable to obtain "approved" health care plans in accordance with the Proclamation and will therefore be inadmissible under its terms. The individual Plaintiffs (but not LatNet) seek to represent two proposed subclasses of persons: (1) a "U.S. Petitioner Subclass" consisting of certain U.S. persons who are sponsoring alien relatives who are unable to satisfy the Proclamation's requirements; and (2) a "Visa Applicant Subclass" that generally consists of aliens applying for immigrant visas who cannot meet the Proclamation's requirements. Because all seven individual Plaintiffs are U.S. citizens, none is a member of the proposed Visa Applicant Subclass.

---

the Secretaries who head those Departments. The day after the preliminary injunction was granted, Plaintiffs filed a First Amended Complaint that added an eighth plaintiff. Nothing about our disposition of this appeal turns on any difference between the two complaints, and we therefore focus on the original complaint that was before the district court at the time that it ruled.

The complaint alleges four causes of action.  First, the individual Plaintiffs (on behalf of themselves and the subclasses) and LatNet contend that Defendants' actions violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), on a variety of grounds, including that the Proclamation exceeded the President's authority under INA § 212(f) and conflicted with a variety of other federal statutes.  Second, the individual Plaintiffs, on behalf of the U.S. Petitioner Subclass, contended that the Proclamation was motivated by discriminatory animus in violation of the equal protection component of the Fifth Amendment's Due Process Clause.  Third, all Plaintiffs and classes asserted that the Proclamation was ultra vires because it exceeded the scope of the power Congress delegated to the President, conflicted with congressional judgments as reflected in the INA, and violated the separation of powers by contravening Congress's extension of certain "health care-related benefits to legal immigrants."  Fourth, the individual Plaintiffs, on behalf of the U.S. Petitioner Subclass, alleged that the Proclamation's delegation of decisionmaking authority about health insurance matters to "consular officer[s] with no medical training" violated their procedural due process rights.

On November 1, 2019, Plaintiffs requested a temporary restraining order halting the Proclamation's implementation, which was granted the next day.  On November 8, 2019, Plaintiffs filed two motions: one for class certification and one for a preliminary injunction.  Plaintiffs' request for a preliminary injunction rested

on its ultra vires, APA, and due process claims and did not rely on the equal

protection claim.  Without resolving the class certification motion or certifying a

class, the district court on November 26, 2019 issued a worldwide preliminary

injunction that enjoined "any action to implement or enforce" the Proclamation.

*See Doe #1*, 418 F. Supp. 3d at 605.

In finding that Plaintiffs were likely to succeed on the merits, the district

court relied solely on Plaintiffs' ultra vires claim.  *See id*. at 598 (declining to

address the due process and APA claims).  Even though Plaintiffs' motion did not

squarely raise the issue, the district court held that, at least in the context of the

"*domestic* policymaking" the court thought was reflected in the Proclamation,

Congress's delegation of power to promulgate additional classes of inadmissible

aliens under INA § 212(f) was too standardless and "thus fails under the

nondelegation doctrine."[3]  *Id*. at 592 (emphasis in original).  The court further held

that the Proclamation violated separation-of-powers principles by effectively

overriding and contravening the carefully crafted limitations that Congress had

---

[3] In their motion for a preliminary injunction, Plaintiffs argued that the "broad delegation of discretion" in § 212(f) was *not* "unlimited," because it was bounded by the congressional judgments reflected in the other statutory provisions that Plaintiffs claimed that the Proclamation contravened.  Plaintiffs argued that a broader reading of the President's discretion under § 212(f) would not be "consistent with the non-delegation doctrine."  The motion thus argued only that § 212(f) had to be construed *consistently* with the nondelegation doctrine; it did not argue that the congressional delegation of power actually *did* violate the nondelegation doctrine.

placed, in INA § 212(a)(4), *see* 8 U.S.C. § 1182(a)(4), on the admission of aliens who are likely to become a "public charge."[4]  418 F. Supp. 3d at 595.  The court expressly declined to address "whether the Proclamation also contravenes or overrides various healthcare laws and other immigration laws and provisions, as argued by Plaintiffs."  *Id*. at 597 n.6.

Having found a likelihood of success on the merits, the district court further held that all Plaintiffs were likely to suffer irreparable harm in the absence of preliminary relief.  *Id*. at 598–99.  In addition to the irreparable harm that the court posited from delays in the visa process, the court stated that the individual Plaintiffs "cannot afford the plans that are available to them."  *Id*. at 598.  The court further specifically held that two of the individual Plaintiffs "are not likely to meet the requirements of the Proclamation, and there is no indication that they will otherwise fail any of the requirements" of § 212(a) for obtaining visas.  *Id*.  The court also concluded that LatNet would suffer irreparable harm from "hav[ing] to continue to divert resources and abandon a significant portion of its core mission if the Proclamation were allowed to go into effect."  *Id*. at 599.  Weighing the equities and the public interest, the district court concluded that they "tip[ped]

---

[4] As noted, the district court did not reach Plaintiffs' due process or APA claims. The court also did not separately address whether the Proclamation was a proper exercise of Executive authority under INA § 215(a)(1), 8 U.S.C. § 1185(a)(1). *See Doe #1*, 418 F. Supp. 3d at 586 n.2.

sharply in favor of Plaintiffs." *Id*. at 602.  Finally, the court held that a worldwide injunction was "necessary to provide Plaintiffs and putative class members with relief at this stage of the litigation and to preserve the *status quo*." *Id*. at 604–05.

On December 4, 2019, the Government timely appealed the preliminary injunction and sought an immediate administrative stay from this court. Concluding that there was no "sufficient exigency to justify changing the status quo," a motions panel of this court, by a 2-1 vote, denied the requested administrative stay. *See Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019).

On April 7, 2020, more than four months after issuing the preliminary injunction, the district court granted, "with a modest modification of the requested definition" of the U.S. Petitioner Subclass, Plaintiffs' motion for certification of two classes under Federal Rule of Civil Procedure 23(b)(2).  *Doe #1 v. Trump*, 335 F.R.D. 416, 421 (D. Or. 2020).

On May 4, 2020, the motions panel, again by a 2-1 vote, denied the Government's motion for a stay of the preliminary injunction pending appeal.  *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020).  In denying the motion, the majority was at pains to emphasize that it was not "prejudg[ing] the merits of the appeal," but was only addressing whether, in its stay motion, the Government had "met the high standard" for a stay, *viz*., whether the Government's moving papers had demonstrated "a *strong* likelihood of success on the merits." *Id*. at 1062; *see also*

*id*. at 1067 ("Again, we do not prejudge the resolution of the merits" of Plaintiffs'

argument that the Proclamation "effectively rewrit[es] provisions of the INA"

because "the question is whether the government has shown a strong likelihood of

success."); *id*. ("In deference to the merits panel, we decline to address the

probable likelihood of success for either party" on the nondelegation claim.); *id*. at

1070 ("We do not prejudge the consideration of the merits appeal.").  In view of

the motions panel's firmly expressed intention not to prejudge any aspect of the

merits, and its explicit reliance on the higher burden the Government faced at the

stay stage, we do not view the motions panel opinion as precluding us from re-

examining the merits of the issues afresh in light of the now-completed merits

briefing and argument.

We have jurisdiction over the Government's appeal of the preliminary

injunction under 28 U.S.C. § 1292(a)(1).

## II

The Government has not challenged Plaintiffs' Article III standing, either in

its opposition to the preliminary injunction motion below or in its briefs in this

court.  Nonetheless, we have "an independent obligation to assure that standing

exists, regardless of whether it is challenged by any of the parties," *Summers v.

Earth Island Inst.,* 555 U.S. 488, 499 (2009), and the Plaintiffs' showing of injury

in support of the requested injunction provides a sufficient basis for evaluating

their Article III standing as well.

Organizations can assert Article III standing in their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), or they may rely upon the Article III standing of their members under the doctrine of associational standing, *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In arguing in the district court that it had suffered irreparable injury, LatNet relied on a *Havens Realty* theory rather than on associational standing. In *Havens Realty*, the Supreme Court held that a fair housing organization that "provide[d] counseling and referral services for low- and moderate-income homeseekers" suffered a cognizable injury-in-fact for Article III purposes when the defendants' alleged racially discriminatory steering practices caused the organization to "devote significant resources" in assisting such homeseekers to "identify and counteract" the defendants' practices, thereby "frustrat[ing]" the organization's "efforts to assist equal access to housing through counseling and other referral services." 455 U.S. at 379. We conclude that LatNet's showing below was sufficient to establish injury-in-fact under *Havens Realty*.

LatNet submitted unchallenged evidence in the district court stating that, even before the Proclamation was promulgated, LatNet had been providing information about immigrant visas to clients and "connect[ing] them to legal service providers to assist family reunification applications through the immigrant

visa process." Because many of LatNet's clients are concerned that their relatives may be unable to meet the Proclamation's requirements, LatNet's ongoing counseling efforts have been increasingly devoted to providing "individual consultations with members of [its] community who are concerned about how the implementation of the Proclamation will affect their ability . . . to sponsor family members in the process of applying for an immigrant visa." LatNet described how these counseling efforts, as well as other "community education efforts" to address community members' concerns about the Proclamation, caused it to divert personnel and resources from other tasks to assisting in Proclamation-related activities. LatNet's evidence showed that, all told, "up to 15% of paid staff members' weekly time during business hours" was devoted to "responding to client concerns and inquiries" about the Proclamation. Because the Proclamation led to a significant increase in the demand and need for LatNet's pre-existing counseling programs, and caused LatNet to shift resources from other activities in order to address those efforts to counteract the Proclamation, "there can be no question that the organization has suffered injury in fact" under *Havens Realty*. 455 U.S. at 379. The injury is also fairly traceable to the Proclamation and would be redressed by the requested equitable and declaratory relief against the Proclamation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). LatNet therefore has Article III standing. *Id.*

And because LatNet has standing, we need not address whether the individual Plaintiffs also have standing. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."); *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.").[5]  We therefore proceed to the merits of Plaintiffs' request for a preliminary injunction.

### III

"We review the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).  "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Id.*

"A plaintiff seeking a preliminary injunction must establish that he is likely

---

[5] The standing of the other Plaintiffs might have mattered if, upon turning to the merits, we had concluded that the Proclamation was likely invalid, because the respective standing of the Plaintiffs could affect the scope of the injunctive relief that would then be warranted to redress the Plaintiffs' injuries.  But given that we conclude that Plaintiffs are unlikely to succeed on the merits, we may consequently deny preliminary injunctive relief to the remaining Plaintiffs without considering their standing.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998).

to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is the most important *Winter* factor." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (simplified). When the Government is a party to a case, "the balance of the equities and public interest factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

We turn first to whether the district court correctly held that Plaintiffs were likely to succeed on the merits of their ultra vires cause of action, which alleges that the Proclamation exceeds the President's delegated authority, conflicts with congressional judgments embodied in the INA, and violates the separation of powers. We conclude that Plaintiffs have not demonstrated a likelihood of success as to any of their challenges to the Proclamation.

## A

We note, preliminarily, that the Government has not raised any contention in this court that Plaintiffs lack an ultra vires cause of action, nor has it argued that Plaintiffs do not fall within any relevant zone of interests that might be applicable to such a claim. *Cf. Sierra Club v. Trump*, 963 F.3d 874, 890–95 (9th Cir. 2020), *cert. granted*, 2020 WL 6121565 (Oct. 19, 2020). Moreover, because such issues

go to the existence of a cause of action and not to our jurisdiction, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014), we have no obligation to address them sua sponte.  We therefore assume that, to the extent that they have Article III standing, Plaintiffs may assert an ultra vires cause of action to challenge the Proclamation on constitutional and statutory grounds.

The Government has, however, raised one threshold issue concerning the asserted justiciability of the merits.  Specifically, the Government contends that all of Plaintiff's claims are ultimately statutory in nature, and the Government asserts that, under the consular nonreviewability doctrine, the courts cannot review such *non-constitutional* challenges to the political branches' decisions to exclude aliens. We need not decide whether the Government is correct in arguing that all of Plaintiffs' claims are statutory claims rather than constitutional claims.[6]  Even

---

[6] As noted earlier, Plaintiffs did not assert a straight nondelegation constitutional challenge to § 212(f) in the district court, *see supra* note 3, and they do not defend the district court's reasoning on that score on appeal.  Rather, as they did below, Plaintiffs assert only the more limited argument that, *if* the court were to conclude that the statutory limitations that Plaintiffs invoke do not constrain the President's exercise of the delegated authority under § 212(f), *then* the statute would raise serious nondelegation concerns.  However, Plaintiffs *do* assert in this court (and asserted below) that the President's disregard of the congressionally imposed limitations on his authority violate the constitutional separation of powers, and the district court agreed.  *See supra* at 10–12.  Citing *Dalton v. Specter*, 511 U.S. 462, 471–77 (1994), the Government contends that these separation-of-powers claims are actually statutory claims dressed in constitutional garb and are therefore subject to any limitations that are applicable to statutory claims.  For the reasons explained in the text, we do not need to address this argument.

assuming that they are, we conclude that there is no obstacle to our disposition on the merits here.  As it likewise told the Supreme Court in *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018), the Government expressly reaffirmed at oral argument that the consular nonreviewability doctrine is *not* a jurisdictional limit.  It follows that there is no bar to our rejecting Plaintiffs' claims on the merits without addressing this threshold issue.  *See id.*; *cf. Steel Co.*, 523 U.S. at 89–102. Because, as explained below, we conclude that Plaintiffs' claims are likely to fail on the merits, we have no obligation to reach the consular nonreviewability issue, and like the Supreme Court in *Trump v. Hawaii*, we decline to do so.[7]

## B

Plaintiffs' primary contention on appeal is that the Proclamation is not a lawful exercise of the President's delegated authority under INA § 212(f).  That section provides, in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  The Supreme Court recently analyzed the scope of the

---

[7] Of course, if we had concluded that Plaintiffs *were* likely to succeed on the merits, we would then have been required to address the Government's properly asserted arguments concerning the consular nonreviewability doctrine.

President's delegated authority under § 212(f) when it reversed the grant of a

preliminary injunction blocking the enforcement of a different presidential

proclamation in *Trump v. Hawaii*, 138 S. Ct. at 2423.  The Court's analysis in that

case therefore frames the inquiry into the merits in this one.

In *Trump v. Hawaii*, the Supreme Court addressed a presidential

proclamation that "placed entry restrictions on the nationals of eight foreign states

whose systems for managing and sharing information about their nationals the

President deemed inadequate." 138 S. Ct. at 2404.  A panel of this court upheld a

preliminary injunction against the proclamation, concluding that it "'conflicts with

the INA's finely reticulated regulatory scheme' by addressing 'matters of

immigration already passed upon by Congress.'" *Id*. at 2406–07 (quoting *Hawaii

v. Trump*, 878 F.3d 662, 685, 690 (9th Cir. 2017)).  The Supreme Court rejected

this broad theory that the President cannot use § 212(f) to impose additional

restrictions that address subject areas already expressly covered by more limited

restrictions elsewhere within the INA.  Instead, the Court was willing only to

"assume" that § 212(f) "does not allow the President to *expressly override*

particular provisions of the INA." *Id*. at 2411 (emphasis added).  Applying this

standard, the Court concluded that the plaintiffs in that case had failed to establish

"any *contradiction* with another provision of the INA." *Id*. at 2412 (emphasis

added).  And because the proclamation otherwise satisfied the prerequisites of

§ 212(f), the Court held that the proclamation was "squarely within the scope of Presidential authority under the INA." *Id*. at 2415. Under these standards, Proclamation No. 9945 is likewise well within the President's authority under § 212(f).

### 1

In addressing the scope of the President's delegated authority under § 212(f), the *Trump v. Hawaii* Court observed that the statutory text "exudes deference to the President in every clause" and "grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long." 138 S. Ct. at 2408, 2413; *see also id*. at 2408 (stating that § 212(f) "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA" (quoting *Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 187 (1993))). The Court identified three limitations on the President's authority in the text of § 212(f), and it held that all of them were satisfied in the case before it. *Id*. at 2408–10. We conclude that the same is true here.

First, the Court stated that the "sole *prerequisite* set forth" in § 212(f) for imposing additional restrictions is that "the President 'find[ ]' that the entry of the covered aliens 'would be detrimental to the interests of the United States.'" 138 S. Ct. at 2408 (quoting § 212(f)) (emphasis added). As in *Trump v. Hawaii*, the "President has undoubtedly fulfilled that requirement here." *Id*. The President

22

expressly made such a finding in the Proclamation, concluding that unrestricted entry of immigrants who could not demonstrate approved insurance coverage or ability to pay for foreseeable healthcare costs would be "detrimental to the interests of the United States."  Proclamation No. 9945, 84 Fed. Reg. at 53991.

Plaintiffs nonetheless contend that the finding required by § 212(f) has *not* been made because, in their view, the President's supporting explanation for that finding in the Proclamation is inadequate.  The Supreme Court rejected a similar argument in *Trump v. Hawaii*, 138 S. Ct. at 2409, and we reject it here as well. There, the Court held that the "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications" for the proclamation at issue was "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere."  *Id*.  Indeed, the Court found it "questionable" that § 212(f)'s requirement to *make* a finding is accompanied by any sort of requirement to *explain* those findings in detail.  *Id*.  Even so, the *Trump v. Hawaii* Court noted that the proclamation at issue in that case was more detailed than any proclamation previously issued under § 212(f), some of which contained merely barebones explanations as short as one or five sentences long.  *Id*. (citing Proclamation No. 6958, 61 Fed. Reg. 60007 (Nov. 26, 1996) (President Clinton), Proclamation No. 4865, 46 Fed. Reg. 48107 (Oct. 1, 1981) (President Reagan)).

Here, the Proclamation concisely explains the adverse impact that

uncompensated healthcare costs have on the American people, federal and state government budgets, private and public hospitals, and other stakeholders. Proclamation No. 9945, 84 Fed. Reg. at 53991.  It also points out that *lawful* immigrants are three times more likely than U.S. citizens to lack health insurance, further exacerbating the problem of uncompensated healthcare costs on the American healthcare system.  *Id.*  Considered in light of the substantial deference owed to the President in this area, *Trump v. Hawaii*, 138 S. Ct. at 2409, these explanations are adequate to support the conclusion that restricting the immigration of persons who lack unsubsidized health insurance will avoid an impact that "would be detrimental to the interests of the United States," 8 U.S.C. § 1182(f).  In imposing restrictions under § 212(f), the President "is not required to conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions."  138 S. Ct. at 2409 (simplified).  To demand a more "searching inquiry," as Plaintiffs seek here, "is inconsistent" with the deference owed to the President and would improperly shift to the courts the weighing of policy justifications for additional restrictions under § 212(f).  But "[w]hether the President's chosen method of addressing perceived risks is justified from a policy perspective is irrelevant to the scope" of his authority under § 212(f).  *Id.* (simplified).

24

Second, the Supreme Court noted that § 212(f)'s reference to "suspend[ing]" the entry of particular classes of aliens indicates that the limitations imposed under that section must be temporally limited. 138 S. Ct. at 2410. In elaborating on this requirement, the Court rejected the notion "that the President is required to prescribe in advance a fixed end date for the entry restrictions" and instead held that it is sufficient for the President to tie the duration of additional restrictions on entry, "implicitly or explicitly, to the resolution of the triggering condition." *Id*. Plaintiffs contend that the Proclamation fails under this standard because the asserted triggering conditions are too vaguely stated and because it is "impossible" to determine when those conditions "will be resolved." We disagree. As in *Trump v. Hawaii*, the Proclamation here establishes a process to ensure that the continued propriety of its restrictions is subject to a systematic and regular review. *Id*. Specifically, the Proclamation instructs the Secretary of State to submit to the President, "in consultation with" certain agency heads, a report addressing "the continued necessity of and any adjustments that may be warranted to the [Proclamation's] suspension and limitation on entry." Proclamation No. 9945, 84 Fed. Reg. at 53993. Such a report must be submitted "within 180 days" of the Proclamation's effective date, and again annually thereafter. *Id*. The Proclamation makes clear that "[i]f the Secretary of State, in consultation with the heads of other appropriate executive departments and agencies, determines that circumstances no

25

longer warrant the continued effectiveness of the suspension and limitation on entry," the President is to be "immediately" advised. *Id*. As confirmed by the findings that underlie the Proclamation and by the title of the section that requires this periodic review, the continued need for these restrictions is to be considered in light of what the available evidence then shows about the "financial burdens imposed by immigrants on the healthcare system." *Id*. (capitalization omitted). Plaintiffs assert—and the dissent agrees, *see* Dissent at 14—that this standard is too uncertain and open-ended. That is wrong. Nothing in *Trump v. Hawaii* requires a bright-line trigger for terminating additional restrictions that have been imposed under § 212(f), and the sort of diplomatic and security judgments the Court upheld as adequate triggering (and terminating) conditions in that case are no less multi-faceted and inexact than the consideration of financial burdens required here. 138 S. Ct. at 2410 (additional restrictions may be tied to resolution of a "diplomatic dispute or policy concern").

Third, the Court held that § 212(f) requires the President to properly identify a "class of aliens" who are subject to the additional restrictions. *Id*. Plaintiffs do not contest that the Proclamation adequately defines the specific class of persons who are subject to its restrictions, and so this condition is met as well.

We therefore hold that the Proclamation comports with the textual limitations of § 212(f) as set forth in *Trump v. Hawaii*.

**2**

Plaintiffs contend that the Proclamation nevertheless exceeds the President's authority under § 212(f) because, in their estimation, the Proclamation conflicts with *other* provisions of law.  In addressing similar arguments in *Trump v. Hawaii*, the Supreme Court rejected this court's view that an entry restriction promulgated under § 212(f) is invalid if it "address[es] 'matters of immigration already passed upon by Congress'" and thereby "'conflicts with the INA's finely reticulated regulatory scheme.'"  138 S. Ct. at 2406–07 (quoting 878 F.3d at 685, 690).  In lieu of this broad congressional-displacement theory, the Supreme Court was willing only to "assume" that § 212(f) "does not allow the President to *expressly override* particular provisions of the INA."  *Id*. at 2411 (emphasis added).[8]  We likewise assume that such a limitation applies to § 212(f), and we further assume that it also precludes the President from expressly overriding provisions of statutes other than the INA, such as the Affordable Care Act ("ACA").  This standard would be met, under *Trump v. Hawaii*, when there is a "*conflict* between the statute and the Proclamation that would implicitly bar" the Proclamation's additional restriction.  138 S. Ct. at 2411 (emphasis added).  Such a "contradiction with another provision of the INA" would exist where, for example, "'Congress has

---

[8]  Even then, the Court was willing only to "assume" this more limited proposition arguendo; it did not *hold* that such a limitation applies to § 212(f).  *See* 138 S. Ct. at 2411.

stepped into the space and solved the *exact* problem'" addressed by the

Proclamation. *Id.* at 2412 (emphasis added).[9]  Here, Plaintiffs failed to show a

likelihood of success on their claims that the Proclamation conflicts with other

statutes under these standards.

### a

Noting that the Proclamation's definition of "[a]pproved health insurance"

includes a "health plan offered in the individual market within a State" only if the

plan is "*unsubsidized*," *see* Proclamation No. 9945, 84 Fed. Reg. at 53992

(emphasis added), Plaintiffs contend that the Proclamation conflicts with

Congress's decision in the ACA to make subsidized plans in the individual market

available to lawful immigrants.  The Government argues that Plaintiffs did not

properly present this issue below, and it notes that the district court's preliminary

injunction order does not resolve it.  We need not decide whether this contention

---

[9] The dissent rests on the strawman argument that we have adopted a sort of reverse repeal-by-implication standard, under which the requisite conflict would not exist unless the statute (had it been enacted later) would be thought to "repeal" by implication the Proclamation's rules.  *See* Dissent at 4–5.  Nothing in our opinion adopts any such standard; rather, we have simply followed the applicable standards as they have been articulated by *Trump v. Hawaii*.  The dissent, by contrast, would find the requisite conflict with a statutory provision whenever a restriction adopted by the President under § 212(f) is "inconsistent" with "congressional intent" behind that provision or "displace[s]" congressional judgments in the same general area.  *See* Dissent at 8, 10.  That seems akin to the more amorphous standard that we had adopted, and that the Supreme Court rejected, in *Trump v. Hawaii*.

was adequately raised below, because we conclude that it has no merit in any event.

The ACA "seeks to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line." *King v. Burwell*, 576 U.S. 473, 482 (2015) (citing 26 U.S.C. § 36B).  An "alien lawfully present in the United States" with a household income below a certain threshold may be eligible for such tax credits. 26 U.S.C. § 36B(c)(1)(B).  Plaintiffs contend that the Proclamation "overrides" the ACA scheme by "den[ying] entry to immigrants who would use the assistance Congress provided for comprehensive coverage" and by "requir[ing] new immigrants to reject benefits Congress expressly intended for them to have."  We disagree.

The Proclamation does not "expressly override" this feature of the ACA, *Trump v. Hawaii*, 138 S. Ct. at 2411, because the two provisions operate in different spheres.  The ACA extends tax credits only to aliens who *already* are "lawfully present in the United States."  *See* 26 U.S.C. § 36B(c)(1)(B)(ii); *see also* 42 U.S.C. § 18032(f)(1)(A)(ii), (3) (providing that, to purchase any insurance in the exchanges created under the ACA, whether subsidized or unsubsidized, the alien must be "lawfully present" and a resident of the relevant State).  The Proclamation, by contrast, applies "only to aliens seeking to enter the United States

29

pursuant to an immigrant visa." *See* Proclamation No. 9945, 84 Fed. Reg. at 53992. The Proclamation therefore does not prevent aliens who are "lawfully present in the United States" from purchasing subsidized insurance plans; it instead creates an additional requirement that an alien must satisfy before he or she may receive an immigrant visa. Put simply, the Proclamation excludes only those who, at the threshold, cannot arrange unsubsidized coverage or cannot cover their own medical costs. But as the Government expressly conceded at oral argument, *after* an alien satisfies the requirements of the Proclamation and gains lawful permanent residence, nothing in the Proclamation prevents the alien from then obtaining subsidized insurance plans as provided for under the ACA.[10] There is thus no conflict between the Proclamation and the ACA scheme.

For similar reasons, we also conclude that the Proclamation does not expressly override the provisions of the Children's Health Insurance Program Reauthorization Act ("CHIPRA") that authorize States to extend Medicaid coverage to certain specified lawful aliens. *See*, *e.g.*, 42 U.S.C. § 1396b(v)(4).

---

[10] In particular, the Proclamation's prohibition on any "willful misrepresentation of a material fact," *see* Proclamation No. 9945, 84 Fed. Reg. at 53993, would not be violated simply because an alien who was admitted under the Proclamation later obtained subsidized insurance. Because the Proclamation only conditions receipt of a visa on a showing that the alien will be "covered by approved health insurance . . . *within 30 days* of the alien's entry into the United States," *id*. at 53992 (emphasis added), an alien is not required to make any representation about what he or she will do *after* that initial coverage by unsubsidized insurance.

Because the Proclamation applies "only to aliens seeking to enter the United States pursuant to an immigrant visa," Proclamation No. 9945, 84 Fed. Reg. at 53992, and the relevant CHIPRA provisions apply only to those who already "are lawfully residing in the United States," 42 U.S.C. § 1396b(v)(4)(A), we do not discern any sense in which the Proclamation may be said to "expressly override" these provisions of CHIPRA.

**b**

Plaintiffs also contend, and the district court held, that they are likely to succeed on their argument that the Proclamation conflicts with the so-called "public charge" provision of the INA.  We again disagree.

Section 212(a)(4)(A) of the INA renders inadmissible any alien who "is likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).  In deciding whether an alien is likely to become a public charge, a consular officer must consider, "at a minimum," an alien's age, health, family status, assets, resources, financial status, education, and skills.  *Id.* § 1182(a)(4)(B)(i).  No single factor is dispositive; rather, the statute requires a holistic approach.  *See City & Cnty. of San Francisco v. USCIS*, 944 F.3d 773, 796 (9th Cir. 2019) ("If anything has been consistent, it is the idea that a totality-of-the-circumstances test governs public-charge determinations."); *see also City & Cnty. of San Francisco v. USCIS*, 981 F.3d 742, 752 (9th Cir. 2020) (noting that an Attorney General decision in

1964 "collected authorities indicating that it is the totality of circumstances that must be considered in order to determine whether 'the burden of supporting the alien is likely to be cast on the public'" (citation omitted)).  Plaintiffs argue that the Proclamation impermissibly conflicts with this holistic approach by creating a single-factor test based solely on healthcare coverage.[11]  This contention fails.

At the broadest level, there is undoubtedly some overlap between the INA's exclusion of those "likely . . . to become a public charge," 8 U.S.C. § 1182(a)(4)(A), and the Proclamation's exclusion of those who "will financially burden the United States healthcare system," *see* Proclamation No. 9945, 84 Fed. Reg. at 53992.  As a result, Plaintiffs' argument might have had substantial force under the opinion of this court that was reversed in *Trump v. Hawaii*, where we had held that the President could not impose additional restrictions under § 212(f) that "address[ed] 'matters of immigration already passed upon by Congress.'"  138 S. Ct. at 2407 (quoting 878 F.3d at 690).  But the Supreme Court held that such overlap was not enough, and that, at the very least, the plaintiffs had to show that

---

[11] Because Plaintiffs' claim here is based on an asserted conflict between the "public charge" provision's totality-of-the-circumstances approach and the Proclamation's specific focus on the ability to cover healthcare expenses, the issue before us does not turn on the distinct question concerning the scope of the "public charge" provision that divided the panel in our recent decision in *City & County of San Francisco v. USCIS*.  *See* 981 F.3d at 756–58 (holding, by a 2-1 vote, that "public charge" meant "*long-term* dependence on government support, and had never been interpreted to encompass *temporary* resort to supplemental non-cash benefits" (emphasis added)).

the proclamation at issue there "expressly over[o]de particular provisions of the

INA." *Id*. at 2411. Thus, even though the sort of security and vetting issues

addressed by the proclamation challenged in *Trump v. Hawaii* were also addressed

in the INA, the Court's higher standard was not met because the result was "not a

situation where 'Congress has stepped into the space and solved the *exact*

problem.'" *Id*. at 2412 (emphasis added).

The same is true here. The Proclamation does not override the public charge

provision or its multi-factor inquiry; rather, the Proclamation merely creates an

additional, separate ground for inadmissibility, which is within the President's

authority under § 212(f). *See id*. at 2408 (stating that § 212(f) "vests the President

with 'ample power' to impose entry restrictions in addition to those elsewhere

enumerated in the INA" (citation omitted)). The public charge provision is

concerned only with *public* costs broadly conceived, while the Proclamation is

concerned with a specific type of costs—those involving healthcare—and with the

fact that a significant portion of such unreimbursed costs is absorbed by *private*

entities in the form of higher insurance premiums and hospital losses. *See*

Proclamation No. 9945, 84 Fed. Reg. at 53991. Thus, while the problems and

approaches overlap, they do not solve the "exact" same problem. 138 S. Ct. at

2412.

Because an alien seeking an immigrant visa must not be inadmissible under

any of the numerous inadmissibility grounds in § 212, an immigrant visa applicant would need to satisfy the requirements of *both* the public charge provision and the Proclamation. *See* Proclamation No. 9945, 84 Fed. Reg at 53993 (specifying that the Proclamation's review process "is separate and independent" from that of "other statutes, regulations, or proclamations"); *see generally* 8 U.S.C. § 1182. In short, the suspension of entry created by the Proclamation is an additional inadmissibility ground distinct from the public charge provision. Thus, the Proclamation does not conflict with the public charge provision and is not an unlawful exercise of the President's authority on that basis.

### c

Plaintiffs' arguments based on the Violence Against Women Act ("VAWA") fail for the same reason. VAWA's amendments to the INA expressly exempt from the INA's public charge provision certain qualifying alien survivors of specified violent crimes. *See*, *e.g.*, 8 U.S.C. § 1182(a)(4)(E); *see also id.* § 1101(a)(51). Plaintiffs contend that the Proclamation conflicts with the INA's VAWA amendments because it does not similarly exempt crime victims from its mandate. This assertion that the Proclamation does not mirror the various details of the public charge provision is simply a variant of the same arguments that we rejected earlier. The Proclamation does nothing to override the VAWA amendments, because an alien who satisfies VAWA's eligibility requirements is

*still* exempt from the INA's public charge provision.  But VAWA did not exempt

those crime victims who satisfy its requirements from all grounds of

inadmissibility in the INA, and the President was not required to duplicate that

exception merely because the Proclamation overlaps in certain respects with the

public charge provision.

*      *      *

Accordingly, we conclude that the Proclamation's restrictions rest on a valid

exercise of the authority delegated in § 212(f) and that those restrictions do not

violate any of the other congressional enactments on which Plaintiffs rely.[12]

**C**

Finally, we reject the district court's contention that, to the extent that

§ 212(f) allows the President to impose additional entry restrictions based on

"*domestic* policymaking" concerns, § 212(f) *itself* violates the nondelegation

doctrine.  *See* 418 F. Supp. 3d at 592.

As noted earlier, Plaintiffs pointedly avoid defending this holding in their

appellate briefing, instead making the more limited argument that the statute would

violate the nondelegation doctrine only to the extent that it were construed as

"plac[ing] no constraints on the President's power to exclude prospective

---

[12] As such, Plaintiffs' arguments that the Proclamation impermissibly overrides
congressional judgments in violation of the separation of powers likewise fails.

immigrants." But that is not how the Supreme Court in *Trump v. Hawaii*, or we in this case, have construed § 212(f). On the contrary, the Supreme Court articulated several statutory requirements that must be satisfied in connection with an invocation of § 212(f), and it further assumed that the specific requirements of the INA could not be overridden through such an invocation. 138 S. Ct. at 2408–15. We have applied the same limitations and the same assumptions here. *See supra* at 20–35. Even if these various limitations collectively provide only a modest constraint on the "comprehensive delegation" contained in § 212(f), *see id.* at 2408, we have little difficulty concluding that they sufficiently provide "an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality) (simplified). That is enough to defeat any nondelegation challenge to § 212(f).

Contrary to what the district court concluded, it makes no difference whether the additional entry restrictions are imposed under § 212(f) based on assertedly domestic policy concerns. The district court's demand for additional congressional guidance when "domestic" concerns are at issue lacks a principled basis and is unworkable: because all additional restrictions under § 212(f) on who may *enter* the United States are ultimately based on the "detrimental" impact of those aliens' presence, *see* 8 U.S.C. § 1182(f), all such restrictions may be characterized as

36

reflecting "domestic" policy concerns to a greater or lesser degree.  Indeed, the

many grounds for inadmissibility in § 212(a) of the INA underscore how the

decision whether to admit an alien can have adverse domestic consequences.  *See*,

*e.g.*, 8 U.S.C. § 1182(a)(1)(A)(i) (aliens with "communicable disease[s] of public

health significance"); *id.* § 1182(a)(1)(A)(ii) (aliens who have not been vaccinated

"against vaccine-preventable diseases"); *id.* § 1182(a)(2)(A) (aliens convicted of

certain crimes); *id.* § 1182(a)(4) (aliens who are likely to become public charges);

*id.* § 1182(a)(5) (aliens seeking entry for employment purposes whose employment

would "adversely affect the wages and working conditions of workers in the

United States similarly employed").  The district court identified no coherent basis

for insisting that, in delegating authority to impose additional restrictions on who

may immigrate into this country from another nation, Congress must provide

greater guidance when the asserted detrimental impact of such aliens is based on

"domestic" policy concerns.

## IV

This court has held that a likelihood of success on the merits is the "'most

important' factor" in the preliminary injunction analysis, such that "if a movant

fails to meet this 'threshold inquiry,' we need not consider the other factors."

*California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Disney*, 869 F.3d at

856).  To be sure, this court follows a "'sliding scale'" approach, in which "'a

stronger showing of one element may offset a weaker showing of another.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). But even "when the balance of hardships tips sharply in the plaintiff's favor," the plaintiff still must demonstrate "'serious questions going to the merits.'" *hiQ Labs*, 938 F.3d at 992 (quoting *Alliance*, 632 F.3d at 1135). Here, as we have explained, Plaintiffs have not demonstrated any serious questions going to the merits. Thus, we need not analyze the other preliminary injunction factors.

## V

For the foregoing reasons, the district court abused its discretion in granting the preliminary injunction enjoining the Proclamation's implementation. Because the preliminary injunction should not have been issued in the first instance, we need not address whether the injunction's universal scope was overbroad. The order of the district court is reversed, and the preliminary injunction is vacated.

**REVERSED.**

FILED

*Doe #1 v. Trump*, No. 19-36020

DEC 31 2020

TASHIMA, Circuit Judge, dissenting:

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

I agree with the district court, *Doe #1 v. Trump*, 418 F. Supp. 3d 573 (D. Or.

2019), and with the motions panel of this court, *Doe #1 v. Trump*, 957 F.3d 1050

(9th Cir. 2020), that Plaintiffs are likely to succeed on the merits of their ultra vires

cause of action because Presidential Proclamation No. 9945, 84 Fed. Reg. 53,991

(Oct. 4, 2019), purports to override immigration policies adopted by Congress.

The Proclamation overrides both the Affordable Care Act ("ACA"), which makes

recently arrived lawful immigrants eligible for subsidized health insurance plans,

26 U.S.C. § 36B(c)(1)(B), and the public charge rule of the Immigration and

Nationality Act ("INA"), which comprehensively addresses the circumstances

under which individuals may be excluded from this country due to their limited

financial means or the financial burdens they will place on others, 8 U.S.C.

§ 1182(a)(4).  Although § 212(f) of the INA, 8 U.S.C. § 1182(f) ("§ 212(f)"),

"grants the President broad discretion to suspend the entry of aliens into the United

States," *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018), it does not authorize a

President to override congressional policy judgments.  The Proclamation therefore

exceeds the President's authority under § 212(f).

Even if that were not the case, I would have grave doubts for other reasons

about whether the Proclamation falls within the authority delegated to the President

under § 212(f).  In contrast to the order upheld by the Supreme Court in *Trump v. Hawaii*, Proclamation 9945 has no nexus to national security, addresses a purely domestic concern (uncompensated health care costs), lacks any conceivable temporal limit, and works a major overhaul of this nation's immigration laws without the input of Congress—a sweeping and unprecedented exercise of unilateral Executive power.

As the district court observed, "[t]he Proclamation is anticipated to affect approximately 60 percent of all immigrant visa applicants," *Doe #1*, 418 F. Supp. 3d at 597—about 375,000 prospective immigrants a year, *Doe #1*, 957 F.3d at 1060—requiring them to obtain health insurance plans that are, in many cases, "legally or practically unavailable" to them, *Doe #1*, 418 F. Supp. 3d at 583, while denying them access to the health insurance plans Congress expressly provided them.  Although the Proclamation asserts that these restrictions are needed to address the national problem of uncompensated health care costs, the evidence in the record shows that "recent uninsured immigrants use less than one-tenth of one percent (0.06 percent) of total American medical resources and only 0.08 percent of emergency room services."  *Id.*  Indeed, although the Proclamation purports to address uncompensated health care costs, it perversely forces lawful immigrants into low-quality health insurance options, plans that "often result in significant

2

uncompensated care," worsening the very problem the Proclamation purports to address.  *Id.*

Because I agree with the district court and the motions panel as to the strength of Plaintiffs' claims, I would hold that the district court properly granted preliminary injunctive relief.  I therefore respectfully dissent.[1]

# I

# A

Section 212(f) "grants the President broad discretion to suspend the entry of aliens into the United States," vesting "the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA."  *Trump v. Hawaii*, 138 S. Ct. at 2408 (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993)).  "We may assume," however, that § 212(f) "does not allow the President to expressly override particular provisions of the INA."  *Id.* at 2411.  Under this limitation, the President may not impose entry restrictions under § 212(f) where Congress has "implicitly foreclose[d] the Executive" from doing so, *i.e.*, where there is a "conflict between [a] statute and the Proclamation," or "Congress has stepped into the space and solved the exact problem."  *Id.* at

---

[1]     Specifically, I dissent from Part III-B-2 of the majority opinion.  I agree with Part II of the majority opinion, regarding standing, and express no view as to the remaining parts of the majority's analysis.

3

2411–12.  As Plaintiffs argued in *Trump v. Hawaii*, the President "may supplement the INA, but he cannot supplant it" by "countermand[ing] Congress's considered policy judgments."  *Id.* at 2410.

In *Trump v. Hawaii*, the comparatively narrow additional restrictions on entry imposed by the proclamation satisfied these requirements because they "support[ed]" and "promote[d] the effectiveness" of Congress's own policy judgments.  *Id.* at 2411.  The Court therefore had no occasion to address a presidential invocation of § 212(f) like the one before us now—a Proclamation that undermines, rather than complements, Congress's policy judgments.

The majority opinion and the government's briefing conclude that the "expressly override" standard articulated by the Court in *Trump v. Hawaii* is akin to the "irreconcilable conflict" standard governing the repeal by implication doctrine.  *See, e.g.*, *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("There are two well-settled categories of repeals by implication:  (1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act.").  Because "repeals by implication are not favored," *id.*, a court presented with two statutes "will 'regard

4

each as effective'—unless . . . the two laws are 'irreconcilable.'" *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974)). So long as "two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* (quoting *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003)).

The question here, however, is not repeal by implication but rather determining, as a matter of statutory interpretation, the scope of authority Congress intended, in the first instance, to delegate to the President under § 212(f). We certainly do not begin with a presumption that Congress intended to give effect to the Proclamation, and an interpretation that places limits on the authority delegated by § 212(f) is not disfavored. The extraordinarily demanding irreconcilable conflict standard therefore has no place here.

I do not read *Trump v. Hawaii* as suggesting otherwise. The Court there chose the term "conflict," not "irreconcilable conflict," to describe the assumed limits of § 212(f). *Trump v. Hawaii*, 138 S. Ct. at 2408, 2411. And the other word chosen by the Court—"override"—likewise connotes ordinary rather than irreconcilable conflict. Although this word can mean "to set aside" or annul, it more commonly means "to ride over or across," to "trample." *Override*, Merriam-

5

Webster's Online Dictionary,

https://www.merriam-webster.com/dictionary/override?src=search-dict-hed (last

visited Dec. 10, 2020); *see also Override*, Webster's Third New International

Dictionary 1609 (2002); *Override*, American Heritage Dictionary of the English

Language 1255 (4th ed. 2000). This suggests that, in enacting § 212(f), Congress

did not intend to authorize the President to adopt restrictions on entry that are

inconsistent with, and antagonistic to, its own immigration laws. It strains

credulity to suggest that Congress intended to authorize the President to undermine

its own policy judgments.

Thus, the issue before us is simply whether the Proclamation "overrides"

immigration laws in the common understanding of that word. Plaintiffs need not

show that the Proclamation and congressionally adopted immigration laws are in

*irreconcilable* conflict—that it is *impossible* to give effect to both. They need

show only that the Proclamation seriously undermines these laws, or, alternatively,

that "Congress has stepped into the space and solved the exact problem." *Trump v.

Hawaii*, 138 S. Ct. at 2412.

### B

I would further hold that Plaintiffs have made the required showing here.

6

**1**

First, Plaintiffs are likely to succeed on their claim that the Proclamation overrides the ACA, which makes lawful immigrants eligible for subsidized health insurance plans.  *See* 26 U.S.C. § 36B(c)(1)(B); 42 U.S.C. § 18032(f)(3).  Under the Proclamation, however, a visa applicant cannot rely on a subsidized insurance plan to gain admission to the country.  84 Fed. Reg. at 53,992.  As the motions panel explained:

> Despite Congress's clear intent to extend these tax credits to legal immigrants, the Proclamation explicitly excludes such "subsidized plans" from the list of approved health insurance plans.  As a result, an immigrant attempting to legally enter the United States will not have access to ACA tax credits as Congress intended.

*Doe #1*, 957 F.3d at 1063.

The majority concludes that there is no conflict between the Proclamation and the ACA scheme because "*after* an alien satisfies the requirements of the Proclamation and gains lawful permanent residence, nothing in the Proclamation prevents the alien from then obtaining subsidized insurance plans as provided for under the ACA."  Maj. Op. 30 (footnote omitted).  That argument is specious.  It is premised on the assumption unsupported by the record that prospective immigrants will be able to satisfy the Proclamation's health insurance requirement without

7

relying on the ACA.  The district court found, based on the record evidence, that "the approved insurance plans delineated in the Proclamation were 'legally or practically unavailable to intending, or prospective, immigrants.'" *Doe #1*, 957 F.3d at 1060 (quoting *Doe #1*, 418 F. Supp. 3d at 583).

The government has shown at most that there is no *irreconcilable* conflict between the Proclamation and the ACA:  that however much the Proclamation undermines the ACA, it is at least *possible* to give effect to both provisions.  As discussed, however, I would not require Plaintiffs to demonstrate irreconcilable conflict.  I would instead require them to show only that the Proclamation is inconsistent with, and antagonistic to, any reasonable understanding of congressional intent underlying the ACA.  Plaintiffs have made that showing here.  As the motions panel concluded, "the Proclamation bars immigrants from accessing subsidized insurance plans despite Congress's express intent to extend those plans to legal immigrants."  *Id.* at 1063.

## 2

Second, Plaintiffs are likely to succeed on their claim that the Proclamation overrides the public charge rule and the Violence Against Women Act ("VAWA") amendments to that rule.  The public charge rule provides that "[a]ny alien who . . . is likely at any time to become a public charge is inadmissible," and it states that,

"[i]n determining whether an alien is inadmissible under this paragraph, the

consular officer or the Attorney General shall at a minimum consider the alien's

. . . age; . . . health; . . . family status; . . . assets, resources, and financial status;

and . . . education and skills." 8 U.S.C. § 1182(a)(4)(A)–(B). Since 1882, public

charge determinations have consistently been made under a "totality-of-the-

circumstances test." *City & County of San Francisco v. U.S. Citizenship &*

*Immigr. Servs.*, 944 F.3d 773, 796 (9th Cir. 2019).

Plaintiffs argue that the Proclamation conflicts with this rule because it

supplants the totality-of-the-circumstances test with one dispositive factor:

whether an alien can obtain health insurance or afford health care. They argue that

"the Proclamation's heathcare insurance test cannot be reconciled with the long-

standing congressional judgment about the holistic way to assess admissibility for

immigrants who may financially burden the United States."

The government plausibly contends in response that the Proclamation

supplements rather than conflicts with the public charge rule. As the Court said in

*Trump v. Hawaii*, "[f]airly read, [§ 212(f)] vests authority in the President to

impose additional limitations on entry beyond the grounds for exclusion set forth

in the INA." 138 S. Ct. at 2412. Because the Proclamation purports to address

uncompensated health care costs, some of which are borne by private healthcare

9

providers rather than government, it is possible to argue, as the majority concludes, that the Proclamation in this respect complements rather than supplants the public charge rule.  Maj. Op. 32.

On balance, however, Plaintiffs likely are correct that Congress never intended the President to use the authority delegated by § 212(f) in this unusual manner—to effectively displace Congress's own judgment about when aliens should be denied admission for financial reasons.  In the public charge rule, Congress has specifically and comprehensively addressed when, based on financial status, an alien should be excluded from the United States.  The Proclamation plainly overrides that congressional policy judgment.  As the motions panel concluded, "[t]he Proclamation eviscerates the statutory scheme by making the acquisition of designated forms of health insurance the sole consideration of whether an applicant should be excluded from consideration for a family visa [for financial reasons].  Any argument contending that the Proclamation complements the public charge statutory scheme is therefore incorrect."  *Doe #1*, 957 F.3d at 1064 (citation omitted).

The conflict between the Proclamation and the public charge rule is even clearer when the VAWA amendments to the rule are considered.  As the motions panel explained, "[t]he VAWA amendments exempted from the public charge

10

exclusion certain immigrant relatives of victims of violent crimes, such as felony assault, sexual assault, incest, kidnapping, or human trafficking," and "victims of battering and extreme cruelty." *Doe #1*, 957 F.3d at 1062 (citing 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1154(a)(1)(A)(iii)–(vi)). "Congress expressly provided that these immigrants—including the spouses, children, and parents of violent crime victims—were categorically exempt from the financial burden or 'public charge' provisions of the INA." *Id.* The Proclamation, by contrast, "makes no such exemption. Rather, it effectively prohibits family members of violent crime victims from obtaining visas and joining their families in the United States by declaring them to be financial burdens and ineligible, directly contradicting VAWA." *Id.*

Once again, the majority concludes that there is no conflict, "because an alien who satisfies VAWA's eligibility requirements is *still* exempt from the INA's public charge provision." Maj. Op. 35. But again, the majority requires Plaintiffs to demonstrate an irreconcilable conflict rather than a substantial one. It would make no sense for Congress to exempt these individuals from the financial burden requirements of the public charge rule, but to authorize the President to impose a comparable requirement. In purpose and effect, the Proclamation undoes what Congress sought to achieve through the VAWA amendments. The Proclamation,

11

therefore, is incompatible with the VAWA amendments to the public charge rule.

The President has, through § 212(f), imposed a second and far stricter version of

the public charge rule's financial burden test.  I am not persuaded that the

discretion afforded to the President by § 212(f) includes the power to override

congressional immigration policy in this unprecedented manner.

## II

That the Proclamation impermissibly overrides congressional immigration

policy is sufficient to show that Plaintiffs have shown a strong likelihood of

success on the merits.  Even if that were not the case, however, I would have grave

doubts about whether the Proclamation falls within the President's authority under

§ 212(f).

These doubts begin with the Proclamation's sweeping, legislative nature.  As

the motions panel noted, "[t]he district court concluded that the Proclamation

likely would negatively affect approximately 60% of all immigrant visa

applicants." *Doe #1*, 957 F.3d at 1060.  "[A]pproximately 375,000 immigrants

each year—primarily those seeking to enter the United States on family-sponsored

petitions—would be affected, and potentially precluded from obtaining an

immigrant visa, by the Proclamation." *Id.*  Although the Court has made clear that

§ 212(f) "grants the President sweeping authority to decide whether to suspend

12

entry, whose entry to suspend, and for how long," *Trump v. Hawaii*, 138 S. Ct. at 2413, I am not aware of any instance in which a President has invoked his authority under § 212 to work such a profound transformation of immigration law. *See Doe #1*, 957 F.3d at 1062 (citing "the well-settled principle that the President's powers are executive, not legislative, in nature").[2]

In addition, in contrast to the proclamation at issue in *Trump v. Hawaii*, Proclamation 9945 does not address "national security risks." *Trump v. Hawaii*,

---

[2]     Because I conclude that Plaintiffs are likely to succeed on their ultra vires cause of action, I do not address their separation of powers claim.  As the district court pointed out, however, the Supreme Court has repeatedly emphasized the central role that Congress has to play in making immigration policy.  *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("This Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909))); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of these policies [pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.").  Although the President also possesses authority in this area, *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty.  The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."), the role of Congress is central, *see Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) ("The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless.  It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations."), *aff'd by an equally divided court sub nom. Reagan v. Abourezk*, 484 U.S. 1 (1987) (per curiam).

138 S. Ct. at 2403. It instead "deals with a purely domestic economic problem: uncompensated healthcare costs in the United States." *Doe #1*, 957 F.3d at 1067.

Moreover, the Proclamation does not qualify as a *suspension*, as the statute requires. Although § 212(f) does not require the President "to prescribe in advance a fixed end date for the entry restrictions," the President must "link the duration of those restrictions, implicitly or explicitly, to the resolution of the" policy concern that triggers the suspension. *Trump v. Hawaii*, 138 S. Ct. at 2410. Section 4(b) of Proclamation 9945 states:

> If the Secretary of State, in consultation with the heads of other appropriate executive departments and agencies, determines that circumstances no longer warrant the continued effectiveness of the suspension or limitation on entry set forth in section 1 of this proclamation or that circumstances warrant additional measures, the Secretary shall immediately so advise the President.

84 Fed. Reg. at 53,993. But the triggering condition at issue—uncompensated health care costs—has no foreseeable end date. The Proclamation itself, certainly, cannot meaningfully address the underlying policy concern, as "uninsured immigrants represent . . . only 2.9% of uninsured adults," "use less than 0.06% of total American medical resources," and use only "0.08% of emergency service expenditures." *Doe #1*, 957 F.3d at 1059. Furthermore, even if the problem of uncompensated healthcare costs were resolved tomorrow, nothing in the language

14

of the Proclamation suggests that the President would rescind these entry restrictions. *See id.* at 1065.

These additional concerns, as Plaintiffs have shown, raise serious questions of their own about the permissibility of the President's actions.

### III

Because the restrictions imposed by Proclamation No. 9945 are incompatible with immigration policies adopted by Congress in the ACA, the public charge rule of the INA, and the VAWA's amendments to the public charge rule, Plaintiffs have demonstrated a likelihood of success on the merits.

Accordingly, I respectfully dissent.